AARON J. FISCHER (SBN 247391)
  Aaron.Fischer@disabilityrightsca.org
ANNE HADREAS (SBN 253377)
  Anne.Hadreas@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA  94612
Telephone: (510) 267-1200
Fax: (510) 267-1201

TIFANEI RESSL-MOYER (SBN 319721)
  Tifanei.Ressl-Moyer@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1831 K Street
Sacramento, CA  95811
Telephone: (916) 504-5800
Fax: (916) 504-5801

DON SPECTER (SBN 83925)
  DSpecter@prisonlaw.com
MARGOT MENDELSON (SBN 268583)
  MMendelson@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORENZO MAYS, RICKY RICHARDSON, JENNIFER BOTHUN, ARMANI LEE, LEERTESE BEIRGE, and CODY GARLAND, on behalf of themselves and all others similarly situated, | Case No.: |
| Plaintiffs, | **CLASS ACTION** |
| v. | **CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| COUNTY OF SACRAMENTO, Defendant. | |

# NATURE OF THE ACTION

1.      This action arises out of Defendant's unconstitutional and illegal treatment of people incarcerated in Sacramento County's two jails, Sacramento County Main Jail ("Main Jail") and Rio Cosumnes Correctional Center ("RCCC"). Defendant knowingly has created and perpetuated overcrowded and understaffed jails, subjecting the approximately 3,800 men and women held in the County's jails to dangerous, inhumane, and degrading conditions.

2.      Defendant regularly subjects people in its custody—the majority of whom have not been convicted of any crime—to harsh, prolonged, and undue isolation.  Every day, Defendant locks up hundreds of people in solitary confinement in dark, cramped, filthy cells for 23 ½ hours or more per day.  While these individuals are held in isolation, Defendant deprives them of human contact, programming, fresh air, and sunlight.  Many people do not get outside to see the sun for weeks or months at a time.  The extreme isolation and deprivation place people at serious risk of profound physical and psychological harm.

3.      Defendant incarcerates people with serious mental illness at dangerous and disproportionately high rates.  Defendant subjects people with serious mental illness to extreme isolation, with little or no mental health treatment.  More than one-third of Sacramento County's jail population has a mental illness, including dozens of people waiting for psychiatric inpatient placements in state hospitals.  Yet Defendant fails to provide adequate mental health care, including basic measures to prevent suicide and self-harm. Defendant's failure to provide minimally adequate mental health treatment— combined with the deplorable conditions of confinement in the jails—exacerbates individuals' existing mental illnesses and increases the likelihood that people will suffer serious decompensation or death.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

4.      Since November 2016, at least five individuals have died by suicide while held in Sacramento County jails.  Many more individuals have attempted suicides, resulting in grave injuries as serious as permanent paralysis.

5.      Defendant fails to provide minimally adequate medical care to the people in its custody.  Defendant fails to adequately screen people entering the jails for medical conditions, does not timely or adequately respond to requests for medical care, and denies or delays for excessive periods the provision of necessary chronic and specialty care.   Defendant examines and treats patients in common spaces of the jail, without basic confidentiality, rather than in proper exam rooms with necessary medical equipment.  Defendant fails to sufficiently monitor or treat people experiencing alcohol or drug withdrawal, leaving them instead to languish in sobering cells in the decrepit booking loop in the basement of the Main Jail.  Defendant's failure to provide adequate medical care subjects people in the jails to serious risk of injury or death.  Individuals held in the county's jails have been denied essential cancer treatment, lost their eyesight where treatment could have prevented it, and faced needless pain and irreparable harms due to delayed or denied care.

6.      Defendant deprives people with disabilities access to jail programs, activities and services.  Defendant fails to adequately screen people with disabilities or provide them necessary accommodations, including wheelchairs, canes, eyeglasses, hearing aids, and other items they need to perform everyday activities.  Defendant's jails are full of physical obstacles that prevent people with mobility disabilities from bathing, moving around their housing units, or visiting with family, friends, and attorneys.

7.      Defendant has been aware of the constitutionally and legally inadequate care and conditions in its jails for years.  Reports from multiple outside agencies and consultants have repeatedly documented chronic overcrowding and

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

understaffing in the jails, major deficiencies in health care, excessive use of isolation, and the denial of rights to people with disabilities.

8.      In the last decade, no fewer than a dozen reports have detailed significant deficiencies in the treatment of individuals in the Sacramento County jails and, in particular, the treatment of individuals with disabilities.  Inspector General reports, Grand Jury reports, and reports completed by subject matter experts retained by the County have repeatedly made clear that the health and well-being of people incarcerated in the jails are at serious risk.  They have found that conditions are "unlikely to meet constitutional standards" and identified "serious violations" of the rights of people with disabilities.

9.      In 2015, after a detailed investigation, Disability Rights California issued a report (*see* **Exhibit A**) on conditions in Sacramento County's jails. The report documented harmful policies, practices, and conditions that adversely impact prisoners, in particular prisoners with serious mental illness, medical conditions, and physical, sensory, or mental health disabilities.  The report detailed the Jail's inadequate health care system, excessive use of solitary confinement, and violations of federal disability law.  Nearly all of the deficiencies identified in the report persist, and recommendations to address those deficiencies remain largely unimplemented.

10.     In January 2016, the parties entered into a Structured Negotiations Agreement as an alternative to imminent litigation.  The parties agreed to work toward a settlement to address the conditions of confinement in Defendant's jails. The parties further agreed that Defendant would retain neutral experts to advise it about health care and custodial practices in the jails, and that their reports would be admissible in evidence and available to the public.  After two and a half years of negotiations, the settlement process broke down.

11.     Since early 2016, Defendant has contracted with five nationally recognized subject matter experts to assess conditions in the jails and make

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

recommendations.  The experts issued written findings consistent with those of Disability Rights California, condemning the conditions of confinement in the jails, identifying serious risks of psychological and physical harm to people in the jails, and calling for significant and immediate changes to address the deficiencies.

12.     Correctional expert Eldon Vail documented dangerous understaffing and inhumane, excessively punitive conditions of confinement, such as the widespread use of prolonged solitary confinement and the practice of withholding food from individuals for disciplinary purposes.  *See* **Exhibit B**: Eldon Vail, Sacramento County Jail, Mentally Ill Prisoners and the Use of Segregation: Recommendations for Policy, Practice and Resources.  The Vail report concluded that "custody staffing for both jails is startlingly and dangerously low," and found that Defendant's jails "operate in a state of near perpetual emergency" on account of chronic understaffing.

13.     Psychiatric expert Bruce Gage found that Defendant fails to provide minimally adequate mental health care, in part due to significant understaffing of mental health professionals.  *See* **Exhibit C**: Bruce C. Gage, Evaluation of Mental Health Services: Sacramento County Jails.  Dr. Gage found that the conditions for people with mental illness in the jails are dangerous, noting that "those with psychotic disorders can be expected to become more psychotic" and "those who are depressed, suicidal, or self-destructive are similarly placed at greater risk of harming themselves" given the jail's conditions and lack of treatment.

14.     Jail suicide prevention expert Lindsay Hayes identified numerous problems with Defendant's suicide prevention policies and practices.  He reported that Defendant subjects individuals on suicide watch to punitive and "anti-therapeutic" conditions.  *See* **Exhibit D**: Lindsay M. Hayes, Report on Suicide Prevention Practices Within the Sacramento County Jail System.  Mr. Hayes identified structural hazards in the jails' physical plant that increase the risk that individuals will die by suicide.  He provided twenty-six recommendations to

- 4 -

address deficiencies in Defendant's system.  Defendant has failed to implement many, if not all, of those recommendations.  Meanwhile, the suicide rate in the Defendant's jails has *increased* since Mr. Hayes issued his report, with at least five suicides occurring between November 2016 and April 2018 alone.

15.     Correctional disability access experts Sabot Consulting, LLC found scores of "serious violations" of the Americans with Disabilities Act in Defendant's jails, including inadequate screening for disabilities, denials of disability-related accommodations, improper housing of individuals with disabilities, facilities that are inaccessible and dangerous to individuals with disabilities, denials of equal access to jail programming and recreation, inadequate disability-related policies and procedures, and lack of training for staff.  *See* **Exhibit E**: Sabot Consulting, Sacramento County Sheriff's Department Correctional Services Americans with Disabilities Act (ADA) Assessment.  Few, if any, of Sabot's recommendations to address these serious violations have been implemented.

16.     Correctional experts Jim Austin, Emmitt Sparkman, and Robin Allen ("Austin et al.") assessed Defendant's highly isolated and punitive "Total Separation" (or "T-Sep") classification.  *See* **Exhibit F**: James Austin et al., Evaluation of the Sacramento County Jail Inmate Classification and T-SEP Systems.  Austin et al. documented scores of people classified as T-Sep being "placed in harsh conditions of solitary confinement and isolated from direct contact with other inmates for excessive periods of time."  They found that the T-Sep classification and its harsh solitary confinement conditions are "unique to Sacramento County."  They also found that over 75% of the more than 162 individuals in the jails' T-Sep units had mental health needs, and many were housed in T-Sep in part *because* Defendant lacks appropriate and safe places to house people with mental illness.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

17.     Even as Defendant's own consultants have documented serious and widespread violations of the rights of people in its custody, Defendant has failed to take reasonable steps to mitigate the harms inflicted on people every day. Widespread understaffing of mental health, medical, and custody personnel persists.  People in the jail remain unable to access timely and appropriate health care.  Hundreds of people live in conditions of profound sensory deprivation due to their T-Sep status and related custodial practices at the jail.  Defendant has failed to make physical plant renovations to expand disability access or address known suicide hazards. Nearly all of the serious and dangerous deficiencies identified by the County's experts remain to this day.

18.     Plaintiffs MAYS, RICHARDSON, BOTHUN, LEE, BEIRGE, and GARLAND seek declaratory and injunctive relief for Defendant's constitutional and statutory violations.

## JURISDICTION

19.     The claims alleged herein arise pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.6, and related state law.

20.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.  Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202; and 42 U.S.C. § 1983 and 12117(a); and California Government Code § 11135.

## VENUE

21.     Venue is properly in this Court, pursuant to 28 U.S.C. § 1391(b)(1), because Plaintiffs' claims for relief arose in this District and one or more of the Defendants reside in this District.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## PARTIES

**PLAINTIFFS**

22.     Plaintiff LORENZO MAYS is a pre-trial detainee with serious mental illness and cognitive disabilities who has suffered significant physical and psychological harm for nearly a decade while awaiting trial at the jail.  Since 2010, his criminal proceedings have been stalled based on repeated findings that Mr. MAYS is not competent to stand trial due to an intellectual disability and mental illness, including a possible traumatic brain injury.  Defendant has placed Mr. MAYS in solitary confinement housing for nearly his entire period of incarceration.  In solitary confinement, he has suffered auditory hallucinations, worsening depression, suicidal thoughts, and a diagnosed Vitamin D deficiency related to the lack of exposure to sunlight.  Defendant has failed to provide Mr. Mays adequate medical and mental health care and has subjected him to discrimination based on his disability by denying him reasonable accommodations and access to services and programs at the jail.  Plaintiff MAYS is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m).

23.     Plaintiff RICKY RICHARDSON is a pretrial detainee who sustained a spinal cord injury in 2000 and is paraplegic.  He relies on a wheelchair for mobility.  Defendant has denied Plaintiff RICHARDSON reasonable accommodations for his disability and access to services and programs based on his disability status.  Defendant has further denied Plaintiff RICHARDSON adequate medical treatment for his condition.  Plaintiff RICHARDSON is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m).

24.     Plaintiff JENNIFER BOTHUN is a pretrial detainee who has limited vision and a severe cataracts condition that has continued to get worse due to lack of adequate treatment during her time incarcerated at the jail.  She also has

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

significant mental health needs.  After receiving threats from other incarcerated people, Plaintiff BOTHUN was placed in solitary confinement housing, where she has suffered from depression and overwhelming anxiety.  Defendant has failed to provide her adequate medical and mental health treatment and with necessary reasonable accommodations for her disability-related needs.  Plaintiff BOTHUN is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m).

25.     Plaintiff ARMANI LEE is a pretrial detainee who has been diagnosed with serious mental illness, including bipolar disorder, and has a history of multiple suicide attempts.  Defendant has placed Plaintiff LEE in solitary confinement for extended periods of time, during which his mental health has deteriorated.  Plaintiff LEE was booked into the jail with recent gunshot-related injuries, including a fractured pelvis and neurological injuries that impair his ability to ambulate.  Defendant has failed to provide Plaintiff LEE with adequate medical and mental health care and with necessary reasonable accommodations for his disability-related needs.  Plaintiff LEE is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m).

26.     Plaintiff LEERTESE BEIRGE is a pretrial detainee diagnosed with serious mental illness with a history of suicidal ideations and attempts.  He was found incompetent to stand trial and referred to receive treatment in the Department of State Hospitals.  During the more than seven months he spent at the Jail prior to the hospital placement, Defendant designated Plaintiff BEIRGE as "Total Separation," meaning he was placed in solitary confinement with essentially no human contact and almost complete isolation.  This setting worsened his psychiatric condition, and Defendant failed to provide adequate mental health treatment.  Plaintiff BEIRGE attempted suicide while in Total Separation solitary confinement and expressed suicidal ideation on multiple occasions, resulting in

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

placements in cold safety cells and empty classrooms.  He was referred for placement in the acute mental health unit on multiple occasions, but repeatedly was denied such placement due to lack of bed space.  Instead, he was returned to the same solitary confinement unit, resulting in a cycle of decompensation that repeated itself at least four times in the months he was awaiting transfer to a state psychiatric hospital.  Plaintiff BEIRGE is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m).

27.     Plaintiff CODY GARLAND is a sentenced prisoner at Sacramento County Jail with extensive medical needs, including related to glaucoma and chronic allergy and respiratory conditions.  Plaintiff GARLAND is also diagnosed with mental illness.  Defendant has failed to provide Plaintiff GARLAND with adequate medical and mental health care, which has led to irreversible loss of vision, multiple emergency room visits and hospital stays, and at least one serious suicide attempt that required outside medical attention.  Plaintiff GARLAND is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m).

**DEFENDANT**

28.     Defendant COUNTY OF SACRAMENTO ("County" or "Sacramento County") is a public entity, duly organized and existing under the laws of the State of California.  Under this authority, Defendant County operates and manages two jails: the Main Jail, located in downtown Sacramento, and Rio Cosumnes Correctional Center, located in a rural area of Elk Grove.  The County has at all relevant times been responsible for the actions and/or inactions and the policies, procedures, practices, and customs of the Sacramento County Sheriff's Department.

29.     Defendant is responsible for ensuring that the basic human needs of individuals in its custody are met, and for ensuring that individuals are not at risk

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

of serious harm, including by providing appropriate funding, oversight, and corrective action to ensure adequate conditions.  Defendant is also responsible for ensuring that jail policies and practices do not violate individuals' substantive and procedural rights or discriminate against individuals with disabilities.

**FACTUAL ALLEGATIONS**

**I.      DEFENDANT KNOWINGLY OPERATES DANGEROUSLY UNDERSTAFFED JAILS**

30.      Defendant incarcerates far more people than it is able to house safely and humanely in its jails.  Together, the two jails incarcerate approximately 3,800 people each day, including both pretrial and sentenced individuals.

31.      The large jail population stems from the County's high incarceration rates, particularly of people with mental illness and/or disabilities.  In November 2016, an outside consultant hired by Defendant, CGL Management Group, LLC ("CGL"), tied the overcrowding in Defendant's jails to the County's incarceration rate, which was reported to be 41% higher than the California average, and higher than most California counties.   Defendant has a higher-than-average incarceration rate because of long lengths of stay in the jails, lack of community diversion programs, lack of transitional and supportive housing for people experiencing homelessness, an unnecessarily harsh bail system and underutilized pretrial release system, and longer-than-average probation terms. Defendant disproportionately incarcerates people with serious mental illness.  Because Defendant fails to provide sufficient community resources to meet the needs of people with mental illness, such as community mental health services, crisis intervention, and supportive housing, people with mental illness regularly cycle in and out of the jails, contributing to their unnecessary and harmful incarceration.

32.      In 2015, the Sacramento County Grand Jury reported that the number of people who received a mental health diagnosis at the time of intake at Defendant's jails had nearly doubled since 2009, from 18% to 34%.  Defendant has

- 10 -

understaffed its mental health program for over a decade, and the program falls further and further behind as the share of individuals with serious mental health needs in Defendant's custody remains exceedingly high.

**A. Defendant Subjects People in its Custody to Serious Risk of Harm by Failing to Provide Adequate Custody and Health Care Staff**

33.     Defendant's jails are alarmingly understaffed.  Due to Defendant's failure to provide adequate resources, the jails maintain dangerously low levels of custody staff.

34.     As a result, Defendant is unable to comply with its own policies and procedures, as well as correctional practice standards, with respect to supervision, out-of-cell time and programming, mental health and medical care, and cleanliness. Defendant also maintains insufficient staff to ensure timely emergency or outside hospital transportation.  Inadequate staffing at the jails puts the safety, security, and health of incarcerated people at serious risk.

35.     Because of custody staffing shortages, Defendant routinely staffs only two deputies to areas that house as many as 200 people of differing security factors and needs.  Without sufficient custody staffing to supervise its population, Defendant simply locks up hundreds of people inside their cells for 22 to 24 hours every day.

36.     Dramatic shortages in medical and mental health care staffing also put people in the jails at serious risk of harm.  Chronic shortages in the number of health care professionals contribute to inadequate intake procedures and follow-up, extreme delays or lapses in care, an overreliance on nurses acting beyond their scope of practice, and dangerous medication administration practices.

**B. Defendant Has Ignored Report after Report Calling for Significant Increases in Staffing in the Jails**

37.     Defendant is aware of the dangerously low staffing levels because multiple reports over the last decade – including Defendant's own internal reports,

- 11 -

reports commissioned by Defendant, and investigations conducted by the Sacramento County Grand Jury – have repeatedly found that staffing is inadequate and poses a danger to inmates and staff.

38.     In 2009, the Office of the Inspector General ("OIG") conducted a Jail Operations Audit for the Sacramento County Jails.  The audit noted that "significant staffing deficiencies" at Defendant's jails had been reported as far back as 2006, but nonetheless persisted.  The OIG found that understaffing among health care professionals was jeopardizing the effectiveness of intake health screening at the jails, with implications for public health.

39.     A year later, the OIG again reported that Defendant's jails were "understaffed by any measure."  The staffing study concluded that "sufficient staffing to safely and effectively do the job is rarely, if ever, reached," and that the low staffing levels compromised safety.

40.     In 2011, the Sacramento County Grand Jury reached the same conclusion.  The Grand Jury found that Defendant's insufficient deputy staffing prevented the provision of sufficient out-of-cell time to people in the jail and contributed to low staff morale.

41.     In January 2015, Health Management Associates (HMA), a consulting group hired by Defendant, found that "[m]ental health staffing compared to other jails and increasing service demands and wait times may be placing the county at risk for poor behavioral health outcomes."  HMA found that Defendant did not have sufficient nursing or physician staff to address chronic care needs of patients, and lacked a "regular process to collect and evaluate access to nursing, address bottlenecks or situations that cause lags, and the subsequent risks."

42.     In June 2016, the Sacramento Grand Jury issued a report describing RCCC as "overcrowded" and observing that custody staffing levels were lower than similar-sized facilities.  The following year, the Grand Jury again found that staff shortages were of primary concern.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

43.     In November 2016, yet another consultant, CGL reported that Defendant operated the Main Jail with a staff-to-prisoner ratio that "far exceeds advisable levels."  The CGL report found that "Main Jail staffing does not meet contemporary standards for adequate supervision of the inmate population."  CGL concluded that housing unit staffing alone would have to almost double in order to meet recommended supervision levels.

44.     Mr. Vail, Defendant's expert consultant in correctional practices, recently reported that Defendant's jail system was "*dangerously understaffed and struggling to meet even the minimal requirements of their current policies*."  He called for a "sizable increase in both mental health and custody staffing."

45.     Other experts retained by Defendant made similar findings.  Dr. Austin, Dr. Gage, and Sabot Consulting reported that staffing shortages in Defendant's jails undermine the provision of minimally adequate health care, prevent compliance with federal and state disability law, and contribute to inhumane conditions of confinement.

46.     Despite these repeated warnings, Defendant has failed to increase staffing levels in a meaningful way.  Current staffing levels are nowhere close to sufficient to address the risk of substantial harm to people incarcerated in Defendant's jails.

## II.     DEFENDANT IMPROPERLY SUBJECTS PEOPLE IN THE JAILS TO PROFOUND, PROLONGED, AND HARMFUL ISOLATION

### A. Conditions of Confinement in Defendant's Restrictive Housing Units Are Extremely Harsh and Harmful

47.     Defendant, by its policy and practice, locks hundreds of people each day in tiny, dirty, concrete cells for at least 23 ½ hours per day, with little to no opportunity for human interaction, exercise, or recreation, in many cases for months or years at a time.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

48.     According to Defendant's policies and practices, individuals in the jail are entitled to only three hours of out-of-cell time per seven-day period.  In practice, Defendant often fails to ensure that even that small amount of out-of-cell time is provided due to staffing shortages, lockdowns, and insufficient space.

49.     Defendant has created and maintains an extremely harsh form of solitary confinement called "Total Separation," otherwise known as "T-Sep." Defendant deprives individuals classified as T-Sep of virtually all human contact. People on T-Sep live in single cells, by policy are permitted no more than 30 minutes outside of their cells per day, have essentially no access to sunlight or fresh air, and have limited access to showers, phones, books, and canteen privileges.  Defendant often offers out-of-cell time only in the middle of the night, preventing individuals from getting to a phone at a time when they can reach their loved ones or attorneys.  Even when individuals in T-Sep units are permitted to be out of their cells, they are forbidden from recreating or socializing with others.

50.     Defendant holds hundreds of people in the extreme conditions of T-Sep for months or years at a time.  On average, people have been held on T-Sep status for six months and, in some cases, for many years.  Plaintiff MAYS has spent nearly all of his approximately eight years at Sacramento County Jail in solitary confinement as a "T-Sep" prisoner.

51.     Similarly, under its policies and practices, Defendant denies almost all out-of-cell time to individuals subjected in disciplinary detention units.  People in disciplinary detention spend their days in total isolation, prohibited from social contact and nearly all their property, phone calls, or other forms of normal human contact.  For example, Defendant has placed Plaintiff LEE in solitary confinement for long periods, despite knowing that he has significant mental health needs, a history of multiple suicide attempts, and a painful skin condition.  During one month-long stretch in disciplinary isolation, Defendant did not allow Mr. LEE any time outside of his cell, even to shower.  The denial of showers greatly exacerbated

- 14 -

his already painful rashes and itchiness.  He also experienced worsening depression and suicidal ideation while in isolation.

52.      Defendant's restrictive housing cells are tiny, concrete blocks.  There is no fresh air or natural light, no clocks, and no method to track time.  Lack of ventilation and inadequate temperature control lead to sweltering temperatures in the summer and freezing conditions in the winter.  Defendant sometimes fails to provide mattresses, leaving people to sleep on hard, cold, dirty floors for days. Defendant fails to maintain basic cleanliness and sanitation, housing individuals in cells that are covered in feces and urine, old food, garbage, and bugs.  Many lack outside windows or visibility from one cell to another, and only small windows to the dayroom that have been covered by flaps, increasing the isolation and sensory deprivation.  For example, Defendant has covered Plaintiff LEE's solitary confinement cell window for weeks at a time, leaving him unable to see outside of his small, filthy cell.



*Photo:  Total Separation ("T-Sep") Solitary Confinement Cell*

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

53.     Defendant's failure to provide adequate mental health care exacerbates these serious health and sanitation problems.  One expert found that Defendant lacks the resources to adequately treat people with serious mental illness housed in isolation, in some cases leaving them to languish in their own urine, feces, and garbage.  Bodily fluids and garbage leak out of individual cells into the hallways, making conditions unbearable to everyone around them.

**B. Defendant Subjects People to Severe Isolation for Illegitimate Reasons and Deny Them Any Meaningful Opportunity to Challenge Their Placements.**

54.     According to Defendant's policy and practice, people are locked in restrictive housing units even when there is no legitimate penological purpose for doing so.  Correctional experts Austin et al. found that Defendant automatically places into T-Sep people with a history of serving time in T-Sep during a previous jail detention or who have been in a Security Housing Unit (SHU) while in state prison, even if such placement was years in the past and even if the individual poses no current threat to safety or security.  Once a person has been classified as "T-Sep," they may be placed on such status automatically in perpetuity.  For example, one individual got into an argument with a jail deputy over a decade ago. She has been told that she would be "T-Sep for life" and has been placed in T-Sep during her subsequent incarcerations, despite no recent disciplinary infractions.

55.     Defendant regularly places people with intellectual disabilities or mental illness in T-Sep and other restrictive housing units, including people who are actively psychotic and showing severe mental health symptoms such as delusions, hallucinations, paranoia, and incoherent speech.  People on T-Sep have experienced severe physical and psychological harms, and frequently threaten or engage in self-harm and suicide attempts.  Many individuals spend months in T-Sep isolation while awaiting placement in a state psychiatric hospital.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

56.     Defendant warehouses these vulnerable individuals in punitive and isolated conditions, without adequate mental health treatment.  Plaintiff BEIRGE spent more than 200 days as a T-Sep prisoner while awaiting transfer to a psychiatric hospital.  He repeatedly communicated to jail staff that he was having great difficulty coping and was "mentally exhausted" in the isolated T-Sep setting, writing that he thought about "coming out in a box."  During that time, Plaintiff BEIRGE decompensated and became suicidal at least four times.  Each time, he was placed on suicide precautions and then returned to the same T-Sep housing where he had decompensated. Defendant also places individuals in long-term solitary confinement for their own "protection."  Plaintiff BOTHUN has been held in isolation for several months based on threats made against her by other people in the jail.  Rather than "protecting" her, such placement has been severely harmful. In isolation, she has experienced depression and "overwhelming anxiety."



*Photo:  Women's Solitary Confinement Cell*

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

57.     Plaintiff MAYS offers another deeply troubling example.  Defendant placed Plaintiff MAYS in solitary confinement soon after his arrival at the jail in 2010, based on an incident in which he was assaulted by other prisoners.  He has been in restrictive housing for non-disciplinary reasons for almost his entire incarceration – stretching out nearly a decade.  His years in extreme isolation have had detrimental effects on his psychological and physical health.  He has developed severe skin conditions and difficulty sleeping.  He was diagnosed with a Vitamin D deficiency, a health problem attributed to inadequate exposure to sunlight.  Plaintiff MAYS also experienced auditory hallucinations, suicidal ideations, and depression while in isolation, for which Defendant provided limited and inadequate mental health treatment.

58.     According to its experts, Defendant has failed to implement appropriate criteria or meaningful review for placement in restrictive housing.  The Sheriff's Department lacks the staffing and other resources to address this serious deficiency.  As a result, Defendant continues to lock hundreds of people in restrictive housing based on an irrational and highly punitive system.  By design, Defendant regularly fails to notify individuals of the reason for their solitary confinement placement, when they will be released, or what they can do to get back to general population housing.

## C. Defendant Is Aware of the Harm Caused by its Use of Excessive, Harsh, and Prolonged Isolation

59.     Defendant has knowingly created and perpetuated a jail system that relies heavily on excessive isolation, putting people at a serious risk of harm or death.  The United States Department of Justice defines "solitary confinement" as the "state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others."  Prolonged solitary confinement is defined as any period of time over three to four weeks.  Defendant is aware that individuals are confined to their locked cells for well over

- 18 -

22 hours per day and remain in that setting for periods lasting as long as months and years.

60.     Mental health and correctional experts have documented the harmful effects of solitary confinement.  Common side effects of prolonged solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors.  *Davis v. Ayala*, 135 S.Ct. 2187, 2210 (2015) (Kennedy, J., concurring) (citing Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006)).  Prisoners punished with solitary confinement may be up to seven times as likely to commit acts of self-harm.  Upon information and belief, a disproportionate number of the suicides and suicide attempts inside Defendant's jails occur in solitary confinement units.

61.     Defendant's policies and practices of subjecting people in its custody to severe isolation and idleness also cause serious physiological harm, including cardiovascular and gastrointestinal problems, migraines, profound fatigue, deteriorating eyesight, back and joint pain, and aggravation of other preexisting conditions.  The physiological consequences are both physical manifestations of the psychological effects of isolation and the result of periods of extreme inactivity, lack of natural light, and lack of fresh air.

62.     Defendant's overuse of restrictive housing is particularly harmful to those with intellectual disabilities or mental illness, who are particularly sensitive to psychological stressors and emotional distress associated with isolation conditions.  Defendant's jails currently have almost 30 people with mental illness waiting for transfer to a state psychiatric hospital.  Despite full knowledge of their severe mental health conditions, Defendant places many of these individuals in solitary confinement units for extended periods.

63.     Despite the documented deleterious effects of restrictive housing, Defendant continues to fail to conduct an adequate assessment before placing a person in a restrictive housing unit to determine whether such placement is

- 19 -
CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

contraindicated for a person's physical or mental health.  Defendant also does not conduct regular rounds in restrictive housing units to monitor individuals' mental health.  These omissions place Plaintiffs at an unreasonable and unnecessary risk of harm.

64.     Defendant is aware of the severe harm that prolonged and harsh isolation causes because individuals in the jails regularly complain to staff members, orally and in writing, about the conditions in restrictive housing units and the damaging impact on their physical and mental health.

65.     Defendant also has been placed on notice of the impact of its restrictive housing practices by multiple written reports.  Disability Rights California's report documented the dangers of the overuse of restrictive housing in harsh conditions, including extreme isolation, minimal out-of-cell time, few opportunities for exercise or recreation, and inadequate monitoring of and care for people with mental health needs in restrictive housing.

66.     In June 2016, Mr. Vail found that Defendant "overuses segregation both for the mentally ill and the non-mentally ill," and that the conditions in Defendant's restrictive housing units are "very stark and unlikely to meet constitutional standards."

67.     In November 2016, CGL found that "the amount of out of cell time and recreation time provided to inmates in the Main Jail is insufficient . . . due at least in part to the lack of correctional staff available to adequately supervise inmates out of their cells."

68.     In May 2017, Austin et al. reported that Defendant places individuals, including those with mental illness, in "harsh conditions of solitary confinement . . . for excessive periods of time," and that there is no "credible or transparent process" by which individuals are assigned to or removed from restrictive housing.

69.     Despite Defendant's knowledge of its overuse of solitary confinement and the harmful effects thereof, it continues to rely on profound and prolonged

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

restrictive housing.  Defendant has failed to meaningfully reduce the T-Sep population in the jails or to commit the resources necessary to address this serious problem.  To this day, hundreds of individuals are still subjected to dangerous and inhumane conditions in restrictive housing units.  Similarly, Defendant has failed to address systemic deficiencies in its disciplinary process or the degrading conditions of confinement for individuals in disciplinary detention.

## III.      DEFENDANT FAILS TO PROVIDE MINIMALLY ADEQUATE MENTAL HEALTH CARE IN ITS JAILS

70.      Defendant has a policy and practice of failing to provide sufficient mental health care to the more than 1,500 individuals with mental health needs in the jails.  Many of those individuals suffer from severe mental illness and experience symptoms such as paranoia, auditory and visual hallucinations, and persistent thoughts of self-harm.

71.      Defendant's mental health system is defined by severe staffing shortages, an inadequate screening and assessment process, significant delays in access to clinicians and medications, a dearth of treatment and services, inadequate treatment space, and an overreliance on harsh, restrictive housing units.  Defendant's system of care is wholly inadequate to meet the significant and growing mental health needs of its population.

### A. Defendant Fails to Identify or Respond Timely to the Mental Health Needs of Individuals in the Jails

72.      Defendant's mental health screening process at intake is inadequate to identify the serious needs and risk factors of individuals in the jails.  Nurses conduct intake assessments in a noisy and crowded booking and intake area, within earshot of custody staff and other people being interviewed and booked into the jail.  Privacy and confidentiality are compromised, reducing the likelihood that people will disclose mental health needs and risk factors for suicide.  The intake assessment lacks critical questions regarding individuals' mental health history and

cognitive limitations, current mental health complaints, risk of self-harm and suicidality, history of suicidality during past incarcerations, and medication needs.

73.     Defendant lacks a system for triaging and following up timely on mental health referrals after intake, creating a significant risk that even someone who discloses mental health needs during the screening process, such as recent or current suicidal ideation, will not be timely seen by mental health staff, leaving them to suffer or further decompensate without treatment.  In several recent suicides at the jails, Defendant had documented mental health referrals that had not led to a clinical mental health contact by the time of the individual's suicide death.

74.     Defendant's severe understaffing leads to dangerously long wait times for psychiatric assessments for those identified as requiring psychiatric care, with some individuals waiting over a month.  Mental health staff take days or weeks to review and respond to kites seeking mental health treatment.

75.     Defendant's dangerous understaffing and broken system of care means that manageable mental health conditions deteriorate into emergent ones that require crisis responses and, in far too many cases, lead to an individual's death or permanent injury.

## B. Defendant Fails to Provide Minimally Adequate Mental Health Treatment

76.     For the vast majority of individuals identified as having mental health needs, Defendant provides no more than the most rudimentary mental health care: basic assessment, psychotropic medication management, and crisis response. Defendant does not provide adequate treatment planning, and it does not offer adequate individual or group therapy, structured activities, or rehabilitative services.  Defendant's experts have found that when mental health care staff respond to requests for care, such visits can be as short as 15-30 seconds.

77.     Defendant fails to provide confidentiality for mental health contacts. Instead, clinicians routinely meet with patients at cell front or in other heavily

- 22 -

trafficked areas.  This practice severely limits patients' privacy and interferes with the provision of mental health services.  Many people refuse treatment in public or are unwilling to share important information when other staff or prisoners can hear them.

78.     The experience of Plaintiff LEE, who has a history of suicide attempts and significant mental health needs, illustrates this systemic problem.  Defendant's mental health staff has communicated with Mr. LEE almost exclusively at cell front through a closed metal door.  Mr. LEE does not feel safe disclosing his mental health within earshot of custody staff and others in the area.  The lack of privacy has undermined any clinical treatment provided by mental health staff, leading to Mr. Lee experiencing worsening depression and suicidal thoughts.

79.     Defendant maintains a haphazard and dangerous medication distribution system.  Due to insufficient staffing, psychiatric prescribers frequently start or change individuals' medications without even seeing the patients or providing any follow-up to monitor side effects and medication efficacy.  Psychotropic medications are distributed to patients at inconsistent and odd hours of the day, sometimes in the middle of the night.

80.     Defendant's dangerous practices leave many people with mental illness either over- or under-medicated.  One woman received such an inappropriately high dosage of her medication that she lost consciousness.

81.     Even in the Main Jail's acute psychiatric unit, Defendant fails to provide necessary mental health care.  Mental health staff provide little to no individualized treatment beyond medication management.  The conditions in the acute care unit are grim.  Defendant confines patients to their cells, which are small, dirty concrete boxes that often smell like urine and feces, for up to 23 hours per day.  Out-of-cell time for acute patients is limited to no more than one hour per day, in a bare dayroom with no space to exercise and no opportunity to engage in

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

therapeutic activity.  The unit is extremely noisy, with people shrieking and banging on their cell doors because of poorly treated mental illness.



***Photo:  Main Jail Acute Mental Health Unit Cell***

82.        The acute inpatient unit also lacks sufficient capacity to meet the demand for inpatient care.  Many people requiring inpatient care are left waiting for extended periods of time because the unit is understaffed, has an insufficient number of beds, and frequently has a waitlist for admission.  Individuals with acute treatment needs are routinely left to languish in isolation cells and in rooms designed to be used for jail programming because Defendant has no treatment bed

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

available for them.  Plaintiff BEIRGE has been referred several times for placement in the inpatient mental health unit due to suicidal ideation and other symptoms of mental illness.  Each time, he was placed on the inpatient wait list due to lack of bed space, resulting in a delay – and often outright denial – of clinically indicated inpatient care.

83.     Defendant's treatment of people who require outpatient care is no better.  Defendant provides *no* dedicated outpatient mental health unit or program for women with mental health needs.  Even the men's Outpatient Psychiatric Program ("OPP") provides no additional outpatient care or programming beyond basic medication management.  Far from a therapeutic environment, OPP often amounts to solitary confinement for people with mental health needs.

84.     Defendant's Intensive Outpatient Program ("IOP"), created to provide sheltered living to male prisoners with sub-acute mental health needs, has markedly inadequate capacity to meet the treatment needs of the jail population.  No such program exists for women with urgent mental health needs.  As a result, people cycle in and out of acute care settings and suicide watch, or simply end up warehoused in solitary confinement.

85.     Defendant punishes people with mental illness for behaviors associated with their mental health or other disabilities.  Defendant has no mechanism for identifying individuals with disabilities during the disciplinary process or for providing accommodations to ensure they understand the charges against them and can participate in the process.

86.     Defendant even imposes disciplinary sanctions for individuals on suicide watch.  In one case, an individual on suicide watch allegedly removed a piece of the ceiling and used it to cut his wrists.  Defendant handcuffed the individual, put him in a barren cell, and charged him with vandalism/theft and insubordination for talking back to an officer.  Defendant failed to provide the

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

individual with adequate treatment for his self-harming behavior and did not consider how mental illness contributed to his behavior before imposing sanctions.

87.     Plaintiff MAYS, who has developed irregular sleep patterns and other ill effects from his years in isolation in Sacramento County's jails, has been disciplined more than twenty-five times for "Failure to Rise" when jail staff count prisoners in the unit during the few hours he is able to sleep. Each time, Defendant imposed further "lock-downs" as punishment, thus denying Mr. MAYS the already miniscule out-of-cell time permitted to individuals in Total Separation units. These practices are extremely harmful and discriminate against people based on their disabilities.

88.     Defendant's failure to provide adequate mental health care placements and treatment creates an unreasonable risk of victimization and violence. In one case, a woman diagnosed with schizophrenia and bipolar disorder was celled with a person without mental illness. She was attacked by her cellmate. After the incident, the woman was placed in solitary confinement on Total Separation status, a placement that served only to worsen her psychological condition.

## C. Defendant Fails to Provide Basic Pre-Release Discharge Planning to Individuals with Serious Mental Illness

89.     Defendant fails to adequately prepare people with mental illness for transition back to the community after their incarceration. Barely three percent of the nearly 4,000 people released each month receive reentry services. Due to insufficient staffing and resources, Defendant fails to supply medications to people receiving psychiatric medications in the jail when they are released to the community, leaving people with dangerous gaps in treatment. Some do not even know what their diagnosis is, what medications they take, or how to renew their prescriptions.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

90.     Defendant's failure to provide sufficient discharge planning services means that individuals cycle in and out of the jail again and again, in some cases returning to the jail within 24 hours of release.

91.     Defendant also routinely discharges individuals directly from solitary confinement to the streets, with no preparation for the transition and little regard for the well-established lingering psychological effects of isolation.

### D. Defendant Is Deliberately Indifferent to the Harm Caused by Its Deficient Mental Health Care Practices

92.     Defendant's policy and practices cause severe harm to people with serious mental illness.  Defendant's practice of subjecting people with mental illness to severe isolation, deprivation, and lack of treatment exacerbates existing mental illness, leading to increased anxiety, depression, psychosis and other mental health symptoms.

93.     Defendant is well aware of the inadequacy of its mental health care system.  The November 2016 report by CGL found that "[t]reatment programs and housing for mentally ill offenders  . . . do not meet contemporary professional standards."  CGL documented that many people with mental illness in the jails are "confined to their cells for most of the day."  This, in turn, "affects the safety of staff, who face more challenging and volatile inmates in a physical plant that was not designed for that population, and the mentally ill offenders themselves, who may become a danger to themselves and those around them because of inadequate facilities and treatment."

94.     Defendant's expert Dr. Gage made similar findings of a failing mental health system, documenting numerous critical failures in the provision of care to individuals with severe psychiatric disabilities.

95.     Mr. Vail and Sabot Consulting reported on deficient mental health services and the unjustifiable reliance on solitary confinement to deal with the individuals with mental health needs in Defendant's jails.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

96.     Despite knowledge of its woefully inadequate mental health care system and systematic overuse of restrictive housing for individuals with serious mental illness, Defendant has failed to take reasonable steps to address the grave and ongoing harm to Plaintiffs and others.  Defendant has failed to expand mental health staffing, substantially increase the number of treatment beds to meet the needs of the inmate population, ensure adequate treatment planning, or improve its deficient discharge planning practices.

**IV.     DEFENDANT FAILS TO TAKE BASIC MEASURES TO PREVENT SUICIDE**

97.     Defendant fails to take basic measures to prevent suicide in the jails. Defendant's policies and procedures fail to identify individuals at risk of suicide during intake, provide insufficient support to those who demonstrate self-harm or express suicidal ideation, and treat individuals in a punitive manner that discourages reporting of suicidality and increases the risk that suicide attempts and suicides will occur.  As a result, individuals are dying by suicide at an alarmingly high rate in Defendant's jails.

98.     Defendant fails to provide sufficient supervision of people at risk of suicide.  Because of insufficient custody staffing, there are few deputies to interact with and identify people who may be experiencing suicidal ideation or engaging in self-harming behaviors.  The absence of adequate staff is particularly troubling in isolation units, where individuals may not be seen by or interact with another person for hours or days at a time.

99.     Defendant fails to properly train staff about suicide risks and prevention.  Defendant's training for custody staff fails to adequately address how to handle suicidal individuals and does not mention basic crisis intervention strategies.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## A. Defendant Subjects Individuals on Suicide Watch to Punitive and Degrading Conditions

100.     Defendant grossly mistreats people who are identified as suicidal. Defendant's policies and practices are unnecessarily and inappropriately punitive, relying on excessive isolation and deprivation, which can be even harsher than the conditions experienced by people facing disciplinary sanctions.

101.     When a person is identified as suicidal, Defendant strips him or her of clothes, removes the person from his or her cell, and places him or her in temporary housing without any personal belongings and no access to phones or visitation with family.  If a person is unwilling or unable to take off his or her clothing, deputies forcibly remove it by ripping or cutting it off with scissors.  On information and belief, this practice has included male deputies forcibly removing women's clothes.

102.     Defendant routinely places people who are actively suicidal in barren "safety cells" or empty classrooms while they await psychiatric attention. Classrooms, also known as multi-purpose rooms, are located in the center of housing pods and enclosed in windows, leaving the person exposed to the gazes of others during a mental health crisis.  Defendant confines people who are suicidal in these harsh conditions around the clock for extended periods of time while they await psychiatric assessment.  These placements have no beds, mattresses, toilets, or sinks, and are ill-equipped to house anyone on an extended basis, let alone a person who is actively suicidal.  One woman on suicide watch in a classroom was

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

prohibited from leaving the room to use the bathroom, and was told by custody staff to "piss in the drain" in the floor.



*Photo: "Safety Cell" for Suicidal Prisoners, with Floor Grate Serving as a Toilet*

103.      Defendant's experts have condemned Defendant's reliance on classrooms for suicide watch.  Dr. Gage described the setting as "punitive" and stated that "[t]he use of the so-called 'classrooms' holding inmates pending evaluation or on [suicide watch] monitoring needs to be halted.  These are not living spaces, have no toileting provisions, are publicly visible spaces, and are not suicide-proof."  Similarly, Mr. Hayes reported that "[t]he classrooms . . .  should never be utilized for the housing of suicidal inmates (for any duration)."  Mr. Vail called the setting "humiliati[ng]" and recommended that Defendant immediately cease using classrooms for suicide watch.  Nonetheless, Defendant continues to put people in dire psychiatric crisis in these degrading and unsafe settings.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1
2
3
4
5
6
7
8
9
10



11 *Photo:  "Classroom" Used to Hold Overflow Prisoners with Acute Mental Illness*

12 104.        Plaintiff BEIRGE has been placed in these cells several times.  On at

13 least one occasion, he begged mental health staff to remove him from suicide

14 precautions because sleeping on the hard floor without clothing was so cold.

15 105.        Defendant has a practice of placing individuals on suicide watch in

16 places with known suicide hazards.  For example, the classrooms that Defendant

17 uses for suicide watch contain light fixtures, vents, and other protrusions that can

18 be used by individuals attempting to hang themselves.  Defendant's experts have

19 found that even the designated "mental health units" in the jails have unsafe

20 features for people at risk of suicide or self-harm.  Yet Defendant has failed to

21 commit the resources to address these known hazards in its jail facilities.

22 106.        Defendant's own experts have found that Defendant relies

23 excessively and inappropriately on "safety suits," which are garments designed to

24 prevent a person from using the fabric as a noose or to otherwise commit suicide.

25 Safety suits are heavy, bulky, uncomfortable, and stigmatizing.  Defendant uses

26 safety suits indiscriminately and for excessively long periods of time, in some

27 cases several months.  In addition, Defendant forces some people to wear safety

28

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

suits – with no other clothing, including underwear – even after they are no longer suicidal, a degrading and punitive practice.

107.    One man with a mobility disability who requires use of a walker or cane has been placed on suicide watch in a barren "safety cell" or classroom more than six times at Sacramento County Jail.  During one such incident, he was placed in a safety cell without an assistive device and no alternative accommodation for his disability.  Defendant left the individual lying on the floor in a safety suit, where he urinated on himself and remained in a urine-soaked suit for more than four hours.

108.    Defendant's practice of subjecting people who are suicidal to punitive isolation and deprivations is extremely harmful, exacerbating existing mental health crises.  Research indicates that these types of punitive responses to suicidality makes incarcerated people reluctant to discuss their suicidal thoughts *because* of the harsh conditions they will face on suicide precautions.  Defendant's policies and practices place an already vulnerable population at further risk of decompensation and death.

**B. Defendant's Knowing Failure to Take Adequate Suicide Prevention Measures Has Tragic Consequences.**

109.    Defendant's knowing failure to reform its suicide prevention practices consistent with the detailed report of its expert, Lindsay Hayes, has had tragic consequences.  Since November 2016, there has been a rash of suicides in Defendant's jails, with inmates dying by suicide at a rate nearly twice the national jail population average.  At least three suicide deaths have occurred in solitary confinement housing units.

110.    In 2017, two men died by suicide in the Defendant's jails.  One man hanged himself hours after he was booked into the jail.  He indicated at the time of intake that he previously had been hospitalized for mental health treatment.  At the time of his death, he had a pending referral for psychiatric services.

111.     Another man hanged himself in his cell after spending almost four months in solitary confinement as a "Total Separation" inmate.  He had previously sought mental health treatment at the jail, stating that he was nearing a mental breakdown and needed help coping with suicidal thoughts.

112.     So far in 2018, there have been two suicides in Defendant's jails.  One man hanged himself with a ripped towel in his T-Sep cell.  At the time of his arrest, the individual had been taken by police for psychiatric evaluation because of erratic behavior.  Despite indications that the man had serious mental health needs, he was housed for nearly two months in solitary confinement in "Total Separation" status.  He remained a T-Sep prisoner until the time of his death by suicide.

113.     Another man hanged himself in his cell the day after his attorney had requested a mental health evaluation on his behalf.  The evaluation never took place.  The man had been openly sobbing in his housing unit on the day he died.

114.     In a recent period of less than 15 weeks, Defendant's recorded more than 500 placements of individuals on suicide precautions.  On information and belief, nearly 300 of these placements were in the makeshift "classrooms" that were never designed to house people with acute mental health needs.  Dozens more were placed in barren safety cells.

115.     Despite knowledge of the serious shortcomings in its suicide prevention practices and ongoing physical hazards in the jails, Defendant has failed to take reasonable steps to address the harm to Plaintiffs.

V.     **DEFENDANT FAILS TO PROVIDE MINIMALLY ADEQUATE MEDICAL CARE**

116.     Defendant provides grossly deficient medical care to individuals in custody in the jails.  Defendant's medical care system is plagued with inadequate staffing, an inefficient and incomplete intake process, excessive delays in responding to requests for care and providing treatment, an incoherent system for tracking and treating chronic care conditions or providing specialty care, and

- 33 -

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

decrepit infirmary conditions that lack even basic privacy protections.  Defendant has failed to commit the resources necessary to remedy these widespread and obvious problems.

### A. Defendant Fails to Identify and Track the Medical Needs of People in its Custody or to Ensure the Timely Provision of Necessary Medical Care

117.     Defendant's intake system is inadequate to identify individuals' serious medical needs and to ensure the provision of adequate care.  Defendant's experts have found that the intake screening process is confusing, unwieldy, and fails to cover critically important topics.  Nurses fail to ask all questions on the intake form or to consult available medical records that contain critical health information.  Nurses conduct intake assessments in the noisy and crowded booking and intake area, within earshot of custody staff and other people being interviewed and booked into the jail.  Privacy and confidentiality are severely compromised.

118.     Defendant's practices for verifying patient medications and requesting medical records from community health providers are disorganized, haphazard, and ineffective, resulting in dangerous disruptions in care.

119.     Defendant's system for handling health services requests ("HSRs" or "kites") is inefficient and ineffective, forcing patients with serious medical needs to languish without care in their cells for excessive periods of time.  Although Defendant's own policy requires that nurses make contact with an individual within 24 hours of receiving a kite, patients routinely wait days or weeks before they receive a response to their request.  People in the jail, particularly those in solitary confinement units, lack reliable access to kites, and generally must submit medical care requests to custody staff, a practice that compromises patient confidentiality, discourages reporting of medical needs, and creates an opportunity for abuse or harassment by staff.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

120.    Defendant has a "one problem per visit" policy, whereby nurses and providers refuse to see patients for more than one medical issue at a time. In other words, if a patient requires care for multiple (and even related) medical issues, he or she must submit multiple requests and wait for multiple appointments to address their needs. This system is ineffective for addressing co-morbidities that require coordinated care.

121.    Plaintiff RICHARDSON's experience is but one example of the consequences of Defendant's inadequate system of care. Mr. RICHARDSON arrived at the jail in early 2016 with signs of a deep bone infection and a "stage four pressure sore" for which a scheduled surgery with an outside provider was precluded by his incarceration. Several medical staff recommended that Mr. RICHARDSON receive an evaluation for surgery to address the "open," "deep," and often foul-smelling wound. Nearly two years later, in March 2018, a physician again recommended referral for surgical intervention to treat the wound. As of July 2018, Mr. RICHARDSON was still waiting for surgical care, suffering significant pain, discomfort, and stress every day due to the lack of treatment.

122.    In another example, Plaintiff BOTHUN entered the jail with bilateral cataracts and limited vision. For months as far back as August 2017, Ms. BOTHUN repeatedly notified Defendant of constant and severe pain in her eyes. Defendant's failure to provide adequate care led to Ms. BOTHUN's complete loss of vision in her right eye, increased ocular pressure in both eyes, dizziness, and constant pain. Defendant has failed to provide clinically indicated surgery for Ms. BOTHUN to address her condition. Each day of delay in care has brought her closer to permanent and complete blindness.

123.    Because Defendant has failed to adequately staff medical care positions, it is almost impossible for patients to timely see a doctor when they need care. Instead, Defendant relies excessively on nurses, who are often acting outside of their scope of practice and without nursing protocols to inform their practices.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Such a system leads to delays or mistakes in diagnosis and treatment, putting patients at a serious risk of harm.

### B. Defendant Has an Ineffective, *Ad Hoc* System for Chronic and Specialty Care and Fails to Provide Adequate Dental Care

124.     Defendant lacks an adequate system for providing regular care to patients with chronic conditions, such as diabetes and hepatitis.  Defendant has a haphazard and inconsistent approach to providing chronic care.  Defendant lacks appropriate protocols and guidelines to ensure that people with chronic conditions do not suffer needlessly in the absence of treatment.

125.     For example, Defendant has denied Plaintiff GARLAND appropriate care for a chronic medical condition that puts him at constant risk of severe and life-threatening allergic reactions. Plaintiff GARLAND has experienced approximately fifteen emergent anaphylactic reactions during his time in Defendant's custody, but Defendant has repeatedly failed to provide timely care for his condition.  On one occasion, Plaintiff GARLAND suffered severe shortness of breath and excruciating itching that did not improve with the basic breathing treatment and Benadryl that was provided at the jail.  Defendant failed to provide timely emergent care.  Instead, medical staff documented that they thought his symptoms were a "stunt."  It was not until the next day, after Plaintiff GARLAND had gone hours in a panic, feeling like his throat was closing, that Defendant transferred him to a hospital, where he required inpatient treatment for more than a month.

126.     Defendant also fails to provide timely and appropriate specialty care, such as neurology, oncology, and ophthalmology.  Defendant's system for providing specialty care is disorganized, with no effective mechanism for tracking and following up on specialty care requests from physicians.  Defendant fails to provide sufficient guidance to physicians and nurses about when specialty care is appropriate.

127.     In many cases, Defendant denies patients access to urgently needed specialty care.  For example, health care staff determined in September 2015 that Richard Galindo, who was incarcerated at the Main Jail, had cancer.  Health care staff referred Mr. Galindo for surgery, but arrangements for the surgery were not made for seven months.  By the time steps were taken to schedule the surgery, in or about April 2016, it was determined that Mr. Galindo's cancer had advanced to the point that surgery was no longer an option.  Defendant did not provide Mr. Galindo with alternative therapy for his condition until November 30, 2016 – *fifteen months* after the original referral for surgery.

128.     In the case of Plaintiff MAYS, Defendant failed to provide a necessary surgery to remove temporary pins from his fractured hand.  Mr. MAYS submitted repeated requests for medical care over a period of twelve months.  These requests document that he was experiencing excessive pain and even that the pins were coming through his skin, causing his hand to bleed and putting him at risk of infection.  Such alarming symptoms continued for nearly a year due to Defendant's delay in providing treatment.

129.     Jail medical staff referred Plaintiff GARLAND to a glaucoma specialist for his serious ophthalmological needs more than three years ago.  To date, Defendant has not provided Plaintiff GARLAND with the specialty care recommended by its own medical professionals.  During his lengthy incarceration, Plaintiff GARLAND has suffered irreversible vision loss, having lost nearly all vision in his left eye and deteriorated vision in his right eye since the initial referral by jail medical staff in or about 2015.

130.     Defendant provides inadequate dental care and generally limits dental treatment to emergency situations.  Defendant has failed to commit the resources necessary to provide routine or basic dental care.  Defendant restricts access to toothbrushes and toothpaste to people in restrictive housing units, creating or exacerbating dental problems.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

131.     Patients wait weeks or months to receive dental care, in many cases having to deal with severe pain or decay on their own.  Due to lack of space and insufficient staffing, dental care providers at times conduct examinations at cell-front, through closed doors and glass.  Patients report that the dentists reach flashlights through the cell doors to examine their mouths.

### C. Defendant Uses Deficient Medical Treatment Spaces and Medically Inappropriate Housing Units

132.     Defendant examines and treats patients in highly public areas that lack visual and auditory privacy, and do not contain basic equipment such as exam tables and sinks.  At the Main Jail, medical staff conduct physical exams and provide treatment right in the middle of the 2 East unit.  In the Medical Housing Unit (MHU) at RCCC, physicians regularly perform examinations in the open dormitory space as well.  The exams are conducted in plain sight of deputies and other prisoners in the housing units.

133.     The acute medical housing units at both jails are dingy and grim.  At both Main Jail and RCCC, the conditions in the acute medical units are excessively harsh and restrictive, limiting out-of-cell time, personal property, and recreational activities.  Defendant provides extremely limited out-of-cell time each day in the medical units at the Mail Jail or the high security medical unit cells at RCCC, regardless of a patient's security classification.  In the medical units, Defendant does not offer educational, vocational, job, recreation, religious, or other programming.

134.     Plaintiff GARLAND experienced extreme stress while housed in a restrictive medical unit cell at RCCC (similar to the one pictured below) over a period of five months.  He reached a point where he "just could not take it anymore," and attempted suicide by swallowing staples and other metal objects, and then trying to hanging himself with noose fashioned out of bed sheets.



***Photo:  High Security "Medical" Unit Cell***

135.     Without adequate medical housing for women, women requiring a medical placement must be housed in the extremely restrictive inpatient medical unit at the Main Jail, regardless of the acuity of their needs or their security classification.

**D. Defendant Fails to Ensure Continuity of Care**

136.     Defendant lacks a functioning system for prescription and distribution of medication.  Individuals receiving medication in the community prior to arrest often experience delays in getting necessary medication after they arrive in custody.  Medical staff terminate or change medications or dosages without proper examination of patients, leading to disruptions in treatment and dangerous side effects.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

137.     Due in part to insufficient resources, Defendant also lacks an adequate system for ensuring continuity of care for people being released from the jails back to the community.  Defendant does not reliably supply medications to people receiving medications in the jail when they are released to the community or ensure that they are connected to community resources to continue their medical treatment.  These practices are extremely harmful, leaving individuals with medical needs without critical health care information and medications.

**E. Defendant Fails to Provide Necessary Care to People with Disabilities, People Who Are Experiencing Detoxification, and Transgender People in the Jails**

138.     Defendant's inadequate medical care system is especially harmful to people with disabilities housed in the jail.  The kite system prevents some individuals with disabilities from accessing care, as staff generally do not assist individuals with filling out medical kites.  Defendant's inadequate medical system leaves people with disabilities without access to needed medical care and accommodations.

139.     In one illustrative case, Defendant's consultant found that a person with several disabilities required diapers for incontinence.  Medical staff failed to provide them, causing her to soil herself.  Staff then failed to provide her clean clothes.

140.     Defendant's protocols and practices for detoxification are also alarmingly deficient, putting patients at serious risk of injury or death.  Defendant leaves individuals experiencing withdrawal in small, grim "detox cells" for hours at a time without adequate supervision.  Notably, in July 2017, a man died in the booking loop at the Main Jail due to alcohol withdrawal.

141.     Defendant also fails to provide medication-assisted interventions for substance abuse disorders.  Defendant's failure to conform to community standards by providing medications to people with substance abuse disorders needlessly

- 40 -

exposes those individuals to risk of suffering and death, both while housed in the jails and upon release.

142.     Defendant fails to provide necessary medical services to transgender people in its custody.  Defendant lacks a system or adequate policy for evaluating, diagnosing, or providing transgender people with necessary care, including hormone therapy.  Defendant also has no system for identifying those who have received treatment, including hormone therapy, in the community and for continuing such treatment consistent with medical need.

## F.  Defendant Is Deliberately Indifferent to the Harm Caused by Its Deficient Medical Care Practices

143.     Defendant has been placed on notice for years about inadequate medical care.  In 2009, the OIG reported on significant cuts to the Correctional Health Services budget, resulting in a major reduction of health care staff. According to the OIG, the cuts resulted in significant treatment delays and compromised access to care.

144.     In 2010, the OIG again reported on "unprecedented reductions" in the Correctional Health Services operating budget.  The OIG found that budget cuts had "a profound effect on medical care services in the jail facilities," and that "service levels have been severely compromised."  In particular, the OIG found that the lack of nurses in the housing units "severely threaten[ed] [the jails'] ability to respond to emergencies or issues with patients on the acute units."

145.     In January 2015, Defendant's consultant, HMA, reported that Defendant's approach to managing chronic care was "insufficient to adequately mitigate the risk associated" with its population.  HMA found that "[n]either facility has a process to treat chronic conditions in an organized and proactive manner.  Each provider schedules follow-ups in the absence of clinical guidelines and there is no standardization of determining disease classification or level of control."

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

146.     HMA reported that current staffing levels prevented Defendant from providing necessary services to individuals with disabilities.  HMA characterized jail health care staff as "maxed out."

147.     HMA faulted Defendant for staffing an inadequate number of nurses to serve the jail population, noting that Sacramento is an outlier in its inmate-to-nurse ratio.  HMA found that Defendant was "exposing [itself] to significant clinical risk" by understaffing nurses and relying on temporary and agency staff nurses.  The HMA report stated: "Merely providing a nurse—rather than a competency-tested, well-prepared correctional nurse—is not enough to mitigate [the County's] risk for adverse clinical outcomes, incorrect processes and procedures, and threats to staff and inmate safety."

148.     HMA also raised concerns about the conditions of confinement in Defendant's medical units, noting that the unit at Main Jail is "dark and crowded with equipment and boxes in the hallways."  HMA documented that individuals in these units have "no access to exercise or daylight and there is no day room."

149.     Disability Rights California reported that "the medical staff at RCCC conceded that they 'struggle' to provide care for chronic conditions and plan to develop policies for long-term management of conditions such as asthma, diabetes, hypertension, and hyperlipidemia."

150.     Even more recently, Defendant's expert, Sabot Consulting, reached many of the same conclusions about deficiencies in the medical care provided to people in the jail.  Sabot reported on problems with medication continuity, including delays in the provision of medications after booking and changes to medications that caused serious side effects.

151.     Sabot also reported on delays in responding to requests for medical care.  According to Sabot, "medical staff cited a backlog . . . in large part due to staffing vacancies across all disciplines.  They acknowledged that this ultimately adversely affects the health care process."

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

152.     Sabot further reported on Defendant's pervasive failure to ensure confidentiality in medical encounters, noting that "health care staff talk with inmates at cell doors, inside pods, [and] inside rec/dayroom areas with inmates in the areas."

153.     Despite these alarming findings, Defendant has made virtually no changes to meaningfully enhance health care staffing, ensure confidentiality of medical encounters, or provide adequate chronic and specialty medical care.

154.     Defendant's inadequate medical care system places all people in the jails, and especially people with disabilities, at serious risk of harm or death.

## VI.   DEFENDANT DISCRIMINATES AGAINST AND FAILS TO ACCOMMODATE PEOPLE WITH DISABILITIES

155.     Defendant incarcerates a significant number of people with disabilities in its jails.  Defendant fails to ensure that those individuals have equal access to programs, services and activities, and fails to provide people with disabilities reasonable accommodations.  Defendant's written policies often ignore completely the needs of individuals with disabilities.

156.     As a result of these failures, Defendant places people with disabilities at a substantial risk that they will be improperly housed in unduly restrictive placements, subjected to discipline based on their disabilities, injured or left behind in an emergency, victimized by others, and unable to access necessary health care.

### A. Defendant Fails to Adequately Identify or Track People with Disabilities

157.     Defendant fails to appropriately identify individuals' disabilities and whether they need assistive devices or other accommodations.  Defendant's disability screening is conducted in an inconsistent and incomplete manner.  Defendant's expert found that medical staff sometimes skip entirely the questions related to disability.  Rather than relying on a standard assessment, staff report that they know who has a disability "by the way [they] walk and talk."  Such a

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

haphazard screening system virtually guarantees that individuals with disabilities are not appropriately identified and provided accommodations they need.

158.     Defendant fails to screen, evaluate, and provide accommodations to individuals with intellectual disabilities.  Defendant often houses individuals with intellectual disabilities in the acute psychiatric unit or in solitary confinement units simply because there are no appropriate housing options to meet their specific disability needs.  Plaintiff MAYS' many years in Total Separation isolation is but one example.

159.     Even if Defendant does identify individuals' disabilities at intake, Defendant fails to maintain an adequate system for tracking people with disabilities once identified.  Defendant's inmate tracking system does not track individuals identified as having intellectual disabilities, mental health concerns, or physical disabilities, nor whether they have been issued health care appliances, assistive devices, durable medical equipment, or other accommodations.

## B. Defendant Fails to Provide Reasonable Accommodations to People with Disabilities in the Jails Who Need Them

160.     Defendant does not have a process for providing timely and appropriate reasonable accommodations to people once they are housed in the jail, or for maintaining that disability-related equipment.  For example, individuals whose personal wheelchairs are confiscated must use jail-issued chairs or walkers that are often old and in disrepair.  Individuals requiring canes frequently wait weeks or months, or never receive them at all.  Individuals requiring eyeglasses and hearing aids have difficulty obtaining them in a timely fashion.

161.     For example, after medical staff recommended a cushion as a support surface for Plaintiff RICHARDSON's wheelchair, the accommodation was not provided for more than four months.  As a result, Mr. RICHARDSON suffered the pain of intense pressure on his wounds and infections caused by the lack of an adequate support surface, along with reduced ability to get around on his own.

- 44 -

162.     Similarly, Defendant has refused to provide Plaintiff LEE with a wheelchair to assist him with his condition based on his severe pelvic and neurological injuries.  Medical providers confirmed that it was difficult and painful for him to walk, but Defendant provided him only a heavy, cumbersome walker that he was unable to use safely.  Staff noted that they could not provide him a more suitable assistive device because they did not have one available.  He has fallen on multiple occasions while trying to use the walker, including in front of jail staff.

163.     Defendant fails to provide even basic maintenance for assistive devices, such as replacement batteries for hearing aids.  Instead, Defendant requires individuals' family members to bring those items to the jail.

164.     Defendant routinely confiscates assistive devices, such as wheelchairs, walkers, crutches, cranes, braces, hearing aids, and eyeglasses, during the booking and intake process and does not allow individuals to retain them once they are classified and housed in the jail.  Defendant thereby denies individuals with disabilities the ability to complete everyday activities, such as getting around safely, seeing, reading, or hearing.

165.     Defendant fails to provide individuals with disabilities with reasonable accommodations during transportation to court.  Defendant denies individuals canes and other assistive devices during the transit process.  Defendant's consultant noted that Defendant has subjected some people with disabilities to the dehumanizing practice of having to crawl into vans and buses on their way to court.

166.     Defendant does not provide effective communication or basic reasonable accommodations to people with hearing, speech, or other communication impairments during critical interactions with jail staff, including intake and screening, classification, education and other programming, disciplinary proceedings, and medical and mental health care appointments.  For example,

- 45 -

Defendant fails to provide sign language interpreters during intake screening for people with hearing disabilities.  Similarly, Defendant does not provide sign language interpreters for educational or vocational programs, leaving individuals with hearing disabilities excluded and isolated.

167.     Defendant has no policy or practice for accommodating people with disabilities in emergency situations.  For example, there are no visual alarms for people with hearing impairments.  There is no method for staff to identify those with disabilities, or their needed accommodations, during an emergency.  This failure leaves people with disabilities extremely vulnerable during emergencies and creates an unreasonable risk of harm.

## C. Defendant Houses Individuals with Disabilities in Unsafe and Unduly Restrictive Settings and Denies Them Equal Access to Jail Programs, Services, and Activities

168.     Defendant fails to house people with disabilities in locations where they can safely access programs and services.  The Main Jail has no ADA-accessible general population housing for full-time wheelchair-users or those needing other medical equipment.  As a result, many individuals requiring use of a wheelchair, regardless of security classification level, are housed in medical housing units solely due to their disabilities.  These units themselves lack sufficient ADA-accessible showers and other features.  People with wheelchairs in the medical housing units struggle to move around, do not have access to safe showers, and cannot engage in healthy physical activity.  For example, Defendant has denied Plaintiff RICHARDSON, a wheelchair-user, physical therapy or any other meaningful opportunity for physical activity in the medical unit's restrictive setting.  Given the forced level of inactivity during his two years at the jail, Plaintiff RICHARDSON has developed symptoms of diabetes and other health problems.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

169.     Defendant's consultant found extensive evidence of ADA violations in Defendant's jails and significant resulting harms.  There is not a single ADA-compliant cell shower, bathroom, or living unit in Defendant's jail facilities, and paths of travel have potholes, cracks, steep slopes, and other non-compliant features.  The consultant found that one individual who requires a wheelchair reported that because the two shower chairs in his unit were unstable (and also filthy), he was forced to sit on his knees to clean himself, and that he had fallen in the process.  Another person requiring a cane to ambulate was housed up a flight of stairs for three days, and staff provided him with no assistance navigating the stairs or accessing meals.  Others have fallen trying to move up and down stairs to the visiting room and yards, or have slept on the floor because they do not have access to a lower bunk.

170.     Defendant denied Plaintiff RICHARDSON, who has a mobility disability, the opportunity to shower for six days after he was booked at the jail.  This denial exacerbated his wheelchair-related pressure sores and wound infections.  When Defendant finally provided Mr. RICHARDSON the opportunity to shower, the shower was inaccessible and unsafe.  The shower chair was old, flimsy, and unstable.  Mr. RICHARDSON fell out of the shower chair when it became stuck in the drain.  With no assistance, Mr. RICHARDSON had to drag his body across the filthy shower floor back to his wheelchair.  Since that incident, Mr. RICHARDSON has had to bring his wheelchair into the shower to mitigate the risk of falling, leaving him with a wet seat after he showers.

171.     Plaintiff BOTHUN has been housed in inappropriate and dangerous locations for her disability.  She has limited vision and suffers from bouts of dizziness.  She reported to jail medical staff that she did not feel safe navigating stairs.  She was nevertheless housed on an upper tier in her housing unit, exposing her to significant danger each time she had to navigate the stairs to get to appointments, her meals, or other activities.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

172.     Defendant denies individuals with disabilities equal access to vocational and recreational programming, religious services, visitation, and phone calls.  Plaintiff GARLAND has long been housed in restrictive medical units due to his severe allergies, sleep apnea condition, and need for a Continuous Positive Airway Pressure (CPAP) machine.  By policy, because of his medical housing placement, Mr. GARLAND has been denied the opportunity to participate in programs and activities available to people in the general population who do not have a medical condition or disability.

173.     Visiting areas for both legal and social visits require climbing stairs and/or navigating inaccessible paths of travel, making them inaccessible and unsafe to individuals with mobility-related disabilities.  Plaintiff RICHARDSON, for example, who has no use of his legs, must hoist himself out of his wheelchair to enter the attorney visiting booth and stumble into a plastic chair inside the booth through a dangerous set of maneuvers.

174.     Defendant's system for work assignments also discriminates against individuals with disabilities due to lack of accommodations.  For example, individuals with intellectual disabilities are not provided with assistance necessary to enable them to participate in work programs successfully.

**D. Defendant Lacks Basic Mechanisms to Inform Individuals with Disabilities about Their Rights, Respond to Disability-Related Requests, or Monitor Compliance with Disability Law.**

175.     Defendant does not provide individuals with disabilities notice of their rights or how to request reasonable accommodations.

176.     Defendant does not have an effective complaint mechanism for people with disabilities to report discrimination or to request accommodations, forcing them to rely on the poorly tracked general grievance system.  In addition, individuals with visual, speech, or intellectual disabilities who may have difficulty

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

reading, writing, or comprehending the grievance process are denied the assistance necessary for them to be able to report disability discrimination.

177.     Even when individuals are able to submit grievances, Defendant's responses are delayed, do not address the underlying needs, and are not effectively communicated.  For example, one person submitted a grievance requesting help with showering; he was told by a nurse that "There [are] more important things to do besides helping you with your shower."  Understaffing and insufficient resources make an adequate disability accommodation system nearly impossible.

### E. Defendant Is Deliberately Indifferent to the Harm Caused by its Inadequate Disability-Related Policies and Practices

178.     Defendant has failed to take reasonable steps to address the well-documented, serious, and harmful deficiencies in its disability-related policies and practices.

179.     For example, Disability Rights California's report documented the vast denial of rights to people with disabilities in Defendant's jails.  Disability Rights California reported that Defendant denies individuals access to jail programs and services on account of their disabilities, including by housing them in units without dayrooms and denying them opportunities for outdoor recreation. The report also reported a range of serious physical plant problems that prevent people with disabilities from safely accessing the showers and other jail facilities.

180.     Sabot Consulting produced a nearly 500-page report detailing pervasive discrimination against people with disabilities in Defendant's jails.  The report documented major deficiencies in screening practices, major physical plant problems, serious denials of disability-related accommodations, improper housing of individuals with disabilities, and widespread denial of equal access to jail programming and recreation.

181.     Despite these highly detailed and extensive reports about serious and harmful shortcomings in the treatment of people with disabilities in Defendant's

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

jails, Defendant has failed to make necessary changes to its policies, practices, nad physical plant.

## VII. CLASS ACTION ALLEGATIONS

182. Plaintiffs MAYS, RICHARDSON, BOTHUN, LEE, BEIRGE, and GARLAND bring this action on behalf of themselves and on behalf of all people who are, or will be in the future, incarcerated in the Sacramento County jails, pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), and (b)(2).

183. All class members are at risk of harm due to the following policies and practices:

    a. Failure to provide minimally adequate medical, mental health, and dental care, including identification and monitoring of serious medical and mental health conditions, sufficient staffing levels, timely access to appropriate clinicians, medications, and treatment plans, effective suicide prevention practices, and the complete range of medical and mental health care services necessary to maintain health;

    b. Failure to provide basic human needs, including basic hygiene, physical exercise, fresh air, normal human contact, meaningful activity, and environmental stimulation to people in restrictive housing placements; and

    c. Failure to provide equal access of individuals with disabilities to programs, services and activities in the jails, the denial of health care appliances, assistive devices, durable medical equipment, and other reasonable accommodations, and the improper housing of individuals with disabilities in unnecessarily restrictive placements because of their disability.

184. There are questions of law and fact common to the Class, including whether Defendant, by its policy and practice of (a) denying individuals' basic human needs by locking them in their cells for 22 to 24 hours a day for indefinite

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

periods of time violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment; (b) locking people in restrictive housing cells due to untreated mental illness, past incarceration in restrictive housing, or victimization concerns, in the absence of immediate safety or security concerns, violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment; (c) locking people in restrictive housing without a hearing, written notice, an opportunity to defend themselves through witness or documentary evidence, or meaningful review of their placements, violates the Due Process Clause of the Fourteenth Amendment; (d) denying minimally adequate mental health, medical, and dental care violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment; (e) locking people with psychiatric disabilities and/or intellectual disabilities in restrictive housing or medical housing units based on their disabilities, violates the ADA, Section 504 of the Rehabilitation Act, and California Government Code § 11135; (f) denying people with disabilities reasonable accommodations, assistive devices, effective communication, and accessible housing violates the ADA, Section 504 of the Rehabilitation Act, and California Government Code § 11135; (g) failing to provide notice to people with disabilities about their rights under the ADA and a meaningful way to request accommodations or to challenge disability discrimination violates the ADA.

185.     Since there are thousands of Class members, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for Defendant.

186.     Plaintiffs' claims are typical of the Class, since their claims arise from the same policies, practices, and courses of conduct and their claims are based on the same theories of law as the Class's claims.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

187.     The Named Plaintiffs, through counsel, will fairly and adequately protect the interests of the class.  Plaintiffs do not have any interests antagonistic to the Plaintiff Class.  Plaintiffs, as well as the Plaintiff Class members, seek to enjoin the unlawful acts and omissions of Defendant.  Further, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

**Disabilities Subclass**

188.     The named Plaintiffs further bring this action on their own behalf and, pursuant to Rule 23(a), b(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all qualified individuals with disabilities, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), who are, or will be in the future, incarcerated in the Jail ("Disabilities Subclass").  All prisoners with disabilities who are incarcerated in the Jail are at risk of being discriminated against or denied access to programs, services, and activities offered at the Jail as a result of the policies and practices of Defendant.

189.     The Disabilities Subclass is so numerous that joinder of all members is impracticable.  The exact number of members of the Disabilities Subclass is unknown. According to data gathered by the United States Department of Justice's Bureau of Justice Statistics regarding the incidence of disabilities among individuals in jails, approximately 40% of Jail prisoners have one or more disabilities, suggesting an estimated 1,500 or more members of the Disabilities Subclass.  There are likely many hundreds of Sacramento County Jail prisoners who would be members of the Disabilities Subclass based on a mental health disability alone.  Defendant's mental health care consultant, found that approximately 19% of the jail population receive psychotropic medications, and that nearly 40% of the jail population are on the mental health caseload.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

190.     There are questions of law and fact common to the Disabilities Subclass, including whether Defendant violated the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and California Government Code § 11135.

191.     Defendant has acted and failed to act on grounds that apply generally to the Disabilities Subclass, so that final injunctive or corresponding declaratory relief is appropriate respecting the Disabilities Subclass as a whole.

192.     The claims of the named Plaintiffs are typical of the claims of the Disabilities Subclass, since their claims arise from the same policies, practices, and courses of conduct and his claims are based on the same theory of law as the Disabilities Subclass's claims.

193.     Plaintiffs, through counsel, will fairly and adequately protect the interests of the Disabilities Subclass.  Plaintiffs do not have any interests antagonistic to the Disabilities Subclass.  Plaintiffs, as well as the Disabilities Subclass members, seek to enjoin the unlawful acts and omissions of Defendant. Further, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**(Eighth Amendment – Cruel and Unusual Punishment, 42 U.S.C. § 1983)**

194.     Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

195.     By the policies and practices described herein, Defendant subjects Plaintiffs and the Class to a substantial risk of serious harm and injury from inadequate medical and mental health care, and deprive Plaintiffs and the Class of the minimal civilized measure of life's necessities and human dignity through the excessive and inappropriate use of solitary confinement and other restrictive

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

placements, thus violating Plaintiffs' rights to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

196.     These policies have been and continue to be implemented by Defendant and its agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity, and are the proximate cause of the Plaintiffs' and the Class's ongoing deprivation of rights secured under the Eighth Amendment.

197.     Defendant has been and is aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct. It should be obvious to Defendant and to any reasonable person that the conditions imposed on class members for many months or years cause tremendous mental anguish, suffering, and pain to such individuals.  Moreover, Defendant has repeatedly been made aware, through administrative grievances and written complaints, that class members are currently experiencing, or are at risk of, significant and lasting injury.

## SECOND CAUSE OF ACTION

**(Fourteenth Amendment – Cruel and Unusual Conditions, 42 U.S.C. § 1983)**

198.     Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

199.     By the policies and practices described herein, Defendant subjects Plaintiffs and the Class to a substantial risk of serious harm and injury from inadequate medical and mental health care, and deprive Plaintiffs and the Class of the minimal civilized measure of life's necessities and human dignity through the excessive and inappropriate use of solitary confinement and other restrictive placements, thus violating Plaintiffs' rights to due process under the Fourteenth Amendment to the United States Constitution.

200.     These policies have been and continue to be implemented by Defendant and its agents, officials, employees, and all persons acting in concert

under color of state law, in their official capacity, and are the proximate cause of the Plaintiffs' and the Class's ongoing deprivation of rights secured under the Fourteenth Amendment.

201.    Defendant has been and is aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.  It should be obvious to Defendant and to any reasonable person that the conditions imposed on class members for many months or years cause tremendous mental anguish, suffering, and pain to such individuals.

202.    In addition, Defendant violates the Fourteenth Amendment due process rights of prisoners who are awaiting trial or are civil detainees, and thus are not convicted of a crime, on the basis that the conditions of confinement amount to punishment, or alternatively, that Defendant made an intentional decision with respect to: (1) Plaintiffs and members of the Class's health care and (2) the conditions under which Plaintiffs and members of the Class are confined put them at substantial risk of suffering serious harm.  Defendant failed to take reasonable available measures to abate that risk, even though a reasonable actor in the circumstances would have appreciated the high degree of risk involved.

## THIRD CAUSE OF ACTION

### (Fourteenth Amendment – Procedural Due Process, 42 U.S.C. § 1983)

203.    Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

204.    Defendant's policy and practice of using indefinite and prolonged restrictive housing and other restrictive placements, such as T-Sep, subject Plaintiffs and the Class to a significant deprivation of liberty without any procedural safeguards.  Plaintiffs have a liberty interest in not being confined in a restrictive housing unit unless it is necessary to ensure the safety and security of staff and other individuals.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

205.     The conditions and the duration of Defendant's placement of Plaintiffs and Class members in restrictive housing and other restrictive placements constitute an atypical and significant hardship as compared with the ordinary incidents of jail life because of the harsh and isolated conditions and the lengthy duration of confinement in those conditions. People in restrictive housing and other restrictive placements, such as T-Sep, as compared to other individuals in the jail, have significantly less or no access to social interaction, environmental stimulation, programs and activities, physical exercise, personal property, hygiene products, sunlight, and fresh air.

206.     Because prolonged placement in restrictive housing and other restrictive placements constitutes a significant and atypical hardship, by the policies and practices described herein, Defendant has deprived Plaintiffs and class members of a liberty interest without due process of law by denying them: (1) a hearing with advance written notice before initial placement in restrictive housing or other restrictive placements, (2) the opportunity to present witnesses and documentary evidence, (3) written reasons for the decision, (4) counsel-substitute for illiterate or disabled individuals or in a case with complex issues, and (5) meaningful and timely periodic review of their continued long-term and indefinite detention in restrictive housing and other restrictive placements, and meaningful notice of what they must do to earn release, in violation of the Fourteenth Amendment to the United States Constitution.

207.     The costs to Defendant of providing such procedural safeguards would be minimal, and any such costs are outweighed by the great risk of erroneous deprivation of liberty that exists under Defendant's current policies and practices.

208.     The policies and practices complained of herein have been and continue to be implemented by Defendant and its agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity.

### FOURTH CAUSE OF ACTION

### (Americans with Disabilities Act, 42 U.S.C. § 12132 and 28 C.F.R. § 35.152(b)(1))

209.     Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

210.     By its policies and practices of discriminating against prisoners with disabilities, Defendant violates the Americans with Disabilities Act, 42 U.S.C. § 12132 and 28 C.F.R. § 35.152(b)(1) ("ADA").

211.     Defendant is a public entity as defined under 42 U.S.C. § 12131(1)(A).

212.     Plaintiffs MAYS, RICHARDSON, BOTHUN, LEE, BEIRGE, and GARLAND and members of the Disabilities Subclass have physical, psychiatric, or intellectual disabilities, and are qualified individuals with disabilities.  They have an impairment that substantially limits one or more major life activities, they have a record of such impairment, or they are regarded as having such an impairment. All people with disabilities in the jails meet the eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendant.  42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

213.     Defendant violates the ADA by failing to ensure that people with disabilities have access to, are permitted to participate in, and are not denied the benefits of programs, services, and activities provided by the Defendant, 42 U.S.C. § 12132; 28 C.F.R. § 35.152(b)(1).

214.     Defendant violates the ADA by failing to make "reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability. . . ."  28 C.F.R. § 35.130(b)(7)(i).

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

215.    Defendant violates the ADA by failing to "ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals.  28 C.F.R. § 35.152(b)(2).

216.    Defendant violates the ADA by failing to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities … an equal opportunity to participate in … a service, program, or activity of a public entity."  28 C.F.R. § 35.160(b)(1).

217.    Defendant violates the ADA by failing to notify people about their rights under the ADA while detained in its jails.  28 C.F.R. § 35.106.

218.    Defendant violates the ADA by failing to "adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by … [the ADA]."  28 C.F.R. § 35.107(b).

219.    As a result of Defendant's policies and procedures regarding individuals with disabilities in the jails, members of the Plaintiff class and Disabilities Subclass are unnecessarily placed in solitary confinement and other types of restrictive housing due to their disabilities; and are denied equal access to jail activities, programs and services for which they are otherwise qualified.

## FIFTH CAUSE OF ACTION

### (Section 504 of the Rehabilitation Act, 29 U.S.C. § 794)

220.    Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

221.    Plaintiffs MAYS, RICHARDSON, BOTHUN, LEE, BEIRGE, and GARLAND and members of the Disabilities Subclass are qualified individuals with disabilities as defined in Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

222.    Defendant received federal funding within the meaning of the Rehabilitation Act.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

223.     By its policy and practice of discriminating against and failing to reasonably accommodate prisoners with disabilities, Defendant violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

224.     As a result of Defendant's discriminating against and failing to provide a grievance procedure and reasonable accommodations, Plaintiffs MAYS, RICHARDSON, BOTHUN, LEE, BEIRGE, and GARLAND and members of the Disabilities Subclass do not have equal access to Jail activities, programs, and services for which they are otherwise qualified.

## SIXTH CAUSE OF ACTION
### (California Government Code § 11135)

225.     Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

226.     Defendant receives financial assistance from the State of California as part of Realignment Legislation, California Government Code §§ 30025, 30026, and 30029, and through other statutes and funding mechanisms.

227.     Plaintiffs MAYS, RICHARDSON, BOTHUN, LEE, BEIRGE, and GARLAND and members of the Disabilities Subclass are persons with disabilities as defined by California Government Code § 11135.

228.     Defendant denies Plaintiffs MAYS, RICHARDSON, BOTHUN, LEE, BEIRGE, and GARLAND and members of the Disabilities Subclass full access to the benefits of the Jail's programs and activities which receive financial assistance from the State of California and unlawfully subject Plaintiffs and members of the Disabilities Subclass to discrimination within the meaning of California Government Code § 11135(a) on the basis of their disabilities.

229.     Through their counsel and through grievances and other documentation submitted to the Jail, Plaintiffs MAYS, RICHARDSON, BOTHUN, LEE, BEIRGE, and GARLAND demanded that Defendant stop its

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

unlawful discriminatory conduct described above, but Defendant refused and still refuses to refrain from that conduct.

## PRAYER FOR RELIEF

230.     Plaintiffs and the Class and the Disabilities Subclass have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies and practices of the Defendant as alleged herein, unless Plaintiffs are granted the relief they request.  The need for relief is critical because the rights at issue are paramount under the Constitution of the United States, the ADA, and Section 504 of the Rehabilitation Act.

231.     WHEREFORE, Plaintiffs on behalf of themselves, the Class and the Disabilities Subclass they represent, request that the Court grant the following relief:

    a.  Declare the suit is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(1) and (b)(2);

    b.  Adjudge and declare that the conditions, acts, omissions, policies and practices of Defendant and its agents, officials, and employees are in violation of the rights of Plaintiffs, the Class, and the Disabilities Subclass they represent under the Eighth and Fourteenth Amendments to the U.S. Constitution, the ADA, and Section 504 of the Rehabilitation Act;

    c.  Enjoin Defendant, its agents, officials, and employees and all persons acting in concert under the color of state law or otherwise, from continuing the unlawful acts, conditions, and practices described in this Complaint;

    d.  Order Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to provide adequate mental health, medical, and dental care, including but not

limited to sufficient, timely, and confidential intake screening, triaging and responses to health care requests, access to appropriate clinicians, prescription and distribution of appropriate medications and supplies, access to chronic care and specialty care, access to adequate treatment, inpatient and outpatient mental health treatment, suicide prevention, and sufficient medical and mental health staffing;

e.   Order Defendant, its agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that Plaintiffs and members of the class suffer due to Defendant's policy and practice of locking people in their cells for 22 hours or more a day for prolonged or indefinite periods of time, to end the harmful practice of housing people with serious mental illness in solitary confinement conditions, to ensure that people are not housed in restrictive housing without a legitimate penological purpose, and to provide a meaningful opportunity to be heard and to challenge classification decisions resulting in restrictive housing or other restrictive placements;

f.   Order Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to provide equal access to programs, services, and activities for people with disabilities, including but not limited to housing people with physical disabilities in accessible housing appropriate to their needs, timely delivery of and appropriate access to assistive devices and medical supplies, housing people with disabilities in the least restrictive and most integrated settings appropriate to their needs, providing an effective grievance system to contest disability discrimination, and

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

notifying people with disabilities their rights under the ADA and
Section 504 of the Rehabilitation Act;

g. Award Plaintiffs, pursuant to 29 U.S.C. § 794, 42 U.S.C. § 1988, and
42 U.S.C. §§ 12205, 12133, and other applicable law, the costs of this
suit and reasonable attorneys' fees and litigation expenses;

h. Retain jurisdiction of this case until Defendant has fully complied
with the orders of this Court, and there is reasonable assurance that
Defendant will continue to comply in the future absent continuing
jurisdiction;

i. Appoint the undersigned counsel as class counsel pursuant to Federal
Rule of Civil Procedure 23(g); and

j. Award such other and further relief as the Court deems just and
proper.

Dated:  July 31, 2018                    Respectfully submitted,

/s/ Aaron J. Fischer
AARON J. FISCHER (SBN 247391)
Aaron.Fischer@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA 94612
Telephone: (510) 267-1200
Fax: (510) 267-1201

/s/ Margot Mendelson
(as authorized on 7/31/18)
MARGOT MENDELSON (SBN 268583)
MMendelson@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF