

*California's protection & advocacy system*
*Toll-Free (800) 776-5746*

# Report on Inspection of the Sacramento County Jail (Conducted April 13-14, 2015)

-   **Dated August 4, 2015**
-   **Revised October 15, 2015**

## EXECUTIVE SUMMARY

Disability Rights California (DRC) is the state and federally designated protection and advocacy agency charged with protecting the rights of people with disabilities in California.  DRC has the authority to inspect and monitor conditions in any facility that holds people with disabilities.  Pursuant to this authority, DRC is conducting inspections of conditions in six county correctional facilities in 2015.  One of these facilities is the Sacramento County Jail ("Jail"), which we inspected on April 13 and 14, 2015.  We appreciate that Sheriff Department staff were helpful and cooperative during our inspection.

We observed many positive practices and programs. Booking was efficient, with a private screening area and procedures to expedite intake for prisoners with acute medical or mental health needs. Health and mental health staff were engaged and followed up immediately on our concerns about individual prisoners. The Main Jail has mental health staff available 24 hours per day, 7 days per week due to the inpatient unit. The Main Jail and the non-dorm areas in Rio Cosumnes Correctional Center are of a podular design, with two tiers of cells opening on to a central dayroom. Custody staff was aware of an accessible route that avoided the stairs between the booking area in which buses unload in the Main Jail, and had also monitored compliance with lower bunk orders in Rio Cosumnes. The Sheriff's Department has a strong emphasis on education and re-entry that is apparent from its website.

However, we also found evidence of the following violations of the rights of prisoners with disabilities:

(a) Undue and excessive isolation and solitary confinement;
(b) Inadequate mental health care; and
(c) Denial of rights under the Americans with Disabilities Act (ADA).

Pursuant to our authority under 42 U.S.C. §10805(a)(1) and 29 U.S.C. § 794(f)(3) and as a result of this initial inspection, we find there is probable cause to conclude that prisoners with disabilities are subjected to abuse and/or neglect in the Sacramento County Jail. We are opening an investigation into the treatment of prisoners with disabilities and will be requesting additional documents and information. We are also interested in meeting with you to discuss these findings and the next steps in our investigation.

## Background

The Sacramento County Jail currently houses approximately 4300 prisoners in two facilities – the Main Jail and Rio Cosumnes Correctional Center. When the Main Jail was completed in 1989, its 1250 cells were intended to hold single prisoners with a rated capacity of 1625. Later, these single cells were converted to double cells and the rated capacity increased to 2400 prisoners.[1] In 1989, a federal court set a population cap of 2432 for the Main Jail.

Rio Cosumnes Correctional Center ("RCCC") consists of some newer podular buildings and older dormitories dating to the 1960s. RCCC has a rated capacity of 1,625 prisoners but its actual census has

---

[1] Sacramento County Office of Inspector General, Jail Operations Audit, September 2009, p. 26-27, available at http://www.inspectorgeneral.saccounty.net/Documents/sac_020670.pdf. "Return to Main Document"

ranged from the current level of 1900 to as high as 2400 prisoners. Sentenced prisoners are primarily housed at RCCC but can also be housed in the Main Jail.  Pre-trial detainees may also be housed in RCCC to comply with the population cap in the Main Jail.

Following the implementation of AB 109 in 2011, prisoners may be sentenced to California jails for years at a time.  A recent report found that by late 2014, the number of prisoners housed in county jails serving sentences of more than five years has skyrocketed due to AB 109.[2] Sacramento County is no exception.  In late 2014, between 1700 and 1900 (about 40% of the total) prisoners in the Sacramento Jail were there because they had been sentenced, with jail terms ranging from several months to as long as eight years.[3]

## FINDINGS RE: ABUSE AND/OR NEGLECT OF

## PRISONERS WITH DISABILITIES

Based on our monitoring visits on April 13 and 14, 2015, review of records and documents accessed, as well as review of other public documents, we found the following evidence of abuse and neglect in Sacramento County Jail.

1. **Excessive use of Isolation and Solitary Confinement**

---

[2]Public Policy Institute of California, "California's County Jails," available from http://www.ppic.org/main/publication_show.asp?i=1061. "Return to Main Document"

[3] California Board of State and Community Corrections, Jail Profile Study, http://www.bscc.ca.gov/downloads/2014_3rd_Qtr_JPS_Full_Report.pdf; Sacramento County Grand Jury 2012-2013 Report, p. 44 (under AB 109, prisoners at RCCC began serving sentences of 18 months to 8 years), available from  http://www.sacgrandjury.org/reports/12-13/2012-2013-Report.pdf.  "Return to Main Document"

Isolation and solitary confinement in correctional facilities are generally considered to be situations in which prisoners are held in their cells, alone or with a cellmate, for 22 to 24 hours per day.[4] Prisoners may be held in isolation because they are classified as maximum security, are in administrative segregation or Protective Custody, or subject to short-term discipline.  In contrast, prisoners in general population typically are locked in their cells only during sleeping hours, and are in dayrooms, activities or recreation areas during waking hours.

Even a short stay in conditions of extreme isolation is likely to worsen prisoners' mental health symptoms, causing them "to lapse in and out of a mindless state" or "semi-fatuous condition" at a heightened risk for suicide.  *See Davis v. Ayala*, 576 U.S. ___, No. 13-1428, 2015 WL 2473373, at *20 (U.S. June 18, 2015) (Kennedy, J., concurring). Consequently, correctional facilities should place prisoners in isolation only when security conditions permit no alternative.[5] Prisoners with mental health problems are especially harmed by prolonged isolation (defined as a duration of more than three to four weeks).[6] Many state

---

[4] For support for this accepted definition of isolation, *see, e.g.,* U.S. Department of Justice, Investigation of State Correctional Institution at Cresson, May 13, 2013, Attachment #7, p. 5, available at http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf ("terms 'isolation' or 'solitary confinement' mean the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others. … An isolation unit means a unit where either all or most of those housed in the unit are subjected to isolation."); *Wilkinson v. Austin*, 545 U.S. 209, 214, 224 (2005) (describing solitary confinement as limiting human contact for 23 hours per day); *Tillery v. Owens,* 907 F.2d 418, 422 (3d Cir. 1990) (21 to 22 hours per day). "Return to Main Document"

[5] Metzner J.L., Fellner J., "Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics," J Am Acad Psychiatry Law 38:104–8, 2010, Attachment #2.  "Return to Main Document"

[6] American Psychiatric Association, Position statement on segregation of prisoners with mental illness (2012), Attachment #4, available from

correctional systems, including those in California, Illinois, Massachusetts, Ohio and Pennsylvania, have adopted policies to ensure that prisoners with mental illness are excluded from isolation and solitary confinement.[7]

We observed widespread overuse of isolation throughout the Sacramento Jail. Conditions in isolation units in the Jail were characterized by inadequate exercise, extreme social isolation and inadequate mental health monitoring. Many prisoners and many categories of prisoners were locked in small cells alone or with a cell-mate for 22 to 24 hours per day.  We observed this in the Main Jail in pods on the 4th and 8th floor and in pods throughout RCCC. This isolation occurs in areas that were designed to permit indirect supervision and easy access to dayrooms for most of every day,[8] but are instead operated to restrict prisoners to small cells for extended periods.

---

http://www.psychiatry.org/File%20Library/Learn/Archives/Position-2012-Prisoners-Segregation.pdf. *Accord*, Society for Correctional Physicians, "Restricted Housing of Mentally Ill Inmates, Position Statement," July 9, 2013, Attachment #5, avaiable from http://societyofcorrectionalphysicians.org/resources/position-statements/restricted-housing-of-mentally-ill-inmates ("prolonged segregation of inmates with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment.")  "Return to Main Document"

[7] Metzner J.L., Dvoskin J.A., "An Overview of Correctional Psychiatry," Psychiatr Clin North Am 29:761–72 (2006), Attachment #1. *See also,* U.S. Department of Justice, "Investigation of the Pennsylvania Department of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities," February 24, 2014, Attachment #8, http://www.justice.gov/crt/about/spl/documents/pdoc_finding_2-24-14.pdf. "Return to Main Document"

[8] See Attachment #10, photographs of the Sacramento Main Jail Pods, 1989, available from http://www.inspectorgeneral.saccounty.net/Documents/sac_023929.pdf; http://www.inspectorgeneral.saccounty.net/Documents/sac_026412.pdf. "Return to Main Document"

The widespread use of isolation in the Sacramento Jail affects prisoners with mental illness in at least two ways.  First, the Jail makes no attempt to screen and exclude prisoners with mental illness from isolation conditions in administrative segregation, protective custody and maximum security.  Second, the housing areas specifically set aside for prisoners with mental illness are operated as isolation units, in which conditions are more solitary than in many maximum security and supermax facilities.

*ISOLATION IN MAXIMUM SECURITY AND ADMINISTRATIVE SEGREGATION.*

Prisoners are held in isolation if they are given a classification status of maximum security using the Northpointe classification system common to many jails, or if they are determined to be at risk of assault by or upon other prisoners and classified as Administrative Segregation, Protective Custody or Total Separation.  Once assigned to isolation units for these reasons, prisoners have no clear means to work their way into less restrictive housing,[9] and thus may remain in isolation for the duration of their jail stay.

Prisoners with mental illness are not excluded from these isolation conditions, although this is the recommended practice.[10] In fact, during

---

[9] See Report from MGT of America, "ICE Detention Standards Compliance Review," Dec. 12, 2009, pps 6, 9, 56, Attachment # 11 (no notice of classification status or how to appeal this). "Return to Main Document"

[10] See Metzner J.L., Dvoskin J.A., "An Overview of Correctional Psychiatry," Attachment #1. A recent agreement between the Department of Justice and a county jail in Georgia provides that segregation "shall be presumed contraindicated" for inmates with serious mental illness. If an inmate has a "serious mental illness" or other acute mental health contraindications to segregation, that inmate "shall not remain in segregation absent extraordinary and exceptional circumstances." MOA Between the U.S. Department of Justice and Columbus, Georgia Regarding the Muscogee County Jail, January 16, 2015, Attachment #9, available from

our inspection, custody staff volunteered that 30% of the prisoners in Maximum Security, Total Separation and Protective Custody pods in the Main Jail also had mental illness and were taking psychotropic medication.[11]  In interviews, several prisoners in a Total Separation pod confirmed that they have a serious mental illness.

Custody staff reported the following schedules for out-of-cell time in segregation housing areas:

- In Maximum Security and Protective Custody areas, the most generous out-of-cell program described by custody was an hour in the dayroom in the morning, 90 minutes in the afternoon. Other than a scheduled three hours of outdoor recreation once per week, prisoners spend the remaining 21.5 hours per day locked down in their cells, sometimes with a cellmate;
- In Total Separation areas, custody stated that prisoners were allowed out of their cells for 30 minutes daily.  The remaining 23.5 hours per day were spent locked down in their cells, other than outdoor recreation for an hour per day, three times per week.

Significantly, every prisoner in isolation units whom we interviewed reported that he received far less than the out-of-cell time reported by custody and only inconsistently received access to outdoor exercise each week, if at all. Earlier reports on conditions in the Sacramento Jail

---

http://www.justice.gov/crt/about/spl/documents/muscogee_moa_1-16-15.pdf. "Return to Main Document"

[11] The Sacramento County Grand Jury recently described these classification categories and reported that one third of the prisoners in the jail have mental illness. Grand Jury Report, 2013-2014, pps 48-49, available from http://www.sacgrandjury.org/reports/13-14/2013-2014-Report-CF.pdf. "Return to Main Document"

contained similar observations about the lack of out-of-cell time and outdoor recreation.[12]

Conditions in all of the isolation units are very austere, with extended, enforced idleness. Prisoners report that lights are left on constantly for days at a time. Prisoners receive their meals through a slot in their solid cell doors and eat alone in their cells. They are not permitted to have televisions or radios in their cells.  Generally, the central day-rooms have a large television, but most prisoners cannot see or hear these when locked in their cells.  Sentenced prisoners in isolation units may not leave their cells to participate in the vocational and educational programs available to other sentenced inmates.

Some prisoners in the maximum security and administrative segregation pods are housed alone, but others are held with a cell-mate. Conditions for these prisoners are especially difficult because they are confined in close quarters with a stranger (who may also have mental illness), while simultaneously deprived of access to programming, meaningful forms of social interaction and distractions such a television or radio. Since all the cells in the Main Jail were originally designed to hold only a single prisoner, they are small for two people by any measure.[13]

---

[12] See MGT of America report, Attachment # 11, p. 29 (jail population in Ad Seg and other special management housing "does not routinely receive outdoor recreation"); Sacramento County Grand Jury Report, 2010-2011, p. 5 (warning that prisoners are allowed out of their cells for only three hours per week "due to limited staff. This presents a potential 'boil-over' situation. Assaults among inmates are increasing."), available from http://www.sacgrandjury.org/reports/10-11/2010-2011%20Report.pdf. "Return to Main Document"

[13] See note 1, supra, and 2010-2011 Grand Jury Report, p. 17. http://www.sacgrandjury.org/reports/10-11/2010-2011%20Report.pdf.  "Return to Main Document"

The Sacramento Jail's practice of double-celling prisoners in isolation may have contributed to the death of a prisoner in protective custody in December 2014.[14] The victim's cell-mate had bipolar disorder and has been charged with the murder, according to news reports.  The cell-mate had earlier complained to custody staff that the victim – a registered sex offender who also had mental illness – was harassing him and soiling his clothes and their cell and that if they did not move his cell-mate, "he's going to get beat up."[15]  Custody staff took no action, and the second prisoner was found dead the next day.

## ISOLATION AND MENTAL HEALTH UNITS

The Jail has designated areas in the Main Jail and RCCC as special housing for prisoners with mental illness who are stepping down from suicide watch or the inpatient unit, or are deemed unable to function in general population.  Custody has elected to operate these housing units as isolation housing, in which prisoners have even less out-of-cell time than in maximum security units. According to custody, this occurs because the mentally ill prisoners on the unit have different security classifications, so deputies will not let an entire tier into the dayroom together for showers and telephone. Because only a few prisoners of the same classification level are let out at the same time, out-of-cell time for prisoners with mental illness is reduced to 60 to 90 minutes per day. In interviews, prisoners stated that they customarily had far less than this, with reports of no out-of-cell time (and thus, no showers or telephone) for three days at a time, and of getting one hour

---

[14] Sacramento Bee, "Two Inmates Killed in Separate Incidents at Sacramento County Jail," March 8, 2015, http://www.sacbee.com/news/local/crime/article13048712.html, accessed April 17, 2015.  "Return to Main Document"

[15] *Id.*  "Return to Main Document"

of dayroom time every other day at 8 pm or 9 pm, which is too late to call legal representation.

In the Outpatient Psych Pod in the Main Jail and in the mental health pods in RCCC, prisoners reported that they rarely get outdoor recreation, and are provided recreation as seldom as once per month, or even once every few months.  The claims are credible in light of reported custody practices.  Custody staff in the mental health pod that we observed in RCCC confirmed that they do not schedule regular recreation times for prisoners on the unit.  Custody stated that prisoners could request outdoor recreation, but in interviews, prisoners denied any knowledge of this procedure. Other custody staff stated that prisoners declined outdoor recreation when it was offered. In interviews, prisoners stated that when they were offered recreation in early morning or very late at night, they would decline because it was too cold and dark.

In addition to the Outpatient Psych Pod, the Main Jail has an 18 bed inpatient mental health unit, in which the conditions of isolation were especially disturbing.  The unit is devoid of stimulation and without essential mental health treatment.  Cells are bare, with only a combination sink/toilet and a steel bed with a thin mattress.  The steel bed has tie-off points that create an unreasonable risk of suicide.  A steel door facing the dayroom or hallway has a small window and a food-port.  These otherwise featureless rooms have no chairs or desks, and many lack any natural light.  There is no programming or television, and staff report letting the prisoners out of their cells for dayroom only once or twice per week.[16]  The dayroom, which was dirty and stunk of feces

---

[16] Compare, Position Statement from Society for Correctional Physicians, Attachment #5 ("Inmates who are seriously mentally ill should be either excluded from prolonged segregation status (i.e. beyond 4 weeks) or the conditions of their confinement should be modified in a manner that allows for adequate out-of-cell structured therapeutic activities and adequate time in an appropriately designed outdoor exercise area.") "Return to Main Document"

during the tour, is itself largely featureless with only a round bench in the middle, and there are no recreational activities provided. Prisoners are not released from their cells for clinical contacts.  Instead, clinicians speak through the food-port, preventing face-to-face contact and confidentiality.  This is not mental health treatment and does not provide a therapeutic environment. Indeed, during the DRC tour, a prisoner—celled in what staff said was a medical bed portion of the unit, where conditions were indistinguishable from those of the mental health beds—tried to commit suicide by submerging his head in a toilet. Prisoners remained in bed in their cells throughout the tour, other than a shirtless youth who was pressed against the cell window, crying and ignored by staff; a sense of despair hung over the unit.

## 2. <u>Inadequate Mental Health Care</u>

Under the U.S. Constitution, there are "six basic, essentially common sense, components of a minimally adequate prison mental health care delivery system."  *Coleman v. Brown*, 938 F. Supp.2d 955, 970 (E.D. Cal. 2013). The components are: screening, staffing, recordkeeping, medication, suicide prevention, and "a treatment program that involves more than segregation and close supervision of mentally ill inmates." *Id.* at 970 n. 24; *Balla v. Idaho State Board of Corrections,* 595 F. Supp. 1558, 1577 (D. Idaho 1984); *Ruiz v. Estelle,* 503 F. Supp. 1265, 1339 (S.D.Tex.1980).  The jail must address the negative effects of housing in harsh segregated environments (*Coleman,* 938 F. Supp.2d at 979–80), and provide "treat[ment] in an individualized manner" for mental disorders. *Id.* at 984.  Treatment must have the goal of "stabilization and symptom management." *Madrid v. Gomez*, 889 F. Supp. 1146, 1222 (N.D. Cal. 1995).

The mental health treatment provided in the Sacramento Jail does not meet these constitutional minimums, nor does it ameliorate the harsh isolation conditions in which prisoners are confined.  The prisoners we interviewed described multiple suicide attempts, long delays in receiving medication and that repeated requests to see a psychiatrist were often ignored.

Mental health staff report that they do not offer group or individual counseling and therapy, even in the Outpatient Psych Pod and areas set aside in the RCCC for mental health housing. Outpatient mental health care appears consists solely of medication management and what staff described as "brief supportive contact" at cell-front or in dayrooms. The absence of any structured out-of-cell therapeutic activities violates minimum standards of care for prisoners with mental illness. For example, the National Commission on Correctional Health Care provides that "[r]egardless of facility size or type, basic on-site outpatient [mental health] services include, at a minimum, … individual counseling, group counseling and psychosocial/psychoeducational programs." Standards for Health Services in Jails (2014), Standard J-G-04, Attachment #3.[17]

Some of the other disturbing conditions we observed were:

- Suicide gowns are used as "long-term" clothing for prisoners in the Outpatient psych pod; and
- Custody staff appear to rely heavily on restraint chairs to manage prisoner behavior.[18]

---

[17] See also APA Position Statement on Segregation of Prisoners with Mental Illness," Attachment #4 ("If an inmate with serious mental illness is placed in segregation, out of cell structured therapeutic activities (i.e., mental health/psychiatric treatment) in appropriate programming space and adequate unstructured out of cell time should be permitted."); Muscogee County Jail Agreement, Attachment #9, p. 12 – 13 (Prisoners with mental illness "shall be offered a minimum of (i) at least 10 hours of out-of-cell structured time each week" including a schedule of individual or group therapeutic treatment).  "Return to Main Document"

[18] This finding is based on staff report and is consistent with an earlier report that restraint chairs were used several times per week during some time periods. MGT of America Review, Attachment #11, p. 5 (restraint chair used 26 times in a three month period). "Return to Main Document"

At both jail facilities, mental health staff were clear that they did not make regular rounds of any segregation areas, including the outpatient psych pods or other isolation units. In monitoring prisoners' mental health status, staff stated that they rely primarily on "kites" that prisoners give to custody staff, who then forward the requests to medical or mental health. Mental health staff also stated that they are on the mental health units in both jails every day.

As we discuss below, relying primarily on requests transmitted via custody officers violates confidentiality and may lead to drastic underreporting of prisoner need.  Instead, prisoners must be able to give their health and mental health care requests directly to health care staff, or place their requests in a locked box; custody should not be responsible for/involved in collecting requests. In addition, the Jail has no real-time means to tell whether kites that make it through to mental health staff have been addressed in a timely manner. Mental health staff stated that a report on overdue responses to kites could be run, but that they do not do so on a regular basis.[19]

The absence of regular mental health rounds for the Outpatient Psych Pod and other isolation units violates accepted standards of care.[20] Even assuming that the Jail had a confidential and timely procedure for requesting mental health assistance, an adequate mental health care system cannot rely on requests alone and must include

---

[19] This is consistent with findings by the Grand Jury about the absence of reliable data regarding timely response to medical requests generally. Grand Jury 2005-2006 Report, http://www.sacgrandjury.org/reports/05-06/GJReport2005-2006.pdf.  The Grand Jury also raised concerns, which we share, about the ability of medical and mental health staff to adequately triage requests for care.  "Return to Main Document"

[20] For example, the 2009 MGT Report found the Jail out of compliance with a federal requirement that prisoners in Administrative Segregation have rounds from a medical professional three times per week. Attachment #11 at page 65. "Return to Main Document"

regular rounds, especially of isolation and segregation units. The National Commission on Correctional Health Care addresses the need for regular rounds in segregation. For "inmates who are segregated and have limited contact with staff or other inmates," the Commission recommends documented monitoring rounds three times per week. Standard J-E-09 (2), Attachment #3.  *Accord*, Metzner J.L., Dvoskin J.A., "An Overview of Correctional Psychiatry," Attachment #1.

### 3. <u>Denial of Rights under the Americans with Disabilities Act</u>

Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Jails and prisons are subject to the prohibitions and protections in Title II. *Pierce v. County of Orange*, 526 F.3d 1190, 1214 (9th Cir. 2008) (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998).  In correctional settings, the ADA protects participation in jail programs, services and activities including the ability to safely use personal hygiene services such as toilets and showers, to engage in activities such as ambulation and exercise, and participate in programs such as visitation, educational classes, religious services, and inmate worker programs on the same basis as non-disabled prisoners.

In 2010, the Department of Justice issued a new regulation specifically addressing the "nondiscrimination and program access obligations" of a correctional facility. 28 C.F.R. § 35.152, effective <u>March 15, 2011.</u>[21]  This regulation provides in part that "[p]ublic entities shall

---

[21] U.S. Department of Justice, Notice re: Final Regulations implementing Title II of the ADA, 75 Fed. Reg. 56164, 56218-56223 (2010), Attachment #6, also available at <u>http://www.ada.gov/regs2010/titleII_2010/titleII_2010_regulations.htm#a2010guidance</u>. <u>"Return to Main Document"</u>

implement reasonable policies, including physical modifications to additional cells in accordance with the 2010 Standards, so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing." 42 C.F.R. § 35.152(b)(3).  Justice Department commentary on this regulation makes clear that it concerns the *program access* obligations of a correctional facility, which do not depend on the date of construction, as opposed to requirements for architectural accessibility, which are tied to the date of construction or modification.[22]

*Segregation of Inmates with Disabilities*

In the Sacramento Jail, it is policy to place prisoners with physical disabilities and mobility impairments in single cells in the medical area in 2 East 100, an area in which prisoners have no regular access to a day room or outdoor recreation. Housing prisoners in the infirmary solely because they use assistive devices, as the jail appears to do, is not an effective use of medical resources.

Housing prisoners with disabilities in the infirmary also violates 28 C.F.R. §135.152 (b)(2), which requires correctional facilities to "ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals." The regulation expressly prohibits a jail from "plac[ing] inmates or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment," unless certain limited exceptions are present.  To resolve this problem, DOJ emphasized the importance

---

[22] *Id.*, 75 Fed. Reg. at 56218-56223, Attachment #6. "Return to Main Document"

of dispersing accessible cells throughout a facility and correctional system.  75 Fed. Reg. 56219 (2010).[23]

As noted above, the Jail also segregates prisoners with mental illness in isolation units in which they have less access to outdoor recreation, out-of-cell time and programming than non-disabled prisoners.  According to the Department of Justice, such a practice of isolating prisoners on the basis of their mental illness constitutes impermissible discrimination under the Americans with Disabilities Act "where it unjustifiably denies those prisoners access to services and programs provided to most other prisoners."[24]

*Toilet and Shower Areas*

The toilet and shower areas in the medical area of the Main Jail do not meet architectural standards for wheelchair use, and lack properly placed grab bars, shower heads, etc.[25]  In interviews, prisoners said they

------------------------------------------------

[23] For example, veterans who use wheelchairs cannot participate in the special "Honor Dorm" in RCCC, even if they meet other criteria for acceptance into this much lauded program, because it has no ADA accessible cells. "Return to Main Document"

[24] U.S. Department of Justice, "Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation," May 31, 2013, Attachment #7, available from http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf. "Return to Main Document"

[25]  We are happy to provide you with copies of DOJ publications on accessibility standards for correctional facilities, which can also be obtained online:  ADA/Section 504 Design Guide: Accessible Cells in Correctional Facilities, available from http://www.ada.gov/accessiblecells.htm and the ADA standards for Accessible Design that specify the requirements for an accessible shower, §§ 603.1 to 610.4; acceptable reach ranges for fixtures, § 308, and accessible faucet and handle types, § 309.4. http://www.ada.gov/regs2010/2010ADAStandards/2010ADAstandards.htm#sec805. "Return to Main Document"

were afraid of falling in the bathroom and shower, had requested assistance from jail staff and been refused this help, and that some prisoners had already fallen because of unsafe conditions in the shower area. Segregating prisoners with disabilities in the medical area without ensuring safe access to sanitary facilities violates 28 C.F.R § 35.152(b)(2).

*ADA Coordinator*

The ADA regulations require the Jail to have an ADA coordinator. 42 C.F.R. § 35.106.  The coordinator's role is "to ensure that individuals dealing with large agencies [such as the Sheriff's Department] are able to easily find a responsible person who is familiar with the requirements of the [ADA and the DOJ regulations] and can communicate those requirements to other individuals in the agency who may be unaware of their responsibilities."  *Appendix A to Part 35*, 28 C.F.R. at page 568. We saw no evidence of an ADA coordinator in the Jail. When questioned, staff were unaware of such a position and could not identify any particular individual responsible for arranging accommodations.  We conclude that the Jail does not have an ADA coordinator and is not in compliance with this requirement.

*Notice of Rights and Complaint Procedure*

The Jail also has an obligation to provide notice to prisoners of their rights under the ADA (28 C.F.R. § 35.106), and must have an ADA complaint procedure by which prisoners with disabilities may contest any disability-based discrimination or violation of the ADA. 28 C.F.R. § 35.107(b). The complaint procedure must provide for "*prompt and equitable* resolution of complaints alleging any action that would be prohibited by [the ADA regulations.]." § 35.107(b) (emphasis added). The Jail's designated ADA coordinator is responsible for investigating complaints submitted through this process. § 35.107(a).

Custody staff provided us with a copy of the Sacramento County Main Jail Inmate Handbook, which is 66 pages and supposedly "contains

information about some of the services available to you, and what you have to do to obtain or benefit from these services." However, this handbook did not mention rights under the ADA or how to submit an ADA complaint. This omission violates the notice requirement in 28 C.F.R. § 35.106, as well as making the ADA complaint system effectively unavailable.  Not surprisingly, in interviews, prisoners were unfamiliar with any procedure for requesting accommodations for their disabilities.

By report, the Jail does not have an ADA complaint system, and its existing grievance system cannot substitute because it does not meet the ADA requirements. In the Main Jail we saw no boxes in which to place completed requests or grievances. There were request boxes in RCCC but no grievance boxes. Custody stated that prisoners would give them a "kite," and they would "try to resolve the issue at the lowest possible level" rather than communicating the request or complaint to a supervisor.[26] This means that neither prisoners nor jail administration have a record of how custody responds to their requests and grievances.

We did not have an opportunity to review the Jail's substantive policies regarding prisoners with disabilities. However, we have concerns about what these will reveal because staff appeared to be untrained in how to respond to disability issues in general.  Asked about accommodations for prisoners who are deaf or hard of hearing, staff said that they had never seen a deaf person in the jail, and did not know how to locate an American Sign Language (ASL) interpreter if needed, but thought that a custody officer might know ASL. In addition, the Inmate

---

[26] The Inmate Handbook for the Main Jail confirms this practice.  Prisoners are to "file the completed [grievance] form with the housing unit officer." P. 12-13. The Sheriff's Department order regarding grievances states that "grievances shall not be discarded" even if resolved. However, in light of prisoners' reports that they frequently receive no response to their requests and complaints, jail management has no effective means to assess compliance with this policy. "Return to Main Document"

Handbook (pg. 21) states that hearing aids or hearing aid batteries are not provided, and medical staff reported there is no contract with an audiologist for these services.

Medical staff were unable to describe any procedure to obtain disability accommodations for a prisoner, other than requests for a lower bunk. In interviews, prisoners described how they were given jail-issued wheelchairs without brakes and were refused staff assistance in bathing, and with writing requests and kites.[27] The Inmate Handbook (at pg. 21) confirms the Jail's policy of categorically denying items such as special shoes and extra clothing and linen, without permitting any exception for disability-related needs. We will continue to investigate this issue in the future.

More generally, the ADA regulations require the Sheriff's Department to conduct a self-evaluation of its services, policies and practices to determine whether they meet the requirements of the ADA. 28 C.F.R. § 35.105(a).  Since the Jail has more than 50 employees, it was also required to complete a Transition Plan by July 1993, detailing the steps and timeline it will take to achieve compliance with the ADA. Although the deadline to complete a self-evaluation and transition plan is long past, this is a continuing obligation and public entities that missed this deadline are not exempt from compliance. Reviewing policies and procedures is one part of the self-evaluation required by §35.105(a).

### 4. **Other Areas of Concern, Including Medical and Dental Care**

   a. Floor sleeping and Overcrowding

---

[27] MGT of America Report, Attachment #11, p. 16 (no information about "how detainees may obtain … special assistance if illiterate, <u>disabled</u> or non-English speaking during the grievance process") (emphasis added).  "Return to Main Document"

In the Main Jail in the medical unit and inpatient psych unit, we saw prisoners who did not have a bunk or a boat and had only mattresses on the floor.  A county audit in 2009 also noted that although the census in the Main Jail is 2400 prisoners, "the design and infrastructure for this facility call for housing just over 1,200 inmates. The problem is that staffing levels and facility infrastructure (kitchen, medical facilities, day rooms, holding tanks, plumbing, etc.), for the most part, still reflect the original design intent of around 1,200 inmates. This greatly compounds the challenges associated with operating the Main Jail."[28]  Also, the Sacramento Grand Jury has reported on overcrowded conditions and low staffing levels in RCCC, which it described as "jam-packed."[29] Unlike the Main Jail, which is subject to a population cap of 2432 set by the federal court, RCCC has no population cap.

> b.  Request and Complaint Process

The Jail does not have a confidential, reliable request and complaint process.  In addition to the ADA concerns described above, we have questions about timely responses to medical and mental health kites, and about confidential reporting of deputy misconduct.

> c.  Inmate Handbook

The Main Jail has an inmate handbook that explains inmate rights, how to request medical and dental care, PREA, confidentiality, discipline, visiting, canteen, etc. An earlier review also noted the inadequacies in the handbook as regards appeals and prisoner rights.[30]

---

[28] Office of Inspector General, 2009 Jail Operations Audit, note 1, *supra*, page 26. "Return to Main Document"

[29] 2013-14 Grand Jury Report, p. 41, available from http://www.sacgrandjury.org/reports/13-14/2013-2014-Report-CF.pdf.  "Return to Main Document"

[30] MGT of America Review, Attachment #11, pps 18, 24. "Return to Main Document"

According to Custody staff, the handbook is provided to prisoners with their clothing and bedroll at booking.  However, no prisoners with whom we spoke recalled having received this handbook, and RCCC did not have a comparable handbook available for our review.

      d.  Dental Care

The Jail has a dental service in both facilities that provides extractions and treats dental infection. The Jail does not offer dental cleanings, periodontal care or dental floss; for sentenced prisoners with months or years to serve, this practice violates standards of care. Jail staff stated that the dentists will provide restorative dental care on a "case by case" basis to prisoners sentenced to the Jail for a long period under AB 109.  Such a policy is not transparent and fails to offer prisoners information about their options and their right to appeal if dental care is denied.

      e.  Medical Care for Chronic Conditions and Disabilities

In interviews, prisoners complained about poor care for diabetes and other chronic conditions.  The medical staff at RCCC conceded that they "struggle" to provide care for chronic conditions and plan to develop policies for long-term management of conditions such as asthma, diabetes, hypertension, and hyperlipidemia.  Prisoners also stated that they were denied access to physical therapy, even when medically necessary and/or prescribed by an outside physician.  Since physical therapy is part of a normal continuum of care, the Jail must either hire or contract with a physical therapist to treat prisoners in the jail or take prisoners to providers in the community when medically necessary.

# SUMMARY OF INITIAL RECOMMENDATIONS[31]

**1. Isolation**
   a. Increase out-of-cell time and ameliorate isolation conditions in Administrative Segregation, Protective Custody, Total Separation, Maximum Security and mental health housing.
   b. Exclude prisoners with mental illness from any isolation settings.
   c. Develop a system to continuously monitor compliance with standards for out-of-cell time and outdoor recreation.

**2. Mental health Treatment**
   a. Provide regular mental health rounds and offer structured therapeutic activities and unstructured out of cell time in mental health housing areas.
   b. Reduce reliance on restraint chair, suicide gowns and isolation as means to address disability-related behavior.
   c. Schedule regular rounds to check on all prisoners in isolation housing.
   d. Develop a more effective therapeutic environment in the inpatient psych unit.
   e. Develop a confidential system for prisoners to submit requests for mental health treatment directly to health care staff, and implement a monitoring and tracking system to ensure those requests received timely and appropriate

---

[31] The Sacramento County Sheriff's Office provided DRC responses to these initial recommendations prior to the public release of this report.  Those response are included in the Appendix, infra. "Return to Main Document"

responses.

**3. ADA**
    a. Add wheelchair accessible cells in different classification and housing areas, including the honor dorms at RCCC.
    b. Ensure that prisoners with physical, sensory and mental health disabilities have access to the full range of jail programs and activities, including all vocational and education programs RCCC.
    c. Appoint an ADA coordinator, establish an effective ADA complaint system, conduct a self-evaluation and develop a Transition plan to achieve ADA compliance.
    d. Develop informational materials for prisoners with disabilities about how to request accommodations.

# APPENDIX

Sacramento County Sheriff's Department

Correctional Services

Response to Disability Rights California initial recommendations

**1. Isolation**

a.  <u>Increase out-of-cell time and ameliorate isolation conditions in Administrative Segregation, Protective Custody, Total Separation, Maximum Security and mental health housing.</u>

**The Sacramento County Sheriff's Department responds as follows:**

The maximum amount of recreation time a housing unit can offer without negatively impacting the security, floor and daily operations will be explored for **<u>all</u>** classification of inmates. The current Operations Order will be amended to include any operational changes. We are still awaiting a list of consultant experts to be provided by DRC as discussed and open to implementing reasonable suggestions.

b.  <u>Exclude prisoners with mental illness from any isolation settings.</u>

**The Sacramento County Sheriff's Department responds as follows:**

The above changes will include Out-Patient Psych inmates.

c.  <u>Develop a system to continuously monitor compliance with standards for out-of-cell time and outdoor recreation.</u>

**The Sacramento County Sheriff's Department responds as follows:**

Outdoor recreation and dayroom activities are noted in the control room log book by control room officers. The log books are checked twice a shift by a sergeant and once by a lieutenant. The Operations Order pertaining to the monitoring of out of cell time and outdoor recreation will be amended to add that a watch commander or acting watch commander will be required to check the log books to ensure compliance with inmate out of cell time or outdoor recreation. We are currently looking at the feasibility of electronically departing inmates on dayroom/outdoor recreation in our current JIMS system.  This would allow additional reports to be generated to account for recreational time. The reports will further assist in the monitoring of recreational activities. We are also releasing an RFP this month for a new JIMS system that will include reports for monitoring dayroom and outdoor recreation activities along with the routine scheduling of these functions.

**2. Mental health Treatment**

    a. <u>Provide regular mental health rounds and offer structure therapeutic activities and unstructured out of cell time in mental health housing areas.</u>

## The Sacramento County Sheriff's Department responds as follows:

Jail Psychiatric staff is required to meet with all inmates to diagnose any mental health issues. Based upon the inmate's diagnosis, medications administered for treatment and the medical assessment of the inmate, will dictate the level of care each inmate receives. We are currently working on increasing the amount of out of cell time for those inmates in the outpatient mental health housing areas. We are exploring the costs and requirements for providing structured and unstructured therapeutic activities in addition to the regular assessments and interventions provided in our outpatient psychiatric areas.

b.  Reduce reliance on restraint chair, suicide gowns, and isolation as means to address disability-related behavior.

## The Sacramento County Sheriff's Department responds as follows:

The restraint chair, suicide gowns, and isolation are not used to address disability-related behavior. The restraint chair is used to restrain an individual that is uncontrollably violent and demonstrating a desire to harm staff members, other inmates, and/or themselves. A medical evaluation is immediately performed upon placement in the restraint chair, and followed up in the first 15 minutes. A psychiatric evaluation is ordered, and completed within eight hours of placement. Unless extended by the Watch commander, no person will be placed in the restraint chair in excess of one hour. Between January 1, 2015 and September 4, 2015, the restraint chair was only used 38 times.

The safety suit "suicide gown" program is currently being evaluated and will most likely be modified and **ONLY** used for inmates that state or report suicidal ideation and/or engages in deliberate self-harm. Every inmate placed in a safety suit is assessed by psychiatric staff and regularly evaluated depending upon their diagnosis and the assessment of their overall mental health. Ongoing dialogue is occurring with Jail Psychiatric services on the safety suit program.

The Operations Order pertaining to the use of safety suits will be amended to include the changes as described.

Isolation is not used to address disability related behavior. Placement into Administrative Segregation and Total Separation

"isolation" is used to separate inmates from general population when specific facts demonstrate they cannot be housed for the safety of themselves or others. The inmate can also request Administrative Segregation and or total separation at which time a classification review will be initiated to determine the validity of their request.

<u>Schedule regular rounds to check on all prisoners in isolation housing.</u>

## The Sacramento County Sheriff's Department responds as follows:

Medical staff is required to perform daily checks on all inmates who have been placed in isolation. These checks are required to be done twice daily by medical staff. During these checks an inmate can request medical, mental health or dental services via a hand delivered KITE to medical staff. All requests received are triaged by priority of services needed. Any noted change, medical or psychiatric, in an inmate while in isolation housing will be reported to the correct medical discipline and triaged appropriately. The inmate handbook will be updated to specify the necessary procedures required by an inmate to ensure that their request for medical, mental, or dental services is received and reviewed by medical staff.

c. <u>Develop a more effective therapeutic environment in the inpatient psych unit.</u>

## The Sacramento County Sheriff's Department responds as follows:

The inpatient psychiatric unit is an 18-bed unit used to treat acute psychiatric issues. The average length of stay in the inpatient psychiatric unit is six days. While in this unit, 24-hour care is provided and inmate rounds are completed every thirty minutes in addition to any extra checks order by the psychiatrist. A multi-disciplinary treatment team makes daily rounds and assesses inmates daily in the inpatient psychiatric unit. Treatment plans are evaluated during all phases of treatment and conferences are held within 72 hours of admission. The goal of the inpatient psychiatric unit is to stabilize the patient's mental health issues so they can be discharged to the outpatient psychiatric area and eventually released to general population.

d. <u>Develop a confidential system for prisoners to submit requests for mental health treatment to health care staff and implement a monitoring and tracking system to ensure those request received timely and appropriate response.</u>

## The Sacramento County Sheriff's Department responds as follows:

Inmates can request medical, mental health, and dental services by completing a paper KITE. Instructions for requesting these services and completing the KITE are provided during the medical intake and in the inmate handbook. Additionally, complete instructions for completing and submitting a KITE are spelled out on the back of each KITE in Spanish and English. Inmates are instructed to give completed KITEs to the nurse that delivers medication to inmate housing locations, or other medical staff members. Once the KITE is received, it is reviewed and urgent mental health needs are immediately referred to our psychiatric unit. All other KITES are entered into our electronic medical records system and are triaged by an RN. All KITES are triaged within 24 hours, but most are triaged within 12. Depending upon

the medical request and the inmate's medical history an appointment will be scheduled appropriately. Emergent requests will be seen and assessed immediately in the medical housing area. Urgent requests will be seen and assessed by an RN within 12 hours in the housing units. The timing for all other appointments is based on medical need. All requests for medical, mental health, and dental services, are logged and tracked within our electronic medical records system.

The Department is currently evaluating new systems (kiosks) which will allow inmates to request medical, mental health, and dental services electronically. These systems will be able to electronically transmit and track all requests for services. The electronic system will also interface and upload directly to our electronic medical records system confidentially.

The inmate handbook will be updated to specify and describe how an inmate is to submit a confidential medical request to medical staff.

## 3. ADA

a.  Add wheelchair accessible cells in different classification and housing areas, including the honor dorms at RCCC.

# The Sacramento County Sheriff's Department responds as follows:

The Sheriff's Department is planning on consulting with an ADA expert to devise solutions to address the issues associated with the use of wheel chairs at the Main Jail.

b.  Ensure that prisoners with physical, sensory and mental health disabilities have access to the full range of jail programs and activities, including all vocational and education programs RCCC.

## The Sacramento County Sheriff's Department responds as follows:

We are currently developing a comprehensive transition plan to ensure our facilities are ADA compliant. This will include an ADA manager, ADA coordinator, and ADA policy. Once implemented, the ADA Manager and Coordinator will facilitate the placement of inmates with physical, sensory, and mental health disabilities and ensure access to the full range of jail programs and activities, including all appropriate vocational and education programs at RCCC.

c.  Appoint an ADA coordinator, establish an effective ADA complaint system, conduct a self-evaluation and develop a Transition plan to achieve ADA compliance.

## The Sacramento County Sheriff's Department responds as follows:

We are currently developing a comprehensive transition plan to ensure our facilities are ADA compliant. This will consist of an ADA manager, ADA coordinator, and ADA policy. The transition plan will include an effective ADA complaint system. The final goal overall is full ADA compliance in our correctional facilities.

d.  Develop informational materials for prisoners with disabilities about how to request accommodations.

## The Sacramento County Sheriff's Department responds as follows:

This will be part of the transition plan to full ADA compliance. The inmate handbook will be updated to include information advising all inmates of their ADA rights and how to submit a request for accommodation. Future technology in the form of inmate kiosks will

make it easier to inform inmates of the ability to request accommodations and for facility personnel to process those requests.

# ATTACHMENTS

1. Metzner J.L., Dvoskin J.A., "An Overview of Correctional Psychiatry," Psychiatr Clin North Am 29:761–72 (2006).
2. Metzner J.L., Fellner J., "Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics," J Am Acad Psychiatry Law 38:104–8, 2010.
3. National Commission on Correctional Health Care, Standards for Health Services in Jails (2014), Standards J-E-09 and J-G-04.
4. American Psychiatric Association, Position statement on segregation of prisoners with mental illness (2012), http://www.psychiatry.org/File%20Library/Learn/Archives/Position-2012-Prisoners-Segregation.pdf
5. Society for Correctional Physicians, "Restricted Housing of Mentally Ill Inmates, Position Statement," July 9, 2013, available from http://societyofcorrectionalphysicians.org/resources/position-statements/restricted-housing-of-mentally-ill-inmates.
6. U.S. Department of Justice, Notice re: Final Regulations implementing Title II of the ADA, 75 Fed. Reg. 56164, 56218-56223 (2010), also available from http://www.ada.gov/regs2010/titleII_2010/titleII_2010_regulations.htm#a2010guidance.
7. U.S. Department of Justice, Investigation of State Correctional Institution at Cresson, May 13, 2013 at 5, available at http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf
8. U.S. Department of Justice, "Investigation of the Pennsylvania Department of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities," February 24, 2014, http://www.justice.gov/crt/about/spl/documents/pdoc_finding_2-24-14.pdf

9.  Memorandum of Agreement Between the United States Department of Justice and the Consolidated Government of Columbus, Georgia Regarding the Muscogee County Jail, January 16, 2015, available from http://www.justice.gov/crt/about/spl/documents/muscogee_moa_1-16-15.pdf

10.     View of Pods in Sacramento Main Jail, from http://www.inspectorgeneral.saccounty.net/Documents/sac_023929.pdf; http://www.inspectorgeneral.saccounty.net/Documents/sac_026412.pdf

11.     MGT of America, ICE Detention Standards Compliance Review, Dec. 12, 2009.

12.     Sacramento Bee, "Two Inmates Killed in Separate Incidents at Sacramento County Jail," March 8, 2015, http://www/sacbee.com/news/local/crime/article13048712.html.

*Disability Rights California is funded by a variety of sources, for a complete list of funders, go to* http://www.disabilityrightsca.org/Documents/ListofGrantsAndContracts.html.