## Bruce C. Gage, M.D.

## General and Forensic Psychiatry

### EVALUATION OF MENTAL HEALTH SERVICES

### SACRAMENTO COUNTY JAILS

June 8, 2016

# Introduction

This evaluation was completed by the undersigned at the request of the Sacramento Sheriff's Department (SSD).  Mental health services are rendered by contract with the University of California at Davis (UCD). The charge is "…to conduct an evaluation of mental health care in the Sacramento County jails" and "…make recommendations to the COUNTY to remedy any deficiencies including violations of state and federal law."  Further, the report will include the following areas at a minimum:

- Intake
- Access to care
- Quality of care
- Medication administration
- Policies and procedures
- Clinical facilities
- Patient privacy
- Record-keeping
- Quality assurance
- Staffing
- Suicide prevention
- Clinical restraint/pro-straint

It is important to note that the focus of this report was not to detect or evaluate actual harm.  As such, the emphasis was on systems issues and service delivery more than an assessment of the care provided to individual inmates.  Individual cases were reviewed in order to evaluate services but were not selected based on a concern regarding adequacy of services and potential harm to that individual.  However, it is clear that delivering adequate services is necessary for the prevention of harm.

The opinions rendered in this report are those of the undersigned alone and are rendered within a reasonable medical probability and certainty. My opinions are based on my background, education, training, clinical practice and other professional experience; my review of the materials; and my knowledge of the relevant medical and scientific literature.  Resource documents include, but are not limited to, National Commission on Correctional Health Care standards and the American Psychiatric Association's Correctional Guidelines.  However, the recommendations are not designed to meet accreditation standards but to use these as a guide to adequacy of correctional mental health services.

## Qualifications

I am a board certified psychiatrist licensed to practice in the State of Washington.  I am certified in General Psychiatry and Forensic Psychiatry by the American Board of Psychiatry and Neurology.  I completed my undergraduate training at the Massachusetts Institute of Technology, receiving a degree in chemistry.  I then went to medical school at the University of Washington, completing my degree in 1983.  Following a year of post-doctoral fellowship training in physiology, I completed an internship and general psychiatry residency at Cambridge Hospital/Harvard Medical School, where as chief resident I did specialty training in forensic psychiatry.

After two years in a clinical and teaching position with UCLA at the Sepulveda Veterans Hospital, I joined the faculty at the University of Washington (UW) at The Washington Institute for Mental Health Research and Training located at Western State Hospital (WSH).  I remained at these institutions in various roles until 2008 when I became Chief of Psychiatry for the Washington State Department of Corrections (WA DOC).  I was the founder and Program Director of the UW Forensic Psychiatry Fellowship until 2008.  I hold an appointment as Clinical Associate Professor at the UW.

Throughout my career, I have evaluated and treated thousands of patients for behavioral disorders, including numerous mood and psychotic disorders.  Currently, I do limited direct care, consult on challenging clinical cases for WA DOC, conduct forensic evaluations (including private cases), provide monitoring services and consultation, and teach residents and other trainees in the areas of mental illness and forensics.  I am a member of the Psychopharmacology Committee of the American Academy of Psychiatry and the Law.

A copy of my *curriculum vitae* is attached, which includes a listing of all publications I authored in the past ten years.

## Trial Testimony and Deposition Testimony in the Last Four Years

Trial Testimony:
2015
State of Alaska v. Karan Clifton (Superior court of Alaska, Third Judicial District)

2014
State of Washington v. Isaac Zamora (Skagit County Superior Court, Washington)
Sheard v. Daniel Habeeb and Robert Polakoff (King County Superior Court, Washington)

2013
Lashawn Jones, et al., and the United States of America v Marlin Gusman, Sheriff
In the Estate of Akagi, (Snohomish County Superior Court, Washington)

Deposition Testimony:
2015
In re the Estate of Bernard (King County Superior Court, Washington)

2014
Sheard v. Daniel Habeeb and Robert Polakoff (King County Superior Court, Washington)

2013
In the Estate of Akagi, (Snohomish County Superior Court, Washington)
Watson v Dyncorp International and The Continental Insurance Company (U.S. Department of Labor,
        Office of Administrative Law Judges)

## **TABLE OF CONTENTS**

The major topic headings are in bold.  Beneath each is a listing of minor topic headings within each section.  These minor headings may have further subdivisions in the text such as differentiating Main Jail and Rio Consumnes Correctional Center findings.

| Page | Title | Description |
|------|-------|-------------|
| **4** | **Database** | **Listing of sources for the report** |
| **6** | **Summary of Salient Information** | **Discussion of findings from sources** |
| 6 | Jail General Information | Basic data about the jail |
| 7 | Organizational Structure | Mental health organizational structure |
| 9 | Mental Health Data | Data provided by JPS |
| 11 | Staffing | Overall staffing per the JPS contract |
| 11 | Intake Screening | Observations, policies, and procedures |
| 13 | Access to Care | Observations, policies, and procedures |
| 22 | Quality of Care | Observations and summary of chart reviews |
| 30 | Suicide Prevention | Observations, policies, and procedures |
| 34 | Restraint and Seclusion | Observations, policies, procedures, chart reviews |
| 36 | Reentry Services | Observations, policies, procedures, chart reviews |
| 36 | Patient Privacy | Observations, policies, procedures, chart reviews |
| 37 | Record Keeping | Observations, policies, procedures, chart reviews |
| 37 | Training | Review of training materials |
| 38 | Policy and Procedures | Policies and procedures not covered elsewhere |
| 39 | Quality Assurance and Quality Improvement | Policy, procedure, review of materials provided |
| **40** | **Opinions and Recommendations** | **Discussion of opinions and recommendations** |
| 42 | Specific Deficiencies | Discussion of deficiencies arranged by the general topic areas under **Summary of Salient Information** |
| 51 | Recommendations Regarding Specific Deficiencies | Targeted recommendations for deficiencies |
| 64 | Recommendations for Creating a Basic System of Care | Components and capacity of a basic system of care, including some staffing Recommendations |
| 75 | Recommendations for Creating a Robust System of Care | Potential enhancements with high yield |
| Appendix 1 | | Clinical case reviews |
| Appendix 2 | | Evaluating suicide-resistance of facilities |

# DATABASE

The following constitutes the database for this report. The staffs of the SSD and UCD were uniformly helpful; they provided information and access to both staff and inmates and were candid in their responses and reports. Their professionalism was notable and appreciated.

1. Multiple interviews (individually and in groups) of mental health, nursing, and custody staff and leadership
2. Job shadows of several mental health staff including crisis, outpatient follow-up, and psychiatry
3. Interviews and chart reviews of patients at both jails
4. Visits to representative parts of all facilities with a special focus on intake, mental health special management units (OPP), and the LPS-Certified unit (2P)
5. Descriptions of jail programs
6. Health care forms
7. Protocols and pre-printed plans and orders
8. Death reviews numbered as follows: 44856640, 3545179, 4851556, 2678178, 4821356
9. UC Davis Jail Psychiatric Services (UCDJPS) policies, procedures, and forms including:
   a. UCDJPS Policy & Procedure Manual dated January 2014
   b. UCDJPS Inpatient Unit forms for auditing charts, admissions, and discharge/transfer
   c. Initial Psychiatric Attending Assessment
   d. Clinical Assessment
   e. Initial Psychiatric Evaluation
   f. JPS-2P Admission Orders
   g. JPS-2P Orders
   h. Discharge Planning Request/Documentation Form
   i. Attending Psychiatrist Discharge Summary
   j. Patient Discharge Resource List
   k. Denial and Reinstatement of Patient's Rights
   l. Patients' Rights Denial-Monthly Tally
   m. Restraint Documentation Record
   n. Restraint Reporting Form
   o. JPS Patient Observation Record
   p. Various template nursing care plans
10. Sacramento County Sheriff's Department policies and procedures including:
    a. Operations Orders
       i. Bomb Threats, Suspicious Items, or Explosions
       ii. Evacuation Plans – Main Jail & RCCC
       iii. Fire Suppression – Main Jail & RCCC
       iv. Natural Disasters
       v. Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding #2
       vi. Suicide Prevention Program
11. Sacramento County Sheriff's Department Correctional Health Services (CHS) policies and procedures including:
    a. Mission Statement
    b. Organizational Chart
    c. Staffing Information
    d. Program Descriptions

    e.   Medical Autonomy
    f.   Quality Improvement Program
    g.   Decision Making – Special Needs
    h.   Support Services
    i.   Direct Orders
    j.   Health Care Philosophy
    k.   Continuity of Care
    l.   Hospital Care
    m.   Staff Development and Training
    n.   Medication Administration Training
    o.   Licensure
    p.   Credentialing and Privileging Adult Mental Health Practitioners
    q.   Credentialing and Privileging
    r.   Medical Assistant – Scope of Practice
    s.   Receiving-Screening
    t.   Access to Treatment
    u.   Clinic Care
    v.   Outpatient Housing Unit
    w.   Mental Health Services
    x.   Suicide Prevention 2M – Joint Policy
    y.   Use of Restraints and the Prostraint Chair
    z.   Patients in Safety Cells
    aa.  Adult Developmental Disability
    bb.  Hunger Strike
    cc.  Special Needs Patients
    dd.  Patients in Segregation Cells in Intake
    ee.  Incident Reporting
    ff.   Management and Removal of Taser Probes
    gg.  Emergency Response
    hh.  Limitations for Admission to the Jail Acute Psychiatric Inpatient Unit
    ii.   Inmate Health Care Grievances
    jj.   Management of Pharmaceuticals
    kk.  Medication Administration
    ll.   Over-the-Counter Medications
    mm.       Over-the-Counter Medications – Indigent Patient Procurement
    nn.  Informed Consent
    oo.  Health Record Format and Contents
    pp.  Transfer of Health Records and Information
    qq.  Records Retention
    rr.   Pharmacy Policy and Procedure Manual

12. CHS forms, including:
    a.   Medical Intake
    b.   Medical Intake – Detox Evaluation
    c.   Miscellaneous Medical Needs
    d.   Special Needs

13. Jail-based competency treatment program forms and documents, including:
    a.   Competency Training Record

    b.  Social Services Discharge Summary and Recommendations for Aftercare
    c.  Group schedule revised 1/11/16
    d.  Initial Intake Assessment
    e.  Treatment Plan
    f.  Patient-Inmate Workbook
    g.  Court Competency Information and Training Guide
    h.  Recreation and Leisure Assessment
    i.  Scope of Work
    j.  Screening Assessment

14. Training materials including the following:
    a.  Suicide Prevention Training dated 2015
15. Jail Psychiatric Services Statistics from 2014-2015 and 2015-2016
16. Title 15 Adult Type I, II, III and IV Facilities: Local Detention Facility Health Inspection Report, Health and Safety Code Section 101045 – for the Rio Consumnes Correctional Center dated 4/23/15
17. Title 15 Adult Type I, II, III and IV Facilities: Local Detention Facility Health Inspection Report, Health and Safety Code Section 101045 – for the Main Jail dated 4/10/15

# SUMMARY OF SALIENT INFORMATION

## Jail General Information

The average census at the Main Jail (MJ) for fiscal year 2015 – 2016 (through March 2016) was 2131. The average census at the Rio Consumnes Correctional Center (RCCC) for fiscal year 2015 – 2016 (through March 2016) was 1913.78. RCCC staff reported that for the year 2015 the average census was 2018, 208 of which were women. Women are housed at both the MJ and RCCC. Jail leadership reported there are typically about 250 women at the MJ and 150 at RCCC (there were 173 women at RCCC the day I visited).

About 300-400 inmates are ICE or US Marshall detainees.

There are between 50,000 and 60,000 annual bookings at the jails.

There are male general population mental health residential units referred to as Outpatient Psychiatry (OPP) at both RCCC and the MJ. There is no dedicated mental health residential housing for women. There is a unit within the jail that is certified for Lantermann-Petris-Short (LPS) commitments that serves both men and women.

Almost all custody supervision is indirect supervision. Even in dormitory settings, custody is generally in a secure station and is on the living units only for hourly checks and other required functions.

The MJ is a large, traditional urban jail. It is generally set up in two-tiered pods with a day room having large glass fronts and keyed entry. Typically, two pods share what is referred to as an indoor recreation area. Above and behind this area with a view into the pods is the control station, typically housing one or two custody staff. Programming space and interview rooms are very limited at the MJ.

RCCC serves primarily those who are sentenced, though the number of pretrial detainees has increased and is now about 500. RCCC has a much longer average length of stay than the MJ but I was unable to get clearly accurate statistics. It is divided into numerous smaller units. Programming space and interview rooms are generally much more available at this facility. Many of these units have classrooms

(high security) or portables and a recreation hall (low security) available to them.  The exception is the medium custody areas which have no dedicated classroom space and provide even less activities than in the high security areas; they house primarily short stay, pretrial males.  Most areas have large yards associated with them. Most areas also have day rooms with the exception of the women's maximum area, Ramona, which has no dayroom.  Other than those housed in Ramona, inmates eat at a common dining area.  Work and program participation are much more emphasized at this facility; most inmates have been sentenced, especially the women.  On the day of my visit, the following census information was provided by RCCC leadership:

- Male
  - High security (typical two-tiered pods with jump barriers on the second tier)
    - CBF    111
    - SBF    144
    - JKF    306
    - KBF    297
  - Medium security
    - RBF    221
    - JK      150 (this is a barracks)
  - Low security (all barracks, generally quite crowded)
    - M      66
    - C      74
    - H      106
    - D      64
    - G      90
- Female
  - SLF (3 dorms, all low security)
    - 54
    - 35
    - 48
  - Ramona (high security) 36
  - Medium security females are housed in both of the above units

AB 109 has resulted in a substantial increase in length of stay for many inmates.  RCCC custody staff reported that there are about 245 AB 109 inmates at that facility with an average length of stay over six years.  Inmates at RCCC generally report much more extensive access to yards and day rooms than at the MJ.  In higher custody settings such as CBF, inmates report getting out to the yard about three hours per week and into the day room about three hours per day. Those in disciplinary housing on SBF get much less time out.

## Organizational Structure

There is no identified Director of Mental Health.  Andrea Javist of UCD has the title "Program Director". This title appears on the JPS organizational chart as reporting to the Chief Administrative Officer (also of UCD) who then reports to the Chair of the Department of Psychiatry, UCD but there is no specification of the relationship of this position to the Sheriff's Department or Custody Health Services (CHS). Psychiatrists do not report to the Program Director or the Chief Administrative Officer but to the Chair of the Department of Psychiatry, UCD.

There is no mention of mental health or psychiatric services with regard to administrative functions in the CHS policies except "Credentialing and Privileging Adult Mental Health Practitioners" that speaks to UCD credentialing "all psychiatrists, psychologists and midlevel practitioners…. "

There is a formal contract between JPS and the County of Sacramento regarding Correctional Psychiatric services for the jail.  This contract was reportedly reduced following the economic downturn of 2008, resulting in the loss of about 50% of the mental health staff.  For the fiscal year 2012 2013 the contract amounted to $5,285,388; the 2008-2009 contract amounted to $7,793,603.  Amongst other things, the contract includes the following provisions:

- UCD will "make fiscal, program evaluation, progress, and other such reports as may be reasonably required" by the Sheriff.
- Specified clinical services include:
  - "[O]utpatient services including assessment, treatment, medication support and crisis intervention services as required for inmates in both the main jail and Rio Consumnes Correctional Center"
    - "Non-urgent request will be seen within 14 days with a face to face contact from a licensed healthcare professional."
    - "Requests for crisis intervention and urgent evaluations will be provided 24/7 at the Main Jail and weekdays 7:00 to 17;30 at RCCC"
  - "JPS will provide appropriate staffing and services to operate an 18 bed locked inpatient psychiatric unit at the Main Jail."
  - "JPS will provide one hour annually [sic] suicide prevention risk assessment and training for custody staff."
  - "JPS will participate in regular management meetings with both CHS executive staff and SSD custodial staff."
  - "UCD JPS shall assist County in obtaining and maintaining appropriate licensing, certification and accreditation of County, to include inpatient and outpatient psychiatric units and will cooperate with County and provide all assistance necessary to obtain such certification, licensure and accreditation."
  - "UCD JPS will meet and maintain Institute for Medical Quality (IMQ) and title 15 standards in providing services pursuant to this agreement."
- "County DHHS-MH shall examine Jail Psychiatric Services records and perform quarterly medical record reviews as part of County external peer review process."
- "UCD JPS shall be responsible for providing monthly statistics in a manner and format determined by County. The details of this reporting are to be developed cooperatively between UCD JPS and County."
- "UCD JPS shall participate in a process for handling of incident reports in accordance with procedures defined by County. This shall include a process for evaluating incidents uniquely involving jail psychiatric services, reviewing the outcomes of all such incidents with County and providing a summary of these incident reports to County DHHS-MH QI Committee in a format defined by County DHHS-MH. In addition, UCD JPS will participate with County and regularly scheduled reviews of incidents that concern both medical and psychiatric services."
- "UCD JPS shall participate in administrative, strategic planning and operational committees as necessary and as requested by County."
- There are specifications for quality improvement as well (UCD declined to provide QI data to me):

- o "UCD JPS shall maintain a Program Performance Improvement Committee whose activities shall be reported to County DHHS-MH QI Committee.  Quality improvement activities related to psychiatric inpatient care shall also be reported to County's DHHS-MH QAI Committee."
- o "Representatives from UCD JPS shall participate in County DHHS-MH QI committees upon County's request."

## Mental Health Data

### Mental Health Population

Per JPS statistics for fiscal year 2015 – 2016 (through March 2016) there was an average of 469.11 inmates at the MJ and 316.56 at RCCC receiving psychotropic medications each month; this amounts to 469.11/2131 ADP = 22% of the MJ population and 316.56/1913.78 ADP = 17% of the RCCC population (amounting to 19% of the overall population of the jails).  The average number of cases open on the last day of each month was 944 at the MJ and 653 at RCCC or about 40% of the jail population.

The pharmacist reported that about 23% of the jail population was on antipsychotics or lithium.  The pharmacist reported that antidepressant and mood stabilizer use for psychiatric reasons is not tracked because the pharmacy does not track the prescriber or diagnosis and thus cannot be sure of whether these medications are being used for psychiatric purposes.  However, JPS reports that the above numbers reflect all psychotropic orders; JPS identifies psychotropic use by virtue of the medication being ordered by a psychiatric prescriber.  Thus the pharmacist's estimate of the number on antipsychotics and lithium must be high.

The pharmacist also noted that those on medical medications had increased from about 30% in the past to over 50%.

### Mental Health Encounters

The JPS Program Director reported that mental health staff do about 450 intakes per month.  Patients are seen in the booking area only for emergencies, which vary widely in number from about 4 to 20 per day.  These booking emergencies are not tracked separately from other emergencies.

<u>Main Jail</u>

For fiscal year 2014 - 2015 the following encounter information was provided by JPS:

- New/open cases averaged 482.17 per month
- Follow-up contacts average 346.75 per month
- After hours follow-up contacts by nurses averaged 27.08 per month
- Discharge planning contacts averaged 80.33 per month
- Medication clinic visits averaged 266.08 per month

For fiscal year 2015 – 2016 (through March 2016) the following encounter information was provided by JPS:

- New/open cases averaged 497.56 per month
- Follow-up contacts average 495.22 per month's
- After hours follow-up contacts by nurses averaged 18.56 per month
- Discharge planning contacts averaged 73.56 per month

- Medication clinic visits averaged 302.33 per month

RCCC

RCCC has no patients at the highest utilization level (FOSS I); the FOSS II-IV population is typically about 500, about 300 of whom are on psychotropic medications.

For fiscal year 2014 - 2015 the following encounter information was provided by JPS:

- New/open cases averaged 190.83 per month
- Follow-up contact's average 136.75 per month's
- Discharge planning contacts averaged 48.17 per month
- Medication clinic visits averaged 285.17 per month

For fiscal year 2015 – 2016 (through March 2016) the following encounter information was provided by JPS:

- New/open cases averaged 161.67 per month
- Follow-up contacts average 143.89 per month's
- Discharge planning contacts averaged 49.78 per month
- Medication clinic visits averaged 267 per month

**LPS-Certified Unit Data**

There were 736 admissions to the LPS-certified unit in fiscal year 2014 to 2015. There were slightly over 60 admissions and discharges per month. The average census was 15.5 and the average length of stay 6.25 days. The number pending admission (waiting list) averaged 25.33 per month.

For the current fiscal year there are about 40 admissions and discharges per month. The average census has been about 17.5 and the average length of stay about 9.5 days. The number of pending admissions has gone up dramatically since October 2015. The average per month is 146.89; the actual number was 200 and 238 in February and March 2016 respectively.  The length of stay has also continued to increase.

**Mental Health Incident Reports**

I inquired about data related to the following contract provision:

> "UCD JPS shall participate in a process for handling of incident reports in accordance with procedures defined by County. This shall include a process for evaluating incidents uniquely involving Jail Psychiatric services, reviewing the outcomes of all such incidents with County and providing a summary of these incident reports to County DHHS-MH QI Committee in a format defined by County DHHS-MH. In addition, UCD JPS will participate with County and regularly scheduled reviews of incidents that concern both medical and psychiatric services."

I was informed by the JPS Program Manager in a 4/28/16 email that:

> "[UCDJPS does] not provide a summary of incidents to the County. We have a process for reviewing JPS related incidents. Please see the attached Policy and Procedure that describes our Incident Review process. However, as with the other requests for CQI, the Department does not provide this information to outside individuals or entities."

## Staffing

It is important to begin by noting recent history with regard to funding in the county in general. As noted above, with the financial crisis of 2008 and 2009 there was a substantial reduction in staffing in the jails. The mental health contract was reduced, resulting in an approximately 50% reduction in clinical staff (per CHS and JPS leadership).  The 2012-2013 contract (the most recent I received) provides for the following staffing:

- One program director
- Two LCSW supervisors
- Three Clinical Nurse II
- Eight LCSW
- One Senior Psychiatric Technician
- Seven Licensed Vocational Nurses
- Three HUSC III
- On-call nursing (the contractual amount for this is $420,000)
- Psychiatrists and on-call MDs (the contractual amount for this is $860,696)
- Resident (the contractual amount for this is $72,200) - providing for approximately one resident
- Fellow (the contractual amount for this is $93,438) - providing for approximately one fellow

Prescribers are both psychiatrists and psychiatric nurse practitioners.  There are no psychologists on staff.

The jails psychiatric nurses are provided, as detailed above, under the JPS contract. They are primarily assigned to cover the LPS-certified unit 24/7 but render some crisis services after hours and give psychotropic injections to some patients in general population.

**On-Call Psychiatric Services**

UCD psychiatrists are assigned to take call 24/7.  They are reliably available according to nursing staff. They can give telephone orders, including emergency medications, and orders for restraint for the LPS-certified unit.

## Intake Screening

The vast majority of booking and intake screening is done at the MJ.  There is some limited booking at RCCC (about 150 cases per month) primarily from outlying jurisdictions, California Highway Patrol, and US Marshals.

The MJ booking area includes tanks, safety cells, segregation cells, and areas dedicated to various other intake functions.  Nursing staff conduct full intakes at three desk stations in a common area without visual or auditory privacy barriers; these stations have marginal privacy.

The RCCC booking area is smaller.  It includes two holding cells, a safety cell, an officers' station, and changing areas. There is also a tiny nursing station that the nurse and perhaps one inmate could fit into. However, the nurse reports that the nursing screening is typically done in an open area with the inmate sitting on a bench with custody standing by.  This booking area and the limited medical infirmary noted below are slated to be replaced by a new facility.  The current area provides for minimal privacy if the nursing station is not used.

The CHS policy "Receiving-Screening" governs CHS intakes.  Prior to acceptance, a nurse conducts a basic "Receiving Screening" and diverts any arrestees with substantial health care needs for emergency

medical treatment; JPS may be "requested to evaluate arrestee's mental status," with two options following:  "Arrestee(s) may be housed in the Outpatient Housing Unit" or "Arrestees may be referred for follow-up psychiatric care."  There is no mention of hospitalization, referral to an emergency room, or civil commitment.

After the arrestee is accepted, the full nursing intake screening is done.  When I watched a nurse conduct a screening, custody was standing nearby and the conversation was semi-private in that others could hear anything but a very quiet conversation.  RNs and LVNs do the intake screenings; there is a nurse supervisor on site 24/7 as well.  Nurses also originate a plan of care during the intake process for those needing medical services.

The policy "Adult Developmental Disability" directs medical personnel and Sheriff's Department employees to "be alert to the possibility of developmental disability" and if there is "suspicion of a developmental disability" there is to be "a notation on the Receiving Screening medical form and a referral made to the JPS Outpatient Department."  JPS is then charged with notifying the Regional Center whose staff are to "play a consultative role in the management of incarcerated clients."

The Medical Intake form includes the following mental health screening information.  Questions, in yes/no format, addressed to the arrestee include:
- *Are you currently suicidal, or do you feel like hurting yourself or someone else?
- *Have you given birth within the last year? (If no, stop here!)  Are you charged with murder or attempted murder of your child?
- Within the last two weeks have you felt suicidal?
- Have you been hospitalized for mental health treatment within the past 30 days?
- Are you currently taking or been prescribed [sic] psychiatric medications within the past 30 days?
- Do you have a history of developmental disabilities? Have you been treated at Alta Regional Center?

Information that the screening nurse is asked to provide include:
- *Is the arrestee mentally disabled and/or a danger to self or others?

Those questions marked with an asterisk require an emergent referral to JPS.  Other positive responses are directed to yield a routine referral. Other questions that are pertinent to mental illness but asked in other sections include:
- Does the arrestee have physical/developmental disabilities that prevent them from caring for themselves?
- Have you had any significant injuries, hospitalizations, or illnesses within the last three weeks?

The nurse is also to make some specific observations regarding possible withdrawal that may be relevant to mental health status including whether the nurse notes the presence of tremor, anxiety, agitation, hallucinations, or problems with orientation.

The CHS policy "Receiving-Screening" specifies that receiving health screening should include inquiry into "History or appearance of suspected mental illness, including suicidal ideation or behavior" and "Appearance or history of developmental disability."  It also directs observation of "Behavior, which includes state of consciousness, mental status, appearance, conduct, tremors, and sweating" and "Slowness in speech or lack of comprehension of questions suggestive of developmental disabilities."  This is the only mention of mental health screening in policies.  With regard to disposition, this policy mentions "referral to an appropriate … Mental Health Service" and "Isolation or special observation in the facility" but nothing else specific to mental health.  The CHS policy "Mental Health Services" adds

that, "On-site mental health staff will be consulted whenever signs of mental illness are noted or suspected."

The nurse screened an inmate with mental illness while I was watching. The arresting officer form was completed and was all negative. She asked most of the questions on the form as required though not some of the substance abuse questions, presumably because the inmate was coming from a prison rather than the community. The nurse instructed the inmate on how to access services through a kite at pill call or asking a deputy. The nurse also had the inmate sign a release of information. The inmate came with a medication list from a prison. The nurse planned to call JPS, normally only done for urgent or emergent referrals, because the inmate reported having a Keyhea (involuntary medication) order in place but noted that she would normally have made a routine referral given that he seemed stable.

The policy "Patients in Segregation Cells in Intake" states these cells "may be used for arrestees who must be separated from the rest of the population within intake due to their charges, sexual orientation, physical or mental condition, behavior, age, gang affiliation or custody status." It specifies that mental health and medical must be notified within one hour of placement. Those so placed must also be assessed by medical staff "within the first six hours and at least every six hours thereafter to assess their medical condition." This is to be accompanied by a note in the medical record and an entry in the custody log outside the cell. Custody is directed to perform 30 minute checks on this population.

The intake area has an Accudose for dispensing medications and the emergency medication kit was fully stocked. Nurses note that on rare occasions, emergency psychotropics are given but this is done by the psychiatric nurses who come to intake from 2P, the LPS-certified unit where they are stationed. Haloperidol, lorazepam, and diphenhydramine are the typical agents given in this situation.

There is a phlebotomy station in the intake area and labs are routinely collected. Stat (immediate) labs are not available and anybody needing stat labs is sent to the emergency room.

8E is used to place inmates from intake pending classification. 7E is used for overflow if necessary. Classification is usually done within 24 hours but may take longer for inmates who are placed on 2P or in medical; for these settings classification is typically not done until they depart.

Inmates were being processed during my site visit; there were few waiting. I saw no evidence that the booking process was unreasonably lengthy when staff are available. However, staff on 8E report that inmates may be in booking up to a few days though are supposed to be out in 12 hours per a consent decree. Despite this consent decree, there is, reportedly, no formal time frame for moving through booking. Inmates with medical needs can be expedited and are typically out within two hours.

There are two male and one female safety cells in the booking area as well as segregation cells and a sobering tank. The safety cells have a floor grate and no furniture or sink. The segregation cells have a bench, sink, and toilet. The sobering tank has a sink and toilet; officers were unsure of its capacity, offering that while they did not know, they had "never reached it."

There were no intakes in booking when I was at RCCC and I did not visit the intake unit at RCCC, which reportedly has a capacity of 92. Most on this unit reportedly are sentenced and either return for weekends or are being processed in for a longer stay.

## Access to Care

I begin with a general overview of avenues of access to care. I then consider deployment of staff as this should really be considered in the context of access to care as how staff are arrayed and at what hours is at

least as important to access as are the mechanisms for activating care.  Lastly, I explore specific settings and services.

In addition to identification at intake, there are several other pathways to mental health services.  The CHS policy "Clinic Care" notes:

> "1.  Medical Health Services (HS) Kites (request for medical attention) are available in the Housing Units, from the pill call nurses and from custody officers.
> 2.  HS Kites are triaged by an RN within 24 hours of being received and an appropriate appointment(s) are scheduled."

The CHS policy "Mental Health Services" describes "In-patient and out-patient services for the detection, diagnosis, and treatment of mental illness"; that include:

> "1.  Screening for mental health problems on intake during the booking process;
> 2.  Crisis intervention and management of acute psychiatric episodes;
> 3.  Stabilization of the mentally ill and the prevention of psychiatric deterioration in the jail setting;
> 4.  Provision for referral and admission to licensed mental health facilities for patients whose psychiatric needs exceed the treatment capability of the facility."

It goes on to provide:

> "With the exception of involuntary short term in-patient treatment in the Acute In-Patient Unit, admission for mental health services is voluntary. Inmates that are referred are given an assessment interview to determine whether they would benefit from mental health treatment. Patients who are determined to be inappropriate for the program are referred to alternative care such as for substance abuse, alcoholism, and social services. Patients who meet criteria for involuntary psychiatric treatment, per 'Welfare and Institutions Code 5150', are admitted to the Acute In-Patient Unit. Those patients for whom brief supportive contacts are felt to be appropriate will receive such assistance through the Jail Psychiatric Services (JPS) Out-Patient Program. Inmates may be referred for care from any source within the jail."

It states further:

> "2.  Request forms (kites) for mental health services, are made available to inmates. Inmates are informed of the availability of mental health services, both verbally and in writing. "Mental Health Request" forms are available on each floor at central dayroom locations.
> 3.  Crisis intervention and management of acute psychiatric episodes are available 24 hours a day. Correctional Officer(s) are trained in the early recognition of signs and symptoms of mental illness, emotional disturbances and suicide prevention.
> 4.  Mentally disordered patients shall be admitted for acute or sub-acute services as authorized by the Jail Psychiatric Services staff.
> 5.  The Health Record must document discussion with the inmate's attending physician concerning the inmate's condition and include an appropriate consent for treatment. The patient must be examined by the facility psychiatrist prior to the initiation of medication.
> 6.  No new or renewal psychotropic medications shall be ordered without an on-site evaluation completed by the prescribing facility psychiatrist which is documented in the Health Record.
> 7.  Psychotropic medications are not to be unilaterally discontinued without consultation with the facility psychiatrist."

The CHS policy "Special Needs Patients" specifies that those with intellectual disability are required to have a treatment plan.  This is a CHS policy and does not reference JPS.

I met with classification who informed me that they use the Northpointe classification system. Classification statuses include: high, medium, low, total separation, administrative segregation, restriction, discipline, OPP, and inpatient.  Those on total separation, even if intellectually disabled or mentally ill, are generally not housed at lower custody levels (including OPP settings) unless they have a medical problem. Females are placed on the seventh floor and males are placed on the eighth floor of the MJ; these are essentially restrictive housing settings.

Inmate kites for mental health reasons are sent to 2P where night shift nursing staff triage cases. Those designated "must see" result in electronic notice to JPS staff. These kites are triaged again by social work the next day to assure that any potentially serious problems are not missed.

The JPS policy "Overview of Staff Responsibilities – Outpatient Department" indicates that crisis intervention calls may come from a variety of sources including "custody and medical staff…family members, friends, legal staff, and other community members."  Ordinary referrals may also come from "Correctional Health Services, custody staff, inmates, external agencies, or family member."  Routine referrals are generally made electronically.  Triage of such referrals is governed by the JPS policy "Outpatient Department Triage" which provides for categorization into emergencies, referral to a psychiatrist, referral to other jails services, and no services indicated (The JPS policy "Outpatient Intake" also provides for follow-up visits with mental health clinicians).  While this policy indicates that the assigned Outpatient Department triage clinician is to triage kites, as noted in the preceding paragraph this is reportedly being done by night shift 2P nurses and then reviewed by the triage clinician the following morning.

Cases are prioritized according to the following designations: must see, new, and follow-up. Those designated "must see" typically have suicidal ideation, certain charges considered to put the person at risk, and/or bizarre behavior.  There are typically 10 to 20 of these "must-see" patients per day at the MJ, about half or slightly less are in the booking area.  Notification about this group comes usually both by telephone call and electronic notification.

Clinicians have the option to designate follow-ups to themselves or to a generic pool of clinicians They rarely follow up with the same patient as courses of treatment are uncommon.

Frequency of follow-up is driven by "FOSS" level:
> "I. Follow-up / Daily by clinical staff
> II. Follow-up / At least once per month
> III. Follow-up / Per MD, at least every 90-days
> IV. Initial Assessment with no planned follow-up"

The levels are defined as follows:
> "Level I - Patients are those who meet criteria for W&I 5150 and are either on 2P, on the wait list for 2P, or are 2M suicidal.
>
> Level II - Patients that are discharged from 2P, cleared from 2M suicidal status, cleared from 2P wait list prior to admission, or in need of follow-up related to significant psychiatric history at this jail. Follow-up visit after discharge from 2P, or last clinical contact must be within one-month or sooner if clinically indicated.
>
> Level III - Patients are open to JPS and receiving medication management services. Follow-up will be determined by JPS physician or clinician if not on medications. This follow-up will be no more than 90-days from MD contact.
>
> Level IV - Patients are assessed by a clinician and are not in need of additional JPS services at this time. These patients are advised to kite for services as needed."

JPS policy provides for access to an interpreter service. Clinicians report that this service is generally available and adequate.  JPS policy "Interpreting Services" provides that custody can be used to interpret except for "psychiatric evaluations" in consideration of "confidentiality."  It is not clear whether this extends to other mental health contacts.

There is a mechanism for developing behavior management plans conjointly with custody but this is virtually never done.

There is no provision for group programming in restraint chairs or other secure arrangement.

There are no special management units for the intellectually disabled, cognitively impaired, personality disordered or other mental health populations other than those described below which serve all populations but primarily focus on the seriously mentally ill, though often house many other populations as described in **Access to Residential Care** below.  Sometimes the frail mentally ill (e.g., those with dementia) are placed in the medical infirmary.

While clinicians have schedules of when they are slated to see assigned patients, the rooms are not scheduled and visits are frequently cancelled or delayed, though this is not tracked.  It was common during my visits in all locations.  With regard to scheduled patient encounters, mental health clinicians at both facilities come to units with a list of patients they hope to see.  There is no advance appointment or call out.  They give this list to the booth officer and a custody staff invites the patient out. If the patient does not come out, clinicians normally ask the booth officer what happened but generally do not go to the cell to encourage participation, though social workers do this more commonly for those they are concerned about. They do track refusals (though I did not receive any data on refusals) but not cancelled or delayed appointments.  A JPS psychiatrist reported a no-show frequency of about 10% at the MJ. It is reportedly higher at RCCC.

I note here that custody operations have a substantial impact on access to care, including provision for escorts, opportunities for confidential clinical interactions, and provision of space for clinical service delivery.  It is expected that custody considerations of safety and security will have an impact on access to care but such limitations must be reasonable safety and security concerns, not simply a matter of convenience, or driven by lack of resources.  Observations regarding these limitations are detailed in the following sections and are discussed under **SPECIFIC DEFICIENCIES**.

**Deployment of Staff**

In order to properly examine access to care it is important to consider how staff are arrayed and the kinds of services they are expected to deliver.  The JPS policy "Overview of Staff Responsibilities – Outpatient Department" provides that services will be provided at both the MJ and RCCC from 0700 to 1730 Monday through Friday.  It goes on to add "Hours may be extended at either site depending on emergencies that may arise with new crisis referrals or with inmate-patients on existing caseloads. After-hours, holiday and weekend crisis evaluations are provided by the Inpatient Unit's staff."  As noted below, some mental health staff are assigned to work outside of normal weekday working hours as allowed by this policy.

The UCDJPS Mental Health Policy and Procedure Manual specifies that the following services are provided:
"In-custody Services Currently Provided:
   • Crisis intervention
   • Medication evaluation and follow-up
   • Brief supportive contacts

      • Release planning and community referrals
      • Psychiatric hospitalization and stabilization
      • Consultation and education to Sheriff's Department and Correctional Health Services staff.
      • Consultation, education and information to community partners/agencies.
      • Patient education
      • Suicide prevention
    In-custody Services NOT currently provided:
      • Conservatorship investigation
      • Court testimony
      • Forensic evaluations
      • Long term psychotherapy"

Current staffing deployment (reported as full time equivalents or FTE) is as follows.

<u>Main Jail</u>

There are 4-5 mental health staff assigned to work on weekdays. Hours vary so that coverage extends a little beyond normal working hours. On weekends there is usually just one mental health staff on site in addition to the 2P psychiatric nurses.

One psychiatric nurse works in the MJ from 1130-2400 Friday through Sunday, assisting with weekend coverage. Another works Sunday through Thursday 1800-0230, assisting with evening coverage. They can also help on 2P if necessary. There is no mental health coverage outside of 2P nurses from 0230-0700.

There is one psychiatrist assigned to 2P and one psychiatrist and one psychiatric nurse practitioner assigned to the remainder of the jail, splitting it up geographically. Trainees also run small clinics at assigned units under supervision of the psychiatrist.

On 2P, RNs and LVNs work 12 hour shifts. There is psychiatric nursing on 2P 24/7. There is one LVN and one RN on from 0630 to 1830 each day. From 1130 to 2400 there is an additional LVN. From 1830 to 0630 there is a night shift LVN. From 1800 to 2400 or 0230 the above mentioned general population nurses assist if needed. There is also a medical assistant on site from 2300 to 0700 but this person can do very little unless there is a doctor on site, which is never the case during this time.

When there are insufficient psychiatrists and social workers to manage after-hours mental health crises, the UCDJPS Mental Health Policy and Procedure Manual includes policy "After Hours Emergency Psychiatric Evaluations" providing that inmates may be sent to 2P for JPS nursing staff to perform an evaluation. Nurses will also come to the booking area to do evaluations. They have access to psychiatrists on call. But subsequent mental health evaluations may not occur for several days afterwards. Mental health staff are able to see some patients on weekends but this is limited owing to the light weekend coverage.

<u>RCCC</u>

There is one psychiatric nurse practitioner assigned to RCCC. A psychiatrist from the MJ is assigned one day per week to the Jail Based Competency Restoration Program. They are currently seeking a 0.5 FTE psychiatrist to accommodate the intended expansion of this program from 16 to 32 beds.

There are two full-time and one halftime social workers working Monday through Friday. The JPS Program Director also works there about one day per week. Most of the clinical work is routine follow-up as the mentally ill population at RCCC is more stable than at the MJ.

CHS nurses are responsible for responding to crises after hours and on weekends and holidays. A nurse will typically do a brief medical assessment and ask questions about suicidal ideation and psychotropic medication taking behavior. If the case is considered an emergency or urgency, the inmate is placed in a safety suit and returned to the MJ for assessment, typically by the 2P nurses.

**Access to Residential Care**

Placement in residential settings, referred to as Outpatient Psychiatry (OPP), is ultimately the decision of classification.  These settings exist only in male units, though one female unit is unofficially considered OPP (see below).  CHS policy "Decision Making – Special Needs" also provides that:

> "Consultation between the Facility Commander and the Medical Director is required for actions regarding patients who are diagnosed as having significant medical or mental health disorders, as follows:
> 1. Housing assignments.
> 2. Program assignments.
> 3. Disciplinary measures.
> 4. Admissions to and transfers from institutions."

Such consultation rarely occurs with regard to the mentally ill.  Classification staff told me that placements in OPP are done by classification using information from the nursing booking screening, special-needs form, history of placements, and inmate requests to determine who to place on OPP. As the classification staff put it, they "use judgment" to decide who to place on OPP. Unlike admission to OPP, release from OPP is primarily driven by inmate or mental health requests for reclassification to general population. OPP males are typically placed on 3W or 3E and females on 7W 300, though the latter also houses PC, transgendered inmates, and general population overflow.  There is an OPP waitlist at times. There is no mechanism for triaging acuity and access to OPP is according to time on the waiting list, though mental health sometimes requests that a more acute inmate be placed in OPP.

The UCDJPS Mental Health Policy and Procedure Manual provides that JPS may make recommendations to custody about placement.  The JPS policy "Outpatient Intake" has the related following provision, which mental health stated they regularly invoked but classification staff stated was occasional:

> "Based upon clinical presentation and if indicated, the clinician will submit a request for reclassification for male inmate-patients who meet the following criteria for Outpatient Psychiatric Pod housing (OPPH) in the 3-East, 300 Pod:
> • Recent County RST, ISA, SCMHTC patients
> • State Hospital or other Psychiatric hospital patients with verifiable treatment within one (1) year.
> • Patients with a diagnosis of:
>> 1. Schizophrenia
>> 2. Delusional disorder
>> 3. Psychotic Disorder NOS, Mood Disorder NOS, Bipolar Disorder
>> 4. Major Depression Recurrent
>> 5. Paranoid Personality Disorder
>> 6. Schizoaffective"

I saw occasional instances of such requests in the medical records but many more qualifying cases where no such request was in the record.

Those found committable under LPS are placed on 2P once a bed is available. Patients may be voluntarily admitted to this unit if they meet admission requirements for acuity.

The policy "Limitations for Admission to Jail Acute Psychiatric Inpatient Unit" provides for appropriate limitations on the placement of medically ill inmates on the LPS-certified unit. It specifically excludes those with delirium and need for substance abuse detoxification.

The CHS policy "Adult Developmental Disability" provides that this population "may require special consideration in the classification process" but provides no specific guidance and, as noted previously, there are no residential settings specified for this population.  The 2P psychiatrist reported that some with intellectual disability (ID) are placed on 2P.  He also noted generally good coordination with community ID services.  There are limited options for placement of this population in the jail; they are often placed in the mental health housing areas.  The problem is similar for those with dementia, who sometimes end up on 2P or in the medical infirmary due to lack of other placement option in the jails for these vulnerable populations.

I was told that there is regularly a waiting list of 5-10 patients for the LPS-certified unit.  Patients often wait two weeks for a bed but the waiting list is not formally tracked in terms of time.  Note that even though those on the list are felt to meet 5150 criteria for civil commitment, this paperwork is not filed until a bed becomes available.  These patients are seen daily by a mental health clinician.  The JPS policy entitled "Outpatient Referral for Admission to the Acute Unit" provides for delayed admission and filing of LPS paperwork only for gravely disabled.  The JPS policy "Medical Director Consult List (Prior to 2P Admission)" provides for special review of certain patients, designed to limit inappropriate use of 2P beds, who must have medical director review prior to being admitted to 2P:

> "1. Multiple prior 2P admission, without therapeutic benefit, and/or
> 2. History of well documented malingering of psychiatric symptoms, and/or
> 3. Other clinical considerations which render 2P admission ineffective for behavioral symptoms (i.e. reinforcing negative jail behaviors, including deliberate self harm, not directly attributable to active symptoms of a major mental illness)."

The psychiatrist noted that about half the population (2P has an 18-bed capacity) on the unit really did not need the level of service provided or were otherwise needlessly occupying a bed.  This included patients awaiting a bed for competency restoration at Napa State Hospital, those found non-restorable (competency to stand trial could not be restored) and pending LPS conservatorship, and those not acutely ill but on 2P because of recurrent self-harm or threats of self-harm.  The problem is that there are limited general population services available to manage those with behavioral problems such as self-harm.  Release is not blocked; rather, the patients often bounce back quickly.  Some of these repeat admissions are then retained because of the likelihood they will commit self-harm or make suicidal statements and be returned.

Access to the jail-based competency restoration program at RCCC is governed by court order.

Thus, there are provisions for mental health staff to participate in special needs placement but their use is inconsistent at best.  Mental health staff report that their recommendations to classification are generally honored.  It is, however, also clear that patients are sometimes transferred into and out of OPP without the knowledge of the local mental health staff.  It is important to observe once again that the population on these units is highly mixed and includes many without serious mental illness as well as many with profound mental illness, cognitive deficits, and personality disorders.

**Psychiatric Services**

Inmates who have psychotropic medications verified at intake have their medications ordered either by a psychiatrist or a CHS medical provider.  Record review demonstrated that verified medications are

usually ordered within one or two days following admission and documentation demonstrates that prescriptions are being verified.

The wait time for initial psychiatric assessment varies widely but can be over a month. Many patients have initial medications ordered by a psychiatric prescriber but are then not seen for weeks.

Psychiatric prescribers commonly change and start medications both without ever seeing the patient and in response to patient and social worker requests. I saw numerous instances of this, sometimes with the patient not being seen for months after the change.

Note that policy specifies that renewal of an order requires "a clinical evaluation of the patient which may include a review of the documented effectiveness of the medication in the medical record." This does not address the starting of a new medication, which would require even more careful clinical evaluation. There is no specified minimum frequency of visits with a psychiatric provider. Recall also that the CHS policy "Mental Health Services" specifies that "No new or renewal psychotropic medications shall be ordered without an on-site evaluation completed by the prescribing facility psychiatrist which is documented in the Health Record."

MJ

I job shadowed a MJ psychiatrist who had several years' experience at the Sacramento jails. He reported typically seeing 20 patients per day and that this was typical for all other psychiatric prescribers. Psychiatric assessments are typically 30 minutes and medication follow-ups are 15 or 20 minutes.

He had a computer with network access and was able to review records and enter orders during the encounter. Visits were in the indoor recreation area, which was public and, at times, very loud. I was able to hear the conversation between the psychiatrist and a patient from a pill line being held about 15 feet away.

The psychiatrist noted that he receives communications from a variety of sources, including custody, medical, social workers, outside sources, and kites. He also regularly reviews and responds to patient grievances.

Observations of some of the patients seen during these encounters are found in Appendix 1.

RCCC

I job shadowed a RCCC psychiatric nurse practitioner who had several years' experience at the Sacramento jails. Each day's patient schedule is sent by an administrative assistant at the MJ (they lost their local administrative support in 2009); the schedule is driven by the psychiatrist at the MJ directing a follow-up and by recommended follow-up periods. New patient visits (psychiatric assessments) are typically 30 minutes. Prior to walking to the units to make patient contacts, the nurse practitioner reviews the electronic record and may bring printed records along as well. The nurse practitioner typically sees about 300 patients each month (about 15-20 per day), including about 6 new (most days) and follow-up cases; if the nurse practitioner is unable to see all of them, they are bumped to the future. The nurse practitioner reported seeing follow-up cases about every 8 to 10 weeks in routine situations. If clinical need requires she may see people as often as weekly. Most of the patients she sees are in the OPP and are typically long stay inmates.

The nurse practitioner is not provided clinic space, both because of lack of space and difficulty getting patients to the clinic, so goes to the units to see patients, taking handwritten notes due to lack of network access. Patient encounters are typically off the unit in an examination room or other group or office

space.  The nurse practitioner is not supposed to see patients without a custody staff in the room with her (presumably this was not necessary at the MJ because the psychiatrist was seeing patients in a public space).  She sometimes has difficulty finding staff to help; medical is provided a dedicated custody staff and the nurse practitioner will sometimes "borrow" this officer.  For two of our patients, there was no custody staff in attendance though custody did let the patient out of the unit living area to go into the interview room situated between the living areas.  The nurse practitioner estimates 70% of each day is spent providing direct service; the primary problem is access to patients due to lack of custody availability to assist as required.

The nurse practitioner notes that it can be difficult to order release medications prior to an inmate releasing due to lack of notice.  Release prescriptions are normally for 30 days and she estimates about 30% of patients actually obtain their release medications.  She also noted difficulty with release planning, commonly learning of release the day of or a few days prior to the actual release, if she hears at all. This occurred when we were visiting a patient who was slated to leave homeless the following day. The nurse practitioner attempted to contact the discharge planner to try to link the person up for services without success.

Observations of some of the patients seen during these encounters are found in Appendix 1.

**Restrictive Housing**

Mental health does not do intake screening of those in restrictive housing and does not do rounds.  They may see referrals from these settings but in general have very little contact with this population and are unable to see these inmates in a private setting.  There is also no standard nurse intake screening or rounds in restrictive housing.

**Medication Administration**

I shadowed a nurse conducting pill call.  The nurse placed a medication cart in the open doorway to a living unit dayroom and patients lined up in the dayroom.  The policy "Medication Administration" specifies that nursing staff is to "verify the patient has taken the medication" and "with custody's help verify the medication has been swallowed (mouth checks)."  It was not a confidential setting.  There was no discussion of efficacy of medications or side effects.  The nurse gave a kite to a patient who wanted to discontinue medication and also received kites from inmates.  The nurse did not do any mouth checks. Custody supervised the pill call and did mouth checks.  The nurse reports that deputies are supposed to do mouth checks but may not and that she does them if she is concerned about adherence.

The nurse did identification checks with a scanner, scanning both the patient and the unit dose packaging. The nurse reported that she does wrist band checks and verbal name queries when the scanner is not functioning.

There were numerous reports that the pill lines at the MJ are frequently not on time. Evening pill line might come very late, even after midnight though that is uncommon; but several hours late is not uncommon.  The morning pill line I attended began at 1030, several hours later than it is supposed to be. When reviewing the MAR, there were instances of evening medications being given after midnight and other less egregious instances of late pill lines was common.

Pill lines at RCCC reportedly run more on time, typically between 0700 and 1000 in the morning and 1900 to 2000 in the evening.  At RCCC there are three pill call nurses for the whole facility drawn from the four on duty for the general facility.

The CHS policy "Medication Administration" includes a section on medication refusal that appears to be incomplete and not to specify what nursing staff is supposed to do in the face of the refusal, likely because of exclusion of a portion of the intended policy. Psychiatric prescribers reported that they got regular electronic notice of non-adherence designated as "JPS Chart Review." However, they were unclear how often they were not notified.

As all psychotropic medications are administered at pill line, I did not review the keep on person program.

### Call Buttons

Call buttons that I tested were in working order and officers responded.

### Institutional Transfers

When inmates are transferred between facilities I saw rare instances where they were screened by nursing or other clinical staff upon arrival. There is no formal provision for clinical screening upon transfer but scheduled appointments reportedly reliably follow patients to the next facility.

Because the pharmacy system is computerized and there are medication packaging machines at both facilities, there is no problem with medications following patients at the time of transfer.

## Quality of Care

### General Population Mental Health Services

General population mental health treatment services at both jails consist almost entirely in the provision of medication, crisis response, and limited supportive services. Consistent with this level of services, the JPS policy "Overview of Staff Responsibilities – Outpatient Department" states that, "The role of Outpatient Services is to provide crisis intervention, suicide prevention, supportive counseling, consultation, case management, medication monitoring, and medication clinics to inmates in general population."

Correspondingly, there are no mental health groups and no courses of individual therapy; clinicians report they will occasionally provide brief supportive therapy. Most follow-up is case management is done on a monthly basis and consists of limited assessment, referral to a psychiatric prescriber or other services (e.g. detoxification), and limited release planning. The encounter information reported above is also consistent with this constellation of services.

The clinical staff consists of a small pool of mental health clinicians (primarily licensed social workers, nurses, psychiatric nurse practitioners, and psychiatrists) who respond to crises (chiefly done by the social workers) on a rotating basis and conduct follow-up. Continuity of care (follow-up by the same provider) is not a priority but is accommodated to some degree on a case-by-case basis. The JPS policy "Overview of Staff Responsibilities – Outpatient Department" refers to "assigning an inmate the appropriate Frequency of Service Scale (FOSS) number." This drives frequency of visits as noted in **Access to Care Above**. Those who are FOSS I ("Patients are those who meet criteria for W&I 5150 and are either on 2P, on the wait list for 2P, or are 2M suicidal"), who are to be seen daily, the minimum expectation is monthly for FOSS II and every 90 days for FOSS III.

Mental health staff have limited administrative support. Despite limitations, mental health services are generally well-organized and efficient; mental health resources are being used maximally.

Initial contact is almost always with a JPS social worker either in response to a crisis or referral. Formal assessments may ensue and are supposed to be done prior to psychiatric referral. Assessments are highly variable in quality. Some are thorough both in history, mental status examination, and diagnostic assessment. Others are very minimal and do not provide a foundation for diagnosis or treatment considerations. Consistent with the defined mission of JPS, documentation is primarily observational in nature with very little evidence of supportive treatment or more active intervention. Correspondingly, mental health staff do not develop treatment plans in any setting other than the LPS-Certified unit (see below for information on the LPS-Certified unit and see Appendix 1 for clinical case reviews).

Some mental health clinicians try to help their patients by giving them workbooks, puzzles, and journaling assignments but this is done inconsistently. They do not have a supply of treatment workbooks or similar materials and rely on donations, which are minimal and inconsistent. Note that the UCDJPS Mental Health Policy and Procedure Manual would seem to permit this practice if such material is considered "necessary" for care:

> "Staff will be alert at all times regarding potential weapons such as pens, paper clips, hairpins, staples, clipboards, stethoscopes, blood pressure cuffs, tourniquets, etc. Control of these items will be maintained at all times. Staff will not give any items to inmates except community resource lists, informed consents, or other necessary paperwork related to the inmates care. Paperwork shall not contain staples or paperclips. If staff becomes aware that an inmate possesses contraband, an officer will be notified immediately."

In the majority of records reviewed, psychiatric assessments do not include thorough histories and mental status examinations. Visits and their associated notes are both brief, including initial visits that would provide the foundation for an assessment. There are no treatment plans and rarely is there a medication plan. Medical record documentation of medication monitoring (primarily laboratory studies) is inconsistent; levels of medications requiring such monitoring are typically present but metabolic studies, baseline laboratories, and other routine examinations are inconsistent and often absent. Some clinicians do routine testing for movement disorders (typically done with the Abnormal Involuntary Movement Scale) but others do not document having completed these examinations. In instances when psychiatrically relevant laboratory studies are done, often ordered by medical prescribers, the results are rarely documented in the chart. In short, psychiatric documentation tends to be very limited.

As noted above, mental health clinicians have little involvement with restricted housing inmates. For the mentally ill, this is primarily medication management and limited crisis response as access to patients is very limited. Further, mental health staff rarely work with custody, or on their own, to develop behavior management plans to assist custody in managing mentally ill and behaviorally disruptive inmates, usually those with severe personality disorders. [Note that the UCDJPS Mental Health Policy and Procedure Manual includes provisions for behavior management plans on 2P but not for general population inmates.]

There are physical plant limitations at the MJ but there is sufficient space to provide active treatment. At present, the area designated as the "classroom" is used almost entirely for suicide watches. These rooms provide for limited privacy as they are quite publicly visible (mostly glass walls) but allow confidential communication and are adequate for individual and group sessions. Mental health staff sometimes meet with patients here, though none did during my visit, except for an interview of an inmate placed there in a safety suit by custody the previous evening. At present, most patient contacts are in the open indoor recreation area, the public and highly visible space in front of the officers' station.

The situation is better at RCCC with more access to programming space in most areas. There are limited programming spaces in some of the dorm areas, but these inmates have more freedom of movement and

could easily be seen at a more central location, though this is not done.  As noted in the appendix detailing clinical case reviews, mental health staff will even conduct interviews in outdoor public areas through a chain link fence owing to lack of space or ability to move patients to clinics.

At present, engagement in jail programming does not affect classification status; the jails are currently looking at creating incentive-based programs that would allow for privileges to be tied to program participation. The new differential out of cell time for low medium and high classification statuses is a part of this initiative.

**Residential Mental Health in the Jails**

Treatment on these units is no different than in other general population settings.  There are no chemical dependency (CD) services available on the residential units (OPP or 2P).  Referral for most jail programs is based on inmate self-referral through classification. Certain charges such as domestic violence lead to referral by classification to program such as anger management.  Those in residential units typically have no or very little engagement in jail programs.

Officers assigned to the residential mental health units have no required special training.  Some have received CIT training.

Officers report there are no standard schedules or provisions for routine cell searches.  It is up to the Sergeant or Lieutenant.  Similarly, there are no standard approaches to hoarding, whether of medications or other items.

While job shadowing mental health providers, we saw some seriously mentally ill with profound functional deficits who were housed in the OPP units; see Appendix 1 for details.  These units also contained a diversity of inmates with widely varying conditions including personality disorders, cognitive deficits, and both mild and serious mental illness.

MJ

On floor 3E, the lower tier of the 300 pod is identified as mental health housing (OPP) and houses low, medium, and high classification risk levels.  This is a classic 2-tier pod with jump bars preventing ready jumping from the upper tier, but they are not a complete barrier.  There is a large, open dayroom with 4-person spider tables.

The upper tier is for PC.  The two groups do not come out together, limiting their access to time out of cell compared to others in similar settings.  According to a new scheme just instituted, inmates are to come out to the dayroom twice daily; those who are high risk level come out for 30 minutes, medium for 60 minutes, and low for 90 minutes.  While these are the expected times, it is still up to local custody staff to determine when inmates come out.  Data is just starting to be collected and shows a great deal of inconsistency across units but the sergeant reviewing this data with me questioned the accuracy of some of the data and doubted that it was a good reflection of actual practice.

As in other GP units, between pods there is a so-called "classroom" that is primarily used for temporarily placing inmates that custody puts on watch pending JPS evaluation, usually for danger to self.  At the time I was there, an inmate (#3969024) was in this space in a safety suit. This inmate had reportedly gotten outside the jump bars the previous evening and was threatening to jump from the upper tier but was talked down by custody staff.  He had not yet been seen by JPS and it was well over 12 hours after the event.  Custody staff told me that they did 15 minute checks by camera only, as long as the inmate was moving, and hourly physical checks but would do a physical check if the inmate was not moving.

The inmate gets a bathroom break by pushing an intercom button but there are no regularly scheduled breaks.  They get meals when served but otherwise get no additional food or fluids.  The log for this case showed 15 minute checks, food and fluid intake, and restroom breaks.

There is a non-contact visiting area above the classroom but it is for visitors coming from outside and must be accessed from the first floor so is not easily accessed from inside the secure jail areas and thus is not readily usable for clinical interviews; community social workers and new discharge navigators will sometimes use this area for patient encounters.  There is limited space for clinical interviews other than the (rarely used) classroom.  As in GP settings, most patient contacts occur in the very noisy and public large indoor recreation area outside the pods and just in front of the officer's station.  It was being used as an exercise space and a number of people passed though while we were meeting with patients.  This is also where pill lines are typically held.

There are at least three deputies, as there were when I visited, assigned to cover 3E and 3W.  Normally there are four deputies from 0630-1830.  3W houses inmate workers and is slightly larger.  Each houses about 80.  Sometimes "overflow" mentally ill will be housed on 3W.

There is an examination room shared by the two units.  This is used only for medical visits, not by JPS though it was unclear why.

These units share the outdoor recreation area serving floors 2-4.  This recreation area is quite large but has very limited equipment.  There are three such areas.  Each floor gets a block of time but the same restrictions apply in terms of conjoint programming of different classification security levels and PC; thus the mentally ill tend to get less time than others.  Recreation therapists do some structured activities in these areas but nothing specifically designed for the mentally ill.

RCCC

Staff at RCCC reported that CBF, which is a high security unit, houses the OPP for RCCC on the 400 pod with a capacity of 32 (the census was 26 the day of my visit).  The policy "Special Psychiatric Housing at RCCC" indicates that this is on the 600 pod.  Presently, JPS runs a residential competency restoration program for the mentally ill on the CBF 600 pod.  This program treats up to 16 patient-inmates and is about to expand to 32.  This program is staffed robustly and has an active group program, typically holding 3 to 4 hours of groups per day.  I attended one of the groups and observed staff interacting effectively with seriously mentally ill patients in the dayroom area. They were unrestrained and all engaged in recreational therapy using art as the organizing activity. Three custody staff were embedded along with two mental health staff serving seven patients.  Some individual treatment is also provided.  Cells were generally clean and in good order except for one patient they are having difficulty getting to come out.  This population is provided regular outdoor recreation and has an active program of morning stretching as well. While they have access to a classroom, it is set up in typical classroom style and staff find dayroom more conducive to running groups.

The disciplinary process works differently on this unit, reportedly only administering infractions or discipline for serious misbehavior such as assaults.

LPS-Certified Unit

This unit is not licensed owing both to inadequate staffing provisions and physical plant limitations.  The facility is somewhat decrepit.  It can house up to 18 and is virtually always at capacity.

One custody officer is on the unit during day shift on weekdays but this is the only posted position on 2P. There is always an officer just off the unit, available to both the medical and mental health unit at the medical desk. There used to be three officers assigned to 2P.

Men and women are not segregated by area but by cell with men and women right next door to each other.

There is one two-person cell. JPS staff on 2P report that they recommend who should be placed together but it is ultimately a custody determination. The JPS policy "Use of Cell 2P-1" states that "The Treatment Team will … Not place two patients on active assault precautions together in this cell." It also specifies that the Treatment Team will "consult with custody staff to assure a thorough review of the inmate-patients' classifications prior to placing two inmate-patients together." This language indicates that it is intended for this decision to fall to the Treatment Team rather than custody.

Meals are eaten in their cells. There is a small dayroom with an 8-person table. There is no yard access for this population.

Inmate-patients have very limited time out of their cells, typically one hour out 2-3 days each week per custody staff. Time out of cell does not vary based on inmate classification risk level. Review of medical records (see appendix) demonstrates a great deal of variability with some patients coming out 2 to 3 days per week but others going weeks without ever being in the dayroom. There is no progressive privilege or level system. Patients spend 23 to 24 hours per day in their cells in almost all most cases.

Sometimes inmate-patients are allowed out together; custody determines whether this will be done and it is not dependent on their classification risk level though nursing staff report that custody generally prevents mixing different classification security levels. Those who are on protective custody status (PC) can only come out alone. Those in a safety suit may only be brought out with others in a safety suit.

The psychiatrist or custody staff may place inmate-patients in a safety suit. On this unit, JPS staff determine whether to discontinue use of a safety suit.

The JPS policy "Accessing Patients on the Inpatient Unit" states that "when direct access is required for certain duties including vital signs, lab work, school examinations, assessments, or treatments, staff shall request custody officers to provide access to the inmate-patients. Custody staff will open the inmate-patient's cell door and stand by while the treatment is performed. For dayroom or group activities, custody staff will be present on the unit if staff are in the dayroom area with inmates-patients." However, the same policy goes on to state "Attempts to gain direct access to inmate-patients that are denied by custody will be referred to a supervisor for resolution and will be documented in the inmate-patient record. The Sheriff's Department and JPS chain of command will be followed as necessary to resolve patient care issues involving access to inmate-patient's." It was the understanding of custody and staff on 2P that it was custody's decision whether or not to provide direct access to patients, including through the cuff port. I saw numerous instances of custody denying access but no evidence of any attempt to access the chain of command.

Inmate-patients are sometimes brought out for meetings with clinicians but a good deal of interaction takes place at cell front; virtually all of the patient contacts documented in the medical records were at cell front. I was told by custody and nursing staff on 2P that custody staff determines whether or not the cuff port will be opened to allow more ready conversation. The basis for this decision was unclear.

Inmate-patients get a standard kit of belongings regardless of classification risk level.  Those in safety suits are not allowed any additional items.   Items can be differentially restored based on risk but conditions of confinement are set by custody who typically consults with JPS staff.

There are two pill lines a day; a third is conducted if necessary.  Medications are delivered to the cell front.

The UCDJPS "Mental Health Policy and Procedure Manual" specifies that the following services are to be provided on this unit:

"Jail Psychiatric Services Acute Inpatient Unit provides 24-hour care to those inmates requiring an acute level of psychiatric care and treatment. The treatment program consists of the following elements.
• Assessment, diagnosis, and treatment planning
• Stabilization
• Safe housing
• Suicide prevention
• Crisis counseling and brief individual psychotherapy
• Behavior management
• Patient education
• Psychosocial milieu including supervision of activities of daily living
• Socialization and recreational activities
• Medication and medication monitoring
• Referral, discharge planning, and continuity of care

Treatment modalities emphasize coping skills, self help skills, assertiveness, anger management, establishment of interpersonal boundaries and limit setting, relaxation, enhanced self esteem, and adjustment to incarceration."

There are no groups and virtually no individual therapy.  There used to be groups including coping skills, symptom management, discharge planning, health and wellness, depression and anxiety, and medication education.  They had a recreation therapist as well who ran groups both on 2P and the residential mental health unit (OPP) at the MJ. There is no social work support.  There are no jail programs or chemical dependency services on 2P either.

There are no typical treatment plans. Treatment plans consist of nursing care plans rather than physician directed treatment plans. Treatment teams do discuss treatment but most treatment plans are aggregations of template nursing care plans.  Documentation reflects virtually no active treatment.  Treatment consists primarily of psychotropic medications, monitoring, and crisis response.

The JPS policy "Special Treatment-Inpatient Unit" provides for formal behavioral management using limited behavioral plans that allow reinforcement of desirable behaviors and sanction of undesirable behaviors.  However, the rewards are extremely limited (an hour of reading material or playing cards for each day free of "unacceptable behavior and engaging in only acceptable behavior") and the sanctions substantial (e.g., restraints, safety suit, loss of some visiting privileges, loss of commissary).  It also provides that the sanctions are permanent until the individual leaves 2P.  I saw no cases where this or any other behavior management plan for assisting custody in their interactions was put in place.

Nurses do checks on all patients every 30 minutes.  Nurses also conduct cell front rounds at least twice a day. They do a brief mental status examination and suicide check. Nurses report that after-hours psychiatrists are responsive to calls and will provide emergency medication orders when needed.  Nurses report that restraint episodes are rare, perhaps occurring every other month; I saw few instances of

restraint in the records. This is primarily for self-harm rather than danger to others. Custody conducts the restraint after a physician gives an order, except in emergencies when nursing staff may initiate restraint. Custody always honors these orders but after hours response to emergency situations such as self-injurious behavior can be slow.  Emergency response can also be difficult when there are only two nurses on the unit as one nurse will typically be on the telephone with the doctor and the other getting medications prepared or otherwise coordinating emergency response, leaving nobody to run the floor.

Cells on 2P are not well suicide-proofed. There are number of anchor points and nurses reported watching a patient climb on top of a light fixture on video and, before custody arrived, saw him dive headfirst onto the floor from over 6 feet up. Lights are also easily destroyed and used to create instruments for self-harm.

Length of stay on 2P is variable but 10 days is typical, consistent with data on length of stay reported above.  There are some long term patients, primarily voluntary patients and those already on a conservatorship.  Temporary conservatorships are almost never sought.  There is about one Riese hearing (to obtain permission for administering medications involuntarily) weekly, on average, and 1-4 patients on involuntary medications on the unit at any one time.  Those who remain on an LPS hold at the time of release from jail are sent to the emergency room for evaluation.  No data on recent hearings or LPS commitments are conservatorships was provided.

The unit was fairly clean though there was a distinct smell of urine and one of the showers was not clean. Some storage areas were piled with supplies in a somewhat haphazard manner and a number of safety suits were spread on the floor.  Several occupied cells had a good deal of garbage in them.  The officer told me that inmate-patients are encouraged to clean their own cells by nurses and custody but when it gets bad, they are removed and an inmate worker cleans the cell.

**Medical Infirmaries**

I visited the medical infirmary, which is contiguous with 2P.  At the time of my visit, there were no 2P patients or 2P waiting list patients on the unit but this reportedly occurs commonly.

Detoxification protocols are done in the infirmary.

This area of the facility was also somewhat decrepit.  The medical area was in some degree of disarray. The dental area was clean and well-organized.

There was a patient with an IV who has lying on a mattress on the floor, reportedly because of being unsteady on his feet.  Those who are suicidal also have their mattresses placed on the floor.

I also visited the 2E step-down area.  There are 5 cells primarily for those in wheelchairs.  There are 15 two-person cells.

There is a limited infirmary at RCCC that can do intravenous therapy but not much beyond that.  It has 17 beds in open barracks and four single and two double cells contiguous with the barracks (I was given a slightly different count by leadership but close to the same number).  Those with any significant medical needs are either sent to a hospital or returned to the MJ.  There is a small clinic with two exam rooms in a different area of the facility. There is one RN, one medical assistant, and one doctor on site in the clinic five days per week during normal working hours.  Nurses are on site 24/7. They work in 12 hour shifts. Four nurses are on at night.

Medical equipment inspected in the infirmaries and other areas was functional.

**Restrictive Housing**

As noted above, mental health has very little contact with this population.

In the main jail restrictive housing is on the eighth floor. These are single cells with varying degrees of additional security placed on the doors, primarily to prevent throwing. The cells have furniture and fixtures with numerous anchor points and are far from suicide proof.

On the eight floor, which is essentially restrictive housing, JPS may only see their patients at cell front either through the cuff/food port, occasionally with the door open, or through the door.  Which mode is determined by custody, who stands by during the interview.  Pill lines are cell-to-cell on this unit.

8W 400 is for discipline, 300 is for Surenos and Crips, 200 for Nortenos and Bloods, and 100 is mixed.  There was one patient (#1618829) in the classroom in a safety suit.  I interviewed him (see Appendix 1).

The female restrictive housing is in RCCC consists of old-style linear cells.  It is quite dingy, but the area was clean, including most cells. There are only two single cells; the rest are doubles. They contain desks, bunks, toilet and sink, and bookshelf. Lights are not recessed; many cells had televisions (considered a privilege). There are numerous anchor points. Cells in this restrictive housing would not be considered suicide proof.

**Psychotropic Medication**

Jail psychiatric prescribers have access to the same formulary as medical providers. The formulary emphasizes generic medications but is adequate.  The formulary for antipsychotics is generally reasonable and includes clozapine.  Mood stabilizing medications are also well represented.  Medications for Attention Deficit Disorder with Hyperactivity (ADHD), benzodiazepines, soporifics, and antidepressants are also sufficient, though it is surprising escitalopram is not included given its efficacy and tolerability.  Medications for opiate addiction used in medication assisted therapy (MAT) are also available.

Long-term benzodiazepine use is formally discouraged but is available.  If a patient comes into the jail on a verified long-term benzodiazepine, this will generally be ordered rather than automatically tapered though the patient will be assessed for discontinuation as well.

The pharmacy uses computerized unit-dose packaging.  There are packaging machines at both facilities with access to the pharmacy database, assuring that medications are promptly available when an inmate transfers.  Patients reported that medications were rarely missed upon transfer for more than one dose.

There are supplies of emergency and Acudose access to medications for times when the pharmacy is closed. This includes antipsychotics and benzodiazepines.

Pill lines are run by CHS except on the LPS-certified unit where JPS psychiatric nurses administer medications at cell front.

As required by California law, there is no provision for self-administered (keep on person) psychotropic medications.

The JPS policy "Outpatient Medication Verification" directs JPS clinicians to verify outpatient medications "prior to submitting an eChart request for a physician order to continue a particular medication prescribed by another agency."  This is done fairly consistently as noted above.

The policy "Management of Pharmaceuticals" specifies that orders for psychotropics may not exceed 30 days whereas other medications may be ordered for up to 90 days, however this does not seem to be enforced as I saw psychotropic orders lasting longer than 30 days.

The psychiatric prescribers noted no significant formulary challenges.  There is also provision for non-formulary drug requests; psychiatric prescribers conveyed that when such requests are necessary, they are readily honored.

**Ancillary Services**

Laboratory services are readily available and psychiatrists can order special studies if needed. Psychiatrists can get imaging and electrophysiology studies if needed but these must be cleared by medical; they are not permitted to order these on their own.  This is reportedly the same process medical providers must go through.

## <u>Suicide Prevention</u>

In fiscal year 2014 – 2015, there were no completed suicides in the jails. JPS statistics report that there were 19 suicide attempts at the MJ and none at RCCC.  In fiscal year 2015 – 2016 (through March 2016), there has been one completed suicide at the MJ. JPS statistics report that there were 2 suicide attempts at the MJ and two at RCCC.  It is not clear how data on suicide attempts is captured or classified.

There are four safety cells at the MJ, three in booking (two male, one female) and one on 2P serving the LPS-Certified unit housed there.  RCCC has one female safety cell in the Ramona wing of the Sandra Larson Facility but no male safety cells; males needing a safety cell are transferred to the MJ.  I visited all of these cells.  In general, they were clean but their suicide-proofing was mixed.  The fixtures in these cells are not recessed and some of them are reachable.  Some lack a call intercom and some had grates over vents that had holes larger than they should be.  Safety cells had padded walls but it was in good order.  The two in the male booking area had cameras but these cameras are not routinely monitored at the officer's station, though they are functional.  The Ramona safety cell had a floor grate and while it had external fixtures the ceilings were high enough that the fixtures were not reachable. There was no furniture in this safety cell either but padding was again used and was in fair condition.

Cells in 2P were not adequately suicide-proof for this type of unit.  OPP cells and restricted housing settings had numerous anchor points in cells and some restricted housing cells had poor visibility.

Phone cords have been removed in the booking area, limiting the opportunity for hanging in these areas.

Suicide prevention is largely driven by custody policies except on the LPS-certified unit where JPS policies have more governance.

With regard to suicide prevention at intake, the Sheriff's Department Operations Order "Suicide Prevention Program" directs arresting officers to document "any observations related to suicidal statements and/or behavior displayed prior to arrival at the custody facility on the intake screening form." The intake nurse then completes the receiving screening form and if there are any concerns about suicidality must contact JPS "immediately during duty hours" and during nonduty hours at RCCC must "conduct a preliminary evaluation of the prisoner to determine if there are indications the prisoner may be suicidal" and subsequently consult with JPS.

The Sheriff's Department Operations Order "Suicide Prevention Program" policy statement directs custody staff to immediately contact JPS whenever a prisoner is "exhibiting or verbalizing suicidal

behavior." The prisoner is to "be kept under direct visual observation until medical or psychiatric staff evaluates the prisoner."

When the intake nurse detects any suicidal concerns they must notify custody staff as well, who either places the prisoner "in an occupied holding cell in the booking area" or "[i]f the prisoner displays behavior which may result in the prisoner harming him/her or others, custody staff shall place the prisoner in an unoccupied cell in accordance with [Sheriff's Department] Operations Order 4/05, Use of Safety Cells, Segregation Cells, North Holding #2, and Multipurpose Rooms" (discussed below). Custody staff must then "make direct visual observation of suicidal prisoners at least twice every 30 minutes." JPS and custody staff then consult "to determine the appropriate housing location for the prisoner." This section on intake seems inconsistent with the policy statement above that the prisoner is to "be kept under direct visual observation until medical or psychiatric staff evaluates the prisoner." The intent may be to cover this by referral to "Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding #2.", but the policy is constructed ambiguously and is inconsistent across sections.

The CHS policy "Patients in Safety Cells" provides for the use of safety cells for those who are "uncontrollably violent, gravely disabled or displaying behavior which could result in harm to themselves or others." This policy mandates contacting on-site medical and mental health staff and specifies that medical staff "are required to assess the patient within the first six hours of placement and at least every six hours thereafter to assess the inmates medical condition." For those remaining in the safety cell more than 24 hours, they must be seen by a physician within 48 hours of placement. Though there is a requirement to initially contact mental health, there is no specific requirement for mental health evaluation. Custody staff must contact medical staff within 15 minutes after placing a prisoner in a safety or segregation cell, even when the placement is not related to medical or mental health, such as gang affiliation. The custody and medical staff are then directed "to address the nutritional, fluid, and hygiene needs of the prisoner."

"Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding #2" states that those prisoners placed for danger to self or others are provided Styrofoam cups "in place of eating utensils for offering food to prisoners." It further states that "prisoners will be offered meals except when the situation exists which prevents custody staff from offering a meal." The reason for not offering meal must be documented. Custody staff are also directed to "make reasonable accommodations to provide prisoners access to restroom facilities." None of these policies specify frequencies for meals, fluids, hygiene, or toileting.

With regard to Housing Unit Referrals in Sheriff's Department Operations Order "Suicide Prevention Program," custody staff contacts JPS or medical after identifying potentially suicidal persons and, more consistent with the initial policy language, is to place the prisoner "in a secured area where the prisoner can be continuously observed while awaiting a JPS evaluation." Custody is also to conduct a cell search. But then it reads that custody staff "Monitor the prisoner by performing direct visual observation at least twice every (30) minutes," which seems inconsistent with the above language regarding being "continuously" observed. JPS or medical staff then determine whether referral to the acute psychiatric unit is necessary (this is not mentioned for intake). There are other provisions for placement in a single cell for monitoring at RCCC in "Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding #2" (see below).

There is also procedure language about using video but that video is not a substitute "for direct visual observation", though it is unclear if this applies to the twice every 30 minutes checks and/or the continuous observation.

The practice is to place inmates on 15 minute checks, such as the inmate who had climbed outside the jump bars and had been pending JPS evaluation for 12 hours and inmate in the safety cells in the booking area.

Per Sheriff's Department Operations Order "Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding #2", in order to place an inmate in a safety cell a watch commander or division commander must give prior approval except in "the most volatile of circumstances" when "custody staff may place a prisoner in a safety…in order to keep the prisoner or others from being injured." Those in restraints "may be placed in a safety cell." It also provides that "Prisoners placed in a safety cell shall be allowed to retain enough clothing or be provided with a suitably designed 'safety garment', to provide for the prisoners personal privacy unless specific identifiable risks to the prisoners safety or to the security of the facility exist and are documented." The use of a safety garment requires either direction by JPS or authorization by a sworn supervisor. If a safety garment is not used prisoners may "retain personal clothing except for shoe laces, shoes, belts, or any other clothing articles which could threaten his/her safety or damage property."

"Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding #2" also speaks to using segregation cells for, amongst other things, "sexual orientation/transgender status," "behavior which disrupts facility operations," or "placement into restraints as a result of combative or violent behavior, physical attempt to harm self or others, or the destruction of property."

"Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding #2" provides that "prisoners in housing units who are in need of immediate mental health services referral and/or have been placed in restraints may be temporarily placed in a multipurpose room or North Holding #2 at RCCC for observation." These rooms "may be used to temporarily hold prisoners identified to be a threat to self or others until he/she is evaluated by medical or mental health staff or transported to the Main Jail." Custody staff are directed to "conduct direct visual observations on prisoners at least twice every 30 minutes." But there is no clear provision for continuous observation, as mentioned above. The duty to provide visual observations is shared with psychiatric staff on unit 2P. A custody supervisor is also supposed to do a "direct visual observation of the prisoner every two hours. A watch commander shall conduct a review for continued retention in the safety cell, including P13 [on P2], at least every eight hours."

The Operations Order goes on to specify that for all those in safety cells, segregation, and multipurpose rooms, a "medical assessment shall be completed within 12 hours of placement or the next daily sick call, whichever is earliest. The prisoner must be medically cleared for continued retention every 24 hours thereafter." Mental health evaluation is also required within 24 hours. These provisions are not consistent with the previously noted CHS policy "Patients in Safety Cells" regarding medial assessments for these cells and JPS policy does not specifically provide for mental health evaluation within 24 hours of those placed in these cells.

The policy "Suicide Prevention 2M – Joint Policy" provides for suicide assessment and monitoring of those in the medical infirmary. It provides for appropriate suicide-prevention strategies prior to JPS evaluation. This policy appears to provide for continuous observation but it is not entirely clear.

The JPS policy "Suicide Prevention Program" is a relatively barren policy. It provides for assessment and treatment in general terms. It does not speak to the content of suicide assessment, provisions for monitoring those who are suicidal, or establishment of conditions of confinement.

The JPS policy entitled "Suicide Prevention-Acute Inpatient Unit" states:

"Staff may use the following categories as a guide to implementing observations.

A. SUICIDE RISK: 15 MINUTE CHECKS

Inmate-patients who have been determined to be a moderate suicide risk require every 15-minute checks. The nursing staff will perform the checks by going to the inmate-patient's cell door and observing the inmate-patient. The check also includes a brief survey of the cell environment for safety purposes. The nursing staff will document the check on the flow sheet and make at least one entry in the eChart clinical notes section each shift. Camera monitoring may also be indicated for inmate-patients identified as a moderate risk.

An example of inmate-patient requiring 15-minute checks should be a patient expressing suicidal ideation with some ambiguity and either no plan or a poorly formed plan.

B. HIGH SUICIDE RISK: CAMERA MONITORING

Inmate-patients determined to be a high-risk are actively suicidal and require constant observation by nursing staff. One nursing staff will remain in the nurses' station at all times and is responsible for camera monitoring.

Inmate-patients on camera monitoring may also be on 15-minute checks. Nurses must complete the checks at the inmate/patients cell door and will not complete checks via the camera monitor. These checks will be documented on an observation record and will include a minimum of one progress note each shift.

Camera monitoring requires an immediate order from the psychiatrist, and the telephone order must be signed within 24- hours. Cameras should not remain on for any length of time if there is no physician's order. Nurses may turn a camera on to view a patient, but if the camera remains on, the physician must write an order.

If no camera cell is available and an inmate-patient is a high-risk for suicide, 1:1 staffing may be used. The Inpatient Unit charge nurse will consult with the Inpatient psychiatrist and the supervisor or administrator-on-call if necessary. The charge nurse will arrange for a sitter and may accomplish this by utilizing a JPS staff person who will monitor the inmate-patient by sitting outside the cell and maintaining constant observation. If two patients require constant direct observation, one staff may be assigned to sit outside the cell to observe two patients."

The JPS policy entitled "Safety Suit Procedures for Inmate-Patients on Acute Psychiatric Unit" specifies that those in safety suits will be allowed "attorney visits (at custody discretion), court-ordered psychiatric/psychological evaluations, reading material (all staples removed), telephone calls, showers, court appearances (at custody discretion)."  Clinical staff may also limit access to reading material, telephone calls, and showers.  This policy also provides for safety suit use in the general population as follows:

"Safety Suits for inmates in general population are used at the discretion of custody staff on a case-by-case basis. A JPS physician or an outpatient clinician may recommend the use of a safety suit if clinically or behaviorally indicated. Recommendation for use of the safety suit should be justified in the clinician's assessment of the inmate-patient. The Medical Director or his designee must approve each case."

The JPS policy "Monitoring of P 13" speaks to the use of the safety cell on 2P.  This policy refers to the Sheriff's Department policy "Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding #2".  The two policies together appear to indicate there is provision for monitoring only up to checks twice every 30 minutes.

In the medical infirmary (2M), the JPS policy entitled "2M Suicidal Patient" states that JPS provides:

"Recommendations for suicidal medical patients generally include safety suit and blanket, non-hospital style bed, no regular jail issued blankets, restriction of unnecessary items such as

utensils, a cell closer to nurse's station, and frequent observation as determined by medical nursing staff.

[and]

The CHS physician will determine appropriate orders and treatment plans, taking into consideration the recommendations of Jail Psychiatric Services staff. The psychiatrist will address follow-up plans in the progress note."

Policy and procedure are not clear about who has the authority to set conditions of confinement outside 2P and 2M (other than the use of a safety suit and conditions related to its use as noted above) or to determine the release of those placed in safety cells for suicidality.

The observations, interventions, and visits by health staff are to be documented in a custody log. When I reviewed these logs on site (none were included in the medical records I received) they did not report on a good deal of the required information. They consistently indicated times of checks but did not consistently demonstrate the offering of food, fluids, toilet, or visits by healthcare staff.

All agreed that whenever an inmate expressed thoughts of self-harm that this led to an automatic referral to mental health, even if the inmate had been seen just an hour before. Behavior plans are not used to help manage those expressing recurrent self-harm ideation.

In review of records (see Appendix 1) and direct observation, I noted the following general patterns:

- Those in safety cells, segregation, and classrooms are not monitored by medical staff as specified by policy.  Medical staff does monitoring but the visits are less frequent than specified and the required physician visits were uncommon.
- There was no clear distinction between those placed in safety cells and other settings (e.g. segregation cells or the classrooms) that was discernible in the records.  This may reflect the fact that this is a custody determination.
- Reasons for establishing levels of checks were absent from the record except for those on 2P. This may reflect the fact that this is a custody determination.
- Suicide assessments usually addressed relevant clinical issues (e.g., signs and symptoms of mental illness) but usually did not address suicide risk factors and protective factors.
- Safety suits are used a great deal and for long periods of time in all settings, including 2P.
  - Reasons for using safety suits are often absent or poorly documented outside of 2P.
  - Those in safety suits outside of 2P may be seen as infrequently as monthly by JPS.
- There was almost no documentation on conditions of confinement outside of checks and safety suits in any setting.
- 15-minute checks are documented and reflect random times but logs frequently do not include notations regarding food, fluids, toilet, limb rotations, or clinician visits.

## Restraint and Seclusion

Behavioral restraint is not ordered by mental health staff within the jails. Custody staff can place individuals in restraint chairs for behavioral reasons for up to one hour. A Watch Commander may authorize additional time; no maximum is indicated in policy.

The CHS policy "Use of Restraints and the Prostraint Chair" speaks to custody ordered restraint.  The policy states, "Except as defined separately under Jail Psychiatric Services Policy, the application of restraints is not initiated by medical staff."  It goes on to state: "Mentally disordered inmates and/or other

inmates who display bizarre behavior which results in the destruction of cell furnishings or reveals an intent to cause physical harm to themselves or to others may need physical restraint devices to protect themselves and others from harm. When such a situation arises, the inmates can be placed in restraints **ONLY** with the approval of the Sergeant."  The policy specifies that medical or JPS staff "shall monitor the inmate's vital signs and circulation."  It further provides that "a medical evaluation be requested within the first 15 minutes and every two hours thereafter" and that "inmates in restraints shall be hydrated and their extremities exercised at least every two hours. Medical staff shall document this in the inmates Health Record."  Those placed in a Prostraint chair must be evaluated by medical within the first 15 minutes and JPS must consult within eight hours of placement.  The medical evaluations are to consist of "checking vital signs, circulation, sanitation needs, possible dispensation of fluids and nutrients as medically indicated."  Inmates restrained for longer than eight hours "require a medical and mental health examination prior to continuance of such restraints."  Inmates placed in restraint must be placed in a safety or segregation cell. Direct visual observation is required twice every 30 minutes.

"Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding #2" directs that "custody staff shall conduct restraint checks and/or evaluations in addition to the requirements outlined in this order and in accordance with Operations Order 2/02, Use of Restraint Devices."

The policy "Patients in Safety Cells" provides for the use of safety cells for those who are "uncontrollably violent, gravely disabled or displaying behavior which could result in harm to themselves or others."  Thus, they are used both for suicide monitoring and prevention and, essentially, for seclusion. This policy mandates contacting on-site medical and mental health staff and specifies that medical staff "are required to assess the patient within the first six hours of placement in at least every six hours thereafter to assess the inmates medical condition." For those remaining in the safety cell more than 24 hours, they must be seen by a physician within 48 hours of placement. Though there is a requirement to initially contact mental health, there is no requirement for mental health evaluation.

Restraints on 2P may be physician ordered but custody can also order restraint on 2P.  The 2P psychiatrist estimates episodes of restraint occur about once every two months.  Restraint is rarely needed in large part because inmate-patients are rarely out of their cells.  The JPS policy entitled "Use of Restraints in the Acute Inpatient Psychiatric Unit" provides for typical psychiatric restraint procedures. Physician orders are for up to 12 hours.  The policy provides for either supine or prone restraint; it specifies contraindications to prone restraint as "pregnancy, severe obesity, and chest or abdominal wounds." Psychiatrists may order use of the ProStraint chair when there are medical contraindications to restraint in the supine and prone position.  Monitoring provisions are vague, stating that "nursing staff will assess the inmate/patient and include documentation of the initial respiratory and circulatory check, evidence of any injuries, and the general condition of the inmate-patient. Nursing staff will also check placement of restraints and ensure proper application and inmate-patient comfort. The nurse will advise officers of restraint builds or cuffs should be adjusted to provide adequate circulation and movement."  The policy goes on to specify 15 minute visual nursing checks that must be documented.  Nursing staff are also required to "complete an assessment which includes the inmate/patient's overall physical condition, circulation, and skin check" every hour at which time the nurse is also directed to offer food, fluids and toileting needs.  Vital signs are to be done "as indicated."  Range of motion of all extremities is to be done every two hours for 10 minutes unless the patient is asleep or too combative.  All monitoring provisions apply to custody ordered restraint as well.  The policy precludes progressive release from restraint.

The ProStraint chair is reportedly rarely used at either facility but I did not receive any data on use; there was nobody in a ProStraint chair during my visit.  The Director Nursing reported that nursing regularly does checks of those in the chair and only one time in the last year was the initial check done outside of

required time frames. None of the cases I reviewed included episodes of restraint in the ProStraint chair. One case included several hours in restraint on 2P.  Nurse checks were complete except for one that was missed owing to unavailability of custody staff.  Range of motion was offered (and accepted all but once) by custody every two hours as specified by policy.

## Reentry Services

The UCDJPS Mental Health Policy and Procedure Manual specifies that:
> "A. All inmate-patients open to JPS should be assessed for the following:
>    1. Housing needs post-incarceration
>    2. Current or prior providers of community mental health or psychiatric care services
>    3. Post-incarceration medical and psychiatric care needs
> B. Inmate-patients identified as needing discharge planning services will be referred to the Discharge Planner via an electronic referral form.
> C. The assigned staff will meet with the inmate-patient to more fully assess discharge planning needs and will complete the Discharge Planning Referral form and Patient's Discharge Resource List. The inmate-patient will be provided a copy of the Resource List and any other information related to their specific discharge planning needs.
> D. A copy of the Patient's Discharge Resource List and the Discharge Planning Referral form will be submitted for scanning into the inmate-patient's eChart record."

Those releasing to the community are not given a supply of medications.  The patient typically goes to a pharmacy and the pharmacy calls the psychiatrist who calls in a telephone order to the pharmacy.  The county pays for a 30-day supply.  Release medication acquisition is not tracked.  The RCCC ARPN estimates that only about 30% of patients get their release medications.

The county recently hired community navigators to assist in transition from the jail to the community.  Their focus is primarily on those staying in jail for less than 12 hours.  JPS handles release planning for others.  Encounters for reentry services were about 50 per month at RCCC and 75 per month at the MJ.  Given that there are over 4000 releases per month and 40% of the population has an open mental health case (and 19% are on psychotropics), a very small fraction of the mentally ill are getting reentry services.

Linkage to County mental health is very limited. The homeless must report on their own to the "Guest House" where they must stand in line in order to register for services. Those with an address can call a telephone number to request services and if they qualify they get an appointment.  Mental health is unable to make appointments prior to release except for those who have been incarcerated less than 90 days. Those incarcerated for more than 90 days have their services discontinued and have to reapply through the preceding process.

Records and direct observation demonstrated limited release planning.

## Patient Privacy

The policy "Health Care Philosophy" states:

> "All health care, including medical interviews, examinations and procedures will be conducted in private in a manner designed to encourage the patient's subsequent utilization of health services."

> "There will be no counseling or examining patients at cell side, or in other non-medical settings, for reasons of convenience and efficiency. Such an approach fails to provide for adequate confidentiality, tends to discourage discussion of unstated complaints of a sensitive nature, and provides a sub-optimal examination setting.

> This does not preclude clinicians from responding to the site of an emergency, performing status evaluations of patients in safety or detoxification cells, or from cell-side evaluations when there are overriding security concerns. It is expected, however, that routine medical and mental health services shall be provided in a clinical setting in a manner assuring the dignity and respect of the individual."

The UCDJPS Mental Health Policy and Procedure Manual specifies that clinicians "[s]crupulously maintain confidentiality as it relates to the nature of the work that we perform." It also directs that "JPS staff shall not enter any inmate cell without custody staff directly outside for backup and safety reasons." On 2P, the JPS policy "Accessing Patients on the Inpatient Unit" states that "Staff will request officer presence whenever face to face contact is necessary within inmate-patient outside of the inmate-patient's cell." This is reinforced by the JPS policy "Assault Precautions-Inpatient Unit" which states:

> "Assault Risk - Universal safety measures will be utilized for all inmate-patients which include: requesting officer stand-by for face to face and direct patient care, the avoidance of being isolated alone with inmates, and constant vigilance regarding potential safety and environmental hazards."

There is no policy guidance as to how these apparently conflicting policies and principles are to be resolved or reconciled. Practice, as witnessed and documented in the record, is that almost all contacts on 2P are at cell front. In general population and intake, as documented above, privacy is clearly not maintained and it is clear that it is accepted practice to have patient visits in highly public areas. In short, the policy "Health Care Philosophy" is by no means observed with regard to the mentally ill.

## Record-Keeping

The jails use an electronic record system that integrates mental health, medical, and dental records. There is also provision for electronic physician order entry and electronic Medication Administration Record (MAR). The system is adequate.

The CHS policy "Health Record Format and Contents" specifies that "documentation of all healthcare services rendered to inmates," including care provided off-site, be placed in the medical record with the exception of the initial health screening which is only included in the record if there is subsequent healthcare delivered.

Policies provide for access to archived medical records though it may take several days for them to arrive from storage (which becomes less important the longer electronic medical records are in place). Policy also provides for relevant health information to be communicated to any receiving facilities outside of the Sacramento County jails.

JPS policies and forms regarding expected documentation are generally sufficient, though treatment planning provisions are limited. As noted elsewhere, actual documentation is variable and at times very minimal and not consistent with policy expectations.

Clinicians have limited access to county community mental health records, essentially just encounters and placements rather than access to actual records; diagnostic and medication information is generally available. Mental health staff take full advantage of available information.

## Training

The CHS policy "Staff Development and Training" states: "CHS will provide a comprehensive orientation and continuing education program for all new employees." Among specific training topics

included are: "Psychiatric emergencies" and "Suicide prevention techniques" but no other mental health training topics. I did not receive related training materials.

**Custody**

Officers noted that they get little training in mental health and mental illness other than the suicide training. The only location where custody staff are required to have any mental health related training is on the jail based competency treatment program at RCCC, for which they must have a 24 hour CIT training.

<u>Academy Training</u>

I received no information on Academy training.

<u>Other Training</u>

I reviewed the suicide training provided by UCD to correctional staff. The information provided is accurate but limited. More importantly, it provides very little guidance about how to interact with suicidal inmates and nothing about crisis intervention strategies.

Custody staff all get 8 hours of CIT training. A 24 hour CIT elective is available but must be requested and authorized or officers can pay for it themselves. Staff were unclear but believed this was a law enforcement CIT rather than a custody-oriented CIT.

**Mental Health**

I received no information on training for mental health staff.

## **Policies and Procedures**

In general, policies are comprehensive, as attested by the Title 15 review done for both facilities in 2015. Most policies were sound with the exception of policies around suicide prevention, safety/segregation/classroom cell use, seclusion/restraint, and those that specify very limited mental health service provision. The following are some salient observations regarding other salient policy content, some of which have minor gaps.

There are JPS policies and procedures regarding LPS commitment, admission and treatment on the LPS-certified unit, Tarasoff duties, voluntary treatment, infection control, patient information, patient rights, release planning, documentation, incident reporting, patient complaints, laboratory specimens, and staff responsibilities, among others.

The CHS policy "Informed Consent" states that "any competent patient can refuse treatment." It goes on to say that "any competent patient may refuse in writing both emergency and nonemergency medical and psychiatric care." It also states that informed consent is not necessary for "an emergency which requires immediate medical intervention for the safety of patients" and "emergency psychiatric intervention in circumstances where the patient is a danger to self or others." It also refers to more extensive policies and procedures with regard to involuntary psychotropics "for the Jail Psychiatric Services Program." It does not speak to involuntary treatment for grave disability per se.

The JPS policy entitled "Informed Consent and Riese Hearing" provides for obtaining informed consent from competent inmates under most circumstances. The policy allows emergency medications to be given without informed consent but mandates that "one staff person and the MD must concur that an emergency exists and provide documentation in the inmate-patient's chart." The policy goes on to specify

how to obtain a Riese hearing.  An additional policy entitled "Management of Inmate-Patient's Determined to Lack Capacity to Give Informed Consent for Medications" gives detailed instructions about obtaining a Riese hearing for LPS-committed patients who are incompetent.

There is no direction in JPS policy about how to manage incompetent patients who are not LPS-committed.

The "Pharmacy Policy and Procedures Manual," amongst other things, establishes a Pharmacy Services Committee.  There is no expectation of or provision for psychiatric representation on this committee.

Custody PREA policies are adequate but JPS does not have corresponding policy specifying their role.

## Quality Assurance And Quality Improvement (QA/QI)

I was not permitted access to UCD QA information regarding JPS.  They reportedly provide quarterly reports of frequency of encounters, response time, and self-harm.  I received only encounter information. Encounter types include:  new, follow-up, emergent, initial psychiatric assessment, and psychiatric follow-up.  Consistent with this report, the UCDJPS Mental Health Policy and Procedure Manual includes a "Quality Improvement Plan" that specifies:

> "Jail Psychiatric Services uses quarterly monitors to collect data for evaluations of quality care. These indicators and measurable variables are used to monitor aspects of care and are developed by the Clinical Director or designee and in conjunction with the JPS Leadership Team and the Department of Psychiatry and Behavioral Science CQI Committee.
>
> The Clinical Director or designee prepares quarterly reports of these monitors and forwards reports to the Department of Psychiatry CQI Committee. The results of these monitors are reviewed on a quarterly basis by the Leadership Team and the UCD Department of Psychiatry QI Committee. Recommendations by this committee are implemented as necessary."

The CHS Quality Improvement policy, which includes an Executive Committee, Patient Care Policy Committee, Infection Control Committee, and Pharmacy and Therapeutics Committee, speaks to health care generally but does not speak to mental health or psychiatry specifically.  Much of what this committee does would appear to have a direct impact on mental health and psychiatry but they are not represented on this committee.

The policy "Incident Reporting" specifies that certain incidents are to be forwarded to CHS administration "for review, analysis, and appropriate action. When a pattern of adverse events is identified, the matter will be forwarded to the appropriate quality improvement or administrative committee to be addressed through corrective policy and procedure."  The policy gives examples of the sorts of things that should be reported but does not include any mandatory reporting.  I received no such reports.

The policy "Inmate Health Care Grievances" specifies a grievance process for inmates. However it is primarily administered by custody rather than CHS or JPS.  As noted above, grievances are routed to mental health and reviewed.

The "Pharmacy Procedure Manual" provides for medication error reporting.  It also specifies, "Each pharmacy shall establish or participate in an established quality assurance program which documents and assesses medication errors to determine cause and an appropriate response…."

Other than the JPS statistics reported previously, I received no other QA/QI information.  While on site I inspected several death reviews.

**Death Reviews**

I examined five death reviews (enumerated in the database above).  Of these, two involved an inmate being killed by another inmate, one of which led to the reprimand of the deputy and suspensions of others. One was a suicide.

None of the death reviews I saw included any analysis of policy or systems issues and there were no associated corrective action plans.  They were primarily just collections of data on the deaths; some were incomplete even though quite old (for instance awaiting a coroner's report).  Several of the death reviews contained information that suggested corrective action may have been indicated, including the inmate killings.

In the case of the suicide, there was evidence that suggested this inmate's problems could have been detected substantially prior to the suicide.  Had he come to the attention of JPS staff, the suicide might have been averted. However, no analysis was done with regard to whether staff was aware of the inmate's functional decline or to for consideration of approaches that might promote access to data that was subsequently revealed that might have identified this inmate prior to death.

In another case involving the fall of an inmate in a wheelchair, there was no analysis of the conditions under which this occurred or the time it took to respond to his condition.

# OPINIONS AND RECOMMENDATIONS

There are numerous deficiencies in mental health care at the Sacramento jails.  These include organizational structure, the intake process, conditions of confinement (in that they contribute to inadequate care), access to care, quality of care, medication monitoring, medication administration, medico-legal considerations, patient privacy, suicide prevention, clinical restraint, restrictive housing, reentry services, training, and QA/QI.  I will address the deficiencies in each of these areas and specific recommendations within each area.  These are detailed below.  Then I will offer recommendations for overall system change designed to provide constitutionally adequate basic care.  I make some general recommendations regarding staffing needs and provide a more detailed set of recommendations in a separate report which the jail is free to use or not; the only important outcome is that mental health services are adequate, not any particular staffing model.

I will also provide recommendations for additional services if the county wishes to go beyond a merely adequate mental health system for the jails.  I can offer information on such additional services if desired. Mostly, however, it would consist in strengthening the services detailed below and expanding the mental health benefit to more patients.  Specific areas where services should be considered for expansion beyond basic care are development of specialized services for the severely personality disordered (beyond behavioral management plans, crisis intervention, and supportive services which will be necessary for adequate basic care), those with cognitive disorders (those with intellectual disabilities, traumatic brain injury, autism-spectrum disorders (PDD), and dementia – some of whom will be receiving mental health services regardless of any expansion), trauma-related services (including complex trauma related to childhood abuse), and co-occurring disorders (for mental health and substance abuse).

Before proceeding it is important to make some comments and general observations.  Jail mental health services clearly suffered substantial setbacks owing to staffing reductions during the recent economic

crisis and have not recovered from those losses.  When staff are lost, programs and systems of care are also lost or degraded.  The County faces the challenge of restoring program infrastructure while hiring new staff.  It is vitally important to take the time to carefully plan the services; this requires a systematic approach:

- Establish the organizational elements needed to support change and maintenance of change
  - An organizational structure that recognizes the essential distinction and substantial volume of mental health work in the jail setting (correctional mental health needs represent a larger proportion of services than in the community or general hospital setting)
    - Establish a stronger reporting relationship between JPS, CHS, and the SSD
    - Participation of mental health in jail executive leadership
  - Assure a strong QI/QA process to track implementation and assure program fidelity in addition to traditional functions
- Assess the population
  - Determine the diagnostic distribution (below, I offer estimates based on research as no diagnostic information was provided)
    - Diagnostic distribution by custody level
  - Functional limitations within the mentally ill population (as this drives treatment needs)
- Work with custody to establish logistical limitations
  - Physical plant
    - Options for placement of the mentally ill
    - Access to treatment space
      - Group
      - Individual
  - Inmate movement
  - Custody level
    - What role will mental health staff have in placement decisions and/or custody overrides if classification decisions?
- Based on the foregoing, establish a model of care for the program
  - Develop a staffing plan
  - Determine funding
    - Which may require reconsideration of the model and/or staffing plan
- Train staff
- Implement in stages
  - Attend to the order of roll out as this will determine the success of cultural change
  - Ensure fidelity to each change before rolling out the next stage

With regard to cultural change, it is important to state that at the present time, the system does not demonstrate a valuation of mental health treatment.  This occurs at both a structural level (e.g., lack of resources, inadequate settings and custody resources to permit mental health staff to see their patients in an efficient and structured manner) and at an attitudinal level in that mental health staff are not seen as integral parts of the team.  They are also expected to function almost exclusively as a crisis response service, which should be more of a joint function between custody and mental health.  The primary function of mental health is to treat mental illness just as is the case for medical staff who treat medical illnesses.  In order to do so, mental health staff must have protected time to provide structured services.  Crisis response should be a more limited component and it must be recognized that it is a marginally

effective treatment for serious mental illness (it is almost ineffective as a treatment modality), which treatment must be the focus of mental health. Further, when access to service is driven by crisis, then crisis is reinforced and necessarily escalates. It is essential for this latter point to be deeply recognized if the system is to be both effective and efficient.

## Specific Deficiencies

It is important to repeat that this analysis does not address harm. Clearly, gaps in service represent the potential for harm but I make no attempt to connect gaps with specific instances of harm.

### Organizational Structure

It is reasonable for the jail to contract services as it does with UCD for mental health services. However, as health services, including mental health, are a necessary part of jail function, mental health needs to be represented at executive levels. The coordination needs between custody, medical, and mental health are substantial. In fact, the coordination of mental health services is much more difficult in that mental health has elements of both behavioral and medical management; medical services are more discrete and are less embedded in the daily management of the jail milieu.

The jail mental health system needs a Director of Mental Health that oversees all jail mental health, coordinates with other clinical services, participates in executive leadership, and has robust connections to the community. See specific recommendations below for details. But it is important to emphasize that the lack of a Director of Mental Health is identified as a deficiency.

The current position of JPS Program Director does not oversee all of jail mental health services and has limited engagement with executive leadership and CHS. The JPS Medical Director has some engagement with CHS leadership but it is notable that there is no provision for the JPS Medical Director to sit on committees such as Pharmacy and Therapeutics.

### Intake

While I did not see evidence that the screening process was taking undue time, review of records demonstrates that some inmates remain in booking much longer than the 12 hour target. This is especially true for those with mental health concerns and is consistent with 8E staff reports. I was not provided QA/QI data on the timeliness of services. Case reviews and observations demonstrate a great deal of variability but without more data it is difficult to assess the timeliness of responses to intake by JPS.

Confidentiality at the nursing screening station is marginally adequate and would benefit from enhancement. This could be done by providing camera monitoring of the nurses and/or asking custody to remain out of earshot during intakes and the addition of sound screens between nursing stations.

As I received no data on the number of positive nurse screenings resulting in JPS referrals, it is not possible to comment in any detail on the adequacy of screening at a population level. It can be expected based on research that 15-25% of the inmate population is seriously mentally ill (SMI). JPS statistics show that, on average for this fiscal year, $(944 + 653)/(2131 + 1913.788) = 39.5\%$ of the population had open cases and $(469.11\ 316.56)/(2131 + 1913.788) = 19.4\%$ were on medications. Thus it is clear that JPS is likely identifying the vast majority of SMI. However, it is not clear how well these cases are being detected at intake. I saw a good deal of evidence in record review that many cases of SMI, even those with psychosis at admission, were not detected at screening, even when available jail medical records demonstrated a clear history of SMI.

The county is to be commended for having nursing staff conduct the health intake screening rather than officers. However, the mental health screening questions in the nursing intake assessment are inadequate to screen well for high risk and high acuity problems. The questions should seek to detect potential suicidal ideation, risk for self-harm, danger to others due to mental illness, acute psychosis, and cognitive deficits and to identify those on psychotropic medications. This screening should at a minimum address: present suicidal ideation, history of suicidal behavior, current psychotropic medication (prescribed and whether taking) and other mental health services, current mental health complaints, presence of psychosis, evidence of cognitive deficits, past history of inpatient or outpatient treatment, substance abuse history (current use is generally considered part of the medical assessment), history of sexually aggressive behavior, and risk/history of victimization, especially sexual victimization. It is probably apparent why it is important to ask about any current mental health complaints; in short, such a question increases the likelihood that conditions highly associated with danger to self and others will be detected. For instance, many may deny current suicidality but yet represent a substantial risk owing to their current level of distress, psychosis, or depression. It is also important that all questions be asked consistently and no assumptions made about what an inmate would respond if asked. There should also be a number of nurse observations pertinent to mental illness.

Specific problems with the Medical Intake form include:

- It combines questions about danger to self and others
- It includes conclusory and combinatorial questions such as "Is the arrestee mentally disabled and/or a danger to self or others?" but provides no direction or questions that would underlie such a finding.
- It limits questions about past suicidality to the last two weeks.
- It limits questions about past psychiatric hospitalizations to the last 30 days.
- It limits questions about past psychiatric medications to the last 30 days.
- It asks questions such as "Do you have a history of developmental disabilities?" which is an unreasonable way to assess cognitive limitations.
- It only asks for important observations such as anxiety, agitation, hallucinations, and orientation if the inmate has a high likelihood of sedative-hypnotic withdrawal.
- There are no questions or observations regarding the level of disorganization of the inmate.

**Conditions of Confinement**

The general conditions of confinement in the Sacramento jails are typical of a system this size and do not represent a substantial problem. Dayroom facilities and recreation yards are each adequate in terms of space but have limited facilities. It is encouraging that there are plans to augment yard equipment as it is quite limited.

The biggest problem for the mentally ill is access, especially to dayrooms and the large recreation area. Exercise is a valuable mental health intervention and the mentally ill have limited access to reasonable quality exercise opportunities. Programming space is often limited (especially in the MJ) but, if scheduled and fully utilized, is generally adequate. Access to mental health services is also impeded by conditions of confinement in that mental health staff are sometimes not allowed access, access is delayed, or gaining access is so challenging to effect that clinicians meet at cell front and other public spaces.

The general conditions for the mentally ill are unnecessarily restrictive. This is a result of several factors. First, it is unreasonable to presume that all patients on LPS commitment require a restrictive level of security. For many who are suicidal, isolation is deleterious to their condition and exacerbates risk of

suicide and many of these patients represent no risk to others.  Those who are acutely suicidal must sometimes be contained but this cannot be the sole management and treatment approach for this population.  Similarly, those who are seriously mentally ill and are not a danger to others, usually those who are gravely disabled, often need to be engaged in activities rather than isolated, sinking further into despair or psychosis.  Further, it is generally not possible to determine whether a patient represents a danger to others if they are not allowed gradual exposure to congregate programming under controlled conditions.  While some of this function could be provided in OPP after release from the LPS-Certified unit, it must nonetheless begin prior to step-down in order to ascertain readiness for a less restrictive setting.

On the mental health special management units (OPP), the mentally ill end up being limited in their access to the dayroom as they are not allowed to come out with other groups; these units house populations that should not mix for legitimate reasons or are not allowed to mix for reasons that could be overcome.  Further, most of the OPP beds are in relatively restrictive units. This affects access to patients and access to care in ways that are in many cases not justifiable. Clearly patients who pose a substantial and imminent risk to others must be limited in their contact with others, including clinicians. However, absent such a clear and present risk, mental health clinicians need to have access to their patients just as any other health provider does. While it is certainly appropriate to limit face-to-face contact with those properly identified as presenting a substantial and imminent risk to others, no effort is made to formally distinguish the dangerous mentally ill from the non-dangerous.

It is also highly desirable to examine the classification system.  The mentally ill present unique challenges to classification because their risk is easily over and under-estimated.  It is beyond the scope of this analysis to address classification but I encourage the county to seek the advice of a recognized expert in this area if not addressed by Mr. Vail in his report.

Isolation is deleterious to many mentally ill as is a lack of structure, especially for those with more serious illnesses.  In the absence of proper assistance, they are often impaired in their ability to perform such tasks as activities of daily living, particularly when under stressful conditions such as incarceration. Isolation also creates a greater need for the use of suicide watches and commitment to the LPS-Certified unit owing to the associated deterioration in their condition and the increased likelihood that many with limited coping skills will feel suicidal, self-harm, or claim to be suicidal in order to get a housing change or simply to access contact with others, including custody and mental health, that comes with such protestations.  And, as noted above, the lack of physical activity is also problematic, not to mention the lack of important treatment modalities as discussed below.

The cleanliness of the housing for the mentally ill was mixed. In most cases it was adequate.  Assistance with cell cleanliness is necessary for some mentally ill.  General jail cleanliness was mixed as well.

It is also important to make regular, but random, cell searches to assure that the mentally ill do not hoard medications or possess contraband items that might be used to harm themselves or others.  It should not be solely at the discretion of custody supervisors and should be driven by policy.

In summary, the conditions of confinement unique to the mentally ill not only impede access to care but are themselves dangerous to the mentally ill.  Those with psychotic disorders can be expected to become more psychotic under conditions of relative isolation and unstructured time. Those who are depressed, suicidal, or self-destructive are similarly placed at greater risk of harming themselves under these conditions.

## Access to Care

Access to care contemplates not only ultimate access but timely access. Both are necessary to provide adequate care and associated risk reduction that mental health services can deliver. It also entails access to the right service setting.

As the system is very crisis focused, emergency calls receive a prompt response by mental health clinicians most of the time though there are problems after hours and on weekends. Officers make frequent calls to mental health to refer for these services, primarily driven by suicidal statements and overt behavioral problems that may be related to mental illness (which are also responded to promptly) even when not clinically necessary, as this is an expectation of the system. Similarly, mental health promptly reviews and responds to computer generated mental health referrals. In short, mental health is responding promptly to crisis calls, when on site and available, and many referrals are viewed as crises.

As discussed under **Intake**, many inmates in need of services are likely missed at reception. Data suggests that they are detected later but even so, services are unreasonably delayed. It is also not clear whether the quietly mentally ill are being detected at screening or by custody.

As noted in the observations, access to psychiatric prescribers is frequently delayed. This occurs both following intake and in response to routine referrals.

Another issue best captured under access to care is placement in the appropriate setting. Mental health staff must be able to secure placement in settings that are dedicated to the seriously mentally ill, other than the LPS-Certified unit, and not excessively admixed with other populations. This is not just because it is necessary for adequate treatment but also because it will limit the numbers of patients cycling in and out of the LPS-Certified unit, reducing costs and increasing efficiency, assuming they are provided adequate treatment and conditions of confinement that are not unduly restrictive.

I saw clear evidence of patients that were in OPP who were much sicker than some of patients on the LPS-Certified unit. It is clear that the system is challenged to place patients at the appropriate level of service. Many patients cycle in and out of the LPS-Certified unit both because they cannot be sustained by the limited services available in GP and even in OPP and also because many are forbidden placement in OPP for custody reasons, often being placed in restrictive housing due to behavioral problems which in some instances were related to their mental illness. JPS has created the Medical Director Consult to try to address this. It has not been terribly effective. I would also note that the provision for review of those with "Multiple prior 2P admission, without therapeutic benefit" must be interpreted carefully as the seriously ill who are a danger to self or others or are gravely disabled who not benefit from treatment should nonetheless be in a treatment setting. Again, if the OPP settings were actual treatment settings, this would provide a reasonable location for this population.

An important deficiency best characterized under access to care is the lack of an OPP setting for women. Thus must be remedied.

The mentally ill who are capable of availing themselves of custody programs (groups, education, work) must also be afforded such opportunities. There are many mentally ill who are capable, with appropriate supports, of being in minimum custody settings where they can engage in work, education, and programs to address substance abuse, criminal thinking, anger management, and so on. It is not reasonable to exclude the mentally ill from these programs by virtue of their mental illness. If they can be in these settings with appropriate supports, they must have this opportunity. Of course, those too ill or dangerous to others or who are an imminent risk to themselves need not, and should not, be in such programs.

A related problem is transfers that either preclude access to care or needlessly disrupt care.  Transfer into and out of residential settings (absent an emergency or clear and present safety and security concern) should be done with mental health assent.  When inmates must be moved to a higher security level, mental health should be notified and the inmate should generally be moved to an OPP unit at that higher security level.

Access to care is also an issue because of challenges clinicians have in gaining access to patients as noted in Conditions of Confinement.  In addition, the lack of provision for custody escorts when such are provided to medical (at least at RCCC) is a clear marker of a problem.  Whether such escorts are necessary or not is a decision for custody (based on a reasonable classification scheme) but when identified as necessary, escorts must be provided.  The inability to schedule spaces and patients (whether in a clinic setting or on the units) also creates barriers to access.

Similarly, lack of reasonable spaces to see patients is a barrier to access.  Asking mental health to see patients in public areas or at cell front is not only a problem in terms of privacy, but also represents a substantial barrier to access in that many mentally ill will refuse such public treatment and/or be unwilling to share important clinical information.

**Quality of Care**

Treatment services within the Sacramento jail system essentially consist of crisis response, assessment, monitoring, and psychotropic medication.  There are virtually no groups, no rehabilitative services, and no structured activities, especially for the most ill.  This includes the OPP units and the LPS-certified unit.

What services are provided are efficient and sound, though assessment is uneven both by social workers and psychiatric prescribers (in part a resource issue).  The JPS does a tremendous amount of work for the limited resources at its command.

JPS is very clear that it is not providing any substantial individual or group treatment.  As such, there is limited effort to assure continuity of care by having the same practitioners see patients, though there is some continuity with psychiatric prescribers and social workers occasionally see patients in a series of follow-up visits.

There are no meaningful CD services available on the residential mental health units (none at all on 2P).

In short, other than psychotropic medications, the jails have no meaningful treatment.  While medications alone are sometimes adequate for minor conditions such as uncomplicated depression or anxiety, it is not sufficient for major mental illness and many minor conditions as well.

Psychotropic medications are prescribed on a regular basis and to a sufficiently large portion of the population to suggest that most needing medications are getting them.  Medication follow-up appointments were not sufficiently frequent owing to lack of resource, resulting in the ordering of medications without seeing patients.  Some patients also have medications ordered upon admission but may not be seen for weeks.  Prescribing patterns in the records reviewed were reasonable.

The County's formulary restrictions, for instance emphasizing generics first, are also reasonable, especially since non-formulary requests are granted in critical situations.  I did not see any cases where clozapine was used which may have been a problem of case selection.  It is important that this highly effective, but difficult to use, medication be considered in refractory patients.

Lastly, as noted elsewhere, but it bears repeating, crisis response is not treatment. It may avert an immediate disaster in some cases but without formal treatment, the risk is not diminished. And, again, it reinforces crisis behavior, driving further ineffective resource utilization.

**Medication Monitoring**

Psychiatric monitoring of patients on antipsychotics is inadequate. With the exception of one prescriber, I did not see a single Abnormal Involuntary Movement Scales (AIMS), even those who had been on first generation antipsychotics for extended periods. Laboratory studies to monitor for metabolic syndrome were rarely done and seemed generally to be ordered by medical providers. Even when ordered, I rarely saw the results in the record or reference to the results or consideration of such findings in medication choice.

These tests are the standard of care because antipsychotics can cause an unremitting movement disorder (Tardive Dyskinesia) and metabolic syndrome that can lead to substantial weight gain, diabetes mellitus, and complications associated with hyperlipidemia (e.g. heart disease and stroke). Patients with hyperlipidemia are started or continued on medications that pose a high risk of complicating these conditions with no mention of this in the medical record.

Baseline laboratories were almost universally absent. These are studies that should be ordered and reviewed prior to initiation of certain medications.

Levels for drugs such as Depakote or lithium were usually obtained but not universally. However, associated laboratory examinations such as renal and liver function tests or EKG were often absent. It may be that they are done, but they are not being included or referenced in the medical record.

It is important to note that those on involuntary medications should be subject to involuntary blood draws in order to properly monitor their medical condition.

Further, monitoring for side effects and efficacy of treatment was inconsistent. Most records, but not all, had general statements about side effects but there was rarely documentation of specific side effects and sometimes problems were noted in the medical record that might have been side effects but this was not discussed. More importantly, targets for treatment with medication are rarely established and, correspondingly, progress in treatment was frequently poorly documented. There were often statements about general functioning, but specific symptoms were rarely addressed.

**Medication Administration**

Other than substantial problems with timeliness and privacy, I did not see major problems with medication administration. The scanning system and computerized pharmacy make patient identification and accurate medication administration much more reliable than other methods. It also assures much more reliable continuity of care when patients transfer.

Timeliness of medications is important for their efficacy. It is also entirely unreasonable to offer patients medications late at night, hours after they were supposed to be delivered and at a time when patients are expected to be sleeping, sometimes even after midnight.

Lack of privacy is a general problem as noted above. At pill lines, it impairs the nurse's ability to get information about efficacy of treatment, side effects, and any new medical problems.

There also needs to be greater clarity about mouth checks. Mouth checks done for the purpose of determining medication adherence should be done by nursing as this is a clinical function. Mouth checks

done for the purpose of safety and security should be done by custody.  When custody detects lack of adherence, it is essential that they notify clinical staff.  Clinical staff should notify custody if the lack of adherence raises concerns regarding safety and security, such as diversion of medication.

Reports of patient medication non-adherence were often noted in the record and prescribers reported being notified on a regular basis.

**Medico-Legal Considerations**

There is no direction about how to manage incompetent patients who are not LPS-committed.  As an incompetent patient can neither refuse nor accept treatment, this population must be addressed in policy.  I saw a number of patients of dubious competence who were allowed to consent for care.  This is a general problem with regard to the mentally ill but some effort must be made to address this issue.

The practice of releasing patients at the expiration of their 5270 commitment and then readmitting them is unreasonable.  The fact that JPS indicates that it does not do conservatorships does not absolve them of responsibility to use whatever legal means are at their disposal to assure that patients get their needs met.  This must be rectified.  Given the growing length of stay in the jails, this is of growing importance.

While the jail PREA policy is comprehensive, there are no JPS policies addressing PREA and the jail policies lack specificity with regard to expectations of mental health staff.  I saw no evidence of JPS responding to PREA referrals and yet saw a number of cases where a PREA referral was likely indicated.

In short, medico-legal considerations related to competency, LPS commitment, conservatorship, and PREA need attention.

Use of emergency medications and other involuntary orders (outside of the above) seemed to be done when necessary.

I also note that a number of patients in the jail who had been found incompetent to stand trial and were waiting placement in the state hospital for extended periods of time, often months. I recognize that the jail is not responsible for this but note that the OAC v Mink decision from the Ninth Circuit demands that these admissions occur within one week based on substantive and procedural due process rather than simply state statute (see also the Trueblood case from Washington).

**Patient Privacy**

While confidentiality has important limitations in correctional settings, they primarily contemplate breaching confidentiality when there is a current identified risk or other "need to know" situation, in which case there is no expectation of confidentiality.  Limiting confidentiality because a risk might emerge is not reasonable.  Thus, the routine expectation should be that clinical communication is confidential.  This applies at intake, pill call, clinic visits, and in written communications such as grievances and requests for services.

It is expected and necessary that non-clinicians are privy to personal health information in the natural course of business such as administrative staff processing records.  But staff who do this work should be formally bound by clinical confidentiality and sign appropriate statements of confidentiality.  This might also apply to specially trained officers who are supporting clinical services; that is an option the County could consider.

The chilling effect that non-confidential clinical interactions have on the free and complete exchange of information between patients and clinicians must be minimized, especially if that includes custody staff.

## Suicide Prevention

The figures presented by JPS for suicide attempts at the jails seem very low. It is not clear how this data is captured or what definition is being used. However, it is highly likely that this data excludes events of non-suicidal self-injurious behavior, which was noted to be quite frequent by clinicians. This needs to be more thoroughly monitored and assessed through QA/QI processes.

Mental health should have a more thoroughgoing role in determining conditions of confinement (suicide precautions) and monitoring for all patients on suicide status; JPS plays a fairly passive role in this function outside of 2P. It is unreasonable to ask custody or medical staff to set suicide prevention conditions. This is the area of expertise of mental health clinicians and they need to be the ones that take responsibility for this function in all jail settings, though recognizing that other classification-based risk considerations also have an impact on conditions. It is rarely reasonable for mental health to set conditions that are less restrictive than classification-based risk conditions with the exception that for some mentally ill, it is so deleterious to their mental condition that relative isolation substantially elevates their suicide risk. [Note: Consistent with Federal case law, the NCCHC has recently come out with a position statement recommending elimination of solitary confinement for the mentally ill in general, and juveniles and pregnant women, and strictly limiting the time anyone is placed in solitary confinement to 15 consecutive days.]

Monitoring of patients in safety cells is not being done per policy. Notably, nursing assessments of those who are remaining in safety cells for extended periods of time, primarily those awaiting placement on 2P, are often late. Custody is sometimes not allowing these assessments for reasons such as serving meals, which is unreasonable. The physician checks that are supposed to be done after 48 hours in the safety cell do not appear to be regularly done.

Placement of inmates in the MJ classrooms for suicide monitoring exposes these inmates to public scrutiny and has a punitive quality. It is also not an efficient use of space that should be used for more constructive purposes. More rapid assessment and determination of what conditions are actually necessary for assuring safety and provision of more treatment generally will likely eliminate the need to use these spaces, such as the inmate waiting 12 hours in the classroom for a JPS crisis assessment. It may be that custody staffing plays a role here in that it is an easy place for limited custody staff to watch these inmates; please see Mr. Vail's report in that regard.

Further, there are deficiencies in monitoring policies. Mental health emergencies should be responded to within four hours. Anything necessitating placement in a safety suit should be considered such an emergency and placement in a safety cell should almost always be considered at least an emergency or at least an urgency. It is reasonable for nursing staff to do an initial assessment in an emergency situation and then consult with on-call mental health staff. At this point, conditions of confinement should be established, for instance whether or not a safety suit is truly indicated. It is not reasonable to delay any changes or reductions of conditions of confinement pending evaluation by another JPS clinician which may occur days later. If the County wishes to have those determinations made by a non-nursing JPS staff following in-person assessment, then those staff need to be available 24/7.

Equally important, there is no provision for constant, direct monitoring of those who are imminently suicidal (even on 2P, this is not offered unless the camera cell is not available). Such monitoring should rarely be needed after initial JPS assessment and in such cases could be restricted to the LPS-certified unit if immediate admission was possible for any patient who was imminently suicidal. However, constant visual observation should be expected for any inmate pending mental health evaluation for suicidality, whether during intake or on the units. Fifteen minute checks are sufficient in most cases needing long-

term monitoring but that decision should rest with JPS after conducting an assessment which, as above, could be done by JPS nurses in consultation with an on-call mental health staff.

Safety suits, as well as other restrictions to reduce the risk of self-harm, are being utilized for unduly extended periods of time, in many cases even months. This is likely related to the absence of active treatment opportunities both in OPP and on the LPS-certified unit. It may also reflect a punitive use in some instances but here again, this is likely attributable to a lack of availability of more constructive approaches to behavioral problems including mental health treatment and behavior management plans.

Lastly, it is important that policies be made internally consistent and that there is a more clear designation of who has decisional authority at what points in the process over conditions of confinement, use of safety suits, and placement in safety cells and similar settings. At present, policies are inconsistent and less than clear.

**Clinical Restraint and Pro-Straint Chair**

Restraint seems to be little used and I did not see or receive evidence of any prolonged restraint. Restraint monitoring appears adequate though I only saw one instance of restraint in the records I reviewed.

Restraint in the prone position, provided for in policy, is known to be very risky and generally contraindicated. It is reasonable to restrain those who might vomit in a non-supine position but I question whether even these patients should be placed prone. With those at risk of seizure, there is variable opinion but I also question whether prone, as opposed to on the side, is preferable in this population either.

I did not receive data on the use of restraint chairs so cannot comment on its frequency of use, appropriateness, or duration though all reported rare usage. Restraint chairs should only be used for a maximum of four hours and require the same review as clinical restraint. Current policy does not specify a maximum time but does provide for appropriate medical monitoring. However, policy specifies that mental health be consulted within eight hours of placement in restraints. Given that the restraint chair should not be used longer than 4 hours, mental health should be consulted at that point to consider whether mental health treatment is indicated, a behavior management plan is needed, and/or placement in a restraint bed is necessary. It is reasonable for restraint decisions outside of 2P to be a custody decision as it is now but mental health should be consulted earlier in the process as mental health placement should be considered whenever prolonged restraint is necessary.

**Restrictive Housing**

The jails do not provide mental health or medical assessment of those entering restrictive housing or mental health rounds for those in restrictive housing. These are essential functions for this high risk population. See below for recommendations.

**Reentry Services**

This is an area of current focus. Plans to develop greater boundary-spanning functions such as discharge navigators should strengthen the ability to successfully transition patients into community services. However, at present reentry services are very limited. At present, reentry services are being provided at a very low rate that is identified as a deficiency.

There are two primary gaps in the reentry services that are being provided. The first is that there is no provision for direct placement of the seriously mentally ill from the jail into supported housing and no

conduit to locked community facilities for those leaving the jail, though these facilities are available to the mentally ill leaving hospitals.

The other gap has to do with release medications. As the county does not give a supply of medications to patients when they leave, patients have to take a prescription to a pharmacy and then try to secure a prescription from the jail prescribers after the fact (they are not provided prescriptions at release). The only estimate I heard was that "about 30%" got their release prescriptions. But this information is not tracked so it is difficult to ascertain the scope of the problem.

I will also note that the barriers in the community to accessing services described in the body of this report impact the jails but I recognize the jails and UCD have limited ability to impact these systems.

### Training

I only received the annual suicide training by UCD. This is an extremely limited training, though conveyed accurate information. It cannot be considered adequate suicide training.

As I did not get any materials on the training deputies receive at the academy, I cannot comment further. Solid training in mental illness and crisis intervention are critical parts of custody training.

The lack of training requirements for custody staff working on residential mental health units is problematic. These are unique populations requiring different approaches. In this regard, it is important that custody staff receive training that focuses on correctional issues rather than general law enforcement. For instance, CIT training for law enforcement is quite different than that for custody settings.

### Quality Assurance and Quality Improvement

As UCD would not provide any QA/QI data, it is difficult to assess this area. However, all evidence points to a substantial lack in this regard. It may be that this is one of the most important deficiencies but without the necessary data from UCD, it is difficult to be certain.

This is a substantial and vitally important function for jail mental health services. In this regard, I note that the data I was provided is inadequate to create a clear picture of the services being delivered, let alone their adequacy. Thus the only way to evaluate services is through a chart review and patient interview, as provided in this report. That is an extremely inefficient methodology, though an important adjunct to general QA/QI data collection. As a simple example, mental health intake assessments are not tracked.

The poor quality of death reviews also stands as a marker of the inadequacy of QA/QI. None of these demonstrated any analysis of the cause of death or identified any corrective action plan, let alone follow-up of completion of such a plan.

## Recommendations Regarding Specific Deficiencies

In this section, I offer some targeted suggestions for the specific deficiencies. I offer a more global set of recommendations for developing an overarching system of care in **RECOMMENDATIONS FOR CREATING A SYSTEM OF CARE.**

### Organizational Structure

A Director of Mental Health should oversee all mental health in the jail, including psychiatric prescribers and psychiatric nurses. I understand that mental health services are contracted with UCD, which places some limitations on organizational structures. However, the Direct of Mental Health should have strong reporting requirements to the Sheriff and the Chief Medical Officer and should also participate in jail

executive management.  This position should not be an administrator but a clinical manager.  The exact discipline is not critical, but in general it should be someone with a doctoral degree in a mental health field with clinical experience and a robust clinical administration background and correctional (or at least institutional) experience.  This is a very difficult and vital position that requires knowledge of clinical services, the law, and administration.  A person with additional forensic training would be ideal.

The Director of Mental health should be responsible for overseeing program development, clinical practice, and policy as well as interfacing with jail and medical leadership and community mental health.

### Intake

The intake screening form for nurses needs to be reworked.  Part of the reason these changes are important is that a mental health professional should be using this information to prioritize cases. These questions must be designed to identify the most acute and risk-laden mental health conditions to allow the most rapid identification of these conditions both by the nurse and the mental health clinician reviewing the form.

There are many existing screening forms in the public domain and it is up to the county to decide whether to use one of these or create its own. A checklist format with some narrative options is preferred. Several process and content requirements bear mentioning.  The content should be directed to no higher than a sixth grade reading level and must be available in foreign languages commonly encountered in the jails. The mental health component should take less than 5 minutes in the vast majority of cases, about 1-2 minutes if all negative.  At a minimum, the following must be included (not necessarily asked in this order or using this exact language):

- Current psychotropic medications (to be verified per existing processes)
    - Medication and dosage
    - Adherence, including last dose
- Mental health treatment history
    - Current treatment, if yes
        - Most recent visit
        - Location (clinic name)
        - Provider name(s)
    - Past treatment, if yes
        - Inpatient (y/n)
        - Outpatient (y/n)
- Ever in special education classes problems with learning (y/n)
- Use drugs or alcohol? If yes,
    - Which
    - How often
    - How much
    - Last use
- Mental status questions
    - Orientation
    - Have you been feeling sad or depressed? If yes,
        - How long?
    - Are you hearing/seeing things others do not? If yes,
        - What is the content? (brief summary)
    - Do you have any mental concerns or need mental health help? If yes,

- ▪ What is bothering you? (brief summary)
- Observations
  - o Level of consciousness (alert, somnolent, obtunded)
  - o Agitated (y/n)
  - o Responsiveness/demeanor/level of cooperation (give options)
  - o Self-care (good, adequate, poor, malodorous)
  - o Responding to internal stimuli or distracted/inattentive (y/n)
  - o Affect (give options, for example: euthymic, tearful, depressed, labile, elated, irritable, sullen, angry, fearful, anxious)
  - o Any delusional content (y/n – specify)
  - o Evidence of intellectual or cognitive limitations (y/n)

Referral to mental health should be based on responses.  Certain responses or combinations of responses should lead to an automatic referral.  The nurse should always have discretion to refer other cases as well.

The mental health intake assessment should build on the information collected by the nurse.  Note that some of the below repeats the above – and should.  This can be based on a checklist with narrative specifiers or based on an outline and entered in the record.  Referring to the nursing assessment and verifying the patient's responses is legitimate and encouraged. It should take 15-30 minutes. At a minimum, the following must be included (but not necessarily asked in this order or exactly this way):

- Explain why referred
- General question about current concerns
- Mental health treatment history
  - o Current treatment, if yes
    - ▪ Most recent visit
    - ▪ Location (clinic name)
    - ▪ Provider name(s)
  - o Past treatment, if yes
    - ▪ Inpatient
      - How many times (grouped)
      - Where (types of hospitals)
      - What for
      - Last admission
    - ▪ Outpatient
      - What clinic
      - Provider name
      - What for
      - Last visit
  - o History of self-harm
    - ▪ Suicide attempts
      - How many
      - Most serious
      - Most recent
      - Ever hospitalized
    - ▪ Other self-harm
- Current psychotropic medications (to be verified per existing processes)
  - o Medication and dosage schedule

- o Adherence, including last dose
- Any recent losses
  - o Characterize
- Highest grade completed
  - o If in special education classes, what grades
  - o If special services for learning or presentation suggests intellectual limitations inquire about enrollment in programs for intellectual disability
- Use drugs or alcohol? If yes (verify report to nurse),
  - o Which
  - o How often
  - o How much
  - o Last use
  - o Ever in treatment
- Mental Status Examination
  - o Orientation (if not fully oriented with nurse)
  - o Mood
    - ▪ Ask questions to characterize
  - o Are you hearing/seeing things others do not? If yes,
    - ▪ What is the content
      - If auditory hallucinations,
        - o Where do they come from?
        - o What do you think they are?
        - o Do they tell you to do things? If yes,
          - ▪ What?
          - ▪ Are you able to resist?
    - ▪ How long
  - o Do you feel that you are in danger? If yes,
    - ▪ How come
  - o Have you considered ending your life or harming yourself?
    - ▪ When
    - ▪ How
    - ▪ Means
- Observations
  - o Level of consciousness
  - o Responsiveness/demeanor/level of cooperation
  - o Agitated (y/n)
  - o Characterize psychomotor state
  - o Characterize affect
  - o Responding to internal stimuli or distracted/inattentive
  - o Delusional content, if yes
    - ▪ Characterize
  - o Evidence of intellectual or cognitive limitations, if yes
    - ▪ Characterize
- Potential for victimization

In terms of data collection and the ability to report out and audit the intake process, computerized systems that can readily be queried for positive screens (or standing reports) should be utilized. Utilization of the EHR should readily facilitate this process.

**Conditions of Confinement**

I discuss conditions of confinement related to self-harm below. Here, I emphasize the need to have provisions for addressing the conditions of confinement for the mentally ill in consideration of their illness. Just as medical illness requires modifications of conditions in some instances, and within limits, so too does mental illness.

I recommend considering adoption of an internal classification scheme (or similar process) that is based on behavior change in a formal way and that allows input from mental health but that is beyond the scope of this report. Regardless, it is essential to have formal mental health input into conditions of confinement for the mentally ill and those at risk of self-harm or who are gravely disabled.

The jails must allow change of security level based on behavior and clinical needs (in this case, mental health needs). This should include a process for custody overrides (or whatever terminology is chosen), that still considers static risk and current behavior, but allows some flexibility in the placement of the SMI population into the appropriate level of services and in the least restrictive environment. This should include the capacity to both ease and tighten conditions of confinement. Easing of conditions of confinement should be based only on demonstrated behavioral improvement and can include a formal reduction in security level or other process allowing placement into less restrictive mental health housing. For instance, an inmate who had been acutely manic and agitated at admission and required high levels of security (e.g. 1668040) should have the opportunity to move to lower levels of security once stabilized. Mental health should have a formal role in these determinations for inmates with SMI and danger to self. Clearly, there must be limitations on such reductions and inmate static risk (classification) must be given its proper emphasis. At times static risk is so high that any consideration of reduction in security level should be precluded.

It is also vitally important to recognize that some mentally ill that score at low security levels may nonetheless be quite dangerous, especially until treated, and this must be accommodated as well – but not through the vehicle of infraction and sanction. Tightening of conditions of confinement for increased risk related to mental illness should not contemplate infraction or a permanent increase in security level as this amounts to punishing patients for being mentally ill. This requires mental health input into the infraction process, sometimes not infracting when the behavior is driven by mental illness; but tighter conditions of confinement might nonetheless be necessary by virtue of their present risk. In short, they are not infracted but they are placed in what amounts to a higher security setting because their clinical condition necessitates such limitation. Sometimes, there may be no infractable behavior but elevated risk is still present; this requires mental health staff to have some ability to drive custody overrides and/or be able to place the mentally ill under more restrictive conditions or in more restrictive housing other than by the sole vehicle of LPS commitment. For instance, an inmate might be admitted in stable condition and with no mental health symptoms and then decompensate and become agitated but not commit an infraction; but a higher degree of confinement might nonetheless be clinically indicated but still short of LPS-commitment. This both responds to the clinical needs of the individual and serves to meet the jails' responsibility to keep the inmate-patient and others safe.

In other cases, mental health input may be important to establish the type of sanction; in such cases sanctions would be designed to both limit the chances of worsening the mental illness and, when possible, to help the inmate (e.g., completion of a program module such as anger management or workbook is

given as the sanction).  As the mentally ill are not immune from instrumental and other problem behavior not related to their mental illness, it is also unreasonable to preclude sanction of the mentally ill; it must be considered in light of the relationship, or lack thereof, between the illness and the behavior.

In short, mental health staff can provide input that will help the decision-maker assess the degree of contribution of mental illness to the problem behavior and help generate conditions that are most likely to mitigate risk.  In this regard, it bears emphasizing that treatment does reduce risk to self and others.

Those on LPS commitment also need to have the opportunity to progress in privileges as permitted by their clinical condition (within their classification security level), rather than all being placed at the highest level of confinement as it is at present.  This allows a determination of their readiness to step-down from an acute level of care.  Without being able to assess the inmate-patient's ability to handle greater privileges, it is not possible to make a sound judgement about a change in placement to a less intensive and well-supervised setting.  It is also unreasonable to presume that those who are LPS-committed are necessarily dangerous to others and require a restrictive housing setting.  Privileges should track their classification security level absent the types of considerations noted in the preceding paragraphs.

The current initiative to provide differential privileges (in this case, out of cell time) tied to their classification security level is closely related.  But on 2P and OPP, it needs to permit differentiation of privileges within their security classification level based on the inmate-patient's behavior and clinical stability.  A formal level system is the best vehicle for doing this.  There should be such a program in place at least on 2P.

Requiring more uniform conditions throughout the jails for each security level that are driven by policy and limit local interpretation of conditions is also essential.  In this regard, it is also important to provide for regular, random cell searches of OPP units (and perhaps for all units) at an established frequency that is not discretionary.  This should specifically include attention to hoarding and potentially dangerous contraband.

Lastly, minimizing admixing of incompatible populations that reduce the now disproportionate impact borne by the mentally ill is also necessary.  In short, mixing the mentally ill with other populations that have their own intrinsic limitations is resulting in restrictions on their privileges that unfairly and disproportionately affect them.  This may require rethinking how PC functions (and its co-placement with mental health residential settings), which may also be considered in the context of modifying the classification system.

**Access to Care**

Because this is a global problem and touches on so many aspects of the system, including custody operations, it is better addressed below in **RECOMMENDATIONS FOR CREATING A SYSTEM OF CARE**.

**Quality of Care**

In addition to the general provisions articulated below in **RECOMMENDATIONS FOR CREATING A SYSTEM OF CARE**, some more specific recommendations are in order.  I will note here that the Jail Based Competency Restoration Program has many of the features needed in a residential mental health setting and can be used, to some degree, as a template for OPP though OPP will not require as much staffing to provide adequate care.

The most important populations to treat are those with severe illness and those who represent a danger to self or others by virtue of their mental illness. Thus, services should be designed to address these types of disorders. While crisis response is an important first step, it is only a first step, just as is the case in the treatment of a medical condition. Continued care is necessary.

In order to provide appropriate care, good assessment in all cases is an indispensable first step. There must be sufficient resource and access to allow for a thorough assessment prior to initiation of treatment, absent an emergency (in which case an assessment must ensue). Once identified at intake or through subsequent referral, a thorough assessment is needed in order to determine the setting and type of service needed both according to diagnosis and level of functioning.

For those with psychotic disorders, highly structured activities and treatment, avoidance of isolation (while also limiting over-stimulation), and medication are the key elements of adequate care. Psychosis itself is a destructive condition, literally damaging the brain, that must be alleviated. These patients cannot organize themselves and readily fall more deeply into their psychotic thinking when isolated and become more agitated or disorganized when overstimulated. Such treatment does not seek deep psychological insight but to reduce symptoms, develop self-management skills (e.g. symptom and emotion management), develop social skills sufficient to get needs met and limit conflict, provide education about mental illness and medications, and expand basic living skills (activities of daily living, self-care, accessing jail and community services, etc.). These are not highly technical interventions and do not take extensive resources. They are most efficiently delivered in group settings.

Those with serious mood disorders often need much of the preceding. Those with depression may also require some individual or group treatment focused specifically on depression. There are many "off the shelf" short-term group and individual treatment modules that are readily run in correctional settings. Many of these employ cognitive behavioral therapy but other methods are also effective.

Those with recurrent and severe self-injurious behavior and some other recurrent behavioral problems require different approaches. It is essential to be able to develop and implement behavior management plans to decrease the inadvertent reinforcement of such behavior as often occurs in correctional setting. One of the most common dynamics is that when the system is crisis-driven, crises are reinforced as they are the only sure way to get both correctional and clinical staff to respond, whether negatively or positively. Developing plans to limit this dynamic is important. This population, especially the self-injurious, also needs interventions focused on self-management rather than the development of insight or addressing personal psychological traumas, which is beyond the reasonable scope of what a correctional setting must offer.

Those with cognitive deficits will also require some degree of mental health care. While such services can be offered in residential mental health settings, this is not optimal. While developing a formal program for this population should be considered, it would not be required for a basic system of care as long as their needs are met and their presence in mental health settings does not prevent meeting the treatment needs of the mentally ill.

**Medication Monitoring**

Medication monitoring must correspond to the standard of care in the community. While this need not be specified in policy or procedure, that is one approach some systems use to set a formal standard that can then be audited or peer-reviewed.

Medication monitoring can be roughly grouped into four categories, all of which must be consistently done:

- Baseline studies
  - Studies that must be done prior to initiating treatment
    - May include ECG, blood, urine and sometimes other studies
- Medication monitoring
  - Monitoring levels of medications
    - To assure levels are within a therapeutic window
    - To evaluate different rates of metabolism in a particular patient
    - To assess patient adherence
  - Monitoring for adverse effects
    - Routine monitoring
      - Antipsychotics for metabolic syndrome and movement disorders
      - Certain medications for known risks, e.g.
        - Renal and thyroid function for lithium
        - Liver function for valproic acid
    - Monitoring in light of evidence of possible adverse effect
      - This is highly situation-specific
- Monitoring for side effects
  - Side effects should be assessed and documented at each visit
- Monitoring for efficacy
  - Targets for treatment need to be established
    - Progress towards targets should be assessed and documented at each visit

**Medication Administration**

There needs to be sufficient resource (nursing and custody) to administer medications timely.  It is reasonable for medications to be delivered an hour before or after the designated time under routine conditions, thereby providing a two-hour window.

Further, checks of adherence (such as mouth checks) should be done by clinical staff as this is a clinical function.  Custody may also conduct mouth checks for safety and security reasons but these need to be recognized as different functions.

As mentioned elsewhere, routine cell searches are important as well.  Being clear about what inmate-patients are allowed in light of consideration of pharmacy functions (e.g., how long it takes for refills of KOP medications to be processed), expected adherence problems (70% adherence is typical in the community), and store orders.  This requires being clear about how many OTC medications may be possessed, when KOP refills need to be obtained and how much additional medication this will necessarily place in the inmate-patient's possession, and how many excess pills should be allowed (given that some non-adherence is normal).

**Medico-Legal Considerations**

The three areas that stand out as needing attention are competency and consent, LPS commitment and conservatorship, and PREA.

Policies must clearly differentiate and address the following (for medical and mental health):

- Emergency treatment
  - Competent patient
    - When treatment may be refused
    - When treatment may not be refused
  - Incompetent patient
    - When an attempt to contact a surrogate must be made before treating
      - What to do when a surrogate cannot be contacted
    - When treatment should be rendered prior to any attempt to contact a surrogate
- Incompetent patient
  - Process for determination of incompetency
  - Mechanisms for establishing a surrogate decision-maker
    - What to do prior to the establishment of a surrogate

The practice of putting those who are committable under LPS on a 2P pre-admit list and then later, when a bed becomes available, submitting commitment paperwork is deeply problematic. If a patient is committable, they must be committed and treated and housed in a location that corresponds to their level of need. While improvements in the OPP and other mental health services may reduce the need for 2P beds, it is possible that more LPS-certified beds will be required to meet this need. Systems of this size typically need about 40 beds, though it varies a good deal based not only on other jail services but also on the adequacy of community services and the behavior of law enforcement and courts. Regardless, the County must provide access to LPS-certified or licensed beds for any who meet commitment criteria.

The limited use of temporary and permanent LPS-conservators also needs to be reviewed and addressed. There are too few being placed on these statuses. Given the sometimes long stays in the jails, it is essential to have this tool; it is unreasonable to release a patient in need of LPS commitment from 2P only to immediately re-admit them when the law provides for other mechanisms.

PREA policies and procedures also need to be examined for conformity and, if necessary, corrected; the SSD policies are generally sufficient. JPS policies, and probably CHS policies, need to be developed to correspond to the existing SSD policies.

**Patient Privacy**

Provide for confidentiality in all settings to the maximum degree possible. Confidentiality is essential to mental health treatment. The default position must be that all clinical interactions are private absent an identified present risk.

All written documents including personal health information should be processed by health care staff, which includes health service administrative staff, or custody staff who are bound by the same confidentiality strictures as health care providers. Sealed materials can be handled by any staff, e.g., for the purposes of transport. In the case of grievances, they should be marked as medical or mental health and should be so directed and not reviewed by any custody staff.

Patient-clinician encounters should be confidential to the maximum extent possible, absent an identified (not potential) risk. It is reasonable and desirable for deputies to be able to observe intake screenings but the content of the conversation should remain confidential. It is possible to provide for confidential medical and mental health screening at intake by allowing visual observation by custody staff who cannot hear the content of the interaction, restraining the inmate if necessary.

It is also legitimate to provide close custody monitoring of clinical interactions when there are no other reasonable options for providing for safety and security but, again, on a case-by-case basis, not as a routine practice. There should be provision for restraining dangerous inmates to allow a private clinical interaction when appropriate.

The county could develop specialized deputies who serve dual roles of treatment and custody as a way of maximizing safety and security and ensuring confidentiality; many systems have developed such positions. But this is an option, not a need or a formal recommendation.

It is a recommendation that custody staff assigned to OPP and 2P have special training in mental health which should include confidentiality training and signing confidentiality statements regarding protected health information.

HIPAA regulations, often the most restrictive, provide for disclosure of protected health information on a need to know basis. The determination of the need to know is the responsibility of clinical staff on a case-by-case basis, though policy can certainly set guidelines for the type of information that rises to that level. It is especially important that policy direct clinical staff to disclose current risks to the safety and security of the jail and future risks in compliance with Tarasoff laws. Clinician disclosure of past criminal or other salient behaviors (e.g. sexual abuse of a minor) should be done only in accordance with laws governing statutory disclosure.

**Suicide Prevention**

Comprehensive review and restructuring of suicide assessment and monitoring is necessary. As noted above, mental health staff should have the responsibility to assess risk of self-harm and, within classification security level limitations, establish conditions of confinement related to the potential for self-harm. This means that mental health staff should have the responsibility and authority to determine clothing, other items, and the degree of monitoring and privileges a suicidal inmate-patient may have, within the limitations of their classification security level.

Custody and medical staff must have the authority to immediately initiate full precautions (including the most suicide-proof cells and initial placement in a safety suit) in the face of an imminent risk of self-harm such as actual self-harm behavior, expressions of suicidal ideation with a plan, or behavior that indicates an intent to self-harm. This exists in current policy and properly results in an immediate JPS referral; this mechanism should be retained. Pending JPS assessment in such cases, such inmates should be under constant, direct visual monitoring.

Safety cells vary in the degree to which they are suicide-proof. These cells should be maximally suicide-proof. General standards for evaluating and eliminating suicide hazards are included as an attachment in Appendix 2. The County should evaluate its safety cells and other high suicide risk locations in light of these standards. The so-called "seg cells" in the booking area, restrictive housing areas, OPP, and 2P should also be evaluated in light of these standards and make reasonable efforts to remediate any deficiencies.

The use of the segregation cells in the booking area or placement in any setting other than a safety cell for those on suicide monitoring should only be allowed once mental health has assessed and cleared inmate-patients to be in these cells given that they are not suicide-proof. These cells may be used for other forms of behavioral disruption at the discretion of custody as provided for in current policy. Mental health should be able to recommend placement of the behaviorally disordered or agitated mentally ill in these

cells as well but only be able to direct their use (or an equivalent setting) for those who are a danger to self in the process of stepping down from more intensive suicide monitoring.

The use of the so-called "classrooms" holding inmates pending evaluation or on monitoring needs to be halted. These are not living spaces, have no toileting provisions, are publicly visible spaces, and are not suicide-proof. These spaces should be used for programming and treatment.

In terms of monitoring standards, it is essential to have at least four levels of monitoring: constant 1:1 monitoring, direct visual observation, 15 minute checks, and routine checks (usually every 30 or 60 minutes). While the latter is not technically suicide monitoring, it is of course a check that would include attention to self-harm. Constant 1:1 monitoring should only be employed as a short term measure for the imminently suicidal prior to mental health assessment and pending transfer to 2P after mental health assessment; longer term constant 1:1 monitoring must be available at least on 2P (as long as there are always beds available). Those not imminently suicidal but where there is a concern about possible self-harm can be under direct visual observation pending assessment; the County could choose to provide this on all units or move such inmates to a location where such observation is readily available. 15-minute checks should be available in booking, OPP, restrictive housing, and 2P and as a temporizing measure in other settings for those not suicidal, pending mental health assessment.

Video monitoring is never a substitute for direct observation but can be used to supplement it. For instance, video monitoring can be used to supplement periodic checks but is not a substitute for constant 1:1 monitoring or conducting direct visual observation or checks.

Assessments for the suicidal should be viewed as emergencies and responded to within 4 hours. It is reasonable for nursing staff to conduct such assessments after hours and on weekends and holidays as long as they have special training in mental health and, if not qualified to conduct such assessment independently, have access to a mental health clinician for consultation.

Mental health must also provide treatment designed to reduce suicide risk and should develop a corresponding treatment plan and/or behavior management plan for every inmate-patient that mental health assesses as requiring any level of suicide monitoring as these patients are presumably at imminent risk of self-harm.

When patients are taken off suicide monitoring, they should be seen by mental health within 72 hours at the most. Mental health should be expected to do daily assessments (which may include providing treatment) of anybody on constant 1:1 monitoring or in a safety suit.

As mentioned above, safety suits are being used excessively. The provision of more active treatment and improving conditions on OPP units is likely to substantially reduce the need for safety suits by addressing unmet clinical needs. However, a small population of inmate-patients who engage in recurrent self-injurious behavior will almost certainly remain. These individuals need carefully developed behavior management plans and appropriately targeted treatment designed for harm reduction. Again, the decision to continue a safety suit for danger to self or other clinical reasons is a decision that must be made by mental health staff who are the experts in this arena.

There also needs to be more robust data collection on suicide and self-injurious behavior. The figures provided to me are highly unlikely to reflect a true picture of self-harm in the jails. This data should include tracking of all instances of self-harm and categorization of those instances, preferably using a method of categorization such as the Centers for Disease Control and Prevention's Risk Rating Scale.

Training in suicide prevention also needs to be strengthened.  This will be addressed in the **Training** section.

## Clinical Restraint and Pro-Straint

Those in restraints, whether in the restraint chair for behavioral reasons or clinical restraints on the LPS-Certified unit, should be on constant watch rather than periodic checks (or constant video monitoring with direct visualization every 15 minutes).  They must be in areas inaccessible to other inmates.  Those in restraints must be checked at least every two hours by a nurse for vital signs, neurovascular assessment, and limb range of motion that includes the legs (which may be done by custody) and offered an opportunity for toileting.  Fluids should be offered at least every four hours and meals at least at meal times.  Every four hours there should be a more thorough clinical assessment to determine the need for continued restraint and whether there are new or previously undetected health problems.  In general, current policy provides for the preceding except for constant monitoring and specification of more detailed assessment every four hours.  This assessment can be done by nursing staff with mental health available for consultation if needed.

Restraint chairs should be utilized for no more than four hours.  When custody staff intend to use behavioral restraint for longer than 4 hours, this should prompt a mental health assessment for consideration for placement of the inmate in a mental health setting, development of a behavior management plan, and/or recommendation regarding continued restraint in a restraint bed.  As noted in the previous paragraph, if the decision is to continue behavioral restraint, subsequent assessment of the inmate's condition should be done every four hours (in addition to the more limited restraint checks done every two hours).

While there is no well-defined standard for timelines of clinical restraint orders in correctional settings, clinical restraint on 2P should be ordered every four hours for the first twelve hours (which may be done by a nurse consulting with the ordering physician and obtaining a telephone order as is done now) and then at least every 24 hours thereafter.

The monitoring of clinical restraint is the same as behavioral restraint.

## Restrictive Housing

It is reasonable for nursing staff to conduct the initial screening of those admitted to restrictive housing in order to identify a possible emergency but mental health staff should screen new arrivals by the next working day.  Mental health consultation must also be available to the nursing staff doing the initial assessments for consideration of emergent mental health needs such as commitment to 2P or medication orders.  Mental health should also do at least weekly rounds in restrictive settings.  At a minimum, those identified as suicidal must be appropriately treated and managed and those needing commitment identified and admitted to the LPS-Certified unit.  Others may be treated in place but the option to divert the seriously mentally ill to an OPP unit is something the county should consider.  It is especially important to consider this when those with mental illness are deteriorating in this isolated setting prior to becoming so ill that they must be committed.  Once the jail staff become aware of their deteriorating condition, a meaningful response of some sort is obligatory.

The county could consider developing a formal residential mental health program in a restrictive setting that has enhanced treatment that could include conducting groups in restraint chairs and similar enhanced treatment access. But this would be something that they county could elect and is not a formal recommendation.  It is important to state that this option is distinct from discussion below about a

behavior management unit which would be designed more for inmates with personality disorders than for those with SMI.

**Reentry Services**

This is identified as an essential function for an adequate system of care.  But here again, these services need not be provided to all those with a mental illness or even all those who are receiving treatment.  The key is to identify those who, by virtue of their serious mental illness, are unable to arrange aftercare themselves.  It is also unreasonable to expect jails to provide robust reentry services to those who are incarcerated for short periods of time.  One simple way to conceptualize this is that the longer the patient is in jail, the further down the following list the reentry services need to extend.  Reentry services for the seriously ill must:

- Assure medication continuity until community services take over (in all cases)
  - This will almost certainly require that medications are given to releasing patients who do not have their own supply of medications in the community
- Assure that a mental health appointment is in place within a period of time that will allow medications not to lapse (those incarcerated for more than two weeks)
- Assist in applying for or restoring benefits (those incarcerated for more than one month)
  - Medical insurance
  - Money benefits
- Assist in securing housing (those incarcerated for more than two months)
  - This should include access to secure settings as well as traditional board and cares and similar settings.

**Training**

Custody staff should receive formal training on mental illness, crisis response, and suicide prevention in their academy training and annual training on at least suicide prevention.  The academy training should include at least a one-day training on mental illness and another day on suicide prevention.  Crisis intervention training (CIT) is also vitally important (which may include sufficient training on mental illness and suicide, depending on how it is conducted).  There are a variety of options for crisis training, but most good correctional CIT is 3 to 5 days.  It is important that it be custody-oriented CIT as those designed for law enforcement address different needs.

The training for all custody staff should include identification of markers for potentially serious problems in addition to suicidality such as psychosis, depression, mania, delirium, catatonia, cognitive disorders, and serious adverse medication reactions.  It is important to note that this training is to identify markers for these conditions and then make an appropriate referral, not to diagnose.  They should also have specific training in the differences between personality disorders and mental illness with an emphasis on Cluster B personality disorders and psychopathy.  Training in behavior management plans and the basic behavioral principles that underlie them is also critical.  As noted above, the CIT training they receive should be specifically tailored to custody settings:  crisis interviewing, verbal interventions over use of force, techniques for interacting with the mentally ill in a custody setting where there is almost always more time (less urgency), and how to access and use additional help (other officers, mental health, etc.).  This must be done in light of the fact that long-term management of this population is the rule which necessitates a different approach.

All deputies that work on residential mental health settings should be required to have additional training. If the county elects to provide a robust training experience in the academy that includes correctional crisis intervention training, the enhanced training for deputies on the residential mental health units may only need to be 1-2 days to provide additional information on severe mental illness, providing relevant observations, special medico-legal considerations, specialized management techniques, and information about the unit program.  But if they have not received correctional crisis intervention training, this should be an additional requirement.

Mental health staff need robust on-boarding.  The correctional environment is unique and community experience does not prepare clinicians for work in the custody setting.  The training needs to cover confidentiality (and its limits), reporting requirements, safety and security requirements, civil commitment and emergency treatment, competency and informed consent, referral to other health providers, behavior management, and reentry.

**Quality Assurance and Quality Improvement**

Good QA/QI is essential and must not be an afterthought.  It is a central and essential part of a well-functioning system.  Sufficient resources must be dedicated to QA/QI.  This means staff resources, IT support, and analytic support.

There must be a robust review of sentinel events.  This must not be limited to death reviews but should also include near miss events, serious self-harm, assaults involving injury on OPP units and the LPS-certified unit, injuries during episodes of restraint, and emergent use of force involving the mentally ill (controlled use of force should be reviewed through standard processes for use of force review).  The review must be prompt, involve QA/QI staff and leadership from custody, mental health, and medical (and any other pertinent staff).  There should be an analysis of the case and any systems issues identified addressed through a corrective action plan with specific tasks assigned to individuals with due dates that are tracked to completion.

Routine monitoring of other problems such as medication errors and a variety of other standard surveillance is also a part of basic QA/QI.  The QA/QI program should include formal provision for clinical supervision and/or peer review.

QA/QI also needs to be tasked with monitoring service provision such as encounters (broken down by different types of service such as intake, crisis response, assessment, suicide review, case management, re-entry services, medication monitoring, and individual and group therapy), referrals and their sources, patterns of psychotropic medication administration, numbers of LPS commitments and other LPS statuses, length of stay in various units, diagnostic categorization of the mentally ill population, adherence to the mental health plan or benefit (if established), and so on.

QA/QI is also essential to implementation of system change.  When a program is implemented, QA/QI processes must be developed to assure the fidelity of the implementation.

## Recommendations for Creating a Basic System of Care

The Sacramento County jails do not have a system of care.  Staff at local facilities respond to crises, conduct limited assessments, monitor those on suicide watch and other special statuses, and provide medications.  There is limited continuity of services.  The only structured services are those provided for competency restoration.

I will offer recommendations in two realms: system components and system capacity.  The components are the elements of the system while capacity looks at physical plant and staffing needs.  The former is based in well-established principles of care and in light of standards emerging from legal requirements and published standards.  The latter is based on population data from Sacramento County Jails considered in the context of national studies regarding the prevalence of mental illness.  Recommended caseloads are based on analysis and experience with systems that provide care sufficient to reasonably prevent harm.

It is important to recognize that jails both have more rapid turnover and are much more acute psychiatric settings than prisons.  As such, they will require more resources for initial assessment and more frequent patient contact.  The clinical needs of jail intake share more with emergency rooms than outpatient clinics.  And residential mental health settings in jails handle a good deal more acute disturbance as well.

In order to achieve a number of the recommendations, clinicians need to have greater access to patients and greater control over who they serve and their level of service, which includes having substantial control over placement in residential settings (OPP units as well as 2P), subject to classification limitations and other legitimate safety and security concerns; the simplest way to describe this is that those going into and leaving these units should have the assent of mental health.  It is important to recognize that the intensity of mental health service needs often bears little relationship to classification level.  This means that there needs to be provision for custody overrides to assure access to services only available at a specific classification security level and/or an array of services needs to be provided at each classification security level.

While adequate treatment could be provided without using groups, it would require far more staffing; the below is predicated on the assumption that such groups will be available, at least in the residential mental health units.

**System Components**

The following are my recommendations for providing a constitutionally adequate and basic level of mental health care.  By comprehensively developing the mental health system, many of the specific deficiencies will be addressed and the system will be more cost effective.  The County is clearly providing some elements of an effective correctional mental health system but is missing many as well.  The essential general features of such a system include:

- Systematic screening and evaluation using valid and reliable methods
  - Intake screening
  - Mental health evaluation
  - Mental health screening and rounds in restricted housing units
- Referral systems (including routine and emergency)
  - Custody staff
  - Health staff
  - Inmate self-referral
- Treatment that is more than mere seclusion or close supervision
  - Outpatient level services
  - Residential mental health housing that is available regardless of custody level
    - Entry into such residential settings must be authorized by mental health to assure appropriateness of the referral and that acuity is properly managed across the system
- Crisis response

- A suicide prevention program
- Mechanisms to minimize the placement of the mentally ill into restrictive housing settings
- Reentry planning
- Involuntary treatment including the use of seclusion, restraint, involuntary medications, and involuntary hospitalization
- Provisions for medico-legal mandates, including
  - Informed consent
  - Privacy of protected health information (with pertinent limitations described)
  - The right to refuse treatment
- Participation in treatment by trained mental health professionals
- Adequate out of cell time on residential mental health units (for both structured and unstructured activities)
  - Generally, a minimum of 10 hours of unstructured and 10 hours of structured (treatment) out of cell time per week
- Accurate, complete, and confidential records
- Safeguards against psychotropic medication prescribed in dangerous amounts, without adequate supervision, or otherwise inappropriately administered
- A grievance program
- Training for mental health staff regarding correctional and security issues
- Training of correctional staff regarding mental health issues
- Quality improvement program
- Policies to support the preceding

In order to accomplish the above a system must provide:

- Adequate physical resources including treatment program space and supplies
- Adequate numbers of properly trained and/or experienced mental health staff who will identify and/or provide treatment to inmates with serious mental illness
- Adequate access for inmates to treatment within a reasonable period of time considering the nature of the problem

The same services should be available for women. But the smaller numbers of women create problems with economy of scale. It may be reasonable to have a single OPP for women. It would have to be more flexible to achieve the necessary out of cell time owing to housing of women with wider variations in classification security levels and acuity.

An array of services and actual treatment must be provided in accordance with the principles laid out above. It is also necessary to focus resources in a manner that assures that the sickest are identified and treated. Not everybody who would benefit from treatment needs to be offered treatment. It is completely reasonable for the County to have what amounts to a mental health "benefit" or, more strongly, the County may limit its services to those who are most in need and whose conditions place themselves and others at risk for mortality or morbidity. Unfortunately, it is not possible to do this solely on the basis of diagnosis as some mental health disorders can vary so widely in the associated functional limitations and symptom severity that some measure of severity and functional limitations must guide the decision to treat in those cases. Clearly, diagnosis can be used to identify the most seriously ill that will always be treated: psychotic disorders, major depression (moderate or more severe), and bipolar disorder (properly diagnosed). Further, it will be necessary to treat those who have made suicide attempts, have suicidal

ideation, or have engaged in recurrent and/or severe self-injurious behavior.  Beyond this, the primary consideration should be for those whose mental illness (excluding personality disorders) is directly related to their continuing stay in segregation or maximum security settings.  This reaches the Constitutional minimum for a basic mental health system but the County may find it to its advantage for additional correctional interests to be drivers of mental health service delivery.  Infractions, criminal recidivism, and ability to program are important interests that mental health treatment can help address in many cases. This may include direct treatment and/or collaboration with custody to develop behavior management plans.  The County must also provide sufficient services to the cognitively impaired to assure their safety and to provide access to programs, health care, and reentry services.

Part of the reason these types of mental health services are necessary is longer lengths of stay; crisis response and other strategies appropriate for exclusively short stay settings are, by themselves, inadequate.  It is in the County's interest to rapidly identify, treat, and stabilize those who are going to remain sometimes for years.  Preventive and maintenance care are cost-effective when properly organized and delivered.

A correctional system of care that can accomplish these ends has the following components:

- Articulation of a mental health benefit (or scope of care) that communicates clearly to inmates, staff, and the community what the jail does and does not provide in terms of mental health treatment
    - This entails a mechanism to identify three populations
        - Those not identified as needing or having needed treatment
        - Those receiving treatment
        - Those who have received treatment but now need only surveillance or case management (monthly check-in)
- Provision for confidential interactions between mental health staff and patients absent a clear and present danger
    - Includes explicit recognition of the limits of confidentiality in correctional settings
- Initial screening that does not miss important conditions and needs and makes referrals accordingly
    - The imminently suicidal or self-destructive
    - Those who are a danger to others by virtue of mental illness
    - Those with psychotic disorders
    - Those who are admitted on psychotropic medications
- A reliable mechanism for assuring continuation of medications upon admission, throughout incarceration, and into the community
- A robust system of detection that responds to intake referrals and seeks to identify those who were missed at initial screening or who have decompensated while in jail
    - A mechanism for inmate-declared emergencies
    - A mechanism for staff-declared emergencies
    - A self-referral process (request for service or "kite")
        - Kites must be prioritized (triaged) within 24 hours
            - Emergent – to be seen ASAP (generally, within four hours)
            - Urgent – to be seen the next working day (within 72 hours)
            - Routine – to be seen within two weeks
            - Response – require only a written or verbal response (e.g. "your refill has been ordered") but no formal clinical assessment or intervention

- o A staff referral process (custody and medical)
    - These may be prioritized (triaged) within 24 hours or the next working day (staff should be expected to be able to identify true urgencies and emergencies)
        - Emergent – to be seen ASAP
        - Urgent – to be seen the next working day
        - Routine – to be seen within two weeks
        - Response – require only a written or verbal response (e.g. "the inmate's refill has been ordered") but no formal clinical assessment or intervention
- A robust suicide assessment and management system
    - o Training (initial and annual)
    - o Suicide screening
    - o Suicide assessment
    - o Suicide monitoring
    - o Conditions of confinement
    - o Treatment designed to reduce the risk of harm
- A system of care that provides several levels of care with non-medication treatments focused on the residential mental health settings
    - o LPS-certified unit
        - Provides acute care to those under LPS commitment and some voluntary patients
        - Out of cell time determined on a case-by-case basis and/or a level system
            - Expectation of minimum of 10 hours of unstructured time and 10 hours of structured time out of cell daily
                - o Exceptions require formal determination and documentation as to why they are not permitted this access (e.g. imminent danger to others)
            - Treatment (individual and/or group), structured recreation, rehabilitation (e.g., psycho-education, supervised ADLs, cell cleaning)
                - o May necessitate development of the ability to hold groups with restrained participants
            - Progression through the system prepares the patient for a less acute settings and demonstrates readiness to move to a less acute setting
    - o A restrictive and/or high security housing level of care
        - For the dangerous mentally ill who do not meet LPS-commitment criteria
        - Progression through levels or steps as a measure for readiness to step-down to a less restrictive setting
        - 10 hours of out of cell unstructured time each week
            - Solo progressing to group
        - 10 hours of out of cell structured activities
            - With staff
            - Treatment (individual and/or group), structured recreation, rehabilitation (e.g., psycho-education, supervised ADLs and cell cleaning), education, work, programs
            - May necessitate development of the ability to hold groups with restrained participants on these units only

- o A step-down level of care (should be a larger number of beds than the restrictive and/or high security settings)
  - ▪ For those who do not need restrictive housing and those who step down from restrictive housing
  - ▪ Expanded out of cell time
    - • The added time can be primarily unstructured but additional structured time with an emphasis on correctional programming, education, and work is beneficial
    - • Structured treatment designed to maintain stability and develop self-management skills rather than to explore or address long-standing psychological problems
- o Develop special housing units or at least differentiate residential settings by pod to separate, as much as possible, those with:
  - ▪ Major mental illness
  - ▪ Personality disorder
  - ▪ Cognitive impairment
- o Outpatient (general population) services
  - ▪ Emphasize primarily medication management and case management services
  - ▪ Other brief treatment focused on self-management skills and support rather than exploring or addressing long-standing psychological problems
- o Placement
  - ▪ A system for placement in residential mental health settings that has the following elements:
    - • No placement in residential mental health without mental health assent
    - • No transfer out of a residential setting without mental health assent (absent an emergency)
    - • Mental health recommendation for placement in residential mental health housing is implemented directly unless a determination is made that safety and security demands preclude such placement
      - o Adequate treatment must still be provided to those denied such placement
    - • Ready access to the LPS-certified unit or a licensed level of care
  - ▪ Mechanisms to divert the seriously mentally ill from maximum custody settings whenever possible
- o Medication management
  - ▪ Provide for emergency involuntary medication in the jails
  - ▪ Consider providing long-term, non-emergent involuntary medication
    - • This can be provided at only the LPS-certified unit but allowing it to occur in jails under specified conditions introduces efficiencies into the system
- o Restraint
  - ▪ Provision for clinical restraint
    - • Directed by appropriately credentialed clinician
    - • Must be available on LPS-certified unit
      - o There must be provision for restraint while awaiting transport and during transport to the LPS-certified unit

- Consider making available in jail residential mental health settings; provides options that introduce efficiencies into the system
    - Provision for behavioral restraint
        - Custody directed
        - Mental health assessment for those in prolonged behavioral restraint
    - Medical monitoring of clinical and behavioral restraint
  - Reentry services
    - Focused on those in residential mental health settings (in a tiered manner as detailed above)
        - Medications provided until care can be resumed or initiated in the community
        - Community follow-up appointments
        - Housing to the extent possible
        - Assistance in securing medical insurance and money benefits
    - General population
        - Medications provided until care can be resumed or initiated in the community
        - Provide information about community resources
  - Training
    - Mental health staff
        - Correctional mental health system
        - Correctional mental health policies
        - Suicide assessment and intervention
        - Treatment modalities to be offered in the jails
    - Correctional staff
        - Mental health policies
        - Critical incident response
        - Recognizing different types of mental illness
        - Interacting with the mentally ill
        - Suicide and self-harm detection and prevention
  - Chemical dependency services
    - The mentally ill must have access to appropriate CD services regardless of location
        - Mental health must be able to refer to or provide CD services
        - May require the development of dual diagnosis approaches
  - Quality Assurance and Quality Improvement processes sufficient to support the above
  - Policies and procedures to support the above plus other important medico-legal issues, including
    - Competence and consent
    - Right to refuse
    - Confidentiality and release of information
        - Including provisions for information exchange for the purposes of continuity of care

## System Capacity

<u>Prevalence of Mental Illness</u>

While there are varying ways of establishing the prevalence of mental illness in correctional settings, it is beyond the scope of this report to detail the extensive literature on this topic.  The numbers I cite are generally accepted and, if anything, conservative (in the sense of reliably detecting true cases while minimizing the detection of false cases and emphasizing serious illness over the mere presence of a diagnosable disorder, which is present in the vast majority of the incarcerated population).

Those with serious mental illness that are likely to need some level of service is 15-25% of the jail population (this does not include those with cognitive deficits or personality disorders).  Those with illness so severe that they require residential or licensed level of service are 2-4% (note that the quality of services available in the general population setting determines how many beds will be needed; this number is for a well-developed system).  Most developed systems treat about 25% of the male population and 30-50% of the female population.

Using these figures and a jail census rounded to 4000, this gives approximately the following:

- 600-1000 with illness needing some level of service
- 80-160 requiring residential or inpatient level of care

These are consistent with figures provided by JPS who reports that 39.5% or about 1600 inmates have open cases and 19.4% or about 800 are on psychotropic medications at any one time.

It is difficult to get a clear picture of the actual numbers in OPP settings as these beds are somewhat fluid with spill-over into other settings.  The populations are also highly admixed with no data on the percentage that re actually SMI.  But there are about 80 OPP beds at the MJ and 32 at RCCC.  There are 18 LPS-certified beds.  Thus, total residential beds are about 130.

<u>Residential Beds</u>

There are many in residential settings who do not suffer from serious mental illness but from personality disorders, cognitive disorders, and even medical disorders.  The county may choose to provide residential services to those with personality disorders and cognitive disorders but this would necessitate provision of beds in addition to the needs enumerated in this section (except for a small number with recurrent and severe self-injury, who will sometimes need to be in residential mental health housing).

Those with cognitive disorders are often housed in residential mental health settings when more than mild deficits are present.  But they have very different needs, typically requiring special housing, separated from general population inmates, with services primarily directed at structured activities and skill development (self-care and self-management) rather than mental health treatment.  The data provided do not allow a reliable estimate of these numbers.  In the community, the prevalence of dementia is very low under age 65 but is about 14% for those aged 71 and above.  The prevalence is higher in correctional settings but it does not represent a substantial number in the jails as there are few inmates over 70.  But the prevalence of intellectual disability in corrections is 4-10%, again higher than in the community.  Prevalence estimates of TBI vary widely and have been found to be as high as 60% in correctional populations.  In 2010, about 1% of the US population had a disability following hospitalization for a traumatic brain injury, providing a conservative estimate.  In short, it is virtually certain that a good deal of cognitive disorder is going undetected in the Sacramento jail system.  Using a lower estimate, 4% + 1% = 5% (200) of the population can be expected to have intellectual disability or disability due to TBI

that are serious enough to result in functional and/or behavioral deficits.  A substantial portion of these are expected to need residential or special housing, conservatively about half or about 100.  A much higher proportion of these patients will also have a diagnosable and sometimes serious mental health disorders than those without these cognitive disorders, meaning some will still need to be housed on mental health residential units.

Taken together with the mental health residential needs from above (80-160), a conservative estimate is that around 200 residential beds are needed.  The jails currently have about 130 residential mental health beds but as noted, not all these beds are occupied by those with SMI.

Thus, the current number of OPP beds is likely sufficient to manage the mentally ill population, assuming OPP and general population services are sufficient to maintain the stability of those seriously mentally ill residing in those settings.  While the number of beds may be sufficient, they are not properly arrayed or utilized.  As mentioned previously, it is important to have residential beds at both high and low levels of custody; presently OPP settings are operated under high security.  And the above-mentioned problem of mixing diverse populations needs to be addressed as well.  Unless those populations are removed from the residential mental health settings, the numbers of beds for the mentally ill would not be sufficient.  Those with cognitive disorders will require a separate housing unit or at least differentiated program opportunities designed more for the habilitative and rehabilitative needs resulting from the functional limitations of this population which, to reiterate, are quite different from the needs of the mentally ill.  If they remain co-housed, there will need to be clear programmatic differentiation and bed-capacity adequate to serve both populations.  A female OPP must also be developed, though as noted previously, it may not be possible to have more than one, necessitating greater flexibility to assure access to care and full privileges in accordance with their classification security level and clinical acuity.

While these improvements are likely to reduce the need for LPS commitments, in my opinion the current 18 beds will remain insufficient.  It is difficult to make a firm estimate of the number of beds needed given the interdependence with the quality and breadth of services provided in the jail, but a unit of about 40 beds would be more typical of a system this size.

An optimal arrangement, assuming the current 130 mental health residential beds, would be approximately:

- 40 LPS-certified beds
  - Serving both men and women but allowing better separation of the sexes
- 20-bed male restrictive OPP
- 50-bed male less restrictive OPP
- 20-bed female OPP

There will then need to be sufficient housing for the cognitively limited and any other identified special populations, such as the behaviorally disordered.  This is estimated at 70, for a total of 200 beds of missioned housing with a strong mental health component.

Staffing

Staffing needs to be sufficient to provide the services described above.  It is beyond the scope of this report to generate a staffing model in large part because it depends on what the jail decides to do; a simple example would be the extent to which the mental health treatment will provide treatment in groups (more efficient for mental health but more challenging for custody) versus individual (less efficient for mental

health but easier for custody). Some general comments and an example may assist in estimating staffing needs.

It is reasonable for a psychiatrist to manage 50 residential patients in an acute correctional setting and 100 in a chronic setting. The LPS unit has high turnover, very high acuity, and requires a good deal of additional work related to medico-legal functions; one psychiatrist can manage about 25 patients. The female and male restrictive units will be more acute than the less restrictive male unit. It can be estimated that 1 psychiatrist can cover the male restrictive and female units. It will take a 0.5 psychiatrist to cover the less restrictive male unit and another 0.5 for the special management residential settings. Thus, 3 psychiatrists are needed just for residential services currently and about 3.5 to 4 if the LPS-certified beds are expanded.

But to look at overall psychiatric need, it is important to assess the relevant functions psychiatrists must serve. Intake or initial psychiatric evaluations take a minimum of one hour and 30 minutes is reasonable for medication follow-up (including all charting and record review and accommodating the logistics of meeting patients in the correctional setting). Thus, if we assume that 25% of the jail population will receive psychotropic medications and remove an estimated 30% of 50,000 bookings that stay a day or less, we can estimate that there will be 0.25 X 35,000 = 7500 intakes (each taking an hour) at the high end (some of those staying between 1 and 7 days may have psychiatric need but not serious enough to warrant attention if only in for a short time). This figure seems to be in line with the JPS report of over 650 "New/Open" cases each month. The actual need could be half that but since initial psychiatric assessment is not being well tracked and often not done at all, this is the best estimate available. This amounts to just short of 2-4 full time equivalents (FTE). This is a very conservative estimate of time as it assumes that 100% of 2000 hours of annual working time is dedicated to patient care. Attaining 70% clinical productivity would be outstanding in a correctional setting, yielding FTE estimates of 2.5 - 5. In addition, follow-up will be necessary. At present, there are about 800 on psychotropic medications at any one time. Removing the 130 in residential settings, that leaves 670. Assuming an average of visits every 90 days (a low frequency because presumed to be stable), that requires 670/3 visits/month * 0.5 hours/visit = 112 hours per month or about 5800 hours per year, or about 4 FTE. A half hour is provided to allow for record review, patient interview, charting, and the logistical challenges inherent in correctional settings.

Thus, conservatively, 9.5-12.5 psychiatrists are needed to provide sound basic services. Right now the jails have about 4 FTE of psychiatric prescriber time. It is thus surprising that they are able to provide medications to a reasonable portion of the inmate population (and with no obvious problem prescribing patterns) but no surprise that there are almost no psychiatric assessments, patients are often prescribed medications without being seen by a psychiatric prescriber, documentation is thin, and medication monitoring is inconsistent.

In my opinion, psychiatric nursing is marginally sufficient for the current number of LPS-certified beds. Night coverage is especially marginal given that they are the crisis response for the jails during some periods. As pointed out by the nurses, it is also a problem when there is a crisis on 2P as there may not be a nurse to monitor the remaining population. In my opinion, there should either be three nursing staff on 2P at nights or two nurses on 2P with an additional nurse always available to either back-up 2P nurses and/or to provide crisis response; this would amount to about 1.7 FTE nursing (to cover weekends and leave). During the day, the additional treatment staff that need to be hired for treatment should make it unnecessary to enhance daytime nursing staff. The lack of custody staff on location at nights and weekends is also a problem that contributes to the challenges nursing faces at these times; in my opinion custody should have a deputy posted on this unit at all times but would defer to Mr. Vail in that regard. If

LPS-certified beds are added, nursing staff will need corresponding enhancement (maintain staff to patient ratios).

While similar calculations can be made for mental health clinicians, this is much more difficult as they serve a wide range of functions that would be difficult to enumerate and estimate the time each takes. The needs represented by treatment requirements of residential settings can be estimated as can approximate general population caseloads for on-going services.  As these functions are not being served effectively at this time, these can be considered as a starting conservative estimate of additional staff requirements.  At present, the jails are managing crisis calls and referrals, responding to intake, and providing limited case-management in general population.  Overall staffing is sufficient for those functions, though is marginal on weekends and may need to be re-arrayed once additional treatment staff are hired.

As noted above, I will presume that groups are the preferred modality as they are, all things considered, the most cost-effective treatment modality for the kinds of services required.

Structured residential programming for a minimum of 10 hours per week for 200 patients begins by establishing group size.  While up to 15 is reasonable in community and hospital settings, it is very difficult to run groups of this size in corrections.  Most systems find that on average 10 is achievable.  We can also assume that up to 25% will refuse groups or not be sufficiently stable for groups, leaving 150.  We can further assume that at least 4 of the 10 hours can be achieved by education and other correctional programs, though it is important to note that this is not occurring at all at the present time and may require additional resources.  Another hour per week of individual contact with a clinician for reentry planning, treatment planning, and limited individual intervention brings the group treatment load to 5 hours per week.  150 patients in groups of 10 for five hours per group amounts to 75 hours per week.  Each hour of group requires an hour of preparation and documentation, bringing the total to 150 hours per week or 7800 hours/year, amounting to 5.5 FTE (at 70% efficiency).  In addition, an hour a week of individual contact for each of the 200 residential patients is another 200 hours or 10,400/year or 7.5 FTE (at 70% efficiency).

For general population settings, I make the following assumptions.  JPS reports that 39.5% or 0.4 * 4000 = 1600 inmates in the jail have open cases.  Subtracting the 200 residential beds, this leaves about 1400 being served in general population.  Assuming that existing resources can serve crisis and case management functions for the majority of that population, it remains to estimate the number that would need some form of active treatment.  Conservatively, about 10% of this population will need some form of on-going treatment.  If half of this can be done in weekly groups and half in weekly individual treatment, this amounts to 70 hours of individual treatment hours and 140 hours of group (one hour group, one hour preparation and charting) each week.  This amounts to 210 * 50 = 10,500 hours.  At 70% efficiency, this is 7.5 FTE.

Lastly, to provide reentry services will require the addition of two FTE in order to serve the 200 in residential settings, who require dedicated resources.  Present reentry services are extremely limited but should be able to serve the remainder of the population.

Thus, in order to provide minimally adequate mental health services (assuming a reduction in existing mental health clinician duties and requirements as described above), an additional 17 FTE of mental health clinician time is required.  Virtually all of these resources would be focused on residential mental health (which in this basic model would also house those with cognitive disorders) and some limited shoring up of general population treatment.

But I must emphasize that the only important outcome is not staffing numbers but the provision of services.  If the Sacramento County jail system can provide the needed services through different staffing approaches, that is entirely reasonable.  Again, these staffing numbers are offered as a way to quantitatively estimate needs.  They are only estimates, though informed by data.

In closing my recommendations for a sound basic mental health system, I note that it would be beneficial to consider hiring other job classes such as Recreational and/or Occupational Therapists (for residential groups).  Another strong recommendation is for the county to hire at least one doctoral level, licensed psychologist at each of the two facilities in order to oversee the system of care and to provide more robust clinical oversight to frontline clinicians.

It is also important to note that many of the functions detailed in this report are non-clinical functions for which I have not provided staffing estimates, most notably QA/QI and the administrative support that will be required to implement and support these programmatic enhancements.  It is even more important to recognize that to do this well will also require enhancements in custody staffing.  How much will depend on the specific model and approach selected.  These staff enhancements add much more to efficiency than is generally recognized and it is money well spent given that it is improving the efficiency of high cost clinical staff.  The county would do well to develop its treatment model prior to finalizing its staffing enhancements.

## Recommendations for Creating a Robust System of Care

I offer the following recommendations for developing a robust mental health system within the jails.  These programs would be in addition to the above basic system.

A few prefatory comments are in order.  The most important point to make is that the infrastructure to support the basic system described above is, for the most part, sufficient to support a more robust system.  In short, adding additional treatment would not require additional staff other than a modest number of treatment staff, their administrative support, and possibly a few officers, depending on the size and type of the program.

The main additional treatment components that should be considered (after fully implementing the basic system) are:  intensifying services for the cognitively impaired, establishing a behavior management program for the personality disordered, providing trauma-informed treatment in the general population, and lastly expanding treatment of less severe mental illness in GP settings.  Some of those targeted by the specialized services below will end up in residential mental health and the LPS-certified unit without such service enhancements but will be poorly served in those settings.  As noted repeatedly, the needs of the SMI are very different than those of these other populations.  The populations also do not mix well together, creating additional management and custody problems.

## Treatment of those with Cognitive Impairment

Those with intellectual disabilities (ID), pervasive developmental disorders (autism spectrum – while not technically a cognitive disorder, services needed are similar), and traumatic brain injury (TBI), more than those with non-TBI dementia (who are few and should be targeted for rapid release), constitute the cognitively impaired group.  It need not be a large program as only the most severe would need such services.  As noted above, there will be up to about 100 with TBI and ID likely to need special management.  There are no good studies of PDD in corrections.  The program herein recommended would only be for a small portion of this 100 plus PDD.  Of the remainder, some would have SMI that

could be managed on the mental health units and others can be managed with limited additional supports; without such a unit, more would have to be managed on residential mental health units.

The size of the unit would depend on physical plant but 20-40 would be in the range needed.  While even this sub-group is certainly not homogeneous, they share enough similarities in terms of treatment needs to be housed together.  The program should be a behavioral program with skill-building training.  Such a program would include a simple reinforcement scheme and the teaching and practicing of skills.  The behavioral scheme should include on the spot reinforcement if possible (possibly a token economy) or at the very least something like a today-tomorrow reinforcement scheme where tomorrow's privileges are driven by today's behavior.  With this population, the former is likely to be more effective as many in this population will have difficulty connecting what they have today with what they did yesterday.  But the main point is that there needs to be a sound, if basic, behavioral program that provides as much immediate reward for desired behaviors (and absence of undesirable behaviors) as possible.  The skills component is very basic (and some are the same as those needed by at least a portion of the SMI population) and targeted at function:  self-care (grooming instruction and practice, medication taking), cell care (cleaning together), social skills (basic instruction, practicing in structured activities), surviving in the jail (how to communicate with officers, how to get basic needs met – practicing these on the unit), accessing community services, and community living skills (what to eat, how to travel, basic budgeting).  There are more options but these are good examples of the types of things that could be done.  These types of programs can be offered by mental health staff but other job classes are more appropriate such as recreation therapists and occupational therapists.

## Behavior Management Program

A behavior management program should be exclusively for those with personality disorders (though they may have other conditions if well compensated) who engage in repeated disruptive behavior, often violence and/or self-harm.  I would recommend a program for the recurrently violent and behaviorally disruptive that is run in a high custody setting.  It could be run as a program using mental health trained staff rather than as treatment that inmates can refuse.  If that is not desirable, one option would be to offer it as a pathway out for those who are stuck in restrictive settings, or even as an option when facing a serious infraction.

The intention would not be to address gang-related behavior; many who are gang-entrenched would not be ready or able to benefit from such a program.  It should use standard approaches to violence reduction such as groups to target anger management, aggression reduction training, criminogenic thinking, and the impact of life trauma.  It would benefit from specialized classroom restraint chairs for group programming (though such a program can be done without such facilties) and have a level advancement system that slowly exposed these individuals higher risk situations as they proved themselves ready for the next step, for example:  congregate treatment in restraint chairs, then congregate treatment and structured activities without restraint, then congregate unstructured activities.  Each stage is accompanied by an advancement in privileges that mean something to the population.  The goals of such a program are three-fold:  return to GP, harm-reduction (in jail and in the community), and minimization of isolation.

Those with recurrent self-harm are likely to be too few to warrant a separate program.  Many will also qualify for the additional treatment programs recommended in this section.  This should also be a modest-sized program of about 30.

## Trauma Treatment

The number of inmates with trauma histories is substantial.  While studies vary, it is safe to say that the majority have suffered some serious trauma and a substantial number have suffered from childhood physical and/or sexual abuse, both men and women.  Some systems are beginning to think of trauma like exposure to body fluids – take universal precautions.  In short, presume that all inmates have trauma histories.  As such, treatment focused on trauma is of great value.  The biggest challenge is getting men to accept such treatment.  It may be offered indirectly through treatment program such as Acceptance and Commitment Therapy (ACT), which also serves other purposes and is much more palatable to men.  For women, ACT is certainly an option as is Dialectical Behavior Therapy (DBT), Systems Training for Emotional Predictability and Problem Solving (STEPPS), and other evidence-based treatments.  I would recommend STEPPS as it is a strong group-based approach that is not as technical as DBT.  It is manualized and relatively easy to implement.  Stephanie Covington has also put together some good packages for trauma work that are readily implemented.

**Additional Outpatient Mental Health**

I put this last because the jails are more challenged by problems related to the previous three categories.  Routine outpatient mental health care is the simplest and easiest piece of the mental health system and it is very tempting to focus resources here and many providers would prefer this kind of work.  But in my opinion, the other populations present far more risk to the jails and to the community; further, mental health has the technology to render effective services to these populations.  But there is also no doubt that those with anxiety disorders, obsessive-compulsive disorder, depression, PTSD, and other common conditions would benefit from additional services.  As it is, the jails are providing a great deal of psychotropic medication for these disorders but other treatment is limited.  There are many evidence-based non-pharmacologic treatments for these populations, many based in CBT and other psychotherapeutic modalities.  There are group and individual approaches to many.  If the jails do go in this direction, I would recommend targeting depression and PTSD because they are common and potentially debilitating and therapies are well-known to augment psychopharmacologic approaches and sometimes even provide better efficacy without medications.

## CONCLUDING REMARKS

It is important to make a few crucial points.  The first is that the conclusions of this report are necessarily limited due to the fact that UCDJPS QA/QI information was not made available to me.  Were that information available, it could substantially impact a variety of opinions and recommendations.

I have repeatedly noted that crisis response is not treatment and, especially in the absence of treatment, a system oriented towards crisis response generates crisis.  This is because when crisis is the only way to get attention, crisis is constantly being reinforced.

Another point that it is crucial to emphasize is that mental health treatment varies substantially depending on the population being treated.  As a result, mixing populations such as the cognitively impaired, those traditionally considered seriously mentally ill (primarily inmates with psychotic and serious mood disorders), and inmate with personality disorders necessarily limits the efficacy of treatment.  As such, it is prudent to provide different services and different settings for these populations to the maximum extent possible.  In this regard, I would add that mental health treatment is most effective for those with serious mental illness as opposed to cognitive disorders and personality disorders.  Those with cognitive disorders can be more safely managed and habilitated in dedicated settings.  Those with personality disorders, especially certain types, are the most challenging to manage and while I recommend consideration of a

behavioral management unit, it is vital to be cognizant of the challenge and the expertise necessary to run such a program.

It should be apparent from the preceding that parsing (whether for placement or services) of inmates with some form of mental illness should be done carefully and with mental health serving a gate-keeping function embedded within the larger classification system.  In short, for placement and treatment to be the most effective, mental health must be able to have the ability to decline inmates to settings and treatments designed for specific populations.

This concludes my report.

Respectfully submitted,

Bruce C. Gage, M.D.