

# Sacramento County Sheriff's Department Correctional Services

# Americans with Disabilities Act Assessment (ADA)

**Submitted to**:
County of Sacramento

Rick Heyer, Supervising Deputy County Counsel
James Wood, Deputy County Counsel

**Produced by**:
Sabot Consulting ADA Experts

Mike Brady, Director
Julian Martinez, Consultant
Rick Wells, Consultant
Paul Bishop, Architect and ADA Access Specialist

**Submitted**:
December 22, 2016

FINAL REPORT



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICANS WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

# Table of Contents

Executive Summary ................................................................................. 1

Intake/Booking (Disability Identification)............................................... 1111

Delivery, Repair, Removal, and Use of Health Care Appliances/Assistive
Devices/Durable Medical Equipment/ Medical Supplies ....................... 2727

Tracking ................................................................................................. 4242

Housing Placements .............................................................................. 52

Medical/Mental Health/Dental ............................................................... 73

Access to Out-of-cell Time (Outside Recreation/Dayroom)................... 100

Access to Programs ............................................................................... 125

Access to Education, Vocation, Reentry and Substance Abuse Programs .......... 147

Access to Industries and Work Assignments ........................................ 166

Effective Communication ....................................................................... 177

Administrative Segregation Unit, Total Separation, Disciplinary Detention Unit . 216

Inmate Grievances ................................................................................. 223

Inmate Disciplinary Process .................................................................. 236

Inmate Orientation ................................................................................. 254

Alarms/Emergencies.............................................................................. 264

Mechanical Restraints/Searches/Count................................................. 271

Release/Discharge/Transfer................................................................... 287

Transportation........................................................................................ 290

Intellectual Disabilities (Housing Units Adaptive Supports)................... 298

Training .................................................................................................. 309

ADA Coordinator .................................................................................... 313

Notices .................................................................................................. 328

Custody Staff.......................................................................................... 330

Accountability ........................................................................................ 334

Policies and Procedures ........................................................................ 338

Americans with Disabilities Act Assets/Features ................................... 345

Introduction Accessibility Survey .......................................................... 353

Accessibility Survey's ............................................................................ 359

Technical Requirements / Standards ...................................................... 454

Conclusions and Recommendations ...................................................... 464

**Assumptions and Considerations** ........................................................................ **468**

**List of Polices Reviewed** ................................................................................... **472**

**List of Forms, Notices and Documents Reviewed** .................................................. **479**

**Abbreviations and Acronyms Used** ....................................................................... **481**



## Executive Summary

Sabot Consulting was retained by the Sacramento County Sheriff's Office to conduct a comprehensive evaluation of their Americans with Disabilities Act (ADA) programs, policies, procedures, practices, forms, and architectural access for disabled inmates in their two Sacramento County detention facilities.

At the outset, we would like to commend the Sacramento County Sheriff, Undersheriff, the Chief Deputy, Correctional Services, the executive management staff, rank and file officers, support staff and contractors for their welcoming, transparent, candid, and cooperative interactions with our experts. We recognize that we added significantly more work to and took valuable time away from these consummate professionals during our time on this project, but because of the unfettered access, cooperation, and transparency of the Chief of Correctional Services and his staff, we were able to complete a far more detailed review in less time than that which could have been accomplished otherwise.

As a result, Sabot Consulting is pleased to provide this independent comprehensive evaluation of the Sacramento County Sheriff's Department (SCSD) detention facilities ADA program and the architectural accessibility of the two detention facilities for inmates with disabilities. The facilities include, the Sacramento Main Jail (MJ) located at 651 I Street in downtown Sacramento and the Rio Cosumnes Correctional Center (RCCC) located at 12500 Bruceville Road, about 10 minutes south of Elk Grove. The MJ houses nearly all the County's pretrial population, and a number of federal pretrial prisoners. RCCC primarily houses overflow pretrial detainees, those inmates who are "post-trial" and have been sentenced to serve jail time in a County facility, and Immigrations and Customs Enforcement (ICE) detainees.

This comprehensive assessment included a field review performed from August 10, 2016 through September 16, 2016, as well as a review and analysis of all relevant existing policies, procedures, forms, logs, training records, processes and practices implemented by both the Sacramento County Sheriff and the Sacramento County Correctional Health Services (CHS). An architectural accessibility survey was also conducted from October 17, 2016 through October 18, 2016, to identify accessibility barriers for mobility impaired inmates as defined by the 1991 Americans with Disabilities Act Standards for Accessible Design (Revised July 1, 1994), and the Americans with Disabilities Act Accessibility Guidelines (ADAAG) including the 2010 amendments to the Americans with Disabilities Act Standards (ADAS). As part of the field review, team members from Sabot Consulting (Assessment Team) conducted interviews of a large number of staff members assigned to the SCSD detention facilities, CHS, Jail Psychiatric Services (JPS), and Elk Grove Unified School District (EGUSD), as

well as a large number of selected and randomly chosen inmates incarcerated at the two SCSD detention facilities.

The specific scope of the review was to conduct a comprehensive assessment of the SCSD detention facilities and programs with respect to access by inmates with disabilities. The assessment consisted of a full review of policies, procedures and practices, which include but was not limited to:

- All policies, procedures and practices regarding inmates with disabilities;
- All policies, procedures and practices regarding the classification and/or housing of inmates with disabilities;
- All policies, procedures and practices regarding inmates requiring Health Care Appliances (HCAs)/Assistive Devices (ADs)/Durable Medical Equipment (DME);
- All policies, procedures and practices regarding out-of-cell time as they relate to disabled inmates as well as all other inmates incarcerated within the SCSD detention facilities;
- All policies, procedures and practices regarding the provision or access to programs, services and activities offered at the SCSD detention facilities, i.e., the MJ and RCCC, to inmates (including those with physical, intellectual, and mental health disabilities), including but not limited to; those currently assigned to work assignments, formally organized programs, services or activities;
- All policies, procedures and practices regarding staff training;
  - With respect to addressing the needs of inmates with disabilities;
- All policies, procedures and practices regarding the identification and tracking of inmates with disabilities; and
- All policies, procedures and practices regarding the grievance process as it relates to inmates with disabilities, including but not limited to requests for accommodations (e.g., disability-related accommodation requests and allegations of discrimination).

The Assessment Team's approach was to observe all processes and practices at the SCSD detention facilities that impact (or may impact) disabled inmates. This included:

- Intake and Booking Process;
- Classification Process;
- Health Care Services (including Disability Identification);
- HCA/AD/DME;
- Housing Units;
- Orientation;
- Library Services;
- Religious Services/Activities;
- Telecommunications;


- Academic Education;
- Work Assignments;
- Vocational Assignments;
- Transportation;
- Inmate Release Process;
- Application of Reasonable Accommodations;
- Work Order Requests;
- Training;
- Out-of-Cell Time;
- Infraction Process (and other due process events);
- Grievances;
- Tracking System;
- All buildings to which inmates had access including the ingress and egress of those buildings and the facility paths of travel utilized by inmates.

In addition, the Assessment Team interviewed staff throughout the SCSD detention facilities directly involved in the processes and practices listed above including a minimum of one staff member assigned to each respective housing unit or pod area. The Assessment Team also interviewed approximately 179 inmates with representatives selected from each respective housing unit area. Inmates selected and interviewed included those with identified or possible/potential disabilities as well as individuals who were randomly chosen. In most cases, between two to four inmates were selected from every housing unit or separate dorm or pod area.

The Americans with Disabilities Act of 1990 (ADA) and Section 504 of the Rehabilitation Act as well as the United States Constitution protect the rights of individuals with disabilities including those housed in correctional facilities.

The command of Title II of the ADA states: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

In accordance with Title 42 of the United States Code - Section 12101-12213, no qualified inmate or parolee with a disability shall, because of that disability, be excluded from participation in or be denied the benefits of programs, services and activities of the department or its jails/facilities or be subjected to discrimination.

California Code - Section 11135 provides that no person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

or by any state agency, which is funded directly by the state, or receives any financial assistance from the state.

Title II of the ADA covers all activities of state and local governments regardless of the government entity's size or receipt of federal funding. Title II requires that state and local governments provide individuals with disabilities an equal opportunity to benefit from all programs, services and activities (e.g. education, employment, transportation, recreation, health care and social services). State and local governments are required to follow the **2010 ADA Standards for Accessible Design** in the new construction and alteration of their buildings. They also must relocate programs or otherwise provide access in inaccessible older buildings; to ensure disabled inmates have equal access to programs, services and activities.

Although public entities are not required to take actions that would result in undue financial and administrative burdens, they are required to make reasonable modifications to policies, practices and procedures where necessary to avoid discrimination, unless they can demonstrate that doing so would fundamentally alter the nature of the service, program, or activity being provided. They are also required to provide auxiliary aids necessary to ensure effective communication, provide legally-required architectural and programmatic access, and provide programs and services in the most integrated setting available.

Facilities covered by Title II of the ADA, including detention and correction facilities, are required to make services, programs and activities accessible to individuals with disabilities. Many inmates housed in local correctional facilities have mobility disabilities and need to be housed in accessible cells. It must be emphasized that detention and correctional institutions/jails are unique facilities under Title II. Inmates cannot leave the facilities and must have their needs met by the corrections system, including needs relating to a disability. If the detention and correctional facilities fail to accommodate inmates with disabilities, these individuals have little recourse, particularly when the need is great (*e.g.*, an accessible toilet; adequate catheters; or a shower chair). It is essential that corrections systems fulfill their nondiscrimination and program/facilities access obligations by adequately addressing the needs of inmates with disabilities, which include, but are not limited to, proper medication and medical treatment, accessible toilet and shower facilities, devices or accommodations such as a bed transfer or a shower chair, and assistance with hygiene methods for inmates with physical disabilities.[1]

Systemic violations of the ADA have resulted in numerous litigation cases throughout the United States at the federal, state and local levels. Systemic violations have also resulted in consent decrees, enforcement orders and formal

---

[1] **Title II Regulations 2010 Guidance and Section-by-Section Analysis**

settlement agreements by the United States Department of Justice (USDOJ), Disability Rights Section, the American Civil Liberties Union, the Disabilities Rights Office, Rosen, Bien, Galvan, and Grunfeld, Attorneys at law, and The Prison Law Office.

Two of the longest major federal cases (which are still ongoing) in California are *Clark v. California* and *Armstrong v. Wilson* (now *Armstrong v. Brown*). *Clark v. California* is an ADA case filed in 1996 against the California Department of Corrections and Rehabilitation (CDCR). This class action lawsuit contended that the CDCR violated the Americans with Disabilities Act by discriminating against prison inmates with developmental disabilities and denying them adequate accommodations, protection, and services because of their developmental disabilities. The state agreed in 2001 to take a series of actions to settle the case including complying with a set of revised policies and procedures as set forth in a court-approved remedial plan. In January 2010, the court found that CDCR was failing to identify, conservatively, at least half of those prisoners who would qualify for protection and accommodation under the Remedial Plan. The court noted, disturbingly, that CDCR systematically failed to provide those developmentally disabled prisoners they did identify with assistance in reading and writing, access to medical care, access to canteen, access to the grievance system, assistance with self-care, and effective communication (e.g. at disciplinary hearings). It found, moreover, that CDCR failed to protect developmentally disabled prisoners from abuse initiated by other prisoners and, more egregiously, by staff.

*Armstrong v. Brown* is another ADA case filed in 1994 against the CDCR. Subsequent to the January 3, 2001 approved settlement agreement (which outlined CDCR's set of plans, policies, and procedures to assure nondiscrimination against inmates with disabilities) and relevant here, the same federal court ruled on, August 28, 2012 that:

> Given the ineffectiveness of Defendants' County Jail Plan, Defendants' consequent reliance on the county jails to accommodate *Armstrong* class members, and the deficiencies identified in the disability-related county jail policies and procedures, and in certain facilities' housing, the Court finds that the types of ADA violations experienced by the class member-declarants have been, and will continue to be, experienced by many other class members who have been and will be housed in county jails throughout California. The serious violations of the rights of class members while housed in county jails are systemic, persistent, and continuing throughout the State and are directly attributable to Defendants' failure to implement appropriate policies and procedures to identify, track, and accommodate these class members to communicate appropriate information to the county jails, and to monitor compliance by the county jails. The Court finds that the harm experienced by class members is caused not only by Defendants'

statewide policies (or lack thereof) regarding the housing of *Armstrong* class members in county jails, but also by Defendants' ongoing failure to train, supervise, and monitor CDCR employees and agents concerning their responsibilities, ongoing failure to communicate with county jails regarding the known needs of class members, and ongoing failure to take responsibility for and to assert influence over county jails through contracts, regulations, letters, meetings, or other communications. The Court therefore finds that only system-wide injunctive relief could prevent *Armstrong* class members from experiencing future ADA violations when housed in county jails.

Although the *Armstrong* case class members only include the CDCR inmates who are housed in a county jail while on out-to-court status or those serving a parole violation in a county jail, the requirement of providing equal access to programs, services and activities for all inmates housed in county jails (as required by Title II) rests with the county jail and is a non-delegable duty. The County Jail Plan is inclusive of Clark class members as well as inmates with mental health disabilities, just as the *Armstrong v. Board of Parole Hearings (BPH)* litigation includes individuals with all disabilities covered under ADA.

In addition, with the passage of Assembly Bill (AB) 109, known as the California Realignment Act of 2011, the mission and the fiscal/programmatic demands on county jails in California have become significantly more complex. County jails are no longer a transitory facility only housing pre-sentenced inmates, or inmates sentenced to a year or less.

County jails now have exponentially greater operational, fiscal, regulatory, statutory, and constitutional challenges to provide services for inmates, many of whom, are serving sentences that are significantly longer than one year. We are aware of at least one county in which an inmate has been sentenced to over 18 years to be served in the county jail.

AB 109 inmates are on average older, sicker, and have more complex medical, mental health, and dental care needs that simply cannot be ignored. The constitutional operation of county jails since realignment has become far more complex and far more expensive, because county jails now serve as a hybrid, providing both the services of a jail and a prison.

Because of this recent, unanticipated phenomenon, county jails must act quickly to adapt their current operations to accommodate the needs of this population and to ensure compliance with Title II and the ADA.

This report details the Assessment Team's review of the policies, procedures and practices of programs, services and activities provided to the SCSD detention facilities' inmate population.

Listed below is a summary of findings of the most serious violations of the ADA as noted by the Assessment Team:



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- The current SCSD detention facilities intake medical screening process is wholly inadequate to identify disabled inmates, to determine if the inmate is a qualified individual, or to determine if the disabled inmate has an impairment that requires a reasonable accommodation;
- Inmates are not being provided with the HCA/AD/DME needed to access programs, services and activities and the subtler upper body disabilities are missed altogether;
- There are cases where the SCSD detention facilities are not allowing inmates to retain their HCAs/ADs/DME during the booking process and therefore these inmates are being systematically housed without the necessary devices to assist them in accessing programs, services and activities which violates the ADA;
- There is no process in place to identify intellectually disabled inmates' adaptive support needs and adaptive functioning deficits such as, communication skills, academic skills, self-care skills, socialization skills, self-advocacy/use of resources, work, health and safety, self-direction, leisure, and assistance staff must provide such as coaching, assisting, monitoring and prompting;
- Disabled inmates (such as those with vision, hearing, speech, learning, and developmental disabilities, as well as those with mental illness and other disabilities) are not informed of available reasonable accommodations, they are not appropriately informed of available programs, services and activities, and they are not receiving the jail rulebook, or observing an inmate orientation video, or having specific rules or expectations explained to them by staff;
- Disabled inmates in the MJ are housed in a medical setting solely based on their disability;
- Inmates housed in the medical housing unit at the MJ are not offered or provided access to equivalent programs, services and activities consistent with their custody level as inmates who are housed in the general population housing units;
- Disabled inmates housed in a medical setting at the MJ and are eligible for housing at RCCC based on classification factors, do not have equal access to education, vocation, self-help programs or jobs;
- Disabled inmates housed in MJ 2 West M/P are not being provided equal access to the outside recreation yard as all other inmates housed in the MJ;
- Disabled inmates housed in 2 East Pod 100 (wheelchair users) are not being provided equal access to the outside recreation yard as all other inmates housed in the MJ;
- The SCSD detention facilities Mental Health staff do not make routine rounds or monitor mentally disabled inmates housed in Disciplinary Detention, Total Separation, and Administrative Segregation units;

- There is no group therapy provided for mentally disabled inmates (except those assigned to the Restoration of Competency (ROC) program/evaluation);
- The responses to requests for mental health services in some cases are not expeditious or within a reasonable timeframe;
- Mentally disabled inmates placed on suicide precaution ("green suits") at the MJ are often temporarily housed on the housing unit floors (from days to weeks at a time), in the recreation/classroom areas;
- In some cases, there is a lack of confidentiality for JPS and medical encounters/interviews;
- There are delays and in some cases no follow-up regarding requests for psychiatric services;
- There is a common concern amongst numerous custody and JPS staff as to a lack of JPS clinicians;
- The staffing levels at the MJ are impacting the ability for staff to provide the required out-of-cell time (dayroom and outdoor recreation) for disabled inmates;
- The disabled mentally ill inmates housed in the mental health residential units referred to as Outpatient Psychiatry (OPP) at the MJ are not being provided equal access to the outside recreation yard and in some cases the dayroom as other non-disabled inmates housed in the SCSD detention facilities;
- The SCSD detention facilities do not provide equal access to the recreational reading material for disabled inmates;
- The SCSD detention facilities do not provide equal access to religious programming for disabled inmates;
- Some of the SCSD detention facility visiting areas do not provide equal access to visiting or attorney visiting for disabled inmates;
- The SCSD detention facilities do not provide equal access to showers for disabled inmates;
- The Inmate Grievance process does not include an expedited process for ADA related appeals or the provision of interim accommodations pending a decision on their grievances/appeals;
- There is no ADA training provided to SCSD detention facility custody staff (custody, medical and support);
- The SCSD detention facilities do not always provide reasonable accommodations for disabled inmates during transport to court;
- There is only one accessible vehicle available for Long Hauls, court transports from RCCC to the MJ, transports from the MJ to RCCC and medical transports;
- Inmate worker and industry positions do not have essential functions identified and listed;

- Medical staff does not identify work duty restrictions, physical limitations, or place inmates on limited/full duty status to assist staff when placing disabled inmates in the appropriate work/industry assignments;
- Inmates with intellectual disabilities assigned to the work/industry position are not provided additional supervision and training to help them meet the requirements of the assignment such as lower production expectations, expanded time frames for completion of projects, etc.;
- There is no comprehensive networked ADA tracking system to identify disabled inmates, to ensure that their EC needs and reasonable accommodations allowing them access to SCSD detention facilities programs, services, and activities are being provided for, and to monitor/identify/correct episodic and systemic non-compliant ADA issues in a timely fashion;
- There is not an effective tracking system in place to identify HCA/DME/AD that have been issued to inmates or were in an inmate's possession upon arrival into custody;
- The ADA coordinators are inexperienced/ineffective, and they have not had the requisite comprehensive ADA training to perform their jobs effectively;
- The ADA coordinators spend a mere 20-25 percent of their time on ADA compliance issues;
- There is not a comprehensive EC policy or practice in place, particularly with events involving due process, clinical encounters, education, or self-help type groups or meetings, e.g., Alcoholics Anonymous and Narcotics Anonymous;
- There currently is not an ADA accountability plan in place to hold staff accountable for egregious, serious or repeated violations of ADA, e.g., discrimination, willful disobedience;
- The SCSD detention facilities do not provide (or adequately provide) inmate orientation information or materials, and do not accommodate disabled inmate (such as those with vision, hearing, speech, learning and developmental disabilities, or those with mental illness or other disabilities) during orientation;
- Operations Orders, Policies and Procedures need to be revised/modified to incorporate applicable ADA language related to inmates with disabilities;
- There are no ADA notices posted in the housing units;
- The inmate disciplinary process is flawed, as there are inconsistencies regarding effective communication being provided, the issuance of the initial and final copies of the write-up report and hearing summaries, and the hearings themselves;
- There is no real mechanism to query for or identify inmates who may have a learning disability, and inmates do not receive a basic education or

reading level test for identification of reading and comprehension ability (except those who have tested for EGUSD);

- A lack of office space (as well as staffing levels for custody and health care staff) has provided for an atmosphere that is not conducive to protecting confidentiality for health care encounters (medical and mental health), classification interviews, and inmate disciplinary hearings;
- Many inmates are not aware of legal law library services or how to request access;
- There isn't a single ADA compliant inmate cell shower, bathroom, or living unit in the SCSD detention facilities;
- Many paths of travel are non-compliant with the wrong slope or huge potholes and cracks directly in the paths of inmate travel;
- The ADA grab bar placements are haphazard. Some are too short, some are in the wrong location, and some are outright missing;
- There is insufficient turn around space in the cells, toilet and sink areas;
- There are no ADA compliant shower chairs;
- There are no high low shower controls or shower hoses; and
- The Facility and Fleet (FAF) staff (County employees responsible for facilities maintenance) lack even a basic understanding of the requirements of the ADA/ADAG/ADAS.

This detailed report outlines the aforementioned and other violations under ADA, as well as best practices needed for an ADA compliant/comprehensive inmate disability program. To be clear, while the ADA does not require a comprehensive, networked ADA tracking system, a comprehensive training program for all staff who have any inmate contact, or a revision of specific policies and procedures, duty statements and forms, it is our expert opinion that without those three best practice components being implemented alongside a comprehensive disability identification process, the SCSD detention facilities will not be successful in coming into compliance with or have any hope of remaining in compliance with the mandates of the ADA in their two detention facilities.

The report of findings for each area reviewed is contained within the various sections of this document.

## Intake/Booking
## (Disability Identification)

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures applicable to screening and identification of disabled inmates and the retention of HCAs/ADs/DME, are outlined in the following policies; 04/01 Intake Search, Receptions and Holding, 04/06 Identification Process, 04/07 Dress In / Dress out Procedure, 05/09 Weekenders, 06/03 Classification Process, 10/04 Medical Intake Screening, Draft Operations Order Inmates with Disabilities - ADA, 1129 ICE Detainee Procedural Considerations, 1404 Receiving Screening, 1417 Adult Developmental Disability, 1422 Special Needs Patients, and 1439 Reports of Disabilities or Impairments.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1207 Medical Receiving Screening, requires that:

With the exception of inmates transferred directly within a custody system that has documented receiving screenings, a screening shall be completed on all inmates at the time of intake. This screening shall be completed in accordance with written procedures and shall include but not be limited to medical and mental health problems, developmental disabilities, and communicable diseases, including, but not limited to, tuberculosis and other airborne diseases. The screening shall be performed by licensed health personnel or trained facility staff.

The facility administrator and responsible physician shall develop a written plan for complying with Penal Code Section 2656 (orthopedic or prosthetic appliance used by inmates).

There shall be a written plan to provide care for any inmate who appears at this screening to be in need of or who requests medical, mental health, or developmental disability treatment.

Written procedures and screening protocol shall be established by the responsible physician in cooperation with the facility administrator.

Per Operations Order 04/01, Intake Search, Receptions and Holdings, arresting/transporting officers are responsible for completing booking paperwork prior to bringing the inmate to the booking area. The booking paperwork includes, but is not limited to:

- Arrest Report
- Probable Cause form (signed by the arresting/transporting officer)
- Intake medical screening forms
- Property and Clothing Record Form (to be completed in accordance with Operations Order 04/03, Prisoner Clothing, Property, and Funds)



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Intake Classification Form (to be completed in accordance with Operations Order 06/03, Classification Process)
- Custody staff is responsible for maintaining an available supply of the necessary booking forms
- And interpreter services are to be provided as needed in accordance with Operations Order 06/14, Interpreter Services

Custody staff is responsible for performing an initial evaluation of the inmate and assigning an appropriate temporary holding location using the Intake Classification Form and the procedures in Operations Orders 06/03, 04/05, Use of Safety, Segregation, North Holding #2 and Multipurpose Rooms, and 04/04, Use of Sobering Cells. Telephone access to the inmates will be provided in accordance with Operations Order 06/13, Telephone and TDD/TTY Equipment Access.

After the inmate has been identified and the booking process has been completed, the inmate is processed according to booking status. Inmates who are eligible to be released or who have posted bail will be processed in accordance with Operations Order 04/09, Releases. Inmates who are not eligible for release will be moved to the appropriate holding area while waiting to be dressed into facility clothing. Inmates will be issued facility clothing and housed in accordance with Operations Order 04/07, Dress In / Dress Out Procedures.

Per Operations Order 04/06, Identification process, inmates who are going to be housed at the MJ or RCCC will be provided a copy of the "Inmate Booking Information Receipt" before they are placed in a housing unit. The information on the receipt should include, but is not limited to:

- Charges/Holds.
- Bail amount.

Custody staff working at the Identification (ID) station should be able to obtain answers to inmates' questions about the booking and/or release process. Information pertaining to the booking process should be made available by custody staff to those who have difficulty understanding English or who are hard of hearing or deaf, or who are visually impaired.

Per Operations Order 04/07, Dress In/Dress out Procedure, during the inmate dress-in process, sworn custody staff shall perform strip searches of inmates who fall under the criteria for strip searches in accordance with current policy and procedures. Sworn custody staff shall dress in inmates who are eligible for a strip search separately from those who will not be strip-searched. Sworn custody staff will move inmates to individual stalls divided by solid opaque dividers or opaque curtains blocking view of each inmate from each other and from outside the dress in area. Sworn custody staff will issue the prescribed inmate clothing for the facility, including but not limited to, the following items:



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- One (1) shirt
- One (1) undershirt
- One (1) pair of pants
- One (1) pair of socks
- One (1) pair of shoes
- One (1) towel
- One (1) complete set of undergarments. Female inmates receive two (2) pairs of panties and one (1) bra.

Custody staff shall issue the inmate a personal hygiene kit, which minimally includes a toothbrush, toothpaste, and comb. Custody staff shall provide the inmate with orientation materials in accordance with Operations Order 04/08- Prisoner Orientation. Once inmates have been dressed in prisoner clothing, custody staff will deliver or make arrangements to deliver the inmates to the housing units in accordance with Operations Orders 06/02, Housing Plan and 6/03, Classification. The inmates may also be issued additional clothing and bedding appropriate to his/her housing facility. The clothing assigned to the inmate will be in accordance with Operations Order 06/11, Laundry, Clothing, and Linens.

Per Operations Order 05/09, Weekenders, at initial booking, males and females are required to report to the Front Counter at the MJ and to the Gatehouse at RCCC to confirm that the commitment order has been received from the court. For purposes of the booking process, weekenders are booked according to the standard booking procedures in accordance with existing booking, property, orientation, and classification orders; however an arrest report and probable clause declaration are typically not needed. If a weekender is on medication which should be continued during incarceration, he/she should bring the currently dated, properly packaged and labeled prescription to the facility so medical staff may evaluate the medication. Medical staff shall determine the course of action with regard to the inmate's medical needs.

Per Operations Order 06/03 Classification Process, at intake, custody staff will perform an initial classification of inmates using the Intake Classification Form. Custody staff will be responsible for separating inmates as appropriate per this order.

Per Operations Order 10/04 Medical Intake Screening, Correctional Health Services staff shall complete a health screening procedure on each arrestee at the time of booking in accordance with Article 11, Section 1207 of the California Code of Regulations, Title 15. Any person not deemed medically fit for incarceration will not be accepted.

At the time of intake a medical receiving screening shall be performed by health personnel for all new inmates, including transfers, and documented on the appropriate forms. The intake medical screening shall minimally include



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

observations of the subject's behavior and physical condition and inquiries into past and present illness and health problems, use of medications, drugs and/or alcohol, and for females, gynecological issues and pregnancies. Medical staff shall, in coordination with Jail Psychiatric Services (JPS), complete a cursory evaluation of the inmate's mental health. If during the intake medical receiving screening process an inmate is found to be in need of immediate medical attention, the inmate shall be promptly referred for emergency care. If referred to an outside medical facility, a written medical clearance shall be obtained prior to acceptance into a facility as described in section III of this order. Inmates accepted for custody and deemed to be a "Medical Expedite" shall be processed through the booking process within two hours. A "Medical Expedite" form shall be initiated by medical staff and completed by custody staff when the inmate is escorted to the medical housing area.

If the arresting/transporting officer finds medication in the inmate's possession, he/she should present the medication to the intake nurse. Medical staff will note the dosage and return the medication to the arresting/transporting officer. If medically required, medical staff will retrieve medication which is a medical equivalent to that taken by the arrested person, and package it for dispensing to the inmate at scheduled pill call in accordance with Operations Order 10/08, Medication Distribution. If an inmate is on medication, he/she should report the details to the nurse conducting the medical screening.

An ambulatory subject who requires but has refused medical attention may be booked at the discretion of medical staff. Medical staff shall verify with the subject that he/she refuses medical treatment, and shall note the refusal. In situations where the arrestee is unable or refuses to respond to the receiving screening questions, health personnel shall visually examine the subject for obvious or noticeable medical problems. If the subject is accepted for incarceration, the form shall be completed at a later time when the subject becomes cooperative or communicative.

Paraplegic arrestees and those who must use crutches or orthopedic appliances but who are otherwise fit shall be accepted for incarceration. Correctional Health Services staff shall not accept for booking any arrestee who is unconscious, unable to walk without the aid of another person or in need of obvious medical attention. If an inmate is deemed unfit for incarceration at the time of intake, the arresting/transporting officer/agency is responsible for transport or providing appropriate staff in the event an ambulance is summoned. Upon return, the inmate shall not be accepted for incarceration unless the arresting/transporting officer provides documentation from an examining physician certifying the subject is fit for incarceration and the previously unfit condition must be rendered appropriate for the level of care provided at the jail as determined by health care staff.


Per Draft Operations Order Inmates with Disabilities - ADA, the medical screening process during intake serves to identify most disabilities and the need for accommodations prior to the housing of an inmate. It is the responsibility of booking and medical staff to assess inmates upon admission for evidence of a disability or special medical need. This assessment information will be recorded on the Inmate Disability Evaluation Form (IDEF) as applicable. Information may be garnered from the inmate's prior custody or medical records.

Custody or medical staff may observe and report a disability or medical condition that would:

- Impact the inmate's housing;
- Impact the intimate's / arrestee's Activities of Daily Living;
- Affect the inmate's program access; or
- Present a safety or security concern for the inmate or others.

It is the responsibility of the intake medical staff to:

- Initiate and sign an IDEF, and forward the form to the Booking Unit and the ADA Coordinator upon determination that an inmate may have a disability.
- Create an "ADA" ALERT in the inmate's medical chart making appropriate notations on the inmate's particular disability or limitation.

A designated deputy will be assigned to assist any obviously disabled inmate in the booking area, as needed. The identified inmate will be escorted either through the dress-in process to an intake floor, to the release holding tank or another holding area as necessary.

For those inmates with disabilities who were not identified at intake booking or processing, there shall be Americans with Disabilities Act Notices posted in the housing units that inform inmates how to obtain information regarding an ADA issue or how to request accommodation. The same information will be duplicated in the Inmate Orientation Handbook. Staff may notify the ADA Coordinator at any time, for any inmate that they feel has a disability, based upon personal observation of the inmate, an oral statement by the inmate, or a written request by the inmate.

Inmates may keep items in their possession, which do not pose a security risk to the facility or a safety risk to staff or other inmates. Such items include, but are not limited to, prescription eyewear, dentures, hearing devices, prostheses, crutches, and medical braces. Intake medical staff shall determine if the requested item is medically necessary. If there is any question on whether an appliance/device is medically necessary, the inmate shall be allowed to keep the item. The inmate shall then be scheduled to be examined by a physician within 24 hours to determine the medical necessity of the requested item. If there is no identifiable medical need, then the item will be placed in the inmate's property.

If an inmate does not have an appliance/device and is in need of one, medical staff shall:

- Evaluate the severity of the need and either approve or deny the request.
- Provide the inmate with crutches, walker, wheelchair or other device as deemed necessary, or
- Make arrangements to obtain the appliance/device.

Per policy 1129 ICE Detainee Procedural Considerations, during intake all ICE Detainees will receive a Tuberculin Skin Test (TST) using Purified Protein Derivative (PPD) solution unless they have a documented positive TST. Documented TST must have the date of the TST, the mm of induration, and a medical provider's signature.

ICE Detainees will receive a complete Personal Health History (PHH) within 14 days of arrival at the facility or within 14 days of being identified as an ICE Detainee. Registered nurses (RNs) completing a PHH will receive training from a physician on how to complete a PHH.

Per policy 1404 Receiving Screening, a receiving health screening is performed by medical staff on all arrestee(s) (including transfers) immediately upon arrival at the facility. Arrestee(s), who are unconscious, semi-conscious, bleeding, or otherwise obviously in need of immediate medical attention, are referred to outside medical care prior to acceptance. The purpose of this health screening is to obtain prompt medical care for those needing it, to identify ongoing or chronic medical needs, and to detect those arrestee(s) who pose a potential threat to the health or safety of others within the general population. Baseline data is established for use in subsequent care and treatment. When referred to an outside emergency department, their return to the jail is predicated upon written medical clearance. Receiving screening findings are recorded on a printed form approved by the Health Authority. At a minimum, the screening includes:

Inquiry into:

- Current illnesses and health problems, including medical, dental, and communicable diseases (including sexually transmitted diseases).
- Medications taken and special health requirements.
- Use of alcohol and other drugs, including types, methods, amounts, frequency, date or time of last use, and a history of problems, which may have occurred after ceasing use (i.e., seizures).
- History or appearance of suspected mental illness, including suicidal ideation or behavior.
- Appearance or history of developmental disability.
- For female arrestee(s), a history of gynecological problems, possibility of current pregnancy, and present use of birth control.
- A complete set of vital signs and a stated height and weight.

Observation of:

- Behavior, which includes state of consciousness, mental status, appearance, conduct, tremors, and sweating.
- Body deformities and ease of movement.
- Condition of skin, including trauma markings, bruises, lesions, jaundice, rashes and infestations, needle marks or other indication of drug abuse.
- Slowness in speech or lack of comprehension of questions suggestive of developmental disabilities.

Disposition, such as:

- Referral to an appropriate Health Care Service or Mental Health Service on an emergency basis; or
- Placement in the general inmate population and later referral to an appropriate Health Care Service; or
- Clearance for housing; or
- Isolation or special observation in the facility.

Procedures will include provisions for segregation and/or special housing for patients with suspected communicable diseases, mental illness, or developmental or physical disabilities, pending medical clearance. Disposition should also provide for referral and follow-up care.

Nursing Staff will provide a medical evaluation on all new arrestees. Arrestees in need of immediate medical treatment are referred to the facility physician. NO arrestee is to be accepted into the jail until he/she has completed the Receiving Screening process. Arrestees may be placed on next scheduled Sick Call.

Jail Psychiatric Services (JPS) may be requested to evaluate an arrestee's mental status. Arrestees may be housed in the Outpatient Housing Unit. They may also be referred for follow-up psychiatric care.

The Receiving Screening shall be conducted by the Nursing Staff at MJ and RCCC. This will become a part of the medical record.

Per policy 1417 Adult Developmental Disability, the identification of a person with developmental disability begins at booking and continues throughout incarceration. The Intake medical personnel should be alert to the possibility of developmental disability by looking for:

- Difficulty in performing basic tasks associated with the process.
- Slowness or apparent difficulty in understanding.
- A history of treatment for developmental disability through a Regional Center or special education class.

If there is suspicion of a developmental disability, a notation will be made on the Receiving Screening medical form and a referral made to the JPS Outpatient Department. In cases where there is uncertainty as to whether the inmate has a

psychiatric condition as opposed (or in addition to) development disability, referral for mental health evaluation is appropriate. It is the responsibility of Jail Psychiatric Services' clinical staff to initiate an Alta Regional Center referral for a person suspected to have developmental disability or to contact Alta Regional for those persons who are already clients of Alta Regional.

Per policy 1439, Reports of Disabilities or Impairments, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

Any report of physical disability or impairment by an inmate or outside organization will be referred to a clinician for review and assessment. This can include reports of mobility impairments such as amputations or paraplegia, or other disabilities that limit daily functioning such as visual, hearing, or speech. The clinician will review the report, assess the inmate's needs and make a determination if special housing or assistive devices are needed. If indicated, these needs will be recorded in the patient-inmate's chart, and communicated to medical and custody staff. Upon report of a disability or impairment (verbal or written):

- A Medical Doctor (MD)/Nurse Practitioner (NP) Sick Call appointment will be scheduled and the nature of the report will be documented.
- The patient-inmates will be seen and their disability or impairment will be assessed and if indicated a plan of care will be developed.
- Any specific patient-inmate's needs or accommodations will be documented in the chart and communicated to medical and custody staff.

## Observations

The Assessment Team observed the entire intake booking process at the MJ and RCCC facilities on multiple days and various times of the day (morning/afternoon/evening/) for male and female inmates. This included the initial arrival of the arrestee, completion of the Special Needs Form, medical intake screening process, the custody booking process and the classification process. The Sacramento County Sheriff's Department Correctional Health Services Medical Intake screening form addresses the following; Vitals, Fever Evaluation, Chest Pain, Shortness Of Breath, or Dyspnea Evaluation, Injury, Trauma, and Life/Limb Medical Issues Evaluation, Asthma Chronic Obstructive Pulmonary Disease (COPD) Evaluation, Diabetes Evaluation, Alcohol or Benzodiazepine Withdrawal Evaluation, Opiate Withdrawal Evaluation, Medical History Conditions, Medical Evaluation, Allergies, Essential Medications, JPS Evaluation and Female Health Evaluation. The following disability-related question is part of the medical intake screening form, "Does the arrestee have physical/developmental disabilities that prevent them from caring for themselves? If yes, arrestee needs segregation or observation in booking and Medical Expedite." The Sacramento County Sheriff's Department Correctional Health


Services Special Needs form addresses the following; Disposition, Special Medical Needs and Arrestee/Detainee possession of specific devices while in medical intake. This form allows medical staff to identify HCA/AD/DME the inmate had in their possession while in medical intake. This form also has a section for custody staff to note if the HCA/AD/DME was sent to property. There are very general disability-related questions that are asked during the medical intake screening process regarding hearing aids, glasses, and other medical conditions.

The medical intake process is conducted in a private setting at both the MJ and RCCC. However, on one occasion, the Assessment Team observed the medical intake process being conducted on the bench in the arresting officers report room. Two nurses were conducting the medical assessment while 7 inmates sat on a bench as the other inmates could overhear the screening questions and inmate responses. Medical staff all used the Sacramento County Sheriff's Department Correctional Health Services Medical Intake screening form, however, the method in which the questions were asked and how information was collected was inconsistent. At RCCC the medical screening nurse was very thorough and ensured that the inmate understood each question being asked. At the MJ, one nurse was observed completing the medical screening process in less than 60 seconds. This nurse was heard stating, "took me more than a minute, I am getting slower." In some cases, medical staff did not ask all and in some cases none of the questions related to screening for disabilities. One nurse was observed referring an inmate to a chart posted on the wall that reflects the medical history and conditions listed in the medical intake screening form, instead of asking the inmate the questions, not inquiring of the inmate whether he could read, see or understand the information on the chart. The medical staff had the inmates sign the medical intake form, however, they did not query or ensure that the inmate understood the information noted on the form.

The Assessment Team observed the JPS intake screening process at the MJ. The Assessment Team noted that the JPS intake screening process is conducted in a non-confidential setting. The screening is conducted cell front with the cell door open and custody staff providing security coverage for the JPS staff member.

The Assessment Team observed the inmate identification process. In booking, inmates were being provided a copy of the "Inmate Booking Information Receipt;" however, staff working at the ID station were only handing the document to the inmates and were not providing EC to ensure disabled inmates understood the information contained in the document.

Neither the custody booking or classification processes included a system to identify disabled inmates as custody staff primarily rely on medical intake screening staff to identify the disabled inmates.

The Assessment Team also conducted a tour of the MJ and RCCC property rooms. During this tour the team observed a significant number of HCAs/ADs/DME that were being stored. The HCAs/ADs/DME observed included; wheelchairs, walkers, canes and crutches.

Although the Assessment Team did not observe any disabled inmates with HCAs/ADs/DME being processed for booking, medical and custody staff informed the Assessment Team that disabled inmates who have such devices are allowed to retain these devices.

### Staff Interviews

The Assessment Team interviewed medical, custody, and mental health staff assigned to the booking and intake process. Medical staff in booking stated that during the medical intake process inmates are asked the questions from the medical intake form line by line. If the inmate is identified as having psych or medical issues they are expedited through the intake process and housed on the 2nd floor. Medical staff stated that they could identify disabled inmates by the way they were walking. If they limped, had a cane, crutches or a wheelchair they were identified as disabled. Inmates with wheelchairs would be housed on 2 East and inmates with other assistive devices would be housed according to classification. Medical staff stated they would also identify disabled inmates by how they answered questions. Additionally, there could be information from a previous stay that would alert medical staff to a potential disability. If an inmate requested a cane or other assistive device, he/she would be scheduled for a medical evaluation. If the inmate arrived with an HCA/AD/DME medical staff would complete a Special Needs form and forward the information to custody. This form would also alert custody staff if an inmate required a lower bunk/lower tier (LB/LT). Medical staff stated there is no centralized tracking system to alert staff of a disabled inmate's accommodation needs. Medical staff stated that if the inmate's glasses (prescription/reading) had metal frames they were not allowed to them and the custody officers would place them in their property. They stated that if a hearing-impaired or deaf inmate were being processed they would write the questions and have the inmate respond in writing because there is no sign language interpreter (SLI) available.

If the medical assessment provides evidence of mental illness, a nurse will refer the inmate to JPS by completing the Special Needs form. The inmate is then moved to a safety holding cell pending evaluation by JPS staff. JPS staff stated that a clinical assessment is completed on inmates referred to JPS by medical staff during the intake/booking process. They also stated that an inmate will either be cleared for housing or referred to the psychiatrist to determine if inpatient housing is warranted. The psychiatrist will either clear the inmate for housing or determine that the inmate requires acute inpatient housing on 2 West-P. Staff stated that based on lack of bed availability inmates at times must remain in the safety cells for up to 2 weeks.

Medical staff stated that ICE detainees receive a PHH exam within 14 days of arrival. The PHH is more thorough and includes a more thorough review/assessment/evaluation for disabilities (physical/intellectual). The PHH asks the detainees questions for self-reporting of mental health and developmental history. The PHH also includes a general physical exam and a mental status exam where the examiner/clinician notes the detainees orientation, perceptions/thought content, appearance, posture, gait/walk, movement, mood, attitude, speech, intelligence and insight.

Custody staff stated that the arresting officers complete the Intake Screening form. Medical staff then complete the intake medical screening. The inmates are searched, photographed, placed in holding cells, ID'd and fingerprinted, placed in a holding cell depending on type of arrest (Quick/Felony), for felony arrests dressed out, shown the Prison Rape Elimination Act (PREA) video, and then housed.

Medical staff acknowledged that inmates expected to be at the jail for a short period of time (e.g., 12 hours or less), and who are undergoing intake booking medical screening are given a Quick Medical Assessment, which consists of less questioning, with little to no disability related questions, other than mental health (MH). One of the RNs who was interviewed indicated that medical staff know who has a disability by the way inmates walk and talk. When asked, another RN admitted that a 60-second medical intake or health screening (as observed by the assessment team) would not constitute a thorough screening.

When asked how cumbersome the workload would be (if any) to increase the medical screening to match that of the ICE medical screening, a nurse replied that more medical staff would have to be hired. She stated that health services is already understaffed, and that medical clearances are a major problem. She cited there are about 7 vacancies now, and they use registry staff to fill the void. She also stated that on some days, positions get filled, and on other days they do not get staffed. When asked what (if anything) suffers when medical positions are not filled, the nurse indicated that some sick calls won't get handled, the less severe Health Services (HS) KITE's are not responded to, and blood pressure checks may go undone. She mentioned that pill call nurses sometimes fill the void, or management attempts to hire overtime if they can.

### Inmate interviews

During the interviews, numerous inmates alleged that staff did not provide and/or confiscated their HCA/AD/DME during the booking process. Inmates also stated that they were not allowed to retain prescription glasses when processed through intake/booking. Numerous inmates who could not read and claimed to have a learning disability and/or attended special education classes in public school stated that they did not understand the booking/classification process. Inmates



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

with intellectual, learning, vision, and hearing disabilities were not identified as having a disability by SCSD detention facility staff.

**Conclusions**

The current SCSD detention facilities intake medical screening process is wholly inadequate to identify disabled inmates to determine if the inmate is a qualified individual or to determine if the disabled inmate has an impairment that requires a reasonable accommodation.

Although SCSD detention facilities have a process in place to allegedly identify the accommodation needs of disabled inmates covered under Title II of the ADA, inmates are not being provided with the HCA/AD/DME needed to access programs, services and activities. The subtler upper body disabilities are missed altogether.

Based on the observations in the property rooms and statements by medical staff and inmates, the SCSD detention facilities are not allowing some inmates to retain their HCAs/ADs/DME during the booking process and therefore are systematically being housed without the necessary devices to assist them in accessing programs, services and activities in violation of the ADA.

There are cases in which inmates have not been provided an HCA/AD/DME to assist them in accessing programs, services and activities. This includes inmates with vision impairments not being allowed to retain prescription glasses when processed through intake/booking. Medical staff does not always approve assistive devices that would assist inmates in accessing programs, services and activities at the SCSD detention facilities.

Inmates with intellectual disabilities are not being screened or reliably and effectively identified when they enter the SCSD detention facilities. The SCSD detention facility staff is not using reliable and valid screening tools for intellectual disabilities. Moreover, screening is done primarily by medical staff who have not received training in identifying and working with individuals with these disabilities.

Inmates with intellectual disabilities are not always easy to distinguish from non-disabled inmates. According to experts only a small percentage of people with developmental disabilities have identifying physical characteristics or impairments in physical or motor skills. In addition, many intellectually disabled individuals work hard to mask their disabilities. Individuals with intellectual disabilities also have inconsistent and uneven skill development, which can mask areas of impairment. A person with adequate self-care skills, for example, may have significant functional impairments in other areas. People with intellectual disabilities might have deficits in information durability. In other words, they might need repeated reminders, even if a task is one they have undertaken before. Many individuals with developmental disabilities have trouble transferring information: taking a skill they have learned in one area and applying it to a

similar task in another area. An intellectually disabled inmate might learn to stay inside the yellow boundary lines painted in his housing unit, but may not apply that skill to another prison if transferred. People with intellectual disabilities can usually function well in highly structured environments such as prisons, where personal choices regarding food, clothing and activities are eliminated. However, jails also have numerous and complex rules. The stress of learning, understanding, remembering, and complying with the multitude of rules that govern jail life can offset the potential benefits of the highly-structured environment for intellectually disabled inmates.

There is no process in place to identify intellectually disabled inmates' adaptive support needs and adaptive functioning deficits such as, communication skills, academic skills, self-care skills, socialization skills, self-advocacy/use of resources, work, health and safety, self-direction, leisure, and assistance staff must provide such as coaching, assisting, monitoring and prompting.

The mental health screening process is being conducted in a non-confidential setting cell front or in the safety cells.

The screening process for inmates with potential intellectual disabilities needs to be refined to include a more detailed screening assessment tool.

A screening process needs to be developed and put in place to screen inmates for learning disabilities and/or literacy concerns.

Inmates who were interviewed by the Assessment Team were identified as having a history of intellectual disabilities, however, SCSD detention facilities staff did not identify these disabilities during the screening and booking process.

During the entire intake process, medical, mental health and custody staff did not ensure EC was established with inmates who may have had disabilities impacting their ability to understand terminology used by staff and documents that they are required to sign acknowledging understanding. Staff must ensure they effectively communicate with all inmates who may have difficulty understanding due to intellectual, mental health, learning and other disabilities. The goal of EC is to understand and to be understood. Staff must adapt their communication techniques when communicating with disabled inmates to ensure EC is established.

## References

**28 C.F.R § 35.104** defines a *Disability* as a physical or mental impairment that substantially limits one or more of the major life activities. The phrase "major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. Mobility disability means and refers to any impairment or condition that limits a person's ability to move any part of his or her body or position of his or her body including,



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

but not limited to, a person's ability to walk, ambulate, maneuver around objects, and ascend or descend steps or slopes. A person with a mobility disability may or may not use a wheelchair, scooter, Electric Personal Assisted Mobility Device, crutches, walker, cane, brace, orthopedic device, Functional Electrical Stimulation, or similar equipment or device, or may be semi-ambulatory.

**28 C.F.R. § 35.130 (b)(1)(iii) and (vii)** state "A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service."

**42 U.S.C. § 12132**:  no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

**28 CFR § 35.130(a)** No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.130(b)(1)** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

**28 CFR § 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities;

**28 CFR § 35.130(b)(7)** A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

that making the modifications would fundamentally alter the nature of the service, program, or activity.

***The following reference from Armstrong v Brown pertains to inmates with disabilities or possible or suspected disabilities:***

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*Verification Process:*

*It is the mutual responsibility of the inmate/parolee and CDC to verify disabilities that might affect their placement and verifying credible claims of disability in response to requests for accommodations of complaints about disability-based discrimination.*

*Verification may be triggered by:*
- *The inmate self-identifies or claims to have a disability;*
- *Staff observes what appears to be a disability severe enough to impact placement, affect program access, or present a safety or security concern;*
- *The inmate's health care or file contains documentation of a disability; and*
- *A Third party (such as a family member) requests an evaluation of the inmate for an alleged disability.*

*Health care appliances shall be documented as property of the inmate and identified as such. No inmate shall be deprived of a health care appliance that was in the inmate's possession upon entry into the CDC system or was properly obtained while in CDC custody, unless for documented safety or security reasons or a physician determines that the appliance is no longer medically necessary or appropriate.*

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Clark v. California settlement agreement.***

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Clark v. California amended March 1, 2002, mandates the following:*

*SCREENING PROCESS*

*All inmates will be screened for developmental disabilities using standard instruments, as described below, to ensure uniform application of departmental policies and procedures for screening, identifying, and verifying developmental*

*disabilities and placing identified inmates in appropriate settings. A four-phase process and clinical judgment will be used to identify those inmates who fit the criteria for developmental disabilities. Phase I should take place within seven days after an inmate arrives at an RC or clinical staff receives a referral. Phase II should take place within seven days after an inmate fails the test administered in Phase 1. Phase III should take place within seven days after an inmate fails the test administered in Phase II.*

*Phase I and Phase II cognitive tests may be refused and, with justification, skipped. The later phase is due seven days after the decision to refuse or skip a phase is documented. The Clark Adaptive Support Evaluation (CASE), which is used for Phase III and Phase IV, is not dependent on inmate cooperation; however, if an inmate refuses to be interviewed for the CASE, the clinician must make use of collateral information such as observation of inmate and his living conditions, staff interviews, central file (C-File), unit health record, and other records.*



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

# Delivery, Repair, Removal, and Use of Health Care Appliances/Assistive Devices/Durable Medical Equipment/ Medical Supplies

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures applicable to the delivery, repair, removal, and use of Health Care Appliances, Assistive Devices and Durable Medical Equipment (HCAs/ADs/DME) are outlined in the following policies; 04/03 Prisoner Clothing, Property and Funds, 04/07 Dress In/Dress Out Procedure, 10/04 Medical Intake Screening, Draft Operations Order Inmates with Disabilities - ADA, 1125 Prosthesis, 1128 Reading Glasses for Inmates, 1404 Receiving Screening, 1431 Footwear In The Jails, and 1439 Reports of Disabilities or Impairments.

Per Operations Orders, 04/03 Prisoner Clothing, Property and Funds and 04/07 Dress In/Dress Out Procedure, inmates may keep items in their possession, which do not pose a security risk to the facility or a safety risk to staff or other inmates. Such items include, but are not limited to:

- Prescription eyewear, dentures, hearing devices
- Prostheses, crutches, and medical braces
- Legal materials
- Lists of telephone numbers and addresses

Per Operations Order 10/04, Medical Intake Screening, at the time of intake a medical receiving screening shall be performed by health personnel for all new inmates, including transfers, and documented on the appropriate forms. The intake medical screening shall minimally include observations of the subject's behavior and physical condition and inquiries into past and present illness and health problems, use of medications, drugs and/or alcohol, and for females, gynecological issues and pregnancies. Paraplegic arrestees and those who must use crutches or orthopedic appliances but who are otherwise fit shall be accepted for incarceration.

Draft Operations Order Inmates with Disabilities - ADA, defines an assistive device as, any device that is designed, made, or adapted to assist a person to perform a particular task (e.g., canes, crutches, walkers, wheelchairs, shower chairs). The draft order defines an orthopedic appliance as a device used to support, align, prevent, or correct deformities or to improve the function of the movable parts of the body (e.g., support braces, orthopedic shoes). The appliance must be prescribed or recommended and fitted by a physician and be subject to the rules delineated in Penal Code Section 2656 and addressed in Section XII of this policy. Prosthesis is defined as a device used to replace a defective or missing part of the body (e.g., artificial limbs).

Per Draft Operations Order Inmates with Disabilities - ADA, inmates may keep items in their possession, which do not pose a security risk to the facility or a safety risk to staff or other inmates. Such items include, but are not limited to, prescription eyewear, dentures, hearing devices, prostheses, crutches, and medical braces. Intake medical staff shall determine if the requested item is medically necessary. If there is any question on whether an appliance/device is medically necessary, the inmate shall be allowed to keep the item. The inmate shall be scheduled to be examined by a physician within 24 hours to determine the medical necessity of the requested item. If there is no identifiable medical need, then the item will be placed in the inmate's property.

If an inmate does not have an appliance/device and is in need of one, medical staff shall:

- Evaluate the severity of the need and either approve or deny the request.
- Provide the inmate with crutches, a walker, a wheelchair or other device as deemed necessary, or
- Make arrangements to obtain the appliance/device.

If there is probable cause to believe an inmate's possession of an appliance or device constitutes an immediate risk of bodily harm to any person in the facility or threatens the safety and security of the facility, the Watch Commander shall direct the removal of the appliance/device. The removal shall be documented at minimum in an Inmate Incident Report (PF10). The item shall be maintained in the facility property room or storage area until final disposition has been received by the Watch Commander.

Whenever an appliance/device is removed, the inmate shall be examined by a physician within 24 hours of the removal. If an alternative appliance/device can be utilized to provide the medical need then it should be considered. If there is no suitable alternative and the examining physician determines that removal is or will be injurious to the health or safety of the inmate, the physician shall inform the inmate and the Watch Commander. Upon receipt of the physician's opinion, the Watch Commander shall either return the appliance/device to the inmate or refuse to return such appliance/device. If the appliance/device is returned, such shall be documented in an Inmate Incident Report (PF10).

If an appliance/device is not returned, the Watch Commander shall:

- Notify the Facility Compliance Supervisor and the reviewing physician.
- Place the appliance/device in the inmate's booking property. If the item is too large to fit in the inmate's property, it shall be booked for safekeeping and sent to the property warehouse.
- Provide the inmate with a completed Petition for Return of an Orthopedic or Prosthetic Appliance form. A copy shall also be placed in the inmate's file.
- Provide final disposition in an Inmate Incident Report (PF10).



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Per policy 1128, Reading Glasses For Inmates, if a patient needs assessment for reading glasses this assessment should be done at nurse sick call. A referral to the MD is not required. To determine the appropriate strength for reading glasses, nurses should use the following guidelines:

Age less than 40 =>1.25
40 – 44 =>1.75
45 – 49 =>2.00
50 and older =>2.25

A nurse would provide the inmate with the appropriate strength based on their age, and the inmate could purchase the glasses through commissary.

If the inmate is medically indigent, a note to that effect and the strength of the glasses needed is to be recorded in the medical file. At that time, a Miscellaneous Medical Needs form will also be completed with the following notation: Medically indigent, needs reading glasses at [the required strength.] A copy of the Miscellaneous Medical Needs form is to be given to the inmate. A second copy is to be placed in the medical file, and the third copy is forwarded to the social worker who will facilitate provision of the glasses. The reading glasses will be paid for through Inmate Welfare Fund (IWF) funds and will be delivered to the inmate by the social worker.

CHS will be purchasing repair kits for each facility, which will be kept in the senior registered nurse (SRN) offices. Please instruct staff (licensed vocational nurses [LVN's] during pill call or RN's during sick call) to take glasses and bring them to the SRN office for repair. Staff will try to repair and return or else replace them.

Per policy 1404, Receiving Screening, a receiving health screening is performed by medical staff on all arrestees (including transfers) immediately upon arrival at the facility. Arrestees who are unconscious, semi-conscious, bleeding, or otherwise obviously in need of immediate medical attention, are referred to outside medical care prior to acceptance. The purpose of this health screening is to obtain prompt medical care for those needing it, to identify ongoing or chronic medical needs, and to detect those arrestees who pose a potential threat to the health or safety of others within the general population. Baseline data is established for use in subsequent care and treatment. When referred to an outside emergency department, their return to the jail is predicated upon written medical clearance. Receiving screening findings are recorded on a printed form approved by the Health Authority. At a minimum, the screening includes:

Inquiry into:

- Current illnesses and health problems, including medical, dental, and communicable diseases (including sexually transmitted diseases).
- Medications taken and special health requirements.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Use of alcohol and other drugs, including types, methods, amounts, frequency, date or time of last use, and a history of problems, which may have occurred after ceasing use (i.e., seizures).
- History or appearance of suspected mental illness, including suicidal ideation or behavior.
- Appearance or history of developmental disability.
- For female arrestees, a history of gynecological problems, possibility of current pregnancy, and present use of birth control.
- A complete set of vital signs and a stated height and weight.

And observation of:

- Behavior, which includes state of consciousness, mental status, appearance, conduct, tremors, and sweating.
- Body deformities and ease of movement.
- Condition of skin, including trauma markings, bruises, lesions, jaundice, rashes and infestations, needle marks or other indication of drug abuse.
- Slowness in speech or lack of comprehension of questions suggestive of developmental disabilities.

Per policy 1431, Footwear In The Jails, detainees seeing physicians or mid-level practitioners with complaints of foot discomfort, especially from jumping activities related to playing basketball, frequently request the use of their street shoes. Most of these have shoelaces. The jail has a strict suicide prevention philosophy. One of the ways this philosophy is implemented is to provide footwear that does not contain shoelaces.

The SCSD detention facilities provide its jail inmates with a soft-soled, all purpose shoe. It is sufficient for most activities, including sports. If, after examination of the patient, a physician believes there is a foot problem such as a deformity, or a disease condition such as neuropathy that requires an orthotic shoe during the stay in the jail to prevent significant pain or deterioration of the condition, the patient should be referred to a specialist for a prescription for the correct orthotic device. The prescriber should be made aware of the ban on shoelaces and metal bracing.

If the patient already has a legitimate orthotic prescription, the orthotic device/shoe needs to be examined by the custody staff for clear and present safety issues. Medically necessary care to alleviate pain and prevent deterioration should not be denied even if some alteration in the means of providing it is required in this environment. Medical staff may need to assist in determining that alternative. This is an appropriate use of the miscellaneous medical needs form (Chrono) to indicate the need for non-jail-issued footwear. Today's average sports shoes now come equipped with additional supports for active lifestyles built into them, and patients may prefer these to putting inserts into the jail shoes. Some podiatrists are advising patients to use these in lieu of

an actual orthotic prescription; however, we cannot substitute this recommendation for an actual orthotic prescription.

If, after an examination of the feet, no orthotic prescription appears needed, the patient should be counseled to make use of the over-the-counter availability of appropriate inserts recommended by our current orthopedist to provide arch support or heel cushioning. If the patient has a complaint of flat feet, heel spurs, or plantar fasciitis, the shoe insert may be helpful. These should be available in canteen, or can be ordered through pharmacy or medical supply if not.

In order to accommodate certain foot or ankle conditions or to better allow the use of the recommended shoe insert, the physician may determine that a closed depth type shoe may be useful. This is a shoe that has an upper that comes up over the top of the foot and closes low around the ankle. It is not a high-top shoe. The Jail has approved such a shoe with a Velcro closure that is available through the commissary. It will be necessary to advise custody staff via the Special Needs form (Chrono) that the patient should be allowed to purchase and use the shoe. It is also necessary to notify Fiscal about the shoe.

This shoe is not a prescription device or an orthopedic or medical shoe, but it is an alternative clothing item. It is not intended or designed to provide therapy for any medical condition and should not be referred to as such for liability reasons. However, it does provide a more secure closure and foot support and may accommodate a shoe insert better than the deck type standard jail issue shoe.

Per policy 1439, Reports of Disabilities or Impairments, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

Any report of physical disability or impairment by an inmate or outside organization will be referred to a clinician for review and assessment. This can include reports of mobility impairments such as amputations or paraplegia, or other disabilities that limit daily functioning such as visual, hearing, or speech. The clinician will review the report, assess the inmate's needs and make a determination if special housing or assistive devices are needed. If indicated, these needs will be recorded in the patient-inmate's chart, and communicated to medical and custody staff. Upon report of a disability or impairment (verbal or written):

- An MD/NP Sick Call appointment will be scheduled and the nature of the report will be documented.
- The patient-inmates will be seen and their disability or impairment will be assessed and if indicated a plan of care will be developed.
- Any specific patient-inmate's needs or accommodations will be documented in the chart and communicated to medical and custody staff.

## Observations

The Assessment Team observed the intake booking process on 4 separate occasions. During the observation, there were no disabled inmates with HCA/AD/DME in their possession during the medical intake screening process. However, the Assessment Team observed on 2 separate occasions a cane that was positioned outside a holding cell/room in the MJ booking area. When questioned, custody staff stated that inmates are not allowed to retain the assistive device in the holding cell/room because it is a security concern. The Assessment Team also toured the inmate property rooms located in the MJ and RCCC. Both inmate property rooms had HCAs/ADs/DME that were being stored with other inmate personal property. This included, wheelchairs, canes, walkers, and crutches. The Assessment Team observed assistive devices that were issued to inmates in the medical housing units ([MHU's] 2-East and RCCC MHU). The wheelchairs available for inmate uses at the RCCC MHU were missing leg rests and were not in working order. The wheelchairs issued to inmates housed in 2-East were not in good working condition. Some had missing leg rests and inmates that were interviewed by the Assessment Team had to hold their legs up while being pushed or have their feet drag on the floor while being pushed.

## Staff Interviews

The Assessment Team interviewed nurses who conduct medical screenings during intake/booking, nurses who provide patient care, medical staff who coordinate delivery of HCAs/ADs/DME to the inmates, physicians assigned to provide patient care, and custody staff. One of the MJ physicians indicated that referrals for disabilities and HCAs/ADs/DMEs are frequent. There are numerous medical staff who schedule the appointments. The doctor admitted not having access to any type of tracking system or roster to identify disabilities or accommodations, but thought that the custody administration was tracking that information. The doctor indicated that nurses are authorized to provide a mobility disabled inmates with interim accommodations such as HCAs/ADs/DME (e.g., cane, walker), and lower bunk chronos, etc., until the inmate could be seen by one of the physicians. HCAs/ADs/DME are ordered via a physician's order. Once the order is written, an RN or LVN writes an electronic supply request. Medical staff is supposed to enter the issuance of any device or accommodation into the electronic E-Chart Main Screen, specifically in the "Problem List." The physician was not sure whether the MJ has a master list of approved/disapproved types of HCAs/ADs/DMEs, but thought that would be a custody management function. The physician said there may be delays with receiving ordered devices, but there are usually some canes, walkers, wheelchairs and crutches in stock at the medical supply area.

One of the MJ nurses indicated that doctors evaluate inmate HCA/AD/DME needs on a case-by-case basis, and will write the orders if needed. The inmates can maintain devices so long as they are not a danger to themselves. If there is

a danger concerned, a written order can provide certain restrictions. The nurse added that in cases where a device is denied by the doctor, nursing staff can collaborate with custody staff and have the inmate rehoused to a lower bunk or another bed area closer to a toilet, and that nursing staff could provide assistance if needed.

The nurses who conduct booking/intake medical screening described the process for delivery of HCAs/ADs/DME during the booking process; If the intake medical assessment indicates the inmate needs a HCA/AD/DME, medical staff will complete the Special Needs form to advise custody. The Special Needs form allows medical staff to identify the HCA/AD/DME that the inmate had in his/her possession while in medical intake. This includes glasses, canes, crutches, walkers, wheelchairs, prosthetic eyes, prosthetic legs, prosthetic arms and other medical equipment. Medical staff stated that the completed form is given to custody. In some instances custody staff will not authorize the inmate to retain the HCA/AD/DME. This is in cases where there is a security concern like metal/aluminum canes or braces with metal. Medical staff also stated that inmates are not allowed to keep glasses that have metal frames. The Special Needs form has an area for custody to indicate if the HCA/AD/DME is sent to property. Medical staff interviewed also stated that the initiation of an inmate's request for a HCA/AD/DME at any point of incarceration is as follows; inmates can submit a HS KITE to medical staff to request health care services. Medical staff will assess the inmate for the need to issue a HCA/AD/DME. A physician schedules the inmate for an assessment; however, typically the device is not issued on an interim/temporary basis. Once prescribed, by a physician, a chrono is generated and issued to the inmate, which documents the approval for the inmate to retain the HCA/AD/DME. A copy of the chrono is also forwarded to custody staff. An email is sent to supply request (office assistant) that provides the HCA/AD/DME to the RN/LVN for issuance to the inmate. The staff assigned to the medical supply area stated that the delivery time of the HCA/AD/DME to an inmate once prescribed by a physician ranges from the next day to up to 4 weeks. The Assessment Team did observe canes, wheelchairs and crutches in stock in the MJ medical supply area. The Assessment Team also observed canes, walkers and crutches in the RCCC medical supply area; however, there were no wheelchairs identified. Medical staff stated that distributed HCAs/ADs/DME remain property of the county which custody staff later collect from the inmates. Inmates may, however, retain their personal HCA/AD/DME if there is not a security safety concern.

Medical staff that was interviewed also stated that the SCSD detention facilities do not have a policy on maintenance or repair of HCAs/ADs/DME; however, a wheelchair repair contract (for county owned wheelchairs) is in the process of being approved. Medical staff added that inmates and family members are responsible for any personally owned wheelchairs. Medical staff stated that there is not an approved (or unapproved) list of HCA/AD/DME that can be prescribed

to inmates to which custody has approved. Medical staff stated that at times case management staff has to approve HCA/AD/DME before they are authorized to order the devices. Several medical staff members who were interviewed acknowledged that there is not a wheelchair repair or inspection log being maintained by medical staff.

The Assessment Team also interviewed custody staff assigned to the housing units. Staff interviewed stated that it is the policy of the SCSD detention facilities to allow inmates with prescribed HCAs/ADs/DME to be housed in any housing unit at the MJ. However, this is a new policy that has recently been implemented, which means that some inmates with assistive devices are not able to access visiting, yard and showers based on path of travel issues and lack of ADA assets and features in the showers and cells.

Recreation staff at the MJ stated that they are responsible for coordinating the provision of reading glasses for inmates at the MJ. Recreation staff provided the following documents to the Assessment Team:

- Process For Delivered Reading Glasses,
- Reading Glasses Fee, and
- Reading Glasses Waiting List.

The inmates receive the following notice when requesting reading glasses:

You have been placed on our reading glasses waiting list. Please allow 2-3 weeks for delivery. The MJ does not offer free reading glasses. They are $12.00 (the same price as commissary glasses). Once you receive the glasses, you will be charged $12.00 from your account. If you do not have $12.00 at the time of receipt, then you will be charged when/if you get money on your account. If you do not want to receive these glasses due to the $12.00 charge, please send us a KITE canceling your request as soon as possible. It is cheaper and quicker to have a friend/family member drop off glasses for you at the MJ front counter if possible. If you still want to receive glasses from us, then you do not need to send us another KITE; we have kept a record of this request. Thank you, The Recreation Staff.

The social worker at RCCC indicated that social workers are responsible for coordinating the delivery of reading glasses when inmates at RCCC request them.

**Inmate Interviews**

During the Assessment Team's inmate interviews, the following information was received regarding the issuance and retention of HCAs/ADs/DME:

- MJ - Inmate claims difficulty transferring from his wheelchair to a somewhat flimsy or unstable and "filthy" shower chair. There are 2 shower chairs in the unit, and 1 appears to be more stable than the other,

but neither appears to be very stable. He claims that he must sit in the shower chair on his knees and take a shower in that manner, as it is the easiest and the safest of his options. He claimed that when he tries to lock the wheels, he sometime falls off the chair. Inmate demonstrated that he has very minimal use of his legs. He was able to slightly lean out in front of his wheelchair, put his feet on the ground, and delicately move his feet and lower legs in a walking-type motion while holding on to the wheelchair. His legs, however, were awkwardly positioned with very limited movement due to his cerebral palsy. The inmate tries to ambulate in this fashion occasionally if just for a few feet for exercise, but he pointed out that his jail-issued orange hard plastic slip on shoes are different sizes. One is a size 9 (his normal size), and the other is a size 10. He claims that this poses a big problem for him when he does try to use his feet. He indicated that he has been asking for the correct size shoe since his arrival 1 month earlier (7/16/16).

- MJ - Inmate claims rear sores/ulcers. He states he would benefit from the use of a trapeze device and has asked to use one. He claims the medical unit has one, but he does not have access to it. He complained about the showerheads and water flow from the shower, as it had been broken for a long period of time, but was recently fixed.

- MJ – Inmate claims he also has an ulcer/sores in his buttocks area. He claims to have to have previously requested and subsequently received a blow-up/cushion, but they busted (2 of them). He claims that he has made requests, but has not received anything since. It is noteworthy to add that the inmate is a somewhat large framed person. Also, the right wheelchair footrest is missing from the wheelchair. According to the inmate, it has been missing since the wheelchair was issued to him (the wheelchair he arrived with was removed as it was an electric version). He claims to have requested (in writing) a new right footrest, but has not received any response. The inmate also expressed an issue with the shower chairs, a difficulty locking the shower chair wheels and trouble transferring from the wheelchair to the shower chair. When he attempts to lock the shower chair wheels, he sometimes "overshoots" his body and falls, but if he does not lock the wheels, then the shower chair is "wobbly" and unstable. The shower does not have a shower hose and he claims that he asked for one. He said he would benefit greatly from a fixed wooden foldout shower bench as opposed to a "wobbly" chair.

- MJ - Inmate states he has requested an allen wrench and an open-ended wrench to adjust the back of his wheelchair and foot rests. His feet are dangling and do not comfortably reach the wheelchair footrest. His right leg/foot is in essence dead, and he can't place his right foot on the footrest. The footrest needs to be adjusted to protrude slightly outward so both feet can rest (the foot rest is one piece [not 2 pieces like normal]). He needs the footrest to also be very slightly tilted in a backward direction. The

inmate said that staff would not take care of this. He has the wheelchair manual and does not have a problem fixing it himself if necessary. Sitting up straight in the wheelchair causes him discomfort/pain.

- RCCC – Barracks – Mobility impaired – Inmate claims he uses a cane on the streets because leg was broken in 3 places and has pins and rods. Medical staff did not provide a cane or a LB/LT chrono.
- RCCC – Barracks – Mobility impaired – Inmate claims staff took his cane in the MJ and have not replaced it.
- RCCC – Barracks – Mobility impaired/Parkinson's – Inmate claims he fell when he arrived because he needed a cane and one was not provided. It took 1 month for a cane to be issued.
- RCCC – Barracks – Mobility impaired – Inmate needed a cane but was not provided one at the MJ. He was not issued one until he arrived at RCCC. It took 1 month to be issued the cane.
- RCCC – SLF – MH – Inmate needs glasses. Glasses were removed in booking because of metal frames.
- RCCC – SLF – Vision impairment. Inmate needs glasses. He has written KITE's to social worker.
- RCCC – Barracks – Mobility impairment – Inmate claims he needs a cane for long distances. Has not been issued one.
- RCCC – KBF – Mobility impairment – Inmate has a cane. Claims he had to hop around for 1 week before the cane was issued.
- RCCC- KBF – Hearing impaired – Inmate has put in KITE's 3 times for hearing aid batteries. No response for 2 weeks.
- RCCC – KPF – Hearing impaired/Mobility impaired – Inmate claims staff took his cane in booking. He has put 2 KITE's in for his cane and received no response. Needs hearing aids and can't afford them.
- MJ – Vision impairment – Inmate claims staff did not allow him to keep glasses. Took him 1 month to get reading glasses.
- MJ- Mobility impairment – Inmate states he has had a cane and needs a cane; however, does not want a cane because they will move him to the 2nd floor.
- MJ – Mobility/Vision impairment – Inmate states he needs a cane. Staff took his cane and leg brace because they contained metal.
- MJ – Mobility impairment – Inmate states he needs a cane and had one in CDCR. Advised medical staff in booking and they did not issue him a cane. Needs orthopedic shoes, as one leg is longer than the other. Medical staff have not issued him or evaluated him for orthopedic shoes.
- MJ – Mobility impairment – Inmate uses prosthetics and requires special shoes. When he first arrived staff took his special shoes that he needs for his prosthetics.
- MJ – Mobility/Vision impairment – Inmate claims he had a wheelchair and medical staff issued him a walker. States he needs a wheelchair.

- MJ – Mobility impairment – Inmate states he needs a cane. Staff did not allow him to keep his in booking and he had to hold on to the wall for 2 weeks.
- MJ – Mobility impairment – Inmate states he had a cane issued by Kaiser (metal) and staff took it away. It took 1 day for staff to issue him a replacement. States that if someone is with him staff takes it away.
- MJ – Mobility impairment – Inmate needs tennis shoes to protect the bottom of his prosthetics. The prosthetic is wearing down and without the tennis shoes the bottom of his prosthetics slip. Claims a sergeant threatened to take his leg and staff do not want to issue him tennis shoes.
- MJ – Mobility impairment – Inmate had a cane but the cane was taken in booking.
- MJ – Mobility/Vision/Hearing impairment – Inmate states he had a cane in CDCR. Had a cane in booking and because it was metal staff took it from him and did not issue him a replacement.
- MJ – Mobility/Paralyzed left side – Inmate has a metal cane. Was housed upstairs for 3 days and found it very difficult to ambulate up the stairs. Staff did not provide assistance or accommodations with meals. Claims if it wasn't for his cellmate he would not be able to eat.
- MJ – Mobility/Vision impairment – Court staff do not allow inmate to keep a cane in his holding cell. Inmate also claims he has to ambulate to court with his cane (including going up stairs), even though he has a walker and wheelchair prescribed.
- MJ – Mobility impairment – Inmate had a cane. He claims though that staff advised him that if he gave up his cane he could be transferred upstairs.
- MJ – Mobility impairment – Inmate had a cane in CDCR and was not issued one in jail. Needs one because of difficulty walking.
- RCCC – CBF – Mobility impairment – Inmate states that arresting officers did not allow him to bring his wheelchair. They prescribed him a wheelchair and a walker; however, they took them away and told him they needed room in 2-East.
- RCCC – SBF – Mobility impairment – Inmate claims he had a cane in the streets; however, staff has not issued him one.
- RCCC KBF – Hearing-impaired inmate stated he needs a hearing aid but he cannot afford one.
- MJ - A hearing-impaired inmate who is prescribed hearing aids advised the Assessment Team that he had been requesting hearing aid batteries from medical staff. The Assessment Team members asked the medical staff if hearing aid batteries were provided to inmates. Medical staff stated that they were and that the inmate had to submit a HS KITE requesting the batteries, and they would be provided. The Assessment Team asked medical staff if there were batteries in stock to provide to inmates requesting them. The medical staff stated that the batteries were available

in a supply cabinet. The Assessment Team verified that hearing aid batteries were available in the cabinet. This information was shared with the inmate. On a subsequent visit the Assessment Team asked the inmate if medical staff had provided the batteries and the inmate stated that medical staff had not. The inmate stated that after medical staff denied his request he submitted a grievance that was responded to by a custody sergeant. The response states "I apologize for the miscommunication or confusion. Your family is allowed to bring your reading glasses and hearing aid batteries to the Main Jail front counter. The Deputy at the front counter will accept your items. The Recreation Technician (Rec Tech) would be responsible for logging the items received and the items would be given to medical staff. Once the medical staff receives your items they will be inspected and given to you. If you have extra batteries, medical staff will store the batteries. They will be granted to you upon your request. It was a pleasure to assist you with your complaint. This matter is considered resolved."

- MJ – An inmate who is a permanent wheelchair user, who at the time of the interview, had been at the jail for several months. He showed the assessment team that his right side foot peg/rest to his wheelchair is missing, and he claims it has been missing since the SCSD detention facilities issued him the wheelchair. He indicated he has requested (in writing) for a new right foot peg/rest. He claimed that he initially arrived at the jail with an electric wheelchair, but he was issued the county wheelchair instead, and his wheelchair was confiscated.

- MJ – An inmate who is paraplegic, a permanent wheelchair user, and claims to have a vision impairment, alleges that he has made numerous attempts to utilize a trapeze device that he claims in available in the second floor medical area. He also stated that staff broke his wheelchair, when they "jammed" his wheelchair in to the lift of a wheelchair accessible van. The wheelchair has not been replaced or repaired.

## Conclusions

The SCSD detention facilities do not have a detailed operations order or policy for the delivery of HCAs/ADs/DME to disabled inmates.

There is no written operations order or policy for maintenance, repair or replacement of HCAs/ADs/DME.

Of great concern are the numerous complaints by inmates alleging that SCSD detention facilities staff did not provide or took away disabled inmates HCAs/ADs/DME. The lack of provision of these assistive devices amounts to unequal treatment and may cause severe harm to the disabled inmates.

The SCSD detention facilities do not have a policy for wheelchair inspections and as a result wheelchairs issued to inmates are not being monitored to ensure they



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

are operational. Wheelchairs that are currently issued to inmates are in need of repair and maintenance.

Although medical staff stated that the SCSD detention facilities' medical staff coordinates the provision of HCAs/ADs/DME for inmates, the SCSD detention facilities do not have a policy for the purchase of the devices for disabled inmates that are indigent.

The SCSD detention facilities do not have a policy to review disabled inmates who are in Mental Health Crisis for possible removal of HCAs/ADs/DME.

There are some inconsistencies in cases where inmates with glasses are being processed through booking, as some inmates are not being allowed to retain their prescription/reading glasses.

There is no standardized process in which inmates can request and obtain reading glasses. The SCSD CHS Policies and Procedure 1128 Reading Glasses for Inmates states that medical staff conducts an assessment of the inmate to determine the need for reading glasses. If the inmate requires reading glasses the social worker coordinates delivery. This is not consistent with the information staff provided at the MJ. At the MJ, staff indicated that the Recreation staff are responsible for the coordination of the delivery of reading glasses. At RCCC staff indicated that the social workers were responsible.

The SCSD detention facilities Draft Operations Order Inmates with Disabilities - ADA when adopted will govern the circumstances in which disabled inmates' HCAs/ADs/DME can be removed. However, the Draft Operations Order does not address the removal of HCA/AD/DME in specialized housing, monitoring the health condition of disabled inmates whose HCA/AD/DME has been taken away in specialized housing units, nor a process in place to issue alternate in-cell accommodations when an HCA/AD/DME is removed from in cell use.

The SCSD detention facilities Draft Operations Order Inmates with Disabilities - ADA when adopted will direct staff to provide HCAs/ADs/DME upon a finding of "medical necessity." This operations order will violate federal law. Under Title II of the ADA, specifically, 28 CFR 35.130(b)(7), a public entity has an affirmative obligation to make a reasonable modification to its policies, practices and procedures to avoid discrimination against persons with disabilities. Here, as a reasonable modification to policies, practices and procedures, SCSD detention facilities must adopt a policy of case-by-case analysis as to whether HCAs/ADs/DME are needed to ensure a given individual is provided meaningful access to programs, services and activities offered by SCSD detention facilities. In sum, the standard for the provision of HCAs/ADs/DME is access, not medical necessity.

## References

Appendix B to Part 35 of the Code of Federal Regulations, which provides Section-by-Section Analysis of the ADA regulations states, "The determination that a person poses a direct threat to the health or safety of others may not be based on generalizations or stereotypes about the effects of a particular disability. It must be based on an individualized assessment, based on reasonable judgment that relies on current medical evidence or on the best available objective evidence, to determine: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk. This is the test established by the Supreme Court in *Arline.* Such an inquiry is essential if the law is to achieve its goal of protecting disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to legitimate concerns, such as the need to avoid exposing others to significant health and safety risks."

Additionally, 28 C.F.R. § 35.130(h) prohibits a public entity from imposing safety requirements unless they "are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities."

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Armstrong v. Brown settlement agreement.***

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*Health Care Appliances:*

*An inmate's health care appliances, including those belonging to the inmate prior to entering into CDC's system, must be approved by custody staff for conformance with safety and security standards. If custody staff, upon inspecting the appliance determines there is a safety or security concern, a physician shall be consulted immediately to determine appropriate action to accommodate the inmate's needs. Accommodations may include modifying the appliance or substitution a different appliance.*

*Health care appliances shall be documented as property of the inmate and identified as such. No inmate shall be deprived of a health care appliance that was in the inmate's possession upon entry into the CDC system or was properly obtained while in CDC custody, unless for documented safety or security reasons or a physician determines that the appliance is no longer medically necessary or appropriate.*

*Health care appliances shall be retained and maintained by inmates upon release to parole.*

*Custody staff shall conduct and log periodic safety and security inspections on all wheelchairs on at least a monthly basis. If a wheelchair is in need of repair medical staff shall be notified to secure necessary repairs.*



## Tracking

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures related to the tracking of disabled inmates and their accommodation needs are outlined in the following policies; 04/01 Intake, Search, Reception and Holding, 06/03 Classification Process, 10/04 Medical Intake Screening, 1404, Receiving Screening, 1417, Adult Developmental Disability, 1422 Special Needs Patients, 1439 Reports of Disabilities or Impairments, 1900 Health Record Format and Contents and Draft Operations Order Inmates with Disabilities - ADA.

The Jail Inmate Management System (JIMS) and WebJPF (Web based Jail Person File) used by custody and the Electronic Medical Record (E-Chart) used by medical staff are the electronic systems used to track custody, classification and medical information for inmates housed at the Sacramento County Jail. The WebJPF is a quick and simple way to access information from multiple systems. Within these systems, there is limited ability to track disabled inmates or their accommodation needs. The electronic systems do not have the ability to track developmentally disabled inmates, inmates with learning disabilities and inmates with other disabilities that impact a major life activity. There is no process in place to identify the accommodations that may be required for learning disabled inmates, or to identify a developmentally disabled inmate's adaptive support needs, adaptive functioning deficits, or the assistance (accommodations) staff must provide such as coaching, assisting, monitoring and prompting. These systems are also not able to identify the disabled inmates who have been issued HCAs/DME/ADs (e.g., hearing aids, canes, crutches, wheelchairs, etc.) or their accommodation needs. They also cannot identify inmates with physical limitations who require accommodations to access programs, services or activities. In addition, although inmates with mental health concerns are identified during the intake/booking process and at times subsequent to housing, the electronic system used by SCSD detention facilities is limited in its capability to track inmates with mental health concerns.

Per policy 1404, Receiving Screening, a receiving health screening is performed by medical staff on all arrestee(s) (including transfers) immediately upon arrival at the facility. Arrestee(s), who are unconscious, semi-conscious, bleeding, or otherwise obviously in need of immediate medical attention, are referred to outside medical care prior to acceptance. The purpose of this health screening is to obtain prompt medical care for those needing it, to identify ongoing or chronic medical needs, and to detect those arrestee(s) who pose a potential threat to the health or safety of others within the general population. Baseline data is established for use in subsequent care and treatment. When referred to an outside emergency department, their return to the jail is predicated upon written medical clearance. Receiving screening findings are recorded on a printed form approved by the Health Authority. At a minimum, the screening includes:

Inquiry into:

- Current illnesses and health problems, including medical, dental, and communicable diseases (including sexually transmitted diseases),
- Medications taken and special health requirements,
- Use of alcohol and other drugs, including types, methods, amounts, frequency, date or time of last use, and a history of problems that may have occurred after ceasing use (i.e., seizures),
- History or appearance of suspected mental illness, including suicidal ideation or behavior,
- Appearance or history of developmental disability,
- For female arrestees, a history of gynecological problems, possibility of current pregnancy, and present use of birth control,
- A complete set of vital signs and a stated height and weight.

Observation of:

- Behavior, which includes state of consciousness, mental status, appearance, conduct, tremors, and sweating,
- Body deformities and ease of movement,
- Condition of skin, including trauma markings, bruises, lesions, jaundice, rashes and infestations, needle marks or other indications of drug abuse,
- Slowness in speech or lack of comprehension of questions suggestive of developmental disabilities,

Disposition, such as:

- Referral to an appropriate Health Care Service or Mental Health Service on an emergency basis,
- Placement in the general inmate population and later referral to an appropriate Health Care Service,
- Clearance for housing, or
- Isolation or special observation in the facility.

Procedures will include provisions for segregation and/or special housing for patients with suspected communicable diseases, mental illness, or developmental or physical disabilities, pending medical clearance.

All findings shall be recorded on a form approved by the Health Authority. The Receiving Screening shall be conducted by the Nursing Staff at the MJ and RCCC. This will become a part of the medical record.

Per policy 10/04, Medical Intake Screening, Correctional Health Services staff shall complete a health screening procedure on each arrestee at the time of booking in accordance with Article 11, Section 1207 of the California Code of Regulations, Title 15. Any person not deemed medically fit for incarceration will not be accepted.

At the time of intake a medical receiving screening shall be performed by health personnel for all new inmates, including transfers, and documented on the appropriate forms. The intake medical screening shall minimally include observations of the subject's behavior and physical condition and inquiries into past and present illness and health problems, use of medications, drugs and/or alcohol, and for females, gynecological issues and pregnancies. Medical staff shall, in coordination with JPS, complete a cursory evaluation of the inmate's mental health. If during the intake medical receiving screening process an inmate is found to be in need of immediate medical attention, the inmate shall be promptly referred for emergency care.

An ambulatory subject who requires but has refused medical attention may be booked at the discretion of medical staff. Medical staff shall verify with the subject that he/she refuses medical treatment, and shall note the refusal. In situations where the arrestee is unable or refuses to respond to the receiving screening questions, health personnel shall visually examine the subject for obvious or noticeable medical problems. If the subject is accepted for incarceration, the form shall be completed at a later time when the subject becomes cooperative or communicative. Paraplegic arrestees and those who must use crutches or orthopedic appliances but who are otherwise fit shall be accepted for incarceration.

Per policy 1900, Health Record Format and Contents, the Health Record shall contain written documentation of all health care services rendered to inmates. It shall provide a means of communication to assure continuity of care; serve as a basis for planning and administering individual patient care; provide data for quality improvement activities; and assist in protecting the medico-legal interests of the inmate, institution, and health care providers.

It shall also serve as a source for required statistical reports, and program planning data and staff education.

Within the jail system, the Problem Oriented Health Record (POHR) is used. In this system, the physician defines and follows each clinical problem and organizes them for solution. The POHR contains a problem list, initial plans, progress notes, and a specific database. This database, or content, includes the inmate's chief complaint, present illness, past history, physical examination, and diagnostic data. The problem list is contained on a sheet, which is placed in the front of the chart. Initial treatment plans describe the patient's condition, treatment for the condition, and a continuing evaluation of the patient on his/her condition. Progress notes follow a S.O.A.P. format, that is, the progress note is arranged generally in this order: Subjective (symptomatic); Objective (measurable); Assessment (interpretation or impression of current condition); and Plan statements.

A health record file is not necessarily established on every patient. However, any health intervention after the initial screening requires the initiation of a record. The "Receiving Screening" form becomes a part of the record at the time of the first health encounter. If a patient is incarcerated more than once, any existing health records will be drawn from storage.

Health records are stored in a secure area readily accessible to health-care providers and inaccessible to custody staff and inmates.

All inmates will have a Health Record established after any health care intervention. The initial health screening completed during booking does not require initiation of a health record. Any health or nursing evaluation provided as a follow-up to the receiving screening does require initiation of a Health Record. Then the Receiving Screening Form becomes a part of the Health Record.

Health record files shall include, but not be limited to:

- The completed Receiving Screening form,
- Health Appraisal Data forms,
- All findings, diagnoses, treatments and dispositions,
- Prescribed medications and documentation of their administration,
- Laboratory, x-ray, and diagnostic studies,
- Signature and title of each documenter,
- Consent and refusal forms,
- Release of information forms,
- Date and time of health encounters,
- Discharge summary of admissions or hospitalizations,
- Health Services Reports (i.e., emergency department, dental, psychiatric and other consultations),
- Individualized Treatment Plans.

Per policy 1417, Adult Developmental Disability, the identification of a person with developmental disability begins at booking and continues throughout incarceration. Intake medical personnel should be alert to the possibility of developmental disability by looking for:

- Difficulty in performing basic tasks associated with the process,
- Slowness or apparent difficulty in understanding,
- A history of treatment for developmental disability through a Regional Center or special education class.

If there is suspicion of a developmental disability, a notation will be made on the Receiving Screening medical form and a referral made to the JPS Outpatient Department.

In cases where there is uncertainty as to whether the inmate has a psychiatric condition as opposed (or in addition) to a developmental disability, referral for mental health evaluation is appropriate.

If the patient doesn't have medical problems he or she will be managed by jail psychiatric services.   If the patient has a medical condition he/she will be managed in conjunction with the medical staff.

### Documentation

JPS staff will make an entry in the medical record when Alta Regional Center is contacted. The Master Problem List in the medical record should be updated to note the presence of known or suspected developmental disability. JPS staff should also make an entry into the Jail Inmate Management System (JIMS) system and if necessary, notify Classification of any special housing recommendations.

Coordination with Classification Plan/Multidisciplinary Treatment Planning:

Where a developmental disability was not identified during the booking or initial classification process, notification of the jail classification officer should be made by JPS Staff as soon as the condition is identified.

Persons with developmental disability are potentially vulnerable in the custody setting and may require special consideration in the classification process.

Likewise, multidisciplinary treatment and discharge planning should take this information into account.  The inmate's developmental disability status should be shared as necessary with treating health professionals, discharge planners, probation officers, and others who are actively involved in the care and custody of the individual.

The Medical Transfer Summary should include information about the inmate's developmental disability, as well as any recommendations that have been generated as the result of treatment planning for this condition.

Per policy 1422, Special Needs Patients, medical staff in coordination with custody personnel, ensure that inmates with special needs receive health care that is both appropriate and beneficial.

Treatment plans will be developed for patients with special health care needs. These patients include but are not necessarily limited to those in the following categories:

- Patients who have sustained an acute injury requiring major medical or surgical intervention
- Patients with medical conditions requiring assistive devices or assistance with the activities of daily living
- Developmentally disabled patients
- Patients with a terminal illness
- Frail or elderly patients
- Patients who are physically handicapped

- Patients with organ transplants or those requiring chronic renal dialysis
- Patients with special nutritional needs
- Pregnant Females.

An inmate's health condition(s) will be listed on the Problem List. Medical and nursing staff will communicate necessary custody interventions promptly with custody staff. When the inmate's condition warrants, the inmate will be admitted to the Outpatient Housing Unit. The nursing service, as part of the inmate's plan of care, will make an effort to address pending discharge needs.

Per policy 1439, Reports of Disabilities or Impairments, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

Any report of physical disability or impairment by an inmate or outside organization will be referred to a clinician for review and assessment. This can include reports of mobility impairments such as amputations or paraplegia, or other disabilities that limit daily functioning such as visual, hearing, or speech. The clinician will review the report, assess the inmate's needs and make a determination if special housing or assistive devices are needed. If indicated, these needs will be recorded in the patient-inmate's chart, and communicated to medical and custody staff. Upon report of a disability or impairment (verbal or written):

- An MD/NP Sick Call appointment will be scheduled and the nature of the report will be documented.
- The patient-inmates will be seen and their disability or impairment will be assessed and if indicated a plan of care will be developed.
- Any specific patient-inmate's needs or accommodations will be documented in the chart and communicated to medical and custody staff.

Per Draft Operations Order Inmates with Disabilities - ADA, Identification of Disabled Inmates - At Intake, the medical screening process during intake serves to identify most disabilities and the need for accommodations prior to the housing of the inmate. It is the responsibility of booking and medical staff to assess inmates upon admission for evidence of a disability or special medical need. This assessment information will be recorded on the Inmate IDEF as applicable. Information may be garnered from the inmate's prior custody or medical records.

Custody or medical staff may observe and report a disability or medical condition that would:

- Impact the inmate's housing;
- Impact the intimate's / arrestee's Activities of Daily Living
- Affect the inmate's program access; or
- Present a safety or security concern for the inmate or others.

It is the responsibility of the intake medical staff to:

- Initiate and sign an IDEF, and forward the form to the Booking Unit and the ADA Coordinator upon determination that an inmate may have a disability.
- Create an "ADA" ALERT in the inmate's medical chart making appropriate notations on the inmate's particular disability or limitations.

Classification staff shall review all *Inmate Disability Evaluation Form*s and:

- Make appropriate notations on the inmate's "Class Comment" log based upon the inmate's individual housing needs;
- Ensure that an "ADA" ALERT is in the JIMS system with the appropriate notations made in the remarks section;
- Notify the ADA Coordinator to arrange for orientation of inmates who are visually impaired or unable to read;
- Make appropriate notations on the *Inmate Disability Evaluation Form*, and forward the form to the ADA Coordinator for ADA compliance review.

Identifying and Handling of Armstrong Class Inmates

An "Armstrong class inmate" is an inmate identified by the CDCR as having ADA concerns due to current or ongoing medical and/or mental health issues. CDCR will notify the Sheriff's Department of inmates in our custody who they have identified as "Armstrong class inmates." They will contact the ADA Coordinator of inmates in our custody who have previously been identified. The ADA Coordinator will act as the central contact point for CDCR. The ADA Coordinator at each facility will act as a liaison between identified Armstrong inmates and the Classification Unit. After CDCR notifies the ADA Coordinator of inmates in our custody who have previously been identified as Armstrong class inmates, the ADA Coordinator will notify the ADA Division Representative. The ADA Coordinator will ensure the inmate is entered in JIMS under the Special Tracking Needs and will follow the same process outlined in section 11.0 of this policy. Once contact is made with the inmate, the ADA Coordinator will notify Health Management Unit via e-mail. This e-mail should include any steps taken to address issues/concerns as well as the resolution. Any medical or mental health grievance concerning Armstrong Class inmates should be addressed as outlined in section 15.0 of this policy.

## Staff Interviews

The Assessment Team interviewed custody deputies from each housing unit, staff from the medical, dental, mental health and education departments, and work supervisors. All custody staff members interviewed indicated that the only system to alert them of disabled inmates was the medical "Special Needs Chrono" issued to inmates by medical staff. Custody staff indicated that this chrono would

list if the inmate had been prescribed an assistive device by medical staff such as a cane, crutches, walker, wheelchair etc. In addition, the chrono would list if inmates required a low tier or bottom bunk. The chrono would be attached to the inmate locater card that moves with the inmate from housing unit to housing unit while he/she is in custody. Custody staff stated that in some cases information regarding an inmate's disability may be located in the JIM System's PF4, PF10 and PF11 screens for some of the disabilities; however, this information would only be available if medical had identified the disability. Most staff stated that they would not be aware of the inmate's disability unless the inmate advised them of the disability. This would be the case for physical disabilities that were not obvious, intellectual disabilities, and learning disabilities. Custody staff stated that other than the accommodation needs listed on the chrono, they would not be aware of a disabled inmate's accommodation needs.

Although the CDCR provides notification to Sacramento County Jail in compliance with the August 28, 2012 Federal court order (County Jail Plan for addressing Armstrong Class Members housed in county jails), staff stated that a tracking list is not maintained of the Armstrong class members. Medical staff stated that they receive the information from CDCR and medical staff schedules the inmate for an evaluation to determine if the accommodation needs listed by CDCR are needed by the inmate while housed in SCSD detention facilities custody. Medical staff stated that this information is forwarded to custody staff. Custody staff stated that this information is not tracked and neither medical or custody staff maintain a list of Armstrong class members currently housed at the SCSD detention facilities other than information maintained in the inmates' medical records. This includes the inmates' accommodation needs.

Medical, dental and mental health staff stated that some disability-related information is contained in the electronic medical record in the e-chart. The staff member would have to query each individual inmate, as there is no comprehensive tracking system to track inmates with disabilities and their accommodation needs.

Education, vocation and reentry staff stated that the only method for them to identify disabled inmates assigned to their classes or area would be based on their observations and or the inmate self reporting. Education, vocation and reentry staff stated they would not be aware of disabled inmates' accommodation needs other than when an inmate self reports those needs to them.

## Conclusion

The SCSD detention facilities must ensure that disabled inmates are properly identified in order to provide reasonable accommodations as required by the ADA. Because regulations implementing the ADA require a public entity to accommodate persons identified as disabled, a tracking system is a necessary part of compliance.

The SCSD detention facilities are lacking even a basic ADA tracking system to track all disabled inmates once they have been identified and verified as having a disability. In addition, there is no system in place other than the chrono for staff to be aware of a disabled inmate's accommodation needs and physical limitations. Therefore, staff assigned to the housing units, work supervisors, education staff and medical staff cannot identify disabled inmates assigned to their work areas, and inmates with disabilities are systematically excluded from privileges, programs, and jobs that non-disabled inmates enjoy. Currently staff must query an individual in the JIMS, WebJPF, individual inmate's locater card or electronic medical record (e-chart) to identify an inmate's disability and accommodation needs.

Although the Special Needs Form and chrono alerts the housing unit staff as to some of the disabled inmates' accommodation needs, it does not identify all of the disabled inmates' accommodation needs.

Although the chrono when approved is maintained by the inmate and by the housing unit deputy, there is no centralized electronic repository for the chronos that are approved by medical staff.

The current medical screening process does not identify all qualified disabled inmates meeting the criteria under Title II of the ADA (i.e. those with developmental, learning, vision, and mental health disabilities as well as all other qualified physical disabilities covered under the ADA.

**References**

28 CFR § 35.130 (a) requires that no qualified individual with a disability shall, on the basis of that disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity. To ensure that the SCSD detention facilities comply with this requirement, there must be a comprehensive networked tracking system to alert staff of qualified individuals and their accommodation needs.

Armstrong v. Davis, 275 F.3d 849, 876 (9th Cir. 2001) ("Because the regulations implementing the ADA require a public entity to accommodate individuals it has identified as disabled, 28 C.F.R. § 35.104, some form of tracking system is necessary in order to enable the Board to comply with the Act.").

*The information below is for reference only.  Due to Federal Court Ordered Injunction (January 18, 2007), the CDCR was ordered to do the following (with regard to developing and implementing computerized, real-time tracking system to track prisoners with disabilities (as well as other disabilities):*

*Inadequate Disability Tracking*

*Underlying all of these violations is defendants' failure to adequately track prisoners' disabilities and the accommodations they need. As this court held on May 30, 2006, "[t]he current system for tracking prisoner . . . disabilities is unreliable, non comprehensive, and insufficient," This court further stated that "[u]se of a tracking system to prevent such violations is required . . . by the underlying law." Defendants' Armstrong and Clark Automated Tracking System has failed to identify and track CDCR prisoners' disabilities and the accommodations needed for those disabilities. The lack of an adequate tracking system has resulted in significant harm to plaintiff class, including but not limited to denial of safe, accessible housing, prompt transfers to designated institutions, and sign language interpretation.*

*B. Tracking System*

*Defendants shall develop, implement, and begin to use a statewide, computerized, networked real-time tracking system to track prisoners with disabilities by May 30, 2007. This system shall be integrated with BPH tracking system previously ordered by the Court. The tracking system shall include prisoners' disability designations and the disability accommodations they require including but not limited to lower bunks, ground floor housing, assistive devices, and effective communication needs such as sign language interpreters, large print, and scribes.*

*For prisoners whose disabilities impact placement (DPW, DPO, DPM, DPV, and DPH), as well as for prisoners who are DPM with housing restrictions, the tracking system shall include placement and classification factors, including but limited to mental health placement needs protective custody, administrative segregation, Security Housing Unit, security level, and developmental disability designation.*

*The tracking system shall be updated continuously as new information is received about prisoners with disabilities.*

## Housing Placements

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures applicable to the classification and housing of inmates are outlined in the following policies; 06/02 Housing Plan, 06/03 Classification Process, Draft Operations Order Inmates with Disabilities - ADA, 1410 Outpatient Housing Unit, 1436 Two East Inmate Transfers, 1417 Adult Developmental Disability, and 1107 Decision Making-Special Needs.

Per Operations Order 06/02, Housing Plan, inmates shall be housed according to specific housing locations for various types of inmate classifications.  The housing plan may be adjusted as necessary to accommodate the ever-changing nature of the inmate population.

Inmates will be housed according to their classification in accordance with Operations Order 6/03-Classification Process. The housing plan for MJ and for RCCC will be determined by physical plant capabilities of the facility and by the classification unit of each facility. Special housing descriptions, locations, and use will be in accordance with Operations Order 4/05, Use of Safety Cells/Segregation Cells/North Holding #2 and Multipurpose Rooms.

The MJ Classification Unit will assign inmates to a housing unit based on the current housing needs of the facility and/or in accordance with Operations Order 6/03, Classification Process. The MJ has two (2) basic housing areas: West Tower and East Tower.  General population housing is established as follows:

- The West Tower houses Crips, Mexican Mafia (EME), southern Mexican gangs, Aryan Brotherhood, and compatible gang members.
- The East Tower houses Bloods, northern Mexican gangs, Black Guerilla Family (BGF), Nuestra Familia (NF), Masters of Destruction (MOD), and compatible gang members.

The MJ has two (2) floors, which have designated housing areas that may be used for inmates who have received disciplinary isolation.

- The 8 West 400 Pod is available for male disciplinary isolation.
- The 7 West 400 Pod is available for female disciplinary isolation.

The MJ has a medical and psychiatric services floor located on 2 West. The MJ has a sub acute medical floor located on 2 East.

The RCCC Classification Unit will assign inmates to a housing unit based on the current housing needs of the facility and/or in accordance with Operations Order 6/03, Classification Process. At RCCC, the housing is assigned according to security level. The Classification Unit will determine an appropriate housing plan based on the following guidelines:

- Minimum Security will include: C, D, G, H, and M Barracks at the Honor Facility (HF), the Medical Housing Unit (MHU) Main Floor, and Kinya Dormitory at the Sandra Larson Facility (SLF). In addition, SLF classifies Golden Poppy Dormitory as Minimum Security for housing inmate workers.
- Medium Security will include: Roger Bauman Facility (RBF), 448 North and 448 South, A, B, J, and K Barracks of the Medium Security (MS) Housing Unit, Camellia Dormitory of SLF, and the MHU single cells as available.
- High Security will include: Christopher Boone Facility (CBF), Stewart Baird Facility (SBF), and Ramona Wing of SLF.

RCCC has one facility for inmates with medical needs located in the MHU.

Per Operations Order 06/03, Classification Process, at intake, custody staff will perform an initial classification of inmates using the Intake Classification Form. Custody staff will be responsible for separating inmates as appropriate per this order.

Designated Classification Officers will perform the duties of classification including, but not limited to:

- Evaluate each inmate to be housed and assign an appropriate housing location in accordance with Operations Order 6/2-Housing Plan.
- Conduct classification interviews of inmates as necessary, and make all necessary entries in the Jail Information Management System (JIMS).
- Research and investigate information supplied by the inmate for verification purposes.
- Respond to inmate grievances related to classification and process inmate requests related to housing locations and/or classification.
- Conduct classification reviews and reclassifications as requested by authorized personnel.
- Forward copies of Incident Report Details (PF-10's) to the appropriate CDC Parole Agent or Probation Officer to allow parole and probation violations to be filed.
- Respond to requests from within the department and other law enforcement agencies and direct new information developed within the facility to the appropriate detective/agency.
- Maintain and update as necessary a classification file system.

For inter-facility transfers, classification officers will review inmate information to ensure each inmate has been properly classified prior to transfer to the facility. A cancelled transfer, or "scratch", will be generated by the receiving facility classification officer or the transport officer when the receiving facility does not have the appropriate housing for a particular inmate's classification and housing needs. The transfer cancellation will be documented on the inter-facility transfer list. It is the duty of the classification officers at the MJ and RCCC to coordinate the transfer of inmates between facilities to ensure appropriate facility housing



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

requirements are met and to maximize the efficiency of the inter-facility transfer process. For the logistics of inter-facility transfers and court appearances, refer to Operations Order 02/13, Inter-Facility Transportation and Court Appearances.

Inmate classification should be based on factors, which affect the security of the facility, staff, and the inmate. Some of these factors include, but are not limited to:

- Physical characteristics, including gender, age, mental and medical conditions.
- Criminal history both in and out of custody, known gang affiliation, prior classification history, current charges or nature of charges against the inmate.
- Legal status, including propria persona (pro per) status, civil commitments, extradition status, or detention as a witness.
- Administrative segregation considerations including prior peace officer or corrections officer employment, gravely disabled status, and/or case notoriety.
- Criminal sophistication, former victims or enemies currently housed within the facility, status as a known law enforcement informant, sexual orientation/transgender status, or status as an inmate worker.

ICE detainees will be additionally assigned a numeric level based on their current charges. This numeric level will assist classification officers with identification of the potential housing unit and also enhance the safety and security of the detainee.

- Level 3     Violent Felonies
- Level 2     Non-violent felonies
- Level 1     Non violent crimes or ICE holds

The inmates should be housed in the appropriate type of housing with regards to the inmate's classification; and the facility's available housing locations, as per Operations Order 6/2- Housing. For the purposes of this order, the levels of housing and housing unit availability will be described based on the following guidelines:

- High Security Housing refers to single occupancy or double occupancy cells as defined in *Title 24 Section 470A.* High Security Housing is available at both facilities.
- Medium Security Housing refers to dormitory style housing as defined in *Title 24 Section 470A.* Medium Security Housing is available only at RCCC.
- Minimum Security Housing refers to dormitory style housing as defined in *Title 24 Section 470A.* Minimum Security Housing is available only at RCCC.

- Special Housing refers to housing designated for inmates with specific segregation needs, status as inmate workers, medical or mental health requirements, and disciplinary isolation. Special Housing needs will be determined by the classification unit and by physical plant design and limitations of each facility.
- General Population Housing refers to housing within each facility, which does not have any specific isolation, protection, or special services needs. Each facility's classification unit will determine the location and use of General Population Housing.

High Security Housing may be used to house inmates at the MJ and RCCC based on guidelines including, but not limited to:

- Inmates with a documented history of in-custody assaults in the last two (2) years. Assault history includes, but is not limited to, past cases of assault and pending cases. Assault history includes predatory behavior involving or victimizing other inmates.
- Inmates with escape or attempted escape histories from secured facilities within the last ten (10) years.
- Inmates who have a current or past criminal history involving victimization of children or the elderly.
- Inmates with two (2) or more major write-ups during the current custody period for rule violations.
- Inmates who are validated gang members and/or have a history of gang related crimes.
- Inmates who have charges filed against them as a result of a write-up during the current custody period.
- Inmates involved in cases that have considerable press coverage or notoriety.

Medium Security Housing may be used to house unsentenced inmates at RCCC who do not meet the criteria for Special or High Security Housing, including but not limited to the following guidelines:

- Inmates who have a felony foreign agency hold for which they could be sentenced to five (5) or more years.
- Inmates with a history of assaults and/or a history of predatory behavior involving/victimizing other inmates which is at least five (5) years old.
- Inmates who have an escape or attempted escape charge from a secured facility, which is at least ten (10) years old.

Minimum Security Housing may be used to house sentenced inmates at RCCC who do not meet the criteria for High or Medium Security Housing or for Special Housing. Minimum Security Housing may also be used to house:

- Inmates who are sentenced with misdemeanor foreign agency holds and/or US Border Patrol Holds, per *US Title 8, Sections 1325 and 1326.*



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Inmates who are in custody only for a parole hold, per *California Penal Code 3056.*

Special Housing may be used to house inmates at Main Jail and RCCC who have special separation or housing needs, including but not limited to:

- Medical or mental health problems or disabilities which prevent the inmates from caring for themselves in a jail setting, or who are required to be isolated for medical reasons.
- Inmates who are classified as Administrative Segregation, Protective Custody, Total Separation, or Civil Commitment status, per Operations Order 6/02.
- Inmates who are placed in disciplinary isolation. A Hearing Sergeant will assign inmates to disciplinary isolation based on the findings of the disciplinary hearing.

General Population refers to inmates who do not meet the criteria for any type of special housing or separation. The divisions' classification staff will designate the housing for General Population inmates at the respective facility.

Classification officers will be responsible for conducting classification reviews in accordance with but not limited to the following guidelines:

- For inmates in High Security Housing, every thirty (30) days.
- For inmates in General Population Housing, after the first sixty (60) days of custody.
- Upon request from custody staff, Medical Staff, Jail Psychiatric Services, and/or court officials, or when the legal status of the inmate changes.
- When an inmate is relocated and/or reclassified due to the outcome of a disciplinary hearing.

All classification reviews will be documented on a Classification Review/Reclassification Form and placed in the classification file system. Classification officers will update JIMS as appropriate. Inmates may appeal the classification or housing assignment and request a classification review using the normal inmate message request or inmate grievance process.

Once an inmate has been assigned to a housing unit, he/she will typically remain in place until the resolution of his/her case or classification review dictates otherwise. If an inmate needs to be moved for security, disciplinary, pod harmony, medical, or other reasons, the housing unit officer should consult with a classification officer. The housing unit officer requesting the move shall minimally complete the facility's Classification Review / Reclassification form and/or the Incident Report Detail (PF-10) Classification Review template and forward it to the classification office. Any other Incident Report Detail (PF-10) generated in connection with the request for reclassification shall also be forwarded to the classification officer. If there is no classification officer available,

a supervisor shall make the determination of whether or not to relocate the inmate. Inmates wising to appeal a reclassification may appeal through the grievance appeals process.

Per Draft Operations Order Inmates with Disabilities - ADA, staff assigned to the Classification Unit are responsible to ensure that inmates with disabilities are housed in the most integrated setting appropriate to the needs of the individuals. Unless it is appropriate to make an exception, Classification staff shall not place inmates with disabilities:

- In inappropriate security classifications because no ADA accessible cells or beds are available.
- In designated medical areas unless they are actually receiving medical care or treatment.
- In facilities that do not offer the same programs as the facilities where they would otherwise be housed.

Classification staff shall review all *Inmate Disability Evaluation Form*s and:

- Make appropriate notations on the inmate's "Class Comment" log based upon the inmate's individual housing needs.
- Ensure that an "ADA" ALERT is in the JIMS system with the appropriate notations made in the remarks section.
- Ensure the inmate is assigned to appropriate housing, or make necessary moves to ensure the inmate's housing is appropriate based upon his/her needs.
- Notify the ADA Coordinator to arrange for orientation of inmates who are visually impaired or unable to read.
- Make appropriate notations on the *Inmate Disability Evaluation Form;* forward the form to the ADA Coordinator for ADA compliance review.

Per policy 1410, Outpatient Housing Unit, admission to the medical housing units is authorized by the physician. Physician Assistants or a Nurse Practitioner may authorize admissions subject to the review and approval of the physician. The patient's health problems or illness must not be severe enough to require care in an acute care hospital setting. The medical housing unit at Rio Cosumnes Correctional Center includes 6 locked cells, and another 20 beds in an open ward. The Main Jail medical housing unit has 10 single-cell medical beds: and the Psychiatric In-Patient Unit has 16 single cells and 1 double cell. There are an additional 5 beds set aside for handicapped inmates on the second floor.

Inmates who require mental health services may be housed in medical beds when mental health wing beds are not available. These inmates are not admitted for medical purposes and will receive the same care they would have received elsewhere in the general population as outpatients. Jail Psychiatric Services staff will document the patient's mental health status every 15 minutes and log their observations.

Per policy 1436, Two East Inmate Transfers, the Sacramento County Jail is experiencing a trend where the age of the inmates that are being arrested and housed at both the New Main Jail and Rio Cosumnes Correctional Center is increasing. As the age of the inmate population increases, the inmates tend to need more care and also need more assistance with ambulation including the use of canes, crutches, and walkers. At the New Main Jail, 2 East is where inmates that require assistive devices are housed. 2 East has become chronically overcrowded, where the demand for beds exceeds the number of beds available.

To help alleviate the chronic overcrowding medical staff work with Custody Staff to determine which of the inmates who have already been sentenced or are solely on a parole hold are appropriate to be housed at RCCC. When room is available these inmates will be transferring from 2 East to RCCC. If the inmate is a security patient and a room is available, they will be moved to 448 100 Pod where sentenced inmates may have assistive devices and casts. If an inmate is an Honors inmate, they will be sent to the MHU or the Medical "M" Dorm where inmates may have assistive devices. This will require the help and coordination of both Custody Staff and Correctional Health Services Staff at both facilities.

Every Tuesday Classification at the New Main Jail will generate a list of inmates housed on 2 East that are either sentenced or simply in custody for a parole hold. This list will be given to the 2 East Nurse who will pull each of the patients' charts and determine who would be a possible candidate for transfer to RCCC. Candidates for movement to RCCC should meet the following criteria:

- They are not a total separation or "TSEP" patient
- They are not a paraplegic or quadriplegic
- They are not a security patient on a CPAP or BiPAP machine (Honors patients are acceptable)
- They are not a dialysis patient
- They have not had any known fights or other behavioral issues on 2 East
- They are not being housed because of a previous suicide attempt by jumping (e.g. from an upper tier.)
- They do not have a wired jaw.
- Ideally the inmate would have no or minor medical issues and is being housed on 2 East simply due to crutches, cast, cane, walker or prosthesis.

The 2 East Nurse will write down the reason(s) why the inmate is housed on 2 East next to the patient's identifying data. This list will be faxed to the SRN office at RCCC. The SRN at RCCC will review the list and recheck that the inmates on the list are appropriate for RCCC housing. The SRN at RCCC will contact the Administration Sergeant and send the list to either the Administration Sergeant or the Classification Officer. The Classification Officer will pick 2 or 3 inmates from this list that are appropriate to be housed at RCCC and make the arrangements to have patients transferred from the New Main Jail to RCCC.



Per policy 1417, Adult Developmental Disability, persons with developmental disability are potentially vulnerable in the custody setting and may require special consideration in the classification process. JPS staff should also make an entry into the JIMS system and if necessary, notify classification of any special housing recommendations.

Per policy 1107, Decision Making-Special Needs, consultation between the Facility Commander and the Medical Director is required for actions regarding patients who are diagnosed as having significant medical or mental health disorders, as follows:

- Housing assignments.
- Program assignments.
- Disciplinary measures.
- Admissions to and transfers from institutions.

Maximum cooperation between custody personnel and health care providers is essential so that both groups are made aware of movements and decisions regarding patients with special medical or psychiatric needs.  For example, health care staff must inform custody personnel when an inmate is suicidal, homicidal, or inappropriately housed in the jail for health care reasons.   An inmate's special needs may complicate housing or work assignments or disciplinary management.  Medications may need to be adjusted for safety at the work assignment or before transfer.

**Observations**

The SCSD detention facilities use the Northpointe classification system.  This system uses the COMPAS Decision Tree Classification System, which is designed to interface with SCSD detention facilities JIMS.  The system classifies inmates into one of three security levels. In addition, it also assigns the inmate a custody level within the security level to better describe the inmate populations within the three security levels and for housing purposes into four levels maximum, medium, minimum and special housing.

The MJ COMPAS Classification Housing Plan (04/03/15)

COMPAS Classification Levels Key:

| | |
|---|---|
| Level 1, 2 | High (House In Same Cell) |
| Level 3, 4, 5 | Medium (House In Same Cell) |
| Level 6, 7, 8, 9 | Low (House In SAME Cell) |

| | | |
|---|---|---|
| 2 West | M | Acute Medical |
| | P | Acute Psychiatric |
| 2 East | 100 | Wheelchair |
| | 200/300 | Male Sub-Acute Medical Detox |



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

| 3 West | 100/200 | Inmate Workers |
| | 300 | Out Patient Psych (Levels 2-9) H/M/L |
| 3 East | 100 | P.C. (Levels 2-9) H/M/L |
| | 200 | P.C. (Levels 2-9) H/M/L |
| | 300 | L/T Out Patient Psych (Levels 2-9) H/M/L |
| | | U/T P. C. (Levels 2-9) H/M/L |
| 4 West | 100 | DVHU/IMAP/REHAB (Levels 3-9) M/L |
| | 200 | P.C. (Levels 2-9) H/M/L |
| | 300 | G.P (Levels 2-5) H/M |
| 4 East | 100 | P.C./PSEG (Levels 2-9) H/M/L |
| | 200 | P.C. (Levels 2-9) H/M/L |
| | 300 | P.C. (Levels 2-9) H/M/L |
| 5 West | 100 | G.P. (Levels 3-9) M/L |
| | 200 | G.P. (Levels 3-5) M |
| | 300 | G.P. (Levels 2-5) H/M |
| 5 East | 100 | G.P. (Levels 3-9) M/L |
| | 200 | G.P. (Levels 3-5) M |
| | 300 | G.P. (Levels 2-5) H/M |
| 6 West | 100 | G.P. (Levels 3-9) M/L |
| | 200 | G.P. (Levels 3-5) M |
| | 300 | G.P. (Levels 2-9) H/M/L |
| 6 East | 100 | G.P. (Levels 3-9) M/L |
| | 200 | G.P. (Levels 3-5) M |
| | 300 | G.P. (Levels 2-5) H/M |
| 7 West | 100 | Female G.P. (Levels 3-9) M/L |
| | 200 | Female G.P. (Levels 3-5) M |
| | 300 | Female P.C. /OPP/TSEP/ADSEG/G.P. |
| | 400 | Female Discipline/ADSEG/TSEP/PC/OPP |
| 7 East | 100 | Female Intake/P.C./SEP/OPP |
| | 200/300 | Male Intake Housing |
| 8 West | 100/200/300 | Male ADSEG/TSEP |
| | 400 | Male Disciplinary Housing |
| 8 East | 100/200/300 | Male ADSG/TSEP Housing |

RCCC Classification Housing Plan

| A Barracks | Medium (un-sentenced) |
| B Barracks | Minimum Honor Facility Reentry |
| C Barracks | Minimum Honor Facility |
| D Barracks | Minimum Honor Facility |
| G Barracks | Minimum Honor Facility |
| H Barracks | Minimum Honor Facility |
| J Barracks | Medium (un-sentenced) |
| K Barracks | Medium (un-sentenced) |

| M Barracks | | Minimum Honor Facility/Medical |
|---|---|---|
| MHU | | Medical Housing Unit |
| | | |
| SLF Kinya | | Female Minimum |
| SLF Golden Poppy | | Female Minimum |
| SLF Camellia | | Female Medium |
| SLF Ramona | | Female Maximum |
| | | |
| JKF | 100 | Medium |
| | 200 | Medium |
| | 300 | Medium |
| | 400 | Medium |
| | 500 | Medium |
| | 600 | Medium |
| | | |
| KBF | 100 | ICE |
| | 200 | P.C. Medium |
| | 300 | ICE |
| | 400 | ICE |
| | 500 | ICE |
| | 600 | P.C. Medium |
| | | |
| CBF | 100 | Restriction |
| | 200 | Intake/Overflow |
| | 300 | P.C Maximum |
| | 400 | County Out Patient Psychiatric |
| | 500 | Maximum |
| | 600 | ROC/CBJT |
| | | |
| SBF | 100 | TSEP & ICE SMU |
| | 200 | Maximum |
| | 300 | Maximum |
| | 400 | Maximum |
| | 500 | Maximum |
| | 600 | P.C Maximum |

The Assessment Team conducted site assessments/tours of all housing units including medical and special housing units where disabled inmates are housed. The team also conducted staff interviews of medical, custody and classification staff, and reviewed applicable operations orders, policies and procedures.

Information obtained from staff, site assessments, and through the review of operations orders, policies and procedures revealed that inmates that have prescribed HCAs/ADs/DME (canes, wheelchairs, walkers etc.) are housed based on classification case factors and they can be housed on any floor/housing unit.

However, the housing of inmates with prescribed HCAs/ADs/DME in housing units based on classification case factors is a change in housing protocols that was made within the past year. At the MJ, it is very difficult to house disabled inmates who have been prescribed a HCA/AD/DME in housing units based on their classification factors. This is based on the fact that the housing units on floors 3 through 8 do not have ADA-compliant in-cell accessible features, accessible showers, accessible visiting areas and accessible access to outdoor recreation. Based on this, disabled inmates that require these types of accommodations must be housed in 2 East (Pods 100/200/300), the male sub acute housing unit. In the 100 Pod, there are 5 cells designed for disabled inmates that have been prescribed a wheelchair. The cells and shower in this pod have ADA accessible features, however, they are not ADA-compliant. Staff reported that there is no accessible housing for fulltime wheelchair users other than in the medical housing units (RCCC MHU, MJ 2 East and MJ 2 West). There is no wheelchair accessible housing for female inmates at RCCC.

Disabled inmates are being housed in a medical/sub acute housing unit solely based on their disability or need for ADA accessible housing. Medical staff stated that half of the inmates housed in 2 East are housed solely based on their need for accommodations and/or based on the prescription of a HCA/AD/DME as these inmates cannot be housed on the upper floors. The housing of this mixed population with varying classification case factors makes it very difficult to provide inmates with out-of-cell time and outdoor recreation. This is because of the numerous factors that restrict the ability for the inmates to program together, requiring multiple groups in order to program the inmates safely (Protective Custody [PC], Total Separation (TSEP), OPP, Classification Level, etc.) Based on the limited number of beds/cells available on 2 East, at times, disabled inmates with prescribed HCAs (cane or crutches), or those who have physical limitations are being housed on the upper floors and struggle to access the programs, services and activities on the upper floors.

There is no ADA accessible housing for disabled female inmates in the female housing units at the MJ who require in-cell ADA accessible features, accessible showers, accessible visiting areas and accessible access to outdoor recreation. If a female requires ADA accessible housing she has to be housed in the medical housing unit on 2 West, transferred to RCCC or housed on the upper floors without required accommodations.

At RCCC the only housing unit with some ADA accessible features for inmates who are mobility impaired and do not require wheelchair accessible housing is Kinya, which is a minimum-security housing unit. If a female medium security inmate at SLF requires ADA accessible housing, staff would have to allow the inmate to be housed in Kinya on a classification override. If a female maximum-security inmate at SLF requires ADA accessible housing, she would have to be

housed in the non-ADA-accessible housing (Ramona) or be transferred to the medical housing unit at the MJ.

There are specific housing units for inmates with mental health disabilities. The housing unit for inpatient (acute) mental health inmate-patients is 2 West P. Designated housing for OPP disabled inmates at the MJ are 3 West 300, 3 East 300 U/T, 7 West 300/400 and 7 East 100. Inmates at the MJ with mental health disabilities and other classification case factors (ADSEG and TSEP) are housed in the designated housing units based on classification case factors. Designated housing for OPP disabled inmates at the RCCC is CBF 400. There is also a special housing unit Jail Based Competency Treatment (JBCT) Program designed to restore mentally ill inmates who've been found incompetent to stand trial to competency without transferring them to a state hospital. Inmates at RCCC with mental health disabilities and other classification case factors (ADSEG and TSEP) are housed in the designated housing units based on classification case factors. If an inmate, male or female, at RCCC requires acute mental health treatment they are transferred to the MJ 2 West P. There is no OPP housing at RCCC SLF for female inmates. Female inmates at RCCC who require OPP housing are transferred to the MJ.

There is no designated housing for male or female inmates with developmental disabilities at the MJ or RCCC.

During the initial classification and subsequent classification processes, classification officers did not provide EC during the inmate interviews to ensure the inmates understood the classification process, and the decisions made regarding classification and housing placement. Although Northpointe classification system has the capability to produce an Inmate Classification Notice that details the inmates case factors such as; Name X-Ref, CII Number, SSN, Race, FBI Number, Ethnicity, Original Bail Set, Date of Birth, Agency, Gender, Inmate Number, Booking Number, Booking date, Current Classification, and Next Review Date, Classification staff reported that this Notice is not issued to inmates. The Inmate Classification Notice also contains a narrative that advises the inmate. A sample provided to the Assessment Team reads as follows:

"You have been placed in the following classification: 3-High Medium (Medium) by the Classification Department. This classification is determined by: current/past convictions; current/past institutional behavior; pending charges or holds in other jurisdictions (if any); unsentenced/sentenced status; and/or any other information that may be deemed appropriate with regard to your personal security or the security of the facility.

Note: Your classification may change when charges are altered or reduced; you are sentenced; due to administrative hearings; due to regular periodic review; program participation; and/or other reasons recommended by the jail staff.

Appeal Process: Any inmate who so desires may appeal his/her classification (in writing) in any of the three basic areas (security level, housing assignment or programs) within 10 days of the primary classification or reclassification by addressing the appeal to: Classification Department."

As reported by the classification staff, inmates do not receive written notice when placed into TSEP, ADSEG or initial housing.  Inmates are also not provided written notice of initial classification or reclassification results.  More than 95 percent of the inmates interviewed were not aware of their classification status or classification level. Because inmates are not advised of their classification level/score or their appeal rights, they are not informed on how to reduce their classification level/score which in turn impacts their program opportunities (dayroom/yard etc.)

## Staff Interviews

The Assessment Team conducted interviews of custody deputies/officers assigned to housing units and intake booking, as well as medical and classification staff.  Intake booking, classification and housing unit staff stated that disabled inmates are housed based on their classification case factors.  Staff stated that this is a change in housing policy that has recently been implemented. Staff stated that inmates prescribed wheelchairs or other HCA/AD/DME who have a difficult time ambulating are housed in the medical floor on 2 East and that this is a medical decision.  Custody staff also stated that medical staff designate and approve an inmate to be housed in a L/B L/T.  This is reflected in a chrono and is also noted in JIMS.  Staff stated that once the JPS designates an inmate as OPP they are moved to the OPP housing unit if case factors allow. There are case factors such as Protective Custody (PC), ADSEG and TSEP that "trump" the inmate's housing in an OPP unit. Staff at RCCC SLF stated that inmates with canes, walkers and crutches are housed based on their classification and that they have never seen a female inmate with a wheelchair housed at RCCC SLF.

Medical staff stated that more than half of the inmates housed in 2 East are being housed in 2 East solely based on their disability and that they do not actually have medical issues that require housing in 2 East.  The Assessment Team asked an RN how many inmates housed in 2E have disabilities without any other overriding (or underlying) medical issues, to which the nurse responded that she believes this applies to more than half the inmates housed within the unit. Another RN stated that inmates who are determined at intake medical screening to have an intellectual disability or a learning disability, may be housed in MJ 2 East (medical housing), and if they are housed "upstairs" (another floor), they may be referred to medical.

An RCCC RN explained stated mobility impaired inmates with prescribed canes are housed in the GP, and inmates with walkers are assigned to M Dorm;

Classifications staff stated that a classification worksheet is completed for all arrivals. The MJ Classification Worksheet does not contain questions regarding disabilities other than a mental health disability. Classification staff stated that disability-related information is obtained from the medical intake screening and the Special Needs Form. The RCCC Classification Worksheet has a question regarding the need for special housing considerations due to a disability. The ICE Classification Worksheet in the Special Management Vulnerabilities and Management Concerns has check boxes for staff to check if a special vulnerability exists such as, serious mental illness and/or disability. Classification staff indicated that a classification interview is conducted on all inmates that arrive at the MJ and RCCC with the exception of inmates initially housed on the 2nd floor of the MJ (Medical Floor). The Assessment Team observed the classification interviews for 15 inmates at the MJ. During the interviews the classification deputies did not ask any disability-related questions with the exception of an inquiry about mental health concerns. The interviews were conducted in the open dayroom with a proximity of 15 feet from other inmates waiting to be interviewed. Classification staff stated that following the interview, the information obtained from the interview and information available in JIMS is entered into the Northpointe system and a recommended classification level is obtained to determine housing.

Although the Operations Order 06/03 Classification requires classification staff to conduct a reclassification for inmates in High Security Housing, every thirty (30) days, for inmates in General Population Housing, after the first sixty (60) days of custody, upon request from custody staff, Medical Staff, Jail Psychiatric Services, and/or court officials, or when the legal status of the inmate changes, and when an inmate is relocated and/or reclassified due to the outcome of a disciplinary hearing, classification staff stated that based on the shortage of classification staff, these reviews are typically done via a paper review as there is insufficient classification officers to conduct face-to-face classification reviews.

### Inmate Interviews

The Assessment Team conducted inmate interviews. Listed below are claims made by inmates during the Assessment Team interviews:

- RCCC CBF inmate: Mobility - Had a wheelchair and walker at MJ 2 East. Staff told him they needed the room, took HCAs, and transferred him to RCCC. Needs grab bars or shower chair. Very difficult for him to walk around in dayroom and yard without a HCA;
- MJ 4 East inmate: Mobility - Claims staff told him if he gave up his cane he would be able to go upstairs. Needs rails in shower or shower chair. Fell 2 times in shower. Very difficult to walk upstairs;
- MJ 2 East inmate: Mobility - Claims when he arrived he was housed in a regular cell on upper bunk and he fell from top bunk. Needs in cell and shower accommodations. Difficult to step over shower lip;

- MJ 2 East inmate: Wears prosthetics - Needs in-cell ADA features. Has to hold on to table to balance when using toilet. Goes to Pod 100 to shower;
- MJ 2 East inmate: Mobility - Needs in-cell ADA features. Has to hold on to table to balance when using toilet. Goes to Pod 100 to shower;
- MJ 2 East inmate: Mobility – Needs shower chair;
- MJ 2 East inmate: Wears prosthetics – Needs ADA features in shower. Difficult to step over shower lip;
- MJ 2 East inmate: Claims that he requires LB/LT and he was celled with another inmate that has LB/LT chrono. He had to sleep on floor.
- MJ 6 West inmate: Mobility – Needs grab bars in cell and shower accommodations. Difficult to walk upstairs;
- MJ 6 West inmate: Mobility – Has fallen in shower without ADA accessible features. It is difficult to walk up and down stairs for visiting and yard;
- MJ 6 West inmate: Parkinson's – Needs a cane but does not want one because he doesn't want to be moved to the 2nd floor. Needs shower chair or grab bars;
- RCCC KBF inmate: Hearing/Vision/Stroke – Uses wall to support himself in shower. Needs cane;
- RCCC KBF inmate: Mobility – Has to use plastic chair to shower;
- RCCC H Barrack inmate: Mobility – Needs to stabilize himself on wall to shower. Needs cane to be able to go to yard does not have one;
- RCCC G Barrack inmate: Mobility – It is difficult to shower. Has to hold on to wall. Needs cane for long distances, but does not have one.
- RCCC B Barrack inmate: Mobility/Gout – Needs grab bars when gout flares up. Difficult to step over lip in shower;
- RCCC K Barracks inmate: Mobility – Has to lean against wall. Needs shower chair or grab bars;
- RCCC KBF inmate: Mobility/Amputee – Housed in MHU for 1 night. Needs shower chair;
- RCCC SBF inmate: Mobility – Needs shower chair or grab bars in shower;
- MJ 2 East inmate: Mobility – Has a walker. Needs grab bars in shower;
- MJ 3 West inmate: Mobility – Has crutches. Needs to hold on to wall to shower. Difficult to walk up and down stairs;
- MJ 2 East inmate: Mobility – Fulltime wheelchair user not in ADA cell. Needs grab bars in cell and shower. Has to hold on to walls to shower, no shower chair;
- MJ 5 West inmate: Mobility – Difficult to walk up and down stairs;
- MJ 7 East inmate: Temporary Crutches – Needs grab bars. Struggles to climb up and down stairs to visiting;
- RCCC SBF inmate: Mobility – Needs grab bars in cell;
- MJ 8 East inmate: Mobility – Hard to take a shower;
- MJ 2 East: Mobility – 3 inmates claimed that although they had a chrono for a low bunk, staff housed them in a cell with another inmate with a low bunk chrono. The inmates claimed that when they advised staff about the

low bunk chrono, staff told them they would either have to climb to the top bunk or sleep on the floor. One of the inmates claimed that he had to sleep with his mattress on the floor for 2 weeks until staff relocated him to a low bunk;

- RCCC JKF inmate: Claims mobility disability (organ failure/breathing) and mental disability. Was denied shower bench and then moved to current location;
- MJ 5E inmate: Claims mobility impairment (lungs/breathing), mental illness, and vision impairment. Claims his cellmate asked for a cell move but staff told his cellmate that they would not move him unless they got in to a fight. The inmate claimed his cellmate assaulted him (1/16) and a small melee ensued;
- MJ 7W inmate: Claims mobility impairment (uses walker), and vision and mental health disability. Has difficulties without a walker and falls down. Had an issue about 7 months after arrival and was moved to 2M once he was issued a walker. Has routinely fallen when entering or exiting the shower because of the raised lip;
- MJ 4E inmate: Mobility impaired (uses a cane). Has a chrono to use a cane for court movement, but custody and medical staff have never honored it or provided a cane. Was initially housed in 2M, but 2 weeks after the chrono was written, he was housed in 4E;
- MJ 4E inmate: Claims a mobility disability (needs hip replacement). Says UCD recommended surgery, but he has been unsuccessful getting it scheduled. He requested a cane 6 months ago, but has not received one;
- MJ 2M inmate: Mobility disabled (permanent wheelchair). Suffers from sores/ulcers in buttocks area. He is a very large individual, and has had 2 separate air blow-up cushions, but they busted. Has not received anything since. His right foot peg/rest to his wheelchair has been broken since it was issued several months ago. The wheelchair is a county-owned wheelchair, as his electric wheelchair was confiscated upon arrival;
- MJ 2M inmate: Mobility disabled (permanent wheelchair user, paraplegic), mentally disabled, and vision impaired. Has sores/ulcers in buttocks area. Hs requested a trapeze but has been denied. Claims that staff broke his chair en route to a transport, as staff "jammed" the wheelchair into the wheelchair van lift;
- MJ 2M inmate: Mobility disabled (permanent wheelchair user). Claims to have difficulty transferring from the wheelchair to the "flimsy" shower chair, which is "filthy." He claims to normally sits on the "flimsy" shower chair on his knees because it is old and dirty;
- MJ 2M inmate – Mobility impaired (prosthetic right leg, and right arm is non-functional). Claims to not be receiving assistance with daily living for showers, and has fallen down in the pod shower repeatedly, as there is not a handrail in the shower;

- MJ 2M inmate: Mobility disabled (quadriplegic and permanent wheelchair user) and mentally disabled. Claims his wheelchair back needs adjustment to relieve pressure. Also, his foot peg/rest has been missing, and his feet "dangle" when he is in his wheelchair. His right foot is not functional, but he can't get his foot on to the foot peg as it needs adjustment;

- MJ 2M inmate: Mobility disabled (permanent wheelchair, Cerebral Palsy since birth). Demonstrated a very awkward angle where he has very minimal use of his lower extremities so long as he is holding his wheelchair. He occasionally performs this movement for therapy and exercise. Has 2 different sized county-issued shoes (size 9 for one foot, and a size 10 for the other). He has made numerous attempts to get the correct shoe size for one shoe, but has not received any accommodation. This is paramount for him to maneuver and obtain minimal movement of his feet and lower legs. He also indicated that he has fallen in the "wobbly" shower chairs on several occasions;

- RCCC JKF inmate: Mobility disabled (crutches, broken pelvis and was in wheelchair for 2 years). Claims his request for orthopedic shoes or shoes with a lift was denied;

- RCCC D Dorm inmate: Mobility disabled (Cerebral Palsy, DPM in CDCR). Claims his cane was taken by Elk Grove Police Department at the time of arrest, but the medical department has refused to issue him a cane. He claims he had a cane in CDCR;

- MJ 6E inmate: Mobility disabled (cane, partially paralyzed in left leg). Claims staff do not honor lower bunk chromos. Instead, they tell cellmates that one of them will have to sleep on the floor. Claims he has been on transports where staff do not let him use his cane to board the transport vehicle. On one such occasion, a court judge ordered that he be taken to court via wheelchair; and

- RCCC CBF Inmate - This inmate is on OPP status, and claims he has been moved as inmates historically tease him.

### Conclusions

There is no ADA accessible housing for disabled inmates who have been prescribed a HCA/AD/DME in the MJ except in 2 East medical housing units. However, as noted in the physical accessibility section, these housing areas are not ADA compliant.

There is no accessible housing for fulltime wheelchair users at RCCC (male or female) except in the MHU, which houses male inmates. Therefore male and female inmates whose case factors allow for lower custody/level housing are being housed in a medical setting solely based on their disability. This is in violation of 28 C.F.R. § 35.152 (b)(1) and (b)(2)(i), (ii), and (iii) of the Title II regulations.



Full-time female/male wheelchair users eligible for RCCC housing are not given the same opportunity to participate in programs, services, and activities as other inmates as they are being housed in the MJ medical housing that does not provide most of the programs, services and activities available at RCCC.

There is no ADA accessible housing for disabled inmates who have been prescribed a HCA/AD/DME in the RCCC except in the MHU, M-Dorm and JKF 100. However, as noted in the physical accessibility section, these housing areas are not ADA-compliant.

All disabled inmates with a wheelchair at the MJ are housed in the medical housing unit for the duration of their incarceration. This is in violation of 28 C.F.R. § 35.152 (b)(1) and (b)(2)(i), (ii), and (iii) of the Title II regulations.

Although it is the policy of SCSD detention facilities to house disabled inmates based on their classification case factors, some disabled inmates with assistive devices who require ADA accessible housing at the MJ are housed in the medical housing unit for the duration of their incarceration. This is in violation of 28 C.F.R. § 35.152 (b)(1) and (b)(2)(i), (ii), and (iii) of the Title II regulations.

Inmates housed in the medical housing unit at the MJ are not offered or provided access to equivalent programs, services and activities consistent with their custody level as inmates who are housed in the general population housing units. This is in violation of 28 C.F.R. § 35.152 (b)(1) and (b)(2)(i), (ii), and (iii) of the Title II regulations.

Although the Draft Operations Order Inmates with Disabilities - ADA, states that unless it is appropriate to make an exception, Classification staff shall not place inmates with disabilities: in inappropriate security classifications simply because no ADA-accessible cells or beds are available, in designated medical areas unless they are actually receiving medical care or treatment, or in facilities that do not offer the same programs as the facilities where they would otherwise be housed. The SCSD detention facilities will not be able to comply with this order unless physical plant modifications are made to the upper floor housing areas of the MJ and RCCC facilities.

Policy 1436 2 East inmate transfers, reflects that sentenced inmates at RCCC may have assistive devices in the 448 100 Pod and the MHU or the Medical "M" Dorm. Restricting disabled inmates with assistive devices to medical housing units violates 28 C.F.R. § 35.152 (b)(1) and (b)(2)(i), (ii), and (iii) of the Title II regulations.

Classification staff does not provide EC for inmates with cognitive deficits that have a difficult time understanding the classification process.

The SCSD detention facilities Classification process does not provide specific housing and placement criteria for developmentally disabled inmates. Staff

members have a duty to protect all inmates, including disabled inmates, from violence at the hands of other inmates. Intellectual disabilities put those inmates at greater risk for abuse and exploitation than non-intellectually disabled inmates. Intellectually disabled inmates may give up possessions to other inmates or become vulnerable to sexual predators or manipulation by other inmates. Therefore staff must monitor these inmates to promote their personal safety. The SCSD detention facilities must also establish specific housing criteria for disabled inmates.

## References

**28 C.F.R. § 35.137 (a)** requires that a public entity permit individuals with mobility disabilities to use wheelchairs and manually-powered mobility aids, such as walkers, crutches, canes, braces or other similar devices designed for use by individuals with mobility disabilities in any areas open to pedestrian use. Additionally 28 § 35.152 (b)(2)(i),(ii), and (iii) state that public entities shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals. Unless it is appropriate to make an exception, a public entity, shall not place inmates or detainees with disabilities in inappropriate security classifications because no ADA accessible cells or beds are available. A public entity shall not place inmates or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment. A public entity shall not place inmates or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed.

**28 CFR 35.130(b)(1)** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service…

**28 CFR § 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability.

**28 CFR § 35.130(a)** requires that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR 35.130(b)(4):** A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

**28 CFR 35.130(b)(8):** A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

**28 C.F.R. § 35.152 (b)(2) (i), (ii), (iii):** Public entities shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals. Unless it is appropriate to make an exception, a public entity, shall not place inmates or detainees with disabilities in inappropriate security classifications because no ADA accessible cells or beds are available. A public entity shall not place inmates or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment. A public entity shall not place inmates or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed.

**28 C.F.R. § 35.152 (b)(3)** states that a public entities shall implement reasonable policies, including physical modifications to additional cells in accordance with the 2010 Standards, so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing.

### *Pierce v. Cty. of Orange,* **526 F.3d 1190 (9th Cir. 2008)**

A group of pretrial detainees housed in the county jail facilities brought a claim that the county failed to provide accessible bathrooms, sinks, and showers, and other fixtures or curative measures.

### *Jaros v. Illinois Department of Correction.,* **684 F.3d 667 (7th Cir. 2012)**

Illinois prison lacked grab bars and thus prevented plaintiff from using his shower and transporting himself to meals. Illinois Department of Correction refused to add accessibility features because the facility was not designated as ADA accessible, but also refused to transfer the inmate to an ADA accessible facility because he would not be incarcerated long enough to meet the Department's criteria for transfer.

### *Clemons v. Dart* **2016 WL 890697 (N.D. Ill. Mar. 9, 2016)**

Inmate who used wheelchair was not assigned to an accessible room. Nurses were on call to help him access the sink, shower, and toilet.

**Sheriff's Position**: No ADA violation because nursing staff allowed plaintiff to access all the same facilities.

**Court:** On-demand nursing support was not equivalent to providing an accessible cell because it reduced plaintiff's ability to engage in independent living to the fullest extent possible.

**Note:** Clarifies that Title II "requires affirmative, proactive accommodations necessary to ensure meaningful access to public services and programs, not accommodation upon request."

### *Wright v. New York State Department of Corrections* 2016 WL 4056036 (2nd Cir. July 29, 2016)

Inmate with cerebral palsy and scoliosis who could operate a motorized wheelchair, but not a manual wheelchair, successfully challenged ban on motorized chairs in prison due to safety concerns.

**Court:** Policy prevented plaintiff from accessing prison services. Rejected option of "inmate mobility aids" as "in tension" with ADA's emphasis on independent living. Also said inmate mobility assistant program was ineffective in practice because it required advanced scheduling.

### *Reaves v. Department of Corrections*, 2016 WL 4124301 (D. Mass July 15, 2016)

Successfully challenging procedure that prevented plaintiff from going outdoors in 16 years finding the procedures could be modified.

## Medical/Mental Health/Dental

Under the Eighth Amendment, the SCSD detention facilities are required to "provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Inmates are entitled to medical care and attention as needed to treat both short-term conditions and long-term illnesses. Inmates who need mental health care are entitled to receive that treatment in a manner that is appropriate under the circumstances. Under the ADA, the SCSD detention facilities are required to ensure disabled inmates have equal access to the programs, services, and activities including access to medical, dental and mental health care.

The Minimum Standards for Local Detention Facilities, Title 15-Crime Prevention and Corrections, Division 1, Chapter 1, Subchapter 4, Article 11, Medical/Mental Health Services, contains several sections applicable to medical, mental health, and dental services:

§ 1200. Responsibility for Health Care Services.

(a) In Type I, II, III and IV facilities, the facility administrator shall have the responsibility to ensure provision of emergency and basic health care services to all inmates. Medical, dental, and mental health matters involving clinical judgments are the sole province of the responsible physician, dentist, and psychiatrist or psychologist respectively; however, security regulations applicable to facility personnel also apply to health personnel.

Each facility shall have at least one physician available to treat physical disorders. In Type IV facilities, compliance may be attained by providing access into the community; however, in such cases, there shall be a written plan for the treatment, transfer, or referral in the event of an emergency.

(b) In court holding and temporary holding facilities, the facility administrator shall have the responsibility to develop written policies and procedures which ensure provision of emergency health care services to all inmates.

§ 1208. Access to Treatment.

The health authority, in cooperation with the facility administrator, shall develop a written plan for identifying and/or referring any inmate who appears to be in need of medical, mental health or developmental disability treatment at any time during his/her incarceration subsequent to the receiving screening. The written plan shall also include the assessment and treatment of such inmates as described in Section 1207, Medical Receiving Screening. Assessment and treatment shall be performed by either licensed health personnel or by persons operating under the authority and/or direction of licensed health personnel.

§ 1209. Mental Health Services and Transfer to Treatment Facility.

(a) The health authority, in cooperation with the mental health director and facility administrator, shall establish policies and procedures to provide mental health services. These services shall include but not be limited to:

1. screening for mental health problems;

2. crisis intervention and management of acute psychiatric episodes;

3. stabilization and treatment of mental disorders; and

4. medication support services.

(b) Unless the county has elected to implement the provisions of Penal Code Section 1369.1, a mentally disordered inmate who appears to be a danger to himself or others, or to be gravely disabled, shall be transferred for further evaluation to a designated Lanterman Petris Short treatment facility designated by the county and approved by the State Department of Mental Health for diagnosis and treatment of such apparent mental disorder pursuant to Penal Code section 4011.6 or 4011.8 unless the jail contains a designated treatment facility. Prior to the transfer, the inmate may be evaluated by licensed health personnel to determine if treatment can be initiated at the correctional facility. Licensed health personnel may perform an onsite assessment to determine if the inmate meets the criteria for admission to an inpatient facility, or if treatment can be initiated in the correctional facility.

(c) If the county elects to implement the provisions of Penal Code Section 1369.1, the health authority, in cooperation with the facility administrator, shall establish policies and procedures for involuntary administration of medications.

The procedures shall include, but not be limited to:

1. Designation of licensed personnel, including psychiatrist and nursing staff, authorized to order and administer involuntary medication;

2. Designation of an appropriate setting where the involuntary administration of medication will occur;

3. Designation of restraint procedures and/or devices that may be used to maintain the safety of the inmate and facility staff;

4. Development of a written plan to monitor the inmate's medical condition following the initial involuntary administration of a medication, until the inmate is cleared as a result of an evaluation by, or consultation with, a psychiatrist;

5. Development of a written plan to provide a minimum level of ongoing monitoring of the inmate following return to facility housing. This monitoring may be performed by custody staff trained to recognize signs of possible medical problems and alert medical staff when indicated; and

6. Documentation of the administration of involuntary medication in the inmate's medical record.

§ 1210. Individualized Treatment Plans.

(a) For each inmate treated by a mental health service in a jail, the treatment staff shall develop a written treatment plan. The custody staff shall be informed of the treatment plan when necessary, to ensure coordination and cooperation in the ongoing care of the inmate. This treatment plan shall include referral to treatment after release from the facility when recommended by treatment staff.

(b) For each inmate treated for a major medical problem in a jail, the treatment staff shall develop a written treatment plan. The custody staff shall be informed of the treatment plan when necessary, to ensure coordination and cooperation in the ongoing care of the inmate. This treatment plan shall include referral to treatment after release from the facility when recommended by treatment staff.

§ 1211. Sick Call.

There shall be written policies and procedures developed by the facility administrator, in cooperation with the health authority, which provides for a daily sick call conducted for all inmates or provision made that any inmate requesting medical/mental health attention be given such attention.

§ 1215. Dental Care.

The facility administrator shall develop written policies and procedures to ensure emergency and medically required dental care is provided to each inmate, upon request, under the direction and supervision of a dentist, licensed in the state.

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures applicable to the provision of medical, dental and mental health services for inmates are outlined in the following Operations Orders and policies:

Operations Orders

- 3/07 Medical Emergencies;
- 10/01 Health Care Services;
- 10/02 Psychiatric Services;
- 10/03 Health Care Treatment Access;
- 10/04 Medical Intake Screening;
- 10/05 Suicide Peer Program;
- 10/08 Medicine Distribution "Pill Call";
- 10/09 Dental Services;
- 10/10 Health Equipment and Control; and
- 10/11 Health Records.

Policies

- 1107 Decision Making – Special Needs;
- 1110 Access to Diagnostic Services;
- 1119 Individualized Treatment Plans;
- 1120 Continuity of Care;
- 1122 Hospital Care;
- 1125 Prosthesis;
- 1126 Health Care Maintenance;
- 1128 Reading Glasses;
- 1130 Transfer Medications;
- 1404 Receiving Screening;
- 1407 Access to Treatment;
- 1409 Clinic Care;
- 1410 Medical Services Provided in the Medical Housing Unit;
- 1411 Mental Health Services;
- 1412 Suicide Prevention – 2M – Joint Policy with JPS;
- 1415 Patients in Safety Cells;
- 1416 Patients in Segregation;
- 1417 Adult Developmental Disability;
- 1422 Special Needs Patients;
- 1425 Admission to Jail Acute Psychiatric Inpatient Unit;
- 1435 Inmate Health Care Grievances;
- 1439 Reports of Disabilities or Impairments;
- 1440 Emergency Mode; and
- 2000 Dental Care.

Per Operations Order 10/1, Health Care Services, "The Main Jail and RCCC shall ensure provisions of emergency and basic health care services and psychiatric services are available to all inmates pursuant to Article 10 of the California Code of Regulations."

Per Operations Order 10/02, Psychiatric Services, "Jail Psychiatric Services (JPS) staff shall respond to requests from custody and medical staff to screen, evaluate and treat inmates in order to provide necessary mental health evaluation and treatment during incarceration."

Per Operations Order 10/9, Dental Services, "The Main Jail and RCCC shall provide emergency and medically required dental care to inmates under the direction and supervision of a state licensed dentist. Whenever possible, dental care shall be delivered on site rather than at an outside facility."

Per Policy 1409, Clinic Care, states the following, "Sick Call is conducted by a physician, mid-level practitioner or nurse, a minimum of five days a week. If a patient's custody status precludes attendance at a clinic, arrangements are made to provide clinic services at the place of the patient's detention. Clinic care is



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

available for ambulatory patient(s) with health concerns and is held at a scheduled time and place. When conducted by a nurse practitioner it is expected that a physician will be on site or available for consultation."

The written procedures contained within policy 1409, state, "Medical Health Services (HS) KITE's (request for medical attention) are available in the Housing Units, from the pill call nurses and from custody officers. HS KITE's are triaged by an RN within 24 hours of being received and appropriate appointments are scheduled. A physician, nurse practitioner or registered nurse is responsible for conducting sick call. Sick call is conducted on a regular weekly basis. Patients with relatively new health problems or those needing immediate attention are seen at that time. The Physician is available on site or by telephone for a consultation regarding patient's treatment. Patients are referred to the Physician on the next scheduled Sick Call for evaluation if necessary. In case of emergency, the patient is transferred to an appropriate facility upon physician's orders."

With regard to documentation of health care, the policy states the following, "Progress notes describing the inmate's complaint, assessment, and plan of care taken are entered in the patient's Medical record. HS KITE's are scanned and added to the inmate's medical record. If 'Standardized Procedures' are utilized, all actions performed are recorded in the Medical Record. Height, weight and vital signs will be obtained and recorded in the medical record as required by the patient's condition."

Per Policy 1125, Prosthesis, states the following, "Medical and dental prostheses, including eye glasses, will be provided when the health of the patients would otherwise be adversely affected as determined by the responsible physician or dentist. Inmates will not be deprived of the possession or use of any orthopedic prosthetic or assistive device if the appliance has been approved by the responsible physician.

- Prostheses are artificial devices to replace missing body parts or compensate for defective bodily functions; and
- Assistive devices include wheelchairs, crutches, and other devices intended to improve functioning due to injured or defective body parts.

In accordance with local Operations Orders and policies, the jail handbook (rulebook) provides specific information to disabled (and all) inmates regarding access to HS (medical, mental health and dental care). The rulebook informs the reader that the SCSD detention facilities have 24-hour per day emergency services for medical, mental health, and dental, and the inmates can contact their respective floor officer for assistance.

The rulebook also explains the process for non-emergency access to health care services. Each inmate must complete a pink Health Services KITE request (pink KITE), which are available from the housing officers, through nurses during the pill call process, and from any medical staff member. The rulebook explains that



inmates can follow the instructions on the back of the KITE request form, must sign it, and give it to any medical services provider, or a pill call nurse.

The rulebook also informs inmates that if they need an assistive device, or if they have a disability, they can complete a pink KITE request, and medical staff will subsequently review the requesting inmate's specific needs, and determine what accommodations may be required. It also states that any ADA accommodations for disabilities are provided free of charge.

For specific medical requests, the rulebook adds that the request for services will be reviewed, and appropriate actions will be taken to address the needs. "Sick Call" is conducted every day. The inmates may be seen by a nurse or a doctor depending on the request and medical condition. If the inmate refuses sick call, he/she will need to sign a refusal form when the service is offered. The inmate must complete additional KITE requests for future appointments.

For specific dental care requests, the rulebook states that after the pink KITE request is submitted, the dentist may come to see the inmate in the day room or dorms to assess the inmate's dental condition and schedule a dental appointment.

For specific JPS mental health requests, the rulebook emphasizes that they don't want inmates to harm themselves. It explains that if an inmate feels severely depressed, or feels like harming him/herself, or feels suicidal, the inmate must tell any custody or health care staff member immediately. The rulebook lays out the same process if an inmate knows of any other inmate that has similar thoughts. For psychiatric KITE requests, the process is also the same, in that upon completion of the KITE (and checking the box for psychiatric services), the inmate must give the KITE to any medical services provider or the pill call nurse. The rulebook articulates that psychiatric services are focused on providing mental health care to inmates during incarceration, and some of the JPS provided are:

- Determine the appropriate level of care needed, including Inpatient Services;
- Continue the care the inmate may have received in the community;
- Intervene in a crisis or emergency; and
- Assist in developing plans to continue treatment after release.

Per Policy 1416, Patients in Segregation, inmates who have been removed from the general population and placed in segregation are evaluated daily by medical personnel, and these encounters are documented. Notations are made of any signs of physical illness or trauma. Observations regarding the patient's attitude or outlook such as depression, suicidal ideations shall be reported to Nursing Supervisor and documented.

Behavior permitting, inmates in administrative segregation are not to be deprived of privileges afforded other inmates. All health care services are available. Pill-Call will be delivered to the cell when necessary. A physician shall visit a cell if it is not practical to move the inmate. Sick Call will be available as usual at other housing units.

Inmates shall be checked on each shift by the pill call nurse. Notation shall be made in the Officers Log Book at Main Jail and at Rio Cosumnes Correctional Center that the pill call nurse made rounds. Pill Call nurses on the p.m. shift at the MJ and RCCC will personally observe every inmate who is in a segregation cell and inquire into their well-being. The nurse will make this inquiry during pill call. Patients will be offered a health service KITE if they need medical services. If an emergency condition is identified, the nurse supervisor or physician will be notified.

There is a draft Operations Order pending revisions ad approval, titled, "Inmates with Disabilities ADA." The draft order contains some language relative to compliance with ADA, assistive devices, assistance with daily living, orthopedic appliances, prosthetic devices, reasonable accommodations, identification of disabilities at intake, identifying disabilities subsequent to intake booking, auxiliary aids for hearing impaired inmates, identifying and handling of Armstrong class members, and other related procedures.

### Observations

The Assessment Team observed numerous health care related activities between the two jails. There were numerous areas of concerns observed. Several activities of primary concern included the following:

- Lack of MH clinicians;
- MH staff do not make routine rounds or monitor mentally disabled inmates housed in Disciplinary Detention (DD), TSEP, and ADSEG units;
- MH staff do not make routine rounds or monitor mentally disabled inmates classified as OPP;
- No group therapy for mentally disabled inmates (except those assigned to the ROC program/evaluation);
- Inmates claimed that 1-on-1 sessions are often very brief and inmates do not feel as if they are getting any meaningful treatment or therapy from it;
- The KITE response process for mental health requests is not expeditious or within a reasonable timeframe;
- Mentally disabled inmates on suicide precaution ("green suits") are often temporarily housed on deck floors, in recreation/classroom areas;
- Social isolation and lack of out-of-cell time for mentally disabled inmates (ADSEG, TSEP, DD, Inpatient, and OPP);
- Lack of a MH step-down program/housing from ADSEG and TSEP to a program with adequate out-of-cell program activities;

- Lack of in-cell activities for mentally disabled inmates housed in ADSEG, TSEP, and DD, and Inpatient program;
- Lack of a classification/screening practice to divert mentally disabled inmates to other viable housing options which would be less restrictive or isolated;
- A lack of programming for mentally disabled inmates classified as OPP;
- A lack of confidentiality for numerous JPS and medical encounters/interviews;
- Lack of confidentiality regarding custody staff handling inmate requests for health care services (HS KITE system);
- Inmates claimed delays and in some cases no follow-up regarding requests for psychiatric services;
- Inmates claimed delays in receiving medication from the time they were booked;
- Inmates claimed that medication they were prescribed and taking in the community was often changed, which caused major side effects for them;
- The KITE response process for medical requests is not expeditious or within a reasonable timeframe;
- Inmates claimed that they had to rely on other inmates in completing requests for HS KITE's as staff would not provide assistance;
- Medical doctors are not issuing physical limitations chronos for inmates as applicable.

The Assessment Team observed numerous CHS and JPS inmate interviews of mentally disabled and other disabled inmates. Areas observed included intake booking at the MJ, and interviews in many of the housing units at both jails, which included male and female inmates, all custody/classification levels, general population, Inpatient, OPP, TSEP, ADSEG, DD, medical housing, and the ROC program, etc.

A common theme was the lack of available office space to conduct the interviews in confidence. The Assessment Team observed JPS interviews taking place at cell doors, in common areas within housing units, e.g., recreation/classroom areas, dayroom areas, outside near the mail boxes and fish bowl (RCCC), and other areas. In most observed cases, there were other inmates sitting in the immediate area or within close proximity and waiting for pill-call or other activities, or inmates were within a reasonable hearing distance from the encounters.

The Assessment Team observed the intake booking JPS referral process. During the intake medical screening, nurses who believe (based on their medical assessment and other factors) that an inmate may be suicidal or possibly have other mental health concerns, refer the inmate to be evaluated by an on-staff Marriage and Family Therapist (MFT) or Licensed Clinical Social Worker (LCSW). Inmates who are deemed to be possibly suicidal or who may be a danger to self or others are placed in a temporary safety cell within the intake booking area pending the MH assessment. Pending the clinical assessment by the clinician

the inmate is placed on suicide precaution 15-minute checks.  A LCSW or MFT conducts an assessment; this is typically done at the safety cell's door or cell. Based on the clinician's assessment, the inmate is either cleared for housing, or referred for a more in-depth clinical assessment by a psychiatrist. Based on the psychiatrist's clinical assessment, the inmate is either cleared for housing (GP or OPP), or referred for inpatient housing. If the inmate is referred for inpatient housing in the MJ 2 West-P, the psychiatrist orders the continuation of the 15 minute rotating visual observation checks, until the inmate is transferred to the psychiatric unit (2/P) or cleared for GP/OPP housing.  During the intake booking process, if an inmate is placed on suicide precaution status, the primary housing location is a MJ safety cell, located on the first floor.  Other locations that are used are the recreation/classrooms in the housing unit decks for inmates who are already housed. The inmate-patients are provided with safety suits, "green suits." Due to a lack of available beds in the inpatient psychiatric unit on 2/P, there are almost always inmates being housed in either a safety cell or the temporary holding areas (recreation/classrooms). Staff reported that there is normally a wait time of up to two or three weeks for bed availability in the inpatient psychiatric unit at the MJ 2/P.  This concern will be addressed in more detail below.  For inmates housed at RCCC who require placement on suicide precaution status due to MH concerns, these inmates are transported to the MJ, as there is no MH staff (psychiatrist) on duty during afterhours and no designated locations for these inmates to be temporarily housed at RCCC pending clinical evaluation. Once the inmates arrive at the MJ, they are placed in either a safety cell if available, or placed in the alternate locations (recreation/classrooms).

Aside from the obvious concern with the interviews conducted at cell-front, there is a lengthy wait list for available inpatient housing at the MJ 2P-housing unit due to the lack of insufficient number of beds in the psychiatric unit on 2/P.

Especially disturbing was the JPS interview process for psychiatric referrals.  As will be discussed below, many inmates who were interviewed complained about this process.  The Assessment Team observed several interviews at the cell doors inside the processing area of intake booking.  The LCSWs and MFTs have access to and generally utilize a standard "Jail Psychiatric Services Clinical Assessment" worksheet during the interviews.  However, during at least one interview, a JPS clinician admitted that the LCSWs and MFTs sometimes utilize their own forms/worksheets. Most surprising was that in at least 2 of the inmate-patient interviews observed, there was an assigned inmate worker ("trustee") seated in a chair at his work site (just a few yards from the interviews) and could hear the dialogue between the clinician and inmate-patient.  One of the inmate-patients arrived at the jail at approximately 0156 hours, and was seen by an LCSW at about 0830 hours, and claimed to be hearing voices.  A second inmate-patient arrived at about 0300 hours, and was seen at about 0835 hours, was suicidal, and was unable to answer any questions from the LCSW, and was referred to a psychiatrist.

Although the Assessment Team did not specifically observe disabled inmates complete a medical request KITE and hand deliver to housing unit staff (to process through the health care services department), inmates claimed that they had to rely on other inmates to complete the medical request as staff would not provide them assistance. However, a few of the inmates also had voiced concerns with staff reading their HS KITE's.

The Assessment Team observed that OPP inmates at the MJ and RCCC are not afforded any therapeutic programs. In contrast, inmates assigned to the RCCC ROC program receive access to the following programs; therapeutic movement, therapeutic recreation and legal knowledge, therapeutic recreation and communication, therapeutic recreation and coping, Jail Based Competency Treatment Program (JBCT) cinema, individual contacts, social skills, symptom management, substance abuse education, wellness, anger management, incentive store, and leisure activity. There is no individual or group therapy provided for OPP inmates or other mentally disabled inmates at the MJ and RCCC (with the exception of the ROC program). Several inmates also indicated to the assessment team that 1-on-1 sessions with JPS staff are often very brief and some of the inmates feel that there is no meaningful treatment/therapy provided during some of these encounters. Also, as cited in detail in the "Programs" section of this report, there is a major disparity with regard to yard and dayroom time allotted, versus that provided to ROC inmates, and also general population inmates. The OPP inmates widely do not receive outside yard time at all, and have limited dayroom (as outlined in detail in the "Programs" section).

The Assessment Team spoke to several staff assigned to MJ 2P (inpatient psychiatric housing), and observed the living conditions for mentally disabled inmates housed within the unit. The staff indicated that they are employed through the UCD system, and the 18 beds contained within the unit are LPS licensed beds. They confirmed that they do not conduct 1-on-1 suicide prevention contacts in that unit, and only provide the 15-minute checks. When asked about the suicide precaution inmates ("green suits") housed in the MJ floor classrooms, they admitted that housing those inmates in classrooms without access to a toilet and other sanitary concerns is not within best operational practices. They acknowledged that housing them in cells with 15 minute checks would certainly be an improvement for their mental stability and overall living conditions. With regard to 2P, all of the inmates were locked in their assigned cells. The Assessment Team did not observe any interaction between staff and the inmates. At the time the Assessment Team was in the unit, there was not any dayroom, exercise yard, or other program activities taking place. Health care staff indicated that the deputy regularly assigned to the unit was on vacation and the position was left vacant and not filled during the duration of the vacation period (2 weeks). The JPS staff did state that if needed the deputies assigned to the medical area of the floor would provide custody/security coverage for the

psychiatric unit. The dayroom area is very small with no equipment or built in apparatus or other features that would seem to suffice as real exercise or program activities. There is a small lounging area (e.g., couch) located in the dayroom. The lighting and mood of the unit seemed somewhat somber. When walking through the unit, it was noticeably quiet. During the 30 or so minutes spent in the unit, very few inmates appeared to be looking through their windows or appeared interested in any interactions taking place in the adjacent nurse's office. Staff indicated that inmates receive access to the dayroom a couple of times each week, but no outside yard. Interestingly, one of the female inmates permanently housed across the hall in 2M (medical inpatient housing) indicated that she rarely gets dayroom, but when she does, she is forced to program in the 2P unit. She said that despite her need to get out of her cell, it is very depressing in 2P. She complained that the unit is always dirty, the inmates seem very distant and depressed, and there are no meaningful activities available there. She claimed that she rarely participates in dayroom anymore. She indicated that it is more depressing to go to 2P then to remain in her cell.

In general, MH clinicians and social workers do not make regular rounds to check on and interact with OPP and other mentally ill inmates housed in the OPP, TSEP, ADSEG and DD units. One of the major complaints the Assessment Team received from the inmates was the isolation and infrequent contact with social workers or other MH staff. Clinicians and social workers for JPS operate under the UCD Health systems Frequency of Services Scale (FOSS). The purpose of the scale is to provide a framework for follow-up care of patients that have been triaged by the JPS clinical staff. The service breakdown is as follows:

- Level I Follow-up / Daily by clinical staff;
  - Patients are those who meet criteria for Welfare and institutions (W&I) 5150 and are either on 2P, on the wait list for 2P, or are 2M suicidal;
- Level II Follow-up / At least once per month;
  - Patients that are discharged from 2P, cleared from 2M suicidal status, cleared from 2P wait list prior to admission, or in need of follow-up related to significant psychiatric history at this jail. Follow-up visit after discharge from 2P, or last clinical contact must be within one-month or sooner if clinically indicated;
- Level III Follow-up / Per MD, at least every 90-days;
  - Patients are open to JPS and receiving medication management services. Follow-up will be determined by JPS physician or clinician if not on medications. This follow-up will be no more than 90-days from MD contact;
- Level IV Initial Assessment with No Planned Follow-up;
  - Patients are assessed by a clinician and are not in need of additional JPS services at this time. These patients are advised to KITE for services as needed.

- Patients may be assigned a different status or more frequent follow-up by the psychiatrist or clinician based on clinical evaluation.

Only inmates housed in the MJ 2 West P psychiatric unit have daily contact with MH staff. Inmates in OPP units are only required to be seen once per month and inmates on medication management are only required to be seen once every 90 days. Inmates interviewed stated that there are delays in receiving psychiatric services at both RCCC and the MJ.

Observing the high number of inmates on suicide precaution (green suits) throughout many of the decks at the MJ was both surprising and alarming. The inmates were housed in recreation/classrooms (just adjacent to the main lobby areas within the decks). More alarming was the manner with which they were housed, and the extended periods of time they remained in the same environment. The inmates are required to sleep on the floor, as there is no bed and only a mattress on the floor. There were serious concerns as inmates had the appearance of being on display for both inmates and staff from the wide-open view as the recreation/classrooms have large windows that run along the entire wall for staff observation. The inmates were isolated with no way to interact with staff or inmates. Some could view the circumstances as the inmates being on "display" for others observation. Due to the Assessment Team's schedules, and the rotating to different areas of the two jails on various days, the team only saw individual inmates housed in these conditions for no more than a couple of days at a time. But many of the staff and inmates interviewed acknowledged that it is a major concern, and some inmates have been housed in those conditions for a week and even two weeks or more, although a few days at most seemed to be the average. The Assessment Team was informed by staff and inmates that inmates have had to defecate on the floors as there is no water or toilet in these rooms, and often the rooms are not clean or sanitary. The inmates have to rely on custody staff to give them access to the restrooms and water. Based on the staffing levels at times there is only one deputy assigned to the unit. The lone deputy must remain in the control room, therefore, if the inmate needs access to the restroom, the deputy must contact another deputy that will provide the inmate access to the restroom. The temporary housing areas do not have a bed, the inmates sleep on a mattress on the floor, there is no table, and therefore they are in essence forced to eat while seated on the floor. On each and every day the Assessment Team was at the MJ, the team observed inmates in these conditions. On numerous occasions there were multiple inmates (3 to 4) in "green suits" in a single recreation/classroom. Staff indicated that the inmates housed in the recreation/classrooms were awaiting placement into the inpatient psychiatric unit located on MJ 2 East 2/P due to a lack of available inpatient psychiatric beds.

It appeared that there was a lack of custody staff as a well as clinicians throughout both jails. Custody and mental health staff, as well as medical personnel corroborated this.

The Assessment Team also observed the medical clinic and pill call process at both the MJ and RCCC. Based on the medication being delivered to the units at the MJ, and the majority of mobility disabled inmates at RCCC housed in MHU and M-Dorm, the Assessment Team did not observe any issues relative to physical access to pill call or medical care.

**Staff Interviews**

The Assessment Team interviewed JPS staff assigned to both the MJ and RCCC.

The team initially observed an LCSW, conducting outpatient initial psychiatric interviews on 5W. He conducted the interview in the open dayroom area, near the staff control booth window. There were 2 inmates within several yards from the interview location. The 2 inmates were walking back and forth in the area. Upon the termination of the JPS interview, the Assessment Team interviewed the LCSW. He explained that after an inmate's initial assessment, they see a psychiatrist every 4-10 weeks. The LCSW takes care of the initial assessment, and then the inmate can submit a HS KITE to be seen again by the LCSW. He admitted that he is not aware of any disabilities, unless he is alerted through the intake screening process via a JPS referral. He indicated that he would contact the Alta Regional Center and write a referral, if the inmate-patient is a past regional center client. In speaking with inmate-patients, he does his best to communicate, and looks for possible signs of suicide. He indicated that he would use written notes when trying to communicate with a deaf/hearing-impaired inmate.

With regard to suicide assessments, the LCSW indicated that the old safety-suit program (whereas inmates wore the "green suits" and were housed in the pods with non-mentally disabled inmates) was abolished 10-12 months earlier. When asked, he stated that nothing should preclude JPS staff from housing overflow psychiatric suicide precaution inmate-patients in a cell with regular observation. He cited a possible problem with that, in that there would be less visibility inside the cell. He acknowledged that the cameras assist with constant observation in the multi-purpose room area (where the "green suits" are often placed). When asked what concerns he has with the usage of the multi-purpose room for "green suits" he cited there is a waitlist; it takes too long to get to the patients; and there is a need for more inpatient beds. He admitted that the practice of having "green suits" sleep on the floor is not feasible, and he has heard of cases where these inmates have defecated on the multi-purpose room floor. He admitted that JPS staffing levels are insufficient, and their workload is as busy at is has been since about 2009/2010. He said a by-product of the lack of staffing is that JPS staff do not get to talk with the patients as soon as they should, and they typically don't get to the inmates until at least several days after the "KITE" is received. When asked, he acknowledged that JPS staff is not consulted to provide clinical input for the inmate disciplinary (write-up) process. The only time JPS is contacted by



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

custody staff is for psychiatric referrals, not discipline-related. He ended the interview by adding that isolation is not helpful to psychiatric patients.

JPS staff at RCCC stated that there are 2 clinicians and one supervising clinician assigned to RCCC. The frequency of MH contacts varies by individual inmate-patients MH needs after the initial MH assessment. The follow-up MH contacts are based on the FOSS. There is no group therapy provided for OPP inmates. One-on-one contact for OPP inmates is typically every 30 days. There are no MH programs available to inmates housed in the OPP unit at RCCC. If an inmate requests MH services by submitting a HS KITE, the timeframe for MH contact is about 2 weeks. Some of the MH (about 30 percent) contacts are conducted adjacent to the "fishbowl" on the Honor Facility.

The Assessment Team interviewed medical staff assigned to the MJ and RCCC jail facilities. In general, medical staff confirmed the practice regarding the HS KITE process. As the aforementioned policy states, inmates can obtain a HS KITE from either their housing deputy or a medical staff member. Again, there is a concern with the confidentiality aspect. The inmate must submit the signed HS KITE's for medical, mental health, and dental requests, and this can be done during pill call, where the nurses can retrieve them either from the unit custody staff or directly from the inmates. Medical staff indicated that the HS KITE's are triaged by a nurse (within 24 hours of receiving the KITE) and appointments are scheduled. A physician, nurse practitioner or registered nurse is responsible for conducting sick calls. Sick call is conducted on a regular weekly basis. Emergencies are handled on a case-by-case basis as appropriate.

The large majority of custody, mental health and medical staff cited a backlog in work or concerns with timely custody and health care responsiveness in large part due to staffing vacancies across all disciplines. They acknowledged that this ultimately adversely affects the health care process.

As mentioned above, the "green suits" being housed in the aforementioned recreation/classrooms on the various decks, create custody and health care concerns for staff.

Most of the staff interviewed were all well aware of the apparent disparity with regard to programming for the different classifications of inmates. Of most concern was the fact that the inmates in administrative segregation do not receive ample out-of-cell time or access to clinical staff, and that inmates assigned to the DD housing unit do not get outside exercise yard time for up to 30 days and do not receive dayroom or out-of-cell time. Even more concerning is that there have been reported cases of inmates being housed on DD status for a 30-day period, then released to general population (or non-specialized housing) for one day before being returned for a second stint in DD housing. Staff members were well aware that OPP inmates receive limited outdoor activities, limited dayroom, and no out-of-cell individual or group therapy at all.

Health care staff acknowledged that there is not a database or disability tracking system available to identify specific disabilities or accommodation needs for health care encounters. Health care staff use the E-Chart and Health Record systems, but with few exceptions, there is no electronic documentation as to some of the specific disabilities and accommodation needs, and health care staff are not commonly logging accommodations provided. Health care staff explained that they generally draw related disability and accommodation information from the initial medical intake screening, from the E-Chart and from progress notes. As stated throughout this report, the current medical intake screening process is not comprehensive. It lacks pertinent testing/evaluations and/or disability-related questions/screening, and the process that is used is not consistent amongst the health care staff.

Some of the housing unit staff interviewed stated that they would be willing to assist inmates in completing the HS KITE request for health care appointments; however, other staff stated that they would refer the inmate to a "houseman" or "trustee", or to another inmate or trustee to assist the inmate in filling out the HS KITE. Many of the staff conveyed much of the same with regard to assisting inmates with a grievance (in the event an inmate wanted to grieve/appeal a health care or other issue), although staff were on average, a little more reluctant to assist with the grievance process.

Other staff interviews provided the following information:

- A JPS referral could be triggered by any of the following; gravely disabled (MH issues), suicidal, and an inmate who has recently been treated for a "5150.";
- JPS staff admitted conducting psychiatric 1-on-1 sessions in main recreation/lobby areas within the MJ;
- A JPS clinician acknowledged that the recreation/classrooms where "green suits" are routinely housed on suicide precaution status are often not clean and contain trash and food on the floors, etc.;
- A JPS clinician assigned to RCCC, stated that OPP inmates must "KITE" for psychiatric services (or be referred by custody or other staff);
- A JPS clinician indicated that HS KITE's are prioritized, with suicidal cases with the highest priority;
- A JPS clinician mentioned that there is no case management, just KITE services;
- JPS clinicians admitted that there are no group services for OPP inmates;
- A JPS clinician stated that 1-on-1 interviews must either be via an inmate HS KITE request or staff referral;
- A JPS clinician (when asked) admitted that there is no evaluation for intellectual disabilities;

- JPS clinicians who were interviewed acknowledged getting calls from Alta Regional Center, but are not aware of any lists or rosters of previous clients;
- JPS clinicians acknowledged conducting welfare checks and chart reviews for inmates identified as past Alta Regional Center consumers;
- A JPS clinician indicated that custody staff determine where prior regional center consumers are housed;
- One of the RCCC JPS clinicians indicated a shortage of staffing at RCCC, and that there are only 2 LCSWs and 1 (or sometimes 2) psychiatrists assigned to RCCC;
- Although doctors appropriately determine which inmates remain in 2E medical housing, and who is removed, medical staff admitted that custody staff sometimes provide input to medical staff;
- When a nurse was asked about encountering an inmate who does not appear to understand, the nurse explained that they would rehouse the inmate to the MJ second floor so that the inmate can be more closely monitored, e.g., MH, Alzheimer's, dementia, and previous regional center consumer;
- An RCCC nurse indicated that ICE inmates have an extra form and more detailed process for medical assessments that are required, and that the medical screening process for non-ICE inmates should be as thorough and comprehensive as that of the ICE medical screening process;
  - ICE inmates are only housed at RCCC (male only);
- An RCCC nurse indicated that only ICE inmates can obtain an outside Optometrist appointment; and
- A deputy assigned to RCCC CBF indicated that the unit houses ROC, OPP, GP, TSEP, DD, and ICE inmates. With regard to staffing, he claimed that JPS staff are sometimes overwhelmed when custody staff have to call on them, and deputies need quicker response time from the JPS staff during MH crisis situations. He believes there needs to be more JPS clinicians hired, and also cited a shortage of custody staff.

**Inmate Interviews**

The Assessment Team also interviewed disabled inmates with various disabilities. Based on these interviews, the inmates claimed they have difficulty accessing health care. Listed below are the specific examples provided during the inmate interviews:

- MJ inmate: The inmate is a permanent wheelchair user, and claims that he has ulcers/sores in his buttocks area. The inmate claims he requires, and has had two separate blow-up cushions to lay on, but they both busted, and he has not received anything since that time. This inmate is a very large-framed individual;
- MJ inmate: The inmate is a permanent wheelchair user, and at the time of the interview, he had been at the jail for several months. He showed the

Assessment Team that his right side foot peg/rest to his wheelchair is missing, and he claims it has been missing since the SCSD detention facilities issued him the wheelchair. He indicated he has requested (in writing) a new right foot peg/rest. He claimed that he initially arrived at the jail with an electric wheelchair, but he was issued the county wheelchair instead, and his wheelchair was confiscated;

- MJ inmate: This inmate is paraplegic and a permanent wheelchair user, and claims to have a vision impairment. He claims he has made numerous attempts to utilize a trapeze device that he claims is available in the second floor medical area. He also stated that staff broke his wheelchair, when they "jammed" his wheelchair into the lift of a wheelchair accessible van. The wheelchair has not been replaced or repaired;

- MJ inmate: This inmate is a permanent wheelchair user, and has had cerebral palsy his entire life. He claims that the medical department is inconsistent with issuance of his "Carnation" milk;

- MJ Inmate: This inmate is a permanent wheelchair user, and has a prosthetic right leg, and his right arm is not functional. He claims that he showers in the unit (second floor) only once per week. He claims a nurse had told him that she would assist him in showering twice per week, but after he filed a grievance, he no longer received any help. He further claimed that he filed a second grievance that he was not receiving assistance with his daily living activities (specifically with showering), and then he began getting assistance with showering once per week. He claimed that a health care manager recently indicated in a grievance response that he would not be receiving any assistance. He also indicated that he has been using the shower in 2M, and still needs assistance, but he is no longer falling from shower chairs, as he was doing before he began showering in 2M;

- MJ inmate: This inmate is a permanent wheelchair user, and suffers from mental illness and depression. He claims that most medical staff are very good, but pointed out that on one occasion he had to lie in his own waste for about 2 hours, and he has had 3 or 4 similar encounters. He said the problems usually occur during the nurse shift change at 7 PM, and the problems or lack of treatment are usually between 7 PM – 10 PM. He claims that despite having been housed at the MJ for nearly a year (at the time of the interview), and despite being prescribed and taking anti-depression medications nightly, he has only seen a psychiatrist on two occasions (and 1 of those times was on his initial arrival date, and the other time was after they had discontinued his medications, which have been restored). He also claimed there are no regular MH interviews with MH staff. He complained that his wheelchair needs to be adjusted. Specifically, the back of the wheelchair and foot peg/rest need to be adjusted, and his feet are "dangling." His right foot is 100 percent non-functional, so he can't put his right foot on the peg/rest. The foot peg/rest

needs to be adjusted to protrude slightly outward so that both feet can rest on it (the wheelchair is designed to have only one long foot peg/rest for both feet). The current adjustment of the wheelchair back and foot peg/rest causes him pain and discomfort. Finally, the inmate reported that many inmates housed in the second floor medical area feel uncomfortable going to staff for any assistance;

- MJ Inmate: This inmate is a dialysis patient and diabetic. The inmate claims that PM nurses sometimes sleep, and at times the emergency call button is turned off or ignored. She claims to have missed a couple of dialysis appointments in the past, and due to complications between the dialysis and diabetes, she was taken to the UCD Medical Center, and spent about 10 days in the hospital;

- RCCC SLF Inmate: This inmate is incontinent and requires and is prescribed diapers. The inmate claims that medical staff only provide her 3 diapers per week. She stated that she needs 5-6 diapers per day. She stated that because she is not provided the diapers she has to resort to using sanitary napkins to absorb her bodily fluids (urine). She further stated that inmates in her dorm complain about the smell when she soils herself because she was not provided the diapers. When the Assessment Team member inquired of medical staff assigned to the facility about the inmate's diapers, the medical staff assigned to the unit was unaware of the inmate being prescribed diapers. When the medical staff queried the inmate's medical record, it was noted that the inmate is prescribed 6 diapers daily;

- MJ 8W Inmate: This inmate is on DD status (for past 20 days), and is a mentally disabled inmate. He claimed that JPS staff interviewed him about his psychiatric medications, but the interview was conducted at the cell door, and was not confidential. He also claimed that he does not receive any group therapy;

- MJ 8W Inmate: This inmate is on TSEP status, and is a mentally disabled inmate. He complained that mental health and medical staff conduct interviews at cell doors (all units). He also indicated that inmates with mental health issues have more difficulty and are not treated fairly by staff. He cited an incident regarding an mentally disabled inmate receiving instructions to "lock-up" was having trouble understanding, and spoke about how staff became angry and did not try to establish any communications or patience. He also stated that "green suits" will also be in the TSEP/ADSEG unit about 30-40 percent of the time, with 4-5 days being the longest duration, but 1-3 days each as more typical;

- MJ 2/P Inmate: This inmate is a psychiatric inpatient inmate. He said that he asked staff about dental, but staff told him dental is only for emergencies, so he never filled out a HS KITE for dental. He said he has never seen a psychiatrist, and there is no group therapy. He also stated that he was on suicide precaution status "green suit" for about 4 days on

the 7th floor. He had to urinate on the classroom floor in the corner of the classroom. He said that staff were not checking on him. A psychiatric staff member came walked by the classroom on a couple of occasions briefly, only to tell him that they were trying to get him rehoused;

- RCCC CBF Inmate: This inmate is mentally disabled, and is in the ROC program. He acknowledged that there are numerous programs available, but he complained that social workers talk to him by using "big words", and he often does not understand them;

- RCCC JKF Inmate: This inmate is mentally disabled and has a speech disability. He complained that there is no interaction with social workers at all, and a named staff member teases him regarding his speech impediment. He also complained that there is not any group therapy offered;

- MJ 3E Inmate: This inmate is mentally disabled (currently OPP). He claimed that while on suicide watch status, and housed in a "rubber room", there was feces, urine, and bloodstains on the floor in the cell, which ultimately caused an infection in his left foot. He claims that his medical records corroborate this. He also stated that psychiatric staff interview him in the main recreation area in front of other inmates;

- MJ 4E Inmate: This inmate is mentally disabled. He indicated that "green suits" are often housed in the multi-purpose/classroom area within the floor/unit, and he has observed these inmates defecate on the floor. He also cited the lack of confidentiality concerning psychiatric interviews;

- MJ 3E Inmate: This inmate is mentally disabled. He claims that despite being on psychotropic medications, a psychiatrist had not been in to see him in the approximate 90 days of his incarceration at the detention facility, and added that medical staff often do not respond to HS KITE's;

- MJ 4E Inmate: This inmate is mentally disabled and currently takes psychotropic medications. He claims that although a psychiatrist used to see him monthly, he has not seen a psychiatrist in about 2 months;

- MJ 3E Inmate: This inmate is mentally disabled (currently on OPP status), and claims he was on a suicide precaution ("green suit") status recently. He complained that he felt as if he had been on display while housed on one of the floor classrooms. He said that staff do not help them, they (OPP inmates) do not feel safe, and inmates on such status must sometimes kick their windows out to get any response from staff. He stated that psychiatrists only check on them for their medications "from a distance", but not in person;

- MJ 3E Inmate: This inmate is mentally disabled (currently on OPP status), and claims he has submitted about 8 HS KITE's for psychiatric services, but was only seen about 3 times.

Other than the inmates housed at RCCC who are in the ROC program almost every inmate interviewed at the MJ and RCCC indicated that there is no group therapy, and several inmates had concerns with what they deemed as

sometimes brief 1-on-1 JPS interviews. When the Assessment Team asked (inmates with known or admitted mental illness) whether they would want to participate in group therapy, most all of the inmates affirmed that they would.

Inmates were well aware of and complained about the lack of confidentiality for medical and mental health encounters, and most had some concerns with their interviews taking place in common areas or at cell doors.

The assessment team also interviewed at least one inmate with mental illness who claimed that a few months earlier he was housed on suicide precaution status ("green suit"), and was housed on one of the deck floors. He claimed that the conditions were dirty and unhealthy, and he felt isolated.

Overall general inmate comments included:

Mental Health:

- Was not aware of the HS KITE process for health care requests;
- JPS HS KITE requests go unanswered;
- They won't see us" unless we fill out a HS KITE, but we get charged a co-pay;
- "LCSW only sees me if I submit a HS KITE";
- Social workers answer HS KITE's, but they will not see us in person;
- Sometimes unable to see a social worker;
- MH visits/appointments are too infrequent.
- No confidentiality with JPS interviews (health care staff talk with inmates at cell doors, inside pods, inside rec/dayroom areas with inmates in the areas, outside by the mailbox in the RCCC fishbowl area);
- No group therapy offered;
- Individual 1-on-1 interviews were sometimes to brief;
- "Was having psychiatric problems and dreams about my deceased son, but it took about 3-4 HS KITE's to be submitted before psych staff saw me";
- Psych visits are sometimes as brief as only 15-30 seconds at the fishbowl;
- Have not seen a psychiatrist about prescribed psychiatric medications;
- OPP inmates not receiving out-of-cell programs;
- Regularly see "green suits" on floor classrooms;
- Don't understand the social workers or other staff;

Medical:

- No confidentiality (health care staff talk with inmates at cell doors, inside pods, inside rec/dayroom areas with inmates in the areas, outside by the mailbox in the RCCC fishbowl area); and
- Was not aware of the HS KITE process for health care requests;

Dental:

- Dental not responding to HS KITE's;
- Was not aware of the HS KITE process for health care requests;

## Conclusion

There are significant flaws in the processes as well as apparent discrimination with regard to equitable programming for MH inpatient and OPP inmates, as well as inmates with disabilities that are housed in medical housing or who are assigned to other units. To ensure nondiscrimination under the ADA, the SCSD detention facilities must ensure that disabled inmates are not subjected to discrimination and they receive equal access to health care services.

Although health care and custody staff should be commended for the hard work they perform, there were alarming observations by the assessment team, and obvious space, access, and accommodation concerns noted, as well as numerous complaints relative to a real or perceived lack of adequate staffing resources, to which (according to numerous staff members) can and has effected access to health care.

The SCSD must ensure nondiscrimination and equal access, and must ensure the following:

Staff must ensure disabled inmates are equally afforded the ability to access medical, dental and mental health services. Reasonable accommodations must also be provided as necessary;
- Operational Orders and CHS policies must be modified as appropriate;
- Confidentiality during medical and JPS inmate encounters;
- Confidentiality regarding staff handling of inmate health care requests (HS KITE's);
  - Unless the policy and practice is modified, and staff are expected to assist to write/scribe/explain documents and processes to inmates, including HS KITE's, staff must ensure the inmates receives assistance from an appropriate staff member;
- Group therapy for all mentally disabled inmates (not just inmates assigned to the ROC program/evaluation);
- Adequate individual therapy (1-on-1 sessions) for mentally ill inmates (not just inmates assigned to the ROC program/evaluation);
- JPS staff must make routine rounds/check for mentally disabled inmates classified as OPP;
- The current UCD FOSS scale of services frequencies that JPS staff must be evaluated;
- Cease temporarily housing "green suit" inmates who are on suicide precaution in the classroom areas on the MJ decks/floors;
- Adequate JPS staffing resources;
- JPS staff must make routine rounds and monitor mentally disabled inmates housed in DD, TSEP, and ADSEG units;

- JPS staff must make routine rounds and monitor mentally disabled inmates classified as OPP;
- The HS KITE response process for mental health and medical requests must be expeditious or within a reasonable timeframe;
- There should be a classification/screening practice to divert mentally disabled inmates to other viable housing options which would be less restrictive or isolated;
- There must not be unnecessary delays or follow-up regarding requests for psychiatric services;
- The intake medical screening and subsequent diagnostic or medical follow-up process (as applicable) must properly identify disabled inmates or determine whether a qualified inmate has an impairment that requires a reasonable accommodation;
- Staff must provide appropriate medical care accommodations for disabled inmates;
- For example, mobility impaired permanent wheelchair users, particularly those housed at the MJ, on the second floor medical unit.  As stated above, some of the issues included; assistance with daily living (showers, bodily fluids), wheelchairs with missing foot peg/rest, wheelchairs in need of adjustment, and use of trapeze device, etc.;
- Inmate orientation must be provided and include detailed instructions on how disabled inmates can access medical, dental, and mental health care;
- As outlined in the training section of this report, staff must receive training regarding ADA Title II, and inmates with disabilities.

### References

**28 CFR § 35.130(a)** requires that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR 35.130(b)(1):** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

**28 CFR 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities;

**28 CFR 35.130(b)(7)** A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Clark v. California settlement agreement.***

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Clark v. California amended March 1, 2002, mandates the following:*

*Medical Care*

*Inmate with developmental disabilities must have access to necessary medical, psychiatric, and dental care in accordance with CCR Title 15, starting at Section 3350.*

*The assigned correctional officer, CC-I, and medical staff at designated DDP institutions will be responsible for assisting DDP inmates in obtaining emergency and routine health care. Assistance may include;*

- *Assistance with completion of sick call requests, including assistance with requesting and obtaining new prescription refills;*

- *Prompt/escorts to medical appointments;*

- *Referral to medical staff if the inmate appears to have symptoms that may require medical care; and*

- *Medical staff must be trained to communicate with developmentally disabled individuals and to gather information necessary to provide medical/psychiatric/dental services.*

***Rasho v. Walker*,** 07-CV-1298 (C.D. Ill.) Class action litigation has been successful at reducing number of hours inmates with mental illness spend in isolation.

**Allegations raised in class complaint (filed in 2007)**

- Lack of adequate treatment;
  - Space for individual or group therapy;
  - Lack of private areas for treatment;
  - Trained and licensed personnel;
  - Hospital level of care;
- Unmonitored use of psychotropic medication;
  - Punitive approach to mental illness;
  - Physical restraints;
  - Crisis cells;
  - Use of fines and segregation; and
  - Physical and verbal abuse by guards;

**Case settled in 2015**

- Hospital for prisoners who need inpatient services;
- Significantly increased staff, including more than 300 new clinical staff and 400 new security staff;
- Construction of four new residential treatment units;
- Drastic improvement of treatment systems; and
- Significant reduction of solitary confinement.
- [www.clearinghouse.net/detail.php?id=12369](http://www.clearinghouse.net/detail.php?id=12369)

*The information below is provided for reference only. This information is provided by recognized expert Bruce C. Gage, M.D. Mr. Gage is an expert in general and forensic psychiatry, and has treated thousands of patients with behavioral disorders. He recently completed a gap analysis of mental health services for a large county's detention facilities which is comparable to the Sacramento County detention facilities, with regard to size, structure, and detention facility sites, as well as the populations of the inmates and staff work force.*

Treatment

The most important populations to treat are those with severe illness and those who represent a danger to self or others by virtue of their mental illness. While crisis response is an important first step, it is only a first step, just as is the case in the treatment of any medical condition. Continued care is necessary.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

In order to provide appropriate care, good assessment in all cases is an indispensable first step. There must be sufficient resource and access to allow for a thorough assessment prior to initiation of treatment, absent an emergency (and then assessment must ensue).

For those with psychotic disorders, highly structured activities and treatment and avoidance of isolation while also limiting stimulation are the key elements in addition to medication. These patients cannot organize themselves and readily fall more deeply into their psychotic thinking when isolated and become more agitated or disorganized when over stimulated. Psychosis itself is a destructive condition that must be alleviated. Such treatment does not seek deep psychological insight but to reduce symptoms, develop self-management skills (e.g. symptom and emotion management), develop capacities to interact sufficiently to get needs met and limit conflict, provide education about mental illness and medications, and expand living skills (activities of daily living, self-care, accessing jail and community services, etc.). It is reasonable for the jail to focus these services on those aspects most relevant to correctional interests: reducing recidivism and jail misbehavior, successful reentry (in that it contributes to reduced recidivism and inmate mortality), treatment adherence (in that it improves all outcomes), and coping with the jail environment. These are not highly technical interventions and do not take extensive resources; most can be done by master's clinicians (social workers, psychologists) or others with special training (recreational therapists, occupational therapists, and bachelor's level staff with appropriate training, experience, and supervision). They are most efficiently delivered in group settings. This necessitates having adequate staff to provide the treatment and to move the inmates as well as policies and procedures to support such activities.

Those with serious mood disorders often need much of the preceding. Those with depression may also require some individual or group treatment focused specifically on depression. There are many "off the shelf" short-term group and individual treatment modules that are readily run in correctional settings. Many of these employ cognitive behavioral therapy but other methods are also effective.

Those with recurrent and severe self-injurious behavior require different approaches. It is essential to be able to develop and implement behavior management plans to decrease the inadvertent reinforcement of such behavior that occurs in the correctional setting. One of the most common dynamics is that when the system is crisis-driven, crises are reinforced, as they are the only sure way to get both correctional and clinical staff to respond. Developing plans to limit this dynamic is important and can be expanded to other populations exhibiting acting out behavior as well. This population also needs interventions focused on self-management rather than the development of insight or addressing psychological traumas, which is beyond the reasonable scope of

what a correctional setting can be expected to offer. There are simple and low cost "off the shelf" treatments for this population suited to the correctional setting.

In order to provide such treatment, which will almost exclusively occur in residential mental health settings, requires about 10 hours of structured activities per week. This can consist of both treatment and other structured activities such as educational services or other correctional programs. It is also necessary for this population to have 10 hours of unstructured out-of-cell time, with others as much as possible, to limit the deleterious effects of isolation and inactivity. Such activities also provide the data for determination of readiness to step down to a lower acuity/security setting.

Restrictive Housing

Those admitted to restrictive housing need to be promptly screened. It is reasonable for nursing staff to conduct the initial screening of those admitted to restrictive housing in order to identify a possible emergency but mental health staff should screen new arrivals by the next working day. Mental health should also do at least weekly rounds in restrictive settings. At a minimum, those identified as suicidal must be appropriately treated and managed and those needing commitment identified and admitted to 8A. Others may be treated in place but consideration for diversion to mental health SMU is something the County should consider in cases involving the SMI. It is especially important to consider this when those with mental illness are deteriorating in this isolated setting prior to becoming so ill that they must be committed. Once the jail staff become aware of their deteriorating condition, a meaningful response of some sort is obligatory.

Medication Monitoring

Psychiatrists must be expected to adhere to the standard of care for medication monitoring. While I saw evidence of some monitoring, there was a clear pattern of failure to adequately monitor those prescribed antipsychotics. Drug levels and labs for mood stabilizers, baseline studies prior to initiating treatment, EKGs for certain medications, etc. need to be done routinely.

Medication administration

Medication administration by nursing staff needs to be standardized and done per community standards. This must include appropriate identification checks. Further, mouth checks for the purpose of establishing adherence should be done by clinical staff, as this is a clinical function. The custody function is subserved by the cell searches detailed above; custody can also perform mouth checks for safety and security reasons.

Confidentiality

Provide for confidentiality in all settings to the maximum degree possible. All written documents including personal health information should be processed by health care staff, including administrative staff (sealed or otherwise protected materials can be handled by any staff, e.g., for the purposes of transport) or custody staff who are bound by the same confidentiality strictures. Patient-clinician encounters should be confidential to the maximum extent possible, absent an identified (not potential) risk. It is reasonable and desirable for officers to be able to observe intake screenings but the content of the conversation should remain confidential. In the case of grievances, they should be marked as medical or mental health and should be so directed and not reviewed by any custody staff.

# Access to Out-of-cell Time (Outside Recreation/Dayroom)

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures applicable to inmate access to out-of-cell time (outside recreation/dayroom), are in: Operations Order 06/10 Recreation, Exercise, and Showering; Draft Operations Order Inmates with Disabilities - ADA, and 1123 Exercising.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1065 Exercise and Recreation, requires that,

> (a) The facility administrator of a Type II or III facility shall develop written policies and procedures for an exercise and recreation program, in an area designed for recreation, which will allow a minimum of three hours of exercise distributed over a period of seven days. Such regulations as are reasonable and necessary to protect the facility's security and the inmates' welfare shall be included in such a program. In Type IV facilities, such a program can be either in-house or provided through access to the community.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, defines exercise as follows:

> "Exercise" means physical exertion of large muscle groups.

Per Operations Order 06/10, Recreation, Exercise, and Showering, all inmates shall receive an exercise program in an area designed for recreation (indoor/outdoor) which will allow a minimum of three (3) hours of exercise distributed over a period of seven (7) days to benefit social, physical and emotional health. All inmates will be allowed to shower upon assignment to a housing unit and at least every other day or more often if possible.

All inmates, regardless of classification or intake housing unit status, shall be given the opportunity for a minimum of three (3) hours of exercise and recreation in a seven (7) day period in an area designed for recreation. The exercise and recreation may be allotted through combined indoor and outdoor recreation periods. Title 15 mandates a minimum of three hours of recreation in seven days; however, the maximum amount of recreation time a housing unit can offer without negatively impacting floor operations should be implemented.

Civil detainees, including Sexually Violent Predator Act (SVPA) detainees, will be allowed more access to recreation, dayroom, showers and telephones than offered to general population inmates, without negatively impacting the safe and efficient operations of the facility. All additional access for civil detainees shall be documented in the unit logbook.


Recreation activities typically will not take place during scheduled or unscheduled lockdowns without supervisor approval. All or part of any recreation and its privileges may be restricted as part of a prescribed punishment determined by a disciplinary proceeding.

Recreation staff develops and distributes recreation schedules to each housing unit. These schedules are ever changing and therefore specific recreation times are not included in the order. Housing unit staff shall make every attempt to follow the schedule.

Recreation staff is responsible for developing, implementing, and supervising a comprehensive recreation program at both facilities. Recreation staff shall monitor any activity, which involves competing for prizes.

Housing unit staff shall log in the logbook the start and end times, any refusals, the type of recreation (indoor/outdoor), and inmate classification if multiple classifications of inmates are housed in a housing unit. Inmates classified, as TSEP shall be given indoor/outdoor recreation alone without any other class of inmate. Inmates classified as ADSEG, PC, GP, or Civil shall be given indoor/outdoor recreation only with inmates within the same classification. Exceptions may exist when inmates or groups of inmates within a classification are unable to recreate together. Inmates on discipline status shall not be scheduled for minimum recreation requirements unless stated in the disciplinary hearing or specified by medical staff.

Indoor and/or outdoor recreation at the MJ and in security housing areas at RCCC may be run between the hours of 0800-2300 hours. Lockdown occurs at 2300 hours each night and no out-of-cell recreation will occur without supervisor approval.

At RCCC, the honor facility and SLF have outdoor recreation "yards" that have minimum lighting. Due to the security and safety issues that may arise, outdoor recreation at these facilities is limited to daylight hours only.

Inmates are to remain inside the prescribed boundaries of the recreation areas, whether indoors or outdoors. Inmates are not allowed to communicate with inmates in other pods/housing units/barracks or with persons outside the facility. Exceptions exist for inmates to communicate by telephone or mail to persons outside the facility.

Housing units that share a recreation area shall coordinate with each other for use of the recreation area. Priority for the use of the recreation area during open periods will be given to inmates who have not yet had the minimum required recreation time. In cell-style housing units, it may be reasonable for housing unit staff to periodically allow inmates access to their cells; however inmates are not allowed into one another's cell.


In cell style housing units, only one (1) pod tier at a time will be allowed to recreate together within their pod. Pods are not allowed to intermingle. All tiers are allowed equal amounts of dayroom time separately.

At the MJ, inmates housed on the inmate worker floor may be allowed to recreate together within their assigned pod.

Only minimum-security inmates at RCCC may be allowed to participate in sporting activities on the athletic fields.

Per Draft Operations Order Inmates with Disabilities - ADA, all inmates shall receive exercise in an area designed for recreation (indoor/outdoor) which will allow for a minimum amount of required exercise distributed over a period of seven (7) days to benefit social, physical and emotional health following Operations Order 6/10, Recreation, Exercise, and Showering.

Per Policy 1123, Exercising, it is policy that each inmate be allowed a minimum of seven (7) hours per week of exercise involving large muscle activity, away from the cell, on a planned, supervised basis.

Examples of large muscle activity include walking, jogging in place, basketball, Ping-Pong, and isometrics. The dayroom adjacent to the cell may be used for this purpose. The dayroom satisfies compliance. Program activities are directly supervised by staff and/or trained volunteers. Television and table games do not satisfy compliance. The use of outside yards, gymnasiums, and multi-purpose rooms for exercising opportunities (i.e. basketball, handball, jogging, running and calisthenics) satisfies compliance, even though the inmate may not take advantage of them.

The Assessment Team reviewed an Inter-Departmental Correspondence dated December 29, 2015, which states,

> "As many of you have heard, changes to our current recreation design are underway. We are implementing a "30/60/90" schedule for both dayroom and outdoor recreation. This entails 30 minutes of recreation for High classified inmates, 60 for Medium, and 90 for Low, once per shift, as minimums. Outdoor recreation will be offered according to the outdoor recreation schedule posted on each floor and will count towards overall out-of-cell time for that shift.

> Increasing out-of-cell time for inmates at the MJ is a primary goal and the above times should be considered minimums. In general, the maximum amount of recreation a housing unit can offer without negatively impacting floor operations should be implemented (Operations Order 6/10).

If your floor completes all minimum recreation programming for the day and you are able to offer more, time should be given to Low and Medium classifications. High-classified inmates will be held to 30 minutes per shift for dayroom and 30 minutes per outdoor rec session to create an incentive to move to a lower classification.

- **Floor 2:**
  Dayroom: Offered once per shift with minimum goal of 30/60/90 based on classification.

  Outdoor Recreation: Offered 3 times a week per outdoor rec schedule with minimum goal of 30/60/90 based on classification.

  2P/2M dayroom and outdoor rec will be offered to those inmates who are deemed fit by Psych/Medical staff. If dayroom/outdoor rec is not afforded to inmates in this area a log book entry will be made indicating the reason. 2E dayroom and outdoor rec will be run by our Rec Tech staff in conjunction with the 2E Officer based on the outdoor recreation schedule.

- **Floors 3-6:**
  Dayroom: Offered once per shift with minimum goal of 30/60/90 based on classification.

  Outdoor Recreation: Offered 3 times a week per outdoor rec schedule with minimum goal of 30/60/90 based on classification.

  Late Night: Low and Medium classified inmates are eligible for "Late Night" dayroom or outdoor recreation as a reward for good behavior.

- **Floors 7-8:**
  Dayroom: Offered once per shift with minimum goal of 30/60/90 based on classification.

  Outdoor Recreation: Offered 3 times a week per outdoor rec schedule with minimum goal of 30/60/90 based on classification.

  All inmates who have not been classed will be treated as a High classified inmate for the purposes of recreation.

  Due to the high number of TSEP, ADSEG, and other classifications, Indoor/Outdoor recreation times will be afforded 24 hours a day. It will be the floor officers' responsibility to ensure that inmates are allowed out during daytime and nighttime hours. When possible, attempts should be



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

made to have small groups or individuals out for outdoor rec during late hours due to noise issues and the surrounding buildings."

The Operation Orders do not contain language or references regarding reasonable accommodations or modifications such as specifically fitted equipment on the exercise yards or sundecks. Many of the yards throughout the facilities contain exercise equipment such as dip bars and pull-up bars.

## Observations

The Assessment Team toured the MJ and RCCC and noted that there are 3 outdoor recreation yards at the MJ. Floors 2, 3 and 4, share a yard, floors 5 and 6 share a yard and floors 7 and 8 share a yard. The inmates housed on floors 3, 5 and 7 must ambulate a flight of stairs to access the yard and the inmates housed on floors 4, 6 and 7 must ambulate up a flight of stairs to access the yard. There is elevator access to each of the yards through the mezzanine level. At RCCC the pods in JKF (Joseph Kievernagel Facility), KBF (Kevin Blount Facility), SBF and CBF each share their own recreation yard that is shared by all 6 pods in each building. At the RCCC SLF all 4 housing units (Ramona, Kinya and Golden Poppy, Camilla) have their own individual yard. For the barracks at RCCC, barracks J, K, A, and B all have an individual yard, barracks C, D, G and H have mini yards adjacent to the barracks, barrack M does not have a yard, however, this barrack has a patio and grass area adjacent to the barrack that is used as a yard, the MHU has an individual yard. At the RCCC honor facility, there is a large recreation yard that provides recreation services for inmates housed there (barracks B, C, D, G, H, and M).

At the MJ, inmates have access to the dayrooms in the unit pods. There is no dayroom in the medical unit at MJ 2 West. There is a dayroom in the MJ 2 West Psych unit. At RCCC's higher security units with celled housing (SBF and CBF), inmates have access to the dayrooms. The pods in units JKF and KBF are dorm housing and inmates have open access to the dayroom most of the day with the exception of lights out and count. The housing units at the SLF at RCCC with the exception of Ramona are dorm housing and inmates have open access to the dayrooms most of the day with the exception of lights out and count. There is no dayroom for the RCCC inmates housed in Ramona. All barracks at RCCC are dorm housing and inmates have open access to the dayroom most of the day with the exception of lights out and count. The MHU at RCCC is an open dorm-housing unit with the exception of 6 cells. The inmates in the open dorm have access to the dayroom most of the day with the exception of lights out and count. The inmates housed in the celled housing in MHU do not have access to the dayroom.

At the MJ the goal for dayroom is to offer dayroom once per shift with a minimum goal of 30/60/90 based on classification. There is no schedule for dayroom use at the MJ. At RCCC for all barracks, JKF, KBF and SLF housing units with the

exception of Ramona, inmates have access to dayroom most of the day and evening as these housing units are dorm type units with an open dayroom. The RCCC staff provided the dayroom schedules for the CBF (Christopher Boone Facility) and SBF units. The schedules are detailed below:

SBF Indoor Recreation Schedule

All GP/PC tiers will be offered indoor recreation 3 times daily. Indoor recreation will be a minimum of 1 hour in length. All ICE detainees and TSEP will be offered indoor recreation daily. Indoor recreation shall be a minimum of 1 hour in length. TSEP indoor recreation should be alternated to vary start times across the population. Reasonable efforts should be made to allow inmates who have participated in outdoor recreation to shower before lockdown. GP/PC Indoor Recreation Hours are 0800-2300. TSEP Indoor Recreation Hours are 0700-2400.

Sunday-Saturday

| | | |
|---|---|---|
| 200-600 Pod | Lower Tiers | Days AM |
| 200-600 Pod | Upper Tiers | Days AM |
| 200-600 Pod | Lower Tiers | Days PM |
| 200-600 Pod | Upper Tiers | Days PM |
| 200-600 Pod | Lower Tiers | Nights PM |
| 200-600 Pod | Upper Tiers | Nights PM |

Sunday-Saturday

| | | |
|---|---|---|
| 100 Pod | County TSEP | All Day |
| 100 Pod | ICE TSEP | All Day |

CBF Indoor Recreation Schedule

All GP/PC/Psych tiers will be offered indoor recreation 3 times daily. Indoor recreation will be a minimum of 1 hour in length. All ROC tiers shall be offered indoor recreation nightly and over the weekend by custody staff. ROC inmates will receive additional indoor recreation during weekday program hours. Indoor recreation shall be a minimum of 1 hour in length. Reasonable efforts should be made to allow inmates who have participated in outdoor recreation to shower before lockdown. Indoor Recreation Hours are 0800-2300.

Sunday-Saturday

| | | |
|---|---|---|
| 200-500 Pod | Lower Tiers | Day Shift - AM |
| 200-500 Pod | Upper Tiers | Day Shift - AM |
| 200-500 Pod | Lower Tiers | Day Shift - PM |
| 200-500 Pod | Upper Tiers | Day Shift - PM |
| 200-600 Pod | Lower Tiers | Night Shift - PM |
| 200-600 Pod | Upper Tiers | Night Shift - PM |



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

The SCSD detention facilities provided the outdoor recreation schedules for the MJ and RCCC (Security Housing) recreation yards.  The schedules are listed below:

MJ Floors 2, 3, and 4 (1st Week of Pay Period)

| 2 East P | Monday | 1400-1700 | |
| | Wednesday | 1400-1700 | |
| | Friday | 1400- 1700 | |
| | | | |
| 3 East | Monday | 0700-1400 | |
| | Wednesday | 1700-2400 | |
| | Thursday | 1100-1500 | Make-up |
| | Saturday | 0700-1500 | |
| | | | |
| 3 West | Sunday | 0700-1500 | |
| | Tuesday | 1500-2300 | |
| | Thursday | 0700-1100 | Make-up |
| | Friday | 0700-1400 | |
| | | | |
| 4 East | Monday | 1700-2400 | |
| | Wednesday | 0700-1400 | |
| | Thursday | 1900-2300 | Make-up |
| | Saturday | 1500-0200 | |

MJ Floors 2, 3, and 4 (2nd Week of Pay Period)

| 2 East P | Monday | 1400-1700 | |
| | Wednesday | 1400-1700 | |
| | Friday | 1400- 1700 | |
| | | | |
| 3 East | Monday | 0700-1400 | |
| | Wednesday | 1700-2400 | |
| | Thursday | 1100-1500 | Make-up |
| | Saturday | 1500-0200 | |
| | | | |
| 3 West | Sunday | 0700-1500 | |
| | Tuesday | 1500-2300 | |
| | Thursday | 0700-1100 | Make-up |
| | Friday | 1700-0200 | |
| | | | |
| 4 East | Monday | 1700-2400 | |
| | Wednesday | 0700-1400 | |
| | Thursday | 1900-2300 | Make-up |
| | Saturday | 0700-1500 | |

MJ Floors 5 and 6 (1st Week of Pay Period)

| | | | |
|---|---|---|---|
| 5 East | Monday | 0700-1500 | |
| | Wednesday | 1500-2300 | |
| | Thursday | 1100-1500 | Make-up |
| | Saturday | 0700- 1500 | |
| | | | |
| 5 West | Sunday | 0700-1500 | |
| | Tuesday | 1500-2300 | |
| | Thursday | 0700-1100 | Make-up |
| | Friday | 0700-1500 | |
| | | | |
| 6 East | Monday | 1500-2400 | |
| | Wednesday | 0700-1500 | |
| | Thursday | 1900-2300 | Make-up |
| | Saturday | 1500-0200 | |
| | | | |
| 6 West | Sunday | 1500-2300 | |
| | Tuesday | 0700-1500 | |
| | Thursday | 1500-1900 | Make-up |
| | Friday | 1500-0200 | |

MJ Floors 5 and 6 (2nd Week of Pay Period)

| | | | |
|---|---|---|---|
| 5 East | Monday | 0700-1500 | |
| | Wednesday | 1500-2300 | |
| | Thursday | 1100-1500 | Make-up |
| | Saturday | 1500- 0200 | |
| | | | |
| 5 West | Sunday | 0700-1500 | |
| | Tuesday | 1500-2300 | |
| | Thursday | 0700-1100 | Make-up |
| | Friday | 1500-0200 | |
| | | | |
| 6 East | Monday | 1500-2400 | |
| | Wednesday | 0700-1500 | |
| | Thursday | 1900-2300 | Make-up |
| | Saturday | 0700-1500 | |
| | | | |
| 6 West | Sunday | 1500-2300 | |
| | Tuesday | 0700-1500 | |
| | Thursday | 1500-1900 | Make-up |
| | Friday | 0700-1500 | |

FINAL REPORT

MJ Floors 7 and 8 (1st Week of Pay Period)

| 7 East | Monday | 0700-1900 | |
| | Wednesday | 1900-0600 | |
| | Thursday | 1100-1500 | Make-up |
| | Saturday | 0700- 1900 | |

| 7 West | Sunday | 0700-1900 | |
| | Tuesday | 1900-0600 | |
| | Thursday | 1700-2200 | Make-up |
| | Friday | 0700-1900 | |

| 8 East | Monday | 1900-0600 | |
| | Wednesday | 0700-1900 | |
| | Thursday | 1200-1700 | Make-up |
| | Saturday | 1900-0600 | |

| 8 West | Sunday | 1900-0600 | |
| | Tuesday | 0700-1900 | |
| | Thursday | 0700-1200 | Make-up |
| | Friday | 1900-0600 | |

MJ Floors 7 and 8 (2nd Week of Pay Period)

| 7 East | Monday | 0700-1900 | |
| | Wednesday | 1900-0600 | |
| | Thursday | 0700-1200 | Make-up |
| | Saturday | 1900- 0600 | |

| 7 West | Sunday | 0700-1900 | |
| | Tuesday | 1900-0600 | |
| | Thursday | 1200-1700 | Make-up |
| | Friday | 1900-0600 | |

| 8 East | Monday | 1900-0600 | |
| | Wednesday | 0700-1900 | |
| | Thursday | 1700-2200 | Make-up |
| | Saturday | 0800-1900 | |

| 8 West | Sunday | 1900-0600 | |
| | Tuesday | 0700-1900 | |
| | Thursday | 2200-0300 | Make-up |
| | Friday | 0700-1900 | |



RCCC JKF - Outdoor Recreation Hours 0800-2300

Minimum Hours of Outdoor Recreation for County Inmates – 7 hours per week.
All county inmates will be offered a minimum of 1 hour of outdoor recreation per
scheduled day.

| 100 Pod | Sunday | A Days | PM |
| | Monday | A Days | AM |
| | Tuesday | A Nights | PM |
| | Wednesday | A/B Days | AM |
| | Thursday | B Days | PM |
| | Friday | B Days | AM |
| | Saturday | A/B Nights | PM |

| 200 Pod | Sunday | A Days | AM |
| | Monday | A Nights | PM |
| | Tuesday | A Days | PM |
| | Wednesday | A Nights | PM |
| | Thursday | B Days | AM |
| | Friday | B Nights | PM |
| | Saturday | B Days | PM |

| 300 Pod | Sunday | A Nights | PM |
| | Monday | A Days | PM |
| | Tuesday | A Days | AM |
| | Wednesday | A/B Days | PM |
| | Thursday | B Nights | PM |
| | Friday | B Days | PM |
| | Saturday | B Days | AM |

| 400 Pod | Sunday | A Nights | PM |
| | Monday | A Days | PM |
| | Tuesday | A Days | AM |
| | Wednesday | A/B Days | PM |
| | Thursday | B Nights | PM |
| | Friday | B Days | PM |
| | Saturday | B Days | AM |

| 500 Pod | Sunday | A Days | PM |
| | Monday | A Days | AM |
| | Tuesday | A Nights | PM |
| | Wednesday | A/B Days | AM |
| | Thursday | B Days | PM |
| | Friday | B Days | AM |
| | Saturday | A/B Nights | PM |



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

| 600 Pod | Sunday | A Days | AM |
|---------|--------|--------|-----|
| | Monday | A Nights | PM |
| | Tuesday | A Days | PM |
| | Wednesday | A Days | PM |
| | Thursday | B Days | AM |
| | Friday | B Nights | PM |
| | Saturday | B Days | PM |

RCCC KBF - Outdoor Recreation Hours 0800-2300

Minimum Hours of Outdoor Recreation for County and ICE Inmates/Detainees – 7 hours per week. All county inmates and ICE detainees will be offered a minimum of 1 hour of outdoor recreation per scheduled day.

| 100 Pod | Sunday | ICE/PC | A Days | PM |
|---------|--------|--------|--------|-----|
| | Monday | ICE/PC | A Days | AM |
| | Tuesday | ICE/PC | A Nights | PM |
| | Wednesday | ICE/PC | A/B Days | AM |
| | Thursday | ICE/PC | B Days | PM |
| | Friday | ICE/PC | B Days | AM |
| | Saturday | ICE/PC | A/B Nights | PM |

| 200 Pod | Sunday | County PC | A Days | AM |
|---------|--------|-----------|--------|-----|
| | Monday | County PC | A Nights | PM |
| | Tuesday | County PC | A Days | PM |
| | Wednesday | County PC | A Nights | PM |
| | Thursday | County PC | B Days | AM |
| | Friday | County PC | B Nights | PM |
| | Saturday | County PC | B Days | PM |

| 300 Pod | Sunday | ICE GP | A Nights | PM |
|---------|--------|--------|----------|-----|
| | Monday | ICE GP | A Days | PM |
| | Tuesday | ICE GP | A Days | AM |
| | Wednesday | ICE GP | A/B Days | PM |
| | Thursday | ICE GP | B Nights | PM |
| | Friday | ICE GP | B Days | PM |
| | Saturday | ICE GP | B Days | AM |

| 400 Pod | Sunday | ICE GP | A Nights | PM |
|---------|--------|--------|----------|-----|
| | Monday | ICE GP | A Days | PM |
| | Tuesday | ICE GP | A Days | AM |
| | Wednesday | ICE GP | A/B Days | PM |
| | Thursday | ICE GP | B Nights | PM |
| | Friday | ICE GP | B Days | PM |
| | Saturday | ICE GP | B Days | AM |

FINAL REPORT



| 500 Pod | Sunday | ICE/Sureno GP | A Days | PM |
| | Monday | ICE/Sureno GP | A Days | AM |
| | Tuesday | ICE/Sureno GP | A Nights | PM |
| | Wednesday | ICE/Sureno GP | A/B Days | AM |
| | Thursday | ICE/Sureno GP | B Days | PM |
| | Friday | ICE/Sureno GP | B Days | AM |
| | Saturday | ICE/Sureno GP | A/B Nights | PM |

| 600 Pod | Sunday | County PC | A Days | AM |
| | Monday | County PC | A Nights | PM |
| | Tuesday | County PC | A Days | PM |
| | Wednesday | County PC | A Days | PM |
| | Thursday | County PC | B Days | AM |
| | Friday | County PC | B Nights | PM |
| | Saturday | County PC | B Days | PM |

RCCC SBF - GP/PC Outdoor Recreation Hours 0800-2300. TSEP Outdoor Recreation Hours 0700-2400. TSEP County Inmates 2 hours per week. Other county inmates 3 hours per week. ICE detainees 5 hours per week. All ICE detainees and TSEP county inmates will be offered a minimum of 1 hour of outdoor recreation per scheduled day. All GP/PC county inmates will be offered a minimum of 1.5 hours of outdoor recreation per scheduled day.

| 100 Pod | Sunday | ICE/SMU | A Days | AM |
| | Monday | ICE/SMU | A Nights | PM |
| | Tuesday | ICE/SMU | A Days | PM |
| | Wednesday | County TSEP | All Day | |
| | Thursday | ICE/SMU | B Nights | PM |
| | Friday | ICE/SMU | B Days | AM |
| | Saturday | County TSEP | All Day | |

| 200 Pod | Lower Monday | GP | A Days | AM |
| | Upper Monday | GP | A Days | AM |
| | Lower Thursday | GP | B Days | PM |
| | Upper Thursday | GP | B Days | PM |

| 300 Pod | Lower Sunday | GP | A Days | PM |
| | Upper Sunday | GP | A Days | PM |
| | Lower Tuesday | GP | A Nights | PM |
| | Upper Tuesday | GP | A Nights | PM |

| 400 Pod | Lower Monday | GP | A Days | AM |
| | Upper Monday | GP | A Days | AM |
| | Lower Friday | GP | B Days | PM |



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

|  |  |  |  |  |
|--|--|--|--|--|
|  | Upper Friday | GP | B Days | PM |
| 500 Pod | Lower Sunday | GP | A Nights | PM |
|  | Upper Sunday | GP | A Nights | PM |
|  | Lower Thursday | GP | B Days | AM |
|  | Upper Thursday | GP | B Days | AM |
| 600 Pod | Lower Tuesday | PC | A Days | AM |
|  | Upper Tuesday | PC | A Days | AM |
|  | Lower Friday | PC | B Nights | PM |
|  | Upper Friday | PC | B Nights | PM |

RCCC CBF - Outdoor Recreation Hours 0800-2300. County Inmates 3 hours per week. ICE detainees 5 hours per week. ROC inmates will receive additional outdoor recreation during weekday program slots. All other inmates will be offered a minimum of 1 hour of outdoor recreation per scheduled day. ICE detainees on restriction are required to be offered outdoor recreation 5 days a week unless outdoor recreation is specifically taken as part of the disciplinary process. ICE/overflow outdoor recreation time slots are to be used for detainees on restriction or for those housed in 200-pod overflow as required.

|  |  |  |  |  |
|--|--|--|--|--|
| 100 Pod | Disciplinary Isolation No Yard |  |  |  |
| 200 Pod | Monday | ICE/Overflow | A Nights | PM |
|  | Monday | ICE/Overflow | B Nights | PM |
|  | Tuesday | ICE/Overflow | A Days | AM |
|  | Tuesday | ICE/Overflow | A Days | AM |
|  | Wednesday | ICE/Overflow | A/B Days | PM |
|  | Wednesday | ICE/Overflow | A/B Days | PM |
|  | Thursday | ICE/Overflow | B Nights | PM |
|  | Thursday | ICE/Overflow | B Nights | PM |
|  | Friday | ICE/Overflow | B Nights | PM |
|  | Friday | ICE/Overflow | B Nights | PM |
| 300 Pod | Lower Sunday | PC | A Days | PM |
|  | Upper Sunday | PC | A Days | PM |
|  | Lower Tuesday | PC | A Nights | PM |
|  | Upper Tuesday | PC | A Nights | PM |
|  | Lower Friday | PC | B Days | AM |
|  | Upper Friday | PC | B Days | AM |
| 400 Pod | Lower Sunday | Psych | A Nights | PM |
|  | Upper Sunday | Psych | A Nights | PM |
|  | Lower Thursday | Psych | B Days | AM |
|  | Upper Thursday | Psych | B Days | AM |

|          | Lower Saturday  | Psych | B Days    | AM |
|----------|-----------------|-------|-----------|----|
|          | Upper Saturday  | Psych | B Days    | AM |
| 500 Pod  | Lower Monday    | GP    | A Days    | PM |
|          | Upper Monday    | GP    | A Days    | PM |
|          | Lower Wednesday | GP    | B Nights  | PM |
|          | Upper Wednesday | GP    | B Nights  | PM |
|          | Lower Saturday  | GP    | B Days    | PM |
|          | Upper Saturday  | GP    | B Days    | PM |
| 600 Pod  | Lower Sunday    | ROC   | A Days    | AM |
|          | Upper Sunday    | ROC   | A Days    | AM |
|          | Monday          | ROC   | A Days    | AM |
|          | Tuesday         | ROC   | A Days    | PM |
|          | Wednesday       | ROC   | A/B Days  | AM |
|          | Thursday        | ROC   | B Days    | PM |
|          | Friday          | ROC   | B Days    | PM |

The Assessment Team observed the following recreation equipment on each individual yard and the MJ and RCCC:

- MJ Floors 2, 3, and 4 – Basketball Hoop
- MJ Floors 5 and 6 –Basketball Hoop
- MJ Floors 7 and 8 Basketball Hoop

All housing units on the MJ floors 3-8 have an indoor recreation area equipped with a pull-up bar and dip bar, however, the indoor recreation area is not used.

- RCCC MHU yard is a small concrete and grass yard with no exercise equipment. The MHU yard is mostly grass with a small concrete section near the doorway. The only accessible area of the yard is the small concrete area near the doorway.
- RCCC M-Dorm Grassy area and patio are used as a yard with no exercise equipment.
- RCCC A, B, J and K Barracks yards have basketball and volleyball and tables.
- RCCC Kinya, Golden Poppy, Camellia yards have basketball and volleyball and tables.
- RCC SLF has an indoor recreation area with a treadmill and 12 exercise machines. Inmates housed in Camellia, Golden Poppy and Kinya use this indoor recreation area.
- RCCC Ramona yard has no exercise equipment.
- RCCC CBF and SBF yards have a ping pong table, basketball and 3 dip and pull-up bar combos.
- RCCC JKF and KBF have 3 dip and pull-up bar combos.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- RCCC Main Yard is a large exercise yard with handball courts, basketball courts, baseball/softball field, soccer field, pull-up bars, dip bars, push-up bars, horseshoe pits, and a running track. The main yard is not accessible to disabled inmates who are fulltime/part-time wheelchair users.

The goal for outside recreation at the MJ is, 30 minutes for high custody inmates, 60 minutes for medium custody inmates and 90 minutes for low custody inmates per session. At RCCC (JKF, KBF, SBF and CBF) all county inmates are offered a minimum of 1 hour of outdoor recreation per scheduled day. The goal for dayroom at the MJ is 30 minutes for high custody inmates, 60 minutes for medium custody inmates and 90 minutes for low custody inmates per session. Some housing units can offer dayroom daily based on the number of separate groups. Specialized units (TSEP, ADSEG, units that house multiple custody classifications) cannot offer dayroom daily, as these inmates require separate dayroom time. The inmates housed in the RCCC honor facility, barracks and SLF are offered recreation yard as time allows. For barracks A, B J, and K recreation yard is usually provided on alternate a.m. and p.m. shifts. For the Ramona unit in SLF inmates are allowed 1 hour of yard per session.

At the MJ staff enter out-of-cell activity into a tracking system designed to track compliance with out-of-cell time. The deputies check inmates out as dayroom or outside recreation in the WEPJPF recreation tracking system. When the inmates return to their cell the deputy checks them in, and the system tracks the out-of-cell time (dayroom and outside recreation). If an inmate is returned to his/her cell and/or leaves the dayroom or recreation yard the deputy reflects this and the system does not count the time in cell as part of the out-of-cell activity. The recreation tracking system was fully placed on line February 2016.

The Assessment Team requested and was provided the following information/data from the recreation tracking system. A detailed report reflecting the inmates' names, housing, time dayroom program was provided (beginning time and ending time), time outside recreation was provided (beginning time and ending time) or if the inmate refused for the following pods and time periods (weeks of March 20th, April 17th, May 8th, and June 26th) for the following housing areas 2 West Medical and Psych, 2 East 100/200/300, 3 West 300, 3 East 200, 4 East 300, 5 East 300, 6 West 300, 7 West 100/300, and 8 West 300/400.

The SCSD detention facilities provided the following, a detailed excel spreadsheet listing the inmates XREF, ShiftStart, ShiftName, DayRoomGoal, DayRoomOffered, DayRoomActual, RecRoomGoal, RecRoomOffered, RecRoomActual, Facility, Area, and pod for the weeks requested.

Listed below is a summary of the data:

2 West M/P – There are 1,471 entries (1,009 for P and 462 for M). Of the 1,471 entries 1,383 reflect a dayroom goal, with 26 entries reflecting that the

goal for dayroom was met. Of the 1,471 entries, zero reflect a RecRoomGoal and that recreation was offered or provided.

2 East 100 (designated wheelchair housing) – There are 273 entries. Of the 273 entries 215 reflect a dayroom goal, with 159 entries reflecting that the goal for dayroom was met. Of the 58 entries where no dayroom goal is noted, 47 reflect that dayroom was provided. Of the 273 entries, zero reflect a RecRoomGoal and that recreation was offered or provided.

2 East 200 (designated medical) – There are 1,244 entries. Of the 1,244 entries 962 reflect a dayroom goal, with 582 entries reflecting that the goal for dayroom was met. Of the 281 entries where no dayroom goal is noted, 184 reflect that dayroom was provided. Of the 1,244 entries, 19 reflect that recreation was provided. Of the 1,244 entries, 269 reflect a RecRoomGoal with zero reflecting that recreation room was offered or provided.

2 East 300 (designated medical) – There are 1,084 entries. Of the 1,084 entries, 850 reflect a dayroom goal, with 457 entries reflecting that the goal for dayroom was met. Of the 234 entries where no dayroom goal is noted, 105 reflect that dayroom was provided. Of the 1,084 entries, 16 reflect that recreation was provided. Of the 1,084 entries, 219 reflect a RecRoomGoal with zero reflecting that recreation room was offered or provided.

2 East 300 (designated medical) – There are 1,084 entries. Of the 1,084 entries, 850 reflect a dayroom goal, with 457 entries reflecting that the goal for dayroom was met. Of the 234 entries where no dayroom goal is noted, 105 reflect that dayroom was provided. Of the 1,084 entries, 16 reflect that recreation was provided. Of the 1,084 entries, 219 reflect a RecRoomGoal with zero reflecting that recreation room was offered or provided.

3 East 200 (designated housing P.C.) – There are 3,543 entries. Of the 3,543 entries, 2,773 reflect a dayroom goal with 2,141 reflecting that the goal for dayroom was met. Of the 771 entries where no dayroom goal is noted, 429 reflect that dayroom was provided. Of the 3,543 entries, 460 reflect that recreation was provided. Of the 3,543 entries, 758 reflect a RecRoomGoal with 326 reflecting that recreation room goal was met. Of the 2,785 entries where no recreation goal is noted, 122 entries reflect recreation room was provided.

3 West 300 (designated housing OPP) – There are 4,094 entries. Of the 4,094 entries, 3,192 reflect a dayroom goal with 939 reflecting that the goal for dayroom was met. Of the 902 entries where no dayroom goal is noted,



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

489 reflect that dayroom was provided. Of the 4,094 entries, 22 reflect that recreation was provided.

4 East 300 (designated housing P.C.) – There are 3,489 entries. Of the 3,489 entries, 2,705 reflect a dayroom goal with 2,010 reflecting that the goal for dayroom was met. Of the 784 entries where no dayroom goal is noted, 410 reflect that dayroom was provided. Of the 3,489 entries, 282 reflect that recreation was provided. Of the 3,489 entries, 736 reflect a RecRoomGoal with 109 reflecting that recreation room goal was met. Of the 2,753 entries where no recreation goal is noted, 170 entries reflect recreation room was provided.

5 East 300 (designated housing G.P.) – There are 3,363 entries. Of the 3,363 entries, 2,573 reflect a dayroom goal with 1,877 reflecting that the goal for dayroom was met. Of the 791 entries where no dayroom goal is noted, 645 reflect that dayroom was provided. Of the 3,363 entries, 345 reflect that recreation was provided. Of the 3,363 entries, 697 reflect a RecRoomGoal with 306 reflecting that recreation room goal was met. Of the 2,666 entries where no recreation goal is noted, zero entries reflect recreation room was provided.

6 West 300 (designated housing G.P.) - There are 4,300 entries. Of the 4,300 entries, 3,169 reflect a dayroom goal with 1,868 reflecting that the goal for dayroom was met. Of the 1,141 entries where no dayroom goal is noted, 663 reflect that dayroom was provided. Of the 4,300 entries, 281 reflect that recreation was provided. Of the 4,300 entries, 869 reflect a RecRoomGoal with 159 reflecting that recreation room goal was met. Of the 3,431 entries where no recreation goal is noted, 61 entries reflect recreation room was provided.

7 West 100 (designated housing female G.P.) - There are 3,484 entries. Of the 3,484 entries, 2,698 reflect a dayroom goal with 1,853 reflecting that the goal for dayroom was met. Of the 786 entries where no dayroom goal is noted, 436 reflect that dayroom was provided. Of the 3,484 entries, 449 reflect that recreation was provided. Of the 3,484 entries, 738 reflect a RecRoomGoal with 220 reflecting that recreation room goal was met. Of the 2,746 entries where no recreation goal is noted, 139 entries reflect recreation room was provided.

7 West 300 (designated housing female P.C., OPP, TSEP, ADSEG, G.P.) - There are 2,007 entries. Of the 2,007 entries, 1,524 reflect a dayroom goal with 395 reflecting that the goal for dayroom was met. Of the 484 entries

where no dayroom goal is noted, 200 reflect that dayroom was provided. Of the 2,007 entries, 80 reflect that recreation was provided. Of the 2,007 entries, 417 reflect a RecRoomGoal with 22 reflecting that recreation room goal was met. Of the 1,524 entries where no recreation goal is noted, 22 entries reflect recreation room was provided.

8 West 300 (designated housing ADSEG, TSEP.) - There are 1,335 entries. Of the 1,335 entries, 1,018 reflect a dayroom goal with 224 reflecting that the goal for dayroom was met. Of the 317 entries where no dayroom goal is noted, 90 reflect that dayroom was provided. Of the 1,335 entries, 7 reflect that recreation was provided. Of the 1,335 entries, 279 reflect a RecRoomGoal with 2 reflecting that recreation room goal was met. Of the 1,056 entries where no recreation goal is noted, 5 entries reflect recreation room was provided.

8 West 400 (designated disciplinary housing) - There are 691 entries. Of the 691 entries, 616 reflect inmate isDiscipline, 224 reflect a dayroom goal with zero reflecting that the goal for dayroom was met. Of the 466 entries where no dayroom goal is noted, 2 reflect that dayroom was provided. Of the 691 entries, zero reflect that recreation was provided. Of the 691 entries, 63 reflect a RecRoomGoal with zero reflecting that recreation room goal was met. Of the 628 entries where no recreation goal is noted, zero entries reflect recreation room was provided.

## Staff Interviews

During the Assessment Team interviews, the MJ recreation staff stated that recreation staff conducts yard activities for the inmates. These yard activities include; organized basketball, handball, football and soccer games, corn toss, and wellness activities (bodyworks). In addition, they coordinate in-house exercise activities. The yard activities are provided to inmates housed on the 3rd, 4th, 5th and 6th floor. They are not provided to inmates housed on the 2nd or 8th floor. The in-house exercise activities are provided to inmates housed on all floors.

The RCCC recreation staff stated that the recreation staff coordinates indoor and outdoor ball activities for male and female inmates for all RCCC outdoor recreation yards. For the females, recreations staff also provide an exercise program. For inmates housed in the honor facility, there is a walking program that is facilitated by recreation staff in addition to the yard activities.

During the Assessment Team interviews housing unit deputies reported that inmates do not always get yard. They may get it once a week. And 2 West does not run outdoor recreation, as inmates can't climb the stairs. The housing unit deputies stated that the impediment in providing the required outdoor recreation

time to inmates is the shortage of staff. The MJ staff stated that staffing for the units is typically 2 deputies in each unit (one in control and one on the floor). However, it is common for there to be only 1 housing unit deputy. This is a result of staffing vacancies due to sick calls, vacation, vacant positions, medical transports etc. When there is only 1 deputy per housing unit, the deputy must remain in the control room. This impacts the ability to provide programing for inmates due to a lack of required custody supervision. The MJ staff reported that at times there have been multiple housing units with only 1 deputy in the control room. The staffing in the MJ 2 East is only 1 deputy; therefore, in order to provide security coverage for escorts to the recreation yard a deputy from the medical unit 2 West is required. When asked how inmates who could not ambulate the stairs to access the yard would be accommodated, more than half of the deputies interviewed were not aware that disabled inmates could be accommodated by allowing them to use the elevator via the mezzanine level to access the yard.

Custody staff stated that inmates on disciplinary isolation do not receive access to dayroom or outside recreation and are only allowed out of their cell for a 15-minute shower every other day. Staff stated that inmates could remain in disciplinary isolation for the time imposed by the disciplinary hearing officer. If an inmate remains in disciplinary isolation for more than 30 days, staff is required to notify the facility commander. Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1080 Rules and Disciplinary Penalties requires that: if an inmate is on disciplinary isolation status for 30 consecutive days there shall be a review by the facility manager before the disciplinary isolation status is continued. This review shall include a consultation with health care staff. Such reviews shall continue at least every fifteen (15) days thereafter until the disciplinary status has ended. Staff stated that a practice exists that if an inmate is approaching the 30th day in disciplinary isolation, the inmate is removed from disciplinary isolation for one day and then placed back on disciplinary isolation again. This eliminates the requirements of title 15 stated above. The Assessment Team asked a custody staff member how many cycles they recall this practice being followed with an inmate. They stated 2 cycles (60 days).

Custody staff specifically assigned to MJ 2/M stated that inmates housed in the unit do not receive outside exercise/recreation opportunities.

A deputy assigned to MJ 3W acknowledged that OPP inmates are housed in pod 300. He stated that inmates housed in pods 100 and 200 are out of the cell "pretty much all of the time", but the OPP inmates classified as high security may get 30 minutes of dayroom on some days, medium security OPP inmates may get an hour on some days, and civil commitments may get 1-1.5 hours on some days. With regard to outside exercise yard, he indicated that non-OPP inmates

(pods 100 and 200) receive exercise yard once per week, but OPP inmates only receive yard once every 2 weeks.

**Inmate Interviews**

During the inmate interviews the inmates reported the following information regarding access to the yard and dayroom:

- MJ 2 West M – A female inmate housed in the medical unit claims she has to use the psych dayroom (she does not live in that area and is not a psych inmate). Stated that using the psych dayroom in front of all of the psych inmates poses a problem to her because she is emotionally stressed because of her severe dialysis condition as well as the seriousness of her diabetes. Claims that for months she was never offered dayroom at all and that she began getting dayroom (but only in the psych area) about 2 month before the Assessment Team interviews at the jail. Stated that a particular deputy on PM shift offers dayroom nightly, and the other deputy on the PM shift offers dayroom sometimes. Also stated that the AM/afternoon shift does not offer dayroom at all. Stated that she has never been offered yard.
- MJ 2 West P - Inmate stated that dayroom is offered 1 to 2 times per week for 15-30 minutes. Stated he has never been offered yard.
- MJ 2 West P - Inmate housed in 2 West Psych stated that dayroom is offered 30 minutes every other day. He stated he has never been offered yard.
- MJ 2 West P - Inmate stated that staff does not offer dayroom or yard.
- MJ 2 West P Inmate - This inmate is a psychiatric inpatient, and complained that he has never been offered outside exercise yard, and is only offered dayroom every other day (AM shift) for about 30 minutes. He stated that there is no dayroom offered for the PM shift, and there are no other programs of any type offered.
- MJ 2 West M - This inmate is a permanent wheelchair user, and complained that he has never been offered outside exercise yard.
- MJ 2 East Pod 100 (wheelchair) - Inmate claims he has been offered outside recreation once in 16 months. Claims the Coach/Recreation Technician tries to pacify the inmates with movies. Stated dayroom is provided for about 2 hours on dayshift and sometimes 1 to 2 hours at night.
- MJ 2 East Pod 100 (wheelchair) - Inmate claims he has never been offered yard and wants to go. Claims he is provided dayroom for about 1 hour on the day shift and 1 hour on the night shift.
- MJ 2 East Pod 100 (wheelchair) - Inmate claims he has never been to yard. Claims he is provided about 1 to 1.5 hours of dayroom each day.
- MJ 2 East Pods 200/300 - Inmates stated that yard is not offered and dayroom depends on the shift working. At times dayroom is offered very late at night (midnight). There is a mixture of classifications (TSEP, PC, and GP) that have to be accommodated for dayroom.

- MJ 3 West – Inmates in the OPP overflow stated that outside recreation is offered once a month. GP inmates stated yard is offered 1 time a week for 30 minutes. Dayroom is offered 30/60 minutes 2 times a day. Inmates in the workers unit stated that dayroom is open all day and yard 2 times a week. Some of the OPP inmates were also frustrated with the lack of activities afforded to them during dayroom time, including a lack of the same equal access to reading materials and board games as the non OPP inmates housed in the same pod receive.
- MJ 3- Dayroom is on average 1-1.5 hours per day on the day shift, but occasionally offered on PM shift. Yard is offered on average once per week on day shift.
- MJ 4 West – Dayroom is offered 2 times a day for 30/60 minutes. Yard is random, sometimes 2 times a week for an hour and sometimes once a week for an hour.
- MJ 4 East - Dayroom is offered 2 times a day for 30/60 minutes. Yard is random, sometimes 2 times a week for an hour, and sometimes once a week for an hour. An inmate claimed that yard was only offered 2 times in 6 months.
- MJ 5 West - Dayroom is offered 2 times a day for 30/60 minutes; however at times dayroom is offered late night (0200). Yard is offered 1 time a week for an hour.
- MJ 5 East – Dayroom is offered on average 2 times daily, 1 hour on day shift and 1 hour on PM shift. Yard is offered on average twice per week for 1 hour each, and generally rotates between shifts. A couple of inmates complained that sometimes yard is offered very late at night or very early in the morning (0100 hours).
- MJ 6 West - Dayroom is offered 2 times a day for 30/60 minutes; however at times dayroom is offered late night (0100-0200). Yard is offered 1 time a week for an hour and sometimes not at all.
- MJ 6 East – Dayroom is offered on average 1 hour on day shift and 1 hour on PM shift on most days (sometimes not on weekends). Yard is offered on average once per week for 1 hour (various times), but recently they have occasionally received it twice per week.
- MJ 7 West – For Pod 100, inmates claim that dayroom is offered during morning/afternoon shift between one to 3 days per week, for about 45 minutes to 90 minutes each. Dayroom is rarely offered during the evening shift. Outside exercise yard is offered about once per week (usually on Sundays) for about one hour. For Pod 200, inmates claim dayroom is offered between one to 2 times per day (no set time schedule) for about 60-90 minutes each (sometimes morning/day shift, and sometimes in the evening). Outside exercise yard is provided either once or twice per week, for about 60 minutes each. For Pod 300, inmates claim that dayroom is offered for about 60 minutes each day (sometimes during

morning/afternoon shift, and sometimes during evening shift). Outside exercise yard has not been offered in the last 2 months.

- MJ 7 East - Dayroom is offered 30/60 minutes, however at times dayroom is offered late night (midnight). Yard is not offered.
- MJ 8 West – No dayroom or yard offered for DD inmates in Pod 400. TSEP Pod 300 was offered dayroom twice. Dayroom for the other pods is offered on average 30 minutes per day on day shift, and 2 nights per week for 30 minutes each. No yard information.
- MJ 8 East - Dayroom is offered 1 time a day or every other day for 30/60 minutes, however at times dayroom is offered late night (0100). Yard is offered 1 time a week for an hour. One inmate stated that yard has only been offered 2-3 times in the past 2 months.
- RCCC SLF – Inmates housed in Kinya, Camellia and Golden Poppy stated they have access to the dayroom and yard most of the day. Inmates housed in Ramona do not have access to a dayroom. The inmates stated that they are offered yard every day for 1 hour.
- RCCC MHU – Inmates stated they have access to the small yard most of the day. They also stated they can go to the main yard; however, it is too far to walk.
- RCCC M-Dorm – Inmates stated they have access to the small yard for several hours daily on day shift, and up to 2 hours daily on PM shift. They also stated they can go to the main yard for about 45-60 minutes daily on day shift;
- RCCC A, B, J and K Barracks – Inmates have open access to dayroom all day. Inmates stated they have access to the yard 4 to 6 hours every day.
- RCCC C, D, G and H Barracks – Inmates have access to dayroom all day. Access to the small yards is 2-4 hours a day. Access to the main yard is when recreation staff provides access.
- RCCC KBF, SBF, JKF and CBF –Dayroom access is consistent with dayroom schedule. Yard access is consistent with yard schedule. CBF Pod 400 (OPP Inmates) are offered dayroom on average twice per day (1 hour each) on day shift (occasionally 1.5 hours), and on PM shift sometimes about 1 hour after the evening meal. Yard is offered on average 1-2 times weekly for about 1.5 hours each on day shift, and sometimes on Sunday evening for about 1.5 hours.

## Conclusions:

There are significant flaws in the processes as well as discrimination with regard to equitable programming for disabled inmates. To ensure nondiscrimination under the ADA, the SCSD detention facilities must ensure that disabled inmates receive equivalent exercise/yard time and access to fitted exercise equipment.

Disabled inmates housed in MJ West M/P are not being provided equal access to the outside recreation yard relative to all other inmates housed in the MJ. This is



supported by the outside recreation tracking data provided by SCSD detention facilities.

Disabled inmates housed in 2 East Pod 100 (wheelchair users) are not being provided equal access to the outside recreation yard relative to all other inmates housed in the MJ. This is supported by the outside recreation tracking data provided by SCSD detention facilities.

Disabled inmates housed in 2 East who are not able to ambulate stairs to access the yard are not being provided equal access to the outside recreation yard relative to all other inmates housed in the MJ. This is supported by the outside recreation tracking data provided by SCSD detention facilities.

The staffing levels at the MJ are impacting the ability for staff to provide the required out-of-cell time (dayroom and outdoor recreation) for disabled inmates.

When disabled mentally ill inmates are found guilty of disciplinary write-ups and are placed in disciplinary isolation by the disciplinary hearing official, they are completely isolated from interactions with others and are not allowed access to dayroom or yard for up to 30 days. It is also a practice to release an inmate for 1 day and return them to disciplinary isolation for 60 days. These inmates are only allowed outside their cell for 45 minutes in a 7-day period. If the reason for the misconduct is due to mental illness, these inmates are being punished and disciplined for their disability, when instead they need to be provided with necessary mental health treatment. In the GAP Analysis of Mental Health Services Santa Clara County Jails, Bruce C. Gage, M.D., states, "It is also vitally important to recognize that some mentally ill that may score at low classification security levels may nonetheless be quite dangerous, especially until treated, and this must be accommodated as well – but not through the vehicle of infraction and sanction as this amounts to punishing inmates for being mentally ill or by universally placing the mentally ill in restrictive settings. This requires mental health input into the infraction process and sometimes not infracting when the behavior is driven by mental illness but when tighter conditions of confinement are nonetheless necessary by virtue of their present risk. In short, they are not infracted but they are placed in what amounts to a higher security setting for risks related to their illness. Sometimes, there may be no infractable behavior but elevated risk is still present; this requires mental health staff to have some ability to drive custody overrides and/or be able to place the mentally ill under more restrictive conditions other than by the sole vehicle of LPS commitment. Similarly, those who are seriously mentally ill and are not a danger to others, usually those who are gravely disabled, often need to be engaged in activities rather than isolated, where they sink further into despair or psychosis."

The disabled mentally ill inmates housed in the OPP are not being provided equal access to outside recreation yard and in some cases dayroom relative to other non-disabled inmates housed in the SCSD detention facilities.

Disabled inmates do not have equal access to the dip and pull-up bars (and other equipment). If this equipment is to remain in the exercise areas for inmate usage, then disabled inmates must either be able to access such bars (for housing units designated to house inmates with disabilities) with reasonable accommodations, or specifically fitted bars or equipment must also be installed.

## References

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.130(a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.130(b)(7)** states that a public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

**28 CFR 35.130(b)(1):** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

**28 CFR 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

**28 CFR 35.130(b)(4):** A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

**28 CFR 35.130(b)(8):** A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

***The information below is for reference only. As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates the following with regard to mobility-disabled inmates (and inmates with other disabilities):***

- *Reasonable accommodation for inmates with disabilities at designated facilities may include the provision of accessible recreation areas and specially fitted equipment. The successful completion of a test to show proper and safe use of fitness apparatus items shall be required and documented.*

## Access to Programs

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures applicable pertaining to inmate orientation are outlined in Operations Orders 06/10 Recreation, Exercise and Showering, 06/13 Telephone and TDD / TTY Equipment Access, 06/17 Social, Social Service Consultation, and Media Visits, 08/06 Prisoner Services, 08/07 Law Library, 08/11 Religious Services, Draft Operations Order Inmates with Disabilities - ADA, and Policy 1124 Personal Hygiene.

The following sections of the Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations address inmate programs in a county jail:

§ 1062. Visiting

> (a) The facility administrator shall develop written policies and procedures for inmate visiting, which shall provide for as many visits and visitors as facility schedules, space, and number of personnel will allow. For sentenced inmates in Type I facilities and all inmates in Type II facilities there shall be allowed no fewer than two visits totaling at least one hour per inmate each week. In Type III and Type IV facilities there shall be allowed one or more visits, totaling at least one hour per week.

> (b) In Type I facilities, the facility administrator shall develop and implement written policies and procedures to allow visiting for non-sentenced detainees. The policies and procedures will include a schedule to assure that non-sentenced detainees will be afforded a visit no later than the calendar day following arrest.

> (c) The visiting policies developed pursuant to this section shall include provision for visitation by minor children of the inmate.

§ 1064. Library Service

> The facility administrator shall develop written policies and procedures for library service in all Type II, III, and IV facilities. The scope of such service shall be determined by the facility administrator. The library service shall include access to legal reference materials, current information on community services and resources, and religious, educational, and recreational reading material. In Type IV facilities such a program can be either in-house or provided through access to the community.

§ 1067. Access to Telephone

> The facility administrator shall develop written policies and procedures which allow reasonable access to a telephone beyond those telephone calls required by Section 851.5 of the Penal Code.

§ 1070. Individual/Family Service Programs

The facility administrator of a Type II, III, or IV facility shall develop written policies and procedures, which facilitate cooperation with appropriate public or private agencies for individual and/or family social service programs for inmates. Such a program shall utilize the services and resources available in the community and may be in the form of a resource guide and/or actual service delivery. The range and source of such services shall be at the discretion of the facility administrator and may include:

   a. individual, group and/or family counseling;
   b. drug and alcohol abuse counseling;
   c. community volunteers;
   d. vocational testing and counseling;
   e. employment counseling;
   f. referral to community resources and programs;
   g. prerelease and release assistance;
   h. legal assistance; and,
   i. regional center services for the developmentally disabled

§ 1072. Religious Observances

The facility administrator of a Type I, II, III or IV facility shall develop written policies and procedures to provide opportunities for inmates to participate in religious services, practices and counseling on a voluntary basis.

§ 1266. Showering

There shall be written policies and procedures developed by the facility administrator for inmate showering/bathing. Inmates shall be permitted to shower/bathe upon assignment to a housing unit and at least every other day or more often if possible.

Per Operations Order 06/10, Recreation, Exercise and Showering, televisions are provided as a leisure time activity to help alleviate boredom, reduce tension, and to facilitate inmates' continued contact with the community. The use of the televisions located within each housing unit is a privilege and pod television privileges may be suspended with supervisor approval. Televisions are typically turned on during indoor recreation periods. Additional viewing times may be authorized by custody staff when all routine tasks and activities have been completed. Televisions damaged or inoperative shall be immediately removed from the housing unit, and housing unit staff will submit a Maintenance Request. Any removal of a television for intentional abuse or vandalism requires watch commander approval. Any removal will be logged and a replacement television will not be installed until the investigation or disciplinary action has been completed.

Title 15, Section 1067 provides that inmates be afforded reasonable access to a telephone beyond those arrest/booking telephone calls which are required by Penal Code 851.5. General telephone access is granted during normal indoor recreation periods, however, telephone access is still a privilege and any individual revocation will be in accordance with the discipline process. The use and access of telephones will be in accordance with Operations Order 6/13, Telephones/TDD/TTY Access.

Inmates are afforded enough time during indoor recreation periods to shower. Each inmate shall be allowed a maximum of fifteen (15) minutes of shower time so it is incumbent upon the inmate to manage his/her dayroom time accordingly. In the event recreation is held to minimum standards, inmates will be afforded the opportunity to shower every other day. Inmates on disciplinary status are allowed to shower once every other day. Acceptance or refusal shall be documented. Reasonable efforts should be made to allow inmates who have participated in outdoor recreation to shower before lockdown. The shower shall not be used as a means of punishment or used to isolate a disruptive or combative inmate. An exception may occur if custody staff needs to control a volatile situation and use of the shower stall is the only means to control that situation. As soon as the situation is stabilized the inmate shall be removed from the shower stall. Inmates whose jobs or work assignments cause them to require more frequent showers should be permitted to shower whenever necessary.

Operations Order 06/12 outlines shaving and cosmetology procedures; however, inmates are afforded the opportunity to shave each day. Inmates scheduled for court shall be provided shower access on the day of the scheduled court appearance. Upon request, males shall be allowed to shave and females shall be allowed to use cosmetology equipment.

Per Operations Order 06/13, Telephone and TDD / TTY Equipment Access, Custody staff shall provide telephone access so that arrestees are able to make the required number of telephone calls upon being booked as per Penal Code 851.5. Reasonable telephone access is also provided to inmates during recreation periods. Once an inmate is identified as hearing impaired, all efforts will be made so that such inmate receives all rights and privileges as would be given any other inmate.

Telephones are accessible to inmates who are participating in dayroom activities. Dayroom typically occurs everyday, unless a situation arises that would prevent or limit the recreation program. Inmates may make unlimited fifteen (15) minute telephone calls. Any individual restriction of telephone access shall be noted in an Inmate Disciplinary Report (PF-10). A logbook entry will be done in the event dayroom access is restricted to the housing unit for any reason. Inmates on disciplinary restriction shall not have access to telephones for the duration of their disciplinary status. Inmates housed in areas, such as the medical infirmary,



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

that are not equipped with "pod" phones shall be allowed access to an inmate telephone that can be plugged into a telephone outlet.

Inmates who are speech and/or hearing impaired shall be given access to the TDD/TTY equipment and are subjected to the same rules as described for telephone access. Inmates may request use of the TDD/TTY equipment through an Inmate Message Request. Housing units that are equipped with free phones will use TDD/TTY equipment for the speech/hearing impaired. Speech/hearing impaired inmates will be escorted to booking or another appropriate area if the housing unit does not have access to TDD/TTY equipment. Housing unit staff shall make an entry in the logbook each time the TDD/TTY equipment is used with the inmate's name, X-reference number, date and time of use and location of where it was used. If the inmate needs to talk to someone who has no TDD/TTY equipment he/she may call the Nor Cal Center for Deafness, a free service, at (916) 973-8448.

Per Operations Order 06/17, Social, Social Service Consultation, and Media Visits, all inmates shall be allowed to have social, social service consultation and media visits during the visit schedule times of the respective facility. All incarcerated inmates shall have reasonable access to social, social service consultation and media visits in an effort to reduce stress and maintain family ties. Reasonable access is based on the individual facility's established visit schedule and physical plant design.

Social, social service consultation, and media visits shall take place in the general social visit booths. Attorney pass-through and non-pass-through booths shall not be used as overflow. Inmates may have social, social service consultation, or media visit privileges taken away for disciplinary reasons. Visit restrictions will only occur as a result of a disciplinary hearing in accordance with the discipline plan.

Social visits are visits with any person who does not meet the confidential visitor, media visitor, or social service visitor requirements. Social visits may include family, friends, minor relatives, associates, etc. Media visits are visits with any person who is a representative of any media source where the purpose of the visit is media-related. Media visits may include correspondents from television, newspaper, magazine, Internet sources etc. Social Service Consultations include visits with governmental service providers and nonprofit advocacy and charity organizations.

At the Main Jail and RCCC, *pre-trial* inmates may receive a maximum of two forty-five-minute NON-CONTACT social visits per week. At the Main Jail, *sentenced* inmates may receive three forty-five-minute NON-CONTACT social visits per week. At RCCC, *sentenced* inmates may receive one sixty-minute NON-CONTACT social visit per week.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Visits for inmates housed in the acute psychiatric unit at the MJ, including inmates wearing blue suits, will be on a case-by-case basis. If the visit is authorized, it shall take place in the 2 East visit area. The visit shall be visually monitored by a deputy. Supervisory approval is required for all visits, whether approved or denied.

Per Operations Order 08/06, Prisoner Services, social service programs will be provided which employ a wide range of in-house and community resources to assist inmates in solving personal and family problems and assist in their rehabilitation. Social services for inmates include, but are not limited to, the following:

- Alcoholics Anonymous.
- Individual and group counseling.
- Religious and community services.
- Substance abuse counseling.
- Notary Public services.

Per Operations Order 08/07, Law Library, Law Libraries in each facility are available to any inmate requesting access to legal materials, however Pro Per status inmates shall have priority to the Law Library. Custody staff will provide assistance to inmates in accessing up to date legal research material and/or accessing the courts. Inmates wanting access to the law library to conduct legal research must submit an "Inmate Message Request" form to the Law Librarian.

Inmates may request legal materials, copies, writ forms, and legal books from the Law Librarian by submitting an Inmate Message Request. Each request will be limited to no more than five books. Up to 25 copies of legal material may be allowed per inmate per week. This number may be limited due to staff availability and budgetary restraints. Inmates, other than Pro Per status inmates, may normally utilize the law library for one (1) hour per week per inmate. Inmates requiring more time may request additional time, subject to availability.

Per Operations Order 08/11, Religious Services, the MJ and RCCC shall make every effort to allow the sincere free practice of religion, limited only by legitimate security and operational considerations. Inmate participation in the religious programs is subject to the review and approval of the Correctional Ministries Director, the Division Commander, and his /her designee.

Inmates may ask to see the Correctional Ministries Director or a Volunteer Chaplain; request religious materials, individual counseling, or a special religious diet; or seek additional information on matters relating to religious practice by submitting a KITE. Custody staff receiving KITE's which contain such requests shall route the request to the Chaplaincy in a timely manner. Inmates wishing to submit a grievance relating to religious issues shall follow the normal inmate grievance procedure.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Inmates may receive religious publications and other materials that have been approved and do not jeopardize the safety and security of the facility, staff, or other inmates, and otherwise conform to the facilities rules and regulations. All publications and other materials will go through the Correctional Ministries Director. Any item in question will be referred to the Division Commander and/or his/her designee for review.

Religious services and programs in Corrections may include, but are not limited to, one-on-one religious counseling and prayer, religious practices and rituals, religious education and classes, and religious counseling.

Per Draft Operations Order Inmates with Disabilities - ADA, persons with a disability are entitled to an equal opportunity to participate in programs, services, or activities offered by the SCSD detention facilities unless doing so creates an undue hardship.

The Sheriff's Department may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, those requirements must be based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.

The ADA coordinator, or their designee, is required to perform a follow-up review every thirty calendar days to ensure the inmate has equal opportunity to participate in programs, services and activities and to discuss any issue the inmate may have regarding his/her treatment.

The programs and services offered within the SCSD detention facilities shall be accessible to all inmates. Provisions shall be made by to ensure that all services, programs, and activities are readily accessible to and usable by, individuals with disabilities.

Exercise and Recreation: All inmates shall receive exercise in an area designed for recreation (indoor/outdoor) which will allow for a minimum amount of required exercise distributed over a period of seven (7) days to benefit social, physical and emotional health following Operations Order 6/10, Recreation, Exercise, and Showering.

Library Service: The California State Library lends books and magazines in braille and on cassette tapes. To obtain any of the available materials, the inmate must first be registered with the State of California Braille and Talking Book Library (BTBL). The inmate must complete and submit an application prior to use. To obtain an application, the inmate must submit an Inmate Request Form (KITE) to the Recreation Technician. A designated Recreation Technician will assist in completing the form, providing certification and returning the application to the Library. The Library will mail a cassette player, along with a catalog of available titles to the inmate, free of charge. A free-return label is included in the package. Once the package arrives at the custody facility, it shall be routed to



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

the Recreation Technicians who will ensure distribution of the materials. A designated Recreation Technician shall provide the inmate with the audio tape equipment, inform the inmate of the resources available and explain how the inmate can access the resources via KITE.

Eligibility requirements for services shall not be imposed if they eliminate or tend to eliminate participation by inmates with disabilities, unless it can be shown that such requirements are necessary for the provision of the service. Inmates who volunteer for, or are required to participate in the drug education course and who experience learning disabilities must be provided a reasonable accommodation toward completion of the course, including an alternate means of testing. All program offerings shall be located in areas that are accessible to all inmates regardless of ability. American Sign Language interpreters are available for all program services and can be arranged by contacting (916) 874-1448.

Substance Abuse Treatment programs include:

Housing for Accountable Living Transitions/Residential Substance Abuse Treatment (HALT/RSAT)

> HALT/RSAT provides substance abuse treatment and reentry service to offenders and supports their transition back into the community. This program provides substance abuse treatment and education, assisting the offender in changing learned behaviors while offering him or her the tools to become a productive member of the community. Participants receive individual needs assessments and assistance with aftercare services for up to one year after they are released from custody. Participants receive a program certificate upon successful completion and time off their sentence for education hours when eligible. Program is 200 hours for low offenders and 300 for medium to high offenders.

Substance Misuse

> The goal of this course is to educate participants in the biological, psychological, and social issues of addiction and chemical dependency and introduce them to appropriate options for recovery. Program is 12 sessions.

Denial Management

> The goal of this course is to help participants recognized their denial patterns and to overcome them. Program completion is dependent on workbook completion.

Relapse Prevention

> This course focuses on the thinking process that leads to relapse and understanding the belief system that can lead to prevention. Program completion is dependent on workbook completion.

Man Alive/Woman Alive

Rio Cosumnes Correctional Center partners with a Sacramento County Certified Batterers Treatment provider to offer participants the strategies needed to stop their pattern of violent behavior and be accountable to themselves, their families, and their community.  Program is 52 hours.

Thinking for Change

This cognitive behavioral course teaches social skills, cognitive self-change and problem solving strategies. It is designed to help participants set personal and professional goals.  Certificate is based on 27 sessions.

Moral Reconation Therapy

A cognitive behavioral course aiming to decrease recidivism rates through lessons focused on criminal thought and the treatment of substance abuse. Program ranges from 24-36 hours.

QUEST

The QUEST Program is the in-custody gang diversion program. QUEST (Question, Understand, Evaluate, Succeed, Transform) contains an evidence-based curriculum, which uses behavioral therapy principles, training and success principles. All participants must be documented gang members or gang associates. All participants are housed together in a joint QUEST / HALT barrack, separate from non-program inmates. This therapeutic housing environment allows participants to focus on their programming and development.

Reentry Services

Reentry services are provided to sentenced inmates. It provides evidence based vocational, educational, and treatment programs. The goal is to reduce the rate of incarceration and to offer inmates the tools necessary for successful reintegration into the community.  Inmates with over 60 days to serve will be assessed to determine the track they will be placed on.  These tracks include: vocational, treatment and education.  If you are placed on the reentry services track a reentry specialist will meet with you to complete an individualized assessment and create a reentry plan.  Your reentry plan may include cognitive behavioral groups, substance abuse classes, employment classes, education, vocational training programs, and family reintegration. Post-release services may be available to those inmates who participate in reentry services.  The post-release services may include supportive services based on individual needs and eligibility will be determined during your participation in the reentry program.

Per Policy 1124, Personal Hygiene, any inmate detained over 48 hours will be furnished bathing facilities in the form of either a tub or shower with hot and cold



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

running water. All inmates shall be permitted regular bathing at least every other day. Inmates will be permitted daily bathing during hot weather in facilities without air temperature control. Inmates whose work assignments cause them to require more frequent showers should be permitted to shower whenever necessary.

Staff shall provide the following items:

- Individual or disposable shaving implements. (These must not be shared among inmates unless properly sterilized.)
- Soap.
- Toothbrush and comb.
- Toothpaste or powder.
- Dental floss (subject to security regulations).
- Toilet paper.
- Sanitary napkins when required.
- Laundry services at least weekly.
- Hair care services are also available unless restricted due to reason of identification.

## Observations

The Assessment Team toured all housing units at each facility including the inmate visiting areas, telephone areas, recreational areas (e.g., television, recreational reading and game room areas). Team representatives also toured the areas where religious services are often conducted, e.g., classrooms and multi-purpose rooms.

The Assessment Team reviewed the current schedules for religious services and other non-religious program, services and activities for the MJ and RCCC Complexes. The following is a breakdown of the listed schedule:

| | | | |
|---|---|---|---|
| MJ 2 East | Tuesday | 1800-1930 | Islamic Quran Class (100 Pod) |
| | Saturday | 1000-1045 | Bible Study (300 Pod) |
| | Saturday | 1100-1200 | Protestant |
| | | | |
| MJ 2 West | No Programs Offered | | |
| | | | |
| MJ 3 East | Monday | 1900-2030 | Protestant Bible Study (100-300 Pods) |
| | Tuesday | 1300-1430 | 7th Day Adventist (100-300 Pods) |
| | Tuesday | 1900-2100 | Protestant Bible Study (100-300 Pods) |
| | Thursday | 0930-1130 | Jehovah Witness |
| | Thursday | 1130-1300 | Jehovah Witness |
| | Saturday | Protestant | Bible Study (100-300 Pods) |
| | | | |
| MJ 3 West | Sunday | 2000-2130 | Cocaine Anonymous (on 4 West) |
| | Monday | 2000-2130 | Narcotics Anonymous |

|  |  |  |  |
|---|---|---|---|
|  | Tuesday | 0900-1030 | Substance Abuse (on 4 West) |
|  | Wednesday | 2030-2200 | Alcoholics Anonymous |
|  | Thursday | 1900-2030 | Protestant Bible Study (100-200 Pods) |
|  | Saturday | 0800-0930 | Protestant Bible Study (100-200 Pods) |
| MJ 4 East | Monday | 1900-2030 | Protestant Bible Study (100-300 Pods) |
|  | Wednesday | 1300-1400 | All Faith Studies (100-300 Pods) |
|  | Saturday | 0800-0930 | Protestant Bible Study (100-300 Pods) |
| MJ 4 West | Sunday | 1300-1400 | Religious |
|  | Sunday | 2000-2130 | Cocaine Anonymous |
|  | Monday | 2000-2130 | Narcotics Anonymous |
|  | Tuesday | 1830-2000 | Celebrate Recovery |
|  | Wednesday | 1900-2030 | Protestant Bible Study (100-200 Pods) |
|  | Wednesday | 2030-2200 | Alcoholics Anonymous |
|  | Thursday | 2000-2130 | Narcotics Anonymous Book Study |
|  | Saturday | 0900-1000 | Protestant Bible Study (open) |
| MJ 5 East | Tuesday | 1900-2030 | Protestant Bible Study (200 Pod) |
|  | Friday | 2000-2130 | Protestant Bible Study (200 Pod) |
|  | Saturday | 2000-2130 | Protestant Bible Study (200 Pod) |
| MJ 5 West | Tuesday | 2000-2130 | Protestant Bible Study (100 Pod) |
|  | Wednesday | 1900-2030 | Russian Bible Study(100 Pod) |
|  | Saturday | 0800-0930 | Protestant Bible Study (100 Pod) |
| MJ 6 East | Sunday | 0800-0930 | Protestant Bible Study (200 Pod) |
|  | Thursday | 1300-1430 | Jehovah Witness (200 Pod) |
|  | Saturday | 0800-0930 | Protestant Bible Study (200 Pod) |
| MJ 7 East | Monday | 1900-2030 | Protestant Bible Study (300 Pod) |
|  | Saturday | 0800-1000 | Protestant Bible Study (300 Pod) |
| MJ 7 West | Tuesday | 2000-2130 | Protestant Bible Study (100 Pod) |
|  | Wednesday | 2000-2130 | Alcoholics Anonymous |
|  | Saturday | 0800-0930 | Protestant Bible Study (100 Pod) |
| MJ 7 West | Sunday | 1300-1430 | Protestant Bible Study (100/300 Pods) |
|  | Sunday | 1930-2100 | Narcotics Anonymous |
|  | Monday | 1900-2030 | Protestant Bible Study (100/300 Pods) |
|  | Monday | 2030-2200 | Narcotics Anonymous |
|  | Tuesday | 1130-1300 | Self Esteem (1st and 3rd Tuesday) |
|  | Tuesday | 1230-1400 | Substance Abuse (2nd and 4th Tuesday) |
|  | Tuesday | 1830-2000 | Celebrate Recovery (100/300 Pods) |

|          | Tuesday   | 2000-2130 | Protestant Bible Study |
|----------|-----------|-----------|------------------------|
|          | Wednesday | 2000-2130 | Alcoholics Anonymous |
|          | Thursday  | 1230-1330 | Book Club (1st and 3rd Thursday) |
|          | Thursday  | 1345-1445 | Catholic Bible Studies |
|          | Thursday  | 1900-2130 | Protestant Bible Study (100/300 Pods) |
|          | Friday    | 2000-2130 | Alcoholics Anonymous |
|          | Saturday  | 0900-1030 | Protestant Bible Study (100/300 Pods) |

| MJ 8 East | No Programs Offered |
|-----------|---------------------|

| MJ 8 West | No Programs Offered |
|-----------|---------------------|

| RCCC CBF | Sunday    | 1200-1500 | Bible Study (Custody/Volunteer decides which Pod attends 100-600) |
|----------|-----------|-----------|------------------------------------------------------------------|
|          | Tuesday   | 1300-1400 | Bible Study (Custody/Volunteer decides which Pod attends 100-600) |
|          | Thursday  | 1300-1400 | Bible Study (Custody/Volunteer decides which Pod attends 100-600) |

| RCCC JKF KBF | Sunday    | 1200-1500 | Bible Study (Custody/Volunteer decides which Pod attends 100-600) |
|--------------|-----------|-----------|------------------------------------------------------------------|
|              | Monday    | 0900-1100 | Man Alive (General Population) |
|              | Wednesday | 1900-2000 | Bible Study (JKF) |
|              | Wednesday | 2000-21000 | Bible Study (KBF) |
|              | Thursday  | 2000-2130 | Narcotics Anonymous |
|              | Saturday  |           | Substance Misuse (General Population) |

| RCCC KBF | Thursday  | 1330-1430 | ICE Bible Study (Pod 500 Classroom) |
|----------|-----------|-----------|-------------------------------------|
|          | Thursday  | 1930-2030 | ICE Bible Study (Pod 500 Classroom) |

| RCCC SBF | Sunday    | 1200-1500 | Bible Study (Custody/Volunteer decides which Pod attends 100-600) |
|----------|-----------|-----------|------------------------------------------------------------------|
|          | Thursday  | 1300-1400 | Bible Study (Custody/Volunteer decides which Pod attends 100-600) |

| RCCC SLF | Sunday    | 0900-1100 | Bible Study (Sutter Hall) |
|----------|-----------|-----------|---------------------------|
|          | Monday    | 2000-2130 | Bible Study (Dining Hall) |
|          | Monday    | 0900-1100 | Thinking for Change HALT (Lecture Hall) |
|          | Tuesday   | 0900-1100 | Substance Misuse HALT (Sutter Hall 1) |
|          | Tuesday   | 0900-1100 | Job Readiness HALT (Sutter Hall 2) |
|          | Tuesday   | 1900-2030 | Alcoholics Anonymous (Dining Hall) |
|          | Tuesday   | 1200-1500 | CENAPS HALT (Sutter Hall 1) |
|          | Tuesday   | 1200-1500 | Relapse Prevention (Sutter Hall 2) |
|          | Wednesday | 0900-1100 | Woman Alive AB 109 (Lecture Hall) |



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

|         | Wednesday | 2000-2130 | Alcoholics Anonymous (Dining Hall) |
|---------|-----------|-----------|-------------------------------------|
|         | Thursday  | 0900-1100 | Thinking for Change AB 109 (Lecture) |
|         | Thursday  | 0900-1100 | Substance Misuse HALT (Sutter Hall 1) |
|         | Thursday  | 0900-1100 | Job Readiness HALT (Sutter Hall 2) |
|         | Thursday  | 1200-1500 | CENAPS AB109 (Lecture Hall) |
|         | Thursday  | 2030-2200 | Bible Study Catholic (Dining Hall) |
|         | Thursday  | 1200-1500 | CENAPS HALT (Sutter Hall 1) |
|         | Thursday  | 1200-1500 | Relapse Prevention (Sutter Hall 2) |
|         | Friday    | 0900-1100 | Thinking for Change (Sutter Hall 1) |
|         | Friday    | 1200-1500 | Substance Misuse AB109 (Lecture Hall) |
|         | Saturday  | 0900-1100 | Bible Study (Sutter Hall 1) |
|         | Saturday  | 1200-1500 | Life Skills HALT (Lecture Hall) |
| RCCC HF | Monday    | 0900-1100 | Gang Diversion Quest (B Barracks) |
|         | Monday    | 0900-1100 | Thinking for Change (AB109 HF Library) |
|         | Monday    | 0900-1100 | Life Skills (HF Rec 1) |
|         | Monday    | 0900-1100 | Parenting (HALT HF Rec 2) |
|         | Monday    | 1200-1500 | Job Readiness (AB 109 HF Library) |
|         | Monday    | 1200-1500 | Thinking for Change (HALT HF Rec 1) |
|         | Monday    | 1200-1500 | Man Alive (HF Rec 2) |
|         | Monday    | 1200-1500 | Thinking for Change (HALT Rec Hall) |
|         | Monday    | 1900-2130 | Alcoholics Anonymous (HF Rec Hall) |
|         | Tuesday   | 0900-1100 | Thinking for Change (QUEST HF) |
|         | Tuesday   | 0900-1100 | CENAPS (HALT HF Library) |
|         | Tuesday   | 0900-1100 | Relapse Prevention (HALT HF Rec 1) |
|         | Tuesday   | 0900-1100 | Parenting (HALT HF Rec 2) |
|         | Tuesday   | 1200-1500 | Relapse Prevention (HALT HF Library) |
|         | Tuesday   | 1200-1500 | CENAPS (HALT HF Rec 1) |
|         | Tuesday   | 1200-1500 | Parenting (HF Rec 2) |
|         | Tuesday   | 1200-1500 | Substance Misuse (AB109 HF Rec Hall) |
|         | Tuesday   | 1900-2200 | Bible Study (A Barracks) |
|         | Tuesday   | 1900-2100 | Bible Study (Rec Hall) |
|         | Tuesday   | 1900-2000 | Bible Study (J Barracks) |
|         | Tuesday   | 2000-2100 | Bible Study (K Barracks) |
|         | Tuesday   | 2000-2100 | Bible Study (B Barracks) |
|         | Wednesday | 0900-1100 | Gang Diversion Quest (B Barracks) |
|         | Wednesday | 0900-1100 | Man Alive (HF Library) |
|         | Wednesday | 0900-1100 | Thinking for Change (HALT HF Rec 1) |
|         | Wednesday | 0900-1100 | Parenting (HALT HF Rec 2) |
|         | Wednesday | 1200-1500 | Man Alive (QUEST Rec 1) |
|         | Wednesday | 1200-1500 | Thinking for Change (HALT HF Library) |
|         | Wednesday | 1200-1500 | Thinking for Change (HALT HF Rec 2) |
|         | Wednesday | 1200-1500 | Recreation (HF Rec Hall) |
|         | Wednesday | 1900-2100 | Celebrate Recovery (HF Rec Hall) |



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

| Thursday | 0900-1100 | CENAPS (HALT HF Lecture Room) |
| Thursday | 0900-1100 | Job Readiness (QUEST HF Library) |
| Thursday | 0900-1100 | Relapse Prevention (HALT (HF Rec 1) |
| Thursday | 0900-1100 | Parenting (HALT HF Rec 2) |
| Thursday | 1200-1500 | Substance Misuse (HALT HF Lecture) |
| Thursday | 1200-1500 | Substance Misuse (HF Rec 1) |
| Thursday | 1200-1500 | Job Readiness (HALT HF Library) |
| Thursday | 1200-1500 | Parenting (HF Rec 2) |
| Thursday | 1200-1500 | Substance Misuse (AB109 Rec Hall) |
| Thursday | 2000-2200 | Bible Study Catholic (HF Rec 2) |
| Friday | 0900-1100 | Gang Diversion Quest (B Barracks) |
| Friday | 0900-1100 | Relapse Prevention (HALT HF Library) |
| Friday | 0900-1100 | Substance Misuse (HALT HF Rec 1) |
| Friday | 0900-1100 | CENAPS (HALT HF Rec 2) |
| Friday | 0900-1100 | Job Readiness (HALT HF Rec Hall) |
| Friday | 1200-1500 | Thinking for Change (HALT HF Rec 1) |
| Friday | 1200-1500 | Job Readiness (AB 109 HF Library) |
| Friday | 1200-1500 | CENAPS (QUEST HF Rec 2) |
| Friday | 1200-1500 | Life Skills (HF Rec Hall) |
| Friday | 2000-2130 | Alcoholics Anonymous (HF Rec Hall) |
| Saturday | 0900-1100 | Life Skills (HALT HF Rec Room) |
| Saturday | 0900-1100 | Life Skills (HALT HF Library) |
| Saturday | 0900-1100 | Thinking for Change (QUEST HF Rec 1) |
| Saturday | 0900-1100 | Bible Study (HF Rec 2) |
| Saturday | 1200-1500 | Substance Misuse QUEST HF Rec1) |
| Saturday | 1200-1500 | Thinking for Change (HALT HF Library) |
| Saturday | 1200-1500 | CENAPS (AB 109 REC 2) |

### *Showers*

The Assessment Team examined the showers in every housing unit and pod. The team found that with the exception of MJ 2 West Medical and 2 East Pod 100, none of the housing units/pods at the MJ maintained shower chairs and grab bars for disabled inmates who may have difficulty standing while talking a shower. The team also found that with the exception of the MHU, M Barracks, JKF Pod 100, KBF Pod 100, and SLF Kinya no other housing unit at RCCC maintained grab bars and shower chairs for disabled inmates who may have difficulty standing while talking a shower. These housing units/pods did not maintain shower hoses or lowered nozzles for disabled inmates to use while seated. The KBF and JKF pods (200-600) did maintain grab bars in the shower, but no other ADA asset or feature was maintained. It was also noted that ADA assets and features maintained in the housing units/pods listed above were not ADA compliant as noted in the accessibility section of this report.

### Library

The Assessment Team noted that there is no physical library access as each pod maintains a selection of recreational reading material that is managed by recreation staff.  The selection of books varies from pod to pod.  Some pods have a larger selection than others (book shelves vs. books scattered around the pod). The selection of books did not contain easy reading or large print books for disabled inmates.

### Law Library

The law library is accessible to all disabled inmates.  There is a law library in the MJ 8th floor in the multi-purpose room, RCCC RBF facility, and individual terminal access in the CBF, SBF, SLF, KBF and JKF facilities. All law library areas are accessible to disabled inmates.

### Visiting

All social visiting at the SCSD detention facilities is non-contact. All visiting areas (social and attorney) on the upper floors (3-8) of the MJ are not accessible to mobility-disabled inmates who cannot ambulate a flight of stairs. The 2nd floor on the MJ (medical floor) does have 2 social visiting booths and 1 attorney-visiting booth; however, the attorney-visiting booth is not accessible for a wheelchair user.  The visiting areas (social and attorney) in the CBF and SBF facilities at RCCC are not accessible to mobility-disabled inmates that cannot ambulate a flight of stairs. The visiting areas (social and attorney) are shared by the JKF/KBF facilities at RCCC and are accessible to disabled inmates via elevator access. The visiting areas (social and attorney) in the RCCC booking area and SLF facility are accessible to all inmates with the exception of disabled inmates in a wheelchair.  The social visiting area in the RCCC recreation visiting is accessible to all disabled inmates. All visiting phones have volume control capability.

### Religious Services

All religious services are accessible to disabled inmates with the exception of the services conducted in the CBF and SBF classroom as this classroom is upstairs with no elevator access for disabled inmates who cannot ambulate a flight of stairs.

### Telephones

The Assessment Team observed the telephone process in many of the housing units.  There are no phone sign-ups nor is there close monitoring by staff. Inmates in celled housing in a majority of the units alternate dayroom schedules by various groups or tiers.  With a lack of close staff oversight or supervision as well as limited time for inmates to participate in dayroom, phone calls, showers, etc., it is likely that some disabled inmates, especially those who have a



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

developmental disability have difficulty utilizing the telephones with equal opportunity and access as non-disabled inmates do.

It is unclear as to whether deaf or hearing-impaired inmates who use the TTY machine are receiving equal access to the TTY services as non-hearing disabled inmates are afforded for regular telephone usage.

**Staff Interviews**

The Assessment Team interviewed deputies from every housing unit at the MJ and RCCC. The team representatives also interviewed many additional staff members, including chaplains, social workers, and recreation staff who provide program services to inmates housed at the SCSD detention facilities.

One of the deputies assigned to MJ 2/M stated that inmates housed in the unit do not receive access to any programs, e.g., self-help groups, etc. A deputy assigned to MJ 6E admitted that there are almost never any program activities, e.g., education groups in 6E due to "green suits" being temporarily housed in the 6E, and estimates that "green suits" are housed in the 6E classroom about 90 percent of the time, and are "taking over."  He said the average stay is about one week per inmate, and the "green suit" currently housed in the unit has been there for about 2 weeks. He said that education used to be the only program offered, but not any longer.

A deputy assigned to MJ 8W explained that Pod 100 includes TSEP and ADSEG inmates, pod 200 includes TSEP and ADSEG inmates including those that are affiliated "bloods and nortenos", Pod 300 includes TSEP and ADSEG inmates including those that are affiliated "crips and surenos", and Pod 400 which are inmates on DD status.  The deputy acknowledged that there are inmates in the MH program housed within the different Pods, and stated that there are no programs, e.g., education, self-help, group or individual therapy for mentally disabled inmates, etc., and cited that only a couple of inmates in the past have received their "GED" in the past, but that was because the inmates had begun the program in other housing units prior to being moved to 8W special housing. He further explained that TSEP inmates come out of their assigned cell 1 at a time to dayroom, ADSEG inmates come out 1 cell at a time (with an average of 30 minutes per day), and outdoor exercise yard is usually for about 1 hour, whenever yard may be available, but it is not consistent.  He indicated that a lack of MH staffing is a concern.

A deputy assigned to MJ 4E acknowledged that "green suits" are temporarily housed in the 4E classroom about 50 percent of the time, and it negatively effects the academic education classes normally scheduled on Mondays.  He said that inmates housed on 4E as well as other floors are assigned, but the classes are usually cancelled. The deputy cited a lack of custody staff, and that deputy sick calls often go un-filled.

A deputy assigned to MJ 2/M indicated that custody staffing is a problem and to some degree can contribute to a lack of program on occasion. He provided that one of the two assigned medical deputies must also cover 2E. He said there is not sufficient staffing, and he must often provide additional duties, such monitoring as pill call, conducting hourly cell checks, conducting AM and PM counts, respond to "man-down" calls, respond to mutual combats (fights), provide inmate escorts, deal with inmate visits, etc.;

A deputy assigned to RCCC CBF indicated that the unit houses ROC, OPP, GP, TSEP, DD, and ICE inmates. He indicated that there are no programs for OPP, TSEP, or DD on the PM shift (other than some of the pods having 1 hour of nightly dayroom, and dayroom on the morning shift), but there is plenty of program time and numerous programs for inmates assigned to the ROC program. The deputy was unsure as to any program (other than dayroom) on the morning shift. He did mention that each pod has outdoor yard about once per week.

### Recreation Services

The following information was obtained from recreation staff. Recreation staff are responsible for managing the recreational reading materials for inmates. The books are donated to the county. About once a month the recreation staff distribute the books to the pods/housing units. Inmates can request specific books (easy read and large print) by submitting a KITE. If they have these books in stock, staff will deliver the books to the inmates. Recreation staff is also responsible for the management and delivery of recreation activities to the inmates. This includes puzzles, word search, board games and cards. These items are delivered about every other month. The books and other recreation material are delivered to the pod/unit "houseman" who in turn distributes to the unit/pod. Recreation staff stated that inmates are advised of programs and services available in the inmate handbook.

### Religious Services

The following information was obtained via chaplain interviews regarding religious services for the MJ and RCCC. Religious services are either a bible study in a classroom setting or 1-on-1 with an inmate. Religious material is also delivered to the pods/housing units 3 times per week. Religious services available to the MJ 2nd floor are limited to 1-on-1's or distribution of religious material. If an inmate requests a large print bible, the chaplain will try to provide it if it is available. The chaplain at RCCC stated that when bible studies are provided in the high security housing units (SBF and CBF) the housing deputy decides what pod attends from the unit pods, as certain pods cannot mix. KITE's from inmates requesting a 1-on-1 or religious material are parceled out to the chaplaincy volunteers.

### Social Services

There are a total of 4 social workers assigned to the SCSD detention facilities (2 at the MJ and 2 at RCCC). The social workers provide social services by providing inmates with information on social services available to inmates in and out of custody. Also provided are reentry services, notary services, grief counseling, and requests for reading glasses. The social workers stated that inmates are advised of the social workers services available to them in the inmate handbook or as they are seen walking around. The social workers also coordinate the Narcotics and Alcoholic Anonymous programs at the SCSD detention facilities. The social workers also coordinate the assessment of intellectually disabled inmates thorough the Alta Regional Center.

### Inmate Interviews

As mentioned above, the Assessment Team interviewed numerous inmates from all housing units throughout the MJ and RCCC. Inmates interviewed included those with the following disabilities or conditions (or suspected disabilities or conditions): mental illness; developmental, learning, mobility, vision, speech, and deaf/hearing disabilities; and those with epilepsy, diabetes, hypertension, memory disorders, as well as other disabilities and conditions.

Although many of the inmates interviewed provided positive feedback regarding staff, programs, services and activities, a number of them also gave negative feedback regarding these and other subject areas. This section of the report primarily captures the concerns levied, many of which have been corroborated throughout this report based on policy and other document reviews, staff interviews, and the Assessment Team observations, while other allegations or claims could not be substantiated. The following outlines information received during interviews as related to religious services, recreational reading, showers etc.

Four inmates who were interviewed had a body odor (during the interviews) consistent with not having showered recently, and appeared to be dirty and unkempt in their jail attire. Two of these inmates have a mental illness, and the other two inmates are likely developmentally disabled. During the Assessment Team interview, these inmates showed signs of possible cognitive deficits and admitted issues with what the Assessment Team representative understood to be adaptive support deficits. Based on their appearance, their body odor, and their responses to some of the questions asked of them during the interviews, it appears that housing unit staff are sometimes helpful to them, but staff are unaware of their disability status and accommodation needs, and are not being proactive to monitor them and provide the hygiene and other prompts as necessary. Some of their responses included the following information and additional concerns: the inmates acknowledged needing help with cleaning their cell and reminders for hygiene, e.g., brushing teeth, and showering. Although some inmates stated that other inmates provide assistance, there are some

concerns with this. Utilizing the inmate "houseman" does not relieve staff of their responsibilities to provide monitoring, assistance and prompting to developmentally disabled inmates. Another key concern is that many developmentally disabled inmates are subject to victimization and vulnerability. Having other inmates have responsibility over issues (with regard to a developmentally disabled inmate) could be problematic. At a minimum, staff must monitor these inmates very closely, or staff must assume this responsibility with this inmate population. In general, many disabled inmates, including OPP and numerous others, complained about an overall lack of programming activities available to them.

A few specific interviews yielded the following information:

- RCCC KBF – Intellectually disabled inmate with prior use of Alta Regional Services stated he doesn't remember to get his laundry.
- RCCC SLF – Inmate with possible intellectual disability claims she requires diapers for incontinence and medical staff will not provide them, when she soils her clothes she can't get clean clothes.
- RCCC SLF – Inmate with intellectual disability claims that she forgets to shower.
- MJ 2 West M - This inmate is a permanent wheelchair user, and complained that there is no program activities offered to medical inpatients, e.g., self-help or education.
- MJ 3E Inmate - He also complained that there are no program opportunities (e.g., self-help groups or education or jobs) for OPP inmates (who constitute approximately half of one pod), and only the PC inmates (who make-up the other half of the pod) have these opportunities.

### Showers

Numerous inmates with more severe mobility disabilities housed throughout the MJ and RCCC stated that they need a shower chair to stabilize themselves in the showers, however shower chairs are not available in the housing units. Inmates also claim that it is difficult to step over the shower threshold/barrier. Some inmates state they must use the wall to support themselves as they shower as there is no shower chair available. Four inmates stated that they have fallen in the shower as a result of not having a shower chair available to use.

A common issue in housing units that house multiple classification levels is that inmates are often times relegated to choosing between either taking a shower or, making a phone call during their dayroom time. This is due to alternate tier rotations or multiple designated dayroom groups within the units. Many inmates complained that there normally isn't adequate time to do both. The dayroom schedule often varies and are not consistent, and the telephones are not closely monitored, e.g., sign-up process, and limited time usage.

### *Library Services*

Inmates stated that the books that are available in the pods/housing units are very scarce. The inmates also claim that there are no easy reading or large print books available in the pods/housing units.

### Conclusion

There are significant flaws in the processes as well as discrimination with regard to equitable programming for disabled inmates. To ensure nondiscrimination under the ADA, the SCSD detention facilities must ensure that disabled inmates receive equivalent programming, e.g., access to library materials, accessible visiting areas and equal access to religious services.

The SCSD detention facilities do not provide equal access to recreational reading material for disabled inmates. There is limited access to easy reading and large print books for disabled inmates who require these accommodations.

The SCSD detention facilities do not provide equal access to religious programing for disabled inmates. Disabled inmates housed in the medical unit at the MJ are not being afforded equal access to religious services as inmates housed in other areas of the MJ.

The SCSD detention facilities do not provide equal access to visiting or attorney visiting for disabled inmates. Disabled inmates not housed on the medical floor at the MJ must ambulate a flight of stairs to participate in social and attorney visits, which is difficult for them based on their disability.

The SCSD detention facilities do not provide equal access to showers for disabled inmates. There are no shower chairs and shower hoses available for disabled inmates that require these accommodations for their disability.

The SCSD detention facilities have a draft policy for staff to assist disabled inmates with reading or scribing documents; however, this policy has not been placed into practice.

The SCSD detention facilities do not have a policy or required practice for staff to provide coaching, assistance, monitoring, and prompting of disabled inmates so that they can complete work tasks or participate in other activities, services, and programs.

The SCSD detention facilities do not have a policy or practice for facility staff to interview speech and deaf/hearing-impaired inmates upon arrival to the jail or housing unit, or after being identified with a speech or hearing disability, to determine the inmate's preferred method of communication.

Based on the lack of an effective tracking system for qualified disabled inmates SCSD detention facilities staff do not have the capability to know what



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

accommodations disabled inmates require to access program, services and activities.

There is no established inmate orientation provided to inmates advising them of services available to them (social services and recreation). The absence of an orientation process is problematic for many disabled inmates (whether they have been identified or not through disability evaluation/screening processes). For disabled inmates (e.g., those with vision, learning and developmental disabilities) where communication, understanding, or advocacy are of concern, it is important they receive necessary information that would enable them to know what services are available, to know how to seek assistance, and to learn what accommodations they may have access to.

Most of the housing deputies and non-custody staff who were interviewed appeared to work very diligently in their assigned positions and have an interest in obtaining as much knowledge as possible to perform their job duties effectively. However, some of the staff interviewed admitted that they don't know who their disabled inmate population is. Some of the staff believe they do know who the disabled inmates are based on the information contained in the JIMS and on locator cards. Even the staff who believe they know who their disabled inmates are often admitted that they do not always know what type of reasonable accommodations are required or what should be provided. Although speech and deaf/hearing-impaired inmates may be screened and identified during the intake/booking process, health care, classification or other custody staff do not interview these inmates to determine their primary or preferred method of communication (for EC concerns). This is not done at the time of intake/booking, classification, housing, or at any other time either upon or after arrival.

In response to the Assessment Team's questions, many staff members interviewed stated that they would help (and have assisted) inmates with reading documents or materials, if they (staff) were asked. Few staff acknowledged being proactive to approach inmates who may need assistance and providing or offering such help. The Assessment Team specifically asked about providing assistance with commissary (e.g., filling out commissary slips, explaining commissary processes, and helping to inventory received commissary items). Very few have done this, but many said they would if they were asked. Nearly all staff interviewed were unaware of adaptive support needs for intellectually disabled inmates. When asked, custody and non-custody work supervisors were also largely unaware of inmates who may need special assistance while performing their work duties. Staff were largely unaware of the need to provide coaching, assisting, monitoring and prompting (to intellectual disabled inmates) to effectively complete work assignments as necessary.

As stated throughout this report, the Assessment Team has strong concerns as the SCSD detention facilities do not have a comprehensive testing/evaluation/screening process to effectively identify inmates with

disabilities, such as those with intellectual and learning disabilities. As a result, custody and non-custody staff are not fully aware of disabled inmates assigned to their housing or work areas. There are obvious exceptions to this as disability-related information is noted on some of the locator cards and the JIMS for disabled inmates, etc., as well as those who reside in OPP designated housing.

## References

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.130(a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.130(b)(7)** states that a public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

**28 CFR 35.130(b)(1):** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

**28 CFR 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

**28 CFR 35.130(b)(4):** A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

**28 CFR 35.130(b)(8):** A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

***The information below is for reference only. As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates the following with regard to mobility-disabled inmates (and inmates with other disabilities):***

- *Reasonable accommodations shall be afforded inmates with disabilities (e.g., mobility disabilities) to facilitate their full participation in visiting as provided in these rules, whether contact, noncontact, or family visiting.*



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

## Access to Education, Vocation, Reentry and Substance Abuse Programs

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures applicable to inmate access to education programs, in custody reentry programs, are: Operations Order 08/04 Educational Services, Draft Operations Order Inmates with Disabilities - ADA, and 1107 Decision Making-Special Needs.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1061 Inmate Education Plan requires that:

> The facility administrator of any Type II or III facility shall plan and shall request of appropriate public officials an inmate education program. When such services are not made available by the appropriate public officials, then the facility administrator shall develop and implement an education program with available resources. Such a plan shall provide for the voluntary academic and/or vocational education of both sentenced and non-sentenced inmates. Reasonable criteria for eligibility shall be established, and an inmate may be excluded or removed from any class based on sound security practices or failure to abide by facility rules and regulations.

Per Operations Order, 08/04 Educational Services, the MJ and RCCC, through the Elk Grove Unified School District (EGUSD), provide a variety of voluntary educational programs in an attempt to equip inmates for productive reentry into the community. The EGUSD has the responsibility of ensuring that programs conform to statutory mandates and professional standards.

Eligible inmates housed in general population or minimum-security housing units will be allowed to participate in educational programs, except those who fail to abide by facility rules or pose a security threat. For these inmates, instruction may be given on an individual basis. Inmates must have a minimum of sixty days remaining in their sentence to be considered for the Education Program. If classes are full, an inmate's name will be added to the waiting list. _The availability of classes offered is dependent upon the resources of Elk Grove Adult Education and the constraints of a particular housing location. Inmates shall request educational services by submitting a KITE to Adult Education. It is the responsibility of a teacher to contact the inmate either personally on a regularly scheduled visit of the housing location or via an "Inmate Message Request" informing the inmate of when the class meets. Participation in educational programs is voluntary with the exception of a student's literacy level as determined by the Comprehensive Adult Student Assessment System (CASAS). Inmates who are assigned jobs that are part of the vocational education program, are eligible to have their work time certified by the education department. A certificate is issued attesting to the time and skills acquired in that field while the

inmate was incarcerated. The Adult Education Department must be notified by the inmate at least two (2) weeks prior to his/her release date in order to obtain the certificate.

The EGUSD provides a variety of educational programs geared to the needs of the inmates. Programs may include, but are not limited to:

- Vocational programs
- GED preparation program
- Adult basic education
- Literacy training
- Substance abuse and self-awareness classes
- Parenting
- Employability courses

A pilot program "Read Out Program" is a joint venture between the EGUSD, the Sacramento Municipal and Superior Courts, and the Sacramento Sheriff's Department. The "Read Out" program allows for time credits of up to twenty (20) days for sentenced inmates who successfully complete a course of education while at a Sacramento County Sheriff's Department Correctional Facility. All interested inmates must meet the following minimum qualifications to be accepted into this program:

- Have thirty or more days remaining on their sentence.
- Must be serving time on a mandatory minimum term of confinement required by law.

The EGUSD Education Department will be responsible for the enrollment of students into the program. Student inmates may earn early release within the following rules:

- In order to encourage individuals to improve their academic abilities and to provide an educational incentive to those who cannot be adequately represented in paragraphs VIII (1) and (2), an inmate will be given one day off of a sentence for every fifteen (15) hours of active participation and progress in an approved education course, up to two (2) days a calendar month.
- A student inmate is able to earn up to ten (10) days off his/her sentence if he/she passes the five sections of the GED test.
  - A student inmate must positively participate in and successfully complete at least seventy-five (75) hours of classroom work in adult education to be eligible.
  - Inmates housed at the Sandra Larson Facility may satisfy the requirement with forty-five (45) hours of participation in classroom work subject to the approval of education staff.
  - Student inmates diagnosed as functionally illiterate (with a reading level below the fourth grade) will be eligible to earn two (2) days off

their sentence for each grade level of progress that they demonstrate in reading. This is limited to five (5) days of earned time credits.

- Upon notification of successful completion of the program, booking personnel will again ensure that the inmate meets the minimum eligibility requirements.
- For those inmates who qualify, booking records staff will adjust the inmate's release date in the JIMS computer system and notify the inmate of the time credited and of the new release date. All completed forms will be signed by the booking officer and placed in the inmate's file.
- The Education Department will have the responsibility of maintaining careful and certified records of educational achievement, which will be contemporaneously logged and preserved for the length of each student inmate's custody and probation period.
- Time earned off any sentence must be used exclusively for the particular student inmate's current Sacramento County sentence.
- Once the inmate is released from custody remaining time will not be "banked" or "stored."
- An inmate's new sentence based on a probation violation on the same case or any sentence on a new and different case will begin with zero in-custody literacy and education incentive program credits.

Per Draft Operations Order Inmates with Disabilities - ADA, the programs and services offered within the Sacramento County Sheriff's Department detention facilities shall be accessible to all inmates. Provisions shall be made to ensure that all services, programs, and activities are readily accessible to and usable by individuals with disabilities. Inmates shall have equal access to educational services within the Sacramento County Detention Facilities. The ADA Coordinator will make arrangements to accommodate special educational needs unless access to these services prevents safe operation of the programs or activities. Eligibility requirements shall not be imposed that eliminate or tend to eliminate inmates with disabilities, unless it can be shown that such requirements are necessary for the provision of the service. Inmates who volunteer for, or are required to participate in, the drug education course and who experience learning disabilities must be provided a reasonable accommodation toward completion of the course, including an alternate means of testing. All program offerings shall be located in areas that are accessible to all inmates regardless of ability. For inmates with an inability to read or write, the ADA Coordinator will ensure reasonable accommodations are made for inmates who are illiterate or who are physically incapable of reading or writing, which may include, but is not limited to, enlarged print materials, identification of desired materials, and assistance in reading and scribing forms.

Per policy 1107, Decision Making-Special Needs, consultation between the Facility Commander and the Medical Director is required for actions regarding



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

patients who are diagnosed as having significant medical or mental health disorders, as follows:

- Housing assignments.
- Program assignments.
- Disciplinary measures.
- Admissions to and transfers from institutions.

Maximum cooperation between custody personnel and health care providers is essential so that both groups are made aware of movements and decisions regarding patients with special medical or psychiatric needs. For example, health care staff must inform custody personnel when an inmate is suicidal, homicidal, or inappropriately housed in the jail for health care reasons. An inmate's special needs may complicate housing or work assignments or disciplinary management. Medications may need to be adjusted for safety at the work assignment or before transfer.

**Programs Overview**

**Main Jail Educational Programs**:

**High School Equivalency** preparation covers math, English language arts (ELA), social science and science content assessed by the HiSET examination. Participants take practice tests and prepare to take the five-part exam. Participants take the official HiSET exams onsite once they have passed the practice tests.

| | |
|---|---|
| 2-East | Only Offered 1 on 1 with 3 slots available |
| 2-West | Not Offered |
| 3-East | PC Pods 100/200 Not offered on Pod 300 (OPP) |
| 3-West | Not Offered |
| 4-East | PC Pods 100/200/300 |
| 4-West | GP Pods 100/300 |
| 5-East | GP Pods 100/200/300 |
| 5-West | GP Pods 100/200/300 |
| 6-East | GP Pods 100/200/300 |
| 6-West | GP Pods 100/200/300 |
| 7-East | TSEP/ADSG/MED/7 East PC 1 on 1 with 3 slots only |
| 7-West | GP Pods 100/200 |
| 8-East | Only Offered 1 on 1 with 3 slots available |
| 8-West | Only Offered 1 on 1 with 3 slots available |

**Adult Basic Education (ABE)**

Designed to develop skills to an eighth grade level, this course is offered to help participants improve in the areas of reading, writing, and mathematics. Length of program varies based on testing scores.

| | |
|---|---|
| 2-West | Not Offered |
| 3-East | PC Pods 100/200 Not offered on Pod 300 (OPP) |
| 3-West | Not Offered |
| 4-East | PC Pods 100/200/300 |
| 4-West | GP Pods 100/300 |
| 5-East | GP Pods 100/200/300 |
| 5-West | GP Pods 100/200/300 |
| 6-East | GP Pods 100/200/300 |
| 6-West | GP Pods 100/200/300 |
| 7-East | TSEP/ADSG/MED/7 East PC 1 on 1 with 3 slots only |
| 7-West | GP Pods 100/200 |
| 8-East | Only Offered 1 on 1 with 3 slots available |
| 8-West | Only Offered 1 on 1 with 3 slots available |

**English as a Second Language (ESL)**

This course teaches English to participants whose primary language is not English.  Length of program varies based on testing scores.

| | |
|---|---|
| 2-West | Not Offered |
| 3-East | PC Pods 100/200 Not offered on Pod 300 (OPP) |
| 3-West | Not Offered |
| 4-East | PC Pods 100/200/300 |
| 4-West | GP Pods 100/300 |
| 5-East | GP Pods 100/200/300 |
| 5-West | GP Pods 100/200/300 |
| 6-East | GP Pods 100/200/300 |
| 6-West | GP Pods 100/200/300 |
| 7-East | TSEP/ADSG/MED/7 East PC 1 on 1 with 3 slots only |
| 7-West | GP Pods 100/200 |
| 8-East | Only Offered 1 on 1 with 3 slots available |
| 8-West | Only Offered 1 on 1 with 3 slots available |

There are only a total of 3 slots available for inmates housed in 2-East, 7-East, 8-East and 8-West.

**Main Jail Substance Abuse Self Help Programs**:

**Substance Misuse/Abuse**

The goal of this course is to educate participants in the biological, psychological, and social issues of addiction and chemical dependency and introduce them to appropriate options for recovery.  Program is 12 sessions. Alcohol Anonymous, Cocaine Anonymous, Narcotic Anonymous, Substance Abuse

| | |
|---|---|
| 2-West | Not Offered |
| 3-East | Not Offered |

| | |
|---|---|
| 3-West | Pods 100/200 Not offered on Pod 300 (OPP) |
| 4-East | Not Offered |
| 4-West | GP Pods 100/300 |
| 5-East | Not Offered |
| 5-West | Not Offered |
| 6-East | Not Offered |
| 6-West | Not Offered |
| 7-East | Pod 100 |
| 7-West | GP Pods 100/200 |
| 8-East | Not Offered |
| 8-West | Not Offered |

**Life Skills**

A weekly class teaching men a variety of topics including goals, relationship skills, self-image, healthy eating, etc.

| | |
|---|---|
| 2-West | Not Offered |
| 3-East | Not Offered |
| 3-West | Not Offered |
| 4-East | Not Offered |
| 4-West | GP Pods 100/300 |
| 5-East | Not Offered |
| 5-West | Not Offered |
| 6-East | Not Offered |
| 6-West | Not Offered |
| 7-East | Not Offered |
| 7-West | GP Pods 100/200 |
| 8-East | Not Offered |
| 8-West | Not Offered |

**Man Alive/Woman Alive**

The MJ partners with a Sacramento County Certified Batterers Treatment provider to offer participants the strategies needed to stop their pattern of violent behavior and be accountable to themselves, their families, and their community. Program is 52 hours.

| | |
|---|---|
| 2-West | Not Offered |
| 3-East | Not Offered |
| 3-West | Not Offered |
| 4-East | Not Offered |
| 4-West | GP Pods 100/300 |
| 5-East | Not Offered |
| 5-West | Not Offered |
| 6-East | Not Offered |

|         |                  |
|---------|------------------|
| 6-West  | Not Offered      |
| 7-East  | Not Offered      |
| 7-West  | GP Pods 100/200  |
| 8-East  | Not Offered      |
| 8-West  | Not Offered      |

## Parent Education (CPS approved)

This program exposes participants to how negative and hurtful parenting affects the psychological and physical development of children. Participants learn ways to create a healthy family environment through nurturing behavior practices. Parent Education Certificate is 60 hours.

|         |                  |
|---------|------------------|
| 2-West  | Not Offered      |
| 3-East  | Not Offered      |
| 3-West  | Not Offered      |
| 4-East  | Not Offered      |
| 4-West  | Not Offered      |
| 5-East  | Not Offered      |
| 5-West  | Not Offered      |
| 6-East  | Not Offered      |
| 6-West  | Not Offered      |
| 7-East  | Not Offered      |
| 7-West  | GP Pods 100/200  |
| 8-East  | Not Offered      |
| 8-West  | Not Offered      |

## Book Club

A Biweekly group for women to read and discuss books of a variety of genres including Forgiveness, Gratitude, Resilience, and Family.

|         |                  |
|---------|------------------|
| 2-West  | Not Offered      |
| 3-East  | Not Offered      |
| 3-West  | Not Offered      |
| 4-East  | Not Offered      |
| 4-West  | Not Offered      |
| 5-East  | Not Offered      |
| 5-West  | Not Offered      |
| 6-East  | Not Offered      |
| 6-West  | Not Offered      |
| 7-East  | Not Offered      |
| 7-West  | GP Pods 100/200  |
| 8-East  | Not Offered      |
| 8-West  | Not Offered      |

**Self Esteem**

Weekly 10 course class addressing awareness, choices, and change for Women.

| | |
|---|---|
| 2-West | Not Offered |
| 3-East | Not Offered |
| 3-West | Not Offered |
| 4-East | Not Offered |
| 4-West | Not Offered |
| 5-East | Not Offered |
| 5-West | Not Offered |
| 6-East | Not Offered |
| 6-West | Not Offered |
| 7-East | Not Offered |
| 7-West | GP Pods 100/200 |
| 8-East | Not Offered |
| 8-West | Not Offered |

**RCCC Educational Programs**:

**High School Equivalency** preparation covers math, English language arts (ELA), social science and science content assessed by the HiSET examination. Participants take practice tests and prepare to take the five-part exam. Participants take the official HiSET exams onsite once they have passed the practice tests.

**Adult Basic Education (ABE)**

Designed to develop skills to an eighth grade level, this course is offered to help participants improve in the areas of reading, writing, and mathematics. Length of program varies based on testing scores.

**English as a Second Language (ESL)**

This course teaches English to participants whose primary language is not English. Length of program varies based on testing scores.

**Parent Education (CPS approved)**

This program exposes participants to how negative and hurtful parenting affects the psychological and physical development of children. Participants learn ways to create a healthy family environment through nurturing behavior practices. Parent Education Certificate is 60 hours.

**Computers**

Participants learn office computer skills relevant to the current job market including Microsoft applications such as Word, Excel, and PowerPoint. Filing procedures, telephone communications, and document duplication are also covered. Computer Application certificate is 150 hours.

**Computer Aided Design/SolidWorks**

Participants will apply their knowledge of fundamental engineering and design principles and practices to review SolidWorks concepts. Additionally, students will have prepared industry-related projects designated by the instructors. They will be prepared for entry-level jobs in the mechanical drafting field. The CAD/SolidWorks certificate is 240 hours.

**Read Out**

*Read Out* is an educational incentive for students. Students can earn time off of a non-mandated sentence for active participation in class(es). *Read Out* is tied to good attendance.

**Transition Assistance**

Elk Grove Adult and Community Education ("EGACE") offers a transition program to students exiting the MJ and RCCC. Upon release, students can schedule to meet with a transition specialist at EGACE on Gerber Road. The transition specialist can help students develop an education and work plan, enroll in academic or training classes at EGACE, transfer to college, or transfer to work. GED Test Preparation students who have taken and passed one exam while at the MJ or RCCC may transfer to EGACE to complete the GED Test Preparation and Testing.

- Inmates housed in JKF/KBF can participate in the following education programs ESL/HiSET/ABE.
- Inmates housed in CBF are not offered education programs.
- Inmates housed in SBF can participate in ESL/HiSET/ABE.
- Inmates housed in SLF (Female) can participate in ESL/HiSET/ABE, and Computers.
- Inmates housed in Barracks A, J, and K are not offered education programs based on pre-sentenced status.
- Inmates housed in Barracks B, C, D, G, H, and M can participate in all educational programs.

**RCCC Reentry Services:**

Reentry services are provided to sentenced offenders. These services provide evidence-based vocational, educational, and treatment programs. The goal is to reduce the rate of incarceration and to offer offenders the tools necessary for successful reintegration into the community. Inmates with over 60 days to serve will be assessed to determine the track they will be placed on. These tracks include: vocational, treatment and education. If an inmate is placed on the reentry services track a reentry specialist will meet with him/her to complete an individualized assessment and create a reentry plan. A reentry plan may include cognitive behavioral groups, substance abuse classes, employment classes,

education, vocational training programs, and family reintegration. Post-release services may be available to those inmates who participate in reentry services. Post-release services may include supportive services based on individual needs, and eligibility is determined during an inmate's participation in the reentry program.

- Inmates housed in JKF/KBF are not offered reentry programs.
- Inmates housed in CBF are not offered reentry programs.
- Inmates housed in SBF are not offered reentry programs.
- Inmates housed in SLF (Female) can participate in reentry programs.
- Inmates housed in Barracks A, J, and K are not offered reentry programs based on pre-sentenced status.
- Inmates housed in Barracks B, C, D, G, H, and M can participate in all reentry programs.

## RCCC Vocational Programs:

### Culinary Arts

Participants learn core culinary skills and are provided with basic training that enables them to get employment in the food service industry. Participants also receive an industry-recognized certificate upon completion. Program length for Cook Assistant and Cook Training Certificate is 170 Hours and Cake Decorating is 8 weeks.

### Employment Readiness and Life Skills

Participants are taught strategies for employment success including the development of a resume, interview practice, and how to dress and present oneself in a professional setting. The Reentry Services Bureau has one Reentry Specialist specifically dedicated to the area of Employment Readiness and Life Skills. Employment partnerships in Sacramento, Elk Grove, and other surrounding areas have been, and are continuing to be, established and job placements are occurring. Life skills is 18 sessions.

### Custodial Training

Participants learn basic procedures in custodial and housekeeping operations to include knowledge of janitorial equipment, basic repairs, cleaning materials, safety along with blood-borne pathogens and infectious waste training. The goal of the course is that upon completion participants are prepared for custodial employment. Custodial Certificate is 150 hours.

### Horticulture and Landscaping

Participants are exposed to different techniques of propagation and irrigation with an emphasis on environmental horticulture and landscape maintenance. Upon completion, participants will have been given the knowledge, practical skills, and

training necessary to successfully attain employment in the nursery and landscaping industry. Introduction to Ornamental Horticulture is 435 hours.

### Welding

The welding program is a three-step program designed to provide participants with knowledge of welding and manufacturing. Participants complete this program in a shop environment to gain an understanding of shop safety, welding, and metal manufacturing. When participants complete the welding program, they will have all of the necessary skills to gain employment in the welding and manufacturing field. The program offers three levels: a Beginning Class, an Advanced Class, and an Apprenticeship. Participants are eligible to test to receive an American Welding Society Welding Certification. Those who complete the Advanced Class are eligible to receive two college credits from Cosumnes River College and are eligible to apply for the Apprenticeship Program. The program is accredited by the California's Division of Apprenticeship Standards. Participants at this level receive apprenticeship hours for the time spent working on projects in the shop. Participants can continue their apprenticeship when they leave the facility. Beginning Certificate is 240 hours and Advanced Welding is an additional 240 hours.

### Northern California Construction Training (NCCT)

NCCT offers a building trade pre-apprenticeship program at the Rio Cosumnes Correctional Center. Participants learn through classroom material and beginning hands-on trade skills. Upon release, the participants can continue the pre-apprenticeship program with NCCT's community-based program.

### Sacramento Wild Horse Program

In partnership with the Bureau of Land Management, Rio Cosumnes Correctional Center offers participants the opportunity to train and maintain the well-being of wild horses. The program has 6 levels of instruction to teach participants basic horsemanship, equipment, gentling techniques, feeding, care and horse anatomy. Certificates are awarded upon successful completion of each domain.

### Engraving/Print Shop

Participants learn how to operate and properly service 3D printers, large format printers, laser engravers, and binding machines while learning various design software including Adobe Photoshop, Adobe Illustrator, Adobe InDesign, and Solid Works. Inmates who successfully complete the training are awarded a certificate of completion that outlines the level of competency they have achieved. Length of program varies.

- Inmates housed in JKF/KBF are not offered vocational programs.
- Inmates housed in CBF are not offered vocational programs.
- Inmates housed in SBF are not offered vocational programs.

- Inmates housed in SLF (Female) can participate in vocational programs.
- Inmates housed in Barracks A, J, and K are not offered vocational programs based on pre-sentenced status.
- Inmates housed in Barracks B, C, D, G, H, and M can participate in all vocational programs offered at RCCC.

**Substance Abuse Treatment RCCC**:

**Housing for Accountable Living Transitions/Residential Substance Abuse Treatment (HALT/RSAT)**

HALT/RSAT provides substance abuse treatment and reentry service to inmates and supports their transition back into the community. This program provides substance abuse treatment and education, assisting the offender in changing learned behaviors while offering him or her the tools to become a productive member of the community. Participants receive individual needs assessments and assistance with aftercare services for up to one year after they are released from custody. Participants receive a program certificate upon successful completion and time off their sentence for education hours when eligible. Program is 200 hours for low offenders and 300 for medium to high offenders.

**Substance Misuse**

The goal of this course is to educate participants in the biological, psychological, and social issues of addiction and chemical dependency and introduce them to appropriate options for recovery. Program is 12 sessions.

**Denial Management**

The goal of this course is to help participants recognize their denial patterns and to overcome them. Program completion is dependent on workbook completion.

**Relapse Prevention**

This course focuses on the thinking process that leads to relapse and understanding the belief system that can lead to prevention. Program completion is dependent on workbook completion.

**Man Alive/Woman Alive**

Rio Cosumnes Correctional Center partners with a Sacramento County Certified Batterers Treatment provider to offer participants the strategies needed to stop their pattern of violent behavior and be accountable to themselves, their families, and their community. Program is 52 hours.

**Thinking for Change**

This cognitive behavioral course teaches social skills, cognitive self-change and problem solving strategies. It is designed to help participants set personal and professional goals. Certificate is based on 27 sessions.

## Moral Reconation Therapy

A cognitive behavioral course aiming to decrease recidivism rates through lessons focused on criminal thought and the treatment of substance abuse. Program ranges from 24-36 hours.

- Inmates housed in JKF/KBF are offered Man Alive, Substance Misuse and Narcotic Anonymous.
- Inmates housed in CBF are not offered substance abuse programs.
- Inmates housed in SBF are not offered substance abuse programs.
- Inmates housed in SLF (Female) can participate in substance abuse programs.
- Inmates housed in Barracks A, J, and K are not offered substance abuse programs based on pre-sentenced status.
- Inmates housed in Barracks B, C, D, G, H, and M can participate in all vocational programs offered at RCCC.

## QUEST

The QUEST Program is the in-custody gang diversion program. QUEST (Question, Understand, Evaluate, Succeed, Transform) contains an evidence-based curriculum which uses behavioral therapy principles, training and success principles. All participants must be documented gang members or gang associates. All participants are housed together in a joint QUEST / HALT barrack, separate from non-program inmates. This therapeutic housing environment allows participants to focus on their programming and development.

## Incarcerated Men's Accountability Program (IMAP):

Incarcerated Men's Accountability Program is a specialized housing unit for offenders seeking substance abuse, batterer's intervention and accountability awareness. The IMAP is not a treatment program, nor does the unit expect to produce, by itself, a profound change in the offender. The program does seek to raise the offender's awareness and provide direction and support for change during the time an inmate is incarcerated after his/her initial arrest.

- Inmates housed in J Barracks can participate in IMAP and Quest.

## Observations

The Assessment Team noted during the on-site assessment that on a regular basis the multi-purpose room where programs are conducted was regularly occupied by an inmate on 15-minute checks.  Based on this the program scheduled would have to be re-located to another area or in most cases canceled due.  Staff indicated that the placing of inmates in the multi purpose rooms occurs frequently and as a result programs are cancelled.

**Staff Interviews**

The Assessment Team interviewed staff assigned to the reentry programs, EGUSD, and program providers. Staff stated that there is no system that would alert the programs unit of an inmate's disability.  Staff stated they could identify an inmate with a physical disability by sight and an inmate with either a learning disability or developmental disability by interacting with the inmate (writing assignments).  In some cases the inmate may self-identify the disability.  The only mechanism that may alert education staff to an inmates learning or intellectual disability would be when the inmate is given the CASAS exam. However, the EGUSD does not share this information with custody staff. The EGUSD staff and the program providers all indicated that inmates with disabilities would be accommodated in the classrooms once the instructor was advised of the disabled inmate's specific needs i.e. allowed to stand, restroom breaks etc. The EGUSD, reentry unit, and program providers do not have a tracking system to identify disabled inmates; therefore, the Assessment Team could not determine how many disabled inmates have been assigned or are currently assigned to an education, reentry, vocation and substance abuse program. EGUSD staff stated that OPP inmates cannot attend education classes as they are screened out by classification.  In addition, for inmates classified as TSEP or ADSEG and those housed on 2-East there are only 3 slots available.

Accommodations for vision-impaired inmates are limited to provision of reading glasses following the reading glasses policy and in some cases enlarging the educational material to a larger font including on a computer screen.  In cases where an inmate requires prescription glasses, the inmate's family is contacted to see if they can provide the glasses.  There are no other assistive devices (large print, magnifiers, Galileo machines etc.) provided for vision-impaired inmates.  In some cases, the teachers stated that they would read the material to the inmate. For hearing-impaired inmates, the only accommodations that the programs can provide is headphones for the computer classes or allowing the inmates to move closer to the instructor during program time when there is no SLI available and/or provided.  An EGUSD teacher stated that there is a deaf inmate assigned to his program, and communication is achieved with written notes.

There are no pull out sessions or teacher's assistants for inmates who are learning or intellectually disabled. Individual Education Plans (IEPs) are not followed and individual teachers make accommodations on a case-by-case basis. Accommodations that are made include pairing an inmate with another student, and providing one-on-one instruction if time allows.  The teachers stated that they would repeat and rephrase the material/lesson in cases where an inmate required accommodations to understand the lesson being presented.

Staff stated that at the MJ inmates are advised of the education and self-help programs via the Inmates Rulebook.  Staff also stated that inmates become aware of the programs via other inmates.  At RCCC, staff stated that inmates become aware of educational, reentry and substance abuse/self help programs

via the inmate handbook and also by word of mouth. The EGUSD staff stated that a weekly orientation is provided based on inmate sign-up/request. Orientation sign-up sheets are delivered to every housing unit/barrack on a weekly basis. The EGUSD staff schedule the inmates for an orientation where staff explain to them the programs that are available. In addition, inmates take the CASAS placement exam and program eligibility is based on their score. If inmates do not receive a score making them eligible for a program, they are enrolled in ABE/ESL in an effort to improve their score.

Staff stated that EGUSD does not test all inmates to identify their reading level. However, for inmates requesting assignment to an EGUSD program, the CASAS test, which is a Life Skills Literacy Test, can be used to identify literacy concerns. In the event information becomes available that an inmate was in special education classes and had an IEP in the community, EGUSD is compelled to follow the IEP. The EGUSD staff stated that they do not receive formal ADA or EC training.

### Inmate Interviews

During the inmate interviews, most inmates housed in locations where education, vocation, reentry and substance abuse programs are not offered stated they are not aware of programs are offered or what types of programs are offered. Most inmates stated that they become aware of the programs available from other inmates as staff does not provide orientation and in some cases inmates are not provided with the Inmate/Detainee Handbook. Most inmates stated they would participate in the programs if they were offered. Inmates housed in the OPP pods and in the medical housing unit at the MJ stated that there is no program availability for them and they would participate if they were offered.

Many inmates assigned to housing on nearly all floors (MJ) indicated that psychiatric inmate-patients on suicide precaution status ("green suits") are often housed in the multi-purpose/classroom areas within the floors/units (for as much as three weeks at a time), and as a result, academic classes are often cancelled.

### Conclusions

Housing the MJ disabled inmates with wheelchairs, walkers, crutches etc. who require accommodations (grab bars, showers chairs etc.) or those that cannot ambulate up stairs or over the shower lip in 2-East Male Sub-Acute housing units is a violation of the ADA. The only program available to disabled inmates housed in 2-East are ESL/ABE/GED. If the inmates were housed in units consistent with their security and classification level, they would have access to the programs available to all other inmates of the same level housed in the MJ. This violates 28 CFR § 35.152 (b)(1) of the Title II Regulations.

Inmates housed in OPP units are being screened out by classification staff and are not able to participate in education, reentry, and substance abuse programs

in the MJ. At RCCC the inmates housed in the OPP are not being provided program opportunities available to non-disabled inmates with similar custody and classification factors. This is in violation of 28 CFR § 35.152 (b)(1) of the Title II regulations.

Disabled inmates are not uniformly advised of educational, reentry and substance abuse self help programs available to them. Although information is contained in the Inmate/Detainee Handbook, this information is not being effectively communicated to disabled inmates. Inmates who are vision, learning or developmentally disabled are not being advised of program availability by staff and must therefore rely on information being provided from other inmates. Although a SCSD detention facilities operations order states that inmates are provided notice via the inmate rulebook given to arriving inmates and verbal orientation of programs offered and available to inmates while in custody, orientation is not being provided, in addition, many vision impaired, learning disabled and developmentally disabled inmates cannot read. Therefore, these disabled inmates are unaware of the programs available and how to access the programs. Inmates must submit a Message Request Form requesting services; however, these disabled inmates cannot complete the Message Request Form since they cannot read or write.

The SCSD detention facilities must ensure disabled inmates are equally afforded the ability to be assigned to educational, vocational, reentry and substance abuse programs.

Based on the lack of an effective tracking system for qualified disabled inmates SCSD detention facilities staff do not have the capability to notify the EGUSD, reentry, vocation, and substance abuse providers/staff of inmates that require accommodations to access programs, services and activities.

Inmates who are hearing impaired and require an SLI as their primary method of communication are being denied this accommodation. The EGUSD does not have a contract in place to provide SLI services for deaf inmates who participate in education and vocational services provided by EGUSD, which is a requirement of ADA.

Inmates with vision disabilities are not being provided the necessary accommodations to participate in the programs. In some cases no accommodations are being provided, as not all inmates who require reading glasses are being provided this accommodation.

There is no testing process in place to identify inmates who cannot read and write or who have potential learning disabilities and may require accommodations during their assigned program.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

**Reference**

**28 CFR§ 35.152(b)(1**) Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.130(a)** requires that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.130(b)(7)** states that a public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

**28 CFR 35.130(b)(1)**: A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

**28 CFR 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

**28 CFR 35.130(b)(4)**: A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

**28 CFR 35.130(b)(8):** A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

*The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Armstrong v. Brown settlement agreement.*

**As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis (now Armstrong v. Brown) amended January 3, 2001, mandates the following (for mobility-disabled inmates as well as those with other disabilities):**

*Inmate Programs and Work Assignments:*

*Eligibility to participate in any program depends upon the inmate's ability to perform the essential functions of the program, with or without reasonable accommodation.*

*Reasonable accommodations for all disabled inmates to access program assignments may include, but are not limited to, a modified work or school schedule, early release to/from meals, or assignments for mobility impaired inmates.*

*Only when an inmate's disability even with reasonable accommodations renders the inmate ineligible to participate in any available work program for which the inmates is otherwise qualified will the inmate be deemed "Medically Disabled".*

*Essential functions are defined as the basic duties/requirements of services, assignments, or program an inmate performs, receives or desires. This does not include the marginal duties of the position, services, assignments, or programs. Duties/requirements should be examined to determine which tasks are essential and which are nonessential.*

*The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Clark v. California settlement agreement.*



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Clark v. California amended March 1, 2002, mandates the following:*

*Inmate Education and Work Assignments:*

*Modification of reading prerequisites, terminal objectives for a class program, and other accommodations are essential if inmates with developmental disabilities are to have equal access to academic, vocational, and work assignments.*

*Inmates with developmental disabilities assigned to an education, vocational, work, or other program may receive additional supervision and training to help them meet the requirements of the assignment. Accommodations may include oral rather than written tests, lower production expectations, expanded time frames for completion of projects etc.*

*Evaluation of an inmate's removal from a program assignment must be done on a case-by-case basis, and will take into account a number of factors including the inmate's ability to perform the essential functions of the program, the inmate's misbehavior and refusal to work as directed.*

## Access to Industries and Work Assignments

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures applicable to inmate access to Industries, and Work Assignments, for disabled inmates are outlined in: Operations Order 06/19 Inmate Workers, Operations Order 07/07 Jail Industries, Draft Operations Order Inmates with Disabilities - ADA, and 1107 Decision Making-Special Needs.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1061 Inmate Education Plan requires that:

The facility administrator of any Type II or III facility shall plan and shall request of appropriate public officials an inmate education program. When such services are not made available by the appropriate public officials, then the facility administrator shall develop and implement an education program with available resources. Such a plan shall provide for the voluntary academic and/or vocational education of both sentenced and non-sentenced inmates. Reasonable criteria for eligibility shall be established and an inmate may be excluded or removed from any class based on sound security practices or failure to abide by facility rules and regulations.

Per Operations Order 06/19 Work Assignments, the Selection Process for Sentenced Inmate Workers is as follows:

Although subject to change, the housing units currently used for housing sentenced inmate workers are 3 West at the MJ, the honor facility barracks, and Kenya and Golden Poppy dorms at RCCC. Custody staff assigned to inmate worker housing units will have the same general responsibilities at both custody facilities. Classification staff is responsible for initially determining which sentenced inmates are eligible to be assigned as sentenced inmate workers. The following factors should be taken into consideration:

- An escape record.
- An extensive criminal history of possession or transportation of narcotics.
- History of assault on officers, staff or other inmates.
- Pending 3056 PC or 2620 PC holds.
- Medical problems or mental deficiencies which would interfere with job performance.
- History and/or current exhibition of anti-social behavior.
- History of, or current, major disciplinary actions.
- Gang membership or association may be a declining factor.

Once a sentenced inmate has been assigned to an inmate worker housing unit, the custody staff assigned to the housing unit will determine what assignment best suits the needs of the facility and inmate. Further evaluation of past history



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

may aid in determining suitability for a certain position. Custody staff assigned to work crews (kitchen, laundry, etc.) will generally be permitted to make the final decision to accept or release a particular worker for the specified work crew.

Sentenced inmate workers are sometimes referred to as minimum-security inmates due to their supervised access to tools, off site facility work, contact with custody staff and access to places within a facility not normally accessed by other inmates.

Custody staff who are most closely associated with directly supervising the job task assigned to an inmate are responsible for presenting that inmate with the training needed to safely and properly perform that task. Inmates should not perform a job or task prior to receiving safety instruction.

Inmates who refuse to work or perform unsatisfactorily may be subject to disciplinary action. If the violations are sustained as a result of a disciplinary hearing, the inmate may lose good time and/or work time credits. As a result of disciplinary action, the inmate may lose worker status. If an inmate worker receives discipline, he/she may appeal the action through the normal grievance appeals process.

Inmates assigned as housing unit pod workers are generally not sentenced inmate workers, rather are pre-trial or post-trial, non-sentenced or pending sentence status inmates. Typical duties of a housing unit worker may include janitorial duties, meal delivery/service, empty cell cleanup, etc. Housing unit inmate workers shall be subjected to a selection process prior to hiring. Inmates meeting the following criteria will not be hired or used as housing unit workers:

- Inmates with murder charges.
- Inmates with a history of escape or attempted escape.
- Inmates with a history of assaultive behavior towards staff or other inmates during this or any previous custody period.
- Inmates with a medical condition that would prevent them from fulfilling the assigned duties.
- Inmates posing a security risk or who are being monitored.
- Inmates assigned to a 100 Pod and affiliated with a gang.
- Inmates who have numerous major violations of jail rules that have resulted in disciplinary action should be evaluated prior to selection.

If a housing unit worker is fired, an Incident Report Detail (PF-10) and logbook entry shall be completed. If another shift wishes to re-hire the fired worker, the firing shift will be consulted and a supervisor will approve the reinstatement.

Per Operations Order 08/10 Jail Industries, program selection for the Jail Industry programs will be based on the value of the training to inmates in terms of providing usable vocational skills, as well as the demand for services and products, allowing private individuals and businesses to conduct programs which



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

employ inmate labor. County staff, instructors from the Elk Grove School District Adult Education Program, qualified volunteers, and other persons as deemed appropriate may be assigned to supervise inmates participating in the Jail Industries program.

Selection of inmates for voluntary participation in the Jail Industry Program will be accomplished in accordance with Operations Order 06/19, Inmate Workers. The shop supervisor or assigned staff will evaluate the inmates before acceptance into the program. Inmates with unacceptable performance histories, custody problems or other disqualifying problems should not be accepted. After acceptance into the program, continued good performance is required for continued participation.

Shop supervisors will have authority to dismiss an inmate from the program at any time. The termination may be for reasons including, but not limited to lack of adequate performance, unruly behavior, and the need to maintain a harmonious environment.

Based on the specifications established by the shop supervisor who must be mastered for beginning competency in the specified trade, a certificate will be issued to the inmate upon discharge or reassignment if the inmate has met the qualifications and has completed the program in good standing.

Per Draft Operations Order Inmates with Disabilities - ADA, all qualified inmates are eligible for job assignments. This includes inmates with disabilities, who, with or without reasonable accommodation, can perform the essential function of the work assignment. Classification staff, in coordination with the ADA Coordinator, shall ensure necessary, reasonable accommodations are made to allow inmates with disabilities equal access to work assignments.

Eligibility requirements for service programs shall not be imposed that eliminate or tend to eliminate inmates with disabilities, unless it can be shown that such requirements are necessary for the provision of the service. Inmates who volunteer for, or are required to participate in, the drug education course and who experience learning disabilities must be provided a reasonable accommodation toward completion of the course, including an alternate means of testing. All program offerings shall be located in areas that are accessible to all inmates regardless of ability. American Sign Language (ASL) interpreters are available for all program services and can be arranged for by contacting (916) 874-1448. All expenses incurred from the utilization of interpreters shall be submitted for payment through the IWF or an alternative. The ADA Coordinator will maintain a list of qualified sign language interpreters who can be utilized in time of need. Temporary clearance can be granted by the Watch Commander on an as-needed basis.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Per Policy 1107 Decision Making-Special Needs, consultation between the Facility Commander and the Medical Director is required for actions regarding patients who are diagnosed as having significant medical or mental health disorders, as follows:

- Housing assignments.
- Program assignments.
- Disciplinary measures.
- Admissions to and transfers from institutions.

Maximum cooperation between custody personnel and health care providers is essential so that both groups are made aware of movements and decisions regarding patients with special medical or psychiatric needs. For example, health care staff must inform custody personnel when an inmate is suicidal, homicidal, or inappropriately housed in the jail for health care reasons. An inmate's special needs may complicate housing or work assignments or disciplinary management. Medications may need to be adjusted for safety at the work assignment or before transfer.

### Staff Interviews

The Assessment Team interviewed custody staff assigned to the housing units where sentenced inmate workers are housed, work supervisors assigned to the laundry and kitchen areas, EGUSD staff assigned to the industry programs, and deputies who are involved in the selection of housing unit pod workers also referred to as "Housemen". All staff interviewed stated that there is no system in place to alert staff that an inmate being considered for a work or industries assignment may have a disability other than information contained in the PF4 and PF10 screen of JIMS. Staff stated that one of the ways staff would be alerted to a potential disability would be based on staff observation or the inmate's self-identification. All staff also stated that there is no system in place to advise staff of an inmate's physical limitations and the inmate's accommodation needs.

Staff from the EGUSD cited the following specific information; there is one regularly assigned teacher (Monday through Friday), and an ESL teacher on Fridays. There are no special education teachers on staff, and none of the current teachers have special education credentials. Currently there are no teacher's aides or assistants on staff. The teachers indicated that they do not facilitate IEPs per se, but they honor them and provide assistance if inmates provides their applicable outside (public) education information. They do not provide formal "pullouts" (1-on-1 sessions), but they try to provide assistance to inmates as much as possible. Staff also mentioned that sometimes they would assign these inmates into low levels in the ESL program.

The EGUSD teachers indicated that they actively recruit, and one of the methods is by sending interest forms to the housing units every month. Once staff



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

receives them, they pass them out to the trustees ("Housemen") to place under the cell doors. Inmates also submit a KITE if they are interested in education services. Staff added that a registration form is completed; if they qualify, they will be placed on a waitlist and ultimately take the CASAS examinations so long as there are no disqualifying concerns. The CASAS score (or any associated reading level/score) is not provided to custody or health care staff or other staff. The CASAS score is the mechanism they use that may alert the teachers as to any possible cognitive or disability-related concerns or special needs. Also, there is some basic information contained within the registration form regarding disabilities.

Inmates who are denied for program consideration are removed from the waitlist. Inmates who are housed on TSEP status usually have a lengthy wait time. Inmates who are rehoused to a different floor are placed at the top of any waitlist, except TSEP inmates are placed at the bottom of the list. Most classes have a cap of 15 students, i.e., ABE/ESL/HISET (GED), and parenting. However, for TSEP/ADSEG and 2M, there is a cap of 3 students. Most classes are offered 3 hours each weekly, but students housed in ADSEG, TSEP, and 2M receive 1 hour per week of 1-on-1 instruction weekly. Parenting class is only available for female inmates. For HISET and ABE, there is one class for 5E and 6E; and there are 2 classes for 4, 5, and 6W. Staff acknowledged that there are times when program classes are closed due to "green suits" (suicide precaution) in classrooms. Per classification practices, mentally disabled inmates who are classified as OPP are disqualified for consideration for assignment based on their disability. Other than OPP inmates, the teachers interviewed are not aware of other disabled inmates being refused admittance to education. One of the teachers admitted that only 1 student from 2M has been accepted into a class within the last 2 years. There is no available data as to how many 2M inmates have applied.

With regard to in-class accommodations, as stated above, teachers do not have a disability roster or tracking list, and will only know whether an inmate has a disability if the inmate self identifies verbally or on the registration form. Accommodations that are available include: a large screen magnifier; computer headphones for hearing-impaired inmates; and mobility-impaired inmates may stand periodically as needed. There is not a seating chart, and inmates who have vision or hearing impairments may sit in the front of class if they need to.

The Assessment Team interviewed staff assigned to 3W, regarding inmate job assignments outside the unit, as well as within the unit. The 3W deputies select the inmates to fill vacant work positions within the MJ detention facility. Staff indicated that the main kitchen is their primary area both in terms of importance and in the number of inmate workers. Inmates housed in pods 100 and 200 are all potential workers. Areas of possible assignment include; main kitchen, law library, shoe shine, staff dining room, and janitorial (throughout the jail including

intake/booking). On a daily basis, the deputies screen inmates housed at RCCC, who have been cleared for work duties. Their own screening process includes some exclusionary criteria, e.g., no gang history, no protective custody classification, no excessive write-ups, and non-suicidal inmates. Staff admitted that they generally are not aware of whether any prospective inmates have a disability. When asked about learning disabled or intellectually disabled inmates, the 2 staff members interviewed indicated that those types of inmates would probably be classified as OPP, so they would not consider them for employment. When asked about mobility impaired inmates who happen to have an HCA/AD/DME, such as a cane, they indicated that there are slip hazards for most jobs, especially in areas such as the kitchen and other areas, and therefore they would not consider them for hire. They also mentioned that these types of inmate are then rehoused to a different floor or unit.

The 3W staff also acknowledged that there are no written inmate job descriptions/duty statements for any of the work positions (except possibly the law library position), and there are no identified essential functions (or marginal functions) listed. Most workers are either low or medium custody level, but there are a few high custody level workers. They described possible inmate work incentives as; daily clothing exchange, having a cellmate will be on a similar schedule, more dayroom and out-of-cell time (almost as much time as they choose), good-time credits, extra commissary privileges, and they can later be recruited for the Sheriff's outside work projects. If selected for outside work projects, the inmates will then be out-of-custody. They also added that those assigned to home detention could be recruited for the program as well.

Custody work supervisors from RCCC stated that there is no Work Assignment Coordinator and staff selects inmates for assignments based on recommendation from other inmates or may know inmates from previous work assignment. The inmates that are available for placement into work assignments are housed in the honor barracks at RCCC. There is no clear criteria or guidelines for hiring inmate workers. Workers do not earn sentencing or good behavior credits for working, but risk losing good time credits if they do not report to work or receive an infraction and are subsequently found guilty. The incentive for working in the laundry would be the ability to select and pick their laundry and extra trays from the dining hall. The incentive for working in the kitchen is extra food. Some of the custody work supervisors stated that they would work with the inmate and accommodate him/her by prompting, reminding, assigning them to a simpler job assignment, etc. Other custody work supervisors stated that they would remove an inmate from the job assignment if they could not perform the job or if they had to repeat instructions and remind inmates of their duties.

The Assessment Team interviewed industry supervisors/instructors assigned to welding, horticultural, and cooking. The supervisors stated that there is no system to alert them of a disabled inmate being assigned to their area. However,



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

in the event that a disabled inmate is assigned to their work area, they would accommodate him/her. Specifically, if the disabled inmate could not perform the duties assigned, staff would provide him/her with alternate job responsibilities. The supervisors stated that there have been disabled inmates assigned to their work area, and they have accommodated them in the past.

The Assessment Team interviewed housing unit staff that oversee and supervise the housing unit pod workers. Most staff stated that the selection of housing unit pod workers is based on each individual housing unit assigned custody staff with approval from Intel and classification. Two staff members indicated that the selection of the housing unit pod workers is based on other inmates' selection/vote with final approval from the custody housing unit staff. Most custody housing unit staff indicated that with the exception of information in JIMS (PF4 and PF10 screens) there was no system to alert them of inmate disabilities, physical limitations and accommodation needs. Some staff indicated that they would consider a disabled inmate for assignment as a housing pod worker; however, there were staff that stated that they would not consider or place a disabled inmate as a housing unit pod worker. These staff stated that it is the housing unit pod workers responsibility to control the unit and be able to diffuse problems before bringing them to the custody housing unit staff, therefore, the housing unit pod workers must have the respect of the other inmates and disabled inmates (intellectual, learning disabled and inmates with MH concerns) would not be suitable for the position.

The Assessment Team observed (and was confirmed through subsequent staff and inmate interviews) that inmates who are mentally disabled (OPP) and assigned to MJ 3E (which constitutes approximately half the inmates residing in one of the pods), are excluded from consideration to work as inmate trustees.

The assessment team also received verbal inmate complaints regarding mentally disabled inmates not being afforded equal access to job opportunities.

## Conclusions

Based on the inmate worker and industry positions not having essential functions identified and listed, it is difficult to determine what jobs disabled inmates could be assigned to based on their physical limitations and accommodation needs.

It does not appear that medical staff identifies work duty restrictions or places inmates on limited/full duty status to assist staff when placing disabled inmates in the appropriate work/industry assignments.

Inmates with intellectual disabilities assigned to work/industry positions are not provided additional supervision and training to help them meet the requirements of the assignment such as lower production expectations, expanded time frames for completion of projects, etc.

The criteria for the selection of inmate housing unit pod worker positions may lead to screening out of disabled inmates solely based on their disability as the criteria states that inmates with a medical condition that would prevent them from fulfilling the assigned duties will not be used or hired as housing unit pod workers. The selection process does not allow or require staff to consider and/or provide reasonable accommodations for disabled inmates who request to be considered as housing unit pod workers.

The SCSD detention facilities' operations orders do not outline whether disabled inmates will be or can be excluded from any specific assignments based on their disability or other criteria. As mentioned above, the current policy and practice does not require a listing of essential job functions for each respective inmate work/industry position.

Operations orders should be modified to provide language or references regarding equitable job opportunities and hiring practices as between disabled inmates and non-disabled inmates (not just between male and female inmates).

Operations Order 06/19 Inmate Workers and Operations Order 07/07 Jail Industries should be modified to contain language or references regarding:

- Disabled inmates, reasonable accommodations or modifications, evaluation by appropriate medical staff for physical limitations (if any), and accessibility for disabled inmates in the workplace;
- Equitable hiring practices, or ensuring that disabled inmates are hired or considered for hire in all work areas available to non-disabled inmates;
  - Hiring staff use clear hiring criteria; and
  - Staff avoids using hiring practices that screen out or tend to screen out inmates with disabilities.
- Essential job functions listed for each respective inmate work position.

The SCSD detention facilities must: ensure there are detailed job duties, or duty statements for inmate worker positions; list the essential functions associated with each position; and utilize specific approved hiring criteria.

Staff must ensure disabled inmates receive reasonable accommodations during their work hours (e.g., being allowed to stand periodically or folding laundry in a seated position).

The SCSD detention facilities must ensure that disability identification is conducted and identified in an electronic tracking system as appropriate. The JIMS (or other system) must provide disability code/information including accommodation needs and physical limitations (if any) for inmates with disabilities (whether lower extremity or due to upper extremity respiratory or other contributing factors).

The SCSD detention facilities must develop and implement a training program that brings about disability awareness and ensures staff is knowledgeable with respect to inmate accommodation needs. The training should help foster an understanding that providing accommodations or modifications does not deter staff from accomplishing their job duties and does not create a heavy workload, but rather it puts the disabled inmate on a level playing field and provides equal access to that of non-disabled inmates in accordance with the ADA.

## References

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.130(a**) requires that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity. The SCSD detention facilities must ensure disabled inmates are equally afforded the ability to be assigned to facility and housing unit worker positions.

**28 CFR § 35.130(b)(7)** states that a public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

**28 CFR 35.130(b)(1):** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

**28 CFR 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

**28 CFR 35.130(b)(8):**  A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

*The information below is for reference only.  Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Armstrong v. Brown settlement agreement.*

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*Inmate Programs and Work Assignments:*

*Eligibility to participate in any program depends upon the inmate's ability to perform the essential functions of the program, with or without reasonable accommodation.*

*Reasonable accommodations for all disabled inmates to access program assignments may include, but are not limited to, a modified work or school schedule, early release to/from meals, or assignments for mobility impaired inmates.*

*Only when an inmate's disability even with reasonable accommodations renders the inmate ineligible to participate in any available work program for which the inmates is otherwise qualified will the inmate be deemed "Medically Disabled".*

*Essential functions are defined as the basic duties/requirements of services, assignments, or program an inmate performs, receives or desires. This does not include the marginal duties of the position, services, assignments, or programs. Duties/requirements should be examined to determine which tasks are essential and which are nonessential.*

*The information below is for reference only.  Due to the settlement*

*agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Clark v. California settlement agreement.*

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Clark v. California amended March 1, 2002, mandates the following:*

*Inmate Education and Work Assignments:*

*Modification of reading prerequisites, terminal objectives for a class program, and other accommodations are essential if inmates with developmental disabilities are to have equal access to academic, vocational, and work assignments.*

*Inmates with developmental disabilities assigned to an education, vocational, work, or other program may receive additional supervision and training to help them meet the requirements of the assignment. Accommodations may include oral rather than written tests, lower production expectations, expanded time frames for completion of projects etc.*

*Evaluation of an inmate's removal from a program assignment must be done on a case-by-case basis, and will take into account a number of factors including the inmate's ability to perform the essential functions of the program, the inmate's misbehavior and refusal to work as directed.*

## Effective Communication

The Title II Effective Communication (EC) regulation states two requirements: First, public entities must "take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others." Second, public entities must "furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity."

Because a disabled inmate's literacy level can impede his/her ability to use jail services, participate in jail activities or programs, and understand classification processes, the regulations implementing the ADA require public entities to take appropriate steps to ensure that the communication of information concerning jail services, activities, and programs is as effective for the disabled as for the non-disabled. In doing so, the jail must provide such services as are necessary to afford an individual with a disability an equal opportunity to participate in jail programs and activities and to determine what services are necessary. Jail staff must give primary consideration to the requests of the individual. Only through EC can staff guarantee that disabled inmates have meaningful access to these proceedings.

Additionally, developmentally disabled inmates may have poor ability to express themselves in writing and they will likely have difficulty with any task requiring reading or processing of written material. In particular, they may have difficulty with disciplinary, classification, and/or appeal processes that require reading and understanding. Accordingly, correctional staff is duty-bound to provide reading and writing assistance to disabled inmates who need assistance. Staff must ensure that notices, orientation, announcements, and similar printed materials are ADA accessible to inmates with developmental disabilities.

Throughout this section of the report, the Assessment Team has reported some concerns regarding EC and the requirement to establish such. Within this section, EC processes, requirements, and concerns are detailed for deaf/hearing-impaired, blind/vision-impaired, and speech-impaired inmates, as well as inmates with learning and intellectual (developmental) disabilities and those with mental illness. Some of the major processes correlated to EC will be outlined below, e.g., inmate disciplinary, grievance, classification, administrative segregation, TSEP, disciplinary detention, medical/mental health/dental encounters (including medical intake screening and JPS interviews, and all other clinical encounters), orientation, release, issuance of documents where due process is at stake, e.g., notice to appear, etc.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1080 Rules and Disciplinary Penalties requires that:

Wherever discipline is administered, each facility administrator shall establish written rules and disciplinary penalties to guide inmate conduct. Such rules and disciplinary penalties shall be stated simply and affirmatively, and posted conspicuously in housing units and in the booking area or issued to each inmate upon booking. For those inmates who are illiterate or unable to read English, and for persons with disabilities, provision shall be made for the jail staff to instruct them verbally or provide them with material in an understandable form regarding jail rules and disciplinary procedures and penalties.

The Assessment Team identified numerous existing Sheriff's Department County of Sacramento Correctional Services Operations Orders and Correctional Health Services Policies and Procedures that should have language relative to EC, or could possibly contain such information. The team examined the operations orders and CHS policies for EC language that could be applicable to inmates with disabilities where a barrier to communication could reasonably exist. Specifically, the Assessment Team reviewed the below listed operations orders and policies:

Operations Orders

- 02/01 Use-of-Force
  - No ADA or EC language contained;
  - No language regarding identification of the involved inmates for disability-related concerns and possible EC accommodation needs; and
  - No de-escalation language specific to mentally ill inmates, intellectually (developmentally) disabled or other disabled inmates, or directives to attempt or ensure EC (as feasible based on the situation) with disabled inmates for de-escalation or other purposes.
- 02/02 Use of Restraint Devices
  - No ADA or EC language contained;
  - No language relative to identifying inmate disabilities or possible EC needs, or to provide EC as needed for inmates during the restraint process (to the extent possible based on the situation) and pending (and during) a MH evaluation, e.g., inmates with mental illness, intellectual (developmental) disabilities, or those with other disabilities to which the disability may pose a barrier to communication.
- 02/03 Use of Pro-Straint Chair
  - No language relative to custody staff identifying inmate disabilities, possible EC needs, or providing EC as needed for inmates during the search or restraint processes (to the extent possible based on the situation), e.g., for inmates with mental illness, intellectual (developmental) disabilities, or those with other disabilities where the disability may pose a barrier to communication; and

- No information for MH or medical staff to provide accommodations and ensure EC during any health care encounters as described.
  - 02/05 Custody Emergency Response Team (CERT) and Cell Extraction Procedures
    - No ADA or EC language contained;
    - No language regarding identification of the involved inmates for disability-related concerns and possible EC needs; and
    - No de-escalation language contained with respect to mentally ill or intellectually (developmentally) disabled inmates, or other disabled inmates, or directives to attempt or ensure EC (as feasible based on the situation) with disabled offenders for de-escalation or other purposes.
  - 03/12 Evacuation Plan – Main Jail
    - No ADA or EC language contained;
    - No language regarding identification of inmates with disabilities for disability-related concerns and possible EC accommodation needs during the evacuation process; and
    - No language directing custody staff to provide EC as needed for inmates during the evacuation process, or search or restraint processes (to the extent possible based on the situation), e.g., for inmates with mental illness, intellectual (developmental) disabilities, or those with other disabilities to which the disability may pose a barrier to communication.
  - 03/13 Evacuation Plan – RCCC
    - No ADA or EC language contained;
    - No language regarding identification of inmates with disabilities for disability-related concerns and possible accommodation needs during the evacuation process; and
    - No language directing custody staff to provide EC as needed for inmates during the evacuation process, or search or restraint processes (to the extent possible based on the situation), e.g., for inmates with mental illness, intellectual (developmental) disabilities, or those with other disabilities to which the disability may pose a barrier to communication.
  - 04/01 Intake, Search, Reception and Holding
    - No ADA or EC language contained; and
    - No language regarding staff responsibilities to attempt or to ensure EC is provided in the completion and issuance of the "paperwork" during intake/reception and holding processes.
  - 04/06 Identification Process
    - Very limited ADA-related language contained;
    - No language regarding attempts to provide or ensure EC is provided or documented during the questioning (from staff or from inmates) and issuance of the "Inmate Booking Information Receipt" (which should

contain information regarding charges/holds as well as bail amount and other information); and

- Despite general language in the order that information pertaining to the booking process should be made available by custody staff to those who have difficulty understanding English or who are hard of hearing or deaf, or who are visually-impaired, it does not extend far enough.
  - o This must include inmates who have mental illness, and those with intellectual (developmental), and learning disabilities as applicable.

- 04/08 Prisoner Orientation
  - No ADA or EC language contained;
  - The "Prisoner Orientation Handbook" (rulebook) referenced in the Order does not contain EC language (this will be identified in greater detail in the "Inmate Orientation" section of this report);
  - The "Verbal Orientation" referenced in the Order is not occurring (with rare exceptions, and will be captured in more detail in the "Inmate Orientation" section of this report);
  - Because inmate orientation is not being provided, there is no standard format that is reasonably understandable to some disabled inmates (for those whose disability may pose a barrier to communications), so there is no EC taking place;
    - o The rulebook only identifies inmates who do not speak or write English, and inmates with disabilities such as those with hearing or visual impairments, but does not reference inmates with other disabilities which may pose a barrier to communications, e.g., mental illness, intellectual (developmental) disability, as well as speech and learning disabilities;
    - o There is no Inmate Orientation video (despite the policy speaking to it);
      - An inmate orientation video must include an ASL signer within the video, or must be delivered via an outside certified sign language interpreter (this will be outlined in greater detail in the "Inmate Orientation" section of this report).

- 04/09 Release Procedures
  - No ADA or EC language contained;
  - No language pertaining to staff (working the "Release" area) identifying a disability for possible EC needs and medically-prescribed or inmate-owned health care appliances/durable medical equipment/assistive devices (HCAs/DME/ADs);
    - o Likewise, there is no language requiring staff to provide EC as necessary, e.g., when discussing, completing, having an inmate sign, and issuance of any paperwork (e.g., Release Screening Form, Citation (Cite and Release), ICE forms, etc.), or when an inmate is being advised about his/her right to make health care

complaints or when being evaluated by medical staff prior to release (if applicable); and
- o There is no language to ensure the inmate is permitted to be released with any prescribed or owned HCA/DME/AD.
- o 05/05 Pre-Trial Release Program
- No ADA or EC language contained;
- No language regarding jail staff ensuring that inmates understand when discussing the possibility that they may be eligible for Pre-Trial Release and that a representative from the Pre-Trial Release program will/may be interviewing them for a judge's possible approval for an OR.
- 05/06 Bail and Surrender
  - No ADA or EC language contained;
  - No language pertaining to staff responsibilities to ensure EC for the Bond or Cash Bail Surrender processes; and
  - No specific TTY language relative to the Bail Reduction process which outlines TTY telephone usage for deaf/hearing-impaired, and speech-impaired inmates as applicable.
- 05/08 Work Project Assignment
  - No ADA or EC language contained;
  - No language relative to staff providing EC (if necessary) or to assist inmates in understanding or completion of the Sheriff's Work Project (SWP) application prior to the inmate's signature and submittal to custody staff; and
    - o Likewise, EC may need to be provided to some inmates with disabilities upon an inmate's receipt of either approval or program denial;
      - If approved, then EC may also need to be provided at the time of an inmate's receipt of an appointment date, time, and new release date;
      - If approved for SWP, and on the date of the appropriate adjusted release date, staff may need to provide EC to some disabled inmates with regard to explanation and reporting date and time to SWP, and to obtain the inmate's signature, and issuance of a copy of the SWP Referral Advisement Form; and
      - If denied, then staff may need to provide EC to some disabled inmates to explain the inmate's appeal rights to the watch commander.
- 05/09 Weekenders
  - No ADA or EC language contained; and
  - No language (for Weekender booking) directing MJ or RCCC Front Counter deputies to provide EC to disabled inmates (as applicable) with regard to a Commitment Order, or as related to other general forms or processes.
- 05/10 Service of Processes of Prisoners

- No ADA or EC language contained for staff to ensure EC during the service of processes.
- 06/03 Classification Process
  - No ADA or EC language contained;
  - No directives for Classification deputies to provide EC to disabled inmates (as applicable) during the intake classification, or re-classification processes;
    - There must be language relative to EC being provided during classification-related interviews, e.g., while questioning an inmate and completing the Intake Classification Form; when evaluating and explaining housing assignment, custody/classification level;
    - There must be language specific to EC being provided as pertinent to any classification-related documentation issued to an inmate, e.g., Classification Review/Classification or Reclassification Form, inmate grievance responses (when needed, and as related to the Classification or housing processes), as well as other related types of documentation;
      - Note: Currently inmates housed at the MJ or RCCC do not receive copies of documentation (outcome of classification processes). This will be outlined in greater detail in the Classification section of this report.
- 06/13 Telephone/TDD/TTY;
  - No language relevant to staff being trained in the usage and operations of the TTY machines, and providing assistance (EC) to deaf/hearing-impaired or speech-impaired inmates (or those who may have a dual diagnosis, e.g., also mental illness, intellectual [developmental] disability or learning disability), and as a result may have difficulty remembering their access code or how to effectively operate the TTY equipment.
- 06/14 Interpreter Services
  - Outlines the process for obtaining a sign language interpreter for "deaf and hard of hearing prisoners", but does not mention inmates with speech impairments who may need the services of a certified sign language interpreter to effect communications;
    - Note: The Operations Order (as well as other applicable Orders) does not identify specific events or occurrences when there is a higher standard to achieve EC and provide qualified interpreter services as applicable, e.g., intake medical screening, other health care encounters, inmate disciplinary (write-up) process, classification, inmate grievance processes, inmate release process, etc.
  - Contains details about an outside contract interpreter service (NorCal Center for Deafness), but most staff and inmates are not aware of this.
- 07/02 Grievances

- No ADA or EC language contained;
- No language in the Order relative to staff providing EC to disabled inmates (whose disability poses or may pose a barrier to communication) as it pertains to the inmate grievance process;
  - No language included that instructs staff to provide EC during inmate interviews (when applicable) during the grievance process;
  - No language that requires staff to provide EC to disabled inmates (as applicable) when the inmate is writing a grievance as related to health care, the inmate disciplinary (write-up) process, classification, notice of charges, the release process, or other events that may be considered as due process related events;
  - No language relative to staff providing EC for a disabled inmate (when applicable) to deliver a staff response to a grievance, e.g., as related to a due process event or clinical encounter, as described above.
- 07/03 Discipline Plan
  - No ADA or EC information contained, other than the following general language: "For those inmates who are illiterate or unable to read English, and for persons with disabilities, verbal instructions or material in an understandable form regarding jail rules and disciplinary procedures and penalties will be provided";
    - As addressed in more detail throughout this report, most inmates (including disabled inmates) are not receiving rulebooks or materials in an "understandable form" regarding jail rules and disciplinary procedures and penalties;
  - No language requiring the approving sergeant or deputy to provide and document EC to disabled inmates (as applicable) at the time of issuance of the initial copy of the disciplinary report to the inmate, which the inmate signs;
  - No language describing that some disabled inmates (e.g., intellectually [developmentally] disabled) may not fully comprehend the waiving of the 24-hour limitation and thus have a disciplinary hearing immediately upon receipt of the write-up report. The same concept may apply for any waivers;
  - No language to address the issue or explain the significance of ensuring EC is established with disabled inmates (those whose disability may pose a barrier to communication) to ensure they understand the inmate disciplinary process, including but not limited to: their rights prior to the hearing, e.g., request witnesses; their rights during the disciplinary hearing; and their post hearing rights, e.g., grievance rights, understanding the disposition and imposed sanctions, understanding the contents of the final copy of the disciplinary report, etc.;
  - No language with regard to ensuring EC (as applicable) when a disabled inmate is moved from the general population and placed in

disciplinary isolation housing, pending outcome of the disciplinary process;

- o The Order must also address the EC requirement (as applicable) when issuing written documentation explaining the removal from general population housing to disciplinary isolation housing (or other non-general population special housing as a result of disciplinary or discipline-related allegations), e.g., administrative segregation, etc.;
  - Currently the MJ and RCCC do not provide such documentation as described above;
  - This also applies to any subsequent custody reviews for duration or extended stays, and health care screenings/reviews for current or continued placement; and
- o No language requiring the watch commander (or other staff) to provide and document EC (as needed for disabled inmates) for any inmate appeal submitted, whether during an appeal interview of the inmate (if applicable), or to explain the watch commander's appeal response.

- 08/04 Educational Services
  - No specific ADA or EC language contained;
    - o There is a brief reference to "functionally illiterate" inmates;
  - No language requiring staff to assist disabled inmates (those whose disability may pose a barrier to communication) as could be needed in the completion of a KITE to Adult Education or for the "Read Out Program";
  - No language requiring the teacher (or custody staff) to ensure EC for the teacher's response to the inmate (either personally or via a KITE) regarding when the class is scheduled to meet; and
  - No language to address assistance or accommodations to "functionally illiterate" inmates (or those with disabilities who may have difficulties with reading, thinking, understanding or learning), e.g., intellectual (developmental) or learning disabilities.
- 08/11 Religious Services
  - No ADA or EC language contained;
  - No language regarding staff requirements to provide assistance in possibly serving as a scribe for an inmate in writing a KITE, or to ensure EC for disabled inmates (for those whose disability may pose a barrier to communications) as needed, when verbally interacting with chaplain staff;
  - No language specific to nondiscrimination toward disabled inmates;
    - o SCSD detention facilities must not limit or exclude disabled inmates from religious services/activities based solely on their disability (or for those who may be housed in specific or specialized units solely because of their disability); and

- No language specific to providing writing/scribing assistance to disabled inmates (as needed) during the grievance process as related to religious services, as well as no information regarding EC in the delivery of any written responses to grievances.
- 10/01 Health Care Services
  - No ADA or EC language contained;
  - Only contains generalized high level information relative to medical and mental health operations; and
  - This particular order needs only a brief generic EC reference that medical and mental health staff will ensure EC during medical and mental health encounters.
- 10/02 Psychiatric Services
  - States in part; "Prisoners identified as mentally disordered or developmentally disabled through the intake medical receiving screening process and requiring a more extensive evaluation shall be referred to Jail Psychiatric Services";
  - Does not provide information regarding medical or mental health staff responsibilities to ensure EC during health care encounters, e.g., during the intake, booking and health care screening (or other processes);
  - No information about JPS requirements to ensure EC in responding to inmate HS KITE's; and
  - Does not address staff providing EC to disabled inmates (as applicable) regarding observation placement as well as restraints.
- 10/03 Health Care Treatment Access
  - No ADA or EC language contained;
  - No language pertaining to staff responsibilities to assist disabled inmates who need help requesting dental or mental health care by completing a medical request KITE;
  - No EC language relative to "Nurse's call" e.g., new instructions or medications, etc.;
  - No language to identify EC needs (as applicable) for disabled inmates, when scheduling them for Nurse's call, doctor appointments, or other health care appointments; and
  - No language regarding the need for medical staff to provide EC to disabled inmates (as applicable) when an inmate refuses to attend a scheduled appointment, and the inmate is required to sign a "Medical Refusal" form.
- 10/04 Medical Intake Screening
  - No ADA or EC language contained;
  - No language relative to medical staff providing EC to disabled inmates (as applicable) at the time of medical screening for new inmates, including transfers, or documenting EC on the appropriate forms; and

- No language relative to EC for medical or mental health (JPS) staff coordinating in a "cursory' evaluation of the inmate's mental health.
- 10/05 Suicide Prevention Program
  - No ADA or EC language; and
  - No language relative to the intake nurse and JPS staff providing EC for occurrences where the intake nurse identifies an inmate as displaying suicidal behavior, completes the screening form, and refers the inmate to JPS, and JPS staff conduct an evaluation; and where the inmate is subsequently rehoused.
- 10/08 Medicine Distribution "Pill Call"
  - No ADA or EC language contained;
  - No language relative to pill call nurses providing EC, when necessary, for disabled inmates during pill call e.g., when giving new medications or new instructions; and
  - No language regarding EC for circumstances when inmates refuse medication, and they are required to sign a "Refusal of Prescribed Medication 1x" form by health care services staff.
    - The EC requirement is also applicable for circumstances when an inmate refuses to sign the form. The circumstances must still be explained to the inmate.
- 10/09 Dental Services
  - No ADA or EC language contained;
  - No EC language requiring staff to provide assistance or scribing for inmates requesting non-emergency dental care and having to complete a "Dental Request Form";
  - No language relative to obtaining a disabled inmate's EC concerns (if applicable) during the scheduling of dental appointments, and having the EC information available for the dentist or dental staff at the time of the scheduled appointment; and
  - No language with regard to dental staff providing EC to inmate-patients during appointments.

Correctional Health Care Services Administrative Policies

- 1107 Decision making – Special Needs
  - No EC language contained; and
  - There is only brief general information pertaining to mental health inmate-patients, and consultation between health care and custody staff relative to housing, program, disciplinary, and admission to and transfer from institutions;
    - Does not include a formalized process for custody disciplinary hearing staff (lieutenants or sergeants) to consult with mental health staff regarding the inmate disciplinary (write-up) process in terms of obtaining a clinician's input on whether the inmate-patient's mental health status contributed to the alleged rule

violation, or regarding an imposed disposition at the disciplinary hearing;

- Also does not include any EC-related language or requirements for health care (medical/mental health) or custody staff.

- 1110 Access to Diagnostic Services
  - No ADA or EC language is applicable, as this policy only identifies three approved outside medical providers to provide diagnostic services.
    - The policy does not identify how the services will be provided or how interactions/communications with inmate-patients will take place.

- 1119 Individualized Treatment Plans
  - No ADA or EC language contained;
  - No instruction or information that within the written treatment plan, health care staff must provide EC to disabled inmates whose disability may pose a barrier to communication.

- 1120 Continuity of Care
  - No ADA or EC language contained;
  - No information that health care staff must ensure EC when obtaining an inmate-patient's written authorization to obtain medical records regarding previous medical care.

- 1128 Reading Glasses for Inmates
  - No EC language contained;
  - No language instructing medical staff to provide EC (as applicable) to disabled inmates whose disability may pose a barrier to communication for related health care encounters, e.g., during a patient's needs assessment for reading glasses (at nurse sick call), when discussing an inmate's magnification strength and explaining options, e.g., commissary or process for indigent inmates, or when issuing a copy of a Miscellaneous Medical Needs form to an inmate-patient.

- 1404 Receiving Screening
  - No EC language contained;
  - No language relative to intake nurses providing EC to disabled inmates (as applicable) during the intake/booking (Receiving) medical screening process. This includes:
    - When considering disabled inmates for isolation or special observation in the facility;
    - When determining an inmate-patient's suicide (or past suicide behavior) or withdrawal potential;
    - When observing a patient's behavior (communication difficulties, speech problems and posturing, impaired level of consciousness, disorganization, memory defects, depression, or evidence of self-mutilation);

- o When considering a disabled inmate for "segregation and/or special housing for patients with suspected communicable diseases, mental illness, or developmental or physical disabilities, pending medical clearance";
- No language requiring EC: for the process when nurses are screening for "appearance or history of developmental disability", or "slowness in speech or lack of comprehension of questions suggestive of developmental disabilities"; for any associated intellectual (developmental) disability evaluation/screening tests; or for any referrals for such tests.
- 1407 Access to Treatment
  - No EC language contained (except as noted below);
  - Existing policy language requires "facility nursing staff [to] explain access procedures orally to all individuals, especially to those unable to read." It also states that "videotapes and/or other materials may be used as an adjunct to orientation";
    - o The nurses are not consistent with delivering this information verbally or otherwise to the inmates;
    - o This policy and process does not include EC requirements, or the assistance of a certified sign language interpreter for deaf/hearing or speech-impaired inmate-patients when the inmate-patient's primary or sole method of communication is sign language (policy only addresses or infers foreign language);
    - o There is no written requirement for the nurses to document EC provided, e.g., what methods were used to ensure the inmate-patient understood (spoke slowly, used simple terminology, rephrased sentences and words, repeated instructions/information), and determination as to how the inmate-patient understood, e.g., the inmate-patient repeated back in his/her own words their understanding of the process/information/instructions, to the nurse's satisfaction that the inmate-patient understood the encounter.
    - o The SCSD detention facilities custody staff and CHS staff do not currently use videotapes as a source of orientation or to explain health care access procedures.
  - With regard to "medical care services and how to obtain health care" being contained in the "Inmate Handbook" (rulebook), as mentioned in other sections throughout this report, the Assessment Team's observations (coupled with inmate interview information received) revealed that there is no consistency with issuance of the rulebooks at both the MJ and RCCC. The majority of inmates interviewed by the Assessment Team claimed that they have never been issued a rulebook; and

- With regard to the policy language relative to "HS KITE's for sick call sign up", there is no EC language to require staff to provide writing/scribing assistance to disabled inmates (as needed) for completion and understanding of the document;

- 1409 Clinic Care – Sick Call
  - No ADA or EC language contained;
  - No language requiring a physician, mid-level practitioner or nurse, to ensure EC for disabled inmates (as needed), during scheduled appointments, pill call (as applicable), etc.;
  - Does not address medical staff citing EC-related language within the medical progress notes (for placement into the inmate-patient's medical record); and
  - Does not address staff requirements to assist with writing/scribing "HS KITE's (request for medical attention)." HS KITE's are available in the housing units, from the pill call nurses and from custody officers.

- 1410 Medical Services Provided in the Medical Housing Units
  - EC-related language does not appear necessary for this policy.

- 1411 Mental Health Services
  - No EC language contained;
  - Does not address health care staff responsibilities to ensure EC to disabled inmates (as needed) for the following identified clinical encounters:
    - Screening for mental health problems in intake during the booking process;
    - Crisis intervention and management of acute psychiatric episodes;
    - Stabilization of the mentally ill and the prevention of psychiatric deterioration in the jail setting;
    - When administering an assessment interview for MH treatment, or admitting or informing an inmate-patient about involuntary short term or voluntary admission for MH services;
    - When informing inmate-patients they have been referred to alternative care such as for substance abuse, alcoholism, and social services;
  - Does not address staff requirements to assist disabled inmates (as applicable) with writing/scribing HS KITE's; and
  - Addresses requirement that request forms "HS KITE's" (for mental health services) are made available to inmates, and that inmates are informed of the availability of mental health services, both verbally and in writing, with "Mental Health Request" forms available on each floor at central dayroom locations;
    - However, as mentioned previously, health care staff are inconsistent with providing inmate-patients with information about access to health care (including information about HS KITE's);

custody staff do not provide a verbal or video orientation, and many inmates do not receive copies of the jail rulebook.

- 1412 Suicide Prevention – 2M – Joint Policy with JPS
  - No EC language contained;
  - No requirement for medical (CHS) and mental health (JPS) staff to provide (to the extent possible) and subsequently document EC provided to inmate-patients when providing both psychiatric and medical care for inmates who are verbalizing or exhibiting suicidal behavior. In accordance with this policy, this includes nursing intervention activities (as ordered by the treating physician) with inmate-patients, including:
    - Having the patient moved (when the patient is not already assigned a 2M bed), and providing a blue safety suit and suicide precautions;
    - Having custody staff modify the environment for the patient's safety, and explaining this procedure to the patient;
    - Documenting the nursing assessment, observations, and intervention, with a timed and dated entry in the patient's chart;
    - Having JPS staff conduct outpatient clinician evaluations within twenty-four (24) hours of receiving the psychiatric referrals from the 2M clinical staff;
    - Psychiatrist visits every 24 hours until an acute episode is resolved, and documentation of the consultative notes and treatment recommendations within the psychiatric chart; and
    - Having the psychiatrist or medical staff document within the inmate-patient's chart, the conclusion, recommendations, and termination of the 2M suicidal status (when the inmate-patient's suicide or psychiatric status is resolved and the patient no longer is at risk of suicide, and the inmate-patient continues to require medical care in the 2M unit).
- 1413 Use of Restraints and the Pro-Straint Chair;
  - No EC language contained;
  - No information requiring health care staff to provide EC (to the extent possible) or document EC for situations where mentally disordered inmates or other disabled inmates are being prepared to be placed in, or are being placed in restraints and/or the Pro-Straint chair.  This includes:
    - During a medical evaluation (including circulatory status and vital sign checks) within the first 15 minutes and every two hours thereafter;
    - When medical offer and subsequently document the offering of fluids and nourishment, and when documenting exercising of the extremities, in the inmate's Health Record;

- o During medical and MH examinations prior to continuance of such restraints, and when documenting as such in the progress notes; and
  - • During JPS MH assessments to assess the need for MH treatment.
- ▪ 1414 Restraint Check Method
  - • No EC language contained; and
  - • No language requiring medical staff to provide EC to disabled inmates as needed (for those inmates whose disability may pose a barrier to communication) for the following encounters:
    - o Medical evaluations, including an inmate's circulatory status and vital signs; and
    - o When medical staff document in the inmate-patient's medical record any significant change in the restrained individual's condition, and whether the restrained inmate-patient remains in the restraints longer than 2 hours.
- ▪ 1415 Patients in Safety Cells
  - • No EC language contained;
  - • No language requiring medical staff to provide or document EC for disabled inmates as needed for the following described encounters:
    - o During medical checks of the inmate within the first 6 hours of placement in a safety cell, and every six hours thereafter (if an inmate asks questions or is asked questions by medical staff, or if there is an explanation or exchange of health care-related information) to assess the inmate's condition;
    - o During physician re-evaluations for inmates who have remained in the safety or segregation cell for 24 hours beyond the initial medical clearance; and
- ▪ 1416 Patients in Segregation
  - • No EC language contained;
  - • No language requiring medical staff to provide and document EC for disabled inmates as needed for the following encounters:
    - o Daily medical evaluations for inmates being removed from the general population and placed in segregation;
    - o During pill-call while housed in segregation; and
    - o During physician cell visits while in segregation (if applicable);
  - • No EC language relative to the KITE process while an inmate is housed in segregation, e.g. requiring a nurse (or custody staff) to provide writing/scribing assistance or explain the KITE process with regard to medical services.
- ▪ 1417 Adult Developmental Disability
  - • No EC language contained;

- No language requiring health staff to provide or document EC for intellectually (developmentally) disabled inmates for the following described medical encounters or related processes;
  - When identifying inmates for intellectual (developmental) disabilities at booking and other encounters throughout the incarceration;
  - When determining whether the inmate has difficulties performing basic tasks, slowness or apparent difficulty in understanding;
  - When making notations on the Receiving Screening medical form or medical progress notes.
    - Note: Despite the fact that the policy requires medical staff to make appropriate notations in the "Master Problem List" in the medical record and in the JIMS system relative to a known or suspected "developmental disability" and to notify Classification staff of any housing recommendations, as mentioned in greater detail in other areas of this report, the SCSD detention facilities do not have a comprehensive or effective intellectual (developmental) disability testing/screening process, or an inmate disability tracking system.
- 1422 Special Needs Patients
  - No EC language contained;
  - No language requiring medical staff to provide or document EC to disabled inmates (as applicable) for the following health care encounters described in the policy:
    - When interacting with inmates and discussing medical conditions (and developing treatment plans) for inmates requiring assistive devices and for "developmentally disabled" inmates;
    - When admitting an inmate to the Outpatient Housing Unit;
    - For inmate plan of care and addressing pending discharge needs.
- 1425 Patients in Segregation Cells in Intake
  - No EC language contained: and
  - No language requiring medical staff to provide or document EC to disabled inmates (as applicable) for the following health care encounters described in the policy;
    - Medical assessments of the inmate-patient within the first six (6) hours of placement and at least every six (6) hours thereafter to assess the inmate's medical condition; and
    - Physician assessments for inmate-patients who remain in a segregated cell for at least 24 hours.
- 1433 Admission to Jail Acute Psychiatric Inpatient Unit
  - No EC language contained; and
  - No language requiring health care staff to provide or document EC to disabled inmates (as applicable) for the following health care encounters described in the policy:

- o JPS clinical assessments, including vital signs and a mini-mental status exam, prior to a patient being admitted to 2P, or when a patient has a change in condition, to determine if the patient meets the delirium guidelines; and
- o CHS medical assessments (based on JPS referral to 2M), and subsequent housing of the patient on 2M, 2P, or transfer to an outside medical facility for acute or emergency care.
- 1435 Inmate Health Care Grievances
  - No EC language contained; and
  - No language requiring health care staff to provide or document EC to disabled inmates (as applicable) for Priority Administrative Review appointments where the inmate is medically assessed.
- 1439 Reports of Disabilities or Impairments
  - No EC language contained; and
  - Although the policy cites general ADA-related language (as outlined in the bullet below) it contains no EC direction or requirements to provide and document EC for related health care encounters. Policy language cited includes:
    - o Any report of physical disability or impairment by an inmate or outside organization will be referred to a clinician for review and assessment;
      - This can include reports of mobility impairments such as amputations or paraplegic, or other disabilities that limit daily functioning such as visual, hearing, or speech. The clinician will review the report, assess the inmate's needs, and make a determination if special housing or assistive devices are needed;
    - o Upon report of disability or impairment (verbal or written):
      - An MD/NP Sick Call appointment will be scheduled and the nature of the report will be documented;
      - The patient-inmates will be seen and their disability or impairment will be assessed and if indicated a plan of care will be developed; and
      - Any specific patient-inmate's needs or accommodations will be documented in the chart and communicated to medical and custody staff.
        - o Note: It does not appear that the intent of the policy language as outlined in the above bullet is meant to include EC-specific needs (at least in terms of requiring staff to provide EC and document accordingly).
- 2000 Dental Care
  - No EC language contained; and

- No language requiring dental (or medical) staff to provide or document EC to disabled inmates (as applicable) for the following dental encounters described in the policy;
  o Intake nurse discussing dental history with inmate;
  o During dental examinations and treatment;
  o During dental/oral hygiene education;
  o When providing information (during routine sick-call and medication administration services) on how to access dental hygiene services;
  o During x-rays for diagnostic purposes;
  o When discussing dental treatment plan with an inmate-patient; and
  o When discussing with the inmate and/or accepting an inmate's completed "Request for Medical Attention" (KITE) or specific dental referral form.

Although the Assessment Team cited EC-related concerns with all the custody operations orders and CHS policies detailed above, it will not be necessary to include detailed EC information in each policy. A comprehensive EC policy, or a comprehensive EC section within an operations order and CHS policy would suffice. Depending on the individual order or policy, either brief language or a simple reference to an approved EC policy would suffice.

With the exception of Operations Order 06/14, titled, "Interpreter Services", none of the aforementioned SCSD detention facilities Custody or Health Care Orders contain any specific EC-related language or references.

Operations Order 06/14, "Interpreter Services", Section I., Policy, states: "Correctional Services staff shall endeavor to communicate effectively with people who have difficulty speaking English or who are deaf or hard of hearing."

Section IV., Interpreter Services for Deaf and Hard of Hearing Prisoners, states in part: "Under the Americans with Disabilities Act (ADA), people who are deaf or hard of hearing are entitled to the same services law enforcement provides to anyone else. They may not be excluded or segregated from services, be denied services, or otherwise be treated differently than other people."

It also states, "Custody staff must provide the communication aids and services needed to communicate effectively with people who are deaf or hard of hearing, except when a particular aid or service would result in an undue burden or a fundamental change in the nature of the law enforcement services being provided.

Custody staff must give primary consideration to providing the aid or service requested by the person with the hearing disability.

The County has a contract for interpreter services for deaf and hard of hearing prisoners with the NorCal Center on Deafness. The address and phone numbers are:



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

4708 Roseville Road, Ste. #112, North Highlands, CA 95660 / Voice/TTY (916) 349-7500 and FAX 349-7578.

Interpreter services are available during business hours (0830-1700) by contacting NorCal Interpreter Services at (916) 349-7525. Requests for interpreters can also be emailed to dispatcher@norcalcenter.org or faxed to (916) 349-7578.

If an interpreter is needed outside of business hours, the request can be made by calling (866) 658-8417."

Section IV., also states in part, "A form is provided to assist deaf and hard of hearing prisoners in understanding the booking process. The form outlines the overall steps involved in booking and release at the Main Jail and at RCCC.

Additional information that may be helpful for law enforcement officers is available at the following website: http://www.usdoj.gov/crt/ada/policeinfo.htm

The U.S. Department of Justice pamphlet, Communicating with People Who Are Deaf or Hard of Hearing, is available at the above website or in Appendix 12-C."

The SCSD detention facilities do not have a stand-alone comprehensive EC operations order, but the draft Operations Order Inmates with Disabilities - ADA, does contain some EC procedural language

As stated above, each individual SCSD detention facilities custody policy and each CHS policy may not need to have specific EC language embedded if a comprehensive EC policy were to be implemented for custody and health care services. The aforementioned SCSD detention facilities draft Operations Order would suffice for custody staff if it were to include a complete EC section, and subsequently be approved.

Section I titled, "Policy Statement" states in part, "It is the policy of the Sacramento County Sheriff's Department to ensure procedures are in place to provide equal treatment to all incarcerated adults. The Department will ensure inmates with qualified disabilities are afforded equal access to programs, services, and activities unless doing so would alter the nature or operations of the institution or program." It also states in part, "The Department will ensure that procedures are in place for inmates with disabilities to request reasonable accommodations and to dispute the accommodations provided under Title II of the Americans with Disabilities Act."

Section II., titled, "Definitions", provides several ADA related definitions, but does not include a definition as to EC. Included are the following definitions:

- Activities of Daily Living (ADL): "includes, but is not limited to, functions such as caring for one's self, eating, bathing, performing manual tasks, walking, seeing, hearing, speaking, learning, and working"; and



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Reasonable Accommodation: "any change or adjustment to an environment that permits a qualified person with a known disability to participate in a job, or to enjoy benefits and privileges of programs or services as an equal to everyone without a disability."

Section III titled, "Compliance with ADA" states in part, "The Sacramento County Sheriff's Department will not discriminate against inmates or members of the public on the basis of disability in providing access to its detention facilities, programs, services and activities."

It also states in part, "Persons with a disability are entitled to an equal opportunity to participate in programs, services, or activities offered by the Sacramento County Sheriff's Department unless doing so creates an undue hardship."

The section further outlines that the duties of the ADA Division Representative (ADA Deputy) include reviewing requests, complaints and grievances related to ADA issues, and that the ADA Division Representative may respond to ADA requests or ADA grievances.

Section IV titled, "Identification of Disabled Inmates - At Intake", describes in part that the medical screening process during intake serves to identify most disabilities and accommodation needs prior to the housing of the inmate. It also explains that it is the responsibility of booking and medical staff to assess inmates upon admission for evidence of a disability or special need. This assessment information will be recorded on the Inmate Disability Evaluation Form (IDEF) as applicable. Language also references medical intake staff responsibilities to initiate and sign an IDEF, and forward the form to the Booking Unit and the ADA Coordinator upon determination that an inmate may have a disability.

Section V titled, "Classification and Inmate Housing", details that classification staff will be responsible for ensuring that inmates with disabilities are housed appropriately (based on their needs), reviewing all IDEF forms, notifying the ADA Coordinator to arrange for orientation of inmates who are visually impaired or unable to read, making appropriate notations on the IDEF form and forwarding the form to the ADA Coordinator for compliance review.

Section VI titled, "ADA Coordinator" explains that coordinator's responsibilities regarding reviewing and monitoring of ADA or disability-related grievances.

Section VII titled "Identifying Disabilities – Subsequent to Booking", contains general information about notifying the ADA Coordinator for any inmate staff feel has a disability.

Section VIII titled, "Program Access", outlines equal access to inmates for education and library services, including responsibilities of the Recreation



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Technician to obtain an audio headset and assortment of audio tapes that are available from the Offender Programs Unit. A designated Offender Programs Unit staff member shall provide inmates with audiotape equipment, inform them of the resources available and explain the *Inmate Request Form* process by which the inmate can access those resources via the Inmate Request Form (KITE). This section also contains policy information pertaining to service programs, and availability of American SLIs.

Section IX titled "Auxiliary Aids for Individuals with Hearing Impairments", states in part, "The type of auxiliary aid or service necessary to ensure effective communication will vary depending on the length and complexity of the communication involved. In routine matters, the exchange of written notes may be sufficient. However, when communication is more complex, extensive, or significant (e.g., during classes, counseling sessions, or disciplinary hearings in which the inmate may lose privileges), the use of a UbiDuo real-time split-screen communication device or a qualified sign language interpreter may be required."

Section X titled, ""Telecommunications Devices (TDD/TTY Equipment)", states, "Prisoners who are speech and/or hearing impaired shall be given access to the TDD/TTY equipment following Operations Order 06/13, Telephone and TDD/TTY Equipment Access."

Section XI titled, "Interpreter Services", states in part, "Interpreter services shall be provided to Non-English speaking prisoners or for prisoners who are speech and/or hearing impaired following Operations Order 06/14, Interpreter Services."

Section XII titled, "Inability to Read and Write", states in part, "[t]he ADA Coordinator will ensure reasonable accommodations are made for inmates who are illiterate or who are physically incapable of reading or writing, which may include, but is not limited to, enlarged print materials, identification of desired materials, and assistance in reading and scribing forms. All staff members shall assist inmates who have language, physical, or competency and capacity barriers, when requested to do so (e.g., assist in completing *Inmate Request Forms*, grievances, and medical requests)."

Section XVII titled, "Identifying and Handling of Armstrong Class Inmates", states in part, "[a]n 'Armstrong class inmate' is an inmate identified by the California Department of Corrections Rehabilitation (CDCR) as having ADA concerns due to current or ongoing medical and/or mental health issues. CDCR will notify the Sheriff's Department of inmates in our custody who they have identified as 'Armstrong class inmates.' They will contact the ADA Coordinator of inmates in our custody who have previously been identified. The ADA Coordinator will ensure the inmate is entered in JIMS under the Special Tracking Needs. Once contact is made with the inmate, the ADA Coordinator will notify HMU via e-mail. This e-mail should include any steps taken to address issues/concerns as well as the resolution."



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Other sections contained within the draft Operations Order include, "Mail - Free Matter for The Blind", "Prosthetic/Orthopedic Appliances and Assistive Devices", "Restraints", "Searches", and "Facility Visitors."

Section XIX titled, "Grievances", states in part, "[a] prisoner with a disability who believes he/she is the subject of disability discrimination or who wants to appeal any denial of ADA housing and/or accommodation may submit a grievance. All grievances concerning conditions of ADA housing and/or accommodations will be made on a Grievance Form following the guidelines in Operation Order (7/02), Grievances. All ADA related grievances shall be routed through the facility Compliance unit. The Compliance unit will determine the best course of action for the grievance (e.g. Medical, Custody, Food Services) and then route it as deemed appropriate."

Section XX titled, "Compliance with PREA, states in part, "The Sheriff's Department will take the appropriate steps to ensure that inmates with disabilities (including, for example, inmates who are deaf, hard of hearing, sight impaired, have low vision, or those with intellectual, psychiatric, or speech disabilities), have an equal opportunity to participate in or benefit from all aspects of the Sheriff's Department efforts to prevent, detect and respond to sexual abuse and sexual harassment. The Sheriff's Department will ensure effective communication with inmates who are deaf or hard of hearing and when necessary will provide access to interpreters who can interpret effectively, accurately, and impartially, using any necessary specialized vocabulary. In addition, the Department will ensure written materials are provided in formats or through methods that ensure effective communication with inmates with disabilities, including inmates who have intellectual disabilities, limited reading skills, or who are sight impaired or have low vision. Inmate interpreters, inmate readers, or other types of inmate assistants will not be used except in limited circumstances where an extended delay in obtaining an effective interpreter could compromise the inmate's safety, the performance of first-responders' duties or the investigation of the inmate's allegations."

The SCSD detention facilities' Inmate/Detainee Handbook (rulebook) does not contain specific information relative to EC. There is one page of general information pertaining to inmates with disabilities. Included in the content is general information regarding Title II of the ADA and a brief explanation that inmates who have difficulty with seeing, hearing, talking, walking, moving, breathing, and learning may have a disability. The rulebook also explains that the SCSD detention facilities will ensure inmates with qualified disabilities are afforded equal access to programs, services, and activities unless doing so would alter the nature of operations of the institution or program. It also has brief non-specific information with regard to reasonable accommodations and requests.

The SCSD detention facilities do not have an EC policy for daily encounters or interactions, nor is there an EC policy when there is a higher standard for providing an ensuring EC, such as for clinical encounters (e.g., mental health, medical, or dental), due process events (e.g., classification process, inmate disciplinary [write-up] process, pre-release process, conditions of release process, Notice of Charges, or probation encounters/meetings), or other specific activities such as self-help groups e.g., Alcoholics Anonymous (AA), Narcotics Anonymous (NA) or other events such as religious activities. Likewise, there is no comprehensive policy relative to providing reasonable accommodations for inmates with disabilities, e.g., deaf/hearing-impaired, vision, speech, learning, and developmentally disabled inmates to ensure equally effective communication during the aforementioned types of events or processes, including applicable interactions with staff, other inmates, and, where applicable, the public.

There are existing policies, as cited above, which contain general information regarding adult "developmental disability," identification and report of disabilities/impairments, orientation, inmate discipline, classification, grievance processes, reading glasses, religious services, education services, interpreter services, and release processes. These policies also include some general language regarding teletypewriter (TTY) and interpreters, but they and other policies do not extend far enough, and do not provide comprehensive requirements or direction with regard to EC. Virtually all of the policies are silent with regard to providing and documenting EC, and there are no policies which define the topic or provide examples. There is no specific policy outlining a requirement to provide auxiliary aids, which are reasonable, effective, and appropriate to the needs of an inmate when simple written or oral communication is not effective. Such aids that could be included in such an EC policy could include, but not be limited to; qualified interpreters, readers, sound amplification devices, captioned television/video text displays, video remote interpreting, video visiting, Telecommunication Devices for the Deaf (TDD)/TTY, audiotaped texts, Braille materials, large print materials, and signage.

**Observations**

The Assessment Team observed a multitude of processes at various sites throughout the MJ and RCCC jails to examine the establishment of EC. Specific processes examined included but were not limited to the following: Intake/booking; medical and mental health screening; inmate classification; service of Notification of Charges; initial serving of inmate write-ups (disciplinary reports) and the inmate disciplinary hearing/process; and inmate orientation. There are additional processes where EC must also be established including education, library services, religious services, and various programs and self-help groups, e.g., Alcoholics Anonymous (AA)/Narcotics Anonymous (NA), etc. These areas were also examined as indicated below, via staff and inmate interviews.

The Assessment Team looked to determine whether staff was making all reasonable attempts to communicate with disabled inmates (e.g., those with vision, hearing, speech, learning and developmental disabilities, as well as others) for all contacts, including normal daily interactions. The team also examined whether staff made all reasonable attempts to achieve EC while applying a higher threshold or standard for due process events (e.g., classification process, inmate disciplinary hearing and related processes, service of notice to appear), and clinical encounters (e.g., diagnosis or prognosis, intake/booking medical and other medical evaluations, discharge instructions, provision of mental health (JPS) evaluations, explanation of medications, procedures, treatment, treatment options, or surgery).

The higher standard of EC includes: identifying an inmate's disability where there may be a barrier to comprehension or communication requiring reasonable accommodation(s); providing effective reasonable accommodation(s) to overcome the communication barrier; and documenting the EC, including the method used to achieve EC and how the staff person determined that the inmate understood the encounter, process, and/or proceeding.

Inmate Disciplinary (Write-up) Process

The Assessment Team observed the inmate disciplinary (write-up) process with regard to EC. Staff who interacted with inmates during the inmate disciplinary (write-up) process did not have an inmate disability tracking list; they did not establish or provide EC to the inmates during the process; nor was there any documentation of such. This includes sergeants or deputies issuing initial copies of the reports, and sergeants conducting the disciplinary hearings. It is the Assessment Team's position that the inmate disciplinary processes not observed also lacked the provision of EC. This includes issuance of the final copy of the inmate disciplinary (write-up) hearing summary and findings (disposition). This is attributed to the lack of a tracking system that would otherwise identify inmates who require staff to provide EC during these types of due process encounters.

Classification Process

The Assessment Team observed the Classification process with regard to EC. Classification staff that interacted with inmates during the classification process did not establish or provide EC to the inmates during the initial classification interviews. This is attributed to the lack of a tracking system that would otherwise identify inmates who require staff to provide EC during these types of due process encounters.

Although the Assessment Team did not observe the Service of Notice of New Charges, it is the Assessment Team's position that this process lacked the provision of EC. This is attributed to the lack of a tracking system that identifies inmates who require staff to provide EC during these due process encounters.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

There is no current SCSD detention facilities requirement for staff to ensure a higher threshold for EC by identifying the disability, potential communication barrier, providing the necessary accommodations to ensure EC, and to document the EC and accommodations provided as well as how the staff determined that the communication and accommodations were effective.

Medical/Mental Health/Dental Encounters:

The Assessment Team observed numerous health care-related processes for EC concerns. These observations began with the intake/booking medical screening process and branched out from there.

The Assessment Team observed several inmates being interviewed by a phlebotomist (for those inmates required to do so commensurate to their charged offense) prior to their intake/medical screening. The questions asked were generally consistent. Aside from drawing the inmate's blood, the phlebotomist took blood pressure and temperature readings. Questions commonly asked were regarding the following: allergies, open wounds, asthma, diabetes, medical medications, psychiatric medications, intent to harm self or others, alcohol use, drug usage, seizures, previous housing if previously incarcerated under the jurisdiction of the SCSD detention facilities, as well as other questions. The phlebotomist appeared to be clear in her communications with the arrestees.

The phlebotomist did not ask the inmates whether they had any disabilities, whether the inmate had any issues in comprehending the process or questions being asked, or if they needed assistance in understanding the process. The phlebotomist was not aware of any mechanism for documenting any EC assistance or concerns if applicable. Because there is not an inmate disability tracking system, even for returning arrestees, the phlebotomist would be (and was) unaware of any disability concerns, unless the inmate going through the process claimed such.

The Assessment Team also observed dozens of inmates (male and female) being processed through the MJ and RCCC intake medical screening process, by several different nurses. The team observed dozens of inmates go through this process on various dates, and on both AM and PM shifts, as well as weekdays and weekends.

The intake medical screenings were not consistent, and did not contain any EC practices in terms of ensuring or documenting EC. Most of the nurses used the standard Receiving Screening Form (SCSD Correctional Health Services Medical Intake), but the form does not contain any disability-related questions. The intake screening staff also completes a form, titled, "SCSD Correctional Health Services Special Needs" with a list of contained items. The list includes a few check boxes for some physical disability-related concerns, but nothing for intellectual (developmental) disabilities, learning disabilities, or deafness/hearing

or speech impairments. There are check boxes relative to MH and glasses/contacts that would or could have EC-related concerns.

The specific questions asked are outlined in more detail in the Health Care section of this report, but depending on the nurse observed, minimal or no disability-related questions were asked, and the nurses were not aware of the need to provide and document EC for disabled inmates whose disability poses or may pose a barrier to communication, or even which inmates would need such assistance.

With regard to securing certified sign language interpreters, the Assessment Team asked numerous intake/screening nurses as well as other nurses throughout the MJ and RCCC about the process at the two jail facilities. The Assessment Team received many different responses. Most nurses were not aware that the SCSD detention facilities had a contract with an outside provider for sign language services, and did not know how to obtain a certified sign language interpreter, or if that was even an option. The Assessment Team received the following verbal responses;

- Have the inmate write everything out;
- Some inmates lip read;
- Use an officer who knows sign language;
  - A couple of names of deputies were provided to the Assessment Team as those who have been used on occasion;
- The jail has a telephone language line;
- Inmates "Surenos" have been used to sign with deaf/hearing-impaired inmates because some of them know sign language; and
- There is a TTY machine located in the sergeant's office.

One of the nursing supervisors at RCCC was aware of a list of five providers in the greater Sacramento area, and was aware of the process.

The Assessment Team was unable to observe any ICE physical examinations/health appraisals (for ICE detainees). Although the aforementioned ICE form includes some disability-related information as to mental health, learning disabilities, and "developmental history," or "appears to be developmentally delayed or mildly retarded", it is highly unlikely that an EC is being documented. It appears that staff assigned to housing units or other areas where they maintain supervision over ICE detainees, or have contact with those detainees, have minimal knowledge of the listed possible concerns. But with a lack of ADA training, no EC documentation requirements, and no policy, procedures, or practice to appropriately deal with cognitive deficits and adaptive support deficits (for intellectual [developmental] disabilities), it is highly unlikely that the EC needs are being met for intellectually disabled or learning disabled inmates, as well as other ICE detainees whose disability poses a barrier to communication.

JPS Encounters:

The Assessment Team was able to observe several JPS interviews in the intake/booking area, including expedited referrals. More detailed information will be outlined in the health care section of this report. Obviously JPS interviews are challenging at most times, and are centered on the inmate's mental health state. But as mentioned throughout this report, clinicians and social workers largely do not have the information necessary to know about EC issues for disabled inmates. The clinicians and social workers appeared to be patient and professional in their communications with the inmate-patients.

Although the Assessment Team did not observe any other types of medical, mental health or dental encounters, it is the team's position that those also lacked the provision of EC. This is attributed to the lack of a tracking system that identifies inmates who require staff to provide EC during these clinical encounters. There is no current SCSD detention facilities or CHS requirement for medical, mental health or dental staff to ensure a higher threshold for EC by identifying the disability, potential communication barrier, providing the necessary accommodation(s) to ensure EC, and documenting the EC and accommodations provided as well as how the medical, mental health or dental staff determined that the communication and accommodations were effective.

Intake/Booking Process (Custody Staff):

The Assessment Team observed intake/booking staff process numerous inmates at the MJ. The process included interviewing the new inmates with general intake questions, e.g., gang status, prior incarceration, and enemies. The intake deputies also had discussion with the inmates during the fingerprinting and photos "mugshot" process, had the inmates sign associated paperwork, and issued the inmates the Inmate Booking Information Receipt that includes charges and bail information. During this process, staff did not know whether the inmates had a disability that may pose a barrier to communication, and as such were not prepared to provide or document EC, if necessary.

Release Process:

The Assessment Team observed the MJ release and Bond release processes. Included in the process was the serving of various documents to different inmates, which required an explanation and subsequent inmate signatures/initials, e.g., PF11 form, Release Screening form, Work Project paperwork, receipt of returned property. Other information relayed included instructions to contact a specific bail bonds company, and information on property, money, dates to report to court or other county jurisdictions. The releasing deputy does not know who may have a disability where there may be a barrier to communication. There was no EC provided, and no EC documentation for this process.

Special housing/Administrative Segregation Process/TSEP Process:

After observations and interviews of staff and inmates at the MJ, the Assessment Team found that inmates are not being provided written notification documentation when they are removed from the general population and placed in special housing, such as administrative segregation or TSEP. As such, there is no EC or documentation being provided to the inmates. The only documentation provided is any associated inmate disciplinary reports (write-up). Again, disabled inmates (those with barriers to communication) are being placed in these restricted environments often without fully understanding the nature of the move, or their rights within the process.

**Staff Interviews**

Through interviewing dozens of housing unit deputies and sergeants, programs staff, work supervisors, and educators, and health care staff, etc., the Assessment Team concluded the following:

- Custody staff, health care staff, teachers, librarians, and other staff have not received adequate ADA training regarding EC and reasonable accommodations;
- With very limited exceptions (primarily deaf/hearing-impaired inmates), custody and non-custody staff do not know which inmates have disabilities where communication barriers exist or may exist;
- A registered nurse indicated that she has never encountered a deaf/hearing impaired or speech impaired inmate who needed a sign language interpreter. She indicated that she would use written notes if confronted with that situation;
- An RCCC nurse indicated that an SLI could be obtained through Case Management staff if necessary, but she also said that they could contact the "language line." She admitted that there are no protocols, but could write notes back and forth if that works for the inmate. She also admitted that it could be a challenge trying to secure an interpreter on the same date needed;
- An RN stated that deaf inmates can read lips and they (medical staff) would communicate with them via writing;
- A medical doctor was able to explain that the E-Chart main screen will often list a disability, and that accommodations will be provided as needed, and communications are made by using simple terminology, and written notes, if necessary;
  - An RN also indicated that only on some occasions there may alerts within the E-Chart as to inmate communication issues;
- An RN admitted that often the E-Chart does not indicate whether staff provided EC, or often does not articulate how staff communicated with a disabled inmate (those who may have communication concerns);
- An RN stated that if an intellectually disabled or learning disabled inmate is unable to read medical instructions, the inmate must first inform medical

staff, then medical staff will have the inmate repeat back the verbal instructions, and medical staff will input the information in to the medical progress notes;

- When asked what to do when an inmate can't read medical related documentation, another nurse mentioned she would explain it to the inmate, and provide a copy of the document to the inmate and also to a deputy;

- One of the nurses (when asked) stated that hearing impaired inmates who need an SLI will receive one through court services (by going through the medical director), but also said that most inmates can and often write notes back and forth with medical staff;

- Other than Locator Cards (sometimes attached with a chrono for a listed health care appliance or other general information) in the housing units, and rare written notations contained within the electronic JIMS system (PF2, PF4 and/or PF 10 screens), staff do not have accurate or complete lists/rosters of disabled inmates;

- Most of the disabled inmates identified or known to staff at both jails (where a communication barrier exists or is likely to exist) are deaf/hearing-impaired;

- This is attributed to not having a comprehensive screening process and subsequent inmate disability tracking system, e.g., testing for intellectual (developmental) disabilities or a process for identifying reading scores to assist in the query process to assess for possible learning disabilities;

- Nearly all staff are not aware of specific EC needs for the large majority of inmates housed or assigned to their living or work areas;

- The majority of staff do not understand how to provide EC and/or are not effectively providing it;

- Most deputies who were interviewed indicated that they would explain documents, processes, and forms to inmates, and would read pertinent information, e.g., written response to grievances and KITE's, if they were asked to do so;

- A smaller number of deputies said that they write/scribe a document for an inmate if they asked, and if an inmate needed the help;

- A few of the staff members interviewed acknowledged that they have provided that specific type of assistance in the past;

- Staff do not currently document any EC (if provided);

- Most custody staff do not fully understand the difference between inmates with mental illness, intellectual "developmental" disabilities, and learning disabilities, and generally do not understand the types of accommodations that are necessary to ensure EC for these types of inmates;

- The staff that were most aware of inmate disabilities were those in the ROC program at RCCC where, by nature of the program, inmates are continuously examined for competency;

- There is also a disability alert process, in that MH records are reviewed, and Intelligence Quotient (IQ) test is administered, and inmates receive a "MOCA" quick exam (Montreal Cognitive Assessment), which takes about 15 minutes to administer;
- A ROC-assigned psychologist explained that large print handouts are provided, and instructions are explained, rephrased/broken-down in simple terminology, and often 1-on-1 sessions are conducted to maximize inmates' understanding of instructions;
- However, ROC staff acknowledged that there is no inmate disability tracking system or disability designation process in place.

Most custody staff and other staff were open-minded and positive when asked how they would respond to an inmate who didn't seem to understand rules, policies, or expectations. Some staff stated that they would be patient and continue explaining. But most of the staff that was interviewed was not aware of specific methods (e.g., speak slowly, use simple phrases/words, allow more time for the inmate to process information, etc.) to use in order to achieve EC.

When asked about providing assistance to disabled inmates to overcome communication barriers or encountering an inmate with communication needs, staff responses included but were not limited to the following:

- Check to see if the inmate has medical or psychiatric issues, and if needed refer the inmate via a psych or medical referral;
- Refer the inmate to a "houseman" or "trustee" for help;
- Try to cell or bunk him with another inmate who is a friend of the inmate's, so the cellmate/bunkmate friend could help him/her;
- Would assist the inmate with writing grievances or KITE's, or explaining information;
- Have helped inmates with writing commissary slips and request slips (KITE's);
- Provide 1-on-1 attention if necessary;
- Would not write an inmate up without first having a 1-on-1 conversation and explaining instructions;
- Be patient and explain, and talk to the inmate individually;
- I would not help an inmate write; the inmate can go to another inmate or trustee; and I would give the inmate a grievance form if needed;
- Be understanding because some inmates have learning disabilities or developmental disabilities;
- Give it more effort in explaining;
- Use levels of communication;
- Use non-verbal communication and gestures;
- Review the locator card for possible information, and contact classification staff for a bed move if needed; and
- Talk to the inmate every day to get to know and understand the inmate better.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

As related to Programs, staff admitted that they do not have a tracking list (electronic or hardcopy roster) for inmates with disabilities, or for any accommodation needs or physical limitation information on the inmates (other than what might be occasionally documented on the Locator card's attached chrono [if available], or within the JIMS system PF2, PF4, or PF 10 screens).  As such, staff acknowledged that they generally don't know what type of disabled inmates they have or what the inmates' specific accommodation needs are.

When asked, most staff indicated that there is a lack of assistive equipment available to assist inmates.  Most staff also indicated that reading glasses can be purchased from the commissary or can be sent in by family members.

With regard to education, academic and vocational instructors from the EGUSD admitted that they do not have a list of disabled inmates, or those with EC concerns.  But they indicated they would pull inmates aside and work with them individually to the extent possible to ensure each inmate understands.  The teachers interviewed had no concerns with disabled inmates being assigned or possibly being assigned to their classes.  One instructor indicated that there would be no problem with a deaf inmate working, and that he (instructor) believes the inmate would not need a sign language interpreter.  Another teacher said she would not put a deaf inmate into any classes because they don't have access to a sign language interpreter.  One teacher stated that she would use an inmate signer if he were a friend of the deaf/hearing (or speech) impaired inmate.  Another teacher stated that he has a deaf inmate in his computer class and the method of communication he uses is written notes.

Most of the teachers acknowledged there are not any large print materials, but that they can enlarge material on the computer screen and print it out if necessary.  Some of the instructors cited that they have access to a case of reading glasses (for students) containing various reading prescription levels.  Other available education accommodations that were noted include a full sheet magnifier (although at least one of the teachers claimed that some of the magnifiers turned up missing in the past), larger font on the computer screens, and lower level tests that can be administered if a student is struggling.  When asked, some of the teachers said they would not have a problem moving a hearing-impaired inmate to the front of the classroom.

There are no IEPs at the SCSD detention facilities or under the EGUSD at the jail facilities, and previous IEP needs are not identified.  Most teachers indicated that they would still try to accommodate disabled inmates with EC concerns, and accommodate their learning strategies to the extent possible.  But some of the instructors admitted that inmates don't usually ask for help or inform the teachers as to a disability or any EC needs.  Due to claimed staffing shortages, and no IEPs in place, there are no formal or recognized "pullouts" being conducted for remedial or tutoring sessions, and there are no available teacher assistants to provide   needed   communication   and   assistance   to   learning   disabled,

developmentally disabled, or other disabled inmates as applicable. As stated above, some of the teachers attempt to provide individual assistance to the extent possible, but this is not in policy, there is no set schedule for it, and it does not appear to be formally documented. Most of the vocational instructors would consider moving a disabled inmate to another position in the event the inmate was struggling with learning (but was still trying), and the workload appeared to be difficult for the inmate to maintain.

**Inmate Interviews**

The Assessment Team interviewed numerous disabled inmates, including those with mental illness, intellectual (developmental) disabilities (or some who may likely have intellectual disabilities), learning disabilities (or some likely to have learning disabilities), speech impairment, hearing impairment, vision impairment and other disabilities. Numerous inmates who were interviewed admitted attending special education classes in public school, and several others either claimed to have been diagnosed as learning disabled, or thought they were but were uncertain. A small number of inmates interviewed were not able to read at all, while there were additional inmates who struggled or had difficulties reading and/or comprehending short excerpts from the SCSD detention facilities Correctional Services Inmate/Detainee Handbook (rulebook), or in reading an ADA Notice as provided by the Assessment Team during the interviews.

With regard to the inmate disciplinary process, most inmates interviewed did not have a history of receiving write-ups. Some of the inmates interviewed complained that they had difficulties in understanding the disciplinary hearings. Some inmates indicated that staff does not explain to them the charges or their rights, and some disabled inmates interviewed acknowledged that they often do not understand the charges or the disciplinary process, or their rights when they receive their initial copy of the write-up, and they are often confused. Some of the inmates interviewed also explained that the hearing sergeants sometimes do not explain the charges or the outcome of the hearing to their understanding. Some complained that there have been occurrences where they did not receive an initial copy of the write-up, but had to attend the disciplinary hearing. A few of the inmates interviewed indicated that they never received their final copy of the report (with the disposition).

The Assessment Team also received several complaints from inmates categorized as OPP (as well as other disabled inmates) that staff will not assist them with writing/scribing/explaining grievances and other forms.

Classification Process:

The vast majority of inmates (including disabled inmates) interviewed had the same complaints. Most of the inmates mentioned that the classification deputies speak too fast, they don't explain what they are talking about, and they quickly

complete the classification process. Many inmates do not understand their classification/custody level, or why they are being housed in a particular area. They claim that they often leave the classification meeting confused, and often don't understand the decisions reached during the classification meeting. Although one of the classification forms at the SCSD detention facilities has a question pertaining to any special considerations due to a disability, the classification deputies were widely not asking this or any other disability-related questions (other than mental illness-related questions). The classification process does not include an EC component (either verbally ensuring EC or associated documentation), and classification deputies do not have a mechanism to identify who the disabled inmate population is. Numerous disabled inmates who were interviewed claimed that classification deputies didn't ask them if they understood the encounter or their decision/outcome, and that they were not provided any accommodations or EC during the process.

The most egregious EC violations reported by inmates include:

MJ 2 East – An inmate who is legally blind with a TABE score of 2.0 stated that he has been requesting assistance in completing a grievance and staff are not being responsive. He stated that because there is only one custody staff member in 2 East, staff must stay in the control booth and are not available to help him with the grievance. He has requested assistance from medical staff specifically requesting that they read him medical information that is provided to him regarding his treatment and diagnosis, and medical staff do not provide him with any assistance.

RCCC KBF – A hearing-impaired inmate stated that it is difficult to hear the announcements on the public address (PA) system. He has to ask other inmates what the announcement was as staff do not communicate with him directly.

RCCC K Barracks – A deaf inmate stated that a SLI has only been provided for his initial JPS interview in booking. He claims that no SLI has been provided for his classification interview and medical appointments at the MJ. He claims that he had to pay an inmate $25.00 to make a phone call for him when the TTY was not working. The inmate said he arrived at the MJ on May 3, 2016 and that 2 days later he was moved to TSEP and kept there for 3 weeks. He stated that staff did not inform him of why he was in TSEP status. He also said that the chaplain does not provide SLI for religious services.

A deaf inmate arrived at the SCSD detention facility MJ on May 24, 2016. The arresting officers report notes a response of "No" to all questions on the Intake Screening Form. Question #9 "Is the arrestee non-responsive to the above questions" is also marked as "No". The SCSD detention facilities CHS Special Needs form reflects "Non-English Speaking and Deaf" and notes that the inmate is "Cleared for 2 East Housing". The Request for Reclassification Form dated 5/26/16 reflects 6 E housing is not appropriate and states, "Patient/Inmate is hard

of hearing/deaf. Requires assistance for ADL's. House in 2E for LOS." It was also noted that the inmate was placed on 15-minute checks from 7/7/16 at 1125 hours to 7/8/16 at 1310 hours. The Assessment Team asked medical staff to review the inmate's medical chart to see how many occasions a physician or nurse had seen the inmate. Medical staff reported that a physician had seen the inmate on at least 6 occasions and nursing staff had seen the inmate on at least 10 occasions. There is no indication that staff attempted to determine the inmate's primary method of communication. The Assessment Team attempted to interview and communicate with the inmate on 8/12/16. The inmate is totally deaf, so the team attempted to communicate with him using written notes. This was unsuccessful as the inmate was unable to read or write English. The inmate was distraught and crying during the interview as the Assessment Team attempted to communicate with him. The SCSD staff were not able to provide the team with documentation that a SLI had been used to determine the inmate's primary method of communication, or if one was used during the Intake/Booking Process (medical and custody), classification process or medical/psychiatric encounters that occurred during the inmates 2 ½ months of being in custody. Medical staff reported that the inmate's family has indicated that he communicates in Mien; however, SCSD detention facilities staff had not verified this with the inmate using a SLI. The SCSD detention facilities medical staff reported that on August 18, 2016 an inmate who communicates in ASL was used in an attempt to communicate with the deaf inmate, but the inmate being used as an interpreter reported that the deaf inmate does not communicate using ASL.

## Conclusion

The SCSD detention facilities do not provide disabled inmates with accommodations for medical/mental health/dental encounters.

The SCSD detention facilities do not provide disabled inmates with accommodations for the Inmate Disciplinary (Write-up) process.

The SCSD detention facilities do not provide disabled inmates with accommodations for the classification process.

The SCSD detention facilities do not provide disabled inmates with accommodations for the release processes.

The SCSD detention facilities must have a comprehensive EC custody Operations Order (policy) and CHS policy in place to ensure that reasonable accommodations are provided and EC is achieved (or all reasonable attempts are made) for disabled inmates during clinical encounters (medical, mental health and dental), due process events (e.g., classification process, inmate disciplinary process, release processes, notification of charges, probation encounters/meetings), and other specific activities such as self-help groups e.g., AA/NA or religious activities.

A comprehensive EC custody Operations Order and CHS policy must also include inmate access to various auxiliary aids (e.g., qualified interpreters, readers, sound amplification devices, captioned television/video text displays, video remote interpreting, video visiting, TDD/TTY, audiotaped texts, Braille materials, large print materials, and signage), whether pertaining to a specific type of encounter, for work, or for recreation.

The SCSD detention facilities may decide to have a stand-alone comprehensive EC Operations Order and CHS policy, or, a comprehensive EC section within an ADA Order and policy (such as the draft ADA Operations Order, upon approval), or, incorporate necessary language within the numerous local Orders and policies as cited above. Also, as indicated above, nearly all of the local custody Operations Orders and CHS policies contain no EC language or references. A select few (as cited above) outline very brief and general EC related language, but do not extend far enough to ensure a higher standard and threshold to ensure EC and nondiscrimination.

Numerous operations orders and CHS policies contain some general EC-related language, but do not extend far enough and are not described in sufficient detail. Most are silent and do not address EC requirements.

The SCSD detention facilities must also ensure the following:

- Training: custody, health care (medical/dental/mental health), teachers, librarians, and other staff must receive adequate ADA training regarding EC, reasonable accommodations and auxiliary aids.
- Development of a comprehensive disability assessment process, with applicable screening instruments, and forms/documentation;
- Development and implementation of an electronic inmate disability tracking system, to provide custody, health care, classification, education, library and other staff with an updated identification and tracking roster/list or system for identifying disabled inmates as well as their accommodation and EC needs;
- Staff must understand and follow the higher standard and threshold for EC; identify the disability and EC needs of the inmate; provide the necessary accommodations/make all reasonable attempts to ensure EC (the inmate understands staff, and staff understand the inmate); and document the encounter (including the type of EC or accommodation(s) provided, and how the staff member concluded that the inmate understood the encounter);
- Staff must understand specific methods for providing EC (e.g., speak slowly, use simple phrases/words, allow more time for the inmate to process information);
- Staff must document EC provided for clinical contacts, and various due process events;

- The EGUSD education staff should be provided with necessary assistive equipment to assist disabled inmates (those who have EC needs);
- The EGUSD education staff should have the resources to accommodate learning strategies of those inmate-students who have special needs, such as those with developmental, learning, vision, hearing, and speech disabilities;
- Sign language interpreters must be provided as necessary for due process events, clinical encounters, as well as educational and religious services when warranted;
- Classification and Inmate Disciplinary Hearing staff (as well as other staff during various due process events or clinical encounters) must make all reasonable attempts to carefully explain the process, charges, outcome, etc., and provide EC during the encounter.

An effective EC Operations Order/Policy must contain but not be limited to the following references:

- Assurance of EC with all inmates during all encounters or interactions;
- A higher standard or threshold for due process events and clinical encounters;
- A general literacy trigger (e.g., reading level) for purposes of querying inmates for inmate disciplinary events (for those who may not have been tested for learning disabilities or intellectual [developmental] disabilities, or otherwise may have literacy or cognitive concerns);
- Relevant formal classroom EC training for all staff.
- Requirement that disabled inmates with communication needs are interviewed (and provided EC as necessary) as part of the inmate grievance/appeal process as warranted.

### References

**28 CFR 35.130(b)(1)** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability:

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service.

**28 CFR § 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability.

**28 CFR § 35.130(a)** requires that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR 35.130(b)(4):** A public entity may not, in determining the site or location of a facility, make selections:

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

**28 CFR 35.160** (a) (1) A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others.

**28 CFR 35.160** (b) (1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford qualified individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.

**28 CFR 35.160 (b)** (2) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

**U.S. Department of Justice Civil Rights Division *Disability Rights Section* Commonly Asked Questions About The Americans With Disabilities Act and Law Enforcement:**

**V. Modifications of Policies, Practices, and Procedures**

**23. Q: What types of modifications in law enforcement policies, practices, and procedures does the ADA require?**

**Example -** A department modifies the procedures for giving <u>Miranda</u> warnings when arresting an individual who has mental retardation. Law enforcement personnel use simple words and ask the individual to repeat each phrase of the warnings in her or his own words. The personnel also check for understanding, by asking the individual such questions as what a lawyer is and how a lawyer might help the individual, or asking the individual for an example of what a right is. Using simple language or pictures and symbols, speaking slowly and clearly, and asking concrete questions, are all ways to communicate with individuals who



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

have mental retardation.

**ADA Best Practices Tool Kit for State and Local Governments**

**Chapter 3**

**General Effective Communication Requirements Under Title II of the ADA**

**A. Providing Equally Effective Communication**

Under Title II of the ADA, all state and local governments are required to take steps to ensure that their communications with people with disabilities are as effective as communications with others. This requirement is referred to as "effective communication and it is required except where a state or local government can show that providing effective communication would fundamentally alter the nature of the service or program in question or would result in an undue financial and administrative burden."

What does it mean for communication to be "effective"? Simply put, "effective communication" means that **whatever is written or spoken must be as clear and understandable to people with disabilities** as it is for people who do not have disabilities. This is important because some people have disabilities that affect how they communicate.

How is communication with individuals with disabilities different from communication with people without disabilities? For most individuals with disabilities, there is no difference. But people who have disabilities that affect hearing, seeing, speaking, reading, writing, or understanding may use different ways to communicate than people who do not.

*Pierce v. D.C.* **128 F. Supp. 3d 250 (D.D.C. 2015)**

Deaf individual was incarcerated for 51 days. Prison staff never assessed Plaintiff's communication needs. Assumed lip-reading and written notes were sufficient. Plaintiff asserts he asked for an interpreter for medical intake, health services and various classes.

**Court:** Granted summary judgment for Plaintiff on effective communication and intentional discrimination. Denied prison's motion for summary judgment.

**Court:** Prison violated ADA/504 as a matter of law by failing to evaluate Plaintiff's need for accommodation when taken into custody.

**Violation:** Failure to assess needs of deaf inmate. Prisons have an affirmative duty to assess the accommodation needs of inmates with known

disabilities taken into custody.   Even if the individual has not made a specific request.  Prison officials cannot rely solely on their own assumptions.

**Violation:** Plaintiff was not provided with required interpreter. Requested interpreter – evidenced by notes, testimony.   Needed an interpreter evidenced by differences in ASL/English versus ☐dealing with complex communications. Rejected argument that District employees said they believed   Pierce understood them.     No undue hardship/fundamental alteration.

### *Holmes v. Godinez* 311 F.R.D. 177 (N.D. Ill. 2015)

Plaintiffs (deaf/hard of hearing inmates) argued that prisons fail to provide effective communication, including:  Visual alarms and notifications, access to TTYs, hearing aids and batteries, other auxiliary aids.

**Court:** Found for plaintiffs (denied MSJ) and granted class certification. Case demonstrates the wide range of programming requiring  access, including:   religious services, disciplinary hearings, medical, mental health and rehabilitation programs, educational and vocational   programming.

### *See also Bearden v. Clark Cty.*, 2016 WL 1158693 (W.D. Wash. Mar. 24, 2016)

Advocates argue that effective communication requires prisons to provide videophones, not just TTYs.

### Recent agreements out of Maryland and Kentucky

Deaf and hard of hearing inmates will have access to videophones to communicate with people outside of prison.  Other select provisions: Visual notification of oral announcements regarding: emergencies; Access to interpreters and other auxiliary aids and services; Broad scheme of policy implementation, training, outreach, and monitoring to ensure equal treatment.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

## Administrative Segregation Unit, Total Separation, Disciplinary Detention Unit

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures pertaining to Administrative Segregation process are outlined in Operations Orders 06/03 Classification Process and 06/02 Housing Plan and Policy 1107 Decision Making-Special Needs.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1080 Rules and Disciplinary Penalties requires that:

> Wherever discipline is administered, each facility administrator shall establish written rules and disciplinary penalties to guide inmate conduct. Such rules and disciplinary penalties shall be stated simply and affirmatively, and posted conspicuously in housing units and the booking area or issued to each inmate upon booking. For those inmates who are illiterate or unable to read English, and for persons with disabilities, provision shall be made for the jail staff to instruct them verbally or provide them with material in an understandable form regarding jail rules and disciplinary procedures and penalties.

"People with disabilities" are defined to include, but not be limited to, persons with a physical or mental impairment that substantially limits one or more of their major life activities or those persons with a record of such impairment or perceived impairment that does not include substance use disorders resulting from current illegal use of a controlled substance.

Operations Order 06/03 Classification Process states, "Prisoner classification should be based on factors, which affect the security of the facility, staff, and the prisoner. Some of these factors include, but are not limited to:

- Physical characteristics, including gender, age, mental and medical conditions.
- Criminal history both in and out of custody, known gang affiliation, prior classification history, current charges or nature of charges against prisoner.
- Legal status, including propria persona (pro per) status, civil commitments, extradition status, or detention as a witness.
- Administrative segregation considerations including prior peace officer or corrections officer employment, gravely disabled status, and/or case notoriety.
- Criminal sophistication, former victims or enemies currently housed within the facility, status as a known law enforcement informant, sexual orientation/transgender status, or status as an inmate worker."



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

"High Security Housing may be used to house prisoners at the MJ and RCCC based on guidelines including, but not limited to:

- Prisoners with a documented history of in-custody assaults in the last two (2) years. Assault history includes, but is not limited to, past cases of assault and pending cases. Assault history includes predatory behavior involving or victimizing other prisoners.
- Prisoners with escape or attempted escape histories from secured facilities within the last ten (10) years.
- Prisoners who have a current or past criminal history involving victimization of children or the elderly.
- Prisoners with two (2) or more major write-ups during the current custody period for rule violations.
- Prisoners who are validated gang members and/or have a history of gang related crimes.
- Prisoners who have charges filed against them as a result of a write-up during the current custody period.
- Prisoners involved in cases that have considerable press coverage or notoriety."

"Medium and Minimum Security Housing may be used to house unsentenced prisoners at RCCC who do not meet the criteria for Special or High Security Housing.

Special Housing refers to housing designated for prisoners with specific segregation needs, status as inmate workers, medical or mental health requirements, and disciplinary isolation. Special Housing needs will be determined by the classification unit and by physical plant design and limitations of each facility.

Special Housing may be used to house prisoners at MJ and RCCC who have special separation or housing needs, including but not limited to:

- Medical or mental health problems or disabilities which prevent the prisoners from caring for themselves in a jail setting, or who are required to be isolated for medical reasons.
- Prisoners who are classified as Administrative Segregation, Protective Custody, Total Separation, or Civil Commitment status, per Operations Order 06/02.
- Prisoners who are placed in disciplinary isolation. A Hearing Sergeant will assign prisoners to disciplinary isolation based on the findings of the disciplinary hearing."

"Classification officers will be responsible for conducting classification reviews in accordance with but not limited to the following guidelines:

- For prisoners in High Security Housing, every thirty (30) days.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- For prisoners in General Population Housing, after the first sixty (60) days of custody.
- Upon request from custody staff, Medical Staff, Jail Psychiatric Services, and/or court officials, or when the legal status of the prisoner changes.
- When a prisoner is relocated and/or reclassified due to the outcome of a disciplinary hearing."

Operations Order 06/02, Housing Plan states, "the MJ and RCCC Classification Unit will assign prisoners to a housing unit based on the current housing needs of the facility and/or in accordance with Operations Order 6/03, Classification Process."

"The MJ has two (2) floors, which have designated housing areas that may be used for prisoners who have received disciplinary isolation.

- The 8 West 400 Pod is available for male disciplinary isolation.
- The 7 West 400 Pod is available for female disciplinary isolation."

Operations Order 07/03, Inmate Discipline Plan states, "no inmate may be deprived of the implements necessary to maintain an acceptable level of personal hygiene. Inmates will be allowed to keep or be provided with a toothbrush, toothpaste, soap, shaving implements, comb and tampons/sanitary napkins pads for female inmates. Inmates will be allowed to shower at least every other day. While on disciplinary isolation, prisoners are allowed to keep the above items, a bible, and all legal materials to include paper/envelopes/pencil for legal correspondence."

"Major facility violations shall be punishable by any of the disciplines listed in the applicable regulations, as well as loss of commissary privileges, social visits, dayroom/outdoor recreation, telephones, housing unit programs, removal from inmate worker status, relocation, loss of good time, disciplinary isolation diet, and disciplinary isolation housing."

An inmate may be removed from general population housing when a rule violation is aggravated or if it could recur or incite other misconduct. To ensure the safety and security of the facility, an inmate may be moved to another housing unit, including a disciplinary housing unit, pending the outcome of either the disciplinary process or prosecution. A sergeant or watch commander may make this decision. The person making the decision will not be involved in the hearing.

Inmates found guilty of violating major rules may be moved to a disciplinary isolation-housing unit to serve his/her discipline. The maximum time any privilege can be suspended for a single facility Major violation shall not exceed 15 days. When multiple violations arise from a single incident, each violation may be punished concurrently or consecutively, but shall not exceed 30 days suspension. Any inmate on disciplinary isolation housing status for more than 30

days because of multiple incidents shall have a review by the division commander before the disciplinary isolation status is continued. This review shall include a consultation with health care staff and continue every 15 days until the inmate is off discipline."

The SCSD detention facilities TSEP and ADSEG Inmate Housing Plan outlines the following privileges provided to TSEP and ADSEG inmates while they are housed at the Main Jail. Inmates classified as TSEP and ADSEG present special consideration based upon their inability or unwillingness to be near other inmates. In order to comply with Title 15, the SCSD detention facilities will provide the base minimum Title 15 standards for inmates classified as TSEP and ADSEG.

"TELEPHONE – TSEP and ADSEG inmates shall be allowed no more than 5 contact numbers entered into the phone system at any one time. Removing or adding numbers will require a request identifying the number to be added, person's name, area code and relation to inmate.

CORRESPONDENCE – TSEP and ADSEG inmates shall only be able to correspond with 5 verified mailing addresses at any one time. Removing or adding names will require a request identifying the address, receiver's name, and the person's relation to the inmate. This does not apply to legal mail.

COMMISSARY – TSEP and ADSEG inmates shall only purchase from the approved item menu and will only be allowed a maximum of $100.00 in their account at any given time. TSEP and ADSEG inmates will only be allowed a maximum weekly gift order of $30.00. If an inmate receives a gift order they will not be allowed to order commissary that week. Additionally, TSEP and ADSEG inmates will gain access to commissary only once per week.

READING MATERIAL – TSEP and ADSEG inmates shall not be allowed to loan any book, periodical or newspaper to any other inmate and will comply with the jail rules associated with the total number of publications allowed.

INMATE ORIENTATION – TSEP and ADSEG inmates shall not be allowed to have television playing when an inmate is not in the dayroom. During that time, a jail orientation video will discuss jail rules associated with general population and TSEP status."

Per policy 1107, Decision Making-Special Needs, "consultation between the Facility Commander and the Medical Director is required for actions regarding patients who are diagnosed as having significant medical or mental health disorders, as follows:

- Housing assignments.
- Program assignments.
- Disciplinary measures.

▪ Admissions to and transfers from institutions.

Maximum cooperation between custody personnel and health care providers is essential so that both groups are made aware of movements and decisions regarding patients with special medical or psychiatric needs. For example, health care staff must inform custody personnel when an inmate is suicidal, homicidal, or inappropriately housed in the jail for health care reasons. An inmate's special needs may complicate housing or work assignments or disciplinary management. Medications may need to be adjusted for safety at the work assignment or before transfer."

## Observations

The Assessment Team toured the housing units that are designated to house ADEG, TSEP and Disciplinary Detention prisoners. The MJ housing is located in 8-West Pods 100, 200, 300 and 400, 8-East Pods 100, 200 and 300, 7-East Pod 100, and 7-West Pods 300 and 400. The RCCC housing is located in SBF Pod 100 and CPF Pod 100. The Assessment Team also noted that there were TSEP designated inmates housed in 2-East where inmates with medical conditions and inmates with assistive devices or disabilities that cannot ambulate stairs to access visiting, outside recreation or showers.

## Staff Interviews

The Assessment Team interviewed staff to determine if disabled inmates housed in the ADSEG, TSEP and Disciplinary Detention units have equal access to programs and services as other inmates housed in the general population units. Classification staff stated that the designation of TSEP is based on classification factors that require an inmate to be totally separated from other inmates and includes type of charges, criminal history, behavior or high notoriety crime/person. The criteria for ADSEG are escape risks, current validated prison gang, assaultive towards staff or other inmates, or who by the nature of their behavior have demonstrated potential for violence. Criteria for being placed in Disciplinary Detention are based on the disposition of a major rule infraction. Inmates do not receive written notice and/or final notice of the decision made to place or retain them in TSEP other than a verbal notice at the time of placement or the 30-day re-reviews, which are conducted face-to-face. Inmates do not receive written notice and/or final notice of the decision made to place or retain them in ADSEG status/housing. Staff stated that inmates are allowed to retain their HCAs in ADSEG, TSEP and Disciplinary Housing. Staff stated that inmates on TSEP status are restricted to $30.00 of commissary in cell. All other programs, services and activities are the same as general population inmates with the exception of available education/self-help programs due to program space restrictions.

## Inmate Interviews

The Assessment Team interviewed 9 inmates that were on TSEP and ADSEG status. Of the inmates interviewed 5 were not aware of their classification

designation and stated that they did not understand the classification process. Three of the inmates stated that they couldn't read without reading glasses. There were 3 inmates with mobility impairments who stated that they had a difficult time ambulating up the stairs to the visiting area and also to the yard. Most inmates interviewed indicated that they would participate in education and self-help programs if they were offered. The inmates housed in MJ stated that at times yard is offered; however, some of those times it is offered at 1 or 2 a.m. Inmates also stated that the chaplain does come around, however, very infrequently. A few of the ADSEG and TSEP inmates claimed to have little contact with JPS staff.

One of the inmates housed at the MJ (was formerly on TSEP status) indicated that when he was on TSEP status, he was never informed as to why he was on that status, and he subsequently submitted a KITE to ascertain why. He later came to his own conclusion that he was placed on TSEP because he was sexually assaulted. He then agreed to go to PC status, but had remained on TSEP for about another week.

## Conclusion

Disabled inmates placed in TSEP, ADSEG and Disciplinary Detention housing have equal access to the programs, services, and activities as non-disabled inmates. However, there are some concerns with disabled inmates having a difficult time accessing visiting and the recreation yard. This is not based on their specific housing, as these barriers would exist if they were in general population housing. More than ninety percent of the inmates interviewed were not aware of their classification, which is mainly due to staff not providing effective communication during the classification interview. This is addressed in further detail in the effective communication section of this report. The Operations Orders must include the criteria for placement into and the criteria for removal from TSEP and ADSEG status. This needs to be effectively communicated to inmates to ensure they are aware of such criteria. Although classification staff advised the Assessment Team of the criteria for designation and placement into TSEP and ADSEG status/housing, the Operations Orders do not include the specific criteria for TSEP and ADSEG classification designation. The Classification training PowerPoint does detail the specific criteria for TSEP and ADSEG classifications.

The Operations Orders should also include the following specific privileges afforded to segregated inmates:

- Hygiene;
- Exchange of clothing and bed linens and access to barbering and hair care;
- Correspondence privileges;
- Opportunity for visitation;

- Opportunity to use the telephone;
- Access to courts and counsel;
- Access to leisure;
- Access to legal research assistance services via a unit-based or delivery system;
- Opportunity to exercise outside the cell a minimum of three hours per week; and
- Access to programs and services that will generally include:
  - Education;
  - Commissary;
  - Social Services;
  - Counseling;
  - Religious services; and
  - Medical and Mental Health Services.

## References

**28 CFR § 35.130 (a)** states no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

## Inmate Grievances

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures applicable to the ADA Grievance process are outlined in: Operations Order 07/02 Grievances, 1435 Inmate Health Care Grievances, and Draft Operations Order Inmates with Disabilities - ADA.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1073 Inmate Grievance Procedure requires that;

(a) Each administrator of a Type II, III, or IV facility and Type I facilities which hold inmate workers shall develop written policies and procedures whereby any inmate may appeal and have resolved grievances relating to any conditions of confinement, included but not limited to: medical care; classification actions; disciplinary actions; program participation; telephone, mail, and visiting procedures; and food, clothing, and bedding. Such policies and procedures shall include:

(1) a grievance form or instructions for registering a grievance;
(2) resolution of the grievance at the lowest appropriate staff level;
(3) appeal to the next level of review;
(4) written reasons for denial of grievance at each level of review which acts on the grievance;
(5) provision for response within a reasonable time limit; and,
(6) provision for resolving questions of jurisdiction within the facility.

Per Operations Order 07/02, Grievances, Correctional Services shall provide a written process that allows inmates to grieve specific conditions. All written grievances shall receive a written response within a reasonable time limit and will be resolved at the lowest appropriate staff level.

A grievance is a complaint by an inmate regarding any condition of confinement, act, rule or policy, written or unwritten, in which an inmate contends that there is an infringement upon his or her personal, human or constitutional rights. A grievance may include complaints against the substance of policies or rules, as well as their application. A grievance may include complaints about disciplinary and classification actions or rulings, conditions of confinement, work project supervision or home detention as well as complaints about:

- Medical care
- Program participation
- Telephone and Mail
- Visiting Procedures
- Food, Clothing, Bedding

An inmate should first direct his/her issue to custody or supervising staff as the issue should be resolved at the lowest appropriate staff level. If custody or supervising staff is unable to resolve the issue, the inmate may file a formal written grievance. The inmate has the right to file a grievance within five (5) calendar days following the occurrence of, or after the inmate became aware of a specific incident regarding any condition of confinement, work project supervision or home detention. A grievance regarding Department policy may be filed at any time. Only one issue may be included in the grievance. If an inmate wishes to challenge several issues, each issue must be set forth on a separate grievance.

When an inmate requests a grievance form, custody or supervising staff shall provide the form. Once an inmate completes a grievance, the grievance must be turned into any housing unit staff assigned to the inmate's housing location or staff assigned to supervise the inmate's work project or home detention activities. When an inmate submits a grievance, housing unit or supervising staff shall accept the grievance.

The receiving housing unit or supervising staff shall print and sign his/her name, badge number, date and time of the acceptance of the grievance and return a copy to the inmate. Housing unit or supervising staff shall review the grievance and resolve it if possible. Any action taken or resolution offered by housing unit or supervising staff shall be documented in the grievance reply section or on a separate grievance reply form. Housing unit or supervising staff shall place the grievance and any reply in the appropriate facility repository (grievance box located on the second floor of the RCCC administration office; black box in the MJ Administration area; Administrative Supervisor's box of the Work Release Division), whether or not staff is able to resolve the problem.

ALL grievances and replies shall be forwarded to administration. Grievances shall NOT be discarded simply because the issue has been resolved. Administration will log the grievance, scan it into the Department Records Management System (RMS) and distribute unresolved grievances to the appropriate supervisor(s) for review.

Once received, the supervisor shall review each grievance submitted by custody or supervising staff and determine the initial course of action for the grievance. If the supervisor determines that the grievance has been resolved, the supervisor will approve the resolution by signing and dating the grievance and reply, then return both to administration as required above. If the supervisor determines that the grievance should be routed to a specific section for review and potential resolution, the supervisor will note this on the grievance. The supervisor will then:

- Distribute the original copy of the grievance to the appropriate shift or unit (i.e. medical, JPS, food services, home detention, work project.)
- Distribute the yellow or other copy of the grievance to the division secretary or designee so the grievance can be updated with the



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

appropriate shift or unit handling the grievance into the grievance tracking system.

The supervisor assigned to handle the grievance shall review the grievance and all pertinent documents, reports, records and files related to the grievance. The supervisor may distribute the grievance to appropriate staff for resolution. If the appropriate staff person was not able to resolve the problem or the inmate wishes to appeal, the supervisor will take the appropriate action necessary to resolve the problem. This action or supervisor reply will be documented in the grievance reply section or on a separate grievance reply form. Once the grievance is answered, the supervisor will forward the entire grievance and any responses to the watch commander or unit manager within four (4) days for review.

The watch commander/unit manager has (4) four days to review and approve the response, add additional responses to the grievance or require further investigation. The completed grievance response will be forwarded to the assistant division commander for review. The assistant division commander may approve the reply by signing the completed form. In the event the grievance involves staff conduct, the assistant division commander shall notify the division commander who thereafter will decide if a copy should be forwarded to Professional Standards. The assistant division commander may return the package to a supervisor or the investigating staff for further investigation if needed.

When a grievance package is complete, the entire package shall be logged into the facility's grievance tracking system. The original grievance and any replies will be maintained by the division for seven years. The yellow copy or other copy and any response shall be placed in the inmate's file. A copy of any response will be sent back to the inmate after the investigation is completed.

If the inmate is dissatisfied with the reply, the inmate may send a written appeal on a grievance form to the division commander within five (5) days of the initial reply. The division commander will decide the manner in which the grievance is handled. Any time limit may be extended upon mutual agreement by the division commander. No reprisal shall be taken against any inmate for filing a grievance or an appeal of a grievance decision.

All inmates have the right to appeal and have resolved any grievances related to any condition of their confinement; however, grievances are to be filed on an individual basis. So-called "Group" or "Class-action" grievances are not permitted. When multiple grievances are received from more than one inmate on an identical issue, each such grievance will be processed individually. Each inmate shall be provided with a response. A statement shall be included in the response explaining that the grievance has been designated as one of multiple



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

identical grievances for processing purposes and the same response is being distributed to each inmate.

The division commander, at his or her discretion, may refuse to accept grievances from an inmate if it is found the inmate is filing an excessive number of grievances of a frivolous nature or grieving issues that were previously grieved and resolved.

Per Draft Operations Order Inmates with Disabilities - ADA, the intent of the ADA Division Representative is to review requests, complaints and grievances related to ADA issues, maintain the Division's ADA files, and provide training to facility staff on auxiliary aids and services. The ADA Division Representative may respond to ADA requests or ADA grievances and will ensure the Facility ADA Coordinators are updated and informed of all ADA issues as well as perform inspections.

The ADA Coordinator, or his/her designee, is responsible for keeping the ADA division representative informed of all requests, complaints, or grievances related to ADA issues, review claims, complaints and grievances regarding disabilities, and ensuring complaints and grievances are finalized.

An inmate with a disability who believes he/she is the subject of disability discrimination or who wants to appeal any denial of ADA housing and/or accommodation may submit a grievance. All grievances concerning conditions of ADA housing and/or accommodations will be made on a Grievance Form following the guidelines in Operation Order (7/02), Grievances. All ADA related grievances shall be routed through the facility Compliance unit. The Compliance unit will determine the best course of action for the grievance (e.g. Medical, Custody, Food Services) and then route it as deemed appropriate. The Compliance unit will track all ADA related grievances until finalized. A copy will be forwarded to the ADA Corrections Division Representative.

Any grievance in which an inmate claims the ADA housing and/or accommodations are causing an imminent threat to his/her health or safety shall be expedited. A copy will be forwarded to the facility Compliance unit. A copy of any grievance for ADA conditions and/or accommodations made by an inmate being held for the California Department of Corrections and Rehabilitation (e.g. parole hold, detainer) or for any Federal contract (e.g. U.S. Marshals, Immigration and Customs Enforcement) shall be made available upon that agency's official request.

Per policy 1435, Inmate Healthcare Grievances, an inmate has the right to file a grievance within five (5) calendar days of the incident regarding the problem with his/her health care. Once an inmate completes the grievance, the grievance must be turned into any housing unit custody staff assigned to the inmate's housing location.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Custody staff will review each grievance submitted and forward the grievance to the nurse who is responsible for handling inmate health care grievances. All healthcare grievances will be logged into a CHS grievance log for tracking and resolution. The nurse will review the grievance and all pertinent medical records. The nurse may schedule a Priority Administrative Review appointment so the patient-inmate can be medically assessed. A written response indicating the action taken will be prepared and delivered to custody within ten (10) days.

The watch commander/other equivalent support unit supervisor will have four (4) days to review and approve, add additional responses to the grievance, or require further investigation. The completed grievance response will be forwarded to the assistant division commander for review. The assistant division commander may approve the reply by signing the completed form. In the event the grievance involves staff conduct, the assistant division commander, after notification of the division commander, will decide if a copy should be forwarded to Internal Affairs.

The assistant division commander may return the package to Correctional Health Services for further action. When a grievance package is complete, the entire package is forwarded to the respective division's employee responsible for logging it into the facility's grievance tracking system. The original grievance and any replies will be maintained by the division for seven (7) years. A copy of all responses will be sent back to the inmate after the investigation is completed.

If the inmate is dissatisfied with the reply, the inmate may send a written appeal on a grievance form to the division commander within five (5) days of the initial reply. The division commander will decide the manner in which the grievance is handled. Any time limit may be extended upon mutual agreement by the division commander or his/her designee.

All inmates have the right to appeal and have grievances resolved with respect to any aspect of their health care; however, grievances are to be filed on an individual basis. So-called "Group" or "Class-action" grievances will not be reviewed. The division commander, at his or her discretion, may refuse to accept grievances from an inmate if it is found the inmate is filing an excessive number of grievances of a frivolous nature or grieving issues that were previously grieved and resolved.

## Observations

The grievance coordinators at the MJ and RCCC provided the Assessment Team with the categories used to track grievances. This listing identifies 8 Grievance categories with 32 sub-categories and 1 Appeal category with 7 sub-categories.

| Grievance – Health | JPS |
| | Medical - Treatment |
| | Medicine |

| | Treatment - Conduct not Medical Attention |
|---|---|
| Grievance – Legal | Attorney<br>Courts<br>Law Library |
| Grievance – Other | Other - Commendations Maintenance Issues |
| Grievance – Policy or Procedure | Classification<br>Discipline<br>Facility<br>Other - Time Comps<br>Security |
| Grievance - Program | Education<br>Reentry<br>Religious<br>SWP Program |
| Grievance – Property | Mail<br>Money - Commissary/Me Co-Pays<br>Personal<br>Tank Property |
| Grievance – Services | Clothing<br>Commissary<br>Food<br>Laundry<br>Phones<br>Recreation<br>Showers<br>Visitation |
| Grievance – Staff Conduct | Sexual Misconduct – Staff<br>Treatment<br>Use-of-Force |
| Grievance – Appeal | Commissary - Items only<br>Discipline<br>Food<br>Law Library<br>Medical<br>Money - Welfare Kit Charge<br>Other |

There is no category for ADA grievances or appeals including requests for reasonable accommodations. The grievance coordinators provided the Assessment Team with the previous 90 days of grievances. Although there is no specific ADA category the Assessment Team identified the grievances that are ADA-related. A detailed summary of these grievances is as follows:

- MJ 2 East: Inmate states he fell in the shower in 2 East Pod 100, requested to use the 2 medical shower, requested medical needs form for 2 medical shower. Response states request for showering on 2 medical is a custody matter please discuss your request with custody;

- MJ 2 East: Inmate requested assistance with showering; claims nurse stated, "There is more important things to do besides helping you with your shower". Response states this issue has already been addressed by the Medical Director and the Director of Nursing;

- MJ 8 East: Inmate states he is a developmentally disabled inmate with a TABE scorer of 0.7. He states he needs help all the time with everything and he cannot get it on TSEP. Deputy responded that he was not aware the inmate was developmentally disabled. Inmate received assistance in writing a letter and information about his charges;

- MJ 4 East: Inmate is requesting grab bars and shower chair. States he slipped and fell in the shower.

- MJ 8 East: Inmate states he had a "no stair" chrono in CDCR. Inmate states he is fully disabled due to multiple disabilities. Needs accommodations for health and safety;

- MJ 8 East: Inmate states he can't walk that 1 step to shower. How will I get to visit? He is not allowed to shower with a chair. What was the doctor thinking when he said I was clear? Response states "Patients who use assistive devices such as canes, walkers and crutches no longer require housing on the medical floor; you are ordered a lower bunk, lower tier, an extra mattress and blanket;"

- MJ 4 East: Inmate requests access to showers with handicap railing, handicap cell with lower bunk. Claims he is forced to "bird bath" or use plastic slippery chair. Claims he fell outside the shower. Claims he has been sleeping on the floor;

- MJ 3 East: Inmate is requesting an extra mattress due to degenerative disk disease. Response states an extra mattress was ordered;

- MJ 8 West: Inmates states he is an Armstrong class member and requires ground floor, limited stairs, lower/bottom bunk, eyeglasses, hearing aids, assistive device for mobility and mental health care. Response states inmate is provided a lower bed on a lower floor, as well as reasonable accommodations for stairs. Will add that inmate will have personal and attorney visits on the 2nd floor where there are no stairs. If you are unable to navigate the stairs to the recreation area a Deputy will escort you through the mezzanine level. You are already in contact with Jail Psych

Services; eyeglasses, hearing aids mobility devices were ordered at this time;

- MJ 5 West: Inmate states he has a low bunk/low tier chrono that is not being honored. Response recommends that inmate submit a HS KITE requesting one;
- MJ 7 East:  Inmate states he is totally disabled and can't do stairs for family and attorney visits. Response does not address inmates request only medical care provided;
- MJ 4 East: Inmate is requesting glasses for trial, to see witnesses and read documents. Response states that the Jail policy on glasses has been revised to accept all glasses.  Contact whoever can deliver your glasses;
- MJ 6 West: Inmate states he has fallen a few times and is requesting a cane. Response states a cane was ordered.  Medical contacted the floor deputy regarding the cane that was ordered by medical.  The floor deputy reported that the cane was in control, and inmate was issued the cane;
- RCCC JKF: Inmate is requesting his psych medications. Response states medication were discontinued due to inmate "cheeking" meds;
- RCCC H Barrack:  Inmate states he is not receiving psych meds. Response states he has orders for psych medications;
- RCCC SLF: Inmate states she was being questioned in the hallway outside the bubble by correctional officers and psychiatric staff while inmate workers were around walking and talking by.  "I don't need anyone to know my business."

### Staff Interviews

The Assessment Team interviewed the grievance coordinators for the MJ and RCCC facilities. The grievance coordinator at the MJ stated that she receives the custody-related grievances after they have been responded to by custody.  The completed grievances must have a sergeant's signature.  Deputies try to resolve the grievance issue at the lowest level. There are no timelines in which the grievance must be completed. Once the custody response is received, the grievance is forwarded to the lieutenant for review and final approval.  Once the lieutenant approves the custody grievance, the grievance is issued a log number and entered into RMS.

The grievances that require a medical response or are outside the purview of custody, are forwarded to the grievance coordinator by custody staff.  These grievances do not have a completed response.  For medical grievances, the grievance coordinator emails a scanned copy of the grievance to medical staff for response.  Once medical staff completes the response, medical staff forwards the typed completed response to the grievance coordinator. The grievance coordinator prints the response and attaches the response to the grievance and forwards the grievance and the typed response to the lieutenant for review and approval.

Inmate copies of the completed grievances (custody and medical) are forwarded to the floor officers and distributed to the inmates. The completed grievance is scanned into the inmate record. There is no detailed policy of how custody staff must distribute the copy of the grievance to ensure EC when issuing a grievance response to a disabled inmate. Prior to May of 2016, all completed grievances were shredded after being scanned; however, administrative staff is now retaining the completed grievances.

The grievance coordinator at the RCCC stated grievances are placed in a designated grievance folder in the booking area. The grievances are collected every business day morning and afternoon. Once received, grievances are assigned a log number and entered into RMS. The grievances are assigned to the appropriate area for response. There are no timelines in which the grievance must be completed. The grievances that require a medical response are scanned and emailed to medical staff for response. Once medical staff completes the response, medical staff forwards the typed response to the grievance coordinator. The grievance coordinator prints the response and attaches the response to the grievance.

Once the grievance responses are received, the grievance is forwarded to the sergeant and lieutenant for review and approval. Once the grievance response is approved, the grievance and response are scanned into RMS. The inmate copies of the completed grievances (custody and medical) are distributed to the officers inbox and are distributed to the inmates. There is no detailed policy of how custody staff must distribute the copy of the grievance to ensure EC when issuing a grievance response to a disabled inmate. All completed grievances are shredded after being scanned.

To comply with the August 28, 2012, federal court order (County Jail Plan for addressing Armstrong Class Members housed in county jails), issued by Judge Claudia Wilkins, in the matter of Armstrong vs. Brown, Case Number 94-2307CW, the SCSD detention facilities received CDCR 2275-CJ Forms-Requests for Reasonable Modification or Accommodation for Access to Housing and/or Program(s) in a County Jail from CDCR. The Assessment Team reviewed 4 CDCR 2275-CJ forms.

- DNM – Notification - Requires level terrain no obstructions in the path of travel. Ground Floor- Limited stairs. Lower/Bottom Bunk Only.
- No (Disability Placement Program) DPP Code EOP – CDCR 2275-CJ - Requires Ground Floor, Lower/Bunk, No Climbing, No prolonged standing. Requests mental health treatment.
- DD1 – CDCR 2275-CJ - Lower/Bottom Bunk. Requests help reading and comprehending docs.
- No DPP Code CCCMS – CDCR 2275-CJ – Basic nonreader. Needs reading glasses and help understanding documents.

- DD2 – CDCR 2275-CJ – Requests assistance with reading and understanding all documents.

The SCSD detention facilities medical staff stated that after receipt of a CDCR 2275-CJ, the patient's Electronic Medical Record (EMR) is pulled and reviewed. The information from the CDCR letter attached to the CDCR 2275-CJ is placed into the EMR chart in the clinical notes. The inmate is scheduled for a face-to-face clinical visit with a doctor. During this exam the doctor evaluates and determines if the accommodations listed on the CDCR letter and CDCR 2275-CJ are appropriate.

Medical staff stated that they also receive the email notification from CDCR notifying SCSD detention facilities and identifying each parolee with a disability, including those subject to California Penal Code section 3056, being held in SCSD detention facilities, each parolee with a disability booked in the SCSD detention facilities, each CDCR out-to-court prisoner with a disability housed in SCSD detention facilities and the last-known disabilities and the accommodations in housing or programming the prisoner received as of the date he or she was transferred from a prison. Medical staff stated that the same process for the CDCR 2275-CJ listed above is followed for CDCR's County Jail Plan email notification. Medical staff stated that the information is forwarded to the facility lieutenant; however, the facility lieutenant stated that custody staff does not track the information provided by medical staff.

More than half of the housing unit officers interviewed stated that they would not assist inmates in completing grievances. The officers stated they would direct the inmate to other inmates or the "houseman" for assistance in completing the grievance.

**Inmate Interviews**

More than 35 percent of the inmates interviewed stated that they either did not know how to access the grievance process or needed assistance in completing and submitting grievances. These inmates also stated that staff had not explained the grievance process to them and that they had to rely on other inmates to explain the grievance process to them. About 10 percent of the inmates interviewed claimed that staff were reluctant to give them a grievance if the issue involved a custody staff member; however, custody staff was willing to provide the grievance if the issue being grieved was a medical issue.

**Conclusions**

One of the most important tools for any jail is the grievance process provided to inmates in order to file complaints regarding conditions as well as events in the jail where the inmate believes their rights are violated, including violations of the ADA. By providing inmates with a proper grievance process, the jail administration can resolve issues within the jail environment before the



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

conditions or events lead to litigation. For the grievance process to be effective, inmates must be made aware of the process. Although the SCSD detention facilities have adopted and published a grievance process, inmates are not being made aware of the grievance process as required by the Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations which requires that information regarding the grievance process be made available during inmate orientation. As stated in this report, orientation is not being provided to inmates.

Although the Draft Operations Order Inmates with Disabilities - ADA speaks to the ADA Grievance Process, this Order has not been implemented. And based on inmates not being made aware of the method in which to request accommodations, disabled inmates essentially do not have a means to request accommodations for their disabilities or address discrimination based on violations of the ADA.

Although the Draft Operations Order Inmates with Disabilities - ADA addresses an expedited process for ADA grievances there are no specific timelines outlined in the order.

The Draft Operations Order Inmates with Disabilities - ADA does not provide for interim accommodations for inmates during the time frame the ADA grievance is being processed and responded to.

The SCSD detention facilities' ADA grievance process does not comply with the requirements of the "Opinion in Support of Order Distributing and Enforcing the Amended County Jail Order and Plan dated 8/28/12" (Armstrong v. Brown, 857 F. Supp. 2d 919, 939 (N.D. Cal. 2012), order enforced (Aug. 28, 2012), order aff'd, appeal dismissed, 732 F.3d 955 (9th Cir. 2013)).

Disabled inmates may have poor ability to express themselves in writing and they will likely have difficulty with any task requiring reading or processing written material. In particular, they may have difficulty with the grievance process which requires reading and understanding. Accordingly, correctional staff is duty-bound to provide reading and writing assistance to disabled inmates who need assistance. More than half of the staff interviewed indicated they would not assist disabled inmates in accessing the grievance process. The Draft Operations Order Inmates with Disabilities - ADA requires that staff assist disabled inmates in accessing the grievance process, SCSD detention facilities must ensure staff is trained in this requirement.

SCSD detention facilities must ensure the grievance procedures are readily available to all inmates. Staff must make appropriate provisions to communicate those procedures to the disabled. Because access to the grievance process must be meaningful, staff must ensure that developmentally disabled inmates can submit grievances and staff must provide the necessary assistance to all

disabled inmates on a case-by-case basis to ensure that those who have difficulty communicating in writing will be provided reasonable access to the grievance process. The right of meaningful access to grievance procedures is particularly important because an inmate must exhaust the jails administrative remedies by complying with that procedure before he can access the courts.

Completed grievance responses are not effectively communicated to inmates that are developmentally disabled and learning disabled.

Consideration must be given to requests for reasonable modification or accommodations separate from the grievance process for inmates to request ADA accommodations and modifications.

The CDCR 2275-CJ should be tracked in the SCSD detention facilities grievance tracking system in RMS.

### References

**28 CFR §35.107 (b)** Requires that a public entity that employs 50 or more persons adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by Title II of the ADA.

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

*The information below is for reference only. Due to the "Opinion in Support of Order Distributing and Enforcing the Amended County Jail Order and Plan dated 8/28/12" (Armstrong v. Brown, 857 F. Supp. 2d 919, 939 (N.D. Cal. 2012), order enforced (Aug. 28, 2012), order aff'd, appeal dismissed, 732 F.3d 955 (9th Cir. 2013)).*

*"Class members housed in county jails must have ready access to disability grievance forms, either the CDCR's Reasonable Modification or Accommodation Request form (CDC 1824) or a separate county jail grievance form." If Defendants elect to utilize the CDC 1824 form in any of the counties, Defendants shall collect the grievance forms from class members no less than twice a week, and shall provide copies to a designated person at the county jail. Defendants shall respond to all grievances within fifteen calendar days of receipt and make their best efforts to ensure that necessary and reasonable accommodations are provided. If a class member identifies the grievance as urgent or an emergency (i.e., if it alleges a condition which is a threat to the parolee's health or safety, or is necessary for participation or effective*

*communication in a parole revocation proceeding), Defendants shall respond to such a grievance within five calendar days of receipt and make their best efforts to ensure that necessary and reasonable accommodations are provided on an interim basis. For the first six months in which the plan is in effect, Defendants must produce to Plaintiffs' counsel on a monthly basis all grievances collected by Defendants pursuant to this subsection. Production may shift to two times a year after the first six months.*

*d. If Defendants contend that the process outlined in Paragraph (1)(c) is unnecessary because a jail has an adequate disability grievance process, Defendants must certify, within thirty days of the acceptance of their plan, that each such jail's disability grievance policy contains the following elements:*

*i. Is readily available to all class members housed in that county's jail facilities;*

*ii. Has an initial response deadline of no later than fifteen calendar days from receipt by the designated jail staff member;*
*iii. Contains a provision for expediting a response if the appeal alleges a condition, which is a threat to the parolee's health or safety, or is necessary for participation or effective communication in a parole revocation proceeding;*

*iv. Includes a provision for review of the parolee's request by medical staff, if necessary;*

*v. Provides a right to appeal denials; and*

*vi. Requires that a copy of each and every grievance and response be provided to Defendants at the same time it is provided to the Armstrong class member.*

## Inmate Disciplinary Process

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures pertaining to the inmate disciplinary process are outlined in Operations Order 07/03 Discipline Plan, and Policy 1107, Decision Making-Special Needs.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1080 Rules and Disciplinary Penalties requires that:

Rules and disciplinary penalties shall be stated simply and affirmatively, and posted conspicuously in housing units and the booking area or issued to each inmate upon booking.  For those inmates who are illiterate or unable to read English, and for persons with disabilities, provision shall be made for the jail staff to instruct them verbally or provide them with material in an understandable form regarding jail rules and disciplinary procedures and penalties.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1081 Plan for Inmate Discipline requires that:

Each facility administrator shall develop written policies and procedures for inmate discipline, which shall include, but not be limited to, the following elements:

a) Designation of one or more subordinates who will act on all formal charges of violation of facility rules by inmates, and who shall have investigative and punitive powers. Staff so designated shall not participate in disciplinary review if they are involved in the charges.

b) Minor acts of non-conformance or minor violations of institution rules may be handled informally by any staff member by counseling or advising the inmate of expected conduct, assignment to an extra work detail, or removal from a work assignment without loss of work time credit. In addition, temporary loss of privileges such as, but not limited to, access to television, telephones, or commissary, or lockdown for less than 24 hours, may be considered minor discipline if such acts are accompanied by written documentation, and a policy of review and appeal to a supervisor.

c) Major violations or repetitive minor acts of non-conformance or repetitive minor violations of institutional rules shall be reported in writing by the staff member observing the act and submitted to the disciplinary officer. The inmate shall be informed of the charge(s) in writing. The consequences of a major violation may include, but are not limited to, loss of good time/work time, placement in disciplinary isolation, disciplinary isolation diet, or loss of privileges mandated by regulations. In addition:

(1) Charges pending against an inmate shall be acted on no sooner than

24 hours after the report has been submitted to the disciplinary officer and the inmate has been informed of the charges in writing. A violation(s) shall be acted on no later than 72 hours after an inmate has been informed of the charge(s) in writing. The inmate may waive the 24-hour limitation. The hearing may be postponed or continued for a reasonable time through a written waiver by the inmate or for good cause.

(2) The inmate shall be permitted to appear on his/her own behalf at the time of hearing.

(3) Subsequent to final disposition of disciplinary charges by the disciplinary officer, the charges and the action taken shall be reviewed by the facility manager or designee.

(4) The inmate shall be advised of the action taken by the disciplinary officer by a copy of the record required to be kept by Penal Code Section 4019.5.

d) Nothing in this section precludes a facility administrator from administratively segregating any inmate from the general population or program for reasons of personal, mental, or physical health, or under any circumstance in which the safety of the inmates, staff, program, or community is endangered, pending disciplinary action or a review as required by Section 1054 of these regulations.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, §1082 Forms of Discipline states that:

The degree of punitive actions taken by the disciplinary officer shall be directly related to the severity of the rule infraction. Acceptable forms of discipline shall consist of, but not be limited to, the following:

a) Loss of privileges.
b) Extra work detail.
c) Short term lockdown for less than 24 hours.
d) Removal from work details.
e) Forfeiture of "good time" credits earned under Penal Code Section 4019.
f) Forfeiture of "work time" credits earned under Penal Code Section 4019.
g) Disciplinary isolation.
h) Disciplinary isolation diet.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, §1083 Limitations on Disciplinary Actions, states in part:

The Penal Code and the State Constitution expressly prohibit all cruel and unusual punishment. Additionally, there shall be the following limitations:

a) If an inmate is on disciplinary isolation status for 30 consecutive days

    there shall be a review by the facility manager before the disciplinary isolation status is continued. This review shall include a consultation with health care staff. Such reviews shall continue at least every fifteen days thereafter until the disciplinary status has ended. This review shall be documented.

b) The disciplinary isolation cells or cell shall have the minimum furnishings and space specified in Title 24, Part 2, 1231.2.6 and 2.7. Occupants shall be issued clothing and bedding as specified in Articles 13 and 14 of these regulations and shall not be deprived of them through any portion of the day except that those inmates who engage in the destruction of bedding or clothing may be deprived of such articles. The decision to deprive inmates of such articles of clothing and bedding shall be reviewed by the facility manager or designee during each 24-hour period.

c) Penal Code Section 4019.5 expressly prohibits the delegation of authority to any inmate or group of inmates to exercise the right of punishment over any other inmate or group of inmates.

d) In no case shall a safety cell, as specified in Title 24, Part 2, 1231.2.5, or any restraint device be used for disciplinary purposes.

e) No inmate may be deprived of the implements necessary to maintain an acceptable level of personal hygiene as specified in Section 1265 of these regulations.

f) Food shall not be withheld as a disciplinary measure.

h) Correspondence privileges shall not be withheld except in cases where the inmate has violated correspondence regulations, in which case correspondence may be suspended for no longer than 72 hours, without the review and approval of the facility manager.

i) In no case shall access to courts and legal counsel be suspended as a disciplinary measure.

The SCSD detention facilities Operations Orders 07/03, Discipline Plan, specifically pertains to the Inmate Disciplinary (Write-up) process for inmates and detainees. The purpose of the Order is to standardize procedures for administering discipline and disciplinary diets, establishing rules and penalties for inmate conduct, and to ensure a fair and impartial inmate disciplinary process in accordance with Article 7 of Title 15 of the California Code of Regulations ("Title 15").

Section I. Policy, states, "Prisoners accused of violating a facility rule shall be provided a fair and impartial disciplinary process. Discipline shall be directly related to the severity of the offense and shall be administered in a firm, fair and consistent manner.

Section II. Compliance with California Code of Regulations Title 15, states in part, "The discipline plan shall be administered in compliance with Title 15 of the California Code of Regulations;

- All prisoners being housed will receive an orientation booklet that contains all facility rules guiding inmate conduct and the corresponding disciplinary penalties; and
- For those inmates who are illiterate or unable to read English, and for persons with disabilities, verbal instructions or material in an understandable form regarding jail rules and disciplinary procedures and penalties will be provided;"

Section VI. Major Incident Procedures, states in part, "Once the sergeant approves the report, the approving sergeant shall deliver a copy to the inmate. The sergeant delivering a written copy of the report to the inmate shall obtain the inmate's signature on a copy, note the date and time of delivery on that copy and sign that notation."  Language within the Order also states,

- "Inmates must receive a written copy of the disciplinary report at least 24 hours in advance of the hearing;
- Consequently, no disciplinary hearing for violations pending against an inmate shall occur sooner than 24 hours after the inmate has been informed of the violations in writing;
- The inmate may waive the 24-hour limitation and have a disciplinary hearing conducted immediately upon delivery of the report in writing to the inmate;
- The inmate will sign the appropriate space on the write-up acknowledging the waiver;
- The waiver shall be documented in the report.  Once the inmate has received a written notice that he/she has received a disciplinary write-up (PF-10), the violation must be acted on by the hearing sergeant within 72 hours;
- The hearing officer will render a decision regarding the violations and impose discipline pursuant to Section IV, which shall be included in the report;
- A written copy of the final hearing results (PF-10) will be given to the inmate;
- An inmate may be removed from general population housing when a rule violation is aggravated or if it could recur or incite other misconduct.  To ensure the safety and security of the facility, an inmate may be moved to another housing unit, including a disciplinary housing unit, pending the outcome of either the disciplinary process or prosecution;
- Inmates found guilty of violating major rules may be moved to a disciplinary isolation housing unit to serve their discipline;
- Any inmate on disciplinary isolation housing status for more than 30 days because of multiple incidents shall have a review by the division commander before the disciplinary isolation status is continued; and
- This review shall include a consultation with health care staff and continue every 15 days until the inmate is off discipline."

Section VII. Minor incident report procedures, states in part, "Custody staff witnessing a violation of minor facility rules and wishing to impose any discipline listed above will be required to complete an Incident Report Detail (PF-10) by the end of shift." It also states in part,

- Upon completion of the report, the staff member writing the report shall notify a sergeant so the sergeant can review the report and approve/disapprove of the discipline. No hearing is required;
- If the sergeant approves the discipline, the sergeant will note the discipline imposed in the PF-10 report;
- A written copy of the report will be delivered to the inmate by the housing unit officer. The staff member delivering a written copy of the report to the inmate shall obtain the inmate's signature on a copy, note the date and time of delivery on that copy; and
- The inmate will be allowed to appeal the supervisor's discipline via the grievance procedure."

Section X. Inmate Appeals, states in part, "Inmates may appeal the disciplinary actions to a watch commander through the inmate grievance procedure within five days from the time the disciplinary decision was delivered to the inmate." It also states in part, "Inmate appeals shall be answered and returned within five working days from the time they were received by the watch commander."

The Inmate Handbook (rulebook) contains a section titled, "Conduct and Discipline", and a section titled, "Rules of Conduct Codes." The Conduct and Discipline section outlines specific rights that inmates and detainees will be afforded, their responsibilities within the process, categories of violations, contraband, and disciplinary process and penalties. The Rules of Conduct section lists the various rule codes with corresponding descriptions (specific acts).

Although there is a requirement in the Operation Orders that for those inmates who are illiterate or unable to read English, and for persons with disabilities, provisions are not routinely made by the jail staff to instruct the inmates verbally or provide them with reasonable accommodations and/or materials in an understandable form regarding jail rules and disciplinary procedures and penalties. As such, staff does not routinely provide reasonable accommodations for deaf/hearing-impaired or speech-impaired inmates (or other inmates) such as access to a qualified interpreter or accommodations for disabled inmates who have compromised communication skills, or who are otherwise unable to meaningfully participate in an infraction hearing.

**Observations**

The Assessment Team observed several Major Disciplinary (Write-up) Hearings at the MJ and RCCC jail facilities.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

During observation of a hearing at the MJ, the Assessment Team observed the following SCSD detention facilities disciplinary hearing practices: inmates are permitted witnesses; inmates do not have a right to have the reporting employee present at the hearing; facilities do not utilize a staff assistant employee or an investigative employee system; hearing sergeants draw possible disposition penalties from the Sacramento County Sheriff's Department Correctional Services Inmate Rule Code Violation Schedule. Of concern was the location and method of where and how the disciplinary hearings are conducted. The hearings at the MJ are conducted in the dayrooms or near the dayrooms. The hearings at RCCC were conducted just outside the pod doorways (rotunda area) with the inmate and the hearing sergeant standing just outside the pod.

During observation of a hearing at the MJ, the respective inmate was charged with a rule violation. The hearing sergeant asked the inmate if he was aware of the write-up. The sergeant read the report aloud, and then asked the inmate what happened, to which the inmate responded with an explanation, and there were several back and forth questions and answers between both parties. The sergeant ended the hearing by assessing a verbal warning to the inmate, and told the inmate he was going to be rehoused to another unit (as the inmate had complained of safety concerns). The sergeant advised the inmate of his appeal rights.

During observation of another hearing at the MJ (a different hearing sergeant), the Assessment Team observed the following: the sergeant read the report out loud, the inmate provided an explanation, and there were a few back and forth questions and answers. The sergeant then asked how the inmate wanted to plea, to which the inmate replied, "not guilty." The inmate was found guilty and assessed 12 hours of full restriction (but could maintain attorney visits or any program such as education, self-help groups, etc.). The sergeant explained to the inmate his right to appeal the findings to the jail commander, and he provided an explanation of possible outcomes from the appeal process.

During observation of another hearing at the MJ, the Assessment Team observed the following: The charged inmate appeared to have mental health concerns, and admitted to the charge of fighting. The sergeant asked the inmate to explain the circumstances as to what happened. The Assessment Team noted that the hearing was conducted in the unit indoor recreation area lobby, approximately 30 feet from a 1-on-1 psychiatric interview with an inmate-patient, with no barrier to preserve confidentiality for the MH encounter or for the disciplinary hearing. The sergeant asked the inmate, "do you think it is alright to fight", and asked him if he knew that fighting was against the rules. The inmate replied "yes." The inmate was found guilty, and assessed 10 days of full restriction. The sergeant explained that the inmate would receive a disciplinary shower every other PM shift, to which the inmate replied, "I don't need a shower." The inmate made slight verbalizations about harming his parents. After the

completion of the hearing and dismissal of the inmate, the Assessment Team asked the sergeant whether there was a process built-in to consult with a clinician prior to the hearing to obtain input for MH purposes, specifically, whether the clinician believes the MH status may have contributed to some degree as to the inmate's actions. The sergeant indicted that there is no such policy or practice.

During observation of a major violation hearing at RCCC, the Assessment Team observed the following: the sergeant asked whether the inmate had received a copy of the write-up, and asked if the inmate had any questions. The sergeant asked the inmate whether he wanted to plead guilty, not guilty, or guilty with an explanation, to which the inmate pled not guilty. The sergeant asked what happened, and the inmate responded. The sergeant asked if the inmate could have pressed the emergency button and avoided the fight, and asked about the inmate's injuries. The sergeant then instructed the inmate to go back inside to his assigned pod area. There was no explanation as to the disposition, whether the hearing would be resumed later, or any other detail or instructions.

During observation of another major violation hearing at RCCC, the Assessment Team observed the following; the sergeant read the report and asked whether the inmate had received a copy of the write-up, to which the inmate acknowledged that he had. The sergeant asked whether he had been written up before, and the inmate replied, "yes." The sergeant asked the inmate to state his plea, which was "guilty." Several questions and answers were delivered back and forth, and then this hearing was also halted with any further explanation or disposition.

There were at least 2 additional hearing at the RCCC with very similar observations.

The Assessment Team was able to observe the issuance of initial copies of write-ups to inmates at the MJ, however, our multiple requests to observe the issuance of initial copies of write-ups to inmates at RCCC was not facilitated. During the initial service of write-ups, the Assessment Team noted that the control room deputies issued the initial copy of the write-up to the inmate through the control room window slot. The deputies advised the inmate of the charge and had the inmate sign the document. The deputies issued the inmate a copy and advised the inmate that the sergeant would conduct the hearing. There was no EC provided to ensure the inmate understood the charges and/or the disciplinary process.

## Staff Interviews

The Assessment Team interviewed sergeants who conduct disciplinary hearings and issue initial copies of write-ups for major (and minor offenses), and also spoke with deputies who issue initial copies of write-ups for minor violations. The team was informed that the deputies primarily deliver the initial copies of the



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

write-ups to the charged inmates. The team was also informed that within the process, inmates/detainees receive an initial copy of the charges to which they sign acknowledgement of receipt, or they can refuse to sign. Most of the sergeants interviewed indicated that they read the write-up out loud in front of the inmate.

The sergeants review and approve a deputy or staff member's report. A sergeant then schedules a disciplinary hearing. Information regarding the minimum amount of time that a hearing can be scheduled from the date and time of initial issuance of the write-up report, was identified as 24 hours, and also 48 hours, but no more than 72 hours later, unless the charged inmate waives that right to prepare for the hearing, and therefore opts for a quicker hearing to be conducted. The staff interviewed told the Assessment Team that the common practice is for the opposite shift (AM versus PM) to conduct the hearings for the write-up reports written for the opposite shift. The hearings are conducted on the floors/housing unit areas where the charged inmates/detainees reside.

The staff that was interviewed indicated that the sergeants could take away time credits (for guilty findings) for major violations, for inmates who have been sentenced by the court. The sergeants indicated that they follow an approved inmate disciplinary matrix for possible imposed penalties. Aside from time taken, other penalties include but are not limited to, DD/TSEP, loss of privileges, e.g., dayroom, visits, telephone calls, etc.

The sergeants and deputies acknowledged that there is not an alert system or tracking system to help them identify inmates with disabilities, or those whose disabilities may pose a barrier to communication, e.g., learning disabled, intellectually (developmentally) disabled, or those who may be deaf/hearing-impaired, or speech-impaired. They mentioned the JIMS system PF10 screen that provides them some information, and may contain some disability-related information. When asked about a hypothetical scenario in which an inmate did not understand the hearing or process, one of the sergeants mentioned that he would not do the hearing, would research the issue further, and might ask a psychologist as to the best approach to deal with the inmate. When asked their response if the charged inmate was unable to read the write-up, one sergeant indicated that that issue has never happened with him. He said he would have someone read it to the inmate, and that the hearing would be held at a later date. When asked about possible hearing-impaired inmates, one sergeant stated that he would conduct the hearing by reading and writing with the inmate, and he would maintain the written notes used back and forth until completion of the writing of the disposition, then he would shred all notes used. Most of the sergeants indicated that inmates receive final copies of the hearing findings, and the sergeants usually deliver them. Some of the staff said that the inmate appeal rights are written on the back of the initial and final report copies, but this was inconsistent. He said that inmates cannot call witnesses, and they can gather

their own evidence for the hearings. The Assessment Team was also told that there is no standard assistance provided for inmates who are "illiterate." When asked about the process when a charged inmate gets moved from a specific building or pod to another, the Assessment Team was told that it is up to the discretion of the respective hearing sergeant.

The staff explained that after completion of the disciplinary hearings, the sergeant verbally explains his/her findings. However, the supervising lieutenant can later modify the findings and disposition, and ultimately is the approving authority for findings. Most of the staff interviewed stated that there is not a final copy of the disposition that is provided to the inmate. There is an employee who tracks all inmate disciplinary actions. When asked, the staff interviewed indicated that although inmates have appeal rights regarding the write-up, disposition and penalty, inmates do not receive any written documentation advising them of their appeal rights.

### Inmate Interviews

During the inmate interviews several inmates who could not read and understand (or had some difficulties with) a section of the inmate rulebook and other material used by the Assessment Team to assist in determining inmate literacy and inmates who may have a history of developmental and learning disabilities stated they did not fully understand the write-up process. A few of the inmates were unable to remember if they had received a write-up in the past.

A summary of the statements made by inmates who recall receiving an Infraction is detailed below.

- MJ inmate (Mental Illness, prior special education): 5 write-ups; no explanation about rights while signing for initial copy or at hearing; process is confusing; no EC provided, no assistance provided;
- MJ inmate (Mental Illness): not enough time to prepare for hearing, no access to witnesses, no complaints as to the hearing, but very confused at the time of issuance of first copy and not knowing his rights;
- MJ inmate (Mental illness): 2 separate write-ups, and didn't receive initial copies; no assistance; no explanation of rights or process; was confused and had to research with no staff assistance; one sergeant explained everything, and the other sergeant did not;
- MJ inmate (Mental Illness): nobody explained the process or his rights throughout the process;
- MJ inmate (Mental Illness and likely Intellectual [developmental] Disability, and prior Special Education): does not remember everything about the process, was confused;
- MJ inmate: no EC, no explanation, was confused throughout entire process;

- MJ inmate (Mental Illness): 19 write-ups; no EC; never received final copies; is afraid to appeal to risk getting a more serious penalty than was imposed by the sergeants;
- MJ inmate: served 3 weeks on disciplinary detention, and never received initial copy of write-up; when he received write-ups for a different offense, the staff member handed it to him without any explanation, and told him to sign it;
- MJ inmate (Mental Illness); served disciplinary detention; his only concern was not being told his rights throughout the process and an explanation as to how the process works;
- MJ inmate (Mental Illness): no EC; no assistance;
- RCCC inmate (Mental Illness)" no explanation at the time of signing for initial copy; afraid to appeal due to the possibility of getting a stronger penalty;
- RCCC inmate: no explanation of charges, process or rights;
- RCCC inmate; initial copy was slid under the cell door, and 2 days later had the hearing; sergeant did not explain anything at the hearing; no mention of appeal rights; never received a final copy summary;
- RCCC inmate: while at MJ, never received an explanation as to charges, rights, process at the time of issuance of initial copy of write-up;
- RCCC inmate (Mental Illness; prior Special Education): went to administrative segregation with no paperwork or explanation; never received an initial copy of the write-up, but did have a hearing.

## Conclusions

Because a disabled inmate's literacy level can impede his/her ability to participate in jail services, the regulations implementing the ADA require public entities to take appropriate steps to ensure that the communication of information concerning jail services, activities, and programs is as effective for the disabled as for the non-disabled. In doing so, the jail must provide such services as are necessary to afford an individual with a disability an equal opportunity to participate in jail programs and activities and in determining what services are necessary. Jail staff must give primary consideration to the requests of the individual.

Intellectually (developmentally) disabled inmates may have poor ability to express themselves in writing and will likely have difficulty with any task requiring reading or processing written material. In particular, they may have difficulty with disciplinary processes which require reading and understanding. Accordingly, jail staff is duty-bound to provide reading and writing assistance to disabled inmates who need assistance. Only through EC can staff guarantee that an intellectually disabled inmate has meaningful access to the disciplinary proceedings. The Due Process Clause requires that staff assistants provide EC to developmentally disabled prisoners during disciplinary proceedings where there is a protected liberty interest at stake.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Additionally, when addressing inmate misconduct, staff members must take into consideration the severity of the inmate's disability and the inmate's need for adaptive services when determining the appropriate method of discipline. When the inmate does not understand that he has broken a rule, staff should provide the reasonable accommodation of direct instructions, prompting, or verbal counseling. Only if the intellectually disabled inmate continues to engage in the misconduct should staff resort to the disciplinary process.

Since inmates under the jurisdiction of the SCSD detention facilities can in some cases lose good time credits if they are guilty of major violations, the procedure for determining whether such misconduct has occurred must observe certain minimal due process requirements based on constitutional case law.

In Wolff v. McDonnell, 418 U.S. 539 (1974), the Supreme Court found that, when prisoners lose good time credits because of a disciplinary offense, they are entitled to:

- Written notice of the disciplinary violation;
- The right to call witnesses at their hearing;
- Assistance in preparing for the hearing;
- A written statement of the reasons for being found guilty; and
- A fair and impartial decision-maker in the hearing.

A second important Supreme Court case, Sandin v. Conner, 515 U.S. 472 (1995), however, sharply limits the decision of Wolff and sets a higher standard that has to be met in order to show that you have a liberty interest.

The inmates have the right to assistance if illiterate and issues are complex. This certainly includes inmates who are intellectually disabled, mentally disabled, learning disabled, and those who are unable or have difficulty reading and comprehending.

The inmates must be provided advanced written notice of charges which must be given to the disciplinary charged inmate, no less than 24 hours before his/her appearance before the Hearing Official. Additionally, applies or must be adhered to:

- There must be a written statement by the fact finders as to the evidence relied on and reasons for the disciplinary action;
- The inmate should be allowed to call witnesses and present documentary evidence in his/her defense if permitting him/her to do so will not jeopardize institutional safety or correctional goals;
- The inmate has no constitutional right to confrontation and cross-examination in disciplinary proceedings, such procedures in the current environment, where disruption remains a serious concern, being discretionary with the officials; and

- Inmates have no right to retain or appoint counsel in such proceedings, although counsel substitutes should be provided in certain cases.

There is no system in place for sergeants conducting the disciplinary hearings to identify disabled inmates during the hearing process. Therefore, hearing sergeants are not providing the necessary accommodations for disabled inmates. Hearing sergeants do not provide EC for disabled inmates (learning, developmental and vision), assistive devices are not provided for vision-impaired inmates (magnifiers and large print documents). Effective communication is required throughout the entire disciplinary process from the issuance of the initial copy, during the hearing, during the final issuance of the disciplinary report and during the appeal process. By not providing EC, disabled inmates are not being afforded equal access to the disciplinary process and their due process rights.

Disabled inmates (learning, developmental and mental health) are not being provided staff assistance to ensure that they are aware of their rights and that their position is presented during the disciplinary process.

The SCSD detention facilities Operations Order and local practice must allow for provision of accommodations for disabled inmates, and should be mandatory.

In cases when an inmate indicates he/she does not understand the charges or otherwise objects to the clarity of the write-up or has any question about it, the Hearing Sergeant must not be allowed to proceed with the hearing. This applies even if the Hearing Sergeant determines that a reasonable person reading the charge would be able to understand the nature of what the inmate was charged with and there is no rational reason why the particular inmate might not have been able to understand the charge (e.g. inmate's inability to read or limited intellectual capacity). Remember, there is no effective tracking system to alert the Hearing Sergeant of an inmate's disability that would limit his/her ability to comprehend the nature of the charges, the Hearing process, and the inmate's rights. Additionally, and as stated above, inmates are not being provided staff assistance to ensure their position is presented at the hearing.

Staff is not taking into account the inmate's developmental and mental health disability and the adaptive support needs of the inmate (if applicable) when making a determination of the method used to address the misconduct.

Although a sergeant who was interviewed stated that he would request information from mental health if it appeared that the inmate's mental health contributed to the violation, this is not policy, and it is not uniformly applied. Staff should consult with mental health staff in cases where an inmate in the mental health program has received a disciplinary write-up, so that mental health staff can provide information relative to the inmate's mental health status at the time of the offense and information regarding the potential mental health implications of the penalty being imposed by the Hearing Sergeant (e.g., DD, TSEP, loss of



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

visits, phone etc.). Imposing these types of penalties may have a detrimental effect on the inmate's mental health and well-being.

The policy states that an inmate can grieve/appeal a restriction to the watch commander, but it does not require a face-to-face review to ensure the inmate's position is presented during the formal review process. In addition, violations of policy and jail rules for inmates with mental health concerns or inmates with developmental disabilities may be as a result of their disability and staff may not be aware of these factors when determining the method of intervention/discipline. Placing an inmate who is acting-out based on his mental health condition in isolation may be detrimental to his mental health and well-being.

### References

**28 CFR§ 35.152(b)(1**) Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.130(a)** requires that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.130(b)(7)** states that a public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

**28 CFR 35.130(b)(1)**: A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

**28 CFR 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

**28 CFR 35.130(b)(4):** A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

**28 CFR 35.130(b)(8):** A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Armstrong v. Brown settlement agreement.***

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*Disciplinary Process*

*Reasonable accommodations shall be afforded inmates with disabilities in the disciplinary process.*

*To assure a fair and just proceeding, the assignment of a Staff Assistant (SA) and/or an Investigative Employee (IE), as provided in CCR Sections 3315 (d)(1) an (2), may be required for the inmate. The inmate and/or SA or IE may need to be assigned by a bilingual aide or qualified interpreter in order to ensure effective communication. Additional accommodations may be appropriate. All written notes utilized and exchanged for effective communication between the inmate and staff shall be attached and included with the disciplinary documents for placement in the inmate's central file.*

***The information below is for reference only. Due to the settlement***

*agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Clark v. California settlement agreement.*

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Clark v. California" amended March 1, 2002, mandates the following:*

*DISCIPLINARY PROCESS*

*To assist DDP inmates in conforming departmental rules and regulations, all staff who interact with this population must closely monitor the inmates' daily activities. An employee may attempt to address problematic behavior informally; e.g., direct instructions, prompting, verbal counseling. The employee must ensure the inmate understands (to the best of his/her ability) the consequences of continued misconduct. If this informal intervention successfully corrects the behavior, no further disciplinary action is required. If the inmate continues the misconduct and informal intervention was not successful or the behavior was of a serious nature the misconduct must be handled in accordance with CCR, Title 15, starting at Section 3310. The method of discipline may include:*

- *Issuing a CDC Form 128-A, Chrono-Custodial Counseling*
- *Issuing a CDC Form 115 the staff member observing the misconduct must take into consideration the severity of the inmate's disability and the inmate's need for adaptive support services when determining the method of discipline.*

*To assure a fair and just proceeding, if the misconduct is recorded on a CDC Form 115 (administrative or serious rules violations), all DDP inmates must be assigned an SA. The SA can be any staff who have received training referenced in Section X, D, and training in due process hearings. The assigned SA may be assisted by a bilingual aide, reader, mental health clinician, etc., as necessary. In accordance with CCR, Title 15, Sections 3318(b) and 3315 (d)(2), the SA must:*

- *Inform the inmate of his/her rights and ensure that he/she understands the disciplinary procedures to the best of the inmate's ability;*
- *Help the inmate to prepare for the disciplinary hearing;*
- *Represent the inmate's position at the hearing;*
- *Ensure the inmate's position is understood;*
- *Ensure the inmate understands to the best of his/her ability the decisions reached;*
- *Provide the hearing official with information related to the inmate's developmental disability and the adaptive support services required;*
- *Be present at the disciplinary hearing and all interviews related to the disciplinary process;*

- *Refrain from giving legal counselor specifying the position the inmate should take in any disciplinary proceeding; and*
- *Additional assistance as appropriate.*

*The SAs and hearing officials must be trained to communicate with DDP inmates. The SA must complete courses in the Overview of Developmental Disabilities, Staff Assistance for Inmates with Developmental Disabilities, and the Overview of the Inmate Disciplinary Process.*

*If the inmate is found guilty of a rules violation, the Chief Disciplinary Officer (CDO) must review the completed CDC Form 115 in accordance with CCR, Title 15, Section 3312.*

*The CDO must consult with the clinician assigned to DDP inmates regarding the findings and disposition of the hearing before taking action. The clinician assigned to DDP inmates must provide input as to the effectiveness of the disposition in correcting the inmate's behavior. Both the CDO and clinician must sign the completed CDC Form 115. By signing the CDC Form 115, the clinician is not endorsing the disposition of the CDC Form 115, but only acknowledging the consultation. The need for the CDO to consult with clinicians concerning the disposition of CDC Forms 115 for inmates with developmental disabilities must be incorporated into applicable Lesson Plans, Post Orders, and Operational Procedures of all designated institutions. In accordance with CCR, Title 15, Section 3313(c), the classification of a CDC Form 115 may be changed before, during, or after a disciplinary hearing from serious to administrative. Other decisions for CDC Forms 115 can be to:*

- *Affirm, reverse, or modify the disciplinary action and/or credit forfeiture;*
- *Order a different action or a different method of discipline;*
- *Dismiss the charge;*
- *Order a rehearing of the charge;*
- *Refer the charge for criminal prosecution; and*
- *Order a combination of any of these actions.*

*If a DDP inmate exhibits on going behavioral problems, institution clinical staff shall refer the case to HCSD Clark Coordinator for assistance in assessing the causes of the behavior and creating an intensive behavioral modification and treatment plan.*

*The ADA Coordinator will review CDC Form 115s at least monthly to identify any patterns of misbehavior that may be related to the DDP inmates' disabilities (see Section VI, L).*



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

## U.S. Department of Justice Civil Rights Division *Disability Rights Section* Commonly Asked Questions About The Americans With Disabilities Act and Law Enforcement

## II. Interacting with People with Disabilities

8. Q: What steps should officers follow to communicate effectively with an individual who is blind or visually impaired?

A: It is important for officers to identify themselves and to state clearly and completely any directions or instructions -- including any information that is posted visually. Officers must read out loud in full any documents that a person who is blind or visually impaired needs to sign. Before taking photos or fingerprints, it is a good idea to describe the procedures in advance so that the individual will know what to expect.

## III. Effective Communication

11. Q: If the person uses sign language, what kinds of communication will require an interpreter?

A: The length, importance, or complexity of the communication will help determine whether an interpreter is necessary for effective communication.

- In a simple encounter, such as checking a driver's license or giving street directions, a notepad and pencil normally will be sufficient;

- During interrogations and arrests, a sign language interpreter will often be necessary to effectively communicate with an individual who uses sign language;

- If the legality of a conversation will be questioned in court, such as where Miranda warnings are issued, a sign language interpreter may be necessary. Police officers should be careful about miscommunication in the absence of a qualified interpreter -- a nod of the head may be an attempt to appear cooperative in the midst of misunderstanding, rather than consent or a confession of wrongdoing;

- In general, if an individual who does not have a hearing disability would be subject to police action without interrogation, then an interpreter will not be required, unless one is necessary to explain the action being taken.

18. Q: Procedures at my office require citizens to fill out forms when reporting crimes. What if the person has a vision disability, a learning disability, mental

retardation or some other disability that may prevent the person from filling out a form?

A: The simplest solution is to have an officer or clerk assist the person in reading and filling out the form. Police officers have probably been doing this for years. The form itself could also be provided in an alternative format. Providing a copy of the form in large print (which is usually as simple as using a copy machine or computer to increase type size) will make the form accessible to many individuals with moderate vision disabilities.

## V. Modifications of Policies, Practices, and Procedures

23. Q: What types of modifications in law enforcement policies, practices, and procedures does the ADA require?

A: The ADA requires law enforcement agencies to make reasonable modifications in their policies, practices, and procedures that are necessary to ensure accessibility for individuals with disabilities, unless making such modifications would fundamentally alter the program or service involved. There are many ways in which a police or sheriff's department might need to modify its normal practices to accommodate a person with a disability.

Example: A department modifies the procedures for giving Miranda warnings when arresting an individual who has mental retardation. Law enforcement personnel use simple words and ask the individual to repeat each phrase of the warnings in her or his own words. The personnel also check for understanding, by asking the individual such questions as what a lawyer is and how a lawyer might help the individual, or asking the individual for an example of what a right is. Using simple language or pictures and symbols, speaking slowly and clearly, and asking concrete questions, are all ways to communicate with individuals who have mental retardation.

## Inmate Orientation

The Sheriff's Department County of Sacramento Correctional Services Operations Orders pertaining to inmate orientation are outlined in Operations Orders 04/07 Dress In/Dress Out Procedures, 04/08 Prisoner Orientation and 07/03 Inmate Discipline Plan.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1069 Inmate Orientation requires that:

(a) In Type II, III, and IV facilities, the facility administrator shall develop written policies and procedures for the implementation of a program reasonably understandable to inmates designed to orient a newly received inmate at the time of placement in a living area. Such a program shall be published and include, but not be limited to, the following:

1) correspondence, visiting, and telephone usage rules;
2) rules and disciplinary procedures;
3) inmate grievance procedures;
4) programs and activities available and method of application;
5) medical services;
6) classification/housing assignments;
7) court appearance where scheduled, if known; and,
8) voting, including registration.

§ 1080. Rules and Disciplinary Penalties requires that;

Wherever discipline is administered, each facility administrator shall establish written rules and disciplinary penalties to guide inmate conduct. Such rules and disciplinary penalties shall be stated simply and affirmatively, and posted conspicuously in housing units and the booking area or issued to each inmate upon booking. For those inmates who are illiterate or unable to read English, and for persons with disabilities, provision shall be made for the jail staff to instruct them verbally or provide them with material in an understandable form regarding jail rules and disciplinary procedures and penalties.

§ 1080 defines people with disabilities as including but not limited to:

Persons with a physical or mental impairment that substantially limits one or more of their major life activities or those persons with a record of such impairment or perceived impairment that does not include substance use disorders resulting from current illegal use of a controlled substance.

Per Operations Order 04/07, Dress in/Dress Out Procedures, custody staff shall provide the prisoner with orientation materials in accordance with Operations Order 04/08 Prisoner Orientation.

Per Operations Order 07/03, Inmate Discipline Plan, all inmates being housed will receive an orientation booklet that contains all facility rules guiding inmate conduct and the corresponding disciplinary penalties. For those inmates who are illiterate or unable to read English, and for persons with disabilities, verbal instructions or material in an understandable form regarding jail rules and disciplinary procedures and penalties will be provided.

A copy of the inmate orientation book describing the inmate discipline plan, rules and penalties shall be kept at the Public Counter/Gatehouse and shall be made available to the public upon request.

Per Operations Order 04/08, Prisoner Orientation, custody staff shall be responsible for providing each inmate with an orientation handbook and giving each inmate a verbal orientation prior to being located in a housing unit.

Inmates shall be provided with an inmate orientation handbook, which includes but is not limited to the following information:

- Correspondence, visiting, and telephone usage rules.
- Rules of conduct and disciplinary procedures.
- Inmate grievance procedures.
- Available programs, activities, and inmate services.
- Medical, dental, and psychiatric services.

Custody staff are responsible for being able to provide inmate orientation information in a format reasonably understandable to inmates. Considerations for providing this information includes, but is not limited to, the following:

- Inmates who do not speak or write English.
- Inmates with disabilities such as hearing or visual impairment.

Custody staff is responsible for providing a verbal orientation in summary to all inmates prior to the inmate(s) being housed in a housing unit. The verbal orientation includes, but is not limited to:

- Explaining the basic rules of conduct of the respective facility.
- Referring inmates to the inmate handbook or other appropriate orientation information.

Inmates are provided the opportunity to have questions answered about their housing facility or incarceration. The methods inmates may use to ask questions include, but are not limited to:

- Prisoner request forms.
- Medical, dental, and psychiatric service request forms.

- Direct questions to custody staff.

Orientation information may be provided in person and/or by using a video format presentation prepared by the respective facility. At the MJ, the orientation material will be presented by custody staff in property. At RCCC, the orientation material will be presented by custody staff during intake.

Orientation information may be given in the housing unit to supplement the information given at the above locations at each facility.

**Observations**

The Assessment Team observed the intake/booking/classification and housing process at the MJ, as well as intake and processing at RCCC for both male and female inmates.

At the MJ, on several occasions during the day shift (0600-1800 hours) and night shift (1800-0600 hours), the Assessment Team observed the entire intake, booking, medical and mental health screening, and housing (including "dress-in") process. On different dates and shifts, the Assessment Team observed numerous inmates go through the entire process from beginning to end. Additionally, the Assessment Team observed several other inmates go through various parts of the process, whether intake, booking, medical screening, mental health screening, or housing. Note: in many of the latter cases, Assessment Team representatives would alternate observing particular inmates go through each phase of the process, meaning several more of these inmates were observed through the entire process.

There is no video orientation provided at the MJ, however, inmates that are being housed at the MJ are shown a PREA video. This video is shown after the inmate has been dressed out into jail-issued clothing in the felony holding tank. When observing the MJ dress out process the Assessment Team noted that there are inconsistencies on how the different teams process inmates through the dress out process. One of the teams was observed providing all inmates with an Inmate/Detainee Handbook at the time of the dress out. Another team advised the inmate that the Inmate/Detainee Handbook was being offered and they could obtain one from the counter as they were placing the identification band on the inmates. Another team didn't offer or provide the inmates with an Inmate/Detainee Handbook during the dress out process. All of the teams required the inmates to sign the Inmate/Detainee PREA Attestation Form indicating that they had received the inmate handbook and had viewed the PREA education video, even though they had not received the inmate handbook.

At no time was there any verbal inmate orientation as to the jail rules, expectations, or information relative to programs, services or activities, nor was any information provided to inmates (including those with disabilities) with regard to emergencies, alarms, evacuations, disability programs or services. The

Assessment Team also observed the classification process, and there was no verbal orientation provided during the classification interview either.

At the RCCC, the Assessment Team made numerous attempts to observe inmate processing; however, as most of the new arrivals are processed through the MJ, the team was unable to observe new arrivals being processed at RCCC.

The Assessment Team notes that at RCCC, ICE detainees are required to receive orientation. The RCCC detainee orientation is a typed 2-page document that notes "To Be Read To The Detainee" and reads as follows:

### The RCCC Detainee Orientation

The following information must be read to all U.S. Immigrations and Customs Enforcement (ICE) detainees during intake/classification process after arrival to the Rio Cosumnes Correctional Center (RCCC). A signed copy of this document shall be placed in the detainee's file.

You are currently being detained by the U/S Immigration and Customs Enforcement (ICE) pending the outcome of your immigration proceedings. This facility is the Rio Cosumnes Correctional Center (RCCC), which is operated by the Sacramento County Sheriff's Department. The facility is located in Sacramento, California.

The following is a brief overview of the RCCC policies and services available to you at the facility. Detailed information of each of the below items can be found in the RCCC Inmate and Detainee Orientation Handbook.

- Detainees housed at RCCC must follow all facility rules. These rules must be followed or you will be subject to disciplinary action. Anyone accused of violating a facility rule shall be provided a fair and impartial disciplinary process.

- All detainees will be counted a minimum of six times in a 24-hour period. These counts will generally occur before meals and during shift exchange. There is no talking or activities allowed during any count. All detainees will remain on their assigned bunks until count is clear.

- Meals are served three times a day. Special allergen free food trays are available for those with a doctor's order. Special religious food trays are available for those who are approved by the facility Chaplain.

- All detainees will be issued jail clothing, bedding, a towel, and personal hygiene kit. Laundry services for all clothing and bedding will be provided on a regular basis.

- All detainees will have access to telephones, mail services, incoming email services, visitation, televisions, outdoor recreation, religious

programs, and a variety of reading materials. A schedule of programs services and daily activities is posted in your housing unit.

- All detainees will be afforded access to the law library. To visit the law library, you will need to send an inmate message request (KITE) to the law librarian. The librarian will schedule your visits.

- All detainees will have access to medical and psychiatric services 24 hours each day / seven days each week. Detainees will not be charged a co-payment for healthcare services. You can request to see medical or psychiatric staff by submitting a pink medical request (KITE) that is available in your housing location. Any medical or psychiatric emergencies should be reported to facility staff immediately.

- The ICE _Know Your Rights_ video is shown regularly on facility televisions in English, Spanish and French. Information on how to contact your consulate is contained in the RCCC Inmate and Detainee Handbook.

- Additional information can also be found in the information packet posted in each housing location. This packet contains a variety of information related to pro bono legal services and how to pursue those services. This packet also contains information on how to contact ICE.

- Any ICE related questions should be directed to the onsite ICE representative or by completing an ICE inmate message request form (KITE). These request forms can be placed in the mailbox labeled "ICE" located in your housing location or given directly to the ICE representative.

- Any other questions, not ICE related may be directed to housing officers or written on a RCCC inmate message request form (KITE). You will receive an answer in a timely manner.

- Do you have any questions?

You are being provided a copy of the RCCC Inmate and Detainee Handbook. You are encouraged to read through the handbook to familiarize yourself with the rules, regulations, policies and procedures to be followed while housed at RCCC.

Detainees are required to initial and certify that they were provided orientation. The staff member is required to also note if any translation service or interpreter was utilized to provide the information to the detainee.

## Staff Interviews

The Assessment Team interviewed deputies assigned to the intake, booking and property area (assigned to escort new arrivals to their respective housing units) upon completion of intake processing). The Assessment Team also interviewed approximately 52 custody staff, which included deputies from every housing unit



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

at the MJ and RCCC, where inmates are housed. Much of the interview information obtained relative to inmate orientation was inconsistent and wasn't in accordance with the aforementioned policy.

Most deputies indicated that all inmates are provided an Inmate/Detainee Handbook during processing. A few of the staff interviewed indicated that inmates are required to view an orientation video; however, the video referred to is actually specific to PREA and does not pertain to inmate orientation.

Nearly all of the housing unit deputies interviewed admitted that they (themselves) do not issue rulebooks to inmates upon arrival to their respective units. However, a few of the staff mentioned that they would provide them if the inmate asked for one.

Most of the intake, booking or housing unit staff indicated that they provide verbal orientation to inmates, or that orientation is normally given in any of those areas. A couple of the deputies mentioned they provide verbal orientation to inmates. Some staff stated that they provide the rules of the unit or basic expectations like use of the emergency call button, inmate responsibility during alarms, KITE's, and count process. However, this information is not specific to orientation-type material, such as available programs, services and activities, e.g., grievance process, library/law library, religious services, etc. including orientation material required to be covered by Title 15. Moreover, after being asked, these deputies acknowledged that they do not follow any script or written material, but rather provide these basic house rules from their memory. Although many of the deputies did acknowledge that they verbally provide the basic rules of the housing unit to the newly arrived inmates, the vast majority of them also admitted that that does not suffice as an official inmate orientation. The deputies further acknowledged that there is not a current process in place to log whether orientation was provided or to determine the specific orientation material that should be covered.

**Inmate Interviews**

During the inmate interviews, about two-thirds of the inmates interviewed indicated that they were not provided a rulebook. About ninety percent of the inmates stated that staff did not provide any form of orientation.

The inmates who acknowledged ever receiving a verbal orientation/information indicated that this orientation was of basic unit rules, but even most of those inmates believed that the information was more of the deputies' own house rules rather than a detailed inmate orientation. Some inmates admitted they received information from other inmates, such as their cellmates and/or "houseman". Some inmates stated that they felt lost and just learned about pertinent jail information such as programs and expectations from other inmates and not staff. Some inmates that received the Inmate/Detainee Handbook cannot read and therefore, they were not aware of the information contained in the handbook.

Of the 8 ICE detainees interviewed; only one indicated that staff had read the orientation information to him. All detainees with the exception of one stated that they had been issued the handbook in booking.

## Conclusion

The SCSD detention facilities do not accommodate disabled inmates during the inmate orientation process.

Disabled inmates (e.g., those with vision, hearing, speech, learning and developmental disabilities, as well as those with mental illness and other disabilities) are being held accountable for their actions, and are expected to understand the jail's rules and expectations. Yet the disabled inmates as well as the rest of the inmate population are not being informed of jail rules. Disabled inmates (such as those with vision, hearing, speech, learning, and developmental disabilities, as well as those with mental illness and other disabilities) are not informed of available reasonable accommodations; they are not appropriately informed of available programs, services and activities; and they are not receiving the jail rulebook, or observing an inmate orientation video, or having specific rules or expectations explained to them by staff. As a result, the SCSD detention facilities are exposing disabled inmates to possible discrimination and exclusion from equal participation in the jail's programs and other activities.

The SCSD detention facilities do not provide (or adequately provide) inmate orientation information or materials, and do not accommodate disabled inmates (such as those with vision, hearing, speech, learning and developmental disabilities, or those with mental illness or other disabilities) during orientation. Because orientation is not provided, there is no mechanism to allow for EC and alternate or accessible methods in presenting inmate orientation materials or information.

As a result of the assessment, which included reviews of applicable policies and other documents, as well as staff and inmate interviews, findings for this area include:

- SCSD detention facilities staff are not adhering to Operations Order 04/08 Prisoner Orientation, which requires staff to provide each inmate with an orientation handbook and to give each prisoner a verbal orientation prior to being located in a housing unit. As a result:
  - There is no verbal inmate orientation information being provided (other than isolated cases where unit deputies provide an unscripted or unwritten account of the deputies' personal unit expectations); and
  - Inmates are rarely being issued jail rulebooks.

In order for the SCSD detention facilities to come into compliance with Title II of the ADA, Operation Orders, and to ensure best practices, staff must ensure the following:

- The inmate orientation process must be comprehensive and provided in accessible formats;
- Vision-impaired and deaf/hearing-impaired inmates as well as those with learning disabilities shall be accommodated with alternate forms of communication, e.g., verbal communication, video/audio presentation, and written material (large print), in order to ensure EC in presentation of the information;
- Staff must effectively communicate the contents of the rulebook (handbook) and related materials to all inmates. This obviously includes inmates who are deaf or hearing-impaired, including those for whom written language is not an effective means of communication;
  - Staff may meet this obligation by providing a video of a qualified interpreter signing the contents of the jail rulebook, or by using on on-site interpreter or an interpreter through video interpreter services; and
  - Appropriate technology for viewing the video must be utilized.

The following information should be incorporated as part of the inmate orientation process:

- The purpose of the disability program;
- Availability of Title 15 and any pertinent existing and future disability-related forms or materials (in accessible formats to inmates with disabilities);
- The inmate grievance process and location of the forms (this should also include any possible future related forms or materials if implemented, e.g., request for Reasonable Modifications or Accommodation forms and information);
- Reasonable modifications or accommodations available to qualified inmates, e.g., SLIs for due process settings (i.e. inmate infraction hearings, notifications of charges, notices to appear) health care consultations, and classification interviews/processes;
- If implemented in the future, information regarding access to inmate staff readers or scribes, and availability of specialized library equipment for qualified hearing/vision-impaired and learning disabled inmates such as text magnifiers, large print materials, audiocassette tapes;
- The process of personal notification by staff and possible use of a dry erase/chalk board and/or lighted electrical banner for notification of announcements, visits, ducats (appointment slips) or messages in the housing unit;
- Access to a TTY and volume control telephone;
- Access to a closed captioning television in the housing unit;

- Information regarding emergency alarms, evacuations, announcements and notices; and
- The SCSD detention facilities inmate assistance program (if further developed in the future to include assistance to hearing, vision, speech, learning and intellectually disabled inmates).

**References**

**28 CFR § 35.130(a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 C.F.R. 35.106** states that a public entity shall make available to applicants, participants, beneficiaries, and other interested persons information regarding non-discrimination on the basis of disabilities in the services, programs, or activities of the public entity.

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

***The information below is for reference only.***

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates delivery of inmate orientation at each of CDCR's adult institutions. Examples of required information for mobility impaired inmates include the following: the purpose of the inmate disability program, availability of Title 15, rulebooks, availability of grievances and reasonable accommodation requests, reasonable accommodations/modifications available to qualified inmates, inmate assistance program or assistance that may be provided by inmates (if applicable), information regarding emergency alarms, evacuations, etc.*

As a result of the initiation of an administrative investigation (by the United States Department of Justice [USDOJ]) due to a complaint filed pursuant to Title II of the ADA, and Section 504 of the Rehabilitation Act of 1973, in March 2013, a settlement agreement was reached between the United States of America (United States Department of Justice) and the County of Arapahoe, Colorado.

The settlement agreement specifically applied to inmates who were deaf or hearing impaired. As related to inmate orientation, terms and conditions of the settlement agreement included but were not limited to the following:

Inmate handbook:

At the earliest reasonable time, Personnel will effectively communicate the contents of the Inmate Handbook and similar publications to all inmates who are deaf or hard of hearing, including those for whom written language is not an effective means of communication. Personnel may choose to meet this obligation by providing a video of a qualified interpreter signing the contents of the Inmate Handbook, along with appropriate technology for viewing, or by providing a qualified interpreter to interpret the contents of the Inmate Handbook to the inmate who is deaf or hard of hearing.

## Alarms/Emergencies

The Sheriff's Department County of Sacramento Correctional Services Operations Orders pertaining to the emergency response and evacuation processes include: 02/01 Use of Force; 02/04 Weapons, Tactical Weapons, and Specialized Equipment; 03/01 Critical Incident Response Plan; 03/09 Fights, Riots, Hostage and Minor Disturbances; 03/12 Evacuation Plan – Main Jail; and 03/13 Evacuation Plan – RCCC. The Assessment Team reviewed the above listed Operations Orders to identify whether they contained any language specific to ADA or inmates with disabilities.

Specifically, the Assessment Team reviewed the operations orders to determine if language included: information about staff access to a current roster/list from an electronic tracking system for disabled inmates; requirements for inmates during emergency alarms or evacuations, e.g., return to their assigned cell/bed areas, freeze movement, 'take a knee' on the ground, face the nearest wall, sit on the ground, lay on ground in a prone position, or await for specific verbal instructions from staff; inmate identification vests (or similar process), e.g., for mobility, deaf/hearing, and blind/vision impaired inmates; inmate notification; reasonable accommodations/assistance (during evacuations or emergencies); effectively communicating (as feasible) with inmates whose disability may make it difficult for them to either know or understand that an alarm or emergency may be taking place, or whose disability may pose a barrier to communications and therefore may encounter difficulties understanding how to appropriately react to emergencies, e.g., deaf/hearing impaired inmates as well as those with an intellectual (developmental) disability; de-escalation for inmates with mental illness (as applicable), and special considerations for mobility impaired inmates or others during movement or transport.

None of the operations orders reviewed contained any ADA or inmate disability language or references, and all were silent regarding an expectation to either return to their cell/bed area, freeze movement, 'take a knee' on the ground, face the nearest wall, sit on the ground, lay in a prone position on the ground, or await other verbal instructions.

Operations Order 03/12, Evacuation Plan - MJ, Section II.D. outlines the evacuation priorities of individual housing units:

1) Evacuation of prisoners exposed to immediate risk of injury;

2) Evacuation of the infirmary (2-West) and the sub-acute (2-East) prisoners;

3) Evacuation of female prisoners;

4) Evacuation of High Security, Disciplinary Housing, and acute psychiatric prisoners separate from the general population; and

    5)  Evacuation of Booking and Court Holding areas.

Section II.F., states in part, "Each housing unit shall follow the evacuation procedure contained in this Order unless directed otherwise by the Incident Commander:

    1)  Housing unit officers should account for prisoners in their housing area, by both locator card and Control Point Group List (PF-11) unless the resources are unavailable; and

    2)  If locator cards or the PF-11 lists are unavailable, handwritten lists or location boards may be substituted."

The Assessment Team also reviewed the following list of Operations Orders to ascertain whether pertinent ADA language existed as well: 01/14 Division Safety Program; 01/15 Reporting of Incidents and Crimes; 02/02 Use of restraint Devices; 02/03 Use of Pro-Straint Chair; 02/05 Custody Emergency Response Team; 02/06 Prisoner Searches; 02/12 Transportation of Prisoners; 03/02 Fire Prevention – Main Jail; 03/03 Fire Suppression – Main Jail; 03/04 Fire Prevention – RCCC; 03/05 Fire Suppression – RCCC; 03/06 Emergency Systems and Equipment; 03/07 Medical Emergencies; 03/11 Natural Disasters, and 03/15 Escape Response. These Operations Orders also did not contain any relevant ADA or inmate disability information. However, most of these Orders will be outlined with noted concerns and recommendations for other ADA-related issues, and will be detailed in other sections of this report as applicable.

## Observations

During the time periods the Assessment Team was on grounds at the MJ and RCCC facilities, the team members observed a few emergency alarms primarily from adjacent housing areas or just outside the respective units. The Assessment Team did not observe any visual alarms (e.g., flashing lights) to alert deaf/hearing-impaired inmates as to an emergency situation or incident. It appears that the alarms are audible only. A deaf inmate housed at RCCC complained to the Assessment Team that there is no mechanism for him to immediately or quickly learn of an alarm sounding.

There were no evacuations; therefore, the Assessment Team was unable to observe these processes.

In touring the housing units, most of the units/pods had notices for emergency and fire exits routes posted, but several units/pods throughout the MJ and RCCC did not. This will be outlined in more detail in another section of this report.

## Staff Interviews

The Assessment Team interviewed one or more deputies from every housing unit at both the MJ and RCCC facilities to obtain information relative to staff

knowledge and practices, and their expectations of inmates during emergencies and inmate evacuations. The Assessment Team asked questions pertaining to: identification of disabled inmates or staff access to an updated tracking roster of disabled inmates; requirements or expectations for inmates during emergency alarms, e.g., freeze movement, 'take a knee' on the ground, sit on the ground, face the nearest wall, lay on ground in a prone position, or await for specific verbal instructions from staff; inmate identification vests (or similar process), inmate notification; reasonable accommodations/assistance (during evacuations or emergencies); effectively communicating (as feasible) with inmates whose disability may make it difficult for them to either know or understand that an alarm or emergency may be taking place, or whose disability may pose a barrier to communications and therefore may encounter difficulties understanding how to appropriately react to emergencies; and special considerations for mobility impaired inmates or others during movement or transport.

All staff interviewed acknowledged that there is no master-tracking roster of identified inmates with disabilities. Most staff were not aware of the Operations Orders requirement for staff to use the Locator Cards during emergency evacuations, and there was no consistency in a primary method with which staff would identify inmates during an emergency evacuation.

Staff provided the following responses or cited the following methods with which they would identify an inmate as having a disability or special need: they (staff) are regularly assigned to their specific unit and already know who their disabled inmates (and those with medical needs) are; observing and talking/interviewing with the inmates; the JIMS system PF2, PF4, and PF10 screens (although some staff admitted that this system usually does not tell them if an inmate has a specific disability); Locator Cards and attached medical chronos for health care appliances/assistive devices (inmates are required to maintain the chronos on their persons); face-to-face identification check (using Locator Cards); white boards in control booths (written in grease pencil) for RCCC housing units; and the white board in the Nurses Station (second floor medical at MJ) will indicate 'MA Assist' for inmates who require extra care or assistance; disabled inmates are usually housed on the second floor medical unit (for MJ).

The Assessment Team asked the housing unit deputies about the current practices and expectations of inmates during emergency alarms. Staff mentioned that they conduct periodic evacuation drills for readiness. The overwhelming majority of staff indicated that inmates are ultimately expected to 'lockdown' and return to their respective assigned cells/bed areas. The inmates must turn and face the nearest wall, place their hands inside the waistband of their pants, and stop all movement. About 20 percent of the housing unit staff stated that they use discretion as to whether to require the inmates to lay on the ground in a prone position. Some staff said they use further discretion whether



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

to use physical force to ensure an inmate assumes a prone position (if an inmate does not voluntarily assume such position).

However, most of these staff acknowledged that if they are aware that a particular inmate has a mobility or other disability that precludes them from assuming a prone position, then an exception would be made, and those inmates would not be required to lay or sit on the ground if they were unable to do so.

Most staff acknowledged that when they respond to an emergency alarm in a unit where they are not regularly assigned, it is very difficult or impossible to know each inmate and whether any inmates have a disability that could prevent them from immediately being aware of an alarm, or from being able to immediately face the nearest wall or assume a prone position on the ground. Some of the staff admitted that the wristband and locator card identification systems are not effective for emergency alarm situations. Most of the staff also thought a more visible type of identification system could be more appropriate for quick identification as well as staff safety during emergency alarm situations, e.g., identification vests for specific types of disabilities, e.g., mobility, blind/vision, and deaf/hearing.

Nearly all staff interviewed stated they would provide any inmate accommodations as necessary during an evacuation or emergency situation. For emergency inmate notification, staff make a verbal announcement on their cell/housing unit intercom system. Staff indicated that they have the capability to do a major group release if necessary.

Staff seemed to be very accommodating with their responses. Most staff said they would use their assigned radio to call for staff assistance as warranted, and would provide any assistance to disabled inmates as needed, including physically helping them, obtaining a wheelchair if necessary, etc. During evacuations, staff cycle each inmate out one-by-one to make sure no inmates are left behind, and they check each cell/bed area, common area, and other areas.

## Conclusion

Listed below are noted concerns regarding the Sheriff's Department County of Sacramento Correctional Services Operations Orders and/or staff practices and expectations of disabled inmates during emergencies and alarms:

- The aforementioned applicable Operations Orders must contain ADA or disability-related language;

- There must be a comprehensive inmate disability screening and identification process as well as an electronic tracking system in place to ensure all staff are aware of all inmates with disabilities, physical limitations, and accommodations/assistance needs;

- o Operations Order 03/12, Evacuation Plan – MJ Section II.F. must reflect any future modifications for staff responsibilities toward identifying inmates during emergencies and alarms;

- There must be written information contained in the applicable Operations Orders regarding directives or expectations for inmates (including disabled inmates) during emergencies and alarms;

  - o There must be staff consistency with their expectations of inmates during emergency alarms;

  - o Without any directive from the applicable Operations Orders, most staff are directing inmates to face the nearest wall (with their hands placed inside the waist bands of their pants), while other staff instruct inmates to lay on the ground in a prone position. As stated above, a portion of these staff also indicate they may use physical force if an inmate refuses to lay in a prone position;

  - o Because of an inadequate health care screening process for disabilities, physical limitations, and accommodation needs, staff don't generally know which inmates have a disability, or who has the ability to assume a prone position on the ground, or who may need assistance;

  - o Unless the Operations Order is modified to indicate that no inmates will be required to lay on the ground in a prone position during alarms or emergencies, then the applicable Order must contain language that mobility-disabled inmates will not be forced to a prone or in a seated position on the ground during an emergency alarm;

- There must be written information in the applicable Operations Orders regarding inmate notification (during alarms or emergencies);

- There must be written information in the applicable Operations Orders regarding identifying accommodation/assistance needs for disabled inmates, so staff can provide help as necessary during emergencies or alarms;

- There must be written information in the applicable Operations Orders regarding communicating appropriately (effectively) during emergencies or alarms, with inmates who may have a disability that provides a potential barrier to communications;

- Any prioritization for evacuating individual housing units and/or disabled inmates must be articulated in the appropriate Operations Orders;



**SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES**
**AMERICAN WITH DISABILITIES ACT ASSESSMENT**
**DECEMBER 22, 2016**

- o Operations Order, 03/12 Evacuation Plan – MJ, Section II.D. as shown above, outlines the guidelines in determining how to prioritize the evacuation of individual housing units. However, in the past nearly all disabled inmates either were or were assumed to be housed on the MJ second floor (2/W and 2/E). There is no priority listed in the Order for the evacuation of disabled inmates. Although a large percentage of disabled inmates at the MJ are still housed on the second floor infirmary, many of them (various disabilities) are now being housed in other areas of the MJ as well as the RCCC.

- There are no visual alarms (audible only);

  - o Deaf inmates would not quickly be alerted to alarms or emergencies;

- All housing units/pods must have the notices for emergency and fire exits routes posted;

- The SCSD detention facilities should give consideration to other more visible and easily identifiable methods of inmate identification (during emergencies) other than wristbands, e.g., identification vests for mobility, deaf/hearing-impaired and blind/vision impaired inmates.

  - o Staff acknowledged that they are largely unfamiliar with inmates, their disabilities, or their special needs, when they (staff) respond to other housing units for alarms or emergencies. Most staff indicated that the wristband identification process is not effective for emergency situations.

### References

**28 CFR § 35.105 (a)** requires that a public entity evaluate its current policies, and practices, and to the extent modification of any such policies, and practices is required, the public entity shall proceed to make the necessary modifications if they do not or may not meet the requirements Title II.

**28 CFR § 35.130 (b)(7)** requires a public entity to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

**28 CFR 35.130(b)(1)** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Armstrong v. Brown settlement agreement.***

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*Evacuation Procedures:*

*Each institution/facility (DPP designated institutions, nondesignated institutions, and reception centers) shall ensure the safe and effective evacuation of inmates with disabilities.*

*Local evacuation procedures shall be adopted at each facility.*

*Each institution/facility (DPP designated institutions, nondesignated institutions, and reception centers) shall ensure custody staff in housing units where inmates with disabilities that impact placement reside maintain a copy of the identification card/picture for that inmate with the inmate roster, to alert unit staff of the special needs required for emergency evacuation of the inmate. Special needs may include personal notification for hearing-impaired inmates, or assistance provided to vision or mobility impaired inmates in responding to emergency situations.*

*Evacuation procedures shall be effectively communicated to disabled inmates during orientation process. These procedures shall also be incorporated into unit staff's post orders.*

## Mechanical Restraints/Searches/Count

The Minimum Standards for Local Detention Facilities, Title 15-Crime Prevention and Corrections, Division 1, Chapter 1, Subchapter 4, Article 5. Classification and Segregation, contains the following section applicable to Mechanical Restraints:

§ 1058. Use of Restraint Devices.

The facility administrator, in cooperation with the responsible physician, shall develop written policies and procedures for the use of restraint devices and may delegate authority to place an inmate in restraints to a physician. In addition to the areas specifically outlined in this regulation, at a minimum, the policy shall address the following areas: acceptable restraint devices; signs or symptoms which should result in immediate medical/mental health referral; availability of cardiopulmonary resuscitation equipment; protective housing of restrained persons; provision for hydration and sanitation needs; and exercising of extremities.

Restraint devices shall only be used on inmates who display behavior which results in the destruction of property or reveal an intent to cause physical harm to self or others. Restraint devices include any devices, which immobilize an inmate's extremities and/or prevent the inmate from being ambulatory. Physical restraints should be utilized only when it appears less restrictive alternatives would be ineffective in controlling the disordered behavior.

Inmates shall be placed in restraints only with the approval of the facility manager, the facility watch commander, or the designated physician; continued retention shall be reviewed a minimum of every two hours. A medical opinion on placement and retention shall be secured as soon as possible, but no later than four hours from the time of placement. The inmate shall be medically cleared for continued retention at least every six hours thereafter. A mental health consultation shall be secured as soon as possible, but in no case longer than eight hours from the time of placement, to assess the need for mental health treatment.

Direct visual observation shall be conducted at least twice every thirty minutes to ensure that the restraints are properly employed, and to ensure the safety and well-being of the inmate. Such observation shall be documented. While in restraint devices all inmates shall be housed alone or in a specified housing area for restrained inmates which makes provisions to protect the inmate from abuse. In no case shall restraints be used for discipline, or as a substitute for treatment.

The provisions of this section do not apply to the use of handcuffs, shackles or other restraint devices when used to restrain inmates for security reasons.

The SCSD detention facilities Operations Orders applicable to inmate searches, mechanical restraints, and inmate counts, are outlined in the following Orders:



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

02/01 Use of Force; 02/02 Use of Restraint Devices; 02/03 Use of Pro-Straint Chair; 02/05 Custody Emergency Response Team (CERT) and Cell Extraction Procedure; 02/06 Prisoner Searches; 02/12 Transportation of Prisoners; 04/01 Intake, Search, Reception and Holding; 04/04 Use of Sobering Cell; 04/05 Use of Safety, Segregation, North Holding #2, and Multipurpose Rooms; 06/04 Counts and Lockdowns; 06/06 Organized Searches in a Housing Unit (Shakedowns), and 06/08 Court Pull Procedures.

The CHS Administrative Policies applicable to inmate searches, mechanical restraints, and inmate counts, are outlined in the following policies: 1413 Use of Restraints and the Pro-Straint Chair; 1414 Restraint Check Method; 1415 Patients in Safety Cells; 1416 Patients in Segregation; and 1425 Patients in Segregated Cells at Intake.

Operations Order 02/01 Use of Force, states in part, "Officers shall use only that force which is reasonable, given the facts and circumstances perceived by the officer at the time of the event, to effectively bring an incident under control. The reasonableness of the force used must be judged from the perspective of a reasonable officer on the scene at the time of the incident."

It also states in part, "The application of force shall cease when control of a prisoner or situation is achieved and shall not be used as a form of punishment. The objective in applying reasonable force is to control persons and incidents thereby minimizing injury to all persons involved."

With regard to Alternative Resolutions in Lieu of Force/De-escalation, it states,

"Staff should be cognizant of the unique environment in a correctional setting. Each situation shall be evaluated to determine the urgency of enforcement action. In situations where an immediate response may escalate or aggravate the situation, officers should consider the containment of the event as a tactic. Further, staff shall appropriately de-escalate the level of force in response to the suspect's level of compliance. Possible alternative resolutions in lieu of the application of force include:

- Containment of the situation;
- Shutting off utilities (Water, Electricity);
- Negotiation; and
- Waiting situation out until suspect(s) voluntarily comply

Operations Order 02/02 Use of Restraint Devices, states in part, "Restraint devices shall only be used on prisoners who display behavior that results in the destruction of property or reveals the intent to cause physical harm to self or others. Physical restraints should be utilized only when it appears less restrictive alternatives would be ineffective in controlling the disorderly behavior. The use of restraints shall not be used as a form of discipline or as a substitution for treatment. Sworn staff utilizing restraints shall be trained in the proper use of the

device(s). The provisions of this order do not apply to the use of handcuffs, shackles, or other restraint devices when used to restrain prisoners for security or transportation purposes. Sworn staff has the option of using an appropriate authorized restraint device to move or restrain a prisoner for security reasons."

The Order also states in part, "Restraint devices include any devices which immobilize a prisoner's extremities and/or prevent the prisoner from being ambulatory. The following restraint devices are authorized for use:

- Pro-Straint Chair;
- Protective Helmet;
- Handcuffs / Leg Shackles / Belly Chains;
- Posey (5-point) soft ties;
- Leather leg and/or wrist cuffs;
- Plastic Handcuffs;
  - Plastic cuffs should only be used when none of the more conventional methods can be used due to the size of the inmate or lack of available equipment. A cutting tool must be readily available in case the cuffs need to be removed;
- Multi-Prisoner Cuff Chains (used for transportation/security only); and
- R.E.A.C.T. Belt (used only in court when authorized).

With regard to Procedures and Observation of Restrained Prisoner, the Order also states in part, "Custody staff shall follow these procedures when restraining prisoners, who threaten or display behavior that results in the destruction of property or reveal an intent to cause physical harm to self or others, in restraint devices: Prisoners shall be placed in restraints only with the approval of the watch commander or designated watch commander;

- Restraints shall not be used in a manner that would cause unnecessary injury or discomfort. Only sworn staff shall apply and remove restraints. Sworn staff applying the restraints shall always thoroughly search the prisoner, double-lock the restraints, and check all restraints to reduce the risk of injury to the inmate;
- A "Spit Net" will be used when appropriate to prevent spitting or biting;
- While in restraint devices all prisoners shall be housed alone or in an area that will protect the person from abuse;
- A custody supervisor shall ensure the prisoner's sanitary needs are met;
- A medical evaluation shall be requested and conducted, if possible, within the first fifteen (15) minutes and every two hours thereafter. Prisoners restrained for a period exceeding six (6) hours shall require a medical evaluation prior to continuance of such restraints;
- Custody staff shall conduct direct visual observation of the restrained prisoner at least twice every thirty (30) minutes to ensure the restraints are properly employed and to ensure the safety and well-being of the prisoner;

- A custody supervisor shall conduct a direct visual observation once every thirty (30) minutes;
- Continued retention in restraints beyond one hour shall be reviewed and approved by the watch commander or designated watch commander. Clear and articulable facts must exist to justify continued retention.
- A mental health evaluation shall be requested and conducted as soon as possible but within six (6) hours of placement in restraints.    Prisoners restrained for a period exceeding six (6) hours shall require a mental health evaluation prior to continuance of such   restraints."

The Order further states in part, "Prisoners housed in the Acute Psychiatric Unit (JPS) at the **Main Jail**, shall require the consent of the psychiatrist or designee prior to being placed in restraints except when emergency circumstances exist;

- Upon the request by JPS personnel to restrain a prisoner, custody   staff shall notify a watch commander and receive additional authorization;
- Prisoners shall be restrained in those cells designated for JPS use  and JPS staff shall primarily be responsible for observation of the prisoner;
- Custody staff assigned to the medical floor will be responsible for following the procedures outlined in Section III."

With regard to dialysis treatment, the Order states in part, "Restraints will not be routinely used on prisoners receiving dialysis    treatment.  Limitations of the use of restraints during dialysis:

- Restraints will only be applied on inmates who display behavior which results in the destruction of property or reveals an intent to cause physical harm to self or others; and
- An individualized assessment of any need for restraints will be made for each inmate who receives dialysis treatments."

Operations Order 02/03 Use of the Pro-Straint Chair, states in part, "The Pro-Straint Chair is a restraint device which immobilizes a prisoners extremities and/or prevents the inmate from being ambulatory.  Other restraint devices that may be utilized with the Pro-Straint Chair are:

- Handcuffs / Leg shackles;
- Leather leg and/or wrist cuffs;
- Protective helmet; and
- Soft restraints attached to the side of the Pro-Straint Chair."

The Order also states, "Custody staff shall follow these procedures when restraining prisoners, who threaten or display behavior that results in the destruction of property    or reveal an intent to cause physical harm to self or others, in the Pro-Straint Chair;

- The Pro-Straint Chair shall not be used in a manner that would cause unnecessary injury or discomfort.  Only sworn staff shall apply and remove

the restraints. Sworn staff placing a prisoner into the Pro-Straint Chair shall always thoroughly search the prisoner and double-lock and check all restraints/straps to reduce the risk of injury to the prisoner.;

- Prisoners may be placed in the Pro-Straint Chair with their hands handcuffed behind their back or with the prisoners arms handcuffed to the sides of the Pro-Straint Chair with soft restraints or handcuffs;
- If it becomes necessary to hold the prisoner handcuffed behind the back for more than one hour, the prisoner should be released from the metal handcuffs and re-handcuffed to each side of the Pro-Straint Chair with soft or "Posey" restraints or handcuffs;
- While in the Pro-Straint Chair, a prisoner shall be housed alone or in an area that will protect him/her from abuse;
- Custody staff shall notify a custody supervisor and request medical staff if the prisoner's condition appears to deteriorate;
- In addition to the cardiopulmonary resuscitation (CPR) equipment that is maintained at each medical station, rescue breathing "pocket" masks and Automated External Defibrillators are strategically placed throughout each facility, available for rapid emergency response in the event that CPR is necessary;
- A medical evaluation shall be requested and conducted, if possible, within the first fifteen (15) minutes and every two hours thereafter. Prisoners restrained in the Pro-Straint Chair for a period exceeding six (6) hours shall require a medical evaluation prior to continuance of such restraints;
- Custody staff shall conduct direct visual observation of a prisoner in the Pro-Straint Chair at least twice every thirty (30) minutes to ensure the restraints are properly employed and to ensure the safety and well-being of the prisoner;
- A custody supervisor shall conduct a direct visual observation once every thirty (30) minutes; and
- A mental health evaluation shall be requested and conducted as soon as possible but within six (6) hours of placement in the Pro-Straint Chair. Prisoners restrained for a period exceeding six (6) hours shall require a mental health evaluation prior to continuance of such restraints."

Operations Order 02/05 Custody Emergency Response Team (CERT) and Cell Extraction Procedures, states in part, "The intent of this is to establish consistent and safe methods to handle critical incidents that may require the utilization of C.E.R.T. and the implementation of cell extraction procedures to reduce the risk of injury to staff and prisoners. Safe procedures to extract a violent, non-cooperative or armed prisoner from his/her cell who fails to comply with direct orders will be addressed. Only the amount of force necessary to overcome resistance and maintain control shall be used during a cell extraction. The use of force shall cease when control of a prisoner or situation is achieved and shall not be used as a form of punishment. This policy is to be used in conjunction with,

but does not supersede, either the General Order or Correctional Services Operations Order regarding the use of force."

With regard to cell extraction procedures, the policy states in part, "The C.E.R.T. Sergeant or designee may take the following steps during the cell extraction:

- Direct the prisoner to voluntarily exit the cell;
- Direct the prisoner to comply with the commands given to him/her so that he/she can be escorted safely out of the cell;
- Give the prisoner reasonable time to comply with the commands;
- If the prisoner does not comply, the C.E.R.T. Sergeant or designee will direct the extraction team to remove the prisoner
- The C.E.R.T. Sergeant or designee will determine if the prisoner will be placed in:
  - An authorized restraint device(s) as per Operations Order 02/02, Use of Restraints; and
  - A safety or segregation cell, multipurpose room, or other area where the prisoner can be regularly monitored and safe from other prisoners as per Operations Order 04/05, Use of Safety Cell, Segregation Cell, North Holding #2, and Multipurpose Rooms;
- If the prisoner and/or staff are injured, necessary medical treatment will immediately be summoned. Treatment of the injured party will occur when the scene is rendered safe."

Operations Order 02/06, Prisoner Searches, states in part, "Intake staff shall use the type of search, level of force and means of restraint necessary to conduct a thorough search of combative, uncooperative or high-risk arrestees." It also states, "All strip searches shall be conducted individually and in an area of privacy so that the search can be observed only by officers participating in the search. Only necessary personnel shall be present during the search. At least two sworn personnel shall participate in a search."

Operations Order 02/12, Transportation of Prisoners, states in part, "Prior to transporting a prisoner from another facility, transport staff should check with custody staff, medical staff, and/or psychiatric staff to determine if the prisoner has any special needs or to determine any anticipated behavior…. Transporting deputies shall minimally conduct a pat-down search and metal detector search consistent with departmental guidelines on all prisoners before placing the prisoner in the vehicle…. Transporting deputies shall ensure that all prisoners are restrained. All restraints that have a locking cuff will be double locked. All prisoners will be restrained by one of the following means:

- Handcuffs;
- Security Belly/Waist Chains;
- Leg Chains/Shackles; and
- Multiple Prisoner Chains (four, six, ten, chains).



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

The Order also states, "If a vehicle needs to be evacuated at any time during a transport, deputies may have prisoners stand, sit, kneel, or lie prone in a safe area. One deputy shall monitor the prisoners. Medical needs, not perceived as emergencies, shall be attended to by medical staff upon arrival at the destination or as soon as practical."

Operations Order 04/01 Intake, Search, Reception and Holding states in part, "If a strip search is required, the search shall be performed in accordance with Operations Order 02/06", and also states, "telephone access to the prisoners will be provided in accordance with Operations Order 06/13-Telephone and TDD/TTY Equipment Access."

Operations Order 04/04 Use of Sobering Cell, states in part, "Prisoners placed in the sobering cell should be medically cleared for custody by medical staff, and should not have a medical condition which requires emergency medical treatment. It also states, "Custody staff shall perform direct visual observations of prisoners in a sobering cell no less than once every half hour. Each check shall include a visual check of the prisoner to ensure he or she is breathing regularly. An arousal attempt to ensure the prisoner will respond to verbal or pressure stimulation shall be done by custody staff." It further states, "Prisoners will not remain in a sobering cell longer than six (6) hours without an evaluation by medical or custody staff to determine if the prisoner has an urgent medical problem", and "[i]f the prisoner has a serious medical condition, he or she will be removed from the sobering cell. Urgent medical needs will be addressed by available medical staff or the prisoner will be referred to the appropriate medical facility. A report will be taken to document the incident."

Order 04/05 Use of Safety, Segregation, North Holding #2, and Multipurpose Rooms, states in part, "The Safety Cell shall only be used to hold those prisoners who threaten or display behavior that endangers self, other people, or property. Examples include, but are not limited to:

- Combative or violent behavior;
- Threats or attempts to harm self or others; and
- Destruction of property."

The Order also states, "Prisoners placed in physical restraints may be placed in a safety cell" and " shall only be kept in a safety cell until they are no longer a danger to self or others and/or they no longer pose a threat to the safety or security of the facility."

The Order further outlines the following:

"Custody staff shall make reasonable accommodations to provide prisoners access to the inmate telephone system in accordance with California Penal Code 851.5. Custody staff shall document the telephone access for prisoners placed



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

in segregation cells and/or will document the reasons why telephone access is restricted;

Prisoners in housing units who are in need of immediate mental health services referral and/or have been placed in restraints may be temporarily placed in a multipurpose room or North Holding #2 at RCCC for observation;

Custody staff shall notify medical staff within fifteen (15) minutes that a prisoner is temporarily housed in a safety or segregation cell and shall work with medical staff to address the nutritional, fluid, and hygiene needs of the prisoner; and

If a prisoner's behavior indicates that entering the cell to provide food, fluids, medical evaluation, or sanitary needs would result in a use of force incident or be unsafe for the prisoner, medical staff, or deputies, then a supervisor shall be notified."

Operations Order 06/04 Counts and Lockdowns, states in part, "Scheduled lockdowns and counts of all prisoners shall be conducted at least three times during each shift.  Each shift shall be responsible for conducting one face-to-locator counts as described in Section III of this order conducted at the beginning of a shift."

The Order also states, in part, "Prisoners housed in infirmary cells shall be locked down at all times unless undergoing medical treatment which makes it necessary for them to be out of their cells... The standard procedure for advising prisoners to return to their cells is via a verbal announcement or an announcement over the intercoms located in the housing units."

Operations Order 06/06 Organized Searches in a Housing Unit (Shakedowns), states in part, "Routine searches shall be conducted by custody staff to maintain the security of the facility, provide for the safety of staff and inmates, and to provide for the division commander to manage operations.  These described searches shall be conducted by sworn and non-sworn staff of all areas of the facility to which prisoners and/or the public have or could have access."

Operations Order 06/08 Court Pull Procedures, states in part, "If a prisoner(s) is leaving a custody facility to attend court in a different building, custody staff shall apply the proper restraints for transport.  Prisoners restrained solely for security reasons are not subject to Title 15, Section 1058 restraint device requirements.  The restraints may include a multi prisoner handcuff chain or belly chain/shackle combination. Although not preferred, handcuffs or other restraint devices may be used with supervisor approval."  It also states, "Transport staff is responsible for segregating prisoners in the transport vehicle according to classifications."

Correctional Health Services (CHS) Administrative Policy 1413 Use of Restraints and the Pro-Straint Chair, states in part, "Restraint devices may be used to overcome resistance and to gain and maintain control of persons in custody.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Restraint devices include any devices which immobilize an inmate's extremities and/or prevent the inmate from being ambulatory. The use of restraints shall not be used as a form of punishment. Except as defined separately under Jail Psychiatric Services Policy, the application of restraints is not initiated by medical staff."

The Order also states in various parts, "Deputies shall visually monitor inmates restrained in Safety and/or Segregation Cells at least twice every thirty (30) minutes. Deputies shall document observations in the Safety and/or Segregation Log", and "Deputies shall notify a Sergeant and request medical staff if the inmate's condition appears to deteriorate."

The order also indicates the following: the Sergeant shall review the continued need for restraint of the inmate at least once every two (2) hours; a medical evaluation shall be requested within the first fifteen (15) minutes and every two (2) hours thereafter which will include circulatory status and vital signs; and inmates restrained for a period exceeding eight (6) hours shall require a medical and mental health examination prior to continuance of such restraints.

The (CHS) Administrative Policy 1414 Restraints Check Method, states in part, "Restraint checks will be completed by medical staff on all individuals placed in physical restraints by custody. Patients in the Psychiatric Unit will be monitored by JPS staff. Restraint checks will be initiated within 15 minutes of the time medical staff is notified that an individual has been placed in restraints. Deputies will perform a visual restraint check twice every thirty minutes. Additional checks will be completed by medical staff when medically indicated to ensure restraints are properly employed. All necessary adjustments to the position of restraints will be completed by custody. Each restraint-check by nursing staff will be documented on the Restraint Check Flow Sheet by the Nurse. Medical evaluation, including the circulatory status and vital signs, will be completed on restrained individuals within the first fifteen minutes, and at least every two (2) hours, and as often as medically indicated."

The Order also states in part, "JPS will be notified of the individual's placement in restraints." The Order contains language that recommendations shall be made to custody every two hours for range of motion to all extremities based upon nursing judgment, and that in cases of persons with altered sensorium or possible history of diabetes or overdose, the physician shall be contacted.

Correctional Health Services (CHS) Administrative Policy 1416 Patients in Segregation states in part, "Inmates that have been removed from the general population and placed in segregation are evaluated daily by medical personnel, and these encounters are documented. Notations are made of any signs of physical illness or trauma. Observations regarding the patient's attitude or outlook such as depression, suicidal ideations shall be reported to Nursing Supervisor and documented." It also states, "Behavior permitting, inmates in



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

administrative segregation are not to be deprived of privileges afforded other Inmates. All health care services are available."

The (CHS) Administrative Policy 1425 Patients in Segregated Cells at Intake, states in part, "Recently arrived arrestees with behavior serious enough to require isolation in a segregation cell may have underlying medical or mental health problems. Medical staff must be alerted when an arrestee, who may be unknown to facility staff, is placed in a segregation cell." It also states, "Evaluation shall emphasize detection of serious infectious disease, head trauma, acute states of delirium, and serious mental disorders which would require intervention to prevent life-threatening deterioration." The Order states, "Once the initial assessment has been completed, nursing staff will continue to assess, evaluate and document every six (6) hours", and "The Nursing Supervisor will be notified when a patient has remained in a segregation cell for eight hours. If an arrestee remains in the segregation cell for 24 hours, he/she must be evaluated by a physician. Should the nurse observe a significant change in the patient's condition or an injury, the Nursing Supervisor and the physician shall be notified immediately."

With the exception of mental illness, all of the aforementioned SCSD detention facilities Operations Orders and CHS Policies are silent regarding inmates with mobility impairments (or other disabilities). Likewise, there is no information regarding accommodations for mobility-disabled inmates (including those with prosthetic limbs), such as those inmates whose disabilities may prevent the application of restraint equipment in the ordinarily prescribed manner. Reasonable accommodations must be applied in these instances as warranted. There is no policy or procedure verbiage with respect to mechanical restraints being applied to ensure effective application while reasonably accommodating an inmate's mobility disability.

None of the Orders contain procedures for custody staff to follow relative to mobility-disabled inmates during the pat-down or strip search process. There is no information pertaining to inmates who use wheelchairs and/or who have severe mobility impairments and are unable to perform standard strip search maneuvers to be afforded reasonable accommodation to ensure a thorough search.

None of the Orders contain information or direction to staff relative to prosthetic devices, dental plates, or other removable items. There is no language pertaining to modifications for pat-searches or strip-searches, for inmates who have a disability (mental or physical) that prevents the employment of standard search methods.

None of the Orders contain procedures as to what to do in the event an inmate does not voluntarily remove or relinquish his/her prosthetic device during the unclothed body search process.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Operations Order 06/04 Counts and Lockdowns does not require standing inmate counts, therefore there is no reasonable accommodation concerns for this area.

Operations Order 02/05 CERT and Cell Extraction Procedures is silent with respect to inmates with mobility disabilities (including those with prosthetic limbs). As a result, there are no specific procedures for staff to follow with regard to consideration for accommodations for mobility-disabled inmates or those with prosthetic limbs during these occurrences.

None of the aforementioned Operations Orders or CHS Policies pertaining to safety cells, sobering cells or Pro-Straint Chair, and Safety and Segregation Rooms contain any language pertaining to inmates with mobility disabilities, or prosthetic limbs, or directions for custody staff to follow regarding application of restraints on an inmate with a prosthetic limb prior to being placed in a Restraint Chair.

Operations Order 06/08 Court Pull Procedures, does not contain language requiring staff to ensure that inmates with prescribed HCAs/ADs/DME are allowed to maintain their devices at all times, including the time period while the inmate is waiting in the court processing/holding area while being processed to or from court.

The Order (as well as all of the aforementioned Orders and Policies are silent with regard to possible assistance (staff assistance or inmate assistance), which could be provided for inmates with severe mobility impairments, e.g., wheelchair users, or those who may have difficulty ambulating to or from court, with or without an assistive device.

## Observations

The Assessment Team did not observe the court processing, as those services are under the authority of the county and court system.  The Assessment Team did observe the court processing (bus loading process) at both the MJ and RCCC jails.  Detailed information is contained in the Transportation section of this report.

**The Assessment Team did not observe any physical restraints being actively applied.**

## Staff Interviews

The Assessment Team did not interview deputies assigned to the court processing area, as the process is under the authority of the county and court system.   The Transportation section of this report captures interviews of Transportation staff.

Most of the custody staff (MJ and RCCC) that was interviewed was not aware of any specific procedures pertaining to special accommodations for mobility impaired inmates (or those with prosthetic devices) during the search restraint process, and they had not been trained in that area. Nearly all of the custody staff who were interviewed had not had to search a mobility impaired inmate wheelchair user or an inmate with a prosthetic limb. However, most indicated that they would conduct any searches in a separate setting (except during emergencies), and would preserve the inmate's dignity. Most of the staff indicated that they would accommodate inmates with reasonable accommodations as necessary, e.g., using a chair next to the wheelchair to transfer back and forth during the search process, etc.

### Inmate Interviews

The Assessment Team did not interview any inmates during the transportation or court bus loading process. The Assessment Team did not interview any inmates during the court movement process, as the oversight authority for that process falls under the county and court system.

### Conclusion

The SCSD detention facilities do not currently have adequate SCSD detention facilities Operations Orders or CHS policies, procedures and training in place to ensure that staff provides mobility-disabled inmates (including those with prosthetic limbs) the necessary accommodations with respect to using mechanical restraints and conducting searches. It is essential that this be incorporated into the orders, policies and training and that staff be sufficiently trained within the local policies.

The SCSD detention facilities Operations Orders should contain procedures with regard to possible assistance (staff assistance or inmate assistance), which could be provided for inmates with severe mobility impairments, e.g., wheelchair users, or those who may have difficulty ambulating to or from court, and other areas with or without an assistive device.

The SCSD detention facilities do not have a modified restraint policy for mobility-disabled inmates.

The SCSD detention facilities do not provide accommodations for mobility-disabled inmates who are subjected to body searches.

Operations Order 02/02 Use of Restraint Devices should include language regarding inmates with mobility disabilities. Specifically, the Order should include information relative to accommodations for mobility-disabled inmates (including those with prosthetic limbs), such as for those inmates whose disabilities may prevent the application of restraint equipment in the ordinarily prescribed manner. Language should also be included to indicate that reasonable accommodations must be applied in these instances as warranted. Procedure language should



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

articulate that when applying mechanical restraints staff must ensure effective application while reasonably accommodating the inmate's mobility disability.

Operations Order 02/06 Prisoner Searches (and possibly other related Orders) should include procedures for custody staff to follow in the event an inmate does not voluntarily remove or relinquish his/her prosthetic device during the strip-search search process. The Order and procedures should contain information for staff to follow relative to mobility-disabled inmates (including wheelchair users, and those with prosthetic limbs, etc.) during the clothed body search process. The Order should contain information pertaining to inmates who use wheelchairs and/or who have severe mobility impairments and are unable to perform standard strip search maneuvers to be afforded reasonable accommodation to ensure a thorough search.

Operations Order 02/05 CERT and Cell Extraction Procedure, should contain procedures regarding staff considerations when preparing to cell extract or while extracting mobility-disabled inmates (including those with prosthetic limbs).

Operations Order 04/05 Use of Safety, Segregation, North Holding #2, and Multipurpose Rooms, should contain procedures regarding the handling and placement of inmates with mobility disabilities.

Operations Order 02/03 Use of Pro-Straint Chair and CHS Policy 1413 Use of Restraints and the Pro-Straint Chair, should contain procedures for staff to follow relative to the application of restraints for inmates with a prosthetic limb prior to being placed in a Restraint Chair.

Operations Orders 02/12 Transportation of Prisoners, and 06/08 Court Pull Procedures, should include procedures which would require staff to ensure that inmates with prescribed or authorized HCAs/ADs/DME are allowed to maintain their devices at all times, including the time period while the inmate is waiting or preparing to be processed to or from court. The SCSD detention facilities policies should also include procedures regarding providing assistance (staff assistance or inmate assistance) to inmates with severe mobility disabilities, e.g., wheelchair users, or those who may have difficulty ambulating to or from court (or in preparation for court) with or without an assistive device.

The SCSD detention facilities' administration and staff should ensure the following; assistance is provided to inmates who struggle or may struggle to push themselves in their wheelchairs moving to or from court.

The SCSD detention facilities staff must not temporarily remove canes or other assistive devices, which have been prescribed to or otherwise authorized for the inmates, and staff must receive training to that end. Custody staff must be trained and understand the medical referral process for inmates who may have difficulties ambulating and may need a reasonable accommodation such as an HCA/AD/DME, i.e. a cane, walker, or crutches.

### References

**28 CFR § 35.130(a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR 35.130(b)(1)** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;

**28 CFR 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

**28 CFR 35.130(b)(4)** A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

**28 CFR 35.130(b)(7)** states that a public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

**28 CFR 35.130(b)(8)** A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

**28 CFR 35.130(h)** A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

***The information below is for reference only***.

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates the following relative to mobility-disabled inmates (and inmates with other disabilities):*
*Restraints*

- *Inmates who have a disability that prevents application of restraint equipment in the ordinarily prescribed manner shall be afforded reasonable accommodation, under the direction of the supervisor in charge. Mechanical restraints shall be applied to ensure effective application while reasonably accommodating the inmate's disability.*

*Searches*

- *Inmates who have a disability that prevents the employment of standard search methods shall be afforded reasonable accommodation under the direction of the supervisor in charge. Such searches shall be thorough and professional, with the safety and security being the paramount concern.*

- o *Inmates who use wheelchairs and who may have severe mobility impairments and are unable to perform standard unclothed body search maneuvers shall be afforded reasonable accommodation to ensure a thorough search, including body cavities. If the search includes removal or disassembly of a health care appliance, it shall be conducted in a clean setting.*
- o *If a search requires removal of the appliance, a compliant inmate shall be allowed to remove the appliance and tender it to staff. If forcible removal of an appliance from a noncompliant inmate is necessary, health care staff shall be available for consultation regarding the safe removal of the appliance.*
- o *No inmate/parolee shall be required to lie or sit on extremely hot or cold surfaces to perform strip search maneuvers.*
- o *Health appliances attached to the inmate's/parolee's body will be removed for inspection only during an unclothed body search.*
- o *Complex devices (i.e., electronic medical devices, etc.) shall be· disassembled for inspection only when there is reasonable cause to believe the inmate has concealed contraband inside the device. Inspection of such devices shall require approval from a Captain or above after consultation with appropriate medical staff. Only a trained professional shall disassemble such devices.*

- *To ensure the safety of staff and inmates/parolees, all institutions/facilities (DPP designated institutions, nondesignated institutions, and reception centers) shall establish procedures for the routine inspection of health care appliances, i.e., inspection of a mobility impaired inmate's prosthetic device whose disability does not impact placement.*

## Release/Discharge/Transfer

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures applicable to the release and transfer of inmates, and the issuance and retention of HCAs/ADs/DME are outlined in: Operations Orders 02/12 Transportation of Prisoners, 04/03 Prisoner Clothing, Property and Funds, 04/07 Dress In/Dress Out Procedures, 04/09 Releases, 04/10 Property and Money Return and Release Procedure, Draft Operations Order Inmates With Disabilities - ADA, Policy 1423 Post Release Medical Care Planning, and Policy 1439 Reports of Disabilities and Impairments.

These policies are silent with respect to the disposition of prescribed HCAs/ADs/DME upon the release and transfer from the SCSD detention facilities. In an effort to identify the practice of whether inmates are allowed to retain their devices upon transfer or release, the Assessment Team interviewed custody, transportation and medical staff. The Assessment Team also observed the inmate release process at the MJ and RCCC.

### Observations

The Assessment Team observed the release process at the MJ and RCCC. During the observations there were no disabled inmates with prescribed HCAs/ADs/DME being released or discharged. The Assessment Team also toured the property rooms in both the MJ and RCCC. During the tour/observations the team identified numerous HCAs/ADs/DME that were stored in the property rooms at both MJ and RCCC property rooms. The team identified the following HCAs/ADs/DME being stored; a wheelchair, and numerous walkers, canes, and crutches.

### Staff Interviews

The Assessment Team interviewed transportation staff as well as deputies assigned to the inmate release process. Staff who were interviewed stated there is no tracking system to identify inmates who are disabled or who have an HCA/AD/DME prescribed to them. Some staff stated that if the inmates had an assistive device on their person, when released the inmates would be allowed to retain their respective device. Other staff stated that an inmate would not be released with the assistive device unless it was verified that it was his/her personal property.

The Assessment Team interviewed transportation staff relative to the transfer of disabled inmates with HCAs/ADs/DME. Staff stated that disabled inmates are transferred with their device. Staff also mentioned that inmates are allowed to use their HCA/AD/DME to access the transportation vehicle at which point the device is retained by staff until the transport has reached its final destination. The inmate is then re-issued their HCA/AD/DME to exit the transportation vehicle.

The Assessment Team interviewed medical staff assigned to the area responsible for the issuance of HCAs/ADs/DME and custody staff involved in the release process. Medical staff stated that the HCAs/ADs/DME issued by the SCSD detention facilities do not become the property of the disabled inmates, and inmates are not supposed to take them when released. One RN stated that arrangements could possibly be made for permanent full time wheelchair users to be released with a wheelchair. Custody staff stated that the inmates could retain their HCAs/ADs/DME when released; however, wheelchairs are not provided to the inmates upon release. Staff stated that they would try to see if someone could pick the inmate up as opposed to allowing the inmate to be released with a county-issued wheelchair. Staff stated that there have been occasions when an inmate's personal HCA/AD/DME was put in stored property and they had to issue an HCA/AD/DME to the inmate upon his/her release.

## Conclusion

There was conflicting information provided by staff whether inmates are allowed to retain their HCA/AD/DME when being released. In addition, the SCSD detention facilities do not have a policy regarding the retention of the devices for inmates that are being released. The Assessment Team observations of the property room storage that had HCAs/ADs/DME being stored was very concerning. There is not an effective tracking system in place for inmates that have been issued or arrived into custody with a HCA/AD/DME. There is a potential possibility that some disabled inmates are being released without their HCA/AD/DME, which are necessary for them to ambulate.

The SCSD detention facilities do not have a policy for the retention of HCAs/ADs/DME by disabled inmates that are being transferred. The Sacramento County Jail must incorporate provisions into their operations orders to ensure inmates are permitted to retain their prescribed or authorized HCAs/ADs/DME upon release, transfer or discharge.

## References

**28 CFR § 35.130 (a**) states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.130(b)(7)** states that a public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

**28 CFR 35.130(b)(1):** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
>
> (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

**28 CFR 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

> (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Armstrong v. Brown settlement agreement.***

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*Health Care Appliances:*

*Health care appliances shall be retained and maintained by inmates upon release to parole.*

*Transportation:*

*The special needs of inmates with disabilities shall be considered in transporting them. An inmate's special health care aids and appliances shall be transported with the inmate upon transfer.*

## Transportation

The Sheriff's Department County of Sacramento Correctional Services Operations Orders applicable to inmate transportation are outlined in Operations Orders 02/12 Transportation of Prisoners, 02/13 Inter-Facility Transfers/Court Appearances, and 03/07 Medical Emergencies.

Per Operations Order 02/12, custody staff assigned to the transportation of prisoners shall transport prisoners in a manner that will provide the highest levels of safety and security available to both the prisoners and transport staff. Custody staff shall operate Sheriff Department vehicles in accordance with the General Orders and state law.

Sworn staff assigned to the correctional facilities may be responsible for transporting prisoners. Prisoner transport may occur for a variety of reasons and may be scheduled or unscheduled. Most scheduled transports are conducted by the Long Haul Transportation Unit, the Medical Transportation Units, and the RCCC Facility Transportation Bus Details; however, it may become necessary for the individual shifts to assign staff for transportation duties.

Situations where individual shifts may be responsible for supplying transportation staff may include:

- Unscheduled emergency medical transports "Med Runs".
- Transportations to the Sacramento County Mental Health Center (SCMHC).
- Late notice scheduled medical appointments.
- Warrant pickups from other agencies.
- Inter-facility transfers (FATRNS).

Medical Transport Units ("Med Transport") operate out of the MJ and RCCC. Each facility has designated personnel that are responsible for transporting inmates to and from scheduled appointments.

The Long Haul Transportation Unit operates out of the MJ Division and is supervised by the Intelligence Unit Supervisor. The Long Haul Transportation Unit is responsible for transporting inmates to various places within the State of California. The unit is minimally responsible for transporting the following inmates:

- All newly committed state prisoners to state facilities.
- Prisoners returning from state and county facilities back to Sacramento County per court order.
- Prisoners committed to state and mental health facilities.
- Persons held in other California jurisdictions on Sacramento County Superior Court and Sacramento County Juvenile Court warrants.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Sacramento County Juvenile Probation Wards to their guardian's county of residence.
- Local prisoners scheduled for satellite courts within the county.

The RCCC Facility Transportation Bus(es) ("branch bus") operates out of RCCC and is supervised by on duty RCCC shift supervisors. The RCCC buses are generally used for transporting prisoners scheduled for court and inter-facility transfers to and from the MJ and RCCC.

Transportation staff assigned to transport prisoners shall, prior to transporting a prisoner from another facility, check with custody staff, medical staff, and/or psychiatric staff to determine if the prisoner has any special needs or to determine any anticipated behavior.

Transporting deputies shall ensure that all prisoners are restrained. All restraints that have a locking cuff will be double locked. All prisoners will be restrained by one of the following means:

- Handcuffs
- Security Belly/Waist Chains
- Leg Chains/Shackles
- Multiple Prisoner Chains (four, six, ten, chains)

Unscheduled "med runs" are typically handled by the individual shifts. Staff assigned to a "med run" involving prisoners having an emergency medical issue that requires ambulance transport shall follow the procedures outlined in the previous sections.

Per Operations Order 02/13, Inter-Facility Transfers/Court Appearances, RCCC booking staff will verify releases and which prisoners will go on Bus #1. Releases from RCCC without their own transportation arrangements will be transported to the MJ. Releases from RCCC will be processed within the MJ Central Control lobby. Bus Crew #1 will coordinate with MJ Central Control in securing the Central Control Lobby and processing the group of released prisoners. Once the release process is completed the prisoners will be directed out through the Front Lobby.

RCCC prisoners with court appearances generally will not gather their cell/tank property as it is anticipated they will return to RCCC upon completion of the court appearance. RCCC Bus Crews will coordinate with Court Transportation for exchange of inmates in the MJ garage.

After transporting the first group of inmates to court, Bus Crew #1 will transport FATRNS to RCCC, focusing on taking the general population transfer inmates. Departure from the Main Jail is approximately 0700 hours. The inmate files and paperwork bound for RCCC should transfer on the same trip as the transferring inmates. RCCC laundry services will be notified of the arriving transfers.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Bus Crew #2 will transport FATRNS to RCCC, focusing on taking the remaining general population transfer inmates and inmates who need to be separated from the general population. Upon returning to RCCC, Bus Crew #1 will transport remaining inmates with court appearances and assist with processing FATRNS as needed.

The bus crews will coordinate with Court Transportation for court returns at approximately 1130 hours and will transport afternoon court appearances from RCCC. Arrival at the MJ is approximately 1230 hours. Bus crews will coordinate with Court Transportation for court returns at approximately 1500 hours and again at approximately 1700 hours. Any inmates remaining in court or at the MJ after 1700 hours will be transported to RCCC, prior to 2300 hours. Transportation duties will be a shared responsibility between MJ and RCCC. On odd numbered calendar days, RCCC will be responsible for transportation. On even numbered calendar days, MJ will be responsible for transportation.

Per Operations Order 03/07, Medical Emergencies, if medical staff determines the inmate must be transported to an outside medical facility, a sworn supervisor shall assign custody staff to accompany the inmate. If the inmate is transported by ambulance, at least one custody staff member shall accompany the inmate in the ambulance. Additional custody staff may respond to the hospital in a separate Sheriff's Department vehicle. If the inmate is to be transported by custody staff, normal transportation procedures shall apply.

## Observations

The Assessment Team observed two deputies coordinate and process a busload of inmates being transported from the RCCC to the MJ (releases and court). One of the inmates that was processed and boarded that particular transport bus was walking with assistive devices (crutches). During the processing, the transporting deputy processed the inmate last, allowed him to use his assistive devices until he was seated in the transport bus, at which point the deputy took the assistive devices and secured them for the transport. The deputy assisted the inmate in navigating up the bus steps stabilizing the inmates and ensuring he did not fall.

Although not assigned to the SCSD detention facilities transportation teams, the Assessment Team observed 2 court transportation deputies process 2 mobility disabled inmates onto a wheelchair accessible transport vehicle. One of the inmates was able to navigate into the vehicle, as he wasn't a fulltime wheelchair user. The deputies assisted him into the transport vehicle. The other inmate was a fulltime wheelchair user and the deputies after lifting the inmate and the wheelchair into the vehicle, ensured the inmate in his wheelchair was secured with the wheelchair straps.

The Assessment Team inquired about the accessible vehicles used to transport wheelchair users. MJ staff advised the Assessment Team that the accessible

transport vehicle was maintained in a county vehicle garage next the MJ. The Assessment Team obtained the keys to the vehicle and with the assistance of a county garage employee examined the accessible transport vehicle. The vehicle can accommodate one wheelchair user, the lift is functional, has the safety straps/belts for securing the wheelchair and inmate, and they appear to meet safety and ADA regulations.

## Staff Interviews

The Assessment Team asked questions of various deputies, including those assigned to Long Haul transportation, RCCC facility transport, and medical transports.

The deputy assigned to Long Haul transportation stated that the identification of disabled inmates that require wheelchair accessible transportation is based on the location of the inmates housing. Inmates in wheelchairs are housed on the 2nd floor and this would alert them of the need for the accessible vehicle. If a disabled inmate with an assistive device (cane, walker etc.) is being transported, they are allowed to retain their assistive device until they are seated at which time the transporting officer stores the assistive device until the inmate arrives at his/her destination. Once at the destination, the inmate can again use the assistive device to disembark the transportation vehicle. In the event the inmate requires assistance in navigating the steps to the bus, the deputies assist the inmate in boarding the bus. If an inmate cannot safely board the bus with staff's assistance, the inmate would be transported in an accessible vehicle. The deputy stated that there is one wheelchair accessible vehicle to transport disabled inmates that require accessible transportation.

The deputy assigned to RCCC facility transport stated that they receive the court list of inmates to be transported. There may be information in JIMS (PF4/PF10) that would alert them of a disabled inmate and the need for an accessible vehicle. The inmate's housing (M-Barracks/MHU) may also alert transportation staff of a disabled inmate's need for accessible transportation. In the event they need a wheelchair accessible van, transportation staff must get the van from the MJ since the wheelchair accessible vehicle is kept there. The deputy stated that if a disabled inmate with an assistive device (cane, walker etc.) is being transported, they are allowed to retain their assistive device until they are seated at which time the transporting officer stores the assistive device until the inmate arrives at their destination. Once at the destination, the inmate can again use the assistive device to disembark the transportation vehicle. In the event the inmate requires assistance in navigating the steps to the bus, the deputies assist the inmate in boarding the bus. If an inmate cannot safely board the bus with staff assistance, the inmate would be transported in an accessible vehicle. The deputy stated that there is one wheelchair accessible vehicle to transport disabled inmates that require accessible transportation.

The SCSD detention facilities transportation staff stated that this is the only ADA accessible transport vehicle available for transporting inmates that require accessible transportation from the MJ to other jurisdictions (jails/prisons), medical transports, from the MJ to RCCC and from RCCC to the MJ.

The staff responsible for issuing the keys to the wheelchair accessible vehicle stated that there is no specific tracking of disabled inmates transported by the vehicle other than the record of staff who were issued the vehicle keys.

**Inmate Interviews**

During the inmate interviews some disabled inmates stated that deputies provide accommodations during the court transport process such as, assisting them up the vehicles and providing assistance in pushing wheelchairs; however, some reported the following issues and concerns regarding the transpiration process:

- Inmate housed in CBF stated that after arrival at the MJ he was transported to court in a "paddy wagon". The vehicle has steel benches and no handrails for him to hold on to during the transport and it is very difficult for him to remain seated without falling to the vehicle floor. He stated he is transported in a wheelchair from his housing unit to the transportation area and from the vehicle to the courthouse;
- Inmate housed in 2 East stated that he has to crawl into the van when being transported to court;
- Inmate housed in 2 East stated he is usually transported in a wheelchair; however on one occasion a wheelchair was not provided;
- Inmate housed in 2 East stated that when he was housed at RCCC he had to crawl into a regular van. Claims that the deputies told him if he didn't get in the vehicle, he was essentially refusing court. He further claims that on one occasion when he was scheduled for court staff did not transport him to court. Following this, his attorney asked him why he had refused court, and he advised his attorney that he had not refused;
- Inmate housed in 2 East stated he has been left on 3 separate occasions when he was scheduled for court and no accessible vehicle was available. Claims the deputies advised the court that he had refused court. Stated that he is transported in a big "paddy wagon" and staff tell him to try to get up on the vehicle, and he has to slide to get on;
- Inmate housed in 4 East stated that he is not provided accommodations for long distances and stairs;
- Inmate housed in 4 West stated that it is very painful to walk to court. When he doesn't go to court across the street it is very difficult to walk up the stairs;
- Inmate housed in 5 West stated that cane was taken away in court holding cell. Claims he has to climb up stairs to court. States it is very difficult with a cane, and;

- Inmate housed in 6 West stated that cane was taken away in court holding cell;
- Inmate housed in 2M stated that custody staff broke his wheelchair when they tried to force it into the wheelchair van, and thus jammed it against the lift;
- Inmate housed in 2M stated that he has broad shoulders, and it is very painful when the custody staff does not double handcuff him. He has to walk up 2 sets of stairs to court with the restraints on while in pain, and he claims it is dangerous walking up the stairs;
- Inmate housed in 6E stated that he has been transported where staff didn't let him use his cane to get on to the transport vehicle. On one occasion he refused, and ultimately a judge ordered the administration to provide him a wheelchair in the future;
- Inmate housed in 7W claimed that he has to get out of his wheelchair and "crawl" into the van and seat. He acknowledged that staff does assist him. He stated that on about three occasions, custody staff hurt him while trying to help him, as they "grabbed" his arms and bruised him; and
- Inmate housed in 7W claimed that on one occasion, a custody officer tightened his handcuffs too tight, and he considered it "excessive."

## Conclusion

The SCSD detention facilities do not always provide reasonable accommodations for disabled inmates during transport to court. One of the most egregious ADA violations that the Assessment Team learned of pertained to staff requiring inmates to crawl into transport vehicles. It was also difficult to understand the process and temporary denial of canes while the inmates are placed in temporary holding cells with other inmates.

Alarming to hear were the claims that disabled inmates were not transported to court while the court was advised that the inmate had refused to attend court.

With the lack of a tracking system to identify disabled inmates and their accommodation needs, inmates are being required to access the courts without the necessary accommodations.

Operations Orders and practices should ensure that prescribed canes for disabled inmates are maintained in the possession of the respective inmate at all times.

With only one accessible vehicle, if the vehicle is in use for a Long Haul transport, court transport from RCCC to the MJ, transport from the MJ to RCCC or a medical transport that does not require emergency transport and another disabled inmate requires accessible transportation, the SCSD detention facilities would not be able to accommodate the disabled inmate.

### References

**28 CFR § 35.130 (a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR 35.130(b)(7)** states that a public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

**28 CFR 35.130(b)(1):** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

**28 CFR 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

**28 CFR 35.130(b)(8)** A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

**28 CFR 35.130(h)** A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are based on actual

risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

***The information below is for reference only.***
*Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to mobility-disabled inmates under the Armstrong v. Brown settlement agreement.*

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*Transportation:*

*The special needs of inmate's with disabilities shall be considered in transporting them. An inmate's/parolee's special health care aids and appliances shall be transported with the inmate/parolee upon transfer.*

*Accessible vehicles shall be used to transport inmates/parolees in wheelchairs and those whose disability, i.e., mobility, necessitates specialized transportation. All other inmates/parolees shall be transported in standard vehicles.*

## Intellectual Disabilities (Housing Units Adaptive Supports)

The Minimum Standards for Local Detention Facilities, Title 15 - Crime Prevention and Corrections, Division 1, Chapter 1, Subchapter 4, Article 5. Classification and Segregation, contains the following section applicable to intellectual disabilities:

§ 1057. Developmentally Disabled Inmates.

> The facility administrator, in cooperation with the responsible physician, shall develop written policies and procedures for the identification and evaluation of all developmentally disabled inmates.

> The health authority or designee shall contact the regional center on any inmate suspected or confirmed to be developmentally disabled for the purposes of diagnosis and/or treatment within 24 hours of such determination, excluding holidays and weekends.

Correctional Health Services Administrative Policy 1417, Adult Developmental Disability, describes the purpose of the policy as, "To stress the identification of persons with developmental disability and to refer known or suspected cases for appropriate evaluation and treatment." The policy requires that "medical shall contact Jail Psychiatric Services regarding any inmate who is suspected or confirmed to be developmentally disabled."

Developmental disability is defined as "represent[ing] one or more conditions whose onset occurs before age 18 and results in a substantial handicap. Qualifying conditions include mental retardation with an I.Q. of 70 or less, autism, neurological disability, cerebral palsy, and epilepsy."

The policy and procedures provide that "The identification of a person with developmental disability begins at booking and continues throughout incarceration. The intake medical personnel should be alert to the possibility of developmental disability by looking for:

- Difficulty in performing basic tasks associated with the process;
- Slowness or apparent difficulty in understanding; and
- A history of treatment for developmental disability through a Regional Center or special education class."

Policy 1417 further explains the following procedure:

If there is suspicion of a developmental disability, a notation will be made on the Receiving Screening medical form and a referral made to the JPS Outpatient Department.

In cases where there is uncertainty as to whether the inmate has a psychiatric condition as opposed (or in addition to) development disability, referral for mental health evaluation is appropriate.



With regard to referrals, a referral will be made once JPS clinical staff contacts the inmate and identifies an inmate's developmental disability status. The regional center serving Sacramento County is:

- Alta California Regional Center
  2241 Harvard St., Sacramento, CA 95815
  (916) 978-6400
  FAX (916) 489-1033

  Counties served: Alpine, Colusa, El Dorado, Nevada, Placer, Sacramento, Sierra, Sutter, Yolo, Yuba.

It is the responsibility of Jail Psychiatric Services' clinical staff to initiate an Alta Regional Center referral for a person suspected to have developmental disability or to contact Alta Regional for those persons who are already clients of Alta Regional.

Policy 1417 provides information relative to the role of the Alta Regional Center, the referral process, establishing a diagnosis, recommendations for management and treatment, etc. The procedures address assistance to be rendered by CHS and JPS for the local regional center, and that regional center representatives may provide input to health care services staff.

The Master Problem List in the medical record should be updated to note the presence of known or suspected developmental disability. JPS staff should also make an entry into the JIMS system and if necessary, notify classification of any special housing recommendations.

Where developmental disability was not identified during the booking or initial classification process, notification of the jail classification officer should be made by JPS Staff as soon as the condition is identified.

Policy 1417 also states that, "Persons with developmental disability are potentially vulnerable in the custody setting and may require special consideration in the classification process. Likewise, multidisciplinary treatment and discharge planning should take this information into account. The inmate's developmental disability status should be shared as necessary with treating health professionals, discharge planners, probation officers, and others who are actively involved in the care and custody of the individual." Additionally, there is brief language relative to sharing information when a "developmental disabled" inmate is transferred.

Correctional Health Services Administrative Policy 1107, Decision Making – Special Needs, defines the treatment for patients with special medical or psychiatric needs. The policy states that consultation between the Facility Commander and the Medical Director is required for actions regarding patients



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

who are diagnosed as having significant medical or mental health disorders, as follows:

- Housing assignments;
- Program assignments;
- Disciplinary measures; and
- Admissions to and transfers from institutions.

The procedures within the policy describe that "maximum cooperation between custody personnel and health care providers is essential so that both groups are made aware of movements and decisions regarding patients with special medical or psychiatric needs. For example, health care staff must inform custody personnel when an inmate is suicidal, homicidal, or inappropriately housed in the jail for health care reasons. An inmate's special needs may complicate housing or work assignments or disciplinary management. Medications may need to be adjusted for safety at the work assignment or before transfer. Other examples include:

- Suitability for travel based on medical evaluation;
- Preparation of a summary or copy of pertinent Health Record information to ensure continuity of care;
- Medication or other therapy required en route;
- Instructions for transporting patients in lay terminology regarding medications or other special treatment; and
- Specific precautions that should be taken (i.e. masks or gloves)."

The procedures also state, "For each inmate treated for a major medical problem in jail, the treatment staff will develop a written treatment plan. Custody staff must be informed of the treatment plan when necessary to ensure coordination and cooperation in the ongoing care of the inmate without violating the confidentiality of the clinical record."

**Observations**

As the aforementioned CHS Policies do not reflect a comprehensive screening process or program, there is not a disability tracking system in place, custody post orders do not reflect specific responsibilities relative to intellectually disabled inmates/detainees, and there are numerous noticeable gaps as related to staff duties and ensuring equal access to services, programs, and activities for intellectually disabled inmates. Many intellectually disabled inmates are often vulnerable and manipulated, and historically victimized. Nondiscrimination and safety are of paramount concern with this population in the jail environment.

Without proper identification of an inmate's cognitive deficits coupled with adaptive deficits (and adaptive support needs/accommodations) custody, health care services, EGUSD teachers, and other staff will not be able to know what reasonable accommodations to provide intellectually disabled inmates, and may

have difficulty ensuring safety. An acceptable screening instrument/testing process and screening results form would enable Mental Health clinician to outline the adaptive support needs of each developmentally (intellectually) disabled inmate. Such form could be maintained and secured in all housing units where intellectually disabled inmates are housed, and by all work supervisors and teachers who supervise these inmates.

There is not currently a testing instrument or process in place to examine for inclusion into an Intellectual Disability Program (regardless of the age of onset), where the following are both present:

- Low cognitive functioning (usually IQ of 75 or below); and
- Concurrent deficits or impairments in adaptive functioning (the abilities necessary to care for oneself and to access programming and services in the jail setting).

Staff is widely unaware of the safety/vulnerability/victimization concerns and special concerns and accommodations needs of this population, as they have not been identified. Even those with prior regional center services, or those who were tested in CDCR and placed in the Developmental Disability Program (DDP) are not placed on a jail-wide tracking list, and there are no documented adaptive support accommodations needs. Also, because there is no tracking system or testing process, there is not a clustering or semi-clustering approach for these inmates. Other inmates such as cellmates, and inmates housed in the same pods/units may not be thoroughly screened for predatory/victimization concerns.

There is a strong likelihood that non-diagnosed intellectually disabled inmates are receiving write-ups, being found guilty, and possibly being moved to ADSEG or TSEP without procedural due process rights or reasonable accommodations being provided. If this is happening, part of the explanation is because staff are not aware of the need to provide specific types of adaptive support services/accommodations to the intellectually disabled inmates (which are specific to each individual), and because there is not a consult process built into the disciplinary hearing process between the hearing sergeant and a clinician.

Staff are not aware of the primary adaptive deficits that intellectually disabled inmates may possess. Adaptive Deficits may be identified in various areas during the adaptive deficit evaluation conducted by a psychiatrist, psychologist or LCSW. Examples of areas in which adaptive deficits may be presented are:

- Health and Safety
  - The intellectually disabled inmates may appear naïve about maintaining health in terms of eating; identifying, treating, or preventing illness; basic safety considerations, such as following rules or seeking assistance. These inmates will likely use inappropriate behavior with others and have difficulty communicating choices/needs and participating in social interactions.

- Socialization Skills
  - The intellectually disabled inmates may show difficulty establishing and maintaining positive relationships. They may give up possessions to other inmates. They may become vulnerable to sexual predators, manipulation by other inmates, and/or be recruited for gang activities. The intellectually disabled inmates may engage in a repetitive cycle of disciplinary infractions involving other inmates or correctional officers. This could be suggestive of a lack of judgment and failure to understand the consequences of their actions.
- Academic Skills
  - The intellectually disabled inmates may show evidence of poor cognitive abilities/skills related to learning, such as reading, writing, and using basic mathematical concepts.
- Communications Skills
  - The intellectually disabled inmates may have poor ability to express themselves verbally or in writing.
- Leisure
  - The intellectually disabled inmates may not have acquired many leisure and recreational interests that reflect personal preferences and choices.
- Self-Advocacy/Use of Inmate Resources
  - The intellectually disabled inmates may have difficulty advocating for themselves during classification interviews/processes, disciplinary proceedings, and the inmate grievance process, and may waive their rights without understanding what they are doing.
- Self-Care Skills
  - The intellectually disabled inmates may show evidence of poor self-care; e.g., seldom bathing, soiled or unkempt clothing, poor eating habits, and/or the inmate's cell may be disorganized/dirty.
- Self-Direction
  - The intellectually disabled inmates may have difficulty making choices; learning and following a schedule; initiating activities appropriate to particular settings, conditions, schedules, and personal interests; completing necessary or required tasks; seeking assistance when needed; resolving problems in familiar and unfamiliar situations; and demonstrating appropriate assertiveness and self-advocacy skills.
- Work
  - The intellectually disabled inmates may have difficulty maintaining a work assignment due to inappropriate social behavior and a lack of related work skills.

Staff are widely unaware of some of the common adaptive support services that intellectually disabled inmates may need, such as;

- Monitoring for Pressuring/Victimization



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Assistance with reading/writing/scribing/explaining
- Reminders to brush their teeth
- Reminders/instructions on cell cleaning
- Monitoring clothing (dirty/clean)
- Monitoring and assistance with Commissary/Packages/Property
  - Intellectually disabled inmates are often taken advantage of
- Health Care Appointments/Pill-line/Medications
- Laundry Exchange
- Showers
- Yard/Dayroom/Social Interaction.

There is not a multi-disciplinary committee or support team specific to periodically monitor intellectually disabled inmates, monitor the on-going potential for victimization and whether they can function safely, monitor their programming, ensure their accommodation needs are being met, and ensure the inmates are functioning at an acceptable level in the jail environment.

**<u>Staff Interviews</u>**

Most custody staff that were interviewed admitted that they have received little to no ADA training, or training specific to intellectual disabilities. Many staff do not understand the difference between intellectual disabilities, mental illness, and learning disabilities, and they don't know who the intellectually disabled population is. There were a couple of deputies who knew of inmates who had received services from Alta Regional Center in the past. But the staff members acknowledged that the only way to know what type of assistance to provide the inmates is just through knowing and observing them, and from any help that a respective inmate may ask for.

The large majority of staff indicated that they would help intellectually disabled inmates. When asked general questions about observing behavior traits that may be associated with an intellectual disability, staff responded with some of the following answers: refer the inmate to JPS, refer the inmate to CHS, be patient, provide simple instructions, repeat instructions, have trustee or houseman help the inmate, observe the inmate more closely, talk to him every day, house in M-Dorm or MHU, give them extra time, talk confidentially, give very specific directions, use levels of communication, use non-verbal gestures, etc.

When asked questions involving safety or possible victimization concerns for intellectually disabled (or possible intellectually disabled) inmates, staff provided the following responses: move him to a different pod, move him "off the floor", talk to the inmate and find out what the issues are, "nip it in the bud if we see someone doing something", confirm issue and "roll-up" the suspect (and issue a write-up), "we need more training on this, but I would try to handle internally", nobody gets victimized in this unit, address the issue with the responsible inmate, address the issue with the entire dorm, investigate, look for possible video

evidence, put him (intellectual disabled inmate) in TSEP or PC, make sure he is not housed with an enemy, and take care of the inmate the best we can.

## Inmate Interviews

As addressed throughout this report, because the SCSD detention facilities do not administer a comprehensive testing/screening process for intellectual (developmental) disabilities, and there is not a disability tracking system in place, it was difficult for the Assessment Team to accurately select intellectually disabled inmates for interview. However, through the process, several inmates (from the MJ and RCCC) were interviewed who were or were possibly intellectually disabled. A few of the inmates claimed that they received services from Alta Regional Center. Some of the inmates admitted to being in special education in public school, which was one possible indicator. Some of the inmates interviewed also admitted (when asked) that they needed reminders for activities in the jail, e.g., showering, cleaning their cell/bed area, programming, meeting time schedules, managing their time, and keeping clean clothing.

Some of the inmate comments and concerns are outlined below:

- RCCC KBF – Intellectually disabled inmate with prior Alta Regional Services stated that when he asks for assistance from staff, they do not help him. Claims that inmates call him a "crybaby and retard." Says that he doesn't remember to get his laundry.
- RCCC SLF – Possible intellectual disability. Has had to pay inmates to write her letters. Stated she paid $25.00 for another inmate to write 4 letters. All of her commissary was stolen from her. Doesn't know how to use the telephone. Her Bunkie helps her out, and she shares her food with her. Claims she was forced to hold contraband for other inmates. She does not know about any programs (visiting, medical, and law library etc.). She claims she requires diapers for incontinence, and medical staff will not provide them. She soils her clothes and can't get clean clothes. Another inmate that assists her also reported this.
- RCCC SLF – Intellectual disability. She is an Alta Regional Center client. Inmate claims that she was moved from her dorm to a cell because other inmates were teasing her and threatened her. Claims that she forgets to shower.
- MJ Inmate – Possible intellectual disability (unable to read, special education in public school and receives SSI benefits). Has had numerous write-ups. Claims his cell is "filthy," and he has trouble cleaning it or getting help to do so.
- MJ Inmate - Intellectual disability (prior Alta Regional Center consumer, special education, unable to read). Has trouble understanding many jail processes. Was very confused with the inmate disciplinary process. Has difficulty remembering, and staff does not help him (he goes to trustees).

- ▪ MJ Inmate – Possible intellectual disability (poor reading). Claims he has been victimized for commissary items in the past.

## Conclusion

The SCSD detention facilities must have a comprehensive custody Operations Order relative to intellectually disabled inmates. The CHS must either create a new policy relative to JPS services and services for intellectually disabled inmates, or provide necessary modifications for policies 1417, Adult Developmental Disability, and 1107, Decision Making – Special Needs.

Policies and procedures must include directions and information regarding the following:

- ▪ A comprehensive screening/testing process with recognized instruments, to allow psychiatrists, psychologists, or LCSW's to determine whether inmates are intellectually (developmentally) disabled. The testing must include an examination for:
  - • Low cognitive functioning (usually IQ of 75 or below); and
  - • Concurrent deficits or impairments in adaptive functioning (the abilities necessary to care for oneself and to access programming and services in the jail setting).
- ▪ An electronic disability tracking system to identify inmates with disabilities (including intellectual disabilities), their required accommodation needs (including adaptive support services), any physical limitations, and other pertinent information
- ▪ Staff responsibilities regarding safety/vulnerability/victimization issues, special concerns, and accommodations needs of this population
  - • This includes classification screening for predator/victimization concerns with other inmates within the housing unit, as well as other related responsibilities.
- ▪ Housing protocols for intellectually disabled inmates (possible clustering/semi-clustering approach)
- ▪ Inmate disciplinary process as related to intellectual disabilities
  - • Including responsibilities for deputies, sergeants, work supervisors, mental JPS staff, etc.
  - • Clinical consult process for inmate write-ups
  - • Monitoring of patterns or numerous individual write-ups
    - o Monitor possible placement in administrative segregation or TSEP housing for intellectually disabled inmates, possibly as a result of receiving write-ups and being found guilty, but not being afforded procedural due process rights, or their required adaptive support needs.
- ▪ Multi-disciplinary committee or support team specific to periodically monitor intellectually disabled inmates, their ongoing potential for victimization, and whether they can function safely; monitor programming;

ensure inmates' accommodation needs are being met, and ensure that inmates are functioning at an acceptable level in the jail environment

- Monitoring may include but not be limited to: safety/victimization/vulnerability, commissary, write-ups, personal hygiene (e.g., showering, brushing teeth, clean clothes), work, education, program activities, yard/dayroom, leisure activities and ensuring that housing unit deputies and work supervisors are providing adaptive support accommodations.

An ADA training component must be developed and implemented regarding disabilities (including intellectual disabilities) to provide custody and non-custody staff the tools and knowledge to ensure all disabled inmates are not discriminated against on the basis of their disabilities, and to ensure equal access to all programs, services and activities offered by the SCSD detention facilities and any associated contractor, e.g., EGUSD, CHS. Staff must be trained to:

- Be aware of safety and victimization concerns and uphold a policy of zero tolerance for inmates or staff belittling or name calling individuals with intellectual disabilities
- Be proactive to engage intellectually disabled inmates verbally (sometimes in confidential settings), provide accommodations, assistance, and adaptive support services, and not delegate this to inmate trustees or "housemen"
- Understand that this population may have difficulties advocating for themselves, and may be reluctant to ask for help
  - Understand that many intellectually disabled inmates may have a dual diagnosis, with either medical and/or mental health concerns, and those concerns must also be met, whether or not the inmate seeks assistance
- Understand that disabled inmates cannot arbitrarily be rehoused or moved without a thorough examination of associated events/circumstances, and they must be treated fairly and equally
- Understand that intellectually disabled inmates may be confused at times, and may need constant or periodic instructions, or simple reminders to complete a task or to understand.

Custody staff post orders should also reflect assigned duties as applicable to this population.

## References

**28 CFR § 35.105 (a)** requires that a public entity evaluate its current policies, and practices, and to the extent modification of any such policies, and practices is required, the public entity shall proceed to make the necessary modifications if they do not or may not meet the requirements Title II.

**28 CFR § 35.130 (b)(7)** requires a public entity to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

**28 CFR 35.130(b)(1)** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Clark v. California settlement agreement.***

*Notices, Announcements, and Alarms:*

*Written Materials: Each designated DDP institution/facility must ensure that CCR notices, orientation packages, announcements, and similar printed materials are accessible to inmates with developmental disabilities. Institution staff must provide the necessary assistance to all DDP inmates on a case-by-case basis to ensure that those who have difficulty reading and/or communicating in writing will be provided reasonable access to forms, regulations, and procedures. Local operational procedures must reflect specific notices, announcements, and alarm procedures for DD2 and DD3 inmates. Post orders for staff assigned to provide such services to DD2 and DD3 inmates must reflect these specific procedures.*

*Verbal Announcements: Each designated DDP institution/facility must ensure effective communication is made with inmates with developmental disabilities regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, and unlock, etc. Local operational procedures must reflect specific requirements for verbal announcements impacting DD2 and DD3 inmates. Post orders for staff assigned to provide such services to DD2 and DD3 inmates must reflect these specific procedures, i.e., prompts for visits or hearings, if an inmate does not respond.*

*Count And Movement*

*Each designated DDP institution and facility must review local policies and procedures to ensure DDP inmates are provided with necessary prompting so that they comply with count time expectations, respond to visits, keep work/school schedules, and respond to meals and other movement calls. Local operational procedures must reflect specific count and movement procedures for DD2 and DD3 inmates. Post orders for staff assigned to designated buildings/units/wings that house DD2 or DD3 inmates must reflect the specific count and movement procedures.*

*Evacuation Procedures*

*Local evacuation procedures must be adopted at each designated DDP facility to ensure the safe and effective evacuation of inmates with developmental disabilities. Local operational procedures must reflect specific evacuation procedures for DD2 or DD3 inmates. Post orders for staff providing services for DD2 or DD3 inmates must reflect these procedures.*

*All DDP inmates will be provided instructions for evacuation/emergency procedures during orientation before initial classification at designated institutions.*

## Training

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures pertinent to training are outlined in Operations Order 01/02 Command and Responsibility, Draft Operations Order Inmates with Disabilities - ADA, and policy 1302, Staff Development and Training.

Per Operations Order, 01/02 Command and Responsibility, the Administrative/Training Sergeant works under the supervision of the Assistant Division Commander and/or the Operations Lieutenant for the division to coordinate all training, including the jail-training program for new officers. The Admin/Training Sergeant maintains division forms, Operations Orders, fire and armory equipment, and assists with personnel assignments and issues. He/she also directly supervises the Training Coordinator, Law Library Officer, Safety Officer, Facility Maintenance staff, and other authorized positions.

Per Draft Operations Order Inmates with Disabilities - ADA, the ADA Coordinator is responsible to provide training to staff in regards to ADA policies and procedures. Additionally, it is the ADA Corrections Division Representative's responsibility to provide training to facility staff on auxiliary aids and services. Although, these policies require the ADA Division Representative and ADA Coordinator to provide ADA training, this Draft Operations Order is currently not approved and in place. As such, there is no order or policy requirement to provide annual formalized ADA training, one-time formalized ADA training, or formalized ADA training during new employee orientation.

### Observations

The SCSD detention facilities require all officers assigned to the MJ and RCCC to attend and complete a 66-hour Standard Training for Corrections Program certified course titled Adult Corrections Officer Supplemental Core Course. This course is for officers who completed the Peace Officer Standards and Training (POST) Regular Basic Course (academy) and are newly assigned to corrections. The course is designed to complete competencies in the following topics, Title 15 regulations on inmate supervision; codes, statues, and legal documents, inmate classification, gangs and subcultures, evidence and contraband, communication, mechanical restraints and safety cells, cell extractions, booking and receiving, releasing, maintaining security, distribution of supplies and commissary, monitoring psychological and physical health, and PREA. Although some of these modules contain some ADA-related information, these training modules are specific to general training requirements for corrections, and are not ADA-specific.

The training modules do not cover a deeper sense of what disabilities or impairments are, and how these disabilities affect inmates and staff with respect

to discrimination (nondiscrimination) and disabled inmates gaining equal access to programming, services and activities in accordance with Title II of the ADA. The training modules do not cover effective communication, reasonable accommodations, HCAs/ADs/DME, disability identification (screening/testing/evaluating), interim accommodations, inmate grievances/requests for modifications or accommodations, staff assistance, inmate disciplinary (infraction) process, accessibility/path of travel, learning disabilities, adaptive deficits/adaptive supports (for developmentally disabled inmates), housing, work/education, law library/recreational library, group therapy/individual therapy, or inmate orientation.

## Staff Interviews

Most housing unit, medical (including county and registry staff), and support staff who were interviewed could not recall specific ADA training they had received either at the academy or on site at the jail. Some staff members were able to recall having received training at the academy regarding mental health and other disabilities; however, this training was directed towards street law enforcement.

## Conclusion

Because the SCSD detention facilities do not currently have a comprehensive ADA identification process, and because there is not an ADA tracking system in place, nor an adequate ADA training program, the Assessment Team representatives determined that staff in large part are not aware of many inmates who have disabilities covered under the ADA. Moreover, staff members do not have a thorough understanding of the rights afforded to inmates under the ADA, or how to ensure equal access and non-discrimination (whether they know who the particular disabled inmates are or not).

In accordance with the spirit of Title II of the ADA, and the 1991 Section-by-Section Analysis, the SCSD detention facilities have failed to develop and incorporate a comprehensive ADA training component for custody and non-custody staff. The ADA or inmate disability program/plan cannot and will not function unless a comprehensive training regimen consists of: formalized lesson plans, certified or otherwise qualified ADA expert trainers, close monitoring of the training program, and curriculum consisting of all major aspects of ADA, including but not limited to: disability identification/verification, tracking system, housing, HCAS/ADs/DME (including removal/non-removal), reasonable accommodations, equal access, transportation, searches, mechanical restraints, inmate grievances, orientation, work/industries/job assignments, education, alarms, notices, emergencies, evacuations, library operations/equipment, religious services, and visiting. Quite simply, a quality ADA training program must be in place to ensure staff are appropriately trained to perform their job duties and to help ensure disabled inmates are provided equal access to programs, services and activities provided at the jail facilities, and thus not discriminated against.

The SCSD detention facility training requirements should include the requirement that formalized ADA training be provided to custody and non-custody staff (managers, supervisors, and rank-and-file employees) at the jail facilities.

A comprehensive formalized ADA training curriculum must be developed and incorporated. This should be a primary formal classroom-training course for custody and non-custody staff (managers, supervisors, and rank-and-file staff) at the jail.

The SCSD detention facilities must ensure that ADA instructors receive appropriate ADA training and provide the level of subject matter expertise needed to effectively provide formalized classroom ADA training to staff.

**References**

**28 CFR § 35.130 (a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR Section-by-Section Analysis, Section 35.105** Self-Evaluation commenters suggested that the rule require that every self-evaluation include an examination of training efforts to assure that individuals with disabilities are not subjected to discrimination because of insensitivity, particularly in the law enforcement area. Although the Department of Justice did not add such a specific requirement to the rule, the Department felt it would be appropriate for public entities to evaluate training efforts because, in many cases, lack of training leads to discriminatory practices, even when the policies in place are nondiscriminatory.

***The information below is for reference only. Due to the settlement agreement and subsequent Armstrong v. Schwarzenegger Federal Court Ordered Injunction (January 18, 2007), the CDCR was ordered to do the following (with regard to providing ADA related training, which pertains to disabled inmates as well as inmates with other disabilities):***

*Settlement Agreement (January 3, 2001)*

*The CDC (CDCR) will provide Disability Placement Program (DPP) training to institution/parole staff on ADA regulations and DPP requirements. This training shall include but not be limited to evacuation and emergency procedures, reasonable accommodations and effective communication.*

*Federal Court Injunction (January 18, 2007)*

*Within 60 days of the date of this Order, defendants, subject to the approval of*



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

*plaintiff's counsel, shall select and retain outside experts to provide training of health care staff and correctional counselors in effective communication issues.*

*Within 60 days of the date of this Order, the parties shall jointly agree on outside experts, and defendants shall retain them to provide training to all custody staff who work in administrative segregation units, the security housing units, or Receiving and Release on their obligations not to confiscate assistive devices and the reasons therefor.*

*Defendants' employees may jointly provide training with the outside experts. The training of all appropriate staff shall be completed by September 1, 2007, and a regular schedule of ongoing and refresher training shall be established.*



## ADA Coordinator

The SCSD detention facilities do not have any operations orders, policies or procedures solely for the MJ and RCCC Compliance Sergeant (ADA Coordinator) or for the ADA Deputy (Assistant ADA Coordinator/ADA Corrections Division Representative) in place. However, there is a Draft Operations Order titled, 'Inmates with Disabilities – ADA', which is pending further revision and approval.

The MJ and RCCC facilities each have their own Compliance Sergeant and ADA Deputy assigned to ADA or disability-related compliance responsibilities.

In accordance with a County of Sacramento, Department of Personnel Services, Position Description Questionnaire (PDQ), for the RCCC Compliance Sergeant position, general work/oversight responsibilities include: 25 percent of the work time to create and implement an ADA transition plan and future compliance enforcement; 25 percent monitoring and enforcing compliance efforts related to the ICE Contract and the 2000 Federal Detention Standards; 15 percent coordinating and monitoring the custody/classification portion of the JBCT program; 15 percent conferring and cooperating with personnel associated with other county agencies, outside law enforcement, mental health, medical, and others as required to ensure compliance; 10 percent coordinating facility audits and inspections; 5 percent monitoring Title 15 compliance, dayroom and recreation goals, and policy updates; and 5 percent engaging in the protection of life and property, as well as participating in investigations of criminal offenses to identify, apprehend, and prosecute the responsible parties by collection, preservation, and analysis of facts and evidence, and other related responsibilities include locating, interviewing or interrogating victims, witnesses, and suspects.

In accordance with the specific PDQ for the RCCC ADA Deputy position, general work/oversight responsibilities include: 40 percent assisting in creating and implementing an ADA transition plan and future compliance enforcement; 20 percent conferring and cooperating with personnel associated with other county agencies, outside law enforcement, mental health, medical, and others as required ensuring compliance; 20 percent assisting in coordinating facility audits and inspections; 15 percent assisting in monitoring Title 15 compliance, dayroom and recreation goals, and policy updates, etc.; and 5 percent engaging in the protection of life and property, and participating in investigations of criminal offenses to identify, apprehend, and prosecute the responsible parties by collection, preservation, and analysis of facts and evidence, and additional duties such as locating, interviewing, or interrogating victims, witnesses, and suspects.

The Assessment Team also requested a copy of any existing documents relative to ADA or disability-related duties, e.g., PDQ, post orders, and duty statements, for the MJ Compliance Sergeant and ADA Deputy. However, upon interviewing



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

the staff in these two identified positions, they indicated that such documentation did not exist specific to their assignments.

Specific ADA/disability-related functions and responsibilities for the Compliance Sergeant and ADA Deputy at both the MJ and RCCC facilities are outlined in the aforementioned Draft Operations Order Inmates with Disabilities – ADA.

In accordance with the Draft Operations Order, the purpose of the policy is to establish standard and consistent procedures by which an inmate with a disability is identified, assessed, and provided appropriate reasonable accommodations in compliance with Title II of the ADA.

The policy statement (within the Order) provides that is it the policy of the SCSD detention facilities to ensure procedures are in place to provide equal treatment to all incarcerated adults.  The policy statement states, "The Department will ensure inmates with qualified disabilities are afforded equal access to programs, services, and activities unless doing so would alter the nature or operations of the institution or program.  Limitations may be imposed for legitimate safety requirements necessary for the safe operations of services, programs, and/or activities."  The policy statement further adds, "The Department will implement modifications to facilities and programs where possible to allow for reasonable accommodations for inmates with disabilities.  This practice will be followed unless doing so would be an undue burden to the Department, cause a fundamental alteration to a program, or pose a direct threat of substantial harm to the health and safety of the individual or others.  The Department will ensure that procedures are in place for inmates with disabilities to request reasonable accommodations and to dispute the accommodations provided under Title II of the ADA."

The Operations Order provides numerous ADA/disability-related definitions, including: ADA, Assistive Device, Disability, Activities of Daily Living (ADL), Orthopedic Appliance, Prosthesis, Reasonable Accommodation, Service Animal, and Undue Hardship.

The definition provided for 'Disability' is:

1. "A physical or mental impairment that substantially limits one or more of the major life activities of such individual;

2. A record of such an impairment; or

3. Being regarded as having such impairment."

Draft Operations Order Inmates with Disabilities - ADA, Section III. A., states, "The Sacramento County Sheriff's Department will not discriminate against inmates or members of the public on the basis of disability in providing access to its detention facilities, programs, services and activities.

1. The Americans with Disabilities Act Inmate Notice will be prominently posted in all inmate housing units; and

2. The Americans with Disabilities Act Public Notice will be prominently posted at the public entrances of all jail facilities."

Section B. states, "Persons with a disability are entitled to an equal opportunity to participate in programs, services, or activities offered by the Sacramento County Sheriff's Department unless doing so creates an undue hardship."

The Draft Operations Order contains ADA/disability information and responsibilities specific to the ADA Corrections Division Representative (ADA Deputy/Assistant ADA Coordinator), and the ADA Coordinator (Compliance Sergeant).

Section III. C. (Compliance with ADA), (ADA Corrections Division Representative), states,

1. "The intent of the ADA Division Representative is to review requests, complaints and grievances related to ADA issues, maintain the Division's ADA files, and provide training to facility staff on auxiliary aids and services;

2. The ADA Division Representative may respond to ADA requests or ADA grievances and will ensure the Facility ADA Coordinators are updated and informed of all ADA issues as well as perform inspections; and

3. The ADA Division Representative will represent the Department on ADA related issues."

Note: the other identified ADA Corrections Division Representative duties outlined in the Order, are captured below within the language relative to ADA Coordinator's responsibilities (i.e., Section XVII. [Identifying and Handling of Armstrong Class members], and Section XIX. [Grievances]).

Section VI. of the Draft Order indicates that the ADA Coordinator (or designee) will:

1. "Keep the ADA Division Representative informed of all ADA related requests, complaints, and grievances related to ADA issues;

2. Maintain an ADA file on each disabled arrestee/inmate documenting each contact in regards to their ADA needs, accommodations, special education and requests;

3. Provide training to staff in regards to ADA policies and procedures;

4. Initiate contact with the disabled inmate within two working days of receiving the ADA paperwork and, if necessary, ensure that the court is notified of any accommodations needed;

   a. The ADA Coordinator and inmate may agree at any time to suspend monthly follow-ups if there is no change in the inmate's status; and

   b. If the inmate needs to contact the ADA Coordinator after suspending follow-up visits, the inmate can do so via an Inmate Request form (KITE);

5. Notify classification deputies when a disabled inmate is housed and may require an accommodation to access programs, services, or special education;

6. Review claims, complaints and grievances regarding disabilities;

7. Ensure complaints and grievances are finalized;

8. Confer with medical staff each month to review whether accommodations continue to be appropriate and necessary and document the contact;

9. Audit the location and condition of the TDD machine once per month; and

10. Perform a follow-up review every thirty calendar days to ensure the inmate has equal opportunity to participate in programs, services and activities and to discuss any issue the inmate may have regarding their treatment."

There are numerous ADA Coordinator duties outlined throughout the Operations Order in various sections or the Order. These responsibilities include:

Section IV. (Identification of Disabled Inmates – At Intake):

1. Receipt of all Inmate Disability Evaluation Forms (IDEF) from intake medical staff, for inmates who have (or may have) a disability.

Section V. (Classification and Inmate Housing);

1. Receive notifications from classification staff to arrange inmate orientation of inmates who are visually impaired or unable to read;

2. Receive IDEF forms with appropriate notations from classification staff for compliance review; and

3. In coordination with classification staff, ensure necessary, reasonable accommodations are made to allow inmates with disabilities equal access to work assignments.

Section VII. (Identifying Disabilities – Subsequent to Booking);

May receive notifications from staff at any time for an inmates who staff believe has a disability, based upon personal observation of the inmate, oral statements by the inmate, or a written request from the inmate.

Section VIII. (Program Access);

1. Make arrangements to accommodate special educational needs unless access to these services prevents safe operation of the program or activities; and

2. Maintain a list of qualified sign language interpreters who can be utilized in time of need.

Section XII. (Inability to Read or Write);

1. Ensure reasonable accommodations are made for inmates who are physically incapable of reading or writing, which may include, but is not limited to; enlarged print materials, identification of desired materials, and assistance in reading and scribing forms.

Section XIV. (Prosthetic/Orthopedic Appliances and Assistive Devices):

1. Receive notification (from the Watch Commander) if an appliance/assistive device is not returned to or provided to an inmate (after a physician examined the inmate and determined that the previously removed device or an alternative accommodation is to be provided to the inmate).

Section XVII. (Identifying and Handling of Armstrong Class Members);

1. Receive contacts from staff regarding in-custody inmates who have been previously identified as a CDCR Armstrong class member;

2. Will act as the central contact point for CDCR. The ADA Coordinator at each facility (MJ and RCCC) will act as a liaison between identified Armstrong inmates and the classification unit;

3. After receiving notification from CDCR as to an Armstrong class member in custody at an SCSD detention facility, the ADA Coordinator will notify the ADA Division representative. The ADA Coordinator will ensure the inmate is entered into the JIMS, under the Special Tracking Needs, and will follow the same process outlined in Section 11.0 of this policy (Order); and

4. Once contact is made with the inmate, the ADA Coordinator will notify HMU via email. This email should include any steps taken to address issues/concerns as well as a resolution.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Section XVIII. (Facility Visitors);

1. Visitors who will require reasonable accommodation will be asked to notify the ADA Coordinator or on-duty Watch Commander of their needs prior to visiting.

Section XIX. (Grievances);

1. All ADA related grievances shall be routed through the facility Compliance Unit. The Compliance unit will determine the best course of action for the grievance (e.g., medical, custody) and then route it as deemed appropriate. The Compliance Unit will track all ADA related grievances until finalized. A copy will be forwarded to the ADA Corrections Division Representative.

The following sections of the Operations Order do not contain information or responsibilities specific to the Compliance Sergeant: Section III. (Compliance with ADA); Section IX. (Auxiliary Aids for Individuals with Hearing Impairments); Section X. (Telecommunications devices [TDD/TTY Equipment]); Section XI. (Interpreter Services); Section XIII. (Mail – Free for the Blind); Section XV. (Restraints); Section XVI. (Searches); and Section XX. (Compliance with PREA).

The Draft Operations Order, PDQs (RCCC), and information received from the two Compliance Sergeants and both ADA Deputies are conflicting as to the working titles of the positions.

The Compliance Sergeant position must have the authority and the civil service rank to raise pertinent issues to executive level management and affect change or modifications to the ADA inmate disability program as warranted. The Compliance Sergeant positions (at the MJ and RCCC) must also have normal 'hands on' day-to-day oversight and involvement over the ADA or inmate disability program. The Compliance Sergeant or ADA Deputy positions must maintain all ADA related documents to assist in identifying ADA or disability-related requirements for the operation of the SCSD detention facilities.

**Observations**

The Assessment Team did not have any specific observations to report with regard to the Compliance Sergeants, or ADA Deputies at either the MJ or RCCC facilities. However, through staff interviews of the MJ Compliance Sergeant and MJ ADA Deputy, as well as the same positions for the RCCC facility, and a multitude of staff (from numerous disciplines) assigned to the MJ and RCCC facilities, numerous inmate interviews, examinations of applicable documents and forms, and general observations of virtually all detention facility processes and activities, the Assessment Team determined there are numerous areas where a detailed Operations Order is necessary to provide procedures for applicable ADA or disability-related functions. For many applicable ADA or



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

disability-related topics, the Draft Operations Order does not address the issues, there is key information not included within the content, or there are concerns with the written Order itself as well as with current practices. Some of the key concerns will be captured in the conclusion (below), and the major concerns will be cited throughout this entire report.

**Staff Interviews**

As mentioned above, the Assessment Team interviewed both Compliance Sergeants (MJ and RCCC), and both ADA Deputies (MJ and RCCC), and asked pertinent questions of other selected staff (e.g., housing officers, custody and non-custody staff who deal with grievances, infractions, and inmate referrals).

The team attempted to gain a better understanding of the separate roles and responsibilities between both Compliance Sergeants as well as both ADA Deputies.

From interviews of staff (custody and non-custody), a review of documents and logs, and general overall observation, the Assessment Team drew the following findings: The Compliance Sergeants for the MJ and RCCC facilities are designated at the Sheriff's Sergeant classification, but the positions are not dedicated solely for ADA-related duties. Per the PDQ for the RCCC position, only 25 percent of the duties are associated to ADA or a disability program (charged with creating a transition plan and for future compliance enforcement). Within the other 75 percent of the duties (as outlined above) there is a very small percentage of responsibilities tied to inmates with disabilities, e.g., ICE inmates who happen to have a disability, and monitoring of the custody/classification portion of the JBCT program will have some involvement with inmates who happen to have a disability. The Compliance Sergeants acknowledged that they have various responsibilities outside of ADA, as stated above, e.g., MOUs, contracts, litigation or compliance with Federal laws. One of the ADA staff members interviewed confirmed that the RCCC PDQs are consistent with the duties and percentage of work time actually being completed.

As mentioned above, there is not a PDQ, post order or duty statement for the MJ Compliance Sergeant (ADA Coordinator) to outline any ADA or disability program responsibilities, or, the Assessment Team was not provided with such. Both Compliance Sergeants have been in their respective positions a very short time. They have received no ADA Coordinator-specific training, and relatively little training applicable to ADA or disabilities. However, PREA, MH, and Crisis Intervention Team (CIT) trainings were cited as having been received in the past.

The ADA Deputies for the MJ and RCCC facilities are designated at the Sheriff's Deputy level, but the positions are not dedicated solely for ADA or disability program related duties. The MJ and RCCC ADA Deputies have been assigned to their new positions for approximately five months and two months respectively (at the time of interviews). They have not had any specific ADA training to



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

prepare them for their new assignment, other than minimal general ADA information provided at the Sheriff's Academy, and an 8-hour online course that reportedly did not focus in any depth on Title II of the ADA. One of the deputies explained that despite being new in the position, he would be transitioning out of the assignment very soon.

Per the PDQ for the RCCC position, only 40 percent of the duties are geared toward ADA or an inmate disability program (tasked with assisting in creating and implementing an ADA transition plan and future compliance enforcement). As explained earlier in this report section, there is not a PDQ, post order, or duty statement for the MJ ADA Deputy to outline the ADA or disability program responsibilities, or, the Assessment Team was not provided with such. The specific duties of the new positions have not been fully explained to them, and they are in the process of attempting to better understand their roles and responsibilities.

One of the ADA Deputies admitted that he has not really performed much ADA or disability-related work outside of a physical accessibility standpoint. The other ADA Deputy admitted that only a small amount of work time is allocated to ADA or disability-related duties, but he works primarily on PREA and jail operations. One of the ADA Deputies indicated some contact with non-mobility-impaired, inmates, e.g., assisting an intellectually disabled inmate with access to legal law materials and addressing issues brought to his attention, such as grievance and KITE issues. But he clarified that he does not automatically receive ADA-related grievances or KITE's, and most are funneled to the medical department. The ADA deputies have admittedly not reviewed any grievances pertaining to effective communication issues or inmates with learning or intellectual/developmental disabilities.

The ADA staff is aware of the email notifications received from CDCR, for CDCR Armstrong class members housed at the SCSD detention facilities. But they do not receive these notices, unless the receiving medical staff informs them (which rarely occurs). A couple of the ADA staff members were not aware of previous inmate grievances submitted regarding either shower chair issues or accessibility concerns.

Although some staff and inmates are aware of the newly assigned ADA staff, and have reportedly asked the ADA staff for assistance or information, e.g., health care appliances and reasonable accommodations for inmates, many inmates and some staff are not aware of their existence or positions. The staff interviewed admitted that there is not a health care appliance/assistive device inspection log (for accountability or functionality).

Although one of the ADA staff believed that the jail rulebook addresses the Compliance Sergeant (ADA Coordinator) position, the rulebook has a very brief



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

section about ADA and Title II, but there is no language regarding the ADA Coordinator or other ADA staff.

Additional information obtained through the ADA staff interviews included but is not limited to the following: the Compliance Sergeants for the MJ and RCCC as well as both ADA Deputies do not maintain daily monitoring of the ADA Program, and do not currently have on-going ADA or disability monitoring (whether daily, weekly or monthly) relative to the inmate grievance process/resolution, inmate request (KITE) process, inmate disciplinary process, inmate tracking process, touring ADA housing units and work sites, interviewing housing officers, clinicians, teachers, work supervisors, or other staff, or interviewing inmates regarding ADA concerns or issues.

The ADA staff at both detention facilities have numerous other required duties outside of ADA or inmate disabilities. There is no adequate inmate disability identification or tracking system in place for proper identification of inmates with disabilities. In speaking with the ADA staff, they did not have a clear or thorough understanding as to what their specific job duties entailed as related to inmates with disabilities. At the time of the interviews, it did not appear that the Draft Operations Order had been available to them to review. The Compliance Sergeants and ADA Deputies do discuss pertinent ADA-related issues as necessary.

The majority of all detention facility staff (both facilities) who were interviewed were not familiar with the process to secure a contract sign language interpreter in the event of a due process event or clinical encounter (if the inmate's primary method of communication is signing). One of the ADA staff provided the Assessment Team with an SLI list of contractors, and both ADA Deputies were aware of this list. One of the ADA Deputies did not believe that health care staff has ever inquired about the list or did not know if some of them are aware of its existence. The ADA Deputies were not aware of any instances where jail staff have had to utilize a contract provider, but indicated that staff have done "workarounds" in the past by having deaf/hearing-impaired or speech-impaired inmates use written notes. When asked whether a certified SLI has ever been used for a deaf and mute inmate housed in MJ 2nd floor medical unit, the ADA Deputy who was asked did not know. The ADA Deputies explained where the TTY machines were located in the 2 detention facilities. Of the dozens of staff interviewed, only a couple of them were trained in or knew how to use the TTY equipment.

The ADA staff were not trained in or familiar with providing EC to inmates with disabilities, where there may be barriers to communication, e.g., intellectually disabled/developmentally disabled, learning disabled, mental health, deaf/hearing-impaired, and speech-impaired. The ADA Deputies were unsure as to how to obtain the names of inmates who have an intellectual/developmental disability or a learning disability, but would consult with staff from the psychiatric



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

department for a list of inmates with mental health concerns. One of the ADA Deputies said he has provided alternatives to writing inmate disciplinary reports on some inmates with disabilities, but acknowledged that disciplinary reports for ADA inmates by other staff are generally not routed to the ADA staff for review.

Some of the ADA staff interviewed (as well as medical and other custody staff) indicated that there was no master list of health care appliances/assistive devices issued to inmates at the MJ and RCCC facilities.

The Compliance Sergeants (ADA Coordinators) do not track or log any activities or tours through the housing units or other areas, and do not track or log any interviews of disabled inmates or key staff.

Neither the Compliance Sergeants nor the ADA Deputies have received any formal ADA training that would qualify them to perform the relevant ADA functions and oversight over the program or to serve as ADA trainers to staff.

The Compliance Sergeants do not maintain or have access to an inmate disability tracking system or list to identify inmates with disabilities. Currently, they also do not receive the names or a list of CDCR Armstrong class members housed at the MJ or RCCC facilities.

**Conclusion**

In violation of Title II of the ADA (as specifically described below), the SCSD detention facilities do not have a dedicated ADA Coordinator in place at either the MJ or RCCC facility to coordinate efforts to comply with and carry out the multitude of necessary responsibilities of the position, which also includes oversight of employee accountability and allegations of noncompliance. In the absence of a comprehensive inmate disability program/plan, and clear duties delineated for the positions, the Compliance Sergeants (ADA Coordinators) for the MJ and RCCC facilities as well as the ADA Deputies (Assistant ADA Coordinator/ADA Corrections Division Representative) for both facilities are unable to effectively perform their duties.

As a result, they will ultimately be unable to help ensure that the SCSD detention facilities are abiding with Title II of the ADA, and will not be able to ensure the employment of best practices with respect to inmates with disabilities. Given the mandates under ADA, the various court orders, injunctions and settlement agreements ordered or approved by the courts (around the nation), the current lack of an acceptable ADA training component for both custody and non-custody staff is concerning.

The Compliance Sergeants (ADA Coordinators) and ADA Deputies (ADA Assistants/ADA Corrections Division Representatives) at the two facilities have not been adequately trained regarding ADA or in the development of a comprehensive inmate disability program. Likewise, they do not currently



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

possess the requisite expertise or training to provide effective oversight to ensure overall program and staff accountability or to ensure that all detention facility staff is trained with regard to ADA and an effective inmate disability program.

28 CFR § 35.107(a) states that a public entity that employs 50 or more persons shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to it alleging its noncompliance with this part or alleging any actions that would be prohibited by this part.

As stated above, the SCSD detention facilities have not designated a dedicated employee to coordinate its efforts to comply with and carry out its responsibilities under Tittle II of the ADA, including investigation of any complaint alleging noncompliance or any actions that would be prohibited. The Compliance Sergeant at each facility (MJ and RCCC) only performs ADA/disability-related functions about 25 percent of the time (or slightly more as there are likely occasional ADA-related issues during the course of the other approximate 75 percent of their duties). The Compliance Sergeants are still working to determine what their job duties fully entail or what they should consist of in the future. Much of the ADA/disability-related workload is either shared or handled by the two respective ADA Deputies. However, the Deputies are also in the process of working to determine their own work responsibilities within the position while trying to also determine what additional specific job duties must be added.

Although the Compliance Sergeants have electronic access to the JIMS system PF-2, PF-4 and PF-10 screens for very limited ADA/disability-related information; they do not maintain ADA related documents to assist them in identifying ADA requirements for the operation of their respective detention facility.

The Operations Order Inmates with Disabilities - ADA, is currently in draft form and is likely going to be modified further prior to approval. Although a senior supervisory or manager level (e.g., Sheriff's Lieutenant) is the strongly recommended employee classification for a dedicated ADA Coordinator position, the position of Sheriff's Sergeant may be acceptable so long as the incumbent has sufficient command authority over the program to effect necessary change and program modifications as needed and has ongoing dialogue with the executive management team to keep them apprised of compliance, trends, training needs, and recommendations for overall program improvement.

The operations order should require the ADA Coordinators to be dedicated positions (or a single dedicated position for oversight of both facilities) for ADA responsibilities, and not have other duties (e.g., PREA, ICE, custody/classification monitoring of the JBCT Program).

The position must have command authority over the program, have the ability to effectively oversee daily operations, have the responsibility to affect change or

modifications as needed, and have the authority to engage with executive level management on a regular basis.

The operations order must include a more exhaustive list of responsibilities for the ADA Coordinators.

The operations order must also require the ADA Coordinators to tour units, interview staff and inmates on a regular basis, and monitor all disability-related tracking documents. The ADA Coordinators should maintain all ADA-related documents to assist them in identifying ADA requirements for the operation of the SCSD detention facilities.

The operations order should articulate that the ADA Coordinators will regularly monitor all facets of the ADA program to help ensure that inmates are being afforded equal access to all programs, services and activities offered by the SCSD detention facilities (and other entities, e.g., EGUSD and volunteer chaplains), and not being discriminated against in accordance with Title II of the ADA.

As a result of the assessment, which included reviews of applicable operations orders and policies as well as staff and inmate interviews, findings for this area include:

- Draft Operations Order Inmates with Disabilities – ADA, must include the following:
    - Articulate that the ADA Coordinators will regularly monitor all facets of the ADA program to help ensure that inmates with disabilities are being afforded equal access to all programs, services and activities offered by the SCSD detention facilities, and not being discriminated against in accordance with the ADA, Title II;
    - Provide greater information and a more exhaustive list of additional ADA/disability-related responsibilities for the ADA Coordinators and ADA Deputies which are not currently captured in the Order:
        - These duties are outlined in detail throughout most of the sections of this entire report. Examples include:
            - Oversee an inmate disability tracking system; tour housing, work, education, library and other units; interview inmates with disabilities and other inmates; periodically interview custody and non-custody staff (e.g., housing officers, academic/vocational instructors, classification staff, health care staff, self-help group sponsors/staff); review inmate request for accommodations and inmate grievances related to ADA/disabilities; monitor the inmate disciplinary process as related to inmates with disabilities; ensure EC for inmates with disabilities relative to due process events and clinical encounters; provide auxiliary aids, reasonable accommodations, and equal access to

programs, services and activities; review removal/non-removal of health care appliances/assistive devices;

- The operations order must contain a listing of all applicable disability-related forms and documents, including forms/documents currently being used as well as those that will need to be developed and implemented in the future (e.g., related to custody, medical, mental health, and academic), based on future management decisions. Specific examples are cited throughout other sections of this report;
- Examine whether the ADA Coordinator positions should be designated at a Sheriff's Lieutenant level or above, or to remain at the Sheriff's Sergeant classification;
- There must be a requirement for both ADA Coordinators to be dedicated positions for ADA responsibilities (no PREA or other non-ADA duties), or consider approval for a single dedicated ADA Coordinator position for oversight over both MJ and RCCC facilities;
- The ADA Coordinator position(s) must have command authority over the ADA program;
  - o The ability to effectively oversee daily operations;
  - o The ability to affect change or modifications as needed; and
  - o The authority to engage with executive level management on a regular basis;
- The MJ ADA Coordinator and ADA Deputy positions must have a PDQ, duty statement or post order to identify specific duties and responsibilities for the positions;
- Clarification must be made as to the specific working title of the positions (Compliance Supervisor/ADA Coordinator, and ADA Deputy/Assistant ADA Coordinator/ADA Corrections Division Representative);
- The Compliance Sergeants, and ADA Deputies must be adequately trained to effectively perform their ADA and disability-related duties, and all custody and non-custody staff must be trained with regard to the ADA and an inmate disability program;
- The Compliance Sergeants and ADA Deputies must have a greater understanding of their respective roles and responsibilities;
- While the Draft Operations Order indicates that the purpose of the policy is to establish standards and consistent procedures by which an inmate with a disability is identified, the current inmate disability identification process is severely flawed. For example, there is no testing/screening for intellectual disabilities; there are concerns with the medical intake screening process for potential disabilities; there is no current method to identify possible learning disabilities, e.g., a reading or literacy test (other than for those testing for EGUSD classes);

- Develop and implement an electronic comprehensive inmate disability tracking system;
- The Compliance Sergeants and ADA Deputies must be made aware of the CDCR Armstrong class members housed at the SCSD detention facilities;
- The operations order does not contain the newer revised full ADA definition (the revised definition is defined in another section of this report);
- The operations order must also contain other pertinent definitions not currently captured in the order, e.g., Compliance Supervisor (ADA Coordinator), ADA Deputy, TDD/TTY, Talking Book Program, Inmate Disability Tracking Program, disability codes (to be established), qualified interpreter, intellectual disability (developmental disability), Equally Effective Communication, due process, clinical encounter, auxiliary aids and services (e.g., qualified readers and qualified interpreters);
- Section III. of the order cites non-discrimination and ADA compliance, but numerous processes, forms, and training (as explained in detail throughout other sections of this report) must be put in place to ensure that discrimination does not take place relative to ADA and inmates with disabilities; and
- The jail rulebook does not refer to Compliance Sergeants (ADA Coordinators) or ADA Deputies (ADA Corrections Division representatives), and has very limited ADA/disability-related information. Numerous disability-related topics must be included, and are outlined in other sections throughout this report.

## References

**28 CFR § 35.130(a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.107(a)** states that a public entity that employs 50 or more persons shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to it alleging its noncompliance with this part or alleging any actions that would be prohibited by this part.

***The information below is for reference only.***

*Due to the settlement agreement and subsequent Armstrong v. Schwarzenegger Federal Court Ordered Injunction (January 18, 2007), the CDCR was ordered to do the following with regard to their ADA program which includes inmates with disabilities, e.g., mobility, blind/vision, deaf/hearing, learning, and those with*

*kidney disease (undergoing dialysis treatment):*

*"Within 45 days of this Order, defendants shall appoint one full-time staff member at the Associate Warden level or higher as the ADA Coordinator at each institution designated to house prisoners with disabilities impacting placement (including designated reception centers and designated security housing units and condemned housing) to work only on ADA compliance matters…"*

## Notices

The Sheriff's Department County of Sacramento Correctional Services Operations Orders pertaining to ADA Notices are outlined in the draft Operations Order Inmates with Disabilities - ADA. This Operations Order indicates that The Americans with Disabilities Act Inmate Notice will be prominently posted in all inmate-housing units and the Americans with Disabilities Act Public Notice will be prominently posted at the public entrances of all Jail facilities.

These Notices are required to advise disabled inmates and other interested persons of information regarding the provisions of Title II of the ADA and its applicability to services, programs, or activities and to make the information available in a manner necessary to apprise individuals of the protections against discrimination assured them by the ADA. The Notices are also required to make available to all individuals the name, office address, and telephone number (for the public) of the employee designated to coordinate compliance with the ADA.

### Observations

The Assessment Team conducted a site assessment and review of all inmate housing units and public entrances at the MJ and the RCCC facilities. The site assessment revealed that the ADA Notices are not prominently displayed in any of the housing units in the MJ and RCCC facilities. The public entrances at the MJ and RCCC facilities do have ADA Public Notices posted. However, the ADA Notices refer individuals to the Department ADA Coordinator "Ivanna Chow" and to the Manager, EEO Disability Compliance Countywide ADA Coordinator.

### Conclusions

The SCSD detention facilities do not provide the Notices to all inmates as required by 28 CFR §35.106. As a result, inmates are not provided information regarding the provisions of Title II of the ADA and its applicability to the services, programs, or activities. They are not apprised of the protections against discrimination assured them by the ADA, and they are not informed as to the name, office address, and telephone number of the employee or employees designated to coordinate compliance with the ADA.

### References

**28 C.F.R. § 35.106** requires a public entity to make available to applicants, participants, beneficiaries and other interested persons information regarding the provisions of Title II and its applicability to the services, programs, or activities of the public entity, and make such information available to them in such manner as the head of the entity finds necessary to apprise such persons of the protections against discrimination assured them by Title II of the ADA.

**28 C.F.R § 35.107** requires a public entity that employs 50 or more persons to designate at least one employee to coordinate its efforts to comply with and

carry out its responsibilities of title II of the ADA, including any investigation of any complaint communicated to it alleging its noncompliance or alleging any actions that would be prohibited. The public entity shall make available to all interested individuals the name, office address, and telephone number of the employee or employees designated pursuant to this paragraph.





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

## Custody Staff

All staff must have a working knowledge of and comply with all existing operations orders, post orders, policies, procedures and directives. Unlike the operations orders, policies and procedures, post orders contain specific post-related instructions and requirements and typically are required to remain at the specific post site. Post orders clearly outline duties, responsibilities, and expectations of staff. Without post orders, there is limited accountability for staff performing their day-to-day responsibilities/duties. In addition, staff should be required to sign the post orders acknowledgement log acknowledging that they read and understood the post orders.

**Observations**

The Assessment Team reviewed the following post orders:

- 8 WEST 400 Pod Disciplinary Housing Unit
- JKF Security Checks Post Order Protocol
- Booking Security Check Post Order Protocol
- CBF Cleaning Procedures Post Order Protocol
- CBF Daily Event Schedule
- CBF Security Checks Protocol
- Detainee Correspondence Post Order Protocol
- Detainee Orientation Post Order Protocol
- Emergency Psychiatric Evaluation Post Order Protocol
- Gatehouse Security Check Post Order Protocol
- Hunger Strike Post Order Protocol
- ICE Compliance Fire Drills Post Order Protocol
- ICE Detainee Classification Process Post Order Protocol
- ICE Detainee Strip Search Post Order Protocol
- ICE Guidelines Post Order Protocol
- ICE Notifications Post Order Protocol
- JKF Cleaning Procedures Post Order Protocol
- JKF Daily Event Schedule
- KBF Cleaning Procedures Post Order Protocol
- KBF Daily Event Schedule
- KBF Security Checks Post Order Protocol
- Kitchen Security Check Post Order Protocol
- Laundry Security Check Post Order Protocol
- MSDS/Hazardous Substance Inventory Log Post Order Protocol
- RBF Cleaning Procedures Post Order Protocol
- RBF Daily Event Schedule
- RBF Security Checks Post Order Protocol
- SBF Cleaning Procedures Post Order Protocol
- SBF Daily Event Schedule
- SBF Security Checks Post Order Protocol



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Security Housing Food Services Post Order Protocol
- Special Management Unit Post Order Protocol
- Tower Security Check Post Order Protocol
- Booking Post Order
- CBF Post Order
- Gatehouse Post Order
- JBCT (ROC) Program Post Order
- JKF Post Order
- KBF Post Order
- Kitchen Post Order
- Laundry Post Order
- RBF Post Order
- SBF Post Order
- Tower Post Order

Based on this review it was found that the custody post orders do not contain any language relative to staff requirements and duties regarding disabled inmates, or reasonable accommodation requirements, etc. It was also found that there are no post orders for custody positions at the MJ and the RCCC minimum and medium security barracks housing units and custody support positions.

## Conclusions

The existing SCSD detention facilities custody post orders must be developed and/or revised with specific requirements for staff to ensure disabled inmates have equal access to programs, services and activities, and staff are aware of the assistance and accommodations/modifications that they must provide for disabled inmates. Examples of specific information to be inserted include, but are not limited to: assistance to inmates with learning and developmental disabilities, reasonable accommodation requirements during verbal announcements, alarms, and evacuation procedures for disabled inmates. For custody positions that currently do not have post orders in place, post orders must be developed with specific requirements for staff to ensure disabled inmates have access to programs, services and activities. This means, in part that staff must be aware of the  assistance and accommodations/modifications they need to provide for disabled inmates.

## References

**28 CFR § 35.105 (a)** requires that a public entity evaluate its  current policies and practices, and to the extent that modification of any such policies and practices is required, the public entity shall proceed to make the necessary modifications if they do not or may not meet the requirements of Title II.

*The information below is for reference only.  Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Armstrong v. Brown settlement agreement.*



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*"Each institution/facility (DPP designated institution, nondesignated institution, and reception center), shall ensure custody staff in housing units where an inmate with impairments that impact placement resides, maintains a copy of the identification card/picture for that inmate with the inmate roster, to alert unit staff of the special needs of the inmate during count, emergency evacuation, verbal announcements, etc."*

*Post Orders:*

*Specific ADA requirements are required to be incorporated into staff unit post orders. This includes the following areas:*

- *Verbal Announcements and Alarms;*
- *Evacuation Procedures; and*
- *Count.*

*Staff post orders must be revised to include the specific requirements for staff to ensure they are aware of assistance and modifications that must be provided to disabled inmates.*

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Clark v. California settlement agreement.***

*Notices, Announcements, and Alarms:*

*Written Materials: Each designated DDP institution/facility must ensure that CCR notices, orientation packages, announcements, and similar printed materials are accessible to inmates with developmental disabilities. Institution staff must provide the necessary assistance to all DDP inmates on a case-by-case basis to ensure that those who have difficulty reading and/or communicating in writing will be provided reasonable access to forms, regulations, and procedures. Local operational procedures must reflect specific notices, announcements, and alarm procedures for DD2 and DD3 inmates. Post orders for staff assigned to provide such services to DD2 and DD3 inmates must reflect these specific procedures.*

*Verbal Announcements: Each designated DDP institution/facility must ensure effective communication is made with inmates with developmental disabilities regarding public address announcements and reporting instructions, including*

*those regarding visiting, yard release and recall, count, lock-up, and unlock, etc. Local operational procedures must reflect specific requirements for verbal announcements impacting DD2 and DD3 inmates. Post orders for staff assigned to provide such services to DD2 and DD3 inmates must reflect these specific procedures, i.e., prompts for visits or hearings, if an inmate does not respond.*

*Count And Movement*

*Each designated DDP institution and facility must review local policies and procedures to ensure DDP inmates are provided with necessary prompting so that they comply with count time expectations, respond to visits, keep work/school schedules, and respond to meals and other movement calls. Local operational procedures must reflect specific count and movement procedures for DD2 and DD3 inmates. Post orders for staff assigned to designated buildings/units/wings that house DD2 or DD3 inmates must reflect the specific count and movement procedures.*

*Evacuation Procedures*

*Local evacuation procedures must be adopted at each designated DDP facility to ensure the safe and effective evacuation of inmates with developmental disabilities. Local operational procedures must reflect specific evacuation procedures for DD2 or DD3 inmates. Post orders for staff providing services for DD2 or DD3 inmates must reflect these procedures.*

*All DDP inmates will be provided instructions for evacuation/emergency procedures during orientation before initial classification at designated institutions.*

## Accountability

The SCSD detention facilities do not have any existing operations orders, policies or procedures for the MJ or RCCC pertinent to investigating, monitoring or tracking allegations or violations of Title II of the ADA. Since there is no local policy requirement, the Assessment Team did not observe or review the tracking of ADA or disability-related allegations or violations against inmates.

**Observations**

Sacramento County Sheriff's Department, Operations Order 01/03, Employee Conduct, states in part; "The purpose of this Order is to outline the standards of employee conduct at the Main Jail and Rio Cosumnes Correctional Center (RCCC)."

Section II. Related General Orders, states in part, "Employees shall be aware of and adhere to the policies and regulations within the Sheriff's Department's Departmental General Orders and Divisional Operations Orders."

Section III. General Behavior, states in part; "All persons employed at the correctional facilities, either in a paid or volunteer capacity must observe all rules, regulations, and laws pertaining to custodial facilities. Any failure to do so may result in disciplinary action, exclusion from the facilities, or legal consequences."

However, Operations Order 01/03, Employee Conduct, does not contain specific language regarding staff accountability with regard to violations or allegations relative to the ADA or inmates with disabilities.

Sacramento County Sheriff's Department, Operations Order 07/02 Grievances, states in part, "Correctional Services shall provide a written process that allows inmates to grieve specific conditions. All written grievances shall receive a written response within a reasonable time limit and will be resolved at the lowest appropriate staff level."

Section II. Definitions, states in part, "A grievance is a complaint by an inmate regarding any condition of confinement, act, rule or policy, written or unwritten, in which an inmate contends that there is an infringement upon his or her personal, human or constitutional rights." It also contains language indicating that a grievance may include complaints against the substance of policies or rules, conditions of confinement, medical care, classification actions, disciplinary actions, program participation, telephone, mail and visiting procedures.

Section III. Grievance Procedures, states in part; "An inmate should first direct his/her issue to custody or supervising staff as the issue should be resolved at the lowest appropriate staff level. If custody or supervising staff is unable to resolve the issue, the inmate may file a formal written grievance."

Section IV. Supervisor Responsibilities, states in part; "The watch commander/unit manager has four days to review and approve the response, add additional responses to the grievance or require further investigation. The completed grievance response will be forwarded to the assistant division commander for review. In the event the grievance involves staff conduct, the assistant division commander shall notify the division commander who thereafter will decide if a copy should be forwarded to Professional Standards."

Operations Order 07/02 Grievances, encourages and expects internal problems to be solved at the lowest possible level of inmate contact, offers administrators a means for continuous review of administrative policy and procedure, and provides written documentation of inmate complaints. The Order allows inmates a grievance/appeal process for a multitude of issues, e.g., conditions of confinement, including but not limited to: health care, classification actions, disciplinary actions, program participation, telephone, mail, visiting, etc.

Although the Order does not contain a separate avenue for writing or tracking confidential letters directly to an executive or other administrators, and does not contain specific information relative to disabilities, health care appliances, or other ADA or disability concerns/issues, the grievance process is the mechanism for formal and informal resolution of disability-related concerns. Likewise, although not defined in written policy as such, KITE's (including HS KITE's) are the expected process for disability-related requests, e.g., access to programs, services and activities, including health care, reasonable accommodations, effective communication, staff assistance, health care appliances/assistive devices/durable medical equipment, and auxiliary aids.

Section IV. Supervisor Responsibilities, states in part, "The watch commander/unit manager has four days to review and approve the response, add additional responses to the grievance or require further investigation. The completed grievance response will be forwarded to the assistant division commander for review. In the event the grievance involves staff conduct, the assistant division commander shall notify the division commander who thereafter will decide if a copy should be forwarded to Professional Standards.

There is no specific policy or procedure, however, to formally track ADA-related grievances or issues (either by egregious, serious, or repeat allegations or violations, or by housing unit, nature of complaint, team/shift, date, or other criteria) in order to monitor disability-related problem areas for immediate or on-going attention.

As stated above in Section IV. Supervisor Responsibilities, it is implied that the administration and Professional Standards staff would follow-up on complaints of staff misconduct. But this does not describe or include any timelines or any specific course of action (or staff disciplinary matrix for any substantiated ADA or disability-related allegations).

**Staff Interviews**

Assessment Team members interviewed the Compliance Sergeants (ADA Coordinators) and the ADA Deputies (Assistant ADA Coordinators), as well as Inmate Grievance Office staff and numerous other custody and non-custody supervisors and staff throughout the MJ and RCCC.

**Inmate Interviews**

During the inmate interviews, some inmates who are permanent wheelchair-users and other mobility-disabled inmates, as well as inmates who are deaf, have kidney disease (undergoing kidney dialysis), mental illness, and those with other disabilities reported incidents that can be classified as egregious ADA or disability-related violations and which would meet the criteria for investigating, monitoring and tracking. Specific allegations and information are captured throughout this report.

**Conclusion**

The SCSD detention facilities are in violation of Title II of the ADA, with regard to implementation or oversight of a defined accountability or investigative mechanism to monitor and track staff ADA violations. It is paramount that the SCSD detention facilities develop and implement a policy and practice relative to accountability and investigations specific to ADA and disabled inmates.

The SCSD detention facilities do not have an existing policy (or procedures) pertinent to monitoring, investigating and tracking violations of Title II of the ADA. Nor do they have a mechanism to specifically capture staff ADA violations (e.g., egregious or serious violations or repeat occurrences).

The SCSD detention facilities currently handle inmate grievances and staff complaints in accordance with existing SCSD detention facilities Operations Order 07/02, Grievances. However, this process only captures alleged violations as a result of inmate grievances filed. This process does not capture events where supervisors, managers or other staff identify violations of Title II of the ADA (or any violations relative to future SCSD detention facilities policies).

The SCSD detention facilities must ensure a new policy (and related procedures) are written and implemented regarding monitoring, investigating and tracking staff violations or allegations of violations of Title II of the ADA (as well as violations or allegations of violations of future local ADA-related policies).

As a result of the assessment, the team found:

- There is no existing policy pertaining to monitoring, investigating and tracking staff violations (or allegations of such violations) of Title II of the ADA;
- The SCSD detention facilities need to incorporate a written policy and procedures regarding monitoring, investigating, and tracking staff



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

violations (or allegations of violations) of Title II of the ADA (and any new SCSD detention facilities operations orders pertaining to the ADA or an inmate disability program);

- Staff must be trained on any new policy and expectations; and
- Staff must be subject to discipline for violations of the ADA.

## References

**28 CFR § 35.130 (a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.107 (a)** states that a public entity that employs 50 or more persons shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to it alleging its noncompliance with this part or alleging any actions that would be prohibited by this part.

***The information below is for reference only. Due to Federal Court Ordered Injunction (January 18, 2007), the CDCR was ordered to do the following (with regard to instituting an Accountability Plan) to hold managers and staff accountable for violations of the ADA and related settlement agreements, court injunctions, etc., as pertained to inmates with disabilities:***

*Federal Court Injunction (January 18, 2007)*

*Accountability:*

*"Within 120 days of the date of this Order, defendants, in cooperation with the Office of the Inspector General and the Receiver in Plata v. Schwarzenegger, shall develop a system for holding wardens and prison medical administrators accountable for compliance with the Armstrong Remedial Plan and the orders of this court. This system shall track the record of each institution and the conduct of individual staff members who are not complying with these requirements. Defendants shall refer individuals with repeated instances of non-compliance to the Office of Internal Affairs for investigation and discipline if appropriate."*

*"Within 60 days of the date of this Order, defendants shall amend post orders and duty statements of correctional staff as appropriate to include the Armstrong requirements for which they are responsible."*


## Policies and Procedures

The Assessment Team reviewed the Sheriff's Department County of Sacramento Correctional Services Operations Orders, Correctional Health Services Policies and Procedures and the Correctional Health Services Standardized Nursing Procedures that specifically pertain to or should pertain to inmates with disabilities. The following list details the Operation Orders and Policies and Procedures that require revision with ADA-specific requirements.

**Sheriff's Department County of Sacramento Correctional Services Operations Orders**

| | |
|---|---|
| 01/05 | Training Program / Training Requests |
| 01/11 | Line-Ups |
| 01/15 | Reporting of Incidents and Crimes |
| 02/01 | Use of Force |
| 02/02 | Use of Restraint Devices |
| 02/03 | Use of Pro-Straint Chair |
| 02/04 | Weapons, Tactical Weapons, and Specialized Equipment |
| 02/05 | CERT and Cell Extraction Procedures |
| 02/06 | Prisoner Searches |
| 02/12 | Transportation of Prisoners |
| 02/13 | Inter-Facility Transportation and Court Appearances |
| 03/03 | Fire Suppression - Main Jail |
| 03/05 | Fire Suppression – RCCC |
| 03/09 | Fights, Riots, Hostage and Minor Disturbances |
| 03/12 | Evacuation Plan - Main Jail |
| 03/13 | Evacuation Plan - RCCC |
| 03/16 | Crimes Occurring Within Correctional Facilities |
| 03/17 | Preventing, Detecting, Responding to Inmate Detainee Sexual Assault |
| 04/01 | Intake, Search, Reception and Holding |
| 04/02 | Evidentiary/ Exposure Blood Draws |
| 04/03 | Prisoner Clothing, Property, and Funds |
| 04/04 | Use of Sobering Cell |
| 04/05 | Use of Safety, Segregation, North Holding #2, and Multipurpose Rooms |
| 04/07 | Dress-In/Dress-Out Procedures |
| 04/08 | Prisoner Orientation |
| 04/09 | Release Procedures |
| 04/10 | Property and Money Return and Release Procedures |
| 04/12 | Missing Property and Property Claims |
| 05/04 | DNA Samples |
| 05/08 | Work Project Assignment |
| 05/09 | Weekenders |

| | |
|---|---|
| 05/10 | Service of Processes on Prisoners |
| 06/02 | Housing Plan |
| 06/03 | Classification Process |
| 06/04 | Count and Lockdowns |
| 06/08 | Court Pull Procedures |
| 06/09 | Prisoner Movement Within a Facility |
| 06/10 | Recreation, Exercise and Showering |
| 06/11 | Laundry, Clothing & Linen |
| 06/13 | Telephone/TDD/TTY Equipment Access |
| 06/14 | Interpreter Services |
| 06/17 | Social and Media Visits |
| 06/19 | Inmate Workers |
| 06/20 | Court Holding Area and Courtroom Security |
| 07/01 | Inmate Message Requests (KITE's) |
| 07/02 | Grievances |
| 07/03 | Discipline Plan |
| 08/04 | Educational Services |
| 08/05 | Commissary Operations |
| 08/06 | Prisoner Services |
| 08/07 | Law Library |
| 08/10 | Jail Industries |
| 08/11 | Religious Services |
| 09/01 | Housing Unit Inspections and Cost Recovery |
| 09/10 | Maintenance Requests and Equipment Repair |
| 10/01 | Health Care Services |
| 10/02 | Psychiatric Services |
| 10/03 | Health Care Treatment Access |
| 10/04 | Medical Intake Screening |
| 10/05 | Suicide Prevention Program |
| 10/08 | Medicine Distribution "Pill Call" |
| 10/09 | Dental Services |
| Draft | Inmates With Disabilities - ADA |

## Correctional Health Services Policies and Procedures

| | |
|---|---|
| 1125 | Prosthesis |
| 1128 | Reading Glasses for Inmates |
| 1129 | ICE Detainee Procedural Considerations |
| 1302 | Staff Development and Training |
| 1404 | Receiving Screening |
| 1407 | Access to Treatment |
| 1409 | Clinic Care – Sick Call |
| 1410 | Medical Services Provided in the Medical Housing Unit |
| 1411 | Mental Health Services |

| 1412 | Suicide Prevention – 2M – Joint Policy with JPS |
| 1413 | Use of Restraints and the Pro-Straint Chair |
| 1414 | Restraint Check Method |
| 1415 | Patients in Safety Cells |
| 1417 | Adult Developmental Disability |
| 1421 | Hunger Strike |
| 1422 | Special Needs Patients |
| 1423 | Post Release Medical Care Planning |
| 1424 | Sexual Assault |
| 1425 | Patients in Segregation Cells in Intake |
| 1431 | Footwear in the Jails |
| 1433 | Admission to Jail Acute Psychiatric Inpatient Unit |
| 1435 | Inmate Health Care Grievances |
| 1436 | Two East Inmate Transfers |
| 1439 | Reports of Disabilities or Impairments |
| 1601 | Medication Administration |
| 1801 | Informed Consent |
| 1803 | DNA Procedure at MJ and RCCC |
| 1900 | Health Record Format and Contents |
| 2000 | Dental Care |

## Conclusion

The Sheriff's Department County of Sacramento Correctional Services and Correctional Health Services must revise the operations orders and policies and procedures identified above adding specific ADA language and requirements, as they relate to disabled inmates. In addition, policies and procedures must be created to ensure: EC is provided to disabled inmates; inmates are screened and evaluated for disabilities and accommodations needs based on their disabilities; and out-of-cell time is made equitable to the extent possible for inmates with disabilities. The Sheriff's Department County of Sacramento Correctional Services and Correctional Health Services must also ensure their operations orders and policies and procedures address accommodations that must be provided to disabled inmates (e.g., those with learning and developmental disabilities) to ensure disabled inmates have equal access to programs, services, and activities.

## References

**28 CFR § 35.130 (b)(7)** requires a public entity to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

**28 CFR 35.105** requires a public entity to evaluate its current services, policies, and practices and the effects thereof, that do not or may not meet the requirements of Title II of the ADA and to the extent modification of any such services, policies and practices is required, the public entity shall proceed to make the necessary modifications.

**28 CFR 35.130 (a)** No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

(3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

(4) A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

(7) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

(8) A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Armstrong v. Brown settlement agreement.***



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*Notice, Announcements, and Alarms*

*Written Materials*

*Each institution/facility (DPP designated institutions, nondesignated institutions and reception centers) shall ensure that CCRs, Notices, Orientation Packages, Job Announcements and similar printed materials that it distributes to inmates are accessible to inmates with disabilities.*

*Each institution/facility shall ensure that accommodations such as magnifiers, photocopying machines with capability to enlarge print for vision-impaired inmates, inmate or staff assistance, computer assisted devices audiotapes and Braille are provided when necessary. Institution staff shall provide the assistance and equipment necessary to all inmates with disabilities on a case-by-case basis to ensure that have difficulty reading and/or communication in writing e.g., learning disabled inmates, are provided reasonable access to forms CCRs, and procedures. The type of equipment available will vary based upon the institution's mission designation. Information regarding access to written materials will be provided to disabled inmates during the orientation process.*

*Verbal Announcements and Alarms*

*Each institution/facility (DPP designated institutions, nondesignated institutions and reception centers) shall ensure that effective communication is made with inmates who have hearing impairments impacting placement regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, unlock etc.*

*All verbal announcements in housing units where inmates with hearing impairments impacting placement reside shall be done on the public address system (if applicable) and by flickering the unit lights on and off several times alerting impaired inmates that an announcement is imminent.*

*The verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, etc. These procedures shall be communicated to disabled inmates during the orientation process. These requirements shall be incorporated into unit staff post orders.*

*Local policies and procedures shall be adopted to reflect this obligation.*



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

*Evacuation Procedures:*

*Each institution/facility (DPP designated institutions, nondesignated institutions and reception centers) shall ensure the safe and effective evacuation of inmates with disabilities.*

*Local evacuation procedures shall be adopted at each facility.*

*Each institution/facility (DPP designated institutions, nondesignated institutions, and reception centers) shall ensure custody staff in housing units where inmates with disabilities that impact placement reside maintain a copy of the identification card/picture for that inmate with the inmate roster, to alert unit staff of the special needs required for emergency evacuation of the inmate. Special needs may include personal notification for hearing impaired inmates, or assistance provided to vision or mobility impaired inmates in responding to emergency situations.*

*Evacuation procedures shall be effectively communicated to disabled inmates during orientation process. These procedures shall also be incorporated into unit staff's post orders.*

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Clark v. California settlement agreement.***

*Notices, Announcements, and Alarms:*

*Written Materials: Each designated DDP institution/facility must ensure that CCR notices, orientation packages, announcements, and similar printed materials are accessible to inmates with developmental disabilities. Institution staff must provide the necessary assistance to all DDP inmates on a case-by-case basis to ensure that those who have difficulty reading and/or communicating in writing will be provided reasonable access to forms, regulations, and procedures. Local operational procedures must reflect specific notices, announcements, and alarm procedures for DD2 and DD3 inmates. Post orders for staff assigned to provide such services to DD2 and DD3 inmates must reflect these specific procedures.*

*Verbal Announcements: Each designated DDP institution/facility must ensure effective communication is made with inmates with developmental disabilities regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, and unlock, etc. Local operational procedures must reflect specific requirements for verbal announcements impacting DD2 and DD3 inmates. Post orders for staff assigned*

*to provide such services to DD2 and DD3 inmates must reflect these specific procedures, i.e., prompts for visits or hearings, if an inmate does not respond.*

*Count And Movement*

*Each designated DDP institution and facility must review local policies and procedures to ensure DDP inmates are provided with necessary prompting so that they comply with count time expectations, respond to visits, keep work/school schedules, and respond to meals and other movement calls. Local operational procedures must reflect specific count and movement procedures for DD2 and DD3 inmates. Post orders for staff assigned to designated buildings/units/wings that house DD2 or DD3 inmates must reflect the specific count and movement procedures.*

*Evacuation Procedures*

*Local evacuation procedures must be adopted at each designated DDP facility to ensure the safe and effective evacuation of inmates with developmental disabilities. Local operational procedures must reflect specific evacuation procedures for DD2 or DD3 inmates. Post orders for staff providing services for DD2 or DD3 inmates must reflect these procedures.*

*All DDP inmates will be provided instructions for evacuation/emergency procedures during orientation before initial classification at designated institutions.*

## Americans with Disabilities Act Assets/Features

The Sheriff's Department County of Sacramento Correctional Services Operations Orders applicable to requesting or facilitating repair and maintenance requests, are outlined in Operations Orders 09/10, Maintenance Requests and Equipment Repair.

The purpose of the Order is to standardize the procedures for maintenance requests and facility equipment repair at the MJ and RCCC.

Section I of the policy (Overall maintenance), states in part, "Custody and assigned staff at each facility are responsible for inspecting facility equipment in their respective work areas on a daily basis and will promptly report all needed repairs."

Section II (Main Jail), state in part, "At the Main Jail facility equipment needing repair and general maintenance will be fielded through the project officer using a Maintenance Request form."

Section III (RCCC), states in part, "At RCCC, facility equipment needing repair and general maintenance will be fielded through the project officer using the maintenance hotline phone listing, which is available from the projects officer and/or administration.

Section III also states in part, "If a maintenance issue is not urgent, the after-hours non-emergency line may be used to leave a message", and "If the maintenance issue is an emergency, a supervisor shall be notified. Employees should not leave a message on the non-emergency line and should contact the projects officer or the trade directly.

However, there are no policies or procedures with regard to inventorying and tracking structural or fixed assets/features, e.g., grab bars, transfer bars, raised toilets, sinks, water fountains, and exercise apparatus. Likewise, there are no existing policies or procedures to identify specific categories or priorities specific to ADA-related maintenance requests/repairs.

For the MJ, the Assessment Team interviewed the Basement Project Manager (sworn sheriff's deputy), as well as an SCSD Sheriff's Lieutenant. The Basement Project Manager is responsible for receiving maintenance/work request issues, and submitting them to the SCGS. For RCCC, the Assessment Team interviewed SCSD detention facilities Records Officer (non-sworn) who is responsible for the RCCC maintenance and work order process. The team also interviewed two SCGS Facility Managers, who work collaboratively with the aforementioned staff, and are responsible for receiving and following up on maintenance requests. The process at both detention facilities is basically identical. There are minor differences, e.g., the specific buildings and areas for



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

written work requests/work orders are different, and some of the RCCC areas include industries.

For both jails, potential work orders/requests can be initially identified by staff, or inmates can report an issue or discrepancy and notify a deputy or appropriate jail staff. Staff may initiate a general order (work request) for maintenance and repair work requests electronically through the SCSD detention facilities Web-Portal. Specifically, staff complete the order (work request) by identifying the location and specific issue warranting repair or replacement, and answering relevant questions via drop-down menus and a comments section. All electronic requests submitted by staff are received by either the MJ Basement Project Manager or the RCCC Records Officer who has oversight of the RCCC work request process.

The MJ Basement Project Manager and RCCC assigned Records Officer receive the electronic email notification of requests (from requesting staff member), and make all reasonable attempts to informally ensure all appropriate maintenance/repair/replacement requests are completed as soon as possible. If the issue(s) cannot be resolved informally, the MJ Basement Project Manager or RCCC Records Officer electronically navigates through the County Automated Facility Maintenance (CAFM) management system. Each respective party (as applicable) will input the requests and information (type of issue, location, etc.) into a work order, and forward the order to the SCGS.

Categories for work orders include: routine, urgent and emergent. The aforementioned staff at both the MJ and RCCC indicated that they make immediate phone calls to the SCGS for emergent issues, and ongoing communication takes place between them and the SCGS Facility Managers as to any remaining open work orders (including those in immediate need). The Assessment Team was informed that work orders never 'fall off' (are not deleted from) the CAFM system until 7 days after completion of the repair or replacement. Most work orders associated with ADA are considered routine maintenance issues (which are the lowest level of the priorities), but both the MJ Basement Project Manager and RCCC Records Officer indicated that they inform an SCGS Facility Manager if an issue involves ADA non-compliance.

Once the SCGS Facility Manager receives the electronic Work Order from either the MJ Basement Project Manager or RCCC Records Officer, he dispatches a maintenance staff member to provide maintenance repair or replacement as necessary. According to the staff members interviewed, routine maintenance requests generally take 2-3 working days to complete. The Assessment Team was informed, however, that routine ADA work requests as well as emergency requests are usually completed on the same day that the SCGS Facility Manager receives the electronic work order from the MJ or RCCC.

Both aforementioned staff members from the MJ and RCCC admitted that there is not a master listing or inventory of ADA structural or fixed assets or features, nor is there a policy, procedure, or standard practice for identifying 'ADA' within the work order or request process. The only current method to identify a maintenance issue as ADA-related, would be to incorporate language into the comments section of the initial request email and subsequent work order outlining the discrepancy as ADA-related. However, as Operations Order 09/10 currently does not require this, and there is no other related written policy or procedure, there is no current directive for staff to do this. The MJ Basement Project Manager and RCCC Records Officer both acknowledged the SCGS maintenance staff for their diligence with regard to promptly fixing maintenance issues as they arise.

The SCGS Facility Managers interviewed confirmed there is no standard report generated or monitored to track the state of repairs for ADA or disability-related maintenance issues, unless SCGS staff individually sort [in the CAFM system] by a specific known item/issue/discrepancy, or, unless requesting staff or the MJ Basement Project Manager or RCCC Records Officer identify a particular issue as 'ADA' (in the request email or electronic work order comments section). They also confirmed the following: there is no master list of structural or fixed ADA assets/features; there are no ADA or disability categories for maintenance work orders; there are no expedited timelines or priority categories specifically for ADA or disability-related maintenance requests; and there is no regular preventive maintenance or serviceability checks for the few structural or fixed ADA assets/features that do exist at the MJ and RCCC.

One of the SCGS Facility Managers interviewed indicated that he could create or produce just about any type of report or spreadsheet as requested. But in interviewing all pertinent staff members, the primary report utilized is a general report listing open and completed work orders.

The Assessment Team received the following related documents (reports) produced from the CAFM system: spreadsheet of all open and closed work orders submitted during the previous 12 months (and beyond); a spreadsheet of all open and completed work orders for Facility 505 (MJ - Lorenzo Patino Hall of Justice) and Facility 507 (RCCC); and a listing of all open and completed work orders (since 6/1/16) specifically focusing on areas (not necessarily specific to actual structural or fixed ADA assets or features) where mobility-disabled inmates are most likely housed and where ADA fixed/structural assets or features exist or should exist (e.g., MJ 2nd floor, RCCC MHU, M-Dorm). However, SCGS staff was unable to produce any historic list of service call or maintenance requests (open or completed) specifically for ADA or disability-related issues.

One of the CAFM reports (spreadsheet) received for open/completed work orders contained the following fields: preventive maintenance work record code,

description, requestor, status, current date, and current time. A second CAFM report received contained the following fields: facility code (505 [MJ] or 507 [RCCC]); floor (e.g., 2nd floor); facility name; address; work order #; work order description; status (e.g., O, C, X, D, T); status description (e.g., in-progress, dispatched, completed, on-line); work order creation day; work order completion day; and requestor. The above listed 'status' letters/codes represent the following: O=Open (possibly dispatched, in-progress, on-hold, on-line, or vendor); C=Completed; D=Deferred; T=Terminated work order (possibly work was not needed or had already been completed); X=Duplicate (previous work order had already been completed.

A review of the CAFM generated Report for the MJ (for the previous 12 months) showed a listing of approximately 3,060 work orders submitted. Of those work orders, only 2 were identified in the CAFM Report as ADA or disability-related. As stated above, this is the exception, as there is no current policy or common practice to identify these as such. One of the two work orders was applicable to inmates (including mobility-impaired inmates). This particular work order was submitted as a facility-wide request to install handrails in every shower in the MJ due to "ADA Compliance rules", and also "old style showers" need to have a slip grip tape installed on the floor. The work order was submitted on 1/19/16, and is still categorized as an 'Open' work order. The second ADA-related work order concerns visiting civilians/non-inmates (not applicable to an Inmate Disability Program), and is specific to the Women's ADA (courtroom side) toilet not flushing. This work order was submitted on 8/11/16, and is currently categorized as an 'Open' work order.

Of the more than 3,000 MJ work orders submitted during the previous 12-month period, only about 13 of the work orders were either clearly, likely, or somewhat likely to be ADA (disability/accessibility) related. A number of these would depend on what type of inmate (whether disabled and depending on specific type of disability) lived in the cell, bed area, or was housed in the respective housing unit. There were at least a couple of dozen additional work orders (in addition to the aforementioned 13 referred to) that may have also been ADA (disability/accessibility) related, also depending upon whether a disabled inmate lived in the cell, bed area, or was assigned to the respective housing unit. However, for both scenarios, without an electronic or other tracking process to identify disabled inmates (e.g., mobility and vision-impaired), and in the absence of a policy and process to identify and track ADA-related work orders, it is extremely difficult to obtain this information.

A review of the second CAFM generated report (spreadsheet) depicted all existing 'Open' work orders (regardless of when submitted) as well as all work orders submitted since 6/1/16, regardless of status (e.g., open, completed, etc.). This spreadsheet captured the MJ building/area 505 (Lorenzo Patino), specifically the 2nd floor, and RCCC building/area 537, specifically MHU and M-

barracks. This report is not normally generated or reviewed specifically for identifying or tracking ADA related work requests/work orders or otherwise. However, the Assessment Team specifically asked for this type of report as these are the primary areas (though not exclusive) where inmates with disabilities are currently or most likely to be housed, e.g., those with mobility and vision-impairments.

Information gleaned from approximately 129 MJ (2nd floor) work orders included: none of the work orders were flagged or identified as ADA (disability or accessibility) related; about 47 of the work orders are categorized as current 'Open' work orders (approximately 22 between 2011-2015 [primarily 2015]); About 82 are categorized as 'Completed'; and about 7 are either clearly, likely, or somewhat likely to be ADA (disability/accessibility) related. Of the approximate 7 ADA (or likely ADA related) work orders; about 4 of them are currently categorized as 'Open' work orders. Note: some of the work orders from this spreadsheet are also captured in the previously identified spreadsheet (CAFM generated report for work orders for the previous 12 months).

Information obtained from the 41 RCCC (building/area 537 – MHU, and M-Barracks) work orders included: none of the work orders are flagged or identified as ADA (disability or accessibility) related; 3 of the work orders are categorized as 'Open' work orders; 38 are identified as 'Completed'; and about 7 from RCCC are either clearly, likely, or somewhat likely to be ADA (disability/accessibility) related. Of the 7 ADA (or likely ADA) related work orders, all of them are identified as 'Completed.'

There is no identification or tracking category to specifically identify ADA or disability-related Work Requests/Work Orders, there is no log or list specific to ADA/disabled inmates or disability-related work requests/orders, and there are no existing records of ADA or disability-related maintenance or service calls.

The requests are categorized according to problem, but not relative to ADA, a disabled inmate, or a disability-related maintenance/repair issue.

Staff explained that ADA or disability-related maintenance/repair issues are normally categorized as 'Routine' (lowest level of priority category), but are often fixed or replaced immediately or within about 2-3 days.

Staff interviewed indicated the Compliance Sergeants (ADA Coordinators) and ADA Deputies (Assistant ADA Coordinators) for the MJ and RCCC do not receive copies of the work requests/work orders for monitoring, tracking or other purposes.

## Conclusion

Although Operations Order 09/10, Maintenance Requests and Equipment Repair is applicable to requesting or facilitating repair and maintenance requests, neither

the SCSD detention facilities nor SCGS have an operations order, policy, procedure, or process in place to track the state of repair for structural or fixed ADA assets and features. The current housing process is severely flawed in that it places mobility-disabled inmates in housing which is not accessible with regard to their cells, paths of travel, and inappropriate or non-fixed assets/features, such as grab bars, transfer bars, accessible toilets, showers, and sinks. It is vital that the SCSD detention facilities house mobility-disabled inmates in housing commensurate with their ADA needs as well as their custody level and programming needs (notwithstanding other overriding placement factors, e.g., mental health housing). The SCSD detention facilities must develop and put into place a comprehensive process to include an inventory and tracking system of housing placements available to inmates with mobility disabilities (i.e. full-time wheelchair users, intermittent wheelchair users, mobility-disabled inmates who do not use wheelchairs [but may require the use of an assistive device], etc.), and the status of repairs for ADA accessible assets/features and ADA-related maintenance (Work Requests/Work Orders).

ADA Title II Regulations, 28 CFR 35.133 Maintenance of Accessible Features, mandates that a public entity must maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by qualified individuals with disabilities (e.g., inmates with mobility disabilities).

28 CFR 35.152 Jails, Detention and Correctional Facilities, and Community Correctional Facilities, subsection (b)(3) Discrimination Prohibited, requires public entities to implement reasonable policies, including physical modifications to additional cells in accordance with the 2010 Standards, so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe and appropriate housing.

As a result of the assessment, which included reviews of applicable policies and other documents, as well as staff interviews, findings for this area include:

- The SCSD detention facilities and SCGS have no policies or procedures that pertain to requesting or facilitating repair and maintenance requests.
- The SCSD detention facilities and SCGS have no policies or procedures with regard to inventorying and tracking structural or fixed assets/features, e.g., grab bars, transfer bars, raised toilets, sinks, water fountains, exercise apparatus.
- There are no existing SCSD detention facilities operations orders or SCGS policies or procedures to identify categories or priorities specific to ADA requests/repairs.
- There is no identification or tracking category to specifically identify ADA-related Work Requests.
- There is not a log or list specific to ADA-related work requests.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- There is not currently a requirement for staff or supervisors to indicate on the electronic Work Request or Work Order that a request pertains to an ADA issue.
  - A couple of the employees interviewed (who have maintenance-related duties) indicated that the only way of knowing whether a work request/work order is ADA related is if the staff member who input the information into the work request email or work order request to SCGS indicates such in the comments section, but this is not currently required or routinely done.
- There is not an existing inventory list or tracking system for structural or fixed ADA assets/features (i.e.., grab bars, transfer bars, raised toilet seats, accessible sinks, water fountains, and exercise apparatus).
- There are no existing records to track ADA-related service calls for repairs or replacements completed, or to identify the length of time an ADA asset or feature may have been inoperable or missing.
- Fixed or structural ADA assets or features are not routinely checked for serviceability, and there is no known documentation of such.
- Work Requests/Work Orders are categorized according to the problem/discrepancy, but not relative to whether it's an ADA asset or feature or ADA related issue.
- There is not an official automatic priority list for ADA-related Work Requests (priority is based on criteria levels [e.g., emergent, urgent, routine], that do not pertain to the ADA).
- ADA-related Work Request/Work Order information is not being forwarded to the Compliance Sergeants (ADA Coordinators) or ADA Deputies (Assistant ADA Coordinators) at the MJ or RCCC for possible monitoring or tracking.
- In the two CAFM generated reports (spreadsheets) which tracked the description of work requested and submitted for the MJ and RCCC, with the exception of 2 (out of over 3,000 work orders submitted) there was no indication as to whether the listed requested repairs were ADA (disability or accessibility) issues, fixed ADA structural assets or features, or from a mobility-disabled inmate's cell or bed area.

**References**

**28 C.F.R. §§ 35.133 and 35.152**, detailed above.

*The information below is for reference only.  Due to Federal Court Ordered Injunction (January 18, 2007), the CDCR was ordered to do the following (with regard to the state of repair of accessible ADA features):*

*In January 2007, in the United States District Court, Northern District of California, the Honorable Judge Claudia Wilken issued a Federal Court Injunction against the California Department of Corrections and Rehabilitation (CDCR) as a result of violations of the Americans with Disabilities Act (ADA), Section 504 of the*



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

*Rehabilitation Act, and a previous court settlement agreement. One of several key issues cited in the Federal Injunction pertained to an inventory of housing placements, the status of state of repairs of accessible ADA features, and maintenance (Work Requests/Work Orders). Specifically, the Order mandated CDCR to generate an inventory of housing placements available to inmates with mobility disabilities (i.e., full time wheelchair users, intermittent wheelchair users, mobility impaired inmates not requiring the use of wheelchairs, and inmates with a vision disability). The Order included the requirement to include information regarding the current state of repair of accessible features for each placement. The placement inventory was required to be updated continuously as new information is received regarding placement factors and maintenance. Upon completion of the inventory, CDCR was required to no longer house the aforementioned type of disabled inmates at any placements without adequate accessible housing, including working (operational) accessible toilets and showers, etc.*



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

## Introduction Accessibility Survey

The survey section of this report is an effort to identify accessibility barriers as defined according to the 1991 Americans with Disabilities Act Standards for Accessible Design (Revised July 1, 1994) (ADAAG) and/or the 2010 Americans with Disabilities Act Standards (ADAS). Although "ADAAG" is the commonly used term for the 1991 ADA Standards, the term technically applies to the Guidelines published by the Unites States Access Board. When Guidelines are codified into law by the United States Department of Justice, they become Standards and are enforceable as law. Please refer to Part III Assumptions & Considerations / Technical Assumptions for a detailed explanation of ADAAG and ADAS. For purposes of this report, we will use the term "ADAAG" when referring to the 1991 ADA Standards and "ADAS" when referring to the 2010 ADA Standards.

The field survey for SCSD detention facilities was conducted using a digital level, tape measure and door pressure gauge. Photographs of typical compliant and noncompliant conditions were taken at each of the facilities. Collected data was reviewed and analyzed for appropriate recommendations to remove the barriers.

The field surveys were performed on October 17 and 18, 2016. Both areas that were currently being used as well as inactive areas such as Rodger Bauman Facility (RBF) were surveyed.

**OVERVIEW OF ADA REQUIREMENTS AS APPLICABLE TO SACRAMENTO COUNTY JAIL FACILITIES**

The Americans with Disabilities Act of 1990 (ADA) is civil rights legislation designed to extend civil rights protection to persons with disabilities.

There are four Titles to the ADA. Title II is the one that applies to Public Entities such as SCSD detention facilities.

Title II Public Services and Transportation - Prohibits state and local governments from discrimination by requiring "program accessibility". Program accessibility can be attained by rescheduling and/or relocating programs to accessible locations or by making physical facility changes, called "structural changes" in the ADA. Program accessibility must be achieved to the extent that it does not cause "an undue burden" to the Public Entity.

28 CFR, PART 35 --NONDISCRIMINATION ON THE BASIS OF DISABILITY IN STATE AND LOCAL GOVERNMENT SERVICES is the document that describes the ADA requirements for Public Entities such as SCSD detention facilities. These requirements include:

§35.105 Self Evaluation – requires that all Public Entities were to have evaluated all of their services, policies and practices to determine if they are all accessible



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

to persons with disabilities. The Self Evaluation was to have been completed by July 26, 1993. We have not been provided with a copy of an ADA Self Evaluation prepared by Sacramento County that included the County Jail facilities. Online research provided information that other County departments such as Transportation had prepared ADA Transition Plans (http://www.sacdot.com/Pages/AmericansWithDisabilitiesAct-ADA.aspx).

It should also be noted that corrective work to remove architectural barriers to program access did not begin with the ADA. Previous requirements to prepare a Self Evaluation and Transition Plan and to remove architectural barriers began with Section 504 of the Rehabilitation Act of 1973 for public entities receiving federal funding. We have likewise not been provided with a copy of a Section 504 Self Evaluation prepared by Sacramento County that included the County Jail.

§35.150 Existing Facilities – requires that "a Public Entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." However, the law does not require a "public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens.

The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity." We are not aware that the Sacramento County Sheriff's Office determined that any action that would have improved access to any of the services, programs and activities represent a fundamental alteration of those services, programs or activities or would result in an undue financial burden.

35.150(b)(1) indicates that a public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance. 35.150(d) also requires that In the event that structural changes are required to achieve program accessibility, the Public Entity shall develop by January 26, 1993 a Transition Plan setting forth the steps necessary to complete

such changes. Structural changes were to have been completed by July 26, 1995.

We are not aware if the County of Sacramento prepared a Transition Plan or of any structural changes that were performed at any of the SCSD detention facilities between January 26, 1993 and July 26, 1995.

It should be noted that the requirements for a Self Evaluation and Transition Plan under the ADA are taken from Section 504 of the Rehabilitation Act of 1973, which applied to projects that received federal funding. The ADA extended those requirements to Public Entities receiving state or local funding.

§ 35.151 New construction and alterations – requires that newly constructed and altered facilities built by or on behalf of Public Entities shall be fully accessible if construction commenced after January 26, 1992. Public Entities had the option of using the Uniform Federal Accessibility Standards (UFAS) or ADAAG as the technical standards for new construction and alterations.

28 CFR Part 35 was amended on September 15, 2010 and included new sections that affect the SCSD detention facilities:

35.151(k) Detention and correctional facilities

(1) New construction of jails, prisons, and other detention and correctional facilities shall comply with the 2010 Standards except that public entities shall provide accessible mobility features complying with section 807.2 of the 2010 Standards for a minimum of 3%, but no fewer than one, of the total number of cells in a facility. Cells with mobility features shall be provided in each classification level.

(2) *Alterations to detention and correctional facilities.* Alterations to jails, prisons, and other detention and correctional facilities shall comply with the 2010 Standards except that public entities shall provide accessible mobility features complying with section 807.2 of the 2010 Standards for a minimum of 3%, but no fewer than one, of the total number of cells being altered until at least 3%, but no fewer than one, of the total number of cells in a facility shall provide mobility features complying with section 807.2. Altered cells with mobility features shall be provided in each classification level.

However, when alterations are made to specific cells, detention and correctional facility operators may satisfy their obligation to provide the required number of cells with mobility features by providing the required mobility features in substitute cells (cells other than those where alterations are originally planned), provided that each substitute cell—

(i) Is located within the same prison site;

(ii) Is integrated with other cells to the maximum extent feasible;

(ii) Has, at a minimum, equal physical access as the altered cells to areas used by inmates or detainees for visitation, dining, recreation, educational programs, medical services, work programs, religious services, and participation in other programs that the facility offers to inmates or detainees; and

(iv) If it is technically infeasible to locate a substitute cell within the same prison site, a substitute cell must be provided at another prison site within the corrections system.

(3) With respect to medical and long-term care facilities in jails, prisons, and other detention and correctional facilities, public entities shall apply the 2010 Standards technical and scoping requirements for those facilities irrespective of whether those facilities are licensed.

### § 35.152 Jails, detention and correctional facilities, and community correctional facilities.

(b) *Discrimination prohibited.*

(1) Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

(2) Public entities shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals. Unless it is appropriate to make an exception, a public entity–

(i) Shall not place inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available;

(ii) Shall not place inmates or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment;

(iii) Shall not place inmates or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed; and


(iv) Shall not deprive inmates or detainees with disabilities of visitation with family members by placing them in distant facilities where they would not otherwise be housed.

(3) Public entities shall implement reasonable policies, including physical modifications to additional cells in accordance with the 2010 Standards, so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing.

The United States Department of Justice (USDOJ) has issued a document titled "Guidance on the 2010 ADA Standards" and a copy can be found in Appendix A.

It should be noted that Title II does not define "barrier" as does Title III for Public Accommodations. Similarly, Title II entities are not required to remove physical barriers even if they are "Readily Achievable", since this concept does not apply to Public Entities. As described in §35.150, a Public Entity is required to identify all programs, services and activities and to determine if people with disabilities are provided nondiscriminatory access to them. An example of a "service" at Sacramento County Jail would be a toilet within a prison cell; if there are no accessible cells/toilets with grab bars as required by the 1991 ADAAG or UFAS, that would be an example of lack of program access. Another example would be a path of travel leading to a building where a program (e.g., classroom) is provided that has a slope of 10%. While this latter condition could be addressed by providing an assistant that could push a wheelchair user up the steep slope, it is doubtful that the former condition could be made fully accessible by other means than installing grab bars.

Citing past case law is also illustrative of the nexus between correcting conditions that are non-compliant with the 1991 ADAAG or UFAS and the obligation to provide program access. "While the ADAAG regulations clearly are not dispositive in this case, they can still provide guidance as to whether an existing facility is readily accessible and usable by individuals with disabilities." Brown v. County of Nassau, 736 F. Supp. 2d 602, 617 (E.D.N.Y. 2010). The United State Supreme Court has also noted that "older facilities" can avoid structural changes by "relocating services to alternative accessible sites" or using other methodology, but if these measures are "ineffective in achieving accessibility" the public entity is "required to make structural changes." Tennessee v. Lane, 541 U.S. 509, 532 (2004). Title II "imposes on public entities the requirement that they provide qualified disabled individuals with meaningful access to public services, which in certain instances necessitates that public entities take affirmative steps to remove architectural barriers to such access in the process of altering existing facilities." Ability Center of Greater Toledo v. City of Sandusky, 385 F.3d 901, 913 (6th Cir. 2004).

Therefore, there are two different criteria that apply to the two SCSD detention facilities:

FACILITIES CONSTRUCTED PRIOR TO JANUARY 26, 1992:

For those facilities that were constructed prior to January 26, 1992, structural changes are required if any condition that does not comply with ADAAG limits or prevents the ability of an inmate with a disability to access any program at the Sacramento County Jail and other methods do not provide a similar level of compliance.

FACILITIES CONSTRUCTED OR ALTERED AFTER JANUARY 26, 1992:

For construction projects that have been performed after January 26, 1992 (including alteration projects), all work should be in compliance with ADAAG. For projects that commenced construction after March 15, 2012, all work should be in compliance with the 2010 ADAS, which for Title II entities includes 28 CFR Part 35.151 and the 2004 ADAAG. Refer to the detailed description of both standards in **Section D** below.

## Accessibility Survey's

The SCSD is responsible for the care and custody or all prisoners falling under the jurisdiction of the Sacramento County Court System. The SCSD also contracts with the U.S. Government to house federal inmates. The SCSD operates two detention facilities: the MJ and the RCCC. The MJ is located at 651 I Street in downtown Sacramento and RCCC is located approximately 25 miles South at 12500 Bruceville Road in Elk Grove.

The MJ, opened in approximately 1989 and is a Type II facility that houses nearly all of the County's pretrial population, a number of federal pretrial prisoners. The structure is comprised of two 9-story towers with a vertical spine in between that contain circulation and exercise space. Inmates are housed on seven floors (each floor includes two levels of stacked cells), with the Superior Court and Jail Administration support space located on the first two floors of the facility.

The MJ has a rated capacity for 2,380 male and female inmates and contains 2,432 beds. Inmate areas include the basement level, which contains the Kitchen and Laundry; first floor, which includes Medical Intake Screening, Women's Booking, Holding, Clothing Exchange & Release, Men's Booking & Holding; second floor, which includes the Medical, Dental and Psychiatry Units; third floor and general inmate housing on floors 3-8. Each inmate has a cell with a toilet, lavatory, mirror, and bed. Inmates eat and participate in programs in a common day room area equipped with tables, chairs, and telephones. Some areas such as the Male Release Tank were occupied on the day of the site visit and were not inspected.

The SCSD detention facilities accommodates inmates with disabilities by issuing different size wheelchairs to inmates who require this type of mobility device, and some inmates are allowed to keep their personal wheelchairs. Nursing staff assists inmates with disabilities with their bathing activities while housed in the Medical Unit. SCSD detention facility staff indicated that the MJ currently houses a small population of inmates with various types of disabilities.

Typical conditions observed in the MJ that are not compliant with ADAS:

<u>Basement</u>

Neither of the Kitchen inmate restrooms provide a 60" diameter clear turning space, grab bars or toilet accessories within accessible reach range and the doors only provide 30" clear width. The urinal rim in one of the restrooms is 25" AFF and there is no 60" wide space at the toilet



- All of the Laundry folding counter is 36" AFF, which is too high for a person in a wheelchair to work at



1st Floor

- Transaction counters are typically 42" - 44" AFF and openings that are used to pass items back and forth between staff and inmates are 52" AFF



- Changing benches in Dress In rooms that are not a minimum of 24" deep x 48" long



- Use of typical combination lavatory/toilet unit that does not provide knee space for a front approach at the lavatory or drinking fountain bubbler
- Female segregation cell restroom is only 26" wide at rear of toilet and lacks 60" diameter clear maneuvering space, toilet lacks grab bars, flush control is not on wide side of fixture and centerline of fixture is 13-1/2" from adjacent wall



- Lack of 60" clear width at toilet and 60" diameter turning space in holding cells and inmate restrooms



- No grab bars at toilet in holding cells or inmate restrooms



- Inmate restrooms and holding cells with toilet seat height of 14-3/4" – 15-1/2" AFF and flush control is not on wide side of fixture
- Width of opening into toilet compartment in holding cells, Male Interview Waiting Room, Male Dress In rooms and Female Clothing Exchange is 24" - 28"



- No 30" wide x 29" high x 17" deep knee space at lavatory or drinking fountain in holding cells or inmate restrooms, drinking fountain bubbler is more than 5" from front of fixture and mirrors are too high for a wheelchair user to see their reflection



- Bottom of reflective surface of mirror 47" - 49" AFF in holding cells and inmate restrooms
- Highest operating part of paper towel dispenser in Medical Intake Screening inmate restroom is 52" AFF
- Toilet paper dispenser in Medical Intake Screening inmate restroom and Women's Booking & Holding Side inmate restroom is located behind toilet and not on side wall 7" – 9" in front of toilet



- Slope of floor in holding cells is 4.0%



- Holding cell, Male Interview Waiting Room, Male Dress In rooms & Female Release pay telephones lack 29" long cords and/or are not adjacent to a 30" x 48" clear floor space due to benches located below and/or the volume control buttons are 57-1/2" – 62" AFF



- The clear accessible width to the Female Release counter is only 30"



<u>2nd Floor</u>

- Drinking fountain in corridor is not accessible to a wheelchair user or person who cannot bend or stoop due to the spout height and lack of knee space



- Psychiatry Unit shower is not 60" wide minimum, lacks a compliant seat and spray attachment, the controls are not mounted on the wall adjacent to the seat and the mirror and coat hook are too high



- Psychiatry Unit & Medical Unit cells lack grab bars at the toilet, toilet seat height is 15-1/2" AFF and there is no knee space at the lavatory/drinking fountain



- Lack of wheelchair seating with a 30" wide x 27" high x 19" deep knee space in Psychiatry Unit, Medical Housing and Medical Unit Wheelchair Pod day rooms



- Psychiatry Unit showers lacks grab bars or a folding seat



- Medical Unit Housing and Wheelchair Pod day room drinking fountain lacks knee space for a front approach, spout height is 37" - 41" AFF and/or lacks a spout high enough for individuals who have difficulty bending or stooping



- Medical Unit Wheelchair Pod cells lack 36" long rear grab bar, the side grab bar only projects 43" – 44" from the rear wall and the lavatory lacks knee space and the rim height is 36-1/2" AFF



- Wheelchair Pod shower controls are not located on wall adjacent to seat, seat is not the required minimum size, there is no spray attachment, a grab bar extends above the seat so a wheelchair user cannot lean against that wall and the mirror and coat hook are too high



- Medical Unit Housing shower is not a standard 30" x 60" or alternate 36" x 60" roll-in shower design, the door is only 24" wide and has a 6" curb



- Lack of 60" diameter clear turning space in Dental Exam room and X-Ray room



- Fixed examination chairs and tables do not accommodate wheelchair side transfer



- Medical Holding Cell lacks 60" wide space at toilet, toilet seat height is 15" AFF and clear width of opening into toilet compartment is only 27" wide



- Medical Housing Day Room telephones are too high and lack a 29" long cord



- Medical Housing Cell 6 door is only 30" wide, lacks grab bars at toilet, toilet seat height is 15" AFF, lavatory lacks knee space and encroaches on required clear space at cell door



- Medical Housing 200 Pod Day Room drinking fountain lacks knee space and spout is 40-1/2" AFF



- Door from Family Visiting to Attorney Visiting Room is only 24" wide



- Attorney Visiting Room rooms lack 30" x 48" clear floor space at counter due to fixed stool and lacks 60" diameter turning space since room is only 42-1/2" wide



- Release Cell door is only 32" wide, there is only 39" clear width at the toilet and 28" at the lavatory, the toilet lacks grab bars and the toilet seat height is 15-1/2" AFF



- Release Cell issue counter is 38" AFF



- Inmate restroom door requires 8 pounds of opening force and closes from fully open to within 12 degrees of the latch in only 2-1/2 seconds, rear grab bar is mounted with ½" clearance to the flush valve, not parallel to wall and 15" past centerline of toilet to one side and 21" to the other side, centerline of toilet is 23" from adjacent wall, lavatory rim is 35-1/2" AFF, pipes are not insulated and soap and paper towel dispensers are more than 40" AFF to the highest operating part



3rd Floor

- Medical Exam Room table cannot be lowered to 17" – 19" to allow a wheelchair user to transfer on and off and there is only 22" clear width on each side of the table



- Medical Exam Room toilet room is only 38" wide and rear grab bar is only 24" long

3rd, 4th, 5th,, 6th, 7th & 8th Floor

- All visiting rooms are located up a flight of stairs from the housing unit levels and there is no accessible route



- All Attorney Visiting rooms lack a 60" diameter clear maneuvering space, and a 30" w. 27" h. x 19" d. knee space below the counter to allow a wheelchair user to make a front approach



- Stairs to mezzanine levels in dayrooms and Recreation Rooms lack a cane detectable railing below



- Lack of 30" w. x 27" h. x 19" knee space at all dayroom tables



- Housing Unit showers are not a standard 30" x 60" or alternate 36" x 60" roll-in shower design, the door is only 24" wide and has a 6" curb



- Housing Unit dayroom pay telephone volume control buttons are 58-1/2" AFF and have 18" long cords
- Housing Unit day room drinking fountains are not high/low and not located in an alcove or out of the circulation path and lack a 27" high knee space 8" in from the front of the fixture



- Common Recreation Room drinking fountain is not high/low, is not located in an alcove or out of the circulation path, lacks a 27" high knee space 8" in from the front of the fixture and the shaving mirrors are too high



- Cell doors only provide 28-1/2" clear opening
- Cell toilets lack grab bars, toilet seat height is 15" AFF, combination toilet/lavatory lacks knee space at lavatory and bottom of mirror is 53" AFF



- Recreation Room toilets only have a 35" wide clear floor space, the seat height is 15" AFF, there is no knee space at the lavatory and the door is only 30" wide





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Yard toilets lack grab bars and only provide 32" clear space in front of toilet and 27" clear width at cased opening to toilet compartment



- Yard urinal rims are 25" AFF and the flush controls are 47" AFF



RCCC in Elk Grove has a rated capacity for 1,625 male and female inmates. The campus is divided into 2 separate compounds for male and female inmates and serves as the County's branch jail facility housing overflow pretrial detainees and sentenced male and female inmates. The County operated the original facility as a road camp until the first facilities and infrastructure were built in 1959. Currently, RCCC contains more than 18 temporary and permanent buildings of various vintages and uses. RCCC can house male and female inmates of all classifications and houses inmates en route to other jurisdictions, federal prisoners under contract with the U.S Bureau of Prisons, and reciprocal prisoners from other counties. A staff of more than 180 Sheriff's Department employees supervises inmates and several support services activities augment the custody staff and provide services and programs for inmate housing.

The female side of the compound is known as the Sandra Larsen Facility (SLF) and is entirely self-contained and has no interaction with the male side. SLF has

3 dormitory pods; Golden Poppy (60 beds - minimum security), Kinya (92 beds - minimum security) and Camelia (70 beds - medium facility), each with its own day room and recreation yard. Ramona Hall houses maximum-security inmates in cell-type housing. A kitchen, dining hall, infirmary, visiting area and recreation room are also provided at SLF.

The men's minimum-security housing is all provided in the HF. Medium security inmates are housed in the A, J & K barracks as well as JKF and RBF. Maximum-security inmates are housed in CBF 500 mod and SBF 200-500 mods.

The original construction dates of RCCC are unknown. The County of Sacramento took possession of RCCC and the existing buildings in 1947. The first structures and infrastructure constructed by Sacramento County as part of a detention facility starting in 1959, prior to the enactment of the ADA. RBF, CBF, JKF and SBF are all masonry construction and the barracks are a combination of masonry and wood frame construction. Several modular classroom buildings were placed on site in and provide educational and program space.

Although the topography of the RCCC is generally level and much of the walkway system complies with ADAS and CBC we observed a number of locations with noncompliant running slope, cross slope and level changes. Also observed were a number of wood and metal ramps with noncompliant slopes and handrails.

Typical conditions observed at RCCC that are not compliant with ADAS:

<u>SLF Intake & Booking, Laundry, Medical & Visiting</u>

- Transaction counters are typically 42-1/2" AFF



- Holding cell doors are only 30" wide and provide a 29" clear width when fully open



- Holding cell and dorm dayroom pay telephones are not adjacent to a 30" x 48" clear floor space due to benches or counters located below and/or the volume control buttons are 54" - 56" AFF



- Laundry unisex restroom lacks a 60" diameter clear turning space and a 60" clear space adjacent to the toilet, grab bars at the toilet, centerline of toilet is 15" from adjacent bathtub and toilet seat height is 15-1/2", lavatory apron is 27-3/4" AFF and pipes are not insulated, bottom of reflective surface of mirror is 56" AF and paper towel dispenser is 54" AFF



- Less than 42" clear aisle width in the Laundry storage area where inmates work



- Fixed examination chairs and tables do not accommodate wheelchair side transfer



- All Attorney Visiting stations have a 28" wide door and have fixed stools and lack a 60" diameter clear maneuvering space, and a 30" w. 27" h. x 19" d. knee space below the counter to allow a wheelchair user to make a front approach



- All Social Visiting stations have a fixed stool and lack a 60" diameter clear maneuvering space



Program & Dining Area (Sutter Hall)

- Inmate restroom lacks a 60" wide toilet compartment with grab bars to accommodate a wheelchair user, the lavatory apron is all 25-1/2" AFF and the pipes are not insulated, the shower compartment has a 4-1/2" curb and is not a standard 30" x 60" or alternate 36" x 60" roll-in configuration and lacks grab bars and a seat, the bottom of the mirrors is 52" and the paper towel dispenser is 52-1/2" AFF







- Hall and Dining Hall drinking fountain only provides a 22" - 23" high knee space, is not in an alcove or outside the path of travel and the spout is 39" - 40" AFF



- There is not a 30" wide x 48" long clear floor space adjacent to at least one of each type of exercise machine



- Law Library station in the Dining Hall has a fixed stool and lacks a 30" wide x 27" high x 19" deep knee space



- Dining Hall tray slide is 37-1/2" AFF



- Lack of 30" w. x 27" h. x 19" knee space at all Dining Hall tables



Housing Areas

- Kinya dorm dayroom restroom has 28" high lavatory aprons, pipes are not insulated, shelves are all 64" AFF, 31" clear space provided in front of toilet, centerline of toilet is 19-1/2" from adjacent wall and toilet compartment door stile width is 16"



- Kinya dorm ambulant toilet compartment only provides a 31" wide door that is not self-closing, the seat height is 15" AFF and the grab bars are only 36" long



- Golden Poppy dorm bathrooms lack any lavatories with 30" wide x 27" high x 19" deep knee space, the lavatory pipes are not insulated, none of the toilet compartments have a 32" wide door, grab bars and are 60" wide and provide a 48" clear space in front of the toilet



- Golden Poppy dorm showers lack a seat and grab bars and have a 3-1/2" high curb



- All dorm dayroom showers compartment are not a standard 30" x 60" or alternate 36" x 60" roll-in configuration with grab bars on 2 walls, seat and spray attachment and the floor slopes 4.9%



- Dorm bathroom drinking fountains provide a 22" - 23" high knee space, is not in an alcove or outside the path of travel and the spout is 39" - 40" AFF



- Lack of 30" w. x 27" h. x 19" knee space at all dorm dayroom tables



- Door threshold at entrance to Kinya and Camelia dorms is 1-1/2" high



- Door thresholds from dayrooms to yards are 1" – 2-1/2" high and the exterior landing at Kinya dorm slopes 12.7%



- Kinya dorm recreation yard cross slope is 3.1% - 4.6% and no picnic tables at any recreation yard with 30" wide x 27" high x 19" deep knee space



- No picnic tables at any recreation yard with 30" wide x 27" high x 19" deep knee space



- Much of the recreation yard for Camelia dorm does not provide a stable, firm and slip-resistant surface



- All Ramona Hall housing and safety cell doors are only 29" wide, centerline of toilet is 15-1/2" from adjacent wall, combination toilet/lavatory unit lacks knee space at lavatory and drinking fountain bubbler, no clear floor space at desk due to fixed stool and desk only provides 25-1/2" high knee space



- Ramona Hall bathroom door is only 30" wide, the bathtub lacks grab bars and a seat, the toilet lacks grab bars and the seat height is 15-1/2", neither shower is a standard 30" x 60" or alternate 36" x 60" roll-in shower and both have a 12" high curb at the compartment entrance and the room lacks a 60" diameter clear maneuvering space



Exterior Circulation Route

- ▪ 1" high elevation change at several locations along path of travel to Program Area at relocatables



- ▪ There is no accessible route to the portable toilets adjacent to the classrooms and none of the portable toilets is accessible to a wheelchair user



- The ramp to Classroom 1 & 2 slopes 19/1%, the handrails circumference exceeds 6-1/4" and lack extensions, the lower landing is only 48" deep and has a ¾" high elevation change



Classrooms 1, 2 & 3

- Door threshold at Classroom 1 is 1" high



- The threshold from the ramp access at Classroom 3 is 2" high



- Ramp to Classroom 3 slopes 9.5% and lacks handrail extensions at the top and the handrails are not continuous



- None of the tables in Classroom 3 provide a 30" wide x 27" high x 19" deep knee space



- Classroom 3 sink is 38" AFF and lacks knee space



- Classroom 3 only has an 18" wide clear width to reach the baking area and all counters are 35-1/2" AFF



CBF

- Cell doors are only 27-1/2" wide and provide a 27" clear opening when fully open, combination toilet/lavatory unit lacks knee space at lavatory and drinking fountain bubbler, no clear floor space at desk due to fixed stool and cell lacks 60" diameter clear maneuvering space



- Lack of 30" w. x 27" h. x 19" knee space at all dayroom tables



- Lack of cane detectable barrier below dayroom stairs and stairs lack level handrail extensions and have open risers with no contrasting striping at nosing and upper approach



- Dayroom sink is 36" AFF and lacks knee space below to allow a wheelchair user to make a front approach



- All dorm dayroom showers compartment are not a standard 30" x 60" or alternate 36" x 60" roll-in configuration with grab bars on 2 walls, seat and spray attachment and the floor slopes 4.9%



- No pull up stations are accessible to a wheelchair user since the bars are 61" AFF, which is above accessible reach range



- Yard toilet centerline is 21" from adjacent angled wall and lacks grab bars and 60" clear width to side of lavatory, lavatory lacks knee space and rim height is 35-1/2"



- Law Library lacks clear floor space at station due to fixed stool



- No accessible route to Visiting or Classrooms upstairs (stairs only), handrails lack level extensions, horizontal portion of handrail brackets is less than 1-1/2" below the handrails and upper approach and stair treads lack a contrasting nosing stripe



- None of the 19 Visiting stations provide a 30" x 48" clear floor space due to the fixed stool and the 2 private Visiting room doors also have fixed stools and only have a 27" clear opening when the door is fully open



- 2nd floor classrooms lack any stations with a 30" wide x 27" high clear floor space due to the fixed stools and the sink rim height is 36" AFF



- floor classroom door is only 31" wide, toilet lacks grab bars and 60" clear width from adjacent wall to side of lavatory, lavatory centerline is only 14" from adjacent wall, rim height is 36" AFF and only 23" high knee space is provided below, mirror is 58" AFF and shelf is 49" AFF



SBF

- Law Library lacks clear floor space at station due to fixed stool



- No showers are a standard 30" x 60" or alternate 36" x 60" roll-in shower with spray attachment, folding seat and grab bars



- None of the 19 Visiting stations provide a 30" x 48" clear floor space due to the fixed stool and the top telephone button is 63" AFF



KBF

- Holding cells and Classroom restroom only provide 53" – 57-1/2" clear width between wall and side of lavatory at toilet, side grab bar only projects 48" from rear wall and lavatory only provides 27" high knee space at apron



- Holding tank #1 toilet only provides 36" clear width at toilet, toilet seat height is 15-1/2" AFF, lacks grab bars and bottom of reflective surface of mirror is 55-1/2" AFF



- Yard toilet only has 55" clear width from wall to side of toilet, lacks grab bars, lavatory apron only provides 27-1/2" high knee space, bottom of reflective surface of mirror is 43" AFF and drinking fountain does not accommodate inmates who have difficulty bending or stooping



- Although a wheelchair seating space is provided in the 100 Pod day room, there is not a 19" deep toe space due to the ½" high metal base plate



- 100 Pod day room drinking fountain does not accommodate inmates who have difficulty bending or stooping



- 100 Pod accessible toilet side grab bar only projects 48" from rear wall



- 100 Pod shower is not a compliant alternate 36" x 60" roll-in shower with spray attachment, folding seat and grab bars are on the wrong walls



- 200 Pod, 300 Pod, 400 Pod, 500 Pod and 600 Pod shower is similar to 100 Pod shower but lacks a folding seat



- Barbershop counter is 39" AFF and only 16" deep and is a protruding object, fixed stool encroaches into 60" diameter clear turning space, centerline of sink is only 13-1/2" from side wall and sink lacks insulated pipes and knee space below to allow for a front wheelchair approach



- Kitchen inmate restroom toilet centerline is 20" from adjacent wall, only 53-1/2' is provided from the adjacent wall to the side of the lavatory, the side grab bar only projects 48" from the rear wall, the lavatory apron is only 26-1/2" AFF and the highest operating part of the soap and paper towel dispensers is 51" – 52" AFF



- Kitchen inmate worker tables do not provide a 30" wide x 27" high x 19" deep wheelchair seating space



<u>Booking</u>

- ▪ The 4 counters are all 41" AFF and there is no lowered counter for a wheelchair user



- ▪ Holding Cells 1 & 2 provide 42-1/2" clear space in front of toilet, toilet lacks grab bars, centerline of toilets is 19-1/2" from adjacent wall and combination unit does not provide knee space at lavatory and drinking fountain bubbler



- Holding Cell 3 only provides 32" clear width at toilet, toilet lacks grab bars and seat height is 15-1/2" AFF and combination unit does not provide knee space at lavatory and drinking fountain bubbler



- The mat in front of the fingerprint machine is 1" thick



Medical Screening

- Door is only 29-1/2" wide and room lacks 60" diameter clear maneuvering space



- Urinal only projects 13" from wall, rim is 24" AFF, only a 21-1/2" deep clear floor space is provided in front to the lavatory, lavatory is only 14-1/2" deep and pipes are not insulated



- ▪ The 4 clothing window counters are all 40-1/2" AFF and there is no lowered counter for a wheelchair user



- ▪ Changing benches are only 12" deep



- None of the 28 Visiting stations provide a 30" x 48" clear floor space due to the fixed stool and there is only 26-1/2" high knee space provided below the counter



- All 3 attorney rooms lack a 60" diameter clear turning space and a 30" x 48" clear floor space due to the fixed stool



Medical Housing Unit

- Hard and soft cells only provide 29" clear width at toilet, toilet lacks grab bars and centerline is 10" from adjacent wall, combination unit does not provide knee space at lavatory and drinking fountain bubbler and door is only 29-1/2" wide



- All of the lavatories only provide a 25" high knee space to the underside of the support beam and the bottom of the reflective surface of the mirror is 42" and the mirrors are tilted away from the user



- The restroom has 6 toilets but no 36" wide ambulant toilet with parallel grab bars is provided, there is only 28" clear width between the toilets to reach the accessible toilet, only 40-1/2" clear width is provided at the accessible toilet to the adjacent toilet and the urinal rim is 18" AFF



- The ramp to the shower has a 10.0% slope, is only 37" wide, has a handrail on only one side and the horizontal portion of the handrail bracket is less than 1-1/2" below the handrail



- The open shower is not a standard 30" x 60" or alternate 36" x 60" roll-in configuration with grab bars on 2 walls, seat and spray attachment and the floor slopes 6.0% at the floor drain



- None of the 3 changing seats outside the shower is a minimum of 24" x 48"



- Most of the yard is not a stable, firm and slip-resistant surface



- Door to yard has a 1" high vertical threshold, knob hardware, exterior landing with a 6.6% slope and closer projects 5" into door opening and bottom of closer is 76" AFF



<u>M Dorm</u>

- Entry door threshold is 1-3/4" high and vertical



- All of the lavatories only provide a 25-1/2" high knee space to the underside of the support beam, the pipes are not insulated, the floor slopes 7.7% at the floor drain and the mirrors are tilted away from the user



- There is only 27" clear width between the toilets to reach the accessible toilet, only 35" clear width is provided at the accessible toilet to the adjacent toilet and the urinal rim is 19" AFF



- The ramp to the shower has a 12.2% slope, is only 37" wide, has a handrail on only one side and the horizontal portion of the handrail bracket is less than 1-1/2" below the handrail



B Barracks (re-entry Dorm)

- The exterior landing at the entry slopes 14.2%, has s 40" long bottom landing and lacks handrails and lacks a 24" landing at the strike side of the door



- Counter is 49" AFF



- All 12 lavatories have a 24-1/2" high knee space to the bottom of the support beam, the pipes are not insulated and the bottom of the reflective surface of the mirrors is more than 40" AFF and the mirrors tilt away from the user



- The rim at all 3 urinals is 19" AFF and none of the toilets are accessible or provide grab bars



- Open shower has a 6" high curb at the entry and lacks a folding seat and grab bars



- Lowest leading edge of security mirror is 69" AFF and projects 16" from wall



A Barracks

- Exterior landing at the entry slopes more than 8.33% and lacks a 24" landing at the strike side of the door



- Running slope at transition from concrete to asphalt paving in yard is 13.7%



<u>K Barracks</u>

- None of the telephones are within reach range as the highest control is 59"
  AFF and all have 18" long cords



- Both doors to the yard have a 1-1/2" high vertical threshold and a 4-1/2"
  elevation change at the edge of the stoop



Fishbowl

- Adjacent KITE's box handle is 54-1/2" above walking surface



- Walk from KITE's box to Fishbowl has 4.6% cross slope



- Fishbowl counter is 38" AFF



D Barracks

- Entry door threshold is 1" high and vertical



- Rim at all 4 urinals is 25" AFF and no toilets are accessible and have grab bars, most likely accessible toilet centerline is 14-1/2" from adjacent wall and only provides 34-1/2" clear width to adjacent toilet



- Walk to yard has 4" vertical elevation change at stoop



- All exterior telephones top button is 56" AFF and have 18" long cord



- Walk to Yard at adjacent gate has 7.1% running slope and 1" vertical lip at the bottom



Laundry Exchange

- Exterior issue counter is 43" AFF



- Threshold at inmate entry door is 1-1/2" high and vertical



- Inmate restroom lacks 60" diameter clear turning radius and has only 42" clear width from wall adjacent to toilet to side of lavatory, toilet lacks grab bars and door is only 32" wide and has knob hardware, lavatory pipes are not insulated and soap and paper towel dispensers are more than 40" AFF



- Sewing machine station is not usable by a wheelchair user since the treadle encroaches on the required knee space



- Barbershop and classroom doors have a 1-1/2" high threshold



- Barbershop sink is 36-1/2" AFF and lacks knee space below



- Exterior walks between Laundry and classrooms have cross slopes of 3.7% - 4.8%



- ▪ Prefabricated ramp to Classrooms 3 & 4 has a 10.3% slope and handrails are 32" above ramp surface and lack horizontal extensions at the top landing and inside handrail is not continuous



- ▪ None of the stations in Classroom 3, 4 or 5 provide a 27" high knee space



- Ramp to Classroom 5 slopes 18.8%, has handrails that exceed a 6-1/4" outside diameter and lack horizontal extensions, top landing is only 45" x 48" and is 1-1/2" below the floor level and bottom landing does not align with direction of ramp



Big Yard

- No accessible route that is stable, firm and slip-resistant is provided to handball, baseball, horseshoe, picnic and basketball areas or drinking fountain



- ▪ No wheelchair accessible portable toilets are provided



- ▪ Inmate worker approach to Kitchen has 7.9% running slope but no handrails



- Exterior Kitchen inmate restroom door landing has 7.0% running slope at entrance, wash sink lacks knee space below and soap and paper towel dispensers are more than 40" AFF



- Exterior Kitchen inmate restroom toilet lacks grab bars, centerline is 15-1/2" from adjacent wall and toilet paper dispenser is above and behind toilet



Dining Hall

- Entry and exit ramps lack horizontal handrail extensions and edge protection and intermediate landing is only 62" long



<u>RBF</u>

- Barbershop sink is 36-1/2" AFF and lacks knee space below



- Temporary Holding Cell has combination unit that lacks knee space at lavatory and grab bars at toilet, centerline of toilet is 15-1/2" from adjacent wall, doorway only provides 28" clear opening and only 27-1/2" clear width is provided between fixed bed and toilet



- Open shower has a 4-1/2" high curb at the entry and *the folding seat is not mounted on the compliant wall with respect to the grab bars, and* lacks a spray attachment



Dorm 11

- Toilet lacks grab bars and only provides 29" clear width at rear wall and 45" clear space from rear wall, entrance into toilet is only 20" wide to shelf, centerline of lavatory is only 11" from adjacent wall and provides 17" high knee space



Dorm 20

- Combination unit lacks grab bars at toilet and knee space at lavatory and entrance to toilet is less than 32" clear width



- "Accessible" door to Yard has 5" vertical elevation change at stoop



- West and East Yard toilets lack grab bars, enclosure is only 36" wide x 44" long and has a 2-1/2" vertical elevation change at entrance (West yard) and combination unit lacks knee space at lavatory



Main Law Library (Honor Side)

- None of the stations provide knee space due to the fixed stool



- Inmate worker restroom has 7" step at entrance, no accessible toilets with grab bars, only 35" clear space in front of toilets to lavatories and lavatories have knob faucets, only provide 28" high knee space at apron and lack insulated pipes



Re-Entry Dorm

- None of the stations in Classroom 1 & 2 provide a 27" high knee space



- Sink in Classroom 2 is used by inmates for art classes and lacks a 27" high knee space below and sink height is 36" AFF



- Inmate restroom lacks 60" diameter clear turning space, only provides 34" width at toilet, toilet lacks grab bars, door has knob hardware and only provides 9" strike side clearance on pull side and lavatory only has 22-1/2" high knee space



Recreation Hall

- Entrance door has 1-1/2" high threshold and only 10" strike side clearance at the exterior pull side



- No accessible route is provided to the stage



JKF

- North Holding Tank #2 (used as safety cell) restroom has typical combination toilet/lavatory unit that lacks knee space at lavatory and grab bars at toilet and lacks 60" wide clear space at toilet due to fixed restraint bed



The conditions cited above are not intended to be an all-inclusive list of noncompliant conditions; numerous other noncompliant conditions were observed and noted during our site visit.

Other factors that should be considered when reviewing this Report:

Although there are no ADA requirements for the clear vertical height above a bunk bed when a disabled inmate occupies the lower bunk, some cell arrangements provide limited headroom above the lower bunk, resulting in the inability for a wheelchair user to transfer onto and off the bunk from their wheelchair and remain erect. Studies have indicated that a minimum vertical clearance be provided above the top of the mattress to provide adequate space for an adult male to sit upright.

Although the ADA has not yet adopted requirements for examination tables in medical facilities, the US Access Board has recently proposed guidelines that address the need for adjustable examination tables that enable disabled patients to transfer between the table and their wheelchair. More information can be obtained at http://www.access-board.gov/medical-equipment.htm. We recommend that SCSD consider purchase of new medical diagnostic equipment that complies with the Access Board recommendations.

## Technical Requirements / Standards

28 CFR Part 35 Nondiscrimination on the Basis of Disability in State and Local Government Services; Final Rule, which implements subtitle A of Title II of the ADA, Public Law 101-336, prohibits discrimination on the basis of disability by public entities. Per the preamble to Subpart D – Program Accessibility, Section 35.149 Discrimination Prohibited, this requirement applies to "facilities now in existence, because the cost of retrofitting existing facilities is often prohibitive." The preamble goes on to note "the regulation makes clear, however, that a public entity is not required to make each of its existing facilities accessible." The law requires that Public Entities must make all of its programs accessible "except where to do so would result in a fundamental alteration in the nature of the program or in undue financial and administrative burdens." It does not require that a Public Entity make all of its existing facilities accessible via structural changes where other methods provide accessibility to services, programs and activities of the Public Entity.

Since the Sacramento County Jail is subject to Title II of the ADA, the primary obligation to inmates of the jail (as opposed to employees who are covered under Title I of the ADA) is to provide access to individuals with disabilities to all of its services, programs and activities. This concept was adopted directly from Section 504 of the Rehabilitation Act, which required access to programs and activities that received Federal assistance.

28 CFR 35.150 applies to alteration projects; all alteration projects commenced after July 26, 1992 were to comply with the scoping and technical requirements in force at the time. Modular buildings placed on the RCCC after that date would also have been required to comply with the same requirements. Please refer to the next section for an explanation of these requirements.

### 1991 ADAAG & 2010 ADAS

The 1991 Americans with Disabilities Act Accessibility Guidelines (ADAAG), published by the U.S. Access Board and adopted as the Americans with Disabilities Act Standards for Accessible Design (ADA Standards) by the USDOJ, was the Federal technical standard applicable when constructing new facilities or altering existing public accommodations to comply with the ADA up until March 15, 2012. The U.S. Department of Justice published new requirements in 2004 that have now been codified as the 2010 Americans with Disabilities Act Standards (ADAS), which replaced the 1991 ADAAG as of March 15, 2012 for Title II entities

However, even in the absence of a technical requirement under ADAAG or ADAS, a public entity must provide access to all of its programs subject to the exceptions described above.

The 2010 ADAS introduced new scoping requirements that did not appear in the 1991 ADAAG. Specific to Sacramento County Jail, ADAS Section 232 Detention Facilities and Correctional Facilities includes requirements that had no precedent in the 1991 ADAAG, and therefore are not subject to the Safe Harbor provision of ADAS. Refer to Section III General Assumptions Item No. 1 for an explanation of the Safe Harbor provision. As of March 15, 2012, Sacramento County Jail is required to comply with these new scoping provisions for new construction and alteration work subject to the exceptions provided under Title II.

Among these new requirements are:

1. At least 3% of the total number of cells in a facility are required to provide mobility features that comply with ADAS Section 807.2. These features include a 60 inch diameter turning space, accessible bench, clear floor space at the bed for a wheelchair transfer, and accessible toilet and bathing facilities that serve these cells.

2. At least 2% of the total number of cells are required to be equipped with audible emergency alarm systems.

3. Patient bedrooms or cells in infirmaries are required to comply with the percentages listed above, as well as applying to medical isolation cells.

4. Special holding cells are required to provide a minimum of one (1) cell that complies with Section 807.2. Such cells include cells for the purpose of orientation, protective custody, administrative or disciplinary detention or segregation, detoxification or medical isolation.

5. Visiting areas serving accessible cells shall be accessible on both the visitor and inmate side.

*California Building Code*

The California Building Code (CBC), as opposed to the ADA, which is a civil rights law, is a building code modeled after the International Building Code, which is a "model code". Building codes such as the CBC do not apply to existing buildings as does the ADA, but only apply when new construction, additions and alteration projects occur. The CBC contains accessibility requirements that were first developed in 1982 and are only applicable in California. Since the CBC requirements pre-date the ADA, the technical and scoping requirements are different than those found in ADAS. In recent years, the differences between the CBC and ADAS have been reduced, but some still remain. The State of California Division of the State Architect is currently attempting to have the CBC certified by the USDOJ as equivalent with the ADA. This has resulted in the current 2013 edition of the CBC being at least as stringent in all respects with ADAS, as well as having more stringent requirements for certain elements such as accessible toilet compartments. The 2016 edition of the CBC becomes

effective on January 1, 2017, but there are no code changes that affect the Sacramento County Jail facilities.

Although the CBC does not act as a "trigger" to require barrier removal, its requirements come into play when performing certain types of barrier removal work. As described above, if an element does not comply with ADAS (and does not qualify for the Safe Harbor exemption), then it must be corrected subject to the undue hardship limitation. However, if the CBC has a more stringent requirement than ADAS, then the corrective work must then comply with the CBC.

As described above, some buildings have been remodeled or placed into service since the passage of the ADA, particularly at the RCCC. While these should have fully complied with ADAAG/ADAS and the CBC accessibility requirements in force at the time of building permit submittal, we found that there were several locations where these buildings did not comply, such as at KBF. Additionally, the CBC has contained accessibility requirements since 1982, although its applicability to detention and correction facilities has been a subject of contention for some time. Lastly, as indicated above, Sacramento County is required to comply with Section 504 of the Rehabilitation Act of 1973. Section 504 scoping and technical requirements for accessibility were provided in the Uniform Federal Accessibility Standards (UFAS), first issued in 1984. Although UFAS did not include scoping requirements for detention and correction facilities, it did include most of the same type of requirements for building elements as now found in ADAS and the CBC.

*Current ADAS and CBC requirements for Detention & Correction Facilities*

If structural changes to existing facilities will be performed, the following is a partial list of scoping and technical requirements that apply to the SCSD detention facilities:

- There must be a minimum of 2 drinking fountains per floor and one must accommodate wheelchair users with a maximum spout height of 36" AFF and another spout at 38" – 43" AFF (ADAS 211.2 & CBC 11B-211.2)
- There must be a minimum of 5% of the total of each type of seating that provides a knee space that allows a wheelchair user to make a front approach (ADAS 226.1 & CBC 11B-226.1)
- Floor and ground surfaces must be stable, firm and slip-resistant (ADAS 302.1 & CBC 11B-302.1)

- Changes in level are not permitted to exceed 1/4" vertical or 1/2" at a



  maximum 1:2 bevel (ADAS 303 & CBC 11B-303)
- All accessible spaces shall provide a 60" diameter clear maneuvering space or a T-shaped space per Figure 304.3.2 / 11B-304.3.2 (ADAS 304.3.1 & CBC 11B-304.3.1)



- The bottom of objects along a path of travel must be 80" AFF minimum if they project more than 4" into the path of travel (ADAS 307.2 & CBC 11B-307.2)
- 27" minimum height cane-detectable railings are required where the vertical clearance below an object is reduced to less than 80" AFF (ADAS 307.4 & CBC 11B-307.4)



- The maximum reach range to an accessible control is 48" AFF (ADAS 308 & CBC 11B-308)

- Walking surfaces shall not exceed 2.08% cross slope and 5.0% running slope unless they provide handrails on both sides and level landings for each 30" of vertical rise (ADAS 403.3 & CBC 11B-403.3)
- The minimum clear width along an accessible route must be 36" (ADAS 403.5.1 & CBC 11B-403.5.1)
- The minimum clear width at a turn must be 42" (ADAS 403.5.2 and CBC 11B-403.5.2)
- Doors must be 36" minimum width and provide a minimum 32" clear width opening when open 90 degrees (ADAS 404.2.3 & CBC 11B-404.2.3)
- Accessible doors (including doors to accessible toilet compartments) must have 18" minimum strike side clearance and 60" deep clearance on the pull side (ADAS 404.2.4.1 & CBC 11B-404.2.4.1)



- Accessible door landings must not exceed 2.08% (1/4":1'-0") slope (ADAS 404.2.4.4 & CBC 11B-404.2.4.4)
- Accessible door thresholds must be ½" high maximum and be beveled at a 1:2 maximum slope (ADAS 404.2.5 & CBC 11B-404.2.5)
- Accessible door hardware shall not require tight grasping, pinching or twisting of the wrist and shall be operable with one hand (ADAS 404.2.7 & CBC 11B-404.2.7)
- Door opening force shall not exceed 5 pounds and closing speed shall not be less than 5 seconds from 90 degrees open to within 12 degrees of door latch (ADAS 404.2.8 and CBC 11B-404.2.8 and 11B-404.2.9)
- Ramp slope shall not exceed 8.33% (ADAS 405.2 & CBC 11B-405.2)
- Top landings at ramps must be 60" x 60" minimum and bottom landings 72" minimum in length (ADAS 405.7 & CBC 11B-405.7)

- Ramps must have a curb or barrier with the bottom less than 4" above the ramp surface (ADAS 405.9.2 & CBC 11B-405.9.2)



- Stair nosing must have contrasting stripes (ADAS Advisory 504.4 & CBC 11B-504.4.1)
- Ramp handrails must be 34" minimum - 38" AFF maximum above ramp surface (ADAS 505.4 & CBC 11B-505.4)
- Horizontal portion of handrail brackets shall be 1-1/2" minimum below handrail (ADAS 505.6 & CBC 11B-505.6)





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Ramp handrails must have 12" long level extensions at the top and bottom of ramp runs (ADAS 505.10 & CBC 11B-505.10)



- Accessible drinking fountain spouts must be 36" AFF maximum (ADAS 602.4 & CBC 11B-602.4)
- Accessible drinking fountain spouts must be 5" maximum from the front edge of the fixture (ADAS 602.5 & CBC 11B-602.5)
- All drinking fountains must be located in alcoves or otherwise out of pedestrian way (CBC 11B-602.9)
- Accessible mirrors must have the bottom of the reflective surface at 40" AFF maximum (ADAS 603.3 & CBC 11B-603.3)
- Shelves must be located between 40" - 48" AFF (ADAS 603.4 & CBC 11B-603.4)
- Accessible toilet accessories in sanitary facilities must have the highest operating part at 40" AFF maximum (CBC 11B-603.5)
- Accessible toilets must be located 17" – 18" from the adjacent wall (ADAS 604.2 & CBC 11B-604.2)
- Accessible toilets must have 60" clear width to adjoining obstructions and 48" clear in front of toilet (ADAS 604.3 & CBC 11B-604.3)




FIGURE 11B-604.3.1
SIZE OF CLEARANCE AT WATER CLOSETS

- Accessible toilet seats must be 17" – 19" AFF (ADAS 604.4 & CBC 11B-604.4)
- Accessible toilets must have a minimum 36" long rear grab bar and a minimum 42" long side grab bar, both mounted 33" – 36" AFF (ADAS 604.5 & CBC 11B-604.5)



- Accessible toilet flush controls must be located on the wide side of the fixture and not require more than 5 pounds of operating force (ADAS 604.6 & CBC 11B-604.6)
- Toilet rooms with 6 or more toilets or combination of toilets and urinals must have an ambulatory toilet with parallel grab bars 35" - 37" apart (ADAS 604.8.2 & CBC 11B-604.8.2)
- Accessible urinal rims must be 17" AFF maximum and the flush controls must be 44" AFF maximum (ADAS 605.2 & CBC 11B-605.2)
- Accessible urinals must be 13-1/2" deep minimum (ADAS 605.2 & CBC 11B-605.2)
- Accessible lavatories must provide a minimum 27" high knee space 8" in from the front of the lavatory and the apron must be 29" minimum AFF (ADAS 606.2 & CBC 11B-606.2)



- Accessible lavatories must be 34" AFF maximum to the rim (ADAS 606.3 & CBC 11B-606.3)



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Accessible lavatory controls must not require grasping (ADAS 606.4 & CBC 11B-606.4)
- Accessible lavatory pipes must be insulated (ADAS 606.5 & CBC 11B-606.5)
- Roll-in showers must have a minimum 60" wide opening, a 17" – 19" high folding seat with controls on the adjacent wall, grab bars and 60" long spray hose attachment (ADAS 608.2.2 & CBC 11B-608.2.2)



- Roll-in shower thresholds must not exceed ½" high (ADAS 608.7 & CBC 11B-608.7)
- Space between grab bar and objects below must be 1-1/2" minimum (ADAS 609.3 & CBC 11B-609.3)



- Accessible telephones must have an adjacent 30" x 48" clear floor space and minimum 29" long cords (ADAS 704.2.1 & 704.2.4 & CBC 11B-704.2.1 & 11B-704.2.4)
- Accessible seating must provide a minimum 30" w. x 27" h. x 19" d. knee space (ADAS 902.4.1 & CBC 11B-902.4.1)
- Dressing and changing benches must be 24" d. x 48" l. minimum (CBC 11B-903.3)

- Transaction counters and work surfaces must provide a minimum 36" long section at 28" – 34" AFF and provide a minimum 30" x 48" clear floor space that allows for a front or parallel approach (ADAS 904.4 & CBC 11B-904.4)
- Tray slides at food service lines shall be 28" - 34" AFF (ADAS 904.5.2 & CBC 11B-904.5.2)
- A minimum of one of each type of exercise equipment shall have a 30" wide by 48" long adjacent clear floor space

## Conclusions and Recommendations

We believe that due to inadequacies with the physical plant at both SCSD detention facilities, SCSD does not comply with the ADA in providing access to all programs for inmates with disabilities. The area that presents the most physical barriers is the MJ. Barriers in this area include lack of accessible cells with required maneuvering clearances and accessible toilet fixtures, sanitary facilities and showers and dining/day room seating that does not accommodate wheelchair users. It also appears that inmates with disabilities are underrepresented in the worker population and that an inmate with a disability would encounter difficulties in many of the RCCC work environments.

An additional problem that was noted was the reported lack of an accessible route to any of the yard areas, which are located midway between the main level and mezzanine level of each housing floor. Access from each level of housing is provided by stairs, which are used able-bodied inmates but do not provide an accessible route for inmates with disabilities. From discussions with staff, we learned that elevator access is provided from the main level at each housing floor, but not all staff was aware of the location of this elevator (Elevator 'D'). Therefore, this barrier can be removed by informing all staff of the location of the elevator and installing policies to allow inmates with disabilities to use the elevator when they are provided with yard time.

### Main Jail

Although the construction of MJ utilizes poured in place concrete for walls, it is possible to alter these structures to create wider openings and walls can be removed to combine multiple smaller rooms into one larger room. This type of alteration can be costly, so use of this alternative should be kept to a minimum and used when placing different classifications of inmates in other more accessible facilities is not feasible.

However, a number of accessibility improvements can be made without these expensive types of projects, including:

- Enlarging a minimum of one shower and/or installing partitions or walls and installing folding seat, grab bars and shower spray attachment to create compliant configuration roll-in showers in each area
- Replacing combination toilet room fixtures with newer fixtures that provide the required clearances
- Installing or relocating grab bars at toilets
- Installing toilet seats to raise the seat height to accessible range
- Lowering a minimum of one (1) urinal in toilet rooms to accessible height in each area
- Insulating lavatory pipes
- Lowering mirrors

- Replacing benches in dressing and shower rooms with accessible size benches with backs or long side against walls
- Replacing a 36" long section of each type of counter with an accessible counter at 28" – 34" AFF
- Removing fixed stools at a minimum of one (1) of each type of visiting or interview room
- Lowering a minimum of one (1) 1 telephone in each area and call buttons so the highest operating part is 48" AFF and replacing cords with minimum 29" long cords
- Rearranging furnishings and equipment to provide a minimum 36" wide clear accessible route and 60" diameter turning space in all rooms and spaces where services, programs and activities occur, especially at medical examination tables
- Where inmates with visual impairments are present, relocate protruding objects out of the circulation path and install cane detectable railing below stairs

The most difficult barrier to correct at the MJ is the lack of any Family or Attorney Visiting Rooms on the main level of each housing floor. Providing elevator access from the main level to the mezzanine level at any of these pods would be problematic, if not impossible. We recommend that SCSD detention facilities explore the possibility of converting cell space into Visiting Rooms on the main level of at least some housing floors.

## Rio Cosumnes Correctional Center

As noted elsewhere in this report, some of the barracks housing facilities do provide accessible beds but the sanitary facilities are not designed and constructed to enable ease of use for inmates with disabilities and several building entrances and doors to adjacent yards are not compliant. Part of this condition can be attributed to the age of the buildings, since most were designed prior to the passage of the ADA. The barracks housing units are constructed of concrete masonry and/or wood frame, which is a construction type that is relatively simple and inexpensive to alter compared to the MJ. Replacing plumbing fixtures with compliant accessible fixtures, adding partitions to create compliant roll-in showers, installing grab bars, replacing ramps and exterior door landings are all reasonably inexpensive alterations. Other recommended alterations to improved the level of accessibility in the barracks buildings include:

- Relocate toilets to 17" -18" from adjacent wall and install rear and side grab bars
- Lower a minimum of one (1) urinal so that the rim is 17" AFF maximum and the flush controls are 44" AFF maximum
- Relate / replace a minimum of one (1) lavatory so the rim is 34" AFF maximum, the minimum clear knee height at the apron is 29" AFF and insulate the pipes



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Lower the mirror above the proposed accessible lavatory so the bottom of the reflective surface is 40" AFF maximum
- Install walls/partitions, folding seat, grab bars & shower spray hose and reconfigure shower controls to create a compliant accessible roll-in shower
- Replace ramps and install handrails where running slope exceeds 5.0%
- Replace exterior door landings so the threshold height does not exceed ½" with a 1:2 maximum bevel.

Accessible routes must be provided to all activity areas such as athletic fields and classrooms. Compliant aluminum ramps can replace existing ramps and stairs at modular buildings and are available from a number of manufacturers such as TMP Services (http://www.tmpservices.com/aluminum.aspx).

Seating within dining facilities and housing unit dayrooms is another area where SCSD detention facilities has not provided equal access to inmates with disabilities. Most tables do not provide a knee space that allows a wheelchair user to roll completely under the table and have use of a dining surface equivalent to able-bodied inmates. Replacement tables should be provided or stools should be removed in these spaces so that wheelchair users can dine comfortably with other wheelchair users as well as able-bodied companions. We recommend that dining and dayroom seating should be reconfigured in each area so that wheelchair users are provided with the opportunity to sit with other wheelchair users or able-bodied companions. Removal of fixed stools at a minimum of one (1) Visiting Room in each area would also provide the minimum required quantity of visiting rooms.

RCCC is generally quite accessible due to its level topography. A system of concrete and asphalt pedestrian routes is provided through the facility that experiences a large amount of pedestrian traffic from inmates and staff. Concrete is a far longer-lasting paving material than asphalt or other surfaces and usually provides the greatest degree of accessibility due to its longevity and relative need for maintenance, but is more costly than asphalt. We encountered a number of areas where the running slope and cross slope exceed the maximum allowed by the ADA. Additionally, we observed several where the concrete has moved vertically and level changes along the Path of Travel exceed the maximums allowed by the ADA.

Although the SCSD detention facilities employs a program whereby deputies assist inmates with disabilities in circulating throughout the facility, the ADA encourages independent movement if it is feasible to do so. The alternative system currently employed would only be considered an equivalent alternative to structural barrier removal if a deputy was available at all times to all inmates needing such assistance. Additionally, deputies should receive proper training on how to provide safe assistance to wheelchair users. Therefore, the exterior pedestrian route should be made as compliant as possible. All required



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

emergency exits should also be provided with compliant walks that connect to the pedestrian circulation path to enable these inmates to reach a safe distance away from a building in the event of an emergency.

Several features at the SCSD detention facilities can be easily corrected, such as replacement of knob-type door hardware with lever hardware, replacement of non-compliant door thresholds and provision of accessible changing benches. Mirrors can be added or lowered to accessible heights, lavatory pipe insulation can be added, and grab bars can be replaced or relocated; there are a number of newer penal-style toilet fixtures that are now available that were not available when these facilities were originally constructed. High/low drinking fountains can replace existing single-height fixtures and exterior door landings can be replaced. Toilet seats can be installed on existing toilets, depending upon security requirements. These seats are available in 1" – 4" thicknesses to correct existing toilet seat heights as low as 13" AFF.

We recommend that these barrier removal efforts be undertaken as soon as possible, especially where it can be demonstrated that the changes will significantly increase the level of accessibility. Some barrier removal will required the services of a licensed architect and structural engineer and will involve additional design study.



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

## Assumptions and Considerations

In performing this survey, there are a number of parameters which are defined to document the application of the requirements of the 1991 ADAAG, 2010 ADAS & CBC. We have divided these assumptions and considerations about the survey into three broad categories: Facility, General, and Technical Assumptions. While some of the General issues may sound very technical, the concepts are important and have general implications.

**Facility Assumptions / Considerations**

1. Inmate Areas versus Staff Areas –All areas that inmates currently use were surveyed for purposes of identifying and correcting barriers as part of this survey. However, we did not survey staff work stations since they would be included as part of a reasonable accommodation per Title I of the ADA. Areas where inmate workers perform their job duties are not considered staff work areas for the purpose of this study.

2. Shower Spray Attachment –Due to safety concerns, flexible spray attachments at accessible showers may be provided by staff on an as-needed basis when inmates make a request. Spray attachments should be stored close to shower areas, immediately available to staff and in working order at all times.

**General Assumptions**

1. Safe Harbor Provision - The survey and citations applied are based upon whether a particular element complied with the 1991 ADAAG; if so, then compliance with the 2010 ADAS is not required even if the ADAS is more stringent than the 1991 ADAAG. This is referred to by the United States Department of Justice (USDOJ) as the "Safe Harbor Provision". However, if an element did not comply with the 1991 ADAAG then it is now required to comply with the 2010 ADAS. One example would be a wall switch or control used by inmates; if the height of such an element was 52" and a front approach is possible, this complies with the 1991 ADAAG and would not be cited. However, if the height of this item was 56", it would not be in compliance with the 1991 ADAAG and would now have to be lowered to 48" in conformance with the 2010 ADAS.

2. Plumbing Fixture Counts – Some solutions may result in a reduction of the fixture count in a restroom. The SCSD should verify if this is compliant with applicable building codes and operational requirements.

3. No Testing of Hidden Conditions - No testing of operational systems such as fire alarms or review of building, fire or health codes was undertaken as part of this inspection.

4. Visual Fire Alarms – ADAAG require that visual alarms be located 80" above the floor or 6" below the finish ceiling, whichever is lower. We did

not perform an inspection of visual alarm device locations as part of our services. We recommend that the SCSD employ the services of a licensed fire protection engineer to survey both Jail facilities to determine if the visual alarms comply in all locations.

5. Drinking Fountains – If a building has multiple drinking fountains within 200 feet of each other and both are accessible to the same inmate population, our recommendation is to make one a wheelchair accessible fixture (36" maximum spout height and knee space below) and one for individuals with difficulty bending or stooping (spout height 38" – 43") and to provide directional signage indicating the location of the companion fixture. The assumption is that the travel time to go to the other fixture is acceptable accommodation.

6. Braille / tactile exit signage – The 2010 ADAS requires Braille / tactile exit signage where illuminated exit signs are provided at doors. We did not verify if illuminated exit signs are actually required by the building code at any doors; if one was provided we recommend that a Braille / tactile exit sign be provided. Also see Item 5 under Technical Assumptions below.

7. Furnishings, Fixtures & Equipment (F,F & E) – Both the 1991 ADAAG and 2010 ADAS apply to fixed or built-in elements of buildings, structures & site improvements. Therefore, non-fixed elements such as classroom desks would not be covered by technical requirements. However, since the lack of accessibility of these elements can limit or prevent access to programs, activities and services at Sacramento County Jail we strongly urge that these elements be reviewed for compliance with the most relevant technical criteria.

## Technical Assumptions:

Detectable Warnings Requirement - Barriers were not cited requiring the use of detectable warnings on curb ramps and other areas as a warning to visually impaired individuals that they are about to enter a hazardous area. Detectable warnings with truncated domes, as specified in the 1991 ADAAG have been controversial due to issues of maintainability, safety for those with various impairments, including vision, and locational requirements. A Joint Final Ruling issued by the USDOJ, the U.S. Access Board and the U.S. Department of Transportation called for temporary suspension of the requirement pending further study until July 26, 2001. The suspension expired and detectable warnings were again made a requirement. However, the 2010 ADAS removed the requirement for detectable warnings so we have opted to apply the most current standard. It is anticipated that the USDOJ will adopt the requirements for detectable warnings for Public Rights-of-Way when the final rule is approved, but detectable warnings will not be required within private or public property. The CBC still requires that a 36" deep band of truncated domes be provided at the

bottom of all curb ramps and where a pedestrian way is adjacent to a vehicular way and not separated by a curb.

1. Slip Resistance – ADAS Section 302.1 require floors on accessible routes and accessible room areas to be "slip-resistant". The Access Board recommends a coefficient of friction (COF) of 0.6. Ramps require a higher COF of 0.8.

   SCSD detention facilities should be aware that some VCT (vinyl composition tile) and sealed concrete slab floors may not have a Coefficient of Friction (COF) of 0.6, and therefore would not be considered slip-resistant. Floors like polished vinyl are very slippery. Furthermore, water, contaminants and floor treatments lessen slip-resistance from the cited coefficients. Detailed product information is only now being documented and made available. However, the actual testing to determine slip resistance requires expensive equipment and is not easily performed in place. Therefore, testing was not included in the scope of work.

2. *Door Closers* –the 1991 ADAAG and 2010 ADAS do not have a requirement for maximum opening force for exterior hinged doors. However, most building codes require the maximum opening force to be no greater than 8.5 pounds and the CBC requires that exterior and interior doors along an accessible route not require an opening force exceeding 5 pounds. Although the ADA does not contain a similar requirement, it has been our experience that this requirement is extremely necessary for many individuals to enter a building. It has been our experience that existing door closers can only be adjusted to within approximately 3 pounds of their current operating force. Accordingly, at doors operated by inmates, we recommend replacement of door closers as opposed to simply adjustment where the opening pressure exceeds 5 pounds.

3. Dimensional Tolerances – Section 3.2 of the 1991 ADAAG states that all dimensions are subject to conventional building industry tolerances for field conditions. Although many studies have been performed to determine what are acceptable dimensional tolerances, there are relatively few widely-accepted tolerances. The 2010 ADAS Section 104.1.1 Construction and Manufacturing Tolerances which reads "All dimensions are subject to conventional industry tolerances except where the requirement is stated as a range with specific minimum and maximum end points." One example would be a toilet centerline dimension from an adjacent wall; whereas the 1991 ADAAG required an absolute 18" dimension and the 2010 ADAS allows a range of 16" – 18", a toilet located 18-1/2" from the side wall might have been considered within conventional industry tolerances under the old regulations but not the new ones.

It should be noted that in the case of new construction, design documents can often lead to dimensions that exceed 1991 ADAAG /2010 ADAS/CBC maximums and minimums, such as a ramp that is designed with a 1:12 slope. The contractor may construct the ramp with a slight field tolerance, which results in a ramp that slightly exceeds the 1:12 slope, which is actually the maximum slope allowed, not a desired slope. Therefore, design documents should specify maximums and minimums where applicable and also allow for field tolerances. Advisory 104.1.1 of the 2010 ADAS states that "recognized tolerances are not intended for design work."

4. *Building, Fire & Health Codes* – Our scope of services did not include verifying items such as the required number of exits in a facility and their location, areas of refuge, if visual fire alarms are required or design requirements in areas where food is prepared. We recommend that SCSD detention facilities consult with qualified consultants in each discipline to determine if any barrier removal required by the ADA affects these other code requirements.

5. Call Buttons – Although the ADA nor the CBC include any requirements for call buttons in standard housing cells, SCSD detention facilities might consider inclusion of a system when performing alterations of existing cells and the construction of new housing units. Call buttons are provided in cells so that inmates can contact staff in the event of an emergency.

6. Signage – Section 216.1 of the 2010 ADAS / 11B-216.1 of the 2013 CBC contains an exemption for compliance for signage in detention and correctional facilities that is not located in public use areas. Although the exception is provided, it is our recommendation that compliant tactile and visual signage be provided if possible to ensure program accessibility



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

## List of Polices Reviewed

The Assessment Team reviewed the following list of the Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures.  Although the majority of these policies are addressed within this report (based on their applicability to disabled inmates and to the overall assessment), some of the policies listed below were not pertinent to inmates with disabilities.  However, the Assessment Team did an exhaustive review of all of the listed policies to be certain.

01/01    Introduction
01/02    Command and Responsibilities
01/03    Employee Conduct
01/04    Employee Assignments, Attendance / Daily Schedules, Time Off, Time Sheets
01/05    Training Program / Training Requests
01/06    Correctional Services Identification Cards
01/07    Volunteer Program
01/08    Intelligence Unit
01/09    Prisoner and Video Monitoring Requests
01/10    Operational Video System
01/11    Line-Ups
01/12    Concealed Weapon Permits
01/13    Supply Requisition
01/14    Division Safety Program
01/15    Reporting of Incidents and Crimes
01/16    Public Information Plan
01/17    Operations Orders Review and Update
02/01    Use of Force
02/02    Use of Restraint Devices
02/03    Use of Pro-Straint Chair
02/04    Weapons, Tactical Weapons, and Specialized Equipment
02/05    CERT and Cell Extraction Procedures
02/06    Prisoner Searches
02/07    Access to Facilities
02/08    Access to Facilities - Deliveries and Services
02/09    Metal Detector and X-ray Machine Operation
02/10    Key Control and Equipment Issuance
02/11    Communications Equipment
02/12    Transportation of Prisoners
02/13    Inter-Facility Transportation and Court Appearances
02/14    Evidence and Contraband Disposition
02/15    Perimeter Patrols
03/01    Critical Incident Response Plan
03/02    Fire Prevention - Main Jail

03/03   Fire Suppression - Main Jail
03/04   Fire Prevention - RCCC
03/05   Fire Suppression - RCCC
03/06   Emergency Systems and Equipment
03/07   Medical Emergencies
03/08   First Aid Kits
03/09   Fights, Riots, Hostage and Minor Disturbances
03/10   Death or Serious Injury of a Prisoner
03/11   Natural Disasters
03/12   Evacuation Plan - Main Jail
03/13   Evacuation Plan - RCCC
03/14   Bomb Threats, Suspicious Items, or Explosions
03/15   Escape Response
03/16   Crimes Occurring Within Correctional Facilities
04/01   Intake, Search, Reception and Holding
04/02   Evidentiary/ Exposure Blood Draws
04/03   Prisoner Clothing, Property, and Funds
04/04   Use of Sobering Cell
04/05   Use of Safety, Segregation, North Holding #2, and Multipurpose Rooms
04/06   Identification Process
04/07   Dress-In/Dress-Out Procedures
04/08   Prisoner Orientation
04/09   Release Procedures
04/10   Property and Money Return and Release Procedures
04/11   Mass Arrests
04/12   Missing Property and Property Claims
04/13   Housing of Juveniles -Main Jail
05/01   Arrest Types and Bookings
05/02   Cal ID/ ID Hold/ Merging X-Reference Numbers
05/03   Prisoner File System/ Teletypes/Information Requests
05/04   DNA Samples
05/05   Pre-Trial Release Program
05/06   Bail & Surrender
05/07   Sentence Computation
05/08   Work Project Assignment
05/09   Weekenders
05/10   Service of Processes on Prisoners
05/11   Classified Documents
05/12   Archives
06/01   Log Books
06/02   Housing Plan
06/03   Classification Process
06/04   Count and Lockdowns

06/05   Housing Unit Checks
06/06   Organized Searches in a Housing Unit (SHAKEDOWNS)
06/07   Processing Prisoners Out of a Housing Unit
06/08   Court Pull Procedures
06/09   Prisoner Movement Within a Facility
06/10   Recreation, Exercise and Showering
06/11   Laundry, Clothing & Linen
06/12   Hair Care and Cosmetology Services
06/13   Telephone/TDD/TTY Equipment Access
06/14   Interpreter Services
06/15   Prisoner Correspondence
06/16   Publications
06/17   Social and Media Visits
06/18   Confidential Visits
06/19   Inmate Workers
06/20   Court Holding Area and Courtroom Security
07/01   Inmate Message Requests (KITE's)
07/02   Grievances
07/03   Discipline Plan
08/01   Inmate Welfare Trust Fund Debits and Credits
08/02   Inmate Trust Fund Debits and Credits
08/03   Corrections Cashier
08/04   Educational Services
08/05   Commissary Operations
08/06   Prisoner Services
08/07   Law Library
08/08   In-Propria Persona (Pro-Per)
08/09   Cost Recovery for Housing of Prisoners
08/10   Jail Industries
08/11   Religious Services
09/01   Housing Unit Inspections and Cost Recovery
09/02   Facility Sanitation and Cleanliness
09/03   General Waste Disposal
09/04   Hazardous Materials Controls
09/05   Infectious Waste Disposal
09/06   Pest Control
09/07   Vermin Infestation
09/08   Smoking Ordinance
09/09   Maintenance Equipment Accountability
09/10   Maintenance Requests and Equipment Repair
10/01   Health Care Services
10/02   Psychiatric Services
10/03   Health Care Treatment Access
10/04   Medical Intake Screening

10/05    Suicide Prevention Program
10/06    Blood and Body Fluid Exposure
10/07    Communicable Disease Management
10/08    Medicine Distribution "Pill Call"
10/09    Dental Services
10/10    Health Equipment and Control
10/11    Health Records
11/01    Food Services
11/02    Meal Counts and Services
11/03    Staff Meals
11/04    Culinary Equipment Control

1000    Department and Division Overview
1001    Mission Statement
1002    Organizational Chart
1003    Staffing Information
1004    Program Descriptions
1100    Responsible Health Authority
1101    Medical Autonomy
1102    Administrative Meetings and Reports
1103    Quality Improvement Program
1104    External Medical Peer Review
1105    Policies and Procedures
1106    Public Advisory Committee
1107    Decision Making - Special Needs
1108    Support Services
1109    First Aid Kits
1110    Access to Diagnostic Services
1111    Notification of Next of Kin
1112    Medical Review of In-Custody Deaths
1113    Medical Research
1114    Inmate Workers
1115    Utilization of Volunteers
1116    Direct Orders
1117    Health Care Philosophy
1118    Female Reproductive Services
1119    Individualized Treatment Plans
1120    Continuity of Care
1121    Health Promotion and Disease Prevention
1122    Hospital Care
1123    Exercising
1124    Personal Hygiene
1125    Prosthesis
1126    Health Care Maintenance

| | |
|---|---|
| 1127 | Notification of Inmate Death or Impending Death |
| 1128 | Reading Glasses for Inmates |
| 1129 | ICE Detainee Procedural Considerations |
| 1130 | Transfer Medications |
| 1302 | Staff Development and Training |
| 1303 | Basic Training for Correctional Personnel |
| 1304 | Medication Administration Training |
| 1305 | Licensure |
| 1306 | Credentialing and Privileging-Adult Medical |
| 1306.1 | Credentialing and Privileging-Adult Mental Health |
| 1307 | Medical Assistant – Scope of Practice |
| 1400 | Medical Transportation |
| 1401 | Transfer of Patients with Acute Illnesses |
| 1403 | Emergency Services |
| 1404 | Receiving Screening |
| 1405 | Detoxification – Management of Intoxicated Patients |
| 1406 | Heroin Detoxification – Intake Protocol |
| 1407 | Access to Treatment |
| 1409 | Clinic Care – Sick Call |
| 1410 | Medical Services Provided in the Medical Housing Unit |
| 1411 | Mental Health Services |
| 1412 | Suicide Prevention – 2M – Joint Policy with JPS |
| 1413 | Use of Restraints and the Pro-Straint Chair |
| 1414 | Restraint Check Method |
| 1415 | Patients in Safety Cells |
| 1416 | Patients in Segregation |
| 1417 | Adult Developmental Disability |
| 1418 | Health Inventory and Communicable Disease   Screening |
| 1419 | Chemically Dependent Patients |
| 1420 | Court Orders |
| 1421 | Hunger Strike |
| 1422 | Special Needs Patients |
| 1423 | Post Release Medical Care Planning |
| 1424 | Sexual Assault |
| 1425 | Patients in Segregation Cells in Intake |
| 1426 | Incident Reporting |
| 1427 | Pregnant Diabetics |
| 1428 | Management and Removal of Taser Probes |
| 1429 | Emergency Response |
| 1430 | Hyperthermia |
| 1431 | Footwear in the Jails |
| 1433 | Admission to Jail Acute Psychiatric Inpatient Unit |
| 1434 | Evaluation and Care of Inmates Subject to Disciplinary Diet |
| 1435 | Inmate Health Care Grievances |

1436    Two East Inmate Transfers
1437    Bedtime Snack (HS Snack)
1438    Advanced Directives / DNR
1439    Reports of Disabilities or Impairments
1440    Emergency Mode
1600    Management of Pharmaceuticals
1601    Medication Administration
1604    Over-the-Counter Medications
1605    Over-the-Counter – indigent Patient
1700    Communicable Disease Plan
1701    Diseases and Conditions Reportable to Public Health
1702    Communicable Disease Outbreak Investigation
1703    Employees with Communicable Infections
1704    Immunocompromised Patients
1705    Transport of Patients with Communicable Infection
1706    Transmission Based Isolation
1707    Blood-borne Pathogen Exposure Control Plan
1708    Standard Precautions
1709    First Aid Following Exposure to Blood and/or Body Fluids
1710    Care of Respiratory Therapy Equipment
1711    Cleaning and Disinfection of Hand or Foot Care Instruments
1712    Handwashing
1713    Disposal of Used Needles and Syringes
1714    Personal Protective Equipment
1715    Tube and Draining Wound Care
1716    Use of Sterile Disposable Items
1717    Microbiological Cultures of the Environment and Personnel
1718    Waste Management Policy
1719    Airborne Pathogen Exposure Control Plan
1719.1  Employees with Unprotected Exposure to Patients with TB
1720    Respiratory Isolation
1721    Varicella Zoster
1724    Pertussis
1725    Rubella Infection
1726    Rubeola Infection
1727    Amebiasis
1728    MRSA Infections
1729    Conjunctivitis
1730    Coxsackie Virus
1731    Gastroenteritis (Viral)
1731.1  Gastroenteritis (Bacterial)
1732    Influenza Vaccine
1733    Meningitis
1736    Streptococcal (Group A) Infections

1737    West Nile Virus
1738    Ecto-Parasites
1739    Pediculosis Infestation
1740    Scabies Infestation
1741    Hepatitis C
1800    Collection of Forensic Evidence
1801    Informed Consent
1802    Body Cavity Searches
1803    DNA Procedure at MJ and RCCC
1900    Health Records Format and Contents
1901    Confidentiality of the Health Record
1902    Transfer of Health Records and Information
1903    Records Retention
1904    Modifications to Medical Records
2000    Dental Care
2100    Tear Gas Usage
2101    Disaster Plan
2300    Food Service
2301    Inmate Medical Clearance for Food Handling
2302    Health and Hygiene Requirements – Food Service Workers

# List of Forms, Notices and Documents Reviewed

The Assessment Team conducted an exhaustive review of the following SCSD detention facilities forms, notices and documents as part of the assessment. Some of the items listed below are mentioned throughout the report as related to the review. Many of the forms, notices and documents reviewed were applicable to inmates with mobility disabilities and/or were relevant to the overall assessment, while others were found not to be pertinent.

- Agreement to Appear
- Authorization for Release of Medical /Health Information
- Classification Checklist - ICE Detainees
- Classification PF4
- County Jail Message Request
- Correctional Health Services Special Medical Intake
- Correctional Health Services Special Needs Form
- Correctional Services Inmate/Detainee Handbook
- Correctional Services Property and Clothing Record
- Community Resource Guide
- EGACE Registration Form
- EGUSD General Rules
- EGUSD Orientation Sign-up
- EGUSD Student Interest Form
- Foreign Warrant Arrests/Defendant's Rights
- HALT/RSAT Program Information
- Health Services KITE
- ICE Classification Worksheet
- ICE Physical Examination/Health Appraisal
- Inmate Booking Information Receipt
- Inmate Information Request
- Inmate Reclassification Notice
- Inmate Rule Code Violation Schedule
- Inmate/Detainee PREA Attestation Form
- Intake Screening Form JPS Clinical Assessment
- Jail Psychiatric Services Outpatient Referral
- JBCT Group Schedule
- JPS Frequency of Services
- Main Jail Division COMPAS Classification Housing Plan
- Main Jail Division Intake Classification
- Main Jail Division Request for Reclassification
- Main Jail Division Classification Worksheet
- Outdoor Recreation Schedules
- Personal Jewelry Waiver and Release of Liability

- Property Receipt Report
- RCCC Classification Worksheet
- RCCC Detainee Orientation
- RCCC Master Schedule
- Reentry Client Admit Data Sheet
- Reading Glasses Policy
- Reentry Services
- Reinstatement of Probation
- Release from Custody Information
- Release Screening Form
- Reply to Inmate Grievance Suggestion

## Abbreviations and Acronyms Used

**AA** – Alcoholics Anonymous

**AB** – Assembly Bill

**ABE** – Adult Basic Education

**AD -** Assistive Device

**ADA** – Americans with Disabilities Act

**ADAAG** – Americans with Disabilities Act Accessibility Guidelines

**ADAS** – Americans with Disabilities Act Standards

**ADL**- Assistance with Daily Living

**ADSEG** – Administrative Segregation

**AFF** – Above Finished Floor

**ASL** – American Sign Language

**BiPAP** – Bilevel Positive Airway pressure

**BPH** – Board of Parole Hearings

**BTBL** – State of California Braille and Talking Book Library

**CAFM** – County Automated Facility Maintenance

**CASAS** – Comprehensive Adult Student Assessment System

**CASE** – Clark Adaptive Support Evaluation

**CBC** – California Building Code

**CBF** – Christopher Boone Facility

**CBJT** – Competency Based Jail Treatment

**CCR** – California Code of Regulations

**CDC** – California Department of Corrections

**CDCR** – California Department of Corrections and Rehabilitation

**CDO** – Chief Disciplinary Officer (CDCR)

**CENAPS** –Center of Applied Sciences

**CERT** – Custody Emergency Response Team

**CHS** – Correctional Health Services

**CIT** – Crisis Intervention Team (training)

**CJ** – County Jail

**COF** – Coefficient of Friction

**COPD** – Chronic Obstructive Pulmonary Disease

**CPAP** – Continuous Positive Airway pressure

**CBF** – Christopher Boone Facility

**CPR** – Cardiopulmonary Resuscitation

**CPS** – Child Protective Services

**DD** – Disciplinary Detention

**DDP** – Developmental Disability Program (CDCR)

**DD1** – No acronym (code means mild intellectual disabled CDCR inmate with mild cognitive deficits/adaptive supports

**DD2** – No acronym (code means moderate intellectual disabled CDCR inmate with moderate cognitive deficits/adaptive support needs, and/or victimizations concerns

**DD3** – No acronym (code means severe intellectual disabled CDCR inmate with severe cognitive deficits/adaptive support needs, and/or victimization concerns

**DME** – Durable Medical Equipment

**DPH** – No acronym (code means permanent deaf/hearing impaired CDCR inmate)

**DPM** – No acronym (code means permanent mobility impaired CDCR inmate, non-wheelchair user)

**DPO** – No acronym (code means intermittent CDCR wheelchair user)

**DPP** – Disability Placement Program (CDCR)

**DPV** – No acronym (code means permanent vision impaired CDCR inmate)

**DPW** – No acronym (code means permanent full-time CDCR inmate wheelchair user)

**DVHU** – Domestic Violence Housing Unit

**EC** – Effective Communication

**EGACE** – Elk Grove Adult and Community Education

**EGUSD** – Elk Grove Unified School District

**EKG** – Electrocardiogram

**ELA** – English Language Arts

**EMR** – Electronic Medical Record

**ESL** – English Second Language

**FAF** – Facility and Fleet (Maintenance)

**FATRNS** – Inter-Facility Transfers

**FOSS** – Frequency of Services Scale

**GED** – General Educational Development

**GP** – General Population

**H** – High

**HALT** – Housing for Accountable Living Transitions (Substance Abuse Treatment)

**HCA** – Health Care Appliance

**HCSD** – Health Care Services Division (CDCR)

**HiSET** – High School Equivalency Test

**HF** – Honor Facility

**HMU** – Health Management Unit

**HS** – Health Services

**ICE** – Immigration and Customs Enforcement

**ID** – Identification

**IDEF** – Inmate Disability Identification Form

**IE** – Investigative Employee (CDCR)

**IEP** – Individual Education Plan

**IMAP** – Incarcerated Men's Accountability Program

**IQ** – Intelligence Quotient

**IWF** – Inmate Welfare Fund

**JBCT** – Jail Based Competency Treatment

**JIMS** –Jail Inmate Management System

**JKF** – Joseph Kievernagel Facility

**JPS** – Jail Psychiatric Services

**KBF** – Kevin Blount Facility

**L** – Low

**LB/LT** – Lower bunk/Lower Tier

**LCSW** – Licensed Clinical Social Worker

**LPS** – Lanterman-Petris-Short

**LVN** – Licensed Vocational Nurse

**M** – Medium

**MD** – Medical Doctor

**M Dorm** – Medical Dorm

**MFT** – Marriage and Family Therapist

**MH** – Mental Health

**MHU** – Medical Housing Unit

**MJ** – Main Jail

**MOCA** – Montreal Cognitive Assessment

**MS** – Medium Security

**NA** – Narcotics Anonymous

**NCCT** – Northern California Construction Training

**NP** – Nurse Practitioner

**OPP** – Outpatient Psychiatry

**PA** – Public Address

**PC** – Protective Custody

**PDQ** – Position Description Questionnaire

**PHH** – Personal Health History

**POHR** – Problem Oriented Health Record

**POST** – Peace Officer Standards and Training

**PPD** – Purified Protein Derivative

**PREA** - Prison Rape Elimination Act

**QUEST** – Question, Understand, Evaluate, Succeed, Transform (in-custody gang diversion program)

**RBF** – Roger Bauman Facility

**RC** – Reception Center

**RCCC** – Rio Cosumnes Correctional Center

**REACT** (Belt) – Remote Electronically Activated Control Technology

**RMS** – Records Management System

**RN** – Registered Nurse

**ROC** – Restoration of Competency

**RSAT** – Residential Substance Abuse treatment

**SA** – Staff Assistant (CDCR)

**SBF** – Stewart Baird Facility

**SCGS**- Sacramento County General Services

**SCSD** – Sacramento County Sheriff's Department

**SCMHC** – Sacramento County Mental Health Center

**SLI** – Sign Language interpreter

**SLF** – Sandra Larson Facility

**SMI** – Serious Mental Illness

**SMU** – Special Management Unit

**SOAP** – Subjective Objective Assessment Plan

**SOB** – Shortness of Breath

**SRN** – Senior Registered Nurse

**SVPA** – Sexually Violent Predator Act

**SWP** – Sheriff's Work Project

**TDD** – Telecommunications device for the Deaf

**TSEP** – Total Separation

**TST** – Tuberculin Skin Test

**TTY** – Tele-Typewriter

**UCD** – University of California, Davis

**UFAS** – Uniform Federal Accessibility Standards

**US** – United States

**USDOJ** – United States Department of Justice

**VCT** – Vinyl Composition Tile

**WebJPF** – Web based Jail Person File

**W&I** – Welfare and Institutions

**XREF** – X Reference (inmate jail number)