# Evaluation of the Sacramento County Jail
# Inmate Classification and T-SEP Systems

Prepared by

James Austin
Emmitt Sparkman
Robin Allen

May 2017

**Introduction**

Dr. James Austin was asked to assess the Sacramento County Jail inmate classification system and the T-SEP (or Total Separation) housing system. The larger inmate classification system is used to house prisoners within the jail's general population. Inmates are typically scored on a number of objective factors that are related to the current charges/offenses, prior criminal record, escape history, prior institutional conduct, demographic (age and gender), and several stability factors (education, residency, employment). Inmates assigned to the T-SEP status are so assigned based on other security factors that are intended to identify and house inmates who pose a significant and on-going threat to other inmates, staff and perhaps themselves.

There are two dominant jail classification systems that are operational within the U.S.  One is referred to as the National Institute of Corrections (NIC) Objective Jail Classification system (OJC). It is based on the NIC prison classification system, which is the dominant inmate classification system in the U.S.  All but two state prison systems have a version of the NIC objective prison classification system.  The NIC Objective Jail Classification is an additive point system that is used for both initial and reclassification purposes.  A system of over-rides is used to depart from the scored system. Because the NIC system was developed by NIC, there is no cost to the agency to implement it.  A correctional agency is also able to customize the factor's weights, scale, and over-ride factors.  Versions can also be developed for male and female inmates based on validation results.

The other jail classification system was designed by the Northpointe company and is known as the decision-tree model. While using many of the same factors found in the NIC system, the format for scoring an inmate is much different. As the name implies, rather than using an additive point format, the Northpointe system uses a decision-tree format.  The important difference is all the scoring items are not used in each assessment. Rather, only those items needed for each security level are sequentially applied.  The early version of the Northpointe system had no reclassification component. Finally, because the system is owned by Northpointe, the user is not allowed to make any changes or customize the instrument. Also, no models have been developed specifically adapted for female inmates.

Part of the inmate classification and housing system is what is referred to as the T-SEP (or Total Separation) housing unit where inmates are confined to single cells for extensive periods of time. At the time that study was initiated on January 11, 2017, there were approximately 172 inmates assigned to TSEP at the Main Jail out of 3,948 inmates (or about 4%).  Significantly, by the end of April 2017 the T-SEP population had declined to 120.  There is a much smaller T-SEP unit at the Rio Cosumnes Correctional Center (RCCC) which houses about 15-16 T-SEP male inmates at any given time

The concept of "T-SEP" is unique to Sacramento County.  In other jail and prison systems, inmates who are classified as highly disruptive, a threat to other inmates or staff are typically

assigned to the status of "administrative segregation". In this status, they are separated from the general population and receive limited access to recreation, showers, services, visits and other aspects afforded other inmates.

The remainder of this report summarizes the evaluation results of these two separate, but closely related classification and housing systems.

**T-SEP Evaluation**

Although inmates assigned T-SEP are also housed at the RCCC, the main focus of this assessment was the Main Jail.  A site visit was made to the RCCC but no inmate interviews were conducted.  It is noteworthy that the RCCC T-SEP unit operates differently than the Main Jail T-SEP unit in regard to out of cell time.  At the RCCC unit, inmates are offered daily time out of their cells in the one to two hour range. As described below the Main Jail out of cell time is much more restricted.

In evaluating the Main Jail T-SEP program three site visits were conducted at the Main Jail where most of the T-SEP inmates are housed on the 7th and 8th floors.  During these site visits, structured interviews were conducted with a random sample of inmates assigned to the units. Interviews were also conducted with staff responsible for and assigned to the T-SEP Units. The evaluation also included touring jail areas, observing jail operations, and, reviewing policies/documents.  A TSEP Inmate Interview Questionnaire was developed and utilized for all the inmate interviews. Dr. Austin and Emmitt Sparkman, an associate of Dr. Austin, conducted all of the inmate and staff interviews.

Assisting in the inmate interviews were Sheriff Deputies Cristine Jackson and Richard Dunlap (Compliance Officer).  Either one or both were present for all inmate interviews that were conducted in a private setting.  Both were very helpful in ensuring access to the T-SEP Inmates, touring needed areas of the Main Jail, providing jail operation information, and obtaining documents/policies needed for the assessment. All inmates who were interviewed walked from their cells to the interview room unescorted and without any restraints.

The Sheriff's Department, County of Sacramento, Operations Order Classification identifies T-SEP as Special Housing used to house inmates at the Main Jail or RCCC.  Inmates assigned to T-SEP have special separation needs per Sheriff's Department Operations Order 6/2-Housing. State of California Title 15 Minimum Standards for Local Detention Facilities establishes the guidelines for operation of the Sacramento Main Jail including T-SEP**.**

*T-SEP Attributes*

The Sacramento Sheriff's Department provided a data file of all prisoners who were classified as a T-SEP inmate as of January 11, 2017at the Main Jail. That file contained 172 inmates. Of that number, eight inmates had been released by the time the site visits were initiated. There were another four inmates where the key data elements were incomplete.  Table 1 shows the key

2

attributes of the 162 T-SEP inmates for which there were complete data.  The key attributes of the T-SEP inmates at the Main Jail can be summarized as follows:

1.  Primarily male (92%);

2.  Largely Black (47%) followed by White (29%) and Hispanic (20%);

3.  Average age of 36 years with the youngest being 18 years and the oldest being 81 years;

4.  The average total amount of time served in the jail system, including time in T-SEP, to date was 262 days with a median time served to date of 166 days;

5.  There was one T-SEP person who has been in custody in the jail for over six years and over 5 years in T-SEP housing;

6.  In terms of time in T-SEP status, the average time served was 180 days with a median of 106 days;

7.  Overall, Main Jail T-SEP inmates have spent 73% of their jail time in a T-SEP housing unit; and,

8.  41 (25%) of the T-SEP inmates have spent their entire period of jail time in a T-SEP unit.

By way of comparison the RCCC T-SEP male inmates had much shorter periods of time in the jail (average of 196 days and a median of 55 days) and in T-SEP status (average of 48 days and median of 26 days).  Based on the interviews with staff, the RCCC T-SEP inmates tended to be those who manifested management issues at the RCCC after being admitted to the jail system and not at admission.

Table 1 also shows the mental health status of the T-SEP population. The University of California, Davis is responsible for providing mental health services for the Main Jail inmates including those on T SEP status. The UC Davis staff use the following four FOSS Levels to assess an inmate's mental health status:

FOSS 1: Anyone who is in Inpatient Psych (2P) or is in a classroom or safety cell awaiting admission to 2P.  They are seen daily by a qualified mental health professional;

FOSS 2: These patients are seen every 30 days or less by a qualified mental health professional.  Most have a diagnosed mental illness;

FOSS 3: These patients are seen every 90 days or less by a qualified mental health professional.  Most are on some sort of psychotropic medication and need occasional ongoing follow up; and,

3

FOSS 4: Those that are open to JPS, but aren't actively being seen or treated.

Most (54%) T-SEP inmates are assessed at the FOSS 3 level with 15% at the higher FOSS 2 level. There was only one inmate who was assessed at the highest level of mental health care.

**Table 1.  T-SEP Population**
**January 11, 2017**

| Attribute | Inmates | % |
|---|---|---|
| Total | 162 | 100% |
| Gender | | |
| Male | 149 | 92% |
| Female | 13 | 8% |
| Race | | |
| White | 47 | 29% |
| Black | 76 | 47% |
| Hispanic | 33 | 20% |
| Other | 6 | 4% |
| Age | | |
| Average | | 36 yrs. |
| Youngest | | 18 yrs. |
| Oldest | | 81 yrs. |
| Time In Custody | | |
| Average | | 262 days |
| Median | | 166 days |
| More than 1 yr. | | 31 inmates |
| Longest Time | | 2,350 days |
| Time in T-SEP | | |
| Average | | 180 days |
| Median | | 106 days |
| More than 1 yr. | | 22 inmates |
| Longest Time | | 1,970 days |
| % of Jail Time in T-SEP | | 73% |
| Inmates 100% in T-SEP | 41 | 25% |
| FOSS Level | | |
| 1 | 1 | 1% |
| 2 | 25 | 15% |
| 3 | 94 | 58% |
| 4 | 30 | 19% |
| Other | 12 | 7% |

*T-SEP Housing*

The Main Jail houses T-SEP male inmates in the following locations:  Housing 8 East PODs 100, 200, 300, 8 West PODS 100, 200, 300, and 400.  Housing 8 West 400 POD is utilized to house inmates on disciplinary status for the most serious violations.  T-SEP for female inmates is located in Housing 7 West 400 POD.  Female inmates on Administrative Segregation, Protective Custody, Outpatient Psychiatry and Disciplinary are also housed in Housing 700 West 400 POD. Male and Female inmates on T-SEP and Disciplinary status are single celled.

It is important to note that the only difference between T-SEP and Administrative Segregation is T-SEP is single-celled and Administrative Segregation is double-celled.  Thus, a T-SEP inmate, by definition, is believed unsuitable for double-celling.

The Main Jail has the following other special/restrictive housing units:

| | |
|---|---|
| Medical Unit | 10 cells |
| Acute Psychiatric Unit | 18 cells |
| Disability Unit | 5 cells |
| Medical Sub Acute Units | 32 cells (2) Units 16 cells per unit |

The total number of acute psychiatric beds is quite low for a nearly 4,000 inmate population. The lack of acute and step-down/sub-acute beds is no doubt contributing to the creation and expansion of the T-SEP population.

A Medical Exam Room is located on the Main Jail Floors 3, 4, 5, 6, 7, and 8, and is shared by Housing East and West Housing Units on each floor.  The Medical Unit, where medical and acute psychiatric cells are located, is on the Main Jail 2nd Floor.

The Main Jail has three recreation areas for the inmate population.  The recreation areas are located between Main Jail Floors 3 and 4, 5 and 6 and 7 and 8.  Housing located on 2nd, 3rd, and 4th Floors share the 3/4 Recreation Area. Housing located on the 5th and 6th Floors share the 5/6 Recreation Area, and Housing on the 7th and 8th Floors share the Housing 7/8 Recreation Area. Recreation Areas shared by floors limits inmate access.  Housing 7/8 Recreation Area accessibility is very limited because it is shared by male and females. Another factor limiting accessibility is that inmates requiring separation assigned to T-SEP, Administrative Segregation. Protective Custody and Disciplinary Housing status are housed on these main jail floors.

Each housing unit has a common area adjacent to each POD and another common area inside each POD. The Housing Units have a large classroom, nine non-contact visitation booths with three designed for confidential visits.   Inmate cells have intercoms connected to the Housing Unit Control Booth allowing inmates to communicate with staff from their cell.  Showers for the inmates are located in each of the POD Units.  T-SEP inmates are not allowed to participate in any group congregate activities.

The following policy related documents were provided by the Sheriff to review T-SEP housing procedures and policies:

1. County of Sacramento Inter-Department Correspondence dated October 21, 2015 Subject:  Discipline Period Review;
2. Sheriff's Department, County of Sacramento, Operations Order, Classification Process;
3. Sheriff's Department, County of Sacramento, Post Order 8 West 400 POD Disciplinary Housing Unit;
4. Sheriff's Department County of Sacramento, Operations Order, Housing Plan;
5. Sheriff's Department County of Sacramento, Outdoor Recreation Schedule; and,
6. State of California Title 15 Minimum Standards for Local Detention Facilities.

Custodial Deputies are to perform one (1) hour cell checks for inmates on T SEP status.  Most correctional systems require 30-minute cell checks for inmates in Special Housing Units.  T-SEP is identified as a Special Housing Unit by the Sheriff's Department, County of Sacramento, Operations Order, Classification Process.   A serious concern is the number of T-SEP inmates with mental health issues, isolated in a Special Housing Unit and receiving one (1) hour cell checks.

*Inmate Interviews*

From the T-SEP spreadsheet, random samples of the current T-SEP population were drawn for the purpose of being interviewed.  Over three site visits, a total of 52 inmates were selected to be interviewed.   Of that number, ten inmates refused to be interviewed with 42 being completed. Three interviews were conducted cell side due to these inmates initially refusing to participate but later agreeing to an interview without leaving their cells.  An additional classified T-SEP inmate was on suicide watch housed in a classroom of Housing Unit 5 East.  The inmate was on suicide watch in the Housing Classroom until a bed became available in the 2P Acute Psychiatric Unit that was at capacity.   His interview was not completed due to the inmate's inability to understand and answer the questions, as well as difficulty conversing through a solid door.

Consistent with the data in Table 1, the majority of the interviewed inmates had mental health issues varying from mild, controlled by psychotropic medication to serious issues impacting their ability to perform in the general population.  Interviews revealed 75% of the inmates were currently receiving mental health treatment, or had previously received mental health treatment involving taking psychotropic medication and being seen by mental health staff.  The interviews also revealed a number of the inmates had significant mental health issues that contributed to their placement and retention in T-SEP.  Staff and interviewed inmates reported T-SEP inmates frequently threaten self-harm, and are often placed on suicide watch.   As indicated, one of the interviewed T-SEP inmates during the assessment was on suicide watch awaiting bed space in the Main Jail Acute Psychiatric Unit.

In terms of the basis for placement in T-SEP, the primary reasons cited in these cases were as follows:

1. Negative Institution Adjustment Problems/Violations (63%);
2. Inmate's Safety (32%); and,
3. Criminal Charges  (5%).

Within reason #1, a factor that often applied was prior placement in the CDCR SHU units. For these inmates, they were immediately assigned to the T-SEP unit and will remain there until they are released from the jail.  Included in reason #2 are inmates who require protection from other inmates and, who otherwise would be designated as a protective custody inmate if it were not for the single cell requirement.

Also, consistent with the data in Table 1, the length of time the interviewed inmates had been on T-SEP status varied, with most having been on the status for less than one (1) year.  The longest time identified was one (1) inmate on T-SEP status for approximately two and one half years. Here again we noted that about $1/4^{th}$ of the interviewed cases were admitted to T-SEP upon booking and had spent their entire period of custody in a T-SEP unit.

The vast majority (over 90%) of the interviewed inmate records did not reveal significant disciplinary violations while they were on T-SEP status.  Inmates did frequently incur rule violations for *Failure to Rise for Count.*  The rule violation is not a formal write-up and deputies can impose immediate sanctions without a due process hearing. Disturbingly, the sanction imposed was to forfeit the inmate's 30 minute out of cell time for the day if he/she fails to rise for count.

All of the interviewed inmates reported that there had been no formal hearing or interview by classification staff prior to their placement in T-SEP status. This is not to say that they were not interviewed by the classification staff as part of the mandatory initial classification process. What the inmates consistently reported was they did not have a formal interview or hearing where the basis for placement in T-SEP was explained to them as in normally done in other jail and prison systems. They have not received any formal document explaining or justifying their T-SEP status nor have they had their current status formally reviewed and justified. Finally, none of them have received any information on how they request or secure release from T-SEP.

It should also be noted that most of the interviewed inmates cannot be immediately released to the general population due to well documented security issues. But continued placement in the current T-SEP status and under the severe conditions of confinement that exist in these units is also unwarranted.

*T-SEP Classification Process*

Inmates are classified to T-SEP status by Main Jail Classification Staff.  As noted above, interviewed inmates reported their involvement in T-SEP placement is either non-existent or

extremely limited.  None of the inmates reported having a face to face classification interview prior to T-SEP placement.

Classification reviews for inmates on T-SEP status occur every 30 days after initial placement. Until recently, the classification reviews were paper reviews without any inmate participation. Approximately three weeks prior to the T SEP Assessment, classification staff begin conducting reviews at the "cell side".  The classification reviews conducted at the cell side are done communicating through the inmate's cell door.  The quality of these cell side classification reviews is questionable based on confidentiality concerns and the difficulty this consultant had interviewing inmates at cell side.

*Out of Cell Activities and Privileges*

The Main Jail T-SEP inmates maximum amount of time out of cell is three (3) hours per week provided in 30 minute sessions per day.  Interviewed inmates also reported their out of cell time is primarily the 30 minute sessions totaling a maximum of three (3) hours per week.  Other noted, but less frequent, out of cell activities were revealed as visits and advanced medical treatment.  Main Jail staff confirmed T-SEP inmates rarely exit their cell except for the 30-minute daily session when it is offered.  T-SEP inmates receive limited privileges mirroring those of inmates on Administrative Segregation while Protective Custody inmates receive increased privileges similar to those received by General Population inmates.  As indicated earlier, *Failure to Rise for Count* violations result in the inmate forfeiting the out of cell time for the day. Interviewed inmates reported the out of cell time is occasionally offered during sleeping times (i.e. 2:00 a.m., 3:00 a.m. or missed due to staffing shortages).  The 30 minute out of cell time is given in the POD common area.  None of the interviewed inmates reported being able to utilize the shared 7/8 Housing Unit Recreation area.

Inmates described utilizing the 30 minutes to shower, talk on the telephone, and if time permitted, visit with other inmates outside their cell door or watch the television mounted on the POD common area wall.  Access to showers is only provided during the 30 minutes out of cell time.  When the 30 minutes out of cell is not provided or the inmate declines the out of cell time he/she is not afforded a shower.  A number of inmates reported going days without a shower.  Meals are served to T-SEP inmates in their cells.  Inmates complained about the amount of commissary received while on T SEP status.

*Medical*

T-SEP inmate medical access is primarily in the Housing Unit POD at the cell or at the Medical Exam Room on the Housing Unit Floor.  Medication is provided by nurses coming on the unit and administering medication through the cell door.  Higher level medical treatment and after hours medical treatment is provided T-SEP inmates at the Main Jail 2nd Floor Medical Unit.  The Main Jail Physician provides sick call for T-SEP inmates one to two times per week in the Housing Unit Floor Medical Exam Room.

*Mental Health*

Interviewed inmates reported their contacts with mental health staff are almost always cell-side, including the psychiatrist, and rarely received out-of-cell face to face assessments. Inmates threatening self-harm are typically left on the Housing Unit until assessed by Medical Services staff.  Custodial staff do not provide one to one supervision until the individual is assessed by a qualified mental health professional for inmates threatening self-harm.  The inmate is given suicide prevention clothing and placed in the Housing Unit Classroom and observed by staff from the Control Room and/or during cell checks.

*Rehabilitation Programs*

Education is the only rehabilitation program available for T-SEP inmates to participate.  T-SEP inmates can request to participate in education programs by writing the Main Jail Education Department.  Once approved to participate, the inmate is given in cell education materials and periodically meets with an instructor in the non-contact visitation rooms located in the housing unit.

*Visitation*

T-SEP inmates can receive two non-contact visits weekly in the visitation booths located in the housing unit.  A number of the interviewed T-SEP inmates reported receiving visits.  There were no complaints regarding ability to receive visits while on T-SEP status.

**Conclusions and Recommendations**

There are a number of issues that need to be addressed regarding the Sacramento Sheriff's T-SEP housing unit as it operates at the Main Jail.  These can be separated into the three major categories of due process, conditions of confinement, and mental health services.

*Due Process.* There is not a credible or transparent process by which inmates are assigned to the T-SEP status.  Further, there is no structured review process which determines whether the inmate should be retained or released from T-SEP status.  Finally, there are no structured criteria by which inmates can secure release based on their compliant behavior.

*Conditions of Confinement*.  Inmates are placed in harsh conditions of solitary confinement and isolated from direct contact with other inmates for excessive periods of time. Inmates are limited to a maximum three (3) hours per week out of cell time, 30 minutes a day. Routinely, custodial staff deny Main Jail T-SEP inmates 30 minutes out of cell time for a *Failure to Rise for Count,* or due to staffing shortages. Out of cell time is also occasionally offered during inmate sleeping times.  Custodial staff performing the one hour cell checks for T-SEP inmates is problematic based on our observations of the units during the evaluation.

9

*Mental Health Care.* Most Main Jail T-SEP inmates have mental health issues with staff reporting frequent episodes of threatened self-harm.  However, inmates threatening self-harm are not placed on one-to-one observation until evaluated by a qualified mental health professional.  Further, out-of-cell assessments and treatment does not occur.

Based on these findings and recommendations, the following recommendations are made;

1. Terminate the term of T-SEP and re-assign the current population to either the general population or one of the following three special population statuses:

   A.  Administrative Segregation;
   B.  Protective Custody; or
   C.  Mental Health (acute or step-down).

2. The elimination of the T-SEP status and re-assignment of the current T-SEP population would be completed by the Special Population Committee (SPC) that consists of the following people:
   A.  Classification (Chair)
   B.  Mental Health
   C.  Security

3. The SPC would conduct a face to face interview with each T-SEP inmate unit during which the basis for placement in one of the designated special populations would be explained to him/her and documentation provided to the inmate.

4. It is expected that most of the existing T-SEP population would need to be placed in Administrative Segregation or a Mental Health Step Down unit.

5. Within the Administrative Segregation status, a two-phased program would be established that would allow most inmates to receive greater amounts of out of cell time and privileges consistent with a case plan developed by the SPC (see Table 2).  The proposed Administrative Segregation Phase 2 privileges should be commensurate with the privileges received by inmates in the general population.

6. Inmates placed in the Administrative Segregation units will continue to receive face to face interviews every 60 days to assess the inmate's progress and compliance with the case plan and the need to continued placement in a SPC unit.

7. Inmates in Administrative Segregation Phase 1 should be afforded the opportunity to participate in In-Cell Self Improvement Programs.

8. Phase 2 inmates should be afforded the opportunity to participate in Self Improvement Programs 1 hour per day, 5 days a week in a congregate setting; unless, the inmate poses a significant and on-going threat to other inmates, staff and perhaps themselves.

10

9. The Mental Health Step Down Unit would be for inmates assigned to FOSS level 2 and who do not pose a security threat to other inmates and staff.  The basic attributes of this program are shown in Table 3.

10. Inmates in the Mental Health Step Down Unit would be single or double-celled based on their SPC Case Plan.

11. The Mental Health Step Down Program privileges should be commensurate with the privileges received by inmates in the general population.  Inmates in the Mental Health Step Down Program should be afforded the opportunity to participate in 1 hour per day, 5 days per week out of cell structured activities as determined by the SPC Case Plan.

12. Today's technology provides an opportunity to offer inmate programs on computer tablets that are not connected to the internet.  The tablets can be loaded with education and rehabilitation programs that will assist the inmate both while he/she is confined and after release.  Consideration should be given to explore offering education and rehabilitation programs to inmates through this delivery system.

13. In both units, mental health staff would be required to make visits to the unit on a daily basis to tend to basic casework tasks, and to be available to any inmate requiring any emergency request.

14. In both units, custody staff to provide one to one observation when an inmate threatens self-harm until he/she is evaluated by a qualified mental health professional;

15. In both units, require classification, medical, and mental health discontinue cell side assessments and require face to face interviews/reviews in a private setting;

16. In both units, prohibit custodial staff from taking structured out of cell events without a due process hearing. Out of cell sessions should only be scheduled and offered during normal waking hours.

**Table 2**
**Recommended Administrative Segregation Housing**

| Attribute | Phase 1 | Phase 2 |
|---|---|---|
| | | |
| Celling | Single | Mixed |
| Recreation | Daily 1 hr. | Daily 2  hrs. |
| Showers | Three times per week | Five times per week |
| Visitation | Restricted | Un-restricted |
| Telephone | Restricted | Un-restricted |
| Programs | In Cell Self Improvement Programs | Group Congregate Self Improvement Programs Out of Cell 1 hour per day 5 days a week |
| Status Review | 30 days | 60 days |
| Mental Health Review | 30 days | 60 days |
| On Floor Security Staffing | Yes | Yes |
| Cell Checks | 30 minutes | Hourly |
| Privileges | Current Jail Administrative Segregation Privileges | General Population Like Privileges |

**Table 3**
**Recommended Mental Health Step Down Program**

| Attribute | |
|---|---|
| | |
| Celling | Mixed |
| Recreation | 2 hrs. |
| Showers | Daily |
| Visitation | Un-Restricted |
| Telephone | Un-Restricted |
| Programs | 1 hour per day 5 days a week structured activities provided by mental health staff |
| Status Review | 30 days |
| Mental Health Review | 30 days |
| On Floor Security Staffing | Yes |
| Cell Checks | 30 minutes |
| Privileges | General Population Like Privileges Unless Modified in by the SPC in the Case Plan |

12

**Classification Evaluation**

In order to evaluate the current classification system a number of tasks were undertaken. The initial task was to conduct analysis of the Northpointe system in terms of how it is classifying the current inmate population of approximately 3,947. The Northpointe Decision Tree initial instrument separates inmates into nine levels which can then be collapsed into three traditional custody levels of Close, Medium, and Minimum. As shown in Table 4, the majority of the inmates are assigned to the generic medium custody level (57%) followed by minimum custody (28%) and close/high (11%). Another 78 inmates who had been recently booked were "unclassified".   There were 127 inmates who were classified under the ICE classification system which is an additive point system that is similar to the one developed by the NIC.

In general, the distribution of the population by these three custody levels is pretty consistent with other jail systems with two slight exceptions.  Both the percent of inmates classified as close/high, or, minimum custody is slightly lower that one would expect. Generally, the close/maximum population is in the 20-25% range while the minimum custody population is in the 30 -40% range.

*Classification Process*

In 2013, the Sheriff implemented the Decision-Tree system at the main jail.  Prior to that year, the classification system was un-structured and based on just a few criteria. The RCCC implemented the system in 2016. Most of the classifications at the RCCC are reclassifications while the Main Jail staff conduct most of the initials as well as reclassifications.

The Sheriff's Department maintains a dedicated classification unit that has 12 deputies assigned to classification functions. Eight of the 12 staff are assigned to the Main Jail while the other four are assigned to the RCCC.  The larger number of staff at the MJ is appropriate given the large number of bookings that must be classified at the Main Jail.

Appropriately, not all newly booked inmates are classified.  Those that are to be cited and released within a few hours are not classified. The remaining new bookings are labeled as "keepers" and are assessed using the "Primary Screen" Decision Tree instrument.  The initial classification includes a face-to-face interview with the inmate.  Over-rides can be applied to deviate from the scored classification level.

Reclassifications can be done under Northpointe every 30, 60, or 90 days. The 30-day interval is a departure from the NIC system which only allows for 60 or 90 day intervals.  The 30-day interval was selected by Sacramento because it wanted to have the T-SEP inmates reviewed every 30 days. So, it was important to the Department (but not necessary) for the rest of the inmates to have their population reclassified every 30 days.

**Table 4.**
**Sacramento Classification Levels**
**Current Jail Population**

| Class Level | Custody Level | Inmates | Score Level % | Custody Level % |
|---|---|---|---|---|
| 1 | High | 201 | 5% | 11% |
| 2 | Close | 246 | 6% | |
| 3 | Medium | 734 | 19% | 57% |
| 4 | | 862 | 22% | |
| 5 | | 613 | 16% | |
| 6 | Minimum | 558 | 14% | 28% |
| 7 | | 52 | 1% | |
| 8 | | 336 | 9% | |
| 9 | | 141 | 4% | |
| ICE 1 | | 6 | 0% | 0% |
| ICE 2 | | 58 | 1% | 1% |
| ICE 3 | | 33 | 1% | 1% |
| ICE PC | | 30 | 1% | 1% |
| Unclassified | | 78 | 2% | 2% |
| Total | | 3,947 | 100% | 100% |

There are two problems with the 30-day review cycle standard as opposed to a 60 or 90-day interval.  First, it produces twice or three times the number of reclassifications that must be completed by staff.  This excessive workload also contributes to the fact that only the T-SEP inmates are being interviewed for a reclassification event.  All of the other inmates are not interviewed which is contrary to NIC standards. The reasons for the interview are as follows:

1. Allows the inmate to convey any information that might impact the staff's decision to classify and/or house an inmate;
2. Gain a better basis for either using or not using an over-ride;

14

3. Develop intelligence from the inmate about any threatening situation that may be occurring in a housing unit;
4. Verifying that all current charge and bail amount data are accurate and up-to date; and,
5. Convey to the inmate the basis for his/her reclassification level and how subsequent behavior may impact his/her future custody level.

Over-rides can also be employed by the classification staff to over-ride or depart from a scored classification level. Unlike the NIC OJC system, these over-rides are not structured by either *non-discretionary* and *discretionary* types of over-rides.  The latter would reflect departmental policy that would restrict placement of an inmate in minimum custody regardless of the inmate's classification score. The former can be applied at the discretion of the classification staff to either increase or decrease a scored custody level.   Unlike the NIC OJC system, whenever an over-ride is applied it does not need to be approved by a supervisor.

Listed below is the complete list of 29 reasons that one can use to override someone up or down on the scored Decision Tree classification level. For each over-ride, the NIC OJC criteria for an over-ride have been applied (mandatory-up, discretionary-down, discretionary–up). There were some over-ride reasons where it was not clear on the use of the over-ride and how it would be applied to an inmate.

1. Assaultive threats toward staff (discretionary – up)
2. Increased risk of escape (discretionary – up)
3. Serious institutional behavior history (discretionary – up)
4. Inmate under investigation for additional crimes (mandatory – up)
5. New charges may be added (discretionary – up)
6. Hold, detainer for assaultive felony offense (mandatory – up)
7. Known gang leader (mandatory –up)
8. Suspected drug trafficker (discretionary – up)
9. Inmate faced with lengthy prison term (20+ yrs.) (mandatory – up)
10. Mentally unstable (discretionary – up)
11. Lengthy street time since last assaultive offense (discretionary – down)
12. Notorious/particularly heinous offense (discretionary – up)
13. Inmate well known to staff (discretionary – down)
14. Developmentally disabled (discretionary – up)
15. Administrative (unknown)
16. Threats towards other inmates (discretionary up)
17. Hired workers (discretionary – down)
18. Does not meet TSEP criteria (unknown)
19. Sentenced (unknown)
20. Claims enemies in PC (unknown)

15

21. Assaulted by other inmates (unknown)
22. Court dismissed charges (discretionary – down)
23. Employed/Former law enforcement (unknown)
24. Refusing to cell with anyone (unknown)
25. No problems in past 30 days (discretionary down)
26. Prison gang member (discretionary – up)
27. PREA suspect (discretionary – up)
28. Felony hold added (mandatory – up)
29. Resisted/Assaulted arresting officer (discretionary – up).

*Statistical Analysis of the Decision Tree Versus the NIC OJC systems*

As noted earlier, a random sample of 348 inmates was drawn from a snapshot of the jail population.  For each inmate sample, the current Decision Tree instrument data were copied and forwarded to the consultant for data entry.   Also, for each sampled case, either the initial or reclassification instrument was completed by Cris Jackson who was trained by the consultant on how to complete it.  Based on NIC OJC standards, inmates who had been in custody for less than 60 days had the initial classification form completed and for those in custody for 60 days or more a reclassification form was completed.  These data were then key-entered into a data base and formatted for statistical analysis.

Table 5 shows the Decision Tree results for both the entire jail population and the random sample. There were 3 cases where a custody level was missing. That aside, there are two points to be made here. First, the sample is representative of the entire jail population as the distribution of the major custody levels for the sample are equivalent to the entire jail population. This means the results of the pilot test can be applied to the entire jail population. Second, one can also see that under the Decision Tree system, the vast majority of the inmates are classified as medium custody (61%) followed by the minimum custody category (26%).

Table 6 shows how the same random sample of inmates would be classified under the NIC OJC system. Two important differences emerge in this scenario: Under the NIC OJC system, significantly higher numbers of inmates score as minimum custody or maximum custody. In other words, the large medium custody population under the Decision Tree system is being re-assigned to either minimum or maximum custody.  However, when the various over-rides are applied to the NIC OJC scored cases, the number assigned to minimum custody drops to the same levels as the Northpointe derived levels.

16

**Table 5. Decision Tree Custody Levels**
**Random Sample and Total Jail Population**

| Class Levels | Random Sample | | Total Jail | |
|---|---|---|---|---|
| | Inmates | % | Inmates | % |
| High | 16 | 5% | 201 | 6% |
| Close | 22 | 6% | 246 | 7% |
| Medium | 211 | 61% | 2,209 | 61% |
| Minimum | 96 | 28% | 946 | 26% |
| Total | 345 | 100% | 3,602 | 100% |

**Table 6. NIC OJC Custody Levels**
**Scored versus Final**

| Custody Levels | NIC Scored | | NIC Final | |
|---|---|---|---|---|
| | Inmates | % | Inmates | % |
| Maximum | 82 | 24% | 99 | 28% |
| Medium | 94 | 27% | 151 | 43% |
| Minimum | 172 | 49% | 98 | 28% |
| Total | 348 | 100% | 348 | 100% |

A closer review of the over-rides is presented in Table 7. Here one can see that most of the over-rides are occurring on the reclassification instrument for which 56% of the inmates are under having been in custody for at least 60 days or more. The two dominant over-ride reasons were holds/detainers and gang affiliation. The former is a mandatory over-ride that takes a minimum custody inmate and re-assigns them to medium custody. The latter is a discretionary over-ride that usually takes a scored minimum custody inmate and re-assigns to them to medium custody.

17

The overall over-ride rate is 24% while the one based only on discretionary factors alone is 11%. This rate is within the standard of 5-15% for discretionary over-rides. However, there were no discretionary over-rides employed that would serve to lower the inmate's scored custody level.

Another way to look at the over-ride phenomena is to compare the scored and final levels for the NIC OJC initial and the reclassification instruments (Tables 8 and 9). For the initial classifications, the largest movement is for the 76 inmates who were scored as minimum but for whom 20 were over-ridden to medium custody for the reasons cited earlier.  For the reclass cases, it is the same pattern but with higher numbers of inmates being over-ridden from minimum to medium custody.

The reclassification instrument allows one to test the validity of the NIC OJC classification system.  For those inmates so classified, the number of major and minor disciplinary reports were recorded allowing one to see the association between the scored and final custody levels. As shown in the Table 10, there is a strong statistical relationship between the scored and final classification levels. It is noteworthy that the statistical relationships between the "Final" scored custody levels are not as strong as the "Scored" custody levels.  This is because the "Final" medium custody level has a lot of inmates who scored minimum but were over-ridden to medium due to a hold or being designated as a gang member.

When compared to the same custody levels provided by the Decision Tree one can see that the results are similar.  Both systems are sorting inmates by their disciplinary behavior. However, as noted earlier, the NIC OJC is identifying a higher number of inmates for close and minimum custody who have behaved in a manner consistent with their designated risk level. Using the metric of percent of inmates receiving a disciplinary report of some kind, the NIC OJC scored version does the best job.

Finally, a test was completed on the accuracy of the scoring process.  Known as an inter-rate reliability test, this was done by having a second person trained in the Decision Tree to rescore a random sample of 20 cases selected by Dr. Austin.  There were ten initial and ten reclass cases so tested.  While there were no errors for the ten initial class cases there were three errors in the ten reclass cases.  Two of the errors centered around the "positive attitude" item and the other was an error on the presence of a warrant.  Due to the high number of errors on the reclass instrument another ten cases were selected for testing.  For these cases, another five cases were found to have errors in them.  Two were again related to the "positive attitude" item and another was on the "warrant" item.  The other two were related to the "family ties" and the "serious assaultive behavior problem."  This level of scoring error is unacceptable and needs to be corrected immediately.

18

**Table 7.**

**Over-Rides by Initial and Reclassification Instruments**

|  | Initial | Reclass | Total |
|---|---|---|---|
| Inmates | 153 | 195 | 348 |
| Over-Rides | 21 | 62 | 83 |
| Total Over-Ride % | 14% | 32% | 24% |
| Discretionary % | 5% | 15% | 11% |
| Mandatory |  |  |  |
| Detainer | 15 | 19 | 34 |
| Discretionary |  |  |  |
| Gang Member | 3 | 22 | 25 |
| Management Problem | 0 | 3 | 3 |
| Prior Record Severe | 3 | 2 | 5 |
| Offense Severity | 2 | 0 | 2 |
| Others | 0 | 2 | 2 |

**Table 8.**
**Scored vs. Final**
**Initial Classification**

| Scored Level | Final Level | | | |
|---|---|---|---|---|
|  | Maximum | Medium | Minimum | Total |
| Maximum | 32 | 0 | 0 | 32 |
| Medium | 3 | 42 | 0 | 45 |
| Minimum | 1 | 20 | 55 | 76 |
| Total | 36 | 62 | 55 | 153 |

19

**Table 9.**
**Scored vs. Final**
**Re-Classification**

| Scored Level | Final Level | | | |
|---|---|---|---|---|
| | Maximum | Medium | Minimum | Total |
| Maximum | 50 | 0 | 0 | 50 |
| Medium | 12 | 37 | 0 | 49 |
| Minimum | 1 | 52 | 43 | 96 |
| Total | 63 | 89 | 43 | 195 |

**Table 10.**
**Misconducts for Re-Classified Inmates by**
**NIC OJC Scored and Final Custody Levels, and, Tree**

| | Maximum | Medium | Minimum | Total |
|---|---|---|---|---|
| Scored NIC OJC | | | | |
| Inmates | 50 | 49 | 96 | 195 |
| % Misconducts Past 60 days | 70% | 45% | 17% | 37% |
| Final NIC OJC | | | | |
| Inmates | 63 | 89 | 43 | 195 |
| % Misconducts Past 60 days | 65% | 29% | 14% | 37% |
| Tree Final | | | | |
| Inmates | 24 | 127 | 41 | 195 |
| % Misconducts Past 60 days | 62% | 37% | 22% | 37% |

**Recommendations**

There are two major options that the Sheriff can pursue regarding its classification system. First, it can retain its use of the Northpointe Decision Tree, or second, it can adopt the NIC OJC system.  Switching to the NIC OJC system would produce higher numbers of inmates classified for minimum and maximum custody without jeopardizing staff or inmate safety. It would also

allow the Sheriff to completely control the criteria for classification as the NIC OJC system is in the public domain and can be used at no-cost to the user.

However, there are logistical issues underpinning such a change.  In particular, the current jail management information system would have to be modified to accommodate any new application.  Our experiences with other jurisdictions is that this not a difficult or significant expensive undertaking but it must be recognized as a new task to be completed.[1]

If the Sheriff elects to keep the Northpointe Decision Tree system, the following operational recommendations are made that, if implemented, would enhance the Decision Tree and classification in general:

1. **Shift from a 30-day to 60-day time frame for conducting a reclassification review.**
   *Rationale:*  The 30-day period is not sufficient time to monitor inmate behavior.  The 30-day period allows aggressive and violent inmates to have their custody level lowered after only 30 days of compliant behavior.   Finally, the 30-day review adds an unnecessary workload to the classification staff. If the 60-day review is implemented, it would serve to increase the number of close custody inmates and decrease the number of medium custody.

2. **Require a face-to-face interview with inmates who are being reclassified every 60 days**.
   *Rationale:*  Computer or paper reviews for the critical reclassification decision do not allow the classification staff to have sufficient information to make a reliable and valid classification decision. It's also important that, like the initial classification event, the inmate have an opportunity to be told the basis for the re-classification decision and offer any information that may be relevant to the security and safety of the unit he/she is assigned to. If the Sheriff feels the 60-day face to face interview is too burdensome, the requirement could be waived for minimum custody inmates who would still have a 60-day "computer" review.

3. **Remove the factor of pre-trial status as a factor in the Decision Tree (initial and reclass).**
   *Rationale:*  Legal status is not a predictor of inmate conduct or escape risk. It is not used in other jail classification systems and serves to unnecessarily increase the number of medium custody inmates.

---

[1] Santa Clara County and Clark County (Las Vegas), have recently completed such installations at minimal costs and time frames.

4. **Develop more precise definitions of what constitutes "less serious behavior problem, serious behavior problem, marked improvement in compliance, positive attitude change, no behavior problem, and court/staff compliance" factors used on the Decision Tree reclassification instrument.**

   *Rationale:*  By definition, these items are subjective in nature.  Classification staff need guidance and testing on these items to ensure they are being assessed in a reliable manner.  These items also underscore the need for a face-to-face interview to make such an assessment.

5. **Using the existing over-reasons, sort them into the following three categories:**
   a. **Non-discretionary overrides that restrict placement in minimum custody;**
   b. **Higher Discretionary over-rides that allows placement of an inmate scored as medium or minimum to upgraded one level.**
   c. **Lower Discretionary over-rides that allows placement of an inmate scored as close or medium custody to down-grade one level.**

6. **All such over-rides must be reviewed and approved by a supervisor.**

   *Rationale:*  The current list of over-rides is not structured and should be formalized along the lines set forth above and adopted by the NIC OJC system.

7. **Conduct a "refresher" training session on the current Decision Tree system to reduce the number of scoring errors.**

   *Rationale:* The pilot test effort found unacceptable levels of coring errors by staff in the use of the Decision Tree system.  A one-day training session should be conducted for all classification staff to test them on their knowledge of the "business rules" that underpin the scoring process and the use of structured over-rides.  This training class would consist of staff undergoing a reliability exercise on ten standardized test cases (five initial and five reclass) to see if different staff make the same classification decision on each case.