**Sacramento County Jail**
**Mentally Ill Prisoners and the Use of Segregation:**
**Recommendations for Policy, Practice and Resources**



**Eldon Vail**
**June 2016**

0

## <u>TABLE OF CONTENTS</u>

**Introduction**……………………………………………...1

**Summary of Findings**………………………………...5

**Overview of the Jail**………………………………..7

**Types of Segregation in the Jail**…………………...8

**Housing the Mentally Ill in Segregation**…………………9

**Housing the Non-mentally ill in Segregation**……………13

      *Administrative Segregation*………………………....14
      *Protective Custody and Total Separation*…......................17
      *Disciplinary Detention*…………………………………...17

**Conditions of Confinement in the Segregation Units**……18

**Correctional Policies and Practices**………………………....21

      *Segregation Policy*…………………………………….21
      *Protective Custody and Total Separation*………………...21
      *Classification Process*…………………………….....21
      *Inmate Discipline Plan*……………………....………22
      *Use of Force, CERT & Cell Extractions*…………..….24
      *Use of Restraint Devices*……………………………....25
      *Employee Conduct & Prisoner Services*…………...…….26

**Suicide Prevention Measures**……………………………..27

**Custody Staffing in the Jail**………………………….……29

**Staffing Recommendations**……………………….……32

      *Deputy Staffing Recommendations*…………...................33
      *Civilian Staffing Recommendations*………………..…….36

**Policy and Practice Recommendations**………………………..38

**Conclusion**…………………………………………………**41**

**Appendix A**………………………………………**Main Jail Days**

**Appendix B**………………………………………**Main Jail Nights**

**Appendix C**………………………………………**Main Jail Weekends**

**Appendix D**………………………………………**RCCC Days**

**Appendix E**………………………………………**RCCC Nights**

**Appendix F**………………………………………**RCCC Weekends**

**Appendix G**………………………………………**Civilian Staffing**

## INTRODUCTION

In August of 2015 the Sacramento County Sheriff's Department (SCSD) received a *Report on Inspection of the Sacramento County Jail* by Disability Rights California (DRC). The report found evidence of violations of the rights of prisoners with disabilities as follows:

   a) Undue and excessive isolation and solitary confinement;

   b) Inadequate mental health care; and

   c) Denial of rights under the Americans with Disabilities Act (ADA)[1]

As a result of that report, in January of 2016 the county entered into a Structured Negotiations Agreement with the DRC and the Prison Law Office as an alternative to litigation. In February of 2016, based on my experience as a correctional administrator successfully managing these issues and as an expert/consultant working on them in multiple jurisdictions, I was contracted to conduct my own inspection of the SCSD jail and report on items (a) and (b) above.

During the past four years I have been retained in a number of cases regarding the treatment of mentally ill inmates in jails and prisons and the overuse of solitary confinement in the state prison systems of California, Arizona, Mississippi, New York, Alabama, Illinois and Delaware and in county jails in New Jersey and Arizona.[2] My work experience includes 35 years in adult and juvenile corrections in the State of Washington, retiring in 2011 as the Secretary of the Washington Department of Corrections. Much of my focus as a correctional practitioner was on responding to the increasing numbers of the mentally ill

_____

[1] Disability Rights California, Report on Inspection of the Sacramento County Jail, April 13-14, 2015, page 1 and 2

[2] Settlements were achieved in New York, Arizona, and Illinois. Settlement discussions are ongoing in Delaware and New Jersey. California has been under the jurisdiction of the court on this same set of issues for over 2 decades.

coming into our prison system and finding ways to provide them with appropriate care, including decreasing use of segregation.[3]

My contract with the SCSD goes somewhat further than the findings of the DRC report. The contract adds additional detail and specifies the following:

- Evaluation of maximum security, administrative segregation, protective custody, and other locked-down units

- Evaluation of dayroom use, programs, recreation, and other out-of-cell time for all prisoners

- Suicide prevention measures of the facilities

- Correctional officer staffing vs. workload

- Correctional policies and practices

I will respond to each of these items in this report. Dr. Bruce Gage was contracted to report more specifically on mental health issues and has issued a separate report.

I have read a variety of documents regarding the operation of the SCSD jails, including previous studies and current SCSD Operations Orders or policies. I visited the jails on two occasions, for three days each time. On my first trip in February of this year I spent three days inspecting conditions at the jails and interviewing jail staff. On my second trip in April I concentrated on interviewing inmates and conducted twenty-four confidential interviews in order to understand their experience of condition at the jails.

I found the jail staff to be professional, candid and open to the exploration of any issue related to my assignment. I also found them to be dangerously understaffed and struggling to meet even the minimal requirements of their current policies.

Sacramento County is not alone in their struggle to provide constitutional care for the mentally ill in their jail without an over reliance on the use of segregation. Corrections agencies all over the country are faced with this same set of problems and resources are always a problem. Following the de-institutional movement away from mental health hospitals and the corresponding lack of funding provided for community treatment resources for the mentally ill that began about 1970, prisons and jails have seen a growing influx of the mentally ill into corrections facilities.[4]

It was not the choice of our profession to see so many mentally ill come into our jails and prisons. But that is the reality of corrections today. While it may not have been our choice, it is now our moral and legal obligation to find ways to appropriately respond and provide for the humane and constitutional care for this vulnerable population. Judge Karlton in one of his many ruling in the *Coleman* case said:

> The court finds that placement of seriously mentally ill inmates in the harsh, restrictive and non-therapeutic conditions of California's administrative segregation units for non-disciplinary reasons for more than a minimal period necessary to effect transfer to protective housing or a housing assignment violates the Eighth Amendment. . . . Defendants shall commence forthwith to reduce the number of Coleman class members housed for non-disciplinary reasons in any administrative segregation unit that houses disciplinary segregation inmates. Commencing sixty days from the date of this order, defendants will be prohibited from placing any Coleman class member in any administrative segregation unit that houses inmates for a period of more than seventy-two hours if the placement is for non-disciplinary reasons including but

---

[4] *The Treatment of Persons with Mental Illness in Prisons an Jails: A State Survey*, April 8, 2014, A Joint Report, Treatment Advocacy Center and the National Sheriffs' Association, page 6

not limited to safety concerns or lack of appropriate bed space.[5]

The Sacramento County Sheriff's Department is to be applauded for their response to seek solutions to the findings of the DRC and improve the treatment of mentally ill and all inmates incarcerated in their jails.

---

2[5] Order at 55, Coleman v. Brown, No. CIV. S-90-520 LKK/DAD (PC) (E.D. Cal. Apr. 10, 2014)

## SUMMARY OF FINDINGS

The use of segregation[6] in the Sacramento County Jails is dramatically out of step with emerging national standards and practices and with what the research tells us about the dangers of segregation regarding placing mentally ill inmates in segregated housing. The SCSD jails make no provision to exclude the mentally ill from segregation despite the mounting evidence that this population is particularly vulnerable to serious risk of significant harm from such placement. The SCSD overuses segregation both for the mentally ill and the non-mentally ill. Because of the lack of sufficient out of cell time and programming opportunities, conditions in the jails for segregated inmates are very stark and unlikely to meet constitutional standards.

Jail Psychiatric Services (JPS) provide mental health services in the SCSD jails. While JPS staff are dedicated and hard working, the authorized staffing levels are so meager that little treatment of the incarcerated mentally ill actually takes place. Services are primarily limited to medication management and crisis intervention. There is a near total lack of individual or group therapy, elements that in my experience as a correctional administrator over a state prison system are critical for the care of this vulnerable population.

The level of custody staffing for both jails is startlingly and dangerously low for even their current operation and as a result they operate in a state of near perpetual emergency. Absent a significant reduction in the population of the jail, there is no way they could achieve compliance with the applicable standards for managing the mentally ill and segregated inmates with their current staffing levels. There must be a sizable increase in both mental health and custody staffing to properly provide treatment to the mentally ill and avoid what would likely be successful litigation should this matter go before the Federal court.

---

[6] The practice of placing inmates in a cell, with or without a cell-mate for 22 or 23 hours a day without access to the programs and activities available to the rest of the prison or jail population goes by many names—solitary confinement, restricted housing, isolation, etc. For purposes of simplicity in this report I use the word "segregation".

The jail is in need of an updated Housing Plan. Currently, inmates with different custody levels and mental health needs are housed in units or pods that are not clearly defined by these important factors. It is possible that some of the recommended increases in custody staffing (included later in this report) could be reduced with a Housing Plan that houses maximum inmates with maximum inmates, medium with medium, etc. in the same pods or units. The same is true for levels of mental health acuity. Not all mentally ill inmates require maximum custody or restrictive housing. Some can do quite well in medium or minimum custody treatment units. It is recommended that the jail's classification system be reviewed and updated as part of establishing an improved Housing Plan.

A complete list of recommendations is at the end of this report.

**OVERVIEW OF THE JAIL**

The Sacramento County Jail is split into two jail sites. The Main Jail is in downtown Sacramento and the Rio Consumes Correctional Center (RCCC), is in a rural area about a half an hour outside the city. The Main Jail has a population cap set by a Federal court in 1989 at 2,432 inmates and RCCC has held as many as 2,400 inmates. On April 22, 2016 the Main Jail held 2,089 inmates and RCCC held 1,639 inmates.

The Main Jail consists of 8 floors, seven of which house inmates in fourteen different units. Each unit is divided into separate pods. Women are housed on the 7th floor. The original design of the units was for direct supervision, with the officers working inside the housing pods on each floor having constant contact with the inmates, monitored by an officer in a control booth. However, the jail was never appropriately staffed to allow for this excellent design to be utilized and officers are not consistently in the pods. This decision, made more than thirty years ago, has dramatically impacted the operation of this facility and severely limited the county's ability to properly supervise both mentally ill and non-mentally ill inmates.

The RCCC consists of multiple designs of living units for inmates. This includes two maximum-security units with a similar design as the Main Jail; two units, originally called the "448" facility, which consists of three pods of dormitories in each unit with an elevated control booth and no cells; and, a series of barracks type dormitories which also have no cells.  The latter are problematic for the type of inmates being held in the dormitories and the current staffing levels makes it difficult for proper supervision of the inmate population. The Sandra Larsen Facility (SLF) houses women, has a separate perimeter and is comprised of three dormitories and a small segregation unit.

## TYPES OF SEGREGATION IN THE JAIL

Inmates, including mentally ill inmates, can be placed in segregation in the following categories:

***Disciplinary Detention***—Following a disciplinary hearing, inmates can be placed in Disciplinary Detention for a specified amount of time as a result of a sanction for acts of misbehavior that took place within the jail.

***Administrative Segregation***—Although the SCSD uses the term "Administrative Segregation" they have no workable definition or process for such placement in their current policies. This is a significant problem, which I will address later in this report. The only policy reference to Administrative Segregation I have been able to find is in the Classification Policy and it says, "Administrative Segregation considerations including prior peace officer or corrections officer employment, gravely disabled status, and/or case notoriety".[7]

***Total Separation***—These inmates are determined to be unable to be in the presence of any other inmate in the facility. Once again there is no workable definition or process to describe how inmates are placed into this status. The phrase is also simply mentioned once in their Classification Policy.

***Protective Custody***—Some inmates who are classified as requiring protective custody are placed into segregation. Others are not placed in segregation and instead are allowed to live together in a medium security environment separate from general population inmates.

***Outpatient Psychiatric Pod (OPP)***—Each of the jails has an OPP that function essentially as a segregation unit even though they don't call it that.[8] While some inmates who are mentally ill do require secure housing, these units are not operated as treatment units and inmates assigned suffer essentially the same conditions of confinement as those in segregation.

---

[7] SCSD Operations Order 6-03, Classification Process
[8] They also have an inpatient acute unit at the main jail. I will defer to Dr. Gage on the operation of this unit except to say that it is not staffed by a dedicated officer 24 hours a day and it should be.

## HOUSING THE MENTALLY ILL IN SEGREGATION

It is widely recognized that placing mentally ill inmates in segregation creates a significant risk of harm for that vulnerable population. This has been firmly stated by the American Psychiatric Association:

> Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic activities (i.e., mental health/psychiatric treatment) in appropriate programming space and adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for these individuals.[9]

Dr. Terry Kupers, one of the countries foremost psychiatric experts on the impacts of segregation on the mentally ill prisoner has said,

> It is stunningly clear that for prisoners prone to serious mental illness, time served in isolation and idleness exacerbates their mental illness and too often results in suicide. This is the main reason that federal courts have ruled that prisoners with serious mental illness must not be subjected to long-term isolation.[10]

There is no question the SCSD routinely houses mentally ill inmates in segregated confinement. In order to avoid the significant risk of harm from such placements the SCSD should convert their OPP's from segregation like units to treatment units and dedicate more beds and pods solely for the treatment and housing of the mentally ill. It would be unthinkable to fail to treat an inmate in the

---

[9] APA Statement on Segregation of Prisoners with Mental Illness, 2012
[10] Kupers, T., 2013, *Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?* The Routledge Handbook of International Crime and Justice Studies, page 4

jail who had a broken leg. The same applies to those suffering from mental illness—they require treatment.

The consensus understanding shared with me is that 30% of the inmates in the Main Jail are mentally ill and are taking psychotropic medication. During my interviews of inmates in the jail I met with several individuals who were on psychotropic medications and who shared with me their mental health diagnosis and were on the mental health caseload but they were not housed in the OPP's. Instead they were living in segregation on some type of segregation status. Others are undoubtedly scattered throughout the jail population. Both mentally ill inmates and non-mentally ill inmates were unanimous in the opinion that these two groups need to be housed in separate pods for the safety and well being of all concerned. I agree. When untreated mentally ill inmates are housed with non mentally ill inmates they are more likely to be victimized by other prisoners and more likely to struggle with the demands and challenges expected of inmates who are not mentally ill—which can sometimes erupt in disturbances and violence.

At the Main Jail there is a lack of sufficient number of OPP beds for men. OPP beds for men are housed in all or part of 3 pods in different units. OPP beds for women at the Main Jail are in two pods where they are mixed in with inmates on Administrative Segregation, Protective Custody and Total Separation. OPP beds for men at the RCCC are confined to one pod in the segregation unit and any women who meet the criteria for OPP at RCCC live in the segregation unit. Nowhere in either facility is there an opportunity for inmates to step-down from a high security treatment unit to a lower custody treatment or special needs unit where they would not suffer the restrictions associated with segregated confinement.

An unused advantage of the existing secure units in both jails is that the pods are relatively small. That means that different pods in the same unit can be used for graduated levels of placement and privileges for the mentally ill based on behavior and progress in treatment. This is especially possible at the Main Jail and

likely possible at the RCCC. That is not the practice today but it is an opportunity. The design of the pods in the SCSD makes it possible to change current housing practices to provide for better treatment and protection of the mentally ill.

The SCSD should seek to concentrate the mentally ill in the same pods and units and infuse those units with additional mental health staff to share their operation in partnership with custody staff. Different pods for the mentally ill could provide for increased level of privileges based on the individual's risk and treatment progress as determined by clinicians. This is a fundamental paradigm shift for jail officials but the powerful combination of mental health staff working together with the Deputies to manage the secure treatment units where mentally ill reside will result in dramatic improvements in behavior and treatment progress for the mentally ill. This should include mental health staff input into housing decisions base on the treatment progress of individual inmates. Medium and minimum-security treatment beds should be available to mentally ill inmates that do not require a more secure bed.

It is absolutely critical that custody staff assigned to mental health treatment units should receive additional training for this assignment and should not be rotated out of those units without the new officers first receiving similar training. This is not the practice today.

During my interviews with inmates I did not find a single prisoner who had individual (other than for medication management) or group sessions with clinicians. In my experience as a corrections administrator overseeing treatment programs for the mentally ill, treatment must include more than medication management and crisis intervention. JPS staff reported that in the past they provided group treatment but lost the resources to do so in 2009 during the global financial crisis. Inmates should regularly have individual out of cell sessions with a treatment provider and should participate in group therapy and psycho-educational programs.

The consensus minimum standard for getting mentally ill inmates out of their cells in every jurisdiction that I am aware of that has faced this challenge through litigation is ten hours a week for individual and group treatment, plus ten hours a week for recreation, structured or unstructured. I recommend the SCSD establish these as requirements in their facilities. It is clear that such significant changes in treating the mentally ill in the SCSD jail will require more mental health and more custody staff.

The SCSD must establish in policy and in practice that their OPP's are not segregation units but are treatment units. This will require both additional mental health and custody staff and a fundamental re-thinking of how those units are to be managed to decrease the risks to mentally ill prisoners. When revising that policy, the SCSD should require that mentally ill inmates should not be placed in segregation, absent exigent circumstances, similar to the current practices in the states of California, Arizona, Ohio, Pennsylvania, Massachusetts, New York and Colorado, to mention just a few jurisdictions where this is the policy driven norm.

Additionally, all inmates placed in any type of segregated housing should be assessed by a mental health professional prior to or shortly after a placement occurs to make certain the placement is not contra-indicated. Mental health staff should do rounds in segregation at least weekly to monitor inmates in segregation. Neither one of these routine and common correctional practices are in place in the jail today.

## HOUSING THE NON-MENTALLY ILL IN SEGREGATION

Dr. Craig Haney, a professor and attorney from the University of California—Santa Cruz, who has been involved with several landmark cases related to the impacts of inmates in segregation has said, based on the results of several decades of research that,

> There is not a single published study of solitary or supermax-like confinement in which non-voluntary confinement lasting for longer than 10 days, where participants were unable to terminate their isolation at will, that failed to result in negative psychological effects. The damaging effects ranged in severity and included such clinically significant symptoms as hypertension, uncontrollable anger, hallucinations, emotional breakdowns, chronic depression, and suicidal thoughts and behavior. Of course, it is important to emphasize that not all supermax prisons are created equal, and not all of them have the same capacity to produce the same number and degree of negative psychological effects.[11]

Writing specifically about the effects of segregation on the non-mentally ill, Dr. Kupers has said,

> It is predictable that prisoners' mental state deteriorates in isolation. Human beings require at least some social interaction and productive activities to establish and sustain a sense of identity and to maintain a grasp on reality. In the absence of social interactions, unrealistic ruminations and beliefs cannot be tested in conversation with others, so they build up inside and are transformed into unfocused and irrational thoughts. Disorganized behaviors emerge. Internal impulses linked with anger, fear and other strong emotions grow to overwhelming proportions.[12]

---

[11] Haney, C.  2003, *Mental Health Issues in Long-term Solitary and "Supermax" Confinement,* Crime & Delinquency, 49

[12] Kupers, T., 2013, *Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?* The Routledge Handbook of International Crime and Justice Studies, page 5

*Administrative Segregation*

The SCSD lacks a coherent policy that defines the reason and process that inmates can be placed into Administrative Segregation. Based on best practices and emerging legal trends, the Segregation Policy must contain the following elements:

- o   A criteria and process for placing inmates in Administrative Segregation

- o   An assumption that, absent exigent circumstances, the mentally ill will not be housed in segregation

- o   A review by mental health staff review to determine any contra-indications.

- o   Regular rounds by mental health staff of segregation units.

- o   Periodic review of inmates in segregation to determine if it needs to be continued or if the inmate can be released to general population.

- o   A level system so that inmates in Administrative Segregation can achieve additional privileges for compliant behavior and participation in available programs.

- o   A limitation on Disciplinary Detention of no more than 30 days.

- o   Conditions of confinement that mirror best practices and current standards for inmates held in segregation.

The inference from these recommendations is that inmates in Administrative Segregation need to have incentives for positive behavior and need access to programs to help them gain control of their behavior. It is a simple carrot and stick approach. As behavior improves, so do privileges and the conditions of confinement. Like all of us, inmates respond to incentives. "Step-down" programs are common in segregation units throughout the country and both facility and

14

community safety would be improved if the SCSD established them in their jails.[13]

In my own state, University of Washington researchers found that inmates who had spent time in segregation had higher felony recidivism rates than those who did not. But more importantly, they found that inmates released directly from segregation to the streets were far more likely to reoffend, thus there is a clear public safety need for step-down programs to get inmates out of segregation before being released to the community.[14]

Cognitive Behavioral Therapy (CBT) is very frequently utilized in step-down programs and is generally considered the most cost effective intervention.

Again to quote Dr. Kupers,

> In fact, when enlightened correctional managers devise programs in their prisons' supermax units whereby prisoners can earn incrementally greater amenities and freedoms by exhibiting acceptable behavior, and the increments are short enough and the required behaviors reasonable and attainable, most prisoners in isolation are willing to cooperate and earn their way out of "the hole."[15]

Many step-down programs for inmates in segregation begin group CBT sessions for inmates who require restraints when out of the cell. As the inmate progresses in the program there comes a time when restraints are removed. This allows the staff to test the inmate's progress in a controlled environment before returning them to general population. The SCSD may want to consider this option for their step-down program.

---

[13] Although not as robust, the Restoration of Competency program at the RCCC is closer to what a step-down program might look like. Corrections and mental health staff both told me that they consider it a success.

[14] See Lovell, D., *Recidivism of Supermax Prisoners in Washington State*, Crime and Delinquency, September 2007

[15] Kupers, T., 2013, *Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?* The Routledge Handbook of International Crime and Justice Studies, page 10



I would note, however, that of the 24 inmates I interviewed, most of whom were in segregation, none of them required restraints when out of their cells to meet with me. While I was encouraged by this practice, it may simply reflect the reality that many of the inmates in the Sacramento jails do not actually require segregation.

Like programs for the mentally ill, step-down programs would require additional custody staff for the movement and supervision of inmates out of their cells as well as staff to deliver the program content. In my own jurisdiction, custody officers sometimes deliver the programs. This has a profound impact on the acceptance of the programs by other officers. Education and mental health staff also deliver the programs.

The SCSD should include in their Segregation Policy a process for placement and review of inmates in Administrative Segregation. The SCSD should establish a step-down program to assist inmates to earn their way out of segregation placement. As I explain later in this report, SCSD also needs to revise their Classification Policy to make a distinction between a classification score of maximum custody and segregation placement. General population maximum

custody pods should be operated with more privileges and out of cell time than segregation pods.

### *Protective Custody and Total Separation*

While it is sometimes difficult to achieve, inmates who require Protective Custody should have the same programs and privileges as general population inmates. A Protective Custody policy should establish this expectation. But my larger concern is with the practice of Total Separation.

In my experience the need for complete separation of one inmate from all others is very rare. It does occur but usually just a small handful of inmates ever meet this threshold. Keeping an individual separate at all times from all other inmates is a drastic limitation on normal social interaction that creates risk for the individual prisoners.

I recommend that SCSD create a separate policy that describes the process and criteria for placement of inmates into Protective Custody. After that policy and a new Segregation Policy are established, I also recommend they review the Total Separation population in an effort to reduce the number of inmates currently assigned to this category.

### *Disciplinary Detention*

Disciplinary Detention should be limited to a maximum of 30 days. Current policy imposes this limitation but allows for it to be exceeded with the approval of the division commander. If an inmate requires segregation for more than 30 days they should be transferred to Administrative Segregation status so that the inmate can benefit from the programs described above.

## CONDITIONS OF CONFINEMENT IN THE SEGREGATION UNITS

Unfortunately the conditions of confinement in the SCSD segregation units today are very stark and violate contemporary standards. For example, regarding exercise and recreation for prisoners in segregated housing, the American Bar Association says,

> Correctional authorities should provide all prisoners daily opportunities for significant out-of-cell time and for recreation at appropriate hours that allows them to maintain physical health and, for prisoners not in segregated housing, to socialize with other prisoners. Each prisoner, including those in segregated housing, should be offered the opportunity for at least one hour per day of exercise, in the open air if the weather permits.[16]

This is in stark contrast with the current policy in the SCSD jails, which allow recreation for all inmates, including those in segregation, only 3 hours per 7-day period. In my interviews with staff and inmates often times even this low standard is not met. Some inmates get out only one half hour a day and this includes their only opportunity to take a shower or make a phone call. I did not find an inmate at the Main Jail who told me they participated in outdoor recreation more than once a month. Very rarely do the inmates get to go outside, especially at the Main Jail, despite secure outdoor areas that are more than adequate.[17]

Today inmates in Disciplinary Detention are explicitly denied any recreation at all and this must be changed. Absent a specific and documented threat by an individual inmate, the opportunity of at least a full hour a day outside the cell and outdoors if weather permits should not be denied for any inmate. Time for a shower should be in addition to the hour out of the cell.

---

[16] American Bar Association Standard, 23-3.6

[17] The outdoor recreation areas at both jail locations are very good compared to those I have seen in other facilities. The Main Jail should consider interior fencing of their outside yards to create 2 smaller areas in order to allow more inmates access to the outdoor area.

Today inmates in Disciplinary Detention are not allowed to make personal phone calls. This should change as well. Maintaining contact with family and friends is a known protective factor and is associated with reduced recidivism.

In the Main Jail the windows of the cell doors in the disciplinary pod are all covered with a flap. Apparently this modification was done as an overreaction when some inmates attempted to throw liquids and bodily fluids at the staff. The unfortunate result is that the isolation in those cells is even more profound as there is no view into the dayroom from the cell itself. These flaps should be removed and SCSD should manage individual inmates who throw or attempt to throw by using a freestanding cell shield, a common practice in multiple jails and prisons around the country.

For inmates held in all types of segregation there is a notable lack of activities to help inmates improve their behavior and to help them manage the burden of so much idle time. Books are hard to come by in the SCSD segregation units (except for the units for females who appear to be getting a level of service that the men should receive as well). The SCSD should expand their source of books for prisoners, including connecting with volunteer organizations that will collect and bring them to the jail. This is a very common practice at jails and prisons around the country and though there are obvious security concerns, other jurisdictions have found solutions. This would go a long ways towards improving the conditions of inmates in the SCSD segregation units.

During my interviews with inmates I used a prepared list of questions to interview the inmates. Nearly every inmate that I interviewed at the Main Jail raised issues that were not on my list of prepared questions. One of those issues came from inmates who were in Disciplinary Detention or recently had been. They universally told me that upon their first entry into the Disciplinary Detention cell that they were dirty, sometimes contained smeared feces, and that they were not allowed access to cleaning supplies until they demanded them. In most cases it took considerable time for cleaning supplies to be provided. Also, and again not

on my prepared list of questions, they all told me that they had to wait a few days to receive a mattress. Multiple inmates informed me, again without me asking, that food is sometimes withheld as punishment for inmates in Disciplinary Detention.

To the extent that these are actual practices at the jail, they should cease. Properly trained inmates can clean any cell and should be employed to do so, even in a segregation unit. No inmate should go without a mattress as a matter of routine practice and food should never be withheld as punishment. It is likely that if this is happening it is a result of inadequate staffing and supervision of the segregation units in the Sacramento County Jails. The staffing levels in the segregation units are so low (including the supervisory levels) that Deputies struggle to meet the demands of current policy requirements. For those requirements to expand in order to improve the conditions of confinement for the mentally ill and the non-mentally ill in segregation, there must be an increase in custody staffing and better supervision for those units.

The SCSD needs to establish in their Segregation Policy conditions of confinement that mirror best practices and current standards for inmates held in segregation. The county will then need to staff the segregation units with enough employees to meet these standards.

## CORRECTIONAL POLICIES AND PRACTICES

The lack of a consistent correctional administrative staff overseeing the jail does not give their overall policy structure the importance it deserves. In fact, due to the frequent movement of jail administrators and line staff between patrol and jail responsibilities, the existence of policies that are explicit, current and audited are even more critical for the safe, secure and constitutional operation of the jail. I recommend that a civilian staff member be assigned the responsibility for reviewing and updating all the SCSD jail policies and be assigned that responsibility on an ongoing basis.

This section will not be a comprehensive review of all SCSD policies. Instead I focus my comments on areas where policies should be reviewed and updated to accommodate for the needs of the mentally ill and the inmates housed in segregation.

### *Segregation Policy*

The Segregation Policy must be revised to be consistent with the discussion and recommendations I make in an earlier section of this report.

### *Protective Custody and Total Separation*

SCSD should create a separate policy that describes the process and criteria for placement of inmates into Protective Custody. After that policy and a new Segregation Policy are established, I also recommend they review the Total Separation population in an effort to reduce the number of inmates currently assigned to this category.

### *Classification Process*

The SCSD makes the mistake of conflating a maximum or high security classification score as requiring the same conditions of confinement as a

21

segregation unit. This is significant error on their part and reflects a lack of understanding of effective corrections practices. Some inmates who score maximum custody on a classification instrument can also do well in a maximum custody general population unit. However, a maximum custody general population unit requires a level of staffing that the SCSD currently does not have, explaining, I believe, why the maximum units are basically operated too much like segregation units. While maximum custody units allow less freedom of movement and privileges than medium or minimum units, they typically allow much more than a segregation unit, for example having access to the dayroom during most of the regular waking hours.  Doing so avoids the risks associated with segregated confinement for a population who does not need that level of security. In a well functioning system, inmates who wind up in segregation have demonstrated specific behavior(s) or have a documented risk that requires such secure confinement, not simply because they scored maximum custody on a classification instrument. The SCSD must revise their Classification Policy and prohibit any inmate from being placed into segregation based solely on their classification score.

Officials at the RCCC from top to bottom were adamant that the Northpointe classification product currently in use at both jails does not work for them. They described the need for overrides of the instrument as much as 50% of the time. Reportedly the instrument does not account for gang membership, a major management issue for any incarcerated population in the State of California. One Deputy told me that about a year ago about 18% of the inmates housed in the minimum units at RCCC actually scored maximum custody. If accurate, this is a clear issue of potential liability for the county and deserves a much closer look. I recommend that the SCSD bring in an outside expert to interview staff at both jails to see how their classification system could be improved.

*Inmate Discipline Plan*

I make three recommendations regarding the current SCSD disciplinary policy:

1.      The current policy makes no accommodation for attention to the nexus between behaviors that might result in a disciplinary violations and a prisoner's mental illness. To state it as simply as possible, inmates should not be punished for symptoms of their mental illness. The current policy should change so that any inmate on the mental health caseload who has received an alleged disciplinary violation has that allegation reviewed by mental health staff before the hearing occurs. The review needs to be documented in writing and include whether or not the mental illness was related to the alleged violation behavior and if there are particular sanctions that the Hearing Officer should avoid if the inmate is found guilty so that the inmate's mental illness will not be exacerbated. That written report should be shared with the Hearing Officer and included as part of the final disciplinary report. Consideration of the information from mental health, including how it was considered, must be included in the Hearing Officer's disposition of the hearing. If the guidance from mental health was not followed, Hearing Officers must explain in writing why it was not followed.

2.      Currently Sergeants in the SCSD jail conduct disciplinary hearings. This impacts the workload of a group of staff that is already stretched too thin to adequately supervise the line staff who run the jails. Additionally, the legal requirements of the disciplinary process continue to grow in complexity, such as the first recommendation I make in this section. I strongly recommend that the SCSD establish one Hearing Officer for each jail site. Doing so will bring greater consistency to the process and allow the Sergeants to provide better supervision of the line staff and will help make sure that policy compliance is being achieved. I

23

see no reason that such full time positions need to be fully commissioned Deputies. I recommend civilian staff fill these positions.

3.     Current policy allows that a disciplinary diet, "the loaf", as a potential sanction for, "major violations of institutional rules".[18] This is wrong. Any reference to a disciplinary diet should be removed from the disciplinary policy. Contrary to what their current policy suggests, it does not work to modify behavior and serves no legitimate penological objective. Food should never be withheld as punishment. An alternate diet should be available for inmates who act out by throwing food or misusing eating utensils but that alternate diet is typically a sack lunch with no utensils and is authorized only as long as necessary to control the inmate's behavior. An alternate diet must be authorized by a supervisory staff member, include a medical and mental health review and be reviewed every 24 hours to see if it is still necessary.

***Use of Force, CERT and Cell Extraction Procedures***

While the current Use of Force policy would benefit from a comprehensive review to bring it up to date with similar policies that have been litigated in the 9th Circuit, I will address the most glaring omissions here. While the current policy does make reference of the need to de-escalate the level of force, there is insufficient detail regarding what the de-escalation needs to look like when dealing with a mentally ill inmate and there is an insufficient review to make sure there is compliance with that practice.

Absent an imminent threat of physical harm to a person or a threat so serious that an escape from the facility might be possible, physical force should not be used against a mentally ill person without first attempting to de-escalate the situation. In a planned use of force, such as a cell extraction, there should be a

---

[18] SCSD Operations Order, Inmate Discipline Plan, IX

required cooling down period and a structured attempt by mental health staff to attempt to de-escalate the need for use of force.

In another jurisdiction, in a facility larger than the SCSD, I made this same recommendation to the judge a couple of years ago and the judge ordered it be implemented. I have recently reviewed records for that facility for compliance with this policy requirement. My review showed that 60% of the times that mental health professionals conducted de-escalation attempts no use of force was required. Any day officers don't have to put their hands on an inmate is a good day in corrections.

Policy should be amended so that supervisory reviews of use of force reports specifically examine to see if an attempt to de-escalate a potential use of force with a mentally ill inmate was attempted.

I recommend that the cell extraction portion of the policy on CERT and Cell Extraction Procedures be moved to the policy on Use of Force. Keeping this information in separate policies creates the possibility that, over time, the language become disconnected and conflicting. A better practice is to include it all in the same policy.

The Use of Force policy must include a definition and a protocol for a planned use of force. The protocol must require that a hand held video camera document any planned use of force. Video evidence of a planned use of force and supervisory reviews of those videos and related paperwork must be required to ensure that unnecessary or excessive use of force incidents are not occurring in the jail.

### *Use of Restraint Devices*

The policy needs to be revised to include more involvement of mental health staff for inmates on the mental health caseload. Current policy requires the involvement of the psychiatrist or designee only for inmates in the Acute

25

Psychiatric Unit. I recommend this requirement be expanded to apply to all inmates on the mental health caseload.

Current policy says that spit nets may be used "when appropriate".[19] I recommend additional detail be included in the policy to clarify when it is appropriate to use a spit net.

### *Employee Conduct Policy and Prisoner Services*

I am concerned about the following language in the Employee Conduct Policy, "Non-sworn personnel will not intervene in any prisoner versus prisoner or prisoner versus sworn staff dispute".[20] To the degree that this language could be construed to silence mental health or medical staff from representing the interests and needs of inmates, it is problematic. I recommend this language be removed from the policy or clarified to not silence mental health or medical staff from expressing concerns based on their professional judgment.

There is similar language in the Prisoner Services policy, "Social workers will not intercede with security or logistics considerations within the facility."[21] For the same reasons referenced in the above, I recommend this language be removed or clarified.

---

[19] SCSD Operation Order 2-02, Use of Restraint Devices-III. A. 1. b
[20] SCSD Operations Order 1-03, Employee Conduct--III. C.  1
[21] SCSD Operations Order, 8-06, Prisoner Services--II. C.

## SUICIDE PREVENTION MEASURES

It is my understanding that Dr. Gage was also tasked with reviewing this issue and any comments I make on current on the current policy and practice should be tempered by his conclusions on the subject.

A recent study of suicides and suicide attempts in the New York City jail said, "We found that acts of self-harm were strongly associated with assignment of inmates to solitary confinement. Inmates punished by solitary confinement were approximately 6.9 times as likely to commit acts of self-harm".[22] Given the overuse of segregation in the SCSD this is clear evidence of the importance that jail officials pay attention to the risk of suicide segregation can create.

SCSD officials have informed me that their rate of completed suicides have gone down over the last decade due to additional staff training, a critical component of any suicide prevention program, and the removal of items such as sheets and tube socks from authorized inmate property. According to JPS administrators they frequently receive referrals from concerned Deputies in all parts of the jails, from the court and from a hotline that family members can call. These are important accomplishments and should not go unnoticed. However, any policy can be improved and the SCSD's policy on suicide prevention is no exception.

The current policy lacks specific detail regarding the frequency and authority for the timing of checks of inmates on suicide watch.  Dr. Lindsay Hayes, one of the country's foremost authorities on prevention of suicides in jails and prisons, recommends two levels, close observation and constant observation.

> 1. Close observation is reserved for the inmate who is not actively suicidal but expresses suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) or has a recent prior history of self-destructive behavior. In addition, an inmate who denies suicidal

---

[22] Venters, et al, *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, Research and Practice, American Journal of Public Health, March 2014

27

ideation or does not threaten suicide but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury should be placed under close observation. Staff should observe such an inmate in a protrusion-free cell at staggered intervals not to exceed every 10 minutes (e.g., 5, 10, 7 minutes).

2. Constant observation is reserved for the inmate who is actively suicidal, either threatening or engaging in suicidal behavior. Staff should observe such an inmate on a continuous, uninterrupted basis. In some jurisdictions, an intermediate level of supervision is used with observation at staggered intervals that do not exceed every 5 minutes.[23]

I recommend that SCSD adopt these or similar definitions and change their policy accordingly and that the decision of which type of observation is necessary in an individual case, as well as the conditions under which the observation occur, be the authority of mental health, not custody staff. The current policy is not clear on these issues.

I also observed and was informed that the secure classrooms in each unit of the Main Jail are sometimes used as watch cells. In my opinion this practice should cease for two reasons. First, this location is in clear view of many inmates and staff in the living units and creates the possibility for personal observation and humiliation of an inmate experiencing a serious mental health crisis. During my first inspection of the jail I witnessed a woman in a suicide smock in a mixed gender unit, in full view of male inmates in some pods and by anyone walking through the unit. Second, this is premium space for program activities. The priority and sole use of this space, absent a significant emergency, should be reserved to provide additional program opportunities in the unit.

---

[23] Hayes, L., Guide to Developing and Revising Suicide Protocols Within Jails and Prisons © 2013 National Center on Institutions and Alternatives

## CUSTODY STAFFING IN THE JAIL

The dangerously low custody staffing levels of the jail has been the subject of multiple studies and reports in the past 10 years. I want to emphasize that these reviews did not contemplate expanding the duties of the officers in order to provide for better supervision and treatment of the mentally ill and inmates held in segregation. Instead, they focused on establishing sufficient staffing levels to simply meet the minimal requirements of the policies in place at the time.

In 2006 the Braun Study found, "Concerns were identified regarding insufficient staffing levels, supervision and security in jail facilities".[24] The primary concerns of this study were for the Honor Farm section of the RCCC and the vacancy rate at both jails. While the vacancy rate is no longer a problem I have serious concerns about staffing at the RCCC and especially at the Honor Farm section of that part of the facility.

Shortly thereafter the county conducted their own internal study of the staffing needs of their jails. The study contained many recommendations, including the following staffing needs that remain largely the same set of problems that exist for the jails today:

- Increase the Deputy staffing on the Honor Facility
- Increase the Deputy staffing in maximum security
- Increase the level of supervision, particularly in maximum security
- Increase the Deputy staffing in the medium security facilities
- Increase the Deputy staffing in SLF (Sandra Larson Facility)
- Increase the Deputy staffing available for emergency medical runs

---

[24] Sheriff's Department Assessment, Executive Summary and Key Findings and Recommendations, Joseph Brann & Associates, LLC, page 7

- Increase the Deputy staffing level to ensure that relief can be provided to critical assignments[25]

Although this internal study made most of these recommendations about the RCCC, I believe that they all apply to both facilities today

During my interviews with jail administrators they described a significant reduction in the number of Deputies assigned to the jails as a result of the global financial crisis of 2008. The impacts of those reductions were detailed in the 2011 Sacramento Grand Jury report. Their report regarding the main jail said:

> Budget cuts have had a severe impact. In the past two years, 139 full-time staff positions were eliminated, including 122 Deputy positions. Currently, only 38 Deputies are available per shift; this is a ratio of 1 Deputy for 63 inmates. Staff shortages and Deputy reassignments back to the jail cause safety issues and low morale, along with the increased use of sick leave.[26]

That report goes on to describe the impact of similar reductions at the RCCC and highlights concerns about staffing in the maximum security units, the lack of a roving response team and the increasing number of gang members housed in the minimum security section of that facility.[27]

While I understand and agree with the conclusions made by both external and internal studies that the RCCC is dangerously understaffed, I believe previous work on staffing levels has not emphasized that serious custody staffing deficits also exist in the Main Jail as well. The result is that inmates confined at both jails, especially those in some level of segregated confinement, experience conditions that are likely to cause harm for some inmates and create dangerous working conditions for the staff.

---

[25] Sacramento County Sheriff's Department, Staffing Analysis for Corrections, pages 43 & 73

[26] Sacramento County Under Duress: Problems and Opportunities, Superior Court of Sacramento Grand Jury, January 12, 2011, page 3

[27] ibid, page 4

The conditions described in this report for inmates in segregation are being driven by the lack of Deputies assigned to supervise those units. In my inspections and interviews for this report I found no lack of understanding of the need to get segregation inmates out of their cells more frequently and of the need for programs for this group. But given today's level of staffing they struggle to meet even the miniscule demands of their current policies, for example, time out of cell for exercise and recreation. Absent a dramatic reduction in the total population of the SCSD jails with the staff re-deployed to respond to these issues, there is no way for the jail to implement the changes necessary and come into compliance with humane and constitutional practices for inmates held in segregation without a significant increase in Deputy staffing levels.

## STAFFING RECOMMENDATIONS

Staffing in correctional facilities is driven by 2 primary factors. One is the design of the physical plant and the second is the custody level of the inmates. Generally speaking, minimum-custody inmates require less physical plant control and fewer staff. Medium custody inmates require more of both. Maximum custody inmates require more secure housing units and more staff to monitor the activities of the inmates. Special populations such as inmates and those in OPP status also require more staff because of the need to get them out of their cells with proper supervision during clinical encounters, programs and recreation time. My recommendations for custody staffing are consistent with these principles.

As I said earlier in this report, it is possible that implementing a new Housing Plan that houses like inmates in the same units or pods could reduce the need for some of these additional staff. However, the staffing recommendations in this report are based on the current Housing Plans in the 2 jail locations. They assume the present configuration of the type of inmates housed in the living units remains the same. I strongly recommend that the SCSD consider implementing a new Housing Plan in order to achieve efficiency in staffing the living units in the jail.

For example, at the Main Jail, there are 5 pods that houses maximum-security inmates in five different units and in 2 pods in another unit. If some of these maximum-security inmates could be consolidated in fewer units there would be less need for additional staff.

Similarly, at the Main Jail there are male OPP beds in 2 different units. Consolidating them into one unit would save some of the need for additional staff.

Like the males, the female OPP's and segregation inmates in the Main Jail are spread between 3 pods in 2 different units. It may be possible to reduce the need for some of the recommended Deputy increases if those units could be "resorted" to create one without OPP or segregation inmates.

At the end of this report I have included revised rosters for both jail locations for day and night shifts and well as for the weekend but they are based on the current Housing Plans. It is likely that if new Housing Plans were implemented the specific additions to staff that I recommend would at least shift their location, if not be reduced. The principles embedded in the narrative of this report should be applied whether or not a new Housing Plan is implemented.

### Deputy Staffing Recommendations:

**OPP's**—The OPP's have no dedicated Deputy staffing today. For regular individual and group therapy programs to be established in each unit that contains OPP inmates, it will require an additional 2 Deputies during program hours to assist with the escort and supervision of inmates. The direct supervision unit design at both jail locations needs to finally be utilized so that the Deputies are stationed in the units when inmates are out of their cells.

**Segregation Units**—The segregation unit Deputy staffing today has one officer in the booth and 2 on the floor at the Main Jail. Deputies and supervisors report that one of these officers is gone to respond to other jail duties and emergencies about 90% of the time.  This is not an acceptable practice and the expectation must be that the 3rd officer is available to perform the duties required in the unit. Deputy staffing in the RCCC segregation unit is 1 in the booth and 2 on the floor. These staffing levels are not sufficient to regularly accomplish the duties currently required today.

For a step-down program and increased out of cell time to be implemented the staffing in the segregation units must add 2 officers on the floor in the Main Jail and RCCC segregation units during the day shift.

Some units contain segregation pods and OPP pods. Dedicated Deputy staff must be added for both functions to ensure adequate out of cell time can be achieved. For example, currently 7 West has OPP and segregation inmates in the same units and the same pods. For that reason I recommend 2 additional Deputies

to perform the functions associated with segregated inmates and 2 additional Deputies to perform the functions associated with the OPP inmates during the day shift. The same is true for CBF at the RCCC.

**RCCC Barracks**—These units are medium security and lack the structural and physical plant controls necessary for this population. Today a single Deputy supervises them. I recommend staffing be increased to 2 in each unit for the safety of the staff and the inmates.

**RCCC Honor Units**—The level of sophistication of the inmates living in these barracks and the physical plant makes for a potentially volatile situation. I recommend that 2 officers be added per shift to constitute the roving response team called for in the previous mentioned Grand Jury report.

**Acute Psychiatric Unit**—Current Deputy staffing for this unit is for coverage 8 hours a day. For safety of the prisoners it needs to be increased to 24 hours a day, 7 days a week. On the day shift there should be a second officer added so that this group of inmates can get out of their cells to participate in therapy, programs and increased opportunities for recreation.

**Sergeant Supervision**—Accountability in a correctional facility is a combination of good policies, good supervision and good training. The Sergeants that supervise the segregation units and OPP's in the SCSD are stretched too thin to provide proper oversight and direction to the Deputies. Currently Sergeants are assigned multiple units to supervise. In order to implement the changes recommended in this report a dedicated Sergeant must be assigned for each segregation and OPP unit that the jail operates. If there are OPP's, segregation inmates or a combination in a unit, those units need Sergeant supervision 24 hours a day, 7 days a week.

Today, at the Main Jail there are two Sergeants assigned to supervise all of the living units. One Sergeant has booking and the units on floors 2-5. The other Sergeant has the units on floors 6-8. As I have said throughout this report, the critical needs of the OPP and segregation populations require closer supervision of the officers than they currently receive. But, the current Housing Plan makes

determining recommendations for Sergeants more difficult. It is clear that the programs currently offered on the 3rd, 7th and 8th floors at the Main Jail demand a dedicated Sergeant for each floor for a total of 3 new Sergeants on both the day and night shifts.

At the RCCC unit CBF should have 1 dedicated Sergeant on both the day and night shifts.

I recommend that a total 8 Sergeants be added to provide for proper supervision of both jails.

**Emergency Medical Trips and Hospital Watch**—By all accounts and by the data there are an insufficient number of Deputies on duty to manage unscheduled but predictable emergency medical runs at the Main Jail.[28] Jail administrators and Deputies report that with great frequency Deputies are pulled away from their mandatory posts in living units or overtime is used to provide escort for emergency medical trips and inmates who need to be seen in an emergency room or outside hospital. I witnessed such emergencies during my tours of the jail. If the officers are not available to supervise the unit, inmates will be left in their cells, exacerbating the problems that this report is trying to correct. Typically, adding full time employees to handle these unscheduled events can reduce costs.

The data about the frequency and cost of these emergency medical runs has been collected and shared with me from April of 2015 through March of 2016. This data reveals a monthly high in January of 2016 of 1,479 hours of straight time at the Main Jail. The monthly high for overtime costs at the Main Jail (which are paid at time and a half) is 2,101 hours. The lowest number of hours per month for emergency medical runs is 557 hours at straight time in September of 2015 and 183 hours of overtime in February of 2016.

Depending on the jurisdiction, a full time employee usually works and is budgeted between 170 and 180 hours per month. It is very clear that adding some additional Deputies for emergency medical runs would be a wise move for the

---

[28] The data shows this is not currently a problem at the RCCC.

county. Even at the lowest number of hours required in the last year there is sufficient justification to add additional Deputies on a full time basis. I recommend that 2 additional Deputies be added on the day shift at the Main Jail 7 days a week. Even at 180 hours for each Deputy, an additional 2 will cost well below the September 2015 low-end total of 557 hours a month and will reduce the need to pull Deputies off the floor of the living units.

The Main Jail cannot routinely continue to take officers off of the floor and send them on these runs. Today it puts the Deputies that remain behind without proper backup at risk. It makes it impossible to properly supervise the inmates and keep the inmates or the Deputies safe. Failing to add additional Deputies for emergency medical runs will make it impossible to achieve the primary objectives of this report to get the OPP and segregation inmates out of their cells for treatment, programs and recreation.

I further recommend that the jail continue to track the emergency medical runs after these Deputies are added to determine if additional Deputies might also be added to further reduce costs.


### *Civilian Staffing Recommendations*

**Hearing Officers**—I recommend that one full time civilian hearing officer be assigned to each jail to conduct inmate disciplinary hearings.

**Policy Support**—I recommend that one full time civilian employee be added whose sole function is to maintain jail policies so that they are current and regularly updated to remain consistent with current standards.

**Classification**—I recommend the county consider adding civilian staff to perform classification duties at the jails. While the Deputies I met who are doing classification are hardworking and knowledgeable of the process and overall operation of the jails, these are functions that can be and are performed by civilians in other jurisdictions. It is likely that civilian employees assigned to perform classification duties would, over time, add a level of consistency to this important

process particularly maintaining the integrity of a revised Housing Plan and would avoid the disruption that occurs when Deputies are transferred from jail to patrol duties.

**POLICY AND PRACTICE RECOMMENDATIONS**

1.     Establish in a new Segregation Policy:

   o   A criteria and process for placing inmates in
       Administrative Segregation

   o   An assumption that, absent exigent circumstances, the
       mentally ill will not be housed in segregation

   o   A review by mental health staff review to determine
       any contra-indications.

   o   Regular rounds by mental health staff of segregation
       units.

   o   Periodic review of inmates in segregation to determine
       if it needs to be continued or if the inmate can be
       released to general population.

   o   A level system so that inmates in Administrative
       Segregation can achieve additional privileges for
       compliant behavior and participation in available
       programs.

   o   A limitation on Disciplinary Detention of no more than
       30 days.

   o   Conditions of confinement that mirror best practices
       and current standards for inmates held in segregation.

2.     Revise the Classification Policy to prohibit placing inmates into
       segregation based solely on their classification score.

3.     Engage an independent classification expert to review the current
       classification instrument to make sure it is useful for the RCCC.

4.     Create a new Housing Plan that houses like inmates with like inmates.
       This will likely reduce the impact of my recommendations for Deputy
       staffing and provide better treatment environments for the mentally ill.

5.     As part of that Housing Plan, concentrate the mentally ill in treatment
       units that are operated by both custody and mental health staff that

include incentives and programs that lessen the impact of segregation and allow inmates to gain additional privileges based on improved behavior and progress in treatment. Individual and group counseling should be provided. Inmates should receive ten hours of week out of cell treatment and ten hours a week of recreation with the opportunity to earn more time out of cell.

6.     Provide Crisis Intervention Training (CIT) and training in managing mentally ill inmates prior to assigning Deputies to those units

7.     Create a step-down program for non-mentally ill inmates that include incentives and programs that lessen the impact of segregation and allow inmates to gain additional privileges and out of cell time based on improved behavior and program participation.

8.     Create a policy that describes the process and criteria for placement of inmates into protective custody that provides for the same conditions of confinement as inmates in general population, whenever possible. Review the Total Separation population in an effort to reduce the number of inmates currently assigned this category.

9.     Improve conditions of confinement in segregation to include:

    a.     The opportunity for exercise out of the cell and outdoors when weather permits 7 days a week for all prisoners with the opportunity to earn additional hours
    b.     Allow phone calls for all inmates in segregation, including Disciplinary Detention
    c.     Remove the flaps on the doors of segregation cells
    d.     Provide additional reading material to inmates
    e.     Allow inmates to have radios with headphones in their cells
    f.     Establish procedures so that cells are searched and cleaned prior to placement of an inmate in the cell.

10.    Stop using the classrooms in the Main Jail as watch cells.

11.    Revise the Disciplinary Policy to involvement mental health in the hearings process.

12.    Do not allow food to be used as punishment and eliminate "the loaf" as an alternate diet.

13.     Revise the Use of Force Policy so that, absent an imminent threat, to require an attempt to de-escalate the situation for inmates on the mental health caseload prior to authorizing use of force against mentally ill inmates. Add a protocol for planned use of force situations including the use of hand held video cameras to document the event. Move cell extraction procedures to the Use of Force Policy.

14.     Revise the Use of Restraint Devices policy to involve mental health staff in decisions regarding restraints.

15.     Provide additional clarity about when spit masks are appropriate.

**CONCLUSION**

Once again I will say the SCSD is to be commended for confronting the problems of the mentally ill in their jails and the overuse of segregated confinement but these problems cannot be solved within current resources. Increases in mental health staff, as recommended by Dr. Gage, and increases in Deputy staffing of the jail must occur if change is to be successful.

But adding more staff will not be enough. Success in treating the incarcerated mentally ill comes when custody staff and mental health staff work together. This requires confronting the problem of the frequent movement of jail administrators and line staff between jail and patrol responsibilities. Consistency can be improved by adding some civilian staff to the jail, increasing line level supervision, keeping policy and procedures current with national standards and making sure custody staff are properly trained to work with mentally ill inmates.

The question of funding is absent from this report and so is not addressed. However, the solution found in other jurisdictions is to closely examine the jail population in an effort to finds ways to reduce the numbers currently confined so that the total population can be reduced and resources redirected to improve services. Sentencing alternatives and mental health courts have strong records of achieving success in other jurisdictions and should be explored by Sacramento County officials.

I was also recently informed that the County has contracted with Carter Goble Lee (CGL) to conduct a comprehensive study of the current criminal justice system. That study is expected to produce specific recommendations on policies that could be reasonably implemented to significantly reduce the current jail population.  Specifically policies and programs that would reduce the size of the pretrial population, sentenced inmates and ICE inmates now housed under a contract with the Department of Justice.  These recommendations, if implemented, would serve to reduce the current shortage in security staff now assigned to the jail

41

and the need for medical and mental health staff to manage these special populations.