# REPORT ON SUICIDE PREVENTION PRACTICES WITHIN THE SACRAMENTO COUNTY JAIL SYSTEM
## Sacramento, California

by

## Lindsay M. Hayes
40 Lantern Lane
Mansfield, MA 02048
(508) 337-8806
e-mail: Lhayesta@msn.com

November 22, 2016

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

# TABLE OF CONTENTS

A.      <u>Introduction</u>………………………………………………………………3-5

B.      <u>Qualifications</u>………………………………………………………………..6-7

C.      <u>Findings and Recommendations</u>……………………………………........8-9

        1) Staff Training…………………………………………………10-15
        2) Identification/Screening/Assessment……………………………16-25
        3) Communication………………………………………………26-27
        4) Housing……………………………………………………28-37
        5) Levels of Supervision/Management……………………………38-51
        6) Intervention…………………………………………………52-53
        7) Reporting……………………………………………………54
        8) Follow-up/Mortality-Morbidity Review…………………………...55-59

D.      <u>Summary of Recommendations</u>……………………………………60-66

E.      <u>Conclusion</u>………………………………………………………....67

**Appendices**

**REPORT ON SUICIDE PREVENTION PRACTICES WITHIN THE SACRAMENTO COUNTY JAIL SYSTEM**
Sacramento, California

## A.    INTRODUCTION

The following is a summary of the observations, findings, and recommendations of Lindsay M. Hayes following an assessment of suicide prevention practices within the Sacramento County Jail System operated by the Sacramento County Sheriff's Department in Sacramento, California. Although the Sacramento County Jail System has had a relatively low rate of suicide during the past several years (see below), in light of a 2015 investigative report by Disability Rights California into the mental health treatment of inmates with disabilities in the Sacramento County Jail System,[1] the County Counsel's Office for Sacramento County requested this writer's services to independently assess current suicide prevention practices, as well as offer any appropriate recommendations to the revision of suicide prevention policies and procedures.

In conducting the assessment, this writer met with and/or interviewed numerous correctional, medical, and mental health officials and staff from the Sacramento County Sheriff's Department (SCSD), Correctional Health Services (CHS), and Jail Psychiatric Services (JPS);[2] reviewed numerous policies and procedures related to suicide prevention, screening/assessment protocols, and training materials; reviewed various medical charts, incident reports, and available investigative reviews of three (3) inmate suicides between 2014 and 2016, as well as a serious suicide attempt in October 2016; reviewed various medical charts of inmates on suicide

---

[1] See *Report on Inspection of Sacramento County Jail*, October 15, 2015, www.disabilityrightsca.org/pubs/702701.pdf
[2] Medical services are provided to inmates by the SCSD's Correctional Health Services division, whereas mental health services are provided to inmates by Jail Psychiatric Services through a contractual agreement with the University of California-Davis.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

precautions during the on-site assessment; and toured both the Sacramento County Main Jail and Rio Cosumnes Correctional Center (RCCC). The on-site assessment was conducted on September 19 thru September 23, 2016.[3]

As of November 3, 2016, the Sacramento County Main Jail had a yearly average daily population of 2,083 inmates, whereas the Rio Cosumnes Correctional Center averaged 1,822 inmates.   Combined, the two jail facilities held approximately 3,905 inmates, making the Sacramento County Jail System one of the largest in California and among the 15th largest county jail systems in the United States. As shown by Table 1, the Sacramento County Jail System had three (3) inmate suicides during the 6-year period of 2011 through November 2016, all occurring at the Main Jail.  Based upon the average daily population during this same time period, the suicide rate within the Sacramento County Jail System was 12.3 deaths per 100,000 inmates  --  a rate that is substantially lower than that of county jails of varying size throughout the United States.[4] The suicide rate at the Main Jail during this time period was 23.8 deaths per 100,000 inmates (also a very low suicide rate), whereas the Rio Cosumnes Correctional Center did *not* have any suicides during this 6-year time period, but sustained a very serious suicide attempt in October 2016.

## TABLE 1

---

[3]It is important to note that, with the exception of the inmate suicides in 2014-2015, the assessment encompassed review of suicide prevention practices *currently* in operation within the Sacramento County Jail System as of September-October 2016, and did not include review of practices prior to that date.

[4]According to Heron, M. (2016), "Deaths: Leading Causes for 2013," *National Vital Statistics Report*, 65 (2), Hyattsville, MD: National Center for Health Statistics, the suicide rate in the general population is approximately 13 deaths per 100,000 citizens.  According to the most recent data on jail suicide, the suicide rate in county jails throughout the country is approximately 46 per 100,000 inmates, Noonan, M., Rohloff, H. and Ginder, S. (2015), *Mortality in Local Jails and State Prisons, 2000-2013 - Statistical Tables*, Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice, Office of Justice Programs.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

5

**AVERAGE DAILY POPULATION, YEARLY ADMISSIONS, SUICIDES, AND SUICIDE RATE WITHIN THE SACRAMENTO COUNTY JAIL SYSTEM 2011 THRU 2016\***

| Year | ADP | Yearly Admissions | Suicides | Suicide Rate[5] |
|------|-----|-------------------|----------|-----------------|
| 2011 | 4,019 | 50,846 | 0 | 0 |
| 2012 | 4,053 | 47,679 | 0 | 0 |
| 2013 | 4,155 | 49,101 | 0 | 0 |
| 2014 | 4,279 | 51,485 | 1 | 23.3 |
| 2015 | 4,047 | 44,946 | 1 | 24.7 |
| 2016 (Nov) | 3,905 | 30,745 | 1 | 25.6 |
| 2011-2016 (Nov) | 24,458 | 274,802 | 3 | 12.3 |

\*Source: Sacramento County Sheriff's Department

---

[5]The jail suicide rate is calculated by dividing the number of suicides by the ADP and then multiplying at number by 100,000.

CONFIDENTAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

## B.     QUALIFICATIONS

This writer is a Project Director of the National Center on Institutions and Alternatives, with an office in Mansfield, Massachusetts.  This writer is nationally recognized as an expert in the field of suicide prevention within jails, prisons and juvenile facilities, and has been appointed as a Federal Court Monitor (and expert to special masters/monitors) in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction. This writer has also served as a suicide prevention consultant to the U.S. Justice Department's Civil Rights Division (Special Litigation Section) and selectively for the Office of Civil Rights and Civil Liberties of the U.S. Department of Homeland Security (Immigration and Customs Enforcement) in their investigations of conditions of confinement in both adult and juvenile correctional facilities throughout the country.  This writer also serves as an expert witness/consultant in inmate suicide litigation cases, as well as serving as a technical assistance consultant/expert by conducting training seminars and assessing inmate and juvenile suicide prevention practices in various state and local jurisdictions throughout the country.

This writer has conducted the only five national studies of jail, prison, and juvenile suicide (*And Darkness Closes In...National Study of Jail Suicides* in 1981, *National Study of Jail Suicides: Seven Years Later* in 1988, *Prison Suicide: An Overview and Guide to Prevention* in 1995, *Juvenile Suicide in Confinement: A National Survey* in 2004, and *National Study of Jail Suicide: 20 Years Later* in 2010).  The jail and prison suicide studies were conducted through contracts with the National Institute of Corrections (NIC), U.S. Justice Department; whereas the first national study of juvenile suicide in confinement was conducted through a contract with the Office of Juvenile Justice and Delinquency Prevention, U.S. Justice Department.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

This writer served as editor/project director of the *Jail Suicide/Mental Health Update*, a quarterly newsletter devoted to research, training, prevention, and litigation that was funded by NIC from 1986 thru 2008; and was a consulting editor and editorial board member of *Suicide and Life-Threatening Behavior*, the official scientific journal of the American Association of Suicidology, as well as current editorial board member of *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, the official scientific journal of the International Association of Suicide Prevention.  This writer has authored over 70 publications in the area of suicide prevention within jail, prison and juvenile facilities, including model training curricula on both adult inmate and juvenile suicide prevention.  This writer's *Training Curriculum and Program Guide on Suicide Detection and Prevention in Juvenile Detention/Correctional Facilities and Residential Programs: Instructor's Manual* was released in April 2013; whereas the *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities: Instructor's Manual* was released in March 2016.

As a result of research, technical assistance, and expert witness consultant work in the area of suicide prevention in correctional facilities, this writer has reviewed and/or examined over 3,500 cases of suicide in jail, prison, and juvenile facilities throughout the country during the past 37 years.  This writer was a past recipient of the National Commission on Correctional Health Care's Award of Excellence for outstanding contribution in the field of suicide prevention in correctional facilities.  This writer's work has been cited in the suicide prevention sections of various state and national correctional health care standards, as well as numerous suicide prevention training curricula. This writer's curriculum vitae is attached in the Appendices.

## C.      FINDINGS AND RECOMMENDATIONS

Detailed below is this writer's assessment of suicide prevention practices within the Sacramento County Jail System.   It is formatted according to this writer's eight (8) critical components of a suicide prevention policy: staff training, identification/screening, communication, housing, levels of supervision/management, intervention, reporting, and follow-up/mortality-morbidity review.   This protocol was previously developed by this writer and is consistent with national correctional standards, including those of the American Correctional Association's *Performance-Based Standards for Adult Local Detention Facilities* (2004); Standard J-G-05 of the National Commission on Correctional Health Care's *Standards for Health Services in Jails* (2014); "Suicide Prevention and Intervention Standard" of the U.S. Department of Homeland Security's *Operations Manual ICE Performance-Based National Detention Standards* (2011),[6] California Board of State and Community Corrections' *Minimum Standards for Local Detention Facilities* (2012) as outlined in Titles 15 and 24, California Code of Regulations,[7] and "312: Suicide Prevention" section of the California Institute for Medical Quality's *Health Care Accreditation Standards for Adult Detention Facilities* (2013).[8] Where indicated, recommendations are also provided.

---

[6]American Correctional Association (2004), *Performance-Based Standards for Adult Local Detention Facilities*, 4th Edition, Lanham, MD: Author; National Commission on Correctional Health Care (2008), *Standards for Health Services in Jails*, 8th Edition, Chicago, IL: Author; and U.S. Department of Homeland Security (2011), Immigration and Customs Enforcement, *Operations Manual ICE Performance-Based National Detention Standards*, Washington, DC: Author.

[7]It should be noted that Title 15 is not very helpful in outlining specific components to a suicide prevention policy, simply requiring jurisdictions to adhere to the following in in Section 1219: "The facility administrator and the health authority shall develop a written plan for a suicide prevention program designed to identify, monitor, and provide treatment to those inmates who present a suicide risk."

[8]California Institute for Medical Quality (2013), *Health Care Accreditation Standards for Adult Detention Facilities*, San Francisco, CA: Author. Unfortunately, the Institute for Medical Quality's suicide prevention standards simply paraphrases Title 15 requirements.

Finally, this writer reviewed various Sacramento County Sheriff's Department, Correctional Health Services, and Jail Psychiatric Services policies, including:

<u>Sacramento County Sheriff's Department Operations Orders</u>

- 3/07-Medical Emergencies;
- 3/08-First-Aid Kits/Trauma Bags;
- 4/05-Use of Safety Cells/ Segregation Cells/Multipurpose Rooms/North Holding #2;
- 6/05-Housing Unit Checks;
- 10/02-Psychiatric Services;
- 10/04-Medical Intake Screening;
- 10/05-Suicide Prevention Program;

<u>Correctional Health Services, Administrative Policies</u>

- 1404-Receiving Screening;
- 1411-Mental Health Services;
- 1412-Suicide Prevention 2M-Joint Policy;
- 1415-Patients in Safety Cells;
- 1433-Limitations for Admission in Jail Acute Psychiatric In-Patient Unit;

<u>Jail Psychiatric Services' Policies:</u>

- 1006-Incident Reporting;
- 1009-Suicide Precautions: Acute In-Patient Unit;
- 1010-Safety Suit Procedures for Inmate-Patients on Acute Inpatient Unit;
- 1022-Overview of Staff Responsibilities: Out-Patient Department;
- 1029-Out-Patient Department Triage;
- 1033-2M Suicidal Patients;
- 1049-Suicide Prevention Program.

CONFIDENTAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

1)     **<u>Staff Training</u>**

***All*** **correctional, medical, and mental health staff should receive eight (8) hours of initial suicide prevention training, followed by two (2) hours of annual training. At a minimum, training should include guiding principles to suicide prevention, avoiding negative attitudes to suicide prevention, inmate suicide research, why correctional environments are conducive to suicidal behavior, potential predisposing factors to suicide, high-risk suicide periods, warning signs and symptoms, identifying suicidal inmates despite the denial of risk, components of the agency's suicide prevention policy, and liability issues associated with inmate suicide.**

The key to any suicide prevention program is properly trained correctional staff, who form the backbone of any correctional system. Very few suicides are actually prevented by mental health, medical or other professional staff. Because inmates attempt suicide in their housing units, often during late afternoon or evening, as well as on weekends, they are generally outside the purview of program staff. Therefore, these incidents must be thwarted by correctional staff who have been trained in suicide prevention and are able to demonstrate an intuitive sense regarding the inmates under their care. Simply stated, correctional officers are often the only staff available 24 hours a day; thus they form the front line of defense in suicide prevention.

Both the American Correctional  Association (ACA) and National Commission on Correctional Health Care (NCCHC) standards stress the importance of training as a critical component to any suicide prevention program. ACA Standard 4-ALDF-7B-10 requires that all correctional staff receive both initial and annual training in the "signs of suicide risk" and "suicide precautions;" while Standard 4-ALDF-4C-32 requires that staff be trained in the implementation of the suicide prevention program. As stressed in NCCHC Standard J-G-05 -- "All staff members who work with inmates are trained to recognize verbal and behavioral cues that indicate potential

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

suicide, and how to respond appropriately.  Initial and at least biennial training are provided, although annual training is highly recommended."  Finally, the U.S. Department of Homeland Security's *Operations Manual ICE Performance-Based National Detention Standards* require that all staff receive both pre-service and annual training in the following areas: recognizing verbal and behavioral cues that indicate potential suicide; demographic, cultural, and precipitating factors of suicidal behavior; responding to suicidal and depressed detainees; effective communication between correctional and health care personnel; necessary referral procedures; constant observation and suicide-watch procedures; follow-up monitoring of detainees who have already attempted suicide; and reporting and written documentation procedures."

**FINDINGS:**  Title 15 requires that all newly hired correctional officers working in California county jails complete a 176-hour "Adult Corrections Officer Core Course" within one year of employment. The core course includes 4-hour instruction on "Suicide Issues." Neither the Sacramento County Sheriff's Department (SCSD)'s "Suicide Prevention Program" policy (No. 10/5) nor Jail Psychiatric Services (JPS)'s "Suicide Prevention Program" policy (No. 1049) provided adequate descriptions on the suicide prevention training requirements for custody, medical, and mental health personnel, with the SCSD policy simply stating that "JPS staff will provide training regarding suicide prevention to custody staff at least annually, in addition to in-service officer training."

Due to the vague language contained within these agency directives, this writer conferred with several custody and mental health officials responsible for the provision of suicide prevention training within the SCSD, as well as reviewed various training curricula. The review found that,

in practice, the SCSD operated its own Training Academy and conducted a 23-week **pre-service** instructional course to all new law enforcement/jail deputy employees. The course included a state Commission on Peace Officer Standards and Training (POST) course entitled "People with Disabilities" (Learning Domain 37).   This course had a very limited discussion on suicide prevention. However, immediately after completion of the main Training Academy, jail deputies were required to complete a 66-hour Jail Operations course that included the 4-hour instruction on "Suicide Issues" (Module 15.3). This writer reviewed Module 15.3 and found it to be adequate. Medical and mental health personnel were *not* required to complete this pre-service training course, nor any other pre-service training related to suicide prevention.

In addition, the SCSD began offering Crisis Intervention Team (CIT) training in February 2014. CIT is a nationally-known program model for community policing that brings together law enforcement, mental health providers, hospital emergency departments and individuals with mental illness and their families to improve responses to people in crisis. CIT programs enhance communication, identify mental health resources for assisting people in crisis and ensure that officers get the training and support that they need. The 24-hour version of the CIT training was offered to SCSD personnel on a voluntary basis, and an 8-hour version of the training had recently been mandated for all jail deputies.

With regard to **annual in-service** suicide prevention training, there have been numerous variations of training provided to jail deputies over the past several years, including a 16-slide PowerPoint presentation entitled "Annual Officer Training: Suicide Prevention for Corrections" and a 27-slide PowerPoint presentation entitled "Suicide Prevention Training."  These PowerPoint

slide presentations were developed by deputies working within the SCSD's Jail Operations Division. In addition, JPS had previously developed a 27-slide PowerPoint presentation entitled "Suicide Prevention Training."  Up until approximately 2013, JPS provided annual suicide prevention training to jail deputies. Then beginning in 2013 and continuing through February 2016, deputies from the Jail Operations division provided the training through multiple 20-30-minute shift briefings. Since February 2016, annual suicide prevention training had been provided to jail deputies through a web-based training video that encompassed a PowerPoint presentation. With regard to health care personnel, both medical (CHS) and mental health (JPS) personnel receive training through web-based instruction from JPS's above-described PowerPoint presentation. According to training records, almost all custody, medical, and mental health personnel had received some form of web-based suicide prevention training during 2016.

In conclusion, although the SCSD and JPS might very well be in compliance with vague Title 15 requirements regarding suicide prevention training, and most personnel had received some form of training, training initiatives during the past several years could only be described as uneven. The lack of a classroom environment, and reliance on periodic and brief shift briefing instruction, as well as web-based instruction on suicide was problematic. It was noteworthy that when this writer was on-site and observed a Suicide Prevention Task Force meeting on September 20, 2016, correctional leadership at the SCSD had already made a commitment to reinstitute the more traditional classroom training format in the near future.

**RECOMMENDATIONS**:  Several recommendations are offered to strengthen both the content and deliverability of suicide prevention training offered to both custody and health care

personnel who work within the Sacramento County Jail System. *First*, it is strongly recommended that both the SCSD and JPS revise its respective suicide prevention policies to include a more robust description of the requirements for both pre-service and annual suicide prevention training, to include an overview of the required topics, as well as requirement that all custody, medical, and mental health personnel received such training on an annual basis. *Second*, it is strongly recommended that the SCSD and JPS only utilize classroom-instructed suicide prevention training. It has been this writer's experience that suicide prevention encompasses pro-active attitudes and collaboration, principles that are lost when an employee is sitting alone in a chair at a computer terminal. Desktop instruction might comply with an accreditation and/or regulatory requirement, but it is not as meaningful as classroom-instructed training.


*Third*, it is strongly recommended that the SCSD and JPS collaborate on the development of a 4 to 8 hour pre-service suicide prevention curriculum for new employees (including custody, medical, and mental health staff) that includes the following topics:

- guiding principles to suicide prevention
- avoiding obstacles (negative attitudes) to prevention
- inmate suicide research
- why facility environments are conducive to suicidal behavior
- identifying suicide risk despite the denial of risk
- potential predisposing factors to suicide
- high-risk suicide periods
- warning signs and symptoms
- components of the SCSD/JPS suicide prevention programs
- liability issues associated with inmate suicide

Presentation should be in a PowerPoint slide format. These and other pertinent topics are available in this writer's *Training Curriculum and Program Guide on Suicide Detection and Prevention in*

*Jail and Prison Facilities* (March 2016), a copy of which was previously forwarded to the SCSD for consideration.[9]

*Fourth*, it is strongly recommended that the SCSD and JPS collaborate on the development of a 2-hour annual suicide prevention curriculum for all custody, medical and mental health staff) that includes an abbreviated discussion the above topics. The 2-hour annual refresher training should include a review of: 1) avoiding obstacles (negative attitudes) to prevention, 2) predisposing risk factors, 3) warning signs and symptoms, 4) identifying suicidal inmates despite the denial of risk, and 5) review of any changes to the SCSD/JPS suicide prevention policies. The annual training should also include general discussion of any recent suicides and/or serious suicide attempts in the jail system. Presentation should be in a PowerPoint slide format.

*Fifth*, as will be discussed later in this report, it is strongly recommended that all JPS personnel (including psychiatrists) receive additional training on how to develop a reasonable treatment plan that contains specific strategies in reducing future suicidal ideation, to include examples of adequate and inadequate treatment plans.

2)    **Intake Screening/Assessment**

**Intake screening for suicide risk must take place immediately upon confinement and prior to housing assignment. This process may be contained within the medical screening form or as a separate form, and must include inquiry regarding: past suicidal ideation and/or attempts; current ideation, threat, plan; prior mental health treatment/hospitalization; recent significant loss (job, relationship, death of family member/ close friend, etc.); history of suicidal behavior by family member/close**

---

[9]See www.ncianet.org/criminal-justice-services/suicide-prevention-in-custody

**friend; suicide risk during prior confinement; transporting officer(s) believes inmate is currently at risk.   The intake screening process should include procedures for referral to mental health and/or medical personnel. Any inmate assigned to a segregation unit should be screened to ensure that there are no medical and/or mental health contraindications for such placement.**

Intake screening/assessment is also critical to a correctional system's suicide prevention efforts.  An inmate can attempt suicide at any point during incarceration  -- beginning immediately following reception and continuing through a stressful aspect of confinement.  Although there is disagreement within the psychiatric and medical communities as to which factors are most predictive of suicide in general, research in the area of jail and prison suicides has identified a number of characteristics that are strongly related to suicide, including: intoxication, emotional state, family history of suicide, recent significant loss, limited prior incarceration, lack of social support system, psychiatric history, and various "stressors of confinement."[10]  Most importantly, prior research has consistently reported that at least two thirds of all suicide victims communicate their intent some time prior to death, and that any individual with a history of one or more suicide attempts is at a much greater risk for suicide than those who have never made an attempt.[11]  In addition, according to the most recent research on inmate suicide, at least one-third of all inmate suicide victims had prior histories of both mental illness and suicidal behavior.[12]  The key to identifying potentially suicidal behavior in inmates is through inquiry during both the intake screening/assessment phase, as well as other high-risk periods of incarceration.

---

[10]Bonner, R. (1992), "Isolation, Seclusion, and Psychological Vulnerability as Risk Factors for Suicide Behind Bars," in R. Maris et. al. (Editors) *Assessment and Prediction of Suicide*, New York, NY: Guilford Press, 398-419.
[11]Clark, D. and S.L. Horton-Deutsch (1992), "Assessment in Absentia: The Value of the Psychological Autopsy Method for Studying Antecedents of Suicide and Predicting Future Suicides," in R. Maris et. al. (Editors) *Assessment and Prediction of Suicide*, New York, NY: Guilford Press, 144-182.
[12]Hayes, L.M. (2012), "National Study of Jail Suicides: 20 Years Later," *Journal of Correctional Health Care*, 18 (3).

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

Finally, given the strong association between inmate suicide and special management (e.g., disciplinary and/or administrative segregation, etc.) housing unit placement, any inmate assigned to such a special housing unit should receive a brief assessment for suicide risk by health care staff upon admission to such placement. For example, both the ACA and NCCHC standards address the issue of assessing inmates assigned to segregation.  According to ACA Standard 4-ALDF-2A-45: "When an inmate is transferred to segregation, health care personnel are informed immediately and provide assessment and review as indicated by the protocol as established by the health authority."  NCCHC Standard J-E-09 states that "Upon notification that an inmate is placed in segregation, a qualified health care professional reviews the inmate's health record to determine whether existing medical, dental, or mental health needs contraindicate the placement or require accommodation."

**FINDINGS:**      The Sacramento County Sheriff's Department (SCSD)'s "Suicide Prevention Program" policy (No. 10/5) provided general procedures regarding the intake screening process to identify suicidal inmates, whereas the Jail Psychiatric Services (JPS)'s "Suicide Prevention Program" policy (No. 1049) provided little guidance on the issue, simply stating that "All inmates booked into the Main Jail and RCCC will have an intake screening completed by CHS staff which includes questions related to suicidal risk factors. Inmates who screened positive for suicide risk factors and/or other psychiatric concerns will be referred to JPS." The CHS "Receiving Screening" policy (No. 1401) provided an adequate description of the intake screening responsibilities.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

In practice, almost all newly admitted inmates into the Sacramento County Jail System were processed through the booking and intake area of the Main Jail. Over 40,000 inmates were booked into the Main Jail each year.[13] Upon admission, arresting officers were required to complete a SCSD "Intake Screening" form *prior* to the detainee being accepted into SCSD custody. The form contained several questions regarding medical problems, as well as the following suicide risk inquiry: "Are you currently suicidal, or do you feel like hurting yourself or someone else?" Once completed, the arresting officer was required to present the form to one of the CHS nurses assigned to the booking and intake area. This form provided an excellent opportunity for arresting officers to communicate any medical, mental health, and suicide risk concerns to medical and/or custody staff.

Nursing staff was assigned to the booking area 24 hours a day to conduct intake screening, with up to three stations located side-by-side in a Nurse's Office. A "Medical Intake" form was utilized by nursing staff to both medically clear the detainee into custody, as well as collect medical, mental health, and suicide risk information. The form, which was embedded in the electronic medical record called "E-Chart," contained the following questions regarding mental health and suicide risk (that were listed under "JPS Evaluation" on the form):

- "Are you currently suicidal, or do you feel like hurting yourself or someone else?"
- "Is the arrestee mentally disabled and/or a danger to self or others?"
- "For Females: Have you given birth within the last year. Are you charged with murder or attempted murder of your child?"
- "Within the last 2 weeks have you felt suicidal?"
- "Have you been hospitalized for mental health treatment within the past 30 days?"

---

[13] Approximately 3,687 were booked into the RCCC each year, mostly from local law enforcement agencies in the Elk Grove area, as well as the US Department of Homeland Security's Immigration and Customs Enforcement (ICE).

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

- "Are you currently taking or been prescribed psychiatric medications within past 30 days?"
- "Do you have a history of intellectual disability (not learning disability)?"
- "Have you been treated at Alto Regional Center?"
- "Do you have a conservator?"

The form also allowed nursing staff to note any observational concerns.

This writer spent several hours over the course of two days (on September 20 and September 22) observing nursing staff complete intake screening on newly admitted detainees. Such observation found several very troubling practices. *First*, up to three (3) nurses could be stationed in the office at one time, separated only by small partitions. Therefore, detainees were only separated from each other by a few feet. In addition, each detainee was accompanied by at least one arresting officer who was stationed within arms' length of the detainee. Due to the occurrence of multiple intake screenings at the same time, involving multiple nurses, detainees, and arresting officers, confidentiality was severely compromised.[14] In addition, due to its small size, the Nurse's Office was loud and chaotic at times, with arresting officers socializing with other medical personnel. *Second*, this writer observed five (5) different nurses conduct intake screening over the course of the two days. During this time, *only* one nurse asked all the required "JPS Evaluation" questions regarding mental health and suicide risk. The other nurses were observed to simply ask:

- "Do you feel like hurting yourself?" and "Received any mental health treatment within the past 30 days?" (1st Nurse)

---

[14]It should be noted that the shield of privacy and confidentiality extends not only between inmate and inmate, but inmate and non-health care personnel (e.g., custody staff ).

Further, the Nurse's Office within the booking area at RCCC was also inspected by this writer and found to contain similar problems of privacy and confidentiality. Although intake screening was not observed by this writer, custody personnel explained the intake screening process as follows: the nurse remained situated in the office with the detainee standing in the doorway, straddled by the arresting officer. The door of the Nurse's Office remained open.

- "Do you feel suicidal or have you been in within the last two weeks?" (2nd Nurse)

- "Feeling suicidal now?" "Suicidal in last two weeks?" and "Ever been out to the regional center?" (3rd Nurse)

- "Feel like hurting yourself or anyone else?" and "Are you taking any psych meds?" (4th Nurse)

The observation of multiple nurses failing to consistently ask all mental health and suicide risk questions reflected a systemic deficiency to the intake screening process.

*Third*, apart from the fact that the nurses were not consistently asking the required intake screening questions, the questions themselves were limited in both scope and timeframe. For example, suicide risk inquiry was limited to current ideation and ideation within the *past two weeks.* Mental health treatment and psychotropic medication was limited to the *past 30 days.*[15]

*Fourth*, while observing the intake screening process, this writer noticed a placard on each of the three partitions that stated: "Please Inform Nurse If You Have Any Of The Following Conditions: alcohol/drug abuse, dental/dentures, dialysis, glasses/contacts, glaucoma, hearing aids, heart disease, hepatitis, HIV/AIDS, high blood pressure, organ transplant, psychiatric history, recent pregnancy, seizures, skeletal deformities, STDs, stroke, TB, cancer." This writer subsequently observed a few, but not all, of the nurses ask detainees to look at the placard and

---

[15]Although outside this writer's area of expertise, the efficacy of asking a detainee about their "history of intellectual disability" and whether they "have a conservator" appeared questionable.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

inform them if they had any of the listed medical issues. Due to small font size, the placard was difficult to read and the overall efficacy of such a practice was highly questionable.[16]

*Fifth*, although nursing staff had access to the E-Chart at booking via desktop computers at two of the stations, nurses were observed to be rarely accessing the E-Chart. When asked by this writer if they could determine whether or not a newly admitted detainee was on suicide precautions during a prior SCSD confinement, several nurses responded that they were not aware as to whether such information was available. As such, intake nurses did not independently verify a detainee's prior placement on suicide precautions in the SCSD. This writer was subsequently informed that the "Problems and Conditions" screen of the E-Chart contained the Frequency of Service Scale (FOSS) for each inmate triaged by JPS staff. If an inmate was placed on suicide precautions and housed anywhere within the jail system, they would be classified as a FOSS Level 1 and seen daily by JPS staff. Inmates receiving a FOSS Level 2 designation were those who were discharged from suicide precautions and/or had a serious mental illness requiring follow-up (within 30 days).

*Sixth*, there did not appear to be any policy, procedure, or directive to guide nursing staff in triaging mental health referrals. In practice, nursing staff were instructed to triage a detainee's current suicidal ideation as an "urgent JPS referral" and complete a "green folder" that was forwarded to JPS. In addition, nursing staff were required to contact the JPS out-patient program (OPP) office by telephone during regular business hours or the 2P-Unit in-patient program office during non-business hours. An OPP clinician or 2P-Unit nurse then had up to four hours to respond

---

[16]This writer was also subsequently informed that intake nurses had been instructed to initiate JPS referrals for any detainees admitted on the following charges: murder, child sexual abuse, and/or any other high profile offense. Such a practice could not be confirmed because this writer did not observe any detainees booked on these charges, as well as told that nursing staff were rarely made aware of specific booking offenses.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

and assess the inmate. All other JPS referrals were designated as "non-urgent" or "routine" and

forwarded to a "JPS Scheduler" and responded to within six (6) days. Therefore, mental health

referrals were written and responded to either within four (4) hours or within six (6) days.

The following case summary exemplified the concern regarding both the inability to

identify newly admitted detainees who had previously been placed on suicide precautions during

a prior SCSD confinement and an inefficient mental health triage process:

> The inmate (**Case No. 1**) was admitted into the Main Jail on September 7, 2016.
> During the intake process, she self-reported taking psychotropic medication, but
> answered "no" to all "JPS Evaluation" questions. The nurse generated a routine JPS
> referral (indicating the inmate would be seen by an OPP clinician within 6 days).
> The inmate was *never* seen by JPS, expressed suicidal ideation two weeks later on
> September 21 and placed on suicide precautions. This writer shadowed an OPP
> clinician responsible for assessing suicidal inmates on September 21. The clinician
> assessed the inmate in the safety cell of the 2P-Unit. The inmate appeared
> depressed, was crying, and reported feeling suicidal for the past three weeks. The
> OPP clinician decided to continue her suicide precautions. A subsequent review of
> the E-Chart by this writer found that the inmate had previously been confined in
> the Main Jail a few months earlier on May 13, 2016, expressed suicidal ideation
> during the intake screening process, and was placed on suicide precautions for 3
> days. Had such information been accessed by the intake nurse on September 7,
> 2016, the inmate theoretically could have been assessed earlier and the mental
> health crisis potentially averted.

Finally, this writer was informed that neither medical or mental health personnel review

the E-Chart and/or screen an inmate placed in a segregated housing unit to determine whether

existing medical and/or mental health needs contraindicate the placement or require

accommodation."  In addition, medical and mental health personnel do not routinely conduct

regular rounds in segregated housing units, and only enter such units to pass medication or see an

individual inmate.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE
PREVENTION PRACTICES"

In conclusion, the intake screening process within the Sacramento County Jail System was very problematic. Privacy and confidentiality were severely compromised, nursing staff at the Main Jail were observed to not be consistently asking all the required screening questions, suicide risk and mental health inquiry was not comprehensive, a determination of suicide precautions during prior confinement not performed, and the mental health triage system was in need of revision.

**RECOMMENDATIONS:** Several recommendations are offered to improve the intake screening/assessment process within the Sacramento County Jail System. *First*, it is strongly recommended that SCSD and CHS officials look at options to better ensure reasonable sound privacy in the booking area when multiple nurses are conducting intake screening at the same time period. One option would be installation of interview booths similar in design to current visiting booths or attorney booths found that the RCCC. *Second*, it is strongly recommended that the current suicide risk inquiry contained on the current CHS "Medical Intake" form embedded in the E-Chart be revised to include the following:

- Have you ever attempted suicide?
- Have you ever considered suicide?
- Are you now or have you ever been treated for mental health or emotional problems?
- Have you recently experienced a significant loss (relationship, death of family member/close friend, job, etc.)?
- Has a family member/close friend ever attempted or committed suicide?
- Do you feel there is nothing to look forward to in the immediate future (inmate expressing helplessness and/or hopelessness)?
- Are you thinking of hurting and/or killing yourself?

Follow-up inquiry (e.g., when did you last attempt suicide? etc.) should be added to each of these questions in order to triage the appropriate level of mental health referral as determined by JPS (see below).

*Third*, it is strongly recommended that CHS officials initiate a continuous quality assurance plan to periodically audit the intake screening process to ensure that nursing staff are asking all questions to newly admitted detainees as required.

*Fourth*, regardless of the detainee's behavior or answers given during intake screening, a mental health referral should always be initiated based on documentation reflecting possible serious mental illness and/or suicidal behavior during an inmate's prior confinement within the Sacramento County Jail System.  As such, the "Problems and Conditions" screen of the E-Chart contains the Frequency of Service Scale (FOSS) for each inmate triage by JPS staff. If an inmate was placed on suicide precautions and housed anywhere within the jail system, they would be classified as a FOSS Level 1. Inmates receiving a FOSS Level 2 designation are those who were discharged from suicide precautions and in need of follow-up related to their serious mental illness. As such, the following procedures should be incorporated within both CHS and JPS policies:

- Any inmate placed on suicide precautions should be designated as either a FOSS Level 1 or FOSS Level 2 in the "Problems and Conditions" screen of the E-Chart by JPS staff;

- Nursing staff conducting intake screening should always review the detainee's "Problems and Conditions" screen of the E-Chart to verify whether they were previously confined in the SCSD and had any history of suicidal behavior/placement on suicide precautions during a prior confinement; and

- Regardless of the detainee's behavior or answers given during intake screening, further assessment by JPS staff should always be initiated based on

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

documentation reflecting possible serious mental illness and/or suicidal behavior during a detainee's prior confinement within the SCSD.

*Fifth*, it is strongly recommended that the current mental health triage practice of JPS responding to inmates expressing suicidal ideation within 4 hours as an "urgent" referral, and responding to all other mental health referrals within 6 days as "not urgent" or "routine" referrals be revised. Although there is no standard of care that consistently specifies time frames to respond to mental health referrals, one suggested schedule would be as follows: <u>Emergent</u> - now or within 4 hours; <u>Urgent</u> - within 24-48 hours; and <u>Routine</u> - within 7 days. In addition, JPS officials should develop a mental health triage policy that defines response levels, sets time constraints for each level, and defines the acuity of behavior(s) that dictates a specific response level. Of course, as currently practice within the SCSD, an inmate expressing current suicidal ideation and/or current suicidal/self-injurious behavior should result in an <u>emergent</u> JPS referral.

*Sixth*, given the strong association between inmate suicide and special management (e.g, disciplinary and/or administrative segregation, "total separation," etc.) housing unit placement, it is strongly recommended that medical personnel review the E-Chart to determine whether existing medical and/or mental health needs contraindicate the placement or require accommodation. In addition, a "best practice" would be that any inmate assigned to such a special management housing unit receive a brief assessment for suicide risk by nursing staff upon admission to such placement.

**3)    <u>Communication</u>**
**Procedures that enhance communication at three levels: 1) between the sending institution/arresting-transporting officer(s) and correctional staff; 2) between and among staff (including medical and mental health personnel); and 3) between staff and the suicidal inmate.**

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

Certain signs exhibited by the inmate can often foretell a possible suicide and, if detected and communicated to others, can prevent such an incident.  There are essentially three levels of communication in preventing inmate suicides: 1) between the sending institution/arresting-transporting officer and correctional staff; 2) between and among staff (including mental health and medical personnel); and 3) between staff and the suicidal inmate.  Further, because inmates can become suicidal at any point in their incarceration, correctional staff must maintain awareness, share information and make appropriate referrals to mental health and medical staff.

**FINDINGS:** Effective communication between correctional, medical, and mental health staff is not an issue that can be easily written as a policy directive, and is often dealt with more effectively through examples of multidisciplinary problem-solving.  Although on-site for only five days, this writer sensed that correctional, medical, and mental health personnel had a good working relationship. There were numerous examples of effective communication within the Sacramento County Jail System.  For example, as previously detailed in this report, arresting officers completed an "Intake Screening" form on each newly admitted detainee and provided a copy of the form to one of the CHS nurses assigned to the booking area. This form provided an excellent opportunity for arresting officers to communicate any medical, mental health, and suicide risk concerns to medical and/or custody staff. Further, the E-Chart was fully integrated and contained both medical and mental health records that better ensured the continuity of care and enhancing communication between health care staff. Mental health referrals for inmates identified as potentially suicidal were documented in a variety of ways, including on a "Special Needs" form by CHS nurses.  In addition, the SCSD's "Suicide Prevention Program" policy (No. 10/5) provided general procedures regarding the communication process for custody personnel referring potentially suicidal inmates

to JPS clinicians. In addition, although the JPS program director met with the CHS executive team twice a month, as well as met informally with the Main Jail commander on almost a daily basis, this writer was unaware of any regularly scheduled management meetings that included custody, medical staff, *and* mental health personnel. Further, the SCSD established an "inmate-patient care hotline" that was managed by CHS. Concerned parties, including family members, community providers, etc., could contact the hotline by e-mail, telephone, or SCSD website, and relay their health care concerns about specific inmates. JPS officials estimated that they received between 5 and 10 mental health referrals per week, most of a non-emergency nature. This was an excellent initiative. Finally, as explained in more detail later in this report, a Suicide Prevention Task Force had been re-established and met on at least a quarterly basis. The multidisciplinary committee included representation from the custody, CHS, and JPS.

**RECOMMENDATION**: Only one recommendation is offered. To the extent that a formalized meeting does not currently exist, it is strongly recommended that the SCSD establish regularly scheduled management meetings between custody, CHS, and JPS personnel. Such meetings, scheduled on either a weekly or bi-weekly basis, would provide an excellent opportunity for multidisciplinary problem-solving of difficult to manage inmate-patients, including suicidal inmates.

CONFIDENTAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

4)    **Housing**

> **Isolation should be avoided.  Whenever possible, house in general population, mental health unit, or medical infirmary, located in close proximity to staff.  Inmates should be housed in suicide-resistant, protrusion-free cells.  Removal of an inmate's clothing (excluding belts and shoelaces), as well as use of physical restraints (e.g. restraint chairs/boards, straitjackets, leather straps, etc.) and cancellation of routine privileges (showers, visits, telephone calls, recreation, etc.), should be avoided whenever possible, and only utilized as a last resort for periods in which the inmate is physically engaging in self-destructive behavior.**

In determining the most appropriate location to house a suicidal inmate, there is often the tendency for correctional officials in general to physically isolate the individual.  This response may be more convenient for staff, but it is detrimental to the inmate.  The use of isolation not only escalates the inmate's sense of alienation, but also further serves to remove the individual from proper staff supervision.  National correctional standards stress that, to every extent possible, suicidal inmates should be housed in the general population, mental health unit, or medical infirmary, located in close proximity to staff.

Of course, housing a suicidal inmate in a general population unit when their security level prohibits such assignment raises a difficult issue.  The result, of course, will be the assignment of the suicidal inmate to a housing unit commensurate with their security level.  Within a correctional system, this assignment might be a "special housing" unit, e.g., restrictive housing, disciplinary confinement, administrative segregation, etc. However, *the most important consideration is that suicidal inmates must be housed in suicide-resistant, protrusion-free cells*.  Further, cancellation of routine privileges (showers, visits, telephone calls, recreation, etc.), removal of clothing (excluding belts and shoelaces), as well as the use of physical restraints (e.g., restraint

chairs/boards, straitjackets, leather straps, etc.) should be avoided whenever possible, and only utilized as a last resort for periods in which the inmate is physically engaging in self-destructive behavior.  Housing assignments should not be based on decisions that heighten depersonalizing aspects of incarceration, but on the ability to maximize staff interaction with inmates.

**FINDINGS:** The SCSD's "Suicide Prevention Program" policy (No. 10/5) provided general procedures regarding the housing of suicidal inmates, whereas JPS's "Suicide Prevention Program" policy (No. 1049) provided little guidance on the issue.  JPS's "Suicide Precautions - Acute Inpatient Unit" (No. 1009) was limited to placement of suicidal inmates in the 2P-Unit. CHS's "Suicide Prevention 2M - Joint Policy" (No. 1412) provided general procedures regarding the housing of suicidal inmates in the Medical Housing Unit (2M-Unit).  SCSD's "Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding No. 2" policy (No. 4/05) provided general procedures regarding the placement of inmates, including those identified as suicidal, in various "temporary" housing locations. The term "temporary" was not otherwise defined in the policy.

In practice, this writer found that inmates identified as suicidal were placed in one or more of the following locations:

**Safety Cells**: There were 4 safety cells located at the Main Jail; 2 in the male booking area, 1 in the female booking area, 1 in the 2P-Unit; as well as 1 safety cell located at RCCC. All of these were padded, dry cells (i.e., not containing a sink or toilet). There were no bunks in the cells.

**Segregation Holding Cells**: There were 6 segregation holding cells at the Main Jail, 5 located in the male booking area and 1 located in the female booking area. All of these were wet cells (containing a sink and toilet). There was a small bench in each cell.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

**Multi-Purpose Rooms**: These rooms, commonly and hereafter referred to as "classrooms," were located on all of the housing floors. Approximately 10 classrooms were available to temporarily house suicidal inmates. These large, glass-enclosed areas, did not have beds, sinks, or toilets.

**North Holding Cell No. 2**: This holding cell was located at RCCC. It had a raised cement slab as a bunk, as well as a sink and toilet.

**2P-Acute In-Patient Unit**: This housing unit contained 18 beds (16 single cells and 1 double cell). All cells had bunks, sinks, and toilets.

With regard to suicide resistant, protrusion-free housing for suicidal inmates, this writer found that cells within the 2P-Unit were suicide-resistant, and did not contain any obvious protrusions that could be utilized by an inmate to attempt suicide by hanging. In fact, almost all cells within the Sacramento County Jail System, particularly the Main Jail, inspected by this writer did not contain many of the obvious protrusions (e.g., light fixtures, ventilation grates, clothing hooks, bunk holes, etc.) found in other comparably-sized correctional facilities. Of note, this writer's review of recent inmate suicides, as well as serious suicide attempts, within the Sacramento County Jail System found that very few incidents involved inmates who affixed a ligature to an obvious protrusion in their cell.[17]

With the exception of the 2P-Unit, housing suicidal inmates in *any* of the safety cells, segregation holding cells, and North Holding Cell beyond a few hours would be very problematic. These cells, particularly the dry cells, were not designed for long-term use. The classrooms were certainly not designed for inmate housing, and should never be utilized for the housing of suicidal

---

[17]This data stood in contrast to national research on inmate suicides indicating that the overwhelming majority (93%) of deaths were by hanging, with inmates utilizing protrusions such as light fixtures, cell doors, and ventilation grates, see Hayes, L.M. (2012), "National Study of Jail Suicides: 20 Years Later," *Journal of Correctional Health Care*, 18 (3).

inmates (for any duration). Yet, this writer observed that it was not uncommon for inmates to be housed under these conditions for well over 24 hours in the Main Jail.

While on-site, with the exception of the North Holding Cell at RCCC,[18] this writer observed inmates on suicide precautions in all of these locations. Although SCSD policy did not specifically prohibit allowing an inmate from retaining their clothing, in practice, all inmates were clothed only in a safety smock and provided a safety blanket. Inmates housed in the safety cells and classrooms were forced to sleep on the floor, and had to ask custody personnel to use a toilet outside the area. Inmates in all locations were not provided showers. They were locked down 24-hours a day under these conditions. Clinical assessments were provided cell-side, with the OPP clinician standing in the open doorway, the inmate sitting on a bench or floor, and an officer standing in the area.

Surprisingly, conditions for inmates housed on suicide precautions in the 2P-Unit were not appreciably better. Although each cell contained a bunk, sink, and toilet, most inmates were clothed only in a safety smock *even* after being discharged from suicide precautions and remaining on the unit. These inmates remained clothed only in their safety smocks even if they were allowed certain personal possessions. (This issue will be discussed in more detail in the next section). Although showers were said to be offered on a daily basis, 2P-Unit inmates were still locked down more than 23 hours a day. Since September 2016 when a second officer was assigned to the 2P-Unit post, inmates were offered up to 30 minutes of dayroom time per day. (Prior to that, out-of-

---

[18]It should be noted that RCCC's North Holding Cell No. 2 was utilized infrequently for suicide precautions, and the current practice was for RCCC inmates to be transferred to the Main Jail within an hour or two of being identified as suicidal.

cell dayroom time was offered only on a periodic basis.) Telephone and visiting privileges were prohibited. Clinical assessments were also conducted cell-side. A recreational therapist was available to 2P-Unit inmates once a week, but their services were limited to the cell-side provision of reading material. Group treatment services were not available. Although most, if not all, of these prohibitions were not articulated in policy, they were in practice.

In many ways, the conditions for all inmates placed on suicide precaution were harsher than for those on segregation status, and it would be this writer's opinion that current management of inmates placed on suicide precautions within the Sacramento County Jail System was generally overly restrictive and seemingly punitive. Confining a suicidal inmate to their cell for up to 24 hours a day only enhances isolation and is anti-therapeutic.  Under these conditions, it is also difficult, if not impossible, to accurately gauge the source of an inmate's suicidal ideation.  Take, for example, the scenario of a clinician interviewing an inmate on suicide precautions.  The inmate has been in the cell or classroom for a day or two, clothed only in a safety smock.  The clinician approaches the inmate cell-side and asks:  "Are you suicidal?"  Given the circumstances he or she finds themselves in, the likelihood of an inmate answering affirmatively to that question, the result of which will be his continued placement under these conditions, is highly questionable.

Recent research suggests that suicidal inmates are often reluctant to discuss their suicidal thoughts because of the likelihood of being exposed to the harsh conditions of suicide precautions, with almost 75 percent of inmates reporting that they did not want to be transferred to an observation cell.  According to the authors:

> "Possible reasons inmates dislike observation cells are numerous. For GP patients
> they can suffer taunting from other inmates with the identification of being in a

mental health crisis after they return from the OB (observation). Further, an inmate-patient is removed from his more familiar surroundings of a single cell with his books, writing material, and own clothes, and his normal routine of recreation and work assignment. In the OB he often can no longer wear his clothes, and books and recreation are limited. In an OB cell a patient often is dressed in a special gown and the room may only contain a special mattress. Privacy is limited, since often all four sides of the OB are available for observation whereas in his own cell only one side is open for observation. Finally, admission in an OB can create anxiety and fear for the patient as it may be an unknown environment, and because the OB is the place the psychiatrists decide if patient is to be involuntarily transferred to the distant inpatient unit."[19]

Many SCSD and JPS officials informed this writer that the conditions of suicide precautions were not intentionally punitive, but driven by concern for the safety of the inmate. The commitment to safety was not being challenged here.  Safety of the inmate is, of course, of utmost concern when developing a suicide prevention policy.  But the number and types of restrictions (e.g., overreliance on safety smocks, denying visitation and telephone privileges, etc.) imposed in the name of safety must be reasonable and commensurate with the inmate's level of suicide risk. Officials might also have argued (although they did not to this writer) that the rationale for these restrictions was that suicidal inmates were unpredictable and bad news received during a family visit or telephone call might trigger suicidal ideation and result in an increased risk for suicide. This rationale, however, ignores the obvious  --  what better opportunity was there to observe an inmate's reaction to potentially negative news then when they were on suicide precautions, as well as the fact that interaction with the outside world can be therapeutic and reduce isolation  --  a leading cause of suicidal behavior.   Staff might also have argued (although they did not to this writer) that most inmates who were mentally ill and on suicide precautions were so debilitated by their illness that "they did not care" how they were treated (i.e., the withholding of basic

---

[19]See Way, B., Kaufman, A., Knoll, J., and Chlebowski, S. (2013), "Suicidal Ideation Among Inmate-Patients in State Prison: Prevalence, Reluctance to Report, and Treatment Preferences," *Behavioral Sciences and the Law*, 30: 230-238.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

privileges). Of course, this assumption was not only unsupported but ignored the real possibility that these measures were contributing to an inmate's debilitating mental illness.

Further, some might also argue that these highly restrictive measures were effective in managing those inmates suspected as being manipulative or malingering. As should be discussed during suicide prevention training workshops, although distinguishable, manipulative behavior and suicidal behavior were not mutually exclusive. Both types of behavior could occur (or overlap) in the same individual and cause serious injury and death. Several studies of self-harm and suicide in the correctional environment have found "substantial co-existence of manipulative motive with both suicidal intent and potentially high lethality of self-harming behavior." As one observer has stated, "There are no reliable bases upon which we can differentiate 'manipulative' suicide attempts posing no threat to the inmate's life from those 'true, non-manipulative' attempts which may end in death. The term 'manipulative' is simply useless in understanding, and destructive in attempting to manage, the suicidal behavior of inmates (or of anybody else). Self-harm is often a complex, multifaceted behavior, rather than simply manipulative behavior motivated by secondary gain. At a minimum, any inmate who would go to the extreme of threatening suicide or engaging in self-harming behavior is suffering from at least an emotional imbalance that requires special attention. They may also be seriously mentally ill. Simply stated, inmates labeled as manipulative still commit suicide.

Finally, it is very important to note that SCSD officials were currently in the planning stages for conversion and renovation of the "300 Pod" of the 3-West Unit. This unit currently housed OPP inmates. Preliminary plans were for 20 lower tier cells in the unit to be utilized for

supplemental housing for inmates on suicide precautions and/or as step-down from 2P-Unit discharge. This writer inspected the housing unit and found that, with a few exceptions, it was mostly suicide-resistant and protrusion-free.  Based upon this writer's recommendations, the following fixtures were to be removed from each of these 20 lower tier cells: upper bunk, table, hook on left side of sink, and anti-squirt slit in faucet. In addition, approximately four corner cells in the unit should not be utilized for suicide precaution because of their unique design that included a blind spot which obscured visibility into the cells. Of note, there were also plans to convert the classroom on the 3-West Unit into office space for OPP clinicians. These recent initiatives were very commendable.

**RECOMMENDATIONS:** The following recommendations are offered to improve the housing and management of inmates on suicide precautions within the Sacramento County Jail System. *First*, this writer strongly supports the SCSD decision to convert and renovate the "300 Pod" of the 3-West Unit for supplemental housing of inmates on suicide precautions and/or as step-down from 2P-Unit discharge, as well as conversion of the classroom on the 3-West Unit into office space for OPP clinicians. As noted above, it is strongly recommended that the following fixtures be removed from each of the 20 lower tier cells: upper bunk, table, hook on left side of sink, and anti-squirt slit in faucet. In addition, approximately four corner cells in the unit should not be utilized for suicide precaution because of their unique design that includes a blind spot which obscures visibility into the cells. *Second*, this writer was informed that the SCSD is embarking on new construction project at the RCCC that will include the possibility of temporary housing for suicidal inmates. As such, it is strongly recommended that this writer's "Checklist for

the 'Suicide-Resistant' Design of Correctional Facilities," included as Appendix A of this report, be utilized as a guideline.

*Third*, it is strongly recommended that, as soon as the newly renovated "300 Pod" of the 3-West Unit is activated, SCSD officials issue a memorandum that: 1) strictly prohibits the use of any multi-purpose room or "classroom" for the housing of inmates for any duration of time, and 2) strictly limits the use of safety cells, segregation holding cells, or other holding cells for the housing of suicidal inmates of up to four (4) hours. In addition, SCSD, CHS, and JPS policy should be revised accordingly.

*Fourth*, it is strongly recommended that JPS officials instruct their clinical staff on the appropriate use of safety smocks, i.e., they should not be utilized as a default, and not to be used as a tool in a behavior management plan (i.e., to punish and/or attempt to change perceived manipulative behavior).  Rather, safety smocks should only be utilized when a clinician believes that the inmate is at high risk for suicide by hanging. Should an inmate be placed in a safety smock, the goal should be to return full clothing to the inmate prior to their discharge from suicide precautions. Finally, custody personnel should *never* place an inmate in a safety smock unless it had been previously approved by medical and/or mental health personnel.

*Fifth*, current SCSD and JPS suicide prevention policies do not address procedures for deciding which possessions and privileges were provided to inmates on suicide precautions. As such, it is strongly recommended that policies be revised to include the following requirements:

- All decisions regarding the removal of an inmate's clothing, bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and privileges shall be

commensurate with the level of suicide risk *as determined on a case-by-case basis by JPS staff and as documented in the E-Chart*;

- If JPS staff determine that an inmate's clothing needs to be removed for reasons of safety, the inmate shall always be issued a safety smock and safety blanket;

- A mattress shall be issued to all inmates on suicide precautions unless the inmate utilizes the mattress in ways in which it was not intended (i.e., attempting to tamper with/destroy, utilizes to obstruct visibility into the cell, etc.);

- All inmates on suicide precautions shall be allowed all routine privileges (e.g., family visits, telephone calls, recreation, etc.), unless the inmate has lost those privileges as a result of a disciplinary sanction; and

- Inmates on suicide precautions shall not automatically be locked down.  They should be allowed dayroom and/or out-of-cell access commensurate with their security level and clinical judgment of JPS staff.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

## 5)  Levels of Supervision/Management

**Two levels of supervision are generally recommended for suicidal inmates -- *close observation* and *constant observation*. *Close Observation* is reserved for the inmate who is not actively suicidal, but expresses suicidal ideation and/or has a recent prior history of self-destructive behavior.  In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury, should be placed under close observation. This inmate should be observed by staff at staggered intervals not to exceed every 10-15 minutes. *Constant Observation* is reserved for the inmate who is actively suicidal, either by threatening or engaging in self-injury.  This inmate should be observed by a staff member on a continuous, uninterrupted basis.  Other supervision aids (e.g., closed circuit television, inmate companions/watchers, etc.) can be utilized as a supplement to, but never as a substitute for, these observation levels. Inmates on suicide precautions should be reassessed on a daily basis.**

Experience has shown that prompt, effective emergency medical service can save lives. Research indicates that the overwhelming majority of suicide attempts in custody is by hanging.[20] Medical experts warn that brain damage from asphyxiation can occur within four minutes, with death often resulting within five to six minutes.  In inmate suicide attempts, the promptness of the response is often driven by the level of supervision afforded the inmate.  Both the ACA and NCCHC standards address *levels of supervision*, although the degree of specificity varies.  ACA Standard 4-ALDF-2A-52 vaguely requires that "suicidal inmates are under continuous observation," while NCCHC Standard J-G-05 requires physical observation ranging from "constant supervision" to "every 15 minutes or more frequently if necessary."  According to the Suicide Prevention and Intervention Standard from the U.S. Department of Homeland Security's *Operations Manual ICE Performance-Based National Detention Standards*, "Suicidal detainees will

---

[20]Hayes, L.M. (2010), "National Study of Jail Suicides: 20 Years Later," *Journal of Correctional Health Care*, 18 (3).

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

be monitored by the assigned security officers who maintain constant one-on-one visual observation, 24 hours a day, until the detainee is released from suicide watch. The assigned security officer makes notations every 15 minutes on the behavioral observation checklist."

In addition, the component of "Levels of Supervision" encompasses the overall management of the inmate on suicide precautions and includes the appropriate level of observation, timely and comprehensive suicide risk assessments, downgrading the level of observation following a period of stability, and providing periodic follow-up assessments following discharge from suicide precautions based upon an individualized treatment plan.

**FINDINGS:** The SCSD's "Suicide Prevention Program" policy (No. 10/5) provided limited guidance regarding the observation of suicidal inmates, simply stating that custody personnel were required to provide direct visual observation of suicidal inmates "at least twice every thirty (30) minutes." JPS's "Suicide Precautions - Acute Inpatient Unit" (No. 1009) outlined the following two levels of observation for suicidal inmates:

> **Suicide Risk: 15-Minute Checks**: This level of observation is required for inmates who have been determined to be a moderate suicide risk. "An example of an inmate-patient requiring 15-minute checks should be an inmate-patient expressing suicidal ideation with some ambiguity and either no plan or a poorly formed plan."

> **High Suicide Risk: Camera Monitoring**: This level of observation is required for inmates who have been "determined to be a high risk, are actively suicidal, and require constant observation by nursing staff.  One nursing staff will remain in the nurse's station all times and is responsible for camera monitoring." These inmates could also be on 15-minute checks. The type(s) of behavior exemplifying high-risk behavior was not defined in the JPS policy.

In addition, according to the JPS policy, "in atypical cases, and in conjunction with camera monitoring, some inmates may require 1:1 staffing," which resulted in a staff person sitting outside the cell and maintaining constant observation.

In practice, although the SCSD policy was vaguely written to require observation "at least twice every thirty (30) minutes," meaning an officer could conceivably conduct two checks within 10 minutes and then leave the inmate unobserved for the remaining 20 minutes, this writer found that the vast majority of inmates placed on suicide precautions were observed at approximate 15-minute intervals. Within the 2P-Unit, safety and holding cells, staff was required to walk up to, and look through, the cell door every 15 minutes to verify the well-being of inmate on "suicide risk" status. When suicidal inmates were placed in the "classroom," observation was performed from the officer's control station. This type of observation was problematic because the control stations were enclosed, situated approximately 20-30 yards away from classrooms, and there was limited ability for interaction between custody staff and the inmate because cell-side checks were not required.

Although used infrequently within the 2P-Unit, this writer did observe closed-circuit television monitoring (CCTV) being observed as the primary level of observation for a few "high risk" suicidal inmates during the on-site visit. This practice can be very problematic. The use of CCTV as an alternative to staff observation is not supported by national correctional standards, and this writer has written about its potential danger in the aforementioned suicide prevention training manual:

> "Utilized primarily as an alternative to assigning staff to the suicidal inmate, closed circuit television (CCTV) is a popular, yet deadly form of supervision. Within the

area of jail suicide, there are numerous examples of inmates committing suicide in full view of CCTV equipment. Although facilities that utilize CCTV often limit the number of hours that any one staff member can view a monitor, it is not unusual for staff to suffer from "monitor hypnosis" or burnout during their assignment. Other serious problems include fuzzy or distorted CCTV reception, equipment breakdowns, and staff being distracted from monitor viewing by other responsibilities….

Reminder: Despite its intended use, CCTV does not prevent a suicide, it only records a suicide attempt in progress. In fact, the mere presence of CCTV may encourage suicidal or other acting-out behavior, particularly from inmates you believe to be manipulative. If utilized, most experts agree that CCTV should be used only as a *supplement* (not as a substitute) for staff observation, and a staff member should not be assigned to view a monitor for more than one hour without being relieved by other staff."[21]

Based upon the observations of this writer, as well as conversations with JPS officials and staff, as well as review of several medical charts, current practices within the Sacramento County Jail System were that inmates on suicide precautions were seen *daily* by JPS clinicians. Inmate-patients on suicide precautions in 2P-Unit were assessed by psychiatrists and/or a psychiatric nurse practitioner.[22] Inmates on suicide precautions in housing units outside of the 2P-Unit were assessed by OPP clinicians. As observed by this writer, inmates on suicide precautions in both the 2P-Unit and elsewhere were seen cell-side, thus adversely affecting both privacy and confidentiality.

The standard of care requires that documentation of a comprehensive assessment of suicide risk includes sufficient description of the current behavior and justification for either placement on, or discharge from, suicide precautions. For example, the assessment should include a brief mental status examination (MSE), listing of chronic and acute risk factors (including prior history

---

[21]Hayes, L. (2016), *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities*, Mansfield, MA: National Center on Institutions and Alternatives.
[22]In addition, three board eligible forensic psychiatric fellows from the University of California-Davis , School of Medicine, Department of Psychiatry and Behavioral Sciences, assisted in both the 2P-Unit and OPP.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

of suicidal behavior), listing of any protective factors, level of suicide risk (e.g., low, medium, or high), and a treatment plan.[23]   According to national correctional standards, a mental health clinician should develop a "treatment plan" for an inmate discharged from suicide precautions that "describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur" (see NCCHC, 2014).

Within the Sacramento County Jail System, a JPS "Clinical Assessment" form was utilized to document suicide risk evaluations. The form, embedded into the E-Chart, contained four main sections: mental health history, mental status exam, suicide assessment, and case disposition. The suicide assessment section was very comprehensive and included inquiry regarding: evidence of suicidal ideation; suicide attempts; last reported attempt; lethality of last attempt; consequence of last attempt; reported level of suicidal intent; primary method of planned suicide; inmate's report of a suicide plan; reasons, meaning and social context of past attempts; incarceration factors related to suicidality; current suicide risk factors; protective factors; narrative explaining explanation of positive findings; and treatment plan.

This writer's chart review found that OPP clinicians documented their suicide risk assessment findings on the JPS Clinical Assessment form, but psychiatry staff in the 2P-Unit documented their findings as a progress note (albeit infrequently) and Physician Orders form. The reason why psychiatry staff were not required to complete a Clinical Assessment form was unclear.

---

[23]See American Psychiatric Association (2003), "Practice Guideline for the Assessment and Treatment of Patients with Suicidal Behaviors," *American Journal of Psychiatry*, (160) 11: 1-60 (Supplement).

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

Finally, current SCSD and JPS policies did not require a specific frequency for follow-up by mental health staff following an inmate's discharge from suicide precautions [although JPS had a Frequency of Service Scale (FOSS) protocol that required inmates discharged from suicide precautions to be seen again by a clinician "within one month or sooner if clinically indicated." As explained later in this section, such a frequency of follow-up far exceeded the standard of care.

This writer reviewed the charts of several inmates who were placed on, and subsequently discharged from, suicide precautions. Without critiquing the clinical judgment utilized by any JPS clinician, this writer found that although almost all inmates were seen on a regular basis by a clinician as required, most of the reviewed charts included documentation that: 1) did not provide a sufficient description of the current behavior and justification for discharge from suicide precautions on the 2P-Unit (other than the inmate's denial of suicidal ideation), 2) included orders for continued issuance of a "safety smock" despite the fact that the inmate was cleared from suicide precautions, 3) included orders for follow-up that were often inconsistent with the FOSS scale, and 4) did not provide a viable treatment plan for reducing future suicidal ideation. The following case summaries were illustrative of the problem:

- In **Case No. 2**, the inmate was admitted into the Main Jail on May 30, 2016. He had a history of Schizophrenia and Bipolar Disorder and was subsequently seen by JPS clinicians periodically based upon custody referrals for delusional behavior. On July 25, 2016, the inmate was observed smearing food and feces on the walls of his cell. He had begun refusing psychotropic medications. The inmate was placed on the 2P-Unit for grave disability, but allowed to have his own clothing and observed at 30-minute intervals. His behavior stabilized and he was discharged from the 2P-Unit several days later on July 31 (although the psychiatric note authorizing the discharge was not written until 12 days later on August 12). The note stated: "T-Sep. per custody, JPS out-patient to follow in the clinic, readmit if criteria present."

During the month of August, the inmate was seen several times by both OPP clinicians and a psychiatrist based upon referrals from custody staff for depression and failure to follow directives. He continued to refuse medication, but did not meet the 2P-Unit admission criteria for grave disability. Finally, on September 9, the inmate was seen again by a psychiatrist and consented to initiate psychotropic medication.

On September 16, the inmate was referred to JPS by custody staff based upon suicidal ideation and grave disability. When assessed by an OPP clinician that morning, he was clothed in a safety smock in a segregation cell located in the booking area. A "Clinical Assessment" form was completed, which included a suicide risk assessment. The inmate continued to voice suicidal ideation without a plan. He was maintained on suicide precautions in the segregation cell and placed on the waitlist for the 2P-Unit. The inmate remained in the segregation cell for several days and was seen daily by an OPP clinician. On September 19, he was admitted into the 2P-Unit, and remained in a safety smock with a requirement for observation at 15-minute intervals. The following day (September 20), psychiatric and nursing notes stated that the inmate was downgraded to 30-minute checks and remained in the safety smock. There was no justification in the notes as to why the inmate was being discharged from suicide precautions.

A separate "Nursing Problem List/Care Plan" dated September 20 stated: "Problem 1 - Alteration in thought process and/or disorganized behavior related to psychosis or cognitive impairment; Problem 2 - Potential for self-directed violence related to suicidal ideation, gestures or behavior."

Nursing notes dated September 21 and 22 did not address any goals or strategies to address the two problem areas, and a psychiatric note dated September 21 simply continued an order for 30-minute checks and a safety smock. As of September 22, the inmate remained on the 2P-Unit on 30-minute checks and clothed in a safety smock.

In **sum**, there was no justification in the notes as to why the inmate was being discharged from suicide precautions on September 20, nor a reasonably articulated treatment plan. The inmate was not deemed a suicide risk, but continued to be clothed in a safety smock.

- In **Case No. 3**, the inmate was booked into the Main Jail on September 17, 2016. He was intoxicated and expressed suicidal ideation, both currently and within the past two weeks. He was placed on suicide precautions by custody personnel and when assessed by an OPP clinician the following morning (September 18), he was clothed in a safety smock in a segregation cell located in the booking area. A suicide risk assessment was completed that indicated that the inmate had been receiving psychiatric treatment and psychotropic medication for several years, and had previously attempted

suicide in 2015 by overdose. He continued to express suicidal ideation without a plan, and appeared hopeless. Suicide precautions were continued and the inmate was placed on the 2P-Unit waitlist. The following day (September 19), the inmate was seen again by an OPP clinician in the segregation cell and denied suicidal ideation, stating "I'm better." The clinician later consulted with a psychiatrist and the inmate was discharged from suicide precautions. The treatment plan section of the clinical assessment form stated: "1) Custody advised patient cleared, 2) Clinic, 3) FOSS III."

In **sum**, there was no documentation in the clinical assessment of September 19 to indicate why the inmate was no longer suicidal, there was no treatment plan, and an order for FOSS III (i.e., follow-up within 90 days) greatly exceeded the established protocol of 30-day follow-up for inmates discharged from suicide precautions.

- In **Case No. 4**, the inmate was readmitted into the Main Jail on June 30, 2016 and reported a prior history of psychiatric treatment, but denied any current suicidal ideation. (Unbeknownst to nursing staff at intake, the inmate had previously been housed in the 2P-Unit from January through April 2016 for suicidal ideation.) Approximately 10 days later on July 10, he expressed suicidal ideation with a plan to hang himself and was placed on suicide precautions in a classroom by custody personnel. The following day (July 11), an OPP clinician completed a suicide risk assessment and the inmate continued to express suicidal ideation. He was maintained on suicide precautions and placed on the 2P-Unit waitlist. The inmate was seen daily by an OPP clinician in the classroom and, based upon a suicide risk assessment completed on July 14, was initially cleared from suicide precautions with the following treatment plan: "Cleared by JPS, JPS PRN, FOSS III."

The inmate, however, continued to express suicidal ideation and remained on suicide precautions in the classroom from July 15 through July 19. On July 20, the inmate attempted to asphyxiate himself by tying a plastic bag around his neck. He was subsequently transferred to the 2M-Unit on suicide precautions. Two days later on July 20, he was observed to be banging his head against the cell walls and screaming. The following day (July 23), another suicide risk assessment was completed and the inmate denying any current suicidal ideation. He was discharged from suicide precautions with the following treatment plan: "Client scheduled for clinic. JPS welfare check schedule, FOSS II."

A few weeks later on August 17, a psychiatric note indicated that the inmate was readmitted into the 2P-Unit for suicidal ideation. The following day (August 18), another psychiatric note indicated that suicide precautions

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

were discontinued, with the inmate placed on 30-minute checks and clothed in a safety smock.

The inmate apparently remained in the 2P-Unit until September 13 when he was discharged. The following day (September 14), however, he again threatened suicide and was referred to JPS. An OPP clinician completed a suicide risk assessment and he was placed back onto suicide precautions in a classroom. He was seen daily by an OPP clinician from September 15 thru 19. The following day (September 20), the inmate was admitted into the 2P-Unit with a Physician Order, but no psychiatric note. He remained in a safety smock and required to be observed at 15-minute intervals. The following day (September 21), a Physician Order stated that inmate was discharged from suicide precautions and placed on 30-minute observation in a smock. There was no psychiatric note.

A "Nursing Problem List/Care Plan," also dated September 21, listed the following treatment plan: "Problem 1 - Potential for self-directed violence related to suicidal ideation, gestures or behavior." The Plan did not address any goals or strategies to address the problem. Another nursing note dated September 21 stated "encourage patient to use coping skills," but did not identify any coping skills. The following day (September 22), a nursing note quoted the inmate as stating "I think I am suicidal." Despite this self-reported suicidal ideation, the inmate remained on 30-minute observation in a smock.

In **sum**, the intake nurse on June 30, 2016 did not access the E-Chart to determine that the inmate had previously been housed in the 2P-Unit several months earlier. The inmate had several suicide risk assessments completed by OPP clinicians, but none by psychiatric staff when housed in the 2P-Unit. Several Physician Orders were completed without psychiatric notes justifying the orders. The inmate was inappropriately given a FOSS III follow-up after discharge from the 2P-Unit on July 14. On September 22, the inmate apparently expressed suicidal ideation to a nurse, but remained on 30-minute observation. At times when the inmate was not deemed to be suicidal, he remained close in a safety smock. There was no treatment planning.

- In **Case No. 5**, the inmate was readmitted into the Main Jail on August 23, 2016 and reported mental health treatment, psychotropic medications, current suicidal ideation, as well as ideation for the past two weeks. (The E-Chart documented his prior suicidal ideation in the Main Jail during June 2012 that was not noted on the intake screening form.) The inmate was placed on suicide precautions and placed in a segregation cell within the booking area. The next day (August 24), an OPP clinician completed a suicide risk assessment and he was given an initial diagnosis of "Rule-Out Schizophrenia and Other Psychotic Disorder." The inmate self-reported

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

four prior suicide attempts of low lethality within the last month. The assessment noted that "at present, client is unable to reliably contract for safety." Suicide precautions were continued and the inmate was placed on the 2P-Unit waitlist. He was seen the following day and then on August 26, and OPP clinician completed another suicide risk assessment. The inmate denied any current suicidal ideation and, following consultation with a psychiatrist, was discharged from suicide precautions. The treatment plan stated: "reviewed safety protocols, cleared, refer to clinic, FOSS III."

A few weeks later on September 15, the inmate expressed suicidal ideation to custody personnel, placed on suicide precautions in a classroom, and referred to JPS. The following day (September 16), and OPP clinician completed another suicide risk assessment, with the inmate continuing to express suicidal ideation. He remained on suicide precautions in a classroom and was placed on the 2P-Unit waitlist. OPP clinical notes dated September 17 and 18 stated that the inmate continued to meet the criteria for a 2P-Unit based upon continued suicidal ideation, with the inmate stating that he has a "a lot of things going on." On September 19, the inmate was admitted to the 2P-Unit with a Physician Order for suicide precautions at 15-minute intervals and a safety smock. A "Nursing Problem List/Care Plan," also dated September 19, listed the following treatment plan: "Problem 1 - Potential for self-directed violence as evidenced by history of suicide attempts, feeling depressed, missing family." The Plan did not address any goals or strategies to address the problem. The following day (September 20), a Physician Order discontinued the suicide precautions and placed the inmate on 30-minute observations in a safety smock. There was no psychiatric note to justify the decision. Subsequent physician orders dated September 21 and 22 stated that the inmate would remain in a safety smock on 30-minute observation.

In **sum**, the treatment plans on both August 26 and September 19 did not contain any goals or strategies to address the identified problem areas problem. A FOSS III follow-up was inappropriately ordered on August 26 by the OPP clinician. There was no documentation to justify the inmate's discharge from suicide precautions on September 20, and the inmate remained in a safety smock after being discharged from suicide precautions.

As indicated above, this writer observed that many, but not all, inmates placed in the 2P-Unit were clothed in safety smocks despite the fact that they were on 30-minute observation. This was an apparent contradiction in orders because safety smocks should be utilized for inmates that are assessed as suicidal, while 30-minute observation should be utilized for inmates that are assessed as *not* suicidal. This writer also observed other questionable practices on the 2P-Unit. For

example, observation forms to document the frequency of checks at either 15- or 30-minute intervals were kept on a clipboard in the Nurse's Office, rather than on the cell doors of each inmate. Although not observed by this writer, such a practice created the possibility that nursing staff would document the checks as having occurred without leaving the Nurse's Office and observing each inmate cell-side. In addition, as previously noted, although used infrequently, this writer did observe CCTV being observed as the primary level of observation for a few "high risk" suicidal inmates within the 2P-Unit, and psychiatrists frequently ordered CCTV observation as a supplemental measure for lower risk inmates. Further, all inmates who were admitted to the 2P-Unit remained in safety smocks throughout their stay, even if Physician Orders granted them other personal possessions. Although inmates were offered showers on a daily basis, use of the day room was limited to approximately 30 minutes each day per inmate.[24] Although not addressed in any SCSD or JPS policy, inmates were prohibited by practice from making telephone calls and having visits.

**RECOMMENDATIONS:**   This writer would offer several recommendations to strengthen the observation and management of inmates identified as suicidal and/or exhibiting self-injurious behavior within the Sacramento County Jail System.   *First*, it is strongly recommended that both the SCSD and JPS suicide prevention policies be revised to include two levels of observation that specify descriptions of behavior warranting each level of observation. A proposed revision is offered as follows:

> ***Close Observation*** is reserved for the inmate who is not actively suicidal, but expresses suicidal ideation and/or has a recent prior history of self-destructive behavior and would be considered a low

---

[24]According to 2P-Unit custody personnel, an inmate's access to the dayroom on a daily basis was only a recent occurrence due to the posting of two deputies during the day shift. Previously, when only one deputy was assigned to the Unit, inmates were only offered 30-minute dayroom "a couple times per week."

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

risk for suicide. In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury, should be placed under close observation. This inmate should be observed by staff at staggered intervals not to exceed every 10-15 minutes, and should be documented as it occurs.

**Constant Observation** is reserved for the inmate who is actively suicidal, either by threatening or engaging in self-injury, *and* considered a high risk for suicide. This inmate should be observed by an assigned staff member on a continuous, uninterrupted basis. The observation should be documented at 15-minute intervals.

*Second*, it is strongly recommended that CCTV be utilized only as a supplement to, and not a replacement for, the personal observation of high risk suicidal inmates. As such, any inmate considered "high risk" as defined by current JPS policy should be assigned a staff member who would be physically stationed outside the inmate's cell to provide continuous, uninterrupted observation.

*Third*, it is strongly recommended that the SCSD replace the narrative of "twice every 30 minutes" currently contained within its policies with "staggered intervals that do not exceed 10-15 minutes."

*Fourth*, it is strongly recommended that all OPP and *psychiatric* staff complete a "Clinical Assessment" form (which includes the suicide risk assessment) each time they are downgrading and/or discharging an inmate from suicide precautions in the 2P-Unit or 3-West Unit. As such, all JPS clinicians should complete the "Clinical Assessment" form at least twice, i.e., for initiation of suicide precautions, as well as justification for discharging the inmate from suicide precautions.

*Fifth*, it is strongly recommended that completion of the Clinical Assessment, as well as other clinical encounters, should occur in a private setting and not cell-side unless the inmate refuses a private interview. Refusal of a private interview should be documented in the E-Chart.

*Sixth*, it is the strongly recommended that an inmate should never be clothed in a safety smock if they are being observed at 30-minute observations. If a JPS clinician believes that an inmate's behavior necessitates a safety smock, they should be on suicide precautions. If a JPS clinician believes that 30-minute observations are warranted, then the inmate is not suicidal and should have their full clothing and possessions.

*Seventh*, it is strongly recommended that, consistent with NCCHC and other national correctional standards, JPS clinician(s) develop treatment plans for inmates discharged from suicide precautions that "describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur" (see NCCHC, 2014).

*Eighth*, it is strongly recommended that, in order to safeguard the continuity of care for suicidal inmates, all inmates discharged from suicide precautions should remain on mental health caseloads and receive regularly scheduled follow-up assessments by JPS clinicians until their release from custody.  JPS's current follow-up schedule for inmates released from suicide precautions of "within 30 days" is well below the standard of care. As such, unless an inmate's individual circumstances directs otherwise (e.g., an inmate inappropriately placed on suicide precautions by non-mental health staff and released less than 24 hours later following an

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

assessment), it is recommended that the FOSS II scale for inmates discharged from suicide precautions be dramatically revised as follows:  follow-up within 24 hours, again within 72 hours, again within 1 week, and then periodically until release from custody.

*Ninth*, given the strong association between inmate suicide and segregation placement (e.g., 2 of 3 of the most recent inmate suicides were on "total separation" status the time of their deaths), it is strongly recommended that custody personnel increase their rounds of such housing units from 60-minute to 30-minute intervals. In addition, a "best practice" would also be for nursing staff to conduct one daily round each day of all cells in these segregation units while they are dispensing medication, as well as for OPP clinicians to conduct weekly rounds in these units.

CONFIDENTAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

6)      **Intervention**

> **A facility's policy regarding intervention should be threefold: 1)
> all staff who come into contact with inmates should be trained
> in standard first aid and cardiopulmonary resuscitation (CPR);
> 2) any staff member who discovers an inmate attempting suicide
> should immediately respond, survey the scene to ensure the
> emergency is genuine, alert other staff to call for medical
> personnel, and begin standard first aid and/or CPR; and 3) staff
> should never presume that the inmate is dead, but rather initiate
> and continue appropriate life-saving measures until relieved by
> arriving medical personnel.   In addition, all housing units
> should contain a first aid kit, pocket mask or mouth shield,
> Ambu bag, and rescue tool (to quickly cut through fibrous
> material).  All staff should be trained in the use of the emergency
> equipment.  Finally, in an effort to ensure an efficient emergency
> response to suicide attempts, "mock drills" should be
> incorporated into both initial and refresher training for all staff.**

Following a suicide attempt, the degree and promptness of intervention provided by staff

often foretells whether the victim will survive.   Although both ACA and NCCHC standards

address the issue of intervention, neither are elaborative in offering specific protocols.   For

example, ACA Standard 4-ALDF-4D-08 requires that -- "Correctional and health care personnel

are trained to respond to health-related situations within a four-minute response time.  The training

program...includes the following: recognition of signs and symptoms, and knowledge of action

required in potential emergency situations; administration of basic first aid and certification in

cardiopulmonary resuscitation (CPR)..."   NCCHC Standard J-G-05 states  -- "Intervention: There

are procedures addressing how to handle a suicide attempt in progress, including appropriate first-

aid measures."


**FINDINGS:** The SCSD's "Suicide Prevention Program" policy (No. 10/5) provided an

adequate description of the proper emergency response from custody personnel to a suicide

attempt.  In addition, first aid kits were located in all housing units toured by this writer.  Each kit

contained a cut-down tool (utilized to quickly cut through fibrous material) and CPR mask.  In addition, automated external defibrillators (AEDs) were found in various locations in both the Main Jail and RCCC. According to recent training data reviewed by this writer, approximately 100 percent of both custody and nursing personnel were currently certified in cardiopulmonary resuscitation (CPR) and AED. This writer's review of investigative files for the three (3) inmate suicides between 2014 and 2016, as well as a serious suicide attempt in October 2016, found that proper emergency responses were found in each case.

**RECOMMENDATIONS:** None

**7)**   **Reporting**

**In the event of a suicide attempt or suicide, all appropriate correctional officials should be notified through the chain of command.  Following the incident, the victim's family should be immediately notified, as well as appropriate outside authorities. All staff who came into contact with the victim prior to the incident should be required to submit a statement as to their full knowledge of the inmate and incident.**

**FINDINGS**: This writer's review of investigative reports and other documentation from the three (3) inmate suicides between 2014 and 2016, as well as the serious suicide attempt in October 2016, found that all reporting requirements appeared to have been appropriately followed.

**RECOMMENDATIONS**: None

CONFIDENTAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

**8)**   **Follow-up/Mortality-Morbidity Review**

**Every completed suicide, as well as serious suicide attempt (i.e., requiring hospitalization), should be examined by a morbidity-mortality review. (If resources permit, clinical review through a psychological autopsy is also recommended.)   The review, separate and apart from other formal investigations that may be required to determine the cause of death, should include: 1) review of the circumstances surrounding the incident; 2) review of procedures relevant to the incident; 3) review of all relevant training received by involved staff; 4) review of pertinent medical and mental health services/reports involving the victim; 5) review of any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt; and 6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. Further, all staff involved in the incident should be offered critical incident stress debriefing.**

Experience has demonstrated that many correctional systems have reduced the likelihood of future suicides by critically reviewing the circumstances surrounding incidents as they occur. While all deaths are investigated either internally or by outside agencies to ensure impartiality, these investigations are normally limited to determining the cause of death and whether there was any criminal wrongdoing. *The primary focus of a morbidity-mortality review should be two-fold: What happened in the case under review and what can be learned to help prevent future incidents?* To be successful, the morbidity-mortality review team must be multidisciplinary and include representatives of both line and management level staff from the corrections, medical and mental health divisions.

**FINDINGS:**   Neither the Sacramento County Sheriff's Department (SCSD)'s "Suicide Prevention Program" policy (No. 10/5) nor Jail Psychiatric Services (JPS)'s "Suicide Prevention Program" policy (No. 1049) provided adequate descriptions regarding the mortality and/or

administrative review process following an inmate suicide, with the JPS policy simply stating that "The JPS Management Team (including Medical Director, Program Director and any designees) will review attempted and completed suicides and report any findings to the UC- Davis Department of Psychiatry." In addition, SCSD's "Death or Serious Injury of a Prisoner" policy (No. 3/10) outlined the protocol for responding to the scene of the incident by custody personnel, as well as the notification and investigative processes. The incident reporting form for JPS's "Incident Reporting" policy (No. 1006) simply required that the Mental Health Director complete the form in a manner that "Describes incident and care provided to patient by Jail Psychiatric Services. Include applicable dates of patient contact, presentation, FOSS Level and any plans for follow-up care. Describe incident, staff involved (if applicable), and outcome of incident."

In practice, all inmate deaths (including suicides) were reported to the SCSD Homicide Bureau, but inmate suicides were rarely investigated by the Bureau. Instead, inmate suicides were investigated by the SCSD Correctional Services Bureau which completed an "In-Custody Death Report" compiled by supervisory custodial personnel who were assigned to the facility at the time of the incident. The reports included all relevant custody-related documents pertaining to the inmate, including, but not limited to, arrest, classification, custody records, incident reports by custody staff, other inmate interviews, and housing unit log books. Once completed, the Reports were reviewed during an "In-Custody Death Review Team," which was comprised of the "facility administrator and/or manager, the health administrator, responsible physician, and other healthcare and supervisory staff who are relevant to the incident." Further, in addition to the "incident report" form completed by JPS, JPS management staff conversed with psychiatric leadership from the University of California-Davis regarding the incident.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

It is been this writer's experience that custody investigations (including Homicide Bureau and/or Internal Affairs) of inmate suicides normally focus upon assisting the medical examiner in determining the cause of death, whether any criminal wrongdoing was committed, and determining whether or not employees consistently followed custody policies and procedures. Health care reviews normally are limited to a designated provider's review of the inmate's medical chart. On the other hand, a viable mortality review process includes: 1) review of the circumstances surrounding the incident; 2) review of procedures relevant to the incident; 3) review of all relevant training received by involved staff; 4) review of pertinent medical and mental health services/reports involving the victim; 5) review of any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt; and 6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. The process does not focus on individual employee conduct or misconduct, but rather it looks at systemic issues impacting future prevention efforts. Following a discussion with both SCSD and JPS officials regarding the review processes, as well as review of several inmate suicides, it would be this writer's opinion that the Sacramento County Jail System does *not* currently engage in a viable mortality review process, nor did it have a formal morbidity process to review serious suicide attempts.

In addition, as previously discussed in this report, a Suicide Prevention Task Force had recently been re-established and met on at least a quarterly basis. The multidisciplinary committee included representation from the custody (at both the Main Jail and RCCC), CHS, and JPS. Although it had met only once to date and specific goals and responsibilities had yet to be

articulated, the committee was said to be responsible for reviewing the quality and quantity of suicide prevention and mental health training; establishing better communication between custody, medical, and mental health personnel; and on-going review of suicide prevention policies and practices.

Finally, according to JPS officials, although both SCSD and JPS collected separate data on all inmate suicide attempts (including "serious suicide attempts" and "deliberate self-harm" incidents), the purpose of such data collection was unclear to this writer. The different types of suicide attempts were not defined and there did not seem to be any attempt to analyze the data and present it in a fashion that would be helpful to continuous quality improvement efforts by either agency. However, of some interest to this writer and as previously referenced in this report (see page 31), review of suicide attempt incidents found that very few incidents involved inmates who affixed a ligature to an obvious protrusion in their cell, the possible result of the fact that most cells did not contain many of the obvious protrusions (e.g., light fixtures, ventilation grates, clothing hooks, bunk holes, etc.) found in other comparably-sized correctional facilities. The utility of collecting data on suicide attempts was discussed during the September 2016 meeting of the Suicide Prevention Task Force attended by this writer.

**RECOMMENDATIONS:** A few recommendations are offered to improve the mortality-morbidity review process for inmate suicides. *First*, it is strongly recommended that the Suicide Prevention Task Force be responsible for conducting mortality reviews of any inmate suicide. Such reviews should include: 1) review of the circumstances surrounding the incident; 2) review of procedures relevant to the incident; 3) review of all relevant training received by involved staff; 4)

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

review of pertinent medical and mental health services/reports involving the victim; 5) review of any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt; and 6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. The committee should also conduct similar morbidity reviews of any serious suicide attempts (i.e., incidents resulting in hospitalization). To assist the Suicide Prevention Task Force in these processes, this writer's "Mortality-Morbidity Review of Inmate Suicides /Serious Suicide Attempts Checklist" is offered for consideration in Appendix B.

*Second*, it is strongly recommended that the Suicide Prevention Task Force be responsible for developing a corrective action plan to implement the recommendations contained within this writer's report.

CONFIDENTAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

D.      **SUMMARY OF RECOMMENDATIONS**

**Staff Training**

1) It is strongly recommended that both the SCSD and JPS revise its respective suicide prevention policies to include a more robust description of the requirements for both pre-service and annual suicide prevention training, to include an overview of the required topics, as well as requirement that all custody, medical, and mental health personnel received such training on an annual basis.

2) It is strongly recommended that the SCSD and JPS only utilize classroom-instructed suicide prevention training. It has been this writer's experience that suicide prevention encompasses pro-active attitudes and collaboration, principles that are lost when an employee is sitting alone in a chair at a computer terminal. Desktop instruction might comply with an accreditation and/or regulatory requirement, but it is not as meaningful as classroom-instructed training.

3) It is strongly recommended that the SCSD and JPS collaborate on the development of a 4 to 8 hour pre-service suicide prevention curriculum for new employees (including custody, medical, and mental health staff) that includes the following topics:

- guiding principles to suicide prevention
- avoiding obstacles (negative attitudes) to prevention
- inmate suicide research
- why facility environments are conducive to suicidal behavior
- identifying suicide risk despite the denial of risk
- potential predisposing factors to suicide
- high-risk suicide periods
- warning signs and symptoms
- components of the SCSD/JPS suicide prevention programs
- liability issues associated with inmate suicide

Presentation should be in a PowerPoint slide format. These and other pertinent topics are available in this writer's *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities* (March 2016), a copy of which was previously forwarded to the SCSD for consideration.

4) It is strongly recommended that the SCSD and JPS collaborate on the development of a 2-hour annual suicide prevention curriculum for all custody, medical and mental health staff) that includes an abbreviated discussion the above topics. The 2-hour annual refresher training should include a review of: 1) avoiding obstacles (negative attitudes) to prevention, 2) predisposing risk factors, 3) warning signs and symptoms, 4) identifying suicidal inmates despite the denial of risk, and 5) review of any changes to the SCSD/JPS suicide prevention policies.  The annual training should also include general discussion of any recent suicides and/or serious

suicide attempts in the jail system. Presentation should be in a PowerPoint slide format.

5) It is strongly recommended that all JPS personnel (including psychiatrists) receive additional training on how to develop a reasonable treatment plan that contains specific strategies in reducing future suicidal ideation, to include examples of adequate and inadequate treatment plans.

**Intake Screening/Assessment**

6) It is strongly recommended that SCSD and CHS officials look at options to better ensure reasonable sound privacy in the booking area when multiple nurses are conducting intake screening at the same time period. One option would be installation of interview booths similar in design to current visiting booths or attorney booths found that the RCCC. Second, it is strongly recommended that the current suicide risk inquiry contained on the current CHS "Medical Intake" form embedded in the E-Chart be revised to include the following:

- Have you ever attempted suicide?
- Have you ever considered suicide?
- Are you now or have you ever been treated for mental health or emotional problems?
- Have you recently experienced a significant loss (relationship, death of family member/close friend, job, etc.)?
- Has a family member/close friend ever attempted or committed suicide?
- Do you feel there is nothing to look forward to in the immediate future (inmate expressing helplessness and/or hopelessness)?
- Are you thinking of hurting and/or killing yourself?

Follow-up inquiry (e.g., when did you last attempt suicide? etc.) should be added to each of these questions in order to triage the appropriate level of mental health referral as determined by JPS (see below).

7) It is strongly recommended that CHS officials initiate a continuous quality assurance plan to periodically audit the intake screening process to ensure that nursing staff are asking all questions to newly admitted detainees as required.

8) Regardless of the detainee's behavior or answers given during intake screening, a mental health referral should always be initiated based on documentation reflecting possible serious mental illness and/or suicidal behavior during an inmate's prior confinement within the Sacramento County Jail System. As such, the "Problems and Conditions" screen of the E-Chart contains the Frequency of Service Scale (FOSS) for each inmate triage by JPS staff. If an inmate was placed on suicide precautions and housed anywhere within the jail system, they would be classified as a FOSS Level 1. Inmates receiving a FOSS Level 2 designation are those who were discharged from suicide precautions and in need of follow-

up related to their serious mental illness. As such, the following procedures should be incorporated within both CHS and JPS policies:

- Any inmate placed on suicide precautions should be designated as either a FOSS Level 1 or FOSS Level 2 in the "Problems and Conditions" screen of the E-Chart by JPS staff;

- Nursing staff conducting intake screening should always review the detainee's "Problems and Conditions" screen of the E-Chart to verify whether they were previously confined in the SCSD and had any history of suicidal behavior/placement on suicide precautions during a prior confinement; and

- Regardless of the detainee's behavior or answers given during intake screening, further assessment by JPS staff should always be initiated based on documentation reflecting possible serious mental illness and/or suicidal behavior during a detainee's prior confinement within the SCSD.

9) It is strongly recommended that the current mental health triage practice of JPS responding to inmates expressing suicidal ideation within 4 hours as an "urgent" referral, and responding to all other mental health referrals within 6 days as "not urgent" or "routine" referrals be revised. Although there is no standard of care that consistently specifies time frames to respond to mental health referrals, one suggested schedule would be as follows: Emergent - now or within 4 hours; Urgent - within 24-48 hours; and Routine - within 7 days. In addition, JPS officials should develop a mental health triage policy that defines response levels, sets time constraints for each level, and defines the acuity of behavior(s) that dictates a specific response level. Of course, as currently practice within the SCSD, an inmate expressing current suicidal ideation and/or current suicidal/self-injurious behavior should result in an emergent JPS referral.

10) Given the strong association between inmate suicide and special management (e.g, disciplinary and/or administrative segregation, "total separation," etc.) housing unit placement, it is strongly recommended that medical personnel review the E-Chart to determine whether existing medical and/or mental health needs contraindicate the placement or require accommodation. In addition, a "best practice" would be that any inmate assigned to such a special management housing unit receive a brief assessment for suicide risk by nursing staff upon admission to such placement.

### Communication

11) To the extent that a formalized meeting does not currently exist, it is strongly recommended that the SCSD establish regularly scheduled management meetings between custody, CHS, and JPS personnel. Such meetings, scheduled on either a weekly or bi-weekly basis, would provide an excellent opportunity for multidisciplinary problem-solving of difficult to manage inmate-patients, including suicidal inmates.

**Housing**

12) This writer strongly supports the SCSD decision to convert and renovate the "300 Pod" of the 3-West Unit for supplemental housing of inmates on suicide precautions and/or as step-down from 2P-Unit discharge, as well as conversion of the classroom on the 3-West Unit into office space for OPP clinicians. As noted above, it is strongly recommended that the following fixtures be removed from each of the 20 lower tier cells: upper bunk, table, hook on left side of sink, and anti-squirt slit in faucet. In addition, approximately four corner cells in the unit should not be utilized for suicide precaution because of their unique design that includes a blind spot which obscures visibility into the cells. Second, this writer was informed that the SCSD is embarking on new construction project at the RCCC that will include the possibility of temporary housing for suicidal inmates. As such, it is strongly recommended that this writer's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities," included as Appendix A of this report, be utilized as a guideline.

13) It is strongly recommended that, as soon as the newly renovated "300 Pod" of the 3-West Unit is activated, SCSD officials issue a memorandum that: 1) strictly prohibits the use of any multi-purpose room or "classroom" for the housing of inmates for any duration of time, and 2) strictly limits the use of safety cells, segregation holding cells, or other holding cells for the housing of suicidal inmates of up to four (4) hours. In addition, SCSD, CHS, and JPS policy should be revised accordingly.

14) It is strongly recommended that JPS officials instruct their clinical staff on the appropriate use of safety smocks, i.e., they should not be utilized as a default, and not to be used as a tool in a behavior management plan (i.e., to punish and/or attempt to change perceived manipulative behavior). Rather, safety smocks should only be utilized when a clinician believes that the inmate is at high risk for suicide by hanging. Should an inmate be placed in a safety smock, the goal should be to return full clothing to the inmate prior to their discharge from suicide precautions. Finally, custody personnel should never place an inmate in a safety smock unless it had been previously approved by medical and/or mental health personnel.

15) Current SCSD and JPS suicide prevention policies do not address procedures for deciding which possessions and privileges are provided to inmates on suicide precautions. As such, it is strongly recommended that policies be revised to include the following requirements:

- All decisions regarding the removal of an inmate's clothing, bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and privileges shall be commensurate with the level of suicide risk as determined on a case-by-case basis by JPS staff and as documented in the E-Chart;

- If JPS staff determine that an inmate's clothing needs to be removed for reasons of safety, the inmate shall always be issued a safety smock and safety blanket;

- A mattress shall be issued to all inmates on suicide precautions unless the inmate utilizes the mattress in ways in which it was not intended (i.e., attempting to tamper with/destroy, utilizes to obstruct visibility into the cell, etc.);

- All inmates on suicide precautions shall be allowed all routine privileges (e.g., family visits, telephone calls, recreation, etc.), unless the inmate has lost those privileges as a result of a disciplinary sanction; and

- Inmates on suicide precautions shall not automatically be locked down. They should be allowed dayroom and/or out-of-cell access commensurate with their security level and clinical judgment of JPS staff.

## Levels of Supervision/Management

16) It is strongly recommended that both the SCSD and JPS suicide prevention policies be revised to include two levels of observation that specify descriptions of behavior warranting each level of observation. A proposed revision is offered as follows:

- ***Close Observation*** is reserved for the inmate who is not actively suicidal, but expresses suicidal ideation and/or has a recent prior history of self-destructive behavior and would be considered a low risk for suicide. In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury, should be placed under close observation. This inmate should be observed by staff at staggered intervals not to exceed every 10-15 minutes, and should be documented as it occurs.

- ***Constant Observation*** is reserved for the inmate who is actively suicidal, either by threatening or engaging in self-injury, and considered a high risk for suicide. This inmate should be observed by an assigned staff member on a continuous, uninterrupted basis. The observation should be documented at 15-minute intervals.

17) It is strongly recommended that CCTV be utilized only as a supplement to, and not a replacement for, the personal observation of high risk suicidal inmates. As such, any inmate considered "high risk" as defined by current JPS policy should be

assigned a staff member who would be physically stationed outside the inmate's cell to provide continuous, uninterrupted observation.

18) It is strongly recommended that the SCSD replace the narrative of "twice every 30 minutes" currently contained within its policies with "staggered intervals that do not exceed 10-15 minutes."

19) It is strongly recommended that all OPP and psychiatric staff complete a "Clinical Assessment" form (which includes the suicide risk assessment) each time they are downgrading and/or discharging an inmate from suicide precautions in the 2P-Unit or 3-West Unit. As such, all JPS clinicians should complete the "Clinical Assessment" form at least twice, i.e., for initiation of suicide precautions, as well as justification for discharging the inmate from suicide precautions.

20) It is strongly recommended that completion of the Clinical Assessment, as well as other clinical encounters, should occur in a private setting and not cell-side unless the inmate refuses a private interview. Refusal of a private interview should be documented in the E-Chart.

21) It is the strongly recommended that an inmate should never be clothed in a safety smock if they are being observed at 30-minute observations. If a JPS clinician believes that an inmate's behavior necessitates a safety smock, they should be on suicide precautions. If a JPS clinician believes that 30-minute observations are warranted, then the inmate is not suicidal and should have their full clothing and possessions.

22) It is strongly recommended that, consistent with NCCHC and other national correctional standards, JPS clinician(s) develop treatment plans for inmates discharged from suicide precautions that "describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur" (see NCCHC, 2014).

23) It is strongly recommended that, in order to safeguard the continuity of care for suicidal inmates, all inmates discharged from suicide precautions should remain on mental health caseloads and receive regularly scheduled follow-up assessments by JPS clinicians until their release from custody. JPS's current follow-up schedule for inmates released from suicide precautions of "within 30 days" is well below the standard of care. As such, unless an inmate's individual circumstances directs otherwise (e.g., an inmate inappropriately placed on suicide precautions by non-mental health staff and released less than 24 hours later following an assessment), it is recommended that the FOSS II scale for inmates discharged from suicide precautions be dramatically revised as follows:  follow-up within 24 hours, again within 72 hours, again within 1 week, and then periodically until release from custody.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

24) Given the strong association between inmate suicide and segregation placement (e.g., 2 of 3 of the most recent inmate suicides were on "total separation" status the time of their deaths), it is strongly recommended that custody personnel increase their rounds of such housing units from 60-minute to 30-minute intervals. In addition, a "best practice" would also be for nursing staff to conduct one daily round each day of all cells in these segregation units while they are dispensing medication, as well as for OPP clinicians to conduct weekly rounds in these units.

**<u>Intervention</u>**

None

**<u>Reporting</u>**

None

**<u>Follow-Up/Mortality-Morbidity Review</u>**

25) It is strongly recommended that the Suicide Prevention Task Force be responsible for conducting mortality reviews of any inmate suicide. Such reviews should include: 1) review of the circumstances surrounding the incident; 2) review of procedures relevant to the incident; 3) review of all relevant training received by involved staff; 4) review of pertinent medical and mental health services/reports involving the victim; 5) review of any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt; and 6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. The committee should also conduct similar morbidity reviews of any serious suicide attempts (i.e., incidents resulting in hospitalization). To assess the suicide prevention task force committee and these processes, this writer's "Mortality-Morbidity Review of Inmate Suicides/Serious Suicide Attempts Checklist" is offered for consideration in Appendix B.

26) It is strongly recommended that the Suicide Prevention Task Force be responsible for developing a corrective action plan to implement the recommendations contained within this writer's report.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

### E.   <u>CONCLUSION</u>

It is hoped that the suicide prevention assessment provided by this writer, as well as the recommendations contained within this report, will be of assistance to both the Sacramento County Sheriff's Department and Jail Psychiatric Services of the University of California-Davis. This writer met numerous SCSD and JPS officials and supervisors, as well as officers, nurses, and mental health clinicians, who appeared genuinely concerned about inmate suicide and committed to taking whatever actions were necessary to reduce the opportunity for such tragedy in the future. Although there are numerous recommendations contained within this report, as well as the need to revise several SCSD and JPS policies, this writer found that the Sacramento County Jail System had the foundation for a good suicide prevention program. Finally, based upon the pro-active attitude and high caliber on-site management from these current officials, who were also members of the Suicide Prevention Task Force, this writer is confident that full implementation of the recommendations contained within this report will result in successful continuing efforts to prevent inmate suicides and maintaining a low rate of suicide within the Sacramento County Jail System.


Respectfully Submitted By:


<u>s/s Lindsay M. Hayes</u>
Lindsay M. Hayes

November 22, 2016

# APPENDIX A

## CHECKLIST FOR THE "SUICIDE-RESISTANT" DESIGN OF CORRECTIONAL FACILITIES

### Lindsay M. Hayes
©National Center on Institutions and Alternatives, 2016

The safe housing of suicidal inmates is an important component to a correctional facility's comprehensive suicide prevention policy. Although impossible to create a "suicide-proof" cell environment within any correctional facility, given the fact that almost all inmate suicides occur by hanging, it is certainly reasonable to ensure that all cells utilized to house potentially suicidal inmates are free of all obvious protrusions. And while it is more common for ligatures to be affixed to air vents and window bars (or grates), *all* cell fixtures should be scrutinized, since bed frames/holes, shelves with clothing hooks, sprinkler heads, door hinge/knobs, towel racks, water faucet lips, and light fixtures have been used as anchoring devices in hanging attempts. As such, to ensure that inmates placed on suicide precautions are housed in "suicide-resistant" cells, facility officials are strongly encouraged to address the following architectural and environmental issues:

1) Cell doors should have large-vision panels of Lexan (or low-abrasion polycarbonate) to allow for unobstructed view of the entire cell interior at all times. These windows should *never* be covered (even for reasons of privacy, discipline, etc.) If door sliders are not used, door interiors should not have handles/knobs; rather they should have recessed door pulls. Any door containing a food pass should be closed and locked.

Interior door hinges should bevel down so as not to permit being used as an anchoring device. Door frames should be rounded and smooth on the top edges. The frame should be grouted into the wall with as little edge exposed as possible.

In older, antiquated facilities with cell fronts, walls and/or cell doors made of steel bars, Lexan paneling (or low-abrasion polycarbonate) or security screening (that has holes that are ideally 1/8 inches wide and no more than 3/16 inches wide or 16-mesh per square inch) should be installed from the *interior* of the cell.

Solid cell fronts must be modified to include large-vision Lexan panels or security screens with small mesh;

2) Vents, ducts, grilles, and light fixtures should be protrusion-free and covered with screening that has holes that are ideally 1/8 inches wide, and no more than 3/16 inches wide or 16-mesh per square inch;

3) If cells have floor drains, they should also have holes that are ideally 1/8 inches wide, and no more than 3/16 inches wide or 16-mesh per square inch (inmates have been known to weave one end of a ligature through the floor drain with the other end tied around their neck, then lay on the floor and spin in a circular motion as the ligature tightens);

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

4) Wall-mounted corded telephones should *not* be placed inside cells.  Telephone cords of varying length have been utilized in hanging attempts;

5) Cells should *not* contain any clothing hooks. The traditional, pull-down or collapsible hook can be easily jammed and/or its side supports utilized as an anchor;

6) A stainless steel combo toilet-sink (with concealed plumbing and outside control valve) should be used. The fixture should *not* contain an anti-squirt slit, toothbrush holder, toilet paper rod, and/or towel bar;

7) Beds should ideally be either heavy molded plastic or solid concrete slab with rounded edges, totally enclosed underneath.

If metal bunks are utilized, they should be bolted flush to the wall with the frame constructed to prevent its use as an anchoring device. Bunk holes should be covered; ladders should be removed.  (Traditional metal beds with holes in the bottom, not built flush to the wall and open underneath, have often been used to attach suicide nooses. Lying flat on the floor, the inmate attaches the noose from above, runs it under his neck, turns over on his stomach and asphyxiates himself within minutes.);

8) Electricity should be turned off from wall outlets outside of the cell;

9) Light fixtures should be recessed into the ceiling and tamper-proof.  Some fixtures can be securely anchored into ceiling or wall corners when remodeling prohibits recessed lighting. All fixtures should be caulked or grouted with tamper-resistant security grade caulking or grout.

Ample light for reading (at least 20 foot-candles at desk level) should be provided.  Low-wattage night light bulbs should be used (except in special, high-risk housing units where sufficient lighting 24 hours per day should be provided to allow closed-circuit television (CCTV) cameras to identify movements and forms).

An alternative is to install an infrared filter over the ceiling light to produce total darkness, allowing inmates to sleep at night.  Various cameras are then able to have total observation as if it were daylight.  This filter should be used only at night because sensitivity can otherwise develop and produce aftereffects;

10) CCTV monitoring does *not* prevent a suicide, it only identifies a suicide attempt in progress. If utilized, CCTV monitoring should *only* supplement the physical observation by staff. The camera should obviously be enclosed in a box that is tamper-proof and does not contain anchoring points. It should be placed in a high corner location of the cell and all edges around the housing should be caulked or grouted.

Cells containing CCTV monitoring should be painted in pastel colors to allow for better visibility.  To reduce camera glare and provide a contrast in monitoring, the headers above cell doors should be painted black or some other dark color.

CCTV cameras should provide a clear and unobstructed view of the entire cell interior, including _all_ four corners of the room.  Camera lens should have the capacity for both night or low light level vision;

11) Cells should have a smoke detector mounted flush in the ceiling, with an audible alarm at the control desk.  Some cells have a security screening mesh to protect the smoke detector from vandalism. The protective coverings should be high enough to be outside the reach of an inmate and far enough away from the toilet so that the fixture could not be used as a ladder to access the smoke detector and screen.  Ceiling height for new construction should be 10 feet to make such a reasonable accommodation. Existing facilities with lower ceilings should carefully select the protective device to make sure it cannot be tampered with, or have mesh openings large enough to thread a noose through.

Water sprinkler heads should not be exposed.  Some have protective cones; others are flush with the ceiling and drop down when set off; some are the breakaway type;

12) Cells should have an audio monitoring intercom for listening to calls of distress (_only_ as a supplement to physical observation by staff).  While the inmate is on suicide precautions, intercoms should be turned up high (as hanging victims can often be heard to be gurgling, gasping for air, their body hitting the wall/floor, etc.);

13) Cells utilized for suicide precautions should be located as close as possible to a control desk to allow for additional audio and visual monitoring;

14) If modesty walls or shields are utilized, they should have triangular, rounded or sloping tops to prevent anchoring.  The walls should allow visibility of both the head and feet;

15) Some inmates hang themselves under desks, benches, tables or stools/pull-out seats. Potential suicide-resistant remedies are:  (a) Extending the bed slab for use as a seat; (b) Cylinder-shaped concrete seat anchored to floor, with rounded edges; (c) Triangular corner desk top anchored to the two walls; and (d) Rectangular desk top, with triangular end plates, anchored to the wall.  Towel racks should also be removed from any desk area;

16) All shelf tops and exposed hinges should have solid, triangular end-plates which preclude a ligature being applied;

17) Cells should have security windows with an outside view.  The ability to identify time of day via sunlight helps re-establish perception and natural thinking, while minimizing disorientation.

If cell windows contain security bars that are not completely flush with window panel (thus allowing a gap between the glass and bar for use as an anchoring device), they

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

should be covered with Lexan (or low-abrasion polycarbonate) paneling to prevent access to the bars, or the gap, should be closed with caulking, glazing tape, etc.

If window screening or grating is used, covering should have holes that are ideally 1/8 inches wide, and no more than 3/16 inches wide or 16-mesh per square inch;

18) The mattress should be fire retardant and not produce toxic smoke.  The seam should be tear-resistant so that it cannot be used as a ligature;

19) Given the fact that the risk of self-harm utilizing a laundry bag string outweighs its usefulness for holding dirty clothes off the floor, laundry bag strings should be removed from the cell;

20) Mirrors should be of brushed, polished metal, attached with tamper-proof screws;

21) Padding of cell walls is prohibited in many states.  Check with your fire marshal.  If permitted, padded walls must be of fire-retardant materials that are not combustible and do not produce toxic gasses; and

22) Ceiling and wall joints should be sealed with neoprene rubber gasket or sealed with tamper-resistant security grade caulking or grout for preventing the attachment of an anchoring device through the joints.

NOTE: A portion of this checklist was originally derived from R. Atlas (1989), "Reducing the Opportunity for Inmate Suicide: A Design Guide," *Psychiatric Quarterly*, 60 (2): 161-171. Additions and modifications were made by Lindsay M. Hayes, and updated by Randall Atlas, Ph.D., a registered architect.  See also Hayes, L.M. (2003), "Suicide Prevention and "Protrusion-Free Design of Correctional Facilities," *Jail Suicide/Mental Health Update*, 12 (3): 1-5. Last revised Lindsay M. Hayes in February 2016.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

## APPENDIX  B

## MORTALITY/MORBIDITY REVIEW OF INMATE SUICIDES/ SERIOUS SUICIDE ATTEMPTS CHECKLIST*
### Lindsay M. Hayes
©National Center on Institutions and Alternatives, 2016

1)      **Training**

- Had all correctional, medical, and mental health staff involved in the incident received both basic and annual training in the area of suicide prevention prior to the incident?

- Had all staff who responded to the incident received training (and were currently certified) in standard first aid and cardiopulmonary resuscitation (CPR) prior to the incident?

2)      **Identification/Referral/Assessment**

- Upon this inmate's initial entry into the facility, were the arresting/transporting officer(s) asked whether they believed the inmate was at risk for suicide? If so, what was the response?

- Had inmate been screened for potentially suicidal behavior upon entry into the facility?

- Did the screening form include inquiry regarding: past suicidal ideation and/or attempts; current ideation, threat, plan; sense of immediate future (inmate expressing helplessness and/or hopelessness); prior mental health treatment/hospitalization; recent significant loss (job, relationship, death of family member/close friend, etc.); and history of suicidal behavior by family member/close friend?

- If the screening process indicated a potential risk for suicide, was inmate properly referred to mental health/medical personnel?

- Had inmate received any post-admission mental health screening/assessment?

- Had inmate previously been confined in the facility/system? If so, had the inmate been on suicide precautions during a prior confinement in the facility/system? Was such information available to staff responsible for the current intake screening and mental health assessments?

_____

*A *morbidity* review should be conducted on a serious suicide attempt, defined here as referring to an incident of self-injury requiring hospitalization.

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

3)   **Communication**

- Was there information regarding inmate's prior and/or current suicide risk from outside agencies that was not communicated to the facility?

- Was there information regarding inmate's prior and/or current suicide risk from correctional, mental health and/or medical personnel that was not communicated throughout the facility to appropriate personnel?

- Did inmate engage in any type of behavior that might have been indicative of a potential risk of suicide? If so, was this observed behavior communicated throughout the facility to appropriate personnel?

4)   **Housing**

- Where was inmate housed and why were they assigned to this housing unit?

- If the inmate was on suicide precautions at the time of the incident, was the inmate housed in a suicide resistant, protrusion-free cell?

- Was inmate on "segregation" status at the time of the incident?

- If placed was on "segregation" or any "special management" (e.g., disciplinary and/or administrative segregation) status, had he/she received a written assessment for suicide risk by mental health and/or medical staff due to this status?

- Was there anything regarding the physical design of inmate's cell that contributed to the incident (e.g., poor visibility, protrusions conducive to hanging attempts, etc.)?

5)   **Levels of Observation/Management**

- What level and frequency of supervision was inmate under immediate prior to the incident?

- Given inmate's observed behavior prior to the incident, was the level of supervision appropriate?

- When was inmate last physically observed by staff prior to incident?

- Was there any reason to question the accuracy of the last reported observation by staff?

- If inmate was not physically observed within the required time interval prior to the incident, what reason(s) was determined to cause the delay in supervision?

- Was inmate on a mental health and/or medical caseload? If so, what was frequency of contact between inmate and mental health and/or medical personnel?

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

- When was inmate last seen by mental health and/or medical personnel?

- Was there any reason to question the accuracy of the last reported observation by mental health and/or medical personnel?

- If inmate was not on a mental health and/or medical caseload, should he/she have been?

- If inmate was not on suicide precautions at the time of the incident, should he/she have been?

6) **Intervention**

- Did staff member(s) who discovered the inmate follow proper intervention procedures, i.e., surveyed the scene to ensure the emergency was genuine, called for back-up support, ensured that medical personnel were immediately notified, and initiated standard first aid and/or CPR?

- Did staff initiate standard first aid and/or CPR within four (4) minutes following discovery of the incident?

- Did the inmate's housing unit contain proper emergency equipment for staff to effectively respond to a suicide attempt, i.e., first aid kit, gloves, pocket mask or Ambu bag, and rescue tool (to quickly cut through fibrous material)?

- Were there any delays in either correctional or medical personnel immediately responding to the incident? Were medical personnel properly notified as to nature of emergency and did they respond with appropriate equipment? Was all the medical equipment working properly?

7) **Reporting**

- Were all appropriate officials and personnel notified of incident in a timely manner?

- Were other notifications, including inmate's family and appropriate outside authorities, made in a timely manner?

- Did all staff who came into contact with inmate prior to the incident submit a report and/or statement as to their full knowledge of inmate and incident? Was there any reason to question the accuracy and/or completeness of any report and/or statement?

8) **Follow-Up/Mortality-Morbidity Review**

- Were all affected staff and inmates offered crisis intervention services following the incident?

CONFIDENTIAL AND PRIVILEGED "ATTORNEY WORK PRODUCT: EXPERT REPORT ON SUICIDE PREVENTION PRACTICES"

- Were there any other investigations conducted (or that should be authorized) into incident that may be helpful to the mortality-morbidity review?

- As a result of this mortality-morbidity review, were there any possible precipitating factors (e.g., circumstances which may have caused victim to commit suicide or engage in the serious suicide attempt) offered and discussed?

- Were there any findings and/or recommendations from previous mortality-morbidity reviews that are relevant to this review?

- As result of this review, what recommendations (if any) are necessary for revisions in policy, training, physical plant, medical or mental health services, and operational procedures to reduce the likelihood of future incidents.

- What are specific corrective active plans (CAP) for each recommendation, who is responsible party for each CAP, and what is expected timeframe to complete each CAP?