Aaron J. Fischer (SBN 247391)
  Aaron.Fischer@disabilityrightsca.org
Anne Hadreas (SBN 253377)
  anne.hadreas@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA  94612
Telephone: (510) 267-1200
Fax: (510) 267-1201

Tifanei Ressl-Moyer (SBN 319721)
  tifanei.ressl-moyer@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1831 K Street
Sacramento, CA  95811
Telephone: (916) 504-5800
Fax: (916) 504-5801

Donald Specter (SBN 83925)
  dspecter@prisonlaw.com
Margot Mendelson (SBN 268583)
  mmendelson@prisonlaw.com
Sophie Hart (SBN 321663)
  sophieh@prisonlaw.coom
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704

*Attorneys for Plaintiffs*

Jessica Valenzuela Santamaria (SBN 220934)
  jvs@cooley.com
Mark A. Zambarda (SBN 314808)
  mzambarda@cooley.com
Addison M. Litton (SBN 305374)
  alitton@cooley.com
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

|  |  |
|---|---|
| LORENZO MAYS, RICKY RICHARDSON, JENNIFER BOTHUN, ARMANI LEE, LEERTESE BEIRGE, and CODY GARLAND, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SACRAMENTO, <br><br> Defendant. | Case No. 2:18-cv-02081 TLN KJN <br><br> **CLASS ACTION** <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT OR IN THE ALTERNATIVE PRELIMINARY INJUNCTION RE: MENTAL HEALTH CARE AND SOLITARY CONFINEMENT** <br><br> DATE:    May 16, 2019 <br> TIME:    10:00 a.m. <br> JUDGE:   Hon. Kendall J. Newman <br><br> Complaint Filed: July 31, 2018 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 2

I.     Defendant does not provide adequate treatment for the growing number of
class members requiring higher levels of mental health care in the Jail ..................... 4

    a.     Defendant fails to provide timely mental health care to class members
actively experiencing acute mental health crises .............................................. 4

    b.     Defendant allows treatable conditions to deteriorate in the absence of
adequate mental health treatment ....................................................................... 8

II.    Defendant warehouses people with serious mental illness in an extreme form
of solitary confinement ............................................................................................. 12

    a.     Class members with serious mental illness experience severe
psychological trauma while on T-Sep status ................................................... 14

    b.     Defendant continues to place class members with serious mental
illness on T-Sep status .................................................................................... 17

ARGUMENT ....................................................................................................................... 18

I.     Defendant's failure to treat people with serious mental illness violates the
Eighth and Fourteenth Amendments .......................................................................... 19

    a.     Defendant fails to provide timely, adequate care to people with serious
mental illness in violation of the Eighth and Fourteenth Amendments ......... 21

    b.     Placing people with serious mental illness on Total Separation violates
the Eighth and Fourteenth Amendments .......................................................... 24

II.    If issues of fact make summary judgment premature, preliminary relief is
necessary ................................................................................................................... 27

III.   The relief requested is consistent with the Prison Litigation Reform Act ................. 29

CONCLUSION .................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Albino v. Baca,*
747 F.3d 1162 (9th Cir. 2014) (en banc) ...................................................................20

*Alliance for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) .................................................................................31

*Am. Trucking Ass'ns, Inc. v. City of L.A.,*
559 F.3d 1046 (9th Cir. 2009) ................................................................................31

*Amoco Prod. Co. v. Village of Gambell,*
480 U.S. 531 (1987)................................................................................................30

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)................................................................................................21

*Armstrong v. Schwarzenegger,*
622 F.3d 1058 (9th Cir. 2010) ................................................................................33

*Bell v. Wolfish,*
441 U.S. 520 (1979)...........................................................................................22, 23

*Braggs v. Dunn,*
257 F. Supp. 3d 1171 (M.D. Ala. 2017) .................................................26, 27, 28, 32

*Brown v. Plata,*
563 U.S. 493 (2011)...........................................................................................25, 26

*Casey v. Lewis,*
834 F. Supp. 1477 (D. Ariz. 1993) ....................................................................29, 30

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)................................................................................................20

*Coleman v. Brown,*
28 F. Supp. 3d 1068 (E.D. Cal. 2014).................................................................29, 30

*Coleman v. Brown,*
938 F. Supp. 2d 955 (E.D. Cal. 2013)......................................................................25

*Coleman v. Schwarzenegger,*
922 F. Supp. 2d 882 (E.D. Cal. 2009)..................................................................25, 26

*Coleman v. Wilson,*
912 F. Supp. 1282 (E.D. Cal. 1995)....................................................................23, 25

*Davis v. Ayala,*
135 S. Ct. 2187 (2015)............................................................................................27

**TABLE OF AUTHORITIES**
(continued)

Page

*Dawson v. Kendrick*,
  527 F. Supp. 1252 (S.D. W. Va. 1981).........................................................25

*Doe v. Kelly*,
  878 F.3d 710 (9th Cir. 2017) ....................................................................33

*Doty v. Cty. of Lassen*,
  37 F.3d 540 (9th Cir. 1994) ...............................................................23, 24

*Estelle v. Gamble*,
  429 U.S. 97 (1976).............................................................................21, 24

*Farmer v. Brennan*,
  511 U.S. 825 (1994)...........................................................................21, 22

*Farris v. Seabrook*,
  677 F.3d 858 (9th Cir. 2012) ....................................................................31

*Glossip v. Gross*,
  135 S. Ct. 2726 (2015)..............................................................................27

*Gordon v. Cty. of Orange*,
  888 F.3d 1118 (9th Cir. 2018) ..................................................................23

*Grenning v. Miller-Stout*,
  739 F.3d 1235 (9th Cir. 2014) ...........................................................21, 22

*Harris v. Bd. of Supervisors, L.A. Cty.*,
  366 F.3d 754 (9th Cir. 2004) ....................................................................32

*Helling v. McKinney*,
  509 U.S. 25 (1993).............................................................................21, 27

*Hernandez v. Cty. of Monterey*,
  110 F. Supp. 3d 929 (N.D. Cal. 2015) .................................................27, 32

*Hoptowit v. Ray*,
  682 F.2d 1237 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*,
  515 U.S. 472 (1995)..................................................................................24

*Hudson v. Palmer*,
  468 U.S. 517 (1984)..................................................................................21

*Hutto v. Finney*,
  437 U.S. 678 (1978)..................................................................................22

*Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r*,
  No. 1:08–cv01317–TWP–MJD, 2012 WL 6738517 (S.D. Ind. Dec. 31, 2012)............29

*Inmates of Allegheny Cty. Jail v. Peirce*,
  487 F. Supp. 638 (W.D. Pa. 1980)..............................................................26

**TABLE OF AUTHORITIES**
(continued)

Page

*Innovation Law Lab v. Nielsen,*
310 F. Supp. 3d 1150 (D. Or. 2018) ..........................................................33

*Jett v. Penner,*
439 F.3d 1091 (9th Cir. 2006) .................................................................24

*Jones 'El v. Berge,*
164 F. Supp. 2d 1096 (W.D. Wis. 2001) .............................................29, 32

*Jones v. Blanas,*
393 F.3d 918 (9th Cir. 2004) .................................................................23

*King Cty. v. Azar,*
320 F. Supp. 3d 1167 (W.D. Wash. 2018) ................................................21

*Langley v. Coughlin,*
715 F. Supp. 522 (S.D.N.Y. 1989) ...........................................................29

*Lopez v. Heckler,*
713 F.2d 1432 (9th Cir. 1983) .................................................................33

*Madrid v. Gomez,*
889 F. Supp. 1146 (N.D. Cal. 1995) ................................................24, 26, 28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986)...............................................................................20

*McGuckin v. Smith,*
974 F.2d 1050 (9th Cir. 1992) .................................................................24

*In re Medley,*
134 U.S. 160 (1890)...............................................................................27

*Melendres v. Arpaio,*
695 F.3d 990 (9th Cir. 2012) .............................................................31, 32

*Miller v. Carlson,*
768 F. Supp. 1331 (N.D. Cal. 1991) .........................................................33

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
422 F.3d 782 (9th Cir. 2005) .................................................................31

*Nyhuis v. Reno,*
204 F.3d 65 (3d Cir. 2000)......................................................................22

*Palakovic v. Wetzel,*
854 F.3d 209 (3d Cir. 2017)..............................................................27, 28

*Parsons v. Ryan,*
754 F.3d 657 (9th Cir. 2014) .................................................................27

**TABLE OF AUTHORITIES**
(continued)

Page

*Peralta v. Dillard*,
744 F.3d 1076 (9th Cir. 2014) (en banc) ............................................................23, 24

*Pierce v. Cty. of Orange*,
526 F.3d 1190 (9th Cir. 2008) ......................................................................................22

*Pierce v. Cty. of Orange*,
761 F. Supp. 2d 915 (C.D. Cal. 2011) .........................................................................33

*Ramos v. Lamm*,
639 F.2d 559 (10th Cir. 1980) .....................................................................................25

*Republic of the Philippines v. Marcos*,
862 F.2d 1355 (9th Cir. 1988) (en banc) .....................................................................31

*Revere v. Mass. Gen. Hosp.*,
463 U.S. 239 (1983)......................................................................................................23

*Rodde v. Bonta*,
357 F.3d 988 (9th Cir. 2004) .................................................................................32, 33

*Ruiz v. Johnson*,
37 F. Supp. 2d 855 (S.D. Tex. 1999), *rev'd on other grounds*, 243 F.3d 941 (5th
Cir. 2001), *adhered to on remand*, 154 F. Supp. 2d 975 (S.D. Tex. 2001) ...................29

*Sammartano v. First Jud. Dist. Ct.*,
303 F.3d 959 (9th Cir. 2002) .......................................................................................32

*Smith v. Knox Cty. Jail*,
666 F.3d 1037 (7th Cir. 2012) .....................................................................................30

*Spain v. Procunier*,
600 F.2d 189 (9th Cir. 1979) .......................................................................................23

*Tillery v. Owens*,
719 F. Supp. 1256 (W.D. Pa. 1989).............................................................................26

*Von Colln v. Cty. of Ventura*,
189 F.R.D. 583 (C.D. Cal. 1999) .................................................................................32

*Wellman v. Faulkner*,
715 F.2d 269 (7th Cir. 1983) .......................................................................................24

*Williamson v. Stirling*,
912 F.3d 154 (4th Cir. 2018) .......................................................................................29

*Wilson v. Seiter*,
501 U.S. 294 (1991)......................................................................................................22

*Winter v. Nat'l Res. Def. Council*,
555 U.S. 7 (2008).............................................................................................30, 31, 32

**TABLE OF AUTHORITIES**
(continued)

Page

*Young v. Quinlan,*
    960 F.2d 351 (3d Cir. 1992)..............................................................22

**Statutes**

18 U.S.C.
    § 3626(a)(1) ..............................................................................33
    § 3626(a)(2) ..............................................................................33

**Other Authorities**

Am. Psychiatric Ass'n, *Position Statement on Segregation of Prisoners with Mental
    Illness* (2012) ............................................................................30

Bruce C. Gage, M.D., *Evaluation of Mental Health Services: Sacramento County
    Jails* (2016) ............................................................................3, 6

Cal. Dep't of State Hosp., *Legal Commitments* ........................................3

Eldon Vail, *Sacramento County Jail Mentally Ill Prisoners and the Use of
    Segregation: Recommendations for Policy, Practice and Resources* (2016) ............1, 6

Fed. R. Civ. P.
    56(a)....................................................................................20
    56(c)....................................................................................20
    65(c)....................................................................................33

Jail Psychiatric Servs., *Policy and Procedure Manual* ................................5

James Austin, Emmitt Sparkman, & Robin Allen, *Evaluation of the Sacramento
    County Jail Inmate Classification and T-SEP Systems* (2017) .................... passim

Lindsay M. Hayes, *Report on Suicide Prevention Practices Within the Sacramento
    County Jail System* ........................................................... passim

Nat'l Comm'n on Corr. Health Care, *Solitary Confinement, Position Statement on
    Solitary Confinement* (2016).............................................................30

Sacramento County Grand Jury, *Final Report 2014-2015* ................................2

U.S. Dep't of Justice, *Report and Recommendations Concerning the Use of
    Restrictive Housing* (Jan. 2016).........................................................27

vi.

# INTRODUCTION

In 2016, the County of Sacramento retained five nationally recognized experts to evaluate the policies, practices, and conditions in the Sacramento County Jails ("Jail"). All five experts documented serious deficiencies and hazards threatening the safety and health of people incarcerated in the Jail. The experts determined that Defendant lacks sufficient staffing and physical space to care for people experiencing acute mental health crises, and that Defendant isolates these people for extended periods in harmful settings while they wait to receive the acute care they need. The experts found that Defendant fails to provide adequate mental health treatment to people before their mental health conditions deteriorate, allowing treatable conditions to worsen to the point of psychiatric crisis.

The experts further reported that Defendant warehouses many people with serious mental health treatment needs in profound and prolonged solitary confinement. At least three men have died by suicide in solitary confinement units since Defendant's expert concluded that "[t]he use of segregation in the Sacramento County Jails is dramatically out of step with emerging national standards and practices and with what the research tells us about the dangers of segregation regarding placing mentally ill inmates in segregated housing," and that conditions in those units are "unlikely to meet constitutional standards." Eldon Vail, *Sacramento County Jail Mentally Ill Prisoners and the Use of Segregation: Recommendations for Policy, Practice and Resources* ("Vail Report") (2016) at 8, ECF No. 37-7.[1]

The experts called on Defendant to take action to remedy these issues. More than two years later, Defendant has failed to take reasonable steps to alleviate the unconstitutional and dangerous conditions in its jails. According to Defendant's own testimony, Defendant has failed to meaningfully expand its capacity to treat people with serious mental illness or to remove people with mental health needs from solitary confinement. Class members continue to suffer humiliation,

---

[1] The parties have stipulated that the reports of Defendant's five experts may be submitted as part of the evidentiary record in this case. *See* Joint Stipulation of Facts in Support of Class Certification ¶ 11 (Oct. 18, 2018), ECF No. 28-1 ("The reports of Subject Matter Experts Eldon Vail, Bruce C. Gage, M.D., Lindsay M. Hayes, Sabot Consulting, and James Austin regarding their assessments of Sacramento County Jail are not confidential, are available to the public, and may be submitted as part of the record to the Court.").

isolation, and psychological decompensation in Defendant's Jail due to the harmful conditions and denial of adequate mental health care.  People with well-documented serious mental illness have died by suicide in the solitary confinement units, having been denied necessary mental health treatment.

The facts are not in dispute.  According to Defendant's own experts, Defendant's current practices place class members at great risk of decompensation and suicide.  In addition to the considerable documentary evidence illustrating the deficiencies discussed herein, testimony from Defendant's Rule 30(b)(6) witnesses confirms the damning findings of the experts.  Plaintiffs therefore request entry of partial summary judgment and an order requiring Defendant to submit a plan to promptly address these constitutional deficiencies.  If the Court should identify factual issues that make summary judgment premature at this time, preliminary injunctive relief is warranted and urgently necessary to protect Plaintiffs from further suffering and risk of serious harm caused by Defendant's unlawful practices.

## STATEMENT OF FACTS

The Sacramento County Jail houses a significant and growing number of people with serious mental illness.  Between 2009 and 2015, the number of people receiving a mental health diagnosis at intake nearly doubled in size, from 18% to 34%.  *See* Declaration of Aaron J. Fischer in Support of Plaintiffs' Motion for Partial Summary Judgment or Preliminary Injunction ("Fischer Decl."), Ex. G (Sacramento Cty. Grand Jury, *Final Report 2014-2015* at 10); *see also id.*, Ex. M (excerpts of Deposition of Andrea Javist as Fed. R. Civ. P. 30(b)(6) Person Most Knowledgeable ("Def.'s Mental Health PMK Dep.") (Dec. 6, 2018) at 76:15–18).[2]  The Jail houses roughly 4,000 individuals; Defendant's mental health expert estimated that as many as 1,000 have serious mental illness.[3]  *See* Bruce C. Gage, M.D., *Evaluation of Mental Health Services: Sacramento County Jails* ("Gage

---

[2]     Defendant contracts with Jail Psychiatric Services (JPS) to provide mental health care to people in the Jail; the contract is administered and overseen by the County through the Sheriff's Department's Correctional Health Services (CHS).  Joint Stip. of Facts ISO Joint Mot. for Class Cert. ¶ 7 (Oct. 18, 2018), ECF No. 28-1.

[3]     Defendant operates two jail facilities, the Main Jail and Rio Cosumnes Correctional Center ("RCCC").  Joint Stip. of Facts ISO Joint Mot. for Class Cert. ¶ 1 (Oct. 18, 2018), ECF No. 28-1.  As of October 1, 2018, the Sheriff's Department reported that the two facilities together imprisoned approximately 3,746 people.  *Id.*

Report") (2016) at 42, 71, ECF No. 37-8.  Many exhibit severe symptoms, including paranoia,
auditory and visual hallucinations, and persistent thoughts of self-harm.  *See* Def.'s Mental Health
PMK Dep. at 64:15–65:6.  Many have a mental illness so serious that they qualify for civil
commitment and placement in a state psychiatric hospital.  *See* Gage Report at 48; Confidential
Declaration of Margot Mendelson in Support of Plaintiffs' Motion for Partial Summary Judgment or
in the Alternative Preliminary Injunction ("Confidential Mendelson Decl.") (filed under seal), Ex. A
(July 16, 2018 "SSD-DSH Placement Pends" Chart) (listing 29 class members on wait list for
psychiatric hospital placement as of July 2018).[4]  Their transfer is often significantly delayed,
confining them to the Jail "for extended periods of time, often months."  Gage Report at 48.  On any
given day, many of these class members awaiting hospital placement are held in solitary
confinement.  *See* Fischer Decl. ¶ 12 & Exs. D & E (Defendant's data shows eight class members on
"Total Separation" status and state hospital wait list as of October 2018); *see e.g.*, Declaration of
Leertese Beirge ¶¶ 6, 8, ECF No. 33 (housed in "Total Separation" status and experienced suicidal
ideations repeatedly while awaiting transfer to psychiatric hospital for four months).

Defendant significantly cut its mental health programming in 2008 and 2009, reducing
mental health staffing by roughly 50%.  *See* Gage Report at 8, 11, 40–41 (describing "substantial
setbacks" to the jail mental health services "owing to staffing reductions"); Def.'s Mental Health
PMK Dep. at 77:21–78:3.  Defendant concedes that this was a budgetary decision.  *See* Def.'s
Mental Health PMK Dep. at 78:17–21.  According to Defendant's mental health expert, the Jail's
mental health services "have not recovered from those losses."  Gage Report at 40–41.  By
Defendant's own account, "inmates at the Sacramento County Jails have had an increased need for
mental health treatment and services" in recent years, and "the ability to provide such treatment and
services has not kept pace with demand."  Fischer Decl., Ex. F (Memorandum from Sacramento Cty.
Sheriff's Dep't to Sacramento Cty. Bd. of Supervisors at 1 (March 7, 2017)).  As a direct and

---

[4]     The Department of State Hospitals houses patients with serious mental illness, including
those who are found incompetent to stand trial or not guilty by reason of insanity, those who have
been classified a "mentally disordered offender," and those who require acute, inpatient psychiatric
care.  *See* Cal. Dep't of State Hosp., *Legal Commitments*, http://www.dsh.ca.gov/Legal/
Legal_Commitments.aspx (last accessed Feb. 5, 2019).

foreseeable consequence, scores of class members suffer without access to adequate treatment every day.

## I.   Defendant does not provide adequate treatment for the growing number of class members requiring higher levels of mental health care in the Jail.

### a.   Defendant fails to provide timely mental health care to class members actively experiencing acute mental health crises.

Defendant fails to provide timely care to class members experiencing acute mental health crises. The Jail's acute mental health care unit is overburdened and unable to keep up with the demands of the incarcerated population. People who need immediate mental health crisis intervention routinely are placed on long waitlists pending admission to the acute inpatient unit. While they wait, they are often confined to grim and isolating settings, which serves only to exacerbate their symptoms.

Defendant operates a small, 18-bed inpatient unit ("2P") for patients experiencing acute psychiatric distress. The unit is designated for those who present an active danger to themselves or others, or who are so ill that they meet the conditions for involuntary hospitalization under California Welfare and Institutions Code § 5150. *See* Fischer Decl., Ex H (Jail Psychiatric Servs., *Policy and Procedure Manual*, Policy # 700); Def.'s Mental Health PMK Dep. at 17:7–10, 61:5–16; Gage Report at 15, 25–28. 2P is a crisis response unit intended to stabilize patients; patients typically remain in the unit for no more than 10 days. *See* Gage Report at 28.

In 2016, Defendant's mental health expert determined that the number of pending admissions to the 2P unit had increased "dramatically" since October 2015. *Id.* at 10. Defendant admits that 2P currently lacks the capacity to treat everyone in the Jail experiencing a severe mental health crisis. Andrea Javist, Program Director for the Jail's mental health services provider, testified that there is "frequently" a waitlist for 2P, and that the unit cannot provide timely care for everyone who requires inpatient psychiatric treatment. *See* Def.'s Mental Health PMK Dep. at 32:21–23, 34:9–19; *see also* Gage Report at 19. As a result, a significant number of patients in urgent need of crisis care must languish without appropriate treatment for their acute symptoms.

According to Defendant's own clinicians, patients need immediate crisis care at the moment they are referred to the acute unit. *See* Def.'s Mental Health PMK Dep. at 31:24–32:2 (referral to 2P

1  means that inpatient crisis care is indicated *at the time of referral*); Gage Report at 19 (patients on

2  the 2P waitlist "meet [the] criteria for civil commitment" at the moment they are referred).  But due

3  to chronic shortages of space on 2P, patients regularly must wait extended periods for 2P inpatient

4  placement.  *See* Gage Report at 19 ("Patients often wait two weeks for a bed but the waiting list is

5  not formally tracked in terms of time."); Def.'s Mental Health PMK Dep. at 109:17–23, 111:16–21

6  (admitting that patients wait for "multiple days" and in some cases for "[m]ore than a week" for 2P

7  placement); Fischer Decl. ¶ 4 & Ex. A (Defendant's data shows that patients referred to 2P between

8  July 15, 2018 and October 19, 2018 waited on average 2.4 days, and as long as 11 days, for acute

9  care admission).

10  Without sufficient acute treatment beds, Defendant routinely holds class members who are

11  experiencing psychiatric crisis in harsh and dangerous "temporary" housing spaces, where they do

12  not receive treatment they require.  Most troubling, Defendant regularly houses people who are

13  awaiting inpatient psychiatric treatment in multipurpose rooms (or "classrooms") that were never

14  meant to house anyone, much less people in crisis.  *See* Fischer Decl., Ex. I (Operations Order 4/05

15  IV); Fischer Decl., Ex. N (excerpts of Deposition of Chief Deputy Jennifer Freeworth ("Freeworth

16  Dep.") (Nov. 8, 2018) at 96:23–97:2) (explaining that people are held in classrooms for suicide

17  observation due to lack of alternative space); Gage Report at 23; Lindsay M. Hayes, *Report on*

18  *Suicide Prevention Practices Within the Sacramento County Jail System* ("Hayes Report") (2016) at

19  29–30, ECF No. 37-9; Def.'s Mental Health PMK Dep. at 53:13–18, 111:1–24.  The classrooms lack

20  furniture, toilets, and running water, and reek of urine.  Gage Report at 61; Hayes Report at 30;

21  Def.'s Mental Health PMK Dep. at 112:6–16; Declaration of Jonathan Rykert ¶ 6.  They are located

22  in the center of the Main Jail housing pods and are enclosed by large windows, leaving the person

23  who is experiencing a psychiatric crisis exposed to everyone who lives in or passes through the

24  housing unit.  Def.'s Mental Health PMK Dep. at 112:6–23; Gage Report at 61; Hayes Report at 30;

25  Vail Report at 31; Beirge Decl. ¶ 6; *see* Fischer Decl., Ex. O (photo of multipurpose room in Main

26  Jail).  Often, people in these settings are naked except for jail-issued suicide smocks that do not

27  provide adequate cover for privacy.  *See* Vail Report at 31 ("I witnessed a woman in a suicide smock

28  in a mixed gender unit, in full view of male inmates in some pods and by anyone walking through

the unit."); Hayes Report at 31; Def.'s Mental Health PMK Dep at 112:17–23, 114:13–115:13; *e.g.*, Declaration of Frank Moppins ¶ 14.  Defendant admits that classrooms were not designed to house people and that it is not clinically appropriate to keep patients experiencing psychiatric crises in these rooms.  *See* Def.'s Mental Health PMK Dep. 112:6–23 ("Q: Does JPS consider classrooms to be clinically appropriate for its patients on suicide precautions? . . . A: It's -- no."); *see also* Gage Report at 61; Hayes Report at 30–31.

Defendant also houses class members awaiting acute care in small, concrete safety cells with no furniture, mattresses, showers, or running water.  *See* Fischer Decl., Ex. I (Operations Order 4/05 II); *id.*, Ex. P (photo of safety cell in Main Jail); Hayes Report at 29; Def.'s Mental Health PMK Dep. at 108:16–109:23.  Grates in the floor serve as toilets.  *See* Def.'s Mental Health PMK Dep. at 108:16–19.  There, too, people who are experiencing acute psychiatric crisis may spend days sleeping nearly naked on the concrete floor.  For example, one class member reported that in October 2018, he attempted suicide in his cell.  As he recounted: "Jail staff responded by putting me in the hole, with no water and no bathroom, just a grate on the floor.  It was terrible.  They made me strip out of my clothes, wear a green suit, and sleep on the freezing cold floor. . . . I felt like I was being punished for trying to kill myself."  Declaration of James Holston ¶ 6; *see also* Moppins Decl. ¶ 13 ("One time, deputies placed me naked in a small safety cell that smelled like urine, was filthy, and was freezing. There was no toilet, just a grate in the floor."); Beirge Decl. ¶ 6 ("The cell was a dark and bare room with only a grate in the floor to use as a toilet.").

As a consequence of the chronic inpatient bed shortage and prolonged delays in access to care, class members suffer serious harm.  Denying treatment to patients who are experiencing acute mental health distress is not only inhumane, but also causes serious injury.  "Psychosis itself is a destructive condition, literally damaging the brain, that must be alleviated."  Gage Report at 57.  Isolating these patients rather than engaging them in treatment may cause them to "sink[] further into despair or psychosis."  *See id.* at 44.  Defendant's suicide prevention expert explained that "[t]he use of isolation not only escalates the inmate's sense of alienation, but also further serves to remove the individual from proper staff supervision."  Hayes Report at 28.  Indeed, for many people experiencing psychiatric crisis, "isolation is deleterious to their condition and exacerbates risk of

suicide." Gage Report at 43–44; *see also* Def.'s Mental Health PMK Dep. at 132:25–133:16

(isolation removes protective factors that mitigate against suicide and self-harm).

These punitive conditions also discourage patients from reporting suicidal thoughts, placing

them at greater risk of suicide. *See* Hayes Report at 32 ("Recent research suggests that suicidal

inmates are often reluctant to discuss their suicidal thoughts because of the likelihood of being

exposed to the harsh conditions of suicide precautions, with almost 75 percent of inmates reporting

that they did not want to be transferred to an observation cell."); *see, e.g.*, Beirge Decl. ¶ 6

("Sometimes I would tell staff that I felt better in order to escape the cell or the classroom, because

of how uncomfortable and humiliated I felt."); Holston Decl. ¶ 7 ("If I feel suicidal again I am not

sure that I would tell anyone at the jail.  I do not want to go back to the hole.").

Defendant is well aware of these problems.  More than two years ago, Defendant's mental

health expert recommended that Defendant expand its acute psychiatric unit to 40 beds—more than

twice the current capacity—to meet the needs of the individuals in the Jail.  Gage Report at 72; *see*

*also id.* at 10, 25 (observing that 2P was "virtually always at capacity").  Defendant's experts also

condemned the use of temporary spaces for housing people in psychiatric crisis.  They concluded

that the Jail's treatment of people in psychiatric crisis is "overly restrictive," "seemingly punitive,"

"anti-therapeutic," and even "harsher" than solitary confinement.  Hayes Report at 32; *see also* Gage

Report at 23, 49 (noting that "[p]lacement of inmates in the . . . classrooms . . . exposes these

inmates to public scrutiny and has a punitive quality"); Vail Report at 31 (concluding that the use of

classrooms creates potential for "humiliation of an inmate experiencing a serious mental health

crisis").  Suicide prevention expert Lindsay Hayes called on Defendant to change its practices to

"strictly prohibit[] the use of any multi-purpose room or 'classroom' for the housing of inmates for

any duration of time" and "strictly limit[] the use of safety cells . . .  to four (4) hours."  Hayes

Report at 36.

But the situation persists.  Defendant has neither expanded the capacity of its acute mental

health unit nor ceased placing people in psychiatric crisis in classrooms and safety cells.  Def.'s

Mental Health PMK Dep. at 17:7–10, 33:25–34:8, 53:13–18, 109:17–23, 110:19–111:12.

Substantial numbers of people are affected.  Between April 1 and October 22, 2018, Defendant

1   placed at least 509 people in a classroom after they were identified as requiring suicide precautions.

2   Fischer Decl. ¶ 7 & Exs. B & C.  Fifty-four people remained in a classroom for three days or more;

3   one man was confined to a classroom for 23 consecutive days.  *Id.*  To this day, Defendant fails to

4   provide timely mental health treatment and instead subjects people with acute mental illness to

5   degrading and isolating settings.

6           b.      *Defendant allows treatable conditions to deteriorate in the absence of
                   adequate mental health treatment.*

7

8           Defendant's failure to provide adequate treatment to those who require acute crisis care is

9   only part of the problem.  People with serious mental illness who do not require inpatient

10  hospitalization receive essentially no mental health treatment beyond medication.  *See* Gage Report

11  at 22 ("General population mental health treatment services at both jails consist almost entirely in

12  the provision of medication, crisis response, and limited supportive services."); Def.'s Mental Health

13  PMK Dep. 56:5–12 ("[W]e're really focused on crisis intervention, brief support[ive] contacts,

14  medication management . . . [R]eally just our focus is stabilization.").  Defendant clusters some

15  people with mental health needs into "Outpatient Psychiatric Program (OPP)" units, but fails to

16  deliver any meaningful treatment in those settings.  Gage Report at 6, 24 ("Treatment on these units

17  is no different than in other general population settings."); *see also* Def.'s Mental Health PMK Dep.

18  54:11–14 (these units provide "[t]he same services we offer to individuals in the general

19  population"); Beirge Decl. ¶ 9 ("Even though the unit is for people with mental health needs, we still

20  do not receive therapy or any real mental health treatment.").  As Defendant admits, the mental

21  health care for the non-acute population is focused on crisis intervention and stabilization.  Def.'s

22  Mental Health PMK Dep. 56:5–12.

23          The lack of treatment for people with serious mental illness leads to a greater incidence of

24  psychiatric crisis and suffering.  As Dr. Gage explained, "crisis response is not treatment." Gage

25  Report at 47.  "[W]hen access to service is driven by crisis, then crisis is reinforced and necessarily

26  escalates."  *Id.* at 42; *see also id.* at 57 ("While crisis response is an important first step, it is only a

27  first step, just as is the case in the treatment of a medical condition.  Continued care is necessary.").

28  Thus, "[m]any patients cycle in and out of the [acute] unit . . . because they cannot be sustained by

1   the limited services available in [the general population]." *Id.* at 45.  As Defendant concedes, the

2   expansion of sub-acute mental health programming could reduce the need for acute bed space

3   because some patients "wouldn't decompensate to an extent [of] need[ing] 2P level of care if there

4   was an intermediate level of care."  Def.'s Mental Health PMK Dep. 34:20–35:5; *see also id.* at

5   34:9–19 (explaining that some "individuals might not be needing acute level of care" if the jail

6   offered more intermediate care).  In essence, Defendant admits that its failure to meet the known

7   mental health needs of its population leads some people to needlessly decompensate to the point of

8   crisis.

9        Patient 11 in Dr. Gage's report provides a troubling illustration of the harm caused by

10   Defendant's failure to provide adequate mental health care before patients devolve into crisis.  *See*

11   Confidential Mendelson Decl., Ex. F (Gage Report, app. 1) (filed under seal).  Patient 11 was

12   identified as schizophrenic at intake.  *Id.* at 81.  Despite his serious mental health needs, he was

13   placed in general population.  *Id.* at 81–83.  His medical records indicated that after 45 days in the

14   Jail, "[h]is cell smelled of urine and stool," he was "banging on his cell door," "intermittently

15   refusing his medication," and was "paranoid and responding to internal stimuli."  *Id.* at 82.  Within a

16   week, it was reported that he was "uncooperative, throwing feces, [had a] ripped up mattress,

17   blanket, clogged toilet, [and would] not eat."  *Id.*

18        Patient 11 was referred to JPS, but "[t]he social worker did not think he met criteria for civil

19   commitment."  *Id.*  With no other options for treatment, "[t]he plan was to monitor him."  *Id.*  Ten

20   days later, he was again referred to JPS and was placed on the waitlist for the 2P inpatient unit.  *Id.*

21   He was housed in a safety cell for four days before being placed on 2P.  *Id.* at 82–83.  After

22   placement on 2P, Patient 11 was released back to general population, where he "began intermittently

23   refusing his antipsychotics virtually immediately."  *Id.* at 83.  Within a month, Patient 11 had again

24   decompensated and become suicidal.  *Id.* at 83–84.  According to medical records, he reported

25   feeling that "he has no reasons to live" and that "nobody cares about us."  *Id.* at 84.  This time,

26   Patient 11 was held in a classroom for four days before being re-admitted to 2P.  *Id.* at 83–84.  In

27

28

sum, Patient 11 needlessly cycled in and out of acute psychiatric crisis because Defendant could not provide adequate care for his known mental health needs.[5]

In early 2017, while the parties were in settlement negotiations, Defendant created a small Intensive Outpatient Program ("IOP") "to begin addressing the gap in mental health treatment" in the Jail. *See* Fischer Decl., Ex. F (Memorandum from Sacramento Cty. Sheriff's Dep't to Sacramento Cty. Bd. of Supervisors at 1 (March 7, 2017)); *see also* Def.'s Mental Health PMK Dep. at 35:8–9, 38:15–16. The program was intended to serve as both a "step-up" from general population for people who need mental health treatment and a "step-down" from 2P. Def.'s Mental Health PMK Dep. at 35:14–36:2. From the outset, the 20-bed program was intended merely as an initial step to address a much broader deficiency. But almost two years after the program started, Defendant has failed to expand it beyond the 20-bed capacity. *See* Freeworth Dep. at 116:4–118:6 (explaining that there is currently no financial commitment to expand the IOP program at the Jail).

By Defendant's own admission, the current IOP unit is far too small to meet the mental health needs of the Jail population. Defendant has confirmed that the current capacity of 20 beds does not meet the needs of the class; that is, there are more people in the Jail who meet clinical criteria for placement in IOP than there are IOP beds. Def.'s Mental Health PMK Dep. at 38:17–23. Consequently, many patients who would benefit from IOP are denied access, and some people receiving care on the unit are pushed out to make room for new arrivals. *See id.* at 42:4–6 (conceding that "some patients . . . would remain on the IOP unit longer if there were more IOP beds"); *e.g.*, Declaration of Joseph Lee Brooks ¶¶ 7–8 (explaining that he "felt so much better" in IOP, but "was told that [he] had finished the program" after a month, so was transferred back to his old housing unit, where his "depression has gotten much worse again"); Holston Decl. ¶ 5 (similar).

---

[5] Defendant's experts' reports are replete with similar examples. *See e.g.*, Confidential Mendelson Decl., Ex. F at 97 (Gage Report, app. 1) (filed under seal) (describing Patient 27, who "was placed on the 2P pre-admit list the day after his release from 2P" and who never received "treatment designed to address his behavior management problems"); Hayes Report at 43–44 (describing a patient with a history of schizophrenia and bipolar disorder who, after almost two months in the Jail, "was observed smearing food and feces on the walls of his cell" and "had begun refusing psychotropic medications," and so had to be stabilized on 2P; after discharge from the unit, he deteriorated and became suicidal, requiring a second admission to 2P).

The current IOP also excludes two groups of people: women and people requiring a high-security setting. *See* Def.'s Mental Health PMK Dep. at 42:9–11 (women); Freeworth Dep. at 116:7–9 (same), Def.'s Mental Health PMK Dep. at 44:18–20, 45:25–46:8, 96:19–97:18 (high security). Defendant estimates that there are 20 to 25 women in the Jail who meet the clinical criteria for placement in IOP, but are denied access to IOP care. Def.'s Mental Health PMK Dep. at 42:12–21; *see generally* Gage Report at 71 ("Most developed [correctional] systems treat about 25% of the male population and 30-50% of the female population."). Defendant also explained that, because there is no IOP level of care for people determined to require a high-security setting, many end up in solitary confinement. Def.'s Mental Health PMK Dep. at 46:18–47:5 (these individuals are typically housed in a "solitary confinement situation"); *id.* at 125:16–126:4 (explaining these individuals "would benefit from IOP treatment"); *see also* Statement of Facts Part II.a., *infra*.

Defendant has acknowledged the need to expand IOP to 120 beds—five times its current capacity. Def.'s Mental Health PMK Dep. at 38:17–39:5, 41:2–13 (explaining that JPS has "estimated anywhere between 85 to 120 beds" to meet "IOP bed need"); *see also id.* at 25:23–26:5 (explaining that JPS recently put together a staffing proposal to expand IOP); Fischer Decl., Ex. K (copy of staffing proposal). But Defendant has failed to make any financial commitment to expand IOP. *See* Freeworth Dep. at 117:25–118:6. As a consequence, the vicious and harmful cycle continues. Defendant fails to meet the known needs of class members with serious mental illness, leading to their foreseeable deterioration into psychiatric crisis. Unequipped to cope with the magnitude of the demand for crisis care, Defendant then subjects those class members to humiliating, punitive, and anti-therapeutic settings while they sit on waiting lists to receive crisis care.

## II.   Defendant warehouses people with serious mental illness in an extreme form of solitary confinement.

Unable to provide adequate care to class members with serious mental illness, Defendant simply warehouses many of them in profound and prolonged isolation. Defendant operates an extreme isolation unit which it calls "Total Separation" or "T-Sep." According to national correctional experts Jim Austin, Emmitt Sparkman, and Robin Allen, hired by Defendant in 2016 to

evaluate the T-Sep classification, T-Sep is "unique to Sacramento County."  James Austin, Emmitt

Sparkman, & Robin Allen, *Evaluation of the Sacramento County Jail Inmate Classification and T-*

*SEP Systems* ("Austin Report") (2017) at 2, ECF No. 37-11.  They found that people classified as T-

Sep were "placed in harsh conditions of solitary confinement and isolated from direct contact with

other inmates for excessive periods of time."  *Id.* at 10.[6]

> People on T-Sep status can go weeks, months, and even years with little or no opportunity for

social contact.  They do not have cellmates and are confined to their cells for 23 ½ to 24 hours a day.

*See* Fischer Decl., Ex. J (Operations Order 6/10 II.A) (providing for "a minimum of three (3) hours

of exercise and recreation in a seven (7) day period"); Austin Report at 2, 9 ("Main Jail staff

confirmed T-SEP inmates rarely exit their cell except for the 30 minute daily session when it is

offered."); *see, e.g.*, Declaration of Lorenzo Mays ¶ 4, ECF No. 29; Declaration of Jennifer Bothun ¶

9, ECF No. 32; Declaration of Goldyn Cooper ¶ 7; Rykert Decl. ¶ 4; Beirge Decl. ¶ 4; Nelson Decl.

¶ 6; Moppins Decl. ¶ 4.  Even during the 30 minutes of out-of-cell time, they are isolated.  *See*

Fischer Decl., Ex. J (Operations Order 6/10 IV.A.1) (noting that for those on T-Sep, recreation is

provided "alone without any other class of prisoner"); Freeworth Dep. at 83:24–84:2 (explaining that

people on T-Sep are not permitted to be in the dayroom or at recreation with any other incarcerated

person).  Moreover, Defendant routinely withholds the 30 minutes of out-of-cell time due to staffing

shortages, *see* Freeworth Dep. at 34:22–35:15 (admitting that staffing shortages prevent Defendant

from providing "the adequate number of out-of-cell time"), or as a sanction for such infractions as

failing to rise for count.  Austin Report at 10.  Defendant concedes that not rising for count can be a

symptom of a person's mental illness.  *See* Def.'s Mental Health PMK Dep. at 134:18–25

(explaining that "someone with a lot of negative symptoms of schizophrenia . . . may not be getting

up for count"); *see, e.g.*, Beirge Decl. ¶ 5 (explaining that while on T-Sep, he "became mentally

exhausted and suicidal" and "stopped bothering to get out of [his] bed for count"); Mays Decl. ¶ 8

("Because of the difficulty sleeping and irregular sleep patterns, I have been disciplined many times

---

[6]   T-Sep is distinct from disciplinary detention.  Defendant operates a different solitary confinement unit as punishment for disciplinary violations.  *See* Vail Report at 11.

1  for 'Failure to Rise' in the morning."). As a consequence, some people spend days at a time locked

2  in their cells, with no access to fresh air or human contact.

3       Defendant holds people on T-Sep status in small, cold, concrete cells that often smell of feces

4  and urine. *See* Cooper Decl. ¶ 4 ("When I first arrived on T-Sep, my cell was filthy. There were

5  feces and what looked like blood smeared on the walls, old food on the floor, and gnats buzzing

6  around the cell. . . . The smell was so terrible that I became ill and vomited."); Declaration of Jackie

7  Burke ¶¶ 5–6 ("When I first arrived on T-Sep, my cell was filthy. There were feces smeared on the

8  walls. . . . The unit smells awful."); Rykert Decl. ¶¶ 4–5 ("My cell was . . . very small and always

9  cold. . . . The pod I was in was loud and smelled awful. People in that unit smeared their feces on

10 the walls and on themselves."). Defendant has sometimes failed to provide mattresses to people in

11 isolation units, leaving them to sleep on hard, cold surfaces for days. Vail Report at 22–23; *see e.g.*,

12 Burke Decl. ¶ 5.

13      People on T-Sep status are afforded very few sources of stimulation or links with the outside

14 world. They are not allowed to have radios or TVs. *See* Nelson Decl. ¶ 7; Rykert Decl. ¶ 4. There

15 are no clocks, so people have no method to track time while in their cells. *See* Nelson Decl. ¶ 5.

16 Defendant sometimes offers out-of-cell time only at night, preventing class members from getting to

17 a phone at a time when they can reach their loved ones or attorneys. *See* Fischer Decl., Ex. J

18 (Operations Order 6/10 IV.B) (noting that recreation "may be run between the hours of 0800-2300

19 hours"); Austin Report at 10; *see e.g.*, Beirge Decl. ¶ 5 ("On the rare occasions when I was permitted

20 to leave my cell, staff let me out at odd times, like 3:00 AM. This meant that I could not

21 communicate with my family, who were asleep during the periods when I was let out of my cell.").

22      Defendant holds people in these extreme conditions of isolation for months or years at a time.

23 Defendant's correctional experts found that, on average, people are held on T-Sep status for six

24 months and, in some cases, for many years. *See* Austin Report at 4. Plaintiff Mays has spent almost

25 eight years on T-Sep status. Mays Decl. ¶ 4; *see also* Brooks Decl. ¶ 4 (more than a year); Nelson

26 Decl. ¶ 4 (more than ten months); Bothun Decl. ¶ 7 (nine months); Burke Decl. ¶ 4 (more than seven

27 months); Beirge Decl. ¶¶ 4–8 (more than four months).

28

> a.   *Class members with serious mental illness experience severe psychological trauma while on T-Sep status.*

There is no dispute that Defendant routinely houses people with serious mental illness on T-Sep status.  *See* Def.'s Mental Health PMK Dep. at 67:6–10 (confirming that "[t]here are individuals . . . on the T-Sep with a serious mental illness"); Vail Report at 9 ("There is no question the SCSD routinely houses mentally ill inmates in segregated confinement.").  Defendant's experts found that about 75% of the people on T-Sep status require mental health treatment.  *See* Austin Report at 7.  Defendant's own data show that the vast majority of people on T-Sep status have mental health needs.  As of October 2018, Defendant had identified 116 of 133 people on T-Sep status as requiring ongoing mental health services.  *See* Fischer Decl. ¶ 10 & Exs. D & E.  Of those, at least six were in need of immediate inpatient treatment.  *See id*. ¶ 11 & Exs. D & E.  Eight others were awaiting transfer to the Department of State Hospital.  *See id*. ¶ 12 & Exs. D & E.

In fact, Defendant's experts concluded that many people were placed on T-Sep *because of* their mental illness.  *See* Austin Report at 7 (noting that "a number of the inmates had significant mental health issues that contributed to their placement and retention in T-SEP"); Gage Report at 45 (noting that mentally ill patients may be "placed in restrictive housing due to behavioral problems . . . related to their mental illness").  Indeed, Defendant's classification criteria specifically calls for individuals to be placed on T-Sep if they exhibit "severe psych issues."  *See* Fischer Decl., Ex. L (Current TSep Criteria/TSep Overrides).

Recognizing "the dangers of . . . placing mentally ill inmates in segregated housing," Defendant's expert on solitary confinement concluded that "[t]he use of segregation in the Sacramento County Jails is dramatically out of step with emerging national standards and practices and with [current research]."  Vail Report at 8.  As Dr. Gage explained, "[i]solation is deleterious to many mentally ill . . . especially for those with more serious illnesses."  Gage Report at 44.  Isolation causes "deterioration in their condition and the increased likelihood that many with limited coping skills will feel suicidal, self-harm, or claim to be suicidal in order to get a housing change or simply to access contact with others."  *Id.*; *see also id.* at 62 (noting that "those with mental illness are deteriorating in this isolated setting" and "becoming so ill that they must be committed").

Defendant recognizes that "individuals with serious mental illness that are isolated will oftentimes decompensate around that isolation." Def.'s Mental Health PMK Dep.at 68:3–7; *see also id.* at 23:8–24:2 (noting that "[l]imiting isolation," "[h]aving social contact, having social interactions, [and] participating in activities" are very beneficial for patients with acute mental illness). Indeed, Defendant admits that some people with serious mental illness may decompensate on T-Sep and "cycle back and forth between T-Sep unit and 2P." *Id.* at 125:16–21, 127:2–10. A disproportionately high number of referrals to 2P have come from the segregation units, including T-Sep. In July through October 2018, roughly 4% of people housed in the Jails were in segregation, but 33% of referrals or placements into the 2P acute psychiatric unit came from segregation units. *See* Fischer Decl. ¶¶ 13–15.

For example, jail medical records from September 2018 document the decompensation of one patient after about eight months on T-Sep status. *See* Confidential Mendelson Decl., Ex. B (patient's housing history) & C (excerpts of patient's mental and medical health records) (filed under seal). Staff documented that the patient "d[id] not shower" and that his "cell had flies all over the walls and trash all over the floor." *Id.*, Ex. C at 49–50. He was placed on the 2P acute care waitlist that day, but remained in his T-Sep cell. *Id.* at 45–46; Ex. B at 4. The next day, he "presented with rambling, mumbling and pressured speech, [which was] incongruent and loosely associated." *Id.*, Ex. C at 43. After four days on the waitlist, JPS staff "observed a swarm of flies" in his cell that was so dense that it was "difficult to see [the patient] in his cell." *Id.* at 33–34. After a week on the waitlist, he "had odd arm movements all the time and his cell was very malodorous." *Id.* at 20. Staff reported that he "had so many flies following him, that when he moved there was a silhoutte [sic] of no flies." *Id.* He was finally moved out of T-Sep and admitted to 2P. *Id.* His deterioration on T-Sep was foreseeable; indeed, the medical records indicate that he was "admitted to 2P under very similar circumstances one year ago." *Id.* at 11.

Class members with serious mental illness in T-Sep are also at great risk of self-harm and suicide. Austin et al. found that "T-SEP inmates frequently threaten self-harm, and are often placed on suicide watch." Austin Report at 7, 10. Defendant has conceded that "T-Sep status . . . isolates people and creates a situation where there is not a lot of protective factors" that would mitigate the

1  risk of suicide.  *See* Def.'s Mental Health PMK Dep. at 132:25–133:16; *see also* Hayes Report at 28.

2  The statistics bear this out: Mr. Hayes found that "2 of 3 of the most recent inmate suicides were on

3  'total separation' status [at] the time of their deaths."  Hayes Report at 51.

4  Since Mr. Hayes released his report, at least two additional suicide deaths have occurred in

5  the T-Sep units.  In 2017, one man hanged himself in his cell after spending almost four months on

6  T-Sep status.  *See* Confidential Mendelson Decl., Ex. D at 63 (filed under seal).  He had previously

7  sought mental health treatment at the Jail, stating that he was nearing a mental breakdown and

8  needed help coping with suicidal thoughts.  *Id.*  In 2018, a man hanged himself with a ripped towel

9  in his T-Sep cell.  *Id.*, Ex. E at 66, 69.  His arrest had occurred during an involuntary psychiatric

10  evaluation, after he suddenly ran out of the hospital on foot.  *Id.* at 68.  Despite clear indications that

11  the man had extremely serious mental health needs, he was placed on T-Sep and remained there for

12  two months, until he died by suicide in his T-Sep cell.  *Id.* at 66, 69.

13  Class members continue to suffer severe psychological trauma on T-Sep status to this day.

14  They describe feeling "hopeless" and "unable to cope with the extreme isolation in T-Sep."  Cooper

15  Decl. ¶ 7; Brooks Decl. ¶¶ 5, 8.  They report feeling "trapped" in their small cells, and explain that

16  they have difficulty breathing due to the extreme anxiety.  Cooper Decl. ¶ 7 ("I feel trapped, like an

17  animal.  My anxiety gets so bad when I am in my cell that I feel like I cannot breathe."); Bothun

18  Decl. ¶¶ 7, 9.   Some have "become so depressed" that they sleep continuously and rarely leave their

19  cells, even to shower.  Brooks Decl. ¶¶ 5, 8; Burke Decl. ¶¶ 7–8.  Some class members report

20  becoming suicidal while on T-Sep, and describe being placed temporarily on suicide precautions and

21  then returned to the same T-Sep housing where they had decompensated.  Beirge Decl. ¶¶ 5–7;

22  Rykert Decl. ¶¶ 6–7.  Class members also describe experiencing auditory and visual hallucinations

23  while in isolation, explaining that the voices "get louder" when they are alone in their cells.  *See*

24  Mays Decl. ¶¶ 4, 6–9; Nelson Decl. ¶ 7; Cooper Decl. ¶ 7.  They describe feeling as if the walls are

25  closing in on them.  Nelson Decl. ¶ 7; Rykert Decl. ¶ 4.

26

27

28

16

> **b.** *Defendant continues to place class members with serious mental illness on T-Sep status.*

Defendant's experts called for the "elimination of the T-Sep classification," Austin Report at 11–12, and recommended that Defendant screen people referred to segregation units to determine whether their mental illness places them at risk of harm in solitary confinement, *see* Vail Report at 41; Hayes Report at 62; Gage Report at 62, 69.  Dr. Gage described this screening process as an "essential function" to protect high-risk populations from serious harm.  Gage Report at 50.

More than two years later, Defendant has failed to adopt these recommendations.  Defendant continues to use the T-Sep classification, and does not screen people referred to T-Sep to determine whether their mental illness places them at risk of deterioration or suicide in solitary confinement. *See* Def.'s Mental Health PMK Dep. at 88:16–90:20 (confirming that JPS does not currently "conduct a formal review of clinical factors" nor "routine suicide risk assessments" before T-Sep placement).  As a result, in the time since the experts issued their reports, the number of people with the most serious mental health needs on T-Sep status has only increased.  According to Austin's 2017 report, Defendant placed one person requiring the highest level of mental health care ("FOSS I") on T-Sep status, and 25 people requiring the second-highest level of care ("FOSS II") on T-Sep status.  Austin Report at 5, tbl.1.  By October 2018, Defendant had six people at FOSS I and 31 people at FOSS II on T-Sep status.  Fischer Decl. ¶ 11 & Exs. D & E.[7]

## ARGUMENT

According to Defendant's own testimony and experts, the Jail lacks sufficient space and staff to treat class members with serious mental illness.  Also according to Defendant's own testimony and experts, its practice of warehousing people with serious mental illness in solitary confinement places them at serious risk of psychological and physical harm, including death.  These practices violate the Eighth and Fourteenth Amendments.

---

[7]  Defendant classifies patients' mental health needs into four levels of care.  Gage Report at 15; Austin Report at 4–5; Def.'s Mental Health PMK Dep. at 60:7–16.  Patients at the highest level of care (FOSS I) meet the criteria for an involuntary psychiatric hold under California Welfare and Institutions Code § 5150.  *See* Def.'s Mental Health PMK Dep. at 61:5–16.  According to Defendant, all patients at the FOSS II level of care have serious mental illness; some at the FOSS III level of care do as well.  *See id*. at 69:14–16, 70:6–10.

1      Summary judgment is appropriate because no facts are in dispute with respect to Plaintiffs'

2  claims.  *See* Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (en banc).  In

3  reviewing a motion for summary judgment, the Court "view[s] the evidence in the light most

4  favorable to the non-moving party."  *Baca*, 747 F.3d at 1168. However, the nonmoving party may

5  prevail only by "designat[ing] specific facts showing that there is a genuine issue for trial."  *Celotex*

6  *Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also* Fed. R. Civ. P. 56(c).  "When the moving party

7  has carried its burden under Rule 56(c), its opponent must do more than simply show that there is

8  some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio*

9  *Corp.*, 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly

10  probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

11  249–50 (1986) (citations omitted).

12      According to Defendant's own evidence, the Jail fails to provide access to inpatient (2P) and

13  sub-acute residential (IOP) beds to scores of people with serious mental illness who require such

14  treatment.  Also according to Defendant's own evidence, Defendant continues to place many class

15  members with serious mental illness in solitary confinement.  Defendant's own experts opined that

16  this practice places people at great risk of deterioration and suicide.  Because Plaintiffs' motion

17  relies on Defendant's experts and Defendant's own person-most-knowledgeable testimony, and thus

18  requires only an application of undisputed—and undisputable—facts to the law, summary judgment

19  is appropriate.  *See, e.g.*, *King Cty. v. Azar*, 320 F. Supp. 3d 1167, 1170–71 (W.D. Wash. 2018)

20  (granting plaintiffs' motion for summary judgment and dismissing plaintiffs' motion for preliminary

21  injunction as moot because the "parties' dispute is purely legal").

22      **I.      Defendant's failure to treat people with serious mental illness violates the Eighth**
23              **and Fourteenth Amendments.**

24      Embodying "broad and idealistic concepts of dignity, civilized standards, humanity, and

25  decency," the Eighth Amendment proscribes conditions of confinement "which are incompatible

26  with the evolving standards of decency that mark the progress of a maturing society, or which

27  involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102–03

28  (1976) (citations omitted).  The Constitution thus requires that officials "must provide humane

1   conditions of confinement . . . and must 'take reasonable measures to guarantee the safety of the

2   inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517,

3   526–27 (1984)).

4          An Eighth Amendment violation has both an objective and subjective prong.  *See Grenning*

5   *v. Miller-Stout*, 739 F.3d 1235, 1238 (9th Cir. 2014).  The objective prong is satisfied if the

6   institution deprives a person of "basic human needs," *Helling v. McKinney*, 509 U.S. 25, 32–33

7   (1993), or a "minimal civilized measure of life's necessities," *Wilson v. Seiter*, 501 U.S. 294, 298

8   (1991) (citation omitted).  "The touchstone is the health of the inmate.  While the prison

9   administration may punish, it may not do so in a manner that threatens the physical and mental

10  health of prisoners." *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992) (citing *Hutto v. Finney*,

11  437 U.S. 678, 685–87 (1978)), *superseded by statute on other grounds as stated in Nyhuis v. Reno*,

12  204 F.3d 65, 71 (3d Cir. 2000).  The subjective prong is satisfied if the defendant acts with

13  "deliberate indifference." *Grenning*, 739 F.3d at 1238.  "A showing of deliberate indifference . . .

14  requires a showing that the defendant knew of an excessive risk to inmate health or safety that the

15  defendant deliberately ignored." *Id.* at 1239; *see also Farmer*, 511 U.S. at 835–40 (adopting

16  subjective recklessness as the test for deliberate indifference under the Eighth Amendment).

17         Because many members of the Plaintiff class are pre-trial, they are also protected by the

18  Fourteenth Amendment's Due Process Clause.  *See Bell v. Wolfish*, 441 U.S. 520, 533–37 (1979);

19  *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008).  "Under the Due Process Clause,

20  detainees have a right against jail conditions or restrictions that 'amount to punishment.'  This

21  standard differs significantly from the standard relevant to convicted persons, who may be subject to

22  punishment so long as it does not violate the Eighth Amendment's bar against cruel and unusual

23  punishment." *Pierce*, 526 F.3d at 1205 (citing *Bell*, 441 U.S. at 535–37 & n.16).  While an

24  individual who has been convicted of a crime must show subjective deliberate indifference to

25  establish a violation of the Eighth Amendment, the analysis differs for pretrial detainees arguing that

26  a denial of health care violates the Fourteenth Amendment.

27         [T]he elements of a pretrial detainee's medical care claim against an individual
           defendant under the due process clause of the Fourteenth Amendment are: (i) the
28         defendant made an intentional decision with respect to the conditions under which the

plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018).  Accordingly, deprivations of health care that violate the rights of the convicted population *a fortiori* violate the rights of those who are pretrial.  *See Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (holding that the protections of the Due Process clause "are at least as great as the Eighth Amendment protections available to a convicted prisoner"); *Bell*, 441 U.S. at 545; *see also Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004) (noting that the Fourteenth Amendment is "more protective").  Thus, Plaintiffs rely primarily on cases involving the Eighth Amendment.

It is well established that a "[l]ack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations.  A case seeking prospective relief thus can't be dismissed simply because there is a shortage of resources." *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc) (citations omitted); *see also Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979) ("The cost or inconvenience of providing adequate facilities is not a defense to the imposition of a cruel punishment.").

> a.   *Defendant fails to provide timely, adequate care to people with serious mental illness in violation of the Eighth and Fourteenth Amendments.*

Defendant's failure to provide class members in its care with access to necessary mental health treatment violates the Eighth and Fourteenth Amendments.  "The obligation to provide for the basic human needs of prisoners includes a requirement to provide access to adequate mental health care." *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 (E.D. Cal. 1995).  The Ninth Circuit has held that "the requirements for mental health care are the same as those for physical health care." *Doty v. Cty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994).

"To establish unconstitutional treatment of a medical condition, including a mental health condition, a prisoner must show deliberate indifference to a 'serious' medical need." *Doty*, 37 F.3d

at 546; *see also Estelle*, 429 U.S. at 104–05. "A medical need is serious if failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Peralta*, 744 F.3d at 1086 (citation omitted). Indicators of a "serious" medical need include: whether "a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992). Class members with serious mental illness plainly have serious mental health needs. *See Madrid v. Gomez*, 889 F. Supp. 1146, 1255 n.201 (N.D. Cal. 1995) (finding a serious mental health need where "members of the class suffer from mental disorders and illnesses that go beyond the mere stress or anxiety that is part of the 'routine discomfort' of incarceration"); *see also Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) ("Treatment of the mental disorders of mentally disturbed inmates is a 'serious medical need.'").

Defendant's failure to provide adequate treatment for the scores of class members with serious mental illness violates the Eighth and Fourteenth Amendments. To provide minimally adequate treatment of a serious mental health condition, officials must provide "a system of ready access" to mental health care. *See Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). This "precludes prison officials from preventing treatment which is medically necessary in the judgment of the treating doctor." *Madrid*, 889 F. Supp. at 1257–58; *see also Estelle*, 429 U.S. at 104–05. And it requires that "access to medical treatment cannot be substantially delayed in a systematic manner." *Madrid*, 889 F. Supp. at 1257; *see also Estelle*, 429 U.S. at 104–05 (stating that "intentionally . . . delaying access to medical care" evidences deliberate indifference); *Jett v. Penner*, 439 F.3d 1091, 1096–98 (9th Cir. 2006) (similar); *Ramos v. Lamm*, 639 F.2d 559, 577–78 (10th Cir. 1980) (upholding district court finding that delays in mental health treatment violated the Eighth Amendment); *Dawson v. Kendrick*, 527 F. Supp. 1252, 1308 (S.D. W. Va. 1981) (similar).

Defendant's knowing failure to provide ready access to higher levels of mental health care, including inpatient (2P) and intensive outpatient (IOP) treatment, for people with serious mental illness violates the Eighth and Fourteenth Amendments. In *Coleman*, plaintiffs provided evidence of

"a 'major problem' with access to acute inpatient hospitalization, and a 'backlog of cases awaiting transfer to Enhanced Outpatient Program due to the limited number of beds available.'" 912 F. Supp. at 1309.[8]  The *Coleman* court held that the State acted with deliberate indifference in denying timely access to "mental health care at each level of the mental health care delivery system." *Id.* at 1308–09, 1315–19.  The United States Supreme Court endorsed these holdings when concluding that subsequent remedial efforts had not cured this constitutional violation. *See Brown v. Plata*, 563 U.S. 493, 503–04, 516, 519 (2011) (noting that "[p]risoners in California with serious mental illness do not receive minimal, adequate care" in part due to a "shortage of treatment beds"); *see also Coleman*, 922 F. Supp. 2d at 887, 907 (concluding that "mental health care . . . in the California prison system is woefully and constitutionally inadequate" in part because "the expanding wait lists" and "critical shortage of beds" "meant that a growing number of the most seriously mentally ill inmates in the CDCR were not receiving in a timely fashion the levels of care they needed"); *Coleman v. Brown*, 938 F. Supp. 2d 955, 983–84, 990 (E.D. Cal. 2013) (denying defendants' motion to terminate in part because defendants had not yet solved the problem of providing "access to beds at each level of mental health care").

Courts nationwide have found constitutional violations when an institution has failed to provide ready access to appropriate levels of mental health care. *See, e.g.*, *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1213–31, 1267 (M.D. Ala. 2017) (finding that Defendant's "mental-health care is horrendously inadequate" in part because the prison system had a "chronic shortage of crisis cells," "fail[ed] to provide hospital-level care to severely ill prisoners," and failed to provide adequate step-down treatment for those coming out of crisis cells); *Inmates of Allegheny Cty. Jail v. Peirce*, 487 F. Supp. 638, 642–44 (W.D. Pa. 1980) (concluding that incarcerated persons with mental illness were "denied reasonable access to psychiatric diagnosis and care" and ordering the jail to create a

---

[8]     California Department of Corrections and Rehabilitation's ("CDCR") Enhanced Outpatient Programs (EOP) provides intensive outpatient care, and is analogous to Defendant's IOP program. *See Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 903 n.24 (E.D. Cal. 2009) ("The EOP level of care is for inmates who . . . are unable to function in the general prison population but do not require twenty-four hour nursing care or inpatient hospitalization.").

dedicated mental health unit); *Tillery v. Owens*, 719 F. Supp. 1256, 1303–04 (W.D. Pa. 1989) (similar).

Defendant's system of mental health care suffers from the same constitutional deficiencies identified in these cases. As discussed above, Defendant routinely leaves acutely psychotic patients "to suffer, in a hallucinatory and distraught state, without being referred to needed inpatient or intensive outpatient treatment." *Madrid*, 889 F. Supp. at 1259; *see* Statement of Facts, Part I.a., *supra*. People are housed in inappropriate, non-treatment settings "while awaiting transfer to scarce mental health treatment beds for appropriate care." *Plata*, 563 U.S. at 519; *see* Statement of Facts, Part I.a., *supra*. And class members who are "denied necessary mental health placements 'are decompensating and are ending up in mental health conditions far more acute than necessary . . . creat[ing] a cycle of sicker people being admitted, with greater resources necessary to treat them, which then creates even further backlog in an already overwhelmed system.'" *Coleman*, 922 F. Supp. 2d at 930 (alteration and omission in original); *see* Statement of Facts, Part I.b., *supra*. These practices are in clear violation of the Eighth and Fourteenth Amendments.

        b.     *Placing people with serious mental illness on Total Separation violates the Eighth and Fourteenth Amendments.*

Defendant also violates the Eighth and Fourteenth Amendments by warehousing many people with serious mental illness on Total Separation status, putting them at risk of psychological and physical harm, including death. "[P]rison officials are constitutionally prohibited from being deliberately indifferent to policies and practices that expose inmates to a substantial risk of serious harm." *Parsons v. Ryan*, 754 F.3d 657, 677 (9th Cir. 2014); *see Helling*, 509 U.S. at 33–34. It is widely recognized that people with serious mental illness in solitary confinement "are especially vulnerable, and their mental health symptoms—including depression, psychosis, and self-harm—are especially likely to grow more severe." *Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 946 (N.D. Cal. 2015). As early as 1890, the Supreme Court observed that in one of the first experiments with solitary confinement, "[a] considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide." *In re Medley*, 134 U.S. 160,

1   168 (1890). As the Third Circuit recently noted in *Palakovic v. Wetzel*, there is now a "robust body

2   of legal and scientific authority recognizing the devastating mental health consequences caused by

3   long term isolation in solitary confinement." 854 F.3d 209, 225–26 (3d Cir. 2017); *see also Davis v.*

4   *Ayala*, 135 S. Ct. 2187, 2209–10 (2015) (Kennedy, J., concurring) (noting the need for courts to pay

5   closer attention to research on harmful mental health effects of solitary confinement); *Glossip v.*

6   *Gross*, 135 S. Ct. 2726, 2765–66 (2015) (Breyer, J., dissenting) (reviewing research on harmful

7   mental health effects of solitary confinement).[9]

8       More than twenty years ago, in *Madrid v. Gomez*, the court found that placing people with

9   mental illness in solitary confinement "is the mental equivalent of putting an asthmatic in a place

10  with little air to breathe." 889 F. Supp. at 1265. There, individuals were permitted to leave their

11  cells for about 1.5 hours each day—*three times* more out-of-cell time than provided in Defendant's

12  T-Sep units. *Id.* at 1229; *see* Statement of Facts, Part II, *supra*. People in solitary confinement were

13  not allowed to participate in many recreational or educational programs; they left their cells only for

14  medical appointments, non-contact visits, religious programs, solitary exercise, and showers.

15  *Madrid*, 889 F. Supp. at 1229; *see* Statement of Facts, Part II, *supra*. The court concluded that

16  people with mental illness "[we]re at a particularly high risk for suffering very serious or severe

17  injury to their mental health, including overt paranoia, psychotic breaks with reality, or massive

18  exacerbations of existing mental illness as a result of conditions in the [solitary confinement unit]"

19  and that housing those people in solitary confinement "constitute[d] cruel and unusual punishment in

20  violation of the Eighth Amendment." *Madrid*, 889 F. Supp. at 1265–67.

21      Similarly, in *Braggs v. Dunn*, the court recently held that routinely placing people with

22  serious mental illness in solitary confinement violated the Eighth Amendment. 257 F. Supp. 3d at

23  1247. Like in Defendant's T-Sep unit, people in solitary confinement spent "on average over 23

24  hours per day inside of a cell," did not have access to programming, and were "allowed very few

---

[9]     Solitary confinement "generally refers to the correctional practice of keeping a prisoner in a cell for 22.5 hours or more a day." *Braggs*, 257 F. Supp. 3d at 1235; *see also* U.S. Dep't of Justice, *Report and Recommendations Concerning the Use of Restrictive Housing* at 3 (Jan. 2016), *available at*: https://www.justice.gov/archives/dag/report-and-recommendations-concerning-use-restrictive-housing (22 hours). Defendant's T-Sep unit plainly falls within this definition. *See* Statement of Facts, Part II, *supra* (class members spend roughly 23.5 hours in their cell each day).

items in their cells to occupy themselves." *Id.* at 1238; *see* Statement of Facts, Part II, *supra*.  The court found that "[t]he combination of the lack of any meaningful activity or social contact and the stressors of living in a dilapidated, filthy, and loud housing unit for almost 24 hours per day results in a heightened risk of decompensation for mentally ill prisoners." *Braggs*, 257 F. Supp. 3d at 1238.

Indeed, courts have reached a broad and longstanding consensus that the practice of regularly housing people with serious mental illness in solitary confinement violates the Constitution.  *See, e.g.*, *Palakovic*, 854 F.3d at 225–26 (noting "the increasingly obvious reality that extended stays in solitary confinement can cause serious damage to mental health"); *Williamson v. Stirling*, 912 F.3d 154, 179–80 (4th Cir. 2018) (finding the fact that Defendant continued to house Plaintiff in solitary confinement despite his "worsening mental health symptoms . . . would undermine the claim that [Plaintiff]'s prolonged conditions of solitary confinement were 'reasonably' related to some supporting rationale"); *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1095, 1100 (E.D. Cal. 2014) (finding that the "placement of seriously mentally ill inmates in California's segregated housing units can and does cause serious psychological harm, including decompensation, exacerbation of mental illness, inducement of psychosis, and increased risk of suicide," and "the Eighth Amendment prohibits placements of seriously mentally ill inmates in conditions that pose a substantial risk of exacerbation of mental illness, decompensation, or suicide"); *Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r*, No. 1:08–cv01317–TWP–MJD, 2012 WL 6738517 at *15–17, 23 (S.D. Ind. Dec. 31, 2012) (holding that the practice of placing prisoners with serious mental illness in segregation without treatment constituted cruel and unusual treatment in violation of the Eighth Amendment); *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1101–05, 1116, 1125–26 (W.D. Wis. 2001) (issuing preliminary injunction requiring removal of seriously mentally ill from solitary confinement); *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 915 (S.D. Tex. 1999), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered to on remand*, 154 F. Supp. 2d 975, 984–85 (S.D. Tex. 2001) ("Conditions in . . . administrative segregation units clearly violate constitutional standards when imposed on the subgroup of the plaintiffs' class made up of mentally-ill prisoners."); *Langley v. Coughlin*, 715 F. Supp. 522, 540 (S.D.N.Y. 1989) (similar).

1   Courts have found that much shorter terms of solitary confinement than at issue here violate

2   the Eighth Amendment for people with serious mental illness.  Class members spend, on average, six

3   months and, in some cases, many years on T-Sep status.  *See* Statement of Facts, Part II, *supra*.  In

4   *Casey v. Lewis*, for example, "both the plaintiffs' and defendants' experts agreed that it is

5   inappropriate to house acutely psychotic inmates in segregation facilities for more than three days."

6   834 F. Supp. 1477, 1548–49 (D. Ariz. 1993); *see also Coleman*, 28 F. Supp. 3d at 1099–1100 (E.D.

7   Cal. 2014) (prohibiting placement of those with serious mental illness in solitary confinement "for a

8   period of more than seventy-two hours if the placement is for non-disciplinary reasons"); *see*

9   *generally Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) ("Even a few days' delay in

10   addressing a severely painful but readily treatable condition suffices to state a claim of deliberate

11   indifference.").  Professional standards recommend that officials discontinue or substantially limit

12   the use of solitary confinement for people with serious mental illness.  *See* Am. Psychiatric Ass'n,

13   *Position Statement on Segregation of Prisoners with Mental Illness* (2012) (explaining that

14   individuals with serious mental illness should not be subject to prolonged solitary confinement due

15   to the potential for harm); Nat'l Comm'n on Corr. Health Care, *Solitary Confinement*, *Position*

16   *Statement on Solitary Confinement* (2016), *available at*: https://www.ncchc.org/solitary-confinement

17   (declaring that persons with mental illness should not be placed in segregation absent extenuating

18   circumstances, and even in those circumstances, the stay should be less than 15 days).  Defendant's

19   practice of holding people it knows to be seriously mentally ill in solitary confinement for months or

20   years at a time plainly violates the Eighth and Fourteenth Amendments.

21   **II.    If issues of fact make summary judgment premature, preliminary relief is**
22   **       necessary.**

23   If the Court should identify factual issues that make summary judgment premature at this

24   time, however, preliminary injunctive relief is necessary because: (1) Plaintiffs are likely to succeed

25   on the merits; (2) Plaintiffs are likely to suffer irreparable harm absent preliminary relief; (3) the

26   balance of equities tips in Plaintiffs' favor, and (4) an injunction is in the public interest.  *See Winter*

27

28

1    *v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008).[10]  Plaintiffs are also entitled to preliminary relief

2    under the "sliding scale" approach, the Ninth Circuit's "alternate formulation" of the *Winter*

3    standard.  *See Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).  Under this approach, courts

4    can issue an injunction if the *Winter* factors regarding irreparable harm and public interest are met,

5    and movants raise (1) "serious questions going to the merits," and (2) the balance of equities "tips

6    sharply towards the [movants]."  *Id.* (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

7    1127, 1135 (9th Cir. 2011)).

8         To establish a substantial likelihood of success on the merits, Plaintiffs are only obligated to

9    show "a fair chance of success."  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782,

10   794 (9th Cir. 2005) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir.

11   1988) (en banc)).  Plaintiffs plainly satisfy this standard.  *See* Argument, Part I, *supra*.

12        The remaining equitable factors in the preliminary injunction analysis weigh heavily in

13   Plaintiffs' favor.  First, Plaintiffs suffer irreparable harm each day as a result of the degrading and

14   dangerous conditions of confinement in the Jail.  The Ninth Circuit has held that "the deprivation of

15   constitutional rights 'unquestionably constitutes irreparable injury,'" *Melendres v. Arpaio*, 695 F.3d

16   990, 1002 (9th Cir. 2012) (citation omitted), because these violations "cannot be adequately

17   remedied through damages," *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1059 (9th Cir.

18   2009) (citation omitted).  Moreover, Defendant's policies and procedures create a serious and

19   ongoing threat of harm to class members with serious mental illness.  *See* Statement of Facts, Part

20   I.a., *supra* (failure to provide timely access to acute care causes suffering and discourages patients

21   from reporting suicidal thoughts); Part I.b., *supra* (failure to provide access to intermediate care

22   causes needless decompensation into crisis); Part II.a., *supra* (placement on T-Sep heightens risk of

23   decompensation and suicide).  These harms plainly constitute irreparable injury: "pain, suffering and

24   the risk of death constitute 'irreparable harm' sufficient to support a preliminary injunction in prison

25   cases."  *See Jones 'El*, 164 F. Supp. 2d at 1123 (issuing preliminary injunction requiring removal of

26

---

27   [10]    For the same reasons, Plaintiffs also satisfy the standard for permanent injunctive relief.  *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a

28   preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

1    seriously mentally ill from solitary confinement); *Hernandez*, 110 F. Supp. 3d at 956 (holding the

2    same and granting preliminary injunction requiring county jail to implement sweeping changes to

3    intake processes, mental health services, and disability accommodations); *see also Rodde v. Bonta*,

4    357 F.3d 988, 999 (9th Cir. 2004) (holding that "delayed and/or complete lack of necessary

5    treatment, and increased pain and medical complications" constitutes irreparable harm); *Von Colln v.*

6    *Cty. of Ventura*, 189 F.R.D. 583, 598 (C.D. Cal. 1999) ("Defendants do not argue that pain and

7    suffering is not irreparable harm, nor could they.").

8         Second, enjoining unconstitutional conditions of confinement at the Sacramento County Jail

9    is in the public interest.  The Ninth Circuit has made clear that "it is always in the public interest to

10   prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quoting

11   *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002)).

12        Finally, the balance of hardship tips heavily in Plaintiffs' favor.  Under this prong of the

13   preliminary injunction analysis, courts "must balance the competing claims of injury and must

14   consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555

15   U.S. at 24 (internal quotation marks omitted).  Here, as discussed above, Plaintiffs suffer serious

16   harm from Defendant's failure to provide mental health treatment, and failure to remove people with

17   serious mental illness from solitary confinement.  Defendant will merely be required to devise a plan

18   to bring the Jail in line with professional health care standards and the practices of jails and prisons

19   nationwide.  *See generally Braggs*, 257 F. Supp. 3d at 1237 & n.61.  While Defendant will incur

20   costs to implement the necessary changes, the Ninth Circuit squarely has held that an interest in

21   protecting people from harm outweighs monetary costs to government entities.  *See Harris v. Bd. of*

22   *Supervisors, L.A. Cty.*, 366 F.3d 754, 766 (9th Cir. 2004) ("[F]aced with . . . a conflict between

23   financial concerns and preventable human suffering, [the court has] little difficulty concluding that

24   the balance of hardships tips decidedly in plaintiffs' favor." (quoting *Lopez v. Heckler*, 713 F.2d

25   1432, 1437 (9th Cir. 1983))); *Rodde*, 357 F.3d at 990 (upholding preliminary injunction prohibiting

26   the county from closing a hospital that provided inpatient and outpatient rehabilitative care to

27   disabled individuals, despite the county's contention that doing so would save millions of dollars).

28   The "government suffers no harm from an injunction that merely ends unconstitutional practices

1   and/or ensures that constitutional standards are implemented." *Doe v. Kelly*, 878 F.3d 710, 718 (9th

2   Cir. 2017) (upholding preliminary injunction requiring constitutionally adequate conditions in U.S.

3   Border Patrol temporary detention facilities in Arizona) (citation omitted).[11]

4   ### III.   The relief requested is consistent with the Prison Litigation Reform Act.

5       As set forth in the Proposed Order filed herewith, Plaintiffs request an order requiring

6   Defendant to devise a remedial plan to address these Constitutional violations.  The Prison Litigation

7   Reform Act ("PLRA") authorizes courts to issue injunctive relief to remedy unlawful conditions in

8   correctional facilities.  *See* 18 U.S.C. § 3626(a)(1) & (2).  The PLRA requires that the relief be

9   narrowly drawn, no broader than necessary, and the least intrusive means to correct the violations.

10  *See id*.

11      Plaintiffs' request for relief intrinsically meets these requirements.  "Allowing defendants to

12  develop policies and procedures to meet [their legal] requirements is precisely the type of process

13  that the Supreme Court has indicated is appropriate for devising a suitable remedial plan in a prison

14  litigation case." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1071 (9th Cir. 2010); *see also Pierce*

15  *v. Cty. of Orange*, 761 F. Supp. 2d 915, 954 (C.D. Cal. 2011) (explaining that "the least intrusive

16  means to compel the County to remedy the [deficiencies identified in the case] is to allow the

17  County to draft a proposed plan").

18                                  **CONCLUSION**

19      For the reasons set forth above, Plaintiffs respectfully request that this Court issue the

20  Proposed Order for Partial Summary Judgment, filed herewith.  In the alternative, Plaintiffs request

21  that this Court issue the Proposed Order for Preliminary Injunction, filed herewith.

22                                  Respectfully submitted,

23  Dated: February 12, 2019              */s/ Margot Mendelson*
                                          Margot Mendelson (SBN 268583)
24                                        PRISON LAW OFFICE

25                                        *Attorney for Plaintiffs*

26  ---

    [11]     Plaintiffs seek a waiver of the security requirement for preliminary injunctions.  Fed. R. Civ.
27  P. 65(c).  Security "is not required where plaintiffs are indigent or where considerations of public
    policy make waiver of a bond appropriate."  *Miller v. Carlson*, 768 F. Supp. 1331, 1340 (N.D. Cal.
    1991)*; see also Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1165 (D. Or. 2018) (noting
28  that "any security in this case would be unjust").

1

Dated: February 12, 2019

2

*/s/ Aaron Fischer (as authorized 2/11/19)*
Aaron J. Fischer (SBN 247391)
DISABILITY RIGHTS CALIFORNIA

3

*Attorney for Plaintiffs*

4

Dated: February 12, 2019

5

*/s/ Jessica Valenzuela Santamaria (as
authorized 2/11/19)*

6

Jessica Valenzuela Santamaria (SBN 220934)
COOLEY LLP

7

*Attorney for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28