# G R A N D   J U R Y

### SACRAMENTO COUNTY

# FINAL REPORT

# 2014-2015



# TABLE OF CONTENTS

Letter from the Foreperson _____1

2014-2015 Sacramento County Grand Jury Roster _____2

Photo of the Grand Jury _____3

The Role of the Sacramento County Grand Jury _____4

A Year in Review _____6

2014-2015 Reports _____8

Mental Health Crisis Intervention Services
   ...Sacramento County's Shameful Legacy of Neglect _____9

City of Sacramento Fire Department Handling of Narcotics _____33

Red Light Cameras
   ...Timing is Everything _____36

The Ralph M. Brown Act
   ...Not to be Taken Lightly _____40

Sacramento Correctional System Review _____50

Responses to the 2013-2014 Grand Jury Reports_____55

Grand Jury Complaint Form _____60

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SACRAMENTO GRAND JURY



**CORINNE MAU**
**FOREPERSON**

**NEPTALY AGUILERA**

**MURIEL BROUNSTEIN**

**ALLENE DODDS**

**JO DORAIS**

**WES ERVIN**

**DOUG FOWLER**

**BETSY HITE**

**JENNA ISHIZAKI**

**TERRY KASTANIS**

**HARRIET KIYAN**

**STEPHEN MAYBERG**

**MICHAEL MICCICHE**

**MARTI OVERTON**

**DON PRANGE, SR.**

**DUANE TADLOCK**

**DONALD TUTTLE**

**NANCY WILLIAMS**

June 18, 2015

The Honorable Russell Hom
Advisor Judge to the Sacramento Grand Jury
Sacramento Superior Court
729 Ninth Street, Department 22
Sacramento, CA 95814

Dear Judge Hom and Citizens of Sacramento County:

The 2014-2015 Sacramento County Grand Jury has completed its term of service, and it is my honor and pleasure to submit our Final Report. This report represents the highlights of the Grand Jury's work over the past year. There are six reports contained in this publication. We hope you find each one enlightening and useful. Our intent was to act on behalf of all county residents on items we thought would make a real difference in our governments and in our daily lives.

This publication also includes a section entitled A Year in Review. You might find it interesting to understand the internal operations of a Grand Jury – and how 19 Sacramento County citizens organize themselves to complete the work before them. Our intent is to educate and encourage more citizens to participate in this very unique and rewarding experience.

We are grateful to the many public officials who met with us during the year to discuss agency operations. Special acknowledgement to Supervising Deputy County Counsel Krista Whitman, and Chief Assistant District Attorney Stephen Grippi – for your valuable advice and counsel on matters brought before the Grand Jury, and Becky Castaneda, Grand Jury Coordinator, who served all of us well during the year and exhibited endless support.

While the Grand Jury investigated a number of controversial issues in Sacramento County, we are also optimistic about the direction Sacramento County has embarked on that allows reevaluation and transformation of some of their existing programs. Recognizing the importance of employment and skills for at-risk individuals, the Grand Jury is pleased to support the Jail Industries Program at Rio Cosumnes Correctional Center by contracting with them to produce this publication.

Lastly, I want to publicly acknowledge the dedication and hard work put in by each member of the Grand Jury; and to thank them for their support and teamwork throughout the year. It was a pleasure to see a very diverse group come together to accomplish a valuable service to the citizens of Sacramento County. They utilized their individual skills, knowledge and abilities to collectively tackle a myriad of complaints submitted to the Grand Jury for consideration. I commend them for truly being a "grand" Grand Jury that served Sacramento County well.

Sincerely,

*Corinne Mau*
Corinne Mau, Foreperson, 2014-2015 Sacramento County Grand Jury

# 2014-2015
## SACRAMENTO COUNTY GRAND JURY ROSTER

| | |
|---|---|
| Neptaly "Taty" Aguilera | Sacramento |
| Muriel Brounstein | Folsom |
| Allene Dodds | Folsom |
| Jo Dorais | Sacramento |
| Wes Ervin | Citrus Heights |
| Doug Fowler | Herald |
| Elizabeth "Betsy" Hite | Wilton |
| Jenna Ishizaki | Rancho Cordova |
| Terry Kastanis | Sacramento |
| Harriet Kiyan | Sacramento |
| Stephen Mayberg | Carmichael |
| Corinne "Corky" Mau | Sacramento |
| Michael Micciche | Sacramento |
| Marti Overton | Sacramento |
| Don Prange, Sr. | Citrus Heights |
| Duane Tadlock | Sacramento |
| Donald Tuttle | Folsom |
| Nancy Williams | Sacramento |

# SACRAMENTO COUNTY GRAND JURY 2014-15



**Back Row:**
**Stephen Mayberg, Doug Fowler, Michael Micciche, Wes Ervin, Don Prange, Sr., Taty Aguilera, Donald Tuttle**

**Middle Row:**
**Terry Kastanis, Nancy Williams, Jo Dorais, Allene Dodds, Betsy Hite, Marti Overton**

**Front Row:**
**Jenna Ishizaki, Harriet Kiyan, Duane Tadlock, Judge Russell Hom, Becky Castaneda (Grand Jury Coordinator), Corky Mau (Foreperson), Muriel Brounstein**

# THE ROLE OF THE
# SACRAMENTO COUNTY GRAND JURY

Section 23, Article 1 of the California Constitution requires that a Grand Jury "be drawn and summoned at least once a year in each county." The Sacramento County Grand Jury as been drawn annually for more than 100 years.

To satisfy the constitutional requirement, state law describes the selection of grand jurors, and the watchdog and indictment functions of a Grand Jury. The Grand Jury authority is located primarily in Penal Code sections 888-939.91, et seq., and the accusation process that leads to the removal of a public officer is described in Government Code sections 3060-3075, et seq.

The Grand Jury is not the same body as a "petit" jury, selected to hear evidence in a single case in a trial court. Instead, a Grand Jury is impaneled for a one-year period to perform several functions that are described in law. Broadly, the Grand Jury is charged with assuring honest, efficient government that operates in the best interest of the people of the county. The primary function of the Grand Jury is to examine aspects of county government, special districts, school districts, and city government.

Specifically, this includes:

- Civil Watchdog – to inquire into the willful or corrupt misconduct of public officers; to investigate and report on at least one county officer, department or function; and to inquire into the condition and management of public correctional facilities within the county.

- Criminal Indictments – to present to the court, a criminal charge of a public offense against a person based upon evidence considered by the Grand Jury.

- Accusation – to remove from office a public officer based upon evidence of willful or corrupt misconduct considered by the Grand Jury. This judicial process is initiated by the Grand Jury.

The Grand Jury is an arm of the Sacramento County Superior Court and is considered part of the judicial branch of government. As such, the Grand Jury may ask the advice of the advisor judge to the Grand Jury, the county counsel, or the district attorney. The Grand Jury may inquire into or investigate a matter based on a complaint or upon its own initiative. The Grand Jury may subpoena witnesses and documents, conduct interviews, and consider evidence presented to it by the District Attorney's Office or the California State Attorney General. Law prohibits witnesses from disclosing their interview, testimony, or any other proceedings of the Grand Jury prohibits witnesses. The authority of the Grand Jury does not extend to the courts or to state departments or operations.

Sacramento County Grand Jury                                           2014-2015

The Sacramento County Grand Jury is comprised of 19 citizens who:

- are 18 years or older;

- are Sacramento County residents for at least one year before selection;

- have sufficient knowledge of the English language;

- are in possession of their natural faculties; and

- possess a fair character.

Generally, jurors are selected in a random lottery process. The advisor judge, representing the Superior Court of California, appoints a Foreperson from the selected Grand Jury panel and administers the oath to all jurors. The oath requires each juror to diligently inquire into matters where the juror can obtain legal evidence and cannot disclose any of the proceedings, discussions, names of individuals interviewed, or votes of the Grand Jury. The juror's term of service is July 1 to June 30 of the following year.

Sacramento County residents interested in serving on the Grand Jury can obtain an application online at www.sacgrandjury.org, at the back of this report, or by calling the Grand Jury office at (916) 874-7578.

Any individual may file a complaint with the Sacramento County Grand Jury. A complaint form can be found at the back of this report.

# A YEAR IN REVIEW

The 2014-15 Sacramento County Grand Jury served a one-year term that ended June 30, 2015. Most Grand Jury work is done by committees. In its "civil watchdog" role, this Grand Jury inquired into willful or corrupt misconduct of public officers; investigated and reported on at least one county officer, department or function; and inquired into the condition and management of pubic correctional systems within the County. During its term, the Grand Jury received and analyzed a number of allegations. In performing its duties, this body examined city government, county government and special districts.

Each year, the new Grand Jury decides which committees to establish and how often they will meet. A juror may be on two or three committees, each of which meet at least every other week. In order to provide a better idea of how the Grand Jury functions, the following is a summary of each committee that was formed by this year's Grand Jury.

## ADMINISTRATIVE AND MUNICIPAL AFFAIRS COMMITTEE

This committee investigates the policies and procedures relating to the administration and management of municipal agencies within Sacramento County. The committee reviews budgets, organizational charts, and policies of these agencies. This year, the committee received 12 complaints.

## CONTINUITY COMMITTEE

This committee ensures a seamless transition from one Grand Jury to the next. This year, committee members prepared and delivered a comprehensive orientation training for incoming jurors; vastly improved and updated the jurors' Procedures Manual; developed and presented a briefing to over 150 prospective jurors for the 2015-16 term; reviewed responses from agencies and departments highlighted in the prior year's Grand Jury report; and maintained the reference library.

## CRIMINAL AND JUVENILE JUSTICE COMMITTEE

This committee reviews and investigates complaints against criminal justice agencies, and assesses compliance with established policies and procedures, as well as with state and federal laws. This committee also helps the Grand Jury Coordinator arrange for group site visits to correctional facilities located within the county. This year, the committee received 14 complaints.

## EDIT COMMITTEE

This committee edits, compiles, publishes and distributes the Grand Jury's final investigative reports, and the consolidated end-of-year final report. The committee's overall goal is to use style, grammar, and punctuation rules and standards to create a final report that is logical, clear and understandable. This year, the committee contracted with Rio Cosumnes Correctional Center to publish the consolidated final report.

## EDUCATION COMMITTEE

This committee monitors and investigates alleged irregularities of Sacramento County school districts and schools (including charter schools), the Los Rios Community College District, the Sacramento County of Education, public libraries, and educational programs. This year, the committee received seven complaints.

## ENVIRONMENTAL, PUBLIC WORKS, AND SPECIAL DISTRICTS COMMITTEE

This committee reviews complaints about local and county governmental agencies that oversee environmental and hazardous waste programs; and over 100 special districts that perform a variety of services for Sacramento County residents. The committee looks at both dependent and independent special districts that provide services such as fire protection, rescue and medical emergency, water, air quality, etc. This year, the committee received eight complaints.

## HEALTH AND HUMAN SERVICES COMMITTEE

This committee gathers information on and investigates various agencies in all incorporated cities and in Sacramento County, which are involved with health and human services. This may include programs that are offered by, for example, the Sacramento County Departments of Human Assistance and Health and Human Services. This year, the committee received two complaints.

## TECHNOLOGY COMMITTEE

Committee members provide technology support to all jurors and especially the investigative committees. This committee helped record many interviews and loaded them into organized committee files. Members also offered "basic training" to jurors who needed computer assistance.

# 2014-2015 REPORTS

# MENTAL HEALTH CRISIS INTERVENTION SERVICES
## ...SACRAMENTO COUNTY'S SHAMEFUL LEGACY OF NEGLECT

## SUMMARY

Suicide rates are up, inmates at the jail with mental illness have doubled, hospital emergency rooms are overwhelmed and police officers are diverted off the streets to deal with mental health crises; all attributable to County decisions. The Grand Jury was appalled by the continued neglect and lack of action that Sacramento County has shown in dealing with their mental health crisis response system failings.

Untreated mental illness can have devastating consequences for individuals, family members and the community as a whole. Research has shown that failure to address mental health needs can increase the risks of homelessness, unemployment, family dysfunction and criminal justice involvement.

Every day we see or read about the impact of inadequate treatment in our community, whether it is persons with mental illness on the street, reports of self-injurious behaviors, tragic suicides or violence directed at family or others. The social and economic consequences of untreated mental illness are staggering. Thus, it is incomprehensible how Sacramento County would neglect and continually ignore those most in need of treatment.

Since 2009, persons with an acute mental health crisis have not been able to access services from an available Sacramento County crisis program. The costs to the community have far exceeded the money saved by program cuts. However, Sacramento County's decisions not to fund crisis services are more far-reaching than just budgetary cuts. The Grand Jury investigation has revealed the economic impact, the public safety impact, the health care impact and, most of all, the tragic personal toll that this lack of services has caused.

The Grand Jury found a continuing pattern of troubling decisions, starting with the Board of Supervisors' decisions to close the Crisis Stabilization Unit and reduce acute-care hospital beds by **50%** in the 2009-2010 budget. Despite ample and well-articulated warnings from departmental mental health staff, providers and community advocates of the dire consequences of the FY 2009-2010 proposed Mental Health budget cuts, Sacramento County all but eliminated crisis intervention services. Those budget decisions did not make sense then, and the failure to rectify the damage caused by those decisions at any time since then, makes no sense now.

The County, for over five years, has continued to abdicate responsibility for mental health crisis services, especially to low-income and indigent residents suffering from serious mental health disorders. Reviewing the County's decisions regarding the provisions of mental health crisis services over the past five years, the Grand Jury has seen little progress in resolving these serious problems. These actions have destabilized our mental health delivery system and caused major disruption in crisis care.

By their actions, Sacramento County:

- Shifted the primary responsibility for crisis intervention to community hospitals and law enforcement.

- Continued to provide inadequate funding to restore needed hospital and long-term care beds.

- Failed to capitalize on opportunities to restructure their mental health system to be more cost-effective, efficient and responsive.

- Forced law enforcement to take individuals involuntarily detained due to mental crises to area emergency rooms, substantially reducing the time that they could spend on patrol.

- Failed to maximize a variety of funding and revenue sources including grants, Medi-Cal reimbursement and Proposition 63.

- Created a worsening long-term drain on County financial resources.

- Damaged relationships and trust among the community, law enforcement and health providers.

- Generated lawsuits that successfully challenged the County's denial of basic mental health services.

- Created a situation where there are no County crisis stabilization services available to the public and law enforcement.

- Negatively impacted patient care:

   ○ In 2010, the year following the County cutbacks, the suicide rate spiked by **16%** (California Department of Public Health).

   ○ Since 2009, jail inmates receiving a diagnosis for mental disorders doubled (**18%** to **34%**).

   ○ There is a revolving door of patients with mental disorders continually recycling through the mental health crisis system. For example, last year only **16%** of patients at the intake stabilization unit were first time admissions.

There have been no discernible substantive efforts by the County to assume responsibility for the crisis programs or to initiate alternatives, in spite of the lawsuits, reports, independent findings and community concerns. The burden continues to fall on law enforcement, hospital emergency rooms, underfunded community programs, and most of all, on families and patients who are in crisis.

The Grand Jury's investigation explored a wide range of issues related to these budget cuts. Six months of research, interviews and extensive document review provided ample evidence of the need for the County to move quickly to establish an integrated crisis treatment capability.

The Grand Jury is recommending a series of actions, which, if adopted, can start the rebuilding process. A summary of these recommendations includes:

- Sacramento County needs a coherent, coordinated and cost-effective mental health system embodying early intervention and continuity of treatment at therapeutically appropriate levels of care providing more efficacious outcomes at lower costs.

- The County needs to provide timely crisis management response and to re-establish 24-hour intake, evaluation and referral programs similar to the level of services provided prior to the 2009 cutbacks.

- The County needs to immediately support and develop programs that use levels of care that avoid expensive and often unnecessary acute hospitalization. When hospitalization is required, it should be in facilities eligible for Federal reimbursement. Expanding the number of Psychiatric Hospital Facilities (PHFs) is an essential component for cost containment. Fostering greater use of residential treatment and skilled nursing facilities also provides more appropriate care settings at a lower cost.

- Sound County mental health programs cannot exist in a vacuum. Establishing trust and respect between the County and mental health professionals, law enforcement, hospitals, community providers, patients, advocates, and families will require coordinated and collaborative decision-making and should be a high priority. The County has opportunities to optimize the funding of the mental health system. Increased Medi-Cal revenue and Proposition 63 fund availability coupled with a restructured mental health system should provide greater long term stability.

The County mental health system must be organized so that it flows more smoothly from screening to hospitalization to discharge. A problem in any part of that continuum creates inefficiencies, unnecessary expenses and inadequate treatment. Sacramento County has problems in all three areas, and all three systems need to be addressed in order to make the mental health system more functional. The Grand Jury cannot overstress the interrelatedness of these issues of crisis, hospitalization, long-term care and lack of community resources pre and post hospitalization.

Sacramento County must accept responsibility that their mental health system has been fundamentally damaged by poor decisions and neglect, and will only be repaired when the County acknowledges and prioritizes the importance of mental health services. This is not just a budget issue but an issue of planning, programming and leadership to create a functional, responsive and effective mental health system.

## BACKGROUND

The Grand Jury investigation of the County's mental health crisis response system was generated after hearing numerous complaints from hospitals and law enforcement about a problematic and non-responsive County mental health system. There were critical articles in the news media and there appeared to be increasing evidence of a dysfunctional system in our communities and on the streets. These factors led the Grand Jury to initiate a full investigation of the Sacramento County mental health crisis and hospital programs.

At the end of the last decade, California and the nation were experiencing a deep and prolonged fiscal crisis. State and local budgets were severely compromised and very difficult decisions

needed to be made. Sacramento County chose to make budget cut decisions in mental health by eliminating crisis services and dramatically reducing hospital bed availability. The effects of this fiscal crisis were expressed and reflected in the FY 2009-2010 budget. While there were dire warnings and ample concerns about the potential ramifications of the proposed cuts, Sacramento County implemented a series of reductions that have continuing and lasting negative impacts on the entire mental health system.

The magnitude and nature of the cuts were so severe and impactful that the mental health staff, law enforcement, local hospitals and the community expressed their alarm. The California Department of Mental Health sent formal letters expressing concerns that Sacramento County was failing to meet statutory requirements. A lawsuit was filed regarding the failure to provide crisis hospital services. Another lawsuit was filed regarding process and implementation of these cuts. The current Grand Jury found that the issues and concerns so frequently expressed had not been addressed despite an improved fiscal picture five years later.

Welfare and Institution Code 17000 statutorily requires counties to provide health care and emergency services to the medically indigent population and to act as a safety net provider. Sacramento has repeatedly chosen not to provide mental health or crisis services to the low-income and indigent population, even though they are County residents. Federal law and California's regulations regarding Medi-Cal programs require counties to provide mandated hospital and crisis services for the mentally ill in order to be eligible to receive any Medi-Cal dollars. Sacramento County was sued for their failure to provide hospital services, and settled the lawsuit by agreeing to pay for hospital services for Medi-Cal eligible individuals but not for indigent care.

A decision was made by the County in 2009 to eliminate the Crisis Stabilization Unit (CSU) to adults and reduce by 50% the inpatient bed availability at the Sacramento County Mental Health Treatment Center (SCMHTC). At that time the SCMHTC was averaging over 100 hospitalized patients a day and the CSU was experiencing over 6800 adult crisis visits a year. With these reductions there were no plans for any County crisis stabilization. The County only had plans for minimal contract hospital beds to be added.

This is not a new problem. The 2009-2010 Sacramento County Grand Jury identified some of these same concerns in their report, "A System in Crisis," calling for immediate County action to address these serious system failures. As part of the 2010 lawsuit, the County was required to hire an outside expert to assess the adult mental health program. That report, The Independent Expert Review Final Report, issued in May 2011 was very critical of the Sacramento County mental health crisis system and offered many recommendations that were well-reasoned, cost-effective alternatives to the current system. Only a few of those recommendations have been implemented.

The current Grand Jury tracked the consequence of Sacramento County's decisions. Findings and Recommendations from the Grand Jury's subsequent investigation are set forth in the following report sections.

## METHODOLOGY

This investigation spanned a significant cross-section of the mental health environment. The Grand Jury performed the following activities and research during this investigation:

12

**INTERVIEWS**

- Senior management of community hospital systems including Kaiser Permanente, University of California - Davis Health System, Dignity Health and Sutter Health

- Law enforcement officials representing the cities of Sacramento, Folsom, Elk Grove, Citrus Heights and the County

- Senior managers from Sacramento County Behavioral Health (past and present) and senior management from the Sacramento County Health and Human Services Department

**RECORDS REVIEWED**

- Financial and budgetary records, including FY 2007-2008 to the present, encompassing mental health budgets, cost reports, revenue, expenditure and accrual information, and program and fiscal audits

- Bed utilization documents for 24-hour bed utilization statistics:

    ○ State hospital contract beds

    ○ Sacramento Mental Health Treatment Center beds

    ○ Institute for Mental Disease contract beds

    ○ Contract inpatient beds and crisis residential beds

    ○ 23-hour crisis utilization

- Related correspondence, memos, analysis for Sacramento County Mental Health Center bed reduction and emails:

    ○ Crisis Stabilization Unit closure, Proposition 63 (Mental Health Services Act) budgets, expenditures, allocations, prudent reserves

    ○ Senate Bill 82 (Mental Health Wellness Act) grant applications and funding

    ○ Correspondence, memos, analysis and emails related to the current SCMHTC plans; Sacramento County Mental Health funding categories, i.e. Medi-Cal, indigent, insured patient population by year; and number of Murphy Conservatees and Incompetent to Stand Trial (Penal Code 1370)

- Additional information was reviewed from research articles and publications and a partial list is provided in Appendix C.

## DISCUSSION

Due to the complexity of the issues surrounding this investigation, the foregoing discussion is organized to correspond to the Grand Jury's formal Findings presented toward the end of this report. Most of these problems are inextricably interrelated and, as such, should not be addressed or considered solely on their own.

**Sacramento County has abdicated the provision of crisis services for the mentally ill. The current mental health crisis services in Sacramento County are inadequate, anti-therapeutic, costly and dangerous.**

Prior to 2009 the Crisis Stabilization Unit (CSU) and the Sacramento County Mental Health Treatment Center (SCMHTC) served as the centralized point of intake for crisis treatment for the County. Both law enforcement and the community knew that in any mental health crisis there was around–the-clock availability for crisis screening and issue resolution, including hospitalization at the Stockton Boulevard facility. In the FY 2009-2010 mental health budget, Sacramento County, based on severe fiscal constraints on National, State and local budgets, eliminated the CSU and reduced capacity at the SCMHTC by 50%, even though there were ample credible warnings of the dire consequences of this decision.

In a formal presentation to the County Board of Supervisors, County Behavioral Health administrators warned that the proposed budget actions would have profound consequences. The warnings given to the Board prior to the adoption of the ordered budget cuts had merit then and still resonate:

> *"Impacts of Reductions to Law Enforcement*
>
> - *Place a greater burden on law enforcement to find placement for mentally disordered persons (5150)*
> - *Increase number of psychiatric patients entering jail system*
> - *Increased volume of court cases*
>
> *Impacts of Reductions to County Government*
>
> - *Increase of liability risk to County*
> - *May not meet minimum requirements for State Regulations for funding of Mental Health Plan (e.g., serving all Medi-Cal patients)*
> - *Risk of losing Mental Health Realignment allocation if unable to meet Mental Health Plan Contract with State*
>
> *Impacts of Reductions to Community*
>
> - *Increased number of psychiatric patients in local emergency rooms thereby decreasing number of available beds for medical patients*
> - *Shifts costs of emergency psychiatric treatment to local hospitals*
> - *Increase psychiatric homeless population*
> - *Radically reduce acute care services in Sacramento County*
> - *Increase in completed suicides"*

The presentation to the Board of Supervisors about consequences of the cuts was prophetic and, in reality, the outcomes have worsened with time as the Grand Jury has found:

### Impacts of Reductions to Law Enforcement

- Virtually overnight law enforcement was required to transport persons in mental health crisis, 5150 holds, to area emergency rooms (ERs) rather than to a more therapeutically appropriate, available and less costly County Crisis Stabilization Unit. These patients are required to be medically evaluated, including an exam and laboratory tests, incurring unnecessary and wasteful costs.

- Sheriff's deputies and police officers were forced to spend extra time in the ERs until patients on 5150 holds could be medically assessed. This extra time spent in the ERs detracted from time on patrol at a time when the law enforcement had already incurred substantial personnel cutbacks.

### Impacts of Reductions to County Government

- The County was served with several lawsuits challenging their decision to reduce mental health outpatient services as well as for failure to reimburse private psychiatric hospitals for County Medi-Cal patients. While the cutbacks in outpatient mental health services are not addressed in this investigation, it is referenced since it speaks to a pattern of unwillingness or inability to implement recommendations that could provide more cost-effective treatment options.

- A lawsuit stemming from the earlier action eliminating contracts with private psychiatric hospitals against the County, BHC Sierra Vista Hospital, Inc., and BHC Heritage Oaks Hospital Inc. v. County of Sacramento et al. (*BHC v. County*), centered on the County's failure to reimburse private psychiatric hospitals for care rendered to Medi-Cal mental health patients admitted as emergencies.

- In 2009, the California Department of Mental Health legal department wrote a letter raising serious concerns about Sacramento County's failure to provide statutorily required hospital and crisis services to Medi-Cal eligible residents.

- A second lawsuit, *Napper v. County of Sacramento*, was filed asserting that some of the mental health cuts were illegal.

### Impacts of Reductions to Community

- Hospital ERs, already stretched to capacity, were now forced to revamp their facilities in an attempt to isolate 5150 patients from other patients with medical emergencies. Millions of dollars were spent to enhance internal security and to absorb additional losses for uncompensated care.

- Mental health services provided by local private contractors were eliminated or greatly reduced. County employees displaced by the closure of the CSU and the reduction in SCMHTC beds were transferred to fill positions previously occupied by the private contractors. Testimony offered by present and former department officials differed with respect to the cost-effectiveness and work quality of replacing the private contractors with County employees.

- Despite large budget cuts eliminating services, the final 2009-2010 department budget only reduced the total approved County mental health positions by 1.5 full-time equivalents out of about 352 personnel.

- In 2010 there was a significant spike of **16%** in suicide rates in Sacramento County, as reported by the California Department of Public Health.

**Sacramento County's decision to close the Crisis Stabilization Unit to adult patients and to eliminate 50 beds from the Sacramento County Mental Health Treatment Center had widespread negative fiscal consequences.**

The decisions reducing the Behavioral Health budget by approximately $14,000,000 had a profound impact on a wide array of services and the community at large as mentioned in the previous discussion:

- The County settled the private hospital lawsuit by paying $3,000,000 in back payments and agreed to pay a higher $950 per day rate for Medi-Cal patients at these hospitals.

- Hospitals had to hire additional professional staff to deal with the unique characteristics of this population.

- Hospitals had to hire or contract for added security.

- Hospitals had to develop and fund referral resources, including residential treatment, on their own.

- Law enforcement had to spend more time on psychiatric emergencies requiring a redirection of resources.

- The Sheriff's Department had to provide more mental health services in the jail.

- Increased Medi-Cal eligibility, due to the Affordable Care Act (ACA), increased the County's financial liability at the private psychiatric hospitals.

An unintended impact on the court settlement agreeing to pay a higher per diem rate for Medi-Cal patients was the implementation of the Affordable Care Act (ACA). Patients previously determined to be low-income or indigent are now granted immediate Medi-Cal eligibility under a presumptive eligibility provision. Due to the 2010 settlement, the County must now pay higher costs based on the inflated negotiated daily rate for an escalating number of Medi-Cal recipients. Although the terms of the lawsuit settlement ended during 2014, the County agreed to continue paying the same higher rate. The County has thus far been unable to negotiate a lower rate.

The inpatient fiscal liability would be worse were it not for a Congressional pilot waiver program negotiated by Congresswoman Doris Matsui (Matsui Waiver) to allow Federal dollars to pay for acute inpatient stays at non-governmental hospitals classified as Institutions for Mental Diseases (IMD). Sacramento County was one of two California counties to participate in the pilot program. This participation and subsequent funding has saved millions of dollars for the County, and is scheduled to expire in July, at the end of the current fiscal year.

The Mental Health Department has gone back to the Board of Supervisors asking for significantly more money to fund this shortfall. If the Matsui Waiver is discontinued, the budgetary impact to the County will be even greater. That possibility alone should be sufficient emphasis to undertake system-wide changes.

With increased eligibility and Federal matching funds, the County has added opportunities to receive reimbursement for treatment services. When the County closed the CSU to adult patients in 2009, the County estimated that they would lose approximately $2,500,000 in annual revenue from Medi-Cal. With the continued closure of the CSU, the County has lost opportunities to capture significant revenues.

As discussed in previous sections of this report, the County's failure to either utilize or have in place less expensive alternatives to inpatient hospitalization only exacerbates its fiscal liability. A comparison is provided of the daily cost for acute mental health hospitalization:

|  |  |
|---|---|
| Sacramento County Mental Health Treatment Center | $1,325 |
| State Hospitals | $646 |
| Psychiatric Hospitals (negotiated rate) | $950 |
| Sacramento County PHFs | $653 |

While the differences in hospital costs are significant, the potential savings to the County by better use of appropriate therapeutic levels of care are demonstrated by the costs of skilled nursing facilities (SNFs) that range between $181 and $225 per day in the Sacramento region. Another cost-effective alternative is the expanded use of residential treatment facilities that offers another potential for savings.

The high level of the cost of care rendered at the SCMHTC merits reexamination. In order to receive Federal reimbursement for mental health hospital treatment, the care must be rendered in an inpatient facility that offers a full array of hospital inpatient services; SCMHTC is not eligible for Federal reimbursement. To enable the County to receive Federal matching funds for SCMHTC patients, an option would be to pursue an arrangement transferring the SCMHTC to the University of California, Davis Medical Center. Other alternatives are also worthy of serious exploration.

Best practices and evidence-based solutions provide many examples of programs reducing the overall cost of crisis care by lessening the intensity and the severity of otherwise costly mental health crises and/or hospitalizations. A summary of some widely accepted best practices is contained in Appendix B.

Investing in programs providing long term solutions costs money. Testimony, however, indicated that the County has been overly cautious in seeking funds from various grant programs established specifically to kick-start a wide array of mental health treatment programs. Best practices and a review of research material indicate that patients are placed in the appropriate levels of care and are given the treatment appropriate to their condition, further providing long-term cost savings when compared to a system with limited scope.

**Sacramento County's shift of responsibility for crisis services has overwhelmed community hospital emergency rooms.**

Hospital ERs have had to assume a disproportionate share of the responsibility for this segment of the population. These overwhelming challenges to hospital ER professionals have included access to appropriate services, lack of treatment alternatives, knowledge of and access to previous psychiatric history within the County's treatment system, as well as ongoing communication difficulties with the County.

Prior to the closure of the CSU, law enforcement officers brought patients on 5150 holds to the CSU and were then able to drop them off. The CSU had 6869 admissions in the year prior to closure. These admissions were a combination of walk-in and law enforcement referrals. In 2013, more than 15,600 patients, or over 1300 per month, were taken to hospital ERs in mental health crisis. In 2014, this number had increased to an estimated 1400-1500 per month.

The majority of these patients were brought in for mental health reasons without presenting problems requiring medical attention. According to several community hospital officials, patients are often subjected to unnecessary, invasive and expensive screening and testing because the County or the private psychiatric hospitals require these tests.

With limited bed availability in stand-alone psychiatric hospitals, mental health patients admitted through the community ERs can remain on a gurney in hospital hallways for 18 to 30 hours, and sometimes longer, waiting for a bed. During these extended times in the emergency room sometimes the crisis abates without treatment and these patients are no longer deemed to be a threat to themselves or others, and then must be discharged, because legally they can no longer be confined.

Community hospital representatives who were interviewed were unanimous in their opinion that ERs are not the appropriate therapeutic venue to deal with patients whose primary issues may be psychiatric, often coupled with co-occurring substance abuse problems.

One very serious concern for ERs is the cost to provide additional security to deal with the increase in violent behavior exhibited by mental health patients. Hospitals must either employ their own security personnel or contract with local law enforcement. Even with increased security, injuries to hospital staff have risen.

A significant portion of mental health patients are not receiving appropriate treatment for their mental health issues, creating a situation where many of these individuals are repeat patients. This reflects either inadequate previous hospital treatment and/or a current lack of community resources to deal appropriately with the needs of these mental health patients.

The lack of crisis intervention services and adequate community programs can have a negative effect on the recovery of individuals. In the 2013–2014 fiscal year, only **16%** of individuals referred to the intake stabilization unit were discharged to the community as compared to **46%** before the cutback in services. This suggests that individuals were not receiving the treatment that they needed and that crises escalated to the point of hospitalization; or that there were inadequate community resources available.

Previously, the gatekeeping function of the CSUs prevented unnecessary hospitalizations, resolving mental health crises more quickly and with better outcomes than sending them to local ERs. Without any County gatekeeping, the impact on community hospitals is undeniable.

**Sacramento County's shift of responsibility for crisis services has adversely impacted area law enforcement agencies.**

Equally disturbing is the effect that the County's decisions have had on area law enforcement. Currently, under Police Officers Standards and Training (POST) requirements, police academies need only to provide six hours of initial training on mental disorders and strategies for dealing with individuals in crisis. Law enforcement agencies are beginning to offer Crisis Intervention Training

18

(CIT) in both 8 and 24 hour courses that offer more in-depth information, strategies and techniques for handling individuals in crisis. Enhanced training comes from the recognition that law enforcement is now increasingly required to make assessments of mental health issues.

Law enforcement had asked for more mental health training and requested funds from the County to develop more mobile crisis teams and CIT utilizing Proposition 63 dollars. Unable to obtain any funding from County Mental Health and realizing this crucial need for training to deal with patients with mental disorders, the Sheriff's Department independently obtained a CIT grant. Recently, a Senate Bill 82 grant has partnered County Mental Health and two area law enforcement agencies in pilot mobile crisis programs.

Between 2008 and 2014 the Sacramento County population increased by less than **10%** and the number of mental health crisis calls to law enforcement dispatchers in three jurisdictions collecting this data reported increases averaging **29%**.

During the same time period, five law enforcement agencies reported that the number of individuals detained on 5150 holds increased by **8%**.

The increase in mental health 5150 holds would have been significantly greater were it not for a sharp decrease in the number of holds recorded by the Sacramento County Sheriff's Department in 2014. The Sheriff's office believes that this decrease could be attributable to the CIT provided to deputies in late 2013 and throughout 2014. The reduction of 305 fewer holds over the last year, suggests the potential cost savings from this type of program. Prior to this enhanced training, 5150 holds increased an average of **12.4%** in the County.

A lack of community resources may affect how law enforcement personnel handle the disposition of persons exhibiting inappropriate or unstable behavior. This scenario was particularly evident in the year immediately following the closure of the Crisis Stabilization Unit: between the City of Sacramento and the Sheriff's Department, service calls increased **4.5%**, yet the number of 5150 holds correspondingly decreased by **30%** and **51%** respectively.

Given the lack of community treatment options, it is not surprising that the Sheriff's Department reports that the incidence of significant mental health disorders among inmates has increased from **18%** prior to the cutbacks to the current rate of approximately **34%**.

Available data clearly shows that the problem of mental health crisis calls is worsening. In response, law enforcement has had to look for other alternatives to better deal with their increased mental health crisis responsibility.

**Sacramento County's use of inpatient hospitals is dysfunctional and currently too expensive.**

Sacramento for many years has relied on the Sacramento County Mental Health Treatment Center (SCMHTC) to provide adult acute psychiatric hospital care. In 2008, responding to budget constraints, Sacramento County eliminated its contracts with private freestanding psychiatric hospitals for inpatient mental health services. Then in 2009, the County eliminated 50 of the 100 SCMHTC beds. These severe reductions created an acute psychiatric bed crisis. Prior to the bed reduction, SCMHTC was already exceeding its legal capacity by almost **10%** each day. When the County made bed reductions they had no adequate replacement plans in place for this at-risk population. Almost immediately after these cuts, the California Department of Mental Health sent

a letter to Sacramento County stating that the County appeared not to be in compliance with California and Federal Medicaid requirements.

A legal challenge to the County's refusal to pay private psychiatric hospitals for care provided to Medi-Cal and indigent patients, resulted in a settlement, *BHS v. County*, assuring that the County would be responsible for payment for Medi-Cal clients admitted to several local private psychiatric hospitals. As part of the settlement, the County agreed to pay an inflated $950 daily rate. On face value the higher rate is unsupported by payments made to the other Sacramento psychiatric hospitals. One explanation provided to the Grand Jury for the higher settlement rate is that the FSHs also agreed that the County would not be liable for care provided to indigent and low-income adult mental health patients if they were accepted for admission.

In this settlement, the County assumed no responsibility for indigent care costs at the hospitals. It appears to the Grand Jury that this settlement provision echoes a pattern of refusing to accept program and fiscal responsibility for mental health crisis and hospital care for low-income and indigent patients.

At the time of the cutbacks, SCMHTC was not eligible to receive Medi-Cal reimbursement, while small 16-bed or less psychiatric hospitals could be deemed eligible. In 2010, Sacramento County contracted with Crestwood, a private facility contractor for the development and operation of two 16-bed Psychiatric Health Facilities (PHFs), one of which opened in 2010 with 12 beds and added 4 additional beds the following year. A second 16–bed unit was also opened the following year.

By the end of 2012, including the 50 SCMHTC beds, the County had a total of 82 acute mental health inpatient beds, far fewer than were needed in 2008. These PHF beds are currently filled to capacity 100% of the time indicating the need for additional beds, especially those eligible for Federal reimbursement.

While the SCMHTC is not currently eligible for Federal reimbursement, the County should explore options for better utilization of that facility. There are 50 beds at SCMHTC not being utilized and which could not be reasonably replaced if they are eliminated, a renovation that the County is actively pursuing. There must be a thoughtful analysis of all the alternatives for SCMHTC, including expansion. For example, SCMHTC could become a resource for indigents needing hospitalization, it could be converted to a long term care facility, or there could be a complete transfer of administration or ownership of the facility to gain potential eligibility for reimbursement under Medi-Cal.

The community hospital emergency rooms are referring more patients for hospitalization. The 32 PHF beds are always filled and there are limited non-hospital alternatives. The SCMHTC is currently using **50%** of the 50 beds for non-acute patients. If there was a problem with inadequate bed availability in 2009, those inadequacies are even more pronounced today.

**Sacramento County's relationship with hospital providers and law enforcement is strained or conflictual.**

In interviews with the four community hospital systems and five law enforcement agencies, Grand Jury members repeatedly heard reports of conflicts in the relationship with Sacramento County Departments of Behavioral Health and Health and Human Services. Respondents offered unsolicited comments that their relationships with Sacramento County officials since 2009 were either strained, conflictual, poor or non-existent.

According to both medical providers and law enforcement, the problems associated with the closures can be divided into three categories: communication, shifting responsibility and shifting financial costs.

**COMMUNICATION**

- Both hospitals and law enforcement saw the closures as abrupt, with little prior warning, and with insufficient time to plan for the care of mental health patients in crisis. The community had inadequate information on where to go in a mental health crisis. The only instructions given to the community were to call 911 or to go to an ER.

- Emergency rooms were not prepared for the onslaught of patients. Words used by the hospitals during our interviews to describe the County's actions included "irresponsible," "unconscionable" and "non-responsive." Hospitals report that they continue to have difficulty working with the County to develop solutions to resolve this situation. Not only do hospital systems believe that the County is not cooperating in reducing long emergency room stays, but the hospitals also believe that the County is requiring unnecessary medical tests.

- The law enforcement community described the relationship with the County as "fractured," "opaque," "not helpful" and "unresponsive." Some in the law enforcement community maintained that there was little prior communication from the County on what the impact would be on law enforcement's added responsibilities concerning mental health patients. It should be noted that law enforcement reported that they had an excellent relationship with County Mental Health prior to closure of the Crisis Stabilization Unit. The decision to close the CSU was a critical changing point in the relationship.

**SHIFTING RESPONSIBILITY**

- Emergency rooms now have to do crisis and medical screening prior to intake stabilization unit acceptance. Hospital systems characterize the County's actions as a conscious shift of public responsibility to the private sector. They have been told by County officials that they must assume more responsibility for the mentally ill population. Hospital officials expressed their belief that the County had abdicated their responsibility for care and treatment of the mentally ill, adding to the tension.

- In 2010 three hospitals filed suit against Sacramento County for failure to meet the statutory responsibility for care of the mentally ill who needed hospitalization. The County settled this suit by agreeing to pay a higher rate for Medi-Cal patients' hospitalizations, while maintaining that they were not liable to pay for indigents' hospitalizations.

- Individuals in mental health crisis or their family members have been told to call 911 instead of a County mental health program. Prior to the reductions, patients and families in crisis could call the CSU or other mental health providers and would receive services that could often avoid hospitalization. The County's mental health providers were familiar with their patients and could better assess treatment options.

- As sole responders to increased 911 calls, law enforcement must now deal with more patients in mental health crises.

**SHIFTING FINANCIAL COSTS**

- All community hospitals have incurred substantial costs for crisis screening and testing, security and support professionals.

- Area hospitals have been warned by County officials that it is their responsibility to contribute to new mental health crisis program costs or the hospitals can expect a continuation of the current problems besetting their emergency rooms.

- Increasing 911 mental health responses have reduced law enforcement's ability to perform normal policing duties.

- Increasing numbers and the frequency of patients cycling through all these other systems that are not a part of the mental health continuum increases the cost to these other adversely impacted entities.

**Sacramento County's use of long-term, non-acute 24-hour care utilization is inadequate, costly and fails to utilize more appropriate alternatives.**

During the course of this investigation, it became apparent that there was a problem with the lack of availability of 24-hour care for individuals who do not need acute hospitalization. At times, acute hospital beds were filled with individuals who no longer needed that level of care, which prevented new admissions from being accepted. The genesis of the long-term bed availability was in FY 2008-2009 when there began a steady process of reducing long-term care bed contracts.

- According to bed utilization reports, during FY 2009–2010, Sacramento County was using **131** beds per day from a variety of providers [State Hospitals, Institutes for Mental Disease (IMD), and skilled nursing facilities (SNFs), etc.] for individuals with 24-hour care non-acute needs. Currently, the County is contracting for only **30** long-term care beds per day. It is not clear why this number has dropped, or whether those individuals are even receiving treatment.

- There is some evidence that the Proposition 63 programs have helped return some of these individuals from these long-term care facilities to the community. However, it does not appear that these programs can meet the needs of all individuals requiring longer term residential care.

- There are more individuals in need of mental health longer term treatment than resources available, and some of those individuals have complex placement needs.

- An indicator that needs are not being met is the fact that of the 50 beds available at the SCMHTC for acute hospitalization, almost **50%** are currently filled with non-acute patients awaiting placement. This utilization is problematic for several reasons, among them that beds are not available for acute admissions as well as being overly expensive.

While the shortage of appropriate long-term beds is one concern of the Grand Jury, another concern is the financial impact of the current pattern of utilization. Patients who are in the SCMHTC are currently costing the County **$1,325** per day, which is not reimbursable by any other source other than County general funds. This is an exceedingly high rate to pay for individuals who do not need acute hospitalization. Daily costs for stays in State hospitals at **$646** per day or a skilled nursing facility at **$225** per day are drastically less. While stays in most long-term care facilities such as State hospitals and IMDs are not reimbursable by Medi-Cal, they are still

considerably less expensive than the acute daily rates at psychiatric hospitals and dramatically less than the SCMHTC.

Sacramento Mental Health officials report that there is a statewide shortage of appropriate long-term care options, and that this problem of placement is not unique to Sacramento County. Because of the issue of supply and demand, private contractors who provide long-term care have been able to be more selective about whom they have accepted for care. Since private providers are not accepting these patients with complex needs, the County should develop less expensive resources to provide these appropriate residential services.

Currently, patients who are in need of a lower level of care are often at SCMHTC where they are utilizing expensive acute hospital beds. A significant concern is that these non-acute patients inappropriately filling scarce hospital beds deny this resource to patients who need this level of care.

This inability to place acutely ill psychiatric patients has led to unacceptably long stays in emergency rooms, impacting services and care to other critically ill medical patients. This has a ripple effect on the whole mental health system because of the logjam created by not placing non-acute patients appropriately. There are models of best practices throughout the State of non-hospital alternatives that are less costly and more effective at moving patients to an appropriate level of care quickly. Data from the Urgent Care mental health program in Los Angeles County is an example of a program that provides strong support for alternative models of care.

## IN CONCLUSION

The County mental health system must be organized so that it flows more smoothly from screening to hospitalization and to discharge. A problem in any part of that continuum creates inefficiencies, unnecessary expenses and inadequate treatment. Sacramento County has problems in all three areas, and all three system components need to be addressed in order to make the mental health system more functional. The Grand Jury cannot overstress the inter-relatedness of these issues of crisis, hospitalization, long-term care and lack of community resources pre and post hospitalization.

## FINDINGS

F1. Sacramento County has abdicated the provision of crisis services for the mentally ill. The current mental health crisis services in Sacramento County are inadequate, anti-therapeutic, costly and dangerous.

F2. Sacramento County's decision to close the Crisis Stabilization Unit to adult patients and to eliminate 50 beds from the Sacramento County Mental Health Treatment Center, as well as subsequent program decisions, has had widespread negative fiscal consequences.

F3. Sacramento County's shift of responsibility for crisis services has overwhelmed community hospital emergency rooms.

F4. Sacramento County's use of inpatient hospitals is dysfunctional and currently too expensive.

F5. Sacramento County's shift of responsibility for crisis services has adversely impacted area law enforcement agencies.

F6. Sacramento County's relationship with hospital providers and law enforcement is strained or conflictual.

F7. Sacramento County's use of long-term, non-acute 24-hour care utilization is inadequate, costly and fails to utilize more appropriate alternatives.

## RECOMMENDATIONS

The Grand Jury's facts and findings provide ample evidence that the negative ramifications of prior policy decisions are widespread and complex. As such, the Grand Jury's recommendations span a wide array of options, some more critical than others. The following recommendations are numbered for reference only and do not connote any order of priority or preference.

## SACRAMENTO COUNTY SHOULD:

R1. Provide documentation that they are meeting all requirements for the provision of crisis and hospital services for the seriously mentally ill.

R2. Establish a fully functional and available 23-hour intake and evaluation crisis unit (Crisis Stabilization Unit) or similar urgent care model.

R3. Develop, expand and support outpatient programs that respond to and mitigate mental health crises before they escalate.

R4. Expand mobile crisis programs.

R5. Assure continuation of CIT (Crisis Intervention Training) opportunities for law enforcement by exploring all available funding options.

R6. Expand crisis residential services, both acute and non-acute.

R7. Maximize reimbursable services utilizing funding sources including Prop 63 (MHSA), S.B. 82 (Mental Health Wellness Act), and Medi-Cal.

R8. Clearly articulate the County's budget for crisis and hospital services for non-Medi-Cal patients.

R9. Involve the community in developing strategies regarding hospital bed availability, utilization and funding for patients requiring psychiatric inpatient care.

R10. Cease the ongoing renovation project to convert the closed 50 beds at the SCMHTC and conduct an independent evaluation of cost-effective and highest use for this facility.

R11. Use existing SCMHTC hospital beds for acute stays rather than for non-acute or administrative stays.

R12. Consider additional 16-bed Psychiatric Health Facilities contingent on the analysis of an overall mental health crisis response plan.

R13. Address the damaged relationships with community hospitals, law enforcement, and the mental health community at large.

R14. Provide alternative longer-term 24-hour non-acute capacity that is less expensive than acute hospitalization.

R15. Develop and implement programs for difficult to place patients.

2014-2015

## RESPONSES

Penal Code sections 933 and 933.05 require that the following officials submit specific responses to the findings and recommendations in this report to the Presiding Judge of the Sacramento County Superior Court by October 1, 2015:

- Sacramento County Board of Supervisors - All Recommendations, 1- 15

- Director, Sacramento County Department of Health and Human Services - Recommendation 13

**Mail or hand-deliver a hard copy of the response to:**

Robert C. Hight, Presiding Judge
Sacramento County Superior Court
720 9th Street, Department 47
Sacramento, California 95814

In addition, email the response to:

Becky Castaneda, Grand Jury Coordinator at castanb@saccourt.com

## DISCLAIMER

This report was issued by the Grand Jury with the exception of one juror who believed there might be a perceived conflict of interest. This Grand Juror was excluded from all parts of the investigation, including interviews, deliberations, and the writing and approval of this report.

## APPENDIX A

### GLOSSARY

**Acute**: when used in conjunction with hospitalization, hospital beds or a medical condition, refers to active but short-term treatment for a severe injury or episode of illness, an urgent medical condition.

**Co-occurring**: typically refers to an individual having co-existing mental health and substance use disorders.

**Crisis Intervention Training (CIT)**: in both 8 and 24 hour versions, provides first responders with the tools to identify mental disorders, the communication skills to ensure the safest outcome for all involved, and information about community resources.

**Crisis Residential Program (CRP)**: community-based treatment programs for adults experiencing a mental health crisis.

**Crisis Respite**: a home-like setting staffed around the clock, seven days a week, by counselors serving individuals or families experiencing a mental health crisis but who are not an immediate danger to self or others.

**Crisis Stabilization Unit (CSU)**: an outpatient psychiatric service providing screening, assessment, and crisis intervention and medication management strategies for up to 24 hours for individuals suffering behavioral health crises.

**Emergency Room (ER)**: a hospital room or area staffed and equipped for the reception and treatment of persons with conditions (illness or trauma) requiring immediate medical care. Also referred to as emergency departments (ED).

**Fiscal Year (FY)**: any yearly period without regard to the calendar year, at the end of which a firm, government, etc., determines its financial condition. In Sacramento County it is July1 to June 30.

**Institutions for Mental Diseases (IMD)**: a hospital, nursing facility, or other institution of 17 beds or more that is primarily engaged in providing diagnosis, treatment, or care of people with mental diseases.

**Involuntary Psychiatric Hold (5150)**: a section of the California Welfare and Institutions Code (WIC) which reads, in part, when a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, gravely disabled, a peace officer, … upon probable cause, take, or cause to be taken, the person into custody for a period of 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Mental Health Services.

**Mental Health Service Act (MHSA) aka (Proposition 63)**: passed in 2004, taxes high-earning personal income with the money being used to provide dedicated funding for the expansion of certain mental health services and programs. These funds cannot be used for involuntary or hospital services.

**Mental Health Wellness Act of 2013 (Senate Bill 82)**: established a competitive grant program to disburse funds to California counties or to their nonprofit or public agency designates for the purpose of developing mental health crisis support programs.

**Non-acute**: maintenance or care in which the primary clinical purpose or treatment goal is support for a patient with impairment, activity limitation or participation restriction due to a health condition.

**Peer Support**: individuals who have experienced mental disorders and who provide support, encouragement, hope, mentorship and assistance with linkage to mental health services.

**Psychiatric Health Facility (PHF or PHF Unit)**: a facility for the care and treatment of patients affected with acute or chronic mental disorders. To qualify for Federal reimbursement a PHF must have 16 or fewer licensed beds.

**Psychiatric Emergency Services (PES)**: an outpatient psychiatric service providing screening, assessment, crisis intervention, and medication management strategies for up to 24 hours for individuals suffering behavioral health crises.

**Sacramento County Mental Health Treatment Center (SCMHTC)**: Sacramento County owned and operated hospital for the treatment of acute mental disorders.

**Urgent Care, Mental Health**: usually operated with extended hours to provide both emergency and non-emergency evaluation and treatment on a walk-in or appointment basis.

# APPENDIX B

## BEST PRACTICES

The term "best practices" describes innovative strategies and programs providing desirable outcomes in such areas as science, business, health care and manufacturing. In the field of mental health, the following best practices have provided proven, cost-effective and efficacious alternatives:

## LAW ENFORCEMENT PROGRAMS

### CRISIS INTERVENTION TRAINING

(CIT) was developed by the Memphis Police Department to assist officers in the field in facilitating the officers' experiences in dealing with persons experiencing mental disorders and its interface with the criminal justice system. CIT is a structured educational program that has a series of classroom trainings and modules, workshops and role-playing activities that help the officers better understand how to make appropriate interventions in the field. This program has been widely disseminated and has been utilized throughout California by many law enforcement agencies.

### MOBILE CRISIS

There are a number of programs throughout California that pair sworn peace officers with licensed mental health professionals to address crisis situations in the field. While there may a number of variations of this program, for example PERT, MET, SMART, PET are common acronyms for these "emergency" response teams, all have the same guiding principles of law enforcement and mental health partnerships.

Mobile Crisis response programs have demonstrated a marked reduction in hospitalizations and serve to enhance the ability to provide appropriate services in the community through appropriate referrals. Sacramento County recently received a grant (SB 82) to develop this type of program with the Sacramento Police Department, the Sacramento County Sheriff's Department and Sacramento County Behavioral Health.

### MANDATED TRAINING

Currently peace officers are only exposed to a limited amount of training in understanding mental health issues in their initial POST (Peace Officer Standard Training) required training (8 hours). Best practices indicate that expanding the number of hours of exposure to training on mental health issues has an exponential effect on the efficiency in dealing with mental health situations in the community. Some Sacramento County Law Enforcement agencies have mandated further continuing education in mental health for their officers.

## PSYCHIATRIC HOSPITAL PROGRAMS

### ALAMEDA MODEL

Emergency Rooms and hospitals often cite the model of services provided in Alameda County and other similar county programs as a best practice. The John George Psychiatric Hospital in Oakland is a stand-alone psychiatric campus that is part of the Alameda County Health System. This facility

Sacramento County Grand Jury                                                    2014-2015

provides psychiatric emergency services and acute care services to adults experiencing severe
mental health crises.

This program has dramatically reduced the amount of time that mental health patients are held in
emergency rooms in Alameda County to less than two hours and has also been able to refer over
76% of the 5150 patients to community resources rather than hospitalization. This program is
similar to the program that used to exist in Sacramento with the Crisis Stabilization Unit and the
Mental Health Treatment Center on Stockton Boulevard.

## COMMUNITY PROGRAMS

### CRISIS STABILIZATION UNITS-23 HOUR (CSU)

These outpatient programs are very effective in accepting referrals of all who need some level of
psychiatric care and who are in mental health crisis. Available 24hours a day, seven days a week,
these programs are staffed by trained multi-disciplinary health professionals. Often these programs
are connected with a 24- hour acute care facility whether it is a freestanding hospital (FSH), a
Psychiatric Health Facility (PHF), or an acute care hospital. These programs can be designated
5150 receiving facilities.

Statewide, these programs have shown consistent results in reducing hospitalizations, following
through with appropriate community referrals. By working closely with law enforcement, the CSUs
have diminished the length of time that law enforcement must be engaged at a mental health
facility so that officers can return to the community to continue policing. These programs are
characterized by their strong linkages to the community and their ability to provide appropriate
referrals and arrange for follow-up. This was similar to the program that existed in 2008-2009 in
Sacramento County.

### MOBILE CRISIS

Mobile Crisis is a best practice program that consists of a mental health interdisciplinary team that
is able to respond to a request for crisis intervention in the community. It differs from the law
enforcement mobile crisis model that pairs a police officer with a mental health professional.
These mental health field evaluations often can avoid hospitalizations, increase the possibility of
appropriate referrals, and can de-escalate situations on a timely basis. It is not unusual for mobile
crisis programs to have access to other community resources such as outpatient treatment or crisis
residential services reducing hospital admission rates by 30-40%. These programs are eligible for
MHSA funds, Mental Health Wellness Act funds (SB 82), realignment funds, and can be Medi-Cal
reimbursable.

### URGENT CARE

Urgent care programs can be seen as a hybrid of crisis intervention programs, crisis stabilization
centers and drop-in/walk-in support programs where individuals can be assessed for their needs
and crisis stabilization provided on site. The urgent care services include medication evaluation
and management, crisis intervention, brief intervention/stay, psychiatric evaluation and social
services with information and referrals.

These programs are run by a multidisciplinary team of physicians, nurse practitioners, Masters level
clinicians and mental health specialists. Crisis counseling occurs in these settings as well as

Sacramento County Grand Jury                                                2014-2015

psychiatric evaluations for individuals on 5150 holds. Los Angeles County Mental Health has utilized these programs extensively and has found them to be cost-effective, efficient, and to reduce the need for 5150 hospitalizations dramatically. These programs can be funded by Mental Health Services Act funds, AB109 dollars, county general funds, Medi-Cal funds, Realignment funds and SB82, Mental Health Wellness funds.

## CRISIS RESIDENTIAL SERVICES

Crisis residential services are a 24 hour care community based on alternative inpatient hospitalizations for adults experiencing an acute psychiatric episode. While these programs have psychiatric coverage, they are often more social in nature and do not have the medical orientation of a hospital stay. These programs have proven to be effective in avoiding hospitalizations and are considerably less expensive than hospital costs. Participation in these programs is voluntary and they cannot accept 5150 referrals. Sacramento County has a crisis residential program through a contract with Turning Point and is available by referral from the county mental health system.

## "SOFT" SERVICES

Good crisis intervention programs have a number of ancillary programs that offer support during times of crisis. These programs may include such things as hotlines or warm lines. Suicide Prevention hot lines are good examples of this type of program. Soft services may also include patient support groups, wellness or drop-in centers that allow individuals in crisis to talk to someone who is not a licensed professional rather than needing to go to an emergency room or a crisis stabilization center. There is a long history of the utilization and effectiveness of these programs which can be funded by MHSA funds, realignment funds and often are run by volunteers and community-based organizations.

## APPENDIX C

## SUPPORTING INFORMATION

- *Lessons Learned from California's AB 2034 Program*: California Institute of Mental Health

- *Mental Health Services Act (Prop 63): Best Practices*: California Institute of Behavioral Health Solutions

- *Alameda Model*: An Effort Worth Emulating: Western Journal of Emergency Medicine.

- *Independent Expert Review Final Report*: Callahan and Associates

- Medicaid IMD waiver (Matsui)

- Best Practices-Crisis Response and Diversion: Maryland Health Care Commission
  Urgent Care Los Angeles (Exodus Recovery)

- Sacramento County Mental Health Advisory Board minutes

- Sacramento County Assembly Bill 109 Realignment reports

# CITY OF SACRAMENTO FIRE DEPARTMENT HANDLING OF NARCOTICS

## SUMMARY

The Sacramento County 2014-2015 Grand Jury investigated the Sacramento Fire Department's handling of narcotics carried in the course of their duties and found that there are necessary safeguards against the inappropriate and illicit use of narcotics by Department personnel. The Grand Jury did not find any evidence of narcotic misuse in their investigation. The Department should continue to implement the City Auditor's recommendations.

## BACKGROUND

In August 2014 the Office of the City Auditor released a report, *Audit of the Fire Department Inventory System and Narcotics*, critical of the Department's handling and inventory controls for narcotics administered by City paramedics. The Auditor's investigation was triggered by an anonymous tip concerning missing vials of morphine, similar to 2008 charges of narcotic abuse levied against fire personnel.

The City Auditor's report determined that the allegation of a large number of missing drugs was the result of sloppy record keeping rather than nefarious abuse or pilfering, as widely reported in the media. The Auditor made numerous recommendations to strengthen the Fire Department's policies and procedures related to purchasing, inventory, and distribution of narcotics and accounting of drugs administered by paramedics in the field.

Based on information received by the Grand Jury, an investigation was conducted to determine the adequacy of the Fire Department's policies and procedures to prevent the illegal use of narcotics by paramedics or other Fire Department personnel, a related issue not investigated by the City Auditor.

## METHODOLOGY

This investigation was conducted over a period of several months which consisted of a review of various documents, including the *Audit of the Fire Department Inventory System and Narcotics*. The Grand Jury also heard testimony from senior Fire Department management and the City Auditor.

## DISCUSSION

In response to findings by the City Auditor, the City of Sacramento Fire Department purchased and began implementation of a computerized order, inventory and tracking system for narcotic drugs carried on fire apparatus and rescue vehicles. Concurrent with systems implementation, internal policies and procedures were adopted and training was conducted to orient users with system functionality and operational requirements.

The new management system replaces unreliable paper processes that led to narcotic inventory discrepancies and installs greater security access to restricted drugs.

33

Nationally, the abuse or theft of narcotic drugs carried on fire apparatus and rescue vehicles is a well-documented but relatively rare occurrence.  Typical abuse involves either outright theft of narcotics from supplies either carried on the fire apparatus or from warehoused supplies.

A more insidious abuse involves using a hypodermic to withdraw a portion of the narcotic, transferring it to another vial, and then replacing the stolen amount of narcotic with an equal amount of safe saline solution.  The result is a visually intact and full vial of narcotic whose potency has been greatly diminished.

Given the negative impact that these abuses can have for patients suffering traumatic injuries, it is paramount that stringent safeguards be in place to ensure that drugs are undiluted and administered by drug-free personnel.

## FINDINGS

The Grand Jury, based on the testimony and review of policies and procedures put in place or in process of implementation, determined that:

F1. The Fire Department's implementation of new computerized systems to replace manual inventory and tracking systems will greatly increase the accuracy and timeliness of information related to the purchase, storage, distribution and use of narcotics.

F2. The Department's implementation of coded access by authorized personnel provides better assurance that narcotics are only accessed by those with the proper and unique access codes, as referenced by the City Auditor's report.

F3. No evidence was discovered to indicate drug theft or tampering.

F4. The Department's publically stated willingness to consider random drug testing, as stated in the City Auditor's report, is recognition of a proven program to create a safer work environment for fire personnel and to ensure better patient care.

## RECOMMENDATIONS

R1. The City of Sacramento Fire Department should continue implementing the City Auditor's recommendations.

R1. The City Auditor should conduct a follow-up audit to determine the adequacy of the Fire Department's implementation and operation of the systems, policies and procedures required to properly manage narcotics under the Department's control.

R3. In consultation with the City Attorney, the Fire Department should diligently pursue discussions with firefighter union representatives to institute a random drug testing program.

## RESPONSES

Penal Code sections 933 and 933.05 require that the following officials submit specific responses to the findings and recommendations in this report to the Presiding Judge of the Sacramento County Superior Court by October 1, 2015:

- The City of Sacramento Fire Department Chief - all Findings and all Recommendations

**Mail or hand-deliver a hard copy of the response to:**

    Robert C. Hight, Presiding Judge

    Sacramento County Superior Court

    720 9th Street, Department 47

    Sacramento, California 95814

In addition, email the response to:

    Becky Castaneda, Grand Jury Coordinator at castanb@saccourt.com

# RED LIGHT CAMERAS
## ...TIMING IS EVERYTHING

## SUMMARY

While there seem to be many areas of concern about the use of red light cameras in the City of Citrus Heights (Citrus Heights), the investigation conducted by the 2014-15 Sacramento County Grand Jury focused on two issues: (1) is the timing of yellow signal lights in compliance with Federal and State standards? and (2) has there been a reduction of accidents at the intersections where such cameras are installed?

It is the finding of this Grand Jury that Citrus Heights chronically and systematically ignores its own policies for oversight, testing, monitoring, maintenance and record keeping. The City's primary stated goal of the program is to reduce the incidence of accidents and fatalities, yet it fails to routinely collect and analyze the necessary data which would enable it to gauge the effectiveness of the program on an ongoing basis. The documentation received from Citrus Heights Police Department (CHPD) is flawed; thus, the actual reduction of accidents cannot be verified.

Citrus Heights should reassess its red light program to ensure it is using best practices toward compliance with the California Department of Transportation (CA DOT), California Vehicle Code (CVC) and the Police Department's own policy.

## BACKGROUND

Citrus Heights has been incorporated as a city since January, 1997. In June of 2006 the City formed its own police department. Red light cameras were installed beginning January 2008 at the five intersections discussed in this report: Greenback Lane at San Juan Avenue (camera at southbound San Juan), Auburn Boulevard at Antelope Road (camera at northbound Auburn), Greenback Lane at Fountain Square Drive (camera at eastbound Greenback), Oak Avenue at Sunrise Boulevard (cameras at northbound Sunrise and southbound Sunrise), and Antelope Road at Garden Gate Drive (camera at westbound Antelope).

At the time of this investigation, Citrus Heights had five intersections that utilized red light camera enforcement. The City has recently added three more intersections with camera enforcement that were not a part of this investigation. Citrus Heights is in contract with Arizona based company Redflex to provide and support red light cameras.

## METHODOLOGY

The Grand Jury interviewed members of the CHPD, Traffic and Signal Operations Supervisor, and a vice president of Redflex. We reviewed multiple documents and records related to traffic studies and collision history data, CHPD red light program policies, the Photo Red Light Enforcement Program (PRLEP) agreement, the CVC and CA DOT. Members of the Grand Jury also conducted an informal stopwatch timing of the yellow lights at each intersection where red light cameras were in operation at the time of this report.

Sacramento County Grand Jury                                                2014-2015

---

## DISCUSSION

Jurisdictions that elect to implement a red light camera program must adopt policies which govern the operations of their camera system. This Grand Jury found that the CHPD routinely failed to follow its adopted policies and as such, is not effectively administering the red light program.

### REDUCTION OF ACCIDENTS

The CHPD maintains that red light cameras reduce accidents. When asked to provide the Grand Jury with documentation to substantiate this claim, we were given an abundance of raw data. This data did not offer an analysis of actual numbers of accidents at their red light intersections.

When the Grand Jury analyzed the raw data, it was noticed that included were intersections where no red light camera existed, as well as a duplication of accidents. These discrepancies were brought to the attention of the Police Department.

The Grand Jury then asked a third time for accurate documentation of accident reduction and were told it did not exist. They admitted that they do not routinely analyze the data they collect. The Grand Jury was told they were attempting to create and provide a document with accurate accident information. The resulting document that was provided included the same incorrect data.

Based on the inconsistencies in the documentation provided by the CHPD, the actual reduction in accidents cannot be verified.

### YELLOW SIGNAL LIGHT SEQUENCING (DURATION OF YELLOW LIGHTS)

The policy directive from the CA DOT sets a standard for the sequencing of yellow light change intervals. The standard set for yellow light change interval at intersections with a speed limit of 40 miles per hour (mph) must be a minimum of 3.9 seconds.

In Citrus Heights, there are no streets with a speed limit higher than 40 mph. At the red light camera intersections Citrus Heights sets a warning so that when yellow light sequencing falls below 3.5 seconds, that intersection will revert to flashing red, indicating a problem with the sequencing of the signal lights. This is below the minimum standard of 3.9 seconds set by the CA DOT. This is the only method of "monitoring" the City does to ensure that the signal lights are functioning properly. The City does no physical timing with stopwatches at those intersections, nor any other type of check to determine if the yellow light sequencing is accurate or potentially fluctuating.

During the Grand Jury's informal timing at the site of each red light camera intersection, one of those intersection's yellow light sequence timing was off by approximately one second. This was an informal timing done by Grand Jury members with a stopwatch, but this raises a concern for the potential of variances in the timing of the yellow lights.

## INSPECTION AND MAINTENANCE

The CHPD Policy titled *Red Light Photo Enforcement Policy*, states, in part, that their PRLEP personnel shall be responsible for maintaining records involving the day to day operation of the program. These records shall include, but are not limited to:

1.  Monthly signal light maintenance documents provided by the City's traffic engineers including, but not limited to, the amber (yellow) lighting sequences per the CA DOT standards.

2.  Monthly stopwatch audits confirming the amber (yellow) light timing.

The CHPD provided multiple documents that were designated as checklists for documenting the "stopwatch" audits of the yellow light timing. Some of the documents they provided were postdated beyond the date they were received. In other words, the Grand Jury was given documents with future dates that had not yet occurred.

The CHPD stated that their only method of stopwatch timing of the yellow light sequencing was done by using video taken by the red light cameras. Redflex stated that it is not advisable to rely on their video for yellow light timing. There are variances in timing due to the way video is compressed. The unreliability of digital formatting affects the accuracy of timing.

Redflex advised that their company is responsible for the installation, inspection and maintenance of the cameras and follows a maintenance schedule that is stated in the contract between Redflex and Citrus Heights. This includes, in part, monthly site checks and needed repairs, as well as electronic monitoring of the cameras and related equipment.

## FINDINGS

F1. Citrus Heights does not uphold its responsibility to operate and monitor its red light camera program.

F2. The CHPD routinely fails to follow its adopted policy and procedures on red light cameras.

F3. The accident reduction data used to judge the effectiveness of the program by the CHPD is inconsistent and inaccurate in some instances.

F4. The City has no process in place to be alerted when the yellow light sequencing falls below the minimum standard set by CA DOT and mandated by the CVC.

F5. Citrus Heights has no reliable process in place to ensure that the timing of the yellow light sequencing is consistent. CHPD performs stopwatch audits of the yellow light sequencing using Redflex video, which is compressed and unreliable.

Sacramento County Grand Jury                                                    2014-2015

## RECOMMENDATIONS

R1. The CHPD should routinely produce and analyze actual traffic incident data. This information should then be used to judge the effectiveness of the program. This will allow informed decisions such as whether the cameras are placed at intersections that yield the most desired effect.

R2. Citrus Heights Public Works should set the minimum timing for yellow lights at the minimum standard, in order to trigger the red flashing signal, indicating a problem with the timing.

R3. Citrus Heights should assign personnel to conduct an on-site physical timing of the yellow signal lights at each intersection where there is a red light camera. A written maintenance log should be kept.

## RESPONSES

Penal Code sections 933 and 933.05 require that the following officials submit specific responses to the findings and recommendations in this report to the Presiding Judge of the Sacramento County Superior Court by October 1, 2015:

- Citrus Heights Chief of Police - Findings 1, 2, 3 and Recommendations 1, 3

- Citrus Heights City Manager - Findings 1, 4, 5 and Recommendations 1, 2, 3

**Mail or hand-deliver a hard copy of the response to:**

Robert C. Hight, Presiding Judge
Sacramento County Superior Court
720 9th Street, Department 47
Sacramento, California 95814

In addition, email the response to:

Becky Castaneda, Grand Jury Coordinator at castanb@saccourt.com

Sacramento County Grand Jury                                    2014-2015

# THE RALPH M. BROWN ACT
## ...NOT TO BE TAKEN LIGHTLY

## SUMMARY

Several complaints received by the Grand Jury included allegations of Brown Act violations. These included board decisions being made that were not on the agenda, secret or serial board discussions, or inadequate availability of materials in advance of meetings. Because of the frequency of such complaints, the Grand Jury decided to closely study this issue. The Grand Jury surveyed board members and executive staff of various jurisdictions[1] in Sacramento County about their Brown Act training and experiences. In addition, the Grand Jury closely monitored the Twin Rivers Unified School District, in which the appointment of a Board member was rescinded due to a Brown Act violation.

The Brown Act seems straightforward, but compliance is not as easy as it seems. Inadvertent violations do occur, and when they do, they are usually easily fixed. However, sometimes a violation can cause great public embarrassment, controversy, and result in significant cost. To avoid procedural complaints, jurisdictions are encouraged to always follow the Brown Act requirements to the letter, including noticing, agenda development, conducting meetings, and limiting off-line discussions by board members. Jurisdictions should track that new board members and key staff get training upon appointment and every two years thereafter. Lastly, jurisdictions may want to invite the public to periodic Brown Act training during public meetings.

## BACKGROUND

The Ralph M. Brown Act, or "The California Open Meeting Act" was enacted in 1953, with the intent to ensure that the public's business is conducted in public, and with adequate opportunities for public input. The Act finds and declares that the public commissions, boards, and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of the law that their actions and deliberations be conducted openly.[2] Though the Act has been law for six decades, there is ongoing confusion by many, including special district boards and staff, and the citizens that attend and participate during meetings, about the Brown Act and its implementation requirements.

There are several small districts within Sacramento County that are governed by the Board of Supervisors. The Brown Act requires, in part, that public agencies and their commissions, committees, boards and other bodies that are "legislative bodies"[3]:

- Post a notice of meetings at least 72 hours prior, except in certain cases;

- Post an agenda for meetings at least 72 hours prior, except in certain cases;

---

1 This report uses the generic term "jurisdiction" to mean all public boards and bodies subject to the Brown Act

2 Government Code Section 54950

3 Government Code 54951 further defines "legislative bodies" as created by charter, ordinance, resolution or formal action of a legislative body

- Make all documents used by the board to make decisions readily available to the public at the same time they are distributed to the board. Government Code section 54950 specifies that documents be available to the public "without delay" if distributed to all or a majority of members of a board before or at a meeting, unless the documents are exempt under the Public Records Act; and

- Not require a sign-in at public meetings.

The Grand Jury received many complaints alleging Brown Act violations. The frequency of these complaints triggered a broader investigation about Brown Act compliance among jurisdictions within the County. Allegations included:

- Boards made back-room decisions or conducted serial meetings by email prior to meetings, so that certain decisions were pre-determined;

- Information used by boards to make decisions was not available to the public at all, or not in a timely manner;

- Agendas posted on-line lacked adequate backup materials;

- Agendas were too vague for the public to understand; and

- Board chairs or executive staff did not allow adequate public comment, or rode roughshod over agendas and meetings.

In addition, the Brown Act seems to be a frequent topic for grand juries. In a review of recent Grand Jury reports throughout the state we discovered this topic was addressed in the Grand Jury Reports of: Madera County 2013, Humboldt County 2014, Shasta County 2014, and Alameda County 2014.

## METHODOLOGY

The Grand Jury investigated a number of alleged Brown Act violations. Members reviewed extensive documents and interviewed each complainant along with numerous individuals, including those from the County Counsel's office and the California Special District Association. The Grand Jury also closely monitored the Brown Act controversy at the Twin Rivers Unified School District. Lastly, to find out more about Brown Act training, compliance, and concern in Sacramento County, the Grand Jury conducted a short survey of 118 board members and executive staff whose jurisdictions are covered by the Brown Act.

## DISCUSSION

The Brown Act seems simple to follow, but compliance is not as easy as it seems. Procedural complaints appear common throughout the State, but actual violations are less common. Because cities and larger jurisdictions often have legal counsel in attendance at meetings, procedural issues are dealt with on the spot. Smaller districts and boards less often have instant access to counsel, and are more likely to violate a procedure.

Violations, when they occur, are most often inadvertent and not serious, usually easily fixed by a new vote at the next meeting to re-confirm the Board's intent. However, in some cases the violation is only rectified at great cost and embarrassment. In addition, an individual citizen or

small group may sometimes use the Brown Act as a bludgeon to advance its own agenda or try to intimidate boards and staff into delaying or reversing decisions with which he/she/they disagree.

Three examples are discussed below.

## CARMICHAEL RECREATION AND PARKS DISTRICT

Several citizens complained about procedures followed by the District in conducting a special election, which included alleged Brown Act violations. In particular, there was an allegation that an "Engineers Report" was released to the public without enough advance notice prior to a successful April 17, 2014 property tax assessment election. If this document were not available to the public in a timely manner, it would mean that the public was not given adequate information about its vote prior to the election.

District Board discussions about a possible assessment election started in May of 2013, and on January 14, 2014, the County Board of Supervisors approved proceeding with that election. An Engineer's Report was required to be prepared. This report is a key document that contains proposed improvement projects, proposed boundaries of the new district, and an assessment per parcel. The draft report was prepared in January 2014, and the District Board preliminarily approved it on February 6, 2014. It is unclear whether this draft was available for public review 72 hours prior, as required by the Brown Act, but it was available by February 9.

Ballots were mailed to residents within the proposed District boundaries on February 23, 2014. The official Engineer's Report was finalized on March 17, 2014. It was thus made available to the public for review at least 45 days prior to the election, as prescribed by Proposition 218, the law under which the election/public hearing was conducted.

Though the Brown Act may have been violated, voters had almost two months to review and comment on two versions of the Engineer's Report before the April 17, 2014 vote deadline. This is an example of a potential technical violation that did not have major consequences because of subsequent actions.

## ARCADE CREEK RECREATION AND PARKS DISTRICT

The Grand Jury received a complaint alleging a Brown Act violation by the Arcade Creek Recreation and Parks District during the re-naming of Hamilton Street Park. In January 2011, the District Board voted to re-name Hamilton Street Park to Jane Steele Park, in honor of the retiring District Administrator's years of service. In an attempt to surprise Administrator Steele, the Board had agreed to the change prior to the meeting, without any public notice of the discussions and without posting it on any agenda. A $10,000 concrete monument was erected in July 2011. The Board had no inkling that the decision would be controversial. A few local citizens, upon noticing the sign, became upset by the name change, but no further action occurred for three years. However, the September 25, 2014 meeting was quite controversial, with 14 citizens signing in and eight citizens expressing the desire to return the park to its former name. Brown Act violations were alleged. Legal counsel happened to be at that meeting and researched the allegations. After researching, Counsel reported at the October 2014 meeting that Brown Act violations did occur, that the 90-day statute of limitations had long expired and that the Board could take action to void the January 2011 decision. The Board immediately voted to again name the park Hamilton Street Park, and has spent additional funds to alter the monument sign.

The Hamilton Street Park naming was an example of a board conducting "secret" or "serial" meetings at which the public was excluded. Though this decision was clearly conducted with the good intent to surprise the honoree, these and other discussions about agenda items very likely occurred during regular pre-meeting potlucks which several board members routinely attended. Such discussions clearly violate the Brown Act. Potlucks, dinner meetings and receptions are acceptable as long as no business is discussed until after the meeting is opened. We note that the Arcade Creek Recreation and Parks District has recently discontinued its potlucks.

Currently, the posting of agendas and certain background materials by the District appear to comply with the Brown Act. Agendas and materials are also emailed to those who request them. However, not all documents used by the Board are posted on the website, particularly lengthy documents and items relating to the consent calendar and budgets. The website notes, however, that these documents are available on request. In the future, the District may want to make every attempt to post all supporting documents on its website. The Grand Jury notes that the District has now adopted an official park naming policy, and commends the District for including a 90- minute Brown Act training module at its annual Board retreat on January 31, 2015.

## TWIN RIVERS UNIFIED SCHOOL DISTRICT

A group of local citizens circulated a petition to vacate the unanimous appointment on December 8, 2014 of a new Trustee to the District's Board. The petition alleged that a Brown Act violation occurred when the District voted to seat the appointee without properly putting it on the agenda. That agenda stated the actual vote would take place on December 11, 2014.

On January 13, 2015, the District Superintendent admitted the District had violated the Brown Act, and that the Board would "cure and correct" the problem. On January 22, the Sacramento County Office of Education Superintendent issued a letter directing the School District to conduct an election to fill the vacancy. On January 27, the Twin Rivers Unified School District Board voted to rescind the December 8 appointment. On February 24, the District Board approved a traditional polling process and limited boundaries for a May 12, 2015 election. The cost of the special election to the tax payers has been estimated at $113,000 by the Sacramento County Voter Registration Office. This was a very expensive procedural mistake for the District.

# BROWN ACT SURVEY

To find out more about Brown Act training, compliance, and concern in Sacramento County, the Grand Jury sent a 10-question electronic survey to 118 board members and executive officers at a number of jurisdictions known to be legislative bodies under Government Code Section 54951. Forty-nine responses were received. The results are summarized below. The Appendix includes the actual survey.

Responses were received from 13 types of jurisdictions, including school districts, water districts, recreation and park districts, cemetery districts, fire protection districts, cities, Sacramento Local Agency Formation Commission, a Community Service District, a sewer district, a reclamation district, a flood control district, and a public utility. The number of responses was evenly split between board members and executive staff.

All respondents stated that they had taken Brown Act training once, upon being named to a board or hired. The California Special Districts Association (CSDA) and other associations provided training. It is unclear whether training occurs every two years, as required by AB 1234 (GC 53234 et seq.) as part of general ethics training. Most respondents think they are adequately trained, but some do not.

All but one respondent believe that they understand the Brown Act and that their jurisdiction follows it consistently. About half of the time, Brown Act compliance does come up as an issue, but these are generally resolved through consultation with counsel or by making procedural changes.

Procedural issues vary. The most common types of complaints are:

- Conducting board discussions about agenda items off-line, either in serial emails or calls, or prior to meetings;

- Inadequate public notice, either late notice or inadequate availability of materials;

- Inadequate public comment opportunities during meetings; and

- Misuse of closed sessions.

Interestingly, in three of the jurisdictions, there was some inconsistency between a board member and staff about whether the Act's procedures were properly followed. More frequent training, including case studies, should reduce the conflicts within boards, and between boards and the public.

One respondent provided additional information about the validity of procedural complaints, stating:

> "While the District has received complaints regarding Brown Act violations …. The complaints have usually resulted from a lack of knowledge by the complainant. …. The district consults with District counsel when a violation is alleged."

Sacramento County Grand Jury                                                                                      2014-2015

## FINDINGS

F1. Larger boards such as the Board of Supervisors and city councils, which can afford consistent legal guidance at their meetings, usually follow Brown Act procedures.

F2. There may be Brown Act violations that go unnoticed by staff, board members, and the public, especially in smaller jurisdictions.

F3. Awareness of such violations is often triggered by a controversial decision, and can cause great embarrassment. Rectifying violations can be very expensive and result in unplanned costs.

F4. There are numerous opportunities to get professional Brown Act training. New board members and key employees appear to all receive training. It is unclear whether that training is reinforced every two years as required in Government Code 53234(d)(3).

F5. Since the general public has limited exposure to the Brown Act, strict adherence reduces the potential for procedural controversy.

## RECOMMENDATIONS

R1. Jurisdictions must always follow Brown Act procedures.

R2. All jurisdictions should keep a log to ensure that board members and key staff receive training every two years, as required by Government Code 53235.1(c)(2)(b).

R3. Board members and staff should personally ensure that their training is adequate and current.

R4. Jurisdictions should periodically schedule Brown Act training on a meeting agenda and invite members of the public to attend.

R5. To ensure full transparency, jurisdictions should regularly review their meeting and posting procedures for compliance with the Brown Act. Further, jurisdictions can also consider reviewing all their public practices, including seeking a "District Transparency Certificate of Excellence", which is offered by the Special District Leadership Foundation.

R6. The Sacramento County Board of Supervisors and all cities within the County should ensure that their commissions, committees, boards and other bodies subject to the Brown Act, maintain records on their ethics and Brown Act training compliance.

## RESPONSES

Penal Code sections 933 and 933.05 require that the following officials submit specific responses to the findings and recommendations in this report to the Presiding Judge of the Sacramento County Superior Court by October 1, 2015:

- Sacramento County Board of Supervisors - all Findings and Recommendation 6.

**Mail or hand-deliver a hard copy of the response to:**

Robert C. Hight, Presiding Judge
Sacramento County Superior Court
720 9th Street, Department 47
Sacramento, California 95814

In addition, email the response to:

Becky Castaneda, Grand Jury Coordinator at castanb@saccourt.com

## APPENDIX

## GRAND JURY BROWN ACT SURVEY



### Brown Act Survey - February 4, 2015

The Sacramento County Grand Jury is eager to learn about your experiences with the Ralph M. Brown Act and how your jurisdiction is implementing it. A random sampling of a number of special districts, school districts and cities within Sacramento County has been asked to complete this brief survey. As investigations of the Grand Jury are confidential, please refrain from sharing this information with other individuals within your organization or outside agencies. The compiled survey results may be included in a future Grand Jury report so your response is very important. Your complete survey should be submitted no later than February 11, 2015. Thank you in advance for your continued commitment to good government.

If you have questions or comments, please contact the Sacramento County Grand Jury Coordinator at castanb@saccourt.com, or (916) 874-7559. 720 9th Street, Room 611, Sacramento, CA 95814.

**1. My role within my organization is (check all that apply):**

☐ Member of the Board

☐ Executive staff

☐ Counsel

☐ Other (please specify)

[                    ]

**2. For verification purposes only, please provide your name and title of your organization.**

First name [                    ]

Last name [                    ]

Title of your organization [                    ]

**3. My jurisdiction can be identified as (check appropriate response):**

☐ Recreation and Park District

☐ Cemetery District

☐ School District

☐ Water District

☐ Fire Protection District

☐ City

☐ Other (please specify)

---

**4. Ralph M. Brown Act Training - Individual (check one)**

○ I have had some formal training in the Brown Act

○ I have not had any training or instruction in the Brown Act

---

**5. Ralph M. Brown Act Training - Organization (check one):**

○ I think my organization needs Brown Act Training

○ I think my organization does not need Brown Act Training

---

**6. Ralph M. Brown Act Training Opportunities (Check all that apply):**

☐ I have received training via the California Special District Association ethics training program

☐ I have attended a Webinar sponsored by the California Special District Association

☐ Our own jurisdiction counsel has provided us with workshops and/or seminars

☐ I have read the Brown Act on my own and I don't need special training

☐ Other (please specify)

---

**7. Ralph M Brown Act Training Frequency (check one)**

○ I have had training <u>once</u> in the past two years

○ It has been <u>more</u> than two years since I have had training or attended a training session

○ Our jurisdiction conducts training sessions on an <u>as-needed</u> basis

○ I have read the Brown Act on my own and I don't need special training

**8. Ralph M. Brown Act working knowledge (check one)**

○ I think I understand it and our jurisdiction follows it consistently

○ This is something I leave up to others or our legal counsel

○ I know a little about it and we seem to get by without any problems

**9. Ralph M. Brown Act Experiences (Check all that apply)**

☐ Citizens have alleged that the Brown Act has been violated

☐ We had an issue(s) and it resolved itself by implementing procedural changes

☐ It's a minor nuisance in our deliberative process, and we've learned to live with it

☐ It's an ongoing issue that distracts us from good government and an open process

**10. Ralph M. Brown Act...a list of <u>alleged complaints</u> (Check all that apply)**

☐ Secret or serial board discussions not at an open meeting

☐ Inadequate public notice

☐ Improper or vague agendas

☐ Lack of agenda backup materials available to the public

☐ Inadequate "Web" postings by our jurisdiction

☐ Board decisions being made that were not on the agenda

☐ Secret ballots during a vote

☐ Controversy over decisions made in closed vs. open public sessions

☐ Not enough opportunity for the public to comment during meetings

☐ Misuse of public comment  period at open meetings

☐ None

☐ Other (please specify)

[                                        ]

Done

# SACRAMENTO CORRECTIONAL SYSTEM REVIEW

## BACKGROUND

California Penal Code 919(b) provides that the Grand Jury "shall inquire into the conditions and management of the public prisons within the County." To fulfill this responsibility, the Grand Jury annually undertakes the task of visiting and evaluating the physical conditions and management of each jail and prison located within Sacramento County. The Grand Jury members visited each facility. This report is the result of the Grand Jury's observations of these facilities that included site visits, review of written materials and public governmental data and information available on the Internet.

## FACILITIES VISITED

- Folsom State Prison

- California State Prison, Sacramento

- Sacramento County Rio Cosumnes Correctional Center

- Sacramento County Main Jail

- Sacramento County Probation Department

- Sacramento Youth Detention Facility

## SUMMARY

In response to prison overcrowding and court mandates, California has changed the way those convicted of crimes would serve their sentences by shifting a substantial percentage of criminals from State prisons to County detention facilities. Assembly Bill 109, often referred to as Realignment, was a catalyst that has produced major changes for the community and also has provided opportunities to rethink the entire criminal justice spectrum. Balancing public safety with programs designed to reintegrate prisoners back to the community is a challenge. It appears that some of the new re-entry programs may actually not only provide increased public safety, but also better results with fewer arrests, less costly incarceration and law enforcement budgets, more engagement in productive activities, and improved connection with the community and neighborhood in which the released prisoners live.

Criminal justice research results provide ample evidence that programs that provide meaningful opportunities and alternatives to avoid incarceration accomplish these objectives. Recognizing the value of re-entry programs, the California Legislature provided substantial funding to defray the cost of the influx of prisoners. However, these additional State funds are insufficient to cover the costs unless counties seize the opportunity to reduce their costs by incorporating programs to reduce recidivism. While re-entry programs are essential to the success of Realignment in transforming the criminal justice system, they are not a panacea.

Equally important:

- Diversion and early intervention programs are not only cost effective and successful, but they also address the causal roots of some of the problems that impact the criminal justice system.

- Education, physical and mental health, and substance abuse treatment are essential not only in the institutions but also in the community.

- Coordination, collaboration and integration of services should be the standard of care. Involvement of not only County departments and agencies, but also of the community and volunteers, enhances success.

- Follow-up in the community is necessary to ensure public safety and good outcomes. Responsibility, accountability and ongoing support are all crucial aspects of these programs.

- Innovation and the introduction of evidence-based programs should be the expectation for the criminal justice system, and not just continuing with the status quo.

## DISCUSSION

### CALIFORNIA STATE PRISONS

The impact of Realignment was readily apparent in the Grand Jury review of the criminal justice facilities in Sacramento County. The State of California's decision to release low level offenders to county supervision and custody with the accompanying assumption of responsibility has had a noticeable effect on criminal justice programs in Sacramento. The reduced census at the two State prison facilities (Folsom State Prison and California State Prison, Sacramento) should now provide opportunities for the prisons to offer a variety of programs and to develop appropriate re-entry strategies.

### FOLSOM STATE PRISON

Folsom State Prison (FSP) has been reclassified as primarily a Level II facility (previously Level III), which means that inmates are considered a lesser risk and are often transferred there prior to release into the community. The prison needs to develop strategies and programs to deal with this changing population. Programs to prepare inmates for transition to the community are essential to prevent crimes and rearrests. There are evidence-based programs that have been effective and are desired by the inmates. The vocational, educational and life skills classes are examples of successful re-entry programs which need to be more fully integrated into the daily activities at FSP. For those inmates who are not slated for imminent release, there are programs that provide meaningful engagement and serve to keep the facility more manageable. There are also those programs that help resolve facility issues by fostering a collaborative dialog, such as the Men's Advisory Council (MAC).

The Grand Jury spent time at the MAC meeting and was impressed with the dialog and the problem-solving nature of this group. The structured inclusion of the diverse representation serves as a mechanism to resolve tensions proactively before they escalate to misbehavior or violence. The MAC is also an excellent mechanism for feedback to staff and administration regarding issues

and policies that may be problematic and that can be resolved conjointly. They mentioned a number of relevant suggestions about the prison and its operation and were unanimous in their desire for more re-entry programs.

### CALIFORNIA STATE PRISON SACRAMENTO

California State Prison Sacramento (CSPS) is primarily a Level IV facility (highest security risk inmates) with a large proportion of inmates who have mental health issues. The renewed focus on developing appropriate mental health treatment options in a safe and secure environment was evident. The correctional officers were engaged in the prison's mission to balance security and treatment. There was an environment that appeared functional, professional and organized. Many inmates were actively engaged in treatment activities or other programs.

The Grand Jury visited the Inmates Advisory Council (IAC) at CSPS, and, like the MAC at FSP, this diverse group offered insights and helpful feedback to correctional staff and management. The meeting was run in a business like manner, with mutually respectful dialog. It was reported that the IAC has served as an effective mechanism to reduce tensions and resolve issues before they become problematic. In addition to focusing on mental health and medical problems, CSPS offers an array of programs, including education, food services and prison industries. There are self-help groups, run monthly by over 140 community volunteers. These programs provide relevant experience for community re-entry.

## SACRAMENTO COUNTY FACILITIES

The impact of Realignment could be seen in the County Systems, and especially at Rio Cosumnes Correctional Center, as evidenced by the increased number of incarcerated individuals and the different type of inmates. It is now possible to have inmates serving jail sentences longer than one year, having greater criminal sophistication, with prior involvement in the criminal justice system. Previously many of these inmates would have gone to prison.

### MAIN JAIL

The Grand Jury noted that the main jail continues to serve primarily as an intake, holding, housing and processing facility that provides some medical and psychiatric care. Inmates who present certain security risks are housed at the main jail. The Sheriff reports that there has been a significant increase in referrals of the mentally ill (18% to 34%) since Realignment.

### RIO COSUMNES CORRECTIONAL CENTER

Significant changes in the inmate population were seen at Rio Cosumnes Correctional Center (RCCC), including the type of inmate and the expectation for types of programs essential to deal with the needs of this new population. The Grand Jury was impressed with the effectiveness of the re-entry programs being developed and offered at RCCC. A concerted effort has been focused on implementing programs that provide skills to succeed in the community in order to lower the rate of recidivism. The investment in these types of programs seems essential to public safety, cost-effectiveness and a more reasoned approach to rehabilitation.

The inmates at RCCC have a variety of needs, including vocational, physical, mental health, and substance abuse. A coordinated and integrated approach to address these needs seems to be the underlying philosophy of this facility and an important goal at this institution. Programs have been

developed to address many of these issues that, if unaddressed, contribute to recidivism. The Grand Jury recognizes the effort in trying to individualize re-entry options with the understanding that different programs are effective with different inmates.

There are a number of examples of programs geared for successful re-entry. The RCCC's partnership with Elk Grove Unified School District has provided the basis for a number of exemplary programs. The educational programs offered to remediate school and learning problems are essential. The adult education programs are structured to meet the unique needs of the inmate population. The possibility of obtaining a General Education Degree (GED) gives inmates the opportunity to be more competitive in the job market when they are released.

There are a number of significant programs offered through the Elk Grove Unified Career Technology Program, including welding, culinary arts, custodial, landscape and horticulture, and computer applications. All of these programs are popular with the inmates, allowing them to make good use of their incarceration time to learn a skill or trade that will help them obtain employment upon release. Employment is a good predictor of less recidivism. In addition, these programs contribute to the smooth operation of the facility, as inmates are occupied in gainful activity. Because selection for these programs is based on good behavior, compliance with rules and expectations are encouraged.

Additionally, the Grand Jury was impressed with the Jail Industries programs because they are another example where inmates are taught transferable skills in meaningful jobs in diverse areas like computer aided technology/graphic design, sewing, engraving and printing. These programs are focused on making products to be sold. These educational and vocational programs prepare inmates for a more successful community re-entry because they reduce recidivism and are partially self-supporting.

The Grand Jury also wants to highlight those programs that focus on personal growth, including insight and awareness, anger-management and self-control, as well as parenting skills. There is a specific program designed for State prisoners who are returned to County custody. It was excellent in its focus, specificity and impact. Participants had high praise for this type of practical problem-solving, skill-building and issue-resolution educational approach. Inmates stated that this type of program should be expanded because it was not available in prison and would assist in re-entry.

## SACRAMENTO COUNTY PROBATION DEPARTMENT

Realignment not only impacted the prison and jail correctional programs, but it also heavily impacted the probation system. Parole services previously provided by the State were drastically cut back with more inmates being returned to County supervision. The Grand Jury visited and reviewed a number of Probation Department programs and came away with a better understanding of the challenges facing Probation. There are several programs that deserve recognition for their concepts and impact.

The Drug Court and treatment program is one such program. The Probation Department's research showed that a shockingly high percentage of arrestees are under the influence of drugs at the time of arrest, with 83% testing positive for substances at booking. The probation officers were also able to show that substance abuse has a causal effect on many crimes in this community. Addressing the root of the problem makes excellent sense in developing a drug treatment program. This program has a comprehensive approach including testing, treatment, strategies to support sobriety,

and other ways to deal with substance abuse problems, including sanctions. Ninety (90) percent of the drug test screenings were negative for substances. This entire program has such a positive impact that it should be commended, and should be considered a high priority.

The data provided by the Probation Department suggests that last year there were $1.4 million in prison cost savings and $827,000 in County jail savings. These savings were due to reduction in incarcerations. It should be noted that the County has also instituted several other specialty courts including Mental Health Court, Veterans' Court and Re-entry Court. Grand Jury members have seen the workings of the Drug Court and Mental Health Court and were impressed with the collaboration, case management, and the success of these programs.

Several other programs generated positive comments from both Grand Jury members and the program participants. The collaboration with Northern California Construction Training and County Education utilizes Workforce Investment Act (WIA) dollars providing training in all aspects of the building industry through a structured classroom hands-on experience. Graduates have real skills to get real jobs in the building industry, as well as having skills to use in everyday life. This program is not only a skill-builder, but it is also a self-esteem builder that rewards responsibility and commitment. There is a 92% job placement rate for graduates now working with local labor unions. There are currently 60 individuals in this program and there is a substantial waiting list.

Another County probation program that appears to have succeeded with high risk offenders is the development of a structured re-entry program as seen at the North Area Reporting Center. This is another Realignment program that is multifaceted, involving education, personal skill-building, therapy, drug treatment and community involvement, to build responsibility and accountability. It is specifically structured for high risk individuals and requires participation and demonstrable change to succeed. This type of proactive program appears to have a better chance of reducing recidivism and successful re-entry into the community than just incarceration or traditional probation oversight. This intensive program prevents crime, provides on-site supervision and programs, and promotes successful re-entry. This program has had over 350 graduates to date. According to Probation Department statistics, 88% of Reporting Center participants have had no new criminal convictions in their first year in the community.

### SACRAMENTO YOUTH DETENTION FACILITY

While prison realignment has had the most impact on the adult correctional system, there still are principles of re-entry and intervention that apply to the juvenile justice system. The Grand Jury toured the Sacramento Youth Detention Facility (Juvenile Hall). While the adult system is overcrowded, there is ample unused space at the Youth Detention Facility. There is staffing for more residents than they currently have, which allows for ample individual attention. This facility has a library to encourage reading. As of now, the juvenile stay is short and programs are focused on education and return to the community. A program that stands out is the Boys and Girls Club program because it embodies re-entry values and collaboration with the community. The Boys and Girls Club runs this program within the facility, stressing community values, as well as providing classes where acquired skills translate to the community. The focus on conflict resolution, personal responsibility and communication skills all seem to prevent recidivism.

# RESPONSES TO THE 2013-2014 GRAND JURY REPORTS

The 2013-2014 Grand Jury Consolidated Final Report contained three investigative reports. The 2014-2015 Grand Jury reviewed responses submitted by the various governmental entities to these reports. This information is available online at www.sacgrandjury.org.

# ABANDONED WELLS….. ABANDONED PROGRAM?

## REASON FOR INVESTIGATION

The Abandoned Wells Program (AWP) is a unique inspection and enforcement program in the State of California administered by the Environmental Management Department (EMD). It began in 2009, with dedicated funding of $4.7 million, to inspect and appropriately decommission the more than 1,000 abandoned wells that have been identified in the greater Sacramento County. Abandoned wells, if not properly decommissioned, can contaminate our groundwater and/or present a hazard to livestock and people who may fall into these wells. Based on department records from 2012-2013, the EMD spent almost $200,000 on 'overhead costs,' while conducting minimal mandated inspection/enforcement activities.

This investigation was initiated to determine why the EMD abruptly suspended court-ordered inspection and enforcement activities. The Grand Jury looked at two issues: (1) why were mandated activities curtailed, and (2) how effective was the new approach of relying on a volunteer reporting system?

## SUMMARY OF GRAND JURY FINDINGS AND RECOMMENDATION

Findings: The Grand Jury found that EMD changed program approach due to pressure from angry landowners and not for valid personnel or budgetary reasons. Further, the Grand Jury found that conducting a public outreach campaign (including voluntary citizen reporting of abandoned wells) was ineffective in addressing potential environmental threats to the County's groundwater.

Recommendation: The Grand Jury recommended that the EMD resume the inspection/enforcement program activities and fully staff the Abandoned Wells Program, as mandated by the courts.

## RESPONSE FROM THE DIRECTOR OF EMD

The Director of EMD disagreed with both of the Grand Jury's findings. The Director asserted that the AWP was not suspended, but simply adjusted its inspection approach. In addition, the Director maintained that the AWP is a discretionary program and as such, the Department may adjust staffing levels as needed. Lastly, the Director believes the new inspection approach has been effective and sustainable.

Specific to the Grand Jury's recommendation, the EMD Director confirmed that it has been implemented. The Department has been in the process of interviewing and hiring new full-time employees to carry out AWP education, compliance, inspection and enforcement activities.

## 2014-2015 GRAND JURY COMMENTS

The Grand Jury notes that the response from the EMD Director was submitted in compliance with Penal Code sections 933 and 933.05. However, additional program data was requested by the Grand Jury to substantiate information included in the Director's response. This additional data was reviewed and the Grand Jury still maintains a differing opinion about the sustained effectiveness of the AWP. Based on the Grand Jury's review of the program activity data, a majority of inspection/ enforcement activities occurred in 2010-2011, employing the more vigorous enforcement model. EMD staff only decommissioned 19 wells between 2012-2014, compared to 150 in 2010-2011. Most of calendar year 2014 was spent engaged in the hiring process. The EMD has since filled five full time limited term positions. At this time, we do not know if there has been any well monitoring activity by the EMD.

The Grand Jury strongly encourages future Sacramento County Grand Juries to monitor the EMD to determine if progress is being made to inspect and properly decommission abandoned wells in the county. Sacramento's citizens must be assured that there is no environmental threat to the County's groundwater supply. The County needs to assure there is not any public or animal safety hazard.

# A FIRESTORM RAGING IN HERALD

## REASON FOR INVESTIGATION

The Herald Fire Protection District (HFPD) is an independent special district, charged with providing fire, rescue and medical emergency services to the Herald community in southeast Sacramento County. These services are carried out largely by volunteer firefighters. The District is governed by a five member, elected Board of Directors.

The Grand Jury initiated an investigation centered on three issues: (1) is the Board of Directors effectively managing the District's fiscal affairs; (2) is the Fire Chief employing sound, legal personnel practices; and (3) is the Board effectively and transparently implementing sound governance policies and practices?

Findings: The Grand Jury found many operational deficiencies in the District, including inadequate internal accounting controls and outdated governance policies.

Recommendations: Pertinent to District personnel, the Grand Jury recommended that a better internal accounting control system be established to guard against misappropriation of District assets; the District should review and adopt policies that conform to the Firefighters' procedural Bill of Rights Act; and the Board of Directors should review and update as needed, all governance policies and the District's Master Plan. The Grand Jury also recommended that the County Auditor (Department of Finance) conduct an audit of the District's finances; and the Sacramento Local Agency Formation Commission (LAFCo) conduct a Municipal Services Review.

## RESPONSES

District: The Board and interim Fire Chief agree with the Grand Jury's recommendations and are in the process of implementing changes to existing processes and policies.

County: The Department of Finance (DOF) responded that Government Code 26909 requires special districts to have an audit. This code allows a district to procure its own audit services or the County Auditor can make or contract with a certified public accountant to conduct an independent audit. The Department will try to help the District procure a qualified auditor in early 2015.

LAFCo: As of September 3, 2014, LAFCo has begun the Municipal Service Review (MSR) process. The District provided initial responses to a LAFCo questionnaire. Prior to finalizing the MSR, LAFCo will evaluate the viability of reorganization/consolidation of fire and emergency services with another nearby fire district. In the event consolidation is not feasible, LAFCo will assist the District to correct management and governance deficiencies.

## 2014-2015 GRAND JURY COMMENTS

The Grand Jury notes that all required responses to this investigation were submitted in compliance with Penal Code sections 933 and 933.05.

In the period following the issuance of the 2013-2014 Grand Jury Final Report, many changes have occurred at the Herald Fire Protection District including: the Fire Chief, Administrative Assistant and three sitting Board members resigned; Board Director vacancies were filled with the November 2014 elections: a new Chairman of Board of Directors was appointed; and the Board engaged the services of a private auditing firm to perform a comprehensive audit of District finances. It appears that the interim Fire Chief (former Fire Chief of the Galt Fire Protection District) is trying to address operational improvements. However, residents continue to express concerns that emergency response time is compromised because volunteer firefighters are resigning from service with the District.

This Grand Jury has confidence that with new leadership and assistance from both the County and an experienced auditing firm, past deficiencies in the District will be corrected. In time, the greater Herald community will have renewed assurance that the Herald Fire Protection District in meeting its fire, rescue, and medical emergency obligations.

# MILLION$ ARE WASTED ON CLOSED JUVENILE FACILITIES

## REASON FOR INVESTIGATION

Since 2010, Sacramento County has spent approximately $2 million annually to maintain two closed, unused properties that previously served as treatment centers for youths under juvenile probation jurisdiction.

The Grand Jury initiated an investigation into why so much money is still being spent on closed buildings. The investigation focused on two issues: (1) why is the County spending money to maintain these closed buildings, seemingly doing very little to reduce taxpayer losses; and (2) what happened to the youths who were served by these closed facilities?

## SUMMARY OF GRAND JURY FINDINGS AND RECOMMENDATIONS

Findings: (1) Millions of taxpayer dollars are spent annually to maintain these unused facilities; and (2) facilities and programs for youths in need of long-term treatment are limited or non-existent.

Recommendations: (1) The County of Sacramento should consider leasing or selling the property; and take action to maximize the property's value. (2) The Board of Supervisors should appoint a task force to look into the viability of establishing a commitment program at the Youth Center.

## SACRAMENTO COUNTY RESPONSE

Although County executives disagreed with Finding 1, they responded that Recommendation 1 is being implemented. Efforts are underway to explore all options to repurpose the closed facilities. Further, they recognize it is important to relieve the County of all of its current financial liabilities associated with these unused facilities.

The County agreed with Finding 2. A recent report issued by the Sacramento Criminal Justice Cabinet, "*Juvenile Case Processing and Program Intervention Gap Analysis,*" confirms the Grand Jury finding that the County needs more facilities and programs for youths in need of long-term treatment. Since the County Probation Department is already assessing the viability of establishing a residential treatment program at the Youth Center, County executives said it is not necessary to implement Recommendation 2.

## 2014-2015 GRAND JURY COMMENTS

The Grand Jury notes that responses from the General Services, Probation Department, Board of Supervisors, and the County Executive were submitted in compliance with Penal Code sections 933 and 933.05. The Grand Jury accepts their responses and is encouraged that proactivity is underway.

# GRAND JURY COMPLAINT FORM

**Access the Complaint Form and other information on the Grand Jury's website at:**

www.sacgrandjury.org

# SACRAMENTO COUNTY GRAND JURY COMPLAINT FORM

Among the responsibilities of the Grand Jury is the investigation of the public's complaints to assure that all branches of city and county government are being administered efficiently, honestly and in the best interest of its citizens.

Complaints submitted to the Grand Jury will be treated confidentially whenever possible. However, it may be impossible to conduct an investigation without revealing your name and complaint.

The results of the complaints investigated by the Grand Jury are published in its final report in which the residents of the county are made aware of its investigations, findings and recommendations and the entities reported on are required by statute to respond.

## GENERAL INFORMATION

A major function of the Sacramento County Grand Jury is to examine local county and city government, special districts, school districts, and any joint powers agency located in the county to ensure their duties are being carried out lawfully.

### The Grand Jury:

- May review and evaluate procedures used by these entities to determine whether more efficient and economical methods may be employed;

- May inspect and audit the books, records and financial expenditures as noted above to ensure that public funds are properly accounted for and legally spent;

- May investigate any charges of willful misconduct in office by public officials;

- Shall inquire into the condition and management of the public prisons within the county.

## COMPLAINT PROCESS

- Present your complaint as soon as possible. The Grand Jury's term of service begins July 1st and ends June 30th of the following year.

- Identify your specific concern and describe the circumstances as clearly and concisely as possible.

- Document your complaint with copies of pertinent information and evidence in your possession.

- Mail or deliver your complaint in a sealed envelope to:

**Sacramento County Grand Jury**
**720 9th Street, Room 611**
**Sacramento, CA 95814**

Anyone may ask the Grand Jury to conduct an investigation of an issue within its jurisdiction. Whether it chooses to investigate such a complaint is entirely in its discretion and may be affected by workload, resource limitations or legal restrictions.

By law, the proceedings of the Grand Jury are confidential. The findings and recommendations of those complaints and issues it chooses to address are published in its final report.

The information I have submitted on this form is true, correct and complete to the best of my knowledge.

_____          _____
**Complainant's Signature**                                              **Date**

(This blank form may be duplicated.)

Sacramento County Grand Jury

**GRAND JURY USE ONLY**

| | |
|---|---|
| Date Received: | |
| Number: | |
| Subject: | |
| | |
| | |
| | |

**PERSON OR AGENCY ABOUT WHICH COMPLAINT IS MADE**

Name: _____

Address: _____

_____

Phone Number: _____

**NATURE OF COMPLAINT** (Describe events in the order they occurred as clearly and concisely as possible. Also indicate what resolution you are seeking. Use extra sheets if necessary and attach copies of any correspondence you feel is pertinent. Documentation becomes the property of the Grand Jury and will not be returned. *Please note: The Sacramento County Grand Jury has no jurisdiction over state or federal agencies, the courts, judicial officers, private companies or most organizations.*)

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**WHAT PERSONS OR AGENCIES HAVE YOU CONTACTED ABOUT YOUR COMPLAINT?**

| Person or Agency | Address | Date of Contact | Result |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**WHO SHOUD THE Grand Jury CONTACT ABOUT THIS MATTER?**

| Person or Agency | Address | Phone |
|---|---|---|
| | | |
| | | |
| | | |

Your Name: _____

Address: _____

_____

Phone Number: _____   Driver's License Number: _____