Aaron J. Fischer (SBN 247391)
 Aaron.Fischer@disabilityrightsca.org
Anne Hadreas (SBN 253377)
 anne.hadreas@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA  94612
Telephone: (510) 267-1200
Fax: (510) 267-1201

Tifanei Ressl-Moyer (SBN 319721)
 tifanei.ressl-moyer@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1831 K Street
Sacramento, CA  95811
Telephone: (916) 504-5800
Fax: (916) 504-5801

Donald Specter (SBN 83925)
 dspecter@prisonlaw.com
Margot Mendelson (SBN 268583)
 mmendelson@prisonlaw.com
Sophie Hart (SBN 321663)
 sophieh@prisonlaw.coom
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704

*Attorneys for Plaintiffs*

Jessica Valenzuela Santamaria (SBN 220934)
 jvs@cooley.com
Mark A. Zambarda (SBN 314808)
 mzambarda@cooley.com
Addison M. Litton (SBN 305374)
 alitton@cooley.com
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

*Attorneys for Plaintiffs*

Todd H. Master (SBN 185881)
 tmaster@hrmrlaw.com
Shawn M. Ridley (SBN 144311)
 sridley@hrmrlaw.com
HOWARD ROME MARTIN & RIDLEY
1900 O'Farrell Street, Suite 280
San Mateo, CA 94403
Telephone: (650) 365-7715
Facsimile: (650) 364-5297

*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| LORENZO MAYS, RICKY RICHARDSON, JENNIFER BOTHUN, ARMANI LEE, LEERTESE BEIRGE, and CODY GARLAND, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>COUNTY OF SACRAMENTO,<br><br>                    Defendant. | Case No. 2:18-cv-02081 TLN KJN<br><br>**CLASS ACTION**<br><br>**[PROPOSED] CONSENT DECREE**<br><br>JUDGE:    Hon. Kendall J. Newman<br><br>Complaint Filed: July 31, 2018 |

**A.      Introduction**

1.      The parties to this Consent Decree are Plaintiffs Lorenzo Mays, Ricky Richardson, Jennifer Bothun, Armani Lee, Leertese Beirge, Cody Garland, and the class and subclass of people they represent (collectively, "Plaintiffs"), and Defendant County of Sacramento ("Defendant").  The parties enter into this Consent Decree to ensure the provision of constitutional medical and mental health care, to ensure non-discrimination for people with disabilities, and to address the use of restrictive housing in the Sacramento County jails.[1]

2.      Plaintiffs filed this Action on July 31, 2018.  ECF No. 1.  The Action alleges that Defendant fails to provide minimally adequate medical and mental health care to the people incarcerated in its jails, imposes on people in the jails the harmful and excessive use of solitary confinement in violation of the Eighth and Fourteenth Amendments to the United Constitution, and discriminates against certain individuals with disabilities in violation of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act.  *Id.* Defendant has denied liability.  On December 27, 2018, the Court granted the parties' joint motion for class certification.  ECF No. 49.

3.      The Plaintiff class consists of "all people who are now, or in the future will be, incarcerated in the Sacramento County jails" and a subclass of "[a]ll qualified individuals with disabilities, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), who are, or will be in the future, incarcerated in the Sacramento County jails."  ECF No. 49 at 2.

4.      In January 2016, Disability Rights California, Prison Law Office, and the County of Sacramento entered into a Structured Negotiations Agreement as an alternative to imminent litigation.  ECF. No. 35-1.  The parties agreed that the County of Sacramento

---

[1]      For the purposes of this Consent Decree, references to the Sacramento County jails include the Main Jail and the Rio Cosumnes Correctional Center, and any new structures designated to house prisoners under the jurisdiction of the Sacramento County Sheriff subsequent to the date of this Consent Decree.

would retain mutually agreed-upon experts to evaluate the policies, procedures, practices, and conditions in the jails and to complete reports.  Consistent with this agreement, the County retained five nationally recognized experts (the "Subject Matter Experts"): Eldon Vail as the expert on mentally ill prisoners and the use of segregation; Bruce C. Gage, M.D. as the expert on correctional mental health care; Lindsay M. Hayes as the expert on correctional suicide prevention practices; Sabot Consulting as the expert on correctional disability access; and James Austin as the expert on correctional classification systems and segregated housing.

5.     The Subject Matter Experts conducted extensive tours and reviews of the jail facilities, policies, and procedures and interviewed staff and people incarcerated in the jail. Plaintiffs' counsel did not participate in the Subject Matter Experts' assessments or the completion of their written reports.  The Subject Matter Experts thereafter submitted their final reports setting forth their respective findings and making recommendations for remedial action; the reports are part of the record in this case.  *See* ECF. Nos. 37-7, 37-8, 37-9, 37-10, 37-11.

6.     With respect to medical care in the jails, the parties engaged in direct discussions without benefit or need of joint experts or expert reports or findings.

7.     The parties thereafter negotiated individual remedial plans pertaining to the matters alleged in the Action and those individual plans have been incorporated into a single, global Remedial Plan, attached hereto as **Exhibit A**.

8.     Each party to this Consent Decree was represented by counsel during its negotiation and execution. Plaintiffs and the Plaintiff classes and subclasses are represented by Aaron J. Fischer, Anne Hadreas, and Tifanei Ressl-Moyer, Disability Rights California; Donald Specter, Margot Mendelson, and Sophie Hart, Prison Law Office; and Jessica Valenzuela Santamaria, Mark A. Zambarda, and Addison M. Litton, Cooley LLP. Defendant is represented by Todd H. Master and Shawn M. Ridley, Howard, Rome, Martin, & Ridley.

9.      Through this Consent Decree, Defendant agrees to implement the measures set forth in the Remedial Plan, subject to monitoring by the Court Experts and Plaintiffs' counsel, negotiation between the parties and, if necessary, enforcement by the Court after use of the Dispute Resolution procedure set forth below.

**B.      Remedial Plan**

10.     Defendant shall fully implement all of the remedial measures, according to specified timeframes (where identified), set forth in the Remedial Plan.  The Remedial Plan is designed to meet the minimum level of mental and medical health care necessary to fulfill Defendant's obligations under the Eighth and Fourteenth Amendments, to avoid the unlawful use of segregated or restrictive housing in the jails, as well as to ensure non-discrimination against people with disabilities in the areas addressed by the Remedial Plan, as required by the ADA and Section 504 of the Rehabilitation Act.

11.     Defendant shall, in consultation and collaboration with Plaintiffs' counsel, develop and implement appropriate and adequate plans, policies, and practices to ensure compliance with the Remedial Plan.  At least 30 days prior to implementing any new plans or policies developed to meet the terms of the Remedial Plan, Defendant will submit such plans or policies to Plaintiffs' counsel for their review and comment.  The parties shall meet & confer in an attempt to informally resolve any disagreements about the adequacy of such plans or policies before implementation.  The parties' informal meet and confer process shall be completed within 30 days. Failing that, any such disagreements shall be resolved pursuant to the dispute resolution procedure set forth below.

12.     Not less than 120 days, and not more than 180 days, after this Consent Decree is approved by the Court, Defendant shall provide to Plaintiffs' counsel and the Court Experts (discussed below) a Status Report which (1) shall include a description of the steps taken by Defendant to implement each provision set forth in the Remedial Plan; and (2) specifies provisions of the Remedial Plan which have not yet been implemented.  With respect to the provisions of the Remedial Plan not yet implemented, Defendant's Status

Report shall (i) describe all steps taken by Defendant toward implementation; (ii) set forth with as much specificity as possible those factors contributing to non-implementation; and (iii) set forth a projected timeline for anticipated implementation based on the best information available to Defendant.  Not later than the end of each subsequent 180-day period during the term of this Consent Decree, Defendant shall provide to Plaintiffs' counsel and the Court Experts (discussed below) an updated Status Report addressing each item of the Remedial Plan and shall specify whether it believes it is or is not in substantial compliance with each provision of the Remedial Plan.

**C.     Court Experts**

13.     The parties shall jointly request the appointment of Court Experts pursuant to Rule 706 of the Federal Rules of Evidence to advise the Court on the County's compliance or non-compliance with the (a) mental health, (b) medical, and (c) suicide prevention components of the Remedial Plan, to assist with dispute resolution matters addressed below, and to provide testimony, if required, in any proceedings before the Court.   If the parties fail to agree on Rule 706 experts, the parties shall submit recommendations to Magistrate Judge Nathanael Cousins, who shall select individuals to be proposed as Court Experts.

14.     Within 180 days after entry of this Consent Decree, the Court Experts shall each complete a review and report to advise the Parties and the Court on Defendant's progress in implementing the mental health, medical, and suicide prevention components of the Remedial Plan within each such expert's area of expertise.

15.     Not less than 180 days after the completion of their respective first reports, and then every 180 days thereafter during the term of this Consent Decree, the Court Experts shall complete reviews and reports ("180-Day Reports") to advise the parties and the Court on Defendant's compliance or non-compliance with each provision relating to the mental health, medical, and suicide prevention components of the Remedial Plan.  The reports of the Court Experts shall be publicly filed with the Court and shall be admissible as evidence in any proceedings before the Court.

16.     In each 180-Day Report, the Court Experts shall identify whether Defendant is or is not in substantial compliance with each provision relating to the mental health, medical, and suicide prevention components of the Remedial Plan within the expert's area of expertise.  These findings are hereinafter referred to as "Substantial Compliance Determinations."

17.     The Court Experts' duties specified in **Exhibit B** shall be provided to the Court Experts pursuant to Rule 706(b).  The Court Experts shall be entitled to reasonable compensation in an amount approved by the Court, which shall be paid by Defendant.

18.     With appropriate notice, the Court Experts shall have reasonable access to all parts of any Sacramento County jail facility.  Access to the facilities will not be unreasonably restricted.  The Court Experts shall have access to correctional and health care staff and people incarcerated in the jails, including confidential and voluntary interviews as the Court Experts deem appropriate. The Court Experts shall also have access to documents, including budgetary, custody, and health care documents, and institutional meetings, proceedings, and programs to the extent the Court Experts determine such access is needed to fulfill their obligations.  Documents produced to the Court Experts will be made available to Plaintiffs' counsel.  The Court Experts' tours shall be undertaken in a manner that does not unreasonably interfere with jail operations.  The Court Experts shall be bound, where applicable, by the Stipulated Protective Order (Dkt. 27), entered by the Court on October 16, 2018, and attached hereto as **Exhibit C**.

19.     The parties agree that they are each entitled to engage in ex parte communications with the Court Experts.  However, all of the Court Experts' findings and recommendations shall be set forth in writing in their reports.

20.     If, for any reason, a designated Court Expert can no longer serve, the Parties shall attempt to agree on who shall be appointed to serve in such expert's place. If the Parties do not agree, Defendant and Plaintiffs shall each nominate and submit two potential experts for the Court's consideration and selection.

**D.     Notice to Class Members**

21.     Defendant shall post notices to class members of this Action in a manner agreed upon by the parties.  Such notices shall include a brief statement that includes a description of Plaintiffs' claims, the definition of the classes and subclasses, notice that the parties have entered into this Consent Decree, a description of the subject areas covered by the Consent Decree and Remedial Plan, and the contact information for the Prison Law Office and Disability Rights California to allow people incarcerated in the Sacramento County jails to contact Plaintiffs' counsel.  The parties shall meet and confer as to the content of the notice and the method for posting the notice.  Defendant will post notices consistent with the parties' agreement within 30 days after the entry of this Consent Decree, and shall maintain the notices so long as the Consent Decree is in effect, absent further order of the Court.  In the event disagreements arise regarding the contents of such notice, the parties will first meet and confer in an informal attempt to resolve same.  Failing that, any such disagreements shall be resolved pursuant to the dispute resolution procedure set forth below.

**E.     Plaintiffs' Monitoring and Access to Information**

22.     Plaintiffs' counsel shall be permitted to monitor Defendant's compliance with all aspects of the Remedial Plan.  Defendant shall provide Plaintiffs' counsel with access to information, including all Sacramento Jail facilities, documents, records, and staff that Plaintiffs' counsel believes in good faith is necessary to monitor Defendant's compliance with the Remedial Plan subject, where applicable, to the Stipulated Protective Order (Dkt. 47), entered by the Court on October 16, 2018, and attached hereto as **Exhibit C**.  From the date this Consent Decree is entered by the Court, Defendant shall provide Plaintiffs' counsel with access to such information within 21 calendar days of their request.  If Defendant believes that the information requested by Plaintiffs' counsel is not necessary to monitor compliance with the Remedial Plan, or is otherwise unlawful or inappropriate, the parties shall engage in the dispute resolution process described below.

6

23.     Plaintiffs' counsel shall monitor and report on compliance with the Remedial Plan and, in particular, the County's compliance with the segregation/restrictive housing, Disciplinary Measures/Use of Force for Prisoners with Mental Health/Intellectual Disabilities, and ADA/Disability components of the Remedial Plan. In the reports, Plaintiffs' counsel shall state an opinion as to whether Defendant is or is not in substantial compliance with the segregation, mental health/discipline, and ADA components of the Remedial Plan. These opinions are hereinafter referred to as "Substantial Compliance Determinations."

24.     Defendant shall grant Plaintiffs' counsel and their consultants the opportunity to conduct at least three tours of each Sacramento County jail facility (Main Jail and Rio Cosumnes Correctional Center) per calendar year for the purpose of monitoring compliance with the Remedial Plan so long as the Consent Decree is in effect.  After three years, the parties shall meet and confer about any appropriate adjustments to the frequency of Plaintiffs' tours. Unless otherwise agreed by the parties or ordered by the Court, monitoring tours by Plaintiffs and/or their consultants shall be separated by a period of no less than 120 days.

25.     Tours by Plaintiffs and/or their consultants shall include reasonable access to all of the jail facilities, including all housing units, facilities where health care services are provided, facilities where people with disabilities are or may be housed and provided programming, and any other facilities where services are provided pursuant to the Remedial Plan.  During the tours, Defendant shall make available for interview any supervisory, clinical, custodial, and program staff that have direct or supervisory responsibility for inmate health care, classification, discipline, jail operations, and disability accommodations. Defendant shall provide a Sheriff's Department contact person to ensure cooperation of institution staff with Plaintiffs' counsel in obtaining information requested during the tours. However, Defendant's counsel reserve the right to be present during staff interviews and staff may decline to participate in any interview conducted by Plaintiffs' counsel. During the tours, Defendant shall permit and facilitate Plaintiffs' counsel having confidential and

voluntary discussions with any incarcerated person or group of incarcerated people at the request of Plaintiffs' counsel, consistent with safety and security needs.  Upon request by Plaintiffs and pursuant to the Stipulated Protective Order entered in this case, Defendant shall make available for inspection and/or copying the health care and/or custody files of specified incarcerated persons.  Disputes that may arise over Plaintiffs' counsel's access to jail information or personnel shall be addressed by the dispute resolution process.

26.     If Plaintiffs' counsel form the good faith belief that Defendant is not substantially compliant with any component of the Remedial Plan based on the reviews of the Court Experts and/or Plaintiffs' counsel monitoring, Plaintiffs' counsel shall so inform Defendant and, as applicable, the relevant Court Expert(s) of any alleged noncompliance and identify the component of the Remedial Plan alleged to be noncompliant.

27.     Defendant shall investigate the alleged noncompliance and provide Plaintiffs' counsel with a response in writing within 30 calendar days, unless the parties agree that Defendant will include a response in the next scheduled Status Report.  Either party shall have the option of requesting an investigation and opinion from the relevant Court Expert. If Plaintiffs' counsel is not satisfied with Defendant's response, the parties shall engage in the dispute resolution process described below.

28.     Defendant shall ensure that Plaintiffs' counsel has access to confidential visits and phone calls with class members.  The parties will establish an efficient means to allow Plaintiffs' counsel to interview a class member or group of class members, and to conduct confidential telephonic interviews with individual class members, with reasonable notice, in a manner that does not disrupt jail operations.

29.     Plaintiffs' counsel shall be allowed to send postage pre-paid envelopes (metered) to their clients in the Sacramento County jails.

**F.     Individual Class Member Concerns**

30.     Plaintiffs' counsel may bring concerns about individual people in the jails, including but not limited to issues regarding health care, housing, isolation, disability

accommodations or access, use of force, or safety/well-being to the attention of Defendant's counsel, or their designee, who shall respond in writing within 10 calendar days, unless the urgency of the issue requires a more expedited response. The parties will work cooperatively to resolve individual concerns.

31.     This process is not meant to replace or circumvent the existing processes for requesting medical or mental health services or following the existing request and grievance processes in the jails.  People in the jails will be encouraged to make use of those processes.

**G.     Dispute Resolution**

32.     Either party may initiate the dispute resolution process with respect to any matter covered by this Consent Decree by providing written notice of a dispute ("Dispute Notice") to the other party.

33.     Following service of the Dispute Notice, the parties shall undertake good faith negotiations at such times and places as they deem sufficient in an effort to resolve the dispute informally between them.  If, within 30 days after service of the Dispute Notice, the parties have failed to resolve the dispute, either party may request that the Court Expert(s) most knowledgeable in the subject matter of the dispute be permitted to evaluate the issue in dispute and prepare a report.  The Court Expert(s) must provide the report regarding the area of disagreement to the parties within 45 days of the request.  Defendant will pay the expert's reasonable fees for any report prepared by a Court expert at the request of a party about a disputed issue, as contemplated by this paragraph.  If the issue in dispute relates to medical care, mental health care, or suicide prevention, the relevant Court Expert shall prepare the report.  If the issue in dispute relates to ADA compliance, restrictive housing, or discipline/use of force, the parties shall attempt to agree on who shall be appointed to serve as the Court Expert.  If the Parties do not agree, Defendant and Plaintiffs' counsel shall each nominate and submit two potential experts for the Court's consideration and selection.

34.     The following general protocol will apply to all disputes arising under this Consent Decree: In the event of disagreement between the parties regarding any aspect of

this Consent Decree, including but not limited to (1) interpretation of its terms; (2) implementation of its provisions; and/or (3) a determination of the parties' respective rights, obligations and duties under same, the parties shall first undertake good faith negotiations in an effort to resolve the dispute informally between them. The parties understand and agree that this good faith attempt to resolve the dispute informally between the parties is a necessary prerequisite before either party may request or avail themselves of Court assistance or intervention in resolving the dispute. The parties' informal negotiation process shall be completed within 30 days of the identification of a dispute. In the event the parties' good faith attempt to resolve the dispute informally proves unsuccessful, the parties shall next seek the assistance, advice and/or guidance of Magistrate Judge Nathanael Judge Cousins, or his designee if he is not available, in attempting to resolve dispute.  If Magistrate Judge Cousins is unable to resolve the dispute, *then and only then* may the parties formally seek the Court's assistance in resolving the dispute. In the event formal intervention of the Court is required, the parties agree that Magistrate Judge Cousins may consult, advise and share with the Court his views regarding the nature of the dispute, the relative merits (or lack thereof) of the positions taken by the parties and any proposal(s) he might have regarding the manner in which the dispute should be resolved

**H.    Enforcement**

35.    The Court shall retain jurisdiction to enforce the terms of this Consent Decree and shall have the power to enforce the agreement through specific performance and all other remedies permitted by law until Defendant fulfills its obligations under this Consent Decree.

36.    The Protective Order agreed upon by the parties shall remain in force while this Consent Decree is effective.

**I.    Duration and Termination**

37.    The duration of this Consent Decree is six years from the date this Consent Decree is entered by the Court, unless it (a) is terminated earlier pursuant to paragraph 39 below, or (b) subject to the dispute resolution process, is extended as to any provision of this

[PROPOSED] CONSENT DECREE
CASE NO.: 2:18-CV-02081 TLN KJN

1
2
3
4

Consent Decree or the Remedial Plan with which the Defendant is not in substantial

compliance until such time as substantial compliance is achieved.  Any such extension not

mutually agreed upon by the parties shall be subject to the dispute resolution process set

forth above.

5
6
7
8
9

38.    Defendant may, after conferring with Plaintiffs' counsel, request a finding by

the Court that Defendant is in substantial compliance with one or more components of the

Remedial Plan and has maintained such substantial compliance for a period of at least twelve

months.  Unless otherwise ordered by the Court, such a finding will result in a suspension of

monitoring by the relevant Court expert and Plaintiffs' counsel of any such component.

10
11
12
13
14
15
16
17
18
19
20
21

39.    If Plaintiffs form the good faith belief that Defendant is no longer in substantial

compliance with any component(s) of the Remedial Plan previously found to be in

substantial compliance and as to which monitoring has been suspended, Plaintiffs shall

promptly so notify Defendant in writing and present a summary of the evidence upon which

such belief is based. Within 30 days thereafter, Defendant shall serve a written response

stating whether it agrees or disagrees that it is no longer in substantial compliance with

respect to the identified component(s) of the Remedial Plan. In the event that Defendant

agrees, monitoring by the Court experts and Plaintiffs pursuant to this Consent Decree shall

resume. In the event Defendant disagrees, Plaintiffs may bring a motion before the Court

seeking such relief as may be appropriate, including but not limited to reinstating full

monitoring, provided that, before bringing such a motion, Plaintiffs have complied with the

dispute resolution process described herein.

22
23
24
25
26
27
28

40.    Defendant may seek termination of this Consent Decree by bringing a

termination motion pursuant to 18 U.S.C. § 3626(b)(1)(A)(i), provided however, that (i)

Defendant shall not bring any such motion for a period of five years from the date this

Consent Decree is entered by the Court; (ii) any termination motion shall be based on a

record of no less than one year of substantial compliance with all the requirements of this

Consent Decree and the Remedial Plan; and, (iii) prior to bringing such a motion, Defendant

shall have complied with the dispute resolution process set forth herein.

**J.     Costs and Fees**

41.     *Costs and Fees Prior to Entry of the Consent Decree*: The parties agree that, by entry of this Consent Decree, Plaintiffs are the prevailing party in this litigation. Defendant shall pay Plaintiffs' counsel's reasonable fees and expenses incurred from the date that Plaintiffs' counsel commenced an investigation into conditions at the Sacramento County Jails through Final Approval of the Consent Decree, including approval of the Remedial Plan.  The parties shall attempt to agree on the amount of the attorney's costs and fees.  If the parties fail to agree on an amount, they shall mediate the dispute with the assistance of Magistrate Judge Nathanael Cousins.  If the matter is not resolved through mediation by September 2, 2019, the parties agree that the amount of Plaintiffs' attorney's costs and fees will be determined by binding arbitration, administered by JAMS.  The parties will each submit the names of two proposed arbitrators.  To the extent that the parties are unable to agree upon an arbitrator from that list, they shall submit the names to Magistrate Judge Nathanael Cousins and he, or his designee, shall select the arbitrator.  The award will be final and binding on the parties, with no right of appeal.

42.     *Costs and Fees for Monitoring and Enforcement*: Subject to Defendant's right to object to the reasonableness of the fees sought by Plaintiffs' counsel, Plaintiffs' counsel shall be compensated for their reasonable time and reasonable expenses (including the costs of any consultants Plaintiffs' counsel may retain) relating to monitoring and enforcing this Consent Decree and Remedial Plan, including any time and expenses incurred in connection with the resolution of any dispute pertaining to such monitoring and enforcement.   As with the fees and costs referenced in paragraph 41, the parties shall attempt to reach an agreement on the issue of monitoring fees and expenses. If the parties fail to reach such an agreement, they shall mediate the dispute with the assistance of Magistrate Judge Nathanael Cousins.  If the matter is not resolved through mediation by September 2, 2019, the parties agree that the issue of monitoring fees and expenses will be determined by binding arbitration,

administered by JAMS.  The parties will each submit the names of two proposed arbitrators.

To the extent that the parties are unable to agree upon an arbitrator from that list, they shall

submit the names to Magistrate Judge Nathanael Cousins and he, or his designee, shall select

the arbitrator.  The award will be final and binding on the parties, with no right of appeal.

43.     *Costs and Fees for Litigation Before the Court*:  Subject to both Court approval and

Defendant's right to object to the reasonableness of the number of hours for which Plaintiffs'

counsel may seek compensation, Defendant agrees to pay Plaintiffs' counsel's reasonable

rates for any litigation required to enforce or defend this Consent Decree or Remedial Plan

before the Court.

**K.     Effect of Consent Decree in Other Actions**

44.     Neither the fact of this Consent Decree nor any statement of claims contained

herein shall be used in any other case, claim, or administrative proceedings, except that

Defendant and its employees and agents may use this Consent Decree and any statement

contained herein to assert issue preclusion or *res judicata*.

45.     Nothing in this Consent Decree is intended to and does not modify, revise or

change any existing orders or consent decrees applicable to Defendant or to operations at or

people housed in the Sacramento County Jails.

**L.     Necessity for Relief as Provided in Remedial Plans**

46.     The parties agree that the relief contained herein is narrowly drawn, extends no

further than necessary to ensure the protection of the federal constitutional and statutory

rights of Plaintiffs, and is the least intrusive means necessary to accomplish those objectives.

**IT IS SO AGREED AND STIPULATED.**

Respectfully submitted,

Dated: ___June 5___, 2019

Margot Mendelson (SBN 268583)
PRISON LAW OFFICE
*Attorney for Plaintiffs*

13

1   Dated: 6/5, 2019
2
3                                   Aaron J. Fischer (SBN 247391)
                                    DISABILITY RIGHTS CALIFORNIA
4   Dated: 6/5, 2019                Attorney for Plaintiffs
5
                                    Jessica Valenzuela Santamaria (SBN 220934)
6                                   COOLEY LLP
                                    Attorney for Plaintiffs
7   Dated: 6/5, 2019
8
                                    Todd H. Master (SBN 185881)
9                                   HOWARD ROME MARTIN & RIDLEY
                                    Attorney for Defendant
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                                14          [PROPOSED] CONSENT DECREE
                                            CASE NO : 2:18-CV-C2081 TLN KJN

# EXHIBIT A

**Consent Decree**

*Mays v. County of Sacramento*

## *MAYS V. COUNTY OF SACRAMENTO*

### REMEDIAL PLAN

I.   **Definitions**

**"Chief Disciplinary Officer"** is the individual who is responsible for overseeing the disciplinary system and ensuring consistency in disciplinary practices and procedures.

**"County"** refers to Sacramento County.

**"Designated Mental Health Units"** refers to any specialized units specifically operated to house and serve prisoners requiring mental health treatment, including the inpatient unit (2P), the Intensive Outpatient Program (IOP), the Outpatient Psychiatric Pods.

**"Disciplinary Hearing Officer"** includes any sergeant, officer, or other individual who has responsibility for adjudicating a disciplinary report and/or imposing disciplinary measures.

**"Discipline"** is the imposition of penalties for prisoner misconduct that violates Jail facility rules.

**"Disability"** means any physical or mental impairment that substantially limits one or more major life activities. These include, but are not limited to, any disability that would substantially limit the mobility of an individual or an impairment of vision and/or hearing, speaking or performing manual tasks that require some level of dexterity. Additionally, disability includes a physical or mental impairment that would inhibit a person's ability to meet the rules and regulations of the facility.

**"Effective Communication"** means that any written or spoken communication must be as clear and understandable to people with disabilities as it is for people who do not have disabilities.

**"Intellectual Disability"** is a disability characterized by significant limitations in intellectual functioning (such as learning, reasoning, and problem-solving) and in adaptive behavior (conceptual skills such as language, literacy, money, time, and self-direction; social and interpersonal skills; and practical skills such as personal care and schedules/routines). This includes people for whom the onset of the disability occurred before age 18 (developmental disabilities) and people for whom events later in life resulted in similar limitations (for example, head injury, stroke, or dementia).

**"Medical Staff"** means medical personnel including physicians, dentist, pharmacist, nurse practitioners, supervising registered nurses, registered nurses, registered dental hygienists, licensed vocational nurses, pharmacy technicians, medical assistants, registered dental assistants, certified nursing aids and other medical personnel.

"**Medical services**," "**medical treatment**" and "**medical staff**" includes dental services, dental treatment and dental staff, as well as medical pharmacy services and pharmacy staff.

"**Mental health caseload**" means all prisoners in the jail with a current need for any mental health services.

"**Out-of-cell activities**" are activities which occur out of the inmates' cell. Examples of such activities include but are not limited to games, the use of tablets and other socialization among inmates.

"**Provider**" means physician, dentist, pharmacist, physician's assistant, or nurse practitioner.

"**Qualified Mental Health Professional**" means psychiatrists, psychologists, master's level social workers, licensed professional counselors, licensed nurses, or others who by virtue of their education, credentials, and experience are permitted by law to evaluate and provide mental health care to patients.

"**Qualified Health Care Professional**" means physicians, physician assistants, nurses, nurse practitioners, dentists, qualified mental health professionals, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and provide health care to patients.

"**Qualified Sign Language Interpreter**" ("SLI") is an individual, available on-site or through a VRI service, who is adept at American Sign Language and has passed a test and qualified in one of the categories established by the National Association for the Deaf (NAD) or one of the categories established by the Registry of Interpreters for the Deaf (RID).

"**Segregation**" means the confinement in a locked room or cell, with or without a cellmate, with limited social contact as compared with the general population, in conditions characterized by substantial isolation, whether pursuant to disciplinary, administrative, or classification action.  If a housing unit or location does not meet the above definition, the unit will not be considered a segregation unit, regardless of name.

"**Serious Mental Illness**" ("**SMI**") means a mental, behavioral, or emotional disorder of mood, thought, or anxiety that significantly impairs judgment, behavior, capacity to recognize reality, or substantially interferes with primary activities of daily living.

"**Temporary Suicide Precautions Housing**" refers to any non-inpatient unit where the Jail houses prisoners requiring suicide precautions and/or inpatient level of psychiatric care, including but not limited to safety cells, holding cells, North Holding Cell No. 2 at RCCC, Main Jail booking segregation cells, and the classrooms/multipurpose rooms adjacent to the Main Jail housing units.

"**TTYs**" **or** "**TDDs**" means devices that are used with a telephone to communicate with persons who are Deaf by typing and reading communications.

"**Videophone**" means a device with a video camera that can perform bi-directional video and audio transmissions between people in real-time.

"**Video-Relay Services**" or "**VRS**" is a video telecommunications relay service that enables persons with hearing-related disabilities who use Sign Language to communicate with voice telephone users through video equipment, such as a Videophone, rather than through typed text.

"**Video Remote Interpreting service**" or "**VRI service**" means an interpreting service that uses video conference technology over dedicated lines or wireless technology offering clear, delay-free, full-motion video and audio over high-speed connection that delivers high-quality video images as provided in 28 § 35.160(d).

II. **GENERAL PROVISIONS**

A. The County shall maintain sufficient medical, mental health, and custody staff to meet the requirements of this Remedial Plan.

B. The parties agree that the custodial and health care staff must be increased to meet minimal constitutional and statutory standards.  Presently, there are insufficient deputies to supervise out-of-cell activities for people in the general population and administrative segregation, and to provide security for health-related tasks.  The parties agree that reduction in jail population is a cost-effective means to achieve constitutional and statutory standards.

   1. The County intends to hire additional custodial and health care staff.  The parties agree that population reduction of the jails will facilitate compliance with this Remedial Plan.  All population reduction measures should be designed to promote public safety through evidence-based programs.

   2. If through the monitoring process it is determined that the County is not fulfilling the provisions of this Remedial Plan due to staffing deficiencies, the parties will meet and confer regarding what steps to take to reduce the population of the jail, including available resources to facilitate population reduction.

C. The parties agree to meet and confer regarding the gathering and posting of data related to the Jail population. The parties agree that the categories of information to be gathered and publicly posted on a quarterly basis are the following:

   a) the number of people with mental illness booked into jail;

   b) their average length of stay;

   c) the percentage of people connected to treatment;

   d) their recidivism rates;

e) the total number of people in jail with a mental health need;

f) the number of people who were receiving mental health services at the time of booking; and

g) the number of sentenced and unsentenced inmates in custody.

h) For sentenced people in the jail, the nature of the commitment convictions, length of sentence(s), and level of mental health care (*e.g.*, Acute, IOP, OPP).

i) For unsentenced people in the jail, the nature of the charges, length of pre-trial detention, and level of mental health care (*e.g.*, Acute, IOP, OPP).

## III.  AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE

### A. Policies and Procedures

1. It is the County's policy to provide access to its programs and services to prisoners with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests. No prisoner with a disability, as defined in 42 U.S.C. § 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities or be subjected to discrimination. The County's policy is to provide reasonable accommodations or modifications where necessary, consistent with 28 C.F.R. §§ 35.150 & 35.152, and other applicable federal and state disability law.

2. The County shall, in consultation with Plaintiffs' counsel, revise its Operations Order to establish standard and consistent procedures for the Jail to ensure compliance with the ADA and the remedial provisions outlined herein.

3. The County shall, within 12 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, revise policies, procedures, and inmate orientation materials (e.g. Inmate Handbook), in accordance with the revised Operations Order and the remedial provisions outlined herein. A list of policies which the County will revise consistent with the provisions outlined herein, as appropriate and in consultation with Plaintiffs' counsel, is attached as **Exhibit A-1.**

4. All staff will receive training appropriate to their position on policies and procedures related to compliance with the Americans with Disabilities Act (ADA) and related disability laws.

### B. ADA Tracking System

1. The County shall develop and implement a comprehensive system (an "ADA Tracking System") to identify and track screened prisoners with disabilities as well as accommodation and Effective Communication needs.

2. The ADA Tracking System shall identify:

a) All types of disabilities, including but not limited to psychiatric, intellectual, developmental, learning, sensory, mobility, or other physical disabilities, and special health care needs;

b) Prisoners with disabilities that may pose a barrier to communication, including but not limited to learning, intellectual, or developmental disabilities, and hearing, speech, or vision impairments;

c) Accommodation needs, including as to housing, classification, Effective Communication, adaptive supports, and assistive devices;

d) Prisoners who require specific health care appliances, assistive devices, and/or durable medical equipment (HCA/AD/DME);

e) Prisoners who are class members in *Armstrong v. Newsom* (N.D. Cal. No. 94-cv-02307), with their applicable disability classification(s) and accommodation need(s).

3. The ADA Tracking System's prisoner disability information will be readily accessible to custody, medical, mental health, and other staff at the Jail who need such information to ensure appropriate accommodations and adequate program access for prisoners with disabilities.

## C. ADA Coordinator

1. The County shall have a dedicated ADA Coordinator at each facility.

2. The ADA Coordinator position shall be dedicated to coordinating efforts to comply with and carry out ADA-related requirements and policies, shall have sufficient command authority to carry out such duties, and shall work with the executive management team regarding ADA-related compliance, training, and program needs.

3. The County shall clearly enumerate, in consultation with Plaintiffs' counsel, the job duties and training requirements for the ADA Coordinator position and for ADA Deputies assigned to support the ADA Coordinator position.

4. The County shall ensure that ADA Coordinators and ADA Deputies possess requisite training to implement and ensure compliance with the Jail's disability program and services, including operation of the ADA Tracking System.

## D. Screening for Disability and Disability-Related Needs.

1. The County shall conduct adequate screening of prisoners to be housed in the Jail in order to identify disabilities and disability-related accommodation, housing, classification, and other needs.  All individuals detained at the Jail for any period of time will be assessed for Effective Communication needs, consistent with the provisions herein.

2. The County shall take steps to identify and verify each prisoner's disability and disability-related needs during medical intake screening, including based on:

a) The individual's self-identification or claim to have a disability;

b) Documentation of a disability in the individual's health record;

c) Staff observation that the individual may have a disability that affects placement, program access, or Effective Communication; or

d) The request of a third party (such as a family member) for an evaluation of the individual for an alleged disability.

E. **Orientation**

1. The County shall ensure that, for the population to be housed in the Jails, prisoners with disabilities are adequately informed of their rights under the ADA, including but not limited to:

   a) Accommodations available to prisoners;

   b) The process for requesting a reasonable accommodation;

   c) The role of the ADA coordinator(s) and method to contact them;

   d) The grievance process, location of the forms, and process for getting assistance in completing grievance process;

   e) Instructions on how prisoners with disabilities can access health care services, including the provision of Effective Communication and other accommodations available in accessing those services.

2. Upon processing and classification, prisoners with disabilities shall receive, in an accessible format, the jail rulebook; orientation handbook; and a verbal orientation or orientation video regarding rules or expectations.

3. The County shall accommodate individuals with disabilities in the orientation process through the use of alternative formats (*e.g.* verbal communication, large print, audio/video presentation), when necessary for Effective Communication of the information.

4. The County shall develop an Americans with Disabilities Act Inmate Notice. The Notice shall be prominently posted in all prisoner housing units, in the booking/intake areas, in medical/mental health/dental treatment areas, and at the public entrances of all Jail facilities.

F. **Health Care Appliances, Assistive Devices, Durable Medical Equipment**

1. The County shall establish a written policy to ensure provision of safe and operational HCA/AD/DME, with a process for repair and replacement.

2. The County shall timely provide HCA/AD/DME to prisoners with disabilities who require such assistance. The County shall ensure an individualized assessment by medical staff to determine whether HCA/AD/DME is warranted to ensure equal and meaningful access to programs, services, and activities in the Jail.

3. The County shall allow prisoners to retain personal HCAs/ADs/DME (which will include reading glasses), unless there is an individualized determination that doing so would create an articulated safety or security risk.

   a) Where Jail staff determine it is necessary to remove a prisoner's personal HCA/AD/DME for security reasons, the County shall provide an equivalent Jail-issued device unless custody staff, with supervisory review, determine and document, based on an individualized assessment, that the device constitutes a risk of bodily harm or threatens the security of the facility.

   b) If such a determination is made, the ADA coordinator or supervisory-level designee shall document the decision and reasons for it, in writing, and shall consult with medical staff to determine an appropriate alternative accommodation.

4. The County shall, in consultation with Plaintiffs' counsel, implement a written policy governing the release of prisoners who need assistive devices upon release.

   a) The County will ensure that any personal mobility device belonging to a prisoner is returned to the prisoner prior to release from custody.

   b) If a prisoner does not have a personal mobility device, but is ambulatory with the assistance of a cane, crutch, or walker, the prisoner will be permitted to retain such device that was used while in custody upon release, or will be provided a comparable device, upon release.

   c) If a prisoner who is due for release requires a wheelchair, but does not have a personal wheelchair, Jail staff shall coordinate with the prisoner, the prisoner's family or friends, and other County agencies as needed to secure a wheelchair or take other steps to address the individual's needs upon release. The County shall document this process in the ADA Tracking System for purposes of individual tracking and quality assurance.

## G. Housing Placements

1. The County shall house prisoners with disabilities in facilities that accommodate their disabilities.

2. The County shall implement a housing assignment system that includes an individualized assessment of each individual's functioning limitations and restrictions, including but not limited to:

   a) The need for ground floor housing;

   b) The need for a lower bunk;

   c) The need for grab bars in the cell and/or shower;

    d) The need for accessible toilets;

    e) The need for no stairs in the path of travel; and

    f) The need for level terrain.

3. Prisoners with disabilities shall be housed in the Jail consistent with their individual security classification. Prisoners prescribed or possessing HCAs/ADs/DME will not automatically be housed in a medical housing unit. Placement in a medical housing unit will be based on individualized clinical determination of need for treatment.

4. Classification staff shall not place prisoners with disabilities in:

    a) Inappropriate security classifications simply because no ADA-accessible cells or beds are available;

    b) Designated medical areas unless the prisoner is currently receiving medical care or treatment that necessitates placement in a medical setting; or

    c) Any location that does not offer the same or equivalent programs, services, or activities as the facilities where they would be housed absent a disability.

**H. Access to Programs, Services, and Activities**

**1.** The County shall ensure prisoners with disabilities, including those housed in specialized medical units or mental health units (*e.g.*, OPP, IOP, Acute) have equal access to programs, services, and activities available to similarly situated prisoners without disabilities, consistent with their health and security needs. Such programs, services, and activities include, but are not limited to:

    a) Educational, vocational, reentry and substance abuse programs

    b) Work Assignments

    c) Dayroom and other out-of-cell time

    d) Outdoor recreation and fitted exercise equipment

    e) Showers

    f) Telephones

    g) Reading materials

    h) Social visiting

    i) Attorney visiting

    j) Religious services

    k) Medical, mental health, and dental services and treatment

**2.** The County shall provide reasonable accommodations and modifications as necessary to ensure that prisoners with disabilities have equal access to programs, services, and activities available to similarly situated prisoners without disabilities.

3. The County shall develop and implement a written policy for staff to provide appropriate assistance to prisoners with psychiatric, developmental, or cognitive disabilities so that they can fully participate in programs, services, and activities provided at the Jail.

**4.** The County shall implement a written policy for staff to provide assistance to prisoners with disabilities in reading or scribing documents.

5. The County shall provide equal access to library, recreational, and educational reading materials for prisoners with disabilities, including easy reading and large print books for individuals who require such accommodations.

6. The County shall ensure equitable inmate worker opportunities for prisoners with disabilities, including by:

   a) Ensuring clear job duty statements, with essential functions and specific criteria, for each Worker position;

   b) Ensuring that medical staff conduct an individualized assessment to identify work duty restrictions and/or physical limitations to facilitate appropriate work/industry assignments and to prevent improper exclusions from work opportunities;

   c) Providing reasonable accommodations to enable prisoners with disabilities to participate in inmate worker opportunities.

I. **Effective Communication**

1. The County shall assess all individuals detained at the Jail for any period of time for Effective Communication needs, and shall take steps to provide Effective Communication based on individual need.

2. The County's ADA policies shall include comprehensive guidance to ensure Effective Communication for prisoners with vision, speech, hearing, intellectual, learning, or other disabilities. The County shall, in consultation with Plaintiffs' counsel, ensure that sufficient guidance on the provision of Effective Communication is included in Jail custody and health care policies and procedures.

3. Standard for Provision of Effective Communication in Due Process Events and Clinical Encounters

   a) A higher standard for the provision of Effective Communication shall apply in the following situations:

      i. Due Process Events, including the following:

- Classification processes

- Prisoner disciplinary hearing and related processes

- Service of notice (to appear and/or for new charges)

- Release processes

- Probation encounters/meetings in custody

ii. Clinical Encounters, including the following:

- Determination of medical history or description of ailment or injury

- Diagnosis or prognosis

- Medical care and medical evaluations

- Provision of mental health evaluations, rounds, group and individual therapy, counseling and other therapeutic activities

- Provision of the patient's rights, informed consent, or permission for treatment

- Explanation of medications, procedures, treatment, treatment options, or surgery

- Discharge instructions

b) In the situations described in subsection (a), above, Jail staff shall:

i. Identify each prisoner's disability where there may be a barrier to comprehension or communication requiring reasonable accommodation(s);

ii. Provide effective reasonable accommodation(s) to overcome the communication barrier; and

iii. Document the method used to achieve Effective Communication and how the staff person determined that the prisoner understood the encounter, process, and/or proceeding.

4. Effective auxiliary aids and services that are appropriate to the needs of a prisoner with Effective Communication needs shall be provided when simple written or oral communication is not effective. Such aids may include bilingual aides, SLIs, readers, sound amplification devices, captioned television/video text displays, Videophones and other telecommunication devices for deaf persons (TDDs), audiotaped texts, Braille materials, large print materials, writing materials, and signage.

5. In determining what auxiliary aid service to provide, the County shall give primary consideration to the request of prisoner with Effective Communication needs.

6. Education providers (*e.g.,* Elk Grove Unified School District) at the Jail will ensure Effective Communication for prisoners participating in education programs, including by providing necessary assistive equipment and take steps to accommodate learning strategies of those prisoner-students who have special needs, such as those with developmental, learning, vision, hearing, and speech disabilities.

7. The County shall assist prisoners who are unable to complete necessary paperwork (*e.g.*, related to health care, due process, Jail processes) on their own with reading and/or writing as needed.

8. The County shall permit prisoners, including those who are illiterate, non-English speaking, or otherwise unable to submit written or electronic sick call requests, to verbally request care. Such verbal requests shall immediately be documented by the staff member who receives the request on an appropriate form and transmitted to a qualified mental health or medical professional for response in the same priority as those sick call requests received in writing.

9. The County shall post and disseminate notices, policies, job announcements, and other written material in alternative formats to promote Effective Communication.

J. **Effective Communication and Access for Individuals with Hearing Impairments**

1. The County shall develop and implement a policy for newly arrived and newly identified prisoners with hearing disabilities to determine each prisoner's preferred method of communication.

2. Qualified Sign Language Interpreters (SLIs) will be provided during intake and for due process functions, health care encounters, and Jail programming, when sign language is the prisoner's primary or only means of Effective Communication, unless the prisoner waives the assistance of an interpreter and/or delay would pose a safety or security risk.

   a) The County shall maintain a contract or service agreement with interpreter services in order to provide such services for deaf or hearing impaired prisoners. Jail staff will be informed of the availability of contract interpreter services.

   b) Lip reading will not be the sole method of Effective Communication used by staff, unless the prisoner has no other means of communication.

   c) In cases where the use of an SLI is not practicable, or is waived by the prisoner, Jail staff shall employ the most effective form of communication available.

   d) The County will maintain a log of (a) when, for whom, and for what purpose an SLI was used; and (b) when, for whom, and why a SLI was

*not* used for a prisoner with an identified need for SLI services (*e.g.*, prisoner waived SLI or delay would have posed safety or security risk).

    e) When a prisoner waives an SLI, the log must document (a) the method of communication of the waiver, and (b) the method staff used to determine that the waiver was knowing and freely given.

3. Jail Staff shall effectively communicate the contents of the Inmate Handbook and other materials providing information on Jail rules and procedures to all prisoners to be housed in the Jail who are deaf or hard of hearing. For those prisoners for whom written language is not an effective means of communication, Jail Staff may meet this obligation by providing a video of an SLI signing the contents of the Inmate Handbook, along with appropriate technology for viewing, or by providing an SLI to interpret the contents of the Inmate Handbook to the prisoner who is deaf or hard of hearing.

4. The County shall, within 12 months from court approval of the Settlement, make Videophones available for deaf and hard of hearing prisoners. The Videophones shall provide for calls through the use of Video-Relay Services (VRS) at no cost to deaf and hard of hearing prisoners or for calls directly to another Videophone.

5. Deaf/hard of hearing prisoners who use telecommunication relay services, such as Videophone or TDD/TTY machine, in lieu of the telephone shall receive equal access to the Videophone or TDD/TTY services as non-disabled prisoners are afforded for regular telephone usage.

6. The County shall provide deaf/hard of hearing prisoners with additional time for calls using telecommunication relay services, such as a Videophone or TDD/TTY, to account for the fact that signed and typed conversations take longer than spoken conversations. The County shall document the time that each prisoner uses and has access to such equipment.

7. Prisoners who require an SLI as their primary method of communication shall be provided an SLI for education, vocational, or religious programs and services.

8. Public verbal announcements in housing units where individuals who are deaf or hard of hearing reside shall be delivered on the public address system (if applicable) and by flicking the unit lights on and off several times to alert prisoners that an announcement is imminent. This includes announcements regarding visiting, meals, recreation release and recall, count, lock-up, and unlock. Verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, as consistent with individual need. These procedures shall be communicated to prisoners during the orientation process and also shall be incorporated into relevant policies and post orders.

K. **Disability-Related Grievance Process**

1. The County shall implement a grievance system for prisoners with disabilities to report any disability-based discrimination or violation of the ADA, this Remedial Plan, or Jail ADA-related policy, and shall provide a prompt response and equitable resolution in each case.

2. The County shall ensure that the grievance procedures are readily available and accessible to all prisoners.

   a) The County shall make reasonable efforts to ensure all prisoners are aware of the disability grievance procedures, including the availability of accommodations and staff assistance to submit a grievance and/or appeal.

   b) The County shall ensure the prisoners with disabilities have meaningful access to grievance forms, including through provision of staff assistance and large print materials.

3. Response to Grievances

   a) The County shall develop and implement an ADA grievance process that includes (1) a reasonable timeline for response to ADA-related grievances and appeals, including an expedited process for urgent ADA grievance (*e.g.*, involving prisoner safety or physical well-being); and (2) provision for interim accommodations pending review of the individual's grievances/appeals.

   b) The County shall ensure that prisoners with communication needs are interviewed and provided assistance as part of the grievance/appeal process where necessary to ensure meaningful access and Effective Communication.

   c) The County shall document each denial of a reasonable accommodation request and shall record the basis for such determination.

   d) The County shall provide in writing a copy of the grievance (or appeal) response to the prisoner, including the resolution, the basis for a denial (if applicable), and the process for appeal.

   e) The County shall ensure that completed grievance responses are effectively communicated to prisoners with disabilities.

4. The submission, processing, and responses for disability-related grievances and complaints shall be tracked.

L. **Alarms/Emergencies**

1. The County shall ensure that all written policies regarding alarms and emergencies contain mandatory provisions to accommodate prisoners with disabilities.

2. The County shall implement written policies regarding the expectations of staff as to prisoners with identified disabilities during emergencies and alarms, including as to disabilities that may affect prisoners' ability to comply with orders or otherwise respond to emergencies and alarms. For example, the policies shall ensure appropriate handling of prisoners with mobility-related disabilities who are unable to prone or take a seated position on the ground during an alarm or emergency. Such policies shall be communicated to staff, incorporated into the relevant Operations Orders, and communicated to prisoners with disabilities using Effective Communication.

3. The County shall implement written policies for staff regarding communicating effectively and appropriately with prisoners who have disabilities that may present barriers to communication during emergencies or alarms.

4. In order to facilitate appropriate accommodations during alarms or emergencies, the County shall offer, but shall not require, individuals who have disabilities visible markers to identify their disability needs (*e.g.*, identification vests). The County shall maintain a list, posted in such a way to be readily available to Jail staff in each unit, of prisoners with disabilities that may require accommodations during an alarm or emergency.

5. The County shall install visual alarms appropriate for individuals who are deaf or hard of hearing, which shall comply with relevant fire code regulations.

6. All housing units shall post notices for emergency and fire exit routes.

M. **Searches, Restraints, and Extractions**

1. The County shall modify its written policies to ensure that prisoners with mobility impairments, including those with prosthetic devices, receive reasonable accommodations with the respect to the following: (1) Pat searches and unclothed body searches; (2) Application of restraints devices, including Pro-Straint Chair; and (3) Cell extractions.

N. **Transportation**

1. The County shall provide reasonable accommodations for prisoners with disabilities when they are in transit, including during transport to court or outside health care services.

2. Prescribed HCAs/ADs/DME, including canes, for prisoners with disabilities shall be available to the prisoner at all times during the transport process, including in temporary holding cells, consistent with procedures outlined in Part VII.

3. The County shall use accessible vehicles to transport prisoners in wheelchairs and other prisoners whose disabilities necessitate special transportation, including by maintaining a sufficient number of accessible vehicles. (295)

    4. Prisoners with mobility impairments shall be provided assistance onto transport vehicles.

## O. Prisoners with Intellectual Disabilities

1. The County shall, in consultation with Plaintiffs' counsel, develop and implement a comprehensive written policy and procedure regarding prisoners with an Intellectual Disability, including:

    a) Screening for Intellectual Disabilities;

    b) Identification of prisoners' adaptive support needs and adaptive functioning deficits; and

    c) Monitoring, management, and accommodations for prisoners with Intellectual Disabilities.

2. A multidisciplinary team that includes appropriate health care staff will monitor and ensure appropriate care for prisoners with an Intellectual Disability. The multidisciplinary team will develop an individualized plan for each prisoner with an Intellectual Disability, which addresses: (1) safety, vulnerability, and victimization concerns, (2) adaptive support needs, (3) programming, housing, and accommodation needs. The multidisciplinary team's plan will be regularly reviewed and updated as needed.

3. Prisoners with an Intellectual Disability assigned to a work/industry position will be provided additional supervision and training as necessary to help them meet the requirements of the assignment.

## P. ADA Training, Accountability, and Quality Assurance

1. The County shall ensure all custody, health care, facility maintenance, and other Jail staff receive ADA training appropriate to their position.

    a) The County shall provide to all staff appropriate training on disability awareness, including the use and purpose of accommodations and modifications in accordance with the ADA.

    b) The ADA training shall include: formalized lesson plans and in-classroom or virtual training for staff (including managers, supervisors, and rank-and-file staff) provided by certified or otherwise qualified ADA trainers.

2. ADA instructors shall have appropriate ADA training and subject matter expertise necessary to effectively provide ADA training to staff.

3. The County shall, in consultation with Plaintiffs' counsel, develop and implement written policies and procedures regarding monitoring, investigating, and tracking staff violations (or allegations of violations) of ADA requirements and Jail ADA policies.

4. The County shall develop an ADA accountability plan that will ensure quality assurance and establish staff accountability for egregious, serious, or repeated violations of the ADA and Jail ADA-related policies and procedures.

### Q. Accessibility Remedial Plan to Address Physical Plant Deficiencies

1. The County shall, within 24 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, develop and fully implement an Accessibility Remedial Plan to address Jail physical plant deficiencies that result in access barriers for prisoners with disabilities. In the interim, the Sheriff's Office shall house prisoners with disabilities in the most integrated and appropriate housing possible, providing reasonable accommodations and assistance where necessary to ensure appropriate accessibility to Jail programs, services, and activities.

2. The Accessibility Remedial Plan shall ensure the following:

   a) Adequate provision of accessible cells and housing areas with required maneuvering clearances and accessible toilet fixtures, sanitary facilities, showers, dining/dayroom seating, and recreation/yard areas.

   b) Accessible paths of travel that are compliant with the ADA.

   c) Equal and adequate access for all prisoners with disabilities to Family and Attorney Visiting areas in reasonable proximity to their housing location.

## IV.  MENTAL HEALTH CARE

### A. Policies and Procedures

1. The County shall establish policies and procedures that are consistent with the provisions of this Remedial Plan and include the following:

   a) A written document reflecting the complete spectrum of mental healthcare programming and services provided to prisoners;

   b) Minimum and maximum timeframes for when each type of mental healthcare service will be completed, including but not limited to laboratory tracking and psychiatry follow-up services, in accordance with prevailing community and professional standards;

   c) An intake and referral triage system to ensure timely and effective resolution of inmate requests and staff referrals for mental healthcare;

   d) Specific credentialing requirements for the delivery of mental healthcare services, including but not limited to only qualified mental health professionals may make critical treatment decisions.

   e) Clinical monitoring of inmates, including but not limited to those who are involuntarily medicated, clinically restrained or secluded, segregated, or on suicide watch;

f)  Descriptions of specialized mental health programming that specifically identify admitting and discharge criteria and the staff members who have the authority to place inmates in specialized mental health housing;

g)  Procedures for involuntary medications and other appropriate measures for the management of inmates with serious mental illness who lack the capacity to give informed consent, in accordance with relevant state law;

h)  Training for all staff members who are working with inmates with mental illness in all aspects of their respective duty assignments.

2.  The County's policies and procedures shall be revised, as necessary, to reflect all of the remedial measures described in this Remedial Plan.

3.  The County shall continue to operate its acute inpatient program and its Outpatient Psychiatric Pod (OPP) program. The County shall establish a new Intensive Outpatient Program (IOP) for inmates who require a higher level of outpatient psychiatric care than what is provided in the OPP program.

4.  The County shall operate its non-acute mental health programs – IOP, OPP, and General Population-Mental Health – consistent with the JPS Psychiatric Services overview, attached as **Exhibit A-2**.

B.  **Organizational Structure**

1.  The County shall develop and implement a comprehensive organizational chart that includes the Sheriff's Department ("Department"), Correctional Health Services ("CHS"), Jail Psychiatric Services ("JPS"), Chief Administrative Officer, Medical Director of the JPS Program, and any other mental health staff, and clearly defines the scope of services, chains of authority, performance expectations, and consequences for deficiencies in the delivery of mental health care services.

2.  A Medical Director of Jail Psychiatric Services shall be designated and shall oversee all mental health care functions in the jails, including psychiatric prescribers and psychiatric nurses.  The Director shall possess clinical experience and a doctoral degree.

3.  The Medical Director of Jail Psychiatric Services shall participate in jail executive leadership and shall be responsible for overseeing program development, clinical practice, and policy, as well as interfacing with jail and medical leadership and community mental health.

C.  **Patient Privacy**

1.  All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff.  In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any

other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification.

    a) For any determination that a clinical interaction with a patient requires the presence of custody staff, staff shall document the specific reasons for the determination.  Such decisions shall be reviewed through the Quality Assurance process.

    b) If the presence of custody staff  is determined to be necessary to ensure the safety of medical staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

    c) The County's patient privacy policies, as described in this section, shall apply to contacts between inmates and Triage Navigator Program staff and/or other staff that provide mental health-related services on site at the Jail.

2. Jail policies that mandate custody staff to be present for any mental health treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above.  Custody and mental health staff shall be trained accordingly.

3. It shall be the policy of the County that mental health clinicians shall not conduct their patient contacts at cell front except pursuant to documented refusals or specific, documented security concerns that warrant cell front contacts.

4. For each clinical contact, mental health staff shall document whether the encounter was confidential, including whether it took place at cell front.  If the contact occurred at cell front or otherwise was non-confidential, the reasons shall be clearly documented in the individual patient record and for purposes of Quality Assurance review procedures.

5. A process shall exist for sick call slips or other mental health treatment-related requests to be collected without the involvement of custody staff.

D. **Clinical Practices**

1. Mental health staff shall develop and maintain at each jail facility an accurate case list of all prisoners requiring mental health treatment services at the jail ("caseload") which, at a minimum, lists the patient's name, medical chart number, current psychiatric diagnoses, date of booking, date of last appointment, date of next appointment, and the name of the treating prescriber.

2. Qualified mental health professionals shall have access to the patient's medical record for all scheduled clinical encounters.

3. Qualified mental health professionals shall provide individual counseling, group counseling, and psychosocial/psychoeducational programs based on individual patients' clinical needs.

4. A qualified mental health professional shall conduct and document a thorough assessment of each individual in need of mental health care following identification.

**5.** The County shall ensure prompt access to psychiatric prescribers following intake and in response to referrals and individual patient requests in accordance with the referral and triage timelines defined in the Access to Care provisions, below.

**6.** The County shall, in consultation with Plaintiffs' counsel, implement an electronic system for tracking mental health evaluation, treatment, and other clinical contacts, as well as sick call slips and other mental health treatment-related requests or referrals.

7. The County shall develop and implement an electronic tracking system with alert and scheduling functions to ensure timely delivery of mental health services to individual patients.

8. Treatment planning:

   a) The County shall ensure that each prisoner on the mental health caseload receives a comprehensive, individualized treatment plan based on the input of the Multi-Disciplinary Treatment Team (MDT).  The MDT shall include multiple clinical disciplines with appropriate custody and counseling staff involvement.

   b) The treatment plan shall reflect individual clinical need, and the County shall ensure that all clinically indicated services are available and provided.

   c) The treatment plan shall include, at a minimum, the frequency of follow-up for clinical evaluation and adjustment of treatment modality, the type and frequency of diagnostic testing and therapeutic regimens (which may include clinical contacts more frequent than the minimum intervals described herein), and instructions about adaptation to the correctional environment.

   d) This treatment plan shall include referral to treatment after release from the facility when recommended by treatment staff.

   e) Custody staff shall be informed of a patient's treatment plan where appropriate to ensure coordination and cooperation in the ongoing care of the patient.

   f) The County shall, in consultation with Plaintiffs' counsel, develop and implement a Treatment Plan Form that will be used to select and

document individualized services for prisoners who require mental health treatment.

g) The County shall implement guidelines and timelines for the initiation and review of individual treatment plans, consistent with the JPS Psychiatric Services overview, attached as **Exhibit A-2**.

E. **Medication Administration and Monitoring**

1. The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws and through the following:

   a) The County shall ensure that initial doses of prescribed medications are delivered to inmates within 48 hours of the prescription, unless it is clinically required to deliver the medication sooner;

   b) The County shall make best efforts to verify a patient's prescribed medications and current treatment needs at intake, including outreach to pharmacies and community providers to request prescriptions and other health care records relating to ongoing care needs.  The policy shall ensure that any ongoing medication, or a clinically appropriate alternative, shall be provided within 48 hours of verification of the prescription or from a determination by a physician that the medication is medically necessary. Any orders that cannot be reconciled or verified, such as those with conflicting prescriptions from multiple prescribers, shall be referred to a health care provider for reconciliation or verification the next clinic day after booking.

   c) The County shall ensure that medical staff who administer medications to inmates document in the inmate's Medical Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, and (3) the date and time for any refusal of medication.

2. Qualified mental health professionals shall, for each individual patient, establish targets for treatment with respect to the use of psychotropic medication and shall assess and document progress toward those targets at each clinical visit.

3. Qualified mental health professionals shall, for each individual patient, monitor and document the following with respect to psychotropic mediations: (1) levels of medications, (2) adverse impacts (including through renal and liver function tests where indicated), (3) side effects, and (4) efficacy.

4. Qualified mental health professionals shall, for each individual patient, conduct and document baseline studies, including ECG, blood, urine, and other studies, as clinically appropriate, prior to the initiation of treatment.

5. The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

6. Medication adherence checks that serve a clinical function shall be conducted by nursing staff, not custody staff. Custody staff shall conduct mouth checks when necessary to ensure institutional safety and security.

7. Psychiatric prescribers shall consider clinically indicated considerations and conduct an in-person consultation, with the patient prior to changing or initiating medications. In the event there is no in-person consultation before prescribing or changing medications the psychiatric prescriber shall note and document the reasons for why there was not an in-person consultation with the patient.

F. **Placement, Conditions, Privileges, and Programming**

1. Placement:

   a) It shall be the policy of the County to place and treat all prisoners on the mental health caseload in the least restrictive setting appropriate to their needs.

   b) Placement in and discharge from Designated Mental Health Units shall be determined by qualified mental health professionals, with consultation with custody staff as appropriate.

   c) Absent emergency circumstances, the County shall obtain the assent of qualified mental health professionals before transferring prisoners with SMI into or out of Designated Mental Health Units.

   d) It shall be the policy of the County to place prisoners with SMI in appropriate settings that ensure provision of mental health services, patient safety, and the facilitation of appropriate programs, activities, and out-of-cell time.  Co-housing with other populations shall be avoided to the extent that such a practice prevents or hinders any of the above.

   e) All patients requiring placement in a Designated Mental Health Unit shall be provided access to such placement and care based on current clinical need and without any requirement for director-level approval.

2. Programming and Privileges

   a) All Designated Mental Health Units shall offer a minimum of 7 hours of unstructured out-of-cell time per week and 10 hours of structured out-of-cell time per week for each prisoner. While out-of-cell hours per prisoner may vary from day to day, each prisoner will be offered some amount of out-of-cell time every day of the week. All treatment and out-of-cell time shall be documented for each prisoner, and reviewed as part of Quality Assurance procedures.

b) The County shall ensure that prisoners on the mental health caseload have access and opportunity to participate in jail programming, work opportunities, and education programs, consistent with individual clinical input.

c) The County shall develop and implement, in the 2P inpatient unit and the IOP unit, a program for progressive privileges (including time out of cell, property allowances, etc.) for patients as they demonstrate behavioral progress. A patient's level of privileges and restrictions shall be based on both clinical and custody input regarding current individual needs. The County shall ensure a process to review custody classification factors when necessary, so that placement, privileges, and restrictions match current individual circumstances and needs.

d) Individuals on a mental health caseload shall receive, at minimum, privileges consistent with their classification levels, absent specific, documented factors which necessitate the withholding of such privileges. Clinical staff shall be informed of the withholding of privileges and the reasons for the withdrawal shall be documented and regularly reviewed by clinical and custody staff. The restoration of privileges shall occur at the earliest time appropriate based on individual factors.

e) Where a prisoner in a Designated Mental Health Unit is subject to any restrictions of property, privileges, or out-of-cell time, the mental health treatment provider and Multi-Disciplinary Treatment Team will, on a weekly basis, assess and discuss with the prisoner progress and compliance with the prisoner's individual case plan. This process will include clinical contact in a private, face-to-face, out-of-cell setting. The Multi-Disciplinary Treatment Team will provide input to classification staff regarding the prisoner's mental health and appropriateness for removal of imposed restrictions. Classification staff will follow the recommendation of the Multi-Disciplinary Treatment Team to remove restrictions unless there is a clear, documented security reason to maintain the restriction.

3. Conditions:

a) Staff shall provide prisoners in Designated Mental Health Units with the opportunity to maintain cell cleanliness and the opportunity to meet their hygiene needs. Custody and clinical staff shall provide assistance to prisoners on these matters, as appropriate to individual patient needs

b) The County shall ensure uniformity of practice with respect to cell searches, such that searches are not done for punitive or harassment reasons. The County shall monitor whether cell search practices may be serving as a disincentive for prisoners in Designated Mental Health

Units to leave their cells for treatment or other out-of-cell activities, and shall take steps to address the issue as appropriate.

4. Bed planning:

   a) The County shall provide a sufficient number of beds in Designated Mental Health Unit, at all necessary levels of clinical care and levels of security, to meet the needs of the population of prisoners with SMI.

   b) The County shall conduct a bed needs assessment, to be updated as appropriate, in order to determine demand for each category of Designated Mental Health Unit beds and shall ensure timely access to all levels of mental health care, consistent with individual treatment needs.

   c) The County shall establish mental health programming for women that ensures timely access to all levels of care and is equivalent to the range of services offered to men.

5. General Exclusion of Prisoners with Serious Mental Illness from Segregation

   a) Prisoners with Serious Mental Illness will not be housed in Segregation units, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and there is no reasonable alternative, in which cases the provisions of **Section VIII.D** of the Segregation/Restrictive Housing Remedial Plan shall apply.

   b) Where prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit are assessed a Disciplinary Segregation term, they will serve the term in a Designated Mental Health Unit, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and shall receive structured out-of-cell time and programming as determined by the Multi-Disciplinary Treatment Team.

6. Access to Care

   a) The County shall designate and make available custody escorts for mental health staff in order to facilitate timely completion of appointments and any other clinical contacts or treatment-related events.

   b) The County shall ensure sufficient and suitable treatment and office space for mental health care services, including the Triage Navigator Program and other mental health-related services provided on site at the Jail.

   c) Locations shall be arranged in advance for all scheduled clinical encounters.

d) The County shall track and document all completed, delayed, and canceled mental health appointments, including reasons for delays and cancelations.  Such documentation shall be reviewed as part of the Quality Assurance process.

e) Referrals and triage:

　　i. The County shall maintain a staff referral process (custody and medical) and a kite system for prisoners to request mental health services.  Referrals by staff or prisoners must be triaged within 24 hours.

　　ii. Referrals and requests for mental health services shall be handled in accordance with the following timeframes, and based on the definitions and guidance in **Exhibit A-2**:

▪ Prisoners with "Must See" (Emergent) mental health needs shall be seen for assessment or treatment by a qualified mental health professional as soon as possible, and within six (6) hours. Prisoners with emergent mental health needs shall be monitored through continuous observation until evaluated by a mental health professional.

▪ Prisoners with Priority (Urgent) mental health needs shall be seen for assessment or treatment by a qualified mental health professional within 36 hours.

▪ Prisoners with Routine mental health needs shall be seen for assessment or treatment by a qualified mental health professional within two (2) weeks;

▪ Prisoners whose requests do not require formal clinical assessment or intervention shall be issued a written response, with steps taken to ensure effective communication.

## G. Medico-Legal Practices

1. The County shall provide access to appropriate inpatient psychiatric beds to all patients who meet WIC § 5150 commitment criteria.  At the time a patient's need for inpatient care is identified, commitment paperwork shall be initiated immediately.  Placement in an inpatient unit shall occur at the earliest possible time, and in all cases within 24 hours.  For individual prisoners placed on a pre-admit or wait list for inpatient placement, affirmative steps to process and place them shall begin immediately.

2. The County shall not discharge patients from the LPS unit and immediately re-admit them for the purpose of circumventing LPS Act requirements.  For patients with continuing need for LPS commitment, the County shall follow all required procedures under the LPS Act.

3. The County shall review all County and JPS policies and procedures for PREA compliance, and revise them as necessary to address all mental health-related requirements.

## H. Clinical Restraints and Seclusion

1. Generally:

   a) It is the policy of the County to employ restraints and seclusion only when necessary and to remove restraints and seclusion as soon as possible.

   b) It is the policy of the County to employ clinical restraints and seclusion only when less restrictive alternative methods are not sufficient to protect the inmate-patient or others from injury. Clinical restraint and seclusion shall not be used as punishment, in place of treatment, or for the convenience of staff.

   c) The placement of a prisoner in clinical restraint or seclusion shall trigger an "emergent" mental health referral, and a qualified mental health professional shall evaluate the prisoner to assess immediate and/or long-term mental health treatment needs.

   d) When clinical restraints or seclusion are used, Jail staff will document justification for their application and the times of application and removal of restraints.

   e) There shall be no "as needed" or "standing" orders for clinical restraint or seclusion.

   f) Individuals in clinical restraints or on seclusion shall be on constant watch, or on constant video monitoring with direct visualization every 15 minutes. All checks will be documented.

   g) Fluids shall be offered at least every four hours and at meal times.

2. Clinical Restraints

   a) The opinion of a qualified health care professional or qualified mental health professional on placement and retention in restraints will be obtained within one hour from the time of placement.

   b) A thorough clinical assessment shall be conducted by qualified health care professional or qualified mental health professional every four hours to determine the need for continued restraint.

   c) Individuals in restraints shall be checked every two hours by a nurse for vital signs, neurovascular assessment, and limb range, and offered an opportunity for toileting.

3. Reentry Services

a) The County shall provide a 30-day supply of current psychotropic medications to inmates on the mental health caseload, who have been sentenced and have a scheduled released date, immediately upon release.

b) Within 24 hours of release of any inmate who is on the mental health caseload and classified as pre-sentence, the County shall transmit to a designated County facility a prescription for a 30-day supply of the inmate's current psychotropic medications.

c) The County, in consultation with Plaintiffs' counsel, develop and implement a reentry services policy governing the provision of assistance to prisoners on the mental health caseload, including outpatient referrals and appointments, public benefits, medical insurance, housing, substance abuse treatment, parenting and family services, inpatient treatment, and other reentry services.

d) The County agrees that, during the course of the implementation of the remedial plans contained in this agreement, it will consider Plaintiffs' input on measures to prevent unnecessary or avoidable incarceration of individuals with serious mental illness.

## I.  Training

1. The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

   a) All jail custody staff shall receive formal training in mental health, which shall encompass mental health policies, critical incident response, crisis intervention techniques, recognizing different types of mental illness, interacting with prisoners with mental illness, appropriate referral practices, suicide and self-harm detection and preventions, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

   b) Custody staff working in Designated Mental Health Units shall receive additional training, including additional information on mental illness, special medico-legal considerations, de-escalation techniques, working with individuals with mental health needs, relevant bias and cultural competency issues, and the jail's mental health treatment programs.

   c) Mental health staff shall receive training on the correctional mental health system, correctional mental health policies, suicide assessment and intervention, relevant bias and cultural competency issues, and treatment modalities to be offered in the jails.

## V. DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH MENTAL HEALTH OR INTELLECTUAL DISABILITIES

### A. Role of Mental Health Staff in Disciplinary Process

1. The County's policies and procedures shall require meaningful consideration of the relationship of a prisoner's behavior to any mental health or intellectual disability, the efficacy of disciplinary measures versus alternative interventions, and the impact of disciplinary measures on the health and well-being of prisoners with disabilities.

2. Prisoners who are alleged to have committed a rules violation shall be reviewed by a qualified mental health professional if any of the following apply:

   a) Prisoner is housed in any Designated Mental Health Unit;

   b) Jail staff have reason to believe the prisoner's behavior was unusual, uncharacteristic, or a possible manifestation of mental illness;

   c) Prisoner is on the mental health caseload and may lose good time credit as a consequence of the disciplinary infraction with which he or she is charged.

3. If any of the above criteria is met, the qualified mental health professional shall complete the form attached as **Exhibit A-3** (JPS-Rules Violation Mental Health Review) and indicate:

   a) Whether or not the reported behavior was related to mental illness, adaptive functioning deficits, or other disability;

   b) Whether the prisoner's behavior is, or may be, connected to any of the following circumstances:

      i. An act of self-harm or attempted suicide

      ii. A cell extraction related to transfer to a medical/mental health unit or provision of involuntary treatment

      iii. Placement in clinical restraints or seclusion.

   c) Any other mitigating factors regarding the prisoner's behavior, disability, and/or circumstances that should be considered and whether certain sanctions should be avoided in light of the prisoner's mental health disability or intellectual disability, treatment plan, or adaptive support needs.

B. **Consideration of Mental Health Input and Other Disability Information in Disciplinary Process**

1. The County shall designate one Chief Disciplinary Hearing Officer for each jail facility, who shall be responsible for ensuring consistency in disciplinary practices and procedures.

2. The Disciplinary Hearing Officer shall ensure that prisoners are not disciplined for conduct that is related to their mental health or intellectual disability.

3. The Disciplinary Hearing Officer shall consider the qualified mental health professional's findings and any other available disability information when deciding what, if any, disciplinary action should be imposed.

4. The Disciplinary Hearing Officer shall consider the qualified mental health professional's input on minimizing the deleterious effect of disciplinary measures on the prisoner in view of his or her mental health or adaptive support needs.

5. If the Disciplinary Hearing Officer does not follow the mental health staff's input regarding whether the behavior was related to symptoms of mental illness or intellectual disability, whether any mitigating factors should be considered, and whether certain sanctions should be avoided, the Disciplinary Hearing Officer shall explain in writing why it was not followed.

6. Prisoners will not be subjected to discipline which prevents the delivery of mental health treatment or adaptive support needs, unless necessary for institutional safety.

7. Prisoners shall not be subject to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of self-injurious behavior.

C. **Accommodations for Prisoners with Mental Health or Intellectual Disabilities During the Disciplinary Process**

1. The County shall provide reasonable accommodations during the hearing process for prisoners with mental health or intellectual disabilities.

2. The County shall take reasonable steps to ensure the provision of effective communication and necessary assistance to prisoners with disabilities at all stages of the disciplinary process.

D. **Use of Force for Prisoners with Mental Health or Intellectual Disabilities**

1. The County's Correctional Services Operations Orders shall include language that ensures meaningful consideration of whether a prisoner's behavior is a manifestation of mental health or intellectual disability.

2. For prisoners with a known mental health or intellectual disability, and absent an imminent threat to safety, staff shall employ de-escalation methods that take into account the individual's mental health or adaptive support needs.

3. The County's Correctional Services Use of Force policies shall include a definition and a protocol for a planned Use of Force that provides appropriate guidance for a planned Use of Force that involves a prisoner with mental health or intellectual disability.

4. Prior to any *planned* Use of Force, such as a cell extraction, against a prisoner with mental health or intellectual disabilities, there will be a "cooling down period," consistent with safety and security needs. This period includes a structured attempt by mental health staff (and other staff if appropriate), to de-escalate the situation and to reach a resolution without Use of Force. Such efforts, including the use of adaptive supports, will be documented in writing. Medical and/or mental health staff should be consulted if the purpose of the cell extraction is related to the delivery of treatment.

5. The County shall require video documentation for any planned Use of Force, absent exigent circumstances. Jail staff shall endeavor to record the specific actions, behavior, or threats leading to the need for Use of Force, as well as efforts to resolve the situation without Use of Force.

6. The County shall ensure the completion of supervisory review of Use of Force incidents, including video (for any planned Use of Force), interviews, and written incident documentation, in order to ensure appropriateness of Use of Force practices including de-escalation efforts. The County shall take corrective action when necessary.

7. The County shall review and amend as appropriate its policies on Use of Force, including its policies on Custody Emergency Response Team (CERT) and Cell Extraction Procedures.

E. **Training and Quality Assurance**

1. All custody staff, and mental health staff, shall be trained on the policies and procedures outlined herein that are relevant to their job and classification requirements. Custody staff will receive periodic training on identifying behaviors that may be manifestations of mental illness and other situations warranting a referral to mental health staff, including for a Rules Violation Mental Health Review or other mental health assessment.

2. All custody staff shall be trained on the identification of symptoms of mental illness, the provision of adaptive supports, and the use of de-escalation methods appropriate for prisoners with mental health or intellectual disabilities.

3. The County shall track the outcomes of all disciplinary hearings for prisoners who are on the mental health caseload or who have intellectual disabilities,

including whether the recommendation of the mental health professional was followed.

4. The County shall track all Uses of Force (planned and reactive) involving prisoners who are on the mental health caseload or who have intellectual disabilities, including the number of Uses of Force and the number of cell extractions by facility.

5. The County shall implement a continuous quality assurance/quality improvement plan to periodically audit disciplinary and Use of Force practices as they apply to prisoners who are on the mental health caseload or who have intellectual disabilities.

## VI.  MEDICAL CARE

### A.  Staffing

1. The County shall provide and maintain sufficient staffing to meet professional standards of care and to execute the requirements of this Remedial Plan, including clinical staff, office and technological support, QA/QI units, and custody staff for escorts and transportation.

2. Provider quality shall be evaluated regularly to ensure that relevant quality of care standards are maintained. This review shall be in addition to the peer review and quality improvement processes described in this plan. The parties shall meet and confer regarding any deficiencies identified in the evaluation. Should the parties disagree regarding matters of provider quality, the Court Expert shall evaluate the quality of provider care and to complete a written report.

### B.  Intake

1. All prisoners who are to be housed shall be screened on arrival in custody by Registered Nurses (RNs).  RN screening shall take place prior to placement in jail housing.

2. Health care intake screening shall take place in a setting that ensures confidentiality of communications between nurses and individual patients. Custody staff may maintain visual supervision but may not be close enough to overhear communication, unless security concerns based on an individualized determination of risk that includes a consideration of requests by the health care staff require that custody staff be closer at hand.  There shall be visual and auditory privacy from other prisoners.

3. The County shall, in consultation with Plaintiffs, revise the contents of its intake screening, medical intake screening, and special needs documentation to reflect community standards and ensure proper identification of medical and disability related needs.

4. Nurses who perform intake screening shall consult any available electronic health care records from prior incarcerations or other County agencies. The form shall include a check box to confirm that such a review was done.

5. The County shall make best efforts to verify a patient's prescribed medications and current treatment needs at intake, including outreach to pharmacies and community providers to request prescriptions and other health care records relating to ongoing care needs. The policy shall ensure that any ongoing medication, or a clinically appropriate alternative, shall be provided within 48 hours of verification of the prescription or from a determination by a physician that the medication is medically necessary. Any orders that cannot be reconciled or verified, such as those with conflicting prescriptions from multiple prescribers, shall be referred to a health care provider for reconciliation or verification the next clinic day after booking.

6. The County shall follow a triage process in which intake nurses schedule patients for follow-up appointments based on their medical needs and acuity at intake, and shall not rely solely on patients to submit Health Services Requests once housed. The policy shall, in consultation with Plaintiffs' counsel, establish clear protocols that include appropriate intervals of care based on clinical guidelines, and that intake nurses shall schedule follow-up appointments at the time of intake based on those protocols.

7. All nurses who perform intake screenings will be trained annually on how to perform that function.

## C. Access to Care

1. The County shall ensure that Health Services Requests (HSRs) are readily available to all prisoners, including those in segregation housing, from nurses and custody officers.

2. The County shall provide patients with a mechanism for submitting HSRs that does not require them to share confidential health information with custody staff. The County shall install lockboxes or other secure physical or electronic mechanism for the submission of HSRs (as well as health care grievances) in every housing unit. Designated health care staff shall collect (if submitted physically) or review (if submitted electronically) HSRs at least two times per day in order to ensure that CHS receives critical health information in a timely manner. Designated health care staff shall also collect HSRs during pill call and shall go door to door in all restricted housing units at least once a day to collect HSRs. HSRs and health care grievances will be promptly date- and time-stamped. The County may implement an accessible electronic solution for secure and confidential submission of HSRs and health care grievances.

3. The County shall establish clear timeframes to respond to HSRs:

a) All patients whose HSRs raise emergent concerns shall be seen by the RN immediately on receipt of the HSR.  For all other HSRs, a triage RN shall, within 24 hours of receipt of the form (for urgent concerns) or within 72 hours of receipt of the form (for routine concerns):

   i. conduct a brief face-to-face visit with the patient in a confidential, clinical setting;

   ii. take a full set of vital signs, if appropriate;

   iii. conduct a physical exam, if appropriate;

   iv. assign a triage level for a provider appointment of emergent, urgent, routine, or written response only;

   v. inform the patient of his or her triage level and response time frames;

   vi. provide over-the-counter medications pursuant to protocols; and

   vii. consult with providers regarding patient care pursuant to protocols, as appropriate.

b) If the triage nurse determines that the patient should be seen by a provider:

   i. patients with emergent conditions shall be treated or sent out for emergency treatment immediately;

   ii. patients with urgent conditions shall be seen within 24 hours of the RN face-to-face; and

   iii. patients with only routine concerns shall be seen within two weeks of the RN face-to-face.

c) Patients whose requests do not require formal clinical assessment or intervention shall be issued a written response, with steps taken to ensure effective communication, within two weeks of receipt of the form.

d) The County shall permit patients, including those who are illiterate, non-English speaking, or otherwise unable to submit written or electronic HSRs, to verbally request care. Such verbal requests shall immediately be documented by the staff member who receives the request on an appropriate form and transmitted to a qualified medical professional for response in the same priority as those HSRs received in writing.

4. The County shall designate and make available custody escorts for medical staff in order to facilitate timely and confidential clinical contacts or treatment-related events.

5. The County shall track and regularly review response times to ensure that the above timelines are met.

6. The County shall discontinue its policy of prohibiting patients from reporting or inquiring about multiple medical needs in the same appointment.

7. When a patient refuses a medical evaluation or appointment, such refusal will not indicate a waiver of subsequent health care.

   a) When a patient refuses a service that was ordered by medical staff based on an identified clinical need, medical staff will follow up to ensure that the patient understands any adverse health consequences and to address individual issues that caused the patient to refuse the service.

   b) Any such refusal will be documented by medical staff and must include (1) a description of the nature of the service being refused, (2) confirmation that the patient was made aware of and understands any adverse health consequences by medical staff, (3) the signature of the patient, and (4) the signature of medical staff witness. In the event that obtaining the signature of a patient is not possible, medical staff shall document the circumstances.

## D. Chronic care

1. Within three months of the date the Consent Decree is issued by the Court, the County shall, in consultation with Plaintiffs' counsel, develop and implement a chronic disease management program that is consistent with national clinical practice guidelines.  The chronic disease program will include procedures for the identification and monitoring of such patients and the establishment and implementation of individualized treatment plans consistent with national clinical practice guidelines.

   a) The chronic disease management program shall ensure that patients with chronic illness shall be identified and seen after intake based on acuity (on the day of arrival for patients with high acuity and not to exceed 30 days for all others). The County will timely provide clinically indicated diagnostic testing and treatment, including prior to this post-intake appointment. Follow-up appointments will be provided in intervals that do not exceed 90 days unless such patients are clinically stable on at least two consecutive encounters, in which case follow-up appointment intervals will not exceed 365 days (and sooner if clinically indicated), subject to a chart review by a clinician at least every six (6) months.

   b) The chronic disease management program shall ensure that patients are screened for Hepatitis C at intake. If medical staff recommend Hepatitis testing based on screening results, such testing shall be offered on an "opt-out" basis for those individuals who remain in custody long enough to receive a housing unit assignment. If the individual declines

the testing, the refusal shall be documented in the health record. Patients found to have Hepatitis C shall be offered immunizations against Hepatitis A and Hepatitis B.

c) The chronic disease management program shall include a comprehensive diabetic management protocol that conforms to the guidance of the ADA's Diabetes Management in Correctional Institutions.  The protocol shall be developed in coordination with custody administration to address normal circadian rhythms, food consumption times, and insulin dosing times.

d) The chronic disease management program shall ensure that patients who take medications for their chronic conditions shall have the medications automatically renewed unless the provider determines that it is necessary to see the patient before renewing the medication.  In that case, the patient shall be scheduled to be seen in a reasonable time period to ensure medication continuity.

2. The County shall track compliance with the chronic disease management program requirements for timely provision of appointments, procedures, and medications.  The County shall ensure that its electronic medical record system is adequate to support these critical functions.

3. The County shall review its infection control policies and procedures for dialysis treatment to ensure that appropriate precautions are taken to minimize the risk of transmission of blood-borne pathogens, given the proximity of HCV+ and HCV- patients receiving dialysis in the same room.

E. **Specialty care**

1. The County shall develop and implement policies regarding specialty referrals using an algorithm with evidence-based referral criteria and guidelines.

2. Within three months of the date the Consent Decree is issued by the Court, the County shall develop and implement policies and procedures to ensure that emergency consultations and diagnostic and treatment procedures, as determined by the medical provider, are provided immediately; high priority consultations and procedures, as determined by the medical provider, are seen within 21 calendar days of the date of the referral; and routine consultations and procedures, as determined by the medical provider, are seen within 90 calendar days of the date of the referral.

3. Patients whose routine specialty consultation or procedure do not take place within 90 calendar days from the date of the referral shall be examined by a clinician monthly and evaluated to determine if urgent specialty care is indicated.

4. Within 5 calendar days of the completion of a high priority specialty consultation or procedure or within 14 calendar days of a routine specialty

consultation or procedure, patients returning to the Sacramento jails shall have their specialty reports and follow up recommendations reviewed by a jail nurse practitioner, physician's assistant or physician.  A nurse practitioner, physician's assistant or physician will review this information with the patient within 14 calendar days of the receipt of the specialist's report.

5. Specialty care consultations and outside diagnostic and treatment procedures shall be tracked in a log that identifies the referral request date, the date the referral was sent to the specialty care provider, the appointment date for the consultation or procedure is scheduled, the date the appointment takes place, and, if the appointment is rescheduled or cancelled, the reason it was rescheduled or canceled.

6. Requests for specialty consultations and outside diagnostic and treatment procedures shall also be tracked to determine the length of time it takes to grant or deny the requests and the circumstances and reasons for denials.

7. At least twice a year, the County shall conduct an audit of specialty care referral logs described in subsections (5) and (6), above, and complete a report as to whether each category of specialty care is provided in a reasonable timeframe, consistent with established timeframes. If any specialty care area has a record of untimely appointments as determined by the Correctional Health Service Continuous Quality Improvement Committee, the County shall report to Plaintiffs and the parties shall meet and confer to take prompt steps to address the issue. The County will provide Plaintiffs access to the specialty care referral logs and audit reports periodically and upon written request. The parties will work to resolve issues with untimely specialty care in individual patient cases and with respect to systemic trends, including through the dispute resolution process.

8. The County shall consider implementing an e-referral system to reduce delays and facilitate communication between specialists and primary care providers, as well as reducing unnecessary transportation costs and unnecessary specialist appointments by ensuring that the specialist has all the information he or she needs before an appointment takes place.

9. The County shall ensure that utilization management and/or scheduling staff provides notification of whether a patient's specialty care appointment is scheduled to occur within the timeline pursuant to the referral and/or clinical recommendation, including as follows:

    a) Medical staff may request and obtain information as to whether any patient's specialty care appointment is scheduled, and as to the general timing of the appointment (e.g. within a one-week's date range).

    b) If a specialty care appointment is denied or is not scheduled to occur within the timeline pursuant to the referral and/or clinical

recommendation, such information will be affirmatively provided to the treatment team and to the patient.

c) If a previously scheduled specialty care appointment is postponed to a date that is outside the timeline pursuant to the referral and/or clinical recommendation, such information will be affirmatively provided to the treatment team and to the patient.

10. The County shall consider creating a physical therapy clinic at the jail to more efficiently meet the significant demand for this service.

F. **Medication administration and monitoring**

1. The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws and through the following:

    a) ensuring that initial doses of prescribed medications are delivered to patients within 48 hours of the prescription, unless it is clinically required to deliver the medication sooner;

    b) ensuring that medical staff who administer medications to patients document in the patient's Medical Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, (3) the date and time for any refusal of medication, and (4) in the event of patient refusal, documentation that the prisoner was made aware of and understands any adverse health consequences by medical staff.

2. The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

3. The County shall provide pill call twice a day in each housing unit, at regular times that are consistent from day to day, except as may be required by non-routine facility security concerns.  The County shall develop and implement policies and procedures to ensure that prescribed medications are provided at therapeutically appropriate times as determined by the ordering physician. Any patient who requires administration of medications at times outside the regular pill call shall be provided that medication at the times determined by the ordering physician.

4. The County shall develop and implement policies and procedures to ensure that patients are provided medications at therapeutically appropriate times when out to court, in transit to or from any outside appointment, or being transferred between facilities. If administration time occurs when a patient is in court, in transit or at an outside appointment, medication will be administered as close as possible to the regular administration time.

5. The County shall develop and implement policies and procedures to ensure that medication efficacy and side effects are monitored by staff and reviewed by appropriate clinicians at appropriate intervals.

6. The County shall explore the expansion of its Keep-on-Person medication program, (especially for inhalers and medications that are available over-the-counter in the community) and to facilitate provision of medications for people who are out to court, in transit, or at an outside appointment.

G. **Clinical space and medical placements**

1. The County shall provide adequate clinical space in every facility to support clinical operations while also securing appropriate privacy for patients. Adequate clinical space includes visual and auditory privacy from prisoners and auditory privacy from staff, the space needed reasonably to perform clinical functions as well as an examination table, sink, proper lighting, proper equipment, and access to health care records.

2. The County shall ensure that any negative pressure isolation rooms meet community standards, including an antechamber to ensure that the room remains airtight, appropriate pressure gauges, and regular documented checks of the pressure gauges.

3. The County shall ensure that absent individualized, documented safety and security concerns, patients in acute medical or quarantine placements shall be allowed property and privileges equivalent to what they would receive in general population based on their classification levels.

4. The County shall ensure that patients in medical placements are not forced to sleep on the floor, including by providing beds with rails or other features appropriate for patients' clinical needs and any risk of falling.

5. The County shall not discriminate against patients in medical placements solely because of their need for C-Pap machines, but instead shall provide access to programs and services in accordance with their classification level, as set forth in the ADA Remedial Plan.

H. **Patient privacy**

1. The County shall develop and implement policies and procedures to ensure that appropriate confidentiality is maintained for health care services. The policies shall ensure confidentiality for clinical encounters, including health care intake screening, pill call, nursing and provider sick call, specialty appointments, and mental health treatment. The policies shall also ensure confidentiality for written health care documents, such as health care needs requests and grievances raising medical care or mental health care concerns, which shall not be collected by custody staff.

2. The County shall provide adequate clinical space in each jail to support clinical operations while also securing appropriate privacy for patients, including visual and auditory privacy from prisoners and auditory privacy from staff.

3. All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff. In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification. The issuance of pills does not constitute a clinical interaction.

   a) For any determination that a clinical interaction with a patient requires the presence of custody staff, staff shall document the specific reasons for the determination.  Such decisions shall be reviewed through the Quality Assurance process.

   b) If the presence of a correctional officer is determined to be necessary to ensure the safety of staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

   c) The County's patient privacy policies, as described in this section, shall apply to contacts between patients and all staff who provide health-related services on site at the Jail.

4. Jail policies that mandate custody staff to be present for any medical treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above.  Custody and medical staff shall be trained accordingly.

**I.  Health care records**

1. The County shall develop and implement a fully integrated electronic health record system that includes medical, psychiatric, and dental records and allows mental health and medical staff to view the medical and mental health information about each patient in a single record. This shall be accomplished within 12 months of the date the Consent Decree is issued by the Court.

2. Until such a system is implemented, the County shall develop and implement policies and procedures to ensure that medical staff have access to mental health information and mental health staff have access to medical information, as needed to perform their clinical duties.  This information shall include all intake records.  Medical and mental health staff shall be trained in these policies and procedures within one month of the date the Consent Decree is issued by the Court.

3. The County shall develop and implement policies and procedures to monitor the deployment of the CHS Electronic Health Records to ensure the records system is modified, maintained, and improved as needed on an ongoing basis,

including ongoing information technology support for the network infrastructure and end users.

## J. Utilization management

1. The County shall revise its utilization management (UM) system to ensure that critical health decisions about patients' access to care are made with sufficient input from providers and a thorough review of the health care records.

2. The County shall ensure that decisions about a patient's access to, timing of or need for health care are made by a physician, with documented reference to the patient's medical record. Nurses may gather information and coordinate the UM process, so long as it does not interfere with that requirement. All decisions by the UM committee shall be documented, including the clinical justification for the decision.

3. The UM system shall ensure that providers and patients are promptly informed about decisions made by the UM committee, including denial of a specialist referral request.

4. The UM system shall include an appeal process to enable patients and providers to appeal a decision denying a referral request.

## K. Sanitation

1. The County shall consult with an Environment of Care expert to evaluate facilities where patients are housed and/or receive clinical treatment, and to make written recommendations to address issues of cleanliness and sanitation that may adversely impact health.

## L. Reproductive and Pregnancy-Related Care

1. The County shall ensure that pregnant patients receive timely and appropriate prenatal care, specialized obstetrical services when indicated, and postpartum care (including mental health services).

2. The County will provide pregnant patients comprehensive counseling and timely assistance in accordance with their expressed desires regarding their pregnancies, whether they elect to keep the child, use adoptive services, or have an abortion.

3. The County shall provide non-directive counseling about contraception to female prisoners, shall allow female prisoners to continue an appropriate method of birth control while incarcerated (with consideration given to the patient's preference and/or current method of birth control), and shall provide access to emergency or other contraception when appropriate.

## M. Transgender and gender nonconforming health care

1. The County shall implement policies and procedures to provide transgender and intersex prisoners with care based upon an individualized assessment of

the patient's medical needs in accordance with accepted standards of care and prevailing legal and constitutional requirements, including, as appropriate:

   a) Hormone therapy

   b) Surgical care

   c) Access to gender-affirming clothing

   d) Access to gender-affirming commissary items, make-up, and other property items

2. The County shall ensure that medical and mental health staff have specific knowledge of and training on the WPATH Standards of Care.

## N. Detoxification protocols

1. Within three months of the date the Consent Decree is issued by the Court, the County shall develop and implement protocols for assessment, treatment, and medication interventions for alcohol, opiate, and benzodiazepine withdrawal that are consistent with community standards.

2. The protocols shall include the requirements that (i) nursing assessments of people experiencing detoxification shall be done at least twice times a day for five days and reviewed by a physician; (ii) nursing assessments shall include both physical findings, including a full set of vital signs, as well as psychiatric findings; (iii) medication interventions to treat withdrawal syndromes shall be updated to provide evidence-based medication in sufficient doses to be efficacious; (iv) the County shall provide specific guidelines to the nurses for intervention and escalation of care when patients do not respond to initial therapy; and (v) patients experiencing severe, life-threatening intoxication (an overdose) or withdrawal shall be immediately transferred under appropriate security conditions to a facility where specialized care is available.

## O. Nursing protocols

1. Nurses shall not act outside their scope of practice.

2. To that end, the County shall revise its nursing standardized protocols to include assessment protocols that are sorted, based on symptoms, into low, medium, and high risk categories.

   a) Low-risk protocols would allow RNs to manage straightforward symptoms with over-the-counter medications;

   b) Medium-risk protocols would require a consultation with a provider prior to treatment; and

   c) High-risk protocols would facilitate emergency stabilization while awaiting transfer to higher level of care.

P. **Reviews of in-custody deaths**

1. Preliminary reviews of in-custody deaths shall take place within 30 days of the death and shall include a written report of the circumstances and events leading to the death, with the goal to identify and remedy preventable causes of death and any other potentially systematic problems.

2. Mortality reviews shall include an investigation of the events occurring prior to the death, an analysis of any acts or omissions by any staff or prisoners which might have contributed to the death, and the identification of problems for which corrective action should be undertaken.

Q. **Reentry Services**

1. The County shall provide a 30-day supply of current medications to patients who have been sentenced and have a scheduled released date, immediately upon release.

2. Within 24 hours of release of any patient who receives prescription medications while in custody and is classified as pre-sentence, the County shall transmit to a designated County facility a prescription for a 30-day supply of the patient's current prescription medications.

3. The County, in consultation with Plaintiffs, shall develop and implement a reentry services policy governing the provision of assistance to chronic care patients, including outpatient referrals and appointments, public benefits, inpatient treatment, and other appropriate reentry services.

R. **Training**

1. The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

   a) All jail custody staff shall receive formal training in medical needs, which shall encompass medical treatment, critical incident response, crisis intervention techniques, recognizing different types of medical emergencies, and acute medical needs, appropriate referral practices, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

VII. **SUICIDE PREVENTION**

A. **Substantive Provisions**

1. The County recognizes that comprehensive review and restructuring of its suicide assessment, monitoring, and prevention practices are necessary to address the risk of suicide and self-harm attendant to detention in a jail setting.

2. The County shall establish, in consultation with Plaintiffs' counsel, a new Suicide Prevention Policy that shall be in accordance with the following:

B. **Training**

1. The County shall develop, in consultation with Plaintiffs' counsel, a four- to eight-hour pre-service suicide prevention curriculum for new Jail employees (including custody, medical, and mental health staff), to be conducted in person in a classroom or virtual classroom setting, that includes the following topics:

   a) avoiding obstacles (negative attitudes) to suicide prevention;

   b) prisoner suicide research;

   c) why facility environments are conducive to suicidal behavior;

   d) identifying suicide risk despite the denial of risk;

   e) potential predisposing factors to suicide;

   f) high-risk suicide periods;

   g) warning signs and symptoms;

   h) components of the jail suicide prevention program

   i) liability issues associated with prisoner suicide;

   j) crisis intervention.

2. The County shall develop, in consultation with Plaintiffs' counsel, a two-hour annual suicide prevention curriculum for all custody, medical, and mental health staff, to be conducted in person in a classroom or virtual classroom setting, that includes:

   a) review of topics (a)-(j) above

   b) review of any changes to the jail suicide prevention program

   c) discussion of recent jail suicides or attempts

3. Custody officers assigned to Designated Mental Health Units shall receive additional specialized training on suicide prevention and working with prisoners with serious mental illness.

4. All mental health staff, including nurses, clinicians, and psychiatrists, shall receive additional training on how to complete a comprehensive suicide risk assessment and how to develop a reasonable treatment plan that contains specific strategies for reducing future suicidal ideation.

5. All mental health staff and custody officers shall be trained on the appropriate use of safety suits—*i.e.*, not to be utilized as a default, not to be used as a tool in behavior management, not to be utilized for patients being observed at 30-minute observations.

6. The County shall ensure that all staff are trained in the new Suicide Prevention Policy.

C. **Nursing Intake Screening**

1. Intake screening for suicide risk will take place at the booking screening and prior to a housing assignment. If clinically indicated, JPS will then perform an additional clinical assessment after the inmate is placed in a housing assignment.

2. All nursing intake screening shall be conducted in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

3. The County shall revise its nursing intake assessment procedures and screening forms to ensure timely identification of acute and high-risk mental health conditions, consistent with the recommendations made by Lindsey Hayes. Intake screening, as documented on screening forms, shall include:

    a) Review of suicide risk notifications in relevant medical, mental health, and custody records, including as to prior suicide attempts, self-harm, and/or mental health needs;

    b) Any prior suicidal ideation or attempts, self-harm, mental health treatment, or hospitalization;

    c) Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;

    d) Other relevant suicide risk factors, such as:

        i. Recent significant loss (job, relationship, death of family member/close friend);

        ii. History of suicidal behavior by family member/close friend;

        iii. Upcoming court appearances;

    e) Transporting officer's impressions about risk.

4. Regardless of the prisoner's behavior or answers given during intake screening, a mental health referral shall always be initiated if there is a documented history related to suicide or self-harm, including during a prior incarceration.

5. The County shall develop and implement a written policy and procedure for referrals to mental health by intake staff.  The policy shall correspond with the triage system and timeframes set forth in the Mental Health Remedial Plan.

6. Any prisoner expressing current suicidal ideation and/or current suicidal/self-injurious behavior shall be designated as an emergent referral and immediately referred to mental health staff.

D. **Post-Intake Mental Health Assessment Procedures**

1. All mental health assessments shall be conducted in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

2. Mental health staff shall conduct assessments within the timeframes defined in the mental health referral triage system.

3. The County shall revise its mental health assessment procedures and related forms to ensure identification of historical and current patient mental health and suicide risk information, consistent with the recommendations of the subject matter expert.

E. **Response to Identification of Suicide Risk or Need for Higher Level of Care**

1. When a prisoner is identified as at risk for suicide and placed by custody staff in a safety cell, on suicide precautions, and/or in a safety suit, mental health staff shall be contacted immediately.  A qualified mental health professional, or other appropriately trained medical staff in consultation with mental health staff, shall complete a confidential in-person suicide risk assessment as soon as possible, consistent with the "must-see" referral timeline.

2. Consistent with current RCCC policy, if there is no mental health staff on site at RCCC at the time that an emergent mental health need is identified, the prisoner shall be transported to the Main Jail for emergency evaluation within two hours of the initial report.

3. The County shall revise its JPS suicide risk assessment procedures and forms in consultation with Plaintiffs.  The County shall ensure that its JPS suicide risk assessment process, policies, and procedures consider and document the following:

   a) Review of suicide risk notifications and records from any previous incarcerations at the Jail, including records pertaining to suicide attempts, self-harm, and/or mental health needs;

   b) Other prior suicide ideation or attempts, self-harm, mental health treatment or hospitalization;

   c) Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;

   d) Suicide risk factors and protective factors, such as:

      i. Recent significant loss (job, relationship, death of family member/close friend);

      ii. History of suicidal behavior by family member/close friend;

Page **44** of **62**

           iii. Upcoming court appearances;

    e)  Transporting officer's impressions about risk;

    f)  Suicide precautions, including level of observation.

4.  The County shall ensure that the meal service schedule or other custody-related activities cause no delay in the completion of suicide risk assessments for prisoners.

## F. Housing of Inmates on Suicide Precautions

1.  The County's policy and procedures shall direct that prisoners, including those identified as being at risk for suicide, be treated in the least restrictive setting appropriate to their individual clinical and safety needs.

## G. Inpatient Placements

1.  The County shall ensure that prisoners who require psychiatric inpatient care as clinically indicated are placed in the 2P unit within 24 hours of identification, absent exceptional circumstances.  In all cases, the provision of clinically indicated treatment to any prisoner requiring inpatient level of care shall be initiated within 24 hours.

## H. Temporary Suicide Precautions

1.  No prisoner shall be housed in a safety cell, segregation holding cell, or other Temporary Suicide Precautions Housing for more than six (6) hours. If mental health or medical staff determine it to be clinically appropriate based on detoxification-related needs, this time limit may be extended to no more than eight (8) hours. If exceptional circumstances prevent transfer within these timelines, those circumstances shall be documented, and transfer shall occur as soon as possible. This does not preclude the housing of a prisoner in the IOP unit if clinically indicated.

2.  The County shall ensure, including by revising written policies and procedures where necessary, the timely and adequate completion of medical assessments for prisoners in need of suicide precautions, as required under Operations Order 4/05 (*i.e.*, within 12 hours of placement of the next daily sick call, whichever is earliest, and then every 24 hours thereafter).

3.  The County shall ensure that any cell used for holding prisoners on suicide precautions is clean prior to the placement of a new prisoner, as well as cleaned on a normal cleaning schedule.

4.  The County shall create and implement a written policy ensuring adequate frequency for meals, fluids, hygiene, showers, prescribed medications, and toileting when a prisoner is in cell used for holding prisoners on suicide precautions.

5. Inmates on suicide precautions shall not automatically be on lockdown and should be allowed dayroom or out-of-cell access consistent with security and clinical judgments.

6. The classrooms or multipurpose rooms adjacent to the housing units in the Main Jail are designed for, and should be made available for, prisoner programs and treatment.  Absent an emergency, the County shall not use the classrooms and multipurpose rooms to hold prisoners pending a mental health evaluation or on suicide precautions.  Where such emergency occurs, the County shall document the reasons for retention and move the prisoner, within six (6) hours, to the inpatient unit or other appropriate housing location for continued observation, evaluation, and treatment.

I. **Suicide Hazards in High-Risk Housing Locations**

1. The County shall not place prisoners identified as being at risk for suicide or self-harm, or for prisoners requiring IOP level of care, in settings that are not suicide-resistant as consistent with Lindsay Hayes's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities."

2. Cells with structural blind spots shall not be used for suicide precaution.

J. **Supervision/Monitoring of Suicidal Inmates**

1. The County shall ensure adequate visibility and supervision of prisoners on suicide precautions.

2. The County shall not cover cell windows with magnetic flaps or any other visual barrier preventing visibility into any cell that is housing a prisoner on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need.

3. The County shall revise its policies regarding the monitoring of prisoners on suicide precautions to provide for at least the following two defined levels of observation:

   a) Close observation shall be used for prisoners who are not actively suicidal but express suicidal ideation (*e.g.*, expressing a wish to die without a specific threat or plan) or have a recent prior history of self-destructive behavior.  Close observation shall also be used for prisoners who deny suicidal ideation or do not threaten suicide but are engaging in other concerning behaviors indicating the potential for self-injury. Staff shall observe the prisoner at staggered intervals not to exceed every 15 minutes and shall document the observation as it occurs.

   b) Constant observation shall be used for prisoners who are actively suicidal, either threatening or engaging in self-injury, *and* considered a high risk for suicide.  An assigned staff member shall observe the

prisoner on a continuous, uninterrupted basis. The observation should be documented at 15-minute intervals. Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation.

4. For any prisoner requiring suicide precautions, a qualified mental health professional shall assess, determine, and document the clinically appropriate level of monitoring based on the prisoner's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically-determined level of monitoring.

5. Video monitoring of prisoners on suicide precaution shall not serve as a substitute for Close or Constant observation.

K. **Treatment of Inmates Identified as at Risk Of Suicide**

1. Qualified mental health professionals shall develop an individualized treatment plan and/or behavior management plan for every prisoner that mental health staff assesses as being a suicide risk.

2. Treatment plans shall be designed to reduce suicide risk and shall contain individualized goals and interventions. Treatment plans shall be reviewed following discharge from suicide precautions and updated as clinically indicated.

3. All assessments, treatment, and other clinical encounters shall occur in an area that provides reasonable sound privacy and confidentiality. If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

L. **Conditions for Individual Inmates on Suicide Precautions**

1. The County's Suicide Prevention Policy shall set forth clear and internally consistent procedures regarding decisional authority for determining the conditions for individual inmates on suicide precautions. Mental health staff shall have primary authority, consistent with individualized classification and security needs, with respect to the following:

M. **Property and Privileges**

1. Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of routine privileges (*e.g.*, visits, telephone calls, recreation) that are otherwise within the limitations of a prisoner's classification security level. Any removal of privileges shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

2. Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff depending on suicide risk, the removal and/or return of a prisoner's clothing and possessions (*e.g.*, books, slippers/sandals, eyeglasses) that are otherwise within the limitations of a prisoner's classification security level.  The removal of property shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

3. Cancellation of privileges should be avoided whenever possible and utilized only as a last resort.

## N. **Use of Safety Suits**

1. Decisions about the use of a safety suit (smock) or removal of normal clothing will be under mental health staff's authority, based on individualized clinical judgment along with input from custody staff.

2. Custody staff may only temporarily place an inmate in a safety suit based on an identified risk of suicide by hanging until the qualified mental health professional's evaluation, to be completed within the "must see" referral timeline. Upon completion of the mental health evaluation, the mental health professional will determine whether to continue or discontinue use of the safety suit.

3. If an inmate's clothing is removed, the inmate shall be issued a safety suit and safety blanket.

4. As soon as clinically appropriate, the provision of regular clothing shall be restored.  The goal shall be to return full clothing to the inmate prior to discharge from suicide precautions.

5. A qualified mental health professional shall conduct daily assessments of any prisoner in a safety suit and document reasons for continued use when clinically indicated.

6. If a qualified mental health professional determines that 30-minute (or less frequent) observations are warranted for a prisoner, safety suits shall not be used on that prisoner.

7. Safety suits shall not be used as a tool for behavior management or punishment.

## O. **Beds and Bedding**

1. All prisoners housed for more than four hours on suicide precautions and/or in an inpatient placement shall be provided with an appropriate bed, mattress, and bedding unless the prisoner uses these items in ways for which they were not intended (*e.g.*, tampering or obstructing visibility into the cell).  Such a determination shall be documented and shall be reviewed on a regular basis.

P. **Discharge from Suicide Precautions**

1. A qualified mental health professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions in order to ensure that the discharge is appropriate and that appropriate treatment and safety planning is completed.

2. Treatment plans shall be written for all prisoners discharged from suicide precautions.  The treatment plan shall describe signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur.

3. Qualified mental health professionals shall provide clinical input regarding clinically appropriate housing placement (*e.g.*, whether isolation is contraindicated for the prisoner) upon discharge.  Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement.  Once clinically discharged from suicide precautions, the prisoner shall be promptly transferred to appropriate housing.

4. Prisoners discharged from suicide precautions shall remain on the mental health caseload and receive regularly scheduled clinical assessments and contacts.  Unless a prisoner's individual circumstances direct otherwise, a qualified mental health professional shall provide follow-up assessment and clinical contacts within 24 hours of discharge, again within 72 hours of discharge, again within one week of discharge.

Q. **Emergency Response**

1. The County shall keep an emergency response bag that includes appropriate equipment, including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units.  All custodial and medical staff be trained on the location of this emergency response bag and shall receive regular training on emergency response procedures, including how to use appropriate equipment.

2. All custody and medical staff shall be trained in first aid and CPR.

3. It shall be the policy of the County that any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel.  Trained staff shall begin to administer standard first aid and/or CPR, as appropriate.

R. **Quality Assurance and Quality Improvement**

1. The County shall establish regularly scheduled multidisciplinary meetings related to treatment, and plan of care issues, on a monthly basis, between medical, and mental health personnel.

2. The County shall, in consultation with Plaintiffs' counsel, revise its in-custody death review policy and procedures. Reviews shall be conducted with the active participation of custody, medical, and mental health staff. Reviews shall include analysis of policy or systemic issues and the development of corrective action plans when warranted.

3. For each suicide and serious suicide attempt (*e.g.*, requiring hospitalization), the County's Suicide Prevention Task Force shall review: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt. Where applicable, the Review Team shall generate recommendations for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

4. The County will track all critical incidents which include prisoner suicides, attempted suicides, and incidents involving serious self-harm. The County shall review critical incidents and related data through its quality assurance and improvement processes.

5. The County shall implement a continuous quality assurance/quality improvement plan to periodically audit suicide prevention procedures that include, but are not limited to: intake screening (to include audits to ensure that staff ask and record all suicide screening questions), mental health assessments, suicide risk assessments, crisis response, and treatment plans/behavior management plans for prisoners identified as being at risk of suicide or self-harm.

## VIII.   SEGREGATION/RESTRICTIVE HOUSING

### A. General Principles

1. Prisoners will be housed in the least restrictive setting necessary to ensure their own safety, as well as the safety of staff, other prisoners, and the public.

   a) The County shall not place prisoners in more restrictive settings, including Segregation, based solely on a mental illness or any other disability. Prisoners will be housed in the most integrated setting appropriate to their individual needs.

   b) The County shall not place prisoners into Segregation units based solely on classification score.

   c) The County shall review the housing and restrictions of female prisoners classified as high security to ensure that this population is not subject to Segregation conditions of confinement.

       d) Specialized medical units (e.g., Main Jail 2 West Med/Psych, Main Jail 2 East) and mental health units (e.g., OPP, IOP, MHU, 2P) are not Segregation housing units. The County shall ensure that prisoners housed in these units receive daily access to out-of-cell time, telephones, showers, and other programs, services, and activities consistent with their classification and treatment plan.

2. The County shall not place a prisoner in Segregation units without first determining that such confinement is necessary for the safety of the staff, other prisoners, or the public. The County shall clearly document in writing the specific reason(s) for a prisoner's placement and retention in Segregation housing. The reason(s) shall be supported by clear, objective evidence. Prisoners will remain in Segregation housing for no longer than necessary to address the reason(s) for placement.

3. The County shall not place the following prisoners in a Segregation setting unless necessary to address a serious risk of physical harm, and in such cases only for the minimum time necessary to identify an alternative appropriate placement:

       a) Prisoners with acute medical needs that require an inpatient level of care and/or daily nursing care;

       b) Prisoners who are pregnant, post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy.

## B. Conditions of Confinement

1. The County will provide at least 17 hours of out-of-cell time per week for all prisoners, with the exception of prisoners subject to Administrative Segregation Phase I and Disciplinary Segregation in accordance with this remedial plan. The County will monitor out-of-cell time, and if minimum out-of-cell time requirements are routinely not being met at a particular facility or in a particular housing unit, the Sheriff's Department division commander or designee will review the situation and take appropriate steps to resolve the issue.

       a) The County shall implement a policy to document out-of-cell time provided to each prisoner. The County shall conduct monthly audits to ensure that prisoners have been provided the required treatment and recreation time out of cell. This data will be regularly reviewed as part of the County's Quality Assurance procedures.

2. Out-of-cell time with the opportunity to exercise shall be provided to each prisoner seven (7) days per week, including outdoors/recreation time when feasible. The County shall offer out-of-cell time at appropriate times of day.

3. The County shall modify its non-disciplinary Segregation policies and procedures to allow reasonable access to the following: (1) Personal phone

calls for all prisoners, including at least five hours or three weekdays per week of phone access during normal business hours; (2) Education, rehabilitation, and other materials (e.g. writing implements, art supplies, tablets), for in-cell activities; (3) Personal and legal visiting; (4) Religious services; and (5) Commissary.

    a) The conditions and privileges described above shall be provided unless there is a specific safety or security issue preventing provision of such materials or the prisoner is subjected to disciplinary action.

4. Cell windows shall not be covered with magnetic flaps, towels, sheets, or any other visual barrier preventing visibility into and out of the cell, unless there is a specific security or privacy need that is documented, and then for only a period of time necessary to address such security or privacy need. This provision shall apply to all cells housing prisoners.

5. The County shall establish procedures so that all housing unit cells are searched and cleaned prior to a prisoner's placement in the cell.

6. The County shall establish procedures to ensure that no prisoner is placed in a Segregation housing cell without a mattress and appropriate bedding.

## C. Mental Health Functions in Segregation Units

1. Segregation Placement Mental Health Review

    a) All prisoners placed in a non-disciplinary Segregation housing unit and all prisoners housed in a Disciplinary Detention unit shall be assessed by a qualified mental health professional within 24 hours of placement to determine whether such placement is contraindicated. All prisoners subjected to Disciplinary Segregation conditions for 72 hours in their general population housing unit (*i.e.*, confined to cell 23 hours per day) shall also be assessed by a qualified mental health professional no later than the fourth day of such placement.

    b) Any decision to place prisoners with Serious Mental Illness in Segregation shall include the input of a qualified mental health professional who has conducted a clinical evaluation of the prisoner in a private and confidential setting (absent a specific current risk that necessitates the presence of custody staff), is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

    c) Mental Health Staff shall consider each prisoner's age and cognitive functioning as part of the Segregation Placement review. Staff shall receive training regarding the features of youth and brain development of young adults (*i.e.*, 24 years old and younger) and the needs of individuals with intellectual disabilities.

d) If mental health or medical staff find that a prisoner has a Serious Mental Illness or has other contraindications to Segregation, that prisoner shall be removed from Segregation absent exceptional and exigent circumstances.

e) The County shall document and retain records of all Segregation Placement mental health evaluations, as described above. The County shall consult with Plaintiffs regarding such documentation, including the development of new forms where necessary.

2. Segregation Rounds and Clinical Contacts

a) Cell checks (to ensure that prisoners are safe and breathing) shall be conducted for all prisoners in Segregation at least every 30 minutes, at staggered intervals. Completion of cell checks will be timely documented.

b) A qualified mental health or medical professional shall conduct check-ins at least once a week, to assess and document the health status of all prisoners in Segregation, and shall make referrals as necessary. The check-in shall include a brief conversation with each prisoner, a visual observation of the cell, and an inquiry into whether the prisoner would like to request a confidential meeting with a mental health or medical provider. Steps shall be taken to ensure effective communication, as well as auditory privacy consistent with security needs. When a prisoner in Segregation requests a confidential meeting with a mental health or medical provider, or the medical or mental health professional identifies a mental health or medical need, staff shall make appropriate arrangements to include triage, examination and treatment in an appropriate clinical setting. In such cases, staff shall give the prisoner the opportunity to complete a health care request but will otherwise initiate a referral without requiring the prisoner to complete a request form.

3. Response to Decompensation in Segregation

a) If a prisoner in Segregation develops signs or symptoms of mental illness where such signs or symptoms had not previously been identified, suffers deterioration in his or her mental health, engages in self-harm, or develops a heightened risk of suicide, the prisoner shall immediately be referred for appropriate assessment and treatment from a qualified mental health professional who will recommend appropriate housing and/or programming.

b) Jail staff shall follow a mental health recommendation to remove a prisoner from Segregation unless such removal poses a current safety risk that is documented. In such a case, the Commander or management-

level designee shall be notified and staff shall work to remove the prisoner from Segregation and secure a placement in an appropriate treatment setting at the earliest possible time.

D. **Placement of Prisoners with Serious Mental Illness in Segregation**

1. Prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit (2P, IOP, OPP) will not be placed in Segregation, but rather will be placed in an appropriate treatment setting – specifically, the inpatient unit or other Designated Mental Health Unit providing programming as described in **Exhibit A-2**.

2. In rare cases where a prisoner with a mental health condition meeting criteria for placement in a Designated Mental Health Unit presents an immediate danger or significant disruption to the therapeutic milieu, and there is no reasonable alternative, such a prisoner may be housed separately for the briefest period of time necessary to address the issue, subject to the following:

   a) The prisoner shall receive commensurate out-of-cell time and programming as described in **Exhibit A-2** (including for IOP and OPP, 10 hours/week of group treatment/structured activities, 7 hours/week unstructured out-of-cell time, weekly individual clinical contact) with graduated programming subject to an individualized Alternative Treatment Program.

   b) The prisoner shall receive the following:

      i. As part of the weekly confidential clinical contact, the clinician shall assess and document the prisoner's mental health status and the effect of the current placement on his or her mental health, and determine whether the prisoner has decompensated or is at risk of decompensation.

      ii. The weekly check-ins described in **Section VIII.C.2.b** shall supplement, and not be a substitute for, the weekly treatment session described herein.

      iii. Treatment provided in the least restrictive setting that is appropriate based on the prisoner's circumstances.

      iv. Privileges commensurate with the Designated Mental Health Unit program, unless modified in an Alternative Treatment Program based on individual case factors that are regularly reviewed.

      v. Daily opportunity to shower.

3. A prisoner with Serious Mental Illness requiring restraints (*e.g.*, handcuffs, belly chains, etc.) shall not be denied clinically indicated group or individual treatment due to security factors, absent exceptional circumstances that are

documented. Prisoners with Serious Mental Illness housed in Segregation who require restraints when out of cell shall have the opportunity to work their way out of restraints through graduated programming subject to an individualized Alternative Treatment Program.

E. **Administrative Segregation**

1. Use of Administrative Segregation

   a) Only the Classification Unit can assign a prisoner to Administrative Segregation.

   b) The County may use Administrative Segregation in the following circumstances:

      i. Objective evidence indicates that a prisoner participated in a recent assault and the assaultive behavior involved an assault on staff or visitors, serious injury, use of a weapon, gang removals, or multiple prisoner assaults. Mutual combat situations that do not otherwise qualify for Administrative Segregation are excluded.

      ii. During a brief investigative period not to exceed ten days while Classification staff attempts to verify the need for Protective Custody or while the prisoner is awaiting transfer to another facility.

   c) The Compliance Commander shall have the authority to place prisoners in Administrative Segregation under the following circumstances:

      i. The prisoner poses an extraordinary safety risk and no other housing unit is sufficient to protect the prisoner from harm;

      ii. The prisoner has failed to integrate into a lesser restrictive housing setting because of repeated and recent history of assaultive behavior or current threats of violence associated with being in a lesser restrictive setting; or

      iii. Objective evidence indicates that the prisoner attempted to escape or presents an escape risk.

2. Notice, Documentation, and Review of Administrative Segregation Designations

   a) The Classification Unit shall document the rationale for designating a prisoner for Administrative Segregation in the classification file using objective evidence. For prisoners younger than 24, the Classification Unit shall consider the prisoner's age as a mitigating factor when assigning the prisoner to Administrative Segregation.

b) Classification shall attempt to down-class prisoners to a lesser restrictive housing setting at the earliest possible opportunity, consistent with safety and security.

c) County shall provide prisoners in Administrative Segregation with a written notice within 72 hours of the prisoner's initial placement in Administrative Segregation, explaining the reasons for the prisoner's Administrative Segregation designation and how the prisoner may progress to a lesser restrictive housing setting.

d) Prisoners housed in Segregation units will, at least every thirty (30) days, receive face-to-face interviews in a private out-of-cell setting, consistent with individual security needs, to discuss progress and compliance with their individual case plan as part of a classification review. Consideration will be given to their mental health and to their appropriateness for transfer to a less restrictive setting.

e) The Compliance Commander or higher-ranked officer will review and approve the decision to designate a prisoner for Administrative Segregation for longer than 15 days.

f) The County shall document the reason the prisoner is retained in the same Administrative Segregation Phase. The prisoner will be given written notice of the reasons the prisoner is being retained in the same Phase of Administrative Segregation and what conduct the prisoner is required to exhibit to progress to a lesser restrictive housing setting.

g) The Compliance Commander or higher-ranked officer must approve the continued retention of a prisoner in Administrative Segregation for longer than 90 days, and the Compliance Commander or higher-ranked officers must reauthorize such placement at least every 90 days thereafter.

3. Administrative Segregation Phases

a) The County shall develop and implement a phased system for prisoners designated as Administrative Segregation to achieve a lesser restrictive housing setting.

b) Administrative Segregation Phase I:

   i. This is the most restrictive designation for prisoners in Administrative Segregation.

   ii. Prisoners shall be offered a minimum of one hour per day out of cell time for a total of seven hours per week.

   iii. Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least five of the seven hours per week.

iv. Prisoners shall not remain in Phase I for longer than 15 days unless the prisoner engages in new conduct warranting retention in Administrative Segregation as specified in **Section VIII.E.1.b.**

c) Administrative Segregation Phase II:

a) Prisoners shall be offered a minimum of 17 hours of out of cell time per week.

b) Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least 10 of the 17 hours per week.

c) Prisoners shall be offered the opportunity to program in groups of two to four prisoners, unless pairing with another prisoner is not possible for safety or security reasons, and those reasons are documented by the County.

d) The County shall develop a program of incentives for good behavior.

e) Prisoners shall not remain in Phase II for longer than 30 days unless the prisoner commits a serious behavioral violation while in Administrative Segregation: fighting; threatening staff or other prisoners; resisting or delaying an order from staff that impedes Jail operations (e.g., failure to lock down); refusing to submit to a search of person or property; destroying or damaging Jail property (excluding property issued to a prisoner and/or minor defacing of property or destruction of low-value property) or facilities; possessing contraband that implicates safety or security (e.g., weapons, razors, unauthorized medication, but not extra clothing, commissary items, or food); cell flooding; tampering with cell locking mechanisms or other security features (e.g., cameras); and/or sexual activity/harassment. In the event a prisoner engages in a serious behavioral violation, the conduct will be referred to the Classification Sergeant or higher-ranking officer, who shall have the discretion to extend the prisoner's Phase II time by 15 days, and shall develop an individual behavioral management plan, if one does not yet exist, for the prisoner.

## F. Protective Custody

1. When a prisoner faces a legitimate threat from other prisoners, the County will seek alternative housing, by transferring the threatened prisoner to the general population of another facility or unit, or to a special-purpose housing (Protective Custody) unit for prisoners who face similar threats.

2. The County will not operate Protective Custody units with Segregation-type conditions of confinement. Prisoners placed in Protective Custody shall have

the same programs and privileges as general population prisoners, absent exceptional circumstances that are documented.

3. The County shall create a policy that describes the process and criteria for placement of prisoners into Protective Custody. The County shall consult with Plaintiffs to develop such a policy.

4. Prisoners who are lesbian, gay, bisexual, transgender, or intersex (LGBTI) or whose appearance or manner does not conform to traditional gender expectations should not be placed in Segregation or Protective Custody solely on the basis of such identification or status, or because they are receiving gender dysphoria treatment.

   a) When a prisoner who is LGBTI or gender nonconforming faces a legitimate threat, the County shall identify alternative housing, with conditions comparable to those of general population. Privileges and out-of-cell time for this population will be documented and regularly reviewed by supervisory level staff to ensure appropriate housing, out-of-cell-time, and related conditions for this group of prisoners.

   b) In deciding whether to assign a transgender or intersex prisoner to a facility or program for male or female prisoners, the County shall consider on a case-by-case basis whether a placement would ensure the prisoner's health and safety, and the health and safety of other prisoners, giving serious consideration to the prisoner's own views.

   c) Jail staff will receive training on the unique issues of managing transgender prisoners, with refresher training at least bi-annually.

5. For prisoners who are LGBTI or whose appearance or manner does not conform to traditional gender expectations, the County shall identify the prisoner's preferred gender of jail staff who will perform searches of the prisoner.  The County shall honor the request except in exigent circumstances when doing so is not possible.

## G. Disciplinary Segregation

1. The County will not place a prisoner in disciplinary housing pending investigation of, and due process procedures for, an alleged disciplinary offense unless the prisoner's presence in general population would pose a danger to the prisoner, staff, other prisoners or the public.

2. The County will adhere to a discipline matrix, developed in consultation with Plaintiffs, that clearly defines when disciplinary housing may be imposed.

3. Prisoners who are found to have violated disciplinary rules following due process procedures will be placed in Segregation only after the County has determined that other available disciplinary options are insufficient, with reasons documented in writing.

4. The denial of out-of-cell time for more than four (4) hours will not be imposed as a sanction absent a formal disciplinary write-up and due process hearing.

5. Prisoners serving a Disciplinary Segregation term shall receive at least seven (7) hours per week of out-of-cell time. Out-of-cell time with the opportunity to exercise shall be provided to each prisoner one (1) hour a day, seven (7) days per week.

6. Prisoners in Disciplinary Segregation shall, absent an individualized assessment of security risk that is documented be provided at least one book (which prisoners may regularly exchange), legal documents, hygiene materials, legal phone calls, and legal visits.

7. No Disciplinary Segregation term for non-violent rules violations will exceed 15 days.

8. The County will, in consultation with Plaintiffs' counsel, modify its inmate discipline policy and practice to limit placements in Disciplinary Segregation conditions to no more than 15 days, absent cases of serious violations stemming from distinct incidents and with Watch Commander-level approval.

9. No prisoner shall be placed in Disciplinary Segregation for more than 30 consecutive days.

10. If after a Disciplinary Segregation term, Jail staff, with the input of a mental health clinician, determine that the prisoner cannot safely be removed from Segregation, placement on Administrative Segregation status may occur only subject to the process set forth in **Section VIII.E**.

11. Once a prisoner has been moved out of Disciplinary Segregation, that prisoner shall not be placed back into Disciplinary Segregation absent (a) a new incident warranting discipline, and (b) completion of all mental health review procedures required for new Segregation placements.

H. **Avoiding Release from Jail Directly from Segregation**

1. The County will avoid the release of prisoners from custody directly from Segregation-type housing, to the maximum extent possible.

2. If a sentenced prisoner housed in Segregation has an upcoming expected release date (i.e. less than 120 days), the County will take and document steps to move the prisoner to a less restrictive setting, consistent with safety and security needs. If Segregation becomes necessary during this time, the County will provide individualized discharge planning to prepare the sentenced prisoner for release to the community.

I. **No Food-Related Punishment**

1. The County shall modify its policy and take steps to ensure that the denial or modification of food is never used as punishment. The County shall eliminate

use of "the loaf" as a disciplinary diet.  Nothing in this paragraph shall be read to preclude the County from denying a prisoner use of the commissary.

J. **Restraint Chairs**

1. Restraint chairs shall be utilized for no more than six hours.

2. The placement of a prisoner in a restraint chair shall trigger an "emergent" mental health referral, and a qualified mental health professional shall evaluate the prisoner to assess immediate and/or long-term mental health treatment needs.

3. The opinion of a qualified medical professional on placement and retention in a restraint chair will be obtained within one hour from the time of placement.

IX.  **QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT**

A. **Generally**

1. The County shall develop and implement, in collaboration with Plaintiffs' counsel, a quality assurance ("QA") plan to regularly assess and take all necessary measures to ensure compliance with the terms of this Remedial Plan.

2. The QA/QI Unit shall meet regularly and include representatives from all levels of the organization and from all facilities. The meeting shall include custody representatives for topics that are relevant to custody operations.

3. The County shall provide sufficient resources to the QA/QI program.

B. **Quality Assurance, Mental Health Care**

1. The JPS Medical Director, the JPS Program Manager, jail administrators, and the medical psychiatric, dental, and nursing directors, or appropriate designees, will attend and participate in this process at a minimum of every quarter. Formal minutes will be taken and maintained whenever the committee convenes.

2. The mental health care quality assurance plan shall include, but is not limited to, the following:

   a) Intake processing;

   b) Medication services;

   c) Screening and assessments;

   d) Use of psychotropic medications;

   e) Crisis response;

   f) Case management;

   g) Out-of-cell time;

   h) Timeliness of clinical contacts;

    i) Provision of mental health evaluation and treatment in confidential settings;

    j) Housing of inmates with SMI, including timeliness of placements in higher levels of care and length of stay in various units;

    k) Number of commitments pursuant to Welf. & Inst. Code § 5150, *et seq.*;

    l) Use of restraint and seclusion;

    m) Tracking and trending of agreed upon data on a quarterly basis;

    n) Clinical and custody staffing;

    o) Morbidity and mortality reviews with critical analyses of causes or contributing factors, recommendations, and corrective action plans with timelines for completion; and

    p) Corrective action plans with timelines for completion to address problems that arise during the implementation of this Remedial Plan and prevent those problems from reoccurring.

3. The County will conduct peer and supervisory reviews of all mental health staff and professionals at least annually to assess compliance with policies and procedures and professional standards of care.

## C. Quality Assurance, Medical Care

1. The County shall establish a Quality Assurance/Quality Improvement (QA/QI) Unit to develop accurate tracking mechanisms and monitor the timeliness and effectiveness of the following processes of health care, ensuring that all are reviewed at least annually, and shall recommend corrective action for all deficiencies:

    a) intake screenings;

    b) emergent, urgent, and routine requests from patients and staff referrals for health care, including Health Service Request availability;

    c) clinical monitoring of patients, including the delivery of chronic care services to those patients who qualify as chronic care patients;

    d) prescriptive practices by the prescribing staff;

    e) medication administration, including the initiation of verified medications, the first doses of medications, medication errors, patient refusals, and patterns of medication administration;

    f) grievances regarding healthcare;

    g) specialty care (including outside diagnostic tests and procedures);

    h) clinical caseloads;

    i)  coordination between custody staff and medical staff, including escorts to medical appointments and delivery of care.

2. The studies shall be done with sufficient sample numbers to arrive at statistically valid conclusions. The studies shall include (a) a clearly articulated goals, objective, and methodology to determine if standards have been met, including a sampling strategy; (b) data collection; (c) analysis of data to identify trends and patterns; (d) analysis to identify the underlying causes of problems; (e) development of remedies to solve problems; (f) a written plan that identifies responsible staff and establishes a specific timeline for implementing remedies; (g) follow-up data collection; and (h) analysis to determine if the remedies are effective.

3. The QA/QI Unit study recommendations shall be published to all staff.

4. The County will conduct peer and supervisory reviews of all medical staff and professionals at least annually to assess compliance with policies and procedures and professional standards of care.

# EXHIBIT A-1

## Consent Decree

### *Mays v. County of Sacramento*

**EXHIBIT A-1**
**ADA COMPLIANCE REMEDIAL PLAN**
**Sacramento County Jail – Policies Warranting ADA-Related Revisions**

## SHERIFF'S DEPARTMENT OPERATIONS ORDERS

### 02/01 Use of Force

Effective Communication

Procedures for Prisoners Manifesting Serious Mental Illness

### 02/02 Use of Restraint Devices

Effective Communication

Mobility-Related Disability Accommodations

### 02/03 Use of Pro-Straint Chair

Effective Communication

Mobility-Related Disability Accommodations

### 02/05 CERT and Cell Extraction Procedures

Effective Communication

Identification and Tracking of ADA Needs and Accommodations

Procedures for Prisoners Manifesting Serious Mental Illness

### 02/06 Prisoner Searches

Effective Communication

Identification and Tracking of ADA Needs and Accommodations

### 02/12 Transportation of Prisoners

Mobility-Related Disability Accommodations, HCA/AD/DME

### 03/12 Evacuation Plan - Main Jail

Provision of ADA Reasonable Accommodations

### 03/13 Evacuation Plan – RCCC

Provision of ADA Reasonable Accommodations

Sacramento County Jail – Policies to Revise re ADA

Page | 2

## 04/01 Intake, Search, Reception and Holding

Identification and Tracking of ADA Needs and Accommodations

Effective Communication

## 04/08 Prisoner Orientation

Effective Communication

ADA Coordinator and Disability-Related Grievance and
Accommodation Process

## 04/09 Release Procedures

HCA/AD/DME, Provision of ADA Reasonable Accommodations

Effective Communication

## 06/02 Housing Plan

Identification and Tracking of ADA Needs and Accommodations

Equal Access

## 06/10 Recreation, Exercise and Showering

Equal Access

Mobility-Related Disability Accommodations

Staff Assistance of Inmates with Disabilities

## 06/13 Telephone/TDD/TTY Equipment Access

Equal Access

Effective Communication

Video Relay Services/Videophones

## 06/14 Interpreter Services

Identification and Tracking of ADA Needs and Accommodations

Updates as to Provision of Sign Language Interpreter Procedures

## 07/01 Inmate Message Requests (KITE's)

Sacramento County Jail – Policies to Revise re ADA
Page | 3

ADA Coordinator and Disability-Related Grievance and Accommodation Process

Staff Assistance of Inmates with Disabilities

## 07/02 Grievances

ADA Disability-Related Grievance and Accommodation Process

Staff Assistance of Inmates with Disabilities

## 07/03 Discipline Plan

Effective Communication

Coordination with JPS, Consideration of Mental Health/Intellectual Disability Factors

Identification and Tracking of ADA Needs and Accommodations

## 08/04 Educational Services

Equal Access. Reasonable Accommodations

Effective Communication

## 08/06 Prisoner Services

Equal Access

## 10/01 Health Care Services

Identification and Tracking of ADA Needs and Accommodations

Effective Communication

## 10/04 Medical Intake Screening

Identification and Tracking of ADA Needs and Accommodations

Effective Communication

Sacramento County Jail – Policies to Revise re ADA

Page | 4

## CORRECTIONAL HEALTH SERVICES POLICIES AND PROCEDURES

### 1107 Decision Making-Special Needs

Identification and Tracking of ADA Needs and Accommodations

Prisoners with ID/DD

### 1302 Staff Development and Training

General ADA Requirements

Identification and Tracking of ADA Needs and Accommodations

Effective Communication

ADA Coordinator and Disability-Related Grievance and Accommodation Process

### 1400 Medical Transportation

Mobility-Related Disability Accommodations, HCA/AD/DME

### 1404 Receiving Screening

Identification and Tracking of ADA Needs and Accommodations

Effective Communication

Prisoners with ID/DD

### 1407 Access to Treatment

ADA Coordinator and Disability-Related Grievance and Accommodation Process

Effective Communication

### 1409 Clinic Care

Equal Access

Staff Assistance of Inmates with Disabilities

### 1413 Use of Restraints and the Pro-Straint Chair

Identification and Tracking of ADA Needs and Accommodations

Effective Communication

Sacramento County Jail – Policies to Revise re ADA
Page | 5

Mobility-Related Disability Accommodations

## 1417 Adult Developmental Disability

Updates to Policy Consistent with Remedial Plan

## 1423 Post Release Medical Care Planning

HCA/AD/DME

## 1435 Inmate Health Care Grievances

Disability-Related Grievance and Accommodation Process

Staff Assistance of Inmates with Disabilities

## 1436 Two East Inmate Transfers

Equal Access

Disability-Related Grievance and Accommodation Process

## 1439 Reports of Disabilities or Impairments

Identification and Tracking of ADA Needs and Accommodations

Sacramento County Jail – Policies to Revise re ADA
Page | 6

## JAIL PSYCHIATRIC SERVICES POLICIES

## 800 Discharge Planning

Effective Communication

## 1022 Overview of Staff Responsibilities

Updates Pursuant to Mental Health Remedial Plan, ADA Remedial Plan, Mental Health/Disciplinary Measures Remedial Plan

Effective Communication

## 1025 Interpreters for the Hearing Impaired

Identification and Tracking of ADA Needs and Accommodations

Updates as to Provision of Sign Language Interpreter Procedures

## 1037 Outpatient Intake

Identification and Tracking of ADA Needs and Accommodations

Effective Communication

## 1049 Suicide Prevention Program

Effective Communication

# EXHIBIT A-2

## Consent Decree

### *Mays v. County of Sacramento*

**MENTAL HEALTH TREATMENT**

## OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)

**INTENSIVE OUTPATIENT PROGRAM (Projected - 85 to 120 beds)**

**Caseload of 10 per LCSW/MSW**

I.  **Admission Criteria**
    - The presence of suicidal ideations without a plan or intent and requiring enhanced observation and safety measures;
    - 2P Pre-Admissions who require 1:1 observation for acute suicidal ideations and/or attempts (with placement in inpatient unit within 24 hours of identified inpatient need);
    - Discharge from the Acute Inpatient Unit upon recommendation of discharging Psychiatrist;
    - Acute onset or significant decompensation of a serious mental illness characterized by increased delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs with definitive impairment of reality testing and/or judgment; and/or
    - Inability to function in General Population (GP) or Outpatient Psychiatric Pod (OPP) and,
        i. The presence of dysfunctional or disruptive social interaction including withdrawal, bizarre or disruptive behavior, inability to respond to staff directions, provocative behavior toward others, inappropriate sexual behavior, etc., **as a consequence of serious mental illness**; and/or
        ii. A significant impairment in the activities of daily living including eating, grooming and personal hygiene, maintenance of housing area, and ambulation, **as a consequence of serious mental illness**.

II.  **Service Components**
    - Case Management provided by LCSW or MSW.
    - Two (2), one (1)-hour Group Therapy Sessions per day, 5 days a week, will be offered to each inmate-patient, unless clinical indicators or Alternative Treatment Plan (see below) precludes participation.
    - At least seven (7) hours of unstructured out-of-cell time per week
    - 1:1 confidential contact with a mental health professional every 7 days or more often if clinically indicated.
    - Psychological testing as clinically indicated.
    - Graduated Programming for inmate-patients requiring restrictive housing and/or restriction of privileges due to severity of symptoms and/or behaviors and/or classification. Alternative Treatment Program (ATP) will be initiated and documented in Treatment Plan.  ATP will address barriers to treatment, ATP goals and progress toward least restrictive housing and/or privileges. ATP will provide clear system of opportunities for inmate-patients to gain additional

MENTAL HEALTH TREATMENT

# OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)

privileges based on progress in program.

- Multi-Disciplinary Treatment Team (MDT) Meetings (Initial 14 day and then every 60 days or sooner if clinically indicated).
- Treatment Plan initiated within 14 days of IOP placement and then every 60 days or sooner if clinically indicated.
- Initial MD or NP assessment within 5 days of admit and then every 30 days thereafter (or more often if clinically indicated).
- Staggered 30-minute cell checks performed by Custody for all inmate-patients participating in the program.
- Designated Custody Staff who participate as part of the MDT.
- Treatment planning when moving to less intensive level of mental health care.
- Discharge planning and continuity of care with community providers

## III.  Treatment Goals

Treatment goals will address mental health conditions which are limiting an inmate's ability to adjust to incarceration and focus on symptom reduction and management, coping skills and stress reduction.  Treatment goals may include:

- Medication compliance (if applicable)
- Substance Abuse Recovery/Prevention
- Activities of Daily Living (ADL) Skill Development
- Crisis intervention/Adjusting to incarceration
- Symptom reduction
- Socialization and recreation
- Behavior management (if applicable)
- Coping skills
- Stress reduction
- Return to GP-MHC or OPP-MHC

## IV.  IOP Officers (24/7 Coverage)

Designated IOP Officers will be active members of the treatment team.  In order for the Officers to take active roles in treatment, dayshift Officers must participate in weekly (or more often if needed) treatment team meetings with JPS staff and contribute information on inmate-patient behavior (both directly observed, and communicated by night shift deputies).

Duties and Responsibilities of the IOP Officers include:

MENTAL HEALTH TREATMENT

# OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)

- Staggered 30-minute safety checks of all inmate-patients housed in the IOP.
- Daily security checks. Inmate movements to, from, and within the facility.
- Oversight of food delivery.
- Oversight of medical, dental, and psychiatric requests/services.
- Oversight of daily indoor and outdoor recreation.
- Housing moves and inmate conflict mediation.
- Incident investigation/documentation for both jail and criminal level offenses.

The IOP Officer also has additional program specific duties which include:

- Ensuring the safety and security of the JPS/IOP civilian staff.
- Inmate-patient movement to/from groups and individual contacts with JPS/IOP staff.  If needed, Officers will stand by while the civilian staff conducts daily group therapy (two to three hours each day) and separate one-to-one therapy/education sessions.
- Daily cell inspections.
- Provide IOP inmate-patients with the opportunity or assistance needed to meet their basic hygiene needs and the opportunity to maintain clean cells and activity/housing areas.

**V.    Discharge Criteria**
- Able to function in a GP-MHC or OPP-MHC setting.
- Stabilization of the crisis behavior and the ability to function in a less clinically structured environment.
- Has clinically decompensated to the extent that placement into the Acute Inpatient Unit is required.
- Has reached release date, and clinical services will be transferred to community service provider.

**MENTAL HEALTH TREATMENT**

## OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)

**OUTPATIENT PSYCHIATRIC POD (PROJECTED - 200 BEDS)**

**Caseload of 25 per LCSW/MSW**

I.    **Admission Criteria**

- Qualifying diagnosis (see below) **and** are unable to house in general population due to severity of symptoms, potential for victimization and/or significant difficulty maintaining ADLs.
- Diagnosed with a serious mental illness (SMI):
  1. Schizophrenia (all subtypes)
  2. Delusional Disorder
  3. Schizophreniform Disorder
  4. Schizoaffective Disorder
  5. Brief Psychotic Disorder
  6. Intellectual Disability with prior Regional Center Services and/or with a co-occurring serious mental illness
  7. Other Specified and Unspecified Schizophrenia Spectrum and other Psychotic Disorder
  8. Major Depressive Disorder
  9. Bipolar Disorders I and II
  10. Other Specified and Unspecified Bipolar and Related Disorders
  11. Borderline Personality Disorder

II.    **Service Components**

- Case Management provided by LCSW or MSW.
- One (1) 1-hour Group Therapy Sessions per day, 7 days a week, will be offered to each OPP-MHC inmate-patient.  Three (3) additional hours of structured out-of-cell time will be offered to each OPP-MHC inmate-patient by recreational technicians or other service providers.
- At least seven (7) hours of unstructured out-of-cell time per week
- Psychological testing as clinically indicated.
- 1:1 confidential contact with mental health professional at least every 14 days or more often if clinically indicated.
- Treatment Plan initiated within 30 days of placement in OPP-MHC and updated every 6 months or sooner if clinically indicated.
- Evaluation by psychiatrist or psychiatric nurse practitioner every 30-90 days (or more often if clinically indicated).
- Treatment planning when moving to less intensive level of mental health care.
- Discharge planning and continuity of care with community providers

III.    **Treatment Goals**

**MENTAL HEALTH TREATMENT**

## OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)

- Stabilization of mental health symptoms and overall improvement in functioning
- Medication compliance (if applicable)
- Substance Abuse Recovery/Prevention
- Activities of Daily Living (ADL) Skill Development
- Crisis intervention/Adjusting to incarceration
- Symptom reduction
- Socialization and recreation
- Behavior management (if applicable)
- Hygiene skills
- Coping skills
- Stress reduction
- Discharge planning and continuity of care with community providers

IV.     **Discharge Criteria**
- Able to function in a GP-MHC.
- Stabilization/resolution of mental health symptoms and ability to function in a less clinically structured environment.
- Clinically decompensates and requires higher level of care and placement in IOP.
- Clinically decompensates to the extent that placement into the Acute Inpatient Unit is required.
- Has reached release date, and clinical services will be transferred to community service provider.

**MENTAL HEALTH TREATMENT**

## OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)

**GENERAL POPULATION – MENTAL HEALTH CASELOAD**

**Caseload of 28-30 per LCSW/MSW**

**I.   Admission Criteria**
- Diagnosed mental health disorder
- Exhibits symptom control or partial remission as result of treatment

**II.   Service Components**
- Case Management provided by LCSW or MSW.
- Individual or group treatment provided as clinically indicated.
- Psychological testing as clinically indicated.
- 1:1 confidential contact by mental health professional at least every 90 days or more often if clinically indicated.
- Treatment Plan initiated within 30 days of placement in GP-MHC and updated every 12 months or sooner if clinically indicated.
- Evaluation by psychiatrist or psychiatric nurse practitioner every 90 days (if prescribed psychotropics), or more often if clinically indicated.
- Treatment planning when moving off mental health caseload.
- Discharge planning and continuity of care with community providers

**III.   Treatment Goals**
- Symptom management
- Medication monitoring
- Crisis intervention/Adjusting to incarceration
- Preventing decompensation

**IV.   Discharge Criteria**
- Remission of symptoms, no longer requires medication monitoring or mental health services.
- Clinically decompensates and requires higher level of care and placement in IOP or OPP.
- Clinically decompensates to the extent that placement into the Acute Inpatient Unit is required.
- Has reached release date, and clinical services will be transferred to community service provider.

MENTAL HEALTH TREATMENT

# OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)

**INTAKE & CRISIS RESPONSE TEAM**

Current JPS staff will continue to manage all new intakes, priority referrals and must-sees. These staff will not carry a caseload and will be available to respond to new intakes and crisis referrals on a 24/7 basis.

## DEFINITIONS

**Must-See Referrals**

Referrals for currently suicidal (i.e., attempt, ideation, or self-injurious behavior), homicidal or gravely disabled inmate-patients (5150 evaluations), acute crisis related to nature of charges or other arrest factors, alleged Prison Rape Elimination Act victim assessments, and/or custody or administration requests urgent evaluation.

**Priority Referrals**

Referrals for inmate-patients reporting recent psychiatric hospitalization, intellectual disability with observed poor adaptive functioning, suicidal ideation within past two weeks, demonstrating worsening of mental health symptoms, identified as a possible suspect per Prison Rape Elimination Act, or other significant mental health symptoms that staff may have reason to be concerned about inmate's mental stability.

**Routine Referrals**

Referrals for inmate-patients reporting current or prior mental health treatment, currently prescribed psychiatric medication or reporting to receive medication in community.  May have complaints of adjustment or other mental health issues, and/or significant AVATAR history, but are stable.

**Mental Health Caseload (MHC)**

Inmate-patients open to JPS and receiving mental health services in General Population-Mental Health Caseload (GP-MHC), Outpatient Psychiatric Pod (OPP-MHC), Intensive Outpatient Program (IOP-MHC), or on the Acute Inpatient Unit (2P).

**General Population (GP-MHC)**

Inmate-patients classified as GP-MHC meet the following criteria:

- Stable, on psychotropics, or
- Stable, not receiving psychotropics but may require time-limited services to address mental health symptoms.

**MENTAL HEALTH TREATMENT**

## OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)

## DEFINITIONS

**Intensive Outpatient Unit (IOP-MHC)**

Inmate-patients classified as IOP-MHC meet any of the following criteria:

- The presence of suicidal ideations without a plan or intent and requiring enhanced observation and safety measures;
- 2P Pre-Admissions who require 1:1 observation for acute suicidal ideations and/or attempts;
- Discharge from the Acute Inpatient Unit upon recommendation of discharging Psychiatrist;
- Acute onset or significant decompensation of a serious mental illness.

**Outpatient Psychiatric Pod (OPP)**

Inmate-patients classified as OPP-MHC meet the following criteria:

- Diagnosed with serious mental illness and are unable to be housed in general population due to severity of symptoms, potential for victimization and/or significant difficulty maintaining ADLs.

**Acute Inpatient Unit (2P)**

18-bed LPS designated facility.

- Inmate-patients meet criteria for either voluntary or involuntary acute inpatient psychiatric treatment

# EXHIBIT A-3

## Consent Decree

### *Mays v. County of Sacramento*



**Sacramento County Sheriff's Department**
Correctional Health Services
**JPS – Rules Violation Mental Health Review**

Name: _____                              DOB: _____

X-Ref: _____

Date of Incident: _____ Rules Violation Charge(s): _____

Type of Review:  ☐ Record Review and Clinical Evaluation   ☐ Record Review Only
(The clinician will complete an in-person interview with the inmate unless there are specific reasons why an interview is not necessary or appropriate.)
*For Clinical Evaluations: Inform the inmate of purpose of evaluation and that information is* __*not*__ *confidential and will be used for purposes discipline review/hearing.*

Is the inmate currently receiving mental health services?                     ☐ Yes     ☐ No

Level of MH services:   ☐ 2P Pre-Admit   ☐ 2P   ☐ IOP   ☐ OPP   ☐ GP   ☐ JBCT

1a) Is there a possibility of a nexus between the inmate's mental illness/symptoms and/or developmental disability/functioning deficits and the behavior(s)?                ☐ Yes     ☐ No

1b) Was the inmate's behavior connected to any of the following? *(If any are checked, Rule Violation should be cancelled.)*

☐ An act of self-harm or attempted suicide

☐ A cell extraction related to transfer to a medical/mental health unit or provision of involuntary treatment

☐ Placement in mental health restraints or seclusion

2) If the inmate is found guilty of the offense(s), what mental health factors and/or developmental disability/cognitive or adaptive functioning deficits should the hearing officer consider when assessing the penalty? **(Check all that apply):**

☐ N/A                                                        ☐ Dementia

☐ Difficulty maintaining/performing ADLs                    ☐ Poor social skills and/or peer interactions

☐ Psychotic symptoms                                        ☐ Difficulty processing information/verbal commands

☐ Intellectual disability                                   ☐ Traumatic Brain Injury

☐ Poor impulse control (must be related to mental health diagnosis)

☐ Other Mitigating Factors: _____

3) If the inmate is found guilty of the offense(s), what penalties may have an adverse impact on inmate's mental health condition or functioning **(Check all that apply):**

☐ N/A                                                        ☐ Loss of commissary privileges

☐ Loss of social visits                                     ☐ Loss of dayroom/outdoor recreation

☐ Loss of tablet privileges                                 ☐ Loss of telephones

☐ Housing Relocation                                        ☐ Loss of good time

☐ Loss of work time                                         ☐ Disciplinary housing unit

☐ Isolation Housing (Full restriction)                      ☐ Lockdown for less than 24 hours

☐ Assigned Extra Work Duty

6)  Provide narrative of findings that should be considered by the hearing officer, regarding: (1) whether there is a nexus between the inmate's behavior and mental illness and/or developmental disability, (2) any relevant mitigating circumstances, and (3) penalties that should be avoided.
(If no in-person interview/clinical evaluation was completed, please explain.)

_____         _____
Reviewer's Name                                          Signature


_____
Date of Review

# EXHIBIT B

**Consent Decree**

*Mays v. County of Sacramento*

**MAYS v. COUNTY OF SACRAMENTO**
**DUTIES OF RULE 706 EXPERTS**

Pursuant to Rule 706(b) of the Federal Rules of Evidence, the parties set forth the duties of the Court Experts.

1. The Court Experts shall advise the parties and the Court on Defendant's compliance or non-compliance with the medical care, mental health care, and suicide prevention provisions of the Remedial Plan, to assist with dispute resolution matters, and to provide testimony, if required, in any proceedings before the Court.

2. Within 180 days after entry of this Consent Decree, and then every 180 days thereafter during the term of this Consent Decree, the Court Experts shall each complete comprehensive reviews and reports ("180-Day Reports") to advise the parties and the Court on Defendant's compliance or non-compliance with the Remedial Plan.

3. In each 180-Day Report, the Court Experts shall state their opinion as to whether Defendant is or is not in substantial compliance with each material component of the Remedial Plan within the expert's area of expertise. These opinions are referred to in the Consent Decree as "Substantial Compliance Determinations." The 180-Day Reports shall be considered separate and apart from any evaluations and reports prepared as part of the dispute resolution process set forth in the Consent Decree and shall be admissible in evidence in any proceedings before the Court.

4. The Court Experts shall be entitled to reasonable expenses incurred plus reasonable hourly and/or daily rates, which shall be paid by Defendant.

5. With appropriate notice, the Court Experts shall have reasonable access to all parts of any Sacramento County jail facility. Access to the facilities will not be unreasonably restricted. The Court Experts shall have access to correctional and health care staff and people incarcerated in the jails, including confidential and voluntary interviews as they deem appropriate. The Court Experts shall also have access to documents, including budgetary, custody, and health care documents, and institutional meetings, proceedings, and programs to the extent the Court Experts determine such access is needed to fulfill their obligations. The Court Experts' tours shall be undertaken in a manner that does not unreasonably interfere with jail operations as reasonably determined by jail administrators.

6. The Court Experts may engage in ex parte communications with the parties, as requested. However, all of the Court Experts' findings and recommendations shall be set forth in writing in their reports.

7. Pursuant to the dispute resolution procedures set forth in the Consent Decree, either party may request that the relevant Court Expert evaluate the issue in dispute and prepare a

report. The expert must provide the report regarding the area of disagreement to the parties and the Mediator within 45 days of the request.  Defendant will pay the Court Experts' reasonable fees for any reports prepared by a Court expert at the request of a party about a disputed issue, as contemplated by this paragraph.

# EXHIBIT C

**Consent Decree**

*Mays v. County of Sacramento*

AARON J. FISCHER (SBN 247391)
(Aaron.Fischer@disabilityrightsca.org)
ANNE HADREAS (SBN 253377)
(Anne.Hadreas@disabilityrightsca.org)
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA 94612
Telephone: (510) 267-1200
Fax: (510) 267-1201

TIFANEI RESSL-MOYER (SBN 319721)
(Tifanei.Ressl-
Moyer@disabilityrightsca.org)
DISABILITY RIGHTS CALIFORNIA
1831 K Street
Sacramento, CA 95811
Telephone: (916) 504-5800
Fax: (916) 504-5801

DONALD SPECTER (SBN 83925)
(DSpecter@prisonlaw.com)
MARGOT MENDELSON (SBN 268583)
(MMendelson@prisonlaw.com)
SOPHIE HART (SBN 321663)
 SophieH@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704

Attorneys for Plaintiffs

JESSICA VALENZUELA
SANTAMARIA (220934)
(jvs@cooley.com)
MARK A. ZAMBARDA (314808)
(mzambarda@cooley.com)
ADDISON M. LITTON (305374)
(alitton@cooley.com)
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

KATHLYN A. QUERUBIN
(275085)
(kquerubin@cooley.com)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORENZO MAYS, RICKY RICHARDSON, JENNIFER BOTHUN, ARMANI LEE, LEERTESE BEIRGE, and CODY GARLAND, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>COUNTY OF SACRAMENTO,<br><br>    Defendant. | Case No. 2:18-cv-02081 TLN KJN (PC)<br><br>CLASS ACTION<br><br>STIPULATION AND ~~PROPOSED~~ PROTECTIVE ORDER |

1.    A.    <u>PURPOSES AND LIMITATIONS</u>

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted.    Accordingly, Plaintiffs Lorenzo Mays, Ricky Richardson, Jennifer Bothun, Armani Lee, Leertese Beirge, and Cody Garland and Defendant County of Sacramento (the "Parties") hereby stipulate to and petition the Court to enter the following Stipulated Protective Order.    The Parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.

Defendant asserts that it will only designate materials as "CONFIDENTIAL" under this Protective Order if they contain sensitive health or other personal information, or if they contain information that has been deemed confidential by the Sacramento County Sheriff's Department or other relevant agency for safety and security reasons and has been restricted from general distribution, including but not limited to inmates and the public.

Defendant agrees that Plaintiffs may request, and Defendant will provide, inmate custody and/or health records upon such request.

Documents and information provided to Disability Rights California ("DRC") pursuant to DRC's statutory access authority during the course of its investigation preceding this litigation may be submitted to the court. Such materials will be presumed to be "CONFIDENTIAL" pursuant to this Agreement and Protective Order, except to the extent that the Parties agree the materials do not warrant such designation or where a Party disputes the designation, in which case that Party must employ the dispute resolution procedure outlined in Section 6 below.

B.   GOOD CAUSE STATEMENT

This action is likely to involve sensitive information for which special protection from public disclosure and from use for any purpose other than prosecution of this action is warranted. Such confidential and proprietary materials and information consist of protected health information and otherwise sensitive personal information pertaining to Plaintiffs and members of the purported class and other information otherwise generally unavailable to the public, or which may be privileged or otherwise protected from disclosure under state or federal statutes, court rules, case decisions, or common law. Accordingly, to expedite the flow of information, to facilitate the prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the parties are entitled to keep confidential, to ensure that the parties are permitted reasonable necessary uses of such material in preparation for and in the conduct of trial, to address their handling at the end of the litigation, and serve the ends of justice, a protective order for such information is justified in this matter.

C.   ACKNOWLEDGEMENT OF PROCEDURE FOR FILING UNDER SEAL

The parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Local Civil Rule 141 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal. There is a strong presumption that the public has a right of access to judicial proceedings and records in civil cases. In connection with non-dispositive motions, good cause must be shown to support a filing under seal. *See Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1176 (9th Cir. 2006), *Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002), *Makar-Welbon v. Sony Electrics, Inc.*, 187 F.R.D. 576, 577 (E.D. Wis. 1999) (even stipulated protective orders require good cause showing), and a specific showing of good cause

2.                    Stipulated Protective Order
(Case No. 2:18-cv-02081 TLN KJN)

1   or compelling reasons with proper evidentiary support and legal justification, must

2   be made with respect to Protected Material that a party seeks to file under seal. The

3   parties' mere designation of Disclosure or Discovery Material as CONFIDENTIAL

4   does not—without the submission of competent evidence by declaration establishing

5   that the material sought to be filed under seal qualifies as confidential, privileged, or

6   otherwise protectable—constitute good cause.  Further, if a party requests sealing

7   related to a dispositive motion or trial, then compelling reasons, not only good cause,

8   for the sealing must be shown, and the relief sought shall be narrowly tailored to

9   serve the specific interest to be protected.  *See Pintos v. Pacific Creditors Ass'n*., 605

10  F.3d 665, 677-79 (9th Cir. 2010). For each item or type of information, document, or

11  thing sought to be filed or introduced under seal in connection with a dispositive

12  motion or trial, the party seeking protection must articulate compelling reasons,

13  supported by specific facts and legal justification, for the requested sealing order.

14  Again, competent evidence supporting the application to file documents under seal

15  must be provided by declaration.  Any document that is not confidential, privileged,

16  or otherwise protectable in its entirety will not be filed under seal if the confidential

17  portions can be redacted.  If documents can be redacted, then a redacted version for

18  public viewing, omitting only the confidential, privileged, or otherwise protectable

19  portions of the document, shall be filed. Any application that seeks to file documents

20  under seal in their entirety should include an explanation of why redaction is not

21  feasible.

22  2.      DEFINITIONS

23          2.1     Challenging Party:  a Party or Non-Party that challenges the

24  designation of information or items under this Order.

25          2.2     "CONFIDENTIAL" Information or Items:  information (regardless of

26  how it is generated, stored or maintained) or tangible things that qualify for

27  protection under Federal Rule of Civil Procedure 26(c).

28          2.3     Designating Party:  a Party or Non-Party that designates information

3.

or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL."

2.4     Disclosure or Discovery Material:  all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced, made available for inspection, or generated in disclosures or responses to discovery in this matter.

2.5     Expert:  a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action.

2.6     Non-Party:  any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.7     Outside Counsel of Record:  attorneys who are retained to represent or advise a party to this action and have appeared in this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that Party (as well as their support staff).

2.8     Party:  any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.9     Producing Party:  a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.10    Professional Vendors:  persons or entities that provide litigation support services to Counsel of Record or the Parties(e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.11    Protected Material:  any Disclosure or Discovery Material that is designated as "CONFIDENTIAL."

2.12 <u>Receiving Party</u>:  a Party that inspects or receives Disclosure or Discovery Material from a Producing Party.

3.   <u>SCOPE</u>

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party.  Any use of Protected Material at trial shall be governed by a separate agreement or order.

4.   <u>DURATION</u>

Once a case proceeds to trial, information that was designated as CONFIDENTIAL or maintained pursuant to this protective order used or introduced as an exhibit at trial becomes public and will be presumptively available to all members of the public, including the press, unless compelling reasons supported by specific factual findings to proceed otherwise are made to the trial judge in advance of the trial. *See Kamakana*, 447 F.3d at 1180-81 (distinguishing "good cause" showing for sealing documents produced in discovery from "compelling reasons" standard when merits-related documents are part of court record). Accordingly, the terms of this protective order do not extend beyond the commencement of the trial.

1    5.    DESIGNATING PROTECTED MATERIAL

2        5.1    Exercise of Restraint and Care in Designating Material for Protection.

3    Each Party or Non-Party that designates information or items for protection under

4    this Order must take care to limit any such designation to specific material that

5    qualifies under the appropriate standards described herein.  The Designating Party

6    must designate for protection only those parts of material, documents, items, or oral

7    or written communications that qualify – so that other portions of the material,

8    documents, items, or communications for which protection is not warranted are not

9    swept unjustifiably within the ambit of this Order.

10        Mass, indiscriminate, or routinized designations are prohibited.  Designations

11    that are shown to be clearly unjustified or that have been made for an improper

12    purpose (e.g., to unnecessarily encumber or retard the case development process or

13    to impose unnecessary expenses and burdens on other parties) expose the

14    Designating Party to sanctions.

15        If it comes to a Designating Party's attention that information or items that it

16    designated for protection do not qualify for protection, that Designating Party must

17    promptly notify all other Parties that it is withdrawing the mistaken designation.

18        5.2    Manner and Timing of Designations.  Except as otherwise provided in

19    this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise

20    stipulated or ordered, Disclosure or Discovery Material that qualifies for protection

21    under this Order must be clearly so designated before the material is disclosed or

22    produced.

23        Designation in conformity with this Order requires:

24        (a)    for information in documentary form (e.g., paper or electronic

25    documents, but excluding transcripts of depositions or other pretrial or trial

26    proceedings), that the Producing Party affix the legend "CONFIDENTIAL" to each

27    page that contains protected material.  If only a portion or portions of the material on

28    a page qualifies for protection, the Producing Party also must clearly identify the

1  protected portion(s) (e.g., by making appropriate markings in the margins).

2       A Party or Non-Party that makes original documents or materials available for

3  inspection need not designate them for protection until after the Receiving Party has

4  indicated which material it would like copied and produced.  During the inspection

5  and before the designation, all of the material made available for inspection shall be

6  deemed "CONFIDENTIAL."  After the Receiving Party has identified the documents

7  it wants copied and produced, the Producing Party must determine which documents,

8  or portions thereof, qualify for protection under this Order.  Then, before producing

9  the specified documents, the Producing Party must affix the "CONFIDENTIAL"

10  legend to each page that contains Protected Material.  If only a portion or portions of

11  the material on a page qualifies for protection, the Producing Party also must clearly

12  identify the protected portion(s) (e.g., by making appropriate markings in the

13  margins).

14       (b)    for testimony given in deposition or in other pretrial or trial proceedings,

15  that the Designating Party identify on the record, before the close of the deposition,

16  hearing, or other proceeding, all protected testimony.

17       (c)    for information produced in some form other than documentary and for

18  any other tangible items, that the Producing Party affix in a prominent place on the

19  exterior of the container or containers in which the information or item is stored the

20  legend "CONFIDENTIAL."  If only a portion or portions of the information or item

21  warrant protection, the Producing Party, to the extent practicable, shall identify the

22  protected portion(s).

23       5.3   <u>Inadvertent Failures to Designate</u>.  If timely corrected, an inadvertent

24  failure to designate qualified information or items does not, standing alone, waive

25  the Designating Party's right to secure protection under this Order for such material.

26  Upon timely correction of a designation, the Receiving Party must make reasonable

27  efforts to assure that the material is treated in accordance with the provisions of this

28  Order.

6.    CHALLENGING CONFIDENTIALITY DESIGNATIONS

     6.1    <u>Timing of Challenges</u>.    Any Party or Non-Party may challenge a designation of confidentiality at any time that is consistent with the Court's Scheduling Order.    Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

     6.2    <u>Meet and Confer</u>.    The Challenging Party shall initiate the dispute resolution process by providing written notice to the Designating Party of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order.    The Challenging Party and the Designating Party shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice.    In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation.    A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

     6.3    <u>Joint Stipulation.</u> If the Challenging Party and the Designating Party cannot resolve a challenge without court intervention, the Parties shall prepare a joint statement regarding the dispute pursuant to Civil Local Rule 251.    The Designating Party shall file and serve a motion to retain confidentiality, attaching the Parties' joint

statement regarding the dispute, within 21 days of the initial notice of challenge or within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within 21 days (or 14 days, if applicable) shall automatically waive the confidentiality designation for each challenged designation. In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all Parties shall continue to treat the material in question to the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge.

6.4     The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all Parties shall continue to treat the material in question to the level of protection to which it is entitled under the Producing Party's designation until the

1    court rules on the challenge.

2    7.    ACCESS TO AND USE OF PROTECTED MATERIAL

3    7.1    <u>Basic Principles.</u> A Receiving Party may use Protected Material that is

4    disclosed or produced by another Party or by a Non-Party in connection with this

5    case only for prosecuting, defending, or attempting to settle this litigation.  Such

6    Protected Material may be disclosed only to the categories of persons and under the

7    conditions described in this Order.  When the litigation has been terminated, a

8    Receiving Party must comply with the provisions of section 13 below (FINAL

9    DISPOSITION).

10    Protected Material must be stored and maintained by a Receiving Party at a

11    location and in a secure manner that ensures that access is limited to the persons

12    authorized under this Order.

13    7.2    <u>Disclosure of "CONFIDENTIAL" Information or Items</u>.

14    This Protective Order is intended to and does preclude Counsel of Record from

15    allowing Plaintiff to possess or retain a copy of any information designated

16    "CONFIDENTIAL."  However, this Protective Order is not intended to and does not

17    preclude Counsel of Record from displaying, disclosing or discussing the contents of

18    such information or items to Plaintiff.  The Parties agree that information or items

19    labeled "CONFIDENTIAL" may be displayed or disclosed to or discussed between

20    Counsel of Record and Plaintiff to the extent necessary to conduct litigation.

21    In addition to the above, unless otherwise ordered by the court or permitted in

22    writing by the Designating Party, a Receiving Party may disclose any information or

23    item designated "CONFIDENTIAL" only to:

24    (a)    the Receiving Party's Counsel of Record in this action, as well as

25    employees of said Counsel of Record to whom it is reasonably necessary to disclose

26    the information for this litigation (as well as support staff);

27    (b)    the officers, directors, and employees of the Receiving Party to whom

28    disclosure is reasonably necessary for this litigation and who have signed the

"Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c)     Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d)     the court and its personnel;

(e)     court reporters and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgement and Agreement to be Bound" (Exhibit A);

(f)     during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court.  Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

(g)     the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

(h)     any mediator or settlement officer, and their supporting personnel, mutually agreed upon by any of the parties engaged in settlement discussions.

8.     <u>PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION</u>

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" that Party must:

(a)     promptly notify in writing the Designating Party.  Such notification shall include a copy of the subpoena or court order;

(b)     promptly notify in writing the party who caused the subpoena or order

11.

1  to issue in the other litigation that some or all of the material covered by the subpoena

2  or order is subject to this Protective Order.  Such notification shall include a copy of

3  this Stipulated Protective Order; and

4          (c)     cooperate with respect to all reasonable procedures sought to be pursued

5  by the Designating Party whose Protected Material may be affected.

6          If the Designating Party timely seeks a protective order, the Party served with

7  the subpoena or court order shall not produce any information designated in this

8  action as "CONFIDENTIAL" before a determination by the court from which the

9  subpoena or order issued, unless the Party has obtained the Designating Party's

10  permission.  The Designating Party shall bear the burden and expense of seeking

11  protection in that court of its confidential material – and nothing in these provisions

12  should be construed as authorizing or encouraging a Receiving Party in this action to

13  disobey a lawful directive from another court.

14  9.     A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE
       PRODUCED IN THIS LITIGATION
15

16         9.1     Production of Protected Material by a Non-Party

17         The terms of this Order are applicable to information produced by a Non-Party

18  in this action and designated as "CONFIDENTIAL."  Such information produced by

19  Non-Parties in connection with this litigation is protected by the remedies and relief

20  provided by this Order.   Nothing in these provisions should be construed as

21  prohibiting a Non-Party from seeking additional protections.

22         9.2     Production of a Non-Party's Protected Material by a Party

23         (a)     In the event that a Party is required, by a valid discovery request, to

24  produce a Non-Party's confidential information in its possession and the Party is

25  subject to an agreement with the Non-Party not to produce the Non-Party's

26  confidential information, then the Party shall:

27                (1)     promptly notify in writing the Requesting Party and the Non-

28  Party that some or all of the information requested is subject to a confidentiality

12.

agreement with a Non-Party;

   (2) promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

   (3) make the information requested available for inspection by the Non-Party.

  (b) If the Non-Party fails to object or seek a protective order from this Court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to a confidentiality agreement with the Non-Party before a determination by the court.[1] Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this Court of its Protected Material.

10. <u>UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL</u>

  If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material labeled "CONFIDENTIAL" to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

11. <u>INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL</u>

---

[1] The purpose of this provision is to alert the interested parties to the existence of confidentiality rights of a Non-Party and to afford the Non-Party an opportunity to protect its confidentiality interests in this court.

1    When a Producing Party gives notice to Receiving Parties that certain

2  inadvertently produced material is subject to a claim of privilege or other protection,

3  the obligations of the Receiving Parties are those set forth in Federal Rule of Civil

4  Procedure 26(b)(5)(B).  This provision is not intended to modify whatever procedure

5  may be established in an e-discovery order that provides for production without prior

6  privilege review.  Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the

7  Parties reach an agreement on the effect of disclosure of a communication or

8  information covered by the attorney-client privilege or work product protection, the

9  Parties may incorporate their agreement in the stipulated protective order submitted

10  to the Court.

11  12.    MISCELLANEOUS

12    12.1    Right to Further Relief.  Nothing in this Order abridges the right of any

13  person to seek its modification by the court in the future.

14    12.2    Right to Assert Other Objections.  By stipulating to the entry of this

15  Protective Order no Party waives any right it otherwise would have to object to

16  disclosing or producing any information or item on any ground not addressed in

17  this Stipulated Protective Order.  Similarly, no Party waives any right to object on

18  any ground to use in evidence of any of the material covered by this Protective

19  Order.

20    12.3    Filing Protected Material.    Without written permission from the

21  Designating Party or a court order secured after appropriate notice to all interested

22  persons, a Party may not file in the public record in this action any Protected Material.

23  A Party that seeks to file under seal any Protected Material must comply with Civil

24  Local Rule 141.  Protected Material may only be filed under seal pursuant to a court

25  order authorizing the sealing of the specific Protected Material at issue. If a Party's

26  request to file Protected Material under seal is denied by the court, then the Receiving

27  Party may file the information in the public record unless otherwise instructed by the

28  court.

13.   FINAL DISPOSITION

        (a)   Counsel of Record are entitled to retain an archival copy of all documents, pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material.  Counsel of Record is not required to destroy or return copies of Protected Material that may be stored on back-up tapes created in the Receiving Party's normal course of business and retained for disaster-recovery purposes.  Any such archival or back-up tape copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

14.   VIOLATION

        Any violation of this Order may be punished by appropriate measures including, without limitation, contempt proceedings and/or monetary sanctions.

1        IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

2    DATED: October 10, 2018     /s/ Aaron J. Fischer_____

3                            AARON J. FISCHER (SBN 247391)
                              DISABILITY RIGHTS CALIFORNIA

4

5                             Attorneys for Plaintiffs

6    DATED: October 10, 2018     /s/ Margot Mendelson (as authorized on

7                              10/10/18)\_
                              MARGOT MENDELSON (SBN 268583)

8                              PRISON LAW OFFICE

9                             Attorneys for Plaintiffs

10

11   DATED: October 10, 2018     /s/ Jessica Valenzuela Santamaria (as

12                             authorized on 10/10/18)\_
                              JESSICA VALENZUELA SANTAMARIA
                              (220934)

13                             COOLEY LLP

14                             Attorneys for Plaintiffs

15   DATED: October 10, 2018     /s/ Shawn M. Ridley (as authorized on

16                             10/10/18)\_

17                             SHAWN M. RIDLEY (SBN 144311)
                             HOWARD ROME MARTIN & RIDLEY,

18                             LLP

19                             Attorneys for Defendant

20                             County of Sacramento

21

22

23   PURSUANT TO STIPULATION, IT IS SO ORDERED.

24   Dated:  October 16, 2018

25

26                             KENDALL J. NEWMAN
                             UNITED STATES MAGISTRATE JUDGE

27   /mays2081.po

28

1    <u>EXHIBIT A</u>

2    <u>ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND</u>

3         I, _____ [print or type full name], of

4    _____ [print or type full address], declare under penalty of perjury

5    that I have read in its entirety and understand the Stipulated Protective Order that was

6    issued by the United States District Court for the Eastern District of California on

7    July 31, 2018, in the case of *Mays, et al. v. County of Sacramento* (Case No. 2:18-

8    cv-02081 TLN KJN).  I agree to comply with and to be bound by all the terms of this

9    Stipulated Protective Order and I understand and acknowledge that failure to so

10   comply could expose me to sanctions and punishment in the nature of contempt.  I

11   solemnly promise that I will not disclose in any manner any information or item that

12   is subject to this Stipulated Protective Order to any person or entity except in strict

13   compliance with the provisions of this Order.

14        I further agree to submit to the jurisdiction of the United States District Court

15   for the Eastern District of California for the purpose of enforcing the terms of this

16   Stipulated Protective Order, even if such enforcement proceedings occur after

17   termination of this action.

18        I hereby appoint _____ [print or type full name] of

19   _____ [print or type full address and telephone

20   number] as my California agent for service of process in connection with this action

21   or any proceedings related to enforcement of this Stipulated Protective Order.

22   Date: _____

23   City and State where sworn and signed: _____

24
     Printed name: _____
25        [printed name]

26
     Signature: _____
27        [signature]

28

                                   17.          Stipulated Protective Order
                                                (Case No. 2:18-cv-02081 TLN KJN)