# MEMORANDUM OF AGREEMENT

Face Coverings for Staff as Precaution Against COVID-19 Transmission in
Sacramento County Jail Facilities, and Other COVID-19 Matters
*Mays v. County of Sacramento* (Case No. 2:18-cv-02081-TLN-KJN)

**Whereas**, Plaintiffs' class counsel and Defendant County of Sacramento
(the "Parties") reached a settlement agreement in *Mays v. County of Sacramento*
(Case No. 2:18-cv-02081-TLN-KJN), with a Consent Decree approved by the
Court on January 13, 2020; and

**Whereas**, the novel coronavirus (COVID-19) pandemic has posed
significant challenges to protect the health and well-being of incarcerated persons
in criminal detention facilities like the Sacramento County Jail's Main Jail and Rio
Cosumnes Correctional Center (RCCC) (together, "the Jail"); and

**Whereas**, pursuant to the Parties' agreement (Stipulation, Dkt. 118, Apr. 27,
2020), the County has provided regular updates and data to Plaintiffs' class
counsel, and the Parties have conferred by teleconference on a regular basis to
discuss the County's response to the pandemic as relevant to Jail operations; and

**Whereas**, the Parties agree that the issues set forth in the *Mays* Complaint
and the *Mays* Consent Decree, including with respect to the provision of health
care, environmental health/safety conditions, and custody operations generally
cover the County's response to the COVID-19 pandemic as it impacts *Mays* class
members; and

**Whereas**, Plaintiffs' class counsel sent a Notice of Dispute letter (attached
as **Exhibit A**), dated May 27, 2020, regarding two alleged deficiencies regarding
the County's COVID-19 response vis-à-vis Jail operations: <u>first</u>, the failure to
require custody staff to wear face coverings in the Jail facilities; and <u>second</u>, the
denial of showers and access to phones to class members subject to the mandatory
seven-day intake quarantine period for new arrivals and to the fourteen-day
quarantine period for people who live in celled housing and have symptoms or
possible exposure to COVID-19; and

**Whereas**, consistent with the Dispute Resolution provisions set forth in the
Consent Decree (Section G), the Parties notified by written correspondence dated
May 30, 2020, the designated Dispute Resolution mediator, the Hon. Nathanael
Cousins, as to the dispute; and

MEMORANDUM OF AGREEMENT – Face Coverings for Staff
*Mays v. County of Sacramento* (Case No. 2:18-cv-02081-TLN-KJN)
Page **2** of **4**

**Whereas**, consistent with the Dispute Resolution provisions set forth in the Consent Decree (Section G), the Court-appointed experts on medical care (Michael Rowe, M.D. and Madeleine LaMarre MN, FNP-BC) prepared an expert report entitled *Report Regarding the Sheriff's Department Face Mask Policy at the Sacramento County Jail in the Setting of the COVID-19 Pandemic*, dated June 8, 2020 (attached as **Exhibit B**); and

**Whereas**, by Sacramento Sheriff's Office Inter-Departmental Correspondence dated June 1, 2020, the County issued a directive stating that class members will be provided an opportunity to a shower at the start of any quarantine period and that, where an entire housing unit pod is quarantined due to symptoms or potential exposure, the showering of inmates will be coordinated on a case-by-case basis with medical and custody input to achieve the most efficient and safe method of offering showers; and

**Whereas**, the Parties and the Court-appointed experts on medical care participated in a video conference mediation with Magistrate Judge Cousins on June 15, 2020, as part of the Dispute Resolution process;

**Now therefore**, the Parties agree as follows:

1. All Sacramento County Sheriff's Department Jail custody deputies ("Deputies") will be required to carry a Department-issued face covering at all times while on their shift.

2. All Deputies will be required to wear a Department-issued face covering when in elevators, day rooms, dorm housing units, transport vehicles, health care treatment areas, and classrooms whenever one or more class member(s) are present in that area.

3. All Deputies will be required to wear a Department-issued face covering in *any* location when they are within six feet of a class member without a physical barrier.

4. All Deputies will be required to wear a Department-issued face covering in the Intake area during all periods when an arrestee or any class member otherwise being housed is present in an unsecured portion of the intake loop (*i.e.* not behind holding cell doors).

Case 2:18-cv-02081-TLN-KJN   Document 120-1   Filed 06/24/20   Page 3 of 20

MEMORANDUM OF AGREEMENT – Face Coverings for Staff
*Mays v. County of Sacramento* (Case No. 2:18-cv-02081-TLN-KJN)
Page **3** of **4**

5. Within five (5) business days of execution of this Agreement, the Sheriff's Department will issue a clear directive, via written policy and Inter-Departmental Correspondence, to all Jail staff regarding the requirements set forth above, including articulated public health reasons for the new directive and provision for its enforcement.

6. The Jail's Adult Correctional Health staff's existing COVID-19 staff guidance for all mental health and medical staff – which provides that "universal masking is a requirement and the mask is considered part of work attire" – shall remain in place.

7. Jail staff will continue to offer face coverings to all class members (in the intake area and in all housing units), and will provide face coverings upon request by any class member.

8. The County will review its policies regarding face coverings periodically. Should relevant federal or state governmental public health guidance regarding COVID-19 precautions be updated, the County may seek to modify its policies.  In such case, the County agrees to notify Plaintiffs' class counsel and the Court experts on medical care prior to any modification to the policy.  If Plaintiffs' class counsel objects to the change in policy in whole or in part, the Parties will meet and confer – with the assistance of Magistrate Judge Cousins, if available – before any disputed component(s) of the policy change is implemented.

9. Notwithstanding the above, deputies will not be required to wear a mask in situations where there is an immediate safety threat such that donning a mask would compromise physical safety.

10. Plaintiffs' class counsel may bring concerns regarding reports of alleged Jail staff non-compliance with the face covering directives described herein. The Sheriff's Department will promptly investigate any such reports, and will provide an update to Plaintiffs' class counsel as to any identified non-compliance and the steps taken to address such non-compliance.

11. The Parties will continue to meet and confer through the Dispute Resolution process, with the assistance of Magistrate Judge Cousins as appropriate, regarding the provision of showers and access to phones for class members during the seven- and fourteen- day quarantine periods discussed herein.

MEMORANDUM OF AGREEMENT – Face Coverings for Staff
*Mays v. County of Sacramento* (Case No. 2:18-cv-02081-TLN-KJN)
Page **4** of **4**

12. The terms of this Agreement are subject to the monitoring and enforcement provisions set forth in the *Mays* Consent Decree.

This Agreement shall be deemed fully executed and effective when all Parties have executed it by signature.


Dated:        June 18, 2020        _Aaron J. Fischer_

DISABILITY RIGHTS CALIFORNIA
Attorney for Plaintiffs



Dated:        June 18, 2020

PRISON LAW OFFICE
Attorney for Plaintiffs



Dated:        June / 8, 2020

SACRAMENTO COUNTY COUNSEL
Attorney for Defendant

# EXHIBIT A

exhibits to notice omitted

# EXHIBIT A

exhibits to notice omitted



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson

May 27, 2020

Rick Heyer
Supervising County Counsel
P.O. Box 988
Sacramento, CA 95812-0988
heyerr@saccounty.net

Re:   *Mays v. County of Sacramento*, 2:18-cv-02081-TLN-KJN (E.D. Cal.)
        Notice of Dispute

Dear Rick:

We write regarding serious concerns about the Sacramento Sheriff's Department's response to the COVID-19 pandemic.  In the course of the parties' ongoing discussions about COVID-19 prevention and containment measures in the jails, two serious deficiencies have emerged: (1) the Department's failure to require custody staff to wear face coverings when interacting with incarcerated people, and (2) the extreme and harsh conditions of confinement for people during the mandatory seven-day intake observation period for new arrivals and the fourteen-day quarantine for people who live in celled housing and have symptoms or possible exposure to COVID-19.  We previously have expressed our concerns about these harmful practices, including that they are out of step with other California county jail systems.  As the Sheriff's Department has not acted to resolve these problems, we write pursuant to Paragraphs 32-34 of the Consent Decree to give notice of our initiation of the dispute resolution process.

We acknowledge and appreciate the steps the County has taken to respond to this crisis.  In particular, we recognize the hard work of custody staff to manage new housing arrangements and of Adult Correctional Health to implement strategies to address the serious threat posed by COVID-19.  However, the magnitude of the present public health crisis cannot be overstated.  As of May 26, 2020, there have been over five million confirmed cases of COVID-19 worldwide, and more than 340,000 people have died.[1]  There is no vaccine, and there is no proven treatment.[2]

_____

[1] World Health Organization, Coronavirus Disease (COVID-19) Pandemic, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last accessed May 26, 2020).
[2] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Frequently Asked Questions, https://www.cdc.gov/coronavirus/2019-ncov/faq.html (last accessed May 26, 2020).

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva • Jean Lu
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris • Vishal Shah

The virus that causes COVID-19 is highly transmissible: it spreads from person to person through small droplets when a person coughs or exhales,[3] and people can spread the virus without knowing they are sick.[4]  And, because this is a new virus, most people lack immunity.  It can also cause severe illness: roughly 20% of people who contract COVID-19 will require hospitalization.[5]  People who are older or who have underlying health conditions are more likely to become severely ill or die from COVID-19.[6]

     People incarcerated in the Sacramento County Jails face a substantially higher risk of serious health consequences from COVID-19 than the general population.  Many people in the jails are older or in poor health, and thus are at greater risk of severe illness or death if they contract COVID-19.  Hundreds of people in Sacramento County Jail custody have conditions that render them vulnerable to COVID-19, including asthma, heart conditions, lung disease, severe obesity, chronic kidney disease, liver disease, and diabetes.[7]

     Moreover, infectious diseases like COVID-19 spread more rapidly in congregate settings, where people share sleeping areas, dining facilities, and bathrooms.  In the Sacramento County Jails, many people live in crowded dorms where they are unable to achieve social distancing.  People with high-risk medical conditions and people in high-risk age categories live in these dorms, where they share common surfaces and routinely come within six feet of other people.

     Nationwide, prisons and jails have been an epicenter of viral transmission.  "Of the nation's top twenty-five clusters of COVID-19 cases, all but three are congregate living environments (jails and prisons, nursing and veteran's homes, and the U.S.S. Theodore Roosevelt)."[8]  A recent analysis identified more than 47,000 coronavirus infections and 485 deaths in inmates and staff at state prisons, federal prisons and local jails.[9]  "Nearly every state

---

[3] *Id.*

[4] Centers for Disease Control and Prevention, Social Distancing, Quarantine, and Isolation, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last updated May 26, 2020) ("CDC Social Distancing").

[5] Centers for Disease Control and Prevention, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidancemanagement-patients.html (last accessed May 26, 2020).

[6] Centers for Disease Control and Prevention, People Who Are at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed May 26, 2020).

[7] *Id.*

[8] Brie Williams, Cyrus Ahalt, David Sears, & Stefano M. Bertozzi, Limiting COVID-19 Transmission and Mitigating the Adverse Consequences of a COVID-19 Outbreak in Correctional Settings: RELEASE · COHORT · TEST, Apr. 26, 2020, https://amend.us/wp-content/uploads/2020/05/Cohorting-Guidance.Amend_.UCB_.pdf .

[9] Coronavirus in the U.S.: Latest Map and Case Count, New York Times (last updated May 27, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#hotspots.

prison system has at least one infection among either inmates or staff.  Many of the infections have been asymptomatic, suggesting that the problem is more common than is understood."[10]

**ISSUES IN DISPUTE**

**1. Use of Face Coverings by Custody Staff**

The Sacramento Sheriff's Department has taken the position that it will not require custody officers to wear face coverings—an essential, well-accepted practice to limit the risk that staff will unknowingly transmit the virus to incarcerated people.  This position is indefensible and stands in stark contrast to public health recommendations and standard practices in California county jails and prisons.

The U.S. Centers for Disease Control and Prevention (CDC) have established that face coverings are an essential component of an adequate program for limiting the transmission of COVID-19.  Because "the virus can spread between people interacting in close proximity—for example, speaking, coughing, or sneezing," the CDC recommends "the use of simple cloth face coverings to slow the spread of the virus and help people who may have the virus and do not know it from transmitting it to others."[11]  Face coverings are of particular importance because of the documented asymptomatic spread of the virus.  The *Los Angeles Times* recently reported that, according to the CDC, "there's a 20%-to-50% chance that those infected with the coronavirus do not show symptoms.  Yet even those asymptomatic people may be just as capable of transmitting the disease as other infected people who eventually become visibly sick . . . .  That's why it's so important to adhere to social distancing and wearing masks, experts say."[12]

The CDC expressly endorses the use of face coverings in correctional settings.  The CDC has recognized that "because staff members move between correctional facilities and their communities daily," they may constitute "an important source of virus introduction into facilities."[13]  The CDC has concluded that staff screening measures, such as temperature checks,

---

[10] *Id*.  Sacramento County Jail has had one confirmed case of COVID-19 among its incarcerated population, identified on May 6, 2020.  While the County conducts COVID-19 tests for all people entering the jail, it does not conduct asymptomatic testing of the existing jail population.  Consequently, there is reason to believe that this represents an undercount.

[11] Centers for Disease Control and Prevention, Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission, April 3, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

[12] Rong-Gong Lin II, Coronavirus 'silent spreaders' become a bigger risk as California reopens, *L.A. Times*, May 26, 2020, https://www.latimes.com/california/story/2020-05-26/coronavirus-silent-spreaders-bigger-risk-as-california-reopens.

[13] Centers for Disease Control and Prevention, COVID-19 guidance for correctional and detention facilities, COVID-19 in Correctional and Detention Facilities — United States, February–April 2020, Mortality and Morbidity Weekly Report (MMWR), May 15, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm.

are "inadequate" to identify affected persons and prevent transmission of the virus.[14]
Consequently, the CDC endorses "[a]dditional strategies, including . . . use of cloth face
coverings . . . to prevent and manage spread within correctional and detention facilities."[15]

Sacramento County public health officials themselves have recognized the critical
importance of face coverings to limit viral transmission.  On May 22, 2020, the Health Officer of
Sacramento County issued a Public Health Order stating that "it is critical . . . to adhere to
important public health recommendations to reduce the transmission of COVID-19."[16]  The order
directs that "people should wear face coverings when in public places where social distancing of
six feet or more can't be achieved by persons of separate households."[17]  The Sheriff's
Department has elected not to abide by that guidance in the high-risk jail environment where
social distancing has not been facilitated.

Indeed, the Sheriff's Department's refusal to require custody staff to wear masks conflicts
with the County's own correctional health department policy.  A directive by Sacramento
County's Adult Correctional Health Department observes that "[a]n employee may harbor
COVID-19 but have no symptoms.  In light of this, Adult Correctional Health implemented
universal masking for its employees."[18]  "*[U]niversal masking is a requirement and the mask is
considered part of work attire.  If staff report to work without a personal mask, s/he will need to
use leave balances to return home to get the mask.*"[19]  In other words, while correctional health
staff in the jail must wear face coverings, custody staff who interact directly with incarcerated
people are subject to no such requirement.[20]  We are aware of no reasoned basis for this position.

---

[14] *Id.*

[15] *Id.* The CDC's guidance is consistent with its recommendations for other congregate living
settings, in which it has directed that "[a]*ll staff and residents should wear a cloth face covering
when in shared areas of the facility and maintain social distancing to slow the spread of the
virus.*"  Centers for Disease Control and Prevention, COVID-19 Guidance for Shared or
Congregate Housing, April 25, 2020, https://www.cdc.gov/coronavirus/2019-
ncov/community/shared-congregate-house/guidance-shared-congregate-housing.html (emphasis
in original).

[16] Order of the Health Officers of the County of Sacramento Directing All Individuals Living in
the County to Continue to Stay at Home or at their Place of Residence, Recommend Wearing
Face Coverings and Relaxing Restrictions on Low-Risk Businesses Consistent with Direction
From the State of California, May 22, 2020, https://www.saccounty.net/COVID-
19/Documents/2020-05-22%20Health%20Order%20Stay%20at%20Home%20SIGNED.pdf.

[17] *Id.*

[18] Sacramento County Adult Correctional Health, COVID-19 Staff Guidance, Mar. 2, 2020 (rev.
May 18, 2020) (attached hereto as **Exhibit A**).

[19] *Id.* (emphasis in original).

[20] Although the use of face coverings by custody staff is not prohibited, responses to a survey sent
by Plaintiffs' counsel to class members at both jails indicate that custody staff frequently do not
wear face coverings in the jail.  Forty-six of 57 class members reported that custody staff do not
wear face masks in the jails.

The Sheriff's Department's failure to require custody officers to wear masks diverges sharply from the practices of other California county jails and the California state prisons. Alameda County, Yuba County, Riverside County, Fresno County, Contra Costa County, Santa Clara County, Santa Barbara County, and San Bernardino all require custody staff to wear masks when in proximity to incarcerated people.  The Fresno County Sheriff's Department recent directive speaks for itself:

> *EFFECTIVE IMMEDIATELY MASKS ARE REQUIRED IN ALL JAIL FACILITIES*
> *The Fresno County Sheriff's Office requires facial masks for everyone that enters the Fresno County Detention Facilities.*
> *Amid the coronavirus outbreak and in order to protect the health of our staff and the public, wearing a face mask in now mandatory.*
> *Wearing a face mask is not a substitute for social distancing.*
> *This applies to everyone.*

The California Department of Corrections and Rehabilitations also requires staff to wear face coverings while working on institutional grounds.  A court in the Central District of California just this week ordered Orange County to require that all jail staff wear masks "when interacting with any person or when touching surfaces in cells or common areas."[21]

The Sheriff's Department's refusal to require the use of face coverings for custody staff in the jails is contrary to public health recommendations and established practices in peer counties. This position is reckless and dangerous in the face of what we all recognize as a serious risk of harm and human suffering.

We understand that the Sheriff's Department is proud of the fact that just one incarcerated person has tested positive for COVID-19 to date.  The County should follow the clearly established and widespread practice of required face coverings for all staff so as not to undermine its other prevention measures.

## 2.  Conditions of Confinement in Initial Observation Period

The Sheriff's Department's current practice is to place all people entering the jail into a seven-day initial observation period to monitor for symptoms of COVID-19.  From the time they are booked into the jail until the end of that seven-day period, incarcerated people cannot use the showers.  Their only means to clean their bodies is to use the sink in their cells.  They also cannot leave their cells to recreate or exercise, and they cannot use the telephones except for certain, limited phone legal phone calls with a pre-approved list of attorneys.  We understand that similar restrictions apply to the fourteen-day quarantine period for people living in celled housing who have symptoms or possible exposure to COVID-19.

---

[21] *Melissa Ahlman v. Don Barnes,* No. SACV 20-835 JGB at 21 (C.D. Cal. May 26, 2020) (attached hereto as **Exhibit B**).

Showers are critical for hygiene and mental health, especially in the often tumultuous period following arrest and booking in the jail. Showering also promotes good sanitation practices, which are essential to preventing the transmission of COVID-19. Title 15 expressly requires jails to provide showers at least every other day. *See* 15 Cal Code Regs § 1266. Similarly, the American Correctional Association requires that even where movement on a housing unit is restricted, people shall be able to showers three times per week.[22] The American Bar Association's Standards on the Treatment of Prisoners state that even in cases of institutional lockdowns, incarcerated people should be afforded access to showers.[23]

Plaintiffs recognize that some circumstances may justify deviations from normal shower schedule in the jails. However, standards governing access to showers may not be abandoned without a legitimate justification. The Sheriff's Department has failed to provide any legitimate reason for denying the right to shower to people entering the jail—many of whom may be entering the jail in states of uncleanness and/or from circumstances of homelessness. The Sheriff's Department has offered two rationales for the ban on showers: (1) the burden of disinfecting the showers after use, and (2) the possibility of viral transmission associated with shower use. Neither objection is credible. Showers can be disinfected after each use, as they are elsewhere in the jail during this time of heightened attention to sanitation. Moreover, the movement of one individual through a locked down jail pod to and from the shower does not pose a significant risk of transmission. If the Sheriff's Department is concerned about viral transmission during the short movement to and from the showers, it could choose to provide face masks to those individuals.

In this regard, too, the Sacramento Sheriff's Department's practices are an outlier. In the California prison system, all people in observation, quarantine, or medical isolation status receive showers and yard time. People in medical isolation for suspected or confirmed COVID-19 are required to have access to showers at least every other day, as well as yard and dayroom time, phone calls, and personal property. We are aware of multiple other county jails that provide showers and out-of-cell time for people on observation or quarantine status. A court recently granted a preliminary injunction ordering Orange County Jail to provide daily showers to people in its custody.[24]

The blanket denial of showers to people in the intake observation period and or in quarantine is inhumane, unjustified, and counterproductive to the important objectives of maintaining hygiene and sanitation in the jails. Likewise, the Department should modify its complete ban on access to phones for calls to loved ones, in a manner that appropriately balances public health needs and the rights of *Mays* class members to humane conditions of confinement.

---

[22] American Correctional Association, Restrictive Housing Performance Based Standards, (Aug. 2016), 4-RH-0017.

[23] American Bar Association Standards for Criminal Justice, Treatment of Prisoners, 2011 (3d ed.), Standard 23-3.9

[24] *See* Order, Exhibit B at 20.

**Next steps**

Given the significant harm at stake, we are initiating the Dispute Resolution process pursuant to Paragraphs 32-34 of the Consent Decree.  Pursuant to those provisions, we are providing a copy of this letter to Judge Cousins and requesting that he schedule a mediation session at his soonest availability.

The Consent Decree also calls for the parties to meet and confer about this dispute.  The parties have discussed these issues before and are scheduled to do so again tomorrow, May 28, at 11 am, with the presence and assistance of the Court's health care experts.

Sincerely,

*/s/ Margot Mendelson*           */s/ Aaron J. Fischer*

Margot Mendelson                 Aaron J. Fischer
Prison Law Office                Disability Rights California


cc:     Judge Nathanael Cousins
        Chief Santos Ramos
        Lt. Alex McCamy
        Deputy Director Sandy Damiano
        Director Tammy Morin
        Michael B. Rowe, M.D. – *Mays* Court Expert, Medical Care
        Madeline LaMarre, MN, FNP-BC – *Mays* Court Expert, Medical Care

7

# EXHIBIT B

# EXHIBIT B

**Report Regarding the Sheriff's Department Face Mask Policy at the Sacramento County Jail in the Setting of the COVID-19 Pandemic**

### Introduction

Pursuant to the Consent Decree in this matter, we have been requested to provide expert medical testimony on the matter of the decision by Sacramento County to not require Sheriff's Department staff to comply with public health recommendations for universal face masks at the Sacramento County Jail during the COVID-19 global pandemic.   A Notice of Dispute on this issue was filed by the Plaintiffs.  On 5/28/2020 a "meet and confer" conference was held between the parties and, without agreement being reached, the matter is proceeding to mediation.

### Coronavirus Disease 2019 (COVID-19)

In late 2019, an unusual cluster of cases of pneumonia resulting in a number of deaths was identified in China. Subsequently, the cause of this outbreak was identified as a novel coronavirus that became known as Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2). The disease it causes is commonly known as COVID-19.  As this is a new coronavirus, there is no pre-existing immunity in the population and due to its highly infectious nature, the virus has spread rapidly around the globe. On March 19, 2020 the World Health Organization (WHO) declared COVID-19 to be a worldwide pandemic.

According to the Johns Hopkins University Coronavirus Dashboard, as of June 3, 2020 there have been over 6 million confirmed COVID-19 cases globally with more than 380,000 deaths.  In the United States, there have been more than 1,800,000 cases and 106,000 deaths.[1]

California ranks among the top 10 states in number of cases with more than 118,000 confirmed cases and 4,360 deaths. As of May 29, 2020, according to the Sacramento County Department of Health Services COVID-19 Dashboard there have been 1,373 cases and 56 deaths in Sacramento County. Due to the number of asymptomatic infections and lack of widely available testing early in the pandemic, the number of reported COVID-19 infections can be presumed to be lower than the number of actual infections. [2]

---

[1] https://coronavirus.jhu.edu
[2] For example, a study recently done in Los Angeles County for antibodies to the virus concluded that approximately 4.65% of the community had been infected suggesting as many as 55 times the reported number of cases. Sacramento County can also be presumed to have much higher numbers of cases than confirmed cases reported to the health department.  Sood N, Simon P, Ebner P, et al. Seroprevalence of SARS-CoV-2–Specific Antibodies Among Adults in Los Angeles County, California, on April 10-11, 2020. JAMA. Published online May 18, 2020. doi:10.1001/jama.2020.8279.

**Clinical Features of COVID-19 Infection**

Many patients exhibit no symptoms but are capable of transmitting infection.  The spectrum of symptomatic infection ranges from mild to critical with approximately 20% of patients experiencing severe disease.

Symptoms of mild COVID-19 infection include fatigue, fever, chills, headache, muscle aches, cough, shortness of breath, nasal congestion, sore throat, loss of taste and smell, skin rash, and diarrhea. Severe disease is primarily characterized by respiratory failure requiring mechanical ventilation, multiple organ failure, and death. COVID-19 also results in damage to the heart, kidney and vascular systems. There have been increasing reports of clotting disorders causing venous thromboembolism and stroke, sometimes in young adults with no other health problems. There have also been reports of a multi-system inflammatory response syndrome (MIS-C) in children which has resulted in deaths.

Severe illness can occur in otherwise healthy individuals at any age, but predominantly occurs in older adults or those with underlying medical conditions. These conditions include chronic lung disease, asthma, cardiovascular disease, hypertension, diabetes, severe obesity, end-stage renal disease on dialysis, or liver disease such as chronic Hepatitis C infection.  Any condition which compromises the ability of the immune system to fight infection including cancer, HIV/AIDS, smoking, a prior bone marrow or organ transplantation, or a requirement for any medications which weaken the immune system will increase the risk of complications and death. Having more than one of these conditions increases the risk even more significantly.[3]  In New York City, which has had the most experience to date in the U.S. with the care of critically ill patients with COVID-19 infection, if a patient required mechanical ventilation, there was a 76% chance of dying in the group that was 18-65 years of age and a 97% of chance of dying if older than 65.

The population of almost all jails and prisons includes a large number of individuals with one or more of these types of chronic medical conditions which can increase their risk of severe disease and death from COVID-19. It has been estimated by the US Department of Justice that 40% of incarcerated persons have at least one chronic medical condition and 24% reported two conditions.  In addition, correctional facilities house many older individuals whose age alone increases their risk for severe complications and death.[4]

**Transmission of COVID-19**

Coronavirus is primarily spread through direct person-to-person respiratory transmission of infectious droplets when an infected person coughs, sneezes, or talks.[5]  These droplets can remain suspended in the air for between 8-14 minutes for the larger droplets to more than an hour for the smallest ones.  All of these droplets can cause infection.  This enables transmission between persons through inhalation of air containing suspended virus even when the original

---

[3] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html
[4] https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf
[5] J Aerosol Sci 2009; 40:122-133) (https://www.pnas.org/cgi/doi/10.1073/pnas.2006874117

source is no longer near the recipient.[6] In addition, since these droplets settle on surfaces, a person can also get coronavirus by touching a surface or object that has the virus on it and then touching their own mouth, nose, or eyes.

Recent epidemiologic data supports the concept of common transmission of coronavirus from individuals who are asymptomatic (will never develop symptoms) or pre-symptomatic (have not yet developed symptoms). Reported cases of infected persons who transmitted the virus to others while asymptomatic or presymptomatic have occurred within families or households, during shared meals or during visits with hospitalized family members. The Centers for Disease Control and Prevention (CDC) estimates that 35% of coronavirus cases are asymptomatic and that these cases are as likely to be as infectious as cases that are symptomatic.[7] Asymptomatic transmission reinforces the inadequacy of symptom monitoring alone for limiting the spread of the virus and reinforces the value of measures that prevent the spread of COVID-19 by infected persons who may not exhibit illness despite being infected. These measures include social distancing, use of face cloths in public, and universal masking in health care facilities.[8]

### COVID-19 in US Jails and Prisons

Coronavirus outbreaks have been reported in jails and prisons throughout the country.  An ongoing register of COVID-19 cases in correctional facilities in the U.S. currently shows 45,026 cases among residents as well as 517 deaths and 10,808 cases among staff including 50 deaths as of 6/4/2020.[9] *In a CDC report, more than half of affected facilities reported cases only among staff members.[10]* This speaks to the extent to which correctional staff acquire COVID-19 infection in the community and subsequently introduce it into a correctional facility.

Correctional institutions face significant challenges in controlling the spread of highly infectious pathogens such as COVID-19.  These include crowded dormitories, shared lavatories, limited medical and isolation resources, daily entry and exit of staff members and visitors, continual introduction of newly incarcerated or detained persons, and transport of incarcerated or detained persons in multi-person vehicles for court-related, medical, or security reasons.[11]  The risks of COVID-19 transmission apply to both staff and inmates.

*The nature of correctional facilities is that it is generally not possible to socially distance between inmates, and between staff and inmates. The correctional environment contributes to the spread of several communicable diseases (e.g. tuberculosis, influenza), including COVID-19.*

Rapid and large-scale transmission of COVID-19 in correctional institutions is illustrated by the following recent examples. In April 2020, at Marion State Prison in Ohio, 2,000 (80%) of 2,500

---

[6] https://www.scientificamerican.com/article/how-coronavirus-spreads-through-the-air-what-we-know-so-far1/

[7] https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html.

[8] https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article

[9] UCLA COVID-19 Behind Bars Data Project

[10] https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm

[11] https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm

inmates tested positive for COVID-19. [12]  At nearby Pickaway Correctional Institution, 1,500 (75%) of 2,000 inmates also tested positive for COVID-19. The Ohio Department of Corrections reports 19 inmate and 2 staff deaths to date.[13]  In May 2020, at Wayne County Jail in Detroit, 206 Sheriff's Office employees and 89 inmates tested positive for COVID-19.  This was following the deaths of two physicians including the Medical Director, as well as 2 correctional staff and a recently released detainee.[14]

As of May 31, 2020, the California Department of Corrections (CDCR) reported that there were 1,688 incarcerated persons with active cases of COVID-19, and 9 deaths.  In addition, they reported 148 cases and 1 death among custody staff.  Although cases have clustered in large numbers at certain institutions, other institutions have not yet had outbreaks. [15] As of May 31, 2020, the Federal Bureau of Prisons reported 1,629 cases and 67 deaths among federal inmates and 177 staff are infected. As in the CDCR, these cases have clustered in a number of facilities. [16]

As of May 29, 2020, Orange County Jail in California reported a large outbreak with 377 cases.[17] Around the same time, Cook County Jail in Chicago reported 547 cases and 7 deaths.[18] By early April 2020, Rikers Island Jail in New York City, reported over 700 cases among inmates and over 440 among staff.[19]  Though official statistics are not available, several inmates as well as staff have died.

Jail populations are characterized by rapid turnover with release of detainees back into the community. Therefore, in cases of COVID-19 outbreaks, this poses significant risk to the communities to which they return.  Therefore, prevention of transmission of COVID-19 within correctional institutions substantially contributes to the public health.

### Reducing transmission of COVID-19 in Correctional Institutions

On 3/23/2020 the Centers for Disease Control and Prevention (CDC) published interim guidance on management of coronavirus disease 2019 in correctional and detention facilities.[20] Prevention strategies focused on reinforcing hygiene practices, intensifying cleaning and disinfection of the facility, screening (new intakes, visitors and staff), continued communication with incarcerated persons, and staff and social distancing.  At that time, these recommendations did not recommend the use of face masks or testing except when staff or inmates demonstrated symptoms of COVID-19.

---

[12] https://www.ideastream.org/news/inside-marion-correctional-with-covid-19-we-just-passed-it-around
[13] https://fox8.com/news/coronavirus/nurse-at-pickaway-correctional-institution-dies-of-covid-19/
[14] https://www.clickondetroit.com/news/local/2020/05/09/206-wayne-county-sheriffs-office-employees-29-jail-inmates-test-positive-for-covid-19/
[15] https://www.cdcr.ca.gov/covid19/
[16] https://www.bop.gov/coronavirus/index.jsp
[17] https://www.ocsd.org/documents/sheriff/COVIDStats5.29.20.pdf
[18] https://www.cookcountysheriff.org/covid-19-cases-at-ccdoc/
[19]  https://www.newsweek.com/rikers-island-covid-19-new-york-city-1496872
[20] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

Face masks have been found to be effective in reducing transmission of communicable respiratory infections such as tuberculosis and influenza.  Face masks have also been found to be effective for reducing the spread of COVID-19. For example, one recent study that evaluated household transmission showed a 79% reduction in transmission of infection when everyone in the household wore a mask.  This degree of protection was only the case when masks were worn prior to the onset of symptoms in any individual. [21]

In April 2020, in light of mounting evidence of asymptomatic transmission of COVID-19, CDC published additional guidance to the public recommending wearing face cloth coverings in public settings where social distancing measures were difficult to maintain, especially in areas of significant community-based transmission.[22]

On May 15, 2020, CDC published a report of COVID-19 cases in correctional institutions that noted that symptom screening alone was inadequate to promptly identify and isolate infected persons in congregate settings such as correctional and detention facilities. Additional strategies including physical distancing, movement restrictions, *use of face cloth coverings,* intensive cleaning, infection control for staff members, and disinfection of high touch surfaces in shared spaces were recommended to prevent and manage spread within correctional and detention facilities.[23]

The CDC guidance was specific that to "prevent introduction of COVID-19 into facilities from the community" it is recommended that cloth face coverings be worn by incarcerated or detained persons *and staff members*".  It is also noted that "consistent application of prevention measures within correctional and detention facilities are critical to protecting incarcerated or detained persons, staff members, and the communities to which they return."[24]

Recommendations and requirements for the consistent use of masks by individuals in all settings of potential spread of this infection is no longer understood primarily as a means of self-protection, though that is an ancillary benefit, but is considered one of the most critical strategies to try and decrease further spread of the virus, protect vulnerable populations, and shorten the duration of the epidemic.

Universal staff mask/face covering policies have been implemented in many other correctional settings.  These include the Federal Bureau of Prisons, the California Department of Corrections, and the New York City Department of Corrections.  *These policies apply to all institutions even those which have not yet had cases or outbreaks.* [25]

---

[21] https://pubs.acs.org/doi/abs/10.1021/acsnano.0c03252; https://www.foxnews.com/health/wearing-face-mask-reduce-coronavirus-transmission-75-percent-study-shows;
https://gh.bmj.com/content/bmjgh/5/5/e002794.full.pdf
[22] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html
[23] https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm
[24] https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm
[25] https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf
https://www1.nyc.gov/site/doc/media/coronavirusap.page

**COVID-19 Prevention and Management at the Sacramento County Jail**

COVID-19 can be transmitted into Sacramento County Jail in several ways; from admission of an infected detainee; infected visitors and volunteers[26], and from infected staff members. Once introduced, subsequent transmission between inmates and staff is likely.

To its credit, Sacramento County Jail has taken measures to detect and prevent transmission of COVID-19 into the jail. This includes implementation of symptom screening of newly arriving inmates, COVID-19 testing for newly arriving and symptomatic inmates, quarantine of new arrivals, and medical isolation of infected inmates.

There is a "universal requirement" for healthcare staff at the Sacramento County Jail to wear masks in both patient care areas as well as in all non-patient care areas.  This requirement is defined as "wearing a cloth face covering" (or surgical mask).  Other, more extensive personal protective equipment is expected in some settings when greater risk is perceived.  Face masks are considered part of "work attire" and healthcare staff are sent home to obtain their personal mask if they report without one (and are expected to use leave balance for the time involved). CDC guidance is cited in this policy.[27]

As of May 22, 2020, the Sacramento County Department of Health Services continued to recommend that the public wear face coverings outside of the home when adequate social distancing cannot be maintained.[28]

However, at the Sacramento County Jail there is currently no universal requirement for custody staff to wear face coverings. This ignores CDC recommendations and data from correctional facilities around the United States that correctional staff have been infected with COVID-19 and likely contribute to transmission within correctional facilities.  It is also not consistent with practices of CDCR and other county jails (e.g., Alameda, Yuba, Riverside, Fresno, Contra Costa, Santa Clara, Santa Barbara, and San Bernardino).[29]

Sacramento County Jail asserts that "….CDC guidance on masking is that it should be done when social distancing is not possible….social distancing or separation by barriers is maintained between custody staff and the inmate population or the contacts are fleeting. Because this is the case, the Department is being consistent with the CDC guidance."[30]   However, daily activities such as transporting inmates in vehicles, applying and removing handcuffs, unplanned use of force, etc. cannot assure that only "fleeting" encounters occur between staff and inmates.  In addition, custody staff congregate together during shift changes and other activities that present a risk of infection to other staff.  As noted earlier in this report, infectious particles can linger in the air for periods of time and the use of face masks has been demonstrated to reduce transmission. Consequently, CDC recommends social distancing <u>and</u> the use of face masks.

---

[26] Currently, there are restrictions to visitors and volunteers.
[27] Sacramento County Adult Correctional Health COVID-19 Staff Guidance, revised May 18, 2020
[28] https://www.saccounty.net/COVID-9/Documents/2020-05-22
[29] Letter to Rick Heyer re: Notice of Dispute. May 27, 2020.
[30] Email correspondence from Rick Heyer to medical experts, 6/8/2020.

**Discussion and Opinions**

COVID-19 is a highly infectious disease that is known to cause serious illness and death, particularly among persons with underlying medical conditions and those of older age. The Centers for Disease Control and Prevention have made recommendations to reduce transmission that include the use of face masks by inmates and staff. While CDC guidelines are not legal mandates, they represent expert, evidence-based medical recommendations regarding measures needed to limit the spread of COVID-19. There is no reasonable justification for lack of adherence to the recommendations.

The failure of Sacramento County Jail to require custody staff to wear masks presents a risk of correctional staff acquiring and transmitting COVID-19 infection within the jail and the community. This presents an immediate and ongoing risk of serious harm, including serious illness and death, to detainees and correctional staff at Sacramento County Jail, as well as the community at large.

**Recommendations**

1. The Sacramento County Jail should immediately come into compliance with the current CDC recommendations for Correctional and Detention Facilities regarding use of face masks/coverings by all staff in the facility.

2. The Sacramento County Jail should continue to implement other strategies to prevent introduction of COVID-19 infection into the facilities. They should also engage in an ongoing process of formal review and revision of their policies in regard to the COVID-19 epidemic in order to improve current practice and incorporate new expert recommendations as they become available.

3. The Sacramento County Jail should also ensure that appropriate face coverings are made available to all incarcerated persons in their custody at all times.

Respectfully Submitted,

Michael Rowe MD                                      Madeleine LaMarre MN, FNP-BC

Date: June 8, 2020

7