1  LISA A. TRAVIS, County Counsel
   RICK HEYER, Supervising Deputy County Counsel
2     [State Bar No. 216150]
   COUNTY OF SACRAMENTO
3  700 H Street, Suite 2650
   Sacramento, CA  95814
4  Telephone:  (916) 874-7538
   Facsimile:  (916) 874-8207
5  E-mail:  heyerr@saccounty.net
   File No.:  126602-000012
6

7  Attorneys for County of Sacramento

8              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF CALIFORNIA
9                    SACRAMENTO DIVISION

10  LORENZO MAYS, RICKY                Case No. 2:18-cv-02081 TLN KJN
    RICHARDSON, JENNIFER BOTHUN,
11  ARMANI LEE, LEERTESE BEIRGE, and   FILING OF COUNTY STATUS REPORT
    CODY GARLAND, on behalf of themselves  PURSUANT TO PARAGRAPH 12 OF THE
12  and all others similarly situated     CONSENT DECREE

13              Plaintiffs,            JUDGE: Hon. Kendall J. Newman

14  vs.

15  COUNTY OF SACRAMENTO

16              Defendant.

17

18        Paragraph 12 of the Consent Decree in this matter requires the County to provide

19  Plaintiffs' counsel and the Court appointed subject matter experts with a status report no later

20  than 180 days from the approval of the proposed decree. In compliance with this requirement,

21  the County provided the "First Status Report; May's Consent Decree" on July 17, 2020.

22  Attached to this filing is that status report.

23  DATED:  10-1-20          LISA A. TRAVIS, County Counsel
                             Sacramento County, California
24

25

26  By: _____
       Rick Heyer
27     Supervising Deputy County Counsel

28
                              -1-

FILING OF COUNTY STATUS REPORT

EXHIBIT 1

**COUNTY OF SACRAMENTO**
**OFFICE OF THE COUNTY COUNSEL – DOWNTOWN OFFICE**

700 H Street, Suite 2650, Sacramento, California 95814  Telephone (916) 874-5544 Facsimile (916) 874-8207

COUNTY COUNSEL
 Lisa A. Travis

ASSISTANT COUNTY COUNSEL
 Traci F. Lee
 Krista C. Whitman

SUPERVISING DEPUTY
COUNTY COUNSEL
 Craig E. Deutsch
 Rick Heyer
 Jennifer McLaren
 June R. Powells-Mays
 John E. Reed
 Janice M. Snyder
 Lindsay C. Zettel

DEPUTY COUNTY COUNSEL
 Janet E. Bender
 Corrie Brite
 William C. Burke
 Christopher S. Costa
 Katherine Ann Covert
 Denise L. Cummings
 Joanne C. East
 Michelle M. Espy
 Keith W. Floyd
 Lilly C. Frawley
 Laura Froome
 Shilpa M. Girimaji
 Christophe Guillon
 Kelsey D. Johnson
 Michael J. Keene
 Jocelynn J. Maier
 Jason A. Manoogian
 Susan R. Masarweh
 Diane E. McElhern
 Deon C. Merene
 C. Stacey Miller
 Nicole M. Misner
 Katrina G. Nelson
 Lura L. O'Brien
 Robert P. Parrish
 Nanci A. Porter
 Joy A. Ramos
 Andy Read
 Taylor W. Rhoan
 Tina M. Roberts
 Nicole L. Roman
 Diana L. Ruiz
 Rachelle Smith
 Catherine Spinelli
 Samantha Tali
 Ashley M. Wisniewski
 James R. Wood
 Peter C. Zilaff

July 15, 2020

Donald Specter
Margot Mendelson
Sophie Hart
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, CA  94710

Aaron J. Fischer
Anne Hadreas
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA  94612

Re:    First Status Report Pursuant to Paragraph 12 of the
       Mays Consent Decree

Dear Counsel:

Paragraph 12 of the Consent Decree requires the County to provide to Counsel and the Court-appointed experts a status report 180 days after the consent decree was finalized, and every 180 days thereafter.  By and through this letter and the attached documents the County is providing the First Status Report.

As Counsel and Experts are aware, this first 180 days has been dominated by responding to the COVID-19 pandemic.  Part of the response to the challenges presented by the pandemic has been an unprecedented reduction in the population of the jails.  It is accurate to state the reduction in population has had some benefits in regard to compliance with certain aspects of the Consent Decree.  However, by and large the pandemic has stretched resources and delayed the County's efforts to meet many of the requirements of the Consent Decree.  The attached documents from Correctional Health and the Sheriff's Department detail these challenges in greater detail.

One area of work that multiple County departments have engaged in is the planning for new construction to address the ADA requirements and other provisions of the Consent Decree.  This planning was delayed by the inability of the County's workgroup to meet in March and April because of the restrictions put in place by the various public health orders.  This work has resumed virtually and the County continues to move forward with its consultants.  The current consultants, Nacht and

GRANITE PARK OFFICE ● 3331 POWER INN ROAD, SUITE 350, SACRAMENTO, CALIFORNIA 95826 ● TELEPHONE (916) 875-6877 FACSIMILE (916) 875-7020

Prison Law Office                                    -2-                                    July 15, 2020
Disability Rights California

Lewis, have been retained to help the County determine the scope of what the new construction and renovation should entail.  Once Nacht and Lewis complete their work, the County will issue a Request for Proposals for a firm(s) to enter into a design build contract with the County to complete this construction.

For the County's complete report on the status of compliance on specific aspects of the Consent Decree, please see the attached documents from Correctional Health and the Sheriff's Department.

Looking forward to the next six months, the County anticipates that live tours may continue to be difficult to arrange because of ongoing concerns regarding COVID-19.  As an alternative to this, the County will work with Counsel and the experts to conduct virtual tours.  In addition, the experts and Counsel have provided the County with requests for documents.  The County is striving to complete these requests as soon as possible.

Should you have any questions or concerns regarding this report, please do not hesitate to contact me directly.

Sincerely,

LISA A. TRAVIS
County Counsel

By: _____
Rick Heyer
Supervising Deputy County Counsel

Enclosures

cc:   Michael Rowe
      Madeline Lamarre
      Mary Perrien
      Lindsay Hayes

1913484

# ATTACHMENT 1
# Correctional Health
# First Status Report

Sacramento County
Department of Health Services
Primary Health Division

Adult Correctional Health
REMEDIAL PLAN STATUS REPORT

| GENERAL |
| --- |

Consent Decree: January 13, 2020
First Status Report Due: July 20, 2020
First Status Report Date: July 10, 2020

Policy Work in Process Overview:

- Policy and Procedures required a complete revision due to the remedial plan and community standards. This involves changes in work flow or related policies. The following steps have been taken: new templates, revised organization, and posting management approved policies on an intranet web page. Policy development and revision efforts are in process and include the following manuals in various stages: *Adult Correctional Health (main manual), Infection Control, Standardized Nursing Procedures, Mental Health, and Pharmacy.* Some policies are applicable to all staff and therefore will not be specific to a particular service.
- Forms are being developed or revised when indicated and also noted in the policies and placed on the intranet.
- Some policies have been forwarded to the PLO/DRC for review and comment. These are also in different stages. Some approved, some in process, and some may need Subject Matter Expert (SME) review.

Electronic Health Record (EHR) (Section I Health Care Records, page 39):

- Staff transitioned from a home grown electronic medical record to the Fusion/Centricity product April 2018. This transition was completed extremely quickly with very little transition, configuration, or training. Some key interfaces remain incomplete. This product is not meeting program needs.
- Centricity is an integrated electronic health record (EHR) that includes medical, mental health, and dental information in a single record. All staff (medical, mental health, dental, pharmacy, and clerical) utilize the EHR and are able to view and/or enter information.
- Reporting is extremely challenging with this product. There were no reports for the initial year and basic reports began July 2019. Staff are working on a report for Fiscal Year 2019/20. It will provide an overview of healthcare in the jails.
- A Centricity Steering Committee was established about a year ago and meets monthly. A new position was created to assist with the EHR and the staff person began November 2019. This level of resource is insufficient and another position is being requested.

1

Challenges:

- COVID-19 Pandemic:  COVID-19 screening, testing, observation, etc. continues to be a major challenge for health and custody staff.  The reduction of the jail population due to several court orders and population reduction strategies has been helpful.  Staff guidance documents were developed March 2, 2020 and have been regularly revised as changes have occurred.  The latest revisions were completed on June 24, 2020.  Updated documents are routinely submitted to the PLO/DRC.  We have also participated in meetings with PLO/DRC to answer questions.  Daily COVID-19 management and monitoring is staff intensive.  This has delayed policy development and implementation in certain areas which are noted in this report.

- Workforce Shortage:  In addition to COVID-19, there has been a significant workforce shortage.  This has impacted nursing and provider staff.  Nursing has been hiring and anticipates filling most of their vacancies this summer.  Provider recruitment has been more challenging due to media coverage of the jails, COVID-19 concerns, and recent protests.  The provider shortage for in-person encounters has been further diminished by an onsite absence of certain providers.

  Staff have undertaken multiple actions in this area. Staff completed work and received board approval to increase the contracted registry rates for providers.  These are now in effect and 3-4 providers are in the background clearance phase.  Additionally, staff have worked with county personnel services to increase advertisement electronically.

  Specialty Shortage:  Three specialty providers resigned amidst COVID-19 which further strains specialty capacity.

---

## II. GENERAL PROVISIONS – SUFFICIENT STAFFING (page 3)

The County developed a multi-year "phase in" plan to provide sufficient staffing for service provision within the jail facilities.   Actions taken consistent with this plan include the following:

| Health Care Staffing Augmentation | |
|---|---|
| Fiscal Year | Staffing |
| FY 2018/19 (Midyear) | 12 FTEs<br>• 1 FTE Physician<br>• 1 FTE Dentist<br>• 1 FTE Pharmacist<br>• 1 FTE Pharmacy Technician<br>• 4 FTE Registered Nurses (RN)<br>• 4 FTE Licensed Vocational Nurses (LVN) |

2

| Health Care Staffing Augmentation | |
| --- | --- |
| Fiscal Year | Staffing |
| FY 2019/20 | 12.0 FTEs<br>• 4 FTE Quality Improvement (QI)/Compliance Team – 1 Planner, 1 RN, 2 ASO I<br>• 4 FTE – 2 Physicians, 2 Medical Assistants (MA)<br>• 2 FTE Supervising RNs<br>• 2 FTE Senior Office Assistants (SROA) |
| FY 2020 /21 | Pending September budget hearing – counties are facing challenging fiscal climate with reduced revenues and increased expenditures due to COVID-19. |

| Mental Health Contract Augmentation | | |
| --- | --- | --- |
| Fiscal Year | Staffing | Facility |
| FY 2017/18 | 20 Intensive Outpatient Program (IOP) Beds (male) | Main Jail |
| FY 2018/19 (Midyear) | 24/7 Licensed Clinical Social Worker (LCSW) Coverage | Main Jail |
| FY 2019/20 | 15 IOP Beds (female)<br>24 IOP Beds (male)<br>24/7 LCSW Coverage | Main Jail<br>RCCC<br>RCCC |
| FY 2020/21 | Pending September budget hearing – counties are facing challenging fiscal climate with reduced revenues and increased expenditures due to COVID-19. | |

## II. GENERAL PROVISIONS – MENTAL HEALTH (MH) DATA POSTING (page 3)

This work has been in process since last year. It is challenging since data must be pulled from multiple data systems (SSO, Adult Correctional Health, and Behavioral Health). Initial data reports were pulled for a specific point in time and reported total inmates, unique patients provided mental health services while incarcerated, and those served by community mental health providers.

For the last report, data on mental health clients served was refined. It now depicts patients with a mental health condition and a subset of those diagnosed with a Serious Mental Illness (SMI). For the January 6, 2020 "Point in Time" report, 50% of the average daily population received mental health services. 25% had a SMI mental health diagnosis and 25% had a non-SMI diagnosis. Only 8% of the patients seen in jail for mental health services while incarcerated, were open to a community mental health provider. This is the first time this data has been pulled and integrated by these programs. It will help with assessing needs for community resources.

Health and Sacramento Sheriff's Office (SSO) representatives met and conferred with the PLO/DRC to review recommended MH data indicators. The group agreed on indicators and to post data on an SSO webpage quarterly. The first report integrating criminal justice data indicators is in process. It will include data indicators such as sentenced/presentence, length of stay, and misdemeanors/felonies. Data on charges was challenging and will not be included in this next report. Staff will work with SSO on a method for future inclusion.

3

## III. AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE (page 4)

As policies are being revised, they will be retooled or combined and will supersede former policies. These items are important, complex, and are being phased in. The deadline for ADA-related policy updates to the PLO/DRC is January 2021.

Policy reviewed by PLO/DRC:

- PP 01-09 Grievance Process for Health Complaints – This was reviewed a few times by PLO/DRC. Sent 6/17/20 with final edits mainly to the forms.
- PP 06-XX Effective Communication (new) – This was reviewed by PLO/DRC and returned 7/8/20. Comments will be incorporated and returned along with a form.

Draft policies that will be released soon to the PLO/DRC include:

- PP 03-08 Staff Training and Development (revision)
- PP 04-09 Medical Transportation (revision)
- PP 05-05 RN Intake (revision)
- PP 06-XX Persons with Disabilities (addresses several old policies) – submission will also include draft forms for Effective Communication and Disabilities. Disability form will list housing recommendations when indicated. Currently staff are working to integrate these forms into EHR templates.

ADA Tracking System:

- ADA Tracking is not feasible within the existing electronic health record. SSO demonstrated their new data system, ATIMS, which is projected to begin in FY 2020/21. Staff have determined the SSO data system will not work for Adult Correctional Health needs.
- Staff participated in a vendor demonstration of a software product that was used initially by the California Department of Corrections & Rehabilitation. At this time, staff are determining whether to purchase a product for ADA Tracking or to review other options.

Other:

- Nursing staff piloted a revised nurse intake process January 2020 with full implementation April 2020. Designated RNs were trained.
- Staff submitted revised language for the Inmate Handbook regarding patients with disabilities and accessing health care services to custody. This will require updating once policies are approved.

4

## IV. MENTAL HEALTH CARE (page 17)

Policies approved by PLO/DRC:

- PP 08-02 Data Sharing – Physical Health and Mental Health.  Addressed in the General Section.

Draft policies that will be released soon to the PLO/DRC include:

- PP 01-10 Access to Mental Health Services (revision)
- PP 04-01 Intensive Outpatient Program (new)
- PP 05-10 Discharge Planning (revision)

MH policies outlining organizational structure will also be released soon:

- PP 01-01 Department and Division Overview
- PP 01-03 Responsible Mental Health Authority
- PP 01-04 Medical/Clinical Autonomy
- PP MH Services – draft is in process and not ready to send at this time.  It will describe the mental health levels of care.

Training

- Mental Health Awareness Training – Mental health staff developed and provided training October 2019 for custody staff working in the designated mental health units.  Training contained information on recognizing different types of mental illness, interacting with patients with SMI, and mental health policies.
- Psychological Autopsy Training – Five (5) staff completed training provided by the American Association of Suicidology January 2020.

Other

Staff continue to review service modalities for potential improvements.  Examples are noted below:

- Staff piloted a new enhanced outpatient program called clinical case management.  This level of service included one-to-one mental health services, medication management, care coordination, treatment planning, and discharge planning.  The pilot was small (N=54) but outcome data was promising.  There was a 78% decrease in disciplinary write-ups, 59% decrease in number of urgent referrals, and a 77% decrease in acute psychiatric admissions.  As a result of the pilot, staff have asked for an "enhanced outpatient program" for patients in the outpatient program.  If approved in the new fiscal year, services will be provided for approximately 500 patients.
- Due to the lower average daily population (ADP), staff began offering pilot services to approximately 136 patients at the Main Jail and 30 patients at RCCC who have a diagnosis of serious mental illness and would benefit from additional services.  They were categorized by a Frequency of Service Scale (FOSS) level II, meaning they need services

5

at least once a month. In addition, staff provide these services to the following patients – those discharged from acute unit to the general population and those transferred from the acute unit to the IOP (assessed and assigned service if indicated).

## V. DISCIPLINARY MEASURES AND USE OF FORCE / MH OR INTELLECTUAL DISABILITIES (page 28)

- Mental health staff are involved in decisions regarding discipline of patients placed in intensive programs such as IOP and Jail Based Competency Treatment (JBCT).
- Staff need to work on developing these policies and practices in collaboration with SSO.

## VI. MEDICAL CARE (page 31)

Staffing: See Section II. Staffing.

Policies approved by PLO/DRC:

- PP 08-02 Data Sharing – Physical Health and Mental Health (page 39). Addressed in the General Section.

Draft policies that were reviewed with PLO/DRC:

- PP 04-08 Specialty Care Referrals (page 35) – Sent to the PLO/DRC March 2020 with deferral to SME. Resent this policy to counsel on 7/1/20 for submission.
- PP 07-XX Transgender & Gender Non-Conforming Health Care (page 41) – reviewed with PLO/DRC. Final edits incorporated and resent to PLO/DRC on 6/19/20.

Draft policies that will be released soon to the PLO/DRC include:

- PP 05-05 RN Intake (revision) – This was mentioned in ADA section but is broader than ADA items.
- PP 04-10 Discharge Medication – Staff implemented a pilot for discharge medication for sentenced patients late December 2019. It was extended to all sentenced patients mid-January.

| Medication Discharge Pilot: Sentenced | | | | | | |
|---|---|---|---|---|---|---|
| Month | Dec* | Jan | Feb | Mar** | Apr | May |
| Indicator | | | | | | |
| # of patients discharged who received medications | 11 | 120 | 146 | 186 | 142 | 83 |

*Began late December.
**Population reduction due to COVID-19 began.

Pilot planning is in process for the presentence population with estimated target date July/August 2020.

Policies not yet completed/past timeframe:

Provider shortages/work on COVID-19 impacted the Medical Director workload. She estimates these drafts will be completed within four to six months, pending onboarding new providers. There are currently four (4) registry providers in background clearance.

- PP 05-XX Chronic Care
- PP 05-XX Hepatitis (revision, old policy)
- PP 05-XX Detoxification (revision, old policies) – see Substance Use Disorder section below.

Specialty Referrals

- A contract for an Evidence Based software product, *Interqual*, was recently executed. Staff need to develop an implementation plan including training.
- Staff have experienced delays with an electronic health record interface called *Carequality*. This interface is a data sharing platform for the purpose of continuity of care. Many local providers such as hospitals, County Mental Health, and local federally qualified health are using this interface or a comparable one. Once the interface is configured, staff will be able to receive clinical data from shared providers such as service provider, date, encounters, diagnoses, medications, labs, etc.
- Efforts to augment the specialty contracts have not been successful to date. At this time, work is focused on obtaining telehealth and e-consult providers to augment specialists.

Substance Use Disorders (SUD) and Medication Assisted Treatment (MAT)

Staff are working to improve Substance Use Disorders (SUD) assessment and referrals. This has several components. A major part of the effort includes Sacramento County participation in a statewide learning collaborative for jails and implementation grant for expansion of MAT. Rollout and progress has slowed considerably due to the provider shortage and COVID-19 management. Items in process are listed below.

- PP 05-02 Medication Assisted Treatment (MAT) was developed. *Note: This policy will need to be revised due to the recent roll out of a SUD counselor at the Main Jail and updated American Society of Addiction Medicine (ASAM) Opioid Use Disorder practice guidelines.*
- Contracted SUD counselor began at the Main Jail late June 2020. PP 05-07 SUD Counselor was recently finalized. Custody has two contracted reentry staff providing SUD services through the same organization at the RCCC jail.
- A contract with CORE Medical Clinic, a local Narcotic Treatment Provider (NTP), was recently executed and PP 05-06 Methadone Treatment was finalized.
- PP 05-XX Detoxification Protocol (page 41) is not completed but Standardized Nursing Procedures for SUD including Alcohol Withdrawal Syndrome Treatment, Benzodiazepine Withdrawal Treatment, and Opiate Withdrawal Treatment were recently completed. *Note: These will need review and revision due to the recent roll out of a Substance Use Disorder*

*(SUD) counselor and updated American Society of Addiction Medicine (ASAM) Alcohol Use Disorder and Opioid Use Disorder practice guidelines.*

Continuity of Care

In addition to discharge medication practices mentioned in an earlier section, staff are working on other continuity of care practices.

- MH staff provide linkage for inmates with a Serious Mental Illness (see MH section) to community based mental health providers.
- Staff make referrals to County Alcohol & Drug Services for inmates who needs an onsite SUD assessment, referral, and linkage to a community based provider. The new onsite SUD counselor will assist in assessments, education, support, treatment, and will facilitate continuity of care.
- Staff recently executed a contract for health care navigation with a local provider, *Sacramento Covered*. Sacramento Covered assists individuals with Medi-Cal applications, linkage to health care (health plans, primary care providers, behavioral health providers), and/or social services when indicated. This will be particularly helpful for the presentence population. Contractor start date is estimated Fall 2020. Additional work with the contractor and internal staff is needed prior to implementation. Additional staff resources are also pending.
- The department is also working on execution of a contract with *UniteUs* (HIPAA compliant, cloud based platform for care management including health care and/or social service referrals). This is a department wide effort and there is not an estimated timeframe.
- Staff requested positions in the new proposed budget for an internal discharge team to assist inmates being released with referrals for chronic health conditions.

## VII. SUICIDE PREVENTION (page 42)

This section is large and requires more internal work prior to submission.

Draft policies that were reviewed with PLO/DRC:
- PP 07-04 Suicide Prevention Program (Planning Document) – This is not ready to return for review. Further work is needed internally.

Training:

- Suicide Risk Assessment (SRA) Training – Hired a forensic expert to update the SRA training and refine the assessment tool May 2019. Training increased from a four (4) hour training to a seven – eight (7-8) hour training module.
- Safety Planning Intervention (SPI) – Began training all mental health staff in the use of SPI January 2020. All outpatient and intensive outpatient staff have been trained. Training for staff in the acute inpatient unit and Jail Based Competency Treatment (JBCT) program is in process.

Supervision/Monitoring of Suicidal Inmates

- <u>Close (direct) observation</u> – Requirements are being met for patients who are not actively suicidal but express suicidal ideation as well as for patients who deny suicidal ideation or do not threaten suicide but are engaging in other concerning behaviors indicating the potential for self-injury.
- <u>Constant Observation</u> – Requirements are met for Suicidal Inmate Temporary Housing Unit (SITHU). This currently houses male patients only. An additional area is pending for female patients.

Property and Privileges

- MH staff in consultation with custody determine limitation, removal, and return of patient clothing, property, and/or routine privileges (e.g. visits, telephone calls, recreation) based on the patient's current functioning and ability to maintain safety. Procedures and staff training are being developed for outpatient programs and patients pending admission to the acute inpatient unit. This area is currently partially compliant.
- MH staff assess patients in safety suits every 24 hours but a policy is not yet formalized. Staff will draft a policy for outpatient staff.

Discharge from Suicide Precautions

- MH staff complete and document a suicide risk assessment prior to discharge from suicide precautions. Patients discharged from the acute unit are seen within 24 hours, 72 hours, and then within one week of discharge (implementation March 2020).

## VIII. SEGREGATION/RESTRICTIVE HOUSING (page 52)

- MH staff assigned to provide case management for individuals housed in segregation coordinate care with custody and identify and recommend less restrictive housing options or placement in a mental health program as clinically appropriate.
- Staff need to work on policy development in conjunction with custody.

## EMERGENCY RESPONSE (page 50)

This section was listed in the remedial plan under Mental Health Services.

Policies that will be released to the PLO/DRC for review shortly include:

- PP 04-11 Emergency Bag/Equipment (revision) – *pending nursing staff training*
- PP 04-12 Emergency Medical Response (revision) – *pending nursing staff training*

Training:

- Basic Life Support training was held in March and April 2020 for nursing staff.

- Training completion was interrupted by the COVID pandemic but will resume when feasible. Although eight (8) sessions were offered, not all nurses received training due to course size and scheduling issues. Other session(s) will also be scheduled for provider staff.

CPR is required for credentialing and every two years for Physicians, Nurse Practitioners, Dentists and Registered Nurses.

## IX. QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE (page 61)

Policy approved by PLO/DRC:

- PP 01-07 Quality Improvement (QI) Program including a QI Plan was approved.
- This policy is applicable to health and mental health staff. It includes a Quality Improvement Committee, Mental Health Subcommittee, and Pharmacy & Therapeutics Subcommittee. Each forum meets quarterly. The two subcommittees were established in December 2019. A new Safety Subcommittee will begin meeting in July 2020.

Quality Improvement / Compliance Team

Staff positions were created in FY 2019/20 to create a small team to help staff with QI and compliance efforts.

Reporting

Staff were not able to generate data reports from April 2018 – June 2019 (transitioned to Centricity EHR April 2018). As of Fiscal Year 2019/20, basic data reports have been produced. Reports from this EHR are time consuming and some are not available. Other options are being reviewed in order to meet PLO/DRC and community standards for reporting.

***The following two sections pertain to Sacramento County and include the efforts of the County Executive's Office, Sheriff's Office, other criminal justice partners, Department of General Services, and the Department of Health Services.***

## JAIL FACILITY NEEDS

Sacramento County has been engaged in planning for facility improvements to meet the needs of the consent decree including Americans with Disabilities Act (ADA) standards, patient privacy, and sufficient space for medical and mental health services.

Main Jail Annex Project:

This project consists of design and construction of a new building on the northeast corner of the existing Main Jail facility. This construction will add a new intake/booking area, additional medical and mental health space, education, and program space. Areas will be designed to be compliant with the Americans with Disabilities Act (ADA) and Health Insurance Portability and

10

Accountability Act (HIPAA). On April 21, 2020, the Board of Supervisors approved a contract with an architectural firm to design the proposed annex.

Rio Cosumnes Correctional Center (RCCC) Facility Project:

The intent of this project was to make improvements to the RCCC facility (new medical, mental health, and program space) and to accept SB 1022 grant project funds. The additional areas would be compliant with ADA and HIPAA requirements. The Board of Supervisors raised questions about this project at the hearing and did not take action. This project has not yet returned to the Board.

---

### COUNTY EFFORTS TO REDUCE THE JAIL POPULATION

Sacramento County is engaged in multiple efforts to reduce the jail population. See Board of Supervisors meeting dated 10/22/2019, Item #66 (*Report on County Efforts to Reduce the Jail Population*). Updates on some of these efforts are listed below.

- Pretrial Felony Mental Health Diversion: Public Defender (lead agency) received a grant from State Hospitals to implement a Pretrial Mental Health Diversion Program. The target population includes adults with serious mental illness charged with felonies that are incompetent to stand trial or in danger of being incompetent to stand trial. The Public Defender released the RFP on 6/26/2020 for community based treatment services that will begin in September 2020.

- Forensic Behavioral Health Innovation Program: DHS Behavioral Health created an innovation project for individuals with a serious mental illness and criminal justice involvement who are being released from the jail. The project plan and Mental Health Services Act funding was approved 6/25/2020 by the Mental Health Services Oversight and Accountability Commission. The next step will be to release an RFP. Services estimated to begin in early 2021.

- Pretrial Assessment: Probation (lead agency) received local general funds and a grant from the Superior Court to utilize the Public Safety Assessment (PSA) tool to inform pretrial release decisions based on risk of failure to appear (FTA), risk of new criminal activity, and risk of new violent criminal activity. The Pretrial Pilot began in October 2019.

- Jail Diversion Treatment and Resource Center: Probation (lead agency) received a California Health Facilities Financing Authority community services infrastructure grant to provide a community based facility to divert criminal justice-involved adults with mental health disorders, substance use disorders, and/or other trauma-related disorders from jail and/or prison. On June 2, 2020, Probation received the Board of Supervisors approval on this project and is in the beginning phases.

Additionally, the County retained consultants to review key areas, report findings and make recommendations.  They include:

| # | Consultant Reports | Consultant | Comments |
|---|---|---|---|
| 1 | Sacramento County Consultant Report on Jail Alternatives (May 29, 2020) | Carey Group | See notes below. |
| 2 | Feasibility Study:  Regional Mental Health Correctional Facility (June 24, 2020) | CGL | |
| 3 | Mental Health Services Oversight & Accountability Commission Data Driven Recovery Project | O'Connell Research, Inc. | |

1.  Recommendations will be reviewed by the County's Criminal Justice Cabinet which includes all criminal justice partners and other critical health and social service departments/leads. A work plan is under development for implementation of recommendations during FY 2020-21.

2.  Nine counties participated in this feasibility study and the report has been finalized.  Two counties have dropped out of this project.  The remaining seven counties are determining whether to proceed with Phase II of the feasibility study.

3.  Sacramento County was awarded this grant along with four other counties. The consultant is aligning work with the *Stepping Up Initiative* and will integrate, review, and analyze health and criminal justice data on inmates (mental health services provided while incarcerated, mental health services in the community, and criminal justice data). This work is in process. Findings will be shared with the Criminal Justice Mental Health Work Group and will focus on gaps identified, programs and services correlated with recidivism reduction, and informing decisions on operational changes that aim to reduce justice involvement for people with significant behavioral health needs.

# ATTACHMENT 2
# Sheriff's First Status Report

*MAYS V. COUNTY OF SACRAMENTO*

COMBINED REMEDIAL PLAN – May 30, 2019

III.    AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE

A.  **Policies and Procedures**

**Sacramento Sheriff Response**

1.  It is the County's policy to provide access to its programs and services to prisoners with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests. No prisoner with a disability, as defined in 42 U.S.C. § 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities or be subjected to discrimination. The County's policy is to provide reasonable accommodations or modifications where necessary, consistent with 28 C.F.R. §§ 35.150 & 35.152, and other applicable federal and state disability law.

The Sheriff's Office has engaged in several steps, some through policy revision, others through practice to ensure all inmates receive equal access regardless of disability.  Notably, the Compliance Unit, through tracking mechanisms, and personal visits, ensures equal access and effective communication on an individual basis for all inmates with disabilities.  Practices invovling lower bunks and lower tiers have been modified to ensre the maximum number of beds are available for those needing accomodations.  Patients identified with mobility issues are escorted in or with the proper DME to ensure they are not denied equal access to facilities, programs and services.

2.  The County shall, in consultation with Plaintiffs' counsel, revise its Operations Order to establish standard and consistent procedures for the Jail to ensure compliance with the ADA and the remedial provisions outlined herein.

ADA Operations Order under review.

3. The County shall, within 12 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, revise policies, procedures, and inmate orientation materials (e.g. Inmate Handbook), in accordance with the revised Operations Order and the remedial provisions outlined herein. A list of policies which the County will revise consistent with the provisions outlined herein, as appropriate and in consultation with Plaintiffs' counsel, is attached as **Exhibit A-1.**

Discipline housing, Housing unit checks, Tsep procedures sent as temporary polices. TGNI, Suicide Prevention and Effective Communication under revision.

4. All staff will receive training appropriate to their position on policies and procedures related to compliance with the Americans with Disabilities Act (ADA) and related disability laws.

This item is pending the approval and completion of the ADA policy.

B. **ADA Tracking System**

1. The County shall develop and implement a comprehensive system (an "ADA Tracking System") to identify and track screened prisoners with disabilities as well as accommodation and Effective Communication needs.

ATIMS under development to track ADA needs.

2. The ADA Tracking System shall identify:

a) All types of disabilities, including but not limited to psychiatric, intellectual, developmental, learning, sensory, mobility, or other physical disabilities, and special health care needs;

ATIMS under development to track ADA needs.

b) Prisoners with disabilities that may pose a barrier to communication, including but not limited to learning, intellectual, or developmental disabilities, and hearing, speech, or vision impairments;

ATIMS under development to track ADA needs.

| | |
|---|---|
| c)  Accommodation needs, including as to housing, classification, Effective Communication, adaptive supports, and assistive devices; | ATIMS under development to track ADA needs. |
| d)  Prisoners who require specific health care appliances, assistive devices, and/or durable medical equipment (HCA/AD/DME); | ATIMS under development to track ADA needs. |
| e)  Prisoners who are class members in *Armstrong v. Newsom* (N.D. Cal. No. 94-cv-02307), with their applicable disability classification(s) and accommodation need(s). | ATIMS under development to track ADA needs. |
| 3.  The ADA Tracking System's prisoner disability information will be readily accessible to custody, medical, mental health, and other staff at the Jail who need such information to ensure appropriate accommodations and adequate program access for prisoners with disabilities. | ATIMS under development to track ADA needs. |

## C.  ADA Coordinator

| | |
|---|---|
| 1.  The County shall have a dedicated ADA Coordinator at each facility. | Both positions overseen by the Compliance Sergeant at each facility. |
| 2.  The ADA Coordinator position shall be dedicated to coordinating efforts to comply with and carry out ADA-related requirements and policies, shall have sufficient command authority to carry out such duties, and shall work with the executive management team regarding ADA-related compliance, training, and program needs. | Both positions overseen by the Compliance Sergeant at each facility. |
| 3.  The County shall clearly enumerate, in consultation with Plaintiffs' counsel, the job duties and training requirements for the ADA Coordinator position and for ADA Deputies assigned to support the ADA Coordinator position. | This item is pending the approval and completion of the ADA policy. |

4.  The County shall ensure that ADA Coordinators and ADA Deputies possess requisite training to implement and ensure compliance with the Jail's disability program and services, including operation of the ADA Tracking System.

This item is pending the approval and completion of the ADA policy.

D.  **Screening for Disability and Disability-Related Needs.**

E.  **Orientation**

1.  The County shall ensure that, for the population to be housed in the Jails, prisoners with disabilities are adequately informed of their rights under the ADA, including but not limited to:

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means.

a)  Accommodations available to prisoners;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means.

b)  The process for requesting a reasonable accommodation;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means.

c)  The role of the ADA coordinator(s) and method to contact them;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means.

d) The grievance process, location of the forms, and process for getting assistance in completing grievance process;

This function is performed by Compliance Officers on an as needed basis. This can be expanded to include all inmates, pre-recorded effecive communcations means.

e) Instructions on how prisoners with disabilities can access health care services, including the provision of Effective Communication and other accommodations available in accessing those services.

This function is performed by Compliance Officers on an as needed basis. This can be expanded to include all inmates, pre-recorded effecive communcations means.

2. Upon processing and classification, prisoners with disabilities shall receive, in an accessible format, the jail rulebook; orientation handbook; and a verbal orientation or orientation video regarding rules or expectations.

Verbal and written communication presented by compliance officers upon request.

3. The County shall accommodate individuals with disabilities in the orientation process through the use of alternative formats (*e.g.* verbal communication, large print, audio/video presentation), when necessary for Effective Communication of the information.

This function is performed by Compliance Officers on an as needed basis. This can be expanded to include all inmates, pre-recorded effecive communcations means.

4. The County shall develop an Americans with Disabilities Act Inmate Notice. The Notice shall be prominently posted in all prisoner housing units, in the booking/intake areas, in medical/mental health/dental treatment areas, and at the public entrances of all Jail facilities.

This item is pending the approval of the ADA policy.

F. **Health Care Appliances, Assistive Devices, Durable Medical Equipment**

b)  If such a determination is made, the ADA coordinator or supervisory-level designee shall document the decision and reasons for it, in writing, and shall consult with medical staff to determine an appropriate alternative accommodation.

Planning for this item is underway.

a)  The County will ensure that any personal mobility device belonging to a prisoner is returned to the prisoner prior to release from custody.

Current practice.

## G.  **Housing Placements**

1.  The County shall house prisoners with disabilities in facilities that accommodate their disabilities.

Jail Annex Planning.

2.  The County shall implement a housing assignment system that includes an individualized assessment of each individual's functioning limitations and restrictions, including but not limited to:

Jail Annex Planning.

a)  The need for ground floor housing;

Jail Annex Planning.

b)  The need for a lower bunk;

Jail Annex Planning.

c)  The need for grab bars in the cell and/or shower;

Jail Annex Planning.

d)  The need for accessible toilets;

Jail Annex Planning.

e)  The need for no stairs in the path of travel; and

Jail Annex Planning.

f)  The need for level terrain.

Jail Annex Planning.

3.  Prisoners with disabilities shall be housed in the Jail consistent with their individual security classification. Prisoners prescribed or possessing HCAs/ADs/DME will not automatically be housed in a medical housing unit. Placement in a medical housing unit will be based on individualized clinical determination of need for treatment.

Jail Annex Planning.

4.  Classification staff shall not place prisoners with disabilities in:

a)  Inappropriate security classifications simply because no ADA-accessible cells or beds are available;

Current practice.

b)  Designated medical areas unless the prisoner is currently receiving medical care or treatment that necessitates placement in a medical setting; or

Current practice.

c)  Any location that does not offer the same or equivalent programs, services, or activities as the facilities where they would be housed absent a disability.

Jail Annex Planning.

## H.  Access to Programs, Services, and Activities

1.  The County shall ensure prisoners with disabilities, including those housed in specialized medical units or mental health units (*e.g.*, OPP, IOP, Acute) have equal access to programs, services, and activities available to similarly situated prisoners without disabilities, consistent with their health and security needs. Such programs, services, and activities include, but are not limited to:

Current practice.

a)  Educational, vocational, reentry and substance abuse programs

Jail Annex Planning.

b)  Work Assignments                                          Jail Annex Planning.

c)  Dayroom and other out-of-cell time                        Increased out of cell time.

d)  Outdoor recreation and fitted exercise equipment          Increased outdoor recreation time.

e)  Showers                                                   Current practice.

f)  Telephones                                                Current practice.

g)  Reading materials                                         Current practice.

h)  Social visiting                                           Current practice.

i)  Attorney visiting                                         Current practice.

j)  Religious services                                        Current practice.

k)  Medical, mental health, and dental services and treatment  Current practice.

**2.**  The County shall provide reasonable accommodations and modifications as necessary to ensure that prisoners with disabilities have equal access to programs, services, and activities available to similarly situated prisoners without disabilities.                                             Jail Annex Planning.

3.   The County shall develop and implement a written policy for staff to provide appropriate assistance to prisoners with psychiatric, developmental, or cognitive disabilities so that they can fully participate in programs, services, and activities provided at the Jail.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

**4.**   The County shall implement a written policy for staff to provide assistance to prisoners with disabilities in reading or scribing documents.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

5.   The County shall provide equal access to library, recreational, and educational reading materials for prisoners with disabilities, including easy reading and large print books for individuals who require such accommodations.

Curent practice, inlcuding the purchase of keep-on-person magnifiers.

6.   The County shall ensure equitable inmate worker opportunities for prisoners with disabilities, including by:

Jail Annex Planning.

a)   Ensuring clear job duty statements, with essential functions and specific criteria, for each Worker position;

Jail Annex Planning.

b)   Ensuring that medical staff conduct an individualized assessment to identify work duty restrictions and/or physical limitations to facilitate appropriate work/industry assignments and to prevent improper exclusions from work opportunities;

Jail Annex Planning.

c)   Providing reasonable accommodations to enable prisoners with disabilities to participate in inmate worker opportunities.

Jail Annex Planning.

I.   **Effective Communication**

1.   The County shall assess all individuals detained at the Jail for any period of time for Effective Communication needs, and shall take steps to provide Effective Communication based on individual need.

This item is pending the creation and approval of the effective communication order.

2.   The County's ADA policies shall include comprehensive guidance to ensure Effective Communication for prisoners with vision, speech, hearing, intellectual, learning, or other disabilities. The County shall, in consultation with Plaintiffs' counsel, ensure that sufficient guidance on the provision of Effective Communication is included in Jail custody and health care policies and procedures.

This item is pending the creation and approval of the effective communication order.

a)   A higher standard for the provision of Effective Communication shall apply in the following situations:

i.    Due Process Events, including the following:

▪ Classification processes

This item is pending the creation and approval of the effective communication order.

▪ Prisoner disciplinary hearing and related processes

This item is pending the creation and approval of the effective communication order.

▪ Service of notice (to appear and/or for new charges)

This item is pending the creation and approval of the effective communication order.

▪ Release processes

This item is pending the creation and approval of the effective communication order.

- Probation encounters/meetings in custody

This item is pending the creation and approval of the effective communication order.

i.  Identify each prisoner's disability where there may be a barrier to comprehension or communication requiring reasonable accommodation(s);

This item is pending the creation and approval of the effective communication order.

ii.  Provide effective reasonable accommodation(s) to overcome the communication barrier; and

This item is pending the creation and approval of the effective communication order.

iii.  Document the method used to achieve Effective Communication and how the staff person determined that the prisoner understood the encounter, process, and/or proceeding.

This item is pending the creation and approval of the effective communication order.

4.  Effective auxiliary aids and services that are appropriate to the needs of a prisoner with Effective Communication needs shall be provided when simple written or oral communication is not effective. Such aids may include bilingual aides, SLIs, readers, sound amplification devices, captioned television/video text displays, Videophones and other telecommunication devices for deaf persons (TDDs), audiotaped texts, Braille materials, large print materials, writing materials, and signage.

VRI system installed at RCCC with the intention of bringing a similar system to the Main Jail.  Video visitation RFP is in process.

5.  In determining what auxiliary aid service to provide, the County shall give primary consideration to the request of prisoner with Effective Communication needs.

This item is pending the creation and approval of the effective communication order.

6.  Education providers (*e.g.,* Elk Grove Unified School District) at the Jail will ensure Effective Communication for prisoners participating in education programs, including by providing necessary assistive equipment and take steps to accommodate learning strategies of those prisoner-students who have special needs, such as those with developmental, learning, vision, hearing, and speech disabilities.

This item is pending the creation and approval of the effective communication order.

7.  The County shall assist prisoners who are unable to complete necessary paperwork (*e.g.*, related to health care, due process, Jail processes) on their own with reading and/or writing as needed.

Current practice.

## J.  Effective Communication and Access for Individuals with Hearing Impairments

1.  The County shall develop and implement a policy for newly arrived and newly identified prisoners with hearing disabilities to determine each prisoner's preferred method of communication.

This item is pending the creation and approval of the effective communication order.

2.  Qualified Sign Language Interpreters (SLIs) will be provided during intake and for due process functions, health care encounters, and Jail programming, when sign language is the prisoner's primary or only means of Effective Communication, unless the prisoner waives the assistance of an interpreter and/or delay would pose a safety or security risk.

VRI system installed at RCCC.

a)  The County shall maintain a contract or service agreement with interpreter services in order to provide such services for deaf or hearing impaired prisoners. Jail staff will be informed of the availability of contract interpreter services.

Current practice.

b)  Lip reading will not be the sole method of Effective Communication used by staff, unless the prisoner has no other means of communication.

Current practice.

c)  In cases where the use of an SLI is not practicable, or is waived by the prisoner, Jail staff shall employ the most effective form of communication available.

Current practice.

d)  The County will maintain a log of (a) when, for whom, and for what purpose an SLI was used; and (b) when, for whom, and why a SLI was *not* used for a prisoner with an identified need for SLI services (*e.g.*, prisoner waived SLI or delay would have posed safety or security risk).

This item is pending the creation and approval of the effective communication order.

e)  When a prisoner waives an SLI, the log must document (a) the method of communication of the waiver, and (b) the method staff used to determine that the waiver was knowing and freely given.

This item is pending the creation and approval of the effective communication order.

3.  Jail Staff shall effectively communicate the contents of the Inmate Handbook and other materials providing information on Jail rules and procedures to all prisoners to be housed in the Jail who are deaf or hard of hearing. For those prisoners for whom written language is not an effective means of communication, Jail Staff may meet this obligation by providing a video of an SLI signing the contents of the Inmate Handbook, along with appropriate technology for viewing, or by providing an SLI to interpret the contents of the Inmate Handbook to the prisoner who is deaf or hard of hearing.

This item is pending the creation and approval of the effective communication order.

4.   The County shall, within 12 months from court approval of the Settlement, make Videophones available for deaf and hard of hearing prisoners. The Videophones shall provide for calls through the use of Video-Relay Services (VRS) at no cost to deaf and hard of hearing prisoners or for calls directly to another Videophone.

VRI system installed at RCCC.

5.   Deaf/hard of hearing prisoners who use telecommunication relay services, such as Videophone or TDD/TTY machine, in lieu of the telephone shall receive equal access to the Videophone or TDD/TTY services as non-disabled prisoners are afforded for regular telephone usage.

Current RFP for video visitiation services.

6.   The County shall provide deaf/hard of hearing prisoners with additional time for calls using telecommunication relay services, such as a Videophone or TDD/TTY, to account for the fact that signed and typed conversations take longer than spoken conversations. The County shall document the time that each prisoner uses and has access to such equipment.

Telephone calls are not timed.  This is current practice.

7.   Prisoners who require an SLI as their primary method of communication shall be provided an SLI for education, vocational, or religious programs and services.

This item is pending the creation and approval of the effective communication order.

8.   Public verbal announcements in housing units where individuals who are deaf or hard of hearing reside shall be delivered on the public address system (if applicable) and by flicking the unit lights on and off several times to alert prisoners that an announcement is imminent. This includes announcements regarding visiting, meals, recreation release and recall, count, lock-up, and unlock. Verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, as consistent with individual need. These procedures shall be communicated to prisoners during the orientation process and also shall be incorporated into relevant policies and post orders.

This item is pending the creation and approval of the effective communication order.

K.  **Disability-Related Grievance Process**

1.   The County shall implement a grievance system for prisoners with disabilities to report any disability-based discrimination or violation of the ADA, this Remedial Plan, or Jail ADA-related policy, and shall provide a prompt response and equitable resolution in each case.

Medical Greivance boxes installed. ADA added to greivance forms.

2.   The County shall ensure that the grievance procedures are readily available and accessible to all prisoners.

Grievances are made available to all inmates.

a)   The County shall make reasonable efforts to ensure all prisoners are aware of the disability grievance procedures, including the availability of accommodations and staff assistance to submit a grievance and/or appeal.

Current practice.

b)   The County shall ensure the prisoners with disabilities have meaningful access to grievance forms, including through provision of staff assistance and large print materials.

Current practice, however, large print has not been developed yet.

3.  Response to Grievances

a)  The County shall develop and implement an ADA grievance process that includes (1) a reasonable timeline for response to ADA-related grievances and appeals, including an expedited process for urgent ADA grievance (*e.g.*, involving prisoner safety or physical well-being); and (2) provision for interim accommodations pending review of the individual's grievances/appeals.

This item is pending the approval and completion of the ADA policy.

b)  The County shall ensure that prisoners with communication needs are interviewed and provided assistance as part of the grievance/appeal process where necessary to ensure meaningful access and Effective Communication.

This item is pending the approval and completion of the ADA policy.

c)  The County shall document each denial of a reasonable accommodation request and shall record the basis for such determination.

This item is pending the approval and completion of the ADA policy.

d)  The County shall provide in writing a copy of the grievance (or appeal) response to the prisoner, including the resolution, the basis for a denial (if applicable), and the process for appeal.

This item is pending the approval and completion of the ADA policy.

e)  The County shall ensure that completed grievance responses are effectively communicated to prisoners with disabilities.

This item is pending the approval and completion of the ADA policy.

4.  The submission, processing, and responses for disability-related grievances and complaints shall be tracked.

Current practice.

L.  **Alarms/Emergencies**

**1.** The County shall ensure that all written policies regarding alarms and emergencies contain mandatory provisions to accommodate prisoners with disabilities.

This item is pending the approval and completion of the ADA policy.

**2.** The County shall implement written policies regarding the expectations of staff as to prisoners with identified disabilities during emergencies and alarms, including as to disabilities that may affect prisoners' ability to comply with orders or otherwise respond to emergencies and alarms. For example, the policies shall ensure appropriate handling of prisoners with mobility-related disabilities who are unable to prone or take a seated position on the ground during an alarm or emergency. Such policies shall be communicated to staff, incorporated into the relevant Operations Orders, and communicated to prisoners with disabilities using Effective Communication.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

3. The County shall implement written policies for staff regarding communicating effectively and appropriately with prisoners who have disabilities that may present barriers to communication during emergencies or alarms.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

4. In order to facilitate appropriate accommodations during alarms or emergencies, the County shall offer, but shall not require, individuals who have disabilities visible markers to identify their disability needs (*e.g.*, identification vests). The County shall maintain a list, posted in such a way to be readily available to Jail staff in each unit, of prisoners with disabilities that may require accommodations during an alarm or emergency.

This item is pending the approval and completion of the ADA policy.

| | |
|---|---|
| 5.  The County shall install visual alarms appropriate for individuals who are deaf or hard of hearing, which shall comply with relevant fire code regulations. | Jail annex planning. |
| 6.  All housing units shall post notices for emergency and fire exit routes. | Emergency and fire exit routes posted. |

## M.  Searches, Restraints, and Extractions

| | |
|---|---|
| 1.  The County shall modify its written policies to ensure that prisoners with mobility impairments, including those with prosthetic devices, receive reasonable accommodations with the respect to the following: (1) Pat searches and unclothed body searches; (2) Application of restraints devices, including Pro-Straint Chair; and (3) Cell extractions. | Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. |

## N.  Transportation

| | |
|---|---|
| 1.  The County shall provide reasonable accommodations for prisoners with disabilities when they are in transit, including during transport to court or outside health care services. | ADA Transport Van. |
| 2.  Prescribed HCAs/ADs/DME, including canes, for prisoners with disabilities shall be available to the prisoner at all times during the transport process, including in temporary holding cells, consistent with procedures outlined in Part VII. | Current practice. |
| 3.  The County shall use accessible vehicles to transport prisoners in wheelchairs and other prisoners whose disabilities necessitate special transportation, including by maintaining a sufficient number of accessible vehicles. (295) | ADA Transpor Van. |

4.  Prisoners with mobility impairments shall be provided assistance onto transport vehicles.

Current practice.

O.  **Prisoners with Intellectual Disabilities**

1.  The County shall, in consultation with Plaintiffs' counsel, develop and implement a comprehensive written policy and procedure regarding prisoners with an Intellectual Disability, including:

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

a)  Screening for Intellectual Disabilities;

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

b)  Identification of prisoners' adaptive support needs and adaptive functioning deficits; and

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

c)  Monitoring, management, and accommodations for prisoners with Intellectual Disabilities.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

3.  Prisoners with an Intellectual Disability assigned to a work/industry position will be provided additional supervision and training as necessary to help them meet the requirements of the assignment.

This will be contained in future policy.

P.  **ADA Training, Accountability, and Quality Assurance**

1.   The County shall ensure all custody, health care, facility maintenance, and other Jail staff receive ADA training appropriate to their position.

This item is pending the approval and completion of the ADA policy.

a)   The County shall provide to all staff appropriate training on disability awareness, including the use and purpose of accommodations and modifications in accordance with the ADA.

This item is pending the approval and completion of the ADA policy.

b)   The ADA training shall include: formalized lesson plans and in-classroom or virtual training for staff (including managers, supervisors, and rank-and-file staff) provided by certified or otherwise qualified ADA trainers.

This item is pending the approval and completion of the ADA policy.

2.   ADA instructors shall have appropriate ADA training and subject matter expertise necessary to effectively provide ADA training to staff.

This item is pending the approval and completion of the ADA policy.

3.   The County shall, in consultation with Plaintiffs' counsel, develop and implement written policies and procedures regarding monitoring, investigating, and tracking staff violations (or allegations of violations) of ADA requirements and Jail ADA policies.

This item is pending the approval and completion of the ADA policy.

4.   The County shall develop an ADA accountability plan that will ensure quality assurance and establish staff accountability for egregious, serious, or repeated violations of the ADA and Jail ADA-related policies and procedures.

This item is pending the approval and completion of the ADA policy.

Q.   **Accessibility Remedial Plan to Address Physical Plant Deficiencies**

1.   The County shall, within 24 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, develop and fully implement an Accessibility Remedial Plan to address Jail physical plant deficiencies that result in access barriers for prisoners with disabilities. In the interim, the Sheriff's Office shall house prisoners with disabilities in the most integrated and appropriate housing possible, providing reasonable accommodations and assistance where necessary to ensure appropriate accessibility to Jail programs, services, and activities.

Jail annex plannning.

2.   The Accessibility Remedial Plan shall ensure the following:

a)   Adequate provision of accessible cells and housing areas with required maneuvering clearances and accessible toilet fixtures, sanitary facilities, showers, dining/dayroom seating, and recreation/yard areas.

Jail annex plannning.

b)   Accessible paths of travel that are compliant with the ADA.

Jail annex plannning.

c)   Equal and adequate access for all prisoners with disabilities to Family and Attorney Visiting areas in reasonable proximity to their housing location.

Jail annex plannning.

## IV.   MENTAL HEALTH CARE

### A.  Policies and Procedures

h)   Training for all staff members who are working with inmates with mental illness in all aspects of their respective duty assignments.

Relias training for custody deputies.  CIT training for IOP depuites.

2.   The County's policies and procedures shall be revised, as necessary, to reflect all of the remedial measures described in this Remedial Plan.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

3.   The County shall continue to operate its acute inpatient program and its Outpatient Psychiatric Pod (OPP) program. The County shall establish a new Intensive Outpatient Program (IOP) for inmates who require a higher level of outpatient psychiatric care than what is provided in the OPP program.

Main Jail IOP to include 20 males and 15 females.  RCCC IOP to include 24 males.

## B.   Organizational Structure

1.   The County shall develop and implement a comprehensive organizational chart that includes the Sheriff's Department ("Department"), Correctional Health Services ("CHS"), Jail Psychiatric Services ("JPS"), Chief Administrative Officer, Medical Director of the JPS Program, and any other mental health staff, and clearly defines the scope of services, chains of authority, performance expectations, and consequences for deficiencies in the delivery of mental health care services.

The Sheriff's Organizational chart exists.

## C.   Patient Privacy

1.   All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff.  In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification.

Secluded privacy interview room created on first floor for booking related clinical interactions.  Use of private attorney visit booths for housing unit clinical interactions.

b)  If the presence of custody staff  is determined to be necessary to ensure the safety of medical staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

Jail annex planning.

2.  Jail policies that mandate custody staff to be present for any mental health treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above.  Custody and mental health staff shall be trained accordingly.

No policies exist mandating custody to be present with mental health treatment.

3.  It shall be the policy of the County that mental health clinicians shall not conduct their patient contacts at cell front except pursuant to documented refusals or specific, documented security concerns that warrant cell front contacts.

Case management Post Order.

5.  A process shall exist for sick call slips or other mental health treatment-related requests to be collected without the involvement of custody staff.

Sick call slips may be handed medical staff directly.

D.  **Clinical Practices**
E.  **Medication Administration and Monitoring**

5.  The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

Growth request submitted for medical escort team.

6.  Medication adherence checks that serve a clinical function shall be conducted by nursing staff, not custody staff. Custody staff shall conduct mouth checks when necessary to ensure institutional safety and security.

Curent practice.

F.  **Placement, Conditions, Privileges, and Programming**

1.  Placement:

a)  It shall be the policy of the County to place and treat all prisoners on the mental health caseload in the least restrictive setting appropriate to their needs.

Current practice.

b)  Placement in and discharge from Designated Mental Health Units shall be determined by qualified mental health professionals, with consultation with custody staff as appropriate.

Current practice.

c)  Absent emergency circumstances, the County shall obtain the assent of qualified mental health professionals before transferring prisoners with SMI into or out of Designated Mental Health Units.

Current practice.

d)  It shall be the policy of the County to place prisoners with SMI in appropriate settings that ensure provision of mental health services, patient safety, and the facilitation of appropriate programs, activities, and out-of-cell time.  Co-housing with other populations shall be avoided to the extent that such a practice prevents or hinders any of the above.

Current practice.

2.  *Programming and Privileges*

a)   All Designated Mental Health Units shall offer a minimum of 7 hours of unstructured out-of-cell time per week and 10 hours of structured out-of-cell time per week for each prisoner. While out-of-cell hours per prisoner may vary from day to day, each prisoner will be offered some amount of out-of-cell time every day of the week. All treatment and out-of-cell time shall be documented for each prisoner, and reviewed as part of Quality Assurance procedures.

Curent practice.

b)   The County shall ensure that prisoners on the mental health caseload have access and opportunity to participate in jail programming, work opportunities, and education programs, consistent with individual clinical input.

Current practice.  Work assignments will be based on the patient's ability to safely perform those functions given the appropriate level of supervision.

c)   The County shall develop and implement, in the 2P inpatient unit and the IOP unit, a program for progressive privileges (including time out of cell, property allowances, etc.) for patients as they demonstrate behavioral progress. A patient's level of privileges and restrictions shall be based on both clinical and custody input regarding current individual needs. The County shall ensure a process to review custody classification factors when necessary, so that placement, privileges, and restrictions match current individual circumstances and needs.

Current practice.

d)   Individuals on a mental health caseload shall receive, at minimum, privileges consistent with their classification levels, absent specific, documented factors which necessitate the withholding of such privileges. Clinical staff shall be informed of the withholding of privileges and the reasons for the withdrawal shall be documented and regularly reviewed by clinical and custody staff. The restoration of privileges shall occur at the earliest time appropriate based on individual factors.

Current practice.

3. Conditions:

a) Staff shall provide prisoners in Designated Mental Health Units with the opportunity to maintain cell cleanliness and the opportunity to meet their hygiene needs.  Custody and clinical staff shall provide assistance to prisoners on these matters, as appropriate to individual patient needs

Current practice.

b) The County shall ensure uniformity of practice with respect to cell searches, such that searches are not done for punitive or harassment reasons. The County shall monitor whether cell search practices may be serving as a disincentive for prisoners in Designated Mental Health Units to leave their cells for treatment or other out-of-cell activities, and shall take steps to address the issue as appropriate.

Cell searches are done randomly on a revolving basis.

4. Bed planning:

a) The County shall provide a sufficient number of beds in Designated Mental Health Unit, at all necessary levels of clinical care and levels of security, to meet the needs of the population of prisoners with SMI.

Jail annex planning.  IOP units have been created for male and female patients, with the expansion of Enhanced Treatment pods.

c) The County shall establish mental health programming for women that ensures timely access to all levels of care and is equivalent to the range of services offered to men.

Women's IOP and OPP unit established at Main Jail.  2P services already offered to women.

5. General Exclusion of Prisoners with Serious Mental Illness from Segregation

a) Prisoners with Serious Mental Illness will not be housed in Segregation units, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and there is no reasonable alternative, in which cases the provisions of **Section VIII.D** of the Segregation/Restrictive Housing Remedial Plan shall apply.

This is being implemented.  JPS is using an alternative treatement program in IOP to take Administrative Segregation inmates.  Fewer and fewer TSEPs are on the SMI caseload.

b) Where prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit are assessed a Disciplinary Segregation term, they will serve the term in a Designated Mental Health Unit, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and shall receive structured out-of-cell time and programming as determined by the Multi-Disciplinary Treatment Team.

Current practice.  Disciplinary Segregation Post Order reflects all but the most serious violations will result in in-place discipline.

6.   Access to Care

a) The County shall designate and make available custody escorts for mental health staff in order to facilitate timely completion of appointments and any other clinical contacts or treatment-related events.

IOP deputies have been structure to oversee MH treatment on the entire third floor.

b) The County shall ensure sufficient and suitable treatment and office space for mental health care services, including the Triage Navigator Program and other mental health-related services provided on site at the Jail.

Jail annex planning.

c) Locations shall be arranged in advance for all scheduled clinical encounters.

Current practice.

e) Referrals and triage:

i.   The County shall maintain a staff referral process (custody and medical) and a kite system for prisoners to request mental health services.  Referrals by staff or prisoners must be triaged within 24 hours.

Current practice.

G.  **Medico-Legal Practices**
H.  **Clinical Restraints and Seclusion**
I.   **Training**

1.   The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

a)   All jail custody staff shall receive formal training in mental health, which shall encompass mental health policies, critical incident response, crisis intervention techniques, recognizing different types of mental illness, interacting with prisoners with mental illness, appropriate referral practices, suicide and self-harm detection and preventions, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

Many aspects of this training are already covered during in-service and pre-service training.  A comprehensive review of current training offerings, compared against the needs of this element is under reveiew.

b)   Custody staff working in Designated Mental Health Units shall receive additional training, including additional information on mental illness, special medico-legal considerations, de-escalation techniques, working with individuals with mental health needs, relevant bias and cultural competency issues, and the jail's mental health treatment programs.

IOP deputies are given CIT training.

## V.    DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH MENTAL HEALTH OR INTELLECTUAL DISABILITIES

### A.  Role of Mental Health Staff in Disciplinary Process

1.   The County's policies and procedures shall require meaningful consideration of the relationship of a prisoner's behavior to any mental health or intellectual disability, the efficacy of disciplinary measures versus alternative interventions, and the impact of disciplinary measures on the health and well-being of prisoners with disabilities.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

2.   Prisoners who are alleged to have committed a rules violation shall be reviewed by a qualified mental health professional if any of the following apply:

a)   Prisoner is housed in any Designated Mental Health Unit;

Pilot program to indclude JPS in the hearing process for IOP inmates.

b)   Jail staff have reason to believe the prisoner's behavior was unusual, uncharacteristic, or a possible manifestation of mental illness;

Policy has not been created, but the JPS pilot program is leading to effective organizational structure to meet this element.

c)   Prisoner is on the mental health caseload and may lose good time credit as a consequence of the disciplinary infraction with which he or she is charged.

Policy has not been created, but the JPS pilot program is leading to effective organizational structure to meet this element.

### B.  Consideration of Mental Health Input and Other Disability Information in Disciplinary Process

1.   The County shall designate one Chief Disciplinary Hearing Officer for each jail facility, who shall be responsible for ensuring consistency in disciplinary practices and procedures.

Identification of this position is underway to determine if existing staff can take on the workload or if a growth request is necessary to make a standalone position.

2.   The Disciplinary Hearing Officer shall ensure that prisoners are not disciplined for conduct that is related to their mental health or intellectual disability.

Identification of this position is underway to determine if existing staff can take on the workload or if a growth request is necessary to make a standalone position.

3.   The Disciplinary Hearing Officer shall consider the qualified mental health professional's findings and any other available disability information when deciding what, if any, disciplinary action should be imposed.

Identification of this position is underway to determine if existing staff can take on the workload or if a growth request is necessary to make a standalone position.

4.   The Disciplinary Hearing Officer shall consider the qualified mental health professional's input on minimizing the deleterious effect of disciplinary measures on the prisoner in view of his or her mental health or adaptive support needs.

Identification of this position is underway to determine if existing staff can take on the workload or if a growth request is necessary to make a standalone position.

5.   If the Disciplinary Hearing Officer does not follow the mental health staff's input regarding whether the behavior was related to symptoms of mental illness or intellectual disability, whether any mitigating factors should be considered, and whether certain sanctions should be avoided, the Disciplinary Hearing Officer shall explain in writing why it was not followed.

Identification of this position is underway to determine if existing staff can take on the workload or if a growth request is necessary to make a standalone position.

6.   Prisoners will not be subjected to discipline which prevents the delivery of mental health treatment or adaptive support needs, unless necessary for institutional safety.

Curent practice.

7.   Prisoners shall not be subject to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of self-injurious behavior.

Current practice.

## C.   Accommodations for Prisoners with Mental Health or Intellectual Disabilities During the Disciplinary Process

1.   The County shall provide reasonable accommodations during the hearing process for prisoners with mental health or intellectual disabilities.

Current practice.

2.   The County shall take reasonable steps to ensure the provision of effective communication and necessary assistance to prisoners with disabilities at all stages of the disciplinary process.

This item is pending the creation and approval of the effective communication order.

## D.   Use of Force for Prisoners with Mental Health or Intellectual Disabilities

1.   The County's Correctional Services Operations Orders shall include language that ensures meaningful consideration of whether a prisoner's behavior is a manifestation of mental health or intellectual disability.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

2.   For prisoners with a known mental health or intellectual disability, and absent an imminent threat to safety, staff shall employ de-escalation methods that take into account the individual's mental health or adaptive support needs.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

3.  The County's Correctional Services Use of Force policies shall include a definition and a protocol for a planned Use of Force that provides appropriate guidance for a planned Use of Force that involves a prisoner with mental health or intellectual disability.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

4.  Prior to any *planned* Use of Force, such as a cell extraction, against a prisoner with mental health or intellectual disabilities, there will be a "cooling down period," consistent with safety and security needs. This period includes a structured attempt by mental health staff (and other staff if appropriate), to de-escalate the situation and to reach a resolution without Use of Force. Such efforts, including the use of adaptive supports, will be documented in writing. Medical and/or mental health staff should be consulted if the purpose of the cell extraction is related to the delivery of treatment.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

5.  The County shall require video documentation for any planned Use of Force, absent exigent circumstances. Jail staff shall endeavor to record the specific actions, behavior, or threats leading to the need for Use of Force, as well as efforts to resolve the situation without Use of Force.

Current practice.

6.  The County shall ensure the completion of supervisory review of Use of Force incidents, including video (for any planned Use of Force), interviews, and written incident documentation, in order to ensure appropriateness of Use of Force practices including de-escalation efforts. The County shall take corrective action when necessary.

Current Practice.

7.  The County shall review and amend as appropriate its policies on Use of Force, including its policies on Custody Emergency Response Team (CERT) and Cell Extraction Procedures.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

E.  **Training and Quality Assurance**

1.  All custody staff, and mental health staff, shall be trained on the policies and procedures outlined herein that are relevant to their job and classification requirements. Custody staff will receive periodic training on identifying behaviors that may be manifestations of mental illness and other situations warranting a referral to mental health staff, including for a Rules Violation Mental Health Review or other mental health assessment.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

2.  All custody staff shall be trained on the identification of symptoms of mental illness, the provision of adaptive supports, and the use of de-escalation methods appropriate for prisoners with mental health or intellectual disabilities.

Many aspects of this training are already covered during in-service and pre-service training.  A comprehensive review of current training offerings, compared against the needs of this element is under reveiew.

4.  The County shall track all Uses of Force (planned and reactive) involving prisoners who are on the mental health caseload or who have intellectual disabilities, including the number of Uses of Force and the number of cell extractions by facility.

Current Practice.

5.  The County shall implement a continuous quality assurance/quality improvement plan to periodically audit disciplinary and Use of Force practices as they apply to prisoners who are on the mental health caseload or who have intellectual disabilities.

Current use of Blue-Team software to track and monitor use of force incidents, while predicting possible problematic trends in officer behavior.

VI.   **MEDICAL CARE**

A.  **Staffing**
B.  **Intake**

1.  All prisoners who are to be housed shall be screened on arrival in custody by Registered Nurses (RNs).  RN screening shall take place prior to placement in jail housing.

2.  Health care intake screening shall take place in a setting that ensures confidentiality of communications between nurses and individual patients. Custody staff may maintain visual supervision but may not be close enough to overhear communication, unless security concerns based on an individualized determination of risk that includes a consideration of requests by the health care staff require that custody staff be closer at hand.  There shall be visual and auditory privacy from other prisoners.

Jail annex planning.

3.  The County shall, in consultation with Plaintiffs, revise the contents of its intake screening, medical intake screening, and special needs documentation to reflect community standards and ensure proper identification of medical and disability related needs.

In consultation with CHS, several forms have been ammended to reflect this area.

C.  **Access to Care**

1.  The County shall ensure that Health Services Requests (HSRs) are readily available to all prisoners, including those in segregation housing, from nurses and custody officers.

Current practice.

2.  The County shall provide patients with a mechanism for submitting HSRs that does not require them to share confidential health information with custody staff. The County shall install lockboxes or other secure physical or electronic mechanism for the submission of HSRs (as well as health care grievances) in every housing unit.  Designated health care staff shall collect (if submitted physically) or review (if submitted electronically) HSRs at least two times per day in order to ensure that CHS receives critical health information in a timely manner. Designated health care staff shall also collect HSRs during pill call and shall go door to door in all restricted housing units at least once a day to collect HSRs.  HSRs and health care grievances will be promptly date- and time-stamped. The County may implement an accessible electronic solution for secure and confidential submission of HSRs and health care grievances.

Current practice.

4.  The County shall designate and make available custody escorts for medical staff in order to facilitate timely and confidential clinical contacts or treatment-related events.

Growth request submitted for medical escort team.

D.  **Chronic care**
F.  **Medication administration and monitoring**
G.  **Clinical space and medical placements**

1.  The County shall provide adequate clinical space in every facility to support clinical operations while also securing appropriate privacy for patients. Adequate clinical space includes visual and auditory privacy from prisoners and auditory privacy from staff, the space needed reasonably to perform clinical functions as well as an examination table, sink, proper lighting, proper equipment, and access to health care records.

Jail Annex planning.

2.   The County shall ensure that any negative pressure isolation rooms meet community standards, including an antechamber to ensure that the room remains airtight, appropriate pressure gauges, and regular documented checks of the pressure gauges.

Jail Annex planning.

3.   The County shall ensure that absent individualized, documented safety and security concerns, patients in acute medical or quarantine placements shall be allowed property and privileges equivalent to what they would receive in general population based on their classification levels.

Current practice.

4.   The County shall ensure that patients in medical placements are not forced to sleep on the floor, including by providing beds with rails or other features appropriate for patients' clinical needs and any risk of falling.

Current practice.

5.   The County shall not discriminate against patients in medical placements solely because of their need for C-Pap machines, but instead shall provide access to programs and services in accordance with their classification level, as set forth in the ADA Remedial Plan.

Jail annex planning.

H.  **Patient privacy**

1.   The County shall develop and implement policies and procedures to ensure that appropriate confidentiality is maintained for health care services.  The policies shall ensure confidentiality for clinical encounters, including health care intake screening, pill call, nursing and provider sick call, specialty appointments, and mental health treatment.  The policies shall also ensure confidentiality for written health care documents, such as health care needs requests and grievances raising medical care or mental health care concerns, which shall not be collected by custody staff.

Jail Annex planning.

2.   The County shall provide adequate clinical space in each jail to support clinical operations while also securing appropriate privacy for patients, including visual and auditory privacy from prisoners and auditory privacy from staff.

Jail Annex planning.

3.   All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff.  In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification. The issuance of pills does not constitute a clinical interaction.

Jail Annex planning.

b)  If the presence of a correctional officer is determined to be necessary to ensure the safety of staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

Jail Annex planning.

4.   Jail policies that mandate custody staff to be present for any medical treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above.  Custody and medical staff shall be trained accordingly.

No policies exist mandating deputies be present during medical treatment.

I.   **Health care records**
J.   **Utilization management**
K.  **Sanitation**
L.   **Reproductive and Pregnancy-Related Care**
M. **Transgender and gender nonconforming health care**

c) Access to gender-affirming clothing      Current practice, outlined in TGNI order.

d) Access to gender-affirming commissary items, make-up, and other property items      Current practice, outlined in TGNI order.

N. **Detoxification protocols**
O. **Nursing protocols**
P. **Reviews of in-custody deaths**

1. Preliminary reviews of in-custody deaths shall take place within 30 days of the death and shall include a written report of the circumstances and events leading to the death, with the goal to identify and remedy preventable causes of death and any other potentially systematic problems.      Current practice.

2. Mortality reviews shall include an investigation of the events occurring prior to the death, an analysis of any acts or omissions by any staff or prisoners which might have contributed to the death, and the identification of problems for which corrective action should be undertaken.      Current practice.

Q. **Reentry Services**
R. **Training**

1. The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

a) All jail custody staff shall receive formal training in medical needs, which shall encompass medical treatment, critical incident response, crisis intervention techniques, recognizing different types of medical emergencies, and acute medical needs, appropriate referral practices, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

Training needs are being evaluasated against on-going in-service training.

## VII.   SUICIDE PREVENTION

### A. Substantive Provisions

1. The County recognizes that comprehensive review and restructuring of its suicide assessment, monitoring, and prevention practices are necessary to address the risk of suicide and self-harm attendant to detention in a jail setting.

Draft policy under review.

2. The County shall establish, in consultation with Plaintiffs' counsel, a new Suicide Prevention Policy that shall be in accordance with the following:

Draft policy under review.

### B. Training

1. The County shall develop, in consultation with Plaintiffs' counsel, a four- to eight-hour pre-service suicide prevention curriculum for new Jail employees (including custody, medical, and mental health staff), to be conducted in person in a classroom or virtual classroom setting, that includes the following topics:

Training needs are being evaluasated against on-going pre-service training.

a) avoiding obstacles (negative attitudes) to suicide prevention;

Training needs are being evaluasated against on-going pre-service training.

b)  prisoner suicide research;                                    Training needs are being evalusated against on-going pre-service training.

c)  why facility environments are conducive to suicidal behavior;   Training needs are being evalusated against on-going pre-service training.

d)  identifying suicide risk despite the denial of risk;          Training needs are being evalusated against on-going pre-service training.

e)  potential predisposing factors to suicide;                   Training needs are being evalusated against on-going pre-service training.

f)  high-risk suicide periods;                                    Training needs are being evalusated against on-going pre-service training.

g)  warning signs and symptoms;                                   Training needs are being evalusated against on-going pre-service training.

h)  components of the jail suicide prevention program             Training needs are being evalusated against on-going pre-service training.

i)  liability issues associated with prisoner suicide;            Training needs are being evalusated against on-going pre-service training.

j)  crisis intervention.                                          Training needs are being evalusated against on-going pre-service training.

2.  The County shall develop, in consultation with Plaintiffs' counsel, a two-hour annual suicide prevention curriculum for all custody, medical, and mental health staff, to be conducted in person in a classroom or virtual classroom setting, that includes:    Training needs are being evalusated against on-going in-service training.

a)  review of topics (a)-(j) above

b)  review of any changes to the jail suicide prevention program

c)  discussion of recent jail suicides or attempts               Training needs are being evalusated against on-going in-service training.

3.   Custody officers assigned to Designated Mental Health Units shall receive additional specialized training on suicide prevention and working with prisoners with serious mental illness.

IOP Deputies receive CIT training.

5.   All mental health staff and custody officers shall be trained on the appropriate use of safety suits—*i.e* ., not to be utilized as a default, not to be used as a tool in behavior management, not to be utilized for patients being observed at 30-minute observations.

Outlined in policy.

6.   The County shall ensure that all staff are trained in the new Suicide Prevention Policy.

Draft policy under review.

C. **Nursing Intake Screening**
D. **Post-Intake Mental Health Assessment Procedures**

1.   All mental health assessments shall be conducted in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

Booking area interview room modified for psychiatric use.

E. **Response to Identification of Suicide Risk or Need for Higher Level of Care**

1.   When a prisoner is identified as at risk for suicide and placed by custody staff in a safety cell, on suicide precautions, and/or in a safety suit, mental health staff shall be contacted immediately.  A qualified mental health professional, or other appropriately trained medical staff in consultation with mental health staff, shall complete a confidential in-person suicide risk assessment as soon as possible, consistent with the "must-see" referral timeline.

Current custody practice.

2.   Consistent with current RCCC policy, if there is no mental health staff on site at RCCC at the time that an emergent mental health need is identified, the prisoner shall be transported to the Main Jail for emergency evaluation within two hours of the initial report.

Current practice.  Development of procedures for use of suicide resisitant cells at RCCC to limit transport to only the most acute patients.

4.   The County shall ensure that the meal service schedule or other custody-related activities cause no delay in the completion of suicide risk assessments for prisoners.

Current practice.

F.  **Housing of Inmates on Suicide Precautions**

1.   The County's policy and procedures shall direct that prisoners, including those identified as being at risk for suicide, be treated in the least restrictive setting appropriate to their individual clinical and safety needs.

Policy forthcoming.  Current post orders and practice indicate least restrictive housing for suicidal inmates.

G.  **Inpatient Placements**

1.   The County shall ensure that prisoners who require psychiatric inpatient care as clinically indicated are placed in the 2P unit within 24 hours of identification, absent exceptional circumstances.  In all cases, the provision of clinically indicated treatment to any prisoner requiring inpatient level of care shall be initiated within 24 hours.

Jail Annex planning.

H. **Temporary Suicide Precautions**

1.   No prisoner shall be housed in a safety cell, segregation holding cell, or other Temporary Suicide Precautions Housing for more than six (6) hours. If mental health or medical staff determine it to be clinically appropriate based on detoxification-related needs, this time limit may be extended to no more than eight (8) hours. If exceptional circumstances prevent transfer within these timelines, those circumstances shall be documented, and transfer shall occur as soon as possible. This does not preclude the housing of a prisoner in the IOP unit if clinically indicated.

Jail Annex planning.

2.   The County shall ensure, including by revising written policies and procedures where necessary, the timely and adequate completion of medical assessments for prisoners in need of suicide precautions, as required under Operations Order 4/05 (*i.e.*, within 12 hours of placement of the next daily sick call, whichever is earliest, and then every 24 hours thereafter).

Current practice.

3.   The County shall ensure that any cell used for holding prisoners on suicide precautions is clean prior to the placement of a new prisoner, as well as cleaned on a normal cleaning schedule.

Will add langauge to policy under review.

4.  The County shall create and implement a written policy ensuring adequate frequency for meals, fluids, hygiene, showers, prescribed medications, and toileting when a prisoner is in cell used for holding prisoners on suicide precautions.

Current practice.  Will add langauge to policy under review.

5.  Inmates on suicide precautions shall not automatically be on lockdown and should be allowed dayroom or out-of-cell access consistent with security and clinical judgments.

Current practice.

6.  The classrooms or multipurpose rooms adjacent to the housing units in the Main Jail are designed for, and should be made available for, prisoner programs and treatment.  Absent an emergency, the County shall not use the classrooms and multipurpose rooms to hold prisoners pending a mental health evaluation or on suicide precautions.  Where such emergency occurs, the County shall document the reasons for retention and move the prisoner, within six (6) hours, to the inpatient unit or other appropriate housing location for continued observation, evaluation, and treatment.

Multi-purpose rooms are no longer used for holding suicide precaution, or mental health evaluation inmates.  Written directives to staff document acceptable practice for at-risk patients, without the use of MPRs.  There is currently a zero use policy, not even as a last resort.

I.  **Suicide Hazards in High-Risk Housing Locations**

1.  The County shall not place prisoners identified as being at risk for suicide or self-harm, or for prisoners requiring IOP level of care, in settings that are not suicide-resistant as consistent with Lindsay Hayes's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities."

Current practice.

2.  Cells with structural blind spots shall not be used for suicide precaution.

Current practice.

J.  **Supervision/Monitoring of Suicidal Inmates**

1.   The County shall ensure adequate visibility and supervision of prisoners on suicide precautions.

Current practice.

2.   The County shall not cover cell windows with magnetic flaps or any other visual barrier preventing visibility into any cell that is housing a prisoner on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need.

Current practice.

3.   The County shall revise its policies regarding the monitoring of prisoners on suicide precautions to provide for at least the following two defined levels of observation:

a)   Close observation shall be used for prisoners who are not actively suicidal but express suicidal ideation (*e.g.*, expressing a wish to die without a specific threat or plan) or have a recent prior history of self-destructive behavior.  Close observation shall also be used for prisoners who deny suicidal ideation or do not threaten suicide but are engaging in other concerning behaviors indicating the potential for self-injury.  Staff shall observe the prisoner at staggered intervals not to exceed every 15 minutes and shall document the observation as it occurs.

Language of "direct observation" was used in other areas.  This should be ammended.  Policy under review contains this language.

b)  <u>Constant observation</u> shall be used for prisoners who are actively suicidal, either threatening or engaging in self-injury, *and* considered a high risk for suicide.  An assigned staff member shall observe the prisoner on a continuous, uninterrupted basis.  The observation should be documented at 15-minute intervals.  Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation.

This type of monitoring occurs in the SITHU or 2P level of care currently.

4.   For any prisoner requiring suicide precautions, a qualified mental health professional shall assess, determine, and document the clinically appropriate level of monitoring based on the prisoner's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically-determined level of monitoring.

Current practice.

5.   Video monitoring of prisoners on suicide precaution shall not serve as a substitute for Close or Constant observation.

Current practice.

K.  **Treatment of Inmates Identified as at Risk Of Suicide**

3.   All assessments, treatment, and other clinical encounters shall occur in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

Jail Annex planning.  However, we have attempted to maximize our ability to follow this plan portion to the best of our ability.

L.  **Conditions for Individual Inmates on Suicide Precautions**

1.   The County's Suicide Prevention Policy shall set forth clear and internally consistent procedures regarding decisional authority for determining the conditions for individual inmates on suicide precautions.  Mental health staff shall have primary authority, consistent with individualized classification and security needs, with respect to the following:

M. **Property and Privileges**

1.   Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of routine privileges (*e.g.*, visits, telephone calls, recreation) that are otherwise within the limitations of a prisoner's classification security level.  Any removal of privileges shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

Current practice.

2.   Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff depending on suicide risk, the removal and/or return of a prisoner's clothing and possessions (*e.g.*, books, slippers/sandals, eyeglasses) that are otherwise within the limitations of a prisoner's classification security level.  The removal of property shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

Current practice.

3.   Cancellation of privileges should be avoided whenever possible and utilized only as a last resort.

Current practice.

N. **Use of Safety Suits**

| | |
|---|---|
| 1.   Decisions about the use of a safety suit (smock) or removal of normal clothing will be under mental health staff's authority, based on individualized clinical judgment along with input from custody staff. | Current practice. |
| 2.   Custody staff may only temporarily place an inmate in a safety suit based on an identified risk of suicide by hanging until the qualified mental health professional's evaluation, to be completed within the "must see" referral timeline. Upon completion of the mental health evaluation, the mental health professional will determine whether to continue or discontinue use of the safety suit. | Policy under revies. |
| 3.   If an inmate's clothing is removed, the inmate shall be issued a safety suit and safety blanket. | Current practice. |
| 4.   As soon as clinically appropriate, the provision of regular clothing shall be restored.  The goal shall be to return full clothing to the inmate prior to discharge from suicide precautions. | Current practice. |
| 6.   If a qualified mental health professional determines that 30-minute (or less frequent) observations are warranted for a prisoner, safety suits shall not be used on that prisoner. | This causes some confusion to address.  County request discussion on the exact meaning of this provision. |
| 7.   Safety suits shall not be used as a tool for behavior management or punishment. | Current practice. |

O. **Beds and Bedding**

1.   All prisoners housed for more than four hours on suicide precautions and/or in an inpatient placement shall be provided with an appropriate bed, mattress, and bedding unless the prisoner uses these items in ways for which they were not intended (*e.g.*, tampering or obstructing visibility into the cell).  Such a determination shall be documented and shall be reviewed on a regular basis.

Attempting to meet this criteria through use of suicide resistant cells, and an emphasis on removal from booking housing as soon as practical.

P.   **Discharge from Suicide Precautions**

1.   A qualified mental health professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions in order to ensure that the discharge is appropriate and that appropriate treatment and safety planning is completed.

Current custody practice.

3.   Qualified mental health professionals shall provide clinical input regarding clinically appropriate housing placement (*e.g.*, whether isolation is contraindicated for the prisoner) upon discharge.  Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement.  Once clinically discharged from suicide precautions, the prisoner shall be promptly transferred to appropriate housing.

Current custody practice.

Q.  **Emergency Response**

1.   The County shall keep an emergency response bag that includes appropriate equipment, including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units.  All custodial and medical staff be trained on the location of this emergency response bag and shall receive regular training on emergency response procedures, including how to use appropriate equipment.

Many of these items are stored on, or within very close proximimity of the housing locations.  Nursing staff responding to man-down situations bring the required equipment.

2.   All custody and medical staff shall be trained in first aid and CPR.

Current custody practice.

3.   It shall be the policy of the County that any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff shall begin to administer standard first aid and/or CPR, as appropriate.

Current practice.

R.  **Quality Assurance and Quality Improvement**

2.   The County shall, in consultation with Plaintiffs' counsel, revise its in-custody death review policy and procedures.  Reviews shall be conducted with the active participation of custody, medical, and mental health staff.  Reviews shall include analysis of policy or systemic issues and the development of corrective action plans when warranted.

Current practice.

3.   For each suicide and serious suicide attempt (*e.g*., requiring hospitalization), the County's Suicide Prevention Task Force shall review: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt.  Where applicable, the Review Team shall generate recommendations for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

Current practice.

## VIII.    SEGREGATION/RESTRICTIVE HOUSING

### A.  General Principles

1.   Prisoners will be housed in the least restrictive setting necessary to ensure their own safety, as well as the safety of staff, other prisoners, and the public.

Working toward this goal constantly.  Reduction of nearly 2/3 of all TSEP inmates to lower levels of housing.  Piloting of the TSEP reduction plan involved stepping down several TSEPs transferred to general population floors.

a)   The County shall not place prisoners in more restrictive settings, including Segregation, based solely on a mental illness or any other disability. Prisoners will be housed in the most integrated setting appropriate to their individual needs.

The creation of the third floor as a mental health treatment floor has allowed most, if not all, SMI TSEPs to integrate into more normative housing.  This allows all but the most violent individuals to house in a mental health setting, while maintaining Administrative Segregation for inmates not on the behavioral health case load.

b)   The County shall not place prisoners into Segregation units based solely on classification score.

Several objective indicators are used to determine the appropriateness of segregation.  Written docuementation is required, and we are working toward periodic review of justification for segregation.  Inmates solely classified as "high" are not routinely segregated.

c)   The County shall review the housing and restrictions of female prisoners classified as high security to ensure that this population is not subject to Segregation conditions of confinement.

Current practice.

d)   Specialized medical units (e.g., Main Jail 2 West Med/Psych, Main Jail 2 East) and mental health units (e.g., OPP, IOP, MHU, 2P) are not Segregation housing units. The County shall ensure that prisoners housed in these units receive daily access to out-of-cell time, telephones, showers, and other programs, services, and activities consistent with their classification and treatment plan.

Current practice.

2.   The County shall not place a prisoner in Segregation units without first determining that such confinement is necessary for the safety of the staff, other prisoners, or the public. The County shall clearly document in writing the specific reason(s) for a prisoner's placement and retention in Segregation housing. The reason(s) shall be supported by clear, objective evidence. Prisoners will remain in Segregation housing for no longer than necessary to address the reason(s) for placement.

Working toward this goal.  Pilot programs for AdSeg Phase 1 and 2 with steps to reduce between the two.

3.   The County shall not place the following prisoners in a Segregation setting unless necessary to address a serious risk of physical harm, and in such cases only for the minimum time necessary to identify an alternative appropriate placement:

a) Prisoners with acute medical needs that require an inpatient level of care and/or daily nursing care;

Current practice.

b) Prisoners who are pregnant, post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy.

Not codified in policy, however can be implemented in practice immediately.

**B. Conditions of Confinement**

1. The County will provide at least 17 hours of out-of-cell time per week for all prisoners, with the exception of prisoners subject to Administrative Segregation Phase I and Disciplinary Segregation in accordance with this remedial plan. The County will monitor out-of-cell time, and if minimum out-of-cell time requirements are routinely not being met at a particular facility or in a particular housing unit, the Sheriff's Department division commander or designee will review the situation and take appropriate steps to resolve the issue.

Current practice. Weekly reports show nearly universal compliance, even during more stringent social distancing for COVID precautions. The negotiated ramp-up hours were almost immediatley exceeded meeting the prescribed hours at the point the consent decree was signed.

a) The County shall implement a policy to document out-of-cell time provided to each prisoner. The County shall conduct monthly audits to ensure that prisoners have been provided the required treatment and recreation time out of cell. This data will be regularly reviewed as part of the County's Quality Assurance procedures.

Out of cell time is monitored and recorded in the current JIMS system. Reports are generated on a weekly basis, and checked for compliance. Inconsistent out of cell times are addressed. Particularly during COVID precautions, once inmates are out of quarantine, they are recieving nearly 20 hours per week out of cell time.

2. Out-of-cell time with the opportunity to exercise shall be provided to each prisoner seven (7) days per week, including outdoors/recreation time when feasible. The County shall offer out-of-cell time at appropriate times of day.

Schedules have been created to ensure fair distribution of outdoor recreation. Initial indications are that inmates are receiving at least one hour per week of outdoor recreation, with some housing locations receiving up to 3 hours per week. Much of the 17 hour out of cell time is unstructure, allowing for exercise.

3.   The County shall modify its non-disciplinary Segregation policies and procedures to allow reasonable access to the following: (1) Personal phone calls for all prisoners, including at least five hours or three weekdays per week of phone access during normal business hours; (2) Education, rehabilitation, and other materials (e.g. writing implements, art supplies, tablets), for in-cell activities; (3) Personal and legal visiting; (4) Religious services; and (5) Commissary.

Working toward this goal.  Commissary restrictions have been lifted.  Personal and legal visiting is unrestricted. Working toward more phone time during weekday hours.  Working toward programming and education for the pre-sentenced population.

a)   The conditions and privileges described above shall be provided unless there is a specific safety or security issue preventing provision of such materials or the prisoner is subjected to disciplinary action.

Continuing to work toward meeting this goal.

4.   Cell windows shall not be covered with magnetic flaps, towels, sheets, or any other visual barrier preventing visibility into and out of the cell, unless there is a specific security or privacy need that is documented, and then for only a period of time necessary to address such security or privacy need. This provision shall apply to all cells housing prisoners.

Current practice.

5.   The County shall establish procedures so that all housing unit cells are searched and cleaned prior to a prisoner's placement in the cell.

Policy drafted to this respect, working toward ensuring full compliance in this area.

6.   The County shall establish procedures to ensure that no prisoner is placed in a Segregation housing cell without a mattress and appropriate bedding.

Current practice.

C.   **Mental Health Functions in Segregation Units**

1.   Segregation Placement Mental Health Review

a)  All prisoners placed in a non-disciplinary Segregation housing unit and all prisoners housed in a Disciplinary Detention unit shall be assessed by a qualified mental health professional within 24 hours of placement to determine whether such placement is contraindicated. All prisoners subjected to Disciplinary Segregation conditions for 72 hours in their general population housing unit (*i.e.*, confined to cell 23 hours per day) shall also be assessed by a qualified mental health professional no later than the fourth day of such placement.

Partial implementation through pilot programs with JPS.

b)  Any decision to place prisoners with Serious Mental Illness in Segregation shall include the input of a qualified mental health professional who has conducted a clinical evaluation of the prisoner in a private and confidential setting (absent a specific current risk that necessitates the presence of custody staff), is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

Partial implementation of this goal.

d)  If mental health or medical staff find that a prisoner has a Serious Mental Illness or has other contraindications to Segregation, that prisoner shall be removed from Segregation absent exceptional and exigent circumstances.

Current practice.

2.  Segregation Rounds and Clinical Contacts

a)  Cell checks (to ensure that prisoners are safe and breathing) shall be conducted for all prisoners in Segregation at least every 30 minutes, at staggered intervals. Completion of cell checks will be timely documented.

Current practice.

b)  A qualified mental health or medical professional shall conduct check-ins at least once a week, to assess and document the health status of all prisoners in Segregation, and shall make referrals as necessary. The check-in shall include a brief conversation with each prisoner, a visual observation of the cell, and an inquiry into whether the prisoner would like to request a confidential meeting with a mental health or medical provider. Steps shall be taken to ensure effective communication, as well as auditory privacy consistent with security needs. When a prisoner in Segregation requests a confidential meeting with a mental health or medical provider, or the medical or mental health professional identifies a mental health or medical need, staff shall make appropriate arrangements to include triage, examination and treatment in an appropriate clinical setting. In such cases, staff shall give the prisoner the opportunity to complete a health care request but will otherwise initiate a referral without requiring the prisoner to complete a request form.

Partial implementation.

3.  Response to Decompensation in Segregation

a)  If a prisoner in Segregation develops signs or symptoms of mental illness where such signs or symptoms had not previously been identified, suffers deterioration in his or her mental health, engages in self-harm, or develops a heightened risk of suicide, the prisoner shall immediately be referred for appropriate assessment and treatment from a qualified mental health professional who will recommend appropriate housing and/or programming.

Current practice.

b)  Jail staff shall follow a mental health recommendation to remove a prisoner from Segregation unless such removal poses a current safety risk that is documented. In such a case, the Commander or management-level designee shall be notified and staff shall work to remove the prisoner from Segregation and secure a placement in an appropriate treatment setting at the earliest possible time.

Current practice for nearly all mental health placements.  Full compliance with the acute unit and nearly universal compliance with the IOP unit.

### D.  Placement of Prisoners with Serious Mental Illness in Segregation

1.  Prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit (2P, IOP, OPP) will not be placed in Segregation, but rather will be placed in an appropriate treatment setting – specifically, the inpatient unit or other Designated Mental Health Unit providing programming as described in **Exhibit A-2**.

Current practice.

2.  In rare cases where a prisoner with a mental health condition meeting criteria for placement in a Designated Mental Health Unit presents an immediate danger or significant disruption to the therapeutic milieu, and there is no reasonable alternative, such a prisoner may be housed separately for the briefest period of time necessary to address the issue, subject to the following:

a)  The prisoner shall receive commensurate out-of-cell time and programming as described in **Exhibit A-2** (including for IOP and OPP, 10 hours/week of group treatment/structured activities, 7 hours/week unstructured out-of-cell time, weekly individual clinical contact) with graduated programming subject to an individualized Alternative Treatment Program.

Working toward this goal.  IOP no longer removes patients that are disruptive without clinical assessment and agreement by JPS. When patients are moved, they are placed on the case management protocol for JPS interaction and treatment.

iv. Privileges commensurate with the Designated Mental Health Unit program, unless modified in an Alternative Treatment Program based on individual case factors that are regularly reviewed.

Working toward universal compliance.

v. Daily opportunity to shower.

Current practice.

3. A prisoner with Serious Mental Illness requiring restraints (*e.g.*, handcuffs, belly chains, etc.) shall not be denied clinically indicated group or individual treatment due to security factors, absent exceptional circumstances that are documented. Prisoners with Serious Mental Illness housed in Segregation who require restraints when out of cell shall have the opportunity to work their way out of restraints through graduated programming subject to an individualized Alternative Treatment Program.

Current custody practice.

E. **Administrative Segregation**

1. Use of Administrative Segregation

a) Only the Classification Unit can assign a prisoner to Administrative Segregation.

Current practice.

b) The County may use Administrative Segregation in the following circumstances:

i. Objective evidence indicates that a prisoner participated in a recent assault and the assaultive behavior involved an assault on staff or visitors, serious injury, use of a weapon, gang removals, or multiple prisoner assaults. Mutual combat situations that do not otherwise qualify for Administrative Segregation are excluded.

Current practice.

ii.  During a brief investigative period not to exceed ten days while Classification staff attempts to verify the need for Protective Custody or while the prisoner is awaiting transfer to another facility.

Working toward this goal.  Implemented steps to achieve compliance and practice changes.

c)  The Compliance Commander shall have the authority to place prisoners in Administrative Segregation under the following circumstances:

Current practice.

i.   The prisoner poses an extraordinary safety risk and no other housing unit is sufficient to protect the prisoner from harm;

Current practice.

ii.  The prisoner has failed to integrate into a lesser restrictive housing setting because of repeated and recent history of assaultive behavior or current threats of violence associated with being in a lesser restrictive setting; or

Current practice.

iii.  Objective evidence indicates that the prisoner attempted to escape or presents an escape risk.

Current practice.

2.  Notice, Documentation, and Review of Administrative Segregation Designations

a)  The Classification Unit shall document the rationale for designating a prisoner for Administrative Segregation in the classification file using objective evidence. For prisoners younger than 24, the Classification Unit shall consider the prisoner's age as a mitigating factor when assigning the prisoner to Administrative Segregation.

Working toward this element, with partial complinace to date.

b)  Classification shall attempt to down-class prisoners to a lesser restrictive housing setting at the earliest possible opportunity, consistent with safety and security.

Current practice.

c)  County shall provide prisoners in Administrative Segregation with a written notice within 72 hours of the prisoner's initial placement in Administrative Segregation, explaining the reasons for the prisoner's Administrative Segregation designation and how the prisoner may progress to a lesser restrictive housing setting.

Working toward this element, with partial complinace to date.

d)  Prisoners housed in Segregation units will, at least every thirty (30) days, receive face-to-face interviews in a private out-of-cell setting, consistent with individual security needs, to discuss progress and compliance with their individual case plan as part of a classification review. Consideration will be given to their mental health and to their appropriateness for transfer to a less restrictive setting.

Working toward complinace in this area through JPS.

e)  The Compliance Commander or higher-ranked officer will review and approve the decision to designate a prisoner for Administrative Segregation for longer than 15 days.

Working toward this element, with partial complinace to date.

f)  The County shall document the reason the prisoner is retained in the same Administrative Segregation Phase. The prisoner will be given written notice of the reasons the prisoner is being retained in the same Phase of Administrative Segregation and what conduct the prisoner is required to exhibit to progress to a lesser restrictive housing setting.

Working toward this element, with partial complinace to date.

g)  The Compliance Commander or higher-ranked officer must approve the continued retention of a prisoner in Administrative Segregation for longer than 90 days, and the Compliance Commander or higher-ranked officers must reauthorize such placement at least every 90 days thereafter.

Working toward this element, with partial complinace to date.

3.  Administrative Segregation Phases

a)  The County shall develop and implement a phased system for prisoners designated as Administrative Segregation to achieve a lesser restrictive housing setting.

Working toward this element, with partial complinace to date.

b)  Administrative Segregation Phase I:

i.  This is the most restrictive designation for prisoners in Administrative Segregation.

ii.  Prisoners shall be offered a minimum of one hour per day out of cell time for a total of seven hours per week.

Current Practice.

iii.  Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least five of the seven hours per week.

Current Practice.

iv.  Prisoners shall not remain in Phase I for longer than 15 days unless the prisoner engages in new conduct warranting retention in Administrative Segregation as specified in **Section VIII.E.1.b.**

Working toward this element, with partial complinace to date.

c)  Administrative Segregation Phase II:

a)      Prisoners shall be offered a minimum of 17 hours of out of cell time per week.

Approaching this timeframe, however we tend to consistently fall short with the COVID housing protocols taking many traditional ADSEG pods.

b)      Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least 10 of the 17 hours per week.

Current Practice.

c)      Prisoners shall be offered the opportunity to program in groups of two to four prisoners, unless pairing with another prisoner is not possible for safety or security reasons, and those reasons are documented by the County.

Current Practice.

d)      The County shall develop a program of incentives for good behavior.

Plans in place to identify low cost incentives, including eating meals outside of cells and lower restrictive housing.

e)      Prisoners shall not remain in Phase II for longer than 30 days unless the prisoner commits a serious behavioral violation while in Administrative Segregation: fighting; threatening staff or other prisoners; resisting or delaying an order from staff that impedes Jail operations (e.g., failure to lock down); refusing to submit to a search of person or property; destroying or damaging Jail property (excluding property issued to a prisoner and/or minor defacing of property or destruction of low-value property) or facilities; possessing contraband that implicates safety or security (e.g., weapons, razors, unauthorized medication, but not extra clothing, commissary items, or food); cell flooding; tampering with cell locking mechanisms or other security features (e.g., cameras); and/or sexual activity/harassment.  In the event a prisoner engages in a serious behavioral violation, the conduct will be referred to the Classification Sergeant or higher-ranking officer, who shall have the discretion to extend the prisoner's Phase II time by 15 days, and shall develop an individual behavioral management plan, if one does not yet exist, for the prisoner.

Working toward this element, with partial complinace to date.

F.   **Protective Custody**

1.   When a prisoner faces a legitimate threat from other prisoners, the County will seek alternative housing, by transferring the threatened prisoner to the general population of another facility or unit, or to a special-purpose housing (Protective Custody) unit for prisoners who face similar threats.

Current Practice.

2.   The County will not operate Protective Custody units with Segregation-type conditions of confinement. Prisoners placed in Protective Custody shall have the same programs and privileges as general population prisoners, absent exceptional circumstances that are documented.

Current Practice.

3.   The County shall create a policy that describes the process and criteria for placement of prisoners into Protective Custody. The County shall consult with Plaintiffs to develop such a policy.

Policy yet to be developed.

4.   Prisoners who are lesbian, gay, bisexual, transgender, or intersex (LGBTI) or whose appearance or manner does not conform to traditional gender expectations should not be placed in Segregation or Protective Custody solely on the basis of such identification or status, or because they are receiving gender dysphoria treatment.

Current Practice.

a)  When a prisoner who is LGBTI or gender nonconforming faces a legitimate threat, the County shall identify alternative housing, with conditions comparable to those of general population. Privileges and out-of-cell time for this population will be documented and regularly reviewed by supervisory level staff to ensure appropriate housing, out-of-cell-time, and related conditions for this group of prisoners.

TGNI inmates not able to house in general population are placed in protective custody.  Out of cell priveleges are commensurate with most general population prisoners.

b)  In deciding whether to assign a transgender or intersex prisoner to a facility or program for male or female prisoners, the County shall consider on a case-by-case basis whether a placement would ensure the prisoner's health and safety, and the health and safety of other prisoners, giving serious consideration to the prisoner's own views.

Current practice.

c)  Jail staff will receive training on the unique issues of managing transgender prisoners, with refresher training at least bi-annually.

Training concepts are being evaluated against current training models.

5.  For prisoners who are LGBTI or whose appearance or manner does not conform to traditional gender expectations, the County shall identify the prisoner's preferred gender of jail staff who will perform searches of the prisoner.  The County shall honor the request except in exigent circumstances when doing so is not possible.

Current practice.  Statement of preference form completed by TGNI prisoners allowing them to request the gender of searching officer.

## G.  Disciplinary Segregation

1.  The County will not place a prisoner in disciplinary housing pending investigation of, and due process procedures for, an alleged disciplinary offense unless the prisoner's presence in general population would pose a danger to the prisoner, staff, other prisoners or the public.

Current practice.

2.  The County will adhere to a discipline matrix, developed in consultation with Plaintiffs, that clearly defines when disciplinary housing may be imposed.

Plans are in place to modify the discipline schedule to a different model, taking behavior and restriction timeframes into account.

3.  Prisoners who are found to have violated disciplinary rules following due process procedures will be placed in Segregation only after the County has determined that other available disciplinary options are insufficient, with reasons documented in writing.

Plans are in place to modify the discipline schedule to a different model, taking behavior and restriction timeframes into account.

4.  The denial of out-of-cell time for more than four (4) hours will not be imposed as a sanction absent a formal disciplinary write-up and due process hearing.

Current practice.

5.  Prisoners serving a Disciplinary Segregation term shall receive at least seven (7) hours per week of out-of-cell time. Out-of-cell time with the opportunity to exercise shall be provided to each prisoner one (1) hour a day, seven (7) days per week.

Current practice.

6.  Prisoners in Disciplinary Segregation shall, absent an individualized assessment of security risk that is documented be provided at least one book (which prisoners may regularly exchange), legal documents, hygiene materials, legal phone calls, and legal visits.

Current practice.

7.  No Disciplinary Segregation term for non-violent rules violations will exceed 15 days.

Current practice.

8.  The County will, in consultation with Plaintiffs' counsel, modify its inmate discipline policy and practice to limit placements in Disciplinary Segregation conditions to no more than 15 days, absent cases of serious violations stemming from distinct incidents and with Watch Commander-level approval.

Current practice, contained in Discipline Housing Post Order.

9.  No prisoner shall be placed in Disciplinary Segregation for more than 30 consecutive days.

Current practice, contained in Discipline Housing Post Order.

10. If after a Disciplinary Segregation term, Jail staff, with the input of a mental health clinician, determine that the prisoner cannot safely be removed from Segregation, placement on Administrative Segregation status may occur only subject to the process set forth in **Section VIII.E**.

Current practice.

11. Once a prisoner has been moved out of Disciplinary Segregation, that prisoner shall not be placed back into Disciplinary Segregation absent (a) a new incident warranting discipline, and (b) completion of all mental health review procedures required for new Segregation placements.

Current practice, contained in Discipline Housing Post Order.

H. **Avoiding Release from Jail Directly from Segregation**

1. The County will avoid the release of prisoners from custody directly from Segregation-type housing, to the maximum extent possible.

Current practice, but will be added to future policy.

2. If a sentenced prisoner housed in Segregation has an upcoming expected release date (i.e. less than 120 days), the County will take and document steps to move the prisoner to a less restrictive setting, consistent with safety and security needs. If Segregation becomes necessary during this time, the County will provide individualized discharge planning to prepare the sentenced prisoner for release to the community.

Current practice.

I. **No Food-Related Punishment**

1. The County shall modify its policy and take steps to ensure that the denial or modification of food is never used as punishment. The County shall eliminate use of "the loaf" as a disciplinary diet. Nothing in this paragraph shall be read to preclude the County from denying a prisoner use of the commissary.

Current practice.

J. **Restraint Chairs**

1. Restraint chairs shall be utilized for no more than six hours.

Current practice.

2.   The placement of a prisoner in a restraint chair shall trigger an "emergent" mental health referral, and a qualified mental health professional shall evaluate the prisoner to assess immediate and/or long-term mental health treatment needs.

Current practice.

3.   The opinion of a qualified medical professional on placement and retention in a restraint chair will be obtained within one hour from the time of placement.

Current practice.

IX.   **QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT**

A.   **Generally**
B.   **Quality Assurance, Mental Health Care**
C.   **Quality Assurance, Medical Care**