1   **LISA A. TRAVIS, County Counsel**
    **RICK HEYER, Supervising Deputy County Counsel**
2       **[State Bar No. 216150]**
        **COUNTY OF SACRAMENTO**
3       **700 H Street, Suite 2650**
        **Sacramento, CA  95814**
4       **Telephone:  (916) 874-7538**
        **Facsimile:  (916) 874-8207**
5       **E-mail:  heyerr@saccounty.net**
        **File No.:  126602-000012**
6

7   **Attorneys for County of Sacramento**

8                   **IN THE UNITED STATES DISTRICT COURT**
                      **EASTERN DISTRICT OF CALIFORNIA**
9                           **SACRAMENTO DIVISION**

10  **LORENZO MAYS, RICKY**                    **Case No. 2:18-cv-02081 TLN KJN**
    **RICHARDSON, JENNIFER BOTHUN,**
11  **ARMANI LEE, LEERTESE BEIRGE, and**
    **CODY GARLAND, on behalf of themselves**   **JUDGE: Hon. Kendall J. Newman**
12  **and all others similarly situated**

13              **Plaintiffs,**                **FILING OF SECOND COUNTY STATUS**
                                                **REPORT PURSUANT TO PARAGRAPH**
14  **vs.**                                     **12 OF THE CONSENT DECREE**

15  **COUNTY OF SACRAMENTO**

16              **Defendant.**

17

18          Paragraph 12 of the Consent Decree in this matter requires the County to provide

19  Plaintiffs' counsel and the Court appointed subject matter experts with a status report no later

20  than 180 days from the approval of the proposed decree. In compliance with this requirement the

21  County provided the "Second Status Report; Mays Consent Decree" on January 12, 2021 to the

22  subject matter experts and the attorneys monitors from the Prison Law Office and Disability

23  Rights California. Attached to this filing is that status report.

24  DATED: _/- 22-21_                    LISA A. TRAVIS, County Counsel
                                          Sacramento County, California
25

26                                        By:
27                                            Rick Heyer
                                              Supervising Deputy County Counsel
28
                                              -1-

EXHIBIT 1

**COUNTY OF SACRAMENTO**

**OFFICE OF THE COUNTY COUNSEL – DOWNTOWN OFFICE**

700 H Street, Suite 2650, Sacramento, California 95814  Telephone (916) 874-5544 Facsimile (916) 874-8207

January 12, 2021

**COUNTY COUNSEL**
Lisa A. Travis

**ASSISTANT COUNTY COUNSEL**
Traci F. Lee
Krista C. Whitman

**SUPERVISING DEPUTY COUNTY COUNSEL**
Craig E. Deutsch
Rick Heyer
Jennifer McLaren
June R. Powells-Mays
John E. Reed
Janice M. Snyder
Lindsay C. Zettel

**DEPUTY COUNTY COUNSEL**
Janet E. Bender
Corrie Brite
William C. Burke
Christopher S. Costa
Katherine Ann Covert
Denise L. Cummings
Michelle M. Espy
Keith W. Floyd
Lilly C. Frawley
Laura Froome
Shilpa M. Girimaji
Christophe Guillon
Kelsey D. Johnson
Michael J. Keene
Jocelynn J. Maier
Jason A. Manoogian
Susan R. Masarweh
Diane E. McElhern
Deon C. Merene
C. Stacey Miller
Nicole M. Misner
Katrina G. Nelson
Lura L. O'Brien
Robert P. Parrish
Nanci A. Porter
Joy A. Ramos
Andy Read
Taylor W. Rhoan
Tina M. Roberts
Nicole L. Roman
Diana L. Ruiz
Rachelle Smith
Catherine Spinelli
Samantha Tali
Ashley M. Wisniewski
James R. Wood
Peter C. Zilaff

Donald Specter
Margot Mendelson
Patrick Booth
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, CA 94710

Aaron J, Fischer
Anne Hadreas
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA 94612

**Re:   Second Status Report Pursuant to Paragraph 12 of the Mays Consent decree**

Dear Counsel:

Paragraph 12 of the Consent Decree requires the County to provide to Counsel and the Court appointed experts a status report 180 days after the consent decree was finalized and every 180 days thereafter. By and through this letter and the attached documents, the County is providing the Second Status Report.

In the initial status report, the County noted that working to mitigate the spread of the COVID-19 pandemic at that point was the dominant priority of the first 180 days of the Consent Decree. That fact is true for the second 180 days of the Consent Decree as well. The parties agreed that because issues surrounding efforts to mitigate the spread of COVID-19 are so important, the Medical and Mental Health subject matter experts should evaluate the County's efforts. That evaluation was completed in December. I believe it fair to say that the experts found much to be impressed with in regard to the County's efforts. The County has strived to meet many of the recommendations made by the experts to improve these efforts.

Nonetheless, the County is seeing the tangible impact of the community surge in COVID-19 cases in our jail facilities. In the period between March 2020 and late December 2020, the only COVID-19 positive inmates in the jails were those inmates brought into custody

Prison Law Office
Disability Rights California                     -2-                     January 12, 2021

from fresh arrests. In late December, the County became aware of the spread of COVID-19 in the existing jail population.

Since that time, the County continues to see spread of the infection. The County has initiated additional measures to address this spread;

- Limiting transfers between facilities and isolating inmates prior to a movement if a transfer is warranted
- Sought and received a new order from the Superior Court for the release of most inmates that are within 90 days of their release date
- SSO are now in full PPE when in units with COVID-19 positive inmates
- Increased signage in facilities advising that masking and social distancing is necessary to mitigate the spread
- Sacramento County Public Health has made vaccines for COVID-19 available to medical and custody staff, as well as medically vulnerable inmates.

Despite the increase in infections, the overwhelming majority of inmates that have tested positive have been asymptomatic. A small portion have experienced mild flu like symptoms. To date, no one has needed to be hospitalized due to complications from COVID-19.

The response to this outbreak and general mitigation continues to delay County's efforts to meet many of the reequipments of the Consent Decree. The attached documents from Correctional Health and the Sheriff's Department detail these challenges in greater detail.

The County departments continue to engage in the planning for new construction to address the ADA requirements and other provisions of the Consent Decree. The current consultants, Nacht and Lewis, have been retained to help the County determine the scope of what the new construction and renovation should entail. Once Nacht and Lewis complete their work, the County will issue a Request for Proposals for a firm(s) to enter into a design build contract with the County to complete this construction.

For the County's complete report on the status of compliance on specific aspects of the Consent Decree, please see the attached documents from Correctional Health and the Sheriff's Department.

Looking forward to the next six months, the County is hopeful that vaccinations will be completed and allow for an easing of the isolations and quarantines in the facilities. The County is also hopeful that vaccinations will allow the experts to conduct in person tours.

Prison Law Office
Disability Rights California                     -3-                     January 12, 2021

      Should you have any questions or concerns regarding this report, please
do not hesitate to contact me directly.

                              Sincerely,

                              LISA A. TRAVIS
                              County Counsel

By:                            
                              Rick Heyer
                              Supervising Deputy County Counsel

Attachments

cc:   Madeline Lamarre
      Mary Perrien
      Lindsay Hayes

2032624

ATTACHMENT 1

Sacramento County
Department of Health Services
Primary Health Division

Adult Correctional Health
REMEDIAL PLAN STATUS REPORT

| GENERAL |
|---|

Consent Decree:        January 13, 2020
First Status Report:     July 15, 2020
Second Status Report:  January 5, 2021

This is the second Remedial Plan Status Report concluding the first year of the Consent Decree. This has been an unprecedented year for health care staff within the jail facilities due to the historic COVID-19 pandemic which has overshadowed all operations, required leadership to develop protocols, daily ongoing work managing the population, and greatly impacted staffing levels. Key challenges during this period include COVID-19 management, electronic health record, and work force issues. Despite these challenges, staff made progress on some items consistent with the consent decree. The challenges and accomplishments are outlined in this status report.

Policy Development:

Policy development and revision efforts are in process and include the following manuals in various stages: *Adult Correctional Health (main manual), Infection Control, Injury and Illness Prevention Program (new), Standardized Nursing Procedures, Mental Health, and Pharmacy*.

- Some policies are applicable to all staff and are located in the main Adult Correctional Health Manual.
- All policy manuals are posted on the Adult Correctional Health intranet page. Old manuals are located in a shared drive. Forms are developed or revised when indicated, are referenced in the policies, and posted on the intranet.
- Since staffing is insufficient and there was a lack of prior infrastructure including necessary base policies and consistent training, policy and work flow development is an *iterative process*.

This is a complete overhaul of all existing policies and procedures. Some policies must be revised periodically as items are phased in. Phase in processes include development of related policies, training, and implementation. Some processes take longer than others due to needs for additional staffing, equipment, software, and/or related policies. Policies that are required as part of the Remedial Plan are drafted and shared with Plaintiffs' Counsel for review, feedback, and/or submission to the Subject Matter Experts (SMEs).

1

COVID-19 Pandemic:

During this period, daily monitoring and management of COVID-19 required *immense daily efforts* and *resources*. In addition to daily COVID-19 management strategies and duties, staff have worked with the SMEs on refining COVID-19 procedures. While this was helpful, it derailed efforts to work on components of the remedial plans.

- COVID-19 Staff Guidance was developed March 2, 2020 and has been regularly revised due to changes in local/federal guidance or refinement of processes. The latest revision was completed on November 16, 2020. There have been fifteen (15) publications to date.
- In August 2020, staff developed a COVID-19 Dashboard with SSO. This information depicts point in time data and is updated weekly. Data is also sent weekly to the PLO/DRC and subject matter experts. A sample of the posted data is shown below:

> As of **12/30/20**:
> Total Inmate Population (Main Jail & Rio Cosumnes Correctional Center): 3,233
> Total number of COVID-19 tests: 7,840 *(Net increase = 404)*
> Total number of confirmed COVID-19 cases: 298 *(Net increase = 84)*
> Total number of confirmed COVID-19 cases during the intake observation/quarantine period: 242 *(Net increase = 29)*
> Total number of COVID-19 positive inmates currently in custody: Main Jail - 25 / RCCC – 58
> SSO Link: https://www.sacsheriff.com/pages/covid19.php

- Overall, ACH and SSO staff did a great job during the ten months of the pandemic in terms of identifying confirmed COVID-19 within the intake observation/quarantine period. However, on 12/30/20 an active outbreak was identified and work is in process.
- An Infection Prevention Coordinator position and role was added during the monitoring period. This position is currently focused on COVID-19 but will also work on other communicable disease prevention and management strategies when time permits.
- COVID-19 protocol has been continually updated and refined throughout the pandemic.
- Sufficient staffing has been an ongoing problem exacerbated by the pandemic. This is addressed in Section II.
- Public Health has prioritized health care staff within the jails for the COVID-19 vaccine. Staff will begin immunizing staff 1/4/21 at RCCC and 1/5/21 at the Main Jail. The immunization process will be phased in.

Electronic Health Record (EHR) (Section I Health Care Records, page 39):

The electronic health record remains extremely challenging and does not meet workforce needs for data tracking and reporting. Key interfaces remain incomplete. Staff have decided that the current electronic health record will not meet program needs and are in the early phases of developing next steps.

One staff position was created in November 2019 to assist with the EHR and an additional position was added in the most recent budget augmentation. It is not yet filled and will take some time once filled for training.

## II. GENERAL PROVISIONS – SUFFICIENT STAFFING (page 3)

Work Force Issues:

COVID-19 negatively impacted the healthcare work force that was already strained pre-pandemic.

- Recruitment – Hiring efforts for providers and nursing staff have been ongoing during this period. Staff have undertaken multiple actions in this area, however there is still a significant and persistent staffing shortage impacting access to care and health care service delivery. In addition to recruitment for permanent positions, the availability of provider and nursing staff through medical registries has sharply declined during the pandemic due to limited supply, the COVID-19 surge, and approaching holidays.
- Providers – Staff received Board of Supervisors approval to increase the contracted registry rates for provider staffing. Additionally, staff have worked with county personnel services to increase advertisement electronically. These efforts have yielded a few new on-call staff but are insufficient due to additional staff leaves and retirements. Work is underway to establish a contract with Maxim Healthcare Services for physician recruitment services. Lack of sufficient providers impacts access to care and implementing key policies and procedures.
- Staff leaves – The number of staff leaves have increased during the community COVID-19 surge due to close contact exposures or Families First Coronavirus Response Act (FFCRA). This exacerbates staffing issues.
- Medical Director – The Medical Director resigned on 9/1/20 after providing a two-week notice. An Acting Medical Director was appointed effective 9/2/20 for a six month period, pending retirement. Interviews for this position were completed and the new Medical Director began onboarding on 12/31/20. The Acting Medical Director will assist with the transition.
- Mental Health Program Director – The Program Director transferred to a new position at the end of October and an Interim Mental Health Program Director was appointed. He is getting oriented to changes in responsibilities associated with his role. Recruitment and interviewing is in process.
- SSO Leadership – There have been major changes in custody leadership positions at both jail facilities.
- Culture change – There is a huge push for change across policies, procedures, communication, training, and use of data to monitor clinical/organization operations. Factors prompting change include the transition from the Sheriff's Department to Health Services Department, remedial plan work, and identifying/operationalizing standards.

3

- <u>Communication</u> – Efforts to increase staff communication are multi-faceted (posted policies/forms on a dedicated intranet page, monthly staff newsletter, expectation of consistent staff meetings by service line managers, as well as various meetings).

Managers and staff are taxed with absorbing changes as well as managing within a pandemic which overshadows daily work.   Staff can only absorb so much change at once and it is unrealistic to expect staff to work on all components of the remedial plan simultaneously.

<u>Budget Growth Request</u>:

- On September 10, 2020, the Board of Supervisors approved the Revised Recommended Budget for FY 2020/21.  This included approximately $1.8 million in growth for Adult Correctional Health (12.0 FTEs and an augmentation for the UC Davis contract).
- New positions were available to fill in October with the exception of those delayed until mid-year.  See tables below for details.

| **Health Care Staffing Augmentation** | |
|---|---|
| Fiscal Year | Staffing |
| FY 2018/19 (Midyear) | 12 FTEs<br>• 1 FTE Physician<br>• 1 FTE Dentist<br>• 1 FTE Pharmacist<br>• 1 FTE Pharmacy Technician<br>• 4 FTE Registered Nurses (RN)<br>• 4 FTE Licensed Vocational Nurses (LVN) |
| FY 2019/20 | 12.0 FTEs<br>• 4 FTE Quality Improvement (QI)/Compliance Team – 1 Planner, 1 RN, 2 Administrative Services Officer I<br>• 4 FTE – 2 Physicians, 2 Medical Assistants (MA)<br>• 2 FTE Supervising RNs<br>• 2 FTE Senior Office Assistants (SROA) |
| FY 2020/21<br><br>*Budget hearings were delayed until September.* | 12.0 FTEs<br>• 2 FTE Physicians – *midyear Jan 2021*<br>• 5 FTE Registered Nurses (3 sick call, 1 discharge planning, 1 chronic care)<br>• 1 FTE Dental Hygienist (replaces registry staff)<br>• 1 FTE Pharmacist<br>• 1 FTE Pharmacy Technician<br>• 1 FTE Administrative Services Officer III (Electronic Health Record)<br>• 1 FTE Administrative Services Officer II (Contracts) |

ACH has 158.5 FTE permanent county positions. As of 12/29/20, 133 positions were filled and 25.5 positions were vacant.

*Permanent position vacancies includes*:
6.5 FTE Physician
1.0 FTE Supervising Nurse
11.0 FTE Registered Nurse
3.0 FTE Medical Assistant
1.0 FTE Office Assistant
2.0 FTE Administrative Services Officers (I, II & III)

The county permanent positions do not include county on-call, registry or contract positions. Historically, the county has relied heavily on temporary staff versus permanent staff. Use of temporary staff is inadequate and hampers service delivery and quality due to need to follow structured policies and protocols.

SSO received approval for 8 additional FTEs (2 per shift) to provide escorts for appointments. This will help patient movement for onsite medical and mental health services. Escorts are essential to daily operations. Lack of sufficient staffing impacts productivity and access to care.

See table below for mental health contract program additions:

| Mental Health Contract Augmentation | | |
|---|---|---|
| Fiscal Year | Program Additions | Facility |
| FY 2017/18 | 20 Intensive Outpatient Program (IOP) Beds (male) | Main Jail |
| FY 2018/19 (Midyear) | 24/7 Licensed Clinical Social Worker (LCSW) Coverage | Main Jail |
| FY 2019/20 | 15 IOP Beds (female) 24 IOP Beds (male) 24/7 LCSW Coverage | Main Jail RCCC RCCC |
| FY 2020/21 | Enhanced Outpatient Mental Health Services for the Outpatient Psychiatric Pod. Includes mental health services, medication evaluation and monitoring, case management, and discharge planning. Adds a new level of service. Will serve approx. 125 patients at any given time. – *midyear Jan 2021* | |

Last year, staff completed a pilot program on the new service. The pilot was quite small (N = 54) but outcome data was very promising (77% decrease in acute psychiatric admissions, 78% decrease in disciplinary write ups, 59% decrease in urgent referrals). MH staff will track data on this new program.

## II. GENERAL PROVISIONS – MENTAL HEALTH (MH) DATA POSTING (page 3)

Point-in-time data reports are posted quarterly with email notification to the PLO/DRC. See SSO Transparency/Corrections Consent Decree: https://www.sacsheriff.com/pages/transparency.php.

A brief synopsis of the reports is located in the following table.

5

**Jail Inmate Population: Mental Health**

| Report Point-in-Time | 1/6/20 | 4/6/20 | 7/6/20 | 10/5/20 |
|---|---|---|---|---|
| Census | 3,511 | 2,721 | 2,673 | 3,093 |
| **Mental Health** | | | | |
| No mental health condition | 1,737 (50%) | 1,211 (44%) | 1,172 (44%) | 1,187 (38%) |
| MH non-SMI diagnosis | 890 (25%) | 805 (30%) | 867 (32%) | 1,111 (36%) |
| SMI | 884 (25%) | 705 (26%) | 634 (24%) | 795 (26%) |
| **Outpatient Mental Health** | | | | |
| Open | 31 (8%) | 39 (6%) | 32 (6%) | 28 (4%) |
| Discharged | 355 (92%) | 592 (94%) | 547 (94%) | 656 (96%) |
| **Substance Use Treatment & Prevention (SUPT)** | | | | |
| Open | 26 (20%) | 34 (15%) | 27 (14%) | 33 (12%) |
| Discharged | 107 (80%) | 190 (85%) | 170 (86%) | 235 (88%) |

January data is pre-pandemic while the latter data points occur during the pandemic. Despite the drop in census, the percentage of adults with Serious Mental Illness (SMI) remained consistent and the percentage of adults connected to community outpatient mental health remains low.

The need to reduce the SMI population in the jail facilities and promote connections to community treatment will be addressed in later sections of this report. A data review is in process with a consultant who is examining staff data, criminal justice data, and mental health plan provider data. While not required by the remedial plan, it will help system partners with strategies to track and reduce the SMI population in the jail facilities.

## III. AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE (page 4)

As policies are being revised, they will be retooled or combined and will supersede former policies. These items are important, complex, and are being phased in.

Approved by PLO/DRC:

- PP 01-09 Grievance Process for Health/Disability Complaints
- PP 06-02 Persons with Disabilities (addresses several old policies)
- PP 06-03 Effective Communication
- Disability and Effective Communication Forms

ACH policies sent to the PLO/DRC but have not yet been reviewed:

- PP 03-08 Staff Training and Development (revision)
- PP 04-09 Medical Transportation (revision)
- PP 05-05 Nurse Intake (draft revision)

Grievance Tracking:

- Staff began to track grievances and note trends beginning in FY 2019/20. Previously grievance data was not tracked or analyzed.

6

ADA Implementation Process Status:

- ADA/EC forms have been configured for the electronic health record (EHR) and staff began testing the forms in November.  The forms will permit staff to pull data reports for inmates with disabilities as well as accommodation and Effective Communication needs. The forms will enable identification of the following:
  - o Types of disabilities;
  - o Inmates with disabilities that may pose a barrier to communication;
  - o Accommodation needs;
  - o Inmates who require health care appliances, assistive devices, and/or durable medical equipment (HCA/AD/DME);
  - o Class members in *Armstrong v. Newsom*
- Electronic Tracking – ADA Reports have not yet been built and system does not permit dashboard type tracking.   Interface development is in process between the EHR system and ATIMS Jail Inmate Management System. This will allow certain data indicators to be sent electronically to ATIMS.  ATIMS is anticipated to go live February 2021.
- Interpretation – ACH utilizes Language Line for interpretation services including Sign Language Interpretation (SLI).  SLI is provided via video remote interpreting (VRI) which should be available in early 2021.  PP 06-XX Interpretation Services draft is in process and should be finalized in early January.
- New Policy Drafts – ADA Coordination policy draft is in process which will address communication and coordination between ACH and SSO on disability and accommodation items. Other draft policies are also in development (patients with special needs, health care appliances) that will complement the Patients with Disabilities policies.
- ADA/Effective Communication Training – Policies were recently posted on the intranet and training material is in development. Staff plan to phase in training beginning late January 2021.  This is a key area of focus for 2021.
- ACH has had preliminary discussions with the new SSO Compliance Lieutenants on ADA coordination, operations, and training.  ACH is reviewing the additional policy drafts with SSO for feedback to ensure operations are consistent.

## IV. MENTAL HEALTH CARE (page 17)

Policies approved by PLO/DRC:

- PP 08-02 Data Sharing – Physical Health and Mental Health.  Addressed in the General Section.

MH policies reviewed by PLO/DRC and sent to MH Experts 12/30/20:

- PP 01-03 Responsible Mental Health Authority
- PP 01-10 Access to Mental Health Services (revision)
- PP 04-01 Intensive Outpatient Program (new)
- PP 04-02 FOSS Levels

- PP 05-01 Mental Health Discharge Planning
- PP 07-01 Behavioral Management Plan
- PP 07-02 MH Treatment Planning
- PP 09-02 Lanterman Petris Short (LPS) Conservatorship

Notes:

- Some of the policies that are applicable to medical and mental health are noted in the VI. Medical Section.
- Work has been delayed on MH policy development due to the changes in leadership.

Training

- Suicide Prevention Training – Once the policy is finalized, staff will develop a timeline to create the training materials and train the workforce.

MH Enhanced Outpatient Program (EOP)

- This new level of care is targeted for implementation in early January.

- Recruitment of mental health personnel for the program is in process. Services include assessment, treatment, case management, crisis intervention, medication evaluation and monitoring, and discharge planning services. These services will be provided to 125 patients placed in the Outpatient Psychiatric Pod.

Space Meeting

- Per Mental Health Expert draft report, staff will convene a space meeting in 2021 to determine if any modifications can be made to existing space pending the development of the new facility.

## V. DISCIPLINARY MEASURES AND USE OF FORCE / MH OR INTELLECTUAL DISABILITIES (page 28)

- MH PP 07-01 Behavioral Management Plan describes the behavioral interventions used for patients who have significant behavioral issues due to psychiatric illness and/or intellectual disabilities.
- See Section III for Effective Communication and accommodations for patients with MH issues or Intellectual Disabilities.
- Staff will work on developing these policies and practices with SSO.

## VI. MEDICAL CARE (page 31)

Staffing: See Section II. Staffing.

Policies approved by PLO/DRC:

- PP 08-02 Data Sharing – Physical Health and Mental Health (page 39). Addressed in the General Section.

8

Draft policies that were reviewed with PLO/DRC:

- PP 04-08 Specialty Care Referrals (page 35) – Sent to the PLO/DRC March 2020 with deferral to SME.  Resent this policy to counsel on 7/1/20 for submission.
- PP 05-XX Transgender & Gender Non-Conforming Health Care (page 41) – reviewed with PLO/DRC.  Final edits incorporated and resent to PLO/DRC on 6/19/20.  This policy has not been implemented.

ACH policies sent to the PLO/DRC and not yet reviewed:

- PP 01-01 Department and Division Overview
- PP 01-03 Responsible Health Authority
- PP 01-04 Medical/Clinical Autonomy
- PP 01-10 Organizational Charts
- PP 01-11 Service Overview
- PP 01-12 Access to Care
- PP 01-13 Pharmacy & Therapeutics Committee
- PP 02-03 Female Reproductive Services
- PP 04-09 Medical Transportation
- PP 04-10 Discharge Medications
- PP 04-17 Medication Administration
- PP 04-18 Pill Call
- PP 04-19 Over the Counter Medication
- PP 04-20 Keep on Person Medication
- PP 05-05 RN Intake (revision)
- PP 05-10 Discharge Planning
- PP 05-xx Chronic Disease Management Draft
- PP 05-xx Hepatitis C Testing & Treatment Draft
- PP 05-xx Initial History & Physical Assessment Draft

Policies not yet completed/past timeframe:

Development for these policies has been hampered by COVID-19 operations, the Medical Director transition, and work force shortage.

- Diabetes Management
- Detoxification – *See Substance Use Disorders section.*

Standardized Nursing Procedures (SNP)

- All SNPs are in various states of review and revision process.   The first group should be finalized in January 2021.
- Once approved by the Nursing and Medical Directors, they will be posted.  Once finalized, staff will be trained.

Specialty Referrals

- A contract for an evidence-based software product, *InterQual*, was recently executed. Staff completed training however an implementation plan is needed.
- Staff have executed a contract with *RubiconMD*, an eConsult platform which enables primary care clinicians an electronic consultation with specialty providers. This is a HIPAA-compliant application with access to over 120 specialists that provide responses within 12 hours. Clinician and case management training utilizing RubiconMD specialists is currently in process.
- Staff have not had success with initiating specialty contracts due to COVID-19 concerns by potential providers. Recently, American Correctional Solutions, a contracted service provider, began the process of recruiting a physical therapist for an onsite clinic. Staff will work on developing the scope of service.

RN Intake

- Nursing staff piloted a revised nurse intake process January 2020 with implementation April 2020. Designated RNs were trained. Staff edited EHR forms to ensure information is captured for COVID-19 screenings and discharge planning.
- There is another nurse intake configuration change in process to incorporate the ADA and Effective Communication forms and other key items.

Substance Use Disorders (SUD) and Medication Assisted Treatment (MAT)

Staff are working to improve Substance Use Disorders (SUD) assessment and referrals. This has several components. A major part of the effort includes Sacramento County participation in a statewide learning collaborative for jails and implementation grant for expansion of MAT.

Rollout and progress has slowed considerably due to the provider shortage and COVID-19 management. Items in process are listed below.

- PP 05-02 Medication Assisted Treatment (MAT) was developed. This policy is being revised due to the addition of the SUD counselor at the Main Jail and updated American Society of Addiction Medicine (ASAM) Opioid Use Disorder practice guidelines.
- Contracted SUD counselor began at the Main Jail late June 2020. PP 05-07 SUD Counselor was finalized. A weekly alcohol & drug education group for women began in late October 2020. An alcohol & drug group for men is targeted to begin soon. Custody has two contracted reentry staff providing SUD services through the same organization at the RCCC jail.
- A contract with CORE Medical Clinic, a local Narcotic Treatment Provider (NTP), was recently executed and PP 05-06 Methadone Treatment was finalized. The latter is now in revision due to program updates.
- PP 05-XX Detoxification Protocol (page 41) is not completed. Standardized Nursing Procedures for SUD including Alcohol Withdrawal Syndrome Treatment, Benzodiazepine Withdrawal Treatment, and Opiate Withdrawal Treatment are in revision due to the

updated American Society of Addiction Medicine (ASAM) Alcohol Use Disorder and Opioid Use Disorder practice guidelines.

- A part-time registry physician who is an <u>Addiction Medicine Specialist</u> began work in October 2020. He is consulting on new and policy revisions. Policy revisions will require Medical Director input and modification.

Continuity of Care

Continuity of Care is a complex process and is in various stages of being phased in.

- MH staff provide linkage for inmates with a Serious Mental Illness (see MH section) to community based mental health providers.
- Staff make referrals to County Alcohol & Drug Services for inmates who needs an onsite SUD assessment, referral, and linkage to a community based provider. The onsite SUD counselor at the Main Jail assists in assessments, education, support, treatment, and facilitates continuity of care. SSO has contracts with a community provider for onsite SUD services at the branch jail. They provide SUD services and continuity of care.
- Staff continue to experience delays with an electronic health record interface called *Carequality*. This interface is a data sharing platform for the purpose of continuity of care. Many local providers such as hospitals, County Mental Health, and local federally qualified health centers are using this interface or a comparable one. Once the interface is configured, staff will be able to receive clinical data from shared providers such as service provider, date, encounters, diagnoses, medications, labs, etc. Implementation is planned for 1st quarter of 2021.
- Staff have a contract for health care navigation with a local provider, *Sacramento Covered*. Sacramento Covered assists individuals with Medi-Cal applications, linkage to health care (health plans, primary care providers, behavioral health providers), and/or social services when indicated. Staff began to pilot work with Sacramento Covered in late October.
- A Supervising Nurse was hired and began work in late October 2020. Her areas of focus are discharge planning and Medication Assisted Treatment (MAT) for Opioid Use Disorders (OUD). Two discharge planning positions were added for the discharge team but have not yet been hired.
- The department is also working on execution of a contract with *UniteUs* (HIPAA compliant, cloud based platform for care management including health care and/or social service referrals). This is a department wide effort and there is not an estimated timeframe.

Continuity of Care – Discharge Medication

- Staff began to dispense medications for the "*sentenced population*" in late December 2019. Chart below reflects data for this fiscal year.

| Medication Discharge Pilot: Sentenced | | | | | |
|---|---|---|---|---|---|
| Date of Report: December 15, 2020 | | | | | |
| **Month** | **Jul 2020** | **Aug 2020** | **Sept 2020** | **Oct 2020** | **Nov 2020** |
| **Indicator** | | | | | |
| # of patients discharged – *received medications* | 66 (81%) | 83 (65%) | 97 (81%) | 85 (83%) | 79 (88%) |

| Medication Discharge Pilot: Sentenced | | | | | |
|---|---|---|---|---|---|
| Date of Report: December 15, 2020 | | | | | |
| **Month** | **Jul 2020** | **Aug 2020** | **Sept 2020** | **Oct 2020** | **Nov 2020** |
| **Indicator** | | | | | |
| # of patients discharged – *pharmacy prepared medications but patients did not obtain medications* | 15 (19%) | 45 (35%) | 23 (19%) | 17 (17%) | 11 (12%) |
| Total # of patients | 81 (100%) | 128 (100%) | 120 (100%) | 102 (100%) | 90 (100%) |

- The pilot for prescriptions for the "*presentence population*" continues to be delayed due to pharmacy software implementation and the provider shortage. Once a target date is established, the roll out will include training and be gradual to identify and correct process glitches. The pilot will include coordination and processing of prescriptions with the Primary Care Pharmacy.

## VII. SUICIDE PREVENTION (page 42)

This section is large and requires more internal work prior to submission. The transition of MH Program leadership has delayed progress on this work. It will resume in early 2021.

Draft policies that were reviewed with PLO/DRC:

- PP 07-04 Suicide Prevention Program (Planning Document) – This is not ready to return for review. Further work is needed internally with mental health, medical and custody staff.

Training:

- Suicide Risk Assessment (SRA) Training – Hired a forensic expert to update the SRA training and refine the assessment tool May 2019. Training increased from a four (4) hour training to a seven – eight (7-8) hour training module.
- Safety Planning Intervention (SPI) – Began training all mental health staff in the use of SPI January 2020. All outpatient and intensive outpatient staff have been trained. Training for staff in the acute inpatient unit and Jail Based Competency Treatment (JBCT) program is in process.
- Suicide Prevention Training & Refresher – Once the Suicide Prevention Policy has been completed, a training plan will need to be drafted for mental health, health, and custody staff.

Supervision/Monitoring of Suicidal Inmates:

- Close (direct) observation – Requirements are being met for patients who are not actively suicidal but express suicidal ideation as well as for patients who deny suicidal ideation or do not threaten suicide but are engaging in other concerning behaviors indicating the potential for self-injury.
- Constant Observation – Requirements are met for Suicidal Inmate Temporary Housing Unit (SITHU). This houses male patients only.

12

Property and Privileges:

- MH staff in consultation with custody determine limitation, removal, and return of patient clothing, property, and/or routine privileges (e.g. visits, telephone calls, recreation) based on the patient's current functioning and ability to maintain safety. This is practice in the Acute Psychiatric Unit. Procedures and staff training are being developed for outpatient programs and patients pending admission to the acute inpatient unit.
- MH staff assess patients in safety suits every 24 hours but a policy is not yet formalized. Staff will draft a policy for outpatient staff.

Discharge from Suicide Precautions:

- MH staff complete and document a suicide risk assessment prior to discharge from suicide precautions. Patients discharged from the acute unit are seen within 24 hours, 72 hours, and then within one week of discharge (implementation March 2020).

## VIII. SEGREGATION/RESTRICTIVE HOUSING (page 52)

- MH staff assigned to provide case management for individuals housed in segregation coordinate care with custody and identify and recommend less restrictive housing options or placement in a mental health program as clinically appropriate.
- Staff need to work on policy development in conjunction with medical and custody.

## EMERGENCY RESPONSE (page 50)

This section was listed in the remedial plan under Mental Health Services.

Policies reviewed by PLO/DRC and sent to MH Experts 12/30/20:

- PP 04-11 Emergency Bag/Equipment (revision)
- PP 04-12 Emergency Medical Response (revision)

ACH policies sent to the PLO/DRC and not yet reviewed:

- PP 04-13 Man-Down Drill
- PP 04-14 Disaster Response

Training/Other:

- Basic Life Support training was held in March and April 2020 for nursing staff. Training was interrupted by the pandemic but resumed in September 2020.
- Main Jail Senior Health Program Coordinator provided training on emergency response at nurse staff meetings in September.
- Planning is underway to ensure staff receive emergency response training annually.
- CPR is required for credentialing and every two years for Physicians, Nurse Practitioners, Dentists and Registered Nurses.

- In October 2020, new crash carts arrived and were outfitted with supplies.  Individual skills training was provided.
- Individual staff skills training was conducted on responding to emergencies and how to use equipment.
- Safety Committee developed a work group to coordinate and debrief man down drills.

QIC Safety Subcommittee:

- Created July 2020.  Includes nursing and custody representatives from each facility as well as other disciplines.
- Policies relating to topics such as disaster planning or man down drills are routed through the committee and/or key staff for input.

## IX. QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE (page 61)

Policy approved by PLO/DRC:

- PP 01-07 Quality Improvement (QI) Program including a QI Plan was approved.

Quality Improvement / Compliance Team:

Staff positions were created in FY 2019/20 to create a small QI/Compliance team.  An additional Planner position was redeployed to ACH during the pandemic to assist with QI/Compliance efforts.

Meetings include: Quality Improvement Committee (QIC), Mental Health Subcommittee, and Pharmacy & Therapeutics Subcommittee.   Each forum meets quarterly.   The two subcommittees were established in December 2019.  A new Safety Subcommittee was created July 2020.  Custody participates in the QIC and Safety Committees.  Staff will be reviewing QI forums to ensure each group is tracking completion of remedial items.

Reporting:

Staff were not able to generate data reports from April 2018 – June 2019 (transitioned to Centricity EHR April 2018).  As of Fiscal Year 2019/20, basic data reports have been produced.  Reports from this EHR are time consuming and some are not available.  Other options are being reviewed in order to meet PLO/DRC and community standards for reporting.

- "Adult Correctional Health Report for Fiscal Year 2019/20" was created, shared with staff, and distributed to the PLO/DRC and subject matter experts during this reporting period. This report provided an overview of health and behavioral health services within the jail facilities, data, and current areas of focus and is the first of its kind.
- Staff continue to create data reports to assist operations and/or QI activities.
- QI studies for finalized policies will be phased in.

## IX. TRAINING

Specific training is listed in the Medical, Mental Health, and Emergency Response sections.

ACH policies sent to the PLO/DRC:

- PP 03-08 Staff Development and Training (revised 11-30-20).   This is a phased in implementation.

Training Plan:

- Staff organized resources on the intranet webpage.
- Developed a training plan from the policy and procedure specific to each discipline.
- Staff will create a shared folder for training materials.

"ProLiST" Application:

- The Department of Technology developed a web-based application called Pro-LiST.  The initial phase included staff clinical license data and renewals.  IT development staff have completed the second phase requirements and will begin work shortly on additional functionality for training.  At this time there is not an estimated timeframe for go live.


*The following two sections pertain to Sacramento County and include the efforts of the County Executive's Office, Sheriff's Office, other criminal justice partners, Department of General Services, and the Department of Health Services.*

## JAIL FACILITY NEEDS

Sacramento County has been engaged in planning for facility improvements to meet the needs of the consent decree including Americans with Disabilities Act (ADA) standards, patient privacy, and sufficient space for medical and mental health services.

Main Jail Correctional Health & Mental Health Facility Project:

This project consists of design and construction of a new building on the northeast corner of the existing Main Jail facility.  This construction will add a new intake/booking area, additional medical and mental health space, education, and program space.  Areas will be designed to be compliant with the Americans with Disabilities Act (ADA) and Health Insurance Portability and Accountability Act (HIPAA). On April 21, 2020, the Board of Supervisors approved a contract with an architectural firm to design the proposed annex.

- Planning meetings for the Main Jail Annex began June 2020.  Representatives participating in the planning sessions include SSO, ACH, Counsel, County Executive's Office, General Services, and design consultants. Meetings are time intensive.
- Initial meetings were focused on population reduction based scenario planning to identify and quantify potential impacts on jail population based on a variety of changes (policy, programs or practices).

15

- The County Executive's Office added a component to the project to explore and review population reduction scenarios and possible impact to the project.
- Mail Jail "Annex" was rebranded the *Correctional Health & Mental Health Services Facility.*
- The facility programming phase meetings began October 2020. Adult Correctional Health and SSO participate along with other County leadership and the contracted project staff and experts.

Rio Cosumnes Correctional Center (RCCC) Facility Project:

The RCCC facility requires modifications to be responsive to the consent decree. The County initially worked on a project to make improvements to the RCCC facility (new medical, mental health, and program space) using SB 1022 grant project funds. The Board of Supervisors decided in late September to not accept the SB 1022 funding. There are no updates at this time.

---

**COUNTY EFFORTS TO REDUCE THE JAIL POPULATION**

Sacramento County is engaged in multiple efforts to reduce the jail population. See Board of Supervisors meeting dated 10/22/2019, Item #66 (*Report on County Efforts to Reduce the Jail Population*). Updates on some of these efforts are listed below.

**Jail Diversion Programs that are active**:

- Pretrial Assessment: Probation (lead agency) received local general funds and a grant from the Superior Court to utilize the Public Safety Assessment (PSA) tool to inform pretrial release decisions based on risk of failure to appear (FTA), risk of new criminal activity, and risk of new violent criminal activity. The Pretrial Pilot began October 2019 and will operate through June 30, 2021.
- Public Defender Pretrial Support Project (PTSP): Public Defender (lead agency) received a grant from Bureau of Justice Assistance (BJA) to develop and operate a pretrial support program using evidence based tools to interview jail inmates prior to arraignment to identify needs, provide social worker support/case management, link to services, and coordinate safe discharge plans.

**New Programs in Development**:

- Pretrial Felony Mental Health Diversion: Public Defender (lead agency) received a grant from the Dept. of State Hospitals to implement a Pretrial Mental Health Diversion Program. The target population includes adults with serious mental illness charged with felonies that are incompetent to stand trial or in danger of being incompetent to stand trial. The Public Defender released the RFP on 6/26/2020 for community based treatment services that will begin in February 2021. At the conclusion of the process, the contract was awarded to TeleCare for services to 40 individuals a year with housing for 20. Clients will be referred to TeleCare through the granting of Felony Mental Health Diversion by Sacramento Superior Court.

16

- Forensic Behavioral Health Innovation Program: DHS Behavioral Health created an innovation project for individuals with a serious mental illness and criminal justice involvement who are being released from the jail. The project plan and Mental Health Services Act funding was approved 6/25/2020 by the Mental Health Services Oversight and Accountability Commission. The next step will be to release an RFP. Services estimated to begin July 2021.
- Jail Diversion Treatment and Resource Center: Probation (lead agency) received a California Health Facilities Financing Authority community services infrastructure grant to provide a community based facility to divert criminal justice-involved adults with mental health disorders, substance use disorders, and/or other trauma-related disorders from jail and/or prison. On June 2, 2020, Probation received the Board of Supervisors approval on this project and is in the beginning phases. This program is targeted to begin April 2021.
- Alternatives to 9-1-1 Response (new): At the September Budget Hearing, BOS asked staff to develop a proposal for alternative responses to mental health and homeless-related 911 calls to complement the existing Mobile Crisis Support Teams (MCST). The County Executive's Office is facilitating an internal countywide work group to review data, review models from other jurisdictions, and obtain community input. The group will return to the BOS for a recommended pilot in early 2021.

**System Planning:**

- Work Plan to Reduce Use of the Jail: The Correctional Facilities Committee has adopted a work plan to implement recommendations from the Carey Work Group Report. These recommendations and approaches focus on managing justice-involved individuals in a setting other than jail.
- Data Driven Recovery Project (DDRP): The Criminal Justice Cabinet's Mental Health Work Group began to meet with the consultant for the DDRP to review data from individuals in the criminal justice system who have serious mental illness (SMI). The focus will be identifying opportunities for engagement/other services in order to decrease the population of individuals with SMI in the jail facilities. This work is in alignment with the national "Stepping Up Initiative" which focuses on reducing the population of adults in jails with SMI. The Work Group is currently reviewing baseline measures to develop a common understanding and fuller view of people touching multiple systems. The DDRP work is aimed at implementing changes that keep people with SMI out of jail, shorten the length of stay for those with SMI, increasing connections to services at release, and keeping people with SMI from coming back to jail.

ATTACHMENT 2

*MAYS V. COUNTY OF SACRAMENTO*

**COMBINED REMEDIAL PLAN – May 30, 2019**

III.    **AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE**

A.  **Policies and Procedures**                    **Sacramento Sheriff Response**

1.   It is the County's policy to provide access to its programs and services to prisoners with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests. No prisoner with a disability, as defined in 42 U.S.C. § 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities or be subjected to discrimination. The County's policy is to provide reasonable accommodations or modifications where necessary, consistent with 28 C.F.R. §§ 35.150 & 35.152, and other applicable federal and state disability law.

The Sheriff's Office has engaged in several steps, some through policy revision, others through practice to ensure all inmates receive equal access regardless of disability. Notably, the Compliance Unit, through tracking mechanisms, and personal visits, ensures equal access and effective communication on an individual basis for all inmates with disabilities.  Practices invovling lower bunks and lower tiers have been modified to ensre the maximum number of beds are available for those needing accomodations.  Patients identified with mobility issues are escorted in or with the proper DME to ensure they are not denied equal access to facilities, programs and services.

2.   The County shall, in consultation with Plaintiffs' counsel, revise its Operations Order to establish standard and consistent procedures for the Jail to ensure compliance with the ADA and the remedial provisions outlined herein.

ADA Operations Order under review.

3.   The County shall, within 12 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, revise policies, procedures, and inmate orientation materials (e.g. Inmate Handbook), in accordance with the revised Operations Order and the remedial provisions outlined herein. A list of policies which the County will revise consistent with the provisions outlined herein, as appropriate and in consultation with Plaintiffs' counsel, is attached as **Exhibit A-1.**

Discipline housing, Housing unit checks, Tsep procedures sent as temporary polices. TGNI and Effective Communication under revision. The Suicide Prevention plan was updated in January 2020 to refelect the remedial plan requirements. Additional info still needs to be added in another revision to address deficiencies noted in Lindsey Hays' December 2020 report.

4.   All staff will receive training appropriate to their position on policies and procedures related to compliance with the Americans with Disabilities Act (ADA) and related disability laws.

This item is pending the approval and completion of the ADA policy.

## B.  ADA Tracking System

1.   The County shall develop and implement a comprehensive system (an "ADA Tracking System") to identify and track screened prisoners with disabilities as well as accommodation and Effective Communication needs.

ATIMS under development to track ADA needs. It is supposed to go live in 2021. We currently utilize a rudimentary tracking system through Excel.

2.   The ADA Tracking System shall identify:

a)   All types of disabilities, including but not limited to psychiatric, intellectual, developmental, learning, sensory, mobility, or other physical disabilities, and special health care needs;

ATIMS under development to track ADA needs. It is scheduled to go live in 2021. Our current tracking system lists disabilities.

b)   Prisoners with disabilities that may pose a barrier to communication, including but not limited to learning, intellectual, or developmental disabilities, and hearing, speech, or vision impairments;

ATIMS under development to track ADA needs. It is scheduled to go live in 2021. Our current tracking system lists disabilities.

c)   Accommodation needs, including as to housing, classification, Effective Communication, adaptive supports, and assistive devices;

ATIMS under development to track ADA needs. It is scheduled to go live in 2021. Our current tracking system lists disability Needs/Requests/Accomodations.

d)   Prisoners who require specific health care appliances, assistive devices, and/or durable medical equipment (HCA/AD/DME);

ATIMS under development to track ADA needs. It is scheduled to go live in 2021. Our current tracking system lists disability Needs/Requests/Accomodations.

e)   Prisoners who are class members in *Armstrong v. Newsom* (N.D. Cal. No. 94-cv-02307), with their applicable disability classification(s) and accommodation need(s).

ATIMS under development to track ADA needs. It is scheduled to go live in 2021. Our current system lists when an inmate is part of the Armstrong lawsuit.

3.   The ADA Tracking System's prisoner disability information will be readily accessible to custody, medical, mental health, and other staff at the Jail who need such information to ensure appropriate accommodations and adequate program access for prisoners with disabilities.

ATIMS under development to track ADA needs. It is scheduled to go live in 2021. Our current system is only available to the Compliance staff.

C. **ADA Coordinator**

1.   The County shall have a dedicated ADA Coordinator at each facility.

Both positions overseen by the Compliance Sergeant at each facility.

2.   The ADA Coordinator position shall be dedicated to coordinating efforts to comply with and carry out ADA-related requirements and policies, shall have sufficient command authority to carry out such duties, and shall work with the executive management team regarding ADA-related compliance, training, and program needs.

Both positions overseen by the Compliance Sergeant at each facility.

3.   The County shall clearly enumerate, in consultation with Plaintiffs' counsel, the job duties and training requirements for the ADA Coordinator position and for ADA Deputies assigned to support the ADA Coordinator position.

This item is pending the approval and completion of the ADA policy.

4.   The County shall ensure that ADA Coordinators and ADA Deputies possess requisite training to implement and ensure compliance with the Jail's disability program and services, including operation of the ADA Tracking System.

This item is pending the approval and completion of the ADA policy.

D. **Screening for Disability and Disability-Related Needs.**

E. **Orientation**

1.   The County shall ensure that, for the population to be housed in the Jails, prisoners with disabilities are adequately informed of their rights under the ADA, including but not limited to:

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. There is signage posted in Intake/Booking and in all housing units/ADA contact info is in the handbook/ADA hotline recording. NMJ advises through the inmate handbook in addition to the mentioned signage

a) Accommodations available to prisoners;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. **NMJ inmates can fill out a pink slip for medical**

b) The process for requesting a reasonable accommodation;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. There is signage posted in Intake/Booking and in all housing units/ADA contact info is in the handbook/ADA hotline recording.  **NMJ accomodations through medical for chrono**

c) The role of the ADA coordinator(s) and method to contact them;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. **NMJ has * # available and kites for communication**

d) The grievance process, location of the forms, and process for getting assistance in completing grievance process;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effective communcations means. This process is included in the handbook that is provided to the inmates uopn intake. **NMJ in handbook, floor officers have the physical forms**

e) Instructions on how prisoners with disabilities can access health care services, including the provision of Effective Communication and other accommodations available in accessing those services.

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. Additionally, the advisement by ACH upon intake and the general process is listed in the inmate handbook that is provided upon intake and anytime during the inmate's custody period upon their request. Our policies must be revised to include effective communication provisions. **NMJ medical kite or a request to compliance**

2.   Upon processing and classification, prisoners with disabilities shall receive, in an accessible format, the jail rulebook; orientation handbook; and a verbal orientation or orientation video regarding rules or expectations.

Verbal and written communication presented by compliance officers upon request. The handbook is received at intake and available upon request however, only one format/version of the handbook is avaialble.

3.   The County shall accommodate individuals with disabilities in the orientation process through the use of alternative formats (*e.g.* verbal communication, large print, audio/video presentation), when necessary for Effective Communication of the information.

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means.

4.   The County shall develop an Americans with Disabilities Act Inmate Notice. The Notice shall be prominently posted in all prisoner housing units, in the booking/intake areas, in medical/mental health/dental treatment areas, and at the public entrances of all Jail facilities.

This item is pending the approval of the ADA policy. There is ADA signage posted in noted areas. The signage is compliant with ADA federal requirements.

### F.  Health Care Appliances, Assistive Devices, Durable Medical Equipment

b)  If such a determination is made, the ADA coordinator or supervisory-level designee shall document the decision and reasons for it, in writing, and shall consult with medical staff to determine an appropriate alternative accommodation.

Planning for this item is underway.  <span style="color:red">NMJ approved by medical reviewed by compliance</span>

a)  The County will ensure that any personal mobility device belonging to a prisoner is returned to the prisoner prior to release from custody.

Current practice.

### G.  Housing Placements

1.   The County shall house prisoners with disabilities in facilities that accommodate their disabilities.

RCCC accomodates inmate disabilities as recommended by CHS and "chrono" issued. <span style="color:red">NMJ determined by medical</span>

2.   The County shall implement a housing assignment system that includes an individualized assessment of each individual's functioning limitations and restrictions, including but not limited to:

RCCC accomodates inmate disabilities as recommended by CHS and "chrono" issued. <span style="color:red">NMJ determined by medical</span>

a)  The need for ground floor housing;

Jail Annex Planning. <span style="color:red">NMJ CHS decides</span>

b)  The need for a lower bunk;

Jail Annex Planning. <span style="color:red">NMJ CHS decides</span>

c)   The need for grab bars in the cell and/or shower;

RCCC housing facilities have shower chairs available for inmates with identified needs. <span style="color:red">NMJ 2E & 2M have grab bars; shower chairs on every floor available upon request</span>

d)   The need for accessible toilets;

Jail Annex Planning. <span style="color:red">NMJ CHS decides</span>

e)   The need for no stairs in the path of travel; and

RCCC accomodates inmate disabilities as recommended by CHS and "chrono" issued. <span style="color:red">Same at NMJ</span>

f)   The need for level terrain.

RCCC accomodates inmate disabilities as recommended by CHS and "chrono" issued. <span style="color:red">Same at NMJ</span>

3.   Prisoners with disabilities shall be housed in the Jail consistent with their individual security classification. Prisoners prescribed or possessing HCAs/ADs/DME will not automatically be housed in a medical housing unit. Placement in a medical housing unit will be based on individualized clinical determination of need for treatment.

RCCC - an inmate's security clssification is not determines by their disability or HCA/AD/DME; Medical Housing Unit (MHU) housing is determined by CHS based on an individual assessment. <span style="color:red">Nmj already adhering to this</span>

4.   Classification staff shall not place prisoners with disabilities in:

a)   Inappropriate security classifications simply because no ADA-accessible cells or beds are available;

Current practice.

b)   Designated medical areas unless the prisoner is currently receiving medical care or treatment that necessitates placement in a medical setting; or

Current practice.

c)   Any location that does not offer the same or equivalent programs, services, or activities as the facilities where they would be housed absent a disability.

RCCC programs and services are available based on eligibility and classification. <span style="color:red">Same practice at NMJ</span>

H.   **Access to Programs, Services, and Activities**

**1.**  The County shall ensure prisoners with disabilities, including those housed in specialized medical units or mental health units (*e.g.*, OPP, IOP, Acute) have equal access to programs, services, and activities available to similarly situated prisoners without disabilities, consistent with their health and security needs. Such programs, services, and activities include, but are not limited to:

Current practice.

a)  Educational, vocational, reentry and substance abuse programs

RCCC offers distance learning to all classification levels. Reentry programs are not offered to inmates in specialized mental health units. <span style="color:red">Same at NMJ; we are in the process of a programs overhaul and inroduction of reentry at NMJ</span>

b)  Work Assignments

RCCC work assignments are based on medical clearance to work determinations made by CHS staff; Reasonable accomodations are made based on CHS recommendation. <span style="color:red">Classification & medical assist</span>

c)  Dayroom and other out-of-cell time

Out of cell time determined by the Consent Decree is currently met by all housing facilities at RCCC. Inmates in specialized MH uints such as IOP and JBCT receive additional out of cell and dayroom time due to the nature of their program. <span style="color:red">Same as NMJ</span>

d)  Outdoor recreation and fitted exercise equipment

Recreational access is based on security classification and not on the inmate's disability.

e)  Showers

Current practice.

f)  Telephones

Current practice.

g)  Reading materials

RCCC recreation staff does not provide reading materials for special needs (Braille, large print) on a regular basis. Occassionly they receive large print books and they distribute them to the inmates.<span style="color:red">NMJ ADA tablet, braille; chrono</span>

h)  Social visiting

Current practice.

i)   Attorney visiting

Current practice.

j)   Religious services

Current practice.

k)   Medical, mental health, and dental services and treatment

Inmates assigned to specialized MH units (IOP, JBCT) receive additional, individualized, specialized mental health services through their program, in addition to the services provided through JPS. pink kite for treatment request at NMJ

**2.**   The County shall provide reasonable accommodations and modifications as necessary to ensure that prisoners with disabilities have equal access to programs, services, and activities available to similarly situated prisoners without disabilities.

RCCC - Current practice. Programs and activity availability differs based on the inmate's security classification. All inmates participate in activities and programs available to their security classification. Same at NMJ

3.   The County shall develop and implement a written policy for staff to provide appropriate assistance to prisoners with psychiatric, developmental, or cognitive disabilities so that they can fully participate in programs, services, and activities provided at the Jail.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

**4.**   The County shall implement a written policy for staff to provide assistance to prisoners with disabilities in reading or scribing documents.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. Inmates with disabilities in reading/scribing are still being provided with assistance desite the lack of a written policy. Their needs are being monitored through the Compliance Unit at RCCC.

5.   The County shall provide equal access to library, recreational, and educational reading materials for prisoners with disabilities, including easy reading and large print books for individuals who require such accommodations.

Curent practice, inlcuding the purchase of keep-on-person magnifiers. Nmj chrono; soft magnifiers; hard one broke; law library has one on hand

6.   The County shall ensure equitable inmate worker opportunities for prisoners with disabilities, including by:

Jail Annex Planning.

a)  Ensuring clear job duty statements, with essential functions and specific criteria, for each Worker position;

No clear job descriptions are currently available. This will have to be addressed.  NMJ has positions in kitchen

b)  Ensuring that medical staff conduct an individualized assessment to identify work duty restrictions and/or physical limitations to facilitate appropriate work/industry assignments and to prevent improper exclusions from work opportunities;

RCCC - Current practice.  Medical does individual assessment to make sure they are qualified

c)  Providing reasonable accommodations to enable prisoners with disabilities to participate in inmate worker opportunities.

RCCC - Current practice.  Classification & medical requirements

I.   **Effective Communication**

1.   The County shall assess all individuals detained at the Jail for any period of time for Effective Communication needs, and shall take steps to provide Effective Communication based on individual need.

RCCC -  Upon intake, inmates are assessed by CHS staff and intake officers for special needs. Effective communication assistance for inmates is based upon the individual (SLI, VRI, Etc.) The inmate's information is forwarded to the Compliance Unit for tracking and further assistance.   same at NMJ

2.   The County's ADA policies shall include comprehensive guidance to ensure Effective Communication for prisoners with vision, speech, hearing, intellectual, learning, or other disabilities. The County shall, in consultation with Plaintiffs' counsel, ensure that sufficient guidance on the provision of Effective Communication is included in Jail custody and health care policies and procedures.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

a)  A higher standard for the provision of Effective Communication shall apply in the following situations:

i.   Due Process Events, including the following:

▪ Classification processes

This item is pending the creation and approval of the effective communication order.

- Prisoner disciplinary hearing and related processes

This item is pending the creation and approval of the effective communication order.

- Service of notice (to appear and/or for new charges)

This item is pending the creation and approval of the effective communication order.

- Release processes

This item is pending the creation and approval of the effective communication order.

- Probation encounters/meetings in custody

This item is pending the creation and approval of the effective communication order.

i.   Identify each prisoner's disability where there may be a barrier to comprehension or communication requiring reasonable accommodation(s);

This item is pending the creation and approval of the effective communication order.

ii.  Provide effective reasonable accommodation(s) to overcome the communication barrier; and

This item is pending the creation and approval of the effective communication order.

iii. Document the method used to achieve Effective Communication and how the staff person determined that the prisoner understood the encounter, process, and/or proceeding.

This item is pending the creation and approval of the effective communication order.

4.   Effective auxiliary aids and services that are appropriate to the needs of a prisoner with Effective Communication needs shall be provided when simple written or oral communication is not effective. Such aids may include bilingual aides, SLIs, readers, sound amplification devices, captioned television/video text displays, Videophones and other telecommunication devices for deaf persons (TDDs), audiotaped texts, Braille materials, large print materials, writing materials, and signage.

VRI system installed at RCCC with the intention of bringing a similar system to the Main Jail.  Video visitation RFP is in process.  RCCC employs VRS technology, TDD and signage for hearing impaired inmates. The use of SLI is authorized through policy; bilingual aides are also available. NMJ VRS & TDD SLI -no tablet

5.   In determining what auxiliary aid service to provide, the County shall give primary consideration to the request of prisoner with Effective Communication needs.

RCCC offers a variety of auxiliary aids for inmates with effective communication needs and gives primary consideration to the request of the inmate with E.C. needs. <span style="color:red">Same at NMJ</span>

6.   Education providers (*e.g.,* Elk Grove Unified School District) at the Jail will ensure Effective Communication for prisoners participating in education programs, including by providing necessary assistive equipment and take steps to accommodate learning strategies of those prisoner-students who have special needs, such as those with developmental, learning, vision, hearing, and speech disabilities.

This item is pending the creation and approval of the effective communication order however, the RCCC Compliance Unit tracks inmates with special needs and works with the Elk Grove Unified School District to provide accomodations. VRI has been used to assist in the past. Currently, pending EGUSD response for their practices/policies on this subject.

7.   The County shall assist prisoners who are unable to complete necessary paperwork (*e.g.*, related to health care, due process, Jail processes) on their own with reading and/or writing as needed.

Current practice.

**J.   Effective Communication and Access for Individuals with Hearing Impairments**

1.   The County shall develop and implement a policy for newly arrived and newly identified prisoners with hearing disabilities to determine each prisoner's preferred method of communication.

This item is pending the creation and approval of the effective communication order. RCCC  utilizes VRI services at intake/transfer to communicate with inmates with hearing disabilities. These inmates are referred to the Compliance Unit for individualized assistance and assessment.  <span style="color:red">Same at NMJ based on chrono or request</span>

2.   Qualified Sign Language Interpreters (SLIs) will be provided during intake and for due process functions, health care encounters, and Jail programming, when sign language is the prisoner's primary or only means of Effective Communication, unless the prisoner waives the assistance of an interpreter and/or delay would pose a safety or security risk.

RCCC Video Remote Interpreting (VRI) tablets provide live interactive SLI services. The tablet is located in Booking and in the Classification office. The service is available 24/7 for use by officers for any procedure. <span style="color:red">Same at NMJ, through VRS</span>

a)   The County shall maintain a contract or service agreement with interpreter services in order to provide such services for deaf or hearing impaired prisoners. Jail staff will be informed of the availability of contract interpreter services.

RCCC currently has a contract for live VRI services in addition to contracted services listed in Operations Order 6/14 - Interpreter Services. Information regarding both are available to custody staff. Nmj same/contract

b)   Lip reading will not be the sole method of Effective Communication used by staff, unless the prisoner has no other means of communication.

RCCC offers a variety of auxiliary aids for inmates with effective communication needs and gives primary consideration to the request of the inmate with E.C. needs. Same at NMJ

c)   In cases where the use of an SLI is not practicable, or is waived by the prisoner, Jail staff shall employ the most effective form of communication available.

RCCC Video Remote Interpreting (VRI) tablets provide live interactive SLI services. The tablet is located in Booking and in the Classification office. The service is available 24/7 for use by officers for any procedure. Same through VRS

d)   The County will maintain a log of (a) when, for whom, and for what purpose an SLI was used; and (b) when, for whom, and why a SLI was *not* used for a prisoner with an identified need for SLI services (*e.g.*, prisoner waived SLI or delay would have posed safety or security risk).

RCCC - VRI keeps log by name and xref but only available on device At NMJ the floor officer & 2 east officer log in book when VRS is used

e)   When a prisoner waives an SLI, the log must document (a) the method of communication of the waiver, and (b) the method staff used to determine that the waiver was knowing and freely given.

This item is pending the creation and approval of the effective communication order.

3.   Jail Staff shall effectively communicate the contents of the Inmate Handbook and other materials providing information on Jail rules and procedures to all prisoners to be housed in the Jail who are deaf or hard of hearing. For those prisoners for whom written language is not an effective means of communication, Jail Staff may meet this obligation by providing a video of an SLI signing the contents of the Inmate Handbook, along with appropriate technology for viewing, or by providing an SLI to interpret the contents of the Inmate Handbook to the prisoner who is deaf or hard of hearing.

At RCCC, all inmates are provided with a copy of the inmate handbook however, there is no video with an SLI signing the contents. Same

4.   The County shall, within 12 months from court approval of the Settlement, make Videophones available for deaf and hard of hearing prisoners. The Videophones shall provide for calls through the use of Video-Relay Services (VRS) at no cost to deaf and hard of hearing prisoners or for calls directly to another Videophone.

VRS/VRI system installed at RCCC. <span style="color:red">VRS at NMJ</span>

5.   Deaf/hard of hearing prisoners who use telecommunication relay services, such as Videophone or TDD/TTY machine, in lieu of the telephone shall receive equal access to the Videophone or TDD/TTY services as non-disabled prisoners are afforded for regular telephone usage.

Current RFP for video visitation services.  RCCC officers are notified by the Compliance Unit officers of the inmate's need for VRS services and allow those inmates using VRS equal phone time. <span style="color:red">Same</span>

6.   The County shall provide deaf/hard of hearing prisoners with additional time for calls using telecommunication relay services, such as a Videophone or TDD/TTY, to account for the fact that signed and typed conversations take longer than spoken conversations. The County shall document the time that each prisoner uses and has access to such equipment.

Telephone calls are not timed.  This is current practice.

7.   Prisoners who require an SLI as their primary method of communication shall be provided an SLI for education, vocational, or religious programs and services.

This item is pending the creation and approval of the effective communication order. RCCC is awaiting a response from EGUSD for policy and practices.

8.   Public verbal announcements in housing units where individuals who are deaf or hard of hearing reside shall be delivered on the public address system (if applicable) and by flicking the unit lights on and off several times to alert prisoners that an announcement is imminent. This includes announcements regarding visiting, meals, recreation release and recall, count, lock-up, and unlock. Verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, as consistent with individual need. These procedures shall be communicated to prisoners during the orientation process and also shall be incorporated into relevant policies and post orders.

This item is pending the creation and approval of the effective communication order however , RCCC has no standard practice for notification. Officers assigned to housing units where a deaf inmate is housed are advised by the Compliance Unit officers of the need for special accomodations regarding verbal announcements. <span style="color:red">same at NMJ/officers will go to the door if they know they are deaf and need to come out</span>

K.  **Disability-Related Grievance Process**

1.   The County shall implement a grievance system for prisoners with disabilities to report any disability-based discrimination or violation of the ADA, this Remedial Plan, or Jail ADA-related policy, and shall provide a prompt response and equitable resolution in each case.

Medical Greivance boxes installed. ADA added to greivance forms.

2.   The County shall ensure that the grievance procedures are readily available and accessible to all prisoners.

Grievances are made available to all inmates. Process is included in handbook.

a)   The County shall make reasonable efforts to ensure all prisoners are aware of the disability grievance procedures, including the availability of accommodations and staff assistance to submit a grievance and/or appeal.

Current practice.

b)   The County shall ensure the prisoners with disabilities have meaningful access to grievance forms, including through provision of staff assistance and large print materials.

Current practice however, large print has not been developed yet.

3.   Response to Grievances

a)   The County shall develop and implement an ADA grievance process that includes (1) a reasonable timeline for response to ADA-related grievances and appeals, including an expedited process for urgent ADA grievance (*e.g.*, involving prisoner safety or physical well-being); and (2) provision for interim accommodations pending review of the individual's grievances/appeals.

This item is pending the approval and completion of the ADA policy.

b)   The County shall ensure that prisoners with communication needs are interviewed and provided assistance as part of the grievance/appeal process where necessary to ensure meaningful access and Effective Communication.

This item is pending the approval and completion of the ADA policy however, RCCC inmates with E.C. needs are identified and tracked by the Compliance Unit. Inmates have access to the officers in the Compliance Unit via regularly scheduled interviews, phone, or correspondence. Inmates can request assistance from the Compliance Unit officers at any time. follow up is dependent on needs

c)  The County shall document each denial of a reasonable accommodation request and shall record the basis for such determination.

This item is pending the approval and completion of the ADA policy. At RCCC, the custodial staff coordinates with CHS staff to make medically necessary accomodations.  Same at NMJ

d)  The County shall provide in writing a copy of the grievance (or appeal) response to the prisoner, including the resolution, the basis for a denial (if applicable), and the process for appeal.

This item is pending the approval and completion of the ADA policy however, the inmates receive a copy of their grievance resolution pursuant to operations order 7/02.

e)  The County shall ensure that completed grievance responses are effectively communicated to prisoners with disabilities.

This item is pending the approval and completion of the ADA policy however, the Compliance Officers are available to assist inmates with E.C. needs.

4.  The submission, processing, and responses for disability-related grievances and complaints shall be tracked.

Current practice.

L.  **Alarms/Emergencies**

**1.**  The County shall ensure that all written policies regarding alarms and emergencies contain mandatory provisions to accommodate prisoners with disabilities.

This item is pending the approval and completion of the ADA policy.

**2.**  The County shall implement written policies regarding the expectations of staff as to prisoners with identified disabilities during emergencies and alarms, including as to disabilities that may affect prisoners' ability to comply with orders or otherwise respond to emergencies and alarms. For example, the policies shall ensure appropriate handling of prisoners with mobility-related disabilities who are unable to prone or take a seated position on the ground during an alarm or emergency. Such policies shall be communicated to staff, incorporated into the relevant Operations Orders, and communicated to prisoners with disabilities using Effective Communication.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

3.   The County shall implement written policies for staff regarding communicating effectively and appropriately with prisoners who have disabilities that may present barriers to communication during emergencies or alarms.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

4.   In order to facilitate appropriate accommodations during alarms or emergencies, the County shall offer, but shall not require, individuals who have disabilities visible markers to identify their disability needs (*e.g.*, identification vests). The County shall maintain a list, posted in such a way to be readily available to Jail staff in each unit, of prisoners with disabilities that may require accommodations during an alarm or emergency.

This item is pending the approval and completion of the ADA policy.

5.   The County shall install visual alarms appropriate for individuals who are deaf or hard of hearing, which shall comply with relevant fire code regulations.

At RCCC, visual alarms are currently installed compliant with relevant fire code regulations. Same as NMJ

6.   All housing units shall post notices for emergency and fire exit routes.

Emergency and fire exit routes posted.

## M. **Searches, Restraints, and Extractions**

1.   The County shall modify its written policies to ensure that prisoners with mobility impairments, including those with prosthetic devices, receive reasonable accommodations with the respect to the following: (1) Pat searches and unclothed body searches; (2) Application of restraints devices, including Pro-Straint Chair; and (3) Cell extractions.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

## N. **Transportation**

1.   The County shall provide reasonable accommodations for prisoners with disabilities when they are in transit, including during transport to court or outside health care services.

RCCC currently does not have an ADA van assigned to the facility, but has been approved for one.  In the meantime, RCCC can borrow an ADA compliant van from the Main Jail if the need arises.

2.   Prescribed HCAs/ADs/DME, including canes, for prisoners with disabilities shall be available to the prisoner at all times during the transport process, including in temporary holding cells, consistent with procedures outlined in Part VII.

Current practice.

3.   The County shall use accessible vehicles to transport prisoners in wheelchairs and other prisoners whose disabilities necessitate special transportation, including by maintaining a sufficient number of accessible vehicles. (295)

RCCC currently does not have an ADA van assigned to the facility, but has been approved for one.  In the meantime, RCCC can borrow an ADA compliant van from the Main Jail if the need arises.

4.   Prisoners with mobility impairments shall be provided assistance onto transport vehicles.

Current practice.

## O. Prisoners with Intellectual Disabilities

1.   The County shall, in consultation with Plaintiffs' counsel, develop and implement a comprehensive written policy and procedure regarding prisoners with an Intellectual Disability, including:

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

a)   Screening for Intellectual Disabilities;

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

b)   Identification of prisoners' adaptive support needs and adaptive functioning deficits; and

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

c)   Monitoring, management, and accommodations for prisoners with Intellectual Disabilities.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

3.   Prisoners with an Intellectual Disability assigned to a work/industry position will be provided additional supervision and training as necessary to help them meet the requirements of the assignment.

This will be contained in future policy.

## P.   ADA Training, Accountability, and Quality Assurance

1.   The County shall ensure all custody, health care, facility maintenance, and other Jail staff receive ADA training appropriate to their position.

RCCC is currently in the process of creating ADA training that will be incorporated in the new Adult Corrections Supplemental Core Course.

a)   The County shall provide to all staff appropriate training on disability awareness, including the use and purpose of accommodations and modifications in accordance with the ADA.

This item is pending the approval and completion of the ADA policy.

b)   The ADA training shall include: formalized lesson plans and in-classroom or virtual training for staff (including managers, supervisors, and rank-and-file staff) provided by certified or otherwise qualified ADA trainers.

This item is pending the approval and completion of the ADA policy.

2.   ADA instructors shall have appropriate ADA training and subject matter expertise necessary to effectively provide ADA training to staff.

This item is pending the approval and completion of the ADA policy.

3.   The County shall, in consultation with Plaintiffs' counsel, develop and implement written policies and procedures regarding monitoring, investigating, and tracking staff violations (or allegations of violations) of ADA requirements and Jail ADA policies.

This item is pending the approval and completion of the ADA policy.

4.   The County shall develop an ADA accountability plan that will ensure quality assurance and establish staff accountability for egregious, serious, or repeated violations of the ADA and Jail ADA-related policies and procedures.

This item is pending the approval and completion of the ADA policy.

## Q.   Accessibility Remedial Plan to Address Physical Plant Deficiencies

1.  The County shall, within 24 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, develop and fully implement an Accessibility Remedial Plan to address Jail physical plant deficiencies that result in access barriers for prisoners with disabilities. In the interim, the Sheriff's Office shall house prisoners with disabilities in the most integrated and appropriate housing possible, providing reasonable accommodations and assistance where necessary to ensure appropriate accessibility to Jail programs, services, and activities.

At RCCC, inmates with disablties are housed according to their security classification and granted access to programs according to their classification. Reasonable accomodations are made where necessary to ensure special needs are met. <span style="color:red">Same at NMJ</span>

2.  The Accessibility Remedial Plan shall ensure the following:

a)  Adequate provision of accessible cells and housing areas with required maneuvering clearances and accessible toilet fixtures, sanitary facilities, showers, dining/dayroom seating, and recreation/yard areas.

Jail annex plannning.

b)  Accessible paths of travel that are compliant with the ADA.

Jail annex plannning.

c)  Equal and adequate access for all prisoners with disabilities to Family and Attorney Visiting areas in reasonable proximity to their housing location.

At RCCC, legal visitation areas in male areas provide equal and adequate access for inmates with disabilities. RCCC social visitation areas provide inmates with disabilities the same opportunity to visit with their family. <span style="color:red">NMJ visit on 2E w/ chrono</span>

## IV.   MENTAL HEALTH CARE

### A.   Policies and Procedures

h)  Training for all staff members who are working with inmates with mental illness in all aspects of their respective duty assignments.

Relias training for custody deputies.  CIT training for IOP deputies. We are also exploring the option of working with JPS to develop additional training.

2.   The County's policies and procedures shall be revised, as necessary, to reflect all of the remedial measures described in this Remedial Plan.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

3.   The County shall continue to operate its acute inpatient program and its Outpatient Psychiatric Pod (OPP) program. The County shall establish a new Intensive Outpatient Program (IOP) for inmates who require a higher level of outpatient psychiatric care than what is provided in the OPP program.

Main Jail IOP to include 20 males and 15 females.  RCCC IOP to include 24 males in our 400 pod. We have an additional 64 beds in the 500 and 600 pods that are used for the ROC and JBCT programs.

## B.   Organizational Structure

1.   The County shall develop and implement a comprehensive organizational chart that includes the Sheriff's Department ("Department"), Correctional Health Services ("CHS"), Jail Psychiatric Services ("JPS"), Chief Administrative Officer, Medical Director of the JPS Program, and any other mental health staff, and clearly defines the scope of services, chains of authority, performance expectations, and consequences for deficiencies in the delivery of mental health care services.

The Sheriff's Organizational chart exists.

## C.   Patient Privacy

1.   All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff.  In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification.

Secluded privacy interview room created on first floor for booking related clinical interactions.  Use of private attorney visit booths for housing unit clinical interactions.

b)   If the presence of custody staff  is determined to be necessary to ensure the safety of medical staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

This will be addressed by the jail annex plan. Until that facility is built, JPS has purchased machines that make white noise. They are utilizing these machines to create privacy if an officer needs to be present. If there are safety concerns, the interview will take place in an attorney room.

2.   Jail policies that mandate custody staff to be present for any mental health treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above.  Custody and mental health staff shall be trained accordingly.

No policies exist mandating custody to be present with mental health treatment.

3.   It shall be the policy of the County that mental health clinicians shall not conduct their patient contacts at cell front except pursuant to documented refusals or specific, documented security concerns that warrant cell front contacts.

Case management Post Order.

5.   A process shall exist for sick call slips or other mental health treatment-related requests to be collected without the involvement of custody staff.

Sick call slips may be handed to medical staff directly.

D.   **Clinical Practices**
E.   **Medication Administration and Monitoring**

5.   The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

Growth request submitted for medical escort team. 8 Deputy Sheriff positions added to main jail for escorts. 2 for each shift

6.   Medication adherence checks that serve a clinical function shall be conducted by nursing staff, not custody staff. Custody staff shall conduct mouth checks when necessary to ensure institutional safety and security.

Curent practice.

F.   **Placement, Conditions, Privileges, and Programming**

1.   Placement:

a)   It shall be the policy of the County to place and treat all prisoners on the mental health caseload in the least restrictive setting appropriate to their needs.

Current practice.

b)  Placement in and discharge from Designated Mental Health Units shall be determined by qualified mental health professionals, with consultation with custody staff as appropriate.

Current practice.

c)  Absent emergency circumstances, the County shall obtain the assent of qualified mental health professionals before transferring prisoners with SMI into or out of Designated Mental Health Units.

Current practice.

d)  It shall be the policy of the County to place prisoners with SMI in appropriate settings that ensure provision of mental health services, patient safety, and the facilitation of appropriate programs, activities, and out-of-cell time.  Co-housing with other populations shall be avoided to the extent that such a practice prevents or hinders any of the above.

Current practice.

*2.*   Programming and Privileges

a)  All Designated Mental Health Units shall offer a minimum of 7 hours of unstructured out-of-cell time per week and 10 hours of structured out-of-cell time per week for each prisoner. While out-of-cell hours per prisoner may vary from day to day, each prisoner will be offered some amount of out-of-cell time every day of the week. All treatment and out-of-cell time shall be documented for each prisoner, and reviewed as part of Quality Assurance procedures.

Designated MH Units (IOP,JBCT) structured out of cell time is determined by program coordinators (JPS, UC Davis) as part of their treatment. Inmates in these programs generally have more than seven hours of unstructured out of cell time and more than ten hours of structured time per week. These hours are being met when not affected by COVID restrictions.

b)  The County shall ensure that prisoners on the mental health caseload have access and opportunity to participate in jail programming, work opportunities, and education programs, consistent with individual clinical input.

Current practice.  Work assignments will be based on the patient's ability to safely perform those functions given the appropriate level of supervision.

c)   The County shall develop and implement, in the 2P inpatient unit and the IOP unit, a program for progressive privileges (including time out of cell, property allowances, etc.) for patients as they demonstrate behavioral progress. A patient's level of privileges and restrictions shall be based on both clinical and custody input regarding current individual needs. The County shall ensure a process to review custody classification factors when necessary, so that placement, privileges, and restrictions match current individual circumstances and needs.

Current practice.

d)   Individuals on a mental health caseload shall receive, at minimum, privileges consistent with their classification levels, absent specific, documented factors which necessitate the withholding of such privileges. Clinical staff shall be informed of the withholding of privileges and the reasons for the withdrawal shall be documented and regularly reviewed by clinical and custody staff. The restoration of privileges shall occur at the earliest time appropriate based on

Current practice.

3.   Conditions:

a)   Staff shall provide prisoners in Designated Mental Health Units with the opportunity to maintain cell cleanliness and the opportunity to meet their hygiene needs.  Custody and clinical staff shall provide assistance to prisoners on these matters, as appropriate to individual patient needs

Current practice.

b)   The County shall ensure uniformity of practice with respect to cell searches, such that searches are not done for punitive or harassment reasons. The County shall monitor whether cell search practices may be serving as a disincentive for prisoners in Designated Mental Health Units to leave their cells for treatment or other out-of-cell activities, and shall take steps to address the issue as appropriate.

Cell searches are done randomly on a revolving basis. They are not done for punitive or harassment reasons. They are done to ensure the inmates do not have any contraband or weapons that can harm themselves, JPS staff or SSO staff.

4.   Bed planning:

a)  The County shall provide a sufficient number of beds in Designated Mental Health Unit, at all necessary levels of clinical care and levels of security, to meet the needs of the population of prisoners with SMI.

IOP units have been created for male and female patients, with the expansion of Enhanced Treatment pods.

c)  The County shall establish mental health programming for women that ensures timely access to all levels of care and is equivalent to the range of services offered to men.

Women's IOP and OPP unit established at Main Jail.  2P services already offered to women.

5.  General Exclusion of Prisoners with Serious Mental Illness from Segregation

a)  Prisoners with Serious Mental Illness will not be housed in Segregation units, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and there is no reasonable alternative, in which cases the provisions of **Section VIII.D** of the Segregation/Restrictive Housing Remedial Plan shall apply.

This is being implemented.  JPS is using an alternative treatement program in IOP to take Administrative Segregation inmates.  Fewer and fewer TSEPs are on the SMI caseload.

b)  Where prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit are assessed a Disciplinary Segregation term, they will serve the term in a Designated Mental Health Unit, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and shall receive structured out-of-cell time and programming as determined by the Multi-Disciplinary Treatment Team.

Current practice.  Disciplinary Segregation Post Order reflects all but the most serious violations will result in in-place discipline.

6.  Access to Care

a)  The County shall designate and make available custody escorts for mental health staff in order to facilitate timely completion of appointments and any other clinical contacts or treatment-related events.

IOP deputies have been structured to oversee MH treatment on the entire third floor. The JBCT/IOP programs at RCCC have 13 officers assigned to them. These officers are responsible for ensuring the inmates receive what they need from a custody perspective. They act as escorts for the mental health staff. If the inmates needs to be taken to an appointment off-site, that is facilitated by our medical escort team.

b)  The County shall ensure sufficient and suitable treatment and office space for mental health care services, including the Triage Navigator Program and other mental health-related services provided on site at the Jail.

At RCCC, office space for MH care providers and treatment is available and constantly being re-evaluated based on needs and advisement of JPS administrators. At NMJ we work collaboratively with JPS when space needs arise

c)  Locations shall be arranged in advance for all scheduled clinical encounters.

Current practice.

e)  Referrals and triage:

i.   The County shall maintain a staff referral process (custody and medical) and a kite system for prisoners to request mental health services.  Referrals by staff or prisoners must be triaged within 24 hours.

Custodial staff make JPS referrals based on personal observations or at the request of the inmate; Inmates may also request MH services via kite. Refer to ACH for their practices and policies and to JPS for their policy regarding response time.

G.  **Medico-Legal Practices**
H.  **Clinical Restraints and Seclusion**
I.   **Training**

1.   The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

a)  All jail custody staff shall receive formal training in mental health, which shall encompass mental health policies, critical incident response, crisis intervention techniques, recognizing different types of mental illness, interacting with prisoners with mental illness, appropriate referral practices, suicide and self-harm detection and preventions, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

Many aspects of this training are already covered during in-service and pre-service training.  A comprehensive review of current training offerings, compared against the needs of this element is under reveiew.

b) Custody staff working in Designated Mental Health Units shall receive additional training, including additional information on mental illness, special medico-legal considerations, de-escalation techniques, working with individuals with mental health needs, relevant bias and cultural competency issues, and the jail's mental health treatment programs.

IOP deputies are given 24 hours of CIT training.

## V.   DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH MENTAL HEALTH OR INTELLECTUAL

### A. Role of Mental Health Staff in Disciplinary Process

1. The County's policies and procedures shall require meaningful consideration of the relationship of a prisoner's behavior to any mental health or intellectual disability, the efficacy of disciplinary measures versus alternative interventions, and the impact of disciplinary measures on the health and well-being of prisoners with disabilities.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

2. Prisoners who are alleged to have committed a rules violation shall be reviewed by a qualified mental health professional if any of the following apply:

a) Prisoner is housed in any Designated Mental Health Unit;

JBCT and IOP mental health workers are immediately notified of disciplinary write-ups that occur and they work closely with custodial staff to determine the best course of action.

b) Jail staff have reason to believe the prisoner's behavior was unusual, uncharacteristic, or a possible manifestation of mental illness;

Policy has not been created, but the JPS pilot program is leading to effective organizational structure to meet this element.

c) Prisoner is on the mental health caseload and may lose good time credit as a consequence of the disciplinary infraction with which he or she is charged.

Policy has not been created, but the JPS pilot program is leading to effective organizational structure to meet this element.

**B.  Consideration of Mental Health Input and Other Disability Information in Disciplinary Process**

| | |
|---|---|
| 1.   The County shall designate one Chief Disciplinary Hearing Officer for each jail facility, who shall be responsible for ensuring consistency in disciplinary practices and procedures. | Identification of this position is underway to determine if existing staff can take on the workload or if a growth request is necessary to make a standalone position. |
| 2.   The Disciplinary Hearing Officer shall ensure that prisoners are not disciplined for conduct that is related to their mental health or intellectual disability. | Identification of this position is underway to determine if existing staff can take on the workload or if a growth request is necessary to make a standalone position. |
| 3.   The Disciplinary Hearing Officer shall consider the qualified mental health professional's findings and any other available disability information when deciding what, if any, disciplinary action should be imposed. | Identification of this position is underway to determine if existing staff can take on the workload or if a growth request is necessary to make a standalone position. |
| 4.   The Disciplinary Hearing Officer shall consider the qualified mental health professional's input on minimizing the deleterious effect of disciplinary measures on the prisoner in view of his or her mental health or adaptive support needs. | Identification of this position is underway to determine if existing staff can take on the workload or if a growth request is necessary to make a standalone position. |
| 5.   If the Disciplinary Hearing Officer does not follow the mental health staff's input regarding whether the behavior was related to symptoms of mental illness or intellectual disability, whether any mitigating factors should be considered, and whether certain sanctions should be avoided, the Disciplinary Hearing Officer shall explain in writing why it was not followed. | Identification of this position is underway to determine if existing staff can take on the workload or if a growth request is necessary to make a standalone position. |
| 6.   Prisoners will not be subjected to discipline which prevents the delivery of mental health treatment or adaptive support needs, unless necessary for institutional safety. | Curent practice. |

7. Prisoners shall not be subject to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of self-injurious behavior.

Inmates with suicidal ideations or self injurous tendencies are closely evaluation by JPS staff; Documentation of their behavior is made however, no disciplinary actions are taken against the inmate. Inmates may refuse medications at any time unless the administration of medication is mandated by the court through a valid order. JPS is heavily involved in this process.

**C.  Accommodations for Prisoners with Mental Health or Intellectual Disabilities During the Disciplinary Process**

1. The County shall provide reasonable accommodations during the hearing process for prisoners with mental health or intellectual disabilities.

Current practice.

2. The County shall take reasonable steps to ensure the provision of effective communication and necessary assistance to prisoners with disabilities at all stages of the disciplinary process.

This item is pending the creation and approval of the effective communication order.

**D.  Use of Force for Prisoners with Mental Health or Intellectual Disabilities**

1. The County's Correctional Services Operations Orders shall include language that ensures meaningful consideration of whether a prisoner's behavior is a manifestation of mental health or intellectual disability.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

2. For prisoners with a known mental health or intellectual disability, and absent an imminent threat to safety, staff shall employ de-escalation methods that take into account the individual's mental health or adaptive support needs.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. At Main Jail we are in the process of incorporating a Custody-Cirtical Incident Negotiation Team (C-Cint) adn training all of our IOP deputies. This will be a monumental forward step in de-escalation tactics.

3.   The County's Correctional Services Use of Force policies shall include a definition and a protocol for a planned Use of Force that provides appropriate guidance for a planned Use of Force that involves a prisoner with mental health or intellectual disability.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

4.   Prior to any *planned* Use of Force, such as a cell extraction, against a prisoner with mental health or intellectual disabilities, there will be a "cooling down period," consistent with safety and security needs. This period includes a structured attempt by mental health staff (and other staff if appropriate), to de-escalate the situation and to reach a resolution without Use of Force. Such efforts, including the use of adaptive supports, will be documented in writing. Medical and/or mental health staff should be consulted if the purpose of the cell extraction is related to the delivery of treatment.

This is the current practice with all planned use of force incidents involving inmates in specialzed units. The officers assigned to MH units work closely with JPS staff when incidents requiring a planned use of force arise. After consultation with JPS staff and ample opportunities for consultation and intervention by JPS. <span style="color:red">At Main Jail we are in the process of incorporating a Custody-Cirtical Incident Negotiation Team (C-Cint) adn training all of our IOP deputies. This will be a monumental forward step in de-escalation tactics.</span>

5.   The County shall require video documentation for any planned Use of Force, absent exigent circumstances. Jail staff shall endeavor to record the specific actions, behavior, or threats leading to the need for Use of Force, as well as efforts to resolve the situation without Use of Force.

Current practice.

6.   The County shall ensure the completion of supervisory review of Use of Force incidents, including video (for any planned Use of Force), interviews, and written incident documentation, in order to ensure appropriateness of Use of Force practices including de-escalation efforts. The County shall take corrective action when necessary.

Current Practice.

7.   The County shall review and amend as appropriate its policies on Use of Force, including its policies on Custody Emergency Response Team (CERT) and Cell Extraction Procedures.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

E.   **Training and Quality Assurance**

1.   All custody staff, and mental health staff, shall be trained on the policies and procedures outlined herein that are relevant to their job and classification requirements. Custody staff will receive periodic training on identifying behaviors that may be manifestations of mental illness and other situations warranting a referral to mental health staff, including for a Rules Violation Mental Health Review or other mental health assessment.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.

2.   All custody staff shall be trained on the identification of symptoms of mental illness, the provision of adaptive supports, and the use of de-escalation methods appropriate for prisoners with mental health or intellectual disabilities.

Many aspects of this training are already covered during in-service and pre-service training.  A comprehensive review of current training offerings, compared against the needs of this element is under reveiew.

4.   The County shall track all Uses of Force (planned and reactive) involving prisoners who are on the mental health caseload or who have intellectual disabilities, including the number of Uses of Force and the number of cell extractions by facility.

Current Practice.

5.   The County shall implement a continuous quality assurance/quality improvement plan to periodically audit disciplinary and Use of Force practices as they apply to prisoners who are on the mental health caseload or who have intellectual disabilities.

Current use of Blue-Team software to track and monitor use of force incidents, while predicting possible problematic trends in officer behavior.

## VI.   MEDICAL CARE

### A.   Staffing
### B.   Intake

1.   All prisoners who are to be housed shall be screened on arrival in custody by Registered Nurses (RNs).  RN screening shall take place prior to placement in jail housing.

Current practice. All incoming inmates are medically cleared prior to being booked into the facility.

2.  Health care intake screening shall take place in a setting that ensures confidentiality of communications between nurses and individual patients. Custody staff may maintain visual supervision but may not be close enough to overhear communication, unless security concerns based on an individualized determination of risk that includes a consideration of requests by the health care staff require that custody staff be closer at hand.  There shall be visual and auditory privacy from other prisoners.

Current Practice @ RCCC. Deputies standby near the intake interview but outside door. Same at Main Jail

3.  The County shall, in consultation with Plaintiffs, revise the contents of its intake screening, medical intake screening, and special needs documentation to reflect community standards and ensure proper identification of medical and disability related needs.

In consultation with CHS, several forms have been ammended to reflect this area.

C.  **Access to Care**

1.  The County shall ensure that Health Services Requests (HSRs) are readily available to all prisoners, including those in segregation housing, from nurses and custody officers.

Current practice. HSRs are available at medical appointments, pill call, and in housing units.

2.  The County shall provide patients with a mechanism for submitting HSRs that does not require them to share confidential health information with custody staff. The County shall install lockboxes or other secure physical or electronic mechanism for the submission of HSRs (as well as health care grievances) in every housing unit.  Designated health care staff shall collect (if submitted physically) or review (if submitted electronically) HSRs at least two times per day in order to ensure that CHS receives critical health information in a timely manner. Designated health care staff shall also collect HSRs during pill call and shall go door to door in all restricted housing units at least once a day to collect HSRs. HSRs and health care grievances will be promptly date- and time-stamped. The County may implement an accessible electronic solution for secure and confidential submission of HSRs and health care grievances.

HSRs are turned in directly to nursing staff duriing pill call twice a day. Boxes for Medical Grievances have been in installed in all housing units at RCCC. Medical staff collects and tracks health care grievances. NMJ medical grievance box on each floor custody staff does not have access to

4.   The County shall designate and make available custody escorts for medical staff in order to facilitate timely and confidential clinical contacts or treatment-related events.

Growth request submitted for medical escort team. Custody staff currently escorts Medical staff. 8 Deputy positions added specifically for medical escorts (2 per shift).

D.   **Chronic care**
F.   **Medication administration and monitoring**
G.   **Clinical space and medical placements**

1.   The County shall provide adequate clinical space in every facility to support clinical operations while also securing appropriate privacy for patients.  Adequate clinical space includes visual and auditory privacy from prisoners and auditory privacy from staff, the space needed reasonably to perform clinical functions as well as an examination table, sink, proper lighting, proper equipment, and access to health care records.

RCCC- All medical  and psychiatric offices are confidential and free of recording. There are no cameras in medical offices to ensure privacy for inmates. All medical offices have equipment determined to be necessary by ACH. All exam rooms at Main Jail are visually and auditorily confidential.

2.   The County shall ensure that any negative pressure isolation rooms meet community standards, including an antechamber to ensure that the room remains airtight, appropriate pressure gauges, and regular documented checks of the pressure gauges.

Jail Annex planning. At Main Jail our negative pressure rooms are checked daily by DGS to ensure the requested standards are met.

3.   The County shall ensure that absent individualized, documented safety and security concerns, patients in acute medical or quarantine placements shall be allowed property and privileges equivalent to what they would receive in general population based on their classification levels.

All inmates in medical or quarantine placements are allowed to keep personal property with them as well as participate in programs that do not interfeer with safety and secutity concers.

4.   The County shall ensure that patients in medical placements are not forced to sleep on the floor, including by providing beds with rails or other features appropriate for patients' clinical needs and any risk of falling.

RCCC- No inmate is forced to sleep on the floor. Beds with rails are avaiable in the Medical Houing Unit. Same at Main Jail

5.   The County shall not discriminate against patients in medical placements solely because of their need for C-Pap machines, but instead shall provide access to programs and services in accordance with their classification level, as set forth in the ADA Remedial Plan.

Housing units in RCCC currently do not have outlets near any sleeping areas, except MHU. Inmates housed in the Medical Housing Unit are able to participate in programs and services consistent with others in their classification. NMJ SAME

## H.   **Patient privacy**

1.   The County shall develop and implement policies and procedures to ensure that appropriate confidentiality is maintained for health care services.  The policies shall ensure confidentiality for clinical encounters, including health care intake screening, pill call, nursing and provider sick call, specialty appointments, and mental health treatment.  The policies shall also ensure confidentiality for written health care documents, such as health care needs requests and grievances raising medical care or mental health care concerns, which shall not be collected by custody staff.

Clinical encounters are offered in a private and confidential setting. Deputies stand near when necessary for safety, while still offering privacy. All written health care correspondence is handled directly by Medical staff, including medical grievances.

2.   The County shall provide adequate clinical space in each jail to support clinical operations while also securing appropriate privacy for patients, including visual and auditory privacy from prisoners and auditory privacy from staff.

RCCC- All medical  and psychiatric offices are confidential and free of recording. There are no cameras in medical offices to ensure privacy for inmates. Medical offices on floors have video/no audio, for nurses safety

3.   All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff.  In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification. The issuance of pills does not constitute a clinical interaction.

All medical and psychiatric visits are done in a private and confidential setting. Officers standby when necessary for safety, while still offering privacy to the inmate. Max and medium security facilities occur in a private setting, out of hearing range, proximity is determined by the inmates behavior not housuing placement.

b)   If the presence of a correctional officer is determined to be necessary to ensure the safety of staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

Deputies stand at a distance that offers their ability to intervene if necessary, while offering auditory privacy.

4.  Jail policies that mandate custody staff to be present for any medical treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above.  Custody and medical staff shall be trained accordingly.

No policies exist mandating deputies be present during medical treatment.

I.  **Health care records**
J.  **Utilization management**
K.  **Sanitation**
L.  **Reproductive and Pregnancy-Related Care**
M.  **Transgender and gender nonconforming health care**

c)  Access to gender-affirming clothing

Current practice, outlined in TGNI order. All inmates shall be issued clothing consistent with their preferred gender identity and/or expression, regardless of their housing location.

d)  Access to gender-affirming commissary items, make-up, and other property items

Current practice, outlined in TGNI order. Per IWF, all inmates can purchase gender affirming items available on commissary.

N.  **Detoxification protocols**
O.  **Nursing protocols**
P.  **Reviews of in-custody deaths**

1.  Preliminary reviews of in-custody deaths shall take place within 30 days of the death and shall include a written report of the circumstances and events leading to the death, with the goal to identify and remedy preventable causes of death and any other potentially systematic problems.

Current practice. In-CUSTODY Death Reviews shall happen as soon as possible.

2.  Mortality reviews shall include an investigation of the events occurring prior to the death, an analysis of any acts or omissions by any staff or prisoners which might have contributed to the death, and the identification of problems for which corrective action should be undertaken.

Current practice.

Q. **Reentry Services**
R. **Training**

1.   The County shall develop and implement, in collaboration with Plaintiffs'
counsel, training curricula and schedules in accordance with the following:

a)   All jail custody staff shall receive formal training in medical needs, which shall
encompass medical treatment, critical incident response, crisis intervention
techniques, recognizing different types of medical emergencies, and acute medical
needs, appropriate referral practices, relevant bias and cultural competency issues,
and confidentiality standards. Training shall be received every two years, at
minimum.

Training needs are being evaluated against on-going in-service training. All Custody
staff receive 8 hours of Crisis intervention training, medical emergency and CPR
training is done every two years. Specialized units receive additional training relevant
to their assignment. Additional training is evaluated and assigned as determined by in-
service training.

VII.   **SUICIDE PREVENTION**

A. **Substantive Provisions**

1.   The County recognizes that comprehensive review and restructuring of its
suicide assessment, monitoring, and prevention practices are necessary to address
the risk of suicide and self-harm attendant to detention in a jail setting.

Operations Order Suicide Prevention Program was revised and approved January of
2020 however, additional information will need to be added so it is compliant with the
Consent Decree.

2.   The County shall establish, in consultation with Plaintiffs' counsel, a new
Suicide Prevention Policy that shall be in accordance with the following:

Operations Order Suicide Prevention Program was revised and approved January of
2020 however, additional information will need to be added so it is compliant with the
Consent Decree.

B. **Training**

1. The County shall develop, in consultation with Plaintiffs' counsel, a four- to eight-hour pre-service suicide prevention curriculum for new Jail employees (including custody, medical, and mental health staff), to be conducted in person in a classroom or virtual classroom setting, that includes the following topics:

As part of pre-service training, the Adult Corrections Officer Supplemental Core Course is being revised where Module 19.0 addresses suicide prevention. Additionally, suicide prevention training is completed by all custody staff on a yearly basis.

a) avoiding obstacles (negative attitudes) to suicide prevention;

Training needs are being evaluated against on-going pre-service training.

b) prisoner suicide research;

Training needs are being evaluated against on-going pre-service training.

c) why facility environments are conducive to suicidal behavior;

Training needs are being evaluated against on-going pre-service training.

d) identifying suicide risk despite the denial of risk;

Training needs are being evaluated against on-going pre-service training.

e) potential predisposing factors to suicide;

Training needs are being evaluated against on-going pre-service training.

f) high-risk suicide periods;

Training needs are being evaluated against on-going pre-service training.

g) warning signs and symptoms;

Training needs are being evaluated against on-going pre-service training.

h) components of the jail suicide prevention program

Training needs are being evaluated against on-going pre-service training.

i) liability issues associated with prisoner suicide;

Training needs are being evaluated against on-going pre-service training.

j) crisis intervention.

This is already being taught in our Academy.

2. The County shall develop, in consultation with Plaintiffs' counsel, a two-hour annual suicide prevention curriculum for all custody, medical, and mental health staff, to be conducted in person in a classroom or virtual classroom setting, that includes:

This is something we have to work on with JPS. Due to COVID, these topics haven't progressed since the last report.

a) review of topics (a)-(j) above

| | |
|---|---|
| b)  review of any changes to the jail suicide prevention program | This is something we have to work on with JPS and ACH. Due to COVID, these topics haven't changed since the last report. |
| c)  discussion of recent jail suicides or attempts | <span style="color:red">Discussions occur daily with IOP and JPS staff. If there are any attempts, they may be covered in these conversations.</span> |
| 3.   Custody officers assigned to Designated Mental Health Units shall receive additional specialized training on suicide prevention and working with prisoners with serious mental illness. | IOP and JBCT Deputies receive 24 hours of advanced CIT training.  IOP/JBCT Deputies also attend training with the department's Critical Incident Negotiations Team (CINT) to learn how to deal with persons with a mental illness.  IOP/JBCT Deputies will also attend a custody based negotiations class facilitated by the FBI. |
| 5.   All mental health staff and custody officers shall be trained on the appropriate use of safety suits—*i.e* ., not to be utilized as a default, not to be used as a tool in behavior management, not to be utilized for patients being observed at 30-minute observations. | Outlined in Suicide Prevention Operations Order. Safety Suits are used at the discretion of JPS based on collaboration with custody staff and not as a behavior management tool. |
| 6.   The County shall ensure that all staff are trained in the new Suicide Prevention Policy. | The policy is in the process of being updated. This area will be addressed in the revised version of the policy. |

**C.   Nursing Intake Screening**
**D.   Post-Intake Mental Health Assessment Procedures**

| | |
|---|---|
| 1.   All mental health assessments shall be conducted in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk. | This is currently being done at RCCC. The interviews are taking place in an area where the officers can stand back to give them privacy. JPS recently purchased machines that make white noise to help make it more difficult to hear the assessment. If there is a safety concern, the assessments are conducted in an attorney room so there is barrier between JPS staff and the inmate. At Main Jail, inmate privacy is a priority. When JPS assessments are conducted we offer the maximum level of privacy afforded given the case-by-case safety risk. |

**E.  Response to Identification of Suicide Risk or Need for Higher Level of Care**

1.  When a prisoner is identified as at risk for suicide and placed by custody staff in a safety cell, on suicide precautions, and/or in a safety suit, mental health staff shall be contacted immediately.  A qualified mental health professional, or other appropriately trained medical staff in consultation with mental health staff, shall complete a confidential in-person suicide risk assessment as soon as possible, consistent with the "must-see" referral timeline.

Current practice as outlined in our Suicide Prevention Operations Order updated in January 2020. In addition, a correctional based negotiations team is in the beginning stages of being developed to assist with suicide de-escalation incidents or inmates who are experiencing a crisis. Deputies selected to be a part of this team will attend a custody based negotiations class facilitated by the FBI.

2.  Consistent with current RCCC policy, if there is no mental health staff on site at RCCC at the time that an emergent mental health need is identified, the prisoner shall be transported to the Main Jail for emergency evaluation within two hours of the initial report.

Current practice.  Development of procedures for use of suicide resisitant cells at RCCC to limit transport to only the most acute patients.

4.  The County shall ensure that the meal service schedule or other custody-related activities cause no delay in the completion of suicide risk assessments for prisoners.

Current practice.

**F.  Housing of Inmates on Suicide Precautions**

1.  The County's policy and procedures shall direct that prisoners, including those identified as being at risk for suicide, be treated in the least restrictive setting appropriate to their individual clinical and safety needs.

Policy forthcoming.  Current post orders and practice indicate least restrictive housing for suicidal inmates. JPS staff shall consult with custody staff to determine the appropriate housing location for the inmate.

**G.  Inpatient Placements**

1.  The County shall ensure that prisoners who require psychiatric inpatient care as clinically indicated are placed in the 2P unit within 24 hours of identification, absent exceptional circumstances.  In all cases, the provision of clinically indicated treatment to any prisoner requiring inpatient level of care shall be initiated within 24 hours.

Jail Annex planning.

H. **Temporary Suicide Precautions**

1.   No prisoner shall be housed in a safety cell, segregation holding cell, or other Temporary Suicide Precautions Housing for more than six (6) hours. If mental health or medical staff determine it to be clinically appropriate based on detoxification-related needs, this time limit may be extended to no more than eight (8) hours. If exceptional circumstances prevent transfer within these timelines, those circumstances shall be documented, and transfer shall occur as soon as possible. This does not preclude the housing of a prisoner in the IOP unit if clinically indicated.

Jail Annex planning will strengthen this request. We currently follow these timeframes as much as possible with the limited number of cells in the IOP unit.

2.   The County shall ensure, including by revising written policies and procedures where necessary, the timely and adequate completion of medical assessments for prisoners in need of suicide precautions, as required under Operations Order 4/05 (*i.e.*, within 12 hours of placement of the next daily sick call, whichever is earliest, and then every 24 hours thereafter).

Current practice. Custody staff shall notify medical staff within fifteen (15) minutes that a prisoner is temporarily housed in a safety or segregation cell and medical staff shall complete an assessment within 12 hours of placement or the next sick call, whichever us earliest.

3.   The County shall ensure that any cell used for holding prisoners on suicide precautions is clean prior to the placement of a new prisoner, as well as cleaned on a normal cleaning schedule.

Current practice, but will add langauge to policy under review.

4.   The County shall create and implement a written policy ensuring adequate frequency for meals, fluids, hygiene, showers, prescribed medications, and toileting when a prisoner is in cell used for holding prisoners on suicide precautions.

Current practice.  Will add langauge to policy under review. RCCC has no cells for long term housing of inmates on suicide precautions.

5.   Inmates on suicide precautions shall not automatically be on lockdown and should be allowed dayroom or out-of-cell access consistent with security and clinical judgments.

Current practice.

6.   The classrooms or multipurpose rooms adjacent to the housing units in the Main Jail are designed for, and should be made available for, prisoner programs and treatment.  Absent an emergency, the County shall not use the classrooms and multipurpose rooms to hold prisoners pending a mental health evaluation or on suicide precautions.  Where such emergency occurs, the County shall document the reasons for retention and move the prisoner, within six (6) hours, to the inpatient unit or other appropriate housing location for continued observation, evaluation, and treatment.

Multi-purpose rooms are no longer used for holding suicide precaution, or mental health evaluation inmates.  Written directives to staff document acceptable practice for at-risk patients, without the use of MPRs.  There is currently a zero use policy, not even as a last resort.

I.   **Suicide Hazards in High-Risk Housing Locations**

1.   The County shall not place prisoners identified as being at risk for suicide or self-harm, or for prisoners requiring IOP level of care, in settings that are not suicide-resistant as consistent with Lindsay Hayes's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities."

Current practice. Inmates at risk for suicide, self harm, or IOP level of care are not housed in settings that are not suicide resistant.

2.   Cells with structural blind spots shall not be used for suicide precaution.

Current practice.

J.   **Supervision/Monitoring of Suicidal Inmates**

1.   The County shall ensure adequate visibility and supervision of prisoners on suicide precautions.

Current practice.

2.   The County shall not cover cell windows with magnetic flaps or any other visual barrier preventing visibility into any cell that is housing a prisoner on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need.

Current practice.

3.   The County shall revise its policies regarding the monitoring of prisoners on suicide precautions to provide for at least the following two defined levels of observation:

a) <u>Close observation</u> shall be used for prisoners who are not actively suicidal but express suicidal ideation (*e.g.*, expressing a wish to die without a specific threat or plan) or have a recent prior history of self-destructive behavior. Close observation shall also be used for prisoners who deny suicidal ideation or do not threaten suicide but are engaging in other concerning behaviors indicating the potential for self-injury. Staff shall observe the prisoner at staggered intervals not to exceed every 15 minutes and shall document the observation as it occurs.

Language of "direct observation" was used in other areas. This should be ammended. Policy under review will contain this language.

b) <u>Constant observation</u> shall be used for prisoners who are actively suicidal, either threatening or engaging in self-injury, *and* considered a high risk for suicide. An assigned staff member shall observe the prisoner on a continuous, uninterrupted basis. The observation should be documented at 15-minute intervals. Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation.

This type of monitoring occurs in the SITHU or 2P level of care currently.

4. For any prisoner requiring suicide precautions, a qualified mental health professional shall assess, determine, and document the clinically appropriate level of monitoring based on the prisoner's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically-determined level of monitoring.

Current practice. Once JPS staff has completed the inmate's evaluation, the JPS staff member shall consult with custody staff to determine the appropriate housing location for the inmate.

5. Video monitoring of prisoners on suicide precaution shall not serve as a substitute for Close or Constant observation.

Current practice. Outlined in our Suicide Prevention Policy

K. **Treatment of Inmates Identified as at Risk Of Suicide**

3.   All assessments, treatment, and other clinical encounters shall occur in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

When necessary, custody staff will standby for security while offering auditory privacy. Proximity is dependent on the inmated behavior safety risk.

## L.   **Conditions for Individual Inmates on Suicide Precautions**

1.   The County's Suicide Prevention Policy shall set forth clear and internally consistent procedures regarding decisional authority for determining the conditions for individual inmates on suicide precautions.  Mental health staff shall have primary authority, consistent with individualized classification and security needs, with respect to the following:

## M.   **Property and Privileges**

1.   Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of routine privileges (*e.g.* , visits, telephone calls, recreation) that are otherwise within the limitations of a prisoner's classification security level.  Any removal of privileges shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

Current practice.  Prisoners placed in a safety cell shall be allowed to retain enough clothing or be provided with a suitably designed "safety garment" to provide for the prisoners personal privacy unless specific identifiable risks to the prisoner's safety or to the security of the facility exist and are documented.

2.   Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff depending on suicide risk, the removal and/or return of a prisoner's clothing and possessions (*e.g.* , books, slippers/sandals, eyeglasses) that are otherwise within the limitations of a prisoner's classification security level. The removal of property shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

Current practice.  If deemed necessary by JPS staff, the inmate's clothing shall be taken and the inmate will be given a "safety suit" to wear.  Prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damage property.

3.   Cancellation of privileges should be avoided whenever possible and utilized only as a last resort.

Current practice. Cancellation of privledges would be done only as a last resort or if deemed necessary per JPS.

### N.  Use of Safety Suits

1.   Decisions about the use of a safety suit (smock) or removal of normal clothing will be under mental health staff's authority, based on individualized clinical judgment along with input from custody staff.

Current practice. Outlined in Suicide Prevention Program Operations Order.The use of the "Safety Suit" shall be at the discretion of JPS, based on collaboration with intake or custody staff.

2.   Custody staff may only temporarily place an inmate in a safety suit based on an identified risk of suicide by hanging until the qualified mental health professional's evaluation, to be completed within the "must see" referral timeline. Upon completion of the mental health evaluation, the mental health professional will determine whether to continue or discontinue use of the safety suit.

Absent direction from Jail Psychiatric Services (JPS) deeming a "safety garment" necessary, a sworn supervisor must authorize custody staff to take the clothing and supply the prisoner with a "safety garment".  Unless a "safety garment" is necessitated by the prisoner's behavior, prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damage property

3.   If an inmate's clothing is removed, the inmate shall be issued a safety suit and safety blanket.

Current practice. See above.

4.   As soon as clinically appropriate, the provision of regular clothing shall be restored.  The goal shall be to return full clothing to the inmate prior to discharge from suicide precautions.

Current practice. Determination is made by JPS.

6.   If a qualified mental health professional determines that 30-minute (or less frequent) observations are warranted for a prisoner, safety suits shall not be used on that prisoner.

This causes some confusion to address.  County request discussion on the exact meaning of this provision.

7.   Safety suits shall not be used as a tool for behavior management or punishment.

Current practice. Safety suits are only used when necessary for the safety and security of the inmate.

O. **Beds and Bedding**

1.   All prisoners housed for more than four hours on suicide precautions and/or in an inpatient placement shall be provided with an appropriate bed, mattress, and bedding unless the prisoner uses these items in ways for which they were not intended (*e.g.*, tampering or obstructing visibility into the cell).  Such a determination shall be documented and shall be reviewed on a regular basis.

Attempting to meet this criteria through use of suicide resistant cells and an emphasis on removal from booking housing as soon as proper housing is available.

P. **Discharge from Suicide Precautions**

1.   A qualified mental health professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions in order to ensure that the discharge is appropriate and that appropriate treatment and safety planning is completed.

Current custody practice.

3.   Qualified mental health professionals shall provide clinical input regarding clinically appropriate housing placement (*e.g.*, whether isolation is contraindicated for the prisoner) upon discharge.  Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement.  Once clinically discharged from suicide precautions, the prisoner shall be promptly transferred to appropriate housing.

Current custody practice. This is accomplished with the input of Classification staff and JPS.

Q. **Emergency Response**

1.   The County shall keep an emergency response bag that includes appropriate equipment, including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units.  All custodial and medical staff be trained on the location of this emergency response bag and shall receive regular training on emergency response procedures, including how to use appropriate equipment.

Those items are available in each facility.

2.  All custody and medical staff shall be trained in first aid and CPR.

Current custody practice. Sworn staff receives CPR training every two years

3.  It shall be the policy of the County that any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff shall begin to administer standard first aid and/or CPR, as appropriate.

Current practice.

R.  **Quality Assurance and Quality Improvement**

2.  The County shall, in consultation with Plaintiffs' counsel, revise its in-custody death review policy and procedures. Reviews shall be conducted with the active participation of custody, medical, and mental health staff. Reviews shall include analysis of policy or systemic issues and the development of corrective action plans when warranted.

Current practice.

3.  For each suicide and serious suicide attempt (*e.g* ., requiring hospitalization), the County's Suicide Prevention Task Force shall review: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt. Where applicable, the Review Team shall generate recommendations for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

Current practice. <span style="color:red">Plans to re-establish the Suicide Prevention Task Force at Main Jail are underway.</span>

VIII.  **SEGREGATION/RESTRICTIVE HOUSING**

A.  **General Principles**

1.   Prisoners will be housed in the least restrictive setting necessary to ensure their own safety, as well as the safety of staff, other prisoners, and the public.

Working toward this goal constantly.  Reduction of nearly 2/3 of all TSEP inmates to lower levels of housing.  Piloting of the TSEP reduction plan involved stepping down several TSEPs transferred to general population floors.

a)   The County shall not place prisoners in more restrictive settings, including Segregation, based solely on a mental illness or any other disability. Prisoners will be housed in the most integrated setting appropriate to their individual needs.

The creation of the third floor as a mental health treatment floor has allowed most, if not all, SMI TSEPs to integrate into more normative housing.  This allows all but the most violent individuals to house in a mental health setting, while maintaining Administrative Segregation for inmates not on the behavioral health case load. RCCC has implemented several SMI program pods, where inmates housed in a single cell are only assigned based on JPS recommendation and allowed program/recreation time with other inmates, minimum 17 hours a week.

b)   The County shall not place prisoners into Segregation units based solely on classification score.

Several objective indicators are used to determine the appropriateness of segregation. Written docuementation is required and we are working towards periodic review of justification for segregation.  Inmates solely classified as "high" are not routinely segregated.

c)   The County shall review the housing and restrictions of female prisoners classified as high security to ensure that this population is not subject to Segregation conditions of confinement.

Current practice.

d)   Specialized medical units (e.g., Main Jail 2 West Med/Psych, Main Jail 2 East) and mental health units (e.g., OPP, IOP, MHU, 2P) are not Segregation housing units. The County shall ensure that prisoners housed in these units receive daily access to out-of-cell time, telephones, showers, and other programs, services, and activities consistent with their classification and treatment plan.

Current practice. RCCC has open floor plan setting for medical housing with access to phones, showers, and yard.

2.   The County shall not place a prisoner in Segregation units without first determining that such confinement is necessary for the safety of the staff, other prisoners, or the public. The County shall clearly document in writing the specific reason(s) for a prisoner's placement and retention in Segregation housing. The reason(s) shall be supported by clear, objective evidence. Prisoners will remain in Segregation housing for no longer than necessary to address the reason(s) for placement.

Working toward this goal.  Pilot programs for AdSeg Phase 1 and 2 with steps to reduce between the two. At RCCC need for segregation housing is clearly documented in the JIMS system. Face to Face interviews are set up with Classification Deputies in order to determine if housing is appropriate. If an inmate remains in Phase 1, it is clearly documented in JIMS.

3.   The County shall not place the following prisoners in a Segregation setting unless necessary to address a serious risk of physical harm, and in such cases only for the minimum time necessary to identify an alternative appropriate placement:

a)  Prisoners with acute medical needs that require an inpatient level of care and/or daily nursing care;

Current practice.

b)  Prisoners who are pregnant, post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy.

Not codified in policy, however can be implemented in practice immediately.

B.   **Conditions of Confinement**

1.   The County will provide at least 17 hours of out-of-cell time per week for all prisoners, with the exception of prisoners subject to Administrative Segregation Phase I and Disciplinary Segregation in accordance with this remedial plan. The County will monitor out-of-cell time, and if minimum out-of-cell time requirements are routinely not being met at a particular facility or in a particular housing unit, the Sheriff's Department division commander or designee will review the situation and take appropriate steps to resolve the issue.

Current practice.  Weekly reports show nearly universal compliance, even during more stringent social distancing for COVID precautions.  The negotiated ramp-up hours were almost immediatley exceeded meeting the prescribed hours at the point the consent decree was signed.

a)   The County shall implement a policy to document out-of-cell time provided to each prisoner. The County shall conduct monthly audits to ensure that prisoners have been provided the required treatment and recreation time out of cell. This data will be regularly reviewed as part of the County's Quality Assurance procedures.

Out of cell time is monitored and recorded in the current WebJPF system.  Reports are generated on a weekly basis, and checked for compliance.  Inconsistent out of cell times are addressed.  Particularly during COVID precautions, once inmates are out of quarantine, they are receiving nearly 20 hours per week out of cell time.

2.   Out-of-cell time with the opportunity to exercise shall be provided to each prisoner seven (7) days per week, including outdoors/recreation time when feasible. The County shall offer out-of-cell time at appropriate times of day.

Schedules have been created to ensure fair distribution of outdoor recreation.  Initial indications are that inmates are receiving at least one hour per week of outdoor recreation, with some housing locations receiving up to 3 hours per week. Much of the 17 hours out of cell time is unstructured, allowing for exercise.

3.   The County shall modify its non-disciplinary Segregation policies and procedures to allow reasonable access to the following: (1) Personal phone calls for all prisoners, including at least five hours or three weekdays per week of phone access during normal business hours; (2) Education, rehabilitation, and other materials (e.g. writing implements, art supplies, tablets), for in-cell activities; (3) Personal and legal visiting; (4) Religious services; and (5) Commissary.

Working toward this goal.  Commissary restrictions have been lifted.  Personal and legal visiting is unrestricted. Working toward more phone time during weekday hours. Working toward programming and education for the pre-sentenced population. At RCCC phones are available during any out of cell time.

a)   The conditions and privileges described above shall be provided unless there is a specific safety or security issue preventing provision of such materials or the prisoner is subjected to disciplinary action.

Continuing to work toward meeting this goal.

4.   Cell windows shall not be covered with magnetic flaps, towels, sheets, or any other visual barrier preventing visibility into and out of the cell, unless there is a specific security or privacy need that is documented, and then for only a period of time necessary to address such security or privacy need. This provision shall apply to all cells housing prisoners.

Current practice. Cell window and bunk obstructions are not permitted for the safety and security of the inmate

5.   The County shall establish procedures so that all housing unit cells are searched and cleaned prior to a prisoner's placement in the cell.

Policy drafted to this respect, working toward ensuring full compliance in this area.

6.   The County shall establish procedures to ensure that no prisoner is placed in a Segregation housing cell without a mattress and appropriate bedding.

Current practice.

## C.   Mental Health Functions in Segregation Units

1.   Segregation Placement Mental Health Review

a)   All prisoners placed in a non-disciplinary Segregation housing unit and all prisoners housed in a Disciplinary Detention unit shall be assessed by a qualified mental health professional within 24 hours of placement to determine whether such placement is contraindicated. All prisoners subjected to Disciplinary Segregation conditions for 72 hours in their general population housing unit (*i.e.*, confined to cell 23 hours per day) shall also be assessed by a qualified mental health professional no later than the fourth day of such placement.

Partial implementation through pilot programs with JPS.

b)   Any decision to place prisoners with Serious Mental Illness in Segregation shall include the input of a qualified mental health professional who has conducted a clinical evaluation of the prisoner in a private and confidential setting (absent a specific current risk that necessitates the presence of custody staff), is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

RCCC has multiple SMI programs. Inmates in IOP and JBCT are not in segregation/restriction housing. Disciplinary housing is issued only with clearance from JPS staff assigned to these programs. Consultation with SMI inmates and JPS in these programs are confidential.

d)   If mental health or medical staff find that a prisoner has a Serious Mental Illness or has other contraindications to Segregation, that prisoner shall be removed from Segregation absent exceptional and exigent circumstances.

Current practice.

2.   Segregation Rounds and Clinical Contacts

a)   Cell checks (to ensure that prisoners are safe and breathing) shall be conducted for all prisoners in Segregation at least every 30 minutes, at staggered intervals. Completion of cell checks will be timely documented.

Current practice. See POST ORDER HOUSING UNIT CHECKS

b)  A qualified mental health or medical professional shall conduct check-ins at least once a week, to assess and document the health status of all prisoners in Segregation, and shall make referrals as necessary. The check-in shall include a brief conversation with each prisoner, a visual observation of the cell, and an inquiry into whether the prisoner would like to request a confidential meeting with a mental health or medical provider. Steps shall be taken to ensure effective communication, as well as auditory privacy consistent with security needs. When a prisoner in Segregation requests a confidential meeting with a mental health or medical provider, or the medical or mental health professional identifies a mental health or medical need, staff shall make appropriate arrangements to include triage, examination and treatment in an appropriate clinical setting. In such cases, staff shall give the prisoner the opportunity to complete a health care request but will otherwise initiate a referral without requiring the prisoner to complete a request form.

Partial implementation. This has been impelemented in IOP and JBCT housing.

3.   Response to Decompensation in Segregation

a)  If a prisoner in Segregation develops signs or symptoms of mental illness where such signs or symptoms had not previously been identified, suffers deterioration in his or her mental health, engages in self-harm, or develops a heightened risk of suicide, the prisoner shall immediately be referred for appropriate assessment and treatment from a qualified mental health professional who will recommend appropriate housing and/or programming.

Current practice.

b)  Jail staff shall follow a mental health recommendation to remove a prisoner from Segregation unless such removal poses a current safety risk that is documented. In such a case, the Commander or management-level designee shall be notified and staff shall work to remove the prisoner from Segregation and secure a placement in an appropriate treatment setting at the earliest possible time.

Current practice for nearly all mental health placements.  Full compliance with the acute unit and nearly universal compliance with the IOP unit.

D. **Placement of Prisoners with Serious Mental Illness in Segregation**

1.   Prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit (2P, IOP, OPP) will not be placed in Segregation, but rather will be placed in an appropriate treatment setting – specifically, the inpatient unit or other Designated Mental Health Unit providing programming as described in **Exhibit A-2**.

Several programs available for SMI inmates. IOP, OPP, JBCT. Inmates are not segregated based on SMI

2.   In rare cases where a prisoner with a mental health condition meeting criteria for placement in a Designated Mental Health Unit presents an immediate danger or significant disruption to the therapeutic milieu, and there is no reasonable alternative, such a prisoner may be housed separately for the briefest period of time necessary to address the issue, subject to the following:

a)   The prisoner shall receive commensurate out-of-cell time and programming as described in **Exhibit A-2** (including for IOP and OPP, 10 hours/week of group treatment/structured activities, 7 hours/week unstructured out-of-cell time, weekly individual clinical contact) with graduated programming subject to an individualized Alternative Treatment Program.

Working toward this goal.  IOP no longer removes patients that are disruptive without clinical assessment and agreement by JPS. When patients are moved, they are placed on the case management protocol for JPS interaction and treatment.

iv.   Privileges commensurate with the Designated Mental Health Unit program, unless modified in an Alternative Treatment Program based on individual case factors that are regularly reviewed.

Inmates in DMHUs housed without a cellmate receive program and recreation time with other inmates. Incentives programs are utilized as advised by JPS staff. They generally exceed the 17 hour minimum per our weekly reports. JPS determines when an inmate in these housing facilities must be housed in a solitary cell

v.   Daily opportunity to shower.

Current practice. Hygiene opportunities are available during any recreation time and incentivised in some programs

3.   A prisoner with Serious Mental Illness requiring restraints (*e.g.*, handcuffs, belly chains, etc.) shall not be denied clinically indicated group or individual treatment due to security factors, absent exceptional circumstances that are documented. Prisoners with Serious Mental Illness housed in Segregation who require restraints when out of cell shall have the opportunity to work their way out of restraints through graduated programming subject to an individualized Alternative Treatment Program.

Current custody practice.

E.   **Administrative Segregation**

1.   Use of Administrative Segregation

a)   Only the Classification Unit can assign a prisoner to Administrative Segregation.

Current practice.

b)   The County may use Administrative Segregation in the following circumstances:

i.   Objective evidence indicates that a prisoner participated in a recent assault and the assaultive behavior involved an assault on staff or visitors, serious injury, use of a weapon, gang removals, or multiple prisoner assaults. Mutual combat situations that do not otherwise qualify for Administrative Segregation are

Current practice.

ii.   During a brief investigative period not to exceed ten days while Classification staff attempts to verify the need for Protective Custody or while the prisoner is awaiting transfer to another facility.

Working toward this goal.  Implemented steps to achieve compliance and practice changes.

c)   The Compliance Commander shall have the authority to place prisoners in Administrative Segregation under the following circumstances:

| | |
|---|---|
| i.   The prisoner poses an extraordinary safety risk and no other housing unit is sufficient to protect the prisoner from harm; | Current practice. |
| ii.   The prisoner has failed to integrate into a lesser restrictive housing setting because of repeated and recent history of assaultive behavior or current threats of violence associated with being in a lesser restrictive setting; or | Current practice. |
| iii.   Objective evidence indicates that the prisoner attempted to escape or presents an escape risk. | Current practice. |

2.   Notice, Documentation, and Review of Administrative Segregation Designations

| | |
|---|---|
| a)   The Classification Unit shall document the rationale for designating a prisoner for Administrative Segregation in the classification file using objective evidence. For prisoners younger than 24, the Classification Unit shall consider the prisoner's age as a mitigating factor when assigning the prisoner to Administrative Segregation. | Working toward this element, with partial complinace to date. |
| b)   Classification shall attempt to down-class prisoners to a lesser restrictive housing setting at the earliest possible opportunity, consistent with safety and security. | Current practice. |
| c)   County shall provide prisoners in Administrative Segregation with a written notice within 72 hours of the prisoner's initial placement in Administrative Segregation, explaining the reasons for the prisoner's Administrative Segregation designation and how the prisoner may progress to a lesser restrictive housing setting. | Working toward this element, with partial complinace to date. |

d)   Prisoners housed in Segregation units will, at least every thirty (30) days, receive face-to-face interviews in a private out-of-cell setting, consistent with individual security needs, to discuss progress and compliance with their individual case plan as part of a classification review. Consideration will be given to their mental health and to their appropriateness for transfer to a less restrictive setting.

Working toward complinace in this area through JPS.

e)   The Compliance Commander or higher-ranked officer will review and approve the decision to designate a prisoner for Administrative Segregation for longer than 15 days.

Working toward this element, with partial complinace to date.

f)   The County shall document the reason the prisoner is retained in the same Administrative Segregation Phase. The prisoner will be given written notice of the reasons the prisoner is being retained in the same Phase of Administrative Segregation and what conduct the prisoner is required to exhibit to progress to a lesser restrictive housing setting.

Working toward this element, with partial complinace to date. RCCC documents in inmate JIMS system all inmate classification reviews including reasons for inmate to remain in current classification.

g)   The Compliance Commander or higher-ranked officer must approve the continued retention of a prisoner in Administrative Segregation for longer than 90 days, and the Compliance Commander or higher-ranked officers must reauthorize such placement at least every 90 days thereafter.

Working toward this element, with partial compliance to date. <span style="color:red">Will be the practice with ATIMS</span>

3.   Administrative Segregation Phases

a)   The County shall develop and implement a phased system for prisoners designated as Administrative Segregation to achieve a lesser restrictive housing setting.

Working toward this element, with partial compliance to date. RCCC Classification Unit currently class interviews with all Phase 1 inmates on a face to face level and documents attempts to step inmate down into lower classification level. Official policy to be created. <span style="color:red">Will be the practice with ATIMS</span>

b)   Administrative Segregation Phase I:

i.   This is the most restrictive designation for prisoners in Administrative Segregation.

ii.  Prisoners shall be offered a minimum of one hour per day out of cell time for a total of seven hours per week.

Current Practice. Per TSEP SEGREGATION HOUSING POST ORDER, inmates receive 9 hours/week out of cell time. Currently monitored weekly with out of cell reports… with exception to inmates on COVID-19 Isolation

iii. Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least five of the seven hours per week.

Current Practice. Per TSEP SEGREGATION HOUSING POST ORDER, inmates receive 9 hours/week out of cell time. Currently monitored weekly with out of cell reports… with exception to inmates on COVID-19 Isolation

iv.  Prisoners shall not remain in Phase I for longer than 15 days unless the prisoner engages in new conduct warranting retention in Administrative Segregation as specified in **Section VIII.E.1.b.**

Working toward this element, with partial complinace to date. RCCC currently conducts face to face classification interviews with all TSEP/PHASE 1 inmates and documents either classification down or reasons why an inmate is to stay. The move from every 30 days to every 15 days has been implemented.

c)   Administrative Segregation Phase II:

a)        Prisoners shall be offered a minimum of 17 hours of out of cell time per week.

Current practice at RCCC, montitored with weekly reports through WebJPF. Meeting criteria except for those subject to COVID-19 isolation procedures. <span style="color:red">Same at Main Jail</span>

b)        Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least 10 of the 17 hours per week.

Current Practice. Inmates not in phase one receive a minimum of 17/week. Currently monitored weekly with out of cell reports… with exception to inmates on COVID-19 Isolation

c)        Prisoners shall be offered the opportunity to program in groups of two to four prisoners, unless pairing with another prisoner is not possible for safety or security reasons, and those reasons are documented by the County.

Current Practice. RCCC allows dayroom for inmates in cell settings to include multiple inmates except for inmates in TSEP/PHASE 1. Same at Main Jail

d)      The County shall develop a program of incentives for good behavior.

Plans in place to identify low cost incentives, including eating meals outside of cells and lower restrictive housing.

e)      Prisoners shall not remain in Phase II for longer than 30 days unless the prisoner commits a serious behavioral violation while in Administrative Segregation: fighting; threatening staff or other prisoners; resisting or delaying an order from staff that impedes Jail operations (e.g., failure to lock down); refusing to submit to a search of person or property; destroying or damaging Jail property (excluding property issued to a prisoner and/or minor defacing of property or destruction of low-value property) or facilities; possessing contraband that implicates safety or security (e.g., weapons, razors, unauthorized medication, but not extra clothing, commissary items, or food); cell flooding; tampering with cell locking mechanisms or other security features (e.g., cameras); and/or sexual activity/harassment.  In the event a prisoner engages in a serious behavioral violation, the conduct will be referred to the Classification Sergeant or higher-ranking officer, who shall have the discretion to extend the prisoner's Phase II time by 15 days, and shall develop an individual behavioral management plan, if one does not yet exist, for the prisoner.

RCCC currently practices a 30 day classification interview process and documents either a class to a lower level or reasons why an inmate is to stay at current level. Same at Main Jail

F.   **Protective Custody**

1.   When a prisoner faces a legitimate threat from other prisoners, the County will seek alternative housing, by transferring the threatened prisoner to the general population of another facility or unit, or to a special-purpose housing (Protective Custody) unit for prisoners who face similar threats.

Current Practice. Inmates who face threats from other inmates are transferred to other housing units of the same classification and not automatically classed to a higher security level.

2.   The County will not operate Protective Custody units with Segregation-type conditions of confinement. Prisoners placed in Protective Custody shall have the same programs and privileges as general population prisoners, absent exceptional circumstances that are documented.

Current Practice. RCCC currently has re-entry programs for PC classifications and dorm style housing units with open dayroom.

3.   The County shall create a policy that describes the process and criteria for placement of prisoners into Protective Custody. The County shall consult with Plaintiffs to develop such a policy.

Policy yet to be developed.

4.   Prisoners who are lesbian, gay, bisexual, transgender, or intersex (LGBTI) or whose appearance or manner does not conform to traditional gender expectations should not be placed in Segregation or Protective Custody solely on the basis of such identification or status, or because they are receiving gender dysphoria treatment.

Current Practice.

a)   When a prisoner who is LGBTI or gender nonconforming faces a legitimate threat, the County shall identify alternative housing, with conditions comparable to those of general population. Privileges and out-of-cell time for this population will be documented and regularly reviewed by supervisory level staff to ensure appropriate housing, out-of-cell-time, and related conditions for this group of prisoners.

TGNI inmates not able to house in general population are placed in protective custody.  Out of cell priveleges are commensurate with most general population prisoners.

b)   In deciding whether to assign a transgender or intersex prisoner to a facility or program for male or female prisoners, the County shall consider on a case-by-case basis whether a placement would ensure the prisoner's health and safety, and the health and safety of other prisoners, giving serious consideration to the prisoner's own views.

Current practice.

c)   Jail staff will receive training on the unique issues of managing transgender prisoners, with refresher training at least bi-annually.

Training curriculum is being created and in the approval and implementation process

5.   For prisoners who are LGBTI or whose appearance or manner does not conform to traditional gender expectations, the County shall identify the prisoner's preferred gender of jail staff who will perform searches of the prisoner.  The County shall honor the request except in exigent circumstances when doing so is not possible.

Current practice.  Statement of preference form completed by TGNI prisoners allowing them to request the gender of searching officer.

G. **Disciplinary Segregation**

1.   The County will not place a prisoner in disciplinary housing pending investigation of, and due process procedures for, an alleged disciplinary offense unless the prisoner's presence in general population would pose a danger to the prisoner, staff, other prisoners or the public.

Current practice.

2.   The County will adhere to a discipline matrix, developed in consultation with Plaintiffs, that clearly defines when disciplinary housing may be imposed.

Plans are in place to modify the discipline schedule to a different model, taking behavior and restriction timeframes into account.

3.   Prisoners who are found to have violated disciplinary rules following due process procedures will be placed in Segregation only after the County has determined that other available disciplinary options are insufficient, with reasons documented in writing.

Plans are in place to modify the discipline schedule to a different model, taking behavior and restriction timeframes into account.

4.   The denial of out-of-cell time for more than four (4) hours will not be imposed as a sanction absent a formal disciplinary write-up and due process hearing.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

5.   Prisoners serving a Disciplinary Segregation term shall receive at least seven (7) hours per week of out-of-cell time. Out-of-cell time with the opportunity to exercise shall be provided to each prisoner one (1) hour a day, seven (7) days per week.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

6.    Prisoners in Disciplinary Segregation shall, absent an individualized assessment of security risk that is documented be provided at least one book (which prisoners may regularly exchange), legal documents, hygiene materials, legal phone calls, and legal visits.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

7.   No Disciplinary Segregation term for non-violent rules violations will exceed 15 days.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

8.   The County will, in consultation with Plaintiffs' counsel, modify its inmate discipline policy and practice to limit placements in Disciplinary Segregation conditions to no more than 15 days, absent cases of serious violations stemming from distinct incidents and with Watch Commander-level approval.

Current practice, contained in Discipline Housing Post Order.

9.   No prisoner shall be placed in Disciplinary Segregation for more than 30 consecutive days.

Current practice, contained in Discipline Housing Post Order.

10. If after a Disciplinary Segregation term, Jail staff, with the input of a mental health clinician, determine that the prisoner cannot safely be removed from Segregation, placement on Administrative Segregation status may occur only subject to the process set forth in **Section VIII.E**.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

11. Once a prisoner has been moved out of Disciplinary Segregation, that prisoner shall not be placed back into Disciplinary Segregation absent (a) a new incident warranting discipline, and (b) completion of all mental health review procedures required for new Segregation placements.

Current practice, contained in Discipline Housing Post Order.

H.  **Avoiding Release from Jail Directly from Segregation**

1.   The County will avoid the release of prisoners from custody directly from Segregation-type housing, to the maximum extent possible.

Current practice, but will be added to future policy.

2.   If a sentenced prisoner housed in Segregation has an upcoming expected release date (i.e. less than 120 days), the County will take and document steps to move the prisoner to a less restrictive setting, consistent with safety and security needs. If Segregation becomes necessary during this time, the County will provide individualized discharge planning to prepare the sentenced prisoner for release to the community.

Current practice.

I. **No Food-Related Punishment**

1.  The County shall modify its policy and take steps to ensure that the denial or modification of food is never used as punishment. The County shall eliminate use of "the loaf" as a disciplinary diet.  Nothing in this paragraph shall be read to preclude the County from denying a prisoner use of the commissary.
Current practice.

J. **Restraint Chairs**

1.  Restraint chairs shall be utilized for no more than six hours.
Current practice.

2.  The placement of a prisoner in a restraint chair shall trigger an "emergent" mental health referral, and a qualified mental health professional shall evaluate the prisoner to assess immediate and/or long-term mental health treatment needs.
Current practice.

3.  The opinion of a qualified medical professional on placement and retention in a restraint chair will be obtained within one hour from the time of placement.
Current practice.

IX.    **QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT**

A. **Generally**
B. **Quality Assurance, Mental Health Care**
C. **Quality Assurance, Medical Care**

1

**PROOF OF SERVICE**

2

I declare:

3

I am over the age of 18 years, and not a party to the above-entitled action.  I am employed in the County of Sacramento and my business address is 700 H Street, Suite 2650, Sacramento, California, 95814.

4

5

On January 22, 2021, I served a copy of the following document(s): **FILING OF SECOND COUNTY STATUS REPORT PURSUANT TO PARAGRAPH 12 OF THE CONSENT DECREE** on interested parties in this action by:

6

7

☒    mail by enclosing a true copy in a sealed envelope in a designated area for outgoing mail, addressed as set forth below.  I am readily familiar with the business practices of the Office of the Sacramento County Counsel for collection and processing of correspondence for mailing with the United States Postal Service, and correspondence so collected and processed is deposited with the United States Postal Service on the same date in the ordinary course of business.

8

9

10

Sammy Davis Morgan
77266-097
Victorville Medium I
Federal Correctional Institution
Inmate Mail/Parcels
P.O. Box 3725
Adelanto, CA 92301

11

12

13

14

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on January 22, 2021, at Sacramento, California.

15

16

17

_____
KRYSTA L. GUTHRIE

18

19

20

2040238

21

22

23

24

25

26

27

28

-2-