# First Monitoring Report on Americans with Disabilities Act Compliance Practices in the Sacramento County Jails

## *Mays v. County of Sacramento*

## March 2021

Law Office of Aaron J. Fischer
Aaron J. Fischer

Prison Law Office
Margot Mendelson
Patrick Booth

Disability Rights California
Anne Hadreas

**Table of Contents**

I.    Introduction ...................................................................................3

II.   Background ....................................................................................3

III.  Methodology ..................................................................................5

IV.  Findings .........................................................................................5

    A.   Policies and Procedures ...........................................................5

    B.   ADA Tracking System..............................................................6

    C.   ADA Coordinator and Related Positions.................................7

    D.   Screening for Disability and Disability-Related Needs.....................8

    E.   Orientation .............................................................................10

    F.   Health Care Appliances, Assistive Devices, Medical Equipment.....11

    G.   Housing Placements for People with Disabilities............................15

    H.   Access to Programs, Services, and Activities.................................16

    I.   Effective Communication .......................................................20

    J.   Effective Communication, Individuals with Hearing Impairments ..20

    K.   Disability-Related Grievance Process ...................................21

    L.   Alarms/Emergencies ..............................................................23

    M.  Searches, Restraints, and Extractions ...............................23

    N.   Transportation .......................................................................23

    O.   Prisoners with Intellectual Disabilities ...............................24

    P.   ADA Training, Accountability, and Quality Assurance...................24

    Q.   Accessibility Remedial Plan re: Physical Plant Deficiencies............26

V.    Conclusion...................................................................................27

## I.      Introduction

The Consent Decree in this matter provides that Plaintiffs' counsel will issue written reports on Sacramento County's compliance with the Americans with Disabilities Act (ADA)/Disability components of the Court-ordered Remedial Plan.  *See* Consent Decree, Doc. No. 85-1 (June 20, 2019); Order, Doc. No. 110 (Jan. 8, 2020) (adopting Consent Decree).  As such, this report examines the practices and policies of the County of Sacramento with respect to the ADA/Disability Remedial Plan provisions.  This is the first monitoring report on this aspect of the Remedial Plan.

Plaintiffs' counsel acknowledges the challenges posed by the COVID-19 pandemic to the management of the Sacramento County Jails (the "Jail") and to the implementation of the provisions in the Remedial Plan.  Managing the pandemic has required the significant, ongoing attention of Jail health care and custody staff and leadership, which in some respects diverted resources from efforts to implement the ADA/Disability Remedial Plan. At the conclusion of the first round of monitoring, the County remains largely noncompliant with the ADA/Disability provisions of the Remedial Plan.  The rollout of the new ADA Tracking System, the new electronic health records system, and related trainings indicate that the County is on the precipice of meaningful progress on several aspects of the ADA/Disability Remedial Plan.  ACH policy development on disability-related issues has been another area of considerable progress.

Other aspects of the Remedial Plan have seen little or no progress and will require greater attention moving forward.  Most concerning is the lack of any clear plan or path for the County to comply with Consent Decree requirements to address Jail physical plant deficiencies that result in access barriers for class members with disabilities.  The continued deficiencies in this area will impede efforts to make progress on several components of the ADA/Disability Remedial Plan, including as to screening, housing placements, and equal access to programs.

## II.     Background

Compliance with ADA/Disability legal requirements has been a core element of this matter going back to 2015, when Disability Rights California issued its initial investigation report documenting serious and systemic ADA violations, including: the segregation and placement of people with disabilities into more-restrictive-than-necessary settings; inaccessible and unsafe facilities; the lack of a system and ADA-designated staff to monitor and ensure compliance; and deficiencies in the processes to notify people with disabilities of their ADA rights.  *Mays* Dkt. No. 1-1, DRC Report at 14-19.

As part of negotiations between the parties, the County retained an expert team to assess disability compliance-related policies and practices.  The expert team made extensive findings as to ADA violations at the Jail.  Dkt. No. 1-5, Sabot Consulting, *Report on Sacramento County Sheriff's Department Correctional Services – Americans with Disabilities Act Assessment* (Dec. 2016), Doc. No. 1-5.  There was little dispute that

ADA-related remediation was necessary.  In November 2019, the SSO commander designated as "person-most-knowledgeable" regarding the Jail's ADA/Disability policies, practices, and procedures, testified that he was "fairly confident most of the jail is not ADA compliant or accessible."

The Remedial Plan contains a detailed set of provisions necessary for the County to achieve ADA compliance. The Plan requires the revision of policies, operations orders, and other documents to facilitate and ensure ADA compliance.  Consent Decree Remedial Plan Sec. III.A.  It requires implementation of a comprehensive ADA Tracking System to identify and track class members with disabilities as well as their accommodation and Effective Communication needs.  Sec. III.B.  The Plan requires the designation of trained ADA coordinators and deputies to implement and ensure compliance with the Jail's disability program and services. Sec. III.C.

The County is required to implement an adequate system for screening class members for disabilities and disability-related accommodation, housing, classification, and other needs.  Sec. III.D.  This screening process begins at the time each class member arrives at the Jail, and it must be paired with the provision of adequate orientation and notice as to class members' ADA rights and the process for requesting ADA accommodations and related assistance.  Sec. III.E.

A critically important component of the Remedial Plan is the provision of safe and operational Health Care Appliances, Assistive Devices, Durable Medical Equipment (HCA/AD/DME) for class members with disabilities who need them, both during their incarceration and when released.  Sec. III.F.  The provision of such equipment is necessary to "ensure equal and meaningful access to programs, services, and activities in the Jail."  Sec. III.F.2; 28 C.F.R. § 35.130.  Importantly, "medical necessity" is not the appropriate standard for determining when disability-related accommodations are warranted.

The Remedial Plan requires that class members with disabilities be housed in facilities that accommodate their disabilities, are consistent with their individual security needs, and provide equal access to Jail programs, services, and activities, with accommodations provided as needed.  Sec. III.G & H.

There are additional requirements with respect to the provision of Effective Communication for class members with disabilities who use different ways to communicate, in the context of all programs at the Jail and especially for due process events and clinical encounters.  Specific provisions address the Effective Communication and program access needs of individuals with hearing-related disabilities.  Sec. III.I & J.

The Remedial Plan sets forth required grievance procedures for class members to report and get resolution as to any instances of disability-based discrimination or a violation of the ADA.  Sec. III.K.

Additional provisions require appropriate accommodations and assistance in the context of alarms and emergencies (Sec. III.L), searches, restraints, and cell extractions

(Sec. III.M), and transportation (Sec. III.N).  Provisions for the screening, monitoring, management, and accommodation of class members with Intellectual Disabilities are also set forth in the Remedial Plan. Sec. III.O.

Compliance with the Remedial Plan requires an effective system for adequate training, accountability, and quality assurance related to ADA/Disability policies and practices.  Sec. III.P.

Finally, the ADA/Disability Remedial Plan requires the County to develop and fully implement an Accessibility Remedial Plan to address Jail physical plant deficiencies that result in access barriers for class members with disabilities.  Sec. III.Q.

## III.    Methodology

The methodology for this monitoring report was greatly impacted by the COVID-19 pandemic and the monitors' inability to tour the facility and meet in person with staff and class members.  The report is based on interviews with Jail leadership, deputies, health care staff, and class members, as well as review of records, data, and other information produced by the County.

In late 2020 and early 2021, Plaintiffs' counsel conducted phone interviews with Sacramento Sheriff's Office (SSO) Compliance team members at both facilities, a classification supervisor, the Reentry programs Commander, and multiple Adult Correctional Health Services (ACH) staff.  Other Jail leadership offered input as needed *via* email and telephone calls.

Plaintiffs' class counsel interviewed approximately 25 class members with disabilities at the Main Jail and Rio Cosumnes Correctional Center ("RCCC") for purposes of this report.  Plaintiffs' class counsel also gathered information through ongoing correspondence with class members and through surveys regarding disability-related housing, accommodation, and program access issues.

Jail staff and leadership were helpful in facilitating interviews with class members. Staff were forthcoming in interviews and responsive to the monitors' information and document requests.

## IV.    Findings

### A.    Policies and Procedures

The Remedial Plan requires the development of policies, operations orders, and other documents to facilitate and ensure ADA compliance.  Sec. III.A.  The SSO, ACH, and Jail Psychiatric Services (JPS) each have obligations in this regard.  Existing policies requiring ADA-related revisions are listed in Exhibit A-1 to the Remedial Plan.  Policy development and revision efforts were reportedly slowed due to exigencies and staffing limitations related to COVID-19.

For the SSO, drafts of a revised Operations Order on ADA/Disability issues have been exchanged with class counsel.  The County has indicated that a revised ADA

Operations Order remains "under review." Defs.' Second Status Report, Dkt 137, at 25 of 85. Significant work remains to finalize that Operations Order as well as several other SSO policies listed in Exhibit A-1.

ACH has recently made significant progress on ADA/Disability policies and forms, providing drafts to class counsel for review in recent weeks. Plaintiffs' class counsel has provided feedback on draft policies, forms, and related materials, and look forward to working with ACH to finalize and implement them. Particularly as the new ADA Tracking System and electronic health records system are rolled out during 2021, additional revisions to the training may be warranted.

### B.     ADA Tracking System

A foundational component to achieving compliance with the Remedial Plan and federal and state disability law is the development and implementation of an effective system to identify and track prisoners with disabilities as well as their accommodation and Effective Communication needs. Sec. III.B.

The Jail's ADA Tracking System must effectively and reliably incorporate the information gathered by *both* health care and custody processes. All relevant staff – custody, classification, health care, and program staff – need to have complete information about the needs of people with disabilities. The health care and custody procedures for tracking people with disabilities historically and currently are not linked, adversely impacting the system's effectiveness.

**Custody Tracking System.** Historically, the SSO has utilized, in its own words, a "rudimentary [ADA] tracking system through Excel." Defs.' Second Status Report, Dkt 137, at 26 of 85. The existing tracking system is the product of *ad hoc*, disjointed efforts by staff who have not been provided the necessary resources or direction.

Custody staff have also not had a shared information system linking the two Jail facilities. According to staff, the two facilities have utilized their own ADA tracking charts, which are "similar but not connected." Compliance team staff are not always notified when a person with a disability is moved between facilities. Custody staff rely on email or other communications to share disability-related information about a class member moving between facilities. According to the RCCC Compliance Unit, when someone with a disability is transferred from Main Jail to RCCC, the RCCC Compliance staff will meet with the individual "if we are informed that they are there and have a need." To this end, the RCCC Compliance Unit runs a weekly report of people who have met with ADA Compliance staff previously; they then set up an interview for any new arrivals. They further rely on medical notifications and other information provided by various staff members to identify new class members with disability-related needs.

The County has been working on development and implementation of an electronic system for classification management – specifically, the ATIMS Jail Management Software. The system is expected to include disability tracking and other functions. At the time of monitoring, the ATIMS system was still in development and

not ready for demonstration. Custody leadership and the compliance teams were aware of its development but were not yet familiar with the system. Rollout of the system and related staff training was delayed, primarily due to COVID-19-related exigencies. As of March 2021, staff training on ATIMS had begun.

Staff consistently expressed hope that the new ADA Tracking System would address the existing problems with disability tracking and information-sharing.

**ACH Health Care Tracking System.** Starting in November 2020, ACH began testing revised ADA/Effective Communication forms that are configured with the new electronic health record system. Rollout of the new forms is expected in 2021. ACH staff report that work is being done on "interface development" between the electronic health records system and ATIMS, allowing "certain data indicators to be sent electronically to ATIMS." Defs.' Second Status Report, Dkt 137, at 13 of 85. This synchronization will be an important component of the County's ADA Tracking System moving forward.

***Armstrong* Class Member Notifications.** One additional issue raised in staff interviews was the lack of communication regarding disability-related information available to parolees who come into Jail Custody. Under the *Armstrong v. Newsom* court orders, the State provides county jails with notifications about parolees with disability-related needs. Sec. III.B.4. Some health care and Compliance Unit staff reported that they do not reliably receive the *Armstrong* notifications. SSO leadership state that the expected practice is for all *Armstrong* notifications to be forwarded to ACH, JPS, and Compliance Unit staff. A process for sharing of this information with health care staff is specified in recently revised ACH policy.

This issue will continue to be monitored, including in the context of the new ADA Tracking System rollout.

### C.    ADA Coordinator and Related Positions

The Remedial Plan requires that the County employ a dedicated ADA Coordinator at each facility who is responsible for coordinating efforts to comply with ADA-related requirements and policies, has sufficient command authority to carry out such duties, and works with the executive management team on ADA compliance processes. The Remedial Plan further provides for the use of ADA Deputies assigned to support the ADA Coordinator at each facility. Sec. III.C.

The ADA Coordinator and ADA Deputy roles are filled by a Compliance Team at each of the two Jail facilities. Compliance team members are responsible for implementation of policies and procedure related to ADA compliance as well as maintaining compliance with the Prison Rape Elimination Act (PREA), among other duties.

At the Main Jail, there is one Compliance Supervisor (Sergeant-level) who reports to the Main Jail Compliance commander (Lieutenant-level). Three deputies and one records officer report to the Main Jail Compliance Sergeant.

At RCCC, there is one Compliance Supervisor (Sergeant-level) who reports to the RCCC Compliance commander (Lieutenant-level). Three staff members (two deputies and one records officer) report to the RCCC Compliance Sergeant.

Turnover in the SSO Compliance Units appears to be a significant issue. Class counsel received a roster of the Compliance teams in late spring 2020. By December 2020, when the monitoring interviews began, the Lieutenant in charge of the Compliance team, who had developed subject matter expertise and a commitment to ADA-Disability policy improvement, had rotated into a different unit in the SSO. The sergeants overseeing the Compliance teams at each Jail facility had also been replaced by new sergeant-level staff. The new Main Jail Compliance sergeant indicated that she would be rotating off the team in early 2021. There had also been significant turnover among the Main Jail Compliance deputies.

The frequent turnover on the Compliance teams will make successful implementation of the ADA/Disability Remedial Plan provisions much harder and less durable. These positions require both specific formal training and on-the-jobs skills development. Class counsel urges the County to make adjustments such that Compliance team members remain in their roles for a sufficient period, with professional advancement pathways consistent with the importance of these positions.

The County produced job announcements for the Compliance Supervisor and Compliance Deputy, which include duties and qualifications. There is no information, in these documents are elsewhere, as to the training requirements for these positions. As discussed in Section P, below, the provision of adequate ADA training will need to be a focus area in the months to come. Sec. III.C.3. The work of the Compliance teams must be guided by the requirements in the Remedial Plan and not historical practices.

### D.    Screening for Disability and Disability-Related Needs

To identify people with a disability and their disability-related accommodations, housing, classification, and other needs, there must be an effective disability screening process, including during the intake process. Sec. III.D.

The County has historically relied on a handwritten Special Needs form that health care intake staff completes and then provides to custody staff. Custody staff then review the Special Needs form, in some cases entering information on an Excel spreadsheet that lists class members with disabilities and various disability-related information.

After being notified by health care staff of a possible accommodation need, the expected practice is for an SSO Compliance Unit member to follow up with the class member, utilizing a separate SSO ADA Assessment Form. The Compliance Unit will do an in-person review every 30 days, unless the class member initials on a form that they

do not need a follow-up interview with Compliance staff.  According to Main Jail staff, most class members waive the follow-up interview.  RCCC staff report that follow-up interviews are common at that facility.  For class members who receive a 30-day interview, there is an SSO ADA 30 Day Review Form.

The information gathered through these various processes, and documented on the forms and spreadsheets, is inconsistent and generally incomplete.

On a more positive note, the County was in the midst of a transition to a new electronic system for ACH health care staff's disability screening.  Staff leadership provided the monitors a virtual tour of the new electronic system interface.  It appears to have been developed thoughtfully.  Staff indicated that the process had not been rolled out at the time of the virtual tour, with work still to be done on workflow and information-sharing procedures.  Rollout of the new intake and disability screening system was expected in early 2021.  It will be a focus of monitoring in the second round.

The monitors identified several issues that warrant attention as the new disability screening system is implemented.  First, the Special Needs ("Sacramento Special Needs") form on the new electronic system contains important disability-related information; however, the organization and categorization on this electronic form are in some ways difficult to follow.  For example, there is a menu of "Diabilities" [sic] that lists check boxes related to hearing, speech, vision, and physical/mobility impairments, with corresponding accommodations in a separate "ADA Alerts" section.  There is a separate menu of "Impairments" with check boxes related to Intellectual Disability, reading/writing ability, and various adaptive support needs.  The monitors suggest a reorganization that organizes all disability categories together in one menu, and all disability accommodation/support needs in a second menu.  (ACH has informed class counsel that, since the virtual tour, these forms were reorganized in the EHR system in response to these concerns.)

Second, it will be important that the forms generated by ACH's new electronic system for intake screening are timely transmitted and affirmatively reviewed by necessary custody staff – in particular, the Compliance teams responsible for provision of disability-related needs and ADA compliance.

Third, and relatedly, class counsel did not have the opportunity to assess the ATIMS system that the County intends to implement this year.  Implementation of that system must effectively and reliably incorporate the information gathered by ACH's new electronic screening and tracking system.

Finally, the procedure and physical location for the intake disability screening remain inadequate.  The physical plant deficiencies in the intake areas continue to compromise the privacy and confidentiality that are essential to an effective disability screening system.  In addition, the current intake screening process creates challenges for health care staff to gather complete and accurate disability-related information.  According to nursing leadership, the Jail had designed for intake screening, including

disability screening, to be divided into two stages – first, an initial assessment when a person arrives at the jail, and second, a more thorough assessment that happens later, when there is more time and an opportunity for staff to communicate with the individual more privately.  However, this two-part screening has been condensed into a single assessment at arrival, in part due to COVID-related operational constraints.  Leadership indicated that this procedure has proven to be "too rushed" and ineffective.

Overall, the virtual tour of the ACH electronic intake and disability screening system suggests that the disability screening effort remains a work in progress, but one that is encouraging.  The location and procedures for completion of the screening continue to require remediation.  As with the ADA Tracking System rollout, this topic will be a focus area for the second round of monitoring.

### E.    Orientation

The Remedial Plan requires that the County ensure that class members are adequately informed of their rights under the ADA, including as to requesting and receiving accommodations, the role of the ADA coordinator(s) and how to contact them, the grievance process, and Effective Communication.  Sec. III.E.1.

Class members must receive, in an accessible format, the Jail rulebook, orientation handbook, and a verbal orientation or orientation video regarding rules and expectations at the Jail.  Sec. III.E.2.

**Accommodations during Orientation.**  Under the Remedial Plan, the County must accommodate class members with disabilities during the orientation process, including through the use of alternative formats (*e.g.*, verbal communication, large print, audio/video presentation) when necessary for Effective Communication of the information.  Sec. III.E.3.  The County has recognized that its "policies must be revised to include effective communication provisions" on this matter.  Defs.' Second Status Report, Dkt 137, at 28 of 85.  The County has not produced an orientation video for class members.  The provision of accommodations and Effective Communication during the orientation process will be assessed further in future monitoring rounds.

**Notice of ADA Rights and Procedures.**  Many class members reported that they did not know or understand the processes to request disability accommodations or to submit grievances on such issues.

The Inmate Handbook does provide information on these procedures, stating: "You may request an accommodation or a change in accommodation by utilizing a pink Health Services Kite or by notifying medical staff directly. Non-medical related accommodations [sic] can be made by kite to the Compliance Unit."  There is, however, confusion among class members (as well as among staff, as discussed elsewhere in this report) regarding which accommodations are "medical-related."

**Page 10 of 27**

As revised ADA policies are developed and implemented, class counsel urges the County to revise the Inmate Handbook and related materials to improve clarity and align with practice.

The County is also required to prominently post an Americans with Disabilities Act Inmate Notice in all Jail housing units, in the booking/intake areas, in medical/mental health/dental treatment areas, and at the public entrances. Sec. III.E.4. Class counsel received a copy of the one-page notice that is reportedly posted at RCCC. Similar information (covering both Jail facilities) is provided in the Inmate Handbook. The language used, last revised in January 2018 (according to the RCCC Notice), has a reading level that is too high to be considered accessible.

Many class members at RCCC stated that they have not seen the ADA Inmate notice in their housing units. Reports from Main Jail indicate that some, but not all, housing units have the Notice posted in a place that class members can view it.

Class counsel proposes to work with the County to revise the Notice during the next monitoring round, to ensure appropriate content and accessibility. The Notice needs to be posted prominently and consistent with Remedial Plan requirements.

### F.   Health Care Appliances, Assistive Devices, Medical Equipment

The provision of safe and operational health care appliances, assistive devices, and durable medical equipment (HCA/AD/DME) is a critical component of the Remedial Plan. Sec. III.F. Newly developed ACH policy (06-07) aims to address these requirements, and if effectively implemented, is expected to result in meaningful improvements.

**Provision of HCA/AD/DME (Sec. III.F.1).** During the monitoring period, class counsel learned of cases in which class members went extended periods without necessary assistive devices.

Several class members reported denials and delays in receiving their assistive devices. Two reported significant delays in getting a cane that they needed to ambulate safely; one man who was denied a cane stated that he was unable to leave his cell unless others in his housing unit assisted him. One man waited nearly one year to receive hearing aids that he needed. Another class member with a medical condition that makes it difficult for him to regulate his body temperature had to wait several weeks (during the winter months) to receive thermal clothing that Jail staff had ordered for him.

We are also aware that, in December 2020, *Armstrong* class counsel reported several examples of class members with disabilities held at Sacramento County Jail being denied assistive devices and related equipment for which there was documented need. The reported denials included canes, a walker, a wheelchair, a knee brace, a back brace, and compression stockings.

**Repair and Replacement of HCA/AD/DME (Sec. III.F.1).** There were also reports regarding failure to timely repair or replace ill-functioning assistive devices. In

**Page 11 of 27**

some cases, the failure to timely repair or replace broken or otherwise insufficient devices created safety and accessibility problems for class members.

One class member with paralysis faced several such issues.  First, he was made to use a broken commode that made using the bathroom facilities extremely difficult; he fell on multiple occasions.  Second, according to the class member, he was provided a mobile shower chair for which he could not lock the wheels, compromising his safety during shower time.  (Staff report that the shower chair in the unit where this person was housed has wheels that can be locked.  The shower chairs will be assessed during a future site visit.)  After Plaintiffs' class counsel raised these issues, Jail staff replaced the commode and ordered an accessible shower bench for the class member.  The class member also had problems with his personal wheelchair, including the Jail's removal of anti-tip bars, a broken cushion, and broken armrest, which posed safety and accessibility problems.  Without the anti-tip bars, the man tipped backward and hit his head on the cement floor, requiring treatment at the hospital.

The Jail offered a replacement wheelchair, but the class member's condition required use of his personal wheelchair.  Staff stated that Jail policy was not to assist in the repair of personal wheelchairs.  After several months of back-and-forth, and with class counsel's numerous requests, the Compliance team assisted in the delivery and installation of replacement parts that the class member's family delivered to the Jail.

When questioned, staff also shared concerns regarding delays in repairing or replacing assistive devices.  They noted the lack of contracts with outside providers for the timely repair or replacement of devices.  One example shared was a class member who had a non-functioning hearing aid.  Health care staff requested assistance with the case management team, but the issue could not be resolved due to a lack of arrangements with appropriate vendors to repair the equipment.

Potentially adding to these delays is the impression by Compliance staff that if an assistive device or other equipment requires repair, it is health care staff's responsibility to resolve the issue.  Meanwhile, statements from ACH staff and class members indicate that ACH staff do not consistently see this as their responsibility.  Ultimately, coordinated problem-solving efforts by custody and health care staff are necessary.  Steps to resolve these issues should be a focus area in the near term. Sec. III.F.1-2.

**HCA/AD/DME to Meet Individual Needs (Sec. III.F.2).**  As the County rolls out its new ADA Tracking System and procedures, there *cannot* be a rigidly prescribed list of devices, or accommodations, available to class members with disabilities.  The provision of an assistive device, or any disability-related accommodation, must be based on an "individualized assessment" that identifies what is necessary "to ensure equal and meaningful access to programs, services, and activities in the Jail." Sec. III.F.2.

As an example of this problem, one class member has a neurological disability that makes it difficult for him to write with a normal pencil or pen.  He had communicated with staff about his need for an accommodation to fill out jail forms and to correspond

**Page 12 of 27**

with loved ones and legal counsel.  The Jail declined to provide an accommodation.
Class counsel then advocated on his behalf, requesting the provision of Pencil Grips, an
item costing just a few dollars that would allow him to write more effectively.  Several
weeks later, this assistive device was reportedly provided to the class member.  However,
during the Main Jail Compliance team interview, staff indicated that this was a unique
circumstance given class counsel's involvement and that accommodations not on the
Jail's "list" are generally not provided.

Another class member with multiple knee surgeries and chronic knee pain had a
documented history of using a walker as an assistive device when in CDCR state prison.
At the Jail, he was provided only crutches.  Medical records confirm that he experienced
great pain and difficulty getting around using crutches, including when having to
navigate stairs to get from his housing unit to the visiting area.  In early 2021, after an
attorney visit, he fell down several stairs, causing injury and worsening his condition.  At
a follow-up visit, health care staff offered him a cane, but curiously told him (as
documented in the record) that if he wanted a walker, he "will have to make a request
with the officers of this facility."  This statement again underscores the need for
coordination between custody staff and ACH as to the provision of assistive devices.

(Health care staff documented that "when released from this facility," the man
should seek physical therapy, cortisone injection, and possibly surgery.  If such care is
clinically indicated, then ACH staff should take steps to provide it to class members.)

The expressed views of staff suggest that further training – with an eye towards
individualized, solution-oriented disability accommodation procedures – is necessary.

A related and frequently reported issue, confirmed by staff, is what may be called
the "hot potato" problem.  For example, a class member had the seat cushion for his
wheelchair, which he needs to relieve pressure and prevent pressure sores, confiscated at
the time of his arrest.  He requested that he be provided a replacement cushion.
Compliance staff told him they could not provide one to him unless a doctor "prescribes"
it.  When the class member saw health care staff, they told him that he does not need a
prescription for a cushion and declined to write one, leaving the man without recourse.
(The issue was resolved after class counsel raised it with Jail staff.)  This problem again
calls for improved ADA tracking, better coordination between health care and custody
staff, and a solution-driven process to address class member disability accommodation
needs.

Interviews also confirmed a misimpression among staff that the provision of
assistive devices or other accommodations must be "based on a medical need."  This is
incorrect.  The ADA requires that people with disabilities be provided with reasonable
modifications in policies, practices, or procedures when necessary to provide meaningful
access to the Jail's services, programs, or activities and to avoid discrimination.  Sec.
III.F; 28 C.F.R. § 35.130.

**Removal of HCA/AD/DME Based on Security Risk (Sec. III.F.3).**  The Remedial Plan requires that class members with disabilities be allowed to retain personal HCAs/ADs/DME (including reading glasses), unless there is an individualized determination that doing so would create an articulated safety or security risk.  Where there is an articulated risk, the County must provide an equivalent Jail-issued device unless there is a documented, supervisor-reviewed determination that the device constitutes a risk of bodily harm or threatens the security of the facility.  Sec. III.F.3.

The County's January 2021 Status Report states that "planning for this item is underway."  Defs.' Second Status Report, Dkt 137, at 29 of 85.  The RCCC Compliance team shared that these situations are uncommon at the facility.  They described an example of a cane that had a removable piece that could be used as a weapon being confiscated for security reasons; they reported that the class member was provided another cane instead.  Main Jail Compliance staff indicated that there is a form used in cases where a device is taken for security purposes.  This form was not provided to the monitors.

One class member who used a wheelchair in the community was initially provided a walker at the Jail until it was taken from him.  The Jail's records state that the walker was "destroyed" by the class member and that medical staff had "removed chrono."  A review of the health care records raises significant concerns about this case.  The records document that: (1) the class member was experiencing hallucinations and other significant psychiatric symptoms when he "dismantled" the walker; (2) mental health staff determined that he had done so to throw it at one of his hallucinations; (3) the class member had fallen after the device was removed, requiring outside medical care, and his gait appeared "unsteady"; and (4) he continued to need an assistive device, including potentially a wheelchair, yet it appears no alternative device was provided after the confiscation.  This individual case indicates a failure by the County to comply with Section III.F.3 of the Remedial Plan.

This issue will be the subject of further assessment in the next monitoring round.

**Provision of Assistive Devices at Time of Release (Sec. III.F.4).** An important element of the ADA/Disability Remedial Plan relates to class members who need assistive devices when they are released from custody.  Sec. III.F.4.  Compliance team staff reported that they are aware that class members are permitted to keep a Jail-issued cane at the time of release, but that they are not aware of a similar process for class members with a Jail-issued wheelchair.

Health care leadership report that they are working on a written policy for this provision.  Nursing staff indicated efforts to work with outside providers and others to make sure class members have the assistive devices or other equipment they need at release, though they acknowledged that this effort has not been fully implemented yet.

### G.     Housing Placements for People with Disabilities

Given the longstanding physical plant deficiencies, the placement of class members with disabilities in appropriate and accessible housing units is an acute challenge for the County.  Until these deficiencies are remedied, the County cannot achieve compliance with this component of the Remedial Plan.  Facility renovation and construction plans have been delayed.  *See* Part IV.Q, below.  For now, the County must continue to make efforts to place class members with disabilities in the "most integrated and appropriate housing possible, providing reasonable accommodations and assistance where necessary to ensure appropriate accessibility to Jail programs, services, and activities."  Sec. III.Q.1.

**Housing in Accessible Facilities that Accommodate Disabilities (Sec. III.G.1-2).**  Class members with disabilities reported struggling with several inaccessible aspects of the Jail facilities:

➢ Shower facilities remain inaccessible.  Class members reported being denied a functional shower chair, grab bars (for showers, toilets, and beds), and other necessary accessible features.

➢ Class members in the disability cluster units describe filthy shower and bathroom facilities, with indications that they are cleaned with insufficient frequency, and possibly less often than other units.

➢ Class members expressed concern about doors, including in the disability cluster units, being too heavy and hard to manage for people in wheelchairs or with other physical disabilities.

➢ A class member described how his walker does not fit into the shower stall, which does not have appropriate grab bars, putting him at risk of a fall.

➢ A class member described falling out of his wheelchair, and getting injured, in a unit that does not have level, accessible flooring.

➢ Some class members with disabilities must navigate stairs to reach visiting, recreational, and programming areas.

**Inappropriate Placement in Medical Units (Sec. III.G.3 & 4).**  Class members with disabilities must be housed consistent with their individual security classification need.  They may not be placed in medical housing units solely based on their need for an HCA/AD/DME, but rather based on individualized clinical determination of their need for treatment.  These Remedial Plan requirements have not been implemented.  Class members are housed in medical housing units due to their use of assistive devices or medical equipment, not for purposes of treatment.  As discussed in the next section, such placements in many cases result in the denial of access to programs, jobs, out-of-cell time, and other activities and services.

Among the challenges is the lack of electrical outlets in general population units.  For example, at RCCC, the Medical Housing Unit (MHU) is the only unit with electrical

outlets; as a result, class members requiring access to electric medical equipment, such as a CPAP machine, can only be housed in the MHU.  Class members have reported that placement in the MHU means less access to programs at the facility.  For class members with a higher security classification, it also means placement in one of the small and extremely restrictive cells along the back wall of the MHU, where they have little or no out-of-cell time.

**Inappropriate Placement Higher Security Classifications (Sec. III.G.3 & 4).** A related concern applies in the context of class members with mental health needs. Plaintiffs' counsel is informed that the Jail's new ATIMS management system prevents people who receive outpatient mental health services from being classified as Minimum Custody.  Specifically, anyone who is designated as being at the OPP level of mental health care cannot be classified lower than Medium Security, regardless of their individual security factors or recent conduct.  We understand that this policy was not devised or implemented by the County, but rather is built into the ATIMS system.

Assigning people to higher security levels solely by virtue of their mental health needs constitutes disability discrimination.  It violates federal disability law to assign people to higher custody levels on account of their disabilities.  28 C.F.R. § 35.152(b). The practice also violates the Remedial Plan provisions requiring that people be assigned to the least restrictive housing settings appropriate to their individual needs.  Sec. IV.F, Sec. VIII.A.  Custody leadership has noted that Low and Medium Custody class members are able to house and program together and that there are no differences in restrictions or privileges between the two classifications.

The Jail's housing plans confirm that Low and Medium Custody class members are housed together in some units.  However, it also indicates that Medium Custody class members may be housed in Medium/High Security units, which have been observed to be more restrictive. Further attention by the County, and monitoring by class counsel, will be necessary to ensure against the placement of OPP class members in more-restrictive-than-necessary placements.

### H.   Access to Programs, Services, and Activities

The Remedial Plan requires the County to ensure that class members with disabilities, including those housed in specialized medical or mental health units, have equal access to programs, services, and activities available to similarly situated class members without disabilities, consistent with individual health and security needs.  The County must provide reasonable accommodations and modifications as necessary to ensure such access.  Sec. III.H.1-3.

**Equal Access to Programs, Services, and Activities (Sec.H.1).**  Class members with disabilities do not have equal access to the Jail's programs, services, and activities as compared to similarly situated prisoners without disabilities.  This issue is most salient in the second-floor units at the Main Jail, where class members with disabilities are clustered.

Class members with disabilities housed on the Main Jail's second-floor housing units do not have equal access to the outdoor/recreation areas and inmate programs. Many shared their desire to participate in various classes and programs but report being told they were not allowed to participate, either because of their disability or their housing location (which was determined by their disability). One stated, "I'm on the medical floor. It's been rough. . . . No classes or activities are available. . . . We barely go outdoors for recreation." It remains the case that the Main Jail recreation areas require class members on several floors to navigate stairs, preventing safe and meaningful access to recreation activity for people with mobility disabilities.

Class members with disabilities also do not have equal access to visiting. There is just one visiting booth at the Main Jail that does not require the navigation of stairs. For many class members with mobility disabilities, this limits access to visiting. Others report having to navigate long flights of stairs to meet with their loved ones or their legal counsel.

**Reasonable Accommodations (Sec.H.2).** Class counsel identified continued issues related to the provision of accommodations for class members with disabilities.

A core issue remains custody staff overruling or ignoring health care staff regarding class member disability accommodation needs, as is common in jail systems that do not have a fully mature, legally compliant ADA tracking and accommodations system. Health care staff and class members provided specific instances. For example:

➢ A class member required more frequent clothing exchanges due to incontinence. Health care staff requested the accommodation for the class member. Custody staff refused to provide it, stating that clothing supply/exchange rules could not be modified for this class member.

➢ There is reportedly inconsistency in the provision of an "extra blanket" as an accommodation for a person with a particular medical or disability need. As one staff member explained: "I see variances, and I see custody and medical are providing what is easiest and not what is the most appropriate."

➢ One class member requested an extra mattress to help manage the pain of sleeping on the hard steel bunks. Custody staff refused the accommodation, on the ground that "only pregnant women receive an extra mattress."

**Assistance with reading and scribing documents (Sec. III.H.4).** Interviews with staff and class members suggest that assistance with reading and scribing documents is provided on an inconsistent basis. A Compliance team staff member stated that class members who need such assistance can ask for it, but staff cannot provide it "on a regular basis." Class members with vision-related disabilities reported having to rely on other incarcerated people to help them with reading and writing, in some cases having to pay them with food or commissary items. Class counsel urges the County to institute a formal policy, and to provide for adequate staffing, to ensure that reading/scribing assistance is provided when needed. (RCCC staff described a recent situation in which a class member requested, via the ADA helpline, assistance with reading. Compliance

staff had a face-to-face interview with him and set a plan on how to provide assistance, informing staff on all shifts in his housing unit of his need for assistance with reading.  At a follow-up interview, the class member reportedly confirmed that he was receiving the assistance he needed.  This success story can be a model for SSO policy.)

A positive development relates to health care access.  ACH's recently revised policy on Effective Communication (06-03) calls for health care staff to assist patients who are unable to complete paperwork on their own.  The policy also allows for ACH health care referrals without a written request.  According to staff, such a policy will be extremely helpful to ensuring access to care for class members with disabilities.  JPS already has a practice of accepting requests for a mental health consultation without a written request form.

**Access to library, recreational, and educational reading materials, including easy reading and large print books as necessary (Sec. III.H.5).**  Compliance team staff reported that all books available to the incarcerated population are donated.  They shared that there currently are no large-print recreational or educational books available at RCCC.  Religious materials are reportedly available in large print.

**Reentry, Vocational, Educational, and Work Release Programs (Sec. III.H.1 & 3).**  The lieutenant overseeing the Reentry Services Unit expressed a commitment to providing meaningful opportunities for class members with disabilities to participate in the programs that he oversees.  Some additional work will be necessary to achieve this objective.

The monitors reviewed the Reentry Services Unit Program Guide (Revision 9-20). It includes an array of programs, including Cognitive Behavioral Therapy/Treatment programs, outside educational programs, and vocational programs (Automotive Training, Construction Training, Culinary Arts, Custodial Training, Engraving, Landscape/Horticulture, Warehouse Training, Welding, and the Wild Horse Program). These programs are currently offered at RCCC only.  The County is working on implementation of Reentry/vocational programming at the Main Jail.  Defs.' Second Status Report, Dkt 137, at 31 of 85.

The monitors were unable to complete a statistical assessment as to whether people with disabilities have access to these programs, with accommodations provided as needed.  However, interviews and policy review strongly suggest that further work is necessary on this subject, including in the following areas.

➤ ***Provision of Reasonable Accommodations to Facilitate Participation.***  The Reentry Services Unit Program Guide does not, but should, reference the provision of reasonable accommodations for people with disabilities who wish to participate.  Relatedly, there are not, but should be, written essential functions for the programs.  A description of essential functions for each program is necessary to ensure a process for would-be participants with disabilities to participate, with accommodations provided as appropriate.

➢ ***Access to Work Release Division Programs.***  The lieutenant overseeing the Reentry Services Unit also discussed the County's Work Release program, which is operated by the Sheriff's Work Release Division.  The program allows for qualified inmates to serve their sentences by participating in community work projects, such as work assignments on road-side crews or in community programs.  The Work Release program reportedly excludes people with certain disabilities.  The lieutenant was not aware of alternative programs that provide opportunities for qualified people with a disability to participate in the program (and thus avoid incarceration).  This issue – which appears to be a clear violation of disability anti-discrimination law – warrants further attention.

➢ ***Access to Education Programs.***  The monitors are informed that there is a competitive bidding process occurring for education programming, with a new contract to begin in approximately July 2021.  The County will need to work with that provider to ensure appropriate disability-related policies and procedures.  Sec. III.H.1.a, III.I.6.

➢ ***Access for People with Mental Health Disabilities.***  Reentry programs are not offered to class members in specialized mental health units.  Defs.' Second Status Report, Dkt 137, at 31 of 85.  Consideration should be given to providing such programming opportunities to people housed in these units.

**Inmate-Worker Opportunities (Sec. III.H.6).**  Many class members with disabilities express a desire to participate in inmate-worker job programs.  They have, however, been told that such jobs are not available to them because of their disability and/or their housing placement in the disability cluster unit (*e.g.*, Main Jail 2-East).

Nearly all inmate-worker positions (kitchen, cleaning crew, laundry, etc.) are not available to this disabled population.  One experienced staff member shared that there had been just one such inmate-worker at the Main Jail in the last twenty years.  Jail staff expressed a problematic position that people with disabilities categorically could not take on jobs (*e.g.*, "you use a walker, you can't work in the kitchen").  (Main Jail staff stated that there are two "utility worker" positions available for class members with disabilities in the 2-East housing units.)

Staff acknowledged that physical accessibility deficiencies at the Main Jail made it harder for class members with disabilities to participate in job assignments.  For example, due to the lack of accessible paths of travel between floors at the Main Jail, class members with mobility disabilities have been excluded from certain job opportunities.

At RCCC, staff provided two examples of class members with mobility disabilities having had a job – someone who uses a wheelchair working in the kitchen and someone who uses a cane working a custodial job.

The monitors will continue to assess with people with disabilities have meaningful access to inmate-worker opportunities at the Jail.

**Page 19 of 27**

The County has not yet completed inmate-worker job duty statements that contain essential functions and specific qualifications. Defs.' Second Status Report, Dkt 137, at 33 of 85. This is a necessary step towards a procedure by which class members with disabilities can be appropriately assessed for inmate-worker positions, including with the provision of reasonable accommodations. Sec. III.H.6. A concerted effort, with staff training, will be essential to implementation of this provision.

**I.      Effective Communication**

This component of the ADA/Disability Remedial Plan was not a focus of monitoring in this round. The issue will be monitored in the next round, including through on-site assessment.

Notably, ACH has developed a new Effective Communication screening tool, completed a new Effective Communication policy and form, and created training materials. These achievements put ACH in a good position to address these important components. Efforts regarding health care records documentation of Effective Communication needs and accommodations are in progress, with trainings scheduled to begin with mental health staff in early 2021.

Updated policies and training are still needed for custody operations.

**J.      Effective Communication, Individuals with Hearing Impairments**

Some progress has been made with respect to Effective Communication and accommodations for class members with hearing-related disabilities.

The SSO reported in January 2021 that a video remote interpreting (VRI) system has been installed at RCCC, with the intention of bringing a similar system to the Main Jail. Steps towards implementing video visitation, which will benefit people with hearing-related disabilities, are also in progress. Defs.' Second Status Report, Dkt 137, at 34 of 85. Video-Relay Services (VRS) are available at both Jail facilities.

A Deaf class member who communicates through sign language reported that he gets access to a videophone less than once per week, much less than the access to phones that hearing class members have. *See* Sec. III.J.5 (requiring that class members with disabilities receive equal access to the Videophone or TDD/TTY services as non-disabled prisoners are afforded for regular telephone usage). (Staff report that VRS and TDD/TTY are not limited by policy and are available upon request by the class member. However, although the policy may allow equal access, in practice, requests may be denied.)

Effective January 2021, the Jail utilizes three new sign language interpretation services for Deaf/Hard of Hearing class members – Norcal Services for Deaf and Hard of Hearing, Interpreters Unlimited, and Eaton Interpreting Services. Staff reported that, as of March 2021, they did not have records of any invoices for Sign Language Interpretation (SLI) services with any provider.

ACH has stated that it continues to utilize the Language Line for SLI services. ACH states that SLI services will be provided via VRI, as required by the Remedial Plan (Sec. III.J.4) starting in early 2021.  A new ACH Policy 06-04, "Interpretation Services," has been drafted and should be finalized, with class counsel's input, soon.

Health care staff shared concerns about difficulty getting access to communication equipment.  They report that custody staff claim ownership of the equipment, in some cases causing difficulty to health care staff in getting it when needed.  When asked to propose a solution to this challenge, they suggested the use of medical carts with effective communication technology installed (a health care "workstation on wheels"), from which the staff member could access a sign language interpreter or other Effective Communication modality.

One Deaf class member interviewed during this round of monitoring reported that he was not provided an SLI for group programs (Substance Abuse and Jeopardy) in which he participated.  He also noted that closed captioning is not provided on the tablets that are distributed to class members for educational and entertainment activities.  *See* Sec. III.J.2 & 7.

Several Deaf and Hard-of-Hearing class members reported they were unable to understand communications through the Jail's public address system and had to rely on other incarcerated people for the information.  Some noted instances in which they were reprimanded by staff as a result of missing announcements about meals, dayroom time, etc.  Sec. III.J.8.

These findings suggest consequential failures to provide accommodations, meaningful program access, and Effective Communication to class members with disabilities.  Recently revised ACH policies (06-03, 06-04) are promising and will be helpful in addressing these issues in the context of health care delivery.  The monitors will continue to assess the County's efforts to comply with these important requirements in the next monitoring round.  Sec. III.I & J.

## K.    Disability-Related Grievance Process

Among the essential tools in a functioning jail disability program is a grievance process that allows people with disabilities to submit complaints regarding issues relating to their disability needs and right to meaningful access to jail programs.  The grievance process must facilitate serious consideration of the validity of individual complaints, with prompt remedial action taken when warranted.  Sec. III.K; 28 C.F.R. § 35.107(b).

Custody and health care staff maintain separate grievance procedures.

Class member ADA grievances were not systematically reviewed by the monitors during the first round of monitoring.  However, class member and staff interviews as well as policy review reveal areas of concern with respect to the ADA grievance process.

**SSO/Custody ADA Grievances.**  According to Compliance staff, grievances completed on an SSO form are each assigned a number.  There is an "ADA" box on the

grievance form.  ADA grievances may be routed to the custody Compliance team or to health care staff, depending on the content.

SSO staff do not separately track and or maintain ADA grievances in a manner to facilitate quality assurance processes.  The County should incorporate ADA grievance documentation, processing, and quality assurance into the new ADA Tracking System. Sec. III.K.4, III.P.

The Compliance teams monitor an ADA helpline available at each facility, which class members may call to leave a voice message regarding disability-related concerns. The number is *206 at the Main Jail and *232 at RCCC.  Information about the helpline is provided on the ADA Notice, discussed above, and in the Inmate Handbook.

If the request made in a helpline voice message is clear, the Compliance team responds.  If the request is not clear, then a Compliance deputy is supposed to meet with the class member to discuss the issue further.

The RCCC Compliance team reported that in a typical week, there are about 5-10 ADA helpline calls.  Calls at RCCC are reportedly logged.

The Main Jail Compliance team reported that there are about 6-10 ADA helpline calls per day.  The helpline calls at the Main Jail are not logged or tracked.  The existing Main Jail ADA spreadsheet is updated if appropriate, although staff do not document a class member's use of the helpline.

One class member who has a hearing-related disability reported that when he called the ADA helpline, staff informed him that he was not eligible since the Jail had not (yet) identified him as having a disability.

**Health Care ADA Grievances.**  During the monitoring round, ACH instituted a new policy (01-09), *Grievance Process for Health/Disability Complaints*.  Class counsel reviewed and provided feedback.  An ongoing concern is the unclear distinction between "medical" and "non-medical" disability-related grievances (the latter of which are sent to custody staff).  The handling of ADA grievances must involve *coordination* between health care and custody staff when appropriate, with respect to both resolving the ADA issue and tracking.

ACH reported that staff have begun to "track grievances and note trends."  Defs.' Second Status Report, Dkt 137, at 12 of 85.  The grievance tracking system will be monitored in future rounds.

**Equal Access to Grievances.**  The County is required to provide class members with disabilities meaningful access to grievance forms (and other written forms), including through provision of staff assistance and large print materials. Sec. III.K.2, Sec. III.I.4.  There are no large print or other alternative format forms.  Defs.' Second Status Report, Dkt 137, at 38 of 85.

Staff stated that they endeavor to assist class members with filling out forms as needed, while also acknowledging that the forms should be revised to enhance readability and accessibility.

### L.    Alarms/Emergencies

The Remedial Plan requires that the Jail have adequate written policies regarding alarms and emergencies, with mandatory provisions to accommodate people with disabilities.  The policies must describe the expectations of staff as to class members with identified disabilities during emergencies and alarms, including as to disabilities that may affect people's ability to comply with orders or otherwise respond to emergencies and alarms, as well as Effective Communication needs. Sec. III.L.1-3.

Custody staff noted that this component has not yet been addressed through policy and practice changes.

Certain aspects of this Remedial Plan section require on-site monitoring, including the provision of identification vests or other optional visible markers of disability need (Sec. III.L.4), installation of visual alarms to ensure Effective Communication of emergencies to people who are Deaf or Hard of hearing (Sec. III.L.5), and the posting of notices for emergency and fire exit routes (Sec. III.L.6).  These provisions will be monitored during future rounds.

### M.    Searches, Restraints, and Extractions

The County is required to develop and implement policies to ensure that prisoners with mobility impairments, including those with prosthetic devices, receive reasonable accommodations with respect to: (1) Pat searches and unclothed body searches; (2) Application of restraints devices, including Pro-Straint Chair; and (3) Cell extractions. Sec. III.M.

This aspect of the Remedial Plan was not assessed during this round.  Custody staff noted their impression that "most cell extractions occur in specialized units" housing people with mental health needs.  These issues will be reviewed in greater depth in the next round of monitoring.

### N.    Transportation

Provision of safe and accessible access during transport to, from, or between Jail facilities is a distinct and important component of a jail disability system.  The Remedial Plan requires provision of reasonable accommodations to class members in transit. Sec. III.N.

The County reports that RCCC currently does not have an ADA van assigned to the facility, though the facility has been approved for one.  Defs.' Second Status Report, Dkt 137, at 40 of 85.  At present, RCCC staff must request the use of an ADA-compliant vehicle from the Main Jail as needed.  RCCC staff state that they can generally get access

to a Main Jail ADA-compliant vehicle when needed, but they emphasized that they would like to get their own ADA vehicle as soon as possible.

Class counsel is aware of reports in which the lack of access to an accessible vehicle has caused delays in transport and in some cases canceled outside medical appointments.

One class member with a physical disability reported that the method of shackling during transport has been very painful for him, an issue of which staff should be aware.

### O.    Prisoners with Intellectual Disabilities

The County is required to develop and implement a comprehensive written policy and procedure regarding class members with an Intellectual Disability, including screening as well as utilization of a multidisciplinary team to ensure appropriate care, safety, adaptive support needs, and accommodations.  Sec. III.O.

The intake health care screening in the newly developed electronic system has multiple sections referencing ADL ("Activities of Daily Living") accommodations. However, the system reviewed by class counsel does not include an adequate Intellectual Disability screening tool.  ACH staff stated that JPS mental health staff are responsible for conducting a more complete screening for Intellectual Disability.  Class counsel was not provided information about JPS's screening.  It was also unclear whether and how JPS screening information, including as to Intellectual Disability, is (or will be) integrated into the ACH and custody ADA Tracking System(s).

There appears to have been some progress on this component of the Remedial Plan.  However, Class counsel remain concerned that people with an Intellectual Disability are not being reliably identified.  The County's ADA tracking system-produced lists of class members with disabilities (in May/June 2020 and November 2020) contained just one person with an identified Intellectual Disability (designated as "developmentally delayed").

Relatedly, health care staff shared concern that more work needs to be done at the Jail to meet the needs of people with autism, a condition that in some cases has significant overlap with intellectual or developmental disabilities.

This component will receive further attention in the next monitoring round.

### P.    ADA Training, Accountability, and Quality Assurance

**ADA/Disability Training.**  The County must provide staff with adequate training on disability-related requirements as appropriate to their position.  ADA/Disability-related training must include formalized lesson plans and training provided by certified or otherwise qualified ADA trainers.  Sec. III.P.1-2, III.A.4.  Specific training requirements apply to ADA Coordinators and ADA Deputies.  Sec. III.C.3-4.

At present, the ADA/Disability training system for custody staff (specifically, custody staff) is not adequate.

**Page 24 of 27**

The SSO provided three documents in response to class counsel's request for ADA/Disability training: (1) a POST Basic Course workbook entitled "Learning Domain 47-People with Disabilities"; (2) course materials for an SSO training called "Crisis Intervention Training for Academy"; and (3) a PowerPoint training on autism (the "Bakarich training"). These trainings do not provide adequate guidance as to ADA compliance requirements in the jail setting, either generally or specifically as to Sacramento County Jail.

Custody leadership reported their understanding that while certain staff trainings are done annually (*e.g.*, PREA), ADA-related training is conducted only "as needed." They also report that some shift training is being done, which will be assessed in the next monitoring round.

Custody staff acknowledged that they "rely heavily" on more experienced colleagues for ADA-related issues. The statement raises some concern insofar as ADA practices must be guided by the requirements in the Remedial Plan and not historical practices to which veteran colleagues may be accustomed.

Compliance Unit staff reported having received some ADA training in recent years, including a conference in Pittsburgh, a Pacific ADA Center conference, and an online course. The RCCC Compliance Unit staff reported having regularly attended an annual ADA Coordinator training, and the Compliance Unit at both facilities reported participation in an ADA Coordinators Virtual Training in Winter 2021.

As ADA policy revisions are implemented and the ADA Tracking System is rolled out, the SSO will need to develop a training curriculum that covers both ADA legal requirements generally and Sacramento County Jail ADA policies specifically. The SSO has indicated that ADA/Effective Communication Training will be a "key area of focus for 2021." Defs.' Second Status Report, Dkt 137, at 13 of 85.

ACH health care ADA/Disability training materials have been provided to class counsel for review. The materials are generally very well done; class counsel provided minor feedback on the content. We are informed that ADA training for ACH health care staff has been delayed for COVID-related reasons.

The monitors were not provided ADA/Disability training materials for JPS staff.

**Quality Assurance and Accountability.** The County must develop and implement written policies and procedures regarding monitoring, investigating, and tracking staff violations (or allegations of violations) of ADA requirements and Jail ADA policies. Sec. III.P.3. The Remedial Plan further requires the County to develop an ADA accountability plan that will ensure quality assurance and establish staff accountability for egregious, serious, or repeated violations of the ADA and Jail ADA-related policies and procedures. Sec. III.P.4.

Quality assurance and accountability protocols were not monitored in this round. They will be the subject of future monitoring.

**Q.      Accessibility Remedial Plan re: Physical Plant Deficiencies**

The Consent Decree requires the County to develop and fully implement an Accessibility Remedial Plan to address Jail physical plant deficiencies that result in access barriers for class members with disabilities.  Sec. III.P.  The Accessibility Remedial Plan must address specific longstanding deficiencies: a) "Adequate provision of accessible cells and housing areas with required maneuvering clearances and accessible toilet fixtures, sanitary facilities, showers, dining/dayroom seating, and recreation/yard areas"; b) "Accessible paths of travel that are compliant with the ADA"; and (c) "Equal and adequate access for all prisoners with disabilities to Family and Attorney Visiting areas in reasonable proximity to their housing location."

The Sacramento County Jail facilities contain extensive deficiencies with respect to accessibility and safety for class members with disabilities.  As a commander assigned to the Jail's ADA/Disability policies, practices and procedures testified in November 2019, "I am fairly confident most of the jail is not ADA compliant or accessible."

In recent monitoring interviews, staff described the deficiencies with respect to the physical plant, both in terms of accessibility and the delivery of health care.  One member of health care leadership stated that "medical services provided in the facility are very disjointed because the facility was not set up with medical services in mind, without thinking about privacy, ADA, [or] HIPAA. . . . Services need to be provided . . . appropriately and effectively, [and we] need the setup to do that."

The Remedial Plan provides a specific deadline of January 2022 (i.e., 24 months from court approval of the Consent Decree) to develop and fully implement the Accessibility Remedial Plan to "address Jail physical plant deficiencies that result in access barriers" for class members with disabilities.  Sec. III.Q.1. Recent developments demonstrate not only that the County is not on track to meet this deadline, but also that it has no viable plan for doing so.

The County has previously developed plans for construction of facilities at RCCC and the Main Jail to address the deficiencies identified in the *Mays* case.  In November 2019, the County abandoned a plan for facility improvements at RCCC.  Plans to fund the initial design stage of a "Main Jail Annex" next to the current Main Jail facility, which would provide accessible housing and program space for people in the Jail, also were abandoned.

The County has stated in public documents that the necessary remediation cannot be accommodated in the existing Main Jail facility due to limitations in design, configuration, and square footage.  The County has represented that renovations to the current Main Jail facility would involve "very high costs" and "significant time to complete the work."  March 10, 2021 Agenda, Letter to Board of Supervisors re: Workshop – Review the Design-Build Process Related to the Correctional Health and Mental Health Services Facility Project at 2.

**Page 26 of 27**

Thus, at present, there is no clear plan or path for the County to comply with this critical component of the Remedial Plan. Federal and state disability anti-discrimination law requires the County to provide for physical accessibility and meaningful program access to people with disabilities. These requirements of the Consent Decree and federal law statutory and Consent Decree requirements must be implemented.

Establishing a path forward on this Remedial Plan component must be a top priority for the County and the parties in the second monitoring round. Importantly, the *Mays* settlement requires that the physical plant Accessibility Remedial Plan be developed "in consultation with Plaintiffs' counsel." Class counsel expects to be provided regular updates as to development of the Accessibility Remedial Plan in the months ahead.

On this matter, the Jail population reduction that Sacramento County Jail saw (like many of California's large county jail systems) in response to the COVID-19 pandemic warrants special note. A meaningful commitment by the County to maintain and build on the Jail population reduction that it recently achieved during the pandemic would create opportunities to implement an adequate remedy that is also cost- and time-efficient. While there is little doubt that some physical plant renovations and construction will be necessary to comply with the Consent Decree's requirements, class counsel welcomes discussions with the County on a path forward that includes continued and durable jail population reduction efforts.

As the parties jointly set forth in the Consent Decree, "population reduction of the jails will facilitate compliance with this Remedial Plan." Sec. II.B.1. Jail population reduction measures can and should be "designed to promote public safety through evidence-based programs." Sec. II.B.2. The County has begun to solicit outside input in this regard. *See* The Carey Group, *Sacramento County Consultant Report on Jail Alternatives*, May 29, 2020 (estimating a potential "mid-range reduction" of 20% of the incarceration rate through proposed jail population reduction initiatives). Concrete steps and investments to reduce the Jail population, now and moving forward, will give the County more flexibility in efforts towards cost- and time-effective implementation of the Consent Decree requirements.

## V.    Conclusion

During an extraordinarily challenging year, the County has made some important strides towards compliance with the ADA/Disability provisions of the Remedial Plan. Extensive work remains. Staff and leadership will need adequate resources and support to continue the work that has already begun.

Persistent physical plant deficiencies and staffing challenges pose significant obstacles to achieving compliance. The County must remain committed to the available paths towards Remedial Plan implementation. Plaintiffs' class counsel maintains that parallel discussions about durable population reduction, consistent with public safety, are in all parties' interest in pursuing cost- and time-effective remedial efforts.