**LISA A. TRAVIS, County Counsel**
**RICK HEYER, Supervising Deputy County Counsel**
  [State Bar No. 216150]
**COUNTY OF SACRAMENTO**
**700 H Street, Suite 2650**
**Sacramento, CA  95814**
**Telephone:  (916) 874-7538**
**Facsimile:  (916) 874-8207**
**E-mail:  heyerr@saccounty.net**
**File No.:  126602-000012**

**Attorneys for County of Sacramento**

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF CALIFORNIA
### SACRAMENTO DIVISION

| | |
|---|---|
| **LORENZO MAYS, RICKY RICHARDSON, JENNIFER BOTHUN, ARMANI LEE, LEERTESE BEIRGE, and CODY GARLAND, on behalf of themselves and all others similarly situated**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**COUNTY OF SACRAMENTO**<br><br>**Defendant.** | **Case No. 2:18-cv-02081 TLN KJN**<br><br>**JUDGE: Hon. Kendall J. Newman**<br><br>**FILING OF THIRD COUNTY STATUS REPORT PURSUANT TO PARAGRAPH 12 OF THE CONSENT DECREE** |

Paragraph 12 of the Consent Decree in this matter requires the County to provide

Plaintiffs' counsel and the Court appointed subject matter experts with a status report no later

than 180 days from the approval of the proposed decree.  In compliance with this requirement,

the County provided the "Third Status Report; Mays Consent Decree" on July 7, 2021 to the

subject matter experts and the attorneys monitors from the Prison Law Office and Disability

Rights California.  Attached to this filing is that status report.

DATED: July 7, 2021

LISA A. TRAVIS, County Counsel
Sacramento County, California

By: _____
Rick Heyer
Supervising Deputy County Counsel

2145234

-1-

EXHIBIT 1

**COUNTY OF SACRAMENTO**
**OFFICE OF THE COUNTY COUNSEL – DOWNTOWN OFFICE**

700 H Street, Suite 2650, Sacramento, California 95814  Telephone (916) 874-5544 Facsimile (916) 874-8207

July 7, 2021

**COUNTY COUNSEL**
Lisa A. Travis

**ASSISTANT COUNTY COUNSEL**
Traci F. Lee
Krista C. Whitman

**SUPERVISING DEPUTY COUNTY COUNSEL**
Craig E. Deutsch
Rick Heyer
Jennifer McLaren
June R. Powells-Mays
John E. Reed
Janice M. Snyder
Lindsay C. Zettel

**DEPUTY COUNTY COUNSEL**
Janet E. Bender
Corrie Brite
William C. Burke
Jennifer A. Cerri
Christopher S. Costa
Katherine Ann Covert
Denise L. Cummings
Michelle M. Espy
Keith W. Floyd
Laura Froome
Shilpa M. Girimaji
Christophe Guillon
Eric Handler
Kelsey D. Johnson
Michael J. Keene
Jocelyn J. Maier
Jason A. Manoogian
Susan R. Masarweh
Diane E. McElhern
Deon C. Merene
C. Stacey Miller
Nicole M. Misner
Katrina G. Nelson
Lura L. O'Brien
Robert P. Parrish
Nanci A. Porter
Joy A. Ramos
Andy Read
Tina M. Roberts
Nicole L. Roman
Diana L. Ruiz
Rachelle Smith
Catherine Spinelli
Samantha Tali
Ashley M. Wisniewski
James R. Wood
Peter C. Zilaff

Donald Specter
Margot Mendelson
Patrick Booth
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, CA  94710

Aaron J, Fischer
2001 Addison St., Ste 300
Berkeley, CA 94704

Anne Hadreas
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA  94612

**Re:**   **Third Status Report Pursuant to Paragraph 12 of the Mays Consent decree**

Dear Counsel:

Paragraph 12 of the Consent Decree requires the County to provide to Counsel and the Court appointed experts a status report 180 days after the consent decree was finalized and every 180 days thereafter. By and through this letter and the attached documents, the County is providing the Third Status Report.

In the prior status reports, the County noted that working to mitigate the spread of the COVID-19 pandemic took a tremendous amount of staff time and focus. This work continued through the beginning portion of this monitoring period as well. During January and February, the County detected, treated and halted a predominately asymptomatic outbreak of COVID-19 in the County's correctional systems. By March, this outbreak was largely contained in no small part to the County's efforts to roll out vaccines to staff and inmates.

The County has paused the active planning for new construction for an annex to our Main Jail. During this pause, the County continues to work with the consultants Nacht and Lewis to determine the numbers of inmates that can be held and meet constitutional standards in our system.

Prison Law Office
Disability Rights California                    -2-                        July 7, 2021

    For the County's complete report on the status of compliance on specific
aspects of the Consent Decree, please see the attached documents from
Correctional Health and the Sheriff's Department.

    Should you have any questions or concerns regarding this report, please
do not hesitate to contact me directly.

                              Sincerely,

                              LISA A. TRAVIS
                              County Counsel


                      By:  _____
                              Rick Heyer
                              Supervising Deputy County Counsel

Attachments

cc:    Madeline Lamarre (*via email only*)
       Karen Saylor (*via email only*)
       Mary Perrien (*via email only*)
       Lindsay Hayes (*via email only*)


2145438

ATTACHMENT 1



Primary Health Division
Department of Health Services

# Adult Correctional Health
# REMEDIAL PLAN STATUS REPORT
June 23, 2021

The Consent Decree was approved by the federal court on January 13, 2020.  Every 180 days, the county is required to issue a status report which is sent to Class Counsel and the appointed medical and mental health experts.  This report covers the period of January 2021 – June 2021.

The report covers:

- Staff challenges
- Progress on the following remedial plan provisions – general, medical, mental health, and suicide prevention
- Brief updates on facilities and county efforts to reduce the jail population.

Work on the remedial plan is intensive but extremely worthwhile.  It will enable staff to provide services that are timely, necessary, and adheres to outlined remedial plan provisions.  This work constitutes a paradigm shift from the pre-consent decree period that was based on episodic urgent care with inadequate policies, protocols, and staffing.  Since this is a dynamic process, work continues to evolve, and change must be incorporated at each step.

## CHALLENGES IMPACTING REMEDIAL PLAN WORK

Challenges to completion of remedial plan work include work force issues, space, culture change, and COVID-19 management.

| Work Force Issues |
| --- |

Work force issues impact remedial plan work.  These are listed below. Progress occurred during this period and more is anticipated in the next monitoring period.

Leadership Positions filled since last report –

- Medical Director began work December 31, 2020. This is a key position for medical direction, policy/protocol development, and physician recruitment.
- Acting Mental Health Program Director was appointed by UC Davis into a permanent position effective March 2021.

Leadership and Administrative Positions that are vacant –

- Adult Correctional Health (ACH) Chief retired effective March 2021.  A candidate is pending background clearance and completion of processing. The position's working title will be changed to Health Services Administrator.  Once the person is on-boarded, all service line managers with the exception of quality improvement (QI), will report to this position.  QI will also transition at some point.
- Two new administrative positions are also in the interviewing process:  Administrative Officer III (Electronic Health Record) and Administrative Officer II (contracts/procurements).
- Supervising Case Management Nurse was recently vacated.  Recruitment is in process.

Recruitment –

- Recruitment of medical staff is an ongoing challenge due to market demands for these disciplines.  Additionally, a series of long-term provider and nursing staff retirements offset staffing gains.
- Physician advertising was increased and physician rates were modified in the registry contracts.
- County labor agreements will expire at the end of June.  The contract involving physicians is in negotiation.  A salary study was completed and distributed.  Increasing compensation will assist in recruitment.
- Mental health contractor also reports challenges with staff recruitment.

Change Management / Culture change –

There is overlapping significant change which impacts staff ability to absorb information and rolling out training.  Some employees are not used to the transition to new standards or patient centered care which means supervisors face challenges of training, coaching, and/or personnel

2

actions.  In order to assist with the culture change and accountability, several actions have been taken since ACH moved from Sacramento Sheriff's Office (SSO) to Department of Health Services (DHS):

- <u>Position Standards</u> have been developed for many positions, some are still in development or need to be created.
- <u>ACH Code of Conduct</u> and <u>Safety & Security Guidelines</u> forms requiring review/signature were created for all new hires and articulate standards.  Additionally, ACH now requires annual personnel evaluations.
- <u>Policy and Procedure Manuals</u> are in various stages of development.  All policies are posted for staff on the intranet.
- <u>Training Plan</u> was created.  While still in its infancy, it outlines key training requirements and will be updated as indicated.  A shared drive has also been created for materials. Managers introduced more training during this period.
- <u>Quality Improvement Team</u> and QI policy was developed. QI subcommittees are being phased in.
- <u>Data tracking and reports</u> are still fairly new for ACH but a key component of QI and culture change.  Reports are being phased in as able.  The electronic health record (EHR) has some limitations.
- <u>Communication</u> – Efforts to increase staff communication are multi-faceted (posted policies/forms on a dedicated ACH intranet page, monthly staff newsletter, and expectation of consistent staff meetings).  Articles in the newsletter focus on new practices and patient care.

| Space |
|---|

Sufficient space to provide the necessary services within the remedial plan is a challenge.  Some spaces are very limited within the jail facilities and require construction or additional space.  A few examples are listed below:

- Booking area lacks private interview space.  There also needs to be an area for close observation of withdrawal symptoms and monitoring patients with acute mental illness or suicide risk.
- Medical staff need a medical clinic space and a unit with beds for monitoring substance use withdrawal.
- Mental health needs a larger space for the acute psychiatric unit with individual/group treatment rooms.

Space is addressed in this report in the Medical and Mental Health sections and in the planning section at the end of the report.  Staff work with custody to modify space where feasible for assessment, treatment, or staff use.

3

Class Counsel has requested a staffing and space analysis which will occur during the next monitoring period.  Additionally the County has hired a consultant to review jail population and to focus on efforts to reduce the population.

| COVID-19 Management |
|---|

Staff developed the initial COVID-19 Staff Guidance on March 2, 2020 and began COVID-19 management strategies with SSO.  The latest revision of the staff guidance was completed on May 17, 2021.  In addition to the main guidance, there are several other COVID-19 related documents on the ACH COVID-19 Webpage.  These serve as key resources for staff.

Medical staff were fully engaged in daily COVID-19 management during the first two months of this monitoring period.  *Medical staff began to experience some relief beginning March 2021 after the outbreak resolved and transmission rate in the community began to decrease.*

Despite the low numbers of confirmed cases, staff continue to adhere to protocol which means quarantine is in effect for all new arrivals/transfers which is a substantial number daily to manage at both facilities.  Those with confirmed cases are housed in isolation.

COVID-19 management strategies are team based strategies.  There has been extensive collaboration with SSO on daily management including regular meetings to review progress, obstacles, and changes in practice.  Additionally, ACH leadership meets with the Public Health Officer and designated staff to review data and/or ask questions.

COVID-19 Data Dashboard was developed in August 2020.  This information depicts point-in-time data and is updated weekly.  The data has been important for monitoring, retooling efforts, and communication.  The latter occurs within the county and is also sent weekly to the Plaintiffs' Counsel and experts.

| Weekly COVID-19 Data as of June 23, 2021 |
|---|
| Total number of COVID-19 tests since March 2020: 17,811 *(Net increase = 251)* |
| Total number of confirmed COVID-19 cases since March 2020: 1,814 *(Net increase = 2)* |
| Total number of confirmed COVID-19 cases during the intake observation/quarantine period since March 2020:  393 *(Net increase = 1)* |
| Total number of COVID-19 positive inmates currently in custody: Main Jail – 0 / RCCC – 2 |
| Total number of COVID-19 related deaths:  0 |
| SSO COVID-19 Link: *https://www.sacsheriff.com/pages/covid19.php* |
| |
| Net increase of weekly new cases and total confirmed cases in custody remains low. See charts below for period of April 14, 2021 – June 23, 2021: |



COVID-19 Vaccination process began for staff late January and inmates March 2021.  Vaccination is critical to maintaining a safe working environment for patients, inmates, staff, and visitors.

The Janssen "pause" and associated media impacted administration of the Janssen and other vaccines.  Additionally, media noting lifting of criteria and reduced transmission within the facilities also played a role.  Inmates also shared with peers that if you get vaccinated you will be transferred to prison sooner.  The number of inmates being vaccinated has considerably slowed down. Inmates, similar to members in the community, have vaccine hesitancy.

In support of the health/SSO protocols, the Public Defender created a flyer to support COVID-19 vaccination and encourage inmates to ask questions.

Inmate Vaccination Data

As of 06/23/21, 1,628 inmates received at least one COVID-19 vaccine dose.  Of those inmates, 1,365 are fully vaccinated.   This is a cumulative number since the inmate vaccination program began on 01/29/21.  Interest in vaccination has declined significantly since the Janssen pause for all vaccines.  The media on this issue plus declining case rates/reopening hampered progress.

ACH and SSO are discussing incentives for inmates to become fully vaccinated.  An incentive program will begin in July.

Staff Vaccination Data

As of 06/23/21, 438 health care and SSO staff received at least one COVID-19 vaccine dose and 423 are fully vaccinated.  This data does not include staff who received vaccines offsite or mental health staff who received vaccines through UC Davis.

## GENERAL PROVISIONS (Section II. – III.)

| Staffing (Section II. Provisions A.B.) |
| --- |
| Status:  Partial Compliance |

Per County's agreement with Class Counsel, there is a multi-year staffing plan.  County began to add staff and/or contract augmentations prior to the finalization of the Consent Decree (January 2020).   The following tables outline staffing resource enhancement efforts to date.

| Health Care Staffing Augmentation | |
| --- | --- |
| **Fiscal Year** | **Staffing** |
| FY 2018/19 (Midyear) | 12 FTEs<br>• 1 FTE Physician<br>• 1 FTE Dentist<br>• 1 FTE Pharmacist<br>• 1 FTE Pharmacy Technician<br>• 4 FTE Registered Nurses (RN)<br>• 4 FTE Licensed Vocational Nurses (LVN) |
| FY 2019/20 | 12.0 FTEs<br>• 4 FTE Quality Improvement (QI) Team –<br>  1 Planner, 1 RN, 2 Administrative Services Officer I<br>• 4 FTE – 2 Physicians, 2 Medical Assistants (MA)<br>• 2 FTE Supervising RNs<br>• 2 FTE Senior Office Assistants (SROA) |
| FY 2020/21<br><br>*Budget hearings were delayed until September.* | 13.0 FTEs<br>• 2 FTE Physicians *(midyear)*<br>• 5 FTE Registered Nurses (3 sick call, 1 discharge planning, 1 chronic care)<br>• 1 FTE Medical Assistant<br>• 1 FTE Dental Hygienist (replaces registry staff)<br>• 1 FTE Pharmacist<br>• 1 FTE Pharmacy Technician<br>• 1 FTE Administrative Services Officer III (Electronic Health Record)<br>• 1 FTE Administrative Services Officer II (Contracts) |

6

| Health Care Staffing Augmentation | |
|---|---|
| Fiscal Year | Staffing |
| FY 2021/22 | 29.0 FTEs<br>• 2.0 FTE Supervising Registered Nurse (Infection Prevention Coordinator to replace behind the RCCC SRN position / Nurse Educator)<br>• 6.0 FTE Registered Nurses (Sick Call – 2, Chronic Care – 3, QI - 1)<br>• 9.0 FTE Licensed Vocational Nurses (Infection Prevention – 2, Pill Call - 2, Pill Call/Medication Assisted Treatment Program – 4, Discharge Planning - 1)<br>• 1.0 FTE Medical Assistant (Discharge Planning)<br>• 1.0 FTE Pharmacist (expansion of hours)<br>• 1.0 FTE Pharmacy Technician (expansion of hours)<br>• 6.0 FTE Registered Dental Assistants (replace registry staff)<br>• 1.0 FTE Planner (remedial plan support)<br>• 2.0 FTE Senior Office Assistants (medical records) |

Health care staffing (medical/administrative) is critical for two reasons. One, staff are needed to provide the range of services required in the consent decree. This moves the program from episodic urgent care to comprehensive services. Two, there has historically been a high reliance on temporary or per diem staffing. Heavy use of temporary staff does not lend itself to building strong teams or coordination within teams. It is also hard to maintain consistency with protocols and workflows within a large, complex, and highly evolving dynamic.

The county permanent positions do not include county on-call, registry or contract positions. The staffing enhancement decreases the need for temporary staff. See "Challenges" section for additional information.

| Mental Health Contract Augmentation | | |
|---|---|---|
| Fiscal Year | Program Additions | Facility |
| FY 2017/18 | 20 Intensive Outpatient Program (IOP) Beds (male) | Main Jail |
| FY 2018/19 (Midyear) | 24/7 Licensed Clinical Social Worker (LCSW) Coverage | Main Jail |
| FY 2019/20 | 15 IOP Beds (female)<br>24 IOP Beds (male)<br>24/7 LCSW Coverage | Main Jail<br>RCCC<br>RCCC |
| FY 2020/21 (Midyear) | Enhanced Outpatient Mental Health Services for the Outpatient Psychiatric Pod. Includes mental health services, medication evaluation and monitoring, case management, and discharge planning. Adds a new level of service. Will serve approx. 125 patients at any given time. | |

| Mental Health Contract Augmentation | | |
|---|---|---|
| Fiscal Year | Program Additions | Facility |
| FY 2021/22 | Enhanced outpatient (EOP) mental health services in the Outpatient Psychiatric Pod (OPP) will be expanded to provide services to an additional 150 patients requiring intensive services.  This expansion will bring the total patients served to 275 patients from the 125 patient program previously approved in the FY 2020/21 budget. | |

Mental health services are provided under a contract with UC Davis Department of Psychiatry.

Next Steps for Medical/Mental Health Staff

New positions were approved by the Board of Supervisors June 10, 2021 and staff should receive the positions in July.

Class Counsel has asked for a staffing analysis and report of the necessary human resources needed in order to fulfill the remedial plan.  This will be completed in the next monitoring period.

| Mental Health Data Posting (Section II. Provision C.) Status:  Substantial Compliance |
|---|

Point-in-time data reports are posted quarterly with email notification to Class Counsel.  See SSO Transparency/Corrections Consent Decree: https://www.sacsheriff.com/pages/transparency.php.

A brief summary of the report data is located in the following table.

| Report Point-in-Time | 1/6/20 | 4/6/20 | 7/6/20 | 10/5/20 | 1/4/21 | 4/5/21 |
|---|---|---|---|---|---|---|
| Census | 3,511 | 2,721 | 2,673 | 3,093 | 3,275 | 3,372 |
| **Mental Health** | | | | | | |
| No mental health condition | 1,737 (50%) | 1,211 (44%) | 1,172 (44%) | 1,187 (38%) | 1,211 (37%) | 1,231 (37%) |
| MH non-SMI[*] diagnosis | 890 (25%) | 805 (30%) | 867 (32%) | 1,111 (36%) | 1,141 (35%) | 1,237 (37%) |
| SMI | 884 (25%) | 705 (26%) | 634 (24%) | 795 (26%) | 923 (28%) | 904 (27%) |
| **Behavioral Health Services** | | | | | | |
| *Outpatient Mental Health* | | | | | | |
| Open | 31 (8%) | 38 (7%) | 32 (6%) | 28 (4%) | 27 (4%) | 32 (5%) |
| Discharged | 355 (92%) | 535 (93%) | 547 (94%) | 656 (96%) | 708 (96%) | 647 (95%) |
| *Full Service Partnership (FSP)* | | | | | | |
| Open | | 13 (21%) | 18 (28%) | 32 (34%) | 32 (30%) | 37 (33%) |
| Discharged | | 50 (79%) | 47 (72%) | 63 (66%) | 73 (70%) | 75 (67%) |

*SMI = serious mental illness

Notes:
- Outpatient Mental Health data for 1/6/20 also includes crisis and inpatient.
- All reports except 1/6/20 were completed during COVID-19 pandemic operations.
- Percentage of SMI population incarcerated varies from 24% – 28%.

8

- Percentage of MH Non-SMI population incarcerated gradually increased during the pandemic (30% – 37%).
- Patients currently open at county mental health services in the community remains consistently low.  Most were discharged from service.  See *County Efforts to Reduce the Jail Population* for services that are active or in development at the end of this report.

## Americans with Disabilities Act (ADA) Compliance

Staff have created and/or revised key policies, electronic health record templates, developed PowerPoint training, and are completing training.  Where indicated (*in revision based on feedback*), staff received feedback from Class Counsel or Medical Experts and are in the process of policy revision.

| Policies and Procedures (Section III. Provision A.) |
| --- |
| Status:  Substantial Compliance |

Policies:

- ACH PP 01-09 Grievance Process for Health/Disability Complaints (revision 04/08/21) – *in revision based on feedback*
- ACH PP 06-02 Patients with Disabilities (12/01/20)
- ACH PP 06-03 Effective Communication (revision 03/12/21)
- ACH 06-04 Interpretation Services (revision 04/05/21)
- ACH 06-05 ADA Coordination (revision 04/05/21)
- ACH 06-06 Patients with Disabilities or Other Significant Health Needs (revision 04/05/21)
- ACH 06-07 Health Care Appliances Assistive Devices and Durable Medical Equipment (revision 04/05/21)

Forms:

- Grievance Form and Appeal Form (revision 04/08/21)
- Disabilities Template (EHR)
- Effective Communication Template (EHR)

See last ADA provision for training information.

| ADA Tracking System (Provision B.) |
| --- |
| Status: Partial Compliance |

- Staff have developed electronic health record templates to document disabilities and accommodations.  These forms permit ongoing changes if accommodations need to be modified.
- There is a designated clerical staff member that maintains a log of any correspondence sent from external agencies providing notification of an individual with ADA needs. A

medical assistant (MA) has been assigned to review the EHR and verify accommodations have been provided. If not, the MA notifies nurse and/or provider to assess patient.

- SSO is pending the ATIMS go live for ADA tracking and identification.  Staff have worked on an interface between these two systems.  Until the electronic data fields are solidified and testing has begun, ACH cannot assess visibility and use for health staff.

---

**Screening for Disability and Disability-Related Needs (Provision D.)**
**Status: Partial Compliance**

Policies:

- ACH PP 05-05 Nurse Intake (revision 06/03/21)
- ACH PP 06-02 Patients with Disabilities (12/01/20)

Other:

- Nurse Intake policy revision is substantial and was recently approved along with the electronic forms.  Staff will need to provide training and QI will provide audits.
- The RN Intake includes essential electronic forms on disabilities, accommodations, and effective communication.
- The RN is required to send referrals to mental health for post-intake assessment of psychiatric, developmental, or intellectual disabilities.

---

**Health Care Appliances, Assistive Devices, Durable Medical Equipment (Provision F.)**
**Status: Partial Compliance**

Policy:

- ACH 06-07 Health Care Appliances Assistive Devices and Durable Medical Equipment (revised 04/05/21)

Other:

- Electronic forms were completed to assist in identification and tracking of assistive devices and Durable Medical Equipment (DME).
- Policy and EHR forms were modified to allow providers to select "other" when ordering assistive devices/DME in addition to the pre-determined list.

---

**Effective Communication (Provision I.)**
**Status:  Partial Compliance**

Policy:

- ACH PP 06-03 Effective Communication (revision 03/12/21)

10

Other:

- While staff historically documented in the narrative, it was inconsistent. Development of the policy and an electronic form will assist in identification and tracking of patients' effective communication needs.
- The EHR has been reconfigured such that the Effective Communication form is the first form to be completed in all clinical encounters.

---

| Effective Communication and Access for Individuals with Hearing Impairments (Provision J.) Status:  Partial Compliance |
|---|

Policies:

- ACH PP 06-03 Effective Communication (revision 03/12/21)
- ACH PP 06-04 Interpretation Services (revision 04/05/21)

Other:

- County has *LanguageLine InSight* Video Interpreting for provision of Sign Language Interpretation (SLI) services to individuals with hearing impairments.  Necessary icon is available to access the application on designated computers.

---

| Disability-Related Grievance Process (Provision K.) Status: Partial Compliance |
|---|

Policy/Form:

- ACH PP 01-09 Grievance Process for Health/Disability Complaints (revised 04/08/21) – *in revision based on feedback*
- Grievance Form and Appeal Form

Other:

- Grievances are tracked.  With the addition of the electronic forms, it will permit more accurate tracking.

---

| Transportation (Provision N.) Status: Partial Compliance |
|---|

Policies:

- ACH PP 04-09 Medical Transportation – *in revision due to feedback and process update*
- ACH PP 06-06 Patients with Disabilities or Other Significant Healthcare Needs (revised 04/05/21)
- ACH PP 06-07 Health Care Appliances, Assistive Devices, and Durable Medical Equipment (revised 04/05/21)

| Prisoners with Intellectual Disabilities (Provision O.) |
| :--- |
| Status: Partial Compliance |

Policy:

- ACH PP 05-05 Nurse Intake (revision 06/03/21)

Other:

- Nurses, through the intake process, may gather information through screening, past history, third party or observation noting possible intellectual disability.  Nurses refer to mental health staff for an assessment and treatment plan.
- MH will draft a policy for assessment of intellectual disability.

| ADA Training, Accountability, and Quality Assurance (Provision P.) |
| :--- |
| Status: Substantial Compliance |

Training:

- ADA and Effective Communication Training and Documentation PowerPoints were developed and approved.
- Training completed for case management and quality improvement nurses in late December 2020.  Training began in the jail facilities in March 2021.  Training is mandatory for all ACH staff, including contracted mental health staff, in the jails as well as administrative positions (case management and quality improvement) working offsite.
- As of May 24, 2021, staff have completed nine (9) trainings that included 173 staff.

Tracking:

- Grievances, including those for disabilities and effective communication, have been tracked.  Tracking is more specific post policies and forms.
- Staff have developed a tool to audit disabilities, accommodations and effective communication.  The first audit was completed in June.  Audits will be scheduled periodically and data/trends will be reviewed for errors, systemic issues, and opportunities to improve detection and create individualized care plans.  Data will be reviewed at the Quality Improvement (QI) meeting.

## AREAS OF FOCUS FOR THIS MONITORING PERIOD

Adult Correctional Health continues to work toward improving access and services as outlined in the remedial plan.  Where indicated (*in revision based on feedback*), staff received feedback from Class Counsel or Medical Experts and are in the process of policy revision.

## MEDICAL CARE [Remedial Plan Section VI]

Class Counsel outlined five areas for focus including the intake screening, sick call system, chronic care, specialty care, and roll out of the new electronic health record (EHR) system.  These are shaded in blue. The remainder of provision sections are not shaded and were not an area of focus.  Status is listed for each provision.

| Intake Screening (Provision B.) |
| Status:  Partial Compliance |

Policies:

- PP 05-05 Nurse Intake (06/02/21) was recently revised.  This is a substantial revision with many key changes.
- PP 05-13 Initial History & Physical Assessment (04/09/21) and the revised Nurse Intake policy specify referral criteria and timeframes to ensure patients are seen post-intake based on their medical needs and acuity.

Forms:

- Nurse Intake electronic health record (EHR) forms were significantly revised based on expert reports and are in testing.  A check box was added to confirm prior history review from the electronic record.  Key screenings were expanded including suicide risk inquiry and screening for disabilities and effective communication needs.
- A Nurse Intake Workflow (for EHR) is in testing and should be completed this month.  It will be used for staff training and reference.

Implementation:

- The revised Nurse Intake Policy and form will be implemented in July post training.

Other:

- See Nurse Intake policy for medication verification.  Staff continue to work on an interface called Carequality which provides coordination of care data such as medication.  (The Carequality interface is ready and pending a workflow.)  The intake process was changed to ensure that nurses order an essential medication review when indicated.
- Nurses are required to be trained annually. This training requirement is included in the PP 03-08 Staff Development and Training (revised 11/30/21).  Additionally, nurses assigned to the intake process receive training when there are changes to the policy and/or form.
- QI staff will develop an audit tool for the revised Nurse Intake.  Will begin regular reviews to provide data and feedback.

Space:

- Through space planning meetings, ACH and SSO have agreed to designate space in the Main Jail on 2 East. This means the screening (fit for incarceration) will occur in the booking intake area and those inmates who are not released will receive the comprehensive intake interview on 2 East.  This space has privacy and is less frenetic than the booking loop.  The work stations have been ordered and delivery is expected in about 5 weeks.  Installation should be fairly quick.
- Nurse screening occurs in the booking/intake area.  The second part of the Nurse intake is a comprehensive interview.  Facility and process modifications are in process to move the second part of the intake to the Main Jail second floor.  This will permit privacy.
- ACH, SSO and Facility Management participate in ongoing meetings to modify medical areas on 2 Medical and 2 East to utilize space more efficiently to provide patient care.

| Access to Care "Sick Call System" (Provision C.) |
| --- |
| Status: Partial Compliance |

Policies:

- PP 05-09 Health Service Requests (revision 04/29/21) includes key components as noted in the remedial plan.
- PP 06-16 Medical Sick Call (revision 05/19/21) to include feedback from Class Counsel.

Other:

- Designated staff are responsible to ensure adequate provision and nursing picks up health service requests (HSRs) at least twice daily.
- The HSR form was revised to include Class Counsel feedback including more space for patients to write.
- Policy and forms were modified to end the practice of prohibiting patients from reporting or inquiring about multiple medical needs in the same appointment.
- Staff have developed an audit tool for timely access to services.
- Per Custody, SSO received additional staff for escorts.  Some are in background clearance.
- Confidential HSR lock boxes (separate from the Grievance boxes) were installed at RCCC and pending installation at Main Jail.

| Chronic Care (Provision D.) |
| --- |
| Status: Partial Compliance |

Policies & Provider Guidelines:

- PP 05-18 Chronic Disease Management (05/12/21).
- PP 05-19 Hepatitis C Testing and Treatment (05/12/21).  The policy was revised on 06/09/21 to incorporate plaintiffs' counsel feedback.  It will be modified again since

additional feedback was received.  Staff need to phase in "opt out" testing in July.  Nursing has been ensuring continuity of care for patients released/transferred.

- PP 05-20 Diabetes Management (06/03/21).
- Provider Treatment Guidelines were developed for: Hypertension (05/10/21), Diabetes Management (06/02/21) and HIV/AIDS (06/02/21).  Additional guidelines will be developed.
- In addition to the above policies, the following two policies were revised/created: PP 05-05 RN Intake (revision 06/02/01) and PP 05-13 Initial History and Physical Assessment (04/09/21).  These are critical assessments that begin the identification and treatment of chronic disease.

Implementation:

- The chronic disease management related policies and guidelines are newly developed. They are being *phased in* with training and the addition of provider and nurse staff. Nursing recently dedicated two staff to chronic care and received budget approval for additional nurses for FY 2021/22.
- Contract has been executed for a specialist to provide an onsite Gastroenterology and Hepatology Clinic weekly.  Start date for the weekly clinic is pending.
- A primary care provider with additional training in HIV will staff a weekly HIV Clinic starting in late June.  Infectious disease consultation is also available through RubiconMD or contracted off-site Infectious Disease specialist as clinically indicated.

Other:

- Providers have been trained to use RubiconMD (e-consult service with access to numerous specialists).
- Medical Director has been providing training for providers and began to maintain training rosters in May.  Medical Director will continue regular staff meetings and trainings.
- Staff recently developed reports that can be pulled on chronic conditions and labs which will help with chronic disease management.
- Staff will develop an audit tool for adherence to policy and timelines.  Will begin audits in the next monitoring period.

| Specialty Care (Provision E.)<br>Status: Partial Compliance |
| --- |

Policies:

- PP 04-08 Specialty Referrals (revision 06/11/21) – *in revision based on feedback.*

Other:

- InterQual, evidence based guidelines, were implemented in late March 2021.

- RubiconMD, an e-consult service, was implemented. This permits access to numerous specialties.
- ACS, a contractor that provides some onsite services, is making some service improvements.  These include replacing the existing dialysis machines with equipment that allows for faster and more up to date treatment, replacing the ultrasound equipment that has newer technological capabilities, and will begin an on-site physical therapy clinic. A date for the Physical Therapy Clinic is pending but is anticipated in July.
- Also see Chronic Care section.

Tracking:

- The Specialty Services Referral Log was developed and is in production.  A workflow was created and staff were trained.  The form will be live in the EHR effective July.
- Will begin audits in the next monitoring period on the timeliness of referrals including patients who need to see a primary care provider due to the delay of a specialty consultation appointment.
- Staff will begin to complete the twice annual audits of specialty care referral logs.  The initial base line audit will be completed in July.

| New Rollout Electronic Health Record System (Provisions B.4, C.6-8, D. 1., 6-7), I.1-5), N.6 Status:  Partial Compliance |
|---|

The electronic health record remains challenging and does not meet workforce needs for data tracking and reporting.

- Key interfaces such as Apollo Lab, Dental Radiology, and Inmate Picture remain incomplete.  Staff are working on a workflow and launch date for Carequality.
- Changes in EHR templates or creation of reports is time consuming.
- Staff developed a document called, *Electronic Health Record: Current Status,* for the Medical Expert document request.   This document outlines the status of interfaces/modifications, encounter and form development, reports and training.   It describes estimated completion dates where available.

Despite all of the efforts, this EHR product remains difficult to navigate and is time consuming for end-users.   Changes do not move quickly whenever the vendor must be involved.  For these reasons, staff will look at other products.

Key position vacancies have hampered work on the EHR

- Health Services Administrator (hire in process)
- Administrative Officer III EHR (interviews in process)
- Department of Technology (DTECH) business analyst (staff pending start date)

Staff have continued to adjust EHR workflows and add or modify templates as new protocol or policies are rolled out. The EHR system replacement will be areas of focus for the Health Services Administrator and ASO III positions.

## MEDICAL PROVISIONS: OUTSIDE AREAS OF FOCUS

The remainder of this section outlines the status for items that were not areas of focus during this monitoring period.  Where indicated (*in revision based on feedback*), staff received feedback from Class Counsel or Medical Experts and is in the process of policy revision.

> Medication Administration and Monitoring (Provision F.)
> Status: Partial Compliance

Staff have created and/or revised policies for medication administration and monitoring.

Policies:

- ACH PP 04-17 Medication Administration (revised 10/30/20) – *in revision*
- ACH PP 04-18 Pill Call (initial 10/30/20) – *in revision*
- ACH PP 04-19 Over the Counter Medications (revised 10/30/20)
- ACH PP 04-20 Keep on Person Medications (revised 10/30/20) – *in revision*
- ACH PP 04-02 Insulin Administration (initial 08/19/20)

Quality Improvement:

- ACH PP 01-13 Pharmacy and Therapeutics Subcommittee (revised 06/23/21)
- ACH PP 02-04 Medication Incident Reporting (02/19/21) and form

Other:

- PP 04-17 Medication Administration and PP 04-18 Pill Call are being modified to increase effectiveness of medication administration and decrease time lag.  A section will be added to the policy for patients that are off-site due to court or other engagements.  The policy changes should be completed in July.  Training will precede implementation.  In addition to policy changes, several key changes have been completed or are in process including: changes in pill call nurse and pharmacy schedules, ordering new pill carts, reassigning some tasks, and improving the network capacity.  Additional medical escorts are required to ensure efficient operations.
- PP 04-20 Keep on Person (KOP) Medications is in revision.  Medical staff are engaged in meetings with custody representatives to discuss adding inhalers and other medications to the list of KOP medications. Staff will need to create a consistent data entry field or form within the electronic health record to track KOP medications.
- QI Data is compiled and presented in the Pharmacy and Therapeutics Subcommittee for review and recommendations.  Data is also presented to nursing leadership.

| Patient Privacy (Provision H.) |
| Status: Partial Compliance |

Policies:

- ACH PP 08-01 Safeguarding Protected Health Information (revision 06/03/21) clarifies the process for hand-carried patient information in a sealed envelope.
- ACH PP 08-03 Release of Protected Health Information (01/10/20)
- ACH PP 08-08 Patient Privacy (revision 05/13/21)

Other:

- Electronic Health Record template will be modified to include documentation through a radio button the specific reason for a non-confidential encounter for medical staff.
- Certain areas within the existing jail structure lack privacy, such as the Nurse Intake area within the booking loop.  After a series of meetings with custody, another area will be designated for this purpose.  *See report section on Nurse Intake for detail.*
- Other space meetings will focus on any other areas which can be made available for nurse or physician encounters.  Space is currently very limited with one exam room on most floors of the Main Jail.

| Utilization Management (Provision J.) |
| Status: Partial Compliance |

Policies:

- ACH PP 01-14 Utilization Management (03/25/21) – *in revision based on feedback*
- ACH PP 04-08 Specialty Referrals (revision 06/11/21) – *in revision based on feedback*

Other:

- Case Management staff began using InterQual as the Utilization Management platform for specialty referrals late March 2021.

Other:

- The Supervising Case Management Nurse retired in May.  Temporary coverage is in place while recruitment is in process.
- A Utilization Review Subcommittee will be created in the next monitoring period.
- A tool will be drafted early in the next monitoring period for audits as noted in PP 01-14 Utilization Management.

---
Reproductive and Pregnancy Related Care (Provision L.)
Status: Substantial Compliance

---

Policies:

- ACH PP 02-03 Female Reproductive Services (revision 10/16/20) – *in revision based on feedback*
- ACH PP 05-04 Pregnancy Testing (initial 04/16/20)
- ACH PP 06-01 Lactation Support (initial 04/22/20)

Other:

- ACH contracts with UC Davis for OB/GYN services.  Services are provided onsite at least once weekly.
- Through a contract with UC Davis, OB/GYN Family Planning Center provides comprehensive counseling and timely assistance in accordance with expressed desires regarding pregnancies (whether to keep the child, use adoptive services, or have an abortion).

---
Transgender and Non-Conforming Health Care (Provision M.)
Status: Partial Compliance

---

Policy:

- ACH PP 05-12 Transgender and Gender Nonconforming Health Care (04/09/21).

Other:

- For continuity of care, patients who are identified as receiving hormone treatment from a community licensed provider continue the medication while incarcerated.  A provider will assess the patient and include the medication as part of the patient's treatment plan while incarcerated.
- Staff training has not yet been developed on the WPATH Standards of Care.  Will review all mandatory training and prioritize for the new Educator position.

---
Detoxification Protocols (Provision N.)
Status: Partial Compliance

---

The following policies and Standardized Nursing Procedures (SNP) were completed or revised during this monitoring period.

- ACH PP 05-17 Alcohol Withdrawal Treatment (revision 06/10/21)
- ACH PP 05-15 Opiate Withdrawal Treatment (initial 04/21/21)
- ACH PP 05-14 Benzodiazepine Withdrawal Treatment (revision 04/15/21)
- SNP Alcohol Withdrawal Syndrome Treatment (revision 06/10/21)
- SNP Opioid Withdrawal Treatment (revision 04/21/21)

- SNP Benzodiazepine Withdrawal Treatment (revision 06/23/21)
- MH PP 07-03 Use of Benzodiazepines (revision 04/15/21)

Substance Use Disorders (SUD) Policies:

While substance use disorders are chronic health conditions and may not belong in this section, development of these policies was important to ensure patients receive proper treatment and are not withdrawn from medication that is beneficial.

- ACH PP 05-02 Medication Assisted Treatment (revision 02/11/20) – *in revision*
- ACH PP 05-06 Methadone Treatment (06/24/20) – *in revision*
- ACH PP 05-07 SUD Counselor (06/24/20)

Other:

- Alcohol Withdrawal PP and SNP were recently revised to ensure continuity across these practices.  Other SUD policies require updates to reflect changes in practices.
- Electronic Health Record templates were revised to capture the latest changes.
- Medical Director would like to begin use of Buprenorphine taper for withdrawal management but is pending additional staffing that is consistent.
- Additional nurse staffing was approved as part of the budget for assistance with MAT pill call and care management.
- Medical and Custody leadership has designated a space for withdrawal management. This will permit better observation and monitoring of patients.  Medical staff will have further discussion with custody to determine when the space will be ready for use.

| Nursing Protocols (Provision O.) |
| --- |
| Status: Substantial Compliance |

In order to ensure nurses act within their scope of practice, several items have been completed.

- <u>Standardized Nursing Procedures (SNP)</u> have been either created or revised.  They include SNPs in the functional areas listed below.
    - General (1)
    - Abdominal (1)
    - Cardiovascular & Lung (7)
    - Dental (1)
    - Endocrine (1)
    - Eyes, Ears, Nose & Throat (5)
    - Infection Control (1)
    - Musculoskeletal (2)
    - Neurological (4)
    - Pregnancy (1)
    - Skin (12)

- – Substance Use Disorders (4)
- – Urological (5)
- Nurse managers are reviewing other areas that may require a SNP.
- Nurses are currently being trained and tested on the SNPs.
- Nursing Position Standards have been created or revised.  They include standards for the Senior Health Program Coordinator, Supervising Registered Nurse, Infection Prevention Coordinator, Registered Nurse, Licensed Vocational Nurse, and Medical Assistant.
- In late 2019, a Nursing Director was appointed to oversee the Senior Health Program Coordinators (nurse managers) responsible for nursing staff at respective jail facilities. This brings continuity to overall nursing services.
- There are regularly scheduled meeting with nurse managers (Senior Health Program Coordinators and Supervising Nurses) and staff meetings (direct nursing staff).  Meetings include training on policies, procedures or protocols; issues of concern; announcements; etc.
- Nursing has received positive acknowledgment from SSO representatives on emergency medical response and coordination following considerable training and use of a debriefing tool.
- Since nursing completes essential functions and operates 24/7, training and education is critical due to the complexity and breadth of tasks.  A Nurse Educator (civil service classification Supervising Nurse) position was recently approved.

| |
|---|
| Review of In Custody Deaths (Provision P.)<br>Status:  Substantial Compliance |

Policy:

- ACH PP 01-08 Medical Review of In-Custody Deaths (revision 03/11/21)

Other:

- Preliminary Medical Review process began in March 2021.  Medical Director is following the timeframes noted in ACH PP 01-08 Medical Review of In-Custody Deaths.
- Corrective Action Plans are created when indicated.

| |
|---|
| Reentry Services (Provision Q.)<br>Status: Partial Compliance |

Policies:

- ACH PP Discharge Medication (02/29/20) – *in revision based on feedback*
- ACH PP 05-10 Discharge Planning (revision 05/19/21) – *in revision based on feedback*
- MH PP 05-01 Discharge Planning (10/01/20) – *in revision*

Discharge Medication:

- Sentenced patients are provided a 30-day supply of medications when released. Presentenced patients are required to receive a prescription for a 30-day supply of medication at the County Primary Care Pharmacy.  This process was previously in place only for certain patients with a serious mental illness as referred by mental health staff. This process has not been piloted yet as envisioned due to provider shortage (for primary care and psychiatric prescribers).
- Other components of the pilot are ready:
    - Surescripts (pharmacy software for outpatient prescriptions) has been installed and tested.
    - Process between the correctional and primary care pharmacies has been outlined.
    - Primary Care pharmacy staff have access to EHR to confirm data.
- Pharmacy Director is completing a process review to determine why some sentenced patients do not receive medication prior to release.  He is also meeting with Medical Directors to plan a pilot for the presentence population.

Discharge Planning:

- Discharge policies will be revised based on feedback. Staff are problem solving some obstacles to improve discharge planning.  This requires work with custody and other team members. Staff are creating a workflow with a phase in process.
- Designated discharge planning nurses will work with patients with complex conditions to ensure there is continuity of care post release.
- ACH contracted with Sacramento Covered, a community based organization that provides health care navigation, to assist referred patients needing linkage for Medi-Cal (California's version of Medicaid), managed care health plan, primary care provider, etc.
- SUD Counselor works with referred patients on continuity of SUD treatment.
- Mental health are required to provide linkage of patients with a serious mental illness to County Mental Health Providers.  County Mental Health is working on linkage to the County's APSS Clinic for patients who are not connected with a provider and need medication management and other treatment services.
- Staff are also working with local health plans that will roll out a new benefit under a program called CalAIM.  This provides care management and coordination for patients with intensive health/mental health needs.  Many have difficulty navigating the multiple organized health systems to get the care that is needed.  This care management will be in person rather than telephonic.

| Training for SSO (Provision R.) |
| Status:  N/A |

- Refer to SSO.  Will collaborate with SSO on training as requested.

| Next Steps for Medical Remedial Plan Provisions |
|---|

There has been significant amount of work completed on medical remedial plan provisions during this monitoring period.  Numerous policies and protocols were created, hiring and/or work on positions is continuous, minor space modifications are completed as agreement is reached in meetings, electronic health record templates modified, and staff education is ongoing.   Much of the work was completed in the latter half of the monitoring period once the COVID-19 outbreak became contained.

Next steps for the new monitoring period include:

- Complete key policies or protocols that are in revision or draft form.
- Provide training and implementation for the new or revised policies developed in June.
- Create and complete audit tools for necessary areas.  This process will include feedback loops to staff and additional steps if needed (e.g., more training, process changes, etc.)
- Add a Utilization Review Subcommittee and add infection control to the Safety Subcommittee.  The latter will be focused on overall infection control and will not be solely focused on COVID-19.
- Complete an analysis of staff and space per the request of Class Counsel.

## MENTAL HEALTH CARE [Remedial Plan Section IV]

Class Counsel outlined five areas for focus including staffing, space planning, IOP, OPP, & Acute Bed assessment and planning, use of force for prisoners with mental health or intellectual disabilities, mental health and disciplinary measures, and roll out of the new electronic health record (EHR) system.  These items are shaded in blue.  The remainder of provisions are not shaded.  Status is listed for each.

| Staffing (Section II.  General Provision) |
|---|

- ACH has a contract with UC Davis to provide mental health services.
- See staffing section under General Provisions for a list of new services by fiscal year.

| Space<br>Status: Partial compliance |
|---|

- Seven new work stations were added at the Main Jail for the Enhanced Outpatient Program.
- Mental health met with custody representatives on 06/02/21 and 06/04/21.  These meetings focused on providing confidential assessment/screening spaces for patients that may need placement in mental health outpatient housing or programs.

- During these meetings, staff discussed reopening the Constant Observation unit.   This unit has been closed since the start of the COVID-19 Pandemic.  Currently here is not a projected opening date.
- Space for therapeutic groups was discussed and it was determined that the best time for these services is between 1900 and 2200 hours. Staff will use the outdoor recreation areas and the indoor day rooms.  Mental health staff have been identified to provide this service, but the change in staff schedules requires work with UC Davis human resources and labor relations prior to approving the change.

> **IOP, OPP, & Acute Bed Assessment & Planning (Section II. General Provision)**
> **Status: Partial Compliance**

- MH Administration met with custody to create new group therapy schedules that begin in the evening hours.  The new schedules will start in IOP and OPP once the meet and confer processes have been completed and staff have been notified of the change in work schedules.
- MH Administration has daily bed assignment/utilization meetings with custody to review movement between the IOP, OPP, & and Acute Unit. This includes admissions, discharges, and mental health recommendations for housing (when the patient is moved to general population).
- Staff are now able to obtain patient specific group attendance and the number of therapeutic hours per week through a newly created, Group Participation Report.  The report does not track group cancellations or reasons for cancellations. This data is being kept on a separate spreadsheet until the report function can be expanded.

> **Use of Force for Prisoners with Mental Health or Intellectual Disabilities (Provision V.)**
> **Status: Non-Compliance**

Policies:

- MH PP XX-XX Use of Clinical Restraints - Acute Inpatient Unit Policy DRAFT – *in review*
- ACH PP XX-XX Use of Restraints DRAFT – *in review*

Other:

- A policy and procedure for MH PP Use of Force is in development.
- A multi-disciplinary meeting (MH, Medical and SSO) is scheduled for 06/28/21 to discuss Use of Force/Restraints Policy draft.

> **Mental Health and Disciplinary Measures (Provision V.)**
> **Status:  Partial Compliance**

- Custody consults mental health providers concerning disciplinary measures when a patient is located in MH housing.

- The use of restraints outside of the Acute Inpatient Unit is addressed in the MH PP 07-04 Suicide Prevention Program Policy DRAFT.
- A policy on MH and disciplinary measures will be drafted in the next reporting period.

> New Electronic Health Care System (Provisions B.4, C.6-8, D. 1., 6-7), I.1-5), N.6

See EHR section under Medical.  Accomplishments solely related to mental health tracking are listed below:

- <u>Confidential Encounter Form</u> has been created and implemented. Documentation includes whether the assessment was in a confidential setting and rationale when the interview is not confidential.
- <u>Treatment plans</u> have been updated:
    - Records the duration of a group session
    - System bugs have been resolved to allow multiple goals within the treatment plan
    - Treatment forms have been reviewed and updated to reflect current practices
- <u>Provider Licensure</u> titles have been updated to correctly reflect the provider's title for sign-off.
- <u>MH Providers</u> can review all scheduled clinical encounters.
- <u>MH staff</u> have been identified to perform system acceptance testing for future EHR updates and improvements.

## MENTAL HEALTH PROVISIONS: OUTSIDE AREAS OF FOCUS

> Policies and Procedures (Provision A.)
> Status: Partial Compliance

Policies:

- MH PP 01-10 Access to Mental Health Services (04/17/20)
- MH PP 04-01 Intensive Outpatient Program (04/17/20)
- MH PP 04-02 FOSS Levels (12/16/20) – *in review based on feedback*
- MH PP 05-01 Discharge Planning (10/01/20)
- MH PP 07-01 Behavior Management Plan (09/16/20)
- MH PP 07-02 Treatment Planning (11/18/20)
- MH PP 07-03 Use of Benzodiazepines (04/15/21)
- MH PP 09-02 Lanterman-Petris-Short (LPS) Conservatorship (04/17/20)
- MH PP 09-03 Use of Safety Suits (05/24/21)
- MH PP 09-04 Administration of Involuntary Psychotropic Medication (revision 05/27/21).
- MH PP 09-05 Informed Consent-Acute Inpatient Unit (05/27/21)

Other:

- A basic description of MH services was developed and submitted for inclusion in the SSO "Inmate Handbook" on 04/15/21.

| Organizational Structure (Provision B.) |
| :--- |
| Status: Partial Compliance |

Policy:

- ACH PP 01-10 Organizational Charts (08/03/20) – *charts to be updated with new approved positions, change in position titles, and organization structure.  Other related policies will also be updated.*

Other:

- The MH Medical Director and Program Director oversee MH services.  These managers participate in a variety of meetings including Executive Team, Quality Improvement, Multidisciplinary, ad hoc meetings and regularly interface with medical and custodial leadership.

| Patient Privacy (Provision C.) |
| :--- |
| Status: Partial Compliance |

Policy:

- ACH PP 08-08 Patient Privacy (05/13/21) – *joint policy*

Other:

- MH staff document confidential encounters including rationale when it is not confidential.
- An audit was conducted on the documentation of confidential encounters.  As a result of the audit recommendations, MH has defined a drop-down menu of common reasons for lack of confidentiality for uniformity and data purposes.  This requires configuration.

| Clinical Practices (Provision D.) |
| :--- |
| Status: Partial Compliance |

Policies:

- MH PP 01-10 Access to Mental Health Services (04/17/20)
- MH PP 07-01 Behavior Management Plans (09/16/20)
- MH PP 07-02 Treatment Planning (11/18/20)
- MH PP 05-01 Discharge Planning (10/01/20)

Other:

- The nurse intake form has been substantially updated and will be implemented in July. See ACH PP 05-05 Nurse Intake (revision 06/03/21).
- There is a MH triage clinician assigned to emergent referrals for each shift.
- MH staff have access to the EHR which identifies all individuals who are receiving MH services at each facility.
- MH is working with EHR vendor to create reports for the amount of therapeutic out-of-cell activity per patient and program on the MH caseload. Estimated to be in production by end of June.

| Medication Administration and Monitoring (Provision E.) |
| --- |
| Status: Partial Compliance |

Policies:

- MH PP 07-03 Use of Benzodiazepines (04/15/21)
- MH PP 09-04 Administration of Involuntary Psychotropic Medication (revision 05/27/21).
- ACH PP 04-17 Medication Administration (revised 10/30/20) – *in revision*
- ACH PP 04-18 Pill Call (initial 10/30/21) – *in revision*

Other:

- These policy revisions will be completed in July.  See *Medical Provisions: Outside Areas of Focus for Medication Administration & Monitoring* updates.

| Placement Conditions, Privileges, and Programming (Provision F.) |
| --- |
| Status: Partial Compliance |

Policies:

- MH PP 01-10 Access to Mental Health Services (04/17/20)
- MH PP 04-01 Intensive Outpatient Program (04/17/20)
- MH PP 07-04 Suicide Prevention Program DRAFT (revised 06/22/21)

Other:

- MH and SSO designees will meet weekly to review the restrictions until they are restored to the patient.  They also collaborate on patient specific plans to restore a patient's property or privileges.
- MH staff have daily bed assignment/unitization meetings with custody to review movement between the IOP, OPP, & and Acute Beds. This includes admissions, discharges, and MH recommendations for housing when the patient is moved to general population.

| Medico-Legal Practices (Provision G.)<br>Status: Partial Compliance |
| --- |

Policy:

- MH PP 04-07 Acute Inpatient Unit - Precautions and Observation DRAFT – *in review*
- MH PP 09-02 Lanterman-Petris-Short (LPS) Conservatorship (04/20/21)

| Clinical Restraints and Seclusion (Provision H.)<br>Status: Partial Compliance |
| --- |

Policy:

- MH PP XX-XX Use of Clinical Restraints - Acute Inpatient Unit Policy DRAFT – *in review*
- ACH PP 04-10 Discharge Medication (02/29/20) – *in revision*

Other:

- The use of restraints outside of the Acute Inpatient Unit is addressed in the draft MH PP 07-04 Suicide Prevention Program Policy.

| Training (Provision I.)<br>Status: Partial Compliance |
| --- |

Policy:

- ACH PP 03-08 Staff Development and Training (11/30/20) – *in revision based on feedback*

Other:

- MH has a training coordinator who monitors training compliance.
- MH developed draft training which has been submitted to MH experts for review.
    - Common MH disorders (for custodial staff who work in MH units)
    - Youth/brain development of young adults
- MH staff receive regular training on approved MH policies and document attendance.
- 64% of MH staff completed Suicide Risk Assessment training.
- MH training coordinator is developing a training schedule to provide required trainings for medical/custodial staff.

## SUICIDE PREVENTION (Remedial Plan Section VII)

Class Counsel outlined six areas for focus including revision of the Suicide Prevention Policy, changes to the policy and practice of Safety Suits, confidentiality at intake and for suicide risk assessment, property and privileges, and resuming a Suicide Prevention Task Force or a multidisciplinary committee. These items are shaded in blue. The remainder of provisions are not shaded. Status is listed for each.

| Substantive Provisions (Provision A.) |
| --- |
| Status: Partial Compliance |

Policies:

- MH PP 07-04 Suicide Prevention Program DRAFT (revision 06/22/21)
- ACH PP 07-XX Suicide Prevention DRAFT (revision 06/23/21)

Other:

- Draft Suicide Prevention policies were submitted to experts.  SSO has drafted Suicide Prevention Program Orders.

| Use of Safety Suits (Provision N.) |
| --- |
| Status: Substantial Compliance |

Policy:

- MH PP 09-03 Use of Safety Suits (05/24/21)

Other:

- The remedial plan requirements surrounding Safety Suits are being met with the exception being during the intake process when custody may also place an inmate in a safety suit if it is determined that they are at risk of imminent self-harm. In these instances, MH is notified immediately.

| Nurse Intake Screening (Provision C.) |
| --- |
| Status: Partial Compliance |

Policies:

- MH PP 07-04 Suicide Prevention Program DRAFT (revision 06/22/21)
- ACH PP 05-05 Nurse Intake (revision 06/03/21)

Other:

- Nurse Intake has significant revisions.  Revised form incorporates MH requirements including recommended suicide risk questions.  The new nurse intake form will be implemented in July.

| Post-Intake Mental Health Assessment Procedures (Provision D.) |
| --- |
| Status: Partial Compliance |

Policies:

- MH PP 01-10 Access to Care (04/17/20)
- MH PP 07-04 Suicide Prevention Program DRAFT (revision 06/22/21)

Other:

- MH assessments are conducted within the timeframes defined in the MH triage system.
- MH clinicians document whether assessments are confidential or non-confidential including rationale if indicated.
- The draft policy addresses the mental health assessment to be completed if a suicide risk is noted at intake or if any staff member becomes aware of a patient verbalizing or has engaged in acts of self-harm or suicidal ideation. Licensed MH clinical staff will conduct a suicide risk assessment.

| Property and Privileges (Provision M.) |
| --- |
| Status: Partial Compliance |

Policy:

- MH PP 07-04 Suicide Prevention Program DRAFT (revision 06/22/21)

Other:

- MH staff determine limitation, removal, and return of clothing, property, and/or privileges based on clinical judgement on a case-by-case basis. Changes are documented with clinical justification in the medical record.

| Quality Assurance and Quality Improvement (Provision R.) |
| --- |
| Status: Partial Compliance |

Policies:

- MH PP 07-04 Suicide Prevention Program DRAFT (revision 06/22/21)
- ACH PP 01-07 Quality Improvement Program (revised 05/27/21) – *joint policy*
- ACH PP 01-08 Medical Review of In-Custody Deaths (revised 03/11/21) – *joint policy*
- ACH PP 01-15 Suicide Prevention Committee – *joint policy – in revision*

Other:

- MH has convened a multi-disciplinary Suicide Prevention Subcommittee to review, track and audit the requirements. There have been two Subcommittee meetings to date.
- A MH QI Subcommittee was developed with the first meeting on 05/03/21. This Subcommittee will meet quarterly. The MH QI team will review the development of a crisis response treatment plan and determine best practices for this program.

| Training (Provision B.) |
| --- |
| Status: Partial Compliance |

Policy:

- ACH PP 03-08 Staff Development and Training (11/30/20) – *in revision*

Other:

- MH has a training coordinator who also monitors compliance for training requirements.
- MH has drafted a 2-hour Suicide Prevention Refresher training. It was submitted to MH experts for review.
- MH is developing the 4-8 hour Suicide Prevention Training.
- 64% of MH staff have completed Suicide Risk Assessment training. The training was sent to MH experts for review.

| Response to Identification of Suicide Risk or Need for Higher Level of Care (Provision E.) |
| --- |
| Status: Partial Compliance |

Policies:

- MH PP 07-04 Suicide Prevention Program DRAFT (revision 06/22/21)
- MH PP 09-03 Use of Safety Suits (revision 05/24/21)

Other:

- Timeframes are noted in the policies.
- The Suicide Risk Assessment captures the information listed in this provision for consideration and documentation.

| Housing of Inmates on Suicide Precautions (Provision F.) |
| --- |
| Status: Partial Compliance |

- MH policies and procedures state that all patients, including those identified as being at risk for suicide, are treated in the least restrictive setting appropriate to their clinical needs.

| Inpatient Placements (Provision G.) |
| --- |
| Status: Partial Compliance |

- MH staff makes every effort to ensure that patients assessed for the Acute Inpatient Unit are placed within 24 hours of identification, absent exceptional circumstances. Patients who are on the preadmission list beyond 24 hours are assessed daily for continuous need of placement or clearance.

31

> **Temporary Suicide Precautions (Provision H.)**
> Status: Partial Compliance

Policies:

- MH PP 07-04 Suicide Prevention Program DRAFT (revision 06/22/21)
- ACH PP 07-03 Patients in Safety Cells (02/24/21) – *joint policy in revision based on feedback*

> **Supervision/Monitoring of Suicidal Inmates (Provision J.)**
> Status: Partial Compliance

Policy:

- MH PP Access to Care (04/17/20) – *in revision*

Other:

- MH has met with custody to discuss re-opening the Suicidal Inmate Temporary Housing Unit (SITHU).  Staff will continue to work with custody to facilitate re-opening.
- MH staff has daily bed assignment/utilization meetings with custody to review movement between the IOP, OPP, & Acute Beds.

> **Treatment of Inmates Identified as at Risk of Suicide (Provision K.)**
> Status: Partial Compliance

Policy:

- MH PP 07-01 Behavior Management Plans (09/16/20)
- MH PP 07-02 Treatment Planning (11/18/20)
- MH PP 09-03 Use of Safety Suits (05/24/21)
- ACH PP 08-08 Patient Privacy (05-13-21) – *joint policy*

Other:

- Designated staff monitor the Acute Inpatient Unit preadmission list of patients.
- The outpatient appointment log has been updated to better reflect appointment types (emergent, urgent and routine).

> **Conditions for Individual Inmates on Suicide Precautions (Provision L.)**
> Status: Partial Compliance

Policy:

- MH PP 07-04 Suicide Prevention Program DRAFT (revision 06/22/21)
- MH PP 09-03 Use of Safety Suits (05/24/21)

Other:

- Policy draft addresses MH role as the primary authority, to make decisions on property and privileges, use of safety suits, and discharge from suicide precaution based on clinical assessment.

| Beds and Bedding (Provision O) |
|---|
| Status: Partial Compliance |

Policies:

- MH PP 05-XX Denial of Rights Policy DRAFT – *in process*
- MH PP 05-13 Patient Rights Policy DRAFT – *in process*
- ACH PP 07-03 Patients in Safety Cells (02/24/21) – *joint policy in revision based on feedback*

Other:

Custodial staff consult with MH whenever beds or bedding are being misused and removed from a suicidal inmate. New policies are under development that address this issue.

| Discharge from Suicide Precautions (Provision P.) |
|---|
| Status: Partial Compliance |

Policies:

- MH PP 07-04 Suicide Prevention Program DRAFT (revision 06/22/21)
- ACH PP 07-03 Patients in Safety Cells (02/24/21) – *joint policy in revision based on feedback*

Other:

- Patients who are discharged from the acute inpatient unit after being treated for a suicide attempt or ideation receive follow up MH appointments (24 hours, 72 hours and 5 days).
- Patients are transferred to IOP when appropriate and a bed is available.
- IOP and Outpatient appointment logs have been updated to reflect the accurate appointment type.

| Emergency Response (Provision Q.) |
|---|
| Status: Partial Compliance |

Policies:

- ACH PP 04-11 Emergency Bag/Equipment (06/11/20) – *in revision based on feedback*
- ACH PP 04-12 Emergency Medical Response (06/17/20)

- ACH PP 04-13 Man-Down Drill (08/21/20)

Other:

- Medical and custody staff are trained in CPR.
- Staff complete a Man-Down Debriefing Summary for incidents requiring medical response or drills.  The form and staff debriefing assist staff in reviewing code response.

# SEGREGATION/RESTRICTED HOUSING [Section VIII]

| Mental Health Functions in Segregation Units (Provision C.)<br>Status: Partial Compliance |
|---|

- MH has been working with SSO for identifying and rounding segregated MH patients.
- MH staff have met with custody to discuss providing groups in the Administrative Segregation unit.  Staff are drafting group curriculum for a pilot this fall.
- MH continues to work with custody on cohorts of individuals in the segregated housing unit that can be in the dayroom together.

| Placement of Prisoners with Serious Mental Illness in Segregation (Provision D.)<br>Status: Partial Compliance |
|---|

- Custody consults with MH staff prior to placing an inmate with serious mental illness in segregation however in emergent circumstances, MH consult will occur after placement.
- MH staff provide case management to patients with serious mental illness who are in segregated housing.

| Restraint Chairs (Provision J.)<br>Status: Partial Compliance |
|---|

Policies:

- MH PP XX-XX Use of Clinical Restraints - Acute Inpatient Unit Policy DRAFT – *in review*
- ACH PP Use of Restraints DRAFT – *in review*

Other:

- Placement in restraint or WRAP triggers an emergent referral to MH.

| Next Steps for Mental Health, Suicide Prevention and Segregated Housing Provisions |
|---|

Next steps for the new monitoring period include:

- Complete key policies that are in revision or draft form.
- Provide training and implementation for the new or revised policies.

- Complete the 4-8 hour Suicide Prevention training curriculum and begin offering to new employees.
- Complete a comprehensive staffing and reallocation plan appropriate for the needs of the remedial plan.
- Coordinate the required multi-disciplinary meetings.
- Create the policy and process for assessment of patients with intellectual disabilities.

## QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT [Section IX.]

| Generally (Provision IX. A.) |
| --- |
| Partial Compliance |

Prior to the remedial plan, there was a very limited policy and procedure on quality improvement, no dedicated staff, no data, and no QI audits.  Steps have been taken to develop the QI structure. These are listed below.

Policies:

- ACH PP 01-07 Quality Improvement Program (revised 05/27/21)
- ACH PP 01-13 Pharmacy & Therapeutics (09/04/20) – *in revision based on feedback*
- ACH PP 01-15 Suicide Prevention Committee (revised 05/18/21) – *in revision*

Committees:

- Quality Improvement Committee was developed along with several subcommittees (Pharmacy and Therapeutics, Mental Health, Safety, Suicide Prevention).  These are multidisciplinary.  Will also create a Utilization Management subcommittee during the next monitoring period.  Will refocus the Safety Subcommittee to include infection control.  This will be led by a designated nurse manager.
- Current work involves updating a list of reports and creating a list of audits for each subcommittee.  These are focused on the indicators listed in the remedial plan.

Staffing:

- A small QI team was created.  Additional positions were approved in June including a QI Nurse and a Staff Educator.
- Many reports have been developed and will continue to be built.
- QI audits are developed or in development as policies develop and staff are trained to audit.

| Quality Assurance, Mental Health Care (Provision IX. B.) |
| --- |
| Partial Compliance |

- Mental health representatives are in all QI meetings but there are two specific mental health multidisciplinary subcommittees, Mental Health (chaired by the MH Program

Director) and a new Suicide Prevention Subcommittee (chaired by the MH Medical Director). Each forum is quarterly.

- Chairs are responsible to ensure indicators are reviewed and tracked.
- Audit tools are in development related to mental health and suicide prevention remedial plan provisions.

---

Quality Assurance, Medical Care (Provision IX. C.)
Partial Compliance

---

- Medical representatives are in all QI meetings.  Each forum is quarterly.
- Chairs are responsible to ensure indicators are reviewed and tracked.
- Audit tools are in development related to medical remedial plan provisions.
- Performance Evaluations are required annually for permanent county staff and more frequently for probationary staff.  (ACH PP 03-09 Performance Evaluations).

---

Next Steps for Quality Assurance Systems Provisions

---

A new Suicide Prevention Subcommittee was developed during this period.  Next steps for the new monitoring period include:

- Create a Utilization Review Subcommittee
- Add infection control to the Safety Subcommittee.  A nurse will assume facilitation.  The latter will be focused on overall infection control and will not be solely focused on COVID-19.
- Create and complete audit tools for necessary areas.  This process will include feedback loops to staff and additional steps if needed (e.g., more training, process changes, etc.)
- Complete hiring for an Administrative Services Officer III (Electronic Health Record).  While not a member of the QI team, this position will lead and enhance work on the EHR which is critical for QI reporting and staff use.
- Recruit and hire a QI Nurse and Educator (new positions recently approved).  These positions will enhance QI work and training.
- MH Peer review will begin mid-August 2021.
- Discuss and make plans for medical peer review process within the QIC Meeting.

---

## JAIL FACILITY NEEDS

---

Sacramento County (representatives from County Executive's Office, General Services, SSO, and ACH) has been engaged in planning for facility improvements to meet the needs of the consent decree including Americans with Disabilities Act (ADA) standards, patient privacy, and sufficient space for medical and mental health services.

Main Jail Correctional Health & Mental Health Facility Project:

This project consisted of design and construction of a new building on the northeast corner of the existing Main Jail facility.  This construction would have added a new intake/booking area, additional medical and mental health space, education, and program space.  Areas would have been designed in compliance with the Americans with Disabilities Act (ADA) and Health Insurance Portability and Accountability Act (HIPAA).

- On April 21, 2020, the Board of Supervisors approved a $7,027,135 contract with an architectural firm to design the proposed annex.
- On March 10, 2021, the Board decided to not proceed with the recommended Correctional Health and Mental Health Services Facility construction project and requested staff to review and consolidate monitoring reports and to create a chart showing risk information for the jail population.

In terms of next steps, the county has hired a consultant to determine the size of the population that can be served at the Main Jail (bed capacity, medical/mental health population).  The county will also engage another consultant to identify the risk profile for those in the jail during dates pre- and post-COVID-19.

Rio Cosumnes Correctional Center (RCCC) Facility Project:

The RCCC facility requires modifications to be responsive to the consent decree.  The County initially worked on a project to make improvements to the RCCC facility (new medical, mental health, and program space) using SB 1022 grant project funds.

The Board of Supervisors decided in late September to not accept $80 million in SB 1022 funding from the state for facility improvements, as recommended by the Grand Jury, which would have covered costs for facility improvements addressing consent decree requirements at RCCC. The Board acknowledged the County will still be responsible for the cost of all the changes required by the Consent Decree.

---

## COUNTY EFFORTS TO REDUCE THE JAIL POPULATION

Sacramento County (representatives from the County Executive's Office, criminal justice partners, SSO, DHS Behavioral Health, and ACH) is engaged in multiple efforts to reduce the jail population.  The County Executive has proposed an ordinance to create a new Public Safety Agency, headed by a Deputy County Executive.  This individual will oversee efforts to reduce the jail population and compliance with the Consent Decree.

See Board of Supervisors webpage for status updates on efforts to reduce the jail population:

- BOS Meeting dated 10/22/2019, Item #66 (*Report on County Efforts to Reduce the Jail Population*).

- BOS Meeting dated 03/10/21, Item #3 (*Workshop – Review the Design-Build Process Related to the Correctional Health and Mental Health Services Facility Project, And Approve Contract No. 81555*…)

Updates on some of these efforts are listed below.

**Jail Diversion Programs that are active**:

Pretrial Assessment and Monitoring: Probation (lead agency) received local funding and a grant from the Superior Court to utilize the Public Safety Assessment (PSA) tool to inform pretrial release and monitoring decisions based on risk of failure to appear (FTA), risk of new criminal activity, and risk of new violent criminal activity.  The Pretrial Pilot began October 2019 and will operate with grant funding through December 2021 and through June 2022 with county funds. Superior Court has released 2,298 clients to Pretrial Monitoring from October 2019 through May 2021.

Public Defender Pretrial Support Project (PTSP): Public Defender (lead agency) received a grant from Bureau of Justice Assistance (BJA) to develop and operate a pretrial support program using evidence based tools to interview jail inmates prior to arraignment to identify needs, provide social worker support/case management (in custody and in the community), link to services, and coordinate safe discharge plans.  At the Board of Supervisors budget hearing, additional funds were granted to expand this program.

Pretrial Felony Mental Health Diversion: Public Defender (lead agency) received a grant to implement a Pretrial Mental Health Diversion Program.  The target population includes adults with serious mental illness charged with felonies that are incompetent to stand trial or in danger of being incompetent to stand trial.  Public Defender has contracted with Telecare to provide services to 40 individuals a year with housing for 20. Clients will be referred through the granting of Felony Mental Health Diversion by the court. This program began March 2021. In the first week of May, there were 14 active participants and an additional 44 applicants pending court review, including 11 from the jail felony incompetent to stand trial (IST) waitlist.

**New Programs in Development**:

Forensic Behavioral Health Innovation Program: DHS Behavioral Health created an innovation project for individuals with a serious mental illness and criminal justice involvement who are being released from the jail.  An RFP was released. Services estimated to begin July 2021.

Jail Diversion Treatment and Resource Center: Probation (lead agency) received an infrastructure grant to provide a community based facility to divert criminal justice-involved adults with mental health disorders, substance use disorders, and/or other trauma-related disorders from jail and/or prison.  On June 2, 2020, Probation received the Board of Supervisors approval on this project. This program is targeted to open October 2021.

Alternatives to 9-1-1 Crisis Response (new):  At the September Budget Hearing, BOS asked staff to develop a proposal for alternative responses to mental health and homeless-related 911 calls to complement the existing Mobile Crisis Support Teams (MCST).  The County facilitated an

internal countywide work group to review data, review models from other jurisdictions, and obtain community input. Staff received approval for crisis response plans that include a 24/7 Crisis Call Center, Crisis Receiving Facilities: Urgent Care, and Mobile Field Response during the FY 2021/22 budget hearings.

**System Planning**:

Work Plan to Reduce Use of the Jail: The Correctional Facilities Committee has adopted a work plan to implement recommendations from the Carey Work Group Report.  These recommendations and approaches focus on managing justice-involved individuals in a setting other than jail. The FY 2021/22 recommended budget includes additional resources to implement recommendations from the Carey Group.

Data Driven Recovery Project (DDRP): In January 2020, the Criminal Justice Cabinet's Mental Health Work Group began to meet with the consultant for the DDRP to review data from individuals in the criminal justice system who have serious mental illness (SMI).  The focus is on use of the sequential intercept model (SIM) to identify behavioral health and criminal justice services and measures at different decision points to determine where there are opportunities to implement changes that will reduce the population of individuals with SMI in the jail facilities. This work is in alignment with the national "Stepping Up Initiative" which focuses on reducing the population of adults in jails with SMI.

The Work Group has reviewed baseline measures to develop a common understanding and fuller view of people touching multiple systems, as well as programmatic analysis in areas such as Mental Health Diversion and Mental Health Treatment Court.  DDRP efforts also include working with justice partners to implement ongoing justice and health data integration through the County's Integrated Justice Information System (IJIS).  Additionally, the DDRP has done some preliminary work to provide a risk profile of the jail population in 2019 to assess potential use of an automated risk screening tool to assist with the County's overarching jail population reduction efforts, but also connected to DDRP work aimed at implementing changes that keep people with SMI out of jail, shortening the length of stay for those with SMI, increasing connections to services at release, and keeping people with SMI from coming back to jail.

ATTACHMENT 2

*MAYS V. COUNTY OF SACRAMENTO*

**COMBINED REMEDIAL PLAN – May 30, 2019**

III.    **AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE**

A. **Policies and Procedures**

**Sacramento Sheriff Response**

1.  It is the County's policy to provide access to its programs and services to prisoners with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests. No prisoner with a disability, as defined in 42 U.S.C. § 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities or be subjected to discrimination. The County's policy is to provide reasonable accommodations or modifications where necessary, consistent with 28 C.F.R. §§ 35.150 & 35.152, and other applicable federal and state disability law.

The Sheriff's Office has engaged in several steps, some through policy revision, others through practice to ensure all inmates receive equal access regardless of disability.  Notably, the Compliance Unit, through tracking mechanisms, and personal visits, ensures equal access and effective communication on an individual basis for all inmates with disabilities.  Practices invovling lower bunks and lower tiers have been modified to ensre the maximum number of beds are available for those needing accomodations.  Patients identified with mobility issues are escorted in or with the proper DME to ensure they are not denied equal access to facilities, programs and services.

2.  The County shall, in consultation with Plaintiffs' counsel, revise its Operations Order to establish standard and consistent procedures for the Jail to ensure compliance with the ADA and the remedial provisions outlined herein.

ADA Operations Order being revised by the team assigned to the Lexipol project.

3.  The County shall, within 12 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, revise policies, procedures, and inmate orientation materials (e.g. Inmate Handbook), in accordance with the revised Operations Order and the remedial provisions outlined herein. A list of policies which the County will revise consistent with the provisions outlined herein, as appropriate and in consultation with Plaintiffs' counsel, is attached as **Exhibit A-1.**

The following Post Orders have been drafted and posted to the RCCC portal where they can be accessed by all staff assigned to the facility: Chief Disciplinary Hearing Officer, Disciplnary Housing, Housing Unit Checks, Case Management, Out-of-Cell Time, Keep Separate Alerts, Cell Cleaning, and Administrative Segregation. Several policies are under revision by the team assigned to the Lexipol project.

4. All staff will receive training appropriate to their position on policies and procedures related to compliance with the Americans with Disabilities Act (ADA) and related disability laws.

This item is pending the approval and completion of the ADA policy. It is being worked on by the team assigned to the Lexipol project.

## B.  ADA Tracking System

1. The County shall develop and implement a comprehensive system (an "ADA Tracking System") to identify and track screened prisoners with disabilities as well as accommodation and Effective Communication needs.

ATIMS under development to track ADA needs. It is supposed to go live in 2021. We currently utilize a rudimentary tracking system through Excel. Staff is currently being trainined in anticipation of ATIMS going live.

2. The ADA Tracking System shall identify:

a) All types of disabilities, including but not limited to psychiatric, intellectual, developmental, learning, sensory, mobility, or other physical disabilities, and special health care needs;

ATIMS under development to track ADA needs. It is scheduled to go live in the Fall of 2021. Our current tracking system lists disabilities. Staff is currently being trainined in anticipation of ATIMS going live.

b) Prisoners with disabilities that may pose a barrier to communication, including but not limited to learning, intellectual, or developmental disabilities, and hearing, speech, or vision impairments;

ATIMS under development to track ADA needs. It is scheduled to go live in 2021. Our current tracking system lists disabilities. Staff is currently being trainined in anticipation of ATIMS going live.

c) Accommodation needs, including as to housing, classification, Effective Communication, adaptive supports, and assistive devices;

ATIMS under development to track ADA needs. It is scheduled to go live in the Fall of 2021. Our current tracking system lists disability Needs/Requests/Accomodations.

d) Prisoners who require specific health care appliances, assistive devices, and/or durable medical equipment (HCA/AD/DME);

ATIMS under development to track ADA needs. It is scheduled to go live in the Fall of 2021. Our current tracking system lists disability Needs/Requests/Accomodations.

e)  Prisoners who are class members in *Armstrong v. Newsom* (N.D. Cal. No. 94-cv-02307), with their applicable disability classification(s) and accommodation need(s).

ATIMS under development to track ADA needs. It is scheduled to go live in the Fall of 2021. Our current system lists when an inmate is part of the Armstrong lawsuit. All of these requests are routed through ACH

3.   The ADA Tracking System's prisoner disability information will be readily accessible to custody, medical, mental health, and other staff at the Jail who need such information to ensure appropriate accommodations and adequate program access for prisoners with disabilities.

ATIMS under development to track ADA needs. It is scheduled to go live in the Fall of 2021. Our current system is only available to the Compliance staff.

C.  **ADA Coordinator**

1.   The County shall have a dedicated ADA Coordinator at each facility.

Both positions overseen by the Compliance Commander at each facility.

2.   The ADA Coordinator position shall be dedicated to coordinating efforts to comply with and carry out ADA-related requirements and policies, shall have sufficient command authority to carry out such duties, and shall work with the executive management team regarding ADA-related compliance, training, and program needs.

Both positions overseen by the Compliance Commander at each facility.

3.   The County shall clearly enumerate, in consultation with Plaintiffs' counsel, the job duties and training requirements for the ADA Coordinator position and for ADA Deputies assigned to support the ADA Coordinator position.

This item is pending the approval and completion of the ADA policy. It is being worked on by the team assigned to the Lexipol project.

4.   The County shall ensure that ADA Coordinators and ADA Deputies possess requisite training to implement and ensure compliance with the Jail's disability program and services, including operation of the ADA Tracking System.

This item is pending the approval and completion of the ADA policy. It is being worked on by the team assigned to the Lexipol project.

D.  **Screening for Disability and Disability-Related Needs.**

E.  **Orientation**

1.   The County shall ensure that, for the population to be housed in the Jails, prisoners with disabilities are adequately informed of their rights under the ADA, including but not limited to:

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. There is signage posted in Intake/Booking and in all housing units/ADA contact info is in the handbook/ADA hotline recording. RCCC and Main Jail advise through the inmate handbook in addition to the mentioned signage

a)  Accommodations available to prisoners;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. RCCC and Main Jail inmates can fill out a pink slip for medical.

b)  The process for requesting a reasonable accommodation;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. There is signage posted in Intake/Booking and in all housing units. ADA contact info is in the handbook, including the ADA hotline number. The handbook outlines the process necessary to request accomodations. Accomodations are made through medical issuing chronos.

c)  The role of the ADA coordinator(s) and method to contact them;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. Main Jail and RCCC inmates can dial * indicated in the handbook from the pod telephones and/or fill out available kites for communication.

d)   The grievance process, location of the forms, and process for getting assistance in completing grievance process;

This function is performed by Compliance Officers on an as needed basis. This can be expanded to include all inmates, pre-recorded effective communcations means. This process is included in the handbook that is provided to the inmates upon intake. The Inmate Handbook identifies the grievance procedure and how to obtain forms.

e)   Instructions on how prisoners with disabilities can access health care services, including the provision of Effective Communication and other accommodations available in accessing those services.

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. Additionally, the advisement by ACH upon intake and the general process is listed in the inmate handbook that is provided upon intake and anytime during the inmate's custody period upon their request. Our policies must be revised to include effective communication provisions. NMJ/RCCC medical kite or a request to compliance

2.   Upon processing and classification, prisoners with disabilities shall receive, in an accessible format, the jail rulebook; orientation handbook; and a verbal orientation or orientation video regarding rules or expectations.

Verbal and written communication presented by compliance officers upon request. The handbook is received at intake and available upon request however, only one format/version of the handbook is avaialble.

3.   The County shall accommodate individuals with disabilities in the orientation process through the use of alternative formats (*e.g.* verbal communication, large print, audio/video presentation), when necessary for Effective Communication of the information.

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means.

4.   The County shall develop an Americans with Disabilities Act Inmate Notice. The Notice shall be prominently posted in all prisoner housing units, in the booking/intake areas, in medical/mental health/dental treatment areas, and at the public entrances of all Jail facilities.

There is ADA signage posted in noted areas. The signage is compliant with ADA federal requirements.

F.   **Health Care Appliances, Assistive Devices, Durable Medical Equipment**

b)  If such a determination is made, the ADA coordinator or supervisory-level designee shall document the decision and reasons for it, in writing, and shall consult with medical staff to determine an appropriate alternative accommodation.

Main Jail medical staff approves these items then they are reviewed by compliance and issued. RCCC current practice.

a)  The County will ensure that any personal mobility device belonging to a prisoner is returned to the prisoner prior to release from custody.

Current practice.

## G.  Housing Placements

1.  The County shall house prisoners with disabilities in facilities that accommodate their disabilities.

RCCC accomodates inmate disabilities as recommended by CHS and "chrono" issued. NMJ  placement is determined by medical staff.

2.  The County shall implement a housing assignment system that includes an individualized assessment of each individual's functioning limitations and restrictions, including but not limited to:

RCCC accomodates inmate disabilities as recommended by CHS and "chrono" issued. NMJ determined by medical staff

a)  The need for ground floor housing;

Jail Annex Planning. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail. NMJ CHS decides. RCCC accomodates inmate disabilities as recommended by CHS and "chrono" issued.

b)  The need for a lower bunk;

Jail Annex Planning. NMJ CHS decides. RCCC accomodates inmate disabilities as recommended by CHS and "chrono" issued.

c)  The need for grab bars in the cell and/or shower;

RCCC housing facilities have shower chairs available for inmates upon request from their control and/or floor officers.  NMJ 2E & 2M have grab bars; shower chairs on every floor available upon request

d)   The need for accessible toilets;

**Jail Annex Planning. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail. NMJ CHS decides**

e)   The need for no stairs in the path of travel; and

RCCC accomodates inmate disabilities as recommended by CHS and "chrono" issued.  Same at NMJ

f)   The need for level terrain.

RCCC accomodates inmate disabilities as recommended by CHS and "chrono" issued.  Same at NMJ

3.   Prisoners with disabilities shall be housed in the Jail consistent with their individual security classification. Prisoners prescribed or possessing HCAs/ADs/DME will not automatically be housed in a medical housing unit. Placement in a medical housing unit will be based on individualized clinical determination of need for treatment.

RCCC -  an inmate's security clssification is not determined by their disability or HCA/AD/DME; Medical Housing Unit (MHU) housing is determined by CHS based on an individual assessment.  Current practice at Main Jail. Medical housing is determined by CHS, not classification status

4.   Classification staff shall not place prisoners with disabilities in:

a)   Inappropriate security classifications simply because no ADA-accessible cells or beds are available;

Current practice.

b)   Designated medical areas unless the prisoner is currently receiving medical care or treatment that necessitates placement in a medical setting; or

Current practice.

c)   Any location that does not offer the same or equivalent programs, services, or activities as the facilities where they would be housed absent a disability.

RCCC programs and services are available based on eligibility and classification. Same practice at NMJ

H.   **Access to Programs, Services, and Activities**

**1.** The County shall ensure prisoners with disabilities, including those housed in specialized medical units or mental health units (*e.g.*, OPP, IOP, Acute) have equal access to programs, services, and activities available to similarly situated prisoners without disabilities, consistent with their health and security needs. Such programs, services, and activities include, but are not limited to:

Current practice.

a) Educational, vocational, reentry and substance abuse programs

RCCC offers distance learning to all classification levels. Reentry programs are not offered to inmates in specialized mental health units. <span style="color:red">Same at NMJ; we are in the process of a programs overhaul and inroduction of reentry at NMJ</span>

b) Work Assignments

RCCC work assignments are based on medical clearance to work determinations made by CHS staff; Reasonable accomodations are made based on CHS recommendation. <span style="color:red">Classification & medical assist</span>

c) Dayroom and other out-of-cell time

Out-of-cell time determined by the Consent Decree is currently met by all housing facilities at RCCC. Inmates in specialized MH units such as IOP and JBCT receive additional out of cell and dayroom time due to the nature of their program. <span style="color:red">At Main Jail we are at or near the out of cell times on a weekly basis. As Covid restrictions lessen, we continue to see these numbers rise.</span>

d) Outdoor recreation and fitted exercise equipment

Recreational access is based on security classification and not on the inmate's disability.

e) Showers

Current practice.

f) Telephones

Current practice.

g) Reading materials

RCCC recreation staff does not provide reading materials for special needs (Braille, large print) on a regular basis. Occassionally they receive large print books and they distribute them to the inmates. Reading glasses can be purchased through commissary. NMJ ADA tablet, braille; chrono.

h) Social visiting

Current practice.

i) Attorney visiting

Current practice.

j) Religious services

Current practice.

k) Medical, mental health, and dental services and treatment

Inmates assigned to specialized MH units (IOP, JBCT) receive additional, individualized, specialized mental health services through their program, in addition to the services provided through JPS. Pink kite for treatment request at Main Jail

**2.** The County shall provide reasonable accommodations and modifications as necessary to ensure that prisoners with disabilities have equal access to programs, services, and activities available to similarly situated prisoners without disabilities.

RCCC - Current practice. Programs and activity availability differs based on the inmate's security classification. All inmates participate in activities and programs available to their security classification. Same at NMJ

3. The County shall develop and implement a written policy for staff to provide appropriate assistance to prisoners with psychiatric, developmental, or cognitive disabilities so that they can fully participate in programs, services, and activities provided at the Jail.

All policies related to the Consent Decree are currently being drafted by the Lexipol project team

**4.** The County shall implement a written policy for staff to provide assistance to prisoners with disabilities in reading or scribing documents.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first.Inmates with disabilities in reading/scribing are still being provided with assistance desite the lack of a written policy. Their needs are being monitored through the Compliance Unit at RCCC. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

5. The County shall provide equal access to library, recreational, and educational reading materials for prisoners with disabilities, including easy reading and large print books for individuals who require such accommodations.

Current practice, inlcuding the purchase of keep-on-person magnifiers. Main Jail issues chrono for the following; soft magnifiers; hard one broke; law library has one on hand

6. The County shall ensure equitable inmate worker opportunities for prisoners with disabilities, including by:

Jail Annex Planning. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail.

a) Ensuring clear job duty statements, with essential functions and specific criteria, for each Worker position;

No clear job descriptions are currently available. This will have to be addressed. NMJ has positions in kitchen

b) Ensuring that medical staff conduct an individualized assessment to identify work duty restrictions and/or physical limitations to facilitate appropriate work/industry assignments and to prevent improper exclusions from work opportunities;

RCCC - Current practice. Medical does individual assessment to make sure they are qualified

c) Providing reasonable accommodations to enable prisoners with disabilities to participate in inmate worker opportunities.

RCCC - Current practice. Classification & medical requirements

I. **Effective Communication**

1.   The County shall assess all individuals detained at the Jail for any period of time for Effective Communication needs, and shall take steps to provide Effective Communication based on individual need.

RCCC -  Upon intake, inmates are assessed by CHS staff and intake officers for special needs. Effective communication assistance for inmates is based upon the individual (SLI, VRI, Etc.) The inmate's information is forwarded to the Compliance Unit for tracking and further assistance.  same at NMJ

2.   The County's ADA policies shall include comprehensive guidance to ensure Effective Communication for prisoners with vision, speech, hearing, intellectual, learning, or other disabilities. The County shall, in consultation with Plaintiffs' counsel, ensure that sufficient guidance on the provision of Effective Communication is included in Jail custody and health care policies and procedures.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

a)   A higher standard for the provision of Effective Communication shall apply in the following situations:

i.   Due Process Events, including the following:

▪ Classification processes

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

▪ Prisoner disciplinary hearing and related processes

This item is pending the creation and approval of the effective communication order.

▪ Service of notice (to appear and/or for new charges)

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

▪ Release processes

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

▪ Probation encounters/meetings in custody

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

i.   Identify each prisoner's disability where there may be a barrier to comprehension or communication requiring reasonable accommodation(s);

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

ii.  Provide effective reasonable accommodation(s) to overcome the communication barrier; and

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

iii. Document the method used to achieve Effective Communication and how the staff person determined that the prisoner understood the encounter, process, and/or proceeding.

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

4.   Effective auxiliary aids and services that are appropriate to the needs of a prisoner with Effective Communication needs shall be provided when simple written or oral communication is not effective. Such aids may include bilingual aides, SLIs, readers, sound amplification devices, captioned television/video text displays, Videophones and other telecommunication devices for deaf persons (TDDs), audiotaped texts, Braille materials, large print materials, writing materials, and signage.

VRI system installed at RCCC with the intention of bringing a similar system to the Main Jail. The VRI provides interpretation for SLI as well as multiple spoken languages. Video visitation RFP is in process.  RCCC employs VRS technology, TDD and signage for hearing impaired inmates to communicate with friends and family. The use of SLI is authorized through policy; bilingual aides are also available. NMJ VRS & TDD SLI -no tablet

5.  In determining what auxiliary aid service to provide, the County shall give primary consideration to the request of prisoner with Effective Communication needs.

RCCC offers a variety of auxiliary aids for inmates with effective communication needs and gives primary consideration to the request of the inmate with E.C. needs. Same at NMJ

6.  Education providers (*e.g.,* Elk Grove Unified School District) at the Jail will ensure Effective Communication for prisoners participating in education programs, including by providing necessary assistive equipment and take steps to accommodate learning strategies of those prisoner-students who have special needs, such as those with developmental, learning, vision, hearing, and speech disabilities.

This item is pending the creation and approval of the effective communication order however, the RCCC Compliance Unit tracks inmates with special needs and works with the Elk Grove Unified School District to provide accomodations. VRI has been used to assist in the past. Currently, pending EGUSD response for their practices/policies on this subject.

7.  The County shall assist prisoners who are unable to complete necessary paperwork (*e.g.*, related to health care, due process, Jail processes) on their own with reading and/or writing as needed.

Current practice.

## J.   Effective Communication and Access for Individuals with Hearing Impairments

1.  The County shall develop and implement a policy for newly arrived and newly identified prisoners with hearing disabilities to determine each prisoner's preferred method of communication.

This item is pending the creation and approval of the effective communication order. RCCC utilizes VRI services at intake/transfer to communicate with inmates with hearing disabilities. These inmates are referred to the Compliance Unit for individualized assistance and assessment.  Same at NMJ based on chrono or request

2.  Qualified Sign Language Interpreters (SLIs) will be provided during intake and for due process functions, health care encounters, and Jail programming, when sign language is the prisoner's primary or only means of Effective Communication, unless the prisoner waives the assistance of an interpreter and/or delay would pose a safety or security risk.

RCCC Video Remote Interpreting (VRI) tablets provide live interactive SLI services. The tablet is located in Booking and in the Classification office. The service is available 24/7 for use by officers for any procedure. Same at NMJ, through VRS

a)   The County shall maintain a contract or service agreement with interpreter services in order to provide such services for deaf or hearing impaired prisoners. Jail staff will be informed of the availability of contract interpreter services.

RCCC currently has a contract for live VRI services in addition to contracted services listed in Operations Order 6/14 - Interpreter Services. Information regarding both are available to custody staff. <span style="color:red">Nmj same/contract</span>

b)   Lip reading will not be the sole method of Effective Communication used by staff, unless the prisoner has no other means of communication.

RCCC offers a variety of auxiliary aids for inmates with effective communication needs and gives primary consideration to the request of the inmate with E.C. needs. <span style="color:red">Same at NMJ</span>

c)   In cases where the use of an SLI is not practical, or is waived by the prisoner, Jail staff shall employ the most effective form of communication available.

RCCC Video Remote Interpreting (VRI) tablets provide live interactive SLI services. The tablet is located in Booking and in the Classification office. The service is available 24/7 for use by officers for any procedure. <span style="color:red">Same at Main Jail through VRS</span>

d)   The County will maintain a log of (a) when, for whom, and for what purpose an SLI was used; and (b) when, for whom, and why a SLI was *not* used for a prisoner with an identified need for SLI services (*e.g.*, prisoner waived SLI or delay would have posed safety or security risk).

RCCC - VRI keeps log by name and xref but only available on device. <span style="color:red">At NMJ the floor officer & 2 east officer log in book when VRS is used</span>

e)   When a prisoner waives an SLI, the log must document (a) the method of communication of the waiver, and (b) the method staff used to determine that the waiver was knowing and freely given.

This item is pending the creation and approval of the effective communication order.

3.  Jail Staff shall effectively communicate the contents of the Inmate Handbook and other materials providing information on Jail rules and procedures to all prisoners to be housed in the Jail who are deaf or hard of hearing. For those prisoners for whom written language is not an effective means of communication, Jail Staff may meet this obligation by providing a video of an SLI signing the contents of the Inmate Handbook, along with appropriate technology for viewing, or by providing an SLI to interpret the contents of the Inmate Handbook to the prisoner who is deaf or hard of hearing.

At RCCC, all inmates are provided with a copy of the inmate handbook however, there is no video with an SLI signing the contents. Assistance would be provided by staff as necessary with the use of the VRI or by reading information needed. Same at Main Jail

4.  The County shall, within 12 months from court approval of the Settlement, make Videophones available for deaf and hard of hearing prisoners. The Videophones shall provide for calls through the use of Video-Relay Services (VRS) at no cost to deaf and hard of hearing prisoners or for calls directly to another Videophone.

VRS/VRI system installed at RCCC. VRS at NMJ. The VRS is provided at no cost to inmates.

5.  Deaf/hard of hearing prisoners who use telecommunication relay services, such as Videophone or TDD/TTY machine, in lieu of the telephone shall receive equal access to the Videophone or TDD/TTY services as non-disabled prisoners are afforded for regular telephone usage.

Current RFP for video visitiation services.  RCCC officers are notified by the Compliance Unit officers of the inmate's need for VRS services and allow those inmates using VRS equal phone time. Same at Main Jail

6.  The County shall provide deaf/hard of hearing prisoners with additional time for calls using telecommunication relay services, such as a Videophone or TDD/TTY, to account for the fact that signed and typed conversations take longer than spoken conversations. The County shall document the time that each prisoner uses and has access to such equipment.

Telephone calls are not timed.  This is current practice.

7.  Prisoners who require an SLI as their primary method of communication shall be provided an SLI for education, vocational, or religious programs and services.

> This item is pending the creation and approval of the effective communication order. RCCC is awaiting a response from EGUSD for policy and practices. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

8.  Public verbal announcements in housing units where individuals who are deaf or hard of hearing reside shall be delivered on the public address system (if applicable) and by flicking the unit lights on and off several times to alert prisoners that an announcement is imminent. This includes announcements regarding visiting, meals, recreation release and recall, count, lock-up, and unlock. Verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, as consistent with individual need. These procedures shall be communicated to prisoners during the orientation process and also shall be incorporated into relevant policies and post orders.

> This item is pending the creation and approval of the effective communication order however , RCCC has no standard practice for notification. Officers assigned to housing units where a deaf inmate is housed are advised by the Compliance Unit officers of the need for special accomodations regarding verbal announcements. same at NMJ/officers will go to the door if they know they are deaf and need to come out

**K.  Disability-Related Grievance Process**

1.  The County shall implement a grievance system for prisoners with disabilities to report any disability-based discrimination or violation of the ADA, this Remedial Plan, or Jail ADA-related policy, and shall provide a prompt response and equitable resolution in each case.

Medical Greivance boxes installed. ADA added to greivance forms.

2.  The County shall ensure that the grievance procedures are readily available and accessible to all prisoners.

Grievances are made available to all inmates. Process is included in handbook.

a)  The County shall make reasonable efforts to ensure all prisoners are aware of the disability grievance procedures, including the availability of accommodations and staff assistance to submit a grievance and/or appeal.

Current practice.

b) The County shall ensure the prisoners with disabilities have meaningful access to grievance forms, including through provision of staff assistance and large print materials.

Current practice however, large print has not been developed yet. Reading glasses can be purchased on commissary.

3. Response to Grievances

a) The County shall develop and implement an ADA grievance process that includes (1) a reasonable timeline for response to ADA-related grievances and appeals, including an expedited process for urgent ADA grievance (*e.g.*, involving prisoner safety or physical well-being); and (2) provision for interim accommodations pending review of the individual's grievances/appeals.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

b) The County shall ensure that prisoners with communication needs are interviewed and provided assistance as part of the grievance/appeal process where necessary to ensure meaningful access and Effective Communication.

This item is pending the approval and completion of the ADA policy however, RCCC inmates with E.C. needs are identified and tracked by the Compliance Unit. Inmates have access to the officers in the Compliance Unit via regularly scheduled interviews, phone, or correspondence. Inmates can request assistance from the Compliance Unit officers at any time. Same as Main Jail and follow up is dependent on needs

c) The County shall document each denial of a reasonable accommodation request and shall record the basis for such determination.

This item is pending the approval and completion of the ADA policy. At RCCC, the custodial staff coordinates with CHS staff to make medically necessary accomodations.  Same at NMJ

d) The County shall provide in writing a copy of the grievance (or appeal) response to the prisoner, including the resolution, the basis for a denial (if applicable), and the process for appeal.

This item is pending the approval and completion of the ADA policy however, the inmates receive a copy of their grievance resolution pursuant to operations order 7/02.

e)   The County shall ensure that completed grievance responses are effectively communicated to prisoners with disabilities.

This item is pending the approval and completion of the ADA policy however, the Compliance Officers are available to assist inmates with E.C. needs. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

4.   The submission, processing, and responses for disability-related grievances and complaints shall be tracked.

Current practice.

L.   **Alarms/Emergencies**

**1.**   The County shall ensure that all written policies regarding alarms and emergencies contain mandatory provisions to accommodate prisoners with disabilities.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipool project team

**2.**   The County shall implement written policies regarding the expectations of staff as to prisoners with identified disabilities during emergencies and alarms, including as to disabilities that may affect prisoners' ability to comply with orders or otherwise respond to emergencies and alarms. For example, the policies shall ensure appropriate handling of prisoners with mobility-related disabilities who are unable to prone or take a seated position on the ground during an alarm or emergency. Such policies shall be communicated to staff, incorporated into the relevant Operations Orders, and communicated to prisoners with disabilities using Effective Communication.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. Eventhough the polcy is not in place, staff does offer assistance during emergencies at RCCC and Main Jail and disabilities are taken into consideration by staff. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

3.   The County shall implement written policies for staff regarding communicating effectively and appropriately with prisoners who have disabilities that may present barriers to communication during emergencies or alarms.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. Eventhough the polcy is not in place, staff does offer assistance during emergencies at RCCC and Main Jail.

4.   In order to facilitate appropriate accommodations during alarms or emergencies, the County shall offer, but shall not require, individuals who have disabilities visible markers to identify their disability needs (*e.g.* , identification vests). The County shall maintain a list, posted in such a way to be readily available to Jail staff in each unit, of prisoners with disabilities that may require accommodations during an alarm or emergency.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

5.   The County shall install visual alarms appropriate for individuals who are deaf or hard of hearing, which shall comply with relevant fire code regulations.

At RCCC, visual alarms are currently installed compliant with relevant fire code regulations. Same as NMJ

6.   All housing units shall post notices for emergency and fire exit routes.

Emergency and fire exit routes posted.

## M. **Searches, Restraints, and Extractions**

1.   The County shall modify its written policies to ensure that prisoners with mobility impairments, including those with prosthetic devices, receive reasonable accommodations with the respect to the following: (1) Pat searches and unclothed body searches; (2) Application of restraints devices, including Pro-Straint Chair; and (3) Cell extractions.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. Although the policy is not in place, Main Jail and RCCC conduct pat searches and unclothed body searches with the inmates needs in mind. This includes the application of retraint devices

## N. **Transportation**

| | |
|---|---|
| 1.  The County shall provide reasonable accommodations for prisoners with disabilities when they are in transit, including during transport to court or outside health care services. | RCCC currently does not have an ADA van assigned to the facility, but has been approved for one.  In the meantime, RCCC can borrow an ADA compliant van from the Main Jail if the need arises. |
| 2.  Prescribed HCAs/ADs/DME, including canes, for prisoners with disabilities shall be available to the prisoner at all times during the transport process, including in temporary holding cells, consistent with procedures outlined in Part VII. | Current practice. |
| 3.  The County shall use accessible vehicles to transport prisoners in wheelchairs and other prisoners whose disabilities necessitate special transportation, including by maintaining a sufficient number of accessible vehicles. (295) | RCCC currently does not have an ADA van assigned to the facility, but has been approved for one.  In the meantime, RCCC can borrow an ADA compliant van from the Main Jail if the need arises. |
| 4.  Prisoners with mobility impairments shall be provided assistance onto transport vehicles. | Current practice. |

**O.  Prisoners with Intellectual Disabilities**

| | |
|---|---|
| 1.  The County shall, in consultation with Plaintiffs' counsel, develop and implement a comprehensive written policy and procedure regarding prisoners with an Intellectual Disability, including: | Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. <span style="color:red">All policies related to the Consent Decree are currently being drafted by the Lexipol project team</span> |
| a)  Screening for Intellectual Disabilities; | Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. |

b)   Identification of prisoners' adaptive support needs and adaptive functioning deficits; and

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. <span style="color:red">All policies related to the Consent Decree are currently being drafted by the Lexipol project team</span>

c)   Monitoring, management, and accommodations for prisoners with Intellectual Disabilities.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first.

3.   Prisoners with an Intellectual Disability assigned to a work/industry position will be provided additional supervision and training as necessary to help them meet the requirements of the assignment.

This will be contained in future policy.

P.   **ADA Training, Accountability, and Quality Assurance**

1.   The County shall ensure all custody, health care, facility maintenance, and other Jail staff receive ADA training appropriate to their position.

<span style="color:red">A New ADA component has been added to the Adult Corrections Supplemental Core Course, but is awaiting approval. ADA training is in module 8.0</span>

a)   The County shall provide to all staff appropriate training on disability awareness, including the use and purpose of accommodations and modifications in accordance with the ADA.

This item is pending the approval and completion of the ADA policy. <span style="color:red">All policies related to the Consent Decree are currently being drafted by the Lexipol project team</span>

b)   The ADA training shall include: formalized lesson plans and in-classroom or virtual training for staff (including managers, supervisors, and rank-and-file staff) provided by certified or otherwise qualified ADA trainers.

This item is pending the approval and completion of the ADA policy. <span style="color:red">All policies related to the Consent Decree are currently being drafted by the Lexipool project team</span>

2.   ADA instructors shall have appropriate ADA training and subject matter expertise necessary to effectively provide ADA training to staff.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

3.   The County shall, in consultation with Plaintiffs' counsel, develop and implement written policies and procedures regarding monitoring, investigating, and tracking staff violations (or allegations of violations) of ADA requirements and Jail ADA policies.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

4.   The County shall develop an ADA accountability plan that will ensure quality assurance and establish staff accountability for egregious, serious, or repeated violations of the ADA and Jail ADA-related policies and procedures.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

Q. **Accessibility Remedial Plan to Address Physical Plant Deficiencies**

1.   The County shall, within 24 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, develop and fully implement an Accessibility Remedial Plan to address Jail physical plant deficiencies that result in access barriers for prisoners with disabilities. In the interim, the Sheriff's Office shall house prisoners with disabilities in the most integrated and appropriate housing possible, providing reasonable accommodations and assistance where necessary to ensure appropriate accessibility to Jail programs, services, and activities.

At RCCC, inmates with disablities are housed according to their security classification and granted access to programs according to their classification. Reasonable accomodations are made where necessary to ensure special needs are met. Same at NMJ

2.   The Accessibility Remedial Plan shall ensure the following:

a)   Adequate provision of accessible cells and housing areas with required maneuvering clearances and accessible toilet fixtures, sanitary facilities, showers, dining/dayroom seating, and recreation/yard areas.

Jail annex plannning. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail.

| | |
|---|---|
| b)  Accessible paths of travel that are compliant with the ADA. | Jail annex plannning. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail. |
| c)  Equal and adequate access for all prisoners with disabilities to Family and Attorney Visiting areas in reasonable proximity to their housing location. | At RCCC, legal visitation areas in male areas provide equal and adequate access for inmates with disabilities. RCCC social visitation areas provide inmates with disabilities the same opportunity to visit with their family. NMJ visit on 2E w/ chrono |

## IV.    MENTAL HEALTH CARE

### A.  Policies and Procedures

| | |
|---|---|
| h)  Training for all staff members who are working with inmates with mental illness in all aspects of their respective duty assignments. | Lexipol training for custody deputies.  24 hour CIT training for IOP/JBCT deputies, 8 hour CIT for all other deputies. We are also exploring the option of working with JPS to develop additional training. |
| 2.   The County's policies and procedures shall be revised, as necessary, to reflect all of the remedial measures described in this Remedial Plan. | Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. |
| 3.   The County shall continue to operate its acute inpatient program and its Outpatient Psychiatric Pod (OPP) program. The County shall establish a new Intensive Outpatient Program (IOP) for inmates who require a higher level of outpatient psychiatric care than what is provided in the OPP program. | Main Jail IOP to include 20 males and 15 females.  RCCC IOP to include 24 males in our 400 pod. We have an additional 64 beds in the 500 and 600 pods that are used for the ROC and JBCT programs. |

### B.  Organizational Structure

1.   The County shall develop and implement a comprehensive organizational chart that includes the Sheriff's Department ("Department"), Correctional Health Services ("CHS"), Jail Psychiatric Services ("JPS"), Chief Administrative Officer, Medical Director of the JPS Program, and any other mental health staff, and clearly defines the scope of services, chains of authority, performance expectations, and consequences for deficiencies in the delivery of mental health care services.

The Sheriff's Organizational chart exists.

## C.   Patient Privacy

1.   All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff.  In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification.

Secluded privacy interview room created on first floor for booking related clinical interactions.  Use of private attorney visit booths for housing unit clinical interactions. All RCCC facilities have JPS offices available for interviews. These areas are private and are not audio recorded.  The doors to these offices were changed so they can be closed and the officer can see what is going on inside through windows. Officers standby as needed based on the inmates calssification/behavior while offer the highest amount of privacy possible.

b)  If the presence of custody staff  is determined to be necessary to ensure the safety of medical staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

This will be addressed by the jail annex plan. Until that facility is built, JPS has purchased machines that make white noise. They are utilizing these machines to create privacy if an officer needs to be present. If there are safety concerns, the interview will take place in an attorney room. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail.

2.   Jail policies that mandate custody staff to be present for any mental health treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above.  Custody and mental health staff shall be trained accordingly.

No policies exist mandating custody to be present with mental health treatment.

3.   It shall be the policy of the County that mental health clinicians shall not conduct their patient contacts at cell front except pursuant to documented refusals or specific, documented security concerns that warrant cell front contacts.

Case Management Post Order. The only time this takes place are in extreme circustances where the inmate presents a huge security risk. Otherwise they are seen in the attorney booth or one of the offices where the doors have been changed so they can be closed and the officers can still see what is taking place inside.

5.   A process shall exist for sick call slips or other mental health treatment-related requests to be collected without the involvement of custody staff.

Sick call slips may be handed to medical staff directly.

D.   **Clinical Practices**

E.   **Medication Administration and Monitoring**

5.   The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

Growth request submitted for medical escort team. 8 Deputy Sheriff positions added to main jail for escorts. 2 for each shift

6.   Medication adherence checks that serve a clinical function shall be conducted by nursing staff, not custody staff. Custody staff shall conduct mouth checks when necessary to ensure institutional safety and security.

Curent practice.

F.   **Placement, Conditions, Privileges, and Programming**

1.   Placement:

a)   It shall be the policy of the County to place and treat all prisoners on the mental health caseload in the least restrictive setting appropriate to their needs.

Current practice.

b)   Placement in and discharge from Designated Mental Health Units shall be determined by qualified mental health professionals, with consultation with custody staff as appropriate.

Current practice.

| | |
|---|---|
| c)  Absent emergency circumstances, the County shall obtain the assent of qualified mental health professionals before transferring prisoners with SMI into or out of Designated Mental Health Units. | Current practice. |
| d)  It shall be the policy of the County to place prisoners with SMI in appropriate settings that ensure provision of mental health services, patient safety, and the facilitation of appropriate programs, activities, and out-of-cell time.  Co-housing with other populations shall be avoided to the extent that such a practice prevents or hinders any of the above. | Current practice. |

*2.*    Programming and Privileges

| | |
|---|---|
| a)  All Designated Mental Health Units shall offer a minimum of 7 hours of unstructured out-of-cell time per week and 10 hours of structured out-of-cell time per week for each prisoner. While out-of-cell hours per prisoner may vary from day to day, each prisoner will be offered some amount of out-of-cell time every day of the week. All treatment and out-of-cell time shall be documented for each prisoner, and reviewed as part of Quality Assurance procedures. | Designated MH Units (IOP,JBCT) structured out of cell time is determined by program coordinators (JPS, UC Davis) as part of their treatment. Inmates in these programs generally have more than seven hours of unstructured out of cell time and more than ten hours of structured time per week.  These hours are being met when not affected by COVID restrictions. |
| b)  The County shall ensure that prisoners on the mental health caseload have access and opportunity to participate in jail programming, work opportunities, and education programs, consistent with individual clinical input. | Current practice.  Work assignments will be based on the patient's ability to safely perform those functions given the appropriate level of supervision. |

c)  The County shall develop and implement, in the 2P inpatient unit and the IOP unit, a program for progressive privileges (including time out of cell, property allowances, etc.) for patients as they demonstrate behavioral progress. A patient's level of privileges and restrictions shall be based on both clinical and custody input regarding current individual needs. The County shall ensure a process to review custody classification factors when necessary, so that placement, privileges, and restrictions match current individual circumstances and needs.

Current practice.

d)  Individuals on a mental health caseload shall receive, at minimum, privileges consistent with their classification levels, absent specific, documented factors which necessitate the withholding of such privileges. Clinical staff shall be informed of the withholding of privileges and the reasons for the withdrawal shall be documented and regularly reviewed by clinical and custody staff. The restoration of privileges shall occur at the earliest time appropriate based on individual factors.

Current practice.

3.  Conditions:

a)  Staff shall provide prisoners in Designated Mental Health Units with the opportunity to maintain cell cleanliness and the opportunity to meet their hygiene needs.  Custody and clinical staff shall provide assistance to prisoners on these matters, as appropriate to individual patient needs

Current practice.

b)  The County shall ensure uniformity of practice with respect to cell searches, such that searches are not done for punitive or harassment reasons. The County shall monitor whether cell search practices may be serving as a disincentive for prisoners in Designated Mental Health Units to leave their cells for treatment or other out-of-cell activities, and shall take steps to address the issue as appropriate.

Cell searches are done randomly on a revolving basis. They are not done for punitive or harassment reasons. They are done to ensure the inmates do not have any contraband or weapons that can harm themselves, JPS staff or SSO staff.

4. Bed planning:

a) The County shall provide a sufficient number of beds in Designated Mental Health Unit, at all necessary levels of clinical care and levels of security, to meet the needs of the population of prisoners with SMI.

IOP units have been created for male and female patients, with the expansion of Enhanced Treatment pods.

c) The County shall establish mental health programming for women that ensures timely access to all levels of care and is equivalent to the range of services offered to men.

Women's IOP and OPP unit established at Main Jail ad RCCC.  2P services already offered to women.

5. General Exclusion of Prisoners with Serious Mental Illness from Segregation

a) Prisoners with Serious Mental Illness will not be housed in Segregation units, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and there is no reasonable alternative, in which cases the provisions of **Section VIII.D** of the Segregation/Restrictive Housing Remedial Plan shall apply.

This is being implemented.  JPS is using an alternative treatement program in IOP to take Administrative Segregation inmates.  Fewer and fewer TSEPs are on the SMI caseload.

b) Where prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit are assessed a Disciplinary Segregation term, they will serve the term in a Designated Mental Health Unit, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and shall receive structured out-of-cell time and programming as determined by the Multi-Disciplinary Treatment Team.

Current practice.  Disciplinary Segregation Post Order reflects all but the most serious violations will result in in-place discipline.

6. Access to Care

a)   The County shall designate and make available custody escorts for mental health staff in order to facilitate timely completion of appointments and any other clinical contacts or treatment-related events.

IOP deputies have been structured to oversee MH treatment on the entire third floor. The JBCT/IOP programs at RCCC have 13 officers assigned to them. These officers are responsible for ensuring the inmates receive what they need from a custody perspective. They act as escorts for the mental health staff. If the inmates needs to be taken to an appointment off-site, that is facilitated by our medical escort team. Same is true for Main Jail although we have 18 deputies and a sergeant assigned to it.

b)   The County shall ensure sufficient and suitable treatment and office space for mental health care services, including the Triage Navigator Program and other mental health-related services provided on site at the Jail.

At RCCC, office space for MH care providers and treatment is available and constantly being re-evaluated based on needs and advisement of JPS administrators. At NMJ we work collaboratively with JPS when space needs arise

c)   Locations shall be arranged in advance for all scheduled clinical encounters.

Current practice.

e)   Referrals and triage:

i.   The County shall maintain a staff referral process (custody and medical) and a kite system for prisoners to request mental health services.  Referrals by staff or prisoners must be triaged within 24 hours.

Custodial staff make JPS referrals based on personal observations or at the request of the inmate; Inmates may also request MH services via kite. Refer to ACH for their practices and policies and to JPS for their policy regarding response time.

G.   **Medico-Legal Practices**
H.   **Clinical Restraints and Seclusion**
I.   **Training**

1.   The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

a) All jail custody staff shall receive formal training in mental health, which shall encompass mental health policies, critical incident response, crisis intervention techniques, recognizing different types of mental illness, interacting with prisoners with mental illness, appropriate referral practices, suicide and self-harm detection and preventions, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

The Academy now offers graduates the 24 hour CIT class, as well as an additional 20 hours of behavioral health as part of their final training before being employed. These classes cover many of the topics listed. Additionally, our staff will be assigned various classes through Lexipol, which they must complete online. Many of these topic are covered through these classes as well.

b) Custody staff working in Designated Mental Health Units shall receive additional training, including additional information on mental illness, special medico-legal considerations, de-escalation techniques, working with individuals with mental health needs, relevant bias and cultural competency issues, and the jail's mental health treatment programs.

IOP and JBCT deputies are given 24 hours of CIT training.

## V. DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH MENTAL HEALTH OR INTELLECTUAL DISABILITIES

### A. Role of Mental Health Staff in Disciplinary Process

1. The County's policies and procedures shall require meaningful consideration of the relationship of a prisoner's behavior to any mental health or intellectual disability, the efficacy of disciplinary measures versus alternative interventions, and the impact of disciplinary measures on the health and well-being of prisoners with disabilities.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

2. Prisoners who are alleged to have committed a rules violation shall be reviewed by a qualified mental health professional if any of the following apply:

| | |
|---|---|
| a)  Prisoner is housed in any Designated Mental Health Unit; | JBCT and IOP mental health workers are immediately notified of disciplinary write-ups that occurr and they work closely with custodial staff to determine the best course of action. |
| b)  Jail staff have reason to believe the prisoner's behavior was unusual, uncharacteristic, or a possible manifestation of mental illness; | A Post Order has been approved. At RCCC, we have appoint a Chief Disciplinary Hearing Officer. He works closely with JPS to identify these cases and ensure discipline is handed down fairly. <span style="color:red">This process at RCCC is being evaluated before being implemented at Main Jail.</span> |
| c)  Prisoner is on the mental health caseload and may lose good time credit as a consequence of the disciplinary infraction with which he or she is charged. | A Post Order has been approved. At RCCC, we have appoint a Chief Disciplinary Hearing Officer. He works closely with JPS to identify these cases and ensure discipline is handed down fairly. <span style="color:red">This process at RCCC is being evaluated before being implemented at Main Jail.</span> |

**B. Consideration of Mental Health Input and Other Disability Information in Disciplinary Process**

| | |
|---|---|
| 1.   The County shall designate one Chief Disciplinary Hearing Officer for each jail facility, who shall be responsible for ensuring consistency in disciplinary practices and procedures. | At RCCC a Chief Disciplinary Hearing officer has been identified. The Post Order has been approved. <span style="color:red">This process at RCCC is being evaluated before being implemented at Main Jail.</span> |
| 2.   The Disciplinary Hearing Officer shall ensure that prisoners are not disciplined for conduct that is related to their mental health or intellectual disability. | Current practice at RCCC. A Chief Disciplinary Hearing officer has been identified. The Post Order has been approved. <span style="color:red">This process at RCCC is being evaluated before being implemented at Main Jail.</span> |
| 3.   The Disciplinary Hearing Officer shall consider the qualified mental health professional's findings and any other available disability information when deciding what, if any, disciplinary action should be imposed. | At RCCC a Chief Disciplinary Hearing officer has been identified. The Post Order has been approved. <span style="color:red">This process at RCCC is being evaluated before being implemented at Main Jail.</span> |

| | |
|---|---|
| 4.  The Disciplinary Hearing Officer shall consider the qualified mental health professional's input on minimizing the deleterious effect of disciplinary measures on the prisoner in view of his or her mental health or adaptive support needs. | At RCCC a Chief Disciplinary Hearing officer has been identified. The Post Order has been approved. This process at RCCC is being evaluated before being implemented at Main Jail. |
| 5.  If the Disciplinary Hearing Officer does not follow the mental health staff's input regarding whether the behavior was related to symptoms of mental illness or intellectual disability, whether any mitigating factors should be considered, and whether certain sanctions should be avoided, the Disciplinary Hearing Officer shall explain in writing why it was not followed. | At RCCC a Chief Disciplinary Hearing officer has been identified. The Post Order has been approved. This process at RCCC is being evaluated before being implemented at Main Jail. |
| 6.  Prisoners will not be subjected to discipline which prevents the delivery of mental health treatment or adaptive support needs, unless necessary for institutional safety. | Curent practice. |
| 7.  Prisoners shall not be subject to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of self-injurious behavior. | Inmates with suicidal ideations or self injurous tendencies are closely evaluation by JPS staff; Documentation of their behavior is made however, no disciplinary actions are taken against the inmate. Inmates may refuse medications at any time unless the administration of medication is mandated by the court through a valid order. JPS is heavily involved in this process. |

**C.  Accommodations for Prisoners with Mental Health or Intellectual Disabilities During the Disciplinary Process**

| | |
|---|---|
| 1.  The County shall provide reasonable accommodations during the hearing process for prisoners with mental health or intellectual disabilities. | Current practice. |
| 2.  The County shall take reasonable steps to ensure the provision of effective communication and necessary assistance to prisoners with disabilities at all stages of the disciplinary process. | This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team |

**D.  Use of Force for Prisoners with Mental Health or Intellectual Disabilities**

1.   The County's Correctional Services Operations Orders shall include language that ensures meaningful consideration of whether a prisoner's behavior is a manifestation of mental health or intellectual disability.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.  A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

2.   For prisoners with a known mental health or intellectual disability, and absent an imminent threat to safety, staff shall employ de-escalation methods that take into account the individual's mental health or adaptive support needs.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. At Main Jail we are in the process of incorporating a Custody-Critical Incident Negotiation Team (C-Cint) and training all of our IOP deputies. This will be a monumental forward step in de-escalation tactics. Current practice at RCCC, descalation is attempted when circumstances permit.

3.   The County's Correctional Services Use of Force policies shall include a definition and a protocol for a planned Use of Force that provides appropriate guidance for a planned Use of Force that involves a prisoner with mental health or intellectual disability.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

4.   Prior to any *planned* Use of Force, such as a cell extraction, against a prisoner with mental health or intellectual disabilities, there will be a "cooling down period," consistent with safety and security needs. This period includes a structured attempt by mental health staff (and other staff if appropriate), to de-escalate the situation and to reach a resolution without Use of Force. Such efforts, including the use of adaptive supports, will be documented in writing. Medical and/or mental health staff should be consulted if the purpose of the cell extraction is related to the delivery of treatment.

This is the current practice with all planned use of force incidents involving inmates in specialzed units. The officers assigned to MH units work closely with JPS staff when incidents requiring a planned use of force arise. After consultation with JPS staff and ample opportunities for consultation and intervention by JPS.  <span style="color:red">At Main Jail we are in the process of incorporating a Custody-Critical Incident Negotiation Team (C-Cint) and training all of our IOP deputies. This will be a monumental forward step in de-escalation tactics.</span>

5.   The County shall require video documentation for any planned Use of Force, absent exigent circumstances. Jail staff shall endeavor to record the specific actions, behavior, or threats leading to the need for Use of Force, as well as efforts to resolve the situation without Use of Force.

Current practice.

6.   The County shall ensure the completion of supervisory review of Use of Force incidents, including video (for any planned Use of Force), interviews, and written incident documentation, in order to ensure appropriateness of Use of Force practices including de-escalation efforts. The County shall take corrective action when necessary.

Current Practice.

7.   The County shall review and amend as appropriate its policies on Use of Force, including its policies on Custody Emergency Response Team (CERT) and Cell Extraction Procedures.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. <span style="color:red">All policies related to the Consent Decree are currently being drafted by the Lexipol project team</span>

E.   **Training and Quality Assurance**

1.  All custody staff, and mental health staff, shall be trained on the policies and procedures outlined herein that are relevant to their job and classification requirements. Custody staff will receive periodic training on identifying behaviors that may be manifestations of mental illness and other situations warranting a referral to mental health staff, including for a Rules Violation Mental Health Review or other mental health assessment.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

2.  All custody staff shall be trained on the identification of symptoms of mental illness, the provision of adaptive supports, and the use of de-escalation methods appropriate for prisoners with mental health or intellectual disabilities.

Many aspects of this training are already covered during in-service and pre-service training.  A comprehensive review of current training offerings, compared against the needs of this element is under reveiew. We are also working with JPS to determine how to fully address this.

4.  The County shall track all Uses of Force (planned and reactive) involving prisoners who are on the mental health caseload or who have intellectual disabilities, including the number of Uses of Force and the number of cell extractions by facility.

Current Practice.

5.  The County shall implement a continuous quality assurance/quality improvement plan to periodically audit disciplinary and Use of Force practices as they apply to prisoners who are on the mental health caseload or who have intellectual disabilities.

Current use of Blue-Team software to track and monitor use of force incidents, while predicting possible problematic trends in officer behavior.

VI.   **MEDICAL CARE**

A.  **Staffing**
B.  **Intake**

1.   All prisoners who are to be housed shall be screened on arrival in custody by Registered Nurses (RNs).  RN screening shall take place prior to placement in jail housing.

Current practice. All incoming inmates are medically cleared prior to being booked into the facility.

2.   Health care intake screening shall take place in a setting that ensures confidentiality of communications between nurses and individual patients.  Custody staff may maintain visual supervision but may not be close enough to overhear communication, unless security concerns based on an individualized determination of risk that includes a consideration of requests by the health care staff require that custody staff be closer at hand.  There shall be visual and auditory privacy from other prisoners.

Current Practice @ RCCC. Deputies standby near the intake interview but outside door. Same at Main Jail

3.   The County shall, in consultation with Plaintiffs, revise the contents of its intake screening, medical intake screening, and special needs documentation to reflect community standards and ensure proper identification of medical and disability related needs.

In consultation with CHS, several forms have been ammended to reflect this area.

C.   **Access to Care**

1.   The County shall ensure that Health Services Requests (HSRs) are readily available to all prisoners, including those in segregation housing, from nurses and custody officers.

Current practice. HSRs are available at medical appointments, pill call, and in housing units.

2.   The County shall provide patients with a mechanism for submitting HSRs that does not require them to share confidential health information with custody staff. The County shall install lockboxes or other secure physical or electronic mechanism for the submission of HSRs (as well as health care grievances) in every housing unit. Designated health care staff shall collect (if submitted physically) or review (if submitted electronically) HSRs at least two times per day in order to ensure that CHS receives critical health information in a timely manner. Designated health care staff shall also collect HSRs during pill call and shall go door to door in all restricted housing units at least once a day to collect HSRs.  HSRs and health care grievances will be promptly date- and time-stamped. The County may implement an accessible electronic solution for secure and confidential submission of HSRs and health care grievances.

HSRs are turned in directly to nursing staff duriing pill call twice a day. Boxes for Medical Grievances have been in installed in all housing units at RCCC. Medical staff collects and tracks health care grievances. <span style="color:red">NMJ medical grievance box on each floor custody staff does not have access to. New boxes are in the process of being ordered.</span>

4.   The County shall designate and make available custody escorts for medical staff in order to facilitate timely and confidential clinical contacts or treatment-related events.

Custody staff currently escorts Medical staff. <span style="color:red">8 Deputy positions were added specifically for medical escorts (2 per shift). We add additional escorts when needed. As of late, they have been requesting threee escorts during the day.</span>

D.  **Chronic care**
F.   **Medication administration and monitoring**
G.  **Clinical space and medical placements**

1.   The County shall provide adequate clinical space in every facility to support clinical operations while also securing appropriate privacy for patients.  Adequate clinical space includes visual and auditory privacy from prisoners and auditory privacy from staff, the space needed reasonably to perform clinical functions as well as an examination table, sink, proper lighting, proper equipment, and access to health care records.

RCCC- All medical  and psychiatric offices are confidential and free of recording. There are no cameras in medical offices to ensure privacy for inmates. <span style="color:red">All medical offices have equipment determined to be necessary by ACH. All exam rooms at Main Jail are visually and auditorily confidential.</span>

2.   The County shall ensure that any negative pressure isolation rooms meet community standards, including an antechamber to ensure that the room remains airtight, appropriate pressure gauges, and regular documented checks of the pressure gauges.

Jail Annex planning. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail. At Main Jail our negative pressure rooms are checked daily by DGS to ensure the requested standards are met.

3.   The County shall ensure that absent individualized, documented safety and security concerns, patients in acute medical or quarantine placements shall be allowed property and privileges equivalent to what they would receive in general population based on their classification levels.

All inmates in medical or quarantine placements are allowed to keep personal property with them as well as participate in programs that do not interfeer with safety and secutity concers.

4.   The County shall ensure that patients in medical placements are not forced to sleep on the floor, including by providing beds with rails or other features appropriate for patients' clinical needs and any risk of falling.

RCCC- No inmate is forced to sleep on the floor. Beds with rails are avaiable in the Medical Houing Unit. Same at Main Jail

5.   The County shall not discriminate against patients in medical placements solely because of their need for C-Pap machines, but instead shall provide access to programs and services in accordance with their classification level, as set forth in the ADA Remedial Plan.

Housing units in RCCC currently do not have outlets near any sleeping areas, except MHU. Inmates housed in the Medical Housing Unit are able to participate in programs and services consistent with others in their classification. NMJ SAME

H.  **Patient privacy**

1.   The County shall develop and implement policies and procedures to ensure that appropriate confidentiality is maintained for health care services.  The policies shall ensure confidentiality for clinical encounters, including health care intake screening, pill call, nursing and provider sick call, specialty appointments, and mental health treatment.  The policies shall also ensure confidentiality for written health care documents, such as health care needs requests and grievances raising medical care or mental health care concerns, which shall not be collected by custody staff.

Clinical encounters are offered in a private and confidential setting. Deputies stand near when necessary for safety, while still offering privacy. All written health care correspondence is handled directly by Medical staff, including medical grievances.

2.  The County shall provide adequate clinical space in each jail to support clinical operations while also securing appropriate privacy for patients, including visual and auditory privacy from prisoners and auditory privacy from staff.

RCCC- All medical and psychiatric offices are confidential and free of recording. There are no cameras in medical offices to ensure privacy for inmates. <span style="color:red">Medical offices on floors have video, but no audio, for nurses safety</span>

3.  All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff.  In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification. The issuance of pills does not constitute a clinical interaction.

All medical and psychiatric visits are done in a private and confidential setting. Officers standby when necessary for safety, while still offering privacy to the inmate. Max and medium security facilities occur in a private setting, out of hearing range, proximity is determined by the inmates behavior not housuing placement.

b)  If the presence of a correctional officer is determined to be necessary to ensure the safety of staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

Deputies stand at a distance that offers their ability to intervene if necessary, while offering auditory privacy.

4.  Jail policies that mandate custody staff to be present for any medical treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above.  Custody and medical staff shall be trained accordingly.

No policies exist mandating deputies be present during medical treatment.

I.   **Health care records**
J.   **Utilization management**
K.  **Sanitation**
L.   **Reproductive and Pregnancy-Related Care**
M.  **Transgender and gender nonconforming health care**

c) Access to gender-affirming clothing

Current practice, outlined in TGNI order. All inmates shall be issued clothing consistent with their preferred gender identity and/or expression, regardless of their housing location.

d) Access to gender-affirming commissary items, make-up, and other property items

Current practice, outlined in TGNI order. Per IWF, all inmates can purchase gender affirming items available on commissary.

N. **Detoxification protocols**
O. **Nursing protocols**
P. **Reviews of in-custody deaths**

1. Preliminary reviews of in-custody deaths shall take place within 30 days of the death and shall include a written report of the circumstances and events leading to the death, with the goal to identify and remedy preventable causes of death and any other potentially systematic problems.

Current practice. In-CUSTODY Death Reviews shall happen as soon as possible.

2. Mortality reviews shall include an investigation of the events occurring prior to the death, an analysis of any acts or omissions by any staff or prisoners which might have contributed to the death, and the identification of problems for which corrective action should be undertaken.

Current practice.

Q. **Reentry Services**
R. **Training**

1. The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

a)  All jail custody staff shall receive formal training in medical needs, which shall encompass medical treatment, critical incident response, crisis intervention techniques, recognizing different types of medical emergencies, and acute medical needs, appropriate referral practices, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

Training needs are being evaluated against on-going in-service training. All Custody staff receive 8 hours of Crisis intervention training, medical emergency and CPR training is done every two years. Specialized units receive additional training relevant to their assignment. Additional training is evaluated and assigned as determined by in-service training.

## VII.    SUICIDE PREVENTION

### A.  Substantive Provisions

1.  The County recognizes that comprehensive review and restructuring of its suicide assessment, monitoring, and prevention practices are necessary to address the risk of suicide and self-harm attendant to detention in a jail setting.

The Sheriff's Office is in the process of revising all of its policies. They will be working with Lexipol to accomplish this. They have indicated that all of the orders related to the Consent Decree will be their priority. We have identified a list of policies we would like them to start on. The Suicide Prevention policy was the first one we asked them to complete.

2.  The County shall establish, in consultation with Plaintiffs' counsel, a new Suicide Prevention Policy that shall be in accordance with the following:

The Sheriff's Office is in the process of revising all of its policies. They will be working with Lexipol to accomplish this. They have indicated that all of the orders related to the Consent Decree will be their priority. We have identified a list of policies we would like them to start on. The Suicide Prevention policy was the first one we asked them to complete.

### B.  Training

1.   The County shall develop, in consultation with Plaintiffs' counsel, a four- to eight-hour pre-service suicide prevention curriculum for new Jail employees (including custody, medical, and mental health staff), to be conducted in person in a classroom or virtual classroom setting, that includes the following topics:

As part of pre-service training, the Adult Corrections Officer Supplemental Core Course has been revised where Module 19.0 addresses suicide prevention. This section has been approved by the Board of State & Community Corrections (BSCC) as well as the Standards and Training for Corrections (STC).  We are working with CHS and JPS to develop a joint curriculum.  Additionally, suicide prevention training is completed by all custody staff on a yearly basis.

a)   avoiding obstacles (negative attitudes) to suicide prevention;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

b)   prisoner suicide research;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

c)   why facility environments are conducive to suicidal behavior;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

d)  identifying suicide risk despite the denial of risk;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

e)  potential predisposing factors to suicide;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

f)  high-risk suicide periods;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

g)  warning signs and symptoms;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

h)  components of the jail suicide prevention program

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

i)    liability issues associated with prisoner suicide;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

j)    crisis intervention.

Training needs are being evaluated against on-going pre-service training.  There is a 24 hour crisis intervention training class included at the end of the academy.  This topic will also be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

2.   The County shall develop, in consultation with Plaintiffs' counsel, a two-hour annual suicide prevention curriculum for all custody, medical, and mental health staff, to be conducted in person in a classroom or virtual classroom setting, that includes:

This is something we have to work on with JPS.  <span style="color:red">A suicide prevention task force has been created which will help with this.</span>

a)  review of topics (a)-(j) above

b)  review of any changes to the jail suicide prevention program

The Sheriff's Office is in the process of revising all of its policies. They will be working with Lexipol to accomplish this. They have indicated that all of the orders related to the Consent Decree will be their priority. We have identified a list of policies we would like them to start on. The Suicide Prevention policy was the first one we asked them to complete.

c)   discussion of recent jail suicides or attempts

Discussions occur daily with IOP and JPS staff. If there are any attempts, they may be covered in these conversations. Additionally, we are in the process of getting the Suicide Prevention Committee back together. We have met several times. The process is being developed.

3.   Custody officers assigned to Designated Mental Health Units shall receive additional specialized training on suicide prevention and working with prisoners with serious mental illness.

IOP and JBCT Deputies receive 24 hours of advanced CIT training.  IOP/JBCT Deputies also attend training with the department's Critical Incident Negotiations Team (CINT) to learn how to deal with persons with a mental illness.
IOP/JBCT Deputies will also attend a custody based negotiations class facilitated by the FBI.

5.   All mental health staff and custody officers shall be trained on the appropriate use of safety suits—*i.e* ., not to be utilized as a default, not to be used as a tool in behavior management, not to be utilized for patients being observed at 30-minute observations.

This will be outlined in the revised Suicide Prevention Operations Order. Safety Suits are used at the discretions of JPS based on collaboration with custody staff and not as a behavior management tool.

6.   The County shall ensure that all staff are trained in the new Suicide Prevention Policy.

The policy is in the process of being updated. This area will be addressed in the revised version of the policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

C.   **Nursing Intake Screening**
D.   **Post-Intake Mental Health Assessment Procedures**

1.   All mental health assessments shall be conducted in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

This is currently being done at RCCC. The interviews are taking place in an area where the officers can stand back to give them privacy. The doors were switched out so they can be closed. They have windows so the officer can stand outside and see what is taking place in the room. JPS recently purchased machines that make white noise to help make it more difficult to hear the assessment. If there is a safety concern, the assessments are conducted in an attorney room so there is barrier between JPS staff and the inmate. At Main Jail, inmate privacy is a priority. When JPS assessments are conducted we offer the maximum level of privacy afforded given the case-by-case safety risk. At Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for Mental health assessments. The phone has had some wiring issues but each time those concerns have been brought to the attention of custody staff, a work order is immediately created and the issue is resolved.

## E.  **Response to Identification of Suicide Risk or Need for Higher Level of Care**

1.   When a prisoner is identified as at risk for suicide and placed by custody staff in a safety cell, on suicide precautions, and/or in a safety suit, mental health staff shall be contacted immediately.  A qualified mental health professional, or other appropriately trained medical staff in consultation with mental health staff, shall complete a confidential in-person suicide risk assessment as soon as possible, consistent with the "must-see" referral timeline.

Current practice as outlined in our Suicide Prevention Operations Order updated in January 2020. In addition, a correctional based negotiations team is in the beginning stages of being developed to assist with suicide de-escalation incidents or inmates who are experiencing a crisis. Deputies selected to be a part of this team will attend a custody based negotiations class facilitated by the FBI. At Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for Mental health assessments. The phone has had some wiring issues but each time those concerns have been brought to the attention of custody staff, a work order is immediately created and the issue is resolved.

2.  Consistent with current RCCC policy, if there is no mental health staff on site at RCCC at the time that an emergent mental health need is identified, the prisoner shall be transported to the Main Jail for emergency evaluation within two hours of the initial report.

Current practice.  Development of procedures for use of suicide resisitant cells at RCCC to limit transport to only the most acute patients. Our goal is to work with Lindsey to create an additional four suicide resistant cells where we can house inmates who fit this criteria.

4.  The County shall ensure that the meal service schedule or other custody-related activities cause no delay in the completion of suicide risk assessments for prisoners.

Current practice.

### F.  Housing of Inmates on Suicide Precautions

1.  The County's policy and procedures shall direct that prisoners, including those identified as being at risk for suicide, be treated in the least restrictive setting appropriate to their individual clinical and safety needs.

Policy forthcoming.  Current post orders and practice indicate least restrictive housing for suicidal inmates. JPS staff shall consult with custody staff to determine the appropriate housing location for the inmate.

### G.  Inpatient Placements

1.  The County shall ensure that prisoners who require psychiatric inpatient care as clinically indicated are placed in the 2P unit within 24 hours of identification, absent exceptional circumstances.  In all cases, the provision of clinically indicated treatment to any prisoner requiring inpatient level of care shall be initiated within 24 hours.

Jail Annex planning in order to meet the 24 hour time limit. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail.

### H.  Temporary Suicide Precautions

1.  No prisoner shall be housed in a safety cell, segregation holding cell, or other Temporary Suicide Precautions Housing for more than six (6) hours. If mental health or medical staff determine it to be clinically appropriate based on detoxification-related needs, this time limit may be extended to no more than eight (8) hours. If exceptional circumstances prevent transfer within these timelines, those circumstances shall be documented, and transfer shall occur as soon as possible. This does not preclude the housing of a prisoner in the IOP unit if clinically indicated.

Jail Annex planning will strengthen this request. We currently follow these timeframes as much as possible with the limited number of cells in the IOP unit. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail.

2.  The County shall ensure, including by revising written policies and procedures where necessary, the timely and adequate completion of medical assessments for prisoners in need of suicide precautions, as required under Operations Order 4/05 (*i.e.*, within 12 hours of placement of the next daily sick call, whichever is earliest, and then every 24 hours thereafter).

Current practice. Custody staff shall notify medical staff within fifteen (15) minutes that a prisoner is temporarily housed in a safety or segregation cell and medical staff shall complete an assessment within 12 hours of placement or the next sick call, whichever us earliest.

3.  The County shall ensure that any cell used for holding prisoners on suicide precautions is clean prior to the placement of a new prisoner, as well as cleaned on a normal cleaning schedule.

Current practice. The Post Order has been approved.

4.  The County shall create and implement a written policy ensuring adequate frequency for meals, fluids, hygiene, showers, prescribed medications, and toileting when a prisoner is in cell used for holding prisoners on suicide precautions.

Current practice.  Will add the language to the new Suicide Prevention policy. RCCC has no cells designed for long term housing of inmates on suicide precautions. RCCC does not have JPS staff available 24 hours a day

5.  Inmates on suicide precautions shall not automatically be on lockdown and should be allowed dayroom or out-of-cell access consistent with security and clinical judgments.

Current practice.

6.   The classrooms or multipurpose rooms adjacent to the housing units in the Main Jail are designed for, and should be made available for, prisoner programs and treatment.  Absent an emergency, the County shall not use the classrooms and multipurpose rooms to hold prisoners pending a mental health evaluation or on suicide precautions.  Where such emergency occurs, the County shall document the reasons for retention and move the prisoner, within six (6) hours, to the inpatient unit or other appropriate housing location for continued observation, evaluation, and treatment.

Multi-purpose rooms are no longer used for holding suicide precaution, or mental health evaluation inmates.  Written directives to staff document acceptable practice for at-risk patients, without the use of MPRs.  There is currently a zero use policy, not even as a last resort.

## I.   Suicide Hazards in High-Risk Housing Locations

1.   The County shall not place prisoners identified as being at risk for suicide or self-harm, or for prisoners requiring IOP level of care, in settings that are not suicide-resistant as consistent with Lindsay Hayes's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities."

Current practice. Inmates at risk for suicide, self harm, or IOP level of care are not housed in settings that are not suicide resistant.

2.   Cells with structural blind spots shall not be used for suicide precaution.

Current practice.

## J.   Supervision/Monitoring of Suicidal Inmates

1.   The County shall ensure adequate visibility and supervision of prisoners on suicide precautions.

Current practice.

2.   The County shall not cover cell windows with magnetic flaps or any other visual barrier preventing visibility into any cell that is housing a prisoner on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need.

Current practice.

3.   The County shall revise its policies regarding the monitoring of prisoners on suicide precautions to provide for at least the following two defined levels of observation:

a)   <u>Close observation</u> shall be used for prisoners who are not actively suicidal but express suicidal ideation (*e.g.*, expressing a wish to die without a specific threat or plan) or have a recent prior history of self-destructive behavior.  Close observation shall also be used for prisoners who deny suicidal ideation or do not threaten suicide but are engaging in other concerning behaviors indicating the potential for self-injury.  Staff shall observe the prisoner at staggered intervals not to exceed every 15 minutes and shall document the observation as it occurs.

The revised policy being worked on by the Lexipol team will address this issue. <span style="color:red">All policies related to the Consent Decree are currently being drafted by the Lexipol project team</span>

b)   <u>Constant observation</u> shall be used for prisoners who are actively suicidal, either threatening or engaging in self-injury, *and* considered a high risk for suicide.  An assigned staff member shall observe the prisoner on a continuous, uninterrupted basis.  The observation should be documented at 15-minute intervals.  Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation.

This type of monitoring occurs in the SITHU or 2P level of care currently.

4.   For any prisoner requiring suicide precautions, a qualified mental health professional shall assess, determine, and document the clinically appropriate level of monitoring based on the prisoner's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically-determined level of monitoring.

Current practice. Once JPS staff has completed the inmate's evaluation, the JPS staff member shall consult with custody staff to determine the appropriate housing location for the inmate.

5.   Video monitoring of prisoners on suicide precaution shall not serve as a substitute for Close or Constant observation.

Current practice. Outlined in our current Suicide Prevention Policy

K.   **Treatment of Inmates Identified as at Risk Of Suicide**

3.   All assessments, treatment, and other clinical encounters shall occur in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

When necessary, custody staff will standby for security while offering auditory privacy. Proximity is dependent on the inmates behavior safety risk. This can be accomplished at RCCC due to the design of the three offices where these contacts take place. All of the doors can be closed. They have windows where the officers can stand outside and see what is taking place in the room. At Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for Mental health assessments. The phone has had some wiring issues but each time those concerns have been brought to the attention of custody staff, a work order is immediately created and the issue is resolved.

## L.   **Conditions for Individual Inmates on Suicide Precautions**

1.   The County's Suicide Prevention Policy shall set forth clear and internally consistent procedures regarding decisional authority for determining the conditions for individual inmates on suicide precautions.  Mental health staff shall have primary authority, consistent with individualized classification and security needs, with respect to the following:

## M.   **Property and Privileges**

1.   Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of routine privileges (*e.g.*, visits, telephone calls, recreation) that are otherwise within the limitations of a prisoner's classification security level.  Any removal of privileges shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

Current practice.  Prisoners placed in a safety cell shall be allowed to retain enough clothing or be provided with a suitably designed "safety garment" to provide for the prisoners personal privacy unless specific identifiable risks to the prisoner's safety or to the security of the facility exist and are documented.

2.  Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff depending on suicide risk, the removal and/or return of a prisoner's clothing and possessions (*e.g.*, books, slippers/sandals, eyeglasses) that are otherwise within the limitations of a prisoner's classification security level.  The removal of property shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

Current practice.  If deemed necessary by JPS staff, the inmate's clothing shall be taken and the inmate will be given a "safety suit" to wear.  Prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damage property.

3.  Cancellation of privileges should be avoided whenever possible and utilized only as a last resort.

Current practice. Cancellation of privledges would be done only as a last resort or if deemed necessary per JPS.

### N.  Use of Safety Suits

1.  Decisions about the use of a safety suit (smock) or removal of normal clothing will be under mental health staff's authority, based on individualized clinical judgment along with input from custody staff.

Current practice. Outlined in the current Suicide Prevention Program Operations Order.The use of the "Safety Suit" shall be at the discretion of JPS, based on collaboration with intake or custody staff.

2.  Custody staff may only temporarily place an inmate in a safety suit based on an identified risk of suicide by hanging until the qualified mental health professional's evaluation, to be completed within the "must see" referral timeline. Upon completion of the mental health evaluation, the mental health professional will determine whether to continue or discontinue use of the safety suit.

Absent direction from Jail Psychiatric Services (JPS) deeming a "safety garment" necessary, a sworn supervisor must authorize custody staff to take the clothing and supply the prisoner with a "safety garment".  Unless a "safety garment" is necessitated by the prisoner's behavior, prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damage property

3.  If an inmate's clothing is removed, the inmate shall be issued a safety suit and safety blanket.

Current practice. See above.

4.   As soon as clinically appropriate, the provision of regular clothing shall be restored.  The goal shall be to return full clothing to the inmate prior to discharge from suicide precautions.

Current practice. Determination is made by JPS.

6.   If a qualified mental health professional determines that 30-minute (or less frequent) observations are warranted for a prisoner, safety suits shall not be used on that prisoner.

This causes some confusion to address.  County request discussion on the exact meaning of this provision.

7.   Safety suits shall not be used as a tool for behavior management or punishment.

Current practice. Safety suits are only used when necessary for the safety and security of the inmate.

## O.  Beds and Bedding

1.   All prisoners housed for more than four hours on suicide precautions and/or in an inpatient placement shall be provided with an appropriate bed, mattress, and bedding unless the prisoner uses these items in ways for which they were not intended (*e.g.*, tampering or obstructing visibility into the cell).  Such a determination shall be documented and shall be reviewed on a regular basis.

Attempting to meet this criteria through use of suicide resistant cells and an emphasis on removal from booking housing as soon as proper housing is available.

## P.  Discharge from Suicide Precautions

1.   A qualified mental health professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions in order to ensure that the discharge is appropriate and that appropriate treatment and safety planning is completed.

Current custody practice.

3.   Qualified mental health professionals shall provide clinical input regarding clinically appropriate housing placement (*e.g.*, whether isolation is contraindicated for the prisoner) upon discharge.  Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement.  Once clinically discharged from suicide precautions, the prisoner shall be promptly transferred to appropriate housing.

Current custody practice. This is accomplished with the input of Classification staff and JPS.

Q.  **Emergency Response**

1.   The County shall keep an emergency response bag that includes appropriate equipment, including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units.  All custodial and medical staff be trained on the location of this emergency response bag and shall receive regular training on emergency response procedures, including how to use appropriate equipment.

Those items are available in each facility.

2.   All custody and medical staff shall be trained in first aid and CPR.

Current custody practice. Sworn staff receives CPR training every two years. It is part of our Advanced Officer Training program.

3.   It shall be the policy of the County that any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff shall begin to administer standard first aid and/or CPR, as appropriate.

Current practice.

R.  **Quality Assurance and Quality Improvement**

2.   The County shall, in consultation with Plaintiffs' counsel, revise its in-custody death review policy and procedures.  Reviews shall be conducted with the active participation of custody, medical, and mental health staff.  Reviews shall include analysis of policy or systemic issues and the development of corrective action plans when warranted.

Current practice.

3.   For each suicide and serious suicide attempt (*e.g* ., requiring hospitalization), the County's Suicide Prevention Task Force shall review: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt.  Where applicable, the Review Team shall generate recommendations for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

Current practice. The Suicide Prevention Task Force has been reestablished and has already had its first meeting.

VIII.     **SEGREGATION/RESTRICTIVE HOUSING**

A. **General Principles**

1.   Prisoners will be housed in the least restrictive setting necessary to ensure their own safety, as well as the safety of staff, other prisoners, and the public.

Working toward this goal constantly.  Reduction of nearly 2/3 of all TSEP inmates to lower levels of housing.  Piloting of the TSEP reduction plan involved stepping down several TSEPs transferred to general population floors.

a)   The County shall not place prisoners in more restrictive settings, including Segregation, based solely on a mental illness or any other disability. Prisoners will be housed in the most integrated setting appropriate to their individual needs.

The creation of the third floor as a mental health treatment floor has allowed most, if not all, SMI TSEPs to integrate into more normative housing.  This allows all but the most violent individuals to house in a mental health setting, while maintaining Administrative Segregation for inmates not on the behavioral health case load. RCCC has implemented several SMI program pods, where inmates housed in a single cell are only assigned based on JPS recommendation and allowed program/recreation time with other inmates, minimum 17 hours a week.

b)   The County shall not place prisoners into Segregation units based solely on classification score.

Several objective indicators are used to determine the appropriateness of segregation.  Written docuementation is required and we are working towards periodic review of justification for segregation.  Inmates solely classified as "high" are not routinely segregated.

c)   The County shall review the housing and restrictions of female prisoners classified as high security to ensure that this population is not subject to Segregation conditions of confinement.

Current practice.

d)   Specialized medical units (e.g., Main Jail 2 West Med/Psych, Main Jail 2 East) and mental health units (e.g., OPP, IOP, MHU, 2P) are not Segregation housing units. The County shall ensure that prisoners housed in these units receive daily access to out-of-cell time, telephones, showers, and other programs, services, and activities consistent with their classification and treatment plan.

Current practice. RCCC has an open floor plan setting for medical housing with access to phones, showers, and yard.

2.   The County shall not place a prisoner in Segregation units without first determining that such confinement is necessary for the safety of the staff, other prisoners, or the public. The County shall clearly document in writing the specific reason(s) for a prisoner's placement and retention in Segregation housing. The reason(s) shall be supported by clear, objective evidence. Prisoners will remain in Segregation housing for no longer than necessary to address the reason(s) for placement.

Working toward this goal.  Pilot programs for AdSeg Phase 1 and 2 with steps to reduce between the two. At RCCC the need for segregation housing is clearly documented in the JIMS system. Face to Face interviews are set up with Classification Deputies in order to determine if housing is appropriate. If an inmate remains in Phase 1, it is clearly documented in JIMS. A Post Order regarding this topic has been approved.

3.   The County shall not place the following prisoners in a Segregation setting unless necessary to address a serious risk of physical harm, and in such cases only for the minimum time necessary to identify an alternative appropriate placement:

a)   Prisoners with acute medical needs that require an inpatient level of care and/or daily nursing care;

Current practice.

b)   Prisoners who are pregnant, post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy.

Not codified in policy, however can be implemented in practice immediately.

B.   **Conditions of Confinement**

1.   The County will provide at least 17 hours of out-of-cell time per week for all prisoners, with the exception of prisoners subject to Administrative Segregation Phase I and Disciplinary Segregation in accordance with this remedial plan. The County will monitor out-of-cell time, and if minimum out-of-cell time requirements are routinely not being met at a particular facility or in a particular housing unit, the Sheriff's Department division commander or designee will review the situation and take appropriate steps to resolve the issue.

Current practice.  Weekly reports show nearly universal compliance, even during more stringent social distancing for COVID precautions.  A Post Order regarding this topic has been approved. Each officer is aware of the amount of out-of-cell time each classification of imate is entitle to receive.

a) The County shall implement a policy to document out-of-cell time provided to each prisoner. The County shall conduct monthly audits to ensure that prisoners have been provided the required treatment and recreation time out of cell. This data will be regularly reviewed as part of the County's Quality Assurance procedures.

Out of cell time is monitored and recorded in the current WebJPF system. Reports are generated on a weekly basis, and checked for compliance. Inconsistent out of cell times are addressed. Particularly during COVID precautions, once inmates are out of quarantine, they are receiving nearly 20 hours per week out of cell time. A Post Order regaring this topic has been approved. The officers are aware of the amount of out-of-cell time each classification of imate is entitle to receive.

2. Out-of-cell time with the opportunity to exercise shall be provided to each prisoner seven (7) days per week, including outdoors/recreation time when feasible. The County shall offer out-of-cell time at appropriate times of day.

Current practice. Schedules have been created to ensure fair distribution of outdoor recreation. Initial indications are that inmates are receiving at least one hour per week of outdoor recreation, with some housing locations receiving up to 3 hours per week. Much of the 17 hours out of cell time is unstructured, allowing for exercise.

3. The County shall modify its non-disciplinary Segregation policies and procedures to allow reasonable access to the following: (1) Personal phone calls for all prisoners, including at least five hours or three weekdays per week of phone access during normal business hours; (2) Education, rehabilitation, and other materials (e.g. writing implements, art supplies, tablets), for in-cell activities; (3) Personal and legal visiting; (4) Religious services; and (5) Commissary.

Commissary restrictions have been lifted. Personal and legal visiting is unrestricted. Working toward more phone time during weekday hours. Working toward programming and education for the pre-sentenced population. At RCCC phones are available during any out of cell time which for non disciplinary segregation is 17 hours per week. The Post Order regarding this topic has been approved.

a) The conditions and privileges described above shall be provided unless there is a specific safety or security issue preventing provision of such materials or the prisoner is subjected to disciplinary action.

Continuing to work toward meeting this goal.

4. Cell windows shall not be covered with magnetic flaps, towels, sheets, or any other visual barrier preventing visibility into and out of the cell, unless there is a specific security or privacy need that is documented, and then for only a period of time necessary to address such security or privacy need. This provision shall apply to all cells housing prisoners.

Current practice. Cell window and bunk obstructions are not permitted for the safety and security of the inmate

5.  The County shall establish procedures so that all housing unit cells are searched and cleaned prior to a prisoner's placement in the cell.

The Post Order regarding this topic was approved.

6.  The County shall establish procedures to ensure that no prisoner is placed in a Segregation housing cell without a mattress and appropriate bedding.

Current practice.

C.  **Mental Health Functions in Segregation Units**

1.  Segregation Placement Mental Health Review

a)  All prisoners placed in a non-disciplinary Segregation housing unit and all prisoners housed in a Disciplinary Detention unit shall be assessed by a qualified mental health professional within 24 hours of placement to determine whether such placement is contraindicated. All prisoners subjected to Disciplinary Segregation conditions for 72 hours in their general population housing unit (*i.e.*, confined to cell 23 hours per day) shall also be assessed by a qualified mental health professional no later than the fourth day of such placement.

Partial implementation through pilot programs with JPS.

b)  Any decision to place prisoners with Serious Mental Illness in Segregation shall include the input of a qualified mental health professional who has conducted a clinical evaluation of the prisoner in a private and confidential setting (absent a specific current risk that necessitates the presence of custody staff), is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

RCCC has multiple SMI programs. Inmates in IOP and JBCT are not in segregation/restriction housing. Disciplinary housing is issued only with clearance from JPS staff assigned to these programs. Consultation with SMI inmates and JPS in these programs are confidential.

d)  If mental health or medical staff find that a prisoner has a Serious Mental Illness or has other contraindications to Segregation, that prisoner shall be removed from Segregation absent exceptional and exigent circumstances.

Current practice.

2.   Segregation Rounds and Clinical Contacts

a)   Cell checks (to ensure that prisoners are safe and breathing) shall be conducted for all prisoners in Segregation at least every 30 minutes, at staggered intervals. Completion of cell checks will be timely documented.

Current practice. See POST ORDER HOUSING UNIT CHECKS

b)   A qualified mental health or medical professional shall conduct check-ins at least once a week, to assess and document the health status of all prisoners in Segregation, and shall make referrals as necessary. The check-in shall include a brief conversation with each prisoner, a visual observation of the cell, and an inquiry into whether the prisoner would like to request a confidential meeting with a mental health or medical provider. Steps shall be taken to ensure effective communication, as well as auditory privacy consistent with security needs. When a prisoner in Segregation requests a confidential meeting with a mental health or medical provider, or the medical or mental health professional identifies a mental health or medical need, staff shall make appropriate arrangements to include triage, examination and treatment in an appropriate clinical setting. In such cases, staff shall give the prisoner the opportunity to complete a health care request but will otherwise initiate a referral without requiring the prisoner to complete a request form.

Partial implementation. This has been impelemented in IOP and JBCT housing.

3.   Response to Decompensation in Segregation

a)  If a prisoner in Segregation develops signs or symptoms of mental illness where such signs or symptoms had not previously been identified, suffers deterioration in his or her mental health, engages in self-harm, or develops a heightened risk of suicide, the prisoner shall immediately be referred for appropriate assessment and treatment from a qualified mental health professional who will recommend appropriate housing and/or programming.

Current practice.

b)  Jail staff shall follow a mental health recommendation to remove a prisoner from Segregation unless such removal poses a current safety risk that is documented. In such a case, the Commander or management-level designee shall be notified and staff shall work to remove the prisoner from Segregation and secure a placement in an appropriate treatment setting at the earliest possible time.

Current practice for nearly all mental health placements.  Full compliance with the acute unit and nearly universal compliance with the IOP unit.

D.  **Placement of Prisoners with Serious Mental Illness in Segregation**

1.  Prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit (2P, IOP, OPP) will not be placed in Segregation, but rather will be placed in an appropriate treatment setting – specifically, the inpatient unit or other Designated Mental Health Unit providing programming as described in **Exhibit A-2**.

Several programs available for SMI inmates. IOP, OPP, JBCT. Inmates are not segregated based on SMI

2.  In rare cases where a prisoner with a mental health condition meeting criteria for placement in a Designated Mental Health Unit presents an immediate danger or significant disruption to the therapeutic milieu, and there is no reasonable alternative, such a prisoner may be housed separately for the briefest period of time necessary to address the issue, subject to the following:

a)   The prisoner shall receive commensurate out-of-cell time and programming as described in **Exhibit A-2** (including for IOP and OPP, 10 hours/week of group treatment/structured activities, 7 hours/week unstructured out-of-cell time, weekly individual clinical contact) with graduated programming subject to an individualized Alternative Treatment Program.

<mark>Current practice at RCCC and Main Jail. IOP no longer removes patients that are disruptive without clinical assessment and agreement by JPS. When patients are moved, they are placed on the case management protocol for JPS interaction and treatment.</mark>

iv.  Privileges commensurate with the Designated Mental Health Unit program, unless modified in an Alternative Treatment Program based on individual case factors that are regularly reviewed.

Inmates in DMHUs housed without a cellmate receive program and recreation time with other inmates. Incentives programs are utilized as advised by JPS staff. They generally exceed the 17 hour minimum per our weekly reports. JPS determines when an inmate in these housing facilities must be housed in a solitary cell

v.   Daily opportunity to shower.

Current practice. Hygiene opportunities are available during any recreation time and incentivised in some programs

3.   A prisoner with Serious Mental Illness requiring restraints (*e.g.*, handcuffs, belly chains, etc.) shall not be denied clinically indicated group or individual treatment due to security factors, absent exceptional circumstances that are documented. Prisoners with Serious Mental Illness housed in Segregation who require restraints when out of cell shall have the opportunity to work their way out of restraints through graduated programming subject to an individualized Alternative Treatment Program.

Current custody practice.

E.   **Administrative Segregation**

1.   Use of Administrative Segregation

a)   Only the Classification Unit can assign a prisoner to Administrative Segregation.

Current practice.

b)   The County may use Administrative Segregation in the following circumstances:

| | |
|---|---|
| i.   Objective evidence indicates that a prisoner participated in a recent assault and the assaultive behavior involved an assault on staff or visitors, serious injury, use of a weapon, gang removals, or multiple prisoner assaults. Mutual combat situations that do not otherwise qualify for Administrative Segregation are excluded. | Current practice. |
| ii.   During a brief investigative period not to exceed ten days while Classification staff attempts to verify the need for Protective Custody or while the prisoner is awaiting transfer to another facility. | Working toward this goal.  Implemented steps to achieve compliance and practice changes. |

c)   The Compliance Commander shall have the authority to place prisoners in Administrative Segregation under the following circumstances:

| | |
|---|---|
| i.    The prisoner poses an extraordinary safety risk and no other housing unit is sufficient to protect the prisoner from harm; | Current practice. |
| ii.  The prisoner has failed to integrate into a lesser restrictive housing setting because of repeated and recent history of assaultive behavior or current threats of violence associated with being in a lesser restrictive setting; or | Current practice. |
| iii. Objective evidence indicates that the prisoner attempted to escape or presents an escape risk. | Current practice. |

2.   Notice, Documentation, and Review of Administrative Segregation Designations

a)   The Classification Unit shall document the rationale for designating a prisoner for Administrative Segregation in the classification file using objective evidence. For prisoners younger than 24, the Classification Unit shall consider the prisoner's age as a mitigating factor when assigning the prisoner to Administrative Segregation.

Working toward this element, with partial complinace to date. The Post Order regarding this topic has been approved.

b)   Classification shall attempt to down-class prisoners to a lesser restrictive housing setting at the earliest possible opportunity, consistent with safety and security.

Current practice.

c)   County shall provide prisoners in Administrative Segregation with a written notice within 72 hours of the prisoner's initial placement in Administrative Segregation, explaining the reasons for the prisoner's Administrative Segregation designation and how the prisoner may progress to a lesser restrictive housing setting.

Current practice at RCCC and Main Jail

d)   Prisoners housed in Segregation units will, at least every thirty (30) days, receive face-to-face interviews in a private out-of-cell setting, consistent with individual security needs, to discuss progress and compliance with their individual case plan as part of a classification review. Consideration will be given to their mental health and to their appropriateness for transfer to a less restrictive setting.

Current practice at RCCC and Main Jail

e)   The Compliance Commander or higher-ranked officer will review and approve the decision to designate a prisoner for Administrative Segregation for longer than 15 days.

Working toward this element, with partial complinace to date.

f)  The County shall document the reason the prisoner is retained in the same Administrative Segregation Phase. The prisoner will be given written notice of the reasons the prisoner is being retained in the same Phase of Administrative Segregation and what conduct the prisoner is required to exhibit to progress to a lesser restrictive housing setting.

Working toward this element, with partial compliance to date. RCCC and Main Jail documents in inmate JIMS system all inmate classification reviews including reasons for inmate to remain in current classification. Current practice. The Post Order regarding this topic has been approved.

g)  The Compliance Commander or higher-ranked officer must approve the continued retention of a prisoner in Administrative Segregation for longer than 90 days, and the Compliance Commander or higher-ranked officers must reauthorize such placement at least every 90 days thereafter.

Working toward this element, with partial compliance to date. Will be the practice with ATIMS. The Post Order regarding this topic has been approved.

3.  Administrative Segregation Phases

a)  The County shall develop and implement a phased system for prisoners designated as Administrative Segregation to achieve a lesser restrictive housing setting.

Working toward this element, with partial compliance to date. RCCC Classification Unit currently class interviews with all Phase 1 inmates on a face to face level and documents attempts to step inmate down into lower classification level. Official policy has been created. Will be the practice with ATIMS

b)  Administrative Segregation Phase I:

i.   This is the most restrictive designation for prisoners in Administrative Segregation.

ii.  Prisoners shall be offered a minimum of one hour per day out of cell time for a total of seven hours per week.

Current Practice. Per TSEP SEGREGATION HOUSING POST ORDER, inmates receive 7 hours/week out of cell time. Currently monitored weekly with out of cell reports… with exception to inmates on COVID-19 Isolation

iii.  Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least five of the seven hours per week.

Current Practice. Per TSEP SEGREGATION HOUSING POST ORDER, inmates receive 7 hours/week out of cell time. Currently monitored weekly with out of cell reports… with exception to inmates on COVID-19 Isolation

iv.  Prisoners shall not remain in Phase I for longer than 15 days unless the prisoner engages in new conduct warranting retention in Administrative Segregation as specified in **Section VIII.E.1.b.**

Working toward this element, with partial complinace to date. RCCC adn Main Jail currently conducts face to face classification interviews with all TSEP/PHASE 1 inmates and documents either classification down or reasons why an inmate is to stay. The move from every 30 days to every 15 days has been implemented.

c)  Administrative Segregation Phase II:

a)  Prisoners shall be offered a minimum of 17 hours of out of cell time per week.

Current practice at RCCC, montitored with weekly reports through WebJPF. Meeting criteria except for those subject to COVID-19 isolation procedures. Same at Main Jail

b)  Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least 10 of the 17 hours per week.

Current Practice. Inmates not in phase one receive a minimum of 17/week. Currently monitored weekly with out of cell reports… with exception to inmates on COVID-19 Isolation

c)  Prisoners shall be offered the opportunity to program in groups of two to four prisoners, unless pairing with another prisoner is not possible for safety or security reasons, and those reasons are documented by the County.

Current Practice. RCCC allows dayroom for inmates in cell settings to include multiple inmates except for inmates in TSEP/PHASE 1. Same at Main Jail

d)  The County shall develop a program of incentives for good behavior.

Plans in place to identify low cost incentives, including eating meals outside of cells and lower restrictive housing.

e)        Prisoners shall not remain in Phase II for longer than 30 days unless the prisoner commits a serious behavioral violation while in Administrative Segregation: fighting; threatening staff or other prisoners; resisting or delaying an order from staff that impedes Jail operations (e.g., failure to lock down); refusing to submit to a search of person or property; destroying or damaging Jail property (excluding property issued to a prisoner and/or minor defacing of property or destruction of low-value property) or facilities; possessing contraband that implicates safety or security (e.g., weapons, razors, unauthorized medication, but not extra clothing, commissary items, or food); cell flooding; tampering with cell locking mechanisms or other security features (e.g., cameras); and/or sexual activity/harassment.  In the event a prisoner engages in a serious behavioral violation, the conduct will be referred to the Classification Sergeant or higher-ranking officer, who shall have the discretion to extend the prisoner's Phase II time by 15 days, and shall develop an individual behavioral management plan, if one does not yet exist, for the prisoner.

RCCC currently practices a 30 day classification interview process and documents either a class to a lower level or reasons why an inmate is to stay at current level. <span style="color:red">Same at Main Jail</span>

F.   **Protective Custody**

1.   When a prisoner faces a legitimate threat from other prisoners, the County will seek alternative housing, by transferring the threatened prisoner to the general population of another facility or unit, or to a special-purpose housing (Protective Custody) unit for prisoners who face similar threats.

Current Practice. Inmates who face threats from other inmates are transferred to other housing units of the same classification and not automatically classed to a higher security level.

2.   The County will not operate Protective Custody units with Segregation-type conditions of confinement. Prisoners placed in Protective Custody shall have the same programs and privileges as general population prisoners, absent exceptional circumstances that are documented.

Current Practice. RCCC currently has re-entry programs for PC classifications and dorm style housing units with open dayroom.

3.   The County shall create a policy that describes the process and criteria for placement of prisoners into Protective Custody. The County shall consult with Plaintiffs to develop such a policy.

> Policy yet to be developed.

4.   Prisoners who are lesbian, gay, bisexual, transgender, or intersex (LGBTI) or whose appearance or manner does not conform to traditional gender expectations should not be placed in Segregation or Protective Custody solely on the basis of such identification or status, or because they are receiving gender dysphoria treatment.

> Current Practice.

a)   When a prisoner who is LGBTI or gender nonconforming faces a legitimate threat, the County shall identify alternative housing, with conditions comparable to those of general population. Privileges and out-of-cell time for this population will be documented and regularly reviewed by supervisory level staff to ensure appropriate housing, out-of-cell-time, and related conditions for this group of prisoners.

> TGNI inmates not able to house in general population are placed in protective custody.  Out of cell privileges are commensurate with most general population prisoners.

b)   In deciding whether to assign a transgender or intersex prisoner to a facility or program for male or female prisoners, the County shall consider on a case-by-case basis whether a placement would ensure the prisoner's health and safety, and the health and safety of other prisoners, giving serious consideration to the prisoner's own views.

> Current practice.

c)   Jail staff will receive training on the unique issues of managing transgender prisoners, with refresher training at least bi-annually.

> A lesson plan and PowerPoint has been created for the topic of Cultural Awareness, which covers managing transgender prisoners.  This training will be provided in the Adult Corrections Officer Supplemental Core Course starting 2021 with all new hires.
> This course will  be transitioned into an online bi-annually refresher training.

5.   For prisoners who are LGBTI or whose appearance or manner does not conform to traditional gender expectations, the County shall identify the prisoner's preferred gender of jail staff who will perform searches of the prisoner.  The County shall honor the request except in exigent circumstances when doing so is not possible.

Current practice.  Statement of preference form completed by TGNI prisoners allowing them to request the gender of searching officer.

## G.  **Disciplinary Segregation**

1.   The County will not place a prisoner in disciplinary housing pending investigation of, and due process procedures for, an alleged disciplinary offense unless the prisoner's presence in general population would pose a danger to the prisoner, staff, other prisoners or the public.

Current practice.

2.   The County will adhere to a discipline matrix, developed in consultation with Plaintiffs, that clearly defines when disciplinary housing may be imposed.

Plans are in place to modify the discipline schedule to a different model, taking behavior and restriction timeframes into account.

3.   Prisoners who are found to have violated disciplinary rules following due process procedures will be placed in Segregation only after the County has determined that other available disciplinary options are insufficient, with reasons documented in writing.

Plans are in place to modify the discipline schedule to a different model, taking behavior and restriction timeframes into account.

4.   The denial of out-of-cell time for more than four (4) hours will not be imposed as a sanction absent a formal disciplinary write-up and due process hearing.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

5.   Prisoners serving a Disciplinary Segregation term shall receive at least seven (7) hours per week of out-of-cell time. Out-of-cell time with the opportunity to exercise shall be provided to each prisoner one (1) hour a day, seven (7) days per week.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

6.  Prisoners in Disciplinary Segregation shall, absent an individualized assessment of security risk that is documented be provided at least one book (which prisoners may regularly exchange), legal documents, hygiene materials, legal phone calls, and legal visits.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

7.  No Disciplinary Segregation term for non-violent rules violations will exceed 15 days.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

8.  The County will, in consultation with Plaintiffs' counsel, modify its inmate discipline policy and practice to limit placements in Disciplinary Segregation conditions to no more than 15 days, absent cases of serious violations stemming from distinct incidents and with Watch Commander-level approval.

Current practice, contained in Discipline Housing Post Order.

9.  No prisoner shall be placed in Disciplinary Segregation for more than 30 consecutive days.

Current practice, contained in Discipline Housing Post Order.

10. If after a Disciplinary Segregation term, Jail staff, with the input of a mental health clinician, determine that the prisoner cannot safely be removed from Segregation, placement on Administrative Segregation status may occur only subject to the process set forth in **Section VIII.E**.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

11. Once a prisoner has been moved out of Disciplinary Segregation, that prisoner shall not be placed back into Disciplinary Segregation absent (a) a new incident warranting discipline, and (b) completion of all mental health review procedures required for new Segregation placements.

Current practice, contained in Discipline Housing Post Order.

H.  **Avoiding Release from Jail Directly from Segregation**

| | |
|---|---|
| 1.   The County will avoid the release of prisoners from custody directly from Segregation-type housing, to the maximum extent possible. | Current practice. This has been added to Administrative Segregation Post Order |
| 2.   If a sentenced prisoner housed in Segregation has an upcoming expected release date (i.e. less than 120 days), the County will take and document steps to move the prisoner to a less restrictive setting, consistent with safety and security needs. If Segregation becomes necessary during this time, the County will provide individualized discharge planning to prepare the sentenced prisoner for release to the community. | Current practice. |

## I.   No Food-Related Punishment

| | |
|---|---|
| 1.   The County shall modify its policy and take steps to ensure that the denial or modification of food is never used as punishment. The County shall eliminate use of "the loaf" as a disciplinary diet.  Nothing in this paragraph shall be read to preclude the County from denying a prisoner use of the commissary. | Current practice. |

## J.   Restraint Chairs

| | |
|---|---|
| 1.   Restraint chairs shall be utilized for no more than six hours. | Current practice. |
| 2.   The placement of a prisoner in a restraint chair shall trigger an "emergent" mental health referral, and a qualified mental health professional shall evaluate the prisoner to assess immediate and/or long-term mental health treatment needs. | Current practice. |
| 3.   The opinion of a qualified medical professional on placement and retention in a restraint chair will be obtained within one hour from the time of placement. | Current practice. |

IX.    **QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT**

A.  **Generally**
B.  **Quality Assurance, Mental Health Care**
C.  **Quality Assurance, Medical Care**