# Second Monitoring Report of the Medical Consent Decree

## Mays et al. v. County of Sacramento

## Case No. 2:18-cv--02081

Submitted
October 1, 2021

Submitted by
Madeleine L. LaMarre MN, FNP-BC
and
Karen Saylor MD, FACP

# Contents

Introduction ......................................................................................................... 3

Compliance Definitions .......................................................................................... 4

Facility Description ................................................................................................ 5

Executive Summary ............................................................................................... 6

Findings ................................................................................................................ 14

    A. Staffing ......................................................................................................... 14

    B. Intake ........................................................................................................... 16

    C. Access to Care .............................................................................................. 20

    D. Chronic Care ................................................................................................ 25

    E. Specialty Services ......................................................................................... 30

    F. Medication Administration and Monitoring ................................................... 34

    G. Clinic Space and Medical Placements ........................................................... 38

    H. Patient Privacy ............................................................................................. 42

    I. Health Care Records ...................................................................................... 45

    J. Utilization Management ................................................................................. 47

    K. Sanitation ..................................................................................................... 48

    L. Reproductive and Pregnancy Related Care ................................................... 49

    M. Transgender and Non-Conforming Health Care ........................................... 52

    N. Detoxification Protocols ............................................................................... 52

    O. Nursing Protocols ......................................................................................... 55

    P. Review in Custody Deaths ............................................................................. 56

    Q. Reentry Services .......................................................................................... 58

    R. Training ........................................................................................................ 59

Medical Remedial Plan Compliance Summary ....................................................... 61

# Introduction

On July 31, 2018, Plaintiffs Lorenzo Mays, Ricky Richardson, Jennifer Bothun, Leertese Beirge, and Cody Garland filed a federal class-action complaint[1] alleging that Defendants: failed to provide minimally adequate medical and mental health care to incarcerated persons in its jails; imposed harmful and excessive use of solitary confinement in violation of the Eighth and Fourteenth Amendments to the US Constitution; and discriminated against individuals with disabilities in violation of the American with Disabilities Act (ADA) and section 504 of the Rehabilitation Act.

On October 18, 2018 the parties entered into a Consent Decree and Defendants agreed to implement measures set forth in a Remedial Plan, to be monitored by court-appointed Court Experts.[2]  On January 13, 2020 the Consent Decree was approved by the federal court. Within 180 days after approval of the Consent Decree, Defendants are to provide Plaintiffs' counsel and Court Experts a Status Report which includes a description of steps taken by Defendant to implement each provision set forth in the Remedial Plan and specifies provisions of the Remedial Plan which have not yet been implemented. With respect to the provisions of the Remedial Plan not yet implemented, Defendant's Status Report needs to: describe all steps taken by Defendant toward implementation; set forth with as much specificity as possible those factors contributing to non-implementation; set forth a projected timeline for anticipated implementation based upon the best information available to Defendant. Every 180 days thereafter, Defendants are to provide Plaintiff's counsel and Court Experts an updated Status Report addressing each item of the Remedial Plan and shall specify a compliance assessment for each provision of the Remedial Plan.

Within 180 days of the Consent Decree, Court Experts are to conduct monitoring tours and produce compliance reports for their respective areas. For this report, the Medical Experts conducted on-site tours from June 15-17, 2021.

We thank Sandy Damiano Ph.D., Deputy Director of the Department of Health Services, Primary Health Division, Deputy Chief Santos Ramos, Sacramento Sheriff's Office (SSO), and their staffs for their assistance and cooperation in completing this review.

---

[1] Mays et al. v. County of Sacramento, Case No: 2:18-cv-02081-TLN-KJN.
[2] In October 2020, Dr. Michael Rowe resigned as one of the Medical Experts. In February 2021 Dr. Karen Saylor was appointed as a Medical Expert. Mary Perrien is the Mental Health Expert and Lindsay Hayes is the Suicide Prevention Expert.

# Compliance Definitions

The Consent Decree offers limited guidance to the court-appointed experts regarding the measurement of compliance with the remedial plan, simply stating that the Defendants are in substantial compliance or not in substantial compliance with an individual provision. The term "substantial compliance" was not defined. The Consent Decree, however, does state that the "Defendant may, after conferring with Plaintiffs' counsel, request a finding by the Court that the Defendant is in substantial compliance with one or more components of the Remedial Plan and has maintained such substantial compliance for a period of at least 12 months."[3] In an effort to more accurately measure compliance with the provisions of this Consent Decree, as well as to provide guidance to the parties, the court-appointed experts subsequently decided to create a three-tier system for the measurement of compliance. Each of the experts have utilized such a system in prior federal court monitoring assignments. As such, the court-appointed experts agreed to the following definitions for compliance measurement for each of the provisions in this Remedial Plan:

**Substantial Compliance:**  Defendants have achieved compliance with most or all components of the relevant provision of the Consent Decree for both the quantitative (e.g., 90% performance measure) and qualitative measures (e.g., consistent with the larger purpose of the Decree). If an individual compliance measure necessitates either a lower or higher percentage to achieve substantial compliance, it will be so noted by the expert. Compliance has been sustained for a period of at least 12 months.

**Partial Compliance:** Defendants have achieved compliance on some of the components of the relevant provision of the Consent Decree, but significant work remains.  A minimum requirement is that for each provision, relevant policies and procedures must be compliant with Remedial Plan requirements, contain adequate operational detail for staff to implement the policy, staff are trained, and the County has begun implementation of the policy.

**Non-Compliance:** Defendants have not yet addressed the requirements of a provision of the Consent Decree or have not made substantive progress.

---

[3] Mays Consent Decree. Page 11.

# Facility Description

The Sacramento County Jail is comprised of two adult jails, the Main Jail (MJ) and Rio Cosumnes Correctional Center (RCCC), also known as Branch Jail.

The Main Jail is a multistory building built in 1989 with an original rated capacity of 1,250 that was later increased to 2,380.  It is the primary intake center for the jail and houses individuals of varying custody levels.  Housing unit design is primarily double cells with solid doors.   As of 9/22/2021 the Main Jail population was 1,854 including 1,628 males and 226 females, or 99% of rated capacity.[4]

RCCC is located in Elk Grove and was originally constructed as an Air Force base, which was deeded to the County in 1947, and converted to a jail around 1960. It is the primary custody facility for detainees sentenced to County Jail from the Sacramento County Courts. In recent years, the SSO has made an effort to house more pre-sentenced detainees at RCCC to deal with population pressures at Main Jail. In addition, RCCC houses detainees enroute to other jurisdictions, federal prisoners under a contract with the Federal Bureau of Prisons, and reciprocal prisoners from other counties. RCCC is the primary reception center for parole violators who are being held pending revocation hearings and the central transportation point for all defendants sentenced to State Prison.  Housing units are a combination of single and double cells as well as open barracks or dormitories.  It has a current rated capacity of 1,625 detainees.  As of 9/22/2021 the RCCC population was 1,292, including 1,192 males and 100 females, or 80% of rated capacity.

It is notable that the jail population has increased from 2,721 in 4/5/2020 to 3,146 on 9/22/2021 with Main Jail being at 99% capacity.  This rising population reduces flexibility in use of bed space and may contribute to obstacles in using bedspace for medical programs such creation of a detoxification unit.

The Sacramento Sheriff's Office (SSO) has overall responsibility for management of the jails. Adult Correctional Health (ACH), a program in the Department of Health Services (DHS) Primary Health Division, provides health care services and physical/behavioral health services through county and contracted staff working in partnership with SSO.

Due to the age of the jails, they were not designed for health care and are not compliant with the American with Disabilities Act (ADA) or Health Insurance Portability and Accountability Act (HIPAA) which were enacted at later dates.  The County considered constructing an Annex to the Main Jail to facilitate compliance with ADA and HIPAA requirements, however the County has paused the active planning for new construction for an annex to the Main Jail.[5]

---

[4] The calculation of rated capacity occupancy is provided by SSO in daily population counts for each facility.
[5] Mays Third Status Report.  Adult Correctional Health. July 7, 2021.

# Executive Summary

## The COVID-19 pandemic continues to present challenges to Remedial Plan implementation

Prevention and management of COVID-19 continues to impose intensive resource demands upon the County. In late December 2020, ACH and Sacramento Sheriff's Office (SSO) responded to a large COVID outbreak at the jail, and by March 2021, transmission within the jail was contained.

The County is proactive in responding to the COVID-19 pandemic through its intake screening, testing, quarantine, isolation, and vaccination programs. Adult Correctional Health (ACH) has offered vaccinations to staff since January 2021.  In March 2021, ACH began offering vaccines to detainees.  In July 2021 an inmate vaccine incentive program was implemented and augmented in September 2021. This program has resulted in increased detainee acceptance of COVID-19 vaccines.  ACH also regularly updates COVID-19 staff guidance as CDC, state, and local public health recommendations are revised.[6]

The COVID-19 Delta variant has resulted in a surge of community infections with a corresponding increase in infections among newly arriving inmates, emphasizing the importance of vaccination programs. On 8/19/2021 the California Department of Public Health (CDPH) issued an order for COVID-19 in state and local detention facilities requiring that all workers be vaccinated or tested weekly with full compliance required by 10/14/2021.[7]  The order also requires that detention facilities maintain records of workers vaccination or test results.

Beginning the week of September 13, 2021, ACH initiated COVID-19 testing clinics for staff, which are administered by Public Health.  Qualtrics, a COVID-19 vaccine verification system has been implemented and staff are inputting data into the system.

With respect to testing, counseling, monitoring and medical evaluation of patients in quarantine and isolation, we have serious concerns.  Staff does not document that patients are informed of their COVID-19 test results and counseled about what symptoms to report, particularly for patients that test positive. We interviewed the RCCC nurse manager who informed us that the patients who test negative are informed as a group, presenting confidentiality issues, and that patients who test positive are informed individually. However, there is no documentation to reflect that patients are notified of their test results.

Nurses conduct quarantine and medical isolation health checks; however, some days health checks are missed.[8]  In one case, we interviewed a patient who tested positive for COVID-19 in January and reported being unable to get urgent assistance for 3 days before he was sent to the

---

[6] ACH COVID-19 Guidance was most recently revised on July 12, 2021.
[7] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Correctional-Facilities-and-Detention-Centers-Health-Care-Worker-Vaccination-Order.aspx
[8] Patients #5 and #32.

emergency department with fever and shortness of breath. Record review showed that a nurse did not timely evaluate him when contacted by a deputy and a nurse did not perform a health check the day prior to his being sent to the emergency department.[9]

We are also concerned that patients with COVID-19 symptoms are not evaluated by a medical provider in accordance with current CDC guidance, which recommends that patients are medically evaluated at the first sign of COVID-19 symptoms.[10]  In one case, a patient submitted two health requests at the beginning and end of January complaining of COVID symptoms, had tested positive in the interval between the two requests, but was not medically evaluated by a medical provider.[11,12]

Another concern is the number of cell side assessments being conducted for patients that need a medical evaluation, particularly during the 10-day quarantine.  In one case, a patient with a history of alcohol abuse reported during previous admissions denied medical conditions at intake screening and was placed in quarantine.  Three days later, custody staff notified mental health staff that the patient had dementia and was gravely disabled.  Mental health conducted all assessments through the cell doors noting his deterioration.  The patient said "I am not crazy, I need medical help." The social worker planned to refer the patient to medical but this never took place. During this time, nurses conducted health checks but failed to note his declining condition and refer the patient urgently for medical evaluation. Five days after stating that he needed medical help, the patient was found unresponsive in his cell and died.[13]

Early in the pandemic, practices to limit movement and defer non-urgent medical care were appropriate with the understanding that *patients need to receive timely and appropriate evaluation and treatment for their serious medical needs.*  While quarantine remains an effective public health measure to prevent intramural transmission, the availability of vaccines and masking practices should allow routine health encounters to take place in appropriate clinical settings.

## Changes in health care leadership and organizational structure positions the County for progress towards Remedial Plan compliance

Sandy Damiano Ph.D., Deputy Director has provided strong leadership to address the COVID-19 pandemic and Remedial Plan compliance during the past 18 months.  She has driven the policy review process which is a foundational element for revising the health care system and Remedial Plan compliance.

---

[9] Patient #32.
[10] Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities. CDC. July 14, 2021.
[11] Patient #5.
[12] In mid-February, two weeks after he submitted the second health request, the patient was found unresponsive in his cell and died. Due to a delay in receiving autopsy reports, the cause of the patient's death is not yet known.
[13] Patient #6.

Some leadership positions that became vacant in the past year have been filled (e.g., Medical Director). The former Chief position that became vacant in March 2021 has been reclassified to a Health Services Administrator.  Once the new Health Services Administrator is filled, Dr. Damiano plans to realign the organizational structure to have all service line managers report to this position.  We strongly support these organizational changes.

## There are insufficient medical and nursing staff to meet Remedial Plan requirements.

With respect to staffing, understanding that there is a multiyear staffing plan in process, currently there are insufficient medical and nursing staff to meet Remedial Plan requirements.

The lack of permanent physicians is one of the most serious staffing concerns.[14] Patients do not have timely access to a medical provider qualified to diagnose and treat their serious medical conditions, including patients with chronic diseases.  Current practice is that physicians conduct medical record reviews without examining the patient and change treatment plans without informing and educating the patient. This practice leads to patient refusals of care and deterioration of their health status.

The lack of physicians has delayed implementation of Consent Decree requirements such as the chronic disease management program.  We also have concerns about whether existing medical staff are being productively assigned and utilized.  During our site visit, we visited 2M—the dedicated medical housing unit at the Main Jail—in the early afternoon and a physician assigned to the area for the day had seen one patient, which is a poor utilization of medical staff given the demand for clinical evaluations.  We recommend that the Medical Director monitor provider productivity and reevaluate the deployment of medical providers to ensure efficient delivery of services and staff productivity.

We also find that there are lack of adequate nursing staff and custody escorts to timely administer medications in accordance with the medication schedule.

## Lack of custody posts dedicated to essential health care functions and custody culture interferes with health care delivery

There is a lack of dedicated custody escorts to enable health care staff to conduct essential health care functions, including medical appointments and medication administration.

We understand that additional custody positions have been funded for health care escorts, however, due to SSO staff shortages the positions are being utilized for COVID-19 escorts and

---

[14] The County has renegotiated contracts to increase the competitiveness of physician salaries and will also renegotiate salaries for nurse practitioners and nurses.

other custody assignments.[15]  Although SSO attempts to fill the positions through overtime, the current shortage of escort deputies prevents the delivery of necessary health care.

Medical record review revealed multiple examples of unkept health care appointments due to lack of custody escorts.  In one case, a pregnant woman had been vomiting for several days, but the obstetrician, who comes only weekly, was unable to see a patient in her cell due to lack of custody escort.  The patient had to be seen urgently later that day by another medical provider for vomiting, but did not receive scheduled prenatal care.[16]

We appreciate that there has been collaboration and cooperation between custody and health care at the jail.  However, health record review shows that there has been custody interference in the provision of health care. We reviewed a case in which a LVN was caring for a gravely disabled patient who was unable to follow directions and feed himself. [17] She planned to assist him but was told by custody that she could not feed him due to "lack of deputy supervision". She inquired if she could feed him in the dayroom and custody declined due to "lack of deputies on the floor".  A RN requested the patient be transferred to 2M for feeding but was told that "2M deputies were too busy in 2M to be asked to escort the patient to 2M".  It is alarming that, despite nurses' attempts to negotiate a solution with custody to feed this gravely disabled patient, no accommodation was reached. There is no documentation that this situation was resolved or elevated up the chain of command.  The next day, a physician saw the patient who was in severe distress, lethargic, unable to be aroused, and hypotensive with a systolic blood pressure in the 60's. Nurses were unable to obtain a pulse or oxygen saturation.  Custody had shut off the water in his cell 3 days earlier because he was flooding his cell. The patient was sent to the hospital where he was diagnosed with acute kidney injury due to dehydration, GI bleeding, and urinary tract infection.  This patient languished to near death before intervention took place.

In another case, an obstetrician documented in the health record that she overheard deputies discussing performing a cell extraction on a 24- week pregnant woman for a court appointment. The obstetrician asked the deputies if she could speak with the patient to convince her to comply. The outcome of the situation was not documented.  However, the fact that deputies would consider conducting a cell extraction on this patient without consulting medical and/or mental health is both dangerous and alarming.

These are examples of lack of adequate custody staffing and a culture in which custody decisions interfere with or override medical care. Culture change is difficult in any organization, and correctional institutions tend to be more insular than other organizations. The County should consider consulting experts in assessing correctional culture. The program Amend based at the University of San Francisco (UCSF) has expertise in correctional culture change and has been utilized by the California Department of Corrections and Rehabilitation (CDCR) for this purpose.

---

[15] SSO and ACH Comments on Medical Experts Draft Report.
[16] Patient #31.
[17] Patient #23.

**The environment of care at the jail is inadequate to enable the jail to provide constitutional health care and meet Consent Decree Requirements.**

The provision of constitutional health care in correctional institutions requires adequate clinical and treatment space to meet the serious medical, mental health, and disability needs of the population.  The Consent Decree outlines services the County is required to provide to meet constitutional care requirements, and there is no disagreement among the parties that the current space is completely inadequate for the population.  Initially, the County planned to build an Annex adjacent to the jail to address space needs, however funding for design and construction of an Annex has not been approved.   Given this, the County has hired an architectural firm, Nacht and Lewis, to assess whether modifications to the jail can be made to meet Consent Decree requirements.[18]

This was the Medical Monitors' first physical inspection of the jail.  We affirm that the current space at Main and Branch Jails is completely inadequate to meet the serious medical needs of the population. Lack of space has contributed to the many cell-side assessments – which compromises confidentiality and health care delivery – and likely to preventable hospitalizations and deaths.

We found that that the booking area lacks adequate space and privacy for nurses to conduct medical screening, and is cluttered and dirty.  A "sobering cell" near the booking area is in poor repair and dehumanizing. Main Jail lacks a detoxification unit to monitor patients withdrawing from alcohol and drugs. With respect to clinical exam rooms, there is only one room on each floor at Main Jail, which is shared by nursing, medical, and mental health staff. If a medical provider is using the room, nurses and mental health staff conduct assessments in day rooms or at cell side with no privacy.  This predictably results in inadequate examinations.  At RCCC, there are similar space, organization and sanitation issues, particularly in the Medical Housing Unit (MHU).

ACH and SSO have established a Space Planning Committee which has met regularly proposed modifications to 2E in order to conduct secondary nurse assessments in that setting rather than the basement booking loop, however, this plan was deemed not feasible and all intake screening components will continue to be conducted in the booking area.  The Space Planning Committee has identified other space issues, but definitive solutions have not yet been reached for several critically important space issues (e.g., detox unit).

There is no immediate solution to providing critically needed space which threatens delivery of care and Consent Decree compliance. However, there are solutions for addressing the lack of clinic organization and cleanliness.  We strongly recommend that health care and SSO leadership develop a plan for terminal cleaning, painting, decluttering, organization and ongoing sanitation and maintenance of all health-related space at the jail, especially in the booking area.

---

[18] In a July 30, 2021 conference call, the medical and mental health experts provided feedback regarding space issues on Nacht and Lewis and other representatives on the call.

## The health care system does not provide inmates timely access to care for their serious medical needs

Inmate interviews and review of health records show that inmates do not have timely access to medical care for their serious medical conditions. The lack of access to care begins following intake screening and throughout the course of incarceration.  Nurses do not consistently review previous medical records to identify inmates requiring referral to a medical or mental health provider.

Nurses do not consistently identify inmates requiring substance abuse withdrawal monitoring and refer them to a medical provider for evaluation.  When nurses order withdrawal monitoring, nurses do not conduct assessments for more than 24 hours by which time inmates are experiencing significant withdrawal symptoms.  Thereafter, nurses do not monitor patient's more than once or twice, even when patients still have withdrawal symptoms. Untreated or inadequately treated substance abuse withdrawal predictably results in preventable suffering, and patients are at risk of hospitalizations and death.

Interviews and health records show that when inmates submit a health services request, it is weeks before a nurse, medical or mental health provider sees them, and sometimes they are not seen at all. This results in inmates submitting repeated health service requests for the same problem, increasing health care staff workload.  Inmates reported that sometimes the only way to receive medical attention is to declare a "man down" (medical emergency) which is not an appropriate or efficient use of medical or custody resources for non-emergent problems. However, it is completely predictable and understandable when the system for accessing care does not work.

For urgent concerns, some inmates reported that when they tell a deputy they have an urgent need, they are told to submit a health request.  It is not the responsibility of deputies to make a judgement whether a complaint is routine or urgent. Deputies should be instructed to contact health care staff, who should timely respond.  Even when deputies notify nurses of patients with urgent conditions, nurses do not timely respond.[19]

The County has not implemented the chronic disease program and inmates with chronic diseases are not timely medically evaluated and treated. This is due to lack of medical provider staffing, lack of clinical space, and lack of prioritization of this patient population. When chronic care is provided, it is often haphazard and disjointed. Some providers treat chronic disease patients via record review only, without examining the patient, and change therapy without informing the patient of test results and medication changes. This predictably results in patient confusion and dissatisfaction, refusals of medications and submission of health service requests.   When providers see patients in person, the quality of evaluations is lacking and does not include

---

[19] Patient #32.

adequate review of systems, pertinent physical examinations, current labs and follow-up in accordance with their disease control.

Specialty services are not timely provided, providers do not timely see patients following their appointments, and consultant recommended follow-up is not timely provided.

Medication orders received by pharmacy are timely dispensed. Nurses do not timely administer medications in accordance with medication schedules. Contributing factors are nurse and/or medication scheduling and lack of nurse and custody staffing.

## The Mortality Review process fails to identify problems with health care systems and quality of care

We reviewed 5 deaths with the corresponding mortality review. Overall, the quality of the mortality reviews is lacking. They are little more than a chronologic list of events leading up to the patient's death. None of the reviews assessed the appropriateness of the care provided, the effectiveness of relevant policies and procedures, or identified opportunities for improvement in the delivery of care in order to prevent future deaths. This latter requirement is the fundamental purpose of performing a death review. There were no corrective action plans developed for any of the deaths, which seems largely due to the failure to recognize that one was needed.

None of the mortality reviews included the autopsy reports, even though the patients in question died months earlier. We discussed this with health care leadership who reported that the SSO maintains the SSO Custody Death Binder and the SSO Assistant Commander is to alert the Medical Director who completes the Final Mortality Review. However, no autopsy reports have been received by the Medical Director and none of the mortality reviews have been finalized.

The Medical Director needs to take a more proactive role in ensuring that autopsy reports are timely received and meaningful reviews are conducted with corresponding corrective action plans as indicated.

## Conclusion

This review showed that inmates with serious medical needs continue to experience harm as a result of lack of an adequate infrastructure (e.g., space, staff), systems issues (e.g., intake screening and chronic care) and quality of care (e.g. chronic care, mortality review). Considerable work remains to achieve Consent Decree compliance.

We recognize and commend ACH and SSO leadership for their work in laying the foundation for making progress: revising organizational structure, filling key leadership positions, adding staff, increasing health care provider salaries, and policy development and implementation. We are confident that if this foundation is sustained, the County is positioned to make progress. However, a serious obstacle to progress is the lack of adequate clinical, treatment, and living

space for inmates with serious medical, mental health and disability needs. The failure to timely and effectively address this issue poses a threat to Consent Decree compliance and puts inmates at daily risk of harm.

More detailed findings and recommendations are contained in the body of this report, as well as medical record reviews attached as an appendix providing supporting documentation for our findings and recommendations.  We are available to assist the County and look forward to working with health care leadership and their staff to improve health care systems. Below is a summary of compliance for the Remedial Plan.  A more detailed table of compliance is found at the end of this report.

**Summary of Medical Remedial Plan Compliance**

| Substantive Area | Total Provisions | Substantial Compliance | | Partial Compliance | | Non-Compliance | | Not Evaluated | |
|---|---|---|---|---|---|---|---|---|---|
| | | # | % | # | % | # | % | # | % |
| **Medical** | 75 | 12 | 16% | 19 | 25% | 37 | 49% | 7 | 9% |

# Findings

## A. Staffing

1. The County shall maintain sufficient medical, mental health and custody staffing to meet professional standards of care to execute the requirements of this remedial plan, including clinical staff, office and technological support, QA/QI units and custody staff for escorts and transportation.

2. Provider quality shall be evaluated regularly to ensure that relevant quality of care standards is maintained. This review shall be in addition to peer review and quality improvement processes described in this plan. The parties shall meet and confer regarding any deficiencies identified in the evaluation. Should the parties disagree regarding matters of provider quality, the Court Expert shall evaluate the quality of provider care and to complete a written report.

**Findings:**

To assess staffing, we interviewed health care leadership, reviewed staffing documents, and the Third 180 Day Status Report of the Mays Consent Decree, which was filed publicly with the federal court.  Although the County has funded positions in each of the past several four fiscal years[20], currently there are insufficient numbers of health care and custody staff to meet Consent Decree requirements. Specific findings are noted below:

- Twenty-Nine (29) new positions are funded in the 2021/2022 fiscal year budget.

- Of 10 FTE permanent physicians, only two 0.5 FTE positions are filled, with 9.0 FTEs vacant. Labor negotiations concluded with a substantial increase to physician compensation. Recruitment is now in process.

- There are 22 on call and registry physician FTEs. The registry compensation rate has been increased which has attracted more physicians, however having a majority registry staff is problematic in that temporary staff come and go, lending no continuity of care, and potentially increasing the risk of errors (see Section D. Chronic Care below). Leadership reports that they need more medical providers but have no space for them to work. This is a critical issue.

- County labor agreements expired at the end of June. Negotiations are beginning for nurses and nurse practitioners.

- Security clearances for new healthcare hires typically take 1 to 2 months on average, with some taking substantially longer.  Given the competition in the labor market, and below-market compensation offered by the county, it is not surprising that applicants are lost to other opportunities.

---

[20] Fiscal Years 2018/2019, 2019/2020, 2020/2021 and 2021/2022.

- While some nurse practitioners work at the jail, we do not find that they are being aggressively recruited to fill vacant medical provider positions.  We strongly recommend that they be recruited along with physicians.
- There are insufficient numbers of custody staff to ensure that patients are escorted to medical and dental appointments at Main and Branch Jails. This is evidenced in part by a June 14, 2021 memorandum at the RCCC Branch Jail to address the issue. [21]

In the past 9 months, key leadership and administrative positions have been filled or are in process of being filled.

- In December 2020 Veer Babu MD was hired as Medical Director and has been focused on policy development and working with existing physician staff.  Dr. Babu is new to correctional health care.
- In March 2021 the Chief position became vacant. The position has been reclassified to Health Services Administrator (HSA). A serious candidate was recruited but has dropped out.  ACH has initiated more extensive advertising, however the Deputy Director is concerned the HSA salary may not be adequate to recruit qualified person.
- Once hired all service line managers will report to the Health Services Administrator.
- In March 2021, Daniel Oforlea LCSW was appointed as permanent Mental Health Program Director.
- One of two new administrative positions have been filled (Administrative Officer III) a candidate for Administrative Officer II (contracts/procurement).
- A Supervising Case Management Nurse position is vacant. Recruitment is in process with a candidate completing the background check.

As noted in the Executive Summary, there are insufficient custody posts dedicated to essential health care functions.

With respect to quality reviews, the Medical Director currently does not perform regular reviews to evaluate the quality of medical care provided to the population, included, but not limited to: intake history and physicals, chronic disease care, specialty services, emergency care, etc.  This is due in part to the lack of implementation of provider history and physicals and the chronic disease program.  The quality of mortality reviews is lacking.

*Provision A.1. is currently in partial compliance. However, if significant progress is not made with respect to filling permanent medical positions and custody posts dedicated to essential health care functions during the next review period, this provision will be downgraded to noncompliance.*

**Compliance Assessment:**
A.1=Partial Compliance
A.2=Noncompliance

---

[21] Proposal for Staffing Dental/Medical Escorts (RCCC). SSO. June 14, 2021.

**Recommendations:**
1. Fill the vacant Health Services Administrator position. Consider enhancing the salary for the position to ensure competitiveness in the current market.
2. Realign organizational structure as planned.
3. Fill vacant medical provider positions.  Enhance recruitment of nurse practitioners.
4. Perform an analysis of essential health care functions requiring custody escorts and identify the numbers of deputies needed to provide timely and appropriate care.
5. Establish health care dedicated custody posts for essential processes, that cannot be redirected to non-health care functions.
6. The Medical Director should perform quality reviews to identify system and quality issues with a corresponding corrective action plan.
7. The security clearance process should be streamlined in order to maximize recruitment of qualified applicants.

# B. Intake

1. All prisoners who are to be housed shall be screened upon arrival in custody by Registered Nurses (RNs). RN screening shall take place prior to placement in jail housing.
2. Health Care intake screening shall take place in a setting that ensures confidentiality of communications between nurses and individual patients. Custody staff may maintain visual communication, unless security concerns based upon an individualized determination of risk that includes a consideration of requests by the health care staff that custody staff be closer at hand. There shall be visual and auditory privacy from other prisoners.
3. The County shall, in consultation with Plaintiffs, revise the content of its intake screening, medical intake screening, and special needs documentation to reflect community standards and ensure proper identification of medical and disability related concerns.
4. Nurses who perform intake screening shall consult any available electronic health care records from prior incarcerations or other county agencies.  The form shall include a check box to confirm that such a review was done.
5. The County shall make best efforts to verify a patient's prescribed medications and current treatment needs at intake, including outreach to pharmacies and community providers to request prescriptions and other health records related to ongoing care needs. The policy shall ensure that any ongoing medication, or clinically appropriate alternative, shall be provided within 48 hours of verification or from a determination by a physician that the medication is medically necessary. Any orders that cannot be reconciled or verified, such as those with conflicting prescriptions from multiple providers, shall be referred to a health care provider for reconciliation or verification the next clinic day after booking.
6. The County shall follow a triage process in which intake nurses schedule patients for follow-up appointments based upon their medical needs and acuity at intake and shall not rely solely on patients to submit Health Services Requests once housed. The policy shall, in consultation with Plaintiff's counsel, establish clear protocols that include

appropriate intervals of care based on clinical guidelines, and that intake nurses shall schedule follow-up appointments at the time of intake based upon those protocols.

7. All nurses who perform intake screenings will be trained annually on how to perform that function.

**Findings:** The County is making substantive changes to the intake process; however, the changes have not yet been fully implemented.  These include: revisions to intake policies and procedures; modifications to the electronic health record; expanded screening for effective communication, disabilities, and suicide risk.  In July 2021, a nurse intake workflow for the electronic health record was being tested.

The intake process involves initial and secondary screening. The first step is to determine fitness for confinement and the second step includes nurse screening for health conditions that require follow-up, identify needs for durable medical equipment, and/or determine housing assignment, etc. Following the screening process, the nurse enters orders into the electronic health record (EHR) including orders for COVID-19 quarantine and testing, provider essential medication review, substance use withdrawal monitoring, and referrals to medical, mental health, and dental providers.

We observed the intake process during our June 2021 site visit.  Newly arriving detainees entered from a parking garage into a large, open room where deputies conducted the booking process. The arresting officer fills out a medical screening form that a registered nurse reviews to assess for fitness for confinement and later enters the contents into the EHR. A certified nurse assistant (CNA) takes vital signs and performs COVID-19 screening adjacent to the deputy who performs property management. There is no privacy during this process. The CNA documents her findings onto a piece of paper, for which the contents are later transcribed into the EHR, rather than the CNA directly entering her findings into the EHR via computer or tablet.

Following CNA screening in the booking area, a registered nurse interviews the detainee. The room where nurses conduct intake screening is too small for its intended purpose.  It contains 3 nurse interview stations immediately adjacent to one another that provide no auditory or visual privacy.  Officers are able to overhear the nurse interview the patient which likely results in patient's not being candid about their medical history including substance use. The room is cluttered and unsanitary. Desks are in disrepair and cannot be adequately disinfected.

A room adjacent to the nurse intake screening area is used to store supplies and has an exam table and sink.  This room is dirty and cluttered. The cabinets are disorganized and in disrepair. There is an automatic external defibrillator (AED) and emergency supplies, but review of a log showed that the AED and supplies were not checked certain days in June 2021.  A refrigerator was unlabeled (e.g., medication or food), but contained both medications and food, which does not meet current standards. The refrigerator also contained open insulin vials that were beyond their expiration dates.

There is a bathroom adjacent to the nurses screening stations that is used to collect urine specimens for pregnancy and/or substance use testing.

In a corridor next to the nurse intake area, there is a large room that is used as a sobering cell. Officers are to conduct 30-minute checks on detainees placed in the cell. It was in disrepair, dirty, and dehumanizing.[22]  (This space is described in greater detail in Section G, below.) Off another short corridor are two safety cells which were also not clean.

ACH staff showed us an area on the second floor for which there were plans to perform the secondary nurse assessment portion of the intake process, and is intended to provide privacy. However, since our site visit, the Medical Experts have been advised that all components of the intake screening process will be conducted in the booking area.

The physical plant in the booking area is completely unacceptable and does not permit the County to be compliant with the Consent Decree.  In discussion with County Counsel, we were advised that the County has retained the services of Nacht and Lewis, an architectural firm to evaluate possible modifications to the booking area and other areas of the jail to meet Consent Decree requirements.[23]  The County is in process of contracting with an Environmental Conditions expert who will assist the County on environmental issues.[24]

Medical record review shows that nurses conduct intake screening on new all new arrivals. Nurses do not consistently take adequate substance abuse histories, including type, amount, frequency, duration, last use, and withdrawal symptoms upon cessation of substance use. Centricity does not contain specific order sets for the intake nurse to order substance use disorder (SUD) monitoring at a frequency and duration required by standardized nurse procedures (e.g., every 6 hours) and the Consent Decree (e.g., minimum of 5 days). Instead, nurses order Priority Flex Nurse (PFN) appointments for substance use withdrawal monitoring that are not performed for 24 hours or more, resulting in patients experiencing withdrawal symptoms before medication regimens are initiated.  The lack of a dedicated detox unit almost certainly contributes to monitoring delays. Housing these high-risk patients in one unit would facilitate nurses' ability to monitor patients and timely respond to changes in patients' condition. This arrangement would both enhance care and streamline workflow.  Health care leadership at the jail are interested in centralizing these services in one unit on the second floor near 2M.

With respect to medication continuity, nurses do not consistently review previous admissions to verify medications that may be medically indicate during the current admission. This was true for mental health conditions, and records showed significant delays in ordering psychotropic medications.[25]

---

[22] SSO states that the sobering cell is cleaned three times daily and is not dirty and the appearance is an aesthetic issue, not one of sanitation.

[23] The Mays Court experts participated in a conference call with representatives of Nacht & Lewis on July 30th to describe physical plant deficiencies.

[24] Per Rick Heyer, County Counsel.

[25] We forwarded cases to Mary Perrien Ph.D., mental health expert.

With respect to provider referrals at intake, an April 2021 CQI study showed that nurses referred 43 of 51 (84%) patients with chronic diseases[26], and did not refer 8 (16%) patients.  Of the 43 referred patients, a provider saw 32 (63%) and did not see 11 patients (37%).  The study did not identify the root causes of why patients were not seen (e.g., medical or custody staffing issue, released, etc.) nor result in a corrective action plan. Staff is to be commended for performing the study, but it has limited benefit unless targeted actions are taken to improve performance.

Other assessments were not timely performed. In one case, a nurse ordered a STAT (i.e., immediate) medical provider referral and STAT mental health assessment on a patient who returned from the hospital but had altered mental status. A STAT referral is an emergent referral however, neither STAT assessment was performed.  By the time the patient was seen the following day, he had decompensated such that he required transfer back to the hospital.[27]

Due to current ongoing revisions in the Intake policy and procedure, we deferred evaluation of staff training related to the intake process.  We will evaluate this provision for the next monitoring period.

In summary, improvements to intake screening are in process and we anticipate that progress will be evident at the next site visit.

**Compliance Assessment:**
- B.1=Substantial Compliance
- B.2=Noncompliance
- B.3=Partial Compliance
- B.4=Partial Compliance
- B.5=Partial Compliance
- B.6=Partial Compliance
- B.7=Not Evaluated

**Recommendations:**
1. Health care and custody leadership should develop an interim plan to address lack of adequate space, privacy, sanitation, and disinfection to the extent possible pending the Nacht & Lewis study and findings and recommendations.
2. Health care and custody leadership should continue to evaluate changes to the intake screening process to make it as efficient as possible.
   a. Finalize the intake policy to include a two-part process: Fitness for Confinement (Step 1) and Secondary Assessment (Step 2). To the extent feasible, eliminate duplicative information between the two sections.

---

[26] ACH Chronic Conditions Compliance. April 1-15, 2021.  We note that the study appears to include patients with chronic diseases and other conditions such as substance abuse and mental health.  Physician appointments included 18 in person appointments and 11 essential medication reviews.
[27] Patient #23.

    b. Ensure that EHR screens correspond to the chronology and content of the intake policy. Standardize provider referral terminology (Emergent, Urgent, Routine).

    c. Reconfigure EHR substance use screens to include an adequate history (type, amount, method, frequency, duration, last use, and withdrawal symptom history).

    d. Defer collection of nonessential medical information to the 14-day history and physical examination (e.g., family history).

    e. Enter all information directly (e.g., vital signs) or scan into the EHR (arresting officer screening form) to avoid nurses having to input the information.

3. Orders in Centricity should be modified to enable ACH to comply with policies, standardized nurse procedures, and provider referrals.  This includes:

    a. Nurse to provider referrals based upon the acuity of the referral (Emergent, Urgent or Routine).

    b. Substance use withdrawal monitoring (CIWA, COWS) to be initiated within 6 hours of arrival and be performed at least twice daily for 5 days.

    c. Provider essential medication review to occur in 12 hours.

    d. Create intake, substance use disorder, and chronic disease order sets to be implemented by the Intake Nurse based upon standardized procedures.

4. Perform CQI studies related to compliance with the intake policy and related referrals to evaluate the timeliness and appropriateness of care.  Include root cause analysis and action plan targeted to root causes.

## C. Access to Care

1. The County shall ensure that Health Service Requests (HSRs) are readily available to all prisoners, including those in segregation housing, from nurses and custody officers.

2. The County shall provide patients with a mechanism for submitting HSRs that does not require them to share confidential information with custody staff. The county shall install lockboxes or other secure physical or electronic mechanism for the submission of HSRs (as well as health care grievances) in every housing unit. Designated staff shall collect (if submitted physically) or review (if submitted electronically) HSR's at least two times per day in order to ensure that CHS receives critical health information in a timely manner. Designated health care staff shall also collect HSRs during pill call and go door to door in all restricted housing units at least once a day to collect HSRs. HSRs and health care grievances will be promptly date- and time stamped. The county may implement an accessible electronic solution for secure and confidential submission of HSRs and grievances.

3. The County shall establish clear time frames to respond to HSRs:

    a. All patients whose HSRs raise emergent concerns shall be seen by the RN immediately upon receipt of the HSR.  For all others, a triage RN shall, within 24 hours of receipt of the form (for urgent concerns) or 72 hours of receipt of the form (for routine concerns).

        i. Conduct a brief face-to-face visit with the patient in a confidential clinical setting.

        ii. Take a full set of vital signs, if appropriate.

      iii. Conduct a physical exam, if appropriate.

      iv. Assign a triage level for a provider appointment of emergent, urgent, routine or written response only.

      v. Inform the patient of his or her triage level and response time frames.

      vi. Provide over-the-counter medications pursuant to protocols; and

      vii. Consult with providers regarding patient care pursuant to protocols, as appropriate.

  b. If the triage nurse determines that the patient should be seen by a provider:

      i. Patients with emergent conditions shall be treated or sent out for emergency treatment immediately.

      ii. Patients with urgent conditions shall be seen within 24 hours of the RN face-to-face; and

      iii. Patients with only routine concerns shall be seen within two weeks of the RN face-to-face.

  c. Patients whose requests do not require formal clinical assessment or intervention shall be issued a written response, with steps taken to ensure effective communication, within two weeks of receipt of the form.

  d. The County shall permit patients, including those that are illiterate, non-English speaking, or otherwise unable to submit verbal or electronic HSR's to verbally request care. Such verbal requests shall immediately be documented by the staff member who receives the request on an appropriate form and transmitted to a qualified medical professional for response in the same priority as those HSRs received in writing.

4. The County shall designate and make available custody escorts for medical staff in order to facilitate timely and confidential clinical contacts or treatment-related events.

5. The County shall track and regularly review response times to ensure that the above timelines are met.

6. The County shall discontinue its policy of prohibiting patients from reporting or inquiring about multiple medical needs in the same appointment.

7. When a patient refuses a medical evaluation or appointment, such refusal will not indicate a waiver of subsequent health care.

  a. When a patient refuses a service that was ordered by medical staff based on an identified clinical need, medical staff will follow up to ensure that the patient understands any adverse health consequences and to address individual issues that caused the patient to refuse a service.

  b. Any such refusal will be documented by medical staff and must include (1) a description of the nature of the service being refused, (2) confirmation that the patient was made aware of and understands any adverse health consequences by medical staff, and (3) the signature of the patient, and (4) the signature of the medical staff. In the event the signature of the patient is not possible, the staff will document the circumstances.

**Findings:** Since the last report, ACH and SSO have implemented changes to the access to care process. These measures include:

- ACH has revised access to care policies (e.g., Health Services Requests and Medical Sick Call) for which the Medical Experts have provided comments.
- The Health Services (HSR) Request Form has been modified to allow more space for patients to write their requests and may include multiple needs.
- The HSR form has a designated space for staff to document the time of receipt and triage disposition that will assist in measuring compliance with required timeframes.
- Confidential Health Service Request boxes have been installed at RCCC, but not yet at Main Jail.
- Custody has received additional staff for escorts.[28]

Timely access to care is fundamental to providing constitutional health care.  However, during our June 2021 tour, inmates reported that although they are able to obtain Health Services Request (HSR) forms, they almost universally reported that they are not seen for weeks, and some are never seen following submission of their HSR.  One inmate reported to us that sometimes inmates don't submit HSR's because they "know nothing will happen".

Our review of medical records confirms lack of timely response to health services request, even when the patient reports signs and symptoms of serious illness. Specific issues include:

1. Delays in nurse triage of HSR's. [29]
2. Delays in nurse assessments following submission of HSRs.[30]
3. Lack of clinic space for nurses to conduct sick call.
4. Inadequate nursing assessments.
5. Lack of referrals to a medical provider.
6. Delays in provider referrals.
7. Providers managing patients via medical record review, without examining the patient and discussing changes in treatment plans.[31]

Examples include the following:

- On 1/1/2021 a patient submitted an HSR in complaining of feeling sick, "I have fever, sore throat and body aches."  A nurse did not assess the patient. On 1/11/2021 the patient tested positive for COVID-19 but there was no documentation by a medical provider or nurse that he tested positive. On 1/24/2021 the patient submitted an HSR asking "Was my COVID-19 test positive or negative?". There is no documentation that the patient was informed of his test result.  On 1/30/2021 the patient submitted an HSR complaining that "my body aches, I have no taste buds, I have off and on fever, night sweats, and my joints hurt, I have no appetite."  Four days later a RN documented seeing the patient but did not measure the

---

[28] Third 180-Day Status Report of the Mays Consent Decree. July 7, 2021. Page 14.
[25] Patient #19
[26] As reported to SMEs during inmate interviews during our site visit.  Patient #32.
[29] Patient #19.
[30] Patient #30.
[31] Patient #20 and #22.

patient's temperature or perform any meaningful assessment. Despite having tested positive for COVID-19 and reporting worsening symptoms as evidenced by his HSRs, the nurse did not refer the patient to a provider.  Two weeks later the patient was found unresponsive and died.  Due to the lack of autopsy reports, the patient's cause of death is unknown.

- We interviewed a 28-year-old man who reported that he tested positive for COVID-19 and his condition worsened and he could not get help.  Review of his record showed that on 1/21/2021 at 17:44 a LVN saw the patient and documented he had no COVID-19 symptoms. Less than an hour later, at 18:23 a deputy called a nurse and reported the patient had multiple complaints of shortness of breath (SOB). Instead of seeing the patient immediately the nurse scheduled a PFN appointment.  On 1/22/2021 no health care provider saw the patient.  On 1/23/2021 at 03:30 a RN saw the patient who was acutely ill. Temperature=101.4 F. The patient was sent to the emergency department and returned the same day.  This case raises questions about the lack of timely response by a nurse to a patient with "multiple complaints of shortness of breath", failure to timely refer a patient with SOB to a medical provider, and the reliability of health checks to detect patients with COVID-19 symptoms.[32]

- A patient reported that he injured his foot after falling off his bunk. A nurse referred him to a provider but he was not seen for a month and at that visit the provider did not address his foot injury.  One week later he was seen by a different provider who ordered an x-ray that showed the patient's great toe was fractured.  He was then referred to a podiatrist who timely saw the patient and provided follow-up.[33]

- A patient with serious mental illness and cognitive impairment fell off her bunk, injuring her left arm.  Over the course of the next week, she was repeatedly referred for nurse evaluation for weakness and difficulty walking, but "refused" to be evaluated on 3 occasions, 2 of which occurred during the middle of the night (12:52 AM and 2:42 AM respectively).  Mental health staff continued to advocate for her and when she was finally assessed 8 days later, it was discovered that her left upper arm was broken into multiple pieces which were not in proper alignment.  In this challenging case, the patient's mental illness interfered with her ability to advocate for the care she needed. Had nursing staff collaborated more closely with their mental health colleagues, they may have recognized this vulnerability and modified their approach to ensure that she was properly and timely evaluated.  Ultimately, it was the mental health staff who persevered until she was seen. [34]

- A 42-year-old man arrived at SCJ on 4/9/2021 with a history of bipolar disorder, alcohol, benzodiazepine, and opiate use disorder and adjustment disorder with mild anxiety.  At admission he reported to be taking psychotropic medication but was not timely seen by a mental health provider.  On 4/16/2021 a LCSW saw the patient but did not refer him to a JPS provider.  On 4/28/2021 the patient told a MSW that he had not received his medications for

---

[32] Patient #32.

[33] Patient #6.

[34] Patient #4.

bipolar disorder. On 4/29/2021 he submitted a HSR stating that he needed his medication because "I am stressed out and going crazy". On 5/25/2021, a JPS provider saw the patient and prescribed medication.[35]

- A 40-year-old woman arrived at SCJ on 2/6/2021. Her medical history included methamphetamine substance use disorder, HIV disease and pregnancy. On 2/14/2021 a CNA documented that she submitted an HSR asking when she was going to get an ultrasound. There is no documentation that the patient's request was responded to. On 2/18/2021 the patient submitted another HSR asking about her ultrasound. A RN documented that it was rejected because it was a duplicate.[36]

We found several other cases in which provider referrals did not timely take place, and on many occasions, physicians practice remote control medicine by changing therapy without examining or discussing the treatment plan with the patient.  Not only can this create confusion for patients, but it is also potentially dangerous. This is further described in the chronic disease section of this report.[37]

Plaintiff's counsel reports that SSO staff reported that health care grievances were not collected at Main Jail for approximately 8 months in 2020 to 2021, and that performance only improved as of June 2021. We did not independently verify this information, however if accurate, detainees lack a means of recourse for failure to respond to their health concerns.  The Medical Experts will address this in the next monitoring period.

In summary, the lack of timely access to care is a critical issue causing harm to patients and the County must immediately prioritize access to care. We discussed this with nursing and medical leadership, emphasizing that nurses must be provided the resources and support to perform nurse sick call daily.

**Compliance Assessment:**
- C.1=Substantial Compliance
- C.2=Partial Compliance
- C.3.a=Noncompliance
- C.3.b=Noncompliance
- C.3.c=Noncompliance
- C.3.d=Noncompliance
- C.4=Noncompliance
- C.5=Noncompliance
- C.6=Substantial Compliance
- C.7.a=Partial Compliance
- C.7.b=Partial Compliance

---

[35] Patient #19.
[36] Patient #30.
[37] Patient #1.

**Recommendations:**

1. Finalize policies and procedures related to access to care. Ensure that nursing work flows drive the process, rather than Centricity work flows.
2. Install sick call boxes in each of the housing pods at Main Jail and RCCC.
3. Dedicate staff to collect HSRs twice daily from sick call boxes, independent of medication administration.
4. Ensure that following collection of HSRs, a RN immediately triages the forms and schedules patients to be seen the following day, and that all patients are seen within 72 hours if rescheduled.
5. Ensure that provider referrals timely take place.
6. Ensure that patients who do not require a face-to-face visit receive a timely written response to their HSR
7. Prioritize and schedule nurse sick call to be conducted in an adequately equipped examination room at a designated time, 7 days a week.
8. Establish custody posts for the purposes of health care escorts, not to be redirected for non-health care duties.
9. Ensure that health care grievances are collected and responded to daily.
10. Perform CQI studies on the access to care process, including availability and collection of HSR forms, timely nurse triage and appointments, quality of nursing assessments and timeliness of medical, mental health and dental provider referrals.

## D. Chronic Care

1. Within three months of the date the Remedial plan is issued by the Court, the County shall, in consultation with Plaintiffs' counsel, develop and implement a chronic disease management program that is consistent with national clinical practice guidelines. The chronic disease program will include procedures for the identification and monitoring of such patients and the establishment and implementation of individualized treatment plans consistent with national clinical practice guidelines.

   a. The chronic disease management program shall ensure that patients with chronic illness shall be identified and seen after intake based upon acuity (on the day of arrival for patients with high acuity and not to exceed 30 days for all others). The County will timely provide clinically indicated diagnostic testing and treatment, including prior to this post-intake appointment. Follow-up appointments will be provided in intervals that do not exceed 90 days unless patients are clinically stable on at least two consecutive encounters, in which case, follow-up appointment intervals will not exceed 365 days (and sooner if clinically indicated), subject to a chart review every 6 months.

   b. The chronic disease management program shall ensure patients are screened for hepatitis C at intake. If medical staff recommend Hepatitis testing based upon screening results, such testing shall be offered on an "opt-out" basis for those individuals who remain in custody long enough to receive a housing assignment. If the

patient declines testing the refusal shall be documented in the health record. Patients found to have hepatitis C shall be offered immunizations against hepatitis A and B.

c.  The chronic disease management program shall include a comprehensive diabetic management program consistent with the American Diabetes Association (ADA) Diabetes Management in Correctional Institutions. The protocol shall be developed in coordination with custody administration to address normal circadian rhythms, food consumption times and insulin dosing times.

d.  The chronic disease management program shall ensure that patients who take medications for their chronic conditions shall have the medications automatically renewed unless the provider determines that it is necessary to see the patient before renewing the medication. In that case, the patient shall be scheduled to be seen in a reasonable time period to ensure medication continuity.

2.  The County shall track compliance with the chronic disease management program requirements for timely provision of appointments, procedures and medications. The County shall ensure that its electronic medical record system is adequate to support these critical functions.

3.  The County shall review its infection control policies and procedures for dialysis treatment to ensure that appropriate precautions are taken to minimize the risk of transmission of blood-borne pathogens, given the proximity of HCV+ and HCV- patients receiving dialysis in the same room.

**Findings:**  In May 2021, 65% of inmates had one or more chronic diseases and 60% of chronic disease patients had 2 or more chronic diseases.[38] The most common diseases were:

- Moderate to Severe Asthma (249)
- Cardiac Disease
  - Angina (47)
  - Arrhythmias (34)
  - CAD (12)
  - Cardiomyopathy/Heart Failure (29)
  - Serious heart conditions (47)
- COPD (30)
- Dementia (6)
- Diabetes (171)
  - Type 1 Diabetes (13)
  - Type 2 Diabetes (158)
- Hyperlipidemia (181)
- Hypertension (436)
- HIV infection (28)
- Hepatitis C infection (85)
- Liver Disease (89)

---

[38] These data were extracted from Centricity and the accuracy of the disease classification is not established.  The percentage of patients identified as having hepatitis C infection, coronary artery disease and related cardiovascular disease appears to be low for the population.

- Seizure Disorder (91)
- Thyroid Disorders (88)

In addition, 19% of inmates were identified as having substance use disorder and 18% had serious mental illness.  This is a high burden of disease and the patients most at risk of harm if medical care is not timely and appropriate. It emphasizes the importance of having a chronic disease program in place and fully implemented.

Only about 2.7% of the population is identified as having hepatitis C virus (HCV) infection.[39] Considering that estimates of this infection among incarcerated populations range between 10 and 30%, this suggests that a large number of infected individuals are not being identified. Additionally, the tracking log should classify HCV cases as previously treated, resolved, or chronically infected. ACH has revised the chronic disease and hepatitis C policies. Provider treatment guidelines have been developed for hypertension, diabetes, and HIV infection. We have reviewed these treatment guidelines and find that they lack sufficient guidance regarding the clinical care of patients and the frequency of follow-up for patients whose disease is not well controlled.[40] We noted the ongoing use of outdated IDDM/NIDDM (insulin dependent and non-insulin dependent diabetes mellitus) terminology in the health records.  This imprecise nomenclature was eliminated by the American Diabetes Association back in 1997 and should no longer be used, as it does not adequately distinguish between the two diseases. It is our understanding that new guidelines for management of diabetes in correctional institutions will be published in the near future.[41] It will be important for ACH to incorporate the guidance into the Provider Treatment Guidelines.  Clinical practice guidelines should also be developed for other common chronic diseases such as asthma, COPD, heart disease, hyperlipidemia, seizure and thyroid disorders.

Patients with asthma are not permitted to keep their rescue inhalers on their person.  This is inherently dangerous, particularly given the problems with access to care as previously described.

ACH reports that the chronic disease program has not yet been implemented due to insufficient physician staffing and space limitations.  However, these patients must be prioritized for identification, referral, and medical evaluation and treatment, independent of the status of a formal program.  The prevailing practice at the jail is that patients are primarily managed via sick call, which is a model of care intended to provide episodic acute care rather than proactive preventative care.

---

[39] The hepatitis C policy provides guidance for patients who will be eligible for treatment. ACH should also develop a Provider Treatment Guideline for hepatitis C infection based upon nationally recognized standards.

[40] The Medical Experts will provide detailed comments regarding the Provider Treatment Guidelines following this report.

[41] Conversation with Aaron Fischer.

Record review shows that not all patients with chronic diseases have been referred for medical evaluation and treatment. The care provided to this population is currently haphazard and disjointed.  For Example:

- A 72-year-old man with diabetes, heart failure, coronary artery disease, hypertension and end stage renal disease on dialysis has been seen multiple times for acute issues such as back pain but only sporadically for his chronic diseases.  He has had several fainting spells due to low blood pressure necessitating transfer to the emergency department on 2 occasions.  Had he been seen regularly for blood pressure management, perhaps these events could have been avoided.  Additionally, his blood sugar has been running too low considering his age and chronic disease burden.  His medications have been adjusted multiple times by "remote control" (i.e., via chart review without a face-to-face visit with the patient). On one occasion, a doctor who was not familiar with his case prescribed a potentially dangerous medication for someone on dialysis.  Luckily, this was caught by his usual provider (also via chart review) and discontinued.[42]

- Another patient with diabetes, hypertension, COPD, and history of stroke was found to have a new diagnosis of hypothyroidism in March 2021.  His diabetes was poorly controlled at that time.  He was started on treatment for the thyroid disease and his diabetes medication was adjusted, but no follow up labs or visit were ordered.  Three months later, another doctor reviewed the chart and noted that he was due for labs and a follow up visit.  The labs were drawn but when he was seen one month later, neither the lab results nor any related chronic diseases were addressed. [43]

- A 46-year-old woman was admitted in March 2021 with a history of asthma and treatment with an albuterol inhaler. Two days after her arrival a provider ordered an albuterol inhaler that was received 4 days after her arrival. [44] In April 2021 a medical provider saw the patient for chronic disease management. The provider did not take an asthma history, perform a pertinent review of systems (ROS), or measure the patient's peak expiratory flow rate (PEFR) to measure airflow obstruction. The provider planned to see the patient in 52 weeks.  On 5/3/2021 a provider saw the patient for a vision problem. The provider did not conduct an asthma assessment but ordered chronic disease follow-up in 6 months.  This patient did not timely receive continuity of medication nor an adequate asthma evaluation.[45]

- A 47-year-old man arrived at SCJ on 4/27/2020 and released on 8/19/2021. The patient was not timely seen for management of his hypertension and diabetes. In May 2021 the provider increased the patient's hypertension medication without examining the patient and informing him of the change in treatment plan. Thereafter, the patient refused the

---

[42] Patient #1.
[43] Patient #2.
[44] ACH commented that there may not have been a provider on duty to conduct an essential medication review.
[45] Patient #21.

medication. The patient has not been provided chronic disease management that addresses all elements of diabetes and hypertension care. His hypertension was not controlled increasing his risk of heart attack and stroke.[46]

- A 42-year-old man arrived at SCJ on 3/24/2021 and was released on 7/7/2021. His medical history included HIV disease and pseudoseizures and treatment with Genvoya. The patient was provided continuity of medications for HIV disease but was not seen by the HIV provider for almost 3 months after arrival. The patient had two hospitalizations within a 3-day period and a physician timely saw the patient following the second hospital discharge. A physician discontinued Keppra upon recommendation of the hospital physician, however a nurse administered Keppra 3 hours after a physician discontinued the medication.[47]

The County has a contract for dialysis services. The Consent Decree requires that the County review its infection control policies and procedures to ensure that appropriate precautions are taken to minimize the risk of transmission of blood-borne pathogens, given the proximity of HCV+ and HCV- patients receiving dialysis in the same room. However, the Third Mays Status Report did not address this requirement.

**Compliance Assessment:**
- D.1=Noncompliance
- D.1.a=Noncompliance
- D.1.b=Noncompliance
- D.1.c=Noncompliance
- D.1.d=Noncompliance
- D.2=Noncompliance
- D.3=Noncompliance

**Recommendations:**
1. The County should prioritize implementation of chronic diseases policies and procedures and clinical practice guidelines.
2. Ensure that intake nurses refer chronic disease patients to a medical provider to be seen based upon their medical acuity, and in accordance with policy and procedures.
3. Implement the 14-day provider history and physical to serve as a baseline assessment and to order chronic disease labs to be performed prior to the first chronic disease visit.
4. Begin referring patients with chronic hepatitis C infection who are eligible for treatment to a hepatologist for initial evaluation and treatment.
5. Develop parameters for MAs to notify nursing staff when vital signs exceed normal parameters.
6. Ensure that providers order follow up visits for patients with chronic diseases based on the degree of disease control in accordance with policy.

---

[46] Patient #22.
[47] Patient # 27.

7. Providers should avoid making substantive changes to patients' chronic disease medications without seeing the patient to discuss the changes and provide education.
8. Develop an electronic tracking system for chronic disease patients to include:
   a. Date of arrival
   b. Dates of initial chronic disease visit
   c. Dates of labs to be performed prior to the next chronic disease visit
   d. Dates of follow-up visits
9. When labs are indicated, schedule them to be performed in advance of clinic visits, so that pertinent clinical information is available to assess disease control (e.g., hemoglobin A1C, INRs, etc.)
10. Perform CQI studies to assess timeliness of referral from intake to a medical provider and medical provider compliance with nationally recognized clinical practice guideline for treatment of chronic diseases.

## E. Specialty Services

1. The County shall develop and implement policies regarding specialty referrals using an algorithm with evidence-based referral criteria and guidelines.
2. Within 3 months of the date the Remedial plan is issued by the Court, the County shall develop and implement policies and procedures to ensure that emergency consultations and diagnostic treatment procedures, as determined by the medical provider; are provided immediately; high priority consultations and procedures, as determined by the medical provider are seen within 14 days of the date of the referral; and routine consultations and procedures, as determined by the provider are seen within 90 days of the date of the referral.
3. Patients whose routine specialty consultation or procedure do not take place within 90 calendar days from the date of the referral shall be examined by a clinician monthly and evaluated to determine if urgent specialty care is indicated.
4. Within 5 days of the completion of a high priority specialty consultation or procedure, or within 14 days of a routine specialty consultation or procedure, patients returning to the Sacramento County Jail shall have their specialty reports and follow-up recommendations reviewed by a jail nurse practitioner, physician assistant or physician.
5. Specialty care consultations and outside diagnostic and treatment procedures shall be tracked in a log that identifies:
   a. The date of the referral request
   b. The date the request is sent to UM
   c. The date of UM notification of approval or denial
   d. The date the referral was sent to the specialty care provider
   e. The date of the consultation or procedure appointment
   f. The date the consultation or procedure took place
   g. If cancelled or rescheduled, the reason for the cancellation/rescheduling
   h. The date the appointment was rescheduled.
6. Requests for specialty consultations and outside diagnostic and treatment procedures shall be tracked to determine the length of time it takes to grant or deny requests and

the circumstances or reasons for denials (Note: date of approval should be on specialty services tracking log, see above).

7. At least twice a year, the County shall conduct an audit of specialty care referral logs described in subsections (5) and (6), above, and complete a report as to whether each category of specialty care is completed in a reasonable time frame, consistent with established time frames. If any specialty care area has a record of untimely appointments as determined by the Correctional Health Service Continuous Quality Improvement (CQI) Committee, the County shall report to Plaintiffs and the parties shall meet and confer to take prompt steps to address the issue. The County will provide Plaintiff's access to the specialty care referral logs and audit reports periodically and upon written request. The parties will work to resolve issues with untimely specialty care in individual patient cases and with respect to systemic trends, including through the dispute resolution process.

8. The County shall consider implementing an e-referral system to reduce delays and facilitate communication between specialists and primary care providers, as well as reducing unnecessary transportation costs and unnecessary specialist appointments by ensuring that the specialist has all the information he or she needs before an appointment takes place.

9. The County shall ensure that utilization management and/or scheduling staff provides notification of whether a patient's specialty care appointment is scheduled to occur within the timeline pursuant to the referral and/or clinical recommendation, including as follows:

   a. Medical staff may request and obtain information as to whether any patient's specialty care appointment is scheduled, and as to the general timing of the appointment (e.g., within a one-week date range).

   b. If a specialty care appointment is denied or is not scheduled to occur within the timeline pursuant to the referral and/or clinical recommendation, such information will be affirmatively provided to the treatment team and to the patient.

   c. If a previously scheduled specialty care appointment is postponed to a date that is outside the timeline pursuant to the referral and/or clinical recommendation, such information will be affirmatively provided to the treatment team and to the patient.

10. The County shall consider creating a physical therapy clinic at the jail to more efficiently meet the demand for service at the jail.

**Findings:** ACH revised the Specialty Referrals policy and procedure on 8/6/2021. The policy referral time frames meet Consent Decree Requirements.

In March 2021, the County implemented InterQual, an evidenced-based platform for evaluating and approving specialty referrals. The County has also implemented RubiconMD an e-consult service which provides consultation advice based upon information provided by the referring provider. RubiconMD is not equivalent to telemedicine as it does not involve the specialist personally evaluating the patient (e.g., medical history, review of systems, and patient

examinations).  Therefore, while RubiconMD is a useful clinical resource, it should not be used to substitute for access to specialists who are able to clinically evaluate and treat patients.

To the extent possible, we recommend implementing telemedicine services at the jail, however currently limited space presents obstacles to providing and expanding on-site services.  During our June 2021 tour, we were shown a room on 2M at Main Jail to be used for optometry and other on-site services.  The room was not large enough for its designated purpose, and was cluttered and unsanitary.

For those specialty services that are not amenable to telemedicine, ACH must ensure timely access to care.  We observed that specialty care is often delayed even when available in the local community.  For example:

- A patient who was involved in an altercation resulting in a complex fracture of the nasal bones was seen in the emergency department.  He returned with instructions that he was to be seen by ENT within one week to have the fracture reduced.  A referral was placed, but he did not have the procedure performed until a month later.[48]

- Another patient with serious mental illness and cognitive impairment fell off her bunk on 10/19/20, suffering a comminuted displaced fracture of the left upper arm.  This type of fracture often requires surgical repair. By the time the patient saw an outside orthopedic surgeon and had a CT scan, a month had passed and the bone was beginning to heal.  She was placed in a sling.  At the 6-week mark, she could not move her left shoulder due to pain and was diagnosed with "Fracture of the proximal end of the left humerus with delayed healing". Nine weeks after the injury on 12/21/20, she was instructed to perform gentle stretching and range of motion exercises.  Given the severity of her mental illness as described in the health record, it is doubtful she was capable of this.  She should have been referred to physical therapy for supervised exercise.  At her last visit 2 weeks prior to her release on 3/12/21, she still had significantly limited range of motion.[49]

- A 24-year-old woman did not receive timely follow-up for her history of a breast lump.  In December 2020 the patient delayed her medical evaluation because she believed she was going to be released in early January 2021. However, in mid-January she requested care and had a mammogram on 1/20/2021 for which she received no follow-up until she experienced increasing pain and breast drainage. The mammogram report is not in the record. On March 12, 2021 she was sent urgently to the ED where she underwent another mammogram showing a large loculated breast mass and a smaller breast mass.  A repeat sonogram was recommended in one month.  She underwent incision and drainage and excisional biopsy of the smaller breast mass. She was due for follow-up 3 days later to remove sutures and review biopsy and culture reports, but this did not occur and she was not returned to the surgical clinic for two more weeks. At that time biopsy results were

---

[48] Patient #3.
[49] Patient #4.

not documented and discussed with the patient.  There was no discussion with the patient of the recommendation for repeat sonogram in one month.

We found cases in which medical providers did not review and address specialty services recommendations following hospitalization. The following is a case in point:

- A 43-year-old man arrived at SCJ on 5/11/2021 and was released on 6/6/2021. His medical history included alcohol dependence and methamphetamine use, hypertension, and adjustment disorder.  On 5/11/2021 the detainee was apprehended and complained of chest pain and the police took the detainee to the hospital where he was diagnosed with chest pain, methamphetamine use, and untreated hypertension.  An EKG and troponins were negative. He tested positive for methamphetamine. The discharge recommendations were to consider outpatient treadmill, initiate blood pressure management and drug treatment.  At intake the nurse documented the hospital discharge recommendations, including the stress test. On 5/12/2021 a provider conducted an essential medication review, noting the patient had diabetes but was not taking medications. The provider but did not address the recommendation for a stress test. On 5/13/2021 a provider reviewed the patient's medical history and recent emergency department visit but did not address the recommendation for a stress test. Two weeks later a provider saw the patient noting no diagnosis of diabetes, blood pressure controlled and to continue lisinopril.  Follow-up 3 months. The provider did not address recommendation for outpatient stress test.  On 6/3/2021 the patient complained of chest pain and his blood pressure was elevated (BP=178/98 mmHg) and an EKG was noted to be abnormal but was not scanned into the record. The patient was transported to the hospital and returned with a diagnosis of atypical chest pain. Two days later, an EKG was performed that was abnormal suggesting ischemia, but there is no accompanying progress note or documentation that a provider was notified. On 6/6/2021 the patient was released without a provider addressing the recommendation for a stress test despite multiple physician visits, two episodes of chest pain and abnormal EKG's. This patient has been readmitted to the jail and as of 9/25/2021 a provider has not seen the patient for chronic disease management and reviewed his previous admissions. [50]

In addition to variability in timeliness of access to specialty care, patients are not always seen timely upon return from specialty appointments.  For example:

- A patient who had a partial resection of his jaw for ameloblastoma (a rare, aggressive tumor) was seen for his most recent post-op follow up by ENT on 3/22/21 and has not been seen by a dentist or physician since.[51]

- Another patient with an unstable ankle fracture was sent to the ED for immediate surgical repair.  He returned to the jail on 11/4/21 and was not seen by a facility provider post

---

[50] Patient #17.
[51] Patient #8.

operatively prior to his release 3 weeks later.  Considering the urgent nature of the surgery, he should have been seen within 5 days per policy to monitor his condition for complications such as infection, blood clots, and pain management.[52]

ACH developed a Specialty Services Tracking Log that is in production and expected to go live July 2021. The medical monitors did not have the opportunity to review the Log. The County plans to begin audits in the next monitoring period on the timeliness of referrals including patients who need to see a primary care provider due to delay in specialty services appointments.  Twice yearly audits of specialty care referral logs are supposed to begin in July 2021. The Medical Experts will review these logs during the next monitoring period.

**Compliance Assessment:**
E.1=Substantial Compliance
E.2=Substantial Compliance
E.3=Not Evaluated
E.4=Partial Compliance
E.5=Noncompliance
E.6=Noncompliance
E.7=Noncompliance
E.8=Substantial Compliance
E.9=Not Evaluated
E.10=Substantial Compliance

**Recommendations:**
1. To the extent possible and appropriate to treatment/evaluation needs, telemedicine services should be implemented at the jail to enhance access to specialty services.
2. Ensure that patients are seen timely by medical providers following specialty appointments, all consultant reports are received, recommendations are addressed, and a treatment plan is developed.
3. Providers should monitor patients to ensure that the treatment plan has been timely implemented and that desired clinical outcome has been achieved.
4. Perform CQI studies to assess timeliness of care by specialty and identify barriers to access so these can be addressed.

# F. Medication Administration and Monitoring

1. The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws through the following:
   a. Ensuring that initial doses of prescribed medications are delivered to patients within 48 hours of the prescription, unless it is clinically required to deliver the medication sooner.

---

[52] Patient #9.

     b.   Ensure that medical staff who administer medications to patients document in the patient's Medication Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, (3) the date and time for any refusal of medication, and (4) in the event of patient refusal, documentation that the prisoner was made aware of and understands any adverse health consequences by medical staff.

2. The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

3. The County shall provide pill call twice a day in each housing unit, at regular times that are consistent from day to day, except as may be required by non-routine facility security concerns. The County shall develop and implement policies and procedures to ensure that prescribed medications are provided at therapeutically appropriate times as determined by the ordering physician. Any patient who requires administration of medications at times outside the regular pill call shall be provided that medication at the times determined by the ordering physician.

4. The County shall develop and implement policies and procedures to ensure that patients are provided medications at therapeutically appropriate times when out to court, in transit to and from any outside appointment, or being transferred between facilities. If administration times occurs when a patient is in court, in transit, or at an outside appointment, medication will be administered as close as possible to the regular administration time.

5. The County shall develop policies and procedures to ensure that medication efficacy and side effects are monitored by staff and reviewed by appropriate clinicians at appropriate levels.

6. The County shall explore the expansion of its Keep-on-Person medication program, (especially for inhalers and medications that are available over-the-counter in the community) and to facilitate provision of medications for people who are out to court, in transit, or at an outside appointment.

**Findings:** Our observation of medication administration and medical record review showed that patients do not timely receive medications. Medications are scheduled to be given twice daily, at 7 am and 7 pm. Standards of nursing practice permit medications to be given one hour before and one hour after a designated medication time. With respect to the current medication schedule, this would permit nurses to administer medications from 6 am to 8 am and 6 pm to 8 pm and meet standards of nursing practice. However, nurses we interviewed at Main Jail reported that they were responsible for several floors and it took 4 to 5 hours to give medications. Medication administration records show that morning medications are given as late as 11:45 am and evening medications are given as late as 2 am, 6 hours after the designated time. Moreover, administering evening medications well after midnight is a barrier to care, and understandably leading to medication refusals, increasing the risk of harm to patients.

Nursing leadership reported that nursing staff schedules that begin at 7 am do not currently allow nurses to take full advantage of the window of time permitted to administer the 7 am dose (6 am

to 8 am).  This could be addressed by changing the times of morning medication to 8 or 9 am to permit nurses to administer medications during the two-hour window.

We interviewed nurses who reported that medication administration is dependent on availability of deputies, who are not always available to meet medication administration schedules. Restricted movement due to lockdowns or quarantine of housing units results in nurses having to go cell to cell instead of inmates lining up at the entrance of the housing pod, which is more efficient and permits more effective oral cavity checks to promote medication compliance. According to ACH, a request has been submitted for 8 deputy positions to Main Jail for escorts, two for each shift.[53]

The County is changing medication administration work flows to increase the efficiency of medication administration.  Work flow changes include order new medication carts, amending medication administration and pharmacy schedules, reassigning tasks, and improving network capacity.  Additional custody escorts will be required to ensure efficient operations.

ACH is revising medication administration policies and the Medical Experts have provided comments.  The Keep on Person (KOP) Medication policy is being revised as well. ACH and custody leadership has met to discuss which medications will be permitted to be KOP.   At a minimum, KOP medications need to include inhalers, nitroglycerin tablets, eye drops, and creams. As is done in correctional systems around the country, it is critically important that inmates are permitted to keep life-saving medication on their person, such as nitroglycerin tablets for angina and rescue inhalers (albuterol) for patients with asthma and COPD. We also recommend that a limited supply of over-the-counter medications (e.g., Tylenol) be included in the KOP program.

We strongly recommend that the KOP program be expanded to include a 7- or 14-day supply of prescription medications such as for diabetes, hypertension and other chronic conditions. Controlled medications such as narcotics and psychotropic medications would not be included in a KOP program.  Implementing a KOP program will significantly reduce nursing and custody time needed for medication administration.   In some large US county jails, KOP medications are administered by pharmacy techs/EMTs who deliver and document administration of the medications in a process separate from nurse administered medications.

We observed nurses administer medications at Main Jail and RCCC. We found that nurses did not consistently adhere to standards of nursing practice with respect to medication administration. A key finding is that nurses did not positively identify patients using two identifiers.  Nurses did not require inmates to state their name and provide a secondary ID such as date of birth or X-Ref number.  Although some inmates presented their ID badge, nurses did not consistently look at the badge to confirm the inmate's identity.

---

[53] Third 180-Day Status Report for May's Consent Decree.

At RCCC, a deputy assisted with having inmates' line up, bring a cup of water, and wear a mask; this helped to maintain an orderly process. The nurse did not use a computer during medication administration to review the Medication Administration Record (MAR), and document administration at the time the medication was given to the patient. This increases the risk of medication errors as a medical provider may discontinue a medication and the nurse may be unaware if the nurse does not review the MAR at the time the medication was given. We reviewed one instance in which a provider discontinued a seizure medication, but a nurse gave the medication to the patient 3 hours later.[54]   At Main Jail, a nurse did use the computer to bring up the MAR and document administration of the medication to the patient at the time it was given. Consistent use of the computer system for MAR review and entries should occur across the system.

At both facilities, nurses poured medications into an emesis basin that was repeatedly used instead of pouring medication into an individual souffle cup to be given to the patient.  Nurses poured medications from the emesis basin into the patient's cup filled with water, a practice known as "floating".  Some medications stuck to the bottom of the cup.  The Director of Nurses informed us that this practice was not compliant with current policy. Oral cavity checks were inconsistently performed by nurses and officers.

We note that nurses must obtain signed refusals for all medications including Tylenol and other over the counter medications. This is not an optimal use of nursing resources and could be avoided with the implementation of a Keep on Person (KOP) medication program.  We note that asthma and COPD patients are not permitted to keep inhalers in their possession.  This is dangerous, as asthma deaths are well known to occur in correctional settings and result in preventable liability.

Inspection of refrigerators in booking showed open insulin vials that had exceeded dates of expiration (i.e., 30 days following vial opening).


**Compliance Assessment:**
- F.1.a=Partial Compliance
- F.1.b=Partial Compliance
- F.2=Noncompliance
- F.3=Partial Compliance
- F.4=Noncompliance
- F.5=Noncompliance
- F.6=Partial Compliance

---

[54] Patient #27.

**Recommendations:**

1. The County needs to finalize and implement medication related policies and procedures, to include procedures for medication administration that complies with standards of nursing practice (e.g., The Five Rights).
2. Nurses should review the MAR and document administration of the medication at the time medication is administered.
3. The County needs to ensure that adequate medical provider resources are dedicated to review of essential medications upon arrival, timely renewal of chronic disease medications, and discharge medications.
4. Conduct CQI studies regarding medication continuity and timeliness.
5. The County should ensure adequate nurse and custody staff assigned to medication administration to ensure that medications are administered within a 2-hour time frame (one hour before and one hour after a designated time).
6. The County needs to permit inmates to keep life-saving medications on their person such as nitroglycerin tablets for angina and rescue inhalers (albuterol) for asthma and COPD.

## G. Clinic Space and Medical Placements

1. The County shall provide adequate space in every facility to support clinical operations while also securing appropriate privacy for patients. Adequate clinical space includes visual and auditory privacy from prisoners, and auditory privacy from staff, the space needed reasonably to perform clinical functions as well as an examination table, sink, proper lighting, proper equipment, and access to health records.
2. The County shall ensure that any negative pressure isolation rooms meet community standards, including an antechamber to ensure that the room remains airtight, appropriate pressure gauges, and regular documented checks of the pressure gauges.
3. The County shall ensure that absent individualized, documented safety and security concerns, patients in acute medical or quarantine placements shall be allowed property and privileges equivalent to what they would receive in general population based upon their classification levels.  The County shall ensure that patients in medical placements are not forced to sleep on the floor, including providing beds with rails or other features appropriate for patients' clinical needs and any risk of falling.
4. The County shall not discriminate against patients in medical placements solely because of their need for C-Pap machines, but instead shall provide access to programs and services in accordance with their classification level, as set forth in the ADA remedial plan.

**Findings:**  The Third Mays Status Report acknowledges space inadequacies such as lack of privacy in the booking area during intake screening; lack of a dedicated unit to monitor patients withdrawing from alcohol and drugs, and lack of space to monitor patients at risk of suicide or with acute mental illness.

In January 2021, ACH and SSO convened a Space Planning Committee which met regularly through April 2021.  Review of the Space Planning Action Items shows that ACH and SSO have not been able to finalize action items to resolve identified issues.  In some cases, this appears to

simply reflect the lack of adequate space with no readily identifiable solution except construction, substantial population reduction, or both.  In other cases, it may reflect that lack of ability to come to consensus on a solution amidst competing priorities (e.g., substance abuse withdrawal monitoring unit).

This was the medical experts first on-site tour to be able to fully appreciate space challenges at Sacramento County Jail.  During our onsite tour we made the following observations:

- There is no auditory privacy for detainees as they go through the medical screening process. This includes:
  - COVID-19 symptom screening (it is performed while the officer does property management, right next to the nurse)[55]
  - Nurse Intake Screening[56]
  - Mental Health Assessments
- The Nurse Intake Screening room is too small for its intended purpose, is cluttered, dirty and unsanitary. Desks and counters are in disrepair, in some cases falling apart, and cannot be adequately disinfected. [57]
- A room off the Nurse Intake Screening room is used to store supplies and has an exam table. The room is dirty and cluttered. The cabinets are disorganized and in disrepair.  There is food in the medication refrigerator.  The refrigerator contained expired insulin.[58]
- Detainees requiring monitoring for alcohol and drug withdrawal are placed in a "Sobering Cell", a large room that is used to monitor a person for withdrawal symptoms. The floor was dirty and the foundation crumbling. It is dehumanizing and no place for any type of therapeutic monitoring.[59]
- There is no space dedicated for an alcohol and drug withdrawal monitoring unit.  Instead, detainees at risk of withdrawal are dispersed in quarantine housing units throughout Main Jail. Record review shows that nurses do not timely perform monitoring assessments for detainees undergoing alcohol/drug withdrawal.  The failure to timely monitor and treat inmates for withdrawal results in preventable hospitalizations and deaths, which was previously noted in the First Mays Monitoring Report.
- It was pointed out to us that there were previously plans to establish a detox unit on 2 East, and we observed 6 beds set aside for this purpose. However, it was also reported that due to COVID-19 the unit was never opened.  It is likely that six beds will not meet the demand for the number of inmates that need to be monitored for withdrawal.

---

[55] Photos 6284 and 6285
[56] Photo 6286
[57] Photo 6287
[58] Photos 6289 to 6303.
[59] Photos 6303 and 6304

- 2 Medical is the Main Jail medical treatment area with clinic rooms, dialysis and 10 medical beds.  There is insufficient space to store medical equipment and supplies, and the hallways are filled with wheelchairs, dialysis dialysate solution, etc. [60]
- 2M Nurses station counters are in disrepair.  Cabinet drawers have fallen off. [61]
- Clinic room desks and carts are in disrepair.[62]
- A 2M Medical room door had dried fluids on the outside of the food port.[63]
- Clinic rooms are cluttered with carts and supplies. The floors and surfaces are dirty. They are not cleaned and disinfected on a routine basis.[64]
- There is a negative pressure room used to house tuberculosis suspects on 2M that does not have an anteroom. This is a requirement of the Consent Decree.  It was reported that the room was tested daily, however, medical does not receive these reports. This is unusual as it is the responsibility of health care staff to know if the room's ventilation is working properly when placing TB suspects or other patients requiring respiratory isolation in the room.
- 2 East 100 is designated for disabled inmates in wheelchairs. It has five cells and, according to staff is always full.
- 2 East 200 is designated for inmates with C-PAP machines because there is no other housing at Main Jail with electrical outlets.  We did not assess whether these inmates have access to programming as required by the Consent Decree.
- On each floor of Main Jail there is an examination room. We toured the clinics on floors 7 and 8 and found them to be relatively clean, organized, and adequately equipped and supplied. However, there is only one clinic on each floor that is currently occupied by a physician from 7 am to 3:30 pm. This is insufficient space to conduct other activities such as nurse sick call, and mental health and psychiatric assessments.  As a result, nurses and mental health staff conduct assessments cell-side. Even obstetricians conduct OB visits at the patient's cell, which is not a clinical setting and does not provide privacy.

Cell-side assessments are wholly inadequate for all but the most minor problems and should be avoided.  The following case described in the executive summary is illustrative:  A 50-year-old man with severe mental illness and substance use disorder was seen cell side on 4/1/21 by a social worker who described a messy cell that smelled like urine with food scattered on the floor and in the toilet.[65]  The patient was lying face down on the floor and "appeared to have poor hygiene and smelled of body odor".  He was described as indifferent, irritable and minimally engaged, oriented to person only, with poor insight and judgment.  Less than 8 hours later, the same patient was seen by a different social worker who describes him as appropriately dressed and groomed, cooperative and pleasant, alert and fully oriented with fair insight and judgement.

---

[60] Photo 6316.
[61] Photos 6317 and 6320.
[62] Photo 6311 and 6312.
[63] Photo 6315.
[64] Photo 6310.
[65] Patient #6.

He reportedly was lying on the floor for comfort.  The next morning, he was found dead in his cell.  An autopsy report is not available.

In another case previously described, nursing staff failed to recognize that a patient had a severely injured arm during 3 consecutive cell side assessments, contributing to a delay in care.[66]

At Branch Jail, we found similar issues related to adequacy of clinic space at Branch jail with respect to the lack of adequate numbers of examination rooms, clutter and lack of sanitation and disinfection. This was also true in the Medical Housing Unit which is an open dormitory like setting without adequate confidential space. It had mattresses in disrepair and that should be replaced.

We note that there are no policies and procedures related to clinic space, equipment and supplies, or infirmary care/medical observation or medical housing.

**Compliance Assessment:**
- G.1=Noncompliance
- G.2=Noncompliance
- G.3=Not Evaluated
- G.4=Not Evaluated

**Recommendations:**
1. The County should develop and implement a plan to immediately improve existing clinical space as much as feasible to include:
   a. Decluttering all clinical areas by removing unneeded or broken equipment, furniture, etc.
   b. Performing terminal cleaning
   c. Painting rooms
   d. Replacement of broken furniture, counters and equipment.
   e. Development of a sanitation and disinfection schedule
   f. Performing monthly environmental inspections with corresponding action plans.
2. The County needs to conduct a comprehensive assessment to identify clinical, treatment, program, and office space needed to meet Consent Decree requirements. This includes but is not limited to:
   a. Medical Assistant stations in booking with computer terminals for access to the EHR for COVID-19 screening and vital signs that provide adequate privacy.
   b. Registered Nurse stations in booking with computer terminals for access to the EHR to conduct intake screening that provide adequate privacy.
   c. An examination room with access to a running sink and computer terminals in booking to conduct physical examinations.
   d. A bathroom in the booking area to collect urines for pregnancy tests, drug screening.

---

[66] Patient #4.

e. An office for a nurse intake supervisor and/or medical provider in the booking area.

f. Mental health interview rooms in booking to conduct confidential mental health assessments

g. Observations rooms with beds and access to a sink and toilet for monitoring patients in the booking area.

h. Examinations/Interview rooms on every housing floor to accommodate nursing, medical and mental health staff appointments.

i. Inmate waiting rooms with access to a bathroom

j. An alcohol and drug withdrawal monitoring housing unit with sufficient beds to accommodate the demand for SUD patients and permit a minimum of 5 days of monitoring.

k. Office space for administrative, nursing, medical and mental health leadership/supervisors at the jail.

l. Adequate office space for nurse, medical and mental health staff.

m. Respiratory Isolation rooms with an anteroom

n. Dental treatment space with sufficient chairs to provide timely dental treatment.

o. Acute care medical and mental health space that has a call system for patients to notify staff for patient needs

p. A nurse's station in the acute care medical and mental health unit

q. Specialty services rooms to sufficient to accommodate on-site specialists and telemedicine equipment.

r. Office space for utilization management and specialty services schedulers.

s. Physical therapy room of adequate size to accommodate equipment

t. Dialysis rooms of sufficient size to accommodate dialysis chairs needed to provide treatment.

u. Medical equipment and supply storage space that is readily accessible to staff.

v. Office space for quality improvement staff

w. Staff conference rooms for meetings and continuing education.

x. Staff breakrooms and lockers.

3. Standardize the contents of all clinical examination rooms.

4. The County should determine whether the respiratory isolation rooms at Main Jail meet current regulations and standards for use with having an anteroom.[67]

5. Develop policies and procedures related to clinic space, equipment and supplies that are consistent with NCCHC standards.[68]

## H. Patient Privacy

1. The County shall develop and implement policies and procedures to ensure that appropriate confidentiality is maintained for health care services. The policies shall ensure confidentiality for clinical encounters, including health care screening, pill call, nursing

---

[67] Standards for Health Services in Jails. 2018. National Commission on Correctional Health Care. J-B-02.
[68] Standards for Health Services in Jails. 2018. National Commission on Correctional Health Care. J-D-03.

and provider appointments, and mental health treatment. The policies shall also ensure confidentiality for written health care documents, such as health care needs requests and grievances raising medical care or mental health concerns, which shall not be collected by custody staff.

2. The County shall provide adequate clinical space in each jail to support clinical operations while securing appropriate privacy for patients, including visual and auditory privacy from prisoners and auditory privacy from staff.

3. All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff. In making such a determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be made based upon housing placement or custodial classification. The issuance of pills does not constitute a clinical interaction.

   a. For any determination that a clinician interaction with a patient requires the presence of custody staff, staff shall document the specific reasons for the determination. Such decisions shall be reviewed through the Quality Assurance process.

   b. If the presence of a correctional officer is determined to be necessary to ensure the safety of staff for any clinical encounter, steps shall be taken to ensure auditory privacy of the encounter.

   c. The County's patient privacy policies, as described in this section, shall apply to contacts between patients and all staff who provide health-related services on site at the jail.

4. Jail policies that mandate custody staff to be present for any medical treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above. Custody and medical staff shall be trained accordingly.

**Findings:**   ACH has revised the Patient Privacy policy, however the policy acknowledges that certain areas of the jail such as booking do not permit privacy. [69] The County planned to build an Annex which would have provided increased clinical space with corresponding privacy. However, the plan to build the Annex is on hold and there is no definitive plan that will provide adequate space and privacy.

The provision of privacy is fundamental to the patient-provider relationship. Privacy encourages patients to share information about their health, and facilitates accurate diagnosis and treatment.   Record review shows that a significant number of clinical encounters, including intake, mental health assessments, nurse sick call and obstetrical encounters[70], are performed in a setting that lacks privacy, such as at cell side or in the housing unit day room.  This permits other inmates and officers to overhear patient-provider encounters, discourages sharing of health information, and violates patients' confidentiality.

---

[69] Patient Privacy, ACH 08-08, Revised 5/13/2021.
[70] Patients #29 and #30.

As noted in the Executive Summary, conducting cell side assessments that lack privacy also results in inadequate clinical evaluations and contribute to harm, including death.[71]

Other factors that may contribute to cell side assessments that lack privacy include lack of custody staff to escort patients to examination rooms and competing demands for available clinical space,

With respect to cell side encounters in quarantine units, early in the pandemic, minimizing movement of quarantined and isolated inmates was understandable to prevent transmission to staff and other inmates.  However, the widespread availability of vaccination combined with the availability of masks no longer justifies conducting all clinical encounters cell side. While some care can be safely deferred until after the 10-day quarantine period, when health care is warranted, it should be conducted in a clinical setting that provides privacy.

As noted in the last report, when patients are transported to the hospital, transporting deputies are given a form to provide the hospital that contains Health Protected Information (HPI) for which the officer does not have a need to know.  The deputy sees this information because the deputy must sign and document the time of departure from the jail on the form. This practice was addressed in the Safeguarding Protected Health Information revised 6/3/2021 but has not been fully implemented as evidenced by this review.

**Compliance Assessment:**
- H.1=Noncompliance
- H.2=Noncompliance
- H.3=Noncompliance
- H.4=Substantial Compliance

**Recommendations:**
1. ACH and SSO leadership need to ensure that patient encounters are conducted in a clinical setting that provides privacy, an effort that must include enhancing practices in the current facility space in the short term as well as moving forward with plans to improve/expand treatment space across the system to support confidentiality during patient encounters.  The County must allocate appropriate resources to achieve this critically important element of the Consent Decree.
2. Fully implement the Patient Privacy and Safeguarding Protected Health Information policies to address the confidentiality of health information when transporting patients to the hospital. HPI should be separated from any forms that require officer review and signature, so that deputies and others are able to deliver appropriate documentation without compromising privacy of patient's protected health information.

---

[71] Patient #6.

## I. Health Care Records

1. The County shall develop and implement a fully integrated electronic health care record system that includes medical, psychiatric, and dental records and allows mental health and medical staff to view the medical and mental health information about each patient in a single record. This shall be accomplished within 12 months of the date the Remedial plan is issued by the Court.
2. Until such a system is implemented, the County shall develop and implement policies and procedures to ensure that medical staff have access to mental health information and mental health staff have access to medical information, as needed to perform their clinical duties. This information shall include all intake records. Medical and mental health staff shall be trained in these policies and procedures within one month of the date the Remedial plan is issued by the Court.
3. The County shall develop and implement policies and procedures to monitor the deployment of the CHS Electronic Health Record (EHR) to ensure the records system is modified, maintained and improved as needed on an ongoing basis, including ongoing information technology support for the network infrastructure and end users.

**Findings:**   According to the County's Third Mays Status Report, ACH acknowledges that the current electronic health record is challenging and does not meet workforce needs for data and tracking. Centricity provides access to medical, mental health and dental information, but does not yet contain key interfaces such as Apollo Lab, Dental Radiology, and Inmate Picture. Changes in EHR templates and creation of reports is time consuming. There are plans to purchase a new electronic health record after the Health Services Administrator is hired.[72]

The County has developed health record policies and procedures including: Release of Protected Health Information, Safeguarding Protected Health Information, Standard Abbreviations and Records Retention.  The County has not developed and implemented policies and procedures "to monitor the deployment of the electronic health record to ensure the records system is modified, maintained and improved as needed on an ongoing basis, including information technology support for the network infrastructure end users."[73]

With regard to specific EHR templates, ACH is in process of modifying the Intake Screening template to be compliant with Consent Decree requirements, including insertion of a radial button for the nurse to check following review of the patient's previous medical records.  The medical experts have recommended that ACH streamline the template by eliminating duplicate information asked in the fitness for confinement and secondary nurse assessment sections. Some information can also be deferred until provider history and physical (e.g., family history).

Centricity work flows don't conform to policy requirements and result in delays in evaluations and treatment. For example, when an intake nurse orders a mental health referral, the order

---

[72] Third Mays 180-Day Status Report.
[73] Consent Decree I.3.

goes to a licensed clinical social worker who orders a mental health assessment.  It's unclear why the intake nurse cannot directly order the mental health assessment.  Likewise, when a patient requires alcohol withdrawal monitoring and treatment, the intake nurse should be able to directly order CIWA monitoring and medication treatment in accordance with the standardized procedures rather than deferring it to a priority flex nurse appointment that delays CIWA assessments and treatment.

Centricity orders needs to be reconfigured to enable the County to meet policy and Consent Decree requirements, particularly with respect to the capacity to order appointments to occur in certain time frames (e.g., Emergent/STAT, Urgent and Routine).

We also note some concerns about the way in which the health record is being utilized. Both nurses and providers do not select the type of encounter that applies to the patient visit. For example, providers do not select MD chronic disease visit when performing chronic care (when it is performed).  Obstetricians do not use the obstetrical flowsheets in Centricity which would enable better tracking of the progress of the pregnancy and permit ACH to monitor the timeliness and appropriateness of care provided by the vendor.

Record reviews shows that health service request forms are not scanned into the EHR. When outside hospital records were scanned into the EHR, medical record staff did not always notify a medical provider of the need to perform chart review, particularly following hospitalizations.

Review of health records show that medical providers may "cut and paste" notes in which it appears that certain review of systems and examinations were not performed.  For example, a provider documented that a patient was unable to give a history and then documented an extensive review of systems.  Providers also document extensive cell side examinations (e.g., abdominal examinations) that are unlikely to have taken place. This results in inaccurate medical information and in some cases falsification of the medical record. Unfortunately, the practice of "cut and pasting" previous notes this is a common practice in the community and corrections, and it is incumbent upon providers to ensure that the notes are accurate with respect to the medical history, current symptoms and examinations performed.  The Medical Director needs to monitor and address this practice.

In addition to maintaining adequate health care records at the local level, providers must have timely access to outside records to enable provision of appropriate care and ensure continuity of critical medications and treatments.  We observed multiple instances of missing reports after patients were seen for outside care by specialists or in the emergency department.  When records were obtained, in some cases only the patient information document was received which does not include enough detail for clinical decision making at the provider level.  As an example, a 40-year-old man[74] reported a history of diabetes, prior stroke, and high blood pressure at intake, but did not mention his history of coronary artery disease and severe heart failure.  He could not remember the names of all his medications and so was not prescribed his home

---

[74] Patient #7.

medication regimen.  As a result, he suffered severely elevated blood pressure for more than a week until he finally was sent to the emergency department with a heart attack.  The hospital staff were able to access his records through the Health Information Exchange, a secure online repository of health information accessible by subscription for health care providers.  In contrast, the patient's outside pharmacy records weren't received by the jail until 5 days after his admission to the hospital.  His outside medical records were received more than a week after he suffered sudden cardiac death at the jail.

**Compliance Assessment:**
- I.1=Substantial Compliance
- I.2=Partial Compliance
- I.3=Noncompliance

**Recommendations:**
1. When health care workflows and policies have been finalized, ACH should pursue the purchase and installation of a new electronic medical record.
2. In the interim, Centricity should be modified for high priority, high volume health care processes to promote timely and appropriate health care.
3. Prioritize the creation of order sets that include completion time frames based upon policy requirements. This includes:
   a. Essential Medication Review
   b. Substance Use Disorder (SUD) monitoring and treatment
   c. Mental health assessment and psychiatric appointments
   d. Intake history and physical examinations
   e. Chronic disease management
4. Ensure that all health documents are timely scanned, and when indicated, health information staff notify medical and mental health providers of the need for chart review.
5. Ensure that outside pharmacy and medical records are obtained timely for continuity of care.  The county should expedite its plan to subscribe to the Health Information Exchange.
6. The Medical Director should conduct provider record review to evaluate the extent to which medical providers "cut and paste" previous medical record notes and whether the notes accurately reflect examinations that have taken place.

## J. Utilization Management

1. The County shall revise its utilization management (UM) system to ensure that critical health decisions about patients' access to care are made with sufficient input from providers and a thorough review of health care records.
2. The County shall ensure that decisions about a patient's access to, timing of or need for health care are made by a physician, with documented reference to the patient's medical record. Nurses may gather information and coordinate the UM process, so long as it does not interfere with that requirement. All decisions by the UM committee shall be documented, including the clinical justification for the decision.

3.  The UM system shall ensure that providers and patients are promptly informed about decisions made by the UM committee, including denial of a specialist referral request.
4.  The UM system shall include an appeal process to enable patients and providers to appeal a decision denying a referral request.

**Findings:** ACH has developed Specialty Services and Utilization Management policies that were revised following feedback from Plaintiffs and medical monitors. The policies include an appeals process. The Medical Experts did not interview UM staff during our site visit.

Record review show cases in which patients did not have timely specialty services appointments.

**Compliance Assessments:**
- J.1=Substantial Compliance
- J.2=Not Evaluated
- J.3=Not Evaluated
- J.4=Partial Compliance

**Recommendations:**
1.  Ensure that UM staff monitor tracking logs to ensure that patients are scheduled for timely initial and follow-up specialty appointments.
2.  Medical providers should monitor patients pending specialty services to determine whether the urgency of the appointment needs to be changed.

## K. Sanitation

1.  The County shall consult with an Environment of Care expert to evaluate facilities where patients are housed and/or receive clinical treatment, and to make written recommendations to address issues of cleanliness and sanitation that may adversely impact health.

**Findings:**  The Third Mays Status Report did not address his provision.  The Infection Prevention and Control Program policy and procedure[75] briefly addresses Environmental Inspections but there is no operational detail regarding what areas are to be inspected and whether health care staff participate in any inspections.  Plaintiffs' Counsel provided copies of Sacramento Main Jail Inspection Reports from 2018 to 2020.

During the June 2021 site visit, we found that basic sanitation and cleanliness to be completely unacceptable. Please see Section C. of this report.

**Compliance Assessment:**
- K.1=Noncompliance

---

[75] Infection Prevention and Control Program. No. 02-02. Effective date 7/24/2020. 01/20/2021

**Recommendations:**

1. As soon as possible, an independent Environment of Care expert should evaluate facilities where patients are housed and/or receive clinical treatment, as required by the Consent Decree. The expert's recommendations for addressing deficiencies must be addressed through changes in policy and practice, with additional allocation of resources provided where necessary to resolve deficiencies.
2. The County needs to institute a sanitation and disinfection program in all areas of the jail, but with particular attention to the booking and intake area, sobering cell, safety cells and all health care areas of the jail. The program should not rely on untrained inmate workers to maintain sanitation at the jail.
3. The program should include a schedule of terminal cleaning of floors, walls, doors with repairs and repainting as needed.
4. There should be sanitation schedules posted with designated persons responsible for ensuring that daily, weekly and monthly sanitation activities are implemented and documented.

## L. Reproductive and Pregnancy Related Care

1. The County shall ensure that pregnant patients receive timely and appropriate pre-natal care, specialized obstetric services when indicated, and post-partum care (including mental health services).
2. The County will provide pregnant patients with comprehensive counseling and timely assistance in accordance with their expressed desires regarding their pregnancies, whether they elect to keep the child, use adoptive services, or have an abortion.
3. The County will provide non-directive counseling about contraception to female prisoners, shall allow female prisoners to continue an appropriate method of birth control, shall provide access to emergency or other contraception when appropriate.

**Findings:** The County has revised its policy on Female Reproductive Services (Revised 7/1/2021) that is compliant with the Consent Decree. The County established a contract with UCD for obstetrical services and it has recently been renewed. The contract requires that UCD provide an obstetrical clinic for 8 hours once a week at the jail.

We reviewed four records of women who were pregnant upon admission to the jail during the period of review. We note that nurses and providers do not utilize Centricity EHR obstetric related flow sheets to document care and facilitate monitoring the progression of the pregnancy.

In all four cases a nurse conducted a urine pregnancy test at intake. In two cases, the nurse did not perform a urine drug screen, although in one case the patient had a history of drug use. In two cases in which the patient was >12 weeks pregnant, the nurse did not check fetal heart tones at intake in accordance with policy. [76] Two of the patients reported a chronic disease (e.g., COPD, asthma) but were not referred to a medical provider for chronic disease management.

---

[76] Patients #29 and #30.

A concern is that all obstetrical appointments were conducted at the patient's cell instead of in a clinical examination room, even when patients were beyond the 10-day quarantine period and had a negative SARS CoV-2 test.  This does not permit the patient to be examined in a clinical setting with real time access to the patient's medical record, and auditory or visual privacy during examinations.  Now that COVID-19 vaccines are widely available to health care and custody staff as well as inmates, patients should be masked and escorted to clinical examination rooms for medical appointments, even during the initial quarantine period.

In one case, there were care coordination issues.  A patient with HIV infection was 7 and ½ months pregnant and being followed in the community. She had recently been started on antiretroviral therapy that was continued at the jail. Her pending outside appointments were canceled under the assumption that care would be provided at the jail, however ACH was unable to timely obtain her community medical records in order to provide informed continuity of care. The patient was released after two weeks, however since her community appointments had been canceled, it's unclear if she received continuity of care.[77]

In another case, an abdominal ultrasound was performed on 4/1/2021 but the radiologist did not read it until 4/22/2021. The delay in reading the ultrasound led to the obstetrician to follow-up on why the ultrasound was not timely read and also commented that the radiologist did not describe the anatomy of the heart. This is an example of lack of an adequate and timely radiology report.

In another case, a patient's intake urine pregnancy test was positive but the nurse initially documented it as negative before correcting it the same day.  The OB apparently did not see the correction and ordered a repeat pregnancy test.  The pregnancy test was repeated 3 days later and confirmed as positive.  The patient submitted HSR's requesting termination of the pregnancy but was not seen again prior to her release.[78]

As noted earlier this report, we found custody escort issues.  In one case, the obstetrician documented that she was not able to see the patient in her cell because no deputy was available to escort her.  During this time, the patient was having persistent nausea and vomiting over a period of several days, and was urgently seen later that day by another medical provider.[79]  While it was fortunate that the patient was seen later the same day, the patient did not receive scheduled prenatal care.

In another case, on 4/22/2021 a provider saw the patient who was 24 weeks gestation. She overheard deputies plan an extraction of a patient from her cell to bring her to court. She requested officers to allow her to speak with the patient to prevent a forced physical removal from her cell.  She counseled the patient who planned to go limp to make it difficult to take her

---

[77] Patient #30.
[78] Patient # 28.
[79] Patient #31.

to court. The outcome of the planned extraction was not documented; however, it is alarming that custody would plan an extraction of a pregnant women with initially consulting medical and mental health staff.[80]

Prenatal labs, vitamins and extra snacks with milk are being ordered for pregnant patients. In one case prenatal labs were not performed due to inadequate specimens. However, there is no indication they were redrawn or reordered. The patient released prior to being completed.[81]

Nurses drop off snacks at the control room rather than delivering directly to the patient. Since this is a therapeutic measure, there should be documentation that not only was the snack delivered to the housing unit, but that the patient timely received the snack.

In several records, we noted lack of timely response to Health Services Requests (HSRs) submitted by pregnant women, and that several were not scanned into the EHR. The only indication that the patient had submitted a request was a certified nurse assistant typed in the contents of the HSR.

**Compliance Assessment:**
- L.1=Partial Compliance
- L.2=Partial Compliance
- L.3=Partial Compliance.

**Recommendations:**

1. Nurses and OB providers need to utilize Centricity OB Flowsheets to document care and monitor the progression of the pregnancy.
2. Nurses need to perform a urine drug screen on all pregnant patients independent of a known history of substance use disorder.
3. Nurses need to perform fetal heart tone checks on any patient with a gestation >12 weeks and inquire about fetal movement for patients with a gestation >20 weeks.
4. Obstetrical patients should be escorted to and medically evaluated in clinical examination rooms with access to the medical record and that provides auditory and visual privacy.
5. Custody needs to dedicate sufficient custody escorts to meet the demand for medical appointments.
6. Custody should never plan to perform a cell extraction on a pregnant woman without consulting medical and mental health staff.
7. Ensure that medical orders (e.g., labs, snacks) are timely implemented.
8. ACH should perform CQI studies to ensure that obstetrical provided to patients meets the community standard.

---

[80] Patient #29.
[81] Patient #31.

## M. Transgender and Non-Conforming Health Care

1. The County shall implement policies and procedures to provide transgender and intersex prisoners with care based upon an individualized assessment of the patient's medical needs in accordance with accepted standards of care and prevailing legal and constitutional requirements, including, as appropriate:
   a. Hormone Therapy
   b. Surgical Care
   c. Access to gender-affirming clothing
   d. Access to gender affirming commissary items, make-up, and other property items
2. The County shall ensure that medical and mental health staff have specific knowledge of and training on the WPATH Standards of Care.

**Findings:** ACH has developed a Transgender and Gender Nonconforming Health Care policy that complies with Consent Decree requirements. [82] SSO policy needs to be modified to address, at a minimum, M. 1 (c) & (d). The Mays 180-Day Status Report did not address whether the policy has been implemented or whether staff have been trained on the WPATH Standards of Care.

Monitoring methodology includes a request for the names of transgendered detainees. compliance. We were not provided names of any transgendered detainees to review their medical records to assess whether care was timely and appropriate and compliant with Consent Decree requirements.

**Compliance Assessment:**
- M.1=Partial Compliance
- M.2=Noncompliance

**Recommendations:**
1. The County needs to train staff regarding WPATH Standards of Care.
2. The County needs to fully implement the policy.
3. The County should perform CQI studies assessing policy compliance.

## N. Detoxification Protocols

1. Within three months of the date the Remedial plan is issued by the Court, the County shall develop and implement protocols for assessment, treatment, and medication interventions for alcohol, opiate and benzodiazepine withdrawal that are consistent with community standards.
2. The protocols shall include the requirements that:
   (i) nursing assessments of people experiencing detoxification shall be done at least twice a day for five days and reviewed by a physician.

---

[82] Transgender and Gender Nonconforming Health Care. 05-12, revised 4/9/2021.

(ii) nursing assessments shall include both physical findings, including a full set of vital signs, as well as psychiatric findings.

(iii) medication interventions shall be updated to treat withdrawal syndromes to provide evidenced-based medication in sufficient doses to be efficacious.

(iv) the County shall provide specific guidelines to the nurses for intervention and escalation of care when patients do not respond to initial therapy; and

(v) patients experiencing severe-life threatening intoxication (an overdose), or withdrawal shall be immediately transferred under appropriate security conditions to a facility where specialized care is available.

**Findings:**   We reviewed revised policies, standardized nurse protocols and health records of patients with a history of alcohol, benzodiazepine, opiate and other substance use disorders.  Our findings are as follows:

- The Alcohol Withdrawal Treatment policy (Revised 5/13/2021) and Alcohol Withdrawal Treatment Standardized Nursing Procedure (SNP) (Revised 6/10/2021) have conflicting information regarding the frequency and duration of CIWA nursing assessments.  The SNP states that CIWA's will be conducted at least twice daily for at least 5 days for all patients at any elevated risk of withdrawal, but then states that if the CIWA score is <8 on two consecutive assessments, monitoring may be stopped. This is a concern because some patients do not develop withdrawal symptoms for up to 24 hours.  This is not compliant with the Consent Decree.[83]
- The Opiate Withdrawal Treatment SNP only requires daily COWS monitoring for 5 days instead of a minimum of twice daily for 5 days.
- Health record review shows:
  - Nurses do not take complete substance use disorder (SUD) histories, including withdrawal histories.[84]
  - Nurses do not timely monitor patients for alcohol and drug withdrawal delaying treatment for patients in withdrawal.
  - Nurses discontinue withdrawal monitoring after as few as CIWA assessment that is not compliant with the current standardized procedure. This is a concern for patients at risk of alcohol and benzodiazepine withdrawal who may not manifest withdrawal symptoms for 24 hours or more.
  - There is no detox unit for nurses to efficiently and effectively monitor patients and conduct assessments.  In Space Planning Meetings the County notes that *"Many discussions have occurred to problem solve space issues and create a detox monitoring unit. While all agreed on the appropriateness of a detox monitoring unit, it would displace other inmates who are currently housed in the proposed area. There is no current space at the MJ where that would be possible."*  *Space*

---

[83] Outpatient Management of Alcohol Withdrawal Syndrome. American Academy of Family Practice. November 1, 2013.

[84] Patient Michael Murdock, John Kirkland, Davonte Lewis, Joyce Beall,

*Planning Action Tool. Revised 4/27/2021.*  The space(s) currently used for detox and withdrawal cases is dirty, unsanitary, and clinically inadequate.

- o   Physicians are not involved in the medical assessment and/or supervision of patients at risk of or experiencing withdrawal.

Examples of delayed monitoring and treatment causing preventable suffering include the following cases:

- A 42-year-old man arrived at SCJ on 4/9/2021 and was released on 7/7/2021. His medical history includes bipolar disorder, alcohol, benzodiazepine and opiate use disorder.  At intake, he reported daily heroin use, a 12 pack of beer daily and valium daily for 20 years and that he had withdrawal symptoms upon cessation.  His urine drug screen was positive for benzodiazepines and heroin. His baseline CIWA and COWS were 0.  Although the patient had a history of withdrawal, the nurse did not order a detox regimen for alcohol, benzodiazepines or heroin.  A nurse did not perform a CIWA and COWS assessment for 24 hours, at such time the patient reported severe and constant pain from body aches. The nurse ordered an opiate withdrawal regimen but the first dose was not given for 20 hours.   Nurses did not conduct follow-up CIWA and COWS screens according to standardized nurse procedures.[85]
- A 25-year-old man arrived at SCJ on 3/10/2021 at 19:39 and is still at the jail. His medical history included alcohol and heroin substance use disorder. On 3/10/2021 at 19:39 a RN performed intake screening. The patient reported using alcohol and heroin. The patient denied taking methamphetamines. The nurse took an adequate heroin and alcohol history except the nurse did not describe whether the patient had alcohol withdrawal syndrome. A UDS was positive for morphine, amphetamine and methamphetamines. Baseline COWS=0 and CIWA=0. On 3/11/2021 a RN did not conduct a COWS or CIWA assessment. On 3/12/2021 COWS score=13, showing the patient was in moderate opiate withdrawal.  A nurse ordered a detox regimen and he received the first dose 4 hours later. The patient was not monitored again for 2 days.[86]
- A 43-year-old woman arrived at SCJ on 3/21/2021 and was released on 4/1/2021. Her medical history included heroin use substance use disorder and cellulitis. On 3/23/2021 at 14:47, 48 hours after arrival a nurse performed COWS screening. The patient reported not feeling well with body aches, and GI issues. She was anxious and restless. COWS=13. Opiate detox protocol initiated.  The nurse entered an order for *COWS Q48* hours and low bunk. The patient received her first dose 7 hours later.

These cases show that nurses do not adhere to standardized nurse procedures for monitoring and treating patients with substance use disorder. Moreover, although substance abuse withdrawal should be performed under medical supervision and ACH policy requires referral to a medical provider, this is not taking place.

---

[85] Patient #19.
[86] Patient #20

On a positive note, we observed that some inmates are provided continuity for buprenorphine treatment, however, inductions are not taking place at this time.

**Compliance Assessment:**
- N.1=Noncompliance
- N.2=Noncompliance

**Recommendations:**
1. The County needs to revise its substance use disorder treatment policies and standardized nursing protocols to be fully compliant with Consent Decree requirements and internally consistent.
2. The County needs to provide additional training and real-time feedback to intake nurses regarding substance use disorder histories, including withdrawal symptoms.
3. Centricity should be reconfigured to create substance use disorder order sets that the intake nurse would order when substance abuse monitoring and treatment is indicated, instead of a generic Priority Flex Nurse (PFN) appointment that does not create an order for nurses to perform CIWA and COWS assessments within 6 hours.
4. Establish a detox unit, with adequate, clean treatment/observation space, to permit timely monitoring and treatment of patients at risk of withdrawal.
5. Consider implementing fixed dose treatment regimens (as opposed to symptom triggered treatment) to prevent escalation of withdrawal syndromes.
6. The Medical Director needs to ensure increased medical supervision of patients undergoing substance use disorder monitoring and treatment.
7. The County should develop a tracking system to ensure that all patients being monitored for substance use withdrawal receive timely assessments.
8. The County should implement CQI studies of performance to track compliance with policies and procedures.

## O. Nursing Protocols

1. Nurses shall not act outside their scope of practice.
2. To that end, the County shall revise its nursing standardized protocols to include assessment protocols that are sorted, based on symptoms, into low, medium and high-risk categories.
   a. Low risk protocols would allow registered nurses to manage straightforward symptoms with over-the-counter medications;
   b. Medium-risk protocols would require a consultation with a provider prior to treatment; and
   c. High-risk protocols would facilitate emergency stabilization while awaiting transfer to a higher level of care.

**Findings:** ACH has developed standardized nursing procedures (SNP) some of which have been recently revised.  The medical monitors have reviewed selected SNP's and find that they do not provide adequate guidance to the nurse.  For example, a SNP entitled *Emergent, Non-Emergent*

*and Hernia* places the responsibility on the nurse to determine whether abdominal pain is emergent or not without providing sufficient clinical guidance and referral criteria to the nurse. As noted in the last report, the SNPs are not organized into low, medium and high-risk protocols.

**Compliance Assessment:**
- N.1=Partial Compliance
- N.2=Noncompliance

**Recommendations:**
1. Nursing leadership should develop Nursing protocols consistent with Consent Decree requirements.
2. Nursing standardized procedures should contain adequate clinical referral criteria to minimize the risk that nurse will exceed their scope of practice.

## P. Review in Custody Deaths

1. Preliminary reviews of in-custody deaths shall take place within 30 days of the death and shall include a written report of the circumstances of the events leading to the death, with the goal to identify and remedy preventable causes of death and any other potentially systemic problems.
2. Mortality reviews shall include an investigation of the events occurring prior to the death, an analysis of any acts or omissions by any staff or prisoners which may have contributed to the death, and the identification of problems for which corrective action should be undertaken.

**Findings:** ACH developed a Medical Review of In-Custody Deaths (revised 3/11/2021) that meets Consent Decree requirements.

Since January 2021, five deaths occurred at the jail.  Three of the five cases were clinically reviewed within 30 days of the death. Two of the cases were clinically reviewed more than 3 months after the death.

The quality of the mortality reviews is lacking.  They are little more than a chronologic list of events leading up to the patient's death.  None of the reviews assessed the appropriateness of the care provided, the effectiveness of relevant policies and procedures, or identified opportunities for improvement in the delivery of care in order to prevent future deaths.  This latter requirement is the fundamental purpose of performing a death review.

None of the mortality reviews included the autopsy reports despite having died months earlier. Neither was there evidence that a corrective action plan developed when indicated.  This is largely due to the failure to recognize any problems with the timeliness or appropriateness of care.

In multiple instances, clinically important information is missing from the mortality review completely.  For instance, one of the reviews did not identify that the patient, who was diagnosed with COVID-19 in mid-January, had submitted two sick call requests complaining of COVID-19 symptoms. The second health request was submitted 1/31/2021 and the patient was found unresponsive on 2/16/2021.  While the cause of death is not yet known, the mortality review did not identify the lack of medical evaluation for a COVID patient reporting worsening symptoms as an issue. [87]

In another case, a patient with a history of alcohol use disorder and serious mental illness was found dead in his cell 11 days after intake.  He was described as "oriented" and "not disheveled" at the time of intake, but 5 days later was found sitting on the floor of his cell, spoiled food on his bed with flies hovering, having soiled himself.  He was unable to communicate effectively and was exhibiting symptoms of psychosis.  He is described in these terms to a greater or lesser degree over most of the next 5 days prior to his death. [88]

It is documented in the chart that the patient was under the influence of alcohol during his committing offense, yet he was not monitored for detox, presumably because he denied substance use at the time of intake.  The patient was never seen by a provider despite multiple referrals by mental health staff.  The only interaction the patient had with any healthcare staff, medical or mental health, was cell side.   The only physical contact with the patient from healthcare staff was to administer CPR after he was found pulseless and not breathing on 4/2/21.  None of these deficiencies were commented upon in the mortality review.

In another example, a 40-year-old man reported on intake 12/16/20 that he had a history of hypertension, diabetes and prior stroke, but did not mention his history of severe cardiomyopathy. Records were requested but were not received until after the patient's death.  Blood pressure checks were ordered upon intake (at which time his BP was 169/117) and he was found to have extremely elevated BP on 12/23/20 (166/118, heart rate 112) and 12/25/21 (173/111, heart rate 123) but on neither occasion did the MA notify a nurse or refer to a provider.[89]

On 12/30/20 he was seen by a nurse for chest pain and severe hypertension with a blood pressure of 183/132 and heart rate of 120.  She contacted the on-call doctor who ordered blood pressure medication but did not send the patient to the emergency department as this situation clearly required.  The nurse checked on the patient later that evening (BP 164/123) and early the next morning (BP 167/125) but did not call a provider.  Later that morning, the doctor adjusted the patient's blood pressure medication and ordered an ECG but the documentation does not indicate whether the provider actually saw the patient.

---

[87] Patient #5.
[88] Patient #6.
[89] Patient #7.

None of the above lapses in care are mentioned in the mortality review. Instead, the review focuses only on what occurred later that morning, starting with another doctor seeing the patient, who is still having intermittent chest pain and extreme hypertension, recognizing the situation for the emergency that it is, and sending him to the hospital where he is admitted with a myocardial infarction (MI). This was the first evidence that the patient was seen by a provider, more than 2 weeks after intake.

**Compliance Assessment:**
- P.1=Partial Compliance
- P.2=Noncompliance

**Recommendations:**
1. Ensure that all mortality reviews critically evaluate the provision of care to identify opportunities for improvement in order to prevent future deaths.
2. Ensure that all relevant clinical history is included in the mortality review.
3. Include nursing staff in the mortality review process to gain a broader perspective with regard to the provision of care.
4. Update the Policy to include a provision to proactively obtain the autopsy report for all in-custody deaths.

## Q. Reentry Services

1. The County shall provide a 30-day supply of current medications to patients who have been sentenced and have a scheduled release date, immediately upon release.
2. Within 24 hours of release of any patient who receives prescription medications while in custody and is classified as presentence, the County shall transmit to a designated County facility a prescription for a 30-day supply of the patient's current prescription medications.
3. The County, in consultation with Plaintiffs, shall develop and implement a reentry services policy governing the provision of assistance to chronic care patients, including outpatient referrals and appointments, public benefits, inpatient treatment, and other appropriate reentry services.

**Findings:** ACH has developed Discharge Medications and Discharge Planning policies, Health Care Linkage Guide, and referral forms.

With respect to discharge medications, ACH currently provides discharge medications to sentenced inmates, but not unsentenced inmates. From July 2020 to April 2021, the pharmacy provided medications to an average of 71 inmates per month, with a high of 133 in January 2021 and low of 38 inmates February 2021.[90] The denominator of eligible inmates was not specified.

---

[90] Medication Discharged for Sentenced Inmates. July 2020 to April 2021. May, 25, 2021.

There is no Reentry policy per se. The Discharge Planning policy states that services will be provided to sentenced inmates, but that discharge planning is not feasible for certain presentenced detainees. The Consent Decree does not distinguish between sentenced and presentenced inmates with respect to discharge planning. Currently, ACH has not implemented its chronic disease program for which inmates would be eligible for discharge planning.

**Compliance Assessment:**
- Q.1=Partial Compliance
- Q.2=Noncompliance
- Q.3=Noncompliance

**Recommendations:**
1. The County should track how many sentenced and pre-sentenced inmates are eligible for discharge medications and/or prescriptions and measure to determine the percentage of inmates successfully provided discharge medications.
2. The County should track the number of discharge prescriptions forwarded to pharmacies for released unsentenced detainees and ensure that detainees are informed about how to access those medications.
3. The County should implement the Discharge Planning policy and provide data on re-entry services.

## R. Training

1. The County shall develop and implement, in collaboration with Plaintiff' counsel, training curricula and schedules in accordance with the following:
   a. All jail custody staff shall receive formal training in medical needs, which shall encompass medical treatment, critical incident response, crisis intervention techniques, recognizing different types of medical emergencies, and acute medical needs, appropriate referral practices, relevant bias and cultural competency issues, and confidentiality standards. Training shall be at a minimum every two years.

**Findings:** The Mays 180 Day Status report did not address this area. The medical experts were not provided information to support compliance with this provision.

The Medical Experts were provided SSO medically related operations orders, some that were last revised in 2007 (e.g., Health Care Services, Communicable Disease Screening), and others more recently revised in June 2019 (e.g., Medical Intake Screening).

**Compliance Assessment:**
- R.1=Noncompliance

**Recommendations:**
1. ACH and SSO ensure that health care policies and SSO policies are internally consistent.
2. The SSO policies should be updated to reflect current health care operations and training performed.
3. The County should develop curricula and implement training for each of the areas identified in the Remedial Plan.
4. The County should maintain centralized records and tracking system of staff training.
5. The County needs to ensure that training is performed and documented every two years.

# Medical Remedial Plan Compliance Summary

|  | Paragraph | Substantial Compliance | Partial Compliance | Noncompliance | Not Evaluated |
|---|---|---|---|---|---|
| 1. | A.1. | | 01/21/2021 **8/27/2021** | | |
| 2. | A.2. | | | 01/20/2021 **8/27/2021** | |
| 3. | B.1. | 1/20/2021 **8/27/2021** | | | |
| 4. | B.2. | | | **8/27/2021** | 01/20/2021 |
| 5. | B.3. | | 01/20/2021 **8/27/2021** | | |
| 6. | B.4. | | **8/27/2021** | 01/21/2021 | |
| 7. | B.5. | | 01/20/2021 **8/27/2021** | | |
| 8. | B.6. | | 01/20/2021 **8/27/2021** | | |
| 9. | B.7. | | | | 01/20/2021 **8/27/2021** |
| 10. | C.1. | **8/27/2021** | | 01/20/2021 | |
| 11. | C.2. | | 01/20/2021 **8/27/2021** | | |
| 12. | C.3.a | | | 01/20/2021 **8/27/2021** | |
| 13. | C.3.b | | | 01/20/2021 **8/27/2021** | |
| 14. | C.3.c | | | 01/20/2021 **8/27/2021** | |
| 15. | C.3.d | | | 01/20/2021 **8/27/2021** | |
| 16. | C.4. | | | 01/20/2021 **8/27/2021** | |
| 17. | C.5 | | | 01/20/2021 **8/27/2021** | |
| 18. | C.6. | **8/27/2021** | | 01/20/2021 | |
| 19. | C.7.a | | **8/27/2021** | 01/20/2021 | |
| 20. | C.7.b | | **8/27/2021** | 01/20/2021 | |
| 21. | D.1. | | | 01/20/2021 **8/27/2021** | |
| 22. | D.1.a | | | 01/20/2021 **8/27/2021** | |

|  | Paragraph | Substantial Compliance | Partial Compliance | Noncompliance | Not Evaluated |
|---|---|---|---|---|---|
| 23. | D.1.b | | | 01/20/2021 **8/27/2021** | |
| 24. | D.1.c | | | 01/20/2021 **8/27/2021** | |
| 25. | D.1.d | | | 01/20/2021 **8/27/2021** | |
| 26. | D.2. | | | 01/20/2021 **8/27/2021** | |
| 27. | D.3 | | | 01/20/2021 **8/27/2021** | |
| 28. | E.1. | **8/27/2021** | | | 01/20/2021 |
| 29. | E.2. | **8/27/2021** | | | 01/20/2021 |
| 30. | E.3. | | | | 01/20/2021 **8/27/2021** |
| 31. | E.4. | | **8/27/2021** | | 01/20/2021 |
| 32. | E.5 | | | **8/27/2021** | 01/20/2021 |
| 33. | E.6. | | | **8/27/2021** | 01/20/2021 |
| 34. | E.7. | | | **8/27/2021** | 01/20/2021 |
| 35. | E.8. | **8/27/2021** | | | 01/20/2021 |
| 36. | E.9 | | | | 01/20/2021 **8/27/2021** |
| 37. | E.10. | **8/27/2021** | | | 01/20/2021 |
| 38. | F.1.a | 01/20/2021 **8/27/2021** | | | |
| 39. | F.1.b | 01/20/2021 **8/27/2021** | | | |
| 40. | F.2. | | | 01/20/2021 **8/27/2021** | |
| 41. | F.3. | | **8/27/2021** | 01/20/202 | |
| 42. | F.4. | | | 01/20/2021 **8/27/2021** | |
| 43. | F.5. | | | 01/20/2021 **8/27/2021** | |
| 44. | F.6. | | 01/20/2021 **8/27/2021** | | |
| 45. | G.1. | | 01/20/2021 | **8/27/2021** | |
| 46. | G.2. | | | **8/27/2021** | 01/20/2021 |
| 47. | G.3. | | | | 01/20/2021 **8/27/2021** |
| 48. | G.4 | | | | 01/20/2021 **8/27/2021** |

|  | Paragraph | Substantial Compliance | Partial Compliance | Noncompliance | Not Evaluated |
|---|---|---|---|---|---|
| 49. | H.1. |  |  | 01/20/2021 **8/27/2021** |  |
| 50. | H.2. |  | 01/20/2021 | **8/27/2021** |  |
| 51. | H.3. |  |  | **8/27/2021** | 01/20/2021 |
| 52. | H.4. | **8/27/2021** |  | 01/20/2021 |  |
| 53. | I.1. | 01/20/2021 **8/27/2021** |  |  |  |
| 54. | I.2. |  | 01/20/2021 **8/27/2021** |  |  |
| 55. | I.3 |  |  | 01/20/2021 **08/27/2021** |  |
| 56. | J.1. | **8/27/2021** | 01/20/2021 |  |  |
| 57. | J.2. |  | 01/20/2021 |  | **8/27/2021** |
| 58. | J.3. |  |  | 01/20/2021 | **8/27/2021** |
| 59. | J.4 |  | **8/27/2021** | 01/20/2021 |  |
| 60. | K.1 |  |  | 01/20/2021 **8/27/2021** |  |
| 61. | L.1. |  | 01/20/2021 **8/27/2021** |  |  |
| 62. | L.2. |  | 01/20/2021 **8/27/2021** |  |  |
| 63. | L.3. |  | 01/20/2021 **8/27/2021** |  |  |
| 64. | M.1. |  | **8/27/2021** | 01/20/2021 |  |
| 65. | M.2. |  |  | 01/20/2021 **8/27/2021** |  |
| 66. | N.1. |  |  | 01/20/2021 **08/27/2021** |  |
| 67. | N.2. |  |  | 01/20/2021 **08/27/2021** |  |
| 68. | O.1. |  | **8/27/2021** | 01/20/2021 |  |
| 69. | O.2. |  |  | 01/20/2021 **8/27/2021** |  |
| 70. | P.1. |  |  | 01/20/2021 **8/27/2021** |  |
| 71. | P.2. |  |  | 01/20/2021 **8/27/2021** |  |
| 72. | Q.1. |  | 01/20/2021 **8/27/2021** |  |  |
| 73. | Q.2. |  |  | 01/20/2021 |  |

|  | Paragraph | Substantial Compliance | Partial Compliance | Noncompliance | Not Evaluated |
|---|---|---|---|---|---|
|  |  |  |  | **8/27/2021** |  |
| 74. | Q.3. |  |  | 01/20/2021 **8/27/2021** |  |
| 75. | R.1. |  |  | **8/27/2021** | 01/20/2021 |
|  | **Total** | **12 (16%)** | **19 (25%)** | **37 (49%)** | **7 (9%)** |