*Mays et al v Sacramento County*
Case No. 2:18-cv-02081-TLN-KJN


Mental Health Expert's Second Round Report of Findings


September 21, 2021

Mary Perrien, Ph.D.

## TABLE OF CONTENTS

1.  Introduction and Background for Second Mental Health monitoring report...................3

2.  Methodology. ................................................................................................................ 5

3.  Areas of Focus ............................................................................................................ 12

4.  Findings of areas prioritized in *First* Mental Health Monitoring Report ...................... 12

5.  Remaining issues – Consent Decree ........................................................................... 24

6.  Conclusion .................................................................................................................. 70

7.  Appendix A: Amended Document Request.................................................................... 71

8.  Appendix B:  Mental Health Staffing Augmentation ...................................................... 78

9.  Appendix C: Patient Waitlists........................................................................................ 81

### 1. Introduction and Background for Second Mental Health Monitoring Report

The Sacramento County Sheriffs' Department continues to operate two jail facilities that provide housing and services to the general detainee populations and those with mental and medical illnesses:  the Main Jail (MJ) located in downtown Sacramento and the Rio Cosumnes Correctional Center (RCCC) located in Elk Grove. Adult Correctional Health (ACH) provides the medical services at both facilities through the Sacramento County Department of Health, the ACH contracts with Jail Psychiatric Services (JPS) through University of California (UC) Davis for mental health services. JPS also has its own nurses who work in the acute inpatient unit, 2P. All other nursing staff are ACH staff. There is another group of people who are not currently the focus of remediation efforts – those who are present in one of the facility's because they were admitted to the Jail Based Competency Treatment Program (JBCT). There is a contract between Sacramento County and the UC Davis (JPS) provider for a specific program of services for those considered JBCT. It may be that because the requirements for JBCT are concrete and include minimum contact standards while IOP/FOSS does not achieve that kind of clarity, it is easier for staff to schedule confidential space and group rooms to the for JBCT structured treatment. This must be overcome with a resolution for how services will be provided for which populations and minimum contact standards for all. As of the site visit, JBCT appeared to have been prioritized over confidential clinical contacts with everyone expecting the non-JBCT clinician to see the patient at cell front or other non-confidential space. No therapeutic intervention can occur during a cell front contact; only the most mundane areas of treatment and/or patient well-being can be discussed in a unit filled with other patients.  The lack of concrete minimum guidelines/standards for mental health services and expectations for care that aligns with acuity creates unequal access to programs, as one program dominates in services scheduled and no genuine problem solving occurs.

Utilizing point in time data (7/5/21), defendants reported the following capacity maximums: 2,552 for RCCC and 2,432 for the MJ with a total capacity of 4,984 across the two facilities. However, because of various legislative efforts to reduce capacity at the facilities, particularly as the COVID-19 pandemic wore on, the census remained significantly below maximum capacity, but it has steadily climbed since April 2020. The jails have added approximately 600 additional detainees to the census in one year. This lower census was perceived by all staff to have made their responsibilities easier to achieve, though the proportion (25-27%) of seriously mentally ill (SMI) detainees generally remained the same. It was noted once the draft was submitted that some of the census numbers provided to this subject matter expert (SME) were not consistent with numbers of some of the defendants. The numbers provided to this SME at the time have been maintained in this document as they matched other documents at that time and there has been no explanation of why any new numbers should be adopted. This may be an area requiring greater review next round, however.

At RCCC, ten of twelve distinct facilities house detainees. Two specialized mental health programs exist at RCCC while the MJ has the largest caseload of specialized programs (acute

inpatient and intensive/enhanced outpatient program). During a prior site visit staff and patients reported that the Jail-Based Competency Treatment (JBCT) program existed at the MJ. However, it now appeared that those participants in the JBCT at the MJ may have been overflow patients or discharged JBCT patients on a "stepdown" through the intensive intermediate services program with no "true" JBCT services provided at the MJ at that time per mental health staff clarification. Since the narrative of the mental health program did not discuss the evolution of this program or any of the mental health programs, decisions to place specific programs in specific locations remained unclear. The two specialized programs at RCCC include the Jail-Based Competency Treatment program (JBCT) for men and women and a higher security level intensive/enhanced outpatient program (IOP/EOP[1]) for men. At the MJ, there were several specialty programs including the mental health "inpatient" treatment program (2P) and IOP/EOP services for both men and women. There were a total of 35 IOP beds at the MJ and 24 IOP beds at the RCCC. There were a total of 18 acute beds located at the MJ shared by men and women (e.g., no separate housing for female detainees). Those detainees who can generally function in the GP but require additional support received enhanced outpatient services, alternately described as intensive case management (ICM), enhanced case management/outpatient services (EOP) and/or intensive outpatient psychiatric program (OPP). The terms have been used interchangeably and when staff were queried on site, they appeared to respond that these various acronyms were interchangeable. It was confusing to understand the continuum of care when staff didn't truly seem to understand what that continuum was and there was contradictory information provided. It would likely be helpful for program names to be determined and staff trained to use that terminology exclusively and consistently, particularly with detainees who may be easily confused. Staff should also be educated regarding the continuum of care, levels of care available, and admission/discharge criteria for those programs. JPS management has indicated that this will become a standard part of their regular staff meetings. It was positive to note that mental health staff were meeting daily and weekly across service areas, allowing such needed training to be incorporated into this existing regular training.

Another weakness in the data provided was that data was not easily analyzed due to internal inconsistencies or errors. For example, data pulled for the initial document request contained recurring data. For example, some census data included a subgroup of the people listed at least three separate times in the same document despite the request specifically requesting that there be no duplication. Some even counted three times on the document. Therefore, a second data request had to be made in July for non-redundant data that was pulled July 9th. Consequently, there are discrepancies in the data due in part to the need to have a "cleaner" data set.[2]

The ongoing reduced census within the Sacramento Jail system has provided all staff with some breathing room and time to plan clinically for various service levels and for compliance with the Consent Decree. This will require that staff recognize that the role in

---

[1]

[2] For the next monitoring round, data should be produced using the same review dates to allow for comparisons across areas and that data should be cleaned to avoid artificially inflating it. By using different time periods, analyses were sometimes compromised by the lack of comparable data and data periods.

assuring that patients receive necessary treatment. When questioning staff, the response was simply a repetition of, "they have a contract." The urgency in providing constitutionally adequate care to *all* detainees with a serious mental illness (SMI) was not readily apparent in staffs' responses.  The absence of such urgency did not appear to be a resistance to providing such service, but more of an institutionalization and lack of knowledge or training about the necessity as well as each team member's duties related to that care being provided outside of JBCT.

As of the site visit, JBCT appeared to have been prioritized over confidential clinical contacts with everyone expecting the clinician to see the patient at cell front or in the open bay area of the unit (e.g., outside control room). No therapeutic intervention can occur during a cell front contact; only the most mundane areas of treatment and/or patient well-being can be discussed in a unit filled with other patients. The same concerns exist for non-confidential contacts that occur in the open bay area as many staff and other detainees can overhear discussion. In fact, one of the most frequent complaints at the MJ was the lack of privacy for clinical contacts and the belief expressed by many patients that mental health staff were trying to convince them that they had no right to privacy and would ask personal questions when staff or other detainees could overhear discussion.

The Consent Decree was formalized in June 2019. It included negotiated individual Remedial Plans focused on medical care, mental health services, and suicide prevention to be monitored by the court-appointed experts of Ms. Madeleine LaMarre, Dr. Karen Saylor, Dr. Mary Perrien, and Mr. Lindsay Hayes, respectively. The remaining areas related to restricted housing and discrimination against people with disabilities would be monitored by Plaintiffs' counsel. Each expert was able to be on-site for in-person visits to allow for in-person observation and assessment of these facilities. Following data analysis, the SMEs reviewed policies (current and draft) policy reviews, and interviews with staff and patients, the SMEs First Monitoring Report to the Court indicated how significant and extensive the problems were for patients housed in the jail setting. The people who would need to be included as problem-solvers were often front-line staff and yet many of the supervisory and management staff were carrying caseloads and performing tasks more in keeping with a line staff or specialist's role. Because the SMEs' reports discussed the need for extensive revision and resources, all parties agreed that this round (2nd report) should focus on specific operational areas that were still managed by defendants with the hope that those areas would experience great improvement. For mental health this meant prioritizing a subset of program areas that would consequently experience great success.

## 2. Methodology

In February 2021, this mental health expert and the suicide prevention expert jointly developed a document request for defendants (the Sacramento County Sheriff's Department [SSO], the Sacramento County Adult Correctional Health Services [ACH], and the University of California, Davis Jail Psychiatric Services [JPS]). That document request can be found at the end of this report (see Appendix A).

In anticipation of the SME June 2021 site visit for the second monitoring round, the existing document request was updated to reflect the information we learned could be produced,

updated census of all mental health caseload participants by level of care with specific information as defined in the Remedial Plan included, and average amount of out-of-cell structured treatment time provided to patients in the IOP by facility and the treatment program. Yard and group schedules were request.

The mental health report is based on the mental health SME's findings following document review, data analysis, observation of operations, interviews of staff and consumers' (i.e., patients), training documents, and medical record review. There was a vast amount of other information provided to the experts, some of which could not be reviewed in depth, though those documents appeared to primarily be additional information not required at this time. This review included multiple assessments of clinical indicators documentation based on medical record review only. While this author strove to review at least 10 records for each indicator, there were times when the 10 cases randomly selected did not include patients who fully met criteria for inclusion.

Another important source of information was the defendants' status report. As stated in the Remedial Plan:

"Not less than 120 days, and not more than 180 days, after this Consent Decree is approved by the Court, Defendant shall provide to Plaintiffs' counsel and the Court Experts (discussed below) a Status Report which (1) shall include a description of the steps taken by Defendant to implement each provision set forth in the Remedial Plan; and (2) specifies provisions of the Remedial Plan which have not yet been implemented. With respect to the provisions of the Remedial Plan not yet implemented, Defendant's Status Report shall (i) describe all steps taken by Defendant toward implementation; (ii) set forth with as much specificity as possible those factors contributing to non-implementation; and (iii) set forth a projected timeline for anticipated implementation based on the best information available to the Defendant. Not later than the end of each subsequent 180-day period during the term of this Consent Decree, Defendant shall provide to Plaintiffs' counsel and the Court Experts (discussed below) an updated Status Report addressing each item of the Remedial Plan and shall specify whether it believes it is or is not in substantial compliance with each provision of the Remedial Plan."

The Defendants have produced their third status report and have not yet been able to include all relevant information as discussed in the Consent Decree. The most recent status report was a significant improvement in quality over the first two. However, Defendants' need to address, with sufficient specificity, each of the listed areas of the Consent Decree with a more detailed definition of how progress would be measured using objective data, preferably from the QM/QI audits and committees. Despite these limitations, the Defendants' third status report was reviewed and where applicable, incorporated into this monitoring report.

As mentioned, the medical records for numerous detainees were also reviewed and provided information for this report. Ten of those records were formalized into case studies. It became clear through documentation review that progress was slow within the mental health caseload and the documentation began to have the same errors and limitations, suggesting that it was a training and supervision matter. This was true for diagnostic clarification, adequate record review prior to meeting with patient, clinical decision-making in crisis situations, and the lack of interdisciplinary treatment teams. It was hopeful to note that the Deputy Director of primary health in Sacramento County indicated that they were developing and would be implementing treatment plan training for the mental health staff.

In summary, for each Remedial Plan item assessed, this expert reviewed relevant documents and data to include Defendants' third status report, policies provided to all experts and plaintiffs, training materials, staffing data and information gathered from this expert's staff and detainee interviews, data analysis, and medical record review. The primary focus of this report will be those areas of priority determined following the first mental health monitoring report.

Based on a "snapshot in time" review of the data (as of July 5, 2021), there were 3,064 detainees in custody. There were 1,902, (62% of the total population) who had received some mental health contact or service, but just 816 (27% of total population) who received ongoing mental health services. There were 819 detainees identified as having a serious mental illness, without explanation for the difference of three cases. This may have been due to an error in data input. Defendants' mental health contractor took issue with the figures provided below though these numbers were provider-based data from the mental health contractor. It was unclear if the discrepancy was due to the data being pulled at different points in time or due to different queries. In the mental health SME's first monitoring report, concern regarding the accuracy of the data report was discussed. This will be a point of focus for next review period. What is inarguable is that regardless of the specific numbers, each round there remains a significant number of detainees waiting for bedspace in mental health designated units and that need seems to be growing.

Using the JPS FOSS level, the level of care for detainees can be broken down as follows:

| FOSS LEVEL | DESCRIPTION | MAIN JAIL | RCCC |
|------------|-------------|-----------|------|
| I | Patients who meet criteria for W&I Code 5150 and are in inpatient unit 2P, waiting for a 2P bed, or are 2M suicidal | 38 | 0 |
| II | Clinical contact must be within month for a variety of reasons including inpatient discharge or | 317 | 135 |

| | | | |
|---|---|---|---|
| | cleared from 2P waitlist or suicide watch | | |
| III | Patients receptive to JPS services **and**[3] receiving psychotropic medication the frequency of contact is clinically determined but not to exceed 90-day intervals | 519 | 369 |
| IV | Detainee has been assessed or had some contact with mental health but were determined to not need additional ongoing mental health services | 84 | 121 |
| TOTAL | | 958 | 625 |

FOSS levels can be problematic in understanding acuity and what to expect for frequency of mental health contacts, but this will be discussed later in the report. While the FOSS levels were expected to map onto program service area, they did not do so in a precise manner. Mental Health management were working internally and had sought feedback from the mental health expert regarding nomenclature that would best capture the acuity of the patient and services rendered.

---

[3] Emphasis is the author's.

A brief look at the level of care by program name (e.g., EOP, IOP, acute):

| Program | Number | Percentage of caseload |
|---|---|---|
| Acute inpatient | 17 | 1% |
| IOP | 61 | 3% |
| Outpatient (no distinction made between outpatient and "enhanced" outpatient | 1461 | 92% |
| TOTAL | 1539 | 96% (remainder were left blank or JBCT) |

Standards for Compliance Determinations

The three experts conferred to mutually decide on the standards of compliance for our particular areas of focus. This would allow for greater understanding across areas of focus for all parties, particularly areas of overlap (e.g., medication management is relevant to both mental health and medical; treatment planning for suicidal individuals has an impact in all three areas if injury has occurred). It should be noted that these standards evolved between the draft and final first monitoring reports as a result of feedback from the Parties. Because of this refining of the definitions, the Parties may find some compliance ratings to have changed. The underlying foundation of those ratings has not changed, only the consistency of the standard used to measure them. Those standards of compliance are as follows (and can be found in expert Mr. L. Hayes first compliance report 1/20/20):

1. **Substantial Compliance**. Substantial compliance is defined as having been achieved when Defendants have met compliance with most or all components of the specific area, process, or provision of the Consent Decree for both the quantitative (e.g., 90% performance measure) and qualitative (e.g., consistent with the larger purpose of the *Decree*) measures. If an individual compliance measure necessitates either a lower or higher percentage to achieve substantial compliance (e.g., 85% or 100%), it will be so noted by the expert for that item/area. To be considered to be in "substantial compliance," compliance has to have been sustained for a period of at least 12 months.

2. **Partial Compliance.** Partial compliance indicates that compliance has been achieved on some components of the relevant provision of the relevant provision of the Remedial Plan, but significant work remains. For example, the County has to finalize a policy that is compliant with Remedial Plan requirements, contains adequate operational detail to staff as to how to implement the policy, train staff, and they must have begun implementation of the policy.

3. **Non-Compliance.** Non-compliance is defined as the Defendants have not met all of the components of the specific area, process, or provision of the Consent Decree for both quantitative and qualitative measures and require significant work to meet compliance.

An additional component to determinations of compliance this round focuses on whether there has been any progress or improvement since the last monitoring round. As a result, some areas that may have been declared "partially compliant" last round may be considered "non-compliant" this review period due to a lack of continued progress or regression.

This report shall be structured similar to the Consent Decree sections with comments and recommendations[4] included in each pertinent area. Where language has been copied directly from the Remedial Plan, it shall be noted by including that language in *italics* and the section of the Remedial Plan referenced. The Remedial Plan generally starts each section. Supporting data that has formed the foundation for this report includes (not an exhaustive list) policy from the SSO, ACH, and JPS as well as the National Commission on Correctional Healthcare (NCCHC) for all correctional healthcare services, 2015 mental health standards and 2018 medical standards. Some areas could not be fully assessed due to any of a number of factors: lack of proof of practice, failure to provide documents, proof of practice was not sufficiently detailed or otherwise inadequate, time (this will be discussed when discussing mental health staff documentation and clinical records), or similar. For example, a description of process for providing inpatient care to those detainees who were beyond the capabilities of the jail, such as a non-compliant high risk pregnant female detainee in need of inpatient psychiatric treatment, was requested along with any budgetary information and utilization in 2020. The response to this inquiry indicated that this was a process that had been looked at over the years. However, no reason for past failures or analysis of this alternative was reviewed or presented. Given the stark nature of the 2P inpatient milieu, that was concerning.

There remained challenges in navigating the medical record. Documentation in the medical record was incomplete and often noted to be problematic. JPS and ACH staff acknowledged that the current electronic health record (EHR) had proved to be more challenging than they had been led to believe. Record reviews identified several consistent problems with documentation, primarily that notes would be vague, incomplete, or cut and paste from prior notes leaving the reader confused as to what the detainee's current status was. Simple monitoring tasks took longer or could not be completed due to these elemental deficiencies. The mental health progress notes were incomplete, level of care was rarely noted despite its importance and clinicians did not appear to review prior notes judging by the contradictory information included. Simple chart reviews became needlessly complex and took far longer than necessary in an effort to decipher if the detainee had been seen in a confidential space. This is one of the areas that JPS

---

[4] Some indicators had little to no progress toward compliance. This is not unexpected given that Defendants were encouraged to focus on specific areas in medical, mental health, and suicide prevention. Where there was little to discuss, recommendations remained the same.

committed to working on with their staff though ACH and JPS are examining the effectiveness of the current system in meeting compliance with the Consent Decree. Documentation is so critically important for continuity of care and appropriate clinical decision making, this must be a high priority item.

The open dialogue that has occurred between this SME and all defendants has been welcome and there is great hope that it will result in compliance being achieved more quickly. In fairness to the defendants, most if not all staff have not been monitored before and are on a steep learning curve. The defendants are in the process of developing more reporting features which will smooth the way for more rapid problem identification and resolution.

I would like to thank all SSO, ACH, and JPS staff for their assistance throughout this process. I would like to specifically thank Sandy Damiano, Ph.D., Deputy Director of Department of Health Services and Ms. Zoe Clauson, Administrative Services Officer I for the continuous provision of information and responsiveness to requests. Ms. Tianna Hammock was equally responsive and helpful during data requests and the site visit. Mr. Daniel Oforlea has also been especially helpful. I'd like to express my deepest appreciation to Sergeant R. Esty, Lieutenants Kato, Hatzenbuhler and Lopez. Mr. Rick Heyer has been a tremendous asset in facilitating all of these different requests and his efforts have been most helpful.

3.  **Areas of Focus**

Following release of the first-round monitoring documents by all SMEs, all parties agreed that the subsequent round would be a focused review. Because of this, those areas will be reviewed in greater detail than those areas not identified as focus areas. These areas were selected because of the possibility that sustained attention would prove dramatically fruitful across several additional areas. For example, resolving space issues would address treatment delivery, treatment access, bed planning, and possibly recruitment and retention. This process was discussed openly amongst experts, defendants and plaintiffs and all parties appeared open.

The areas selected for focused review by mental health are as follows in no particular order:

1.  Space – space is at an absolute premium at the Main Jail and lesser so but still a challenge at RCCC. Treatment cannot be provided without acceptable space available for individual and group therapy.
2.  Staffing – once space is available there must be sufficient numbers of appropriately licensed competent staff to use that space to deliver appropriate treatment.
3.  Use of Force/disciplinary actions – this is a high risk, high liability area that usually involves significant cultural change for both mental health and custody staff to reduce unnecessary uses of force.
4.  Treatment – assess need through bed planning and start to increase delivery. When a system is in a state of crisis need studies are not accurate. Only as the system begins to provide regular, functional services can bed need studies more accurately reflect the need of a functional system.

4.  **Findings – Areas of Focus**

3a.  Space

As discussed by all-parties, the availability of appropriate space plays a critical role in the delivery of adequate mental health services. Without space, adding mental health staff will result in diminishing returns due to the lack of treatment space. Once treatment space is addressed, a better estimate of adequacy of staffing can occur. While insufficient staff and space are primary obstacles to providing constitutional care, space is the most immediate concern so that current mental health staff will have adequate space to provide services.

While clinicians had been consistent in noting the reason for cellside contacts in their progress notes, there were several times when they indicated that there were insufficient custody staff (Case 1) or other detainees were in the space (case 2), but more often they provided no reason and simply conducted clinical activities at the door as though it was acceptable (Cases 3-7 though Case 7 had cell front and out of cell contacts).

The inpatient unit (2P) was not designed to provide acute mental health care. As can be seen below:

**2P View from inside inpatient cell**



**2P- nurses station on left and patient room**



**2P view of dayroom – 2 different views**





**2P dayroom**



As can be easily seen by these photos, this unit has not been maintained well as demonstrated by the overall lack of cleanliness and physical plant deterioration (e.g., peeling paint on walls). The unit looks and feels like a restricted housing unit rather than an inpatient treatment unit. The condition of this unit does not facilitate a therapeutic milieu and is rather depressing. Inexpensive alternatives would include allowing the patients to complete art projects that would then be displayed, allowing patients to take pride in how

they've improved the unit and demonstrating that they are in a treatment area rather than a punitive area such as the restricted housing unit (RHU). Standards of care require that inpatient treatment provided on site must conform to the community legal standards of care including utilization of licensed and/or certified staff. There were no social workers or psychologists providing treatment in 2P at the time of the site visit. This was underscored in the medical record with the absence of indicated treatment, lack of appropriate interdisciplinary team meetings, and individualized treatment plans. When treatment plans were generated by nursing staff, they were often not adequate for the functional level of the patient.

The dayroom was not frequently used according to unit staff. On occasion an individual patient may be able to sit in the dayroom, but there is no opportunity to engage with peers in a pro-social manner while being supervised by staff. There is no space on this unit for confidential mental health care. Contacts occur cell front even with telepsychiatry. The primary modality of treatment is medication management which relies heavily on patient self-report such as symptom improvement, side effects, and other personal information that most patients would prefer to address in private. One of the frequent complaints that detainees mentioned during the site visit was the high frequency of cell front contacts, even in the acute inpatient unit. Many reported that they did not share all relevant information to their providers because of their personal security concerns with other patients hearing details about them. During the site review, custody supervisors were brain-storming ideas for space, only to conclude that there was no viable option in that unit. They were not able to identify space that would meet the requirements for confidential treatment and safety for staff and patients. There are no adequate solutions for increasing necessary space on 2P. The unit's physical plant does not allow for group and treatment team room(s) as well as another space for evaluations and individual contacts.

It would not be practical to escort these patients to another area outside of the unit for a variety of reasons including that many of these patients only have smocks that do not allow for modesty. Escorting patients to another area would require additional staff and close supervision of the patients to be sure that there would be no unnecessary risks (e.g., self-injurious person. However, these patients are in desperate need for therapy and out of cell time. The current physical plant does not have adequate space to allow the unit to function as a true inpatient unit. Achieving Consent Decree compliance will not be possible if 2P remains the inpatient service unit. Standards of care require that patients be provided with individualized treatment plans, therapy as indicated, and housing in a safe and therapeutic environment (NCCHC MH-G-02).

These obstacles to providing access to adequate inpatient care were further hampered by a lack of bed space. At any given time, there will be 12-20 patients on the 2P waitlist with average lengths of stay (LOS) on that waitlist of three days. The unit not only has insufficient therapeutic space, but it also has an insufficient number of beds to house everyone in need of inpatient treatment. The result is a lack of timely access to necessary

inpatient treatment. This is gravely concerning that the waitlists remain even as the jail populations decrease.

One possible solution would be to contract out for inpatient treatment. It did appear that defendants were looking at that as a possible solution in their space study. It is highly recommended that this be seriously pursued as a viable option given that other units do not appear to offer a positive therapeutic milieu with appropriate confidential treatment space.

Another area in need of confidential space is the booking area. Detainees are brought in and asked about extremely important health care related information in a non-confidential space with the arresting officer typically within hearing distance. Under those conditions, detainees are highly unlikely to share critical information with their providers. The facility had identified a "lawyer" booth where detainees could speak to a staff member without fear of being overheard. While the experts had been told that this room had been in use, staff reported rarely if ever using the room. Some staff reported that it was not conveniently located and that it was often broken. When this room was observed during the last site visit in August 2020, the phone was not working at that time either. The interview room is what had been a non-contact attorney visit space. It was approximately the size of two telephone booths with a partition between them. The partition had a glass section of the partition to allow each party to see the other. Both parties had to use a telephone to communicate, and it was that telephone that had not been fixed. During the site visit we asked MJ staff to enter the booths and attempt to have a conversation to assess whether the room could still be used with a broken phone. Despite shouting at each other, they could not hear the other person in the booths with them but everyone outside of the booth could easily make out their words. Having to utilize a phone for a face-to-face interaction was concerning in light of COVID-19 and the need to properly disinfect between users.

Space on all other units was also quite problematic. For example, detainees in 3W are participants in the IOP and enhanced outpatient programs. Women participating in IOP are also housed there. The only confidential space for treatment remains the classrooms. However, on floor 3 (3E) one classroom was converted into office space for the mental health staff that further reduced available treatment space since they are not allowed to see detainees in that space. There is just one classroom to provide treatment space for 3W and 3E, despite the high demand for group and individual treatment on that floor. Staff frequently see detainees in the outside area with inmate porters and deputies milling about and no actual confidentiality. The same is true for 3E though there is no confidential space on that unit because the classroom was converted into office space for mental health. As a result, the classroom in 3W must be shared between units. Because of the difficulties with scheduling access and then adhering to that schedule, mental health staff often do not try to provide confidential contacts in the 3E unit, instead focusing on seeing detainees rather than on where they are seen. This means that actual treatment cannot be implemented and that evaluations may be compromised by the lack of confidentiality.



This is the area outside of each unit where deputies are working. Staff will see patients in areas like that marked by the orange cone. While the unit doors remain closed, detainees can watch the entire session and may be able to decipher some of what is said. Another space used is near the control booth, close to where the nurse is standing in this photo. Detainees reported considerable concern about this arrangement because many believe that the deputy in the control booth is listening to them, and they are even more cautious about what they share in that setting.





**Housing unit in RCCC where IOP treatment occurs**

One challenge with space for IOP services at RCCC occurred because a classroom located near the unit was prioritized for JBCT services. Therefore, IOP had to make do with holding groups in the common area (dayroom) shown above. There was no confidentiality and there was a great deal of movement at times during group. Patients reported that the door to the unit was often left open while deputies stood outside further compromising confidentiality.

A positive step taken between the two monitoring periods occurred at the urging of RCCC custodial staff and their recognition that individual office space could be utilized in a confidential manner as long as the doors were changed or modified to allow for a better view into the space. See photos below:



**Individual space IOP unit RCCC**



**A second office where patients can be seen confidentially**

Lt. Hatzenbuhler and the staff at RCCC should be commended for moving quickly to address confidentiality matters and provide staff with appropriate space to interview and treat detainees with mental illness.

Recommendations
1. The County should immediately begin planning for adequate inpatient services while recognizing that the current housing situation (2P) will never be appropriate for such a unit. Determine if there is a unit/pod that can house a minimum of 20-30 people at a time considering consistent capacity and waitlist numbers. This search should look at physical plant space where a therapeutic milieu can be maintained with a corresponding amount of therapeutic activity (groups and individual treatment), result in patients spending only small blocks of time in their rooms outside of accepted sleep hours.
   a. If there is no such unit that can provide for the minimum space requirements, the County must seriously review what access to inpatient care may be available in the community and attempt to contract inpatient services with appropriate housing that are not inside of the jails.
2. There should be a space on every floor of the MJ so that referral evaluations and crisis response can occur in a confidential setting. This can be a shared space on units not specifically identified to house people with SMI. The one exception would be the restricted housing unit where there is typically increased demand for mental health services regardless of status (crisis calls, individual appointments to

help detainees adjust, group treatment when indicated) and delivery of those services takes more time. In those areas where mental health patients are housed, there must also be sufficient treatment space to allow for regular scheduling of specific clinical groups (maximum size of 8 participants per group) designed to meet the needs of the population so that the assignment to group treatment can be done in treatment team meetings based on individualized needs.

    a. For example, as discussed floor 3 is a high demand area given the multiple mental health residential programs there. There is one group room that must be shared by different programs. Even if group therapy was only provided to IOP participants with a maximum of eight participants per group, that would require a minimum of two rooms to treat 48 total (24 men and 24 women) detainees. This was calculated based on two-hour blocks of group held primarily during regular work hours (six 2-hour groups for the day). This is a simple matter of arithmetic and could be modified to increase capacity by extending the workday and including weekends.

    b. Confidential interview space must begin at intake with nurses conducting screenings in a confidential setting with sound privacy, at minimum. Mental health staff conducting initial assessments and comprehensive intake evaluations must also have a private space. If the County decides to continue trying to use the "attorney" booth as one option for mental health staff, the County should explore moving the partition or placing a speaker in the glass to allow providers and detainees to speak without the telephone or yelling their responses.

    c. On a non-restrictive housing floor that does not typically house caseload detainees, one confidential space that is shared with medical may be sufficient. If it is a floor that also houses caseload patients, two to three such rooms with a larger group/multipurpose room would be necessary so that crisis calls wouldn't interfere with group treatment.

### 3b. Staffing

The County requested and received additional health care positions. While they have been consistently adding medical positions and received authorization for 29 more positions this fiscal year, the additional staff needed for mental health services is somewhat less transparent. For example, the County received authorization to increase the JPS contract to allow for expansion of the enhanced outpatient program (intensive case management and OPP). While the expansion of this level of service is a positive development, higher acuity patients (i.e., inpatient, IOP) are in critical need of additional staff to successfully meet the Consent Decree requirements for treatment and out of cell programming. While changes to the medical record should help streamline services and increase the efficiency of providers, record review during this round indicated that most detainees continue to be seen primarily cell front or in another non-confidential area.

The service expansion does not address the critical services not being provided in acute care nor were psychologists added to that package despite complex cases requiring services by a psychologist and psychiatrist. Required treatment team meetings had not been implemented yet and there was no estimate of appropriate staffing needed to implement this part of the Consent Decree. When treatment plans were completed, they were done on an individual provider basis without input from the entire treatment team.

While ACH promises a staffing analysis for the next review period, there needs to be recognition that space will impact staffing needs. This analysis must start with the requirements of the Consent Decree at each level of care as well as other tasks required of providers (e.g., disciplinary assessments, crisis response) and determine how many staff of what classification will be necessary for successful implementation.

Existing staff need to be used in a strategic manner to maximize the amount of direct service available with current staffing levels. The defendants have discussed this possibility with SSO, ACH and JPS and extended group treatment hours to increase the availability of mental health treatment. This change is in process since it requires notification, union meet and confer sessions, and other formal processes before it can be implemented. This was a particularly positive development since recent tours demonstrated that many staff were unable to provide direct service because they were all on site at the same time and there was insufficient therapeutic space and escorting staff to allow those clinicians to be utilized effective. When a program is as troubled and non-compliant with a Consent Decree as this, it is imperative that when staff are on site, they are able to see patients and provide care. This was a greater challenge at MJ than at RCCC, but it existed at both facilities.

JPS provides the bulk of its clinical activities by social workers without recognition that some services are suitable for delivery by social workers while other require psychologists. In addition, there are a large number of unlicensed social workers on staff and the majority of those unlicensed providers are tasked with care for higher acuity, more challenging IOP patients. This was concerning though unlicensed social workers indicated that they received their required supervision. However, based on statements made, it was not clear that they were receiving supervision that met licensure regulatory requirements. There is significant workload on the few licensed social workers required to provide this supervision. It was also not clear from the medical records that detainees were being informed of their provider's licensure status.

<u>Recommendations</u>
1.  The requirements of each level of care in the Consent Decree should be identified so that mental health management can calculate the number of

services hours required for the capacity that each level of care currently requires. If there is insufficient space allocated to mental health to meet those requirements, mental health must calculate what the maximum number of patients at each level of care can be treated in accordance with the Consent Decree. If there is insufficient space or treatment providers, JPS must clearly specify what they need to meet the requirements for service and provide this to the County.

2.  JPS must review the Consent Decree in its entirety so that they are fully aware of the expectations for their staff.

3.  JPS and ACH should analyze the number of unlicensed providers and the supervision workload on licensed providers. Documentation of supervision of each unlicensed provider should be reviewed to determine if licensing regulations are being met. While analyzing the number of staff needed to implement the Consent Decree, the licensure status of the staff should be included in the analysis. Some of the problems with treatment implementation, treatment planning, and assessment may be the result of insufficient clinical supervision of unlicensed hires.

4.  Utilize staffing analysis to evaluate existing staffing plans and caseloads to determine what an appropriate caseload would be at each level of care. Ratio-based staffing allows for additional staff if the population increases and provides specificity for each level of care.

### 3c. Use of Force/Disciplinary actions involving detainees with SMI and/or intellectual disabilities.

This focus area remains non-compliant. All parties are working to develop acceptable use of force policy that addresses concerns regarding people with mental illness and/or intellectual disabilities. As part of this process, policies on restraints are being reviewed and revised. The issue of use of force goes beyond the use of restraints, whether custodial or clinical. When working with detainees who may have difficulty following direct orders due to their mental illness or intellectual disability, a different process that incorporates understanding the individual and strives to avoid a use of force is necessary. That custody would contemplate a use of force without utilizing clinical intervention and de-escalation (see Medical SMEs Second Round draft report, p. 8) underscores the importance of a comprehensive and adequate policy. Utilization of the WRAP restraint system and clinical de-escalation will be addressed through the SMEs review of the use of force policy and concerns regarding the lack of mental health staff involvement in de-escalation of caseload patients.

The same is true for disciplinary actions. These are closely tied to placement in segregation despite the acknowledged harm that can come to the mentally ill in an isolated setting. The current consultation that should occur requires a standardized format across mental health providers and hearing officers so that it is applied fairly across groups of detainees.

These are critical areas in the safe and humane housing of detainees. A person's mental illness or intellectual disability may result in staff misunderstanding the detainee or the detainee failing to understand staff. That can escalate to a formal disciplinary write-up which can then cause the detainee to be moved to restricted housing and interrupt the person's treatment. It may also escalate to a use of force that could have been prevented with proper training and communication between custody and mental health staff.

3d) Treatment

Treatment expectations have been established through the Consent Decree. However, many JPS staff had not read the Consent Decree. It is critical that this occur as soon as possible if there are still any mental health staff who are unfamiliar with it. Mental health supervisors in particular must become familiar with the Consent Decree so that they can manage their staff in a way that is consistent with its requirements.

Group treatment was observed during the site visit and the quality was dependent on providers. One challenge for all group facilitators was that there was no clinical assignment of patients to groups. Instead, each IOP invited all patients to the group. One group observed had 14 participants. While detainees wore their masks, there was no social distancing. In one group two detainees seemed to become agitated because one was sitting too close to the other who kept asking him to move. The facilitators did not intervene until the situation became quite tense. Fourteen detainees in the classroom was far too many. That may be an acceptable number for outside yard recreation group, but it was almost double the size of what a clinical group should be (up to 8 participants). All participants could not always participate because of the large group size, resulting in some participants becoming bored or distracted. Despite that, most facilitators were aware of participants' wandering attention and worked to bring them back to focus in the group.

A group provided at RCCC IOP was well facilitated despite the many challenges presented by the setting, non-participant detainees, and poor acoustics. This group utilized movement to keep patients engaged and focused on the tasks at hand. Treatment would have been greatly improved if it had occurred in the classroom setting instead of on the dayroom floor in the unit.

An audit completed in March of clinical contacts confirmed that the majority occurred in a non-confidential setting and that reasons for that were not always documented. It should be noted that record reviews completed by the mental health expert confirmed that this continued and identified some reasons provided for non-confidential contacts were questionable. For example, a number of contacts were documented to have been non-confidential due to COVID-19 quarantine which should have still allowed the detainee to be seen privately. Others stated that custody would not let the detainee out of cell or some other reason. The County has suggested a drop-down menu to ensure standardization for reasons for non-confidential contacts. This would be an improvement to allow for follow-up with custody as to why they did not allow a confidential clinical contact.

## CONSENT DECREE REQUIREMENTS AND FINDINGS

*GENERAL PROVISIONS (Section II of Remedial Plan)*
*Staffing.*  *The County shall maintain sufficient medical,* **mental health**[5]*, and custody staff to meet the requirements of this Remedial Plan (II.A.).*

- *The parties agree that the custodial and health care staff must be increased to meet minimal constitutional and statutory standards. Presently, there are insufficient deputies to supervise out-of-cell activities for people in the general population and administrative segregation, and to provide security for health-related tasks. The parties agree that reduction in jail population is* one *cost-effective* method *to achieve constitutional and statutory standards. (II.B)*
- *The County intends to hire additional custodial and health care staff. The parties agree that population reduction of the jails will facilitate compliance with this Remedial Plan. All population reduction measures should be designed to promote public safety through evidence-based programs.(II.B.1)*
- *If through the monitoring process it is determined that the County is not fulfilling the provisions of this Remedial Plan due to staffing deficiencies, the parties will meet and confer regarding what steps to take to reduce the population of the jail, including available resources to facilitate population reduction. (II.B.2)*

FINDING/DISCUSSION:

**Partially compliant.** (II) Based on the 2021-2022 budgeted mental health positions provided by ACH, the agency tasked with managing the contract with UC Davis for the services provided in the jail by JPS, expansion of the enhanced outpatient program has occurred to allow for 275 detainees to be treated in this level of care. The following positions have been allocated:

Staffing Grid (see Appendix B for additional staffing information)

| Staff | Allocated | Licensed Y/N | Filled | % time in this area (half time in IOP would be reflected as .5 filled |
|---|---|---|---|---|
| OP NP | 3 | Yes | Yes | 1.00 |
| 2p RN Sup | 1 | Yes | Yes | 1.00 |
| 2p CN | 4 | Yes | Yes | 1.00 |
| 2p LVN | 6 | Yes | Yes | 1.00 |
| 2p MA | 1 | | | 1.00 |
| 2p PD CN | 8 | Yes | No | 1.00 |
| 2p PD MA | 2 | | Yes | 1.00 |
| IOP LCSW Sup MJ | 1 | Yes | Yes | 1.00 |
| IOP LCSW MJ | 1 | Yes | Yes | 1.00 |
| IOP MSW MJ | 7 | No | Yes | 1.00 |

[5] Emphasis is the author's and meant to identify this expert's area of responsibility for this report.

| OP Discharge planner | 1 | No | Yes | 1.00 |
|---|---|---|---|---|
| IOP/OP LCSW sup RCCC | 1 | Yes | Yes | 1.00 |
| IOP LCSW RCCC | 2 | Yes | Yes | 1.00 |
| IOP MSW RCCC | 2 | No | Yes | 1.00 |
| RCCC OP LCSW | 3 | Yes | Yes | 1.00 |
| JBCT LCSW sup | 1 | Yes | Yes | 1.00 |
| JBCT Prog Sup | 1 | Yes | Yes | 1.00 |
| JBCT Psychologist | 4 | Yes | Yes | 1.00 |
| JBCT Psychologist unlicensed | 2 | No | No | 1.00 |
| JBCT LCSW | 4 | Yes | No | 1.00 |
| JBCT MSW | 1 | No | Yes | 1.00 |
| CCM/EOP LCSW Sup | 1 | Yes | Yes | 1.00 |
| CCM/EOP LCSW | 2 | yes | Yes | 1.0 |
| CCM/EOP MSW | 2 | No | yes | 1.00 |
| OP LCSW | 13 | Yes | Yes | 1.00 |
| OP MSW | 3 | No | Yes | 1.00 |
| HUSC | 2 | No | No | 1.00 |
| OP Per diem LCSW | 7 | Yes | No | 1.00 |
| OP LCSW Sup | 2 | Yes | Yes | 1.00 |
| MD director | 1 | Yes | Yes | 1.00 |
| Prog Director | 1 | Yes | Yes | 1.0 |
| Admin Asst.  3 | 2 | Yes | Yes | 1.0 |
| Program services Coord. | 1 | No | No | 1.0 |
| 2P MD | 1 | Yes | Yes | 1.0 |
| Outpatient MD | 3.5 | Yes | No | 1.0 |
|  |  |  |  |  |

There were also 5.80 administrative positions, all of whom work dayshifts.

Similar to the previous monitoring round, JPS management did not believe staffing was the limiting factor but that space was the cause for non-compliance. However, staff were not yet expected to perform at Consent Decree standards. JPS has not calculated treatment hours for the Consent Decree and judged staffing sufficiency in that manner. Therefore, it remains uncertain as to whether staffing is sufficient to meet the Consent Decree requirements. As mentioned in the focused area discussion of staffing, it was also not fully clear how the large number of unlicensed staff and requirements for supervision may impact availability for service delivery.

One area ripe for reconsideration of staffing allocation was brought up during the last monitoring report and involves JPS using recreational therapists or similar to provide out of cell therapeutic activities that are not primarily clinical. Recreational therapy is an important component of treatment, but social workers are not trained in the provision of recreational therapy. This would allow social workers and psychologists to focus on clinical groups while still ensuring suffient structure out of cell therapeutic activity.

**Recommendations:**

The County should continue to analyze mental health staffing allocation so that services can continue to be expanded in accordance with the Consent Decree. As mentioned in staffing, ACH and JPS have reviewed and plan to extend the offering of therapeutic activities into the evening hours and weekends. This will be assessed during the next monitoring round.

The County and its service providers have been directed by the Remedial Plan to begin tracking out of cell and therapeutic activity. Being able to accurately track completed contacts and therapeutic groups (structured therapeutic activity) and unstructured therapeutic activity (yard, recreational time) daily by detainee will be critical in demonstrating improvement in providing treatment in specific programs and compliance with the Remedial Plan (e.g. section D.6). That data will also be useful in quantifying any need for additional staff. Therefore, this data should be established first and managers from JPS and ACH should work with SSO to utilize this data to develop a revised interim staffing plan based on the Remedial Plan and expected service levels described by the Remedial Plan and JPS attachments. Once the revised interim staffing plan has been established, it should be shared with all parties and evaluated within the context of an interim space plan (to be discussed further). This interim staffing plan and subsequent monitoring reports shall be used to determine if and how many of what type of mental health or custody staff may need to be hired.

PRISONERS WITH INTELLECTUAL DISABILITIES
*Per the Remedial Plan in the Consent Decree: The County shall, in consultation with Plaintiffs' counsel, develop and implement a comprehensive written policy and procedure regarding prisoners with an Intellectual Disability, including:(Section III.O.1)*

   a) *Screening for Intellectual Disabilities; (III.O.1.a)*
   b) *Identification of prisoners' adaptive support needs and adaptive functioning deficits; (III.O.1.b) and*
   c) *Monitoring, management, and accommodations for prisoners with Intellectual Disabilities.(III.O.1.c)*

FINDING/DISCUSSION:
**Noncompliant** (III.O.l.a-c) This item was assessed primarily through review of medical records and responses to document requests. Currently, mental health staff rely on the nursing screening that occurs when a detainee first arrives at the jail. However, NCCHC essential jail guidelines on mental health assessment and evaluation (MH-E-04) indicate that each new arrival should also receive an assessment by mental health. This provision allows for the appropriate triage Those individuals with a positive assessment would receive a comprehensive evaluation. Based on record review, that was not occurring. Ten records were reviewed for initial mental health assessment and evaluation and found that nursing had to generate a referral at intake for mental health to complete the required assessment. This was true for intellectual disabilities and mental illness. To rely on only a nursing screen, the system must cast a wide net and not create additional delays such as currently occurs at Sacramento County Jails; a mental health clinician triages the referral and then creates a referral thereby further delaying the referral and the patient's care.

Detainees' arrival process was reviewed, and the screening and assessment intake process reviewed. There was no evidence of a standardized screening for intellectual disabilities utilized by trained, qualified mental health staff to identify those detainees who have intellectual disabilities. There was also an absence of evidence that mental health staff had been identifying the adaptive support deficits and needs of those detainees identified as intellectually disabled with a formal program of monitoring, management, and accommodations provided for these detainees. While there was implementation of "effective communication" it was unclear what standards that was based on and appeared to be an individual decision as some medical staff noted effective communication was necessary when mental health contradicted that in their documentation. This process requires greater coordination between medical and mental health as well as improved assessment by mental health.

**Recommendations:**  It is again recommended that JPS and other related County

officials meet with Plaintiffs' counsel to develop screening and assessment protocols to identify potentially intellectually disabled detainees, policy regarding the process of screening and identifying those detainees at intake, and a formal program to monitor, manage, and accommodate the needs of identified detainees.

- Another aspect of the Remedial Plan requires *a multidisciplinary team that includes appropriate health care staff will monitor and ensure appropriate care for prisoners with an Intellectual Disability. The multidisciplinary team will develop an individualized plan for each prisoner with an Intellectual Disability, which addresses: (1) safety, vulnerability, and victimization concerns, (2) adaptive support needs, (3) programming, housing, and accommodation needs. The multidisciplinary team's* (MDT) *plan will be regularly reviewed and updated as needed. (III.O.2)*

  2a. **Non-Compliant**. JPS acknowledged during the site visit that MDT meetings were still not implemented for detainees with mental illness and/or intellectual disabilities. Since the site visit they have reported efforts to begin such MDTs which will be reviewed during the next round.

- Prisoners with an Intellectual Disability assigned to a work/industry position will be provided additional supervision and training as necessary to help them meet the requirements of the assignment.

  3a. **Not Assessed**. No documentation of this was found in documents provided as part of the document request nor in medical records reviewed.

## MENTAL HEALTH CARE
### Policies and Procedures
The Remedial Plan states that *the County shall establish policies and procedures that are consistent with the provisions of this Remedial Plan and include the following:(IV.A) (below are sections IV.A.a-h)*

1. *A written document reflecting the complete spectrum of mental healthcare programming and services provided to prisoners;*
2. *Minimum and maximum timeframes for when each type of mental healthcare service will be completed, including but not limited to laboratory tracking and psychiatry follow-up services, in accordance with prevailing community and professional standards;*
3. *An intake and referral triage system to ensure timely and effective resolution of inmate requests and staff referrals for mental healthcare;*
4. *Specific credentialing requirements for the delivery of mental healthcare services, including but not limited to only qualified mental health professionals may make critical treatment decisions.*
5. *Clinical monitoring of inmates, including but not limited to those who are*

> *involuntarily medicated, clinically restrained or secluded, segregated, or*
> *on suicide watch;*
>
> 6. *Descriptions of specialized mental health programming that specifically*
>    *identify admitting and discharge criteria and the staff members who have*
>    *the authority to place inmates in specialized mental health housing;*
>
> 7. *Procedures for involuntary medications and other appropriate measures*
>    *for the management of inmates with serious mental illness who lack the*
>    *capacity to give informed consent, in accordance with relevant state law;*
>
> 8. *Training for all staff members who are working with inmates with*
>    *mental illness in all aspects of their respective duty assignments.*

FINDING/DISCUSSION:

**Partial compliance.**(IV.A.1) The County continues to work with its vendors to revise and develop relevant mental health policies. These policies, as updated, are provided to plaintiffs' counsel and the SMEs for review. Numerous policies are awaiting **this SME'**s review.

> 1. Written document of mental health programming. Detainees during the
>    recent site visit were able to show and report receiving various orientation
>    documents that addressed the range of mental health services available
>    within both the MJ and RCCC. No detainee reported receiving these
>    documents at intake.
>
>    1a) **Recommendations:** Audits are necessary to support that these
>    documents are disseminated at intake as required for new arrivals.
>
>    2a) Referral timeframes. Detainees reported that they were not seen timely
>    by their social worker or psychiatrist. This was consistent with data found
>    in the in the record for individual clinical contacts.
>
>    2b) **Partially compliant**. JPS has established timeframes for referrals for
>    various mental health services. However, they are not consistently
>    compliant with aspects of the consent decree as they differ across types of
>    service (e.g., medication non-compliance, new arrivals, "must see"). For
>    example, a suicidal detainee may only be held in
>    holding/safety/segregation cells for a maximum of 6 hours. If the patient is
>    not seen until 6 hours have elapsed, the defendants will never be
>    compliant with moving the patient within 6 hours from those cells. This is
>    an easy arithmetic. This is consistent with what has occurred in several
>    cases where JPS and the SSO frequently have not moved the detainee
>    within required timelines (see Hayes 2nd monitoring report, page 43).
>    More importantly, it is not in the possibly despondent detainee's clinical
>    best interests to remove the patient's clothing and property, place the
>    patient in a suicide smock, and leave them alone for 6 hours before they
>    are even properly evaluated for suicidality. During this time, they are left
>    alone in a cell with no idea of what to expect. The sooner that the suicide
>    risk evaluation is completed, the more quickly actual intervention can
>    occur. Each system that this expert is familiar with, has reviewed or
>    worked in has used four hours as the standard.

Urgent referrals are commonly completed by the close of "business" on the next day. While this can sometimes add up to thirty-six hours, to state the timeframe as "36 hours" rather than close of business the next day, could extend the timeframe to as much as three days (example: 8pm Friday, not seen until 8am Sunday; not what was intended for an urgent referral).

There is also no clear rationale that JPS would provide different referral timeframes for different types of referrals. The only rationale provided seems to suggest that there were not enough staff. The answer to that challenge would be to conduct a staff analysis to determine if existing staff are sufficient to provide necessary treatment services. Multiple referral timelines merely leads to confusion and decreased compliance for all staff.

2b) **Recommendations:** As recommended in the last monitoring report, it is recommended that JPS re-evaluate their referral policies including any policies addressing medication management, laboratory studies and related medication and detainee/patient monitoring, and update those policies so that they conform to the standards discussed during the Remedial Plan negotiation process. Staff should then be trained in those updated policies with continuous quality improvement studies to follow to ensure effective implementation. Defendants have committed to completing this task.

3-7) **partial compliance**. (IV.A.c-g) The County and/or its vendor, JPS, did have policies to address these areas. They are in the process of being updated to comply with the Consent Decree and are expected to be compliant by the next round.

8) **partial compliance**. (IV.A.h) There were numerous training curricula provided for the 2020-2021 training period. Some of these training modules are under review by the SME and others have been reviewed and deemed satisfactory with some minor edits (e.g., brain development). They will be tracked for the next monitoring period. While the tracking and reporting of staff attendance had greatly improved, it had not yet reached a consistent process. The data provided as requested was extremely helpful. This tracking system should also assist managers in supervising their staff.

8.a) **Recommendations.** Continue maintaining data on attendance and compliance rates as described in the last monitoring report (i.e., training compliance should include data on 1) required training, 2) required attendees, and 3) percent compliance.) As with the last monitoring report, it may be necessary for all parties to meet and confer to clarify which training satisfies which requirements. Once that has been established, training records should include required training and any that Defendants provide in addition to the required modules.

*The County's policies and procedures shall be revised, as necessary, to reflect all of the remedial measures described in this Remedial Plan.(IV.A.2)*
FINDING/DISCUSSION:
**Partial Compliance** (IV.A.2)**.** As mentioned above and described in the County's First Status Report, the County has been in the process of revising its policies to reflect the Remedial Plan. Defendants have updated and drafted numerous policies which are then provided to Plaintiffs and SMEs for approval and/or recommendations for change.

*The County shall continue to operate its acute inpatient program and its Outpatient Psychiatric Pod (OPP) program. The County shall establish a new Intensive Outpatient Program (IOP) for inmates who require a higher level of outpatient psychiatric care than what is provided in the OPP program. (IV.A.3)*
FINDING/DISCUSSION:
**Partially Compliant**. (IV.A.3) This item is complicated by the significant concerns regarding the actual treatment provided to the patients in 2P acute program as well as the extensive wait lists for its unit-based treatment programs (e.g., inpatient, IOP, and EOP). It functions much like a restricted housing unit in many of its operations. Because of this, the County has been strongly encouraged to investigate other avenues there may be within County services that would provide a more therapeutic program. It should also be highlighted that the County maintains a lengthy waitlist for all of its mental health programs (see Appendix C).

*The County shall operate its non-acute mental health programs – IOP, OPP, and General Population-Mental Health – consistent with the JPS Psychiatric Services overview. (IV.A.4)*
FINDING/DISCUSSION:
**Non-compliant.** (IV.A.4) Space limitations continue to impact the ability to provide services consistent with the JPS Psychiatric Services overview. JPS staff were forced to provide confidential mental health services in non-confidential settings because the physical plant at the main jail and RCCC provide them with limited to no options in order to meet the expectations for daily individual and group treatment contact. In addition, the ability to provide expected treatment was further impacted by the immense need for service as illustrated by the waitlists for those services: 17 waiting for acute inpatient treatment, 19 awaiting IOP, 107 awaiting JBCT, and 84 awaiting transfer to a State Hospital (data as of 7/30/21)
**Recommendations:**   The County and JPS need to evaluate available space and determine what treatment can be expected under the current space limitations. Once a baseline has been established, Defendants can work together to increase treatment available. In the interim, staff should closely monitor and document what treatment is provided and the rates of compliance with the various elements of JPS Psychiatric Services and the Consent Decree. While the County currently has a Space Assessment underway, this project should also review appropriate staffing of each discipline to maximize service delivery at the various levels of care and acuity.

MENTAL HEALTH CARE
*Organizational Structure (IV.B)*

1. *The County shall develop and implement a comprehensive organizational chart that includes the Sheriff's Department ("Department"), Correctional Health Services ("CHS"), Jail Psychiatric Services ("JPS"), Chief Administrative Officer, Medical Director of the JPS Program, and any other mental health staff, and clearly defines the scope of services, chains of authority, performance expectations, and consequences for deficiencies in the delivery of mental health care services. (Section IV.B.1)*

2. *A Medical Director of Jail Psychiatric Services shall be designated and shall oversee all mental health care functions in the jails, including psychiatric prescribers and psychiatric nurses. The Director shall possess clinical experience and a doctoral degree. (IV.B.2)*

3. *The Medical Director of Jail Psychiatric Services shall participate in jail executive leadership and shall be responsible for overseeing program development, clinical practice, and policy, as well as interfacing with jail and medical leadership and community mental health. (IV.B.3)*

FINDING/DISCUSSION:

**Partially Compliant**. (IV.B.1-3) There were organizational charts provided for each area, including JPS/mental health. However, how the various organizations and supervisors work together remained unclear. There were efforts to develop reporting structures through the appointment of a contract monitor to JPS, but no organizational chart demonstrated how SSO, ACH, and JPS work together. Thus, there remained concerns about the actual lines of communication in some areas and daily operational authority. While it was clear who worked for whom, this area of the Remedial Plan appeared to be an effort to achieve some equality amongst three different entities in operations of the jail (SSO, ACH, JPS). It remained unclear if that had been achieved and operational efficacy remained based on relationships rather than the established leadership structure and team.

**Recommendations:** Continued assessment of this area by experts in future monitoring of the Remedial Plan. This would be another area where the County's space assessment team should also provide input given their in-depth look at space and staffing.

MENTAL HEALTH CARE

*Patient Privacy (IV.C)*

*All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff. In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification.(IV.C.1)*

1. *For any determination that a clinical interaction with a patient requires the presence of custody staff, staff shall document the specific reasons for the determination. Such decisions shall be reviewed through the Quality Assurance process. (IV.C.1.a)*

2. *If the presence of custody staff is determined to be necessary to ensure the safety of medical staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.(IV.C.1.b)*

3. *The County's patient privacy policies, as described in this section, shall apply to contacts between inmates and Triage Navigator Program staff and/or other staff that provide mental health-related services on site at the Jail.(IV.C.1.c)*

4. *Jail policies that mandate custody staff to be present for any mental health treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above. Custody and mental health staff shall be trained accordingly.(IV.C.2)*

5. *It shall be the policy of the County that mental health clinicians shall not conduct their patient contacts at cell front except pursuant to documented refusals or specific, documented security concerns that warrant cell front contacts. (IV.C.3)*

6. *For each clinical contact, mental health staff shall document whether the encounter was confidential, including whether it took place at cell front. If the contact occurred at cell front or otherwise was non-confidential, the reasons shall be clearly documented in the individual patient record and for purposes of Quality Assurance review procedures. (IV.C.4)*

7. *A process shall exist for sick call slips or other mental health treatment-related requests to be collected without the involvement of custody staff. (IV.C.5)*

FINDING/DISCUSSION:

**Non-compliant.** (IV.C.1, 2, 5) While staff continued to receive further direction to see patients in confidential settings, record review indicated that most patients were seen in non-confidential settings. At times documentation revealed that non-confidential

settings were deemed confidential. This occurred when detainees were seen in the large open area outside of 3W, for example. A new program report was developed to assist managers in monitoring confidentiality. During this review period staff noted approximately half of clinical contacts were not confidential. Yet with the limitation described above, it is believed that this overestimated confidential contacts. This SME found that the majority of individual contacts for cases 1-10 were cell front, even when conducting highly sensitive suicide risk assessments or mental health initial assessments.

**Non-Compliant** (IV.C.2, 4) This item was noted as non-compliant because it continued to be the exception rather than the norm that mental health staff documented where clinical contacts occurred and whether they were confidential. For example, a visiting room in the main jail had reportedly been used for individual sessions, but security staff present during the August 2020 tour indicated that the door would be left at least slightly ajar making the contact non-confidential. Staff had begun to merely state whether a contact was confidential rather than describing the precise location of the contact. There remained a large number of contacts that occurred cellside and were clearly not confidential, including suicide risk assessments.

There were some occasions where contacts were noted to have occurred in a confidential setting in the classroom, though that was clearly the exception rather than the rule. Defendants did note that there has been ongoing training and discussion regarding the need for this and that a drop-down in the electronic chart has been added in an effort to improve in this area.

**Recommendations:**  In addition to the recommendations listed in the Space focus area, supervisors must train staff to understand what is required for a space to be considered confidential. Then supervisors must monitor contacts so that when confidential space is available but not used, providers are made to use that space. In addition, existing space and schedules should be examined so that if staff constantly utilize their available confidential space and expected rate of complaince can be generated.

Clinical staff must be held accountable for documenting in their notes where the contact was held specifically and then whether it was a confidential space. If staff use the dropdown in the electronic chart appropriately, this should improve during the next round.

CLINICAL PRACTICES (IV.D)

The Remedial Plan states that *Mental health staff shall develop and maintain at each jail facility an accurate case list of all prisoners requiring mental health treatment services at the jail ("caseload") which, at a minimum, lists the patient's name, medical chart number, current psychiatric diagnoses, date of booking, date of last appointment, date of next appointment, and the name of the treating prescriber. (IV.D.1)*

FINDINGS/DISCUSSION:

**Partially compliant.** (IV.D) ACH and JPS do utilize an electronic record which includes the patient's name, diagnoses, XREF, booking date and number, and much of the information listed for this item. While some of this information could be provided in a written report, it did not include all required information such as psychiatric diagnosis, dates of booking, last appointment and upcoming appointments. There were several lists provided but none met the standard established in the Consent Decree. Defendants note that they are still working with their electronic database to produce certain required reports.

- o *Qualified mental health professionals shall have access to the patient's medical record for all scheduled clinical encounters. (IV.D.2)*

- o *Qualified mental health professionals shall provide individual counseling, group counseling, and psychosocial/psychoeducational programs based on individual patients' clinical needs. (IV.D.3)*

FINDINGS/DISCUSSION:

**Partially Compliant.** (IV.D.2 & 3) These two items have been negatively impacted by the frequency of cell front contacts. Because detainees were frequently seen cell front, the electronic record was not utilized and most providers reported that they must go back to their offices to complete progress notes. Medical record review seemed to confirm that the medical record had not been available as the progress note clearly demonstrated a lack of familiarity with the patient's history.

- o A *qualified mental health professional shall conduct and document a thorough assessment of each individual in need of mental health care following identification. (IV.D.4)*
- o *The County shall ensure prompt access to psychiatric prescribers following intake and in response to referrals and individual patient requests in accordance with the referral and triage timelines defined in the Access to Care provisions, below. (IV.D.5*
- o *The County shall, in consultation with Plaintiffs' counsel, implement an electronic system for tracking mental health evaluation, treatment, and other clinical contacts, as well as sick call slips and other mental health treatment- related requests or referrals. (IV.D.6)*
- o *The County shall develop and implement an electronic tracking system*

*with alert and scheduling functions to ensure timely delivery of mental health services to individual patients.(IV.D.7)*

FINDING/DISCUSSION:

**Partially Compliant. (**IV.D.4-7) Identification, assessment, referral to prescribers following intake, and electronic tracking of this process with alert and scheduling functions are at various stages of policy development and implementation. Intake screening is not conducted in a confidential setting which may negatively impact the intake process. There are delays in accessing care as each referral results in someone in mental health reviewing the referral and possibly the medical record, then submitting an additional order to see a provider. For example, if a new arrival is screened as positive for mental health symptoms, a referral is sent to mental health. That referral is usually reviewed by a social worker who reviews the chart and submits an order for an assessment. It is not clear why the social worker could not simply see the new arrival rather than submit a rather generic referral. The new arrival is eventually seen by a mental health provider for an assessment. However, based on NCCHC standards, every new arrival should receive an initial mental health assessment which, if positive, results in a comprehensive evaluation. Only after all of this occurs does a new arrival typically get referred for a medication evaluation. This process is not sped up for new arrivals who report currently taking psychotropic medication even when that is confirmed. There were a few occasions where a bridge order was finally completed 5-10 days after arrival despite confirmation that the intake had been prescribed psychotropic medications. Ten intake screens were reviewed as part of this expert's review of intake screenings where all ten detainees were later determined to have a mental health condition, nine identified as SMI, and all had substance abuse issues. The intake screens were not always accurately completed but even when judged to be positive, the intake would not be seen for at least five more business days. There was no explanation for the delays. Nurses rarely obtained ROIs in these cases, only four were collected timely.

**Recommendations.** These recommendations are identical to those provided in the first monitoring round report. SSO, ACH, JPS must review the intake process and areas to identify what changes can be made so that nursing and mental health providers can complete timely intake screening and assessments in a confidential area. Next, a process review with all entities should occur, or at least with ACH and JPS to identify how RNs completing the screens can make appropriate and timely referrals to providers, particularly prescribers so that there are timely orders of essential medications without missed doses as found in documentation including repeated requests by detainees for their psychotropic medications. JPS should conduct its own assessment to determine the appropriate staffing to conduct intake assessments and evaluations that comply with the Consent Decree.

Treatment planning: (*IV.D.8.a-g below*)

a) *The County shall ensure that each prisoner on the mental health caseload receives a comprehensive, individualized treatment plan based on the input of the Multi-Disciplinary Treatment Team (MDT). The MDT shall include multiple clinical disciplines with appropriate custody and counseling staff involvement.*

b) *The treatment plan shall reflect individual clinical need, and the County shall ensure that all clinically indicated services are available and provided.*

c) *The treatment plan shall include, at a minimum, the frequency of follow-up for clinical evaluation and adjustment of treatment modality, the type and frequency of diagnostic testing and therapeutic regimens (which may include clinical contacts more frequent than the minimum intervals described herein), and instructions about adaptation to the correctional environment.*

d) *This treatment plan shall include referral to treatment after release from the facility when recommended by treatment staff.*

e) *Custody staff shall be informed of a patient's treatment plan where appropriate to ensure coordination and cooperation in the ongoing care of the patient.*

f) *The County shall, in consultation with Plaintiffs' counsel, develop and implement a Treatment Plan Form that will be used to select and document individualized services for prisoners who require mental health treatment.*

g) *The County shall implement guidelines and timelines for the initiation and review of individual treatment plans, consistent with the JPS Psychiatric Services overview.*

FINDING/DISCUSSION:

**Non-Compliant.** (IV.D.8.a-g) This area remains problematic due to the lack of treatment teams. JPS readily acknowledged not yet initiating this element of the Consent Decree. Treatment plans continue to be developed by individuals and limited in their quality and efficacy. A MDT format was developed but has not been implemented. Records continued to have progress notes that might list some vague treatment goals but there was no formal treatment plan or documentation of an MDT in any records reviewed. Case 5 was illustrative of a complex case that included a level of care change where there was no multidisciplinary treatment team or even a treatment plan to guide the treatment for all members of the team. This detainee required coordinated care and that occurs through the treatment team process. The same was true for Case 10 at Rio Consummess Correctional Center (RCCC).

FOSS levels appear problematic across this system of mental health service. While they have been slightly revised to allow for minimum services, they do not map well onto the acuity of a patient nor onto existing treatment programs. They also do not address treatment planning,

only clinical contacts despite treatment planning being a key component of treament services. There are specific levels of mental health care which have specific timelines and expectations associated with them which should be consistent with the Remedial Plan. Those timelines are not congruent with all FOSS levels nor do they always imply a specific FOSS level. Two FOSS levels are centered around a specific program (inpatient care in 2P) and two of the levels could reflect a host of contact frequencies with mental health providers. In fact, there were examples of cases where IOP participants were identified as FOSS level II and level III. This was not consistent with the acuity expected in an IOP participant. FOSS level also implies a range of contact intervals for FOSS II-IV but that interval was never specifically identified in the chart. **Recommendations.** This is an area that remains ripe for consultation with SMEs to address treatment planning, necessary participants, and documentation of the same. JPS has expressed a willingness to do this and has begun working on revising the FOSS levels to better map onto the Consent Decree.

It is again strongly recommended that JPS mental health staff in consultation with the mental health and suicide prevention experts re-examine the need for FOSS levels and the way in which they would be utilized effectively while complaint with the Consent Decree. The clinical utility of these levels must be clearly established if they are to be maintained and forms must be created to indicate the level at each contact, the frequency of contacts expected, and the clinical rationale for that determination. Currently, clinical staff do not appear to conceptualize cases in that manner and document such clinical conceptualizations, so this must also be reviewed as an important component of treatment and training for mental health staff.

MENTAL HEALTH CARE

Medication Administration and Monitoring *(IV.E.1.a-c below)*

1. The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws and through the following:

   a) The County shall ensure that initial doses of prescribed medications are delivered to inmates within 48 hours of the prescription, unless it is clinically required to deliver the medication sooner;

   b) The County shall make best efforts to verify a patient's prescribed medications and current treatment needs at intake, including outreach to pharmacies and community providers to request prescriptions and other health care records relating to ongoing care needs. The policy shall ensure that any ongoing medication, or a clinically appropriate alternative, shall be provided within 48 hours of verification of the prescription or from a determination by a physician that the medication is medically necessary. Any orders that cannot be reconciled or verified, such as those with conflicting prescriptions from multiple prescribers, shall be referred to a health care provider for reconciliation or verification the next clinic day after booking.

   c) The County shall ensure that medical staff who administer medications to inmates document in the inmate's Medical Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, and (3) the date and time for any refusal of medication.

2. Qualified mental health professionals shall, for each individual patient, establish targets for treatment with respect to the use of psychotropic medication and shall assess and document progress toward those targets at each clinical visit.(IV.E.2)

3. Qualified mental health professionals shall, for each individual patient, monitor and document the following with respect to psychotropic mediations: (1) levels of medications, (2) adverse impacts (including through renal and liver function tests where indicated), (3) side effects, and (4) efficacy. (IV.E.3)

4. Qualified mental health professionals shall, for each individual patient, conduct and document baseline studies, including ECG, blood, urine, and other studies, as clinically appropriate, prior to

*the initiation of treatment. (IV.E.4)*

5. *The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication. (IV.E.5)*

6. *Medication adherence checks that serve a clinical function shall be conducted by nursing staff, not custody staff. Custody staff shall conduct mouth checks when necessary to ensure institutional safety and security.(IV.E.6)*

7. *Psychiatric prescribers shall consider clinically indicated considerations and conduct an in-person consultation, with the patient prior to changing or initiating medications. In the event there is no in-person consultation before prescribing or changing medications the psychiatric prescriber shall note and document the reasons for why there was not an in-person consultation with the patient. (IV.E.7)*

FINDING/DISCUSSION:

**Partially compliant.** (IV.E.1-7) Medication Management is an area that requires further assessment and review. There was continued evidence of prescribers not reviewing available records and not maintaining treatment continuity as a result. Six of ten new arrivals who reported taking psychotropic medications were not provided with a bridge order or seen by a prescriber for an average of six days post-intake. Psychotropic medications continued to be prescribed without documentation of treatment targets. It was not unusual for psychotropic medications to be changed without the prescribing providers seeing the detainee in person. Laboratory studies were not always ordered when indicated. This was partially compliant because providers did not always fail to do these things but they did not consistently adhere to policy or the Remedial Plan. Detainees interviewed in the IOP and OPP in the MJ continued to complain consistently about delivery of evening medications and missing doses because they were awakened at midnight or later to take their medications. Documentation even noted at times that the detainee had refused medication so that he/she would not have to wake up. Case 8 in the case studies noted that when he arrived at RCCC, he had some difficulty accessing his psychotropic medications and that even after his prior medications were confirmed the patient was not seen but a prescriber did review his record to write a "bridge" order until he could be seen. When that patient was interviewed, he reported to this SME that he had seen a nurse practitioner or psychiatrist two days prior but there was no such documentation in the chart at that time.

**Recommendations.** Medication management has been problematic since the first monitoring period. This must be remedied immediately. Medication administration in the evening should not require people to stay awake through the night to obtain their medications. Detainees should not have to choose between sleep or necessary medications. Since the QM process has been reinvigorated, it is recommended that a quality improvement team (QIT) be chartered to examine this problem and develop solutions that can be implemented quickly.

MENTAL HEALTH CARE

Placement, Conditions, Privileges, and Programming *(IV.F.1.a-e below)*

1. *Placement:*

   a) *It shall be the policy of the County to place and treat all prisoners on the mental health caseload in the least restrictive setting appropriate to their needs.*

   b) *Placement in and discharge from Designated Mental Health Units shall be determined by qualified mental health professionals, with consultation with custody staff as appropriate.*

   c) *Absent emergency circumstances, the County shall obtain the assent of qualified mental health professionals before transferring prisoners with SMI into or out of Designated Mental Health Units.*

   d) *It shall be the policy of the County to place prisoners with SMI in appropriate settings that ensure provision of mental health services, patient safety, and the facilitation of appropriate programs, activities, and out-of-cell time. Co-housing with other populations shall be avoided to the extent that such a practice prevents or hinders any of the above.*

   e) *All patients requiring placement in a Designated Mental Health Unit shall be provided access to such placement and care based on current clinical need and without any requirement for director-level approval.*

FINDINGS/DISCUSSION:

**Noncompliant.** (IV.F) There remained at least 58 caseload inmates identified as seriously mentally ill were housed in restrictive housing during the monitoring round (spreadsheet dated 5/17/21, patients receiving mental health services), with 33 at FOSS level I or II. This suggests that those with the greatest mental health needs who should have been in a designated mental health unit were instead placed in restricted housing. Regardless of the reason for placement, this was far too many patients in the most restrictive setting.

The placement of SMI patients in restricted housing remains a significant concern. There were at least two cases where the detainee had been housed in the acute inpatient unit for several weeks and when determined that he could discharge and go to the IOP the detainee refused IOP placement. Rather than work with the patient to convince the patient to be housed in a less restrictive setting, custody simply took both of those patients to restrictive housing. It was unclear that mental health was informed of where the patient was housed. While the detainees had exhibited aggressive behavior, they were clearly not appropriate for restrictive housing given their continued acuity. JPS staff reported that they are working more closely with custody to avoid those kinds of placements, but there was no policy or procedure that

they could point to that would ensure mental health was consulted before the detainee was moved.

MENTAL HEALTH CARE

Programming and Privileges *(IV.F.2.a-e below)*

- *All Designated Mental Health Units shall offer a minimum of 7 hours of unstructured out-of-cell time per week and 10 hours of structured out- of-cell time per week for each prisoner. While out-of-cell hours per prisoner may vary from day to day, each prisoner will be offered some amount of out-of-cell time every day of the week. All treatment and out- of-cell time shall be documented for each prisoner, and reviewed as part of Quality Assurance procedures.*

- *The County shall ensure that prisoners on the mental health caseload have access and opportunity to participate in jail programming, work opportunities, and education programs, consistent with individual clinical input.*

- *The County shall develop and implement, in the 2P inpatient unit and the IOP unit, a program for progressive privileges (including time out of cell, property allowances, etc.) for patients as they demonstrate behavioral progress. A patient's level of privileges and restrictions shall be based on both clinical and custody input regarding current individual needs. The County shall ensure a process to review custody classification factors when necessary, so that placement, privileges, and restrictions match current individual circumstances and needs.*

- *Individuals on a mental health caseload shall receive, at minimum, privileges consistent with their classification levels, absent specific, documented factors which necessitate the withholding of such privileges. Clinical staff shall be informed of the withholding of privileges and the reasons for the withdrawal shall be documented and regularly reviewed by clinical and custody staff. The restoration of privileges shall occur at the earliest time appropriate based on individual factors.*

- *Where a prisoner in a Designated Mental Health Unit is subject to any restrictions of property, privileges, or out-of-cell time, the mental health treatment provider and Multi-Disciplinary Treatment Team will, on a weekly basis, assess and discuss with the prisoner progress and compliance with the prisoner's individual case plan. This process will include clinical contact in a private, face-to-face, out-of-cell setting. The Multi-Disciplinary Treatment Team will provide input to classification staff regarding the prisoner's mental health and appropriateness for removal of imposed restrictions. Classification staff will follow the recommendation of the Multi-Disciplinary Treatment Team to remove restrictions unless there is a clear, documented security reason to maintain the restriction.*

FINDING/DISCUSSION:

**Non-Compliant.** (IV.F.2) Custody began tracking out of cell activity and was able to provide data for this review period. While they often were able to provide close to seven hours of unstructured time out of cell, the structured 10 hours was problematic given space issues. The

current tracking system used by SSO does not separate the structured from unstructured but combines all out of cell activity. Interviewed detainees did report that they have better access to yard or dayroom, particularly in RCCC. However, without structured treatment approaching the 10 hours per week, this item must remain non-compliant despite the improvements made by the SSO.

In the acute inpatient unit 2P, detainees continued to be regularly restricted to a suicide resistant smock, tear resistant bedding and similar by psychiatry beyond what appeared to be clinically indicated. Progress notes did not consistently renew those orders nor were there clinical justifications for those restrictions. Documentation was more problematic for psychiatry during this review period for 2P inpatient review. While patients were frequently seen daily, the documentation lacked clinical justifications for any actions and restrictions. While this SME found that psychiatry was the primary cause of property/privilege restriction in 2P for cases reviewed, the suicide prevention SME found that it was due to the restriction that custody staff imposed see L. Hayes suicide prevention report (e.g., repeated mentions that SSO interfering with clinical judgment and preventing word search, showers, phone calls, and other appropriate clinical activity. When the mental health SME reviewed 2P patients, the primary issue appeared to be that the psychiatrist continued to refuse those items to the be patients who requested their clothes back or reading materials but the psychiatrist would not allow it nor provide a clinical rationale for that decision.

**Recommendations:**  Each facility should charter a QIT that includes SSO, ACH, and JPS staff to focus on identifying ways to increase out of cell time and provide normalizing experiences for the SMI detainees such as group dining, games, yard, exercise, and other activities at both the RCCC and MJ mental health units including the acute inpatient program. Many interviewed detainees questioned why they could not eat their meals in the dayroom with each other rather than having to return to their cells to eat. They saw this as a possible incentive that could be used to reward detainees who complete their mental health assignments. As multidisciplinary treatment team meetings begin, the patients' schedules and privileges should be reviewed as part of should be implemented as soon as possible and patients' schedules and privileges should be reviewed to be sure that they are getting out of their cells and engaged with treatment.

Clinical staff and security staff must be trained on the remedial plan and educated that detainee in mental health units receive all of the property and privileges that they would have based on their classification and custody level. If security staff restrict any property or privileges of a detainee in a mental health unit, then security staff must inform mental health staff and there must be a plan to restore those privileges/property at the earliest time that would be appropriate. Until that time, the treatment team which includes at least one security representative will regularly review the restrictions on a daily basis until they are restored.

MENTAL HEALTH CARE

Conditions: *(IV.F.3)*

- *Staff shall provide prisoners in Designated Mental Health Units with the opportunity to maintain cell cleanliness and the opportunity to meet their hygiene needs. Custody and clinical staff shall provide assistance to prisoners on these matters, as appropriate to individual patient needs;(IV.F.3.a)*
- *The County shall ensure uniformity of practice with respect to cell searches, such that searches are not done for punitive or harassment reasons. The County shall monitor whether cell search practices may be serving as a disincentive for prisoners in Designated Mental Health Units to leave their cells for treatment or other out-of-cell activities, and shall take steps to address the issue as appropriate.(IV.F.3.b)*

FINDING/DISCUSSION:

Could not Assess. The County could not provide documentation of this yet. Detainees reported not receiving the supplies that they needed. Some staff supported detainee complaints while others disagreed. There was insufficient objective data to conclude one way or the other.

MENTAL HEALTH CARE

Bed planning: *(IV.F.4)*

- *The County shall provide a sufficient number of beds in Designated Mental Health Unit, at all necessary levels of clinical care and levels of security, to meet the needs of the population of prisoners with SMI. (IV.F.4.a)*
- *The County shall conduct a bed needs assessment, to be updated as appropriate, in order to determine demand for each category of Designated Mental Health Unit beds and shall ensure timely access to all levels of mental health care, consistent with individual treatment needs.(IV.F.4.b)*
- *The County shall establish mental health programming for women that ensures timely access to all levels of care and is equivalent to the range of services offered to men.(IV.F.4.c)*

FINDING/DISCUSSION:

**Non-Compliant.** (IV.F.4) Bed planning has not been initiated. However, the County does have a contract to look at space issues. It was unclear if that project may also undertake some bed planning tasks or if that would be left for a later contractor or project. There continues to be waitlists to access IOP and inpatient treatment that require additional capacity. These waitlists have continued from the first monitoring period and are not getting any smaller. A bed needs assessment is essential in determining what must be done for construction and space needs. The same is true for detainees with SMI who end up in restrictive housing and it appears that this is a default for detainees who are not an immediate danger but the County does not really have another place to house these patients.

There are clearly only several options when there are people in custody who require services. One must be to build sufficient capacity to provide the services (e.g., staffing, space, services, beds), and another is to take steps to reduce the need (e.g, alternatives to incarceration, diversion, etc.). It is likely that efforts on both front will be necessary.

**Recommendations.** The SSO, ACH, JPS management should utilize the current space assessment project to complete bed planning or outline the need for County officials to conduct a bed planning assessment.

Defendants have committed to implementing a Space Committee in 2021. While it was not quite as formal as originally hoped for, there have been discussions regarding space, and it was reported that space could not be identified. The planning project should incorporate bed planning to a degree.

MENTAL HEALTH CARE

Access to Care *(IV.F.6)*

- *The County shall designate and make available custody escorts for mental health staff in order to facilitate timely completion of appointments and any other clinical contacts or treatment-related events. (IV.F.6.a)*
- *The County shall ensure sufficient and suitable treatment and office space for mental health care services, including the Triage Navigator Program and other mental health-related services provided on site at the Jail. (IV.F.6.b)*
- *Locations shall be arranged in advance for all scheduled clinical encounters. (IV.F.6.c)*
- *The County shall track and document all completed, delayed, and canceled mental health appointments, including reasons for delays and cancelations. Such documentation shall be reviewed as part of the Quality Assurance process. (IV.F.6.d)*

KNOWLEDGE/DISCUSSION:

**Partially Compliant.** (IV.F.6.a-d) Defendants had developed a reporting feature in their third status report that would track group attendance, the Group Participation Report. The report did not provide data on group cancelations or the reasons for those cancelations but did allow for patient specific group participation. This was not fully functional but did allow for improved tracking of treatment activities. Group cancellations and the reasons for cancelled groups were being tracked on a separate spreadsheet until it can be integrated.

Reviewed data and medical records from the IOP indicated that there were still a fairly large number of IOP groups being cancelled. Seven records were quickly reviewed for therapeutic groups for IOP participants in the MJ. In March and April 2021, approximately 40% of scheduled groups were canceled. Staff reported that this occurs because they are called to attend to a crisis or to cover for another provider. As mentioned in the last monitoring report, there is a great deal of activity that must occur with only one treatment room available in the MJ IOP. This leads to cancelations and indeed, there were more cancelations in the MJ IOP than RCCC IOP. RCCC holds groups in the dayroom of the unit and has fewer cancelations because they do not have to share that space.

Like the last monitoring period, reviewing provided treatment schedules revealed that the JBCT program continues to dominate the other mental health programs in the way that it eats up available space. Rather than divide and share limited space, JBCT is allocated a disproportionate amount of treatment space for groups and activities while IOP and OPP have been expected to make due with space on the unit or no space at all. As a result, many of their groups get canceled and interviewed detainees reported a type of learned helplessness where they became apathetic toward groups and lose the motivation to participate because they've had so

many times when they were excited to go to group only to be disappointed when it was canceled.

The acute inpatient program is even more bleak. The IOP units are larger with more activity overall that participants can watch from their cells. The inpatient unit is small with little going on. There was little stimulation for patients in the acute unit who complained of boredom and lack of reading materials. No groups were offered and patients there were seen primarily by telepsychiatrists limiting their human interactions to just the nurses providing their daily care. As has been stated elsewhere in this report, the experience is much like solitary confinement in segregation where the correctional officers are just replaced by nurses. The primary modality of treatment appears to be isolation despite its negative effects. Medication management remains the other intervention utilized with occasional success despite the bleak environmental challenges. The most ill individuals are placed into this inpatient unit yet they receive even less treatment than those who remain in the IOP.
**Recommendations.** The SSO and JPS are encouraged to continue to explore the possibility of dedicated escort teams. Other systems use mental health or healthcare escort cadres who are dedicated to make sure that this large number of contacts and activities occur, allowing housing deputies to focus on the other escorts and unit activities and programs. The Space Committee should document meetings and discussions regarding what spaces should be available to see inmates in so that more appropriate identified space can be made available for therapeutic activity.

The Defendants should utilize those group participation reports when reviewing progress with patients and developing treatment plans. The same should be provided for acute patients in the inpatient program.

Defendants have indicated that funding was approved for additional officers for pill call. This should eliminate the medication administration problems though they continued to be reported by staff and detainees during the site visit.

Referrals and triage: *(IV.F.6.e.i and ii below)*
- *The County shall maintain a staff referral process (custody and medical) and a kite system for prisoners to request mental health services. Referrals by staff or prisoners must be triaged within 24 hours.*
- *Referrals and requests for mental health services shall be handled in accordance with the following timeframes, and based on the definitions and guidance in Exhibit A-2:*
- *Prisoners with "Must See" (Emergent) mental health needs shall be seen for assessment or treatment by a qualified mental health professional as soon as possible, and within six hours. Prisoners with emergent mental health needs shall be monitored through continuous observation until evaluated by a mental health professional.*

- *Prisoners with <u>Priority (Urgent)</u> mental health needs shall be seen for assessment or treatment by a qualified mental health professional within 36 hours.*
- *Prisoners with <u>Routine</u> mental health needs shall be seen for assessment or treatment by a qualified mental health professional within two (2) weeks;*
- *Prisoners whose requests do not require formal clinical assessment or intervention shall be issued a written response, with steps taken to ensure effective communication.*

FINDINGS/DISCUSSION:

**Non-compliant.** The referral system is effectively broken at the MJ and RCCC. Patients reported submitted requests to be seen by medical and mental health providers and hearing nothing back regarding an appointment. They begin to fear that the request has been lost and submit another request. Many of the detainees interviewed reported that they submit a request daily in an effort to be seen. Because they do not receive any response such as informing them that they will be seen on a certain day, they flood the referral system with duplicate requests in an effort to receive care. If the triage nurse would simply see patients following receipt of a referral, then the workload would actually decrease because fewer duplicative referrals would be submitted. However, at this point the detainees have no trust in the referral system and resort to flooding the system.

**Recommendations.** As stated previously, JPS needs to revise their Access to Care referral policy so that it conforms to the Remedial Plan and does not have different timeframes for different types of referrals. The timeframes should be based on acuity as has been explained previously.  In addition, the triage nursing staff should see the patient and inform them of what to expect (e.g., scheduled appointment). There should not be different timelines for different types of referrals. As detainees come to trust this revised referral process and can expect to receive feedback regarding the plan for an appointment, the fewer duplicative requests will be submitted, decreasing the workload for nursing.

MENTAL HEALTH CARE
<u>Medico-Legal Practices</u> *(IV.G)*

1. *The County shall provide access to appropriate inpatient psychiatric beds to all patients who meet WIC § 5150 commitment criteria. At the time a patient's need for inpatient care is identified, commitment paperwork shall be initiated immediately. Placement in an inpatient unit shall occur at the earliest possible time, and in all cases within 24 hours. For individual prisoners placed on a pre-admit or wait list for inpatient placement, affirmative steps to process and place them shall begin immediately. (IV.G.1)*

2. *The County shall not discharge patients from the LPS unit and immediately re- admit them for the purpose of circumventing LPS Act requirements. For patients with continuing need for LPS commitment, the County shall follow all required procedures under the LPS Act. (IV.G.2)*

3. *The County shall review all County and JPS policies and procedures for PREA compliance, and revise them as necessary to address all mental health-related requirements. (IV.G.3)*

FINDING/DISCUSSION:

**Partially compliant.** (IV.F.G) The County continues to maintain extensive policies and forms to address the forensic aspects of inpatient care including Welfare and Institutions Code 5150 commitment criteria across various timeframes, the LPS commitment paperwork, notification and other forms, firearms restrictions forms following commitment, forms to try to get your right to possess firearms back. This is one area that was quite well covered by JPS. It is partially compliant because this section includes the element of providing access and the jail maintains a steady waitlist of patients waiting for a bed in the acute inpatient unit. This aspect of this item may not be fully compliant until there are additional beds available, whether through an interim plan or MJ Annex.

**Recommendations.** It is recommended that the County use the current space planning contract to complete Bed, space, and treatment planning with identified areas for those activities.

MENTAL HEALTH CARE
Clinical Restraints and Seclusion (*IV.H*)
*Generally: (IV.H.1.a-g below)*

  a.  It is the policy of the County to employ restraints and seclusion only when necessary and to remove restraints and seclusion as soon as possible.

  b.  It is the policy of the County to employ clinical restraints and seclusion only when less restrictive alternative methods are not sufficient to protect the inmate-patient or others from injury. Clinical restraint and seclusion shall not be used as punishment, in place of treatment, or for the convenience of staff.

  c.  The placement of a prisoner in clinical restraint or seclusion shall trigger an "emergent" mental health referral, and a qualified mental health professional shall evaluate the prisoner to assess immediate and/or long- term mental health treatment needs.

  d.  When clinical restraints or seclusion are used, Jail staff will document justification for their application and the times of application and removal of restraints.

  e.  There shall be no "as needed" or "standing" orders for clinical restraint or seclusion.

  f.  Individuals in clinical restraints or on seclusion shall be on constant watch, or on constant video monitoring with direct visualization every 15 minutes. All checks will be documented.

  g.  Fluids shall be offered at least every four hours and at meal times.

*Clinical Restraints (IV.H.2.a-c below)*

  a.  The opinion of a qualified health care professional or qualified mental health professional on placement and retention in restraints will be obtained within one hour from the time of placement.

  b.  A thorough clinical assessment shall be conducted by qualified health care professional or qualified mental health professional every four hours to determine the need for continued restraint.

  c.  Individuals in restraints shall be checked every two hours by a nurse for vital signs, neurovascular assessment, and limb range, and offered an opportunity for toileting.

FINDINGS/DISCUSSION:

**Partially compliant.** (IV.H.1&2) Clinical restraints are those restraints that are initiated by a mental health provider who is qualified and allowed by license to order a patient to be restrained. In the JPS system, that would be psychiatrist primarily. California does not allow social workers to order restraints. The proof of practice data provided during this monitoring round indicated that no patients were restrained for clinical reason. Custody may restrain inmates for different reasons though by policy, mental health staff are not to assist or be involved in custodial restraints. That limitation does not apply to nursing staff, however. Nursing staff are to assist in both clinical restraints and custodial restraints. This section focuses only on clinical

restraints, leaving custodial restraints to the medical SMEs.

Data was provided by defendants that clinical restraints were not used during the monitoring round. JPS and ACH policies on restraints were reviewed and found to be generally acceptable.

**Recommendations.**  Many ACH and JPS policies are in the process of review. While the existing restraint policy is generally consistent in all areas so that it is consistent with all areas of the Consent Decree and uses similar language. The JPS Program Director indicated that mental health staff do not provide services when custody initiate correctional restraints which is appropriate. Revisions of the JPS policies should ensure that this is in the revised policies since it is not always clear in existing policies. ACH nursing staff do have a role in oversight and monitoring for safety when correctional restraints such as the WRAP are used. It would be the medical SMEs who would be responsible for ensuring that those policies have been properly updated and implemented. Finally, it is recommended that any time custodial restraints (e.g. the WRAP) are used on mental health patients, an emergent referral should be sent to the mental health provider who should also be given an opportunity to deescalate the patient. All mental health staff should receive training on clinical restraints as well as the standards for non-clinical restraints. It will be important that restraint use, clinical and custodial, be closely monitored because of the risk involved and potential for harm.

MENTAL HEALTH CARE

<u>Reentry Services</u> *(IV.H.3.a-d below)*

a. *The County shall provide a 30-day supply of current psychotropic medications to inmates on the mental health caseload, who have been sentenced and have a scheduled released date, immediately upon release.*

b. *Within 24 hours of release of any inmate who is on the mental health caseload and classified as pre-sentence, the County shall transmit to a designated County facility a prescription for a 30-day supply of the inmate's current psychotropic medications.*

c. *The County, in consultation with Plaintiffs' counsel, develop and implement a reentry services policy governing the provision of assistance to prisoners on the mental health caseload, including outpatient referrals and appointments, public benefits, medical insurance, housing, substance abuse treatment, parenting and family services, inpatient treatment, and other reentry services.*

d. *The County agrees that, during the course of the implementation of the Remedial Plans contained in this agreement, it will consider Plaintiffs' input on measures to prevent unnecessary or avoidable incarceration of individuals with serious mental illness.*

**FINDING/DISCUSSION**: (IV.H.3) While the Pharmacist again reported the process for providing medications to releasing detainees, no such documentation could be identified in the medical record indicating that the releasing detainee had or had not received discharge medications. This will require further clarification during the next review period.

MENTAL HEALTH CARE

Training (IV.I)

1. *The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following: (IV.I.1)*

   a. *All jail custody staff shall receive formal training in mental health, which shall encompass mental health policies, critical incident response, crisis intervention techniques, recognizing different types of mental illness, interacting with prisoners with mental illness, appropriate referral practices, suicide and self-harm detection and preventions, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum. (IV.I.1.a)*

   b. *Custody staff working in Designated Mental Health Units shall receive additional training, including additional information on mental illness, special medico-legal considerations, de-escalation techniques, working with individuals with mental health needs, relevant bias and cultural competency issues, and the jail's mental health treatment programs. (IV.I.1.b)*

   c. *Mental health staff shall receive training on the correctional mental health system, correctional mental health policies, suicide assessment and intervention, relevant bias and cultural competency issues, and treatment modalities to be offered in the jails. (IV.I.1.c)*

FINDING/DISCUSSION:

**Partially compliant.** (IV.I) SSO and JPS provided volumes of training materials. There were signed attendance sheets provided as well. However, it could not be determined from available data the percentage compliance with specific training modules. As was recommended during the last monitoring period, Defendants need to track who is required to attend specific training sessions and then indicate whether those staff did attend the required training. Additional training curricula were presented during this review period and generally looked positive. There was some modifications necessary for mental health training to focus more on practical knowledge required for non-clinical staff. Minor adjustments would result in strong training modules for all staff.

**Recommendations.** As stated in other areas of this monitoring report, the specific staff positions (e.g., jail deputies, sergeants) (all clinical staff or specific clinical staff) and specific training modules that will be required must be identified with training module number. Training compliance must then be reported by module number and the percentage of required staff who were compliant with the training. Some of the existing trainings do not map well onto the training requirements.

DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH MENTAL
HEALTH OR INTELLECTUAL DISABILITIES *(Section V)*

Role of Mental Health Staff in Disciplinary Process *(V.A)*

1. *The County's policies and procedures shall require meaningful consideration of the relationship of a prisoner's behavior to any mental health or intellectual disability, the efficacy of disciplinary measures versus alternative interventions, and the impact of disciplinary measures on the health and well- being of prisoners with disabilities. (V.A.1)*

2. *Prisoners who are alleged to have committed a rules violation shall be reviewed by a qualified mental health professional if any of the following apply: (V.A.2)*
   a) *Prisoner is housed in any Designated Mental Health Unit;*
   b) *Jail staff have reason to believe the prisoner's behavior was unusual, uncharacteristic, or a possible manifestation of mental illness;*
   c) *Prisoner is on the mental health caseload and may lose good time credit as a consequence of the disciplinary infraction with which he or she is charged.*

3. *If any of the above criteria is met, the qualified mental health professional shall complete the appropriate form and indicate: (V.A.3)*
   a) *Whether or not the reported behavior was related to mental illness, adaptive functioning deficits, or other disability;*
   b) *Whether the prisoner's behavior is, or may be, connected to any of the following circumstances:*
      i. *An act of self-harm or attempted suicide*
      ii. *A cel-19l extraction related to transfer to a medical/mental health unit or provision of involuntary treatment*
      iii. *Placement in clinical restraints or seclusion.*
   c) *Any other mitigating factors regarding the prisoner's behavior, disability, and/or circumstances that should be considered and whether certain sanctions should be avoided in light of the prisoner's mental health disability or intellectual disability, treatment plan, or adaptive support needs.*

**FINDINGS/DISCUSSION:**
**Non-compliant.** (V.A)The Defendants readily acknowledged in their Third Status Report that they were not compliant yet in this focused area. They continue to report that it is a priority and have committed to working on this during the next review period.

There were policies regarding Disciplinary measures and Use of Force for Prisoners with Mental Illness or Intellectual Disabilities that required revision to meet Consent Decree standards. Defendants still need to implement a formal process for considering mental health input in the disciplinary process to standardize the input and process of considering the detainees' mental health. The same is necessary for use of force incidents to decrease the number of incidents with people with mental illness or intellectual disabilities. This process stalled during the monitoring round as other areas progressed. Further work will be required in this area for compliance starting with formal policy development, training of all staff, and tracking.

## DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH MENTAL HEALTH OR INTELLECTUAL DISABILITIES

*Consideration of Mental Health Input and Other Disability Information in Disciplinary Process (V.B.1-7 below)*

1. *The County shall designate one Chief Disciplinary Hearing Officer for each jail facility, who shall be responsible for ensuring consistency in disciplinary practices and procedures.*

2. *The Disciplinary Hearing Officer shall ensure that prisoners are not disciplined for conduct that is related to their mental health or intellectual disability.*

3. *The Disciplinary Hearing Officer shall consider the qualified mental health professional's findings and any other available disability information when deciding what, if any, disciplinary action should be imposed.*

4. *The Disciplinary Hearing Officer shall consider the qualified mental health professional's input on minimizing the deleterious effect of disciplinary measures on the prisoner in view of his or her mental health or adaptive support needs.*

5. *If the Disciplinary Hearing Officer does not follow the mental health staff's input regarding whether the behavior was related to symptoms of mental illness or intellectual disability, whether any mitigating factors should be considered, and whether certain sanctions should be avoided, the Disciplinary Hearing Officer shall explain in writing why it was not followed.*

6. *Prisoners will not be subjected to discipline which prevents the delivery of mental health treatment or adaptive support needs, unless necessary for institutional safety.*

7. *Prisoners shall not be subject to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of self- injurious behavior.*

FINDINGS/DISCUSSION:
See findings on page 55 above. **Non-compliant.** (V.B.1-7) More work to be done in this area. A formalized process must be developed in policy and implemented following training of

both security and clinical staff.

DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH
MENTAL HEALTH OR INTELLECTUAL DISABILITIES

*Accommodations for Prisoners with Mental Health or Intellectual Disabilities During
the Disciplinary Process (V.C)*

1. *The County shall provide reasonable accommodations
   during the hearing process for prisoners with mental health
   or intellectual disabilities. (V.C.1)*
2. *The County shall take reasonable steps to ensure the provision
   of effective communication and necessary assistance to
   prisoners with disabilities at all stages of the disciplinary
   process. (V.C.2)*

FINDINGS/DISCUSSION:

**Non-compliant.** (V.C) See findings page 55 above. No formal process implemented at this time.
Policy still in development.

## DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH MENTAL HEALTH OR INTELLECTUAL DISABILITIES

*Use of Force for Prisoners with Mental Health or Intellectual Disabilities (V.D.1-7 below)*

1. *The County's Correctional Services Operations Orders shall include language that ensures meaningful consideration of whether a prisoner's behavior is a manifestation of mental health or intellectual disability.*

2. *For prisoners with a known mental health or intellectual disability, and absent an imminent threat to safety, staff shall employ de-escalation methods that take into account the individual's mental health or adaptive support needs.*

3. *The County's Correctional Services Use of Force policies shall include a definition and a protocol for a planned Use of Force that provides appropriate guidance for a planned Use of Force that involves a prisoner with mental health or intellectual disability.*

4. *Prior to any planned Use of Force, such as a cell extraction, against a prisoner with mental health or intellectual disabilities, there will be a "cooling down period," consistent with safety and security needs. This period includes a structured attempt by mental health staff (and other staff if appropriate), to de- escalate the situation and to reach a resolution without Use of Force. Such efforts, including the use of adaptive supports, will be documented in writing. Medical and/or mental health staff should be consulted if the purpose of the cell extraction is related to the delivery of treatment.*

5. *The County shall require video documentation for any planned Use of Force, absent exigent circumstances. Jail staff shall endeavor to record the specific actions, behavior, or threats leading to the need for Use of Force, as well as efforts to resolve the situation without Use of Force.*

6. *The County shall ensure the completion of supervisory review of Use of Force incidents, including video (for any planned Use of Force), interviews, and written incident documentation, in order to ensure appropriateness of Use of Force practices including de-escalation efforts. The County shall take corrective action when necessary.*

7. *The County shall review and amend as appropriate its policies on Use of Force, including its policies on Custody Emergency Response Team (CERT) and Cell Extraction Procedures.*

FINDINGS/DISCUSSION:

**Partially-compliant.** (V.D) While there has been some training curriculum provided regarding deescalation, it was not presented in context or explained. Policy development has been

forwarded to the SME for review during this process but that policy has not yet been reviewed. It will be prioritized by this SME.

**Recommendations.** This SME shall review the draft of this policy, the use of the WRAP restraint, and the use of mental health staff to deescalate so that all parties can engage in meaningful discussion regarding use of force.

TRAINING AND QUALITY ASSURANCE *(V.E)*

1.  *All custody staff, and mental health staff, shall be trained on the policies and procedures outlined herein that are relevant to their job and classification requirements. Custody staff will receive periodic training on identifying behaviors that may be manifestations of mental illness and other situations warranting a referral to mental health staff, including for a Rules Violation Mental Health Review or other mental health assessment.(V.E.1)*

2.  *All custody staff shall be trained on the identification of symptoms of mental illness, the provision of adaptive supports, and the use of de-escalation methods appropriate for prisoners with mental health or intellectual disabilities. (V.E.2)*

3.  *The County shall track the outcomes of all disciplinary hearings for prisoners who are on the mental health caseload or who have intellectual disabilities, including whether the recommendation of the mental health professional was followed. (V.E.3)*

4.  *The County shall track all Uses of Force (planned and reactive) involving prisoners who are on the mental health caseload or who have intellectual disabilities, including the number of Uses of Force and the number of cell extractions by facility. (V.E.4)*

5.  *The County shall implement a continuous quality assurance/quality improvement plan to periodically audit disciplinary and Use of Force practices as they apply to prisoners who are on the mental health caseload or who have intellectual disabilities. (V.E.5)*

FINDINGS/DISCUSSION:

**Partially Compliant.** (V.E) The County has an existing training program and CQI. The QM process was reported to have been revived. The last meeting of the mental health subcommittee was held in September 2020. The JPS Director of Mental Health was to be the Chair and a an meeting is scheduled for August 23rd. Defendants are phasing in subcommittees over time to help staff learn the QM process and how it impacts services. Defendants have also begun identifying more data systems that they can use as part of the QM process and developing new systems and/or reports. While the relevant policies have still not all been completed, they are targeted for completion. The policies will impact all of healthcare. It is not yet clear how QA/QI will impact correctional operations and what will be monitored. It is expected that the County will comply with the Remedial Plan and track those areas listed here at a minimum.

# MENTAL HEALTH FUNCTIONS IN SEGREGATION UNITS

<u>Segregation Placement Mental Health Review</u> *(VIII.C.1.a-e below)*

a) *All prisoners placed in a non-disciplinary Segregation housing unit and all prisoners housed in a Disciplinary Detention unit shall be assessed by a qualified mental health professional within 24 hours of placement to determine whether such placement is contraindicated. All prisoners subjected to Disciplinary Segregation conditions for 72 hours in their general population housing unit (i.e., confined to cell 23 hours per day) shall also be assessed by a qualified mental health professional no later than the fourth day of such placement.*

b) *Any decision to place prisoners with Serious Mental Illness in Segregation shall include the input of a qualified mental health professional who has conducted a clinical evaluation of the prisoner in a private and confidential setting (absent a specific current risk that necessitates the presence of custody staff), is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.*

c) *Mental Health Staff shall consider each prisoner's age and cognitive functioning as part of the Segregation Placement review. Staff shall receive training regarding the features of youth and brain development of young adults (i.e., 24 years old and younger) and the needs of individuals with intellectual disabilities.*

d) *If mental health or medical staff find that a prisoner has a Serious Mental Illness or has other contraindications to Segregation, that prisoner shall be removed from Segregation absent exceptional and exigent circumstances.*

e) *The County shall document and retain records of all Segregation Placement mental health evaluations, as described above. The County shall consult with Plaintiffs regarding such documentation, including the development of new forms where necessary.*

FINDINGS/DISCUSSION: (VIII.C)

**Non-compliant.** This has remained a challenging area for Defendants. Mental health staff have experienced difficulty understanding the difference between a pre-placement screening and mental health assessment for disciplinary purposes. Five records were randomly selected of detainees believed to be mental health participants placed in segregation. Similar to this assessment during the last monitoring round, when those medical records were reviewed, there were in fact no mental health problems identified in the chart and no mental health contacts. It was

unclear if the documentation could not be located or if they had been misidentified. Staff did not appear to have any greater understanding of this process during this round and all staff would benefit from a finished policy and training. This was not something that many of the providers had prior experience with (VIII.C.1.d).

## MENTAL HEALTH FUNCTIONS IN SEGREGATION UNITS

<u>Segregation Rounds and Clinical Contacts</u> *(VIII.C.2)*

- *A qualified mental health or medical professional shall conduct check- ins at least once a week, to assess and document the health status of all prisoners in Segregation, and shall make referrals as necessary. The check-in shall include a brief conversation with each prisoner, a visual observation of the cell, and an inquiry into whether the prisoner would like to request a confidential meeting with a mental health or medical provider. Steps shall be taken to ensure effective communication, as well as auditory privacy consistent with security needs. When a prisoner in Segregation requests a confidential meeting with a mental health or medical provider, or the medical or mental health professional identifies a mental health or medical need, staff shall make appropriate arrangements to include triage, examination and treatment in an appropriate clinical setting. In such cases, staff shall give the prisoner the opportunity to complete a health care request but will otherwise initiate a referral without requiring the prisoner to complete a request form.(VIII.C.2.b)*

<u>Response to Decompensation in Segregation</u> *(VIII.C.3)*

- *If a prisoner in Segregation develops signs or symptoms of mental illness where such signs or symptoms had not previously been identified, suffers deterioration in his or her mental health, engages in self-harm, or develops a heightened risk of suicide, the prisoner shall immediately be referred for appropriate assessment and treatment from a qualified mental health professional who will recommend appropriate housing and/or programming. (VIII.C.3.a)*
- *Jail staff shall follow a mental health recommendation to remove a prisoner from Segregation unless such removal poses a current safety risk that is documented. In such a case, the Commander or management-level designee shall be notified and staff shall work to remove the prisoner from Segregation and secure a placement in an appropriate treatment setting at the earliest possible time. (VIII.C.3.b)*

FINDINGS/DISCUSSION:

**Partially compliant.** It did appear that detainees were receiving clinical rounds in segregation. There was one case reviewed where the detainee was having a difficult

time adjusting but he was subsequently moved. It was unclear if he was moved because of any mental health input or simply because of the frequent movement that occurs for many of these detainees.

## MENTAL HEALTH FUNCTIONS IN SEGREGATION UNITS

*Placement of Prisoners with Serious Mental Illness in Segregation (VIII.D)*

1. *Prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit (2P, IOP, OPP) will not be placed in Segregation, but rather will be placed in an appropriate treatment setting – specifically, the inpatient unit or other Designated Mental Health Unit providing programming as by JPS in their program services booklet. (VIII.D.1)*

2. *In rare cases where a prisoner with a mental health condition meeting criteria for placement in a Designated Mental Health Unit presents an immediate danger or significant disruption to the therapeutic milieu, and there is no reasonable alternative, such a prisoner may be housed separately for the briefest period of time necessary to address the issue, subject to the following: (VIII.D.2)*

   a) *The prisoner shall receive commensurate out-of-cell time and programming as described in Exhibit A-2 (including for IOP and OPP, 10 hours/week of group treatment/structured activities, 7 hours/week unstructured out-of-cell time, weekly individual clinical contact) with graduated programming subject to an individualized Alternative Treatment Program.*

   b) *The prisoner shall receive the following:*

      i. *As part of the weekly confidential clinical contact, the clinician shall assess and document the prisoner's mental health status and the effect of the current placement on his or her mental health, and determine whether the prisoner has decompensated or is at risk of decompensation.*

      ii. *The weekly check-ins described in Section VIII.C.2.b shall supplement, and not be a substitute for, the weekly treatment session described herein.*

      iii. *Treatment provided in the least restrictive setting that is appropriate based on the prisoner's circumstances.*

      iv. *Privileges commensurate with the Designated Mental Health Unit program, unless modified in an Alternative Treatment Program based on individual case factors that are regularly reviewed.*

      v. *Daily opportunity to shower.*

FINDINGS/DISCUSSION:

**Partially compliant.** A number of cases reviewed involved detainees on "Alternative

Treatment Program" without clear indication as to the rationale. Mental health staff did work actively to remove the detainee from this Alternative Treatment Program (ATP) and they were generally successful. This most often occurred at RCCC IOP, the identified IOP where more violent segregation inmates would be housed. There was a significant degree of movement for detainees that continued through this monitoring period and made it difficult to determine what had occurred. These moves were rarely explained in the medical chart documentation. There appeared to be a more concerted effort to remove patients from ATP status during this monitoring period. This was consistent with staff interviews as well.

> 3. *A prisoner with Serious Mental Illness requiring restraints (e.g., handcuffs, belly chains, etc.) shall not be denied clinically indicated group or individual treatment due to security factors, absent exceptional circumstances that are documented. Prisoners with Serious Mental Illness housed in Segregation who require restraints when out of cell shall have the opportunity to work their way out of restraints through graduated programming subject to an individualized Alternative Treatment Program. (VIII.D.3)*

FINDINGS/DISCUSSION:

A large number of detainees (58) continued to be placed in segregation/restrictive housing despite a diagnosis of serious mental illness. While the mental health clinician did advocate for some to be moved out of the unit, in most cases the patient was not moved. When there was documentation that the clinician had requested a move, the patient was moved so it was unclear if the problem was with the clinician, bed space or some other point in the system. Many of the contacts appeared to occur cell front without a reason for the non-confidential contact stated. The clinician needed to be reminded of the requirement for confidential contact and the overriding purpose of those contacts.

QUALITY ASSURANCE, MENTAL HEALTH CARE

1. The JPS Medical Director, the JPS Program Manager, jail administrators, and the medical psychiatric, dental, and nursing directors, or appropriate designees, will attend and participate in this process at a minimum of every quarter. Formal minutes will be taken and maintained whenever the committee convenes.

2. The mental health care quality assurance plan shall include, but is not limited to, the following:

    a) Intake processing;
    b) Medication services;
    c) Screening and assessments;
    d) Use of psychotropic medications;
    e) Crisis response;
    f) Case management;
    g) Out-of-cell time;
    h) Timeliness of clinical contacts;
    i) Provision of mental health evaluation and treatment in confidential settings;
    j) Housing of inmates with SMI, including timeliness of placements in higher levels of care and length of stay in various units;
    k) Number of commitments pursuant to Welf. & Inst. Code § 5150, *et seq.*;
    l) Use of restraint and seclusion;
    m) Tracking and trending of agreed upon data on a quarterly basis;
    n) Clinical and custody staffing;
    o) Morbidity and mortality reviews with critical analyses of causes or contributing factors, recommendations, and corrective action plans with timelines for completion; and
    p) Corrective action plans with timelines for completion to address problems that arise during the implementation of this Remedial Plan and prevent those problems from reoccurring.

3. The County will conduct peer and supervisory reviews of all mental health staff and professionals at least annually to assess compliance with policies and procedures and professional standards of care.

FINDING/DISCUSSION:

**Partial Compliance**. Mental health had only recently reestablished its subcommittee. This expert will attend a meeting remotely to observe the process. It is not clear that staff have been appropriately trained in QM and the expectations for subcommittees.

**Recommendations.** This should continue to be a priority for mental health. Incorporating data tracking should assist in modifying problematic practices and helping to secure resources for mental health. It is critical that data tracking systems continue to be developed and that there be a

staff member assigned to monitor and integrate that data so that it can be used to shape programming and service delivery.

CONCLUSION

The defendants have made progress in certain areas related to mental health treatment since the Remedial Plan has gone into effect. While those efforts have been stalled at times by the continuing pandemic, there have been areas where improvements were noted. The progress has been most seriously hampered by serious deficiencies in adequate treatment space and staffing challenges. While the physical plant provides the most obvious impediment to providing adequate care, there is also a failure of staff to recognize where small adjustments could improve service delivery.

The correctional staff, particularly at RCCC, have taken advantage of "low hanging fruit" and worked with mental health to improve confidential space for mental health treatment. All staff need to work collaboratively to problem-solve creative solutions to improve service delivery to detainees. The third status report discusses some of those efforts which will hopefully be maintained. While there has not been as much progress as one might hope, the efforts of staff should be commended and encouraged. While there has been significant changes in leadership, it is this expert's hope that stability in supervisory staff will now prevail. There have been so many staffing changes in such a short period of time that the observer is left even more concerned as to what underlies these changes and whether they are a sign of something more troublesome.

The space study has great potential to assist the Defendants in determining what must occur to comply with the Consent Decree. Certainly, the current physical plant and staffing limitations create significant hurdles to compliance. It is hoped that all parties can work collaboratively moving forward. There are multiple dedicated staff who want to provide constitutionally adequate care and assist the detainee population in adjusting to incarceration as well as improving functioning so that they may avoid returning to jail. There are also numerous line staff who have spent a great deal of time thinking about this case and have some reasonable ideas to improve care and service delivery. It is hoped that the various chains of command will spend time on the units and solicit input by their staff. They are a wealth of information that seems quite reasonable and as though it could be effective.

In light of the limited progress during this monitoring round, it is recommended that the SMEs continue to work collaboratively with their counterparts in mental health and medical. Defendants had many staff who appeared committed to providing quality care for those in their custody. Utilizing the energy and knowledge of these staff to drive improvements and solutions seems to have the greatest potential positive impact.

# APPENDIX A

### *Mays v. County of Sacramento*
### MENTAL HEALTH and SUICIDE PREVENTION CONSENT DECREE PROVISIONS

Document Request: Please provide each item in its own file clearly labeled with the name of the contents (e.g., Suicide Prevention Policy). Any folders containing multiple similar items should also be labeled clearly (e.g., Suicide Prevention, Restrictive Housing, Treatment Teams). Please note that mental health services include medication management. If there are no applicable documents for an item, please provide a single page that clearly indicates "no applicable documents for this item" on a word document for that file.  It is possible that as a result of the documents received, additional documents may be requested.

**NOTE**:
   A.  Please provide a narrative description of the mental health program, improvements that have been implemented, have target dates, or are simply "in process"). Please identify any barriers to care as well as accomplishments since the last monitoring report.


1) **Table of Contents** for any updated policies provided for the Sacramento County Sheriff's Department (SCSD) Policy and Procedure Manual (e.g., policies, local operating procedures, operations memoranda);

2) Any updated SCSD and Adult Correctional Health P**olicies**, procedures, and directives relevant to suicide prevention, mental health services, and detainees/inmates receiving mental health services (e.g., disciplinary, use of force, restrictive housing, clinical documentation, tracking);

3) Any updated Jail Psychiatric Services P**olicies**, procedures, and directives relevant to suicide prevention and mental health services;

4) All DRAFT **Policies**, procedures, and directives relevant to suicide prevention, mental health services, and detainees/inmates receiving mental health services (e.g., disciplinary, use of force, restrictive housing, clinical documentation, tracking);

5) Any updated and DRAFT intake screening, health evaluation, mental health assessment, treatment planning and any other **Forms** utilized for the identification and treatment of suicide risk and mental illness;

6) Any new or updated **Training Curricula** (include draft training) regarding pre-service and in-service staff training, as well as curricula, handouts, etc. regarding suicide prevention, mental illness, and mental health services (since the last review report);

6a) Training **Compliance** for the monitoring period reported in raw numbers by discipline/staff category and course as follows(excludes non-specialized Suicide Prevention training, see No. 12 below):

| STAFF TITLE (Sgt, psychiatrist, etc) | COURSE | REQUIRED ATTENDEES (number) | NUMBER ATTENDED* | % compliant |
|---|---|---|---|---|
| | | | | |
| | | | | |

*this figure should include only the number of required attendees who were present throughout the training.

A. Indicate whether training was in-person (e.g., in a training space with attendees present), virtual interactive (e.g., virtual but presence is monitored live and attendees can ask questions), on-the-job (e.g., shift briefing, staff meeting), or on their own (e.g., staff instructed to review policies or other training materials and submit signed form).

7) Any new or updated training curriculum (including DRAFT) regarding additional suicide prevention and mental health training provided to custody officers assigned to the **Designated Mental Health Units**;

8a) Training compliance for the monitoring period reported in raw numbers by discipline/staff category and course (additional training for MH designated unit correctional staff) as follows:

| STAFF TITLE (Sgt, officer, etc) | COURSE | REQUIRED ATTENDEES (number) | NUMBER ATTENDED* | % compliant |
|---|---|---|---|---|
| | | | | |
| | | | | |

*this figure should include only the number of required attendees who were present throughout the training.


8) Any new or updated **Training Curriculum** (including DRAFT) regarding additional training provided to medical and mental health staff regarding development of **Suicide Risk Assessments and Treatment Plans** for suicidal inmates specifically and mental health caseload inmates generally;

8a) **Training Compliance** for the monitoring period reported in raw numbers by discipline/staff category and course (additional training for MH designated unit medical/MH staff) as follows:

| STAFF TITLE (nurses, clinicians, etc) | COURSE | REQUIRED ATTENDEES (number) | NUMBER ATTENDED* | % compliant |
|---|---|---|---|---|
| | | | | |
| | | | | |

\*this figure should include only the number of required attendees who were present throughout the training.

8b) Indicate whether the staff are **Licensed**. If not licensed, please indicate who the clinical supervisor is in each case. This can be provided in a separate document if that eases the burden

9) **Census** of all detainee/inmates. These should be broken down by level of care.

9a) Census for each facility. Total numbers at Main Jail and RCCC on the day that this request is completed.

9b) Next, please list the total numbers in any specialized custodial unit (e.g., segregated/restricted housing, protective custody, TSEP, programming units, mental health units (e.g., unit 2, IOPs). If possible, please break down those on mental health caseload

9c) Any modified, PROPOSED or changes in locations of all designated areas utilized to house inmates on suicide precautions and mental health designated units (current and proposed);

10) Any new or updated policies, procedures, directives (including DRAFT) related to Q**uality Assurance and Continuous Quality Improvement** in the delivery of mental health services and suicide prevention;

11) **Minutes** from Mental Health continuous quality improvement and Suicide Prevention Task Force meetings, as well as any other regularly scheduled multidisciplinary meetings related to suicide prevention, mental health and quality assurance for January 2021 to the present.

11a) Include minutes and audit results from Mental Health Action Plan item F.1.

12) Documentation of overall staff completion rates for Suicide Prevention [**only Provision VII. B)1 and B)2]** and First Aid/CPR according to the following format:

_____ % of all officers received suicide prevention training during previous 12 months.
_____ % of all medical staff received suicide prevention training during previous 12 months
_____ % of all mental health staff received suicide prevention training during previous 12 months
_____ % of all officers currently certified in CPR
_____ % of all medical staff currently certified in CPR

13) Entire **Case Files** (jail, medical, and mental health), investigative reports, and mortality reviews of all inmate suicides from January 2021 to present;

14) Total number of **Serious Suicide Attempts** (incidents resulting in medical treatment and/or hospitalization) for the period of January 2021 to present, as well as all documentation of such incidents by the Suicide Prevention Task Force;

15) **Listing** of inmates on **Suicide Precautions** from March 1, 2021 to the present;

16) **Listing** of all inmates confined in **Safety Cells** during the month of **May 2021** (include **Length of Stay**).

17) **Listing** of current inmates receiving **Mental Health Services** by level of care, FOSS level, housing, and diagnosis (can provide one spreadsheet that incorporates all of these aspects);

18) **Mental Health Treatment Schedules** by unit and facility;

      18a) Calendar or tracking of groups canceled since the first monitoring period report and reason for cancellation.

      18b) Any reports tracking or documenting the amount of structured therapeutic activity provided at each level of care scheduled, offered, and attended treatment.

19) Current **Mental Health Staffing** allocations and any proposed additions:

    A.  Provide current mental health staffing in grid form by program. Example:

| *EXAMPLE:* | Allocated | Licensed (Y/N) | Filled | % time in this area (half time in IOP would be reflected as .5 filled | Functional Vacancy (divide unfilled positions by allocated positions and that is your functional vacancy rate) |
|---|---|---|---|---|---|
| IOP - psychiatrist | | | | | |
| IOP – psychologist | | | | | |
| IOP – social worker | | | | | |
| IOP – psychiatric nurse practitioner | | | | | |
| IOP – other | | | | | |
| Unit 2 – psychiatrist | | | | | |
| Unit 2 - psychologist | | | | | |
| Unit 2 – nursing staff | | | | | |
| *Continue on until all programs and mental health  staff are included* | | | | | |

20) **Schedule** (weekly/monthly/quarterly) of **multidisciplinary Treatment Team meetings** provided to  inmates receiving mental health services;

      20a) calendar and/or chronological listing of MDTs canceled and reason for cancellation.

21) If applicable (and separate from Suicide Prevention and Mental Health Action Item Tools of March and April 2021), any **Defendants' Status Report** since the last monitoring report in *Mays v. County of Sacramento;*

22) Any **Audits**, logs, tracking or reports on **Mental Health Compliance** with the remedial plan for individual and group treatment, referral tracking and compliance.

23) A copy of the M**ental Health Tracking Log/Report** for referrals to mental health. This log should include whether the referral was emergent, urgent, or routine, detainee name and number, date of referral and date seen.

24) Any **Audits**, logs, reports, or meeting minutes from **Medication Management**, specifically psychotropic mediations.

     24a) list of all detainees who have been on psychotropic medication for at least three months.

     24b) list of all detainees who have been under forced medication orders due to mental health reasons.

25) any **Logs**, audits, or minutes from quality management meetings regarding **Release Planning** services offered.

26) **Minutes** from any **Therapeutic Space Meetings**; documentation (e.g., sign in sheets) to provide proof of practice for attendance.

**27) In Response to Suicide Prevention Action Item Tool (4/28/21):**

    a.  Provide Lessen Plan and Proof of Compliance as indicated for **Provision B) 2.1**

    b.  Provide Lessen Plan and Proof of Compliance as indicated for **Provision B) 4.1**

    c.  Provide Lessen Plan and Proof of Compliance as indicated for **Provision B) 4.2**

    **d.**  Provide Lessen Plan and Proof of Compliance as indicated for **Provision E) 3.4**

**28) In Response to Mental Health Action Tool (4/28/21):**

    a. Provide update on Group Progress Note testing stage and findings (See A.2.)

    b. Provide Policy and Proof of Compliance as indicated for Provision B (See B.1 and B.2)

    c. Provide Lesson Plan and Proof of Compliance for Provision C (see C.1 through C.3)

    d. Provide Proof of Compliance for Provision E (See E.1)

    e. Provide Lesson Plan and Proof of Compliance for Provision G.1

Submitted on May 11, 2021

FOLLOW-UP QUESTIONS/REQUESTS
POST-SITE VISIT
July1, 2021
*Unless stated specifically, the monitoring round shall be 1/1/21 to 6/1/21.*

1.  Use of Force (UOF)
    a.  Total number of UOF incidents for the period of January 1, 2021 to June 1, 2021. Separate incident total by facility (e.g., MJ reported 125 UOF incidents while RCCC reported 200 incidents).
    b.  For each facility, report the total number of UOF incidents broken down by those receiving mental health services and those not receiving mental health services.
    c.  Select 10 detainees receiving mental health services from each facility (for a total of 20) and send the incident/UOF packages.
        i.   Selection for the 10 detainees where the UOF incident occurred at THAT facility. The current location of the detainee is irrelevant for this item.
        ii.  Use the following random numbers to select cases:

|  | RCCC | MJ |
|---|---|---|
| Random selection based on random number generator | 8, 16, 25, 36, 39, 54, 57, 76, 89, 95 | 6, 13, 16, 21, 31 77, 83, 94, 95, 98 |
|  |  |  |

        iii. With these tables, a RCCC would pull incident package 8, incident package 16 and so on. The entire packet should be scanned (if reports cannot simply be downloaded) and placed on the shared drive with a notification to me.
        iv.  As with RCCC above, MJ would provide complete package for case 6, case 13, and so on.

2.  Out of cell time data reports for all IOP detainees (male and female) for the months of April and May 2021, and for 2P inpatient patients. The report should be separated by facility.

| UOF | MJ | RCCC | Comments |
|---|---|---|---|
| Male IOP |  |  |  |
| Female IOP |  |  |  |
| Comparison data from non-MH unit, if possible (note unit(s) used) |  |  |  |
| Male/female inpatient |  | **n/a** |  |

3.  Schedules for available treatment space. During the site visit I was told that the available confidential space (e.g., classrooms) was so problematic that they had to schedule contacts in that space. Please provide the schedules for each unit, regardless of unit function.

4.  Revised patient lists. The lists were not to include duplicates but each detainee is included at least 3 times. You do not have to correct the old list as it may be easier to generate new lists/reports and ensure that there is no redundance. (this refers to #9). Please just clarify the date of the data in the various items.

*Submitted July 11, 2021*

**APPENDIX B**

APPENDIX B

| Mental Health Contract Augmentation | | | |
|---|---|---|---|
| Fiscal Year | Program Additions | Facility | Staff Augmentation |
| FY 2017/18 | 20 Intensive Outpatient Program (IOP) Beds (male) | Main Jail | LCSW Supervisor (1.0) SW1 (4.0) Psychologist II (1.0) Psychiatrist/NP (10%) |
| FY 2018/19 (Midyear) | 24/7 Licensed Clinical Social Worker (LCSW) Coverage | Main Jail | LCSW Supervisor (1) LCSW (4) |
| FY 2019/20 | 15 IOP Beds (female) | Main Jail | LCSW Supervisor (.40) Psychologist II (.20) LCSW (.50) SW 1 (3) NP/Psychiatrist (.40) |
| | 24 IOP Beds (male) | RCCC | LCSW Supervisor (.50) Psychologist II (.20) LCSW (2.0) SWI (2.5) HUSC (1.0) NP/Psychiatrist (.80) |
| | 24/7 LCSW Coverage | RCCC | LCSW Supervisor (1.0) LCSW (3.0) |
| FY 2020/21 (Midyear) | Enhanced Outpatient Mental Health Services for the Outpatient Psychiatric Pod. Includes mental health services, medication evaluation and monitoring, case management, and discharge planning. Adds a new level of service. Will serve approx. 125 patients at any given time. | | LCSW Supervisor (1.0) LCSW (2.0) SWI (2.5) |

| Mental Health Contract Augmentation | | | |
|---|---|---|---|
| Fiscal Year | Program Additions | Facility | Staff Augmentation |
| FY 2021/22 | Enhanced outpatient (EOP) mental health services in the Outpatient Psychiatric Pod (OPP) will be expanded to provide services to an additional 150 patients requiring intensive services.  This expansion will bring the total patients served to 275 patients from the 125 patient program previously approved in the FY 2020/21 budget. | | LCSW Supervisor (1.0)<br>LCSW (3.0)<br>SWI (8.0)<br>RN (.50) |

**APPENDIX C**

APPENDIX C
7/30/21

227 patients on the MH caseload are pending placement.

| Unit/Program | Patients on Waitlist |
|---|---|
| JBCT | 107 (47%) |
| Transfer to a State Hospital | 84 (37%) |
| Intensive Outpatient Program | 19 (8%) |
| Acute Psychiatric Unit | 17 (7%) |
| Total | 227 (100%) |
| **Jail Based Competency Treatment (JBCT)** | |
| Program | Patients |
| Males – Felony | 96 (90%) |
| Females | 6 (6%) |
| Male – Misdemeanor | 5 (5%) |
| Total | 107 (100%) |
| **Intensive Outpatient Program** | |
| Days on Waitlist | Patients |
| 2 | 2 |
| 14 | 5 |
| 20 | 2 |
| 22 | 1 |
| 25 | 2 |
| 27 | 1 |
| 35 | 1 |
| 37 | 1 |
| 52 | 1 |
| 56 | 1 |
| 63 | 1 |
| 80 | 1 |
| Total | 19 |

| Acute Psychiatric Unit | |
|---|---|
| Days on Waitlist | Patients |
| 1 | 4 |
| 2 | 4 |
| 3 | 6 |
| 4 | 2 |
| 6 | 1 |