# <u>Consent Decree in Mays et al v. County of Sacramento</u>

# *Second* Monitoring Report of Suicide Prevention Practices

Submitted by:

Lindsay M. Hayes, Court-Appointed Expert

September 10, 2021

# Introduction

The Sacramento County Jail System consists of the Main Jail located in downtown Sacramento and the Rio Cosumnes Correctional Center (RCCC) located in Elk Grove. The Main Jail has a rated capacity for 2,396 inmates, and the RCCC is rated for 2,259 inmates. As of May 13, 2021, the Mail Jail population was 1,691 inmates, whereas the RCCC held 1,295 inmates.  The jail system is operated by the Sacramento County Sheriff's Office (SCSO), Medical services are provided to inmates through the County Department of Health Services' Adult Correctional Services (ACH), whereas mental health services are provided to inmates by Jail Psychiatric Services (JPS) through a contractual agreement with the University of California-Davis.

In July 2018, the Plaintiffs (Lorenzo Mays, Ricky Richardson, Jennifer Bothun, Armani Lee, Leertese Beirge, Cody Garland, and other class members) filed a federal class-action lawsuit (*Mays et al v. County of Sacramento*, Case 2:18-cv-02081-TLN-KJN) in the United States District Court, Eastern District of California, alleging constitutional violations for medical and mental health care, suicide prevention, discrimination against people with disabilities, and use of restrictive housing (segregation) in the Sacramento County Jail System. Legal counsel for the parties subsequently negotiated individual remedial plans pertaining to medical care, mental health care, and suicide prevention, and those individual plans were then incorporated into a single global remedial plan within the proposed *Consent Decree*. It was further agreed that issues pertaining to discrimination against people with disabilities and use of restrictive housing within the jail system would be monitored by Plaintiffs' counsel. The proposed *Consent Decree* was filed in June 2019 and approved by the federal court on January 13, 2020. Three court-appointed experts (Madeleine LaMarre, Mary Perrien, Karen Saylor, and Lindsay Hayes) were subsequently assigned to monitor the implementation of the Consent Decree. Exhibit A, located at pages 15 through 119 of the *Consent Decree* contains the agreed-upon Remedial Plan for *Mays et al v. County of Sacramento*.

On July 7, 2021, the Defendant filed its *Third* Status Report which was required pursuant to the Consent Decree to "1) include a description of the steps taken by defendant to implement each provision set forth in the remedial plan; and 2) specifies provisions of the remedial plan which have not yet been implemented. With respect to the provisions of the Remedial Plan not yet implemented, Defendant's Status Report shall (i) describe all steps taken by the Defendant toward implementation; (ii) set forth with as much specificity as possible those factors contributing to non-implementation; and (iii) set forth a projected timeline for anticipated implementation based on the best information available to Defendant" (at pages 3-4).  Status reports are required to be submitted to Plaintiffs' counsel and the four court-appointed experts every 180 days.

## Monitoring Compliance with the *Consent Decree*

The *Consent Decree* offers limited guidance to the court-appointed experts regarding the measurement of compliance with the Remedial Plan, simply stating that the Defendant is in substantial compliance or not in substantial compliance with an individual provision. The term "substantial compliance" was not defined. The *Consent Decree*, however, does state that the "Defendant may, after conferring with Plaintiffs' counsel, request a finding by the Court that the Defendant is in substantial compliance with one or more components of the Remedial Plan and

has maintained such substantial compliance for a period of at least 12 months" (at page 11). In an effort to more accurately measure compliance with the provisions of this *Consent Decree*, as well as to provide guidance to the parties, the court-appointed experts subsequently decided to create a three-tier system for the measurement of compliance. Each of the experts have utilized such a system in prior federal court monitoring assignments. As such, the court-appointed experts agreed to the following definitions for compliance measurement for each of the provisions in this Remedial Plan:

> **Substantial Compliance** indicates that the Defendant has achieved compliance with most or all components of the relevant provision of the Remedial Plan for both the quantitative (e.g., 90% performance measure) and qualitative (e.g., consistent with the larger purpose of the *Decree*) measures. If an individual compliance measure necessitates either a lower or higher percentage to achieve substantial compliance, it will be so noted by the expert. Compliance has been sustained for a period of at least 12 months.

> **Partial Compliance** indicates that compliance has been achieved on some of the components of the relevant provision of the Remedial Plan, but significant work remains. A minimum requirement is that for each provision, relevant policies and procedures must be compliant with Remedial Plan requirements, contain adequate operational detail for staff to implement the policy, staff trained, and the County has begun implementation of the policy.

> **Non-Compliance** indicates that most or all of the components of the relevant provision of the Remedial Plan have not yet been addressed and/or have not yet been met.

# Second Monitoring Report

This expert was appointed to monitor the suicide prevention provisions of the *Consent Decree*. There are **63** suicide prevention provisions listed under Section VII (pages 41 through 50) of the Remedial Plan.

Consistent with the *First Monitoring Report* filed January 19, 2021, this *Second Monitoring Report* is formatted to present each provision, followed by the provision's current status or rating (substantial, partial, or non-compliance) as determined by the court-appointed expert, a discussion section which provides justification for each rating, recommendations offered to raise each status to substantial compliance, and the evidentiary basis utilized in monitoring each provision. In addition to the documents listed below, this report is based upon the expert's on-site assessment conducted on June 14-15, 2021.

<u>Documents Requested</u>

In May 2021, this expert and mental health expert jointly submitted a suicide prevention and mental health document request to the Defendant. The request included the following suicide prevention documents:

1) Table of Contents for the Sacramento County Sheriff's Office (SCSO) updated Policy and Procedure Manual;

2) All current SCSO and ACH policies, procedures, and directives relevant to suicide prevention, mental health services, and detainees/inmates receiving mental health services (e.g., disciplinary, use of force, restrictive housing, tracking);

3) All current JPS policies, procedures, and directives relevant to suicide prevention and mental health services;

4) All draft policies, procedures, and directives relevant to suicide prevention, mental health services, and detainees/inmates receiving mental health services (e.g., disciplinary, use of force, restrictive housing, tracking);

5) All current and draft intake screening, health evaluation, mental health assessment, treatment planning and any other forms utilized for the identification of suicide risk and mental illness;

6) Training curriculum regarding pre-service and in-service staff training, as well as curricula, handouts, etc. regarding suicide prevention, mental illness, and mental health services;

7) Draft training curriculum regarding pre-service and in-service staff training, as well as curricula, handouts, etc. regarding suicide prevention, mental illness, and mental health services;

8) Training curriculum (including draft) regarding additional suicide prevention and mental health training provided to custody officers assigned to the Designated Mental Health Units;

9) Training curriculum (including draft) regarding additional training provided to medical and mental health staff regarding development of suicide risk assessments and treatment plans for suicidal inmates specifically and mental health caseload inmates generally;

10) Policies, procedures, directives (including draft) related to quality assurance and continuous quality improvement in the delivery of mental health services and suicide prevention;

11) Minutes from Suicide Prevention Subcommittee meetings, as well as any other regularly scheduled multidisciplinary meetings related to suicide prevention, mental health and quality assurance for January 2021 to the present.

12) Documentation of overall staff completion rates for suicide prevention, first aid/CPR, and mental health training presented as follows:

_____ % of all officers received suicide prevention training during previous 12 months
_____ % of all medical staff received suicide prevention training during previous 12 months
_____ % of all mental health staff received suicide prevention training during previous 12 months
_____ % of all officers currently certified in CPR
_____ % of all medical staff currently certified in CPR

13) Entire case files (jail, medical, and mental health), investigative reports, and mortality reviews of all inmate suicides from January 2021 to present;

14) Total number of serious suicide attempts (incidents resulting in medical treatment and/or hospitalization) for the period of January 2021 to present, as well as all documentation of such incidents by the Suicide Prevention Subcommittee;

15) Listing of inmates on suicide precautions from March 1, 2021 to the present;

16) Listing of all inmates confined in safety cells during the month of May 2021 (include length of stay);

17) Defendant's *Third* Status Report in *Mays v. County of Sacramento*, as well as updated *Suicide Prevention Action Item Tool*.


<u>Documents Received and Reviewed</u>

Sacramento County's *Third* Status Report (July 7, 2021).

*Suicide Prevention Action Item Tool*, March 24, 2021, April 28, 2021, and May 24, 2021.

Meeting minutes from the Suicide Prevention Subcommittee, April 8, 2021, June 3, 2021, and August 5, 2021.

Medical chart review of 14 inmate-patients.

Safety Cell Logs, Length of Stay, May 2021.

The following draft policies:

- ACH's Policy No. 07-xx, Suicide Prevention, draft June 24, 2021.
- ACH Policy No. 07-04, Suicide Prevention Program, draft June 23, 2021.
- ACH's Policy No. 09-03, Use of Safety Suits, draft May 24, 2021.
- ACH's Policy No. 07-03, Patients in Safety Cells, draft February 24, 2021.
- ACH's Policy No. 01-15, Suicide Prevention Subcommittee, draft July 9, 2021.
- ACH's Nurse's Intake First screening template, draft July 15, 2021.
- ACH's Policy No. 02-05, Suicide Prevention Policy, combined policy that integrates safety suits, draft July 27, 2021.

The following training documents:

- "19.6 Behavioral Health: Suicide Prevention Lesson Plan (ACO), four-hours, revised January 2021.

- "19.6 Suicide Prevention," 23-slide PowerPoint presentation.

- "Suicide Prevention: An Overview," 42-slide PowerPoint presentation.

During May through September 2021, the expert returned extensive comments to the County regarding the above reference suicide prevention polices and training documents.

# Conclusion

The *First Monitoring Report* resulted in 53 of the 63 total suicide prevention provisions in Partial Compliance, with 10 suicide prevention provisions in Non-Compliance. No provisions were in Substantial Compliance. As shown in the table below, this *Second Monitoring Report* resulted in 52 of the 63 total suicide prevention provisions in Partial Compliance, with 11 suicide prevention provisions now in Non-Compliance. No provisions were in Substantial Compliance. Given the fact that the County has had well over a year to demonstrate measurable compliance (with the federal court approving the *Consent Decree* on January 13, 2020), these findings continue to be very disappointing.

| Substantive Area for Suicide Prevention | Total Provisions | Substantial Compliance | | Partial Compliance | | Non-Compliance | |
|---|---|---|---|---|---|---|---|
| | | # | % | # | % | # | % |
| **1ˢᵗ Monitoring Report** | 63 | 0 | 0% | 53 | 84% | 10 | 16% |
| **2ⁿᵈ Monitoring Report** | 63 | | | 52 | 83% | 11 | 17% |

At the suggestion of counsel for the Plaintiffs and Defendant following issuance of the *First Monitoring Report* to create several "focus areas" to assist the County in implementation of the suicide prevention provisions, this expert would again repeat the five focus areas that are not only critically important to implementing and sustaining compliance, but are also relatively easy to resolve. They are:

> First, almost all of the 63 suicide prevention provisions in the Remedial Plan require either development of, or revision to, *suicide prevention policies*. Although challenging to complete in the next few months, policy development should be the primary focus.

> Second, several provisions (B.5, M.2, and N.1 thru 7) address the use of "safety suits" or *smocks*. These provisions could quickly come into substantial compliance if the current utilization of safety smocks in the 2P Acute Inpatient Unit practices are consistently practiced in both the safety/administrative segregation and SITHU cells.

> Third, several provisions (C.2, D.1, and K.3) address the requirement for reasonable *privacy and confidentiality* during the intake and assessment processes to identify and manage suicidal inmates. The County should focus on developing immediate, interim measures to ensure such privacy and confidentiality, rather than focusing on preliminary plans for "jail annex" construction or attempting to mitigate the problem by purchasing "white noise" machines.

> Fourth, several provisions (J.1 thru J.5) address the requirement for the *observation of suicidal inmates*, and each of these can quickly come into substantial compliance through policy revision that includes prohibition of ordering closed-circuit television monitoring.

> Fifth, similar to the proper use of safety smocks, there are several provisions (M.1 thru M.3) that address *property and privileges* afforded to suicidal inmates. These provisions could quickly come into substantial compliance if the current utilization of property and privileges afforded to suicidal patients in the 2P Acute Inpatient Unit were consistently practiced for suicidal patients in both the safety/administrative segregation and SITHU cells.

Finally, as recommended in the *First Monitoring Report* and repeated here again under **Provision R) 5. Quality Assurance and Quality Improvement**, given the enormity of responsibility to implement and sustain approximately 63 suicide prevention provisions of this *Consent Decree's* Remedial Plan, the Suicide Prevention Subcommittee (which was reinstated on April 8, 2021 and met only three times to date) or a similar multidisciplinary continuous quality assurance committee should meet more frequently than quarterly (i.e., monthly) and better focus on ensuring that all

suicide prevention provisions are implemented and sustained, including the five focus areas offered above.

As an introduction to the findings presented in this *Second Monitoring Report*, the following case summary symbolizes on-going concerns regarding suicide prevention practices and struggles with implementing the provisions of the *Consent Decree*.

The inmate (Case No. 1) was admitted into the Main Jail on April 14, 2021 on a charge of first-degree murder. Based upon intake screening, he was immediately referred to JPS for assessment. During both the Mental Health Assessment and Suicide Risk Assessment processes, the inmate reported current suicidal ideation, as well as a suicide attempt a few days earlier by cutting his neck. The laceration marks were clearly visible to both medical and mental health personnel. He was assessed at high risk for suicide and placed on suicide precautions, including placement on the 2P (acute inpatient unit) Pre-Admit List. Although unclear and undocumented in the medical chart, it appeared that the inmate was initially housed in a booking safety cell, clothed in a safety smock.

Two days later on April 16, the inmate was admitted into the 2P Unit. According to the initial nursing note by an RN "Via interpreter, pt. reports feelings of loneliness, depression, and not wanting to go on living. No active suicide plan disclosed and vague about if he currently has SI. Discloses past childhood physical abuse and lack of connection with family such as siblings or parents. Reports a few days ago prior to arrest, he tried to kill himself by using a knife to cut his neck and then tried to use it on his abdomen but it failed to cut. He describes his mindset at the time as wanting to go to sleep and not wake up. Reports using meth, cocaine and marijuana around the same time, but denies regular use. Reports he didn't sleep around 6 days prior to arrest and did not sleep 1 night here in jail. States no viable protective factors. Reports his mother is supportive, but then says he hasn't spoken to her and also he has no contact with his siblings."

There were no provider orders to indicate either the level of observation or clothing for the inmate on April 16, other than a nursing note indicating "continue Q-30-minute safety checks." It was unclear from the medical chart whether the patient remained in a safety smock or was issued clothing, and there was no documentation to clinically justify the observation of a suicidal patient at 30-minute intervals.

The following day on April 17, the patient was provided with an Initial Psychiatric Evaluation. He self-reported a long history of depression and substance use, and continued to endorse suicidal ideation (SI) to the provider. According to the assessment, the patient appeared both delusional and paranoid, reporting both visual hallucinations (VH) and auditory hallucinations (AH). He was initially diagnosed with an adjustment disorder.

On April 18, the patient continued to endorse SI to nursing staff, but "verbally contracted for safety." The following day (April 19), a treatment team conference was held and a progress note simply stated "assessed DTS and change, goals not met." A subsequent nursing note stated that a 5250 petition for DTS/GD was filed that day. Another nursing note indicated that the patient had gone to court that day (an indication that, unlike suicidal

inmates housed in either the SITHU or safety cells, 2P patients were permitted to attend their court hearings while on suicide precautions status in the unit). The nursing note also indicated that the patient would be continued on both "Q-30" and closed circuit television (CCTV) monitoring.

According to a nursing note on April 20, "Patient reported 'wanting to hurt myself' when he returned from court yesterday afternoon, he continued to say that the suicidal feeling morphed into feeling depressed, frustrated and overwhelmed. Patient stated that his suicidal ideations are intermittent with no plan…" The patient was also seen by a psychiatrist and that note indicated that he was passively suicidal. Despite this self-reported behavior, only Q-30 checks continued.

The following day (April 21), the patient was observed to be banging his head against the wall, resulting in active bleeding. He was treated by nursing staff and later seen by a psychiatrist who wrote that the patient "passively wished to die, SI without a plan." Observation was increased to 15-minute intervals, as well as CCTV monitoring.[1] The patient continued to report SI on both April 22 and April 23.

On April 24, a provider order (with no indication that the patient was seen by psychiatry) stated "Renew CAM (camera monitoring) - continued unpredictable bx; d/c Q-15 - no longer clinically indicated as pt. has extended period of stability/lack of self-harming bx." On both April 25 and April 26, the patient continued to report "intermittent SI" to nursing staff, but denied SI to a psychiatrist on April 26. A treatment team meeting determined that the patient's "goals not met." Observation continued at 30-minute intervals, as well as CCTV monitoring. On April 26, the patient was finally permitted to shower following a 10-day quarantine on the unit. He also received both dayroom and shower opportunities the following day (April 27). Such a practice appeared to violate the Sacramento Sheriff's Office's "Isolation and Quarantine Showers" policy that required the offering of showers on a daily basis.

The inmate reported intermittent SI on April 27, but denied any SI on both April 28 and April 29. A psychiatrist discontinued CCTV monitoring, and the patient was continued on regular nursing rounds at 30-minute intervals. However, according to a subsequent nursing note later on April 29, the patient "endorsed SI," and "encouraged to utilize coping skills." A description of any coping skills that could be utilized by the patient to reduce his SI was never found in any of the chart notes in this case.

On April 30, a provider note indicated that the patient would now be observed at 15-minute intervals, as well as monitored by CCTV, apparently in reference to the behavior described in the nursing note from the previous day. When seen later in the day by a nurse on April 30, the note stated: "He endorsed SI and stated 'I was trying to use the t-shirt in the afternoon. It was too short. I'm listening to voices. I didn't take the medication. I thought something was in my head.' He stated 'I can't see clearly. I feel like I'm drugged.' When

---

[1] Although JPS commented on the draft version of this report on September 7, 2021 that "Closed circuit television monitoring is never ordered for purposes of suicide watch.  It is ordered by the psychiatrist on the IP unit to observe behaviors that are not related to self-harm," 2P Unit provider notes indicated otherwise.

asked about VH he stated 'Yes, I think there is a lot of visual things that I have.' When asked if he has anxiety he stated 'Yes sometimes I'm cold, sometimes I'm hot, sometimes I'm tired, sometimes I feel with a good mood.' When asked if the medication is working, he stated 'I was thinking of not taking the medication tonight to see if that was the case.' The inmate-patient stated 'Yesterday I was looking for the thing you gave me to cut my beard. I was planning on cutting myself.' Then the IP asked for 'not the yellow but the brown pill.' The charge nurse was notified. The doctor was notified. Camera was reviewed by staff. The inmate-patient was offered and took PRN medication."

The patient continued to express SI to nursing staff on May 1, but denied SI when seen by a provider the following day (May 2). Q-15 observation was discontinued.  However, although the patient reported SI to a nurse later in the day on May 2, observation continued at Q-30 intervals. He continued to report SI on an intermittent basis during the next several days.

On May 8, the patient was observed with a t-shirt around his neck, attempting to asphyxiate himself. He was seen by a provider, placed on 15-minute checks, and clothed in a safety smock. He was later observed to be banging his head against the wall. The patient's SI continued for the next few days. When seen by a provider on May 11, he requested to call his mother, but her telephone number was in his cell phone which was stored in his property.  According to a subsequent provider note: "Per custody at property, they cannot open his property bag without a court order to get anything."

On May 12, there were orders from two different providers, with one continuing the 15-minute checks and safety smock, and the other discontinuing both the Q-15 and smock requirements. According to nursing notes, it appeared the patient remained in a smock. The following day (May 13), he was seen again by a provider, denied any SI, and was provided with clothing. The Q-15 checks were discontinued on May 13. The patient continued to express suicidal ideation on May 15, but remained on Q-30-minute checks. A May 17 nursing note indicated that his "goals not met" during a treatment team meeting.

On May 18, the patient reported being depressed, but not suicidal. In addition, an outpatient clinician completed an SRA indicating that he was not at acute risk for suicide. The following day (May 19), the patient was seen by a provider, denied SI, and the psychiatric note suggested that he might be appropriate for IOP level of care. The patient continued to remain depressed, but denied any SI for the next several days. According to a nursing note on May 23, "Pt. reports he feels depressed and has been thinking about family.  He wants to find a way to talk to his mother and thinks a cousin in Texas may be able to help if he can reach her.  He denies SI/HI/VH but says he hears voices 'a little bit' still but cannot make out what they say.  He is hopeful to make contact with family and that is his primary goal right now."

On May 24, the treatment team note indicated that the patient's "goals are not met today, reschedule for next week." He continued to deny SI. Two days later on May 26, another treatment team note indicated that the patient's "goals met," and a provider note indicating that the patient was discharged from the 2P Unit into the IOP.

On May 27, the patient was provided with a 24-hour follow-up assessment that was required after his discharge from suicide precautions. Two days later on May 29, he told a clinician during the 72-hour follow-up assessment that he was currently suicidal and reported a suicide attempt the previous night by tying a shirt around his neck. The patient also told the clinician that an officer allegedly witnessed the incident and simply told him to remove the ligature from his neck. The clinician completed an SRA and ordered that the patient be placed on suicide precautions in the SITHU, clothed in a safety smock. When seen by a clinician the following day, the patient remained suicidal and appeared paranoid that other inmates would kill him.

On June 1, the patient was seen by a psychiatrist in the privacy of the 3rd Floor classroom (the first opportunity for a private session since his incarceration on April 14). According to the provider's note, "Patient reported that he has been feeling depression. Continues to endorse suicidality because he has had 'some death threats.' Thinks it is some other inmates. Thinks it is due to 'vengeance' for homicidal. Said the voices are in English and he can understand a little bit. Does not have any plans regarding suicidality. Does not feel medications are helpful. Still feeling depressed with poor sleep."

Less than an hour later on June 1, the patient met with a clinician cell front, with a progress note indicating that a confidential setting was not utilized because of the patient's "altered thought process/risk to self." The note further stated: "Met with pt. to continue to assess for suicidal ideation. Translation services utilized via video communication. Pt. aware of, acknowledges and accepts limits of confidentiality. Pt. previously met with psychiatrist just prior to this appointment. Pt. continues to report hearing others threatening him and reports being fearful of other inmates attempting to attack him. Pt. initially stated that he was not sure he would feel safe to return to his cell. He vented concerns about others attempting to harm him specifically if he tried to take a shower. Pt. was informed that we can work with custody to see about providing him an opportunity to shower by himself with no other inmates out in day room. Pt. responded positively to this and was informed that in order to do this, he has to be able to remain safe, and be in his jail provided clothing and in his normal cell. Pt. indicates that he would like to do this. Pt. also was able to agree to notify custody if he is feeling unsafe and stated that he would push his cell button and state 'Help me.' Pt. agreed to this plan and denied any frank suicidal ideation, intent or plan."

Based upon this assessment, the clinician discharged the patient from suicide precautions on June 1 following completion of an SRA. Given the fact that a psychiatrist had assessed the patient an hour earlier and determined that he was still endorsing suicidal ideation, as well as the clinician's rationale for not providing a confidential setting being "risk to self," the written documentation to justify the patient's discharge from suicide precautions was problematic. In addition, the inconsistent use of private settings on the same day, as well as the questionable rationale for not providing a private setting, was problematic. Finally, the patient was not provided with the 24-hour, 72-hour, and 5-day follow-up assessments that were required following discharge from suicide precautions.

Several weeks later on June 18, the patient was observed to be banging his head against the wall of his IOP cell, eating and smearing feces, expressing SI, and complaining of AH. He was placed on suicide precautions in the SITHU, clothed in a smock, and placed on the 2P Pre-Admit List. He was seen cell-side by clinicians on both June 19 and June 20, with the rationales for not providing a confidential setting being "unable to come out a cell due to smearing feces yesterday." On June 21, a clinician completed an SRA, the patient denied current SI, and was discharged from suicide precautions. Although the patient was seen by a nurse practitioner a few days later, he was again not provided with the 24-hour, 72-hour, and 5-day follow-up assessments that were required following discharge from suicide precautions.

Several days later on June 26, the patient again expressed suicidal ideation, with a plan to overdose on his psychotropic medication. He was placed on suicide precautions in the SITHU, clothed in a smock, and placed on the 2P Pre-Admit List. The patient was observed to be banging his head against the wall the following day (June 27), requesting to be returned to the 2P unit. He continued to express SI when seen by a clinician on June 28. On June 29, the patient denied current SI, and was discharged from suicide precautions following completion of an SRA. The 24-hour follow-up assessment was not completed.

On July 1, the patient was seen by an IOP clinician who wrote in a progress note that he had "graduated from IOP" and would benefit from intensive case management (ICM) treatment. Although continuing to complain about AH, the patient denied any current suicidal ideation.

Several days later on July 9, the patient superficially cut his right wrist and was returned to suicide precautions in the SITHU, clothed in a smock, and placed on the 2P Pre-Admit List following completion of an SRA. He was seen on a daily basis by clinicians from July 10 through July 16, and remained clothed in a safety smock. When seen by a clinician on July 17, the patient denied any SI, requesting both clothing and a shower. He was discharged from suicide precautions following completion of an SRA. He was provided with the required 24-hour, 72-hour, and 5-day follow-up assessments. Beginning on July 24, the patient was being seen on a weekly basis by an ICM clinician.

**Summary**: Regular 2P Unit nursing observation at 30-minute intervals was routinely utilized for a patient consistently expressing suicidal ideation, and observation at 15-minute intervals was only utilized when he engaged in self-injurious behavior or attempted suicide. Such practices were contrary to *Consent Decree* requirements. CCTV monitoring was routinely ordered by psychiatry despite the fact it was prohibited by the *Consent Decree* (i.e., it can be utilized as supplement, but not as an alternative to staff observation, and does not need an order.) There was frequent narrative in nursing notes that "treatment goals were not met," but never a description of the treatment goals themselves. There was no description of any safety planning in the 2P Unit to reduce SI. The custody response on May 11 that they could not "open his property bag (to retrieve his cellphone) without a court order to get anything" was problematic despite a later finding the cell phone had been confiscated by police. The 2P Unit treatment team note on May 24 indicating that the patient's "goals are not met today, reschedule for next week," and the decision two days

later on May 26 that the patient's "goals met" and he was discharged from the 2P Unit into the IOP was curious.

The activities on June 1 were very problematic. An out-patient psychiatrist saw the patient in the privacy of the 3 Pod classroom and did not discharge the patient from suicide precautions, whereas less than an hour later, an out-patient clinician met with the patient cell-side due to "risk to self" and discharged him from suicide precautions and did not order the 24-hour, 72-hour, and 5-day follow-up assessments. Finally, the differences between the patient having access to clothes, showers, and dayroom while in the 2P Unit, but being denied access to such possessions and privileges in the SITHU, was startling. With that said, the patient did not receive a shower in the 2P unit until after a 10-day quarantine period, in violation of a SCSO policy requiring the opportunity for daily showers. Several 24-hour, 72-hour, and 5-day follow-up assessments were not made as required following the patient's discharge from suicide precautions on several occasions.

# CONSENT DECREE/REMEDIAL PLAN

## VII.  SUICIDE PREVENTION

| Provision A) Substantive Provisions | 1. The County recognizes that comprehensive review and restructuring of its suicide assessment, monitoring, and prevention practices are necessary to address the risk of suicide and self-harm attendant to detention in a jail setting.<br><br>2. The County shall establish, in consultation with Plaintiffs' counsel, a new Suicide Prevention Policy that shall be in accordance with the following: | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | This provision is interpreted as a "catch-all" provision for all suicide prevention-related provisions, therefore, this provision cannot come into substantial compliance until all of the provisions under Suicide Prevention come into substantial compliance.<br><br>Currently, the Sacramento County Sheriff's Office (SCSO), Adult Correctional Health (ACH), and Jail Psychiatric Services (JPS) all have varying suicide prevention policies.  Pursuant to the requirements of the Consent Decree, these policies were in need of varying degrees of revision.<br><br>Sacramento County's response to this provision, as contained in the *Third* Status Report (July 7, 2021), was reported by ACH as "draft suicide prevention policies were submitted to experts," and by the SCSO as "the Sheriff's office is in the process of revising all of his policies. They will be working with Lexipol to accomplish this. They have indicated that all of the orders related to the Consent Decree will be their priority. We have identified a list of policies we would like them to start on. The suicide prevention policy was the first one we asked them to complete."<br><br>The expert reviewed both the ACH and JPS suicide prevention policies and returned extensive comments on July 2, 2021.  As stated in the preface to the comments:<br><br>"It was very challenging to review these polices separately to ensure that they contained all of the requirements of the *Consent Decree*.  As such, I would strongly recommend that you develop one joint policy for suicide prevention. Most of my comments can be found in the JPS suicide prevention policy (PP-Adult-MH-07-4) which I recommend as the starting point for review. |

It was also unclear why there needs to be separate policies on the Suicide Prevention Committee and Safety Suit policies; they can easily be incorporated into one suicide prevention policy. I have, however, reviewed the safety suit policy and provided comments. As you will see, although the recommended changes are extensive, they are specific to all of the required suicide prevention provisions of the Decree. They are also extensive because I tried to incorporate the requirements of both medical and mental health into one policy. In addition, there should be no policy distinction made between suicidal patients housed in out-patient (SITHU) or in-patient settings. The Decree makes no such distinction. Further, these draft policies by ACH and JPS were written to suggest that this is what the County can implement now, and pages 9 and 10 of the JPS version contain narrative that will be included in a revised policy when additional staff are available. I strongly disagree on this approach. The County committed itself to a suicide prevention policy, not one to be partially implemented now and then revised at some future date when additional staff are available. For purposes of compliance, it is to everyone's advantage to have a comprehensive policy established now even if full implementation will be piecemeal. In other words, first establish the policy and then secure the adequate number of staff to implement it, not the other way around.

As a result of the expert's comments, a decision was made to combine the ACH and JPS policies into one joint suicide prevention policy. A revised draft suicide prevention policy entitled "ACH PP 02-05 Suicide Prevention Policy (combined policy that integrates safety suits)" was submitted to the expert on July 27, 2021 and returned to the County with extensive comments on August 15, 2021. The expert received another revised copy of the policy on August 24, 2021, and returned additional comments regarding the policy to the County on August 30, 2021. On September 7, 2021, the expert received a final draft of the "ACH PP 02-05 Suicide Prevention" policy and provided further comments to the County on September 10, 2021.

To date, the expert has <u>not</u> received any revised suicide prevention policies from the SCSO.

In conclusion, because the County's suicide prevention policies are currently being revised, as well as the fact that all suicide prevention-related provisions are in varying degrees of compliance, this provision remains in Partial Compliance.

| | |
|---|---|
| **Recommendations** | Finalize all draft suicide prevention policies for the SCSO; provide all draft SCSO suicide prevention policies to expert for review. |

| Evidentiary Basis | Sacramento County's *Third* Status Report (July 7, 2021). Review of the current suicide prevention policies: ACH's Policy No. 07-xx, Suicide Prevention, drafts June 24, 2021, July 27, and August 24; ACH Policy No. 07-04, Suicide Prevention Program, draft June 23, 2021, ACH's Policy No. 09-03, Use of Safety Suits, draft May 24, 2021, ACH's Policy No. 07-03, Patients in Safety Cells, draft February 24, 2021, ACH's Policy No. 01-15, Suicide Prevention Subcommittee, draft July 9, 2021, ACH's Nurse's Intake First screening template, draft July 15, 2021, and ACH's Policy No. 02-05, Suicide Prevention Policy, combined policy that integrates safety suits, drafts of July 27, 2021 and September 7, 2021. |
|---|---|

| Provision B) 1. Training | **1. The County shall develop, in consultation with Plaintiffs' counsel, a four- to eight-hour pre-service suicide prevention curriculum for new Jail employees (including custody, medical, and mental health staff), to be conducted in person in a classroom or virtual classroom setting, that includes the following topics:**<br><br>**a) avoiding obstacles (negative attitudes) to suicide prevention;**<br>**b) prisoner suicide research;**<br>**c) why facility environments are conducive to suicidal behavior;**<br>**d) identifying suicide risk despite the denial of risk;**<br>**e) potential predisposing factors to suicide;**<br>**f) high-risk suicide periods;**<br>**g) warning signs and symptoms;**<br>**h) components of the jail suicide prevention program**<br>**i) liability issues associated with prisoner suicide;**<br>**j) crisis intervention.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "As part of pre-service training, the Adult Corrections Officer Supplemental Core Course has been revised where Module 19.0 addresses suicide prevention. This section has been approved by the Board of State and Community Corrections (BSCC) as well as the Standards and Training for Corrections (STC). We are working with CHS and JPS to develop a joint curriculum. Additionally, suicide prevention training is completed by all custody staff on a yearly basis.<br><br>The expert reviewed the above referenced training curriculum entitled "19.6 Behavioral Health: Suicide Prevention Lesson Plan (ACO), four-hours, revised January 2021, as well as the "19.6 Suicide Prevention," 23-slide PowerPoint presentation. An extensive response was sent back to the SCSO on May 5, 2021 that included the following: | |

"There are several concerns about these documents and I have made extensive comments in the attached versions of both. Unfortunately, extensive revisions will be necessary. Overall, these are the main concerns: First, as the *Consent Decree* requires that pre-service and annual suicide prevention training be provided to all custody, medical, and mental health personnel, the curriculum should be developed jointly between the SCSO, ACH, and JPS. It is my understanding that ACH and JPS are currently developing a curriculum, and I would strongly recommend that the SCSO join them in that development. Second, the Decree lists 10 specific topics that are required to be covered during the pre-service training. They are:   a) avoiding obstacles (negative attitudes) to suicide prevention; b) prisoner suicide research; c) why facility environments are conducive to suicidal behavior; d) identifying suicide risk despite the denial of risk; e) potential predisposing factors to suicide; f) high-risk suicide periods; g) warning signs and symptoms; h) components of the jail suicide prevention program; i) liability issues associated with prisoner suicide; j) crisis intervention. Although these 10 topic headings are highlighted in yellow in the Lesson Plan, with the exception of some information on 'warning signs and symptoms,' there is no content associated with any of these topics in the Lesson Plan, slides, or handouts.  For example, what are 'avoiding obstacles to prevention,' what does the research indicate, etc.  Third, much of the narrative in the documents appears to be generic and not specific to the SCSO or Main Jail/RCCC.  For example, there is reference to 'the agency' and 'the facility,' rather than 'Sacramento County Sheriffs' Office' and 'Main Jail.' As another example, there is a suggestion on page 17 of Lesson Plan that 'staff should place at-risk offenders in higher visibility cells or front areas of unit environments that are in direct view from where security staff posts are located.' It would be better to specifically state where designated suicide-resistant cells are in the Main Jail - safety cells, SITHU cells, and 2P in-patient cells. Fourth, it would seem very important to include instruction in both the Lesson Plan and PowerPoint slides regarding the specific suicide prevention requirements of the *Consent Decree* and revised suicide prevention policy. Fifth, it will be very challenging to fit the 10 required topics into a 4-hour time commitment for this initial training. Finally, in revising the Lesson Plan and PowerPoint slides, considerable time would be saved if SCSO, in collaboration with ACH and JPS, utilized this expert's *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison*

*Facilities* which JPS has recently obtained.  All 10 required topics are addressed in my curriculum.

In addition, the expert met with one of the SCSO Training Academy instructors and curricula developer at the RCCC on June 15, 2021. It was an extremely productive meeting, with the expert summarizing the review of the SCSO, emphasizing that it would be more productive for the SCSO to collaborate with JPS in developing a joint suicide prevention curriculum for both pre-service and annual training, and in explaining the *Consent Decree* requirement for live classroom instruction as required by the consent decree, as opposed to a e-learning format as recommended by JPS. As a SCSO Training Academy instructor, this sergeant did not have any concerns regarding coordinating live classroom training at the Academy in Carmichael and/or at classrooms within the Main Jail and RCCC. In addition, the sergeant stated that new employee training for SCSO, ACH, and JPS personnel could be easily scheduled during regular academies throughout the year.

The *Third* Status Report (July 7, 2021) also contained the following response from ACH: "MH has developed a 2-hour suicide prevention refresher training. It was submitted to the MH experts for review. MH is developing the 4-8 suicide prevention training."

The expert reviewed the above referenced training curriculum entitled "Suicide Prevention: An Overview," a 42-slide PowerPoint presentation for two hours duration, revised June 4, 2021. An extensive response was sent back to ACH/JPS on June 28, 2021 that included the following:

> "Overall, the roughly 39 slides (excluding blank slide, first slide title and last slide of references) will not be sufficient to cover two hours of required training. You simply need to create more slides. The 16 slides on Myths, Stigma, Suicide Data in the Community are unnecessary and not part of the required topics. They can certainly be included in the training, but not as a replacement for the required topics. The utility for Slides 25 and 26 on 'adverse childhood experiences' is questionable given the fact that this risk factor is not a measurable piece of the suicide risk assessment utilized by JPS, nor would it have any practical implication for custody and medical staff. Although the 6 slides on liability are not incorrect, they have little to do with the specific topic of jail suicide liability which is a required topic; rather the current slides speak more to general liability relating to inadequate mental health care. Slide(s) on the suicide prevention policy would obviously need to be created once the policy is approved. Slides (s) regarding a case presentation of any serious suicide attempts or suicides during the past year need to be created. Finally, it is curious that the References slide

|  | does not cite my suicide prevention training curriculum. As offered in the First Monitoring Report, the training curriculum would be extremely useful for the development of both the pre-service and annual curricula for the simple reason that most of the 10 required topics above that are contained within the Consent Decree were taken directly from the training curriculum. Three of the most important topics in the required training are "a) avoiding obstacles (negative attitudes) to suicide prevention; c) why facility environments are conducive to suicidal behavior; and d) identifying suicide risk despite the denial of risk."  None of these topics are even discussed in the draft slides, yet are easily available in my training curriculum." |
|---|---|
|  | On September 1, 2021, the expert received a 73-slide revised version of the "Suicide Prevention: An Overview" PowerPoint presentation. It will be reviewed separately from this report, with any comments forwarded to the County. |
|  | Finally, this expert was informed during a Suicide Prevention Subcommittee on August 5, 2021 that a 10-member suicide prevention training subcommittee had been formed to develop the pre-service suicide prevention training curricula. |
|  | In conclusion, the monitoring of **Provision B) 1. Training and Provision B) 1. Training** (below) can only be described as extremely frustrating. The expert's comprehensive jail suicide prevention training curricula entitled *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities* has been available to the County for development of both the pre-service and annual suicide prevention training. The curriculum contains **all** of the required components that encompass the *Consent Decree's* suicide prevention provisions. Despite its availability, it appeared based upon the expert's extensive critiques of both the SCSO and JPS annual suicide prevention curricula that the *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities* was not adequately utilized in the development of the initial draft documents. In addition, the required draft 4- to 8-hour pre-service suicide prevention curriculum has still **not** been provided to the expert for review, and a training subcommittee has recently been formed to develop the pre-service suicide prevention training curricula, further prolonging the process. The provision remains in Partial Compliance. |
| **Recommendations** | Finalize the draft 4- to 8-hour pre-service suicide prevention curriculum to include the 10 topics identified in this provision and available in the expert's *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities*; provide the draft pre-service suicide prevention curriculum to expert for review. |

| Evidentiary Basis | Sacramento County's *Third* Status Report (July 7, 2021). Discussion with SCSO, ACH, and JPS leadership and staff. Review of "19.6 Behavioral Health: Suicide Prevention Lesson Plan (ACO), four-hours, revised January 2021; "19.6 Suicide Prevention," 23-slide PowerPoint presentation; and "Suicide Prevention: An Overview," 42-slide PowerPoint presentation, and 73-slide PowerPoint presentation. |
|---|---|

| Provision B) 2. Training | **The County shall develop, in consultation with Plaintiffs' counsel, a two-hour annual suicide prevention curriculum for all custody, medical, and mental health staff, to be conducted in person in a classroom or virtual classroom setting, that includes:**<br><br>**a) review of topics (a)-(j) above**<br>**b) review of any changes to the jail suicide prevention program**<br>**c) discussion of recent jail suicides or attempts** |
|---|---|
| Status | **Partial Compliance** |
| Discussion | See full discussion above in **Provision B) 1. Training**.<br><br>As noted above, the expert received a 73-slide revised version of the "Suicide Prevention: An Overview" PowerPoint presentation on September 1, 2021. It will be reviewed separately from this report, with any comments forwarded to the County. Because the required 2-hour annual suicide prevention curriculum has still not been finalized and approved, this provision remains in Partial Compliance. |
| Recommendations | Finalize the draft 2-hour annual suicide prevention curriculum to include the three topics identified in this provision and available in the expert's *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities*; provide the draft annual suicide prevention curriculum to expert for review. |
| Evidentiary Basis | Sacramento County's *Third* Status Report (July 7, 2021). Discussion with SCSO, ACH, and JPS leadership and staff. Review of "19.6 Behavioral Health: Suicide Prevention Lesson Plan (ACO), four-hours, revised January 2021; "19.6 Suicide Prevention," 23-slide PowerPoint presentation; and "Suicide Prevention: An Overview," 42-slide PowerPoint presentation, and 73-slide PowerPoint presentation. |

| Provision B) 3. Training | Custody officers assigned to Designated Mental Health Units shall receive additional specialized training on suicide prevention and working with prisoners with serious mental illness. |
|---|---|
| **Status** | **Partial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "IOP and JBCT Deputies receive 24 hours of advanced CIT training. IOP/JBCT Deputies also attend training with the department's Critical Incident Negotiations Team (CINT) to learn how to deal with persons with a mental illness. IOP/JBCT Deputies will also attend a custody-based negotiations class facilitated by the FBI."<br><br>The County reported that approximately 73 percent of deputies and sergeants at the Main Jail had received CIT training, as well as reported that eight (8) JBCT deputies received such training at RCCC.<br><br>As stated in the *First Monitoring Report*, although the provision of CIT training to IOP deputies fulfills a portion of this provision, it was unclear as to the percentage of custody personnel that were trained, as well as no indication whether deputies assigned to the Suicidal Inmate Temporary Housing Unit (SITHU) and 2P Inpatient Unit completed the CIT training.<br><br>In addition, it remained unclear how many total deputies were assigned to the Designated Mental Health Units at the Main Jail and RCCC. Finally, any further specialized suicide prevention training for these deputies should occur subsequent to the implementation of the revised suicide prevention policies.<br><br>In conclusion, because only partial training compliance data for custody personnel was provided, this provision remains in Partial Compliance. |
| **Recommendations** | 1) In the future, any training compliance data for custody personnel should always include: a) the number of custody personnel assigned to the Designated Mental Health Housing Units, and b) the number of custody personnel receiving specialized suicide prevention and mental health training. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Training data. |

| Provision B) 4. Training | All mental health staff, including nurses, clinicians, and psychiatrists, shall receive additional training on how to complete a comprehensive suicide risk assessment and how to develop a reasonable treatment plan that contains specific strategies for reducing future suicidal ideation. | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the *Third* Status Report (July 7, 2021), was: "64 percent of MH staff completed Suicide Risk Assessment training." | |
| | In addition, reviewed training data indicated that 16 staff were provided with SRA training on February 3, February 10, and March 31, 2011, including one (of two) nurse practitioners and various licensed and unlicensed mental health clinicians. The training data did <u>not</u> indicate that any nurses and psychiatric staff assigned to the 2P Inpatient Unit had received the SRA training. | |
| | The expert reviewed the 103-slide PowerPoint presentation entitled "Suicide Assessment in Jail" that was developed for JPS by Joseph Obegi, PsyD. Presentation was very comprehensive, and included instruction on safety planning. | |
| | In conclusion, because not all mental health clinicians had received SRA training, and none of the nursing and psychiatric staff assigned to the 2P Inpatient Unit had received the SRA training, this provision remains in Partial Compliance. | |
| **Recommendations** | 1) In the future, any compliance data for mental health personnel should always include: a) the total number of mental health personnel working at the Main Jail and RCCC, b) the number of mental health personnel required to receive suicide risk assessment training, and c) the number of mental health personnel receiving suicide risk assessment training.<br>2) Ensure that all mental health personnel, including LCSW clinicians, psychiatric nurse practitioners assigned to outpatient services, and nursing and psychiatric staff assigned to the 2P Acute Inpatient Unit receive suicide risk assessment training. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>103-slide PowerPoint presentation entitled "Suicide Assessment in Jail."<br>Various training data. | |

| Provision B)<br>5. Training | **All mental health staff and custody officers shall be trained on the appropriate use of safety suits, i.e., not to be utilized as a default, not to be used as a tool in behavior management, not to be utilized for patients being observed at 30-minute observations.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "this will be outlined in the revised Suicide Prevention Operations Order. Safety suits are used at discretion of JPS based on collaboration with custody staff and not as a behavior management tool."<br><br>Both the SCSO and ACH/JPS policies on use of a safety suit ("smock") for suicidal inmates still under revision, but as described later in this report, this expert reviewed 14 medical charts of inmate-patients placed on suicide precautions. *The review determined that <u>all</u> inmates placed on suicide precautions and housed on an outpatient basis in either the SITHU or safety cells were clothed in safety smocks for the entire duration of their suicide precautions.* The only exception to this practice was limited to the two-day on-site assessment of June 14-15 when this expert conversed with both JPS and custody staff assigned to the SITHU and summarized the *Consent Decree* requirement that use of safety smocks should be individualized on a case-by-case basis as determined by a JPS clinician following daily assessment.<br><br>As stated in the *First Monitoring Report* and with the exception of observation on June 14-15, safety smocks continue to be "utilized as a default" by custody personnel. The current review also found that patients admitted to the 2P-Acute Inpatient Unit were almost always changed from a safety smock to their uniform within 24 hours of admittance. This provision remains in Partial Compliance. | |
| **Recommendations** | Finalize all SCSO and ACH/JPS suicide prevention policies to ensure they are consistent with the requirements of this provision regarding appropriate use of safety smocks; provide verification that all mental health and custody personnel have been trained regarding the new policy. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review.<br>On-site observation on June 14-15, 2021. | |

| Provision B)<br>6. Training | The County shall ensure that all staff are trained in the new Suicide Prevention Policy. | |
|---|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third Status Report* (July 7, 2021), was "The policy is in the process of being updated. This area will be addressed in the revised version of the policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team."<br><br>The County still has not yet revised their suicide prevention policies, therefore, they have not had an opportunity to train all staff on the new policy. This provision remains in Non-Compliance. | |
| **Recommendations** | 1) Finalize the SCSO and ACH/JPS suicide prevention policies; provide the draft suicide prevention policies to expert for review.<br>2) Provide verification that all custody, medical, and mental health personnel have been trained on the revised suicide prevention policies. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). | |

| Provision C)<br>1. Nursing Intake Screening | Intake screening for suicide risk will take place at the booking screening and prior to a housing assignment. If clinically indicated, JPS will then perform an additional clinical assessment after the inmate is placed in a housing assignment. | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the *Third* Status Report (July 7, 2021), stated "Nurse Intake has significant revisions. Revised form incorporates MH requirements including recommended suicide risk questions. The new nurse intake form will be implemented in July."<br><br>The expert reviewed the revised Intake Screening Form utilized by nursing staff at booking and provided comments to the County on the draft template (which is embedded within Centricity, the jail system's electronic medical record) on July 15, 2021. Those comments included the following:<br><br>• It is unclear how the arresting officer completes this section. Do they complete a copy and then nurses inserts into template? Another process? Is this explained in policy?<br><br>• Insert a button for Emergent referral. | |

| | |
|---|---|
| | - If this allows the nurse to auto-file the boxes as all negative, this function should be deleted.  Each question should be asked/answered individually. <br><br> - Delete the term "Normal MH Referral" throughout the document.  MH referrals should only be Emergent, Urgent, and Routine. <br><br> - It is unclear why this Suicide Risk Inquiry section follows the Disposition/Housing section; it should precede it. <br><br> - There is nothing "Routine" about suicide risk.  All these referrals should be Urgent at a minimum, except for No. 9 which is correctly listed as Emergent. <br><br> - Revise Question No. 5 "Have you ever attempted suicide?" as follows: "Have you ever attempted suicide or engaged in self-harm behavior?" <br><br> On September 2, 2021, the expert received and reviewed an updated version of the revised Intake Screening Form. The review found that all of the expert's comments above were incorporated into the revised form. <br><br> On September 9, 2021, the expert forwarded the following additional comment to the County: "Although an Emergent referral is required when the inmate expresses current suicidal ideation, as well as if the arresting/transporting officer believes the inmate is suicidal, with all other singular affirmative response resulting in an Urgent referral, *there should be guidance given to intake nurses that affirmative responses to multiple questions should result in an Emergent referral if the behavior was displayed within the previous 30 days (e.g., suicide attempt in the past days plus has nothing to look forward to).* Such guidance should be included in the pending revised policy and, if possible, on the screen template. <br><br> Finally, review of 14 medical charts by this expert during the current monitoring period indicated that nursing personnel consistently completed the current Intake Screening Form at booking and prior to an inmate's housing assignment. In addition, the chart review found that JPS clinicians consistently completed a suicide risk assessment (SRA) for those inmates referred from intake nurses. However, as detailed in a subsequent provision of this report, there were inconsistent practices regarding 1) inclusion of required suicide risk questions on the intake screening form and 2) nursing staff asking all of the required suicide risk questions during the process. This provision remains in Partial Compliance. |
| **Recommendations** | SCSO and ACH policies should be revised to provide an adequate description of the requirement for suicide risk inquiry during the intake screening process, |

| | as well as requirement for clinical assessment by JPS when appropriate in prior to housing assignment. |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). Revised drafts of the "Nurse Intake First" template. |

| **Provision C) 2. Nursing Intake Screening** | **All nursing intake screening shall be conducted in an area that provides reasonable sound privacy and confidentiality. If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.** |
|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Third* Status Report (July 7, 2021), was omitted.<br><br>Current SCSO and ACH policies do not address privacy and confidentiality during the intake screening process, nor do current practices reflect compliance with this provision.<br><br>This expert observed the intake screening process by nursing staff in the Main Jail during the on-site assessment of June 14-15, 2021. Intake screening was observed on both dates, with multiple nursing staff. The same problematic conditions and practices initially found by this expert (when acting as a consultant) almost five years earlier in September 2016 were still occurring in June 2021. For example, three (3) nurses were stationed in the small nurse's office at one time, separated only by small partitions. Therefore, detainees were only separated from each other by a few feet. In addition, each detainee was accompanied by at least one arresting officer who was stationed within arms' length of the detainee. Due to the occurrence of multiple intake screenings at the same time, involving multiple nurses, detainees, and arresting officers, confidentiality was severely compromised.  In addition, due to its small size, the Nurse's Office was loud and chaotic at times, with arresting officers socializing with each other, as well as with other medical personnel. Further, this writer observed several different nurses conduct intake screening over the course of the two days, and found to not be consistently asking all of the required suicide risk/mental health questions on the screening form. For example, a few nurses simply asked the detainee: "Suicidal?" "Ever suicidal?" "Any mental problems?"<br><br>In conclusion, the intake screening process in the booking area of the Main Jail remains dysfunctional and very problematic. As such, this provision remains in Non-Compliance. |

| Recommendations | In light of the stalled process to obtain funding for a Jail Annex that would have created a new booking and processing area, and absent limiting the intake screening process to one nurse and one detainee at a time (an option that would certainly be impractical), the County must explore options to better ensure reasonable sound privacy in the booking area when multiple nurses are conducting intake screening at the same time period. One option would be installation of multiple interview booths similar in design to the current "JPS Interview Room" located in the booking area. |
|---|---|
| **Evidentiary Basis** | On-site assessment of Main Jail on June 14-15, 2021. |

| **Provision C) 3. Nursing Intake Screening** | **The County shall revise its nursing intake assessment procedures and screening forms to ensure timely identification of acute and high-risk mental health conditions, consistent with the recommendations made by Lindsay Hayes. Intake screening, as documented on screening forms, shall include:**<br><br>**a) Review of suicide risk notifications in relevant medical, mental health, and custody records, including as to prior suicide attempts, self-harm, and/or mental health needs;**<br>**b) Any prior suicidal ideation or attempts, self-harm, mental health treatment, or hospitalization;**<br>**c) Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;**<br>**d) Other relevant suicide risk factors, such as:**<br>    **i. Recent significant loss (job, relationship, death of family member/close friend);**<br>    **ii. History of suicidal behavior by family member/close friend;**<br>    **iii. Upcoming court appearances;**<br>**e) Transporting officer's impressions about risk.** |
|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Third* Status Report (July 7, 2021), was omitted.<br><br>See findings in **Provision C) 1. Nursing Intake Screening** above.<br><br>In conclusion, this provision remains in Partial Compliance. |
| Recommendations | None other than those provided in **Provision C) 1. Nursing Intake Screening** above. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). |

| Provision C)<br>4. Nursing Intake Screening | **Regardless of the prisoner's behavior or answers given during intake screening, a mental health referral shall always be initiated if there is a documented history related to suicide or self-harm, including during a prior incarceration.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Third* Status Report (July 7, 2021), was omitted.<br><br>As noted in the *First Monitoring Report*, the Problem List embedded within Centricity allows for the storage of information regarding an inmate's current and prior medical and mental health history. The Problem List had both an active (highlighted) and inactive view (shaded). Review of various multiple charts indicated that many inmates had both active and inactive mental health problems, including notations for Frequency of Service Scale (FOSS), serious mental illness, suicide attempt, 2P pre-admit, etc. Of note, the designation for "2P pre-admit" was an indication that the inmate had been placed on suicide precautions and was awaiting placement in the Acute Inpatient Unit. As noted in the provision above (C) 3., there is a requirement for nursing staff to "Review of suicide risk notifications in relevant medical, mental health, and custody records, including as to prior suicide attempts, self-harm, and/or mental health needs."<br><br>Review of various medical charts during this current monitoring period found that intake nurses were still not consistently creating orders for mental health referrals when in-coming detainees presented with FOSS levels, 2P pre-admit, suicide attempt, serious mental illness, etc. The vast majority of mental health referrals generated by intake nurses appeared to be driven by current self-reported information from the detainee, rather than also including prior information available from the Problem List. As such, this provision remains in Partial Compliance. | |
| **Recommendations** | 1) Revision of ACH Intake Screening Policy to include the requirement that intake nurses shall create orders for mental health referrals when an in-coming detainee's Problem List includes FOSS levels, 2P pre-admit, suicide attempt, serious mental illness, etc.<br>2) Provide the draft intake screening policies to expert for review.<br>3) Nursing personnel responsible for intake screening shall be trained on the revised intake screening policy.<br>4) Verification of nursing training should be provided to the expert. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review. | |

| Provision C) 5. Nursing Intake Screening | The County shall develop and implement a written policy and procedure for referrals to mental health by intake staff. The policy shall correspond with the triage system and timeframes set forth in the Mental Health Remedial Plan. | |
|---|---|---|
| **Status** | Partial Compliance | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or JPS in the *Third* Status Report (July 7, 2021), was omitted. | |

| **Discussion** | As noted in the *First Monitoring Report*, neither the SCSO Policy No. 10/04 Medical Intake Screening or ACH Policy No. 05-05 Intake addresses this provision; whereas JPS Policy No. 1022 -Overview of Staff Responsibilities – Outpatient Department states that "Triage involves screening to: 1) identify mental illness; 2) identify suicide risk; 3) identify if ongoing mental health treatment is needed; 4) divert the referral to more appropriate services such as detoxification, Correctional Health Services, custody and jail social workers." The policy includes three levels of triage, but does not assign specific time frames to these triage levels.

As this provision does not specifically address the identification of suicidal inmates, the expert would defer to the mental health expert in this *Consent Decree* regarding the reasonableness of the above-described mental health triage timeframes.

In conclusion, because this provision requires creation of policies and procedures regarding timely mental health referrals for inmates identified as possibly in need of mental health services (excluding suicide prevention), and such policies and procedures are currently lacking, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | 1) In collaboration with the mental health expert, develop and implement a written policy and procedure for mental health referrals by intake staff. The policy shall correspond with the triage system timeframes set forth in the Mental Health Remedial Plan. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 17, 2021). SCSO Policy No. 10/04 Medical Intake Screening. ACH Policy No. 05-05 Intake. JPS Policy No. 1022 - Overview of Staff Responsibilities - Outpatient Department. JPS Access to Care document, September 2, 2020. |

| Provision C) 6. Nursing Intake Screening | **Any prisoner expressing current suicidal ideation and/or current suicidal/self-injurious behavior shall be designated as an emergent referral and immediately referred to mental health staff.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Third* Status Report (July 17, 2020), was omitted. | |

**Discussion** (continued)

As noted in the *First Monitoring Report*, neither the SCSO Policy No. 10/04 Medical Intake Screening or ACH Policy No. 05-05 Intake addresses this provision; whereas JPS Policy No. 1022 -Overview of Staff Responsibilities – Outpatient Department states that "Triage involves screening to: 1) identify mental illness; 2) identify suicide risk; 3) identify if ongoing mental health treatment is needed; 4) divert the referral to more appropriate services such as detoxification, Correctional Health Services, custody and jail social workers." The policy includes three levels of triage, but does not assign specific time frames to these triage levels.

In addition, JPS provided this expert with an Access to Care document that lists several mental health responsibilities arising from medical referrals, but does not specifically address mental health triage and time frames for responding to the identification of suicidal inmates at intake.

It would be this expert's opinion that a detainee identified at intake (for any time during confinement) as a possible current risk for suicide should be seen by a JPS clinician on an emergent basis, i.e., immediately or within six (6) hours, as well as under constant observation until assessment; whereas a detainee identified at intake with a prior history of suicidal behavior should be seen by a JPS clinician on an urgent basis, i.e., within 36 hours.

Review of various medical charts during the current monitoring period found that JPS clinicians consistently responded to emergent mental health referrals for inmates currently at risk for suicide, although it was unclear from the record whether the response time was always within six (6) hours.

In conclusion, because this provision requires creation of policies and procedures regarding timely mental health referrals for inmates presenting with either a current risk or prior history of suicidal behavior from intake nurses, and such policies and procedures are currently lacking, this provision remains in Partial Compliance.

| **Recommendations** | 1) The following language should be added to the policy and procedure for mental health referrals by intake staff that is required by another provision (C) 5.): "a detainee identified at intake (for any time during confinement) as a possible current risk for suicide should be seen by a JPS clinician on an emergent basis, i.e., immediately or within six (6) hours, as well as under constant observation until assessment; whereas a detainee identified at intake |
|---|---|

| | with a prior history of suicidal behavior should be seen by a JPS clinician on an urgent basis, i.e., within 36 hours." |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). Medical chart review. |

| Provision D) 1. Post-Intake Mental Health Assessment Procedures | **All mental health assessments shall be conducted in an area that provides reasonable sound privacy and confidentiality. If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.** |
|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "This is currently being done at RCCC. The interviews are taking place in the area where the officers stand back to give them privacy. The doors were switched out so they can be closed. They have windows so the officer can stand outside and see what is taking place in the room. JPS recently purchased machines that make white noise to help make it more difficult to hear the assessment. If there is a safety concern, the assessments are conducted in an attorney room so there is barrier between JPS staff and the inmate. At the Main Jail, inmate privacy is a priority. When JPS assessments are conducted we offer the maximum level of privacy afforded given case-by-case safety risk. At the Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for mental health assessments. The phone has had some wiring issues but each time those concerns have been brought to the attention of custody staff, a work order is immediately created and the issue is resolved." |

Based upon the findings below, the ACH response to this provision was equally inadequate: "MH clinicians document whether assessments are confidential or non-confidential including rationale if indicated."

In fact, both responses are contrary to the County's own data which indicated only 17 percent (68 of 400) suicide risk assessments (SRAs) were conducted in a private, confidential setting during March 2021.

During the on-site assessment on June 14-15, 2021, the expert shadowed several JPS clinicians as they were conducting daily assessments of the inmates identify as suicidal. During the two-day period, 11 such assessments were observed.

Within the booking area, these suicidal inmates were housed in either a safety cell or administrative segregation cell. As detailed in the *First Monitoring*

*Report*, an existing attorney booth in the Main Jail's booking area had been designated and modified for exclusive use by JPS clinicians when they are assessing inmates at risk for suicide. The booth has a solid glass barrier that separates the clinician from the inmate, thus providing full security, and referred to as the "JPS Interview Room."

However, during the on-site assessment on June 14-15, 2021, the expert was informed that the telephone in the "JPS Interview Room" was inoperable and had been on many occasions, therefore, it was not used on a regular basis when clinicians were assessing inmates housed in the booking area's safety and administrative segregation cells. One clinician told the expert that it had been "forever" since they last utilized the JPS interview room.

As such, the expert observed that these daily assessments were conducted (with cooperative inmates) in one of two ways: 1) either the clinician asked a custody officer to open the cell door and conversed with the inmate while they were seated on the floor, with the clinician and officer standing in the doorway; or 2) the inmate was removed from cell, instructed to sit on the floor in the corridor during the assessment, clothed in their safety smock. Assessments held in the corridor were conducted in full view of both the officer and inmate workers who were sitting in the immediate area. Inmates who were not cooperative were assessed cell front through the closed cell door.

The conditions for the assessment of suicidal inmates housed in booking were intolerable and, given the lack of any reasonable privacy or confidentiality, and it would be impossible for a clinician to conduct a reasonable and comprehensive assessment of an inmate suicide risk.

With regard to assessments of suicidal inmates conducted outside of booking and in other areas of the Main Jail, the expert observed that many daily assessments were conducted in the designated classroom on 3-West Pod on June 14-15, 2021. When the classroom was not available, this expert was informed that the clinician's interaction with the inmate occurred in the open area outside the control booth, or through the doorway of one of the mental health pods. If the inmate refused one of these options, the assessment was conducted cell front. Of note, this expert also observed that custody officers often went to the inmate's cell and asked them "Do you want to talk with JPS?"

In addition to these 11 observed on-site assessments, the expert reviewed 14 medical charts of inmates on suicide precautions during the review period. According to the chart review, although the 3-West Pod classroom was utilized on occasion, most of the assessments were conducted cell-side, with the clinician documenting various reasons why a confidential area was not available. Other than the classroom already being utilized, other reasons noted by the clinicians as to why a confidential space was not utilized included the following: "Custody in meeting, not able to monitor safety," "Custody

|  | unavailable due to training," "Custody not available," "COVID-19 isolation," and "Safety and security." As noted in <u>Case No. 1</u> in the preface to this report, a clinician stated in a June 20, 2021 progress note that the rationale for not providing a confidential setting was that the inmate "unable to come out a cell due to smearing feces yesterday." This case was also noteworthy because a psychiatrist saw the inmate in the privacy of the 3-West Pod classroom on June 1, 2021, whereas less than an hour later a clinician met with the patient cell-side due to "risk to self" and discharged him from suicide precautions.<br><br>In conclusion, the on-going lack of privacy and confidentiality during the daily assessment of suicide risk is a significant impediment to the County's ability to provide a reasonable suicide prevention program. Based upon current practices, as well as lack of approved policy to address the issue, this provision remains in Non-Compliance. |
|---|---|
| **Recommendations** | 1) Unless exigent circumstances exist and are documented on a case-by-case basis, any inmate identified as suicidal should be given an opportunity for assessment outside of their cell. This includes initial assessments, daily on-going assessments, discharge assessments, and scheduled follow-up.<br><br>2) JPS clinicians conducting initial and on-going assessments of inmates on suicide precautions should continue to document the location of the assessment in the medical chart and, if the assessment was conducted cell-side, the reason why privacy and confidentiality were not provided.<br><br>3) A permanent solution to the inoperable telephone inside the designated JPS Interview Room in the Main Jail's booking area should be a top priority of the SCSO. Citing on-going work orders for repair as the explanation as to why the interview room is not being utilized is no longer reasonable. The telephone system and its wiring should simply be replaced.<br><br>4) Consistent with the previous recommendation for privacy booths for intake nursing staff, additional designated room(s) or areas outside of the Main Jail's booking area that can provide privacy and confidentiality should be created and routinely utilized for the assessment of suicidal inmates.<br><br>5) The SCSO and ACH/JPS suicide prevention policies should be revised to include an adequate description of the requirement for privacy and confidentiality during the assessment of suicidal inmates.<br><br>6) In order to reduce the level of inmate refusals, instead of a custody officer asking an inmate on suicide precautions whether they want to talk with a JPS clinician, the JPS clinician should go to each inmate's cell and encourage them to come out into a confidential area for their daily assessment.[2] |

[2] Although JPS commented on the draft version of this report on September 7, 2021 that "This is already MHs current *practice*. MH supervisors will reinforce to staff the importance of identifying confidential space whenever

| Evidentiary Basis | Sacramento County's *Third* Status Report (July 7, 2021). On-site observation on June 14-15, 2021. Medical chart review. |
|---|---|

| Provision D) 2. Post-Intake Mental Health Assessment Procedures | **Mental health staff shall conduct assessments within the timeframes defined in the mental health referral triage system.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored ACH in the *Third* Status Report (July 7, 2021) stated: "MH assessments are conducted within the time frames defined in the MH triage system. MH clinicians document whether assessments are confidential or non-confidential including rationale if indicated. The draft policy addresses the mental health assessment to be completed if a suicide risk is noted at intake or if any staff member becomes aware of a patient verbalizing or has engaged in acts of self-harm or suicidal ideation. Licensed MH clinical staff will conduct a suicide risk assessment." As stated in the *First Monitoring Report*, JPS previously provided this expert with an Access to Care document that listed the mental health triage system and time frames for response. As this provision is similar to **Provision C) 5. Nursing Intake Screening** above and is not specifically address suicidal inmates, the expert would defer to the mental health expert in this *Consent Decree* regarding the reasonableness of the above-described mental health triage timeframes for initial mental health assessments. In conclusion, because this provision requires creation of policies and procedures regarding timely mental health referrals for inmates identified as possibly in need of mental health services (excluding suicide prevention), and such policies and procedures are currently lacking, it remains in Partial Compliance. | |
| **Recommendations** | In collaboration with the mental health expert, develop and implement a written policy and procedure regarding timeframe for completion of initial mental health assessments. | |
| **Evidentiary Basis** | JPS Policy No. 1022 - Overview of Staff Responsibilities - Outpatient Department. JPS Access to Care document, September 2, 2020. | |

---

feasible and available and to directly contact patients on suicide watch if they refuse a MH visit.  This will be addressed during huddles and completed by 9/8/21," the expert observed on both June 14 and 15 that it was the *practice* of deputies, not JPS clinicians, to go to each suicidal inmate's cell and ask them if they wanted to talk with JPS.

| Provision D)<br>3. Post-Intake Mental Health Assessment Procedures | **The County shall revise its mental health assessment procedures and related forms to ensure identification of historical and current patient mental health and suicide risk information, consistent with the recommendations of the subject matter expert.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Third* Status Report (July 17, 2020), was omitted.<br><br>As stated in the *First Monitoring Report*, the JPS Mental Health Assessment is embedded within Centricity and contains the following domains: Background and Legal Information, Personal History, Medical Information and Significant Health Issues, Substance Abuse History, Mental Health Treatment History, Medication Verification, Mental Status Examination, DSM-V Diagnoses, and Preliminary Treatment Plan. In addition, the JPS Initial Psychiatric Evaluation is also embedded within Centricity and contains the following domains: Current Psychotropic Medication, Mental Status Examination, DSM-V Diagnoses, and brief Suicide Ideation inquiry. The Mental Health Assessment and Initial Psychiatric Evaluation forms should <u>not</u> be primarily utilized for the assessment of suicide risk.<br><br>In sum, critique of the utility of the current JPS Mental Health Assessment and JPS Initial Psychiatric Evaluation forms are deferred to the mental health expert in the *Consent Decree*. This provision remains in Partial Compliance because JPS does not currently have a policy and procedure that addresses the provision. | |
| **Recommendations** | None | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>JPS Mental Health Assessment form.<br>JPS Initial Psychiatric Evaluation form. | |

| Provision E)<br>1. Responses to Identification of Suicide Risk or Need for Higher Level of Care | **When a prisoner is identified as at risk for suicide and placed by custody staff in a safety cell, on suicide precautions, and/or in a safety suit, mental health staff shall be contacted immediately. A qualified mental health professional, or other appropriately trained medical staff in consultation with mental health staff, shall complete a confidential in-person suicide risk assessment as soon as possible, consistent with the "must-see" referral timeline.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice as outlined in our Suicide Prevention Operations Order updated in January 2020. In addition, a | |

|  | correctional based negotiation team is in the beginning stages of being developed to assist with suicide de-escalation incidents for inmates who are experiencing a crisis. Deputies selected to be part of this team will attend a custody-based negotiations class facilitated by the FBI. At Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for mental health assessments. The phone has had some wiring issues but each time those concerns have been brought to the attention of custody staff, a work order is immediately created and the issue is resolved."<br><br>Consistent with findings from the *First Monitoring Report*, following a recent medical chart review, this expert determine that portions of this provision were in compliance. Inmates identified as suicidal are often placed on suicide precautions in a safety cell and always clothed in a safety smock. JPS is immediately notified and seemingly responds in a timely manner. As stated earlier in this report, JPS clinicians consistently responded to emergent mental health referrals for inmates currently at risk for suicide, although it was unclear from the record whether the response time was always within the recommended six (6) hours. Finally, as also reported throughout in this report, inmates identified as potentially suicidal are still not consistently provided reasonable privacy and confidentiality during the suicide risk assessment process.<br><br>In conclusion, because the SCSO and ACH/JPS suicide prevention policies have not been finalized to incorporate the requirements of this provision, as well as the fact that inmates identified as potentially suicidal are still not consistently provided reasonable privacy and confidentiality during the assessment process, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | 1) Finalize the SCSO and ACH/JPS suicide prevention policies to incorporate the requirements of this provision.<br>2) Create a corrective action plan that resolves issues of reasonable privacy and confidentiality during the assessment of suicide risk. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review. |
| **Provision E) 2. Responses to Identification of Suicide Risk or Need for Higher Level of Care** | **Consistent with current RCCC policy, if there is no mental health staff on site at RCCC at the time that an emergent mental health need is identified, the prisoner shall be transported to the Main Jail for emergency evaluation within two hours of the initial report.** |
| **Status** | **Partial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice. Development of procedures for use of suicide-resistant cells at RCCC to limit transport to only |

the most acute patients. Our goal is to work with Lindsay Hayes to create an additional four suicide-resistant cells where we can house inmates who fit this criteria."

Following review of various medical charts, an inmate identified as suicidal at RCCC continues to be initially seen by a JPS clinician (during regular business hours) and provided with a suicide risk assessment. If the assessment indicates the need for further suicide precautions, the inmate is transported to the Main Jail. If a JSP clinician is not available, the inmate is initially housed in the Safety Cell or North Holding No. 2 Cell and then immediately transported to the Main Jail within two hours.

On June 15, 2021, this expert visited RCCC and spoke with several supervisory custody and mental health personnel. On average, approximately 11 suicidal inmates per month are transported to the Main Jail from RCCC. Supervisory custody and mental health personnel proposed that eight (8) cells could be designated in the facility's IOP unit for inmates who become suicidal, but might not need acute in-patient level of care. The expert inspected the IOP unit and found that all cells were suicide-resistant. Supervisory custody and mental health personnel informed the expert that they were both currently fully staffed to take on responsibility for managing suicidal inmates in the IOP unit. They also identified interview rooms adjacent to the JBCT program that would be utilized for the private and confidential assessment of suicidal inmates. The expert inspected these interview rooms and found the proposed space to be acceptable.

In addition, RCCC custody and mental health supervisory personnel were aware that they needed to develop policies regarding the assessment and management of suicidal inmates when mental health clinicians were not on-site (i.e., after 5:00pm) because the *Consent Decree* limits the length of stay in safety cells to six (6) hours.

Finally, according to a letter to the expert from plaintiffs' counsel dated September 1, 2021, "subject to implementation of the SME recommendations set forth in the report (including adequate on-site mental health clinician coverage, implementation of relevant policies/practices, and designation of adequate facility space) – the Remedial Plan would permit holding class members on suicide observation/precautions at RCCC." As such, unless defendants' counsel disagrees, the expert would support the proposal (as long as it did not involve additional safety cells) contingent upon the recommendations below.

In conclusion, because the SCSO and ACH/JPS suicide prevention policies have not been revised to incorporate the requirements of this provision, this provision remains in Partial Compliance.

| Recommendations | 1) Revise the SCSO and ACH/JPS suicide prevention policies to incorporate the requirements of this provision; provide the draft suicide prevention policies to expert for review.<br>2) Develop a policy regarding the assessment and management of suicidal inmates at RCCC when mental health clinicians are not on-site (i.e., after 5:00pm).<br>3) Ensure that interview rooms adjacent to the JBCT program at RCCC are always available for the private and confidential assessment of suicidal inmates. |
|---|---|
| Evidentiary Basis | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review.<br>Discussion with RCCC custody and mental health supervisory personnel.<br>Inspection of RCCC.<br>*Mays* plaintiffs' counsel letter dated September 1, 2021. |

| Provision E)<br>3. Responses to Identification of Suicide Risk or Need for Higher Level of Care Provision | **The County shall revise its JPS suicide risk assessment procedures and forms in consultation with Plaintiffs. The County shall ensure that its JPS suicide risk assessment process, policies, and procedures consider and document the following:**<br><br>   **a) Review of suicide risk notifications and records from any previous incarcerations at the Jail, including records pertaining to suicide attempts, self-harm, and/or mental health needs;**<br>   **b) Other prior suicide ideation or attempts, self-harm, mental health treatment or hospitalization;**<br>   **c) Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;**<br>   **d) Suicide risk factors and protective factors, such as:**<br>     **i. Recent significant loss (job, relationship, death of family member/close friend);**<br>     **ii. History of suicidal behavior by family member/close friend;**<br>     **iii. Upcoming court appearances;**<br>   **e) Transporting officer's impressions about risk;**<br>   **f) Suicide precautions, including level of observation.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Third* Status Report (July 7, 2021), was omitted.<br><br>As stated in the *First Monitoring Report*, although there are no current policies that address the utilization of a suicide risk assessment (SRA) form, based upon review of various medical charts, JPS previously developed an SRA form that is completed by outpatient clinicians whenever an inmate is identified at risk | |

|  | for suicide. If the inmate is placed on suicide precautions, a follow-up SRA form is subsequently completed upon a determination that the inmate can be discharged from suicide precautions. Of note, if a patient is placed in the 2P Acute Inpatient Unit, the SRA is <u>not</u> completed by either nursing or psychiatry staff. Rather, current practices are for an outpatient clinician to complete the SRA. The expert previously found that the current JPS Suicide Risk Assessment template embedded within Centricity was very comprehensive and exceeded the requirements of this provision.<br><br>The expert's recent medical chart review of 14 cases found that JPS clinicians were consistently completing all of the required domains on the form. In addition, progress notes indicated that clinical supervisors were consistently consulted when the follow-up SRA indicated a recommendation to discharge the inmate from suicide precautions.<br><br>In conclusion, although the ACH/JPS draft suicide prevention policy, to include a description of the SRA has not been finalized, the SRA form was very comprehensive. This provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | 1) Finalize the ACH/JPS suicide prevention policy to incorporate the requirements for completion of suicide risk assessments; provide the finalized draft suicide prevention policies to expert for review.<br>2) In order to comply with the requirement of this provision to "Review of suicide risk notifications and records from any previous incarcerations at the Jail, including records pertaining to suicide attempts, self-harm, and/or mental health needs," JPS clinicians should be instructed to review the inmate's Problem List to determine if it includes FOSS levels, 2P pre-admit, suicide attempt, serious mental illness, etc. notations from previous confinements. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>JPS Suicide Risk Assessment form.<br>Medical chart review. |

| **Provision E)<br>4. Responses to Identification of Suicide Risk or Need for Higher Level of Care** | **The County shall ensure that the meal service schedule or other custody-related activities cause no delay in the completion of suicide risk assessments for prisoners.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *First* Status Report (July 7, 2021), was "Current practice." | |

|  | Review of the SCSO and ACH/JPS suicide prevention policies found that they did not include language to require custody-related activities (including meal service schedule) shall not delay completion of the SRA. However, review of various medical charts did not indicate any impediments to the timely SRA completion.<br><br>In conclusion, because the SCSO and ACH/JPS suicide prevention policies have not been revised to incorporate the requirements of this provision, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | Finalize the SCSO and ACH/JPS suicide prevention policies to incorporate the requirement of this provision; provide the draft suicide prevention policies to expert for review. |
| **Evidentiary Basis** | Sacramento County's *Third Status Report* (July 7, 2021).<br>Medical chart review. |

| **Provision F)**<br>**1. Housing of Inmates on Suicide Precautions** | **The County's policy and procedures shall direct that prisoners, including those identified as being at risk for suicide, be treated in the least restrictive setting appropriate to their individual clinical and safety needs.** | |
|---|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Policy forthcoming. Current post orders and practice indicate least restrictive housing for suicidal inmates. JPS staff shall consult with custody staff to determine the appropriate housing location for the inmate."<br><br>Contrary to the above response, any "current post orders" cited above were again not provided to this expert. Review of current SCSO and ACH/JPS suicide prevention policies found that they did not include language to require that inmates on suicide precautions "be treated in the least restrictive setting appropriate to their individual clinical and safety needs." In addition, review of various medical charts, as well as observation from the June 14-15, 2021 on-site assessment, continued to indicate that many inmates placed on suicide precautions were initially housed in safety cell/administrative segregation cells located in the Main Jail's booking area and clothed in safety smocks. Safety cells continue to be clearly utilized as the initial default setting for many suicidal inmates.<br><br>In conclusion, because current post orders were not provided, SCSO and ACH/JPS suicide prevention policies have not been finalized to incorporate the requirements of this provision, and current practices indicated that many | |

| | |
|---|---|
| | inmates placed on suicide precautions continue to be placed in safety cells and clothed in safety smocks by default, this provision remains in Non-Compliance. |
| **Recommendations** | 1) Finalize SCSO and ACH/JPS suicide prevention policies (including SCSO Policy No. 4/05 - Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding No. 2.) to incorporate the requirement that inmates on suicide precautions "be treated in the least restrictive setting appropriate to their individual clinical and safety needs." The policies should specifically state that safety cells should not be the default setting for inmates initially placed on suicide precautions; provide the draft suicide prevention policies to expert for review.<br>2) Eliminate the practice of utilizing safety and segregation cells as the initial default placement of inmates on suicide precautions. |
| **Evidentiary Basis** | Sacramento County's *Third Status Report* (July 7, 2021).<br>Medical Chart review.<br>Observation during on-site assessment of June 14-15, 2021. |

| **Provision G) 1. Inpatient Placement** | **The County shall ensure that prisoners who require psychiatric inpatient care as clinically indicated are placed in the 2P unit within 24 hours of identification, absent exceptional circumstances. In all cases, the provision of clinically indicated treatment to any prisoner requiring inpatient level of care shall be initiated within 24 hours.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Jail Annex planning in order to meet the 24-hour time requirement. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail."<br><br>The current pertinent ACH/JPS policies (ACH Policy No. 1433 Limitations for Admission to Jail Acute Psychiatric Inpatient Unit and JPS Policy No. 1009 Suicide Precautions - Acute Inpatient Unit) did not specifically address admission criteria that was consistent with this provision.<br><br>The recent medical chart review of inmates placed on suicide precautions continued to find that all cases resulted in automatic placement on the 2P pre-admit list. In practice, not all inmates placed on suicide precautions were eventually placed in the 2P Acute Inpatient Unit. In fact, only a small percentage of suicidal inmates were housed on the 2P Unit. Rather, most of these inmates were initially housed in a safety cell and then transferred to the Suicidal Inmate Temporary Housing Unit (SITHU), located in 3-West Unit, lower 300 pod, cells 301 – 310 for male inmates or 3-West Unit lower 100 pod, cells 101 – 104 for female inmates. Most inmates remained on suicide precautions in the SITHU for several days or longer, while still maintaining a | |

|  | pending 2P pre-admit order. Eventually, the issue was resolved and the 2P Pre-Admit order was withdrawn.

It would be the expert's opinion that not all inmates presenting with suicidal ideation and subsequently placed on suicide precautions met the criteria for a 5150 order and placement on the 2P Acute Inpatient Unit. Such clinical judgment is deferred to the mental health expert in the *Consent Decree*. This provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | 1) Determine the specific criteria for admittance into the 2P Acute Inpatient Unit, to include the scope of "danger to self" behavior.<br>2) Revise the pertinent ACH/JPS policies (ACH Policy No. 1433 Limitations for Admission to Jail Acute Psychiatric Inpatient Unit, JPS Policy No. 1009 Suicide Precautions - Acute Inpatient Unit) and/or other policies to ensure that they are compliant with the requirements of this provision; provide the draft policies to expert for review. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 17, 2020).<br>ACH Policy No. 1433 Limitations for Admission to Jail Acute Psychiatric Inpatient Unit.<br>JPS Policy No. 1009 Suicide Precautions - Acute Inpatient Unit.<br>Medical Chart review.<br>Observation during on-site assessment of June 14-15, 2021. |

| **Provision H)**<br>**1. Temporary Suicide Precautions** | **No prisoner shall be housed in a safety cell, segregation holding cell, or other Temporary Suicide Precautions Housing for more than six (6) hours. If mental health or medical staff determine it to be clinically appropriate based on detoxification-related needs, this time limit may be extended to no more than eight (8) hours. If exceptional circumstances prevent transfer within these timelines, those circumstances shall be documented, and transfer shall occur as soon as possible. This does not preclude the housing of a prisoner in the IOP unit if clinically indicated.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Jail Annex planning will strengthen this request. We currently follow these timeframes as much as possible with the limited number of cells in the IOP unit. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail."

As detailed in the *First Monitoring Report*, there are 4 safety cells located in the Main Jail: 2 in the male booking area, 1 in the female building area, and 1 in the 2P Acute Inpatient Unit. In addition, there is 1 safety cell and 1 holding cell (North Holding No. 2) located at RCCC. There are 6 segregation cells in the Main Jail's booking area, as well as at least 1 sobering cell.  Although the | |

safety cells are prioritized to temporarily house suicidal inmates, any of the remaining segregation, holding, and sobering cells could be designated as Temporary Suicide Precautions Housing.

It was previously determined that "Temporary Suicide Precautions Housing" excludes the Suicidal Inmate Temporary Housing Unit (SITHU) on 3-West Unit because suicidal inmates may be clinically appropriate for placement in the SITHU while awaiting a determination for inpatient hospitalization. For example, this provision does allow for "the housing of a prisoner in the IOP unit if clinically indicated."  As such, length of stay in the SITHU should not be limited to six (6) hours. In addition, it was previously determined that "Temporary Suicide Precautions Housing" includes the Main Jail's "sobering cell" (not currently included in the *Consent Decree* definition) because of the provision's allowance for utilizing such cells for "detoxification-related needs."

During this monitoring period, the expert continued to be told by both custody and JPS leadership that the goal was to remove a suicidal inmate from the safety or other temporary holding cells as soon as possible, and there was a belief that the majority of the inmates were being released from these cells within six (6) hours, as indicated by the SCSO's response above that "we currently follow these timeframes as much as possible."

The expert had previously requested safety cell length of stay data to verify the actual length of stay within these cells. According to SCSO leadership, the current jail inmate management system (JIMS) was not capable of collecting such data. As such, the expert requested that all observation sheets for inmates housed in safety cells during May 2021 be collected to generate length of stay data. The SCSO agreed and subsequently assigned several staff to both collect all of the observation sheets, as well as document the "time placed" and "time removed" from the safety cells. A spreadsheet was forwarded to the expert and length of stay for each inmate was calculated. *The expert determined that 107 inmates were housed in safety cells during May 2021, with an average length of stay of approximately 16 hours.* The shortest length of stay was 30 minutes, and the longest length of stay was 142 hours (from April 27 through May 3, 2021). The review also found that 39 of 107 (or 36%) inmates were housed in safety cells for six (6) hours or less.

Of note, the expert was informed by SCSO leadership that the collection of these 107 safety cell observation sheets and spreadsheet development was very time-consuming and staff-intensive. Although appreciative of the effort, the expert informed SCSO leadership that the agency needed to develop a mechanism to collect such data on a regular basis in order to monitor the length of stay in safety and administrative segregation cells to be compliant with the six (6) hour maximum. The expert was subsequently informed that a new jail management system, entitled ATIMS, was scheduled to be fully activated by

|  | August 2021 and it was anticipated that such length of stay data could be generated by this software program.<br><br>In conclusion, because the current SCSO and ACH safety cell policies had not been finalized to address the requirements of this provision, and available data regarding safety cells use in May 2021 indicated only 36 percent (39 of 107) of inmates were housed in safety cells for six (6) hours or less, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | 1) Finalize all SCSO and ACH/JPS suicide prevention and safety cell use policies to include language that prohibits use of safety cells, sobering cells, and segregation holding cells for more than six (6) hours except for exceptional circumstances; provide all finalize policies to expert for review.<br>3) Beginning October 2021, provide a ATIMS report for the length of stay within safety cells, sobering cells, segregation cells, and any other holding cells utilized for the temporary housing of suicidal inmates to the expert on a monthly basis. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>SCSO Policy No. 4/05 - Use of Safety Cells/ Segregation Cells/Multipurpose Rooms/North Holding #2.<br>ACH Policy No. 1415 – Patients in Safety Cells.<br>Safety cell length of stay data for May 2021. |

| **Provision H)**<br>**2. Temporary Suicide Precautions** | **The County shall ensure, including by revising written policies and procedures where necessary, the timely and adequate completion of medical assessments for prisoners in need of suicide precautions, as required under Operations Order 4/05 (i.e., within 12 hours of placement of the next daily sick call, whichever is earliest, and then every 24 hours thereafter).** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice. Custody staff shall notify medical within 15 minutes that a prisoner is temporarily housed in a safety or segregation cell and medical staff shall complete an assessment within 12 hours of placement or the next sick call, whichever is earliest."<br><br>As stated in the *First Monitoring Report*, the current SCSO Policy No. 4/05 - Use of Safety Cells/ Segregation Cells/Multipurpose Rooms/North Holding No. 2 states: "A medical assessment shall be completed within twelve (12) hours of placement or the next daily sick call, whichever is earliest. The prisoner must be medically cleared for continued retention every 24 hours thereafter." Because this policy is specific to safety cells and other temporary housing cells, and the above provision covers all suicidal inmates regardless of housing location, the requirement for the medical assessment for inmates on | |

| | suicide precautions within 12 hours of placement and then every 24 hours thereafter needs to be incorporated in the SCSO and ACH/JPS suicide prevention policies.<br><br>This expert reviewed 14 medical charts of inmates housed on suicide precautions during this monitoring period. The review found that nursing staff almost always provided timely medical assessments (documented as SOAP notes in Centricity) within 12 hours of placement and then every 24 hours during the entirety of an inmate's placement on suicide precautions. Patients in the 2P Unit were seen approximately three times per day by nursing staff.<br><br>In conclusion, because the medical assessment for inmates on suicide precautions within 12 hours of placement and then every 24 hours thereafter still needs to be incorporated in the SCSO and ACH/JPS suicide prevention policies, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | Finalize all SCSO and ACH/JPS suicide prevention policies to incorporate the requirement that medical assessments for inmates on suicide precautions should occur within 12 hours of placement and then every 24 hours thereafter; provide all draft policies to expert for review. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical Chart review. |

| **Provision H)**<br>**3. Temporary Suicide Precautions** | **The County shall ensure that any cell used for holding prisoners on suicide precautions is clean prior to the placement of a new prisoner, as well as cleaned on a normal cleaning schedule.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice. The Post Order has been approved."<br><br>The expert was provided a copy of the "Housing Unit Cell Cleaning Process" Post Order, revised April 2021. In addition, the expert inspected most of the 10 SITHU cells (1 through 10) utilized to house suicidal inmates. Safety cells and administrative segregation cells in the booking area of the Main Jail could not be inspected because all cells were occupied by inmates. Due to a scheduling conflict, cells in the 2P Acute Inpatient Unit could not be inspected. Inspection of unoccupied SITHU cells found that they were marginally clean.<br><br>In conclusion, pending further inspection of 2P Unit cells, this provision remains in Partial Compliance. | |

| Recommendations | None |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). "Housing Unit Cell Cleaning Process" Post Order, revised April 2021. Inspection of SITHU cells. |

<br>

| **Provision H) 4. Temporary Suicide Precautions** | **The County shall create and implement a written policy ensuring adequate frequency for meals, fluids, hygiene, showers, prescribed medications, and toileting when a prisoner is in cell used for holding prisoners on suicide precautions**. | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice. Will add language to the new suicide prevention policy. RCCC has no cells designated for long term housing of inmates on suicide precautions. RCCC does not have JPS staff available 24 hours a day." <br><br> Current SCSO and ACH/JPS suicide prevention policies still had not been finalized to include the requirements regarding adequate frequency for meals, fluids, hygiene, showers, prescribed medications, and toileting for inmates on suicide precautions. In practice, inmates housed in safety cells continue to not be offered showers, were required to request hydration, and could only defecate into a floor grate. Suicidal inmates housed in SITHU cells rarely were provided showers. Although this provision remains in Partial Compliance, it is in jeopardy of being moved to Non-Compliance if improvement is not found during the next monitoring period. | |
| Recommendations | 1) Finalize all SCSO and ACH/JPS suicide prevention policies to incorporate the requirement regarding adequate frequency for meals, fluids, hygiene, showers, prescribed medications, and toileting for inmates on suicide precautions; provide all draft policies to expert for review. <br> 2) Eliminate practice of not providing showers to suicidal inmates housed in safety, administrative segregation, and SITHU cells. <br> 3) Reinforce SCSO's policy on "Isolation and Quarantine Showers" with custody deputies. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). Medical chart review. Observation during on-site assessment of June 14-15, 2021. SCSO's policy on "Isolation and Quarantine Showers," January 8, 2021. | |

| Provision H)<br>5. Temporary<br>Suicide Precautions | **Inmates on suicide precautions shall not automatically be on lockdown and should be allowed dayroom or out-of-cell access consistent with security and clinical judgments.** | |
|---|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice."<br><br>Contrary to the County's continued response that inmates on suicide precautions had access to dayroom or out of cell activities based upon security and medical judgments, this expert's medical chart review of 14 cases saw <u>no</u> evidence that inmates on suicide precautions in either the safety or SITHU cells were allowed any out-of-cell access, including dayroom. In practice, and with the exception of 2P Unit patients, all inmates on suicide precautions were always locked down.<br><br>During the on-site assessment on June 14-15, 2021, this expert conversed with several JPS clinicians and deputies that were regularly assigned to the 3-West Pod which housed suicidal inmates in the SITHU. Both clinicians and deputies acknowledged that inmates on suicide precautions continued to be locked down in their cells and only on rare occasions even given the opportunity to shower (e.g., such as when the expert was on-site which will be explained in more detail in another section of this report).<br><br>Although deputies who conversed with this expert generally agreed with the philosophy of out-of-cell activities when approved by JPS clinicians, there were exceptions. For example, one deputy freely admitted that they did not believe suicidal inmates should be permitted to attend court hearings or receive telephone privileges because such activities might result in bad news in which the inmate attempted suicide. This expert responded that the most ideal time to receive any potentially bad news would be while the inmate was still being observed on suicide precautions, rather than at a later time when they were not on suicide precautions and went to court and/or received telephone privileges.<br><br>This provision is similar to **Provision M) 1. Property and Privileges"** and will be discussed in more detail in that provision.<br><br>In conclusion, because there are no current SCSO and ACH/JPS policies that address this requirement and, contrary to the County's response, all inmates on suicide precautions in either the safety or SITHU cells are virtually locked down and have no out-of-cell access, this provision remains in Non-Compliance. | |
| **Recommendations** | 1) Finalize all SCSO and ACH/JPS suicide prevention policies to include language that suicidal inmates will not automatically be on lockdown and | |

| | |
|---|---|
| | should be allowed dayroom or out-of-cell activities as determined by JPS clinicians in consultation with custody personnel; provide all draft policies to expert for review.<br>2) Eliminate of the current practice of all management decisions regarding suicidal inmates being made by custody personnel. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review.<br>Observation during on-site assessment of June 14-15, 2021.<br>Discussion with JPS clinicians and deputies on 3-West Pod. |

| | |
|---|---|
| **Provision H)**<br><br>**6. Temporary Suicide Precautions** | **The classrooms or multipurpose rooms adjacent to the housing units in the Main Jail are designed for, and should be made available for, prisoner programs and treatment. Absent an emergency, the County shall not use the classrooms and multipurpose rooms to hold prisoners pending a mental health evaluation or on suicide precautions. Where such emergency occurs, the County shall document the reasons for retention and move the prisoner, within six (6) hours, to the inpatient unit or other appropriate housing location for continued observation, evaluation, and treatment.** |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021) was the same as in prior reports, i.e., "Multi-purpose rooms are no longer used for holding suicide precaution, or mental health evaluation inmates. Written directives to staff document acceptable practice for at-risk patients, without the use of MPRs. There is currently a zero-use policy, not even as a last resort."<br><br>This expert again did not find any evidence in either the on-site assessment in June 2021 or medical chart reviews that multi-purpose rooms, including classrooms, were currently utilized for even the temporary housing of inmates on suicide precautions. In addition, both SCSO and JPS leadership also informed this expert that multi-purpose rooms/classrooms were no longer utilized for that purpose. This provision only remains in Partial Compliance because the existing SCSO Policy No. 4/05 - Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding No. 2. needs to be revised to eliminate reference to multi-purpose rooms. |
| **Recommendations** | SCSO Policy No. 4/05 - Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding No. 2. should be revised to delete reference to multi-purpose rooms, including classrooms, as acceptable locations for the housing of suicidal inmates; provide all draft policies to expert for review. |

| Evidentiary Basis | Sacramento County's *Third* Status Report (July 7, 2021). SCSO Policy No. 4/05 - Use of Safety Cells/ Segregation Cells/Multipurpose Rooms/North Holding #2. Medical chart review. Observation during on-site assessment of June 14-15, 2021. |
|---|---|


| **Provision I) 1. Suicide Hazards in High-Risk Housing Locations** | **The County shall not place prisoners identified as being at risk for suicide or self-harm, or for prisoners requiring IOP level of care, in settings that are not suicide-resistant as consistent with Lindsay Hayes's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities."** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | The expert inspected most of the 10 SITHU cells (1 through 10) utilized to house suicidal inmates. Safety/administrative segregation cells in the booking area of the Main Jail could not be thoroughly inspected because all cells were occupied by inmates. Due to a scheduling conflict, cells in the 2P Acute Inpatient Unit could not be inspected.<br><br>Although inspection of unoccupied SITHU cells found that they were suicide-resistant, there were two concerns. <u>First</u>, it appeared that some cells had slight gaps between fixtures and walls/ceilings that could be utilized as an anchoring point in a suicide attempt by hanging (in which an inmate wedges a ligature in the gap). <u>Second</u>, Cell No. 7 and Cell No. 8 in the SITHU had blind spots in which deputies were not able to fully observe an inmate if they were situated in far corner of those cells. This issue will be addressed below in **Provision I) 2. Suicide Hazards in High-Risk Housing Locations**.<br><br>This provision remains in Partial Compliance because SCSO and ACH/JPS suicide prevention policies need to be finalized regarding the placement of suicidal inmates in suicide-resistant cells, and the above deficiencies need to be remedied by implementing the below recommendations. | |
| **Recommendations** | 1) Finalize the SCSO and ACH/JPS suicide prevention policies to ensure they address the housing of suicidal inmates in suicide-resistant cells.<br>2) SCSO and/or the Suicide Prevention Subcommittee should review all suicidal attempts by hanging in the last 24 months and identify the anchoring point in the cells for those hanging incidents to determine if those same conditions exist in the SITHU, safety/administrative segregation, and 2P Unit cells.<br>3) The SCSO should inspect all SITHU, safety/administrative segregation, and 2P Unit cells to identify any gaps in wall/ceiling fixtures that could be utilized as an anchoring device.  Any gaps should be closed with security caulking. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). SCSO and ACH/JPS suicide prevention policies. Observation during on-site assessment of June 14-15, 2021. | |

|  | Checklist for the 'Suicide-Resistant' Design of Correctional Facilities, Lindsay M. Hayes, December 2019. |
|---|---|

| Provision I)<br>2. Suicide Hazards in High-Risk Housing Locations | **Cells with structural blind spots shall not be used for suicide precaution.** | |
|---|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 17, 2021), was "Current practice."<br><br>Despite the above response that the "current practice" of the SCSO was not to utilize cells with blind spots for inmates on suicide precautions, the expert's inspection of the SITHU found that Cell No. 7 and Cell No. 8 in the SITHU had blind spots in which deputies were not able to observe an inmate if they were situated in far corner of those cells.<br><br>Because this provision specifically prohibits the placement of a suicidal inmate in a cell with blind spots, and Cells 7-8 in the SITHU had blind spots, the provision is now in Non-Compliance. | |
| **Recommendations** | The SCSO should either stop utilizing Cells 7-8 in the SITHU for the housing of suicidal inmates develop a corrective action plan to eliminate the blind spots in those cells, or simply utilize other suicide-resistant cells in the IOP section of the housing unit. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Observation during on-site assessment of June 14-15, 2021. | |

| Provision J)<br>1. Supervision/ Monitoring of Suicidal Inmates | **The County shall ensure adequate visibility and supervision of prisoners on suicide precautions.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *First* Status Report (July 17, 2020), was "Current practice."<br><br>During inspection of the SITHU and safety/administrative segregation cells at the Main Jail on June 14-15, 2021, this expert observed two different practices regarding the documentation of observation for suicidal inmates. For inmates housed in safety/administrative segregation cells in the booking area, individual observation sheets were attached to a clipboard located outside of each cell.  However, in the SITHU, a clipboard containing the observation | |

| | sheets of all inmates on suicide precautions was located on the deputies' desk located outside the SITHU. Such a practice was not desirable, and raised the possibility (although not observed by the expert) that observation sheets could be completed by a deputy without entering the SITHU and observing each inmate. This provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | The SCSO should require that each inmate on suicide precautions should have an observation sheet placed on the outside of their cell door.  The observation sheet, or a separate sheet, should also document the inmate's level of observation, as well as possessions and privileges allowed for the inmate. This requirement should be reflected in the revised SCSO and ACH/JPS suicide prevention policies. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). Observation during on-site assessment of June 14-15, 2021. |

| **Provision J) 2. Supervision/ Monitoring of Suicidal Inmates** | **The County shall not cover cell windows with magnetic flaps or any other visual barrier preventing visibility into any cell that is housing a prisoner on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice." | |
| | During inspection of the 10 SITHU cells utilized to house suicidal inmates, as well as the safety/administrative segregation cells in the booking area of the Main Jail, this expert did <u>not</u> observe the covering of any cell windows by custody personnel. | |
| | In conclusion, this provision remains in Partial Compliance only because the SCSO and ACH/JPS suicide prevention polices were not finalized. | |
| **Recommendations** | None | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). Observation during on-site assessment of June 14-15, 2021. | |

| Provision J) 3. Supervision/ Monitoring of Suicidal Inmates | The County shall revise its policies regarding the monitoring of prisoners on suicide precautions to provide for at least the following two defined levels of observation: |
|---|---|
| | **a) Close observation** shall be used for prisoners who are not actively suicidal but express suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) or have a recent prior history of self-destructive behavior. Close observation shall also be used for prisoners who deny suicidal ideation or do not threaten suicide but are engaging in other concerning behaviors indicating the potential for self-injury. Staff shall observe the prisoner at staggered intervals not to exceed every 15 minutes and shall document the observation as it occurs.<br><br>**b) Constant observation** shall be used for prisoners who are actively suicidal, either threatening or engaging in self-injury, and considered a high risk for suicide. An assigned staff member shall observe the prisoner on a continuous, uninterrupted basis. The observation should be documented at 15-minute intervals. Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation. |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by SCSO in the *Third* Status Report (July 7, 2021), was: 1) "The revised policy being worked on by the Lexipol team will address this address.  All policies related to the Consent Decree are currently being drafted by the Lexipol project team." With regard to inmates requiring constant observation, the SCSO reported that "This type of monitoring occurs in the SITHU or 2P level of care currently."<br><br>In conclusion, this provision remains in Partial Compliance only because the SCSO and ACH/JPS suicide prevention polices were not finalized. |
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). |

| Provision J) 4. Supervision/ Monitoring of Suicidal Inmates | **For any prisoner requiring suicide precautions, a qualified mental health professional shall assess, determine, and document the clinically appropriate level of monitoring based on the prisoner's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically determined level of monitoring.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice. Once JPS staff has completed the inmate's evaluation, the JPS staff member shall consult with custody staff to determine the appropriate housing location for the inmate."<br><br>As previously indicated in the First Monitoring Report and continuing in this report, the expert again found during the medical chart review that when an inmate is identified as suicidal and placed on suicide precautions, they are often initially housed in a safety cell. This is the regular default mechanism utilized by custody staff prior to assessment by a JPS clinician. In addition, during the expert's observation of daily assessments in the booking area on June 14, as well as safety cell use data indicating an average length of stay of 16 hours in May 2021, a JPS clinician could continue the safety cell placement following assessment, regardless of whether a SITHU cell was available or not. This provision remains in Partial Compliance. | |
| **Recommendations** | Finalize all SCSO and ACH/JPS suicide prevention and safety cell policies to include language that suicidal inmates will be placed in the most clinically appropriate setting and placement in a safety cell shall not serve as a substitute for such a clinical determination; provide all draft policies to expert for review. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review.<br>Observation during on-site assessment of June 14-15, 2021. | |

| Provision J) 5. Supervision/ Monitoring of Suicidal Inmates | **Video monitoring of prisoners on suicide precaution shall not serve as a substitute for Close or Constant observation.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice. Outlined in our current Suicide Prevention Policy."<br><br>As previously reported in the *First Monitoring Report*, closed-circuit television (CCTV) monitoring is only available in the 2P Acute Inpatient Unit. According to JPS leadership, nursing personnel assigned to the unit were <u>not</u> assigned | |

|  | exclusively to monitor the CCTV. Therefore, 2P Unit patients were <u>not</u> expected to be continuously monitored by the CCTV.

Despite the unequivocal language against their use as a primary tool in observing suicidal in current SCSO and JPS policies, the recent medical chart review continued to find the inappropriate use of CCTV in the 2P Acute Inpatient Unit. For example, as previously detailed in <u>Case No. 1</u> (on pages 8 through 23 of this report), the suicidal patient was invariably placed on CCTV and Q-30-minute observation while in the 2P Unit from April 16 through May 24, 2021. In theory, CCTV monitoring conceivably provides a more frequent level of observation than regular nursing rounds at 30-minute intervals. As stated in the previous report, observation that 30-minute intervals was prohibited for suicidal patients, and there cannot be a provider order for only CCTV without either constant observation or Q-15 checks.

In conclusion, the easiest solution to resolve the issue of psychiatric providers writing daily orders for CCTV surveillance of suicidal patients would be to simply prohibit the practice of requiring orders for CCTV surveillance. This provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | Finalize SCSO and ACH/JPS suicide prevention policies should include the appropriate language that specify orders for observation of suicidal inmate-patients be limited to either constant direct observation or direct observation at staggered intervals not exceeding every 15 minutes. Orders for CCTV monitoring are prohibited; provide all draft policies to expert for review. |
| **Evidentiary Basis** | Sacramento County's *Third Status Report* (July 7, 2021). SCSO Policy No. 10/05 - Suicide Prevention Program. JPS Policy No. 1011 - Use of Camera Monitors on the Acute Inpatient Unit. Medical chart review. |

| **Provision K) 1. Treatment of Inmates Identified as at Risk of Suicide** | **Qualified mental health professionals shall develop an individualized treatment plan and/or behavior management plan for every prisoner that mental health staff assesses as being a suicide risk.** |
|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Third* Status Report (July 7, 2021), was omitted.

This provision is duplicative to **Provision P) 2. Treatment of Inmates Identified at Risk of Suicide**. There are no current SCSO or ACH/JPS suicide prevention policies that adequately address the requirement for a treatment plan/behavioral management plan for inmates on suicide precautions. As explained in more detail below in Provision P) 2, ACH introduced a new |

| | treatment planning program in January 2020 entitled "Safety Planning Intervention (SPI). Outpatient and IOP clinicians were initially trained, with 2P Unit and Jail Based Competency Treatment (JBCT) program staff scheduled to be trained in the future. Finally, a "MH Suicide Safety Plan" template has been embedded in Centricity based upon the SPI model, and the JPS Suicide Risk Assessment template contains a domain for "Safety and Risk Reduction Plan." Following review of several recent medical charts, the quality of safety planning will be discussed in more detail in Provision P) 2 below.<br><br>In conclusion, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | Finalized SCSO and ACH/JPS suicide prevention policies should include the appropriate language regarding safety planning for inmates on suicide precautions. The language should include the following: "The treatment/safety plan shall describe signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and specific actions (independent coping skills, personal and professional resources for support, etc.) the patient and staff can take if suicidal thoughts do occur. The plan should be updated as clinically indicated." Provide all draft policies to expert for review. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review. |

| **Provision K) 2. Treatment of Inmates Identified as at Risk of Suicide** | **Treatment plans shall be designed to reduce suicide risk and shall contain individualized goals and interventions. Treatment plans shall be reviewed following discharge from suicide precautions and updated as clinically indicated.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Third* Status Report (July 7, 2021), was omitted.<br><br>This provision is also duplicative to **Provision P) 2. Treatment of Inmates Identified at Risk of Suicide**, as well as **Provision K) 1** above. The only difference is that this provision requires that the treatment/safety plan be "updated as clinically indicated." There are no current SCSO or ACH/JPS suicide prevention policies that adequately address the requirement for a treatment plan/behavioral management plan for inmates on suicide precautions. In conclusion, this provision remains in Partial Compliance. | |
| **Recommendations** | Same as above. | |

| Evidentiary Basis | Sacramento County's *Third Status Report* (July 7, 2021). |
| --- | --- |

| Provision K) 3. Treatment of Inmates Identified as at Risk of Suicide | **All assessments, treatment, and other clinical encounters shall occur in an area that provides reasonable sound privacy and confidentiality. If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.** |
| --- | --- |

| Status | **Non-Compliance** | |
| --- | --- | --- |
| Discussion | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "When necessary, custody staff will standby for security while offering auditory privacy. Proximity is dependent on the inmate's behavior safety risk. This can be accomplished at RCCC due to the design of the three offices where these contacts take place. All of the doors can be closed. They have windows where the officers can stand outside and see what is taking place in the room. At Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for mental health assessments. The phone has had some wiring issues but each time those concerns have been brought to the attention of custody staff, a work order is immediately created and the issue is resolved. | |
| | This provision is duplicative of **Provision D) 1. Post-Intake Mental Health Assessment Procedures.** As stated in that section, based on medical chart review and this expert's observation on June 14-15, 2021, although the 3-West Pod classroom was utilized on occasion (and was when this expert was on-site), most of the assessments were conducted cell front, with the clinician utilizing various rationales as to why a confidential area was not available. Other than the classroom already being utilized, other reasons noted by the clinicians as to why a confidential space was not available included the following: "Custody in meeting, not able to monitor safety," "Custody unavailable due to training," "Custody not available," "COVID-19 isolation," and "Safety and security." As previously detailed, all daily assessments of suicidal inmates housed in the safety/administrative segregations cells in booking are conducted cell front because the JPS interview room is often inoperable. Ironically, following discharge from suicide precautions and referral into the IOP, this expert did continue to find examples of inmates being seen by JPS clinicians in a classroom as part of the initial assessment into the program. | |
| | In conclusion, the lack of privacy and confidentiality during the assessment of suicide risk is a significant impediment to the County's ability to provide a reasonable suicide prevention program. Based upon current practices, as well | |

| | as lack of a policy to address the issue, this provision remains in Non-Compliance. |
|---|---|
| **Recommendations** | 1) Unless exigent circumstances exist and are documented on a case-by-case basis, any inmate identified as suicidal should be given an opportunity for assessment outside of their cell. This includes initial assessments, daily on-going assessments, discharge assessments, and scheduled follow-up. |
| | 2) JPS clinicians conducting initial and on-going assessments of inmates on suicide precautions should continue to document the location of the assessment in the medical chart and, if the assessment was conducted cell front, the reason why privacy and confidentiality were not provided. |
| | 3) Unless there is a clearly identified security or safety risk, the designated JPS booth in the booking area of the main jail should be routinely utilized for the assessment of suicidal inmates, to include those inmates housed in the booking area's safety cells, sobering cell, and segregation cell. In addition, unless exigent circumstances exist and are documented on a case-by-case basis, the door to the JPS both should remain closed at all times. |
| | 4) Finalize the SCSO and ACH/JPS suicide prevention policies to incorporate the requirements of this provision. |
| | 5) Create a corrective action plan that resolves issues of reasonable privacy and confidentiality during the assessment of suicide risk. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). Medical chart review. Observation during on-site assessment of June 14-15, 2021. |

<br>

| **Provision L) 1. Conditions for Individual Inmates on Suicide Precautions** | **The County's Suicide Prevention Policy shall set forth clear and internally consistent procedures regarding decisional authority for determining the conditions for individual inmates on suicide precautions. Mental health staff shall have primary authority, consistent with individualized classification and security needs, with respect to the following:** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | This provision is interpreted as a "catch-all" provision for these subsequent provisions: **M. Property and Privileges, N. Use of Safety Suits, and O. Beds and Bedding**, therefore, this provision cannot come into substantial compliance until the suicide prevention policies are revised, and all three of these subsequent provisions come into substantial compliance. | |

|  | As previously stated, in the *First Monitoring Report*, as well as found during the on-site assessment on June 14-15, 2021, the expert found that custody supervisors or deputies were driving the management of inmates on suicide precautions, rather than the Consent Decree requirement that JPS clinicians "shall have primary authority." As such, all SCSO and ACH/JPS suicide prevention polices need to be revised to address this problem. This provision remains in Partial Compliance. |
| **Recommendations** | Finalize all SCSO and ACH/JPS suicide prevention policies to include language that the management of suicidal inmates and suicide precautions should be primarily determined by JPS clinicians in consultation with custody personnel; provide all draft policies to expert for review. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). Medical chart review. Observation during on-site assessment of June 14-15, 2021. |

| **Provision M) 1. Property and Privileges** | **Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of routine <u>privileges</u> (e.g., visits, telephone calls, recreation) that are otherwise within the limitations of a prisoner's classification security level. Any removal of privileges shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.** | |
| --- | --- | --- |
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice. Prisoners placed in a safety cell shall be allowed to retain enough clothing or be provided with a suitably designed 'safety garment' to provide for the prisoners personal privacy unless specific identifiable risks to the prisoner's safety or to the security of the facility exist and are documented." The ACH/JPS response was that "MH staff determine limitation, removal, and return of clothing, property, and/or privileges based on clinical judgement on a case-by-case basis. Changes are documented with clinical justification in the medical record." | |

Contrary to the County's response, and almost identical to the *First Monitoring Report*, both the recent medical chart review and on-site observation (on June 14-15) of various inmates placed on suicide precautions in either safety or the SITHU cells found that all were denied any routine privileges, such as visits, telephone calls, or any out-of-cell activity. Most inmates on suicide precautions either did not receive a shower or rarely, if ever, received a shower.

Further, the County's response that "Prisoners placed in a safety cell shall be *allowed to retain enough clothing* or be provided with a suitably designed

'safety garment'" assumes that an unknown number inmates placed in safety cells have been allowed to retain their clothing. To date, the expert has <u>not</u> received or reviewed any documentation, observed, or been told by any custody, JPS or medical staff that an inmate has ever been placed in a safety cell with their clothing. On the contrary, every inmate identified as suicidal and placed in a safety cell has been stripped of their clothing and issued a safety smock.

On June 14, 2021, the first day of the on-site assessment, this expert observed that all six (6) inmates housed in the safety cells in the Main Jail's booking area were clothed in safety smocks. In addition, all four (4) inmates housed in the SITHU on suicide precautions and assessed by a JPS clinician that day were likewise observed in safety smocks.  This expert was informed by several JPS clinicians and deputies assigned to the 3-W Pod (where the SITHU is located) that not only were all SITHU inmates on suicide precautions always clothed in safety smocks, but they were always locked down 24 hours per day, and prohibited from taking a shower, going out to the dayroom, making telephone calls, or even going to a previously scheduled court hearing. One deputy informed the expert that an inmate on suicide precautions longer than 72 hours "might" get a shower, but it did always occur.

Deputies told this expert that they generally supported allowing SITHU inmates out of their cells, but would defer to JPS clinicians in providing that recommendation or clinical order. JPS clinicians, on the other hand, informed this expert that clothing issue and privileges were the sole discretion of the deputies, not JPS. Neither the JPS clinicians nor the deputies that spoke to this expert appeared familiar with the *Consent Decree* requirements regarding these issues.

The case of <u>Case No. 2</u> was indicative of the problem at the Main Jail. The inmate was admitted to the Main Jail on June 9, 2021. The arresting officer reported he had expressed SI the scene of the arrest. SI was also noted on the intake screening form completed by the nurse. The inmate was placed on suicide precautions in booking safety cell, clothed in a safety smock. The following day (June 10), he was seen by a JPS clinician who completed an SRA. The inmate had a diagnosis of paranoid schizophrenia and schizoaffective disorder. Suicide precautions were continued and the inmate was subsequently transferred to the SITHU. He remained in the safety smock. The inmate continued to be seen on a daily basis by clinicians while on suicide precautions. On June 14, the inmate was seen by a clinician during an assessment that was observed by this expert. The session was held in the 3-W Pod classroom. The inmate appeared very depressed, teary-eyed, and frustrated that he had been clothed in a safety smock for five days and prohibited from having a shower and shave. He was concerned about his appearance for an upcoming court hearing. The inmate complained that "they don't let me out for anything." Although the inmate denied any current SI, the clinician determined

that, "based on his previous statements that he had a suicide plan that he refused to disclose," suicide precautions would be continued.

Following the session, the clinician and this expert discussed the case and options available to JPS clinicians in the management of suicidal inmates in the SITHU. The requirements of the *Consent Decree* were also discussed. This expert reiterated that, based upon clinical judgment, it was the clinician's responsibility to determine if an inmate on suicide precautions should be clothed in a safety smock or uniform, as well as determine if they could receive individual out-of-cell activities, such as a shower. Following this discussion, the clinician conversed with a JPS supervisor and determined that the inmate would remain on suicide precautions, but could be clothed in his uniform. The clinician also recommended that he receive a shower and be allowed to shave under the supervision of the deputy. According to the subsequent SRA, the clinician documented that the inmate had "enough protective factors to remove the clothing restriction. Advised custody to return pt.'s clothes and advocated for pt. to receive a shower as well…. Pt. will continue 2p pre admit, however, will remove the clothing restriction in an effort to assist his current improvement in mood."

The clinician then saw another inmate (Case No. 3) under similar circumstances. He had been clothed in a safety smock in the SITHU for several days and, although expressing vague SI, requested to have his clothing returned. The clinician again conferred with a JPS supervisor and subsequently determined that the inmate would remain on suicide precautions, but could be clothed in his uniform. Deputies were informed of these recommendations.

The following day (June 15), this expert again followed a JPS clinician during the daily assessment of inmates on suicide precautions. The observation included the clinicians' reassessment of Case No. 2 and Case No. 3. Both inmates were clothed in their uniforms and had much brighter affects than the day before. In Case No. 2, the inmate was grateful that he had his clothes and, although he had not yet received a shower or shave, was looking forward to his scheduled court hearing the following day, and was hoping to be discharged from suicide precautions. He denied any suicidal ideation and the clinician, after conferring with a JPS supervisor, decided to clear the inmate from suicide precautions. In Case No. 3, the inmate was equally appreciative of having his clothing returned, denied any current SI, and requested the return of his telephone privileges so that he could call his mother. The inmate was also discharged from suicide precautions following the clinician's consultation with the supervisor.

This expert later conferred with a SITHU deputy who stated that Case No. 2 and Case No. 3 were the first two inmates that were permitted to wear clothing while on suicide precautions that he could recall in his three years working on 3-W Pod.

Returning to <u>Case No. 2</u>, after the inmate was discharged from suicide precautions on June 15, he received a follow-up assessment on June 16, but the second follow-up at 72 hours did not occur, and he was not seen again by JPS until five days later on June 21 when he threatened suicide. According to the SRA completed by a responding clinician, the inmate was frustrated that his court hearing had been postponed until August. He was placed on suicide precautions in the SITHU, clothed in a safety smock. The inmate was seen on a daily basis by clinicians from June 23 through June 27. According to a June 28 progress note, the inmate was "complaining about not getting a shower or safety suit exchange for several days." The inmate continued to express suicidal ideation and remained in the SITHU until July 1 when he was admitted into the 2P Unit. The initial provider order was for observation at 15-minute intervals, CCTV, and a safety smock. The following day (July 1), the inmate's clothing was returned. The next day (July 3), the provider order stated that 15-minute observation and CCTV were discontinued, and the inmate was placed on regular 30-minute rounds. The inmate was permitted a shower on both July 4 and July 8, and met with a psychiatrist on July 6. He was discharged from the 2P unit on July 8. A discharging SRA was not found in the medical chart. The inmate was provided follow-up assessments by out-patient clinicians on July 9 and July 11.  On July 12, the inmate again expressed SI with a plan to commit suicide and was returned to the SITHU clothed in a safety smock.

In sum, it would appear that in <u>Case No. 2</u>, the inmate was permitted to wear a jail uniform and subsequently allowed to shower when this expert was on-site on June 14, as well as allowed to wear a uniform and shower while housed on the 2P Unit. However, when returned to suicide precautions in the SITHU from June 21 through June 30, and then from July 12 through at least July 14, the inmate was clothed in a safety smock and not permitted to shower. An SRA and follow-up assessments were also missing from the chart.

In conclusion, with the exception noted above on June 14 following intervention by this expert, the medical chart review of 14 cases determined that out-of-cell privileges, including showers, were <u>not</u> provided to any inmate housed on suicide precautions in either safety cells or the SITHU. Even when cleared from suicide precautions, inmates were still not permitted certain privileges. For example, in <u>Case No. 4</u>, a JPS clinician discharged the inmate from suicide precautions on May 16, 2021 and, when attempting to provide him with a book and word search game, a deputy interceded and said "No."

One of the many concerns demonstrated in these reviewed cases is the possibility of a suicidal inmate denying that they are suicidal simply because they would like to take a shower, have a telephone call, get out-of-cell access, or go to court. The blanket denial of such routine privileges by deputies, as well as the lack of documentation by JPS clinicians in recommending both clothing

| | |
|---|---|
| | and privileges when appropriate, continues to be very problematic. This provision remains in Non-Compliance. |
| **Recommendations** | Finalize all SCSO and ACH/JPS suicide prevention policies to include language that inquiring that JPS clinicians shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of routine privileges (e.g., visits, telephone calls, recreation) that are otherwise within the limitations of an inmate's classification security level. Any removal of privileges shall be documented with clinical justification in the medical chart. In addition, all inmates on suicide precautions should be allowed to attend any court hearing unless the clinician, based upon their clinical judgment and in consultation with security staff, determines that transportation to court would adversely affect to the inmate; provide all draft policies to expert for review. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). Medical chart review. Observation during on-site assessment of June 14-15, 2021. |

| | |
|---|---|
| **Provision M) 2. Property and Privileges** | **Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff depending on suicide risk, the removal and/or return of a prisoner's <u>clothing and possessions</u> (e.g., books, slippers/sandals, eyeglasses) that are otherwise within the limitations of a prisoner's classification security level. The removal of property shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.** |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice. If deemed necessary by JPS staff, the inmate's clothing shall be taken and the inmate will be given a 'safety suit' to wear. Prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damage property." |
| | As stated above, contrary to the County's response, medical chart review of various inmates placed on suicide precautions in either safety or the SITHU cells found that <u>all</u> (with the exception of those cases in which this expert interceded) were all placed in safety smocks and were never given their uniform or any other possessions until their discharge from suicide precautions. As such, the default remains the issuance of safety smocks as directed by custody personnel. |

| | |
|---|---|
| | For example, in one (<u>Case No. 5</u>) of many cases reviewed, the inmate was seen by a JPS clinician on July 14, 2021 as part of the daily assessment of their suicide precautions. The inmate had been on suicide precautions for four days and the clinician decided he was stable enough to have his clothing, with the progress note stating "custody notified Pt. can have those back." The following day (July 15), the clinician reassessed the inmate and observed that he was still clothed in a safety smock. The progress note stated: "writer informed custody *again* that Pt. can have his clothes back." The next day (July 16), the clinician reassessed the inmate and discharged him from suicide precautions. He was still clothed in a safety smock.<br><br>In stark contrast to housing of suicidal inmates in either safety cells or the SITHU cells, inmate-patients admitted into the 2P Acute Inpatient Unit are treated very differently. The medical chart review continued to find that when an inmate is admitted into the 2P Unit on suicide precautions and initially clothed in a smock, their uniform is generally returned to them within 24 hours. This practice was best exemplified in <u>Case No. 6</u> whereby the inmate was placed on suicide precautions on July 9, 2021 clothed in a safety smock and housed in both a safety cell and SITHU until July 14 when he was admitted into the 2P Unit. According to the initial progress note by a 2P nurse on July 14, the patient "arrived wearing a green safety suit and was provided with jail issued clothing in which he changed into without any issue."<br><br>As previously stated in the *First Monitoring Report*, 2P Unit providers on the 2P Unit follow a "Denial of Rights" (DOR) protocol that works as follows on a case-by-case basis:<br><br>      DOR1: Standard inmate clothing<br>      DOR2: Personal items (including toothbrush, deodorant etc.)<br>      DOR5: Personal visits (visits with attorneys are never limited<br>      but may need to occur at cell-side)<br>      DOR7: Writing utensils (pencils)<br>      DOR10: Placement in restraints<br><br>In conclusion, this provision remains in Partial Compliance (and not Non-Compliance) only because of the stark contrast between safety smock and possessions use in out-patient units versus the 2P Unit within the Main Jail. |
| **Recommendations** | Finalize all SCSO and ACH/JPS suicide prevention policies to include language that inquiring that JPS clinicians shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of clothing and possessions (e.g., books, slippers/sandals, eyeglasses) that are otherwise within the limitations of an inmate's classification security level. Any removal of clothing and possessions shall be documented with clinical justification in the medical chart; provide all draft policies to expert for review. |

| Evidentiary Basis | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review.<br>Observation during on-site assessment of June 14-15, 2021. |
|---|---|

| **Provision M)**<br>**3. Property and Privileges** | **Cancellation of privileges should be avoided whenever possible and utilized only as a last resort.** |
|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice. Cancellation of privileges would be done only as a last resort or if deemed necessary per JPS."<br><br>Although this provision is duplicative with **Provision M) 1. Property and Privileges**, the SCSO response was contrary to this expert's observations and medical chart. This expert has not received or reviewed any documentation, observed, or been told by any custody, JPS or medical staff that an inmate has ever been placed on suicide precautions and permitted a shower (within 72 hours), have a telephone call, get out of their cell, or permitted to go to court. This provision remains in Non-Compliance. |
| **Recommendations** | See above. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review.<br>Observation during on-site assessment of June 14-15, 2021. |

| **Provision N)**<br>**1. Use of Safety Suits** | **Decisions about the use of a safety suit (smock) or removal of normal clothing will be under mental health staff's authority, based on individualized clinical judgment along with input from custody staff.** |
|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice. Outlined in the current Suicide Prevention Program Operations Order. The use of the 'safety suit' shall be at the discretion of JPS, based on collaboration with intake were cut to the staff." The ACH/JPS response was that "The remedial plan requirements surrounding Safety Suits are being met with the exception being during the intake process when custody may also place an inmate in a safety suit if it is determined that they are at risk of imminent self-harm. In these instances, MH is notified immediately." |

|  | Although this provision is duplicative with **Provision M) 1. Property and Privileges**, the SCSO and ACH/JPS responses were contrary to this expert's observations and medical chart. This provision remains in Partial Compliance (and not Non-Compliance) only because of the stark contrast between safety smock use in out-patient units versus the 2P Unit within the Main Jail. |
|---|---|
| **Recommendations** | See above. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). Medical chart review. Observation during on-site assessment of June 14-15, 2021. |

| **Provision N) 2. Use of Safety Suits** | **Custody staff may only temporarily place an inmate in a safety suit based on an identified risk of suicide by hanging until the qualified mental health professional's evaluation, to be completed within the "must see" referral timeline. Upon completion of the mental health evaluation, the mental health professional will determine whether to continue or discontinue use of the safety suit.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Policy under review. Absent direction from Jail Psychiatric Services (JPS) deeming a 'safety garment' necessary, a sworn supervisor must authorize custody staff to take the clothing and supply the prisoner with a 'safety garment.' Unless a 'safety garment' is necessitated by the prisoner's behavior, prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damaged property." Although this provision is duplicative with **Provision M) 1. Property and Privileges**, the SCSO response was contrary to this expert's observations and medical chart. This provision remains in Partial Compliance (and not Non-Compliance) only because of the stark contrast between safety smock use in out-patient units versus the 2P Unit within the Main Jail. Use of safety smocks for suicidal inmates housed in safety and SITHU cells continues to not be "temporary," rather are maintained throughout and inmate's placement on suicide precautions. | |
| **Recommendations** | See above. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). Medical chart review. Observation during on-site assessment of June 14-15, 2021. | |

| Provision N) 3. Use of Safety Suits | **If an inmate's clothing is removed, the inmate shall be issued a safety suit and safety blanket.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice. See above." Although SCSO and ACH/JPS suicide prevention policies need to be revised, the medical chart review continue to find that there were no instances in which an inmate on suicide precautions in the safety or SITHU cells was not provided a safety smock and safety blanket. This provision remains in Partial Compliance only because suicide prevention policies need to be revised. | |
| **Recommendations** | See above. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). Medical chart review. Observation during on-site assessment of June 14-15, 2021. | |

| Provision N) 4. Use of Safety Suits | **As soon as clinically appropriate, the provision of regular clothing shall be restored. The goal shall be to return full clothing to the inmate prior to discharge from suicide precautions.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice. Determination is made by JPS." This provision is duplicative with **Provision M) 2. Property and Privileges**. As noted above, suicidal inmates housed in either safety cells or the SITHU cells are always clothed in safety smocks, whereas patients admitted to the 2P Acute Inpatient Unit might initially be clothed in a smock, but their uniform was generally returned to them within 24 hours. This provision remains in Partial Compliance. | |
| **Recommendations** | See above. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). Medical chart review. Observation during on-site assessment of June 14-15, 2021. | |

| Provision N)<br>5. Use of Safety Suits | **A qualified mental health professional shall conduct daily assessments of any prisoner in a safety suit and document reasons for continued use when clinically indicated.** | |
|---|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the Third Status Report (July 7, 2021), was omitted.<br><br>As noted above, suicidal inmates housed in either safety cells or the SITHU cells were always clothed in safety smocks, whereas patients admitted to the 2P Acute Inpatient Unit might initially be clothed in a smock, but their uniform was generally returned to them within 24 hours. With the exception of the two cases (<u>Case No. 2</u> and <u>Case No. 3</u>) noted above on June 14, 2021, the medical chart review found that there was <u>no</u> documentation of clinical judgment utilized to withhold clothing and continued utilization of safety smocks on individual inmates on suicide precautions in safety/administrative segregation or SITHU cells. This provision remains in Non-Compliance. | |
| **Recommendations** | See above. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review.<br>Observation during on-site assessment of June 14-15, 2021. | |

| Provision N)<br>6. Use of Safety Suits | **If a qualified mental health professional determines that 30-minute (or less frequent) observations are warranted for a prisoner, safety suits shall not be used on that prisoner.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the Third Status Report (July 7, 2021), the same as in previous reports, was "This causes some confusion to address. County requests discussion on the exact meaning of this provision."<br><br>As stated in the *First Monitoring Report*, this expert would agree that a portion of this provision is confusing, i.e., reference to the phrase "<u>or less frequent</u>" than 30-minute observation. This expert has interpreted the provision to mean that, if a qualified mental health professional recommends that an inmate be placed on a 30-minute observation level or greater (e.g., 60 minutes), the inmate was assessed as <u>not</u> being suicidal and, therefore, should not also be issued a safety smock. In other words, safety smocks are only authorized for | |

|  | suicidal inmates, and suicidal inmates can never be placed on 30-minute observation. Following a previous discussion with counsel of the parties, the above interpretation by this expert was correct, i.e., a safety smock can never be authorized for an inmate that a clinician has recommended 30-minute or greater observation level. Safety smocks can only be authorized on a case-by-case basis for those suicidal inmates that require either constant observation or observation at staggered 15-minute intervals.<br><br>With that said, although the chart review during the previous monitoring period found several cases in which patients in the 2P Unit that were clothed in safety smocks <u>and</u> ordered to be observed at 30-minute intervals, the current chart review did <u>not</u> find any such cases. However, as noted previously in this report, there continued to be a concern with 2P Unit providers ordering 30-minute observation and/or CCTV monitoring for suicidal patients. Because this provision is specific to the combined use of 30-minute observation <u>and</u> safety smocks, and no such cases were found, compliance is moved to Partial Compliance. |
|---|---|
| **Recommendations** | Finalize all SCSO and ACH/JPS suicide prevention policies to include language indicating that if a JPS clinician determines an inmate requires 30-minute observation that inmate cannot be clothed in a safety smock. Likewise, if a clinician determines that a suicidal inmate requires a safety smock, they must be observed on either constant observation or close observation; provide all draft policies to expert for review. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review.<br>Observation during on-site assessment of June 14-15, 2021. |

| **Provision N)**<br>**7. Use of Safety Suits** | **Safety suits shall not be used as a tool for behavior management or punishment.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice. Safety suits are only used when necessary for the safety and security of the inmate."<br><br>Although this expert did not find any evidence from the medical chart review during this monitoring period that safety smocks were being utilized as a tool for behavior management or punishment, the use of safety smocks as a default for all inmates housed in safety cells and SITHU cells could certainly be | |

| | interpreted by an inmate and others as a punitive management tool to deter perceived manipulative and/or attention-seeking behavior. <br><br> In conclusion, because SCSO and ACH/JPS suicide prevention policies have not been finalized to address this issue, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | Finalize all SCSO and ACH/JPS suicide prevention policies to include language indicating that use of safety smocks will be determined has clinically appropriate on a case-by-case basis, and they shall not be utilized punitively or as a behavior management tool for inmates perceived to be manipulative and/or displaying attention-seeking behavior; provide all draft policies to expert for review. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). <br> Medical chart review. <br> Observation during on-site assessment of June 14-15, 2021. |

| **Provision O) 1. Beds and Bedding** | **All prisoners housed for more than four hours on suicide precautions and/or in an inpatient placement shall be provided with an appropriate bed, mattress, and bedding unless the prisoner uses these items in ways for which they were not intended (e.g., tampering or obstructing visibility into the cell). Such a determination shall be documented and shall be reviewed on a regular basis.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Attempting to meet this criteria through use of suicide-resistant cells and an emphasis on removal from booking housing as soon as proper housing is available." The ACH/JPS response was: "Custodial staff consult with MH whenever beds or bedding are being misused or removed from a suicidal inmate. New policies are under development that address this issue." <br><br> The parties have previously clarified that the County is responsible for provision of a temporary suicide-resistant bed ("stack-a-bunk") and mattress for inmates housed more than four (4) hours on suicide precautions or in-patient placement. (Provision H.1 separately indicates that safety cell placements may last for up to six (6) hours.) <br><br> To date, the monitor has not found any inadequate practices regarding suicide-resistant beds and mattresses for inmates housed in either the SITHU or 2P Unit. However, with the above clarification, the expert will begin during the next monitoring period to determine the degree to which inmates placed on | |

|  | suicide precautions in safety cells up are provided with suicide-resistant beds and mattresses after four (4) hours.<br><br>In conclusion, because SCSO and ACH/JPS suicide prevention policies have not been finalized to address this issue, and a part of this provision has not yet been monitored, this provision remains in Partial Compliance. |
| --- | --- |
| Recommendations | Finalize all SCSO and ACH/JPS suicide prevention policies to include language indicating that any inmate placed on suicide precautions for more than four hours shall be provided with an appropriate bed, mattress, and bedding unless the inmate uses these items in ways for which they were not intended (e.g., tampering or obstructing visibility into the cell). Such a determination shall be documented and shall be reviewed on a regular basis; provide all draft policies to expert for review. |
| Evidentiary Basis | Sacramento County's *Third* Status Report (July 7, 2021). |

| Provision P)<br>1. Discharge from Suicide Precautions | **A qualified mental health professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions in order to ensure that the discharge is appropriate and that appropriate treatment and safety planning is completed.** | |
| --- | --- | --- |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current custody practice." Such a response was incorrect because this provision is specific to JPS policies and practices.<br><br>Although SCSO and ACH/JPS suicide prevention policies need to be revised in order to better address the requirement that all inmates discharged from suicide precautions should have a suicide risk assessment and safety plan completed, the current medical chart review indicated that SRAs were completed for most, but not all, inmates discharged from suicide precautions. As previously indicated, discharge SRAs for patients assigned to the 2P Acute Inpatient Unit were completed by JSA out-patient clinicians at the end of such placement. | |
| **Recommendations** | 1) Finalize all SCSO and ACH/JPS suicide prevention policies to include language requiring that all inmates discharged from suicide precautions should have a suicide risk assessment and safety plan completed.<br>2) Inmates placed on suicide precautions by either custody or medical personnel and subsequently discharged from suicide precautions by a JPS clinician within 24 hours after finding that the placement was inadvertent (e.g., the inmate was intoxicated when he initially expressed suicidal ideation and is now stable, the inmate expressed suicidal ideation out of frustration or to get | |

|  | other needs met, etc.) might not need a safety plan. However, if the JPS clinicians initial suicide risk assessment determines that continued suicide precautions are appropriate, then a safety plan should always be completed. Counsel for the parties were previously in agreement to this stipulation and the suicide prevention policies should be revised accordingly.<br>3) Provide all draft policies to expert for review. |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review. |

|  |  |  |
|---|---|---|
| **Provision P)**<br>**2. Discharge from Suicide Precautions** | **Treatment plans shall be written for all prisoners discharged from suicide precautions. The treatment plan shall describe signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur.** | |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Third* Status Report (July 7, 2021), was omitted.<br><br>As required by this provision, safety planning includes a specific strategy that describes signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient and clinician can take if suicidal thoughts do occur. Safety planning to reduce suicide risk is challenging, and requires motivation by both the clinician and inmate.<br><br>JPS previously implemented a safety plan model entitled Safety Planning Intervention (SPI). This expert is very familiar with SPI model. SPI is intended to provide a prioritized and specific set of coping strategies and sources of support that suicidal patients could utilize should suicidal thoughts reemerge. Comprising seven steps, SPI was originally developed to be utilized in settings where emergency services or acute care services were provided, such as emergency rooms and crisis hotlines. This expert is not aware of any other state or local correctional agency that currently utilizes SPI. Although initiated by the California Department of Corrections and Rehabilitation 2019, the SPI model has not been successful there and is currently being replaced.<br><br>The current medical chart review found that JPS clinicians continue to struggle to complete adequate safety planning for suicidal inmates. The following example of safety planning exemplified the problem. The inmate (Case No. 5) had an extensive history of being placed on suicide precautions within the Main Jail. He was on suicide precautions briefly on May 22 and May 23, 2020, and then again on November 3, 2020. During 2021, the inmate was on suicide precautions on multiple occasions, including May 20, May 25 through May 26, | |

|  | June 11 through June 16, June 21 through June 22, June 24 through June 29, and July 10 through July 16. The inmate's SPI stated the following:<br><br>Step 1 (Warning Signs): "Having thoughts of suicidal ideation with plans."<br>Step 2 (Internal Coping Strategies): "Exercising, reading, and playing cards."<br>Step 3 (People and Social Settings that Provide Distraction): "no one"<br>Step 4 (People to Ask for Help): "Anybody."<br>Step 5 (Professionals to Contact): "any staff member"<br>Step 6 (Means Safety - Making the Environment Safe): "Asking for help when a crisis is developing."<br>Step 7 (Reasons to Live): "to get better, cope better, and be better."<br><br>The above safety plan was grossly inadequate for an inmate who had been on suicide precautions on numerous occasions. Coping skills identified as "exercising, reading, and playing cards" were not even available to inmates on suicide precautions and the safety plan lacked a specific strategy to reduce suicidal ideation. The inmate also did not have an identified support system.<br><br>An additional deficiency was that development of these safety plans was not collaborative between the patient and clinician. For example, instead of assisting the patient in verbalizing reasonable and practical coping skills that can be utilized in a jail environment to reduce suicidal ideation, clinicians are simply instructed to list, without correction, the patient's exact words, such as "playing cards" as a coping mechanism.<br><br>Finally, the narrative in the safety plans simply failed to address the specific requirement of this provision which is development of "a specific strategy that describes signs, symptoms, and the circumstances in which the risk for suicide was likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient and clinician could take if suicidal thoughts reoccurred. Following multiple placements on suicide precautions, JPS clinicians must recognize that "exercising, reading, and playing cards" are failed strategies to reduce the inmate's SI.<br><br>In conclusion, JPS clinicians will continue to struggle with development of adequate safety plans unless the process is collaborative between the patient and the clinician, and suicide prevention policies are revised to allow clinicians to utilize their clinical judgment in granting routine privileges that can act as coping skills in reducing suicidal ideation. And as previously noted, inmate-patients in the 2P Unit do not receive safety planning until they are discharged from the placement. This also continues to be problematic. This provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | Finalize all SCSO and ACH/JPS suicide prevention policies to allow clinicians to utilize their clinical judgment in granting routine privileges that can act as coping skills in reducing suicidal ideation, and include specific language stating that required treatment/safety plans "shall describe signs, symptoms, and |

| | circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur"; provide all draft policies to expert for review. |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review. |

| Provision P)<br>3. Discharge from Suicide Precautions | **Qualified mental health professionals shall provide clinical input regarding clinically appropriate housing placement (e.g., whether isolation is contraindicated for the prisoner) upon discharge. Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement. Once clinically discharged from suicide precautions, the prisoner shall be promptly transferred to appropriate housing.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current custody practice. This is accomplished with the input of Classification staff and JPS."<br><br>Although current SCSO and ACH/JPS suicide prevention policies do not address this provision, both custody and JPS leadership previously informed this expert that clinicians do work collaboratively with custody personnel in the placement of inmates following their discharge from suicide precautions.  The medical chart review did not provide any evidence to the contrary. This provision remains in Partial Compliance only because the suicide prevention policies have not been revised to reflect the appropriate language. | |
| **Recommendations** | Finalize all SCSO and ACH/JPS suicide prevention policies to include language that allows clinicians to provide clinical input regarding clinically appropriate housing placement for inmates following their discharge from suicide precautions; provide all draft policies to expert for review. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review. | |

| Provision P) 4. Discharge from Suicide Precautions | **Prisoners discharged from suicide precautions shall remain on the mental health caseload and receive regularly scheduled clinical assessments and contacts. Unless a prisoner's individual circumstances direct otherwise, a qualified mental health professional shall provide follow-up assessment and clinical contacts within 24 hours of discharge, again within 72 hours of discharge, again within one week of discharge.** |
|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the *Third* Status Report (July 7, 2021), was "Patients who are discharged from the acute inpatient unit after being treated for a suicide attempt or ideation receive follow-up MH appointments (24 hours, 72 hours and 5 days). Patients are transferred to IOP when appropriate and a bed is available. IOP and Out-patient appointment logs have been updated to reflect the accurate appointment type." |
| | Compared to the *First Monitoring Report*, the current medical chart review did find improvement in this area, with follow-up assessments at 24-hour, 72-hour, and 5-day intervals occurring more consistently for both 2P Unit and out-patient inmates discharged from suicide precautions. In 14 reviewed medical charts, follow-up assessments were consistently completed in 9 cases or 64 percent. This expert had been previously informed by JPS leadership that they were not adequately staffed to provide such scheduled follow-up for out-patient inmates. These current findings are encouraging. |
| | Finally, as noted in the previous report, it remains noteworthy that this provision also includes some discretion that scheduled follow-up might not be required for every inmate discharged from suicide precautions, i.e., "Unless a prisoner's individual circumstances direct otherwise." Such narrative was interpreted by the expert to mean that there might be occasions in which an inmate was placed on suicide precautions by either custody or medical personnel and subsequently discharged from suicide precautions by a JPS clinician within 24 hours after finding that the placement was inadvertent (e.g., the inmate was intoxicated when he initially expressed suicidal ideation and is now stable, the inmate expressed suicidal ideation out of frustration or to get other needs met, etc.) and, therefore, might not need scheduled follow-up at 24 hours, 72 hours, and 5-day intervals. However, similar to safety planning, if the JPS clinician's initial suicide risk assessment determines that *continued* suicide precautions beyond 24 hours is appropriate, then the scheduled follow-up assessments should always occur. |
| | In conclusion, because current suicide prevention policies have not been finalized to include the requirements of this provision, as well as the fact that scheduled follow-up assessments are not consistently occurring in all cases, this provision remains in Partial Compliance. |
| **Recommendations** | 1) Finalize all SCSO and ACH/JPS suicide prevention policies to include the requirement that, unless an inmate's individual circumstances direct otherwise, |

| | a JPS clinician shall provide follow-up assessment within 24 hours, 72 hours, and one week of discharge from suicide precautions.<br>2) The revised suicide prevention policies should provide a description/ examples of "unless an inmate's individual circumstances direct otherwise."<br>3) Provide all draft policies to expert for review. |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Medical chart review. |

| **Provision Q)**<br>**1. Emergency Response** | **The County shall keep an emergency response bag that includes appropriate equipment, including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units. All custodial and medical staff be trained on the location of this emergency response bag and shall receive regular training on emergency response procedures, including how to use appropriate equipment.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Those items are available in each facility." The ACH/JPS response was: "Medical and custody staff are trained in CPR. Staff complete a Man-Down Debriefing Summary for incidents requiring medical response for drills. The form and staff debriefing assist staff in reviewing code response."<br><br>This provision specifically requires that an emergency response bag (including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool) be located in close proximity to all housing units, not simply "available in each facility." This provision also requires that both custody and medical staff be trained on emergency response procedures, including how to use the equipment.<br><br>Compliance with this provision requires revision of current SCSO and ACH/JPS suicide prevention policies to include reference to the above emergency response bag equipment, as well as training data indicating compliance rates that exceed 90 percent. The expert will inspect the current location of the emergency response bag during the next upcoming monitoring assessment. This provision remains in Partial Compliance. | |
| **Recommendations** | 1) Finalize all SCSO and ACH/JPS suicide prevention or other appropriate policies to include the requirement that an emergency response bag should be located in close proximity to all housing units, and that both custody and medical personnel are trained on its location in use; provide all draft policies to expert for review.<br>2) Provide "Man-Down Debriefing Summary for incidents requiring medical response for drills" to the expert, as well as documentation as to the percentage of medical and custody personnel trained on emergency response procedures. | |

| Evidentiary Basis | Sacramento County's *Third* Status Report (July 7, 2021). |
|---|---|

| Provision Q) 2. Emergency Response | **All custody and medical staff shall be trained in first aid and CPR.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current Custody practice. Sworn staff receive CPR training every two years. It is part of our Advanced Officer Training Program."<br><br>According to available training data, approximately 84 percent of Main Jail custody personnel, and 76 percent of RCCC custody personnel, were currently certified in CPR. Training data for medical staff was not made available to this expert, but ACH previously report 100 percent compliance with CPR training in the *First Monitoring Report*. This provision remains in Partial Compliance. | |
| **Recommendations** | Ensure that both medical and custody personnel are at least 90 percent compliant with CPR certification; provide data to the expert. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>SCSO training data. | |

| Provision Q) 3. Emergency Response | **It shall be the policy of the County that any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff shall begin to administer standard first aid and/or CPR, as appropriate.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice."<br><br>The expert reviewed "ACH Incident Report" forms regarding seven (7) serious suicide attempts during the monitoring period. Each of these reports were brief and did not include a description of the emergency response from either correctional or medical personnel and/or initiation of first aid/CPR as appropriate. This provision remains in Partial Compliance because the appropriate policies need to be revised, and available incident reports did not | |

| | include descriptions of the emergency response from both correctional or medical personnel and/or initiation of first aid/CPR as appropriate. |
|---|---|
| **Recommendations** | 1) Finalize all SCSO and ACH/JPS suicide prevention or other appropriate policies to include the requirement that any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff shall begin to administer standard first aid and/or CPR, as appropriate; provide all draft policies to expert for review. <br> 2) Forward all appropriate ACH Incident Reports and SCSO Incident Reports on serious suicide attempts that provide an adequate description of the emergency response from both correctional or medical personnel and/or initiation of first aid/CPR as appropriate. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). <br> ACH Incident Reports on seven (7) serious suicide attempts from January 2021 through April 2021. |

| **Provision R)** <br> **1. Quality Assurance and Quality Improvement** | **The County shall establish regularly scheduled multidisciplinary meetings related to treatment, and plan of care issues, on a monthly basis, between medical, and mental health personnel.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the *Third* Status Report (July 7, 2021), was that "MH has convened a multi-disciplinary Suicide Prevention Subcommittee to review, track and audit the requirements. There have been two Subcommittee meetings to date. A MH QI Subcommittee was developed with the first meeting on May 3, 2021. The Subcommittee will be quarterly. The MH QI team will review the development of a crisis response treatment plan and determine best practices for this program. <br><br> To date, the Suicide Prevention Subcommittee has met on three occasions: April 8, 2021, June 3, 2021, and August 5, 2021. Minutes from these meetings were provided to the expert, who was also a participant of the meeting on August 5, 2021.  This multidisciplinary subcommittee, comprised of mental health, medical, and custody personnel, is facilitated by the JPS medical director. Although medical personnel were not represented during either the April 8 or June 3 meetings, they were participants in the August 5 meeting. Meeting minutes reflected that the Subcommittee discussed the Suicide Prevention Action Item Tool, definitions of suicide and self-harming behaviors, policies and procedures, training, and cursory review of serious suicide attempts. | |

|  | Although this provision does not specifically mention the treatment or "plan of care" for suicidal inmates, a well-rounded multidisciplinary process should include a discussion about suicide prevention in general, as well as specific inmates on suicide precautions that pose unusual challenges to custody, medical, and/or JPS personnel.<br><br>Of note, ACH's final draft of the Suicide Prevention Subcommittee" policy, dated September 7, 2021, now states that "The management of specific inmates on suicide precautions that pose challenges to custody, medical and/or MH personnel shall be discussed in a monthly multi-disciplinary Suicide Precautions Meeting….Meeting minutes shall be taken to record discussion, decisions and recommendations….Members of this multi-disciplinary meeting shall make recommendations, as appropriate, to the Suicide Prevention Subcommittee."<br><br>This provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | Send minutes of Suicide Precautions Meeting to the expert on a monthly basis. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Suicide Prevention Subcommittee meeting minutes from April 8, 2021, June 3, 2021, and August 5, 2021.<br>ACH's final draft of the Suicide Prevention Subcommittee" policy, dated September 7, 2021. |

| **Provision R) 2. Quality Assurance and Quality Improvement** | **The County shall, in consultation with Plaintiffs' counsel, revise its in-custody death review policy and procedures. Reviews shall be conducted with the active participation of custody, medical, and mental health staff. Reviews shall include analysis of policy or systemic issues and the development of corrective action plans when warranted.** | |
|---|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice."<br><br>This provision is more or less duplicative with **Provision R) 3. Quality Assurance and Quality Improvement** below. Current SCSO and ACH/JPS suicide prevention policies do not provide an adequate description of the death review process for inmate suicide, and current practices do not demonstrate that any reviews include analysis of policy, systemic issues, and development of corrective action plans when warranted. This provision remains in Non-Compliance. | |

| Recommendations | Finalize all SCSO and ACH/JPS suicide prevention policies should be revised and include specific language for the multidisciplinary committee to review: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt. Where applicable, the Review Team shall generate recommendations for changes in policy, training, physical plant, medical or mental health services, and operational procedures"; provide all draft policies to expert for review. |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). |

| Provision R) 3. Quality Assurance and Quality Improvement | **For each suicide and serious suicide attempt (e.g., requiring hospitalization), the County's Suicide Prevention Task Force shall review: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt. Where applicable, the Review Team shall generate recommendations for changes in policy, training, physical plant, medical or mental health services, and operational procedures.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Third* Status Report (July 7, 2021), was "Current practice. The Suicide Prevention Task Force has been reestablished and has already had its first meeting."<br><br>This provision is more or less duplicative with **Provision R) 2. Quality Assurance and Quality Improvement** above. Current SCSO and ACH/JPS suicide prevention policies do not provide an adequate description of the review process for an inmate suicide and/or serious suicide attempt.<br><br>During the Suicide Prevention Subcommittee meeting attended by the expert on August 5, 2021, seven (7) incidents of serious suicide attempts were reviewed. Because it was the first time that Subcommittee members had reviewed these incidents, there was a great deal of unknown information regarding each incident, such as housing unit location, whether the inmate was on the mental health caseload and/or suicide precautions at the time of the incident, instrument and anchoring device utilized in the suicide attempts, emergency response, etc. Subcommittee members were simply reviewing a 1 | |

|  | or 2-page summary (ACH Incident Report) of the medical chart that was specific to the incident, and very little information was available regarding the inmate' movement and treatment within the jail facility. The cursory review of each case could <u>not</u> be considered a morbidity review of the incidents because the five (5) identified areas of inquiry above were not reviewed.<br><br>Following the meeting on August 5, 2021, this expert e-mailed Subcommittee members and reminded them that morbidity and mortality reviews were required to include this provision's five (5) specific identified areas of inquiry as listed above.<br><br>In addition, this expert attached a copy of his "Mortality/Morbidity Review of Inmate Suicides/Serious Suicide Attempts Checklist," also in Appendix A of this report. It is hoped that this Checklist will be helpful to the Suicide Prevention Subcommittee in their future reviews of serious suicide attempts and suicides.<br><br>In conclusion, this provision is moved to Partial Compliance only because, as noted above, the Suicide Prevention Subcommittee had made some recent efforts to provide reviews, albeit cursory, of seven (7) serious suicide attempts during the August 5, 2021 meeting. |
|---|---|
| **Recommendations** | Finalize all SCSO and ACH/JPS suicide prevention policies to include specific language for the multidisciplinary committee to review: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt. Where applicable, the Review Team shall generate recommendations for changes in policy, training, physical plant, medical or mental health services, and operational procedures"; provide all draft policies to expert for review. |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021).<br>Observation of, and participation in, the Suicide Prevention Subcommittee meeting of August 5, 2021.<br>ACH Incident Reports on seven (7) serious suicide attempts from January 2021 through April 2021. |

| Provision R) 4. Quality Assurance and Quality Improvement | **The County will track all critical incidents which include prisoner suicides, attempted suicides, and incidents involving serious self-harm. The County shall review critical incidents and related data through its quality assurance and improvement processes.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the Third Status Report (July 7, 2021), was omitted. | |
| | This provision is more or less duplicative with **Provision R) 3. Quality Assurance and Quality Improvement** above because it involves review of both inmate suicides and serious incidents of self-harm, but also includes tracking of attempted suicides (that are not necessarily determined to be serious). Current SCSO and ACH/JPS suicide prevention policies do not provide an adequate description of the review process for an inmate suicide and/or serious suicide attempt. As noted above, serious suicide attempts (resulting in transport to a local hospital for treatment) are reviewed by the JPS director or designee and results in a two-page summary that is now brought to the Suicide Prevention Subcommittee for discussion. It remained unclear how other incidents of self-harm and/or suicide attempts that were not considered serious were being tracked or reviewed. | |
| | Finally, this expert was previously informed by the ACH Quality Improvement (QI) Coordinator that "QI is tracking incident reports that have a breakdown of self-harm, suicides and suicide attempts. We have reviewed this data in the QIC. We have not yet begun periodic auditing of suicide prevention practices but intend to upon finalization of the policy. When that happens it will be reviewed in the MH Subcommittee who will then provide information, interventions and other data to the QIC." | |
| | In conclusion, this provision remains in Partial Compliance. | |
| **Recommendations** | Finalize all SCSO and ACH/JPS suicide prevention or other appropriate quality assurance and improvement policies should be revised to include the requirement to track and review track all suicide, suicide attempts, and incidence of serious self-harm. In addition, the language should state that while all incidents of self-harm should be tracked, only incidents of serious self-harm/attempts and suicides will be reviewed"; provide all draft policies to expert for review. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). Discussion with ACH and JPS leadership. | |

| Provision R) 5. Quality Assurance and Quality Improvement | The County shall implement a continuous quality assurance/quality improvement plan to periodically audit suicide prevention procedures that include, but are not limited to: intake screening (to include audits to ensure that staff ask and record all suicide screening questions), mental health assessments, suicide risk assessments, crisis response, and treatment plans/behavior management plans for prisoners identified as being at risk of suicide or self-harm. | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the Third Status Report (July 7, 2021), was omitted. The County currently has a joint ACH/JPS Mental Health Quality Improvement Committee.<br><br>This expert previously interpreted this provision to indicate that the County must develop a continuous quality assurance/quality improvement plan to ensure that all of the suicide prevention provisions of this *Consent Decree* or implemented and sustained. As stated in the Introduction to this report, given the enormity of responsibility to implement and sustain approximately 63 suicide prevention provisions of this *Consent Decree's* Remedial Plan, the Suicide Prevention Subcommittee (which was reinstated on April 8, 2021 and met only three times to date) or a similar multidisciplinary continuous quality assurance committee should meet more frequently than quarterly (i.e. monthly) and better focus on ensuring that all suicide prevention provisions are implemented and sustained.<br><br>Of note, although JPS commented on the draft version of this report on September 7, 2021 that "The next SP subcommittee meeting is scheduled in November 2021.  However, MH will be proposing to change this meeting from quarterly to monthly," ACH's final draft of the Suicide Prevention Subcommittee" policy, dated September 7, 2021, stated the meetings would be held "at least quarterly."<br><br>Because all of the suicide prevention provisions are in various stages of compliance, and there was no indication that a continuous quality assurance plan has been implemented to date, this provision remains in Partial Compliance. | |
| **Recommendations** | Finalize all SCSO and ACH/JPS suicide prevention policies to include a description of this provision's requirements; provide all draft policies to expert for review. | |
| **Evidentiary Basis** | Sacramento County's *Third* Status Report (July 7, 2021). | |

**APPENDIX A**
**MORTALITY/MORBIDITY REVIEW OF INMATE SUICIDES/**
**SERIOUS SUICIDE ATTEMPTS CHECKLIST\***
**Lindsay M. Hayes**

**1)      Training**

- Had all correctional, medical, and mental health staff involved in the incident received both basic and annual training in the area of suicide prevention prior to the incident?

- Had all staff who responded to the incident received training (and were currently certified) in standard first aid and cardiopulmonary resuscitation (CPR) prior to the incident?

**2)      Identification/Referral/Assessment**

- Upon this inmate's initial entry into the facility, were the arresting/ transporting officer(s) asked whether they believed the inmate was at risk for suicide? If so, what was the response?

- Had inmate been screened for potentially suicidal behavior upon entry into the facility?

- Did the screening form include inquiry regarding: past suicidal ideation and/or attempts; current ideation, threat, plan; sense of immediate future (inmate expressing helplessness and/or hopelessness); prior mental health treatment/ hospitalization; recent significant loss (job, relationship, death of family member/close friend, etc.); and history of suicidal behavior by family member/close friend?

- If the screening process indicated a potential risk for suicide, was inmate properly referred to mental health/medical personnel?

- Had inmate received any post-admission mental health screening/assessment?

- Was the inmate provided reasonable privacy and confidentiality during the intake screening process, as well as during any subsequent screening and/or assessment?

- Had inmate previously been confined in the facility/system? If so, had the inmate been on suicide precautions during a prior confinement in the facility/system? Was such information available to staff responsible for the current intake screening and mental health assessments?

---

\*A morbidity review should be conducted for a serious suicide attempt, defined here as referring to an incident of self-harm with the intent to die serious enough to require medical treatment outside the correctional facility.

**3)    Communication**

- Was there information regarding inmate's prior and/or current suicide risk from outside agencies that was not communicated to the facility?

- Was there information regarding inmate's prior and/or current suicide risk from correctional, mental health and/or medical personnel that was not communicated throughout the facility to appropriate personnel?

- Did inmate engage in any type of behavior that might have been indicative of a potential risk of suicide? If so, was this observed behavior communicated throughout the facility to appropriate personnel?

**4)    Housing**

- Where was inmate housed and why were they assigned to this housing unit?

- Describe the incident.  If hanging, what was the ligature and what the ligature attached to? If a laceration/cutting, what was the instrument used? If an overdose, what was the medication and was it appropriately prescribed to the inmate?

- If the inmate was on suicide precautions at the time of the incident, was the inmate housed in a suicide resistant, protrusion-free cell?

- Was inmate on "segregation" status at the time of the incident?

- If placed was on "segregation" or any "special management" (e.g., disciplinary and/or administrative segregation) status, had he/she received a written assessment for suicide risk by mental health and/or medical staff due to this status?

- Was there anything regarding the physical design of inmate's cell that contributed to the incident (e.g., poor visibility, protrusions conducive to hanging attempts, etc.)?

**5)    Levels of Observation/Management**

- What level and frequency of supervision was inmate under immediately prior to the incident?

- Given inmate's observed behavior prior to the incident, was the level of supervision appropriate?

- When was inmate last physically observed by staff prior to incident?

- Was there any reason to question the accuracy of the last reported observation by staff?

- If inmate was not physically observed within the required time interval prior to the incident, what reason(s) was determined to cause the delay in supervision?

- Was inmate on a mental health and/or medical caseload? If so, what was frequency of contact between inmate and mental health and/or medical personnel?

- When was inmate last seen by mental health and/or medical personnel?

- Was there any reason to question the accuracy of the last reported observation by mental health and/or medical personnel?

- If inmate was not on a mental health and/or medical caseload, should he/she have been?

- If inmate was not on suicide precautions at the time of the incident, should he/she have been?

**6)    Intervention**

- Did staff member(s) who discovered the inmate follow proper intervention procedures, i.e., surveyed the scene to ensure the emergency was genuine, called for back-up support, ensured that medical personnel were immediately notified, and initiated standard first aid and/or CPR?

- Did staff initiate standard first aid and/or CPR within four (4) minutes following discovery of the incident?

- Did the inmate's housing unit contain proper emergency equipment for staff to effectively respond to a suicide attempt, i.e., first aid kit, gloves, pocket mask or Ambu bag, and rescue tool (to quickly cut through fibrous material)?

- Were there any delays in either correctional or medical personnel immediately responding to the incident? Were medical personnel properly notified as to nature of emergency and did they respond with appropriate equipment? Was all the medical equipment working properly?

- Were there any delays in notifying outside emergency medical services personnel (i.e., 911)?

**7)    Reporting**

- Were all appropriate officials and personnel notified of incident in a timely manner?

- Were other notifications, including inmate's family and appropriate outside authorities, made in a timely manner?

- Did all staff who came into contact with inmate prior to the incident submit a report and/or statement as to their full knowledge of inmate and incident? Was there any reason to question the accuracy and/or completeness of any report and/or statement?

## 8)      Follow-Up/Mortality-Morbidity Review

- Were all affected staff and inmates offered crisis intervention services following the incident?

- Were there any other investigations conducted (or that should be authorized) into incident that may be helpful to the mortality-morbidity review?

- In addition to a medical chart review, was a psychological autopsy" conducted in this case? Did the process include examination of the suicide site, and interviews with staff and inmates familiar with the decedent?

- As a result of this mortality-morbidity review, were there any possible precipitating factors (e.g., circumstances which may have caused victim to commit suicide or engage in the serious suicide attempt) offered and discussed?

- Were there any findings and/or recommendations from previous mortality-morbidity reviews that are relevant to this review?

- As result of this review, what recommendations (if any) are necessary for revisions in policy, training, physical plant, medical or mental health services, and operational procedures to reduce the likelihood of future incidents.

- What are specific corrective active plans (CAP) for each recommendation, who is responsible party for each CAP, and what is expected timeframe to complete each CAP?

Last revised: January 2020