1   **LISA A. TRAVIS, County Counsel**
    **RICK HEYER, Supervising Deputy County Counsel**
2       **[State Bar No. 216150]**
    **COUNTY OF SACRAMENTO**
3   **700 H Street, Suite 2650**
    **Sacramento, CA 95814**
4   **Telephone: (916) 874-7538**
    **Facsimile: (916) 874-8207**
5   **E-mail: heyerr@saccounty.net**
    **File No.: 126602-000012**
6

7   **Attorneys for County of Sacramento**

8                   **IN THE UNITED STATES DISTRICT COURT**
                    **EASTERN DISTRICT OF CALIFORNIA**
9                        **SACRAMENTO DIVISION**

10  **LORENZO MAYS, RICKY**               **Case No. 2:18-cv-02081 TLN KJN**
    **RICHARDSON, JENNIFER BOTHUN,**
11  **ARMANI LEE, LEERTESE BEIRGE, and**
    **CODY GARLAND, on behalf of themselves**   **JUDGE: Hon. Kendall J. Newman**
12  **and all others similarly situated**

13              **Plaintiffs,**              **FILING OF THIRD COUNTY STATUS**
                                             **REPORT PURSUANT TO PARAGRAPH**
14  **vs.**                                  **12 OF THE CONSENT DECREE**

15  **COUNTY OF SACRAMENTO**

16              **Defendant.**

17

18          Paragraph 12 of the Consent Decree in this matter requires the County to provide

19  Plaintiffs' counsel and the Court appointed subject matter experts with a status report no later

20  than 180 days from the approval of the proposed decree. In compliance with this requirement,

21  the County provided the "Fourth Status Report; Mays Consent Decree" on January 20, 2022 to

22  the subject matter experts and the attorneys monitors from the Prison Law Office and Disability

23  Rights California. Attached to this filing is that status report.

24  DATED: _1-20-22_                         LISA A. TRAVIS, County Counsel
                                             Sacramento County, California
25

26                                          By: _____
27                                               Rick Heyer
                                                 Supervising Deputy County Counsel
28  2258458

                                            -1-

FILING OF FOURTH COUNTY STATUS REPORT

ATTACHMENT 1



Primary Health Division
Department of Health Services

# Adult Correctional Health
# REMEDIAL PLAN STATUS REPORT
# January 14, 2022

## Table of Contents

COMPLIANCE DEFINITIONS & RATINGS ................................................................................. 3

INTRODUCTION ........................................................................................................................ 4

CHALLENGES IMPACTING REMEDIAL PLAN WORK ................................................................ 6

GENERAL PROVISIONS [Remedial Plan Section II] ............................................................... 14

AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE [Remedial Plan Section III] ............................. 19

MEDICAL CARE [Remedial Plan Section VI] ......................................................................... 24

MENTAL HEALTH CARE [Remedial Plan Section IV] ............................................................. 38

SUICIDE PREVENTION [Remedial Plan Section VII] ............................................................... 45

SEGREGATION/RESTRICTED HOUSING [Remedial Plan Section VIII] ...................................... 52

QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT [Remedial Plan Section IX] .................. 54

JAIL FACILITY NEEDS ............................................................................................................. 56

COUNTY EFFORTS TO REDUCE THE JAIL POPULATION ......................................................... 57

## COMPLIANCE DEFINITIONS & RATINGS

Experts rate compliance on each provision.  The following are definitions for compliance measurement for each of the provisions in this Remedial Plan:

Substantial Compliance indicates compliance with most or all components of the relevant provision of the Remedial Plan for both the quantitative (e.g., 90% performance measure) and qualitative (e.g., consistent with the larger purpose of the *Decree*) measures. If an individual compliance measure necessitates either a lower or higher percentage to achieve substantial compliance, it will be so noted by the expert. Compliance has been sustained for a period of at least 12 months.

Partial Compliance indicates compliance achieved on some of the components of the relevant provision of the Remedial Plan, but significant work remains.  A minimum requirement is that for each provision, relevant policies and procedures must be compliant with Remedial Plan requirements, contain adequate operational detail for staff to implement the policy, staff are trained, and the County has begun implementation of the policy.

Non-Compliance indicates that most or all of the components of the relevant provision of the Remedial Plan have not yet been addressed and/or have not yet been met.

When reviewing each expert report, there is variability in rating methodology.  Medical Experts rate each indicator within a provision separately.  Mental Health and Suicide Prevention Experts rate some indicators as a group but others individually.  Adult Correctional Health rates each provision but does not rate each indicator.

### MEDICAL EXPERT REPORTS

| Medical | Jan 2021 | Oct 2021 | Net Change |
|---|---|---|---|
| Substantial | 5% | 16% | + 11% |
| Partial | 20% | 25% | + 5% |
| Noncompliance | 52% | 49% | + 3% |
| Not Evaluated | 23% | 9% | N/A |

Moved from 25% to 41% with partial/substantial completion across the two monitoring periods.

Medical Experts included a summary table with 75 indicators and rated each indicator within a provision separately.  Example: Nurse Intake provision has seven indicators for ratings.

### SUICIDE PREVENTION & MENTAL HEALTH EXPERT REPORTS

| Suicide Prevention | Jan 2021 | Oct 2021 | Net Change |
|---|---|---|---|
| Substantial | 0% | 0% | N/A |
| Partial | 84% | 83% | -1% |
| Noncompliance | 16% | 17% | -1% |
| Not Evaluated | 0% | 0% | N/A |

Suicide Prevention expert included a summary table containing 63 provisions.  Some indicators are rated as a group.  Example: Nurse Intake Provision C. has five indicators but rated as one item.

| Mental Health | Jan 2021 | Oct 2021 | Net Change |
|---|---|---|---|
| Substantial | 0% | 0% | N/A |
| Partial | 58% | 55% | -3% |
| Noncompliance | 21% | 37% | -16% |
| Not Evaluated | 21% | 8% | N/A |

Mental Health expert included a summary table in the first report indicating a total of 91 provisions – however listed 35 provision ratings with 3 provisions not assessed. The second monitoring report did not include a summary table but contained the 35 rated provisions with 3 provisions not assessed.

Per the First Monitoring Report, the Mental Health SME stated, *"This total was computed by adding major (e.g., IV.B) and substantial sub-major (e.g. IV.A.2) areas of the Remedial Plan."*

## INTRODUCTION

Facilities

The adult correctional facilities consist of two jails, the Main Jail (MJ) located downtown and the Rio Cosumnes Correctional Center (RCCC) located in Elk Grove.

| | MJ | RCCC |
|---|---|---|
| Year Opened | 1989 | 1960 |
| Location | 651 I Street | 12500 Bruceville Road |
| Rated Capacity | 2,380 | 1,625 |

The Sacramento Sheriff's Office (SSO) has overall responsibility and management for the jails. Department of Health Services (DHS), Primary Health Division provides health care services (physical health/behavioral health) through county and contracted staff working in partnership with SSO.

The average daily population of the jail facilities has returned to pre-pandemic levels.  On December 31, 2021, there were 3,351 individuals incarcerated at the jails – MJ, 1,848 and RCCC, 1,503.

The jail population has many health care needs with higher rates of chronic health conditions, serious mental illness (SMI), and substance use disorders (SUD).

Requirement

The Consent Decree was approved by the federal court on January 13, 2020.

4

Every 180 days, the county is required to issue a status report which is sent to Class Counsel and the appointed medical and mental health experts. In addition to the status report, experts each complete document requests, conduct site visits, and provide feedback in an ongoing manner through electronic mail and/or meetings as requested.

This report covers the period of July 2021 – December 2021.

<u>Overview</u>

This report outlines program challenges impacting remedial plan work, progress on remedial plan provisions in the following areas: general, medical, mental health, and suicide prevention, and brief updates on facilities and county efforts to reduce the jail population.

Despite the challenges, a snapshot of policy work through the end of December is depicted in the following tables.

| ACH Policies | Total Policies  (N = 49) |
|---|---|
| Finalized | 23 |
| In Process (Revision/Development) | 7 |
| Sent for Review | 19 |
| Pending Class Counsel Feedback | (2) |
| Pending Medical Expert Feedback | (19) |

| ACH Provider Treatment Guidelines | Total Provider Guidelines N = 4 |
|---|---|
| Sent for Review | 4 |
| Pending Class Counsel | (2) |
| Pending Medical Expert Feedback | (4) |

| ACH Standardized Nursing Procedures (SNP) | Total SNPs N = 45 |
|---|---|
| Sent for Review | 45 |
| Pending Medical Expert Feedback | (45) |

*Note: SNPs describe specific RN actions (RN to manage, requires consult with provider, or emergency stabilization needed) vs. categorization of low, medium and high risk.*

ACH has completed a total of **98** documents (Policies, Provider Guidelines, and SNPs).

| Mental Health | Total Policies  N = 30 |
|---|---|
| Finalized | 2 |
| In Process (Revision/Development) | 4 |
| Sent for Review | 24 |
| Pending Class Counsel Feedback | (13) |
| Pending Mental Health Expert Feedback | (24) |

*Note: 10 of 23 Finalized ACH Policies in the first table are "joint policies" for Medical/Mental Health.  Previously there were separate policies in each manual.*

Each policy drafted is reviewed by Class Counsel and designated experts.  All experts review certain policies.  For staff, the policy draft may include significant changes in workflow, forms, electronic health record templates, reporting, etc.  It is not just a "policy revision."

For certain policies, there is a phased-in implementation due to staffing, equipment, or other needs.

In addition to policies, other remedial plan work such as pilots, quality improvement monitoring, or training was also completed.  Details are provided in the respective sections.

Implementation

Implementation is not a smooth, linear process.  Staff continually work within a framework of human resource limitations, insufficient space for treatment and staff, and expending considerable resources on daily COVID-19 operations.

Change is constant, overlapping, and dynamic while navigating the remedial plan and COVID-19 changes.   The fundamental nature of this accelerated change process is not the most conducive for staff to absorb and integrate.

What does this mean?  There are delays in access to services, starting certain programs, or uneven performance.  Currently there is insufficient staff and space to support requirements within the remedial plan.  There are too many provisions within the remedial plan to work on all provisions simultaneously.  Managers and staff are doing the best they can to navigate this complex array of overlapping change amidst staffing shortages, space constraints, and continually evolving pandemic operations.  Challenges are described in the next section.

## CHALLENGES IMPACTING REMEDIAL PLAN WORK

Work on the remedial plan is intensive and difficult due to many ongoing challenges.  These include work force issues, lack of sufficient space, COVID-19 pandemic operations, and the time consuming feedback process.

| Work Force Issues |
| --- |

Staff shortages and work force issues continue to present significant challenges impacting service access and full implementation of some remedial plan requirements.  These are detailed below.

Leadership and Specialized Positions –

- Health Services Administrator (former Chief position) – New manager will start orientation in January 2022.
- Mental Health leadership – Was restructured in early December to be more responsive to remedial plan work and evolving program needs.  The Program Director position was eliminated and in its place there is a Mental Health Manager, Clinical Operations Supervisor, and an Administrative Operations Supervisor.  The Mental Health Manager

formerly worked with ACH for many years and is knowledgeable about program operations and the remedial plan.  She has oversight of the two supervisors.

- <u>Supervising Nurse (Training Coordinator)</u> – This is a new position.  An employee will transition into the new role in January.  Transition will be gradual until former position is filled.
- <u>Supervising Nurse (Case Management)</u> – A temporary registry worker was completing this role after the former employee retired.  Recruitment is in process.
- <u>Administrative Services Officer III (EHR Administrator)</u> – Staff resigned effective 12/15/21 due to personal circumstances.  This is a valuable position.  Recruitment is underway.
- <u>Administrative Services Officer II (contracts/procurement</u>s) – Staff began onboarding December 13, 2021.  This position was created due to heavy administrative workload.

<u>Recruitment</u> –

Recruitment of medical and mental health staff is an *ongoing challenge* due to market demands for licensed health care and mental health personnel.  Staff are competing with local hospital systems and the prison system.  Nursing and mental health staff report some long term staff have been leaving employment.  Some departures are due to retirement and others are due to the magnitude of changes and the pressures of the remedial plan expectations.

- Physician advertising was increased and physician rates were modified in the registry contracts.
- The physician/dentist labor agreement was negotiated and went to the Board of Supervisors for approval in August 2021.  Recruiting full-time physicians continues to be a challenge in spite of the enhanced economic package.
- The labor agreement for registered nurses was negotiated and went to the Board in November 2021.  Part of the economic package is not effective until January 2022.
- Another bargaining group with various health employees is anticipated to be negotiated in 2022.
- Mental health contractor also reports ongoing challenges with staff recruitment.

See the General Provisions Staffing Section for information on positions and vacancies.

<u>Custody Escorts</u> –

There are insufficient escorts to ensure access to health and mental health services.  Dedicated, trained escorts would be ideal for key services and pill call.

<u>Change Management / Culture Change</u> –

There is overlapping significant change which impacts staff ability to absorb information and roll out training.  Some employees are resistant to the new standards of patient centered care, which means supervisors face challenges of training, coaching, and/or personnel actions.  In order to assist with the culture change and accountability, the following have been developed:

- Position Standards have been developed for many positions.  Some were modified or added during this monitoring period.
- ACH Code of Conduct and Safety & Security Guidelines forms requiring review/signature were created for all new hires and articulate standards.
- Personnel Evaluations are required for staff annually and for staff on probation.
- Policy and Procedure Manuals are in various stages of development.  All policies are posted on the intranet for staff reference.
- Staff Development & Training Policy is updated as training is developed.  A shared drive has also been created for materials.  Managers introduced more training during this period.  Department of Technology developed and modified a program called Pro-LiST.  The Pro-LiST application interfaces with the Department of Consumer Affairs' BreEZe system to retrieve up-to-date license information.  Managers and designated staff can also input data on other staff licensure, testing, training, and vaccination information and pull reports.  Application updates to allow entry and tracking of testing, training, and vaccination information went live mid-November 2021.  Staff are in the implementation process.
- Quality Improvement Team and QI policy was developed and is modified as items are added.  During this monitoring period, a new QI Subcommittee, Utilization Management, began meetings and the Suicide Prevention Subcommittee moved from quarterly to monthly meetings.
- Data tracking and reports continue to be phased in.  The electronic health record (EHR) continues to have limitations.
- Communication efforts are varied.  All policies and forms are posted on a dedicated ACH intranet page, a program newsletter is distributed to staff monthly, managers are expected to have consistent staff meetings, there are regular and ad hoc meetings with custody, and mental health staff are adding Multidisciplinary Team (MDT) Meetings.  Managers are working to integrate culture change and specific remedial plan changes into different venues.  This is a lot of material to absorb and is a clear change from a prior status quo culture.
- Consent Decree Training was provided to medical/mental health staff.  Service line directors report this training was helpful for staff to see the context of change and how it impacts all disciplines.

| Space |
| --- |

Sufficient space to provide the necessary health and mental health services within the remedial plan is a major challenge.  The jails were built pre-ADA and pre-HIPAA and medical/MH areas were not designed as "treatment" or "clinic" space.  Additionally, appropriate space within the jail facilities is extremely limited and requires construction or additional space.  More exam rooms and treatment spaces (individual/group) are needed.  Changes that occurred during the monitoring period or are in planning:

- New nursing station at Main Jail 2 East. (completed)
- New provider exam room at Main Jail 2 East will be completed soon.
- New interview cubicles for nursing at Main Jail 2 East were partially installed and are pending a piece which has been delayed due to supply issues.
- Provider charting room at Main Jail on 2 Medical is in process.
- Nurse Intake in the Main Jail booking will undergo major change including computer stations, larger interview cubicles with privacy barriers, sound machines, individual scanners for documents, and some space for supplies.

ACH/SSO staff have been meeting to review interim plans to move the Acute Psychiatric Unit from 2P to the 3rd floor.  Interim plans also include relocating the existing Intensive Outpatient Program (IOP) to another unit so each will have some confidential space.  SSO will work with General Services to assess feasibility (cost-benefit).  If the move of Acute Psychiatric Unit is possible, beds will increase from 17 to 40 (ten of these cells are now used for inmates who are suicidal and require close monitoring).  It would also free up 2P space to serve as a close observation unit for medical staff.  This is especially needed for withdrawal management and other medical conditions requiring frequent monitoring.  This space is adjacent to medical housing and the nursing station.

ACH, Custody, and General Services completed a tour of storage spaces for nursing, pharmacy and dental within the Main Jail.  The goal was to see how space could be reconfigured to address the space needs and eliminate clutter.  In September, General Services notified ACH that adding storage units was not feasible.

Planning is in process to relocate certain mental health/medical staff and administration to a building on G Street near the Main Jail.  This move is necessary due to lack of on-site space within the facility.  This space will have a conference room and storage for supplies.  Currently, administration is located in South Sacramento.  This location will assist managers and administrative staff with easy access to the jail.

Space is also addressed in the Medical and Mental Health sections and in the planning section at the end of this report.

| COVID-19 Management |
| --- |

Overall, the pandemic has greatly affected staff resources, use of space, and timely access to care due to challenges with providing services while maintaining infection prevention protocols.  Staff efforts in managing the pandemic are focused and continue to evolve.

Staff developed the initial COVID-19 Staff Guidance on March 2, 2020 and began COVID-19 management strategies with SSO.  Staff completed the latest revision of the staff guidance on December 29, 2021.  In addition to the main guidance, there are several other COVID-19 related documents on the ACH COVID-19 Webpage.  These serve as key resource materials for staff.

COVID-19 management strategies are team-based.  There continues to be extensive collaboration with SSO on daily management including regular meetings to review progress, obstacles, and changes in practice.  ACH leadership also meets with Public Health on a regular basis.  Data is provided weekly and posted on the SSO website.

Management strategies have continued to evolve over this monitoring period.  As the average daily population (ADP) increased, it has placed pressure on staff.  A large amount of space is utilized for designated COVID-19 housing (intake quarantine, close contact quarantine, suspect isolation, and case isolation).  The lack of adequate space and population pressures contributed to an outbreak during this monitoring period.  An outbreak was identified the week of October 20th, and resolved mid-November at the Main Jail and mid-December at RCCC. Early identification, initiating multiple actions, vaccinations, and resuming frequent meetings helped to mitigate the extent of the outbreak.   It was far less extensive than the first outbreak which occurred a year ago.  Additionally the Inspector General reviewed ACH and SSO COVID-19 protocols and actions. See report at https://inspectorgeneral.saccounty.gov/Pages/default.aspx.

County and Class Counsel agreed to changes in protocol.  These were included in the most recent *Staff COVID-19 Guidance*.  The precipitant for immediate action was SSO use of certain designated housing at RCCC due to population pressures.  Return to designated housing resumed mid-November and has been maintained.  SSO at RCCC has a plan to assist in maintaining the designated housing.

COVID-19 data continues to be important for monitoring.  Reports include Average Daily Population, the weekly COVID-19 Dashboard, and vaccinations.

Average Daily Population (ADP)

During the COVID-19 pandemic, the adult jail facilities population was dramatically reduced through several court orders and population reduction strategies.  The lowest ADP total following early court releases was 2,418 in May 2020.  The population has been gradually increasing and has returned to pre-pandemic levels.  The average ADP YTD is 3,172.

The highest was pre-pandemic on September 2019 (3,751), lowest was May 2020 due to large population releases early in the pandemic (2,418), and recent (November 2021 - 3,329) ADP totals are shaded grey below.

| Fiscal Year | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019/20 | 3,586 | 3,655 | 3,751 | 3,720 | 3,605 | 3,501 | 3,512 | 3,546 | 3,336 | 2,539 | 2,418 | 2,475 |
| 2020/21 | 2,616 | 2,833 | 3,016 | 3,201 | 3,148 | 3,255 | 3,231 | 3,299 | 3,366 | 3,307 | 3,062 | 3,049 |
| 2021/22 | 3,030 | 3,157 | 3,150 | 3,196 | 3,329 | | | | | | | |



<u>COVID-19 Data Dashboard</u> was developed in August 2020.  This information depicts point-in-time data and is updated weekly.  The data has been important for monitoring, retooling efforts, and communication.  The latter occurs within the county and is also sent weekly to Class Counsel and experts.

<u>Weekly COVID-19 Data as of December 29, 2021</u>
Total number of COVID-19 tests since March 2020: 28,899 *(Net increase = 505)*

Total number of confirmed COVID-19 cases since March 2020: 2,236 *(Net increase = 3)*

Total number of confirmed COVID-19 cases during the intake observation/quarantine period since March 2020: 515 *(Net increase = 3)*

Total number of COVID-19 positive inmates currently in custody: Main Jail – 3  / RCCC – 0

Total number of COVID-19 related deaths: 2

SSO COVID-19 Link: *https://www.sacsheriff.com/pages/covid19.php*

<u>Net Increase in COVID-19 tests</u> reflects tests to inmates.  It does not reflect employee testing due to employee exemptions requiring weekly testing or UC Davis employees.  405 tests were completed the week of December 27, 2021 for staff with exemptions and inmate workers.  The jail testing total for the week (inmates, staff) was 900+.

See charts below for the period of October 6, 2021 – December 29, 2021.  An outbreak was identified the week of October 20th.







<u>COVID-19 Vaccination</u> process began for staff late January and inmates March 2021.  Vaccination is critical to maintaining a safe working environment for patients, inmates, staff, and visitors.

<u>Inmate Vaccination Data</u>

Staff began a COVID-19 Inmate Vaccination Incentive Program in late July 2021 and amended the program on 09/14/21, 10/25/21 and 12/29/21 with the goal to increase vaccination efforts.  The Infection Prevention Team notifies SSO Vaccine program contacts of vaccinations and SSO deposits the incentive in the inmate's account.

| Inmate Vaccination Program Incentive Amount | | |
|---|---|---|
| Vaccine Type | Inmates | Inmate Workers |
| One Dose (Janssen) | $20 for the completed single dose. | $40 for the completed single dose. |
| Two Dose (Moderna/Pfizer) | $10 for each completed dose within the two dose series. | $20 for each completed dose within the two dose series. |
| Booster | $10 for the completed dose | $20 for the completed dose |

As of 12/29/21, 2,684 inmates received at least one COVID-19 vaccine dose.  All inmates are eligible and encouraged to receive vaccinations including booster doses.  Staff also complete the vaccination series for inmates who transfer to the jails partially vaccinated.

| Facility | Total Patients | Total Doses | Completed Vaccine Series | | | Fully Vaccinated Patients | Booster Doses |
|---|---|---|---|---|---|---|---|
| | | | Moderna | Janssen | Pfizer | | |
| MJ | 1,629 | 2,205 | 540 | 834 | 37 | 1,411 | 55 |
| RCCC | 1,055 | 1,449 | 385 | 527 | 13 | 925 | 52 |
| Total | 2,684 | 3,654 | 925 | 1,361 | 50 | 2,336 | 107 |

*This is a cumulative number since the inmate vaccination program began on 01/29/21.  Total includes inmates who are no longer incarcerated*.

Due to the high rate of jail releases, staff also periodically review point in time vaccination data.

### Point in Time 11/16/21 (Daily Population = 3,332)

**30%** of the daily population received at least one vaccination with most having completed the vaccination series. **27%** of the daily population are fully vaccinated.

| | Main Jail | RCCC | Total |
|---|---|---|---|
| Received at least one vaccine dose | 549 | 447 | 996 (30%) |
| *Completed vaccine series* | 495 | 416 | 911 (27%) |

### Point in Time by LOS

Of the 996 who received at least one dose of the COVID-19 vaccine, **81%** have been in custody for more than 60 days.

| Inmates who Received at Least One Vaccine Dose Length of Stay | | | |
|---|---|---|---|
| | Main Jail | RCCC | Total |
| 0 – 15 days | 55 | 1 | 56 (6%) |
| 16 – 30 days | 31 | 15 | 46 (5%) |
| 31 – 60 days | 41 | 43 | 84 (8%) |
| 61 - 90 days | 29 | 47 | 76 (8%) |
| 91+ days | 393 | 341 | 734 (74%) |
| Total | 549 | 447 | 996 (100%) |

Staff Vaccination Data

During this monitoring period, State Department of Public Health issued an order for mandatory vaccination and/or qualified exemptions with weekly testing. This went into effect 8/19/21 with full compliance by 10/14/21. Department of Personnel utilizes software called *Qualtrics* for staff to upload vaccination verification and weekly testing results for exempt workers.

Periodically, staff complete a vaccination report. The last report was on 11/17/21.

| ACH County & Contracted Staff | Percentage Vaccinated |
|---|---|
| Medical | 93% |
| Admin staff based onsite | 100% |
| Admin staff based offsite but go onsite | 100% |
| Registry staff / Contractors | 90% |
| Mental Health staff | 97% |
| Forensic Fellows, Residents & Students | 100% |

The order was amended 12/22/21 requiring vaccination boosters for all workers within the correctional facilities with full compliance by 2/1/22. Unvaccinated exempt workers and booster eligible workers who have not yet received a booster are required to complete weekly testing.

Link to the State Public Health Order:

https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Correctional-Facilities-and-Detention-Centers-Health-Care-Worker-Vaccination-Order.aspx

Department of Personnel Services will modify the employee guidance and issue a new survey to vaccinated personnel for information on boosters.

## GENERAL PROVISIONS [Remedial Plan Section II]

| Staffing (Section II. Provisions A.B.)<br>Status: Partial Compliance |
|---|

Per County's agreement with Class Counsel, there is a multi-year staffing plan. County began to add staff and/or contract augmentations prior to the finalization of the Consent Decree (January 2020). The following tables outline staffing enhancements to date by fiscal year.

| Health Care Staffing Augmentation | |
|---|---|
| Fiscal Year | Staffing |
| FY 2018/19 (Midyear) | 12 FTEs<br>• 1 FTE Physician<br>• 1 FTE Dentist<br>• 1 FTE Pharmacist<br>• 1 FTE Pharmacy Technician<br>• 4 FTE Registered Nurses (RN)<br>• 4 FTE Licensed Vocational Nurses (LVN) |

| Health Care Staffing Augmentation | |
|---|---|
| Fiscal Year | Staffing |
| FY 2019/20 | 12.0 FTEs<br>• 4 FTE Quality Improvement (QI) Team – 1 Planner, 1 RN, 2 Administrative Services Officer I<br>• 4 FTE – 2 Physicians, 2 Medical Assistants (MA)<br>• 2 FTE Supervising RNs<br>• 2 FTE Senior Office Assistants (SROA) |
| FY 2020/21<br><br>*Budget hearings were delayed until September.* | 13.0 FTEs<br>• 2 FTE Physicians *(midyear)*<br>• 5 FTE Registered Nurses (3 sick call, 1 discharge planning, 1 chronic care)<br>• 1 FTE Medical Assistant<br>• 1 FTE Dental Hygienist (replaces registry staff)<br>• 1 FTE Pharmacist<br>• 1 FTE Pharmacy Technician<br>• 1 FTE Administrative Services Officer III (Electronic Health Record)<br>• 1 FTE Administrative Services Officer II (Contracts) |
| FY 2021/22 | 29.0 FTEs<br>• 2.0 FTE Supervising Registered Nurse (Infection Prevention Coordinator to replace behind the RCCC SRN position / Nurse Educator)<br>• 6.0 FTE Registered Nurses (Sick Call – 2, Chronic Care – 3, QI - 1)<br>• 9.0 FTE Licensed Vocational Nurses (Infection Prevention – 2, Pill Call - 2, Pill Call/Medication Assisted Treatment Program – 4, Discharge Planning -1)<br>• 1.0 FTE Medical Assistant (Discharge Planning)<br>• 1.0 FTE Pharmacist (expansion of hours)<br>• 1.0 FTE Pharmacy Technician (expansion of hours)<br>• 6.0 FTE Registered Dental Assistants (replace registry staff)<br>• 1.0 FTE Planner (remedial plan support)<br>• 2.0 FTE Senior Office Assistants (medical records) |

<u>Current staffing for FY 2021/22</u>

Staffing includes 186.5 permanent county FTEs.  The permanent positions do not include county on-call, registry, or contract positions.  Staffing augmentations decrease the need for temporary staff.

<u>Vacancies</u>

There are 29.5 medical staff vacancies for the jail facilities.  Six (6) of the positions have candidates in the background clearance process.  There are seven (7) administrative positions vacant.  See the following charts for details.

15

| Jail Facilities Vacant Positions as of 12/28/21 | | |
|---|---|---|
| *Classification* | *Vacancies* | *Background* |
| Medical Assistant Level | 1 | |
| Licensed Vocational Nurse | 12 | 2 |
| Registered Nurse | 7 | 2 |
| Supervising Registered Nurse | 1 | |
| Physician 3 | 6.5 | 1 |
| Nurse Practitioner | 1 | |
| Dentist | 1 | 1 |
| Total | 29.5 | 6 |
| Administration Vacant Positions as of 12/28/21 | | |
| *Classification* | *Vacancies* | *Background* |
| Admin Services Officer 3 | 1 – EHR | |
| Admin Services Officer 1 | 1 – Medical Records | |
| Medical Records Technician | 1 | |
| Registered Nurse | 2 – QI Nurse | |
| Supervising Registered Nurse | 1 – Case Management | |
| Sr. Office Assistant | 1 | |
| Total | 7 | 0 |

As noted in the challenges section of this report, there are high market demands for medical staff with limited supply including per diem staffing.  Many nurses are eligible for retirement, and the number of temporary replacements available through registry has decreased.  Recruitment for RNs should improve in January since the equity adjustment will be in effect.  Physician staffing is improving slowly although harder to recruit permanent staffing.

Mental health services are provided under a contract with UC Davis Department of Psychiatry and Behavioral Sciences.  The following charts note contract augmentations.

| Mental Health Contract Augmentation | | |
|---|---|---|
| Fiscal Year | Program Additions | Facility |
| FY 2017/18 | 20 Intensive Outpatient Program (IOP) Beds (male) | Main Jail |
| FY 2018/19 (Midyear) | 24/7 Licensed Clinical Social Worker (LCSW) Coverage | Main Jail |
| FY 2019/20 | 15 IOP Beds (female) 24 IOP Beds (male) 24/7 LCSW Coverage | Main Jail RCCC RCCC |

| Mental Health Contract Augmentation | | |
|---|---|---|
| Fiscal Year | Program Additions | Facility |
| FY 2020/21 (Midyear) | Enhanced Outpatient Mental Health Services for the Outpatient Psychiatric Pod. Includes mental health services, medication evaluation and monitoring, case management, and discharge planning.  Adds a new level of service.  Will serve approx. 125 patients at any given time. | |
| FY 2021/22 | Enhanced outpatient (EOP) mental health services in the Outpatient Psychiatric Pod (OPP) expansion to provide services to an additional 150 patients requiring intensive services.  This expansion will increase services to 275 patients with a total EOP service provision of 400 patients. | |

Current staffing for FY 2021/22

Staffing includes 98.4 FTE.   Mental health is also having challenges hiring licensed personnel due to competing market demands.  Like the medical staff shortage, this is not unique locally.

Vacancies

Mental health has 19 vacancies, mostly comprised of social workers at Main Jail.

| Area | Vacancies |
|---|---|
| Main Jail | |
| Outpatient | 5 |
| Enhanced Outpatient Program (EOP) | 6 |
| Intensive Outpatient Program (IOP) | 1 |
| Acute Psychiatric Unit (APU) | 1 |
| RCCC | |
| EOP | 3 |
| IOP | 1 |
| Jail Based Competency | 3 |
| Total | 19 |

Since mental health is a contractor, staff are not subject to the full background clearance that is required of permanent county staff.

Next Steps for Medical/Mental Health Staff

Managers and supervisors continue hiring and onboarding staff on an ongoing basis.  Position control and vacancy reports are regularly updated.

Part of the economic package for registered nurses is effective in January.  Managers will assess how the increase will impact hiring.  A nurse manager is exploring a possible partnership with a local vocational technical college for recruiting medical assistants and licensed vocational nurses.

Negotiations will begin on another health services labor agreement during the next monitoring period.

Class Counsel requested a staffing analysis which was submitted November 2021.  The staffing analysis was also submitted to county leadership and will serve as a basis for growth requests for Fiscal Year 2022/23.  On a practical level, managers will need to continue to monitor hiring, onboarding, space, and program needs as remedial plan policies continue to be developed and implemented.  An iterative process is needed to ensure staffing noted in the analysis makes sense or if modification is needed.   Any changes in policy or program involving criminal justice partners could also impact staffing needs.

| |
|---|
| Mental Health Data Posting (Section II. Provision C.)<br>Status:  Substantial Compliance |

Point-in-time data reports are posted quarterly with email notification to Class Counsel.  See SSO Transparency/Corrections Consent Decree:
https://www.sacsheriff.com/pages/transparency.php.

A brief summary of the report data is located in the following table.

| Report Point-in-Time | 10/5/20 | 1/4/21 | 4/5/21 | 7/5/21 | 10/4/21 |
|---|---|---|---|---|---|
| Census | 3,093 | 3,275 | 3,372 | 3,064 | 3,173 |
| **Mental Health** | | | | | |
| No mental health condition | 1,187 (38%) | 1,211 (37%) | 1,231 (37%) | 1,162 (38%) | 1,167 (37%) |
| MH non-SMI* diagnosis | 1,111 (36%) | 1,141 (35%) | 1,237 (37%) | 1,083 (35%) | 1,123 (35%) |
| SMI | 795 (26%) | 923 (28%) | 904 (27%) | 819 (27%) | 883 (28%) |
| **Behavioral Health Services** | | | | | |
| *Outpatient Mental Health* | | | | | |
| Open | 28 (4%) | 27 (4%) | 32 (5%) | 37 (6%) | 32 (5%) |
| Discharged | 656 (96%) | 708 (96%) | 647 (95%) | 590 (94%) | 620 (95%) |
| *Full Service Partnership (FSP)* | | | | | |
| Open | 32 (34%) | 32 (30%) | 37 (33%) | 27 (28%) | 38 (31%) |
| Discharged | 63 (66%) | 73 (70%) | 75 (67%) | 71 (72%) | 83 (69%) |
| *Substance Use Prevention & Treatment (SUPT)* | | | | | |
| Open | 33 (12%) | 52 (17%) | 35 (12%) | 29 (11%) | 29 (9%) |
| Discharged | 235 (88%) | 247 (83%) | 266 (88%) | 241 (89%) | 277 (91%) |

*SMI - serious mental illness

Notes:
- Percentage of SMI population incarcerated varies from 26% – 28%.
- Percentage of MH Non-SMI population incarcerated gradually increased during the pandemic from 30% (April 6, 2020) to 37% (April 5, 2021).
- Patients currently open with county mental health services in the community remains consistently low.  Most were discharged from service.  See County Efforts to Reduce the Jail Population for services that are active or in development at the end of this report.

## AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE [Remedial Plan Section III]

Staff created and/or revised key policies, electronic health record templates, PowerPoint training, and are completing training.  Where indicated (*in revision based on feedback*), staff received feedback from Class Counsel or Medical Experts and are in the process of policy revision.

| Policies and Procedures (Section III. Provision A.) |
| --- |
| Status:  Substantial Compliance |

Policies:

- ACH PP 01-09 Grievance Process for Health/Disability Complaints (revision 12/01/21) – *Pending final review by Class Counsel/Experts*
- ACH PP 06-02 Patients with Disabilities (12/01/20) – *Final*
- ACH PP 06-03 Effective Communication (revision 03/12/21) – *Final*
- ACH PP 06-04 Interpretation Services (revision 04/05/21) – *Final*
- ACH PP 06-05 ADA Coordination (revision 11/05/21) – *Final, subject to addition of processes related to interface between EHR and Sheriff's Office ATIMS system*
- ACH PP 06-06 Patients with Disabilities or Other Significant Health Needs (revision 04/05/21) – *Final*
- ACH PP 06-07 Health Care Appliances, Assistive Devices, and Durable Medical Equipment (revision 04/05/21) – *Final*
- MH PP 07-XX Mental Health Adaptive Support Program (draft 11/03/21) – *Draft approved by MH Expert; in revision based on Class Counsel feedback*

Forms:

- Grievance Form and Appeal Form (revision 12/01/21)
- Disabilities Screening Template (EHR) – *Final*
- Effective Communication Template (EHR; revision 08/31/21) – *Final*
- Alta Regional Center Referral Form (10/2021)

See last ADA provision for training information.

| ADA Tracking System (Provision B.) |
| --- |
| Status: Partial Compliance |

Staff developed and refined electronic health record templates for screening and documenting disabilities and accommodations.  These forms permit ongoing changes if accommodation status needs to be modified.

There is a designated clerical staff that maintains a log of any correspondence sent from external agencies providing notification of an individual with ADA needs. A medical assistant (MA) has been assigned to review the EHR and verify accommodations have been provided. If not, the MA notifies nurse and/or provider to assess patient.

SSO is pending the ATIMS go-live for ADA tracking and identification.  Staff have worked on an interface between these two systems.  Until the electronic data fields are solidified and testing has begun, ACH cannot assess visibility and use for health staff.

| Screening for Disability and Disability-Related Needs (Provision D.) Status: Substantial Compliance |
| --- |

Policies:

- ACH PP 05-05 Nurse Intake (revision 10/28/21) – *Final*
- ACH PP 06-02 Patients with Disabilities (12/01/20) – *Final*

Other:

- Nurse Intake policy revision was substantial and recently approved along with the electronic forms. The Nurse Intake includes essential electronic forms on disabilities, accommodations, and effective communication and a workflow.
- The RN is required to send referrals to mental health for post-intake assessment of psychiatric, developmental, or intellectual disabilities.
- Nurses received training on the new intake process in November 2021.
- QI has conducted three ADA audits.  Over time, intake nurses have improved with respect to identifying and documenting disabilities and related needs.  See section on ADA Training, Accountability, and Quality Assurance (Provision P) for more information.

| Health Care Appliances, Assistive Devices, Durable Medical Equipment (Provision F.) Status: Substantial Compliance |
| --- |

Policy:

- ACH 06-07 Health Care Appliances Assistive Devices and Durable Medical Equipment (revised 04/05/21) – *Final*

Other:

- Electronic forms were completed to assist in identification and tracking of assistive devices and durable medical equipment (DME).
- Policy and EHR forms allow providers to select "other" when ordering assistive devices and/or DME in addition to the pre-determined list.
- Staff developed a process to ensure newly ordered devices are provided to patients in a timely manner.

| Effective Communication (Provision I.) Status:  Substantial Compliance |
| --- |

Policy:

- ACH PP 06-03 Effective Communication (revision 03/12/21) – *Final*

Other:

- The EHR was reconfigured so that the Effective Communication (EC) form is the first form to be completed in all clinical encounters.  This assists in identifying and tracking patients with effective communication needs, including those that change over time.
- The EC template in the EHR was modified 08/31/21 to include additional questions for identifying EC needs and to simplify the language used in the inquiry.

> Effective Communication and Access for Individuals with Hearing Impairments (Provision J.)
> Status:  Substantial Compliance

Policies:

- ACH PP 06-03 Effective Communication (revision 03/12/21) – *Final*
- ACH PP 06-04 Interpretation Services (revision 04/05/21) – *Final*

Other:

- Staff started using video interpreting services for patients who need Sign Language Interpretation (SLI).  A necessary icon and camera was installed on designated computers to access the *LanguageLine InSight* application.

> Disability-Related Grievance Process (Provision K.)
> Status: Partial Compliance

Policy/Form:

- ACH PP 01-09 Grievance Process for Health/Disability Complaints (revised 12/01/21) – *Pending final review by Class Counsel/Experts*
- Grievance Form and Appeal Form (revised 12/01/21)

Other:

- The grievance policy and forms were substantially revised based on Medical Expert feedback.  Key additions include immediate review of each grievance by a nurse and immediate action when indicated, specific timeframes for requesting and responding to appeals, and more detail on the grievance and appeal forms.
- Nurses at Main Jail received training on the revised grievance forms in December 2021.
- Grievances are tracked.  With the addition of the electronic forms, it will permit more accurate tracking.
- Some patients continue to give health care grievances to custody.  Staff will work with custody to improve coordination on grievances.

| Transportation (Provision N.) |
| Status: Partial Compliance |

Policies:

- ACH PP 04-09 Medical Transportation (revision 07/22/21) – *Final*.  This policy was revised to address medical transportation of patients with disabilities based on Medical Expert feedback.
- ACH PP 06-06 Patients with Disabilities or Other Significant Healthcare Needs (revised 04/05/21) – *Final*
- ACH PP 06-07 Health Care Appliances, Assistive Devices, and Durable Medical Equipment (revised 04/05/21) – *Final*

Other:

- QI completed the first "Medical Transportation Coordination Report" to assess coordination between ACH and SSO with respect to medical escorts.
- QI is working on a template for SSO to provide more accurate transportation coordination data and anticipate implementation in the next monitoring period.

| Prisoners with Intellectual Disabilities (Provision O.) |
| Status: Partial Compliance |

Policy:

- ACH PP 05-05 Nurse Intake (revision 10/28/21) – *Final*
- MH PP 07-XX Mental Health Adaptive Support Program (draft 11/03/21) – *Draft approved by MH Expert; in revision based on Class Counsel feedback*

Other:

- Through the intake process, nurses gather information through screening, past history, third party or observation noting possible intellectual disability.  Nurses refer patients to mental health staff for an assessment and treatment plan.
- MH drafted a policy entitled Adaptive Support Program for assessment of intellectual disability.  Staff are reviewing Class Counsel's feedback received December 6, 2021.  See the MH section of this report for detail.

| ADA Training, Accountability, and Quality Assurance (Provision P.) |
| Status: Substantial Compliance |

Training:

- ADA and Effective Communication Training and Documentation PowerPoints were developed and approved.  The documentation PowerPoint has been updated to include changes to EHR templates.

- Training was completed for case management and quality improvement nurses in late December 2020. Training began in the jail facilities in March 2021. Training is mandatory for all ACH staff, including contracted mental health staff, in the jails as well as administrative positions (case management and quality improvement) working offsite.
- As of December 2021, staff have completed thirteen (13) training sessions that included 229 staff.

Tracking:

- Grievances, including those for disabilities and effective communication, continue to be tracked. Tracking is more specific post policy and form revision.
- Grievance data is reviewed at quarterly Quality Improvement Committee (QIC) meetings. QIC members discuss strategies to improve problem areas and recommend changes in practice.
- Staff have developed a tool to audit disabilities, accommodations and effective communication. Three (3) quarterly audits have been completed, the most recent in October 2021. Data indicates that staff are improving with regard to identifying and documenting disabilities, accommodations, and effective communication. See below.

| Indicator – *Intake RN action on disability-related information* | Data Period – *Intakes completed on:* | | |
|---|---|---|---|
| | 05/03/21 | 07/02/21 | 10/07/21 |
| ADA Assessment form complete and accurate | N/A | 42/84 (50%) | 66/92 (72%) |
| Effective Communication (EC) form complete and accurate | 63/73 (86%) | 73/84 (87%) | 86/92 (93%) |
| EC provided when needed | 9/10 (90%) | 10/12 (83%) | 4/5 (80%) |
| Assistive device ordered when needed | 9/11 (82%) | 8/10 (80%) | 10/10 (100%) |
| Referred to MH when needed | 12/14 (86%) | 18/21 (86%) | 16/17 (94%) |
| Referred to provider when needed | 7/13 (54%) | 1/4 (25%) | 1/2 (50%) |

- Audits will continue on a regular basis and data/trends will be reviewed for errors, systemic issues, and opportunities to improve detection and create individualized care plans. Data is reviewed during QIC meetings.

## AREAS OF FOCUS FOR THIS MONITORING PERIOD

Adult Correctional Health continues to work toward improving access and services as outlined in the remedial plan. Where indicated (*in revision based on feedback*), staff received feedback from Class Counsel or Medical Experts and are in the process of policy revision.

# MEDICAL CARE [Remedial Plan Section VI]

Class Counsel outlined five areas of focus for the second monitoring period including the intake screening, sick call system, chronic care, specialty care, and roll out of the new electronic health record (EHR) system.  These are shaded in blue. The remainder of provision sections are not shaded and were not an area of focus.  Status is listed for each provision.

> Intake Screening (Provision B.)
> Status:  Substantial Compliance (policy and forms); Partial Compliance (implementation)

Policies:

- PP 05-05 Nurse Intake (10/28/21) was recently revised.  This is a substantial revision with many key changes.  Nurses were trained and the revised intake process was implemented in November 2021.
- PP 05-13 Initial History & Physical Assessment (04/09/21; in revision based on feedback) and the revised Nurse Intake policy specify referral criteria and timeframes to ensure patients are seen post-intake based on their medical needs and acuity.

Forms:

- Nurse Intake electronic health record (EHR) forms were significantly revised based on Medical Expert feedback.  Form improvements include:
    a. Nurse must confirm review of the electronic record from previous admissions or indicate patient's first intake in Sacramento County.
    b. Nurse must select yes or no for patient requires medication.  A yes response automatically creates an essential medication order that prompts provider review.
    c. Key screenings were expanded including suicide risk inquiry and screening for disabilities and effective communication needs.
- A Nurse Intake Workflow (for EHR) was finalized and nurses were trained in early November 2021.  It will be used for staff training and reference.
- Lists have been developed in the EHR to categorize nurse follow-up specific to diagnostic tests (e.g., urine collection) and additional screenings (e.g., substance use).  The lists assist with communication and tracking tasks post intake.
- Staff are working to refine EHR templates on an ongoing basis.

Implementation:

- The revised Nurse Intake policy and forms were implemented in November 2021.

Other:

- Nurses are required to be trained annually. This training requirement is included in PP 03-08 Staff Development and Training (revised 07/01/21).  Additionally, nurses assigned to the intake process receive training when there are changes to the policy and/or form.

- QI staff developed several audit tools to assess the nurse intake process.  Reviews completed during this monitoring period include:
  a. ADA Identification and Documentation at Intake
  b. Substance Use Identification, Assessment and Monitoring at Intake
  c. Referrals at Intake (see below)

**Intake Referral Audit**

Focus: To determine whether RNs ordered appropriate referrals at intake.

Data period: November 29, 2021

Charts reviewed:  51

| Referral Type | Patients who needed referral | Patients referred appropriately |
|---|---|---|
| Provider | 20 | 14 (70%) |
| SUD Counselor | 19 | 9 (47%) |
| Mental Health | 15 | 11 (73%) |
| Dental | 7 | 7 (100%) |
| Single or multiple referrals* | 32 | 15 (47%) |

*Does not total because 21 of 51 patients needed multiple referrals.*

- Audit occurred at same time of implementation.  QI will develop additional audit tools during the next monitoring period.

Space:

- ACH, SSO and Facility Management participate in ongoing meetings to modify medical areas to utilize space more efficiently to provide patient care.
- Improvements planned for the Nurse Intake space in the Main Jail include new computer stations, larger interview cubicles with privacy barriers, sound machines, individual scanners for documents, and space for supplies.  These projects are pending the Department of General Services and will be completed in early 2022.

| Access to Care "Sick Call System" (Provision C.) |
|---|
| Status: Partial Compliance |

Policies:

- PP 05-09 Health Service Requests (revision 10/29/21) was significantly modified based on Medical Expert feedback.  *This policy now includes contents from PP 05-16 Medical Sick Call which has been deleted.*

Implementation:

- Key changes to the policy include the requirement for scanning HSR forms within 24 hours of receipt and a new process to send patients a response printout after HSR triage.  These provisions will be implemented in the next monitoring period following staff training.

- Nurse managers are creating a workflow for triaging HSRs.
- EHR templates are in development to ensure accurate documentation and tracking of HSRs submitted by patients.  Testing will begin in January 2022.  The new templates will go live following testing.
- Nurse training and implementation is scheduled for January 2022.

Other:

- Designated staff are responsible to ensure adequate supplies and nursing collects health service requests (HSRs) at least twice daily.
- Confidential locked boxes labeled "Health Service Requests" are installed at both Main Jail and RCCC.
- Patients are permitted to report or inquire about multiple medical needs on a single HSR or during a single appointment.
- There is an insufficient number of escorts at Main Jail to ensure timely access to care.
- Staff have developed an audit tool for timely access to services.  A baseline study was completed prior to the policy revision.
- A video communication pilot will start next monitoring period to improve access to provider consults.  Medical assistants, providers, and other health care staff will be able to have a video consult with a provider in specific circumstances.  The goal is to improve patient care and provider productivity.
- Service access issues are continuing due to SSO and ACH staffing and space challenges and COVID-19 operations.

Space:

- A medical records office at Main Jail 2 East will be converted to a provider exam room in January 2022.  This will increase access to services when it is complete.
- A provider charting office will also be completed in January 2022.
- Other improvements to Main Jail medical areas are in various stages of completion.  There is a new nursing station on 2 East and new interview cubicles for nursing (now partially installed pending parts).

| Chronic Care (Provision D.) |
| Status: Partial Compliance |

Policies & Provider Guidelines:

- PP 05-18 Chronic Disease Management (08/18/21) was revised based on Medical Expert feedback. – *Final*
- PP 05-19 Hepatitis C Testing and Treatment (05/13/21) – *ACH accepted Class Counsel's feedback dated 05/26/21 but waited for Medical Expert feedback to revise the policy. Medical Expert feedback received 12/10/21, the policy is in revision and should be finalized in January.*

26

- PP 05-20 Diabetes Management (06/03/21) – *In revision based on feedback and should be finalized in January.*
- Provider Treatment Guidelines were developed for Asthma (11/19/21).  ACH has not received medical expert feedback on this or the Provider Treatment Guidelines developed last monitoring period: Hypertension (05/10/21), Diabetes Management (06/02/21) and HIV/AIDS (06/02/21).
- Related policies: PP 05-05 Nurse Intake (revision 10/28/21); PP 05-13 Initial History and Physical (H&P) Assessment (04/09/21) – *In revision based on Medical Expert feedback.* These are critical assessments that begin the identification and treatment of chronic disease.

Implementation:

- The chronic disease management related policies and guidelines are newly developed and some are in revision.  Full implementation is pending finalization of the policies.
- Providers have been trained and have started managing chronic diseases.   Full implementation with nursing will occur in 2022.
- Providers have been assigned to specific locations to help ensure continuity of care.
- Providers have been trained to create alerts in the EHR to ensure a particular patient returns to that provider for follow-up care when possible.
- Hepatitis C "opt-out" testing was implemented in November 2021.
- Nursing has been ensuring continuity of care for patients released/transferred.
- Nursing recently dedicated two staff to chronic care.  The chronic care nurses are seeing patients but need EHR templates (currently in development) for accurate documentation.

Chronic Disease Specialty Services:

- A specialist began to provide an onsite Gastroenterology and Hepatology Clinic every other week.  Services started in October 2021.
- A primary care provider with additional training in HIV started a weekly HIV Clinic in July 2021.  Infectious disease consultation is also available through RubiconMD or contracted off-site Infectious Disease specialist as clinically indicated.
- A part-time primary care provider is also a nephrologist and is available for nephrology consults.
- Providers have been trained to use RubiconMD (e-consult service with access to numerous specialists). Staff can refer to specialists as clinically needed.

Other:

- Medical Director has been providing training for providers.  Regular staff meetings and trainings will continue.
- Medical Director developed guidelines for routine vaccinations and health screenings (e.g., diabetes, breast cancer, and colorectal cancer screenings) and trained providers in December 2021.

- Staff recently developed reports that can be pulled on chronic conditions and labs which will help with chronic disease management.  See table below:

| Chronic Conditions Report based on Points in Time | | |
|---|---|---|
| | 08/04/21 | 12/29/21 |
| Patients with chronic conditions | 65% | 71% |
| Patients with three (3) or more chronic conditions | 33% | 38% |
| Patients on medication | 63% | 68% |

*Note: Staff are identifying and treating more chronic health conditions.  Percentage of patients on medication increased alongside patients with chronic conditions.*

- New EHR templates were created for Initial H&P and Provider Chronic Care Follow Up.
- Staff developed an audit tool for diabetes management.  Baseline audit completed in November 2021.  See tables below.

| Chronic Care Provider Visits – Diabetes Reviewed | | | | | |
|---|---|---|---|---|---|
| Facility | Provider Visit within 6 months | Scheduled outside policy timeframe | Patient Refused | Not scheduled | Total |
| Main Jail | 31 (62%) | 2 (4%) | 1 (2%) | 16 (32%) | 50 (100%) |
| RCCC | 45 (85%) | 1 (2%) | 0 | 7 (13%) | 53 (100%) |

| Hemoglobin A1c (HbA1c) Testing | | | | | |
|---|---|---|---|---|---|
| Facility | Test scheduled or result within 6 months | Scheduled outside policy timeframe | Patient Refused | Not scheduled | Total |
| Main Jail | 39 (78%) | 2 (4%) | 2 (4%) | 7 (14%) | 50 (100%) |
| RCCC | 40 (76%) | 6 (11%) | 0 | 7 (13%) | 53 (100%) |

- Will develop additional chronic care audit tools in the next monitoring period.

28

| Specialty Care (Provision E.) |
| Status: Substantial Compliance |

Policies:

- PP 04-08 Specialty Referrals (revision 08/06/21) – *Final; approved by Class Counsel and Medical Experts.*

Other:

- InterQual, evidence based guidelines, were implemented in late March 2021.
- Specialty Care Referral Provider Guidelines were developed and training was provided in October 2021 to assist providers in submitting sufficient documentation when making referrals. Also see Utilization Management section.
- Providers use RubiconMD, an e-consult service, for access to numerous specialties.
- A bi-weekly onsite Gastroenterology/Hepatitis C Clinic began in October 2021.
- ACS, a contractor that provides some onsite services, is making some service improvements.  These include:
    - Physical Therapy Clinic.  Onsite services started in December for one day per week at Main Jail and will expand to RCCC during the next monitoring period.
    - Ophthalmology services.  Background clearance documentation is pending for three ophthalmologists.
- Staff is working on a contract with the National Eye Care Institute to have optometry services onsite.  Background clearance is pending.
- Also see Chronic Care section.

Tracking:

- Staff began manually tracking specialty referrals in February 2021.  A baseline audit was conducted for FY 20/21 that detailed compliance indicators for the five months of data (February through June 2021).
- Compliance indicators for the Specialty Care Report include timeliness of referrals, including patients who need to see a primary care provider due to the delay of a specialty consultation appointment, and provider follow up post consult.
- A Specialty Services Referral Form was developed to track referrals and timeframes with the EHR and went live in July 2021.  Staff have detected issues with the integrity of the data and are working with the vendor to resolve.
- Staff will continue to conduct twice annual audits of specialty care referral logs on a manual basis until the EHR issue is resolved.

**Specialty Care Report: Fiscal Year 2021/2022**

| All Specialty Care Referrals | | | | | | |
|---|---|---|---|---|---|---|
| Referral Type | Feb | Mar | Apr | May | Jun | Total |
| Routine | 34 | 53 | 36 | 32 | 41 | 196 (96%) |
| Urgent | - | - | 3 | 3 | 3 | 9 (4%) |
| Total | 34 | 53 | 39 | 35 | 44 | 205 (100%) |

| Routine Referrals | | | | | | |
|---|---|---|---|---|---|---|
| 90 Day Timeframe | Feb | Mar | Apr | May | Jun | Total |
| Met | 27 (94%) | 30 (77%) | 19 (73%) | 23 (82%) | 25 (74%) | 124 (80%) |
| Not Met – Appointment after 90 days | 1 (3%) | 4 (10%) | 5 (19%) | 4 (14%) | 6 (18%) | 20 (13%) |
| Not Met – Pending appointment | 1 (3%) | 1 (3%) | 1 (4%) | - | 1 (3%) | 4 (2%) |
| Not Met – No appointment and/or released after timeframe expired | - | 4 (10%) | 1 (4%) | 1 (4%) | 2 (6%) | 8 (5%) |
| Total | 29 (100%) | 39 (100%) | 26 (100%) | 28 (100%) | 34 (100%) | 156 (100%) |

| Not Included in Timeframe | Feb | Mar | Apr | May | Jun | Total |
|---|---|---|---|---|---|---|
| Released before 90 days | 4 | 10 | 5 | 3 | 4 | 26 |
| Refused appointment | 1 | 4 | 5 | 1 | 3 | 14 |
| Total | 5 | 14 | 10 | 4 | 7 | 40 |

New Rollout Electronic Health Record System (Provisions B.4, C.6-8, D. 1., 6-7), I.1-5), N.6
Status:  Partial Compliance

The electronic health record remains challenging and does not meet workforce needs for data tracking and reporting.

Carequality is an interface that permits data sharing among participating healthcare organizations.  Staff created a workflow and providers began using Hospital Connect (the product providing real-time access to clinical data via Carequality) in Q3 2021.  This allows providers to import and easily reference patient data from external healthcare entities.

Inmate photo has been added to the EHR to assist with patient identification.

Staff have continued to adjust EHR workflows and add or modify templates as new protocols or policies are rolled out.  Changes do not move quickly whenever the vendor must be involved.

Work on a procurement for a new system is again delayed due to the resignation of the EHR Administrator.

## MEDICAL PROVISIONS: OUTSIDE AREAS OF FOCUS

The remainder of this section outlines the status for items that were not areas of focus during this monitoring period.  Where indicated (*in revision based on feedback*), staff received feedback from Class Counsel or Medical Experts and are in the process of policy revision.

| |
|---|
| Medication Administration and Monitoring (Provision F.)<br>Status: Partial Compliance |

Staff have created and/or revised policies for medication administration and monitoring.

Policies:

- ACH PP 04-02 Insulin Administration (initial 08/19/19)
- ACH PP 04-17 Medication Administration (revised 12/16/21) – *Pending feedback.*
- ACH PP 04-18 Medication Order Entry (initial 12/16/21) – *Pending feedback.*
- ACH PP 04-19 Over the Counter Medications (revised 10/30/20) – *Pending Medical Expert feedback.*
- ACH PP 04-20 Keep on Person Medications (revised 10/27/21) – *In revision based on feedback received 12/28/21.*

Quality Improvement:

- ACH PP 01-13 Pharmacy and Therapeutics Subcommittee (revised 07/01/21) – *Final*
- ACH PP 02-04 Medication Incident Reporting (02/19/21) and form

Other:

- PP 04-17 Medication Administration was revised based on expert feedback.  A section was added to the policy for patients that are off-site due to court or other engagements. The pill call policy was deleted and its contents were integrated into this policy.  Training will precede implementation.  In addition to policy changes, several key changes have been completed including:  changes in pill call and pharmacy schedules, deployment of new pill carts, reassigning some tasks, and improving the network capacity.  Additional medical escorts are required to ensure efficient operations.
- Developed new PP 04-18 Medication Order Entry and Patient Medication Guide handout. The handout informs patients of the Keep on Person and discharge medication programs.
- PP 04-20 Keep on Person (KOP) Medications was revised based on Class Counsel's feedback.   KOP medications were expanded to include inhalers, chronic disease medications, over the counter medications, and others.
- The KOP program started with a small pilot on 12/19/21.  The initial population included eligible patients on the 7th floor of the Main Jail.  Patients have been receptive to the

31

program.  ACH and SSO have designated leads to coordinate problem-solving efforts. Staff created a data entry field within the EHR to track KOP medications.

- Staff will assess the KOP pilot for a minimum of 14 days before rolling out to other units. Will also roll out to RCCC in the near future.
- QI data is presented in the Pharmacy and Therapeutics Subcommittee for review and recommendations.
- Current operations due to the pandemic significantly impact the pill call process at the Main Jail.  SSO requires cell-to-cell pill call administration due to dedicated COVID housing.  This lengthens medication administration times.  There have also been incidents of pill call misses at MJ night shift due to staffing shortages, pill call escorts, etc.  Medical staff and custody have been working on this issue. The roll out of the KOP program will assist pill call efforts.

Patient Privacy (Provision H.)
Status: Partial Compliance

Policies:

- ACH PP 08-01 Safeguarding Protected Health Information (revision 06/03/21) – *Pending Medical/MH Expert feedback.*
- ACH PP 08-03 Release of Protected Health Information (01/10/20)
- ACH PP 08-08 Patient Privacy (revision 05/13/21) – *Pending Medical/MH Expert feedback.*

Other:

- An electronic health record template was modified to require staff to document whether or not each face-to-face encounter was confidential.  If the encounter was not confidential, staff must document the specific reason.  ACH submitted a request for a report on this compliance indicator for medical staff to the EHR vendor, but no completion date has been provided.  There is already a report for mental health staff.
- Certain areas within the existing jail structure lack privacy, such as the Nurse Intake area within the booking loop.  Staff are looking at ways to improve patient privacy within these limitations.  For example, the Nurse Intake area is being remodeled to include privacy barriers and sound machines.
- Ongoing space meetings will focus on any other areas which can be made available for nurse or physician encounters.  Space is currently very limited with one exam room on most floors of the Main Jail.

Utilization Management (Provision J.)
Status: Substantial Compliance

Policies:

- ACH PP 01-14 Utilization Management (08/06/21) – *Final*
- ACH PP 04-08 Specialty Referrals (revision 08/06/21) – *Final*

Other:

- Case Management staff began using InterQual as the Utilization Management platform for specialty referrals in March 2021.
- Specialty Care Referral Provider Guidelines were developed and training was provided in October 2021 to assist providers in submitting sufficient documentation when making referrals that are processed through InterQual.
- A Utilization Management Subcommittee was formed and began meeting in October 2021. Subcommittee members include service line directors, QI and case management.
- Recruitment is in process for the Supervising Case Management Nurse.

Reproductive and Pregnancy Related Care (Provision L.)
Status: Substantial Compliance

Policies:

- ACH PP 02-03 Female Reproductive Services (revision 07/01/21) – *Final*
- ACH PP 05-04 Pregnancy Testing (revision 07/01/21)
- ACH PP 06-01 Lactation Support (initial 04/22/20)

Other:

- ACH contracts with UC Davis for OB/GYN services. Services are provided onsite at least once weekly. Primary care providers are referring patients to the OB/GYN clinic for cervical cancer screening.
- Through the contract with UC Davis, OB/GYN Family Planning Center provides patients with comprehensive counseling and timely assistance in accordance with their expressed desires regarding pregnancies (whether to keep the child, use adoptive services, or have an abortion).
- Staff is working with OB/GYN specialists to modify existing flowsheets in the EHR. Modifications should be complete in the next monitoring period.

---

**Transgender and Non-Conforming Health Care (Provision M.)**
**Status: Partial Compliance**

---

Policy:

- ACH PP 05-12 Transgender and Gender Nonconforming Health Care (initial 04/09/21) – *Pending Medical/MH Expert feedback.*

Other:

- For continuity of care, patients who are identified as receiving hormone treatment from a community licensed provider continue the medication while incarcerated. A provider will assess the patient and include the medication as part of the patient's treatment plan.
- Staff training on the WPATH Standards of Care is pending. Mental Health staff are working with a vendor to develop training for all staff. The training is expected to be ready toward the end of the next monitoring period. It will incorporate the new WPATH Standards once they are released.

---

**Detoxification Protocols (Provision N.)**
**Status: Partial Compliance**

---

Policies and Standardized Nursing Procedures (SNP):

- ACH PP 05-14 Benzodiazepine Withdrawal Treatment (revision 04/15/21) – *Pending Medical Expert feedback*
- ACH PP 05-15 Opiate Withdrawal Treatment (initial 04/21/21) – *Pending Medical Expert feedback*
- ACH PP 05-17 Alcohol Withdrawal Treatment (revision 06/10/21) – *Pending Medical Expert feedback*
- SNP Alcohol Withdrawal Syndrome Treatment (revision 10/13/21) – *Pending Medical Expert feedback*
- SNP Opioid Withdrawal Treatment (revision 10/13/21) – *Pending Medical Expert feedback*
- SNP Benzodiazepine Withdrawal Treatment (revision 10/13/21) – *Pending Medical Expert feedback*
- MH PP 07-03 Use of Benzodiazepines (revision 04/15/21) – *Pending MH Expert feedback*
- MH PP 07-04 Patients with Substance Use Disorders (revision 08/16/21) – *Pending MH Expert feedback*

Until feedback is received, ACH is not able to finalize the above 5 policies and 3 SNPs.

Substance Use Disorders (SUD):

Policies outline identification and treatment of substance use disorders including medication assisted treatment (MAT), methadone, buprenorphine, etc. ACH has a SUD Counselor and SSO has reentry programs.

- ACH PP 05-02 Medication Assisted Treatment (revision 02/11/20) – *Will be revised*
- ACH PP 05-06 Methadone Treatment (initial 06/24/20) – *Will be revised*
- ACH PP 05-07 SUD Counselor (initial 06/24/20)

Other:

- Withdrawal treatment SNPs were recently revised to ensure continuity across these practices.
- Electronic health record templates were revised to capture the latest changes.
- Two RNs are designated for MAT services.
- Medical Director would like to begin use of Buprenorphine taper for withdrawal management but is pending additional nursing staff for monitoring.
- Medical and Custody leadership are in discussion to designate a space for withdrawal management.  This will permit better observation and monitoring of patients.
- QI developed an audit tool to evaluate nurse identification, assessment, and monitoring of patients reporting substance use at intake.  The first audit was conducted in August 2021, prior to revision of the withdrawal treatment SNPs.

| Nursing Protocols (Provision O.) |
| --- |
| Status: Substantial Compliance |

In order to ensure nurses act within their scope of practice, several items have been completed.

Standardized Nursing Procedures (SNP):

- The Remedial Plan states that SNPs shall include assessment protocols that are sorted based on symptoms into low, medium, and high risk categories.  Rather than label protocols as low, medium, and high risk, each SNP notes symptoms that RNs may manage, those that require a provider consult, and those that require emergency stabilization.
- A total of 45 SNPs have been either created or revised.  They include SNPs in the functional areas listed below.  *All SNPs are pending Medical Expert feedback.*
    - General (1)
    - Abdominal (1)
    - Cardiovascular & Lung (7)
    - Dental (1)
    - Endocrine (1)
    - Eyes, Ears, Nose & Throat (5)
    - Infection Control (1)
    - Musculoskeletal (2)
    - Neurological (4)
    - Pregnancy (1)
    - Skin (12)
    - Substance Use Disorders (4)

- Urological (5)
- Until Medical Expert feedback is received, ACH is not able to finalize these 45 SNPs.
- Staff revised seven (7) SNPs during the current monitoring period.
- Nurse managers are reviewing other areas that may require a SNP.

Nursing Structure:

- The Nursing Director oversees the Senior Health Program Coordinators (nurse managers) responsible for nursing staff at respective jail facilities.  This brings continuity to overall nursing services.
- Regularly scheduled meetings with nurse managers (Senior Health Program Coordinators and Supervising Nurses) and staff meetings (direct nursing staff) include training on policies, procedures or protocols; issues of concern; announcements; etc.
- Nursing Position Standards have been created or revised for Senior Health Program Coordinator, Supervising Registered Nurse, Infection Prevention Coordinator, Registered Nurse, Licensed Vocational Nurse, Medical Assistant, and Certified Nursing Assistant.

---

Review of In Custody Deaths (Provision P.)
Status:  Substantial Compliance

---

Policy:

- ACH PP 01-08 Medical Review of In-Custody Deaths (revision 03/11/21) – *To be finalized in January 2022*

Other:

- Preliminary Medical Review process began in March 2021.  Medical Director is following the timeframes noted in ACH PP 01-08 Medical Review of In-Custody Deaths.
- Medical Director will initiate administrative review meetings with SSO.
- Staff develop Corrective Action Plans when indicated to address systemic or training issues.
- Staff also created a new tracking log based on policy changes for implementation in 2022.
- Key ACH leadership are now on the distribution list for coroner's reports in addition to SSO.

---

Reentry Services (Provision Q.)
Status: Partial Compliance

---

Policies:

- ACH PP 04-10 Discharge Medication (10/29/21) – *Final*
- ACH PP 05-10 Discharge Planning (revision 05/19/21) – *In revision based on feedback*
- MH PP 05-01 Discharge Planning (10/01/20) – *In revision*

Discharge Medication:

- Sentenced patients are provided a 30-day supply of medications when released.  In a recent review, discharge medications were provided to 74.6% of sentenced patients upon release, an increase of 16.6% over the previous study period.
- Staff are coordinating with custody to increase medications delivered prior to release.
- In the recent policy revision, the process was expanded to provide medications to presentenced patients upon release.
- Staff began a small pilot in late December 2021 for patients with SMI and comorbid diseases.  A list of patients is received and prescribers transmit prescriptions to the County Primary Care Pharmacy.  This process is currently being evaluated and improved daily to capture all patients in the pilot population.

Discharge Planning:

- Discharge planning policy is in revision.  Staff created a workflow.
- Staff are problem solving some obstacles to improve discharge planning.  This requires work with Sacramento Covered (organization contracted to assist patients with linkage to services), custody, and other team members.
- Designated discharge planning nurses work with patients with complex conditions to ensure there is continuity of care post release.
- SUD Counselor works with referred patients on continuity of SUD treatment.
- Mental health staff are required to provide linkage of patients with a serious mental illness to County Mental Health Providers.  County Mental Health is working on linkage to the County's Adult Psychiatric Support Services (APSS) Clinic for patients who are not connected with a provider and need medication management and other treatment services.
- Staff continue to work with local Medi-Cal Managed Care Plans that will roll out a new benefit under a program called CalAIM (implementation in January 2023).  This provides care management and coordination for patients with intensive health/mental health needs.  Many have difficulty navigating the multiple organized health systems to get the care that is needed.  This care management will be in person rather than telephonic.

---

Training for SSO (Provision R.)
Status:  N/A

---

- Refer to SSO.  Will collaborate with SSO on training as requested.

---

Next Steps for Medical Remedial Plan Provisions

---

Significant work has been completed on medical remedial plan provisions during this monitoring period.  Numerous policies and protocols were created and/or revised, electronic health record

templates were created and/or modified, hiring and/or work on positions is continuous, and staff education is ongoing.

Next steps for the new monitoring period include:

- Complete key policies or protocols that are in revision or draft form.
- Medical Experts sent feedback on five (5) policies in December 2021. These will be prioritized and revisions should be completed in early January or February.
- Provide training and implementation for the new or revised policies.
- Complete key EHR projects including the chronic care nurse templates.
- Implement video communication pilot that will enable video consults with a provider.
- Create and complete audit tools for necessary areas.  This process will include feedback loops to staff and additional steps if needed (e.g., more training, process changes, etc.)

## MENTAL HEALTH CARE [Remedial Plan Section IV]

Class Counsel outlined five areas for focus including staffing, space planning, IOP, OPP, & Acute Bed assessment and planning, use of force for prisoners with mental health or intellectual disabilities, mental health and disciplinary measures, and roll out of the new electronic health record (EHR) system.  These items are shaded in blue.  The remainder of provisions are not shaded.  Status is listed for each.

| Staffing (Section II.  General Provision) |
| --- |

- ACH has a contract with UC Davis to provide mental health services.
- See staffing section under General Provisions for a list of new services by fiscal year.

| Space<br>Status: Partial compliance |
| --- |

- Staff has been using the designated attorney booths in the following locations for confidential interviews: administrative segregation (March 2021), booking (September 2021 for mental health assessments), and fourth floor (December 2021) for psychiatric prescriber evaluations.  Staff developed a workflow outlining the process to use attorney booths and supervisors complete chart audits to ensure staff compliance with use of confidential space.
- Staff created a schedule for MJ (third floor classroom) RCCC (CBF classroom) to maximize space for confidential interviews and groups.
- Staff began offering evening groups to IOP patients in November 2021, which further maximizes classroom space. Staff discuss use of confidential space regularly at team meetings.

| IOP, OPP, & Acute Bed Assessment & Planning (Section II. General Provision) |
|---|
| Status: Partial Compliance |

- ACH/SSO/MH held multiple space planning meetings to discuss an interim proposal to move the Acute Psychiatric Unit to another floor. This would increase bed capacity for the Acute Unit from 17 to 40. Of those cells, 10 cells have been designated for use as the Suicidal Inmate Temporary Housing Unit (SITHU).
- MH administration has daily bed assignment/utilization meetings with custody to review movement between the IOP, OPP, and the Acute Psychiatric Unit. This includes admissions, discharges, and mental health recommendations for housing.
- Staff can obtain patient specific group attendance and the number of therapeutic hours per week through a newly created Group Participation Report. The report does not track group cancellations or reasons for cancellations. This data will be kept on a separate spreadsheet until the report function can be modified.

| Use of Force for Prisoners with Mental Health or Intellectual Disabilities (Provision V.) |
|---|
| Status: Partial Compliance |

Policies:

- ACH PP 05-21 Restraints and Seclusion – Joint policy (09/09/21) – *Pending feedback*
- MH PP 07-05 Mental Health Evaluations for Planned Use of Force (09/02/21) –*Pending feedback*

Other:

- Based on feedback from a meeting with experts on 10/21/21, staff worked collaboratively to combine the restraints, use of force and segregation policies. These policies will be finalized January 2022.
- MH is working with a consultant to develop de-escalation and use of force training for MH staff. Staff estimate the training module will be developed by March 2022.

| Mental Health and Disciplinary Measures (Provision V.) |
|---|
| Status:  Partial Compliance |

Policy:

- MH PP 07-06 Mental Health Rules Violation Review (11/05/21) – *In review based on feedback*

Other:

- Custody consults mental health providers concerning disciplinary measures when a patient is located in MH housing.
- Rules Violation Review (RVR) process was implemented on a limited basis at RCCC (February 2021).  MH began tracking RVR referrals and assessments (July 2021). MH implemented RVR process in IOP, EOP, APU, and Ad Seg (October 2021).  Staff have been

trained and provided workflows on the policy and process. Staff refined the RVR assessment form based on expert feedback.

- MH collaborated with custody on development of an RVR and Administrative Segregation referral form and trained custody on the referral process and workflow for Administrative Segregation assessments (December 2021).
- MH is recruiting four clinicians to provide RVR assessments.

---

New Electronic Health Care System (Provisions B.4, C.6-8, D. 1., 6-7), I.1-5), N.6

See EHR section under Medical. Accomplishments solely related to mental health tracking are listed below:

- Confidential Encounter Form was created and implemented for MH staff. Documentation includes whether the assessment was in a confidential setting and rationale when the interview is not confidential. Two audits have taken place for patient privacy since implementation and further training and form changes have occurred as a result.
- Treatment plans were updated to include the duration of a group session and allow multiple goals. Provider licensure was updated to ensure appropriate titles and treatment plan forms were reviewed to reflect current practices.
- MH Providers can review all scheduled clinical encounters.
- Staff were designated for future EHR system acceptance testing for future updates and improvements.
- Discharge Planning – Developed new report to identify projected release dates and level of care to expedite referrals.
- MH Group Participation Report – This report provides clinicians information on the amount of therapeutic out of cell time (groups) that each patient received on the mental health caseload. Recently there have been issues identified with the report that Fusion is currently working to resolve.

## MENTAL HEALTH PROVISIONS: OUTSIDE AREAS OF FOCUS

Policies and Procedures (Provision A.)
Status: Partial Compliance

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*
- ACH PP 05-21  Restraints and Seclusion – Joint policy (09/09/21) – *Pending feedback*
- ACH PP 07-XX Patients in Segregation – *Pending feedback*
- MH PP 01-10 Access to Mental Health Services (08/06/21) – *Pending feedback*
- MH PP 03-02 Overview of Staff Responsibilities – Acute Psychiatric Unit (08/16/21) – *Pending feedback*
- MH PP 03-03 Overview of Staff Responsibilities – Outpatient (08/18/21) – *Pending feedback*

- MH PP 03-04 Psychiatric Prescriber Duties (09/09/21) – *Pending feedback*
- MH PP 03-05 Acute Psychiatric Nursing Responsibilities (12/16/21) – *Pending feedback*
- MH PP 03-06 Acute Psychiatric Unit – Psychiatrist Responsibilities (12/16/21) – *Pending feedback*
- MH PP 04-01 Intensive Outpatient Program (04/17/20) – *Pending feedback*
- MH PP 04-02 FOSS Levels – *Final*
- MH PP 04-03 Basic Mental Health Services (08/18/21) – *Pending feedback*
- MH PP 04-04 Outpatient Mental Health Services and Levels of Care (10/13/21) – *Pending feedback*
- MH PP 04-07 Acute Psychiatric Unit – Precautions and Observations (11/15/21) – *Pending feedback*
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction (10/01/21) – *Pending feedback*
- MH PP 04-09 Acute Psychiatric Unit – Admission, Programming and Discharge (12/22/21) – *in revision based on feedback*
- MH PP 05-01 Discharge Planning (10/01/20) – *Pending feedback*
- MH PP 07-01 Behavior Management Plan – *in revision based on feedback*
- MH PP 07-02 Treatment Planning (11/18/20) – *Pending feedback*
- MH PP 07-03 Use of Benzodiazepines (04/15/21) – *Pending feedback*
- MH PP 07-04 Patients with Substance Use Disorders (08/18/21) – *Pending feedback*
- MH PP 07-05 Mental Health Evaluations for Planned Use of Force (09/02/21) – *Pending feedback*
- MH PP 07-06 MH Rules Violation Review (11/05/21) – *in revision based on feedback*
- MH PP 09-02 Lanterman-Petris-Short (LPS) Conservatorship (04/17/20) – *Pending feedback*
- MH PP 09-04 Administration of Involuntary Psychotropic Medication (revision 05/27/21) – *Pending feedback*
- MH PP 09-05 Informed Consent-Acute Inpatient Unit (05/27/21) – *Pending feedback*
- MH PP 09-06 Patient's Rights (10/07/21) – *Final*
- MH PP 09-07 Denial of Patient's Rights (08/06/21) – *Pending feedback*
- MH PP 09-08 Prison Rape Elimination Act (08/06/21) – *Pending feedback*
- MH PP 09-11 Involuntary Detainment Advisement (10/8/21) – *Pending feedback*

| Organizational Structure (Provision B.) |
| --- |
| Status: Partial Compliance |

Policy:

- ACH PP 01-10 Organizational Charts (07/09/21) – *charts have been updated with new approved positions, change in position titles, and organization structure.*

41

Other:

- The MH Medical Director and Mental Health Manager oversee jail MH services.
- MH reorganized the leadership structure to address consent decree requirements and support program and staff expansion.
- The Medical Director and Mental Health Manager participate in a variety of meetings including Executive Team, Quality Improvement, Multidisciplinary, ad hoc meetings and regularly interface with medical and custodial leadership.

| Patient Privacy (Provision C.)<br>Status: Partial Compliance |
| --- |

Policy:

- ACH PP 08-08 Patient Privacy (05/13/21) – *joint policy*

Other:

- MH staff document confidential status of encounters including rationale when it is not confidential. A baseline audit was completed.  As a result of audit findings, MH has defined a drop-down menu of common reasons for lack of confidentiality for uniformity and data purposes.  Changes were completed and staff were trained (September 2021).
- See Space section on page 38 for details on confidential interview space.
- MH staff continuously reinforce importance and requirements of confidential individual interviews and group programming during staff meetings and huddles.
- Staff created a schedule for the MJ third floor classroom and RCCC CBF classroom to ensure staff are fully utilizing confidential space and are aware of availability.

| Clinical Practices (Provision D.)<br>Status: Partial Compliance |
| --- |

Policies:

- See policies listed in "Policies and Procedures (Provision A.)"

Other:

- Clinical Multidisciplinary Team (MDT) meetings began in IOP August 2021 with full implementation November 2021.
- Comprehensive treatment plans utilizing the EHR template were implemented for EOP patients in March 2021.
- IOP and EOP staff received training on completing treatment plans and MDTs December 2021. Workflows were developed to help staff understand process and policy.
- MH groups began in APU August 2021.  MH currently offers six groups a week in APU. The APU Daily Patient Activity report was implemented August 2021. This report tracks patient care activities on APU and coordination with custody for patient care support

needs.   Created a workflow for nursing staff and coordinated implementation with custody leadership.

- There is a MH triage clinician assigned to emergent referrals for each shift.
- MH staff review all patients receiving MH services within the EHR.

| Medication Administration and Monitoring (Provision E.) |
| --- |
| Status: Partial Compliance |

Policies:

- ACH PP 04-17 Medication Administration (revised 12/16/21) – *Pending feedback*
- MH PP 03-04 Psychiatric Prescriber Duties (09/09/21)
- MH PP 03-06 Acute Psychiatric Unit – Psychiatrist Responsibilities (12/16/21)
- MH PP 07-03 Use of Benzodiazepines (04/15/21)
- MH PP 09-04 Administration of Involuntary Psychotropic Medication (revision 05/27/21).

Other:

- MH hired two additional psychiatric nurse practitioners in July 2021.
- MH increased psychiatric prescriber coverage to 7 days per week in the Outpatient Program.
- MH established MH Prescribers Meeting in August 2021 to improve communication, patient care practices, and standards related to the Consent Decree.

| Placement Conditions, Privileges, and Programming (Provision F.) |
| --- |
| Status: Partial Compliance |

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21)
- MH PP 01-10 Access to Mental Health Services (08/06/21)
- MH PP 04-01 Intensive Outpatient Program (04/17/20)
- MH PP 04-04 Outpatient Mental Health Services and Levels of Care (10/13/21)
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction (10/01/21)
- MH PP 04-09 Acute Psychiatric Unit – Admission, Programming and Discharge (12/22/21) – *In revision based on feedback*

Other:

- The Suicide Precautions and/or Grave Disability Observations – Custody Instructions Form was developed to document MH staff directions regarding housing, observation level, property, privileges, and clothing restrictions.   Staff provided training to custody leadership on the form and workflow on August 25, 2021.
- Staff provided training and created a workflow for MH staff on responsibilities related to suicide precautions and clinical decisions regarding housing, observation levels, privileges, clothing, and property in August 2021.

43

- MH and SSO designees meet weekly to review the restrictions and collaborate on patient specific plans to restore a patient's property or privileges.
- MH and SSO also meet daily to review bed assignment/utilization and movement between the IOP, OPP, and APU. This includes admissions, discharges, and MH recommendations.

| Medico-Legal Practices (Provision G.)<br>Status: Partial Compliance |
| --- |

Policies:

- ACH PP 05-21 Restraints and Seclusion – Joint policy (09/09/21)
- MH PP 04-07 Acute Inpatient Unit - Precautions and Observation (11/15/21)
- MH PP 09-02 Lanterman-Petris-Short (LPS) Conservatorship (04/17/20)
- MH PP 09-04 Administration of Involuntary Psychotropic Medication (revision 05/27/21)
- MH PP 09-05 Informed Consent-Acute Inpatient Unit (05/27/21)
- MH PP 09-06 Patient's Rights (10/07/21)
- MH PP 09-07 Denial of Patient's Rights (08/06/21)
- MH PP 09-08 Prison Rape Elimination Act (08/06/21)
- MH PP 09-11 Involuntary Detainment Advisement (10/8/21)

| Restraints and Seclusion (Provision H.)<br>Status: Partial Compliance |
| --- |

Policies:

- ACH PP 05-21 Restraints and Seclusion – Joint policy (09/09/21)
- ACH PP 04-10 Discharge Medication (10/29/21) – *Final*

Other:

- Staff provide sentenced patients a 30-day supply of medications upon release. Presentenced patients may obtain a prescription for a 30-day supply of medication at the County Primary Care Pharmacy.  See Reentry Services (Provision Q.) for further detail.
- MH continues to meet regularly with County Behavioral Health to refine the referral process for community based mental health services.  A report was developed to capture the projected release date and level of care to identify patients with SMI and release dates within 6 weeks.
- Based on SME feedback, staff combined the Restraints policies and worked in conjunction with custody to revise drafts of the Restraints and Seclusion, Use of Force, and Segregation policies.

| Training (Provision I.)<br>Status: Partial Compliance |
| --- |

Policy:

- ACH PP 03-08 Staff Development and Training (07/01/21) – *Pending feedback*

Other:

- MH has a training coordinator who monitors training compliance.
- Training was developed and provided on the following:
  - MH RVR Assessments
  - Treatment Planning and MDT Meetings
  - Brain Development/Intellectual Disability
- MH is working with an expert to develop use of force and de-escalation training. Anticipate training will be ready for expert review by March 2022.
- MH is working with a consultant to develop WPATH training.  Anticipate draft training will be available for expert review by April 2022.
- See Section VII (Provision B) for Suicide Prevention related items.


## SUICIDE PREVENTION [Remedial Plan Section VII]

Class Counsel outlined six areas for focus including revision of the Suicide Prevention Policy, changes to the policy and practice of Safety Suits, confidentiality at intake and for suicide risk assessment, property and privileges, and resuming a Suicide Prevention Task Force or a multidisciplinary committee.  These items are shaded in blue.  The remainder of provisions are not shaded.  Status is listed for each.

| Substantive Provisions (Provision A.)<br>Status: Partial Compliance |
| --- |

Policies:

- ACH PP 02-05 Suicide Prevention Program (revision 11/16/21)
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction (revision 10/01/21)

Other:

- The Suicide Precautions and/or Grave Disability Observations – Custody Instructions form was created to provide MH staff directions regarding housing, observation level, property, privileges, and clothing restrictions.
- MH developed a training module called Suicide Precautions and LCSW Role and provided training to MH staff and custody leadership on the form and workflow (August 2021).
- Began implementation of Morbidity and Mortality reviews during Suicide Prevention Subcommittee meetings (December 2021).

| Use of Safety Suits (Provision N.) |
|---|
| Status: Substantial Compliance |

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction (10/01/21)

Other:

- Staff are meeting the remedial plan requirements on use of safety suits except during the intake process.  Custody may place an inmate in a safety suit if it is determined that the inmate is at risk of imminent self-harm. In these instances, MH is notified immediately.

| Nurse Intake Screening (Provision C.) |
|---|
| Status: Substantial Compliance |

Policies:

- ACH PP 02-05 Suicide Prevention Program (revision 11/16/21)
- ACH PP 05-05 Nurse Intake (revision 10/29/21)

Other:

- Staff made significant revisions to the Nurse Intake policy and form based on feedback from all experts.  The revised nurse intake form was implemented in November 2021.
- See Medical Care Intake Screening (Provision B.) for more detail.

| Post-Intake Mental Health Assessment Procedures (Provision D.) |
|---|
| Status: Partial Compliance |

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21)
- MH PP 01-10 Access to Care (revision 08/06/21)
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction (revision 10/01/21)

Other:

- Staff instituted the 4-hour emergent timeline for patients placed in safety cells (October 2021).  MH is tracking compliance to determine barriers/challenges to meeting the 4-hour timeline to care.  A workflow was developed and training was provided to staff regarding the new timeline to care.
- MH implemented televisits for after-hours emergent referrals at RCCC to ensure timely access to care.
- MH assessments are conducted within the timeframes defined in the MH triage system.

- MH clinicians document whether assessments are confidential or non-confidential including rationale, if indicated.
- The Suicide Prevention Program policy addresses the need for a mental health assessment if a suicide risk is noted at intake or if any staff member becomes aware of a patient verbalizing or engaging in acts of self-harm or suicidal ideation. Licensed MH clinical staff will conduct the suicide risk assessment.

| Property and Privileges (Provision M.) Status: Partial Compliance |
|---|

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21)
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction (revision 10/01/21)

Other:

- See Substantive Provisions (Provision A.) for work accomplished in this area.

| Quality Assurance and Quality Improvement (Provision R.) Status: Partial Compliance |
|---|

Policies:

- ACH PP 01-07 Quality Improvement Program (revised 05/27/21) – *joint policy*
- ACH PP 01-08 Medical Review of In-Custody Deaths (revised 03/11/21) – *joint policy – in revision based on feedback*
- ACH PP 01-15 Suicide Prevention Committee (revised 09/17/21) – *joint policy*
- ACH PP 02-05 Suicide Prevention Program (11/16/21)

Other:

- A MH QI Subcommittee reconvened in May 2021. This Subcommittee meets quarterly.
- MH has convened a multi-disciplinary Suicide Prevention Subcommittee to review, track, and audit the requirements.
- Suicide Prevention and Suicide Training Subcommittees moved meetings from a quarterly to monthly schedule to improve communication, implement Suicide Prevention training, and complete morbidity and mortality reports in timely manner.
- A multidisciplinary Suicide Prevention Training Subcommittee was established to develop Suicide Prevention Training.  Committee has met with the expert and has convened four times.
- Began implementation of Morbidity and Mortality reviews during Suicide Prevention Subcommittee meetings in December 2021.
- MH tracks incidents of suicide, attempted suicide and serious self-harm.

> Training (Provision B.)
> Status: Partial Compliance

Policy:

- ACH PP 03-08 Staff Development and Training (07/01/21) – *Pending feedback*

Other:

- MH developed and provided training on the following:
    - Suicide Prevention – Annual 2-hour refresher
    - Suicide Precautions and LCSW Role
    - Suicide Risk Assessment
- MH began offering a 2-hour Suicide Prevention training to medical and custody staff in December 2021
- The initial 4-hour Suicide Prevention Training was modified based on feedback from SME and Class Counsel and should be ready for review in January.
- The Suicide Risk Assessment Training was approved by SME and staff are being trained.
- MH has a training coordinator who also monitors compliance for training requirements.

> Response to Identification of Suicide Risk or Need for Higher Level of Care (Provision E.)
> Status: Partial Compliance

Policies:

- ACH PP 02-05 Suicide Prevention Program (revision 11/16/21)
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction (revision 10/01/21)

Other:

- Timeframes are noted in the policies.
- The Suicide Risk Assessment captures the information listed in this provision.
- See Post-Intake Mental Health Assessment Procedures (Provision D.) for work accomplished in this area.

> Housing of Inmates on Suicide Precautions (Provision F.)
> Status: Partial Compliance

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21)
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction (10/01/21)

Other:

- MH policies state all patients, including those identified as being at risk for suicide, are treated in the least restrictive setting appropriate to their clinical needs.
- See Substantive Provisions (Provision A.) for work accomplished in this area.

| Inpatient Placements (Provision G.) |
| Status: Partial Compliance |

Policy:

- MH PP 04-09 Acute Psychiatric Unit Admission, Program and Discharge (12/22/21)

Other:

- MH staff makes every effort to ensure that patients assessed for the APU are placed in the unit within 24 hours of identification, absent exceptional circumstances. Patients who are on the preadmission list beyond 24 hours are assessed daily for continuous need of placement or clearance.
- ACH has regular meetings with custody leadership to discuss space needs and options for increasing APU beds. See IOP, OPP, & Acute Bed Assessment & Planning (Section II. General Provision) for detail.

| Temporary Suicide Precautions (Provision H.) |
| Status: Partial Compliance |

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21)
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction (10/01/21)

Other:

- See Post-Intake Mental Health Assessment Procedures (Provision D.) for work accomplished in this area.

| Supervision/Monitoring of Suicidal Inmates (Provision J.) |
| Status: Partial Compliance |

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21)
- MH PP 01-10 Access to MH Services (08/06/21)
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction (10/01/21)

49

Other:

- MH continues to meet with custody to discuss re-opening the Suicidal Inmate Temporary Housing Unit (SITHU).
- Staff have daily bed assignment/utilization meetings with custody to review movement between the IOP, OPP, & APU.
- See Substantive Provisions (Provision A.) for work accomplished in this area.

---

Treatment of Inmates Identified as at Risk of Suicide (Provision K.)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21)
- ACH PP 08-08 Patient Privacy (05-13-21) – *joint policy*
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction (10/01/21)
- MH PP 07-01 Behavior Management Plans (09/16/20) – *in revision based on feedback*
- MH PP 07-02 Treatment Planning (11/18/20)

Other:

- Designated staff monitor the APU preadmission list of patients.
- The outpatient appointment log was updated to better reflect appointment types (emergent, urgent, and routine).
- Staff utilize the confidential interview office in booking, classrooms, and attorney booths for confidential interviews.

---

Conditions for Individual Inmates on Suicide Precautions (Provision L.)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21)
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction (10/01/21)

Other:

- The Suicide Prevention Policy addresses MH's role as the primary authority to make decisions on property and privileges, use of safety suits, and discharge from suicide precaution based on clinical assessment.
- See Substantive Provisions (Provision A.) for work accomplished in this area.

---

**Beds and Bedding (Provision O)**
**Status: Partial Compliance**

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21)
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction (10/01/21)

Other:

- The Suicide Prevention Policy addresses MH's role as the primary authority to make decisions on property and privileges for patients on suicide precautions based on clinical assessment.
- See Substantive Provisions (Provision A.) for work accomplished in this area.

---

**Discharge from Suicide Precautions (Provision P.)**
**Status: Partial Compliance**

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21)

Other:

- Patients who are discharged from APU after being treated for a suicide attempt or ideation receive follow up MH appointments (24 hours, 72 hours, and 5 days).
- Patients are transferred to IOP when clinically appropriate and a bed is available.
- IOP and Outpatient appointment logs have been updated to reflect accurate appointment types.

---

**Emergency Response (Provision Q.)**
**Status: Substantial Compliance**

---

Policies:

- ACH PP 04-11 Emergency Equipment (08/25/21) – *Final*
- ACH PP 04-12 Emergency Medical Response (06/17/20) – *Pending feedback*
- ACH PP 04-13 Man-Down Drill (08/21/20) – *Pending feedback*

Other:

- Medical and custody staff are trained in CPR.
- New emergency carts were ordered and delivered to both facilities.  The carts were deployed at Main Jail.  Staff will order new carts for RCCC.
- Staff at both facilities received emergency medical response training in the last monitoring period.

- Staff complete a Man-Down Debriefing Summary for incidents requiring medical response or drills.  The form and staff debriefing assist staff in reviewing code response.

## SEGREGATION/RESTRICTED HOUSING [Remedial Plan Section VIII]

| Mental Health Functions in Segregation Units (Provision C.) |
| --- |
| Status: Partial Compliance |

Policy:

- ACH PP 07-XX Patients in Segregation DRAFT – *Pending feedback*

Other:

- MH, medical, and custody met 12/16/21 to collaborate on the Patients in Segregation policy.
- MH has been working with SSO to identify and meet with segregated MH patients.
- MH staff met with custody to discuss providing groups in the Administrative Segregation unit.  Groups were piloted in segregation September 2021.
- MH continues to work with custody on identifying cohorts of individuals in the segregated housing unit that can be in the dayroom together.
- Collaborated with custody on development of RVR and Administrative Segregation referral form and trained custody on referral process in December 2021.
- Began Administrative Segregation weekly MH assessments in December 2021.

| Placement of Prisoners with Serious Mental Illness in Segregation (Provision D.) |
| --- |
| Status: Partial Compliance |

Policy:

- ACH PP 07-XX Patients in Segregation DRAFT – *Pending feedback*

Other:

- Custody consults with MH staff prior to placing an inmate with serious mental illness in segregation however in emergent circumstances, the MH consult will occur after placement.
- MH staff provide case management to patients with serious mental illness who are in segregated housing.
- MH is working with a consultant to develop de-escalation and use of force training for MH staff.  Anticipate training will be developed by March 2022.

Restraint Chairs (Provision J.)
Status: Partial Compliance

Policy:

- ACH PP 05-21 Restraints and Seclusion – Joint policy (09/09/21) – *Pending feedback*

Other:

- A joint meeting was held on 12/08/21 between mental health, medical and custody to discuss Restraints and Seclusion policy and process.
- Placement in restraint or WRAP triggers an emergent referral to MH.

Next Steps for Mental Health, Suicide Prevention and Segregated Housing Provisions

Next steps for the new monitoring period include:

- Complete key policies that are in revision or draft form.
- Continue to provide training and implementation for the new or revised policies.
- Begin providing the 4-hour Suicide Prevention training to new employees in Spring 2022.
- Provide ongoing training to custody staff who work in MH program areas on common MH disorders.
- Coordinate MDT meetings for patients served in EOP and Administrative Segregation.
- Complete train-the-trainer modules for Use of Force/De-Escalation and WPATH trainings.
- Finalize MH Adaptive Support Program policy and process.
- Hire and train new staff for EOP expansion.
- Increase the number of MH RVR and Administrative Segregation Reviews with augmented staff.

Challenges:

- Confidential space to conduct MH interviews and group programming remains problematic.
- Difficulty recruiting sufficient staff to fill vacant positions. Staffing limitations prevent full rollout of MDTs, comprehensive treatment planning, MH RVR and Administrative Segregations reviews, and constant observation.

## QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT [Remedial Plan Section IX]

| |
|---|
| Generally (Provision IX. A.) |
| Partial Compliance |

Prior to the remedial plan, there was a very limited policy and procedure on quality improvement, no dedicated staff, no data, and no QI audits.  Steps have been taken to expand the QI structure.  These are listed below.

Policies:

- ACH PP 01-07 Quality Improvement Program (revised 05/27/21) – *Final*
- ACH PP 01-13 Pharmacy & Therapeutics Committee (07/01/21) – *Final*
- ACH PP 01-14 Utilization Management (08/06/21) – *Final*
- ACH PP 01-15 Suicide Prevention Subcommittee (09/17/21) – *Final*
- Injury and Illness Prevention (IIPP) PP 01-02 Safety Subcommittee (initial 07/10/20)

Committees:

- Quality Improvement Committee and several subcommittees (Pharmacy & Therapeutics, Mental Health QI, and Safety) met quarterly throughout 2021.  These are multidisciplinary.
- The Suicide Prevention Subcommittee changed to monthly meetings beginning in November 2021.
- A Utilization Management Subcommittee was formed and began meeting in October 2021.
- The Safety Subcommittee will be refocused to include infection control in 2022.  This will be led by a designated nurse manager.
- QI staff updated a list of reports and created a list of audits based on the indicators listed in the remedial plan.  The lists clarify types of data for review in each subcommittee. These documents have been reviewed with service line managers in the Quality Improvement Committee and the MH QI Committee. QI will monitor progress.

Staffing:

- The QI team was approved for two additional positions including a Training Coordinator and a second QI Nurse.  The existing QI Nurse was promoted to Training Coordinator and will begin in January 2022.  Recruitment for two QI Nurses is underway.
- A temporary Administrative Services Officer I was assigned to the QI team in October 2021 to assist with tracking and reporting grievance data and incident reports.

Other:

- Many reports have been developed and will continue to be built.
- QI audits are developed as policies are implemented and staff are trained to audit.

- Audits conducted during the monitoring period include audits of disability identification and documentation, diabetes management, referrals at intake, and substance use disorder identification and follow up.  Audit data is shared with service line managers for appropriate actions.
- Consent Decree training was developed and provided to medical and mental health staff during this monitoring period.

---

Quality Assurance, Mental Health Care (Provision IX. B.)
Partial Compliance

---

- Mental health representatives are in all QI meetings but there are two specific mental health multidisciplinary subcommittees: Mental Health (chaired by the MH Program Director) and a new Suicide Prevention Subcommittee (chaired by the MH Medical Director). Each forum is quarterly.
- Chairs are responsible to ensure indicators are reviewed and tracked.
- Audit tools are in development related to mental health and suicide prevention remedial plan provisions.

---

Quality Assurance, Medical Care (Provision IX. C.)
Partial Compliance

---

- Medical representatives are in all QI meetings.  Each forum is quarterly.
- Chairs are responsible to ensure indicators are reviewed and tracked. Recommendations and corrective actions are discussed and follow up is conducted as needed.
- Audit tools are in development related to medical remedial plan provisions.
- Performance Evaluations are required annually for permanent county staff and more frequently for probationary staff.  (ACH PP 03-09 Performance Evaluations).

---

Next Steps for Quality Assurance Systems Provisions

---

Next steps for the new monitoring period include:

- Add infection control to the Safety Subcommittee.  The focus will be on overall infection control and not solely on COVID-19.  A nurse manager will assume facilitation.
- Continue to create and complete audit tools for necessary areas.  This process will include feedback loops to staff and additional steps if needed (e.g., more training, process changes, etc.)
- Continue recruitment for an Administrative Services Officer III (Electronic Health Record). While not a member of the QI team, this position will lead and enhance work on the EHR which is critical for QI reporting and staff use.
- Recruit and hire two QI Nurses.  These positions will enhance QI work and training.
- Drafted a nurse peer review tool, completed a small pilot and will revise during the next monitoring period.

## JAIL FACILITY NEEDS

Sacramento County (representatives from County Executive's Office, General Services, SSO, and ACH) has been engaged in planning for facility improvements to meet the needs of the Consent Decree including Americans with Disabilities Act (ADA) standards, patient privacy, and sufficient space for medical and mental health services.

Main Jail Correctional Health & Mental Health Services Facility Project:

This project consisted of design and construction of a new building on the northeast corner of the existing Main Jail facility.  This construction would have added a new intake/booking area, additional medical and mental health space, education, and program space.  Areas would have been designed in compliance with the Americans with Disabilities Act (ADA) and Health Insurance Portability and Accountability Act (HIPAA).

- On April 21, 2020, the Board of Supervisors approved a $7,027,135 contract with an architectural firm to design the proposed annex.
- On March 10, 2021, the Board voted to not proceed with the recommended Correctional Health and Mental Health Services Facility construction project and requested staff to review and consolidate monitoring reports and to create a chart showing risk information for the jail population.

In terms of next steps, the county adjusted the scope of work with the contracted architectural and design firm to determine the following:

- What can be achieved in the Main Jail to comply with the Consent Decree without making any physical improvements
- How many beds would be lost
- What requirements would be met
- What requirements would not be met or only be partially met

Findings will identify the size of the population that can be served at the Main Jail (bed capacity, medical/mental health population).

The county has also engaged another consultant to identify the risk profile for those in the jail during dates pre- and post-COVID-19. The consultant will provide findings in a report along with specific policy and program recommendations including use of current programs to target populations for programming options that reduce the jail population by reducing length of stay, bookings, or future jail occurrence, and notes regarding the evidence base for programs that might be new to the county.

Staff will present findings from both studies to the Board of Supervisors in a workshop session to be scheduled in February or March 2022.

Rio Cosumnes Correctional Center (RCCC) Facility Project:

The RCCC facility requires modifications to be responsive to the Consent Decree.  The County initially worked on a project to make improvements to the RCCC facility (new medical, mental health, and program space) using SB 1022 grant project funds.

The Board of Supervisors decided on September 22, 2020 to not accept $80 million in SB 1022 funding from the state for facility improvements, as recommended by the Grand Jury, which would have covered costs for facility improvements addressing consent decree requirements at RCCC. The Board acknowledged the County will still be responsible for the cost of all changes required by the Consent Decree.

## COUNTY EFFORTS TO REDUCE THE JAIL POPULATION

Sacramento County (representatives from the County Executive's Office, criminal justice partners, SSO, DHS Behavioral Health, and ACH) is engaged in multiple efforts to reduce the jail population.  The County Executive proposed and on August 10, 2021 the Board of Supervisors approved an ordinance to create a new Public Safety Agency, headed by a Deputy County Executive.  The recruitment and hiring is still pending, but this individual will oversee efforts to reduce the jail population and compliance with the Consent Decree.

See Board of Supervisors webpage for status updates on efforts to reduce the jail population:

- BOS Meeting dated 10/22/2019, Item #66 (*Report on County Efforts to Reduce the Jail Population*).
- BOS Meeting dated 03/10/2021, Item #3 (*Workshop – Review the Design-Build Process Related to the Correctional Health and Mental Health Services Facility Project, And Approve Contract No. 81555*…)
- BOS Meeting dated 08/10/2021, Item #2 (*Adopt An Ordinance Amending Various Sections Of Chapter 2.09 And Chapter 2.61 Of the Sacramento County Code Related To Creation Of A Public Safety And Justice Agency,…*)

Updates on some of these efforts are listed below.

**Jail Diversion Programs that are active**:

Pretrial Assessment and Monitoring: Probation (lead agency) received local funding and a grant from the Superior Court to utilize the Public Safety Assessment (PSA) tool to inform pretrial release and monitoring decisions based on risk of failure to appear (FTA), risk of new criminal activity, and risk of new violent criminal activity.  The Pretrial Pilot began October 2019 and was recently extended to operate with grant and county funding through December 2022.  Pretrial monitoring can include court reminders, office visits, community visits and GPS monitoring. Superior Court has released 3,189 clients on Pretrial Monitoring from October 2019 through November 2021.

- BOS Meeting dated 12/14/2021, Item #25 (*Authorization To Execute A Memorandum of Understanding With The Superior Court…For The Pretrial Release Program…*)

Public Defender Pretrial Support Project (PTSP): Public Defender (lead agency) received a grant from Bureau of Justice Assistance (BJA) to develop and operate a pretrial support program using evidence based tools to interview jail inmates prior to arraignment to identify needs, provide social worker support/case management (in custody and in the community), link to services, and coordinate safe discharge plans.  Over 1,000 pretrial defendants were screened through this program from April through August 2021.  At the Board of Supervisors September 2021 budget hearing, additional county funds were granted to expand this program. At the December 14, 2021 Board of Supervisors meeting, the program was further expanded through approval of an MOU between the Public Defender's Office and Superior Court that provides additional grant funds from December 15, 2021 through December 2022 for PTSP to provide supplemental services to clients released on Pretrial Monitoring.

- BOS Meeting dated 12/14/2021, Item #27 (*Authorization To Execute A Memorandum of Understanding With The Superior Court…To Provide Supplemental Social Work Services To Support The Superior Court's and Probation Department's Pretrial Project…*)

Pretrial Felony Mental Health Diversion: Public Defender (lead agency) received a grant from the Department of State Hospitals to implement a Pretrial Mental Health Diversion Program. The target population includes adults with serious mental illness charged with felonies that are incompetent to stand trial or in danger of being incompetent to stand trial. Public Defender has contracted with Telecare to provide services to 40 individuals a year with housing for 20. Clients are referred through the granting of Felony Mental Health Diversion by the court. This program began March 2021 and through December 2021 served nearly 50 clients.  Additionally, over 100 clients are on a waitlist for this program.

**New Programs in Development**:

Forensic Behavioral Health Innovation Program: DHS Behavioral Health created an innovation project for individuals with a serious mental illness and criminal justice involvement who are being released from the jail.  This Mental Health Services Act (MHSA) Innovation Project fills a gap in meeting needs of the justice-involved population who "fall through the cracks" and return to custody due to the complexity involved in accessing resources across multiple systems. The Forensic Full Service Partnership will utilize a Multi-System Team approach and provide tailored services to address the unique needs of the justice-involved population. Treatment targets include criminal behavior, mental illness and substance use.  Clients 18 years and older, experiencing serious mental illness with significant functional impairment may be referred by justice partners and MH services within the jail. This innovative project will adapt and expand on the Child and Family Team (CFT) model for the forensic behavioral health population. This teaming model has been successfully used in child welfare systems to address the needs of justice and/or foster system involved youth. The purpose of CFT meetings is to assemble team members to create an integrated plan in order to determine how to address the client's needs and goals

that promote wellness, resilience, and placement stabilization. The comprehensive treatment planning and collaborative system-wide approach will reduce recidivism (return to custody), stabilize psychiatric symptoms, and decrease substance use. Ultimately, meeting the shared goals of increasing public safety and public health for individuals and communities. El Hogar Community Services will begin providing services at an easily accessible site in South Sacramento on February 15, 2022.

Jail Diversion Treatment and Resource Center (JDTRC): Probation (lead agency) received an infrastructure grant to provide a community based facility to divert criminal justice-involved adults with mental health disorders, substance use disorders, and/or other trauma-related disorders from jail and/or prison. On June 2, 2020, Probation received the Board of Supervisors approval on this project. This program recently had a ribbon-cutting ceremony and public open house on December 12, 2021 and subsequently began services targeting individuals who have been granted participation in Misdemeanor Mental Health Diversion or are pending a court decision relative to their participation.

Alternatives to 9-1-1/Wellness Crisis Response and Call Center (new): At the September 2020 Budget Hearing, BOS asked staff to develop a proposal for alternative responses to mental health and homeless-related 911 calls to complement the existing Mobile Crisis Support Teams (MCST). The County facilitated an internal countywide work group to review data, review models from other jurisdictions, and obtain community input. Staff received approval for crisis response plans that include a 24/7 Crisis Call Center, Crisis Receiving Facilities, Urgent Care, and Mobile Field Response during the FY 2021/22 budget hearings. In January 2022 the Behavioral Health Urgent Care Center begins 24/7 operations. Recruitment for the new crisis call center and mobile response teams is currently underway. The Department of Health Services is also working to establish a Community Advisory Board and identify funding for ongoing sustainability, including revenue that could be generated through pending AB 988 legislation.

**System Planning**:

Work Plan to Reduce Use of the Jail: In 2020, a Correctional Facilities Committee adopted a work plan to implement recommendations from the Carey Work Group Report. The group is currently inactive pending direction from a new Deputy County Executive of Public Safety and Justice. Once this position is hired, the group may be reconvened to advance the recommendations and approaches that are focused on managing justice-involved individuals in a setting other than jail. The FY 2021/22 recommended budget includes additional resources to implement recommendations from the Carey Group.

Data Driven Recovery Project (DDRP): In January 2020, the Criminal Justice Cabinet's Mental Health Work Group began to meet with the DDRP consultant to review data from individuals in the criminal justice system who have serious mental illness (SMI). The focus is on use of the sequential intercept model (SIM) to identify behavioral health and criminal justice services and measures at different decision points to determine where there are opportunities to implement changes that will reduce the population of individuals with SMI in the jail facilities. This work is in

alignment with the national "Stepping Up Initiative" which focuses on reducing the population of adults with SMI in jails.

The Work Group has reviewed baseline measures to develop a common understanding and fuller view of people touching multiple systems, as well as programmatic analysis in areas such as Mental Health Diversion and Mental Health Treatment Court.  DDRP efforts also include working with justice partners to implement ongoing justice and health data integration through the County's Integrated Justice Information System (IJIS) and a new Social Health Information Exchange (SHIE) application under development for implementation of CalAIM that expands in January 2023 to include some services for people within 90 days of release from custody. Additionally, the DDRP consultant has done some preliminary work to provide a risk profile of the jail population in 2019 to assess potential use of an automated risk screening tool to assist with the County's overarching jail population reduction efforts, but also connected to DDRP work aimed at implementing changes that keep people with SMI out of jail, shortening the length of stay for those with SMI, increasing connections to services at release, and keeping people with SMI from coming back to jail. The DDRP consultant will continue this work through June 2022.

ATTACHMENT 2

*MAYS V. COUNTY OF SACRAMENTO*

**COMBINED REMEDIAL PLAN – May 30, 2019**

III.    **AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE**

A.  **Policies and Procedures**

**Sacramento Sheriff Response**

1.   It is the County's policy to provide access to its programs and services to prisoners with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests. No prisoner with a disability, as defined in 42 U.S.C. § 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities or be subjected to discrimination. The County's policy is to provide reasonable accommodations or modifications where necessary, consistent with 28 C.F.R. §§ 35.150 & 35.152, and other applicable federal and state disability law.

The Sheriff's Office has engaged in several steps, some through policy revision, others through practice to ensure all inmates receive equal access regardless of disability. Notably, the Compliance Unit, through tracking mechanisms, and personal visits, ensures equal access and effective communication on an individual basis for all inmates with disabilities.  Practices invovling lower bunks and lower tiers have been modified to ensure the maximum number of beds are available for those needing accomodations.  Patients identified with mobility issues are escorted in or with the proper DME to ensure they are not denied equal access to facilities, programs and services.

2.   The County shall, in consultation with Plaintiffs' counsel, revise its Operations Order to establish standard and consistent procedures for the Jail to ensure compliance with the ADA and the remedial provisions outlined herein.

ADA Operations Order being revised by the team assigned to the Lexipol project.

3.   The County shall, within 12 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, revise policies, procedures, and inmate orientation materials (e.g. Inmate Handbook), in accordance with the revised Operations Order and the remedial provisions outlined herein. A list of policies which the County will revise consistent with the provisions outlined herein, as appropriate and in consultation with Plaintiffs' counsel, is attached as **Exhibit A-1.**

The following Post Orders have been drafted and posted to the RCCC portal where they can be accessed by all staff assigned to the facility: Chief Disciplinary Hearing Officer, Disciplnary Housing, Housing Unit Checks, Case Management, Out-of-Cell Time, Keep Separate Alerts, Cell Cleaning, and Administrative Segregation. Several policies are under revision by the team assigned to the Lexipol project.

4.   All staff will receive training appropriate to their position on policies and procedures related to compliance with the Americans with Disabilities Act (ADA) and related disability laws.

This item is pending the approval and completion of the ADA policy. It is being worked on by the team assigned to the Lexipol project. All staff assigned to corrections (sworn staff and records officers) were assigned consent decree training in September of 2021. as new hires come on they are assigned the training and must attest to the completion of the training.

B.   **ADA Tracking System**

1.   The County shall develop and implement a comprehensive system (an "ADA Tracking System") to identify and track screened prisoners with disabilities as well as accommodation and Effective Communication needs.

ATIMS under development to track ADA needs. It is supposed to go live in 2022. We currently utilize a rudimentary tracking system through Excel. Staff is currently being trained in anticipation of ATIMS going live.

2.   The ADA Tracking System shall identify:

a)   All types of disabilities, including but not limited to psychiatric, intellectual, developmental, learning, sensory, mobility, or other physical disabilities, and special health care needs;

ATIMS under development to track ADA needs. It is scheduled to go live in the Fall of 2022. Our current tracking system lists disabilities. Staff is currently being trainned in anticipation of ATIMS going live.

b)   Prisoners with disabilities that may pose a barrier to communication, including but not limited to learning, intellectual, or developmental disabilities, and hearing, speech, or vision impairments;

ATIMS under development to track ADA needs. It is scheduled to go live in 2022. Our current tracking system lists disabilities. Staff is currently being trainned in anticipation of ATIMS going live.

c)   Accommodation needs, including as to housing, classification, Effective Communication, adaptive supports, and assistive devices;

ATIMS under development to track ADA needs. It is scheduled to go live in the Fall of 2022. Our current tracking system lists disability Needs/Requests/Accomodations.

d)   Prisoners who require specific health care appliances, assistive devices, and/or durable medical equipment (HCA/AD/DME);

ATIMS under development to track ADA needs. It is scheduled to go live in the Fall of 2022. Our current tracking system lists disability Needs/Requests/Accomodations.

e)  Prisoners who are class members in *Armstrong v. Newsom* (N.D. Cal. No. 94-cv-02307), with their applicable disability classification(s) and accommodation need(s).

ATIMS under development to track ADA needs. It is scheduled to go live in the Fall of 2022. Our current system lists when an inmate is part of the Armstrong lawsuit. All of these requests are routed through ACH

3.  The ADA Tracking System's prisoner disability information will be readily accessible to custody, medical, mental health, and other staff at the Jail who need such information to ensure appropriate accommodations and adequate program access for prisoners with disabilities.

ATIMS under development to track ADA needs. It is scheduled to go live in the Fall of 2022. Our current system is only available to the Compliance staff. RCCC and Main Jail compliance staff adds chronos for ADA accomodations on to the inmate's PF4 screen to advise other officer's.

C.  **ADA Coordinator**

1.  The County shall have a dedicated ADA Coordinator at each facility.

Both positions overseen by the Compliance Commander at each facility.

2.  The ADA Coordinator position shall be dedicated to coordinating efforts to comply with and carry out ADA-related requirements and policies, shall have sufficient command authority to carry out such duties, and shall work with the executive management team regarding ADA-related compliance, training, and program needs.

Both positions overseen by the Compliance Commander at each facility.

3.  The County shall clearly enumerate, in consultation with Plaintiffs' counsel, the job duties and training requirements for the ADA Coordinator position and for ADA Deputies assigned to support the ADA Coordinator position.

This item is pending the approval and completion of the ADA policy. It is being worked on by the team assigned to the Lexipol project.

4.  The County shall ensure that ADA Coordinators and ADA Deputies possess requisite training to implement and ensure compliance with the Jail's disability program and services, including operation of the ADA Tracking System.

Main Jail Compliance attended the Winter 2021 training presented by the great plains ADA Center. They also had in house training in March. RCCC Compliance Unit has attend all available ADA training presented by the National ADA center with the exception of 2020. One of the deputies attended training in 2019 and 2021. The ADA Compliance sergeant and the deputy mentioned above  attended the two day ADA Coordinators Virtual Training for Winter 2021 presented by the Great Plains ADA center.  The RCCC Compliance team has attended Crisis Intervention Training while in the unit. In addition, the whole RCCC Compliance team is scheduled to attend the 2021 National ADA Symposium V2 Virtual on August 2-5th 2021.All deputies assigned to corrections receive training in Module 8.0 (Adult Corrections Supplemental Core Course). Same for both facilities. Main Jail Complinace team is scheduled to attend Great Plains ADA Center training in Feburary 2022. All staff continues to attend mandatory ADA training through our AOT cycle.

D.  **Screening for Disability and Disability-Related Needs.**

E.  **Orientation**

1.  The County shall ensure that, for the population to be housed in the Jails, prisoners with disabilities are adequately informed of their rights under the ADA, including but not limited to:

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. There is signage posted in Intake/Booking and in all housing units/ADA contact info is in the handbook/ADA hotline recording. RCCC and Main Jail advise through the inmate handbook in addition to the mentioned signage

a)  Accommodations available to prisoners;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. RCCC and Main Jail inmates can fill out a pink slip for medical.

b)   The process for requesting a reasonable accommodation;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. There is signage posted in Intake/Booking and in all housing units. ADA contact info is in the handbook, including the ADA hotline number. The handbook outlines the process necessary to request accomodations. Accomodations are made through medical issuing chronos.

c)   The role of the ADA coordinator(s) and method to contact them;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means.  Main Jail and RCCC inmates can dial * indicated in the handbook from the pod telephones and/or fill out available kites for communication.

d)   The grievance process, location of the forms, and process for getting assistance in completing grievance process;

This function is performed by Compliance Officers on an as needed basis. This can be expanded to include all inmates, pre-recorded effective communcations means. This process is included in the handbook that is provided to the inmates upon intake. The Inmate Handbook identifies the grievance procedure and how to obtain forms.

e)   Instructions on how prisoners with disabilities can access health care services, including the provision of Effective Communication and other accommodations available in accessing those services.

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. Additionally, the advisement by ACH upon intake and the general process is listed in the inmate handbook that is provided upon intake and anytime during the inmate's custody period upon their request. Our policies must be revised to include effective communication provisions. The LEXIPOL team is currently working on updating all policies related to the Consent Decree.  NMJ/RCCC inmates can submit a medical kite or a request to compliance

2.   Upon processing and classification, prisoners with disabilities shall receive, in an accessible format, the jail rulebook; orientation handbook; and a verbal orientation or orientation video regarding rules or expectations.

Verbal and written communication presented by compliance officers upon request. The handbook is received at intake and available upon request however, only one format/version of the handbook is avaialble. We have the ability to print the Handbook in a 8x11 inch size.

3.   The County shall accommodate individuals with disabilities in the orientation process through the use of alternative formats (*e.g.* verbal communication, large print, audio/video presentation), when necessary for Effective Communication of the information.

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. We have the ability to print the handbook in an 8x11 inch size.

4.   The County shall develop an Americans with Disabilities Act Inmate Notice. The Notice shall be prominently posted in all prisoner housing units, in the booking/intake areas, in medical/mental health/dental treatment areas, and at the public entrances of all Jail facilities.

There is ADA signage posted in noted areas. The signage is compliant with ADA federal requirements.

F.  **Health Care Appliances, Assistive Devices, Durable Medical Equipment**

b)  If such a determination is made, the ADA coordinator or supervisory-level designee shall document the decision and reasons for it, in writing, and shall consult with medical staff to determine an appropriate alternative accommodation.

Main Jail medical staff approves these items then they are reviewed by compliance and issued. RCCC current practice.

a)  The County will ensure that any personal mobility device belonging to a prisoner is returned to the prisoner prior to release from custody.

Current practice.

G.  **Housing Placements**

1.   The County shall house prisoners with disabilities in facilities that accommodate their disabilities.

RCCC accomodates inmate disabilities as recommended by CHS and "chrono" issued. NMJ  placement is determined by medical staff.

2.   The County shall implement a housing assignment system that includes an individualized assessment of each individual's functioning limitations and restrictions, including but not limited to:

RCCC accomodates inmate disabilities as recommended by CHS and "chrono" issued. NMJ determined by medical staff

a)  The need for ground floor housing;

Jail Annex Planning. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail. NMJ and RCCC accomodates inmate disabilities as recommended by CHS and "chrono" issued.

b)  The need for a lower bunk;

Jail Annex Planning. NMJ and RCCC accomodates inmate disabilities as recommended by CHS and "chrono" issued.

c)  The need for grab bars in the cell and/or shower;

All RCCC housing facilities have shower chairs available for inmates upon request from their control and/or floor officers.  NMJ 2E & 2M have grab bars; shower chairs on every floor available upon request

d)  The need for accessible toilets;

Jail Annex Planning. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail. NMJ CHS decides.

e)  The need for no stairs in the path of travel; and

RCCC and NMJ accomodates inmate disabilities as recommended by CHS and "chrono" issued.

f)  The need for level terrain.

RCCC and NMJ accomodates inmate disabilities as recommended by CHS and "chrono" issued.

3.   Prisoners with disabilities shall be housed in the Jail consistent with their individual security classification. Prisoners prescribed or possessing HCAs/ADs/DME will not automatically be housed in a medical housing unit. Placement in a medical housing unit will be based on individualized clinical determination of need for treatment.

RCCC -  an inmate's security clssification is not determined by their disability or HCA/AD/DME; Medical Housing Unit (MHU) housing is determined by CHS based on an individual assessment.  Current practice at Main Jail. Medical housing is determined by CHS, not classification status

4.   Classification staff shall not place prisoners with disabilities in:

a)  Inappropriate security classifications simply because no ADA-accessible cells or beds are available;

Current practice.

b)  Designated medical areas unless the prisoner is currently receiving medical care or treatment that necessitates placement in a medical setting; or

Current practice.

c)  Any location that does not offer the same or equivalent programs, services, or activities as the facilities where they would be housed absent a disability.

RCCC and NMJ programs and services are available based on eligibility and classification.

## H. **Access to Programs, Services, and Activities**

**1.**  The County shall ensure prisoners with disabilities, including those housed in specialized medical units or mental health units (*e.g.* , OPP, IOP, Acute) have equal access to programs, services, and activities available to similarly situated prisoners without disabilities, consistent with their health and security needs. Such programs, services, and activities include, but are not limited to:

Current practice.

a)  Educational, vocational, reentry and substance abuse programs

RCCC offers in person learning based on eligibility criteria being met. Reentry programs are not offered to inmates in specialized mental health units.  Same at NMJ; we have intorduced reentry into the main jail and have been mirroring that of RCCC.

b)  Work Assignments

RCCC and NMJ work assignments are based on ACH medical clearanc and ability to perform the essential functions of the job with or without an accommodation; Reasonable accomodations are made based on ACH recommendation.  Classification assists with filtering eligibility criteria.

c) Dayroom and other out-of-cell time

Out-of-cell time determined by the Consent Decree is currently met by all housing facilities at RCCC. Inmates in specialized MH units such as IOP and JBCT receive additional out of cell and dayroom time due to the nature of their program. At Main Jail we are at or near the out of cell times on a weekly basis. As Covid restrictions lessen, we continue to see these numbers improve.

d) Outdoor recreation and fitted exercise equipment

Recreational access is based on security classification and not on the inmate's disability.

e) Showers

Current practice.

f) Telephones

Current practice.

g) Reading materials

RCCC recreation staff does not provide reading materials for special needs (Braille, large print) on a regular basis. Occassionally they receive large print books and they distribute them to the inmates. Reading glasses can be purchased through commissary. RCCC has Magnifying cards on commissary.  NMJ has ADA tablet, braille; chrono.

h) Social visiting

Current practice.

i) Attorney visiting

Current practice.

j) Religious services

Current practice.

k) Medical, mental health, and dental services and treatment

RCCC and NMJ Inmates assigned to specialized MH units (IOP, JBCT) receive additional, individualized, specialized mental health services through their program, in addition to the services provided through JPS. Pink medical kites are available for additional treatment requests.

**2.**   The County shall provide reasonable accommodations and modifications as necessary to ensure that prisoners with disabilities have equal access to programs, services, and activities available to similarly situated prisoners without disabilities.

RCCC and NMJ - Current practice. Programs and activity availability differs based on the inmate's security classification. All inmates participate in activities and programs available to their security classification.

3.   The County shall develop and implement a written policy for staff to provide appropriate assistance to prisoners with psychiatric, developmental, or cognitive disabilities so that they can fully participate in programs, services, and activities provided at the Jail.

All policies related to the Consent Decree are currently being drafted by the Lexipol project team. As policies are created and updated, they are provided to DRC/PLO for review.

**4.**   The County shall implement a written policy for staff to provide assistance to prisoners with disabilities in reading or scribing documents.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first.Inmates with disabilities in reading/scribing are still being provided with assistance despite the lack of a written policy. Their needs are being monitored through the Compliance Unit at RCCC. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

5.   The County shall provide equal access to library, recreational, and educational reading materials for prisoners with disabilities, including easy reading and large print books for individuals who require such accommodations.

Current practice, including the purchase of keep-on-person magnifiers. Main Jail issues chrono for the following; soft magnifiers; hard one broke; law library has one on hand

6.   The County shall ensure equitable inmate worker opportunities for prisoners with disabilities, including by:

Jail Annex Planning. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail.

a)   Ensuring clear job duty statements, with essential functions and specific criteria, for each Worker position;

RCCC- Job Descriptions pending. Medical will determine if eligible inmates can physically perform the job duties in a safe manner.  NMJ has positions in kitchen

b)  Ensuring that medical staff conduct an individualized assessment to identify work duty restrictions and/or physical limitations to facilitate appropriate work/industry assignments and to prevent improper exclusions from work opportunities;

RCCC and NMJ - Current practice.

c)  Providing reasonable accommodations to enable prisoners with disabilities to participate in inmate worker opportunities.

RCCC and NMJ - Current practice.

I.   **Effective Communication**

1.  The County shall assess all individuals detained at the Jail for any period of time for Effective Communication needs, and shall take steps to provide Effective Communication based on individual need.

RCCC and NMJ -  Upon intake, inmates are assessed by CHS staff and intake officers for special needs. Effective communication assistance for inmates is based upon the individual (SLI, VRI, Etc.) The inmate's information is forwarded to the Compliance Unit for tracking and further assistance.

2.  The County's ADA policies shall include comprehensive guidance to ensure Effective Communication for prisoners with vision, speech, hearing, intellectual, learning, or other disabilities. The County shall, in consultation with Plaintiffs' counsel, ensure that sufficient guidance on the provision of Effective Communication is included in Jail custody and health care policies and procedures.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

a)  A higher standard for the provision of Effective Communication shall apply in the following situations:

i.   Due Process Events, including the following:

▪ Classification processes

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

▪ Prisoner disciplinary hearing and related processes

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

▪ Service of notice (to appear and/or for new charges)

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

▪ Release processes

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

▪ Probation encounters/meetings in custody

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

i.   Identify each prisoner's disability where there may be a barrier to comprehension or communication requiring reasonable accommodation(s);

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

ii.  Provide effective reasonable accommodation(s) to overcome the communication barrier; and

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

iii. Document the method used to achieve Effective Communication and how the staff person determined that the prisoner understood the encounter, process, and/or proceeding.

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

4.  Effective auxiliary aids and services that are appropriate to the needs of a prisoner with Effective Communication needs shall be provided when simple written or oral communication is not effective. Such aids may include bilingual aides, SLIs, readers, sound amplification devices, captioned television/video text displays, Videophones and other telecommunication devices for deaf persons (TDDs), audiotaped texts, Braille materials, large print materials, writing materials, and signage.

VRI system installed at RCCC with the intention of bringing a similar system to the Main Jail. The VRI provides interpretation for SLI as well as multiple spoken languages. Video visitation RFP is in process.  RCCC employs VRS tecnology, TDD and signage for hearing impaired inmates to communicate with friends and family. The use of SLI is authorized through policy; bilingual aides are also available. NMJ has VRS & TDD SLI - no tablet

5.  In determining what auxiliary aid service to provide, the County shall give primary consideration to the request of prisoner with Effective Communication needs.

RCCC and NMJ offers a variety of auxillary aids for inmates with effective communication needs and gives primary consideration to the request of the inmate with E.C. needs.

6.  Education providers (*e.g.,* Elk Grove Unified School District) at the Jail will ensure Effective Communication for prisoners participating in education programs, including by providing necessary assistive equipment and take steps to accommodate learning strategies of those prisoner-students who have special needs, such as those with developmental, learning, vision, hearing, and speech disabilities.

This item is pending the creation and approval of the effective communication order however, the RCCC Compliance Unit tracks inmates with special needs and works with the Elk Grove Unified School District to provide accomodations. VRI has been used to assist in the past. Currently, pending EGUSD response for their practices/policies on this subject.

7.  The County shall assist prisoners who are unable to complete necessary paperwork (*e.g.*, related to health care, due process, Jail processes) on their own with reading and/or writing as needed.

Current practice.

**J.  Effective Communication and Access for Individuals with Hearing Impairments**

1.  The County shall develop and implement a policy for newly arrived and newly identified prisoners with hearing disabilities to determine each prisoner's preferred method of communication.

This item is pending the creation and approval of the effective communication order. RCCC utilizes VRI services at intake/transfer to communicate with inmates with hearing disabilities. These inmates are referred to the Compliance Unit for individualized assistance and assessment.  Same at NMJ based on chrono or request

2.  Qualified Sign Language Interpreters (SLIs) will be provided during intake and for due process functions, health care encounters, and Jail programming, when sign language is the prisoner's primary or only means of Effective Communication, unless the prisoner waives the assistance of an interpreter and/or delay would pose a safety or security risk.

RCCC Video Remote Interpreting (VRI) tablets provide live interactive SLI services. The tablet is located in Booking and in the Classification office. The service is available 24/7 for use by officers for any procedure. Same at NMJ, through VRS

a)  The County shall maintain a contract or service agreement with interpreter services in order to provide such services for deaf or hearing impaired prisoners. Jail staff will be informed of the availability of contract interpreter services.

RCCC and NMJ currently have a contract for live VRI services in addition to contracted services listed in Operations Order 6/14 - Interpreter Services. Information regarding both are available to custody staff.

b)  Lip reading will not be the sole method of Effective Communication used by staff, unless the prisoner has no other means of communication.

RCCC and NMJ offers a variety of auxillary aids for inmates with effective communication needs and gives primary consideration to the request of the inmate with E.C. needs.

c)  In cases where the use of an SLI is not practical, or is waived by the prisoner, Jail staff shall employ the most effective form of communication available.

RCCC Video Remote Interpreting (VRI) tablets provide live interactive SLI services. The tablet is located in Booking and in the Classification office. The service is available 24/7 for use by officers for any procedure. Same at Main Jail through VRS

d)  The County will maintain a log of (a) when, for whom, and for what purpose an SLI was used; and (b) when, for whom, and why a SLI was *not* used for a prisoner with an identified need for SLI services (*e.g.*, prisoner waived SLI or delay would have posed safety or security risk).

RCCC - VRI keeps log by name and xref but only available on device. At NMJ the floor officer & 2 east officer log in book when VRS is used

e)  When a prisoner waives an SLI, the log must document (a) the method of communication of the waiver, and (b) the method staff used to determine that the waiver was knowing and freely given.

This item is pending the creation and approval of the effective communication order.

3.   Jail Staff shall effectively communicate the contents of the Inmate Handbook and other materials providing information on Jail rules and procedures to all prisoners to be housed in the Jail who are deaf or hard of hearing. For those prisoners for whom written language is not an effective means of communication, Jail Staff may meet this obligation by providing a video of an SLI signing the contents of the Inmate Handbook, along with appropriate technology for viewing, or by providing an SLI to interpret the contents of the Inmate Handbook to the prisoner who is deaf or hard of hearing.

At RCCC and NMJ, all inmates are provided with a copy of the inmate handbook however, there is no video with an SLI signing the contents. Assistance would be provided by staff as necessary with the use of the VRI or by reading information needed.

4.   The County shall, within 12 months from court approval of the Settlement, make Videophones available for deaf and hard of hearing prisoners. The Videophones shall provide for calls through the use of Video-Relay Services (VRS) at no cost to deaf and hard of hearing prisoners or for calls directly to another Videophone.

VRS/VRI system installed at RCCC. VRS at NMJ. The VRS is provided at no cost to inmates.

5.   Deaf/hard of hearing prisoners who use telecommunication relay services, such as Videophone or TDD/TTY machine, in lieu of the telephone shall receive equal access to the Videophone or TDD/TTY services as non-disabled prisoners are afforded for regular telephone usage.

Current RFP for video visitation services.  RCCC officers are notified by the Compliance Unit officers of the inmate's need for VRS services and allow those inmates using VRS equal phone time. Same at Main Jail

6.   The County shall provide deaf/hard of hearing prisoners with additional time for calls using telecommunication relay services, such as a Videophone or TDD/TTY, to account for the fact that signed and typed conversations take longer than spoken conversations. The County shall document the time that each prisoner uses and has access to such equipment.

Telephone calls are not timed.  This is current practice.

7.   Prisoners who require an SLI as their primary method of communication shall be provided an SLI for education, vocational, or religious programs and services.

This item is pending the creation and approval of the effective communication order. RCCC is awaiting a response from EGUSD for policy and practices. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

8.   Public verbal announcements in housing units where individuals who are deaf or hard of hearing reside shall be delivered on the public address system (if applicable) and by flicking the unit lights on and off several times to alert prisoners that an announcement is imminent. This includes announcements regarding visiting, meals, recreation release and recall, count, lock-up, and unlock. Verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, as consistent with individual need. These procedures shall be communicated to prisoners during the orientation process and also shall be incorporated into relevant policies and post orders.

This item is pending the creation and approval of the effective communication order however , RCCC has no standard practice for notification. Officers assigned to housing units where a deaf inmate is housed are advised by the Compliance Unit officers of the need for special accomodations regarding verbal announcements. Same at NMJ/officers will go to the door if they know they are deaf and need to come out

## K.  Disability-Related Grievance Process

1.   The County shall implement a grievance system for prisoners with disabilities to report any disability-based discrimination or violation of the ADA, this Remedial Plan, or Jail ADA-related policy, and shall provide a prompt response and equitable resolution in each case.

Medical Greivance boxes installed. ADA added to greivance forms. Grievance policy currently in the approval stage.

2.   The County shall ensure that the grievance procedures are readily available and accessible to all prisoners.

Grievances are made available to all inmates. Process is included in handbook.

a)   The County shall make reasonable efforts to ensure all prisoners are aware of the disability grievance procedures, including the availability of accommodations and staff assistance to submit a grievance and/or appeal.

Current practice.

b)   The County shall ensure the prisoners with disabilities have meaningful access to grievance forms, including through provision of staff assistance and large print materials.

Current practice however, large print has not been developed yet. Reading glasses can be purchased on commissary as well as keep on person self magnifying cards at RCCC and NMJ.

3.   Response to Grievances

a)  The County shall develop and implement an ADA grievance process that includes (1) a reasonable timeline for response to ADA-related grievances and appeals, including an expedited process for urgent ADA grievance (*e.g.*, involving prisoner safety or physical well-being); and (2) provision for interim accommodations pending review of the individual's grievances/appeals.

This item is pending the approval and completion of the ADA policy. Grievance Policy is currently in the approval process.

b)  The County shall ensure that prisoners with communication needs are interviewed and provided assistance as part of the grievance/appeal process where necessary to ensure meaningful access and Effective Communication.

This item is pending the approval and completion of the ADA policy however, RCCC inmates with E.C. needs are identified and tracked by the Compliance Unit. Inmates have access to the officers in the Compliance Unit via regularly scheduled interviews, phone, or correspondence. Inmates can request assistance from the Compliance Unit officers at any time. Same as Main Jail.

c)  The County shall document each denial of a reasonable accommodation request and shall record the basis for such determination.

This item is pending the approval and completion of the ADA policy. At RCCC and NMJ, the custody staff coordinates with CHS staff to make medically necessary accomodations.

d)  The County shall provide in writing a copy of the grievance (or appeal) response to the prisoner, including the resolution, the basis for a denial (if applicable), and the process for appeal.

This item is pending the approval and completion of the ADA policy however, the inmates receive a copy of their grievance resolution pursuant to operations order 7/02.

e)  The County shall ensure that completed grievance responses are effectively communicated to prisoners with disabilities.

This item is pending the approval and completion of the ADA policy however, the Compliance Officers are available to assist inmates with E.C. needs. All policies related to the Consent Decree are currently being drafted by the Lexipol project team. The grievance policy is currently in the approval process.

4.  The submission, processing, and responses for disability-related grievances and complaints shall be tracked.

Current practice.

L.  **Alarms/Emergencies**

1.  The County shall ensure that all written policies regarding alarms and emergencies contain mandatory provisions to accommodate prisoners with disabilities.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipool project team

2.  The County shall implement written policies regarding the expectations of staff as to prisoners with identified disabilities during emergencies and alarms, including as to disabilities that may affect prisoners' ability to comply with orders or otherwise respond to emergencies and alarms. For example, the policies shall ensure appropriate handling of prisoners with mobility-related disabilities who are unable to prone or take a seated position on the ground during an alarm or emergency. Such policies shall be communicated to staff, incorporated into the relevant Operations Orders, and communicated to prisoners with disabilities using Effective Communication.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. Even though the polcy is not in place, staff does offer assistance during emergencies at RCCC and Main Jail and disabilities are taken into consideration by staff. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

3.  The County shall implement written policies for staff regarding communicating effectively and appropriately with prisoners who have disabilities that may present barriers to communication during emergencies or alarms.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. Even though the polcy is not in place, staff does offer assistance during emergencies at RCCC and Main Jail.

4.  In order to facilitate appropriate accommodations during alarms or emergencies, the County shall offer, but shall not require, individuals who have disabilities visible markers to identify their disability needs (*e.g.*, identification vests). The County shall maintain a list, posted in such a way to be readily available to Jail staff in each unit, of prisoners with disabilities that may require accommodations during an alarm or emergency.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

5.  The County shall install visual alarms appropriate for individuals who are deaf or hard of hearing, which shall comply with relevant fire code regulations.

At RCCC and NMJ, visual alarms are currently installed compliant with relevant fire code regulations.

6.  All housing units shall post notices for emergency and fire exit routes.

Emergency and fire exit routes posted.

M. **Searches, Restraints, and Extractions**

1.  The County shall modify its written policies to ensure that prisoners with mobility impairments, including those with prosthetic devices, receive reasonable accommodations with the respect to the following: (1) Pat searches and unclothed body searches; (2) Application of restraints devices, including Pro-Straint Chair; and (3) Cell extractions.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. Although the policy is not in place, Main Jail and RCCC conduct pat searches and unclothed body searches with the inmates needs in mind. This includes the application of retraint devices

N. **Transportation**

1.  The County shall provide reasonable accommodations for prisoners with disabilities when they are in transit, including during transport to court or outside health care services.

RCCC received an ADA Compliant Van in August 2021. Main Jail has ADA compliant vans.

2.  Prescribed HCAs/ADs/DME, including canes, for prisoners with disabilities shall be available to the prisoner at all times during the transport process, including in temporary holding cells, consistent with procedures outlined in Part VII.

Current practice.

3.  The County shall use accessible vehicles to transport prisoners in wheelchairs and other prisoners whose disabilities necessitate special transportation, including by maintaining a sufficient number of accessible vehicles. (295)

RCCC received an ADA compliant van in August of 2021. Main Jail has ADA compliant vans.

4.  Prisoners with mobility impairments shall be provided assistance onto transport vehicles.

Current practice.

O. **Prisoners with Intellectual Disabilities**

1.  The County shall, in consultation with Plaintiffs' counsel, develop and implement a comprehensive written policy and procedure regarding prisoners with an Intellectual Disability, including:

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

a)  Screening for Intellectual Disabilities;

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first.

b)  Identification of prisoners' adaptive support needs and adaptive functioning deficits; and

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

c)  Monitoring, management, and accommodations for prisoners with Intellectual Disabilities.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first.

3.  Prisoners with an Intellectual Disability assigned to a work/industry position will be provided additional supervision and training as necessary to help them meet the requirements of the assignment.

This will be contained in future policy.

P.  **ADA Training, Accountability, and Quality Assurance**

1.  The County shall ensure all custody, health care, facility maintenance, and other Jail staff receive ADA training appropriate to their position.

A New ADA component has been added to the Adult Corrections Supplemental Core Course, but is awaiting approval. ADA training is in module 8.0. All staff assigned to corrections (sworn staff and records officers) were assigned consent decree training in September of 2021. as new hires come on they are assigned the training and must attest to the completion of the training.

a)  The County shall provide to all staff appropriate training on disability awareness, including the use and purpose of accommodations and modifications in accordance with the ADA.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

b)  The ADA training shall include: formalized lesson plans and in-classroom or virtual training for staff (including managers, supervisors, and rank-and-file staff) provided by certified or otherwise qualified ADA trainers.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipool project team

2.  ADA instructors shall have appropriate ADA training and subject matter expertise necessary to effectively provide ADA training to staff.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

3.  The County shall, in consultation with Plaintiffs' counsel, develop and implement written policies and procedures regarding monitoring, investigating, and tracking staff violations (or allegations of violations) of ADA requirements and Jail ADA policies.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

4.  The County shall develop an ADA accountability plan that will ensure quality assurance and establish staff accountability for egregious, serious, or repeated violations of the ADA and Jail ADA-related policies and procedures.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

Q.  **Accessibility Remedial Plan to Address Physical Plant Deficiencies**

1.   The County shall, within 24 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, develop and fully implement an Accessibility Remedial Plan to address Jail physical plant deficiencies that result in access barriers for prisoners with disabilities. In the interim, the Sheriff's Office shall house prisoners with disabilities in the most integrated and appropriate housing possible, providing reasonable accommodations and assistance where necessary to ensure appropriate accessibility to Jail programs, services, and activities.

At RCCC and NMJ, inmates with disablities are housed according to their security classification and granted access to programs according to their classification. Reasonable accomodations are made where necessary to ensure special needs are met.

2.   The Accessibility Remedial Plan shall ensure the following:

a)   Adequate provision of accessible cells and housing areas with required maneuvering clearances and accessible toilet fixtures, sanitary facilities, showers, dining/dayroom seating, and recreation/yard areas.

Jail annex plannning. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail.

b)   Accessible paths of travel that are compliant with the ADA.

Jail annex plannning. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail.

c)   Equal and adequate access for all prisoners with disabilities to Family and Attorney Visiting areas in reasonable proximity to their housing location.

At RCCC, legal visitation areas provide equal and adequate access for inmates with disabilities. RCCC social visitation areas provide inmates with disabilities the same opportunity to visit with their family. NMJ arranges these visits on 2E w/ chrono

IV.   **MENTAL HEALTH CARE**

A.   **Policies and Procedures**

h)   Training for all staff members who are working with inmates with mental illness in all aspects of their respective duty assignments.

Lexipol training for custody deputies.  24 hour CIT training for IOP/JBCT deputies, 8 hour CIT for all other deputies. We are also exploring the option of working with JPS to develop additional training.

2.   The County's policies and procedures shall be revised, as necessary, to reflect all of the remedial measures described in this Remedial Plan.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first.

3.   The County shall continue to operate its acute inpatient program and its Outpatient Psychiatric Pod (OPP) program. The County shall establish a new Intensive Outpatient Program (IOP) for inmates who require a higher level of outpatient psychiatric care than what is provided in the OPP program.

Main Jail IOP to include 20 males and 15 females.  RCCC IOP to include 24 males in our CBF 400 pod. We have an additional 40 beds in CBF 600 and four cells in CBF 500 pod that are used for the ROC and JBCT programs.

## B.  Organizational Structure

1.   The County shall develop and implement a comprehensive organizational chart that includes the Sheriff's Department ("Department"), Correctional Health Services ("CHS"), Jail Psychiatric Services ("JPS"), Chief Administrative Officer, Medical Director of the JPS Program, and any other mental health staff, and clearly defines the scope of services, chains of authority, performance expectations, and consequences for deficiencies in the delivery of mental health care services.

The Sheriff's Organizational chart exists.

## C.  Patient Privacy

1.   All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff.  In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification.

Main Jail has secluded privacy interview room created on first floor for booking related clinical interactions.  Use of private attorney visit booths for housing unit clinical interactions. All RCCC facilities have JPS offices available for interviews. These areas are private and are not audio recorded.  The doors to these offices were changed so they can be closed and the officer can see what is going on inside through windows. Officers standby as needed based on the inmates calssification/behavior while offer the highest amount of privacy possible.

b) If the presence of custody staff is determined to be necessary to ensure the safety of medical staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

This will be addressed by the jail annex plan. Until that facility is built, JPS has purchased machines that make white noise. They are utilizing these machines to create privacy if an officer needs to be present. If there are safety concerns, the interview will take place in an attorney room. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail. Three booths were installed in the 2E indoor recreation area to assist with auditory privacy.

2. Jail policies that mandate custody staff to be present for any mental health treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above. Custody and mental health staff shall be trained accordingly.

No policies exist mandating custody to be present with mental health treatment.

3. It shall be the policy of the County that mental health clinicians shall not conduct their patient contacts at cell front except pursuant to documented refusals or specific, documented security concerns that warrant cell front contacts.

Case Management Post Order. The only time this takes place are in extreme circumstances where the inmate presents a huge security risk. Otherwise they are seen in the attorney booth or one of the offices where the doors have been changed so they can be closed and the officers can still see what is taking place inside.

5. A process shall exist for sick call slips or other mental health treatment-related requests to be collected without the involvement of custody staff.

Sick call slips may be handed to medical staff directly.

D. **Clinical Practices**
E. **Medication Administration and Monitoring**

5. The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

Growth request submitted for medical escort team. 8 Deputy Sheriff positions added to main jail for escorts. 2 for each shift

6. Medication adherence checks that serve a clinical function shall be conducted by nursing staff, not custody staff. Custody staff shall conduct mouth checks when necessary to ensure institutional safety and security.

Curent practice.

F.   **Placement, Conditions, Privileges, and Programming**

1.   Placement:

a)  It shall be the policy of the County to place and treat all prisoners on the mental health caseload in the least restrictive setting appropriate to their needs.

Current practice.

b)  Placement in and discharge from Designated Mental Health Units shall be determined by qualified mental health professionals, with consultation with custody staff as appropriate.

Current practice.

c)  Absent emergency circumstances, the County shall obtain the assent of qualified mental health professionals before transferring prisoners with SMI into or out of Designated Mental Health Units.

Current practice.

d)  It shall be the policy of the County to place prisoners with SMI in appropriate settings that ensure provision of mental health services, patient safety, and the facilitation of appropriate programs, activities, and out-of-cell time.  Co-housing with other populations shall be avoided to the extent that such a practice prevents or hinders any of the above.

Current practice.

2.   *Programming and Privileges*

a)  All Designated Mental Health Units shall offer a minimum of 7 hours of unstructured out-of-cell time per week and 10 hours of structured out-of-cell time per week for each prisoner. While out-of-cell hours per prisoner may vary from day to day, each prisoner will be offered some amount of out-of-cell time every day of the week. All treatment and out-of-cell time shall be documented for each prisoner, and reviewed as part of Quality Assurance procedures.

Designated MH Units (IOP,JBCT) structured out of cell time is determined by program coordinators (JPS, UC Davis) as part of their treatment. Inmates in these programs generally have more than seven hours of unstructured out of cell time and more than ten hours of structured time per week.  These hours are being met when not affected by COVID restrictions.

b)  The County shall ensure that prisoners on the mental health caseload have access and opportunity to participate in jail programming, work opportunities, and education programs, consistent with individual clinical input.

Current practice.  Work assignments will be based on the patient's ability to safely perform those functions given the appropriate level of supervision.

c)  The County shall develop and implement, in the 2P inpatient unit and the IOP unit, a program for progressive privileges (including time out of cell, property allowances, etc.) for patients as they demonstrate behavioral progress. A patient's level of privileges and restrictions shall be based on both clinical and custody input regarding current individual needs. The County shall ensure a process to review custody classification factors when necessary, so that placement, privileges, and restrictions match current individual circumstances and needs.

Current practice.

d)  Individuals on a mental health caseload shall receive, at minimum, privileges consistent with their classification levels, absent specific, documented factors which necessitate the withholding of such privileges. Clinical staff shall be informed of the withholding of privileges and the reasons for the withdrawal shall be documented and regularly reviewed by clinical and custody staff. The restoration of privileges shall occur at the earliest time appropriate based on individual factors.

Current practice.

3.  Conditions:

a)  Staff shall provide prisoners in Designated Mental Health Units with the opportunity to maintain cell cleanliness and the opportunity to meet their hygiene needs.  Custody and clinical staff shall provide assistance to prisoners on these matters, as appropriate to individual patient needs

Current practice.

b)  The County shall ensure uniformity of practice with respect to cell searches, such that searches are not done for punitive or harassment reasons. The County shall monitor whether cell search practices may be serving as a disincentive for prisoners in Designated Mental Health Units to leave their cells for treatment or other out-of-cell activities, and shall take steps to address the issue as appropriate.

Cell searches are done randomly on a revolving basis. They are not done for punitive or harassment reasons. They are done to ensure the inmates do not have any contraband or weapons that can harm themselves, JPS staff or SSO staff.

4.  Bed planning:

a)  The County shall provide a sufficient number of beds in Designated Mental Health Unit, at all necessary levels of clinical care and levels of security, to meet the needs of the population of prisoners with SMI.

IOP units have been created for male and female patients, with the expansion of Enhanced Treatment pods. No female IOP at RCCC.

c)  The County shall establish mental health programming for women that ensures timely access to all levels of care and is equivalent to the range of services offered to men.

Women's IOP and OPP unit established at Main Jail and RCCC.  2P services already offered to women.

5.  General Exclusion of Prisoners with Serious Mental Illness from Segregation

a)  Prisoners with Serious Mental Illness will not be housed in Segregation units, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and there is no reasonable alternative, in which cases the provisions of **Section VIII.D** of the Segregation/Restrictive Housing Remedial Plan shall apply.

This is being implemented.  JPS is using an alternative treatment program in IOP to take Administrative Segregation inmates.  Fewer and fewer Adseg1 inmates are on the SMI caseload.

b)  Where prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit are assessed a Disciplinary Segregation term, they will serve the term in a Designated Mental Health Unit, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and shall receive structured out-of-cell time and programming as determined by the Multi-Disciplinary Treatment Team.

Current practice.  Disciplinary Segregation Post Order reflects all but the most serious violations will result in in-place discipline.

6.  Access to Care

a)   The County shall designate and make available custody escorts for mental health staff in order to facilitate timely completion of appointments and any other clinical contacts or treatment-related events.

IOP deputies have been structured to oversee MH treatment on the entire third floor. The JBCT/IOP programs at RCCC have 13 officers assigned to them. These officers are responsible for ensuring the inmates receive what they need from a custody perspective. They act as escorts for the mental health staff. If the inmates needs to be taken to an appointment off-site, that is facilitated by our medical escort team. Same is true for Main Jail although we have 20 deputies and a sergeant assigned to IOP.

b)   The County shall ensure sufficient and suitable treatment and office space for mental health care services, including the Triage Navigator Program and other mental health-related services provided on site at the Jail.

At RCCC, office space for MH care providers and treatment is available and constantly being re-evaluated based on needs and advisement of JPS administrators. At NMJ we work collaboratively with JPS when space needs arise

c)   Locations shall be arranged in advance for all scheduled clinical encounters.

Current practice.

e)   Referrals and triage:

i.   The County shall maintain a staff referral process (custody and medical) and a kite system for prisoners to request mental health services.  Referrals by staff or prisoners must be triaged within 24 hours.

Custodial staff make JPS referrals based on personal observations or at the request of the inmate; Inmates may also request MH services via kite. Refer to ACH for their practices and policies and to JPS for their policy regarding response time.

G.  **Medico-Legal Practices**
H.  **Clinical Restraints and Seclusion**
I.   **Training**

1.   The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

a) All jail custody staff shall receive formal training in mental health, which shall encompass mental health policies, critical incident response, crisis intervention techniques, recognizing different types of mental illness, interacting with prisoners with mental illness, appropriate referral practices, suicide and self-harm detection and preventions, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

The Academy now offers graduates the 24 hour CIT class, as well as an additional 20 hours of behavioral health as part of their final training before being employed. These classes cover many of the topics listed. Additionally, our staff will be assigned various classes through Lexipol, which they must complete online. Many of these topic are covered through these classes as well.

b) Custody staff working in Designated Mental Health Units shall receive additional training, including additional information on mental illness, special medico-legal considerations, de-escalation techniques, working with individuals with mental health needs, relevant bias and cultural competency issues, and the jail's mental health treatment programs.

IOP and JBCT deputies are given 24 hours of additional CIT training.

## V.  DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH MENTAL HEALTH OR INTELLECTUAL DISABILITIES

### A.  Role of Mental Health Staff in Disciplinary Process

1.  The County's policies and procedures shall require meaningful consideration of the relationship of a prisoner's behavior to any mental health or intellectual disability, the efficacy of disciplinary measures versus alternative interventions, and the impact of disciplinary measures on the health and well-being of prisoners with disabilities.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. All policies related to the Consent Decree are currently being drafted by the Lexipol project team. A Post Order has been approved. At RCCC, we have appoint a Chief Disciplinary Hearing Officer. He works closely with JPS to identify these cases and ensure discipline is handed down fairly. Main Jail has identified its Chief Disciplinary Hearing Officer, mirrored the Post Order of RCCC and also works collaboratively with JPS.

2.  Prisoners who are alleged to have committed a rules violation shall be reviewed by a qualified mental health professional if any of the following apply:

a) Prisoner is housed in any Designated Mental Health Unit;

JBCT and IOP mental health workers are immediately notified of disciplinary write-ups that occurr and they work closely with custodial staff to determine the best course of action.

b) Jail staff have reason to believe the prisoner's behavior was unusual, uncharacteristic, or a possible manifestation of mental illness;

A Post Order has been approved. At RCCC, we have appoint a Chief Disciplinary Hearing Officer. He works closely with JPS to identify these cases and ensure discipline is handed down fairly. This process at RCCC is being mirrored at Main Jail and we have started the same process.

c) Prisoner is on the mental health caseload and may lose good time credit as a consequence of the disciplinary infraction with which he or she is charged.

A Post Order has been approved. At RCCC, we have appoint a Chief Disciplinary Hearing Officer. He works closely with JPS to identify these cases and ensure discipline is handed down fairly.  This process at RCCC is being mirrored at Main Jail and we have started the same process.

B. **Consideration of Mental Health Input and Other Disability Information in Disciplinary Process**

1. The County shall designate one Chief Disciplinary Hearing Officer for each jail facility, who shall be responsible for ensuring consistency in disciplinary practices and procedures.

At RCCC a Chief Disciplinary Hearing officer has been identified. The Post Order has been approved.  This process at RCCC is being mirrored at Main Jail and we have started the same process.

2. The Disciplinary Hearing Officer shall ensure that prisoners are not disciplined for conduct that is related to their mental health or intellectual disability.

Current practice at RCCC. A Chief Disciplinary Hearing officer has been identified. The Post Order has been approved.  This process at RCCC is being mirrored at Main Jail and we have started the same process.

3. The Disciplinary Hearing Officer shall consider the qualified mental health professional's findings and any other available disability information when deciding what, if any, disciplinary action should be imposed.

At RCCC a Chief Disciplinary Hearing officer has been identified. The Post Order has been approved.  This process at RCCC is being mirrored at Main Jail and we have started the same process.

4.   The Disciplinary Hearing Officer shall consider the qualified mental health professional's input on minimizing the deleterious effect of disciplinary measures on the prisoner in view of his or her mental health or adaptive support needs.

At RCCC a Chief Disciplinary Hearing officer has been identified. The Post Order has been approved.  This process at RCCC is being mirrored at Main Jail and we have started the same process.

5.   If the Disciplinary Hearing Officer does not follow the mental health staff's input regarding whether the behavior was related to symptoms of mental illness or intellectual disability, whether any mitigating factors should be considered, and whether certain sanctions should be avoided, the Disciplinary Hearing Officer shall explain in writing why it was not followed.

At RCCC a Chief Disciplinary Hearing officer has been identified. The Post Order has been approved.  This process at RCCC is being mirrored at Main Jail and we have started the same process.

6.   Prisoners will not be subjected to discipline which prevents the delivery of mental health treatment or adaptive support needs, unless necessary for institutional safety.

Current practice.

7.   Prisoners shall not be subject to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of self-injurious behavior.

Inmates with suicidal ideations or self injurous tendencies are closely evaluation by JPS staff; Documentation of their behavior is made however, no disciplinary actions are taken against the inmate. Inmates may refuse medications at any time unless the administration of medication is mandated by the court through a valid order. JPS is heavily involved in this process.

## C.   Accommodations for Prisoners with Mental Health or Intellectual Disabilities During the Disciplinary Process

1.   The County shall provide reasonable accommodations during the hearing process for prisoners with mental health or intellectual disabilities.

Current practice.

2.  The County shall take reasonable steps to ensure the provision of effective communication and necessary assistance to prisoners with disabilities at all stages of the disciplinary process.

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team. Although there is currently no policy , a Post Order has been approved. At RCCC, we have appoint a Chief Disciplinary Hearing Officer. He works closely with JPS to identify these cases and ensure discipline is handed down.  This process at RCCC is being mirrored at Main Jail and we have started the same process.

**D.  Use of Force for Prisoners with Mental Health or Intellectual Disabilities**

1.  The County's Correctional Services Operations Orders shall include language that ensures meaningful consideration of whether a prisoner's behavior is a manifestation of mental health or intellectual disability.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.  A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

2.  For prisoners with a known mental health or intellectual disability, and absent an imminent threat to safety, staff shall employ de-escalation methods that take into account the individual's mental health or adaptive support needs.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. At Main Jail we are in the process of incorporating a Custody-Critical Incident Negotiation Team (C-Cint) and training all of our IOP deputies. This will be a monumental forward step in de-escalation tactics. The Post Order for this (C-Cint) has been drafted and is awaiting approval. Current practice at RCCC, descalation is attempted when circumstances permit.

3.   The County's Correctional Services Use of Force policies shall include a definition and a protocol for a planned Use of Force that provides appropriate guidance for a planned Use of Force that involves a prisoner with mental health or intellectual disability.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

4.   Prior to any *planned* Use of Force, such as a cell extraction, against a prisoner with mental health or intellectual disabilities, there will be a "cooling down period," consistent with safety and security needs. This period includes a structured attempt by mental health staff (and other staff if appropriate), to de-escalate the situation and to reach a resolution without Use of Force. Such efforts, including the use of adaptive supports, will be documented in writing. Medical and/or mental health staff should be consulted if the purpose of the cell extraction is related to the delivery of treatment.

This is the current practice with all planned use of force incidents involving inmates in specialzed units. The officers assigned to MH units work closely with JPS staff when incidents requiring a planned use of force arise. After consultation with JPS staff and ample opportunities for consultation and intervention by JPS.  At Main Jail we are in the process of incorporating a Custody-Critical Incident Negotiation Team (C-Cint) and training all of our IOP deputies. This will be a monumental forward step in de-escalation tactics. The Post Order for this (C-Cint) has been drafted and is awaiting approval.

5.   The County shall require video documentation for any planned Use of Force, absent exigent circumstances. Jail staff shall endeavor to record the specific actions, behavior, or threats leading to the need for Use of Force, as well as efforts to resolve the situation without Use of Force.

Current practice.

6.   The County shall ensure the completion of supervisory review of Use of Force incidents, including video (for any planned Use of Force), interviews, and written incident documentation, in order to ensure appropriateness of Use of Force practices including de-escalation efforts. The County shall take corrective action when necessary.

Current Practice.

7.   The County shall review and amend as appropriate its policies on Use of Force, including its policies on Custody Emergency Response Team (CERT) and Cell Extraction Procedures.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

E.   **Training and Quality Assurance**

1.   All custody staff, and mental health staff, shall be trained on the policies and procedures outlined herein that are relevant to their job and classification requirements. Custody staff will receive periodic training on identifying behaviors that may be manifestations of mental illness and other situations warranting a referral to mental health staff, including for a Rules Violation Mental Health Review or other mental health assessment.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. All policies related to the Consent Decree are currently being drafted by the Lexipol project team. All staff assigned to corrections (sworn staff and records officers) were assigned consent decree training in September of 2021. as new hires come on they are assigned the training and must attest to the completion of the training.

2.   All custody staff shall be trained on the identification of symptoms of mental illness, the provision of adaptive supports, and the use of de-escalation methods appropriate for prisoners with mental health or intellectual disabilities.

Many aspects of this training are already covered during in-service and pre-service training.  A comprehensive review of current training offerings, compared against the needs of this element is under reveiew. We are also working with JPS to determine how to fully address this.

4.   The County shall track all Uses of Force (planned and reactive) involving prisoners who are on the mental health caseload or who have intellectual disabilities, including the number of Uses of Force and the number of cell extractions by facility.

Current Practice.

5.   The County shall implement a continuous quality assurance/quality improvement plan to periodically audit disciplinary and Use of Force practices as they apply to prisoners who are on the mental health caseload or who have intellectual disabilities.

Current use of Blue-Team software to track and monitor use of force incidents, while predicting possible problematic trends in officer behavior.

## VI.   MEDICAL CARE

A.  **Staffing**
B.  **Intake**

1.   All prisoners who are to be housed shall be screened on arrival in custody by Registered Nurses (RNs).  RN screening shall take place prior to placement in jail housing.

Current practice. All incoming inmates are medically cleared prior to being booked into the facility.

2.   Health care intake screening shall take place in a setting that ensures confidentiality of communications between nurses and individual patients.  Custody staff may maintain visual supervision but may not be close enough to overhear communication, unless security concerns based on an individualized determination of risk that includes a consideration of requests by the health care staff require that custody staff be closer at hand.  There shall be visual and auditory privacy from other prisoners.

Current Practice @ RCCC. Deputies standby near the intake interview but outside door. At the Main Jail, the nurses conduct the screening process in open cubicles. Sworn staff stand in their presence for security purposes. Plans are in place to renovate this area and make it more auditorily confidential.

3.   The County shall, in consultation with Plaintiffs, revise the contents of its intake screening, medical intake screening, and special needs documentation to reflect community standards and ensure proper identification of medical and disability related needs.

In consultation with CHS, several forms have been ammended to reflect this area.

C.  **Access to Care**

1.   The County shall ensure that Health Services Requests (HSRs) are readily available to all prisoners, including those in segregation housing, from nurses and custody officers.

Current practice. HSRs are available at medical appointments, pill call, and in housing units.

2.   The County shall provide patients with a mechanism for submitting HSRs that does not require them to share confidential health information with custody staff. The County shall install lockboxes or other secure physical or electronic mechanism for the submission of HSRs (as well as health care grievances) in every housing unit.  Designated health care staff shall collect (if submitted physically) or review (if submitted electronically) HSRs at least two times per day in order to ensure that CHS receives critical health information in a timely manner. Designated health care staff shall also collect HSRs during pill call and shall go door to door in all restricted housing units at least once a day to collect HSRs. HSRs and health care grievances will be promptly date- and time-stamped. The County may implement an accessible electronic solution for secure and confidential submission of HSRs and health care grievances.

HSRs are turned in directly to nursing staff duriing pill call twice a day. Boxes for Medical Grievances have been in installed in all housing units at RCCC and Main Jail. Medical staff collects and tracks health care grievances.

4.   The County shall designate and make available custody escorts for medical staff in order to facilitate timely and confidential clinical contacts or treatment-related events.

Custody staff currently escorts Medical staff. 8 Deputy positions were added specifically for medical escorts (2 per shift). We add additional escorts when needed.

D.  **Chronic care**
F.  **Medication administration and monitoring**
G.  **Clinical space and medical placements**

1.   The County shall provide adequate clinical space in every facility to support clinical operations while also securing appropriate privacy for patients.  Adequate clinical space includes visual and auditory privacy from prisoners and auditory privacy from staff, the space needed reasonably to perform clinical functions as well as an examination table, sink, proper lighting, proper equipment, and access to health care records.

RCCC- All medical  and psychiatric offices are confidential and free of recording. There are no cameras in medical offices to ensure privacy for inmates. All medical offices have equipment determined to be necessary by ACH. All exam rooms at Main Jail are visually and auditorily confidential.

2.   The County shall ensure that any negative pressure isolation rooms meet community standards, including an antechamber to ensure that the room remains airtight, appropriate pressure gauges, and regular documented checks of the pressure gauges.

Jail Annex planning. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail. At Main Jail our negative pressure rooms are checked daily by DGS to ensure the requested standards are met.

3.   The County shall ensure that absent individualized, documented safety and security concerns, patients in acute medical or quarantine placements shall be allowed property and privileges equivalent to what they would receive in general population based on their classification levels.

All inmates in medical or quarantine placements are allowed to keep personal property with them as well as participate in programs that do not interfeer with safety and secutity concers.

4.   The County shall ensure that patients in medical placements are not forced to sleep on the floor, including by providing beds with rails or other features appropriate for patients' clinical needs and any risk of falling.

RCCC and Main Jail- No inmate is forced to sleep on the floor. Beds with rails are avaiable in the Medical Houing Unit.

5.   The County shall not discriminate against patients in medical placements solely because of their need for C-Pap machines, but instead shall provide access to programs and services in accordance with their classification level, as set forth in the ADA Remedial Plan.

Housing units in RCCC currently do not have outlets near any sleeping areas, except MHU. Inmates housed in the Medical Housing Unit are able to participate in programs and services consistent with others in their classification. At NMJ inmates who require C-Pap machines are housed on 2E. They have equal access to programs and services in accordance to their classification level.

H.  **Patient privacy**

1.   The County shall develop and implement policies and procedures to ensure that appropriate confidentiality is maintained for health care services.  The policies shall ensure confidentiality for clinical encounters, including health care intake screening, pill call, nursing and provider sick call, specialty appointments, and mental health treatment.  The policies shall also ensure confidentiality for written health care documents, such as health care needs requests and grievances raising medical care or mental health care concerns, which shall not be collected by custody staff.

Clinical encounters are offered in a private and confidential setting. Deputies stand near when necessary for safety, while still offering privacy. All written health care correspondence is handled directly by Medical staff, including medical grievances.

2.   The County shall provide adequate clinical space in each jail to support clinical operations while also securing appropriate privacy for patients, including visual and auditory privacy from prisoners and auditory privacy from staff.

RCCC- All medical  and psychiatric offices are confidential and free of recording. There are no cameras in medical offices to ensure privacy for inmates. Medical offices on floors have video, but no audio, for nurses safety

3.   All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff.  In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification. The issuance of pills does not constitute a clinical interaction.

All medical and psychiatric visits are done in a private and confidential setting. Officers standby when necessary for safety, while still offering privacy to the inmate. Max and medium security facilities occur in a private setting, out of hearing range, proximity is determined by the inmates behavior not housuing placement.

b)   If the presence of a correctional officer is determined to be necessary to ensure the safety of staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

Deputies stand at a distance that offers their ability to intervene if necessary, while offering auditory privacy.

4.   Jail policies that mandate custody staff to be present for any medical treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above.  Custody and medical staff shall be trained accordingly.

No policies exist mandating deputies be present during medical treatment.

I.   **Health care records**
J.   **Utilization management**
K.   **Sanitation**
L.   **Reproductive and Pregnancy-Related Care**
M.   **Transgender and gender nonconforming health care**

c)   Access to gender-affirming clothing

Current practice, outlined in TGNI order. All inmates shall be issued clothing consistent with their preferred gender identity and/or expression, regardless of their housing location.

d) Access to gender-affirming commissary items, make-up, and other property items

Current practice, outlined in TGNI order. Per IWF, all inmates can purchase gender affirming items available on commissary.

N. **Detoxification protocols**
O. **Nursing protocols**
P. **Reviews of in-custody deaths**

1. Preliminary reviews of in-custody deaths shall take place within 30 days of the death and shall include a written report of the circumstances and events leading to the death, with the goal to identify and remedy preventable causes of death and any other potentially systematic problems.

Current practice. In-CUSTODY Death Reviews shall happen as soon as possible, within 30 days.

2. Mortality reviews shall include an investigation of the events occurring prior to the death, an analysis of any acts or omissions by any staff or prisoners which might have contributed to the death, and the identification of problems for which corrective action should be undertaken.

Current practice.

Q. **Reentry Services**
R. **Training**

1. The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

a) All jail custody staff shall receive formal training in medical needs, which shall encompass medical treatment, critical incident response, crisis intervention techniques, recognizing different types of medical emergencies, and acute medical needs, appropriate referral practices, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

Training needs are being evaluated against on-going in-service training. All Custody staff receive 8 hours of Crisis intervention training, medical emergency and CPR training is done every two years. Specialized units receive additional training relevant to their assignment. Additional training is evaluated and assigned as determined by in-service training.

VII.   **SUICIDE PREVENTION**

## A.  Substantive Provisions

1.  The County recognizes that comprehensive review and restructuring of its suicide assessment, monitoring, and prevention practices are necessary to address the risk of suicide and self-harm attendant to detention in a jail setting.

The Sheriff's Office is in the process of revising all of its policies. They will be working with Lexipol to accomplish this. They have indicated that all of the orders related to the Consent Decree will be their priority. We have identified a list of policies we would like them to start on. The Suicide Prevention policy was the first one we asked them to complete.

2.  The County shall establish, in consultation with Plaintiffs' counsel, a new Suicide Prevention Policy that shall be in accordance with the following:

The Sheriff's Office is in the process of revising all of its policies. They will be working with Lexipol to accomplish this. They have indicated that all of the orders related to the Consent Decree will be their priority. We have identified a list of policies we would like them to start on. The Suicide Prevention policy was the first one we asked them to complete.

## B.  Training

1.  The County shall develop, in consultation with Plaintiffs' counsel, a four- to eight-hour pre-service suicide prevention curriculum for new Jail employees (including custody, medical, and mental health staff), to be conducted in person in a classroom or virtual classroom setting, that includes the following topics:

As part of pre-service training, the Adult Corrections Officer Supplemental Core Course has been revised where Module 19.0 addresses suicide prevention. This section has been approved by the Board of State & Community Corrections (BSCC) as well as the Standards and Training for Corrections (STC).  We are working with CHS and JPS to develop a joint curriculum.  Additionally, suicide prevention training is completed by all custody staff on a yearly basis.

a)  avoiding obstacles (negative attitudes) to suicide prevention;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

b)  prisoner suicide research;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

c)  why facility environments are conducive to suicidal behavior;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

d)  identifying suicide risk despite the denial of risk;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

e)  potential predisposing factors to suicide;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

f)  high-risk suicide periods;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

g)  warning signs and symptoms;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

h)  components of the jail suicide prevention program

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

i)  liability issues associated with prisoner suicide;

Training needs are being evaluated against on-going pre-service training.  This topic will be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

j)  crisis intervention.

Training needs are being evaluated against on-going pre-service training.  There is a 24 hour crisis intervention training class included at the end of the academy.  This topic will also be addressed with the development of the joint curriculum with CHS amd JPS by utilizing the "Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.  This topic is addressed in this curriculum.

2.  The County shall develop, in consultation with Plaintiffs' counsel, a two-hour annual suicide prevention curriculum for all custody, medical, and mental health staff, to be conducted in person in a classroom or virtual classroom setting, that includes:

This is something we have to work on with JPS.  A suicide prevention task force has been created which includes sworn staff, JPS staff and medical staff.

a)  review of topics (a)-(j) above

b)  review of any changes to the jail suicide prevention program

The Sheriff's Office is in the process of revising all of its policies. They will be working with Lexipol to accomplish this. They have indicated that all of the orders related to the Consent Decree will be their priority. We have identified a list of policies we would like them to start on. The Suicide Prevention policy was the first one we asked them to complete, it is currently in the approval process.

c) discussion of recent jail suicides or attempts

Discussions occur daily with IOP and JPS staff. If there are any attempts, they will be covered in these conversations. Additionally, the Suicide Prevention Committee has been recreated and we have met several times. The process is being developed.

3. Custody officers assigned to Designated Mental Health Units shall receive additional specialized training on suicide prevention and working with prisoners with serious mental illness.

IOP and JBCT Deputies receive 24 hours of advanced CIT training.  IOP/JBCT Deputies also attend training with the department's Critical Incident Negotiations Team (CINT) to learn how to deal with persons with a mental illness.
IOP/JBCT Deputies will also attend a custody based negotiations class facilitated by the FBI.

5. All mental health staff and custody officers shall be trained on the appropriate use of safety suits—*i.e* ., not to be utilized as a default, not to be used as a tool in behavior management, not to be utilized for patients being observed at 30-minute observations.

This will be outlined in the revised Suicide Prevention Operations Order. Safety Suits are used at the discretions of JPS based on collaboration with custody staff and not as a behavior management tool.

6. The County shall ensure that all staff are trained in the new Suicide Prevention Policy.

The policy is in the process of being updated. This area will be addressed in the revised version of the policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team, the Suicide Prevention Policy is currently in the approval process.

C.  **Nursing Intake Screening**
D.  **Post-Intake Mental Health Assessment Procedures**

1.  All mental health assessments shall be conducted in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

This is currently being done at RCCC. The interviews are taking place in an area where the officers can stand back to give them privacy. The doors were switched out so they can be closed. They have windows so the officer can stand outside and see what is taking place in the room. JPS recently purchased machines that make white noise to help make it more difficult to hear the assessment. If there is a safety concern, the assessments are conducted in an attorney room so there is barrier between JPS staff and the inmate. At Main Jail, inmate privacy is a priority. When JPS assessments are conducted we offer the maximum level of privacy afforded given the case-by-case safety risk. At Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for Mental health assessments. The phone has had some wiring issues but a permanent solution has been established.

E.  **Response to Identification of Suicide Risk or Need for Higher Level of Care**

1.  When a prisoner is identified as at risk for suicide and placed by custody staff in a safety cell, on suicide precautions, and/or in a safety suit, mental health staff shall be contacted immediately.  A qualified mental health professional, or other appropriately trained medical staff in consultation with mental health staff, shall complete a confidential in-person suicide risk assessment as soon as possible, consistent with the "must-see" referral timeline.

Current practice as outlined in our Suicide Prevention Operations Order updated in January 2020. In addition, a correctional based negotiations team is in the beginning stages of being developed to assist with suicide de-escalation incidents or inmates who are experiencing a crisis. Deputies selected to be a part of this team will attend a custody based negotiations class facilitated by the FBI. At Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for Mental health assessments. The phone has had some wiring issues but a permanent solution has been established.

2.  Consistent with current RCCC policy, if there is no mental health staff on site at RCCC at the time that an emergent mental health need is identified, the prisoner shall be transported to the Main Jail for emergency evaluation within two hours of the initial report.

Current practice.  Development of procedures for use of suicide resistant cells at RCCC to limit transport to only the most acute patients. Our goal is to work with Lindsey to create an additional four suicide resistant cells where we can house inmates who fit this criteria.

4.  The County shall ensure that the meal service schedule or other custody-related activities cause no delay in the completion of suicide risk assessments for prisoners.

Current practice.

F.  **Housing of Inmates on Suicide Precautions**

1.  The County's policy and procedures shall direct that prisoners, including those identified as being at risk for suicide, be treated in the least restrictive setting appropriate to their individual clinical and safety needs.

Policy forthcoming.  Current post orders and practice indicate least restrictive housing for suicidal inmates. JPS staff shall consult with custody staff to determine the appropriate housing location for the inmate.

G.  **Inpatient Placements**

1.  The County shall ensure that prisoners who require psychiatric inpatient care as clinically indicated are placed in the 2P unit within 24 hours of identification, absent exceptional circumstances.  In all cases, the provision of clinically indicated treatment to any prisoner requiring inpatient level of care shall be initiated within 24 hours.

Jail Annex planning in order to meet the 24 hour time limit. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail. Currently there is a proposal to move 2P to a larger housing area and we are still in preliminary discussions.

H.  **Temporary Suicide Precautions**

1.  No prisoner shall be housed in a safety cell, segregation holding cell, or other Temporary Suicide Precautions Housing for more than six (6) hours. If mental health or medical staff determine it to be clinically appropriate based on detoxification-related needs, this time limit may be extended to no more than eight (8) hours. If exceptional circumstances prevent transfer within these timelines, those circumstances shall be documented, and transfer shall occur as soon as possible. This does not preclude the housing of a prisoner in the IOP unit if clinically indicated.

Jail Annex planning will strengthen this request. We currently follow these timeframes as much as possible with the limited number of cells in the IOP unit. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail. Currently there is a proposal to move 2P to a larger housing area and we are still in preliminary discussions.

2.  The County shall ensure, including by revising written policies and procedures where necessary, the timely and adequate completion of medical assessments for prisoners in need of suicide precautions, as required under Operations Order 4/05 (*i.e.*, within 12 hours of placement of the next daily sick call, whichever is earliest, and then every 24 hours thereafter).

Current practice. Custody staff shall notify medical staff within fifteen (15) minutes that a prisoner is temporarily housed in a safety or segregation cell and medical staff shall complete an assessment within 12 hours of placement or the next sick call, whichever us earliest.

3.  The County shall ensure that any cell used for holding prisoners on suicide precautions is clean prior to the placement of a new prisoner, as well as cleaned on a normal cleaning schedule.

Current practice. The Post Order has been approved.

4.  The County shall create and implement a written policy ensuring adequate frequency for meals, fluids, hygiene, showers, prescribed medications, and toileting when a prisoner is in cell used for holding prisoners on suicide precautions.

Current practice.  Will add the langauge to the new Suicide Prevention policy. RCCC has no cells designed for long term housing of inmates on suicide precautions. RCCC does not have JPS staff available 24 hours a day, but has TELEPSYCHIATRY available after hours including weekend after hours.

5.  Inmates on suicide precautions shall not automatically be on lockdown and should be allowed dayroom or out-of-cell access consistent with security and clinical judgments.

Current practice.

6.  The classrooms or multipurpose rooms adjacent to the housing units in the Main Jail are designed for, and should be made available for, prisoner programs and treatment. Absent an emergency, the County shall not use the classrooms and multipurpose rooms to hold prisoners pending a mental health evaluation or on suicide precautions.  Where such emergency occurs, the County shall document the reasons for retention and move the prisoner, within six (6) hours, to the inpatient unit or other appropriate housing location for continued observation, evaluation, and treatment.

Multi-purpose rooms are no longer used for holding suicide precaution, or mental health evaluation inmates.  Written directives to staff document acceptable practice for at-risk patients, without the use of MPRs.  There is currently a zero use policy, not even as a last resort.

I.  **Suicide Hazards in High-Risk Housing Locations**

1.  The County shall not place prisoners identified as being at risk for suicide or self-harm, or for prisoners requiring IOP level of care, in settings that are not suicide-resistant as consistent with Lindsay Hayes's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities."

Current practice. Inmates at risk for suicide, self harm, or IOP level of care are not housed in settings that are not suicide resistant.

2.  Cells with structural blind spots shall not be used for suicide precaution.

Current practice.

J.   **Supervision/Monitoring of Suicidal Inmates**

1.   The County shall ensure adequate visibility and supervision of prisoners on suicide precautions.

Current practice.

2.   The County shall not cover cell windows with magnetic flaps or any other visual barrier preventing visibility into any cell that is housing a prisoner on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need.

Current practice.

3.   The County shall revise its policies regarding the monitoring of prisoners on suicide precautions to provide for at least the following two defined levels of observation:

a)   <u>Close observation</u> shall be used for prisoners who are not actively suicidal but express suicidal ideation (*e.g.*, expressing a wish to die without a specific threat or plan) or have a recent prior history of self-destructive behavior.  Close observation shall also be used for prisoners who deny suicidal ideation or do not threaten suicide but are engaging in other concerning behaviors indicating the potential for self-injury.  Staff shall observe the prisoner at staggered intervals not to exceed every 15 minutes and shall document the observation as it occurs.

The revised policy being worked on by the Lexipol team will address this issue. All policies related to the Consent Decree are currently being drafted by the Lexipol project team. The Suicide prevention policy is currently in the approval process.

b)   <u>Constant observation</u> shall be used for prisoners who are actively suicidal, either threatening or engaging in self-injury, *and* considered a high risk for suicide.  An assigned staff member shall observe the prisoner on a continuous, uninterrupted basis.  The observation should be documented at 15-minute intervals.  Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation.

This type of monitoring occurs in the SITHU or 2P level of care currently.

4.   For any prisoner requiring suicide precautions, a qualified mental health professional shall assess, determine, and document the clinically appropriate level of monitoring based on the prisoner's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically-determined level of monitoring.

Current practice. Once JPS staff has completed the inmate's evaluation, the JPS staff member shall consult with custody staff to determine the appropriate housing location for the inmate.

5.   Video monitoring of prisoners on suicide precaution shall not serve as a substitute for Close or Constant observation.

Current practice. Outlined in our current Suicide Prevention Policy

K.  **Treatment of Inmates Identified as at Risk Of Suicide**

3.   All assessments, treatment, and other clinical encounters shall occur in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

When necessary, custody staff will standby for security while offering auditory privacy. Proximity is dependent on the inmates behavior safety risk. This can be accomplished at RCCC due to the design of the three offices where these contacts take place. All of the doors can be closed. They have windows where the officers can stand outside and see what is taking place in the room. At Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for Mental health assessments.

L.  **Conditions for Individual Inmates on Suicide Precautions**

1.  The County's Suicide Prevention Policy shall set forth clear and internally consistent procedures regarding decisional authority for determining the conditions for individual inmates on suicide precautions.  Mental health staff shall have primary authority, consistent with individualized classification and security needs, with respect to the following:

M.  **Property and Privileges**

1.   Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of routine privileges (*e.g.*, visits, telephone calls, recreation) that are otherwise within the limitations of a prisoner's classification security level.  Any removal of privileges shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

Current practice.  Prisoners placed in a safety cell shall be allowed to retain enough clothing or be provided with a suitably designed "safety garment" to provide for the prisoners personal privacy unless specific identifiable risks to the prisoner's safety or to the security of the facility exist and are documented.

2.   Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff depending on suicide risk, the removal and/or return of a prisoner's clothing and possessions (*e.g.*, books, slippers/sandals, eyeglasses) that are otherwise within the limitations of a prisoner's classification security level.  The removal of property shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

Current practice.  If deemed necessary by JPS staff, the inmate's clothing shall be taken and the inmate will be given a "safety suit" to wear.  Prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damage property.

3.   Cancellation of privileges should be avoided whenever possible and utilized only as a last resort.

Current practice. Cancellation of privledges would be done only as a last resort or if deemed necessary per JPS.

### N.  **Use of Safety Suits**

1.   Decisions about the use of a safety suit (smock) or removal of normal clothing will be under mental health staff's authority, based on individualized clinical judgment along with input from custody staff.

Current practice. Outlined in the current Suicide Prevention Program Operations Order.The use of the "Safety Suit" shall be at the discretion of JPS, based on collaboration with intake or custody staff.

2.   Custody staff may only temporarily place an inmate in a safety suit based on an identified risk of suicide by hanging until the qualified mental health professional's evaluation, to be completed within the "must see" referral timeline. Upon completion of the mental health evaluation, the mental health professional will determine whether to continue or discontinue use of the safety suit.

Absent direction from Jail Psychiatric Services (JPS) deeming a "safety garment" necessary, a sworn supervisor must authorize custody staff to take the clothing and supply the prisoner with a "safety garment".  Unless a "safety garment" is necessitated by the prisoner's behavior, prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damage property

3.   If an inmate's clothing is removed, the inmate shall be issued a safety suit and safety blanket.

Current practice. See above.

4.   As soon as clinically appropriate, the provision of regular clothing shall be restored. The goal shall be to return full clothing to the inmate prior to discharge from suicide precautions.

Current practice. Determination is made by JPS.

6.   If a qualified mental health professional determines that 30-minute (or less frequent) observations are warranted for a prisoner, safety suits shall not be used on that prisoner.

This causes some confusion to address.  County request discussion on the exact meaning of this provision.

7.   Safety suits shall not be used as a tool for behavior management or punishment.

Current practice. Safety suits are only used when necessary for the safety and security of the inmate.

O.   **Beds and Bedding**

1.   All prisoners housed for more than four hours on suicide precautions and/or in an inpatient placement shall be provided with an appropriate bed, mattress, and bedding unless the prisoner uses these items in ways for which they were not intended (*e.g.*, tampering or obstructing visibility into the cell).  Such a determination shall be documented and shall be reviewed on a regular basis.

This is current practice. Those housed in safety cells in the booking area are moved to appropriate suicide resistant housing as soon as a bed/cell opens up.

P.   **Discharge from Suicide Precautions**

1.   A qualified mental health professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions in order to ensure that the discharge is appropriate and that appropriate treatment and safety planning is completed.

Current custody practice.

3.   Qualified mental health professionals shall provide clinical input regarding clinically appropriate housing placement (*e.g.*, whether isolation is contraindicated for the prisoner) upon discharge.  Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement.  Once clinically discharged from suicide precautions, the prisoner shall be promptly transferred to appropriate housing.

Current custody practice. This is accomplished with the input of Classification staff and JPS.

Q.  **Emergency Response**

1.   The County shall keep an emergency response bag that includes appropriate equipment, including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units.  All custodial and medical staff be trained on the location of this emergency response bag and shall receive regular training on emergency response procedures, including how to use appropriate equipment.

Those items are available in each facility.

2.   All custody and medical staff shall be trained in first aid and CPR.

Current custody practice. Sworn staff receives CPR training every two years. It is part of our Advanced Officer Training program.

3.   It shall be the policy of the County that any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff shall begin to administer standard first aid and/or CPR, as appropriate.

Current practice.

R.  **Quality Assurance and Quality Improvement**

2.   The County shall, in consultation with Plaintiffs' counsel, revise its in-custody death review policy and procedures.  Reviews shall be conducted with the active participation of custody, medical, and mental health staff.  Reviews shall include analysis of policy or systemic issues and the development of corrective action plans when warranted.

Current practice.

3.   For each suicide and serious suicide attempt (*e.g.*, requiring hospitalization), the County's Suicide Prevention Task Force shall review: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt.  Where applicable, the Review Team shall generate recommendations for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

Current practice. The Suicide Prevention Task Force has been reestablished and has had several meetings.

## VIII.   SEGREGATION/RESTRICTIVE HOUSING

### A.  General Principles

1.   Prisoners will be housed in the least restrictive setting necessary to ensure their own safety, as well as the safety of staff, other prisoners, and the public.

This is our current practice.

a)   The County shall not place prisoners in more restrictive settings, including Segregation, based solely on a mental illness or any other disability. Prisoners will be housed in the most integrated setting appropriate to their individual needs.

The creation of the third floor as a mental health treatment floor has allowed most, if not all, SMI TSEPs to integrate into more normative housing.  This allows all but the most violent individuals to house in a mental health setting, while maintaining Administrative Segregation for inmates not on the behavioral health case load. RCCC has implemented several SMI program pods, where inmates housed in a single cell are only assigned based on JPS recommendation and allowed program/recreation time with other inmates, minimum 17 hours a week.

b)  The County shall not place prisoners into Segregation units based solely on classification score.

Several objective indicators are used to determine the appropriateness of segregation. Written docueemtation is required and we are working towards periodic review of justification for segregation.  Inmates solely classified as "high" are not routinely segregated.

c)  The County shall review the housing and restrictions of female prisoners classified as high security to ensure that this population is not subject to Segregation conditions of confinement.

Current practice.

d)  Specialized medical units (e.g., Main Jail 2 West Med/Psych, Main Jail 2 East) and mental health units (e.g., OPP, IOP, MHU, 2P) are not Segregation housing units. The County shall ensure that prisoners housed in these units receive daily access to out-of-cell time, telephones, showers, and other programs, services, and activities consistent with their classification and treatment plan.

Current practice. RCCC has an open floor plan setting for medical housing with access to phones, showers, and yard.

2.  The County shall not place a prisoner in Segregation units without first determining that such confinement is necessary for the safety of the staff, other prisoners, or the public. The County shall clearly document in writing the specific reason(s) for a prisoner's placement and retention in Segregation housing. The reason(s) shall be supported by clear, objective evidence. Prisoners will remain in Segregation housing for no longer than necessary to address the reason(s) for placement.

Current practice. At RCCC the need for segregation housing is clearly documented in the JIMS system. Face to Face interviews are set up with Classification Deputies in order to determine if housing is appropriate. If an inmate remains in Adseg Phase 1, it is clearly documented in JIMS. A Post Order regarding this topic has been approved.

3.  The County shall not place the following prisoners in a Segregation setting unless necessary to address a serious risk of physical harm, and in such cases only for the minimum time necessary to identify an alternative appropriate placement:

a)  Prisoners with acute medical needs that require an inpatient level of care and/or daily nursing care;

Current practice.

b)  Prisoners who are pregnant, post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy.

Not codified in policy, however is our current practice as we now have regular collaboration with JPS and review all inmates who are housed in segregation.

## B.  Conditions of Confinement

1.   The County will provide at least 17 hours of out-of-cell time per week for all prisoners, with the exception of prisoners subject to Administrative Segregation Phase I and Disciplinary Segregation in accordance with this remedial plan. The County will monitor out-of-cell time, and if minimum out-of-cell time requirements are routinely not being met at a particular facility or in a particular housing unit, the Sheriff's Department division commander or designee will review the situation and take appropriate steps to resolve the issue.

Current practice.  Weekly reports show nearly universal compliance, even during more stringent social distancing for COVID precautions.  A Post Order regarding this topic has been approved. Each officer is aware of the amount of out-of-cell time each classification of imate is entitle to receive.

a)  The County shall implement a policy to document out-of-cell time provided to each prisoner. The County shall conduct monthly audits to ensure that prisoners have been provided the required treatment and recreation time out of cell. This data will be regularly reviewed as part of the County's Quality Assurance procedures.

Out of cell time is monitored and recorded in the current WebJPF system.  Reports are generated on a weekly basis, and checked for compliance.  Inconsistent out of cell times are addressed.  Particularly during COVID precautions, once inmates are out of quarantine, they are receiving nearly 20 hours per week out of cell time. A Post Order regaring this topic has been approved. The officers are aware of the amount of out-of-cell time each classification of imate is entitle to receive.

2.   Out-of-cell time with the opportunity to exercise shall be provided to each prisoner seven (7) days per week, including outdoors/recreation time when feasible. The County shall offer out-of-cell time at appropriate times of day.

Current practice. Schedules have been created to ensure fair distribution of outdoor recreation.

3.   The County shall modify its non-disciplinary Segregation policies and procedures to allow reasonable access to the following: (1) Personal phone calls for all prisoners, including at least five hours or three weekdays per week of phone access during normal business hours; (2) Education, rehabilitation, and other materials (e.g. writing implements, art supplies, tablets), for in-cell activities; (3) Personal and legal visiting; (4) Religious services; and (5) Commissary.

Commissary restrictions have been lifted.  Personal and legal visiting is unrestricted. Working toward more phone time during weekday hours.  Working toward programming and education for the pre-sentenced population. At RCCC phones are available during any out of cell time which for non disciplinary segregation is 17 hours per week. The Post Order regarding this topic has been approved.

a)  The conditions and privileges described above shall be provided unless there is a specific safety or security issue preventing provision of such materials or the prisoner is subjected to disciplinary action.

Current practice

4.  Cell windows shall not be covered with magnetic flaps, towels, sheets, or any other visual barrier preventing visibility into and out of the cell, unless there is a specific security or privacy need that is documented, and then for only a period of time necessary to address such security or privacy need. This provision shall apply to all cells housing prisoners.

Current practice.

5.  The County shall establish procedures so that all housing unit cells are searched and cleaned prior to a prisoner's placement in the cell.

The Post Order regarding this topic was approved.

6.  The County shall establish procedures to ensure that no prisoner is placed in a Segregation housing cell without a mattress and appropriate bedding.

Current practice.

## C.  Mental Health Functions in Segregation Units

1.  Segregation Placement Mental Health Review

a)  All prisoners placed in a non-disciplinary Segregation housing unit and all prisoners housed in a Disciplinary Detention unit shall be assessed by a qualified mental health professional within 24 hours of placement to determine whether such placement is contraindicated. All prisoners subjected to Disciplinary Segregation conditions for 72 hours in their general population housing unit (*i.e.*, confined to cell 23 hours per day) shall also be assessed by a qualified mental health professional no later than the fourth day of such placement.

This process has been started and custody staff notifies JPS immediatley after an inmate is moved to disciplinary housing.

b)   Any decision to place prisoners with Serious Mental Illness in Segregation shall include the input of a qualified mental health professional who has conducted a clinical evaluation of the prisoner in a private and confidential setting (absent a specific current risk that necessitates the presence of custody staff), is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

RCCC has multiple SMI programs. Inmates in IOP and JBCT are not in segregation/restriction housing. Disciplinary housing is issued only with clearance from JPS staff assigned to these programs. Consultation with SMI inmates and JPS in these programs are confidential.

d)   If mental health or medical staff find that a prisoner has a Serious Mental Illness or has other contraindications to Segregation, that prisoner shall be removed from Segregation absent exceptional and exigent circumstances.

Current practice.

2.   Segregation Rounds and Clinical Contacts

a)   Cell checks (to ensure that prisoners are safe and breathing) shall be conducted for all prisoners in Segregation at least every 30 minutes, at staggered intervals. Completion of cell checks will be timely documented.

Current practice. See POST ORDER HOUSING UNIT CHECKS

b)   A qualified mental health or medical professional shall conduct check-ins at least once a week, to assess and document the health status of all prisoners in Segregation, and shall make referrals as necessary. The check-in shall include a brief conversation with each prisoner, a visual observation of the cell, and an inquiry into whether the prisoner would like to request a confidential meeting with a mental health or medical provider. Steps shall be taken to ensure effective communication, as well as auditory privacy consistent with security needs. When a prisoner in Segregation requests a confidential meeting with a mental health or medical provider, or the medical or mental health professional identifies a mental health or medical need, staff shall make appropriate arrangements to include triage, examination and treatment in an appropriate clinical setting. In such cases, staff shall give the prisoner the opportunity to complete a health care request but will otherwise initiate a referral without requiring the prisoner to complete a request form.

Partial implementation. This has been implemented in IOP and JBCT housing. At RCCC, no inmate is denied a request for access to medical or mental health care regardless of housing or classification. If an inmate request to see medical they can fill out a kite if it is not an emergency. If it is an emergency, officers notify medical or mental health.

3.   Response to Decompensation in Segregation

a)   If a prisoner in Segregation develops signs or symptoms of mental illness where such signs or symptoms had not previously been identified, suffers deterioration in his or her mental health, engages in self-harm, or develops a heightened risk of suicide, the prisoner shall immediately be referred for appropriate assessment and treatment from a qualified mental health professional who will recommend appropriate housing and/or programming.

Current practice.

b)   Jail staff shall follow a mental health recommendation to remove a prisoner from Segregation unless such removal poses a current safety risk that is documented. In such a case, the Commander or management-level designee shall be notified and staff shall work to remove the prisoner from Segregation and secure a placement in an appropriate treatment setting at the earliest possible time.

Current practice for nearly all mental health placements.  Full compliance with the acute unit and nearly universal compliance with the IOP unit.

**D.  Placement of Prisoners with Serious Mental Illness in Segregation**

1.   Prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit (2P, IOP, OPP) will not be placed in Segregation, but rather will be placed in an appropriate treatment setting – specifically, the inpatient unit or other Designated Mental Health Unit providing programming as described in **Exhibit A-2**.

Several programs available for SMI inmates. IOP, OPP, JBCT. Inmates are not segregated based on SMI

2.   In rare cases where a prisoner with a mental health condition meeting criteria for placement in a Designated Mental Health Unit presents an immediate danger or significant disruption to the therapeutic milieu, and there is no reasonable alternative, such a prisoner may be housed separately for the briefest period of time necessary to address the issue, subject to the following:

a) The prisoner shall receive commensurate out-of-cell time and programming as described in **Exhibit A-2** (including for IOP and OPP, 10 hours/week of group treatment/structured activities, 7 hours/week unstructured out-of-cell time, weekly individual clinical contact) with graduated programming subject to an individualized Alternative Treatment Program.

Current practice at RCCC and Main Jail. IOP no longer removes patients that are disruptive without clinical assessment and agreement by JPS. When patients are moved, they are placed on the case management protocol for JPS interaction and treatment.

iv. Privileges commensurate with the Designated Mental Health Unit program, unless modified in an Alternative Treatment Program based on individual case factors that are regularly reviewed.

Inmates in DMHUs housed without a cellmate receive program and recreation time with other inmates. Incentives programs are utilized as advised by JPS staff. They generally exceed the 17 hour minimum per our weekly reports. JPS determines when an inmate in these housing facilities must be housed in a solitary cell

v. Daily opportunity to shower.

Current practice. Hygiene opportunities are available during any recreation time and incentivised in some programs

3. A prisoner with Serious Mental Illness requiring restraints (*e.g.*, handcuffs, belly chains, etc.) shall not be denied clinically indicated group or individual treatment due to security factors, absent exceptional circumstances that are documented. Prisoners with Serious Mental Illness housed in Segregation who require restraints when out of cell shall have the opportunity to work their way out of restraints through graduated programming subject to an individualized Alternative Treatment Program.

Current custody practice.

E. **Administrative Segregation**

1. Use of Administrative Segregation

a) Only the Classification Unit can assign a prisoner to Administrative Segregation.

Current practice.

b) The County may use Administrative Segregation in the following circumstances:

i.   Objective evidence indicates that a prisoner participated in a recent assault and the assaultive behavior involved an assault on staff or visitors, serious injury, use of a weapon, gang removals, or multiple prisoner assaults. Mutual combat situations that do not otherwise qualify for Administrative Segregation are excluded.

Current practice.

ii.   During a brief investigative period not to exceed ten days while Classification staff attempts to verify the need for Protective Custody or while the prisoner is awaiting transfer to another facility.

Current practice

c)   The Compliance Commander shall have the authority to place prisoners in Administrative Segregation under the following circumstances:

i.   The prisoner poses an extraordinary safety risk and no other housing unit is sufficient to protect the prisoner from harm;

Current practice.

ii.   The prisoner has failed to integrate into a lesser restrictive housing setting because of repeated and recent history of assaultive behavior or current threats of violence associated with being in a lesser restrictive setting; or

Current practice.

iii.   Objective evidence indicates that the prisoner attempted to escape or presents an escape risk.

Current practice.

2.   Notice, Documentation, and Review of Administrative Segregation Designations

a)   The Classification Unit shall document the rationale for designating a prisoner for Administrative Segregation in the classification file using objective evidence. For prisoners younger than 24, the Classification Unit shall consider the prisoner's age as a mitigating factor when assigning the prisoner to Administrative Segregation.

Current practice as age is a potential mitigating factor to classification as an Administrative Segregation inmate. The Post Order regarding this topic has been approved.

b)  Classification shall attempt to down-class prisoners to a lesser restrictive housing setting at the earliest possible opportunity, consistent with safety and security.

Current practice.

c)  County shall provide prisoners in Administrative Segregation with a written notice within 72 hours of the prisoner's initial placement in Administrative Segregation, explaining the reasons for the prisoner's Administrative Segregation designation and how the prisoner may progress to a lesser restrictive housing setting.

Current practice at RCCC and Main Jail

d)  Prisoners housed in Segregation units will, at least every thirty (30) days, receive face-to-face interviews in a private out-of-cell setting, consistent with individual security needs, to discuss progress and compliance with their individual case plan as part of a classification review. Consideration will be given to their mental health and to their appropriateness for transfer to a less restrictive setting.

Current practice at RCCC and Main Jail

e)  The Compliance Commander or higher-ranked officer will review and approve the decision to designate a prisoner for Administrative Segregation for longer than 15 days.

Current practice.

f)  The County shall document the reason the prisoner is retained in the same Administrative Segregation Phase. The prisoner will be given written notice of the reasons the prisoner is being retained in the same Phase of Administrative Segregation and what conduct the prisoner is required to exhibit to progress to a lesser restrictive housing setting.

Current practice RCCC and Main Jail documents in inmate JIMS system, all inmate classification reviews including reasons for inmate to remain in current classification. Current practice. The Post Order regarding this topic has been approved.

g)  The Compliance Commander or higher-ranked officer must approve the continued retention of a prisoner in Administrative Segregation for longer than 90 days, and the Compliance Commander or higher-ranked officers must reauthorize such placement at least every 90 days thereafter.

This process has been implemented. The Post Order regarding this topic has been approved.

3.  Administrative Segregation Phases

a)  The County shall develop and implement a phased system for prisoners designated as Administrative Segregation to achieve a lesser restrictive housing setting.

Current practice. RCCC Classification Unit currently class interviews with all Phase 1 inmates on a face to face level and documents attempts to step inmate down into lower classification level. Official policy has been created. Will be a simplified practice with ATIMS

b)  Administrative Segregation Phase I:

i.   This is the most restrictive designation for prisoners in Administrative Segregation.

ii.  Prisoners shall be offered a minimum of one hour per day out of cell time for a total of seven hours per week.

Current Practice. Per TSEP SEGREGATION HOUSING POST ORDER, inmates receive 7 hours/week out of cell time. Currently monitored weekly with out of cell reports… with exception to inmates on COVID-19 Isolation

iii. Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least five of the seven hours per week.

Current Practice. Per TSEP SEGREGATION HOUSING POST ORDER, inmates receive 7 hours/week out of cell time. Currently monitored weekly with out of cell reports… with exception to inmates on COVID-19 Isolation

iv.  Prisoners shall not remain in Phase I for longer than 15 days unless the prisoner engages in new conduct warranting retention in Administrative Segregation as specified in **Section VIII.E.1.b.**

Current practice. RCCC and Main Jail currently conducts face to face classification interviews with all PHASE 1 inmates and documents either classification down or reasons why an inmate is to stay. The move from every 30 days to every 15 days has been implemented.

c)  Administrative Segregation Phase II:

a)      Prisoners shall be offered a minimum of 17 hours of out of cell time per week.

Current practice at RCCC and NMJ, montitored with weekly reports through WebJPF. Meeting criteria except for those subject to COVID-19 isolation procedures.

b)      Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least 10 of the 17 hours per week.

Current Practice. Inmates not in phase one receive a minimum of 17/week. Currently monitored weekly with out of cell reports… with exception to inmates on COVID-19 Isolation

c)      Prisoners shall be offered the opportunity to program in groups of two to four prisoners, unless pairing with another prisoner is not possible for safety or security reasons, and those reasons are documented by the County.

Current Practice. RCCC and Main Jail allows dayroom for inmates in cell settings to include multiple inmates except for inmates in PHASE 1.

d)      The County shall develop a program of incentives for good behavior.

Plans in place to identify low cost incentives, including eating meals outside of cells and lower restrictive housing.

e)      Prisoners shall not remain in Phase II for longer than 30 days unless the prisoner commits a serious behavioral violation while in Administrative Segregation: fighting; threatening staff or other prisoners; resisting or delaying an order from staff that impedes Jail operations (e.g., failure to lock down); refusing to submit to a search of person or property; destroying or damaging Jail property (excluding property issued to a prisoner and/or minor defacing of property or destruction of low-value property) or facilities; possessing contraband that implicates safety or security (e.g., weapons, razors, unauthorized medication, but not extra clothing, commissary items, or food); cell flooding; tampering with cell locking mechanisms or other security features (e.g., cameras); and/or sexual activity/harassment.  In the event a prisoner engages in a serious behavioral violation, the conduct will be referred to the Classification Sergeant or higher-ranking officer, who shall have the discretion to extend the prisoner's Phase II time by 15 days, and shall develop an individual behavioral management plan, if one does not yet exist, for the prisoner.

RCCC and Main Jail currently practice a 30 day classification interview process and documents either a class to a lower level or reasons why an inmate is to stay at current level.

F.   **Protective Custody**

1.   When a prisoner faces a legitimate threat from other prisoners, the County will seek alternative housing, by transferring the threatened prisoner to the general population of another facility or unit, or to a special-purpose housing (Protective Custody) unit for prisoners who face similar threats.

Current Practice. Inmates who face threats from other inmates are transferred to other housing units of the same classification and not automatically classed to a higher security level.

2.   The County will not operate Protective Custody units with Segregation-type conditions of confinement. Prisoners placed in Protective Custody shall have the same programs and privileges as general population prisoners, absent exceptional circumstances that are documented.

Current Practice. RCCC currently has re-entry programs for PC classifications and dorm style housing units with open dayroom.

3.   The County shall create a policy that describes the process and criteria for placement of prisoners into Protective Custody. The County shall consult with Plaintiffs to develop such a policy.

Policy yet to be developed.

4.   Prisoners who are lesbian, gay, bisexual, transgender, or intersex (LGBTI) or whose appearance or manner does not conform to traditional gender expectations should not be placed in Segregation or Protective Custody solely on the basis of such identification or status, or because they are receiving gender dysphoria treatment.

Current Practice.

a)   When a prisoner who is LGBTI or gender nonconforming faces a legitimate threat, the County shall identify alternative housing, with conditions comparable to those of general population. Privileges and out-of-cell time for this population will be documented and regularly reviewed by supervisory level staff to ensure appropriate housing, out-of-cell-time, and related conditions for this group of prisoners.

TGNI inmates not able to house in general population are placed in protective custody. Out of cell priveleges are commensurate with most general population prisoners.

b)  In deciding whether to assign a transgender or intersex prisoner to a facility or program for male or female prisoners, the County shall consider on a case-by-case basis whether a placement would ensure the prisoner's health and safety, and the health and safety of other prisoners, giving serious consideration to the prisoner's own views.

Current practice.

c)  Jail staff will receive training on the unique issues of managing transgender prisoners, with refresher training at least bi-annually.

A lesson plan and PowerPoint has been implemented for the topic of Cultural Awareness, which covers managing transgender prisoners.  This training will be provided in the Adult Corrections Officer Supplemental Core Course starting 2021 with all new hires. This course will  be transitioned into an online bi-annually refresher training.

5.  For prisoners who are LGBTI or whose appearance or manner does not conform to traditional gender expectations, the County shall identify the prisoner's preferred gender of jail staff who will perform searches of the prisoner.  The County shall honor the request except in exigent circumstances when doing so is not possible.

Current practice.  Statement of preference form completed by TGNI prisoners allowing them to request the gender of searching officer.

G.  **Disciplinary Segregation**

1.  The County will not place a prisoner in disciplinary housing pending investigation of, and due process procedures for, an alleged disciplinary offense unless the prisoner's presence in general population would pose a danger to the prisoner, staff, other prisoners or the public.

Current practice.

2.  The County will adhere to a discipline matrix, developed in consultation with Plaintiffs, that clearly defines when disciplinary housing may be imposed.

Current practice.

3.   Prisoners who are found to have violated disciplinary rules following due process procedures will be placed in Segregation only after the County has determined that other available disciplinary options are insufficient, with reasons documented in writing.

Current practice. If an inmates discipline warrants a segregation he/she will be moved to that housing and it is documented.

4.   The denial of out-of-cell time for more than four (4) hours will not be imposed as a sanction absent a formal disciplinary write-up and due process hearing.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

5.   Prisoners serving a Disciplinary Segregation term shall receive at least seven (7) hours per week of out-of-cell time. Out-of-cell time with the opportunity to exercise shall be provided to each prisoner one (1) hour a day, seven (7) days per week.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

6.   Prisoners in Disciplinary Segregation shall, absent an individualized assessment of security risk that is documented be provided at least one book (which prisoners may regularly exchange), legal documents, hygiene materials, legal phone calls, and legal visits.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

7.   No Disciplinary Segregation term for non-violent rules violations will exceed 15 days.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

8.   The County will, in consultation with Plaintiffs' counsel, modify its inmate discipline policy and practice to limit placements in Disciplinary Segregation conditions to no more than 15 days, absent cases of serious violations stemming from distinct incidents and with Watch Commander-level approval.

Current practice, contained in Discipline Housing Post Order.

9.   No prisoner shall be placed in Disciplinary Segregation for more than 30 consecutive days.

Current practice, contained in Discipline Housing Post Order.

10. If after a Disciplinary Segregation term, Jail staff, with the input of a mental health clinician, determine that the prisoner cannot safely be removed from Segregation, placement on Administrative Segregation status may occur only subject to the process set forth in **Section VIII.E.**

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

11. Once a prisoner has been moved out of Disciplinary Segregation, that prisoner shall not be placed back into Disciplinary Segregation absent (a) a new incident warranting discipline, and (b) completion of all mental health review procedures required for new Segregation placements.

Current practice, contained in Discipline Housing Post Order.

H. **Avoiding Release from Jail Directly from Segregation**

1. The County will avoid the release of prisoners from custody directly from Segregation-type housing, to the maximum extent possible.

Current practice. This has been added to Administrative Segregation Post Order

2. If a sentenced prisoner housed in Segregation has an upcoming expected release date (i.e. less than 120 days), the County will take and document steps to move the prisoner to a less restrictive setting, consistent with safety and security needs. If Segregation becomes necessary during this time, the County will provide individualized discharge planning to prepare the sentenced prisoner for release to the community.

Current practice.

I. **No Food-Related Punishment**

1. The County shall modify its policy and take steps to ensure that the denial or modification of food is never used as punishment. The County shall eliminate use of "the loaf" as a disciplinary diet. Nothing in this paragraph shall be read to preclude the County from denying a prisoner use of the commissary.

Current practice.

J. **Restraint Chairs**

1.  Restraint chairs shall be utilized for no more than six hours.          Current practice.

2.  The placement of a prisoner in a restraint chair shall trigger an "emergent" mental          Current practice.
    health referral, and a qualified mental health professional shall evaluate the prisoner to
    assess immediate and/or long-term mental health treatment needs.

3.  The opinion of a qualified medical professional on placement and retention in a          Current practice.
    restraint chair will be obtained within one hour from the time of placement.

IX.     **QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT**

A. **Generally**
B. **Quality Assurance, Mental Health Care**
C. **Quality Assurance, Medical Care**