1  | **LISA A. TRAVIS, County Counsel**
2  | **RICK HEYER, Supervising Deputy County Counsel**
     **[State Bar No. 216150]**
3  | **COUNTY OF SACRAMENTO**
     **700 H Street, Suite 2650**
     **Sacramento, CA  95814**
4  | **Telephone:  (916) 874-7538**
     **Facsimile:  (916) 874-8207**
5  | **E-mail:  heyerr@saccounty.net**
     **File No.:  126602-000012**
6  |
7  | **Attorneys for County of Sacramento**

8  | **IN THE UNITED STATES DISTRICT COURT**
     **EASTERN DISTRICT OF CALIFORNIA**
9  | **SACRAMENTO DIVISION**

10 | **LORENZO MAYS, RICKY**            | **Case No. 2:18-cv-02081 TLN KJN**
     **RICHARDSON, JENNIFER BOTHUN,**
11 | **ARMANI LEE, LEERTESE BEIRGE, and**
     **CODY GARLAND, on behalf of themselves** | **JUDGE: Hon. Kendall J. Newman**
12 | **and all others similarly situated**

13 | **Plaintiffs,**                   | **FILING OF FIFTH COUNTY STATUS**
                                          **REPORT PURSUANT TO PARAGRAPH**
14 | **vs.**                            | **12 OF THE CONSENT DECREE**

15 | **COUNTY OF SACRAMENTO**

16 | **Defendant.**

17 |

18 |        Paragraph 12 of the Consent Decree in this matter requires the County to provide

19 | Plaintiffs' counsel and the Court appointed subject matter experts with a status report no later

20 | than 180 days from the approval of the proposed decree.  In compliance with this requirement,

21 | the County provided the "Fifth Status Report; Mays Consent Decree" on June 17, 2022 to the

22 | subject matter experts and the attorneys monitors from the Prison Law Office and Disability

23 | Rights California.  Attached to this filing is that status report.

24 | DATED: _____June 16, 2022_____        LISA A. TRAVIS, County Counsel
                                             Sacramento County, California
25 |

26 |                                       By: _____
27 |                                          Rick Heyer
                                             Supervising Deputy County Counsel
28 | 2350713

                                          -1-

ATTACHMENT 1 -
Correctional Health and Jail
Psychiatric Services Report



Primary Health Division
Department of Health Services

# Adult Correctional Health
# REMEDIAL PLAN STATUS REPORT
## June 14, 2022

## Table of Contents

INTRODUCTION ................................................................................................................................. 3

POLICY STATUS OVERVIEW .............................................................................................................. 5

COMPLIANCE DEFINITIONS & RATINGS ........................................................................................... 6

CHALLENGES IMPACTING REMEDIAL PLAN WORK .......................................................................... 8

GENERAL PROVISIONS [Remedial Plan Section II] ......................................................................... 16

ELECTRONIC HEALTH RECORD (E.H.R.) [Remedial Plan Section VI & IV] ...................................... 22

AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE ........................................................... 23

MEDICAL CARE [Remedial Plan Section VI] .................................................................................... 29

MENTAL HEALTH CARE [Remedial Plan Section IV] ....................................................................... 45

SUICIDE PREVENTION [Remedial Plan Section VII] ........................................................................ 53

SEGREGATION/RESTRICTED HOUSING [Remedial Plan Section VIII] .............................................. 59

QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT ................................................. 61

JAIL FACILITY NEEDS ...................................................................................................................... 64

COUNTY EFFORTS TO REDUCE THE JAIL POPULATION ................................................................. 65

ATTACHMENT 1 – MAYS POLICY TRACKING CHART

# INTRODUCTION

Background

The Consent Decree was approved by the federal court on January 13, 2020.

Every 180 days, the county is required to issue a status report which is sent to Class Counsel and the appointed medical and mental health experts. In addition to the status report, experts each complete document requests, conduct site visits, and provide feedback in an ongoing manner through electronic mail and/or meetings as requested.

This report covers the period of January 1, 2022 – June 14, 2022.   This is the fifth county status report.

Facilities

The adult correctional facilities consist of two jails, the Main Jail (MJ) located downtown and the Rio Cosumnes Correctional Center (RCCC) located in Elk Grove.

|  | MJ | RCCC |
|---|---|---|
| Year Opened | 1989 | 1960 |
| Location | 651 I Street | 12500 Bruceville Road |
| Rated Capacity | 2,380 | 1,625 |

The Sacramento Sheriff's Office (SSO) has overall responsibility and management for the jails. Department of Health Services (DHS), Primary Health Division provides health care services (physical health/behavioral health) through county and contracted staff working in partnership with SSO.

The average daily population (ADP) of the jail facilities has almost returned to pre-pandemic levels.  In April 2022, there were 3,355 individuals incarcerated at the jails – 1,898 at MJ and 1,457 at RCCC.

The jail population has many health care needs with higher rates of chronic health conditions, serious mental illness (SMI), and substance use disorders (SUD).

Overview

This report covers Adult Correctional Health's overall progress toward meeting Consent Decree requirements with emphasis on developments during the current monitoring period.  The report outlines challenges impacting remedial plan work, progress on remedial plan provisions in the

3

following areas: general, medical, mental health, and suicide prevention, and brief updates on facilities and county efforts to reduce the jail population.

Progress

Significant progress has been made in certain areas.  Examples include quality improvement monitoring and policy development (see "Policy Status Overview" section for details).

Another area of significant progress has been training.  Suicide Prevention pre-service and refresher training courses were developed and approved by Class Counsel and Experts.  Refresher training sessions have been provided throughout the monitoring period and pre-service training started in June 2022.  Training on the WPATH Standards of Care for transgender and gender non-conforming health care was developed and will be finalized after receipt of feedback from Mental Health and Suicide Prevention Experts.

Additional detail on these and other areas of substantial progress is provided in the individual sections of this report.

Challenges

Significant challenges have slowed the county's progress toward remedial plan compliance. Ongoing workforce shortages have made it difficult to fully implement some of the policies and practice changes that are necessary for remedial plan compliance.  Space limitations have negatively impacted service provision and patient confidentiality.  COVID-19 pandemic operations have continued to add a layer of difficulty in maintaining patient safety and providing timely access to care.

See the "Challenges Impacting Remedial Plan Work" section for details on these and other challenges.

Implementation

Implementation is not a smooth, linear process.  Staff continually work within a framework of human resource limitations, insufficient space for treatment and staff, and expending considerable resources on daily COVID-19 operations.

Change is constant, overlapping, and dynamic while navigating the remedial plan and COVID-19 changes.   The fundamental nature of this accelerated change process is not the most conducive for staff to absorb and integrate.

What does this mean?  There are delays in access to services, starting certain programs, or uneven performance.  Currently there is insufficient staff and space to support requirements within the remedial plan.  There are too many provisions within the remedial plan to work on all provisions simultaneously.  Managers and staff are doing the best they can to navigate this complex array of overlapping change amidst staffing shortages, space constraints, and continually evolving pandemic operations.

4

ACH continues to work toward remedial plan compliance.

## POLICY STATUS OVERVIEW

Each policy drafted is reviewed by Class Counsel and designated experts.  All experts review certain policies.  For staff, the policy draft may include significant changes in workflow, forms, electronic health record templates, reporting, etc. It is not just a "policy revision."  Some policies have a phased-in implementation due to staffing, equipment, or other needs.

<u>Status</u>

Staff has completed new policies and/or policy revisions to address remedial plan provisions in all major areas.  A snapshot of policy work through June 13, 2022 is depicted in the following tables.  See shaded rows for policies pending review.

| ACH Policies | Total Policies |
|---|---|
| Finalized | 34 (69%) |
| In Process (Revision/Development) | 1 (2%) |
| Pending Class Counsel or Expert review | 14 (29%) |
| Total | 49 (100%) |

*ACH Policies – includes administration, medical and joint policies.*

| ACH Provider Treatment Guidelines | Total Provider Guidelines |
|---|---|
| Finalized | 0 |
| Pending Medical Expert review | 4 (100%) |
| Total | 4 (100%) |

| ACH Standardized Nursing Procedures (SNP) | Total SNPs |
|---|---|
| Finalized | 4 (9%) |
| Pending Medical Expert review | 41 (91%) |
| Total | 45 (100%) |

*Note: SNPs describe specific RN actions (RN to manage, requires consult with provider, or emergency stabilization needed) vs. categorization of low, medium and high risk.*

| Mental Health | Total Policies |
|---|---|
| Finalized | 5 (19%) |
| In Process (Revision/Development) | 0 |
| Pending Class Counsel or Expert review | 22 (81%) |
| Total | 27 (100%) |

65% (81 of 125) of policy documents submitted are pending Expert review.  See Attachment 1 "Mays Policy Tracking Chart" for additional detail.

## COMPLIANCE DEFINITIONS & RATINGS

Experts rate compliance on each provision.   The following are definitions for compliance measurement for each of the provisions in this Remedial Plan:

Substantial Compliance indicates compliance with most or all components of the relevant provision of the Remedial Plan for both the quantitative (e.g., 90% performance measure) and qualitative (e.g., consistent with the larger purpose of the *Decree*) measures. If an individual compliance measure necessitates either a lower or higher percentage to achieve substantial compliance, it will be so noted by the expert. Compliance has been sustained for a period of at least 12 months.

Partial Compliance indicates compliance achieved on some of the components of the relevant provisions of the Remedial Plan, but significant work remains.  A minimum requirement is that for each provision, relevant policies and procedures must be compliant with Remedial Plan requirements, contain adequate operational detail for staff to implement the policy, staff are trained, and the County has begun implementation of the policy.

Non-Compliance indicates that most or all of the components of the relevant provision of the Remedial Plan have not yet been addressed and/or have not yet been met.

When reviewing each expert report, there is variability in rating methodology.  Medical Experts rate each indicator within a provision separately.  Mental Health and Suicide Prevention Experts rate some indicators as a group but others individually.  Adult Correctional Health rates each provision but does not rate each indicator.

Experts have each submitted two monitoring reports as of June 2022.  Anticipate receiving third monitoring reports soon.  See the tables below for a summary of Experts' compliance ratings over the first two monitoring periods.

### MEDICAL EXPERT REPORTS

| Medical | Jan 2021 1st Report | Oct 2021 2nd Report | Net Change |
|---|---|---|---|
| Substantial | 5% | 16% | + 11% |
| Partial | 20% | 25% | + 5% |
| Noncompliance | 52% | 49% | + 3% |
| Not Evaluated | 23% | 9% | N/A |

Moved from 25% to 41% with partial/substantial completion across the two monitoring periods.

Medical Experts included a summary table with 75 indicators and rated each indicator within a provision separately.  Example: Nurse Intake provision has seven indicators for ratings.

### SUICIDE PREVENTION & MENTAL HEALTH EXPERT REPORTS

| Suicide Prevention | Jan 2021<br>1st Report | Oct 2021<br>2nd Report | Net Change |
|---|---|---|---|
| Substantial | 0% | 0% | N/A |
| Partial | 84% | 83% | -1% |
| Noncompliance | 16% | 17% | -1% |
| Not Evaluated | 0% | 0% | N/A |

Suicide Prevention expert included a summary table containing 63 provisions.  Some indicators are rated as a group.  Example: Nurse Intake Provision C. has five indicators but rated as one item.

| Mental Health | Jan 2021<br>1st Report | Oct 2021<br>2nd Report | Net Change |
|---|---|---|---|
| Substantial | 0% | 0% | N/A |
| Partial | 58% | 55% | -3% |
| Noncompliance | 21% | 37% | -16% |
| Not Evaluated | 21% | 8% | N/A |

Mental Health expert included a summary table in the first report indicating a total of 91 provisions – however listed 35 provision ratings with 3 provisions not assessed. The second monitoring report did not include a summary table but contained the 35 rated provisions with 3 provisions not assessed.

Per the First Monitoring Report, the Mental Health SME stated, *"This total was computed by adding major (e.g., IV.B) and substantial sub-major (e.g. IV.A.2) areas of the Remedial Plan."*

### ACH STATUS REPORTS

| ACH Status Reports | | |
|---|---|---|
| # | Monitoring Period | Date Submitted |
| 1 | Jan – Jun 2020 | 07/10/2020 |
| 2 | Jul – Dec 2020 | 01/05/2021 |
| 3 | Jan – Jun 2021 | 06/23/2021 |
| 4 | Jul – Dec 2021 | 01/14/2022 |
| 5 | Jan – Jun 2022 | 06/14/2022 |

## CHALLENGES IMPACTING REMEDIAL PLAN WORK

Work on the remedial plan is intensive and difficult due to many ongoing challenges.  These include work force issues, lack of sufficient space, COVID-19 pandemic operations, and the time consuming feedback process.

| Work Force Issues |
| --- |

Staff shortages and work force issues continue to present significant challenges impacting service access and full implementation of some remedial plan requirements.  These are detailed below.

Leadership and Specialized Positions

All ACH leadership positions have been filled.

- Health Services Administrator – Began work mid-January 2022.
- Training Coordinator – Appointed to role late January 2022. Transition of assignments has been gradual due to a vacant QI RN position.
- Case Management Supervisor – Began work late March 2022.
- EHR Administrator – Began work mid-April 2022.
- MH Leadership Restructure – Completed last monitoring period.  MH team is more responsive to requests and work is proceeding on policies, quality improvement activities and training.

The DHS Primary Health Division Deputy Director had planned to retire at the end of July.  This has been postponed while she functions as the Interim DHS Director who will maintain oversight of the Primary Health Division.  Recruitment is in process for both positions.  This manager has been the lead on the Consent Decree planning and policy work.  A QI Director position was requested at budget (June 2022).  This manager will take over lead of the remedial plan work as well as the continued evolution of the quality improvement program and compliance activities.  Recruitment, orientation, and onboarding of the QI Manager will take time.

Recruitment

Recruitment and hiring of licensed medical and mental health staff is an *ongoing challenge* due to market demands for licensed health care and mental health personnel.  Staff are competing with local large hospital systems and the prison system.  Nursing and mental health staff report some long term staff have been leaving employment.  Some departures are due to retirement and others are due to the magnitude of changes and the pressures of the remedial plan expectations.

- Physicians - Negotiations for the new contract began in late April 2022 and expect to conclude in late June/early July.  Recruiting full-time physicians continues to be a challenge in spite of the enhanced economic package.

- <u>Registered Nurses (RN)</u> - The labor agreement for registered nurses was negotiated and went to the Board in November 2021.  Part of the economic package became effective in January 2022.  There has been some improvement in hiring but there are still considerable vacancies.  Negotiations are in process with closure anticipated in June.
- <u>Health Services</u> - A Labor Agreement representing several healthcare disciplines began in March 2022 and should be completed in June. This particular labor group includes LVN positions which currently has a high vacancy rate.
- <u>Mental Health</u> - Mental health contractor also reports ongoing challenges with staff recruitment.  The Department of Psychiatry and Behavioral Sciences has been working with MH to expand recruitment efforts and increase outreach by posting on professional job boards for licensed social workers and psychologists.  Additionally, MH staff have participated at a large forensic conference to provide recruitment information to participants and has plans for recruitment efforts at the American Psychiatric Association and National Commission on Correctional Health Care conferences.

Staff will begin planning for a job fair tailored for correctional health disciplines post labor agreement negotiations.

See the General Provisions Staffing Section for information on positions and vacancies.

<u>Custody Escorts</u>

There are insufficient escorts to ensure access to health and mental health services.  Dedicated, trained escorts would be ideal for all health services (medical, dental, mental health) and pill call.

<u>Change Management / Culture Change</u>

There is overlapping significant change which impacts staff ability to absorb information and roll out training.  Some employees are resistant to the new standards of patient centered care, which means supervisors face challenges of training, coaching, and/or personnel actions.  In order to assist with the culture change and accountability, the following have been developed:

- <u>Position Standards</u> have been developed for many positions.  Some were modified or added during this monitoring period.
- <u>ACH Code of Conduct</u> and <u>Safety & Security Guidelines</u> forms requiring review/signature were created for all new hires and articulate standards.
- <u>Personnel Evaluations</u> are required for staff annually and for staff on probation.
- <u>Policy and Procedure Manuals</u> are in various stages of development.  All policies are posted on the intranet for staff reference.  This is a continual process.
- <u>Staff Development & Training Policy</u> is updated as training is developed.  A shared drive has also been created for materials.  Managers introduced more training during this period.  Department of Technology (DTech) developed and modified a program called Pro-LiST.  The Pro-LiST application interfaces with the Department of Consumer Affairs' BreEZe system to retrieve up-to-date license information.  Managers and designated staff can also input data on other staff licensure, testing, training, and vaccination information

and pull reports. Application updates to allow entry and tracking of testing, training, and vaccination information went live mid-November 2021, however, staff have reported functionality problems. Staff are working on solutions.

- <u>Quality Improvement</u> structure was developed and continues to be modified. Staff monitor the timeliness and effectiveness of specific areas concerning health care service provision, ensuring that all are reviewed at least annually, and recommend corrective action for all deficiencies. Since its inception, committees, staffing, and reports have been expanded. Meeting forums include: Quality Improvement Committee, Mental Health Subcommittee, Suicide Prevention Subcommittee, Pharmacy & Therapeutics, Safety, and Utilization Management.

- <u>Data tracking and reports</u> continue to be phased in. The electronic health record (EHR) continues to have limitations. The new E.H.R. Administrator began work in April 2022. Having stable leadership with project management skills will be invaluable.

- <u>Communication</u> efforts are varied. All policies and forms are posted on a dedicated ACH intranet page, a program newsletter is distributed to staff monthly, managers are expected to have consistent staff meetings, there are regular and ad hoc meetings with custody, and mental health staff are adding Multidisciplinary Team (MDT) Meetings. Managers are working to integrate culture change and specific remedial plan changes into different venues. This is a lot of material to absorb and is a clear change from a prior status quo culture.

- <u>Consent Decree Training</u> was provided to medical/mental health staff and will continue on an ongoing basis. Service line directors report this training is helpful for staff to see the context of change and how it impacts all disciplines.

---

**Space**

---

Sufficient space to provide the necessary health and mental health services within the remedial plan is a major challenge. The jails were built pre-ADA and pre-HIPAA and medical/MH areas were not designed as "treatment" or "clinic" space. Appropriate space within the jail facilities is extremely limited and requires construction or additional space. More exam rooms and treatment spaces (individual/group) are needed.

Changes that occurred at the Main Jail:

- New nursing station at Main Jail 2 East.
- Completed the interview cubicles across from Nursing station at 2E.
- Converted the Medical records room at 2E into Physician exam room. This room is also used by Physical Therapy clinic once a week.
- Provider charting room at Main Jail on 2 Medical.
- Nurse Intake in the Main Jail booking will undergo major change including computer stations, larger interview cubicles with privacy barriers, sound machines, individual scanners for documents, and some space for supplies.

- Specialty clinics – installed new cabinets and new ophthalmology/optometry equipment.
- Removed excess medical supplies/equipment in hallways, medical exam rooms, specialty clinics and moved them into a storage unit created at 711 G St.

Changes that will occur in the new monitoring period:

- Nurse Intake room modification is in process.  The next phase of the project includes replacing flooring, improving workstations, and installing cabinets by July 2022.
- Replace/repair and re-key all cabinets for medical exam rooms on all floors is expected to begin in July.
- Will begin some RCCC projects.

ACH/SSO staff had a series of meetings to review interim plans to move the Acute Psychiatric Unit from 2P to the 3rd floor.  Interim plans also include relocating the existing Intensive Outpatient Program (IOP) to another unit so each will have some confidential space. Department of General Services secured a contractor to assess feasibility (cost-benefit).  If the move of Acute Psychiatric Unit is possible, beds will increase from 17 to 38 (ten of these cells are now used for inmates who are suicidal and require close monitoring).  It would also free up 2P space to serve as a close observation unit for medical staff.   This is especially needed for withdrawal management and other medical conditions requiring frequent monitoring.  This space is adjacent to medical housing and the nursing station. The feasibility study has been completed and is pending County leadership review for recommendations.

Administrative staff and certain medical/mental health staff will be relocated to a building on G Street near the Main Jail.   The space has two conference rooms and storage for medical supplies.  Supplies were moved in April, administrative staff will move at the end of June/first week of July.

Space is also addressed in the Medical and Mental Health sections and in the planning section at the end of this report.

| COVID-19 Management |
| --- |

Overall, the pandemic has greatly affected staff resources, use of space, and timely access to care due to challenges with providing services while maintaining infection prevention protocols.  Staff efforts in managing the pandemic are focused and continue to evolve.

Staff developed the initial COVID-19 Staff Guidance on March 2, 2020 and began COVID-19 management strategies with SSO.  Staff completed the latest revision of the staff guidance on 6/6/2022. In addition to the main guidance, there are several other COVID-19 related documents on the ACH COVID-19 Webpage.  These serve as key resource materials for staff.

COVID-19 management strategies are team-based. There continues to be extensive collaboration with SSO on daily management including regular meetings to review progress, obstacles, and

changes in practice.  ACH leadership consults with Public Health on a regular basis.  Data is provided weekly and posted on the SSO website.

Management strategies have continued to evolve over this monitoring period.  As the average daily population (ADP) increased, it has placed pressure on staff.  A large amount of space is utilized for designated COVID-19 housing (intake quarantine, close contact quarantine, suspect isolation, and case isolation).  The lack of adequate space and population pressures contributed to the outbreak during this monitoring period.

An "Omicron" outbreak was identified the week of January 12, and resolved in mid-March.  Staff identified the outbreak early and initiated multiple actions.  However, Omicron was far more contagious with a very short incubation period. It impacted inmates and staffing for all disciplines.

COVID-19 data continues to be important for monitoring.   Reports include Average Daily Population, the weekly COVID-19 Dashboard, and vaccinations.

Average Daily Population (ADP)

During the COVID-19 pandemic, the adult jail facilities population was dramatically reduced through several court orders and population reduction strategies.  The lowest ADP total following early court releases was 2,418 in May 2020.  The population has been gradually increasing and has returned to pre-pandemic levels.  The average ADP YTD is 3,259.

| Fiscal Year | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|-------------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2019/20 | 3,586 | 3,655 | 3,751 | 3,720 | 3,605 | 3,501 | 3,512 | 3,546 | 3,336 | 2,539 | 2,418 | 2,475 |
| 2020/21 | 2,616 | 2,833 | 3,016 | 3,201 | 3,148 | 3,255 | 3,231 | 3,299 | 3,366 | 3,307 | 3,062 | 3,049 |
| 2021/22 | 3,030 | 3,157 | 3,150 | 3,196 | 3,329 | 3,371 | 3,312 | 3,350 | 3,338 | 3,355 | | |



COVID-19 Data Dashboard was developed in August 2020.  This information depicts point-in-time data and is updated weekly.  The data has been important for monitoring, retooling efforts, and communication.  The latter occurs within the county and is also sent weekly to Class Counsel and experts.

| |
|---|
| Weekly COVID-19 Data as of June 8, 2022 |
| Total number of COVID-19 tests since March 2020: 39,690 *(Net increase = 561)* |
| Total number of confirmed COVID-19 cases since March 2020: 3,593 *(Net increase = 28)* |
| Total number of confirmed COVID-19 cases during the intake observation/quarantine period since March 2020: 785 *(Net increase = 9)* |
| Total number of COVID-19 positive inmates currently in custody: Main Jail – 33  / RCCC – 0 |
| Total number of COVID-19 related deaths: 3 |
| SSO COVID-19 Link: *https://www.sacsheriff.com/pages/covid19.php* |
| Net Increase in COVID-19 tests reflects tests to inmates.  It does not reflect employee testing due to approved exemptions or lack of booster. |

As community transmission increased due to the Omicron variants, staff began to identify more confirmed cases.  This is clearly depicted on the following charts for the period of January 2022 – June 2022.  See increase noted on June 8, 2022.







During the entire pandemic there have been three outbreaks to date – pre-vaccination, Delta, and Omicron.  While less severe, Omicron has posed challenges due to short incubation period and highly contagious nature.

COVID-19 Vaccination process began for staff late January and inmates March 2021.  Vaccination is critical to maintaining a safe working environment for patients, inmates, staff, and visitors.

Inmate Vaccination Data

Staff began a COVID-19 Inmate Vaccination Incentive Program in late July 2021 and amended the program on 09/14/21, 10/25/21 and 12/29/21 with the goal to increase vaccination efforts.  The Infection Prevention Team notifies SSO Vaccine program contacts of vaccinations and SSO deposits the incentive in the inmate's account.

| Inmate Vaccination Program Incentive Amount | | |
|---|---|---|
| **Vaccine Type** | **Inmates** | **Inmate Workers** |
| One Dose (Janssen) | $20 for the completed single dose. | $40 for the completed single dose. |
| Two Dose (Moderna/Pfizer) | $10 for each completed dose within the two dose series. | $20 for each completed dose within the two dose series. |
| Booster | $10 for the completed dose | $20 for the completed dose |

As of 06/08/22, 3,051 inmates received at least one COVID-19 vaccine dose.  All inmates are eligible and encouraged to receive vaccinations including booster doses.  Staff also complete the vaccination series for inmates who transfer to the jails partially vaccinated.

| Facility | Total Patients | Total Doses | Completed Vaccine Series | | | Fully Vaccinated Patients | Booster Doses |
|---|---|---|---|---|---|---|---|
| | | | Moderna | Janssen | Pfizer | | |
| MJ | 1,812 | 2,456 | 603 | 931 | 73 | 1,607 | 162 |
| RCCC | 1,239 | 1,696 | 449 | 628 | 23 | 1,100 | 177 |
| Total | 3,051 | 4,152 | 1,052 | 1,559 | 96 | 2,707 | 339 |

*This is a cumulative number since the inmate vaccination program began on 01/29/21.  Total includes inmates who are no longer incarcerated.*

Due to the high rate of jail releases, staff also periodically review point in time census vaccination data.

**Point in Time 05/25/22 (Daily Population = 3,386)**

**26%** of the daily population received at least one vaccination with most having completed the vaccination series. **24%** of the daily population are fully vaccinated.

|  | Main Jail | RCCC | Total |
|---|---|---|---|
| Received at least one vaccine dose | 502 | 380 | 882 (26%) |
| *Completed vaccine series* | 462 | 355 | 817 (24%) |

**Point in Time by LOS**

Of the 882 who received at least one dose of the COVID-19 vaccine, **88%** have been in custody for more than 30 days.

| Inmates who Received at Least One Vaccine Dose Length of Stay | | | |
|---|---|---|---|
|  | Main Jail | RCCC | Total |
| 0 – 15 days | 59 | 0 | 59 (7%) |
| 16 – 30 days | 35 | 17 | 52 (5%) |
| 31 – 60 days | 38 | 37 | 75 (9%) |
| 61 - 90 days | 24 | 40 | 64 (7%) |
| 91+ days | 346 | 286 | 632 (72%) |
| Total | 502 | 380 | 882 (100 %) |

Staff Vaccination Data

During this monitoring period, State Department of Public Health issued an order for mandatory vaccination and/or qualified exemptions with weekly testing.  This went into effect 8/19/21 with full compliance by 10/14/21.  Department of Personnel utilizes software called *Qualtrics* for staff to upload vaccination verification and weekly testing results for exempt workers.

Periodically, staff complete a vaccination report.  The last report was on 05/31/22.

| ACH County & Contracted Staff | Percentage Vaccinated |
|---|---|
| Medical | 93% |
| Admin staff based onsite | 100% |
| Admin staff based offsite but go onsite | 100% |
| Registry staff / Contractors | 92% |
| Mental Health staff | 95% |

The order was amended 12/22/21 requiring vaccination boosters for all workers within the correctional facilities with full compliance by 2/1/22.  Unvaccinated exempt workers and booster eligible workers who have not yet received a booster are required to complete weekly testing.

The order was again updated 02/22/22 to permit workers who completed the primary series vaccination and had a recent infection to defer booster dose by up to 90 days from infection.

Link to the State Public Health Order:

https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Correctional-Facilities-and-Detention-Centers-Health-Care-Worker-Vaccination-Order.aspx

## GENERAL PROVISIONS [Remedial Plan Section II]

| Staffing (Section II. Provisions A.B.) Status:  Partial Compliance |
| --- |

Per County's agreement with Class Counsel, there is a multi-year staffing plan.  County began to add staff and/or contract augmentations prior to the finalization of the Consent Decree (January 2020).   The following tables outline staffing enhancements to date by fiscal year.

| Health Care Staffing Augmentation | |
| --- | --- |
| Fiscal Year | Staffing |
| FY 2018/19 (Midyear) | 12 FTEs<br>• 1 FTE Physician<br>• 1 FTE Dentist<br>• 1 FTE Pharmacist<br>• 1 FTE Pharmacy Technician<br>• 4 FTE Registered Nurses (RN)<br>• 4 FTE Licensed Vocational Nurses (LVN) |
| FY 2019/20 | 12.0 FTEs<br>• 4 FTE Quality Improvement (QI) Team –<br>  1 Planner, 1 RN, 2 Administrative Services Officer I<br>• 4 FTE – 2 Physicians, 2 Medical Assistants (MA)<br>• 2 FTE Supervising RNs<br>• 2 FTE Senior Office Assistants (SROA) |
| FY 2020/21<br><br>*Budget hearings were delayed until September.* | 13.0 FTEs<br>• 2 FTE Physicians *(midyear)*<br>• 5 FTE Registered Nurses (3 sick call, 1 discharge planning, 1 chronic care)<br>• 1 FTE Medical Assistant<br>• 1 FTE Dental Hygienist (replaces registry staff)<br>• 1 FTE Pharmacist<br>• 1 FTE Pharmacy Technician<br>• 1 FTE Administrative Services Officer III (Electronic Health Record)<br>• 1 FTE Administrative Services Officer II (Contracts) |

16

| Health Care Staffing Augmentation | |
|---|---|
| Fiscal Year | Staffing |
| FY 2021/22 | 29.0 FTEs<br>• 2.0 FTE Supervising Registered Nurse (Infection Prevention Coordinator to replace behind the RCCC SRN position / Nurse Educator)<br>• 6.0 FTE Registered Nurses (Sick Call – 2, Chronic Care – 3, QI - 1)<br>• 9.0 FTE Licensed Vocational Nurses (Infection Prevention – 2, Pill Call - 2, Pill Call/Medication Assisted Treatment Program – 4, Discharge Planning -1)<br>• 1.0 FTE Medical Assistant (Discharge Planning)<br>• 1.0 FTE Pharmacist (expansion of hours)<br>• 1.0 FTE Pharmacy Technician (expansion of hours)<br>• 6.0 FTE Registered Dental Assistants (replace registry staff)<br>• 1.0 FTE Planner (remedial plan support)<br>• 2.0 FTE Senior Office Assistants (medical records) |
| FY 2022/23<br><br>*Budget Approved 06/09/22* | 39.0 FTE<br>• 11.0 FTE Registered Nurses (includes various needs such as substance use, withdrawal monitoring, chronic care, sick call, intake and discharge planning)<br>• 6.0 FTE Licensed Vocational Nurses for medication administration including Medication Assisted Treatment and services for patients in medical housing.<br>• 8.0 FTE Medical Assistants for discharge planning, infection prevention, assisting medical provider visits, and tracking ADA/durable medical equipment.<br>• 1.0 FTE Office Assistants to assist nursing with phone calls, medical paperwork, and collection of data from nursing/custody.<br>• 1.0 FTE Senior Physician Management will serve under the Medical Director for the RCCC activities.  Assists with Medical Director span of control, direct onsite supervision of physicians/nurse practitioners at RCCC and oversight of clinical services.  Provides back-up during Medical Director's absence.<br>• 1.0 FTE Physician 3 for Chronic Care disease management.  Provides ongoing care for patients needing ongoing chronic care planning and services.<br>• 1.0 FTE Nurse Practitioner for initial history and physical exams.  Must provide the assessment then refer internally for acute care follow-up or ongoing chronic care disease management.<br>• 1.0 FTE Dentist 2 to establish permanent resource and bridge the gap in the expanded operations of the dental clinic at both facilities.<br>• 3.0 FTE Pharmacist and 3.0 FTE Pharmacy Technician to enhance implementation of blister packing medication to meet compliance for "keep on patient" medications and will complete cart fill/pill call preparation in a timely and efficient manner.<br>• 1.0 FTE Health Program Manager, 1.0 FTE Sr. OA and 1.0 FTE Administrative Services Officer 1 for the expansion of administrative services that support the Medical and Mental Health operations. |

17

Current staffing

FY 2021/22 - 186.5 FTE

FY 2022/23 - 225.5 FTE (Program typically receives newly authorized positions mid-July and then begins recruitment).

The permanent positions *do not include* county on-call, registry, or contract positions. Permanent staff augmentations decrease the need for temporary staff and provide more continuity of operations, team work, and more stability.

Vacancies – update

There are 27.0 medical staff vacancies for the jail facilities.  Seven (7) of the positions have candidates in the background clearance process. There are four (4) administrative positions vacant with three (3) in background.  See the following tables for details.

| Jail Facilities Vacant Positions as of 06/08/22 | | |
|---|---|---|
| *Classification* | *Vacancies* | *Background* |
| Medical Assistant Level | 1 | 1 |
| Licensed Vocational Nurse | 13 | 2 |
| Registered Nurse | 4 | 3 |
| Supervising Registered Nurse | 1 | 1 |
| Physician 3 | 6 | |
| Nurse Practitioner | 1 | |
| Office Assistant 2 | 1 | |
| Total | 27 | 7 |
| Administration Vacant Positions as of 06/08/22 | | |
| *Classification* | *Vacancies* | *Background* |
| Admin Services Officer 1 | 2 | 1 |
| Sr. Office Assistant | 2 | 2 |
| Total | 4 | 3 |

As noted in the challenges section of this report, there are high market demands for medical staff with limited supply including per diem staffing.  There are staff retirements and the number of temporary replacements available through registry has decreased.  Labor negotiations are in process for impacted positions and should be concluding in June 2022.

Mental health services are provided under a contract with UC Davis Department of Psychiatry and Behavioral Sciences.  The following charts note contract augmentations.

| Mental Health Contract Augmentation | | |
|---|---|---|
| Fiscal Year | Program Additions | Staff Augmentation |
| FY 2017/18 | 20 Intensive Outpatient Program (IOP) Beds (male) – MJ | LCSW Supervisor (1.0)<br>SW1 (4.0)<br>Psychologist II (1.0)<br>Psychiatrist/NP (10%) |
| FY 2018/19 (Midyear) | 24/7 Licensed Clinical Social Worker (LCSW) Coverage - MJ | LCSW Supervisor (1)<br>LCSW (4) |
| FY 2019/20 | 15 IOP Beds (female) - MJ | LCSW Supervisor (.40)<br>Psychologist II (.20)<br>LCSW (.50)<br>SW 1 (3)<br>NP/Psychiatrist (.40) |
| | 24 IOP Beds (male) - RCCC | LCSW Supervisor (.50)<br>Psychologist II (.20)<br>LCSW (2.0)<br>SWI (2.5)<br>HUSC (1.0)<br>NP/Psychiatrist (.80) |
| | 24/7 LCSW Coverage - RCCC | LCSW Supervisor (1.0)<br>LCSW (3.0) |
| FY 2020/21 (Midyear) | Enhanced Outpatient Mental Health Services for the Outpatient Psychiatric Pod.  Includes mental health services, medication evaluation and monitoring, case management, and discharge planning.  Adds a new level of service.  Will serve approx. 125 patients at any given time. | LCSW Supervisor (1.0)<br>LCSW (2.0)<br>SWI (2.5) |
| FY 2021/22 | Enhanced outpatient (EOP) mental health services in the Outpatient Psychiatric Pod (OPP) expansion to provide services to an additional 150 patients requiring intensive services.  This expansion will increase services to 275 patients with a total EOP service provision of 400 patients. | LCSW Supervisor (1.0)<br>LCSW (3.0)<br>SWI (8.0)<br>RN (.50) |

| Mental Health Contract Augmentation | | |
|---|---|---|
| Fiscal Year | Program Additions | Staff Augmentation |
| FY 2022/23<br><br>*Budget approved 06/09/22* | Contract augmentation includes additional staffing to: 1) complete reviews and recommendations for patients with mental illness pending discipline and/or administrative segregation, 2) expand mental health services for patients in the Acute Psychiatric Unit, and 3) additional staffing for constant observation of patients on suicide precautions. | LCSW Supervisor (2.0)<br>LCSW (8.0)<br>SWI (5.0)<br>MH Worker (16.0) |

Current staffing

FY 2021/22 – 92.3 FTE.  Decrease is due to the closure of the Jail Based Competency Program (JBCT) "misdemeanor" program.  The FTE count includes JBCT felony program.  Without the JBCT program the total FTE count is 79.7 FTE.   Mental health is also having challenges hiring licensed personnel due to competing market demands.  Like the medical staff shortage, this is not unique locally.

FY 2022/23 – 123.3 FTE

Post budget and contract augmentation, mental health will begin recruitment.

Vacancies

Mental health has 15 vacancies, mostly comprised of social workers at Main Jail.

| Mental Health Vacancies as of 06/07/22 | |
|---|---|
| *Area* | *Vacancies* |
| Main Jail | |
| Outpatient | 4 |
| Enhanced Outpatient Program (EOP) | 6 |
| Intensive Outpatient Program (IOP) | 0 |
| Acute Psychiatric Unit (APU) | 0 |
| RCCC | |
| Outpatient | 1 |
| EOP | 1 |
| IOP | 1 |
| Jail Based Competency | 2 |
| Total | 15 |

Since mental health is a contractor, staff are not subject to the full background clearance that is required of permanent county staff.

Next Steps for Medical/Mental Health Staff

Managers and supervisors continue hiring and onboarding staff on an ongoing basis.  Position control and vacancy reports are regularly updated.

Class Counsel requested a staffing analysis which was submitted November 2021.  The staffing analysis was also submitted to county leadership and will serve as a basis for growth requests. On a practical level, managers will need to continue to monitor hiring, onboarding, space, and program needs as remedial plan policies continue to be developed and implemented.   An iterative process is needed to ensure staffing noted in the analysis makes sense or if modification is needed.   Any changes in policy or program involving criminal justice partners could also impact staffing needs.

---

Mental Health Data Posting (Section II. Provision C.)
Status:  Substantial Compliance

---

Point-in-time data reports are posted quarterly with email notification to Class Counsel.  See SSO Transparency/Corrections Consent Decree: https://www.sacsheriff.com/pages/transparency.php.

A brief summary of the report data is located in the following table.

| Report Point-in-Time | 4/5/21 | 7/5/21 | 10/4/21 | 1/3/22 | 4/5/22 |
|---|---|---|---|---|---|
| Census | 3,372 | 3,064 | 3,173 | 3,354 | 3,336 |
| **Mental Health** | | | | | |
| No mental health condition | 1,231 (37%) | 1,162 (38%) | 1,167 (37%) | 1,183 (35%) | 1,198 (36%) |
| MH non-SMI* diagnosis | 1,237 (37%) | 1,083 (35%) | 1,123 (35%) | 1,256 (38%) | 1,237 (37%) |
| SMI | 904 (27%) | 819 (27%) | 883 (28%) | 915 (27%) | 901 (27%) |
| **Behavioral Health Services** | | | | | |
| *Outpatient Mental Health* | | | | | |
| Open | 32 (5%) | 37 (6%) | 32 (5%) | 48 (7%) | 39 (5%) |
| Discharged | 647 (95%) | 590 (94%) | 620 (95%) | 654 (93%) | 681 (95%) |
| *Full Service Partnership (FSP)* | | | | | |
| Open | 37 (33%) | 27 (28%) | 38 (31%) | 42 (31%) | 28 (22%) |
| Discharged | 75 (67%) | 71 (72%) | 83 (69%) | 93 (69%) | 97 (78%) |
| *Substance Use Prevention & Treatment (SUPT)* | | | | | |
| Open | 35 (12%) | 29 (11%) | 29 (9%) | 26 (8%) | 21 (6%) |
| Discharged | 266 (88%) | 241 (89%) | 277 (91%) | 314 (92%) | 314 (94%) |

*SMI - serious mental illness

Notes:
- Percentage of SMI population is consistent.
- Percentage of MH Non-SMI population incarcerated gradually increased during the pandemic from a low of 30% in April 2020 to 37% in the most recent report.
- Patients currently open with county mental health services in the community remains consistently low.  Most were discharged from service.  See County Efforts to Reduce the Jail Population for services that are active or in development at the end of this report.

**ELECTRONIC HEALTH RECORD (E.H.R.) [Remedial Plan Section VI & IV]**

| Electronic Health Record System (Provisions B.4, C.6-8, D. 1., 6-7), I.1-5), N.6 |
|---|
| Status:  Partial Compliance |

The electronic health record remains challenging and does not meet workforce needs for data tracking and reporting.

The EHR continues to have limitations regarding retrieving necessary data parameters and building reports through the contractor's report creation format.  Staff continue to identify needed reports and work with the Department of Technology (DTech) to create new reports. DTech recently delivered a User Audit Report for enhanced EHR access security.

Inmate photos are available in the EHR to assist with patient identification.

Staff have continued to adjust EHR workflows and add or modify templates as new protocols or policies are rolled out.  Changes do not move quickly when multiple entities (vendor, DTech, etc.) must be involved for application enhancements or interface compatibility.

Work on a procurement for a new system is being ramped up with the start of the new EHR Administrator in mid-April 2022.  Staff are researching requirements and options through multiple resources including other counties and jurisdictions and through professional organizations such as the National Commission on Correctional Health Care (NCCHC).

Carequality is an interface that permits data sharing among participating healthcare organizations.  Staff created a workflow and providers began using Hospital Connect (the product providing real-time access to clinical data via Carequality) in late 2021.  This allows providers to import and easily reference patient data from external healthcare entities.

The Sheriff's Office ATIMS system go-live has been delayed until August 2022.  The interface between ATIMS and the EHR will enhance tracking and coordination.

Medical EHR Updates:

- Custom lists for medications for asthma, hypertension, diabetes, and sexually transmitted infections (STI) were modified to enable providers to more easily follow disease-specific guidelines and current standard of care.
- Custom lists for labs for Hepatitis C were updated based on input from the GI Specialist.
- Voice recognition device and software – Procurement was started in 2021 but was delayed when the former EHR Administrator resigned. The Medical Director is working with the new EHR Administrator to obtain approval and implement voice recognition technology to improve documentation during provider encounters.
- Telemedicine – The Medical Director authorized a *Televisit* button in the EHR testing environment.  The *Televisit* button will be activated in the live environment after tablet devices are installed to the secure wireless network by Department of Technology.  Once completed, telemedicine for certain provider visits will begin on a pilot basis.
- See individual provision sections for other items.

22

Mental Health EHR Updates:

- Confidential Encounter Form was created and implemented for MH staff. Documentation includes whether the assessment was in a confidential setting and rationale when the interview is not confidential.  Two audits have taken place for patient privacy since implementation and further training and form changes have occurred as a result.
- Treatment plans were updated to include the duration of a group session and allow multiple goals.  Provider licensure was updated to ensure appropriate titles and treatment plan forms were reviewed to reflect current practices.
- MH Providers can review all scheduled clinical encounters.
- Staff were designated for future EHR system acceptance testing for future updates and improvements.
- Discharge Planning – Developed new report to identify projected release dates and level of care to expedite referrals.
- MH Group Participation Report – This report provides clinicians information on the amount of therapeutic out of cell time (groups) that each patient received on the mental health caseload. Recently there have been issues identified with the report that Fusion is currently working to resolve.
- Discharge Planning – Updated DC Linkage form with additional drop-down options to improve tracking of linkage to County Behavioral Health.
- Timelines to Care – Order Linkage form was created to improve tracking of timelines to care.  Allows staff to enter actual visit time and link the visit time to the visit order.  Report is under development.

## AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE
## [Remedial Plan Section III]

Staff created and/or revised key policies, electronic health record templates, PowerPoint training, and are completing training.  All policies, forms, and training materials have been approved by Class Counsel/Experts except where noted (*pending review*).

| Policies and Procedures (Section III. Provision A.)<br>Status:  Substantial Compliance |
| --- |

Policies:

- ACH PP 01-09 Grievance Process for Health/Disability Complaints (revision 12/01/21) – *Pending final review by Class Counsel/Experts*
- ACH PP 06-02 Patients with Disabilities (12/01/20) – *Final*
- ACH PP 06-03 Effective Communication (revision 03/12/21) – *Final*
- ACH PP 06-04 Interpretation Services (revision 04/05/21) – *Final*
- ACH PP 06-05 ADA Coordination (revision 11/05/21) – *Final, subject to addition of processes related to interface between EHR and Sheriff's Office ATIMS system*

- ACH PP 06-06 Patients with Disabilities or Other Significant Health Needs (revision 04/05/21) – *Final*
- ACH PP 06-07 Health Care Appliances, Assistive Devices, and Durable Medical Equipment (revision 04/05/21) – *Final*
- MH PP 07-07 Mental Health Adaptive Support Program (05/16/22) – *Pending final review by Class Counsel*

Forms:

- Grievance Form and Appeal Form (revision 12/01/21) – *Pending final review*
- Disabilities Screening Template (EHR) – *Final*
- Effective Communication Template (EHR; revision 08/31/21) – *Final*
- Alta Regional Center Referral Form (10/2021) – *Final*
- Mental Health Adaptive Support Survey (05/2022) – *Pending final review*
- Mental Health Adaptive Support Program Screener (05/2022) – *Pending final review*

See last ADA provision for training information.

---

ADA Tracking System (Provision B.)
Status: Partial Compliance

---

Staff developed and refined electronic health record templates for screening and documenting disabilities and accommodations.  These forms permit ongoing changes if accommodation status needs to be modified.

A designated clerical staff maintains a log of any correspondence sent from external agencies providing notification of an individual with ADA needs. A medical assistant (MA) has been assigned to review the EHR and verify accommodations have been provided. If not, the MA notifies nurse and/or provider to assess patient.

SSO is pending the ATIMS go-live for ADA tracking and identification.  Staff have worked on an interface between these two systems.  Until the electronic data fields are solidified and testing has begun, ACH cannot assess visibility and use for health staff.

---

Screening for Disability and Disability-Related Needs (Provision D.)
Status: Substantial Compliance

---

Policies:

- ACH PP 05-05 Nurse Intake (revision 10/28/21) – *Final*
- ACH PP 06-02 Patients with Disabilities (12/01/20) – *Final*

Other:

- Substantial revision of the Nurse Intake policy and subsequent training on the new process was completed in November 2021. The Nurse Intake includes essential electronic forms on disabilities, accommodations, and effective communication and a workflow.

- The RN is required to send referrals to mental health for post-intake assessment of psychiatric, developmental, or intellectual disabilities.
- QI has conducted five quarterly ADA audits.  Over time, intake nurses have improved with respect to identifying and documenting disabilities and related needs.  See section on ADA Training, Accountability, and Quality Assurance (Provision P) for more information.

Health Care Appliances, Assistive Devices, Durable Medical Equipment (Provision F.)
Status: Substantial Compliance

Policy:

- ACH 06-07 Health Care Appliances Assistive Devices and Durable Medical Equipment (revised 04/05/21) – *Final*

Other:

- Electronic forms were completed to assist in identification and tracking of assistive devices and durable medical equipment (DME).
- Policy and EHR forms allow providers to select "other" when ordering assistive devices and/or DME in addition to the pre-determined list.
- Staff developed a process to ensure newly ordered devices are provided to patients in a timely manner.
- Nursing staff sends a weekly update to SSO Compliance Staff on patients with health care appliances, assistive devices and durable medical equipment provided by medical staff.

Effective Communication (Provision I.)
Status:  Substantial Compliance

Policy:

- ACH PP 06-03 Effective Communication (revision 03/12/21) – *Final*

Other:

- The Effective Communication (EC) form is the first form to be completed in all clinical encounters and cannot be bypassed.  This assists in identifying and tracking patients with effective communication needs, including those that change over time.
- The EC template in the EHR was modified last monitoring period to include additional questions for identifying EC needs and to simplify the language used in the inquiry.

Effective Communication and Access for Individuals with Hearing Impairments (Provision J.)
Status:  Substantial Compliance

Policies:

- ACH PP 06-03 Effective Communication (revision 03/12/21) – *Final*
- ACH PP 06-04 Interpretation Services (revision 04/05/21) – *Final*

Other:

- Staff utilizes video interpreting services for patients who need Sign Language Interpretation (SLI). Designated computers have a camera installed and a necessary icon to access the *LanguageLine InSight* application.
- Each MH program area has access to a tablet that is utilized for all *LanguageLine* interactions.

| Disability-Related Grievance Process (Provision K.) |
| --- |
| Status: Partial Compliance |

Policy/Form:

- ACH PP 01-09 Grievance Process for Health/Disability Complaints (revised 12/01/21) – *Pending final review by Class Counsel/Experts*
- Grievance Form and Appeal Form (revised 12/01/21)

Other:

- The grievance policy and forms were substantially revised based on Medical Expert feedback. Key additions include immediate review of each grievance by a nurse and immediate action when indicated, specific timeframes for requesting and responding to appeals, and more detail on the grievance and appeal forms.
- Nurses at Main Jail received training on the revised grievance forms in December 2021.
- Grievances are tracked. With the addition of the electronic forms, it will permit more accurate tracking.
- Some patients continue to give health care grievances to custody. Staff will work with custody to improve coordination on grievances.

| Transportation (Provision N.) |
| --- |
| Status: Partial Compliance |

Policies:

- ACH PP 04-09 Medical Transportation (revision 07/22/21) – *Final.* This policy was revised to address medical transportation of patients with disabilities based on Medical Expert feedback.
- ACH PP 06-06 Patients with Disabilities or Other Significant Healthcare Needs (revised 04/05/21) – *Final*
- ACH PP 06-07 Health Care Appliances, Assistive Devices, and Durable Medical Equipment (revised 04/05/21) – *Final*

Other:

- QI staff completed a "Medical Transportation Coordination Report" in December 2021 to assess coordination between ACH and custody with respect to medical escorts.

- Following the first report, staff developed a template for custody to provide more accurate transportation coordination data and distributed it for implementation.
- The subsequent Medical Transportation Coordination Report showed that more training was needed for RCCC (who had a new transportation team) whereas Main Jail was utilizing the form.  Anticipate full implementation of the form during next monitoring period.  See below for transportation coordination data.

| Medical Transportation Coordination Data Period:  February 2022 | | | | |
|---|---|---|---|---|
| Jail Facility | # of Appointments | # Completed | # Rescheduled | # Cancelled |
| Main Jail | 61 (64%) | 41 | 14 | 6 |
| RCCC | 35 (36%) | 22 | 1 | 12 |
| Total | 96 (100%) | 63 (66%) | 15 (16%) | 18 (18%) |
| Reasons for Cancellations | 8/18 (44%)  Patient refusals | | | |
| | 5/18 (28%)  No longer in custody | | | |
| | 2/18 (11%)  Transferred to MJ | | | |
| | 1/18 (6%)   Outside provider cancelled | | | |
| | 1/18 (6%)   Appointment determined duplicative | | | |
| | 1/18 (6%)   No reason indicated | | | |
| | | | | |
| Reasons for Rescheduling | 5/15 (33%)  Patient in isolation/quarantine | | | |
| | 3/15 (20%)  Patient transferred to RCCC | | | |
| | 2/15 (13%)  Outside provider rescheduling | | | |
| | 1/15 (7%)   Med transport prioritizing other appointments | | | |
| | 1/15 (7%)   Transport received notice too late | | | |
| | 1/15 (7%)   Patient on suicide precautions | | | |
| | 1/15 (7%)   Patient in hospital | | | |
| | 1/15 (7%)   No reason indicated | | | |

Prisoners with Intellectual Disabilities (Provision O.)
Status: Partial Compliance

Policy:

- ACH PP 05-05 Nurse Intake (revision 10/28/21) – *Final*
- MH PP 07-07 Mental Health Adaptive Support Program (05/16/22) – *Pending final review by Class Counsel*

Other:

- During the intake process, nurses gather information through screening, past history, self-identification, third party report or observation noting possible intellectual disability. Nurses refer patients to mental health staff for an assessment and treatment plan.
- The Mental Health Adaptive Support policy is pending final approval prior to training and implementation.

| ADA Training, Accountability, and Quality Assurance (Provision P.) |
|---|
| Status: Substantial Compliance |

Training:

- ADA and Effective Communication Training and Documentation PowerPoints were developed and approved.  The documentation PowerPoint has been updated to include changes to EHR templates.
- Training is mandatory for all ACH staff, including contracted mental health staff, in the jails as well as administrative positions (case management and quality improvement) working offsite.
- Staff completed fifteen (15) training sessions that included 233 staff during 2021 and the first half of 2022.
- Training sessions will resume in the next monitoring period after administrative staff relocate to the G Street facility.

Tracking:

- Grievances, including those for disabilities and effective communication, continue to be tracked.  Tracking is more specific post policy and form revision.
- Grievance data is reviewed at quarterly Quality Improvement Committee (QIC) meetings.  QIC members discuss strategies to improve problem areas and recommend changes in practice.
- Staff developed and refined a tool to audit disabilities, accommodations and effective communication.  Five (5) quarterly audits have been completed, the most recent in April 2022.  Data indicates that staff are improving with regard to identifying and documenting disabilities, accommodations, and effective communication.  See the table below for a comparison of an early audit with the most recent audit:

| Indicator – *Intake RN action on disability-related information* | Data Period – *Intakes completed on:* | |
|---|---|---|
| | 07/02/21 | 04/18/22 |
| ADA Assessment form complete and accurate | 42/84 (50%) | 56/60 (93%) |
| Effective Communication (EC) form complete and accurate | 73/84 (87%) | 55/60 (92%) |
| EC provided when needed | 10/12 (83%) | None needed |
| Assistive device ordered when needed | 8/10 (80%) | 9/9 (100%) |
| Referred to MH when needed | 18/21 (86%) | 12/15 (80%) |
| Referred to provider when needed | 1/4 (25%) | 2/4 (50%) |

- Audits will continue on a regular basis and data/trends will be reviewed for errors, systemic issues, and opportunities to improve detection and create individualized care plans.  Data is reviewed during QIC meetings.

## AREAS OF FOCUS FOR THIS MONITORING PERIOD

Adult Correctional Health continues to work toward improving access and services as outlined in the remedial plan.  As of June 13, 2022, all policies for which staff received feedback from Class Counsel and/or Subject Matter Experts have been revised and resubmitted for review or finalized.

## MEDICAL CARE [Remedial Plan Section VI]

Class Counsel outlined five areas of focus for the second monitoring period including the intake screening, sick call system, chronic care, specialty care, and roll out of the new electronic health record (EHR) system.  These are shaded in blue. The remainder of provision sections are not shaded and were not an area of focus.  Status is listed for each provision.

| Intake Screening (Provision B.) |
| --- |
| Status:  Partial Compliance |

Policies:

- PP 05-05 Nurse Intake (10/28/21) was revised near the end of the last monitoring period and included many key changes.  Nurses were trained and the revised intake process was implemented in November 2021.
- PP 05-13 Initial History & Physical Assessment (01/11/22) and the revised Nurse Intake policy specify referral criteria and timeframes to ensure patients are seen post-intake based on their medical needs and acuity.

Forms:

- Nurse Intake electronic health record (EHR) forms include features to ensure nurses complete a thorough health screening and review of key information:
    a. Nurse must confirm review of the electronic record from previous admissions or indicate patient's first intake in Sacramento County.
    b. Nurse must select yes or no for patient requires medication.  A yes response automatically creates an essential medication order that prompts provider review.
    c. Key screenings were expanded including suicide risk inquiry and screening for disabilities and effective communication needs.
- A Nurse Intake Workflow (for EHR) was finalized and nurses were trained in November 2021.  It is used for staff training and reference.

- Lists have been developed in the EHR to categorize nurse follow-up specific to diagnostic tests (e.g., urine collection) and additional screenings (e.g., substance use). The lists assist with communication and tracking tasks post intake.
- Staff are working to refine EHR templates on an ongoing basis.

Implementation:

- The revised Nurse Intake policy and forms were implemented in November 2021.
- The new intake process has been in place during the current monitoring period. The additional EHR forms and inquiries are resulting in more comprehensive health screenings and more consistent documentation.

Other:

- Nurses are required to be trained annually. This training requirement is included in PP 03-08 Staff Development and Training (revised 07/01/21). Additionally, nurses assigned to the intake process receive training when there are changes to the policy and/or forms.
- QI staff developed several audit tools to assess the nurse intake process. Reviews completed during this monitoring period include:
  a. ADA Identification and Documentation at Intake
  b. Withdrawal Monitoring in the Booking Loop
  c. Medication Initiation and Renewal
  d. Referrals at Intake (see below)

**Intake Referral Audit**

Focus: To determine whether RNs ordered appropriate referrals at intake.

| Type of Referral Needed: | Patients Referred as Needed | |
|---|---|---|
| | 11/29/21 (N=51) | 04/06/22 (N=58) |
| Provider | 14/20 (70%) | 12/21 (57%) |
| Mental Health | 11/15 (73%) | 24/26 (92%) |
| SUD Counselor | 9/19 (47%) | 27/28 (96%) |
| Dental | 7/7 (100%) | None needed |
| Single or multiple referrals | 15/32 (47%) | 34/44 (77%) |

- The first audit was conducted at the time of implementation of the new intake process and provides a baseline for comparison. In the April 2022 audit, nurses showed significant improvement in completing referrals to Mental Health and the SUD Counselor.
- QI will develop additional audit tools during the next monitoring period.

Space:

- ACH, SSO and Facility Management participate in ongoing meetings to modify medical areas to utilize space more efficiently to provide patient care.

- The Nurse Intake space in the Main Jail is undergoing major change including new computer stations, larger interview cubicles with privacy barriers, sound machines, individual scanners for documents, and space for supplies.
- Nurse Intake room modification is in process with completion anticipated early in the next monitoring period.

| Access to Care "Sick Call System" (Provision C.) |
| :--- |
| Status: Partial Compliance |

Policies:

- PP 05-09 Health Service Requests (05/19/22) was revised based on Medical Expert feedback received 02/03/22. – *Pending review by Mental Health Expert*

Implementation:

- Key changes to the policy include clarification that the face-to-face appointment must be completed, not just ordered, within the priority timeframes and the nurse completing the assessment will have the paper Health Service Request (HSR) available during the visit.
- The policy will be fully implemented following approval by the Mental Health Expert and staff training.
- Exam rooms and times are designated for nursing assessments on several floors at Main Jail.
- The electronic HSR form is active in the EHR.  The electronic form ensures HSR information is documented in the EHR in addition to the scanned copy.  This will facilitate data reporting capabilities.

Other:

- Confidential locked boxes labeled "Health Service Requests" are installed in multiple locations at both jail facilities.
- Nursing collects health service requests (HSRs) at least twice daily, once in the morning and once in the evening, and designated staff are responsible to ensure adequate supplies.
- Patients are permitted to report or inquire about multiple medical needs on a single HSR or during a single appointment.
- There is an insufficient number of escorts at Main Jail to ensure timely access to care.
- Staff developed an audit tool for timely access to services and completed a baseline study prior to the policy revision.  Staff will begin periodic audits of the HSR process after training and implementation.
- A video communication pilot will start next monitoring period to improve access to provider consults.  Medical assistants, providers, and other health care staff will be able to have a video consult with a provider in specific circumstances.  The goal is to improve patient care and provider productivity.

- Service access issues are continuing due to SSO and ACH staffing and space challenges and COVID-19 operations.

Medical Equipment:

- Replaced worn out/old/broken medical beds at both facilities.
- Replaced all portable sinks in the medical exam room and specialty clinic at both facilities.
- Purchased rolling medical bags for LVNs to transport medical supplies to different medical floors.
- Purchased Autogen and manual heat press for "Keep on Patient" medication blister packaging for pharmacy.
- Purchasing IPads on wheels for video telehealth appointments.  Initial purchase includes eight (8) units for pilot program.  Department of Technology is currently assessing Wi-Fi connectivity.

Space:

- Main Jail 2 East Provider exam room was completed.
- Main Jail 2 Medical provider charting office was also completed.
- Other improvements to the Main Jail medical areas include the new nursing station on 2 East and the new interview cubicles.
- Excess storage was removed to storage offsite.

| Chronic Care (Provision D.) |
| --- |
| Status: Partial Compliance |

Policies & Provider Guidelines:

- PP 05-18 Chronic Disease Management (revision 08/18/21) – *Final*
- PP 05-19 Hepatitis C Testing, Treatment and Monitoring (revision 04/07/22) – *Final*
- PP 05-20 Diabetes Management (01/07/22) – *Final*
- Provider Treatment Guidelines were developed for Asthma (11/19/21), Diabetes Management (06/02/21), HIV/AIDS (06/02/21) and Hypertension (05/10/21).  ACH has not received medical expert feedback on these Provider Treatment Guidelines.
- Related policies: PP 05-05 Nurse Intake (revision 10/28/21); PP 05-13 Initial History and Physical (H&P) Assessment (revision 01/11/22) – *Final*.  These are critical assessments that begin the identification and treatment of chronic disease.

Implementation:

- The chronic disease management related policies and guidelines are relatively new. Policies revised and approved during the current monitoring period include PP 05-13 Initial H&P, 05-19 Hepatitis C Testing, Treatment and Monitoring, and 05-20 Diabetes Management.

- The policies have been partially implemented.  Full implementation is pending the chronic care nurse function, which is dependent on staffing, training, and EHR templates.
- Providers have been trained and have started managing chronic diseases.  Dedicated chronic care providers are managing some patients with multiple chronic diseases and higher acuity.
- A chronic care provider who is board certified in nephrology is assisting in the care of complex patients with renal failure and other chronic diseases by conducting a dedicated onsite nephrology clinic each month.  The clinic will be expanded once more patients are enrolled.
- Providers have been assigned to specific locations to help ensure continuity of care.
- Nursing has been ensuring continuity of care for patients released/transferred.
- Nursing recently dedicated two staff to chronic care.  Staffing shortages have delayed full deployment of the chronic care nurses.

Electronic Health Record:

- Providers have been trained to create alerts in the EHR to ensure a particular patient will return to that provider for follow-up care when possible.
- Initial H&P and Provider Chronic Care Follow-Up forms are active in the EHR.  Both encounter types include several forms for data collection, such as Periodic Health Assessment and Patient Education details.
- The Asthma form in the EHR was updated to capture additional information during chronic care follow-up visits.
- A Chronic Care form in the EHR is currently in development.  This will ensure consistent and accurate documentation by the Chronic Care Nurses.  The new EHR Administrator is working toward completing this project.
- Hepatitis C "opt-out" testing was implemented in late 2021, however, it was recently discovered that the intake questions in the EHR were not updated.  In early June 2022, staff completed updates to the questions in the intake form to be consistent with an "opt-out" process.

Chronic Disease Specialty Services:

- A specialist provides onsite Gastroenterology and Hepatology clinics every other week. Services started in October 2021.
- A primary care provider with additional training in HIV conducts a weekly HIV Clinic. Infectious disease consultation is also available through RubiconMD or contracted off-site Infectious Disease specialist as clinically indicated.
- A part-time primary care provider is also a nephrologist and is available for nephrology consults.  In the current monitoring period, she started onsite nephrology clinics to complement the telenephrology services provided by UCD for dialysis patients.

- Providers have been trained to use RubiconMD (e-consult service with access to numerous specialists). Staff can refer to specialists as clinically needed.

Other:

- Medical Director continues to provide onboarding and training for providers.  Regular staff meetings and trainings will continue.
- Medical Director developed guidelines for routine vaccinations and health screenings (e.g., diabetes, breast cancer, and colorectal cancer screenings) and trained providers in December 2021.  The Medical Director is working with the EHR team and vendor to implement alerts in the EHR to remind providers when health maintenance vaccinations and screenings are due.
- Staff are pulling data reports on chronic conditions and labs which will help with chronic disease management.  See table below:

| Chronic Conditions Report based on Points in Time | | | |
|---|---|---|---|
| | 12/29/21 | 03/16/22 | 05/25/22 |
| Patients with chronic conditions | 71% | 63% | 68% |
| Of patients with at least 1 chronic condition, those with 2 or more chronic conditions | 63% | 66% | 65% |
| Patients on medication | 68% | 67% | 72% |

*Note: Staff are identifying and treating more chronic health conditions.  Percentage of patients on medication increased alongside patients with chronic conditions.*

Audits:

- Staff developed an audit tool for diabetes management and conducted a baseline audit in November 2021.
- The audit tool was modified in early 2022 as a result of additional information documented in the EHR, such as degree of disease control.  See table below.

### Chronic Care Audit – Diabetes Management

| Indicator | Data Period *Sample of patients with diagnosis of diabetes* | |
|---|---|---|
| | 11/2021 (N=103) | 02/2022 (N=61) |
| Provider follow-up visit within 6 months *(Data parameters changed in 2022)* | 76/103 (74%) | N/A |
| Provider follow-up visit within timeframe based on degree of disease control | N/A | 38/61 (62%) |
| Hemoglobin A1c (HbA1c) test scheduled within 6 months of last result | 79/103 (77%) | 34/61 (56%) |

- QI Nurses are fully staffed as of June 2022.  The next Diabetes Management audit is currently in process.
- Staff will develop additional chronic care audit tools in the next monitoring period.

| Specialty Care (Provision E.) |
|---|
| Status: Partial Compliance |

Policies:

- PP 04-08 Specialty Referrals (revision 08/06/21) – *Final*

Specialty Services:

Staff have worked on improving service utilization by adding specialty services including onsite when feasible.

- <u>E-Consult Service</u> – Providers use RubiconMD for access to numerous specialties.
- <u>Gastroenterology/Hepatitis C Clinic</u> – Bi-weekly onsite clinic began in October 2021.
- <u>Physical Therapy Clinic</u> – Onsite clinic began in late 2021 and serves both jails weekly.
- <u>Ophthalmology Clinic</u> – An onsite clinic began in May 2022 for semimonthly services through July to assist with the wait list.  In July, the onsite clinic will transition to monthly services at Main Jail.  Will continue to work toward recruiting more Ophthalmologists.
- Staff is working on a contract with the National Eye Care Institute to have optometry services onsite.  Anticipated start date is July 2022.
- Also see Chronic Care section.

Specialty Care Guidelines:

- Specialty Care Referral Provider Guidelines were developed and training was provided in October 2021, January 2022 and April 2022 to assist providers in submitting sufficient documentation when making referrals. Also see Utilization Management section.

Tracking:

- Staff began manually tracking specialty referrals in February 2021.  A baseline audit was conducted for FY 20/21 that detailed compliance indicators for the five months of data (February through June 2021).  See data at the end of this section.
- Monthly data reports are reviewed to ensure compliance in this area.  Data is reported three months in arrears to accurately capture compliance to timeframes.
- Compliance indicators for the Specialty Care Report include timeliness of referrals, including patients who need to see a primary care provider due to the delay of a specialty consultation appointment, and provider follow up post consult.
- A Specialty Services Referral Form was developed to track referrals and timeframes within the EHR and went live in July 2021.  Staff detected issues with the integrity of the data and are working to resolve.  The Specialty Care Referral Report will be transitioned from the vendor to DTech for further enhancements.

35

- Staff will continue to conduct twice annual audits of specialty care referral logs on a manual basis until the EHR issue is resolved.

**Specialty Care Report: Fiscal Year 2021/2022**

| All Specialty Care Referrals | | | | | | | |
|---|---|---|---|---|---|---|---|
| Referral | July | Aug | Sept | Oct | Nov | Dec | Total |
| Routine | 61 | 51 | 32 | 45 | 37 | 44 | 270 |
| Urgent | 2 | 1 | 4 | 2 | 1 | 3 | 13 |
| Total | 63 | 52 | 36 | 47 | 38 | 47 | 283 |

| Routine Referrals | | | | | | | |
|---|---|---|---|---|---|---|---|
| 90 Day Timeframe | July | Aug | Sept | Oct | Nov | Dec | Total |
| Met | 34 (65%) | 30 (70%) | 16 (66%) | 23 (70%) | 12 (60%) | 16 (47%) | 131 |
| Not Met – Appointment (apt.) after 90 days | 13 (25%) | 9 (21%) | 5 (21%) | 6 (18%) | 3 (15%) | 13 (38%) | 49 |
| Not Met – Pending apt. | 1 (2%) | - | 2 (9%) | 3 (9%) | 3 (15%) | 1 (3%) | 10 |
| Not Met – No apt. and/or released after time expired | 4 (8%) | 4 (9%) | 1 (4%) | 1 (3%) | 2 (10%) | 4 (12%) | 16 |
| Total | 52 (100%) | 43 (100%) | 24 (100%) | 33 (100%) | 20 (100%) | 34 (100%) | 206 (100%) |
| **Not Included in Timeframe** | **July** | **Aug** | **Sept** | **Oct** | **Nov** | **Dec** | **Total** |
| Released before 90 days | 6 | 5 | 3 | 5 | 11 | 10 | 40 |
| Refused apt. | 3 | 3 | 5 | 7 | 6 | 3 | 27 |
| Total | 9 | 8 | 8 | 12 | 17 | 13 | 67 |

| Urgent Referrals | | | | | | | |
|---|---|---|---|---|---|---|---|
| 14 Day Timeframe | July | Aug | Sept | Oct | Nov | Dec | Total |
| Met | - | - | 1 (34%) | - | 1 (100%) | 1 (33%) | 3 (25%) |
| Not Met – appt. after 14 days | 2 (100%) | 1 (100%) | 1 (33%) | 2 (100%) | - | 1 (33%) | 7 (58%) |
| Not Met – No appt. and/or released after timeframe expired | - | - | 1 (33%) | - | - | 1 (33%) | 2 (17%) |
| Total | 2 (100%) | 1 (100%) | 3 (100%) | 2 (100%) | 1 (100%) | 3 (100%) | 12 (100%) |
| **Not Included in Timeframe** | | | | | | | |
| Released before 14 days | - | - | 1 | - | - | 1 | 2 |
| Total | - | - | 1 | - | - | 1 | 2 |

*One patient received initial apt. after 14 days due to delays in required laboratory work.*

36

- Utilization Management Subcommittee reviews and recommends potential actions on meeting timeframes for routine and urgent referrals.

## MEDICAL PROVISIONS: OUTSIDE AREAS OF FOCUS

The remainder of this section outlines the status for items that were not areas of focus during this monitoring period.  Where indicated (*pending feedback*), staff submitted a new or revised policy and feedback from Class Counsel and/or experts is pending.

| Medication Administration and Monitoring (Provision F.) Status: Partial Compliance |
| --- |

Staff have created and/or revised policies for medication administration and monitoring.

Policies:

- ACH PP 04-02 Insulin Administration (initial 08/19/19)
- ACH PP 04-17 Medication Administration (revised 12/16/21) – *Final*
- ACH PP 04-18 Medication Order Entry (initial 12/16/21) – *Pending feedback*
- ACH PP 04-19 Over the Counter Medications (revised 10/30/20) – *Pending Medical Expert feedback*
- ACH PP 04-20 Keep on Person Medications (revised 01/12/22) – *Final*

Quality Improvement:

- ACH PP 01-13 Pharmacy and Therapeutics Subcommittee (revised 07/01/21) – *Final*
- ACH PP 02-04 Medication Incident Reporting (02/19/21) and form
- QI data is presented in the Pharmacy and Therapeutics Subcommittee for review and recommendations.
- Staff developed a new audit tool to evaluate the timeliness of medication initiation and renewal.  A baseline audit was conducted in March 2022, and another audit is currently in process.

Other:

- PP 04-17 Medication Administration was approved by the Medical Experts in February 2022.  The revised policy includes procedures for patients that are off-site due to court or other engagements.  The pill call policy was deleted and its contents were integrated into this policy.  In addition to policy changes, several key changes have been completed including:  changes in pharmacy schedules, deployment of new pill carts, reassigning some tasks, and improving the network capacity.  Additional medical escorts are required to ensure efficient operations.
- All RNs and LVNs have been cross-trained to administer medications.
- Medication administration times are being changed to improve efficiency.

- Work is in process to purchase handheld tablets that will enable nurses to document in real time when administering medications at the cell.  Staff are exploring options for devices that are HIPAA-compliant and compatible with the EHR.
- Current operations due to the pandemic significantly impact the pill call process at the Main Jail.  Medical staff has been meeting with Custody to resume prior pill call practices.

Keep on Person (KOP):

- PP 04-20 Keep on Person (KOP) Medications was approved by the Medical Experts in February 2022.  KOP medications were expanded to include inhalers, chronic disease medications, over the counter medications, and others.  Staff developed a Patient Medication Guide handout to inform patients of the KOP and discharge medication programs.
- The KOP program started with a small pilot on 12/19/21.  The initial population included eligible patients on the 7th floor of the Main Jail.  The program has been expanded to most locations at both jail facilities.  Providers and nurses refer patients to the program, and patients are assessed for program eligibility.  Patients have been receptive to the program and adherence has been better than anticipated.  ACH and Custody designated leads continue to problem-solve and improve the program.  Pharmacy staff use EHR flowsheet to monitor participants and use the Pharmacy Information System for data management.

| Patient Privacy (Provision H.) |
| Status: Partial Compliance |

Policies:

- ACH PP 08-01 Safeguarding Protected Health Information (revision 06/03/21) – *Pending Medical/MH Expert feedback.*
- ACH PP 08-03 Release of Protected Health Information (01/10/20)
- ACH PP 08-08 Patient Privacy (revision 05/13/21) – *Pending Medical/MH Expert feedback.*

Other:

- EHR templates require staff to document whether or not each face-to-face encounter was confidential.  If the encounter was not confidential, staff must document the specific reason.  The EHR vendor developed parameters for a report on this compliance indicator.  Staff continue to test the report parameters for data on confidentiality of encounters to ensure consistency between all reports requiring confidentiality updates.  Once testing is completed, DTech will provide ongoing support for data tracking and reporting needs.
- Certain areas within the existing jail structure lack privacy, such as the Nurse Intake area within the booking loop.  Staff are looking at ways to improve patient privacy within these limitations.  For example, the Nurse Intake area is being remodeled to include privacy barriers and sound machines.

- Ongoing space meetings will focus on any other areas which can be made available for nurse or physician encounters.  Space is currently very limited with one exam room on most floors of the Main Jail.

| Utilization Management (Provision J.)<br>Status: Substantial Compliance |
| --- |

Policies:

- ACH PP 01-14 Utilization Management (revision 05/05/22) – *Final*
- ACH PP 01-18 Utilization Management Subcommittee (05/05/22) – *Final*
- ACH PP 04-08 Specialty Referrals (revision 08/06/21) – *Final*

Other:

- Case Management staff began using InterQual as the Utilization Management platform for specialty referrals in March 2021.
- Specialty Care Referral Provider Guidelines were developed and training was provided in October 2021, January 2022 and April 2022 to assist providers in submitting sufficient documentation when making referrals that are processed through InterQual.
- A Utilization Management (UM) Subcommittee was formed and began meeting in October 2021.  Subcommittee members include service line directors, QI and case management.
- The UM Subcommittee began reviewing selected cases of high utilizers, high risk, complex, and/or high cost in order to ensure that resources are applied appropriately and timely during the monitoring period.
- A new Supervising Case Management Nurse and Senior Office Assistant began work in March 2022.

| Reproductive and Pregnancy Related Care (Provision L.)<br>Status: Substantial Compliance |
| --- |

Policies:

- ACH PP 02-03 Female Reproductive Services (revision 07/01/21) – *Final*
- ACH PP 05-04 Pregnancy Testing (revision 07/01/21)
- ACH PP 06-01 Lactation Support (initial 04/22/20)

Other:

- ACH contracts with UC Davis for OB/GYN services.  Services are provided onsite at least once weekly.  Primary care providers are referring patients to the OB/GYN clinic for cervical cancer screening.
- Through the contract with UC Davis, OB/GYN Family Planning Center provides patients with comprehensive counseling and timely assistance in accordance with their expressed

desires regarding pregnancies (whether to keep the child, use adoptive services, or have an abortion).

- Providers and OB/GYN specialists submitted input for changes to OB/GYN forms and flowsheets in the EHR.  Modifications should be complete in the next monitoring period.

| Transgender and Non-Conforming Health Care (Provision M.) |
| --- |
| Status: Partial Compliance |

Policy:

- ACH PP 05-12 Transgender and Gender Nonconforming Health Care (initial 04/09/21) – *Pending MH/Suicide Prevention Expert feedback.*

Other:

- For continuity of care, patients who are identified as receiving hormone treatment from a community licensed provider continue the medication while incarcerated.  A provider will assess the patient and include the medication as part of the patient's treatment plan.
- Mental Health staff worked with a consultant to develop training on the WPATH Standards of Care.  Class Counsel provided feedback on the training slides in May 2022.  Feedback from Experts is pending.  The training will be revised when all feedback is received.  Once approved, this training will be provided to health care and custody staff.

| Detoxification Protocols (Provision N.) |
| --- |
| Status: Partial Compliance |

Policies and Standardized Nursing Procedures (SNP):

- ACH PP 05-14 Benzodiazepine Withdrawal Treatment (revision 03/15/22) – *Final*
- ACH PP 05-15 Opioid Withdrawal Treatment (revision 04/22/22) – *Final*
- ACH PP 05-17 Alcohol Withdrawal Treatment (revision 03/29/22) – *Final*
- SNP Alcohol Withdrawal Monitoring and Treatment (revision 04/07/22) – *Final*
- SNP Opioid Withdrawal Monitoring and Treatment (revision 03/29/22) – *Final*
- SNP Benzodiazepine Withdrawal Monitoring and Treatment (revision 04/07/22) – *Final*
- SNP Suspected Opioid Overdose (revision 04/07/22) – *Final*
- MH PP 07-03 Use of Benzodiazepines (revision 04/15/21) – *Pending MH Expert feedback*
- MH PP 07-04 Patients with Substance Use Disorders (revision 08/16/21) – *Pending MH Expert feedback*

Substance Use Disorders (SUD):

Policies outline identification and treatment of substance use disorders including medication assisted treatment (MAT), methadone, buprenorphine, etc.  ACH has a SUD Counselor and SSO has reentry programs.

- ACH PP 05-02 Medication Assisted Treatment (revision 02/11/20) – *Will be revised*
- ACH PP 05-06 Methadone Treatment (initial 06/24/20) – *Will be revised*
- ACH PP 05-07 SUD Counselor (initial 06/24/20)

Other:

- All ACH withdrawal treatment policies and SNPs were revised in the current monitoring period based on feedback.  All were approved by the Medical Experts in April 2022.
- Electronic health record templates were revised to capture the latest changes.
- Two RNs are designated for MAT services.  Designated nurses are assigned to administer medications.
- Designated providers and designated nurses meet monthly and ad hoc as needed to discuss patient caseload and treatment modalities.
- The use of Buprenorphine taper for withdrawal management is pending additional nursing staff, dedicated MAT provider, and dedicated detox unit for monitoring.
- Staff have identified floors at Main Jail for withdrawal monitoring.  Longer term planning includes utilizing 2P for a dedicated withdrawal monitoring unit if APU moves to 3rd floor.
- Staff developed an audit tool to evaluate withdrawal monitoring in the Main Jail booking loop in March 2022.  Audits are completed monthly and a corrective action plan was issued due to delays in timely monitoring.  The purpose is to identify and correct issues with monitoring patients at risk of withdrawal at intake.

MAT Program:

- Three providers (two at Main Jail and one at RCCC) are designated to provide MAT services.
- MAT providers are assigned to take calls from nurses to continue MAT medications during weekdays.  After hours, standby providers order bridge treatment.
- The MAT policy revision is in process.

---

| Nursing Protocols (Provision O.) |
| Status: Substantial Compliance |

In order to ensure nurses act within their scope of practice, several items have been completed.

Standardized Nursing Procedures (SNP):

- The Remedial Plan states that SNPs shall include assessment protocols that are sorted based on symptoms into low, medium, and high risk categories.  Rather than label protocols as low, medium, and high risk, each SNP notes symptoms that RNs may manage, those that require a provider consult, and those that require emergency stabilization.
- A total of 45 SNPs have been either created or revised.  They include SNPs in the functional areas listed below.  *41 SNPs are pending Medical Expert feedback.*

- General (1)
- Abdominal (1)
- Cardiovascular & Lung (7)
- Dental (1)
- Endocrine (1)
- Eyes, Ears, Nose & Throat (5)
- Infection Control (1)
- Musculoskeletal (2)
- Neurological (4)
- Pregnancy (1)
- Skin (12)
- Substance Use Disorders (4) – *Final*
- Urological (5)

- Until Medical Expert feedback is received, ACH is not able to finalize 41 SNPs.
- Staff revised the four (4) Substance Use Disorder SNPs during the current monitoring period.  All were approved by the Medical Experts in April 2022.
- SNP for Vaginitis is currently in development.
- SNPs for Pregnancy and Visual Complaints are currently in revision.
- Nurse managers are reviewing other areas that may require a SNP.

Nursing Structure:

- The Nursing Director oversees two Senior Health Program Coordinators (nurse managers) responsible for nursing staff at respective jail facilities.  This brings continuity to overall nursing services.
- Regularly scheduled meetings with nurse managers (Senior Health Program Coordinators and Supervising Nurses) and staff meetings (direct nursing staff) include training on policies, procedures or protocols; issues of concern; announcements; etc.
- Nursing Position Standards have been created or revised for Senior Health Program Coordinator, Supervising Registered Nurse, Infection Prevention Coordinator, Registered Nurse, Licensed Vocational Nurse, Medical Assistant, and Certified Nursing Assistant.
- New employees complete a structured onboarding process that includes all areas to which a nurse may be assigned.
- Nursing Director conducts concurrent medical chart reviews for nursing documentation and application of nursing practice.  Staff who are not in compliance with policies and procedures receive additional training and mentorship as needed.
- Newly appointed Training Coordinator (SRN) will be able to increase training to nursing staff during the next monitoring period.

| Review of In Custody Deaths (Provision P.)<br>Status:  Substantial Compliance |
| --- |

Policy:

- ACH PP 01-08 Medical Review of In-Custody Deaths (revision 02/16/22) - *Final*

Other:

- Revised policy, tracking log and process went into effect in February 2022.
- Leadership staff are notified when there is an in-custody death and review of the medical chart is initiated by key service line directors.
- ACH schedules a joint administrative review meeting with Custody leadership within ten days of a patient death to determine if any immediate actions are required.
- Staff review the episode of care and develop Corrective Action Plans when indicated to address systemic or training issues.
- Key ACH staff are on the distribution list for coroner's reports.  Death certificates are obtained from Public Health staff when available.

| Reentry Services (Provision Q.)<br>Status: Partial Compliance |
| --- |

Policies:

- ACH PP 04-10 Discharge Medication (10/29/21) – *Final*
- ACH PP 05-10 Discharge Planning for Reentry (revision 05/19/22) – *Pending feedback. This is now a joint policy with MH.  MH PP 05-01 Discharge Planning was deleted.*

Discharge Medication:

- Sentenced and court-ordered patients are provided a 30-day supply of prescribed medications when released.  Staff are coordinating with custody for more accurate lists of potential release candidates in order to increase medications delivered at release.
- Discharge medications continue to be provided to approximately 70% of eligible sentenced and court-ordered patients upon release. Staff continue to work on the discharge medication release process with medical leadership and custody staff.
- Presentenced patients may obtain a prescription for a 30-day supply of medication at the County Primary Care Pharmacy.
- Discharge medications for presentenced patients began in January with a small pilot that initially included patients with SMI and comorbid diseases.  The program was recently expanded to include patients with Type I Diabetes, Hepatitis C, HIV, and patients receiving antibiotics.
- To date, very few presentenced patients pick up their medications.  Efforts are in process to see if additional patient education will increase patient response.  Pharmacy Director meets with Medical and Mental Health Directors to review process and take action.

Discharge Planning:

- Discharge planning policy was revised to become a joint policy with Mental Health and incorporates Medical SME feedback.  It is pending MH SME feedback.
- Staff are problem solving some obstacles to improve discharge planning.  This requires work with Sacramento Covered (organization contracted to assist patients with linkage to services), custody, and other team members.
- Designated discharge planning nurses work with patients with complex conditions to ensure there is continuity of care post release.
- SUD Counselor works with referred patients on continuity of SUD treatment.
- Mental health staff are required to provide linkage of patients with a serious mental illness to County Mental Health Providers.  County Mental Health is working on linkage to the County's Mental Health Access Team.  This team facilitates connection to the Adult Psychiatric Support Services (APSS) Clinic for patients who are not connected with a provider and need medication management and other treatment services.  A workflow was created and MH staff were trained on the referral process.
- County Behavioral Health established the *Community Justice Support Program,* a full-service partnership to serve justice involved patients with serious mental illness.  MH meets regularly with the program leadership to address barriers and collaborate on the referral process. A report was developed to capture the projected release date and level of care to identify patients with SMI and release dates within 6 weeks.
- Staff continue to work with local Medi-Cal Managed Care Plans that will roll out a new benefit under a program called CalAIM. CalAIM provides care management and coordination for patients with intensive health/mental health needs.  Many have difficulty navigating the multiple organized health systems to get the care they need.  This care management will be in person rather than telephonic.  The jail in-reach component of CalAIM was anticipated to begin January 2023 but has been delayed by the State Department of Health Services.  Staff will continue to work on this with partner agencies. The justice involved population meets other criteria for CalAIM.
- The Department of Human Assistance will be required to support pre-release Medi-Cal eligibility effective January 2023 for the justice involved population.  This is crucial in ensuring linkage to necessary services.
- County leadership has been meeting on both the enhanced care management and eligibility provisions in CalAIM.

| Training for SSO (Provision R.) |
| Status:  N/A |

- Refer to SSO.  Will collaborate with SSO on training as requested.

| Next Steps for Medical Remedial Plan Provisions |
| --- |

Substantial work has been completed on medical remedial plan provisions during this monitoring period.  Numerous policies and protocols were created and/or revised, electronic health record templates were created and/or modified, hiring and/or work on positions is continuous, and staff education is ongoing.

Next steps for the new monitoring period include:

- Pending completion of expert review, complete key policies or protocols that are in revision or draft form.
- Provide training and implementation for the new or revised policies.
- Complete key EHR projects including the chronic care nurse templates.
- Implement video communication pilot that will enable video consults with a provider.
- Create and complete audit tools for necessary areas.  This process will include feedback loops to staff and additional steps if needed (e.g., more training, process changes, etc.)

## MENTAL HEALTH CARE [Remedial Plan Section IV]

Class Counsel outlined five areas for focus including staffing, space planning, IOP, OPP, & Acute Bed assessment and planning, use of force for prisoners with mental health or intellectual disabilities, mental health and disciplinary measures, and roll out of the new electronic health record (EHR) system.  These items are shaded in blue.  The remainder of provisions are not shaded.  Status is listed for each.

| Staffing (Section II.  General Provision) |
| --- |

- ACH has a contract with UC Davis for provision of mental health services.
- See staffing section under General Provisions for a list of new services by fiscal year.

| Space |
| --- |
| Status: Partial compliance |

- Staff has been using the designated attorney booths in the following locations for confidential interviews: administrative segregation (March 2021), booking (September 2021 for mental health assessments), and fourth floor (December 2021) for psychiatric prescriber evaluations.  Staff developed a workflow outlining the process to use attorney booths and supervisors complete chart audits to ensure staff compliance with use of confidential space.
- Staff created a schedule for MJ (third floor classroom) RCCC (CBF classroom) to maximize space for confidential interviews and groups.

- Staff began offering evening groups to IOP patients in November 2021, which further maximizes classroom space. Staff discuss use of confidential space regularly at team meetings.
- Designated MH outpatient staff will move to a nearby G Street office late June 2022. Staff will vacate a classroom on the third floor that was converted into IOP office space. This will increase confidential programming space for groups and individual assessments and interventions.

> **IOP, OPP, & Acute Bed Assessment & Planning (Section II. General Provision)**
> **Status: Partial Compliance**

- MH administration has daily bed assignment/utilization meetings with custody to review movement between the IOP, OPP, and the Acute Psychiatric Unit. This includes admissions, discharges, and mental health recommendations for housing.
- Staff can obtain patient specific group attendance and the number of therapeutic hours per week through a newly created Group Participation Report. The report does not track group cancellations or reasons for cancellations. This data will be kept on a separate spreadsheet until the report function can be modified.
- ACH/MH/custody held multiple space planning meetings to discuss an interim proposal to move the Acute Psychiatric Unit to another floor. This would increase bed capacity for the Acute Unit from 17 to 38. Of those cells, 10 cells have been designated for use as the Suicidal Inmate Temporary Housing Unit (SITHU).
- ACH/MH/custody met to discuss and plan increasing high security/high acuity IOP beds to serve patients with SMI who are housed in Administrative Segregation. An addition of 8 bed female IOP at Main Jail was completed in late May/early June 2022. 24 bed male IOP will be implemented by September 1, 2022.
- MH will reallocate EOP staff to support expansion of the high acuity/high security IOP as staffing for the additional IOP beds was not included in the budget augmentation for FY 22/23. Reallocation of EOP staff will reduce the number of patients served in EOP. Will revisit EOP allocation in FY 2023/24 budget.

> **Use of Force for Prisoners with Mental Health or Intellectual Disabilities (Provision V.)**
> **Status: Partial Compliance**

Policies:

- ACH PP 05-21 Restraints and Seclusion – Joint Policy (revised 05/09/22) – *Final*
- MH PP 07-05 Mental Health Evaluations for Planned Use of Force (12/16/21) – *Final*

Other:

- MH is working with a consultant to develop de-escalation and use of force (UOF) training for MH staff. Staff estimate the training module will be developed by July 2022.

- MH and custody have met this monitoring period to discuss planned UOF.  MH is developing a multidisciplinary approach to address UOF incidents and will be providing training to staff on de-escalation and process for engaging attending MD, LCSW supervisor or psychologist prior to initiating planned UOF.

| Mental Health and Disciplinary Measures (Provision V.) |
| --- |
| Status:  Partial Compliance |

Policy:

- MH PP 07-06 Mental Health Rules Violation Review (01/05/22) – *Final*

Other:

- Custody consults mental health providers concerning disciplinary measures when a patient is located in MH housing.
- Rules Violation Review (RVR) process was implemented on a limited basis at RCCC (February 2021).  MH began tracking RVR referrals and assessments (July 2021). MH implemented RVR process in IOP, EOP, APU, and Ad Seg (October 2021).  Staff have been trained and provided workflows on the policy and process.  Staff refined the RVR assessment form based on expert feedback.
- MH collaborated with custody on development of an RVR and Administrative Segregation referral form and trained custody on the referral process and workflow for Administrative Segregation assessments (December 2021).
- MH is recruiting four clinicians to provide RVR assessments.
- MH has received budget approval for FY 2022-23 for clinicians to support RVR and Administrative Segregation reviews and recommendations.

## MENTAL HEALTH PROVISIONS: OUTSIDE AREAS OF FOCUS

| Policies and Procedures (Provision A.) |
| --- |
| Status: Partial Compliance |

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*
- ACH PP 05-21  Restraints and Seclusion – Joint policy (revised 05/09/22) – *Final*
- ACH PP 05-22 Patients in Segregation (05/31/22) – *Final*
- MH PP 01-10 Access to Mental Health Services (08/06/21) – *Pending feedback*
- MH PP 03-02 Overview of Staff Responsibilities – Acute Psychiatric Unit (08/16/21) – *Pending feedback*
- MH PP 03-03 Overview of Staff Responsibilities – Outpatient (08/18/21) – *Pending feedback*
- MH PP 03-04 Psychiatric Prescriber Duties (09/09/21) – *Pending feedback*
- MH PP 03-05 Acute Psychiatric Nursing Responsibilities (12/16/21) – *Pending feedback*

47

- MH PP 03-06 Acute Psychiatric Unit – Psychiatrist Responsibilities (12/16/21) – *Pending feedback*
- MH PP 04-01 Intensive Outpatient Program (04/17/20) – *Pending feedback*
- MH PP 04-02 FOSS Levels (12/30/21) – *Final*
- MH PP 04-03 Basic Mental Health Services (08/18/21) – *Pending feedback*
- MH PP 04-04 Outpatient Mental Health Services and Levels of Care (10/13/21) – *Pending feedback*
- MH PP 04-07 Acute Psychiatric Unit – Precautions and Observations (04/01/22) – *Pending feedback*
- MH PP 04-09 Acute Psychiatric Unit – Admission, Programming and Discharge (05/09/22) – *Final*
- MH PP 07-02 Treatment Planning (03/08/22) – *Pending feedback*.  This policy includes contents of former MH PP 07-01 Behavior Management Plan, which was deleted.
- MH PP 07-03 Use of Benzodiazepines (04/15/21) – *Pending feedback*
- MH PP 07-04 Patients with Substance Use Disorders (08/18/21) – *Pending feedback*
- MH PP 07-05 Mental Health Evaluations for Planned Use of Force (12/16/21) – *Final*
- MH PP 07-06 MH Rules Violation Review (01/05/22) – *Final*
- MH PP 09-02 Lanterman-Petris-Short Conservatorship (04/17/20) – *Pending feedback*
- MH PP 09-04 Administration of Involuntary Psychotropic Medication (revision 05/27/21) – *Pending feedback*
- MH PP 09-05 Informed Consent-Acute Inpatient Unit (05/27/21) – *Pending feedback*
- MH PP 09-06 Patient's Rights (10/07/21) – *Final*
- MH PP 09-07 Denial of Patient's Rights (08/06/21) – *Pending feedback*
- MH PP 09-08 Prison Rape Elimination Act (08/06/21) – *Pending feedback*
- MH PP 09-11 Involuntary Detainment Advisement (10/8/21) – *Pending feedback*

| Organizational Structure (Provision B.) |
| --- |
| Status: Substantial Compliance |

Policy:

- ACH PP 01-10 Organizational Charts (07/09/21) – *charts have been updated with new approved positions, change in position titles, and organization structure.*

Other:

- The MH Medical Director and Mental Health Manager oversee jail MH services.
- MH reorganized the leadership structure to address consent decree requirements and support program and staff expansion.
- The Medical Director and Mental Health Manager participate in a variety of meetings including Executive Team, Quality Improvement, Multidisciplinary, ad hoc meetings and regularly interface with medical and custodial leadership.

| Patient Privacy (Provision C.) |
|---|
| Status: Partial Compliance |

Policy:

- ACH PP 08-08 Patient Privacy (05/13/21; joint policy) – *Pending feedback*

Other:

- MH staff document confidential status of encounters including rationale when it is not confidential. A baseline audit was completed.  As a result of audit findings, MH has defined a drop-down menu of common reasons for lack of confidentiality for uniformity and data purposes.  Changes were completed and staff were trained (September 2021).
- MH supervisors monitor use of confidential space in booking and have regular discussions with staff regarding challenges/barriers to use of confidential space.  Managerial review of patient charts indicates staff are using space unless a safety/security reason is present. Staff are documenting rationale when a confidential interview is not possible.
- See Space section for details on confidential interview space.
- Staff created a schedule for the MJ third floor classroom and RCCC CBF classroom to ensure staff are fully utilizing confidential space and are aware of availability.
- MH and custody meet regularly to discuss challenges/barriers preventing confidential encounters.  MH and custody are developing plans to increase efficiency of using attorney booths on all floors, confidential interviews with patients who present with assaultive or high security/safety issues, and custody standby while ensuring auditory privacy.
- MH staff continuously reinforce importance and requirements of confidential individual interviews and group programming during staff meetings and huddles.

| Clinical Practices (Provision D.) |
|---|
| Status: Partial Compliance |

Policies:

- See policies listed in "Policies and Procedures (Provision A.)"

Other:

- Clinical Multidisciplinary Team (MDT) meetings began in IOP August 2021 with full implementation November 2021.
- IOP and EOP staff received training on completing treatment plans and MDTs in December 2021. Workflows were developed to help staff understand process and policy.
- Provided training to staff on process for completing MDT meeting and documenting patient's absence at MDT in instances where patients refuse to attend.
- Comprehensive treatment plans utilizing the EHR template were implemented for EOP patients in March 2021.

- MH groups began in APU August 2021.  MH currently offers six groups a week in APU. The APU Daily Patient Activity report was implemented August 2021. This report tracks patient care activities on APU and coordination with custody for patient care support needs.  Created a workflow for nursing staff and coordinated implementation with custody leadership.
- MH completed the first QI audit with data collected from APU Daily Patient Activity report.  Staff made recommendations to increase custody support and coverage on APU to support patient care activities and treatment groups.  In response, custody adjusted deputies' work hours to improve coverage on the APU.
- A MH triage clinician is assigned to emergent referrals for each shift.
- MH staff review all patients receiving MH services within the EHR.

| Medication Administration and Monitoring (Provision E.)<br>Status: Partial Compliance |
| --- |

Policies:

- ACH PP 04-17 Medication Administration (revised 12/16/21) – *Final*
- MH PP 03-04 Psychiatric Prescriber Duties (09/09/21)
- MH PP 03-06 Acute Psychiatric Unit – Psychiatrist Responsibilities (12/16/21)
- MH PP 07-03 Use of Benzodiazepines (04/15/21)
- MH PP 09-04 Administration of Involuntary Psychotropic Medication (revision 05/27/21)

Other:

- MH hired two additional psychiatric nurse practitioners in July 2021.
- MH increased psychiatric prescriber coverage to 7 days per week in the Outpatient Program.
- Established a MH Prescribers Meeting in August 2021 to improve communication, patient care practices, and standards related to the Consent Decree.
- Staff completed a baseline audit of intake screenings to determine timelines for verification of patients reporting community psychotropic medications. Recommendations included increasing documentation of pharmacy contact information to assist in improving MH timelines for verification.

| Placement Conditions, Privileges, and Programming (Provision F.)<br>Status: Partial Compliance |
| --- |

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*
- MH PP 01-10 Access to Mental Health Services (08/06/21)
- MH PP 04-01 Intensive Outpatient Program (04/17/20)

- MH PP 04-04 Outpatient Mental Health Services and Levels of Care (10/13/21)
- MH PP 04-09 Acute Psychiatric Unit – Admission, Programming and Discharge (05/09/22) – *Final*

Other:

- The Suicide Precautions and/or Grave Disability Observations – Custody Instructions Form was developed to document MH staff directions regarding housing, observation level, property, privileges, and clothing restrictions.  Staff provided training to custody leadership on the form and workflow on August 25, 2021.
- Staff provided training and created a workflow for MH staff on responsibilities related to suicide precautions and clinical decisions regarding housing, observation levels, privileges, clothing, and property in August 2021.
- MH and custody designees meet weekly to review the restrictions and collaborate on patient specific plans to restore a patient's property or privileges.
- MH and custody also meet daily to review bed assignment/utilization and movement between the IOP, OPP, and APU. This includes admissions, discharges, and MH recommendations.
- Completed baseline study of MH compliance in meeting 4-hour timeline to care for patients in safety cells and presented findings at a MH QI Subcommittee Meeting.  Results showed that low staffing levels significantly impacted compliance.

| Medico-Legal Practices (Provision G.) |
| Status: Partial Compliance |

Policies:

- ACH PP 05-21 Restraints and Seclusion – Joint policy (revised 05/09/22) – *Final*
- MH PP 04-07 Acute Inpatient Unit - Precautions and Observation (04/01/22)
- MH PP 09-02 Lanterman-Petris-Short (LPS) Conservatorship (04/17/20)
- MH PP 09-04 Administration of Involuntary Psychotropic Medication (revision 05/27/21)
- MH PP 09-05 Informed Consent-Acute Inpatient Unit (05/27/21)
- MH PP 09-06 Patient's Rights (10/07/21) – *Final*
- MH PP 09-07 Denial of Patient's Rights (08/06/21)
- MH PP 09-08 Prison Rape Elimination Act (08/06/21)
- MH PP 09-11 Involuntary Detainment Advisement (10/08/21)

See "Policies and Procedures (Provision A.)" for a list of policies and status.

| Restraints and Seclusion (Provision H.) |
| Status: Partial Compliance |

Policies:

- ACH PP 05-21 Restraints and Seclusion – Joint policy (revised 05/09/22) – *Final*
- ACH PP 04-10 Discharge Medication (10/29/21) – *Final*

Other:

- Staff provide sentenced patients a 30-day supply of prescribed medications upon release. Presentenced patients may obtain a prescription for a 30-day supply of medication at the County Primary Care Pharmacy.  See Reentry Services (Provision Q.) for further detail.
- MH continues to meet regularly with County Behavioral Health to refine the referral process for community based mental health services.  A report was developed to capture the projected release date and level of care to identify patients with SMI and release dates within 6 weeks.
- Based on SME feedback, staff combined the Restraints policies and worked in conjunction with custody to revise drafts of the Restraints and Seclusion, Use of Force, and Segregation policies.

| Training (Provision I.) Status: Partial Compliance |
| --- |

Policy:

- ACH PP 03-08 Staff Development and Training (07/01/21)

Other:

- MH has a training coordinator who monitors training compliance.
- Training was developed and provided on the following:
    - Treatment Planning and MDT Meetings
    - Brain Development/Intellectual Disability
    - Effective Communication/ADA
    - Consent Decree
    - 5150 Certification
    - Prison Rape Elimination Act
    - Understanding Mental Health Symptoms in the Correctional Setting (Custody specific training)
- MH is working with an expert to develop use of force and de-escalation training. Anticipate training will be ready for expert review by July 2022.
- MH worked with a consultant to develop WPATH training.  See Transgender and Non-Conforming Health Care (Provision M) for detail and status.
- Developing training for intake nurses on screening for mental health issues, suicide risk assessment screening, danger-to-self or others and grave disability and referral process for emergent MH evaluations. Training implementation estimated for June 2022.
- See Section VII (Provision B) for Suicide Prevention related items.

## SUICIDE PREVENTION [Remedial Plan Section VII]

Class Counsel outlined six areas for focus including revision of the Suicide Prevention Policy, changes to the policy and practice of Safety Suits, confidentiality at intake and for suicide risk assessment, property and privileges, and resuming a Suicide Prevention Task Force or a multidisciplinary committee.  These items are shaded in blue.  The remainder of provisions are not shaded.  Status is listed for each.

Substantive Provisions (Provision A.)
Status: Partial Compliance

Policies:

- ACH PP 02-05 Suicide Prevention Program (revision 11/16/21) – *Final*

Other:

- The Suicide Precautions and/or Grave Disability Observations – Custody Instructions form was created to provide MH staff directions regarding housing, observation level, property, privileges, and clothing restrictions.
- MH developed a training module called *Suicide Precautions and LCSW Role* and provided training to MH staff and custody leadership on the form and workflow.
- Began implementation of Morbidity and Mortality reviews during Suicide Prevention Subcommittee meetings in December 2021.
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction was deleted as its contents are included in the Suicide Prevention policy.
- Updated MH PP 04-07 Acute Psychiatric Unit Precautions and Observations to include relevant sections from the Suicide Prevention Program policy.  Pending Expert feedback.

Use of Safety Suits (Provision N.)
Status: Partial Compliance

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- Staff are meeting the remedial plan requirements on use of safety suits except during the intake process.  Custody may place an inmate in a safety suit if it is determined that the inmate is at risk of imminent self-harm. In these instances, MH is notified immediately.

Nurse Intake Screening (Provision C.)
Status: Partial Compliance

Policies:

- ACH PP 02-05 Suicide Prevention Program (revision 11/16/21) – *Final*

- ACH PP 05-05 Nurse Intake (revision 10/29/21) – *Final*

Other:

- Staff made significant revisions to the Nurse Intake policy and form based on feedback from all experts.  The revised nurse intake form was implemented in November 2021.
- See Medical Care Intake Screening (Provision B.) for more detail.
- Staff are developing training for intake nurses on screening for mental health issues, suicide risk assessment screening, danger-to-self or others and grave disability and referral process for emergent MH evaluations. Training implementation estimated for June 2022.

---

**Post-Intake Mental Health Assessment Procedures (Provision D.)**
**Status: Partial Compliance**

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*
- MH PP 01-10 Access to Care (revision 08/06/21)

Other:

- Staff instituted the 4-hour emergent timeline for patients placed in safety cells (October 2021).  MH is tracking compliance to determine barriers/challenges to meeting the 4-hour timeline to care.  A workflow was developed and training was provided to staff regarding the new timeline to care.
- MH implemented televisits for after-hours emergent referrals at RCCC to ensure timely access to care.
- MH assessments are conducted within the timeframes defined in the MH triage system.
- MH clinicians document whether assessments are confidential or non-confidential including rationale, if indicated.
- The Suicide Prevention Program policy addresses the need for a mental health assessment if a suicide risk is noted at intake or if any staff member becomes aware of a patient verbalizing or engaging in acts of self-harm or suicidal ideation. Licensed MH clinical staff will conduct the suicide risk assessment.
- Completed baseline study of MH compliance in meeting 4-hour timeline to care for patients in safety cells and presented findings at MH QI Subcommittee Meeting. Results show that low staffing levels significantly impacted compliance.

---

**Property and Privileges (Provision M.)**
**Status: Partial Compliance**

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- See Substantive Provisions (Provision A.) for work accomplished in this area.

| Quality Assurance and Quality Improvement (Provision R.) |
| --- |
| Status: Partial Compliance |

Policies:

- ACH PP 01-07 Quality Improvement Program (revised 04/13/22) – *Final*
- ACH PP 01-08 Medical Review of In-Custody Deaths (revised 02/16/22) – *Final*
- ACH PP 01-15 Suicide Prevention Committee (revised 09/17/21) – *Final*
- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- A MH QI Subcommittee convened May 2021. This Subcommittee meets quarterly.
- MH convened a multidisciplinary Suicide Prevention Subcommittee to review, track, and audit the requirements.
- Suicide Prevention Subcommittee moved meetings from a quarterly to monthly schedule to improve communication, implement Suicide Prevention training, and complete morbidity and mortality reports in timely manner.
- A multidisciplinary Suicide Prevention Training Subcommittee was established to develop Suicide Prevention Training.  This group met multiple times and determined a separate subcommittee was no longer needed in late May 2022 once training was approved.
- Class Counsel and Experts approved the 4-hour Suicide Prevention Training for new employees; first training was conducted on June 2, 2022.
- Began Morbidity and Mortality reviews during the Suicide Prevention Subcommittee meetings in December 2021.
- MH tracks incidents of suicide, attempted suicide and serious self-harm.

| Training (Provision B.) |
| --- |
| Status: Partial Compliance |

Policy:

- ACH PP 03-08 Staff Development and Training (07/01/21)

Other:

- MH developed and provided training on the following:
  - Suicide Prevention – Annual 2-hour refresher
  - Suicide Precautions and LCSW Role
  - Suicide Risk Assessment

- MH began offering a 2-hour Suicide Prevention training to medical and custody staff in December 2021.
- The 4-hour Suicide Prevention Training for new employees was approved by Class Counsel and Suicide Prevention Expert in February 2022.  MH staff worked with custody and medical staff to prepare for the training.  The first training was conducted on June 2, 2022.
- The Suicide Risk Assessment Training was approved by SME and staff are being trained.
- MH has a training coordinator who also monitors compliance for training requirements.

| Response to Identification of Suicide Risk or Need for Higher Level of Care (Provision E.) Status: Partial Compliance |
|---|

Policies:

- ACH PP 02-05 Suicide Prevention Program (revision 11/16/21) – *Final*

Other:

- Timeframes are noted in the policies.
- The Suicide Risk Assessment captures the information listed in this provision.
- See Post-Intake Mental Health Assessment Procedures (Provision D.) for work accomplished in this area.

| Housing of Inmates on Suicide Precautions (Provision F.) Status: Partial Compliance |
|---|

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- MH policies state all patients, including those identified as being at risk for suicide, are treated in the least restrictive setting appropriate to their clinical needs.
- See Substantive Provisions (Provision A.) for work accomplished in this area.

| Inpatient Placements (Provision G.) Status: Partial Compliance |
|---|

Policy:

- MH PP 04-09 Acute Psychiatric Unit Admission, Program and Discharge (05/09/22) – *Final*

Other:

- MH staff makes every effort to ensure that patients assessed for the APU are placed in the unit as soon as possible upon bed availability.  Patients who are on the preadmission list beyond 24 hours are assessed daily for continuous need of placement or clearance.

- ACH has regular meetings with custody leadership to discuss space needs and options for increasing APU beds. See IOP, OPP, & Acute Bed Assessment & Planning (Section II. General Provision) for detail.

---

Temporary Suicide Precautions (Provision H.)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- See Post-Intake Mental Health Assessment Procedures (Provision D.) for work accomplished in this area.

---

Supervision/Monitoring of Suicidal Inmates (Provision J.)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*
- MH PP 01-10 Access to MH Services (08/06/21)

Other:

- Custody reopened the Suicidal Temporary Housing Unit (SITHU).  It was closed during most of the pandemic.  MH and custody identify patients who can be placed in SITHU while awaiting assessment or APU bed.
- Staff have daily bed assignment/utilization meetings with custody to review movement between the IOP, OPP, & APU.
- See Substantive Provisions (Provision A.) for work accomplished in this area.

---

Treatment of Inmates Identified as at Risk of Suicide (Provision K.)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*
- ACH PP 08-08 Patient Privacy – Joint policy (05/13/21)
- MH PP 07-02 Treatment Planning (03/08/22)

Other:

- Designated staff monitor the APU preadmission list of patients.
- The outpatient appointment log was updated to better reflect appointment types (emergent, urgent, and routine).

- Order Linkage form was created to improve tracking of timelines to care.  This allows staff to enter actual visit time and link the visit time to the visit order.   Report is under development.
- Staff utilize the confidential interview office in booking, classrooms, and attorney booths for confidential interviews.

---

Conditions for Individual Inmates on Suicide Precautions (Provision L.)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- The Suicide Prevention Policy addresses MH's role as the primary authority to make decisions on property and privileges, use of safety suits, and discharge from suicide precaution based on clinical assessment.
- See Substantive Provisions (Provision A.) for work accomplished in this area.

---

Beds and Bedding (Provision O)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- The Suicide Prevention Policy addresses MH's role as the primary authority to make decisions on property and privileges for patients on suicide precautions based on clinical assessment.
- Custody distributed new suicide-resistant mattresses to the high acuity MH housing areas and safety cells in May 2022.
- See Substantive Provisions (Provision A.) for work accomplished in this area.

---

Discharge from Suicide Precautions (Provision P.)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- Patients who are discharged from APU after being treated for a suicide attempt or ideation receive follow up MH appointments (24 hours, 72 hours, and 5 days).

- Patients are transferred to IOP when clinically appropriate and a bed is available.
- IOP and Outpatient appointment logs have been updated to reflect accurate appointment types.

| Emergency Response (Provision Q.)<br>Status: Substantial Compliance |
| --- |

Policies:

- ACH PP 04-11 Emergency Equipment (revision 08/25/21) – *Final*
- ACH PP 04-12 Emergency Medical Response (revision 05/19/22) – *Pending feedback*
- ACH PP 04-13 Man-Down Drill (08/21/20) – *Pending feedback*

Other:

- Medical and custody staff are trained in CPR.
- New emergency carts were deployed at Main Jail.  New carts are on order for RCCC.
- Staff complete a Man-Down Debriefing Summary for incidents requiring medical response or drills.  The form and staff debriefing assist staff in reviewing code response.

# SEGREGATION/RESTRICTED HOUSING [Remedial Plan Section VIII]

| Mental Health Functions in Segregation Units (Provision C.)<br>Status: Partial Compliance |
| --- |

Policy:

- ACH PP 05-22 Patients in Segregation (05/31/22) – *Final*

Other:

- MH has been working with custody to identify and meet with segregated MH patients.
- MH staff met with custody to discuss providing groups in the Administrative Segregation unit.  Groups were piloted in segregation September 2021.
- MH continues to work with custody on identifying cohorts of individuals in the segregated housing unit that can be in the dayroom together.
- Collaborated with custody on development of RVR and Administrative Segregation referral form and trained custody on referral process in December 2021.
- Began Administrative Segregation weekly MH assessments in December 2021.
- MH meets with custody often to discuss access to patients in segregation and provision of confidential interviews.  Recent discussions included more efficient use of attorney booth, education of custody regarding importance of confidential interviews and options for providing patients with assault precautions confidential interviews.

Placement of Prisoners with Serious Mental Illness in Segregation (Provision D.)
Status: Partial Compliance

Policy:

- ACH PP 05-22 Patients in Segregation (05/31/22) – *Final*

Other:

- Custody consults with MH staff prior to placing an inmate with serious mental illness in segregation, however, in emergent circumstances, the MH consult will occur after placement.
- MH staff provide case management to patients with serious mental illness who are in segregated housing.
- MH is working with a consultant to develop de-escalation and use of force training for MH staff.  Anticipate training will be developed by July 2022.

Restraint Chairs (Provision J.)
Status: Partial Compliance

Policy:

- ACH PP 05-21 Restraints and Seclusion – Joint policy (revised 05/09/22) – *Final*

Other:

- Mental health, medical and custody met to discuss restraints and seclusion process and ensure consistency among respective polices.
- Placement in restraint or WRAP triggers an emergent referral to MH.

Next Steps for Mental Health, Suicide Prevention and Segregated Housing Provisions

Next steps for the new monitoring period include:

- Complete key policies that are in revision or draft form.
- Continue to provide training and implementation for the new or revised policies.
- Begin providing the 4-hour Suicide Prevention training to new employees in June 2022.
- Provide ongoing training to custody staff who work in MH program areas on common MH disorders.
- Coordinate MDT meetings for patients served in EOP and Administrative Segregation.
- Complete train-the-trainer modules for Use of Force/De-Escalation and WPATH trainings.
- Finalize MH Adaptive Support Program policy and process and train core staff to complete evaluations.
- Hire and train new staff for EOP expansion and Administrative Segregation and MH RVR Reviews.

- Increase the number of MH RVR and Administrative Segregation Reviews with augmented staff.
- Staff and develop programming for the new 24 bed male high acuity/high security IOP at RCCC.
- Collaborate with custody on referral process and coordination to ensure MH is involved in planned Use of Force incidents.

Challenges:

- Confidential space to conduct MH interviews and group programming remains problematic.
- Difficulty recruiting sufficient staff to fill vacant positions. Staffing limitations prevent full rollout of MDTs, comprehensive treatment planning, MH RVR and Administrative Segregations reviews, and constant observation.

## QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT
## [Remedial Plan Section IX]

| Generally (Provision IX. A.) |
| --- |
| Partial Compliance |

Prior to the remedial plan, there was a very limited policy on quality improvement, no dedicated staff, no data, and no QI audits.  Extensive actions have been taken to expand the QI structure. These are listed below.

Policies:

- ACH PP 01-07 Quality Improvement Program (revised 04/13/22) – *Final*
- ACH PP 01-13 Pharmacy & Therapeutics Committee (revised 02/04/22) – *Final*
- ACH PP 01-14 Utilization Management (revision 05/05/22) – *Final*
- ACH PP 01-15 Suicide Prevention Subcommittee (09/17/21) – *Final*
- ACH PP 01-18 Utilization Management Subcommittee (05/05/22) – *Final*
- Injury and Illness Prevention (IIPP) PP 01-02 Safety Subcommittee (initial 07/10/20)

Committees:

- Quality Improvement Committee and several subcommittees (Pharmacy & Therapeutics, Mental Health QI, and Safety) met quarterly throughout FY 2021/22.  Meetings are multidisciplinary.
- The Suicide Prevention Subcommittee changed to monthly meetings effective November 2021.
- A Utilization Management Subcommittee was formed and began meeting quarterly in October 2021.

- The Safety Subcommittee will be refocused to include infection control in 2022.  This will be led by a designated nurse manager.
- QI staff updated a list of reports and created a list of audits based on the indicators listed in the remedial plan.  The lists clarify types of data for review in each subcommittee. These documents have been reviewed with service line managers in the Quality Improvement Committee and the MH QI Committee. QI will monitor progress.

Staffing:

- The QI team was approved for two additional positions including a Training Coordinator (Supervising Registered Nurse) and a second QI Nurse.  The existing QI Nurse was promoted to Training Coordinator effective January 2022.  The two QI Nurse positions were recently filled and began employment in late May and early June 2022.  These positions will increase training and audits in the next monitoring period.
- The QI clerical support staff retired in March 2022.  A new Senior Office Assistant has been selected and is currently in background.
- A new Health Program Manager position (QI Director) was approved in budget for FY 2022/23.  This manager will lead the QI team and take point on the consent decree planning which has been led by the Deputy Director.  Additionally the Administrative Services Officer (ASO) I (Data Reports) received approval to be reallocated to an ASO II level commensurate with scope of duties.

Other:

- Many data reports have been developed and will continue to be developed. This includes audit reports and semiannual data reports.
- QI audits are developed as policies are implemented and staff are trained to audit.
- Staff continued to audit areas of focus on a regular basis.  Examples include disability identification and documentation, diabetes management, and referrals at intake.  Audit data is shared with service line managers for appropriate actions.
- Several new audits were developed and conducted during the monitoring period. Examples include medication initiation/renewal and withdrawal management.
- New audit tools will be developed during the next monitoring period due to additional staffing.
- Consent Decree training was developed and provided to medical and mental health staff in late 2021 and early 2022.  This training will be provided periodically to new staff.

| Quality Assurance, Mental Health Care (Provision IX. B.) |
| --- |
| Partial Compliance |

- Mental health representatives participate in all QI meetings but there are three specific mental health multidisciplinary subcommittees: Mental Health (chaired by the MH Program Manager), Suicide Prevention, and Suicide Prevention Training Subcommittee (chaired by the MH Medical Director). The MH QI Subcommittee meets quarterly and

Suicide Prevention Subcommittee meets monthly.  The chair will attend all subcommittee meetings or the meeting will be rescheduled.

- The Suicide Prevention Training Subcommittee ceased to meet in late May 2022 after the Suicide Prevention Training was finalized.
- Chairs are responsible to ensure indicators are reviewed and tracked.
- Audit tools are in development related to mental health and suicide prevention remedial plan provisions.
- Morbidity and Mortality reviews of serious suicide attempts are reviewed at each Suicide Prevention Subcommittee meeting.  Staff adopted a Review Checklist suggested by the Suicide Prevention expert.

---

Quality Assurance, Medical Care (Provision IX. C.)
Partial Compliance

---

- Medical representatives participate in all QI meetings.  Each forum is quarterly.
- Chairs are responsible to ensure indicators are reviewed and tracked. Recommendations and corrective actions are discussed and follow up is conducted as needed.
- Audit tools are in development related to medical remedial plan provisions.
- As audits are completed, service line directors are required to submit corrective action plans for deficiencies that do not improve over time.
- Performance Evaluations are required annually for permanent county staff and more frequently for probationary staff.  (ACH PP 03-09 Performance Evaluations).

---

Next Steps for Quality Assurance Systems Provisions

---

Next steps for the new monitoring period include:

- Add infection control to the Safety Subcommittee.  The focus will be on overall infection control and not solely on COVID-19.  A nurse manager will assume facilitation.
- Continue to create and complete audit tools for necessary areas.  This process will include feedback loops to staff and additional steps if needed (e.g., more training, process changes, etc.)
- Drafted a nurse peer review tool, completed a small pilot and will revise during the next monitoring period.  Will work on additional peer review tools in the next monitoring period.
- Finalize Specialty Referral Report testing and put report into production. This will ease the burden of manual tracking in this area.
- Create a system for both grievance and incident reporting tracking that auto populates data and percentages to reduce manual calculations.
- Refine process for documenting Patient Refusals electronically to prevent duplication and increase ease of reporting.

## JAIL FACILITY NEEDS

Sacramento County (representatives from County Executive's Office, General Services, SSO, and ACH) has been engaged in planning for facility improvements to meet the needs of the Consent Decree including Americans with Disabilities Act (ADA) standards, patient privacy, and sufficient space for medical and mental health services.

Main Jail Correctional Health & Mental Health Services Facility Project:

This project consisted of design and construction of a new building on the northeast corner of the existing Main Jail facility.  This construction would have added a new intake/booking area, additional medical and mental health space, education, and program space.  Areas would have been designed in compliance with the Americans with Disabilities Act (ADA) and Health Insurance Portability and Accountability Act (HIPAA).

- On April 21, 2020, the Board of Supervisors approved a $7,027,135 contract with an architectural firm to design the proposed annex.
- On March 10, 2021, the Board voted to not proceed with the recommended Correctional Health and Mental Health Services Facility construction project and requested staff to review and consolidate monitoring reports and to create a chart showing risk information for the jail population.

In terms of next steps, the county adjusted the scope of work with the contracted architectural and design firm to determine the following:

- What can be achieved in the Main Jail to comply with the Consent Decree without making any physical improvements
- How many beds would be lost
- What requirements would be met
- What requirements would not be met or only be partially met

The contracted firm has provided a draft report with findings regarding the size of the population that can be served at the Main Jail (bed capacity, medical/mental health population). The draft report is currently completing final review.

The county also engaged another consultant to identify the risk profile for those in the jail during dates pre- and post-COVID-19 and examine ways in which justice partners, county services, and community groups can collaborate to ensure the jail is utilized in a purposeful manner, and outline areas where significant reductions in the jail's population are possible, with steps that can be taken at multiple levels by various stakeholders.  The consultant study findings and recommendations are presented in a draft report recently completed. The draft report covers findings and specific policy and program recommendations that include use of current programs to target populations for programming options that reduce the jail population by reducing length of stay, bookings, or future jail occurrence, and notes regarding the evidence base for programs that might be new to the county.  The draft report is currently under review.

The Board of Supervisors requested a peer review of both reports. The county has engaged a peer reviewer who will complete review of both reports sometime in June 2022.  Staff will present findings from both studies and the peer review to the Board of Supervisors in a workshop session in July/August 2022.

Rio Cosumnes Correctional Center (RCCC) Facility Project:

The RCCC facility requires modifications to be responsive to the Consent Decree.  The County initially worked on a project to make improvements to the RCCC facility (new medical, mental health, and program space) using SB 1022 grant project funds.

The Board of Supervisors decided on September 22, 2020 to not accept $80 million in SB 1022 funding from the state for facility improvements, as recommended by the Grand Jury, which would have covered costs for facility improvements addressing Consent Decree requirements at RCCC. The Board acknowledged the County will still be responsible for the cost of all changes required by the Consent Decree.

## COUNTY EFFORTS TO REDUCE THE JAIL POPULATION

Sacramento County (representatives from the County Executive's Office, criminal justice partners, SSO, DHS Behavioral Health, and ACH) is engaged in multiple efforts to reduce the jail population.  On August 10, 2021, the County Executive proposed and the Board of Supervisors approved an ordinance to create a new Public Safety Agency, headed by a Deputy County Executive.  The recruitment and hiring was completed in February 2022 for the Deputy County Executive who now oversees efforts to reduce the jail population and compliance with the Consent Decree.

See Board of Supervisors (BOS) webpage for status updates on efforts to reduce the jail population:

- BOS Meeting dated 10/22/2019, Item #66 (*Report on County Efforts to Reduce the Jail Population*).
- BOS Meeting dated 03/10/2021, Item #3 (*Workshop – Review the Design-Build Process Related to the Correctional Health and Mental Health Services Facility Project, And Approve Contract No. 81555*…)
- BOS Meeting dated 08/10/2021, Item #2 (*Adopt An Ordinance Amending Various Sections Of Chapter 2.09 And Chapter 2.61 Of the Sacramento County Code Related To Creation Of A Public Safety And Justice Agency,…*)
- On 02/15/2022, the BOS authorized the appointment of the new Deputy County Executive (DCE) for the Public Safety and Justice Agency.
- On 06/14/2022, the new DCE will present a charter to establish a Public Safety and Justice Advisory Committee to provide a community voice in dialogue on decreasing the jail

population, recognizing the importance of including voices of individuals with lived experiences and those most closely impacted by incarceration.  Expected to begin meeting in September or October 2022

- Ongoing planning for implementing expansion of a Medi-Cal benefit called CalAIM to better serve justice involved individuals.  The State has delayed the component for the justice involved population which was targeted for January 2023.  Planning will continue.

- Planning is in process to develop a Social Health Information Exchange (SHIE) for integration of health, housing and justice data.  A consultant has been hired and work is in process.

Additional updates on efforts to reduce the jail population are listed below.

**Jail Diversion Programs that are active**:

Pretrial Assessment and Monitoring: Probation (lead agency) received local funding and a grant from the Superior Court to utilize the Public Safety Assessment (PSA) tool to inform pretrial release and monitoring decisions based on risk of failure to appear (FTA), risk of new criminal activity, and risk of new violent criminal activity.  The Pretrial Pilot began October 2019 and was recently extended to operate with grant and county funding through December 2023.  Pretrial monitoring can include court reminders, office visits, community visits and GPS monitoring. Superior Court has released 3,916 clients on Pretrial Monitoring from October 2019 through May 2022.

- BOS Meeting dated 12/14/2021, Item #25 (*Authorization To Execute A Memorandum of Understanding With The Superior Court…For The Pretrial Release Program…*)
- BOS Meeting dated 05/10/2022, Item #43 (*Pretrial Programs Report*) summarizes program activities through February 2022.

Public Defender Pretrial Support Project (PTSP): Public Defender (lead agency) received a grant from Bureau of Justice Assistance (BJA) to develop and operate a pretrial support program using evidence based tools to interview jail inmates prior to arraignment to identify needs, provide social worker support/case management (in custody and in the community), link to services, and coordinate safe discharge plans.  Over 2,200 pretrial defendants were screened through this program from January 2021 through March 2022.  At the Board of Supervisors (BOS) September 2021 budget hearing, additional county funds were granted to expand this program.

At the December 14, 2021 BOS meeting, the program was further expanded through approval of an MOU between the Public Defender's Office and Superior Court for additional grant funds from December 15, 2021 through December 2023 for PTSP to provide supplemental services (transitional housing, transportation from jail and to court/probation/services, behavioral health intervention, employment, phone, clothing, etc.) to clients released on Pretrial Monitoring.

In March 2022, the Exodus Project was contracted to connect community intervention workers with PTSP social workers to provide additional support to individuals released under the Pretrial Support Project.  During the first two months, 32 clients were referred to Exodus Project for services.

- BOS Meeting dated 12/14/2021, Item #27 (*Authorization To Execute A Memorandum of Understanding With The Superior Court…To Provide Supplemental Social Work Services To Support The Superior Court's and Probation Department's Pretrial Project…*)
- BOS Meeting dated 05/10/2022, Item #43 (*Pretrial Programs Report*) summarizes program activities through February 2022.

Pretrial Felony Mental Health Diversion: Public Defender (lead agency) received a grant from the Department of State Hospitals (DSH) to implement a Pretrial Mental Health Diversion Program. The target population includes adults with serious mental illness charged with felonies that are incompetent to stand trial or at risk of being mentally incompetent to stand trial. Public Defender has contracted with Telecare to provide services for a current capacity of 50 with housing for 25. Through additional grant funds from DSH, as soon as Board approval is acquired, the program will expand to serve up to 100 individuals per year with housing for 50.

Clients are referred through the granting of Felony Mental Health Diversion by the court. This program began March 2021 and through May 2022, served nearly 50 clients with 7 successfully completing/graduates.  Additionally, over 130 clients are on a waitlist pending a Mental Health Diversion ruling from the court.

**New Programs in Development**:

Forensic Behavioral Health Innovation Program: DHS Behavioral Health created a Mental Health Services Act (MHSA) Innovation Project for individuals with a serious mental illness and criminal justice involvement who are being released from the jail.  This project fills a gap in meeting needs of the justice-involved population who "fall through the cracks" and return to custody due to the complexity involved in accessing resources across multiple systems. The Forensic Full Service Partnership will utilize a Multi-System Team approach and provide tailored services to address the unique needs of the justice-involved population. Treatment targets include criminal behavior, mental illness and substance use.  Clients 18 years and older, experiencing serious mental illness with significant functional impairment may be referred by justice partners and MH services within the jail.

This innovative project will adapt and expand on the Child and Family Team (CFT) model for the forensic behavioral health population. This teaming model has been successfully used in child welfare systems to address the needs of justice and/or foster system involved youth. The purpose of CFT meetings is to assemble team members to create an integrated plan in order to determine how to address the client's needs and goals that promote wellness, resilience, and placement stabilization. The comprehensive treatment planning and collaborative system-wide approach will reduce recidivism (return to custody), stabilize psychiatric symptoms, and decrease substance use.  Ultimately, meeting the shared goals of increasing public safety and public health

67

for individuals and communities.  El Hogar Community Services began providing services at an easily accessible site in South Sacramento in March 2022.

Jail Diversion Treatment and Resource Center (JDTRC): Probation (lead agency) received an infrastructure grant to provide a community based facility to divert criminal justice-involved adults with mental health disorders, substance use disorders, and/or other trauma-related disorders from jail and/or prison.  On June 2, 2020, Probation received the Board of Supervisors approval on this project. This program recently had a ribbon-cutting ceremony and public open house on December 12, 2021 and subsequently began services targeting individuals who have been granted participation in Misdemeanor Mental Health Diversion or are pending a court decision relative to their participation.

Alternatives to 9-1-1/Wellness Crisis Call Center & Response Team (new, tentative start in October 2022):  At the September 2020 Budget Hearing, BOS asked staff to develop a proposal for alternative responses to mental health and homeless-related 911 calls to complement the existing Mobile Crisis Support Teams (MCST).  The County facilitated an internal countywide work group to review data, review models from other jurisdictions, and obtain community input. Staff received approval for crisis response plans that include a 24/7 Crisis Call Center, Crisis Receiving Facilities, Urgent Care, and Mobile Field Response during the FY 2021/22 budget hearings. In January 2022 the Behavioral Health Urgent Care Center began 24/7 operations.

Recruitment for the new crisis call center and mobile response teams is currently underway. Ongoing work being done on strategies for coordination with CBOs and development of response protocols and workflows. The Department of Health Services is also working to establish a related Community Advisory Board and identify funding for sustainability, including revenue potentially generated through pending AB 988 legislation.

**System Planning**:

Work Plan to Reduce Use of the Jail: In 2020, a Correctional Facilities Committee adopted a work plan to implement recommendations from the Carey Group Report. The group became inactive while leadership changes were underway. It was determined the new Deputy County Executive of Public Safety and Justice would provide direction regarding next steps for the work plan and committee.  Consultant reports will be presented at a Board workshop in July/August 2022. After the workshop, it will be determined what next steps are needed for an updated work plan that incorporates new recommendations along with outstanding Carey Group recommendations and approaches focused on managing justice-involved individuals in a setting other than jail. The County remains committed to these effort with a FY 2022/23 recommended budget that includes resources for enhancing current and new programs and strategies to reduce use of the jail.

Data Driven Recovery Project (DDRP): In January 2020, the Criminal Justice Cabinet's Mental Health Work Group began to meet with the DDRP consultant to review data from individuals in the criminal justice system who have serious mental illness (SMI). The focus is on use of the sequential intercept model (SIM) to identify behavioral health and criminal justice services and measures at different decision points to determine where there are opportunities to implement changes that will reduce the population of individuals with SMI in the jail facilities. This work is in

alignment with the national "Stepping Up Initiative" which focuses on reducing the population of adults with SMI in jails.

The Work Group has reviewed baseline measures to develop a common understanding and fuller view of people touching multiple systems, as well as programmatic analysis in areas such as Mental Health Diversion and Mental Health Treatment Court.  DDRP efforts also include working with justice partners to implement ongoing justice and health data integration through the County's Integrated Justice Information System (IJIS) and a new Social Health Information Exchange (SHIE) application is under development for improved care coordination.  (Information on CalAIM, a new Medi-Cal health plan benefit, is mentioned earlier in the report under the Discharge Planning Provision.)

Additionally, the DDRP consultant has done work to provide a risk profile of the jail population in 2019 to assess potential use of an automated risk screening tool and warrant diversion strategies to assist with the County's overarching jail population reduction efforts, but also connected to DDRP work aimed at implementing changes that keep people with SMI out of jail, shortening the length of stay for those with SMI, increasing connections to services at release, and keeping people with SMI from coming back to jail. The DDRP consultant is continuing this work through June 2022.

# ATTACHMENT 1

**Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

*Initial 07/08/20. Updated by Class Counsel 07/01/21.* *Updated by County 06/07/22.*
Yellow highlighting - used for most recent updates.
Tan shading - final policies.
**Bold -** review and change in process.

Color coding indicates policies pending review by: Blue – Medical Experts Pink – MH Experts Green – Class Counsel

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|--------|------------------------|--------------|-----------------|
| 01-01 Department & Division Overview (Joint policy) *CHS Policy 1000* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 No comments | 7/13/20 Sent policy. Joint policy – FINAL |
| 01-03 Responsible Health Authority *CHS Policy 1100* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Minor comments | 7/13/20 Sent policy. 6/25/21 Accepted feedback for formatting changes which pertain to several PP. Policy revision pending. 7/16/21 Policy revised with formatting/title changes – FINAL |
| 01-04 Medical/ Clinical Autonomy (Joint policy) *CHS Policy 1101* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Minor comments. Ensure leadership titles are consistent between policies 01-03 and 01-04. | 7/13/20 Sent policy. 6/25/21 Accepted feedback on titles/ format. Policy revision pending. 7/16/21 Policy revised with formatting/title changes – FINAL |
| 01-07 Quality Improvement Program (Joint policy) | 7/1/21 Class counsel comments (on inclusion of specific Remedial Plan QA/QI provision) sent. | | 6/25/21 Policy revised and sent. 7/16/21 Per Counsel questions and response via email, staff will create a separate PP on Multi-disciplinary meetings. Specialty Log tracking is noted in Specialty Referrals PP. This item will be tracked in new QI subcommittee Utilization Management to start this year. Baseline report in process. – FINAL |

Policy Revisions Tracking Chart
Case 2:18-cv-02081-TLN-KJN   Document 154   Filed 06/16/22   Page 74 of 220
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-08 Medical Review of In-Custody Deaths (Joint policy) | 7/1/21 Class counsel comments sent. All SMEs should review the draft vis-à-vis their disciplinary focus.<br><br>1/10/22 Class Counsel defer to the Medical SMEs on any additional revisions. | 12/10/21 Medical SMEs sent edits & questions about 2021 death reviews.<br>12/15/21 Medical SME sent additional questions about autopsies.<br>12/17/21 SP SME sent policy edits.<br>2/1/22 Medical SMEs sent comments on the revised draft. | 6/25/21 Policy revised and sent.<br>7/16/21 Per Counsel comments and response via email, all deaths are considered in custody even if occurs offsite. SSO approved content of initial draft. Pending SME.<br>12/16/21 In review and revision.<br>1/4/22 Sent email with revised draft policy based on SME feedback. Unchanged: SSO keeps binders & admin review within 30 days consistent with remedial plan and NCCHC.<br>2/4/22 In review and revision.<br>2/16/22 Policy finalized with SME requested changes. – FINAL |
| 01-09 Grievance Process for Health/ Disability Complaints (Joint policy) *CHS Policy 1435* | 1/5/21 Policy sent to Medical SME for review.<br><br>3/18/21 Class Counsel sent comments on 12/17/20 revision.<br><br>5/5/21 Policy and forms reviewed and approved by class counsel.<br>*SMEs: Please review 4/15/21 version.* | 6/11/21 Substantive comments. | 7/13/20 Resent policy/forms. Last submission incorporated edits on forms (wanted term disability). Believe these were approved.<br>12/17/20 This policy was updated.<br>4/15/21 Sent updated policy/forms based on PLO/DRC feedback.<br>6/25/21 In review and revision.<br>12/1/21 Feedback incorporated. Sent revised policy/forms for final review. |
| 01-10 Organizational Charts | | 6/11/21 Ensure that titles are consistent across PPs. See comments in First Mays Monitoring Report. Nursing services have no direct or indirect reporting relationship to the Division Manager at the jail and outside the jail supervisory structure. | 10/19/20 See attached policy.<br>6/25/21 Revising titles across PP. Incorporating organizational changes as discussed. Policy revision pending.<br>7/16/21 Policy revised with formatting/title/reporting. – FINAL |

Policy Revisions Tracking Chart

Case 2:18-cv-02081-TLN-KJN   Document 154   Filed 06/16/22   Page 75 of 220
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-11 Service Overview | 1/5/21 Policy sent to Medical SME for review. Please review.<br>7/1/21 Class counsel do not have comments at this time. Ready for Medical Experts' final review. | 6/11/21 See comments regarding types of services available. | 10/19/20 See attached policy.<br>6/25/21 Accepted feedback. Policy revised and sent.<br>7/16/21 Policy revised with Med Expert feedback – FINAL |
| 01-12 Access to Care<br>*CHS Policy 1407* | 1/5/21 Policy and guide sent to Medical SME for review. Please review. | 6/11/21 Added language regarding barriers to care to be consistent with NCCHC standards. See comments regarding standardizing terminology and timeframes for referral.<br>8/13/21 SME sent additional edits to the Access to Care Guide. | 10/19/20 See attached policy.<br>6/25/21 In revision based on SME feedback.<br>2/4/22 Sent revised policy and Access to Care Guide. |
| 01-13 Pharmacy and Therapeutics Committee | 1/5/21 Policy sent to Medical SME for review. Please review.<br>7/1/21 Class counsel do not have comments at this time. Ready for Medical Experts' final review. | 6/11/21 Comments regarding key indicators the P&T committee should track. | 10/19/20 See attached policy. This is a QIC subcommittee.<br>6/25/21 Accepted feedback. Policy revised and sent. – FINAL |
| 01-14 Utilization Management | 1/5/21 Policy sent to Medical SME for review.<br>*SMEs: Please review 4/15/21 version.*<br><br>5/5/21 Class counsel do not have comments at this time. | 6/11/21 Added operational detail regarding the UM process including timelines and tracking tools. | 4/15/21 Policy finalized and InterQual guidelines implemented.<br>6/25/21. In review based on SME feedback.<br>8/19/21 Accepted feedback. Tracking log details are noted in PP 04-08 Specialty Referrals. Policy revised and sent. – FINAL |

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-15 Suicide Prevention Subcommittee (Joint policy) | 5/14/21 Class counsel comments sent. ACH to review, and also ready for Suicide Prevention/Mental Health SME review.<br><br>5/26/21 Awaiting ACH revision.<br><br>8/26/21 Class Counsel have no further comments on Policy 01-15. Ready for Lindsay's review. | 6/11/21 Minor comment regarding including titles only rather than names of key personnel to avoid having to revise the policy every time there is personnel turnover.<br><br>8/24/21 MH SME sent minor comments.<br><br>8/30/21 Lindsay Hayes sent final comments on Policy 01-15.<br><br>9/10/21 Lindsay Hayes sent minor edits. | 5/7/21 Joint policy finalized & sent. 5/21/21 Accepted Counsel feedback. Policy in revision. Will create a separate policy on Multidisciplinary Meetings to define members & how the meetings will interact with QIC & Suicide Prevention Committee. 6/25/21 Accepted formatting change. Policy revision pending. 7/16/21 Policy revised with Medical SME comments re: title changes and sent. Pending MH SME feedback. 8/24/21 Will review MH SME input. 9/2/21 Accepted Lindsay's feedback. MH team now reviewing. 9/7/21 MH team has no further edits. Final draft sent to all via email. 9/10/21 Incorporated Lindsay's edits. – FINAL |
| <mark>01-16</mark><br><mark>Multidisciplinary</mark><br><mark>Meetings (Joint policy)</mark> | | | 10/1/21 Sent new policy. See ACH notes on PP 01-07 QI Program & 01-15 Suicide Prevention Subcommittee |
| 02-03 Female Reproductive Services *CHS Policy 1118* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Needs to address gynecological services including STD screening and access to cervical and breast cancer screening. | 10/19/20 See attached policy. 6/25/21 In revision based on feedback. In discussion on separate PP for STI screening & preventative health screenings. Medical Director clarified with providers to order routine HPV and Pap test. 7/16/21 Policy revised with SME feedback and sent. STI screening and cancer screening will be included in separate PP that is not yet developed. – FINAL |

Policy Revisions Tracking Chart
Case 2:18-cv-02081-TLN-KJN   Document 154   Filed 06/16/22   Page 77 of 220
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 02-05 Suicide Prevention (Joint policy) *CHS Policies 1412 and 1415* *JPS Policies 1009, 1010, 1011, 1027, 1049* | Plaintiffs sent comments to R Heyer, 3/7/20, awaiting response.<br><br>Question to ACH: *Will ACH Policy 07-04 be a Joint Policy w/ JPS? Or is a discrete JPS policy forthcoming?*<br><br>7/1/21 Class counsel will allow Lindsay Hayes to review and provide input on this draft policy before we offer feedback.<br><br>8/26/21 Class Counsel provided feedback on Policy 02-05.<br><br>9/10/21 Class Counsel shared input during meeting with ACH. 6-hour timeframe will not work for patients in safety cells.<br><br>1/31/22 Class Counsel sent questions about the Suicide Precautions and/or Grave Disability Observations Custody Instructions form. | 7/2/21 Received extensive comments from Lindsay Hayes. Requested a combined policy for medical/MH and integrate safety suit. He also requested to review in draft form.<br>8/16/21 Lindsay Hayes sent edits on the revised draft policy.<br><br>8/24/21 MH SME sent an edit on the final draft policy.<br><br>8/30/21 Lindsay Hayes sent comments on Policy 02-05.<br><br>9/10/21 Lindsay Hayes sent final comments on Policy 02-05.   MH SME responded to the emergent referral timeframe issue noting that 4 hours was a standard of practice. | 7/13/20 Not ready to submit.  Needs internal work. Not sure if it will be joint or separate.<br>6/25/21 Sent policy drafts for review<br>07/16/21 Drafts were combined into one policy with SME input included. Renumbered from 07-XX to 02-05. Incorporated safety suit policy and will eliminate MH PP 09-03 Use of Safety Suits.<br>7/30/21 Sent revised draft policy to SME for final review. Joint policy.<br>8/19/21 In review and revision.<br>8/24/21 Incorporated SP SME feedback. Incorporated safety cell policy and will eliminate PP 07-03 Patients in Safety Cells. Sent final draft policy to MH & SP SMEs and Counsel for review.<br>9/2/21 Accepted Class Counsel and SME feedback. MH team reviewing.<br>9/7/21 Sent final draft policy along with MH Medical Director note regarding emergent referral timeframe. Requested Class Counsel & SME review and response.<br>9/10/21 Policy will be finalized next week based on feedback from SP & MH SMEs and Class Counsel.<br>9/15/21 Edits incorporated. – FINAL<br>11/19/21 Sent revised policy. CCTV monitoring deleted.<br>1/31/22 MH explained the form. |

Policy Revisions Tracking Chart
Case 2:18-cv-02081-TLN-KJN   Document 154   Filed 06/16/22   Page 78 of 220
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 03-08 Staff Development & Training (Joint policy) *CHS Policy 1302* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Needs to include training on alcohol and drug withdrawal assessment, treatment and monitoring. | 7/13/20 Sent policy. Joint policy. 11/30/20 This policy was updated. 6/25/21 In revision due to feedback and updating based on practice. 7/16/21 Policy revised with SME feedback and sent. Alcohol & Withdrawal is part of Nursing Clinical Skills and Assessment. Pending MH SME feedback. **3/30/22 Updating this policy.** |
| 04-08 Specialty Referrals *CHS Policy 1400* | Time-sensitive, per Remedial Plan IV.E. 5/5/21 Class counsel have reviewed and expressed concern about provision A.1 (access to surgery, specialty imaging, and orthotic devices). See comments in 5/5/21 Class Counsel email. We request Medical SMEs' input and further discussion with ACH. 5/26/21 Class Counsel provided additional input on revised version. | 6/11/21 Substantive comments. The denial of specialty services based upon known or unknown lengths of stay alone is not appropriate and may result in delayed diagnosis and treatment of potentially life-threatening conditions (e.g., imaging services for cancer), etc. Establishing a diagnosis, even if treatment cannot be completed is necessary for serious medical conditions. Time frames for UM approval are addressed. | 7/13/20 Reviewed with Plaintiffs' Counsel at March 2020 meeting. Resent for submission for SME. 10/19/20 Unsure if PLO/DRC sent to Medical SME for review. Have installed an evidence based tool. Training has begun but has not been implemented due to COVID work/provider recruitment. 4/15/21 Policy updated with minor revisions. 5/21/21 Accepted Class Counsel feedback and amended the policy. 6/25/21 In review based on SME feedback. 8/19/21 Accepted feedback. This policy has tracking log details. Policy revised and sent. – FINAL |
| 04-09 Medical Transportation (Joint policy) *CHS Policy 1400* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Policy should address medical transportation of disabled and or pregnant inmates including use of restraints. | 7/13/20 Sent policy. Joint policy. 6/25/21 In review based on SME feedback. 7/30/21 Policy revised with Medical Expert feedback – FINAL |

77

Policy Revisions Tracking Chart
Case 2:18-cv-02081-TLN-KJN   Document 154   Filed 06/16/22   Page 79 of 220
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 04-10    Discharge Medication (Joint policy) | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 SME comments regarding providing operational detail to how the policy will be implemented, including consent decree paragraphs in the references, and removing names of individuals and including titles only. | 7/13/20 Sent policy. 6/25/21 In review based on SME feedback. 10/29/21 Policy revised and sent. Will pilot the process for presentenced patients before full implementation. – FINAL |
| 04-11    Emergency Equipment | 12/30/20 Policy sent to MH/SP SMEs for review. Please review. 1/5/21 Policy sent to Medical SME review. Please review. | 6/11/21 Minor comments. Suggest use of plastic locks on emergency bags to maintain integrity of the supplies in the bag and avoid the need for unnecessary inspections. | 7/13/20 Sent policy. 6/25/21 In review to clarify procedures based on SME feedback. 8/26/21 Accepted SME feedback. Policy revised and sent. – FINAL |
| 04-12    Emergency Medical Response *CHS Policies 1429 and 1403* | 12/30/20 Policy sent to MH/SP SMEs. 1/5/21 Policy sent to Medical SME. Please review. 5/11/22 Class Counsel defers to SMEs. | 5/11/22 Medical SME sent feedback. 5/11/22 SP SME sent edits. | 7/13/20 Sent policy. 4/7/22 Updating this policy. 5/06/22 Sent revised policy. 5/19/22 Medical & SP SME edits incorporated. Pending MH Expert review only. |
| 04-13 Man-down Drill | 1/5/21 Policy sent to Medical SME for review. Please review. | | 12/17/20 See attached policy. |
| 04-14    Disaster Response | 1/5/21 Policy sent to Medical SME for review. Please review. | | 10/19/20 See attached disaster response. |
| 04-17    Medication Administration *CHS Policy 1601* | 1/5/21 Policy and form sent to Medical SME for review. Please review. | 7/21/21 Medical SME sent comments including possibly combining Med Administration and Pill Call into one policy. 2/1/22 Medical Experts approved the policy. | 11/12/20 See attached policy/form. 6/25/21 Staff are refining this policy and Pill Call due to procedural changes.  It will include process for medications when patient is off-site. 7/19/21 Will not finalize until we receive SME feedback.  New carts & computers are delayed until August. 7/22/21 In review and revision. 12/16/21 Sent revised policy. 2/4/22 FINAL |

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 04-18 Pill Call | | | 12/16/21 Policy deleted. Contents integrated into PP 04-17. |
| 04-18 Medication Order Entry | | | 10/29/21 New policy draft sent. Includes Patient Medication Guide handout to explain KOP program & discharge medications to patients. |
| 04-19 Over the Counter Medications *CHS Policies 1604 and 1605* | 1/5/21 Policy sent to Medical SME for review. Please review. | | 11/12/20 See attached policy. |
| 04-20 Keep on Person Medications | 1/5/21 Policy and KOP list sent to Medical SME for review. Please review. 5/5/21 Class Counsel emphasize importance of this policy vis-à-vis the remedial plan, including w/r/t KOP-inhalers. Remedial Plan Provision VI.F.6: *"The County shall explore the expansion of its Keep-on-Person medication program, (especially for inhalers and medications that are available over-the-counter in the community) and to facilitate provision of medications for people who are out to court, in transit, or at an outside appointment."* 5/26/21 Awaiting ACH revision. | 12/28/21 Medical SME sent feedback. 2/1/22 Medical Experts approved the policy. | 11/12/20 See attached policy and KOP Medication List. 5/5/21 Sent Counsel feedback to Medical leadership for review. 5/21/21 Medical staff are meeting with custody on KOP medications. 6/25/21 Medical staff continue to meet with custody on expanding KOP. Will create a method to track KOP meds including inhalers. Will revise based on feedback. 9/17/21 Policy revision is in review internally. Will send when ready. 10/29/21 Final draft sent. Will pilot before full implementation. 12/30/21 Will review and revise. 1/12/22 Sent revised policy with SME feedback incorporated. 2/4/22 FINAL |
| 04-22 Hospital Care | 5/5/21 Class counsel do not have comments at this time. *SMEs: Please review 4/15/21 policy.* | | 04/15/21 Initial policy finalized and sent. |

Policy Revisions Tracking Chart
Case 2:18-cv-02081-TLN-KJN   Document 154   Filed 06/16/22   Page 81 of 220
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 05-05 Nurse Intake *CHS Policy 1404* | 1/5/21 Policy sent to Medical SME for review. Please review.<br><br>7/1/21 Class counsel comments sent. Policy draft should be reviewed by ALL subject matter experts.<br><br>9/7/21 Class counsel approved nurse intake form revision. | 7/15/21 MH SME sent minor edits and Medical SME sent extensive edits.<br><br>9/7/21 Lindsay Hayes approved the nurse intake form revision.<br><br>9/9/21 Lindsay Hayes sent additional comments on the intake form.<br><br>9/14/21 Medical experts sent comments on the intake form. | 7/13/20 Sent draft policy.<br>11/30/20 This policy was updated.<br>6/25/21 Policy and EHR forms revised to incorporate Remedial Plan provisions. Updated policy and EHR screenshots sent. Roll out in July.<br>7/16/21 Received edits. Need to regroup with team. Roll out is postponed and will not occur in July.<br>9/2/21 Draft nurse intake form sent to Counsel and SMEs for review and feedback. Policy revision to follow.<br>9/10/21 Pending Medical SME input<br>9/17/21 Finalizing the EHR form. Working on policy revision.<br>10/18/21 Sent final draft policy and workflow. Input requested by 10/26.<br>10/29/21 No comments received. Will begin training 11/2021- FINAL<br>11/19/21 Sent updated workflow. |
| 05-09 Health Service Requests - HSR form *CHS Policy 1409* | 5/14/21 Class counsel comments sent. ACH to review, and also ready for Medical/Mental Health SME review.<br><br>5/26/21 The revised versions (5/21/21) look good. | 8/13/21 Medical SME sent extensive edits and recommended combining this policy with PP 05-16 Medical Sick Call.<br>2/3/22 Medical SME sent comments on the 10/29/21 policy revision. | 5/7/21 Policy and the HSR form were revised based on SME report recommendations.<br>5/21/21 Accepted Class Counsel comments. Amended policy & form.<br>10/29/21 Policy revised and sent. Combined this policy with PP 05-16 Medical Sick Call (to be deleted). Added a process to respond to patient who submits a HSR.<br>2/4/22 In review and revision.<br>5/19/22 Sent revised policy with Medical SME feedback included. Pending MH SME review only. |

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| **05-10      Discharge Planning (Joint policy)** *CHS Policy 1423* | 1/5/21 Policy, referral form, and linkage guide sent to Medical SME for review. Please review.<br><br>5/26/21 Class Counsel provided written input.  We request input from Medical and Mental Health SMEs. | 6/11/21 See SME comments: Policy should reference and incorporate consent decree requirements. | 10/19/20 See PP and Linkage Guide. Discharge planning is complex and multi-faceted.  Phasing in actions.<br>5/7/21 Updating PP.  Will reissue.<br>5/21/21 Policy and Health Care Linkage Guide revised and sent.<br>6/25/21 In revision based on feedback & procedural changes.<br>5/19/22 Major revision completed based on Medical SME feedback. Now a joint policy & will delete MH PP 05-01 Discharge Planning. Pending MH SME feedback. |
| **05-12 Transgender and Gender** Nonconforming Health Care (Joint policy)<br>- Training PowerPoint | 1/5/21 Policy sent to Medical SME. Class counsel have previously provided input on this policy. Revised draft ACH policy sent to Plaintiffs, 4/15/20. Class counsel accepted ACH revisions and approve pending implementation.<br>5/5/21 Class counsel have no further comments at this time.<br>*SMEs: Please review 4/15/21 policy.*<br>5/13/22 Class Counsel sent feedback on policy and training slides. | 5/11/22 Medical SME sent feedback on the policy. | 7/13/20 Sent to Counsel 4/13/20. Resent today.  That is the correct version.<br>4/15/21 Policy finalized and sent. Pending training.<br>5/9/22 Sent draft training slides.<br>5/19/22 Will review and revise. Pending MH/SP SME feedback. |
| 05-13 Initial History & Physical Assessment | 1/5/21 Policy sent to Medical SME.<br>5/5/21 Class counsel have no comments at this time.<br><br>*SMEs: Please review 4/15/21 policy.* | 12/28/21 Medical SME sent feedback.<br>2/1/22 Medical Experts approved the policy. | 11/30/20 See attached policy DRAFT. This is pending review by PLO/DRC.      Implementation depending on hiring providers.<br>4/15/21 Initial policy finalized and sent.<br>12/30/21 Will review and revise.<br>1/12/22 Sent revised policy with SME feedback incorporated.<br>2/4/22 FINAL |

Policy Revisions Tracking Chart
Case 2:18-cv-02081-TLN-KJN Document 154 Filed 06/16/22 Page 83 of 220
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| Detoxification Policies<br>*CHS policies 1404, 1405, 1406*<br><br>05-14 Benzodiazepine Withdrawal Treatment<br><br>05-15 Opioid Withdrawal Monitoring and Treatment<br><br>05-17 Alcohol Withdrawal Treatment | Time-sensitive per Remedial Plan VI.N<br>5/5/21 Class counsel have no comments at this time.<br>*SMEs: Please review 4/15/21 Policy 05-14, 5/7/21 Policy 05-15, and 5/21/21 Policy 05-17.*<br>7/1/21 Class counsel do not have comments at this time. Ready for Subject Matter Experts' review. | 3/3/22 Medical SME sent edits on the Alcohol Withdrawal policy.<br>3/8/22 Medical SME sent edits on Benzodiazepine Withdrawal policy.<br>3/9/22 Medical SME sent edits on Opioid Withdrawal policy.<br>4/20/22 Medical SMEs approved the 3 withdrawal treatment policies with minor edits to PP 05-15 Opioid Withdrawal Monitoring and Treatment. | 4/15/21 Benzodiazepine Withdrawal policy revised and sent.<br>5/7/21 Sent Opioid Withdrawal PP.<br>5/21/21 Sent Alcohol Withdrawal PP<br>6/25/21 Alcohol Withdrawal policy revised and sent.<br>3/8/22 Sent revised Alcohol Withdrawal policy with feedback incorporated for final review.<br>3/11/22 Sent revised Benzo & Opioid Withdrawal policies with feedback incorporated for final review.<br>3/29/22 Re-sent Alcohol & Opioid Withdrawal policies with minor revisions.<br>4/20/22 Accepted edits. – FINAL |
| ~~05-16 Medical Sick Call~~ | | | 10/29/21 Policy deleted. See PP 05-09 Health Service Requests. |
| 05-18 Chronic Disease Management<br>*CHS Policy 1741* | Time-sensitive per Remedial Plan VI.D<br>5/26/21 Class Counsel do not have comments on Policy 05-18 Chronic Disease Management at this time. Ready for Medical SMEs review. | 7/19/21 Medical SMEs sent extensive feedback on PP 05-18 Chronic Disease Management.<br>8/13/21 Medical SMEs reviewed policy revisions and have no further edits. Requested to be notified when policy is finalized and implemented. | 7/13/20 See notes in the Remedial Plan Status Report re: Chronic Disease, Hepatitis C, & Detox PP.<br>11/30/20 See Draft PP 05-XX Chronic Disease Management.<br>5/21/21 Chronic Disease policy sent.<br>7/27/21 Sent revised draft PP 05-18 to SMEs for final review. Requested SMEs prioritize Hep C & Diabetes.<br>8/19/21 Will inform SMEs when policy is implemented. – FINAL |

82

Policy Revisions Tracking Chart
Case 2:18-cv-02081-TLN-KJN   Document 194   Filed 06/16/22   Page 84 of 220
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| Provider Treatment Guidelines<br>• Hypertension<br>• Diabetes<br>• HIV/AIDS<br>• Asthma | 5/26/21 Medical SMEs: Please review Provider Treatment Guidelines – Hypertension<br>7/1/21 HIV/AIDS and Hypertension Provider Treatment Guidelines ready for SME review. | | 5/21/21 Provider Treatment Guidelines for hypertension sent.<br>6/25/21 Treatment Guidelines for Diabetes and HIV/AIDS sent.<br>11/19/21 Treatment Guidelines for asthma sent. |
| 05-19 Hepatitis C Testing, Treatment and Monitoring | Plaintiffs provided input on Hepatitis C policy via letter, 12/11/19, awaiting response.<br>~~1/5/21 Chronic Disease and Hepatitis C policies sent to Medical SME for review.~~<br>~~Question: We are not clear whether a revised policy is drafted/forthcoming.~~ (Answered by ACH 5/5/21.)<br>5/26/21 Class Counsel provided written input. We request input from Medical SMEs on Hepatitis C Policy 05-19.<br>3/30/22 Class Counsel sent comments.<br>4/13/22 Class Counsel approved the policy and requested ACH track and report on patients with Hepatitis C diagnosis. | 12/10/21 Medical SMEs sent edits.<br><br>3/31/22 Medical SME concurs with Class Counsel's 3/30/22 comments.<br><br>4/20/22 Medical SMEs approved the policy. | 11/30/20 See Draft PP 05-XX.<br>5/5/21 Policies on Chronic Care and Hepatitis C are still draft. Will be finished and sent this month.<br>5/21/21 Hepatitis C policy finalized and sent.<br>6/25/21 PP 05-19 Hepatitis C is in revision. Class Counsel feedback accepted. Expect to implement opt-out testing in July.<br>7/16/21 Pending SME feedback prior to revision.<br>7/27/21 Requested SMEs to prioritize review of Hep C policy.<br>11/10/21 Sent draft policy revision.<br>12/16/21 In review and revision.<br>1/12/22 Sent revised policy. Edits accepted. Staff changed testing to day 10 vs. 3 or 4. Sources do not specify testing date.<br>4/7/22 Sent policy with Class Counsel comments incorporated.<br>4/20/22 Will develop tracking and reporting. – FINAL |

Policy Revisions Tracking Chart
Case 2:18-cv-02081-TLN-KJN   Document 154   Filed 06/16/22   Page 85 of 220
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 05-20      Diabetes Management | 7/1/21 Class Counsel notes that the American Diabetes Association is expected to issue an updated position statement on Diabetes Management in Correctional Institutions, which should inform ACH policy per the Remedial Plan.<br>11/5/21 Class Counsel sent ADA's new guidance on Diabetes Management in Detention Facilities.<br>12/16/21 Class Counsel sent feedback on SME edits. | 12/10/21 Medical SMEs sent edits. | 5/5/21 Diabetes protocol will be drafted this month.<br>5/21/21 Beginning work on Diabetes.<br>6/25/21 PP 05-20 Diabetes Mgmt. finalized and sent.<br>7/30/21 Requested SMEs to prioritize review of diabetes policy.<br>12/16/21 In revision based on feedback.<br>01/12/22 Sent revised policy. Class Counsel & Medical SME feedback incorporated. – FINAL |
| 05-21  Restraints  and Seclusion<br>(Joint policy)<br>*CHS Policy 1413*<br>*JPS Policy 1008*<br>Forms:<br>- Restraint Reporting<br>- Restraint Documentation | 10/21/21 Class Counsel and SMEs met with County and provided feedback.<br><br>3/30/22 Class Counsel sent comments.<br>5/20/22 Class Counsel Deferred to MH Expert on forms.<br>05/27/22 Confirmed approved policy & Forms. | 10/21/21 Class Counsel and SMEs met with County and provided feedback.<br><br>5/5/22 MH Expert approved.<br>5/19/22 MH Expert approved forms. | 9/10/21 Policy revised and sent.<br>10/21/21 Met with Class Counsel and SMEs for feedback. Working on a joint policy. Will delete MH PP 09-09 Clinical Restraint & Seclusion in Acute Psychiatric Unit.<br>12/16/21 Sent revised joint policy.<br>5/6/22 FINAL<br>5/27/22 Forms approved. |
| 06-02   Patients  with Disabilities<br>(Joint policy)<br>*CHS Policies 1107, 1125, 1128, 1417, 1422, 1439* | 3/19/21 Class counsel reviewed and confirmed approval of policy, with Class Counsel input incorporated.<br><br>Policy  looks  good,  subject  to implementation. | | 7/10/20 Sent policy draft with Disabilities Form. Joint policy.<br>8/24/20 PLO/DRC approved form on 8/13/20. Unsure if PP approved. We incorporated their changes.<br>10/19/20 See comments for PP 06-03 below. – FINAL |

84

Policy Revisions Tracking Chart
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN
Case 2:18-cv-02081-TLN-KJN   Document 154   Filed 06/16/22   Page 86 of 220

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 06-03    Effective Communication (Joint policy) | 3/19/21 Class counsel reviewed and confirmed approval of policy, with Class Counsel input incorporated.<br><br>5/5/21 Class counsel have reviewed 4/15/21 version. Policy looks good, subject to implementation. | | 7/10/20 Accepted policy revisions & sent with EC form. Joint policy.<br>8/24/20 PLO/DRC approved form on 8/13/20. Unsure if PP approved. We incorporated their changes.<br>10/19/20 Have worked on templates in the EHR.  Staff are now testing these forms.  Staff are also working on a draft PPT of policy/forms.<br>4/15/21 Sent revised policy - FINAL |
| Disabilities Screening Tool and Effective Communication (EC) Form | 3/19/21 Class counsel reviewed and provided comments to tool/forms.<br><br>5/5/21 ACH incorporated class counsel feedback and provided revised drafts on 4/15/21. Class counsel have no further comments. Forms look good, subject to implementation. | | 7/13/20 See PP 06-02 & 06-03 above<br>10/19/20 See comments for PP 06-03<br>4/15/21 Revised based on feedback.<br>7/16/21 Per email with Counsel, will revise communication inquiry to make it in simpler language.<br>9/2/21 Sent revised form with EC inquiry simplified. Class Counsel approved. – FINAL |
| 06-04    Interpretation Services | 3/19/21 Class counsel reviewed and provided comments.<br>5/5/21 ACH incorporated class counsel feedback and provided revised draft on 4/15/21. Class counsel have no further comments. Policy looks good, subject to implementation. | | 2/19/21 Sent policy.<br>4/15/21 Policy revised based on PLO/DRC feedback. – FINAL |
| 06-05    ADA Coordination<br>*CHS Policy 1107* | 3/19/21 Class counsel reviewed and provided comments.<br>5/5/21 ACH incorporated class counsel feedback and provided revised draft on 4/15/21. Class counsel have no further comments. Policy looks good, subject to implementation. | | 2/19/21 Sent policy.<br>4/15/21 Policy revised based on PLO/DRC feedback.<br>**7/16/21 Will revise post implementation of ATIMs**.<br>11/5/21 Policy revised and sent. Added more operational detail. FINAL (subject to revision noted) |

Policy Revisions Tracking Chart
Case 2:18-cv-02081-TLN-KJN  Document 154  Filed 06/16/22  Page 87 of 220
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 06-06  Patients  with Disabilities  or  Other Significant Health Care Needs *CHS Policy 1422* | 3/19/21  Class  counsel  reviewed  and provided comments. 5/5/21 ACH incorporated class counsel feedback and provided revised draft on 4/15/21. Class counsel have no further comments. Policy looks good, subject to implementation. | | 2/19/21 Sent policy. 4/15/21  Name  changed  and  policy revised  based  on  PLO/DRC feedback. FINAL |
| 06-07  Health  Care Appliances  Assistive Devices  and  Durable Medical Equipment *CHS Policies 1125 and 1128* | 3/19/21  Class  counsel  reviewed  and provided comments. 5/5/21 ACH incorporated class counsel feedback and provided revised draft on 4/15/21. Class counsel have no further comments. Policy looks good, subject to implementation. | | 2/19/21 Sent policy. 4/15/21  Policy  revised  based  on PLO/DRC feedback. FINAL |
| ~~07-03  Patients  in Safety Cells~~ | | | 8/26/21 Contents integrated into joint PP 02-05 Suicide Prevention. |
| ~~07-XX  Patients  in Segregation~~ ~~(Joint policy)~~ *~~CHS Policy 1416~~* | | | ==5/21/22 Changed number to ACH PP 05-22.== |
| 08-01  Safeguarding Protected  Health Information (Joint) | 7/1/21  Class  counsel  do  not  have comments  at  this  time.  Ready  for Medical and MH Experts' review. | | 6/25/21 Policy revised and sent. Joint policy. |
| 08-08  Patient  Privacy (Joint policy) *CHS Policy 1117* | 5/26/21  Class  counsel  have  no comments  at  this  time.  Ready  for  all SMEs'  review,  including  as  to  its compliance  with  Remedial  Plan Sections IV.C, VI.B.2, VI.H, VII.C.2, VII.E.1, etc. | | 5/21/21  Policy  finalized  and  sent. Joint policy. |

| Standardized Nursing Procedure | Counsel Comments | Medical Expert Comments | County Response |
|---|---|---|---|
| Infection Control Section: • COVID-19 Symptomatic Patient | Medical SMEs: Please review 4/15/21 version. | | 4/15/21 Sent new SNP. |

Policy Revisions Tracking Chart
Case 2:18-cv-02081-TLN-KJN  Document 154  Filed 06/16/22  Page 88 of 220
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN

| Standardized Nursing Procedure | Counsel Comments | Medical Expert Comments | County Response |
|---|---|---|---|
| Pregnancy Section:<br>• Pregnancy Diagnosis, Treatment and Conditions | | | 12/16/21 Sent revised SNP. |
| Skin Section:<br>• Acne Vulgaris<br>• Acute Contact Dermatitis<br>• Atopic Dermatitis<br>• Bites and Stings<br>• Corns and Calluses<br>• Folliculitis & Beard Infections<br>• Fungal Skin Infections<br>• Impetigo<br>• Intertrigo<br>• ~~Lice or Scabies~~ Infestations<br>• Psoriasis<br>• Seborrheic Dermatitis/Dandruff | Medical SMEs: Please review 4/15/21 version. | | 4/15/21 Sent revised SNPs.<br>8/19/21 Lice/Scabies SNP renamed Infestations, revised and sent. |
| Substance Use Disorders:<br>• Benzodiazepine Withdrawal Monitoring and Treatment<br>• Opioid Withdrawal Monitoring and Treatment – FINAL<br>• Alcohol Withdrawal Monitoring and Treatment<br>• Suspected Opioid Overdose | Medical SMEs: Please review 4/15/21, 5/7/21, and 5/21/21 versions, respectively.<br><br>7/1/21 Benzodiazepine Withdrawal and Alcohol Withdrawal ready for SME review. | 3/3/22 Medical SME sent edits on SNP Alcohol Withdrawal.<br>3/8/22 Medical SME sent edits on SNP Benzodiazepine Withdrawal.<br>3/9/22 Medical SME sent edits on SNP Opioid Withdrawal.<br>3/31/22 Medical SME sent comments on Benzodiazepine & Alcohol Withdrawal SNPs.<br>4/1/22 Medical SME approved Opioid Withdrawal SNP & sent minor comments on Suspected Opioid Overdose SNP.<br>4/20/22 Medical SMEs approved all SUD SNPs. | 4/15/21 Sent revised SNPs Benzodiazepine & Opiate Withdrawal Treatment.<br>5/7/21 Sent new Suspected Opioid Overdose.<br>5/21/21 Alcohol Withdrawal revised & sent.<br>6/25/21 Benzodiazepine Withdrawal and Alcohol Withdrawal revised again and sent.<br>10/15/21 Benzodiazepine, Opioid, & Alcohol Withdrawal SNPs revised and sent.<br>3/8/22 Sent revised Alcohol Withdrawal SNP with feedback incorporated for final review.<br>3/29/22 Sent revised Benzodiazepine, Opioid & Alcohol Withdrawal SNPs.<br>4/7/22 Sent revised Benzodiazepine, Alcohol Withdrawal and Suspected Opioid Overdose SNPs with SME feedback incorporated.<br>4/20/22 FINAL |
| Urological Section:<br>• Penile Discharge | Medical SMEs: Please review 4/15/21 version. | | 4/15/21 Revised SNPs sent.<br>8/19/21 Scrotal Pain SNP revised and sent. |

87

Policy Revisions Tracking Chart
Case 2:18-cv-02081-TLN-KJN   Document 154   Filed 06/16/22   Page 89 of 220
Mays v. County of Sacramento; Case No. 2:18-cv-02081-TLN-KJN

| Standardized Nursing Procedure | Counsel Comments | Medical Expert Comments | County Response |
|---|---|---|---|
| • Renal or Ureteral Colic<br>• Scrotal Pain<br>• Urinary Retention<br>• Urinary Tract Infection | | | 9/10/21 Penile Discharge revised and sent. |
| **General:**<br>• SNP Overview<br>**Abdominal Section:**<br>• Emergent, Non-Emergent & Hernia<br>**Cardiovascular & Lung Section:**<br>• Asthma<br>• Bronchitis, Pneumonia, & Shortness of Breath<br>• Cardiac Dysrhythmias<br>• Chest Pain<br>• Chronic Stable Angina<br>• Hypertension Urgency and Emergency<br>• Hyperventilation<br>**Dental Section:**<br>• Dental Conditions<br>**Endocrine Section:**<br>• Diabetes<br>**Eyes, Ears, Nose & Throat:**<br>• Ear Conditions<br>• Eye Conditions<br>• Nose Conditions<br>• Throat Conditions<br>• Visual Complaints<br>**Musculoskeletal Conditions:**<br>• Non-traumatic<br>• Traumatic<br>**Neurological Section:** | Medical SMEs: Please review 5/7/21 versions.<br><br>7/1/21 SNPs ready for SME review. Class Counsel notes that the American Diabetes Association is expected to issue an updated position statement on Diabetes Management in Correctional Institutions, which should inform ACH policy per the Remedial Plan. | | 5/7/21 Revised SNPs approved and sent.<br><br>6/25/21 Following SNPs approved & sent:<br>• Diabetes (revision)<br>• Visual Complaints (new)<br><br>7/16/21 Received Counsel feedback. Pending SME review prior to review.<br><br>9/17/21 SNPs Ear Conditions and Visual Complaints revised and sent. |

Policy Revisions Tracking Chart
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN
Case 2:18-cv-02081-TLN-KJN   Document 154   Filed 06/16/22   Page 90 of 220

| Standardized Nursing Procedure | Counsel Comments | Medical Expert Comments | County Response |
|---|---|---|---|
| • Head/Cervical Spine Injury<br>• Headaches<br>• Seizure Disorders<br>• Vasovagal Syncope | | | |

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-03 Responsible Mental Health Authority | 12/30/20 Policy sent to MH SMEs.<br>5/5/21 MH/SP SMEs: Please review. | | 12/17/20 See attached policy. |
| 01-10 Access to Mental Health Services | 12/30/20 Policy sent to MH SMEs.<br>5/5/21 MH/SP SMEs: Please review. | **1/12/22 Prioritize review.** | 7/13/20 Sent draft.<br>8/19/21 Policy revised and sent. |
| 03-01 Medical Assistant Responsibilities<br>*JPS Policy 1051* | | | 8/19/21 Policy revised and sent. |
| 03-02 Overview of Staff Responsibilities – APU<br>*JPS Policy 1021* | | | 8/19/21 Policy revised and sent. |
| 03-03 Overview of Staff Responsibilities – Outpatient<br>*JPS Policy 1022* | | | 8/19/21 Policy revised and sent. |
| 03-04 Psychiatric Prescriber Duties<br>*JPS Policies 1204 & 1207* | | | 9/10/21 Policy revised and sent. |
| 03-05 Acute Psychiatric Nursing Responsibilities<br>*JPS Policy 1021* | | | 12/16/21 Sent policy. |
| 03-06 Acute Psychiatric Unit Psychiatrist Responsibilities<br>*JPS Policies 1201 & 1203* | | | 12/16/21 Sent policy. |
| 04-01 Intensive Outpatient Program (IOP) | 12/30/20 04-01 IOP Policy sent to MH SMEs.<br>5/5/21 MH/SP SMEs: Please review. | **1/12/22 Prioritize review.** | 7/13/20 Sent 04-01 Intensive Outpatient Program policy. |

Policy Revisions Tracking Chart
Case 2:18-cv-02081-TLN-KJN   Document 154   Filed 06/16/22   Page 91 of 220
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 04-02 FOSS Levels | 12/30/20 Policy sent to MH SMEs. 5/5/21 MH/SP SMEs: Please review. | 11/5/21 MH SME sent comments requesting a call to discuss the final draft. 12/7/21 MH SME met with County to discuss final draft. 12/27/21 MH SME approved. | 12/17/20 See attached policy. 9/17/21 In discussion internally. 11/5/21 Final draft sent. 12/22/21 Sent revised final draft. MH SME feedback incorporated. 12/30/21 FINAL |
| 04-03 Basic MH Services *JPS Policies Section 10 CHS Policy 1411* | 3/30/22 Class Counsel noted MH & SP SMEs may need to provide feedback. | **1/12/22 Prioritize review.** | 8/19/21 Sent policy. |
| 04-04 Outpatient MH Services & Levels of Care *JPS Policies 1029 & 1037* | 3/30/22 Class Counsel noted MH & SP SMEs may need to provide feedback. | **1/12/22 Prioritize review.** | 10/15/21 Sent policy. |
| 04-07 Acute Psychiatric Unit Precautions and Observation *JPS Policies 1009 & 1011* | 4/1/22 Class Counsel approved the policy. | 3/15/22 SP SME sent comments. 4/26/22 SP SME requested clarification. 5/9/22 SP SME approved. | 8/19/21 Policy revised and sent. 11/19/21 Sent revised policy. CCTV monitoring deleted. 3/29/22 In review. 4/1/22 Sent policy with feedback incorporated for final review. 5/19/22 Pending MH SME only. |
| ~~04-08 Outpatient Program – Suicide Precautions, Observation Levels & Item Restriction~~ | | 3/15/22 SP SME sent comments. Unclear on need for this policy, as all procedures are included in the Suicide Prevention policy. 3/18/22 MH SME sent comments. | 10/1/21 Sent new policy. 3/29/22 Policy deleted. Contents are included in joint ACH PP 02-05 Suicide Prevention Program. |
| 04-09 Acute Psychiatric Unit Admission, Program, and Discharge *JPS Policies 309, 700, 701, 704, 706, 707 & 805* | | 12/17/21 Suicide Prevention SME sent comments. 12/27/21 MH SME sent feedback on policy and three attachments. 5/5/22 MH SME sent minor feedback. | 12/16/21 Sent policy and attachments. 12/22/21 Sent revised policy with SP SME edits incorporated. 12/30/21 In review and revision. 1/12/22 Sent final draft policy and attachments for final review. 5/6/22 Feedback accepted – FINAL |

Policy Revisions Tracking Chart
Case 2:18-cv-02081-TLN-KJN   Document 154   Filed 06/16/22   Page 92 of 220
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 05-01 MH Discharge Planning *JPS Policy 800* | 12/30/20 Policy and Discharge Resource List sent to MH SMEs. 5/5/21 MH/SP SMEs: Please review. | | 7/13/20 Sent draft. 11/30/20 Policy was updated. 5/19/22 Integrated contents into joint PP 05-10 Discharge Planning and deleted MH PP 05-01. |
| 07-01 Behavior Management Plan *JPS Policy 1003* | 12/30/20 Policy and form sent to MH SMEs. 5/5/21 MH/SP SMEs: Please review. 1/7/22 Class Counsel sent comments. No additional edits to MH SME feedback. | 11/5/21 MH SME sent comments expressing concerns. 12/29/21 MH SME sent comments on revised form. 1/3/22 MH SME sent edits. 1/25/22 Parties met to discuss MH SME feedback. | 11/12/20 See attached policy/form 12/16/21 Sent revised policy draft. 1/12/22 In review and revision. 2/4/22 In review based on meeting 3/8/22 Integrated contents into MH PP 07-02 based on MH SME feedback. Deleted MH PP 07-01. |
| 07-02 Treatment Planning – Multidisciplinary Intervention Plan form | 12/30/20 Policy sent to MH SMEs. 5/5/21 MH/SP SMEs: Please review. | **3/8/22 Prioritize review** | 11/30/20 See attached policy. 3/8/22 Sent revised policy with contents of Behavior Management Plan policy incorporated. |
| *Detoxification Policies* 07-03 Use of Benzodiazepines 07-04 Patients with Substance Use Disorders *JPS Policies 1032, 1112* | Time-sensitive, per Remedial Plan VI.N. 5/5/21 Class counsel have no comments at this time. SMEs: Please review 4/15/21 version. | **1/12/22 Prioritize review.** | Other Withdrawal PP – *Joint*. See ACH PP 05-14, 05-15, & 05-17. 4/15/21 MH 07-03 revised & sent. 8/19/21 MH PP 07-04 revised and sent. |
| 07-05 Mental Health Evaluations for Planned Use of Force | 10/21/21 Class Counsel and SMEs met with County and provided feedback. | 10/21/21 Class Counsel and SMEs met with County and provided feedback. 1/24/22 MH SME approved the policy. | 9/2/21 Initial policy sent. 10/21/21 Met with Class Counsel and SMEs for feedback on policy. 12/16/21 Sent revised policy draft for final review. 2/4/22 FINAL |
| 07-06 Mental Health Rules Violation Review | 1/7/22 Class Counsel sent feedback. | 11/7/21 MH SME sent edits and comments on policy and form. 12/29/21 MH SME sent comments on the revised form. 1/4/22 MH SME sent minor comments on revised policy. | 11/5/21 Initial policy & form sent. 12/16/21 Sent revised policy/form 12/30/21 In review and revision. 1/12/22 Sent revised policy and form with feedback incorporated for final review. 2/4/22 FINAL |

Policy Revisions Tracking Chart

Case 2:13-cv-02461-TLN-KJN    Document 154    Filed 06/16/22    Page 93 of 220
Mary v. County of Sacramento, Case No.: 13-cv-02081-TLN-KJN

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| | | 1/24/22 MH SME approved the policy and form. | |
| 07-07 Mental Health Adaptive Support Program<br>- Alta Regional Referral Form<br>- Adaptive Support Survey<br>- MH Adaptive Support Program Screener | 12/6/21 Class Counsel sent feedback.<br>5/9/22 Class Counsel sent feedback. | 11/5/21 MH SME reviewed and had nothing to add. | 9/17/21 Received IDD screening materials from Class Counsel. Draft policy in development.<br>11/5/21 Sent final draft policy and referral form.<br>12/16/21 In review and revision.<br>1/21/22 Sent revised policy and forms for final review.<br>5/19/22 Incorporated feedback & sent to Class Counsel for final review. |
| 09-02 Lanterman-Petris-Short (LPS) Conservatorship | 12/30/20 Policy sent to MH SMEs. Please review.<br>5/5/21 MH/SP SMEs: Please review. | | 12/17/20 See attached policy. |
| 09-03 Use of Safety Suits | | | See joint ACH PP 02-05 |
| 09-04 Administration of Involuntary Psychotropic Medication | 7/1/21 Class counsel do not have comments at this time. Ready for Medical and MH Experts' review. | 1/12/22 Prioritize review. | 6/25/21 Policy revised and sent. |
| 09-05 Informed Consent – Acute Inpatient Unit | 7/1/21 Class counsel do not have comments at this time. Ready for Medical and MH Experts' review. | | 6/25/21 Policy revised and sent. |
| 09-06 Patient Rights<br>*JPS Policy 303* | 8/4/21 Class Counsel sent feedback on policy and Patient Rights Handbook. | | 7/30/21 Policy revised and sent.<br>8/19/21 MH staff are reviewing Counsel's feedback.<br>10/15/21 Feedback accepted. Policy and handbook revised and sent. – FINAL |
| 09-07 Denial of Rights | | | 8/19/21 Sent policy. |
| 09-08 PREA Referrals and Evaluations<br>*JPS Policy 1052* | | | 8/19/21 Policy revised and sent. |

Policy Revisions Tracking Chart
Case 2:18-cv-02081-TLN-KJN   Document 154   Filed 06/16/22   Page 94 of 220
Mays v. County of Sacramento, Case No. 2:18-cv-02081-TLN-KJN

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 09-09 Clinical Restraint and Seclusion in Acute Psych Unit | | | See joint ACH PP 05-21 Restraints and Seclusion |
| 09-10 Suicide Prevention | | | See joint ACH PP 02-05 Suicide Prevention for all comments. |
| 09-11 Involuntary Detainment Advisement<br>*JPS Policy 304* | | | 10/15/21 Policy revised and sent. |
| LGBTQI Treatment, Policies | | | See joint ACH PP 05-12 |
| Grievance Procedures | | | See joint ACH PP 01-09 |

*Quarterly Data Reporting (Remedial Plan Section II.C)* – SMI Data sent quarterly.  Link: https://www.sacsheriff.com/pages/transparency.php

| Suicide Prevention Training | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| New Employee (4-hour) Training | 1/3/22 Class Counsel sent comments.<br>2/3/22 Class Counsel has questions & concerns about the revised training.<br>2/7/22 Class Counsel approved revised training PPT. | 12/29/21 MH & SP SMEs sent joint edits.<br>2/5/22 SP SME sent comments. | 12/17/21 Sent DRAFT training PowerPoint.<br>1/21/22 In review and revision.<br>2/1/22 Sent revised training.<br>2/4/22 In review.<br>2/7/22 Sent revised PPT with SP SME comments incorporated. |

**Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

*Initial 07/08/20. Updated by Class Counsel 07/01/21.* <mark>*Updated by County 06/07/22.*</mark>
<mark>Yellow highlighting</mark> - used for most recent updates.
Tan shading - final policies.
**Bold** - review and change in process.

Color coding indicates policies pending review by: <mark>Blue</mark> – Medical Experts <mark>Pink</mark> – MH Experts <mark>Green</mark> – Class Counsel

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-01 Department & Division Overview (Joint policy) *CHS Policy 1000* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 No comments | 7/13/20 Sent policy. Joint policy – FINAL |
| 01-03 Responsible Health Authority *CHS Policy 1100* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Minor comments | 7/13/20 Sent policy. 6/25/21 Accepted feedback for formatting changes which pertain to several PP. Policy revision pending. 7/16/21 Policy revised with formatting/title changes – FINAL |
| 01-04 Medical/ Clinical Autonomy (Joint policy) *CHS Policy 1101* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Minor comments. Ensure leadership titles are consistent between policies 01-03 and 01-04. | 7/13/20 Sent policy. 6/25/21 Accepted feedback on titles/ format. Policy revision pending. 7/16/21 Policy revised with formatting/title changes – FINAL |
| 01-07 Quality Improvement Program (Joint policy) | 7/1/21 Class counsel comments (on inclusion of specific Remedial Plan QA/QI provision) sent. | | 6/25/21 Policy revised and sent. 7/16/21 Per Counsel questions and response via email, staff will create a separate PP on Multi-disciplinary meetings. Specialty Log tracking is noted in Specialty Referrals PP. This item will be tracked in new QI subcommittee Utilization Management to start this year. Baseline report in process. – FINAL |

**Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-08 Medical Review of In-Custody Deaths (Joint policy) | 7/1/21 Class counsel comments sent. All SMEs should review the draft vis-à-vis their disciplinary focus.<br><br>1/10/22 Class Counsel defer to the Medical SMEs on any additional revisions. | 12/10/21 Medical SMEs sent edits & questions about 2021 death reviews. 12/15/21 Medical SME sent additional questions about autopsies. 12/17/21 SP SME sent policy edits. 2/1/22 Medical SMEs sent comments on the revised draft. | 6/25/21 Policy revised and sent. 7/16/21 Per Counsel questions and response via email, all deaths are considered in custody even if occurs offsite. SSO approved content of initial draft.  Pending SME. 12/16/21 In review and revision. 1/4/22 Sent email with revised draft policy based on SME feedback. Unchanged: SSO keeps binders & admin review within 30 days consistent with remedial plan and NCCHC. 2/4/22 In review and revision. 2/16/22 Policy finalized with SME requested changes. – FINAL |
| 01-09 Grievance Process for Health/ Disability Complaints (Joint policy) *CHS Policy 1435* | 1/5/21 Policy sent to Medical SME for review.<br><br>3/18/21 Class Counsel sent comments on 12/17/20 revision.<br><br>5/5/21 Policy and forms reviewed and approved by class counsel. *SMEs: Please review 4/15/21 version.* | 6/11/21 Substantive comments. | 7/13/20 Resent policy/forms.  Last submission incorporated edits on forms (wanted term disability). Believe these were approved. 12/17/20 This policy was updated. 4/15/21 Sent updated policy/forms based on PLO/DRC feedback. 6/25/21 In review and revision. 12/1/21 Feedback incorporated. Sent revised policy/forms for final review. |
| 01-10 Organizational Charts | | 6/11/21 Ensure that titles are consistent across PPs. See comments in First Mays Monitoring Report. Nursing services have no direct or indirect reporting relationship to the Division Manager at the jail and outside the jail supervisory structure. | 10/19/20 See attached policy. 6/25/21 Revising titles across PP. Incorporating organizational changes as discussed. Policy revision pending. 7/16/21 Policy revised with formatting/title/reporting. – FINAL |

**Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-11 Service Overview | 1/5/21 Policy sent to Medical SME for review. Please review.<br>7/1/21 Class counsel do not have comments at this time. Ready for Medical Experts' final review. | 6/11/21 See comments regarding types of services available. | 10/19/20 See attached policy.<br>6/25/21 Accepted feedback. Policy revised and sent.<br>7/16/21 Policy revised with Med Expert feedback – FINAL |
| 01-12 Access to Care<br>*CHS Policy 1407* | 1/5/21 Policy and guide sent to Medical SME for review. Please review. | 6/11/21 Added language regarding barriers to care to be consistent with NCCHC standards. See comments regarding standardizing terminology and timeframes for referral.<br>8/13/21 SME sent additional edits to the Access to Care Guide. | 10/19/20 See attached policy.<br>6/25/21 In revision based on SME feedback.<br>2/4/22 Sent revised policy and Access to Care Guide. |
| 01-13 Pharmacy and Therapeutics Committee | 1/5/21 Policy sent to Medical SME for review.  Please review.<br>7/1/21 Class counsel do not have comments at this time. Ready for Medical Experts' final review. | 6/11/21 Comments regarding key indicators the P&T committee should track. | 10/19/20 See attached policy.  This is a QIC subcommittee.<br>6/25/21 Accepted feedback. Policy revised and sent. – FINAL |
| 01-14 Utilization Management | 1/5/21 Policy sent to Medical SME for review.<br>*SMEs: Please review 4/15/21 version.*<br><br>5/5/21 Class counsel do not have comments at this time. | 6/11/21 Added operational detail regarding the UM process including timelines and tracking tools. | 4/15/21 Policy finalized and InterQual guidelines implemented.<br>6/25/21. In review based on SME feedback.<br>8/19/21 Accepted feedback. Tracking log details are noted in PP 04-08 Specialty Referrals.  Policy revised and sent. – FINAL |

**Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-15 Suicide Prevention Subcommittee (Joint policy) | 5/14/21 Class counsel comments sent. ACH to review, and also ready for Suicide Prevention/Mental Health SME review.<br><br>5/26/21 Awaiting ACH revision.<br><br>8/26/21 Class Counsel have no further comments on Policy 01-15. Ready for Lindsay's review. | 6/11/21 Minor comment regarding including titles only rather than names of key personnel to avoid having to revise the policy every time there is personnel turnover.<br><br>8/24/21 MH SME sent minor comments.<br><br>8/30/21 Lindsay Hayes sent final comments on Policy 01-15.<br><br>9/10/21 Lindsay Hayes sent minor edits. | 5/7/21 Joint policy finalized & sent. 5/21/21 Accepted Counsel feedback. Policy in revision. Will create a separate policy on Multidisciplinary Meetings to define members & how the meetings will interact with QIC & Suicide Prevention Committee. 6/25/21 Accepted formatting change. Policy revision pending. 7/16/21 Policy revised with Medical SME comments re: title changes and sent. Pending MH SME feedback. 8/24/21 Will review MH SME input. 9/2/21 Accepted Lindsay's feedback. MH team now reviewing. 9/7/21 MH team has no further edits. Final draft sent to all via email. 9/10/21 Incorporated Lindsay's edits. – FINAL |
| 01-16 Multidisciplinary Meetings (Joint policy) | | | 10/1/21 Sent new policy.  See ACH notes on PP 01-07 QI Program & 01-15 Suicide Prevention Subcommittee |
| 02-03 Female Reproductive Services *CHS Policy 1118* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Needs to address gynecological services including STD screening and access to cervical and breast cancer screening. | 10/19/20 See attached policy. 6/25/21 In revision based on feedback. In discussion on separate PP for STI screening & preventative health screenings.  Medical Director clarified with providers to order routine HPV and Pap test. 7/16/21 Policy revised with SME feedback and sent. STI screening and cancer screening will be included in separate PP that is not yet developed. – FINAL |

4

**Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 02-05 Suicide Prevention (Joint policy) *CHS Policies 1412 and 1415 JPS Policies 1009, 1010, 1011, 1027, 1049* | Plaintiffs sent comments to R Heyer, 3/7/20, awaiting response.<br><br>Question to ACH: *Will ACH Policy 07-04 be a Joint Policy w/ JPS? Or is a discrete JPS policy forthcoming?*<br><br>7/1/21 Class counsel will allow Lindsay Hayes to review and provide input on this draft policy before we offer feedback.<br><br>8/26/21 Class Counsel provided feedback on Policy 02-05.<br><br>9/10/21 Class Counsel shared input during meeting with ACH. 6-hour timeframe will not work for patients in safety cells.<br><br>1/31/22 Class Counsel sent questions about the Suicide Precautions and/or Grave Disability Observations Custody Instructions form. | 7/2/21 Received extensive comments from Lindsay Hayes. Requested a combined policy for medical/MH and integrate safety suit. He also requested to review in draft form.<br>8/16/21 Lindsay Hayes sent edits on the revised draft policy.<br><br>8/24/21 MH SME sent an edit on the final draft policy.<br><br>8/30/21 Lindsay Hayes sent comments on Policy 02-05.<br><br>9/10/21 Lindsay Hayes sent final comments on Policy 02-05.  MH SME responded to the emergent referral timeframe issue noting that 4 hours was a standard of practice. | 7/13/20 Not ready to submit.  Needs internal work. Not sure if it will be joint or separate.<br>6/25/21 Sent policy drafts for review<br>07/16/21 Drafts were combined into one policy with SME input included. Renumbered from 07-XX to 02-05. Incorporated safety suit policy and will eliminate MH PP 09-03 Use of Safety Suits.<br>7/30/21 Sent revised draft policy to SME for final review. Joint policy.<br>8/19/21 In review and revision.<br>8/24/21 Incorporated SP SME feedback. Incorporated safety cell policy and will eliminate PP 07-03 Patients in Safety Cells. Sent final draft policy to MH & SP SMEs and Counsel for review.<br>9/2/21 Accepted Class Counsel and SME feedback. MH team reviewing.<br>9/7/21 Sent final draft policy along with MH Medical Director note regarding emergent referral timeframe. Requested Class Counsel & SME review and response.<br>9/10/21 Policy will be finalized next week based on feedback from SP & MH SMEs and Class Counsel.<br>9/15/21 Edits incorporated. – FINAL<br>11/19/21 Sent revised policy. CCTV monitoring deleted.<br>1/31/22 MH explained the form. |

5

**Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 03-08 Staff Development & Training (Joint policy) *CHS Policy 1302* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Needs to include training on alcohol and drug withdrawal assessment, treatment and monitoring. | 7/13/20 Sent policy.  Joint policy. 11/30/20 This policy was updated. 6/25/21 In revision due to feedback and updating based on practice. 7/16/21 Policy revised with SME feedback and sent.  Alcohol & Withdrawal is part of Nursing Clinical Skills and Assessment. Pending MH SME feedback. **3/30/22 Updating this policy**. |
| 04-08 Specialty Referrals *CHS Policy 1400* | Time-sensitive, per Remedial Plan IV.E. 5/5/21 Class counsel have reviewed and expressed concern about provision A.1 (access to surgery, specialty imaging, and orthotic devices). See comments in 5/5/21 Class Counsel email. We request Medical SMEs' input and further discussion with ACH.  5/26/21 Class Counsel provided additional input on revised version. | 6/11/21 Substantive comments. The denial of specialty services based upon known or unknown lengths of stay alone is not appropriate and may result in delayed diagnosis and treatment of potentially life-threatening conditions (e.g., imaging services for cancer), etc. Establishing a diagnosis, even if treatment cannot be completed is necessary for serious medical conditions. Time frames for UM approval are addressed. | 7/13/20 Reviewed with Plaintiffs' Counsel at March 2020 meeting. Resent for submission for SME. 10/19/20 Unsure if PLO/DRC sent to Medical SME for review.  Have installed an evidence based tool. Training has begun but has not been implemented due to COVID work/provider recruitment. 4/15/21 Policy updated with minor revisions. 5/21/21 Accepted Class Counsel feedback and amended the policy. 6/25/21 In review based on SME feedback. 8/19/21 Accepted feedback. This policy has tracking log details. Policy revised and sent. – FINAL |
| 04-09 Medical Transportation (Joint policy) *CHS Policy 1400* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Policy should address medical transportation of disabled and or pregnant inmates including use of restraints. | 7/13/20 Sent policy.  Joint policy. 6/25/21 In review based on SME feedback. 7/30/21 Policy revised with Medical Expert feedback – FINAL |

6

**Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 04-10 Discharge Medication (Joint policy) | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 SME comments regarding providing operational detail to how the policy will be implemented, including consent decree paragraphs in the references, and removing names of individuals and including titles only. | 7/13/20 Sent policy. 6/25/21 In review based on SME feedback. 10/29/21 Policy revised and sent. Will pilot the process for presentenced patients before full implementation. – FINAL |
| 04-11 Emergency Equipment | 12/30/20 Policy sent to MH/SP SMEs for review. Please review. 1/5/21 Policy sent to Medical SME review. Please review. | 6/11/21 Minor comments. Suggest use of plastic locks on emergency bags to maintain integrity of the supplies in the bag and avoid the need for unnecessary inspections. | 7/13/20 Sent policy. 6/25/21 In review to clarify procedures based on SME feedback. 8/26/21 Accepted SME feedback. Policy revised and sent. – FINAL |
| 04-12 Emergency Medical Response *CHS Policies 1429 and 1403* | 12/30/20 Policy sent to MH/SP SMEs. 1/5/21 Policy sent to Medical SME. Please review. 5/11/22 Class Counsel defers to SMEs. | 5/11/22 Medical SME sent feedback. 5/11/22 SP SME sent edits. | 7/13/20 Sent policy. 4/7/22 Updating this policy. 5/06/22 Sent revised policy. 5/19/22 Medical & SP SME edits incorporated. Pending MH Expert review only. |
| 04-13 Man-down Drill | 1/5/21 Policy sent to Medical SME for review. Please review. | | 12/17/20 See attached policy. |
| 04-14 Disaster Response | 1/5/21 Policy sent to Medical SME for review. Please review. | | 10/19/20 See attached disaster response. |
| 04-17 Medication Administration *CHS Policy 1601* | 1/5/21 Policy and form sent to Medical SME for review. Please review. | 7/21/21 Medical SME sent comments including possibly combining Med Administration and Pill Call into one policy. 2/1/22 Medical Experts approved the policy. | 11/12/20 See attached policy/form. 6/25/21 Staff are refining this policy and Pill Call due to procedural changes.  It will include process for medications when patient is off-site. 7/19/21 Will not finalize until we receive SME feedback.  New carts & computers are delayed until August. 7/22/21 In review and revision. 12/16/21 Sent revised policy. 2/4/22 FINAL |

**Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| ~~04-18 Pill Call~~ | | | 12/16/21 Policy deleted. Contents integrated into PP 04-17. |
| 04-18 Medication Order Entry | | | 10/29/21 New policy draft sent. Includes Patient Medication Guide handout to explain KOP program & discharge medications to patients. |
| 04-19 Over the Counter Medications *CHS Policies 1604 and 1605* | 1/5/21 Policy sent to Medical SME for review.  Please review. | | 11/12/20 See attached policy. |
| 04-20 Keep on Person Medications | 1/5/21 Policy and KOP list sent to Medical SME for review. Please review.<br>5/5/21 Class Counsel emphasize importance of this policy vis-à-vis the remedial plan, including w/r/t KOP-inhalers.<br>Remedial Plan Provision VI.F.6: *"The County shall explore the expansion of its Keep-on-Person medication program, (especially for inhalers and medications that are available over-the-counter in the community) and to facilitate provision of medications for people who are out to court, in transit, or at an outside appointment."*<br>5/26/21 Awaiting ACH revision. | 12/28/21 Medical SME sent feedback.<br>2/1/22 Medical Experts approved the policy. | 11/12/20 See attached policy and KOP Medication List.<br>5/5/21 Sent Counsel feedback to Medical leadership for review.<br>5/21/21 Medical staff are meeting with custody on KOP medications.<br>6/25/21 Medical staff continue to meet with custody on expanding KOP.  Will create a method to track KOP meds including inhalers. Will revise based on feedback.<br>9/17/21 Policy revision is in review internally.  Will send when ready.<br>10/29/21 Final draft sent. Will pilot before full implementation.<br>12/30/21 Will review and revise.<br>1/12/22 Sent revised policy with SME feedback incorporated.<br>2/4/22 FINAL |
| 04-22 Hospital Care | 5/5/21 Class counsel do not have comments at this time.<br>*SMEs: Please review 4/15/21 policy.* | | 04/15/21 Initial policy finalized and sent. |

**Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 05-05 Nurse Intake<br>*CHS Policy 1404* | 1/5/21 Policy sent to Medical SME for review. Please review.<br><br>7/1/21 Class counsel comments sent. Policy draft should be reviewed by ALL subject matter experts.<br><br>9/7/21 Class counsel approved nurse intake form revision. | 7/15/21 MH SME sent minor edits and Medical SME sent extensive edits.<br><br>9/7/21 Lindsay Hayes approved the nurse intake form revision.<br><br>9/9/21 Lindsay Hayes sent additional comments on the intake form.<br><br>9/14/21 Medical experts sent comments on the intake form. | 7/13/20 Sent draft policy.<br>11/30/20 This policy was updated.<br>6/25/21 Policy and EHR forms revised to incorporate Remedial Plan provisions. Updated policy and EHR screenshots sent.  Roll out in July.<br>7/16/21 Received edits.  Need to regroup with team.  Roll out is postponed and will not occur in July.<br>9/2/21 Draft nurse intake form sent to Counsel and SMEs for review and feedback. Policy revision to follow.<br>9/10/21 Pending Medical SME input<br>9/17/21 Finalizing the EHR form. Working on policy revision.<br>10/18/21 Sent final draft policy and workflow. Input requested by 10/26.<br>10/29/21 No comments received. Will begin training 11/2021- FINAL<br>11/19/21 Sent updated workflow. |
| <mark>05-09 Health Service Requests</mark><br>- <mark>HSR form</mark><br>*<mark>CHS Policy 1409</mark>* | 5/14/21 Class counsel comments sent. ACH to review, and also ready for Medical/Mental Health SME review.<br><br>5/26/21 The revised versions (5/21/21) look good. | 8/13/21 Medical SME sent extensive edits and recommended combining this policy with PP 05-16 Medical Sick Call.<br>2/3/22 Medical SME sent comments on the 10/29/21 policy revision. | 5/7/21 Policy and the HSR form were revised based on SME report recommendations.<br>5/21/21 Accepted Class Counsel comments. Amended policy & form.<br>10/29/21 Policy revised and sent. Combined this policy with PP 05-16 Medical Sick Call (to be deleted). Added a process to respond to patient who submits a HSR.<br>2/4/22 In review and revision.<br>5/19/22 Sent revised policy with Medical SME feedback included. Pending MH SME review only. |

**Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 05-10 Discharge Planning (Joint policy) *CHS Policy 1423* | 1/5/21 Policy, referral form, and linkage guide sent to Medical SME for review. Please review.<br><br>5/26/21 Class Counsel provided written input.  We request input from Medical and Mental Health SMEs. | 6/11/21 See SME comments: Policy should reference and incorporate consent decree requirements. | 10/19/20 See PP and Linkage Guide. Discharge planning is complex and multi-faceted.  Phasing in actions. 5/7/21 Updating PP.  Will reissue. 5/21/21 Policy and Health Care Linkage Guide revised and sent. 6/25/21 In revision based on feedback & procedural changes. 5/19/22 Major revision completed based on Medical SME feedback. Now a joint policy & will delete MH PP 05-01 Discharge Planning. Pending MH SME feedback. |
| 05-12 Transgender and Gender Nonconforming Health Care (Joint policy)<br>- Training PowerPoint | 1/5/21 Policy sent to Medical SME. Class counsel have previously provided input on this policy. Revised draft ACH policy sent to Plaintiffs, 4/15/20. Class counsel accepted ACH revisions and approve pending implementation. 5/5/21 Class counsel have no further comments at this time. *SMEs: Please review 4/15/21 policy.* 5/13/22 Class Counsel sent feedback on policy and training slides. | 5/11/22 Medical SME sent feedback on the policy. | 7/13/20 Sent to Counsel 4/13/20. Resent today.  That is the correct version. 4/15/21 Policy finalized and sent. Pending training. 5/9/22 Sent draft training slides. 5/19/22 Will review and revise. Pending MH/SP SME feedback. |
| 05-13 Initial History & Physical Assessment | 1/5/21 Policy sent to Medical SME.<br>5/5/21 Class counsel have no comments at this time.<br><br>*SMEs: Please review 4/15/21 policy.* | 12/28/21 Medical SME sent feedback. 2/1/22 Medical Experts approved the policy. | 11/30/20 See attached policy DRAFT. This is pending review by PLO/DRC.  Implementation depending on hiring providers. 4/15/21 Initial policy finalized and sent. 12/30/21 Will review and revise. 1/12/22 Sent revised policy with SME feedback incorporated. 2/4/22 FINAL |

**Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| Detoxification Policies *CHS policies 1404, 1405, 1406*<br><br>05-14 Benzodiazepine Withdrawal Treatment<br><br>05-15 Opioid Withdrawal Monitoring and Treatment<br><br>05-17 Alcohol Withdrawal Treatment | Time-sensitive per Remedial Plan VI.N<br><br>5/5/21 Class counsel have no comments at this time. *SMEs: Please review 4/15/21 Policy 05-14, 5/7/21 Policy 05-15, and 5/21/21 Policy 05-17.*<br>7/1/21 Class counsel do not have comments at this time. Ready for Subject Matter Experts' review. | 3/3/22 Medical SME sent edits on the Alcohol Withdrawal policy.<br>3/8/22 Medical SME sent edits on Benzodiazepine Withdrawal policy.<br>3/9/22 Medical SME sent edits on Opioid Withdrawal policy.<br>4/20/22 Medical SMEs approved the 3 withdrawal treatment policies with minor edits to PP 05-15 Opioid Withdrawal Monitoring and Treatment. | 4/15/21 Benzodiazepine Withdrawal policy revised and sent.<br>5/7/21 Sent Opioid Withdrawal PP.<br>5/21/21 Sent Alcohol Withdrawal PP<br>6/25/21 Alcohol Withdrawal policy revised and sent.<br>3/8/22 Sent revised Alcohol Withdrawal policy with feedback incorporated for final review.<br>3/11/22 Sent revised Benzo & Opioid Withdrawal policies with feedback incorporated for final review.<br>3/29/22 Re-sent Alcohol & Opioid Withdrawal policies with minor revisions.<br>4/20/22 Accepted edits. – FINAL |
| ~~05-16 Medical Sick Call~~ | | | 10/29/21 Policy deleted. See PP 05-09 Health Service Requests. |
| 05-18 Chronic Disease Management *CHS Policy 1741* | Time-sensitive per Remedial Plan VI.D<br><br>5/26/21 Class Counsel do not have comments on Policy 05-18 Chronic Disease Management at this time. Ready for Medical SMEs review. | 7/19/21 Medical SMEs sent extensive feedback on PP 05-18 Chronic Disease Management.<br>8/13/21 Medical SMEs reviewed policy revisions and have no further edits.  Requested to be notified when policy is finalized and implemented. | 7/13/20 See notes in the Remedial Plan Status Report re: Chronic Disease, Hepatitis C, & Detox PP.<br>11/30/20 See Draft PP 05-XX Chronic Disease Management.<br>5/21/21 Chronic Disease policy sent.<br>7/27/21 Sent revised draft PP 05-18 to SMEs for final review. Requested SMEs prioritize Hep C & Diabetes.<br>8/19/21 Will inform SMEs when policy is implemented. – FINAL |

11

**Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| Provider Treatment Guidelines<br>• Hypertension<br>• Diabetes<br>• HIV/AIDS<br>• Asthma | 5/26/21 Medical SMEs: Please review Provider Treatment Guidelines – Hypertension<br>7/1/21 HIV/AIDS and Hypertension Provider Treatment Guidelines ready for SME review. | | 5/21/21 Provider Treatment Guidelines for hypertension sent.<br>6/25/21 Treatment Guidelines for Diabetes and HIV/AIDS sent.<br>11/19/21 Treatment Guidelines for asthma sent. |
| 05-19 Hepatitis C Testing, Treatment and Monitoring | Plaintiffs provided input on Hepatitis C policy via letter, 12/11/19, awaiting response.<br><s>1/5/21 Chronic Disease and Hepatitis C policies sent to Medical SME for review.</s><br><s>Question: We are not clear whether a revised policy is drafted/forthcoming.</s> (Answered by ACH 5/5/21.)<br><br>5/26/21 Class Counsel provided written input.  We request input from Medical SMEs on Hepatitis C Policy 05-19.<br><br>3/30/22 Class Counsel sent comments.<br><br>4/13/22 Class Counsel approved the policy and requested ACH track and report on patients with Hepatitis C diagnosis. | 12/10/21 Medical SMEs sent edits.<br><br>3/31/22 Medical SME concurs with Class Counsel's 3/30/22 comments.<br><br>4/20/22 Medical SMEs approved the policy. | 11/30/20 See Draft PP 05-XX.<br>5/5/21 Policies on Chronic Care and Hepatitis C are still draft.  Will be finished and sent this month.<br>5/21/21 Hepatitis C policy finalized and sent.<br>6/25/21 PP 05-19 Hepatitis C is in revision. Class Counsel feedback accepted. Expect to implement opt-out testing in July.<br>7/16/21 Pending SME feedback prior to revision.<br>7/27/21 Requested SMEs to prioritize review of Hep C policy.<br>11/10/21 Sent draft policy revision.<br>12/16/21 In review and revision.<br>1/12/22 Sent revised policy. Edits accepted. Staff changed testing to day 10 vs. 3 or 4. Sources do not specify testing date.<br>4/7/22 Sent policy with Class Counsel comments incorporated.<br>4/20/22 Will develop tracking and reporting. – FINAL |

**Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 05-20 Diabetes Management | 7/1/21 Class Counsel notes that the American Diabetes Association is expected to issue an updated position statement on Diabetes Management in Correctional Institutions, which should inform ACH policy per the Remedial Plan.<br>11/5/21 Class Counsel sent ADA's new guidance on Diabetes Management in Detention Facilities.<br>12/16/21 Class Counsel sent feedback on SME edits. | 12/10/21 Medical SMEs sent edits. | 5/5/21 Diabetes protocol will be drafted this month.<br>5/21/21 Beginning work on Diabetes.<br>6/25/21 PP 05-20 Diabetes Mgmt. finalized and sent.<br>7/30/21 Requested SMEs to prioritize review of diabetes policy.<br>12/16/21 In revision based on feedback.<br>01/12/22 Sent revised policy. Class Counsel & Medical SME feedback incorporated. – FINAL |
| 05-21 Restraints and Seclusion<br>(Joint policy)<br>*CHS Policy 1413*<br>*JPS Policy 1008*<br>Forms:<br>- Restraint Reporting<br>- Restraint Documentation | 10/21/21 Class Counsel and SMEs met with County and provided feedback.<br><br>3/30/22 Class Counsel sent comments.<br>5/20/22 Class Counsel Deferred to MH Expert on forms.<br>05/27/22 Confirmed approved policy & Forms. | 10/21/21 Class Counsel and SMEs met with County and provided feedback.<br><br>5/5/22 MH Expert approved.<br>5/19/22 MH Expert approved forms. | 9/10/21 Policy revised and sent.<br>10/21/21 Met with Class Counsel and SMEs for feedback. Working on a joint policy. Will delete MH PP 09-09 Clinical Restraint & Seclusion in Acute Psychiatric Unit.<br>12/16/21 Sent revised joint policy.<br>5/6/22 FINAL<br><mark>5/27/22 Forms approved.</mark> |
| 06-02 Patients with Disabilities<br>(Joint policy)<br>*CHS Policies 1107, 1125, 1128, 1417, 1422, 1439* | 3/19/21 Class counsel reviewed and confirmed approval of policy, with Class Counsel input incorporated.<br><br>Policy looks good, subject to implementation. | | 7/10/20 Sent policy draft with Disabilities Form. Joint policy.<br>8/24/20 PLO/DRC approved form on 8/13/20. Unsure if PP approved. We incorporated their changes.<br>10/19/20 See comments for PP 06-03 below. – FINAL |

13

**Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 06-03 Effective Communication (Joint policy) | 3/19/21 Class counsel reviewed and confirmed approval of policy, with Class Counsel input incorporated.<br><br>5/5/21 Class counsel have reviewed 4/15/21 version. Policy looks good, subject to implementation. | | 7/10/20 Accepted policy revisions & sent with EC form. Joint policy. 8/24/20 PLO/DRC approved form on 8/13/20. Unsure if PP approved. We incorporated their changes. 10/19/20 Have worked on templates in the EHR.  Staff are now testing these forms.  Staff are also working on a draft PPT of policy/forms. 4/15/21 Sent revised policy - FINAL |
| Disabilities Screening Tool and Effective Communication (EC) Form | 3/19/21 Class counsel reviewed and provided comments to tool/forms.<br><br>5/5/21 ACH incorporated class counsel feedback and provided revised drafts on 4/15/21. Class counsel have no further comments. Forms look good, subject to implementation. | | 7/13/20 See PP 06-02 & 06-03 above 10/19/20 See comments for PP 06-03 4/15/21 Revised based on feedback. 7/16/21 Per email with Counsel, will revise communication inquiry to make it in simpler language. 9/2/21 Sent revised form with EC inquiry simplified. Class Counsel approved. – FINAL |
| 06-04 Interpretation Services | 3/19/21 Class counsel reviewed and provided comments. 5/5/21 ACH incorporated class counsel feedback and provided revised draft on 4/15/21. Class counsel have no further comments. Policy looks good, subject to implementation. | | 2/19/21 Sent policy. 4/15/21 Policy revised based on PLO/DRC feedback. – FINAL |
| 06-05 ADA Coordination *CHS Policy 1107* | 3/19/21 Class counsel reviewed and provided comments. 5/5/21 ACH incorporated class counsel feedback and provided revised draft on 4/15/21. Class counsel have no further comments. Policy looks good, subject to implementation. | | 2/19/21 Sent policy. 4/15/21 Policy revised based on PLO/DRC feedback. **7/16/21 Will revise post implementation of ATIMs**. 11/5/21 Policy revised and sent. Added more operational detail. FINAL (subject to revision noted) |

14

**Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 06-06 Patients with Disabilities or Other Significant Health Care Needs<br>*CHS Policy 1422* | 3/19/21 Class counsel reviewed and provided comments.<br>5/5/21 ACH incorporated class counsel feedback and provided revised draft on 4/15/21. Class counsel have no further comments. Policy looks good, subject to implementation. | | 2/19/21 Sent policy.<br>4/15/21 Name changed and policy revised based on PLO/DRC feedback.<br>FINAL |
| 06-07 Health Care Appliances Assistive Devices and Durable Medical Equipment<br>*CHS Policies 1125 and 1128* | 3/19/21 Class counsel reviewed and provided comments.<br>5/5/21 ACH incorporated class counsel feedback and provided revised draft on 4/15/21. Class counsel have no further comments. Policy looks good, subject to implementation. | | 2/19/21 Sent policy.<br>4/15/21 Policy revised based on PLO/DRC feedback.<br>FINAL |
| ~~07-03 Patients in Safety Cells~~ | | | 8/26/21 Contents integrated into joint PP 02-05 Suicide Prevention. |
| ~~07-XX Patients in Segregation~~ ~~(Joint policy)~~ ~~*CHS Policy 1416*~~ | | | 5/21/22 Changed number to ACH PP 05-22. |
| 08-01 Safeguarding Protected Health Information (Joint) | 7/1/21 Class counsel do not have comments at this time. Ready for Medical and MH Experts' review. | | 6/25/21 Policy revised and sent. Joint policy. |
| 08-08 Patient Privacy (Joint policy)<br>*CHS Policy 1117* | 5/26/21 Class counsel have no comments at this time. Ready for all SMEs' review, including as to its compliance with Remedial Plan Sections IV.C, VI.B.2, VI.H, VII.C.2, VII.E.1, etc. | | 5/21/21 Policy finalized and sent. Joint policy. |

| Standardized Nursing Procedure | Counsel Comments | Medical Expert Comments | County Response |
|---|---|---|---|
| Infection Control Section:<br>• COVID-19 Symptomatic Patient | Medical SMEs: Please review 4/15/21 version. | | 4/15/21 Sent new SNP. |
| Pregnancy Section: | | | 12/16/21 Sent revised SNP. |

**Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| Standardized Nursing Procedure | Counsel Comments | Medical Expert Comments | County Response |
|---|---|---|---|
| • Pregnancy Diagnosis, Treatment and Conditions | | | |
| Skin Section:<br>• Acne Vulgaris<br>• Acute Contact Dermatitis<br>• Atopic Dermatitis<br>• Bites and Stings<br>• Corns and Calluses<br>• Folliculitis & Beard Infections<br>• Fungal Skin Infections<br>• Impetigo<br>• Intertrigo<br>• ~~Lice or Scabies~~ Infestations<br>• Psoriasis<br>• Seborrheic Dermatitis/Dandruff | Medical SMEs: Please review 4/15/21 version. | | 4/15/21 Sent revised SNPs.<br>8/19/21 Lice/Scabies SNP renamed Infestations, revised and sent. |
| Substance Use Disorders:<br>• Benzodiazepine Withdrawal Monitoring and Treatment<br>• Opioid Withdrawal Monitoring and Treatment – FINAL<br>• Alcohol Withdrawal Monitoring and Treatment<br>• Suspected Opioid Overdose | Medical SMEs: Please review 4/15/21, 5/7/21, and 5/21/21 versions, respectively.<br><br>7/1/21 Benzodiazepine Withdrawal and Alcohol Withdrawal ready for SME review. | 3/3/22 Medical SME sent edits on SNP Alcohol Withdrawal.<br>3/8/22 Medical SME sent edits on SNP Benzodiazepine Withdrawal.<br>3/9/22 Medical SME sent edits on SNP Opioid Withdrawal.<br>3/31/22 Medical SME sent comments on Benzodiazepine & Alcohol Withdrawal SNPs.<br>4/1/22 Medical SME approved Opioid Withdrawal SNP & sent minor comments on Suspected Opioid Overdose SNP.<br>4/20/22 Medical SMEs approved all SUD SNPs. | 4/15/21 Sent revised SNPs Benzodiazepine & Opiate Withdrawal Treatment.<br>5/7/21 Sent new Suspected Opioid Overdose.<br>5/21/21 Alcohol Withdrawal revised & sent.<br>6/25/21 Benzodiazepine Withdrawal and Alcohol Withdrawal revised again and sent.<br>10/15/21 Benzodiazepine, Opioid, & Alcohol Withdrawal SNPs revised and sent.<br>3/8/22 Sent revised Alcohol Withdrawal SNP with feedback incorporated for final review.<br>3/29/22 Sent revised Benzodiazepine, Opioid & Alcohol Withdrawal SNPs.<br>4/7/22 Sent revised Benzodiazepine, Alcohol Withdrawal and Suspected Opioid Overdose SNPs with SME feedback incorporated.<br>4/20/22 FINAL |
| Urological Section:<br>• Penile Discharge<br>• Renal or Ureteral Colic | Medical SMEs: Please review 4/15/21 version. | | 4/15/21 Revised SNPs sent.<br>8/19/21 Scrotal Pain SNP revised and sent.<br>9/10/21 Penile Discharge revised and sent. |

16

**Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| Standardized Nursing Procedure | Counsel Comments | Medical Expert Comments | County Response |
|---|---|---|---|
| • Scrotal Pain<br>• Urinary Retention<br>• Urinary Tract Infection | | | |
| General:<br>• SNP Overview<br>Abdominal Section:<br>• Emergent, Non-Emergent & Hernia<br>Cardiovascular & Lung Section:<br>• Asthma<br>• Bronchitis, Pneumonia, & Shortness of Breath<br>• Cardiac Dysrhythmias<br>• Chest Pain<br>• Chronic Stable Angina<br>• Hypertension Urgency and Emergency<br>• Hyperventilation<br>Dental Section:<br>• Dental Conditions<br>Endocrine Section:<br>• Diabetes<br>Eyes, Ears, Nose & Throat:<br>• Ear Conditions<br>• Eye Conditions<br>• Nose Conditions<br>• Throat Conditions<br>• Visual Complaints<br>Musculoskeletal Conditions:<br>• Non-traumatic<br>• Traumatic<br>Neurological Section:<br>• Head/Cervical Spine Injury | Medical SMEs: Please review 5/7/21 versions.<br><br>7/1/21 SNPs ready for SME review. Class Counsel notes that the American Diabetes Association is expected to issue an updated position statement on Diabetes Management in Correctional Institutions, which should inform ACH policy per the Remedial Plan. | | 5/7/21 Revised SNPs approved and sent.<br><br>6/25/21 Following SNPs approved & sent:<br>• Diabetes (revision)<br>• Visual Complaints (new)<br><br>7/16/21 Received Counsel feedback. Pending SME review prior to review.<br><br>9/17/21 SNPs Ear Conditions and Visual Complaints revised and sent. |

**Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| Standardized Nursing Procedure | Counsel Comments | Medical Expert Comments | County Response |
|---|---|---|---|
| • Headaches<br>• Seizure Disorders<br>• Vasovagal Syncope | | | |

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-03 Responsible Mental Health Authority | 12/30/20 Policy sent to MH SMEs.<br>5/5/21 MH/SP SMEs: Please review. | | 12/17/20 See attached policy. |
| 01-10 Access to Mental Health Services | 12/30/20 Policy sent to MH SMEs.<br>5/5/21 MH/SP SMEs: Please review. | **1/12/22 Prioritize review.** | 7/13/20 Sent draft.<br>8/19/21 Policy revised and sent. |
| 03-01 Medical Assistant Responsibilities<br>*JPS Policy 1051* | | | 8/19/21 Policy revised and sent. |
| 03-02 Overview of Staff Responsibilities – APU<br>*JPS Policy 1021* | | | 8/19/21 Policy revised and sent. |
| 03-03 Overview of Staff Responsibilities – Outpatient<br>*JPS Policy 1022* | | | 8/19/21 Policy revised and sent. |
| 03-04 Psychiatric Prescriber Duties<br>*JPS Policies 1204 & 1207* | | | 9/10/21 Policy revised and sent. |
| 03-05 Acute Psychiatric Nursing Responsibilities<br>*JPS Policy 1021* | | | 12/16/21 Sent policy. |
| 03-06 Acute Psychiatric Unit Psychiatrist Responsibilities<br>*JPS Policies 1201 & 1203* | | | 12/16/21 Sent policy. |
| 04-01 Intensive Outpatient Program (IOP) | 12/30/20 04-01 IOP Policy sent to MH SMEs.<br>5/5/21 MH/SP SMEs: Please review. | **1/12/22 Prioritize review.** | 7/13/20 Sent 04-01 Intensive Outpatient Program policy. |
| 04-02 FOSS Levels | 12/30/20 Policy sent to MH SMEs.<br>5/5/21 MH/SP SMEs: Please review. | 11/5/21 MH SME sent comments requesting a call to discuss the final draft. | 12/17/20 See attached policy.<br>9/17/21 In discussion internally.<br>11/5/21 Final draft sent. |

**Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| | | 12/7/21 MH SME met with County to discuss final draft. 12/27/21 MH SME approved. | 12/22/21 Sent revised final draft. MH SME feedback incorporated. 12/30/21 FINAL |
| 04-03 Basic MH Services *JPS Policies Section 10 CHS Policy 1411* | 3/30/22 Class Counsel noted MH & SP SMEs may need to provide feedback. | **1/12/22 Prioritize review.** | 8/19/21 Sent policy. |
| 04-04 Outpatient MH Services & Levels of Care *JPS Policies 1029 & 1037* | 3/30/22 Class Counsel noted MH & SP SMEs may need to provide feedback. | **1/12/22 Prioritize review.** | 10/15/21 Sent policy. |
| 04-07 Acute Psychiatric Unit Precautions and Observation *JPS Policies 1009 & 1011* | 4/1/22 Class Counsel approved the policy. | 3/15/22 SP SME sent comments. 4/26/22 SP SME requested clarification. 5/9/22 SP SME approved. | 8/19/21 Policy revised and sent. 11/19/21 Sent revised policy. CCTV monitoring deleted. 3/29/22 In review. 4/1/22 Sent policy with feedback incorporated for final review. 5/19/22 Pending MH SME only. |
| 04-08 Outpatient Program – Suicide Precautions, Observation Levels & Item Restriction | | 3/15/22 SP SME sent comments. Unclear on need for this policy, as all procedures are included in the Suicide Prevention policy. 3/18/22 MH SME sent comments. | 10/1/21 Sent new policy. 3/29/22 Policy deleted. Contents are included in joint ACH PP 02-05 Suicide Prevention Program. |
| 04-09 Acute Psychiatric Unit Admission, Program, and Discharge *JPS Policies 309, 700, 701, 704, 706, 707 & 805* | | 12/17/21 Suicide Prevention SME sent comments. 12/27/21 MH SME sent feedback on policy and three attachments. 5/5/22 MH SME sent minor feedback. | 12/16/21 Sent policy and attachments. 12/22/21 Sent revised policy with SP SME edits incorporated. 12/30/21 In review and revision. 1/12/22 Sent final draft policy and attachments for final review. 5/6/22 Feedback accepted – FINAL |
| 05-01 MH Discharge Planning *JPS Policy 800* | 12/30/20 Policy and Discharge Resource List sent to MH SMEs. 5/5/21 MH/SP SMEs: Please review. | | 7/13/20 Sent draft. 11/30/20 Policy was updated. |

**Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| | | | 5/19/22 Integrated contents into joint PP 05-10 Discharge Planning and deleted MH PP 05-01. |
| 07-01 Behavior Management Plan<br>*JPS Policy 1003* | 12/30/20 Policy and form sent to MH SMEs.<br>5/5/21 MH/SP SMEs: Please review.<br>1/7/22 Class Counsel sent comments. No additional edits to MH SME feedback. | 11/5/21 MH SME sent comments expressing concerns.<br>12/29/21 MH SME sent comments on revised form.<br>1/3/22 MH SME sent edits.<br>1/25/22 Parties met to discuss MH SME feedback. | 11/12/20 See attached policy/form<br>12/16/21 Sent revised policy draft.<br>1/12/22 In review and revision.<br>2/4/22 In review based on meeting<br>3/8/22 Integrated contents into MH PP 07-02 based on MH SME feedback. Deleted MH PP 07-01. |
| 07-02 Treatment Planning – Multidisciplinary Intervention Plan form | 12/30/20 Policy sent to MH SMEs.<br>5/5/21 MH/SP SMEs: Please review. | **3/8/22 Prioritize review** | 11/30/20 See attached policy.<br>3/8/22 Sent revised policy with contents of Behavior Management Plan policy incorporated. |
| *Detoxification Policies*<br>07-03 Use of Benzodiazepines<br>07-04 Patients with Substance Use Disorders<br>*JPS Policies 1032, 1112* | Time-sensitive, per Remedial Plan VI.N.<br>5/5/21 Class counsel have no comments at this time.<br>SMEs: Please review 4/15/21 version. | **1/12/22 Prioritize review.** | Other Withdrawal PP – *Joint*. See ACH PP 05-14, 05-15, & 05-17.<br>4/15/21 MH 07-03 revised & sent.<br>8/19/21 MH PP 07-04 revised and sent. |
| 07-05 Mental Health Evaluations for Planned Use of Force | 10/21/21 Class Counsel and SMEs met with County and provided feedback. | 10/21/21 Class Counsel and SMEs met with County and provided feedback.<br>1/24/22 MH SME approved the policy. | 9/2/21 Initial policy sent.<br>10/21/21 Met with Class Counsel and SMEs for feedback on policy.<br>12/16/21 Sent revised policy draft for final review.<br>2/4/22 FINAL |
| 07-06 Mental Health Rules Violation Review | 1/7/22 Class Counsel sent feedback. | 11/7/21 MH SME sent edits and comments on policy and form.<br>12/29/21 MH SME sent comments on the revised form.<br>1/4/22 MH SME sent minor comments on revised policy.<br>1/24/22 MH SME approved the policy and form. | 11/5/21 Initial policy & form sent.<br>12/16/21 Sent revised policy/form<br>12/30/21 In review and revision.<br>1/12/22 Sent revised policy and form with feedback incorporated for final review.<br>2/4/22 FINAL |

**Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 07-07 Mental Health Adaptive Support Program<br>- Alta Regional Referral Form<br>- Adaptive Support Survey<br>- MH Adaptive Support Program Screener | 12/6/21 Class Counsel sent feedback.<br>5/9/22 Class Counsel sent feedback. | 11/5/21 MH SME reviewed and had nothing to add. | 9/17/21 Received IDD screening materials from Class Counsel. Draft policy in development.<br>11/5/21 Sent final draft policy and referral form.<br>12/16/21 In review and revision.<br>1/21/22 Sent revised policy and forms for final review.<br>5/19/22 Incorporated feedback & sent to Class Counsel for final review. |
| 09-02 Lanterman-Petris-Short (LPS) Conservatorship | 12/30/20 Policy sent to MH SMEs. Please review.<br>5/5/21 MH/SP SMEs: Please review. | | 12/17/20 See attached policy. |
| 09-03 Use of Safety Suits | | | See joint ACH PP 02-05 |
| 09-04 Administration of Involuntary Psychotropic Medication | 7/1/21 Class counsel do not have comments at this time. Ready for Medical and MH Experts' review. | **1/12/22 Prioritize review.** | 6/25/21 Policy revised and sent. |
| 09-05 Informed Consent – Acute Inpatient Unit | 7/1/21 Class counsel do not have comments at this time. Ready for Medical and MH Experts' review. | | 6/25/21 Policy revised and sent. |
| 09-06 Patient Rights<br>*JPS Policy 303* | 8/4/21 Class Counsel sent feedback on policy and Patient Rights Handbook. | | 7/30/21 Policy revised and sent.<br>8/19/21 MH staff are reviewing Counsel's feedback.<br>10/15/21 Feedback accepted. Policy and handbook revised and sent. – FINAL |
| 09-07 Denial of Rights | | | 8/19/21 Sent policy. |
| 09-08 PREA Referrals and Evaluations<br>*JPS Policy 1052* | | | 8/19/21 Policy revised and sent. |
| 09-09 Clinical Restraint and Seclusion in Acute Psych Unit | | | See joint ACH PP 05-21 Restraints and Seclusion |

21

**Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| ~~09-10 Suicide Prevention~~ | | | See joint ACH PP 02-05 Suicide Prevention for all comments. |
| 09-11 Involuntary Detainment Advisement *JPS Policy 304* | | | 10/15/21 Policy revised and sent. |
| ~~LGBTQI Treatment, Policies~~ | | | See joint ACH PP 05-12 |
| ~~Grievance Procedures~~ | | | See joint ACH PP 01-09 |

*Quarterly Data Reporting (Remedial Plan Section II.C)* – SMI Data sent quarterly.  Link: https://www.sacsheriff.com/pages/transparency.php

| Suicide Prevention Training | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| New Employee (4-hour) Training | 1/3/22 Class Counsel sent comments. 2/3/22 Class Counsel has questions & concerns about the revised training. 2/7/22 Class Counsel approved revised training PPT. | 12/29/21 MH & SP SMEs sent joint edits. 2/5/22 SP SME sent comments. | 12/17/21 Sent DRAFT training PowerPoint. 1/21/22 In review and revision. 2/1/22 Sent revised training. 2/4/22 In review. 2/7/22 Sent revised PPT with SP SME comments incorporated. |

ATTACHMENT 2 -
Sheriff's Office Report

*MAYS V. COUNTY OF SACRAMENTO*

**COMBINED REMEDIAL PLAN – May 30, 2019**
III.   **AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE**

A. **Policies and Procedures**                              Sacramento Sheriff Response

1.   It is the County's policy to provide access to its programs and services to prisoners with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests. No prisoner with a disability, as defined in 42 U.S.C. § 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities or be subjected to discrimination. The County's policy is to provide reasonable accommodations or modifications where necessary, consistent with 28 C.F.R. §§ 35.150 & 35.152, and other applicable federal and state disability law.

2.   The County shall, in consultation with Plaintiffs' counsel, revise its Operations Order to establish standard and consistent procedures for the Jail to ensure compliance with the ADA and the remedial provisions outlined herein.

ADA Operations Order under review.

3.   The County shall, within 12 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, revise policies, procedures, and inmate orientation materials (e.g. Inmate Handbook), in accordance with the revised Operations Order and the remedial provisions outlined herein. A list of policies which the County will revise consistent with the provisions outlined herein, as appropriate and in consultation with Plaintiffs' counsel, is attached as **Exhibit A-1.**

Discipline housing, Housing unit checks, Tsep procedures sent as temporary polices. TGNI, Suicide Prevention and Effective Communication under revision.

4.   All staff will receive training appropriate to their position on policies and procedures related to compliance with the Americans with Disabilities Act (ADA) and related disability laws.

B.  **ADA Tracking System**

1.   The County shall develop and implement a comprehensive system (an "ADA Tracking System") to identify and track screened prisoners with disabilities as well as accommodation and Effective Communication needs.

ATIMS under development to track ADA needs.

2.   The ADA Tracking System shall identify:

a)   All types of disabilities, including but not limited to psychiatric, intellectual, developmental, learning, sensory, mobility, or other physical disabilities, and special health care needs;

b)   Prisoners with disabilities that may pose a barrier to communication, including but not limited to learning, intellectual, or developmental disabilities, and hearing, speech, or vision impairments;

c)   Accommodation needs, including as to housing, classification, Effective Communication, adaptive supports, and assistive devices;

d)   Prisoners who require specific health care appliances, assistive devices, and/or durable medical equipment (HCA/AD/DME);

e)   Prisoners who are class members in *Armstrong v. Newsom* (N.D. Cal. No. 94-cv-02307), with their applicable disability classification(s) and accommodation need(s).

3.  The ADA Tracking System's prisoner disability information will be readily accessible to custody, medical, mental health, and other staff at the Jail who need such information to ensure appropriate accommodations and adequate program access for prisoners with disabilities.

C.  **ADA Coordinator**

1.  The County shall have a dedicated ADA Coordinator at each facility.                    Both positions overseen by the Compliance Sergeant at each facility.

2.  The ADA Coordinator position shall be dedicated to coordinating efforts to comply with and carry out ADA-related requirements and policies, shall have sufficient command authority to carry out such duties, and shall work with the executive management team regarding ADA-related compliance, training, and program needs.

3.  The County shall clearly enumerate, in consultation with Plaintiffs' counsel, the job duties and training requirements for the ADA Coordinator position and for ADA Deputies assigned to support the ADA Coordinator position.

4.  The County shall ensure that ADA Coordinators and ADA Deputies possess requisite training to implement and ensure compliance with the Jail's disability program and services, including operation of the ADA Tracking System.

D.  **Screening for Disability and Disability-Related Needs.**

1.   The County shall conduct adequate screening of prisoners to be housed in the Jail in order to identify disabilities and disability-related accommodation, housing, classification, and other needs.  All individuals detained at the Jail for any period of time will be assessed for Effective Communication needs, consistent with the provisions herein.

2.   The County shall take steps to identify and verify each prisoner's disability and disability-related needs during medical intake screening, including based on:

a)   The individual's self-identification or claim to have a disability;

b)   Documentation of a disability in the individual's health record;

c)   Staff observation that the individual may have a disability that affects placement, program access, or Effective Communication; or

d)   The request of a third party (such as a family member) for an evaluation of the individual for an alleged disability.

E.   **Orientation**

1.   The County shall ensure that, for the population to be housed in the Jails, prisoners with disabilities are adequately informed of their rights under the ADA, including but not limited to:

a)   Accommodations available to prisoners;

b)   The process for requesting a reasonable accommodation;

c)  The role of the ADA coordinator(s) and method to contact them;

d)  The grievance process, location of the forms, and process for getting assistance in completing grievance process;

e)  Instructions on how prisoners with disabilities can access health care services, including the provision of Effective Communication and other accommodations available in accessing those services.

2.  Upon processing and classification, prisoners with disabilities shall receive, in an accessible format, the jail rulebook; orientation handbook; and a verbal orientation or orientation video regarding rules or expectations.

Verbal and written communication presented by compliance officers upon request.

3.  The County shall accommodate individuals with disabilities in the orientation process through the use of alternative formats (*e.g.* verbal communication, large print, audio/video presentation), when necessary for Effective Communication of the information.

4.  The County shall develop an Americans with Disabilities Act Inmate Notice. The Notice shall be prominently posted in all prisoner housing units, in the booking/intake areas, in medical/mental health/dental treatment areas, and at the public entrances of all Jail facilities.

F.  **Health Care Appliances, Assistive Devices, Durable Medical Equipment**

1.  The County shall establish a written policy to ensure provision of safe and operational HCA/AD/DME, with a process for repair and replacement.

2.   The County shall timely provide HCA/AD/DME to prisoners with disabilities who require such assistance. The County shall ensure an individualized assessment by medical staff to determine whether HCA/AD/DME is warranted to ensure equal and meaningful access to programs, services, and activities in the Jail.

3.   The County shall allow prisoners to retain personal HCAs/ADs/DME (which will include reading glasses), unless there is an individualized determination that doing so would create an articulated safety or security risk.

a)   Where Jail staff determine it is necessary to remove a prisoner's personal HCA/AD/DME for security reasons, the County shall provide an equivalent Jail-issued device unless custody staff, with supervisory review, determine and document, based on an individualized assessment, that the device constitutes a risk of bodily harm or threatens the security of the facility.

b)   If such a determination is made, the ADA coordinator or supervisory-level designee shall document the decision and reasons for it, in writing, and shall consult with medical staff to determine an appropriate alternative accommodation.

4.   The County shall, in consultation with Plaintiffs' counsel, implement a written policy governing the release of prisoners who need assistive devices upon release.

a)   The County will ensure that any personal mobility device belonging to a prisoner is returned to the prisoner prior to release from custody.

b)   If a prisoner does not have a personal mobility device, but is ambulatory with the assistance of a cane, crutch, or walker, the prisoner will be permitted to retain such device that was used while in custody upon release, or will be provided a comparable device, upon release.

c)  If a prisoner who is due for release requires a wheelchair, but does not have a personal wheelchair, Jail staff shall coordinate with the prisoner, the prisoner's family or friends, and other County agencies as needed to secure a wheelchair or take other steps to address the individual's needs upon release. The County shall document this process in the ADA Tracking System for purposes of individual tracking and quality assurance.

G.  **Housing Placements**

1.   The County shall house prisoners with disabilities in facilities that accommodate their disabilities.

Jail Annex Planning.

2.   The County shall implement a housing assignment system that includes an individualized assessment of each individual's functioning limitations and restrictions, including but not limited to:

Jail Annex Planning.

a)   The need for ground floor housing;

b)   The need for a lower bunk;

c)   The need for grab bars in the cell and/or shower;

d)   The need for accessible toilets;

e)   The need for no stairs in the path of travel; and

f)   The need for level terrain.

Jail Annex Planning.

3.  Prisoners with disabilities shall be housed in the Jail consistent with their individual security classification. Prisoners prescribed or possessing HCAs/ADs/DME will not automatically be housed in a medical housing unit. Placement in a medical housing unit will be based on individualized clinical determination of need for treatment.

4.  Classification staff shall not place prisoners with disabilities in:

a)  Inappropriate security classifications simply because no ADA-accessible cells or beds are available;

b)  Designated medical areas unless the prisoner is currently receiving medical care or treatment that necessitates placement in a medical setting; or

c)  Any location that does not offer the same or equivalent programs, services, or activities as the facilities where they would be housed absent a disability.

H.  **Access to Programs, Services, and Activities**

**1.**  The County shall ensure prisoners with disabilities, including those housed in specialized medical units or mental health units (*e.g.*, OPP, IOP, Acute) have equal access to programs, services, and activities available to similarly situated prisoners without disabilities, consistent with their health and security needs. Such programs, services, and activities include, but are not limited to:

a)  Educational, vocational, reentry and substance abuse programs

b)  Work Assignments

c)  Dayroom and other out-of-cell time                              Increased out of cell time.

d)  Outdoor recreation and fitted exercise equipment               Increased outdoor recreation time.

e)  Showers

f)  Telephones

g)  Reading materials

h)  Social visiting

i)  Attorney visiting

j)  Religious services

k)  Medical, mental health, and dental services and treatment

**2.**  The County shall provide reasonable accommodations and modifications as necessary to ensure that prisoners with disabilities have equal access to programs, services, and activities available to similarly situated prisoners without disabilities.

3.  The County shall develop and implement a written policy for staff to provide appropriate assistance to prisoners with psychiatric, developmental, or cognitive disabilities so that they can fully participate in programs, services, and activities provided at the Jail.

**4.**  The County shall implement a written policy for staff to provide assistance to prisoners with disabilities in reading or scribing documents.

5.   The County shall provide equal access to library, recreational, and educational reading materials for prisoners with disabilities, including easy reading and large print books for individuals who require such accommodations.

6.   The County shall ensure equitable inmate worker opportunities for prisoners with disabilities, including by:

a)   Ensuring clear job duty statements, with essential functions and specific criteria, for each Worker position;

b)   Ensuring that medical staff conduct an individualized assessment to identify work duty restrictions and/or physical limitations to facilitate appropriate work/industry assignments and to prevent improper exclusions from work opportunities;

c)   Providing reasonable accommodations to enable prisoners with disabilities to participate in inmate worker opportunities.

I.   **Effective Communication**

1.   The County shall assess all individuals detained at the Jail for any period of time for Effective Communication needs, and shall take steps to provide Effective Communication based on individual need.

2.   The County's ADA policies shall include comprehensive guidance to ensure Effective Communication for prisoners with vision, speech, hearing, intellectual, learning, or other disabilities. The County shall, in consultation with Plaintiffs' counsel, ensure that sufficient guidance on the provision of Effective Communication is included in Jail custody and health care policies and procedures.

3.   Standard for Provision of Effective Communication in Due Process Events and Clinical Encounters

a)   A higher standard for the provision of Effective Communication shall apply in the following situations:

i.   Due Process Events, including the following:

- Classification processes

- Prisoner disciplinary hearing and related processes

- Service of notice (to appear and/or for new charges)

- Release processes

- Probation encounters/meetings in custody

ii.   Clinical Encounters, including the following:

- Determination of medical history or description of ailment or injury

- Diagnosis or prognosis

▪ Medical care and medical evaluations

▪ Provision of mental health evaluations, rounds, group and individual therapy, counseling and other therapeutic activities

▪ Provision of the patient's rights, informed consent, or permission for treatment

▪ Explanation of medications, procedures, treatment, treatment options, or surgery

▪ Discharge instructions

b)  In the situations described in subsection (a), above, Jail staff shall:

i.   Identify each prisoner's disability where there may be a barrier to comprehension or communication requiring reasonable accommodation(s);

ii.  Provide effective reasonable accommodation(s) to overcome the communication barrier; and

iii. Document the method used to achieve Effective Communication and how the staff person determined that the prisoner understood the encounter, process, and/or proceeding.

4.   Effective auxiliary aids and services that are appropriate to the needs of a prisoner with Effective Communication needs shall be provided when simple written or oral communication is not effective. Such aids may include bilingual aides, SLIs, readers, sound amplification devices, captioned television/video text displays, Videophones and other telecommunication devices for deaf persons (TDDs), audiotaped texts, Braille materials, large print materials, writing materials, and signage.

5.   In determining what auxiliary aid service to provide, the County shall give primary consideration to the request of prisoner with Effective Communication needs.

6.   Education providers (*e.g.,* Elk Grove Unified School District) at the Jail will ensure Effective Communication for prisoners participating in education programs, including by providing necessary assistive equipment and take steps to accommodate learning strategies of those prisoner-students who have special needs, such as those with developmental, learning, vision, hearing, and speech disabilities.

7.   The County shall assist prisoners who are unable to complete necessary paperwork (*e.g.*, related to health care, due process, Jail processes) on their own with reading and/or writing as needed.

8.   The County shall permit prisoners, including those who are illiterate, non-English speaking, or otherwise unable to submit written or electronic sick call requests, to verbally request care. Such verbal requests shall immediately be documented by the staff member who receives the request on an appropriate form and transmitted to a qualified mental health or medical professional for response in the same priority as those sick call requests received in writing.

9.  The County shall post and disseminate notices, policies, job announcements, and other written material in alternative formats to promote Effective Communication.

J.  **Effective Communication and Access for Individuals with Hearing Impairments**

1.  The County shall develop and implement a policy for newly arrived and newly identified prisoners with hearing disabilities to determine each prisoner's preferred method of communication.

2.  Qualified Sign Language Interpreters (SLIs) will be provided during intake and for due process functions, health care encounters, and Jail programming, when sign language is the prisoner's primary or only means of Effective Communication, unless the prisoner waives the assistance of an interpreter and/or delay would pose a safety or security risk.

VRI system installed at RCCC.

a)  The County shall maintain a contract or service agreement with interpreter services in order to provide such services for deaf or hearing impaired prisoners. Jail staff will be informed of the availability of contract interpreter services.

b)  Lip reading will not be the sole method of Effective Communication used by staff, unless the prisoner has no other means of communication.

c)  In cases where the use of an SLI is not practicable, or is waived by the prisoner, Jail staff shall employ the most effective form of communication available.

d)   The County will maintain a log of (a) when, for whom, and for what purpose an SLI was used; and (b) when, for whom, and why a SLI was *not* used for a prisoner with an identified need for SLI services (*e.g.*, prisoner waived SLI or delay would have posed safety or security risk).

e)   When a prisoner waives an SLI, the log must document (a) the method of communication of the waiver, and (b) the method staff used to determine that the waiver was knowing and freely given.

3.   Jail Staff shall effectively communicate the contents of the Inmate Handbook and other materials providing information on Jail rules and procedures to all prisoners to be housed in the Jail who are deaf or hard of hearing. For those prisoners for whom written language is not an effective means of communication, Jail Staff may meet this obligation by providing a video of an SLI signing the contents of the Inmate Handbook, along with appropriate technology for viewing, or by providing an SLI to interpret the contents of the Inmate Handbook to the prisoner who is deaf or hard of hearing.

| | |
|---|---|
| 4.   The County shall, within 12 months from court approval of the Settlement, make Videophones available for deaf and hard of hearing prisoners. The Videophones shall provide for calls through the use of Video-Relay Services (VRS) at no cost to deaf and hard of hearing prisoners or for calls directly to another Videophone. | VRI system installed at RCCC. |
| 5.   Deaf/hard of hearing prisoners who use telecommunication relay services, such as Videophone or TDD/TTY machine, in lieu of the telephone shall receive equal access to the Videophone or TDD/TTY services as non-disabled prisoners are afforded for regular telephone usage. | Current RFP for video visitation services. |

6.   The County shall provide deaf/hard of hearing prisoners with additional time for calls using telecommunication relay services, such as a Videophone or TDD/TTY, to account for the fact that signed and typed conversations take longer than spoken conversations. The County shall document the time that each prisoner uses and has access to such equipment.

7.   Prisoners who require an SLI as their primary method of communication shall be provided an SLI for education, vocational, or religious programs and services.

8.   Public verbal announcements in housing units where individuals who are deaf or hard of hearing reside shall be delivered on the public address system (if applicable) and by flicking the unit lights on and off several times to alert prisoners that an announcement is imminent. This includes announcements regarding visiting, meals, recreation release and recall, count, lock-up, and unlock. Verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, as consistent with individual need. These procedures shall be communicated to prisoners during the orientation process and also shall be incorporated into relevant policies and post orders.

## K.  **Disability-Related Grievance Process**

1.   The County shall implement a grievance system for prisoners with disabilities to report any disability-based discrimination or violation of the ADA, this Remedial Plan, or Jail ADA-related policy, and shall provide a prompt response and equitable resolution in each case.

Medical Greivance boxes installed. ADA added to greivance forms.

2.   The County shall ensure that the grievance procedures are readily available and accessible to all prisoners.

Grievances are made available to all inmates.

a)  The County shall make reasonable efforts to ensure all prisoners are aware of the disability grievance procedures, including the availability of accommodations and staff assistance to submit a grievance and/or appeal.

b)  The County shall ensure the prisoners with disabilities have meaningful access to grievance forms, including through provision of staff assistance and large print materials.

3.   Response to Grievances

a)  The County shall develop and implement an ADA grievance process that includes (1) a reasonable timeline for response to ADA-related grievances and appeals, including an expedited process for urgent ADA grievance (*e.g.* , involving prisoner safety or physical well-being); and (2) provision for interim accommodations pending review of the individual's grievances/appeals.

b)  The County shall ensure that prisoners with communication needs are interviewed and provided assistance as part of the grievance/appeal process where necessary to ensure meaningful access and Effective Communication.

c)  The County shall document each denial of a reasonable accommodation request and shall record the basis for such determination.

d)  The County shall provide in writing a copy of the grievance (or appeal) response to the prisoner, including the resolution, the basis for a denial (if applicable), and the process for appeal.

e)  The County shall ensure that completed grievance responses are effectively communicated to prisoners with disabilities.

4.   The submission, processing, and responses for disability-related grievances and complaints shall be tracked.

L.   **Alarms/Emergencies**

**1.**   The County shall ensure that all written policies regarding alarms and emergencies contain mandatory provisions to accommodate prisoners with disabilities.

**2.**   The County shall implement written policies regarding the expectations of staff as to prisoners with identified disabilities during emergencies and alarms, including as to disabilities that may affect prisoners' ability to comply with orders or otherwise respond to emergencies and alarms. For example, the policies shall ensure appropriate handling of prisoners with mobility-related disabilities who are unable to prone or take a seated position on the ground during an alarm or emergency. Such policies shall be communicated to staff, incorporated into the relevant Operations Orders, and communicated to prisoners with disabilities using Effective Communication.

3.   The County shall implement written policies for staff regarding communicating effectively and appropriately with prisoners who have disabilities that may present barriers to communication during emergencies or alarms.

4.   In order to facilitate appropriate accommodations during alarms or emergencies, the County shall offer, but shall not require, individuals who have disabilities visible markers to identify their disability needs (*e.g.*, identification vests). The County shall maintain a list, posted in such a way to be readily available to Jail staff in each unit, of prisoners with disabilities that may require accommodations during an alarm or emergency.

5.   The County shall install visual alarms appropriate for individuals who are deaf or hard of hearing, which shall comply with relevant fire code regulations.

6.   All housing units shall post notices for emergency and fire exit routes.          Emergency and fire exit routes posted.

M. **Searches, Restraints, and Extractions**

1.   The County shall modify its written policies to ensure that prisoners with mobility impairments, including those with prosthetic devices, receive reasonable accommodations with the respect to the following: (1) Pat searches and unclothed body searches; (2) Application of restraints devices, including Pro-Straint Chair; and (3) Cell extractions.

N. **Transportation**

1.   The County shall provide reasonable accommodations for prisoners with disabilities     ADA Transport Van.
when they are in transit, including during transport to court or outside health care services.

2.   Prescribed HCAs/ADs/DME, including canes, for prisoners with disabilities shall be available to the prisoner at all times during the transport process, including in temporary holding cells, consistent with procedures outlined in Part VII.

3.   The County shall use accessible vehicles to transport prisoners in wheelchairs and other prisoners whose disabilities necessitate special transportation, including by maintaining a sufficient number of accessible vehicles. (295)

4.   Prisoners with mobility impairments shall be provided assistance onto transport vehicles.

## O.   **Prisoners with Intellectual Disabilities**

1.   The County shall, in consultation with Plaintiffs' counsel, develop and implement a comprehensive written policy and procedure regarding prisoners with an Intellectual Disability, including:

a)   Screening for Intellectual Disabilities;

b)   Identification of prisoners' adaptive support needs and adaptive functioning deficits; and

c)   Monitoring, management, and accommodations for prisoners with Intellectual Disabilities.

2.   A multidisciplinary team that includes appropriate health care staff will monitor and ensure appropriate care for prisoners with an Intellectual Disability. The multidisciplinary team will develop an individualized plan for each prisoner with an Intellectual Disability, which addresses: (1) safety, vulnerability, and victimization concerns, (2) adaptive support needs, (3) programming, housing, and accommodation needs. The multidisciplinary team's plan will be regularly reviewed and updated as needed.

ADA Transpor Van.

3.   Prisoners with an Intellectual Disability assigned to a work/industry position will be provided additional supervision and training as necessary to help them meet the requirements of the assignment.

P.   **ADA Training, Accountability, and Quality Assurance**

1.   The County shall ensure all custody, health care, facility maintenance, and other Jail staff receive ADA training appropriate to their position.

a)   The County shall provide to all staff appropriate training on disability awareness, including the use and purpose of accommodations and modifications in accordance with the ADA.

b)   The ADA training shall include: formalized lesson plans and in-classroom or virtual training for staff (including managers, supervisors, and rank-and-file staff) provided by certified or otherwise qualified ADA trainers.

2.   ADA instructors shall have appropriate ADA training and subject matter expertise necessary to effectively provide ADA training to staff.

3.   The County shall, in consultation with Plaintiffs' counsel, develop and implement written policies and procedures regarding monitoring, investigating, and tracking staff violations (or allegations of violations) of ADA requirements and Jail ADA policies.

4.   The County shall develop an ADA accountability plan that will ensure quality assurance and establish staff accountability for egregious, serious, or repeated violations of the ADA and Jail ADA-related policies and procedures.

Q.  **Accessibility Remedial Plan to Address Physical Plant Deficiencies**

1.  The County shall, within 24 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, develop and fully implement an Accessibility Remedial Plan to address Jail physical plant deficiencies that result in access barriers for prisoners with disabilities. In the interim, the Sheriff's Office shall house prisoners with disabilities in the most integrated and appropriate housing possible, providing reasonable accommodations and assistance where necessary to ensure appropriate accessibility to Jail programs, services, and activities.

2.  The Accessibility Remedial Plan shall ensure the following:

a)  Adequate provision of accessible cells and housing areas with required maneuvering clearances and accessible toilet fixtures, sanitary facilities, showers, dining/dayroom seating, and recreation/yard areas.

b)  Accessible paths of travel that are compliant with the ADA.

c)  Equal and adequate access for all prisoners with disabilities to Family and Attorney Visiting areas in reasonable proximity to their housing location.

IV.    **MENTAL HEALTH CARE**

A.  **Policies and Procedures**

1.  The County shall establish policies and procedures that are consistent with the provisions of this Remedial Plan and include the following:

a)  A written document reflecting the complete spectrum of mental healthcare programming and services provided to prisoners;

b)  Minimum and maximum timeframes for when each type of mental healthcare service will be completed, including but not limited to laboratory tracking and psychiatry follow-up services, in accordance with prevailing community and professional standards;

c)  An intake and referral triage system to ensure timely and effective resolution of inmate requests and staff referrals for mental healthcare;

d)  Specific credentialing requirements for the delivery of mental healthcare services, including but not limited to only qualified mental health professionals may make critical treatment decisions.

e)  Clinical monitoring of inmates, including but not limited to those who are involuntarily medicated, clinically restrained or secluded, segregated, or on suicide watch;

f)  Descriptions of specialized mental health programming that specifically identify admitting and discharge criteria and the staff members who have the authority to place inmates in specialized mental health housing;

g)  Procedures for involuntary medications and other appropriate measures for the management of inmates with serious mental illness who lack the capacity to give informed consent, in accordance with relevant state law;

h)   Training for all staff members who are working with inmates with mental illness in all aspects of their respective duty assignments.

Relias training for custody deputies.  CIT training for IOP deputes.

2.   The County's policies and procedures shall be revised, as necessary, to reflect all of the remedial measures described in this Remedial Plan.

3.   The County shall continue to operate its acute inpatient program and its Outpatient Psychiatric Pod (OPP) program. The County shall establish a new Intensive Outpatient Program (IOP) for inmates who require a higher level of outpatient psychiatric care than what is provided in the OPP program.

Main Jail IOP to include 20 males and 15 females.  RCCC IOP to include 24 males.

4.   The County shall operate its non-acute mental health programs – IOP, OPP, and General Population-Mental Health – consistent with the JPS Psychiatric Services overview, attached as **Exhibit A-2**.

B.   **Organizational Structure**

1.   The County shall develop and implement a comprehensive organizational chart that includes the Sheriff's Department ("Department"), Correctional Health Services ("CHS"), Jail Psychiatric Services ("JPS"), Chief Administrative Officer, Medical Director of the JPS Program, and any other mental health staff, and clearly defines the scope of services, chains of authority, performance expectations, and consequences for deficiencies in the delivery of mental health care services.

2.   A Medical Director of Jail Psychiatric Services shall be designated and shall oversee all mental health care functions in the jails, including psychiatric prescribers and psychiatric nurses.  The Director shall possess clinical experience and a doctoral degree.

3.   The Medical Director of Jail Psychiatric Services shall participate in jail executive leadership and shall be responsible for overseeing program development, clinical practice, and policy, as well as interfacing with jail and medical leadership and community mental health.

C.   **Patient Privacy**

1.   All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff.  In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification.

Seculuded privacy interview room created on first floor for booking related clinical interactions.  Use of private attorney visit booths for housing unit clinical interactions.

a)   For any determination that a clinical interaction with a patient requires the presence of custody staff, staff shall document the specific reasons for the determination.  Such decisions shall be reviewed through the Quality Assurance process.

b)   If the presence of custody staff  is determined to be necessary to ensure the safety of medical staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

c)   The County's patient privacy policies, as described in this section, shall apply to contacts between inmates and Triage Navigator Program staff and/or other staff that provide mental health-related services on site at the Jail.

2.   Jail policies that mandate custody staff to be present for any mental health treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above.  Custody and mental health staff shall be trained accordingly.

No policies exist mandating custody to be present with mental health treatment.

3.   It shall be the policy of the County that mental health clinicians shall not conduct their patient contacts at cell front except pursuant to documented refusals or specific, documented security concerns that warrant cell front contacts.

Case management Post Order.

4.   For each clinical contact, mental health staff shall document whether the encounter was confidential, including whether it took place at cell front.  If the contact occurred at cell front or otherwise was non-confidential, the reasons shall be clearly documented in the individual patient record and for purposes of Quality Assurance review procedures.

5.   A process shall exist for sick call slips or other mental health treatment-related requests to be collected without the involvement of custody staff.

Sick call slips may be handed medical staff directly.

D.  **Clinical Practices**

1.   Mental health staff shall develop and maintain at each jail facility an accurate case list of all prisoners requiring mental health treatment services at the jail ("caseload") which, at a minimum, lists the patient's name, medical chart number, current psychiatric diagnoses, date of booking, date of last appointment, date of next appointment, and the name of the treating prescriber.

2.   Qualified mental health professionals shall have access to the patient's medical record for all scheduled clinical encounters.

3.   Qualified mental health professionals shall provide individual counseling, group counseling, and psychosocial/psychoeducational programs based on individual patients' clinical needs.

4.   A qualified mental health professional shall conduct and document a thorough assessment of each individual in need of mental health care following identification.

**5.**   The County shall ensure prompt access to psychiatric prescribers following intake and in response to referrals and individual patient requests in accordance with the referral and triage timelines defined in the Access to Care provisions, below.

**6.**   The County shall, in consultation with Plaintiffs' counsel, implement an electronic system for tracking mental health evaluation, treatment, and other clinical contacts, as well as sick call slips and other mental health treatment-related requests or referrals.

7.   The County shall develop and implement an electronic tracking system with alert and scheduling functions to ensure timely delivery of mental health services to individual patients.

8.   Treatment planning:

a)   The County shall ensure that each prisoner on the mental health caseload receives a comprehensive, individualized treatment plan based on the input of the Multi-Disciplinary Treatment Team (MDT).  The MDT shall include multiple clinical disciplines with appropriate custody and counseling staff involvement.

b)   The treatment plan shall reflect individual clinical need, and the County shall ensure that all clinically indicated services are available and provided.

c)   The treatment plan shall include, at a minimum, the frequency of follow-up for clinical evaluation and adjustment of treatment modality, the type and frequency of diagnostic testing and therapeutic regimens (which may include clinical contacts more frequent than the minimum intervals described herein), and instructions about adaptation to the correctional environment.

d)   This treatment plan shall include referral to treatment after release from the facility when recommended by treatment staff.

e)   Custody staff shall be informed of a patient's treatment plan where appropriate to ensure coordination and cooperation in the ongoing care of the patient.

f)   The County shall, in consultation with Plaintiffs' counsel, develop and implement a Treatment Plan Form that will be used to select and document individualized services for prisoners who require mental health treatment.

g)   The County shall implement guidelines and timelines for the initiation and review of individual treatment plans, consistent with the JPS Psychiatric Services overview, attached as **Exhibit A-2**.

E.   **Medication Administration and Monitoring**

1.   The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws and through the following:

a)  The County shall ensure that initial doses of prescribed medications are delivered to inmates within 48 hours of the prescription, unless it is clinically required to deliver the medication sooner;

b)  The County shall make best efforts to verify a patient's prescribed medications and current treatment needs at intake, including outreach to pharmacies and community providers to request prescriptions and other health care records relating to ongoing care needs.  The policy shall ensure that any ongoing medication, or a clinically appropriate alternative, shall be provided within 48 hours of verification of the prescription or from a determination by a physician that the medication is medically necessary. Any orders that cannot be reconciled or verified, such as those with conflicting prescriptions from multiple prescribers, shall be referred to a health care provider for reconciliation or verification the next clinic day after booking.

c)  The County shall ensure that medical staff who administer medications to inmates document in the inmate's Medical Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, and (3) the date and time for any refusal of medication.

2.  Qualified mental health professionals shall, for each individual patient, establish targets for treatment with respect to the use of psychotropic medication and shall assess and document progress toward those targets at each clinical visit.

3.  Qualified mental health professionals shall, for each individual patient, monitor and document the following with respect to psychotropic mediations: (1) levels of medications, (2) adverse impacts (including through renal and liver function tests where indicated), (3) side effects, and (4) efficacy.

4.   Qualified mental health professionals shall, for each individual patient, conduct and document baseline studies, including ECG, blood, urine, and other studies, as clinically appropriate, prior to the initiation of treatment.

5.   The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

Growth request submitted for medical escort team.

6.   Medication adherence checks that serve a clinical function shall be conducted by nursing staff, not custody staff. Custody staff shall conduct mouth checks when necessary to ensure institutional safety and security.

Curent practice.

7.   Psychiatric prescribers shall consider clinically indicated considerations and conduct an in-person consultation, with the patient prior to changing or initiating medications. In the event there is no in-person consultation before prescribing or changing medications the psychiatric prescriber shall note and document the reasons for why there was not an in-person consultation with the patient.

F.   **Placement, Conditions, Privileges, and Programming**

1.   Placement:

a)   It shall be the policy of the County to place and treat all prisoners on the mental health caseload in the least restrictive setting appropriate to their needs.

Current practice.

b)   Placement in and discharge from Designated Mental Health Units shall be determined by qualified mental health professionals, with consultation with custody staff as appropriate.

Current practice.

c)  Absent emergency circumstances, the County shall obtain the assent of qualified mental health professionals before transferring prisoners with SMI into or out of Designated Mental Health Units.

Current practice.

d)  It shall be the policy of the County to place prisoners with SMI in appropriate settings that ensure provision of mental health services, patient safety, and the facilitation of appropriate programs, activities, and out-of-cell time.  Co-housing with other populations shall be avoided to the extent that such a practice prevents or hinders any of the above.

e)  All patients requiring placement in a Designated Mental Health Unit shall be provided access to such placement and care based on current clinical need and without any requirement for director-level approval.

*2.*   Programming and Privileges

a)  All Designated Mental Health Units shall offer a minimum of 7 hours of unstructured out-of-cell time per week and 10 hours of structured out-of-cell time per week for each prisoner. While out-of-cell hours per prisoner may vary from day to day, each prisoner will be offered some amount of out-of-cell time every day of the week. All treatment and out-of-cell time shall be documented for each prisoner, and reviewed as part of Quality Assurance procedures.

Current practice.

b)  The County shall ensure that prisoners on the mental health caseload have access and opportunity to participate in jail programming, work opportunities, and education programs, consistent with individual clinical input.

c)   The County shall develop and implement, in the 2P inpatient unit and the IOP unit, a program for progressive privileges (including time out of cell, property allowances, etc.) for patients as they demonstrate behavioral progress. A patient's level of privileges and restrictions shall be based on both clinical and custody input regarding current individual needs. The County shall ensure a process to review custody classification factors when necessary, so that placement, privileges, and restrictions match current individual circumstances and needs.

d)   Individuals on a mental health caseload shall receive, at minimum, privileges consistent with their classification levels, absent specific, documented factors which necessitate the withholding of such privileges. Clinical staff shall be informed of the withholding of privileges and the reasons for the withdrawal shall be documented and regularly reviewed by clinical and custody staff. The restoration of privileges shall occur at the earliest time appropriate based on individual factors.

Current practice.

e)   Where a prisoner in a Designated Mental Health Unit is subject to any restrictions of property, privileges, or out-of-cell time, the mental health treatment provider and Multi-Disciplinary Treatment Team will, on a weekly basis, assess and discuss with the prisoner progress and compliance with the prisoner's individual case plan. This process will include clinical contact in a private, face-to-face, out-of-cell setting. The Multi-Disciplinary Treatment Team will provide input to classification staff regarding the prisoner's mental health and appropriateness for removal of imposed restrictions. Classification staff will follow the recommendation of the Multi-Disciplinary Treatment Team to remove restrictions unless there is a clear, documented security reason to maintain the restriction.

3.   Conditions:

a)  Staff shall provide prisoners in Designated Mental Health Units with the opportunity to maintain cell cleanliness and the opportunity to meet their hygiene needs.  Custody and clinical staff shall provide assistance to prisoners on these matters, as appropriate to individual patient needs

Current practice.

b)  The County shall ensure uniformity of practice with respect to cell searches, such that searches are not done for punitive or harassment reasons. The County shall monitor whether cell search practices may be serving as a disincentive for prisoners in Designated Mental Health Units to leave their cells for treatment or other out-of-cell activities, and shall take steps to address the issue as appropriate.

Cell searches are done randomly on a revolving basis.

4.   Bed planning:

a)  The County shall provide a sufficient number of beds in Designated Mental Health Unit, at all necessary levels of clinical care and levels of security, to meet the needs of the population of prisoners with SMI.

b)  The County shall conduct a bed needs assessment, to be updated as appropriate, in order to determine demand for each category of Designated Mental Health Unit beds and shall ensure timely access to all levels of mental health care, consistent with individual treatment needs.

c)  The County shall establish mental health programming for women that ensures timely access to all levels of care and is equivalent to the range of services offered to men.

Women's IOP and OPP unit established at Main Jail.  2P services already offered to women.

5.   General Exclusion of Prisoners with Serious Mental Illness from Segregation

a)  Prisoners with Serious Mental Illness will not be housed in Segregation units, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and there is no reasonable alternative, in which cases the provisions of **Section VIII.D** of the Segregation/Restrictive Housing Remedial Plan shall apply.

This is being implemented.  JPS is using an alternative treatement program in IOP to take Administrative Segregation inmates.  Fewer and fewer TSEPs are on the SMI caseload.

b)  Where prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit are assessed a Disciplinary Segregation term, they will serve the term in a Designated Mental Health Unit, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and shall receive structured out-of-cell time and programming as determined by the Multi-Disciplinary Treatment Team.

Current practice.  Disciplinary Segregation Post Order reflects all but the most serious violations will result in in-place discipline.

6.  Access to Care

a)  The County shall designate and make available custody escorts for mental health staff in order to facilitate timely completion of appointments and any other clinical contacts or treatment-related events.

IOP deputies have been structure to oversee MH treatment on the entire third floor.

b)  The County shall ensure sufficient and suitable treatment and office space for mental health care services, including the Triage Navigator Program and other mental health-related services provided on site at the Jail.

Jail annex planning.

c)  Locations shall be arranged in advance for all scheduled clinical encounters.

Current practice.

d)  The County shall track and document all completed, delayed, and canceled mental health appointments, including reasons for delays and cancelations.  Such documentation shall be reviewed as part of the Quality Assurance process.

e)  Referrals and triage:

i.   The County shall maintain a staff referral process (custody and medical) and a kite system for prisoners to request mental health services.  Referrals by staff or prisoners must be triaged within 24 hours.

Current practice.

ii.   Referrals and requests for mental health services shall be handled in accordance with the following timeframes, and based on the definitions and guidance in **Exhibit A-2**:

▪ Prisoners with <u>"Must See" (Emergent)</u> mental health needs shall be seen for assessment or treatment by a qualified mental health professional as soon as possible, and within six (6) hours. Prisoners with emergent mental health needs shall be monitored through continuous observation until evaluated by a mental health professional.

▪ Prisoners with <u>Priority (Urgent)</u> mental health needs shall be seen for assessment or treatment by a qualified mental health professional within 36 hours.

▪ Prisoners with <u>Routine</u> mental health needs shall be seen for assessment or treatment by a qualified mental health professional within two (2) weeks;

▪ Prisoners whose requests do not require formal clinical assessment or intervention shall be issued a written response, with steps taken to ensure effective communication.

G.  **Medico-Legal Practices**

1.   The County shall provide access to appropriate inpatient psychiatric beds to all patients who meet WIC § 5150 commitment criteria.  At the time a patient's need for inpatient care is identified, commitment paperwork shall be initiated immediately.  Placement in an inpatient unit shall occur at the earliest possible time, and in all cases within 24 hours.  For individual prisoners placed on a pre-admit or wait list for inpatient placement, affirmative steps to process and place them shall begin immediately.

2.   The County shall not discharge patients from the LPS unit and immediately re-admit them for the purpose of circumventing LPS Act requirements.  For patients with continuing need for LPS commitment, the County shall follow all required procedures under the LPS Act.

3.   The County shall review all County and JPS policies and procedures for PREA compliance, and revise them as necessary to address all mental health-related requirements.

H.  **Clinical Restraints and Seclusion**

1.   Generally:

a)   It is the policy of the County to employ restraints and seclusion only when necessary and to remove restraints and seclusion as soon as possible.

b)   It is the policy of the County to employ clinical restraints and seclusion only when less restrictive alternative methods are not sufficient to protect the inmate-patient or others from injury.  Clinical restraint and seclusion shall not be used as punishment, in place of treatment, or for the convenience of staff.

c)  The placement of a prisoner in clinical restraint or seclusion shall trigger an "emergent" mental health referral, and a qualified mental health professional shall evaluate the prisoner to assess immediate and/or long-term mental health treatment needs.

d)  When clinical restraints or seclusion are used, Jail staff will document justification for their application and the times of application and removal of restraints.

e)  There shall be no "as needed" or "standing" orders for clinical restraint or seclusion.

f)  Individuals in clinical restraints or on seclusion shall be on constant watch, or on constant video monitoring with direct visualization every 15 minutes.  All checks will be documented.

g)  Fluids shall be offered at least every four hours and at meal times.

2.  Clinical Restraints

a)  The opinion of a qualified health care professional or qualified mental health professional on placement and retention in restraints will be obtained within one hour from the time of placement.

b)  A thorough clinical assessment shall be conducted by qualified health care professional or qualified mental health professional every four hours to determine the need for continued restraint.

c)  Individuals in restraints shall be checked every two hours by a nurse for vital signs, neurovascular assessment, and limb range, and offered an opportunity for toileting.

3.  Reentry Services

a)  The County shall provide a 30-day supply of current psychotropic medications to inmates on the mental health caseload, who have been sentenced and have a scheduled released date, immediately upon release.

b)  Within 24 hours of release of any inmate who is on the mental health caseload and classified as pre-sentence, the County shall transmit to a designated County facility a prescription for a 30-day supply of the inmate's current psychotropic medications.

c)  The County, in consultation with Plaintiffs' counsel, develop and implement a reentry services policy governing the provision of assistance to prisoners on the mental health caseload, including outpatient referrals and appointments, public benefits, medical insurance, housing, substance abuse treatment, parenting and family services, inpatient treatment, and other reentry services.

d)  The County agrees that, during the course of the implementation of the remedial plans contained in this agreement, it will consider Plaintiffs' input on measures to prevent unnecessary or avoidable incarceration of individuals with serious mental illness.

I.  **Training**

1.   The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

a)   All jail custody staff shall receive formal training in mental health, which shall encompass mental health policies, critical incident response, crisis intervention techniques, recognizing different types of mental illness, interacting with prisoners with mental illness, appropriate referral practices, suicide and self-harm detection and preventions, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

b)   Custody staff working in Designated Mental Health Units shall receive additional training, including additional information on mental illness, special medico-legal considerations, de-escalation techniques, working with individuals with mental health needs, relevant bias and cultural competency issues, and the jail's mental health treatment programs.

IOP deputies are given CIT training.

c)   Mental health staff shall receive training on the correctional mental health system, correctional mental health policies, suicide assessment and intervention, relevant bias and cultural competency issues, and treatment modalities to be offered in the jails.

V.   **DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH MENTAL HEALTH OR INTELLECTUAL DISABILITIES**

A.   **Role of Mental Health Staff in Disciplinary Process**

1.   The County's policies and procedures shall require meaningful consideration of the relationship of a prisoner's behavior to any mental health or intellectual disability, the efficacy of disciplinary measures versus alternative interventions, and the impact of disciplinary measures on the health and well-being of prisoners with disabilities.

2.   Prisoners who are alleged to have committed a rules violation shall be reviewed by a qualified mental health professional if any of the following apply:

a)   Prisoner is housed in any Designated Mental Health Unit;                         Pilot program to indclude JPS in the hearing process for IOP inmates.

b)   Jail staff have reason to believe the prisoner's behavior was unusual, uncharacteristic, or a possible manifestation of mental illness;

c)   Prisoner is on the mental health caseload and may lose good time credit as a consequence of the disciplinary infraction with which he or she is charged.

3.   If any of the above criteria is met, the qualified mental health professional shall complete the form attached as **Exhibit A-3** (JPS-Rules Violation Mental Health Review) and indicate:

a)   Whether or not the reported behavior was related to mental illness, adaptive functioning deficits, or other disability;

b)   Whether the prisoner's behavior is, or may be, connected to any of the following circumstances:

i.   An act of self-harm or attempted suicide

ii.  A cell extraction related to transfer to a medical/mental health unit or provision of involuntary treatment

iii.  Placement in clinical restraints or seclusion.

c)  Any other mitigating factors regarding the prisoner's behavior, disability, and/or circumstances that should be considered and whether certain sanctions should be avoided in light of the prisoner's mental health disability or intellectual disability, treatment plan, or adaptive support needs.

B.  **Consideration of Mental Health Input and Other Disability Information in Disciplinary Process**

1.  The County shall designate one Chief Disciplinary Hearing Officer for each jail facility, who shall be responsible for ensuring consistency in disciplinary practices and procedures.

2.  The Disciplinary Hearing Officer shall ensure that prisoners are not disciplined for conduct that is related to their mental health or intellectual disability.

3.  The Disciplinary Hearing Officer shall consider the qualified mental health professional's findings and any other available disability information when deciding what, if any, disciplinary action should be imposed.

4.  The Disciplinary Hearing Officer shall consider the qualified mental health professional's input on minimizing the deleterious effect of disciplinary measures on the prisoner in view of his or her mental health or adaptive support needs.

5. If the Disciplinary Hearing Officer does not follow the mental health staff's input regarding whether the behavior was related to symptoms of mental illness or intellectual disability, whether any mitigating factors should be considered, and whether certain sanctions should be avoided, the Disciplinary Hearing Officer shall explain in writing why it was not followed.

6. Prisoners will not be subjected to discipline which prevents the delivery of mental health treatment or adaptive support needs, unless necessary for institutional safety.

7. Prisoners shall not be subject to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of self-injurious behavior.                    Current practice.

## C. Accommodations for Prisoners with Mental Health or Intellectual Disabilities During the Disciplinary Process

1. The County shall provide reasonable accommodations during the hearing process for prisoners with mental health or intellectual disabilities.

2. The County shall take reasonable steps to ensure the provision of effective communication and necessary assistance to prisoners with disabilities at all stages of the disciplinary process.

## D. Use of Force for Prisoners with Mental Health or Intellectual Disabilities

1. The County's Correctional Services Operations Orders shall include language that ensures meaningful consideration of whether a prisoner's behavior is a manifestation of mental health or intellectual disability.

2.   For prisoners with a known mental health or intellectual disability, and absent an imminent threat to safety, staff shall employ de-escalation methods that take into account the individual's mental health or adaptive support needs.

3.   The County's Correctional Services Use of Force policies shall include a definition and a protocol for a planned Use of Force that provides appropriate guidance for a planned Use of Force that involves a prisoner with mental health or intellectual disability.

4.   Prior to any *planned* Use of Force, such as a cell extraction, against a prisoner with mental health or intellectual disabilities, there will be a "cooling down period," consistent with safety and security needs. This period includes a structured attempt by mental health staff (and other staff if appropriate), to de-escalate the situation and to reach a resolution without Use of Force. Such efforts, including the use of adaptive supports, will be documented in writing. Medical and/or mental health staff should be consulted if the purpose of the cell extraction is related to the delivery of treatment.

5.   The County shall require video documentation for any planned Use of Force, absent exigent circumstances. Jail staff shall endeavor to record the specific actions, behavior, or threats leading to the need for Use of Force, as well as efforts to resolve the situation without Use of Force.

6.   The County shall ensure the completion of supervisory review of Use of Force incidents, including video (for any planned Use of Force), interviews, and written incident documentation, in order to ensure appropriateness of Use of Force practices including de-escalation efforts. The County shall take corrective action when necessary.

Current Practice.

7.   The County shall review and amend as appropriate its policies on Use of Force, including its policies on Custody Emergency Response Team (CERT) and Cell Extraction Procedures.

E.   **Training and Quality Assurance**

1.   All custody staff, and mental health staff, shall be trained on the policies and procedures outlined herein that are relevant to their job and classification requirements. Custody staff will receive periodic training on identifying behaviors that may be manifestations of mental illness and other situations warranting a referral to mental health staff, including for a Rules Violation Mental Health Review or other mental health assessment.

2.   All custody staff shall be trained on the identification of symptoms of mental illness, the provision of adaptive supports, and the use of de-escalation methods appropriate for prisoners with mental health or intellectual disabilities.

3.   The County shall track the outcomes of all disciplinary hearings for prisoners who are on the mental health caseload or who have intellectual disabilities, including whether the recommendation of the mental health professional was followed.

4.   The County shall track all Uses of Force (planned and reactive) involving prisoners who are on the mental health caseload or who have intellectual disabilities, including the number of Uses of Force and the number of cell extractions by facility.

Current Practice.

5.   The County shall implement a continuous quality assurance/quality improvement plan to periodically audit disciplinary and Use of Force practices as they apply to prisoners who are on the mental health caseload or who have intellectual disabilities.

Current use of Blue-Team software to track and monitor use of force incidents, while predicting possible problematic trends in officer behavior.

## VI.   MEDICAL CARE

### A.  Staffing

1.   The County shall provide and maintain sufficient staffing to meet professional standards of care and to execute the requirements of this Remedial Plan, including clinical staff, office and technological support, QA/QI units, and custody staff for escorts and transportation.

2.   Provider quality shall be evaluated regularly to ensure that relevant quality of care standards are maintained. This review shall be in addition to the peer review and quality improvement processes described in this plan. The parties shall meet and confer regarding any deficiencies identified in the evaluation. Should the parties disagree regarding matters of provider quality, the Court Expert shall evaluate the quality of provider care and to complete a written report.

### B.  Intake

1.   All prisoners who are to be housed shall be screened on arrival in custody by Registered Nurses (RNs).  RN screening shall take place prior to placement in jail housing.

2.   Health care intake screening shall take place in a setting that ensures confidentiality of communications between nurses and individual patients.  Custody staff may maintain visual supervision but may not be close enough to overhear communication, unless security concerns based on an individualized determination of risk that includes a consideration of requests by the health care staff require that custody staff be closer at hand.  There shall be visual and auditory privacy from other prisoners.

3.   The County shall, in consultation with Plaintiffs, revise the contents of its intake screening, medical intake screening, and special needs documentation to reflect community standards and ensure proper identification of medical and disability related needs.

In consultation with CHS, several forms have been ammended to reflect this area.

4.   Nurses who perform intake screening shall consult any available electronic health care records from prior incarcerations or other County agencies.  The form shall include a check box to confirm that such a review was done.

5.   The County shall make best efforts to verify a patient's prescribed medications and current treatment needs at intake, including outreach to pharmacies and community providers to request prescriptions and other health care records relating to ongoing care needs.  The policy shall ensure that any ongoing medication, or a clinically appropriate alternative, shall be provided within 48 hours of verification of the prescription or from a determination by a physician that the medication is medically necessary. Any orders that cannot be reconciled or verified, such as those with conflicting prescriptions from multiple prescribers, shall be referred to a health care provider for reconciliation or verification the next clinic day after booking.

6.   The County shall follow a triage process in which intake nurses schedule patients for follow-up appointments based on their medical needs and acuity at intake, and shall not rely solely on patients to submit Health Services Requests once housed. The policy shall, in consultation with Plaintiffs' counsel, establish clear protocols that include appropriate intervals of care based on clinical guidelines, and that intake nurses shall schedule follow-up appointments at the time of intake based on those protocols.

7.   All nurses who perform intake screenings will be trained annually on how to perform that function.

C.   **Access to Care**

1.   The County shall ensure that Health Services Requests (HSRs) are readily available to all prisoners, including those in segregation housing, from nurses and custody officers.

Current practice.

2.   The County shall provide patients with a mechanism for submitting HSRs that does not require them to share confidential health information with custody staff. The County shall install lockboxes or other secure physical or electronic mechanism for the submission of HSRs (as well as health care grievances) in every housing unit.  Designated health care staff shall collect (if submitted physically) or review (if submitted electronically) HSRs at least two times per day in order to ensure that CHS receives critical health information in a timely manner. Designated health care staff shall also collect HSRs during pill call and shall go door to door in all restricted housing units at least once a day to collect HSRs. HSRs and health care grievances will be promptly date- and time-stamped. The County may implement an accessible electronic solution for secure and confidential submission of HSRs and health care grievances.

Current practice.

3.   The County shall establish clear timeframes to respond to HSRs:

a)   All patients whose HSRs raise emergent concerns shall be seen by the RN immediately on receipt of the HSR.  For all other HSRs, a triage RN shall, within 24 hours of receipt of the form (for urgent concerns) or within 72 hours of receipt of the form (for routine concerns):

i.    conduct a brief face-to-face visit with the patient in a confidential, clinical setting;                    Jail Annex planning.

ii.   take a full set of vital signs, if appropriate;

iii.  conduct a physical exam, if appropriate;

iv.  assign a triage level for a provider appointment of emergent, urgent, routine, or written response only;

v.   inform the patient of his or her triage level and response time frames;

vi.  provide over-the-counter medications pursuant to protocols; and

vii. consult with providers regarding patient care pursuant to protocols, as appropriate.

b)   If the triage nurse determines that the patient should be seen by a provider:

i.    patients with emergent conditions shall be treated or sent out for emergency treatment immediately;

ii.  patients with urgent conditions shall be seen within 24 hours of the RN face-to-face; and

iii.  patients with only routine concerns shall be seen within two weeks of the RN face-to-face.

c)  Patients whose requests do not require formal clinical assessment or intervention shall be issued a written response, with steps taken to ensure effective communication, within two weeks of receipt of the form.

d)  The County shall permit patients, including those who are illiterate, non-English speaking, or otherwise unable to submit written or electronic HSRs, to verbally request care. Such verbal requests shall immediately be documented by the staff member who receives the request on an appropriate form and transmitted to a qualified medical professional for response in the same priority as those HSRs received in writing.

4.  The County shall designate and make available custody escorts for medical staff in order to facilitate timely and confidential clinical contacts or treatment-related events.

Growth request submitted for medical escort team.

5.  The County shall track and regularly review response times to ensure that the above timelines are met.

6.  The County shall discontinue its policy of prohibiting patients from reporting or inquiring about multiple medical needs in the same appointment.

7.   When a patient refuses a medical evaluation or appointment, such refusal will not indicate a waiver of subsequent health care.

a)   When a patient refuses a service that was ordered by medical staff based on an identified clinical need, medical staff will follow up to ensure that the patient understands any adverse health consequences and to address individual issues that caused the patient to refuse the service.

b)   Any such refusal will be documented by medical staff and must include (1) a description of the nature of the service being refused, (2) confirmation that the patient was made aware of and understands any adverse health consequences by medical staff, (3) the signature of the patient, and (4) the signature of medical staff witness. In the event that obtaining the signature of a patient is not possible, medical staff shall document the circumstances.

D.  **Chronic care**

1.   Within three months of the date the Consent Decree is issued by the Court, the County shall, in consultation with Plaintiffs' counsel, develop and implement a chronic disease management program that is consistent with national clinical practice guidelines.  The chronic disease program will include procedures for the identification and monitoring of such patients and the establishment and implementation of individualized treatment plans consistent with national clinical practice guidelines.

a)   The chronic disease management program shall ensure that patients with chronic illness shall be identified and seen after intake based on acuity (on the day of arrival for patients with high acuity and not to exceed 30 days for all others). The County will timely provide clinically indicated diagnostic testing and treatment, including prior to this post-intake appointment. Follow-up appointments will be provided in intervals that do not exceed 90 days unless such patients are clinically stable on at least two consecutive encounters, in which case follow-up appointment intervals will not exceed 365 days (and sooner if clinically indicated), subject to a chart review by a clinician at least every six (6) months.

b)   The chronic disease management program shall ensure that patients are screened for Hepatitis C at intake. If medical staff recommend Hepatitis testing based on screening results, such testing shall be offered on an "opt-out" basis for those individuals who remain in custody long enough to receive a housing unit assignment. If the individual declines the testing, the refusal shall be documented in the health record. Patients found to have Hepatitis C shall be offered immunizations against Hepatitis A and Hepatitis B.

c)   The chronic disease management program shall include a comprehensive diabetic management protocol that conforms to the guidance of the ADA's Diabetes Management in Correctional Institutions.  The protocol shall be developed in coordination with custody administration to address normal circadian rhythms, food consumption times, and insulin dosing times.

d)   The chronic disease management program shall ensure that patients who take medications for their chronic conditions shall have the medications automatically renewed unless the provider determines that it is necessary to see the patient before renewing the medication.  In that case, the patient shall be scheduled to be seen in a reasonable time period to ensure medication continuity.

2.   The County shall track compliance with the chronic disease management program requirements for timely provision of appointments, procedures, and medications.  The County shall ensure that its electronic medical record system is adequate to support these critical functions.

3.   The County shall review its infection control policies and procedures for dialysis treatment to ensure that appropriate precautions are taken to minimize the risk of transmission of blood-borne pathogens, given the proximity of HCV+ and HCV- patients receiving dialysis in the same room.

E.  **Specialty care**

1.   The County shall develop and implement policies regarding specialty referrals using an algorithm with evidence-based referral criteria and guidelines.

2.   Within three months of the date the Consent Decree is issued by the Court, the County shall develop and implement policies and procedures to ensure that emergency consultations and diagnostic and treatment procedures, as determined by the medical provider, are provided immediately; high priority consultations and procedures, as determined by the medical provider, are seen within 21 calendar days of the date of the referral; and routine consultations and procedures, as determined by the medical provider, are seen within 90 calendar days of the date of the referral.

3.   Patients whose routine specialty consultation or procedure do not take place within 90 calendar days from the date of the referral shall be examined by a clinician monthly and evaluated to determine if urgent specialty care is indicated.

4.   Within 5 calendar days of the completion of a high priority specialty consultation or procedure or within 14 calendar days of a routine specialty consultation or procedure, patients returning to the Sacramento jails shall have their specialty reports and follow up recommendations reviewed by a jail nurse practitioner, physician's assistant or physician. A nurse practitioner, physician's assistant or physician will review this information with the patient within 14 calendar days of the receipt of the specialist's report.

5.   Specialty care consultations and outside diagnostic and treatment procedures shall be tracked in a log that identifies the referral request date, the date the referral was sent to the specialty care provider, the appointment date for the consultation or procedure is scheduled, the date the appointment takes place, and, if the appointment is rescheduled or cancelled, the reason it was rescheduled or canceled.

6.   Requests for specialty consultations and outside diagnostic and treatment procedures shall also be tracked to determine the length of time it takes to grant or deny the requests and the circumstances and reasons for denials.

7.   At least twice a year, the County shall conduct an audit of specialty care referral logs described in subsections (5) and (6), above, and complete a report as to whether each category of specialty care is provided in a reasonable timeframe, consistent with established timeframes. If any specialty care area has a record of untimely appointments as determined by the Correctional Health Service Continuous Quality Improvement Committee, the County shall report to Plaintiffs and the parties shall meet and confer to take prompt steps to address the issue. The County will provide Plaintiffs access to the specialty care referral logs and audit reports periodically and upon written request. The parties will work to resolve issues with untimely specialty care in individual patient cases and with respect to systemic trends, including through the dispute resolution process.

8.   The County shall consider implementing an e-referral system to reduce delays and facilitate communication between specialists and primary care providers, as well as reducing unnecessary transportation costs and unnecessary specialist appointments by ensuring that the specialist has all the information he or she needs before an appointment takes place.

9.   The County shall ensure that utilization management and/or scheduling staff provides notification of whether a patient's specialty care appointment is scheduled to occur within the timeline pursuant to the referral and/or clinical recommendation, including as follows:

a)   Medical staff may request and obtain information as to whether any patient's specialty care appointment is scheduled, and as to the general timing of the appointment (e.g. within a one-week's date range).

b)   If a specialty care appointment is denied or is not scheduled to occur within the timeline pursuant to the referral and/or clinical recommendation, such information will be affirmatively provided to the treatment team and to the patient.

c)   If a previously scheduled specialty care appointment is postponed to a date that is outside the timeline pursuant to the referral and/or clinical recommendation, such information will be affirmatively provided to the treatment team and to the patient.

10. The County shall consider creating a physical therapy clinic at the jail to more efficiently meet the significant demand for this service.

F.   **Medication administration and monitoring**

1.   The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws and through the following:

a)   ensuring that initial doses of prescribed medications are delivered to patients within 48 hours of the prescription, unless it is clinically required to deliver the medication sooner;

b)   ensuring that medical staff who administer medications to patients document in the patient's Medical Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, (3) the date and time for any refusal of medication, and (4) in the event of patient refusal, documentation that the prisoner was made aware of and understands any adverse health consequences by medical staff.

2.   The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

3.   The County shall provide pill call twice a day in each housing unit, at regular times that are consistent from day to day, except as may be required by non-routine facility security concerns.  The County shall develop and implement policies and procedures to ensure that prescribed medications are provided at therapeutically appropriate times as determined by the ordering physician.  Any patient who requires administration of medications at times outside the regular pill call shall be provided that medication at the times determined by the ordering physician.

4.   The County shall develop and implement policies and procedures to ensure that patients are provided medications at therapeutically appropriate times when out to court, in transit to or from any outside appointment, or being transferred between facilities. If administration time occurs when a patient is in court, in transit or at an outside appointment, medication will be administered as close as possible to the regular administration time.

5.   The County shall develop and implement policies and procedures to ensure that medication efficacy and side effects are monitored by staff and reviewed by appropriate clinicians at appropriate intervals.

6.   The County shall explore the expansion of its Keep-on-Person medication program, (especially for inhalers and medications that are available over-the-counter in the community) and to facilitate provision of medications for people who are out to court, in transit, or at an outside appointment.

G.   **Clinical space and medical placements**

1.   The County shall provide adequate clinical space in every facility to support clinical operations while also securing appropriate privacy for patients.  Adequate clinical space includes visual and auditory privacy from prisoners and auditory privacy from staff, the space needed reasonably to perform clinical functions as well as an examination table, sink, proper lighting, proper equipment, and access to health care records.

Jail Annex planning.

2.   The County shall ensure that any negative pressure isolation rooms meet community standards, including an antechamber to ensure that the room remains airtight, appropriate pressure gauges, and regular documented checks of the pressure gauges.

Jail Annex planning.

3.   The County shall ensure that absent individualized, documented safety and security concerns, patients in acute medical or quarantine placements shall be allowed property and privileges equivalent to what they would receive in general population based on their classification levels.

Current practice.

4.   The County shall ensure that patients in medical placements are not forced to sleep on the floor, including by providing beds with rails or other features appropriate for patients' clinical needs and any risk of falling.

Current practice.

5.   The County shall not discriminate against patients in medical placements solely because of their need for C-Pap machines, but instead shall provide access to programs and services in accordance with their classification level, as set forth in the ADA Remedial Plan.

## H.  **Patient privacy**

1.   The County shall develop and implement policies and procedures to ensure that appropriate confidentiality is maintained for health care services.  The policies shall ensure confidentiality for clinical encounters, including health care intake screening, pill call, nursing and provider sick call, specialty appointments, and mental health treatment.  The policies shall also ensure confidentiality for written health care documents, such as health care needs requests and grievances raising medical care or mental health care concerns, which shall not be collected by custody staff.

Jail Annex planning.

2.   The County shall provide adequate clinical space in each jail to support clinical operations while also securing appropriate privacy for patients, including visual and auditory privacy from prisoners and auditory privacy from staff.

Jail Annex planning.

3.   All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff.  In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification. The issuance of pills does not constitute a clinical interaction.

Jail Annex planning.

a)   For any determination that a clinical interaction with a patient requires the presence of custody staff, staff shall document the specific reasons for the determination.  Such decisions shall be reviewed through the Quality Assurance process.

b)   If the presence of a correctional officer is determined to be necessary to ensure the safety of staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

Jail Annex planning.

c)   The County's patient privacy policies, as described in this section, shall apply to contacts between patients and all staff who provide health-related services on site at the Jail.

4.   Jail policies that mandate custody staff to be present for any medical treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above.  Custody and medical staff shall be trained accordingly.

No policies exist mandating deputies be present during medical treatment.

I.   **Health care records**

1.   The County shall develop and implement a fully integrated electronic health record system that includes medical, psychiatric, and dental records and allows mental health and medical staff to view the medical and mental health information about each patient in a single record. This shall be accomplished within 12 months of the date the Consent Decree is issued by the Court.

2.   Until such a system is implemented, the County shall develop and implement policies and procedures to ensure that medical staff have access to mental health information and mental health staff have access to medical information, as needed to perform their clinical duties.  This information shall include all intake records.  Medical and mental health staff shall be trained in these policies and procedures within one month of the date the Consent Decree is issued by the Court.

3.   The County shall develop and implement policies and procedures to monitor the deployment of the CHS Electronic Health Records to ensure the records system is modified, maintained, and improved as needed on an ongoing basis, including ongoing information technology support for the network infrastructure and end users.

J.   **Utilization management**

1.   The County shall revise its utilization management (UM) system to ensure that critical health decisions about patients' access to care are made with sufficient input from providers and a thorough review of the health care records.

2.   The County shall ensure that decisions about a patient's access to, timing of or need for health care are made by a physician, with documented reference to the patient's medical record. Nurses may gather information and coordinate the UM process, so long as it does not interfere with that requirement.  All decisions by the UM committee shall be documented, including the clinical justification for the decision.

3.   The UM system shall ensure that providers and patients are promptly informed about decisions made by the UM committee, including denial of a specialist referral request.

4.   The UM system shall include an appeal process to enable patients and providers to appeal a decision denying a referral request.

K.  **Sanitation**

1.   The County shall consult with an Environment of Care expert to evaluate facilities where patients are housed and/or receive clinical treatment, and to make written recommendations to address issues of cleanliness and sanitation that may adversely impact health.

L.  **Reproductive and Pregnancy-Related Care**

1.   The County shall ensure that pregnant patients receive timely and appropriate prenatal care, specialized obstetrical services when indicated, and postpartum care (including mental health services).

2.   The County will provide pregnant patients comprehensive counseling and timely assistance in accordance with their expressed desires regarding their pregnancies, whether they elect to keep the child, use adoptive services, or have an abortion.

3.   The County shall provide non-directive counseling about contraception to female prisoners, shall allow female prisoners to continue an appropriate method of birth control while incarcerated (with consideration given to the patient's preference and/or current method of birth control), and shall provide access to emergency or other contraception when appropriate.

M.  **Transgender and gender nonconforming health care**

1.   The County shall implement policies and procedures to provide transgender and intersex prisoners with care based upon an individualized assessment of the patient's medical needs in accordance with accepted standards of care and prevailing legal and constitutional requirements, including, as appropriate:

a)  Hormone therapy

b)  Surgical care

c)  Access to gender-affirming clothing                              Current practice, outlined in TGNI order.

d)  Access to gender-affirming commissary items, make-up, and other property items       Current practice, outlined in TGNI order.

2.   The County shall ensure that medical and mental health staff have specific knowledge of and training on the WPATH Standards of Care.

N. **Detoxification protocols**

1.   Within three months of the date the Consent Decree is issued by the Court, the County shall develop and implement protocols for assessment, treatment, and medication interventions for alcohol, opiate, and benzodiazepine withdrawal that are consistent with community standards.

2.   The protocols shall include the requirements that (i) nursing assessments of people experiencing detoxification shall be done at least twice times a day for five days and reviewed by a physician; (ii) nursing assessments shall include both physical findings, including a full set of vital signs, as well as psychiatric findings; (iii) medication interventions to treat withdrawal syndromes shall be updated to provide evidence-based medication in sufficient doses to be efficacious; (iv) the County shall provide specific guidelines to the nurses for intervention and escalation of care when patients do not respond to initial therapy; and (v) patients experiencing severe, life-threatening intoxication (an overdose) or withdrawal shall be immediately transferred under appropriate security conditions to a facility where specialized care is available.

O. **Nursing protocols**

1.   Nurses shall not act outside their scope of practice.

2.   To that end, the County shall revise its nursing standardized protocols to include assessment protocols that are sorted, based on symptoms, into low, medium, and high risk categories.

a)  Low-risk protocols would allow RNs to manage straightforward symptoms with over-the-counter medications;

b)  Medium-risk protocols would require a consultation with a provider prior to treatment; and

c)  High-risk protocols would facilitate emergency stabilization while awaiting transfer to higher level of care.

P.  **Reviews of in-custody deaths**

1.  Preliminary reviews of in-custody deaths shall take place within 30 days of the death and shall include a written report of the circumstances and events leading to the death, with the goal to identify and remedy preventable causes of death and any other potentially systematic problems.

2.  Mortality reviews shall include an investigation of the events occurring prior to the death, an analysis of any acts or omissions by any staff or prisoners which might have contributed to the death, and the identification of problems for which corrective action should be undertaken.

Q.  **Reentry Services**

1.  The County shall provide a 30-day supply of current medications to patients who have been sentenced and have a scheduled released date, immediately upon release.

2.   Within 24 hours of release of any patient who receives prescription medications while in custody and is classified as pre-sentence, the County shall transmit to a designated County facility a prescription for a 30-day supply of the patient's current prescription medications.

3.   The County, in consultation with Plaintiffs, shall develop and implement a reentry services policy governing the provision of assistance to chronic care patients, including outpatient referrals and appointments, public benefits, inpatient treatment, and other appropriate reentry services.

R.  **Training**

1.   The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

a)  All jail custody staff shall receive formal training in medical needs, which shall encompass medical treatment, critical incident response, crisis intervention techniques, recognizing different types of medical emergencies, and acute medical needs, appropriate referral practices, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

VII.    **SUICIDE PREVENTION**

A. **Substantive Provisions**

1.  The County recognizes that comprehensive review and restructuring of its suicide assessment, monitoring, and prevention practices are necessary to address the risk of suicide and self-harm attendant to detention in a jail setting.

2.   The County shall establish, in consultation with Plaintiffs' counsel, a new Suicide Prevention Policy that shall be in accordance with the following:

Draft policy under review.

B.  **Training**

1.   The County shall develop, in consultation with Plaintiffs' counsel, a four- to eight-hour pre-service suicide prevention curriculum for new Jail employees (including custody, medical, and mental health staff), to be conducted in person in a classroom or virtual classroom setting, that includes the following topics:

a)  avoiding obstacles (negative attitudes) to suicide prevention;

b)  prisoner suicide research;

c)  why facility environments are conducive to suicidal behavior;

d)  identifying suicide risk despite the denial of risk;

e)  potential predisposing factors to suicide;

f)  high-risk suicide periods;

g)  warning signs and symptoms;

h)  components of the jail suicide prevention program

i)  liability issues associated with prisoner suicide;

j)   crisis intervention.

2.   The County shall develop, in consultation with Plaintiffs' counsel, a two-hour annual suicide prevention curriculum for all custody, medical, and mental health staff, to be conducted in person in a classroom or virtual classroom setting, that includes:

a)   review of topics (a)-(j) above

b)   review of any changes to the jail suicide prevention program

c)   discussion of recent jail suicides or attempts

3.   Custody officers assigned to Designated Mental Health Units shall receive additional specialized training on suicide prevention and working with prisoners with serious mental illness.

IOP Deputies receive CIT training.

4.   All mental health staff, including nurses, clinicians, and psychiatrists, shall receive additional training on how to complete a comprehensive suicide risk assessment and how to develop a reasonable treatment plan that contains specific strategies for reducing future suicidal ideation.

5.   All mental health staff and custody officers shall be trained on the appropriate use of safety suits—*i.e*., not to be utilized as a default, not to be used as a tool in behavior management, not to be utilized for patients being observed at 30-minute observations.

Outlined in policy.

6.   The County shall ensure that all staff are trained in the new Suicide Prevention Policy.

C.  **Nursing Intake Screening**

1.   Intake screening for suicide risk will take place at the booking screening and prior to a housing assignment. If clinically indicated, JPS will then perform an additional clinical assessment after the inmate is placed in a housing assignment.

2.   All nursing intake screening shall be conducted in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

3.   The County shall revise its nursing intake assessment procedures and screening forms to ensure timely identification of acute and high-risk mental health conditions, consistent with the recommendations made by Lindsey Hayes.  Intake screening, as documented on screening forms, shall include:

a)  Review of suicide risk notifications in relevant medical, mental health, and custody records, including as to prior suicide attempts, self-harm, and/or mental health needs;

b)  Any prior suicidal ideation or attempts, self-harm, mental health treatment, or hospitalization;

c)  Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;

d)  Other relevant suicide risk factors, such as:

i.   Recent significant loss (job, relationship, death of family member/close friend);

ii.  History of suicidal behavior by family member/close friend;

iii. Upcoming court appearances;

e)   Transporting officer's impressions about risk.

4.   Regardless of the prisoner's behavior or answers given during intake screening, a mental health referral shall always be initiated if there is a documented history related to suicide or self-harm, including during a prior incarceration.

5.   The County shall develop and implement a written policy and procedure for referrals to mental health by intake staff.  The policy shall correspond with the triage system and timeframes set forth in the Mental Health Remedial Plan.

6.   Any prisoner expressing current suicidal ideation and/or current suicidal/self-injurious behavior shall be designated as an emergent referral and immediately referred to mental health staff.

D.   **Post-Intake Mental Health Assessment Procedures**

1.   All mental health assessments shall be conducted in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

Booking area interview room modified for psychiatric use.

2.   Mental health staff shall conduct assessments within the timeframes defined in the mental health referral triage system.

3.   The County shall revise its mental health assessment procedures and related forms to ensure identification of historical and current patient mental health and suicide risk information, consistent with the recommendations of the subject matter expert.

E.   **Response to Identification of Suicide Risk or Need for Higher Level of Care**

1.   When a prisoner is identified as at risk for suicide and placed by custody staff in a safety cell, on suicide precautions, and/or in a safety suit, mental health staff shall be contacted immediately.  A qualified mental health professional, or other appropriately trained medical staff in consultation with mental health staff, shall complete a confidential in-person suicide risk assessment as soon as possible, consistent with the "must-see" referral timeline.

Current custody practice.

2.   Consistent with current RCCC policy, if there is no mental health staff on site at RCCC at the time that an emergent mental health need is identified, the prisoner shall be transported to the Main Jail for emergency evaluation within two hours of the initial report.

Current practice.  Development of procedures for use of suicide resisitant cells at RCCC to limit transport to only the most acute patients.

3.   The County shall revise its JPS suicide risk assessment procedures and forms in consultation with Plaintiffs.  The County shall ensure that its JPS suicide risk assessment process, policies, and procedures consider and document the following:

a)   Review of suicide risk notifications and records from any previous incarcerations at the Jail, including records pertaining to suicide attempts, self-harm, and/or mental health needs;

b)   Other prior suicide ideation or attempts, self-harm, mental health treatment or hospitalization;

c)   Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;

d)   Suicide risk factors and protective factors, such as:

i.   Recent significant loss (job, relationship, death of family member/close friend);

ii.   History of suicidal behavior by family member/close friend;

iii.   Upcoming court appearances;

e)   Transporting officer's impressions about risk;

f)   Suicide precautions, including level of observation.

4.   The County shall ensure that the meal service schedule or other custody-related activities cause no delay in the completion of suicide risk assessments for prisoners.

F.   **Housing of Inmates on Suicide Precautions**

1.   The County's policy and procedures shall direct that prisoners, including those identified as being at risk for suicide, be treated in the least restrictive setting appropriate to their individual clinical and safety needs.

Policy forthcoming.  Current post orders and practice indicate least restrictive housing for suicidal inmates.

## G.  Inpatient Placements

1.   The County shall ensure that prisoners who require psychiatric inpatient care as clinically indicated are placed in the 2P unit within 24 hours of identification, absent exceptional circumstances.  In all cases, the provision of clinically indicated treatment to any prisoner requiring inpatient level of care shall be initiated within 24 hours.

Jail Annex planning.

## H.  Temporary Suicide Precautions

1.   No prisoner shall be housed in a safety cell, segregation holding cell, or other Temporary Suicide Precautions Housing for more than six (6) hours. If mental health or medical staff determine it to be clinically appropriate based on detoxification-related needs, this time limit may be extended to no more than eight (8) hours. If exceptional circumstances prevent transfer within these timelines, those circumstances shall be documented, and transfer shall occur as soon as possible. This does not preclude the housing of a prisoner in the IOP unit if clinically indicated.

Jail Annex planning.

2.   The County shall ensure, including by revising written policies and procedures where necessary, the timely and adequate completion of medical assessments for prisoners in need of suicide precautions, as required under Operations Order 4/05 (*i.e.* , within 12 hours of placement of the next daily sick call, whichever is earliest, and then every 24 hours thereafter).

3.   The County shall ensure that any cell used for holding prisoners on suicide precautions is clean prior to the placement of a new prisoner, as well as cleaned on a normal cleaning schedule.

4.   The County shall create and implement a written policy ensuring adequate frequency for meals, fluids, hygiene, showers, prescribed medications, and toileting when a prisoner is in cell used for holding prisoners on suicide precautions.

Current practice.  Will add langauge to policy under review.

5.   Inmates on suicide precautions shall not automatically be on lockdown and should be allowed dayroom or out-of-cell access consistent with security and clinical judgments.

Current practice.

6.   The classrooms or multipurpose rooms adjacent to the housing units in the Main Jail are designed for, and should be made available for, prisoner programs and treatment. Absent an emergency, the County shall not use the classrooms and multipurpose rooms to hold prisoners pending a mental health evaluation or on suicide precautions.  Where such emergency occurs, the County shall document the reasons for retention and move the prisoner, within six (6) hours, to the inpatient unit or other appropriate housing location for continued observation, evaluation, and treatment.

Multi-purpose rooms are no longer used for holding suicide precaution, or mental health evaluation inmates.  Written directives to staff document acceptable practice for at-risk patients, without the use of MPRs.  There is currently a zero use policy, not even as a last resort.

I.   **Suicide Hazards in High-Risk Housing Locations**

1.   The County shall not place prisoners identified as being at risk for suicide or self-harm, or for prisoners requiring IOP level of care, in settings that are not suicide-resistant as consistent with Lindsay Hayes's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities."

Current practice.

2.   Cells with structural blind spots shall not be used for suicide precaution.

Current practice.

J.   **Supervision/Monitoring of Suicidal Inmates**

1.   The County shall ensure adequate visibility and supervision of prisoners on suicide precautions.

Current practice.

2.   The County shall not cover cell windows with magnetic flaps or any other visual barrier preventing visibility into any cell that is housing a prisoner on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need.

Current practice.

3.   The County shall revise its policies regarding the monitoring of prisoners on suicide precautions to provide for at least the following two defined levels of observation:

a)   <u>Close observation</u> shall be used for prisoners who are not actively suicidal but express suicidal ideation (*e.g.*, expressing a wish to die without a specific threat or plan) or have a recent prior history of self-destructive behavior.  Close observation shall also be used for prisoners who deny suicidal ideation or do not threaten suicide but are engaging in other concerning behaviors indicating the potential for self-injury.  Staff shall observe the prisoner at staggered intervals not to exceed every 15 minutes and shall document the observation as it occurs.

Language of "direct observation" was used in other areas.  This should be ammended.  Policy under review contains this language.

b)   <u>Constant observation</u> shall be used for prisoners who are actively suicidal, either threatening or engaging in self-injury, *and*  considered a high risk for suicide.  An assigned staff member shall observe the prisoner on a continuous, uninterrupted basis.  The observation should be documented at 15-minute intervals.  Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation.

This type of monitoring occurs in the SITHU or 2P level of care currently.

4.   For any prisoner requiring suicide precautions, a qualified mental health professional shall assess, determine, and document the clinically appropriate level of monitoring based on the prisoner's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically-determined level of monitoring.

Current practice.

5.   Video monitoring of prisoners on suicide precaution shall not serve as a substitute for Close or Constant observation.

Current practice.

K.   **Treatment of Inmates Identified as at Risk Of Suicide**

1.   Qualified mental health professionals shall develop an individualized treatment plan and/or behavior management plan for every prisoner that mental health staff assesses as being a suicide risk.

2.   Treatment plans shall be designed to reduce suicide risk and shall contain individualized goals and interventions.  Treatment plans shall be reviewed following discharge from suicide precautions and updated as clinically indicated.

3.   All assessments, treatment, and other clinical encounters shall occur in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

Jail Annex planning.  However, we have attempted to maximize our ability to follow this plan portion to the best of our ability.

L.   **Conditions for Individual Inmates on Suicide Precautions**

1.   The County's Suicide Prevention Policy shall set forth clear and internally consistent procedures regarding decisional authority for determining the conditions for individual inmates on suicide precautions.  Mental health staff shall have primary authority, consistent with individualized classification and security needs, with respect to the following:

## M. **Property and Privileges**

1.   Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of routine privileges (*e.g.* , visits, telephone calls, recreation) that are otherwise within the limitations of a prisoner's classification security level.  Any removal of privileges shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

Current practice.

2.   Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff depending on suicide risk, the removal and/or return of a prisoner's clothing and possessions (*e.g.* , books, slippers/sandals, eyeglasses) that are otherwise within the limitations of a prisoner's classification security level.  The removal of property shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

Current practice.

3.   Cancellation of privileges should be avoided whenever possible and utilized only as a last resort.

Current practice.

## N. **Use of Safety Suits**

1.   Decisions about the use of a safety suit (smock) or removal of normal clothing will be under mental health staff's authority, based on individualized clinical judgment along with input from custody staff.

Current practice.

2.   Custody staff may only temporarily place an inmate in a safety suit based on an identified risk of suicide by hanging until the qualified mental health professional's evaluation, to be completed within the "must see" referral timeline. Upon completion of the mental health evaluation, the mental health professional will determine whether to continue or discontinue use of the safety suit.

3.   If an inmate's clothing is removed, the inmate shall be issued a safety suit and safety blanket.

Current practice.

4.   As soon as clinically appropriate, the provision of regular clothing shall be restored. The goal shall be to return full clothing to the inmate prior to discharge from suicide precautions.

Current practice.

5.   A qualified mental health professional shall conduct daily assessments of any prisoner in a safety suit and document reasons for continued use when clinically indicated.

6.   If a qualified mental health professional determines that 30-minute (or less frequent) observations are warranted for a prisoner, safety suits shall not be used on that prisoner.

This causes some confusion to address.  If the safety suit is clinically indicated, as well as less than 30 minute checks, we may be in conflict of this provision.

7.   Safety suits shall not be used as a tool for behavior management or punishment.

Current practice.

O.   **Beds and Bedding**

1.   All prisoners housed for more than four hours on suicide precautions and/or in an inpatient placement shall be provided with an appropriate bed, mattress, and bedding unless the prisoner uses these items in ways for which they were not intended (*e.g.*, tampering or obstructing visibility into the cell).  Such a determination shall be documented and shall be reviewed on a regular basis.

Attempting to meet this criteria through use of suicide resistant cells, and an emphasis on removal from booking housing as soon as practical.

P.   **Discharge from Suicide Precautions**

1.   A qualified mental health professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions in order to ensure that the discharge is appropriate and that appropriate treatment and safety planning is completed.

Current custody practice.

2.   Treatment plans shall be written for all prisoners discharged from suicide precautions. The treatment plan shall describe signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur.

3.   Qualified mental health professionals shall provide clinical input regarding clinically appropriate housing placement (*e.g.*, whether isolation is contraindicated for the prisoner) upon discharge.  Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement.  Once clinically discharged from suicide precautions, the prisoner shall be promptly transferred to appropriate housing.

4.  Prisoners discharged from suicide precautions shall remain on the mental health caseload and receive regularly scheduled clinical assessments and contacts.  Unless a prisoner's individual circumstances direct otherwise, a qualified mental health professional shall provide follow-up assessment and clinical contacts within 24 hours of discharge, again within 72 hours of discharge, again within one week of discharge.

Q.  **Emergency Response**

1.  The County shall keep an emergency response bag that includes appropriate equipment, including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units.  All custodial and medical staff be trained on the location of this emergency response bag and shall receive regular training on emergency response procedures, including how to use appropriate equipment.

2.  All custody and medical staff shall be trained in first aid and CPR.          Current custody practice.

3.  It shall be the policy of the County that any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff shall begin to administer standard first aid and/or CPR, as appropriate.          Current practice.

R.  **Quality Assurance and Quality Improvement**

1.  The County shall establish regularly scheduled multidisciplinary meetings related to treatment, and plan of care issues, on a monthly basis, between medical, and mental health personnel.

Current practice.

2.   The County shall, in consultation with Plaintiffs' counsel, revise its in-custody death review policy and procedures.  Reviews shall be conducted with the active participation of custody, medical, and mental health staff.  Reviews shall include analysis of policy or systemic issues and the development of corrective action plans when warranted.

3.   For each suicide and serious suicide attempt (*e.g*., requiring hospitalization), the County's Suicide Prevention Task Force shall review: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt.  Where applicable, the Review Team shall generate recommendations for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

4.   The County will track all critical incidents which include prisoner suicides, attempted suicides, and incidents involving serious self-harm.  The County shall review critical incidents and related data through its quality assurance and improvement processes.

5.   The County shall implement a continuous quality assurance/quality improvement plan to periodically audit suicide prevention procedures that include, but are not limited to: intake screening (to include audits to ensure that staff ask and record all suicide screening questions), mental health assessments, suicide risk assessments, crisis response, and treatment plans/behavior management plans for prisoners identified as being at risk of suicide or self-harm.

VIII.   **SEGREGATION/RESTRICTIVE HOUSING**

A. **General Principles**

1.   Prisoners will be housed in the least restrictive setting necessary to ensure their own safety, as well as the safety of staff, other prisoners, and the public.

Working toward this goal constantly.  Reduction of nearly 2/3 of all TSEP inmates to lower levels of housing.  Piloting of the TSEP reduction plan involved stepping down several TSEPs transferred to general population floors.

a)   The County shall not place prisoners in more restrictive settings, including Segregation, based solely on a mental illness or any other disability. Prisoners will be housed in the most integrated setting appropriate to their individual needs.

The creation of the third floor as a mental health treatment floor has allowed most, if not all, SMI TSEPs to integrate into more normative housing.  This allows all but the most violent individuals to house in a mental health setting, while maintaining Administrative Segregation for inmates not on the behavioral health case load.

b)   The County shall not place prisoners into Segregation units based solely on classification score.

Several objective indicators are used to determine the appropriateness of segregation. Written docuementation is required, and we are working toward periodic review of justification for segregation.  Inmates solely classified as "high" are not routinely segregated.

c)   The County shall review the housing and restrictions of female prisoners classified as high security to ensure that this population is not subject to Segregation conditions of confinement.

Current practice.

d)   Specialized medical units (e.g., Main Jail 2 West Med/Psych, Main Jail 2 East) and mental health units (e.g., OPP, IOP, MHU, 2P) are not Segregation housing units. The County shall ensure that prisoners housed in these units receive daily access to out-of-cell time, telephones, showers, and other programs, services, and activities consistent with their classification and treatment plan.

Current practice.

2.   The County shall not place a prisoner in Segregation units without first determining that such confinement is necessary for the safety of the staff, other prisoners, or the public. The County shall clearly document in writing the specific reason(s) for a prisoner's placement and retention in Segregation housing. The reason(s) shall be supported by clear, objective evidence. Prisoners will remain in Segregation housing for no longer than necessary to address the reason(s) for placement.

Working toward this goal.  Pilot programs for AdSeg Phase 1 and 2 with steps to reduce between the two.

3.   The County shall not place the following prisoners in a Segregation setting unless necessary to address a serious risk of physical harm, and in such cases only for the minimum time necessary to identify an alternative appropriate placement:

a)   Prisoners with acute medical needs that require an inpatient level of care and/or daily nursing care;

Current practice.

b)   Prisoners who are pregnant, post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy.

**B.   Conditions of Confinement**

1.   The County will provide at least 17 hours of out-of-cell time per week for all prisoners, with the exception of prisoners subject to Administrative Segregation Phase I and Disciplinary Segregation in accordance with this remedial plan. The County will monitor out-of-cell time, and if minimum out-of-cell time requirements are routinely not being met at a particular facility or in a particular housing unit, the Sheriff's Department division commander or designee will review the situation and take appropriate steps to resolve the issue.

Current practice.  Weekly reports show nearly universal compliance, even during more stringent social distancing for COVID precautions.  The negotiated ramp-up hours were almost immediatley exceeded meeting the prescribed hours at the point the consent decree was signed.

a)  The County shall implement a policy to document out-of-cell time provided to each prisoner. The County shall conduct monthly audits to ensure that prisoners have been provided the required treatment and recreation time out of cell. This data will be regularly reviewed as part of the County's Quality Assurance procedures.

Out of cell time is monitored and recorded in the current JIMS system.  Reports are generated on a weekly basis, and checked for compliance.  Inconsistent out of cell times are addressed.  Particularly during COVID precautions, once inmates are out of quarantine, they are recieving nearly 20 hours per week out of cell time.

2.  Out-of-cell time with the opportunity to exercise shall be provided to each prisoner seven (7) days per week, including outdoors/recreation time when feasible. The County shall offer out-of-cell time at appropriate times of day.

Schedules have been created to ensure fair distribution of outdoor recreation.  Initial indications are that inmates are receiving at least one hour per week of outdoor recreation, with some housing locations receiving up to 3 hours per week. Much of the 17 hour out of cell time is unstructure, allowing for exercise.

3.  The County shall modify its non-disciplinary Segregation policies and procedures to allow reasonable access to the following: (1) Personal phone calls for all prisoners, including at least five hours or three weekdays per week of phone access during normal business hours; (2) Education, rehabilitation, and other materials (e.g. writing implements, art supplies, tablets), for in-cell activities; (3) Personal and legal visiting; (4) Religious services; and (5) Commissary.

Working toward this goal.  Commissary restrictions have been lifted.  Personal and legal visiting is unrestricted. Working toward more phone time during weekday hours.  Working toward programming and education for the pre-sentenced population.

a)  The conditions and privileges described above shall be provided unless there is a specific safety or security issue preventing provision of such materials or the prisoner is subjected to disciplinary action.

Continuing to work toward meeting this goal.

4.  Cell windows shall not be covered with magnetic flaps, towels, sheets, or any other visual barrier preventing visibility into and out of the cell, unless there is a specific security or privacy need that is documented, and then for only a period of time necessary to address such security or privacy need. This provision shall apply to all cells housing prisoners.

Current practice.

5.  The County shall establish procedures so that all housing unit cells are searched and cleaned prior to a prisoner's placement in the cell.

Policy drafted to this respect, working toward ensuring full compliance in this area.

6.  The County shall establish procedures to ensure that no prisoner is placed in a Segregation housing cell without a mattress and appropriate bedding.

Current practice.

### C.  **Mental Health Functions in Segregation Units**

1.  Segregation Placement Mental Health Review

a)  All prisoners placed in a non-disciplinary Segregation housing unit and all prisoners housed in a Disciplinary Detention unit shall be assessed by a qualified mental health professional within 24 hours of placement to determine whether such placement is contraindicated. All prisoners subjected to Disciplinary Segregation conditions for 72 hours in their general population housing unit (*i.e.*, confined to cell 23 hours per day) shall also be assessed by a qualified mental health professional no later than the fourth day of such placement.

Partial implementation through pilot programs with JPS.

b)  Any decision to place prisoners with Serious Mental Illness in Segregation shall include the input of a qualified mental health professional who has conducted a clinical evaluation of the prisoner in a private and confidential setting (absent a specific current risk that necessitates the presence of custody staff), is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

Partial implementation of this goal.

c)  Mental Health Staff shall consider each prisoner's age and cognitive functioning as part of the Segregation Placement review. Staff shall receive training regarding the features of youth and brain development of young adults (*i.e.*, 24 years old and younger) and the needs of individuals with intellectual disabilities.

d)  If mental health or medical staff find that a prisoner has a Serious Mental Illness or has    Current practice.
other contraindications to Segregation, that prisoner shall be removed from Segregation
absent exceptional and exigent circumstances.

e)  The County shall document and retain records of all Segregation Placement mental
health evaluations, as described above. The County shall consult with Plaintiffs regarding
such documentation, including the development of new forms where necessary.

2.   Segregation Rounds and Clinical Contacts

a)  Cell checks (to ensure that prisoners are safe and breathing) shall be conducted for all    Current practice.
prisoners in Segregation at least every 30 minutes, at staggered intervals. Completion of
cell checks will be timely documented.

Partial implementation.

b)  A qualified mental health or medical professional shall conduct check-ins at least once
a week, to assess and document the health status of all prisoners in Segregation, and shall
make referrals as necessary. The check-in shall include a brief conversation with each
prisoner, a visual observation of the cell, and an inquiry into whether the prisoner would
like to request a confidential meeting with a mental health or medical provider. Steps shall
be taken to ensure effective communication, as well as auditory privacy consistent with
security needs. When a prisoner in Segregation requests a confidential meeting with a
mental health or medical provider, or the medical or mental health professional identifies a
mental health or medical need, staff shall make appropriate arrangements to include triage,
examination and treatment in an appropriate clinical setting. In such cases, staff shall give
the prisoner the opportunity to complete a health care request but will otherwise initiate a
referral without requiring the prisoner to complete a request form.

3.   Response to Decompensation in Segregation

a)   If a prisoner in Segregation develops signs or symptoms of mental illness where such signs or symptoms had not previously been identified, suffers deterioration in his or her mental health, engages in self-harm, or develops a heightened risk of suicide, the prisoner shall immediately be referred for appropriate assessment and treatment from a qualified mental health professional who will recommend appropriate housing and/or programming.

Current practice.

b)   Jail staff shall follow a mental health recommendation to remove a prisoner from Segregation unless such removal poses a current safety risk that is documented. In such a case, the Commander or management-level designee shall be notified and staff shall work to remove the prisoner from Segregation and secure a placement in an appropriate treatment setting at the earliest possible time.

Current practice for nearly all mental health placements.  Full compliance with the acute unit and nearly universal compliance with the IOP unit.

D. **Placement of Prisoners with Serious Mental Illness in Segregation**

1.   Prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit (2P, IOP, OPP) will not be placed in Segregation, but rather will be placed in an appropriate treatment setting – specifically, the inpatient unit or other Designated Mental Health Unit providing programming as described in **Exhibit A-2**.

Current practice.

2.   In rare cases where a prisoner with a mental health condition meeting criteria for placement in a Designated Mental Health Unit presents an immediate danger or significant disruption to the therapeutic milieu, and there is no reasonable alternative, such a prisoner may be housed separately for the briefest period of time necessary to address the issue, subject to the following:

a)   The prisoner shall receive commensurate out-of-cell time and programming as described in **Exhibit A-2** (including for IOP and OPP, 10 hours/week of group treatment/structured activities, 7 hours/week unstructured out-of-cell time, weekly individual clinical contact) with graduated programming subject to an individualized Alternative Treatment Program.

b)   The prisoner shall receive the following:

i.   As part of the weekly confidential clinical contact, the clinician shall assess and document the prisoner's mental health status and the effect of the current placement on his or her mental health, and determine whether the prisoner has decompensated or is at risk of decompensation.

ii.  The weekly check-ins described in **Section VIII.C.2.b** shall supplement, and not be a substitute for, the weekly treatment session described herein.

iii. Treatment provided in the least restrictive setting that is appropriate based on the prisoner's circumstances.

iv.  Privileges commensurate with the Designated Mental Health Unit program, unless modified in an Alternative Treatment Program based on individual case factors that are regularly reviewed.

v.   Daily opportunity to shower.

Working toward this goal.  IOP no longer removes patients that are disruptive without clinical assessment and agreement by JPS. When patients are moved, they are placed on the case management protocol for JPS interaction and treatment.

Working toward universal compliance.

Current practice.

3.   A prisoner with Serious Mental Illness requiring restraints (*e.g.*, handcuffs, belly chains, etc.) shall not be denied clinically indicated group or individual treatment due to security factors, absent exceptional circumstances that are documented. Prisoners with Serious Mental Illness housed in Segregation who require restraints when out of cell shall have the opportunity to work their way out of restraints through graduated programming subject to an individualized Alternative Treatment Program.

Current custody practice.

E.   **Administrative Segregation**

1.   Use of Administrative Segregation

a)   Only the Classification Unit can assign a prisoner to Administrative Segregation.

Current practice.

b)   The County may use Administrative Segregation in the following circumstances:

i.   Objective evidence indicates that a prisoner participated in a recent assault and the assaultive behavior involved an assault on staff or visitors, serious injury, use of a weapon, gang removals, or multiple prisoner assaults. Mutual combat situations that do not otherwise qualify for Administrative Segregation are excluded.

Current practice.

ii.   During a brief investigative period not to exceed ten days while Classification staff attempts to verify the need for Protective Custody or while the prisoner is awaiting transfer to another facility.

Working toward this goal.  Implemented steps to achieve compliance and practice changes.

c)  The Compliance Commander shall have the authority to place prisoners in Administrative Segregation under the following circumstances:

Current practice.

i.   The prisoner poses an extraordinary safety risk and no other housing unit is sufficient to protect the prisoner from harm;

Current practice.

ii.  The prisoner has failed to integrate into a lesser restrictive housing setting because of repeated and recent history of assaultive behavior or current threats of violence associated with being in a lesser restrictive setting; or

Current practice.

iii. Objective evidence indicates that the prisoner attempted to escape or presents an escape risk.

Current practice.

2.   Notice, Documentation, and Review of Administrative Segregation Designations

a)  The Classification Unit shall document the rationale for designating a prisoner for Administrative Segregation in the classification file using objective evidence. For prisoners younger than 24, the Classification Unit shall consider the prisoner's age as a mitigating factor when assigning the prisoner to Administrative Segregation.

b)  Classification shall attempt to down-class prisoners to a lesser restrictive housing setting at the earliest possible opportunity, consistent with safety and security.

Current practice.

c)   County shall provide prisoners in Administrative Segregation with a written notice within 72 hours of the prisoner's initial placement in Administrative Segregation, explaining the reasons for the prisoner's Administrative Segregation designation and how the prisoner may progress to a lesser restrictive housing setting.

d)   Prisoners housed in Segregation units will, at least every thirty (30) days, receive face-to-face interviews in a private out-of-cell setting, consistent with individual security needs, to discuss progress and compliance with their individual case plan as part of a classification review. Consideration will be given to their mental health and to their appropriateness for transfer to a less restrictive setting.

Working toward complinace in this area through JPS.

e)   The Compliance Commander or higher-ranked officer will review and approve the decision to designate a prisoner for Administrative Segregation for longer than 15 days.

f)   The County shall document the reason the prisoner is retained in the same Administrative Segregation Phase. The prisoner will be given written notice of the reasons the prisoner is being retained in the same Phase of Administrative Segregation and what conduct the prisoner is required to exhibit to progress to a lesser restrictive housing setting.

g)   The Compliance Commander or higher-ranked officer must approve the continued retention of a prisoner in Administrative Segregation for longer than 90 days, and the Compliance Commander or higher-ranked officers must reauthorize such placement at least every 90 days thereafter.

3.   Administrative Segregation Phases

a)   The County shall develop and implement a phased system for prisoners designated as Administrative Segregation to achieve a lesser restrictive housing setting.

b)   Administrative Segregation Phase I:

i.   This is the most restrictive designation for prisoners in Administrative Segregation.

ii.  Prisoners shall be offered a minimum of one hour per day out of cell time for a total of seven hours per week.     Current Practice.

iii. Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least five of the seven hours per week.     Current Practice.

iv.  Prisoners shall not remain in Phase I for longer than 15 days unless the prisoner engages in new conduct warranting retention in Administrative Segregation as specified in **Section VIII.E.1.b.**

c)   Administrative Segregation Phase II:

a)       Prisoners shall be offered a minimum of 17 hours of out of cell time per week.     Approaching this timeframe, however we tend to consistently fall short with the COVID housing protocols taking many traditional ADSEG pods.

b)       Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least 10 of the 17 hours per week.     Current Practice.

c)      Prisoners shall be offered the opportunity to program in groups of two to four       Current Practice.
prisoners, unless pairing with another prisoner is not possible for safety or security
reasons, and those reasons are documented by the County.

d)      The County shall develop a program of incentives for good behavior.

e)      Prisoners shall not remain in Phase II for longer than 30 days unless the prisoner
commits a serious behavioral violation while in Administrative Segregation: fighting;
threatening staff or other prisoners; resisting or delaying an order from staff that impedes
Jail operations (e.g., failure to lock down); refusing to submit to a search of person or
property; destroying or damaging Jail property (excluding property issued to a prisoner
and/or minor defacing of property or destruction of low-value property) or facilities;
possessing contraband that implicates safety or security (e.g., weapons, razors,
unauthorized medication, but not extra clothing, commissary items, or food); cell flooding;
tampering with cell locking mechanisms or other security features (e.g., cameras); and/or
sexual activity/harassment.  In the event a prisoner engages in a serious behavioral
violation, the conduct will be referred to the Classification Sergeant or higher-ranking
officer, who shall have the discretion to extend the prisoner's Phase II time by 15 days, and
shall develop an individual behavioral management plan, if one does not yet exist, for the
prisoner.

F.   **Protective Custody**

1.   When a prisoner faces a legitimate threat from other prisoners, the County will seek       Current Practice.
alternative housing, by transferring the threatened prisoner to the general population of
another facility or unit, or to a special-purpose housing (Protective Custody) unit for
prisoners who face similar threats.

2.   The County will not operate Protective Custody units with Segregation-type conditions of confinement. Prisoners placed in Protective Custody shall have the same programs and privileges as general population prisoners, absent exceptional circumstances that are documented.

Current Practice.

3.   The County shall create a policy that describes the process and criteria for placement of prisoners into Protective Custody. The County shall consult with Plaintiffs to develop such a policy.

4.   Prisoners who are lesbian, gay, bisexual, transgender, or intersex (LGBTI) or whose appearance or manner does not conform to traditional gender expectations should not be placed in Segregation or Protective Custody solely on the basis of such identification or status, or because they are receiving gender dysphoria treatment.

Current Practice.

a)   When a prisoner who is LGBTI or gender nonconforming faces a legitimate threat, the County shall identify alternative housing, with conditions comparable to those of general population. Privileges and out-of-cell time for this population will be documented and regularly reviewed by supervisory level staff to ensure appropriate housing, out-of-cell-time, and related conditions for this group of prisoners.

TGNI inmates not able to house in general population are placed in protective custody. Out of cell priveleges are commensurate with most general population prisoners.

b)   In deciding whether to assign a transgender or intersex prisoner to a facility or program for male or female prisoners, the County shall consider on a case-by-case basis whether a placement would ensure the prisoner's health and safety, and the health and safety of other prisoners, giving serious consideration to the prisoner's own views.

Current practice.

c)  Jail staff will receive training on the unique issues of managing transgender prisoners, with refresher training at least bi-annually.

5.  For prisoners who are LGBTI or whose appearance or manner does not conform to traditional gender expectations, the County shall identify the prisoner's preferred gender of jail staff who will perform searches of the prisoner.  The County shall honor the request except in exigent circumstances when doing so is not possible.

Current practice.  Statement of preference form completed by TGNI prisoners allowing them to request the gender of searching officer.

## G.  Disciplinary Segregation

1.  The County will not place a prisoner in disciplinary housing pending investigation of, and due process procedures for, an alleged disciplinary offense unless the prisoner's presence in general population would pose a danger to the prisoner, staff, other prisoners or the public.

Current practice.

2.  The County will adhere to a discipline matrix, developed in consultation with Plaintiffs, that clearly defines when disciplinary housing may be imposed.

3.  Prisoners who are found to have violated disciplinary rules following due process procedures will be placed in Segregation only after the County has determined that other available disciplinary options are insufficient, with reasons documented in writing.

4.  The denial of out-of-cell time for more than four (4) hours will not be imposed as a sanction absent a formal disciplinary write-up and due process hearing.

Current practice.

5.  Prisoners serving a Disciplinary Segregation term shall receive at least seven (7) hours per week of out-of-cell time. Out-of-cell time with the opportunity to exercise shall be provided to each prisoner one (1) hour a day, seven (7) days per week.

Current practice.

6.  Prisoners in Disciplinary Segregation shall, absent an individualized assessment of security risk that is documented be provided at least one book (which prisoners may regularly exchange), legal documents, hygiene materials, legal phone calls, and legal visits.

Current practice.

7.  No Disciplinary Segregation term for non-violent rules violations will exceed 15 days.

Current practice.

8.  The County will, in consultation with Plaintiffs' counsel, modify its inmate discipline policy and practice to limit placements in Disciplinary Segregation conditions to no more than 15 days, absent cases of serious violations stemming from distinct incidents and with Watch Commander-level approval.

Current practice, contained in Discipline Housing Post Order.

9.  No prisoner shall be placed in Disciplinary Segregation for more than 30 consecutive days.

Current practice, contained in Discipline Housing Post Order.

10. If after a Disciplinary Segregation term, Jail staff, with the input of a mental health clinician, determine that the prisoner cannot safely be removed from Segregation, placement on Administrative Segregation status may occur only subject to the process set forth in **Section VIII.E**.

Current practice.

11. Once a prisoner has been moved out of Disciplinary Segregation, that prisoner shall not be placed back into Disciplinary Segregation absent (a) a new incident warranting discipline, and (b) completion of all mental health review procedures required for new Segregation placements.

Current practice, contained in Discipline Housing Post Order.

H. **Avoiding Release from Jail Directly from Segregation**

1.   The County will avoid the release of prisoners from custody directly from Segregation-type housing, to the maximum extent possible.

2.   If a sentenced prisoner housed in Segregation has an upcoming expected release date (i.e. less than 120 days), the County will take and document steps to move the prisoner to a less restrictive setting, consistent with safety and security needs. If Segregation becomes necessary during this time, the County will provide individualized discharge planning to prepare the sentenced prisoner for release to the community.

I. **No Food-Related Punishment**

1.   The County shall modify its policy and take steps to ensure that the denial or modification of food is never used as punishment. The County shall eliminate use of "the loaf" as a disciplinary diet.  Nothing in this paragraph shall be read to preclude the County from denying a prisoner use of the commissary.

Current practice.

J. **Restraint Chairs**

1.   Restraint chairs shall be utilized for no more than six hours.

Current practice.

2.   The placement of a prisoner in a restraint chair shall trigger an "emergent" mental health referral, and a qualified mental health professional shall evaluate the prisoner to assess immediate and/or long-term mental health treatment needs.

3.   The opinion of a qualified medical professional on placement and retention in a restraint chair will be obtained within one hour from the time of placement.                    Current practice.

IX.      **QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT**

A.  **Generally**

1.   The County shall develop and implement, in collaboration with Plaintiffs' counsel, a quality assurance ("QA") plan to regularly assess and take all necessary measures to ensure compliance with the terms of this Remedial Plan.

2.   The QA/QI Unit shall meet regularly and include representatives from all levels of the organization and from all facilities. The meeting shall include custody representatives for topics that are relevant to custody operations.

3.   The County shall provide sufficient resources to the QA/QI program.

B.  **Quality Assurance, Mental Health Care**

1.   The JPS Medical Director, the JPS Program Manager, jail administrators, and the medical psychiatric, dental, and nursing directors, or appropriate designees, will attend and participate in this process at a minimum of every quarter.  Formal minutes will be taken and maintained whenever the committee convenes.

2.   The mental health care quality assurance plan shall include, but is not limited to, the following:

a)   Intake processing;

b)   Medication services;

c)   Screening and assessments;

d)   Use of psychotropic medications;

e)   Crisis response;

f)   Case management;

g)   Out-of-cell time;

h)   Timeliness of clinical contacts;

i)   Provision of mental health evaluation and treatment in confidential settings;

j)   Housing of inmates with SMI, including timeliness of placements in higher levels of care and length of stay in various units;

k)   Number of commitments pursuant to Welf. & Inst. Code § 5150, *et seq.* ;

l)   Use of restraint and seclusion;

m)  Tracking and trending of agreed upon data on a quarterly basis;

n)  Clinical and custody staffing;

o)  Morbidity and mortality reviews with critical analyses of causes or contributing factors, recommendations, and corrective action plans with timelines for completion; and

p)  Corrective action plans with timelines for completion to address problems that arise during the implementation of this Remedial Plan and prevent those problems from reoccurring.

3.   The County will conduct peer and supervisory reviews of all mental health staff and professionals at least annually to assess compliance with policies and procedures and professional standards of care.

C.   **Quality Assurance, Medical Care**

1.   The County shall establish a Quality Assurance/Quality Improvement (QA/QI) Unit to develop accurate tracking mechanisms and monitor the timeliness and effectiveness of the following processes of health care, ensuring that all are reviewed at least annually, and shall recommend corrective action for all deficiencies:

a)  intake screenings;

b)  emergent, urgent, and routine requests from patients and staff referrals for health care, including Health Service Request availability;

c)   clinical monitoring of patients, including the delivery of chronic care services to those patients who qualify as chronic care patients;

d)   prescriptive practices by the prescribing staff;

e)   medication administration, including the initiation of verified medications, the first doses of medications, medication errors, patient refusals, and patterns of medication administration;

f)   grievances regarding healthcare;

g)   specialty care (including outside diagnostic tests and procedures);

h)   clinical caseloads;

i)   coordination between custody staff and medical staff, including escorts to medical appointments and delivery of care.

2.   The studies shall be done with sufficient sample numbers to arrive at statistically valid conclusions. The studies shall include (a) a clearly articulated goals, objective, and methodology to determine if standards have been met, including a sampling strategy; (b) data collection; (c) analysis of data to identify trends and patterns; (d) analysis to identify the underlying causes of problems; (e) development of remedies to solve problems; (f) a written plan that identifies responsible staff and establishes a specific timeline for implementing remedies; (g) follow-up data collection; and (h) analysis to determine if the remedies are effective.

3.   The QA/QI Unit study recommendations shall be published to all staff.

4.   The County will conduct peer and supervisory reviews of all medical staff and professionals at least annually to assess compliance with policies and procedures and professional standards of care.

ATTACHMENT 3 -
Letter from County Executive to
Federal Marshal Regarding Jail
Population Reduction



**Public Safety & Justice**
Eric Jones
Deputy County Executive

**Departments**
Coroner
Probation
Public Defender
Conflict Criminal Defender

**County of Sacramento**

June 14, 2022

Ms. Lasha Boyden
United States Marshal for the Eastern District Of California
U.S. Courthouse
501 I Street
Sacramento, CA 95814

**Subject:** *Contract between the County of Sacramento and the Federal Marshal*

*Delivered via email to Lasha.Boyden@usdoj.gov*

Dear Marshal Boyden:

I write to you in regards to the contract between the County of Sacramento and the Federal Marshal. This is the agreement which establishes that the County will accept Federal pre-trial detainees into custody in the Sacramento County jails. Over the past several months this contract has been the topic of numerous conversations between the County and your office. The specific topic of those conversations has been the restraints the County is under in relation to the Mays Consent Decree and the County's need to reduce our jail population in order to come into compliance with that Federal Court Order.

To that end, the County has discussed with your office reducing the total number of pre-trial detainees in County custody. You, and your staff, have expressed the need to maintain some number of available beds in the County system in order to preserve public safety. The County understands and appreciates this concern. Nonetheless, the County must insist that there be a limit to the number of Federal pre-trial detainees in the County system. Therefore, pursuant to the Period of Performance clause (page 3 of 9) and the Modification and Disputes clause (page 9 of 9) of the agreement this is the County's notice that within 120 days from the date of this letter the total number of Federal pre-trial detainees the County will accept pursuant to this contract is capped at no more than 100 inmates.

Letter to Marshal Boyden
Contract between the County of Sacramento and the Federal Marshal
June 14, 2022
Page **2** of **2**

Thank you for your attention to this matter. Please do not hesitate to contact me should you have any questions or concerns regarding the content of this notice.

Sincerely,

Eric Jones
Deputy County Executive

cc:   Ann Edwards, County Executive
      Scott Jones, Sheriff
      Jim Barnes, Undersheriff