# <u>Consent Decree in Mays et al v. County of Sacramento</u>

# *Third* Monitoring Report of Suicide Prevention Practices

Submitted by:

Lindsay M. Hayes, Court-Appointed Expert

August 19, 2022

# Introduction

The Sacramento County Jail System consists of the Main Jail located in downtown Sacramento and the Rio Cosumnes Correctional Center (RCCC) located in Elk Grove. The Main Jail has a rated capacity for 2,396 inmates, and the RCCC is rated for 2,259 inmates. As of June 15, 2022, the Mail Jail population was 1,951 inmates, whereas the RCCC held 1,556 inmates.[1]  The jail system is operated by the Sacramento County Sheriff's Office (SCSO), Medical services are provided to inmates through the County Department of Health Services' Adult Correctional Services (ACH), whereas mental health services are provided to inmates by Adult Correctional Mental Health (ACMH) through a contractual agreement with the University of California-Davis.

In July 2018, the Plaintiffs (Lorenzo Mays, Ricky Richardson, Jennifer Bothun, Armani Lee, Leertese Beirge, Cody Garland, and other class members) filed a federal class-action lawsuit (*Mays et al v. County of Sacramento*, Case 2:18-cv-02081-TLN-KJN) in the United States District Court, Eastern District of California, alleging constitutional violations for medical and mental health care, suicide prevention, discrimination against people with disabilities, and use of restrictive housing (segregation) in the Sacramento County Jail System. Legal counsel for the parties subsequently negotiated individual remedial plans pertaining to medical care, mental health care, and suicide prevention, and those individual plans were then incorporated into a single global remedial plan within the proposed *Consent Decree*. It was further agreed that issues pertaining to discrimination against people with disabilities and use of restrictive housing within the jail system would be monitored by Plaintiffs' counsel. The proposed *Consent Decree* was filed in June 2019 and approved by the federal court on January 13, 2020. Three court-appointed experts (Madeleine LaMarre/Karen Saylor (joint medical experts), Mary Perrien, and Lindsay Hayes) were subsequently assigned to monitor the implementation of the Consent Decree. Exhibit A, located at pages 15 through 119 of the *Consent Decree* contains the agreed-upon Remedial Plan for *Mays et al v. County of Sacramento*.

On January 20, 2022 and June 16, 2022, the Defendant filed its *Fourth* Status Report and *Fifth* Status Report, respectively, which is required pursuant to the Consent Decree to "1) include a description of the steps taken by defendant to implement each provision set forth in the remedial plan; and 2) specifies provisions of the remedial plan which have not yet been implemented. With respect to the provisions of the Remedial Plan not yet implemented, Defendant's Status Report shall (i) describe all steps taken by the Defendant toward implementation; (ii) set forth with as much specificity as possible those factors contributing to non-implementation; and (iii) set forth a projected timeline for anticipated implementation based on the best information available to Defendant" (at pages 3-4).  Status reports are required to be submitted to Plaintiffs' counsel and the four court-appointed experts every 180 days.

# Monitoring Compliance with the *Consent Decree*

The *Consent Decree* offers limited guidance to the court-appointed experts regarding the measurement of compliance with the Remedial Plan, simply stating that the Defendant is in

---

[1]Of note, this is an increase from the jail populations reported in the *Second* Monitoring Report when the Mail Jail held 1,691 inmates and the RCCC held 1,295 inmates on May 13, 2021, but still below the rated capacities.

substantial compliance or not in substantial compliance with an individual provision. The term "substantial compliance" was not defined. The *Consent Decree*, however, does state that the "Defendant may, after conferring with Plaintiffs' counsel, request a finding by the Court that the Defendant is in substantial compliance with one or more components of the Remedial Plan and has maintained such substantial compliance for a period of at least 12 months" (at page 11). In an effort to more accurately measure compliance with the provisions of this *Consent Decree*, as well as to provide guidance to the parties, the court-appointed experts subsequently decided to create a three-tier system for the measurement of compliance. Each of the experts have utilized such a system in prior federal court monitoring assignments. As such, the court-appointed experts agreed to the following definitions for compliance measurement for each of the provisions in this Remedial Plan:

> **Substantial Compliance** indicates that the Defendant has achieved compliance with most or all components of the relevant provision of the Remedial Plan for both the quantitative (e.g., 90% performance measure) and qualitative (e.g., consistent with the larger purpose of the *Decree*) measures. If an individual compliance measure necessitates either a lower or higher percentage to achieve substantial compliance, it will be so noted by the expert. Compliance has been sustained for a period of at least 12 months.

> **Partial Compliance** indicates that compliance has been achieved on some of the components of the relevant provision of the Remedial Plan, but significant work remains. A minimum requirement is that for each provision, relevant policies and procedures must be compliant with Remedial Plan requirements, contain adequate operational detail for staff to implement the policy, staff trained, and the County has begun implementation of the policy.

> **Non-Compliance** indicates that most or all of the components of the relevant provision of the Remedial Plan have not yet been addressed and/or have not yet been met.

# Third Monitoring Report

This expert was appointed to monitor the suicide prevention provisions of the *Consent Decree*. There are **63** suicide prevention provisions listed under Section VII (pages 41 through 50) of the Remedial Plan.

Consistent with the two previous monitoring reports, this *Third Monitoring Report* is formatted to present each provision, followed by the provision's current status or rating (substantial, partial, or non-compliance) as determined by the court-appointed expert, a discussion section which provides justification for each rating, recommendations offered to raise each status to substantial compliance, and the evidentiary basis utilized in monitoring each provision. In addition to the

documents listed below, this report is based upon the expert's three-day on-site assessment conducted on February 21-23, 2022.[2]

Documents Requested

In January 2022, this expert and mental health expert jointly submitted a suicide prevention and mental health document request to the Defendant. The request included the following suicide prevention documents:

1) Table of Contents for the Sacramento County Sheriff's Office (SCSO) updated Policy and Procedure Manual;

2) All current SCSO and ACH policies, procedures, and directives relevant to suicide prevention, mental health services, and detainees/inmates receiving mental health services (e.g., disciplinary, use of force, restrictive housing, tracking);

3) All updated ACMH policies, procedures, and directives relevant to suicide prevention and mental health services;

4) All updated, final and draft policies, procedures, and directives relevant to suicide prevention, mental health services, and detainees/inmates receiving mental health services (e.g., disciplinary, use of force, restrictive housing, tracking);

5) Any new or updated training curriculum regarding pre-service and in-service staff training, as well as curricula, handouts, etc. regarding suicide prevention, mental illness, and mental health services;

6) Draft training curriculum regarding pre-service and in-service staff training, as well as curricula, handouts, etc. regarding suicide prevention, mental illness, and mental health services;

7) Training curriculum (including draft) regarding additional suicide prevention and mental health training provided to custody officers assigned to the Designated Mental Health Units;

8) Training curriculum (including draft) regarding additional training provided to medical and mental health staff regarding development of suicide risk assessments and treatment plans for suicidal inmates specifically and mental health caseload inmates generally;

9) Policies, procedures, directives (including draft) related to quality assurance and continuous quality improvement in the delivery of mental health services and suicide prevention;

---

[2]The on-site assessment for this *Third Monitoring Report* was delayed a few months by mutual agreement between the Defendant and this expert due to the COVID-19 pandemic.

10) Minutes from Suicide Prevention Subcommittee meetings, as well as any other regularly scheduled multidisciplinary meetings related to suicide prevention, mental health and quality assurance for January 2021 to the present.

11) Documentation of overall staff completion rates for suicide prevention, first aid/CPR, and mental health training presented as follows (using numerator/denominator):

_ % of all officers received suicide prevention training during previous 12 months
_ % of all medical staff received suicide prevention training during previous 12 months
_ % of all mental health staff received suicide prevention training during previous 12 months
_ % of all officers currently certified in CPR
_ % of all medical staff currently certified in CPR

12) Entire case files (jail, medical, and mental health), investigative reports, and mortality reviews of all inmate suicides from January 2021 to present;

13) Total number of serious suicide attempts (incidents resulting in medical treatment and/or hospitalization) for the period of January 2021 to present, as well as all documentation of such incidents by the Suicide Prevention Subcommittee;

14) Listing of inmates on suicide precautions from September 1, 2021 to the present;

15) Listing of all inmates confined in safety cells (including ad seg and sobering cells) between July and December 2021 (include length of stay);

<u>Documents Received and Reviewed</u>

Sacramento County's *Fourth* Status Report (January 20, 2022) and *Fifth* Status Report (June 16, 2022).

Meeting minutes from the Suicide Prevention (and Training) Subcommittee, November 4, 2021, December 6, 2021, January 10, 2022, February 14, 2022, March 14, 2022, May 23, 2022, and June 13, 2022.

Sample medical chart and custody log review of 14 inmate-patients held in safety, ad seg, and sobering cells in Main Jail booking for suicide risk during on-site assessment.

Sample medical chart review of 10 inmate-patients on suicide precautions in the SITHU of Main Jail during on-site assessment.

Observed the intake screening process and/or reviewed the intake screening forms in the medical charts of nine (9) inmates during the on-site assessment.

Safety Cell (including ad seg and sobering cells) Logs, Length of Stay, March 2022 thru May 2022.

SITHU Custody Logs from February 2022.

Various training data as of June 30, 2022.

The following policies:

- ACH 01-15: Suicide Prevention Subcommittee, September 17, 2021, final.
- ACH 02-05: Suicide Prevention Program, November 16, 2021, final.
- ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, June 22, 2022, final.
- ACH 04-12: Emergency Medical Response, May 19, 2022, final.
- ACH 05-05: Nurse Intake, October 28, 2021, final.
- MH-01-10: Access to Mental Health Services, August 6, 2021, final.
- MH-04-04: Outpatient Mental Health Services and Levels of Care, October 13, 2021, final.
- MH-04-09: Acute Psychiatric Unit - Admission, Program, and Discharge, May 6, 2022, final.
- SCSO Policy 722: Suicide Prevention and Intervention, draft pending.

The following training documents:

- "Suicide Prevention and Detection in Jail," four-hour, 185-slide PowerPoint presentation, revised February 7, 2022, final.

- "Suicide Prevention: An Overview," 70-slide PowerPoint presentation, January 21, 2022, final.

Finally, during the most recent on-site assessment, the expert received a "Mental Health Program Update, January 2022," from UC-Davis leadership which highlighted "recent successes, opportunities, and challenges/barriers" for implementation of *Consent Decree* requirements regarding mental health and suicide prevention. According to UC-Davis:

### Recent Successes

- LCSW assigned to Acute Psychiatric Unit three days a week (groups, advocacy, treatment planning, discharge planning, coordination of care). Utilizing current outpatient staff, will require additional staffing to support consistent in daily coverage.

- Implemented workflow to guide LCSWs in process for confidentially interviewing patients in booking and completion of regular audits to ensure staff compliance.
- Implemented process to notify custody of suicide precautions (observation, housing, item restrictions, privilege restrictions, clothing).
- Completed training for all LCSWs and custody leadership related to interviewing patients in booking and suicide precautions and custody notification form.
- Implemented RCCC after-hours Emergent Telehealth visits.
- Established multidisciplinary Suicide Prevention Subcommittee.
- Established multidisciplinary Suicide Prevention Training Subcommittee.
- Completed Suicide Prevention 4-hour Training (pending updates based on SMEs review).
- Created MJ classroom schedule to improve staff access to confidential space and increase utilization of classroom.
- Began providing 2-hour annual Suicide Prevention Training to medical and custody staff in December 2021.

## Opportunities

- Continue to address space limitations on Acute Psychiatric Unit with ACH and SSO - MH considers this a high priority issue.

## Challenges/Barriers

- No mechanism for constant observation. SITHU decommissioned and no female SITHU.
- Do not have staff to provide constant observation for patients on suicide precautions.
- Difficulty recruiting sufficient staff to fill vacant positions.

In its August 11, 2022 response to the draft of this report, the County offered the following revisions (shown in italics):

## Challenges/Barriers

- No mechanism for constant observation. SITHU decommissioned and no female SITHU. *The SITHU beds in the dayroom area were decommissioned due to COVID. As of 2/2022, the SSO reopened 4 of the 8 male overflow beds in the dayroom area. 10 suicide resistant cells are designated as SITHU cells for males and 4 suicide resistant cells are designated as SITHU cells for females.*
- Do not have staff to provide constant observation for patients on suicide precautions. *However, MH has received a budget augmentation for FY*

> *22/23 to hire staff to provide constant observation for patients on suicide precautions.*
> - Difficulty recruiting sufficient staff to fill vacant positions. *MH has expanded recruitment efforts and has plans for recruitment events at two national conferences. Additionally, mental health is exploring options for recruiting licensed mental health professionals from other disciplines to address staffing issues (psychologists, LMFTs).*

# Conclusion

The *First Monitoring Report* resulted in 53 of the 63 total suicide prevention provisions in Partial Compliance, with 10 suicide prevention provisions in Non-Compliance. No provisions were in Substantial Compliance. No progress was noted in the *Second Monitoring Report* whereby 52 of the 63 total suicide prevention provisions were in Partial Compliance, with 11 suicide prevention provisions in Non-Compliance. No provisions were in Substantial Compliance. As shown in the table below, this *Third Monitoring Report* resulted *7* of the 63 suicide prevention provisions were in Substantial Compliance, *48* provisions in Partial Compliance, and *8* provisions in Non-Compliance. In sum, although there has been some improvement, given the fact that the County has had well over two years to demonstrate measurable compliance (with the federal court approving the *Consent Decree* on January 13, 2020), these findings continue to be disappointing.

| Substantive Area for Suicide Prevention | Total Provisions | Substantial Compliance | | Partial Compliance | | Non-Compliance | |
|---|---|---|---|---|---|---|---|
| | | # | % | # | % | # | % |
| **1st Monitoring Report** (1/19/2021) | 63 | | | 53 | 84% | 10 | 16% |
| **2nd Monitoring Report** (9/10/2021) | 63 | | | 52 | 83% | 11 | 17% |
| **3rd Monitoring Report** (7/1/2022) | 63 | 7 | 11% | 48 | 76% | 8 | 13% |

Finally, the parties filed a joint *Status Report RE: Monitoring of Consent Decree Implementation* with the court on June 3, 2022 (Case 2:18-cv-02081-TLN-KJN. Document No. 153). The joint status report was developed following a Dispute Notice letter sent by plaintiffs' counsel on October 29, 2021 "demanding specific actions to implement critical remedial provisions regarding Mental Health and Suicide Prevention on which the County is not in compliance." The parties executed a Memorandum of Agreement regarding these issues on May 27, 2022, and the Suicide Prevention provisions of the Agreement are presented as follows:

**SUICIDE PREVENTION**

**Suicide Prevention Policies (Focus Area #1)**

5. Adult Correctional Health, with input from the Subject Matter Experts and Class Counsel, completed revision of its Suicide Prevention policies (Policy No. 01-15 and 02-05) in September 2021.

a. Adult Correctional Health provided a two-hour suicide prevention training to health care staff on several dates between December 2021 and February 2022. Training of custody staff rolled out in March 2022.

b. In February 2022, the County finalized a 4-6 hour suicide prevention training that covers essential aspects of the Remedial Plan as to suicide prevention. The County will utilize a multidisciplinary team to deliver this training to all newly hired mental health, medical, and custody staff. Such training will begin in June 2022 and will be provided on an ongoing basis as staff members are onboarded.

c. The County will adapt the new-staff suicide prevention training referenced in Paragraph (b), above, to cover all essential suicide prevention aspects of the Remedial Plan, including requirements set forth in this Agreement, to be delivered to all current mental health, medical, and custody staff who have not received the new-staff training. The training was reviewed and approved by the Subject Matter Experts. Training has begun and will continue until all staff members are trained.

6. The County will complete revision of the Sheriff's Office's Suicide Prevention policy, procedure, and training, including based on input from the Subject Matter Experts and Class Counsel, to ensure compliance with all relevant Remedial Plan provisions. The County's Suicide Prevention policies, procedures, and trainings will require the following, with appropriate documentation to show proof of practice:

a. Staff will offer patients on suicide precautions a shower at least daily, and upon reasonable request.

b. Staff will provide prompt assistance with hygiene and cleaning to patients on suicide precautions whenever circumstances warrant.

c. Staff will affirmatively offer patients on suicide precautions water at least every two hours, and upon request.

d. Staff will affirmatively offer patients on suicide precautions food at least consistent with normal daily meal provisions, and upon request (e.g., if they missed a meal due to their mental health or suicide observation status).

e. Staff will provide patients on suicide precautions and held in a cell that does not have a toilet access to a toilet promptly upon request.

**Addressing Overuse and Unnecessary Use of Safety Smocks (Focus Area #2)**

7. Adult Correctional Health shall, with input from the Subject Matter Experts and Class Counsel, has finalized revisions to its suicide prevention policies, including to clarify that (a) decisions about the removal of clothing and the issuance of a safety smock to class members on suicide precautions will be under mental health staff authority based on the clinical judgement of a licensed clinician, (b) class

members will have clothing restored prior to discharge from suicide precautions and as soon as clinically appropriate while on suicide precautions, and (c) mental health staff will conduct at least daily assessments of a patient's readiness for restoration of clothing and shall document reasons for continued use when indicated.

8. The Sheriff's Department's Suicide Prevention policy and procedure will be revised to align with Adult Correctional Health policy regarding use of safety smocks.

9. Staff compliance with safety smock policies to prevent overuse and/or unnecessary use of safety smocks will be subject to a documented quality assurance process for at least 12 months from the date of this Memorandum of Agreement, with quality assurance review at the monthly Suicide Prevention Subcommittee meetings.

a. Health care and custody supervisors will conduct at least weekly reviews of safety smock use to ensure proper implementation, with corrective action taken when warranted.

b. The Mental Health and Suicide Prevention Subject Matter Experts will monitor safety smock policy implementation and the quality assurance process to ensure compliance with relevant Consent Decree requirements.

**Patient Confidentiality for Suicide Risk Assessments, Mental Health Clinical Encounters (Focus Area #3)**

10. The County has fixed the inoperable telephone inside the designated mental health Interview Room in the Main Jail's intake area, and will take additional steps to improve confidentiality in the Main Jail intake screening area to the greatest extent possible given the deficient physical plant. The Subject Matter Experts will review and assess these modifications on future monitoring visits.

11. As an interim measure to mitigate physical plant deficiencies impacting delivery of care, the County is utilizing two confidential attorney visit booths on the Main Jail's third floor, to improve confidentiality of mental health appointments. These interim measures, along with other measures to address deficiencies in the confidentiality of mental health contacts, will be reviewed by the Subject Matter Experts during on-site monitoring.

12. As an interim measure to mitigate physical plant deficiencies impacting delivery of care, the County will relocate (i) staff currently using Main Jail office space and (ii) storage space to a nearby off-site location, to free up rooms and the Main Jail 3-West classroom that has been used as office space. These spaces will be repurposed for confidential individual treatment and group therapy for people in the Intensive Outpatient Program or otherwise requiring mental health treatment. The Subject Matter Experts will assess the adequacy of these spaces during upcoming monitoring visits.

13. The County acknowledges that above-identified interim steps will not be sufficient to facilitate full remediation of the legal and constitutional deficiencies identified in the *Mays* case and addressed in the Consent Decree. Issues regarding provision of patient confidentiality for suicide risk assessments and mental health

clinical contacts will be addressed through continued Dispute Resolution processes related to physical plant and staffing deficiencies, as set forth on Pages 10-13, below.

**Direct Observation of Class Members on Suicide Precautions (Focus Area #4)**

14. On November 15, 2021, ACH ordered an end to use of Closed-Circuit TV (CCTV) for purposes of observing class members on suicide precautions. The Mental Health Medical Director followed up with all psychiatry staff.

15. Adult Correctional Health, with input from the Subject Matter Experts and Class Counsel, finalized Policy No. 02-05 – Suicide Prevention Program on November 16, 2021, which removes CCTV observation and provides for direct observation consistent with Consent Decree requirements.

16. The Subject Matter Experts will evaluate implementation of suicide precaution observation practices during upcoming monitoring visits.

**Appropriate Provision of Privileges and Property for Class Members on Suicide Precautions (Focus Area #5)**

17. Adult Correctional Health shall, with input from the Subject Matter Experts and Class Counsel, finalized revisions to its suicide prevention policies to reflect Remedial Plan requirements regarding privileges and property for patients on suicide precautions. The Sheriff's Office's Suicide Prevention policy and procedure will be revised to align with Adult Correctional Health policy regarding privileges and property for patients on suicide precautions. These policies specifically shall provide:

a. Mental health staff shall have primary responsibility to determine, based on clinical judgment and on a case-by-case basis and in consultation with custody staff, the provision of: • Routine privileges (e.g., visits, telephone calls, recreation) that are otherwise permitted based on a person's classification security level • Clothing and possessions (e.g., books, slippers/sandals, eyeglasses) that are otherwise permitted based on a person's classification security level

b. Patients placed on suicide precautions shall be re-evaluated at least daily to assess clinical readiness for personal and jail-issued possessions, clothing, and privileges.

c. Placement on suicide precautions shall not preclude patients from receiving timely and regular access to (i) meals, (ii) liquids, (iii) prescribed medication, (iv) toilets, and (v) showers.

d. The County shall ensure full implementation of the requirements as set forth in Paragraph 6, above.

e. Class members on suicide precautions shall be allowed to attend scheduled court proceedings unless the clinician, based upon clinical judgment and in consultation with security staff, determines that transportation to court would adversely impact the individual's condition.

f. The removal of property and/or privileges shall be documented with clinical justification in the patient's medical/mental health record and reviewed on a regular

basis. Cancellation of privileges should be avoided whenever possible and utilized only as a last resort.

g. Cell window coverings shall not be used on cells holding any class member on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need, consistent with Remedial Plan Section VII.J. i. Placement of a patient in an opposite gender area (e.g., male placed in suicide precautions cell in female intake area) does not constitute a "security need" for purposes of this remedial provision.

h. The County will provide tear-resistant mattresses for all patients at the acute level of mental health care, in the SITHU, or on suicide precautions for more than four hours (and consistent with Remedial Plan Section VII.O.1).

18. *Staff compliance with the protocols set forth above will be subject to a documented quality assurance process for at least 12 months from the date of this Memorandum of Agreement, with quality assurance review at the monthly Suicide Prevention Subcommittee meeting* (emphasis added).

a. ACH, mental health, and custody supervisors will conduct at least weekly reviews to ensure proper implementation, with corrective action taken when warranted.

b. The Mental Health and Suicide Prevention Subject Matter experts will monitor policy implementation and the quality assurance process to ensure compliance with relevant Consent Decree requirements.

Given the enormity of responsibility to implement and sustain approximately 63 suicide prevention provisions of this *Consent Decree's* Remedial Plan, this expert had previously recommended that the Suicide Prevention Subcommittee meet on a monthly basis (not quarterly as previously practiced) and better focus on ensuring that all suicide prevention provisions of the Remedial Plan are implemented and sustained. The Defendants agreed, and began holding monthly Suicide Prevention Subcommittee meetings in November 2021. As noted in the above detailed Memorandum of Agreement, the Suicide Prevention Subcommittee now has the specific quality assurance responsibility to ensure "staff compliance" with the suicide prevention provisions of the Remedial Plan, "for at least 12 months from the date of this Memorandum of Agreement," including the five focus areas offered above.

Because the Memorandum of Agreement (MOA) was executed on May 27, 2022 which followed this expert's on-site assessment of February 21-23, 2022, the "critical remedial provisions" contained in the MOA will be further scrutinized during the next on-site assessment.

# CONSENT DECREE/REMEDIAL PLAN

## VII. <u>SUICIDE PREVENTION</u>

| Provision A) Substantive Provisions | 1. The County recognizes that comprehensive review and restructuring of its suicide assessment, monitoring, and prevention practices are necessary to address the risk of suicide and self-harm attendant to detention in a jail setting.<br><br>2. The County shall establish, in consultation with Plaintiffs' counsel, a new Suicide Prevention Policy that shall be in accordance with the following: | |
|---|---|---|
| Status | Partial Compliance | |
| Discussion | This provision is interpreted as a "catch-all" provision for all suicide prevention-related provisions, therefore, this provision cannot come into substantial compliance until all of the provisions under Suicide Prevention come into substantial compliance.<br><br>The Sacramento County Sheriff's Office (SCSO), Adult Correctional Health (ACH), and the University of California – Davis, Department of Psychiatry and Behavioral Sciences (referred here as "Adult Correctional Mental Health-ACMH") previously each had varying suicide prevention policies. Pursuant to the requirements of the Consent Decree, these policies were in need of varying degrees of revision.<br><br>To date, and at the recommendation of this expert, ACH and ACMH have combined their respective suicide prevention policies into a joint policy entitled "ACH PP 02-05 Suicide Prevention Program" policy that was approved and became effective on November 16, 2021. In addition, several other suicide prevention-related policies were also developed during the review period, including the "ACH 01-15: Suicide Prevention Subcommittee" policy that was approved and effective on September 17, 2021; the "MH-04-09: Acute Psychiatric Unit - Admission, Program, and Discharge" policy that was approved and effective on May 6, 2022; and the "ACH 04-07: Acute Psychiatric Unit – Precautions and Observations" policy that was approved and effective on June 22, 2022.<br><br>The SCSO provided this expert with a draft "Suicide Prevention and Intervention" policy (No. 722) during the February 2022 on-site assessment. On March 4, 2022, this expert provided extensive edits to the draft policy based upon the requirement to ensure the policy is consistent with the ACH PP 02-05 Suicide Prevention Program policy, as well as *Consent Decree* requirements. | |

|  | Sacramento County's response to this provision, as contained in the *Fifth* Status Report (June 16, 2022), was that "The Sheriff's Office is in the process of revising all of its policies. They will be working with Lexipol to accomplish this. They have indicated that all of the orders related to the Consent Decree will be their priority. We have identified a list of policies we would like them to start on. The Suicide Prevention policy was sent to plaintiff's counsel and we have received feedback and currently reviewing. We should be sending another draft copy to plaintiff's counsel and MH SMEs for review by July 2022." To date, a revised draft policy has not been received.<br><br>In conclusion, because the County's suicide prevention policy has not been finalized, as well as the fact that all suicide prevention-related provisions are in varying degrees of compliance, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | SCSO should finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>Review of the following suicide prevention-related policies: ACH No. 02-05, Suicide Prevention Program policy, effective November 2021; MH-04-09: Acute Psychiatric Unit - Admission, Program, and Discharge policy, effective May 6, 2022; ACH 01-15: Suicide Prevention Subcommittee" policy, effective on September 17, 2021; ACH 04-07: Acute Psychiatric Unit – Precautions and Observations policy, effective June 22, 2022; and SCSO "Suicide Prevention and Intervention" policy (No. 722), last revised February 2022, pending. |

| **Provision B) 1. Training** | **1. The County shall develop, in consultation with Plaintiffs' counsel, a four- to eight-hour pre-service suicide prevention curriculum for new Jail employees (including custody, medical, and mental health staff), to be conducted in person in a classroom or virtual classroom setting, that includes the following topics:**<br><br>**a) avoiding obstacles (negative attitudes) to suicide prevention;**<br>**b) prisoner suicide research;**<br>**c) why facility environments are conducive to suicidal behavior;**<br>**d) identifying suicide risk despite the denial of risk;**<br>**e) potential predisposing factors to suicide;**<br>**f) high-risk suicide periods;**<br>**g) warning signs and symptoms;**<br>**h) components of the jail suicide prevention program**<br>**i) liability issues associated with prisoner suicide;**<br>**j) crisis intervention.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | The history regarding compliance with this provision has been both frustrating and unnecessarily prolonged. As initially reported in the *First* Monitoring | |

Report in January 2021, despite the fact that this expert's *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities* was offered as the resource guide in the development of the required pre-service training requirement for this provision, and contained all of the topics required for this provision, both the SCSO and the University of California – Davis, Department of Psychiatry and Behavioral Sciences (hereafter referred to as "UC-Davis") decided to initially develop their own separate pre-service curricula on suicide prevention.

The SCSO initially developed a training curriculum entitled "19.6 Behavioral Health: Suicide Prevention Lesson Plan" that was said to have been approved by the Board of State and Community Corrections (BSCC) as well as the Standards and Training for Corrections (STC). The curriculum, however, was not consistent with the specific requirements of this *Consent Decree* and required extensive editing by this expert. It was again suggested that the *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities* be utilized. In addition, the process was further delayed when UC-Davis advocated for asynchronous (non-classroom, e-learning format) training despite specific language in the provision that required training was "to be conducted in person in a classroom or virtual classroom setting." Eight months later in August 2021, this expert was informed that a 10-member training subcommittee of the Suicide Prevention Subcommittee had been formed to develop the pre-service suicide prevention training curricula. The subcommittee would utilize this expert's aforementioned training curriculum as a resource guide. In addition, the SCSO ultimately decided to utilize the pre-service curriculum to be developed by the Suicide Prevention Subcommittee. Finally, there was acknowledgment that, consistent with *Consent Decree* requirements, both the pre-service and the annual suicide prevention training would always be conducted "live" in person in a classroom or virtual classroom setting.

Beginning in December 2021, this expert began reviewing drafts of a four-hour pre-service suicide prevention curriculum entitled "Suicide Prevention and Detection in Jail." The curriculum was initially developed as a 220-slide PowerPoint presentation, but with subsequent revisions based upon this expert's edits, the curriculum was reduced to a 185-slide PowerPoint presentation. The pre-service curriculum was finalized and approved on February 7, 2022.

According to Sacramento County's *Fifth* Status Report (June 16, 2022), "New employees will receive the 4-hour suicide prevention training after May 22, 2022." The ACH response within the same report indicated that "The 4-hour suicide prevention training for new employees was approved by Class Counsel and Suicide Prevention Expert in February 2022. MH staff worked with custody and medical staff to prepare for the training. The first training was conducted on June 2, 2022."

| | |
|---|---|
| | In conclusion, the pre-service suicide prevention curriculum was finally developed and became active in June 2022. According to SSO, 24 new employees have been trained. Although this provision remains in Partial Compliance, it is anticipated that, when the County provides documentation indicating over a period of least 12 months that 90 percent or more of new custody, medical, and mental health personnel have the completed pre-service suicide prevention training program, this provision will be moved to Substantial Compliance. |
| **Recommendations** | On an on-going basis, provide documentation of all new custody, medical, and mental health personnel who have regular contact with inmates that have been hired since June 2022, and the number of these employees who have completed the pre-service suicide prevention training program. Percentages should be provided for each discipline. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>"Suicide Prevention and Detection in Jail," four-hour, 185-slide PowerPoint presentation, effective February 7, 2022. |

| | |
|---|---|
| **Provision B) 2. Training** | **The County shall develop, in consultation with Plaintiffs' counsel, a two-hour annual suicide prevention curriculum for all custody, medical, and mental health staff, to be conducted in person in a classroom or virtual classroom setting, that includes:**<br><br>**a) review of topics (a)-(j) above**<br>**b) review of any changes to the jail suicide prevention program**<br>**c) discussion of recent jail suicides or attempts** |
| **Status** | **Partial Compliance** | |
| **Discussion** | See full discussion above in **Provision B) 1. Training**.<br><br>Beginning in June 2021, UC-Davis began to develop a two-hour annual suicide prevention curriculum based upon this expert's *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities*. This expert reviewed various draft versions of the curriculum, entitled "Suicide Prevention: An Overview," in June, October and November 2021. The two-hour "Suicide Prevention: An Overview," 70-slide PowerPoint presentation, was finalized and approved on January 21, 2022.<br><br>According to Sacramento County's *Fifth* Status Report (June 16, 2022), "All current employees are in the process of receiving the newly created to our suicide prevention training developed in collaboration with the mental health SMEs." The ACH response within the same report indicated that "MH is offering a 2-hour suicide prevention training to medical and custody staff in December 2021." |

| | |
|---|---|
| | Available training data indicated that approximately 79 percent (242 of 307) of custody staff, 67 percent (131 of 196) of medical staff, and 83 percent (73 of 88) of mental health staff had received the two-hour suicide prevention training as of June 30, 2022. This provision remains in Partial Compliance. |
| **Recommendations** | *Twice a year in January and June, provide updated data on the total number of current employees for each discipline (i.e., denominator), and the total of current employees (i.e., numerator) who received the two-hour suicide prevention training by discipline* (emphasize added). |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>"Suicide Prevention: An Overview," two-hour, 70-slide PowerPoint presentation, effective January 21, 2022.<br>Combined training data as of June 30, 2022. |

| **Provision B) 3. Training** | **Custody officers assigned to Designated Mental Health Units shall receive additional specialized training on suicide prevention and working with prisoners with serious mental illness.** |
|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Similar to previous reports, Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was "IOP and JBCT Deputies receive 24 hours of advanced CIT training. IOP/JBCT Deputies also attend training with the department's Critical Incident Negotiations Team (CINT) to learn how to deal with persons with a mental illness. IOP/JBCT Deputies will also attend a custody-based negotiations class facilitated by the FBI."<br><br>As stated in the *First Monitoring Report* and repeated here again, although the provision of CIT and CINT training to IOP/JBCT deputies fulfills a portion of this provision, it was unclear as to the percentage of custody personnel that were trained, as well as no indication whether deputies assigned to all Designated Mental Health Units [i.e., the Suicidal Inmate Temporary Housing Unit (SITHU), acute psychiatric unit, IOP, and JBCT] completed the training.<br><br>According to the most recent training data, all 15 officers currently assigned to the Designated Mental Health Units (SITHU, 2P-APU, IOP, and JBCT) have received Crisis Intervention Team training, but none of these current 15 officers have received the Critical Incident Negotiations Team training. As such, this provision remains in Partial Compliance. |
| **Recommendations** | In the future, any training compliance data for custody personnel should always include: a) the number of current custody personnel assigned to the Designated Mental Health Housing Units (the denominator), and b) the number of current |

| | custody personnel receiving specialized suicide prevention and mental health training (the numerator). |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). Training data as of June 30, 2022. |

| **Provision B) 4. Training** | **All mental health staff, including nurses, clinicians, and psychiatrists, shall receive additional training on how to complete a comprehensive suicide risk assessment and how to develop a reasonable treatment plan that contains specific strategies for reducing future suicidal ideation.** |
|---|---|
| **Status** | **Substantial Compliance** |
| **Discussion** | This expert previously reviewed the 103-slide PowerPoint presentation entitled "Suicide Assessment in Jail" that was developed for UC-Davis by Joseph Obegi, PsyD. The curriculum was very comprehensive, and included instruction on safety planning. |
| | Sacramento County's response to this provision, as authored by ACH in the *Fifth* Status Report (June 16, 2022), was: "The Suicide Risk Assessment training was approved by the SME and staff are being trained." According to training data from June 2022, 99 percent (67 of 68) of mental health clinicians received suicide risk assessment (SRA) and safety planning training. According to UC-Davis, approximately 20 administrative staff, hospital unit service coordinators (clerks), LVNs and MAs are not required to receive the SRA training because they do not have regular contact with inmates and/or not responsible for the completion of suicide risk assessments. This provision is moved to Substantial Compliance. |
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). 103-slide PowerPoint presentation entitled "Suicide Assessment in Jail." Training data, June 2022. |

| Provision B)<br>5. Training | All mental health staff and custody officers shall be trained on the appropriate use of safety suits, i.e., not to be utilized as a default, not to be used as a tool in behavior management, not to be utilized for patients being observed at 30-minute observations. | |
|---|---|---|
| Status | Partial Compliance | |
| Discussion | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from a previous status report and stated "This will be outlined in the revised Suicide Prevention Operations Order. Safety suits are used at the discretion of JPS based on collaboration with custody staff and not as a behavior management tool."<br><br>In addition, ACMH previously developed an 18-slide PowerPoint presentation entitled "Suicide Precautions: Observation, Housing, Clothing, Item Restriction, and/or Privilege Restrictions." To date, although ACMH reported that 31 of 33 mental health staff received this training, but remained unclear how many custody personnel have received this training. In addition, as previously indicated, the SCSO suicide prevention policy has not been finalized.<br><br>Finally, as described later in this report, this expert observed inmates on suicide precautions, as well as reviewed medical charts of inmate-patients placed on suicide precautions. The review determined many inmates placed on suicide precautions and housed in safety cells (and ad seg and sobering cells) were clothed in safety smocks prior to assessment by mental health clinicians. This expert, however, did observe that inmates on suicide precautions in the SITHU appeared to only be clothed in safety smocks at the direction of mental health clinicians.<br><br>This provision remains in Partial Compliance because it was unclear how many custody personnel have received the an 18-slide PowerPoint presentation ("Suicide Precautions: Observation, Housing, Clothing, Item Restriction, and/or Privilege Restrictions") which includes the proper use of safety smocks, the SCSO suicide prevention policy has not yet been finalized, and there continues to be the default use of safety smocks, primarily in the booking area, without authorization by mental health clinicians. | |
| Recommendations | Similar to the recommendation above in **Provision B) 2. Training**, provide more recent data on the total number of current employees for each discipline (i.e., denominator), and the total of current employees (numerator) who received the 18-slide PowerPoint presentation ("Suicide Precautions: Observation, Housing, Clothing, Item Restriction, and/or Privilege Restrictions"). | |

| Evidentiary Basis | Sacramento County's *Fifth* Status Report (June 16, 2022). Medical chart review. On-site observation on February 21-23, 2022. "Suicide Precautions: Observation, Housing, Clothing, Item Restriction, and/or Privilege Restrictions," 18-slide PowerPoint presentation. |
|---|---|

| Provision B) 6. Training | The County shall ensure that all staff are trained in the new Suicide Prevention Policy. | |
|---|---|---|
| Status | Non-Compliance | |
| Discussion | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth Status Report* (June 16, 2022), was repeated from previous status reports and stated that "The policy is in the process of being updated. This area will be addressed in the revised version of the policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team, the Suicide Prevention Policy is currently in the approval process." <br><br> The County still has not yet finalized its suicide prevention policy, and all staff have not completed the annual suicide prevention training based, in part based on the ACH 02-05: Suicide Prevention Program policy, and no training data was provided. This provision remains in Non-Compliance. | |
| Recommendations | 1) Finalize the revised draft SCSO suicide prevention policy; provide the revised draft suicide prevention policy to expert for review. <br> 2) As recommended above in **Provision B) 2. Training**, provide more recent data on the total number of current employees for each discipline (i.e., denominator), and the total of current employees (numerator) who received training in both the ACH 02-05: Suicide Prevention Program policy and the SCSO Policy 722: Suicide Prevention by discipline. | |
| Evidentiary Basis | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention, draft pending. | |

| Provision C) 1. Nursing Intake Screening | Intake screening for suicide risk will take place at the booking screening and prior to a housing assignment. If clinically indicated, JPS will then perform an additional clinical assessment after the inmate is placed in a housing assignment. | |
|---|---|---|
| Status | Non-Compliance | |
| Discussion | Sacramento County's response to this provision, as authored by ACH in the *Fifth* Status Report (June 16, 2022), stated "Staff made significant revisions to the Nurse Intake policy inform based on feedback from all experts. The revised nurse intake form was implemented in November 2021…. Staff are developing | |

|  | training for intake nurses on screening for mental health issues, suicide risk assessment screening, danger-to-self or others and grave disability and referral process for emergent MH evaluations. Training implementation estimated for June 2022." |
|---|---|
|  | In addition, this expert observed the intake screening process on February 22, 2022. The screening of three newly admitted inmates was observed. Two nurses were assigned to the booking area at the time of the observation. In each of the three cases, *both nurses inexplicably neglected to ask Questions 2, 3, 6, and 7 in the suicide risk inquiry section of the Nurse Intake Encounter form. In addition, both nurses did not review the electronic health record (EHR) to answer Question 8.* The areas of inquiry not addressed by both nurses were:<br><br>2) Have you recently experienced a significant loss (relationship, death of family member/close friend, job, etc.)?<br>3) Has a family member/close friend ever attempted or committed suicide?<br>6) Do you feel there is nothing to look forward to in the immediate future (expressing helplessness and/or hopelessness)?<br>7) Do you have an upcoming court hearing that you are particularly concerned about?<br>8) After reviewing the active and inactive problem list, was the inmate a suicide risk or receiving mental health services during any prior confinement in this facility (i.e., on suicide precautions, attempted suicide, 2P Pre-Admit, FOSS level indicated, etc.)?<br><br>*Subsequent review of the medical charts for these three inmates found that the nurses marked "No" to each of these five questions, a serious violation of policy and falsification of records.*<br><br>In addition, a separate review of medical charts by this expert during the current monitoring period found that mental health clinicians consistently completed a suicide risk assessment (SRA) for those inmates referred from intake nurses.<br><br>In conclusion, based upon the finding that observed intake nurses were not asking all of the required questions in the suicide risk inquiry section of the Nurse Intake Encounter form, as well as falsely documenting in the EHR that they had asked those questions and reviewed the chart regarding an inmate's previous problem list, this provision is moved to Non-Compliance. |
| **Recommendations** | 1) In addition to nursing training in this area, ACH nursing supervisors should audit the intake screening process to ensure that nursing personnel are accurately completing the suicide risk inquiry section of the Nurse Intake Encounter form.<br>2) Audit results and appropriate corrective action that results from on-going deficiencies should be forwarded to the expert. |

| Evidentiary Basis | Sacramento County's *Fifth* Status Report (June 16, 2022). Revised suicide risk inquiry section to Nurse Intake Encounter form, November 2021. On-site observation at Main Jail on February 22, 2022. |
|---|---|

| **Provision C)** 2. Nursing Intake Screening | **All nursing intake screening shall be conducted in an area that provides reasonable sound privacy and confidentiality. If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.** |
|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | ACH 05-05: Nurse Intake policy, effective October 28, 2021, addresses confidentiality during the intake screening process as follows: "a. Nurse Intake will be conducted in an area that ensures confidentiality of communications between the nurse and patient. <u>Exception</u>: If there is an individualized determination of safety risk, custody staff are positioned to allow visual observation but sound privacy is maintained. b. The nurse will document whether the encounter was confidential and, if not, the reason it was not and whether efforts were made to maintain privacy." Despite this policy, this expert's observation of the intake screening process by nursing staff in the Main Jail on February 22, 2022 remained unchanged from previous monitoring assessments. Two nurses were observed to be stationed in the small nurse's office at one time (there were three desks), separated only by small partitions. Therefore, detainees were only separated from each other by a few feet. In addition, each detainee was accompanied by at least one arresting officer who was stationed within arms' length of the detainee. Due to the occurrence of multiple intake screenings at the same time, involving multiple nurses, detainees, and arresting officers, confidentiality was severely compromised. In addition, due to its small size, the Nurse's Office was loud and chaotic at times, with arresting officers socializing with each other, as well as with other medical personnel. Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Fifth* Status Report (June 22, 2022), was omitted. However, the recent joint Memorandum of Agreement filed on June 3, 2022 does acknowledge that the County did not have a remediation plan for certain "jail physical plant deficiencies" (at page 3), including the provision of reasonable sound privacy and confidentiality during the intake screening process. Two pending assessment reports (i.e., Facilities Report and Jail |

|  | Population Report) will hopefully provide the County with some direction on how to remedy this problem.<br><br>In conclusion, the intake screening process in the booking area of the Main Jail remains dysfunctional and very problematic. As such, this provision remains in Non-Compliance. |
|---|---|
| **Recommendations** | As previously offered, the County must explore options to better ensure reasonable sound privacy in the booking area when multiple nurses are conducting intake screening at the same time period. One option would be installation of multiple interview booths similar in design to the current "ACMH Interview Room" located in the booking area. |
| **Evidentiary Basis** | ACH 05-05: Nurse Intake policy, October 28, 2021, final.<br>On-site assessment of Main Jail on February 22, 2022. |

| **Provision C)<br>3. Nursing Intake Screening** | **The County shall revise its nursing intake assessment procedures and screening forms to ensure timely identification of acute and high-risk mental health conditions, consistent with the recommendations made by Lindsay Hayes. Intake screening, as documented on screening forms, shall include:**<br><br>**a) Review of suicide risk notifications in relevant medical, mental health, and custody records, including as to prior suicide attempts, self-harm, and/or mental health needs;**<br>**b) Any prior suicidal ideation or attempts, self-harm, mental health treatment, or hospitalization;**<br>**c) Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;**<br>**d) Other relevant suicide risk factors, such as:**<br>    **i. Recent significant loss (job, relationship, death of family member/close friend);**<br>    **ii. History of suicidal behavior by family member/close friend;**<br>    **iii. Upcoming court appearances;**<br>**e) Transporting officer's impressions about risk.** |
|---|---|
| **Status** | **Substantial Compliance** |
| **Discussion** | This expert had previously reviewed and made extensive comments to the "suicide risk inquiry" section of the "Nurse Intake Encounter" form (which is embedded within "athenaPractice," the jail system's electronic medical record) and utilized by nursing staff at booking. The comments included deleting options for "routine" mental health referrals and inserting options for "urgent" and "emergent" referrals to mental health clinicians based upon responses to questions, as well as restructuring certain suicide risk inquiry questions. The |

revised form was implemented in November 2021 and now includes the following suicide risk inquiry:

1) Have you ever considered suicide?
2) Have you recently experienced a significant loss (relationship, death of family member/close friend, job, etc.)?
3) Has a family member/close friend ever attempted or committed suicide?
4) Are you now or have you ever received either outpatient or inpatient mental health treatment?
5) Have you ever attempted suicide or engaged in self-harm behavior?
6) Do you feel there is nothing to look forward to in the immediate future (expressing helplessness and/or hopelessness)?
7) Do you have an upcoming court hearing that you are particularly concerned about?
8) After reviewing the active and inactive problem list, was the inmate a suicide risk or receiving mental health services during any prior confinement in this facility (i.e., on suicide precautions, attempted suicide, 2P Pre-Admit, FOSS level indicated, etc.)?
9) Are you thinking about hurting and/or killing yourself?

Affirmative responses to Questions 1 through 8 require an Urgent mental health referral; whereas an affirmative response to Question 9 require an Emergent MH referral. As noted in the instructions section of the form: "'Yes' responses to multiple questions in the Suicide Risk Inquiry require an Emergent MH referral if behavior was within the previous 30 days, i.e., suicide attempt in the past 30 days AND has nothing to look forward to. Refusal to respond to questions required requires an urgent MH referral."

The revised "suicide risk inquiry" section of the Nursing Intake Encounter form at booking is an excellent achievement. This provision is moved to Substantial Compliance.

| | |
|---|---|
| **Recommendations** | None |
| **Evidentiary Basis** | Revised suicide risk inquiry section to Nurse Intake Encounter form, November 2021. |
| | |
| **Provision C) 4. Nursing Intake Screening** | **Regardless of the prisoner's behavior or answers given during intake screening, a mental health referral shall always be initiated if there is a documented history related to suicide or self-harm, including during a prior incarceration.** |
| **Status** | **Non-Compliance** | |

| | |
|---|---|
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Fifth* Status Report (June 16, 2022), was omitted.<br><br>As noted in the *First Monitoring Report*, the Problem List embedded within athenaPractice allows for the storage of information regarding an inmate's current and prior medical and mental health history. The Problem List had both an active (highlighted) and inactive view (shaded). Review of various multiple charts indicated that many inmates had both active and inactive mental health problems, including notations for Frequency of Service Scale (FOSS), serious mental illness, suicide attempt, 2P pre-admit, etc. Of note, the designation for "2P pre-admit" was an indication that the inmate had been placed on suicide precautions and was awaiting placement in the 2P-Acute Psychiatric Unit. As noted in the provision above (C) 3., there is a requirement for nursing staff to complete "Review of suicide risk notifications in relevant medical, mental health, and custody records, including as to prior suicide attempts, self-harm, and/or mental health needs."<br><br>As indicated in the previous provision above, nurses who conduct intake screening are required to answer Question 8 of the suicide risk inquiry section by reviewing the EHR of each newly admitted detainee to determine if they had previously been confined in the Sacramento County jail system and, if they had, review the active and inactive Problem List, and determine if the inmate was "a suicide risk or receiving mental health services during any prior confinement in this facility (i.e., on suicide precautions, attempted suicide, 2P Pre-Admit, FOSS level indicated, etc.)? The answer to Question 8 comes from the EHR, not the inmate.<br><br>As noted above, this expert's observation of the intake screening process on February 22, 2022, found that the two nurses were <u>not</u> accessing the medical charts of the three newly admitted detainees to determine if they had previously been confined in the Sacramento County jail system and had prior histories of suicide risk and/or mental health services during prior confinement.<br><br>In addition, this expert subsequently reviewed the medical charts of six (6) inmates who were randomly found to have prior histories of being placed on suicide precautions (i.e., the "2P-Pre-Admit" list) and required to be referred to mental health staff upon reentry into the jail system. The review found that only one of the six cases (or 17 percent) had an affirmative response to Question 8 that resulted in a mental health referral. In the remaining five cases, despite documentation in the medical charts that each inmate had previously been placed on suicide precautions and the 2P-Pre-Admit list, nursing staff indicated "No" to Question 8 and the detainees were not referred to mental health staff.<br><br>In one case (<u>Case No. 1</u>), the inmate was booked into the Main Jail on February 10, 2022. Despite the fact that his medical chart indicated he had been placed on suicide precautions (and 2P-Pre-Admit list) in April 2019, the intake |

| | |
|---|---|
| | screening form was marked "No" to Question 8 by a nurse. The inmate was not referred to mental health and was not seen by a clinician until 12 days later when he threatened suicide on February 22, 2022 and was assessed by a clinician during daily rounds observed by the expert.<br><br>This provision is moved to Non-Compliance because, based upon observation of the intake screening process and medical chart review, nursing staff are deliberately ignoring the requirement of Question 8 in the suicide risk inquiry section of the Nurse Intake Encounter form to review the applicable medical chart of newly admitted detainees. |
| **Recommendations** | In addition to nursing training in this area, ACH nursing supervisors should audit the intake screening process and audit medical charts to ensure that nursing personnel are accurately completing the suicide risk inquiry section of the Nurse Intake Encounter form. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>Revised suicide risk inquiry section to Nurse Intake Encounter form, November 2021.<br>ACH 05-05: Nurse Intake policy, October 28, 2021, final.<br>Medical chart review. |

| **Provision C)**<br>**5. Nursing Intake**<br>**Screening** | **The County shall develop and implement a written policy and procedure for referrals to mental health by intake staff. The policy shall correspond with the triage system and timeframes set forth in the Mental Health Remedial Plan.** |
|---|---|
| **Status** | **Substantial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACMH in the *Fifth* Status Report (June 16ly 7, 2021), was omitted.<br><br>Review of two ACH policies (ACH 05-05: Nurse Intake, October 28, 2021, and MH-01-10: Access to Mental Health Services, August 6, 2021) indicated that they were consistent with this provision. The MH-01-10: Access to Mental Health Services policy specifies that Emergent mental health referrals are required to be responded to "ASAP – within 6 hours," Urgent mental health referrals are required to be responded to "within 36 hours," and Routine mental health referrals are required to be responded to "within two weeks." The stated response times are consistent with Consent Decree requirements.<br><br>In conclusion, because this provision requires creation of policies and procedures regarding timely mental health referrals from intake screening for inmates identified as possibly in need of mental health services (excluding suicide prevention), and this expert believes that ACH 05-05: Nurse Intake, October 28, 2021, and MH-01-10: Access to Mental Health Services adequately address this provision, August 6, 2021) are consistent with the |

| | |
|---|---|
| | requirements of this provision, this provision is moved to Substantial Compliance. However, because this provision is exclusive to inmates in need of mental health services excluding suicide prevention, this expert would defer to the mental health expert in this Consent Decree for any contrary assessment. |
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 05-05: Nurse Intake, October 28, 2021, final. MH-01-10: Access to Mental Health Services, August 6, 2021, final. |


| **Provision C) 6. Nursing Intake Screening** | **Any prisoner expressing current suicidal ideation and/or current suicidal/self-injurious behavior shall be designated as an emergent referral and immediately referred to mental health staff.** | |
|---|---|---|
| **Status** | **Substantial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Fifth* Status Report (June 16, 2022), was omitted. | |
| | In the *Second Monitoring Report*, this expert recommended that 1) The following language should be added to the policy and procedure for mental health referrals by intake staff that is required by Provision (C) 5. above: "a detainee identified at intake (for any time during confinement) as a possible current risk for suicide should be seen by a JPS clinician on an emergent basis, i.e., immediately or within six (6) hours, as well as under constant observation until assessment; whereas a detainee identified at intake with a prior history of suicidal behavior should be seen by a JPS clinician on an urgent basis, i.e., within 36 hours." | |
| | Review of two ACH policies (ACH 05-05: Nurse Intake, October 28, 2021, and MH-01-10: Access to Mental Health Services, August 6, 2021) indicated that they were consistent with this provision. In fact, the MH-01-10: Access to Mental Health Services policy specifically place this reviewer's recommended narrative into the policy as follows: "A patient identified at intake (or any time during confinement) as a possible current risk for suicide should be seen by a mental health clinician on an emergent basis, as well as under constant observation until assessment; whereas a patient identified at intake with a prior history of suicidal behavior will be seen by a MH clinician on an urgent basis." The ACH 05-05: Nurse Intake policy requires that: "Patients presenting with acute crises such as current suicidal and/or homicidal ideation, acute psychiatric symptoms, posing a danger to self or a danger to others or gravely disabled will prompt an emergent referral to MH and will be seen within 6 hours. Call the MH office at 916-***-**** and document the call. Notify custody and request appropriate housing and constant observation until assessed by a MH clinician." | |

| | |
|---|---|
| | Review of various medical charts during the current monitoring period found that mental health clinicians consistently responded to emergent mental health referrals from intake for inmates currently at risk for suicide on a timely basis. Of note, mental health clinicians are assigned to the Main Jail 24 hours a day.<br><br>In conclusion, because this provision requires creation of policies and procedures regarding timely mental health referrals from intake screening for inmates identified as currently at risk for suicide, the MH-01-10: Access to Mental Health Services policy was revised consistent with this expert's previous recommendation, and medical chart review found that clinicians consistently responded to mental health referrals from intake for inmates currently at risk for suicide on a timely basis, this provision is moved to Substantial Compliance. |
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 05-05: Nurse Intake, October 28, 2021, final.<br>MH-01-10: Access to Mental Health Services, August 6, 2021, final.<br>Medical chart review. |

| | |
|---|---|
| **Provision D) 1. Post-Intake Mental Health Assessment Procedures** | **All mental health assessments shall be conducted in an area that provides reasonable sound privacy and confidentiality. If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.** |
| **Status** | **Partial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from a prior status report as follows: "This is currently being done at RCCC. The interviews are taking place in the area where the officers stand back to give them privacy. The doors were switched out so they can be closed. They have windows so the officer can stand outside and see what is taking place in the room. ACMH recently purchased machines that make white noise to help make it more difficult to hear the assessment. If there is a safety concern, the assessments are conducted in an attorney room so there is barrier between ACMH staff and the inmate. At the Main Jail, inmate privacy is a priority. When ACMH assessments are conducted we offer the maximum level of privacy afforded given case-by-case safety risk. At the Main Jail, a private attorney booth has been converted to be utilized as a confidential interview room for mental health assessments." The ACH response to this provision simply stated: "MH clinicians document whether assessments are confidential or non-confidential including rationale, if indicated." |

Mental health clinicians assigned to the Main Jail utilized various options for their interaction with patients on suicide precautions: 1) a converted attorney booth in booking referred to as the ACMH Interview Room, 2) classrooms on each housing floor (including 300-West Pod that houses the SITHU), 3) the outside control area of 300-West Pod in close proximity to the officer's desk, 4) the SITHU dayroom area, and 5) cell front of the booking cells (safety, ad, seg, or sobering). Cell front, as well as the outside control area of 300-West Pod and the SITHU dayroom area are non-confidential because they are in close proximity to both officers and other inmates. The expert was also informed during the February 2022 on-site assessment, but did not observe, that the visiting booths in 300-West Pod were also available for clinical contacts by mental health clinicians.

During the on-site assessment from February 21-23, 2022, the expert shadowed several mental health clinicians as they were conducting daily assessments of the inmates identified as suicidal. During the three-day period, 21 such assessments were observed. Of those observed assessments, 76 percent (16 of 21) were conducted in either the ACMH Interview Room or in housing unit classrooms, with only 24 percent (5 of 21) of the assessments conducted cell front.  This was a significant improvement from observations reported in prior monitoring reports wherein the ACMH Interview Room had been inoperable for a considerable period of time.

However, the expert also reviewed the medical charts of 10 inmates who were on suicide precautions for a multiple-day period before, during, and after the most recent on-site assessment. The review period spanned between approximately February 17 through March 1, 2022, with inmates housed in either the booking area (in safety, ad seg, or sobering cells) or the SITHU. The medical chart review indicated that mental health clinicians interacted with inmates in <u>both</u> confidential (either the ACMH Interview Room or 300-West Pod classroom) and non-confidential (cell front) settings. In fact, in 40 percent (4 of 10) cases, clinicians consistently met with inmates in the ACMH Interview Room and/or 300-West Pod classroom. In 60 percent (6 of 10 of the cases), clinicians met with inmates <u>both</u> at cell front and in confidential settings during their multiple-day placement on suicide precautions. *From this medical chart review, it was obvious that confidential settings were utilized more during the expert's on-site assessment, and non-confidential cell front interaction was utilized more when the expert was not on-site.*

The expert's interaction with various mental health clinicians, as well as observations during the on-site assessment, indicated that clinicians were often competing with themselves for access to the 300-West Pod classroom.

In addition, the expert observed provider rounds in the 2P-Acute Psychiatric Unit (APU) on February 22, 2022. Rounds included a psychiatrist, forensic

|  | psychiatric fellow, LCSW, and an officer. Because the unit does <u>not</u> have any confidential out-of-cell space, all contacts for the 16 patients in the APU that day were provided cell front. On a case-by-case basis depending upon the perceived stability of the patient, the cell door was opened and the provider or psychiatric fellow interacted with the patient in the doorway alongside an officer. Regardless of whether the cell doors were open or closed, <u>all</u> of these provider contacts were non-confidential.<br><br>In conclusion, although there was some improvement observed during the experts on site assessment, the on-going lack of privacy and confidentiality during the daily assessment of suicide risk continues to be an impediment to the County's ability to provide a reasonable suicide prevention program. Based upon current practices, including some improvement in the capacity to provide reasonable privacy during mental health clinicians' daily interaction with inmates on suicide precautions and coupled with profound physical plant obstacles with the Main Jail, this provision is moved to Partial Compliance. |
| **Recommendations** | 1) As previously recommended, unless exigent circumstances exist and are documented on a case-by-case basis, any inmate identified as suicidal should be given an opportunity for assessment outside of their cell. This includes initial assessments, daily on-going assessments, discharge assessments, and scheduled follow-up.<br>2) As previously recommended, additional designated room(s) or areas outside of the Main Jail's booking area, including additional space near 300-West Pod and space within the 2P-APU, that can provide privacy and confidentiality should be created and routinely utilized for the assessment of suicidal inmates. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>On-site observation on February 21-23, 2022.<br>Medical chart review. |


| **Provision D) 2. Post-Intake Mental Health Assessment Procedures** | **Mental health staff shall conduct assessments within the timeframes defined in the mental health referral triage system.** | |
| --- | --- | --- |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored ACH in the *Fifth* Status Report (June 16, 2022) simply stated: "MH assessments are conducted within the timeframes defined in the MH triage system."<br><br>As this provision is similar to **Provision C) 5. Nursing Intake Screening** above and does not specifically address suicidal inmates, the expert would defer to the mental health expert in this *Consent Decree* as to whether the MH-01-10: Access to Mental Health Services, policy, effective August 6, 2021, | |

|  | satisfies compliance with this provision. At this time, the provision remains in Partial Compliance. |
| --- | --- |
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). <br> MH-01-10: Access to Mental Health Services, August 6, 2021, final. |
|  |  |
| **Provision D) 3. Post-Intake Mental Health Assessment Procedures** | **The County shall revise its mental health assessment procedures and related forms to ensure identification of historical and current patient mental health and suicide risk information, consistent with the recommendations of the subject matter expert.** |
| **Status** | **Partial Compliance** |  |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Fifth* Status Report (June 16, 2022), was omitted. <br><br> As stated in previous monitoring reports, the ACMH Mental Health Assessment is embedded within athenaPractice and contains the following domains: Background and Legal Information, Personal History, Medical Information and Significant Health Issues, Substance Abuse History, Mental Health Treatment History, Medication Verification, Mental Status Examination, DSM-V Diagnoses, and Preliminary Treatment Plan. In addition, the ACMH Initial Psychiatric Evaluation is also embedded within athenaPractice and contains the following domains: Current Psychotropic Medication, Mental Status Examination, DSM-V Diagnoses, and brief Suicide Ideation inquiry. The current ACMH Suicide Risk Assessment template embedded within athenaPractice does contain adequate inquiry regarding prior and current suicide risk behavior. <br><br> The expert would defer to the mental health expert in this Consent Decree as to whether the MH-04-04: Outpatient Mental Health Services and Levels of Care policy, effective October 13, 2021, satisfies compliance with this provision. At this time, the provision remains in Partial Compliance. |
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). <br> ACMH Suicide Risk Assessment form. <br> MH-04-04: Outpatient Mental Health Services and Levels of Care, October 13, 2021, final. |

| Provision E) 1. Responses to Identification of Suicide Risk or Need for Higher Level of Care | **When a prisoner is identified as at risk for suicide and placed by custody staff in a safety cell, on suicide precautions, and/or in a safety suit, mental health staff shall be contacted immediately. A qualified mental health professional, or other appropriately trained medical staff in consultation with mental health staff, shall complete a confidential in-person suicide risk assessment as soon as possible, consistent with the "must-see" referral timeline.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored ACH in the *Fifth Status Report* (June 16, 2022) stated: "Staff instituted the 4-hour emergent timeframe for patients placed in safety cells (October 2021). MH is tracking compliance to determine barriers/challenges to meeting the 4-hour timeframe to care. A workflow was developed and training was provided to staff regarding the new timeline to care….Completed baseline study of MH compliance in meeting 4-hour timeline to care for patients in safety cells and presented findings at MH QI Subcommittee meeting. Results show that low staffing levels significantly impacted compliance." The SCSO response in the same report stated: "Current practice as outlined in our Suicide Prevention Operations Order updated in January 2020. In Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for mental health assessments." | |

Consistent with findings from the previous monitoring reports, and following a recent medical chart review, this expert determined that this provision was in various stages of compliance. Inmates identified as suicidal are often placed on suicide precautions in a safety cell and almost always clothed in a safety smock. Mental health clinicians are immediately notified and required to respond in a timely manner to complete a suicide risk assessment (SRA). According to the ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, "If the patient was placed in a safety cell prior to the assessment, the SRA shall be started within 4 hours of the incident. Note: Only referrals of patients placed in safety cells require a 4-hour timeframe. While other emergent referrals shall be consistent with the 6-hour timeframe."

As stated earlier in this report, mental health clinicians consistently responded to emergent mental health referrals for inmates currently at risk for suicide, although it was unclear from the record whether the response time was always within six (6) hours. Finally, as also reported throughout in this report, inmates identified as potentially suicidal are still not consistently provided reasonable privacy and confidentiality during the suicide risk assessment process.

On March 31, 2022, UC-Davis completed a "Four-hour Timeline to Care Analysis" based upon the number of inmates placed in a safety cell for danger to self in January through March 2022. The analysis found that 47 inmates were

| | |
|---|---|
| | placed in safety cells between January and March 2022 and only 19 (or 40 percent) were seen within four hours. Of the remaining 28 inmates, 23 (or 49 percent) were not seen within the timeline due to insufficient mental health staff, and 4 (9 percent) were not seen timely because they were under the influence of alcohol/drugs. One inmate was not seen due to a custody request. Author(s) of the analysis recommended: 1) continue to actively recruit to fill vacant positions, 2) repeat study for period April 2022 – June 2022 to identify trends and determine need for additional triage/crisis LCSW staff to meet emergent timelines to care, and 3) discuss custody's use of SITHU overflow beds and problem solve how to move patients from booking at time of emergent referral to SITHU overflow to avoid placement in safety cells.<br><br>UC-Davis should be commended for initiating this analysis. However, apart from the finding that a majority of the emergent contacts for inmates placed in safety cells did not occur within the 4-hour timeframe, this expert has concerns about the methodology. <u>First</u>, the SCSO provides monthly reports of booking cell (including safety, ad seg, and sobering cells) use. For March 2022, the SCSO reported 31 inmates placed in safety cells, whereas UC-Davis's analysis reported data on only 15 inmates in safety cells during March. In addition, the SCSO reported 63 (39 percent) inmates were placed in sobering cells, 58 (35 percent) inmates were placed in ad seg cells, and nine (5 percent) inmates placed in multiple booking cells.<br><br><u>Second</u>, according to the *Consent Decree*, the 6-hour time frame for mental health to respond to emergent referrals in Temporary Suicide Precautions Housing has been interpreted by the parties to include all booking cells, including safety cells, ad seg cells, and sobering cells. The UC-Davis analysis was limited to only safety cell data and did not include ad seg and sobering cells. This limitation was problematic because, according to March 2022 data from the SCSO, ad seg and sobering cells accounted for approximately 74 percent of the inmates that were placed in booking cells at the Main Jail.<br><br><u>Third</u>, it would have been noteworthy if, consistent with *Consent Decree* requirements, the UC-Davis study included an analysis as to the percentage of emergent referrals that were seen by mental health clinicians within a 6-hour timeframe.<br><br>In conclusion, because this provision requires timely assessments in private, confidential settings, and current findings indicate that inmates are not consistently seen on a timely emergency basis and consistently provided reasonable privacy and confidentiality during the assessment process, it remains in Partial Compliance. |
| **Recommendations** | 1) UC-Davis and/or the Suicide Prevention Subcommittee should continue to generate analyzes of the timely responses to emergent referrals for danger to self. The analysis should include all Temporary Suicide Precautions Housing |

| | |
|---|---|
| | (safety, ad seg, and sobering cells), as well as both 4-hour and 6-hour response timeframes.<br>2) UC-Davis should collaborate with the SCSO to receive accurate monthly data on booking cell usage. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>"Four-hour Timeline to Care Analysis," UC-Davis, March 31, 2022.<br>SCSO Booking Cell data, March 2022.<br>Medical chart review.<br>ACH 02-05: Suicide Prevention Program policy, November 16, 2021, final. |
| | |
| **Provision E)<br>2. Responses to Identification of Suicide Risk or Need for Higher Level of Care** | **Consistent with current RCCC policy, if there is no mental health staff on site at RCCC at the time that an emergent mental health need is identified, the prisoner shall be transported to the Main Jail for emergency evaluation within two hours of the initial report.** |
| **Status** | **Substantial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored ACH in the *Fifth* Status Report (June 16, 2022) stated: "MH implemented tele-visits for after-hours emergent referrals at RCCC to ensure timely access to care." The SCSO response in the same report stated again that: "Current practice. Development of procedures for use of suicide-resistant cells at RCCC to limit transport to only the most acute patients. Our goal is to work with Lindsay Hayes to create an additional four suicide-resistant cells where we can house inmates who fit this criteria."<br><br>According to the ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, "If a patient at RCCC requires an emergent referral and an assessment from an MH clinician, and MH staff are not currently present at the RCCC facility: a. The patient will be seen within 6 hours through a video visit that is completed by MH staff at the MJ. b. If the video visit cannot be initiated, the patient will be transported to the MJ within 2 hours for the emergent referral to be completed."<br><br>Prior medical chart review indicated that few inmates are identified as suicidal and in need of transport to the Main Jail. However, when it does occur, an inmate identified as suicidal at RCCC continues to be initially seen by a mental health clinician during regular business hours or tele-visit after-hours, and provided with an SRA. If the assessment indicates the need for further suicide precautions, the inmate is transported to the Main Jail. If a clinician is not available on-site or through tele-visit, the inmate is initially housed in the |

|  | Safety Cell or North Holding No. 2 Cell and then immediately transported to the Main Jail within two hours.<br><br>On February 23, 2022, this expert visited RCCC and conversed with several SCSO and UC-Davis leadership personnel. According to these officials, a previous proposal to designate eight (8) cells in the facility's IOP unit for inmates who become suicidal, but might not need acute in-patient level of care, had been put on hold because it was subsequently determined that these IOP cells would be better utilized for IOP patients who were not identified as suicidal. The expert was informed that this proposal might be brought up again in the future if it was determined that an increase in the number of identified suicidal inmates at RCCC necessitated the utilization of these suicide-resistant IOP cells. In addition, interview rooms were identified adjacent to the JBCT program that would be utilized for the private and confidential assessment of suicidal inmates.<br><br>In conclusion, because UC-Davis has implemented after-hours tele-visits at RCCC to ensure timely responses to emergent referrals, and the ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately addresses this issue, this provision is moved to Substantial Compliance. |
|---|---|
| **Recommendations** | This provision should be monitored by the continuous quality improvement process to ensure its sustained compliance, see **Provision R) 5. Quality Assurance and Quality Improvement**. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>Prior medical chart review.<br>Discussion with RCCC custody and UC-Davis leadership.<br>Inspection of RCCC.<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final. |


| **Provision E) 3. Responses to Identification of Suicide Risk or Need for Higher Level of Care Provision** | **The County shall revise its JPS suicide risk assessment procedures and forms in consultation with Plaintiffs. The County shall ensure that its JPS suicide risk assessment process, policies, and procedures consider and document the following:**<br><br>    **a) Review of suicide risk notifications and records from any previous incarcerations at the Jail, including records pertaining to suicide attempts, self-harm, and/or mental health needs;**<br>    **b) Other prior suicide ideation or attempts, self-harm, mental health treatment or hospitalization;**<br>    **c) Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;**<br>    **d) Suicide risk factors and protective factors, such as:**<br>        **i. Recent significant loss (job, relationship, death of family member/close friend);** |
|---|---|

|  | ii. History of suicidal behavior by family member/close friend;<br>iii. Upcoming court appearances;<br>e) Transporting officer's impressions about risk;<br>f) Suicide precautions, including level of observation. |  |
|---|---|---|
| **Status** | **Substantial Compliance** |  |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Fifth* Status Report (June 16, 2022), was omitted.<br><br>As previously stated, UC-Davis previously developed a comprehensive suicide risk assessment (SRA) form that is embedded in athenaPractice. Form is completed by outpatient LCSW clinicians whenever an inmate is identified at risk for suicide. If the inmate is placed on suicide precautions, a follow-up SRA form is subsequently completed upon a determination that the inmate can be discharged from suicide precautions. Of note, if a patient is placed in the 2P-APU, the SRA is <u>not</u> completed by either nursing or psychiatry staff. Rather, current practices are for an outpatient LCSW clinician (or LCSW assigned to the APU) to complete the SRA.<br><br>The expert's recent combined medical chart review (for September 2021 and February 2022) found that mental health clinicians completed all of the required domains on the SRA form in 14 of 17 (82 percent) cases. Of note, SRAs were not completed in two cases because the inmates were discharged from custody prior to their daily assessment, and the SRA in one case was completed late one day after discharge from suicide precautions. In addition, progress notes, as well as on-site observation, found that clinical supervisors were consistently consulted when the follow-up SRA indicated a recommendation to discharge the inmate from suicide precautions.<br><br>The expert previously recommended that in order to comply with the requirement of this provision to "Review of suicide risk notifications and records from any previous incarcerations at the Jail, including records pertaining to suicide attempts, self-harm, and/or mental health needs," mental health clinicians should be instructed by policy to review the inmate's Problem List to determine if it includes FOSS levels, 2P pre-admit, suicide attempt, serious mental illness, etc. notations from previous confinements. The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, provides the required instruction as follows: "The licensed clinician shall conduct a review of suicide risk notifications and records from any previous incarcerations; including records and review of the patient's problem list to determine if it includes previous suicide attempts, self-harm, serious mental illness, FOSS levels, Acute Psychiatric pre-admit, and other notations from pervious confinements." |  |

|  | In conclusion, this provision is moved to Substantial Compliance because the suicide risk assessment form is very comprehensive and the ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains narrative consistent with the requirements of the provision. |
|---|---|
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). ACMH Suicide Risk Assessment form. Medical chart review. ACH 02-05: Suicide Prevention Program, November 16, 2021, final. |

| **Provision E) 4. Responses to Identification of Suicide Risk or Need for Higher Level of Care** | **The County shall ensure that the meal service schedule or other custody-related activities cause no delay in the completion of suicide risk assessments for prisoners.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was "Current practice." The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Meal service or other custody related activity shall not cause a delay in conducting suicide risk assessments." To date, the SCSO Policy 722: Suicide Prevention and Intervention is still being revised. Review of various medical charts, as well as on-site observation, did not indicate any impediments to the timely SRA completion. In conclusion, because the SCSO Policy 722: Suicide Prevention and Intervention was still being revised, this provision, this provision remains in Partial Compliance. | |
| **Recommendations** | Finalize the SCSO Policy 722: Suicide Prevention and Intervention include the following requirement: "Meal service or other custody-related activity shall not cause a delay in conducting suicide risk assessments." | |
| **Evidentiary Basis** | Sacramento County's *Fifth Status Report* (June 16, 2022). Medical chart review. ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. | |

| Provision F) 1. Housing of Inmates on Suicide Precautions | **The County's policy and procedures shall direct that prisoners, including those identified as being at risk for suicide, be treated in the least restrictive setting appropriate to their individual clinical and safety needs.** | |
|---|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was "Policy forthcoming. Current post orders and practice indicate least restrictive housing for suicidal inmates. ACMH staff shall consult with custody staff to determine the appropriate housing location for the inmate." The ACH response in the same report stated: "MH policy state all patients, including those identified as being at risk for suicide, are treated in the least restrictive setting appropriate to their clinical needs." | |

| | |
|---|---|
| | Contrary to the above response, any "current post orders" cited above were again not provided to this expert. Review of the ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Patients identified as suicidal will be held in the least restrictive setting appropriate to the individuals clinical and safety needs." To date, the SCSO Policy 722: Suicide Prevention and Intervention is still being revised. |
| | However, review of various medical charts, as well as observation from the February 21-23, 2022 on-site assessment, continued to indicate that most inmates placed on suicide precautions were initially housed in safety cells, ad seg cells, and sobering cells located in the Main Jail's booking area and clothed in safety smocks. In fact, the February 2022 on-site assessment found a dramatic increase in the use of sobering cells for the initial housing of suicidal inmates. As previously indicated, this expert found that 39 percent of inmates identified as suicidal at booking were placed in sobering cells during the month of March 2022. These safety, ad seg, and sobering cells continue to be clearly utilized as the initial default setting for many suicidal inmates. The expert also found that approximately 59 percent (10 of 17) of inmates observed during mental health rounds of the booking cells and SITHU during the on-site assessment were clothed in safety smocks. |
| | In conclusion, because current post orders were not provided, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized to incorporate the requirements of this provision, and current practices indicated that most all inmates initially placed on suicide precautions continue to be housed in booking cells and clothed in safety smocks by default, this provision remains in Non-Compliance. |

| Recommendations | 1) Finalize the SCSO Policy 722: Suicide Prevention and Intervention include the following requirement: "Patients identified as suicidal will be held in the least restrictive setting appropriate to the individuals clinical and safety needs." 2) Eliminate the practice of utilizing safety, ad seg, and sobering cells as the initial default placement of inmates on suicide precautions. |
|---|---|
| Evidentiary Basis | Sacramento County's *Fifth* Status Report (June 16, 2022). Medical chart review. ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Observation during on-site assessment of February 21-23, 2022. |

| Provision G) 1. Inpatient Placement | The County shall ensure that prisoners who require psychiatric inpatient care as clinically indicated are placed in the 2P unit within 24 hours of identification, absent exceptional circumstances. In all cases, the provision of clinically indicated treatment to any prisoner requiring inpatient level of care shall be initiated within 24 hours. | |
|---|---|---|
| Status | Partial Compliance | |
| Discussion | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from prior reports as: "Jail Annex planning in order to meet the 24-hour time requirement. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail. Currently there is a proposal to move to 2P a larger housing area and we are still in preliminary discussions." The ACH response in the same report stated: "MH makes every effort to ensure that patients assessed for the APU are placed in the unit as soon as possible upon bed availability. Patients who are on the pre-admission list beyond 24 hours are assessed daily for continuous need of placement or clearance." The MH-04-09: Acute Psychiatric Unit - Admission, Program, and Discharge policy, effective May 6, 2022, addresses the admission process, excluding the "24-hours of identification," as follows: "Referring Outpatient clinicians will contact the APU to coordinate the admission of a patient. a. If there is not a bed available on the unit, the patient will be placed on the Pre-Admit List for admission. Nursing staff will contact Outpatient staff when there is a bed available." The recent medical chart review of inmates placed on suicide precautions continued to find that all cases resulted in automatic placement on the 2P Pre-Admit List. In practice, not all inmates placed on suicide precautions were eventually placed in the 2P-APU. In fact, only a small percentage of suicidal inmates were housed on the unit. Rather, most of these inmates were initially housed in booking cells and then either cleared from suicide precautions or | |

|  | transferred to the SITHU where they remained for several days or longer while maintaining a pending 2P Pre-Admit order. Eventually, the suicidal ideation and/or behavior of most inmates was resolved and the 2P Pre-Admit order was withdrawn. |
|  | It would be the expert's opinion that not all inmates presenting with suicidal ideation and subsequently placed on suicide precautions met the criteria for a 5150 order and placement on the 2P-APU. Such clinical judgment is deferred to the mental health expert in the *Consent Decree*. However, this expert's observation is that, based upon limited bed availability within the 2P-APU, no inmates identified as in need of inpatient psychiatric care are placed in the 2P-APU within 24 hours of identification. This provision remains in Partial Compliance. |
| **Recommendations** | Create more bed capacity within the Acute Psychiatric Unit. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). MH-04-09: Acute Psychiatric Unit - Admission, Program, and Discharge policy, May 6, 2022, final. Medical Chart review. Observation during on-site assessment of February 21-23, 2022. |

| **Provision H)** **1. Temporary Suicide Precautions** | **No prisoner shall be housed in a safety cell, segregation holding cell, or other Temporary Suicide Precautions Housing for more than six (6) hours. If mental health or medical staff determine it to be clinically appropriate based on detoxification-related needs, this time limit may be extended to no more than eight (8) hours. If exceptional circumstances prevent transfer within these timelines, those circumstances shall be documented, and transfer shall occur as soon as possible. This does not preclude the housing of a prisoner in the IOP unit if clinically indicated.** | |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Jail Annex planning will strengthen this request. We currently follow these timeframes as much as possible with the limited number of cells in the IOP unit. With the Annex project shelved for the time being we are meeting with the design team and consultants to address additional options in the current jail. Currently there is a proposal to move to 2P to a larger housing unit and we are still in preliminary discussion." | |
|  | The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Any holding cell, including safety or Ad Seg cells, should not be the default housing for patients with suicidal ideation and/or self-injurious | |

behaviors. When utilized, patients shall not be placed in a holding safety or Ad Seg cell for more than 6 hours. If medical staff determine more time is needed due to detoxification, that patient may remain in the cell for a total of 8 hours. The reason for the extension must be clearly documented in the patient's chart." To date, the SCSO Policy 722: Suicide Prevention and Intervention is still being revised.

As detailed in previous monitoring reports, there are 4 safety cells located in the Main Jail: 2 in the male booking area, 1 in the female building area, and 1 in the 2P-APU. In addition, there is 1 safety cell and 1 holding cell (North Holding No. 2) located at RCCC. There are 6 ad seg cells in the Main Jail's booking area, as well as at least 1 sobering cell.  Although the safety cells are prioritized to temporarily house suicidal inmates, any of the remaining ad seg, and sobering cells are utilized as Temporary Suicide Precautions Housing.

It was previously determined that "Temporary Suicide Precautions Housing" excludes the Suicidal Inmate Temporary Housing Unit (SITHU) on 3-West Unit because suicidal inmates may be clinically appropriate for placement in the SITHU while awaiting a determination for inpatient hospitalization. In addition, it was previously determined that "Temporary Suicide Precautions Housing" includes the Main Jail's ad seg cells and "sobering cell" (not currently included in the *Consent Decree* definition) because of the provision's allowance for utilizing such cells for "detoxification-related needs."

Beginning in March 2022, the SCSO began to routinely collect data on the average length of stay (ALOS) in Main Jail's booking cells (safety, ad seg, and sobering). This data is not automated within current jail inmate management system, and has to manually calculated by SCSO personnel counting individual inmate Custody Logs. Upon receiving the data, this expert then calculates the ALOS and percentage of booking cell type.

In **March 2022**,[3] 164 inmates were placed in the Main Jail booking cells, with:
> 63 (39 percent) in sobering cells
> 58 (35 percent) in ad seg cells
> 31 (19 percent) in safety cells
> 9 (5 percent) in multiple cells
> 3 (2 percent) unknown

In **April 2022**, 195 inmates were placed in the Main Jail booking cells, with:

> 117 (60 percent) in sobering cells
> 45 (23 percent) in ad seg cells
> 20 (10 percent) in safety cells
> 13 (7 percent) in multiple cells

---

[3] Average length of stay not calculated.

In April 2022, the average length of stay was **13.3** hours, with the shortest confinement of 19 minutes and the longest confinement over 5 days (120) hours. Approximately 41 percent (79 of 195) of inmates were held in these booking cells for six (6) hours or less.

In **May 2022**, 192 inmates were placed in the Main Jail booking cells, with:

> 100 (52 percent) in sobering cells
> 51 (27 percent) in ad seg cells
> 36 (19 percent) in safety cells
> 5 (2 percent) in multiple cells

In May 2022, the average length of stay was **12.3** hours, with the shortest confinement of 23 minutes and the longest confinement over 9 days (220) hours. Approximately 43 percent (83 of 192) of inmates were held in these booking cells for six (6) hours or less.

In sum, the March through May 2022 data regarding Temporary Suicide Precautions Housing in the Main Jail booking cells indicated that the sobering cells and ad seg cells, both of which had access to a sink and toilet, were utilized over 75 percent of the time for initial housing of suicidal inmates, whereas safety cells (without access to a sink/toilet) were utilized between 10 and 19 percent of the time. In April-May 2022, average length of stay in the cells was 12-13 hours, and only approximately 41-43 percent of inmates were held in these booking cells for six (6) hours or less.

Of note, as the collection and analysis of this data is both time-consuming and staff-intensive, the SCSO needs to better develop a mechanism to generate such data on a regular basis in order to monitor the LOS in Temporary Suicide Precautions Housing with the goal of becoming compliant with the six (6) hour maximum requirement by the *Consent Decree*. The expert was previously informed that a new jail management system, entitled ATIMS, was scheduled to be fully activated during the Summer of 2022, and it was anticipated that such LOS data could be generated by this software program.

In conclusion, because the SCSO suicide prevention policy has not been finalized to address the requirements of this provision, and available data regarding Temporary Suicide Precautions Housing use in April-May 2021 indicated that both the ALOS and large percentage of inmates were housed in these well over six (6) hours, this provision remains in Partial Compliance.

| **Recommendations** | 1) Finalize the SCSO Policy 722: Suicide Prevention and Intervention.<br>2) Continue to utilize Main Jail Temporary Suicide Precautions Housing data to reduce the average length of stay and percentage of inmates housed in the cells over six hours. |

| Evidentiary Basis | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Main Jail Temporary Suicide Precautions Housing data: March thru May 2022. |
|---|---|

| Provision H) 2. Temporary Suicide Precautions | **The County shall ensure, including by revising written policies and procedures where necessary, the timely and adequate completion of medical assessments for prisoners in need of suicide precautions, as required under Operations Order 4/05 (i.e., within 12 hours of placement of the next daily sick call, whichever is earliest, and then every 24 hours thereafter).** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice. Custody staff shall notify medical staff within 15 minutes that a prisoner is temporarily housed in a safety or segregation cell and medical staff shall complete an assessment within 12 hours of placement or the next sick call, whichever is earliest."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with, and even exceeds, the requirements of this provision: "1. Patients may be temporarily placed in a safety and/or SITHU cell by custody or at the recommendation of MH staff. In these instances, nursing staff must: a. Conduct a medical assessment of the patient's physical condition within 1 hour of placement and every 4 hours thereafter. b. Notify the Nursing Supervisor and the Physician immediately if the nurse observes a significant change in the patient's physical health condition or if there is an adverse event.  Staff will contact MH if there is a significant change in the patient's psychiatric condition. c. Document the time of visual observation and include their signature and title on the observation sheet located directly outside of the cell. d. Document their assessment using the Nurse Non-Face-to-Face encounter form within the EHR every 4 hours. 2. If a patient at RCCC requires an emergent MH referral and MH staff are not currently present at the RCCC facility, the RN shall consult with MH staff at MJ to determine an appropriate plan of care." To date, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>This expert's prior medical chart review of inmates on suicide precautions found that nursing staff almost always provided timely medical assessments (documented as SOAP notes in athenaPractice) within 12 hours of placement and then every 24 hours during the entirety of an inmate's placement on suicide precautions. Patients in the 2P-APU were seen approximately three times per day by nursing staff. | |

|  | In conclusion, although the ACH suicide prevention policy exceeds the requirements of this provision by stating that medical assessments are conducted "within 1 hour of placement and every 4 hours thereafter," because the SCSO suicide prevention policy has not been finalized to include the requirement of custody notification to medical staff that an inmate has been placed in a holding cell and/or on suicide precautions, this provision remains in Partial Compliance. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>Prior medical chart review.<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, pending draft. |

| **Provision H)**<br>**3. Temporary Suicide Precautions** | **The County shall ensure that any cell used for holding prisoners on suicide precautions is clean prior to the placement of a new prisoner, as well as cleaned on a normal cleaning schedule.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice. The Post Order has been approved."<br><br>The expert was previously provided a copy of the "Housing Unit Cell Cleaning Process" Post Order, revised April 2021. In addition, although all of the 10 SITHU cells (1 through 10) utilized to house suicidal inmates were almost always full during the three-day on-site assessment, inspection of a few cells that were temporarily empty awaiting new placements found that they were only marginally clean. Temporary Suicide Precautions Housing cells (safety, ad seg, and sobering cells) in the booking area of the Main Jail could not be inspected because all cells were occupied by inmates. Inspection of unoccupied 2P-APU cells also found that they were only marginally clean.<br><br>On a related issue, during observation of clinicians interacting with inmates in the Main Jail's ACMH Interview Room during the February 21-23, 2022 assessment, the telephone utilized by inmates to communicate with the clinician was <u>not</u> sanitized following each use.<br><br>In conclusion, this provision remains in Partial Compliance. | |
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention. | |

| | 2) It is strongly recommended that the SCSO initiate and/or revise a post order in Main Jail booking to require that the telephone in the ACMH Interview Room be sanitized following each inmate use. |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). SCSO Policy 722: Suicide Prevention and Intervention, pending. "Housing Unit Cell Cleaning Process" Post Order, revised April 2021. On-site inspection of SITHU, Temporary Suicide Precautions Housing in Main Jail booking, and 2P-APU cells. |

| **Provision H) 4. Temporary Suicide Precautions** | **The County shall create and implement a written policy ensuring adequate frequency for meals, fluids, hygiene, showers, prescribed medications, and toileting when a prisoner is in cell used for holding prisoners on suicide precautions**. |
|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice. Will add language to the new suicide prevention policy. RCCC has no cells designated for long term housing of inmates on suicide precautions. RCCC does not have ACMH staff available 24 hours a day, but have tele-psychiatry available after-hours including weekend after-hours."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Patients shall receive timely and regular access to meals, liquids, and prescribed medication while on suicide precautions, as necessary. Custody will provide access to a toilet upon request to patients placed in cells without a toilet, absent an immediate security or safety issue. Unless conjured indicated by a licensed mental health clinician, all patients on suicide precautions shall be allowed access to showers consistent with schedules and other housing units." To date, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>The expert's observations during the on-site assessment at the Main Jail, as well as review of various Custody Logs for inmates on suicide precautions in both the Temporary Suicide Precautions Housing and SITHU, found a variety of practices. For example, inmates housed in booking never received either showers or telephone calls, whereas inmates in the SITHU were sometimes offered the opportunity for showers (at night) and telephone calls (during days). Custody logs in the SITHU indicated that a few inmates were not provided a mattress until a few days after their arrival. During the February 21-23, 2022 on-site assessment, a few inmates on suicide precautions in the SITHU complained to the expert that they did not receive evening medication the previous weekend due to a nursing shortage. Although inmates housed in the |

| | |
|---|---|
| | SITHU, ad seg cells, and sobering cells had access to water, sinks and toilets, review of Custody Logs for inmates housed in "dry" safety cells indicated that some were offered water, but not offered out-of-cell toileting and, therefore, could only defecate into a floor grate.<br><br>Based upon the above practices and lack of a finalized SCSO suicide prevention policy, this provision remains in Partial Compliance. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Review of Custody Logs in Temporary Suicide Precautions Housing and SITHU.<br>Interviews with SITHU inmates. |

| **Provision H)**<br>**5. Temporary Suicide Precautions** | **Inmates on suicide precautions shall not automatically be on lockdown and should be allowed dayroom or out-of-cell access consistent with security and clinical judgments.** | |
|---|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice."<br><br>Contrary to the County's continued response that inmates on suicide precautions had access to dayroom or out-of-cell activities based upon security and medical judgments, this expert's review of Custody Logs for inmates on suicide precautions in either the Main Jail booking or SITHU cells found that inmates continued to be denied dayroom access. With the exception of offering showers and telephones, all inmates on suicide precautions continued to be locked down.<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Licensed clinicians have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, the removal or return of routine privileges. This includes, but not limited to: a. Telephone calls; b. Visits (including social visits); c. Recreation/out-of-cell time; d. Court hearings; e. Other activities that are otherwise within the limitations of a patient's classification security level; f. Clothing and possessions....Custody shall ensure all patients on suicide | |

| | |
|---|---|
| | precautions, regardless of length of stay, should receive showers on a schedule commensurate with schedules in other housing units....Patients shall be allowed dayroom or out-of-cell activities as determined by a licensed clinician in consultation with custody staff." To date, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>This provision is similar to **Provision M) 1. Property and Privileges"** and will be discussed in more detail in that provision.<br><br>In conclusion, although the ACH suicide prevention policy contains requirements that are consistent with this provision and SCSO suicide prevention policy has not been finalized, most importantly, in practice, all inmates on suicide precautions are virtually locked down and have no dayroom or other out-of-cell access. This provision remains in Non-Compliance. |
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention to include language that suicidal inmates will not automatically be on lockdown and should be allowed dayroom or out-of-cell activities as determined by ACMH clinicians in consultation with custody personnel; provide all draft policies to expert for review.<br>2) Eliminate of the current practice of all management decisions regarding suicidal inmates being made by custody personnel. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Review of Custody Logs in Temporary Suicide Precautions Housing and SITHU.<br>Observation during on-site assessment of February 21-23, 2022. |


| | |
|---|---|
| **Provision H)**<br><br>**6. Temporary Suicide Precautions** | **The classrooms or multipurpose rooms adjacent to the housing units in the Main Jail are designed for, and should be made available for, prisoner programs and treatment. Absent an emergency, the County shall not use the classrooms and multipurpose rooms to hold prisoners pending a mental health evaluation or on suicide precautions. Where such emergency occurs, the County shall document the reasons for retention and move the prisoner, within six (6) hours, to the inpatient unit or other appropriate housing location for continued observation, evaluation, and treatment.** |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022) was simply: "Current practice."<br><br>The expert again did not find any evidence in either the on-site assessment in February 2022 or medical chart reviews that multi-purpose rooms, including |

| | |
|---|---|
| | classrooms, were currently utilized for even the temporary housing of inmates on suicide precautions. However, the expert was informed by a few clinicians during the most recent on-site assessment that classrooms continued to be utilized in rare occasions for the housing of suicidal inmates.<br><br>This provision remains in Partial Compliance because the existing SCSO Policy No. 4/05 - Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding No. 2. needs to be revised to eliminate reference to multi-purpose rooms, the SCSO Policy 722: Suicide Prevention Policy has not been finalized, and of lingering concerns that classrooms might still be used on occasion for housing suicidal inmates. |
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention.<br>2) SCSO Policy No. 4/05 - Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding No. 2. should be revised to delete reference to multi-purpose rooms, including classrooms, as acceptable locations for the housing of suicidal inmates. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>SCSO Policy No. 4/05 - Use of Safety Cells/ Segregation Cells/Multipurpose Rooms/North Holding #2.<br>Medical chart review.<br>Observation during on-site assessment of February 21-23, 2022. |

| Provision I)<br>1. Suicide Hazards in High-Risk Housing Locations | **The County shall not place prisoners identified as being at risk for suicide or self-harm, or for prisoners requiring IOP level of care, in settings that are not suicide-resistant as consistent with Lindsay Hayes's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities."** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the Fifth Status Report (June 16, 2022) was: "Current practice. Inmates at risk for suicide, self-harm, or IOP level of care are housed in suicide-resistant cells."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Any cell designated to house a suicidal patient shall be suicide-resistant….Cells with structural blind spots shall not be used for suicide precaution.." To date, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>In addition, the expert has interpreted this provision to also include the requirement that suicidal patients housed in the 2P-APU be placed in suicide-resistant cells. During the February 2022 on-site assessment, the expert inspected the 2P-APU cells and found that each contained suicide-restraint | |

beds with hooks that were intended to be used in patient restraint. However, if a patient was placed in the cell without restraints, these hooks would be easily accessible and very conducive to a suicide attempt by hanging. In addition, there was a gap down between the bed and wall in some cells that could be utilized as an anchoring device in a suicide attempt by hanging. Following a discussion with both SCSO and ACH leadership, the decision was made to remove the hooks from the restraint beds in all but one (P-1) of the 16 cells in the 2P-APU. The restraint bed in Cell P-1 will be replaced with a new restraint bed that is more suicide-resistant. In addition, any patient currently assessed as suicidal, but not in need of restraints, would not be permitted to be housed in Cell P-1.

The expert previously inspected most of the 10 SITHU cells (1 through 10) utilized to house suicidal inmates and found two concerns. First, it appeared that some cells had slight gaps between fixtures and walls/ceilings that could be utilized as an anchoring point in a suicide attempt by hanging (in which an inmate wedges a ligature in the gap).  Second, Cell No. 7 and Cell No. 8 in the SITHU had blind spots in which deputies were not able to fully observe an inmate if they were situated in far corner of those cells. This issue will be addressed below in **Provision I) 2. Suicide Hazards in High-Risk Housing Locations**.

Further, during the recent on-site assessment, the expert followed a mental health clinician on daily rounds of inmates who were either on suicide precautions and/or required suicide risk assessments. On the first day (February 21), the expert observed the assessment of two inmates who had been identified as suicidal, but were not in suicide-resistant cells or properly observed by custody personnel.

In the first case (Case No. 1), the inmate (who was mentioned earlier in this report on page 26) was housed on the 7-East Unit and wrote a health care request to mental health staff dated February 19, 2022 that stated the following: "I'm starting to feel suicidal without meds." The form was not entered into the EHR until two days later on February 21 at 4:25am. Several hours later that morning, the expert accompanied a clinician to 7-East for the assessment. The inmate was clothed in a jail uniform and was not on suicide precautions. He expressed depressive thoughts, but denied any current suicidal ideation. An SRA was completed and the inmate was not placed on suicide precautions. According to SCSO leadership, custody personnel never received any notification that the inmate should have been placed on suicide precautions during the early morning of February 21, therefore, a log sheet documenting the inmate's observation was not initiated.

In the second case (Case No. 2), the inmate was housed on the 5-East Unit and wrote a health care request to mental health staff dated February 18, 2022 that stated the following: "To whom it may concern, since incarcerated, I have been

| | |
|---|---|
| | having thoughts of ending my life and crying spells. Please find time to see me so I can be put back on my psych meds." The form was not entered into the EHR until three days later on February 21. Review of the medical chart also indicated that the inmate had submitted a similar health care request on February 20 regarding both suicidal ideation and request to be placed back on psychotropic medication. At approximately 3:51am on February 21, a mental health clinician contacted the contacted 5-East control officer and recommended that the inmate be placed on suicide precautions in a safety smock pending evaluation. All property was removed from the cell. Several hours later at approximately 7:50am, this expert accompanied a clinician to 5-East for the assessment. The inmate expressed depressive thoughts, but denied any current suicidal ideation nor history of suicidal behavior. An SRA was completed, the inmate was discharged from suicide precautions and referred to a psychiatrist for evaluation of psychotropic medication needs. Of note, a log sheet required for documentation of the observation of the suicidal inmate was not found on the 5-East Unit.<br><br>When this issue was subsequently brought to the attention of the SCSO leadership, this expert was informed on March 8, 2022 that an email was distributed throughout the Main Jail to reinforce the requirement that "Only designated suicide-resistant cells could be utilized for the housing of suicidal inmates. In the event no suicide-resistant cells were available, the bunks located in the 3-West 300 Pod (on the SITHU) would be utilized to temporarily house inmates on suicide precautions until a suitable cell became available."<br><br>This provision remains in Partial Compliance because the expert found examples of inmates identified as suicidal who were not housed in suicide-resistant cells awaiting a suicide risk assessment, the SCSO suicide prevention policy has not been finalized, and the above deficiencies need to be remedied by implementing the below recommendations. |
| **Recommendations** | 1) Finalize the SCSO Policy 722: Suicide Prevention and Intervention to address the housing of suicidal inmates in suicide-resistant cells.<br>2) Create a 2P-APU post order or protocol that requires any patient currently assessed as suicidal, but not in need of restraints, would not be permitted to be housed in Cell P-1.<br><br>Two previous recommendations are repeated again as follows:<br><br>3) SCSO and/or the Suicide Prevention Subcommittee should review all suicide attempts by hanging in the last 24 months and identify the anchoring point in the cells for those hanging incidents to determine if those same conditions exist in the SITHU, safety/administrative segregation, and 2P-APU cells.<br>4) The SCSO should inspect all SITHU, safety/administrative segregation, and 2P-APU cells to identify any gaps in wall/ceiling fixtures that could be utilized as an anchoring device.  Any gaps should be closed with security caulking. |

| Evidentiary Basis | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Medical chart review. Observation during on-site assessment of February 21-23, 2022. Checklist for the 'Suicide-Resistant' Design of Correctional Facilities, Lindsay M. Hayes, December 2019. |
|---|---|

| Provision I) 2. Suicide Hazards in High-Risk Housing Locations | Cells with structural blind spots shall not be used for suicide precaution. | |
|---|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was simply: "Current practice." | |
| | Despite the above response that the "current practice" of the SCSO was not to utilize cells with blind spots for inmates on suicide precautions, as well as the ACH 02-05: Suicide Prevention Program policy requirement that "Cells with structural blind spots shall not be used for suicide precaution," the expert's previous inspection of the SITHU found that Cell No. 7 and Cell No. 8 in the SITHU had blind spots in which deputies were not able to observe an inmate if they were situated in far corner of those cells. | |
| | Because this provision specifically prohibits the placement of a suicidal inmate in a cell with blind spots, and Cells 7-8 in the SITHU had blind spots and were occupied with inmates on suicide precautions during the February 2022 on-site assessment, the provision remains in Non-Compliance. | |
| **Recommendations** | 1) SCSO Policy 722: Suicide Prevention and Intervention. 2) The SCSO should either not place suicidal inmates in SITHU cells 7-8 and utilize other suicide-resistant cells in the IOP section of the housing unit, or develop a corrective action plan to eliminate the blind spots in those cells. | |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Observation during on-site assessment of February 21-23, 2022. Checklist for the 'Suicide-Resistant' Design of Correctional Facilities, Lindsay M. Hayes, December 2019. | |

| Provision J) 1. Supervision/ Monitoring of Suicidal Inmates | **The County shall ensure adequate visibility and supervision of prisoners on suicide precautions.** | |
|---|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was simply: "Current practice." | |

**Discussion** (continued)

Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was simply: "Current practice."

The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Each patient on suicide precautions shall have an observation sheet placed on the outside of their cell door. The observation sheet, or a separate form, should also document the patient's level of observation, as well as possessions and privileges allowed for the patient as determined by a licensed MH clinician. Observation Logs shall not be kept at the Deputy's station and/or desk." To date, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.

During inspection of the SITHU and Temporary Suicide Precautions Housing in Main Jail booking (safety, ad seg, and sobering cells) on February 21-23, 2022, this expert again observed two different practices regarding the documentation of observation for suicidal inmates. For inmates housed in booking area cells, individual Custody Log observation sheets were attached to a clipboard located *outside of each cell*. However, in the SITHU, a clipboard containing the Custody Log observation sheets and Custody Instructions sheet of each inmate on suicide precautions was located *on the deputies' desk located outside the SITHU*. Such a practice was not desirable, and raised the possibility (although not observed by the expert) that observation sheets could be completed by a deputy without entering the SITHU and observing each inmate. This practice was also contrary to the ACH 02-05: Suicide Prevention Program policy which required that Custody Logs be located on the door outside each inmate's cell.[4]

In addition, the expert requested and subsequently received copies of the Custody Logs for 11 inmates on suicide precautions the SITHU and Temporary Suicide Precautions Housing in Main Jail booking (safety, ad seg, and sobering cells) on February 21-23, 2022. Each of these inmates was on Close Observation status and required to be observed at staggered intervals not to

---

[4]In its August 11, 2022 response to the draft report, the County stated: "Logs are kept at the desk on SITHU because this prevents tampering from other inmates in the Pod." This response overlooks the ACH policy requirement that Custody Logs be located on the door outside each inmate's cell. In addition, there is no evidence that inmates would tamper with the Custody Logs. As found during the on-site assessment, there were multiple violations found in reviewed Custody Logs that would be better remedied if the Logs were located inside the SITHU and not in a binder on the officer's desk *outside* the area.

| | |
|---|---|
| | exceed 15 minutes.[5] The review found very problematic practices in the observation of inmates on suicide precautions, with multiple violations of the required 15-minute observation checks for each of the 11 inmates. While some of the violations were minor and only a few minutes over the required 15-minute window, many violations were far more serious, with inmates unobserved for 20 minutes or more.<br><br>The expert carefully examined the Custody Log for one inmate (Case No. 3) who was on suicide precautions from February 17, 2022 through February 24, 2022. He was initially placed suicide precautions in an ad seg cell in Main Jail booking on February 17 and moved to SITHU Cell 305 seven (7) days later on February 23. The review found that there were approximately *188 violations of 15-minute checks in the case, including at least two instances in which the inmate was left unobserved for 57 minutes (from 1908 to 2005) on February 22 and 57 minutes (from 0503 to 0600) on February 23.*<br><br>Due to the serious and extensive violations found in the documentation of observation of inmates on suicide precautions, as well as the fact that Custody Logs are kept in a binder on the deputies' desk outside of the SITHU in violation of ACH suicide prevention policy, this provision is moved to Non-Compliance. |
| **Recommendations** | Consistent with current ACH policy, the SCSO should finalize the SCSO Policy 722: Suicide Prevention and Intervention to require that each inmate on suicide precautions a Custody Log and Custody instructions sheet placed on the outside of their cell door in the SITHU. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, June 22, 2022, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Examination of Custody Logs for 11 inmates on suicide precautions during the February 21-23, 2022 on-site assessment. |

---

[5]In its August 11, 2022 response to the draft report, the County also stated: "Policy states twice every 30 minutes." If the SCSO draft Policy 722: Suicide Prevention and Intervention states that suicidal inmates on Close Observation status are observed "twice every 30 minutes," the draft policy will need to be further revised because it is in violation of **Provision J) 3. Supervision/Monitoring of Suicidal Inmates** of the Consent Decree requiring suicidal inmates on Close Observation status to be observed "at staggered intervals not to exceed every 15 minutes."

| Provision J) 2. Supervision/ Monitoring of Suicidal Inmates | The County shall not cover cell windows with magnetic flaps or any other visual barrier preventing visibility into any cell that is housing a prisoner on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need. | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was simply "Current practice." The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Cell windows shall never be covered with magnetic flaps or any other visual barrier preventing visibility into any cell that is housing a patient on suicide precautions or awaiting an Acute Psychiatric Unit bed, unless there is a specific security need and then for only a period of time necessary to address such security need." To date, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. During inspection of the 10 SITHU cells utilized to house suicidal inmates, as well as the Temporary Suicide Precautions Housing in Mail Jail booking, this expert did <u>not</u> observe the covering of any cell windows by custody personnel. However, according to e-mail correspondence between plaintiffs' counsel and Main Jail leadership dated March 15, 2022, there are occasions due to overcrowding whereby male inmates might be placed in female booking cells (safety, ad seg, and sobering) in the Main Jail.  On such occasions, and for reasons of privacy, a covering (e.g., paper bag) would be placed over the cell window which obscures visibility not only out of the cell, but more importantly, into the cell. Under this case scenario, it would be this expert's opinion that this provision would be violated if the inmate had been identified as suicidal and placed in the cell with a window covering. In conclusion, this provision remains in Partial Compliance only because the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. | |
| **Recommendations** | 1) Finalize the SCSO Policy 722: Suicide Prevention and Intervention. 2) Ensure that the SCSO policy prohibits any inmate identified as suicidal from being housed in a cell that contains a window covering obstructing visibility. | |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Observation during on-site assessment of February 21-23, 2022. | |

| Provision J) 3. Supervision/ Monitoring of Suicidal Inmates | The County shall revise its policies regarding the monitoring of prisoners on suicide precautions to provide for at least the following two defined levels of observation: |
| --- | --- |
| | **a) Close observation** shall be used for prisoners who are not actively suicidal but express suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) or have a recent prior history of self-destructive behavior. Close observation shall also be used for prisoners who deny suicidal ideation or do not threaten suicide but are engaging in other concerning behaviors indicating the potential for self-injury. Staff shall observe the prisoner at staggered intervals not to exceed every 15 minutes and shall document the observation as it occurs.

**b) Constant observation** shall be used for prisoners who are actively suicidal, either threatening or engaging in self-injury, and considered a high risk for suicide. An assigned staff member shall observe the prisoner on a continuous, uninterrupted basis. The observation should be documented at 15-minute intervals. Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation. |
| **Status** | Partial Compliance | |
| **Discussion** | Sacramento County's response to this provision, as authored by SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from a prior report as: "The revised policy being worked on by the Lexipol team will address this address. All policies related to the *Consent Decree* are currently being drafted by the Lexipol project team. The suicide prevention policy is currently in the approval process" With regard to inmates requiring Constant Observation, the SCSO reported in the *Fifth* Status Report that "This type of monitoring occurs in the SITHU or 2P level of care currently."

The County's proclamation above that Constant Observation "occurs in the SITHU or 2P level of care currently" is incorrect. The expert does not know of any case in recent memory in which mental health clinicians have placed a suicidal inmate on Constant Observation status. In addition, UC-Davis's "Mental Health Program Update" submitted during the February 2022 on-site assessment included the following "challenges/barriers": "No mechanism for constant observation. SITHU decommissioned and no female SITHU. Do not have staff to provide constant observation for patients on suicide precautions."

The statement that "SITHU "decommissioned" was apparently in reference to the previous practice of placing inmates in bunks situated within the SITHU dayroom that was discontinued because of the COVID-19 pandemic, as well as concerns regarding custody staffing and the inability to post a deputy inside the unit. In addition, an assertion that constant observation occurs at the "2P level |

|  | of care" was apparently in reference to the use of CCTV monitoring in the 2P-APU.<br><br>The specific requirements for Constant Observation within the *Consent Decree* are very specific and require that "*Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation*." Any practice involving use of CCTV as an alternative to the physical observation of staff, as well as not posting staff within the dayroom of the SITHU in order to maintain continuous and uninterrupted observation, would be in violation of the Constant Observation requirements of this provision.<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, as well as ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, effective June 22, 2022, contain definitions and procedures for both Close Observation and Constant Observation that are consistent with this provision. To date, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>In conclusion, this provision remains in Partial Compliance because the option of placing an inmate assessed as "actively suicidal, either threatening or engaging in self-injury, and considered a high risk for suicide" on Constant Observation is not currently available within the Sacramento County jail system. In addition, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. |
|---|---|
| **Recommendations** | 1) Consistent with policy, create a practice whereby an inmate assessed as "actively suicidal, either threatening or engaging in self-injury, and considered a high risk for suicide" is placed on Constant Observation.<br>Finalize the SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, June 22, 2022, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>"Mental Health Program Update, January 2022," UC-Davis. |

| Provision J) 4. Supervision/ Monitoring of Suicidal Inmates | For any prisoner requiring suicide precautions, a qualified mental health professional shall assess, determine, and document the clinically appropriate level of monitoring based on the prisoner's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically determined level of monitoring. | |
|---|---|---|
| **Status** | **Substantial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice. Once JPS staff has completed the inmate's evaluation, the JPS staff member shall consult with custody staff to determine the appropriate housing location for the inmate." In the same report, ACH stated that mental health "staff have daily bed assignment/utilization meetings with custody to review movement between the IOP, OPP, and APU." | |
| | The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the appropriate language that is consistent with the requirements of this provision: "For any patient requiring suicide precautions, the licensed clinician shall assess, determine, and document the clinically appropriate level of monitoring based on the patient's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically determined level of monitoring." | |
| | The expert again consistently found during the current medical chart review that when an inmate is identified as suicidal and referred to a mental health clinician, the clinician assesses the inmate, completes an SRA, continues to assess the suicidal inmate on a daily basis, and appropriately documents the management of the inmate on suicide precautions to include level of observation, clothing, and out-of-cell activities. In addition, based upon the medical chart review, as well as observation of, and discussion with, multiple mental health clinicians, it appears that an inmate's length of stay Temporary Suicide Precautions Housing in Main Jail booking (safety, ad seg, and sobering cells) beyond the maximum allowable six (6) hours is a result of the inadequate number of beds available in both the SITHU and 2P-APU rather than a clinical determination. | |
| | In conclusion, although this provision addresses the use of safety cells, the expert has already addressed the inappropriate use of safety cells (and ad seg and sobering cells) for the default housing of suicidal inmates in **Provision F) 1. Housing of Inmates on Suicide Precautions** on pages 38-39 of this report. As such, based upon the ACH suicide prevention policy, current medical chart review and observations, this provision is moved to Substantial Compliance. | |
| **Recommendations** | None | |

| Evidentiary Basis | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. Observation during on-site assessment of February 21-23, 2022. Medical chart review. |
| --- | --- |

| Provision J) 5. Supervision/ Monitoring of Suicidal Inmates | **Video monitoring of prisoners on suicide precaution shall not serve as a substitute for Close or Constant observation.** | |
| --- | --- | --- |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from a previous report as: "Current practice. Outlined in our current Suicide Prevention Policy." | |

(continued table, Discussion cell)

The expert previous recommendation was to ensure that the ACH suicide prevention policy applicable to the 2P-APU included the appropriate language that prohibited provider orders for closed-circuit television (CCTV) monitoring in lieu of the physical observation of patients on either close or constant observation status. Despite this recommendation, review of the new ACH 04-07: Acute Psychiatric Unit – Precautions and Observations policy, effective June 22, 2022, found that it did not contain any language regarding CCTV monitoring. SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.

As reported in previous monitoring reports, CCTV monitoring was only available in the 2P-APU. According to UC-Davis leadership, CCTV monitoring was not approved to be an alternative to observation of suicidal patients at 15-minute intervals by nursing personnel, nor were nursing personnel assigned to exclusively monitor the CCTV. Therefore, according to UC-Davis leadership, suicidal patients were not expected to be continuously monitored by the CCTV. In its August 11, 2022 response to the draft report, the County further reiterated that: "*In accordance with recommendations from experts and Sacramento County, all CCTV use was discontinued by MH. No MH provider can order that CCTV is utilized for any reason and no MH nursing can activate or monitor CCTV for any reason.*"

Because the ACH 04-07: Acute Psychiatric Unit – Precautions and Observations policy only became effective on June 22, 2022, the expert did not have an opportunity to assess whether 2P-APU nursing personnel are utilizing CCTV monitoring as an alternative to the physical observation of suicidal patients on either close or constant observation status. Should problems be found during a forthcoming on-site assessment, the ACH 04-07: Acute Psychiatric Unit – Precautions and Observations policy would need to be revised to include language that specifically prohibits provider orders and nurse

|  | practices for using CCTV monitoring in lieu of the physical observation of suicidal patients. <br><br> In conclusion, the monitoring of this provision is deferred based upon the recently enacted ACH policy and remains in Partial Compliance. |
|---|---|
| **Recommendations** | 1) Should problems be found during a forthcoming on-site assessment, the ACH 04-07: Acute Psychiatric Unit – Precautions and Observations policy would need to be revised to include language that specifically prohibits provider orders and nurse practices for using CCTV monitoring in lieu of the physical observation of suicidal patients. <br> 2) Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). <br> ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, June 22, 2022, final. <br> SCSO Policy 722: Suicide Prevention and Intervention, draft pending. |

| **Provision K) 1. Treatment of Inmates Identified as at Risk of Suicide** | **Qualified mental health professionals shall develop an individualized treatment plan and/or behavior management plan for every prisoner that mental health staff assesses as being a suicide risk.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Fifth* Status Report (June 16, 2022), was omitted. <br><br> This provision is duplicative with both **Provision K) 2. Treatment of Inmates Identified at Risk of Suicide** and **Provision P) 2. Discharge from Suicide Precautions**. As such, these three provisions will be monitored as one provision. <br><br> The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains requirements the following requirements that are consistent with this provision: "1. MH staff will develop and utilize a safety planning tool for patients on suicide precautions. The safety plan shall be completed with the patient and identify specific signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and specific actions (independent coping skills, personal and professional resources for support, etc.) the patient or staff can take if suicidal thoughts do occur. The plan should be updated as clinically indicated. 2.The treatment plan shall be updated to include goals and interventions specific to each patient's safety plan and discharge planning." | |

| | As detailed in previous monitoring reports, ACH introduced a new treatment planning program in January 2020 entitled "Safety Planning Intervention (SPI). As previously discussed on pages 18-19 of this report, almost all of the mental health clinicians have been trained in both the completion of suicide risk assessments and safety planning through a 103-slide PowerPoint presentation entitled "Suicide Assessment in Jail." In addition, a "MH Suicide Safety Plan" template has been embedded in athenaPractice based upon the SPI model, and the ACMH Suicide Risk Assessment template contains a domain for "Safety and Risk Reduction Plan."<br><br>Following review of several recent medical charts, the quality of safety planning will be discussed in more detail in **Provision P) 2** below.<br><br>In conclusion, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>Medical chart review. |

| **Provision K) 2. Treatment of Inmates Identified as at Risk of Suicide** | **Treatment plans shall be designed to reduce suicide risk and shall contain individualized goals and interventions. Treatment plans shall be reviewed following discharge from suicide precautions and updated as clinically indicated.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Fifth* Status Report (June 16, 2022), was omitted.<br><br>This provision is duplicative with both **Provision K) 1. Treatment of Inmates Identified at Risk of Suicide** and **Provision P) 2. Discharge from Suicide Precautions**. As such, these three provisions will be monitored as one provision.<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains requirements the following requirements that are consistent with this provision: "1. MH staff will develop and utilize a safety planning tool for patients on suicide precautions. The safety plan shall be completed with the patient and identify specific signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and specific actions (independent coping skills, personal and professional resources for support, etc.) the patient or staff can take if suicidal | |

thoughts do occur. The plan should be updated as clinically indicated. 2.The treatment plan shall be updated to include goals and interventions specific to each patient's safety plan and discharge planning."

As detailed in previous monitoring reports, ACH introduced a new treatment planning program in January 2020 entitled "Safety Planning Intervention (SPI). As previously discussed on page 18-19 of this report, almost all of the mental health clinicians have been trained in both the completion of suicide risk assessments and safety planning through a 103-slide PowerPoint presentation entitled "Suicide Assessment in Jail." In addition, a "MH Suicide Safety Plan" template has been embedded in athenaPractice based upon the SPI model, and the ACMH Suicide Risk Assessment template contains a domain for "Safety and Risk Reduction Plan."

Following review of several recent medical charts, the quality of safety planning found problematic practices. The following four examples exemplify current struggles by mental health clinicians to develop adequate safety plans to reduce suicide risk:

Case No. 4 (documented February 23, 2022)

Step 1 (Warning Signs): _____
Step 2 (Independent Coping Skills): sleep, breathe, eat.
Step 3 (Distracting People & Places): sleep, breathe, eat.
Step 4 (People to Ask for Help): any staff.
Step 5 (Professionals to Contact): any staff member.
Step 6 (Means Safety): press emergency button.
Step 7 (Reasons to Live): get out of here, be released.

Case No. 5 (documented March 1, 2022)

Step 1 (Warning Signs): not being on psych. meds.
Step 2 (Independent Coping Skills): counting, reading.
Step 3 (Distracting People & Places): talk to other inmates in dayroom.
Step 4 (People to Ask for Help): custody, MHS.
Step 5 (Professionals to Contact): any staff member.
Step 6 (Means Safety): press emergency button.
Step 7 (Reasons to Live): "Staying myself. Just knowing who I am."

Case No. 6 (documented February 24, 2022)

Step 1 (Warning Signs): "I don't know what was happening." UTI.

|  | Step 2 (Independent Coping Skills): read, take meds. Step 3 (Distracting People & Places): watch TV from cell. Step 4 (People to Ask for Help): MHS, custody, medical, father, Turning Point workers. Step 5 (Professionals to Contact): any staff member. Step 6 (Means Safety): press emergency button in cell as needed. Step 7 (Reasons to Live): "My kids." Future oriented to IOP services. Case No. 7 (documented September 15, 2021) Refused SPI, clinician documented that "safety plan is IOP." Safety planning involves collaboration between the clinician and patient to identify a specific strategy that describes signs, symptoms, and the circumstances in which the risk for suicide was likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient and clinician could take if suicidal thoughts reoccurred. The above examples of safety planning were simply patients' self-reported responses and did not constitute reasonable strategies to reduce suicide risk in the future. In conclusion, mental health clinicians will continue to struggle with development of adequate safety plans unless the process is collaborative between the patient and the clinician, and patients are granted routine possessions (books, writing materials, etc.) and out-of-cell activities that can assist with coping skills in reducing suicidal ideation. As previously noted, inmate-patients in the 2P-APU do not receive safety planning until they are discharged from the placement. This also continues to be problematic. This provision remains in Partial Compliance. |
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. Medical chart review. |

| Provision K) 3. Treatment of Inmates Identified as at Risk of Suicide | All assessments, treatment, and other clinical encounters shall occur in an area that provides reasonable sound privacy and confidentiality. If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk. |
|---|---|
| **Status** | **Partial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from a prior status report as follows: "When necessary, custody staff will standby for security while offering auditory privacy.  Proximity is dependent on the inmate's behavior safety risk.  This can be accomplished at RCCC due to the design of the three offices where these contacts take place.  All of the doors can be closed. They have windows where the officers can stand outside and see what is taking place in the room.  At the Main Jail,  a private attorney booth has been converted to be utilized as a confidential interview room for mental health assessments." The ACH response in the same report stated that "Staff utilize the confidential interview office in booking, classrooms, and attorney booths for confidential interviews." |

This provision is duplicative of **Provision D) 1. Post-Intake Mental Health Assessment Procedures.** As previously stated in that section on pages 29-31 of this report, mental health clinicians assigned to the Main Jail utilized various options for their interaction with patients on suicide precautions: 1) a converted attorney booth in booking referred to as the ACMH Interview Room, 2) classrooms on each housing floor (including 300-West Pod that houses the SITHU), 3) the outside control area of 300-West Pod in close proximity to the officer's desk, 4) the SITHU dayroom area, and 5) cell front of the booking cells (safety, ad, seg, or sobering). Cell front, as well as the outside control area of 300-West Pod and the SITHU dayroom area are non-confidential because they are in close proximity to both officers and other inmates. The expert was also informed during the February 2022 on-site assessment, but did not observe, that the visiting booths in 300-West Pod were also available for clinical contacts by mental health clinicians.

As previously discussed, the expert shadowed several mental health clinicians as they were conducting daily assessments of the inmates identified as suicidal during the February 21-23, 2022 on-site assessment, During the three-day period, 21 such assessments were observed. Of those observed assessments, 76 percent (16 of 21) were conducted in either the ACMH Interview Room or in housing unit classrooms, with only 24 percent (5 of 16) of the assessments conducted cell front.  This was a significant improvement from observations reported in prior monitoring reports wherein the ACMH Interview Room had been inoperable for a considerable period of time.

|  | However, the expert also reviewed the medical charts of 10 inmates who were on suicide precautions for a multiple-day period before, during, and after the most recent on-site assessment. The review period spanned between approximately February 17 through March 1, 2022, with inmates housed in either the booking area (in safety, ad seg, or sobering cells) or the SITHU. The medical chart review indicated that mental health clinicians interacted with inmates in both confidential (either the ACMH Interview Room or 300-West Pod classroom) and non-confidential (cell front) settings. In fact, in 40 percent (4 of 10) of cases, clinicians consistently met with inmates in the ACMH Interview Room and/or 300-West Pod classroom. In 60 percent (6 of 10) of cases, clinicians met with inmates both at cell front and in confidential settings during their multiple-day placement on suicide precautions. *From this medical chart review, it was obvious that confidential settings were utilized more during the expert's on-site assessment, and non-confidential cell front interaction was utilized more when the expert was not on-site.*<br><br>The expert's interaction with various mental health clinicians, as well as observations during the on-site assessment, indicated that clinicians were often competing with themselves for access to the 300-West Pod classroom.<br><br>In addition, the expert observed provider rounds in the 2P-Acute Psychiatric Unit (APU) on February 22, 2022. Rounds included a psychiatrist, forensic psychiatric fellow, LCSW, and an officer. Because the unit does not have any confidential out-of-cell space, all contacts for the 16 patients in the APU that day were provided cell front. On a case-by-case basis depending upon the perceived stability of the patient, the cell door was opened and the provider or psychiatric fellow interacted with the patient in the doorway alongside an officer. Regardless of whether the cell doors were open or closed, all of these provider contacts were non-confidential.<br><br>In conclusion, although there was some improvement observed during the experts on site assessment, the on-going lack of privacy and confidentiality during the daily assessment of suicide risk continues to be an impediment to the County's ability to provide a reasonable suicide prevention program. Based upon current practices, including some improvement in the capacity to provide reasonable privacy during mental health clinicians' daily interaction with inmates on suicide precautions, this provision is moved to Partial Compliance. |
| **Recommendations** | 1) As previously recommended, unless exigent circumstances exist and are documented on a case-by-case basis, any inmate identified as suicidal should be given an opportunity for assessment outside of their cell. This includes initial assessments, daily on-going assessments, discharge assessments, and scheduled follow-up.<br>2) As previously recommended, additional designated room(s) or areas outside of the Main Jail's booking area, including additional space near 300-West Pod and space within 2)-APU, that can provide privacy and confidentiality should be created and routinely utilized for the assessment of suicidal inmates. |

| Evidentiary Basis | Sacramento County's *Fifth* Status Report (June 16, 2022). On-site observation on February 21-23, 2022. Medical chart review. |
| --- | --- |

| Provision L) 1. Conditions for Individual Inmates on Suicide Precautions | **The County's Suicide Prevention Policy shall set forth clear and internally consistent procedures regarding decisional authority for determining the conditions for individual inmates on suicide precautions. Mental health staff shall have primary authority, consistent with individualized classification and security needs, with respect to the following:** |
| --- | --- |
| **Status** | **Partial Compliance** |
| **Discussion** | Sacramento County's response to this provision as authored by ACH in the *Fifth* Status Report (June 16, 2022) was: "The suicide prevention policy addresses MH's role as a primary authority to make decisions on property and privileges, use of safety suits, and discharge from suicide precaution based on clinical assessment."<br><br>This provision is interpreted as a "catch-all" provision for these subsequent provisions: **M. Property and Privileges**, **N. Use of Safety Suits, and O. Beds and Bedding**, therefore, this provision cannot come into Substantial Compliance until the suicide prevention policies are revised, and all three of these subsequent provisions come into Substantial Compliance. The relevant language from the ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, will be discussed in these subsequent provisions. The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. This provision remains in Partial Compliance. |
| **Recommendations** | Finalize the SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Observation during on-site assessment of February 21-23, 2022. |

| Provision M)<br>1. Property and Privileges | Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of routine <u>privileges</u> (e.g., visits, telephone calls, recreation) that are otherwise within the limitations of a prisoner's classification security level. Any removal of privileges shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis. | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice. Prisoners placed in a safety cell shall be allowed to retain enough clothing or be provided with a suitably designed 'safety garment' to provide for the prisoners' personal privacy unless specific identifiable risks to the prisoner's safety or to the security of the facility exist and are documented."<br><br>The County's response incorrectly attributes this provision to "safety garments," whereas the provision is specific to clinical decisions regarding granting privileges such as visits, telephone calls, and recreation for inmates on suicide precautions.<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains requirements the following requirements that are consistent with this provision: "Licensed clinicians have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, the removal or return of routine privileges. This includes, but not limited to: a. Telephone calls; b. Visits (including social visits); c. Recreation/out-of-cell time; d. Court hearings; e. Other activities that are otherwise within the limitations of a patient's classification security level; f. Clothing and possessions. Custody shall ensure all patients on suicide precautions, regardless of length of stay, should receive showers on a schedule commensurate with schedules in other housing units." The SCSO Policy 722: Suicide Prevention Policy has not been finalized.<br><br>Despite this new ACH policy requirement, consistent with findings in previous monitoring reports, the expert's recent on-site assessment on February 21-23, 2022 continued to find compliance problems with this provision. Based upon observation during rounds by mental health clinicians, interaction with inmates and review of Custody Logs of 11 inmates on suicide precautions in the SITHU and Temporary Suicide Precautions Housing at Main Jail booking (safety, ad seg, and sobering cells), the expert found:<br><br>• Consistent documentation of daily meals and water, as well as nursing and mental health rounds; | |

- Daily mental health rounds occurred either out-of-cell or cell front;

- With the exception of out-of-cell mental health contacts, all inmates on suicide precautions in Temporary Suicide Precautions Housing at Main Jail booking (safety, ad seg, and sobering cells), were locked down;

- Opportunity for out-of-cell activities in SITHU dayroom was not provided;

- Showers were offered occasionally, not on a daily basis, in the SITHU (during night shift);

- There were a few examples of telephone calls offered in thew SITHU (during day shift);

- No showers, telephone calls, or other out-of-cell movement (with the exception of mental health rounds) were offered in the Temporary Suicide Precautions Housing at Main Jail booking (safety, ad seg, and sobering cells);

- Documentation was inconsistent as to whether a mattress was always provided to inmates upon admission into suicide precautions (whether in SITHU or safety, ad seg, and sobering cells); with some examples of documentation indicating mattresses were provided several hours days after admission; and

- Medical chart review indicated that inmates on suicide precautions were no longer routinely denied access to court appearances.

One case (Case No.8) was symbolic of the problems regarding property and privileges provided to inmates on suicide precautions. The inmate was on suicide precautions for 14 days beginning on February 10, 2022 when he expressed suicidal ideations on 4-East Unit and was placed in the SITHU. According to several Custody Instructions sheet completed by mental health clinicians, the inmate did not have any restrictions regarding clothing, items, or privileges. On February 10, he was provided an attorney visit. During the next five days, the Custody Logs indicated that the inmate was provided meals three times per day, and received daily contact with both medical and mental health staff. It was not until February 15 that he was offered and refused a shower. Two days later on February 17, the inmate was given his property. The following day (February 18), the inmate was offered and provided a shower.

| | |
|---|---|
| | He was provided a telephone call on February 21, as well as an attorney visit. The inmate was also offered and refused a shower that day. On February 22, the inmate was moved to Main Jail booking after observed by custody staff to be "fishing." He was discharged from suicide precautions on February 24 and transferred to RCCC.<br><br>This provision remains in Partial Compliance. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Observation during on-site assessment of February 21-23, 2022.<br>Medical chart review.<br>Review of Custody Logs and Custody Instructions Sheets for 11 inmates on suicide precautions. |

| | |
|---|---|
| **Provision M)<br>2. Property and Privileges** | **Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff depending on suicide risk, the removal and/or return of a prisoner's <u>clothing and possessions</u> (e.g., books, slippers/sandals, eyeglasses) that are otherwise within the limitations of a prisoner's classification security level. The removal of property shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.** |
| **Status** | Partial Compliance |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice. If deemed necessary by JPS staff, the inmate's clothing shall be taken and the inmate will be given a 'safety suit' to wear. Prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damage property."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains requirements the following requirements that are consistent with this provision: "Any removal of clothing, property and/or privileges shall be documented with clinical justification in the patient's EMR and reviewed by a licensed clinician on at least a daily basis. For all patients on suicide precautions, the removal or limitation of clothing, property, and/or privileges shall be primarily determined by a licensed clinician. This determination shall be based on clinical judgement and on a case-by-case basis, depending on suicide risk, and in consultation with custody staff. This determination shall be documented in the patient's chart with clinical rationale. Collateral information |

| | |
|---|---|
| | regarding patient's current functioning obtained from custody and/or medical staff shall also be documented." In addition, ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, effective June 22, 2022, requires that "Removal of any personal or jail-issued item from the patient must be documented in the EHR along with the clinical justification for removal and accompanied by a doctor's order and documented on the Denial of Rights form. Magnetic signage will be posted on the patient's cell door indicating that the patient has an item restriction order." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.

Based upon observation during rounds by mental health clinicians on February 21-23, 2022 this expert found that of 17 inmates on suicide precautions, 10 (59 percent) were clothed in safety smocks and 7 (41 percent) were clothed in jail uniforms.  In addition, inmates placed on suicide precautions in the Temporary Suicide Precautions Housing at Main Jail booking (safety, ad seg, and sobering cells) are almost always initially clothed in a safety smock by default until initial assessment by mental health clinician. In practice, inmates placed on suicide precautions in booking safety, ad seg, and sobering cells _never_ receive books, slippers/sandals, eyeglasses. Rather, following a mental health assessment, there simply provided either a safety smock or jail uniform.

In contrast, patients admitted into the 2P-APU on suicide precautions and initially clothed in a safety smock, with their uniform is generally returned to them within 24 hours. 2P-APU providers then follow a "Denial of Rights" (DOR) protocol that works as follows on a case-by-case basis:

    DOR1: Standard inmate clothing
    DOR2: Personal items (including toothbrush, deodorant etc.)
    DOR5: Personal visits (visits with attorneys are never limited
    but may need to occur at cell-side)
    DOR7: Writing utensils (pencils)
    DOR10: Placement in restraints

In conclusion, this provision remains in Partial Compliance (and not Non-Compliance) only because of the stark contrast between safety smock and possessions use in out-patient units versus the 2P-APU at the Main Jail. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention to include language that specifies mental health clinicians shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of clothing and possessions (e.g., books, slippers/sandals, eyeglasses) that are otherwise within the limitations of an inmate's classification security level. |

| Evidentiary Basis | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, effective November 16, 2021, final. ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, effective June 22, 2022, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Medical chart review. Observation during on-site assessment of June 21-23, 2022. |
|---|---|

| Provision M) 3. Property and Privileges | Cancellation of privileges should be avoided whenever possible and utilized only as a last resort. | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice. Cancellation of privileges would be done only as a last resort or if deemed necessary per JPS." Although this provision is duplicative with **Provision M) 1. Property and Privileges**, the SCSO response continues to be contrary to this expert's observations and medical chart review. In conclusion, this provision remains in Partial Compliance (and not Non-Compliance) only because of the ACH suicide prevention policy has been issued, and this expert's recent observation during the February 21-23, 2022 on-site assessment did show a few examples of inmates on suicide precautions receiving telephone calls and being allowed to attend court hearings. | |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. | |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Observation during on-site assessment of February 21-23, 2022. Medical chart review. Review of Custody Logs and Custody Instructions Sheets for 11 inmates on suicide precautions. | |

| Provision N) 1. Use of Safety Suits | Decisions about the use of a safety suit (smock) or removal of normal clothing will be under mental health staff's authority, based on individualized clinical judgment along with input from custody staff. |
|---|---|
| **Status** | **Partial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice. Outlined in the current Suicide Prevention Program Operations Order. The use of the 'safety suit' shall be at the discretion of JPS, based on collaboration with intake or custody staff." <br><br> Although this provision is related to **Provision M) 1. Property and Privileges**, the SCSO response was contrary to this expert's observations and medical chart review. This provision remains in Partial Compliance (and not Non-Compliance) only because the new ACH suicide prevention policy has been issued, and the stark contrast between safety smock use in out-patient units versus the 2P-APU within the Main Jail. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). <br> ACH 02-05: Suicide Prevention Program, effective November 16, 2021, final. <br> ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, effective June 22, 2022, final. <br> SCSO Policy 722: Suicide Prevention and Intervention, draft pending. <br> Medical chart review. <br> Observation during on-site assessment of June 21-23, 2022. |

| Provision N) 2. Use of Safety Suits | Custody staff may only temporarily place an inmate in a safety suit based on an identified risk of suicide by hanging until the qualified mental health professional's evaluation, to be completed within the "must see" referral timeline. Upon completion of the mental health evaluation, the mental health professional will determine whether to continue or discontinue use of the safety suit. |
|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Absent direction from Jail Psychiatric Services (JPS) deeming a 'safety garment' necessary, a sworn supervisor must authorize custody staff to take the clothing and supply the prisoner with a 'safety garment.' Unless a 'safety garment' is necessitated by the prisoner's behavior, prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damaged property." |

| | The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately address this provision as follows: "Custody staff may only temporarily place a patient in a safety suit based on an identified risk of suicide by use of ligature until the licensed clinician's completion of the SRA." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>In practice, it would be this expert's finding that custody personnel issue safety smocks on <u>all</u> inmates initially placed on suicide precautions, not simply those identified at *risk of suicide by hanging* as required by this provision.<br><br>Although this provision is similar to **Provision N) 1. Use of Safety Suits**, the SCSO response was contrary to this expert's observations and medical chart review. This provision remains in Partial Compliance (and not Non-Compliance) only because of the new ACH suicide prevention policy has been issued and addresses this provision, as well as the stark contrast between safety smock use in out-patient units versus the 2P-APU within the Main Jail. |
|---|---|
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention to include specific language that states "inmates can only be temporarily placed in a safety smock based on an identified risk of suicide by hanging."<br>2) As required in the Memorandum of Agreement dated May 27, 2022, Section 9a: "Health care and custody supervisors will conduct at least weekly reviews of safety smock use to ensure proper implementation, with corrective action taken when warranted." |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Memorandum of Agreement, May 27, 2022.<br>Observation during on-site assessment of February 21-23, 2022.<br>Medical chart review.<br>Review of Custody Logs and Custody Instructions Sheets for 11 inmates on suicide precautions. |


| Provision N)<br>3. Use of Safety Suits | **If an inmate's clothing is removed, the inmate shall be issued a safety suit and safety blanket.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice. See above." | |

| | |
|---|---|
| | The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately address this provision as follows: "Should a licensed clinician determine that a suicidal patient clothing may be removed, the patient shall be issued a safety smock and safety blanket." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>This expert's observations and the medical chart review during the most recent on-site assessment continued to find that there were no instances in which an inmate on suicide precautions was not provided a safety smock and safety blanket.<br><br>This provision remains in Partial Compliance only because the SCSO suicide prevention policy has not been finalized. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Observation during on-site assessment of February 21-23, 2022.<br>Medical chart review. |

| **Provision N)**<br>**4. Use of Safety Suits** | **As soon as clinically appropriate, the provision of regular clothing shall be restored. The goal shall be to return full clothing to the inmate prior to discharge from suicide precautions.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice. Determination is made by JPS."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately address this provision as follows: "Patients shall have their clothing restored as soon as clinically appropriate and prior to discharge from suicide precautions. Consideration of a patient's readiness for restoration of clothing shall be determined on an on-going basis (i.e., multiple times each day) to ensure timely return of clothing when clinically appropriate." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>This provision is duplicative with **Provision M) 2. Property and Privileges**. As noted above, suicidal inmates housed in Temporary Suicide Precautions Housing and SITHU cells are normally clothed in safety smocks for prolonged periods of time, whereas patients admitted to the 2P Acute Inpatient Unit might | |

| | |
|---|---|
| | initially be clothed in a smock, but their uniform was generally returned to them within 24 hours. This provision remains in Partial Compliance. |
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention.<br>2) As required in the Memorandum of Agreement dated May 27, 2022, Section 9a: "Health care and custody supervisors will conduct at least weekly reviews of safety smock use to ensure proper implementation, with corrective action taken when warranted." |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Observation during on-site assessment of February 21-23, 2022.<br>Memorandum of Agreement, May 27, 2022.<br>Medical chart review. |

| Provision N)<br>5. Use of Safety Suits | **A qualified mental health professional shall conduct daily assessments of any prisoner in a safety suit and document reasons for continued use when clinically indicated.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Fifth* Status Report (June 16, 2022), was omitted.<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately address this provision as follows: "Any removal of clothing, property and/or privileges shall be documented with clinical justification in the patient's EMR and reviewed by a licensed clinician on at least a daily basis."<br><br>This expert's observation during rounds by mental health clinicians for inmates on suicide precautions, as well as medical chart review, during the most recent on-site assessment on February 21-23, 2022 found that clinicians did not always provide clinical rationalization for us of safety smocks. For example, in <u>Case No. 9</u>, the inmate was booked into the Main Jail in February 19, 2022 and self-reported that he had swallowed razor blades the previous day (February 18). He had been evaluated at local hospital, not referred for a 5150 evaluation, and cleared for transport to the jail. The inmate was placed on suicide precautions, housed in an ad seg cell in booking, and issued a safety smock. He was subsequently seen by a mental health clinician who completed an SRA cell front and determined that the inmate should remain in a safety smock because he could not "contract for safety." There were several concerns. First, it should be common knowledge through suicide risk evaluation training that contracting for safety should not be utilized in the evaluation of suicide risk. Second, because the inmate's self-injurious behavior involved swallowing a razor blade |

| | and a safety smock served no purpose in protecting the inmate from swallowing a razor blade in the future, and he had not expressed any threat to hang himself, there was no rationale in the clinician's SRA to justify continued use of the safety smock. The inmate was assessed again the following day (February 20), remained on suicide precautions, but was issued a jail uniform.<br><br>In a similar case, the inmate (<u>Case No. 6</u>) was booked into the Main Jail during the evening of February 22, 2022 and expressed suicidal ideation. A decision was made to place the inmate on suicide precautions in a safety smock and, as a result, she began to engage in self-injurious behavior by banging her head against the safety cell wall. The inmate was then placed in a safety smock and subsequently seen by mental health clinician. An SRA was completed, but there was no clinical rationale as to how the safety smock was a protection against head-banging. Her clothing was returned the following day (February 23), and she was subsequently discharged from suicide precautions on February 24.<br><br>This provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>Observation during on-site assessment of February 21-23, 2022.<br>Medical chart review. |

| **Provision N)**<br>**6. Use of Safety Suits** | **If a qualified mental health professional determines that 30-minute (or less frequent) observations are warranted for a prisoner, safety suits shall not be used on that prisoner.** |
|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "This causes some confusion to address. County requests discussion on the exact meaning of this provision."<br><br>As stated in previous monitoring reports, this expert would agree that a portion of this provision is confusing, i.e., reference to the phrase "<u>or less frequent</u>" than 30-minute observation. This expert has interpreted the provision to mean that, if a qualified mental health professional recommends that an inmate be placed on a 30-minute observation level or greater (e.g., 60 minutes), the inmate should be assessed as <u>not</u> being suicidal and, therefore, should not also be issued a safety smock. In other words, safety smocks are only authorized for suicidal inmates, and suicidal inmates can never be placed on 30-minute |

|  | observation. Following a previous discussion with counsel of the parties, the above interpretation by this expert was correct, i.e., a safety smock can never be authorized for an inmate that a clinician has recommended 30-minute or greater observation level. Safety smocks can only be authorized on a case-by-case basis for those suicidal inmates that require either constant observation or observation at staggered 15-minute intervals.

The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately address this provision as follows: "Any patient placed on 30-minute observation shall never be placed in a safety suit. If a licensed clinician determines that a patient requires a safety suit, the patient shall be placed on suicide precautions." In addition, the ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, effective June 22, 2022, states that "Patients not on suicide observation status (close observation/constant observation) will be observed at staggered intervals not to exceed 30-minute checks as ordered by the psychiatrist."

The problem of patients on 30-minute observation being clothed in safety smocks was previous found in the medical chart review of patients in the 2P-APU. Although this expert did not find patients in the 2P-APU clothed in safety smocks **and** ordered to be observed at 30-minute intervals during this assessment, compliance with this provision is deferred until the next on-site assessment when more cases can be reviewed. This provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, effective June 22, 2022, final. Observation during on-site assessment of February 21-23, 2022. Medical chart review. |

| Provision N) 7. Use of Safety Suits | **Safety suits shall not be used as a tool for behavior management or punishment.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice. Safety suits are only used when necessary for the safety and security of the inmate." | |

| | |
|---|---|
| | The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately address this provision as follows: "Safety suits shall not be used as a default or as a tool for behavior management or punishment." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>Although this expert did not find any evidence from the medical chart review during this monitoring period that safety smocks were being utilized as a tool for behavior management or punishment, the use of safety smocks as a default for all suicidal inmates initially housed in Temporary Suicide Precautions Housing in Main Jail booking could certainly be interpreted by an inmate as a punitive management tool to deter perceived manipulative and/or attention-seeking behavior.<br><br>In conclusion, because the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized, this provision remains in Partial Compliance. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Observation during on-site assessment of February 21-23, 2022.<br>Medical chart review. |

| **Provision O) 1. Beds and Bedding** | **All prisoners housed for more than four hours on suicide precautions and/or in an inpatient placement shall be provided with an appropriate bed, mattress, and bedding unless the prisoner uses these items in ways for which they were not intended (e.g., tampering or obstructing visibility into the cell). Such a determination shall be documented and shall be reviewed on a regular basis.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was as follows: "This is current practice. Those housing safety cells in the booking area are moved to appropriate suicide-resistant housing as soon as a bed/cell opens up." The ACH response in the same report was that "Custody distributed new suicide-resistant mattresses to the high acuity MH housing areas and safety cells in May 2022."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, partly addresses this provision as follows: "If a patient utilizes a mattress to obstruct staff visibility or tampers with a mattress in a manner that poses danger to the patient, custody personnel may temporarily remove the mattress | |

|  | from the cell. The removal of a mattress and rationale shall be documented. Patients will be assessed regularly by a licensed clinician for the appropriate use of a mattress." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>The parties have previously clarified that the County is responsible for provision of a temporary suicide-resistant bed ("stack-a-bunk") and mattress for inmates housed more than four (4) hours on suicide precautions or in-patient placement. (Provision H.1 separately indicates that safety cell placements may last for up to six (6) hours.)<br><br>There were several concerns found during the on-site assessment on February 21-23, 2022, including a few suicidal patients not provided a mattress in a timely fashion (within four hours) upon placement on suicide precautions, not all suicidal patients being provided with a suicide-resistant blanket, and non-suicide resistant beds in 2P-APU (previously discussed on pages 49-51 of this report). As offered above, the SCSO began distributing suicide resistant mattresses/blankets to inmates on suicide precautions in May 2022.<br><br>In conclusion, this provision remains in Partial Compliance because the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized and the expert will need to inspect the 2P-APU for suicide-resistant beds and cells, as well as distribution to suicide-resistant mattresses/blankets to all suicidal patients during the next on-site assessment. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Observation during on-site assessment of February 21-23, 2022.<br>Medical chart review. |

| **Provision P)** **1. Discharge from Suicide Precautions** | **A qualified mental health professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions in order to ensure that the discharge is appropriate and that appropriate treatment and safety planning is completed.** | |
| --- | --- | --- |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current custody practice." Such a response was incorrect because this provision is specific to a mental health clinician's determination, documented in a SRA, that the inmate can be discharged from suicide precautions because they are no longer at current risk for suicide. | |

|  | The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately addresses this provision as follows: "A licensed clinician shall complete an SRA for each patient discharged from suicide precautions. The SRA shall include recommendations for specific treatment goals based on the circumstances leading to placement on suicide precautions and/or acute psychiatric care including underlying diagnosis."<br><br>This expert's medical chart review of 10 inmates placed on suicide precautions during the on-site assessment in February 2022 found that 90 percent (9 of 10) of the cases resulted in timely completion of suicide risk assessments (SRAs) that justified discharge from suicide precautions. In one case, the SRA was completed untimely the day following discharge. Provision remains in partial compliance. |
|---|---|
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>Medical chart review. |

|  |  |  |
|---|---|---|
| **Provision P)**<br>**2. Discharge from Suicide Precautions** | **Treatment plans shall be written for all prisoners discharged from suicide precautions. The treatment plan shall describe signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur.** | |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Fifth* Status Report (June 16, 2022), was omitted.<br><br>This provision is duplicative with both **Provision K) 1. Treatment of Inmates Identified as at Risk of Suicide** and **Provision K) 2. Treatment of Inmates Identified as at Risk of Suicide** that were addressed on pages 59-62 of this report. As such, these three provisions will be monitored as one provision.<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements that are consistent with this provision: "MH staff will develop and utilize a safety planning tool for patients on suicide precautions. The safety plan shall be completed with the patient and identify specific signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and specific actions (independent coping skills, personal and professional resources for support, etc.) the patient or staff can take if suicidal thoughts do occur. The plan should be updated as clinically indicated….The treatment plan | |

|  | shall be updated to include goals and interventions specific to each patient's safety plan and discharge planning." |
|  | This provision remains in Partial Compliance. |
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. Medical chart review. |

| **Provision P) 3. Discharge from Suicide Precautions** | **Qualified mental health professionals shall provide clinical input regarding clinically appropriate housing placement (e.g., whether isolation is contraindicated for the prisoner) upon discharge. Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement. Once clinically discharged from suicide precautions, the prisoner shall be promptly transferred to appropriate housing.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current custody practice. This is accomplished with the input of Classification staff and JPS." The ACH response in the same report was repeated from previous reports as follows: "Patients are transferred to IOP when clinically appropriate and a bed is available. IOP and Outpatient treatment logs have been updated to reflect accurate appointment types." | |
|  | The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements that are consistent with this provision: "A licensed clinician shall also provide clinical input regarding clinically appropriate housing placement (e.g., whether isolation is contraindicated for the patient) upon discharge and document such input in the EHR. Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement. Once clinically discharged from suicide precautions, the patient shall be promptly transferred to appropriate housing." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. | |
|  | Both SCSO and UC-Davis leadership previously informed this expert that clinicians do work collaboratively with custody personnel in the placement of inmates following their discharge from suicide precautions. Recent medical chart review did not provide any evidence to the contrary. This provision remains in Partial Compliance because the SCSO suicide prevention policy has not been finalized. | |

| Recommendations | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Medical chart review. |

| **Provision P) 4. Discharge from Suicide Precautions** | **Prisoners discharged from suicide precautions shall remain on the mental health caseload and receive regularly scheduled clinical assessments and contacts. Unless a prisoner's individual circumstances direct otherwise, a qualified mental health professional shall provide follow-up assessment and clinical contacts within 24 hours of discharge, again within 72 hours of discharge, again within one week of discharge.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Patients who are discharged from APU after being treated for a suicide attempt or ideation receive follow-up MH appointments (24 hours, 72 hours and 5 days)." The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements that are consistent with this provision: "All patients discharged from suicide precautions shall remain on the mental health caseload and receive regularly scheduled clinical assessments and contacts. Unless a patient's individual circumstances direct otherwise, a clinician shall provide a follow-up assessment and clinical contact within 24 hours of discharge, again within 72 hours of discharge, and again within one week of discharge. a. Individual circumstances that might override the above requirement for follow-up assessments may include incidents in which a patient was placed on suicide precautions by either custody or medical personnel and subsequently discharged from suicide precautions by a licensed clinician within 24 hours and with finding that the placement was inadvertent (See G.3. above). b. However, if the licensed clinician's initial suicide risk assessment determined that continued suicide precautions beyond 24 hours was appropriate, then the scheduled follow-ups shall always occur." This expert's medical chart review of 10 inmates placed on suicide precautions during the on-site assessment in February 2022 found that 4 cases were not applicable for review because the inmates were discharged from custody prior to initiation of the follow-up schedule. Of the remaining 6 cases, 3 (50 percent) inmates received timely follow-up referrals and 3 (50 percent) did not receive timely follow-up referrals (e.g., the first required follow-up after 24 hours was not provided). | |

| | In conclusion, because scheduled follow-up assessments are not consistently occurring in all cases, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>Medical chart review. |

<br>

| **Provision Q)**<br>**1. Emergency Response** | **The County shall keep an emergency response bag that includes appropriate equipment, including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units. All custodial and medical staff be trained on the location of this emergency response bag and shall receive regular training on emergency response procedures, including how to use appropriate equipment.** |
|---|---|
| **Status** | **Partial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Those items are available in each facility." The ACH response was also repeated in previous reports as: "New emergency carts were deployed at Main Jail. New carts are on order for RCCC."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements that are consistent with this provision: "Both the MJ and RCCC shall keep an emergency response cart or bag that includes a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units. All custody and medical staff shall be trained on the location of this emergency response cart and shall receive regular training on emergency response procedures, including how to use appropriate equipment." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>This provision specifically requires that an emergency response bag (including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool) be located in close proximity to all housing units, not simply "available in each facility." Inspection of select Main Jail and RCCC housing units during the February 2022 on-site assessment found that emergency rescue tools and pocket masks (not Ambu bags) were located in the deputies' "bubble" outside each housing unit.<br><br>This provision remains in Partial Compliance because the SCSO suicide prevention policy has not been finalized. |

| Recommendations | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Select housing unit inspection during on-site assessment of February 21-23, 2022. |

| Provision Q) 2. Emergency Response | **All custody and medical staff shall be trained in first aid and CPR.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current Custody practice. Sworn staff receive CPR training every two years. It is part of our Advanced Officer Training Program." The ACH response in the same report stated: "Medical and custody staff are trained in CPR." The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements that are consistent with this provision: "All medical and custody staff are trained in first aid and CPR." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. Recent CPR training data indicated that 52 percent (144 of 278) of custody personnel, and 84 percent (121 of 144) of medical personnel (nursing and providers) were currently certified in CPR. This provision remains in Partial Compliance because the SCSO suicide prevention policy has not been finalized and low percentages of both custody and medical personnel were currently CPR certified. | |
| Recommendations | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention. 2) Twice a year in January and June, provide updated data on the total number of current employees for each discipline (i.e., denominator for both custody and medical personnel), and the total of current employees (i.e., numerator) who are currently CPR certified. | |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Training data provided July 2022. | |

| Provision Q) 3. Emergency Response | It shall be the policy of the County that any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff shall begin to administer standard first aid and/or CPR, as appropriate. | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2021), was repeated from previous reports as: "Current practice." The ACH response in the same report stated: "Staff complete a Man-Down Debriefing Summary for incidents requiring medical response or drills. The form and staff debriefing assist staff in reviewing code response."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements that are consistent with this provision: "Any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff shall begin to administer standard first aid and/or CPR, as appropriate." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>This provision remains in Partial Compliance because the SCSO suicide prevention policy is not finalized, and this expert needs to review additional ACH Incident Reports and SCSO Incident Reports on serious suicide attempts to ensure that they provide adequate descriptions of the emergency response. | |
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention.<br>2) Forward all appropriate ACH Incident Reports and SCSO Incident Reports on serious suicide attempts that provide an adequate description of the emergency response from both correctional or medical personnel and/or initiation of first aid/CPR as appropriate. | |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending. | |

| Provision R) 1. Quality Assurance and Quality Improvement | The County shall establish regularly scheduled multidisciplinary meetings related to treatment, and plan of care issues, on a monthly basis, between medical, and mental health personnel. | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the *Fifth* Status Report (June 16, 2022), was: "A MH QI subcommittee convened | |

May 2021. This Subcommittee meets quarterly. MH convened a multidisciplinary Suicide Prevention Subcommittee to review, track, and audit the requirements. Suicide Prevention Subcommittee moved meetings from a quarterly to monthly schedule to improve communication, implement suicide prevention training, and complete morbidity and mortality reports in a timely manner. A multidisciplinary Suicide Prevention Training Subcommittee was established to develop suicide prevention training. This group met multiple times and determined a separate subcommittee was no longer needed in late May 2022 once training was approved."

The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements that are consistent with this provision: "The Suicide Prevention Subcommittee is a designated subcommittee of the Quality Improvement Committee. The composition of the subcommittee includes representation from all disciplines and both facilities. The subcommittee meets monthly and is facilitated by the Mental Health Medical Director." In addition, the ACH 01-15: Suicide Prevention Subcommittee policy, effective September 17, 2021, provides a full description of the Subcommittee's areas of responsibility, that include, but are not limited to, "Ensuring that all required suicide prevention policies are implemented and sustained." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.

Based upon this expert's recommendation, the Suicide Prevention Subcommittee converted to monthly meetings in November 2021. With the exception of one month (April 2022), the Subcommittee has maintained monthly meetings from November 2021 through June 2022. This multidisciplinary subcommittee, comprised of mental health, medical, and custody personnel, is facilitated by the UC-Davis on-site medical director. This expert is also a regular participant at the Subcommittee meetings. To date, as reflected in the minutes, most of the monthly subcommittee meetings have focused primarily on the morbidity review of various serious suicide attempts occurring in the Main Jail during 2021. The meetings have not adequately addressed one of the Subcommittee's main areas of responsibility, i.e., "ensuring that all required suicide prevention policies are implemented and sustained." This continuous quality assurance responsibility is further discussed below in **Provision R) 5. Quality Assurance and Quality Improvement.**

In addition, both the ACH 02-05: Suicide Prevention Program policy and ACH 01-15: Suicide Prevention Subcommittee policy require that "The management of specific inmates on suicide precautions that pose challenges to custody, medical and/or MH personnel shall be discussed in a monthly multi-disciplinary Suicide Precautions Meeting….Meeting minutes shall be taken to record discussion, decisions and recommendations….Members of this multi-disciplinary meeting shall make recommendations, as appropriate, to the

| | |
|---|---|
| | Suicide Prevention Subcommittee." It was determined during the most recent on-site assessment that monthly multidisciplinary Suicide Precautions meetings had <u>not</u> been initiated, however, UC-Davis leadership subsequently informed this expert that such monthly meetings began on July 6, 2022.<br><br>Based upon the above findings, this provision remains in Partial Compliance. |
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention.<br>2) Future Suicide Prevention Subcommittee meetings should include discussion of continuous quality assurance measures taken to ensure all required suicide prevention policies are implemented and sustained.<br>3) Beginning in July 2022, provide minutes for Suicide Precautions Meeting to the expert on a monthly basis. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 01-15: Suicide Prevention Subcommittee, September 17, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Suicide Prevention Subcommittee meeting minutes from November 2021 thru June 2022. |


| **Provision R)<br>2. Quality Assurance and Quality Improvement** | **The County shall, in consultation with Plaintiffs' counsel, revise its in-custody death review policy and procedures. Reviews shall be conducted with the active participation of custody, medical, and mental health staff. Reviews shall include analysis of policy or systemic issues and the development of corrective action plans when warranted.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice."<br><br>This provision is more or less duplicative with **Provision R) 3. Quality Assurance and Quality Improvement** below. The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements of the Suicide Prevention Subcommittee that are consistent with this provision: "Provide a comprehensive morbidity review of serious suicide attempts (one involving medical intervention or hospitalization) and a mortality review of suicides. Reviews to include: 1. The circumstances surrounding the incident. 2. Possible precipitating factors that may have caused the patient to commit suicide or suffer a serious suicide attempt. 3. Pertinent medical and mental health services, incidents and/or reports involving the patient. 4. The procedures relevant to the incident. 5. All relevant training received by involved staff. 6. Where applicable, the subcommittee shall make | |

| | |
|---|---|
| | recommendations for changes in policy, training, physical plant, medical or mental health services, and/or operational procedures." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>Because the SCSO suicide prevention policy has not been finalized, this provision remains in Partial Compliance. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 01-15: Suicide Prevention Subcommittee, September 17, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending. |

| | |
|---|---|
| **Provision R) 3. Quality Assurance and Quality Improvement** | **For each suicide and serious suicide attempt (e.g., requiring hospitalization), the County's Suicide Prevention Task Force shall review: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt. Where applicable, the Review Team shall generate recommendations for changes in policy, training, physical plant, medical or mental health services, and operational procedures.** |
| **Status** | Partial Compliance | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice. The Suicide Prevention Task Force has been reestablished and has already had its first meeting." The Suicide Prevention Task Force was subsequently renamed the Suicide Prevention Subcommittee at the initiation of monitoring of this *Consent Decree*.<br><br>This provision is more or less duplicative with **Provision R) 2. Quality Assurance and Quality Improvement** above. The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements of the Suicide Prevention Subcommittee that are consistent with this provision: "Provide a comprehensive morbidity review of serious suicide attempts (one involving medical intervention or hospitalization) and a mortality review of suicides. Reviews to include: 1. The circumstances surrounding the incident. 2. Possible precipitating factors that may have caused the patient to commit suicide or suffer a serious suicide attempt. 3. Pertinent medical and mental health services, incidents and/or reports involving the patient. 4. The procedures relevant to the incident. 5. All relevant training received by involved staff. 6. Where applicable, the subcommittee shall make |

|  | recommendations for changes in policy, training, physical plant, medical or mental health services, and/or operational procedures." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. |
|  | As described in a previous provision, the monthly Suicide Prevention Subcommittee meetings have focused on the morbidity review of various serious suicide attempts occurring in the Main Jail during 2021. |
|  | Because the SCSO suicide prevention policy has not been finalized, this provision remains in Partial Compliance. |
| **Recommendations** | Finalize the SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 01-15: Suicide Prevention Subcommittee, September 17, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending. |

| Provision R)<br>4. Quality<br>Assurance and<br>Quality<br>Improvement | **The County will track all critical incidents which include prisoner suicides, attempted suicides, and incidents involving serious self-harm. The County shall review critical incidents and related data through its quality assurance and improvement processes.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the *Fifth* Status Report (June 16, 2022), was simply: "MH tracks incidents of suicide, attempted suicide, and serious self-harm." | |
|  | This provision is more or less duplicative with **Provision R) 3. Quality Assurance and Quality Improvement** above because it involves review of both inmate suicides and serious incidents of self-harm, but also includes tracking of attempted suicides (that are not necessarily determined to be serious). | |
|  | The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements of the Suicide Prevention Subcommittee that are consistent with this provision: "Tracking of all suicides, suicide attempts, and incidents of serious self-harm by the QI Coordinator, with incidents of serious self-harm/attempts and suicides reviewed by the subcommittee." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. | |
|  | As previously discussed in this report, tracking of incidents of suicide attempts by hanging would be important in determining if cells designated to house | |

| | |
|---|---|
| | inmates on suicide precautions are indeed suicide-resistant. For example. If an inmate attempts and/or dies by suicide using a ligature tied to a ventilation grate, bed frame, or other hazard, the SCSO and Suicide Prevention Subcommittee could utilize such information to ensure that all Temporary Suicide Precautions Housing, SITHU, and 2P-APU cells are suicide-resistant.<br><br>Finally, this expert was previously informed by the ACH Quality Improvement Coordinator (QIC) that "QI is tracking incident reports that have a breakdown of self-harm, suicides and suicide attempts. We have reviewed this data in the QIC. We have not yet begun periodic auditing of suicide prevention practices but intend to upon finalization of the policy. When that happens it will be reviewed in the MH Subcommittee who will then provide information, interventions and other data to the QIC."<br><br>In conclusion, this provision remains in Partial Compliance. |
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention.<br>2) SCSO and/or the Suicide Prevention Subcommittee should review all suicidal attempts by hanging in the last 24 months and identify the anchoring point in the cells for those hanging incidents to determine if those same conditions exist in the SITHU, safety/administrative segregation/sobering cells, and 2P-APU cells.<br>3) The SCSO should inspect all SITHU, safety/administrative segregation/sobering cells, and 2P-APU cells to identify any gaps in wall/ceiling fixtures that could be utilized as an anchoring device. Any gaps should be closed with security caulking. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 01-15: Suicide Prevention Subcommittee, September 17, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending. |

| **Provision R)**<br>**5. Quality**<br>**Assurance and**<br>**Quality**<br>**Improvement** | **The County shall implement a continuous quality assurance/quality improvement plan to periodically audit suicide prevention procedures that include, but are not limited to: intake screening (to include audits to ensure that staff ask and record all suicide screening questions), mental health assessments, suicide risk assessments, crisis response, and treatment plans/behavior management plans for prisoners identified as being at risk of suicide or self-harm.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Fifth* Status Report (June 16, 2022), was omitted. The County currently has a joint ACH/ACMH Mental Health Quality Improvement Committee. | |

The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements of the Suicide Prevention Subcommittee that are consistent with this provision: "Periodic auditing of intake screening (to include audits to ensure that nursing staff ask and record all suicide risk and mental health screening questions), mental health assessments, suicide risk assessments, crisis response, and treatment plans/safety plans/behavior management plans for patients identified as being at risk of suicide or self-harm." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.

As detailed in the Introduction section of this report, a Memorandum of Agreement executed by the parties (on May 27, 2022) in the joint *Status Report RE: Monitoring of Consent Decree Implementation*, filed with the court on June 3, 2022 (Case 2:18-cv-02081-TLN-KJN. Document No. 153), contained very specific requirements regarding quality assurance and continuous quality improvement for the suicide prevention provisions of this *Consent Decree*. In fact, Section 18 (page 9) of the Agreement specifies that:

> "*Staff compliance with the protocols set forth above will be subject to a documented quality assurance process for at least 12 months from the date of this Memorandum of Agreement, with quality assurance review at the monthly Suicide Prevention Subcommittee meeting (emphasis added).*
> *a. ACH, mental health, and custody supervisors will conduct at least weekly reviews to ensure proper implementation, with corrective action taken when warranted.*
> *b. The Mental Health and Suicide Prevention Subject Matter experts will monitor policy implementation and the quality assurance process to ensure compliance with relevant Consent Decree requirements.*"

This expert previously interpreted this provision to indicate that the County must develop a continuous quality improvement/quality assurance plan to ensure that all suicide prevention provisions of this *Consent Decree* or implemented and sustained. This Memorandum of Agreement now codifies those responsibilities.

Of note, as previously detailed in this report, UC-Davis recently completed a "Four-hour Timeline to Care Analysis" based upon the number of inmates placed in a safety cell for danger to self from January through March 2022. The analysis, completed on March 31, 2022, measured the number of inmates on suicide precautions that received timely suicide risk assessments. This UC-Davis analysis is an example of the CQI/QA that is required under the *Consent Decree*.

|  | Because all of the suicide prevention provisions in the *Consent Decree* are in various stages of compliance, and the recent Memorandum of Agreement lays out specific continuous quality improvement/quality assurance requirements, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention.<br>2) Future Suicide Prevention Subcommittee meetings should include discussion of continuous quality assurance measures taken to ensure all required suicide prevention policies are implemented and sustained, i.e., the suicide prevention subcommittee to implement the requirements of the Memorandum of Agreement in the joint *Status Report RE: Monitoring of Consent Decree Implementation*, filed June 3, 2022 (Case 2:18-cv-02081-TLN-KJN. Document No. 153). |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 01-15: Suicide Prevention Subcommittee, September 17, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Memorandum of Agreement, May 27, 2022.<br>"Four-hour Timeline to Care Analysis," UC-Davis, March 31, 2022. |