1   **LISA A. TRAVIS, County Counsel**
    **RICK HEYER, Supervising Deputy County Counsel**
2   **[State Bar No. 216150]**
    **COUNTY OF SACRAMENTO**
3   **700 H Street, Suite 2650**
    **Sacramento, CA  95814**
4   **Telephone:  (916) 874-7538**
    **Facsimile:  (916) 874-8207**
5   **E-mail:  heyerr@saccounty.gov**
    **File No.:  126602-000012**
6

7   **Attorneys for County of Sacramento**

8                   **IN THE UNITED STATES DISTRICT COURT**
                    **EASTERN DISTRICT OF CALIFORNIA**
9                        **SACRAMENTO DIVISION**

10  **LORENZO MAYS, RICKY**              **Case No. 2:18-cv-02081 TLN KJN**
    **RICHARDSON, JENNIFER BOTHUN,**
11  **ARMANI LEE, LEERTESE BEIRGE, and**
    **CODY GARLAND, on behalf of themselves**  **JUDGE: Hon. Kendall J. Newman**
12  **and all others similarly situated**

13          **Plaintiffs,**                **FILING OF SIXTH COUNTY STATUS**
                                           **REPORT PURSUANT TO PARAGRAPH**
14  **vs.**                                **12 OF THE CONSENT DECREE**

15  **COUNTY OF SACRAMENTO**

16          **Defendant.**

17

18          Paragraph 12 of the Consent Decree in this matter requires the County to provide

19  Plaintiffs' counsel and the Court appointed subject matter experts with a status report no later

20  than 180 days from the approval of the proposed decree.  In compliance with this requirement,

21  the County provided the "Sixth Status Report; Mays Consent Decree" on January 6, 2023 to the

22  subject matter experts and the attorneys monitors from the Prison Law Office and Disability

23  Rights California.  Attached to this filing is that status report.

24  DATED:  _____January 9, 2023_____      LISA A. TRAVIS, County Counsel
                                               Sacramento County, California
25

26                                             By: _____
27                                                  Rick Heyer
                                                    Supervising Deputy County Counsel
28  2487106
                                        -1-

    FILING OF SIXTH COUNTY STATUS REPORT

# ATTACHMENT 1 - Correctional Health and Jail Psychiatric Services Report



Primary Health Division
Department of Health Services

# Adult Correctional Health
# REMEDIAL PLAN STATUS REPORT
## January 1, 2023

## Table of Contents

INTRODUCTION ...................................................................................................................................... 3

POLICY STATUS OVERVIEW ................................................................................................................... 5

COMPLIANCE DEFINITIONS & RATINGS ................................................................................................ 6

CHALLENGES IMPACTING REMEDIAL PLAN WORK ............................................................................... 8

GENERAL PROVISIONS [Remedial Plan Section II] ............................................................................... 18

ELECTRONIC HEALTH RECORD (E.H.R.) [Remedial Plan Section IV & VI] ............................................ 24

AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE ................................................................ 27

MEDICAL CARE [Remedial Plan Section VI] ........................................................................................ 33

MENTAL HEALTH CARE [Remedial Plan Section IV] ............................................................................ 52

SUICIDE PREVENTION [Remedial Plan Section VII] ............................................................................. 61

SEGREGATION/RESTRICTED HOUSING [Remedial Plan Section VIII] ................................................... 68

QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT .................................................... 70

JAIL FACILITY NEEDS .......................................................................................................................... 73

COUNTY EFFORTS TO REDUCE THE JAIL POPULATION ...................................................................... 76

ATTACHMENT 1 – MAYS POLICY TRACKING CHART

# INTRODUCTION

Background

The Consent Decree was approved by the federal court on January 13, 2020.

Every 180 days, the County is required to issue a status report, which is sent to Mays Class Counsel and the court appointed medical and mental health experts. In addition to the status report, each experts completes document requests, conduct site visits, and provides feedback in an ongoing manner through electronic mail and/or meetings as requested.

This report covers the period of July 2022 – December 2022.   This is the sixth County status report.

Facilities

The adult correctional facilities consist of two jails, the Main Jail (MJ) located downtown and the Rio Cosumnes Correctional Center (RCCC) located in Elk Grove.

|  | MJ | RCCC |
|---|---|---|
| **Year Opened** | 1989 | 1960 |
| **Location** | 651 I Street | 12500 Bruceville Road |
| **Rated Capacity** | 2,380 | 1,625 |

The Sacramento Sheriff's Office (SSO) has overall responsibility and management for the jails. Department of Health Services (DHS), Primary Health Division provides health care services (physical health and behavioral health) through County staff and County contracted staff – working in partnership with SSO.

The average daily population (ADP) of the jail facilities has almost returned to pre-pandemic levels.  In November 2022, there were 3069 individuals incarcerated at the jails – 1874 at MJ and 1195 at RCCC.

The jail population has many health care needs with higher average rates of chronic health conditions, serious mental illness (SMI), and substance use disorders (SUD).

Overview

This report covers Adult Correctional Health's overall progress toward meeting Consent Decree requirements, with emphasis on developments during the current monitoring period.  The report outlines challenges impacting Remedial Plan work and progress on Remedial Plan provisions in the following areas: General, medical, mental health, suicide prevention, brief updates on facilities, and County efforts to reduce the jail population.

Progress Snapshot

Significant progress continues to be made in multiple areas, including quality improvement monitoring and policy development (see "Policy Status Overview" section for details).

Since the Remedial Plan was implemented, ACH has progressed in Consent Decree areas as follows:

- Medical: Lack of compliance to **46%** Partial or Substantial Compliance.  Note: This Expert is the hardest rater and notes each item within a provision separately.
- Suicide Prevention: Lack of compliance to **87%** Partial or Substantial Compliance
- Mental Health: Lack of compliance to **55%** Partial or Substantial Compliance last monitoring report in October 2021. Note: this Expert has not completed a 3rd report.

One area of significant progress has been training:

- Suicide Prevention Initial Training and Refresher Training courses were developed and approved by Class Counsel and Experts.  Refresher training sessions have been provided throughout the monitoring period and Initial 4-hour training started in June 2022.
- Training on LGBTQIA and health equity with reference to the WPATH Standards was developed and all feedback from Medical, Mental Health and Suicide Prevention Experts has been incorporated. The additions are under review and ACH hopes to roll out the training by February 2022.
- Planned Use of Force training course was approved by Class Counsel and Experts and training implementation is projected to begin in February 2023.
- Development of Cultural Competency and Implicit Bias training is in process and training is anticipated to begin in April 2023

Additional detail on these and other areas of substantial progress is provided in the individual sections of this report.

Challenges

Significant challenges have slowed the County's progress toward Remedial Plan compliance. Ongoing workforce shortages have made it difficult to fully implement some of the policies and practice changes that are necessary for Remedial Plan compliance.  Space limitations have negatively impacted service provision and patient confidentiality.   COVID-19 pandemic operations have continued to add a layer of difficulty in providing timely access to care.

See the "Challenges Impacting Remedial Plan Work" section for details on these and other challenges.

Implementation

Implementation is not a quick, linear process.  Staff continually work within a framework of human resource limitations, insufficient space for treatment and staff, and expending considerable resources on daily COVID-19 operations.

4

Change is continual, overlapping, and dynamic while navigating the Remedial Plan and COVID-19 operational requirements.   The fundamental nature of an accelerated change process is not conducive to learning, staff absorption and integration.

Implications

Implications of the challenges listed above along with rapid change requirements results in full and accurate implementation delays, starting new programs, and uneven performance. Currently, there is insufficient staff and space to support requirements within the Remedial Plan. Given the numerous provisions within the Remedial Plan and limitations noted above, working on all provisions simultaneously is not possible.  Managers and staff are working diligently to navigate the complex array of overlapping changes amidst staffing shortages, space constraints, and continually evolving pandemic operations.

ACH continues to work with resources available toward Remedial Plan compliance.


## POLICY STATUS OVERVIEW

Each policy related to provisions of the Remedial Plan is reviewed by Class Counsel and designated experts.  All experts review policies that apply to all disciplines.  For ACH staff, the policy may include significant changes in workflow, new forms, development of electronic health record (EHR) templates, new reporting, etc.  It is not solely a "policy revision."  Some policies have a phased-in implementation due to staffing, equipment, or other needs.

Status

As of December 16, 2022, 40 ACH Medical or Medical/Mental Health joint policies and 14 Mental Health policies have been approved by Class Counsel and/or Subject Matter Experts. Staff have completed new policies and/or policy revisions to address Remedial Plan provisions in all major areas.  A snapshot of policy work through December 1616, 2022 is depicted in the following tables. See shaded rows for policies pending review.

| ACH Medical Policies | Total Policies |
|---|---|
| Finalized | 40 (80%) |
| In Process (Revision/Development) | 5 (10%) |
| **Pending Expert Review** | 5 (10%) |
| Total | 50 (100%) |

*ACH Policies includes administration, medical and joint policies.*

| ACH Provider Treatment Guidelines | Total Provider Guidelines |
|---|---|
| Finalized | 0 |
| In Process (Revision/Development) | 1 (25%) |
| **Pending Medical Expert Review** | 3 (75%) |
| Total | 4 (100%) |

| ACH Standardized Nursing Procedures (SNP) | Total SNPs |
|---|---|
| Finalized | 4 (8%) |
| In Process (Revision/Development) | 6 (12%) |
| **Pending Medical Expert Review** | 41 (80%) |
| Total | 51 (100%) |

*Note: SNPs describe specific RN actions (RN to manage, requires consult with provider, or emergency stabilization needed) vs. categorization of low, medium and high risk.*

| ACH Mental Health Policies | Total Policies |
|---|---|
| Finalized | 14 (52%) |
| In Process (Revision/Development) | 0 |
| **Pending Mental Health Expert Review** | 13 (48%) |
| Total | 27 (100%) |

**47%** (62 of 132) of policy documents submitted are pending Expert review.  See Attachment 1 "Mays Policy Tracking Chart" for additional detail.

## COMPLIANCE DEFINITIONS & RATINGS

Experts rate compliance on each provision.   The following are definitions for compliance measurement for each of the provisions in this Remedial Plan:

Substantial Compliance: Indicates compliance with most or all components of the relevant provision of the Remedial Plan for both the quantitative (e.g., 90% performance measure) and qualitative (e.g., consistent with the larger purpose of the *Decree*) measures. If an individual compliance measure necessitates either a lower or higher percentage to achieve substantial compliance, it will be so noted by the expert. Compliance has been sustained for a period of at least 12 months.

Partial Compliance: Indicates compliance achieved on some of the components of the relevant provisions of the Remedial Plan, but significant work remains.  A minimum requirement is that for each provision, relevant policies and procedures must be compliant with Remedial Plan requirements, contain adequate operational detail for staff to implement the policy, staff are trained, and the County has begun implementation of the policy.

Non-Compliance: Indicates that most or all of the components of the relevant provision of the Remedial Plan have not yet been addressed and/or have not yet been met.

When reviewing each expert report, there is variability in rating methodology.  Medical Experts rate each indicator within a provision separately.  Mental Health and Suicide Prevention Experts

rate some indicators as a group but others individually.  Adult Correctional Health rates each provision but does not rate each indicator.

Medical and Suicide Prevention Experts have each submitted three monitoring reports as of October 2022.  The Mental Health Expert has submitted two monitoring reports as of December 2022.  See the tables below for a summary of Experts' compliance ratings over the first two monitoring periods.

**MEDICAL EXPERT REPORTS**

| Medical | January 2021<br>1st Report | October 2021<br>2nd Report | October 2022<br>3rd Report |
|---|---|---|---|
| Substantial | 5% | 16% | 17% |
| Partial | 20% | 25% | 29% |
| Noncompliance | 52% | 49% | 44% |
| Not Evaluated | 23% | 9% | 9% |

- *Medical Experts included a summary table with 75 indicators and rated each indicator within a provision separately.  Example: Nurse Intake provision has seven indicators for ratings.*
- *ACH moved from 25% to **46%** with Partial/Substantial compliance across the three monitoring periods.*

**SUICIDE PREVENTION & MENTAL HEALTH EXPERT REPORTS**

| Suicide Prevention | January 2021<br>1st Report | October 2021<br>2nd Report | August 2022<br>3rd Report |
|---|---|---|---|
| Substantial | 0% | 0% | 11% |
| Partial | 84% | 83% | 76% |
| Noncompliance | 16% | 17% | 13% |
| Not Evaluated | 0% | 0% | 0% |

- *Suicide Prevention Expert included a summary table containing 63 provisions.  Some indicators are rated as a group.  Example: Nurse Intake Provision C. has five indicators but rated as one item.*

| Mental Health | January 2021<br>1st Report | October 2021<br>2nd Report |
|---|---|---|
| Substantial | 0% | 0% |
| Partial | 58% | 55% |
| Noncompliance | 21% | 37% |
| Not Evaluated | 21% | 8% |

- *The first Mental Health report indicated a total of 91 provisions; however, listed 35 provision ratings with 3 provisions not assessed.* Mental Health Expert stated, *"This total was computed by adding major (e.g., IV.B) and substantial sub-major (e.g. IV.A.2) areas of the Remedial Plan."*

- *The second monitoring report did not include a summary table but contained the 35 rated provisions with 3 provisions not assessed.*
- *As of this January 2022 Status Update, the Mental Health Expert has not submitted a third monitoring report.*

**ACH STATUS REPORTS**

| ACH Status Reports | | |
|---|---|---|
| # | Monitoring Period | Date Submitted |
| 1 | Jan – Jun 2020 | 07/10/2020 |
| 2 | Jul – Dec 2020 | 01/05/2021 |
| 3 | Jan – Jun 2021 | 06/23/2021 |
| 4 | Jul – Dec 2021 | 01/14/2022 |
| 5 | Jan – Jun 2022 | 06/14/2022 |
| 6 | July – Jan 2023 | 01/01/2022 |

# CHALLENGES IMPACTING REMEDIAL PLAN WORK

Work on the Remedial Plan is intensive and difficult due to many ongoing challenges.  These include work force issues, lack of sufficient space, COVID-19 pandemic operations, and the time consuming feedback process.

**Work Force Issues**

Staff shortages and work force issues continue to present significant challenges impacting service access and full implementation of some Remedial Plan requirements.  These are detailed below.

Leadership and Specialized Positions

All ACH leadership positions have been filled.

- Health Services Administrator: Started mid-January 2022.
- Training Coordinator: Appointed late January 2022 and fully in role late June 2022.
- Case Management Supervisor: Started late March 2022.
- EHR Administrator:  Started mid-April 2022.
- QI Director – Starts January 2023
- Primary Care Division Deputy Director:  Starts January 2023

The previous DHS Primary Health Division Deputy Director's planned retirement was postponed to function as the Interim DHS Director while maintain oversight of the Primary Health Division during the reporting period.  The DHS Director position was filled on November 7, 2022 and the Deputy Director for the Primary Health Division was recently filled.  The QI Director will take over

lead of the Remedial Plan work as well as the continued evolution of the Quality Improvement program and compliance activities. Onboarding and training of the QI Director will take time.

Recruitment

Recruitment and hiring of licensed medical and mental health staff is an *ongoing challenge* due to market demands for licensed health care and mental health personnel.  Staff are competing with local large hospital systems and the prison systems.

At the end of September 2022, ACH partnered with the County Department of Personnel Services and County Media PIOs to market and hold a Correctional Health Hiring Event. Hiring Event and ACH position brochures were marketed on various platforms – resulting in onsite interviewing and eventual conditional offers for multiple positions.

- Providers:
    - Physicians: Labor Agreement negotiations concluded with an enhanced economic package. Vacancy reduction since the last report:  **3.5 FTE**
    - Nurse Practitioners: Vacancy reduction since last report: **2.0 FTE**
- Registered Nurses (RN):  Vacancy reduction since last report: **7.0 FTE**
- LVNs: Labor Agreement negotiations concluded with enhanced economic package; however, this position continues to be a challenge for hiring.  Vacancy reduction since last report: **4.0 FTE**
- Mental Health - The UCD Department of Psychiatry and Behavioral Sciences has been working with MH to expand recruitment efforts and increase outreach by posting on professional job boards for licensed social workers and psychologists.  Additionally, efforts to establish a correctional differential is being considered by UCD to assist with recruitment. UCD attended both a national and two California forensic conferences as an exhibitor to expand recruitment efforts for licensed mental health professionals. Recruitment of licensed staff continues to be a challenge.

See the General Provisions Staffing Section for information on positions and vacancies.

Custody Escorts

There are insufficient Custody escorts to ensure access to medical and mental health services. Dedicated, trained escorts are needed for all health services (medical, dental, mental health), including medication administration (pill call).

Change Management / Culture Change

Rapid change impacts staff's ability to roll-out training to large numbers of staff and for staff to absorb the information.  Some long-term County employees are resistant to the new standards of patient centered care – resulting in additional time and resources for supervisors to monitor, train, coach, and enforce accountability. To support ongoing cultural change and accountability, the following has been implemented:

- <u>Position Standards:</u> To clarify expectations and duties specific to ACH standard of care in addition to the County classification/position definitions, ACH Position Standards were developed.
- <u>ACH Code of Conduct:</u> Clarifies expectations regarding conduct standards – requires review and signature by all staff.
- <u>Safety & Security Guidelines</u>: Requires review and signature for all staff and articulates safety and security guidelines.
- <u>Personnel Evaluations:</u> All supervisors are required to complete for staff at-minimum annually and more often while on probation.
- <u>Policy and Procedure Manuals:</u> All are in various stages of development.  All policies are posted on the County intranet for staff reference.
- <u>Staff Development & Training Policy:</u> The policy has been updated to clarify training roles and responsibilities – for staff and trainers.  An ACH Training Intranet page has been developed to guide staff on available trainings and method to register.  Managers and the ACH Training Coordinator introduced more trainings during this period. ACH is working with the Department of Technology (DTech) to tailor a program called Pro-LiST to track ACH trainings.  The Pro-LiST application interfaces with the Department of Consumer Affairs' BreEZe system to retrieve up-to-date license information as well.  Managers and designated staff can also input data on other staff licensure, testing, training, and vaccination information and pull reports.  Functionality challenges have improved with the application and feedback on remaining challenges are being worked on to address.
- <u>Quality Improvement Program:</u> Positions continued to be added to support QI goals.  The QI Director, and three administrative support staff positions have been filled to support the large role of QI in taking lead on Remedial Plan goals. Staff monitor the timeliness and effectiveness of specific areas concerning health care service provision, ensuring all are reviewed at least annually, and recommend corrective action for any deficiencies.  Since its inception, QI committees, staffing, and reports have been expanded.  Meeting forums include: Quality Improvement Committee, Mental Health Subcommittee, Suicide Prevention Subcommittee, Pharmacy & Therapeutics, Safety, and Utilization Management.
- <u>Data tracking and reports:</u> Needed reports and audits for monitoring continue to be phased in.  The electronic health record (EHR) continues to have limitations – the new E.H.R. Administrator began work in April 2022, supporting current E.H.R needs, while preparing to procure a new EHR to better support service documentation monitoring of service quality.  Several reports related to monitoring of service quality are progressing through various stages of the development process or have already been deployed to the production environment.  These include reports being utilized by the Mental Health service line in the areas of timelines to care, encounters and confidentiality, and discharge linkage data.  Additionally, medical staff will soon be able to generate status and patient population reports addressing specialty care referrals and chronic conditions as well as

10

manage lab orders and results for Public Health lab service requests.  ACH EHR staff meet weekly with the EHR vendor and the County's DTech to collaboratively address report functionality, enhancements and user acceptance testing.   EHR management has continued to regularly run the EHR User Account reports to properly regulate access to the EHR by only those staff who have a business need to conduct transactions.

- Communication: Disseminating large amounts of information at a rapid frequency to a healthcare system has challenges that leadership continues to problem solve.  All policies and forms are posted on a dedicated County ACH intranet page and those related to Remedial Plan requirements and areas of deficiency are developed into trainings. An ACH Newsletter is distributed to all staff monthly.  Managers are expected to have consistent staff meetings, regular and ad hoc meetings with Custody, and clinical Multidisciplinary Team (MDT) Meetings.  ACH leadership continues to integrate cultural changes and specific Remedial Plan changes into different venues.

- Consent Decree Training: Developed and provided to all medical/mental health staff and is part of the training curriculum for onboarding new staff.  Service line directors report this training is helpful for staff to see the context of change and how it impacts all disciplines.

| Space |
|---|

Sufficient space to provide the necessary health and mental health (MH) services within the Remedial Plan is a major challenge.  The jails were built pre-ADA and pre-HIPAA and medical/MH areas were not designed as "treatment" or "clinic" space.  Appropriate space within the jail facilities is extremely limited and requires construction or additional space to meet Remedial Plan requirements.  More exam rooms and treatment spaces (individual/group) are much needed.

Changes that occurred:

- New nursing station at Main Jail 2 East.
- Completed the interview cubicles across from nursing station at 2E Main Jail.
- Converted the Medical Records room at Main Jail 2E into a Physician exam room and Physical Therapy clinic.
- Provider charting room at Main Jail on 2 Medical.
- Nurse Intake in the Main Jail booking area completed a remodel to include new computer stations, cabinets, larger interview cubicles with privacy barriers, sound machines to support confidentiality, individual scanners for documents, new flooring, paint, and more space for supplies.
- Specialty clinics: Installed new cabinets and new ophthalmology/optometry equipment.
- Administrative staff, medical leadership staff, and all mental health staff were relocated to a building on G St near the Main Jail in July and August – freeing up some clinical space at the Main Jail for mental health services.  The new administration building has two conference rooms, a training room and storage for medical supplies.

- Removed excess medical supplies/equipment in hallways, medical exam rooms, specialty clinics and moved them into a storage unit created at the G St administration building.
- 3E classroom used for office space was vacated by mental health staff when moved to the G St administration building – allowing the classroom to be utilized as additional confidential interview and group programming space.
- The Acute Psychiatric Unit underwent modifications to improve safety of cells and each cell was renovated, which included a deep cleaning and fresh paint.
- Eight additional female IOP beds were added at the Main Jail in May 2022 and 24 high acuity/high security male beds were added at RCCC in September 2022.
- WiFi enhancements: Additional Access Points (AP) installed in multiple areas at Main Jail to improve WiFi connectivity for Medical staff.
- A new ultrasound machine in the Radiology room at Main Jail was installed and staff were trained on the operation of the equipment.
- Replaced exam tables in the medical exam rooms at the Main Jail.

Changes that will occur in the new monitoring period:

- Replace/repair and re-key all cabinets for medical exam rooms on all floors.
- Detox/Medical Monitoring pod at the Main Jail to be identified and implemented.
- Projects at the RCCC, including:
  - Intake area remodel to create new workstation outside of the current Intake Room and create an exam room adjacent to support confidentiality.
  - Retrofit the RBF supply room to build six workstations for Infection Prevention, Discharge Planning, and Administrative staff, as well as install shelving to organize and more easily access of medical supplies.

The proposal to move of the Acute Psychiatric Unit from 2P to the 3rd floor was heard at the December 7, 2022 Board of Supervisors meeting to increase beds from 17 to 38 (ten of these cells are now used for inmates who are suicidal and require close monitoring). This plan will free up 2P space to serve as a close observation unit for medical staff. This is especially needed for withdrawal management and other medical conditions requiring frequent monitoring. This space is adjacent to medical housing and the nursing station. The plan was approved by the Board on December 8, 2022. At the same hearing the Board approved moving forward with plans to construct a new intake/health facility on the vacant lot next to the Main Jail. It is anticipated that this project will take at least five years to complete.

Consultant reports regarding facility needs were also heard by the Board and the proposal approved – see details in the planning section at the end of this report.

Space is also addressed in the Medical and Mental Health sections.

**COVID-19 Management**

Overall, the pandemic has greatly affected staff resources, use of space, and timely access to care due to challenges with providing services while maintaining infection prevention protocols.  Staff efforts in managing the pandemic are focused and continue to evolve.

Staff developed the initial COVID-19 Staff Guidance on March 2, 2020 and began COVID-19 management strategies with SSO.  Staff completed the latest revision of the staff COVID Guidance on 2/19/2022.  In addition to the main COVID Guidance, there are several other COVID-19 related documents on the ACH COVID-19 Webpage.  These serve as key resource materials for staff.

COVID-19 management strategies are team-based. There continues to be extensive collaboration with SSO on daily management – including regular meetings to review progress, obstacles, and changes in practice.  ACH leadership consults with Public Health on a regular basis.  Data is provided weekly and posted on the SSO website.

Management strategies have continued to evolve over this monitoring period.  High average daily population (ADP) at the height of the very contagious COVID "Omicron" variant paired with limited space contributed to an outbreak from late July 2022 to mid-September 2022. Staff identified the outbreak early and initiated multiple actions to assist with ameliorating the outbreak. Large amounts of space is dedicated to COVID-19 housing (intake quarantine, close contact quarantine, suspect isolation, and case isolation) – preventing the use of space of other needed housing, such as a much needed medical monitoring (including detox monitoring) unit. Ongoing quarantine also impacts out of cell time and access to programming.

COVID-19 data continues to be important for monitoring.   Reports include Average Daily Population, the weekly COVID-19 Dashboard, and vaccinations.

<u>Average Daily Population (ADP)</u>

During the COVID-19 pandemic, the adult jail population was dramatically reduced through several court orders and population reduction strategies.  The lowest ADP total following early court releases was 2,418 in May 2020.  The population has been gradually increasing and has returned to pre-pandemic levels.  The average ADP YTD is 3325.

| Fiscal Year | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019/20 | 3,586 | 3,655 | 3,751 | 3,720 | 3,605 | 3,501 | 3,512 | 3,546 | 3,336 | 2,539 | 2,418 | 2,475 |
| 2020/21 | 2,616 | 2,833 | 3,016 | 3,201 | 3,148 | 3,255 | 3,231 | 3,299 | 3,366 | 3,307 | 3,062 | 3,049 |
| 2021/22 | 3,030 | 3,157 | 3,150 | 3,196 | 3,329 | 3,371 | 3,312 | 3,350 | 3,338 | 3,355 | 3,424 | 3,443 |
| 2022/23 | 3,521 | 3,473 | 3,353 | 3,208 | 3,069 | | | | | | | |



**ADP Totals by Month**

___

<u>COVID-19 Data Dashboard</u>

Developed in August 2020.  This information depicts point-in-time data and is updated weekly.
The data has been important for monitoring, retooling efforts, and communication.  The latter
occurs within the County and is also sent weekly to Class Counsel and Experts.

<u>Weekly COVID-19 Data as December 14, 2022</u>
- Total number of COVID-19 tests since March 2020: 54,576 *(Net increase = 390\*)*
- Total number of confirmed COVID-19 cases since March 2020: 4,299 *(Net increase = 28)*
- Total number of confirmed COVID-19 cases during the intake observation/quarantine period since March 2020: 937 *(Net increase = 6)*
- Total number of COVID-19 positive inmates currently in custody: Main Jail – 1 / RCCC – 21
- Total number of COVID-19 related deaths: 3

SSO COVID-19 Link: *https://www.sacsheriff.com/pages/covid19.php*

*\*Net Increase in COVID-19 tests reflects tests to inmates – it does not reflect employee testing due to approved exemptions or lack of booster.*

Community transmission increased due to the Omicron variants and staff began to identify more confirmed cases in custody.  As depicted in the following charts, the previous monitoring period had the highest confirmed cases in February.  The next wave during this monitoring period was in August and fortunately had much lower confirmed cases compared to the previous wave.





During the entire pandemic there have been four outbreaks to date – pre-vaccination, Delta, and Omicron twice.  While less severe, Omicron has posed challenges due to short incubation period and highly contagious nature.

<u>COVID-19 Vaccinations and Patient Data</u>

Vaccinations began for staff late January, 2021 and inmates in March 2021.  Vaccination is critical to maintaining a safe working environment for patients, inmates, staff, and visitors.   Staff began a COVID-19 Inmate Vaccination Incentive Program in late July 2021 and amended the program on 09/14/21, 10/25/21, 12/29/21, and 09/21/22 with the goal to increase vaccination efforts.  The incentives were increased in September 2022, which assisted with increasing participants.

The Infection Prevention Team notifies SSO Vaccine contacts of vaccinations and SSO deposits the incentive in the inmate's account.

| Inmate Vaccination Incentive Program | | |
|---|---|---|
| Vaccine Type | Incentive Amount | SSO Provision of Incentive |
| One Dose (Janssen) | Inmates - $20<br>Inmate Workers - $25 | Monday – Thursday: Designated amount is transferred to their account same day via CORE Banking system.<br>Friday – Sunday: Designated amount transferred to their account on Monday via CORE Banking system. |
| Two Dose<br>(Moderna/ Pfizer) | Inmates - $20 per dose<br>Inmate Workers - $25 per dose | Inmates - $20 per dose<br><br>Inmate Workers - $25 per dose |
| Booster Dose (Inmates receive another incentive for receiving an additional dose after completing a one dose or two dose series.) | Inmates - $20 per dose<br>Inmate Workers - $25 per dose | |

*As of 12/14/22, 3,247 inmates received at least one COVID-19 vaccine dose. All inmates are eligible and encouraged to receive vaccinations – including boosters. Staff also complete the vaccination series for inmates who transfer to the jails partially vaccinated.*

| Facility | Total Patients | Total Doses | Completed Vaccine Series | | | Fully Vaccinated Patients | Booster Doses |
|---|---|---|---|---|---|---|---|
| | | | Moderna | Janssen | Pfizer | | |
| MJ | 1,932 | 2,623 | 619 | 984 | 100 | 1,703 | 241 |
| RCCC | 1,315 | 1,808 | 470 | 641 | 41 | 1,152 | 259 |
| Total | 3,247* | 4,431 | 1,089 | 1,625 | 141 | 2,855 | 500 |

*\*This is a cumulative number since the inmate vaccination program began on 01/29/21 – the total includes inmates who are no longer incarcerated.*

Due to the high rate of jail releases, staff also periodically review point in time census vaccination data.

| Vaccination Point in Time 12/2/22<br>(Daily Population = 3,006) | | | |
|---|---|---|---|
| Vaccination Dose | Main Jail | RCCC | Total |
| Received at least one vaccine dose | 342 | 241 | 583 (18%) |
| Completed vaccine series | 304 | 217 | 521 (16%) |

*17%* *of the daily population received at least one vaccination with most having completed the vaccination series.* *16%* *of the daily population are fully vaccinated.*

| Inmates who Received at Least One Vaccine Dose Length of Stay (LOS) | | | |
|---|---|---|---|
| LOS | Main Jail | RCCC | Total |
| 0 – 15 days | 28 | 2 | 30 (5%) |
| 16 – 30 days | 32 | 2 | 34 (6%) |
| 31 – 60 days | 42 | 11 | 53 (9%) |
| 61 - 90 days | 18 | 22 | 40 (7%) |
| 91+ days | 222 | 204 | 426 (73%) |
| Total | 342 | 241 | 583 (100 %) |

*Of the 583 who received at least one dose of the COVID-19 vaccine,* *89%* *have been in custody for more than 30 days.*

COVID-10 Staff Vaccination Data

The State Department of Public Health issued an order for mandatory vaccination and/or qualified exemptions with weekly testing, effective 8/19/21 with full compliance by 10/14/21. The County Department of Personnel utilizes software called *Qualtrics* for staff to upload vaccination verification and weekly testing results for exempt workers.

Periodically, staff complete a vaccination report.  The last report was on 12/29/22.

| ACH County & Contracted Staff | Percentage Vaccinated |
|---|---|
| Medical | 82% |
| Administrative Onsite | 100% |
| Administrative based Offsite – Goes Onsite | 100% |
| Mental Health | 96% |

The order was amended 12/22/21 requiring vaccination boosters for all workers within the correctional facilities with full compliance by 2/1/22.  Unvaccinated exempt workers and booster eligible workers who have not yet received a booster are required to complete weekly testing. The order was updated 02/22/22 to permit workers who completed the primary series vaccination and had a recent infection to defer booster dose by up to 90 days from infection. The order was again updated 09/13/22, rescinding testing requirements for workers exempt due to medical reasons or religious beliefs. Note Medical staff percentage decreased from the last monitoring period due to an increase in new staff pending vaccination updates in our tracking system.

Link to the State Public Health Order:

https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Correctional-Facilities-and-Detention-Centers-Health-Care-Worker-Vaccination-Order.aspx

## GENERAL PROVISIONS [Remedial Plan Section II]

| **Staffing** (Section II. Provisions A.B.)<br>Status:  Partial Compliance |
| --- |

Per County's agreement with Class Counsel, there is a multi-year staffing plan.  County began to add staff and/or contract augmentations prior to the finalization of the Consent Decree (January 2020).  The following tables outline staffing enhancements to date by fiscal year.

Medical

| Medical Health Care Staffing Augmentation | |
| --- | --- |
| **Fiscal Year** | **Staffing** |
| FY 2018/19 (Midyear) | 12 FTEs<br>• 1 FTE Physician<br>• 1 FTE Dentist<br>• 1 FTE Pharmacist<br>• 1 FTE Pharmacy Technician<br>• 4 FTE Registered Nurses (RN)<br>• 4 FTE Licensed Vocational Nurses (LVN) |
| FY 2019/20 | 12.0 FTEs<br>• 4 FTE Quality Improvement (QI) Team –<br>  1 Planner, 1 RN, 2 Administrative Services Officer I<br>• 4 FTE – 2 Physicians, 2 Medical Assistants (MA)<br>• 2 FTE Supervising RNs<br>• 2 FTE Senior Office Assistants (SROA) |
| FY 2020/21<br><br>*Budget hearings were delayed until September.* | 13.0 FTEs<br>• 2 FTE Physicians *(midyear)*<br>• 5 FTE Registered Nurses (3 sick call, 1 discharge planning, 1 chronic care)<br>• 1 FTE Medical Assistant<br>• 1 FTE Dental Hygienist (replaces registry staff)<br>• 1 FTE Pharmacist<br>• 1 FTE Pharmacy Technician<br>• 1 FTE Administrative Services Officer III (Electronic Health Record)<br>• 1 FTE Administrative Services Officer II (Contracts) |

| Medical Health Care Staffing Augmentation | |
|---|---|
| **Fiscal Year** | **Staffing** |
| FY 2021/22 | 29.0 FTEs<br>• 2.0 FTE Supervising Registered Nurse (Infection Prevention Coordinator to replace behind the RCCC SRN position / Nurse Educator)<br>• 6.0 FTE Registered Nurses (Sick Call – 2, Chronic Care – 3, QI - 1)<br>• 9.0 FTE Licensed Vocational Nurses (Infection Prevention – 2, Pill Call - 2, Pill Call/Medication Assisted Treatment Program – 4, Discharge Planning -1)<br>• 1.0 FTE Medical Assistant (Discharge Planning)<br>• 1.0 FTE Pharmacist (expansion of hours)<br>• 1.0 FTE Pharmacy Technician (expansion of hours)<br>• 6.0 FTE Registered Dental Assistants (replace registry staff)<br>• 1.0 FTE Planner (remedial plan support)<br>• 2.0 FTE Senior Office Assistants (medical records) |
| FY 2022/23<br><br>*Budget Approved 06/09/22* | 39.0 FTE<br>• 11.0 FTE Registered Nurses (includes various needs such as substance use, withdrawal monitoring, chronic care, sick call, intake and discharge planning)<br>• 6.0 FTE Licensed Vocational Nurses for medication administration including Medication Assisted Treatment and services for patients in medical housing.<br>• 8.0 FTE Medical Assistants for discharge planning, infection prevention, assisting medical provider visits, and tracking ADA/durable medical equipment.<br>• 1.0 FTE Office Assistants to assist nursing with phone calls, medical paperwork, and collection of data from nursing/custody.<br>• 1.0 FTE Senior Physician Management will serve under the Medical Director for the RCCC activities.  Assists with Medical Director span of control, direct onsite supervision of physicians/nurse practitioners at RCCC and oversight of clinical services.  Provides back-up during Medical Director's absence.<br>• 1.0 FTE Physician 3 for Chronic Care disease management.  Provides ongoing care for patients needing ongoing chronic care planning and services.<br>• 1.0 FTE Nurse Practitioner for initial history and physical exams.  Must provide the assessment then refer internally for acute care follow-up or ongoing chronic care disease management.<br>• 1.0 FTE Dentist 2 to establish permanent resource and bridge the gap in the expanded operations of the dental clinic at both facilities.<br>• 3.0 FTE Pharmacist and 3.0 FTE Pharmacy Technician to enhance implementation of blister packing medication to meet compliance for "keep on patient" medications and will complete cart fill/pill call preparation in a timely and efficient manner.<br>• 1.0 FTE Health Program Manager, 1.0 FTE Sr. OA and 1.0 FTE Administrative Services Officer 1 for the expansion of administrative services that support the Medical and Mental Health operations. |

The County has increased positions for Medical staff from 118.5 in FY 2017/18 to **217.5** in FY 2022/23 – which includes 14 FTEs reallocated from UCD's Mental Health contract for nursing staff.  There are currently 61.0 FTE medical staff vacancies for the jail facilities.  Nineteen (19) of the positions have candidates in the background clearance process.

The permanent medical positions *do not include* County On-Call, Registry, or contract medical positions.  Permanent staff augmentations decrease the need for temporary staff and provide continuity of operations, team work, and more stability.

The FTEs above do not include ACH Administrative staff.  There are six (6) Administrative positions vacant with three (3) in background.  See the following tables for details.

| Jail Facilities Medical Vacant Positions as of 12/9/22 | | |
|---|---|---|
| **Classification** | **Vacancies** | **Background** |
| Medical Assistant Level | 7 | 4 |
| Licensed Vocational Nurse | 23 | 4 |
| Registered Nurse | 18 | 5 |
| Supervising Registered Nurse | 1 | 0 |
| Physician 3 | 7 | 2.5 |
| Nurse Practitioner | 2 | 2 |
| Office Assistant 2 | 1 | 0 |
| Pharmacist | 1 | 0 |
| Pharmacy Technician | 1 | 1 |
| Total | 61 | 18.5 |
| **Administration Vacant Positions as of 12/9/22** | | |
| **Classification** | **Vacancies** | **Background** |
| Admin Services Officer 2 | 1 | 1 |
| Sr. Office Assistant | 2 | 1 |
| Office Assistant Lv 2 | 3 | 1 |
| Total | 6 | 3 |

Total County ACH staffing includes **239.5** permanent allocated FTEs between Medical and Administration. As noted in the "Challenges" section of this report, there are high market demands for medical staff with limited supply – including per diem staffing. The number of temporary replacements available through Registry has decreased.  Labor negotiations have concluded to enhance economic packages were needed.  LVNs continue to be a challenge to hire.

Mental Health

Mental health services are provided under a contract with UC Davis Department of Psychiatry and Behavioral Sciences.  The following charts show contract augmentations to date.

20

| Mental Health Contract Augmentation | | |
|---|---|---|
| **Fiscal Year** | **Program Additions** | **Staff Augmentation** |
| FY 2017/18 | 20 Intensive Outpatient Program (IOP) Beds (male) – MJ | LCSW Supervisor (1.0)<br>SW1 (4.0)<br>Psychologist II (1.0)<br>Psychiatrist/NP (10%) |
| FY 2018/19 (Midyear) | 24/7 Licensed Clinical Social Worker (LCSW) Coverage - MJ | LCSW Supervisor (1)<br>LCSW (4) |
| FY 2019/20 | 15 IOP Beds (female) - MJ | LCSW Supervisor (.40)<br>Psychologist II (.20)<br>LCSW (.50)<br>SW 1 (3)<br>NP/Psychiatrist (.40) |
| | 24 IOP Beds (male) - RCCC | LCSW Supervisor (.50)<br>Psychologist II (.20)<br>LCSW (2.0)<br>SWI (2.5)<br>HUSC (1.0)<br>NP/Psychiatrist (.80) |
| | 24/7 LCSW Coverage - RCCC | LCSW Supervisor (1.0)<br>LCSW (3.0) |
| FY 2020/21 (Midyear) | Outpatient Mental Health Services was expanded to include mental health services, medication evaluation and monitoring, case management, and discharge planning for the Outpatient Psychiatric Pod (OPP) – adding a new level of service.  Will serve approximately 125 patients at any given time. | LCSW Supervisor (1.0)<br>LCSW (2.0)<br>SWI (2.5) |
| FY 2021/22 | Enhanced outpatient (EOP) mental health services in the OPP was expanded to provide services to an additional 150 patients requiring intensive services.  This expansion will increase services by 275 patients, creating a total EOP service provision of 400 patients. | LCSW Supervisor (1.0)<br>LCSW (3.0)<br>SWI (8.0)<br>RN (.50) |

21

| Mental Health Contract Augmentation | | |
|---|---|---|
| **Fiscal Year** | **Program Additions** | **Staff Augmentation** |
| FY 2022/23<br><br>*Budget approved 06/09/22* | Contract augmentation includes additional staffing for the following:<br>1. Complete reviews and recommendations for patients with mental illness pending discipline and/or administrative segregation.<br>2. Expand mental health services for patients in the Acute Psychiatric Unit.<br>3. Add staffing for constant observation of patients on suicide precautions. | LCSW Supervisor (2.0)<br>LCSW (8.0)<br>SWI (5.0)<br>MH Worker (16.0) |

The County has increased funding for additional positions for Mental Health staff from $11,603,681 in FY 2017/18 to $25,178,547 in FY 2022/23.

Mental Health is also having challenges hiring licensed personnel due to competing market demands. The medical staff shortage is not unique locally.

Mental health has 33 vacancies as of 12/6/22, mostly comprised of social workers and constant observation staff at Main Jail.

| Mental Health<br>Vacancies as of 12/06/22 | |
|---|---|
| **Area** | **Vacancies** |
| **Main Jail** | |
| Outpatient | 4 |
| Enhanced Outpatient Program (EOP) | 2 |
| Intensive Outpatient Program (IOP) | 1 |
| MH RVR & Ad Segregation Reviews | 34 |
| Ad Seg Patient Safety & Support Program | 417 |
| **RCCC** | |
| **Area** | **Vacancies** |
| Outpatient | 13 |
| EOP | 0 |
| IOP | 0 |
| Jail Based Competency | 1 |
| Total | 33 |

Staffing Next Steps

Managers and supervisors for Medical and Mental Health continue hiring and onboarding staff on an ongoing basis. Position control and vacancy reports are regularly updated.

Class Counsel requested a staffing analysis which was submitted November 2021. The staffing analysis was also submitted to County leadership and services as a basis for growth requests.

Managers continue to monitor hiring, onboarding, space, and program needs as Remedial Plan policies continue to be developed and implemented.  An iterative process is needed to ensure staffing noted in the analysis makes sense or if modification is needed.   Any changes in policy or program involving criminal justice partners could also impact staffing needs.

| |
|---|
| **Mental Health Data Posting** (Section II. Provision C.) <br> Status:  Substantial Compliance |

Point-in-time data reports are posted quarterly with email notification to Class Counsel.  See SSO Transparency page for information related to the Corrections Consent Decree: https://www.sacsheriff.com/pages/transparency.php.

A brief summary of quarterly data is listed in the following table through October 3, 2022:

| Jail Average Daily Population (ADP) & Mental Health Quarterly Data – Point in Time | | | | | |
|---|---|---|---|---|---|
| **Report Date** | **10/4/21** | **1/3/22** | **4/5/22** | **7/1/22** | **10/3/22** |
| **ADP** | 3,173 | 3,354 | 3,336 | 3447 | 3,311 |
| **Adult Correctional Mental Health** <br> Mental Health Services Provided while Incarcerated | | | | | |
| No Mental Health Condition | 1,167 (37%) | 1,183 (35%) | 1,198 (36%) | 1300 (38%) | 1095 (33%) |
| Non-SMI* Mental Health Condition | 1,123 (35%) | 1,256 (38%) | 1,237 (37%) | 1195 (35%) | 1205 (36%) |
| SMI* | 883 (28%) | 915 (27%) | 901 (27%) | 952 (28%) | 1011 (31%) |
| **County Behavioral Health Services** <br> Mental Health Services Provided while in the Community Prior to Incarceration | | | | | |
| *Mental Health Outpatient Services* | | | | | |
| Open | 32 (5%) | 48 (7%) | 39 (5%) | 22 (3%) | 39 (5%) |
| Discharged | 620 (95%) | 654 (93%) | 681 (95%) | 661 (97%) | 707 (95%) |
| *Mental Health Full Service Partnership (FSP)* | | | | | |
| Open | 38 (31%) | 42 (31%) | 28 (22%) | 45 (28%) | 60 (34%) |
| Discharged | 83 (69%) | 93 (69%) | 97 (78%) | 113 (72%) | 115 (66%) |
| *Substance Use Prevention & Treatment (SUPT)* | | | | | |
| Open | 29 (9%) | 26 (8%) | 21 (6%) | 28 (7%) | 31 (8%) |
| Discharged | 277 (91%) | 314 (92%) | 314 (94%) | 369 (92%) | 369 (92%) |

*SMI - serious mental illness

Notes:
- Percentage of SMI population served by ACH MH is an average of 28%.
- Percentage of Non-SMI population incarcerated gradually increased during the pandemic from a low of 30% in April 2020 to 36% in October 2022.
- Of the 1011 with SMI served while incarcerated in October 2022:
  - 10% were still open to community County Mental Health services.

- o  81% were linked to community County Mental Health services in the past, but no longer open.
- See County Efforts to Reduce the Jail Population for services that are active or in development at the end of this report.

## ELECTRONIC HEALTH RECORD (E.H.R.) [Remedial Plan Section VI & IV]

> **Electronic Health Record System** (Provisions B.4, C.6-8, D. 1., 6-7), I.1-5), N.6
> Status:  Partial Compliance

Despite recent successes in developing and implementing automation tools for ACH service lines to use, the electronic health record (EHR) falls short to adequately address workforce needs in the area data tracking and reporting as relates to  measurement of service quality metrics.

Inmate photos are available in the EHR's online eMAR management systemEHR to assist with patient identification and ensure the proper medication is being administered to the correct patient.  This functionality will be included as a minimum requirement for the new EHR system and accessible from anywhere in the patient's chart.

Staff have continued to adjust EHR workflows and add or modify templates as new protocols and/or policies are rolled out.  Because coordination and collaboration must occur among multiple entities (vendor, DTech, etc.) for application enhancements or interface compatibility to occur, implementation solutions have sometimes become complicated and time consuming – especially when resource and staffing deficiencies continue to exist across all entities.

Additional nursing protocol modules available by the vendor have been loaded into the ACH EHR test environment to determine the extent to which these protocols can be adapted to current ACH Standardized Nursing Procedures (SNPs).   Nurse Protocols in the areas of various illness/injuries, emergency problems, chronic issues and mental health have been uploaded for review and testing.

ACH EHR staff have developed a tentative timeline for procurement and implementation of a new EHR system over the next 12 to 18 months.  A more specific project task timeline is being developed in conjunction with a procurement team being comprised of clinical, administrative and technical staff who will provide input regarding scope development, technical requirements and evaluation criteria for applicants.

Carequality is an interface that permits data sharing among participating healthcare organizations.  ACH has implemented a workflow for providers to use Hospital Connect (the product providing real-time access to clinical data via Carequality) since late 2021.  This allows providers to import and easily reference patient data from external healthcare entities.  In a continued effort to improve the efficacy of data exchange among the ACH EHR and external healthcare systems, DTech is reviewing with DHS Primary Care EHR support staff to review how this is achieved between Primary Care and its external healthcare systems.   Any system

improvements gleaned from this process will be implemented by ACH EHR support staff as appropriate.

The Sacramento Sheriff's Office (SSO) ATIMS jail management system go-live date has been delayed again – now tentatively scheduled for the end of March 2023.  The interface between ATIMS and the EHR will enhance patient tracking and coordination between ACH healthcare staff and SSO Custody staff.  ACH, DTech staff and SSO continue to meet weekly to perform extensive testing on a multitude of scenarios and workflows ensuring the data exchange requirements between the two systems will be verified before the new ATIMS go-live date.

Medical EHR Updates:

- Public Health Lab Requisitions/Test Results – In September 2022, the integration between the EHR and the Public Health Apollo Lab Management System went live.  This allows for clinical staff to create lab requisitions online within the EHR which are then sent to the lab electronically.  Once lab tests are completed, the results are automatically uploaded to the patient's chart for review.  This has virtually eliminated the need for paper requisitions and has greatly improved the turnaround times for test results.  This is particularly important with regard to COVID testing volume and quarantine requirements.  These automated processes have also reduced the document indexing workload for the Medical Records unit – thereby allowing staff to focus resources on other high priority items. Voice recognition device and software (VRS) – Procurement of an EHR vendor-approved VRS system was initiated in December 2022, with delivery and implementation tentatively scheduled for the first quarter of 2023.  This voice recognition technology streamlines the clinical documentation requirements during provider encounters, thereby improving the accuracy and completeness of patient records..
- Telemedicine – In August 2022, tablet devices were installed at the Main Jail to pilot telehealth visits by the providers, allowing them to conduct patient encounters remotely.  This pilot project continues to progress with much success, and additional devices have been ordered for use at RCCC.
- Health Service Requests (HSR):  The electronic HSR form has been updated to include further details to better track form completion date/time by the patient, form received date/time, and triage date/time/staff for improved monitoring to access to service timelines.  Additionally, a Disposition section has been added to the HSR form to document triage details specific to the assigned service line.  Capturing this data will better allow for review of HSR processing efficacy.  The final version of the form is being implemented to be consistent with updates to the HSR policy.
- ACH staff are testing a web application within the Fusion EHR known as BedBoard to manage inpatient beds within the medical and mental health facilities at both Main Jail and RCCC.  This functionality is also being employed to create "virtual rooms" based on patient acuity and monitoring interval requirements for better notification and alerts regarding patient withdrawal monitoring.
- Custom List order added: Case Management - Audiology
- Telemedicine service indicator was added to capture Provider visits using telemedicine when needed to provide follow-up services within access to care timelines.

- Modification of macros in the Provider document to ensure Providers document details of counselling given and prevent general statement documentation.
- "Other" checkbox added to the Degree of Control for Acute Problems area to be able to more accurately document when the other degree of control options are not relevant.
- Global task lists were created for Providers to ensure priority for patients in need of being seen promptly and within access to care timelines.

Mental Health EHR Updates:

- Confidential Encounter Form was created and implemented for MH staff. Documentation includes whether the assessment was in a confidential setting and rationale when the interview is not confidential.  Two audits have taken place for patient privacy since implementation and further training and form changes have occurred as a result.
- Treatment plans were updated to include the duration of a group session and allow multiple goals.  Provider licensure was updated to ensure appropriate titles and treatment plan forms were reviewed to reflect current practices.
- MH Providers can review all scheduled clinical encounters.
- Staff were designated for future EHR system acceptance testing for future updates and improvements.
- Discharge Planning – Developed new report to identify projected release dates and level of care to expedite referrals.
- MH Group Participation Report – This report provides clinicians information on the amount of therapeutic out of cell time (groups) that each patient received on the mental health caseload. Recently there have been issues identified with the report that Fusion is currently working to resolve.
- Discharge Planning – Updated DC Linkage form with additional drop-down options to improve tracking of linkage to County Behavioral Health.
- Timelines to Care – Order Linkage form was created to improve tracking of timelines to care.  Allows staff to enter actual visit time and link the visit time to the visit order. Report is under development.
- MH Adaptive Support Plan - Added an indicator in the EHR to alert all staff and improve tracking of patients who have an Adaptive Support Plan in place.
- Suicide Precautions EHR form – replicated Suicide Precautions paper form in the EHR to eliminate need for scanning and allow MH staff to review Suicide Precautions form in real-time.
- Order Types – added additional order/appointment types to improve scheduling and tracking of Administrative Segregation Reviews, MH Rules Violation Review (RVR) Assessments and Medication Verifications.
- Confidential Contacts Report – report developed and utilized to audit compliance with confidential MH contacts.  Able to utilize study to highlight facility infrastructure limitations and other challenges that impede confidential services with patients.

## AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE
## [Remedial Plan Section III]

Staff created and/or revised key policies, electronic health record templates, PowerPoint training, and are completing training.  All policies, forms, and training materials have been approved by Class Counsel/Experts except where noted (*pending review*).

---

**Policies and Procedures** (Section III. Provision A.)
Status:  Substantial Compliance

---

Policies:

- ACH PP 01-09 Grievance Process for Health/Disability Complaints (revision 12/01/21) – *Pending review by Mental Health Expert*
- ACH PP 06-02 Patients with Disabilities (12/01/20) – *Final*
- ACH PP 06-03 Effective Communication (revision 03/12/21) – *Final*
- ACH PP 06-04 Interpretation Services (revision 04/05/21) – *Final*
- ACH PP 06-05 ADA Coordination (revision 11/05/21) – *Final, subject to addition of processes related to interface between EHR and Sheriff's Office ATIMS system*
- ACH PP 06-06 Patients with Disabilities or Other Significant Health Needs (revision 04/05/21) – *Final*
- ACH PP 06-07 Health Care Appliances, Assistive Devices, and Durable Medical Equipment (revision 04/05/21) – *Final*
- MH PP 07-07 Mental Health Adaptive Support Program (06/15/22) – *Final*

Forms:

- Grievance Form and Appeal Form (revision 12/01/21) – *Pending review by MH Expert*
- Disabilities Screening Template (EHR) – *Final*
- Effective Communication Template (EHR; revision 08/31/21) – *Final*
- Alta Regional Center Referral Form (10/2021) – *Final*
- Mental Health Adaptive Support Survey (05/2022) – *Final*
- Mental Health Adaptive Support Program Screener (05/2022) – *Final*
- Refusal Form – *In review based on feedback*
- Health Services Request form – *In revision*

See last ADA provision for training information.

---

**ADA Tracking System** (Provision B.)
Status: Partial Compliance

---

ACH developed and refined EHR templates for screening and documenting disabilities and accommodations.  These forms permit ongoing changes if accommodation status needs to be modified.

A medical assistant (MA) has been assigned to review the EHR and verify accommodations have been provided and notifies Nursing and/or a Provider to assess patient if not. If not, the MA notifies Nursing and/or a Provider to assess patient.

SSO is pending the ATIMS go-live for ADA tracking and identification that will assist with communication in this area.  Staff have worked on an interface between these two systems – until testing begins, ACH cannot assess visibility and use for health staff.  Currently a shared spreadsheet is used to ensure communication between SSO and ACH.

---

**Screening for Disability and Disability-Related Needs** (Provision D.)
Status: Substantial Compliance

---

Policies:

- ACH PP 05-05 Nurse Intake (revision 12/01/22) – *Final*
- ACH PP 06-02 Patients with Disabilities (12/01/20) – *Final*

Other:

- Substantial revision of the Nurse Intake policy and subsequent training on the new process was completed in November 2021.  Annual refresher training was completed in November and December 2022. The Nurse Intake includes essential electronic forms on disabilities, accommodations, effective communication and a workflow.
- The RN is required to send referrals to mental health for post-intake assessment of psychiatric, developmental, or intellectual disabilities.
- QI conducts quarterly ADA audits.  Over time, intake nurses have improved with respect to identifying and documenting disabilities and related needs.  See section on ADA Training, Accountability, and Quality Assurance (Provision P) for more information.

---

**Health Care Appliances, Assistive Devices, Durable Medical Equipment** (Provision F.)
Status: Substantial Compliance

---

Policy:

- ACH 06-07 Health Care Appliances Assistive Devices and Durable Medical Equipment (revised 04/05/21) – *Final*

Other:

- Electronic forms were completed to assist in identification and tracking of assistive devices and durable medical equipment (DME).
- Policy and EHR forms allow providers to select "other" when ordering assistive devices and/or DME in addition to the pre-determined list.
- Staff developed a process to ensure newly ordered devices are provided to patients in a timely manner.
- Nursing staff sends a weekly update to SSO Compliance Staff on patients with health care appliances, assistive devices and durable medical equipment provided by medical staff.

> **Effective Communication** (Provision I.)
> Status:  Substantial Compliance

Policy:

- ACH PP 06-03 Effective Communication (revision 03/12/21) – *Final*

Other:

- The Effective Communication (EC) form is the first form to be completed in all clinical encounters and cannot be bypassed.  This assists in identifying and tracking patients with effective communication needs, including those that change over time.
- The EC template in the EHR was modified in late 2021 to include additional questions for identifying EC needs and to simplify the language used in the inquiry.

> **Effective Communication and Access for Individuals with Hearing Impairments** (Provision J.)
> Status:  Substantial Compliance

Policies:

- ACH PP 06-03 Effective Communication (revision 03/12/21) – *Final*
- ACH PP 06-04 Interpretation Services (revision 04/05/21) – *Final*

Other:

- Staff utilizes video interpreting services for patients who need Sign Language Interpretation (SLI).  Designated computers have a camera installed and a necessary icon to access the *LanguageLine InSight* application.
- Each MH program area has access to a tablet that is utilized for all *LanguageLine* interactions.

> **Disability-Related Grievance Process** (Provision K.)
> Status: Partial Compliance

Policy/Form:

- ACH PP 01-09 Grievance Process for Health/Disability Complaints (revised 12/01/21) – *Pending review by Mental Health Expert*
- Grievance Form and Appeal Form (revised 12/01/21)

Other:

- The Grievance policy and forms were substantially revised based on Medical Expert feedback.  Key additions include immediate review of each grievance by a nurse and immediate action when indicated, specific timeframes for requesting and responding to appeals, and more detail on the grievance and appeal forms.

- Nurses at Main Jail received training on the revised grievance forms in December 2021 and the nurses at the RCCC in January, 2022.
- Grievances are tracked.  With the addition of the electronic forms, it will permit more accurate tracking.
- Some patients continue to give health care grievances to SSO Custody.  ACH will continue to coordinate with Custody to ensure coordination on grievances.
- Corrective actions have been put in place in order to achieve greater compliance in meeting response timeframes.
    - A shared folder was created for both jail nursing staff and QI staff.
    - Both facilities maintain a combined spreadsheet of open grievances and a copy scanned to the secured folder for review by nursing and QI.
    - QI is able to view all open grievances based on the information in the shared folder.
    - Corrective actions and updates are discussed at a monthly multi-disciplinary meeting.
- Staff have convened a Utilization Review (UR) team in December 2022 and met to discuss UR tools and other logistics. A Provider and QI nurse will meet monthly to review randomly selected cases pulled from patient grievances. Targeted reviews may result from the original UR and tools will be revised as needed. ACH anticipates the UR process to begin in February 2023.

| |
|---|
| **Transportation** (Provision N.)<br>Status: Partial Compliance |

Policies:

- ACH PP 04-09 Medical Transportation (revision 07/22/21) – *Final*.  This policy was revised to address medical transportation of patients with disabilities based on Medical Expert feedback.
- ACH PP 06-06 Patients with Disabilities or Other Significant Healthcare Needs (revised 04/05/21) – *Final*
- ACH PP 06-07 Health Care Appliances, Assistive Devices, and Durable Medical Equipment (revised 04/05/21) – *Final*

Other:

- QI staff completed a "Medical Transportation Coordination Report" in December 2021 to assess coordination between ACH and custody with respect to medical escorts.
- Following the first report, staff developed a template for custody to provide more accurate transportation coordination data and distributed it for implementation.
- The subsequent Medical Transportation Coordination Report showed that more training was needed for RCCC (who had a new transportation team) whereas Main Jail was utilizing the form.

- Full implementation of the form has occurred at both sites.  QI periodically creates a report based on the information provided and reviews in multi-disciplinary meetings. See below for most recent transportation coordination data.

| Medical Transportation Coordination Data Period:  August 2022 | | | | |
|---|---|---|---|---|
| **Jail Facility** | **# of Appointments** | **# Completed** | **# Rescheduled** | **# Cancelled** |
| Main Jail | 69 (52%) | 45 | 5 | 19 |
| RCCC | 64 (48%) | 38 | 7 | 19 |
| Total | 133 (100%) | 83 (62%) | 12 (9%) | 38 (29%) |
| Reasons for Cancellations | 19/38 (50%)  No longer in custody | | | |
| | 17/38 (45%)  Patient refusals | | | |
| | 2/38 (5%) Patient seen at a different hospital | | | |
| | | | | |
| Reasons for Rescheduling | 3/12 (25%)  Patient in isolation/quarantine | | | |
| | 3/12 (25%)  Patient moved to RCCC | | | |
| | 3/12 (25%) Not enough transporters (Other priority appointment) | | | |
| | 1/12 (8%)  Hospital scheduled CT scan same day | | | |
| | 1/12 (8%)  Patient in hospital | | | |
| | 1/12 (8%)  Patient in court appointment | | | |

| **Prisoners with Intellectual Disabilities** (Provision O.) Status: Partial Compliance |
|---|

Policy:

- ACH PP 05-05 Nurse Intake (revision 12/01/22) – *Final*
- MH PP 07-07 Mental Health Adaptive Support Program (06/15/22) – *Final*

Other:

- During the intake process, nurses gather information through screening, past history, self-identification, third party report or observation noting possible intellectual disability. Nurses refer patients to mental health staff for an assessment and treatment plan.
- The Mental Health Adaptive Support policy was approved and finalized in June 2022 and was approved on 06/15/22.
- Mental Health began staff training and implementation of the Mental Health Adaptive Support Program in September 2022. Adaptive Support Plans (ASPs) are entered into patient charts as well as a copy provided to housing unit Custody. The ASP is also entered on the patient Problems and Conditions in the EHR.
- A patient's mental health ASP indicates the additional assistance a patient needs in order to program in the jail, based on diagnosis and identified needs. Once a patient has a mental health ASP, it is required that all staff interacting with the patient provide the

adaptive supports identified in the ASP during encounters and document to such in the encounter note. This information has been messaged to all service lines in multiple ways, including the December Newsletter.

| **ADA Training, Accountability, and Quality Assurance** (Provision P.)<br>Status: Substantial Compliance |
| --- |

Training:

- ADA and Effective Communication (EC) Training and Documentation PowerPoints were developed and approved.  The documentation PowerPoint has been updated to include changes to EHR templates.
- Training is mandatory for all ACH staff, including contracted mental health staff, in the jails as well as administrative positions (case management and quality improvement) working offsite.
- Staff completed fifteen (15) training sessions that included 233 staff during 2021 and the first half of 2022.
- The Training Coordinator provided three ADA and EC training sessions in November 2022 with 132 staff in attendance.

Tracking:

- Grievances, including those for disabilities and effective communication, continue to be tracked.  Tracking is more specific post policy and form revision.
- Grievance data is reviewed at quarterly Quality Improvement Committee (QIC) meetings. QIC members discuss strategies to improve problem areas and recommend changes in practice. See **Disability-Related Grievance Process** (Provision K.) for further detail.
- Staff developed and refined a tool to audit disabilities, accommodations and effective communication.  Six (6) quarterly audits have been completed, the most recent in July 2022.  Data indicates that staff are improving with regard to identifying and documenting disabilities, accommodations, and effective communication.  See the table below for a comparison of an early audit with the most recent audit:

| **Indicator** – *Intake RN action on disability-related information* | **Data Period** – *Intakes completed on:* | |
| --- | --- | --- |
| | 07/02/21 | 07/15/22 |
| ADA Assessment form complete and accurate | 42/84 (50%) | 36/44 (82%) |
| Effective Communication (EC) form complete and accurate | 73/84 (87%) | 40/44 (91%) |
| Housing accommodation provided when needed | 38/39 (97%) | 12/13 (92%) |
| Assistive device ordered when needed | 8/10 (80%) | 2/6 (33%) |
| Referred to MH when needed | 18/21 (86%) | 12/12 (100%) |

| | | |
|---|---|---|
| Referred to provider when needed | 1/4 (25%) | 9/10 (90%) |

- Audits will continue on a regular basis and data/trends will be reviewed for errors, systemic issues, and opportunities to improve detection and create individualized care plans.  Data is reviewed during QIC meetings.

## MEDICAL CARE [Remedial Plan Section VI]

Class Counsel outlined five areas of focus for the monitoring period, including the intake screening, sick call system, chronic care, specialty care, and roll out of the new electronic health record (EHR) system.  These are shaded in blue. The remainder of provision sections are not shaded and were not indicated as an area of focus.  Status is listed for each provision.

**Intake Screening** (Provision B.)
Status:  Partial Compliance

Policies:

- PP 05-05 Nurse Intake (12/01/22) was revised in November 2021 and included many key changes.  The policy was updated again in December 2022 for clarity and consistency with other policies.
- PP 05-13 Initial History & Physical Assessment (01/11/22) and the revised Nurse Intake policy specify referral criteria and timeframes to ensure patients are seen post-intake based on their medical needs and acuity.

Forms:

- Nurse Intake electronic health record (EHR) forms include features to ensure nurses complete a thorough health screening and review of key information:
  a. Nurse must select yes or no for patient required medication.  A yes response automatically creates an essential medication order that prompts Provider review.
  b. Key screenings were expanded and additional questions added to multiple areas, such as mental health, women's health, and substance abuse.
- A Nurse Intake Workflow (for EHR) was finalized and utilized for training and reference – nurses were trained in November 2021.  The Workflow was again revised 12/1/22 and training began in December 2022.
- Lists have been developed in the EHR to categorize nurse follow-up specific to diagnostic tests (e.g., urine collection) and additional screenings (e.g., substance use).  The lists assist with communication and tracking tasks post intake.
- Staff are working to refine EHR templates on an ongoing basis.

Implementation:

- Nurses were trained on the Nurse Intake policy and the revised intake process was implemented in November 2021. The revised policy in December 2022 was implemented late December.
- Nurses are required to be trained annually on the Nurse Intake process. This training requirement was fulfilled in November and December 2022 when the Training Coordinator provided intake training to nursing staff.  Additionally, nurses assigned to intake receive training when there are changes to the policy and/or forms.
- The revised Nurse Intake policy and forms were implemented in November 2021.
- The additional EHR forms and inquiries are resulting in more comprehensive health screenings and more consistent documentation.

Other:

- QI staff developed several audit tools to assess the nurse intake process.   Reviews completed during this monitoring period include:
  a. ADA Identification and Documentation at Intake
  b. Withdrawal Monitoring in the Booking Loop
  c. Medication Initiation and Renewal
  d. Referrals at Intake (see below)
- QI staff will begin in-person observation audits of the nurse intake process in January 2023 to ensure all screening questions are asked.

### Intake Referral Audit

Focus:  To determine whether RNs ordered appropriate referrals at intake.

| Type of Referral Needed: | Patients Referred as Needed | |
|---|---|---|
| | 11/29/21 (N=51) | 10/10/22 (N=21) |
| Provider | 14/20 (70%) | 9/12 (75%) |
| Mental Health | 11/15 (73%) | 8/9 (89%) |
| SUD Counselor | 9/19 (47%) | 15/15 (100%) |
| Dental | 7/7 (100%) | 13/13 (100%) |

- The first audit was conducted at the time of implementation of the new intake process and provides a baseline for comparison.  In the October 2022 audit, nurses showed significant improvement in completing referrals as indicated.
- QI will develop additional audit tools during the next monitoring period.

Space:

- ACH, SSO and Facility Management participate in ongoing meetings to modify medical areas to utilize space more efficiently to provide patient care.

34

- The Nurse Intake space in the Main Jail was reconstructed to include new computer stations, larger interview cubicles with privacy barriers, sound machines, individual scanners for documents, new flooring, and space for supplies.

**Access to Care** "Sick Call System" (Provision C.)
Status: Partial Compliance

Policies:

- PP 05-09 Health Service Requests (06/23/22) was revised based on Medical Expert feedback received 06/17/22 – *Revised and pending finalization*
- Due to ongoing barriers to meeting access to care timelines, the Health Service Request policy and form were revised. Once the form is finalized, staff will be trained prior to full implementation in January, 2023.
- PP 07-01 Informed Consent and Right to Refuse (10/03/22) was revised to address issues with patient refusals. Class Counsel and Medical Experts provided feedback in November 2022. The policy and Refusal Form is in discussion with the Medical Expert, give current policy and Refusal Form appear to meet the Remedial Plan requirement and community standards.

Implementation:

- Key changes to the Health Service Request policy includes clarification regarding access to care timelines, such as the face-to-face appointment must be completed when indicated within the priority timeframes – rather than the appointment ordered.
- Other key changes to the policy are intended to improve timeliness by creating better efficiencies in collaboration with SSO Custody.
- Exam rooms and appointment times are designated for nursing assessments on several floors at the Main Jail.
- The electronic HSR form in the EHR was updated to better capture data helpful in monitoring timeliness at each step of the process. The electronic form also ensures HSR information is documented in the EHR to better support facilitate data reporting capabilities.

Other:

- Confidential locked boxes labeled "Health Service Requests" are installed in multiple locations at both jail facilities.
- Nursing collects health service requests (HSRs) at least twice daily, once in the morning and once in the evening, and designated staff are responsible to ensure adequate supplies.
- Patients are permitted to report or inquire about multiple medical needs on a single HSR or during a single appointment.

- ACH developed a Corrective Action Plan (CAP) in July 2022 to address deficiencies in the health service request system.  The CAP is monitored in monthly meetings between nursing leadership and QI.
- There is an insufficient number of escorts at Main Jail to ensure timely access to care. Staff started meeting with SSO Custody leadership on a monthly basis beginning August 2022 to address ongoing issues with patient access to care.
- Staff developed an audit tool for timely access to services and completed a baseline study prior to the policy revision.  Staff will begin periodic audits of the HSR process after training and implementation.
- A video communication pilot will expand from the pilot to improve access to Provider consults.  Medical assistants, Providers, and other health care staff will be able to have a video consult with a Provider in specific circumstances when needed.  The goal is to improve patient care and Provider productivity.
- Service access continues to be impacted by lack of sufficient staffing, confidential space, and COVID-19 operations.

Medical Equipment:

- Replaced worn out/old/broken medical beds at both facilities.
- Replaced all portable sinks in the medical exam room and specialty clinic at both facilities.
- Purchased rolling medical bags for LVNs to transport medical supplies to different medical floors.
- Purchased Autogen and manual heat press for "Keep on Patient" medication blister packaging for pharmacy.
- Purchasing iPads on wheels for video telehealth appointments.  Initial purchase includes eight (8) units for pilot program.  Department of Technology is currently assessing Wi-Fi connectivity for stronger Wi-Fi signal quality.  Additional equipment has been procured for the Main Jail to improve connections for the telehealth program and other clinical staff devices.  A price quoted has been requested by the Sheriff to run cabling throughout the Main Jail for installation of Wi-Fi access points.  It is anticipated that this project is tentatively scheduled for completion by the end of Q1 2023.  A similar project is being embarked up at RCCC with an additional 8 iPads on order and a Wi-Fi connectivity site map drawn up.

Space:

- Main Jail 2 East Provider exam room was completed.
- Main Jail 2 Medical provider charting office was also completed.
- Other improvements to the Main Jail medical areas include the new nursing station on 2 East and the new interview cubicles.
- Excess storage was removed to storage offsite.

36

| **Chronic Care** (Provision D.) |
|---|
| Status: Partial Compliance |

Policies & Provider Guidelines:

- PP 05-18 Chronic Disease Management (revision 08/18/21) – *Final*
- PP 05-19 Hepatitis C Testing, Treatment and Monitoring (revision 04/07/22) – *Final*
- PP 05-20 Diabetes Management (01/07/22) – *Final*
- Provider Treatment Guidelines were developed for Asthma (11/19/21), Diabetes Management (06/02/21), HIV/AIDS (06/02/21) and Hypertension (05/10/21).
- ACH has received Medical Expert feedback on the Provider Treatment Guidelines for Hypertension and Diabetes.  The Hypertension guideline was revised and is pending review by the Medical Experts.  Also pending Medical Expert review are the Asthma and HIV/AIDS guidelines.
- Related policies: PP 05-05 Nurse Intake (revision 12/01/22); PP 05-13 Initial History and Physical (H&P) Assessment (revision 01/11/22) – *Final*.  These are critical assessments that begin the identification and treatment of chronic disease.

Implementation:

- The chronic disease management policies have been partially implemented.  Full implementation is pending the chronic care nurse function, which is dependent on staffing, training, and EHR templates.
- Providers have been trained and have started managing chronic diseases.  Dedicated chronic care providers are managing patients with multiple chronic diseases and higher acuity.
- Providers have been assigned to specific locations to help ensure continuity of care.
- Nursing has been ensuring continuity of care for patients released/transferred.
- Nursing recently dedicated two staff to chronic care.  Staffing shortages have delayed full deployment of the chronic care nurses.
- Providers are trained in at least one chronic disease policy or guideline at every monthly Provider meeting by the Medical Director and also feedback is given to Providers after chart reviews.
- Providers have been trained again in the last few months to use the right document type to capture the chronic care encounter and to address all chronic care problems during a Provider Sick Call.
- Chronic care compliance will improve once chronic care nurses are staffed and able to monitor a panel of patients to ensure timely follow-up, including completion of labs, imaging and other coordination of care as needed.
- Clinical pharmacists will be added to the chronic care team pending Board approval to enable Providers to better manage chronic care patients with diabetes, HTN, hyperlipidemia, Hep C, asthma.

Electronic Health Record:

- Providers have been trained to create alerts in the EHR to ensure a particular patient will return to that provider for follow-up care when possible.
- Initial H&P and Provider Chronic Care Follow-Up forms are active in the EHR.  Both encounter types include several forms for data collection, such as Periodic Health Assessment and Patient Education details.
- The Asthma form in the EHR was updated to capture additional information during chronic care follow-up visits.
- A Chronic Care form in the EHR is currently in development.  This will ensure consistent and accurate documentation by the Chronic Care Nurses.  The new EHR Administrator is working toward completing this project.
- Hepatitis C "opt-out" testing was implemented in late 2021, however, it was recently discovered that the intake questions in the EHR were not updated.  In early June 2022, staff completed updates to the questions in the intake form to be consistent with an "opt-out" process.

Chronic Disease Specialty Services:

- A specialist provides onsite Gastroenterology and Hepatology clinics every other week. Services started in October 2021.
- A primary care provider with additional training in HIV conducts a weekly HIV Clinic. Infectious disease consultation is also available through RubiconMD or contracted off-site Infectious Disease specialist as clinically indicated.
- A part-time primary care provider is also a nephrologist and is available for nephrology consults.  In the current monitoring period, she started onsite nephrology clinics to complement the telenephrology services provided by UCD for dialysis patients.
- Providers have been trained to use RubiconMD (e-consult service with access to numerous specialists). Staff can refer to specialists as clinically needed.

Other:

- Medical Director continues to provide onboarding and training for providers.  Regular staff meetings and trainings will continue.
- Medical Director developed guidelines for routine vaccinations and health screenings (e.g., diabetes, breast cancer, and colorectal cancer screenings) and trained providers in December 2021.  The Medical Director is working with the EHR team and vendor to implement alerts in the EHR to remind providers when health maintenance vaccinations and screenings are due.
- Staff are pulling data reports on chronic conditions and labs which will help with chronic disease management.  See table below:

| Chronic Conditions Report<br>Point in Time | | | |
|---|---|---|---|
| | 07/27/22 | 09/28/22 | 11/30/22 |
| Patients with chronic conditions | 66% | 69% | 68% |
| Of patients with at least 1 chronic condition, % with 2 or more chronic conditions | 66% | 64% | 64% |
| Patients on medication | 67% | 71% | 75% |

*Note: Staff are identifying and treating more chronic health conditions.  Percentage of patients on medication increased significantly.*

Audits:

- QI developed an audit tool for diabetes management and conducted a baseline audit in November 2021.
- The data shows that Providers are improving with respect to scheduling follow-up visits and HbA1c testing within appropriate timeframes.  See table below.

**Chronic Care Audit – Diabetes Management**

| Indicator | Data Period<br>*Sample of patients with diagnosis of diabetes* | |
|---|---|---|
| | 02/2022 (N=61) | 08/2022 (N=28) |
| Provider follow-up visit within timeframe based on degree of disease control | 38/61 (62%) | 20/28 (72%) |
| Hemoglobin A1c (HbA1c) test scheduled within 6 months of last result | 34/61 (56%) | 17/28 (61%) |

- QI Nurses are fully staffed as of June 2022.  The next Diabetes Management audit is currently in process.
- Staff will develop additional chronic care audit tools in the next monitoring period.

**Specialty Care** (Provision E.)
Status: Partial Compliance

Policies:

- PP 04-08 Specialty Referrals (revision 09-07-22) – *Final*

Specialty Services:

Staff have worked on improving service utilization by adding specialty services – including onsite when feasible.

- <u>E-Consult Service</u> – Providers use RubiconMD for access to numerous specialties.
- <u>Gastroenterology/Hepatitis C Clinic</u> – Bi-weekly onsite clinic began in October 2021.

- <u>Physical Therapy Clinic</u> – Onsite clinic began in late 2021, serving both jails weekly and was expanded at the end of 2021-22 FY.
- <u>Ophthalmology Clinic</u> – An onsite clinic began in May 2022 for semi-monthly services through July to assist with the waitlist.  In July 2022, the onsite clinic transitioned to monthly services at the Main Jail.  ACH continues to work toward recruiting more Ophthalmologists.
- <u>Optometry Clinic</u> – Optometry Clinic began onsite in July 2022; however, contractor services has been limited due to inadequate equipment. Equipment is scheduled to be delivered by end of December 2022, which will allow for the contractor to complete a broader range of services, including additional Ophthalmology services.
- <u>Specialty Contracts</u> – ACH is working on specialty contract possibilities with audiology, sleep studies, cardiology, dialysis, and ENT.
- Also see Chronic Care section.

Specialty Care Guidelines:

- Specialty Care Referral Provider Guidelines were developed and training was provided in October 2021, January 2022 and April 2022 to assist providers in submitting sufficient documentation when making referrals. Also see Utilization Management section.

Tracking:

- Staff began manually tracking specialty referrals in February 2021.  A baseline audit was conducted for FY 20/21 that detailed compliance indicators.
- Monthly data reports are reviewed to ensure compliance in this area.  Data is reported three months in arrears to accurately capture compliance timeframes.
- Compliance indicators for the Specialty Care Report include timeliness related to:
    - Receipt of complete specialty referrals.
    - Specialty care consult appointments.
    - Appointments with onsite Primary Care Providers when specialty appointments are delayed.
    - Provider follow-up appointments post specialty consult.
- Additional information has been added to the Specialty Referral tracker based on Expert recommendations. This includes tracking of additional workup prior to appointment when needed, date specialty documentation was received post specialty appointment, if a nurse visit occurred upon return from a specialty appointment, and if additional tests are needed post appointment.
- A Specialty Services Referral Form was developed to track referrals and timeframes within the EHR and went live in July 2021.  However, due to the significant delay in implementation, the report no longer meets the needs due to the growth in tracking elements. The Specialty Services Referral Form will still be utilized in the EHR for providing the detail and history of the referral; however, staff will continue manually tracking and

reporting on data until a comprehensive report can be built containing all of the necessary indicators.

**Specialty Care Report: Fiscal Year 2021/2022 (Data as of 10/14/22)**

| All Specialty Care Referrals | | | | | | | |
|---|---|---|---|---|---|---|---|
| Referral Priority | Jan | Feb | March | April | May | June | Total |
| Routine | 32 | 35 | 53 | 43 | 28 | 39 | 230 |
| Urgent | 1 | 0 | 4 | 1 | 0 | 1 | 7 |
| Total | 33 | 35 | 57 | 44 | 28 | 40 | 237 |

| Routine Referrals | | | | | | | |
|---|---|---|---|---|---|---|---|
| 90 Day Timeframe | Jan | Feb | March | April | May | June | Total |
| Met | 12 (60%) | 15 (48%) | 24 (63%) | 22 (69%) | 10 (53%) | 13 (48%) | 96 (60%) |
| Not Met – Appointment (appt) after 90 days | 6 (30%) | 7 (28%) | 9 (24%) | 9 (28%) | 4 (21%) | 2 (7%) | 37 (23%) |
| Not Met – Pending appt | 1 (5%) | - | 3 (8%) | - | 3 (16%) | 10 (37%) | 17 (11%) |
| Not Met – No appt and/or released after time expired | 1 (5%) | 3 (12%) | 2 (5%) | 1 (3%) | 2 (11%) | 2 (7%) | 11 (7%) |
| Total | 20 (100%) | 25 (100%) | 38 (100%) | 32 (100%) | 19 (100%) | 27 (100%) | 161 (100%) |
| **Not Included** | **Jan** | **Feb** | **March** | **April** | **May** | **June** | **Total** |
| Released before 90 days | 8 | 10 | 14 | 7 | 7 | 12 | 58 |
| Refused apt. | 4 | 0 | 1 | 4 | 2 | 0 | 11 |
| Total | 12 | 10 | 15 | 11 | 9 | 12 | 69 |

| Urgent Referrals | | | | | | | |
|---|---|---|---|---|---|---|---|
| 14 Day Timeframe | Jan | Feb | March | April | May | June | Total |
| Met | - | - | 1 (25%) | 1 (100%) | - | - | 2 (29%) |
| Not Met – Appt after 14 days | 1 (100%) | - | 3   (75%) | - | - | 1 (100%) | 5 (71%) |
| Not Met – No Appt and/or released after timeframe expired | - | - | - | - | - | - | - |
| Total | 1 (100%) | - | 4 (100%) | 1 (100%) | - | 1 (100%) | 7 (100%) |

- Utilization Management Subcommittee reviews and recommends potential actions on meeting timeframes for routine and urgent referrals.
- QI Coordinator and Case Management SRN began meeting weekly this reporting period to review the specialty tracker and timeframes in order to address identified issues and gaps with the Medical Director.

**MEDICAL PROVISIONS OUTSIDE AREAS OF FOCUS**

The remainder of this section outlines the status for items that were not identified as areas of focus during this monitoring period.  Where indicated (*pending feedback*), staff submitted a new or revised policy and feedback from Class Counsel and/or experts is pending.

| |
|---|
| **Medication Administration and Monitoring** (Provision F.)<br>Status: Partial Compliance |

Staff have created and/or revised policies for medication administration and monitoring.

Policies:

- ACH PP 04-02 Insulin Administration (initial 08/19/19)
- ACH PP 04-17 Medication Administration (revised 07/29/22) – *Final*
- ACH PP 04-18 Medication Order Entry (revised 09/15/22) – *Final*
- ACH PP 04-19 Over the Counter Medications (revised 09/15/22) – *Final*
- ACH PP 04-20 Keep on Person Medications (revised 01/12/22) – *Final*

Quality Improvement:

- ACH PP 01-13 Pharmacy and Therapeutics Subcommittee (revised 07/01/21) – *Final*
- ACH PP 02-04 Medication Incident Reporting (02/19/21) and form
- QI data is presented in the Pharmacy and Therapeutics Subcommittee for review and recommendations.
- Staff developed a new audit tool to evaluate the timeliness of medication initiation and renewal.  A baseline audit was conducted in March 2022, and another audit was conducted in September 2022.  See table below:

| Medication Initiation and Renewal | | |
|---|---|---|
| Indicator | Data Period | |
| | 02/02/22 (N=80) | 08/17/22 (N=42) |
| Timely initial medication (<48 hours from order) | 65/65 (100%) | 35/35 (100%) |
| Timely renewal (no missed doses) | 7/11 (64%) | 6/7 (86%) |

Other:

- PP 04-17 Medication Administration was approved by the Medical Experts in February 2022, and a minor revision was completed in July 2022.  The policy includes procedures for patients that are off-site due to court or other engagements.  The pill call policy was deleted and its contents were integrated into this policy.  In addition to policy changes, several key changes have been completed including:  changes in pharmacy schedules, deployment of new pill carts, reassigning some tasks, and improving the network capacity.  Additional medical escorts are required to ensure efficient operations.
- All RNs and LVNs have been cross-trained to administer medications.
- Medication administration times have been changed to improve efficiency.
- Handheld tablets have been purchased for testing effectiveness nurses being able to document in real time when administering medications at the cell.  The devices need to be HIPAA-compliant and compatible with the EHR.  Nursing is providing feedback and additional tablets will be ordered based on feedback and ability to meet the need.
- The COVID-19 pandemic significantly impacted the pill call process at the Main Jail.  ACH met with Custody to resume prior pill call practices – which was implemented during the monitoring period.

Keep on Person (KOP):

- PP 04-20 Keep on Person (KOP) Medications was approved by the Medical Experts in February 2022.  KOP medications were expanded to include inhalers, chronic disease medications, over the counter medications, and others.  Staff developed a Patient Medication Guide handout to inform patients of the KOP and discharge medication programs.
- The KOP program started with a small pilot on 12/19/21.  The initial population included eligible patients on the 7th floor of the Main Jail.  The KOP program has been expanded throughout both facilities.  As patients are deemed eligible to participate, their medications are assessed by a Pharmacist and placed in the KOP program.  Pharmacy is continuing to assess eligible patients and convert to KOP.
- ACH is increasing eligibility – including for patients on restricted medications, by only dispensing the non-restricted medications as KOP.  Patients with restricted medications still go through the pill line for the restricted medications. ACH is also assessing all levalbuterol inhalers (rescue inhalers), thus increasing KOP.
- Patients continue to be receptive to the program and adherence has been better than anticipated.  ACH and Custody KOP designated leads continue to problem-solve and improve the program.  Pharmacy staff use the EHR flowsheet to monitor participants and use the Pharmacy Information System for data management.

| **Patient Privacy** (Provision H.)<br>Status: Partial Compliance |
| --- |

Policies:

- ACH PP 08-01 Safeguarding Protected Health Information (revision 06/03/21) – *Pending Medical/MH Expert feedback.*
- ACH PP 08-03 Release of Protected Health Information (01/10/20)
- ACH PP 08-08 Patient Privacy (revision 05/13/21) – *Pending Medical/MH Expert feedback.*

Other:

- EHR templates require staff to document whether or not each face-to-face encounter was confidential.  If the encounter was not confidential, staff must document the specific reason.  The EHR vendor developed parameters for a report on this compliance indicator. Staff continue to test the report parameters for data on confidentiality of encounters to ensure consistency between all reports requiring confidentiality updates. Once testing is completed, DTech will provide ongoing support for data tracking and reporting needs.
- Certain areas within the existing jail structure lack sufficient privacy.
- Nurse Intake renovation took place in December 2022 to create more confidential space.
- Ongoing space meetings will focus on any other areas which can be made available for nurse or physician encounters.  Space is currently very limited with one exam room on most floors of the Main Jail.
- ACH has have been in discussion regarding the use of a form that is used when sending a patient outside the facility for care (ITI form) – including offsite specialty appointments and the ER.  The form is used to communicate with the receiving service provider regarding the healthcare need.
  - For specialty appointments, staff put all documentation in a sealed envelope and do not include Protected Health Information (PHI) on the ITI.
  - Quality Improvement (QI) and Case Management (CM) identified a problem with PHI on the ITI form with ER send outs. QI, CM and Nursing met to determine best course of action and created a form to place in the sealed envelope that provides the ER the necessary information and the ITI updated to state "See inside attached envelope for medical request detail" as well as "Attention medical staff: Do not write in this box due to HIPAA Requirements."
  - The back of the ITI will be edited to state "Return completed form with patient in a sealed envelope".
  - CM and QI staff will monitor for compliance.

---

**Utilization Management** (Provision J.)
Status: Substantial Compliance

---

Policies:

- ACH PP 01-14 Utilization Management (revision 05/05/22) – *Final*
- ACH PP 01-18 Utilization Management Subcommittee (05/05/22) – *Final*
- ACH PP 04-08 Specialty Referrals (revision 09-07-22) – *Final*

Other:

- Case Management staff began using InterQual as the Utilization Management platform for specialty referrals in March 2021.
- Specialty Care Referral Provider Guidelines were developed and training was provided in October 2021, January 2022 and April 2022 to assist providers in submitting sufficient documentation when making referrals that are processed through InterQual.
- A Utilization Management (UM) Subcommittee was formed and began meeting in October 2021.  Subcommittee members include service line directors, QI, MH and case management.
- The UM Subcommittee continued reviewing selected cases of high utilizers, high risk, complex, and/or high cost in order to ensure that resources are applied appropriately and timely during the monitoring period.
- A new Supervising Case Management Nurse and Senior Office Assistant began work in March 2022.
- ACH PP 01-14 Utilization Management is under revision so that it does not overlap with the Specialty Care policy and is more geared toward overall management of service utilization management and monitoring.
- A Utilization Review (UR) team formed in December 2022 and met to discuss UR tools and other logistics. A Provider and QI nurse will meet monthly to review randomly selected cases pulled from patient grievances. Targeted reviews may result from the original UR and tools will be revised as needed. ACH anticipates the UR process to begin in February 2023.

---

**Reproductive and Pregnancy Related Care** (Provision L.)
Status: Substantial Compliance

---

Policies:

- ACH PP 02-03 Female Reproductive Services (revision 07/01/21) – *Final*
- ACH PP 05-04 Pregnancy Testing (revision 07/01/21)
- ACH PP 06-01 Lactation Support (initial 04/22/20)

Other:

- ACH contracts with UC Davis for OB/GYN services.  Services are provided onsite at least once weekly.  Primary care providers are referring patients to the OB/GYN clinic for cervical cancer screening.
- Through the contract with UC Davis, OB/GYN Family Planning Center provides patients with comprehensive counseling and timely assistance in accordance with their expressed desires regarding pregnancies (whether to keep the child, use adoptive services, or have an abortion).

- Providers and OB/GYN specialists submitted input for changes to OB/GYN forms and flowsheets in the EHR.  Modifications should be complete in the next monitoring period.
- QI will begin to review reproductive and pregnancy related care in 2023.

| **Transgender and Non-Conforming Health Care** (Provision M.)<br>Status: Partial Compliance |
| --- |

Policy:

- ACH PP 05-12 Transgender and Gender Nonconforming Health Care (initial 04/09/21) – *In review and revision.*

Other:

- For continuity of care, patients who are identified as receiving hormone treatment from a community licensed provider continue the medication while incarcerated.  A provider will assess the patient and include the medication as part of the patient's treatment plan.
- Mental Health staff worked with a consultant to develop training on the WPATH Standards of Care, LGBTQIA and health equity. Feedback from Medical, Mental Health and Suicide Prevention Experts has been incorporated. In consideration of the Medical Expert recommendation, ACH has created additional slides regarding the WPATH standards in relation to ACH policy to be included in the training. The additions are under review and ACH hopes to roll out the training by February 2022.

| **Detoxification Protocols** (Provision N.)<br>Status: Partial Compliance |
| --- |

Policies and Standardized Nursing Procedures (SNP):

- ACH PP 05-14 Benzodiazepine Withdrawal Treatment (revision 03/15/22) – *Final*
- ACH PP 05-15 Opioid Withdrawal Treatment (revision 04/22/22) – *Final*
- ACH PP 05-17 Alcohol Withdrawal Treatment (revision 03/29/22) – *Final*
- SNP Alcohol Withdrawal Monitoring and Treatment (revision 04/07/22) – *Final*
- SNP Opioid Withdrawal Monitoring and Treatment (revision 03/29/22) – *Final*
- SNP Benzodiazepine Withdrawal Monitoring and Treatment (revision 04/07/22) – *Final*
- SNP Suspected Opioid Overdose (revision 04/07/22) – *Final*
- MH PP 07-03 Use of Benzodiazepines (revision 04/15/21) – *Pending MH Expert feedback*
- MH PP 07-04 Patients with Substance Use Disorders (revision 08/16/21) – *Pending MH Expert feedback*

Substance Use Disorders (SUD):

Policies outline identification and treatment of substance use disorders including medication assisted treatment (MAT), methadone, buprenorphine, etc.  ACH has a SUD Counselor and SSO has reentry programs.

- ACH PP 05-02 Medication Assisted Treatment (revision 07/20/22)
- ACH PP 05-06 Methadone Treatment (initial 06/24/20) – *Will be revised*
- ACH PP 05-07 SUD Counselor (initial 06/24/20)

Other:

- All ACH withdrawal treatment policies and SNPs were revised in the current monitoring period based on feedback.  All were approved by the Medical Experts in April 2022.
- Electronic health record templates were revised to capture the latest changes.
- Two RNs are designated for MAT services and designated nurses are assigned to administer medications daily.
- Designated providers and designated nurses meet monthly and ad hoc as needed to discuss patient caseload and treatment modalities.
- Discussion continues surrounding the use of Buprenorphine taper for withdrawal management; however, consistent use is pending additional nursing and MAT Providers, as well as a dedicated detox unit for monitoring.
- ACH is currently working with Custody at Main Jail to designate specific housing pods for withdrawal monitoring as a result in a decrease need for quarantine pods.  Longer term planning includes utilizing 2P for a dedicated withdrawal monitoring unit if APU moves to 3rd floor.
- Staff developed an audit tool to evaluate withdrawal monitoring in the Main Jail booking loop in March 2022.  Audits are completed monthly and a corrective action plan was issued due to delays in timely monitoring for the purpose of identifying and correcting issues with monitoring patients at risk of withdrawal.

MAT Program:

- Three providers (two at Main Jail and one at RCCC) are designated to provide MAT services.
- MAT providers are assigned to take calls from nurses to continue MAT medications during weekdays.  After hours, standby providers order bridge treatment.
- QI, Pharmacy and MAT nursing met with a Sublocade (injectable suboxone) distributor this reporting period to discuss the use of this medication to prevent diversion and alleviate medication administration demands. QI is looking into the possibility of a MAT funding grant to assist in purchasing the medication.
- The MAT policy was revised in July 2022.

---

**Nursing Protocols** (Provision O.)
Status: Substantial Compliance

---

In order to ensure nurses act within their scope of practice, several items have been completed.

Standardized Nursing Procedures (SNP):

- The Remedial Plan states that SNPs shall include assessment protocols that are sorted based on symptoms into low, medium, and high risk categories.  Rather than label protocols as low, medium, and high risk, each SNP notes symptoms RNs may manage, those requiring a Provider consult, and those that require emergency stabilization.
- A total of 51 SNPs have been created and are available on the Intranet site.  They include SNPs in the functional areas listed below.
    - General (1)
    - Abdominal (1) – *Medical Expert feedback received 08/05/22*
    - Allergies (1)
    - Cardiovascular & Lung (7)
    - Dental (1)
    - Endocrine (1)
    - Eyes, Ears, Nose & Throat (5)
    - Infection Control (1)
    - Musculoskeletal (2)
    - Neurological (4)
    - Pregnancy (1)
    - Skin (12)
    - Substance Use Disorders (4) –
    - Urological (5)
    - Sexually Transmitted Infections (5) – *Medical Expert feedback received 11/18/22*
- Staff revised the four (4) Substance Use Disorder SNPs during the previous monitoring period.  All were approved by the Medical Experts in April 2022.
- Visual Complaints SNP was revised in June 2022 and is pending Medical Expert feedback.
- SNP for Abdominal Complaints was revised and Medical Expert feedback was received in August 2022.  This SNP is currently in review and revision.
- SNP for Pregnancy was revised in October 2022 and is pending Medical Expert feedback.
- Vaginitis was created and Medical Expert feedback received in August 2022.  Based on feedback, five new Sexually Transmitted Infection SNPs were developed and Medical Expert feedback received.  SNPs are in review and revision.
- A new SNP category was created for allergies, and a new SNP was developed for Allergic Reactions, including Anaphylaxis.
- Nurse managers are reviewing other areas that may require SNPs.
- Registered Nurses have completed SNP testing for all SNPs which are current as of November 2022.

Nursing Structure:

- The Nursing Director oversees two Senior Health Program Coordinators (nurse managers) responsible for overseeing nursing staff at each respective jail facility for continuity to overall nursing services.
- Nursing has 14 Supervising Registered Nurses (SRNs) directly supervising nursing staff and daily operations.
- Regularly scheduled meetings with nurse managers (Senior Health Program Coordinators and SRNs) and meetings with direct nursing staff include trainings on policies and procedures, review of QI audits and corrective action plans to strategize problem solving around areas of concern, announcements, etc.
- Nursing Position Standards were created or revised for the Senior Health Program Coordinators, Supervising Registered Nurses, Infection Prevention Coordinator, Registered Nurses, Licensed Vocational Nurses, Medical Assistants, and Certified Nursing Assistants.
- New employees complete a structured onboarding process that includes all areas to which a nurse may be assigned.
- The Nursing Director conducts concurrent medical chart reviews for nursing documentation and application of nursing practice. Staff who are not in compliance with policies and procedures receive additional training and mentorship as needed.
- The Training Coordinator (QI SRN) has begun implementing trainings for nursing and will be able to increase training to nursing staff during the next monitoring period.

| **Review of In Custody Deaths** (Provision P.) |
| --- |
| Status: Substantial Compliance |

Policy:

- ACH PP 01-08 Medical Review of In-Custody Deaths (revision 02/16/22) - *Final*

Other:

- Revised policy, tracking log and process went into effect in February 2022.
- Leadership staff are notified when there is an in-custody death and review of the medical chart is initiated by key service line directors.
- ACH schedules a joint administrative review meeting with Custody leadership within ten days of a patient death to determine if any immediate actions are required.
- Monthly multidisciplinary meetings are scheduled recurring to review the episode of care and develop corrective action plans when indicated to address systemic or training issues.
- ACH has implemented a monthly Mortality CAP meeting to monitor active corrective action plans until completed.
- Key ACH staff are on the distribution list for coroner's reports. Death certificates are obtained from Public Health staff when available.

| **Reentry Services** (Provision Q.) |
| --- |

Status: Partial Compliance

Policies:

- ACH PP 04-10 Discharge Medication (10/29/21) – *Final*
- ACH PP 05-10 Discharge Planning for Reentry (revision 05/19/22) – *Final. This is a joint policy with Mental Health. MH PP 05-01 Discharge Planning was deleted.*

Discharge Medication:

- Sentenced and court-ordered patients are provided a 30-day supply of prescribed medications when released. ACH staff are coordinating with SSO Custody for more accurate lists of potential release candidates in order to increase medications delivered at release.
- Discharge medications continue to be provided to approximately 70% of eligible sentenced and court-ordered patients upon release. Staff continue to work on the discharge medication release process with Medical leadership and Custody staff.
- Presentenced patients may obtain a prescription for a 30-day supply of medication at the County Primary Care Pharmacy.
- Discharge medications for presentenced patients began in January with a small pilot that initially included patients with SMI and comorbid diseases. The program was recently expanded to include patients with Type I Diabetes, Hepatitis C, HIV, and patients receiving antibiotics.
- Under 5% of the patients pick up their medications from Primary Care Pharmacy.

Discharge Planning:

- Discharge Planning policy was revised to become a joint policy with Mental Health and incorporates Expert feedback.
- ACH meets internally and participates in County-wide meetings to address obstacles to improve discharge planning and successful linkage to ongoing care. Collaboration between ACH Medical and Mental health, SSO Custody, the Courts, community partners such as Sacramento Covered for ongoing medical needs and County Behavioral Health for individuals with serious mental illness (SMI) is necessary for successful discharge planning.
- Designated Discharge Planning nurses work with patients with complex conditions to ensure there is continuity of care post release.
- SUD Counselor works with patients in need of continuity of SUD treatment.
- Mental health staff are required to provide linkage of patients with SMI to County Mental Health – a workflow was created and MH staff were trained on the referral process.
- County Behavioral Health established the *Community Justice Support Program* – a full-service partnership to serve justice involved patients with serious mental illness. ACH Mental Health meets regularly with the program leadership to address barriers and collaborate on the referral process. A report was developed to capture the projected

release date and level of care to identify patients with SMI and release dates within 6 weeks.

- Medi-Cal Managed Care Plans rolled out a new benefit under a program called CalAIM. CalAIM provides enhanced care management (ECM) and coordination for patients with intensive health/mental health needs.  Many have difficulty navigating the multiple organized health systems to get the care they need. Sacramento County Behavioral Health and Sacramento Covered are contracted with all Managed Care Plans as ECM providers.  ACH refers patients with ongoing mental health needs to County Behavioral Health and those with ongoing medical needs to Sacramento Covered.
- The jail in-reach component of CalAIM was anticipated to begin January 2023; however, there have has been delays by the State Department of Health Services.  Staff will continue to work on this with partner agencies. The justice involved population meets other criteria for CalAIM.
- The Department of Human Assistance will be required to support pre-release Medi-Cal eligibility starting January, 2023 for the justice involved population.  This is crucial in ensuring linkage to necessary services.
- County leadership has been meeting on both the ECM and eligibility provisions in CalAIM.

| **Training for SSO** (Provision R.) |
| --- |
| Status:  N/A |

- Refer to SSO.  Will collaborate with SSO on training as requested.

**Next Steps for Medical Remedial Plan Provisions**

Substantial work has been completed on medical Remedial Plan provisions during this monitoring period.  Numerous policies and protocols were created and/or revised, EHR templates were created and/or modified, hiring and/or work on positions is continuous, and staff training and education is ongoing.

Next steps for the new monitoring period include:

- Pending completion of expert review, complete key policies or protocols that are in revision or draft form.
- Provide training and implementation for the new or revised policies.
- Complete key EHR projects including the chronic care nurse templates and EHR procurement.
- Expand video communication pilot that will enable video consults with a Provider.
- Create and complete audit tools for necessary areas.  This process will include feedback loops to staff and additional steps if needed (e.g., more training, process changes, etc.)

## MENTAL HEALTH CARE [Remedial Plan Section IV]

Class Counsel outlined five areas for focus including staffing, space planning, IOP, OPP, & Acute Bed assessment and planning, use of force for prisoners with mental health or intellectual disabilities, mental health and disciplinary measures, and roll out of the new electronic health record (EHR) system. These items are shaded in blue. The remainder of provisions are not shaded. Status is listed for each.

| **Staffing** (Section II. General Provision) |
|---|

- ACH has a contract with UC Davis for provision of mental health services.
- See staffing section under General Provisions for a list of new services by fiscal year.

| **Space**<br>Status: Partial compliance |
|---|

- Mental Health (MH) staff use designated attorney booths in the following locations for confidential interviews: administrative segregation (March 2021), booking (September 2021 for mental health assessments), and fourth floor (December 2021) for psychiatric prescriber evaluations. Staff developed a workflow outlining the process to use attorney booths and supervisors complete chart audits to ensure staff compliance with use of confidential space.
- Completed audit of confidential contacts utilizing new EHR report. Identified challenges, barriers, and opportunities for improvement.
- Staff created a schedule for Main Jail (third floor classroom) RCCC (CBF classroom) to maximize space for confidential interviews and groups.
- MH began offering evening groups to IOP patients in November 2021, which further maximizes classroom space. Staff discuss use of confidential space regularly at team meetings.
- Designated MH outpatient staff moved to a nearby G St office. Staff vacated a classroom on the third floor that was converted into IOP office space. This increased confidential programming space for groups and individual assessments and interventions.
- SSO and MH continue to meet regularly to discuss challenges and barriers to providing confidential contacts.
- SSO and MH consulted with office furniture distributor to discuss construction of confidential interview booths for each floor. SSO is determining next steps, funding and approval to determine feasibility of constructing interview booths.
- The Board of Supervisors deliberated on 12/08/2022, regarding recommendations for Jail Population Reduction Plans and Plans to address Jail Facility Deficiencies for the Mays Consent Decree – resulting in approval. See Jail Facility Needs and Plans for Jail Population Reductions sections before for more detail.

**IOP, OPP, & Acute Bed Assessment & Planning** (Section II. General Provision)
Status: Partial Compliance

- MH administration has daily bed assignment/utilization meetings with SSO Custody to review movement between the IOP, OPP, and the Acute Psychiatric Unit. This includes admissions, discharges, and MH recommendations for housing.
- MH can obtain patient specific group attendance and the number of therapeutic hours per week through a newly created Group Participation Report.  The report does not track group cancellations or reasons for cancellations. This data will be kept on a separate spreadsheet until the report function can be modified.
- ACH Medical, MH, and SSO Custody held multiple space planning meetings to discuss an interim proposal to move the Acute Psychiatric Unit to the 3rd floor to increase bed capacity for the Acute Unit from 17 to 38. Of those cells, 10 cells have been designated for use as the Suicidal Inmate Temporary Housing Unit (SITHU).   This proposal was presented to the Board of Supervisors and approved on December 8, 2022.
- The plan to increase high security/high acuity IOP beds to serve patients with SMI who are housed in Administrative Segregation was implemented – an additional 8 IOP female beds were added at the Main Jail in late May/early June 2022 and 24 male IOP beds were implemented in September 2022 at the RCCC.
- MH reallocated EOP staff to support expansion of the high acuity/high security IOP as staffing for the additional IOP beds was not included in the budget augmentation for FY 2022/23. Reallocation of EOP staff reduced the capacity of patients that can be served in EOP.   ACH will be proposing growth next FY budget to replace the EOP reallocation.
- MH began providing groups for patients on 7W, 3E and 3W who are participating in the EOP.

**Use of Force for Prisoners with Mental Health or Intellectual Disabilities** (Provision V.)
Status: Partial Compliance

Policies:

- ACH PP 05-21 Restraints and Seclusion – Joint Policy (revised 05/09/22) – *Final*
- MH PP 07-05 Mental Health Evaluations for Planned Use of Force (12/16/21) – *Final*

Other:

- MH worked with a consultant to develop De-escalation and Use of Force (UOF) training for MH staff.   Training was approved by Class Counsel and Experts in October 2022. Training sessions will begin in February 2023.
- MH and SSO Custody have met this monitoring period to discuss planned UOF in order to develop a multidisciplinary approach to address UOF incidents.

**Mental Health and Disciplinary Measures** (Provision V.)

> **Status:  Partial Compliance**

Policy:

- MH PP 07-06 Mental Health Rules Violation Review (01/05/22) – *Final*

Other:

- Custody consults MH providers concerning disciplinary measures when a patient is located in MH housing.
- Rules Violation Review (RVR) process was implemented on a limited basis at RCCC in February 2021.  MH began tracking RVR referrals and assessments in July 2021 and implemented the RVR process at the Main Jail in IOP, EOP, APU, and Ad Seg in October 2021.   MH staff have been trained and provided workflows on the policy and process. Staff refined the RVR assessment form based on Expert feedback.
- MH collaborated with SSO Custody on development of an RVR and Administrative Segregation referral form and trained custody on the referral process and workflow for Administrative Segregation assessments (December 2021).
- MH and SSO refined the referral process and updated the RVR and Administrative Segregation referral form to ensure referrals were received timely and tracked appropriately.
- MH has received budget approval for additional clinicians to support RVR and Administrative Segregation reviews, assessments, and recommendations.
- MH and QI completed an audit of MH RVR Referrals for period of January – September 2022, and identified areas for improvement in coordination with SSO Custody.
- MH began completing Administrative Segregation assessments for patients on MH caseload in November 2022 with a plan to assess all patients placed in Administrative Segregation once staffing is in place.


**MENTAL HEALTH PROVISIONS OUTSIDE AREAS OF FOCUS**

> **Policies and Procedures** (Provision A.)
> Status: Partial Compliance

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*
- ACH PP 05-21  Restraints and Seclusion – Joint policy (revised 05/09/22) – *Final*
- ACH PP 05-22 Patients in Segregation (05/31/22) – *Final*
- MH PP 01-10 Access to Mental Health Services ( 07/12/22) – *Final*
- MH PP 03-02 Overview of Staff Responsibilities – Acute Psychiatric Unit (08/16/21) – *Pending feedback*
- MH PP 03-03 Overview of Staff Responsibilities – Outpatient (08/18/21) – *Pending feedback*
- MH PP 03-04 Psychiatric Prescriber Duties (09/09/21) – *Pending feedback*

- MH PP 03-05 Acute Psychiatric Nursing Responsibilities (12/16/21) – *Pending feedback*
- MH PP 03-06 Acute Psychiatric Unit – Psychiatrist Responsibilities ( 11/30/22) – *Final*
- MH PP 04-01 Intensive Outpatient Program (06/28/22) – *Final*
- MH PP 04-02 FOSS Levels (12/30/21) – *Final*
- MH PP 04-03 Basic Mental Health Services (07/27/22) – *Final*
- MH PP 04-04 Outpatient Mental Health Services and Levels of Care (06/17/22) – *Final*
- MH PP 04-07 Acute Psychiatric Unit – Precautions and Observations (06/22/22) – *Final*
- MH PP 04-09 Acute Psychiatric Unit – Admission, Programming and Discharge (11/30/22) – *Final*
- MH PP 07-02 Treatment Planning (09/13/22) – *Final.*  This policy includes contents of former MH PP 07-01 Behavior Management Plan, which was deleted.
- MH PP 07-03 Use of Benzodiazepines (04/15/21) – *Pending feedback*
- MH PP 07-04 Patients with Substance Use Disorders (08/18/21) – *Pending feedback*
- MH PP 07-05 Mental Health Evaluations for Planned Use of Force (12/16/21) – *Final*
- MH PP 07-06 MH Rules Violation Review (01/05/22) – *Final*
- MH PP 09-02 Lanterman-Petris-Short Conservatorship (04/17/20) – *Pending feedback*
- MH PP 09-04 Administration of Involuntary Psychotropic Medication (revision 05/27/21) – *Pending feedback*
- MH PP 09-05 Informed Consent-Acute Inpatient Unit (05/27/21) – *Pending feedback*
- MH PP 09-06 Patient's Rights (10/07/21) – *Final*
- MH PP 09-07 Denial of Patient's Rights (08/06/21) – *Pending feedback*
- MH PP 09-08 Prison Rape Elimination Act (08/06/21) – *Pending feedback*
- MH PP 09-11 Involuntary Detainment Advisement (11/21/22) – *Final*

---

**Organizational Structure** (Provision B.)
Status: Substantial Compliance

---

Policy:

- ACH PP 01-10 Organizational Charts (07/09/21) – *charts have been updated with new approved positions, change in position titles, and organization structure.*

Other:

- The MH Medical Director and Mental Health Manager oversee jail MH services.
- MH reorganized the leadership structure to address Consent Decree requirements and support program and staff expansion.
- The Medical Director and Mental Health Manager participate in a variety of meetings including Executive Team, Quality Improvement, Multidisciplinary, ad hoc meetings and regularly interface with medical and SSO Custodial leadership.

---

**Patient Privacy** (Provision C.)

| Status: Partial Compliance |
| --- |

Policy:

- ACH PP 08-08 Patient Privacy (05/13/21; joint policy) – *Pending feedback*

Other:

- MH staff document confidential status of encounters including rationale when it is not confidential. A baseline audit was completed.  As a result of audit findings, MH has defined a drop-down menu of common reasons for lack of confidentiality for uniformity and data purposes.  Changes were completed and staff were trained (September 2021).
- MH supervisors monitor use of confidential space in booking and have regular discussions with staff regarding challenges/barriers to use of confidential space.  Managerial review of patient charts indicates staff are using space unless a safety/security reason is present. Staff are documenting rationale when a confidential interview is not possible.
- See Space section for details on confidential interview space.
- Staff created a schedule for the MJ third floor classroom and RCCC CBF classroom to ensure staff are fully utilizing confidential space and are aware of availability.
- MH and SSO Custody meet regularly to discuss challenges/barriers preventing confidential encounters.  MH and Custody are developing plans to increase efficiency of using attorney booths on all floors, confidential interviews with patients who present with assaultive or high security/safety issues, and Custody standby while ensuring auditory privacy.
- MH staff continuously reinforce importance and requirements of confidential individual interviews and group programming during staff meetings and huddles.
- Supervisors are completing spot-checks daily to ensure staff are appropriately utilizing confidential space.

| **Clinical Practices** (Provision D.)<br>Status: Partial Compliance |
| --- |

Policies:

- See policies listed in "Policies and Procedures (Provision A.)"

Other:

- Clinical Multidisciplinary Team (MDT) meetings began in IOP August 2021 with full implementation November 2021.
- IOP and EOP staff received training on completing treatment plans and MDTs in December 2021. Workflows were developed to help staff understand process and policy.
- Provided training to staff on process for completing MDT meeting and documenting patient's absence at MDT in instances where patients refuse to attend.

- Comprehensive treatment plans utilizing the EHR template were implemented for EOP patients in March 2021.
- MH groups began in the APU August 2021.  MH currently offers six groups a week in APU. The APU Daily Patient Activity report was implemented August 2021. This report tracks patient care activities on APU and coordination with custody for patient care support needs.  Created a workflow for nursing staff and coordinated implementation with custody leadership.
- MH embedded two social workers on the APU to increase group programming, ensure regular MDTs, provide individual counseling, coordinate out-of-cell time and other activities of daily living with SSO Custody and provide advocacy.
- MH completed the first QI audit with data collected from APU Daily Patient Activity report and recommendations to increase SSO Custody support and coverage on the APU to support patient care.  In response, SSO leadership adjusted Custody work hours to improve coverage on the APU.
- A MH triage clinician is assigned to emergent referrals for each shift.
- MH staff review all patients receiving MH services within the EHR.
- Developed a pilot program to provide an additional mental health screening in booking for patients referred by intake to improve timeliness to medication verification and assessment of patients with acute mental health needs.
- A Psychiatrist with combined Internal Medicine/ Psychiatry training joined the acute psychiatric mental health team – allowing for enhanced diagnosis and treatment of patients with combined mental health and medical issues.
- Developed a plan and process with SSO Custody to ensure MH is determining which patients are placed in Outpatient Psychiatric Pod (OPP) housing.
- Coordinated with SSO Custody to update Custody's classification form to better communicate MH recommendations regarding housing of patients served by MH.
- Implemented monthly Suicide Prevention MDTs to discuss patients with complex mental health needs who engage in self-injurious behaviors.
- Trained core staff to complete MoCA assessments to identify patients with cognitive impairments who require adaptive supports.
- Began training SSO Custody working in MH programs on the MH Adaptive Support Program (November 2022).

---

**Medication Administration and Monitoring** (Provision E.)
Status: Partial Compliance

---

Policies:

- ACH PP 04-17 Medication Administration (revised 12/16/21) – *Final*
- MH PP 03-04 Psychiatric Prescriber Duties (09/09/21)
- MH PP 03-06 Acute Psychiatric Unit – Psychiatrist Responsibilities (11/30/22) - *Final*

- MH PP 07-03 Use of Benzodiazepines (04/15/21)
- MH PP 09-04 Administration of Involuntary Psychotropic Medication (revision 05/27/21)

Other:

- MH hired two additional psychiatric Nurse Practitioners in July 2021.
- MH increased psychiatric prescriber coverage to seven (7) days per week in the Outpatient Program.
- Established a MH Prescriber Meeting in August 2021 to improve communication, patient care practices, and standards related to the Consent Decree.
- Staff completed a baseline audit of intake screenings to determine timelines for verification of patients reporting community psychotropic medications. Recommendations included increasing documentation of pharmacy contact information to assist in improving MH timelines for verification.

---

**Placement Conditions, Privileges, and Programming** (Provision F.)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*
- MH PP 01-10 Access to Mental Health Services (07/12/22) – *Final*
- MH PP 04-01 Intensive Outpatient Program (06/28/22) – *Final*
- MH PP 04-04 Outpatient Mental Health Services and Levels of Care (06/17/22) – *Final*
- MH PP 04-09 Acute Psychiatric Unit – Admission, Programming and Discharge (11/30/22) – *Final*

Other:

- The Suicide Precautions and/or Grave Disability Observations – Custody Instructions Form was developed to document MH staff's directions regarding housing, observation level, property, privileges, and clothing restrictions.  Staff provided training to SSO Custody leadership on the form and workflow on August 25, 2021.
- Implemented monthly Suicide Prevention MDTs to discuss patients with complex mental health needs who engage in self-injurious behaviors.
- Staff provided training and created a workflow for MH staff on responsibilities related to suicide precautions and clinical decisions regarding housing, observation levels, privileges, clothing, and property in August 2021.
- MH and custody designees meet weekly to review the restrictions and collaborate on patient specific plans to restore a patient's property or privileges.
- MH and SSO Custody also meet daily to review bed assignment/utilization and movement between the IOP, OPP, and APU. This includes admissions, discharges, and MH recommendations.

- Completed baseline study of MH compliance in meeting 4-hour timeline to care for patients in safety cells and presented findings at a MH QI Subcommittee Meeting. Results showed that low staffing levels significantly impacted compliance.
- Complete weekly audits on MH compliance on determining and documenting housing, observation level, property, privileges, and clothing restrictions for patients placed on suicide precautions. Report findings to Suicide Prevention Subcommittee on monthly basis.

---

**Medico-Legal Practices** (Provision G.)
Status: Partial Compliance

---

Policies:

- ACH PP 05-21 Restraints and Seclusion – Joint policy (revised 05/09/22) – *Final*
- MH PP 04-07 Acute Inpatient Unit - Precautions and Observation (06/22/22)
- MH PP 09-02 Lanterman-Petris-Short (LPS) Conservatorship (04/17/20)
- MH PP 09-04 Administration of Involuntary Psychotropic Medication (revision 05/27/21)
- MH PP 09-05 Informed Consent-Acute Inpatient Unit (05/27/21)
- MH PP 09-06 Patient's Rights (10/07/21) – *Final*
- MH PP 09-07 Denial of Patient's Rights (08/06/21)
- MH PP 09-08 Prison Rape Elimination Act (08/06/21)
- MH PP 09-11 Involuntary Detainment Advisement (11/21/22) – *Final*

See "Policies and Procedures (Provision A.)" for a list of policies and status.

---

**Restraints and Seclusion** (Provision H.)
Status: Partial Compliance

---

Policies:

- ACH PP 05-21 Restraints and Seclusion – Joint policy (revised 05/09/22) – *Final*
- ACH PP 04-10 Discharge Medication (10/29/21) – *Final*

Other:

- Staff provide sentenced patients a 30-day supply of prescribed medications upon release. Presentenced patients may obtain a prescription for a 30-day supply of medication at the County Primary Care Pharmacy. See Reentry Services (Provision Q.) for further detail.
- MH continues to meet regularly with County Behavioral Health to refine the referral process for community based mental health services. A report was developed to capture the projected release date and level of care to identify patients with SMI and release dates within 6 weeks.
- Based on Expert feedback, staff combined the Restraints policies and worked in conjunction with SSO Custody to revise drafts of the Restraints and Seclusion, Use of Force, and Segregation policies.

| Training (Provision I.)<br>Status: Partial Compliance |
| --- |

Policy:

- ACH PP 03-08 Staff Development and Training (07/01/21)

Other:

- MH has a training coordinator who monitors training compliance.
- Training was developed and provided on the following:
  – Treatment Planning and MDT Meetings
  – Brain Development/Intellectual Disability
  – Effective Communication/ADA
  – Consent Decree
  – 5150 Certification
  – Prison Rape Elimination Act
  – Understanding Mental Health Symptoms in the Correctional Setting (Custody specific training)
- Planned Use of Force and De-escalation training finalized in October 2022.  Training session projected to begin in February 2023.
- MH worked with a consultant to develop WPATH training.  See Transgender and Non-Conforming Health Care (Provision M) for detail and status.
- Developing training for intake nurses on screening for mental health issues, suicide risk assessment screening, danger-to-self or others and grave disability and referral process for emergent MH evaluations. Training implementation estimated for March 2023.
- Developed and implemented training for MH Adaptive Support Program.  Begin training staff in September 2022.
- See Section VII (Provision B) for Suicide Prevention related items.

## SUICIDE PREVENTION [Remedial Plan Section VII]

Class Counsel outlined six areas for focus including revision of the Suicide Prevention Policy, changes to the policy and practice of Safety Suits, confidentiality at intake and for suicide risk assessment, property and privileges, and resuming a Suicide Prevention Task Force or a multidisciplinary committee.  These items are shaded in blue.  The remainder of provisions are not shaded.  Status is listed for each.

| Substantive Provisions (Provision A.)<br>Status: Partial Compliance |
| --- |

Policies:

- ACH PP 02-05 Suicide Prevention Program (revision 11/16/21) – *Final*

Other:

- The Suicide Precautions and/or Grave Disability Observations – Custody Instructions form was created to provide MH staff directions regarding housing, observation level, property, privileges, and clothing restrictions.
- MH developed a training module called *Suicide Precautions and LCSW Role* and provided training to MH staff and custody leadership on the form and workflow.
- Began implementation of Morbidity and Mortality reviews during Suicide Prevention Subcommittee meetings in December 2021.
- MH PP 04-08 Outpatient Program – Suicide Precautions, Observation Levels and Item Restriction was deleted as its contents are included in the Suicide Prevention policy.
- Updated MH PP 04-07 Acute Psychiatric Unit Precautions and Observations to include relevant sections from the Suicide Prevention Program policy.  Finalized June 2022.
- Complete weekly audits on MH compliance on determining and documenting housing, observation level, property, privileges and clothing restrictions for patients placed on suicide precautions.  Report findings to Suicide Prevention Subcommittee on monthly basis.
- Implemented monthly Suicide Prevention Multidisciplinary meetings to discuss patients with complex mental health needs who engage in self-injurious behaviors (July 2022).
- 

| **Use of Safety Suits** (Provision N.) |
| Status: Partial Compliance |

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- Staff are meeting the Remedial Plan requirements on use of safety suits outside the intake process.  SSO Custody may place an inmate in a safety suit if it is determined that the inmate is at risk of imminent self-harm. In these instances, MH is notified immediately.
- MH staff began weekly audits and monthly reporting of patients on suicide precautions and the return of clothing and other restrictions.
- ACH QI conducted two audits on the occurrence of daily assessments and clinical justification for continuance of restrictions. The table below is from the QI audit conducted 10/31/22, showing assessments were completed 93% (for clothing) and 92% (for items/privileges) as required and item/privileges/clothing restriction justification was documented 100% of the time.

| Requirement | Clothing | Items/Privileges |
|---|---|---|
| Assessments occurred daily and decisions to continue/ discontinue documented | 39/42 (93%) | 45/49 (92%) |
| Assessments occurred daily and decisions to continue/ discontinue **not** documented | 3/42 (7%) | 3/49 (6%) |
| Assessment did not occur at all | 0/42 (0%) | 1/49 (2%) |
| Clinical Justification documented | 30/30 (100%) | 33/33 (100%) |

---

**Nurse Intake Screening** (Provision C.)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (revision 11/16/21) – *Final*
- ACH PP 05-05 Nurse Intake (revision 10/29/21) – *Final*

Other:

- Staff made significant revisions to the Nurse Intake policy and form based on feedback from Experts.  The revised Nurse Intake form was implemented in November 2021.
- See Medical Care Intake Screening (Provision B.) for more detail.
- Staff are developing training for intake nurses on screening for mental health issues, suicide risk assessment screening, danger-to-self or others and grave disability and referral process for emergent MH evaluations. Formal Intake training by the Training Coordinator began December 2022.
- Due to ongoing challenges with Intake nursing asking all suicide risk screening questions, QI Nursing will begin onsite monitoring of the nurse intake process, including suicide risk assessment questions to ensure compliance with screening requirements.

---

**Post-Intake Mental Health Assessment Procedures** (Provision D.)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*
- MH PP 01-10 Access to Care (revision 08/06/21)

Other:

- MH instituted the 4-hour emergent timeline for patients placed in safety cells (October 2021).  MH is tracking compliance to determine barriers/challenges to meeting the 4-hour timeline to care.  A workflow was developed and training was provided to staff regarding the new timeline to care.
- MH implemented televisits for after-hours emergent referrals at RCCC to ensure timely access to care.

- MH clinicians document whether assessments are confidential or non-confidential including rationale, if indicated.
- The Suicide Prevention Program policy addresses the need for a mental health assessment if a suicide risk is noted at intake or if any staff member becomes aware of a patient verbalizing or engaging in acts of self-harm or suicidal ideation. Licensed MH clinical staff will conduct the suicide risk assessment.
- Completed baseline study of MH compliance in meeting four (4)-hour timeline to care for patients in safety cells and presented findings are reviewed at the MH QI Subcommittee Meeting. Results show that low staffing levels significantly impacted compliance.
- Regular auditing of MH compliance meeting four (4) and six (6)-hour timelines to care are being completed quarterly and presented to MH QI Subcommittee and Suicide Prevention Subcommittee.  Findings indicated that low staffing levels and high levels of emergent referrals are impacting compliance.

---

**Property and Privileges** (Provision M.)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- See Substantive Provisions (Provision A.) and Use of Safety Suits (Provision N.) for work accomplished in this area.

---

**Quality Assurance and Quality Improvement** (Provision R.)
Status: Partial Compliance

---

Policies:

- ACH PP 01-07 Quality Improvement Program (revised 04/13/22) – *Final*
- ACH PP 01-08 Medical Review of In-Custody Deaths (revised 02/16/22) – *Final*
- ACH PP 01-15 Suicide Prevention Committee (revised 09/17/21) – *Final*
- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- A MH QI Subcommittee convened May 2021. This Subcommittee meets quarterly.
- MH convened a multidisciplinary Suicide Prevention Subcommittee to review, track, and audit the requirements.
- Suicide Prevention Subcommittee moved meetings from a quarterly to monthly schedule to improve communication, implement Suicide Prevention training, and complete morbidity and mortality reports in timely manner.

- A multidisciplinary Suicide Prevention Training Subcommittee was established to develop Suicide Prevention Training.  This group met multiple times and determined a separate subcommittee was no longer needed in late May 2022 once training was approved.
- Class Counsel and Experts approved the 4-hour Suicide Prevention Training for new employees; first training was conducted on June 2, 2022.
- Began Morbidity and Mortality reviews during the Suicide Prevention Subcommittee meetings in December 2021.
- MH tracks incidents of suicide, attempted suicide and serious self-harm.
- Implemented monthly Suicide Prevention Multidisciplinary meetings to discuss patients with complex mental health needs who engage in self-injurious behaviors (July 2022).Complete quarterly audits of 4 and 6-hour timelines to care and report findings and recommendations to MH QI and Suicide Prevention Subcommittees.
- Complete audits of number of confidential versus non-confidential contacts and present findings and recommendations to MH QI Subcommittee.
- Completed baseline study of MH Rules Violation Reviews and presented findings and recommendations to MH QI Subcommittee.
- Completed QI study of MHs timeliness to medication verification and initiation following intake referral and presented findings and recommendations to MH QI Subcommittee. As a result of study findings worked with nursing leadership to message intake nurses on importance of identifying community pharmacy and created a hard-stop in intake form that requires response if patient indicates they receive medication in the community.

| **Training** (Provision B.)<br>Status: Partial Compliance |
| --- |

Policy:

- ACH PP 03-08 Staff Development and Training (07/01/21)

Other:

- MH developed and provided training on the following:
    - Suicide Prevention – Annual 2-hour refresher
    - Suicide Precautions and LCSW Role
    - Suicide Risk Assessment
- MH began offering a 2-hour Suicide Prevention training to medical and custody staff in December 2021.
- The 4-hour Suicide Prevention Training for new employees was approved by Class Counsel and Suicide Prevention Expert in February 2022.  MH staff worked with custody and medical staff to prepare for the training.  The first training was conducted on June 2, 2022.
- The Suicide Risk Assessment Training was approved by SME and staff are being trained.
- MH has a training coordinator who also monitors compliance for training requirements.

> **Response to Identification of Suicide Risk or Need for Higher Level of Care** (Provision E.)
> Status: Partial Compliance

Policies:

- ACH PP 02-05 Suicide Prevention Program (revision 11/16/21) – *Final*

Other:

- Timeframes are noted in the policies.
- The Suicide Risk Assessment captures the information listed in this provision.
- See Post-Intake Mental Health Assessment Procedures (Provision D.) for work accomplished in this area.

> **Housing of Inmates on Suicide Precautions** (Provision F.)
> Status: Partial Compliance

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- MH policies state all patients, including those identified as being at risk for suicide, are treated in the least restrictive setting appropriate to their clinical needs.
- See Substantive Provisions (Provision A.) for work accomplished in this area.

> **Inpatient Placements** (Provision G.)
> Status: Partial Compliance

Policy:

- MH PP 04-09 Acute Psychiatric Unit Admission, Program and Discharge (05/09/22) – *Final*

Other:

- MH staff makes every effort to ensure that patients assessed for the APU are placed in the unit as soon as possible upon bed availability. Patients who are on the preadmission list beyond 24 hours are assessed daily for continuous need of placement or clearance.
- ACH has regular meetings with SSO Custody leadership to discuss space needs and options for increasing APU beds. See IOP, OPP, & Acute Bed Assessment & Planning (Section II. General Provision) for detail.

> **Temporary Suicide Precautions** (Provision H.)
> Status: Partial Compliance

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- See Post-Intake Mental Health Assessment Procedures (Provision D.) for work accomplished in this area.

---

**Supervision/Monitoring of Suicidal Inmates** (Provision J.)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*
- MH PP 01-10 Access to MH Services (07/12/22) – *Final*

Other:

- Custody reopened the Suicidal Temporary Housing Unit (SITHU). It was closed during most of the pandemic. MH and custody identify patients who can be placed in SITHU while awaiting assessment or APU bed.
- Staff have daily bed assignment/utilization meetings with custody to review movement between the IOP, OPP, & APU.
- See Substantive Provisions (Provision A.) for work accomplished in this area.

---

**Treatment of Inmates Identified as at Risk of Suicide** (Provision K.)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*
- ACH PP 08-08 Patient Privacy – Joint policy (05/13/21)
- MH PP 07-02 Treatment Planning (09/13/22) – *Final*

Other:

- Designated staff monitor the APU preadmission list of patients.
- The outpatient appointment log was updated to better reflect appointment types (emergent, urgent, and routine).
- Order Linkage form was created to improve tracking of timelines to care. This allows staff to enter actual visit time and link the visit time to the visit order. Report is under development.
- Staff utilize the confidential interview office in booking, classrooms, and attorney booths for confidential interviews.

---

**Conditions for Individual Inmates on Suicide Precautions** (Provision L.)
Status: Partial Compliance

---

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- The Suicide Prevention Policy addresses MH's role as the primary authority to make decisions on property and privileges, use of safety suits, and discharge from suicide precaution based on clinical assessment.
- See Substantive Provisions (Provision A.) for work accomplished in this area.

| **Beds and Bedding** (Provision O) |
| --- |
| Status: Partial Compliance |

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- The Suicide Prevention Policy addresses MH's role as the primary authority to make decisions on property and privileges for patients on suicide precautions based on clinical assessment.
- Custody distributed new suicide-resistant mattresses to the high acuity MH housing areas and safety cells in May 2022.
- APU renovations in progress to improve safety of cells by removing ligature anchors from beds. See Substantive Provisions (Provision A.) for work accomplished in this area.

| **Discharge from Suicide Precautions** (Provision P.) |
| --- |
| Status: Partial Compliance |

Policies:

- ACH PP 02-05 Suicide Prevention Program (11/16/21) – *Final*

Other:

- Patients who are discharged from APU after being treated for a suicide attempt or ideation receive follow up MH appointments (24 hours, 72 hours, and 5 days).
- Patients are transferred to IOP when clinically appropriate and a bed is available.
- IOP and Outpatient appointment logs have been updated to reflect accurate appointment types.

| **Emergency Response** (Provision Q.) |
| --- |
| Status: Substantial Compliance |

Policies:

- ACH PP 04-11 Emergency Equipment (revision 08/25/21) – *Final*

- ACH PP 04-12 Emergency Medical Response (revision 05/19/22) – *Final Final*
- ACH PP 04-13 Man-Down Drill (08/21/20) – *In review and revision*

Other:

- Medical and custody staff are trained in CPR.
- New emergency carts were deployed at Main Jail.  New carts are on order for RCCC.
- Staff complete a Man-Down Debriefing Summary for incidents requiring medical response or drills.  The form and staff debriefing assist staff in reviewing code response.

## SEGREGATION/RESTRICTED HOUSING [Remedial Plan Section VIII]

**Mental Health Functions in Segregation Units** (Provision C.)
Status: Partial Compliance

Policy:

- ACH PP 05-22 Patients in Segregation (05/31/22) – *Final*

Other:

- MH has been working with SSO Custody to identify and meet with segregated MH patients.
- MH staff met with Custody to discuss providing groups in the Administrative Segregation unit.  Groups were piloted in September 2021.
- MH continues to work with Custody on identifying cohorts of individuals in the segregated housing unit that can be in the dayroom together.
- Collaboration occurs with Custody on development of the RVR and Administrative Segregation referral form and trained custody on referral process in December 2021.
- Began Administrative Segregation weekly MH assessments in December 2021.
- MH meets with SSO Custody often to discuss access to patients in segregation and provision of confidential interviews.  Recent discussions included more efficient use of attorney booth, education of custody regarding importance of confidential interviews and options for providing patients with assault precautions confidential interviews.
- 3E 100 was converted to single cells for patients on the MH caseload and eliminates need to classify as administrative segregation when MH recommends single-celled housing.
- Developed 24 high acuity/high security male IOP beds at the Rio Cosumnes Correctional Center – the majority of patients admitted were housed in administrative segregation.

**Placement of Prisoners with Serious Mental Illness in Segregation** (Provision D.)
Status: Partial Compliance

Policy:

- ACH PP 05-22 Patients in Segregation (05/31/22) – *Final*

Other:

- Custody consults with MH staff prior to placing an inmate with serious mental illness in segregation; however, in emergent circumstances, the MH consult will occur after placement.
- MH staff provide case management to patients with serious mental illness who are in segregated housing.
- Planned Use of Force and De-escalation training finalized in October 2022.  Training session projected to begin in February 2023.
- 3E 100 pod was converted to single cells for patients on the MH caseload and eliminates need to classify as administrative segregation when MH recommends single-celled housing.
- MH developed 24 high acuity/high security male IOP beds at the Rio Cosumnes Correctional Center – the majority of patients admitted were housed in administrative segregation.

---

**Restraint Chairs** (Provision J.)
Status: Partial Compliance

---

Policy:

- ACH PP 05-21 Restraints and Seclusion – Joint policy (revised 05/09/22) – *Final*

Other:

- Mental health, medical and custody met to discuss restraints and seclusion process and ensure consistency among respective polices.
- Placement in restraint or WRAP triggers an emergent referral to MH.

---

**Next Steps for Mental Health, Suicide Prevention and Segregated Housing Provisions**

---

Next steps for the new monitoring period include:

- Complete key policies that are in revision or draft form.
- Continue to provide training and implementation for the new or revised policies.
- Provide ongoing training to SSO Custody staff who work in MH program areas on common MH disorders.
- Coordinate MDT meetings for patients served in EOP and Administrative Segregation.
- Complete staff training for Planned Use of Force/De-escalation, LGBTQ+ and WPATH Standards of Care, suicide screening at intake, and MH Adaptive Support Program.

- Complete development of Cultural Competency and Implicit Bias training and submit to Class Counsel and Experts for review and approval.
- Hire additional social workers to support and expand MH care on the APU.
- Hire and train new staff for EOP expansion and Administrative Segregation and MH RVR Reviews.
- Increase the number of MH RVR and Administrative Segregation Reviews with augmented staff.
- Collaborate with SSO Custody on referral process and coordination to ensure MH is involved in planned Use of Force incidences.
- Hire and onboard staff to provide observation of patients on suicide watch who require a constant observation level of care.
- Onsite monitoring by QI of the proper implementation of suicide risk assessments at intake by nursing.

Challenges:

- Confidential space to conduct MH interviews and group programming remains problematic.
- Difficulty recruiting sufficient staff to fill vacant positions. Staffing limitations prevent full rollout of MDTs, comprehensive treatment planning, MH RVR and Administrative Segregations reviews, and constant observation.

## QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT
## [Remedial Plan Section IX]

| **Generally** (Provision IX. A.)<br>Partial Compliance |
| --- |

Prior to the Remedial Plan, there was limited Quality Improvement (QI) policies and practices as a result of no dedicated staff, no data, and no QI audits.  Extensive actions have been taken to expand the QI structure as listed below.

Policies:

- ACH PP 01-07 Quality Improvement Program (revised 04/13/22) – *Final*
- ACH PP 01-13 Pharmacy & Therapeutics Committee (revised 02/04/22) – *Final*
- ACH PP 01-14 Utilization Management (revision 05/05/22) – *Final*
- ACH PP 01-15 Suicide Prevention Subcommittee (09/17/21) – *Final*
- ACH PP 01-18 Utilization Management Subcommittee (05/05/22) – *Final*
- Injury and Illness Prevention (IIPP) PP 01-02 Safety Subcommittee (initial 07/10/20)

Committees:

- Quality Improvement Committee and several subcommittees (Pharmacy & Therapeutics, Mental Health QI, and Safety) meet quarterly and the meetings are multidisciplinary.

70

- The Suicide Prevention Subcommittee changed to monthly meetings, effective November 2021.
- A Utilization Management Subcommittee was formed and began meeting quarterly in October 2021.
- The Safety Subcommittee will be refocused to include infection control in 2023 and led by a designated nurse manager.
- QI staff updated a list of reports and created a list of audits based on the indicators listed in the Remedial Plan.  The lists clarify types of data for review in each subcommittee.  These documents have been reviewed with service line managers in the Quality Improvement Committee and the MH QI Committee. QI will monitor progress.

Staffing:

- The QI team was approved for additional positions for a total of nine (9) positions, including:
  - QI Director
  - Two (2) QI Coordinators
  - Training Coordinator (Supervising Registered Nurse).
  - Two (2) QI Nurses
  - Two (2) Senior Office Assistants
  - Administrative Services Officer II
- The Training Coordinator was effective in the position January 2022.
- The two QI Nurse positions were recently filled and began employment in late May and early June 2022.  These positions will increase training and audits in the next monitoring period.
- The second Senior Office Assistant was added to the QI team in November 2022.
- A new Health Program Manager position (QI Director) was approved in the budget for FY 2022/23 and starts January 2023.  The QI Director will lead the QI team and take point on the Consent Decree planning, which has been led by the Health Services Administrator.
- The Administrative Services Officer II position was offered and is currently in background.

Other:

- Many data reports have been developed and will continue to be developed – including audit reports and semiannual data reports.
- QI audits are developed as policies are implemented and staff are trained to audit.
- Staff continued to audit areas of focus on a regular basis.  Examples include disability identification and documentation, diabetes management, and referrals at intake.  Audit data is shared with service line managers for appropriate actions.
- Several new audits were developed and conducted during the monitoring period.  Examples include medication initiation/renewal and withdrawal management.
- New audit tools will be developed during the next monitoring period due to additional staffing.

- Consent Decree training was developed and provided to medical and mental health staff in late 2021 and early 2022.  The training was provided to new staff during three sessions in November 2022.  This training will be provided periodically to new staff.
- A Utilization Review (UR) team formed in December 2022 and met to discuss UR tools and other logistics. A provider and QI nurse will meet monthly to review randomly selected cases pulled from patient grievances. Targeted reviews may result from the original UR and tools will be revised as needed. Anticipate UR process to begin in February 2023.

---

**Quality Assurance, Mental Health Care (Provision IX. B.)**
Partial Compliance

---

- Mental health representatives participate in all QI meetings but there are three specific mental health multidisciplinary subcommittees: Mental Health (chaired by the MH Program Manager), Suicide Prevention, and Suicide Prevention Training Subcommittee (chaired by the MH Medical Director). The MH QI Subcommittee meets quarterly and Suicide Prevention Subcommittee meets monthly.  The chair will attend all subcommittee meetings or the meeting will be rescheduled.
- The Suicide Prevention Training Subcommittee ceased to meet in late May 2022 after the Suicide Prevention Training was finalized.
- Chairs are responsible to ensure indicators are reviewed and tracked.
- Audit tools are in development related to mental health and suicide prevention remedial plan provisions.
- Morbidity and Mortality reviews of serious suicide attempts are reviewed at each Suicide Prevention Subcommittee meeting.  Staff adopted a Review Checklist suggested by the Suicide Prevention expert.

---

**Quality Assurance, Medical Care** (Provision IX. C.)
Partial Compliance

---

- Medical representatives participate in all QI meetings.  Each forum is quarterly.
- QI Committee Chairs are responsible to ensure indicators are reviewed and tracked. Recommendations and corrective actions are discussed and follow-up is conducted as needed.
- Audit tools have been developed and continue to be in development and revision related to medical Remedial Plan provisions.
- As audits are completed, service line directors are required to submit corrective action plans for deficiencies that do not improve over time.
- Performance Evaluations are required annually for permanent County staff and more frequently for probationary staff (ACH PP 03-09 Performance Evaluations).

| Next Steps for Quality Assurance Systems Provisions |
|---|

Next steps for the new monitoring period include:

- Add infection control to the Safety Subcommittee – the focus will be on overall infection control and not solely on COVID-19.  A nurse manager will assume facilitation.
- Continue to create and complete audit tools for necessary areas.  This process will include feedback loops to staff and additional steps if needed (e.g., more training, process changes, etc.)
- Draft a UR nurse chart review tool, complete a small pilot and revise during the next monitoring period. QI will work on additional review tools in the next monitoring period.
- Create a system for both grievance and incident report tracking that auto populates data and percentages to reduce manual calculations.
- Refine process for documenting Patient Refusals electronically to prevent duplication and increase ease of reporting.
- Begin in person observation audits on the nurse intake questions and medication administration mouth-check adherence.
- Ongoing Quality Assurance Utilization Reviews, including monthly meetings to discuss findings and recommendations.

| **JAIL FACILITY NEEDS** |
|---|

Sacramento County (representatives from County Executive's Office, General Services, SSO, and ACH) has been engaged in planning for remedying the physical plant deficiencies that impede Consent Decree compliance – including compliance with the Americans with Disabilities Act (ADA), patient privacy, and sufficient space for medical and mental health services.

In order to do so, the County retained Nacht and Lewis to build upon their previous studies as well as the population reduction strategies in the O'Connell report. Taking these two previous reports together, the County was left with the conclusion that it could not reasonably release enough inmates to achieve compliance with the Consent Decree through population reduction efforts alone.

Nacht and Lewis was tasked with studying the impacts of jail population reduction strategies on the numbers and types of beds needed; analyzing which of the Consent Decree's medical and behavioral health requirements can and cannot be accommodated in the Main Jail after population reduction strategies have been implemented; and exploring various options and cost estimates for a new facility or facility addition based on the results of this analysis. See Jail Facilities Population Reduction Impacts Study Report for more details. Nacht and Lewis, through their consultants Jay Farbstein & Associates and Falcon Correctional & Community Services, Inc., supplemented their report with information that aids in supporting the County's jail population

reduction plans. This additional information describes the elements desired in developing an integrated resource center, similar to elements of the Bexar County Model, to provide care coordination for County residents whose behavioral health crises are likely to result in imminent contact with the justice system.

Based on the analysis performed, Nacht and Lewis identified five options for capital improvements to achieve Consent Decree compliance following full implementation of all jail population reduction strategies. All proposed options will reduce the bed capacity in the jail system. The five options are as follows:

- 1A. Construct an Intake and Health Services Facility on the Main Jail's Bark Lot. This provides a building addition on adjacent, existing County property to accommodate the Consent Decree requirements that cannot be met in the renovated Main Jail. These would include a new booking loop, medical clinic, and medical housing, as well as the housing units for patients requiring higher levels of mental health care (Acute Inpatient Unit and Intensive Outpatient Program). Staff refer to this option as the Intake and Health Services Facility.

- 1B. Construct a building addition at RCCC to accommodate those patients whose clinical acuity requires higher levels of care (Acute Inpatient Unit and Intensive Outpatient Program).

- 1C. Construct a new building at a separate location (to be determined) to accommodate those patients whose clinical acuity requires higher levels of mental health care (Acute Inpatient Unit and Intensive Outpatient Program). As a stand-alone facility, this option would require duplication of substantial medical, ancillary, and custodial support services.

- 2A. Replace the entire Main Jail with a new facility that would not only include the needed beds currently located in the Main Jail but also additional space requirements to satisfy the Consent Decree.

- 2B. Replace the Main Jail and RCCC with a new facility that would replace beds currently located in the Main Jail and RCCC plus additional space requirements to satisfy the Consent Decree.

Nacht and Lewis evaluated each option's effectiveness in achieving compliance with the requirements of the Consent Decree, impacts on healthcare staffing and operations, impacts on staffing and operations for the Sheriff's Office, time needed for completion, and capital and operating costs. This evaluation scored Option 1A, construction of an Intake and Health Services Facility on the Main Jail's Bark Lot, the highest of all five options. As the design and construction of an Intake and Health Services Facility is estimated to take 60 months (five years), compliance with the Consent Decree will be improved by two additional and related construction projects that can be completed more quickly.

- First, the County will need to construct two control rooms at RCCC. These control rooms will provide higher-level security monitoring for barracks C, D, G, and H. Once completed,

barracks C, D, G, and H at RCCC will be sufficiently secure to accommodate the inmates currently housed in the 3rd floor, 300 West Pod at the Main Jail.
- The 3rd floor, 300 West Pod may then be converted to an Acute Psychiatric Unit (known as the "3P Project").

Together, these projects are expected to take 32 months to complete. The 3rd floor, 300 West Pod conversion project is inadequate to meet all conditions of the Consent Decree for this population, but provides an interim solution to improve treatment and the conditions of confinement for patients with acute psychiatric needs while the Intake and Health Services Facility is constructed.

Based on the evaluation provided by Nacht and Lewis as well as stakeholder input, County staff recommend the Board of Supervisors on December 7, 2022 to direct staff to move forward with planning the following:
- Construct two control rooms at RCCC and convert the 3rd floor, 300 West Pod ("3P Project") at the Main Jail to an Acute Psychiatric Housing Unit (32 months); and
- Construct Option 1A, an Intake and Health Services Facility on the Main Jail's Bark Lot (60 months).

The movement of the Acute Psychiatric Unit from the 2nd floor to the 3rd floor then permits the previous space to be used for medical observation, specifically withdrawal management. While it does not meet all needs for medical observation, it provides an interim measure for this Consent Decree requirement. Together, these construction projects are more cost-effective than building a new jail, will retain the central location of the jail, and will capitalize on existing resources. The Intake and Health Services Facility best achieves Consent Decree compliance by prioritizing a HIPAA and ADA compliant booking loop while also providing sufficient space to care for a jail population with enhanced medical and behavioral health needs. While this facility is in development, constructing control rooms at RCCC and converting the 3rd floor, 300 West Pod will provide improved conditions of confinement for patient-inmates with the highest level of need.

The Board of Supervisors (BOS) Meeting dated 12/08/2022 held deliberations on the County's recommended proposal presented on 12/07/22 regarding Jail Population Reduction Plans and Plans to address Jail Facility Deficiencies for the Mays Consent Decree.  The deliberations to address Jail Facility Deficiencies as outlined above resulted in BOS approval.  More information on the proposed Jail Population Reduction Plans and outcome from the 12/08/22 BOS meeting can be found below.

| COUNTY EFFORTS TO REDUCE THE JAIL POPULATION |
| --- |

Sacramento County (representatives from the County Executive's Office, criminal justice partners, SSO, DHS Behavioral Health, and ACH) is engaged in many efforts to reduce the jail population.  On August 10, 2021, the County Executive proposed and the Board of Supervisors approved an ordinance to create a new Public Safety Agency, headed by a Deputy County Executive.  The recruitment and hiring was completed in February 2022 for the Deputy County Executive who now oversees efforts to reduce the jail population and compliance with the Consent Decree. By December 2022, the County efforts with justice partners have produced some progress with justice reforms, programs and services necessary to reduce the jail population. Guided by expert reports, ongoing input and feedback from social service and justice agencies, other stakeholders and advisory groups, Class Counsel and the community, the County will continue existing efforts and begin new efforts identified in updated plans. In early 2023, the County will continue development of timeline and cost estimates as well as metrics for items in the Jail Population Reduction Plans. There are 33 items which have been summarized based on their relationship to the Sequential Intercept Model (SIM) on the last page of the December update of the Plans and listed below. Collectively, full implementation of plans is estimated to reduce the average daily jail population by 700, from a baseline of approximately 3,200, through incarceration alternatives and individualized services that safely reduce the number of people booked into the jail, the average length of stay in jail, and returns to custody.

See Board of Supervisors (BOS) webpage for status updates on efforts to reduce the jail population:

- BOS Meeting dated 10/22/2019, Item #66 (*Report on County Efforts to Reduce the Jail Population*).

- BOS Meeting dated 03/10/2021, Item #3 (*Workshop – Review the Design-Build Process Related to the Correctional Health and Mental Health Services Facility Project, And Approve Contract No. 81555…*)

- BOS Meeting dated 08/10/2021, Item #2 (*Adopt An Ordinance Amending Various Sections Of Chapter 2.09 And Chapter 2.61 Of the Sacramento County Code Related To Creation Of A Public Safety And Justice Agency,…*)

- On 02/15/2022, the BOS authorized the appointment of the new Deputy County Executive (DCE) for the Public Safety and Justice Agency.

- BOS Meeting dated 06/14/2022, the new DCE presented a charter to establish a Public Safety and Justice Agency (PSJA) Advisory Committee to provide a community voice in dialogue on decreasing the jail population, recognizing the importance of including voices of individuals with lived experiences and those most closely impacted by incarceration.

  o PSJA Advisory Committee began meeting in October 2022

76

- BOS Meeting dated 09/14/2022, the County held a workshop with the Board of Supervisors to share the status of ongoing efforts to identify and address criminal justice system issues, including those specified in the Mays Consent Decree. This included public release of reports completed by Nacht and Lewis, experienced architecture firm, and Kevin O'Connell, a criminal justice and behavioral health data analytics expert Main Jail Improvement Report - Analysis indicates to meet needs, the Main Jail's capacity must be reduced to 1,357 beds from its rated capacity of 2,397 – a loss of 1,040 beds or nearly 44% to get closer to compliance, but substantial compliance with all consent decree requirements is not possible within the Main Jail;

- BOS Meeting dated 12/08/2022, deliberations on recommendations presented 12/07/22 regarding Jail Population Reduction Plans and Plans to address Jail Facility Deficiencies for the Mays Consent Decree resulted in their approval. An update on implementation of the Jail Population Reduction Plans (15 New Recommendations, 18 Existing, 33 Total Strategies) will be provided after the conclusion of the first quarter of 2023.

- Ongoing planning for implementing expansion of a Medi-Cal benefit called CalAIM to better serve justice involved individuals. The State has delayed the component for the justice involved population which was targeted for January 2023.  Planning will continue.

- Planning is in process to develop a Social Health Information Exchange (SHIE) for integration of health, housing and justice data.  A consultant has been hired and work is in process. In February 2023 an update on the SHIE will be provided to the Board of Supervisors and direction will be sought regarding vendor services needed for implementation and procurement of information technology (IT) infrastructure and application products. This work has been incorporated in Jail Population Reduction Plans.

December 2022 Jail Population Reduction Plans are summarized in the following table.

| | | Item # | Title/Brief Description |
|---|---|---|---|
| **Ongoing Efforts and Plans to Reduce Jail Admissions (Strategy 1)** | | 1 | Crisis Receiving for Behavioral Health (CRBH) |
| | | 2 | Sacramento County Mental Health Treatment Center (MHTC) |
| | | 3 | Mental Health Urgent Care Clinic |
| | | 4 | Mobile Crisis Support Teams (MCSTs) |
| | | 5 | 988 Suicide & Crisis Lifeline |
| | | 6 | Wellness Crisis Call Center and Response Team (WCCCRT) |
| | | 7 | Community Outreach Recovery Empowerment (CORE) Centers |
| | | 8 | Assisted Outpatient Treatment (AOT)/Laura's Law |
| | | 9 | Booking Memos and Advisories |
| | NEW | 10 | Commit to partnerships with other LEA's within County to explore use of alternative booking sites for quick releases |
| | NEW | 11 | Enhance citation and field release protocols |
| | NEW | 12 | Develop a multi-disciplinary team to explore feasibility for converting the Jail Diversion Treatment and Resource Center (JDTRC) or other location into an Integrated Resource Center (IRC) |
| | | 13 | Federal Contract reduced to serve only 300 to 100 inmates |
| **Ongoing Efforts and Expansion Plans to Reduce Lengths of Stay and Returns to Custody (Strategy 2)** | NEW | 14 | Establish team dedicated to risk assessments and screening protocols |
| | NEW | 15 | Probation Pretrial Program - (New: Expand Capacity) |
| | NEW | 16 | Public Defender Pretrial Support Program  - (New: Expand Capacity) |
| | NEW | 17 | Expand Adult Day Reporting Center (ADRC) locations and/or other jail alternatives |
| | | 18 | Murphy's Subacute Placement |
| | NEW | 19 | Convene Behavioral Health Diversion and Collaborative Court Workgroup to Support Expansions |
| | | 20 | Public Defender, Conflict Criminal Defender and the District Attorney Review |
| | | 21 | Drug Diversion (PC 1000) |
| | | 22 | Mental Health Diversion |
| | | 23 | Collaborative Courts |
| | NEW | 24 | Implement an automated court reminder system |
| | NEW | 25 | Expand warrant diversion efforts |
| | NEW | 26 | Utilize expanded non-detention Violation of Probation (VOP) criteria |
| | NEW | 27 | Improve connections to services and resources prior to and during jail discharge processes |
| | | 28 | Sheriff's Reentry Services |
| | | 29 | Forensic Full Service Partnership (FSP) |
| | NEW | 30 | Evaluate and expand expungement resources and services |
| | NEW | 31 | Commit to a partnership with Superior Court for expediting the court process |
| | | 32 | Community Input from County Committees and Advisory Boards |
| | NEW | 33 | Improve and streamline county-wide data sharing and transparency |

Additional information on some of the programs is provided below.

**Active Jail Diversion Programs**:

Pretrial Assessment and Monitoring: Probation (lead agency) received local funding and a grant from the Superior Court to utilize the Public Safety Assessment (PSA) tool to inform pretrial release and monitoring decisions based on risk of failure to appear (FTA), risk of new criminal activity, and risk of new violent criminal activity.  The Pretrial Pilot began October 2019 and was recently extended to operate with grant and county funding through December 2023.  Pretrial

monitoring can include court reminders, office visits, community visits and GPS monitoring. Superior Court has released 4,226 clients on Pretrial Monitoring from October 2019 through November 2022.

- BOS Meeting dated 12/14/2021, Item #25 (Authorization To Execute A Memorandum of Understanding With The Superior Court…For The Pretrial Release Program…)

Public Defender Pretrial Support Project (PTSP): Public Defender (lead agency) received a grant from Bureau of Justice Assistance (BJA) to develop and operate a pretrial support program using evidence based tools to interview jail inmates prior to arraignment to identify needs, provide social worker support/case management (in custody and in the community), link to services, and coordinate safe discharge plans. Over 3,700 pretrial defendants were screened through this program from January 2021 through October 2022.  At the Board of Supervisors (BOS) September 2021 budget hearing, additional county funds were granted to expand this program.

At the December 14, 2021 BOS meeting, the program was further expanded through approval of an MOU between the Public Defender's Office and Superior Court for additional grant funds from December 15, 2021 through December 2023 for PTSP to provide supplemental services (transitional housing, transportation from jail and to court/probation/services, behavioral health intervention, employment, phone, clothing, etc.) to clients released on Pretrial Monitoring.

In March 2022, the Exodus Project was contracted to connect community intervention workers with PTSP social workers to provide additional support to individuals released under the Pretrial Support Project.

- BOS Meeting dated 12/14/2021, Item #27 (Authorization To Execute A Memorandum of Understanding With The Superior Court…To Provide Supplemental Social Work Services To Support The Superior Court's and Probation Department's Pretrial Project…)

Pretrial Felony Mental Health Diversion: Public Defender (lead agency) received a grant from the Department of State Hospitals (DSH) to implement a Pretrial Mental Health Diversion Program. The target population includes adults with serious mental illness charged with felonies that are incompetent to stand trial or at risk of being mentally incompetent to stand trial. Public Defender has contracted with Telecare to provide services for a current capacity of 50 with housing for 25. Through additional grant funds from DSH, as soon as Board approval is acquired, the program will expand to serve up to 100 individuals per year with housing for 50.

Clients are referred through the granting of Felony Mental Health Diversion by the court. This program began March 2021. As of December 2022, there 68 active clients in the program with 7 of them coming from the jail's DSH waitlist of individuals found Incompetent to Stand Trial (IST). Staff are in the process of reviewing cases on nearly 80 individuals currently in jail on the DSH waitlist who may be appropriate for Felony Mental Health Diversion. Additionally, over 170 clients are pending a Felony Mental Health Diversion ruling from the court.

Crisis Receiving for Behavioral Health (CRBH): Formerly the Substance Use Respite & Engagement (SURE) Program, operated by WellSpace Health 24 hours a day 7 days a week at 631 H St., conveniently located behind the Main Jail. CRBH provides short-term (4-12 hour) recovery, detox, and recuperation from effect of acute alcohol/drug intoxication or behavioral health crisis. Staffed by healthcare professionals to provide medical monitoring, SUD counseling, and

connections to supportive services and transportation to service partner or home after completion of short-term recovery. Clients are referred by partner agencies, no walk-ins. Capacity currently 20, planned expansion to 40.

**New Programs in Development:**

Forensic Behavioral Health Innovation Program- Forensic Full Service Partnership (FSP): DHS Behavioral Health created a Mental Health Services Act (MHSA) Innovation Project for individuals with a serious mental illness and criminal justice involvement who are being released from the jail.  This project fills a gap in meeting needs of the justice-involved population who "fall through the cracks" and return to custody due to the complexity involved in accessing resources across multiple systems. Through a Behavioral Health Services contract, Forensic Full Service Partnership (FSP) provides peer support, medication support, intensive case coordination, support with benefits acquisitions, housing support, therapy, skill building sessions and groups. Utilizing a Multi-System Team approach and providing tailored services to address the unique needs of the justice-involved population, treatment targets include criminal behavior, mental illness and substance use for clients 18 years and older, experiencing serious mental illness with significant functional impairment may be referred by justice partners and MH services within the jail. El Hogar Community Services began providing Forensic FSP services at an easily accessible site in South Sacramento in March 2022.

Jail Diversion Treatment and Resource Center (JDTRC): Probation (lead agency) received an infrastructure grant to provide a community based facility to divert criminal justice-involved adults with mental health disorders, substance use disorders, and/or other trauma-related disorders from jail and/or prison.  On June 2, 2020, Probation received the Board of Supervisors approval on this project. This program recently had a ribbon-cutting ceremony and public open house on December 12, 2021 and subsequently began services targeting individuals who have been granted participation in Misdemeanor Mental Health Diversion or are pending a court decision relative to their participation. Probation is in the process of working with JDTRC grant administrators who indicated they are supportive of expanding to include a felony mental health diversion population receiving services at the current location near the jail (in addition to the misdemeanor population).

Alternatives to 9-1-1/Wellness Crisis Call Center & Response Team (WCCCRT):  At the September 2020 Budget Hearing, BOS asked staff to develop a proposal for alternative responses to mental health and homeless-related 911 calls to complement the existing Mobile Crisis Support Teams (MCST).  The County facilitated an internal countywide work group to review data, review models from other jurisdictions, and obtain community input. Staff received approval for crisis response plans that include a 24/7 Crisis Call Center, Crisis Receiving Facilities, Urgent Care, and Mobile Field Response during the FY 2021/22 budget hearings. Because a staffing shortfalls, ramp up efforts have been slower than anticipated. A pilot is launching December 2022 for calls from community members requesting behavioral health services and/or are experiencing a mental health crisis. Full implementation will subsequently be phased in provide immediate, 24/7 crisis intervention and de-escalation services, assess needs and risks, and create safety plans. Monthly status updates are posted on the WCCCRT website.

**System Planning:**

Development and implementation of plans to reduce use of the Jail have been ongoing for many years. In 2020, a Correctional Facilities Committee adopted a work plan to implement recommendations from the Carey Group Report. The group became inactive while leadership changes were underway. It was determined the new Deputy County Executive of Public Safety and Justice would provide direction regarding next steps for the work plan and committee. While recruitment and hiring were underway, new consultant studies were conducted per the request of Class Counsel. The new Deputy County Executive began work to lead the jail population reduction efforts along with an extensive list of other duties in February 2022. On September 14. 2022, the new Deputy County Executive presented at a Board workshop on Criminal Justice System Issues and Reforms that included findings from the new consultant studies. The new Public Safety and Justice work has within a very short timeframe significantly increased the amount of information publicly posted, presented and discussed with stakeholders and advisory groups, which includes expert reports and population reduction plans posted on a new Reports and Resources website. After the September Board workshop, the Memorandum of Agreement with Class Counsel required completion of jail population reduction plans and plans for addressing jail facility deficiencies. The Jail Study Report completed by Kevin O'Connell, who has been working with Sacramento County on the Data Driven Recovery Project (DDRP) since 2020, has provided a foundation for jail population reduction plans that incorporate new recommendations along with outstanding Carey Group recommendations and approaches focused on reducing bookings, length of stay, and returns to custody. The Sequential Intercept Model (SIM) has helped with development of plans. Initial Jail Population Reduction Plans completed October 2022 were revised in December 2022 based on feedback from community stakeholders, Class Counsel, data experts, and justice system partners.

December update of plans continue to apply recommended strategies

- STRATEGY 1: Ongoing and New Efforts to Reduce Jail Admissions
- STRATEGY 2: Ongoing and New Efforts to Reduce Lengths of Stay and Returns to Custody

Plans incorporate collaborative, multi-pronged approach

- Phase 1: Data-Informed Population Reduction Recommendations
- Phase 2: Transforming Recommendations into Plans
- Phase 3: Turning Plans into Progress

Notable additions

- Development of a public-facing jail population dashboard
- Expansion of services during jail releases
- Emphasis on identifying opportunities for future prevention-focused efforts in coordination with Sacramento County's Social Services partners
- Identifies where Jail Population Reduction Plan items are within intercepts on the SIM

The County remains committed to these efforts. The FY 2022/23 budget includes resources for enhancing current programs and creating new programs with strategies to reduce use of the jail. Details are currently being worked out for resource needs to advance implementation of plans in FY 2023/24 – this includes potential use of new grant funding resources for ongoing expert consultation work that builds on DDRP efforts to guide implementation and sustainability of the Jail Population Reduction Plans. Quarterly updates on these efforts will be provided for the Board of Supervisors and community beginning after the conclusion of the first quarter of 2023.

## Relationship of Jail Population Reduction Plans to Sacramento County Adult Sequential Intercept Model

| Intercept 0 | Intercept 1 | Intercept 2 | Intercept 3 | Intercept 4 | Intercept 5 |
|---|---|---|---|---|---|
| Crisis Care / Respite / Community Response | Law Enforcement / Co-Response | Initial Detention / Initial Court Hearings | Jail / Courts | Discharge / Reentry | Community Corrections / Community Supports |

| Intercepts 0–2 | Intercepts 2–3 | Intercept 4 | Intercept 5 |
|---|---|---|---|
| Crisis Receiving for Behavioral Health | Establish Team Dedicated to Risk Assessments and Screening Protocols | | Murphy's Subacute Placement |
| Mental Health Treatment Center (MHTC) | | | |
| Mental Health Urgent Care Clinic | Mobile Crisis Support Teams (MCSTs) | Expand Probation Pretrial Program Capacity | Federal Contract Reduction | Improve Connections to Services and Resources Prior to and during Jail Discharge Processes | Evaluate and Expand Expungement Resources & Services |
| 988 Suicide & Crisis Lifeline | Booking Memos & Advisories | Expand Public Defender Pretrial Program Capacity | Convene Behavioral Health Diversion and Collaborative Court Workgroup to Support Expansions | | Sheriff's Reentry Services |
| Wellness Crisis Call Center & Response Team (WCCCRT) | Enhance Citation and Field Release Protocols | Implement Automated Court Reminder System | | | Expand Adult Day Reporting Center (ADRC) Locations & Other Jail Alternatives |
| Assisted Outpatient Treatment (AOT) / Laura's Law | Commit to Partnerships with County LEA's to Explore Alternative Booking Sites | Commit to Partnership with Superior Court for Expediting the Court Process | Public Defender, Conflict Criminal Defender & District Attorney Review | | Utilize Expanded Violation of Probation (VOP) Criteria |
| Develop Multi-Disciplinary Team to Explore Feasibility for Converting the Jail Diversion Treatment and Resource Center (JDTRC) or Other Location into an Integrated Resource Center | | | Drug Diversion (PC 1000) | | Forensic Full Service Partnership (FSP) |
| | | | Mental Health Diversion | | Expand Warrant Diversion Efforts |
| | | | Collaborative Courts | | |

Community Outreach Recovery Empowerment (CORE) Centers - Intercepts 0, 3, 5

Community Input from County Committees and Advisory Boards - Intercepts 0-5

Improve and Streamline County-Wide Data Sharing and Transparency - Intercepts 0-5

*Note: Items outlined in Red represent programs and services that will require new or expanded investments of resources, time, and partnerships to develop and implement.*

82

ATTACHMENT 2 -
Sheriff's Office Report

*MAYS V. COUNTY OF SACRAMENTO*

**COMBINED REMEDIAL PLAN – May 30, 2019**
III.   **AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE**

A.  **Policies and Procedures**

**Sacramento Sheriff Response**

1.   It is the County's policy to provide access to its programs and services to prisoners with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests. No prisoner with a disability, as defined in 42 U.S.C. § 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities or be subjected to discrimination. The County's policy is to provide reasonable accommodations or modifications where necessary, consistent with 28 C.F.R. §§ 35.150 & 35.152, and other applicable federal and state disability law.

The Sheriff's Office has engaged in several steps, some through policy revision, others through practice to ensure all inmates receive equal access regardless of disability. Notably, the Compliance Unit, through tracking mechanisms, and personal visits, ensures equal access and effective communication on an individual basis for all inmates with disabilities.  Practices invovling lower bunks and lower tiers have been modified to ensure the maximum number of beds are available for those needing accomodations.  Patients identified with mobility issues are escorted in or with the proper DME to ensure they are not denied equal access to facilities, programs and services.

2.   The County shall, in consultation with Plaintiffs' counsel, revise its Operations Order to establish standard and consistent procedures for the Jail to ensure compliance with the ADA and the remedial provisions outlined herein.

ADA Operations Order being revised by the team assigned to the Lexipol project.

3.   The County shall, within 12 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, revise policies, procedures, and inmate orientation materials (e.g. Inmate Handbook), in accordance with the revised Operations Order and the remedial provisions outlined herein. A list of policies which the County will revise consistent with the provisions outlined herein, as appropriate and in consultation with Plaintiffs' counsel, is attached as **Exhibit A-1.**

The following Post Orders have been drafted and posted to the RCCC portal where they can be accessed by all staff assigned to the facility: Chief Disciplinary Hearing Officer, Disciplnary Housing, Housing Unit Checks, Case Management, Out-of-Cell Time, Keep Separate Alerts, Cell Cleaning, and Administrative Segregation. Several policies are under revision by the team assigned to the Lexipol project.

Inmate handbook revised April 2022

4.  All staff will receive training appropriate to their position on policies and procedures related to compliance with the Americans with Disabilities Act (ADA) and related disability laws.

This item is pending the approval and completion of the ADA policy. It is being worked on by the team assigned to the Lexipol project. All staff assigned to corrections (sworn staff and records officers) were assigned consent decree training in September of 2021. as new hires come on they are assigned the training and must attest to the completion of the training.

B.  **ADA Tracking System**

1.  The County shall develop and implement a comprehensive system (an "ADA Tracking System") to identify and track screened prisoners with disabilities as well as accommodation and Effective Communication needs.

ATIMS under development to track ADA needs. It is supposed to go live in 2023. We currently utilize a rudimentary tracking system through Excel. Staff is currently being trainned in anticipation of ATIMS going live.

2.  The ADA Tracking System shall identify:

a)  All types of disabilities, including but not limited to psychiatric, intellectual, developmental, learning, sensory, mobility, or other physical disabilities, and special health care needs;

ATIMS under development to track ADA needs. It is scheduled to go live in 2023. Our current tracking system lists disabilities. Staff is currently being trainned in anticipation of ATIMS going live.

b)  Prisoners with disabilities that may pose a barrier to communication, including but not limited to learning, intellectual, or developmental disabilities, and hearing, speech, or vision impairments;

ATIMS under development to track ADA needs. It is scheduled to go live in 2023. Our current tracking system lists disabilities. Staff is currently being trainned in anticipation of ATIMS going live.

c)  Accommodation needs, including as to housing, classification, Effective Communication, adaptive supports, and assistive devices;

ATIMS under development to track ADA needs. It is scheduled to go live in 2023. Our current tracking system lists disability Needs/Requests/Accomodations.

d)  Prisoners who require specific health care appliances, assistive devices, and/or durable medical equipment (HCA/AD/DME);

ATIMS under development to track ADA needs. It is scheduled to go live in 2023. Our current tracking system lists disability Needs/Requests/Accomodations.

e)  Prisoners who are class members in *Armstrong v. Newsom* (N.D. Cal. No. 94-cv-02307), with their applicable disability classification(s) and accommodation need(s).

ATIMS under development to track ADA needs. It is scheduled to go live in 2023. Our current system lists when an inmate is part of the Armstrong lawsuit. All of these requests are routed through ACH

3.  The ADA Tracking System's prisoner disability information will be readily accessible to custody, medical, mental health, and other staff at the Jail who need such information to ensure appropriate accommodations and adequate program access for prisoners with disabilities.

ATIMS under development to track ADA needs. It is scheduled to go live in 2023. Our current system is only available to the Compliance staff. RCCC and Main Jail compliance staff adds chronos for ADA accomodations on to the inmate's PF4 screen to advise other officer's.

## C.  ADA Coordinator

1.  The County shall have a dedicated ADA Coordinator at each facility.

Both positions overseen by the Compliance Commander at each facility.

2.  The ADA Coordinator position shall be dedicated to coordinating efforts to comply with and carry out ADA-related requirements and policies, shall have sufficient command authority to carry out such duties, and shall work with the executive management team regarding ADA-related compliance, training, and program needs.

Both positions overseen by the Compliance Commander at each facility.

3.  The County shall clearly enumerate, in consultation with Plaintiffs' counsel, the job duties and training requirements for the ADA Coordinator position and for ADA Deputies assigned to support the ADA Coordinator position.

This item is pending the approval and completion of the ADA policy. It is being worked on by the team assigned to the Lexipol project.

4.   The County shall ensure that ADA Coordinators and ADA Deputies possess requisite training to implement and ensure compliance with the Jail's disability program and services, including operation of the ADA Tracking System.

Main Jail Compliance attended the Winter 2021 training presented by the great plains ADA Center. They also had in house training in March. RCCC Compliance Unit has attend all available ADA training presented by the National ADA center with the exception of 2020. One of the deputies attended training in 2019 and 2021. The ADA Compliance sergeant and the deputy mentioned above  attended the two day ADA Coordinators Virtual Training for Winter 2021 presented by the Great Plains ADA center. RCCC Compliance team attended Crisis Intervention Training and attended the ADA coordinator training in winter of 2022 as well as the ADA Symposium virtual training in May of 2022.  All deputies assigned to corrections receive training in Module 8.0 (Adult Corrections Supplemental Core Course). Same for both facilities. Main Jail Complinace team attended Great Plains ADA Center training in Feburary 2022. All staff continues to attend mandatory ADA training through our AOT cycle.

D.  **Screening for Disability and Disability-Related Needs.**

E.  **Orientation**

1.   The County shall ensure that, for the population to be housed in the Jails, prisoners with disabilities are adequately informed of their rights under the ADA, including but not limited to:

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. There is signage posted in Intake/Booking and in all housing units/ADA contact info is in the handbook/ADA hotline recording. RCCC and Main Jail advise through the inmate handbook in addition to the mentioned signage

a)   Accommodations available to prisoners;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. RCCC and Main Jail inmates can fill out a pink slip for medical.



b)  The process for requesting a reasonable accommodation;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. There is signage posted in Intake/Booking and in all housing units. ADA contact info is in the handbook, including the ADA hotline number. The handbook outlines the process necessary to request accomodations. Accomodations are made through medical issuing chronos.

c)  The role of the ADA coordinator(s) and method to contact them;

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means.  Main Jail and RCCC inmates can dial 232 indicated in the handbook from the pod telephones and/or fill out available kites for communication.

d)  The grievance process, location of the forms, and process for getting assistance in completing grievance process;

This function is performed by Compliance Officers on an as needed basis. This can be expanded to include all inmates, pre-recorded effective communcations means. This process is included in the handbook that is provided to the inmates upon intake. The Inmate Handbook identifies the grievance procedure and how to obtain forms.

e)  Instructions on how prisoners with disabilities can access health care services, including the provision of Effective Communication and other accommodations available in accessing those services.

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. Additionally, the advisement by ACH upon intake and the general process is listed in the inmate handbook that is provided upon intake and anytime during the inmate's custody period upon their request. NMJ/RCCC inmates can submit a medical kite or a request to compliance.

2.   Upon processing and classification, prisoners with disabilities shall receive, in an accessible format, the jail rulebook; orientation handbook; and a verbal orientation or orientation video regarding rules or expectations.

Verbal and written communication presented by compliance officers upon request. The handbook is received at intake and available upon request however, only one format/version of the handbook is avaialble. We have the ability to print the Handbook in a 8x11 inch size.

3.   The County shall accommodate individuals with disabilities in the orientation process through the use of alternative formats (*e.g.* verbal communication, large print, audio/video presentation), when necessary for Effective Communication of the information.

This function is performed by Compliance Officers on an as needed basis.  This can be expanded to include all inmates, pre-recorded effecive communcations means. We have the ability to print the handbook in an 8x11 inch size.

4.   The County shall develop an Americans with Disabilities Act Inmate Notice. The Notice shall be prominently posted in all prisoner housing units, in the booking/intake areas, in medical/mental health/dental treatment areas, and at the public entrances of all Jail facilities.

There is ADA signage posted in noted areas. The signage is compliant with ADA federal requirements.

F.   **Health Care Appliances, Assistive Devices, Durable Medical Equipment**

b)   If such a determination is made, the ADA coordinator or supervisory-level designee shall document the decision and reasons for it, in writing, and shall consult with medical staff to determine an appropriate alternative accommodation.

Main Jail medical staff approves these items then they are reviewed by compliance and issued. RCCC current practice.

a)   The County will ensure that any personal mobility device belonging to a prisoner is returned to the prisoner prior to release from custody.

Current practice.

G.   **Housing Placements**

1.   The County shall house prisoners with disabilities in facilities that accommodate their disabilities.

RCCC accomodates inmate disabilities as recommended by ACH and "chrono" issued. NMJ  placement is determined by medical staff.

2.   The County shall implement a housing assignment system that includes an individualized assessment of each individual's functioning limitations and restrictions, including but not limited to:

RCCC accomodates inmate disabilities as recommended by ACH and "chrono" issued. NMJ determined by medical staff

a)   The need for ground floor housing;

NMJ and RCCC accomodates inmate disabilities as recommended by ACH and "chrono" issued for lower tier, ground floor housing as appropriate.

b)   The need for a lower bunk;

NMJ and RCCC accomodates inmate disabilities as recommended by ACH and "chrono" issued for a lower bunk as appropriate.

c)   The need for grab bars in the cell and/or shower;

All RCCC housing facilities have shower chairs available for inmates upon request from their control and/or floor officers.  NMJ 2E & 2M have grab bars; shower chairs on every floor available upon request

d)   The need for accessible toilets;

On December 8, 2022 the Sacramento Board of Supervisors approved to build a Jail Intake and health Services Facility as well as make ADA facility improvement to the currently Jail which will include accessible toilets.

e)   The need for no stairs in the path of travel; and

RCCC and NMJ accomodates inmate disabilities as recommended by ACH and "chrono" issued.

f)   The need for level terrain.

RCCC and NMJ accomodates inmate disabilities as recommended by ACH and "chrono" issued.

3.   Prisoners with disabilities shall be housed in the Jail consistent with their individual security classification. Prisoners prescribed or possessing HCAs/ADs/DME will not automatically be housed in a medical housing unit. Placement in a medical housing unit will be based on individualized clinical determination of need for treatment.

RCCC -  an inmate's security clssification is not determined by their disability or HCA/AD/DME; Medical Housing Unit (MHU) housing is determined by ACH based on an individual assessment.  Current practice at Main Jail. Medical housing is determined by ACH, not classification status

4.   Classification staff shall not place prisoners with disabilities in:

a)   Inappropriate security classifications simply because no ADA-accessible cells or beds are available;

Current practice.

b)   Designated medical areas unless the prisoner is currently receiving medical care or treatment that necessitates placement in a medical setting; or

Current practice.

c)   Any location that does not offer the same or equivalent programs, services, or activities as the facilities where they would be housed absent a disability.

RCCC and NMJ programs and services are available based on eligibility and classification.

H.   **Access to Programs, Services, and Activities**

**1.**   The County shall ensure prisoners with disabilities, including those housed in specialized medical units or mental health units (*e.g.*, OPP, IOP, Acute) have equal access to programs, services, and activities available to similarly situated prisoners without disabilities, consistent with their health and security needs. Such programs, services, and activities include, but are not limited to:

Current practice.

a)   Educational, vocational, reentry and substance abuse programs

RCCC offers in person learning based on eligibility criteria being met. Reentry programs are not offered to inmates in specialized mental health units.  Same at NMJ; we have intorduced reentry into the main jail and have been mirroring that of RCCC.

b)   Work Assignments

RCCC and NMJ work assignments are based on ACH medical clearanc and ability to perform the essential functions of the job with or without an acommodation; Reasonable accomodations are made based on ACH recommendation.  Classification assists with filtering eligibility criteria.

c) Dayroom and other out-of-cell time

Out-of-cell time determined by the Consent Decree is currently met by all housing facilities at RCCC. Inmates in specialized MH units such as IOP and JBCT receive additional out of cell and dayroom time due to the nature of their program. At Main Jail we are at or near the out of cell times on a weekly basis. As Covid restrictions lessen, we continue to see these numbers improve.

d) Outdoor recreation and fitted exercise equipment

Recreational schedule is based on security classification and not on the inmate's disability.

e) Showers

Current practice.

f) Telephones

Current practice.

g) Reading materials

RCCC recreation staff does not provide reading materials for special needs (Braille, large print) on a regular basis. Occassionally they receive large print books and they distribute them to the inmates. Reading glasses can be purchased through commissary. RCCC has Magnifying cards on commissary.  NMJ has ADA tablet, braille; chrono.

h) Social visiting

Current practice

i) Attorney visiting

Current practice

j) Religious services

Current practice.

k)  Medical, mental health, and dental services and treatment

RCCC and NMJ Inmates assigned to specialized MH units (IOP, JBCT) receive additional, individualized, specialized mental health services through their program, in addition to the services provided through ACMH. Pink medical kites are available for additional treatment requests.

**2.**  The County shall provide reasonable accommodations and modifications as necessary to ensure that prisoners with disabilities have equal access to programs, services, and activities available to similarly situated prisoners without disabilities.

RCCC and NMJ - Current practice. Programs and activity availability differs based on the inmate's security classification. All inmates participate in activities and programs available to their security classification.

3.  The County shall develop and implement a written policy for staff to provide appropriate assistance to prisoners with psychiatric, developmental, or cognitive disabilities so that they can fully participate in programs, services, and activities provided at the Jail.

All policies related to the Consent Decree are currently being drafted by the Lexipol project team. As policies are created and updated, they are provided to DRC/PLO for review.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutenants will make policies related to the Consent Decree a priority to complete in 2023.

**4.**  The County shall implement a written policy for staff to provide assistance to prisoners with disabilities in reading or scribing documents.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first.Inmates with disabilities in reading/scribing are still being provided with assistance despite the lack of a written policy. Their needs are being monitored through the Compliance Unit at RCCC.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutenants will make policies related to the Consent Decree a priority to complete in 2023.

5.   The County shall provide equal access to library, recreational, and educational reading materials for prisoners with disabilities, including easy reading and large print books for individuals who require such accommodations.

Current practice, including the purchase of keep-on-person magnifiers. Main Jail issues chrono for the following; soft magnifiers; hard one broke; law library has one on hand

6.   The County shall ensure equitable inmate worker opportunities for prisoners with disabilities, including by:

On December 8, 2022 the Sacramento Board of Supervisors approved to build a Jail Intake and health Services Facility as well as make ADA facility improvement to the currently Jail which will include more opportunities for inmates with disabilities.

a)   Ensuring clear job duty statements, with essential functions and specific criteria, for each Worker position;

RCCC- Job Descriptions completed. Medical will determine if eligible inmates can physically perform the job duties in a safe manner.  NMJ has positions in kitchen

b)   Ensuring that medical staff conduct an individualized assessment to identify work duty restrictions and/or physical limitations to facilitate appropriate work/industry assignments and to prevent improper exclusions from work opportunities;

RCCC and NMJ - Current practice.

c)   Providing reasonable accommodations to enable prisoners with disabilities to participate in inmate worker opportunities.

RCCC and NMJ - Current practice.

I.   **Effective Communication**

1.   The County shall assess all individuals detained at the Jail for any period of time for Effective Communication needs, and shall take steps to provide Effective Communication based on individual need.

RCCC and NMJ -  Upon intake, inmates are assessed by CHS staff and intake officers for special needs. Effective communication assistance for inmates is based upon the individual (SLI, VRI, Etc.) The inmate's information is forwarded to the Compliance Unit for tracking and further assistance.

2.   The County's ADA policies shall include comprehensive guidance to ensure Effective Communication for prisoners with vision, speech, hearing, intellectual, learning, or other disabilities. The County shall, in consultation with Plaintiffs' counsel, ensure that sufficient guidance on the provision of Effective Communication is included in Jail custody and health care policies and procedures.

Effective Communications policies have been developed with plaintiffs' counsel.  They are pending approval.

a)   A higher standard for the provision of Effective Communication shall apply in the following situations:

i.   Due Process Events, including the following:

▪ Classification processes

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

▪ Prisoner disciplinary hearing and related processes

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

▪ Service of notice (to appear and/or for new charges)

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

▪ Release processes

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

▪ Probation encounters/meetings in custody

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

i.   Identify each prisoner's disability where there may be a barrier to comprehension or communication requiring reasonable accommodation(s);

This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

| | |
|---|---|
| ii.  Provide effective reasonable accommodation(s) to overcome the communication barrier; and | This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team<br><br>Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023. |
| iii. Document the method used to achieve Effective Communication and how the staff person determined that the prisoner understood the encounter, process, and/or proceeding. | This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team<br><br>Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023. |
| 4.   Effective auxiliary aids and services that are appropriate to the needs of a prisoner with Effective Communication needs shall be provided when simple written or oral communication is not effective. Such aids may include bilingual aides, SLIs, readers, sound amplification devices, captioned television/video text displays, Videophones and other telecommunication devices for deaf persons (TDDs), audiotaped texts, Braille materials, large print materials, writing materials, and signage. | VRI system installed at RCCC with the intention of bringing a similar system to the Main Jail. The VRI provides interpretation for SLI as well as multiple spoken languages. Video visitation RFP is in process.  RCCC employs VRS technology, TDD and signage for hearing impaired inmates to communicate with friends and family. The use of SLI is authorized through policy; bilingual aides are also available. NMJ has VRS & TDD SLI - no tablet |
| 5.   In determining what auxiliary aid service to provide, the County shall give primary consideration to the request of prisoner with Effective Communication needs. | RCCC and NMJ offers a variety of auxiliary aids for inmates with effective communication needs and gives primary consideration to the request of the inmate with E.C. needs. |

6.   Education providers (*e.g.,* Elk Grove Unified School District) at the Jail will ensure Effective Communication for prisoners participating in education programs, including by providing necessary assistive equipment and take steps to accommodate learning strategies of those prisoner-students who have special needs, such as those with developmental, learning, vision, hearing, and speech disabilities.

This item is pending approval of the effective communication order however, the RCCC Compliance Unit tracks inmates with special needs and works with the Elk Grove Unified School District to provide accomodations. VRI has been used to assist in the past. Currently, pending EGUSD response for their practices/policies on this subject.

7.   The County shall assist prisoners who are unable to complete necessary paperwork (*e.g.*, related to health care, due process, Jail processes) on their own with reading and/or writing as needed.

Current practice.

## J.   Effective Communication and Access for Individuals with Hearing Impairments

1.   The County shall develop and implement a policy for newly arrived and newly identified prisoners with hearing disabilities to determine each prisoner's preferred method of communication.

This item is pending the creation and approval of the effective communication order. RCCC utilizes VRI services at intake/transfer to communicate with inmates with hearing disabilities. These inmates are referred to the Compliance Unit for individualized assistance and assessment.  Same at NMJ based on chrono or request

2.   Qualified Sign Language Interpreters (SLIs) will be provided during intake and for due process functions, health care encounters, and Jail programming, when sign language is the prisoner's primary or only means of Effective Communication, unless the prisoner waives the assistance of an interpreter and/or delay would pose a safety or security risk.

RCCC Video Remote Interpreting (VRI) tablets provide live interactive SLI services. The tablet is located in Booking and in the Classification office. The service is available 24/7 for use by officers for any procedure. Same at NMJ, through VRS

a)   The County shall maintain a contract or service agreement with interpreter services in order to provide such services for deaf or hearing impaired prisoners. Jail staff will be informed of the availability of contract interpreter services.

RCCC and NMJ currently have a contract for live VRI services in addition to contracted services listed in Operations Order 6/14 - Interpreter Services. Information regarding both are available to custody staff.

b)  Lip reading will not be the sole method of Effective Communication used by staff, unless the prisoner has no other means of communication.

RCCC and NMJ offers a variety of auxiliary aids for inmates with effective communication needs and gives primary consideration to the request of the inmate with E.C. needs.

c)  In cases where the use of an SLI is not practical, or is waived by the prisoner, Jail staff shall employ the most effective form of communication available.

RCCC Video Remote Interpreting (VRI) tablets provide live interactive SLI services. The tablet is located in Booking and in the Classification office. The service is available 24/7 for use by officers for any procedure. Same at Main Jail through VRS

d)  The County will maintain a log of (a) when, for whom, and for what purpose an SLI was used; and (b) when, for whom, and why a SLI was *not* used for a prisoner with an identified need for SLI services (*e.g.*, prisoner waived SLI or delay would have posed safety or security risk).

RCCC - VRI keeps log by name and xref but only available on device. At NMJ the floor officer & 2 east officer log in book when VRS is used

e)  When a prisoner waives an SLI, the log must document (a) the method of communication of the waiver, and (b) the method staff used to determine that the waiver was knowing and freely given.

This item is pending the creation and approval of the effective communication order.

3.  Jail Staff shall effectively communicate the contents of the Inmate Handbook and other materials providing information on Jail rules and procedures to all prisoners to be housed in the Jail who are deaf or hard of hearing. For those prisoners for whom written language is not an effective means of communication, Jail Staff may meet this obligation by providing a video of an SLI signing the contents of the Inmate Handbook, along with appropriate technology for viewing, or by providing an SLI to interpret the contents of the Inmate Handbook to the prisoner who is deaf or hard of hearing.

At RCCC and NMJ, all inmates are provided with a copy of the inmate handbook however, there is no video with an SLI signing the contents. Assistance would be provided by staff as necessary with the use of the VRI or by reading information needed.

4.   The County shall, within 12 months from court approval of the Settlement, make Videophones available for deaf and hard of hearing prisoners. The Videophones shall provide for calls through the use of Video-Relay Services (VRS) at no cost to deaf and hard of hearing prisoners or for calls directly to another Videophone.

VRS/VRI system installed at RCCC. VRS at NMJ. The VRS is provided at no cost to inmates.

5.   Deaf/hard of hearing prisoners who use telecommunication relay services, such as Videophone or TDD/TTY machine, in lieu of the telephone shall receive equal access to the Videophone or TDD/TTY services as non-disabled prisoners are afforded for regular telephone usage.

Current RFP for video visitation services.  RCCC officers are notified by the Compliance Unit officers of the inmate's need for VRS services and allow those inmates using VRS equal phone time. Same at Main Jail

6.   The County shall provide deaf/hard of hearing prisoners with additional time for calls using telecommunication relay services, such as a Videophone or TDD/TTY, to account for the fact that signed and typed conversations take longer than spoken conversations. The County shall document the time that each prisoner uses and has access to such equipment.

Telephone calls are not timed.  This is current practice.

7.   Prisoners who require an SLI as their primary method of communication shall be provided an SLI for education, vocational, or religious programs and services.

This item is pending approval of the effective communication order. RCCC is awaiting a response from EGUSD for policy and practices. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

8.   Public verbal announcements in housing units where individuals who are deaf or hard of hearing reside shall be delivered on the public address system (if applicable) and by flicking the unit lights on and off several times to alert prisoners that an announcement is imminent. This includes announcements regarding visiting, meals, recreation release and recall, count, lock-up, and unlock. Verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, as consistent with individual need. These procedures shall be communicated to prisoners during the orientation process and also shall be incorporated into relevant policies and post orders.

This item is pending approval of the effective communication order however , RCCC has no standard practice for notification. Officers assigned to housing units where a deaf inmate is housed are advised by the Compliance Unit officers of the need for special accomodations regarding verbal announcements. Same at NMJ/officers will go to the door if they know they are deaf and need to come out

K.  **Disability-Related Grievance Process**

1.   The County shall implement a grievance system for prisoners with disabilities to report any disability-based discrimination or violation of the ADA, this Remedial Plan, or Jail ADA-related policy, and shall provide a prompt response and equitable resolution in each case.

Medical Greivance boxes installed. ADA added to greivance forms. Grievance policy currently in the approval stage.

2.   The County shall ensure that the grievance procedures are readily available and accessible to all prisoners.

Grievances are made available to all inmates. Process is included in handbook.

a)   The County shall make reasonable efforts to ensure all prisoners are aware of the disability grievance procedures, including the availability of accommodations and staff assistance to submit a grievance and/or appeal.

Current practice.

b)   The County shall ensure the prisoners with disabilities have meaningful access to grievance forms, including through provision of staff assistance and large print materials.

Current practice however, large print has not been developed yet. Reading glasses can be purchased on commissary as well as keep on person self magnifying cards at RCCC and NMJ.

3.   Response to Grievances

a)  The County shall develop and implement an ADA grievance process that includes (1) a reasonable timeline for response to ADA-related grievances and appeals, including an expedited process for urgent ADA grievance (*e.g.*, involving prisoner safety or physical well-being); and (2) provision for interim accommodations pending review of the individual's grievances/appeals.

This item is pending the approval and completion of the ADA policy. Grievance Policy is currently in the approval process.

b)  The County shall ensure that prisoners with communication needs are interviewed and provided assistance as part of the grievance/appeal process where necessary to ensure meaningful access and Effective Communication.

This item is pending the approval and completion of the ADA policy however, RCCC inmates with E.C. needs are identified and tracked by the Compliance Unit. Inmates have access to the officers in the Compliance Unit via regularly scheduled interviews, phone, or correspondence. Inmates can request assistance from the Compliance Unit officers at any time. Same as Main Jail.

c)  The County shall document each denial of a reasonable accommodation request and shall record the basis for such determination.

This item is pending the approval and completion of the ADA policy. At RCCC and NMJ, the custody staff coordinates with ACH staff to make medically necessary accomodations.

d)  The County shall provide in writing a copy of the grievance (or appeal) response to the prisoner, including the resolution, the basis for a denial (if applicable), and the process for appeal.

This item is pending the approval and completion of the ADA policy however, the inmates receive a copy of their grievance resolution pursuant to operations order 7/02.

e)  The County shall ensure that completed grievance responses are effectively communicated to prisoners with disabilities.

This item is pending the approval and completion of the ADA policy however, the Compliance Officers are available to assist inmates with E.C. needs. All policies related to the Consent Decree are currently being drafted by the Lexipol project team. The grievance policy is currently in the approval process.

4.  The submission, processing, and responses for disability-related grievances and complaints shall be tracked.

Current practice.

L.  **Alarms/Emergencies**

**1.**  The County shall ensure that all written policies regarding alarms and emergencies contain mandatory provisions to accommodate prisoners with disabilities.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipool project team

Jail and RCCC Compliance Lieutenants will make policies related to the Consent Decree a priority to complete in 2023.

**2.**  The County shall implement written policies regarding the expectations of staff as to prisoners with identified disabilities during emergencies and alarms, including as to disabilities that may affect prisoners' ability to comply with orders or otherwise respond to emergencies and alarms. For example, the policies shall ensure appropriate handling of prisoners with mobility-related disabilities who are unable to prone or take a seated position on the ground during an alarm or emergency. Such policies shall be communicated to staff, incorporated into the relevant Operations Orders, and communicated to prisoners with disabilities using Effective Communication.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. Even though the polcy is not in place, staff does offer assistance during emergencies at RCCC and Main Jail and disabilities are taken into consideration by staff.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutenants will make policies related to the Consent Decree a priority to complete in 2023.

3.  The County shall implement written policies for staff regarding communicating effectively and appropriately with prisoners who have disabilities that may present barriers to communication during emergencies or alarms.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. Even though the polcy is not in place, staff does offer assistance during emergencies at RCCC and Main Jail.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutenants will make policies related to the Consent Decree a priority to complete in 2023.

4.  In order to facilitate appropriate accommodations during alarms or emergencies, the County shall offer, but shall not require, individuals who have disabilities visible markers to identify their disability needs (*e.g.*, identification vests). The County shall maintain a list, posted in such a way to be readily available to Jail staff in each unit, of prisoners with disabilities that may require accommodations during an alarm or emergency.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

5.  The County shall install visual alarms appropriate for individuals who are deaf or hard of hearing, which shall comply with relevant fire code regulations.

At RCCC and NMJ, visual alarms are currently installed compliant with relevant fire code regulations.

6.  All housing units shall post notices for emergency and fire exit routes.

Emergency and fire exit routes posted.

## M. **Searches, Restraints, and Extractions**

1.  The County shall modify its written policies to ensure that prisoners with mobility impairments, including those with prosthetic devices, receive reasonable accommodations with the respect to the following: (1) Pat searches and unclothed body searches; (2) Application of restraints devices, including Pro-Straint Chair; and (3) Cell extractions.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. Although the policy is not in place, Main Jail and RCCC conduct pat searches and unclothed body searches with the inmates needs in mind. This includes the application of retraint devices

As Covid restrictions lessen, Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

## N. **Transportation**

1.  The County shall provide reasonable accommodations for prisoners with disabilities when they are in transit, including during transport to court or outside health care services.

RCCC received an ADA Compliant Van in August 2021. Main Jail has ADA compliant vans.

2.  Prescribed HCAs/ADs/DME, including canes, for prisoners with disabilities shall be available to the prisoner at all times during the transport process, including in temporary holding cells, consistent with procedures outlined in Part VII.

Current practice.

3.  The County shall use accessible vehicles to transport prisoners in wheelchairs and other prisoners whose disabilities necessitate special transportation, including by maintaining a sufficient number of accessible vehicles. (295)

RCCC received an ADA compliant van in August of 2021. Main Jail has ADA compliant vans.

4.  Prisoners with mobility impairments shall be provided assistance onto transport vehicles.

Current practice.

O.  **Prisoners with Intellectual Disabilities**

1.  The County shall, in consultation with Plaintiffs' counsel, develop and implement a comprehensive written policy and procedure regarding prisoners with an Intellectual Disability, including:

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

a)  Screening for Intellectual Disabilities;

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

b)  Identification of prisoners' adaptive support needs and adaptive functioning deficits; and

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

c)  Monitoring, management, and accommodations for prisoners with Intellectual Disabilities.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

3.  Prisoners with an Intellectual Disability assigned to a work/industry position will be provided additional supervision and training as necessary to help them meet the requirements of the assignment.

This will be contained in future policy.

P.  **ADA Training, Accountability, and Quality Assurance**

1.  The County shall ensure all custody, health care, facility maintenance, and other Jail staff receive ADA training appropriate to their position.

 A New ADA component has been added to the Adult Corrections Supplemental Core Course, but is awaiting approval. ADA training is in module 8.0. All staff assigned to corrections (sworn staff and records officers) were assigned consent decree training in September of 2021. as new hires come on they are assigned the training and must attest to the completion of the training.

a) The County shall provide to all staff appropriate training on disability awareness, including the use and purpose of accommodations and modifications in accordance with the ADA.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

b) The ADA training shall include: formalized lesson plans and in-classroom or virtual training for staff (including managers, supervisors, and rank-and-file staff) provided by certified or otherwise qualified ADA trainers.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipool project team

Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

2. ADA instructors shall have appropriate ADA training and subject matter expertise necessary to effectively provide ADA training to staff.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

3. The County shall, in consultation with Plaintiffs' counsel, develop and implement written policies and procedures regarding monitoring, investigating, and tracking staff violations (or allegations of violations) of ADA requirements and Jail ADA policies.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

4.   The County shall develop an ADA accountability plan that will ensure quality assurance and establish staff accountability for egregious, serious, or repeated violations of the ADA and Jail ADA-related policies and procedures.

This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team

Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

Q. **Accessibility Remedial Plan to Address Physical Plant Deficiencies**

1.   The County shall, within 24 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, develop and fully implement an Accessibility Remedial Plan to address Jail physical plant deficiencies that result in access barriers for prisoners with disabilities. In the interim, the Sheriff's Office shall house prisoners with disabilities in the most integrated and appropriate housing possible, providing reasonable accommodations and assistance where necessary to ensure appropriate accessibility to Jail programs, services, and activities.

At RCCC and NMJ, inmates with disablities are housed according to their security classification and granted access to programs according to their classification. Reasonable accomodations are made where necessary to ensure special needs are met.

2.   The Accessibility Remedial Plan shall ensure the following:

a)   Adequate provision of accessible cells and housing areas with required maneuvering clearances and accessible toilet fixtures, sanitary facilities, showers, dining/dayroom seating, and recreation/yard areas.

On December 8, 2022 the Sacramento Board of Supervisors approved to build a Jail Intake and health Services Facility as well as make ADA facility improvement to the current Jail.

b)   Accessible paths of travel that are compliant with the ADA.

On December 8, 2022 the Sacramento Board of Supervisors approved to build a Jail Intake and health Services Facility as well as make ADA facility improvement to the current Jail.

c)  Equal and adequate access for all prisoners with disabilities to Family and Attorney Visiting areas in reasonable proximity to their housing location.

At RCCC, legal visitation areas provide equal and adequate access for inmates with disabilities. RCCC social visitation areas provide inmates with disabilities the same opportunity to visit with their family. NMJ arranges these visits on 2E w/ chrono

## IV.  MENTAL HEALTH CARE

### A.  Policies and Procedures

h)  Training for all staff members who are working with inmates with mental illness in all aspects of their respective duty assignments.

Lexipol training for custody deputies.  24 hour CIT training for IOP/JBCT deputies, 8 hour CIT for all other deputies.

All new employees will receive 4-hours of in-person suicide prevention training developed in collaboration with the suicide prevention SME. Current employees will receive a 2-hour refresher course annually.  This was implemented in May 2021.

2.  The County's policies and procedures shall be revised, as necessary, to reflect all of the remedial measures described in this Remedial Plan.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first.

3.  The County shall continue to operate its acute inpatient program and its Outpatient Psychiatric Pod (OPP) program. The County shall establish a new Intensive Outpatient Program (IOP) for inmates who require a higher level of outpatient psychiatric care than what is provided in the OPP program.

Main Jail IOP has 20 male and 23 female beds.  RCCC IOP and HS IOP has 48 males beds. We have an additional 32 male beds and 12 female beds for the JBCT program.

### B.  Organizational Structure

1.   The County shall develop and implement a comprehensive organizational chart that includes the Sheriff's Department ("Department"), Correctional Health Services ("CHS"), Jail Psychiatric Services ("JPS"), Chief Administrative Officer, Medical Director of the JPS Program, and any other mental health staff, and clearly defines the scope of services, chains of authority, performance expectations, and consequences for deficiencies in the delivery of mental health care services.

The Sheriff's Organizational chart exists.

## C.   **Patient Privacy**

1.   All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff.  In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification.

Main Jail has secluded privacy interview room created on first floor for booking related clinical interactions.  Current use of classrooms with the door shut or private attorney visit booths for housing unit clinical interactions. Additional booths are in the planning stages and will consist of plexiglass enclosures with doors situated in the indoor rec area of each housing unit. Funding and BSCC approval pending.

All RCCC facilities have ACMH offices available for interviews. These areas are private and are not audio recorded.  The doors to these offices were changed so they can be closed and the officer can see what is going on inside through windows. Officers standby as needed based on the inmates calssification/behavior while offer the highest amount of privacy possible.

This will be addressed by the jail annex plan. Until that facility is built, ACMH has purchased machines that make white noise. They are utilizing these machines to create privacy if an officer needs to be present. If there are safety concerns, the interview will take place in an attorney visit booth.

b)  If the presence of custody staff  is determined to be necessary to ensure the safety of medical staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

At the Main Jail additional booths are in the planning stages and will consist of plexiglass enclosures with doors situated in the indoor rec area of each housing unit. Some booths will have a partition for safety as well as security desk/chair. Funding and BSCC approval pending.

SSO has purchased security desk/chair (same used at Santa Clara SO), which allows leg shackles to be secured.  This allows clinitians to safely speak to higher security inmates in privacy without custody staff standing nearby.

2.   Jail policies that mandate custody staff to be present for any mental health treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above.  Custody and mental health staff shall be trained accordingly.

No policies exist mandating custody to be present with mental health treatment.

3.   It shall be the policy of the County that mental health clinicians shall not conduct their patient contacts at cell front except pursuant to documented refusals or specific, documented security concerns that warrant cell front contacts.

Case Management Post Order. Otherwise they are seen in the attorney booth or one of the offices where the doors have been changed so they can be closed and the officers can still see what is taking place inside.

At the Main Jail, ACMH and the Compliance Lieutenant meet regularly to discuss MH assessments and confidentiality. Custody and ACMH staff is often reminded specific documented security concerns must exist for cell front contacts.

5.   A process shall exist for sick call slips or other mental health treatment-related requests to be collected without the involvement of custody staff.

Sick call slips may be handed to medical staff directly.

At the Main Jail, all housing units have secure metal boxes where medical or mental health requests are collected. ACH retrieves these requests several times a day.

D.  **Clinical Practices**
E.  **Medication Administration and Monitoring**

5.   The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

Main Jail is reevaluating resources to have to dedicated medical escorts.  In the mean time, custody is available upon request. Specialty programs like APU and SITHU have impacted and limited our resources for dedicated escorts.  RCCC has at least three dedicated medical escorts. Deputies assigned to facilities are also available.

6.   Medication adherence checks that serve a clinical function shall be conducted by nursing staff, not custody staff. Custody staff shall conduct mouth checks when necessary to ensure institutional safety and security.

Current practice. ACH, ACMH and Compliance Lieutenants meet regularly to discuss and rectify any issues related to medication distribution and medication diversion by inmates as well as ensure staff is conduction required checks.

F.  **Placement, Conditions, Privileges, and Programming**

1.   Placement:

a)   It shall be the policy of the County to place and treat all prisoners on the mental health caseload in the least restrictive setting appropriate to their needs.

Current practice.

b)   Placement in and discharge from Designated Mental Health Units shall be determined by qualified mental health professionals, with consultation with custody staff as appropriate.

Current practice.

c)  Absent emergency circumstances, the County shall obtain the assent of qualified mental health professionals before transferring prisoners with SMI into or out of Designated Mental Health Units.

Current practice.

d)  It shall be the policy of the County to place prisoners with SMI in appropriate settings that ensure provision of mental health services, patient safety, and the facilitation of appropriate programs, activities, and out-of-cell time.  Co-housing with other populations shall be avoided to the extent that such a practice prevents or hinders any of the above.

Current practice.

*2.*   Programming and Privileges

a)  All Designated Mental Health Units shall offer a minimum of 7 hours of unstructured out-of-cell time per week and 10 hours of structured out-of-cell time per week for each prisoner. While out-of-cell hours per prisoner may vary from day to day, each prisoner will be offered some amount of out-of-cell time every day of the week. All treatment and out-of-cell time shall be documented for each prisoner, and reviewed as part of Quality Assurance procedures.

Designated MH Units (IOP,JBCT) structured out of cell time is determined by program coordinators (ACMH, UC Davis) as part of their treatment. Inmates in these programs generally have more than seven hours of unstructured out of cell time and more than ten hours of structured time per week.  These hours are being met when not affected by COVID restrictions.  Both Main Jail and RCCC Compliance monitor out-of-cell times.

b)  The County shall ensure that prisoners on the mental health caseload have access and opportunity to participate in jail programming, work opportunities, and education programs, consistent with individual clinical input.

Current practice.  Work assignments will be based on the patient's ability to safely perform those functions given the appropriate level of supervision.

c)  The County shall develop and implement, in the 2P inpatient unit and the IOP unit, a program for progressive privileges (including time out of cell, property allowances, etc.) for patients as they demonstrate behavioral progress. A patient's level of privileges and restrictions shall be based on both clinical and custody input regarding current individual needs. The County shall ensure a process to review custody classification factors when necessary, so that placement, privileges, and restrictions match current individual circumstances and needs.

Current practice.

d)  Individuals on a mental health caseload shall receive, at minimum, privileges consistent with their classification levels, absent specific, documented factors which necessitate the withholding of such privileges. Clinical staff shall be informed of the withholding of privileges and the reasons for the withdrawal shall be documented and regularly reviewed by clinical and custody staff. The restoration of privileges shall occur at the earliest time appropriate based on individual factors.

Current practice.

3.  Conditions:

a)  Staff shall provide prisoners in Designated Mental Health Units with the opportunity to maintain cell cleanliness and the opportunity to meet their hygiene needs.  Custody and clinical staff shall provide assistance to prisoners on these matters, as appropriate to individual patient needs

Current practice.

b)  The County shall ensure uniformity of practice with respect to cell searches, such that searches are not done for punitive or harassment reasons. The County shall monitor whether cell search practices may be serving as a disincentive for prisoners in Designated Mental Health Units to leave their cells for treatment or other out-of-cell activities, and shall take steps to address the issue as appropriate.

Cell searches are done randomly on a revolving basis. They are not done for punitive or harassment reasons. They are done to ensure the inmates do not have any contraband or weapons that can harm themselves, ACMH staff or SSO staff.

4.  Bed planning:

a)  The County shall provide a sufficient number of beds in Designated Mental Health Unit, at all necessary levels of clinical care and levels of security, to meet the needs of the population of prisoners with SMI.

IOP units have been created for male and female patients, with the expansion of Enhanced Treatment pods. Female IOP will be at the Main Jail.  RCCC expanded the male IOP program and added 24 new beds in the CBF 500 pod.

c)  The County shall establish mental health programming for women that ensures timely access to all levels of care and is equivalent to the range of services offered to men.

Women's IOP and OPP unit established at Main Jail.  2P services already offered to women. RCCC has 12 female beds for JBCT.

5.  General Exclusion of Prisoners with Serious Mental Illness from Segregation

This is being implemented.  ACMH is using an alternative treatement program in IOP to take Administrative Segregation inmates.  Fewer and fewer Adseg1 inmates are on the SMI caseload.

a)  Prisoners with Serious Mental Illness will not be housed in Segregation units, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and there is no reasonable alternative, in which cases the provisions of **Section VIII.D** of the Segregation/Restrictive Housing Remedial Plan shall apply.

Main Jail has implemented female high security IOP with 8 additional beds 3W 100 pod. Main Jail has also implemented a male OPP single cell housing unit in the 3E 100 Pod. Many of these inmates were previouly classified as ADSEG on 8 West.

As Covid restrictions lessen and the requirement for numerous intake pods are reduced, more inmates can be moved off of 8-West and housed in GP pods.

b)  Where prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit are assessed a Disciplinary Segregation term, they will serve the term in a Designated Mental Health Unit, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and shall receive structured out-of-cell time and programming as determined by the Multi-Disciplinary Treatment Team.

Current practice.  Disciplinary Segregation Post Order reflects all but the most serious violations will result in in-place discipline.

6.  Access to Care

a)  The County shall designate and make available custody escorts for mental health staff in order to facilitate timely completion of appointments and any other clinical contacts or treatment-related events.

IOP deputies have been structured to oversee MH treatment on the entire third floor. The JBCT/IOP programs at RCCC have 13 officers assigned to them. These officers are responsible for ensuring the inmates receive what they need from a custody perspective. They act as escorts for the mental health staff. If the inmates needs to be taken to an appointment off-site, that is facilitated by our medical escort team. Same is true for Main Jail although we have 20 deputies and a sergeant assigned to IOP.

b)  The County shall ensure sufficient and suitable treatment and office space for mental health care services, including the Triage Navigator Program and other mental health-related services provided on site at the Jail.

At RCCC, office space for MH care providers and treatment is available and constantly being re-evaluated based on needs and advisement of ACMH administrators. At NMJ we work collaboratively with ACMH when space needs arise

c)  Locations shall be arranged in advance for all scheduled clinical encounters.

Current practice.

e)  Referrals and triage:

i.   The County shall maintain a staff referral process (custody and medical) and a kite system for prisoners to request mental health services.  Referrals by staff or prisoners must be triaged within 24 hours.

Custodial staff makeACMH referrals based on personal observations or at the request of the inmate; Inmates may also request MH services via kite. Refer to ACH for their practices and policies and to ACMH for their policy regarding response time.

G.  **Medico-Legal Practices**
H.  **Clinical Restraints and Seclusion**
I.   **Training**

1.   The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

a)   All jail custody staff shall receive formal training in mental health, which shall encompass mental health policies, critical incident response, crisis intervention techniques, recognizing different types of mental illness, interacting with prisoners with mental illness, appropriate referral practices, suicide and self-harm detection and preventions, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

The Academy now offers graduates the 24 hour CIT class, as well as an additional 20 hours of behavioral health as part of their final training before being employed. These classes cover many of the topics listed. Additionally, our staff will be assigned various classes through Lexipol, which they must complete online. Many of these topic are covered through these classes as well.

All new employees receive 4-hours of in-person suicide prevention training developed in collaboration with the suicide prevention SME. Current employees will receive a 2-hour refresher course annually.  This was implemented in May 2021.

b)   Custody staff working in Designated Mental Health Units shall receive additional training, including additional information on mental illness, special medico-legal considerations, de-escalation techniques, working with individuals with mental health needs, relevant bias and cultural competency issues, and the jail's mental health treatment programs.

IOP and JBCT deputies are given 24 hours of additional CIT training.  Several deputies from the Main Jail and RCCC have received a 2-hour negotiations class specific to a custody setting.

## V.   DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH MENTAL HEALTH OR INTELLECTUAL DISABILITIES

### A.   Role of Mental Health Staff in Disciplinary Process

1.  The County's policies and procedures shall require meaningful consideration of the relationship of a prisoner's behavior to any mental health or intellectual disability, the efficacy of disciplinary measures versus alternative interventions, and the impact of disciplinary measures on the health and well-being of prisoners with disabilities.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision. They will be working on policies related to the Consent Decree first. All policies related to the Consent Decree are currently being drafted by the Lexipol project team. A Chief Disciplinary Hearing Officer Post Order has been approved by plantiff's counsel. Each facility has appointed a Chief Disciplinary Hearing Officer, who works collabortively with ACMH (formerly JPS) to identify mental health or intellectual disability needs and modifiy discipline to ensure health, well-being, and fairness.

All discipline hearings on designated mental health housing areas (OPP, IOP, APU) are conducted by the IOP Sergeant. Before implementing discipline the IOP Sergeant confers with an ACMH staff member about the proposed discipline.

2.  Prisoners who are alleged to have committed a rules violation shall be reviewed by a qualified mental health professional if any of the following apply:

a)  Prisoner is housed in any Designated Mental Health Unit;

JBCT and IOP mental health workers are immediately notified of disciplinary write-ups that occurr and they work closely with custodial staff to determine the best course of action.

All discipline hearings on designated mental health housing areas (OPP, IOP, APU) are conducted by the IOP Sergeant. Before implementing discipline the IOP Sergeant confers with an ACMH staff member about the proposed discipline.

b)  Jail staff have reason to believe the prisoner's behavior was unusual, uncharacteristic, or a possible manifestation of mental illness;

Each facility has appointed a Chief Disciplinary Hearing Officer, who works collabortively with ACMH (formerly JPS) to identify mental health or intellectual disability needs and modifiy discipline to ensure health, well-being, and fairness.

c)  Prisoner is on the mental health caseload and may lose good time credit as a consequence of the disciplinary infraction with which he or she is charged.

All discipline hearings on designated mental health housing areas (OPP, IOP, APU) are conducted by the IOP Sergeant. Before implementing discipline the IOP Sergeant confers with an ACMH staff member about the proposed discipline.

**B.  Consideration of Mental Health Input and Other Disability Information in Disciplinary Process**

1.  The County shall designate one Chief Disciplinary Hearing Officer for each jail facility, who shall be responsible for ensuring consistency in disciplinary practices and procedures.

Current practice at both facilities. A Chief Disciplinary Hearing officer has been identified and a related Post Order has been approved and being implemented.

2.  The Disciplinary Hearing Officer shall ensure that prisoners are not disciplined for conduct that is related to their mental health or intellectual disability.

Current practice at both facilities. A Chief Disciplinary Hearing officer has been identified and a related Post Order has been approved and being implemented.

3.  The Disciplinary Hearing Officer shall consider the qualified mental health professional's findings and any other available disability information when deciding what, if any, disciplinary action should be imposed.

Current practice at both facilities. A Chief Disciplinary Hearing officer has been identified and a related Post Order has been approved and being implemented.

4.  The Disciplinary Hearing Officer shall consider the qualified mental health professional's input on minimizing the deleterious effect of disciplinary measures on the prisoner in view of his or her mental health or adaptive support needs.

Current practice at both facilities. A Chief Disciplinary Hearing officer has been identified and a related Post Order has been approved and being implemented.

5.  If the Disciplinary Hearing Officer does not follow the mental health staff's input regarding whether the behavior was related to symptoms of mental illness or intellectual disability, whether any mitigating factors should be considered, and whether certain sanctions should be avoided, the Disciplinary Hearing Officer shall explain in writing why it was not followed.

Current practice at both facilities. A Chief Disciplinary Hearing officer has been identified and a related Post Order has been approved and being implemented.

6.  Prisoners will not be subjected to discipline which prevents the delivery of mental health treatment or adaptive support needs, unless necessary for institutional safety.

Curent practice.

7.  Prisoners shall not be subject to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of self-injurious behavior.

Inmates with suicidal ideations or self injurous tendencies are closely evaluation by ACMH staff; Documentation of their behavior is made however, no disciplinary actions are taken against the inmate. Inmates may refuse medications at any time unless the administration of medication is mandated by the court through a valid order. ACMH is heavily involved in this process.

**C.  Accommodations for Prisoners with Mental Health or Intellectual Disabilities During the Disciplinary Process**

1.  The County shall provide reasonable accommodations during the hearing process for prisoners with mental health or intellectual disabilities.

Current practice.

2.  The County shall take reasonable steps to ensure the provision of effective communication and necessary assistance to prisoners with disabilities at all stages of the disciplinary process.

A draft copy of SSO Effective Communication order was submitted to plantiff's counsel. We have received feedback and currently reviewing. Although there is currently no policy, a Post Order has been approved. Each facility has appointed a Chief Disciplinary Hearing Officer, who works collaborively with ACMH (formerly JPS) to identify mental health or intellectual disability needs and modifiy discipline to ensure health, well-being, and fairness.

**D.  Use of Force for Prisoners with Mental Health or Intellectual Disabilities**

1.  The County's Correctional Services Operations Orders shall include language that ensures meaningful consideration of whether a prisoner's behavior is a manifestation of mental health or intellectual disability.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions.  A new team was established in April 2021. Their sole focus is policy revision.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

2.  For prisoners with a known mental health or intellectual disability, and absent an imminent threat to safety, staff shall employ de-escalation methods that take into account the individual's mental health or adaptive support needs.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. . Several members from both facilities have received a 2-hour negotiations class specific to a custody setting,

At the Main Jail, ACMH is consulted and given the opportunity to de-escalatee during all preplanned use of force with inmates under MH care. The is the same practice at RCCC when ACMH is available.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision.

3.  The County's Correctional Services Use of Force policies shall include a definition and a protocol for a planned Use of Force that provides appropriate guidance for a planned Use of Force that involves a prisoner with mental health or intellectual disability.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023

Until policy is formalized, ACMH is consulted and given the opportunity to de-escalatee during all preplanned use of force with inmates under MH care at the Main Jail and RCCC.

4.  Prior to any *planned*  Use of Force, such as a cell extraction, against a prisoner with mental health or intellectual disabilities, there will be a "cooling down period," consistent with safety and security needs. This period includes a structured attempt by mental health staff (and other staff if appropriate), to de-escalate the situation and to reach a resolution without Use of Force. Such efforts, including the use of adaptive supports, will be documented in writing. Medical and/or mental health staff should be consulted if the purpose of the cell extraction is related to the delivery of treatment.

This is the current practice with all planned use of force incidents involving inmates in specialzed units. The officers assigned to MH units work closely with ACMH staff when incidents requiring a planned use of force arise. After consultation with ACMH staff and ample opportunities for consultation and intervention by ACMH.

5.  The County shall require video documentation for any planned Use of Force, absent exigent circumstances. Jail staff shall endeavor to record the specific actions, behavior, or threats leading to the need for Use of Force, as well as efforts to resolve the situation without Use of Force.

Current practice.

6.  The County shall ensure the completion of supervisory review of Use of Force incidents, including video (for any planned Use of Force), interviews, and written incident documentation, in order to ensure appropriateness of Use of Force practices including de-escalation efforts. The County shall take corrective action when necessary.

Current Practice.

7.  The County shall review and amend as appropriate its policies on Use of Force, including its policies on Custody Emergency Response Team (CERT) and Cell Extraction Procedures.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

E.  **Training and Quality Assurance**

1.  All custody staff, and mental health staff, shall be trained on the policies and procedures outlined herein that are relevant to their job and classification requirements. Custody staff will receive periodic training on identifying behaviors that may be manifestations of mental illness and other situations warranting a referral to mental health staff, including for a Rules Violation Mental Health Review or other mental health assessment.

Due to COVID-19 concerns, certain policy revisions were temporarily slowed to accommodate an increased need for custody personnel to perform essential functions. A new team was established in April 2021. Their sole focus is policy revision.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

 All staff assigned to corrections (sworn staff and records officers) were assigned consent decree training in September of 2021. as new hires come on they are assigned the training and must attest to the completion of the training.

2.   All custody staff shall be trained on the identification of symptoms of mental illness, the provision of adaptive supports, and the use of de-escalation methods appropriate for prisoners with mental health or intellectual disabilities.

Many aspects of this training are already covered during in-service and pre-service training.  A comprehensive review of current training offerings, compared against the needs of this element is under reveiew. We are also working with ACMH to determine how to fully address this.

4.   The County shall track all Uses of Force (planned and reactive) involving prisoners who are on the mental health caseload or who have intellectual disabilities, including the number of Uses of Force and the number of cell extractions by facility.

Current Practice.

5.   The County shall implement a continuous quality assurance/quality improvement plan to periodically audit disciplinary and Use of Force practices as they apply to prisoners who are on the mental health caseload or who have intellectual disabilities.

Current use of Blue-Team software to track and monitor use of force incidents, while predicting possible problematic trends in officer behavior.

VI.   **MEDICAL CARE**

A. **Staffing**
B. **Intake**

1.   All prisoners who are to be housed shall be screened on arrival in custody by Registered Nurses (RNs).  RN screening shall take place prior to placement in jail housing.

Current practice. All incoming inmates are medically cleared prior to being booked into the facility.

2.   Health care intake screening shall take place in a setting that ensures confidentiality of communications between nurses and individual patients.  Custody staff may maintain visual supervision but may not be close enough to overhear communication, unless security concerns based on an individualized determination of risk that includes a consideration of requests by the health care staff require that custody staff be closer at hand.  There shall be visual and auditory privacy from other prisoners.

Current Practice @ RCCC. Deputies standby near the intake interview but outside door.

At the Main Jail, the nurses conduct the screening process in open cubicles. This screening area was recently remodeled placing the nurse and inmate deeper into the cubical. While this provides for auditory confidentiality from other arrested persons, this does not provide full confidentiality from custody staff.

 On December 8, 2022 the Sacramento Board of Supervisors approved to build a Jail Intake and health Services Facility as well as make ADA facility improvement to the current Jail. The Intake portion of the new building will be fully compliant with ADA and HIPPA, including confidentiality between nurses and individual patients.

3.   The County shall, in consultation with Plaintiffs, revise the contents of its intake screening, medical intake screening, and special needs documentation to reflect community standards and ensure proper identification of medical and disability related needs.

In consultation with ACH, several forms have been ammended to reflect this area.

C.   **Access to Care**

1.   The County shall ensure that Health Services Requests (HSRs) are readily available to all prisoners, including those in segregation housing, from nurses and custody officers.

Current practice. HSRs are available at medical appointments, pill call, and in housing units.

2.   The County shall provide patients with a mechanism for submitting HSRs that does not require them to share confidential health information with custody staff. The County shall install lockboxes or other secure physical or electronic mechanism for the submission of HSRs (as well as health care grievances) in every housing unit.  Designated health care staff shall collect (if submitted physically) or review (if submitted electronically) HSRs at least two times per day in order to ensure that CHS receives critical health information in a timely manner. Designated health care staff shall also collect HSRs during pill call and shall go door to door in all restricted housing units at least once a day to collect HSRs. HSRs and health care grievances will be promptly date- and time-stamped. The County may implement an accessible electronic solution for secure and confidential submission of HSRs and health care grievances.

HSRs are turned in directly to nursing staff duriing pill call twice a day. Lock boxes for Medical Grievances and HSR's have been in installed in all housing units at RCCC and Main Jail. Medical staff collects and tracks health care grievances and HSR's. The lock boxes are checked twice a day.

4.   The County shall designate and make available custody escorts for medical staff in order to facilitate timely and confidential clinical contacts or treatment-related events.

Main Jail is reevaluating resources to have to dedicated medical escorts.  In the mean time, custody is available upon request. Specialty programs like APU and SITHU have impacted and limited our resources for dedicated escorts.  RCCC has at least three dedicated medical escorts.

D.  **Chronic care**
F.   **Medication administration and monitoring**
G.  **Clinical space and medical placements**

1.   The County shall provide adequate clinical space in every facility to support clinical operations while also securing appropriate privacy for patients.  Adequate clinical space includes visual and auditory privacy from prisoners and auditory privacy from staff, the space needed reasonably to perform clinical functions as well as an examination table, sink, proper lighting, proper equipment, and access to health care records.

RCCC- All medical  and psychiatric offices are confidential and free of recording. There are no cameras in medical offices to ensure privacy for inmates. All medical offices have equipment determined to be necessary by ACH. All exam rooms at Main Jail are visually and auditorily confidential.  (RCCC MHU Cells are recorded. No Audio)

2.   The County shall ensure that any negative pressure isolation rooms meet community standards, including an antechamber to ensure that the room remains airtight, appropriate pressure gauges, and regular documented checks of the pressure gauges.

At Main Jail our negative pressure rooms are checked daily by DGS to ensure the requested standards are met.

On December 8, 2022 the Sacramento Board of Supervisors approved to build a Jail Intake and Health Services Facility as well as make ADA facility improvement to the current Jail.

3.   The County shall ensure that absent individualized, documented safety and security concerns, patients in acute medical or quarantine placements shall be allowed property and privileges equivalent to what they would receive in general population based on their classification levels.

All inmates in medical or quarantine placements are allowed to keep personal property with them as well as participate in programs that do not interfeer with safety and secutity concers.

4.   The County shall ensure that patients in medical placements are not forced to sleep on the floor, including by providing beds with rails or other features appropriate for patients' clinical needs and any risk of falling.

RCCC and Main Jail- No inmate is forced to sleep on the floor. Beds with rails are avaiable in the Medical Houing Unit.

5.   The County shall not discriminate against patients in medical placements solely because of their need for C-Pap machines, but instead shall provide access to programs and services in accordance with their classification level, as set forth in the ADA Remedial Plan.

Housing units in RCCC currently do not have outlets near any sleeping areas, except MHU. Inmates housed in the Medical Housing Unit are able to participate in programs and services consistent with others in their classification. At NMJ inmates who require C-Pap machines are housed on 2E. They have equal access to programs and services in accordance to their classification level.

H.   **Patient privacy**

1.  The County shall develop and implement policies and procedures to ensure that appropriate confidentiality is maintained for health care services.  The policies shall ensure confidentiality for clinical encounters, including health care intake screening, pill call, nursing and provider sick call, specialty appointments, and mental health treatment.  The policies shall also ensure confidentiality for written health care documents, such as health care needs requests and grievances raising medical care or mental health care concerns, which shall not be collected by custody staff.

Clinical encounters are offered in a private and confidential setting. Deputies stand near when necessary for safety, while still offering privacy. All written health care correspondence is handled directly by Medical staff, including medical grievances.

2.  The County shall provide adequate clinical space in each jail to support clinical operations while also securing appropriate privacy for patients, including visual and auditory privacy from prisoners and auditory privacy from staff.

RCCC- All medical  and psychiatric offices are confidential and free of recording. There are no cameras in medical offices to ensure privacy for inmates. Medical offices on floors have video, but no audio, for nurses safety.

MJ - Medical offices floors 3-8 are located in the elevator salleyport away from the general floor area to provide privacy. Medical offices on floors have video, but no audio, for nurses safety.

3.  All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff.  In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification. The issuance of pills does not constitute a clinical interaction.

All medical and psychiatric visits are done in a private and confidential setting. Officers standby when necessary for safety, while still offering privacy to the inmate. Max and medium security facilities occur in a private setting, out of hearing range, proximity is determined by the inmates behavior not housuing placement.

b)  If the presence of a correctional officer is determined to be necessary to ensure the safety of staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

Deputies stand at a distance that offers their ability to intervene if necessary, while offering auditory privacy.

4.   Jail policies that mandate custody staff to be present for any medical treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above.  Custody and medical staff shall be trained accordingly.

No policies exist mandating deputies be present during medical treatment.

I.   **Health care records**
J.   **Utilization management**
K.   **Sanitation**
L.   **Reproductive and Pregnancy-Related Care**
M.  **Transgender and gender nonconforming health care**

c)   Access to gender-affirming clothing

Current practice, outlined in TGNI order. All inmates shall be issued clothing consistent with their preferred gender identity and/or expression, regardless of their housing location.

d)   Access to gender-affirming commissary items, make-up, and other property items

Current practice, outlined in TGNI order. Per IWF, all inmates can purchase gender affirming items available on commissary.

N.   **Detoxification protocols**
O.   **Nursing protocols**
P.   **Reviews of in-custody deaths**

1.   Preliminary reviews of in-custody deaths shall take place within 30 days of the death and shall include a written report of the circumstances and events leading to the death, with the goal to identify and remedy preventable causes of death and any other potentially systematic problems.

Current practice. In-CUSTODY Death Reviews shall happen as soon as possible, within 30 days.

2.  Mortality reviews shall include an investigation of the events occurring prior to the death, an analysis of any acts or omissions by any staff or prisoners which might have contributed to the death, and the identification of problems for which corrective action should be undertaken.

Current practice.

Q.  **Reentry Services**

R.  **Training**

1.  The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

a)  All jail custody staff shall receive formal training in medical needs, which shall encompass medical treatment, critical incident response, crisis intervention techniques, recognizing different types of medical emergencies, and acute medical needs, appropriate referral practices, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

Training needs are being evaluated against on-going in-service training. All Custody staff receive 8 hours of Crisis intervention training and 10 hours of medical emergency and CPR training is done every two years. Specialized units receive additional training relevant to their assignment. Additional training is evaluated and assigned as determined by in-service training.

VII.  **SUICIDE PREVENTION**

A.  **Substantive Provisions**

1.  The County recognizes that comprehensive review and restructuring of its suicide assessment, monitoring, and prevention practices are necessary to address the risk of suicide and self-harm attendant to detention in a jail setting.

The Suicide Prevention policy language has been agreed upon by Class Councel and SSO. The policy is being reviewed by Executive Staff and publishing is forthcoming any day.

2.  The County shall establish, in consultation with Plaintiffs' counsel, a new Suicide Prevention Policy that shall be in accordance with the following:

The Suicide Prevention policy language has been agreed upon by Class Councel and SSO. The policy is being reviewed by Executive Staff and publishing is forthcoming any day.

B. **Training**

1.  The County shall develop, in consultation with Plaintiffs' counsel, a four- to eight-hour pre-service suicide prevention curriculum for new Jail employees (including custody, medical, and mental health staff), to be conducted in person in a classroom or virtual classroom setting, that includes the following topics:

As part of pre-service training, the Adult Corrections Officer Supplemental Core Course has been revised where Module 19.0 addresses suicide prevention. This section has been approved by the Board of State & Community Corrections (BSCC) as well as the Standards and Training for Corrections (STC).

All current employees have received the 2-hour suicide prevention training developed in collaboration with the mental health SMEs. New employees have recieved the 4-hour suicide prevention training since May 22, 2022.

a)  avoiding obstacles (negative attitudes) to suicide prevention;

Current practice

b)  prisoner suicide research;

Current practice

c)  why facility environments are conducive to suicidal behavior;

Current practice

d)  identifying suicide risk despite the denial of risk;

Current practice

e)  potential predisposing factors to suicide;

Current practice

f)  high-risk suicide periods;

Current practice

g)  warning signs and symptoms;

Current practice

h)  components of the jail suicide prevention program

Current practice

i)  liability issues associated with prisoner suicide;

Current practice

j)   crisis intervention.                                                Current practice

2.   The County shall develop, in consultation with Plaintiffs' counsel, a two-hour annual    Current Practice
suicide prevention curriculum for all custody, medical, and mental health staff, to be
conducted in person in a classroom or virtual classroom setting, that includes:

a)   review of topics (a)-(j) above                                      Current Practice

b)   review of any changes to the jail suicide prevention program        The Suicide Prevention policy language has been agreed upon by Class Councel and SSO.
                                                                         The policy is being reviewed by Executive Staff and publishing is forthcoming any day.

c)   discussion of recent jail suicides or attempts                      Discussions occur daily with IOP and ACMH staff. If there are any attempts, they will be
                                                                         covered in these conversations. Additionally, the Suicide Prevention Committee meets
                                                                         regularly to review serious suicde attempts. There is also a Suicide Precautions
                                                                         Muntidisciplinary Team Meeting to discuss management of inmates on suicide precautions
                                                                         which are paticularly challenging.

3.   Custody officers assigned to Designated Mental Health Units shall receive additional    IOP and JBCT Deputies receive 24 hours of advanced CIT training.  Several IOP/JBCT
specialized training on suicide prevention and working with prisoners with serious mental    Deputies also attended negotiaition training specific to custody.
illness.

5.  All mental health staff and custody officers shall be trained on the appropriate use of safety suits—*i.e*., not to be utilized as a default, not to be used as a tool in behavior management, not to be utilized for patients being observed at 30-minute observations.

Safety Suits are used at the discretions of ACMH based on collaboration with custody staff and not as a behavior management tool.

During the 4 hour and 2 hour Suicide Prevention Class there is training and discussion about proper safety suit use conssient with this remedial plan.

6.  The County shall ensure that all staff are trained in the new Suicide Prevention Policy.

The SSO Suicide Prevention policy language has been agreed upon by Class Councel and SSO. The policy is being reviewed by Executive Staff and publishing is forthcoming any day. When published, each Sheriff's Office staff member must read and acknowledge the policy.

C.  **Nursing Intake Screening**
D.  **Post-Intake Mental Health Assessment Procedures**

Current practice at RCCC.  At Main Jail, inmate privacy is a priority. When ACMH assessments are conducted we offer the maximum level of privacy afforded given the case-by-case safety risk. At Main Jail a private booking attorney booth has been converted to be utilized as a confidential interview room for Mental health assessments.

1.  All mental health assessments shall be conducted in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

On MJ housing floors,  additional booths are in the planning stages and will consist of plexiglass enclosures with doors situated in the indoor rec area of each housing unit. Some booths will have a partition for safety as well as a security desk/chair. Funding and BSCC approval pending.

SSO has purchased security desk/chair (same used at Santa Clara SO), which allows leg shackles to be secured.  This allows clinitians to safely speak to higher security inmates in privacy without custody staff standing nearby.

E.  **Response to Identification of Suicide Risk or Need for Higher Level of Care**

1.   When a prisoner is identified as at risk for suicide and placed by custody staff in a safety cell, on suicide precautions, and/or in a safety suit, mental health staff shall be contacted immediately.  A qualified mental health professional, or other appropriately trained medical staff in consultation with mental health staff, shall complete a confidential in-person suicide risk assessment as soon as possible, consistent with the "must-see" referral timeline.

Current practice as outlined in our Suicide Prevention Operations Order updated in January 2020. At Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for Mental health assessments.

Custody staff place the inmate/patient in the least restrictive setting as possible contingent on available space. Staff constantly attempts to move inmate/patients out of safety cells to segregation cells (toilet and sink) or a 3-West suicide resistant SITHU cell.

A work order has been approved for 16 additional suicide resistant cells on the lower tier of 3-West 200 pod.

2.   Consistent with current RCCC policy, if there is no mental health staff on site at RCCC at the time that an emergent mental health need is identified, the prisoner shall be transported to the Main Jail for emergency evaluation within two hours of the initial report.

Current practice.  RCCC at-times will use suicide resisitant cells for IOP inmates based on ACMH recommendations.  This was suggested by the suicide prevention SME.

4.   The County shall ensure that the meal service schedule or other custody-related activities cause no delay in the completion of suicide risk assessments for prisoners.

Current practice.

F.  **Housing of Inmates on Suicide Precautions**

1.   The County's policy and procedures shall direct that prisoners, including those identified as being at risk for suicide, be treated in the least restrictive setting appropriate to their individual clinical and safety needs.

The Suicide Prevention policy language has been agreed upon by Class Council and SSO. The policy is being reviewed by Executive Staff and publishing is forthcoming any day.

Current post orders and practice indicate least restrictive housing for suicidal inmates. ACMH staff shall consult with custody staff to determine the appropriate housing location for the inmate.

**G.   Inpatient Placements**

1.   The County shall ensure that prisoners who require psychiatric inpatient care as clinically indicated are placed in the 2P unit within 24 hours of identification, absent exceptional circumstances.  In all cases, the provision of clinically indicated treatment to any prisoner requiring inpatient level of care shall be initiated within 24 hours.

On December 8, 2022 the Sacramento Board of Supervisors approved to build a Jail Intake and health Services Facility as well as make ADA facility improvement to the current Jail. The inpaitent unit will be designed to comply with this 24 hour requirement.

There will be an interm sollution of converting 3-West 300 Pod to a new expanded psychiatric inpatient unit to move toward compliance with the 24 hour requirement.

IOP level of care has been expanded which can help reduce inpatient care requirements.

**H.   Temporary Suicide Precautions**

1.  No prisoner shall be housed in a safety cell, segregation holding cell, or other Temporary Suicide Precautions Housing for more than six (6) hours. If mental health or medical staff determine it to be clinically appropriate based on detoxification-related needs, this time limit may be extended to no more than eight (8) hours. If exceptional circumstances prevent transfer within these timelines, those circumstances shall be documented, and transfer shall occur as soon as possible. This does not preclude the housing of a prisoner in the IOP unit if clinically indicated.

The recently approved Jail Intake and Health Services Facility will bring the County in compliance. The County currently follow these timeframes as much as possible with the limited number of cells in the APU.

The addition of 8 female IOP and 24 male IOP beds has brought us closer to compliance.

Custody staff places the inmate/patient in the least restrictive setting as possible contingent on available space. Staff constantly attempts to move inmate/patients out of safety cells to segregation cells (toilet and sink) or a 3-West suicide resistant SITHU cell.

A work order has been approved for 16 additional suicide resistant cells on the lower tier of 3-West 200 pod. This will alievate the reliance on safety and segregation cells.

2.  The County shall ensure, including by revising written policies and procedures where necessary, the timely and adequate completion of medical assessments for prisoners in need of suicide precautions, as required under Operations Order 4/05 (*i.e.*, within 12 hours of placement of the next daily sick call, whichever is earliest, and then every 24 hours thereafter).

Current practice. Custody staff shall notify medical staff within fifteen (15) minutes that a prisoner is temporarily housed in a safety or segregation cell and medical staff shall complete an assessment within 12 hours of placement or the next sick call, whichever us earliest.

3.  The County shall ensure that any cell used for holding prisoners on suicide precautions is clean prior to the placement of a new prisoner, as well as cleaned on a normal cleaning schedule.

Current practice. The Post Order has been approved.

4.   The County shall create and implement a written policy ensuring adequate frequency for meals, fluids, hygiene, showers, prescribed medications, and toileting when a prisoner is in cell used for holding prisoners on suicide precautions.

Current practice.  Will add the langauge to the new Suicide Prevention policy. RCCC has no cells designed for long term housing of inmates on suicide precautions. RCCC does not have ACMH staff available 24 hours a day, but has TELEPSYCHIATRY available after hours including weekend after hours.

5.   Inmates on suicide precautions shall not automatically be on lockdown and should be allowed dayroom or out-of-cell access consistent with security and clinical judgments.

Current practice.

6.   The classrooms or multipurpose rooms adjacent to the housing units in the Main Jail are designed for, and should be made available for, prisoner programs and treatment. Absent an emergency, the County shall not use the classrooms and multipurpose rooms to hold prisoners pending a mental health evaluation or on suicide precautions.  Where such emergency occurs, the County shall document the reasons for retention and move the prisoner, within six (6) hours, to the inpatient unit or other appropriate housing location for continued observation, evaluation, and treatment.

Current practice.

I.   **Suicide Hazards in High-Risk Housing Locations**

1.   The County shall not place prisoners identified as being at risk for suicide or self-harm, or for prisoners requiring IOP level of care, in settings that are not suicide-resistant as consistent with Lindsay Hayes's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities."

Current practice. Inmates at risk for suicide, self harm, or IOP level of care are housed in suicide resistant cells.

Current practice.

2.  Cells with structural blind spots shall not be used for suicide precaution.

A work order has been approved for 16 additional suicide resistant cells on the lower tier of 3-West 200 pod. This will alievate the reliance on safety and segregation cells.

J.  **Supervision/Monitoring of Suicidal Inmates**

1.  The County shall ensure adequate visibility and supervision of prisoners on suicide precautions.

Current practice.

2.  The County shall not cover cell windows with magnetic flaps or any other visual barrier preventing visibility into any cell that is housing a prisoner on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need.

Current practice.

3.  The County shall revise its policies regarding the monitoring of prisoners on suicide precautions to provide for at least the following two defined levels of observation:

a)  <u>Close observation</u> shall be used for prisoners who are not actively suicidal but express suicidal ideation (*e.g.* , expressing a wish to die without a specific threat or plan) or have a recent prior history of self-destructive behavior.  Close observation shall also be used for prisoners who deny suicidal ideation or do not threaten suicide but are engaging in other concerning behaviors indicating the potential for self-injury.  Staff shall observe the prisoner at staggered intervals not to exceed every 15 minutes and shall document the observation as it occurs.

The revised policy addresses this issue. The SSO Suicide Prevention policy language has been agreed upon by Class Councel and SSO. The policy is being reviewed by Executive Staff and publishing is forthcoming any day. When published, each Sheriff's Office staff member must read and acknowledge the policy.

b) <u>Constant observation</u> shall be used for prisoners who are actively suicidal, either threatening or engaging in self-injury, *and* considered a high risk for suicide.  An assigned staff member shall observe the prisoner on a continuous, uninterrupted basis.  The observation should be documented at 15-minute intervals.  Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation.

ACMH is in the process of hiring "sitters" to perform this fucntion.

4.   For any prisoner requiring suicide precautions, a qualified mental health professional shall assess, determine, and document the clinically appropriate level of monitoring based on the prisoner's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically-determined level of monitoring.

Current practice. Once ACMH staff has completed the inmate's evaluation, the ACMH staff member shall consult with custody staff to determine the appropriate housing location for the inmate.

5.   Video monitoring of prisoners on suicide precaution shall not serve as a substitute for Close or Constant observation.

Current practice. Outlined in our current Suicide Prevention Policy

K.  **Treatment of Inmates Identified as at Risk Of Suicide**

When necessary, custudy staff will standby for security while offering auditory privacy. Proximity is dependent on the inmates behavior safety risk. This can be accomplished at RCCC due to the design of the three offices where these contacts take place. All of the doors can be closed. They have windows where the officers can stand outside and see what is taking place in the room.

At Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for Mental health assessments in booking.

On MJ housing floors, classrooms and confidential attorney booths are available for clinical encounters.

Additional booths are in the planning stages and will consist of plexiglass enclosures with doors situated in the indoor rec area of each housing unit. Some booths will have a partition for safety as well as a security desk/chair. Funding and BSCC approval pending.

SSO has purchased security desk/chair (same used at Santa Clara SO), which allows leg shackles to be secured.  This allows clinitians to safely speak to higher security inmates in privacy without custody staff standing nearby.

3.  All assessments, treatment, and other clinical encounters shall occur in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

L.  **Conditions for Individual Inmates on Suicide Precautions**

1.  The County's Suicide Prevention Policy shall set forth clear and internally consistent procedures regarding decisional authority for determining the conditions for individual inmates on suicide precautions.  Mental health staff shall have primary authority, consistent with individualized classification and security needs, with respect to the following:

Current practice, Mental Health staffs's recommendations are taken into consideration when making housing decisions for inmates with mental health concerns.

## M. **Property and Privileges**

1.  Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of routine privileges (*e.g.*, visits, telephone calls, recreation) that are otherwise within the limitations of a prisoner's classification security level.  Any removal of privileges shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

Current practice.  Prisoners placed in a safety cell shall be allowed to retain enough clothing or be provided with a suitably designed "safety garment" to provide for the prisoners personal privacy unless specific identifiable risks to the prisoner's safety or to the security of the facility exist and are documented.

2.  Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff depending on suicide risk, the removal and/or return of a prisoner's clothing and possessions (*e.g.*, books, slippers/sandals, eyeglasses) that are otherwise within the limitations of a prisoner's classification security level.  The removal of property shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

Current practice.  If deemed necessary by ACMH staff, the inmate's clothing shall be taken and the inmate will be given a "safety suit" to wear.  Prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damage property.

3.  Cancellation of privileges should be avoided whenever possible and utilized only as a last resort.

Current practice. Cancellation of privledges would be done only as a last resort or if deemed necessary per ACMH.

## N. **Use of Safety Suits**

1.  Decisions about the use of a safety suit (smock) or removal of normal clothing will be under mental health staff's authority, based on individualized clinical judgment along with input from custody staff.

Current practice. Outlined in the current Suicide Prevention Program Operations Order.The use of the "Safety Suit" shall be at the discretion of ACMH, based on collaboration with intake or custody staff.

2. Custody staff may only temporarily place an inmate in a safety suit based on an identified risk of suicide by hanging until the qualified mental health professional's evaluation, to be completed within the "must see" referral timeline. Upon completion of the mental health evaluation, the mental health professional will determine whether to continue or discontinue use of the safety suit.

Absent direction from Jail Psychiatric Services (JPS) deeming a "safety garment" necessary, a sworn supervisor must authorize custody staff to take the clothing and supply the prisoner with a "safety garment".  Unless a "safety garment" is necessitated by the prisoner's behavior, prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damage property

3. If an inmate's clothing is removed, the inmate shall be issued a safety suit and safety blanket.

Current practice. See above.

Current practice. Determination is made by ACMH.

4. As soon as clinically appropriate, the provision of regular clothing shall be restored. The goal shall be to return full clothing to the inmate prior to discharge from suicide precautions.

At the Main Jail, After Lindsey Hayes visit in November 2022, It was discovered SSO was not conducting QA reviews of safety smock use persuant to the MOA filed June 3, 2022. Moving forward the IOP Sergeant will conduct QA audits of safety smock use and timely return of clothing and property when notified by ACMH.

6. If a qualified mental health professional determines that 30-minute (or less frequent) observations are warranted for a prisoner, safety suits shall not be used on that prisoner.

This causes some confusion to address.  County request discussion on the exact meaning of this provision.

7. Safety suits shall not be used as a tool for behavior management or punishment.

Current practice. Safety suits are only used when necessary for the safety and security of the inmate.

O. **Beds and Bedding**

1.   All prisoners housed for more than four hours on suicide precautions and/or in an inpatient placement shall be provided with an appropriate bed, mattress, and bedding unless the prisoner uses these items in ways for which they were not intended (*e.g.*, tampering or obstructing visibility into the cell).  Such a determination shall be documented and shall be reviewed on a regular basis.

This is current practice. Those housed in safety cells in the booking area are moved to appropriate suicide resistant housing as soon as a bed/cell opens up.

A work order has been approved for 16 additional suicide resistant cells on the lower tier of 3-West 200 pod. This will alieve the reliance on safety and segregation cells.

P.   **Discharge from Suicide Precautions**

1.   A qualified mental health professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions in order to ensure that the discharge is appropriate and that appropriate treatment and safety planning is completed.

Current custody practice.

3.   Qualified mental health professionals shall provide clinical input regarding clinically appropriate housing placement (*e.g.*, whether isolation is contraindicated for the prisoner) upon discharge.  Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement.  Once clinically discharged from suicide precautions, the prisoner shall be promptly transferred to appropriate housing.

Current custody practice. This is accomplished with the input of Classification staff and ACMH.

Q.   **Emergency Response**

1.   The County shall keep an emergency response bag that includes appropriate equipment, including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units.  All custodial and medical staff be trained on the location of this emergency response bag and shall receive regular training on emergency response procedures, including how to use appropriate equipment.

Those items are available in each facility.

2.   All custody and medical staff shall be trained in first aid and CPR.

Current custody practice. Sworn staff receives CPR training every two years. It is part of our Advanced Officer Training program.

3.   It shall be the policy of the County that any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff shall begin to administer standard first aid and/or CPR, as appropriate.

Current practice.

R.   **Quality Assurance and Quality Improvement**

2.   The County shall, in consultation with Plaintiffs' counsel, revise its in-custody death review policy and procedures.  Reviews shall be conducted with the active participation of custody, medical, and mental health staff.  Reviews shall include analysis of policy or systemic issues and the development of corrective action plans when warranted.

Current practice.

3.   For each suicide and serious suicide attempt (*e.g*., requiring hospitalization), the County's Suicide Prevention Task Force shall review: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt.  Where applicable, the Review Team shall generate recommendations for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

Current practice. The Suicide Prevention Task Force has been reestablished and has had several meetings.

VIII.   **SEGREGATION/RESTRICTIVE HOUSING**

A.  **General Principles**

1.  Prisoners will be housed in the least restrictive setting necessary to ensure their own safety, as well as the safety of staff, other prisoners, and the public.

This is our current practice.

a)  The County shall not place prisoners in more restrictive settings, including Segregation, based solely on a mental illness or any other disability. Prisoners will be housed in the most integrated setting appropriate to their individual needs.

At the Main Jail we have implemented ADSEG classificaiton review utilizing objective criteria and forms created with the assistance of DRC/PLO. Those placed in ADSEG are reviewed based on objective factors for segregation and not mental health status. At the Main Jail the female IOP program was expanded with 8 high security beds to better service the SMI population.

RCCC has implemented several SMI program pods, where inmates housed in a single cell are only assigned based on ACMH recommendation and allowed program/recreation time with other inmates, minimum 17 hours a week.

A high security IOP program has been implemneted at RCCC with aditional 24 male  beds. This reduces reliance on restrictive housing for inmates who are hard to manage.

b)  The County shall not place prisoners into Segregation units based solely on classification score.

Several objective indicators are used to determine the appropriateness of segregation. Written documentation is required and we are working towards periodic review of justification for segregation.  Inmates solely classified as "high" are not routinely segregated.

c)  The County shall review the housing and restrictions of female prisoners classified as high security to ensure that this population is not subject to Segregation conditions of confinement.

Current practice.

To provided needed programming custody staff on 2P is now 12hr day/7 days a week for better availability requested by ACMH.

MJ leadership is still working on finding 2 additional deputy positions assigned on the night shift.. 3-West IOP deputies provide needed staffing for daily access to programing consistent with this requirement.

d) Specialized medical units (e.g., Main Jail 2 West Med/Psych, Main Jail 2 East) and mental health units (e.g., OPP, IOP, MHU, 2P) are not Segregation housing units. The County shall ensure that prisoners housed in these units receive daily access to out-of-cell time, telephones, showers, and other programs, services, and activities consistent with their classification and treatment plan.

The MJ implemented a male OPP single celled housing unit with 30 beds on 3-East 100 Pod. The female IOP program was expanded with 8 high security beds to better service the SMI population.

A simiar high security IOP program has been implemneted at RCCC with aditional 24 male beds. SSO and ACMH have added staffing to provide better services to this population.

RCCC has an open floor plan setting for medical housing with access to phones, showers, and yard. Our IOP housing units have constant programming which allows them to exceed the minimum out of cell time of 17 hours.

2. The County shall not place a prisoner in Segregation units without first determining that such confinement is necessary for the safety of the staff, other prisoners, or the public. The County shall clearly document in writing the specific reason(s) for a prisoner's placement and retention in Segregation housing. The reason(s) shall be supported by clear, objective evidence. Prisoners will remain in Segregation housing for no longer than necessary to address the reason(s) for placement.

With the assistance of Plantiff's Counsel, ADSEG forms were created and are currently being utilized by SSO staff to comply with this requrement. Staff strives to use objective factors when determining segregation status of individual inmates.

While updating this document, the author counted two ADSEG Phase 1 and seven ADSEG Phase 2 classified inmates at the Main Jail on December 27, 2022. Each placement is well documented and justified with the objective ADSEG forms.

RCCC does not have any Adminstrative Segregation housing.

3.   The County shall not place the following prisoners in a Segregation setting unless necessary to address a serious risk of physical harm, and in such cases only for the minimum time necessary to identify an alternative appropriate placement:

New ADSEG forms being utilized to ensure objective reasons for segregation status.

a)   Prisoners with acute medical needs that require an inpatient level of care and/or daily nursing care;

Current practice.

b)   Prisoners who are pregnant, post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy.

Not codified in policy, however is our current practice as we now have regular collaboration with ACMH and review all inmates who are housed in segregation.

B.   **Conditions of Confinement**

1.   The County will provide at least 17 hours of out-of-cell time per week for all prisoners, with the exception of prisoners subject to Administrative Segregation Phase I and Disciplinary Segregation in accordance with this remedial plan. The County will monitor out-of-cell time, and if minimum out-of-cell time requirements are routinely not being met at a particular facility or in a particular housing unit, the Sheriff's Department division commander or designee will review the situation and take appropriate steps to resolve the issue.

With the reduction of COVID lockdowns we are working to meet compliance with feedback from plantiff's counsel. Plantiffs Councel feedback was taken for out of cell reports and will be implemented in the new ATIMS software.

At the MJ, weekly out of cell time reports are distributed to supervisors and managers to ensure compliance.

RCCC has been able to meet the required out of cell time almost consistently across housing units who are not in COVID 19 quarantine/isolation. Out of cell totals are monitored by the compliance unit to ensure we are reaching the required totals.

a)   The County shall implement a policy to document out-of-cell time provided to each prisoner. The County shall conduct monthly audits to ensure that prisoners have been provided the required treatment and recreation time out of cell. This data will be regularly reviewed as part of the County's Quality Assurance procedures.

Out of cell time is monitored and recorded in the current WebJPF system.  Reports are generated on a weekly basis, and checked for compliance. A Post Order regaring this topic has been approved. The officers are aware of the amount of out-of-cell time each classification of imate is entitle to receive.

2.  Out-of-cell time with the opportunity to exercise shall be provided to each prisoner seven (7) days per week, including outdoors/recreation time when feasible. The County shall offer out-of-cell time at appropriate times of day.

Schedules have been created to ensure fair distribution of outdoor recreation.

3.  The County shall modify its non-disciplinary Segregation policies and procedures to allow reasonable access to the following: (1) Personal phone calls for all prisoners, including at least five hours or three weekdays per week of phone access during normal business hours; (2) Education, rehabilitation, and other materials (e.g. writing implements, art supplies, tablets), for in-cell activities; (3) Personal and legal visiting; (4) Religious services; and (5) Commissary.

At MJ personal and legal visiting is unrestricted. With the reduction of ADSEG population out of cell time and phone time are in compliance. Once the majority of our 14 housing units set aside for COVID Intake Quarantine are converted back to GP, we will be able to provide more programs and access to non-disciplinary Segregated inmates.

At RCCC phones are available during any out of cell time which for non disciplinary segregation is 17 hours per week. RCCC does not have Administrative Segregation housing. The Post Order regarding this topic has been approved.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutanants will make policies related to the Consent Decree a priority to complete in 2023.

a)  The conditions and privileges described above shall be provided unless there is a specific safety or security issue preventing provision of such materials or the prisoner is subjected to disciplinary action.

Current practice

Current practice.

4.  Cell windows shall not be covered with magnetic flaps, towels, sheets, or any other visual barrier preventing visibility into and out of the cell, unless there is a specific security or privacy need that is documented, and then for only a period of time necessary to address such security or privacy need. This provision shall apply to all cells housing prisoners.

5.   The County shall establish procedures so that all housing unit cells are searched and cleaned prior to a prisoner's placement in the cell.

The Post Order regarding this topic was approved.

6.   The County shall establish procedures to ensure that no prisoner is placed in a Segregation housing cell without a mattress and appropriate bedding.

Current practice.

## C.   Mental Health Functions in Segregation Units

1.   Segregation Placement Mental Health Review

a)   All prisoners placed in a non-disciplinary Segregation housing unit and all prisoners housed in a Disciplinary Detention unit shall be assessed by a qualified mental health professional within 24 hours of placement to determine whether such placement is contraindicated. All prisoners subjected to Disciplinary Segregation conditions for 72 hours in their general population housing unit (*i.e.*, confined to cell 23 hours per day) shall also be assessed by a qualified mental health professional no later than the fourth day of such placement.

Current practice. Custody staff notifies ACMH immediatley after an inmate is moved to disciplinary housing.

b)   Any decision to place prisoners with Serious Mental Illness in Segregation shall include the input of a qualified mental health professional who has conducted a clinical evaluation of the prisoner in a private and confidential setting (absent a specific current risk that necessitates the presence of custody staff), is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

The need to place prisoners with SMI into segregation has been greatly reduced:

Objective ADSEG Forms reduce unessary segretation

The MJ inplemented a male OPP single celled housing unit with 30 beds on 3-East 100 Pod reduced those on ADSEG. The female IOP program was expanded with 8 high security beds to better service the SMI population.

A simiar high security IOP program has been implemneted at RCCC with aditional 24 male  beds. SSO and ACMH have added staffing to provide better services to this population.

MJ SSO and ACMH meets regularly to discuss confidential MH visists and troubleshoot non compliance.

RCCC has multiple SMI programs. Inmates in IOP and JBCT are not in segregation/restriction housing. Disciplinary housing is issued only with clearance from ACMH staff assigned to these programs. Consultation with SMI inmates and ACMH in these programs are confidential.

d)   If mental health or medical staff find that a prisoner has a Serious Mental Illness or has other contraindications to Segregation, that prisoner shall be removed from Segregation absent exceptional and exigent circumstances.

We are working to meet compliance with feedback from plantiff's counsel. At the MJ female inmates with SMI are removed from segregation and placed into IOP which has recenly been expanded with 8 more beds on 3W100.

A simiar high security IOP program has been implemneted at RCCC with aditional 24 male  beds.

2.   Segregation Rounds and Clinical Contacts

a) Cell checks (to ensure that prisoners are safe and breathing) shall be conducted for all prisoners in Segregation at least every 30 minutes, at staggered intervals. Completion of cell checks will be timely documented.

Current practice. See POST ORDER HOUSING UNIT CHECKS

b) A qualified mental health or medical professional shall conduct check-ins at least once a week, to assess and document the health status of all prisoners in Segregation, and shall make referrals as necessary. The check-in shall include a brief conversation with each prisoner, a visual observation of the cell, and an inquiry into whether the prisoner would like to request a confidential meeting with a mental health or medical provider. Steps shall be taken to ensure effective communication, as well as auditory privacy consistent with security needs. When a prisoner in Segregation requests a confidential meeting with a mental health or medical provider, or the medical or mental health professional identifies a mental health or medical need, staff shall make appropriate arrangements to include triage, examination and treatment in an appropriate clinical setting. In such cases, staff shall give the prisoner the opportunity to complete a health care request but will otherwise initiate a referral without requiring the prisoner to complete a request form.

At the MJ and RCCC custody staff provides access to inmates for medical and mental health staff. No inmate is denied a request for access to medical or mental health care regardless of housing or classification. If an inmate request to see medical they can fill out a kite if it is not an emergency. If it is an emergency, officers notify medical or mental health.

MJ SSO and ACMH meets regularly to discuss confidential MH visists and troubleshoot non compliance.

At the Main Jail additional booths are in the planning stages and will consist of plexiglass enclosures with doors situated in the indoor rec area of each housing unit. Some booths will have a partition for safety as well as security desk/chair. Funding and BSCC approval pending.

SSO has purchased security desk/chair (same used at Santa Clara SO), which allows leg shackles to be secured. This allows clinitians to safely speak to higher security inmates in privacy without custody staff standing nearby.

3.  Response to Decompensation in Segregation

a) If a prisoner in Segregation develops signs or symptoms of mental illness where such signs or symptoms had not previously been identified, suffers deterioration in his or her mental health, engages in self-harm, or develops a heightened risk of suicide, the prisoner shall immediately be referred for appropriate assessment and treatment from a qualified mental health professional who will recommend appropriate housing and/or programming.

Objective ADSEG Forms reduce unessary segregation. At the time of this update (12-27-22) there is currently two Phase 1 and seven Phase 2 Administratively Segregated inmates.

With the reduction of COVID Intake Pods, inmates on 8-West who have been stepped down off ADSEG will be redistributed to other floors with less restrictions.

The MJ implemented a male OPP single celled housing unit with 30 beds on 3-East 100 Pod reduced those on ADSEG. The female IOP program was expanded with 8 additional beds to better service the SMI population.

A simiar high security IOP program has been implemneted at RCCC with aditional 24 male beds. SSO and ACMH have added staffing to provide better services to this population.

b) Jail staff shall follow a mental health recommendation to remove a prisoner from Segregation unless such removal poses a current safety risk that is documented. In such a case, the Commander or management-level designee shall be notified and staff shall work to remove the prisoner from Segregation and secure a placement in an appropriate treatment setting at the earliest possible time.

Numerous former inmates who were housed in segregated units have been distributed to the following mental health housing units in collaboration with ACMH:

The MJ implemented a male OPP single celled housing unit with 30 beds on 3-East 100 Pod reduced those on ADSEG. The female IOP program was expanded with 8 additional beds to better service the SMI population.

A simiar high security IOP program has been implemneted at RCCC with aditional 24 male beds. SSO and ACMH have added staffing to provide better services to this population.

D. **Placement of Prisoners with Serious Mental Illness in Segregation**

1.   Prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit (2P, IOP, OPP) will not be placed in Segregation, but rather will be placed in an appropriate treatment setting – specifically, the inpatient unit or other Designated Mental Health Unit providing programming as described in **Exhibit A-2**.

Numerous former  inmates who were housed in segregated units have been distributed to the following mental health housing units in colaboration with ACMH:

The MJ inplemented a male OPP single celled housing unit with 30 beds on 3-East 100 Pod reduced those on ADSEG. The female IOP program was expanded with 8 additional beds to better service the SMI population.

A simiar high security IOP program has been implemneted at RCCC with aditional 24 male  beds. SSO and ACMH have added staffing to provide better services to this population.

 There sometimes is an objective reason or need to keep individuals separated from other inmates for safety or security reasons. Individuals are intergrated into small groups for treatment whenever feasable to prevent segregation. Segregation is never based on SMI.

2.   In rare cases where a prisoner with a mental health condition meeting criteria for placement in a Designated Mental Health Unit presents an immediate danger or significant disruption to the therapeutic milieu, and there is no reasonable alternative, such a prisoner may be housed separately for the briefest period of time necessary to address the issue, subject to the following:

Current Practice and in collaboration with ACMH.  Rarely ever used. Often between the APU or IOP units segregation is not needed.

a)   The prisoner shall receive commensurate out-of-cell time and programming as described in **Exhibit A-2** (including for IOP and OPP, 10 hours/week of group treatment/structured activities, 7 hours/week unstructured out-of-cell time, weekly individual clinical contact) with graduated programming subject to an individualized Alternative Treatment Program.

We are working to meet compliance with feedback from plantiff's counsel. At both facilities, IOP will no longer remove patients that are disruptive without clinical assessment and agreement by ACMH. When patients are moved, they are monitored by ACMH through case management.

Staff now has more options with the MJ single celled OPP pod, expanded female IOP program and RCCC's 24 bed male high security IOP unit.

Inmates in DMHUs housed without a cellmate receive program and recreation time with other inmates. Incentives programs are utilized as advised by ACMH staff. They generally exceed the 17 hour minimum per our weekly reports. ACMH determines when an inmate in these housing facilities must be housed in a solitary cell.  Custody has deferred all decisions related to property and privleges to ACMH unless deemed a safety or sercuirty risk which will be documented with articulable facts.

iv.  Privileges commensurate with the Designated Mental Health Unit program, unless modified in an Alternative Treatment Program based on individual case factors that are regularly reviewed.

Currently 2 dedicated deputies are assigned to the Acute Psychatric Unit (2P) to facilitate programing during the day. Recently their schedule has changed to 12hr day/7 days a week for better availability requested by ACMH. MJ leadership is planning to augment with 2 additional deputies assigned on the night shift in the near future. We are working to meet compliance with feedback from plantiff's counsel.

v.   Daily opportunity to shower.

Current practice. Hygiene opportunities are available during any recreation time and incentivised in some programs

3. A prisoner with Serious Mental Illness requiring restraints (*e.g.*, handcuffs, belly chains, etc.) shall not be denied clinically indicated group or individual treatment due to security factors, absent exceptional circumstances that are documented. Prisoners with Serious Mental Illness housed in Segregation who require restraints when out of cell shall have the opportunity to work their way out of restraints through graduated programming subject to an individualized Alternative Treatment Program.

Current custody practice.

E. **Administrative Segregation**

1. Use of Administrative Segregation

The MJ has implemented ADSEG forms created in collobration with Plantiff's Counsel to objectively determine if an individual should be classified in ADSEG status. There forms are also used to objectively determine if continued ADSEG classification is appropriate consitent with this section.

a) Only the Classification Unit can assign a prisoner to Administrative Segregation.

Current practice.

b) The County may use Administrative Segregation in the following circumstances:

i.   Objective evidence indicates that a prisoner participated in a recent assault and the assaultive behavior involved an assault on staff or visitors, serious injury, use of a weapon, gang removals, or multiple prisoner assaults. Mutual combat situations that do not otherwise qualify for Administrative Segregation are excluded.

At the Main Jail we have implemented ADSEG classificaiton review utilizing objective criteria and forms created with the assistance of DRC/PLO. Those placed in ADSEG are reviewed based on objective factors for segregation.

SSO continues to move towards complinace with input from Plantiffs Councel. While many inmates have been stepped down to GP they remain on floor 8-West. SSO agrees 8-West objectively appears to be a segregated housing unit. With the reduction of COVID Intake Pods, inmates on 8-West who have been stepped down off ADSEG will be redistributed to other floors with less restrictions.

ii.   During a brief investigative period not to exceed ten days while Classification staff attempts to verify the need for Protective Custody or while the prisoner is awaiting transfer to another facility.

We are working to meet compliance with feedback from plantiff's counsel. More serious investigations, such as sexual assault, may take longer to conclude causing segregation to go beyond 10 days.

c)   The Compliance Commander shall have the authority to place prisoners in Administrative Segregation under the following circumstances:

i.   The prisoner poses an extraordinary safety risk and no other housing unit is sufficient to protect the prisoner from harm;

Current practice.

ii.   The prisoner has failed to integrate into a lesser restrictive housing setting because of repeated and recent history of assaultive behavior or current threats of violence associated with being in a lesser restrictive setting; or

Current practice.

iii.   Objective evidence indicates that the prisoner attempted to escape or presents an escape risk.

Current practice.

2.   Notice, Documentation, and Review of Administrative Segregation Designations

a)   The Classification Unit shall document the rationale for designating a prisoner for Administrative Segregation in the classification file using objective evidence. For prisoners younger than 24, the Classification Unit shall consider the prisoner's age as a mitigating factor when assigning the prisoner to Administrative Segregation.

Current practice as age is a potential mitigating factor to classification as an Administrative Segregation inmate. The Post Order regarding this topic has been approved.

b)   Classification shall attempt to down-class prisoners to a lesser restrictive housing setting at the earliest possible opportunity, consistent with safety and security.

Current practice.

c)   County shall provide prisoners in Administrative Segregation with a written notice within 72 hours of the prisoner's initial placement in Administrative Segregation, explaining the reasons for the prisoner's Administrative Segregation designation and how the prisoner may progress to a lesser restrictive housing setting.

Current practice at RCCC and Main Jail

d)   Prisoners housed in Segregation units will, at least every thirty (30) days, receive face-to-face interviews in a private out-of-cell setting, consistent with individual security needs, to discuss progress and compliance with their individual case plan as part of a classification review. Consideration will be given to their mental health and to their appropriateness for transfer to a less restrictive setting.

Current practice

e)   The Compliance Commander or higher-ranked officer will review and approve the decision to designate a prisoner for Administrative Segregation for longer than 15 days.

Current practice

f)   The County shall document the reason the prisoner is retained in the same Administrative Segregation Phase. The prisoner will be given written notice of the reasons the prisoner is being retained in the same Phase of Administrative Segregation and what conduct the prisoner is required to exhibit to progress to a lesser restrictive housing setting.

Current practice

g)   The Compliance Commander or higher-ranked officer must approve the continued retention of a prisoner in Administrative Segregation for longer than 90 days, and the Compliance Commander or higher-ranked officers must reauthorize such placement at least every 90 days thereafter.

Current practice

3.   Administrative Segregation Phases

a)   The County shall develop and implement a phased system for prisoners designated as Administrative Segregation to achieve a lesser restrictive housing setting.

Current practice

b)   Administrative Segregation Phase I:

i.   This is the most restrictive designation for prisoners in Administrative Segregation.

ii.  Prisoners shall be offered a minimum of one hour per day out of cell time for a total of seven hours per week.

Current practice

iii. Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least five of the seven hours per week.

Current practice

iv. Prisoners shall not remain in Phase I for longer than 15 days unless the prisoner engages in new conduct warranting retention in Administrative Segregation as specified in **Section VIII.E.1.b.**

Current practice

c)   Administrative Segregation Phase II:

a)        Prisoners shall be offered a minimum of 17 hours of out of cell time per week.

Current practice at RCCC and NMJ, montitored with weekly reports through WebJPF. Meeting criteria except for those subject to COVID-19 isolation procedures.

b)        Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least 10 of the 17 hours per week.

Current Practice. Inmates not in phase one receive a minimum of 17/week. Currently monitored weekly with out of cell reports… with exception to inmates on COVID-19 Isolation

c)        Prisoners shall be offered the opportunity to program in groups of two to four prisoners, unless pairing with another prisoner is not possible for safety or security reasons, and those reasons are documented by the County.

Current Practice subject to COVID-19 Isolation/Quarantine.

d)        The County shall develop a program of incentives for good behavior.

Plans in place to identify low cost incentives, including eating meals outside of cells and lower restrictive housing.

e)      Prisoners shall not remain in Phase II for longer than 30 days unless the prisoner commits a serious behavioral violation while in Administrative Segregation: fighting; threatening staff or other prisoners; resisting or delaying an order from staff that impedes Jail operations (e.g., failure to lock down); refusing to submit to a search of person or property; destroying or damaging Jail property (excluding property issued to a prisoner and/or minor defacing of property or destruction of low-value property) or facilities; possessing contraband that implicates safety or security (e.g., weapons, razors, unauthorized medication, but not extra clothing, commissary items, or food); cell flooding; tampering with cell locking mechanisms or other security features (e.g., cameras); and/or sexual activity/harassment.  In the event a prisoner engages in a serious behavioral violation, the conduct will be referred to the Classification Sergeant or higher-ranking officer, who shall have the discretion to extend the prisoner's Phase II time by 15 days, and shall develop an individual behavioral management plan, if one does not yet exist, for the prisoner.

F.   **Protective Custody**

1.   When a prisoner faces a legitimate threat from other prisoners, the County will seek alternative housing, by transferring the threatened prisoner to the general population of another facility or unit, or to a special-purpose housing (Protective Custody) unit for prisoners who face similar threats.

Current practice

Current Practice. Inmates who face threats from other inmates are transferred to other housing units of the same classification and not automatically classed to a higher security level.

We are working to meet compliance with feedback from plantiff's counsel.. RCCC currently has re-entry programs for PC classifications and dorm style housing units with open dayroom.

2.  The County will not operate Protective Custody units with Segregation-type conditions of confinement. Prisoners placed in Protective Custody shall have the same programs and privileges as general population prisoners, absent exceptional circumstances that are documented.

At the Main Jail, protective custody inmates are generaly housed on 4-West with access to privileges consistent with general population. As we strive to meet compliance adjustments can be made to individual needs, housing location, and program availablitiy to better serve this population.

Transgender inmates continue to be a challenge. Class Counsel and SSO plan to meet and discuss options including a plan to move transgender inmates to RCCC for more access to programs.

3.  The County shall create a policy that describes the process and criteria for placement of prisoners into Protective Custody. The County shall consult with Plaintiffs to develop such a policy.

Policy yet to be developed.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutanants will make policies related  to the Consent Decree a priority to complete in 2023.

4.  Prisoners who are lesbian, gay, bisexual, transgender, or intersex (LGBTI) or whose appearance or manner does not conform to traditional gender expectations should not be placed in Segregation or Protective Custody solely on the basis of such identification or status, or because they are receiving gender dysphoria treatment.

We are working to meet compliance with feedback from plantiff's counsel.  After meeting with plaintiff's counsel, we have decided to move PSEGs to RCCC in the beginning of 2023 and when COVID protocols allow for more space.  This will help eliminate the PSEGs programing challenges.

a)   When a prisoner who is LGBTI or gender nonconforming faces a legitimate threat, the County shall identify alternative housing, with conditions comparable to those of general population. Privileges and out-of-cell time for this population will be documented and regularly reviewed by supervisory level staff to ensure appropriate housing, out-of-cell-time, and related conditions for this group of prisoners.

See above

b)   In deciding whether to assign a transgender or intersex prisoner to a facility or program for male or female prisoners, the County shall consider on a case-by-case basis whether a placement would ensure the prisoner's health and safety, and the health and safety of other prisoners, giving serious consideration to the prisoner's own views.

Current practice.

c)   Jail staff will receive training on the unique issues of managing transgender prisoners, with refresher training at least bi-annually.

A lesson plan and PowerPoint has been implemented for the topic of Cultural Awareness, which covers managing transgender prisoners.  This training has been  provided in the Adult Corrections Officer Supplemental Core Course starting 2021 with all new hires. This course will  be transitioned into an online bi-annually refresher training.

5.   For prisoners who are LGBTI or whose appearance or manner does not conform to traditional gender expectations, the County shall identify the prisoner's preferred gender of jail staff who will perform searches of the prisoner.  The County shall honor the request except in exigent circumstances when doing so is not possible.

Current practice.  Statement of preference form completed by TGNI prisoners allowing them to request the gender of searching officer.

G.  **Disciplinary Segregation**

1.  The County will not place a prisoner in disciplinary housing pending investigation of, and due process procedures for, an alleged disciplinary offense unless the prisoner's presence in general population would pose a danger to the prisoner, staff, other prisoners or the public.

Current practice.

2.  The County will adhere to a discipline matrix, developed in consultation with Plaintiffs, that clearly defines when disciplinary housing may be imposed.

Current practice.

3.  Prisoners who are found to have violated disciplinary rules following due process procedures will be placed in Segregation only after the County has determined that other available disciplinary options are insufficient, with reasons documented in writing.

Current practice. If an inmates discipline warrants a segregation he/she will be moved to that housing and it is documented.

4.  The denial of out-of-cell time for more than four (4) hours will not be imposed as a sanction absent a formal disciplinary write-up and due process hearing.

Moving towards compliance - At the Main Jail conflicting policy requriements between "Operations Order 7/03 Discipline Plan" and "POST Order Disciplinary Segregation" caused 12 hour lock-downs to be approved by a reviewing supervisor without a due process hearing.

All Shift Supervisors and Watch Commanders have been notifed any denial of out of cell time for more than four (4) hours requires a due process hearing.

5.  Prisoners serving a Disciplinary Segregation term shall receive at least seven (7) hours per week of out-of-cell time. Out-of-cell time with the opportunity to exercise shall be provided to each prisoner one (1) hour a day, seven (7) days per week.

We are working to meet compliance with feedback from plantiff's counsel.  We have been conitnously messaging out-of-cell times to include Disciplinary Segregation.  This is monitored weekly by the Compliance Units.

6.   Prisoners in Disciplinary Segregation shall, absent an individualized assessment of security risk that is documented be provided at least one book (which prisoners may regularly exchange), legal documents, hygiene materials, legal phone calls, and legal visits.

Current practice

Numerous books, recommended by Plaintiff's Counsel, have been purchased.  Book exchange is available daily and upon request.

7.   No Disciplinary Segregation term for non-violent rules violations will exceed 15 days.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

As Covid restrictions lessen, Jail and RCCC Compliance Lieutanants will make policies related  to the Consent Decree a priority to complete in 2023.

8.   The County will, in consultation with Plaintiffs' counsel, modify its inmate discipline policy and practice to limit placements in Disciplinary Segregation conditions to no more than 15 days, absent cases of serious violations stemming from distinct incidents and with Watch Commander-level approval.

Current practice, contained in Discipline Housing Post Order.

9.   No prisoner shall be placed in Disciplinary Segregation for more than 30 consecutive days.

Current practice, contained in Discipline Housing Post Order.

10. If after a Disciplinary Segregation term, Jail staff, with the input of a mental health clinician, determine that the prisoner cannot safely be removed from Segregation, placement on Administrative Segregation status may occur only subject to the process set forth in **Section VIII.E**.

Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER

11. Once a prisoner has been moved out of Disciplinary Segregation, that prisoner shall not be placed back into Disciplinary Segregation absent (a) a new incident warranting discipline, and (b) completion of all mental health review procedures required for new Segregation placements.

Current practice, contained in Discipline Housing Post Order.

H.   **Avoiding Release from Jail Directly from Segregation**

1.  The County will avoid the release of prisoners from custody directly from Segregation-type housing, to the maximum extent possible.

We are working to meet compliance with feedback from plantiff's counsel.  This has been added to Administrative Segregation Post Order

2.  If a sentenced prisoner housed in Segregation has an upcoming expected release date (i.e. less than 120 days), the County will take and document steps to move the prisoner to a less restrictive setting, consistent with safety and security needs. If Segregation becomes necessary during this time, the County will provide individualized discharge planning to prepare the sentenced prisoner for release to the community.

We are working to meet compliance with feedback from plantiff's counsel.

As Covid restrictions lessen, Jail and RCCC Compliance Lieutanants will make policies related  to the Consent Decree a priority to complete in 2023. Formal policy will be forthcoming.

## I.  **No Food-Related Punishment**

1.  The County shall modify its policy and take steps to ensure that the denial or modification of food is never used as punishment. The County shall eliminate use of "the loaf" as a disciplinary diet.  Nothing in this paragraph shall be read to preclude the County from denying a prisoner use of the commissary.

Current practice.

## J.  **Restraint Chairs**

1.  Restraint chairs shall be utilized for no more than six hours.

Current practice.

2.  The placement of a prisoner in a restraint chair shall trigger an "emergent" mental health referral, and a qualified mental health professional shall evaluate the prisoner to assess immediate and/or long-term mental health treatment needs.

Current practice.

3.  The opinion of a qualified medical professional on placement and retention in a restraint chair will be obtained within one hour from the time of placement.

Current practice.

IX.     **QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT**

A.  **Generally**
B.  **Quality Assurance, Mental Health Care**
C.  **Quality Assurance, Medical Care**