<u>**_Consent Decree in Mays et al v. County of Sacramento_**</u>

**_Fourth_ Monitoring Report of Suicide Prevention Practices**

Submitted by:

Lindsay M. Hayes, Court-Appointed Expert

September 13, 2023

# Introduction

The Sacramento County Jail System consists of the Main Jail located in downtown Sacramento and the Rio Cosumnes Correctional Center (RCCC) located in Elk Grove. The Main Jail has a rated capacity for 2,380 inmates, and the RCCC is rated for 1,625 inmates. As of December 8, 2022, the Mail Jail population was 1,841 inmates, whereas the RCCC held 1,125 inmates. The jail system is operated by the Sacramento County Sheriff's Office (SCSO), Medical services are provided to inmates through the County Department of Health Services' Adult Correctional Services (ACH), whereas mental health services are provided to inmates by Adult Correctional Mental Health (ACMH) through a contractual agreement with the University of California-Davis.

In July 2018, the Plaintiffs (Lorenzo Mays, Ricky Richardson, Jennifer Bothun, Armani Lee, Leertese Beirge, Cody Garland, and other class members) filed a federal class-action lawsuit (*Mays et al v. County of Sacramento*, Case 2:18-cv-02081-TLN-KJN) in the United States District Court, Eastern District of California, alleging constitutional violations for medical and mental health care, suicide prevention, discrimination against people with disabilities, and use of restrictive housing (segregation) in the Sacramento County Jail System. Legal counsel for the parties subsequently negotiated individual remedial plans pertaining to medical care, mental health care, and suicide prevention, and those individual plans were then incorporated into a single global remedial plan within the proposed *Consent Decree*. It was further agreed that issues pertaining to discrimination against people with disabilities and use of restrictive housing within the jail system would be monitored by Plaintiffs' counsel. The proposed *Consent Decree* was filed in June 2019 and approved by the federal court on January 13, 2020. Three court-appointed experts (Madeleine LaMarre/Angela Goehring (joint medical experts), Mary Perrien, and Lindsay Hayes) were subsequently assigned to monitor the implementation of the Consent Decree. Exhibit A, located at pages 15 through 119 of the *Consent Decree* contains the agreed-upon Remedial Plan for *Mays et al v. County of Sacramento*.

To date, the Defendants have filed timely "status reports" every 180 days. The status reports are required pursuant to the Consent Decree to "1) include a description of the steps taken by defendant to implement each provision set forth in the remedial plan; and 2) specifies provisions of the remedial plan which have not yet been implemented. With respect to the provisions of the Remedial Plan not yet implemented, Defendant's Status Report shall (i) describe all steps taken by the Defendant toward implementation; (ii) set forth with as much specificity as possible those factors contributing to non-implementation; and (iii) set forth a projected timeline for anticipated implementation based on the best information available to Defendant" (at pages 3-4).

This current *Fourth Monitoring Report* covers the time period of August 2022 through January 2023. Therefore, Sacramento County's *Sixth* Status Report, filed on January 9, 2023, was reviewed and utilized in this report.

# Monitoring Compliance with the *Consent Decree*

The *Consent Decree* offers limited guidance to the court-appointed experts regarding the measurement of compliance with the Remedial Plan, simply stating that the Defendant is in substantial compliance or not in substantial compliance with an individual provision. The term "substantial compliance" was not defined. The *Consent Decree*, however, does state that the "Defendant may, after conferring with Plaintiffs' counsel, request a finding by the Court that the Defendant is in substantial compliance with one or more components of the Remedial Plan and has maintained such substantial compliance for a period of at least 12 months" (at page 11). In an effort to more accurately measure compliance with the provisions of this *Consent Decree*, as well as to provide guidance to the parties, the court-appointed experts subsequently decided to create a three-tier system for the measurement of compliance. Each of the experts have utilized such a system in prior federal court monitoring assignments. As such, the court-appointed experts agreed to the following definitions for compliance measurement for each of the provisions in this Remedial Plan:

> **Substantial Compliance** indicates that the Defendant has achieved compliance with most or all components of the relevant provision of the Remedial Plan for both the quantitative (e.g., 90% performance measure) and qualitative (e.g., consistent with the larger purpose of the *Decree*) measures. If an individual compliance measure necessitates either a lower or higher percentage to achieve substantial compliance, it will be so noted by the expert. Compliance has been sustained for a period of at least 12 months.

> **Partial Compliance** indicates that compliance has been achieved on some of the components of the relevant provision of the Remedial Plan, but significant work remains. A minimum requirement is that for each provision, relevant policies and procedures must be compliant with Remedial Plan requirements, contain adequate operational detail for staff to implement the policy, staff trained, and the County has begun implementation of the policy.

> **Non-Compliance** indicates that most or all of the components of the relevant provision of the Remedial Plan have not yet been addressed and/or have not yet been met.

# Fourth Monitoring Report

This expert was appointed to monitor the suicide prevention provisions of the *Consent Decree*. There are **63** suicide prevention provisions listed under Section VII (pages 41 through 50) of the Remedial Plan.

Consistent with the three previous monitoring reports, this *Fourth Monitoring Report* is formatted to present each provision, followed by the provision's current status or rating (substantial, partial, or non-compliance) as determined by the court-appointed expert, a discussion section which provides justification for each rating, recommendations offered to raise each status to substantial compliance, and the evidentiary basis utilized in monitoring each provision. In addition to the

documents listed below, this report is based upon the expert's three-day on-site assessment conducted on December 6-8, 2022.

Documents Requested

In November 2022, this expert submitted a suicide prevention and quality assurance and continuous quality improvement document request to Sacramento County Defendant. The request included the following suicide prevention documents:

1) Any updated Sacramento County Sheriff's Office (SCSO) policies, procedures, and directives relevant to suicide prevention, including the finalized Policy 722: *Suicide Prevention and Intervention*, with effective date;

2) Any updated Adult Correctional Health (ACH) policies, procedures, and directives relevant to suicide prevention;

3) Any updated Adult Correctional Mental Health (ACMH) policies, procedures, and directives relevant to suicide prevention and mental health services;

4) Any new or updated training curriculum regarding pre-service and in-service staff training, as well as curricula, handouts, etc., regarding suicide prevention and mental illness;

5) Documentation of overall staff completion rates for suicide prevention and first aid/CPR training presented as follows (using numerator/denominator):

- % of all officers received suicide prevention training during previous 12 months or during 2022

- % of all medical staff received suicide prevention training during previous 12 months or during 2022

- % of all mental health staff received suicide prevention training during previous 12 months or during 2022

- % of all officers currently certified in CPR

- % of all medical staff currently certified in CPR

6) Entire case files (jail, medical, and mental health), investigative reports, and mortality reviews of all inmate suicides from January 2022 to present;

7) List of inmates with serious suicide attempts (incidents resulting in medical treatment and/or hospitalization) for the period of January 2022 to present;

8) Listing of inmates on suicide precautions from July 1, 2022 to November 30, 2022 (including those housed in safety cells, SITHU, and acute psychiatric unit);

9) Custody Logs and Custody Instruction Sheets for all inmates on suicide precautions in October 2022 and November 2022 (can be provided as originals or hard-copies for onsite inspection only);

10) Listing of all inmates confined in safety cells (including ad seg and sobering cells) in October 2022 and November 2022 (include length of stay);

*Quality Assurance and Continuous Quality Improvement*

11) All policies, procedures, directives (including draft) related to quality assurance and continuous quality improvement for suicide prevention;

12) Provision VII.R)5. of the *Mays* Consent Decree requires:

> "The County shall implement a continuous quality assurance/quality improvement plan to periodically audit suicide prevention procedures that include, but are not limited to: intake screening (to include audits to ensure that staff ask and record all suicide screening questions), mental health assessments, suicide risk assessments, crisis response, and treatment plans/behavior management plans for prisoners identified as being at risk of suicide or self-harm."

As such, provide all available documentation that addresses the above quality assurance requirements from May 2022 to present; and

13) In addition to the *Mays* Consent Decree approved in January 2020, the parties entered into a Memorandum of Agreement (MOA) on May 27, 2022 regarding the correction of several critical remedial provisions of Mental Health and Suicide Prevention. The MOA requires the County to develop a specific quality assurance process to address several provisions, including the "Use of Safety Smocks" and "Privileges" for inmates on suicide precautions. The requirements include:

> "9. Staff compliance with safety smock policies to prevent overuse and/or unnecessary use of safety smocks will be subject to a *documented quality assurance process for at least 12 months from the date of this Memorandum of Agreement*, with quality assurance review at the monthly Suicide Prevention Subcommittee meetings.
>
> > a. *Health care and custody supervisors will conduct at least weekly reviews of safety smock use to ensure proper implementation*, with corrective action taken when warranted.

18. Staff compliance with the protocols set forth above (regarding privileges and property) will be subject to a *documented quality assurance process for at least 12 months from the date of this Memorandum of Agreement*, with quality assurance review at the monthly Suicide Prevention Subcommittee meeting (emphasis added).

> a. *Mental health, and custody supervisors will conduct at least weekly reviews to ensure proper implementation*, with corrective action taken when warranted."

As such, provide all available documentation that addresses the above quality assurance requirements from May 2022 to present.

<u>Documents Received and Reviewed</u>

Sacramento County's *Sixth* Status Report (January 9, 2023).

Photographs and PowerPoint Slides of remodeled intake area at Main Jail, January 11, 2023.

Meeting minutes from the *Suicide Prevention Quality Improvement Subcommittee*, August 8, 2022, September 12, 2022, October 18, 2022, November 14, 2022, December 12, 2022, and January 9, 2023.

Minutes from the *Suicide Precautions Multidisciplinary Meeting*, September 7, 2022, October 5, 2022, and November 2, 2022, December 12, 2022, and January 9, 2023.

ACMH - *Suicide Precautions Weekly Review – Monthly Report*, August 8, 2022, September 12, 2022, October 10, 2022, November 14, 2022, and January 9, 2023.

ACMH - *Four-Hour and Six-Hour timelines to Care for Patients in Safety, Sobering and/or Segregation Cells in Booking*, November 8, 2022 and January 9, 2023.

Sample medical chart and custody log review of 14 inmate-patients held in safety, ad seg, and sobering cells in Main Jail booking for suicide risk during on-site assessment.

Sample medical chart review of 12 inmate-patients on suicide precautions in the SITHU (including 3 also admitted to and discharge from) the Acute Psychiatric Unit) of Main Jail during on-site assessment.

Observed ACMH daily rounds of 22 inmate-patients on suicide precautions in booking, SITHU and eight (8) patients in the APU of Main Jail during on-site assessment.

Observed the intake screening process and/or reviewed the intake screening forms in the medical charts of six (6) inmates during the on-site assessment.

Safety Cell (including ad seg and sobering cells) Logs, Length of Stay, December 2022 thru February 2023.

Sample of 19 SITHU Custody Log observation sheets from September through November 2022, as well as Custody Logs for all SITHU inmate-patients during the on-site assessment.

Various training data as of December 31, 2022.

The following policies:

- ACH 05-05: Nurse Intake, December 1, 2022, final.
- MH-03-06: Acute Psychiatric Unit Psychiatrist Responsibilities, November 30, 2022, final.
- MH-04-09: Acute Psychiatric Unit - Admission, Program, and Discharge, November 30, 2022, final.
- MH-07-09: Constant Observation of Mental Health Patients, January 13, 2023, final
- SCCO Policy 722 Suicide Prevention and Intervention, draft remains pending.

Finally, in Sacramento County's *Sixth* Status Report (January 9, 2023), various challenges, implications, and implementation status for all medical, mental health, and suicide prevention provisions the *Consent Decree* were presented. Continuing challenges included the aftereffects of COVID-19 and negative consequences to staffing and future recruitment.  Staffing deficiencies have impacted the ability of custody staff to consistently escort inmates to medical and mental health appointments.  The antiquated design of the Main Jail continues to severely impact the ability to screen, assess, and provide treatment to suicidal inmates in a confidential setting. In addition, the County announced that:

"The proposal to move of the Acute Psychiatric Unit from 2P to the 3rd floor was heard at the December 7, 2022 Board of Supervisors meeting to increase beds from 17 to 38 (ten of these cells are now used for inmates who are suicidal and require close monitoring).  This plan will free up 2P space to serve as a close observation unit for medical staff.  This is especially needed for withdrawal management and other medical conditions requiring frequent monitoring.  This space is adjacent to medical housing and the nursing station. The plan was approved by the Board on December 8, 2022. At the same hearing the Board approved moving forward with

plans to construct a new intake/health facility on the vacant lot next to the Main Jail. It is anticipated that this project will take at least five years to complete."

# Conclusion[1]

The *First Monitoring Report* resulted in **53** of the 63 total suicide prevention provisions in Partial Compliance, with **10** suicide prevention provisions in Non-Compliance. **No** provisions were in Substantial Compliance. No progress was noted in the *Second Monitoring Report* whereby **52** of the 63 total suicide prevention provisions were in Partial Compliance, with **11** suicide prevention provisions in Non-Compliance. **No** provisions were in Substantial Compliance. The *Third Monitoring Report* resulted **7** of the 63 suicide prevention provisions in Substantial Compliance, **48** provisions in Partial Compliance, and **8** provisions in Non-Compliance.

As shown in the table below, this *Fourth Monitoring Report* resulted **9** of the 63 suicide prevention provisions in Substantial Compliance, **46** provisions in Partial Compliance, and **8** provisions in Non-Compliance. In sum, although there has been slight improvement, given the fact that the County has had well over three years to demonstrate measurable compliance (with the federal court approving the *Consent Decree* on January 13, 2020), these findings continue to be disappointing.

| Substantive Area for Suicide Prevention | Total Provisions | Substantial Compliance | | Partial Compliance | | Non-Compliance | |
|---|---|---|---|---|---|---|---|
| | | # | % | # | % | # | % |
| **1st Monitoring Report** (1/19/2021) | 63 | | | 53 | 84% | 10 | 16% |
| **2nd Monitoring Report** (9/10/2021) | 63 | | | 52 | 83% | 11 | 17% |
| **3rd Monitoring Report** (7/1/2022) | 63 | 7 | 11% | 48 | 76% | 8 | 13% |
| **4th Monitoring Report** (8/10/2023) | 63 | 9 | 14% | 46 | 73% | 8 | 13% |

Finally, the parties filed a joint *Status Report RE: Monitoring of Consent Decree Implementation* with the court on June 3, 2022 (Case 2:18-cv-02081-TLN-KJN. Document No. 153). The joint status report was developed following a Dispute Notice letter sent by plaintiffs' counsel on October 29, 2021 "demanding specific actions to implement critical remedial provisions regarding Mental Health and Suicide Prevention on which the County is not in compliance." The parties executed a

---

[1]In the Sacramento County's *Sixth* Status Report, filed on January 9, 2023, it was incorrectly stated on page 7 that the "Suicide Prevention Expert included a summary table containing 63 provisions. Some indicators are rated as a group. Example: Nurse Intake Provision C. has five indicators but rated as one item." This statement is incorrect. As indicated in all monitoring reports, including this *Fourth* Monitoring Report, all provisions are rated individually. For example, Provision C – Nursing Intake Screening has six (6) individual requirements and each is rated separately.

Memorandum of Agreement regarding these issues on May 27, 2022, and the Suicide Prevention provisions of the Agreement are presented as follows:

**SUICIDE PREVENTION**

**Suicide Prevention Policies (Focus Area #1)**

5. Adult Correctional Health, with input from the Subject Matter Experts and Class Counsel, completed revision of its Suicide Prevention policies (Policy No. 01-15 and 02-05) in September 2021.

a. Adult Correctional Health provided a two-hour suicide prevention training to health care staff on several dates between December 2021 and February 2022. Training of custody staff rolled out in March 2022.

b. In February 2022, the County finalized a 4-6 hour suicide prevention training that covers essential aspects of the Remedial Plan as to suicide prevention. The County will utilize a multidisciplinary team to deliver this training to all newly hired mental health, medical, and custody staff. Such training will begin in June 2022 and will be provided on an ongoing basis as staff members are onboarded.

c. The County will adapt the new-staff suicide prevention training referenced in Paragraph (b), above, to cover all essential suicide prevention aspects of the Remedial Plan, including requirements set forth in this Agreement, to be delivered to all current mental health, medical, and custody staff who have not received the new-staff training. The training was reviewed and approved by the Subject Matter Experts. Training has begun and will continue until all staff members are trained.

6. The County will complete revision of the Sheriff's Office's Suicide Prevention policy, procedure, and training, including based on input from the Subject Matter Experts and Class Counsel, to ensure compliance with all relevant Remedial Plan provisions. The County's Suicide Prevention policies, procedures, and trainings will require the following, with appropriate documentation to show proof of practice:

a. Staff will offer patients on suicide precautions a shower at least daily, and upon reasonable request.

b. Staff will provide prompt assistance with hygiene and cleaning to patients on suicide precautions whenever circumstances warrant.

c. Staff will affirmatively offer patients on suicide precautions water at least every two hours, and upon request.

d. Staff will affirmatively offer patients on suicide precautions food at least consistent with normal daily meal provisions, and upon request (e.g., if they missed a meal due to their mental health or suicide observation status).

e. Staff will provide patients on suicide precautions and held in a cell that does not have a toilet access to a toilet promptly upon request.

**Addressing Overuse and Unnecessary Use of Safety Smocks (Focus Area #2)**

7. Adult Correctional Health shall, with input from the Subject Matter Experts and Class Counsel, has finalized revisions to its suicide prevention policies, including to clarify that (a) decisions about the removal of clothing and the issuance of a safety smock to class members on suicide precautions will be under mental health staff authority based on the clinical judgement of a licensed clinician, (b) class members will have clothing restored prior to discharge from suicide precautions and as soon as clinically appropriate while on suicide precautions, and (c) mental health staff will conduct at least daily assessments of a patient's readiness for restoration of clothing and shall document reasons for continued use when indicated.

8. The Sheriff's Department's Suicide Prevention policy and procedure will be revised to align with Adult Correctional Health policy regarding use of safety smocks.

9. Staff compliance with safety smock policies to prevent overuse and/or unnecessary use of safety smocks will be subject to a documented quality assurance process for at least 12 months from the date of this Memorandum of Agreement, with quality assurance review at the monthly Suicide Prevention Subcommittee meetings.

a. Health care and custody supervisors will conduct at least weekly reviews of safety smock use to ensure proper implementation, with corrective action taken when warranted.

b. The Mental Health and Suicide Prevention Subject Matter Experts will monitor safety smock policy implementation and the quality assurance process to ensure compliance with relevant Consent Decree requirements.

**Patient Confidentiality for Suicide Risk Assessments, Mental Health Clinical Encounters (Focus Area #3)**

10. The County has fixed the inoperable telephone inside the designated mental health Interview Room in the Main Jail's intake area, and will take additional steps to improve confidentiality in the Main Jail intake screening area to the greatest extent possible given the deficient physical plant. The Subject Matter Experts will review and assess these modifications on future monitoring visits.

11. As an interim measure to mitigate physical plant deficiencies impacting delivery of care, the County is utilizing two confidential attorney visit booths on the Main Jail's third floor, to improve confidentiality of mental health appointments. These interim measures, along with other measures to address deficiencies in the confidentiality of mental health contacts, will be reviewed by the Subject Matter Experts during on-site monitoring.

12. As an interim measure to mitigate physical plant deficiencies impacting delivery of care, the County will relocate (i) staff currently using Main Jail office space and (ii) storage space to a nearby off-site location, to free up rooms and the Main Jail 3-West classroom that has been used as office space. These spaces will be repurposed for confidential individual treatment and group therapy for people in the Intensive Outpatient Program or otherwise requiring mental health treatment.

The Subject Matter Experts will assess the adequacy of these spaces during upcoming monitoring visits.

13. The County acknowledges that above-identified interim steps will not be sufficient to facilitate full remediation of the legal and constitutional deficiencies identified in the *Mays* case and addressed in the Consent Decree. Issues regarding provision of patient confidentiality for suicide risk assessments and mental health clinical contacts will be addressed through continued Dispute Resolution processes related to physical plant and staffing deficiencies, as set forth on Pages 10-13, below.

**Direct Observation of Class Members on Suicide Precautions (Focus Area #4)**

14. On November 15, 2021, ACH ordered an end to use of Closed-Circuit TV (CCTV) for purposes of observing class members on suicide precautions. The Mental Health Medical Director followed up with all psychiatry staff.

15. Adult Correctional Health, with input from the Subject Matter Experts and Class Counsel, finalized Policy No. 02-05 – Suicide Prevention Program on November 16, 2021, which removes CCTV observation and provides for direct observation consistent with Consent Decree requirements.

16. The Subject Matter Experts will evaluate implementation of suicide precaution observation practices during upcoming monitoring visits.

**Appropriate Provision of Privileges and Property for Class Members on Suicide Precautions (Focus Area #5)**

17. Adult Correctional Health shall, with input from the Subject Matter Experts and Class Counsel, finalized revisions to its suicide prevention policies to reflect Remedial Plan requirements regarding privileges and property for patients on suicide precautions. The Sheriff's Office's Suicide Prevention policy and procedure will be revised to align with Adult Correctional Health policy regarding privileges and property for patients on suicide precautions. These policies specifically shall provide:

a. Mental health staff shall have primary responsibility to determine, based on clinical judgment and on a case-by-case basis and in consultation with custody staff, the provision of: • Routine privileges (e.g., visits, telephone calls, recreation) that are otherwise permitted based on a person's classification security level • Clothing and possessions (e.g., books, slippers/sandals, eyeglasses) that are otherwise permitted based on a person's classification security level

b. Patients placed on suicide precautions shall be re-evaluated at least daily to assess clinical readiness for personal and jail-issued possessions, clothing, and privileges.

c. Placement on suicide precautions shall not preclude patients from receiving timely and regular access to (i) meals, (ii) liquids, (iii) prescribed medication, (iv) toilets, and (v) showers.

d. The County shall ensure full implementation of the requirements as set forth in Paragraph 6, above.

e. Class members on suicide precautions shall be allowed to attend scheduled court proceedings unless the clinician, based upon clinical judgment and in consultation with security staff, determines that transportation to court would adversely impact the individual's condition.

f. The removal of property and/or privileges shall be documented with clinical justification in the patient's medical/mental health record and reviewed on a regular basis. Cancellation of privileges should be avoided whenever possible and utilized only as a last resort.

g. Cell window coverings shall not be used on cells holding any class member on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need, consistent with Remedial Plan Section VII.J. i. Placement of a patient in an opposite gender area (e.g., male placed in suicide precautions cell in female intake area) does not constitute a "security need" for purposes of this remedial provision.

h. The County will provide tear-resistant mattresses for all patients at the acute level of mental health care, in the SITHU, or on suicide precautions for more than four hours (and consistent with Remedial Plan Section VII.O.1).

18. *Staff compliance with the protocols set forth above will be subject to a documented quality assurance process for at least 12 months from the date of this Memorandum of Agreement, with quality assurance review at the monthly Suicide Prevention Subcommittee meeting* (emphasis added).

a. ACH, mental health, and custody supervisors will conduct at least weekly reviews to ensure proper implementation, with corrective action taken when warranted.

b. The Mental Health and Suicide Prevention Subject Matter experts will monitor policy implementation and the quality assurance process to ensure compliance with relevant Consent Decree requirements.

Given the enormity of responsibility to implement and sustain approximately 63 suicide prevention provisions of this *Consent Decree's* Remedial Plan, this expert had previously recommended that the Suicide Prevention Subcommittee meet on a monthly basis (not quarterly as previously practiced) and better focus on ensuring that all suicide prevention provisions of the Remedial Plan are implemented and sustained. The Defendants agreed, and began holding monthly Suicide Prevention Subcommittee meetings in November 2021. As noted in the above detailed Memorandum of Agreement, the Suicide Prevention Subcommittee now has the specific quality assurance responsibility to ensure "staff compliance" with the suicide prevention provisions of the Remedial Plan, "for at least 12 months from the date of this Memorandum of Agreement," including the five focus areas offered above.

Because the Memorandum of Agreement (MOA) was executed on May 27, 2022 which followed this expert's on-site assessment of February 21-23, 2022, the "critical remedial provisions" contained in the MOA were not further scrutinized during the previous assessment, but will now be addressed beginning within this *Fourth Monitoring Report*.

# CONSENT DECREE/REMEDIAL PLAN

## VII.  <u>SUICIDE PREVENTION</u>

| | |
|---|---|
| **Provision A) Substantive Provisions** | **1. The County recognizes that comprehensive review and restructuring of its suicide assessment, monitoring, and prevention practices are necessary to address the risk of suicide and self-harm attendant to detention in a jail setting.**<br><br>**2. The County shall establish, in consultation with Plaintiffs' counsel, a new Suicide Prevention Policy that shall be in accordance with the following:** |
| **Status** | **Partial Compliance** |
| **Discussion** | This provision is interpreted as a "catch-all" provision for all suicide prevention-related provisions, therefore, this provision cannot come into substantial compliance until all of the provisions under Suicide Prevention come into substantial compliance.<br><br>The Sacramento County Sheriff's Office (SCSO), Adult Correctional Health (ACH), and the University of California – Davis, Department of Psychiatry and Behavioral Sciences (referred here as "Adult Correctional Mental Health-ACMH") previously each had varying suicide prevention policies.  Pursuant to the requirements of the Consent Decree, these policies were in need of varying degrees of revision.<br><br>To date, and at the recommendation of this expert, ACH and ACMH have combined their respective suicide prevention policies into a joint policy entitled "ACH PP 02-05 Suicide Prevention Program" policy that was approved and became effective on November 16, 2021. In addition, several other suicide prevention-related policies were also developed during previous review periods, including the "ACH 01-15: Suicide Prevention Subcommittee" policy that was approved and effective on September 17, 2021; the "MH-04-09: Acute Psychiatric Unit - Admission, Program, and Discharge" policy that was approved and effective on May 6, 2022, last revised November 30, 2022; the "ACH 04-07: Acute Psychiatric Unit – Precautions and Observations" policy that was approved and effective on June 22, 2022; and "ACH 07-09: Constant Observation of Mental Health Patients" policy that was approved and effective on January 13, 2023.<br><br>The SCSO provided this expert with a draft "Suicide Prevention and Intervention" policy (No. 722) during the February 2022 on-site assessment. On March 4, 2022, this expert provided extensive edits to the draft policy based |

| | |
|---|---|
| | upon the requirement to ensure the policy is consistent with the ACH PP 02-05 Suicide Prevention Program policy, as well as *Consent Decree* requirements.<br><br>Sacramento County's response to this provision, as contained in the *Fifth* Status Report (June 16, 2022), was that "The Sheriff's Office is in the process of revising all of its policies. They will be working with Lexipol to accomplish this. They have indicated that all of the orders related to the Consent Decree will be their priority. We have identified a list of policies we would like them to start on. The Suicide Prevention policy was sent to plaintiff's counsel and we have received feedback and currently reviewing.  We should be sending another draft copy to plaintiff's counsel and MH SMEs for review by July 2022."<br><br>Sacramento County's *Sixth* Status Report (January 9, 2023) stated that "The Suicide Prevention policy language has been agreed upon by Class Counsel and SSO. The policy is being reviewed by Executive Staff and publishing is forthcoming any day." In early April 2023, the County again forwarded a revised draft for review. On April 12, 2023, this expert again provided extensive comments to the draft policy. To date, a revised draft policy has not been received.<br><br>In conclusion, because the County's suicide prevention policy has <u>not</u> been finalized, as well as the fact that all suicide prevention-related provisions are in varying degrees of compliance, this provision remains in Partial Compliance. |
| **Recommendations** | SCSO should finalize SCSO Policy 722: Suicide Prevention and Intervention, provide final draft to expert for approval, and then provide documentation that all custody personnel have been trained on the new policy. |
| **Evidentiary Basis** | Sacramento County's *Fifth* Status Report (June 16, 2022).<br>Sacramento County's *Sixth* Status Report (January 9, 2023).<br>Review of the following suicide prevention-related policies:  ACH No. 02-05, Suicide Prevention Program policy, effective November 2021; MH-04-09: Acute Psychiatric Unit - Admission, Program, and Discharge policy, effective May 6, 2022; ACH 01-15: Suicide Prevention Subcommittee" policy, effective on September 17, 2021; ACH 04-07: Acute Psychiatric Unit – Precautions and Observations policy, effective June 22, 2022; and SCSO "Suicide Prevention and Intervention" policy (No. 722), last revised April 2023, pending. |

| | |
|---|---|
| **Provision B)<br>1. Training** | **1. The County shall develop, in consultation with Plaintiffs' counsel, a four- to eight-hour pre-service suicide prevention curriculum for new Jail employees (including custody, medical, and mental health staff), to be conducted in person in a classroom or virtual classroom setting, that includes the following topics:**<br><br>a) avoiding obstacles (negative attitudes) to suicide prevention;<br>b) prisoner suicide research;<br>c) why facility environments are conducive to suicidal behavior;<br>d) identifying suicide risk despite the denial of risk;<br>e) potential predisposing factors to suicide;<br>f) high-risk suicide periods;<br>g) warning signs and symptoms;<br>h) components of the jail suicide prevention program<br>i) liability issues associated with prisoner suicide;<br>j) crisis intervention. |
| **Status** | **Partial Compliance** | |
| **Discussion** | Following several years of prolonged delay, the four-hour pre-service suicide prevention curriculum entitled "Suicide Prevention and Detection in Jail" was finalized and approved on February 7, 2022. The curriculum, an 185-slide PowerPoint presentation, was developed by a 10-member training subcommittee of the Suicide Prevention Subcommittee utilizing this expert's *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities* as a resource guide. Finally, there was acknowledgment that, consistent with Consent Decree requirements, both the pre-service and the annual suicide prevention training would always be conducted "live" in person in a classroom or virtual classroom setting. Pre-service training utilizing the new curriculum was initiated in June 2022.<br><br>According to Sacramento County's *Sixth* Status Report (January 9, 2023), "As part of pre-service training, the Adult Corrections Officer Supplemental Core Course has been revised where Module 19.0 addresses suicide prevention. This section has been approved by the Board of State & Community Corrections (BSCC) as well as the Standards and Training for Corrections (STC).....New employees have received the 4-hour suicide prevention training since May 22, 2022."<br><br>Training data received by this expert on January 5, 2023 indicated the following rates of compliance for the four-hour pre-service suicide prevention training:<br><br>Custody: <u>86%</u> (combined pre-service and two-hour annual)<br>Medical: <u>56%</u> (includes registry staff)<br>Mental Health: <u>86%</u> |

|  | In conclusion, the pre-service suicide prevention curriculum was finally developed and became active in June 2022. According to current training data, custody, medical, and mental health personnel remain below 90 percent compliance. This provision will be moved to Substantial Compliance when all three disciplines meet the 90 percent training compliance threshold. |
|---|---|
| **Recommendations** | 1) On an on-going basis, provide documentation of all new custody, medical, and mental health personnel who have regular contact with inmates that have been hired since June 2022, and the number of these employees who have completed the pre-service suicide prevention training program. Percentages should be provided for each discipline.<br>2) The SCSO should separate out both the four-hour pre-service and two-hour annual training data for custody personnel. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>"Suicide Prevention and Detection in Jail," four-hour, 185-slide PowerPoint presentation, effective February 7, 2022.<br>Training data as of December 31, 2022. |

| **Provision B) 2. Training** | **The County shall develop, in consultation with Plaintiffs' counsel, a two-hour annual suicide prevention curriculum for all custody, medical, and mental health staff, to be conducted in person in a classroom or virtual classroom setting, that includes:**<br><br>**a) review of topics (a)-(j) above**<br>**b) review of any changes to the jail suicide prevention program**<br>**c) discussion of recent jail suicides or attempts** |
|---|---|
| **Status** | **Partial Compliance** |
| **Discussion** | See full discussion above in **Provision B) 1. Training**.<br><br>The two-hour "Suicide Prevention: An Overview," 70-slide PowerPoint presentation, was finalized and approved on January 21, 2022. It was based upon this expert's *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities*.<br><br>According to Sacramento County's *Sixth* Status Report (January 9, 2023), "All current employees have received the 2-hour suicide prevention training developed in collaboration with the mental health SMEs."<br><br>Training data received by this expert on January 5, 2023 indicated the following rates of compliance for the two-hour annual suicide prevention training:<br><br>Custody: 86% (combined pre-service and two-hour annual)<br>Medical: 79% (includes registry staff)<br>Mental Health: 99% |

| | |
|---|---|
| | In conclusion, provision will be moved to Substantial Compliance when custody and medical personnel join mental health staff in meeting the 90 percent training compliance threshold. This provision remains in Partial Compliance. |
| **Recommendations** | 1) *Twice a year in January and June, provide updated data on the total number of current employees for each discipline (i.e., denominator), and the total of current employees (i.e., numerator) who received the two-hour suicide prevention training by discipline* (emphasize added).<br>2) The SCSO should separate out both the four-hour pre-service and two-hour annual training data for custody personnel. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>"Suicide Prevention: An Overview," two-hour, 70-slide PowerPoint presentation, effective January 21, 2022.<br>Training data as of December 31, 2022. |

| **Provision B)**<br>**3. Training** | **Custody officers assigned to Designated Mental Health Units shall receive additional specialized training on suicide prevention and working with prisoners with serious mental illness.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Similar to previous reports, Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was "IOP and JBCT Deputies receive 24 hours of advanced CIT training. Several IOP/JBCT Deputies also attended negotiation training specific to custody."<br><br>As initially stated in the *First Monitoring Report* and repeated here again, although the provision of CIT and negotiation training to IOP/JBCT deputies fulfills a portion of this provision, it was unclear as to the percentage of custody personnel that were trained, as well as no indication whether deputies assigned to all Designated Mental Health Units [i.e., the Suicidal Inmate Temporary Housing Unit (SITHU), acute psychiatric unit, IOP, and JBCT] completed the training. In addition, no current training data was provided. This provision remains in Partial Compliance. | |
| **Recommendations** | In the future, any training compliance data for custody personnel should always include: a) the number of current custody personnel assigned to the Designated Mental Health Housing Units (the denominator), and b) the number of current custody personnel receiving specialized suicide prevention and mental health training (the numerator). | |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023). | |

| Provision B) 4. Training | **All mental health staff, including nurses, clinicians, and psychiatrists, shall receive additional training on how to complete a comprehensive suicide risk assessment and how to develop a reasonable treatment plan that contains specific strategies for reducing future suicidal ideation.** | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | This expert previously reviewed the 103-slide PowerPoint presentation entitled "Suicide Assessment in Jail" that was developed for UC-Davis by Joseph Obegi, PsyD. The curriculum was very comprehensive, and included instruction on safety planning. Sacramento County's response to this provision, as authored by ACH in the *Sixth* Status Report (January 9, 2023), was: "The Suicide Risk Assessment training was approved by the SME and staff are being trained." According to training data provided on August 7, 2023, 100 percent (45 of 45) of APU nurses, clinicians, and psychiatrists received suicide risk assessment (SRA) training as of December 2022. This provision remains in Substantial Compliance. | |
| Recommendations | None | |
| Evidentiary Basis | Sacramento County's *Sixth* Status Report (January 9, 2023). 103-slide PowerPoint presentation entitled "Suicide Assessment in Jail." Training data, December 2022. | |

| Provision B) 5. Training | **All mental health staff and custody officers shall be trained on the appropriate use of safety suits, i.e., not to be utilized as a default, not to be used as a tool in behavior management, not to be utilized for patients being observed at 30-minute observations.** | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous status reports and simply stated "Safety suits are used at the discretion of ACMH based on collaboration with custody staff and not as a behavior management tool." This response did not address training. ACMH previously developed an 18-slide PowerPoint presentation entitled "Suicide Precautions: Observation, Housing, Clothing, Item Restriction, and/or Privilege Restrictions." The presentation clearly states on slide 13 that "*Safety suits are __not__ to be used as/for…a default clothing for patients evaluated or pending evaluation for DTS, DTO, or GD*." Neither SCSO or ACMH initially provided any current training data for this requirement. | |

|  | According to an ACMH response to the expert on August 7, 2023, "Safety smock use, privilege and item restriction are covered in the Suicide Prevention Training (2 hr: slides 52-60 & 4 hr: slides 130-154). When we initially rolled out the Suicide Precautions form (2021) we provided training to the Sgts and some of the booking deputies. However, on an ongoing basis this has not been provided to SSO since *we cover these requirements in Suicide Prevention training*. We continue to provide the training for our clinicians at their initial 5150 certification training and bi-annually as an update. It was developed to help our clinicians understand how to use the form and their specific responsibilities for determining or discontinuing suicide precautions.<br><br>In conclusion, because training regarding the proper use of safety suits is now embedded in the two-hour annual suicide prevention training (see **Provision B) 2. Training** above), and the SCSO reported that 86 percent (combined pre-service and two-hour annual) received such training (below the 90% performance threshold for Substantial Compliance), this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>Medical chart review.<br>ACMH's 18-slide PowerPoint presentation entitled "Suicide Precautions: Observation, Housing, Clothing, Item Restriction, and/or Privilege Restrictions," September 2021.<br>Training data, December 2022. |

| **Provision B) 6. Training** | **The County shall ensure that all staff are trained in the new Suicide Prevention Policy.** | |
|---|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth Status Report* (January 9, 2023), stated that "The SSO Suicide Prevention policy language has been agreed upon by Class Counsel and SSO. The policy is being reviewed by Executive Staff and publishing is forthcoming any day. When published, each Sheriff's Office staff member must read and acknowledge the policy."<br><br>To date, the policy has not yet finalized its suicide prevention policy, and all staff have not completed the annual suicide prevention training based, in part based on the ACH 02-05: Suicide Prevention Program policy. This provision remains in Non-Compliance. | |
| **Recommendations** | 1) Finalize the revised draft SCSO suicide prevention policy; provide the revised draft suicide prevention policy to expert for final review. | |

| | 2) Provide documentation that all current custody personnel have reviewed SCSO Policy 722: Suicide Prevention. |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023). SCSO Policy 722: Suicide Prevention, pending. |

| **Provision C) 1. Nursing Intake Screening** | **Intake screening for suicide risk will take place at the booking screening and prior to a housing assignment. If clinically indicated, JPS will then perform an additional clinical assessment after the inmate is placed in a housing assignment.** |
|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the *Sixth* Status Report (January 9, 2023), repeated narrative in previous status reports as follows: "Staff made significant revisions to the Nurse Intake policy and form based on feedback from Experts. The revised Nurse Intake form was implemented in November 2021…. See Medical Care Intake Screening (Provision B.) for more detail….Staff are developing training for intake nurses on screening for mental health issues, suicide risk assessment screening, danger-to-self or others and grave disability and referral process for emergent MH evaluations. Formal Intake training by the Training Coordinator began December 2022…. Due to ongoing challenges with Intake nursing asking all suicide risk screening questions, QI Nursing will begin onsite monitoring of the nurse intake process, including suicide risk assessment questions to ensure compliance with screening requirements." |

The "Nurse Intake: Intake Health" screening template is embedded in the "Athenahealth" electronic health record (EHR) and contains the following Suicide Risk Inquiry:

1) Have you ever considered suicide?
2) Have you recently experienced a significant loss (relationship, death of family member/close friend, job etc.)?
3) As a family member/close friend ever attempted or committed suicide?
4) Are you now or have you ever received either outpatient or inpatient mental health treatment?
5) Have you ever attempted suicide or engaged in self-harm behavior?
6) Do you feel there is nothing to look forward to in the immediate future (expressing helplessness and/or hopelessness)?

7) Do you have an upcoming court hearing that you are particularly concerned about?

8) *After reviewing the active and inactive problem list, was the inmate a suicide risk or receiving mental health services during any prior confinement within this facility (i.e., on suicide precautions, attempted suicide, 2P Pre-admit, FOSS level indicated, etc.)?*

9) Are you thinking about hurting and/or killing yourself?

With the exception of Question 8, all of the questions are required to be asked of the inmate and their self-reported responses entered into the EHR. Question 8 requires the nurse to review the EHR to determine whether or not the inmate had previously been confined in the Sacramento County jail system and was previously identified as either a suicide risk or receiving mental health services.

As detailed in prior monitoring reports, this expert has consistently found that intake nurses were observed to be not asking all of the required questions in the Suicide Risk Inquiry section of the intake screening form, as well as falsely documenting in the EHR that they had asked those questions and reviewed the chart (pursuant to Question 8 on the form) regarding an inmate's previous problem list.

This expert again observed the intake screening process on December 6-8, 2022. The screening of six (6) newly admitted inmates by six (6) different nurses was observed. Of the six cases, nursing staff were observed to be asking all of the suicide risk inquiry questions in only two cases. These two cases also resulted in mental health referrals based upon the inmates' reporting of prior mental health treatment.  In the remaining four cases, the four nurses did <u>not</u> ask all of the required suicide risk inquiry questions.

Subsequent medical chart review of these four cases found that, although two inmates had histories of mental health treatment and prior placement on suicide precautions, nurses inserted "no" on Question 8 to indicate the inmates did not have histories of mental health treatment and prior placement on suicide precautions. Based upon the medical chart of these two cases, the nurses' responses not only violated policy, but were a falsification of records.

An additional problematic practice observed during the on-site assessment was that several nurses were observed to preface their Suicide Risk Inquiry questions to inmates by stating: "These are personal, sensitive questions, you can refuse if you want" or "Just to let you know, these are confidential questions." Such a preface was not given to any other questions on the screening form, including any medical questions, could be interpreted as attempting to dissuade a response, and were completely inappropriate.

| | Finally, this expert's observation of the six intake screenings included a case in which a nurse was observed training a new nurse. The nurse trainer was observed to be asking only the following three questions: "Are you currently suicidal?" (Question 9), "Have you ever received mental health services?" (Question 4), and "Have you ever attempted suicide? (Question 5). The nurse trainer was then observed to be informing the trainee that "You only ask the other questions if the inmate says 'yes' to if they are currently suicidal." For any nurse, particularly a nurse trainer, to be violating policy in such a brazen fashion was very disconcerting.<br><br>In addition, a separate review of medical charts by this expert during the current monitoring period found that mental health clinicians consistently completed a suicide risk assessment (SRA) for those inmates referred from intake nurses.<br><br>In conclusion, based upon the continued finding that observed intake nurses were not asking all of the required questions in the Suicide Risk Inquiry section of the intake screening form, as well as falsely documenting in the EHR that they had asked those questions and reviewed the chart regarding an inmate's previous problem list, this provision remains in Non-Compliance. |
|---|---|
| **Recommendations** | 1) As previously recommended, in addition to nursing training in this area, ACH nursing supervisors should audit the intake screening process to ensure that nursing personnel are accurately completing the suicide risk inquiry section of the Nurse Intake Encounter form.<br>2) Audit results and appropriate corrective action that results from on-going deficiencies should be forwarded to the expert. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>On-site observation at Main Jail on December 6-8, 2022.<br>ACH PP 05-05 Nurse intake, revised December 1, 2022. |

| **Provision C)**<br>**2. Nursing Intake Screening** | **All nursing intake screening shall be conducted in an area that provides reasonable sound privacy and confidentiality. If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.** | |
|---|---|---|
| **Status** | Non-Compliance | |
| **Discussion** | ACH 05-05: Nurse Intake policy, effective October 28, 2021 and revised on December 1, 2022, addresses confidentiality during the intake screening process as follows:<br><br>"a. Nurse Intake will be conducted in an area that ensures confidentiality of communications between the nurse and patient. <u>Exception</u>: If there is an individualized determination of safety risk, | |

|  | custody staff are positioned to allow visual observation but sound privacy is maintained.<br>b. The nurse will document whether the encounter was confidential and, if not, the reason it was not and whether efforts were made to maintain privacy."<br><br>During this expert's onsite assessment in December 2022, the nurses' station within the booking area of the Main Jail was being renovated, and the intake screening process was temporarily relocated to an open area of the arresting officers' loop. This area did not provide any privacy or confidentially. By early January 2023, the renovation project had been completed and this expert was provided photographs and PowerPoint slides of remodeled intake area. The photographs depicted a new and clean intake area, but the three open nurses' stations remained alongside each other, separated by partitions. There were no doors to each station, and this expert was subsequently informed that arresting officers would continue to remain in the nurses' station to provide security.  As such, due to the occurrence of multiple intake screenings at the same time, involving multiple nurses, detainees, and arresting officers, privacy and confidentially continues to be compromised.<br><br>Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Sixth* Status Report (January 9, 2023), was omitted.<br><br>In conclusion, despite the above described renovation efforts, the intake screening process in the booking area of the Main Jail remains dysfunctional and very problematic. As such, this provision remains in Non-Compliance. |
|---|---|
| **Recommendations** | As previously offered, the County must explore options to better ensure reasonable sound privacy in the booking area when multiple nurses are conducting intake screening at the same time period. One option would be installation of multiple interview booths similar in design to the current "ACMH Interview Room" located in the booking area. |
| **Evidentiary Basis** | ACH 05-05: Nurse Intake policy, revised December 1, 2022, final.<br>On-site assessment of Main Jail on December 6-8, 2022.<br>Photographs and PowerPoint Slides of remodeled intake area at Main Jail, January 11, 2023. |

| | |
|---|---|
| **Provision C)**<br>**3. Nursing Intake Screening** | **The County shall revise its nursing intake assessment procedures and screening forms to ensure timely identification of acute and high-risk mental health conditions, consistent with the recommendations made by Lindsay Hayes. Intake screening, as documented on screening forms, shall include:**<br><br>**a) Review of suicide risk notifications in relevant medical, mental health, and custody records, including as to prior suicide attempts, self-harm, and/or mental health needs;**<br>**b) Any prior suicidal ideation or attempts, self-harm, mental health treatment, or hospitalization;**<br>**c) Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;**<br>**d) Other relevant suicide risk factors, such as:**<br>    **i. Recent significant loss (job, relationship, death of family member/close friend);**<br>    **ii. History of suicidal behavior by family member/close friend;**<br>    **iii. Upcoming court appearances;**<br>**e) Transporting officer's impressions about risk.** |
| **Status** | **Substantial Compliance** |
| **Discussion** | This expert had previously reviewed and made extensive comments to the "suicide risk inquiry" section of the "Nurse Intake Encounter" form (which is embedded within athenahealth EHR and utilized by nursing staff at booking. The comments included deleting options for "routine" mental health referrals and inserting options for "urgent" and "emergent" referrals to mental health clinicians based upon responses to questions, as well as restructuring certain suicide risk inquiry questions. As described earlier in this report, the revised form now includes the following suicide risk inquiry:<br><br>1) Have you ever considered suicide?<br>2) Have you recently experienced a significant loss (relationship, death of family member/close friend, job, etc.)?<br>3) Has a family member/close friend ever attempted or committed suicide?<br>4) Are you now or have you ever received either outpatient or inpatient mental health treatment?<br>5) Have you ever attempted suicide or engaged in self-harm behavior?<br>6) Do you feel there is nothing to look forward to in the immediate future (expressing helplessness and/or hopelessness)?<br>7) Do you have an upcoming court hearing that you are particularly concerned about?<br>8) After reviewing the active and inactive problem list, was the inmate a suicide risk or receiving mental health services during any prior confinement in this facility (i.e., on suicide precautions, attempted suicide, 2P Pre-Admit, FOSS level indicated, etc.)? |

<table>
<tr><td></td><td>9)  Are you thinking about hurting and/or killing yourself?

Affirmative responses to Questions 1 through 8 require an Urgent mental health referral; whereas an affirmative response to Question 9 require an Emergent MH referral. As noted in the instructions section of the form: "'Yes' responses to multiple questions in the Suicide Risk Inquiry require an Emergent MH referral if behavior was within the previous 30 days, i.e., suicide attempt in the past 30 days AND has nothing to look forward to. Refusal to respond to questions required requires an urgent MH referral."

The revised "suicide risk inquiry" section of the Nursing Intake Encounter form at booking is an excellent achievement. This provision was moved to Substantial Compliance in the *Third* Monitoring Report and remains in Substantial Compliance despite the nursing practices described in Provision C) 1.</td></tr>
</table>

| **Recommendations** | None |
|---|---|
| **Evidentiary Basis** | Revised suicide risk inquiry section to Nurse Intake Encounter form, November 2021. |
|  |  |

| **Provision C) 4. Nursing Intake Screening** | **Regardless of the prisoner's behavior or answers given during intake screening, a mental health referral shall always be initiated if there is a documented history related to suicide or self-harm, including during a prior incarceration.** | |
|---|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Sixth* Status Report (January 9, 2023), was omitted.

As noted in the *First Monitoring Report*, the Problem List embedded within a athenahealth EHR allows for the storage of information regarding an inmate's current and prior medical and mental health history. The Problem List had both an active (highlighted) and inactive view (shaded). Review of various multiple charts indicated that many inmates had both active and inactive mental health problems, including notations for Frequency of Service Scale (FOSS), serious mental illness, suicide attempt, 2P pre-admit, etc. Of note, the designation for "2P pre-admit" was an indication that the inmate had been placed on suicide precautions and was awaiting placement in the 2P-Acute Psychiatric Unit. As noted in the provision above (C) 3., there is a requirement for nursing staff to complete "Review of suicide risk notifications in relevant medical, mental health, and custody records, including as to prior suicide attempts, self-harm, and/or mental health needs." | |

| | As indicated in the previous provision above, nurses who conduct intake screening are required to answer Question 8 of the suicide risk inquiry section by reviewing the EHR of each newly admitted detainee to determine if they had previously been confined in the Sacramento County jail system and, if they had, review the active and inactive Problem List, and determine if the inmate was "a suicide risk or receiving mental health services during any prior confinement in this facility (i.e., on suicide precautions, attempted suicide, 2P Pre-Admit, FOSS level indicated, etc.)? The answer to Question 8 comes from the EHR, <u>not</u> the inmate. |
| | |
| | As noted above, this expert's chart review of the intake screening process on December 6-8, 2022, found continued examples of nurses <u>not</u> accessing the medical charts of newly admitted detainees to determine if they had previously been confined in the Sacramento County jail system and had prior histories of suicide risk and/or mental health services during prior confinement. |
| | |
| | This provision remains in Non-Compliance because, based upon observation of the intake screening process and medical chart review, nursing staff are deliberately ignoring the requirement of Question 8 in the suicide risk inquiry section of the Nurse Intake Encounter form to review the applicable medical chart of newly admitted detainees. |
| **Recommendations** | As previously offered, in addition to nursing training in this area, ACH nursing supervisors should audit the intake screening process and audit medical charts to ensure that nursing personnel are accurately completing the suicide risk inquiry section of the Nurse Intake Encounter form. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>Medical chart review. |

| **Provision C)**<br>**5. Nursing Intake Screening** | **The County shall develop and implement a written policy and procedure for referrals to mental health by intake staff. The policy shall correspond with the triage system and timeframes set forth in the Mental Health Remedial Plan.** | |
|---|---|---|
| **Status** | **Substantial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Sixth* Status Report (January 9, 2023), was omitted.<br><br>Review of two ACH policies (ACH 05-05: Nurse Intake, October 28, 2021, revised December 1, 2022 and MH-01-10: Access to Mental Health Services, August 6, 2021) indicated that they were consistent with this provision. The MH-01-10: Access to Mental Health Services policy specifies that Emergent mental health referrals are required to be responded to "ASAP – within 6 hours," Urgent mental health referrals are required to be responded to "within | |

| | 36 hours," and Routine mental health referrals are required to be responded to "within two weeks." The stated response times are consistent with Consent Decree requirements.<br><br>In conclusion, because this provision requires creation of policies and procedures regarding timely mental health referrals from intake screening for inmates identified as possibly in need of mental health services (excluding suicide prevention), and this expert believes that ACH 05-05: Nurse Intake, October 28, 2021, revised December 1, 2022 and MH-01-10: Access to Mental Health Services adequately address this provision, August 6, 2021) are consistent with the requirements of this provision, this provision remains in Substantial Compliance. However, because this provision is exclusive to inmates in need of mental health services excluding suicide prevention, this expert would defer to the mental health expert in this Consent Decree for any contrary assessment. |
|---|---|
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 05-05: Nurse Intake, October 28, 2021, revised December 1, 2022.<br>MH-01-10: Access to Mental Health Services, August 6, 2021, final. |

| **Provision C)**<br>**6. Nursing Intake Screening** | **Any prisoner expressing current suicidal ideation and/or current suicidal/self-injurious behavior shall be designated as an emergent referral and immediately referred to mental health staff.** | |
|---|---|---|
| **Status** | **Substantial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Sixth* Status Report (January 9, 2023), was omitted.<br><br>In the *Second Monitoring Report*, this expert recommended that 1) The following language should be added to the policy and procedure for mental health referrals by intake staff that is required by Provision (C) 5. above: "a detainee identified at intake (for any time during confinement) as a possible current risk for suicide should be seen by a JPS clinician on an emergent basis, i.e., immediately or within six (6) hours, as well as under constant observation until assessment; whereas a detainee identified at intake with a prior history of suicidal behavior should be seen by a JPS clinician on an urgent basis, i.e., within 36 hours."<br><br>Review of two ACH policies (ACH 05-05: Nurse Intake, October 28, 2021, revised December 1, 2022 and MH-01-10: Access to Mental Health Services, August 6, 2021) indicated that they were consistent with this provision. In fact, the MH-01-10: Access to Mental Health Services policy specifically place this reviewer's recommended narrative into the policy as follows: "A patient | |

|  | identified at intake (or any time during confinement) as a possible current risk for suicide should be seen by a mental health clinician on an emergent basis, as well as under constant observation until assessment; whereas a patient identified at intake with a prior history of suicidal behavior will be seen by a MH clinician on an urgent basis." The ACH 05-05: Nurse Intake policy requires that: "Patients presenting with acute crises such as current suicidal and/or homicidal ideation, acute psychiatric symptoms, posing a danger to self or a danger to others or gravely disabled will prompt an emergent referral to MH and will be seen within 6 hours. Call the MH office at 916-***-**** and document the call. Notify custody and request appropriate housing and constant observation until assessed by a MH clinician."

Review of various medical charts during the current monitoring period found that mental health clinicians continued to consistently respond to emergent mental health referrals from intake for inmates currently at risk for suicide on a timely basis. Of note, mental health clinicians are assigned to the Main Jail 24 hours a day.

In conclusion, because this provision requires creation of policies and procedures regarding timely mental health referrals from intake screening for inmates identified as currently at risk for suicide, the MH-01-10: Access to Mental Health Services policy was revised consistent with this expert's previous recommendation, and medical chart review found that clinicians consistently responded to mental health referrals from intake for inmates currently at risk for suicide on a timely basis, this provision remains in Substantial Compliance. |
|---|---|
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 05-05: Nurse Intake, October 28, 2021, revised December 1, 2022.<br>MH-01-10: Access to Mental Health Services, August 6, 2021, final.<br>Medical chart review. |

| **Provision D) 1. Post-Intake Mental Health Assessment Procedures** | **All mental health assessments shall be conducted in an area that provides reasonable sound privacy and confidentiality. If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was as follows: "Current practice at | |

RCCC.  At Main Jail, inmate privacy is a priority. When ACMH assessments are conducted we offer the maximum level of privacy afforded given the case-by-case safety risk. At Main Jail a private booking attorney booth has been converted to be utilized as a confidential interview room for Mental health assessments. On MJ housing floors, additional booths are in the planning stages and will consist of plexiglass enclosures with doors situated in the indoor rec area of each housing unit. Some booths will have a partition for safety as well as a security desk/chair. Funding and BSCC approval pending. SSO has purchased security desk/chair (same used at Santa Clara SO), which allows leg shackles to be secured.  This allows clinicians to safely speak to higher security inmates in privacy without custody staff standing nearby." The ACMH response to this provision was repeated from prior reports as follows: "MH clinicians document whether assessments are confidential or non-confidential including rationale, if indicated."

Mental health clinicians assigned to the Main Jail continued to utilize various options for their interaction with patients on suicide precautions: 1) a converted attorney booth in booking referred to as the ACMH Interview Room, 2) classrooms on each housing floor (including 300-West Pod that houses the SITHU), 3) the outside control area of 300-West Pod in close proximity to the officer's desk, 4) the SITHU dayroom area, and 5) cell front of the booking cells (safety, ad, seg, or sobering). Cell front, as well as the outside control area of 300-West Pod and the SITHU dayroom area are non-confidential because they are in close proximity to both officers and other inmates. (Of note, this expert was previously informed during the February 2022 on-site assessment, but has not observed to date, that the visiting booths in 300-West Pod were also available for clinical contacts by mental health clinicians.)

During the on-site assessment from December 6-8, 2022, this expert shadowed several mental health clinicians as they were conducting daily assessments of the inmates identified as suicidal. During the three-day period, daily rounds of 22 inmate-patients on suicide precautions in booking and SITHU were observed, as well as rounds for eight (8) patients in the APU. Of those observed assessments, ACMH clinicians offered (and patients accepted) out-of-cell assessments to all 22 patients in booking and the SITHU. These assessments were conducted in either the ACMH Interview Room or in housing unit classrooms.

However, the expert also reviewed the medical charts of 12 inmate-patients who were on suicide precautions for a multiple-day period before, during, and after the most recent on-site assessment. The review period spanned between approximately October 2022 through February 2023 with inmates housed in either the booking area (in safety, ad seg, or sobering cells) or the SITHU. The medical chart review indicated that mental health clinicians consistently offered inmate-patients out-of-cell assessments in 58 percent (7 of 12) of the cases, with 42 percent (5 of 12) of inmate-patients not consistently offered out-

|  | of-cell assessments.  Of note, four (4) of the seven (7) inmate-patients who were offered out-of-cell assessments were said to consistently refuse the offer of confidentiality and the assessments were then conducted cell front. This was contrary to the expert's on-site assessment when few inmate-patients were observed refusing an offer for out-of-cell confidential assessments.

*From this medical chart review, it was determined that confidential settings were utilized more during the expert's on-site assessment, and non-confidential cell front interaction was utilized more when the expert was not on-site. In addition, documentation of inmate-patient refusals for out-of-cell assessments was far greater when the expert was not on-site.*

Finally, the expert observed provider rounds in the 2P-Acute Psychiatric Unit (APU) for eight (8) patients on December 8, 2022. Rounds included a psychiatrist and forensic psychiatric residents/medical students. Because the APU does <u>not</u> have any confidential out-of-cell space, all contacts for these eight (8) patients were provided cell front. On a case-by-case basis depending upon the perceived stability of the patient, the cell door was opened and the provider or psychiatric fellow interacted with the patient in the doorway alongside an officer. Regardless of whether the cell doors were open or closed, <u>all</u> of these provider contacts were non-confidential.

In conclusion, although there continued to be improvement observed during the expert's on-site assessment, the on-going lack of privacy and confidentiality during the daily assessment of suicide risk (including when the expert is not onsite) continues to be an impediment to the County's ability to provide a reasonable suicide prevention program. This provision remains in Partial Compliance. |
| **Recommendations** | 1) As previously recommended, unless exigent circumstances exist and are documented on a case-by-case basis, any inmate identified as suicidal should be given an opportunity for a confidential assessment outside of their cell. This includes initial assessments, daily on-going assessments, discharge assessments, and scheduled follow-up.
2) As previously recommended, additional designated room(s) or areas outside of the Main Jail's booking area, including additional space near 300-West Pod and space within the 2P-APU, that can provide privacy and confidentiality should be created and routinely utilized for the assessment of suicidal inmates. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).
On-site observation on December 6-9, 2023.
Medical chart review. |

| Provision D) 2. Post-Intake Mental Health Assessment Procedures | **Mental health staff shall conduct assessments within the timeframes defined in the mental health referral triage system.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Sixth* Status Report (January 9, 2023), was omitted.<br><br>As this provision is similar to **Provision C) 5. Nursing Intake Screening** above and does not specifically address suicidal inmates, the expert would defer to the mental health expert in this *Consent Decree* as to whether the MH-01-10: Access to Mental Health Services, policy, effective August 6, 2021, satisfies compliance with this provision. At this time, the provision remains in Partial Compliance. | |
| **Recommendations** | None | |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>MH-01-10: Access to Mental Health Services, August 6, 2021, final. | |
| | | |
| Provision D) 3. Post-Intake Mental Health Assessment Procedures | **The County shall revise its mental health assessment procedures and related forms to ensure identification of historical and current patient mental health and suicide risk information, consistent with the recommendations of the subject matter expert.** | |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Sixth* Status Report (January 9, 2023), was omitted.<br><br>As stated in previous monitoring reports, the ACMH Mental Health Assessment is embedded within athenahealth EHR and contains the following domains: Background and Legal Information, Personal History, Medical Information and Significant Health Issues, Substance Abuse History, Mental Health Treatment History, Medication Verification, Mental Status Examination, DSM-V Diagnoses, and Preliminary Treatment Plan. In addition, the ACMH Initial Psychiatric Evaluation is also embedded within athenahealth EHR and contains the following domains: Current Psychotropic Medication, Mental Status Examination, DSM-V Diagnoses, and brief Suicide Ideation inquiry. The current ACMH Suicide Risk Assessment template embedded | |

| | |
|---|---|
| | within athenahealth EHR does contain adequate inquiry regarding prior and current suicide risk behavior.<br><br>The expert would defer to the mental health expert in this Consent Decree as to whether the MH-04-04: Outpatient Mental Health Services and Levels of Care policy, effective October 13, 2021, satisfies compliance with this provision. At this time, the provision remains in Partial Compliance. |
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACMH Suicide Risk Assessment form.<br>MH-04-04: Outpatient Mental Health Services and Levels of Care, October 13, 2021, final. |

| | |
|---|---|
| **Provision E)**<br>**1. Responses to Identification of Suicide Risk or Need for Higher Level of Care** | **When a prisoner is identified as at risk for suicide and placed by custody staff in a safety cell, on suicide precautions, and/or in a safety suit, mental health staff shall be contacted immediately. A qualified mental health professional, or other appropriately trained medical staff in consultation with mental health staff, shall complete a confidential in-person suicide risk assessment as soon as possible, consistent with the "must-see" referral timeline.** |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the Provision D section of the *Sixth* Status Report (January 9, 2023) stated: "MH instituted the 4-hour emergent timeline for patients placed in safety cells (October 2021).  MH is tracking compliance to determine barriers/challenges to meeting the 4-hour timeline to care.  A workflow was developed and training was provided to staff regarding the new timeline to care…. Completed baseline study of MH compliance in meeting four (4)-hour timeline to care for patients in safety cells and presented findings are reviewed at the MH QI Subcommittee Meeting.  Results show that low staffing levels significantly impacted compliance. Regular auditing of MH compliance meeting four (4) and six (6)-hour timelines to care are being completed quarterly and presented to MH QI Subcommittee and Suicide Prevention Subcommittee.  Findings indicated that low staffing levels and high levels of emergent referrals are impacting compliance."<br><br>Consistent with findings from the previous monitoring reports, and following a recent medical chart review, this expert determined that this provision was again in various stages of compliance. Inmates identified as suicidal are often placed on suicide precautions in a safety cell and almost always clothed in a safety smock. Mental health clinicians are immediately notified and required to respond in a timely manner to complete a suicide risk assessment (SRA). |

According to the ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, "If the patient was placed in a safety cell prior to the assessment, the SRA shall be started within 4 hours of the incident. Note: Only referrals of patients placed in safety cells require a 4-hour timeframe. While other emergent referrals shall be consistent with the 6-hour timeframe."

As stated earlier in this report, mental health clinicians consistently responded to emergent mental health referrals for inmates currently at risk for suicide, although it was unclear from medical charts whether the response time was always within six (6) hours.

Since March 2022, ACMH has completed several "Four-hour Timeline to Care Analysis" based upon the number of inmates placed in a safety cell for danger to self. The analysis was subsequently expanded to include all booking cells, including ad seg sobering cells.

The most recent ACMH analysis entitled "Four-hour and Six-hour Timelines to Care for Patients in Safety, Sobering and/or Segregation Cells in Booking," utilizing data from September 2022 through November 2022 found the following:

- "MH's 4-hour timeline to care for patients placed in safety cells improved from last reporting period and percentage of patients seen within timeline increased overall during quarter.
- **MHs overall average response time for emergent referrals of patients in Safety, Segregation and Sobering cells in September was 5.6 hours, October was 6.4 hours and in November was 4.7 hours. This is a significant improvement from last reporting period (June – 6.25 hours, July – 6.0 hours, and August – 7.0 hours).**
- Significant increase in emergent referrals over the past year. 152% increase between November 2021 and November 2022.
- Insufficient staffing to adequately respond to the increase in 4 and 6-hour emergent referrals.
- Clinicians are not consistently documenting why timeline to care was not met (ex. insufficient staffing, custody request, patient under the influence).
- It is not always clear from the Safety Log, the time patient was initially placed in a safety cell and then moved to either a segregation or sobering cell.
- In one case, the patient was referred for evaluation after being in Male Booking for over 20 hours. MH saw this patient within 30 minutes of the referral being received.

|  | • Spot checked SSO reported MH response time against the time MH received the emergent referral and MH's documented response time in EHR.<br>• Overall, SSO's documented "JPS Evaluation" time was validated through EHR. However, in several instances, MH noted different timelines of when the emergent referral was received."<br><br>There continues to be a concern regarding the ACMH methodology. For example, the SCSO provides monthly reports of booking cell (including safety, ad seg, and sobering cells) use. For December 2022, the SCSO reported 16 inmates placed in safety cells, 43 in segregation cells, and 84 in sobering cells, and 2 in multiple booking cells, for a total of <u>145</u> inmates in booking cells. For the same month (December 2022), a more recent ACMH analysis reported data on 17 inmates in safety cells, and only 41 inmates in segregation/sobering cells, for a total of only <u>58</u> in booking cells. The monthly data discrepancy between the SCSO and ACMH analysis was large and unexplained.<br><br>In conclusion, the ACMH analysis found that, as of November 2022, the average clinical response time for emergent referrals of patients confined in safety, segregation, and sobering cells in booking at the Main Jail was 4.7 hours, a significant improvement from August 2022 when the average response time was 7 hours. However, because the data also indicated that between 75-76 percent of patients (below the 90% performance measure for Substantial Compliance) confined in safety, segregation, and sobering cells confined in safety, segregation, and sobering cells were seen by clinicians under the six-hour threshold, this provision remains in Partial Compliance. This provision also requires consistent privacy and confidentiality during the assessment process. |
|---|---|
| **Recommendations** | ACMH should collaborate with the SCSO to ensure receipt of accurate monthly data on booking cell usage. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>"Four-hour and Six-hour Timelines to Care for Patients in Safety, Sobering and/or Segregation Cells in Booking," from December 2022 through February 2023, reported April 10, 2023.<br>"Four-hour and Six-hour Timelines to Care for Patients in Safety, Sobering and/or Segregation Cells in Booking," from September 2022 through November 2022, reported January 9, 2023.<br>"Four-hour and Six-hour Timelines to Care for Patients in Safety, Sobering and/or Segregation Cells in Booking," from June 2022 through August 2022, reported November 8, 2022.<br>SCSO Booking Cell data, December 2022.<br>Medical chart review.<br>ACH 02-05: Suicide Prevention Program policy, November 16, 2021, final. |

| | |
|---|---|
| **Provision E) 2. Responses to Identification of Suicide Risk or Need for Higher Level of Care** | **Consistent with current RCCC policy, if there is no mental health staff on site at RCCC at the time that an emergent mental health need is identified, the prisoner shall be transported to the Main Jail for emergency evaluation within two hours of the initial report.** |
| **Status** | **Substantial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the Provision D section of the *Sixth* Status Report (January 9, 2023) stated: "MH implemented tele-visits for after-hours emergent referrals at RCCC to ensure timely access to care." The SCSO response in the same report stated that: "Current practice.  RCCC at-times will use suicide-resistant cells for IOP inmates based on ACMH recommendations.  This was suggested by the suicide prevention SME."

According to the ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, "If a patient at RCCC requires an emergent referral and an assessment from an MH clinician, and MH staff are not currently present at the RCCC facility: a. The patient will be seen within 6 hours through a video visit that is completed by MH staff at the MJ. b. If the video visit cannot be initiated, the patient will be transported to the MJ within 2 hours for the emergent referral to be completed."

Prior medical chart review indicated that few inmates are identified as suicidal and in need of transport to the Main Jail. However, when it does occur, an inmate identified as suicidal at RCCC continues to be initially seen by a mental health clinician during regular business hours or tele-visit after-hours, and provided with an SRA. If the assessment indicates the need for further suicide precautions, the inmate is transported to the Main Jail. If a clinician is not available on-site or through tele-visit, the inmate is initially housed in the Safety Cell or North Holding No. 2 Cell and then immediately transported to the Main Jail within two hours.

In conclusion, because ACMH has implemented after-hours tele-visits at RCCC to ensure timely responses to emergent referrals, and the ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately addresses this issue, this provision remains in Substantial Compliance. |
| **Recommendations** | This provision should be monitored by the continuous quality improvement process to ensure its sustained compliance, see **Provision R) 5. Quality Assurance and Quality Improvement**. |

| Evidentiary Basis | Sacramento County's *Sixth* Status Report (January 9, 2023). Prior medical chart review. ACH 02-05: Suicide Prevention Program, November 16, 2021, final. |
|---|---|

| Provision E) 3. Responses to Identification of Suicide Risk or Need for Higher Level of Care Provision | **The County shall revise its JPS suicide risk assessment procedures and forms in consultation with Plaintiffs. The County shall ensure that its JPS suicide risk assessment process, policies, and procedures consider and document the following:**<br><br>**a) Review of suicide risk notifications and records from any previous incarcerations at the Jail, including records pertaining to suicide attempts, self-harm, and/or mental health needs;**<br>**b) Other prior suicide ideation or attempts, self-harm, mental health treatment or hospitalization;**<br>**c) Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;**<br>**d) Suicide risk factors and protective factors, such as:**<br>  **i. Recent significant loss (job, relationship, death of family member/close friend);**<br>  **ii. History of suicidal behavior by family member/close friend;**<br>  **iii. Upcoming court appearances;**<br>**e) Transporting officer's impressions about risk;**<br>**f) Suicide precautions, including level of observation.** |
|---|---|
| **Status** | **Substantial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the *Sixth* Status Report (January 9, 2023) stated: "The Suicide Risk Assessment captures the information listed in this provision." This response is correct. As stated in previous monitoring reports, ACMH previously developed a comprehensive suicide risk assessment (SRA) form that is embedded in athenahealth EHR. The form is completed by outpatient LCSW clinicians whenever an inmate is identified at risk for suicide. If the inmate is placed on suicide precautions, a follow-up SRA form is subsequently completed upon a determination that the inmate can be discharged from suicide precautions. Of note, if a patient is placed in the 2P-APU, the SRA is <u>not</u> completed by either nursing or psychiatry staff. Rather, current practices are for an outpatient LCSW clinician (or LCSW assigned to the APU) to complete the SRA. This issue is further discussed in **Provision P) 1. Discharge from Suicide Precautions**.<br><br>In conclusion, this provision remains in Substantial Compliance because the suicide risk assessment form is very comprehensive and the ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains narrative consistent with the requirements of the provision. |

| Recommendations | None |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACMH Suicide Risk Assessment form.<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final. |

| **Provision E)**<br>**4. Responses to Identification of Suicide Risk or Need for Higher Level of Care** | **The County shall ensure that the meal service schedule or other custody-related activities cause no delay in the completion of suicide risk assessments for prisoners.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was "Current practice."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Meal service or other custody related activity shall not cause a delay in conducting suicide risk assessments." To date, the SCSO Policy 722: Suicide Prevention and Intervention is still being revised. Review of various medical charts, as well as on-site observation, did not indicate any impediments to the timely SRA completion.<br><br>In conclusion, because the SCSO Policy 722: Suicide Prevention and Intervention was still being revised, this provision, this provision remains in Partial Compliance. | |
| **Recommendations** | Finalize the SCSO Policy 722: Suicide Prevention and Intervention include the following requirement: "Meal service or other custody-related activity shall not cause a delay in conducting suicide risk assessments." | |
| **Evidentiary Basis** | Sacramento County's *Sixth Status Report* (January 9, 2023).<br>Medical chart review.<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending. | |
| **Provision F)**<br>**1. Housing of Inmates on Suicide Precautions** | **The County's policy and procedures shall direct that prisoners, including those identified as being at risk for suicide, be treated in the least restrictive setting appropriate to their individual clinical and safety needs.** | |
| **Status** | **Non-Compliance** | |

| | |
|---|---|
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was "The Suicide Prevention policy language has been agreed upon by Class Counsel and SSO. The policy is being reviewed by Executive Staff and publishing is forthcoming any day. Current post orders and practice indicate least restrictive housing for suicidal inmates. ACMH staff shall consult with custody staff to determine the appropriate housing location for the inmate." The ACH response in the same report repeated a response from prior status reports as: "MH policies state all patients, including those identified as being at risk for suicide, are treated in the least restrictive setting appropriate to their clinical needs."

Contrary to the above response, any "current post orders" cited above were again not provided to this expert. Review of the ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Patients identified as suicidal will be held in the least restrictive setting appropriate to the individuals clinical and safety needs." To date, the SCSO Policy 722: Suicide Prevention and Intervention is still being revised.

Review of various medical charts, as well as observation from the December 6-8, 2022 on-site assessment, continued to indicate that most inmates placed on suicide precautions were initially housed in safety cells, ad seg cells, and sobering cells located in the Main Jail's booking area and clothed in safety smocks. The expert also found that approximately 45 percent (10 of 22) of inmates observed during mental health rounds of the booking cells and SITHU during the on-site assessment were clothed in safety smocks, a slight improvement from the previous assessment where 59 percent of inmates were clothed in safety smocks.

In conclusion, because current post orders were not provided, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized to incorporate the requirements of this provision, and current practices indicated that almost all inmates initially placed on suicide precautions continue to be housed in booking cells and clothed in safety smocks by default, this provision remains in Non-Compliance.

Of note, as described later in this report, SCSO previously informed the expert that an additional 16 suicide-resistant cells were being renovated in the 3-West Pod. When completed, these additional could conceivably reduce the need for SCSO personnel to house suicidal inmates in booking cells by default.  The issue will be revisited in the up-coming 5th Monitoring Report. |
| **Recommendations** | 1) Finalize the SCSO Policy 722: Suicide Prevention and Intervention include the following requirement: "Patients identified as suicidal will be held in the least restrictive setting appropriate to the individuals clinical and safety needs."
2) Eliminate the practice of utilizing safety, ad seg, and sobering cells as the initial default placement of inmates on suicide precautions. |

| Evidentiary Basis | Sacramento County's *Sixth* Status Report (January 9, 2023). Medical chart review. ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Observation during on-site assessment of December 6-8, 2022. |
|---|---|

| Provision G) 1. Inpatient Placement | **The County shall ensure that prisoners who require psychiatric inpatient care as clinically indicated are placed in the 2P unit within 24 hours of identification, absent exceptional circumstances. In all cases, the provision of clinically indicated treatment to any prisoner requiring inpatient level of care shall be initiated within 24 hours.** |
|---|---|
| **Status** | **Partial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was that: "On December 8, 2022 the Sacramento Board of Supervisors approved to build a Jail Intake and health Services Facility as well as make ADA facility improvement to the current Jail. The inpatient unit will be designed to comply with this 24-hour requirement. There will be an interim solution of converting 3-West 300 Pod to a new expanded psychiatric inpatient unit to move toward compliance with the 24-hour requirement. IOP level of care has been expanded which can help reduce inpatient care requirements." The ACH response in the same report was repeated from previous reports as follows: "MH makes every effort to ensure that patients assessed for the APU are placed in the unit as soon as possible upon bed availability. Patients who are on the pre-admission list beyond 24 hours are assessed daily for continuous need of placement or clearance. ACH has regular meetings with SSO Custody leadership to discuss space needs and options for increasing APU beds."<br><br>The MH-04-09: Acute Psychiatric Unit - Admission, Program, and Discharge policy, effective May 6, 2022 and revised November 30, 2022, addresses the admission process, *excluding* the "24-hours of identification," as follows: "Referring Outpatient clinicians will contact the APU to coordinate the admission of a patient. a. If there is not a bed available on the unit, the patient will be placed on the Pre-Admit List for admission. b. Nursing staff will contact Outpatient staff when there is a bed available."<br><br>The recent medical chart review of inmates placed on suicide precautions continued to find that <u>no</u> patients are ever directly admitted into the APU. Rather, <u>all</u> cases resulted in automatic placement on the 2P Pre-Admit List. In practice, not all inmates placed on suicide precautions were eventually placed in the 2P-APU. In fact, only a small percentage of suicidal inmates were housed on the unit. Rather, most of these inmates were initially housed in booking cells and then either cleared from suicide precautions or transferred to the SITHU where they remained for several days or longer while maintaining a pending |

|  | 2P Pre-Admit order. Eventually, the suicidal ideation and/or behavior of most inmates was resolved and the 2P Pre-Admit order was withdrawn.<br><br>It is the expert's opinion that not all inmates presenting with suicidal ideation and subsequently placed on suicide precautions met the criteria for a 5150 order and placement on the 2P-APU. Such clinical judgment is deferred to the mental health expert in the *Consent Decree*. However, this expert's observation is that, based upon limited bed availability within the 2P-APU, no inmates identified as in need of inpatient psychiatric care are placed in the 2P-APU within 24 hours of identification. This provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | Create more bed capacity within the Acute Psychiatric Unit. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>MH-04-09: Acute Psychiatric Unit - Admission, Program, and Discharge policy, May 6, 2022, final.<br>Medical Chart review.<br>Observation during on-site assessment of December 6-8, 2022. |

| **Provision H)**<br>**1. Temporary**<br>**Suicide Precautions** | **No prisoner shall be housed in a safety cell, segregation holding cell, or other Temporary Suicide Precautions Housing for more than six (6) hours. If mental health or medical staff determine it to be clinically appropriate based on detoxification-related needs, this time limit may be extended to no more than eight (8) hours. If exceptional circumstances prevent transfer within these timelines, those circumstances shall be documented, and transfer shall occur as soon as possible. This does not preclude the housing of a prisoner in the IOP unit if clinically indicated.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was that: "The recently approved Jail Intake and Health Services Facility will bring the County in compliance. The County currently follow these timeframes as much as possible with the limited number of cells in the APU. The addition of 8 female IOP and 24 male IOP beds has brought us closer to compliance. Custody staff places the inmate/patient in the least restrictive setting as possible contingent on available space. Staff constantly attempts to move inmate/patients out of safety cells to segregation cells (toilet and sink) or a 3-West suicide resistant SITHU cell. A work order has been approved for 16 additional suicide resistant cells on the lower tier of 3-West 200 pod. This will alleviate the reliance on safety and segregation cells.<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Any holding cell, including safety or Ad Seg cells, should not be | |

the default housing for patients with suicidal ideation and/or self-injurious behaviors. When utilized, patients shall not be placed in a holding safety or Ad Seg cell for more than 6 hours. If medical staff determine more time is needed due to detoxification, that patient may remain in the cell for a total of 8 hours. The reason for the extension must be clearly documented in the patient's chart." To date, the SCSO Policy 722: Suicide Prevention and Intervention is still being revised.

As detailed in previous monitoring reports, there are 4 safety cells located in the Main Jail: 2 in the male booking area, 1 in the female building area, and 1 in the 2P-APU. In addition, there is 1 safety cell and 1 holding cell (North Holding No. 2) located at RCCC. There are 6 ad seg cells in the Main Jail's booking area, as well as at least 1 sobering cell.  Although the safety cells are prioritized to temporarily house suicidal inmates, any of the remaining ad seg, and sobering cells are utilized as Temporary Suicide Precautions Housing.

It was previously determined that "Temporary Suicide Precautions Housing" excludes the Suicidal Inmate Temporary Housing Unit (SITHU) on 3-West Unit because suicidal inmates may be clinically appropriate for placement in the SITHU while awaiting a determination for inpatient hospitalization. In addition, it was previously determined that "Temporary Suicide Precautions Housing" includes the Main Jail's ad seg cells and "sobering cell" (not currently included in the *Consent Decree* definition) because of the provision's allowance for utilizing such cells for "detoxification-related needs."

Beginning in March 2022, the SCSO began to routinely collect data on the average length of stay (ALOS) in Main Jail's booking cells (safety, ad seg, and sobering). Until March 2023 (which will be addressed in the 5th Monitoring Report), this data was not automated within current jail inmate management system, and had to manually calculated by SCSO personnel counting individual inmate Custody Logs. Upon receiving the data, this expert then calculates the ALOS and percentage of booking cell type. Data from December 2022 through February 2023 is presented as follows:

In **December 2022**, 145 inmates were placed in the Main Jail booking cells, with:

> 84 (58 percent) in sobering cells
> 43 (30 percent) in ad seg cells
> 16 (11 percent) in safety cells
> 2 (1 percent) in multiple cells

In December 2022, the average length of stay was **16.3** hours, with the shortest confinement of 24 minutes and the longest confinement over 15 days (360 hours). Approximately 35 percent (51 of 145) of inmates were held in these booking cells for six (6) hours or less.

In **<u>January 2023</u>**, 134 inmates were placed in the Main Jail booking cells, with:

> 66 (49 percent) in sobering cells
> 36 (27 percent) in ad seg cells
> 20 (15 percent) in safety cells
> 10 (8 percent) in multiple cells, includes classrooms
> 2 (1 percent) in classrooms

In January 2023, the average length of stay was **<u>12.5</u>** hours, with the shortest confinement of 43 minutes and the longest confinement 3.5 days (90 hours). Approximately 40 percent (53 of 134) of inmates were held in these booking cells for six (6) hours or less.

In **<u>February 2023</u>**, 149 inmates were placed in the Main Jail booking cells, with:

> 103 (69 percent) in sobering cells
> 32 (22 percent) in ad seg cells
> 11 (7 percent) in safety cells
> 2 (1 percent) in holding cell
> 1 (1 percent) in multiple cells, includes classroom

In February 2023, the average length of stay was 13.3 hours, with the shortest confinement of 18 minutes and the longest confinement 3.2 days (76 hours). Approximately 31 percent (46 of 149) of inmates were held in these booking cells for six (6) hours or less.

In sum, the December 2022 through February 2023 data regarding Temporary Suicide Precautions Housing in the Main Jail booking cells indicated that average length of stay (ALOS) in the cells was 14 hours, and approximately 35 percent of inmates were held in these booking cells for six (6) hours or less.

As noted in previous monitoring reports, as the collection and analysis of this data is both time-consuming and staff-intensive, the SCSO needs to better develop a mechanism to generate such data on a regular basis in order to monitor the LOS in Temporary Suicide Precautions Housing with the goal of becoming compliant with the six (6) hour maximum requirement by the *Consent Decree*. The expert was previously informed that a new jail management system, entitled ATIMS, was scheduled to be fully activated on March 11, 2023, and it was anticipated that such ALOS data could be generated by this software program.

In conclusion, because the SCSO suicide prevention policy has not been finalized to address the requirements of this provision, and available data regarding Temporary Suicide Precautions Housing use from December 2022

| | |
|---|---|
| | through February 2023 indicated that both the ALOS and large percentage of inmates were housed in these well over six (6) hours, this provision remains in Partial Compliance. |
| **Recommendations** | 1) Finalize the SCSO Policy 722: Suicide Prevention and Intervention.<br>2) Continue to utilize Main Jail Temporary Suicide Precautions Housing data to reduce the average length of stay and percentage of inmates housed in the cells over six hours. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Main Jail Temporary Suicide Precautions Housing data: December 2022 through February 2023. |

| **Provision H)**<br>**2. Temporary Suicide Precautions** | **The County shall ensure, including by revising written policies and procedures where necessary, the timely and adequate completion of medical assessments for prisoners in need of suicide precautions, as required under Operations Order 4/05 (i.e., within 12 hours of placement of the next daily sick call, whichever is earliest, and then every 24 hours thereafter).** |
|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice. Custody staff shall notify medical staff within fifteen (15) minutes that a prisoner is temporarily housed in a safety or segregation cell and medical staff shall complete an assessment within 12 hours of placement or the next sick call, whichever is earliest."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with, and even exceeds, the requirements of this provision: "1. Patients may be temporarily placed in a safety and/or SITHU cell by custody or at the recommendation of MH staff. In these instances, nursing staff must: a. Conduct a medical assessment of the patient's physical condition within 1 hour of placement and every 4 hours thereafter. b. Notify the Nursing Supervisor and the Physician immediately if the nurse observes a significant change in the patient's physical health condition or if there is an adverse event.  Staff will contact MH if there is a significant change in the patient's psychiatric condition. c. Document the time of visual observation and include their signature and title on the observation sheet located directly outside of the cell. d. Document their assessment using the Nurse Non-Face-to-Face encounter form within the EHR every 4 hours. 2. If a patient at RCCC requires an emergent MH referral and MH staff are not currently present at the RCCC facility, the RN shall consult |

|  | with MH staff at MJ to determine an appropriate plan of care." To date, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. |
|  | This expert's medical chart review of inmates on suicide precautions found that nursing staff almost always provided timely medical assessments (documented as SOAP notes in athenahealth EHR) within 12 hours of placement and then every 24 hours during the entirety of an inmate's placement on suicide precautions. Patients in the 2P-APU were seen approximately three times per day by nursing staff. |
|  | In conclusion, although the ACH suicide prevention policy exceeds the requirements of this provision by stating that medical assessments are conducted "within 1 hour of placement and every 4 hours thereafter," because the SCSO suicide prevention policy has not been finalized to include the requirement of custody notification to medical staff that an inmate has been placed in a holding cell and/or on suicide precautions, this provision remains in Partial Compliance. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2022). Medical chart review. ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, pending draft. |

| **Provision H) 3. Temporary Suicide Precautions** | **The County shall ensure that any cell used for holding prisoners on suicide precautions is clean prior to the placement of a new prisoner, as well as cleaned on a normal cleaning schedule.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice. The Post Order has been approved." | |
|  | The expert was previously provided a copy of the "Housing Unit Cell Cleaning Process" Post Order, revised April 2021. In addition, although all of the 10 SITHU cells (1 through 10) utilized to house suicidal inmates were almost | |

|  | always full during the three-day on-site assessment, inspection of a few cells that were temporarily empty awaiting new placements found that they were only marginally clean. Temporary Suicide Precautions Housing cells (safety, ad seg, and sobering cells) in the booking area of the Main Jail could not be inspected because all cells were occupied by inmates. Inspection of unoccupied 2P-APU cells also found that they were only marginally clean.<br><br>On a related issue, during observation of clinicians interacting with inmates in the Main Jail's ACMH Interview Room during the December 6-8, 2022 assessment, the telephone utilized by inmates to communicate with the clinician was again <u>not</u> sanitized following each use.<br><br>In conclusion, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention.<br>2) It is strongly recommended that the SCSO initiate and/or revise a post order in Main Jail booking to require that the telephone in the ACMH Interview Room be sanitized following each inmate use. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>SCSO Policy 722: Suicide Prevention and Intervention, pending.<br>"Housing Unit Cell Cleaning Process" Post Order, revised April 2021.<br>On-site inspection of SITHU, Temporary Suicide Precautions Housing in Main Jail booking, and 2P-APU cells. |

| Provision H)<br>4. Temporary<br>Suicide Precautions | **The County shall create and implement a written policy ensuring adequate frequency for meals, fluids, hygiene, showers, prescribed medications, and toileting when a prisoner is in cell used for holding prisoners on suicide precautions.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice. Will add language to the new suicide prevention policy. RCCC has no cells designated for long term housing of inmates on suicide precautions. RCCC does not have ACMH staff available 24 hours a day, but have tele-psychiatry available after-hours including weekend after-hours."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Patients shall receive timely and regular access to meals, liquids, and prescribed medication while on suicide precautions, as necessary. Custody will provide access to a toilet upon request to patients placed in cells without a toilet, absent an immediate security or safety issue. Unless contraindicated by a licensed mental health clinician, all patients on suicide precautions shall be | |

| | allowed access to showers consistent with schedules and other housing units." To date, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>The expert's observations during the on-site assessment at the Main Jail, as well as review of various Custody Logs for inmates on suicide precautions in both the Temporary Suicide Precautions Housing and SITHU, continued to find problematic practices and/or lack of documentation in Custody Logs. For example, inmates housed in booking cells never receive either showers or telephone calls, whereas inmates in the SITHU were infrequently or never offered the opportunity for showers (at night) and telephone calls (during days). The expert's current review of Custody Logs for five (5) random inmates housed in the SITHU (and occasionally included a few days of confinement in the booking cells) during September through November 2022 found the following:<br><br>       **Case No. 1**: 10 days; 1 offered shower<br>       **Case No. 2**: 7 days; 2 offered showers<br>       **Case No. 3**: 10 days; 1 offered shower<br>       **Case No. 4**: 16 days; 0 offered showers<br>       **Case No. 5**: 17 days; 3 offered shower; 2 offered telephone calls<br><br>Based upon the above practices and lack of a finalized SCSO suicide prevention policy, this provision remains in Partial Compliance. Of note, this provision is not in Non-Compliance only because it primarily requires a policy to assess compliance and the ACH suicide prevention policy is in effect. |
|---|---|
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Review of Custody Logs in Temporary Suicide Precautions Housing and SITHU, September 2022 through November 2022. |

| **Provision H)<br>5. Temporary<br>Suicide Precautions** | **Inmates on suicide precautions shall not automatically be on lockdown and should be allowed dayroom or out-of-cell access consistent with security and clinical judgments.** | |
|---|---|---|
| **Status** | **Non-Compliance** | |

| | |
|---|---|
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current practice." |
| | Contrary to the County's continued response that inmates on suicide precautions had access to dayroom or out-of-cell activities based upon security and medical judgments, this expert's review of Custody Logs for inmates on suicide precautions in either the Main Jail booking or SITHU cells (see above) found that inmates continued to be denied dayroom access unless they were assigned to a bunk in the SITHU dayroom area. With the exception of the rare offering of showers and telephones to a few inmates, all inmates on suicide precautions continued to be locked down. |
| | The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Licensed clinicians have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, the removal or return of routine privileges. This includes, but not limited to: a. Telephone calls; b. Visits (including social visits); c. Recreation/out-of-cell time; d. Court hearings; e. Other activities that are otherwise within the limitations of a patient's classification security level; f. Clothing and possessions….Custody shall ensure all patients on suicide precautions, regardless of length of stay, should receive showers on a schedule commensurate with schedules in other housing units….Patients shall be allowed dayroom or out-of-cell activities as determined by a licensed clinician in consultation with custody staff." To date, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. |
| | This provision is similar to **Provision M) 1. Property and Privileges"** and will be discussed in more detail in that provision. |
| | In conclusion, although the ACH suicide prevention policy contains requirements that are consistent with this provision and SCSO suicide prevention policy has not been finalized, most importantly, in practice, all inmates on suicide precautions are virtually locked down and have no dayroom or other out-of-cell access. This provision remains in Non-Compliance. |
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention to include language that suicidal inmates will not automatically be on lockdown and should be allowed dayroom or out-of-cell activities as determined by ACMH clinicians in consultation with custody personnel; provide all draft policies to expert for review.<br>2) Eliminate the current practice of all management decisions regarding suicidal inmates being made by custody personnel. |

| Evidentiary Basis | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Review of Custody Logs in Temporary Suicide Precautions Housing and SITHU, September 2022 through November 2022.<br>Observation during on-site assessment of December 6-8, 2022. |

| Provision H)<br><br>6. Temporary Suicide Precautions | **The classrooms or multipurpose rooms adjacent to the housing units in the Main Jail are designed for, and should be made available for, prisoner programs and treatment. Absent an emergency, the County shall not use the classrooms and multipurpose rooms to hold prisoners pending a mental health evaluation or on suicide precautions. Where such emergency occurs, the County shall document the reasons for retention and move the prisoner, within six (6) hours, to the inpatient unit or other appropriate housing location for continued observation, evaluation, and treatment.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023) was repeated from previous reports as: "Current practice."<br><br>As noted above in **Provision H) 1. Temporary Suicide Precautions**, review of Main Jail Temporary Suicide Precautions Housing data from December 2022 through February 2023 found the occasion use of classrooms to confine inmates on suicide precautions.<br><br>This provision remains in Partial Compliance because the existing SCSO Policy No. 4/05 - Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding No. 2. needs to be revised to eliminate reference to multi-purpose rooms, the SCSO Policy 722: Suicide Prevention Policy has not been finalized, and of lingering concerns that classrooms are still being used on occasion for housing suicidal inmates. | |
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention.<br>2) SCSO Policy No. 4/05 - Use of Safety Cells/Segregation Cells/Multipurpose Rooms/North Holding No. 2. should be revised to delete reference to multi-purpose rooms, including classrooms, as acceptable locations for the housing of suicidal inmates. | |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>SCSO Policy No. 4/05 - Use of Safety Cells/ Segregation Cells/Multipurpose Rooms/North Holding #2.<br>Main Jail Temporary Suicide Precautions Housing data: December 2022 through February 2023. | |

| Provision I)<br>1. Suicide Hazards in High-Risk Housing Locations | **The County shall not place prisoners identified as being at risk for suicide or self-harm, or for prisoners requiring IOP level of care, in settings that are not suicide-resistant as consistent with Lindsay Hayes's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities."** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023) was repeated from previous reports as: "Current practice. Inmates at risk for suicide, self-harm, or IOP level of care are housed in suicide-resistant cells."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Any cell designated to house a suicidal patient shall be suicide-resistant….Cells with structural blind spots shall not be used for suicide precaution.." To date, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>In addition, the expert previously interpreted this provision to also include the requirement that suicidal patients housed in the 2P-APU be placed in suicide-resistant cells. During the February 2022 on-site assessment, the expert inspected the 2P-APU cells and found that each contained suicide-restraint beds with hooks that were intended to be used in patient restraint. However, if a patient was placed in the cell without restraints, these hooks would be easily accessible and very conducive to a suicide attempt by hanging. In addition, there was a gap down between the bed and wall in some cells that could be utilized as an anchoring device in a suicide attempt by hanging. Following a discussion with both SCSO and ACH leadership, the decision was made to remove the hooks from the restraint beds in all but one (P-1) of the 16 cells in the 2P-APU. The restraint bed in Cell P-1 will be replaced with a new restraint bed that is more suicide-resistant. In addition, any patient currently assessed as suicidal, but not in need of restraints, would not be permitted to be housed in Cell P-1.<br><br>Of note, pursuant to the Memorandum of Agreement (MOA) on May 27, 2022 regarding the correction of several critical remedial provisions of Mental Health and Suicide Prevention:<br><br>    "16. The County will discontinue use of beds with attachment points of any kind (including the existing beds with 'handles' designed for restraint brackets) for Acute Psychiatric Unit (APU) patients. | |

<table>
<tr><td></td><td>

a. As soon as feasible, and in any case no later than September 30, 2022, the County will safely eliminate the 'handles' from at least 16 of the 17 existing Acute Psychiatric Unit patient rooms in the Main Jail 2P unit. If the County chooses to retain one Main Jail 2P APU room with restraint brackets, it will ensure that no patient who is 'danger-to-self' or at risk of suicide is held in that room (except in cases where clinical restraints are being applied).

b. As part of the County's forthcoming plan to discontinue the Main Jail 2P unit as the APU, the County will ensure that all new APU beds are suicide-resistant and free of attachment points. The County may elect to install an anti-ligature restraint bed in the APU, after conferring with class counsel and the Subject Matter Experts to ensure appropriate measures against suicide."

During the December 2022 on-site assessment, the expert found that 11 of the 2P-APU cells had been renovated.  In addition, the SCSO reported that 16 additional cells in the 3-West Pod had been renovated to be suicide-resistant for the housing of additional suicidal patients. This provision will be reassessed in the 5th Monitoring Report once the renovation has been completed.

Finally, the expert previously inspected most of the 10 SITHU cells (1 through 10) utilized to house suicidal inmates and found that some cells had slight gaps between fixtures and walls/ceilings that could be utilized as an anchoring point in a suicide attempt by hanging (in which an inmate wedges a ligature in the gap).

This provision remains in Partial Compliance until the expert reassesses the 2P-APU cells and 16 additional cells in 3-West Pod during the next on-site assessment, as well as the fact that the SCSO suicide prevention policy has not been finalized, and the above deficiencies in the SITHU need to be remedied by implementing the below recommendations.

</td></tr>
<tr><td>**Recommendations**</td><td>

Previous recommendations are repeated again as follows:

1) Finalize the SCSO Policy 722: Suicide Prevention and Intervention to address the housing of suicidal inmates in suicide-resistant cells.
2) Create a 2P-APU post order or protocol that requires any patient currently assessed as suicidal, but not in need of restraints, would not be permitted to be housed in Cell P-1.
3) The SCSO should inspect all SITHU, safety/administrative segregation, and 2P-APU cells to identify any gaps in wall/ceiling fixtures that could be utilized as an anchoring device.  Any gaps should be closed with security caulking.

</td></tr>
</table>

| Evidentiary Basis | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Observation during on-site assessment of December 6-8, 2022.<br>Checklist for the 'Suicide-Resistant' Design of Correctional Facilities, Lindsay M. Hayes, December 2019.<br>Memorandum of Agreement (MOA), May 27, 2022, regarding the correction of several critical remedial provisions of Mental Health and Suicide Prevention. |

| Provision I)<br>2. Suicide Hazards in High-Risk Housing Locations | **Cells with structural blind spots shall not be used for suicide precaution.** | |
|---|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was simply: "Current practice. A work order has been approved for 16 additional suicide resistant cells on the lower tier of 3-West 200 pod. This will alleviate the reliance on safety and segregation cells."<br><br>Despite the above response that the "current practice" of the SCSO was not to utilize cells with blind spots for inmates on suicide precautions, as well as the ACH 02-05: Suicide Prevention Program policy requirement that "Cells with structural blind spots shall not be used for suicide precaution," the expert's current inspection of the SITHU in December 2022 found that inmates continued to be housed in Cell No. 7 and Cell No. 8, each of which had blind spots in which deputies were not able to observe an inmate if they were situated in the far corner of those cells.<br><br>Because this provision specifically prohibits the placement of a suicidal inmate in a cell with blind spots, and Cells 7-8 in the SITHU had blind spots and were occupied with inmates on suicide precautions during the December 2022 on-site assessment, the provision remains in Non-Compliance. | |
| **Recommendations** | Previous recommendations are repeated again as follows:<br><br>1) Finalize SCSO Policy 722: Suicide Prevention and Intervention.<br>2) The SCSO should either not place suicidal inmates in SITHU Cells 7-8 and utilize other suicide-resistant cells in the IOP section of the housing unit, or develop and fully implement a corrective action plan to eliminate the blind spots in those cells. | |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending. | |

| | Observation during on-site assessment of December 6-8, 2022.<br>Checklist for the 'Suicide-Resistant' Design of Correctional Facilities, Lindsay M. Hayes, December 2019. |
|---|---|

| Provision J)<br>1. Supervision/<br>Monitoring of<br>Suicidal Inmates | **The County shall ensure adequate visibility and supervision of prisoners on suicide precautions.** | |
|---|---|---|
| **Status** | **Non-Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Each patient on suicide precautions shall have an observation sheet placed on the outside of their cell door.  The observation sheet, or a separate form, should also document the patient's level of observation, as well as possessions and privileges allowed for the patient as determined by a licensed MH clinician. Observation Logs shall not be kept at the Deputy's station and/or desk." To date, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>During inspection of the SITHU and Temporary Suicide Precautions Housing in Main Jail booking (safety, ad seg, and sobering cells) on December 6-8, 2022, this expert again observed two different practices regarding the documentation of observation for suicidal inmates. For inmates housed in booking area cells, individual SCSO Custody Log observation sheets were attached to a clipboard located *outside of each cell*.  However, in the SITHU, a clipboard containing the SCSO Custody Log observation sheet of each inmate on suicide precautions was located *on the deputies' desk located outside the SITHU*. Such a practice was not desirable, and raised the possibility (although not observed by the expert) that observation sheets could be completed by a deputy without entering the SITHU and observing each inmate. This practice was also contrary to the ACH 02-05: Suicide Prevention Program policy which required that Custody Logs be located on the door outside each inmate's cell.<br><br>In addition, with the exception of missing sheets for Cell 2 and Cell 6, individual ACMH Suicide Precautions and/or GD Observation Custody Instructions sheets were attached to a clipboard located outside of each SITHU cell. | |

| | In addition, the expert requested and subsequently received copies of the Custody Logs for 19 inmates on suicide precautions in the SITHU and Temporary Suicide Precautions Housing in Main Jail booking (safety, ad seg, and sobering cells) from September through November 2022. Each of these inmates was on Close Observation status and required to be observed at staggered intervals not to exceed 15 minutes. The review found very problematic practices in the observation of inmates on suicide precautions, with numerous violations of the required 15-minute observation checks for each of the 19 inmates. These numerous violations often exceeded 20 minutes or more.

The expert carefully examined the Custody Log for one inmate (<u>Case No. 1</u>) who was on suicide precautions for 10 days in SITHU Cell No. 10 from September 21 through September 30, 2023 (see same inmate also mentioned above in **Provision H) 4. Temporary Suicide Precautions**). The review found that there were approximately <u>321</u> *violations of 15-minute checks in this case, ranging from 20 to over 40 minutes.*

There were other concerns. When the expert shadowed a ACMH clinician on daily SITHU rounds on December 6, 2022, the clinician asked a deputy to see an inmate in Cell No. 1. We entered the SITHU at 7:22am, walked to Cell No. 1, the inmate refused an out-of-cell assessment, and the deputy opened the cell door for a cell-front assessment.  The deputy then departed the SITHU and returned to the deputy's desk without making rounds of other cells. A short time later following the assessment of the inmate in Cell. No. 1, this expert began to review the SCSO Custody Log observation sheet of each inmate on suicide precautions that was located on the deputies' desk outside the SITHU. Each of the observation sheets were marked as if an observation was made on each inmate at 7:22am, despite the fact that the lone deputy only observed the inmate in Cell No. 1 at that time.  In addition, approximately 25 minutes later at 7:47am (and well beyond the 15-minute requirement), another deputy entered the SITHU and proceeded walk around the entire 30-bed unit in less than one minute, not stopping to look into each of the eight (8) cells containing inmates on suicide precautions that day, but rather simply pointing his flashlight at the door of each cell.

Due to the continued serious and extensive violations found in the documentation of observation of inmates on suicide precautions, as well as the fact that Custody Logs are kept in a binder on the deputies' desk outside of the SITHU in violation of the ACH suicide prevention policy, this provision remains in Non-Compliance. |
| **Recommendations** | 1) Consistent with current ACH policy, the SCSO should finalize the SCSO Policy 722: Suicide Prevention and Intervention to require that each inmate on suicide precautions a Custody Log and ACMH Suicide Precautions and/or GD Observation Custody Instructions sheets placed on the outside of their cell door in the SITHU. |

|  | 2) SCSO should ensure that Custody Log and ACMH Suicide Precautions and/or GD Observation Custody Instructions sheets placed on the outside of their cell door in the SITHU.<br>3) SCSO should audit the continued problematic practices of SITHU deputies not observing suicidal inmates at staggered 15-minute intervals. |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, June 22, 2022, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Examination of Custody Logs for 19 inmates on suicide precautions during September and November 2022.<br>Observation of SITHU during on-site assessment of December 6-8, 2022. |

| **Provision J)**<br>**2. Supervision/ Monitoring of Suicidal Inmates** | **The County shall not cover cell windows with magnetic flaps or any other visual barrier preventing visibility into any cell that is housing a prisoner on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following required language that is consistent with this provision: "Cell windows shall never be covered with magnetic flaps or any other visual barrier preventing visibility into any cell that is housing a patient on suicide precautions or awaiting an Acute Psychiatric Unit bed, unless there is a specific security need and then for only a period of time necessary to address such security need." To date, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>During the most recent inspection of the 10 SITHU cells utilized to house suicidal inmates in December 2022, as well as the Temporary Suicide Precautions Housing in Mail Jail booking, this expert did <u>not</u> observe the covering of any cell windows by custody personnel.<br><br>In conclusion, this provision remains in Partial Compliance only because the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. | |
| **Recommendations** | 1) Finalize the SCSO Policy 722: Suicide Prevention and Intervention.<br>2) Ensure that the SCSO policy prohibits any inmate identified as suicidal from being housed in a cell that contains a window covering obstructing visibility. | |

| Evidentiary Basis | Sacramento County's *Sixth* Status Report (January 9, 2023). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Observation during on-site assessment of December 6-8, 2022. |
|---|---|

| Provision J) 3. Supervision/ Monitoring of Suicidal Inmates | **The County shall revise its policies regarding the monitoring of prisoners on suicide precautions to provide for at least the following two defined levels of observation:** |
|---|---|
| | **a) <u>Close observation</u> shall be used for prisoners who are not actively suicidal but express suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) or have a recent prior history of self-destructive behavior. Close observation shall also be used for prisoners who deny suicidal ideation or do not threaten suicide but are engaging in other concerning behaviors indicating the potential for self-injury. Staff shall observe the prisoner at staggered intervals not to exceed every 15 minutes and shall document the observation as it occurs.** |
| | **b) <u>Constant observation</u> shall be used for prisoners who are actively suicidal, either threatening or engaging in self-injury, and considered a high risk for suicide. An assigned staff member shall observe the prisoner on a continuous, uninterrupted basis. The observation should be documented at 15-minute intervals. Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation.** |
| **Status** | **Partial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by SCSO in the *Sixth* Status Report (January 9, 2023), was: "The revised policy addresses this issue. The SSO Suicide Prevention policy language has been agreed upon by Class Counsel and SSO. The policy is being reviewed by Executive Staff and publishing is forthcoming any day. When published, each Sheriff's Office staff member must read and acknowledge the policy…..ACMH is in the process of hiring 'sitters' to perform this function (referencing constant observation)." |
| | The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, as well as ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, effective June 22, 2022, contain definitions and procedures for both Close Observation and Constant Observation that are consistent with this provision. To date, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. |
| | In conclusion, this provision remains in Partial Compliance because the option of placing an inmate assessed as "actively suicidal, either threatening or |

|  | engaging in self-injury, and considered a high risk for suicide" on Constant Observation was not available within the Sacramento County jail system as of December 2022. In addition, the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. |
|---|---|
| **Recommendations** | 1) Consistent with policy, create a practice whereby an inmate assessed as "actively suicidal, either threatening or engaging in self-injury, and considered a high risk for suicide" is placed on Constant Observation.<br>2) Finalize the SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, June 22, 2022, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending. |

<br>

| **Provision J) 4. Supervision/ Monitoring of Suicidal Inmates** | **For any prisoner requiring suicide precautions, a qualified mental health professional shall assess, determine, and document the clinically appropriate level of monitoring based on the prisoner's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically determined level of monitoring.** |
|---|---|
| **Status** | **Substantial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice. Once ACMH staff has completed the inmate's evaluation, the ACMH staff member shall consult with custody staff to determine the appropriate housing location for the inmate." In the same report, ACH stated that mental health "staff have daily bed assignment/utilization meetings with custody to review movement between the IOP, OPP, and APU."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the appropriate language that is consistent with the requirements of this provision: "For any patient requiring suicide precautions, the licensed clinician shall assess, determine, and document the clinically appropriate level of monitoring based on the patient's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically determined level of monitoring."<br><br>The expert again consistently found during the current medical chart review that when an inmate is identified as suicidal and referred to a mental health clinician, the clinician assesses the inmate, completes an SRA, continues to assess the suicidal inmate on a daily basis, and appropriately documents the management of the inmate on suicide precautions to include level of observation, clothing, and out-of-cell activities. In addition, based upon the |

|  | medical chart review, as well as observation of, and discussion with, multiple mental health clinicians, it appears that an inmate's length of stay Temporary Suicide Precautions Housing in Main Jail booking (safety, ad seg, and sobering cells) beyond the maximum allowable six (6) hours is a result of the inadequate number of beds available in both the SITHU and 2P-APU rather than a clinical determination.<br><br>In conclusion, although this provision addresses the use of safety cells, the expert has already addressed the inappropriate use of safety cells (and ad seg and sobering cells) for the default housing of suicidal inmates in **Provision F) 1. Housing of Inmates on Suicide Precautions** on pages 39-40 of this report. As such, based upon the ACH suicide prevention policy, current medical chart review and observations, this provision remains in Substantial Compliance. |
|---|---|
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>Observation during on-site assessment of December 6-8, 2022.<br>Medical chart review. |

| **Provision J) 5. Supervision/ Monitoring of Suicidal Inmates** | **Video monitoring of prisoners on suicide precaution shall not serve as a substitute for Close or Constant observation.** | |
|---|---|---|
| **Status** | **Substantial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from a previous report as: "Current practice. Outlined in our current Suicide Prevention Policy."<br><br>The expert's previous recommendation was to ensure that the ACH suicide prevention policy applicable to the 2P-APU included the appropriate language that prohibited provider orders for closed-circuit television (CCTV) monitoring in lieu of the physical observation of patients on either close or constant observation status. Despite this recommendation, review of the new ACH 04-07: Acute Psychiatric Unit – Precautions and Observations policy, effective June 22, 2022, found that it did <u>not</u> contain any language regarding CCTV monitoring. SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>As reported in previous monitoring reports, CCTV monitoring was only available in the 2P-APU. According to ACMH leadership, CCTV monitoring was not approved to be an alternative to observation of suicidal patients at 15-minute intervals by nursing personnel, nor were nursing personnel assigned to |

|  | exclusively monitor the CCTV. Therefore, according to ACMH leadership, suicidal patients were not expected to be continuously monitored by the CCTV. In its August 11, 2022 response to the expert's draft *Third* Monitoring Report, the County further reiterated that: "*In accordance with recommendations from experts and Sacramento County, all CCTV use was discontinued by MH. No MH provider can order that CCTV is utilized for any reason and no MH nursing can activate or monitor CCTV for any reason.*"<br><br>Although the ACH 04-07: Acute Psychiatric Unit – Precautions and Observations policy did not contain the prohibition for the alternative use of CCTV to monitor suicidal patients, the expert did not observe (or find during the medical chart review) that any APU patients on constant observation during the most recent on-site assessment. However, should problems be found in the future in which CCTV is utilized as an alternative to constant observation, the ACH 04-07: Acute Psychiatric Unit – Precautions and Observations policy would need to be revised to include language that specifically prohibits provider orders and nurse practices for using CCTV monitoring in lieu of the physical observation of suicidal patients.<br><br>In conclusion, because the expert did not observe (or find during medical chart review) that any APU patients were being monitored by CCTV as an alternative to constant observation during the monitoring period, this provision is raised to Substantial Compliance. |
|---|---|
| **Recommendations** | 1) Should problems be found during any future on-site assessments, the ACH 04-07: Acute Psychiatric Unit – Precautions and Observations policy would need to be revised to include language that specifically prohibits provider orders and nurse practices for using CCTV monitoring in lieu of the physical observation of suicidal patients.<br>2) Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, June 22, 2022, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Observation during on-site assessment of December 6-8, 2022.<br>Medical chart review. |

| **Provision K)**<br>**1. Treatment of Inmates Identified as at Risk of Suicide** | **Qualified mental health professionals shall develop an individualized treatment plan and/or behavior management plan for every prisoner that mental health staff assesses as being a suicide risk.** |  |
|---|---|---|
| **Status** | **Partial Compliance** |  |

| Discussion | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Sixth* Status Report (January 9, 2023), was omitted. |
|---|---|
| | This provision is duplicative with both **Provision K) 2. Treatment of Inmates Identified at Risk of Suicide** and **Provision P) 2. Discharge from Suicide Precautions**. As such, these three provisions will be monitored as one provision. |
| | The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains requirements the following requirements that are consistent with this provision: "1. MH staff will develop and utilize a safety planning tool for patients on suicide precautions. The safety plan shall be completed with the patient and identify specific signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and specific actions (independent coping skills, personal and professional resources for support, etc.) the patient or staff can take if suicidal thoughts do occur. The plan should be updated as clinically indicated. 2.The treatment plan shall be updated to include goals and interventions specific to each patient's safety plan and discharge planning." |
| | As detailed in previous monitoring reports, ACH introduced a new treatment planning program in January 2020 entitled "Safety Planning Intervention (SPI)." As previously discussed in this report, almost all of the mental health clinicians have been trained in both the completion of suicide risk assessments and safety planning through a 103-slide PowerPoint presentation entitled "Suicide Assessment in Jail." In addition, a "MH Suicide Safety Plan" template has been embedded in athenahealth EHR based upon the SPI model, and the ACMH Suicide Risk Assessment template contains a domain for "Safety and Risk Reduction Plan." |
| | Following review of several recent medical charts, the quality of safety planning will be discussed in more detail in **Provision K) 2. Treatment of Inmates Identified at Risk of Suicide** below. |
| | In conclusion, this provision remains in Partial Compliance. |
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. Medical chart review. |

| Provision K) 2. Treatment of Inmates Identified | **Treatment plans shall be designed to reduce suicide risk and shall contain individualized goals and interventions. Treatment plans shall be** |
|---|---|

| as at Risk of Suicide | reviewed following discharge from suicide precautions and updated as clinically indicated. | |
|---|---|---|
| Status | Partial Compliance | |
| Discussion | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Sixth* Status Report (January 9, 2023), was omitted.<br><br>This provision is duplicative with both **Provision K) 1. Treatment of Inmates Identified at Risk of Suicide** and **Provision P) 2. Discharge from Suicide Precautions**. As such, these three provisions will be monitored as one provision.<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains requirements the following requirements that are consistent with this provision: "1. MH staff will develop and utilize a safety planning tool for patients on suicide precautions. The safety plan shall be completed with the patient and identify specific signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and specific actions (independent coping skills, personal and professional resources for support, etc.) the patient or staff can take if suicidal thoughts do occur. The plan should be updated as clinically indicated. 2.The treatment plan shall be updated to include goals and interventions specific to each patient's safety plan and discharge planning."<br><br>The expert reviewed the medical charts of 12 patients discharged from suicide precautions during the recent monitoring period and continued to find problematic practices. *In fact, in 50 percent (6 of 12) of the cases, the required safety plans were not completed. In the remaining 50 percent of the cases, the safety plans were found to be inadequate.* Most safety plans that were developed simply used boilerplate narrative such as "custody or mental health" for responses to "People to Ask for Help," "any staff member" for response to "Professionals to Contact," and "press emergency button" for response to "Means Safety."<br><br>The following case example exemplifies current struggles by mental health clinicians to develop adequate safety plans to reduce suicide risk:<br><br>**Case No. 5** (documented December 7, 2022)<br><br>Step 1 (Warning Signs): poor sleep, anxiety<br>Step 2 (Independent Coping Skills): read, sleep, tend to hygiene.<br>Step 3 (Distracting People & Places): dayroom, watch TV.<br>Step 4 (People to Ask for Help): custody, MHS.<br>Step 5 (Professionals to Contact): any staff member.<br>Step 6 (Means Safety): press emergency button. |

<table>
<tr><td></td><td>

Step 7 (Reasons to Live): coffee.

The clinician's recording of "coffee" as the patient's "reason to live" without soliciting a more appropriate response was very problematic. The patient was readmitted onto suicide precautions a few days later and upon their discharge from suicide precautions again five days later, another clinician developed a slightly better safety plan as follows:

**Case No. 5** (documented December 11, 2022)

> Step 1 (Warning Signs): depressed, anxious, angry.
> Step 2 (Independent Coping Skills): yoga, deep breathing, jumping, jog, walking.
> Step 3 (Distracting People & Places): _____
> Step 4 (People to Ask for Help): family, friend (Mike).
> Step 5 (Professionals to Contact): any staff member.
> Step 6 (Means Safety): If becoming suicidal in community, I'm going to call 911. I'm going to call my family. Walk to emergency room.
> Step 7 (Reasons to Live): my two children. myself.

Safety planning involves collaboration between the clinician and patient to identify a specific strategy that describes signs, symptoms, and the circumstances in which the risk for suicide was likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient and clinician could take if suicidal thoughts reoccurred. The safety planning examples reviewed during the monitoring period were simply patients' self-reported responses and did not constitute reasonable strategies, with assistance by the clinician, to reduce suicide risk in the future.

In conclusion, mental health clinicians will continue to struggle with development of adequate safety plans unless the process is collaborative between the patient and the clinician, and patients are granted routine possessions (books, writing materials, etc.) and out-of-cell activities that can assist with coping skills in reducing suicidal ideation. As previously noted, inmate-patients in the 2P-APU do not receive safety planning until they are discharged from the placement. This also continues to be problematic. This provision remains in Partial Compliance.

</td></tr>
<tr><td>**Recommendations**</td><td>ACMH should develop a corrective action plan to address the deficiencies in this provision.</td></tr>
<tr><td>**Evidentiary Basis**</td><td>

Sacramento County's *Sixth* Status Report (January 9, 2023).
ACH 02-05: Suicide Prevention Program, November 16, 2021, final.
Medical chart review.

</td></tr>
</table>

| Provision K) 3. Treatment of Inmates Identified as at Risk of Suicide | All assessments, treatment, and other clinical encounters shall occur in an area that provides reasonable sound privacy and confidentiality. If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk. |
|---|---|
| Status | Partial Compliance | |
| Discussion | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was: "When necessary, custody staff will standby for security while offering auditory privacy. Proximity is dependent on the inmate's behavior safety risk. This can be accomplished at RCCC due to the design of the three offices where these contacts take place. All of the doors can be closed. They have windows where the officers can stand outside and see what is taking place in the room. At Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for mental health assessments in booking. On MJ housing floors, classrooms and confidential attorney booths are available for clinical encounters. Additional booths are in the planning stages and will consist of plexiglass enclosures with doors situated in the indoor rec area of each housing unit. Some booths will have a partition for safety as well as a security desk/chair. Funding and BSCC approval pending." The ACH response in the same report stated that "Staff utilize the confidential interview office in booking, classrooms, and attorney booths for confidential interviews." |

This provision is duplicative of **Provision D) 1. Post-Intake Mental Health Assessment Procedures.** As previously stated in that section on pages 30-31 of this report, mental health clinicians assigned to the Main Jail utilized various options for their interaction with patients on suicide precautions: 1) a converted attorney booth in booking referred to as the ACMH Interview Room, 2) classrooms on each housing floor (including 300-West Pod that houses the SITHU), 3) the outside control area of 300-West Pod in close proximity to the officer's desk, 4) the SITHU dayroom area, and 5) cell front of the booking cells (safety, ad, seg, or sobering). Cell front, as well as the outside control area of 300-West Pod and the SITHU dayroom area are non-confidential because they are in close proximity to both officers and other inmates. The expert was previously informed, but again did not observe, that the visiting booths in 300-West Pod were also available for clinical contacts by mental health clinicians.

In conclusion, and as previously detailed in **Provision D) 1. Post-Intake Mental Health Assessment Procedures**, although there continued to be improvement observed during the expert's on-site assessment, the on-going lack of privacy and confidentiality during the daily assessment of suicide risk (including when the expert is not onsite) continues to be an impediment to the County's ability to provide a reasonable suicide prevention program. This provision remains in Partial Compliance.

| Recommendations | 1) As previously recommended, unless exigent circumstances exist and are documented on a case-by-case basis, any inmate identified as suicidal should be given an opportunity for assessment outside of their cell. This includes initial assessments, daily on-going assessments, discharge assessments, and scheduled follow-up.<br>2) As previously recommended, additional designated room(s) or areas outside of the Main Jail's booking area, including additional space near 300-West Pod and space within 2)-APU, that can provide privacy and confidentiality should be created and routinely utilized for the assessment of suicidal inmates. |
|---|---|
| Evidentiary Basis | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>On-site observation on December 6-8, 2022.<br>Medical chart review. |

| Provision L)<br>1. Conditions for Individual Inmates on Suicide Precautions | **The County's Suicide Prevention Policy shall set forth clear and internally consistent procedures regarding decisional authority for determining the conditions for individual inmates on suicide precautions. Mental health staff shall have primary authority, consistent with individualized classification and security needs, with respect to the following:** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision as authored by the SCSO in the *Sixth* Status Report (January 9, 2023) was: "Current practice, Mental Health staffs' recommendations are taken into consideration when making housing decisions for inmates with mental health concerns." The ACH response in the same report repeated a prior response of: "The suicide prevention policy addresses MH's role as a primary authority to make decisions on property and privileges, use of safety suits, and discharge from suicide precaution based on clinical assessment."<br><br>This provision is interpreted as a "catch-all" provision for these subsequent provisions: **M. Property and Privileges, N. Use of Safety Suits, and O. Beds and Bedding**, therefore, this provision cannot come into Substantial Compliance until the suicide prevention policies are revised, and all three of these subsequent provisions come into Substantial Compliance. The relevant language from the ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, will be discussed in these subsequent provisions. The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. This provision remains in Partial Compliance. | |
| **Recommendations** | Finalize the SCSO Policy 722: Suicide Prevention and Intervention. | |

| Evidentiary Basis | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending. |
|---|---|

| Provision M)<br>1. Property and Privileges | **Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of routine <u>privileges</u> (e.g., visits, telephone calls, recreation) that are otherwise within the limitations of a prisoner's classification security level. Any removal of privileges shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.** | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice. Prisoners placed in a safety cell shall be allowed to retain enough clothing or be provided with a suitably designed 'safety garment' to provide for the prisoners' personal privacy unless specific identifiable risks to the prisoner's safety or to the security of the facility exist and are documented."<br><br>The County's response again incorrectly attributes this provision to "safety garments," whereas the provision is specific to clinical decisions regarding granting privileges such as visits, telephone calls, and recreation for inmates on suicide precautions.<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains requirements the following requirements that are consistent with this provision: "Licensed clinicians have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, the removal or return of routine privileges. This includes, but not limited to: a. Telephone calls; b. Visits (including social visits); c. Recreation/out-of-cell time; d. Court hearings; e. Other activities that are otherwise within the limitations of a patient's classification security level; f. Clothing and possessions. Custody shall ensure all patients on suicide precautions, regardless of length of stay, should receive showers on a schedule commensurate with schedules in other housing units." The SCSO Policy 722: Suicide Prevention Policy has not been finalized.<br><br>Despite this new ACH policy requirement, as detailed earlier in this report, the expert's recent on-site assessment on December 6-8, 2022 continued to find compliance problems with this provision. Based upon observation during rounds by mental health clinicians, interaction with inmates and review of Custody Logs of 19 inmates on suicide precautions in the SITHU and | |

| | |
|---|---|
| | Temporary Suicide Precautions Housing at Main Jail booking (safety, ad seg, and sobering cells), the expert found:<br><br>• Consistent documentation of daily meals and water, as well as nursing and mental health rounds;<br><br>• Daily mental health rounds occurred either out-of-cell or cell front;<br><br>• With the exception of out-of-cell mental health contacts, all inmates on suicide precautions in Temporary Suicide Precautions Housing at Main Jail booking (safety, ad seg, and sobering cells) were locked down;<br><br>• Opportunity for out-of-cell activities in SITHU dayroom or any type of recreation was not provided;<br><br>• Offering of showers, if any, was rarely documented;<br><br>• There were only a few examples of telephone calls offered in the SITHU (during day shift);<br><br>• No showers, telephone calls, or other out-of-cell movement (with the exception of mental health rounds) were documented as being offered in the Temporary Suicide Precautions Housing at Main Jail booking (safety, ad seg, and sobering cells);<br><br>• Documentation was inconsistent as to whether a mattress was always provided to inmates upon admission into suicide precautions (whether in SITHU or safety, ad seg, and sobering cells); with some examples of documentation indicating mattresses were provided several hours or days after admission;<br><br>• APU patients only received clinical contacts cell front due to the lack of confidential space, and rarely received out-of-cell activities because of extremely limited dayroom space/availability; and<br><br>• Medical chart review did not find any instances in which inmates on suicide precautions were denied access to court appearances.<br><br>This provision remains in Partial Compliance. |
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention. |

| | |
|---|---|
| | 2) Consistent with the MOA, SCSO should initiate monthly custody supervisory audits of approved property and privileges offered/received by inmates on suicide precautions. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Observation during on-site assessment of December 6-8, 2022.<br>Medical chart review.<br>Review of SCSO Custody Log and Suicide Precautions and/or GD Observation Custody Instructions Sheets for 19 inmates on suicide precautions. |

| Provision M)<br>2. Property and Privileges | **Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff depending on suicide risk, the removal and/or return of a prisoner's <u>clothing and possessions</u> (e.g., books, slippers/sandals, eyeglasses) that are otherwise within the limitations of a prisoner's classification security level. The removal of property shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.** |
|---|---|
| **Status** | **Partial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice. If deemed necessary by ACMH staff, the inmate's clothing shall be taken and the inmate will be given a 'safety suit' to wear. Prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damage property."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains requirements the following requirements that are consistent with this provision: "Any removal of clothing, property and/or privileges shall be documented with clinical justification in the patient's EMR and reviewed by a licensed clinician on at least a daily basis. For all patients on suicide precautions, the removal or limitation of clothing, property, and/or privileges shall be primarily determined by a licensed clinician. This determination shall be based on clinical judgement and on a case-by-case basis, depending on suicide risk, and in consultation with custody staff. This determination shall be documented in the patient's chart with clinical rationale. Collateral information regarding patient's current functioning obtained from custody and/or medical staff shall also be documented." In addition, ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, effective June 22, 2022, requires that "Removal of any personal or jail-issued item from the patient must be documented in the EHR along with the clinical justification for removal and |

accompanied by a doctor's order and documented on the Denial of Rights form. Magnetic signage will be posted on the patient's cell door indicating that the patient has an item restriction order." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.

As previously detailed on page 39 of this report, review of various medical charts, as well as observation from the December 6-8, 2022 on-site assessment, continued to indicate that most inmates placed on suicide precautions were initially housed in safety cells, ad seg cells, and sobering cells located in the Main Jail's booking area and clothed in safety smocks. The expert also found that approximately 45 percent (10 of 22) of inmates observed during mental health rounds of the booking cells and SITHU during the on-site assessment were clothed in safety smocks, a slight improvement from the previous assessment where 59 percent of inmates were clothed in safety smocks. In practice, inmates placed on suicide precautions in booking safety, ad seg, and sobering cells <u>never</u> receive books, slippers/sandals, eyeglasses. Rather, following a mental health assessment, they are simply provided either a safety smock or jail uniform and the other items (e.g., books, slippers/sandals, eyeglasses) are not provided until they are transferred to the SITHU. Of note, during the on-site assessment in the SITHU on December 6, 2022, an inmate-patient (<u>Case No. 6</u>) was clothed in a smock despite ACMH's Suicide Precautions and/or GD Observation Custody Instructions sheet indicating he could have his jail uniform.

In contrast, for patients admitted into the 2P-APU on suicide precautions and initially clothed in a safety smock, their uniform is generally returned to them within 24 hours, if not sooner. 2P-APU providers then follow a "Denial of Rights" (DOR) protocol that works as follows on a case-by-case basis:

> DOR1: Standard inmate clothing
> DOR2: Personal items (including toothbrush, deodorant etc.)
> DOR5: Personal visits (visits with attorneys are never limited but may need to occur at cell-side)
> DOR7: Writing utensils (pencils)
> DOR10: Placement in restraints

Of note, as detailed in the preface of this report, the parties entered into a Memorandum of Agreement (MOA) on May 27, 2022 regarding the correction of several critical remedial provisions of Mental Health and Suicide Prevention. The MOA requires the County to develop a specific quality assurance process to address several provisions, including the "Property and Privileges" for inmates on suicide precautions. The requirements include:

> "18. Staff compliance with the protocols set forth above (regarding privileges and property) will be subject to a documented quality assurance process for at least 12 months

*from the date of this Memorandum of Agreement, with quality assurance review at the monthly Suicide Prevention Subcommittee meeting (emphasis added).*

*a. **Mental health, and custody supervisors** will conduct at least weekly reviews to ensure proper implementation, with corrective action taken when warranted."*

The MOA was developed based, in part, upon the expert's previous findings that **Provision M) 1. Property and Privileges** and **Provision M) 2. Property and Privileges.**

Beginning in at least August 2022, ACMH has conducted monthly quality assurances audits entitled "ACMH Suicide Precautions Weekly Review-Monthly Report." These audits focus on the following regular clinical responsibilities:

- Suicide Precautions form completed
- MH assessments completed daily for restoration of privileges and property
- Removal of property and privileges documented with clinical justification
- Decisions about removal of clothing and use of safety smock recommended by MH staff
- Daily assessments conducted to determine restoration of clothing or documentation of continued use

In the County's most recent report dated January 9, 2023, ACMH reported the following compliance for December 2022:

- Suicide Precautions form completed (**100%**)
- MH assessments completed daily for restoration of privileges and property (**98%**)
- Removal of property and privileges documented with clinical justification (**100%**)
- Decisions about removal of clothing and use of safety smock recommended by MH staff (**100%**)
- Daily assessments conducted to determine restoration of clothing or documentation of continued use (**100%**)

Although the above clinical audit found very high compliance rates, this audit is limited to clinical recommendations, and *not whether the inmate-patient actually received such property and privileges from custody personnel*. Such a determination could only occur following the required audit by custody supervisors. *To date, SCSO has <u>not</u> conducted any comparable custody*

|  | *supervisory audits of approved property and privileges offered/received by inmate-patients on suicide precautions.*<br><br>In conclusion, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention to include language that specifies mental health clinicians shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of clothing and possessions (e.g., books, slippers/sandals, eyeglasses) that are otherwise within the limitations of an inmate's classification security level.<br>2) Consistent with the MOA, SCSO should initiate monthly custody supervisory audits of approved property and privileges offered/received by inmate-patients on suicide precautions. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, effective November 16, 2021, final.<br>ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, effective June 22, 2022, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Medical chart review.<br>Observation during on-site assessment of December 6-8, 2022.<br>ACMH Suicide Precautions Weekly Review-Monthly Reports, August 2022 through January 2023. |

| **Provision M)**<br>**3. Property and Privileges** | **Cancellation of privileges should be avoided whenever possible and utilized only as a last resort.** |
|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice. Cancellation of privileges would be done only as a last resort or if deemed necessary per ACMH."<br><br>According to the Consent Decree, routine privileges include visits, telephone calls, and recreation opportunities. Although this provision is duplicative with **Provision M) 1. Property and Privileges**, the SCSO response continues to be contrary to this expert's observations and medical chart review.<br><br>In conclusion, this provision remains in Partial Compliance (and not Non-Compliance) only because of the ACH suicide prevention policy has been issued, and this expert's recent observation during the December 6-8, 2022 on- |

|  | site assessment did show a few examples of inmates on suicide precautions receiving telephone calls. |
|---|---|
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention.<br>2) Provision of adequate dayroom space in 2P-APU. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Observation during on-site assessment of December 6-8, 2022.<br>Medical chart review.<br>Review of SCSO Custody Log and Suicide Precautions and/or GD Observation Custody Instructions Sheets for 19 inmates on suicide precautions. |

| **Provision N)**<br>**1. Use of Safety Suits** | **Decisions about the use of a safety suit (smock) or removal of normal clothing will be under mental health staff's authority, based on individualized clinical judgment along with input from custody staff.** |
|---|---|
| **Status** | **Partial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice. Outlined in the current Suicide Prevention Program Operations Order. The use of the 'safety suit' shall be at the discretion of ACMH, based on collaboration with intake or custody staff."<br><br>Although this provision is related to **Provision M) 1. Property and Privileges**, the SCSO response was contrary to this expert's observations and medical chart review. This provision remains in Partial Compliance because the new ACH suicide prevention policy has been issued, and the stark contrast between safety smock use in out-patient units versus the 2P-APU within the Main Jail. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, effective November 16, 2021, final.<br>ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, effective June 22, 2022, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Medical chart review.<br>Observation during on-site assessment of December 6-8, 2022. |

| **Provision N)**<br>**2. Use of Safety Suits** | **Custody staff may only temporarily place an inmate in a safety suit based on an identified risk of suicide by hanging until the qualified mental health professional's evaluation, to be completed within the "must see"** |
|---|---|

| | |
|---|---|
| | **referral timeline. Upon completion of the mental health evaluation, the mental health professional will determine whether to continue or discontinue use of the safety suit.** |
| **Status** | **Partial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Absent direction from Jail Psychiatric Services (JPS) deeming a 'safety garment' necessary, a sworn supervisor must authorize custody staff to take the clothing and supply the prisoner with a 'safety garment.' Unless a 'safety garment' is necessitated by the prisoner's behavior, prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damaged property." The ACH responded in the same status report that: "Staff are meeting the Remedial Plan requirements on use of safety suits outside the intake process.  SSO Custody may place an inmate in a safety suit if it is determined that the inmate is at risk of imminent self-harm. In these instances, MH is notified immediately."

The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately address this provision as follows: "Custody staff may only temporarily place a patient in a safety suit based on an identified risk of suicide by use of ligature until the licensed clinician's completion of the SRA." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.

In practice, it continues to be this expert's finding that custody personnel issue safety smocks on <u>all</u> inmates initially placed on suicide precautions, not simply those identified at *risk of suicide by hanging* as required by this provision.

Although this provision is similar to **Provision N) 1. Use of Safety Suits**, the SCSO response was contrary to this expert's observations and medical chart review. This provision remains in Partial Compliance because of the new ACH suicide prevention policy has been issued and addresses this provision, as well as the stark contrast between safety smock use in out-patient units versus the 2P-APU within the Main Jail. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention to include specific language that states "inmates can only be temporarily placed in a safety smock based on an identified risk of suicide by hanging." |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).
ACH 02-05: Suicide Prevention Program, November 16, 2021, final.
SCSO Policy 722: Suicide Prevention and Intervention, draft pending.
Observation during on-site assessment of December 6-8, 2022.
Medical chart review. |

| Provision N) 3. Use of Safety Suits | If an inmate's clothing is removed, the inmate shall be issued a safety suit and safety blanket. | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice. See above."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately address this provision as follows: "Should a licensed clinician determine that a suicidal patient clothing may be removed, the patient shall be issued a safety smock and safety blanket." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>This expert's observations and the medical chart review during the most recent on-site assessment continued to find that there were no instances in which an inmate on suicide precautions was not provided a safety smock and safety blanket.<br><br>This provision remains in Partial Compliance only because the SCSO suicide prevention policy has not been finalized. | |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. | |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Observation during on-site assessment of December 6-8, 2022.<br>Medical chart review. | |

| Provision N) 4. Use of Safety Suits | As soon as clinically appropriate, the provision of regular clothing shall be restored. The goal shall be to return full clothing to the inmate prior to discharge from suicide precautions. | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice. Determination is made by ACMH."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately address this provision as follows: "Patients shall have their | |

| | |
|---|---|
| | clothing restored as soon as clinically appropriate and prior to discharge from suicide precautions. Consideration of a patient's readiness for restoration of clothing shall be determined on an on-going basis (i.e., multiple times each day) to ensure timely return of clothing when clinically appropriate." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>This provision is duplicative with **Provision M) 2. Property and Privileges**. As noted above, suicidal inmates housed in Temporary Suicide Precautions Housing and SITHU cells are normally clothed in safety smocks for prolonged periods of time, whereas patients admitted to the 2P Acute Inpatient Unit might initially be clothed in a smock, but their uniform was generally returned to them within 24 hours. This provision remains in Partial Compliance. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Observation during on-site assessment of December 6-8, 2022.<br>Medical chart review. |


| **Provision N) 5. Use of Safety Suits** | **A qualified mental health professional shall conduct daily assessments of any prisoner in a safety suit and document reasons for continued use when clinically indicated.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the *Sixth* Status Report (January 9, 2023), was: "MH staff began weekly audits and monthly reporting of patients on suicide precautions and the return of clothing and other restrictions."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately address this provision as follows: "Any removal of clothing, property and/or privileges shall be documented with clinical justification in the patient's EMR and reviewed by a licensed clinician on at least a daily basis."<br><br>Of note, as detailed in the preface of this report, the parties entered into a Memorandum of Agreement (MOA) on May 27, 2022 regarding the correction of several critical remedial provisions of Mental Health and Suicide Prevention. The MOA requires the County to develop a specific quality assurance process to address several provisions, including the use of "Safety Smocks" for inmates on suicide precautions. The requirements include: | |

"9. Staff compliance with safety smock policies to prevent overuse and/or unnecessary use of safety smocks will be subject to a documented quality assurance process for at least 12 months from the date of this Memorandum of Agreement, with quality assurance review at the monthly Suicide Prevention Subcommittee meetings.

a. *Health care and custody supervisors* will conduct at least weekly reviews of safety smock use to ensure proper implementation, with corrective action taken when warranted.

The MOA was developed based, in part, upon the expert's previous findings for **Provision N) 5. Use of Safety Suits**.

Beginning in at least August 2022, ACMH has conducted monthly quality assurances audits entitled "ACMH Suicide Precautions Weekly Review-Monthly Report." These audits focus on the following regular clinical responsibilities:

- Suicide Precautions form completed
- MH assessments completed daily for restoration of privileges and property
- Removal of property and privileges documented with clinical justification
- Decisions about removal of clothing and use of safety smock recommended by MH staff
- Daily assessments conducted to determine restoration of clothing or documentation of continued use

In the County's most recent report dated January 9, 2023, ACMH reported the following compliance for December 2022:

- Suicide Precautions form completed (**100%**)
- MH assessments completed daily for restoration of privileges and property (**98%**)
- Removal of property and privileges documented with clinical justification (**100%**)
- Decisions about removal of clothing and use of safety smock recommended by MH staff (**100%**)
- Daily assessments conducted to determine restoration of clothing or documentation of continued use (**100%**)

Although the above clinical audit found very high compliance rates, this audit is limited to clinical recommendations, and *not whether the inmate-patient actually received such property and privileges from custody personnel*. Such a

|  | determination could only occur following the required audit by custody supervisors. To date, SCSO has <u>not</u> conducted any comparable custody supervisory audits of approved property and privileges offered/received by inmate-patients on suicide precautions.<br><br>In conclusion, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | Consistent with the MOA, SCSO should initiate monthly custody supervisory audits of approved property and privileges offered/received by inmate-patients on suicide precautions. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>Observation during on-site assessment of December 6-8, 2022.<br>Medical chart review.<br>ACMH Suicide Precautions Weekly Review-Monthly Reports, August 2022 through January 2023. |

| **Provision N)**<br>**6. Use of Safety Suits** | **If a qualified mental health professional determines that 30-minute (or less frequent) observations are warranted for a prisoner, safety suits shall not be used on that prisoner.** | |
|---|---|---|
| **Status** | **Substantial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "This causes some confusion to address. County requests discussion on the exact meaning of this provision."<br><br>Such confusion has been addressed in previous monitoring reports. The expert would agree that a portion of this provision was confusing, i.e., reference to the phrase "<u>or less frequent</u>" than 30-minute observation. This expert had interpreted the provision to mean that, if a qualified mental health professional recommended that an inmate be placed on a 30-minute observation level or greater (e.g., 60 minutes), the inmate should be assessed as <u>not</u> being suicidal and, therefore, should not also be issued a safety smock. *In other words, safety smocks are only authorized for suicidal inmates, and suicidal inmates can never be placed on 30-minute observation.* As previously confirmed by counsel of the parties, the above interpretation by this expert was correct, i.e., a safety smock can never be authorized for an inmate that a clinician has recommended 30-minute or greater observation level. Safety smocks can only be authorized | |

| | on a case-by-case basis for those suicidal inmates that require either constant observation or observation at staggered 15-minute intervals.<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately address this provision as follows: "Any patient placed on 30-minute observation shall never be placed in a safety suit. If a licensed clinician determines that a patient requires a safety suit, the patient shall be placed on suicide precautions." In addition, the ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, effective June 22, 2022, states that "Patients not on suicide observation status (close observation/constant observation) will be observed at staggered intervals not to exceed 30-minute checks as ordered by the psychiatrist."<br><br>The problem of patients on 30-minute observation being clothed in safety smocks was previously found in the medical chart review of patients in the 2P-APU. However, this expert has not found any patients in the 2P-APU or the SITHU clothed in safety smocks <u>and</u> ordered to be observed at 30-minute intervals during this assessment, nor during the previous assessment. As such, this provision is raised to Substantial Compliance. |
|---|---|
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 04-07: Acute Psychiatric Unit – Precautions and Observations, effective June 22, 2022, final.<br>Observation during on-site assessment of December 6-8, 2022.<br>Medical chart review. |

| **Provision N)**<br>**7. Use of Safety Suits** | **Safety suits shall not be used as a tool for behavior management or punishment.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice. Safety suits are only used when necessary for the safety and security of the inmate."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately address this provision as follows: "Safety suits shall not be used as a default or as a tool for behavior management or punishment." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. | |

| | |
|---|---|
| | Although this expert did not find any evidence from the medical chart review during this monitoring period that safety smocks were being utilized as a tool for behavior management or punishment, the use of safety smocks as a default for all suicidal inmates initially housed in Temporary Suicide Precautions Housing in Main Jail booking could certainly be interpreted by an inmate as a punitive management tool to deter perceived manipulative and/or attention-seeking behavior.<br><br>In conclusion, because the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized, this provision remains in Partial Compliance. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Observation during on-site assessment of December 6-8, 2022.<br>Medical chart review. |

| | |
|---|---|
| **Provision O)**<br>**1. Beds and Bedding** | **All prisoners housed for more than four hours on suicide precautions and/or in an inpatient placement shall be provided with an appropriate bed, mattress, and bedding unless the prisoner uses these items in ways for which they were not intended (e.g., tampering or obstructing visibility into the cell). Such a determination shall be documented and shall be reviewed on a regular basis.** |
| **Status** | **Partial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was as follows: "This is current practice. Those housed in safety cells in the booking area are moved to appropriate suicide-resistant housing as soon as a bed/cell opens up." The ACH response in the same report was that "Custody distributed new suicide-resistant mattresses to the high acuity MH housing areas and safety cells in May 2022."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, partly addresses this provision as follows: "If a patient utilizes a mattress to obstruct staff visibility or tampers with a mattress in a manner that poses danger to the patient, custody personnel may temporarily remove the mattress from the cell. The removal of a mattress and rationale shall be documented. Patients will be assessed regularly by a licensed clinician for the appropriate use of a mattress." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. |

|  | The parties previously clarified that the County is responsible for provision of a temporary suicide-resistant bed ("stack-a-bunk") and mattress for inmates housed more than four (4) hours on suicide precautions or in-patient placement. (Provision H.1 separately indicates that safety cell placements may last for up to six (6) hours.) |
|  | There were concerns found during the on-site assessment on December 6-8, 2023, including that not all suicidal patients held in the Main Jail safety cells more than four hours were provided a mattress, blanket, and temporary suicide-resistant bed ("stack-a-bunk"). |
|  | In conclusion, this provision remains in Partial Compliance because the SCSO Policy 722: Suicide Prevention and Intervention has not been finalized and the expert will need to reinspect the Main Jail safety cells again to ensure any suicidal inmate held more than four hours is provided a mattress, blanket, and temporary suicide-resistant bed ("stack-a-bunk"). |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Observation during on-site assessment of December 6-8, 2022. |

| **Provision P) 1. Discharge from Suicide Precautions** | **A qualified mental health professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions in order to ensure that the discharge is appropriate and that appropriate treatment and safety planning is completed.** |
|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2022), was repeated from previous reports as: "Current custody practice." Such a response was inappropriate because this provision is specific to a mental health clinician's determination, documented in a suicide risk assessment, that the inmate can be discharged from suicide precautions because they are no longer at current risk for suicide. |
|  | The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, adequately addresses this provision as follows: "A licensed clinician shall complete an SRA for each patient discharged from suicide precautions. The SRA shall include recommendations for specific treatment goals based on the circumstances leading to placement on suicide precautions and/or acute psychiatric care including underlying diagnosis." |

| | |
|---|---|
| | This expert's medical chart review of 12 inmate-patients discharged from suicide precautions during the on-site assessment in February 2022 found that nine (9) patients on suicide precautions in the SITHU each had an SRA completed at discharge, but that <u>none</u> of three (3) admitted to and discharged from the Acute Psychiatric Unit had SRAs completed at discharge. This finding is contrary to ACH 04-09 "Acute Psychiatric Unit, Admission, Program, and Discharge, November 30, 2022, which states that "The LCSW will conduct a discharge SRA and Safety Plan for patients who had been admitted as danger to self and who no longer meet admission criteria."<br><br>This provision remains in Partial Compliance. |
| **Recommendations** | ACMH should ensure that a discharge SRA and safety plan is completed for each patient discharged from the APU in which the reason for admission was danger to self and/or patient became suicidal during placement. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 04-09: Acute Psychiatric Unit, Admission, Program, and Discharge, November 30, 2022, final.<br>Medical chart review. |
| | |
| **Provision P) 2. Discharge from Suicide Precautions** | **Treatment plans shall be written for all prisoners discharged from suicide precautions. The treatment plan shall describe signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur.** |
| **Status** | **Partial Compliance** |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Sixth* Status Report (January 9, 2023), was omitted.<br><br>This provision is duplicative with both **Provision K) 1. Treatment of Inmates Identified as at Risk of Suicide** and **Provision K) 2. Treatment of Inmates Identified as at Risk of Suicide** that were addressed earlier in this report. As such, these three provisions will be monitored as one provision.<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements that are consistent with this provision: "MH staff will develop and utilize a safety planning tool for patients on suicide precautions. The safety plan shall be completed with the patient and identify specific signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and specific actions (independent coping skills, personal and professional resources for support, etc.) the patient or staff can take if suicidal thoughts do occur. The plan should be updated as clinically indicated….The treatment plan |

| | |
|---|---|
| | shall be updated to include goals and interventions specific to each patient's safety plan and discharge planning."<br><br>This provision remains in Partial Compliance. |
| **Recommendations** | See above recommendation. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>Medical chart review. |

| **Provision P)**<br>**3. Discharge from Suicide Precautions** | **Qualified mental health professionals shall provide clinical input regarding clinically appropriate housing placement (e.g., whether isolation is contraindicated for the prisoner) upon discharge. Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement. Once clinically discharged from suicide precautions, the prisoner shall be promptly transferred to appropriate housing.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current custody practice. This is accomplished with the input of Classification staff and ACMH." The ACH response in the same report was repeated from previous reports as follows: "Patients are transferred to IOP when clinically appropriate and a bed is available. IOP and Outpatient treatment logs have been updated to reflect accurate appointment types."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements that are consistent with this provision: "A licensed clinician shall also provide clinical input regarding clinically appropriate housing placement (e.g., whether isolation is contraindicated for the patient) upon discharge and document such input in the EHR. Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement. Once clinically discharged from suicide precautions, the patient shall be promptly transferred to appropriate housing." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>Both SCSO and ACMH leadership previously informed this expert that clinicians do work collaboratively with custody personnel in the placement of inmates following their discharge from suicide precautions. Recent medical chart review did not provide any evidence to the contrary. This provision remains in Partial Compliance only because the SCSO suicide prevention policy has not been finalized. | |

| Recommendations | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
|---|---|
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Medical chart review. |

| **Provision P)**<br>**4. Discharge from Suicide Precautions** | **Prisoners discharged from suicide precautions shall remain on the mental health caseload and receive regularly scheduled clinical assessments and contacts. Unless a prisoner's individual circumstances direct otherwise, a qualified mental health professional shall provide follow-up assessment and clinical contacts within 24 hours of discharge, again within 72 hours of discharge, again within one week of discharge.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Patients who are discharged from APU after being treated for a suicide attempt or ideation receive follow-up MH appointments (24 hours, 72 hours and 5 days)."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements that are consistent with this provision: "All patients discharged from suicide precautions shall remain on the mental health caseload and receive regularly scheduled clinical assessments and contacts. Unless a patient's individual circumstances direct otherwise, a clinician shall provide a follow-up assessment and clinical contact within 24 hours of discharge, again within 72 hours of discharge, and again within one week of discharge. a. Individual circumstances that might override the above requirement for follow-up assessments may include incidents in which a patient was placed on suicide precautions by either custody or medical personnel and subsequently discharged from suicide precautions by a licensed clinician within 24 hours and with finding that the placement was inadvertent (See G.3. above). b. However, if the licensed clinician's initial suicide risk assessment determined that continued suicide precautions beyond 24 hours was appropriate, then the scheduled follow-ups shall always occur."<br><br>This expert's medical chart review of 12 inmates placed on suicide precautions during the on-site assessment in December 2022 found that 8 (67 percent) inmates received timely follow-up referrals and 4 (33 percent) did not receive all timely follow-up referrals (e.g., the first required follow-up after 24 hours was not provided). | |

|  | In conclusion, because scheduled follow-up assessments are not consistently occurring in all cases, this provision remains in Partial Compliance. |
| **Recommendations** | None |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. Medical chart review. |

| **Provision Q) 1. Emergency Response** | **The County shall keep an emergency response bag that includes appropriate equipment, including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units. All custodial and medical staff be trained on the location of this emergency response bag and shall receive regular training on emergency response procedures, including how to use appropriate equipment.** | |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Those items are available in each facility." The ACH response was also repeated in previous reports as: "New emergency carts were deployed at Main Jail. New carts are on order for RCCC."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements that are consistent with this provision: "Both the MJ and RCCC shall keep an emergency response cart or bag that includes a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units. All custody and medical staff shall be trained on the location of this emergency response cart and shall receive regular training on emergency response procedures, including how to use appropriate equipment." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>This provision specifically requires that an emergency response bag (including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool) be located in close proximity to all housing units, not simply "available in each facility." Previous inspection of select Main Jail and RCCC housing units found that emergency rescue tools and pocket masks (not Ambu bags) were located in the deputies' "bubble" outside each housing unit.<br><br>This provision remains in Partial Compliance because the SCSO suicide prevention policy has not been finalized. | |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. | |

| Evidentiary Basis | Sacramento County's *Sixth* Status Report (January 9, 2023). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. |
|---|---|

| Provision Q) 2. Emergency Response | **All custody and medical staff shall be trained in first aid and CPR.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Fifth* Status Report (June 16, 2022), was repeated from previous reports as: "Current Custody practice. Sworn staff receive CPR training every two years. It is part of our Advanced Officer Training Program." The ACH response in the same report stated: "Medical and custody staff are trained in CPR." The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements that are consistent with this provision: "All medical and custody staff are trained in first aid and CPR." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. Recent CPR training data indicated that 67 percent (200 of 296) of custody personnel, and 94 percent (137 of 145) of medical personnel (nursing and providers) were currently certified in CPR. This provision remains in Partial Compliance because the SCSO suicide prevention policy has not been finalized and there remains a low percentage of custody personnel currently CPR certified. | |
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention. 2) Twice a year in January and June, provide updated data on the total number of current employees for each discipline (i.e., denominator for both custody and medical personnel), and the total of current employees (i.e., numerator) who are currently CPR certified. | |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. Training data provided December 2022. | |

| Provision Q) 3. Emergency Response | **It shall be the policy of the County that any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff shall begin to administer standard first aid and/or CPR, as appropriate.** |
|---|---|

| Status | Partial Compliance | |
|---|---|---|
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9 2023), was repeated from previous reports as: "Current practice." The ACH response in the same report stated: "Staff complete a Man-Down Debriefing Summary for incidents requiring medical response or drills. The form and staff debriefing assist staff in reviewing code response."<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements that are consistent with this provision: "Any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff shall begin to administer standard first aid and/or CPR, as appropriate." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>The expert reviewed two morbidity reviews completed by the Suicide Prevention Subcommittee during the review period. Both reviews, completed by the committee on November 14, 2022 regarding a serious suicide attempt on April 21, 2022, and a second review completed by the committee on December 12, 2022 regarding a serious suicide attempt on August 1, 2022, determined that there were not any deficiencies in the emergency medical response by both custody and medical personnel.<br><br>This provision remains in Partial Compliance only because the SCSO suicide prevention policy is not finalized. | |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. | |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending. | |

| **Provision R)**<br>**1. Quality Assurance and Quality Improvement** | **The County shall establish regularly scheduled multidisciplinary meetings related to treatment, and plan of care issues, on a monthly basis, between medical, and mental health personnel.** | |
|---|---|---|
| **Status** | Partial Compliance | |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as follows: "A MH QI subcommittee convened May 2021. This Subcommittee meets quarterly. MH convened a multidisciplinary Suicide Prevention | |

Subcommittee to review, track, and audit the requirements. Suicide Prevention Subcommittee moved meetings from a quarterly to monthly schedule to improve communication, implement suicide prevention training, and complete morbidity and mortality reports in a timely manner. A multidisciplinary Suicide Prevention Training Subcommittee was established to develop suicide prevention training. This group met multiple times and determined a separate subcommittee was no longer needed in late May 2022 once training was approved…. Implemented monthly Suicide Prevention Multidisciplinary meetings to discuss patients with complex mental health needs who engage in self-injurious behaviors (July 2022)."

The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements that are consistent with this provision: "The Suicide Prevention Subcommittee is a designated subcommittee of the Quality Improvement Committee. The composition of the subcommittee includes representation from all disciplines and both facilities. The subcommittee meets monthly and is facilitated by the Mental Health Medical Director." In addition, the ACH 01-15: Suicide Prevention Subcommittee policy, effective September 17, 2021, provides a full description of the Subcommittee's areas of responsibility, that include, but are not limited to, "Ensuring that all required suicide prevention policies are implemented and sustained." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.

Based upon this expert's recommendation, the Suicide Prevention Subcommittee converted to monthly meetings in November 2021. Review of meeting minutes found that the Subcommittee consistently maintained monthly meetings during the review period. This multidisciplinary subcommittee, comprised of mental health, medical, and custody personnel, is facilitated by the ACMH on-site medical director. This expert is also a periodic participant at the Subcommittee meetings.

To date, as reflected in the minutes, most of the monthly Subcommittee meetings continue to focus primarily on the morbidity review of various serious suicide attempts occurring in the Main Jail during 2022. With the exception of ACMH providing monthly audit data on clinical recommendations for clothing and privileges, the meetings have not consistently addressed one of the Subcommittee's main areas of responsibility, i.e., "ensuring that all required suicide prevention policies are implemented and sustained." This continuous quality assurance responsibility is further discussed below in **Provision R) 5. Quality Assurance and Quality Improvement.**

In addition, both the ACH 02-05: Suicide Prevention Program policy and ACH 01-15: Suicide Prevention Subcommittee policy require that "The management of specific inmates on suicide precautions that pose challenges to custody, medical and/or MH personnel shall be discussed in a monthly multi-

| | |
|---|---|
| | disciplinary Suicide Precautions Meeting....Meeting minutes shall be taken to record discussion, decisions and recommendations....Members of this multi-disciplinary meeting shall make recommendations, as appropriate, to the Suicide Prevention Subcommittee." These monthly multidisciplinary Suicide Precautions meetings were initiated by ACMH in July 2023, and reviewed meeting minutes indicate the meetings were mostly held on a consistent monthly basis during the review period.<br><br>Based upon the above findings, this provision remains in Partial Compliance. |
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention and Intervention.<br>2) Future Suicide Prevention Subcommittee meetings should include discussion of continuous quality assurance measures taken to ensure all required suicide prevention policies are implemented and sustained. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 01-15: Suicide Prevention Subcommittee, September 17, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Suicide Prevention Quality Improvement Subcommittee Meeting Agenda and Minutes, monthly from July 2022 through January 9, 2023.<br>Suicide Precautions Multidisciplinary Meeting Agenda and Minutes, monthly from July 2022 through January 2023. |

| | |
|---|---|
| **Provision R)**<br>**2. Quality Assurance and Quality Improvement** | **The County shall, in consultation with Plaintiffs' counsel, revise its in-custody death review policy and procedures. Reviews shall be conducted with the active participation of custody, medical, and mental health staff. Reviews shall include analysis of policy or systemic issues and the development of corrective action plans when warranted.** |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice." The ACH response in the same report was: "Began Morbidity and Mortality reviews during the Suicide Prevention Subcommittee meetings in December 2021."<br><br>This provision is more or less duplicative with **Provision R) 3. Quality Assurance and Quality Improvement** below. The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements of the Suicide Prevention Subcommittee that are consistent with this provision: "Provide a comprehensive morbidity review of serious suicide attempts (one involving medical intervention or hospitalization) and a mortality review of suicides. Reviews to include: 1. The circumstances surrounding the incident. 2. Possible precipitating factors that may have caused |

| | the patient to commit suicide or suffer a serious suicide attempt. 3. Pertinent medical and mental health services, incidents and/or reports involving the patient. 4. The procedures relevant to the incident. 5. All relevant training received by involved staff. 6. Where applicable, the subcommittee shall make recommendations for changes in policy, training, physical plant, medical or mental health services, and/or operational procedures." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. |
|---|---|
| | Because the SCSO suicide prevention policy has not been finalized, this provision remains in Partial Compliance. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023). ACH 02-05: Suicide Prevention Program, November 16, 2021, final. ACH 01-15: Suicide Prevention Subcommittee, September 17, 2021, final. SCSO Policy 722: Suicide Prevention and Intervention, draft pending. |

| **Provision R) 3. Quality Assurance and Quality Improvement** | **For each suicide and serious suicide attempt (e.g., requiring hospitalization), the County's Suicide Prevention Task Force shall review: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt. Where applicable, the Review Team shall generate recommendations for changes in policy, training, physical plant, medical or mental health services, and operational procedures.** |
|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by the SCSO in the *Sixth* Status Report (January 9, 2023), was repeated from previous reports as: "Current practice. The Suicide Prevention Task Force has been reestablished and has already had its first meeting." The Suicide Prevention Task Force was subsequently renamed the Suicide Prevention Quality Improvement Subcommittee at the initiation of monitoring of this *Consent Decree*. |
| | This provision is more or less duplicative with **Provision R) 2. Quality Assurance and Quality Improvement** above. The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements of the Suicide Prevention Subcommittee that are consistent with this provision: "Provide a comprehensive morbidity review of serious suicide attempts (one involving medical intervention or hospitalization) and a mortality review of suicides. Reviews to include: 1. The circumstances |

| | |
|---|---|
| | surrounding the incident. 2. Possible precipitating factors that may have caused the patient to commit suicide or suffer a serious suicide attempt. 3. Pertinent medical and mental health services, incidents and/or reports involving the patient. 4. The procedures relevant to the incident. 5. All relevant training received by involved staff. 6. Where applicable, the subcommittee shall make recommendations for changes in policy, training, physical plant, medical or mental health services, and/or operational procedures." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>As described in a previous provision, the monthly Suicide Prevention Quality Improvement Subcommittee meetings have primarily focused on the morbidity review of various serious suicide attempts occurring in the Main Jail during 2022.<br><br>Because the SCSO suicide prevention policy has not been finalized, this provision remains in Partial Compliance. |
| **Recommendations** | Finalize the SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 01-15: Suicide Prevention Subcommittee, September 17, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending. |

| **Provision R) 4. Quality Assurance and Quality Improvement** | **The County will track all critical incidents which include prisoner suicides, attempted suicides, and incidents involving serious self-harm. The County shall review critical incidents and related data through its quality assurance and improvement processes.** | |
|---|---|---|
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by ACH in the *Sixth* Status Report (January 9, 2023), was simply: "MH tracks incidents of suicide, attempted suicide, and serious self-harm."<br><br>This provision is more or less duplicative with **Provision R) 3. Quality Assurance and Quality Improvement** above because it involves review of both inmate suicides and serious incidents of self-harm, but also includes tracking of attempted suicides (that are not necessarily determined to be serious).<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements of the Suicide Prevention Subcommittee that are consistent with this provision: "Tracking of all suicides, suicide attempts, and incidents of serious self-harm by the QI Coordinator, with | |

| | |
|---|---|
| | incidents of serious self-harm/attempts and suicides reviewed by the subcommittee." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized.<br><br>Of note, the expert previously recommended in August 2022 that SCSO track the ligature anchoring devices utilized for all suicide attempts by hanging in an attempt to determine if cells designated to house inmates on suicide precautions were indeed suicide-resistant. SCSO audit subsequently found that 55 percent (15 of 27) suicide attempts by hanging from July 2020 through July 2022 occurred in IOP/OPP housing locations, but <u>none</u> in the SITHU or other areas designated for suicide precautions. In addition, 41 percent (11 of 27) of the suicide attempts involved use of an anchoring device such as cell desk, toilet, bunk, and light fixture.<br><br>In conclusion, this provision remains in Partial Compliance. |
| **Recommendations** | Finalize SCSO Policy 722: Suicide Prevention and Intervention. |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 01-15: Suicide Prevention Subcommittee, September 17, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>SCSO "Data Review: Main Jail Attempted Suicide via Ligature: July 2020-July 2022," undated. |

| | | |
|---|---|---|
| **Provision R) 5. Quality Assurance and Quality Improvement** | **The County shall implement a continuous quality assurance/quality improvement plan to periodically audit suicide prevention procedures that include, but are not limited to: intake screening (to include audits to ensure that staff ask and record all suicide screening questions), mental health assessments, suicide risk assessments, crisis response, and treatment plans/behavior management plans for prisoners identified as being at risk of suicide or self-harm.** | |
| **Status** | **Partial Compliance** | |
| **Discussion** | Sacramento County's response to this provision, as authored by either the SCSO or ACH in the *Sixth* Status Report (January 9, 2023), was omitted.<br><br>The ACH 02-05: Suicide Prevention Program policy, effective November 16, 2021, contains the following requirements of the Suicide Prevention Subcommittee that are consistent with this provision: "Periodic auditing of intake screening (to include audits to ensure that nursing staff ask and record all suicide risk and mental health screening questions), mental health assessments, suicide risk assessments, crisis response, and treatment plans/safety plans/behavior management plans for patients identified as being at risk of suicide or self-harm." The SCSO Policy 722: Suicide Prevention and Intervention has not been finalized. | |

As detailed in the Introduction section of this report, a Memorandum of Agreement executed by the parties (on May 27, 2022) in the joint *Status Report RE: Monitoring of Consent Decree Implementation*, filed with the court on June 3, 2022 (Case 2:18-cv-02081-TLN-KJN. Document No. 153), contained very specific requirements regarding quality assurance and continuous quality improvement for the suicide prevention provisions of this *Consent Decree*. In fact, Section 18 (page 9) of the Agreement specifies that:

> "*Staff compliance with the protocols set forth above will be subject to a documented quality assurance process for at least 12 months from the date of this Memorandum of Agreement, with quality assurance review at the monthly Suicide Prevention Subcommittee meeting (emphasis added).*
> *a. ACH, mental health, and custody supervisors will conduct at least weekly reviews to ensure proper implementation, with corrective action taken when warranted.*
> *b. The Mental Health and Suicide Prevention Subject Matter experts will monitor policy implementation and the quality assurance process to ensure compliance with relevant Consent Decree requirements.*"

This expert previously interpreted this provision to indicate that the County must develop a continuous quality improvement/quality assurance plan to ensure that all suicide prevention provisions of this *Consent Decree* or implemented and sustained. This Memorandum of Agreement now codifies those responsibilities.

This expert had previously recommended that the *Consent Decree* and MOA requirement to "*implement a continuous quality assurance/quality improvement plan to periodically audit suicide prevention procedures that include, but are not limited to: intake screening (to include audits to ensure that staff ask and record all suicide screening questions), mental health assessments, suicide risk assessments, crisis response, and treatment plans/behavior management plans for prisoners identified as being at risk of suicide or self-harm*" be inserted as a "standing item" in the monthly Suicide Prevention Quality Improvement Subcommittee meeting agenda as a reminder to committee members of these quality assurance responsibilities.

Although this narrative was subsequently inserted into the template for the monthly meeting agenda, review of the monthly Suicide Prevention Quality Improvement Subcommittee meeting minutes during the review period found that suicide prevention requirements such as intake screening, suicide risk assessments, and treatment plans are rarely discussed.

|  | Because all of the suicide prevention provisions in the *Consent Decree* are in various stages of compliance, and the recent Memorandum of Agreement lays out specific continuous quality improvement/quality assurance requirements, this provision remains in Partial Compliance. |
|---|---|
| **Recommendations** | 1) Finalize SCSO Policy 722: Suicide Prevention.<br>2) Ensure that future Suicide Prevention Quality Improvement Subcommittee meetings include discussion of continuous quality assurance measures taken to ensure all required suicide prevention policies are implemented and sustained, i.e., the suicide prevention subcommittee to implement the requirements of the Memorandum of Agreement in the joint *Status Report RE: Monitoring of Consent Decree Implementation*, filed June 3, 2022 (Case 2:18-cv-02081-TLN-KJN. Document No. 153). |
| **Evidentiary Basis** | Sacramento County's *Sixth* Status Report (January 9, 2023).<br>ACH 02-05: Suicide Prevention Program, November 16, 2021, final.<br>ACH 01-15: Suicide Prevention Subcommittee, September 17, 2021, final.<br>SCSO Policy 722: Suicide Prevention and Intervention, draft pending.<br>Memorandum of Agreement, May 27, 2022.<br>Suicide Prevention Quality Improvement Subcommittee Meeting Agenda and Minutes, monthly from July 2022 through January 9, 2023. |