*Mays et al v Sacramento County*
Case No. 2:18-cv-02081-TLN-KJN


Mental Health Expert's Fourth Round Report of Findings


May 1, 2024, final version

Mary Perrien, Ph.D.

TABLE OF CONTENTS

1.  Introduction and Background for Fourth Mental Health monitoring report ..................... 3

2.  Methodology. .......................................................................................................... 8

3.  Areas of Focus and Joint Memorandum of Understanding ............................................. 9

4.  Findings of areas prioritized in Prior Mental Health Monitoring Reports ..................... 10

5.  Remaining issues – Consent Decree  ........................................................................... 23

6.  Conclusion ................................................................................................................ 83

7.  Appendix A:  Document Request ................................................................................. 85

8.  Appendix B:  Mental Health Narrative and Update ....................................................... 96

9.  Appendix C:  Staffing ................................................................................................ 103

10. Appendix D:  Length of Stay on Acute Psychiatric Unit Waitlist ............................... 107

11. Appendix E:  WRAP Restraint Device Photo ............................................................. 109

12. Appendix F:  Use of Force Operations and Post Orders .............................................. 111

13. Appendix G: Use of Body Worn Cameras Interim Order ............................................ 126

14. Appendix H: Summary Consent Decree Compliance Table ......................................... 128

1. **Introduction and Background for Fourth Mental Health Monitoring Report**

This is the Fourth Mental Health Monitoring Report since January 2021. The data review period for this review was January 1 through June 30, 2023, unless otherwise noted. The documentation provided by the mental health contractor, Jail Psychiatric Services (JPS)/Adult Correctional Mental Health (ACMH), was significantly improved from prior review periods. It was highly organized and reflective of progress that had occurred since the Third Mental Health Monitoring (TMHM) report. Custodial data was again incomplete and required subsequent requests for the Main Jail (MJ). This will be discussed further in the Areas of Focus section and will reflect the addition of areas for prioritization.

<u>Summary Background</u>

The Sacramento County Sheriffs' Department continued to operate two jail facilities that provided housing and services to the general detainee populations and those with mental and medical illnesses:  the Main Jail (MJ) located in downtown Sacramento and the Rio Cosumnes Correctional Center (RCCC) located in Elk Grove. While the Sacramento County (SacCo) Sheriff's office (SSO) continued to manage the jails and provide security through their custodial roles, mental health and medical care were provided by different entities, though the providers remained the same as the last mental health monitoring report (hereafter referred to as the Third Mental Health Monitoring Report or TMHMR). These medical and mental health practitioner agencies have provided service in the SacCo jails for years and are extremely familiar with the challenges in providing constitutionally-adequate care. Sacramento County Department of Health via Adult Correctional Health (ACH) provided the medical services at both facilities. The ACH contracted with UC Davis Department of Psychiatry and Behavioral Sciences for mental health services and have been referred to as Adult Correctional Mental Health (ACMH). The ACMH has previously been referred to as Jail Psychiatric Services (JPS) in prior monitoring reports. No structural changes occurred with the name change.

ACH provided all nursing staff including for the Acute Psychiatric Unit (APU) on 2P beginning June 23, 2023. Health services requests continued to be routed through ACH and then to ACMH if related to mental health concerns. Sacramento County continued to operate a contract with the Department of State Hospitals to provide Jail-Based Competency Treatment (JBCT) for competency restoration. This was due in large part to the backlog with access to state hospitals and need for expanded competency restoration treatment. Individuals in the JBCT must be found incompetent to stand trial (IST) through a judicial process. However, these individuals flow between non-JBCT status but high mental health service need and placement in the JBCT or transfer to and return from a state hospital for those services. It was noted in the TMHMR that as part of the fiscal year 2022-2023 contract, JBCT no longer accepted patients from throughout California, instead serving just patients from Sacramento County. The JBCT program is not a focus of remediation efforts in this case.

In May 2022, SacCo and Plaintiffs' counsel signed a Memorandum of Agreement (MOA) for mental health and suicide prevention remediation efforts. These items were in addition to the original Remedial Plan and were monitored throughout the monitoring period. They will be incorporated into the structure of this report and cited as part of the MOA.

Utilizing point in time data (7/14/23), Defendants reported the following capacity maximums: 1,625 for RCCC and 2,380 for the MJ with a total capacity of 4,005 across the two facilities. Because of various legislative efforts to reduce capacity at jails across California and Sacramento County efforts to reduce jail population, the population remained below maximum capacity throughout the monitoring

round and was less than the prior point in time (7/1/22) total. There were 3,447 total detainees as of July 1, 2022. The July (14) 2023 total census across the two facilities was 3,292. This was a decrease of 155 detainees between July 2022 and July 2023 or approximately 4.4%. It remained clear and was reinforced by staff reports that continuing to maintain the population below the maximum capacity made it easier to meet the various missions of the facilities.

Despite overall census numbers decreasing, the proportion of patients receiving mental health services (MHS) increased to 54% or 1,777 across both facilities[1]. Data provided by ACMH:

| Population Receiving MHS[2] | |
|---|---|
| Main Jail Total | 1154 |
| RCCC Total | 623 |
| Total | 1,777 |
| By Level of Care (LOC) | |
| APU Total (2P) | 16 |
| IOP Total (both facilities) | 75 |
| EOP Total (both facilities) | 231 |
| Outpatient (both facilities) | 1455 |
| Total by LOC | 1,777 |
| Waitlist | |
| APU Total Waitlist | 33 |
| IOP Total Waitlist (both facilities) | 32 |
| EOP Total Waitlist (both facilities) | 145 |
| Waitlist total | 210 |
| Additional Assessments Completed[3] | |
| Assessments but not on caseload | 527 |

The workload and overall population have increased since the TMHMR, due at least in part to expansions in program services, staffing, and ability to identify detainees in need of ongoing MHS and/or with serious mental illness (SMI). These numbers were further broken down by LOC at each facility:

| MAIN JAIL (MJ) | |
|---|---|
| APU | 16 |
| IOP | 45 |
| EOP | 231 |
| Outpatient | 862 |
| RIO COSUMNES CORRECTIONAL CENTER (RCCC) | |
| APU | 0 |
| IOP | 30 |
| EOP | 0 |

---

[1] As of 7/11/23

[2] Please see Appendix B for program/level of care descriptions.

[3] As reported by ACMH, these were additional patients who had received mental health assessments but determined to not require MHS at that time.

| | |
|---|---|
| Outpatient | 593 |
| TOTAL | 1,777 |

Progress Overview

It should be noted that there have been multiple areas of progress as will be discussed in detail further in the report. Since the last mental health monitoring report, the County has provided two (7th, and 8th) progress reports to the Court. The most recent progress reports were submitted in January 2024. The County continued to invest significantly in policy development and has finalized a substantial number of policies including 21 mental health policies. There are just six mental health policies in some stage of the review and approval process. There were also five interim post orders completed[4] and one operations memorandum on confidentiality in mental health contacts at the MJ. ACMH has increased the use of the confidential visit booths (attorney booths) in the MJ so that they can be used for all mental health contacts. ACMH supervisors monitor their use and hold regular meetings with staff to discuss barriers to their utilization. Custody and ACMH staff continued to meet to review those barriers and problem-solve challenges to increase utilization and efficiency of use for the attorney booths. Classrooms continued to be utilized for confidential group therapy and individual contacts when not occupied for group therapy. Clinicians were expected to document the reason that confidential space was not used for a contact and ACMH continued to audit these elements of compliance with the Remedial Plan. The results were shared with custody staff as part of the ongoing collaborative training between mental health and custody staff which has decreased the occurrence of non-confidential contacts due to safety and security. The lack of available confidential space remained as a tremendous challenge and primary reason for non-confidential contacts. A plan was developed to construct confidential booths for ACMH contacts on 3W. A "concept" booth was installed on 3W in October 2023 and was reported to provide "excellent" auditory privacy (8th Status Reports to the Court). Approval was received to place additional such booths in each housing unit. Their utilization and effectiveness will be evaluated by the mental health SME during the next monitoring period.

Mental health staffing has increased by approximately 2.7 times (approximately 50.3 to 133.8 staff) though there remained a vacancy rate of almost 26% (as of December 2023)[5] since implementation of the Consent Decree. Three additional social work (SW) staff were assigned to the acute psychiatric unit (APU) to enhance services there. They were responsible for crisis intervention, coordination of treatment planning, and group/individual psychotherapy. An APU social skills/exercise group was observed during the site visit. Patients were engaged with facilitators using positive reinforcement to refocus and include lower functioning patients. This was significant progress toward developing a fully functioning acute care unit. In addition, additional psychiatric prescribers were allocated. Specifically, the number of psychiatric nurse practitioners was doubled (from 2.0 to 4.0) and the number of psychiatrists was increased from two to three. One of those psychiatrists had internal medicine training in addition to psychiatry training. This provider was assigned to the APU because patients there often have complex medical and psychiatric needs.

Multidisciplinary treatment (MDT) team implementation was expanded to the enhanced outpatient (EOP) level of care. Psychiatric providers were included in those MDT team meetings. A

---

[4] Administrative segregation (ASU) (3/23), reproductive healthcare (3/23), planned use of force (UOF) (4/23), clothing exchange (RCCC 5/9/23), and sanitation and cleanliness (RCCC 6/27/23).
[5] Sacramento County ACH Eighth Status Report to the Court.

staffing augmentation was approved for EOP[6] allowing for an expansion in service delivery. In addition, EOP implemented group therapy for those patients housed in the following units: 3E, 3W, 4E, 4W, 7W, and 8E.

As a result of prior mental health monitoring reports and findings from the medical subject matter experts (SMEs), a pilot was implemented to improve timeliness in mental health screening, psychotropic medication verification, and assessment for patients in booking. Because of this implementation with a "hard stop" in the documentation process for nursing in the intake process, timeliness for medication verification improved from 13% to 78% compliance per self-audits.

The progress that ACMH has made between monitoring reports has been commendable. The mental health management team is capable and committed to the provision of quality mental health services and compliance with the Remedial Plan. They remain open to feedback and incorporate that feedback into their continuous quality improvement (CQI) and management of mental health operations. In addition, the continuity of leadership in the ACMH since the second monitoring report has had a tremendous positive impact on the consistent improvement in mental health service delivery.

<u>Significant and Repeated Concerns Regarding Monitoring Process</u>

There has been a significant and repetitive obstacle to properly assessing the status of operations impacting the delivery of mental health services in the Sacramento County jail system that must be a priority for resolution. As this is the fourth monitoring report, there remain ***significant*** and unexplainable problems with the SSO responding to the document request. While the distribution of the document request is unknown to this SME, clearly staff are aware of the need for SSO to provide documentation to numerous items. Following the first document request, repeated additional requests for information were made to SSO. While some documents were provided, they were difficult to utilize as they were not properly labeled and there was no organization to the documents. The documentation at that time was primarily raw data (e.g., illegible sign in sheets, individual reports and/or separate documents that could not be cross-referenced and matched to allow for analysis. Following the second document request, much of the SSO documentation was similarly problematic though most was simply missing. Again, several requests for the information were made and some data was provided, though it was also of limited utility for reasons described above. Repeated offers of clarification and opportunity to meet were provided to SSO and recommended in the monitoring report. It can be difficult to understand what to produce for ongoing monitoring if an entity has not previously experienced such monitoring. Turnover among SSO leadership assigned to work on *Mays* remedial plan implementation and compliance create further challenges and contribute to the problems that arise again and again.

At the time that each document request was submitted, this SME offered to clarify any items as well as a request to notify the SME as soon as possible if something could not be produced. Following the third document request, RCCC was able to produce multiple documents in generally adequate format in response to the request. The MJ did provide some information (e.g., training) but folders for MJ document production did remain empty. Subsequent reminder requests were made without success. RCCC should be commended as the responsible staff there appear to be somewhat familiar with the monitoring reports and clearly familiar with the document request. RCCC has demonstrated substantial efforts to comply with the document request in the manner in which the data is requested. While the MJ has also shown improvement, it has not been as clear and meaningful as that produced by RCCC. For

---

[6] EOP staff had been reassigned to the IOP to increase IOP service delivery and capacity. The EOP staffing augmentation allowed for a return to previous service levels and an expansion to a total capacity to provide mental health treatment to 525 patients.

example, while use of force is a priority area and has repeatedly been part of the document request, the MJ did not provide any incident packages initially, though RCCC did provide such materials. However, based on the data reported regarding incidents of use of force involving people with mental illness and intellectual disability, there was an unexplained paucity of incident reports. It is noted that following a subsequent discussion with the MJ compliance lieutenant via email in September 2023, there were 59 UOF incident reports uploaded to the shared drive. However, no one notified the SME once they had been uploaded. The last download from that drive occurred days before the MJ UOF document upload and went unnoticed until this draft report. Because of the number of cases included, the extensive UOF analysis completed for RCCC reports could not be completed for the MJ. However, basic information and the findings from a small sample review are included in the final version of this report. The MJ did eventually provide the requested information and had properly titled each of the files. However, timely document production for the SSO that is responsive to the document request remained a critical concern during this monitoring period.

Disciplinary information provided included reports from both facilities, but the files were not properly labeled. Because they were incomplete (did not include the MH assessment) and only labeled as "Incident 1, Incident 2…" the SME spent *considerable time* attempting to cross-reference mental health assessments with incident reports. This was a large task that was eventually abandoned. While SSO staff are extremely helpful to this SME during onsite visits and extremely open to feedback, the document request challenges must be resolved. This SME believes that it is likely a function of workload and a lack of understanding of what is required, deadlines for submission, and support from others within the organization in completing the tasks. Consistency in the staff assigned to *Mays* compliance and SME coordination from one reporting period to the next is also essential.

Recommendations:

In an effort to ensure that all available and relevant document and data are produced for the next monitoring round, the following recommendations are made to the SSO and Sacramento County:

1) Identify one custodial manager who is responsible for managing the document request and tracking the submission of necessary information from both RCCC and MJ. This individual should verify that the materials provided are responsive to the request and comprehensive.

2) Each facility should have a custodial supervisor who actually gathers the material for each facility and submits that to the manager identified in number 1.

3) At the time that the document request is submitted to the County, a meeting shall be scheduled (via Zoom or during a site visit) where the custody managers identified above, medical manager (as applicable), mental health managers, quality improvement coordinators, and other staff as deemed necessary by Defendants shall meet with the SME. At that time, the document request will be reviewed item by item to allow for questions and clarification of the requests. This should assist All-Parties in understanding expectations and responsibilities (including the SME) to better facilitate document production.

It is also important to note that some of the challenges for SSO in document production is the lack of proper electronic tracking and report production to respond adequately to all document request items. The same is true for some areas of proof-of-practice for ACMH. The more All Parties can work together to identify these deficits so that Defendants can work on expanding the IT capabilities to support their staff in documenting compliance and providing adequate reports to the SMEs and Plaintiffs' attorneys, the greater the likelihood that the County will be able to achieve and demonstrate

substantial compliance. As the ATIMS jail management system continues to be rolled out and refined, the County should engage with the SMEs and Plaintiffs' class counsel to ensure that the system has functionality to produce data and reporting relevant to *Mays* compliance. Such efforts will be well worth it to the County – first, to facilitate and demonstrate compliance on specific remedial provisions in the *Mays* case, and second, to establish an effective self-monitoring and quality assurance for the future.

Finally, this SME would like to commend ACMH on quickly addressing the initial challenges in document request response and providing information that was properly organized and labeled. ACMH has actively questioned and clarified items with the SME and their substantial efforts to be responsive have been greatly appreciated.

## 2. Methodology

This mental health expert submitted a revised document request to the Defendants. That document request can be found at the end of this report (see Appendix A). Responsive documentation was provided by the end of July 2023. However, there was an absence of requested data from SSO, specifically from the MJ that was not explained as requested in the document production. Once all data production was reviewed, another request was made to SSO for documentation from the MJ when it appeared that data was available because it had been produced by RCCC. There was some additional data eventually uploaded to the shared drive at the end of September 2023, but no one notified this SME until this report. While SSO and ACMH continued to be impeded by limitations in existing data and tracking systems, particularly to provide aggregated data, ACMH had made some progress through auditing and report development. Due to limitations to providing proof of practice in some areas, findings were equally limited. Consequently, a new priority area focused on data management, tracking, and proof of practice has been identified and will be tracked as part of ongoing monitoring.

The mental health report is based on the mental health SME's findings following document review, data analysis, observation of operations, interviews of staff and consumers (i.e., patients), training documents, medical record review, and the Defendants' semi-annual status reports. During the most recent site visit by this SME (July 2023), ACMH staff were well represented in the staff meeting with this SME. They were also very forthcoming and incredibly honest in their descriptions of strengths and challenges of the mental health program as well as the obstacles that they face on a daily basis. This was a stark contrast to prior structured staff meetings and strongly suggested that their leadership had worked hard to make them feel supported and confident in expressing themselves with the SME. A significant amount of valuable information was provided by the staff and was consistent with the shared experiences reported during patient interviews.

In summary, all available documentation produced as either part of the court-ordered Remedial Plan process or in response to the SME's document request was reviewed and synthesized with data drawn from observations, interviews, and medical record review. The primary focus of this report remained those areas of priority identified and maintained in prior reports though compliance in all areas was reviewed.

Standards for Compliance Determinations

As noted in previous reports, the standards of compliance were established through the consensus of all SMEs for each of our respective areas of focus. This would allow for greater understanding across areas of focus for all parties, particularly areas of overlap (e.g., medication

management is relevant to both mental health and medical; treatment planning for suicidal individuals has an impact in all three areas if injury has occurred). Those standards of compliance are as follows:

1. **Substantial Compliance**. Substantial compliance is defined as having been achieved when Defendants have met compliance with most or all components of the specific area, process, or provision of the Consent Decree for both the quantitative (e.g., 90% performance measure) and qualitative (e.g., consistent with the larger purpose of the *Decree*) measures. If an individual compliance measure necessitates either a lower or higher percentage to achieve substantial compliance (e.g., 85% or 100%), it will be so noted by the expert for that item/area. To be considered to be in "substantial compliance," compliance has to have been sustained for a period of at least 12 months.

2. **Partial Compliance.** Partial compliance indicates that compliance has been achieved on some components of the relevant provision of the relevant provision of the Remedial Plan, but significant work remains. For example, the County has to finalize a policy that is compliant with Remedial Plan requirements, contains adequate operational detail to staff as to how to implement the policy, train staff, and they must have begun implementation of the policy.

3. **Non-Compliance.** Non-compliance is defined as the Defendants have not met all of the components of the specific area, process, or provision of the Consent Decree for both quantitative and qualitative measures and require significant work to meet compliance.

The structure of the current mental health monitoring report remains similarly structured to prior reports though the Mental Health – Suicide Prevention Memorandum of Agreement (2022) by the Parties is incorporated into findings where appropriate. Where language has been copied directly from the Remedial Plan, it shall be noted by including that language in *italics* and the section of the Remedial Plan referenced. The Remedial Plan generally starts each section.

I would like to thank all SSO, ACH, and JPS staff for their assistance throughout this process. Specifically, I would like to thank Ms. Tianna Hammock, Health Services Administrator/Quality Improvement Coordinator, Ivàn Mendoza-Manzo, Quality Improvement Coordinator, and Ms. Andrea Javist, Behavioral Health Psychiatric Manager (ACMH/JPS) and her staff.

3. **Areas of Focus**

The Areas of Focus for the mental health elements of the Consent Decree established in prior monitoring reports are as follows:

1. **Space** – space is at an absolute premium at the Main Jail and lesser so but still a challenge at RCCC. Treatment cannot be provided without acceptable confidential space available for individual and group therapy. For example, treatment groups have sometimes occurred in housing units in RCCC but this is not acceptable treatment space. In response to this feedback, RCCC has revised its schedules to utilize the classroom more frequently.

2. **Staffing** – once space is available there must be sufficient numbers of appropriately licensed competent staff to use that space to deliver evidence-based treatment.

3. **Use of Force/disciplinary actions** – this is a high risk, high liability area that usually involves significant cultural change for both mental health and custody staff to reduce unnecessary uses of force.

4. **Treatment** – provide adequate program capacity and structured therapeutic activity in compliance with the Remedial Plan treatment mandates. Needs in these areas must be continuously assessed as space, physical plant limitations, and staffing deficiencies are addressed and in response to mental health caseloads and jail population trends.

In addition, as mentioned in the introduction, an additional area of focus has been identified based on Defendants' current inability to provide sufficient proof of practice reports in relevant areas of the Remedial Plan.

5. **Proof of Practice/Continuous Quality Improvement (CQI)** – the need for adequate data, tracking, reporting, and auditing functions so that the Defendants can provide the proof of practice necessary to demonstrate sustained compliance with the Remedial Plan. For example, while the current systems allow for tracking of treatment groups and canceled treatment groups, it is necessary for proof of practice that Defendants be able to report the average number of structured out of cell treatment activity (STA) per inmate per week and for a given period (e.g., the last six months). This would allow Defendants to accurately know if they consistently offer at least 10 hours of STA per patient per week (in designated mental health units) in compliance with the Consent Decree. The same is true for unstructured out-of-cell activity in that Defendants must be able to provide data that similarly shows the average number of hours per patient per week and for a given time period met or exceeded seven hours offered. Until appropriate proof of practice data is tracked, analyzed, and reported, substantial compliance cannot be achieved. It is not sufficient to report that there are at least 10 hours of treatment groups or seven or more hours of unstructured out-of-cell time on a schedule. Compliance is only met in these and other areas when Defendants can provide reliable data that each patient is offered the minimum number of hours in each area and the average number of hours offered per week per patient.

**4. Findings – Areas of Focus (Please see Appendix H for a summary table of compliance with the Consent Decree)**

A. <u>Space</u>

This focus area was also addressed in the MOA as "Patient Confidentiality for Suicide Risk Assessments and Mental Health Clinical Encounters."

A1. Progress and Actions – Defendants have followed through and were compliant with implementing plan numbers 10 through 12 in the MOA. Item 13 indicates that the Parties will continue to utilize the Dispute Resolution process as outlined in the MOA.

Defendants have expanded the use of confidential attorney booths beyond booking and the third floor to each floor of the MJ. These areas were observed during the site visit and utilized by the SME for specific patient interviews and were found to be satisfactory. ACMH supervisory staff have increased their oversight of utilization of confidential space (e.g., attorney booths, classrooms) through observation, scheduling, and chart audits/reports for both facilities. Mental health and custody staff have held regular meetings to review barriers to utilization of confidential space, problem-solved resolutions and implemented corrective actions. SSO provided custody staff with a memorandum outlining

expectations for custody staff in facilitating confidential contacts. Mental health staff were also provided with the document, encouraged to carry it with them when on units (particularly in MJ) for mental health contacts, and to elevate concerns to the sergeant level when unable to see patients confidentially. In December 2022, the Sacramento County Board of Supervisors approved spending to plan and build a new intake, medical and mental health care building. Spending was for the planning and construction was increased in August 2023 to address previously unincluded costs (e.g., furniture). That process is now uncertain: in April 2024, the County engaged a third party contractor to conduct a peer review of the plans, based on several concerns including the projected costs of the project.

ACMH has expanded the days and times that services are provided. Rather than scheduling all mental health staff to the same shifts which increases demand for confidential space during "peak" times, mental health management has incorporated previous suggestions and expanded service hours. By spacing staff out throughout a given work day, the demand for confidential space is less concentrated, opening up more availability. The challenge is for SSO to ensure that there are sufficient custody staff present to support the extended service hours and days. For example, for a three-month period (July through September 2023), 10% of treatment groups were canceled with custody (lockdowns and custody staffing) as the most frequent reason.

A2. Continued Concerns – The lack of confidential space, particularly at the MJ, remained a significant concern as it negatively impacts the quality of mental health assessments and treatment. While Defendants audits of confidential contacts show improvement due to the multiple efforts Defendants have made regarding space and expectations, this area remained non-compliant. There was an increase in the frequency of confidential contacts across most areas of the MJ, compliance averaged less than 50% (approximately 45%) across all program areas in the MJ. Data was not available for RCCC. This gap will need to be remediated moving forward. The most challenging area to have confidential contacts identified by the data was MJ 8E. The primary cause listed by clinicians for nonconfidential contacts was a lack of available confidential space followed typically by safety and security. However, on the high programming floor (3W/3E), the frequency of confidential contacts appeared to be fairly consistent, suggesting that clinical staff have maximized the use of available space there and without the addition of confidential booths (as has been discussed by Defendants) or other options, approximately half of all clinical contacts will continue to occur in a nonconfidential setting. Successful remedial plan implementation will thus require additional efforts and strategies.

There remain concerns regarding adequate access to services at all levels of mental health treatment. There must be sufficient bedspace to eliminate waitlists. However, bedspace alone is not sufficient unless there is adequate treatment and recreational space to meet the Remedial Plan requirements for at least 10 hours of structured therapeutic activity and 7 hours of unstructured out-of-cell activity per patient, per week. The following table provides an example for **100** IOP patients:

| STANDARD | TOTAL HOURS PER WEEK | PATIENTS PER GROUP | # OF SESSIONS NEEDED | SPACE NEEDED | COMMENTS |
|---|---|---|---|---|---|
| 10 hrs STA per patient per week | 1,000 hours | Max 10 patients per group[7] | 100 groups per week (7 | 3 confid group rooms (5 groups per room daily) | This example assumes no groups |

---

[7] Any reduction in group size due to clinical indications such as patient acuity would increase the number of treatment groups necessary for compliance.

| | | | day schedule); 15 groups per day (7 days per week) | | canceled due to incidents, lack of staffing, or other facility reasons |
|---|---|---|---|---|---|
| 7 hrs unstructured out-of-cell per patient per week | 700 hours | Max 20 patients per yard/area (if area can safely hold that number of patients while still allowing adequate monitoring) | 35 sessions per week; 5 sessions per day | Outdoor yard available for at least 6.5 hours (allows for time lost due to movement); can reduce this need by utilizing appropriate indoor space (provide indoor and outdoor yard each day) | This example also assumes no program interruption or stoppage and sufficient staffing 7 days per week. |
| Based on this example, a 100 bed IOP would **require 3 large confidential treatment rooms** and **2 large recreational spaces (one outside**) along with **sufficient custody staff to escort and monitor** patients to meet minimum compliance with no program disruption. Typically, programs must offer more than the minimum to allow for the reduction in offered hours due to operational disruptions that commonly occur. | | | | | |

The treatment needs for an inpatient acute psychiatric unit will likely be higher. If the standard listed above was sufficient, the patient could be maintained in IOP and wouldn't require inpatient level of care. In fact, research has supported that increased delivery of group therapy was correlated with improved outcomes in psychiatric inpatient programs (e.g., 30-day return rates were halved[8]). Using the same model of calculation above but with an expectation of 20 hours STA per patient per week and allowing for the same treatment group size (10) for an APU with 30 patients, there would need to be 9 treatment groups per day and 2 confidential group treatment spaces. However, since the APU treats people with an acute exacerbation of psychiatric symptoms, treatment groups would typically be much smaller to allow facilitators to manage the group effectively so that all participants can benefit from the treatment group. If treatment groups had a maximum of 6 participants, 15 treatment groups would be required per day and three separate confidential group rooms would be necessary. Currently, Defendants do not have an interim plan that adequately addresses both capacity/bedspace and treatment space.

Because any proposed construction remains at least several years away from completed construction and activation, the APU remains a significant concern due to this lack of sufficient confidential treatment and bedspace, continued waitlists, and inability to provide appropriate alternative

---

[8] E.g., Page & Hook (2009).

treatment pending placement. Defendants have reported that they are actively pursuing the recommendations previously made to identify treatment space outside of the jail. While one barrier remained the dearth of sufficient existing community psychiatric inpatient beds, the interim solutions must get creative (please see recommendations below for examples). Clinical contacts need to occur in a confidential setting for this highest acuity population. Defendants need to provide adequate treatment to these patients and provide them with unstructured out-of-cell activities including outside yard time. Medical records reviewed continued to document that no solutions have been made available so that ACMH can reach compliance with the Remedial Plan.

Defendants continued to appropriately acknowledge their physical plant challenges, particularly as they apply to confidential treatment space and bedspace/program capacity. ACMH has continuously articulated their space and treatment needs to the County/ACH who have in turn conveyed those needs to County Supervisors and stakeholders. While Defendants have engaged in assertive actions to remedy those inadequacies, any possible solutions remain years away from implementation. It is critical to note that the need for such services does not abate while those inadequacies exist. In fact, the need may be increasing as expressed by Defendants due to possible increased acuity. People are suffering while they wait. As people with SMI come into the Sacramento County Jail system with significant needs, the inability to provide adequate treatment to all of those people results in their decompensation which increases the probability that they will not return to their baseline functioning. Research has clearly shown that each time a person with SMI experiences an acute exacerbation of symptoms or decompensation, their baseline functioning decreases, resulting in a poorer prognosis for recovery and increased disability. In addition to that person possibly requiring greater assistance, support, and treatment, they experience avoidable harm while they await adequate treatment. The time for solutions is now.

<u>Recommendations</u>
1. Consider scheduling specific confidential treatment space. For example, if two attorney booths can be utilized at the same time, assign staff in appropriate time blocks (e.g., 2 hours) to each booth so that clinicians know that they will have confidential space available during specific periods of each day.
    a. Expedite installation of the transparent treatment "pods" proposed for the MJ that will provide auditory privacy without impeding vision into housing units. Approval has been received for these pods (four total per floor) and were expected by SSO to be installed within 5-6 months.
2. While waiting for any proposed construction, Defendants must aggressively pursue access to inpatient treatment to allow for compliance with the Consent Decree[9].
    a. Negotiate with community resources (private, County, State) to obtain access to existing inpatient services for patients currently housed in the jail. A specific number of beds should be made available based on the average daily census for APU and average daily waitlist numbers. Because of challenges with community resources, it may be necessary to negotiate "piecemeal" or smaller numbers of beds at different facilities to reach the necessary capacity.

---

[9] In December 2022, the Board of Supervisors approved long-term physical plant improvements including additional proposed construction. This will be reviewed in subsequent report but All Parties are reminded that Defendants themselves noted these solutions would not be immediate and would take several years at a minimum. While this is understood by the SME, there remain consequences to the people housed within the jail system currently and until that time.

3. Identify an existing community facility that can be repurposed to provide inpatient psychiatric treatment. Many of the people housed in the jail who would require such services have not been convicted of a crime and do not have a risk of violence, particularly if provided adequate treatment. A facility does not have to be "hardened" or meet high security standards for those individuals. Other systems have identified facilities operating below capacity or that were vacated and negotiated with building owners to lease the facility and provide inpatient psychiatric care in a segment of the facility or by utilizing the entire facility.

4. All efforts to obtain community-based psychiatric inpatient treatment and any other efforts to improve access to treatment should be documented. Minutes of any meetings related to community-based treatment, internal physical plant changes, and operations modifications should be maintained to document efforts made and provided to the Parties on a regular basis.

5. The County should continue to engage in the meet and confer process as outlined in the Memorandum of Agreement with Plaintiffs' attorneys and all SMEs in this case.

6. Defendants should continue to maintain and utilize the confidential clinical contacts report. It is informative and valuable in managing operations and access to appropriate treatment.

7. Defendants should incorporate RCCC into that same confidential clinical contact report. The report provides data for proof of practice.

8. Patient refusals should be tracked reasons and to identify trends and patterns across areas.

   a. Providers should be expected to reschedule patients who refuse rather than just seeing the patient cell front. The patient can receive a "welfare check" cell front but another appointment should be scheduled for a timely contact. When patients continue to refuse, a multidisciplinary treatment (MDT) team meeting should be scheduled and the patient's lack of engagement in treatment should be a specific problem area identified with an associated objective, behaviorally-based goal and evidence-based interventions implemented.


B.  Staffing

B1. Progress and actions - The County/ACMH requested and received additional mental health (and health care) positions (see Appendix C). ACH took responsibility for staffing nursing in APU (6/2023). Three social workers were assigned to the APU to provide group therapy, crisis intervention, individual clinical contacts, and to facilitate treatment team meetings. The additional mental health staffing positions have allowed for specific staff to be assigned to complete disciplinary mental health assessments for applicable patients and segregation/restricted housing unit (RHU) assessments. Previously, EOP staff had been reassigned to the IOP to allow for expansion of the IOP program. The staffing augmentation returned services to the EOP and expanded the capacity of the program across both facilities to a total of 525 patients.

ACMH has incorporated prior feedback and has become more strategic in their utilization of staff. They have extended the workday to decrease demand for confidential space at any given time, working to spread demand throughout the day. They have also expanded to a 7-day workweek to provide services consistent with a facility that houses people for 24 hours per day, 7

days per week. This has further dispersed the demand for confidential space so that it is no longer as concentrated Monday through Friday during mid-morning to mid-afternoon. Specific staff have been assigned to specific areas (e.g., APU, IOP, EOP, disciplinary mental health assessments, RHU assessments) in an effort to improve accountability and provider expertise within their assigned areas.

B2. Continued Concerns – The necessary mental health positions to meet the mandates of the Consent Decree remained unclear. This is due in part to severe physical plant limitations that impact staffing and the lack of adequate data management, tracking, and reporting systems. The challenges presented at the MJ and RCCC with adequate confidential treatment space require mental health staff to improvise and see patients in clinically inappropriate areas rather than not see them at all. These areas include open areas just outside of housing units, in housing units, and at cell front. There is a lack of efficiency when clinicians must constantly move to various areas of a facility to see patients rather than being centrally located and allowing patients to come to them. Consequently, direct patient contact time for each clinician is reduced due to logistics (e.g., walking to another area or building, taking an elevator in the MJ) and administrative tasks (e.g., returning to a work area with computer access to document progress notes). Clinicians must then reschedule patients for confidential contact and hope that there are sufficient custody staff on shift, no program interruptions or lockdowns, and that confidential space is available.

The ability to use attorney booths in the MJ provided progress in access to available confidential space. However, as reported by mental health supervisors and staff, and observed during the site visit, clinicians spend a significant amount of time 1) waiting for the booth to be free, and 2) waiting for custody staff to notify the patient and allow the patient to walk to the booth. Patients must also use stairs, creating further delays and challenges for mobility-impaired patients. To reach those attorney visiting booths, clinicians must exit the unit where the patient is housed, take an elevator to the main floor of the jail, and enter another elevator (visitor elevator) that provides access to the booths.

The lack of adequate data, tracking, and automated reporting systems make it difficult to determine the degree of compliance with Consent Decree requirements for the timely screening, assessment, treatment planning, and treatment of patients. While the electronic health record does allow for Defendants to track caseload patients, it does not provide easily-accessible reports on length of stay at particular levels of care or on waitlists. ACMH management must monitor report logs regularly, in some cases daily (e.g., APU pre-admit list). In some cases, multiple reports must be combined to access desired information. For structured treatment (STA) and unstructured out-of-cell time, the system does not have the ability to report the data in user-friendly ways that would help management while also providing proof of practice. As described previously, Defendants need to know what percentage of patients in designated mental health units (DMHU) and RHU who are identified as SMI have been offered 10 or more hours of STA. It is also necessary to know the average number of hours per patient per week of STA were offered. This data would allow the Parties and ACMH managers to assess the degree of compliance and remaining staffing needs to reach full compliance with the Consent Decree. The same is true with custody staff and the provision of at least 7 hours of unstructured out-of-cell time: what percentage of applicable patients were provided 7 or more hours of out-of-cell time (1 hour per day) each week and what was the average number of hours offered per patient per week. Until automated data on Consent Decree requirements across areas is readily available, staffing needs will continue to be an estimate based on an approximation of compliance. While by person or by encounter information can be helpful

for individual cases, data must be aggregated to allow a systemic view of operations and unmet staffing needs. SSO reported in reviewing the draft of this report that a QI position had been requested and that this position would audit out of cell time pending automated reports. The SSO is commended for recognizing the need to identify specific QI staffing needs and is encouraged to continue to pursue automated reporting to allow QI staff to focus on organization of data, identification of action plans, implementation of those plans, and assessment of effectiveness of those plans.

As of December 5, 2023, there was a vacancy rate of 26% in ACMH. These positions are reflected in the following table:

| Jail Facilities Mental Health Vacancy Rates Vacant Positions as of 12/05/23 | | |
|---|---|---|
| Title | Vacancies | Vacancy Rate |
| Admin Assistant III | 1 | 50% |
| Administrative Officer 3 | 1 | 50% |
| LCSW Supervisor | 3.8 | 35% |
| Licensed Clinical Social Worker | 11 | 27% |
| Mental Health Worker | 3 | 19% |
| Nurse Practitioner | 3.5 | 49% |
| Psychologist 1 | 1 | 50% |
| Psychologist 2 | 2 | 66% |
| Social Worker I | 3 | 9% |
| Psychiatrist | 0.5 | 100% |
| **Total** | **33.8** | **26%** |

Recruitment efforts continue, though ACMH has noted that finding licensed practitioners to fill these positions has been very challenging. There is a national behavioral health specialist provider shortage.[10] However, Defendants have the advantages of a being located in a large metropolitan area (California's sixth largest city) and an existing association with University of California, Davis Psychiatric Department. While recognizing the strategies already implemented by ACMH (e.g., modified work weeks, rotating staff to avoid burnout), continued efforts should be made to address two common challenges in recruitment and retention: financial resources (e.g., pay, loan forgiveness) and workload.

Defendants have previously promised a staffing analysis. It appears that ACH is in the process of hiring an outside consultant to conduct a staffing analysis for the medical portion of healthcare services. They are strongly encouraged to complete the same for mental health staffing, though All Parties are reminded that such a staffing analysis will only be applicable under the current circumstances and will need to be repeated as any physical plant barriers are resolved through the proposed construction. The mental health staffing analysis must begin with the mandates of the Consent Decree at each level of care and associated tasks as well as other administrative tasks required of providers. The staffing analysis should analyze needs by discipline and should be ratio-based (e.g., 1 provider for every 20 IOP patients) so that as populations

---

10 See for example https://nihcm.org/publications/the-behavioral-health-care-workforce-shortages-solutions.

increase or decrease, staffing can be appropriately modified. The staffing analysis may also provide additional ideas for deployment of existing staff to maximize efficiency.

As noted in prior reports, custody staff have a tremendous impact on access to mental health services. This is not limited to having sufficient custody staffing to allow for patient access to treatment and supervision of ACMH staff to ensure their safety during treatment. The knowledge and interpersonal skills that custody staff bring to each patient encounter whether on the tier, in open space, or at the control booth can have a tremendous impact, both positive and negative, on a patient's mental status and ability to access needed care. This will be discussed further in the "training" section below. For the purposes of staffing, it is critical that SSO also conduct a formal staffing analysis following the parameters described above to identify staffing numbers by discipline (e.g., sergeant, deputy) to meet the requirements of the Consent Decree and provide necessary support for the delivery of mental health services.

The lack of staffing has impacted care across programs and service types. For a three-month period (July through September 2023), 10% of treatment groups were canceled due to lockdowns (possible implemented due to insufficient staffing) and inadequate staffing. In the APU, staffing allocation was changed to provide two deputies in an effort to increase treatment access. However, during a three-month period (January through March 2023), tracking noted that there were never two deputies present. On four of those days, no deputy was present though 80% of the day there was at least one deputy present. However, during the site visit it was observed that a deputy assigned to the IOP had to be diverted to the APU to allow treatment team meetings to occur. This may have negatively impacted IOP but was necessary for any APU activity to occur. Because of ongoing custody staffing challenges, there are often insufficient staff in other areas of the MJ to allow for someone to be diverted.

The SME has also noted that there has been significant turnover in the custody managers responsible for compliance with the Consent Decree. While the need to rotate staff and utilize effective managers across areas of responsibility for SSO is understood, there does not appear to be a formal orientation process for new managers. This creates unnecessary challenges for those managers in addition to the disruption in continuity of operations and compliance efforts. In contrast, ACMH has benefitted from management continuity through the last two monitoring periods. SSO is encouraged to consider a way to create incentives for managers to remain in compliance and to create a formal orientation curriculum for multiple levels of custody management.

Recommendations

1. A formal staffing analysis for mental health should be conducted based on current physical plant limitations at MJ and RCCC. While these will need to be repeated as changes in operations and/or physical plant occur (e.g., proposed construction), point in time data is necessary now so that Defendants can develop a strategic plan that incorporates additional requests for staff and plans for training and deployment of those staff.

   a. The staffing analysis should develop staffing ratios (e.g., 1 provider to 20 patients) at each level of care. That will allow staffing to be adjusted as populations increase or decrease without having to redo the staffing analysis.

   b. The staffing analysis should include a workload analysis for each level of care and discipline/position as a foundational element. That would allow for the

staffing analysis to also indicate appropriate caseload numbers for each program and discipline.

2. SSO must address the custodial staffing needs identified by ACMH to allow for adequate access to mental health services and compliance with the Consent Decree.

   a. APU – increase to day shift deputies and 1 swing shift deputy, assigned and exclusively designated to APU, 7 days per week. These positions should be protected from diversion for other staffing needs.

   b. Designation of IOP deputies to do exclusively IOP programming at the Main Jail. Do not divert these deputies from IOP programming to other duties/units. SSO reportedly agreed to this request. It will be evaluated during the next monitoring review period.

   c. Increase of IOP/EOP deputies (while protecting them from being diverted for other duties/units to allow for these positions to solely run MH programs). As IOP and EOP programming expands as required by the Consent Decree and ACMH intends, additional custody staffing will be necessary to allow these efforts to be successful.

3. Recruitment activities and associated new hires should be tracked and documented. This should be a regular report to the Mental Health Quality Management Committee. That data should be regularly analyzed to identify those recruitment efforts that yield larger numbers of new hires and to eliminate and revise those recruitment activities that provide an inadequate return in new staff.  Monthly recruitment efforts should be tracked and summarized so that it can be provided with regular "transparency" reports on staffing.

4. Tracking/report development to provide data on the outcome for patients who refuse confidential appointments. This report would indicate if the patient was seen in a nonconfidential setting (e.g., cell front) and not rescheduled for a timely visit but instead seen at the next regularly scheduled appointment or if the patient was rescheduled to the next day or later the same week.

5. A formal staffing analysis of custody staff across positions (e.g., deputy, sergeant, lieutenant) should be conducted within the current facilities. That analysis should review the positions necessary to maintain compliance with the Consent Decree and provide adequate access to mental health and medical services. This would include the appropriate observation of contacts for safety and security purposes when indicated.

   a. Consider the creation of a healthcare escort cadre at the MJ. A sufficient number of deputies dedicated to facilitating access to mental health and medical appointments to allow for unit deputies to focus on other duties. These teams of deputies would be scheduled during the primary service hours. SSO reported in their review of this draft report that such a unit was developed in early 2024 to assist in access to care, though primarily for medical appointments. Implementation of this unit will be assessed in the next monitoring period.

C.  Use of Force/Disciplinary actions involving detainees with SMI and/or intellectual disabilities.

USE OF FORCE

C1. Progress and actions – ACMH has implemented their use of force (UOF) training and documentation as required in the Consent Decree and SSO has current Post Orders for UOF at both facilities.

C2. UOF Continued Concerns – the area of UOF was again determined to be partially compliant with non-compliance in a select number of areas (please see Tables below in Use of Force section V). There have been some updated policies/post orders, development and implementation of policies for ACMH, and implementation of UOF training for ACMH and for custody (at RCCC) by ACMH. While the SSO UOF Post Orders were drafted since the last monitoring report, there has been no other improvement in this area. Uses of Force are high-risk, low-frequency events that require frequent refresher training so that staff fully understand the UOF continuum of force, distinctions between planned and immediate UOF, and the expectations for different types of UOF.

Data on UOF was requested through the document request (please see items 21.a. through 21.d.), yet as in other areas, data provided was not fully responsive to the document request. RCCC provided much of the requested data broken down as requested. RCCC also provided 13 UOF incident packages that were to have involved individuals who had known mental health or intellectual difficulties. However, upon review of incident packages, two incidents did not include any class member and one incident involved 48 participants and was removed from analysis once a number of participants were not confirmed class members. A second request was made for the same data from the MJ, but it was not received. However, following an email exchange in September 2023, 59 UOF incident reports from the MJ were uploaded to the shared drive. However, the SME had completed a final download from the shared drive before and was not told of the additional data until the draft review of this report. The primary and extensive analysis was based on the 10 cases provided timely. Upon review of the record, at least one (1) of the 10 cases may have actually occurred at MJ but was included with RCCC documentation. As part of the finalization of this report, an extensive review of 59 cases was not possible, but a separate smaller review was completed and is appended to the original analysis.

Defendants reported a total of 191[11] UOF incidents across both facilities from January through June 2023. Further, RCCC reported 18 UOF incidents where at least one "suspect" or victim was known to have mental health and/or intellectual disabilities and one (1) UOF incident occurred on a DMHU. Upon review of the incident packages provided, all (13) had been reviewed by the supervisory chain (reviews provided as part of the completed packages). Based on the information contained within the UOF packages, at least four (4) had occurred in a DMHU; specifically, the IOP. In at least two (2) of the 13 incidents, the patient was placed into a WRAP device (please see Appendix E for examples) and both had been diagnosed with SMI.

For the MJ, there were 63 UOF incidents involving caseload patients at the MJ from January 1 through June 30, 2023. Seven of those occurred in the IOP, 1 in the APU, and four occurred in the SITHU or temporary housing for those on suicide watch (e.g., pending APU admission) and includes housing used in the booking area. However, based on the UOF log provided, there were eight incidents that involved a patient at the IOP level of care. One patient was listed as IOP in the log but comments indicated that the patient was in the APU for grave disability. It appeared that the patient may have been on the pre-admit waitlist when the UOF occurred. In only one case was mental health contacted prior to the UOF and in only 17 incidents was mental health staff contacted after the incident. Presumably this is indicative of staff not completing an emergent mental health referral consistently following a UOF with a patient identified as having mental health and/or intellectual disabilities. A random sample of five MJ UOF incident packages were reviewed as part

---

[11] This figure was not broken down by facility as requested.

of a limited analysis for the MJ. Of the five cases, four were immediate or emergent uses of force where custody staff needed to immediate respond with hands on the patients in response to physical aggression or fear of physical aggression (e.g., one patient refused to return to his cell with his cellmate and ran out of the unit towards mental health staff meeting with another patient. Custody staff were concerned of his flight toward mental health staff or possibly to exit the unit through the hallway door). However, one planned UOF was extremely concerning. Please see sections V.D. through V.F. below for further detail.

The limitations of the current forms and method of documentation for analysis and proof of practice with compliance with the Consent Decree and SMA will be discussed in detail in section V below. Please refer to section V for more detailed analysis and recommendations in this area.

Recommendations:

1.  Please review the UOF section (V.D through V.F) below.

DISCIPLINARY PROCESS

C.3.  Progress and actions - Mental health staff maintained disciplinary assessment referral log which was used to provide summary statistics. ACMH reported that there was a total of 361 referrals for disciplinary mental health (MH) assessment from the MJ. Of those, 109 or 30% were not completed for one of the following reasons:  1) criteria not met, 2) patient was released, or 3) discipline already imposed. There remained 252 cases where disciplinary MH assessment was required. Seventy-seven percent (195 of 252) of assessments were completed for patients at the MJ. There was a total of 196 referrals to mental health at RCCC and 34 of those were not reviewed for one of the same reasons listed above. Of the 162 remaining referrals, 39 (24%) MH assessments were completed. For both facilities, an overall total of 557 referrals to mental health for assessment were made. There were 143 (26%) referrals that did not result in a completed assessment because the patient was gone, criteria was not met, or discipline was already imposed. That left 414 referrals where MH assessment was indicated. Of those 414 referrals, 234 (57%) received completed assessments. The completed assessment numbers improved at the MJ with continuous improvement from April through June 2023, reaching 100% completion for May and June. At RCCC, completion numbers were less stable with a low completion rate of 3% in February 2023 and a high of 67% in April. An average of 34% of indicated assessments were completed at RCCC. The pronounced improvement at the MJ, where a higher workload exists was likely the direct result of allocated positions to those assessments. As those positions are filled for RCCC, improvement in completion rates are expected for that facility as well.

C.4. Continued Concerns – There was inadequate documentation provided to properly assess this priority area. It was unclear if SSO maintained a tracking log for disciplinary reports, but custody and mental health data must be combined into one tracking report. The complete log (custody and mental health input) can be saved to a shared drive where custody and mental health supervisors can access the log and input their respective data points. Ideally, the data points that mental health and custody must complete on their forms would automatically populate the applicable items in the log. This would decrease error and ease workload.

Recommendations:

Please refer to Disciplinary sections (V.A. – V.C.) below.

D. Treatment

Treatment expectations have been established through the Consent Decree with additional capacity and timeline targets determined through the MOA. Since the last monitoring report, capacity has increased in the high security IOP (mentioned as planned in the third monitoring report), and EOP. Services have been expanded in the APU, high security IOP, and EOP. Treatment groups were initiated in the APU with the assignment of three social workers (SWs) to the program. While these services were limited by the lack of confidential space, increased therapeutic out of cell activity is clinically significant. By expanding the IOP/high security IOP capacity, these patients can now participate in treatment groups that would not have been available if they were housed in the restricted housing unit (RHU). Therapy groups have been increased to provide treatment groups to EOP patients at the MJ (3E, 3W, 4E, 4W, 7W, and 8E). Multidisciplinary treatment teams (MDTTs) have been expanded so that they are now occurring at the APU, IOP, and EOP levels of care.

Group treatment was observed during the site visit and the quality improvement observed during the last review period had been maintained even as services expanded. Patients were well known to the facilitators. Group size was no longer excessive and within the acceptable range (up to 10 patients). ACMH had worked to improve patient access to groups through increased offerings and expanded scheduling of treatment groups. Interpretive services were provided so that participants for whom English is a second language could participate. RCCC was utilizing the classroom space in the IOP instead of holding treatment groups in the dayrooms of the pods. Because of the challenges for custody staff to be able to observe the clinicians and patients in that room, a deputy was present inside the room. While Defendants are strongly encouraged to search for alternatives (e.g., replace door with a door with large Lexan panes to allow deputies to sit outside), any correctional officer who will be present within a therapeutic group should be provided with enhanced training specific to group presence, allowable participation, impact of their presence, and ways to counter any potential negative effects so that their presence does not have a chilling effect on group process and potential positive treatment effects.

Interviewed patients remained quite positive about their treatment group opportunities, treatment providers, and benefits of treatment groups. This was most evident for the IOP patients. However, observation of the treatment group in the APU indicated that all patients were engaged at a level that was appropriate for their degree of impairment and they clearly enjoyed the group. While that group would be identified as an "exercise" group, patients were clearly learning interpersonal skills, communication skills, frustration tolerance, and coping skills, all particularly relevant for patients with chronic serious mental illness.

A new electronic health record (EHR) report was created, the confidential contacts report, that was used by ACMH to monitor compliance with confidential contacts. This data will be discussed in detail below. Significantly, the rates of confidential contacts reported were consistent with the SME's record review findings, attesting to the validity of the report. The most common reason, after patient refusals, for a non-confidential contact was the lack of availability of confidential space except in RHU (8W). While initially the lack of available treatment space was a primary contributor, availability improved with the use of attorney booths such that "safety and security" became the leading reason a clinical contact was not confidential. It should be noted that the frequency of safety and security resulting in non-confidential contacts had drastically decreased over time. The data provided focused on the MJ, where space challenges are most severe. While RCCC staff reported greater availability and utilization of confidential space, that data should be tracked, reviewed, and reported as well to provide proof of practice.

Defendants continue to face severe physical plant limitations that negatively impact available confidential treatment space to allow for necessary treatment (individual and group) to occur. However, Defendants should be commended for finding interim alternatives and positively impacting the jail culture so that custody and mental health staff have an expectation that confidential contacts must occur except in the rare occasion.

Recommendations:
1. ACMH should regularly review treatment scheduled and offered as part of the CQI process to identify opportunities to further expand treatment offerings and document barriers to care.
2. Develop appropriate reporting to allow for compliance data consistent with the Consent Decree requirements for minimum treatment hours by program. ACMH needs to provide data by patient (currently able to do so) and by:
   a. Average number of hours of structured treatment offered per patient per week;
   b. Average number of hours of structured treatment received/attended per patient per week;
   c. Average number of hours of structured treatment canceled per patient per week;
   d. Provide the data in 'a' through 'c' for a specified amount of time such as January through June. An example of this would be, "For January through June 2024, an average of 7.3 hours of treatment were offered per patient per week."
3. Create automated reports or possible and complete chart audits when necessary of compliance with timeliness requirements beginning with intake and addressing all aspects of treatment for each level of care.
4. Develop an evidence-based library resources available to clinicians of various treatments that would be appropriate to the jail setting. This should include manualized treatments as well as non-manualized treatment materials (e.g., books that address treatment goals and interventions, therapeutic videos). ACMH has reported that they do maintain "numerous" evidence-based resources available for staff. Staff should document the use of evidence-based interventions in their clinical notes.

E. Proof of Practice/Continuous Quality Improvement (CQI)
    While ACMH has continued to progress in expansion of CQI efforts and proof of practice, they have been limited in those efforts by technology. As discussed above, an example of this is the current systems that allow for tracking of treatment groups and canceled treatment groups which do not provide the necessary compliance data. It is necessary for proof of practice that Defendants be able to report the average number of structured out of cell treatment activity (STA) per inmate per week and for a given period (e.g., the last six months). This would allow Defendants to accurately know and demonstrate that they consistently offer at least 10 hours of STA per patient per week (in designated mental health units) in compliance with the Consent Decree. The same is true for unstructured out-of-cell activity in that Defendants must be able to provide data that similarly shows the average number of hours per patient per week and for a given time period met or exceeded seven hours offered. Until appropriate proof of practice data is tracked, analyzed, and reported, substantial compliance cannot be achieved and demonstrated. It is not sufficient to report that there are at least 10 hours of treatment groups or seven or more hours of unstructured out-of-cell time on a schedule. Compliance is only met in these and other areas when Defendants can provide reliable data that each patient is offered the minimum number of hours in each area.

While ACMH has made progress, the SSO has lagged far behind in providing audits of compliance with the Consent Decree and other forms of proof of practice. This has consistently been particularly true of the MJ. RCCC has made progress in providing documents and data that are responsive to the document request. It is unclear why RCCC is able to provide information that the MJ has not, but this has negatively impacted compliance ratings.

Recommendations:
1. The staffing analyses recommended should include an assessment of available technology (sufficient computers, appropriate software) and IT support staff so that technology is not an obstacle to demonstrating compliance.
2. The staffing analysis should identify what additional quality improvement staff and related resources are necessary, particularly for the SSO, to support compliance efforts.
3. Review all Consent Decree requirements and identify those areas that ATIMS and the electronic medical record do not currently provide reports or data necessary for compliance audits. Meet with the vendors of those programs and establish any compliance requirements that they cannot support.
   a. Establish alternative methods for documenting compliance.
4. The SSO should consider appointing one person who oversees compliance at both facilities, coordinates CQI efforts, and verifies that all necessary data and documents are gathered and available for the *Mays* monitors.

## REMAINING ISSUES: CONSENT DECREE REQUIREMENTS AND FINDINGS

*GENERAL PROVISIONS (Section II of Remedial Plan)*
<u>*Staffing.*</u>  *The County shall maintain sufficient medical, **mental health**[12], and custody staff to meet the requirements of this Remedial Plan (II.A.).*

- *The parties agree that the custodial and health care staff must be increased to meet minimal constitutional and statutory standards. Presently, there are insufficient deputies to supervise out-of-cell activities for people in the general population and administrative segregation, and to provide security for health-related tasks. The parties agree that reduction in jail population is* one *cost-effective* method *to achieve constitutional and statutory standards. (II.B)*
- *The County intends to hire additional custodial and health care staff. The parties agree that population reduction of the jails will facilitate compliance with this Remedial Plan. All population reduction measures should be designed to promote public safety through evidence-based programs.(II.B.1)*
- *If through the monitoring process it is determined that the County is not fulfilling the provisions of this Remedial Plan due to staffing deficiencies, the parties will meet and confer regarding what steps to take to reduce the population of the jail, including available eresources to facilitate population reduction. (II.B.2)*

FINDING/DISCUSSION:

---

[12] Emphasis is the author's and meant to identify this expert's area of responsibility for this report.

**Partial compliance.** (II.A) Staffing was found to be partially compliant due to Defendants' efforts to comply with Consent Decree requirements through increased allocations of mental health positions, expanded mental health services, policy development and implementation, and limited CQI efforts (specifically including report development and auditing by ACMH). Offered treatment has not yet achieved compliant status, as Defendants' are negatively impacted by physical plant limitations, particularly at MJ, and custody staffing deficits. ACH has contracted for a staffing analysis; such an analysis should be conducted for custody and mental health staff as well, to determine what is needed to reach compliance with *Mays* Remedial Plan provisions.

ACMH has continued to make consistent improvement across monitoring periods. While they have expanded services and improved processes across multiple areas, some of those achievements were in their early stages. This is expected in compliance efforts. Initially, implementation must occur. Implementation includes necessary activities taking place. Typically, this begins with treatment, policy development, training, and monitoring (auditing). As implementation occurs and approaches compliance, timeliness and adequacy/quality become the focus of efforts to achieve compliance. Finally, maintaining compliance over time and tasks designed to support that become the focus. This is not a perfectly linear process, but is all to say that while Defendants may not have achieved compliance in all areas, their (particularly ACMH) continued efforts have been significant in moving toward compliance and providing clinically adequate care to patients with mental illness and intellectual disabilities. Defendants, particularly SSO supervisory staff and ACMH mental health staff, have been especially receptive to feedback which they have utilized in their goal setting and problem-solving. This is most apparent for ACMH in their process modifications and operations practices. SSO has demonstrated this but is encouraged to continue to document their efforts to provide proof of practice and to identify what additional resources are needed to achieve compliance with the Consent Decree and MOA.

**Recommendations:**

1. The County should complete a **staffing analysis** for ACMH and custody staffing. This would identify current staffing needs so that services can continue to be expanded in accordance with the Consent Decree and MOA. As physical plant limitations are resolved, staffing reassessments should occur. When the physical plant issues are fully resolved, another formal staffing analysis should occur so to provide Defendants with the necessary information to achieve compliance in the area of staffing.

2. The County should conduct a **technology and technology staffing** needs analysis. As The County has improved in its staffing and access to mental health treatment, deficits in Defendants ability to provide proof of practice have been highlighted. Currently, the need to provide data in a particular manner cannot be achieved with current systems (e.g., providing by activity [group treatment, unstructured out of cell]) or require parallel manual tracking (e.g., UOF logs, RVR logs). Proof of practice data is necessary to demonstrate compliance with the Consent Decree including maintaining an adequate CQI/QM program.

   a. The proof of practice tools would provide useful tools for custody and mental health managers to supervise their staff. They should be incorporated into the CQI activities as well.

   b. Proof of practice also needs to include summary reports as well. Currently, much of the data provided in the document request is raw data that must be manually computed. To do this would require a significant workload on staff when the data

cannot be sorted, filtered, and analyzed using Excel. It is important that whenever possible, the reports that provide proof of practice be automated.


PRISONERS WITH INTELLECTUAL DISABILITIES
*Per the Remedial Plan in the Consent Decree: The County shall, in consultation with Plaintiffs' counsel, develop and implement a comprehensive written policy and procedure regarding prisoners with an Intellectual Disability, including:(Section III.O.1)*

1. *Screening for Intellectual Disabilities; (III.O.1.a)*
2. *Identification of prisoners' adaptive support needs and adaptive functioning deficits; (III.O.1.b) and*
3. *Monitoring, management, and accommodations for prisoners with Intellectual Disabilities.(III.O.1.c)*
4. *A multidisciplinary team that includes appropriate health care staff will monitor and ensure appropriate care for prisoners with an Intellectual Disability. The multidisciplinary team will develop an individualized plan for each prisoner with an Intellectual Disability, which addresses: (1) safety, vulnerability, and victimization concerns, (2) adaptive support needs, (3) programming, housing, and accommodation needs. The multidisciplinary team's (MDT) plan will be regularly reviewed and updated as needed. (III.O.2)*


FINDING/DISCUSSION:
**Partial Compliance** (III.O.l.a-c). Defendants were found partially compliant because of the ACMH and ACH efforts to track and improve the screening and assessment of new arrivals, identification of patients with adaptive functioning deficits observed in the medical records and mental health tracking. Nursing staff screen new arrivals at intake. This is a high-level screening that includes three pertinent questions. A positive response on any of those items is to result in a routine referral to mental health for further assessment. ACMH has implemented an appropriate process to assess and identify patients who are functionally impaired due to an intellectual disability that includes specific forms. Implementation of this process was confirmed in targeted record reviews by the SME. Confidentiality of these contacts remained a concern based on record review and ACMH audits. Progress had been noted with increased confidential contacts, but February and March 2023 (the last months audit data was available for this review) noted a significant increase in non-confidential contacts. The primary cause for that increase was lack of available confidential space, a constant problem due to physical plant challenges in the booking area.

ACMH had begun holding MDTT meetings for patients who have an intellectual disability. These meetings include development of an appropriate individualized plan of care that addresses vulnerability to victimization, adaptive support needs and interventions, and  ACMH has a MDTT audit process with accompanying tool that is well constructed. However, the MDTT audit process would benefit from inclusion of items specific to intellectual disability to document compliance with Consent Decree requirements especially regarding adaptive support deficits, adaptive support needs, and intervention plans to support the patient in the correctional setting. ACMH also needs reporting capabilities so that the basic information (e.g., total and total by facility of current patients identified as having an intellectual disability, housing unit) can be summarized for reporting and operational needs

and compliance proof of practice.

Limitations that remain in this area include the need for updated policy and training for custodial staff regarding the monitoring, management, and provision of adaptive supports for patients identified as having an intellectual disability. The SSO needs to provide proof of practice for the ATIMS system regarding people with intellectual disabilities (identification and management) and a policy addressing the use of ATIMS by housing unit staff to identify such class members in housing units so that unit deputies are aware and provide adaptive supports were needed. The RVR and UOF documentation process must include whether the subject has an intellectual disability and what adaptive supports and accommodations were made to minimize inappropriate UOF and disciplinary action including when the behavior is the result of the patient's disability.

**Recommendations:**
1. ACMH shall develop a report tracking individuals who have an intellectual disability so that they can provide census information similar to what they do for individuals with mental illness.
   a. This should include the ability to report census data by degree of functional impairment.
2. ACMH should include specific items in the MDTT audit specific to intellectual disability and report findings in the CQI process.
3. ACMH should also develop a CQI process that addresses compliance with the Consent Decree in screening, assessment, and MDTTs. The audit should track timely completion of the necessary tasks.
4. SSO must finalize and implement appropriate policy that addresses the identification, appropriate housing, and management of people identified with intellectual disabilities.
   a. This should include the UOF and RVR processes and documentation.
5. SSO should provide training specific to the updated policy and procedures. Proof of practice shall be maintained and reported as part of the CQI and monitoring process.
6. CQI audits of the RVR and UOF processes should include items specific to people with intellectual disabilities.
   a. SSO is strongly encouraged to develop automatic data collection for the RVR and UOF compliance assessment process where possible. For example, data fields for presence/absence of an intellectual disability could be used to generate a report that would simply require a query rather than manual calculations.

ADDITIONAL REQUIREMENTS
- *Prisoners with an Intellectual Disability assigned to a work/industry position will be provided additional supervision and training as necessary to help them meet the requirements of the assignment.*

   3a. **Not Assessed**. This area will be specifically addressed in the next monitoring report as SSO will be expected to reliably utilize the ATIMS database to identify people with an intellectual disability and use this information in daily operations, including tracking work assignments.

MENTAL HEALTH CARE
Policies and Procedures
The Remedial Plan states that *the County shall establish policies and procedures that are consistent with the provisions of this Remedial Plan and include the following:(IV.A) (below are sections IV.A.a-h)*

1. *A written document reflecting the complete spectrum of mental healthcare programming and services provided to prisoners;*
2. *Minimum and maximum timeframes for when each type of mental healthcare service will be completed, including but not limited to laboratory tracking and psychiatry follow-up services, in accordance with prevailing community and professional standards;*
3. *An intake and referral triage system to ensure timely and effective resolution of inmate requests and staff referrals for mental healthcare;*
4. *Specific credentialing requirements for the delivery of mental healthcare services, including but not limited to only qualified mental health professionals may make critical treatment decisions.*
5. *Clinical monitoring of inmates, including but not limited to those who are involuntarily medicated, clinically restrained or secluded, segregated, or on suicide watch;*
6. *Descriptions of specialized mental health programming that specifically identify admitting and discharge criteria and the staff members who have the authority to place inmates in specialized mental health housing;*
7. *Procedures for involuntary medications and other appropriate measures for the management of inmates with serious mental illness who lack the capacity to give informed consent, in accordance with relevant state law;*
8. *Training for all staff members who are working with inmates with mental illness in all aspects of their respective duty assignments.*

FINDING/DISCUSSION:

**Substantial compliance.** (IV.A.1-7). **Partial compliance** (IV.A.8). Because of the tremendous progress made by ACMH in policy development and implementation, these areas are considered to be in substantial compliance. It is important to note that with the exception of IV.A.8, these requirements only require policies, procedures, or documents. Item 8 requires the existence of a training module, which ACMH has developed, and training of all staff. ACMH tracks offering training and compliance for mental health staff, confirming compliance for ACMH. However, no training compliance was provided by ACH or SSO for the MJ. Compliance data for RCCC indicated compliance. However, it was noted that the document request may require revision so that ACH and SSO report compliance for all staff as of a particular date. Instead, RCCC reported the number of staff in need of the training over a six-month period and how many received the training in that time period. This has been noted for future document requests.

Interviews with patients during the last site visit confirmed that the mental health program orientation materials had been disseminated to patients.

Defendants do have a mental health services referral policy and process. Audits of these timelines are necessary to provide compliance data. The referral process for healthcare services requests (HSRs) remains somewhat confusing. Patients' HSRs pass through several hands; they are collected by nursing, reviewed, and then forwarded to mental health. The start date for any mental health referral should be when it is first received by any staff member. This should be clarified with an update to existing policy. This is the standard used by the SME. Any urgent or emergent mental health referral received by nursing should be expedited with mental health receiving a phone call from nursing as well as the hard copy referral/HSR document. ACMH has audited the timeliness of emergent referrals due to concerns regarding the policy allowing six hours to see the patient when the standard of care in corrections is four hours. The Consent Decree provision requires emergent referrals to be seen "for

assessment or treatment by a qualified mental health professional as soon as possible, and within six (6) hours." Today's standards of care in detention settings provide a maximum of four (4) hours for emergent referrals. ACMH has been tracking timeliness and on a positive note, the time to see the patient has steadily decreased. For the last three months data was available (January through March 2023), the average time to completion was 4.9 hours.

**Recommendations:**
1. ACMH should continue to audit and review the emergent referral timeline (four vs. six hour timeframe) in CQI. ACMH strive to achieve the four-hour referral timeline and in all cases ensure that patients are seen with timeliness consistent with individual clinical need.
2. ACMH should audit referral timelines for urgent and routine referrals as well.
3. SSO must track training compliance and report that data during CQI activities (mental health training to the Mental Health Subcommittee and other training to appropriate QM committees).

- *The County's policies and procedures shall be revised, as necessary, to reflect all of the remedial measures described in this Remedial Plan.(IV.A.2)*

FINDING/DISCUSSION:

**Partial Compliance** (IV.A.2)**.** As mentioned previously, while ACMH has made tremendous strides in policy development and implementation, the SSO has seriously lagged in policy development and updates/revisions. There have been some SSO Post and Interim orders published. However, it is critical that existing policy be updated and new policy developed where indicated, staff trained, and policy implemented so that the County can progress toward compliance.

**Recommendations:**
1. ACMH has completed initial policy development and should complete finalization and implementation, understanding that part of that process requires the SME's assistance in final review.
2. SSO must prioritize policy development and implementation. These policies should be provided for review to All Parties (SMEs and legal counsel) for feedback prior to finalization whenever those policies impact areas of the Consent Decree or operations that may directly or indirectly impact areas of the Consent Decree.

- *The County shall operate its non-acute mental health programs – IOP, OPP, and General Population-Mental Health – consistent with the JPS Psychiatric Services overview. (IV.A.4)*

FINDING/DISCUSSION:

**Partial compliance.** (IV.A.4) Significant advancements have been made by ACMH to provide services consistent with the JPS Psychiatric Services Overview and Consent Decree. ACMH has increased program capacity, expanded programs, and expanded services across programs. There remain challenges with access based on physical plant and staffing limitations. Space limitations continue to impact the ability to provide confidential treatment services particularly at the MJ.

　　Challenges remain in providing care in confidential settings and having sufficient space to provide necessary levels of group treatment. Some assessments were still occurring cellfront due to reasons other than patient refusal. It is important to recognize that assessments should never occur in a non-confidential setting, particularly on the tier. If mental health staff do attempt to gather assessment information on the tier because it is necessary and unavoidable, they should document in the medical record the reason that the assessment could not have been postponed to later in the day or rescheduled.

This should be brief, only occur if there is not an urgent mental health need, and only to provide a confidential setting. ACMH staff should also recognize the limitations to the accuracy of information gathered on the tier and document those limitations in their assessment documentation and corresponding progress note, if completed.

**Recommendations:** This area is addressed at length in Space and Staffing Areas of Focus and in bed planning. Please refer to those areas for recommendations regarding these foundational needs that must be remedied first before ACMH can fully provide services consistent with their psychiatric services overview, policies, and the Consent Decree.

MENTAL HEALTH CARE
*Organizational Structure (IV.B)*

1. *The County shall develop and implement a comprehensive organizational chart that includes the Sheriff's Department ("Department"), Correctional Health Services ("CHS"), Jail Psychiatric Services ("JPS"), Chief Administrative Officer, Medical Director of the JPS Program, and any other mental health staff, and clearly defines the scope of services, chains of authority, performance expectations, and consequences for deficiencies in the delivery of mental health care services. (Section IV.B.1)*
2. *A Medical Director of Jail Psychiatric Services shall be designated and shall oversee all mental health care functions in the jails, including psychiatric prescribers and psychiatric nurses. The Director shall possess clinical experience and a doctoral degree. (IV.B.2)*
3. *The Medical Director of Jail Psychiatric Services shall participate in jail executive leadership and shall be responsible for overseeing program development, clinical practice, and policy, as well as interfacing with jail and medical leadership and community mental health. (IV.B.3)*

FINDING/DISCUSSION:
**Partial Compliance**. (IV.B.1) **Substantial compliance** (IV.B.2-3). As discussed in prior reports, organizational charts continued to outline reporting structures but they were not integrated across chains of command (i.e., Sacramento County Sheriff's Department, ACH, and ACMH). While interviewed supervisors reported holding meetings and working together regularly to problem-solve and resolve operational matters across these entities, this must be formalized through an integrated organizational chart and codified in policy. ACMH does have a medical director and manager of mental health. These two management positions oversee mental health services.

**Recommendations:**
1. The Defendants should work together (SSO, ACH, ACMH) to develop an integrated organizational chart.
2. The County shall draft a policy that reflects the various entities, identifies a schedule for executive staff meetings that include all entities and that policy should identify required attendees. Defendants reported that this has been completed and shall be supplied as part of the next document request for related policies.
3. Necessary proof of practice: Minutes that include attendance should be maintained for those meetings and provided as part of the ongoing compliance monitoring process. Defendants have indicated that these documents shall be provided following the next document request. Only ACMH provided meeting minutes for this fourth monitoring report supporting collaborative

meetings with SSO.

MENTAL HEALTH CARE
*Patient Privacy (IV.C)*
***All***[13] *clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff. In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification.(IV.C.1)*

1. *For any determination that a clinical interaction with a patient requires the presence of custody staff, staff shall document the specific reasons for the determination. Such decisions shall be reviewed through the Quality Assurance process. (IV.C.1.a)*

2. *If the presence of custody staff is determined to be necessary to ensure the safety of medical staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.(IV.C.1.b)*

3. *The County's patient privacy policies, as described in this section, shall apply to contacts between inmates and Triage Navigator Program staff and/or other staff that provide mental health-related services on site at the Jail.(IV.C.1.c)*

4. *Jail policies that mandate custody staff to be present for any mental health treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above. Custody and mental health staff shall be trained accordingly.(IV.C.2)*

5. *It shall be the policy of the County that mental health clinicians shall not conduct their patient contacts at cell front except pursuant to documented refusals or specific, documented security concerns that warrant cell front contacts. (IV.C.3)*

6. *For each clinical contact, mental health staff shall document whether the encounter was confidential, including whether it took place at cell front. If the contact occurred at cell front or otherwise was non-confidential, the reasons shall be clearly documented in the individual patient record and for purposes of Quality Assurance review procedures. (IV.C.4)*

7. *A process shall exist for sick call slips or other mental health treatment-related requests to be collected without the involvement of custody staff. (IV.C.5)*

FINDING/DISCUSSION:
**Partial compliance.** (IV.C.1, 2, 4-7) **Not assessed** (IV.C.3) Custody staff were not typically present for individual or group treatment contacts. The one exception as described previously was RCCC groups occurring in the IOP classroom. As mentioned, this was due to the safety and security concerns because of the difficulties observing clinicians and patients given the exiting door. In this case, auditory privacy was also not possible.

As discussed in other sections, SSO policy development has lagged so that there was not a specific update or policy on confidentiality. However, there was an operational order mandating confidentiality produced for the MJ. While the expectation of ACMH has been that clinical contacts will not occur cellfront, this does continue to occur at both the MJ and RCCC as confirmed by medical record review and the ACMH confidential contacts report data on the MJ. The following data was

---

[13] Bold emphasis added by this author.

provided by ACMH as part of the document request:

**8W: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 395 | 165 (42%) | 230 (58%) |
| February | 220 | 132 (60%) | 88 (40%) |
| March | 170 | 100 (59%) | 70 (41%) |
| **Total** | **785** | **397 (51%)** | **388 (49%)** |

**8E: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 248 | 37 (15%) | 211 (85%) |
| February | 121 | 13 (11%) | 108 (89%) |
| March | 294 | 25 (9%) | 269 (91%) |
| **Total** | **663** | **75 (11%)** | **588 (89%)** |

**7W: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 396 | 133 (34%) | 263 (66%) |
| February | 306 | 129 (42%) | 177 (58%) |
| March | 384 | 157 (41%) | 227 (59%) |
| **Total** | **1086** | **419 (39%)** | **667 (61%)** |

**7E: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 232 | 67 (29%) | 165 (71%) |
| February | 111 | 81 (73%) | 30 (27%) |
| March | 108 | 89 (82%) | 19 (18%) |

**6W/6E: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 452 | 195 (43%) | 257 (57%) |
| February | 229 | 135 (59%) | 94 (41%) |
| March | 208 | 139 (67%) | 69 (33%) |

| | Total | 889 | 469 (53%) | 420 (47%) |
|---|---|---|---|---|

**5W/5E: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 316 | 168(53%) | 148 (47%) |
| February | 229 | 138(60%) | 91 (40%) |
| March | 268 | 200(75%) | 68(25%) |
| Total | 813 | 506 (62%) | 307 (38%) |

**4W/4E: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 535 | 139(26%) | 396(74%) |
| February | 568 | 274(48%) | 294(52%) |
| March | 627 | 350(56%) | 277(44%) |
| Total | 1730 | 763(44%) | 967(56%) |

**3W: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 1309 | 577 (44%) | 732 (56%) |
| February | 1198 | 533 (44%) | 665 (56%) |
| March | 1008 | 462 (46%) | 546 (54%) |
| Total | 3515 | 1572(45%) | 1943(55%) |

**3E: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 497 | 225 (45%) | 272 (55%) |
| February | 452 | 222 (49%) | 230 51%) |
| March | 480 | 240 (50%) | 240 (50%) |
| Total | 1429 | 687(48%) | 742(52%) |

Fourth MH Monitoring Report

**BOOKING: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 352 | 224 (64%) | 128 (36%) |
| February | 326 | 99 (30%) | 227 (70%) |
| March | 117 | 32 (27%) | 85 (73%) |
| **Total** | **795** | **355(45%)** | **440(55%)** |

**BOOKING: Reason for Non-Confidential**

| Month | Confidential Space Unavailable | Safety & Security | Refused Leave Cell | Other |
|---|---|---|---|---|
| January | 50 (39%) | 32 (25%) | 38 (30%) | 8 (6%) |
| February | 143 (63%) | 44 (19%) | 36 (16%) | 4 (2%) |
| March | 55 (65%) | 16 (19%) | 11 (13%) | 3 (3%) |
| **Total** | **248 (56%)** | **92(21%)** | **85(19%)** | **15(3%)** |

**8W: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 100 (43%) | 56 (24%) | 55 (24%) | 19 (8%) |
| February | 12 (14%) | 19 (21%) | 45 (51%) | 12 (14%) |
| March | 10 (14%) | 19 (27%) | 38 (54%) | 3 (4%) |
| **Total** | **122(31%)** | **94(24%)** | **138(36%)** | **34(9%)** |

**8E: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 114 (54%) | 67 (32%) | 25 (12%) | 5 (2%) |
| February | 63 (58%) | 32 (30%) | 12 (11%) | 1 (1%) |
| March | 188 (69%) | 42 (16%) | 34 (13%) | 5 (2%) |
| **Total** | **365(62%)** | **141(24%)** | **71(12%)** | **11(2%)** |

**7W: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 124 (47%) | 91 (35%) | 28 (11%) | 20 (7%) |
| February | 99 (56%) | 55 (31%) | 13 (7%) | 10 (6%) |
| March | 125 (55%) | 56 (25%) | 44 (19%) | 2 (1%) |
| **Total** | **348(52%)** | **202(30%)** | **85(13%)** | **32(5%)** |

**7E: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 129 (78%) | 22 (13%) | 7 (4%) | 7 (4%) |
| February | 11 (37%) | 11 (37%) | 5 (16%) | 3 (10%) |
| March | 12 (63%) | 2 (11%) | 5 (26%) | 0 |
| **Total** | **152(71%)** | **35(16%)** | **17(8%)** | **10(5%)** |

**6W/6E: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 147 (57%) | 59 (23%) | 42 (16%) | 9 (4%) |
| February | 60 (64%) | 19 (20%) | 14 (15%) | 1 (1%) |
| March | 49 (71%) | 4 (6%) | 13 (19%) | 3 (4%) |
| Total | 256(61%) | 82(20%) | 69(16%) | 13(3%) |

**5W/5E: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 102(59%) | 25(17%) | 19(13%) | 2(1%) |
| February | 64(70%) | 2(2%) | 20(22%) | 5(5%) |
| March | 49(72%) | 2(3%) | 16(24%) | 1(1%) |
| Total | 215(70%) | 29(9%) | 55(18%) | 8(3%) |

**4W/4E: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 273(69%) | 35(9%) | 51(13%) | 37(9%) |
| February | 182(62%) | 22(7%) | 65(22%) | 25(9%) |
| March | 204(74%) | 11(4%) | 53(19%) | 9(3%) |
| Total | 659(68%) | 68(7%) | 169(17%) | 71(7%) |

**3W: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 434 (59%) | 110(15%) | 143(20%) | 45(6%) |
| February | 392 (59%) | 98 (15%) | 125(19%) | 50(7%) |
| March | 300 (55%) | 97 (18%) | 118(22%) | 31(6%) |
| Total | 1126(58%) | 305(16%) | 386(20%) | 126(6%) |

**3E: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave | Other |
|---|---|---|---|---|

|  |  |  | Cell |  |
|---|---|---|---|---|
| January | 137 (50%) | 58(21%) | 64(24%) | 13(5%) |
| February | 136 (59%) | 31(13%) | 49(21%) | 14(6%) |
| March | 130 (54%) | 26(11%) | 62(26%) | 22(9%) |
| **Total** | **403(54%)** | **115(15%)** | **175(24%)** | **49(7%)** |

There has been improvement in the frequency of confidential contacts across all areas of the MJ except for booking and 8E. Areas that had already been prioritizing confidential contacts have remained somewhat stable (3W and 3E) as they have maximized the use of available confidential space. ACMH and custody have collaborated on installation of a privacy booth that would not impede visibility on the units but would allow auditory privacy. These have been proposed for



floors 3W, 4 through 6 and 7E with one pod proposed for each. Two pods are expected for floors 3E, 7W and 8. This is an exciting constructive and worthwhile interim proposal to increase confidential space for the MJ. The next monitoring report will review the impact of these pods on the provision of confidential mental health services. The SSO and ACMH are commended for developing this option to increase confidential space while waiting for any proposed construction.

Any physical construction completion and activation remains years away. Defendants had previously reported that they were pursuing community options for the provision of inpatient acute mental health treatment. Because of the challenges with the current unit used for the APU and the wait for completion any proposed construction, Defendants must acquire community acute mental health treatment options immediately. Any type of contract with another entity will require at least several months to finalize. Therefore beds must be identified now so that service contracts can be pursued.

**Recommendations:**
1. The interim order regarding confidential mental health contacts should be developed into formal SSO policy and applicable to MJ and SSO.
2. Custodial staff who may be present during clinical activities (e.g., IDTT, RCCC treatment group) should receive additional training provided by ACMH. This training should focus on confidentiality requirements, the potential impact of their presence and ways to mitigate any potential negative impact of their presence. For example, custody should exhibit a relaxed posture and may be seated during the interaction if it is possible to safely do so. Custody should

not stand over patients unless there is a specific concern regarding possible imminent aggressive behavior of a particular patient. The impact of that action should be reviewed with alternatives to standing over the person in that situation. ACMH should review possible scenarios with custody such as the likelihood that patients may become agitated, angry, or otherwise exhibit behavioral activation that is expected and appropriate to the treatment setting. Another area that should be reviewed involves patient use of curse words and cursing directly at mental health staff. Scenarios that allow custody and mental health staff to discuss appropriate responses in those situations, the expectation that treatment staff will take the lead in deescalation and managing patient behavior, and methods for the mental health staff and custody personnel to communicate non-verbally or otherwise allow for custody to communicate that they are concerned or for mental health staff to request assistance.

3. The presence of a deputy in non-typical settings such as group treatment should be documented in treatment notes and that data should be tracked and reviewed as part of the CQI process.

4. When safety and security is the reason for a non-confidential contact, mental health documentation was to include the specific concern (e.g., patient assaulted staff and remained agitated, patient agitated and deescalation efforts failed) in progress notes. This was not consistently found in documentation reviewed.

5. Updates on design and construction proposals should be provided regularly to All Parties including the SMEs. This can be included in the County status reports or through other means but should occur at minimum every six months.

6. Because the completion of any proposed construction remains years away, Defendants must immediately seek and secure treatment beds in the community that can provide acute inpatient psychiatric services to detainees.

CLINICAL PRACTICES (IV.D)
*Mental health staff shall develop and maintain at each jail facility an accurate case list of all prisoners requiring mental health treatment services at the jail ("caseload") which, at a minimum, lists the patient's name, medical chart number, current psychiatric diagnoses, date of booking, date of last appointment, date of next appointment, and the name of the treating prescriber. (IV.D.1)*

FINDINGS/DISCUSSION:
**Partial compliance.** (IV.D) ACMH do utilize an electronic record which includes the patient's name, diagnoses, XREF, booking date and number, and much of the information listed for this item. However, waitlist reports and census reports continue to contain limited information. ACMH has submitted multiple new and revised report requests to responsible staff. Defendants continue to work on their electronic health record to improve its utility to them and its ability to provide proof of practice data and reports.
**Recommendations:**
1. As included in the last monitoring report, ACMH should continue to work with IT and the EHR vendor to develop appropriate reports that meet Consent Decree requirements and provide proof of practice.
   a. To the extent that waitlists can be automatically produced from data in the EHR, such functionality should be implemented and such reports should be

produced and reviewed regularly.
   b. The census reports should also be automated reports that are expanded to include the information detailed above from the Consent Decree.

- *Qualified mental health professionals shall have access to the patient's medical record for all scheduled clinical encounters.(IV.D.2)*

- *Qualified mental health professionals shall provide individual counseling, group counseling, and psychosocial/psychoeducational programs based on individual patients' clinical needs. (IV.D.3)*

FINDINGS/DISCUSSION:

**Partial Compliance.** (IV.D.2 & 3) These two items continue to be negatively impacted by physical plant limitations and the frequency of cell front and nonconfidential contacts. The EHR/health care staff laptops cannot be easily taken to the cell front. Clinicians were again observed during the site visit utilizing the medical record during observed individual contacts and MDTTs. This was a positive improvement from the last site visit. Training on the development of individualized treatment plans has occurred and medical record review has supported improvement in this area. However, some treatment plans suggest a cut-and-paste approach across different patients or utilization of "pat" phrases (phrases with the same wording for treatment targets and interventions across patients with different functional deficits, diagnoses, or treatment needs). Treatment plan audits would help increase supervisory oversight in this area. Progress notes reviewed did not consistently document implementation of the treatment plan. This appeared to vary by provider. It is important that individual contacts document the intervention(s) utilized and those should be identified in the treatment plan. Improvement has been noted in the development of treatment groups that are less generic such that patients can be assigned to treatment groups based on their individual needs. This remained limited because of the space limitations and focus on providing as many treatment group opportunities as possible to reach compliance with minimum group hours requirements. As treatment plans continue to improve, patients who are assigned to groups because of their level of care or individual needs should have the specific treatment groups listed in their treatment plan and the reason for the group (e.g., learn how to cope with symptoms of depression, develop emotional self-regulation skills).

**Recommendations:**
1. ACMH should implement treatment plan audits. These could be completed when the MDTT observational audit is completed by reviewing treatment plans during that time. ACMH should construct an audit tool that addresses Consent Decree requirements for patients with mental illness and intellectual disabilities. Initially, these audits should occur monthly or quarterly until 90% or greater compliance levels are achieved. Thereafter they can be done semi-annually.
2. Training or an expectation memorandum should be developed and implemented so that treatment staff know to include the interventions used during clinical encounters in their progress notes. If brief interventions or other evidence-based interventions are used during completion of assessments, these should be documented within the assessment documentation.
3. As part of the chart review process, ACMH should review progress notes to audit for inclusion of individualized interventions and confirm that those interventions have been outlined in the

treatment plan.

- *A qualified mental health professional shall conduct and document a thorough assessment of each individual in need of mental health care following identification.(IV.D.4)*
- *The County shall ensure prompt access to psychiatric prescribers following intake and in response to referrals and individual patient requests in accordance with the referral and triage timelines defined in the Access to Care provisions, below. (IV.D.5)*
- *The County shall, in consultation with Plaintiffs' counsel, implement an electronic system for tracking mental health evaluation, treatment, and other clinical contacts, as well as sick call slips and other mental health treatment- related requests or referrals. (IV.D.6)*
- *The County shall develop and implement an electronic tracking system with alert and scheduling functions to ensure timely delivery of mental health services to individual patients.(IV.D.7)*

FINDING/DISCUSSION:

**Partial Compliance.** (IV.D.4-7) ACMH provided referral information in response to the document request. A list of emergent, urgent, and routine orders for the review period was provided:

| | |
|---|---|
| MJ Mental Health Assessments (new intakes) Emergent/Stat | 9 |
| MJ Mental Health Assessments (new intakes) Urgent | 351 |
| MJ Mental Health Assessments (new intakes) Routine | 290 |
| MJ Emergent Referrals | 3545 |
| MJ Follow-ups – Emergent/Stat | 606 |
| MJ Follow-ups – Urgent | 779 |
| MJ Follow-ups – Routine | 301 |
| MJ NP/MD – Emergent/Stat | 1 |
| MJ NP/MD - Urgent | 173 |
| MJ NP/MD - Routine | 2487 |
| RCCC Mental Health Assessments (new intakes) Emergent/Stat | 3 |
| RCCC Mental Health Assessments (new intakes) Urgent | 158 |
| RCCC Mental Health Assessments (new intakes) Routine | 237 |
| RCCC Emergent Referrals | 561 |
| RCCC Follow-ups – Emergent | 120 |
| RCCC Follow-ups – Urgent | 456 |
| RCCC Follow-ups – Routine | 510 |
| RCCC NP/MD – Emergent/Stat | 0 |
| RCCC NP/MD – Urgent | 45 |
| RCCC NP/MD - Routine | 1179 |
| Total Referrals/Orders | 11,811 |

This is a total of 11, 811 orders. The data revealed a dramatic increase in emergency referrals and initial intake referrals. ACMH has hypothesized that this was due to improvements in the mental health screening at intake and the increased acuity in the population. While the increased acuity was noted during the site visit, the increase in emergent referrals is likely also due to the training of all staff focused on working with people with mental illness that has increased staffs' awareness, knowledge, and

utilization of resources. Workload increases are an expected result of an increasingly functional system and educated staff and should be seen as signs of success in the implementation of the Consent Decree and the product of significant efforts on the part of ACMH specifically and Defendants in general.

ACMH and ACH were collaborating to develop a "timeline to care" report that would provide timeliness compliance for these orders. The report was being tested and refined. It was not known if this would include scheduling functions or if staff would have to generate the report and then "order" the necessary activity. The order process in the medical record has been effective at identifying and tracking necessary activities. However, an order does not automatically schedule a clinical activity based on this SME's understanding and review of the record. It functions more as an alert that such a contact is requested or needs to occur. A centralized scheduling function, particularly one that could be automatically generated as a result of orders, would help to increase compliance with timeliness. The EHR may not be able to complete scheduling for emergent and urgent referrals since a clinician or psychiatric prescriber who was not the patient's treating provider may have to respond. Routine referrals and regular clinical activities such as ongoing individual and treatment group contacts could likely utilize this report and the electronic record to automatically schedule future clinical contacts and activities.

Medical record review was able to confirm documentation of completion of necessary mental health assessments. The quality of these assessments and the detail of relevant information documented had improved since the last monitoring report. Clinicians were including greater detail regarding general and psychiatric treatment histories, current symptoms, and functional needs. Psychiatric prescriber documentation had also improved in documentation of thorough assessment, diagnosis, and specific plan including the symptoms to be targeted by each medication. Documentation of the rationale for changes in psychotropic medication was also more consistently included in the prescriber's progress notes.

ACMH had implemented a pilot process for new arrivals to reduce the delays in verifying community medications. A targeted audit of new arrivals who reported community psychotropic medication was completed in early 2023 by ACMH. The audit analyzed 67 intake screenings from January and February 2023 for patients reporting community mental health medication(s) was completed.  The findings:

| Month | Number of New Arrival Patients Reporting Community Psychotropics | Number of Pharmacy Name/Contacts Documented in Intake Screen | Medication Verified by Mental Health | Number Verified Within 48 Hours |
|---|---|---|---|---|
| January | 30 | 30/30 (100%) | 30/30 (100%) | 25/30 (83%) |
| February | 37 | 34/37 (92%) | 35/37 (95%) | 27/37 (73%) |
| **TOTAL** | **67** | **64/67 (96%)** | **65/67 (97%)** | **52/67 (78%)** |

These findings indicate improvement approaching though not achieving compliance levels of 90%. One patient who reported community psychotropic medication was not referred to mental health staff for verification. It is important to note that medication verification improved from 13% (prior data) to 78%. The pilot program implemented has clearly been effective in improving the verification process. The data on timeliness of psychiatric prescriber medication orders was not available because the report remained in development at the time of this review. Once implemented, the timeliness to care report will allow for compliance levels/auditing of compliance for psychiatric prescriber timelines. The SME

expects that this report will be available for review and verification in the next monitoring report.

Medical records demonstrated improvement in obtaining releases of information (ROIs) for new arrivals. However, a small sample of medical records showed that there were still times when ROIs were not timely requested during the initial assessment. Since prior mental health records are so valuable in diagnostic clarification, psychotropic medication responsiveness, and psychotherapy treatment history, these should be consistently requested during the intake assessment and steps taken to ensure that the requested records are timely obtained.

**Recommendations.**

1. ACMH should continue their new arrival medication verification audits for proof of practice in achieving and then sustaining compliance.
2. ACMH chart audits should include initial mental health assessments to identify training needs so that these assessments are consistently adequate. Occasional audits of this process will provide supervisors with helpful information to manage their clinical staff and sustain improvement.
3. As timeliness compliance data is gathered and analyzed for patterns and trends, that information should be utilized to develop additional staffing requests.
4. The mental health staffing analysis recommended in the Staffing Focus Area should assist in identifying if there are adequate psychiatric providers for the population. As it is likely to require additional staffing allocations to meet the Consent Decree requirements and the standard of care, those additional allocations should be sought through the budgetary and contract process.
5. ACMH should utilize the CQI process to identify compliance with obtaining ROIs when indicated, completed requests to the prior providers for records, and receipt of those records.

Treatment planning: (*IV.D.8.a-g below*)

a) *The County shall ensure that each prisoner on the mental health caseload receives a comprehensive, individualized treatment plan based on the input of the Multi-Disciplinary Treatment Team (MDT). The MDT shall include multiple clinical disciplines with appropriate custody and counseling staff involvement.*

b) *The treatment plan shall reflect individual clinical need, and the County shall ensure that all clinically indicated services are available and provided.*

c) *The treatment plan shall include, at a minimum, the frequency of follow-up for clinical evaluation and adjustment of treatment modality, the type and frequency of diagnostic testing and therapeutic regimens (which may include clinical contacts more frequent than the minimum intervals described herein), and instructions about adaptation to the correctional environment.*

d) *This treatment plan shall include referral to treatment after release from the facility when recommended by treatment staff.*

e) *Custody staff shall be informed of a patient's treatment plan where appropriate to ensure coordination and cooperation in the ongoing care of the patient.*

f) *The County shall, in consultation with Plaintiffs' counsel, develop and implement a Treatment Plan Form that will be used to select and document individualized services for prisoners who require mental health treatment.*

g) *The County shall implement guidelines and timelines for the initiation and review of individual treatment plans, consistent with the JPS Psychiatric Services overview.*

FINDING/DISCUSSION:

**Partial compliance.** (IV.D.8.a-g) ACMH has made tremendous improvement in this area. MDTTs have been implemented in APU, IOP, and EOP. Treatment team meetings were observed in the APU during the site visit and all required disciplines were present. They communicated as a cohesive team to the patient and the patients engaged with the treatment team. ACMH has provided additional training to their staff regarding expectations and facilitation of MDTTs and development of the treatment plan within the team meeting. ACMH has developed a MDTT observational audit tool. The tool is well constructed though ACMH should still add items specific to individuals with intellectual disabilities. MDTs had begun for patients who had been identified as having an intellectual disability. The treatment plan form has been revised based on feedback from staff following implementation and from the prior monitoring report.

Medical record review showed improvement in timely MDTTs though not consistently. The SME expects that a report be produced showing timeliness of care, including MDTTs, for the next monitoring report, with validation via the medical record. MDTTs have not been implemented fully at all levels of care due to staffing vacancies. As staffing levels improve, the timely completion of MDTTs is expected to improve as well. Record review has also supported improvement in the individualization of treatment plans. Initial treatment plans tended to be vague and include generally the same or very similar treatment goals and a lack of interventions. While some providers did appear to use a "cut and paste" approach (copying the same treatment goals and interventions from one patient's treatment plan to another), most providers documented increasingly individualized goals. Treatment interventions were not always actual clinical interventions (e.g., increase coping skills). There were excellent treatment plans that included interventions which were also documented in progress notes, but additional training may be necessary so that treatment plans will consistently include appropriately individualized and evidence-based interventions.

There remained a need for custody staff present in the MDTT to participate in a more clinically meaningful and collaborative manner consistently. This can be a challenge as custody staffing deficits result in custody who are unfamiliar with the patient or MDTT process filling in for regularly assigned staff. The custody staffing problems must be resolved first before this area can be adequately resolved. However, in the interim, SSO and ACMH should develop a training specific to the MDTT process that includes confidentiality, expectations, and ways to meaningfully participate that should be provided to all custodial staff who work in DMHUs. If a deputy who does not usually work in a DMHU and/or has not received the training, the clinical team should take time prior to the patient's arrival to briefly review with that deputy an overview of the process and goal of MDTT, the deputy's role in that process, and address any questions that the deputy may have to put them at ease and encourage valuable participation. It is also important that the DMHUs commit to consistent staffing by designated and specifically trained deputies who are well-positioned to participate in MDTTs and related processes.

**Recommendations.** This area has demonstrated significant improvement since the second monitoring report. ACMH has made tremendous progress through policy development and intervention, ongoing training of staff, supervision, and utilization of feedback from both staff and the SME. ACMH continues to improve in the provision of MDTTs and the quality of the MDTT and treatment plan. ACMH has also demonstrated that they are aware of the needed areas of improvement to reach compliance and have developed an audit process to further improve MDTTs and treatment planning.

1. Continue recruitment activities to fill vacant positions so that MDTTs can occur in accordance with the Consent Decree.
2. Expand MDTTs to all levels of mental health care and monitor timely completion of those MDTTs. Priority should be given to DMHUs and more restrictive housing settings that are higher risk, higher stress placements for patients.
3. Implement audit of the MDTTs. Tracking and audit data should confirm that all required disciplines are present and that MDTTs include the assigned treatment providers.
4. Continue revising the treatment plan documentation and procedures in order to meet Consent Decree requirements and to help prompt staff to complete the necessary components of a treatment plan. The treatment plan should be updated whenever a multidisciplinary intervention plan (MDIP) is necessary to reflect the existence of the MDIP and integrate that MDIP with treatment overall. An updated treatment plan should be completed when the MDIP has been resolved and is no longer active.
    a. The treatment plan form could include a checkbox (yes/no) for an active MDIP with a space to include the date of the MDIP. While ACMH noted that this was an unnecessary recommendation because there was already an area in the treatment plan to note when the MDIP was active, record review did not find that to be true. MDIPs were often discovered based on review of clinical progress notes without concurrent updated documentation in the treatment plan. It was unclear if this was because it was a more recent change, but this area will be reviewed again in the subsequent monitoring review.
5. Ongoing training should include a focus on evidence-based treatments and how to document those treatments in the treatment plan. This should include the specific groups the patient will be assigned to, the reason for the group (e.g., to reduce negative self-talk and learn to identify precursors to suicidal ideation), and the expected start date and duration of the group.
6. ACMH should develop a treatment plan audit that can be used with the MDTT audit as part of their CQI process.
7. DMHUs should have consistent custody staffing who are protected from being diverted to other duties. They should be staffed with designated and specifically trained DMHU deputies who are able to participate meaningfully in MDTTs and any related processes. Any substitute deputies in DMHUs or participating on an MDTT should receive additional support and guidance to ensure that treatment planning objectives are met and that their presence is not merely to "check" a box.

MENTAL HEALTH CARE
<u>Medication Administration and Monitoring *(IV.E.1.a-c below)*</u>

1. *The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws and through the following:*
    a) *The County shall ensure that initial doses of prescribed medications are delivered to inmates within 48 hours of the prescription, unless it is clinically required to deliver the*

*medication sooner;*

b) *The County shall make best efforts to verify a patient's prescribed medications and current treatment needs at intake, including outreach to pharmacies and community providers to request prescriptions and other health care records relating to ongoing care needs. The policy shall ensure that any ongoing medication, or a clinically appropriate alternative, shall be provided within 48 hours of verification of the prescription or from a determination by a physician that the medication is medically necessary. Any orders that cannot be reconciled or verified, such as those with conflicting prescriptions from multiple prescribers, shall be referred to a health care provider for reconciliation or verification the next clinic day after booking.*

c) *The County shall ensure that medical staff who administer medications to inmates document in the inmate's Medical Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, and (3) the date and time for any refusal of medication.*

2. *Qualified mental health professionals shall, for each individual patient, establish targets for treatment with respect to the use of psychotropic medication and shall assess and document progress toward those targets at each clinical visit.(IV.E.2)*

3. *Qualified mental health professionals shall, for each individual patient, monitor and document the following with respect to psychotropic medications: (1) levels of medications, (2) adverse impacts (including through renal and liver function tests where indicated), (3) side effects, and (4) efficacy. (IV.E.3)*

4. *Qualified mental health professionals shall, for each individual patient, conduct and document baseline studies, including ECG, blood, urine, and other studies, as clinically appropriate, prior to the initiation of treatment. (IV.E.4)*

5. *The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication. (IV.E.5)*

6. *Medication adherence checks that serve a clinical function shall be conducted by nursing staff, not custody staff. Custody staff shall conduct mouth checks when necessary to ensure institutional safety and security.(IV.E.6)*

7. *Psychiatric prescribers shall consider clinically indicated considerations and conduct an in-person consultation, with the patient prior to changing or initiating medications. In the event there is no in-person consultation before prescribing or changing medications the psychiatric prescriber shall note and document the reasons for why there was not an in-person consultation with the patient. (IV.E.7)*

FINDING/DISCUSSION:

**Partial compliance.** (IV.E.1-7) Defendants provided minutes from the Pharmacy and Therapeutics (P&T) meetings held during the review period. The frequency of the meetings could not be confirmed but appeared to be quarterly. Attendance was taken and necessary personnel were present. While psychotropic medications were not specifically discussed in either meeting held, the ACMH medical director was present. The minutes provided documented that meaningful discussion occurred regarding the topics addressed. Interestingly, the P&T Committee did discuss the large utilization of nutritional supplements, particularly Ensure. In the medical SMEs most recent report, nursing staff reported to the SMEs that the nutritional supplements were used as a reward for medication compliance. While implementing incentives and reinforcers for patients with poor medication compliance is a positive consideration, using high calorie meal supplements if medically unnecessary can contribute to weight gain and obesity, something of particular concern for caseload patients on particular medications. It was not clear if this reward system existed with both medical and psychiatric providers, but the ACMH medical director is encouraged to conduct an audit of psychiatric prescriber practices and a sample of caseload patients to determine if this is a current issue for patients treated by mental health.

There were 84 patients who had been found incompetent to stand trial and had orders allowing the administration of forced psychotropic medication from January through June 2023. There were 113 occasions when patients had to be administered forced medication via an injection due to refusal of oral medications during the same time period. Some patients had to receive forced medication one to four times while other patients did not have to receive any forced medications.

An audit was completed on the timeliness of medication orders (new and renewal). The audit looked at psychotropic medications ordered as "direct observation therapy" (DOT) at both facilities for the audit. While the audit involved a small sample (34 patients), it found that initial orders were completed timely for 23 of 24 (96%) medications and renewed timely for of 18 of 20 (90%) medications. The completion of an audit and the findings indicated improvement in this area. The data to be provided by the timeline of care report should provide additional proof of practice and demonstrate continued compliance or need for improvement. There remained no audit or report that provided data on psychiatric prescriber's orders for clinically indicated laboratory testing and noting of the results of those orders. ACMH was reviewing ways to audit this area. However, psychiatric prescriber progress notes had improved in quality and comprehensiveness since the last monitoring report.

While improvement was noted across various domains for psychiatric prescribers, the medication administration process remained problematic. This has been documented at length in the medical SMEs monitoring reports and addresses administration for mental health caseload patients as well. However, the critical nature of the medication administration deficits cannot be overstated. Interviewed patients consistently reported difficulties in receiving their medications. This was most frequent at the MJ though there were a few patients who reported challenges at RCCC. RCCC patients most frequently complained that morning medication pass would delay their access to the recreation yard resulting in decreased yard time. At the MJ, patients reported not receiving prescribed medications, having to submit HSRs in an effort to obtain their ordered medications, poorly timed blood draws (late at night/very early during normal sleep hours) and continuing to experience late night administration times that interrupt their sleep so that they would sometimes refuse medications. Custodial staff confirmed the patients' complaints regarding timing of medication administration. The P&T report and the medical SMEs indicated that medication errors were not rare, may not be properly documented, and were not

consistently remedied. Medication administration remains an alarmingly problematic area requiring immediate focus and resolution.

**Recommendations.**

1. ACMH Medical Director should complete an audit of psychiatric prescriber practices and a targeted sample of psychiatric patients to identify if they are being prescribed nutritional supplements inappropriately. If this is a current problem for psychiatric patients, appropriate action should be taken to include communicating with the ACH medical director to resolve the problem.
   a. The MDTTs can identify individualized reinforcers (e.g., token economy, photos, word puzzles) for those patients who are impacted by the practice.
   b. If psychiatric patients are impacted but as a result of their primary care physician's orders, the ACMH Medical Director should meet with the ACH Medical Director to resolve those cases and identify other appropriate individualized reinforcers.
2. ACMH should develop an appropriate audit focused on laboratory testing orders and include timely noting by the ordering psychiatric prescriber.
3. ACMH should include an audit of the occurrence of initial orders and initial bridge orders by psychiatric prescribers who have not seen the patient.
   a. This audit should include time from that order without an in-person contact to actual completion of an in-person contact.
4. Complaints regarding the timing of medication and blood draws have persisted since the beginning of this case and been well-documented by the medical SMEs. This must be addressed and resolved immediately. Mental health patients are not receiving medication at ordered administration times or at all in the MJ. This has caused unnecessary stress and frustration for many patients. It is likely that it has contributed to psychiatric decompensation and delayed symptom relief because medications must be consistently taken to reach and maintain a therapeutic level of the medication.
   a. Defendants must address staffing deficits that contribute to problematic medication administration.
   b. Defendants must address the scheduling of nursing staff that further contributes to the problems with medication administration.
   c. Defendants must initiate observational audits of the medication administration process to identify policy violations, need for additional training, and additional interventions to remedy the problematic medication administration process.

MENTAL HEALTH CARE
Placement, Conditions, Privileges, and Programming *(IV.F.1.a-e below)*
   1. *Placement:*
      a) *It shall be the policy of the County to place and treat all prisoners on the mental health caseload in the least restrictive setting appropriate to their needs.*
      b) *Placement in and discharge from Designated Mental Health Units shall be determined by qualified mental health professionals, with consultation with custody*

*staff as appropriate.*

    c)  *Absent emergency circumstances, the County shall obtain the assent of qualified mental health professionals before transferring prisoners with SMI into or out of Designated Mental Health Units.*

    d)  *It shall be the policy of the County to place prisoners with SMI in appropriate settings that ensure provision of mental health services, patient safety, and the facilitation of appropriate programs, activities, and out-of-cell time. Co-housing with other populations shall be avoided to the extent that such a practice prevents or hinders any of the above.*

    e)  *All patients requiring placement in a Designated Mental Health Unit shall be provided access to such placement and care based on current clinical need and without any requirement for director-level approval.*

FINDINGS/DISCUSSION:

**Partial Compliance.** (IV.F) There remained caseload inmates identified as seriously mentally ill who were housed in restrictive housing (RHU) (8W) at the time of the site visit (June 2023). The specific number by classification (ADSEG1, ADSEG2, MAX, or DISC) could not be computed because the MJ failed to provide this data in response to the document request. Only RCCC provided the number of caseload patients by custody level. RCCC did not have patients who were ADSEG or DISC status. There were 77 males and four females classified as MAX status. This data appeared to include all incarcerated people at RCCC who were max status and not just caseload patients. While Defendants reported that there were fewer caseload patients in RHU this could not be confirmed without the necessary data. The review of the disciplinary and hearing process suggested that more rule violations are being resolved through alternative sanctions, but there were still examples of patients who were removed from the IOP specifically and placed into RHU. This practice runs directly counter Consent Decree requirements against placement of people with serious mental illness in restrictive housing. One of those cases occurred at RCCC and there was no documentation that mental health had been consulted first prior to determining the patient needed to be moved. Documentation suggested that custody made the decision and mental health accommodated that decision. Unfortunately, medical record documentation indicated that the patient was discharged from the IOP even though that should have remained his level of care due to the housing transfer. The reason for moving the patient to RHU at the MJ rather than the high security IOP was not clear. Capacity in the high security IOP needs to be increased, particularly in light of the constant waitlist for IOP. Length of stay for patients on the mental health caseload should be tracked for RHU, any RHU overflow, and RHU-like settings to identify cases out of compliance with the Consent Decree in need of supervisory (custody and mental health) intervention. ACMH did utilize prior feedback regarding segregation reviews to provide updated training on RHU reviews. A clinician from the RVR/RHU team was assigned to provide weekly monitoring and assessment of patients housed in RHU.

    The placement of SMI patients in restricted housing remains a significant concern and direct violation of the Consent Decree. There was at least one case identified where the mental health staff indicated that the patient should not be housed in RHU but custody ignored the recommendation and housed the patient in RHU without a clear rationale.

    Patients were moved to DMHU without any requirement for director-level approval. However, there continued to be issues with delays in transfer to a DMHU once referred due to capacity issues.

**Recommendations:**

    1.  As recommended in the prior monitoring report, MDTTs should be held responsible for

identifying the least restrictive treatment environment appropriate for each patient and documenting that in the treatment team and treatment plan documentation. Since a custody representative should be present in the MDTT, they should facilitate a rapid transfer through communication with the appropriate supervisor who moves the patient when the appropriate placement/treatment bed is available. If custody prefers written documentation from mental health staff to make those moves, there should be a form developed that MDTT completes during initial and subsequent MDTTs when the least restrictive treatment environment changes to provide to custody staff.

2. Patients housed in RHU or other functionally restrictive settings (RHU/seg-like) should have their level of care specifically addressed through segregation assessments and in MDTT. The MDTT should see the patient soon after the patient is placed into restrictive or functionally restrictive housing to identify if there is a need for referral to higher levels of care to stabilize the patients in the least restrictive setting where they can receive adequate care.

3. When patients cannot be housed in less restrictive treatment environments like the high security IOP, treatment plans must include goals and interventions to specifically address the underlying reasons for the more restrictive placement and/or repeated or lengthy placements in restricted housing. ACMH has used multidisciplinary intervention plans (MDIP) (formerly referred to as alternate treatment plans) to establish behavioral incentives and reinforcers to decrease aggressive and other problematic behaviors. Data collected has demonstrated success with implementation of these plans and the use of the MDIP should continue to assist patients in reducing problematic behaviors so that they can step down to a less restrictive treatment setting.

4. Length of stay data for the RHU and RHU-like housing should be tracked for each patient and in the aggregate. At the time of this report, ATIMS could not run reports for RHU and RHU-like lengths of stay filtered for mental health caseload patients. While data for length of stay was provided, it could not be confirmed that it was length of stay at that level of care housed in the corresponding DMHU. Some of the data suggested that it may be total length of stay at the jail for patients currently at that particular level of care (IOP, EOP, OPP).

   a. Until reporting capabilities can be developed, Defendants should develop a parallel tracking system outside of ATIMS in Excel or Access where patients who are placed into RHU and are receiving mental health services are tracked. This log should include name, X reference number, level of care, date placed into RHU and date moved out of RHU with automatic calculation of the length of stay for that person. The mental health clinician completing segregation/RHU reviews can assist custody in identifying caseload patients.

5. Continue to use the Confidential Contact report to audit confidential clinical contacts in the RHU. RHU reviews should prioritize moving caseload patients to appropriate treatment settings and assessment of the need for referrals to higher levels of care.

6. MDTT implementation for caseload patients housed in RHU should be a priority for implementation.

## MENTAL HEALTH CARE
Programming and Privileges *(IV.F.2.a-e below)*

   a. *All Designated Mental Health Units shall offer a minimum of 7 hours of unstructured out-of-cell time per week and 10 hours of structured out- of-cell time per week for each prisoner. While out-of-cell hours per prisoner may vary from day to day, each prisoner will be offered*

    *some amount of out-of-cell time every day of the week. All treatment and out- of-cell time shall be documented for each prisoner, and reviewed as part of Quality Assurance procedures.*

b. *The County shall ensure that prisoners on the mental health caseload have access and opportunity to participate in jail programming, work opportunities, and education programs, consistent with individual clinical input.*

c. *The County shall develop and implement, in the 2P inpatient unit and the IOP unit, a program for progressive privileges (including time out of cell, property allowances, etc.) for patients as they demonstrate behavioral progress. A patient's level of privileges and restrictions shall be based on both clinical and custody input regarding current individual needs. The County shall ensure a process to review custody classification factors when necessary, so that placement, privileges, and restrictions match current individual circumstances and needs.*

d. *Individuals on a mental health caseload shall receive, at minimum, privileges consistent with their classification levels, absent specific, documented factors which necessitate the withholding of such privileges. Clinical staff shall be informed of the withholding of privileges and the reasons for the withdrawal shall be documented and regularly reviewed by clinical and custody staff. The restoration of privileges shall occur at the earliest time appropriate based on individual factors.*

e. *Where a prisoner in a Designated Mental Health Unit is subject to any restrictions of property, privileges, or out-of-cell time, the mental health treatment provider and Multi-Disciplinary Treatment Team will, on a weekly basis, assess and discuss with the prisoner progress and compliance with the prisoner's individual case plan. This process will include clinical contact in a private, face-to-face, out-of-cell setting. The Multi-Disciplinary Treatment Team will provide input to classification staff regarding the prisoner's mental health and appropriateness for removal of imposed restrictions. Classification staff will follow the recommendation of the Multi-Disciplinary Treatment Team to remove restrictions unless there is a clear, documented security reason to maintain the restriction.*

FINDING/DISCUSSION:

**Partial compliance** for non-acute units**. Non-compliance** for acute inpatient psychiatric unit (APU) (IV.F.2 a-e) This area was partially compliant because treatment groups and out of cell time was being offered to patients housed in DMHUs. However, the data could not be reported in a manner that allowed for determination of compliance with the Consent Decree. As discussed, ACMH and SSO reports are by patient. These reports simply list raw data for each patient. The reports do not summarize out of cell time received by patient (e.g., Patient A received an average of 7 hours of structured therapy per week during the review period and 6 hours of unstructured out of cell time) or by activity (e.g., IOP patients in unit 'A' received an average of 8 hours STA per week and 5 hours of unstructured out of cell time per week during the review period). The data as currently reported cannot be analyzed for the purposes of demonstrating compliance with the Consent Decree and proof of practice. This was discussed with the Mental Health Program Administrator and other systems with similar mandates were recommended for tracking and IT consultation. Until the proper report can be produced by Defendants, this area cannot progress beyond partial compliance despite the progress in offering and tracking these activities.

    Patients at RCCC DMHU reported that delayed medication administration has resulted in a reduction in available out of cell time, particularly outdoor recreation. Patients in the MJ complained of a lack of outdoor recreation in particular. They reported that they rarely received outdoor yard and that

while they were allowed dayroom time, it was inadequate in the context of the Consent Decree. APU patients did not even have regular access to outdoor recreation.

The APU remained a high priority concern for overall milieu, availability of out of cell time, and treatment offered. As has been well documented, the physical plant is not adequate for sufficient out of cell time to allow for compliance with the Consent Decree and the treatment needs of the patients. The current SSO reporting for out of cell time does not provide information on time out of cell per day (results are aggregated for week) though it does substantiate that patients receive very little out of cell time. As in the last monitoring report, groups are frequently canceled in the APU due to the lack of custody staffing. This unit is simply inadequate to provide appropriate mental health treatment to people experiencing acute mental illness.

While staff reported that patients in DMHUs receive all privileges consistent with their custody level, no proof of practice could be provided. Interviewed patients reported that they did generally have the privileges that they expected and this was not a typical area of complaint. However, Defendants need to review the Consent Decree and identify policy and tracking that can be implemented to demonstrate compliance.

**Recommendations:  (These recommendations are repeated from the last report)**

1. Custody staffing and assignment of custody escorts must be prioritized. A custody staffing analysis should identify how many positions should be allocated to allow for proper access to outdoor yard, dayroom, and mental health treatment. This should identify current needs and evolve over time as the physical plant and clinical staffing changes occur.

2. In the interim, it is again recommended that each facility charter a QIT that includes SSO, ACH, and ACMH staff to focus on identifying ways to increase out of cell time and provide normalizing experiences for the SMI detainees such as group dining, games, yard, exercise, and other activities at both the RCCC and MJ mental health units including the acute inpatient program.

3. Acute inpatient care alternatives must be accessed so that patients can be placed in the clinically indicated appropriate treatment settings outside of the jail setting to receive the necessary psychiatric treatment.

4. (New) Existing software vendors and IT staff should be consulted to identify how current reports can be modified to provide the data needed to determine compliance with the Consent Decree as outlined above.


MENTAL HEALTH CARE

Conditions: *(IV.F.3)*

- *Staff shall provide prisoners in Designated Mental Health Units with the opportunity to maintain cell cleanliness and the opportunity to meet their hygiene needs. Custody and clinical staff shall provide assistance to prisoners on these matters, as appropriate to individual patient needs;(IV.F.3.a)*
- *The County shall ensure uniformity of practice with respect to cell searches, such that searches are not done for punitive or harassment reasons. The County shall monitor whether cell search practices may be serving as a disincentive for prisoners in Designated Mental Health Units to leave their cells for treatment or other out-of-cell activities, and shall take steps to address the issue as appropriate. (IV.F.3.b)*

FINDING/DISCUSSION:

**Partial Compliance.** ACMH and SSO continued to provide an "activities of daily living" (ADL) program in the IOPs that provides assistance in activities that many people with chronic mental illness find challenging. This program occurs regularly in the IOP DMHUs and includes ACMH clinicians, unit deputies, and porters where applicable who go cell to cell assisting the more impaired patients with cell cleanliness and hygiene. This was observed at RCCC IOP during the site visit; staff there used a simple incentive program that provided small rewards (e.g., a piece of candy) to patients each time they would engage with the custody and mental health staff on cell cleaning. This practice appeared to be working well.

As was reported in the Environment of Care (Skipworth) report and noted in the last mental health monitoring report, the lack of preventive maintenance and ongoing cleanliness issues noted for both the MJ and RCCC may have contributed to difficulties that patients have in keeping their living areas clean.

**Recommendations:**
1. In the last monitoring report, SSO was directed to implement the recommendations identified in the Environment of Care report. In addition, SSO must document such efforts and provide proof of practice for both facilities.
2. SSO should review existing policy and ensure that policy for DMHUs complies with the Consent Decree and that there is a process to document the provision of appropriate cleaning materials to individual patients within the DMHUs so that they can maintain the very important ADLs including keeping their living space clean. The tracking logs or process should be reviewed as part of CQI frequently until compliance is achieved at which time it can be reviewed semi-annually.
3. As part of the CQI process, audits of the cleanliness of housing units and inspection for any needed repairs, particularly those that place patients at risk (e.g., broken metal) should occur.
4. SSO should review and update its cell search policy to reflect Consent Decree requirements.
   a. During SSO supervisory walk-throughs in DMHUs, the supervisors should be expected to engage patients in discussion, hear their concerns regarding custody and daily operations, and to solicit any complaints including how they perceive cell searches.
   b. SSO and ACMH should interview patients housed in DMHUs that frequently refuse to attend treatment to identify their reasons for refusal. This interview should be documented in the medical record and include the patient's stated reasons for refusal. If those reasons are custodial in nature, a plan for resolution should be developed by the unit sergeant and the treatment provider which is documented in the medical record.
   c. As part of CQI, SSO should develop an observational audit form for cell searches in DMHUs and implement an auditing schedule that covers different shifts and days. This data should be presented during the Mental Health Sub-Committee meetings.


MENTAL HEALTH CARE
Bed planning: *(IV.F.4)*
- *The County shall provide a sufficient number of beds in Designated Mental Health Unit, at all necessary levels of clinical care and levels of security, to meet the needs of the population of prisoners with SMI. (IV.F.4.a)*
- *The County shall conduct a bed needs assessment, to be updated as appropriate, in order to*

*determine demand for each category of Designated Mental Health Unit beds and shall ensure timely access to all levels of mental health care, consistent with individual treatment needs .(IV.F.4.b)*

- *The County shall establish mental health programming for women that ensures timely access to all levels of care and is equivalent to the range of services offered to men. (IV.F.4.c)*

FINDING/DISCUSSION:

**Partial Compliance** for non-acute units. (IV.F.4 for IOP, EOP) **Non-compliance** as applicable to the acute inpatient psychiatric level of care/APU. As addressed in the last monitoring report, Defendants completed two feasibility studies. The County has approved proposed construction to address deficiencies impacting the delivery of medical and mental health treatment. In August 2023, the County approved an increased budget for the design and construction of that facility. Previously discussed interim plans pending construction of that facility have been abandoned due to the high cost of those interim plans, the length of time to complete those modifications, and the fact that there would remain significant inadequacies. Defendants have referenced seeking alternative treatment in the community to replace the wholly inadequate APU. However, progress in this area for both long term improvement and interim plans has stalled.

ACMH has expanded capacity in the IOP and EOP. Despite this, waitlists remain for IOP and continue for APU. ACMH is encouraged to continue to formally request additional positions to increase the capacity of the IOP. The APU cannot be expanded and an alternative setting must be acquired.

Prior ACMH outcome studies were noted in the last monitoring report. ACMH clearly demonstrated that when patients were provided services that approached compliance with the Consent Decree, emergent referrals, disciplinary write-ups, and acute inpatient admissions decreased. Because those multiple studies clearly demonstrated the efficacy of the EOP and IOP, those programs were expanded. During this monitoring round, studies related to the provision of care focused on group cancellations and whether the APU had necessary custody support. The audits of the APU continued to confirm that during this monitoring round, there was never full custody support. Deputies continued to be diverted and that negatively impacted the ability of patients to access mental health treatment.

Bed planning as a formal process has not been initiated. As Defendants have acknowledged, population reduction is necessary to approach compliance with the Consent Decree and that expansion of DMHUs is necessary based on lengthy waitlists. Based on the identification of patients requiring specific levels of mental health care, a bed plan projection can and must be completed in the near term. Projections may change as improvements in the identification of patient acuity continues to improve. However, such an analysis remains an important component for the design of the proposed construction and should be completed at this stage.

**Recommendations:**

1. Defendants **must acquire** an alternative to the APU in order to provide clinically indicated medically necessary inpatient psychiatric treatment. Seeking an alternative is no longer sufficient. This is a critical emergency where acutely ill patients are not receiving adequate treatment. It is very difficult to imagine that medical patients facing an acute cardiac incident would have their treatment delayed in the way that acute psychiatric patients' treatment has been delayed. These patients suffer very real consequences with longer periods of decompensation, reduced probability that they can return to their previous baseline functioning, possible increased suicidal ideation that may increase their risk of completing suicide at some point, and avoidable psychological pain and suffering. The challenges in accessing psychiatric treatment in the

community for any citizen are well-documented. However, Defendants must utilize their resources to resolve this top priority immediately.

2. APU custody staff must be protected from being diverted for non-emergency duties. These staff were regularly being diverted and consequently, treatment was canceled and access to care was significantly decreased. While SSO has reported that they will protect those staff, that occurred after the data collection period. It will be reassessed during the next monitoring review.

3. In the last monitoring report, the findings by Nacht & Lewis and Mr. O'Connell were discussed at length regarding population reduction strategies. As noted in the census discussion in this report, the number of people housed in the jail system had decreased by 155 from July 2022 to July 2023. This is a small reduction over a 12-month period. As Defendants have acknowledged that population reduction efforts are necessary in addition to construction to meet compliance with the Consent Decree, Defendants should continue to pursue these population reduction strategies and report on their status including any progress in the required Status Reports to the Court.

4. Use existing data to complete a bed need assessment to identify how many beds at each level of care will be required to be compliant with the Consent Decree and share findings with All Parties. To the extent possible, use historical data and growth in the mental health population over time to project future bed needs so that this information can be incorporated into the design of possible future construction. ACMH has repeatedly reported and documented an increase in the acuity of incoming patients so particular attention should be provided to IOP and acute inpatient treatment capacity needs. This assessment must address the entire detainee population.

MENTAL HEALTH CARE

Access to Care *(IV.F.6)*

- *The County shall designate and make available custody escorts for mental health staff in order to facilitate timely completion of appointments and any other clinical contacts or treatment-related events. (IV.F.6.a)*
- *The County shall ensure sufficient and suitable treatment and office space for mental health care services, including the Triage Navigator Program and other mental health-related services provided on site at the Jail. (IV.F.6.b)*
- *Locations shall be arranged in advance for all scheduled clinical encounters. (IV.F.6.c)*
- *The County shall track and document all completed, delayed, and canceled mental health appointments, including reasons for delays and cancelations. Such documentation shall be reviewed as part of the Quality Assurance process. (IV.F.6.d)*

FINDINGS/DISCUSSION:

**Partial Compliance.** (IV.F.6.a-d) For compliance with space mandates, please refer to previous sections on space and confidentiality. The MJ did relocate staff to another building to address office space needs and open up existing space to be used for treatment when possible. ACMH continued to track canceled treatment groups. The process was not automated and required manual tracking and analysis, a significant workload. This provided incredibly useful data as the primary reasons for group cancelations remained custody availability.

There has not been a creation of a healthcare cadre of custody staff to address medical and mental health escort needs. However, the SSO reported that IOP deputies had been structured to oversee mental health treatment on the entire third floor of the MJ. It was unclear how this was expected to positively impact access to care as on its surface, that change seemed like it expanded duties for IOP

deputies. There were 20 deputies and one sergeant assigned to the IOP. Treatment group cancellations substantiate that custody staffing is inadequate as a significant number of treatment groups were canceled in the IOP at the MJ (nearly 1 in every 4 groups for both males and females were canceled) and the primary reason for cancellation remained custody availability. This was also true for treatment groups in the APU. Clearly this area requires immediate attention to identify if additional staff can be allocated to the IOP and APU. These custody staff should also not be diverted from these units except for emergencies. Electronic communications between the parties indicated that the SSO agreed to the ACMH-articulated need for those deputies to be protected from being diverted for other non-emergency duties. How the IOP and APU deputies are utilized and whether they continued to be diverted for non-emergency duties will be evaluated during the next monitoring period. In addition, SSO responded to the draft version of this report that there was a plan to establish a small healthcare liaison unit to facilitate access to care. However, that unit was to primarily address concerns regarding medical access to care. The implementation of this unit and any impact it may have on access to mental health treatment will be assessed in the next monitoring period.

At RCCC, there were 16 deputies and one sergeant assigned to the IOP, JBCT and another program. Those custody staff were responsible to address custody programming including escorting for mental health staff. Off-site appointments at both sites were facilitated by the medical escort team. RCCC had fewer treatment groups canceled based on reported audit data. The most frequent reasons at RCCC were "safety" followed by custody availability. The custody staffing at RCCC does appear to be better able to handle the current program capacity, though that could change as group treatment offerings increase.

The lack of custody staff remained the most common reason for cancelations of treatment in the MJ and must be addressed.

**Recommendations:**
1. The County needs to complete the staffing analysis previously recommended.
    a. Conduct a feasibility study at the MJ of allocating a specific number of deputies to facilitate access to treatment, particularly in the APU, IOP, and RHU, through the deployment of an escort cadre. Report the findings in the Mental Health Sub-Committee and in the Status Report to the Court. If the initial unit conceptualized in the SSO response to this report is implemented with the stated focus on primarily medical access to care, that data should be analyzed so that success in increasing access can be used to support the allocation of additional custody staff to address mental health access to care.
2. SSO should consider hiring consultants to assist in the recruitment and retention of deputies for the jail. All recruitment, hiring, and retention efforts should be documented and tracked as proof of practice in meeting the serious staffing needs.
3. SSO consideration of a pay differential for deputies working in DMHUs is strongly encouraged. The custody staff working in those units must provide a more broad daily program, have enhanced training, and utilize a broader set of skills not found in all custody staff. These positions should be viewed as elite, with greater expectations and greater benefits.
4. Defendants need to further refine the tracking and reporting features associated with the current electronic health record.
    a. Identify if modifications can be made to the EHR or if another tracking database (e.g., ATIMS) could be utilized to generate automated reports of treatment cancelations and delays so that the data can be more easily collected and utilized by SSO and ACMH.

Efforts to improve tracking and reporting functions should be documented and included in CQI reports, Status Reports, and document request responses.

Referrals and triage: *(IV.F.6.e.i and ii below)*

- *The County shall maintain a staff referral process (custody and medical) and a kite system for prisoners to request mental health services. Referrals by staff or prisoners must be triaged within 24 hours.*
- *Referrals and requests for mental health services shall be handled in accordance with the following timeframes, and based on the definitions and guidance in Exhibit A-2:*
- *Prisoners with <u>"Must See" (Emergent)</u> mental health needs shall be seen for assessment or treatment by a qualified mental health professional as soon as possible, and within six hours. Prisoners with emergent mental health needs shall be monitored through continuous observation until evaluated by a mental health professional.*
- *Prisoners with <u>Priority (Urgent)</u> mental health needs shall be seen for assessment or treatment by a qualified mental health professional within 36 hours.*
- *Prisoners with <u>Routine</u> mental health needs shall be seen for assessment or treatment by a qualified mental health professional within two (2) weeks;*
- *Prisoners whose requests do not require formal clinical assessment or intervention shall be issued a written response, with steps taken to ensure effective communication.*

FINDINGS/DISCUSSION:

**Partial compliance.** Defendants have implemented a referral process that includes triage of the paper referral within 24 hours. If it is a HSR and includes mental health concerns, nursing forwards the referral to mental health to be triaged. This multi-step process delays the entry of an order into the EHR for an appointment to occur. It would be beneficial to mental health patients if nurses were trained to triage mental health referrals and could directly input the order into the EHR to reduce this delay. Defendants developed a form that could be provided to patients following submission of an HSR so that they knew their request had been received and a visit scheduled. However, there have been no audits of this process to confirm that the patient is given the document that can be found in the EHR. Patients reported that they had not consistently received those forms. At the MJ, most patients reported that they had never received such a form.

Audits were completed for emergent referrals as part of CQI for suicide prevention. This audit demonstrated that the time from referral to the patient being seen had been steadily decreasing from a high of 6.7 hours in June 2022 to an average of 5 hours in data gathered for this report when the patient had been placed into a safety cell. No data was provided for timeliness of urgent and routine referrals as no audits were completed and the timeliness of care report had not been finalized. The ACMH data report will be included in the next monitoring report. Medical record review indicated inconsistent results. The sample was not large enough to make generalizations. However, anecdotally the referral process appeared to have functioned well for some patients and they were seen timely while others had to submit multiple referrals to be seen.

**Recommendations.**

1. The Timeliness of Care report should be regularly produced and reviewed by supervisory staff and in the Mental Health Sub-Committee to assess compliance with Consent Decree timelines and identify barriers to timely provision of care.
   a. In light of the significant increase in emergent referrals, ACMH should consider

completion of an analysis of the reason for the emergent referral to identify if there has been an increase in population acuity. If any of the referrals appear to have been due to increased crisis in particular housing areas/programs that should be further investigated.

2. Defendants should establish an interdisciplinary workgroup to address concerns identified with the referral process and whether nursing staff could be trained to complete initial triage of HSR that include mental health concerns.

3. This workgroup could also develop and implement an audit that confirms whether patients receive the written receipt for acknowledging receipt of the HSR timely.

Medico-Legal Practices *(IV.G)*

> 1. *The County shall provide access to appropriate inpatient psychiatric beds to all patients who meet WIC § 5150 commitment criteria. At the time a patient's need for inpatient care is identified, commitment paperwork shall be initiated immediately. Placement in an inpatient unit shall occur at the earliest possible time, and in all cases within 24 hours. For individual prisoners placed on a pre-admit or wait list for inpatient placement, affirmative steps to process and place them shall begin immediately. (IV.G.1)*
>
> 2. *The County shall not discharge patients from the LPS unit and immediately re- admit them for the purpose of circumventing LPS Act requirements. For patients with continuing need for LPS commitment, the County shall follow all required procedures under the LPS Act. (IV.G.2)*
>
> 3. *The County shall review all County and JPS policies and procedures for PREA compliance, and revise them as necessary to address all mental health-related requirements. (IV.G.3)*

FINDING/DISCUSSION:

**Partial compliance. (IV.G)** ACMH continued to maintain extensive policies and procedures to address this area of the Consent Decree. They continued to address the forensic aspects of inpatient care including Welfare and Institutions Code 5150 commitment criteria, the LPS commitment paperwork, notification and other forms, firearms restrictions forms following commitment, forms to try to get your right to possess firearms back, and involuntary medication orders (e.g., Sell orders). ACMH has maintained multiple policies to ensure that they follow the law in these areas. They continue to provide treatment via the JBCT for people admitted to that program who have been found incompetent to stand trial. Whereas JBCT used to admit people from all over the State, they are now designated to only admit people from Sacramento County which staff report is an improvement, including in helping to ensure that Sacramento County detainees with treatment needs have more timely access to this mental health treatment programming.

This area will remain only partially compliant until the County provides access to appropriate inpatient beds for patients who meet W&IC 5150 criteria. The inadequacy of the APU has been discussed in detail elsewhere. While ACMH continued to try to improve services by allocating additional staff, the physical plant of the APU is simply so problematic that an alternative setting is necessary.

**Recommendations.**

1. Secure alternative treatment setting that allows patients to receive clinically necessary acute inpatient treatment that meets the clinical need across the incarcerated population..

Clinical Restraints and Seclusion (*IV.H*)
*Generally: (IV.H.1.a-g below)*
  a. *It is the policy of the County to employ restraints and seclusion only when necessary and to remove restraints and seclusion as soon as possible.*
  b. *It is the policy of the County to employ clinical restraints and seclusion only when less restrictive alternative methods are not sufficient to protect the inmate-patient or others from injury. Clinical restraint and seclusion shall not be used as punishment, in place of treatment, or for the convenience of staff.*
  c. *The placement of a prisoner in clinical restraint or seclusion shall trigger an "emergent" mental health referral, and a qualified mental health professional shall evaluate the prisoner to assess immediate and/or long- term mental health treatment needs.*
  d. *When clinical restraints or seclusion are used, Jail staff will document justification for their application and the times of application and removal of restraints.*
  e. *There shall be no "as needed" or "standing" orders for clinical restraint or seclusion.*
  f. *Individuals in clinical restraints or on seclusion shall be on constant watch, or on constant video monitoring with direct visualization every 15 minutes. All checks will be documented.*
  g. *Fluids shall be offered at least every four hours and at meal times.*

*Clinical Restraints (IV.H.2.a-c below)*
  a. *The opinion of a qualified health care professional or qualified mental health professional on placement and retention in restraints will be obtained within one hour from the time of placement.*
  b. *A thorough clinical assessment shall be conducted by qualified health care professional or qualified mental health professional every four hours to determine the need for continued restraint.*
  c. *Individuals in restraints shall be checked every two hours by a nurse for vital signs, neurovascular assessment, and limb range, and offered an opportunity for toileting.*

FINDINGS/DISCUSSION:

**Substantial compliance with explanation.** (IV.H.1&2) Clinical restraints are those restraints that are initiated by a mental health provider who is qualified and allowed by license to order a patient to be restrained. ACMH has developed and implemented appropriate policies and documentation checklists and forms for the use of clinical restraints and seclusion. ACMH reported that there was no use of clinical restraints or seclusion during this review period. It should be noted that patients in the APU are effectively secluded since they are housed alone in a cell. Importantly, since the first mental health monitoring report, ACMH has reported no use of restraints or seclusion and that has been confirmed through chart reviews.

It should be noted that the area of clinical restraints remained a significant concern of the SME. Through the UOF review process, there were incidents of custodial restraint where clinical intervention and consideration of clinical restraint should have occurred but mental health staff were not consulted. There were incidents identified in use of force data where clinical restraint was indicated (e.g., head banging with injury) but not initiated. Instead, custody staff initiated custodial restraint without properly referring the patient to mental health so that the patient could be deescalated or clinical restraint initiated. Once ACMH receives patients, they appropriately use alternative methods to avoid restraint. However, there appears to be a disconnect between SSO and ACMH as to when an incarcerated person should be referred to mental health for emergent needs including possible clinical restraint or deescalation. Through

the UOF review as part of this report, at least two custody uses of the WRAP device were identified and no emergency referral was found. Those patients were taken to medical for evaluation following the UOF, though one refused medical care. However, it was not clear from the UOF documentation how long those individuals were held in the WRAP and whether they were properly monitored. Responsibility for this disconnect and need for proper referrals, intervention, and use of restraints falls upon all parties: SSO, ACH, and ACMH. However, in agreement with the parties, it will be tracked in the UOF section of monitoring reports. To ensure that recommendations are not lost in this report, they shall be included here and the UOF section.

**Recommendations.**
1. Defendants should have an interdisciplinary committee (ACH, ACMH, and SSO) that automatically review all incidents where the WRAP or other immobilizing device (e.g., restraint chair) are used. This committee should review if the incident of restraint was truly a custodial restraint or if it should have been referred to ACMH or ACH for possible clinical restraint.
   a. This committee should make suggestions for avoiding the use of restraints based on the case-by-case analysis.
   b. The review should determine if an emergency referral to mental health and medical was made and timely completed.
   c. The committee should identify training and policy needs as well, if indicated.


MENTAL HEALTH CARE
Reentry Services *(IV.H.3.a-d below)*
   a. *The County shall provide a 30-day supply of current psychotropic medications to inmates on the mental health caseload, who have been sentenced and have a scheduled released date, immediately upon release.*
   b. *Within 24 hours of release of any inmate who is on the mental health caseload and classified as pre-sentence, the County shall transmit to a designated County facility a prescription for a 30-day supply of the inmate's current psychotropic medications.*
   c. *The County, in consultation with Plaintiffs' counsel, develop and implement a reentry services policy governing the provision of assistance to prisoners on the mental health caseload, including outpatient referrals and appointments, public benefits, medical insurance, housing, substance abuse treatment, parenting and family services, inpatient treatment, and other reentry services.*
   d. *The County agrees that, during the course of the implementation of the Remedial Plans contained in this agreement, it will consider Plaintiffs' input on measures to prevent unnecessary or avoidable incarceration of individuals with serious mental illness.*
FINDING/DISCUSSION: (IV.H.3)
**Partial compliance.** Defendants did not provide any data (logs, audits, minutes) that examined the provision of psychotropic medication for releasing patients. ACMH does provide a range of pre-release services. There were 1,261 incidents where releasing patients were transitioned back to their community mental health provider or linked to new services. Forty-six patients were taken to an emergency department for evaluations regarding the need for involuntary treatment and three patients were taken to a community treatment center for services as their acuity did not rise to the level of an emergency department. There is a report regarding pre-release services that is produced and reviewed monthly.

**Recommendations:**
1. ACMH should develop a report or audit process that can identify the number of people who require pre-release services so that the provision of service can be presented as a compliance measure. Currently, only the services delivered are known and while significant, a compliance statistic cannot be generated without data showing the population's total need for pre-release services.
2. Defendants should develop a form to include in the medical record that will be clearly labeled and used to document provision of discharge/release psychotropic (and other) medication.
3. The pharmacy report should be utilized to provide automated data regarding the daily number of caseload patients with psychotropic medications who received those medications at release.

MENTAL HEALTH CARE

Training (IV.I)

*1. The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following: (IV.I.1)*

> *a. All jail custody staff shall receive formal training in mental health, which shall encompass mental health policies, critical incident response, crisis intervention techniques, recognizing different types of mental illness, interacting with prisoners with mental illness, appropriate referral practices, suicide and self-harm detection and preventions, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum. (IV.I.1.a)*

> *b. Custody staff working in Designated Mental Health Units shall receive additional training, including additional information on mental illness, special medico-legal considerations, de-escalation techniques, working with individuals with mental health needs, relevant bias and cultural competency issues, and the jail's mental health treatment programs. (IV.I.1.b)*

> *c. Mental health staff shall receive training on the correctional mental health system, correctional mental health policies, suicide assessment and intervention, relevant bias and cultural competency issues, and treatment modalities to be offered in the jails. (IV.I.1.c)*

FINDING/DISCUSSION:

**Partial compliance. (IV.I)** ACMH provided proof of practice for required training and additional training during the review period that substantiated compliance for their staff. No proof of practice data was provided by ACH for their staff nor did SSO provide proof of practice for the MJ. RCCC did provide proof of practice that substantiated compliance with required training for their custody staff and the additional training for those assigned to IOP. RCCC also indicated that their staff were trained in CIT and in the ACMH UOF (role of mental health) training.

During the site visit (July 2023), there were several deputies observed present in MDTTs, interacting with patients, and in therapy groups (RCCC). These custody staff were observed to hold themselves in a tense stance and to stand when everyone else was typically sitting. At times, their interactions had the potential to unnecessarily escalate patients and in one case, did escalate the patient requiring mental health staff to intervene. In the one incident where the problematic communication escalated the patient, the SME had serious concerns that the patient would continue to escalate and an unnecessary UOF would occur until mental health staff intervened. These observations were discussed with custody supervisors who were receptive to the feedback. It is important to note that the custody staff appeared uncertain of their role or how to best fulfill their role. This was in large part a training issue. All

staff assigned to DMHUs were expected to have additional training provided by mental health staff to help them understand how to work with the people housed in the DMHUs.

In addition to these direct observations, patients reported concerns about some specific officers. These concerns were most alarming at the MJ and included a deputy assigned to the male IOP and two male deputies who were assigned to the female IOP unit.  The patient reports had been reported to the mental health staff and they reported those concerns to their supervisory chain as well as during interviews with the SME. In one case, an investigation into an inappropriate relationship with a female patient had occurred. It appeared that the complaint had been substantiated as the deputy was reassigned. However, the reassignment would still provide him with access to female incarcerated people, including mental health patients. The concerns regarding these personnel were reported to the *Mays* compliance supervisor prior to the end of the site visit by this SME. This supervisor was extremely receptive to the concerns and a productive discussion occurred. One of the concerns expressed by staff and patients focused on the lack of follow-up regarding what was being done about the concerns and allegations. In the absence of information, particularly if the person remains in the same position and if the behavior does not appear to change, staff and patients are left to interpret what they think has been done about the matter. Overwhelmingly, the concern was that nothing had been done and that the complaint had not been taken seriously. While personnel matters are complex and the specific information that can be provided to the complainant may be limited, there are other ways to follow-up to make staff and patients feel that their concerns are taken seriously and to develop a sense of trust that even in the absence of information, serious action will or has been taken. There was clearly a need for training in how to address specific or general staff concerns of mental health patients and how to provide a sense of resolution to them.

**Recommendations:**
1. As repeatedly recommended previously, ACH and SSO must track and maintain proof of practice (data with total staff by discipline and staff by discipline who completed training). This proof of practice should be reported in CQI meetings and provided as part of the document request.
2. Additional training for custody staff in the DMHUs should include expectations regarding their behavior, particularly when engaged in mental health programming (e.g., escorts, MDTTs, supporting the milieu).
3. As supervisory staff complete their tours through the DMHUs, they should observe staff interactions with patients paying particular attention to deputy-patient interactions and provide mentoring in not relying primarily on authoritarian tactics to gain compliance or interact with patients.
4. Additional training should be provided for staff in the staff complaint process including what reporting staff can expect in terms of resolution or follow-up. This would allow staff to be better informed regarding the process and they can further educate patients regarding what to expect when expressing concerns that staff violate their personal privacy, make them feel uncomfortable, or otherwise cause them concerns for their safety.

DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH MENTAL HEALTH OR INTELLECTUAL DISABILITIES *(Section V of Consent Decree; MOA page 4)*

<u>Role of Mental Health Staff in Disciplinary Process</u> *(V.A)*
>    *1.   The County's policies and procedures shall require meaningful*

*consideration of the relationship of a prisoner's behavior to any mental health or intellectual disability, the efficacy of disciplinary measures versus alternative interventions, and the impact of disciplinary measures on the health and well- being of prisoners with disabilities. (V.A.1)*

2. *Prisoners who are alleged to have committed a rules violation shall be reviewed by a qualified mental health professional if any of the following apply: (V.A.2)*

   a) *Prisoner is housed in any Designated Mental Health Unit;*
   b) *Jail staff have reason to believe the prisoner's behavior was unusual, uncharacteristic, or a possible manifestation of mental illness;*
   c) *Prisoner is on the mental health caseload and may lose good time credit as a consequence of the disciplinary infraction with which he or she is charged.*

3. *If any of the above criteria is met, the qualified mental health professional shall complete the appropriate form and indicate: (V.A.3)*

   a) *Whether or not the reported behavior was related to mental illness, adaptive functioning deficits, or other disability;*
   b) *Whether the prisoner's behavior is, or may be, connected to any of the following circumstances:*
      i. *An act of self-harm or attempted suicide*
      ii. *A cell extraction related to transfer to a medical/mental health unit or provision of involuntary treatment*
      iii. *Placement in clinical restraints or seclusion.*
   c) *Any other mitigating factors regarding the prisoner's behavior, disability, and/or circumstances that should be considered and whether certain sanctions should be avoided in light of the prisoner's mental health disability or intellectual disability, treatment plan, or adaptive support needs.*

**FINDINGS/DISCUSSION:**

| Consent Decree Standard (listed above) | Determination of Compliance | Comments |
|---|---|---|
| V.A.1 | Substantial compliance | ACMH has updated policy and trained staff; form addresses all areas; assessments are adequate to good. |
| V.A.2 | Partial compliance | To reach substantial compliance: a) SSO must timely refer applicable incarcerated people and **not** initiate discipline until **after** the mental health asessment is |

| | | |
|---|---|---|
| | | received (with proof of practice), and b) ACMH must timely complete 90% or more of the mental health assessments for the referred individuals. In response to this draft report, SSO has provided a hopeful response expected to address this item. It will be reviewed during the next monitoring period. |
| V.A.3 | Substantial compliance | ACMH should strive to complete a clinical interview of all referred patients, even when they are well known to the program/clinicians. |

(V.A.1-3) Progress and actions - ACMH has maintained previous efforts toward compliance in this area. There were 22 mental health disciplinary assessments provided as part of the document request response. Eleven of those were participants in the IOP, four were participants in the Jail-based Competency Program (often adjudicated as incompetent to stand trial between the disciplinary report and mental health assessment), four were in the outpatient program (OPP) and three were in the general population. In eight (36% of the sample) cases, mental health staff found that there was a nexus between the behavior in the disciplinary report and the individual's mental illness or intellectual disability. Even when clinicians found that there was not a nexus, they recommended that phone calls (most common), visiting, and/or other privileges not be restricted and explained the impact of such restrictions on the patient's stability and mental status. In those cases where a nexus was identified, clinicians typically recommended that the patient not be subjected to prolonged isolation or disciplinary housing due to the acuity of the patient and the negative impact of isolation common in disciplinary housing. Unfortunately, because of the challenge of reviewing all 139 disciplinary packets produced for the monitoring period, corresponding disciplinary reports and hearing outcomes could not be located. A sample of 17 disciplinary reports were reviewed. Nine of those (53%) were informational only, even when they involved verbal or physical aggression. Verbal counseling/reprimand was utilized for one patient who was in a mutual combat with a peer. This sample of disciplinary reports suggested that custody staff were utilizing alternative sanctions for patients on the caseload. In at least two mental health assessments, the clinician documented discussing the patient and findings with the sergeant and agreeing to alternative sanctions.

ACMH implemented policy, training, and related forms during the last monitoring period. They have continued to track significant information related to the referral. The documentation in the medical record and on the mental health assessment form is typically substantial, is written in easy-to-understand language, and typically includes the impact of specific restrictions on the patient's mental health status. These assessments frequently find

that the patient should not be subjected to "prolonged" isolation or disciplinary housing.

Challenges that currently exist include 1) referrals from custody that are not timely so that when ACMH receives the referral, the patient already has discipline imposed; 2) screening patients out of the assessment because custody incorrectly proceeded with punishment without an alternative plan; 3) providing inadequate clinical rationale for decision not to interview patient (e.g., patient was well known to program), and 4) inability to complete timely assessments at RCCC at least 90% of the time.

**Recommendations:**

1. Integrate custody and ACMH tracking. Include all data points that correspond to compliance with the Consent Decree and policy.
2. Develop a QI process that will audit these elements for compliance and includes hearing disposition.
   a. CQI should analyze the tracking data regularly and consider creating a workgroup with custody and mental health staff to identify the challenges with custody making timely referrals to mental health. The workgroup should identify policy or operational solutions, implement those, and monitor effectiveness prior to completion of the workgroup. Workgroup minutes and audit findings should be completed.
3. Hearing deputies must be instructed to not initiate discipline until they receive the mental health assessment.
   a. If discipline processes have been initiated, the clinician should still complete the mental health assessment if possible. At minimum, there should be a process for immediate notification of the mental health and custodial supervisory chain. This should be documented in the tracking log as well as the outcome.
   b. It was noted in the SSO response to this report indicated that a "hard stop" was planned to be implemented in the disciplinary process so that disciplinary action will not occur until the mental health assessment is completed and available for use. The implementation of this process will be reviewed as part of the next monitoring period.
4. ACMH should continue to monitor completion of assessments while including timeliness of the assessment.

DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH MENTAL HEALTH OR INTELLECTUAL DISABILITIES (Section V. of the Consent Decree)

*Consideration of Mental Health Input and Other Disability Information in Disciplinary Process (V.B.1-7 below)*

1. *The County shall designate one Chief Disciplinary Hearing Officer for each jail facility, who shall be responsible for ensuring consistency in disciplinary practices and procedures.*
2. *The Disciplinary Hearing Officer shall ensure that prisoners are not disciplined for conduct that is related to their mental health or intellectual disability.*
3. *The Disciplinary Hearing Officer shall consider the qualified mental health professional's findings and any other available disability*

*information when deciding what, if any, disciplinary action should be imposed.*

4. *The Disciplinary Hearing Officer shall consider the qualified mental health professional's input on minimizing the deleterious effect of disciplinary measures on the prisoner in view of his or her mental health or adaptive support needs.*

5. *If the Disciplinary Hearing Officer does not follow the mental health staff's input regarding whether the behavior was related to symptoms of mental illness or intellectual disability, whether any mitigating factors should be considered, and whether certain sanctions should be avoided, the Disciplinary Hearing Officer shall explain in writing why it was not followed.*

6. *Prisoners will not be subjected to discipline which prevents the delivery of mental health treatment or adaptive support needs, unless necessary for institutional safety.*

7. *Prisoners shall not be subject to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of self- injurious behavior.*

FINDINGS/DISCUSSION:

| Consent Decree Standard (listed above) | Determination of Compliance | Comments |
|---|---|---|
| V.B.1 | Non-compliant | Updated policy was not provided. There was an Operations Order entitled Discipline Plan from October 2019 that must be updated. Training documentation did not include any disciplinary report or hearing training. Disciplinary packages provided did not allow for resolution of this item. |
| V.B.2 | Non-compliant | SSO has not updated policy to require that hearing deputies clearly document mental health assessment findings and disposition consistent with the Consent Decree. |
| V.B.3 | Non-compliant | Custody has failed to document meaningful consideration during the hearing disposition of mental health assessment findings. |

| | | This section requires immediate prioritization. |
|---|---|---|
| V.B.4 | Partial-compliance | This has only been identified as partial compliance because clinicians have documented in the mental health assessment times when they spoke with custody and custody agreed to alternative sanctions. |
| V.B.5 | Partial compliance | In at least one instance, the mental health assessment recommended against placement in disciplinary housing but the patient was still housed in the RHU. There was not sufficient documentation provided to determine if this was a pattern. The tracking log must include the findings of the mental health assessment, consideration by the hearing officer, any disagreement by the hearing officer, and rationale. |
| V.B.6 | Unable to assess due to lack of adequate information | If the patient is not allowed to participate in treatment or restricted from adaptive supports, this must also be included in the log and documentation. |
| V.B.7 | Partial compliance | Based on provided information, this did not appear to be happening regularly. SSO must update policy so that this is clearly prohibited and clinicians should address these occurrences in the mental health assessment so that they can be tracked in the shared disciplinary log. |

See findings on page V.A.1-3 above.

**Recommendations:**
1. Update disciplinary process policy and include the required elements of documentation in the narrative disciplinary report and hearing documentation. This should include the patient's level of care or intellectual disability status, necessary hearing accomodations based on the mental health assessment, meaningful consideration of the clinician's findings regarding the role of mental illness and/or intellectual disability in the behavior, disposition in light of those recommendations, and if restrictions were based on the mental health assessment (V.B.2-4)
   a. The hearing officer must clearly document in the hearing findings the rationale for not adhering to the mental health assessment (V.B.5).
2. Train staff in the updated disciplinary process and their obligations particularly in identifying when a referral is necessary and making that referral timely.
   a. Custody staff should be directed through an interim order (to be incorporated into policy revision and training) that they are not to write disciplinary reports when patients refuse treatment or engage in suicidal ideation/self-injury consistent with the Consent Decree.
3. Tracking must be integrated with mental health tracking so that one log provides a complete picture of the disciplinary process.
4. Work with ACMH to develop a CQI process for the disciplinary process to identify areas requiring modification or improvement. The log will be critical in the CQI process and the CQI process and documentation will provide proof of practice for assessment of compliance.

## DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH MENTAL HEALTH OR INTELLECTUAL DISABILITIES

*Accommodations for Prisoners with Mental Health or Intellectual Disabilities During the Disciplinary Process (V.C)*
> 1. *The County shall provide reasonable accommodations during the hearing process for prisoners with mental health or intellectual disabilities. (V.C.1)*
> 2. *The County shall take reasonable steps to ensure the provision of effective communication and necessary assistance to prisoners with disabilities at all stages of the disciplinary process. (V.C.2)*

FINDINGS/DISCUSSION:
**Could not assess.** Documentation provided did not substantiate that reasonable accommodations and effective communication were provided during the hearing process for patients with mental health and/or intellectual disabilities.
**Recommendations**:
1. Further refine integrated tracking to include use of reasonable accommodations.
2. Hearing findings should document the use and type of adaptive supports, reasonable accommodations, and effective communication during the hearing process.

*Use of Force for Prisoners with Mental Health or Intellectual Disabilities (Consent Decree V.D.1-7 below)*
> 1. *The County's Correctional Services Operations Orders shall include language that ensures meaningful consideration of whether a prisoner's*

    *behavior is a manifestation of mental health or intellectual disability.*

2. *For prisoners with a known mental health or intellectual disability, and absent an imminent threat to safety, staff shall employ de-escalation methods that take into account the individual's mental health or adaptive support needs.*

3. *The County's Correctional Services Use of Force policies shall include a definition and a protocol for a planned Use of Force that provides appropriate guidance for a planned Use of Force that involves a prisoner with mental health or intellectual disability.*

4. *Prior to any planned Use of Force, such as a cell extraction, against a prisoner with mental health or intellectual disabilities, there will be a "cooling down period," consistent with safety and security needs. This period includes a structured attempt by mental health staff (and other staff if appropriate), to de- escalate the situation and to reach a resolution without Use of Force. Such efforts, including the use of adaptive supports, will be documented in writing. Medical and/or mental health staff should be consulted if the purpose of the cell extraction is related to the delivery of treatment.*

5. *The County shall require video documentation for any planned Use of Force, absent exigent circumstances. Jail staff shall endeavor to record the specific actions, behavior, or threats leading to the need for Use of Force, as well as efforts to resolve the situation without Use of Force.*

6. *The County shall ensure the completion of supervisory review of Use of Force incidents, including video (for any planned Use of Force), interviews, and written incident documentation, in order to ensure appropriateness of Use of Force practices including de-escalation efforts. The County shall take corrective action when necessary.*

7. *The County shall review and amend as appropriate its policies on Use of Force, including its policies on Custody Emergency Response Team (CERT) and Cell Extraction Procedures.*

*Memorandum of Agreement:  Use of Force Policies and Practices, Class Members with Disabilities (Focus Area: **referred to here as V.E. 1-3**)*

    *On February 4, 2022, the County, with input from the Subject Matter Expert and Class Counsel, completed revision of its Mental Health Policy No. 07-05 regarding Mental Health-Planned Uses of Force policy. This policy is necessary to implement Remedial Plan requirements to employ de-escalation methods that take into account a class member's mental health or adaptive support needs, utilize mental health staff involvement whenever possible prior to utilizing planned use of force, and requiring video documentation and supervisory review of Use of Force incidents.*

1. *Mental health staff will receive de-escalation and use of force training starting in late April/early May 2022, which will include training on relevant Mays Consent Decree provisions.*

2.  *Adequacy of ACH Mental Health Policy No. 07-05 implementation, training and compliance with Consent Decree requirements regarding Use of Force practices will be monitored by the Subject Matter Experts.*

3.  *The County will modify the Sheriff's Office's Operations Order Use of the WRAP Restraint Device, including based on input from the Subject Matter Experts and Class Counsel, to ensure compliance with all relevant Remedial Plan provisions. Use of force incidents, including all uses of the WRAP Restraint Device, will be monitored by the Subject Matter Experts. (See Appendix E for photos of similar WRAP restraint devices)*

*Training and Quality Assurance (Consent Decree, V.F 1-5)*

1.  *All custody staff, and mental health staff, shall be trained on the policies and procedures outlined herein that are relevant to their job and classification requirements. Custody staff will receive periodic training on identifying behaviors that may be manifestations of mental illness and other situations warranting a referral to mental health staff, including for a Rules Violation Mental Health Review or other mental health assessment.(V.F.1)*

2.  *All custody staff shall be trained on the identification of symptoms of mental illness, the provision of adaptive supports, and the use of de-escalation methods appropriate for prisoners with mental health or intellectual disabilities. (V.F.2)*

3.  *The County shall track the outcomes of all disciplinary hearings for prisoners who are on the mental health caseload or who have intellectual disabilities, including whether the recommendation of the mental health professional was followed. (V.F.3)*

4.  *The County shall track all Uses of Force (planned and reactive) involving prisoners who are on the mental health caseload or who have intellectual disabilities, including the number of Uses of Force and the number of cell extractions by facility. (V.F.4)*

5.  *The County shall implement a continuous quality assurance/quality improvement plan to periodically audit disciplinary and Use of Force practices as they apply to prisoners who are on the mental health caseload or who have intellectual disabilities. (V.F.5)*

FINDINGS/DISCUSSION:

| Consent Decree Standard (listed above) | Determination of Compliance | Comments |
|---|---|---|
| V.D.1 | Partial compliance | Inadequate proof of practice (only RCCC provided requested data) |

| V.D.2 | Partial compliance | Policy description does reference a cooling down period; SSO documentation does not support adequate implementation; SSO policy requires revision |
| V.D.3 | Partial compliance | Policy description does include requirements; significant concerns in implementation |
| V.D.4 | Non-compliant | No evidence/documentation of actual implementation |
| V.D.5 | Partial compliance | There were problems with policy adherence with the use of body-worn cameras that was not addressed in supervisory review. This needs to be resoved through the supervisory review process and documentation. When video is available, it needs to be provided as part of the incident package consistent with the document request. |
| V.D.6 | Partial compliance | While supervisory reviews do occur, they do not appear to include an objective assessment of the need for force, the use of immediate vs planned force, the use of deescalation techniques, and compliance with the Consent Decree and existing post, operational, and interim SSO orders including appropriate use of body-worn cameras. |
| V.D.7 | Non-compliant | SSO must update, train, and implement all UOF-related policies in accordance with the Consent Decree. |

| Memorandum of Agreement (listed above) | Determination of Compliance | Comments |
|---|---|---|
| V.E.1 | Substantial Compliance | |

| V.E.2 | Partial Compliance | Partial due to ACMH training achievement but not compliant in implementation because custody staff fail to properly alert mental health for clinical intervention prior to force and do not consistently generate emergent referrals following use of force (so ACMH does not properly document) |
|-------|--------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| V.E.3 | Non-compliant | This policy had not been updated at the time of the documentation production (see Appendix E for a reference photo of a WRAP device example). |

| Consent Decree | |
|----------------|--------------------|
| V.F.1 | Partial Compliance |
| V.F.2 | Partial Compliance |
| V.F.3 | Noncompliant |
| V.F.4 | Partial Compliance |
| V.F.5 | Noncompliant |

ACMH continued to maintain the previously approved policy for mental health staffs' role in UOF and deescalation. As referenced in the prior monitoring report, ACMH created a training module and provided that training to mental health staff as demonstrated through proof of practice. ACMH also developed a template for documentation by mental health staff in the medical record. SSO developed Post Orders for each facility that were considered "interim requirements" in April 2023 pending required policy revision/development. Those orders address the need to consider the patient's mental status and/or intellectual disability prior to initiating a planned use of force. The Post Orders also referenced the cool-down period and the requirement that ACMH be contacted and provided with a structured time within the cool-off period to deescalate the patient. The provided SSO operations order related to use of the WRAP restraint device was last updated in January 2020. The operation order has not been updated in accordance with the MOA. No updated policies for UOF, cell extraction, or custody emergency response team (CERT) were provided to this SME.

Training records were provided by RCCC and indicated full (100%) compliance with deescalation training and mental health UOF training provided by ACMH. Deescalation training was provided "on their own" to six sergeants and 105 deputies, all required personnel identified in these figures. No training curriculum or instruction was provided to assess the adequacy of this training. It was concerning that this challenging and complex area (e.g., deescalation and deescalation with people experiencing mental illness and/or having an intellectual disability) did not involve in-person training. The training, "Role of mental health in UOF" was provided in person to three sergeants and 23 deputies,

all identified as required. However, any deputy and/or sergeant could be involved in a UOF with patients on the mental health caseload or having an intellectual disability; consequently, all custody staff should be trained in this aspect of UOF protocols, through a current, in-person training curriculum.with these populations. No training records were provided by the MJ in this area.

In addition to summary data, RCCC provided a log of UOF incidents for January through June 2023. The MJ provided no log, no summary data, and no UOF incident packages.[14] While RCCC is to be commended for providing a log, concerns were noted in the accuracy of the log. Both facilities are required by the Consent Decree to maintain a tracking log for *all*[15] UOF incidents including cell extractions at their facilities. These logs should include, at a minimum, 1) subject of UOF name and X reference number, 2) subject's mental health level of care, 2) presence of intellectual disability, 3) date and time of incident, 4) location of incident (specific housing and facility), 5) indicate if it was a planned or immediate (also referred to as emergent) UOF, 6) mental health consultation, 7) presence/absence of cool down period, 8) presence/absence of structured mental health intervention, 9) videotaped, 10) cell extraction (yes/no), 11) emergency referral made (when indicated), 12) supervisory review completed, and 12) findings of the supervisory review. These logs provide valuable operational data that should be analyzed for trends and patterns and used in the management of staff, development of updated training, CQI, and proof of practice. Video of planned UOF should be maintained with the UOF incident packages and provided as part of the monitoring process.

Numerous areas of concern were noted from the limited number of incident packages reviewed (Recommendations are included within concerns):

1. **Custodial policies have not been updated**. While SSO has a post order (Planned Use of Force – Main Jail, April 2023), the UOF policy and operational orders have not been updated. In addition, policies on the use of the Tom A. Swift Electric Rifle (TASER)[16] and WRAP devices have also not been updated. This is of particular concern as research has shown that people experiencing mental illness are 28%[17] more likely to have a TASER used against them than those without mental illness. The increased utilization of the TASER on people with mental illness is noted in existing SSO UOF policy. The use of WRAP has been controversial amongst mental health professionals. While the SME does not dispute that within the jail setting there are times where force and restraint must be used, those options should be a last resort when other efforts have failed. Appropriate medical monitoring and mental health assessment should also be documented as part of the custodial restraint process. As each of these policies is updated, the CERT and cell extraction policies should be appropriately updated so that all policies and practices are internally consistent.

   **NOTE:** People with mental illness are at much higher risk for a UOF against them than those without mental illness and are at higher risk for injury from that UOF. Women and people with mental illness and/or intellectual disability are more likely to have experienced repeated trauma in their lives and more likely to respond negatively to force and the use of restraints such as the WRAP device. Research has shown that people subjected to force experience more symptoms of depression and mania than those who have not experienced force against them by law enforcement. Research has also indicated that trauma including that caused by force or restraint has been associated with symptoms of mania and correlated with sleep

---

[14] There was one incident package for the MJ but it was provided by RCCC.

[15] Logs should include all incidents of force, not just those that involve mental health patients.

[16] A TASER is a conducted energy device used to incapacitate people and can be used as a "stun gun" when pressed against the body (drive stun) not to incapacitate but to gain compliance by causing pain to the recipient.

[17] National Institute of Health (2020).

disturbance, irritability, and agitation. Further, the literature shows that custody trained in crisis intervention team (CIT) training were less likely to use force and less likely to escalate to higher levels of force. Restraint use on patients with mental illness and/or intellectual disability can be equally harmful, particularly since these people may not always understand the cause for restraint or be able to comply with criteria for release because of their mental illness or intellectual disability. Women who have been sexually assaulted prior to incarceration often experience post-traumatic episodes during UOF incidents and restraint.

- *Patient 43 was pending a move to the APU from another floor within the main jail. It was somewhat unclear why C.E.R.T. was activated to assist in this move since there was very little information prior to the activation of C.E.R.T., a deficiency in the UOF incident package. One report indicated that ACMH had determined that Patient 43 was gravely disabled and needed to be moved to the APU for treatment. One report noted that the patient had reportedly refused to comply with directives to move (from 8E to 2P). Another report did indicate that a sergeant and several deputies had attempted to talk to the patient about the move, but that the patient was not listening and appeared "manic" to that custody staff. There was no information of prior efforts to gain compliance. This was extremely concerning since the patient had already been determined to be **gravely disabled**. When an individual is gravely disabled there is clearly a disconnect with reality which likely impairs their ability to understand directives and to comply with those directives. People who have been formally declared as gravely disabled by qualified mental health professionals should be afforded every opportunity to do what is asked without force or violence given their severely impaired mental status. Mental health staff also should have stood by and assisted throughout this mental health move, consistent with policy for planned UOF incidents and to monitor their patient and assist custody in what appeared to be a difficult situation. Unfortunately, that did not happen in this case. C.E.R.T. approached the patient and made some effort, again not detailed in the reports, to gain compliance through verbal commands. The patient responded negatively, yelling, hitting his cell window, cursing, and shouting threats at the deputies. There was no documented cooling off period and no documented mental health intervention. O.C. spray (a 10-second burst) was sprayed into the patient's cell. A second burst of O.C. spray was sprayed into the patient's cell and C.E.R.T. eventually entered the cell and completed a cell extraction, placing the patient in a WRAP restraint device to transport him. He was removed from the restraint device once cleared by medical staff and placed into his APU cell.*

2. **Documentation** was inadequate and did not demonstrate that all aspects of exisitng policy, operational orders, post orders, and interim orders were adhered to (and did not contain a rationale for non-adherence. Documentation requirements for the UOF should be specific to the correctional setting (e.g., not general or patrol requirements).

a. Documentation should also clearly indicate the housing unit in fields that allow for data to be automatically aggregated so that management can more easily identify trends and patterns across housing areas (e.g., RHU, DMHU, general population, honor dorm). This will also allow the SMEs to more easily confirm that reported data and proof-of-practice is consistent with documentation.

b. Documentation should include fields that identify patients who are participants in the mental health services system and/or who have been identified as having intellectual disabilities to allow for the same aggregated data by facility to identify trends and patterns for UOF involving such patients. This information should be readily available to unit staff so that they are aware of policy (and Consent Decree) obligations when an incident occurs.

3. **Lack of clear definitions for *planned use of force* vs *immediate or emergent use of force***. The Consent Decree requires a "definition" for a "planned" use of force. In order for staff to understand that a particular situation is a planned UOF with associated obligations, they must also understand the definition of an immediate/emergent UOF and those associated obligations per policy and Consent Decree. This is an important area for clarification through policy and training. First, the Sacramento County jails house pre-trial detainees and post-conviction inmates which can impact the type of force considered reasonable. An immediate or emergent UOF is most often defined as "a situation created when a detained person's behavior constitutes a serious and immediate[18] threat to self, staff, another detainee, property, or the security of the facility." The California prison system (CDCR) further includes "If it is necessary to use force solely to gain compliance with a lawful order, controlled force shall be used." A planned or controlled UOF is typically defined as "The force used when an inmate's presence or conduct poses a threat to safety or security and the inmate is located in an area that can be controlled or isolated." An imminent threat typically occurs when staff must act immediately, such as when a detainee is assaulting staff or other incarcerated people. Of the incident packages provided, nine (9) involved the assault/battery on a staff member or other incarcerated person. Five involved other people in custody (including mutual combat) and four included violence directed toward staff. In one of the four staff-involved incidents, the patient was first destroying property but then struck a responding officer. The four other incidents included refusals to obey custody staff directions to rehouse or exit a cell. An example for concerns in this area of UOF:

- *Patient 26 (not included in the 13 cases provided as part of the document request but part of a different inquiry) was involved in a UOF that began with him refusing to exit his cell. According to the incident report, custody staff were conducting cell searches at 0135 hours or during overnight hours when the people in custody would be expected to be sleeping. While operational security concerns may require cell searches during overnight hours, passive resistance and verbal complaints should be expected by leadership so that deputies can be provided with a plan to deescalate*

---

[18] "Imminent is often used in place of immediate. Imminent is typically defined as: "an imminent threat is any situation or circumstance that jeopardizes the safety of persons or compromises the security of the institution, requiring immediate action to stop the threat. Some examples include, but are not limited to: an attempt to escape, on-going physical harm or active physical resistance."

*residents and increase the probability of compliance. The incident report included that "deputies tried to obtain verbal compliance…but Patient 1 failed to comply." The specific methods of deescalation were not identified or documented nor was a cooling off period provided to the patient. At this point, this scenario is not appropriately categorized as an immediate/emergent UOF because there is no imminent threat to person or property identified in the incident report. The deputies could have closed the door and moved on to the next cell. It was noted that the patient was holding pencils in one hand as the situation escalated. Again, the cell door could have been closed and any threat neutralized. Instead, a taser was pointed at the patient (who was described as holding a blanket to cover his body which would have interfered with taser deployment) with repeated commands to drop the pencils. At this point, staff are described as attempting to deescalate the patient without any specific techniques or strategies noted in documentation. It should be noted that while they write that they attempted to deescalate, the pointing of the taser at the patient was an escalation. Mental health staff were not consulted at any point despite the ability to call the on-call ACMH staff during the incident or to secure the patient in his cell and consult with ACMH as required. The CERT team was activated and approximately 30 minutes later, arrived on the housing unit where the patient resided. At this point, the incident report seems to indicate that the cell door was closed, eliminating any imminent threat, as the patient was described pacing around his cell and trying to cover the window into the cell. This was another point when ACMH could have and should have been consulted while the patient was provided a cooling off period and mental health staff could have attempted to intervene in person or via video or audio services. It is important to note in this case that Patient 1 was evaluated by ACMH several hours after the incident and was determined to meet criteria for the APU, making the failure to consider the patient's acute mental status and increase deescalation efforts concerning.*

4. The **cooling off period** process must be **defined** in policy and reflected in training, practice, and quality assurance review. Typically, a cooling off period removes most or all custody staff from the area in an effort to deescalate. Due to concerns regarding the patient's safety, one deputy will generally remain to observe the patient and ensure their safety during the cooling off period. This is typically someone who the patient trusts or exhibits minimal agitation toward during the incident. The idea is to give the patient an opportunity to reduce their agitation and anger while regaining the ability to manage their emotional state. It also allows staff an opportunity to do the same, consult with mental health staff, and brainstorm possible strategies that do not require force. The length of time of the cooling off period should be documented in incident reports.

   a. Improved documentation of deescalation efforts including the adaptive supports and/or mental health needs considered as required in the Consent Decree. Current documentation does not typically indicate what techniques were used in an effort to deescalate. Rather than just indicating "deescalation efforts were made," staff should

document, "Deputy X who previously had a good relationship with Person A, approached Person A's cell while other staff dropped back to at least 20 feet from the closed cell door. Deputy X asked Person A what was going on, what Person A needed to comply, and used motivational interviewing to encourage compliance."

5. Policy should include the **custodial supervisory review process**. Many systems utilize a supervisory review checklist to ensure that necessary components of policy and related orders (i.e., Consent Decree requirements) were reviewed. The checklist often includes a narrative section to note compliance/noncompliance and the reason for that determination. These checklists can be more easily utilized in the internal continuous quality improvement process rather than relying on a large packet of original documentation. Supervisory review should be an objective, critical analysis of the UOF process from immediately prior to the UOF (precipitants and opportunities to avert UOF) through conclusion of the incident, documentation of medical assessment, and required referral to ACMH. While one conclusion that the supervisory review opines on is the appropriateness of the UOF, there should also be a conclusory statement regarding full compliance with policy, orders, and relevant Consent Decree requirements.

6. **ACMH** leadership should be **notified** for every **UOF involving patients with mental illness and/or intellectual disability**. As part of the supervisory or CQI process, these incidents should be reviewed and a chart audit completed to ensure that once notified, mental health staff adhere to their policy and training regarding clinical intervention in planned UOF and emergent referrals following UOF. An example of such a review completed by this SME:

   - *Patient 40 was experiencing a psychiatric crisis which was identified by peers who reported to custody staff. The patient was removed to a holding area pending completion of count where he began to engage in self-injurious (e.g., banging his body and head against the wall) and bizarre behavior (e.g., pulled his pants down and flashed his bare buttocks at staff, defecating). Custody staff notified mental health who responded. It was unclear if the ACMH staff member understood that there was a need for a clinical intervention as the required UOF ACMH documentation was not completed. Custody and clinical documentation lacked specificity regarding deescalation efforts. Custody documentation did describe a somewhat chaotic, escalating situation with staff concerned regarding the patient's wellbeing. The patient continued to escalate, defecating in the holding area and was determined by the social worker to be gravely disabled resulting in referral to APU and transfer to the MJ. CERT was activated for a cell extraction and physical force was used to handcuff Patient 40 for medical exam and transfer.* [Video would have been particularly helpful in this incident package to assess the adequacy of deescalation efforts and urgency needed to maintain the safety of Patient 40.]

7. **Use of Force review committee**. Sacramento County is strongly encouraged to utilize a UOF review committee, particularly in cases where the incarcerated person was identified as

experiencing mental illness or having an intellectual disability. Typically, these committees will include, at minimum, the jail commander or designee who has not been part of the supervisory review, health services administrator, and mental health program manager. The incidents for that month or quarterly review are presented (though all members have already fully reviewed the incident packages) and are discussed by the committee. Areas for discussion include precipitants to the use of force, opportunities to deescalate, type of force used, policy compliance, and needs identified (e.g., training, policy revision). These committees should ensure that incidents are reviewed from multiple perspectives with a goal to minimize the UOF on people in custody through the identification of needed policy revision and additional individual (specific staff) or group (all staff) training. These committees play an important role in the CQI process as required by the Consent Decree. Committee reviews should be documented as part of proof-of-practice.

8. **Restraint use incident review.** Defendants should have an interdisciplinary committee (ACH, ACMH, and SSO) that automatically review all incidents where the WRAP or other immobilizing device (e.g., restraint chair) are used. This committee should review if the incident of restraint was truly a custodial restraint or if it should have been referred to ACMH or ACH for possible clinical restraint.
   a. This committee should make suggestions for avoiding the use of restraints based on the case-by-case analysis.
   b. The review should determine if an emergency referral was made and timely completed.
   c. The committee should identify training and policy needs as well, if indicated.

9. **Training.** Once SSO policy has been updated to fully reflect the Consent Decree, a **training curriculum** must be developed. This training should be reviewed by Plaintiffs' attorneys and the SMEs. This training should include SSO and ACMH staff, at minimum, for joint deescalation and clinical intervention and consultation training. It is important that each discipline understands the other's responsibilities and legal requirements and that the disciplines share the same goals (i.e., avoid UOF through gaining compliance or averting escalation earlier in the behavioral chain). Custody staff must understand when to notify ACMH staff and to do so in a manner that makes it clear that mental health staff are being activated to provide a clinical intervention so that they can review relevant records and bring appropriate documentation. Custody staff must clearly document this activation of ACMH in their incident reports. Finally, custody staff must understand the requirement for an emergency referral in the case of immediate UOF incidents. Custody should document completing those referrals and ACMH staff should document that reason for referral in their progress notes.

Several cases from RCCC were reviewed that demonstrated additional efforts were necessary in the areas of policy, training, and quality assurance in the area of UOF:

- *The case of Patient 40 described above is referenced as an example where it was unclear if the responding clinician understood the purpose of the request for their presence.*

- *Patients 28, 30, 34, 37, and 41 did not receive emergent referrals following the UOF. Patient 41 was seen cellfront during the day following UOF but for his daily alternative treatment plan contact. He refused the first contact so ACMH went cellfront again later in the day and asked the patient what happened during the UOF incident earlier in the day.*
- *Patients 29, 32, 27, and 40 were seen by mental health but documentation was unclear as to whether the clinician knew referral was due to a UOF or did not mention the UOF at all. In one case Patient 27), the clinician summarized the custody referral in the progress note and custody indicated that the patient had "made a mess" and was acting oddly requiring referral but did not inform the clinician of the UOF.*

10. **Clarification regarding the use of body worn cameras**. Based on the review of incident reports, body worn cameras (BWC) are not consistently active or powered on. Based on a SSO interim order (Lexipol 1/11/2023), BWCs should be activated at times to include whenever entering a housing unit or holding area occupied by an incarcerated person, when escorting a detainee, responding to a disturbance, and when conducting searches of housing or holding areas. According to that interim order, BWCs are to be affixed to the deputy at the start of their shift and docked at the end of their shift. There is no allowance for the camera to be removed during the custody shift or covered with tape. Documented corrective action (e.g., additional training, letter of instruction) should be documented in the UOF review process without violating personnel privacy concerns. Examples of UOF incidents where deficiencies in this requirement were identified and follow:

- *Patient 29 was involved in a UOF after striking an officer in the face unprovoked. A responder to that event noted: "The incident was not captured on my body camera due to me not having it on while I was seated in the IOP office. Due to the urgency of the situation, **I did not put my body camera on**. [emphasis added] My body camera was near the downstairs IOP at the time of the incident." Of the six responding officer, three did not have their BWC activated. There was no indication in the supervisory review that any corrective action was taken regarding the staff who failed to turn their BWC on or failed to wear it despite both being in violation of the interim order.*
- *Patient 30 was involved in a UOF after refusing to obey an order to re-house when he was inappropriately out of his cell during dayroom. In incident reports, one responding officer noted that he and his partner officer had their BWC on and activated. However, the second officer documented in his incident report: "In regards to my Body Camera, **I habitualy [sic] cover my camera** [emphasis added] due to personal information concerns. When on the floor I failed to remove the tape covering the camera. My Body Worn camera was activated, but did not record video…" The supervisory review did not document the failure to properly activate one BWC or related corrective action.*

11. **Continuous Quality Improvement (CQI)**. As required by the Consent Decree, UOFs shall be part of a CQI process. This includes, at minimum, tracking incidents of UOF with people experiencing mental illness and/or having an intellectual disability. This tracking should include the 12 items identified for UOF logs above. The supervisory review and UOF committee analysis would be part of the CQI process. In addition, the data for incidents of force with people experiencing mental illness and/or intellectual disabilities should be reviewed regularly to identify patterns (e.g., more common on certain shifts or in specific units) and trends (e.g., UOF incidents have been decreasing since training implemented).

MENTAL HEALTH FUNCTIONS IN SEGREGATION UNITS

Segregation Placement Mental Health Review *(VIII.C.1.a-e below)*

    a) *All prisoners placed in a non-disciplinary Segregation housing unit and all prisoners housed in a Disciplinary Detention unit shall be assessed by a qualified mental health professional within 24 hours of placement to determine whether such placement is contraindicated. All prisoners subjected to Disciplinary Segregation conditions for 72 hours in their general population housing unit (i.e., confined to cell 23 hours per day) shall also be assessed by a qualified mental health professional no later than the fourth day of such placement.*

    b) *Any decision to place prisoners with Serious Mental Illness in Segregation shall include the input of a qualified mental health professional who has conducted a clinical evaluation of the prisoner in a private and confidential setting (absent a specific current risk that necessitates the presence of custody staff), is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.*

    c) *Mental Health Staff shall consider each prisoner's age and cognitive functioning as part of the Segregation Placement review. Staff shall receive training regarding the features of youth and brain development of young adults (i.e., 24 years old and younger) and the needs of individuals with intellectual disabilities.*

    d) *If mental health or medical staff find that a prisoner has a Serious Mental Illness or has other contraindications to Segregation, that prisoner shall be removed from Segregation absent exceptional and exigent circumstances.*

    e) *The County shall document and retain records of all Segregation Placement mental health evaluations, as described above. The County shall consult with Plaintiffs regarding such documentation, including the development of new forms where necessary.*

FINDINGS/DISCUSSION: (VIII.C)

**Partial compliance.** ACMH has made significant progress in this area. They have updated the form used for RVR/segregation placement and provided additional training to staff. There is a supervisor assigned to track all segregation review referrals, and an email specific to segregation referrals for review was completed. Assessments of patients were more likely than in prior monitoring reviews to occur in a confidential setting. The SSO and ACMH reported meeting regularly to identify barriers to use of confidential space in RHU. Data collected shows that additional confidential space, such as the transparent treatment pods previously discussed, is necessary. There remain "safety and security" and "other" reasons that remain obstacles to being able to complete a confidential visit. It is important that the frequency of these obstacles to confidential assessments must be dramatically reduced so that they only occur rarely. When the collaborative meetings between SSO and ACMH address obstacles for RHU confidential contacts, those discussions should be documented for proof of practice. Further, there is not currently a tracking system to identify when ACMH determines that RHU placement is clinically contraindicated and whether the patient is still housed in RHU or a clinically appropriate alternative unit. This is an important piece of compliance that cannot currently be assessed. However, there was at least one case identified when ACMH recommended against placement of a patient in RHU due to SMI but the patient was then housed in RHU. This is extremely troubling and Defendants do not currently have a way of identifying it, making it difficult to ascertain if it is an ongoing problem or a rare occurrence.

**Recommendations:**

1. To demonstrate compliance with the Consent Decree, the clinician assigned to and the supervisor assigned to oversee RHU should complete the following tasks daily: 1) the clinician should identify new arrivals to RHU since the last day so that identification of those patients is not dependent on communication from custody, and 2) the supervisor should review new arrivals to RHU since the prior day and verify if any of those patients has been identified with SMI. The clinician would assess new arrivals for contraindications for placement in RHU while the supervisor would verify that an assessment has occurred in a confidential setting.
2. ACMH and SSO need to develop a tracking log that exists on the shared drive to allow documentation from both entities and identifies patients where housing in RHU was contraindicated and mental health staff recommended against it. The tracking log should then indicate if the patient was housed in RHU or RHU-like housing and provide a clear rationale and description of the circumstances that justify overruling the clinical input.
3. Continue to maintain proof of practice to document collaborative review and resolution of obstacles to confidential contacts.

<u>Segregation Rounds and Clinical Contacts</u> *(VIII.C.2)*

- *A qualified mental health or medical professional shall conduct check-ins at least once a week, to assess and document the health status of all prisoners in Segregation, and shall make referrals as necessary. The check-in shall include a brief conversation with each prisoner, a visual observation of the cell, and an inquiry into whether the prisoner would like to request a confidential meeting with a mental health or medical provider. Steps shall be taken to ensure effective communication, as well as auditory privacy consistent with security needs. When a prisoner in Segregation requests a confidential meeting with a mental health or*

*medical provider, or the medical or mental health professional identifies a mental health or medical need, staff shall make appropriate arrangements to include triage, examination and treatment in an appropriate clinical setting. In such cases, staff shall give the prisoner the opportunity to complete a health care request but will otherwise initiate a referral without requiring the prisoner to complete a request form.(VIII.C.2.b)*

Response to Decompensation in Segregation *(VIII.C.3)*

- ▪ *If a prisoner in Segregation develops signs or symptoms of mental illness where such signs or symptoms had not previously been identified, suffers deterioration in his or her mental health, engages in self-harm, or develops a heightened risk of suicide, the prisoner shall immediately be referred for appropriate assessment and treatment from a qualified mental health professional who will recommend appropriate housing and/or programming. (VIII.C.3.a)*
- ▪ *Jail staff shall follow a mental health recommendation to remove a prisoner from Segregation unless such removal poses a current safety risk that is documented. In such a case, the Commander or management-level designee shall be notified and staff shall work to remove the prisoner from Segregation and secure a placement in an appropriate treatment setting at the earliest possible time. (VIII.C.3.b)*

FINDINGS/DISCUSSION:

**Partial compliance.** ACMH provided additional training to staff regarding the regular monitoring through weekly contacts with people housed in the RHU. A mental health clinician was assigned to complete these monitoring rounds weekly as previously recommended. If patients requested or showed signs of decompensation, the person was seen in a confidential setting when possible for further assessment. Medical record review supported that these rounds had been occurring more consistently than in previous monitoring rounds and that the quality of documentation from weekly rounds had improved. As mentioned in the previous section, there is no log tracking cases in which mental health staff have recommended that the patient not be placed in RHU or be removed though at least one case was identified where the recommendation was not followed and ACMH did not know the rationale.

**Recommendations:**

1. ACMH should include audits of compliance with weekly RHU monitoring as part of their CQI.
2. SSO and ACMH must develop and implement a tracking log that identifies people for whom ACMH has recommended against RHU housing or removal. The log must include the subsequent housing and when it contradicts the recommendation documents the rationale and what custodial supervisors were notified.
   a. SSO should regularly audit this log to ensure compliance as part of their CQI activities.

*Placement of Prisoners with Serious Mental Illness in Segregation (VIII.D)*

1. *Prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit (2P, IOP, OPP) will not be placed in Segregation, but rather will be placed in an appropriate treatment setting – specifically, the inpatient unit or other Designated Mental Health Unit*

*providing programming as by JPS in their program services booklet. (VIII.D.1)*

2. *In rare cases where a prisoner with a mental health condition meeting criteria for placement in a Designated Mental Health Unit presents an immediate danger or significant disruption to the therapeutic milieu, and there is no reasonable alternative, such a prisoner may be housed separately for the briefest period of time necessary to address the issue, subject to the following: (VIII.D.2)*

   a) *The prisoner shall receive commensurate out-of-cell time and programming as described in Exhibit A-2 (including for IOP and OPP, 10 hours/week of group treatment/structured activities, 7 hours/week unstructured out-of-cell time, weekly individual clinical contact) with graduated programming subject to an individualized Alternative Treatment Program.*

   b) *The prisoner shall receive the following:*

      i. *As part of the weekly confidential clinical contact, the clinician shall assess and document the prisoner's mental health status and the effect of the current placement on his or her mental health, and determine whether the prisoner has decompensated or is at risk of decompensation.*

      ii. *The weekly check-ins described in Section VIII.C.2.b shall supplement, and not be a substitute for, the weekly treatment session described herein.*

      iii. *Treatment provided in the least restrictive setting that is appropriate based on the prisoner's circumstances.*

      iv. *Privileges commensurate with the Designated Mental Health Unit program, unless modified in an Alternative Treatment Program based on individual case factors that are regularly reviewed.*

      v. *Daily opportunity to shower.*

FINDINGS/DISCUSSION:

**Partial compliance.** While the number of patients with SMI housed in RHU has decreased since the last monitoring report, proof of practice data was not provided for this report. This SME failed to notice that the document request did not include a request for tracking logs for patients placed into RHU during the review period. Because of this, the analysis completed in prior reports could not be completed. This area is determined to be partially compliant because of the activation of the high security IOP which resulted in the movement of several patients from the clinically problematic RHU housing units to an IOP level of care treatment setting where Defendants were better able to comply with the requirements of the Consent Decree. However, because of the waitlists that exist for IOP and APU, it remained the case that patients requiring that level of care remained in RHU, including when such placement was clinically contraindicated and could not provide clinically indicated treatment.

**Recommendations**

1. Defendants must develop a report that identifies patients at the acute, IOP, or EOP level

of care who have been placed into RHU. The report should include, at minimum, the patient's name, X reference number, the mental health level of care, date of placement in RHU, date moved (when applicable) to other housing, and that housing. The report should be able to provide a current RHU housing report as well as admissions to RHU over time.

2. SSO must implement the tracking log described above for when mental health staff inform custody that a patient must be moved.

3. SSO should complete audits of this process to provide proof of practice as part of their CQI.

*A prisoner with Serious Mental Illness requiring restraints (e.g., handcuffs, belly chains, etc.) shall not be denied clinically indicated group or individual treatment due to security factors, absent exceptional circumstances that are documented. Prisoners with Serious Mental Illness housed in Segregation who require restraints when out of cell shall have the opportunity to work their way out of restraints through graduated programming subject to an individualized Alternative Treatment Program. (VIII.D.3)*

FINDINGS/DISCUSSION:

**Partial compliance.** SSO and ACMH held collaborative meetings that resulted in more patients considered a risk by custody or who required handcuffs being provided confidential treatment when space was available. This is a positive development, with additional work still needed. Previously, these patients were typically seen cell-front at the MJ. RCCC had been providing access to such patients through confidential contacts unless there were immediate safety concerns for group and individual treatment. At this time, no treatment groups are provided to people in RHU. The ACMH continued to maintain alternative treatment plans (ATPs) for patients at the acute/APU or IOP level of care while it was referred to as a multidisciplinary intervention plan (MDIP) for those at the EOP or GP level of care. These are not frequently used but when they are put in place, at least one audit confirmed that they are very effective. According to audit findings, once the MDIP was initiated, emergent referrals for those patients decreased by 75%. MDIPs should be employed more frequently. Patients who are repeatedly seen cell front because of "safety" or are unable to attend group on several occasions due to "safety" should be reviewed by MDTT for possible ATP/MDIP. When staff conclude that an ATP/MDIP is warranted, the ATP/MDIP should always be placed into the medical record and MDTT should determine when the patient can be removed from the MDIP.

**Recommendations:**

1. ACMH and SSO should regularly review RHU placements to identify people who have had repeated placements or who have remained in RHU for extended periods. These individuals should be reviewed by the MDTT to identify if a MDIP is indicated or if the patient should be moved to other housing.

2. Patients who require restraints when out of cell should be reviewed as part of the MDTT process to identify if a MDIP is indicated to assist the patient in progressing to no restraints required when out of cell.

3. ACMH should expand audits of the MDIP to include measurement of disciplinary write-ups and UOF incidents.

QUALITY ASSURANCE, MENTAL HEALTH CARE

1. *The JPS Medical Director, the JPS Program Manager, jail administrators, and the medical psychiatric, dental, and nursing directors, or appropriate designees, will attend and participate in this process at a minimum of every quarter. Formal minutes will be taken and maintained whenever the committee convenes.*

2. *The mental health care quality assurance plan shall include, but is not limited to, the following:*
   a) *Intake processing;*
   b) *Medication services;*
   c) *Screening and assessments;*
   d) *Use of psychotropic medications;*
   e) *Crisis response;*
   f) *Case management;*
   g) *Out-of-cell time;*
   h) *Timeliness of clinical contacts;*
   i) *Provision of mental health evaluation and treatment in confidential settings;*
   j) *Housing of inmates with SMI, including timeliness of placements in higher levels of care and length of stay in various units;*
   k) *Number of commitments pursuant to Welf. & Inst. Code § 5150, et seq.;*
   l) *Use of restraint and seclusion;*
   m) *Tracking and trending of agreed upon data on a quarterly basis;*
   n) *Clinical and custody staffing;*
   o) *Morbidity and mortality reviews with critical analyses of causes or contributing factors, recommendations, and corrective action plans with timelines for completion; and*
   p) *Corrective action plans with timelines for completion to address problems that arise during the implementation of this Remedial Plan and prevent those problems from reoccurring.*

3. *The County will conduct peer and supervisory reviews of all mental health staff and professionals at least annually to assess compliance with policies and procedures and professional standards of care.*

FINDING/DISCUSSION:

**Partial Compliance**. ACMH has maintained their Mental Health Sub-Committee QM process. This committee meets quarterly with interdisciplinary (ACH, SSO, and ACMH) representation. Meeting minutes support that relevant topics and substantive discussion occur. ACMH CQI efforts have made significant progress since the last monitoring report. They have completed more operational and compliance audits, created compliance reports, revised forms and developed training as a result of their CQI progress. ACMH should be commended for initiating CQI reviews and for completing audits in response to feedback. This overarching remedial provision will likely be one of the last areas to reach substantial compliance because that is expected in the development of a system such as this so it is

important to recognize the noteworthy work that has been completed by ACMH in reaching the current point.

**Recommendations.**

1. Defendants must continue to review tracking and reporting systems for improvement in providing proof of practice documentation. SSO and ACH must work with ACMH to meet the proof of practice needs of ACMH.
    a. The County must provide sufficient technical and IT support to ACMH so that they can develop the needed automated reports and audits.
2. ACH and SSO must maintain and provide proof of practice to ACMH for those areas addressed in the Mental Health section of the Consent Decree (e.g., medication administration audits, training compliance for mental health training)
3. Continue to add audits and compliance reviews for additional areas of the Consent Decree.


CONCLUSION

ACMH has made tremendous progress across multiple areas since the first monitoring report. Defendants have added mental health staff, increased the utilization of confidential treatment space, established the need for another facility and obtained approval for the design and construction of that building. ACMH has done tremendous work in drafting and implementing policy, identifying training needs and providing that training, and being accountable for providing adequate mental health services. While there is still much to accomplish, ACMH should be commended for their commitment to compliance with the Consent Decree.

Despite these areas of significant progress, there remains critical areas of non-compliance and significant challenges in achieving and demonstrating compliance with the Consent Decree. While there are custodial staff who have demonstrated a commitment to compliance with the Consent Decree, the level of commitment of the SSO as an organization remains questionable. They have lagged in comparison to ACMH in all areas (e.g., policy development, proof of practice, quality assurance). The SSO is hampered by significant staffing vacancies. While not as severe, ACMH compliance is also limited by staffing vacancies. Challenges negatively impacting Defendants' ability to demonstrate compliance also includes significant physical plant problems and resource limitations.  These are some of the most daunting challenges currently facing Defendants.

APPENDIX A:

Document Request

## *Mays v. County of Sacramento*
## MENTAL HEALTH DOCUMENT REQUEST

**DOCUMENT REQUEST**:
**Data Production Period:** 1/1/2023 through June 30, 2023 (Data produced by Defendants, whether produced by SSO, ACH, JPS or other, should follow the file and folder naming instructions below. Please retain materials in their original format (e.g., Excel, Word). If a document is handwritten or hand-signed, it should be

Please provide *each item in its own file clearly labeled with the name of the section identified in the document request* (e.g., 2- MH Program Narrative; ). Any folders containing multiple files relevant to that section should also be labeled clearly (e.g., 3 – Census, 3a.1. by mental health levels of care for Main Jail and RCCC total, 3b – census by custody level) and should not merely be labeled with the section number. Please note that mental health services include medication management. If there are no applicable documents for an item, please provide a single page that clearly indicates "no applicable documents for this item" on a word document for that file.  It is possible that as a result of the documents received, additional documents may be requested.

*There are several items whose production will be necessary to facilitate the upcoming site visit. These items should be easy to produce because they should exist and be regularly updated as part of the regular operations of JPS/mental health and the jails. These items are described in request numbers 3, 4, and 5. If there are any concerns about producing these items, please contact the subject matter expert immediately.*

**Requested due date**: we are respectfully requesting that these documents all be provided by **July 31, 2023**. If any documents cannot be provided by that due date, at your earliest convenience please provide a table listing the items that will not be available by that date and the actual date for production of documents. Also, if there is any problem providing any of the requested data (e.g., unavailable, too voluminous) contact the SME immediately, no later than 7/17/23 so that alternatives can be identified and documented.

**NOTE**:

| ITEM # | ITEM DESCRIPTION (File/Folder Name is in Bold) | Assigned to: SSO | ACH | JPS |
|---|---|---|---|---|
| 1 | **Table of Contents.** for any updated policies provided for the Sacramento County Sheriff's Department (SCSD) Policy and Procedure Manual (e.g., policies, local operating procedures, operations memoranda). | | | |
| 2 | **Narrative.** Please provide a narrative description of the mental health program, improvements since the last monitoring report that have been implemented, have target dates, or are simply "in process"). Please identify any barriers to care as well as accomplishments since the last monitoring report. | | | |

| 3 | **Census.** You must provide summary numbers (not a list of people that must be hand counted) for each of the census items below. Please indicate the date those census numbers were produced.<br><br>**3a**. Total numbers for all people detained in the Main Jail (MJ) and Rio Cosumnes Correctional Center (RCCC) by facility (with any updated maximum capacity data);<br>**3a.1.** Total patients receiving mental health services:<br>**3a.2.** by level of care for the system (aggregate MJ and RCCC census numbers) (e.g., EOP, APU, waitlist)<br>**3a.3.** by level of care by each facility (e.g., MJ IOP, RCCC IOP, waitlist by facility).<br>**3.b.** by custody level (e.g., GP no restrictions, restrictive housing/segregation, MAX, TSEP) for the total population and by facility.<br>[**NOTE:** Please provide these basic summary numbers for the site visit. This information should be provided no later than on the first morning of the site visit, 7/17/23. Please note the date the data was produced.] | | | |
| 4 | **Caseload List** of all patients receiving mental health services (name, Xref number, level of care). These should be broken down by level of care. The date the data was pulled should be noted on each document.<br><br>*[NOTE: The caseload list should be produced at the time of census/document production and appropriately dated (electronic version and paper version). However, for the site visit in July 2023, a current list with patient name and number by level of care will be necessary to complete the site assessment. The site visit caseload lists should include a census of people on suicide watch at either facility, pre-admit inpatient waitlist, IOP waitlist, any other mental health service waitlists, caseload patients housed in segregation/RHUs and TSEP by facility. This census lists should have detainee name, X reference number, booking date, level of care, and housing location. These will be used for the site visit.]* | | | |
| 5 | **Mental Health Treatment Schedules** by unit and facility<br>[**NOTE:** For the site visit a daily schedule of clinical activities will need to be provided in advance, by 7/12/23 at the latest)<br>**5.a. Treatment Team Schedules** Include monthly schedules for treatment teams by unit or level of care (**NOTE**: For the site visit, please include scheduled treatment teams in the schedule of daily activities) | | | |

| | | | | |
|---|---|---|---|---|
| | **5.a.1. Treatment Team Cancellations** please provide by month any treatment team cancellations and the reason for the cancellation by unit or level of care. | | | |
| 6 | **SSO/ACH Policies.** Any updated SCSD/SSO and Adult Correctional Health P**olicies**, procedures, and directives that *have **not** already been provided* to the SMEs and are relevant to suicide prevention, mental health services, and detainees/inmates receiving mental health services (e.g., disciplinary, use of force, restrictive housing, clinical documentation, tracking). Please indicate all new policies that have been implemented following approval from *Mays* defense/plaintiffs' counsel and subject matter experts with date of implementation. These should be consistent with the Table of Contents in item 1; | | | |
| 7 | **JPS Policy.** Any updated Jail Psychiatric Services **Policies**, procedures, and directives relevant to suicide prevention and mental health services. **Please include** all new policies *that have been implemented* following approval from Mays defense/plaintiffs counsel and subject matter experts. These should be in individual files titled according to the policy, procedure, and/or directive title (e.g., Policy – MH services; Policy – UOF SSO). | | | |
| 8 | **Updated/newly drafted Forms.** Any *updated or DRAFT forms* since the last monitoring period (11/2023) including for intake screening, health evaluation, mental health assessment, treatment planning and any other forms utilized for the identification, assessment, and treatment of suicide risk, developmental/cognitive disabilities, and mental illness including release planning; | | | |
| 9 | **Compliance with Consent Decree training requirements.** **9.a.** Any audits, logs, data reports for the review period, or other tracking and/or reports that provide proof of practice for compliance with consent decree requirements (e.g., confidential contacts, amount of structured therapeutic activity provided by level of care, individual psychiatric and primary clinician contacts, timely treatment team meetings, amount of unstructured therapeutic activity). **9.b.** Any new or updated Training Curricula (include draft training) regarding pre-service and in-service staff training, as well as curricula, handouts, etc. regarding suicide prevention, mental illness, and mental health services (since the last review report); | | | |

| | | | | |
|---|---|---|---|---|
| 10 | **Training Compliance** for the monitoring period reported in raw numbers by discipline/job class and course as follows (see Appendix A for format for *all* required staff training. | | | |
| 11 | **Training: Treatment Planning** Any new or updated **Training Curriculum** (including DRAFT) regarding additional training provided to medical and mental health staff regarding development of treatment plans for suicidal inmates specifically and mental health caseload inmates generally; | | | |
| 12 | **Additional Training** Any new or updated training curriculum (including DRAFT) regarding additional suicide prevention and mental health training provided to custody deputies assigned to the **Designated Mental Health Units**; | | | |
| 13 | **Staffing (See Appendix B)** Provide current staffing by program/level of care/position to which staff were assigned during review period. Include ACH nursing positions, JPS/ACMH mental health program staff (i.e., all current allocations, positions filled by staff, positions filled by other methods (e.g., subcontractor, .75 FTE via overtime), custody staff by position and facility, and functional vacancy (allocated positions filled by staff, contractors, overtime, etc.). | | | |
| 14 | **Staffing** Report/logs listing all unlicensed mental health staff by position and name, date of hire, and clinical supervisor (please include same for students, interns, trainee). **12.a.** Include **logs of completed supervision** (proof-of-practice) by discipline (contact the SME if this is too cumbersome and we will identify an adequate alternative). | | | |
| 15 | **Staffing** Provide any requested/planned additional positions (and expected assignment) for SSO, ACH, JPS/ACMH with expected date of hire when available. **15.a.** Update report on existing or planned staffing analyses. | | | |
| 16 | **Data tracking:** **16.a.1** Tracking with the following information for by each program/level of care: **16.a.1.a.** treatment groups offered, **16.a.1.b.** treatment groups canceled,    16.a.1.b.I. reason that treatment group was canceled **16.a.1.c** average number of hours of treatment groups *offered* per week per patient for the review period, **16.a.1.d**. average number of hours of treatment groups *attended* per patient per week for the review period. **16.a.1.e**. average number of hours per week per detainee for cognitively-impaired/intellectual disabilities (as defined in the Consent Decree). 16.a.1.f. Provide total number of multidisciplinary treatment team meetings held specifically for detainees (per Consent | | | |

| | | | | |
|---|---|---|---|---|
| | Decree) with "intellectual disabilities." Also include total number of current detainees who require an assessment and/or their multidisciplinary team meeting.<br>**16.a.2** Total number of incidents involving clinical restraint during the review period. Include log of patient names, X ref numbers, and date of restraint.<br>**16.a.3.** Total number of incidents involving clinical seclusion during the review period. Include log with patient names, X ref numbers, and data of seclusion. | | | |
| 17 | **Mental Health Referrals:** A copy of the Mental Health Tracking Log/Report for referrals to mental health. This log should include whether the referral was emergent, urgent, or routine, detainee name and number, date of referral and date seen.<br>**17.a.** Summary data for review period of total emergent, urgent, and routine mental health referrals and compliance with timeliness for completion by required personnel (e.g., seen by psychiatric provider for psychiatric referral) | | | |
| 18 | **Medication Management:**<br>**18.a.** Any audits, logs, reports, or meeting minutes from Medication Management, specifically psychotropic medications<br>**18.b.** list of all patients who have been on psychotropic medication for at least three months.<br>**18.c.** list of all detainees (name, X ref number, date of order) who have been under forced medication orders due to mental health reasons.<br>**18.d.** Proof of practice that patients are seen by psychiatry timely. There should be three reports at minimum: emergent, urgent, and routine that indicate how many hours/days it took to be seen by a prescriber.<br>**18.e.** Proof of practice for timely administration of psychotropic medication ordered by a psychiatric provider.<br>**18.f.** Compliance with Consent Decree and standard of care requirements for laboratory or other testing for those on particular psychotropic drugs. | | | |
| 19 | **Mortality Reviews:** Entire **Case Files** (jail, medical, and mental health), investigative reports, and mortality reviews of mental health patient deaths from July 1, 2022 to June 30, 2023. | | | |
| 20 | **Disciplinary Activities:**<br>**20.a.** Provide a log of all misconduct disciplinary reports written during the review period for caseload patients/MH participants. This log should include detainee name, X reference number, location of misconduct (facility and unit/area), date of misconduct at minimum;<br>**20.b.** Provide disciplinary packages that include: | | | |

| | | | | |
|---|---|---|---|---|
| | **20.b.1** disciplinary write up<br>**20.b.2** mental health input<br>**20.b.3** documentation of consideration of mental health input by disciplinary officer<br>**20.b.4** outcome of write-up (e.g., placed in RHU for 33 days, found guilty and given loss of visits);<br>**20.b.5.** Average length of stay for the review period for each of the following: a. total population, b. the subgroup within 'a' above were participants in the mental health system, and c. how many identified in 'a' were not receiving mental health services.<br>**(NOTE:** If there is any problem providing complete disciplinary reports, please contact SME immediately, no later than 7/17/23) | | | |
| 21 | **Use of Force:**<br>**21.a.** Provide the total number of UOF incidents during the review period that involved any detainee (grand total) and any MH participants.<br>**21.b.** Provide total number of UOF incidents during the review period involving MH participants by Facility (MJ, RCCC) and by Designated MH Unit within each facility (e.g., MJ IOP, MJ 2P, RCCC IOP).<br>**21.c.** Provide log of all MH participants who were involved in UOF incidents during the review period (name, X reference number, date of use of force).<br>**21.d.** Provide all incident reports and UOF packages and any supporting additional documentation from security, medical, and/or mental health staff related to each incident involving mental health program participants. (if there is any problem with producing this data, please contact the SME immediately) | | | |
| 22 | **Quality Management:**<br>**22.a.** Any new or updated policies, procedures, directives (including DRAFT) related to Quality Assurance and Continuous Quality Improvement in the delivery of mental health services.<br>**22.b.** Minutes from Mental Health Continuous Quality Improvement, as well as any other regularly scheduled multidisciplinary meetings related to mental health and quality assurance from July 2022 to the present.<br>**22.c.** Include minutes and audit results from Mental Health Action Plan.<br>**22.d.** Include minutes and audit results for any studies, audits, or quality improvement teams initiated since July 2022 | | | |

| | | | | |
|---|---|---|---|---|
| **23.** | **Release Planning:** Any logs, audits, or minutes from quality management meetings regarding Release Planning services offered during the review period. | | | |
| **24.** | **Space:**<br>**24.a.** Minutes from any Therapeutic Space Meetings;<br>**24.b.** Documentation (e.g., sign in sheets) to provide proof of practice for attendance.<br>**24.c.** Status update on Main Jail revision/re-tasking of 2P.<br>**24.d.** Interim plan to provide adequate inpatient treatment to people with acute SMI needs.<br>**24.e.** list of acceptable confidential space on each housing unit area<br>**NOTE:** For site visit, SME will want to observe each specified confidential area. | | | |
| **25.** | **Out of Cell Time:**<br>**25.a.** Provide out of cell schedules for the review period for designated MH units (e.g., IOP, 2P) by facility.<br>**25.b.** Provide documentation (audits, logs, reports) of offered out of cell activity by designated MH unit/facility for the review period.<br>**25.c.** Provide average offered per patient per week of out of cell activity for each designated MH unit.<br>**25.d.** Provide average attended per patient per week of out of cell activity for each designated MH unit.<br>**25.e.** Provide list of reasons for canceled out of cell activity in designated mental health units during the review period.<br>**25.f.** Provide copies of actual tools used to screen and assess detainees to identify those with cognitive impairment/intellectual disability. | | | |

**APPENDIX A:**
**Training Compliance**

**Training Compliance** for the monitoring period reported in raw numbers by discipline/staff category and course as follows:

| STAFF TITLE (Sgt, psychiatrist, etc) | COURSE | REQUIRED ATTENDEES (number) | NUMBER ATTENDED* | % compliant |
|---|---|---|---|---|
| | | | | |
| | | | | |

*this figure should include only the number of required attendees who were present throughout the training.

Indicate whether training was in-person (e.g., in a training space with attendees present), virtual interactive (e.g., virtual but presence is monitored live and attendees can ask questions), on-the-job (e.g., shift briefing, staff meeting), or on their own (e.g., staff instructed to review policies or other training materials and submit signed form).

1) Training compliance for the monitoring period reported in raw numbers by discipline/staff category and course (**additional training for MH designated unit correctional staff**) as follows:

| STAFF TITLE (Sgt, officer, etc) | COURSE | REQUIRED ATTENDEES (number) | NUMBER ATTENDED* | % compliant |
|---|---|---|---|---|
| | | | | |
| | | | | |

*this figure should include only the number of required attendees who were present throughout the training.

2) **Training Compliance** for the monitoring period reported in raw numbers by discipline/staff category and course (**additional training for MH designated unit medical/MH staff**) as follows:

| STAFF TITLE (nurses, clinicians, etc) | COURSE | REQUIRED ATTENDEES (number) | NUMBER ATTENDED* | % compliant |
|---|---|---|---|---|
| | | | | |
| | | | | |

*this figure should include only the number of required attendees who were present throughout the training.

3) **Other Training Compliance** for the monitoring period reported in raw numbers by discipline/staff category and course (**please specify target staff and purpose of training**) as follows:

*Fourth MH Monitoring Report*

| STAFF TITLE (Sgt, officer, nurses, clinicians, etc) | COURSE | REQUIRED ATTENDEES (number) | NUMBER ATTENDED* | % compliant |
|---|---|---|---|---|
| | | | | |
| | | | | |

*this figure should include only the number of required attendees who were present throughout the training.

APPENDIX B
STAFFING

Current **Mental Health Staffing** allocations and any proposed additions:

1)  Provide current mental health staffing in grid form by program.
    Example:

| *EXAMPLE:* | Allocated | Licensed (Y/N) | Filled | % time in this area (half time in IOP would be reflected as .5 filled | Functional Vacancy (divide unfilled positions by allocated positions and that is your functional vacancy rate) |
|---|---|---|---|---|---|
| IOP - psychiatrist | | | | | |
| IOP – psychologist | | | | | |
| IOP – social worker | | | | | |
| IOP – psychiatric nurse practitioner | | | | | |
| IOP – other | | | | | |
| Unit 2 – psychiatrist | | | | | |
| Unit 2 - psychologist | | | | | |
| Unit 2 – nursing staff | | | | | |
| *Continue on until all programs and mental health  staff are included* | | | | | |

**APPENDIX B:**

**Program Descriptions and Mental Health Narrative**

**Mental Health Program**

**July 2023**

**Acute Psychiatric Unit**

The Acute Psychiatric Unit is a locked psychiatric facility at the Main Jail (MJ) for patients who have been evaluated to be a danger to themselves, danger to others, or gravely disabled as a result of a mental health disorder.

**Intensive Outpatient (IOP)**

IOP (35 beds - MJ and 24 beds – Rio Consumes Correctional Center (RCCC)) is a designated mental health housing and program unit for patients diagnosed with a serious mental illness. IOP provides individual and group treatment and therapeutic recreation activities.

**Enhanced Outpatient Program (EOP)**

Enhanced outpatient services divided between moderate and intensive categories of need that include increased frequency of individual contacts and group therapy for patients with serious mental illness.

**Outpatient Psychiatric Program (OPP)**

OPP provides case management and individual therapy to patients diagnosed with a serious mental illness. OPP patients are housed in designated mental health housing units.

**Jail Based Competency Treatment Program**

JBCT is a contracted program between the Sacramento Sheriff and the Department of State Hospital where mental health professionals will provided restoration treatment to incarcerated individuals who were found incompetent to stand trial. This regional program treats individuals from every county in California with the goal of having them restored back to competency or transferred to the state hospitals within 90 days.

**Mental Health**
**Program Update**
**JPS/ACMH**
July 2023

**Ongoing**

- ACH Mental Health continues to operate its Acute Psychiatric Unit, Intensive Outpatient Program, Enhanced Outpatient Program and Outpatient Services.

- MH supervisors monitor the use of confidential space in booking and classrooms and have regular discussions with staff regarding challenges/barriers to use of confidential space. Staff are documenting rationale when a confidential interview is not possible.

- MH and SSO Custody meet regularly to discuss challenges/barriers preventing confidential encounters. MH and Custody are developing plans to increase efficiency of using attorney booths on all floors, confidential interviews with patients who present with assaultive or high security/safety issues, and Custody standby while ensuring auditory privacy.

- MH and SSO continue to meet and refine the referral process and update the RVR and Administrative Segregation referral form to ensure referrals are received timely and tracked appropriately.

**Recent Successes**

- MH added three social work staff to the Acute Psychiatric Unit; these staff provide therapeutic interventions, crisis intervention, group therapy, case management, and coordination of MDTs seven days a week.

- MH increased high security/high acuity IOP beds to serve patients with SMI who were/are housed in Administrative Segregation– an additional 8 IOP female beds were added at the Main Jail in late May/early June 2022 and 24 male IOP beds were added at RCCC in September 2022.

- EOP can serve up to 275 patients (based on staffing); services include treatment planning and MDTs, crisis intervention, case management, care coordination, advocacy, discharge planning, and therapeutic interventions including 1:1 and group programming.

- Implementation of MDTs for all patients participating in EOP June 2023.

- Prescribers began attending EOP MDTs in March 2023.

- Staffing augmentation for FY 2023/24 was requested to expand EOP services by an additional 125 patients and restore funding for staff who were redirected to IOP (125 patients). This would increase the total number of patients served to 500.

- EOP expanded therapeutic group services for EOP patients housed on 3E & 3W, 7W, 4E & 4W and 8E.

**Continued**

- As a result of audit findings of confidential contacts, MH has further defined a drop-down menu of common reasons for the lack of confidentiality for uniformity and data purposes. The form will be used by all service lines and projected implementation is planned July 2023.

- Due to ongoing collaboration and training between MH and SSO, audits of confidential encounters have shown a decrease in the number of "safety and security" reasons for non-confidential contacts.

- Lack of available confidential space continues to be the primary reason for non-confidential encounters.

- In 6/2023, SSO distributed IDC to ensure deputy support of confidential contacts. MH educated staff on IDC, provided copies for staff to carry with them and empowered staff to elevate in real time to Sgt if experiencing barriers accessing patients or available confidential space.

- SSO and MH consulted with the office furniture distributor to discuss the construction of confidential interview booths for each floor. SSO has received approval for proof of concept and a confidential booth installation is planned on 3W.

- MH has increased the number of prescribers from two to four NPs and two to three psychiatrists.

- Developed a pilot program to provide an additional mental health screening in booking for patients referred by intake to improve timeliness to medication verification and assessment of patients with acute mental health needs.

- A Psychiatrist with combined Internal Medicine/ Psychiatry training joined the acute psychiatric mental health team – allowing for enhanced diagnosis and treatment of patients with combined mental health and medical issues.

- Worked with ACH to create a hard stop in Intake assessment to ensure nursing staff was documenting last known pharmacy if patient reported community medication. Following this update, MH improved required timeliness to medication verification from 13% to 78%.

- MH revised the medication verification workflow to streamline the process for triaging and verifying community medications.

- MH established a workgroup to review treatment planning module in EHR and develop a workflow to guide staff in treatment planning requirements.

- Process improvement with MDTs, began messaging that MDTs and treatment plan are to be done in conjunction with each other (April 2023)

**Continued**

- **MH Group Participation Report**: The Fusion Group Notes application is being further enhanced to track attendance as well as scheduled/canceled/offered/refused groups and associated program so that the Group Participation report can include this data.

- **Suicide Precautions EHR form** – most recent enhancements are in user acceptance testing and will be put into production upon approval. Enhancements include communication with custody jail management system to alert as to observation type, item/privilege restrictions, Danger to Self/Other.

- **Confidential Contacts Report** – report in production to audit compliance with confidential MH contacts Able to utilize study to highlight facility infrastructure limitations and other challenges that impede confidential services with patients Confidentiality data being tracked via the report.

- MH provided Planned Use Of Force with Mental Health Patients to custody staff in IOP, APU, JBCT, and the CERT teams and Sgts in November 2022 and May – June 2023.

- MH is working with a consultant to develop Cultural Intelligence in Healthcare: The Impact of Unconscious/Implicit Bias in Healthcare Delivery training. Training is projected to begin in August 2023.

- Mental Health staff worked with a consultant to develop training on the WPATH Standards of Care, LGBTQIA and health equity. Feedback from Medical, Mental Health and Suicide Prevention Experts has been incorporated. In consideration of the Medical Expert recommendation, ACH has created additional slides regarding the WPATH standards in relation to ACH policy to be included in the training. The training was approved, and training began in March 2023.

- MH received budget approval FY 2022/23 for additional clinicians to support RVR and Administrative Segregation reviews, assessments, and recommendations. MH continues to actively recruit for these positions. As of June 30, 2023, a supervisor and two clinicians have been hired.

- Updated MH RVR /AD Seg review form and began having MH RVR supervisor track all referrals. Established email address specifically for Ad Seg/MH RVR referrals. (January 2023)

- MH provided updated training on MH RVR and Administrative Segregation Reviews following SME recommendations related to Administrative Segregation assessment in April 2023.

- MH and QI completed an audit of MH RVR Referrals for period of January – December 2022 and January – March 2023, and identified areas for improvement in coordination with SSO.

**Continued**

- Assigned LCSW from Ad Seg/MH RVR team to provide weekly monitoring/assessment of patients placed in administrative segregation.

- SSO expanded the number of suicide resistant observation cells in the Suicidal Temporary Housing Unit (SITHU) at the Main Jail.

- MH hired staff and implemented constant observation level of monitoring in March 2023.

- MH staff have received updated training on the new process of developing safety plans at the time of an SRA evaluation starting in January 2023 with a pilot study with ongoing training. Audits of compliance will happen after all MH staff have been trained on the new process.

- 3E 100 was converted to single cells for patients on the MH caseload and eliminates need to classify as administrative segregation when MH recommends single-celled housing.

**Opportunities**

- MH reallocated EOP staff to support expansion of the high acuity/high security IOP as staffing for the additional IOP beds was not included in the budget augmentation for FY 2022/23. Reallocation of EOP staff reduced the capacity of patients that can be served in EOP. ACH will be proposing growth next FY budget to replace the EOP reallocation.

- EOP staff augmentation may help support providing groups in OPP and IOP on evenings and on weekends.

- Develop plan with SSO to provide custody escorts to assist with confidential interviews and MDTs.

- Provide consistent Training for custody assigned to MH programs – Mental Health Conditions: *Evaluating and Responding to Psychiatric Symptoms in our Inmate Population*.

- Continue to address space limitations on Acute Psychiatric Unit with ACH and SSO – MH considers this a high priority issue.

**Challenges/Barriers**

- Significant increase in emergent referrals and initial intakes. Possible reasons include improved Intake Screening for MH history/symptoms and increased patient acuity.

- Lack of sufficient custody staff to support programming/patient care in MH units, MDTs and groups in OPP and APU.

- Lack of confidential space to conduct MH interviews and group programming.

- Unable to fully implement MDTs for most patients on MH caseload until full staffing augmentations are in place. Currently, titrating services based on staffing.

- Unable to implement comprehensive treatment planning for most patients on MH caseload until full staffing augmentations are in place.  Currently, titrating services based on staffing.

- Difficulty recruiting licensed staff (psychologists and LCSWs) to fill vacant positions.

Fourth MH Monitoring Report

**APPENDIX C:**

**Staffing**

| Mental Health Contract Augmentation (most recent) | | |
|---|---|---|
| Fiscal Year | Program Additions | Staff Augmentation |
| FY 2023/24 | Enhance Outpatient program and treatment planning for patients on MH caseload to increase patients served by 125 (total 525) and provide services 7 days per week | LCSW Supv (0.5)<br>LCSW (1.0)<br>SW1 (4.0)<br>NP (1.0)<br><br>Total 6.5 positions |
| | Early Access Stabilization Services (EASS) – implemented 9/1/23 | LCSW (2.5)<br>Psychologist II (1.5)<br>NP (2.0)<br>AAIII (1.0)<br>Psychiatrist (.5)<br><br>Total 7.5 positions |

7/30/23 Current Mental Health Staffing Allocations:

| STAFF | Allocated | Licensed (Y/N) | Filled | % time in this area (half time in IOP would be reflected as .5 filled | Functional Vacancy (divide unfilled positions by allocated positions and that is your functional vacancy rate) |
|---|---|---|---|---|---|
| APU AN II Supervisor * | 1 | Y | 0 | 1.0 | 1 |
| APU CN II * | 4 | Y | 3 | 1.0 | 0.25 |
| APU Sr. LVN * | 6 | Y | 4 | 1.0 | 0.33 |
| APU MA I * | 1 | N | 0 | 1.0 | 1 |
| APU MD | 1 | Y | 0 | 1.0 | 1 |
| APU LCSW | 3 | Y | 3 | 1.0 | 0.00 |
| MJ IOP LCSW Supervisor | 1 | Y | 1 | 1.0 | 0.00 |
| MJ IOP LCSW | 2 | Y | 2 | 1.0 | 0.00 |
| MJ IOP MSW | 5 | N | 4 | 1.0 | 0.20 |
| MJ/RCCC OP Discharge Planner | 1 | N | 1 | 1.0 | 0.00 |
| MJ OP LCSW | 13 | Y | 11 | 1.0 | 0.15 |
| MJ OP MSW | 3 | N | 3 | 1.0 | 0.00 |
| MJ HUSC | 2 | N | 2 | 1.0 | 0.00 |
| MJ OP NP II | 2.6 | Y | 2.6 | 1.0 | 0.00 |
| MJ OP LCSW Supervisor | 2 | Y | 2 | 1.0 | 0.00 |
| RCCC IOP/OP LCSW Supervisor | 1 | Y | 1 | 1.0 | 0.00 |
| RCCC IOP LCSW | 4 | Y | 4 | 1.0 | 0.00 |
| RCCC IOP MSW | 4 | N | 4 | 1.0 | 0.00 |
| RCCC OP LCSW | 3 | Y | 2 | 1.0 | 0.33 |
| RCCC OP NP II | 1 | Y | 1 | 1.0 | 0.00 |
| JBCT Beh Health Psych Sup II | 1 | Y | 1 | 1.0 | 0.00 |
| JBCT Psychologist II | 3 | Y | 1 | 1.0 | 0.67 |
| JBCT Psychologist I (unlicensed) | 2 | N | 2 | 1.0 | 0.00 |
| JBCT LCSW | 3 | Y | 3 | 1.0 | 0.00 |
| JBCT MSW | 1 | N | 1 | 1.0 | 0.00 |
| JBCT CN II * | 1 | Y | 0 | 1.0 | 1.00 |
| JBCT MD | 0.65 | Y | 0.65 | 1.0 | 0.00 |
| JBCT Admin Assistant III | 1 | N | 1 | 1.0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| EOP LCSW Supervisor | 2 | Y | 2 | 1.0 | 0.00 |
| EOP LCSW | 2 | Y | 2 | 1.0 | 0.00 |
| EOP MSW | 9.5 | N | 9.5 | 1.0 | 0.00 |
| Outpatient MD | 3.25 | Y | 3.25 | 1.0 | 0.00 |
| Medical Director | 1 | Y | 1 | 1.0 | 0.00 |
| MH Manager | 1 | Y | 1 | 1.0 | 0.00 |
| Clinical Ops Supervisor | 1 | Y | 1 | 1.0 | 0.00 |
| Administration Ops Supervisor | 1 | Y | 1 | 1.0 | 0.00 |
| Administration Psychologist II | 1 | Y | 1 | 1.0 | 0.00 |
| Administration Officer III | 1 | N | 1 | 1.0 | 0.00 |
| Administration Admin Assistant III | 1 | N | 1 | 1.0 | 0.00 |
| QA & Training Coordinator LCSW Supervisor | 1 | Y | 1 | 1.0 | 0.00 |
| Pt Safety & Pt Support Supervisor | 1 | Y | 0 | 1.0 | 1.00 |
| Pt Safety & Pt Support MHW | 16 | N | 10 | 1.0 | 0.38 |
| MJ/RCCC MH RVR & Ad Seg LCSW Supervisor | 1 | Y | 1 | 1.0 | 0.00 |
| MJ MH RVR & Ad Seg LCSW | 4 | Y | 1 | 1.0 | 0.75 |
| MJ MH RVR & Ad Seg MSW | 4 | N | 1 | 1.0 | 0.75 |
| RCCC MH RVR & Ad Seg LCSW | 1 | Y | 0 | 1.0 | 1.00 |
| RCCC MH RVR & Ad Seg MSW | 1 | N | 1 | 1.0 | 0.00 |
| | | | | | |
| **Total for all (Does not include nursing)** | 113 | | 92 | | 0.19 |

**Appendix D:**
**Length of Stay on APU Waitlist**

| Acute Psychiatric Unit (7/11/23) Pre-Admit Length of Stay [Point in time data] | |
|---|---|
| Days on Waitlist | Patients |
| 0 | 0 |
| 1 | 7 |
| 2 | 5 |
| 3 | 4 |
| 4 | 4 |
| 5 | 0 |
| 6 | 2 |
| 7 | 2 |
| 8 | 1 |
| 9 | 1 |
| 10 | 2 |
| 13 | 1 |
| 14 | 1 |
| 15 | 1 |

**APPENDIX E**

**WRAP Restraint Device Photo**

This is NOT a photo from Sacramento County or a photo of their device. This is a public photo with the individual's face redacted because it was unknown if this was an actor. This is a WRAP restraint device sold by companies such as Command Sourcing and Safe Restraints.

WRAP restraint device:



Spit mask over individual's head, similar to method Defendants use. It is not opaque – this is due to blocking out face for privacy concerns.



Image of spit mask from manufacturer

Utilization of the WRAP restraint in a "carry" cart that allows transport of the restrained person.



**APPENDIX F**

**Use of Force Operations and Post Orders**

Fourth MH Monitoring Report

Case 2:18-cv-02081-TLN-CSK   Document 177-1   Filed 05/09/24   Page 111 of 128
*Formatting may not match original document as changes occur when converting pdf to MS Word*

**SHERIFF'S DEPARTMENT** ★ **COUNTY OF SACRAMENTO**

## OPERATIONS ORDER

**Use of Force**

The purpose of this order is to provide policy and procedure for the use of force at the **Main Jail** and the **Rio Cosumnes Correctional Center (RCCC).**

I.     Policy

Custody staff shall comply with General Order 2/11 (Use of Force Policy) regarding the use of force. This operations order is to be used in conjunction with, but does not supersede, General Order 2/11.

Deputies shall use only that force which is reasonable, given the facts and circumstances perceived by the officer at the time of the event, to effectively bring an incident under control.  The reasonableness of the force shall be evaluated from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight, and the totality of the circumstances shall account for occasions when the officer may be forced to make quick judgments about the use of force.

The application of force shall cease when control of a prisoner or situation is achieved and shall not be used as a form of punishment.  The objective in applying reasonable force is to control persons and incidents thereby minimizing injury to all persons involved.

II.     Use of Force Options

    A.     Despite the options provided in General Order 2/11 (Appendix A), the following should be noted:

        1.  Per California Assembly Bill 1196 (Government Code 7286.5), the carotid restraint and chokehold are not authorized; however, it is not the intent of Assembly Bill 1196 to take away the general right to self- defense or defense of others against great bodily injury or death.

        2.  Intentionally restricting oxygen or blood flow to the brain is prohibited unless deadly force is authorized.  If an officer does restrict oxygen or blood

flow to a subject's brain, and once the subject is detained, the officer shall:

    a.  Provide medical assistance if necessary (CPR, first aid, etc.).

    b.  Transport the subject to a hospital and obtain intent to incarcerate clearance by a medical doctor.

    c.  Advise jail medical staff for monitoring.

3.  Kneeling, placing bodyweight, or utilizing an object directly upon a subject's neck is prohibited unless overcoming active resistance, or other means of defense or standard weapons are not available or practical.

4.  Kneeling or placing bodyweight upon a subject's torso is prohibited unless overcoming resistance.  If deputies place their weight on a subject's upper back or torso in order to apply handcuffs, once the subject is handcuffed and compliant, deputies shall place the subject in a recovery position. Deputies need to be aware of positional asphyxia. Deputies should monitor the subject and address any medical emergencies should they occur.

5.  Kneeling or placing bodyweight upon a non-resistive prone or supine subject's torso is prohibited.

6.  Distraction blows, strikes, or punches done for the sole purpose of distracting someone in an attempt to gain control, detain, or arrest are prohibited.

7.  Ignoring a subject's plea regarding a medical emergency (chest pains, difficulty breathing, etc.) is prohibited.

III.    <u>De-escalation and Intervention</u>

A.    Deputies must also recognize situations which require de-escalation and/or crisis intervention.  When such situations arise, deputies shall consider and use alternative tactics to try and persuade the individual to voluntarily comply to mitigate the need for a higher level of force to resolve the situation.  In these situations, deputies shall attempt to de-escalate the situation, use crisis intervention tactics by properly trained personnel, and other alternatives to force when reasonable [Government Code §7286(b)(1)].

B.    As time and circumstances reasonably permit, and when community and officer safety would not be compromised, deputies should consider actions that may increase officer safety and may decrease the need for using force:

1. Summoning additional resources able to respond in a reasonably timely manner;

2. Formulating a plan with responding deputies before entering an unstable situation that does not reasonably appear to require immediate intervention;

3. Employing other tactics that do not unreasonably increase officer jeopardy;

4. Shut off utilities (water, electricity);

5. Negotiation;

6. Await voluntary compliance.

C.   Additionally, any employee present and observing another employee using force clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intervene to stop the use of unreasonable force.  Furthermore, any employee who observes another employee using force that exceeds the degree of force permitted by law shall immediately report those observations to a supervisor.

IV.   Authorization and Deployment of Tactical Weapons

A.   With the exception of oleoresin capsicum (OC) and electronic control devices (TASER), all tactical weapons (40mm launchers, sting ball devices, flashbang devices, or similar combustible-fueled devices) are to be deployed and used only with the prior approval of the shift watch commander, or in an emergency situation such as a riot, attempt escape, hostage taking, or other exigent circumstance in accordance with Operations Order 2/04 Weapons, Tactical Weapons & Specialized Equipment.

1. Deployment shall be defined as removal of the weapon and/or device from its place of storage, with the exception of removal for purpose of routine inspection, training, maintenance, or inventory.

2. Tactical weapons are defined as weapons, devices, tools, and other instruments used by deputies to assist in gaining the compliance of non-compliant, assaultive, or self-injurious individuals in situations where the application of force is deemed necessary to bring resolution to the incident.

V.   Recording, Reporting, and Documentation

A.   Deputies shall make every attempt to video record the subject's actions prior to a planned application of force.  Deputies shall endeavor to record the specific actions, behavior, or threats used to justify the use of force. Staff shall also endeavor to record any staff member's directions and

requests for compliance.  The video recording will be logged and stored in the video library for thirty-six (36) months.

B.     Any use of force which results in an apparent or reported injury shall be documented utilizing the Sheriff's Office general offense report writing system.

    1.  In no circumstance will a stand-alone supplemental report be sufficient to document a use of force.

C.     Any *Application of Force* or *Use of Deadly Force*, as described in sections II.B and II.C of Appendix A of General Order 2/11, against any person by an employee of the Sheriff's Office (sworn or professional staff) shall be documented utilizing the Sheriff's Office general offense report writing system.

    1.  Exception- General offense documentation is not required for the use of control/compliance holds, handcuffs, shackles, or other restraint devices when used to restrain persons for security or transportation purposes unless the application resulted in an apparent or reported injury.

    2.  In instances where deputies used firearms, electronic control devices, and/or 40mm type launchers, a weapons discharge form shall be completed no later than the end of watch.

    3.  In no circumstance will a stand-alone supplemental report be sufficient to document use of force, an application of force, or use of deadly force.

D.     The use of control holds on resistive, combative, or noncompliant inmates that does not result in a visible or reported injury, shall be documented in the following manner:

    1.  **Jail Inmate Management System (JIMS) Incident Report (PF10)**;

    2.  **Custody log book entry**;

    3.  **Watch summary log**;

    4.  **Administrative Application Blue Team entry**.

E.     Medical assistance for any injured person shall be obtained as soon as possible.  Prisoners exposed to certain tactical weapons may require evaluation by medical personnel in accordance with Operations Order 2/04 Weapons, Tactical Weapons & Specialized Equipment.

F.     Notification shall be made to an on-duty supervisor as soon as practical following the application of force in any instance, no later than end of watch.

G. The sergeant supervising the incident shall direct the completion of any required reports. The required reports minimally include:

1. **Housing unit log book** entry referencing the incident.

2. **Inmate incident report (PF10)**. The officer will note in the report whether the incident was video recorded. If the incident was not recorded by video, the officer will document the circumstances which prevented video to be recorded.

3. **Watch summary log**.

H. Additional documentation may be necessary and include:

1. **Sheriff's Office general offense incident report**.

2. **Custody log** form.

3. **Restraint extension** Inter-Departmental Correspondence (IDC).

4. **Weapons discharge report** (available on SSDWeb).

5. **Blue Team entry**.

I. The complete use of force report shall include, but is not limited to, the following:

1. Reason for response or enforcement activity;

2. Witness/subject's behavior upon arrival of deputies;

3. Subject's actions and statements prior to the arrest/use of force;

4. Differences in physical odds (height/weight, alcohol/drug intoxication, demonstrated fighting skill);

5. Type and amount of resistance offered;

6. Type and amount of force used to overcome resistance;

7. Medical treatment requested and provided by whom;

8. Time of supervisory notification and to whom;

9. Third party witness statements;

10. Evidence collected, including description of injuries.

J. The supervisor of the incident shall ensure the watch commander receives a copy of all pertinent reports. The report package shall include:

1. **Custody log form**;

2. **Incident (PF10) and other applicable reports**;

3. **Watch summary log**;

4. **Restraint extension IDC or weapons discharge report** if applicable.

K.   The original package shall be placed in the prisoner's custody file.  A copy will be forwarded to the assistant division commander for review and a copy shall be maintained by the division administrative sergeant or designee.

L.   The watch commander shall review the use of force, including any available video.

1. The watch commander shall forward all documentation and available video for the use of force to the assistant division commander in a timely manner.

M.   The supervising sergeant shall ensure a classification officer is notified of the incident and whether a change in housing location for the prisoner is needed.

N.   The supervisor or designee should conduct a debriefing with involved staff as soon as possible.

**Appendices:**        None

**Related Orders:**    General Orders: Reports (1/34), Use of Force Policy (2/11) Operations Orders:  Reporting of Incidents and Crimes (1/15); Use of Restraint Devices (2/02); Use of the Pro-Straint Chair (2/03); Weapons, Tactical Weapons, & Specialized Equipment (2/04); CERT and Cell Extraction Procedures (2/05); Use of The WRAP Restraint Device (2/19)

**References:**        Board of State and Community Corrections Title 15, §1058: Use of Restraint Devices; Blue Team Quick Reference

**CORRECTIONAL SERVICES**                    **2/01 (REV 12/20)**

*Formatting may have changed from source document. However, font color remained the same.*



**SHERIFF'S DEPARTMENT** **COUNTY OF SACRAMENTO**

## OPERATIONS ORDER

# Use of Force

The purpose of this Order is to provide policy and procedures for the Use of Force at the **Main Jail** and the **Rio Cosumnes Correctional Center (RCCC).**

I.      <u>Policy</u>

Custody staff shall comply with General Order 2/11 (Use of Force Policy) regarding the use of force. This policy is to be used in conjunction with, but does not supersede, General Order 2/11.

Deputies shall use only that force which is reasonable, given the facts and circumstances perceived by the officer at the time of the event, to effectively bring an incident under control.  The reasonableness of the force used must be judged from the perspective of a reasonable officer on the scene at the time of the incident.

<u>In instances where an officer should reasonably perceive a physical confrontation is may occur (i.e., failure to lockdown), deputies shall consider the exigency and threat presented at the time, and where applicable, isolate the inmate(s) and immediately request a supervisor's response prior to any use of force.</u>

The application of force shall cease when control of a prisoner or situation is achieved and shall not be used as a form of punishment.  The objective in applying reasonable force is to control persons and incidents thereby minimizing injury to all persons involved.

II.     <u>Alternative Resolutions in Lieu of Force/De-escalation</u>

A.      Staff should be cognizant of the unique environment in a correctional setting.  Each situation shall be evaluated to determine the urgency of enforcement action.  In situations where an immediate response may escalate or aggravate the situation, deputies should consider the containment of the even as a tactic.

B.    Further, staff shall appropriately de-escalate the level of force in response to the suspect's level of compliance.  Possible alternative resolutions in lieu of the application of force include:

    1.    Containment of the situation

    2.    Shutting off utilities (Water, Electricity)

    3.    Negotiation

    4.    Waiting situation out until suspect(s) voluntarily comply

III.    <u>Authorization and Deployment of Tactical Weapons</u>

A.    With the exception of OC spray and Tasers, all tactical weapons (37mm/40mm Launchers, Pepperball, Sting Ball devices, Flashbang devices, or similar combustible-fueled devices) are to be deployed and used only with the prior approval of the shift Watch Commander, or in a bona fide emergency situation such as a riot, attempt escape, hostage taking, or other exigent circumstance in accordance with Operations Order 2-04-Weapons, Tactical Weapons, and Specialized Equipment.

    1.    Deployment shall be defined as removal of the weapon and/or device from its place of storage, with the exception of removal for purpose of routine inspection, training, maintenance, or inventory.

    2.    Tactical Weapons are defined as weapons, devices, tools, and other instruments used by deputies to assist in gaining the compliance of non-compliant, assaultive, or self-injurious individuals in situations where the application of force is deemed necessary to bring a resolution to the incident.

IV.    <u>Recording, Reporting and Documentation</u>

A.    Deputies shall make every attempt to video record the suspect's actions prior to a planned application of force.  Deputies shall endeavor to record the specific actions, behavior, or threats used to justify the use of force. Staff shall also endeavor to record any staff member's directions and requests for compliance.  The video recording will be logged and stored in the video library for thirty-six (36) months.

B.    Any use of force which results in an apparent or reported injury shall be documented utilizing the Automated Field Reporting (AFR) system on a crime/arrest report, a casualty report, a 5150 report, or an information

report – whichever is applicable.

    1.    In no circumstance will a stand-alone supplemental report be sufficient to document a use of force.

C.    Any *Application of Force* or *Use of Deadly Force*, as described in sections II.B and II.C of Appendix A of General Order 2/11, against any person by an employee of this Department (sworn or non-sworn) shall be documented utilizing an AFR incident report which may include, but is not limited to, a crime/arrest report, a casualty report, a 5150 report, or an information report.

    1.    Exception- AFR documentation is not required for the use of control/compliance holds, handcuffs, shackles, or other restraint devices when used to restrain persons for security or transportation purposes <u>unless the application resulted in an apparent or reported</u> injury.

    2.    In instances where deputies used firearms, Electronic Control Devices, and/or 40mm type launchers, a Weapons Discharge Form shall be completed no later than the end of watch.

    3.    In no circumstance will a stand-alone supplemental report be sufficient to document a use of force, an Application of Force, or Use of Deadly Force.

D.    The use of control holds on resistive, combative, or noncompliant inmates that does not result in a visible or reported injury, shall be documented using the Jail Inmate Management System (JIMS) Incident Report (PF10). A Custody Log Book entry and a Watch Summary Log are also required.

E.    Medical assistance for any injured persons shall be obtained as soon as possible.  Prisoners exposed to certain tactical weapons may require evaluation by medical personnel in accordance with Operations Order 2- 04, Weapons, Tactical Weapons, and Specialized Equipment.

F.    Supervisory notification shall be made to an on-duty supervisor as soon as practical following the application of force; in any instance, no later than the end of watch.

G.    The sergeant supervising the incident shall direct the completion of any required reports.  The required reports minimally include:

    1.    A **Housing Unit Log Book** entry referencing the incident.

2.     An **Inmate Incident Report (PF-10)**.  The officer will note in the report if the incident was video recorded and if not, the circumstances preventing the video recording.

3.     An on-line **Watch Summary Log**.

H.     Additional documentation may be necessary and may include:

1.     An AFR Incident Report.

2.     A **"Custody Log"** form.

3.     A "**Restraint Extension"** Inter-departmental Correspondence (IDC).

4.     **Weapons Discharge Report** Incident (available on SSDWeb)

I.     The complete use of force report shall include, but is not limited to, the following:

1.     Reason for response or enforcement activity;

2.     Witness/suspect's behavior upon arrival of deputies;

3.     Suspect's actions and statements prior to the arrest/use of force;

4.     Differences in physical odds; (i.e., height/weight, alcohol/drug intoxication, demonstrated fighting skill);

5.     Type and amount of resistance offered;

6.     Type and amount of force used to overcome resistance;

7.     Medical treatment requested and by whom provided;

8.     Time of supervisory notification and to whom;

9.     Third party witness statements;

10.    Evidence collected, including description of injuries.

J.     The supervisor of the incident shall ensure the Watch Commander receives a copy of all pertinent reports.  The report package shall include:

1.     The Use of Force Routing Sheet.

2.     The Custody Log Sheet.

3.      The PF-10 Incident Report and any Crime/Casualty/Incident Reports.

4.      The Watch Summary Log.

5.      The Restraint Extension IDC, Weapons Discharge Report if applicable.

K.      The original package shall be placed in the prisoner's custody file.  A copy will be forwarded to the assistant division commander for review and a copy shall be maintained by the division administrative sergeant or designee.

L.      The Watch Commander shall review the use of force, including any available video.

1.      The Watch Commander shall forward all documentation and available video for the use of force to the assistant division commander by the end of watch.

M.      The supervising sergeant shall ensure a Classification Officer is notified of the incident and if a change in housing location for the prisoner is needed.

N.      The supervisor or designee should conduct a debriefing session with involved staff as soon as possible.

**Appendices:**          None

**Related Orders:**      General Orders: 1/34, Reports, 2/11, Use of Force Policy
Operations Orders:  1/15, Reporting of Incidents and Crimes, 2/02, Use of Restraints, 2/03, Use of the Prostraint Chair; 2/04, Weapons, Tactical Weapons, and Specialized Equipment; 2/05, CERT and Cell Extraction Procedures

**References:**          Title 15, Section 1058

**CORRECTIONAL SERVICES**                              **2/01 (REV 4/16)**



# POST ORDER

**Planned Use of Force – Main Jail**

The purpose of this Post Order is to add additional requirements for a planned use of force event at the Main Jail. The *Mays* Consent Decree imposes additional obligations on the Sheriff's Office when conducting planned use of force involving a known mental health or intellectually disabled inmate. Changes to applicable Policy and Procedure are planned.  This order will serve as interim requirements.

I.    <u>General</u>

    A.    Prior to a planned use of force for inmates with a known mental health or intellectual disability, and absent an imminent threat to safety, Sheriff staff shall employ de-escalation methods that consider the individual's mental health or adaptive support needs.

II.    <u>Planned Use of Force Procedures</u>

    A.    Prior to a planned use of force event involving an inmate with a known mental health or intellectual disability Adult Correctional Mental Health (ACMH) will be notified.  The goal of ACMH is to reach a resolution without the use of force.

        1.    If an imminent threat to safety becomes apparent, the on-duty supervisor can do what is necessary to bring the event to a safe conclusion.

    B.    Sheriff's staff will collaborate with ACMH staff in regard to strategies and interventions used during the planned use of force.

    C.    Consistent with safety and security needs there will be a "cooling down" period before planned use of force is used against an inmate with mental health or intellectual disabilities.

1.      This period includes a structured attempt by ACMH staff to de-escalate the situation and reach a resolution without use of force.

2.      The ACMH clinician will be allotted a reasonable amount of time to speak and to evaluate the inmate.

3.      The ACMH clinician will report to the Sheriff's supervisor the clinician's evaluation, attempts at de-escalation/resolution and the inmate's response to the interventions.

4.      The "cooling down" period should be limited to four hours if no progress is made to gain voluntary compliance.

III.   Video Documentation

A.     Sheriff's staff shall endeavor to record the specific actions, behavior, or threats leading to the need for use of force, as well as efforts to resolve the situation without force. Any de-escalation attempts with the inmate by Sheriff's employees shall be recorded on a body worn camera (BWC).

B.     After the ACMH Clinician speaks to the inmate, the clinician shall be afforded the opportunity to summarize their attempts at de-escalation and resolution using a department issued camcorder or on a Sheriff's BWC.

IV.   IM Medication Orders

A.     ACMH often has Intermuscular injection (IM) medication ordered as a means to administer needed mental health medication in addition to or in lieu of oral medication.

1.      This order does not preclude Sheriff's staff from providing immediate low-level controlling force to assist ACMH with IM medication on a semi-cooperative inmate.

V.    Unplanned Used of Force

A.     An emergent referral to ACMH will be submitted after an unplanned use of force or any instances of imminent threat to safety.

**Appendices:**        None

**Related Order:**        Operations Orders: 2/01, Use of Force

**References:**        *Mays* Consent Decree V.D., Title 15, Article 13, Section 1260, 1261, 1262, 1263, and1264; Article 14, Sections 1270 and 1271

APPENDIX G

Use of Body Worn Cameras Interim Order

APPENDIX G:  Sacramento Sheriff's Office Policy Manual
INTERIM ORDER - Body Worn Cameras Copyright Lexipol, LLC 2023/01/11, All Rights
Reserved. Published with permission by Sacramento Sheriff's Office

### INTERIM ORDER - Body Worn Cameras – 1200.5.2
### ACTIVATION IN CORRECTIONAL SERVICES

Deputies utilizing body worn cameras in Correctional Services should record the following incidents using all audio and video capabilities set forth in this policy, as well as in the performance of the following duties:

    (a) Removing or escorting an inmate from his or her cell or holding area.

    (b) Entering a cell, pod, dormitory housing, or holding area occupied by or housing an inmate.

        1.Exception: Directly supervising a housing unit or conducting general observation and intensive observation checks, unless a situation arises that dictates otherwise.

    (c)Processing of new arrestees (except during the supervision of medical screening or classification interviews).

    (d)Responding to inmate fights or disturbances, emergency situations, uncooperative inmate(s), use of force situations, unusual or suspicious circumstances, interactions with inmates with a history of uncooperative or unpredictable behavior, using restraint devices, and movement of an assaultive or uncooperative inmate.

    (e) Searching a cell, pod, dormitory housing, or holding area (i.e., shakedowns).

    (f) Supervising inmate workers who are in close proximity to security exit/entry points or perimeters.

    (g) During on-loading and off-loading of Transportation vehicles. Deputies shall not record inmates while conducting a strip search, conducting classification interviews, during a routine medical treatment provided to an inmate, or during inmates' use of toilet or shower. There may be circumstances that require the need for body worn camera activation, such as the inmate becoming uncooperative or resistive, or the possibility of an allegation of misconduct arising from the contact.

APPENDIX H:

Summary Consent Decree Compliance Table

| SECTION OF THE CONSENT DECREE | COMPLIANCE RATING[i] |
|---|---|
| General Provisions (Section II) | PC |
| III.O.1 | PC |
| IV.A.1-7 | SC |
| IV.A.8 | PC |
| IV.A.2 | PC |
| IV.A.4 | PC |
| IV.B.1 | PC |
| IV.B.2-3 | SC |
| IV.C.1, 2, 4-7 | PC |
| IV.C.3 | Not assessed |
| IV.D.1-7 | PC |
| IV.D.8 | PC |
| IV.E.1-7 | PC |
| IV.F.1-3 | PC |
| IV.F.4 | PC for IOP, EOP level of care<br>NC for acute inpatient level of care |
| IV.F.6 | PC |
| IV.G. | PC |
| IV.H.1-2 | SC with explanation |
| IV.H.3 | PC |
| IV.I. | PC |
| V.A.1 | SC |
| V.A.2-3 | PC |
| V.B.1-3 | NC |
| V.B.4, 5, 7 | PC |
| V.B.6 | Unable to assess |
| V.C | Unable to assess |
| V.D.1-3, 5-6 | PC |
| V.D.4, 7 | NC |
| V.E.1 | SC |
| V.E.2 | PC |
| V.E.3 | NC |
| V.F.1, 2, 4 | PC |
| V.G.3, 5 | NC |
| VIII.C.1, 2 | PC |
| VIII.D. | PC |
| Quality Assurance, Mental Health Care | PC |

[i] Compliance rating: SC is substantial compliance; PC is partial compliance; NC is non-compliant