1  **LISA A. TRAVIS, County Counsel**
   **[State Bar No. 184793]**
2  **JANICE M. SNYDER, Assistant County Counsel**
   **[State Bar No. 198673]**
3  **SARAH A. BRITTON, Deputy County Counsel**
   **[State Bar No. 226714]**
4  **COUNTY OF SACRAMENTO**
   **700 H Street, Suite 2650**
5  **Sacramento, CA  95814**
   **Telephone:  (916) 874-6908**
6  **Facsimile:  (916) 874-8207**
   **E-mail:  brittons@saccounty.gov**
7  **File No.:  126602-000012**

8  **Attorneys for County of Sacramento**

9              **IN THE UNITED STATES DISTRICT COURT**
                **EASTERN DISTRICT OF CALIFORNIA**
10                    **SACRAMENTO DIVISION**

11 **LORENZO MAYS, RICKY**                    **Case No. 2:18-cv-02081 TLN KJN**
   **RICHARDSON, JENNIFER BOTHUN,**
12 **ARMANI LEE, LEERTESE BEIRGE, and**
   **CODY GARLAND, on behalf of themselves**    **JUDGE: Hon. Kendall J. Newman**
13 **and all others similarly situated**

14            **Plaintiffs,**                   **FILING OF NINTH COUNTY STATUS**
                                                **REPORT PURSUANT TO PARAGRAPH**
15 **vs.**                                       **12 OF THE CONSENT DECREE**

16 **COUNTY OF SACRAMENTO**

17            **Defendant.**

18         Paragraph 12 of the Consent Decree in this matter requires the County to provide

19 Plaintiffs' counsel and the Court appointed subject matter experts with a status report no later

20 than 180 days from the approval of the proposed decree.  In compliance with this requirement,

21 the County provided the "Ninth Status Report; Mays Consent Decree" on July 11, 2024 to the

22 subject matter experts and the attorneys monitors from the Prison Law Office and Disability

23 Rights California.  Attached to this filing is that status report.

24 DATED:      July 12, 2024            LISA A. TRAVIS, County Counsel
                                        Sacramento County, California
25

26                                      By: *Sarah A. Britton*

27                                          Sarah A. Britton
                                            Deputy County Counsel
28 2840214

-1-
FILING OF NINTH COUNTY STATUS REPORT



Sacramento County

REMEDIAL PLAN STATUS REPORT

July 11, 2024

## Table of Contents

INTRODUCTION ....................................................................................................................................... 3-4

REMEDIAL PLAN COMPLIANCE DEFINITIONS & RATINGS ........................................................................ 4-9

POLICY STATUS OVERVIEW ..................................................................................................................... 10-11

REMEDIAL PLAN STATUS ......................................................................................................................... 11

GENERAL PROVISIONS [Remedial Plan Section II] ................................................................................... 11-24

AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE [Remedial Plan Section III] ........................... 25-68

MENTAL HEALTH CARE [Remedial Plan Section IV] ................................................................................. 69-115

DISCIPLINARY MEASURES & USE OF FORCE FOR PRISONERS w/ MENTAL HEALTH OR INTELLECTUAL DISABILITIES [Remedial Plan Section V].... 115-128

MEDICAL CARE [Remedial Plan Section VI] .............................................................................................. 129-207

SUICIDE PREVENTION [Remedial Plan Section VII] .................................................................................. 208-246

SEGREGATION/RESTRICTED HOUSING [Remedial Plan Section VIII] ........................................................ 247-269

QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT [Remedial Plan Section IX] ................. 270-278

JAIL FACILITY NEEDS & JAIL POPULATION REDUCTION EFFORTS ........................................................... 278-292

ATTACHMENT 1 – ACH MAYS POLICY TRACKING SHEET ......................................................................... 293

# INTRODUCTION

**Background**

The Mays Consent Decree was approved by the federal court on January 13, 2020.

- Every 180 days, Sacramento County is required to issue a Remedial Plan Status Report, which is sent to Mays Class Counsel and the court-appointed medical and mental health experts.
- Each expert is expected to complete Remedial Plan Monitoring Reports annually based on document requests, medical chart reviews, and annual site visits to provide feedback and recommendations with the goal of supporting progress toward compliance with the Mays Consent Decree Remedial Plan.

This report covers the period of January 2024 – June 2024. This is the ninth County Remedial Plan Status Report.

**Jail Facilities**

Sacramento County has two jails – the Main Jail (MJ) located downtown and the Rio Cosumnes Correctional Center (RCCC) located in Elk Grove.

|  | MJ | RCCC |
|---|---|---|
| **Year Opened** | 1989 | 1960 |
| **Location** | 651 I Street | 12500 Bruceville Road |
| **Rated Capacity** | 2,380 | 1,625 |

The Sacramento Sheriff's Office (SSO) has overall responsibility and management for the jail facilities.  Adult Correctional Health (ACH) within Department of Health Services (DHS), Primary Health Division provides the health care services (physical health and behavioral health) through County staff and County contracted staff – working in partnership with SSO.

The jail population has higher average rates of health care needs as compared to the community, including chronic health conditions, serious mental illness (SMI), and substance use disorders (SUD).

**Overview**

This report covers Sacramento County's overall progress toward meeting Consent Decree requirements, including current status, data or evidence to support current status, and action plans in place to address areas not yet in full compliance.

## REMEDIAL PLAN COMPLIANCE DEFINITIONS & RATINGS

**Compliance Definitions**

SUBSTANTIAL COMPLIANCE: Indicates compliance with most or all components of the relevant provision of the Remedial Plan for both the quantitative (e.g., 90% performance measure) and qualitative (e.g., consistent with the larger purpose of the *Decree*) measures. If an individual compliance measure necessitates either a lower or higher percentage to achieve SUBSTANTIAL COMPLIANCE, it will be noted by the expert. Compliance has been sustained for a period of at least 12 months.

PARTIAL COMPLIANCE: Indicates compliance achieved on some of the components of the relevant provisions of the Remedial Plan, but significant work remains.  A minimum requirement is that for each provision, relevant policies and procedures must be compliant with Remedial Plan requirements, contain adequate operational detail for staff to implement the policy, staff are trained, and the County has begun implementation of the policy.

NON-COMPLIANCE: Indicates that most or all of the components of the relevant provision of the Remedial Plan have not yet been addressed and/or have not yet been met.

When reviewing each Expert report, there is variability in rating methodology.
- Medical Experts rate each indicator within a provision separately.
- Mental Health and Suicide Prevention Experts rate some indicators as a group and others individually.

**Remedial Plan Compliance Reports and Ratings Dashboard**

# Adult Correctional Health Ratings

### July 2024







# Sacramento County Sheriff's Office Ratings

### July 2024







## Court-Appointed Expert Reports Ratings

**MEDICAL EXPERT REPORTS & RATINGS**

| Medical | January 2021 1st Report | October 2021 2nd Report | October 2022 3rd Report | August 2023 4th Report |
|---|---|---|---|---|
| Substantial | 5% | 16% | 17% | 33% |
| Partial | 20% | 25% | 29% | 33% |
| Non-compliance | 52% | 49% | 44% | 33% |
| Not Evaluated | 23% | 9% | 9% | 0% |
| |  |  |  |  |

- *Medical Experts included a summary table with 75 indicators and rated each indicator within a provision separately.  Example: Nurse Intake provision has seven indicators for ratings.*
- *ACH moved from 52% to **28%** with Non-Compliance across the five monitoring periods.*

**SUICIDE PREVENTION REPORTS RATINGS**

| Suicide Prevention | January 2021<br>1st Report | October 2021<br>2nd Report | August 2022<br>3rd Report | September 2023<br>4th Report |
|---|---|---|---|---|
| Substantial | 0% | 0% | 11% | 14% |
| Partial | 84% | 83% | 76% | 73% |
| Noncompliance | 16% | 17% | 13% | 13% |
| Not Evaluated | 0% | 0% | 0% | 0% |
| |  |  |  |  |

- *Suicide Prevention Expert included a summary table containing 63 provisions.  Some indicators are rated as a group.  Example: Nurse Intake Provision C. has five indicators but rated as one item.*
- *ACH moved from **0% to 14%** with SUBSTANTIAL COMPLIANCE across the four monitoring periods.*

**MENTAL HEALTH EXPERT RATINGS**

| Mental Health | January 2021 1st Report | October 2021 2nd Report | April 2023 3rd Report | May 2024 4th Report |
|---|---|---|---|---|
| Substantial | 0% | 0% | 0% | 14% |
| Partial | 58% | 55% | 66% | 74% |
| Non-compliance | 21% | 37% | 30% | 5% |
| Not Evaluated | 21% | 8% | 3% | 7% |
| |  |  |  |  |

- *The first Mental Health report indicated a total of 91 provisions; however, listed 35 provision ratings with 3 provisions not assessed.* Mental Health Expert stated, *"This total was computed by adding major (e.g., IV.B) and substantial sub-major (e.g. IV.A.2) areas of the Remedial Plan."*
- *The second monitoring report did not include a summary table but contained the 35 rated provisions with 3 provisions not assessed.*
- *ACH moved from **0% to 14%** with SUBSTANTIAL COMPLIANCE across the four monitoring periods.*

**ACH REMEDIAL PLAN STATUS REPORTS**

| ACH Status Reports | | |
|---|---|---|
| # | Monitoring Period | Date Submitted |
| 1 | Jan – Jun 2020 | 07/10/2020 |
| 2 | Jul – Dec 2020 | 01/05/2021 |
| 3 | Jan – Jun 2021 | 06/23/2021 |
| 4 | Jul – Dec 2021 | 01/14/2022 |
| 5 | Jan – Jun 2022 | 06/14/2022 |
| 6 | July – Jan 2023 | 01/01/2023 |
| 7 | Jan  – July 2023 | 07/01/2023 |
| 8 | July – Dec 2023 | 01/08/2024 |
| 9 | Jan  – July 2024 | 07/11/2024 |

**EXPERT REMEDIAL PLAN MONITORING REPORT**

| Medical Expert Reports | |
|---|---|
| # | Date Submitted |
| 1 | 12/16/2020 |
| 2 | 08/27/2021 |
| 3 | 10/25/2022 |
| 4 | 08/1/2023 |

| 5 | 05/10/24 *(Draft)* |
|---|---|

### ACH POLICY STATUS OVERVIEW

Each policy related to provisions of the Remedial Plan is reviewed by Class Counsel and designated court-appointed Experts. All Experts review policies that apply to all disciplines.

| Suicide Prevention Expert Reports | |
|---|---|
| # | Date Submitted |
| 1 | 01/19/2021 |
| 2 | 09/10/2021 |
| 3 | 08/19/2022 |
| 4 | 09/13/2023 |

| Mental Health Expert Reports | |
|---|---|
| # | Date Submitted |
| 1 | 01/20/2021 |
| 2 | 09/21/2021 |
| 3 | 04/25/2023 |
| 4 | 05/01/2024 |

New or updated policies may include significant changes for ACH, including new workflows, development of new forms, electronic health record (EHR) templates, new Quality Improvement (QI) audits and/or reports, etc.  Some policies have a phased-in implementation due to the need for sufficient staffing, equipment, or other needs.

ACH has completed new policies and/or policy revisions to address Remedial Plan provisions in all major areas.

- As of June 2024, **44** ACH Medical or Medical/Mental Health joint policies and **26** Mental Health policies have been approved by Class Counsel and/or Subject Matter Experts.
- A snapshot of policy work through June 2024 is depicted in the following tables.
  - Shaded rows are policies still pending review by the experts.

| ACH Policies | Total Policies |
|---|---|
| Finalized | 44 (86%) |
| In Process (Revision/Development) | 3 (6%) |
| Pending Subject Matter Expert/Class Counsel Review | 4 (8%) |
| Total | 51 (100%) |

*ACH Policies – Includes administration, medical, and joint (medical/mental health) policies.*

| ACH Provider Treatment Guidelines | Total Provider Guidelines |
|---|---|
| Finalized | 1 (25%) |

| | |
|---|---|
| In Process (Revision/Development) | 0 (0%) |
| Pending Medical Expert Review | 3 (75%) |
| Total | 4 (100%) |

| ACH Standardized Nursing Procedures (SNP) | Total SNPs |
|---|---|
| Finalized | 4 (8%) |
| In Process (Revision/Development) | 6 (12%) |
| Pending Medical Expert Review | 42 (80%) |
| Total | 52 (100%) |

*Note: SNPs describe specific RN actions (RN to manage, requires consult with provider, or emergency stabilization needed) vs. categorization of low, medium, and high risk.*

| Mental Health Policies | Total Policies |
|---|---|
| Finalized | 26 (96%) |
| In Process (Revision/Development) | 0 (0%) |
| Pending Mental Health Expert Review | 1 (4%) |
| Total | 27 (100%) |

- **37%** (50 of 134) of policy documents submitted are pending Expert review.  See Attachment 1 "ACH Mays Policy Tracking Chart" for additional detail.

## REMEDIAL PLAN STATUS UPDATE

**II. GENERAL PROVISIONS**

**Staffing**
**(Section II; Provisions A. – B.)**
**ACH Status: PARTIAL COMPLIANCE**

| SSO Status: NOT APPLICABLE (N/A) |
|---|

**STAFFING**

A. The County shall maintain sufficient medical, mental health, and custody staff to meet the requirements of this Remedial Plan.

B. The parties agree that the custodial and health care staff must be increased to meet minimal constitutional and statutory standards. Presently, there are insufficient deputies to supervise out-of-cell activities for people in the general population and administrative segregation, and to provide security for health-related tasks. The parties agree that reduction in jail population is a cost-effective means to achieve constitutional and statutory standards.

    1. The County intends to hire additional custodial and health care staff. The parties agree that population reduction of the jails will facilitate compliance with this Remedial Plan. All population reduction measures should be designed to promote public safety through evidence-based programs.

    2. If through the monitoring process it is determined that the County is not fulfilling the provisions of this Remedial Plan due to staffing deficiencies, the parties will meet and confer regarding what steps to take to reduce the population of the jail, including available resources to facilitate population reduction.

**Policies:**

- See appendix for all policies

**Compliance Status by Section:**

- II.A. PARTIAL COMPLIANCE
  - County began to add staff and/or contract augmentations prior to the finalization of the Consent Decree (January 2020). Vacancy rates increase as positions are allocated; therefore, monitoring the total FTEs by position allocated in addition to vacancy rates is important to identify and monitor progress.
  - ACH has increased staffing substantially since pre-Consent Decree as outlined below:
    - County ACH Medical staff and Administrative FTEs has increased from 112.5 pre-Consent Decree to a total of **251.5** permanent allocated FTEs current FY.
    - County ACH Mental Health & Administrative staff has increased from **50.3 (FY 17/18)** pre-Consent Decree to a total of **133.8** allocated positions current FY.
    - As of 05/08/2024, the total vacancy rate for:

- ACH Medical and Administrative staff is currently at **7%**
- ACH Mental Health staff is currently at 13.6% as of 6/5/2024**.**
  o ACH receives monthly SSO escort schedule and has meeting 10 days before the start of each month. Theses meetings will ensure SSO and ACH coordinate staffing to better align with medical n eeds, and confirm the medical staff are available at the same time as escorts.
  o Last minute call offs of both escorts and medical staff assignments will be coordinated with all service lines.

The following tables outline staffing enhancements to date by fiscal year pre-Consent Decree to date:

**Medical**

| Medical Health Care Staffing Augmentation | |
|---|---|
| **Fiscal Year** | **Staffing** |
| FY 2018/19 (Midyear) | 12 FTEs<br><br>• 1 FTE Physician<br>• 1 FTE Dentist<br>• 1 FTE Pharmacist<br>• 1 FTE Pharmacy Technician<br>• 4 FTE Registered Nurses (RN)<br>• 4 FTE Licensed Vocational Nurses (LVN) |
| FY 2019/20 | 12.0 FTEs<br><br>• 4 FTE Quality Improvement (QI) Team –<br>  1 Planner, 1 RN, 2 Administrative Services Officers I<br>• 4 FTE – 2 Physicians, 2 Medical Assistants (MA)<br>• 2 FTE Supervising RNs<br>• 2 FTE Senior Office Assistants (SROA) |

| Medical Health Care Staffing Augmentation | |
|---|---|
| **Fiscal Year** | **Staffing** |
| FY 2020/21<br><br>*Budget hearings were delayed until September.* | 13.0 FTEs<br><br>• 2 FTE Physicians *(midyear)*<br>• 5 FTE Registered Nurses (3 sick call, 1 discharge planning, 1 chronic care)<br>• 1 FTE Medical Assistant<br>• 1 FTE Dental Hygienist (replaces registry staff)<br>• 1 FTE Pharmacist<br>• 1 FTE Pharmacy Technician<br>• 1 FTE Administrative Services Officer III (Electronic Health Record)<br>• 1 FTE Administrative Services Officer II (Contracts) |
| FY 2021/22 | 29.0 FTEs<br><br>• 2.0 FTE Supervising Registered Nurse (Infection Prevention Coordinator to replace behind the RCCC SRN position / Nurse Educator)<br>• 6.0 FTE Registered Nurses (Sick Call – 2, Chronic Care – 3, QI - 1)<br>• 9.0 FTE Licensed Vocational Nurses (Infection Prevention – 2, Pill Call - 2, Pill Call/Medication Assisted Treatment Program – 4, Discharge Planning -1)<br>• 1.0 FTE Medical Assistant (Discharge Planning)<br>• 1.0 FTE Pharmacist (expansion of hours)<br>• 1.0 FTE Pharmacy Technician (expansion of hours)<br>• 6.0 FTE Registered Dental Assistants (replace registry staff)<br>• 1.0 FTE Planner (remedial plan support)<br>• 2.0 FTE Senior Office Assistants (medical records) |

| Medical Health Care Staffing Augmentation ||
|---|---|
| **Fiscal Year** | **Staffing** |
| FY 2022/23<br><br>*Budget Approved 06/09/22* | 39.0 FTE<br><br>• 11.0 FTE Registered Nurses (includes various needs such as substance use, withdrawal monitoring, chronic care, sick call, intake and discharge planning)<br>• 6.0 FTE Licensed Vocational Nurses for medication administration including Medication Assisted Treatment and services for patients in medical housing.<br>• 8.0 FTE Medical Assistants for discharge planning, infection prevention, assisting medical provider visits, and tracking ADA/durable medical equipment.<br>• 1.0 FTE Office Assistants to assist nursing with phone calls, medical paperwork, and collection of data from nursing/custody.<br>• 1.0 FTE Senior Physician Management will serve under the Medical Director for the RCCC activities.  Assists with Medical Director span of control, direct onsite supervision of physicians/nurse practitioners at RCCC and oversight of clinical services.  Provides back-up during Medical Director's absence.<br>• 1.0 FTE Physician 3 for Chronic Care disease management.  Provides ongoing care for patients needing ongoing chronic care planning and services.<br>• 1.0 FTE Nurse Practitioner for initial history and physical exams.  Must provide the assessment then refer internally for acute care follow-up or ongoing chronic care disease management.<br>• 1.0 FTE Dentist 2 to establish permanent resource and bridge the gap in the expanded operations of the dental clinic at both facilities.<br>• 3.0 FTE Pharmacist and 3.0 FTE Pharmacy Technician to enhance implementation of blister packing medication to meet compliance for "keep on patient" medications and will complete cart fill/pill call preparation in a timely and efficient manner.<br>• 1.0 FTE Health Program Manager, 1.0 FTE Sr. OA and 1.0 FTE Administrative Services Officer 1 for the expansion of administrative services that support the Medical and Mental Health operations. |

| Medical Health Care Staffing Augmentation | |
| --- | --- |
| **Fiscal Year** | **Staffing** |
| FY 2023/24<br><br>Budget Approved 6/7/2023 | 12.0 FTE<br><br>• 2.0 FTE RN DCF Lv2 for Nurse Intake and Chronic Care Management at Main Jail.<br>• 1.0 FTE SRN DCF onboarding, training, evaluate and hiring in nursing unit.<br>• 1.0 FTE Health Program Coordinator, supervises MAs(registry/County) and Admin clerical support at the facilities, oversees the admin tasks/operational at MJ and RCCC.<br>• 2.0 FTE Medical Assistants – assist providers, physician, and NP, including labs, ensuring medical supplies are ordered and stocked, monitor and ensure sanitation of exam rooms and medical equipment, report damage medical equipment, track and communicate DMEs, etc. to custody etc.<br>• 2.0 FTE Pharmacist – provide treatment for chronic condition under CPA<br>• 1.0 FTE MH Program Coordinator – clinical contracts and monitoring including MH UCD contract.<br>• 1.0 FTE RN DCF Lv 1 – Case management nurse support<br><br>2.0 FTE Sr. OA – admin operations support |

• The County has increased positions for Medical staff from **118.5** FTEs in FY 2017/18 to **225.5** FTEs in FY 2023/24.
• The permanent medical positions *do not include* County On-Call, Registry, or contracted onsite Specialty care staff.
• Permanent staff augmentations decrease the need for temporary staff and provide continuity of services, teamwork, and increased stability.
• The FTEs above do not include ACH Administrative staff.

See the following tables for updated County Medical and Administrative vacancies:

| 06/04/2024 | | | |
| --- | --- | --- | --- |
| **Classification** | **Vacancies** | **Background** | **Vacancy Rate** |
| Medical Assistant Level | 2 | 0 | 9% |

| Licensed Vocational Nurse | 10 | 1 | 24% |
|---|---|---|---|
| Registered Nurse | 3 | 2 | 4% |
| Supervising Registered Nurse | 2 | 1 | 11% |
| Physician 3 | 1 | 0 | 11% |
| **Total for Medical** | **18** | **4** | **9%** |
| **Administration** <br> **Vacant Positions as of 12/05/23** | | | |
| **Classification** | **Vacancies** | **Background** | **Vacancy Rate** |
| Sr. Office Assistant | 1 | 0 | 10% |
| Office Assistant Lv 2 | 1 | | 20% |
| **Total for Administration** | **2** | | **5%** |

**Mental Health**

Mental health services are provided under a contract with UC Davis Department of Psychiatry and Behavioral Sciences.  The following charts show contract augmentations to pre-Consent Decree to date:

| Mental Health Contract Augmentation | | |
|---|---|---|
| **Fiscal Year** | **Program Additions** | **Staff Augmentation** |
| FY 2017/18 | 20 Intensive Outpatient Program (IOP) Beds (male) – MJ | LCSW Supervisor (1.0) <br><br> SW1 (4.0) <br><br> Psychologist II (1.0) |

| Mental Health Contract Augmentation | | |
|---|---|---|
| **Fiscal Year** | **Program Additions** | **Staff Augmentation** |
| | | Psychiatrist/NP (10%) |
| FY 2018/19 (Midyear) | 24/7 Licensed Clinical Social Worker (LCSW) Coverage - MJ | LCSW Supervisor (1)<br>LCSW (4) |
| FY 2019/20 | 15 IOP Beds (female) - MJ | LCSW Supervisor (.40)<br>Psychologist II (.20)<br>LCSW (.50)<br>SW 1 (3)<br>NP/Psychiatrist (.40) |
| | 24 IOP Beds (male) - RCCC | LCSW Supervisor (.50)<br>Psychologist II (.20)<br>LCSW (2.0)<br>SWI (2.5)<br>HUSC (1.0)<br>NP/Psychiatrist (.80) |
| | 24/7 LCSW Coverage - RCCC | LCSW Supervisor (1.0)<br>LCSW (3.0) |

| Mental Health Contract Augmentation | | |
|---|---|---|
| **Fiscal Year** | **Program Additions** | **Staff Augmentation** |
| FY 2020/21 (Midyear) | Outpatient Mental Health Services was expanded to include mental health services, medication evaluation and monitoring, case management, and discharge planning for the Outpatient Psychiatric Pod (OPP) – adding a new level of service.  Will serve approximately 125 patients at any given time. | LCSW Supervisor (1.0) LCSW (2.0) SWI (2.5) |
| FY 2021/22 | Enhanced outpatient (EOP) mental health services in the OPP was expanded to provide services to an additional 150 patients requiring intensive services. This expansion will increase services by 275 patients, creating a total EOP service provision of 400 patients. | LCSW Supervisor (1.0) LCSW (3.0) SWI (8.0) RN (.50) |
| FY 2021/22 Mid-year Reallocation | Increased Intensive Outpatient Program beds to include 24 male high security/high acuity beds at RCCC and an additional 8 female beds at MJ. Redirected staff from EOP to support expansion of IOP. | LCSW (2.0) MSW (3.0) |
| FY 2022/23 *Budget approved 06/09/22* | Contract augmentation includes additional staffing for the following: 1. Complete reviews and recommendations for patients with mental illness pending discipline and/or administrative segregation. 2. Expand mental health services for patients in the Acute Psychiatric Unit. 3. Add staffing for constant observation of patients on suicide precautions. | LCSW Supervisor (2.0) LCSW (8.0) SWI (5.0) MH Worker (16.0) |

| Mental Health Contract Augmentation | | |
|---|---|---|
| **Fiscal Year** | **Program Additions** | **Staff Augmentation** |
| FY 2023/24 | Enhance Outpatient program and treatment planning for patients on MH caseload to increase patients served by 125 (total 525) and provide services 7 days a week. | LCSW Supv (0.5) LCSW (1.0) SW1 (4.0) NP (1.0) Total 6.5 |
| | Early Access Stabilization Services (EASS) – implemented 9/1/23 | LCSW (0.5) LCSW (2.0) Psychologist II (1.5) NP (2.0) AAIII (1.0) Psychiatrist (0.5) Total 7.5 |

The County has increased funding for additional positions for Mental Health staff from $11,603,681 in FY 2017/18 to $27,491,906 in FY 2023/24.

See the following tables for updated Adult Correctional Mental Health vacancies:

| Jail Facilities Mental Health Vacancy Rates Vacant Positions as of 6/5/2024 | | |
|---|---|---|
| **Title** | **Vacancies** | **Vacancy Rate** |
| Admin Assistant III | 0 | 0 |

| Administrative Officer 3 | 0 | 0 |
|---|---|---|
| Behavioral Health Psychiatric Supervisor | 0 | 0 |
| Hospital Unit Service Coordinator | 0 | 0 |
| LCSW Supervisor | 0.8 | 7% |
| Licensed Clinical Social Worker | 9* | 22% |
| Medical Director | 0 | 0 |
| Mental Health Worker | 0 | 0 |
| Nurse Practitioner | 1 | 13% |
| Program Manager | 0 | 0 |
| Psychologist 1 | 0 | 0 |
| Psychologist 2 | 2 | 33% |
| Social Worker I | 5** | 14% |
| Psychiatrist | 0 | 0 |
| **Total all positions** | **17.8** | **13.6%** |
| **Total minus positions on hold**<br>* 3 LCSW vacancies on hold per ACH<br>** 4 SWI vacancies on hold per ACH | **10.8** | **8.3%** |

**Staffing Efforts**

- Recruitment & Hiring:  Managers and supervisors for Medical and Mental Health continue hiring and onboarding staff on an ongoing basis.  ACH nursing has seen a rise in applicants in the last six months and are encouraged by the level of interest. Hiring remains a high priority.
- Position control and vacancy reports are regularly updated and monitored by ACH Administration.
- Staffing Analysis:
    - Class Counsel requested a staffing analysis which was submitted November 2021.

- o   Medical Experts requested an updated and more thorough Staffing Analysis of Medical staff.
- o   ACH secured a contract with a third-party consultant to complete the required Staffing Analysis. A Nurse consultant referred by the medical SME has expertise in County Jail staffing analyses and was originally contracted to begin January 2024. However, she assisted with other high-priority projects first, and due to budget constraints, we had to stop services prior to the staffing analysis completion. The new Interim Nursing Director will focus on this requirement in the upcoming monitoring period.

| **Mental Health Data Posting**<br>**(Section II; Provision C.)** |
| --- |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: N/A** |

**Mental Health Data Posting**

C.  The parties agree to meet and confer regarding the gathering and posting of data related to the Jail population. The parties agree that the categories of information to be gathered and publicly posted on a quarterly basis are the following:
   a)  the number of people with mental illness booked into jail;
   b)  their average length of stay;
   c)  the percentage of people connected to treatment;
   d)  their recidivism rates;
   e)  the total number of people in jail with a mental health need;
   f)  the number of people who were receiving mental health services at the time of booking; and
   g)  the number of sentenced and unsentenced inmates in custody.
   h)  For sentenced people in the jail, the nature of the commitment convictions, length of sentence(s), and level of mental health care (e.g., Acute, IOP, OPP).
   i)  For unsentenced people in the jail, the nature of the charges, length of pre-trial detention, and level of mental health care (e.g., Acute, IOP, OPP).

**Compliance Status by Section:**

- II.C. PARTIAL COMPLIANCE
    - II.C.a. – c. e.-f. The following categories of information are gathered and publicly posted on a quarterly basis to the County SSO's Transparency page:
        - The number of people with mental illness booked into jail.
        - Average length of stay.
        - Percentage of people connected to treatment.
        - Total number of people in jail with a mental health need.
        - Number of people who were receiving mental health services at the time of booking.
    - Point-in-time data reports are posted quarterly with email notification to Class Counsel.  See SSO Transparency page for information related to the Corrections Consent Decree: https://www.sacsheriff.com/pages/transparency.php.

A brief summary of quarterly data is listed in the following table through 3/27/24:

| Jail Average Daily Population (ADP) & Mental Health Quarterly Data – Point in Time | | | | | | |
|---|---|---|---|---|---|---|
| **Report Date** | **1/2/23** | **4/3/23** | **6/28/23** | **9/27/23** | **12/27/23** | **3/27/24** |
| **ADP** | 2888 | 2938 | 3081 | 3157 | 2939 | 2967 |
| **Adult Correctional Mental Health** *Mental Health Services Provided while Incarcerated* | | | | | | |
| No Mental Health Condition | 1211 (42%) | 893 (30%) | 1049 (34%) | 1023 (32%) | 718 (24%) | 748 (25%) |
| Non-SMI* Mental Health Condition | 822 (28%) | 1083 (37%) | 1080 (35%) | 1135 (36%) | 1196 (41%) | 1172 (40%) |
| SMI* | 855 (30%) | 962 (33%) | 952 (31%) | 999 (32%) | 1025 (35%) | 1047 (35%) |
| **County Division of Behavioral Health Services** | | | | | | |

| Mental Health Services Provided while in the Community Prior to Incarceration | | | | | | |
|---|---|---|---|---|---|---|
| **Mental Health Outpatient Services** | | | | | | |
| Open | 27 (3%) | 42 (7%) | 54 (9%) | 86 (88%) | 78 (69%) | 65 (48%) |
| Discharged | 512 (97%) | 579 (93%) | 570 (91%) | 12 (12%) | 35 (31%) | 70 (52%) |
| **Mental Health Full Service Partnership (FSP)** | | | | | | |
| Open | 50 (31%) | 48 (30%) | 45 (25%) | 43 (68%) | 59 (66%) | 73 (66%) |
| Discharged | 109 (69%) | 113 (70%) | 137 (75%) | 20 (32%) | 30 (34%) | 38 (34%) |
| **Substance Use Prevention & Treatment (SUPT)** | | | | | | |
| Open | 21 (7%) | 30 (8%) | 17 (5%) | 4 (18%) | 17 (35%) | 15 (60%) |
| Discharged | 277 (93%) | 331 (92%) | 351 (95%) | 18 (82%) | 31 (65%) | 10 (40%) |

*\*SMI - serious mental illness*

Findings:

- The overall ADP has gradually increased from 2888 in January 2023 to 2967 in March 2024.
- The percentage of SMI population served by ACH MH is an average of 33%. This is an increase from the previous status report's (June 2023) average of 31%.
- The percentage of Non-SMI patients with a mental health condition increased dramatically from 28% in January 2023 to 40% in March 2024.
- Along with the gradual increase of the ADP from January 2023 to March 2024, the percentage of patients with SMI has increased from 30% in January 2023 to 35% in March 2024.
- See County Efforts to Reduce the Jail Population for services that are active or in development at the end of this report.

## III. AMERICANS WITH DISABILITIES (ADA)

### Policy & Procedures
**(Section III; Provision A.)**

| ACH Status: SUBSTANTIAL COMPLIANCE |
| --- |
| SSO Status: PARTIAL COMPLIANCE |

### A.  Policies and Procedures

1. It is the County's policy to provide access to its programs and services to prisoners with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests. No prisoner with a disability, as defined in 42 U.S.C. § 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities or be subjected to discrimination. The County's policy is to provide reasonable accommodations or modifications where necessary, consistent with 28 C.F.R. §§ 35.150 & 35.152, and other applicable federal and state disability law.
2. The County shall, in consultation with Plaintiffs' counsel, revise its Operations Order to establish standard and consistent procedures for the Jail to ensure compliance with the ADA and the remedial provisions outlined herein.
3. The County shall, within 12 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, revise policies, procedures, and inmate orientation materials (e.g. Inmate Handbook), in accordance with the revised Operations Order and the remedial provisions outlined herein. A list of policies which the County will revise consistent with the provisions outlined herein, as appropriate and in consultation with Plaintiffs' counsel, is attached as Exhibit A-1.
4. All staff will receive training appropriate to their position on policies and procedures related to compliance with the Americans with Disabilities Act (ADA) and related disability laws.

All policies, forms, and training materials have been approved by Class Counsel/Experts except where noted as (*pending review*)

**Policies:**

- See appendix for all policies.

**Forms:**

- Grievance Form and Appeal Form (revision 12/01/21) – *Pending review by MH Expert*
- Disabilities Screening Template (EHR) – *Final*
- Effective Communication Template (EHR; revision 08/31/21) – *Final*
- Alta Regional Center Referral Form (10/2021) – *Final*
- Mental Health Adaptive Support Survey (05/2022) – *Final*
- Mental Health Adaptive Support Program Screener (05/2022) – *Final*
- Refusal Form – *In review based on feedback*
- Health Services Request form – *In revision*

**Compliance Status by Section:**

- III.A.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - See County policies in appendix.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - The Sheriff's Office has engaged in several steps, some through policy revision, others through practice to ensure all inmates receive equal access regardless of disability.  Notably, the Compliance Unit, through tracking mechanisms, and personal visits, ensures equal access and effective communication on an individual basis for all inmates with disabilities.  Practices involving lower bunks and lower tiers have been modified to ensure the maximum number of beds are available for those needing accommodations.  Patients identified with mobility issues are escorted in or with the proper DME to ensure they are not denied equal access to facilities, programs and services.
- III.A.2.
  - ACH Status: N/A
  - SSO Status: PARTIAL COMPLIANCE

- ▪ In corroboration with Class Council the Sheriff's Office is continually revising and promulgating Policies and Procedures to ensure compliance with the ADA and remedial provisions.

- III.A.3.
  - ○ ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ See County policies above and ACH Mays Policy Tracker (Attachment 1).
  - ○ SSO Status: PARTIAL COMPLIANCE
    - ▪ SSO is continually revising Policies and Procedures to ensure compliance. See SSO Policies and Procedures in appendix.

- III.A.4.
  - ○ ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ All ACH staff have received training on policies and procedures related to compliance with ADA and continues to be part of ACH onboarding of new staff.
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ All staff assigned to corrections (sworn staff and records officers) are assigned consent decree training since September of 2021. As new hires begin their employment, they are assigned the training and must attest to the completion of the training.
    - ▪ ADA/Medical accommodations have been added to Jail Ops, which is in service training required for all new hires.

| ADA Tracking |
|---|
| **(Section III; Provision B.)** |
| **ACH Status: SUBSTANTIAL COMPLIANCE** |
| **SSO Status: SUBSTANTIAL COMPLIANCE** |

**B. ADA Tracking System**

1. The County shall develop and implement a comprehensive system (an "ADA Tracking System") to identify and track screened prisoners with disabilities as well as accommodation and Effective Communication needs.
2. The ADA Tracking System shall identify:
   a. All types of disabilities, including but not limited to psychiatric, intellectual, developmental, learning, sensory, mobility, or other physical disabilities, and special health care needs;
   b. Prisoners with disabilities that may pose a barrier to communication, including but not limited to learning, intellectual, or developmental disabilities, and hearing, speech, or vision impairments;
   c. Accommodation needs, including as to housing, classification, Effective Communication, adaptive supports, and assistive devices;
   d. Prisoners who require specific health care appliances, assistive devices, and/or durable medical equipment (HCA/AD/DME);
   e. Prisoners who are class members in Armstrong v. Newsom (N.D. Cal. No. 94-cv-02307), with their applicable disability classification(s) and accommodation need(s).
3. The ADA Tracking System's prisoner disability information will be readily accessible to custody, medical, mental health, and other staff at the Jail who need such information to ensure appropriate accommodations and adequate program access for prisoners with disabilities.

**Policies:**

- See appendix for policies.

**Compliance Status by Section:**

- III.B.1.
   - ACH Status: SUBSTANTIAL COMPLIANCE

- ▪ The County has developed and implemented a comprehensive system (an "ADA Tracking System") in SSO's jail management system (ATIMS) to identify and track screened patients with disabilities as well as accommodation and Effective Communication needs.
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ During the last monitoring period, the Sheriff's new Jail Management System (JMS), went live. ATIMS has the ability to communicate with Adult Correctional Health (ACH) Electronic Health Record (EHR) system. This allows data to be shared between the systems and alert Sheriff users of the incarcerated person's ADA and Effective Communication needs.
    - ▪ These alerts are prominent on the system and can be customized depending on the requests and needs of stake holders.
- • III.B.2.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ The ADA Tracking System in ATIMS identifies all areas outlined as required in the Remedial Plan, including disability type/special health care needs, communication needs, accommodation needs, healthcare assistive devices, and/or durable medical equipment needed (HCA/AD/DME) and class members in Armstrong v. Newsom (N.D. Cal. No. 94-cv-02307), with their applicable disability classification(s) and accommodation need(s).
    - ▪ ACH developed and implemented a DME note for staff to use when delivering and/or collecting DME from a patient. This allows staff to easily determine if and when DME was actually given to a patient, which enhances our DME tracking abilities.
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ a) ATIMS displays the information enumerated in this section to Sheriff employees. The information is entered by either the Sheriff's Compliance Unit (ATIMS person alert flags) or can be entered by ACH through their EHR program (medical alert flags).
    - ▪ b) The ATIMS medical alert flags below are used to identify the disabilities that may pose a barrier to communication enumerated in this section.
      - • Developmentally disabled
      - • Effective communication – other
      - • Hearing impairment description

- Intellectual disability
- Learning disability
- Speech impairment description
- Vision impairment description
    - c) All inmates are screened and accommodations identified are displayed and tracked on ATIMS.
- III.B.3.
    - ACH Status: SUBSTANTIAL COMPLIANCE
        - The ADA Tracking System in ACH EHR and SSO's ATIMS is readily accessible to SSO Custody, ACH Medical, ACH Mental Health, and other staff at the Jail who need such information to ensure appropriate accommodations and adequate
        - program access for patients with disabilities.
        - ACH developed and refined EHR templates for screening and documenting disabilities and accommodations. These forms permit ongoing changes if the accommodation status needs to be modified.
        - A Medical Assistant (MA) has been assigned to review the EHR and verify accommodations have been provided and notify Nursing and/or a Provider to assess patient if not. If not, the MA notifies Nursing and/or a Provider to assess patient.
        - Interfaces between EHR and Sheriff's Office (SSO) jail management system (ATIMS) system are designed to support communication in this area.
        - Providers have been instructed to schedule provider follow-ups with patients prior to their DME prescription expiring (ex. Crutches for 3 weeks). If it is determined that the patient continues to need the device/equipment, the order will be extended. SSO does not take away equipment from the patient even if it shows expired in their system. They will coordinate with medical staff to determine if the accommodation is still needed. If not, medical staff will collect the equipment.
    - SSO Status: N/A

| ADA Coordinator |
|---|
| **(Section III; Provision C.)** |
| ACH Status: N/A |
| SSO Status: PARTIAL COMPLIANCE |
| **C. ADA Coordinator**<br><br>1. The County shall have a dedicated ADA Coordinator at each facility.<br>2. The ADA Coordinator position shall be dedicated to coordinating efforts to comply with and carry out ADA-related requirements and policies, shall have sufficient command authority to carry out such duties, and shall work with the executive management team regarding ADA-related compliance, training, and program needs.<br>3. The County shall clearly enumerate, in consultation with Plaintiffs' counsel, the job duties and training requirements for the ADA Coordinator position for ADA Deputies assigned to support the ADA Coordinator position.<br>4. The County shall ensure that ADA Coordinators and ADA Deputies possess requisite training to implement and ensure compliance with the Jail's disability program and services, including operating of the ADA Tracking System. |

**Compliance Status by Section:**

- III.C.1.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Both positions overseen by the Compliance Commader at each facility.
- III.C.2.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Both positions overseen by the Compliance Commader at each facility.
- III.C.3.
  - ACH Status: N/A
  - SSO Status: PARTIAL COMPLIANCE
    - This item is pending the approval and completion of the ADA policy. It is being worked on by the team assigned to the Lexipol project.

- III.C.4.
  - ○ ACH Status: N/A
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Main Jail Compliance attended the Winter 2021 training presented by the great plains ADA Center. They also had in house training in March. RCCC Compliance Unit has attend all available ADA training presented by the National ADA center with the exception of 2020.  RCCC Compliance team attended Crisis Intervention Training and attended the ADA coordinator training in winter of 2022 as well as the ADA Symposium virtual training in May of 2022.   All deputies assigned to corrections receive training in Module 8.0 (Adult Corrections Supplemental Core Course). Same for both facilities. Main Jail Compliance team attended Great Plains ADA Center training in February 2022. All staff continues to attend mandatory ADA training through our AOT cycle. RCCC Compliance team attended Crisis Intervention Training and attended the ADA coordinator training in winter of 2022 as well as the ADA Symposium virtual training in June 2023.  All deputies assigned to corrections receive training in Module 8.0 (Adult Corrections Supplemental Core Course). Same for both facilities. Main Jail Compliance team attended Great Plains ADA Center training in February 2022. All staff continues to attend mandatory ADA training through our AOT cycle.

| Screening for Disability & Disability-Related Needs |
| :---: |
| **(Section III; Provision D.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: N/A |

**D. Screening for Disability and Disability-Related Needs.**

1. The County shall conduct adequate screening of prisoners to be housed in the Jail in order to identify disabilities and disability-related accommodation, housing, classification, and other needs. All individuals detained at the Jail for any period of time will be assessed for Effective Communication needs, consistent with the provisions herein.
2. The County shall take steps to identify and verify each prisoner's disability and disability-related needs during medical intake screening, including based on:
   a) The individual's self-identification or claim to have a disability;
   b) Documentation of a disability in the individual's health record;
   c) Staff observation that the individual may have a disability that affects placement, program access, or Effective Communication; or
   d) The request of a third party (such as a family member) for an evaluation of the individual for an alleged disability.

**Policies:**

- See appendix for policies.

**Audits and Reports:**

- RN Intake Audit – ADA Identification and Documentation
- RN Intake Audit– Referrals Initiated as Indicated
- Nurse Intake Report

**Compliance Status by Section:**

- III.D.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - County ACH conducts an Intake Health Screening for anyone who will be housed in the Jails. The Health Intake Screening includes forms and questions to identify essential information regarding disabilities,

accommodations, and effective communication needs consistent with policy and this Remedial Plan requirement. All individuals detained at the Jail for any period of time will be assessed for Effective Communication needs, consistent with the provisions herein.

- o SSO Status: N/A

- III.D.2.
  - o ACH Status: PARTIAL COMPLIANCE
    - <u>III.D.2.a. – d.</u> ACH's Health Intake Screening process includes forms and questions to identify and verify disability-related needs based on an individual's self-identification or claim to have a disability; documentation of a disability in the individual's health record; staff observation, or collateral (family report) information – information that indicates someone may have a disability that affects housing needs, program access, or Effective Communication needs.
    - Intake training is provided to Intake Registered Nursing (RNs) annually.
    - Automatic referrals or prompts are triggered at intake based on responses to specific questions to mental health for post-intake assessment of psychiatric, developmental, or intellectual disabilities.
    - ACH QI conducts quarterly ADA audits. Over time, intake nurses have improved with respect to identifying and documenting disabilities and related needs.
    - Staff developed and refined a tool to audit disabilities, accommodations, and effective communication.
    - Audits are completed regularly, the most audit covers the 3rd Quarter of FY 23/24. Data indicates that staff are improving with regard to identifying and documenting disabilities, accommodations, and effective communication.
    - Audits will continue on a regular basis and data/trends will be reviewed for errors, systemic issues, and opportunities to improve detection and create individualized care plans. Data is reviewed during QIC meetings.
    - See the table below for a comparison of an early audit with the most recent audit.
    - To reduce barriers to care due to communication issues, in January 2024, ACH ensured that every patient facing computer/tablet had access to the Language Line app which provides access to interpretation services in various languages—including American Sign Language. Additionally, we installed web cameras on every computer and had an individual from the Language Line company provide an in person training to our providers and nurses. The training was recorded and is available for all ACH and ACMH staff to review at any given time.
  - o SSO Status: N/A

| Indicator – *Intake RN action on disability-related information* | Data Period – *Intakes completed on:* | | | | |
|---|---|---|---|---|---|
| | February 2023 | May 2023 | August 2023 | November 2023 | February 2024 |
| ADA Assessment form complete and accurate | 22/23 (96%) | 16/23 (67%) | 33/33 (100%) | 22/30 (73%) | 14/31 (45%) |
| Effective Communication (EC) form complete and accurate | 22/23 (96%) | 23/24 (96%) | 33/33 (100%) | 30/30 (100%) | 31/31 (100%) |
| Housing accommodation provided when needed | 15/23 (65%) | 8/12 (67%) | 3/10 (30%) | 4/4 (100%) | 18/20 (90%) |

| | | | | | |
|---|---|---|---|---|---|
| Assistive device ordered when needed | 4/4 (100%) | 5/10 (50%) | 3/6 (50%) | 2/3 (67%) | 3/3 (100%) |
| Referred to MH when needed | 17/20 (85%) | 16/17 (94%) | 10/14 (71%) | 10/11 (91%) | 6/7 (86%) |
| Referred to provider when needed | 15/23 (65%) | 11/12 (92%) | 4/5 (80%) | 7/7 (100%) | 5/7 (71%) |

| **Orientation** |
|---|
| **(Section III; Provision E.)** |
| ACH Status: N/A |
| SSO Status: PARTIAL COMPLIANCE |

**E. Orientation**

1. The County shall ensure that, for the population to be housed in the Jails, prisoners with disabilities are adequately informed of their rights under the ADA, including but not limited to:
   a) Accoomodations available to prisoners;
   b) The process for requestins a reasonable accommodation;
   c) The role of the ADA coordinator(s) and method to contact them;
   d) The grievance process, location of the forms; and process for getting assistance in completing grievance process;
   e) Instructions on how prisoners with disabilities can access health care services, including the provision of Effective Communication and other accommodations available in accessing those services.
2. Upon processing and classification, prisoners with disabilities shall receive, in an accessible format, the jail rulebook; orientation handbook; and a verbal orientation or orientation video regarding rules of expexctations.
3. The County shall accommodate individuals with disabilities in the orientation process through the use of alternative formas (e.g. verbal communication, large print, audio/video presentation), when necessary for Effective Communication of the information.

4. The County shall develop an Americans with Disabilities Act Inmate Notice.  The Notice shall be prominently posted in all prisoner housing units, in the booking/intake areas, in medical/mental health/dental treatment areas, and at the public entrances of all Jail facilities.

**Compliance Status by Section:**

- III.E.1.
  - ACH Status: N/A
  - SSO Status: Substantial Compliance
    - This function is performed by Compliance Officers on an as needed basis.  Every inmate sees a pre-recorded effective communications orientation video on their tablet as well as a video orientation played in dress-in tanks. There is signage posted in Intake/Booking and in all housing units/ADA contact info is in the handbook/ADA hotline recording. RCCC and Main Jail advise through the inmate handbook in addition to the mentioned signage. This information will also be part of the "inmate orientation" during the booking/intake process.
      - a) This function is performed by Compliance Officers on an as needed basis.  The inmate handbook contains information how to obtain a request form. The most up to date Jail handbook is available on every inmate tablet. RCCC and Main Jail inmates can fill out a health services request with ACH or a message request to SSO compliance.
      - b) This function is performed by Compliance Officers on an as needed basis. There is signage posted in Intake/Booking and in all housing units. ADA contact info is in the inmate handbook, including the ADA hotline number. The handbook outlines the process necessary to request accommodations. Accommodations are made through a medical order and monitored by the compliance unit.
      - c) This function is performed by Compliance Officers on an as needed basis.  Main Jail and RCCC inmates can dial 232 indicated in the handbook from the pod telephones and/or fill out available kites for communication. Contact information is available on announcements posted through the facility and inmate handbook. ADA policy currently being worked on by Lexipol project teams.
      - d) This function is performed by Compliance Officers on an as needed basis. The inmate handbook identifies the grievance procedure and how to obtain forms.  The handbook is available on all inmate tablets. Contact information is available on announcements posted through the facility and inmate

handbook. This process is included in the handbook that is provided to the inmates upon intake. The Inmate Handbook identifies the grievance procedure and how to obtain forms.

- e) This function is performed by Compliance Officers on an as needed basis. The advisement by ACH upon intake and the general process is listed in the inmate handbook that is provided upon intake and anytime during the inmate's custody period upon their request. Inmates can submit a medical health services request or a request to compliance. An inmate orientation video has been added to inmate tablets.  A project is underway to play this orientation video on a loop in the MJ booking dress-in tanks.

- III.E.2.
  - ACH Status: N/A
  - SSO Status: Substantial Compliance
    - Verbal and written communication presented by compliance officers upon request. The handbook is received at intake and available upon request however, only one format/version of the handbook is available on the inmate tablet. We have the ability to print the Handbook in an 8x11 inch size.
    - Inmates are given a verbal orientation by deputies.  A project is underway to play this orientation video on a loop in the MJ booking dress-in tanks.

- III.E.3.
  - ACH Status: N/A
  - SSO Status: Partial Compliance
    - This function is performed by Compliance Officers on an as needed basis.  We have the ability to print the inmate handbook in an 8x11 inch size.
    - The inmate handbook is on the inmate tablet.  A project is underway to play this orientation video on a loop in the MJ booking dress-in tanks.

- III.E.4.
  - ACH Status: N/A
  - SSO Status: Substantial Compliance
    - There is ADA signage posted in noted areas. The signage is compliant with ADA federal requirements.

| Health Care Appliances, Assistive Devices, Durable Medical Equipment |
|:---:|
| **(Section III; Provision F.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: PARTIAL COMPLIANCE |

**F.  Health Care Appliances, Assistive Devices, Durable Medical Equipment**

1. The County shall establish a written policy to ensure provision of safe and operational HCA/AD/DME, with a process for repair and replacement.
2. The County shall timely provide HCA/AD/DME to prisoners with disabilities who require such assistance. The County shall ensure an individualized assessment by medical staff to determine whether HCA/AD/DME is warranted to ensure equal and meaningful access to programs, services, and activities in the Jail.
3. The County shall allow prisoners to retain personal HCAs/ADs/DME (which will include reading glasses), unless there is an individualized determination that doing so would create an articulated safety or security risk.
   a) Where Jail staff determine it is necessary to remove a prisoner's personal HCA/AD/DME for security reasons, the County shall provide an equivalent Jail-issued device unless custody staff, with supervisory review, determine and document, based on an individualized assessment, that the device constitutes a risk of bodily harm or threatens the security of the facility.
   b) If such a determination is made, the ADA coordinator or supervisory-level designee shall document the decision and reasons for it, in writing, and shall consult with medical staff to determine an appropriate alternative accommodation.
4. The County shall, in consultation with Plaintiffs' counsel, implement a written policy governing the release of prisoners who need assistive devices upon release.
   a)  The County will ensure that any personal mobility device belonging to a prisoner is returned to the prisoner prior to release from custody.
   b) If a prisoner does not have a personal mobility device, but is ambulatory with the assistance of a cane, crutch, or walker, the prisoner will be permitted to retain such device that was used while in custody upon release, or will be provided a comparable device, upon release.
   c) If a prisoner who is due for release requires a wheelchair, but does not have a personal wheelchair, Jail staff shall coordinate with the prisoner, the prisoner's family or friends, and other County agencies as needed to secure a wheelchair or take other steps to address the individual's needs upon release. The County shall document this process in the ADA Tracking System for purposes of individual tracking and quality assurance.

**Compliance Status by Section:**

- III.F.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - ACH has established a written policy to ensure the provision of safe and operational HCA/AD/DME, with a process for repair and replacement.
  - SSO Status: PARTIAL COMPLIANCE
    - This item is pending the approval and completion of the ADA policy. It is being worked on by the team assigned to the Lexipol project.

- III.F.2.
  - ACH Status: PARTIAL COMPLIANCE
    - Electronic forms were completed to assist in identification and tracking of assistive devices and durable medical equipment (DME).
    - Policy and EHR forms allow providers to select "other" when ordering assistive devices and/or DME in addition to the pre-determined list.
    - Staff developed a process to ensure newly ordered devices are provided to patients in a timely manner. This includes the use of a DME note that is used to track delivery and pick up of the DME.
    - A flag has been created in ATIMS to identify health care appliances, assistive devices, and durable medical equipment.
      - Nursing or Provider staff orders a DME flag in AthenaPractice which transmits to ATIMS.
      - SSO runs a report in ATIMS to show patients with a medical equipment and device flag.
    - The ability to use CPAPs and their availability have long been an area of non-compliance with the jails. Patients in need of CPAP machines were previously housed in the same area (2 East) due to the need for electrical outlets. ACH secured a contract and ordered 20 battery-operated CPAP machines, so that these patients can be housed in the general population.  ACH Medical Director programmed the machines, helped create the workflow and assisted nursing in training staff.  All battery-operated CPAPs are now in use. For this reason, we have freed up needed cells on 2 East. We are able to move patients who are in our 2 Medical infirmary into 2 East, allowing more flexibility to conduct onsite monitoring and reduce send-outs. Maintaining open beds in 2 Medical and 2 East is critical for operations. We are now conducting in-house sleep studies with a contracted specialist, which has created the need for more battery-operated CPAPs. ACH will purchase more with the new budget in July 2024. This provision will be in substantial compliance once the battery-operated CPAP machines distributed to all who need them
      - More patients can now utilize CPAPs in general population.

- o SSO Status: SUBSTANTIAL COMPLIANCE
  - ▪ Under Adult Correctional Health's purview. ACH approves and issues HCA/AD/ DME. When new equipment needs repair ACH provides replacements.
- III.F.3.
  - o ACH Status: N/A
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Medical staff approves/authorizes medical equipment. Medical and custody work together to determine appropriate alternative accommodations when needed for safety reasons.
- III.F.4.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ If a patient who is due for release from custody requires a wheelchair but does not have a personal wheelchair, ACH nursing will, as part of the discharge planning process, coordinate with the patient, the patient's family or friends, and other County agencies as needed to secure a wheelchair, or take other steps to address the patient's needs upon release. Discharge Planning/Reentry nursing staff monitors the above steps to ensure patients who require a wheelchair have one upon release.
      - SSO will return any personal mobility device to the inmate upon release from custody.
      - If a patient does not have a personal mobility device, but is ambulatory with the assistance of a cane, crutch, or walker, SSO will permit the patient to retain such device that was used while in custody or provide a comparable device upon release.
  - o SSO Status: PARTIAL COMPLIANCE
    - ▪ Policy 519 & Procedure 519 were published on 04/18/2024
    - ▪ Current practice-If an inmate does not have a family member or program coordinator available to meet them with the assistive device the require, SSO allows them to be released from the facility with the equipment they require. SSO is still working on documentation in ATIMS for ADA tracking and QA. Custody works together with medical staff and the inmate to ensure all steps are taken to meet the inmates needs upon release.

| Housing Placements |
|---|
| **(Section III; Provision G.)** |
| **ACH Status: N/A** |

| SSO Status: PARTIAL COMPLIANCE |
|---|

**G. Housing Placements**

1. The County shall house prisoners with disabilities in facilities that accmodate their disabilities.
2. The County shall implement a housing assignment system that includes an individualized assessment of each individual's functioning limitations and restrictions, including but not limited to:
   a) The need for ground floor housing;
   b) The need for a lower bunk;
   c) The need for grab bars in the cell and/or shower;
   d) The need for accessible toilets;
   e) The need for no stairs in the path of travel; and
   f) The need for level terrain.
3. Prisoners with disabilities shall be housed in the Jail consistent with their individual security classification. Prisoners prescribed or possessing HCAs/Ads/DME will not automatically be housed in a medical housing unit. Placement in a medical housing unit will be based on individual clinical determination of need for treatment.
4. Classification staff shall not place prisoners with disabilities in:
   a) Inappropriate security classifications simply because no ADA-accessible cells or beds are available;
   b) Designated medical areas unless the prisoner is currently receiving medical care or treatment that necessitates placement in a medical setting; or
   c) Any location that does not offer the same or equivalent programs, services or activities as the facilities where they would be housed abset a disability.

**Compliance Status by Section:**

- III.G.1.
  - ACH Status: N/A
  - SSO Status: Partial Compliance
    - SSO and ACH provides appropriate housing to the fullest extent possible with the structural limitations of the current facilities.
- III.G.2.
  - ACH Status: N/A

- o SSO Status: Partial Compliance
  - ▪ b) SSO accommodates inmate disabilities as recommended by ACH. Through their Electronic Health Record ACH transmits an alert flag to SSO's Jail Management System, ATIMS. The alert flag determines the individuals housing assignment with a lower bunk.
  - ▪ c) All RCCC housing facilities have shower chairs available for inmates upon request from their control and/or floor officers.  MJ 2E & 2M have grab bars; shower chairs on every floor available upon request.  On December 8, 2022 the Sacramento Board of Supervisors approved to build a Jail Intake and health Services Facility (IHSF) as well as make ADA facility improvement to the currently Jail which will include more accessible cells and showers.  While the HISF is on hold, plans are also in place for renovating the Main Jail creating accessible showers and cells for wheelchairs.  Interim measures are being explored to adapt the existing infrastructure for those with accessibility needs.
  - ▪ d) On December 8, 2022 the Sacramento Board of Supervisors approved to build a Jail Intake and health Services Facility (IHSF) as well as make ADA facility improvement to the currently Jail which will include accessible toilets. While the HISF is on hold, plans are also in place for renovating the Main Jail creating accessible showers and cells for wheelchairs.  Interim measures are being explored to adapt the existing infrastructure for those with accessibility needs.
  - ▪ e) SSO accommodates inmate disabilities as recommended by ACH. through their Electronic Health Record ACH transmits an alert to SSO's Jail Management System, ATIMS, the alert determines the individuals need for no stairs. Social and Attorney visits continue to overwhelm the current Main Jail as there is only one Attorney Visit booth, and 2 Social Visit booths without stairs (located on the 2-East housing unit).  RCCC has visit areas and medical areas with no stairs in the path of travel. On December 8, 2022 the Sacramento Board of Supervisors approved to build a Jail Intake and health Services Facility as well as make ADA facility improvement to the currently Jail which will include more accessible cells and showers.  While the HISF is on hold, plans are also in place for renovating the Main Jail creating accessible showers and cells for wheelchairs.  An interim wheelchair accessible attorney visit booth was created in the court booking area which can be used during business hours.
  - ▪ f) SSO accommodates inmate disabilities as recommended by ACH. Through their Electronic Health Record, ACH transmits an alert flag to SSO's Jail Management System, ATIMS, the alert determines the individuals housing assignment with a lower bunk (no climbing).
- III.G.3.
  - o ACH Status: N/A
  - o SSO Status: Partial Compliance

- ▪ SSO and ACH provides appropriate housing to the fullest extent possible with the structural limitations of the current facilities.  Security classification is not determined by disability or HCA/AD/DME; Medical Housing Unit (MHU) housing is determined by ACH based on an individual assessment.  Current practice at Main Jail. Medical housing is determined by ACH, not classification status.
- III.G.4.
  - ○ ACH Status: N/A
  - ○ SSO Status: Partial Compliance
    - ▪ c) RCCC and MJ programs and services are available based on eligibility and classification.  Expansion of Main Jail IOP services are being explored for those with a disability.

| Access to Programs, Services, and Activities |
|---|
| **(Section III; Provision H.)** |
| ACH Status: N/A |
| SSO Status: PARTIAL COMPLIANCE |

**H.  Access to Programs, Services, and Activities**

1. The County shall ensure prisoners with disabilities, including those housed in specialized medical units or mental health units (e.g., OPP, IOP, Acute) have equal access to programs services, and activities available to similarly situated prisoners without disabilities, consistent with their health and security needs.  Such programs, services, and activities include, but are not limited to:
   a) Educational, vocational, reentry, and substance abuse programs
   b) Work Assignments
   c) Dayroom and other out-of-cell time
   d) Ourdoor recreation and fitted exercise equipment
   e) Showers
   f) Telephones
   g) Reading materials
   h) Social visiting
   i) Attorney Visiting
   j) Religious services

> k) Medical, mental health, and dental services and treatment
> 2. The County shall provide reasonable accommodations and modifications as necessary to ensure that prisoners with disabilities have equal access to programs, services, and activites available to similarly situated prisoners without disabilities.
> 3. The County shall develop and implement a written policy for staff to provide appropriate assistance to prisoners with psychiatric, developmental, or cognitive disabilities so that they can fully participate in programs, services, and activities provided at the jail.
> 4. The County shall implement a written policy for staff to provide assistance to prisoners with disabilities in reading or scribing documents.
> 5. The County shall provide equal access to library, recreational, and educational reading materials for prisoners with disabilities, including easy reading and large print books for individuals who require such accommodations.
> 6. The County shall ensure equitable inmate worker opportunities for prisoners with disabilities, including by:
>    a) Ensuring clear job duty statements, with essential functions and specific criteria, for each Worker position;
>    b) Ensuring that medical staff conduct an individualized assessment to identify work duty restrictions and/or physical limitations to facilitate appropriate work/industry assignments and to prevent improper exclusions from work opportunities;
>    c) Providing reasonable accommodations to enable prisoners with disabilities to participate in inmate worker opportunities.

**Compliance Status by Section:**

- III.H.1.
  - ACH Status: N/A
  - SSO Status: PARTIAL COMPLIANCE
    - a) RCCC offers in person learning based on eligibility criteria being met. Reentry programs are not offered to inmates in specialized mental health units.  Same at MJ; we have introduced reentry into the Main Jail and have been mirroring that of RCCC.
    - b) RCCC and MJ work assignments are based on ACH medical clearance and ability to perform the essential functions of the job with or without an accommodation; Reasonable accommodations are made based on ACH recommendation.  Classification assists with filtering eligibility criteria.
    - c) Out-of-cell time determined by the Consent Decree is currently met by all housing facilities at RCCC. Inmates in specialized MH units such as IOP and JBCT receive additional out of cell and dayroom time due to the nature of their

program.  At Main Jail we are at or near the out of cell times on a weekly basis.  The Main Jail Compliance unit conducts weekly audits of out of cell time and publishes these results to all four shifts to ensure continued compliance or highlighting those areas that are nearing compliance.

- d) Recreational schedule is based on security classification and not on the inmate's disability.  At the MJ there is elevator access to the outdoor recreation area for those with disabilities.
- g) SSO recreation staff does not provide reading materials for special needs (Braille, large print) on a regular basis. Occasionally they receive large print books and they distribute them to the inmates. Reading glasses can be purchased through commissary. RCCC and MJ have magnifying cards on commissary.  The compliance teams will provide them on a needs-based assessment as well.  Each inmate has a tablet reading material capable of being magnified to make the text larger.
- h) RCCC current practice.  Social and Attorney visits continue to overwhelm the current Main Jail as there is only one Attorney Visit booth, and 2 Social Visit booths without stairs (located on the 2-East housing unit). Any individual who cannot climb stairs is required to use the visiting area on 2-East.
- i) RCCC Current practice.  MJ has severe limitations as there is only 1 attorney visit booth on a ground floor level.
- k) RCCC and MJ Inmates assigned to specialized MH units (IOP, JBCT) receive additional, individualized, specialized mental health services through their program, in addition to the services provided through ACMH. Health Service Request (HSR) forms are available for additional treatment requests.

- III.H.2.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - RCCC and MJ - Current practice. Programs and activity availability differ based on the inmate's security classification. All inmates participate in activities and programs available to their security classification.
- III.H.3.
  - ACH Status: N/A
  - SSO Status: PARTIAL COMPLIANCE
    - In February 2023 the Sheriff's Office formed a new Legal and Policy Bureau. A Lieutenant position was added to lead the unit. One of the core duties of this unit it to update all policies and procedures to the Lexipol system with a focus on policies and procedures related to the Mays Consent Decree.  Multiple polices have been updated during this monitoring period.
- III.H.4.
  - ACH Status: N/A

- o   SSO Status: PARTIAL COMPLIANCE
  - ▪ In February 2023 the Sheriff's Office formed a new Legal and Policy Bureau. A Lieutenant position was added to lead the unit. One of the core duties of this unit it to update all policies and procedures to the Lexipol system with a focus on policies and procedures related to the Mays Consent Decree.
  - ▪ Staff will assist inmates with disabilities with reading and scribing documents as needed.
- • III.H.5.
  - o   ACH Status: N/A
  - o   SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current practice, including the purchase of keep-on-person magnifiers. Main Jail issues chrono for the following; soft magnifiers; hard one broke; law library has one on hand.
- • III.H.6.
  - o   ACH Status: N/A
  - o   SSO Status: PARTIAL COMPLIANCE
    - ▪ a) RCCC- Job Descriptions completed. Medical will determine if eligible inmates can physically perform the job duties in a safe manner.  MJ has positions in kitchen

| Effective Communication |
| :---: |
| **(Section III; Provision I.)** |
| ACH Status: SUBSTANTIAL COMPLIANCE |
| SSO Status: PARTIAL COMPLIANCE |

**I.      Effective Communication**

1. The County shall assess all individuals detained at the Jail for any period of time for Effective Communication needs, and shall take steps to provide Effective Communication based on individual need.
2. The County's ADA policies shall include comprehensive guidance to ensure Effective Communication for prisoners with vision, speech, hearing, intellectual, learning, or other disabilities. The County shall, in consultation with Plaintiffs' counsel, ensure that sufficient guidance on the provision of Effective Communication is included in Jail custody and health care policies and procedures.
3. Standard for Provision of Effective Communication in Due Process Events and Clinical Encounters
   a.   A higher standard for the provision of Effective Communication shall apply in the following situations:

      i. Due Process Events, including the following:
- Classification processes
- Prisoner disciplinary hearing and related processes
- Service of notice (to appear and/or for new charges)
- Release processes
- Probation encounters/meetings in custody

      ii. Clinical Encounters, including the following:
- Determination of medical history or description of ailment or injury
- Diagnosis or prognosis
- Medical care and medical evaluations
- Provision of mental health evaluations, rounds, group and individual therapy, counseling and other therapeutic activities
- Provision of the patient's rights, informed consent, or permission for treatment
- Explanation of medications, procedures, treatment, treatment options, or surgery
- Discharge instructions

  b. In the situations described in subsection (a), above, Jail staff shall:

      i. Identify each prisoner's disability where there may be a barrier to comprehension or communication requiring reasonable accommodation(s);

      ii. Provide effective reasonable accommodation(s) to overcome the communication barrier; and

      iii. Document the method used to achieve Effective Communication and how the staff person determined that the prisoner understood the encounter, process, and/or proceeding.

4. Effective auxiliary aids and services that are appropriate to the needs of a prisoner with Effective Communication needs shall be provided when simple written or oral communication is not effective. Such aids may include bilingual aides, SLIs, readers, sound amplification devices, captioned television/video text displays, Videophones and other telecommunication devices for deaf persons (TDDs), audiotaped texts, Braille materials, large print materials, writing materials, and signage.

5. In determining what auxiliary aid service to provide, the County shall give primary consideration to the request of prisoner with Effective Communication needs.

6. Education providers (e.g., Elk Grove Unified School District) at the Jail will ensure Effective Communication for prisoners participating in education programs, including by providing necessary assistive equipment and take steps to

accommodate learning strategies of those prisoner-students who have special needs, such as those with developmental, learning, vision, hearing, and speech disabilities.

7. The County shall assist prisoners who are unable to complete necessary paperwork (e.g., related to health care, due process, Jail processes) on their own with reading and/or writing as needed.

8. The County shall permit prisoners, including those who are illiterate, non-English speaking, or otherwise unable to submit written or electronic sick call requests, to verbally request care. Such verbal requests shall immediately be documented by the staff member who receives the request on an appropriate form and transmitted to a qualified mental health or medical professional for response in the same priority as those sick call requests received in writing.

9. The County shall post and disseminate notices, policies, job announcements, and other written material in alternative formats to promote Effective Communication.

**Compliance Status by Section:**

- III.I.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - ACH assesses all individuals for Effective Communication needs and takes steps to provide Effective Communication based on individual need consistent with policy.
  - SSO Status: PARTIAL COMPLIANCE
    - During intake, ACH assesses a need for effective communication. The Sheriff's Compliance Unit can follow up and provide aid. Applicable policy is being written.
- III.I.2.
  - ACH Status: SUBSTANTIAL COMPLIANCE
  - ACH's Effective Communication policy was completed with approval from Class Counsel and court-appointed Experts and modified in 2021 to include additional questions for identifying EC needs and to simplify the language used in the inquiry.
  - SSO Status: PARTIAL COMPLIANCE
    - Applicable policy is in process.
- III.I.3. – 9.
  - ACH Status: SUBSTANTIAL COMPLIANCE

- The Effective Communication (EC) form in ACH's Electronic Health Record (EHR) is the first form to be completed in all clinical encounters and cannot be bypassed. This assists in identifying and tracking patients with effective communication needs, including those that change over time.
- ACH's Effective Communication policy was completed with approval from Class Counsel and court-appointed Experts.  The Effective Communication form captures clinical encounters, which must include all areas identified in this Remedial Plan requirement.
- ACH updated the specialty contract for Audicus hearing services to allow onsite MAs to test for hearing loss. A workflow has been implemented to ensure patients receive hearing aids when medically necessary. ACH also has assistive hearing devices in lieu of hearing aids.

  o SSO Status: PARTIAL COMPLIANCE
- 3. This item is pending the creation and approval of the effective communication order. All policies related to the Consent Decree are currently being drafted by the Lexipol project team.
- 4. VRI system installed at RCCC with the intention of bringing a similar system to the Main Jail. The VRI provides interpretation for SLI as well as multiple spoken languages. Video visitation RFP is in process.  RCCC employs VRS technology, TDD and signage for hearing impaired inmates to communicate with friends and family. The use of SLI is authorized through policy; bilingual aides are also available. MJ has VRS & TDD SLI -no tablet.
- 5. RCCC and MJ offers a variety of auxiliary aids for inmates with effective communication needs and gives primary consideration to the request of the inmate with E.C. needs.
- 6. This item is pending approval of the effective communication order however, the RCCC Compliance Unit tracks inmates with special needs and works with the Elk Grove Unified School District to provide accommodations. VRI has been used to assist in the past. Currently, pending EGUSD response for their practices/policies on this subject.

| Effective Communication and Access for Individuals with Hearing Impairments |
|---|
| **(Section III; Provision J.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: PARTIAL COMPLIANCE |
| **J.   Effective Communication and Access for Individuals with Hearing Impairments** |

1. The County shall develop and implement a policy for newly arrived and newly identified prisoners with hearing disabilities to determine each prisoner's preferred method of communication.
2. Qualified Sign Language Interpreters (SLIs) will be provided during intake and for due process functions, health care encounters, and Jail programming, when sign language is the prisoner's primary or only means of Effective Communication, unless the prisoner waives the assistance of an interpreter and/or delay would pose a safety or security risk.
   a) The County shall maintain a contract or service agreement with interpreter services in order to provide such services for deaf or hearing impaired prisoners. Jail staff will be informed of the availability of contract interpreter services.
   b) Lip reading will not be the sole method of Effective Communication used by staff, unless the prisoner has no other means of communication.
   c) In cases where the use of an SLI is not practicable, or is waived by the prisoner, Jail staff shall employ the most effective form of communication available.
   d) The County will maintain a log of (a) when, for whom, and for what purpose an SLI was used; and (b) when, for whom, and why a SLI was not used for a prisoner with an identified need for SLI services (e.g., prisoner waived SLI or delay would have posed safety or security risk).
   e) When a prisoner waives an SLI, the log must document (a) the method of communication of the waiver, and (b) the method staff used to determine that the waiver was knowing and freely given.
3. Jail Staff shall effectively communicate the contents of the Inmate Handbook and other materials providing information on Jail rules and procedures to all prisoners to be housed in the Jail who are deaf or hard of hearing. For those prisoners for whom written language is not an effective means of communication, Jail Staff may meet this obligation by providing a video of an SLI signing the contents of the Inmate Handbook, along with appropriate technology for viewing, or by providing an SLI to interpret the contents of the Inmate Handbook to the prisoner who is deaf or hard of hearing.
4. The County shall, within 12 months from court approval of the Settlement, make Videophones available for deaf and hard of hearing prisoners. The Videophones shall provide for calls through the use of Video-Relay Services (VRS) at no cost to deaf and hard of hearing prisoners or for calls directly to another Videophone.
5. Deaf/hard of hearing prisoners who use telecommunication relay services, such as Videophone or TDD/TTY machine, in lieu of the telephone shall receive equal access to the Videophone or TDD/TTY services as non-disabled prisoners are afforded for regular telephone usage.

6. The County shall provide deaf/hard of hearing prisoners with additional time for calls using telecommunication relay services, such as a Videophone or TDD/TTY, to account for the fact that signed and typed conversations take longer than spoken conversations. The County shall document the time that each prisoner uses and has access to such equipment.

7. Prisoners who require an SLI as their primary method of communication shall be provided an SLI for education, vocational, or religious programs and services.

8. Public verbal announcements in housing units where individuals who are deaf or hard of hearing reside shall be delivered on the public address system (if applicable) and by flicking the unit lights on and off several times to alert prisoners that an announcement is imminent. This includes announcements regarding visiting, meals, recreation release and recall, count, lock-up, and unlock. Verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, as consistent with individual need. These procedures shall be communicated to prisoners during the orientation process and also shall be incorporated into relevant policies and post orders.

**Compliance Status by Section:**

- III.J.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - ACH developed and implemented an Effective Communication policy for newly arrived and newly identified prisoners with hearing disabilities to determine each prisoner's preferred method of communication.

  - SSO Status: PARTIAL COMPLIANCE
    - This item is pending the creation and approval of the effective communication order. RCCC utilizes VRI services at intake/transfer to communicate with inmates with hearing disabilities. These inmates are referred to the Compliance Unit for individualized assistance and assessment. Same at MJ based on chrono or request.

- III.J.2.
  - ACH Status: PARTIAL COMPLIANCE
    - Qualified Sign Language Interpreters (SLIs) are accessible and provided during Intake and health care encounters. The County maintains a contract with *LanguageLine* interpreter services and patients are informed of this service at all clinical encounters.

- ACH utilizes video interpreting services for patients who need Sign Language Interpretation (SLI).
- All patient facing computers have camera installed and a necessary icon to access the *LanguageLine InSight* application as of February 2024. Only designated computers had them prior to 2024.
- ACH and ACMH received a training on the use of the LanguageLine. The training was provided by a representative of the LanguageLine. The training was recorded and is available to all staff via a shared drive.
- Each MH program area has access to a tablet that is utilized for all *LanguageLine* interactions.

- ACH does not currently track all of the required elements in the J.2.d-e provision. This log will be created and maintained in the upcoming monitoring periods. Currently ACH tracks LanguageLine usage.
- The data below shows Language Line uses per month and by language from January 2024 through June 7 2024.



- o SSO Status: PARTIAL COMPLIANCE
  - RCCC Video Remote Interpreting (VRI) tablets provide live interactive SLI services. The tablet is located in Booking and in the Classification office. The service is available 24/7 for use by officers for any procedure. Same at MJ, through VRS
    - a) RCCC and MJ currently have a contract for live VRI services in addition to contracted services listed in Operations Order 6/14 - Interpreter Services. Information regarding both are available to custody staff.

- b) RCCC and MJ offers a variety of auxiliary aids for inmates with effective communication needs and gives primary consideration to the request of the inmate with E.C. needs.
- c) RCCC Video Remote Interpreting (VRI) tablets provide live interactive SLI services. The tablet is located in Booking and in the Classification office. The service is available 24/7 for use by officers for any procedure. Same at Main Jail through VRS.
- d) RCCC - VRI keeps log by name and x-reference, spoken language and SLI on device. At MJ the floor officer & 2 east officer log in book when VRS is used.
- e) This item is pending the creation and approval of the effective communication order.

- III.J.3.
  - ○ ACH Status: N/A
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ At RCCC and MJ, all inmates are provided with a copy of the inmate handbook however, there is no video with an SLI signing the contents. Assistance would be provided by staff as necessary with the use of the VRI or by reading information needed.
- III.J.4.
  - ○ ACH Status: N/A
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ VRS/VRI system installed at RCCC. VRS at MJ. The VRS is provided at no cost to inmates.
- III.J.5.
  - ○ ACH Status: N/A
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ VRS services were added through Securus contract during this monitoring period.
- III.J.6.
  - ○ ACH Status: N/A
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Telephone calls are not timed.  This is current practice.
- III.J.7.
  - ○ ACH Status: N/A
  - ○ SSO Status: PARTIAL COMPLIANCE

- ▪ This item is pending approval of the effective communication order. RCCC is awaiting a response from EGUSD for policy and practices. All policies related to the Consent Decree are currently being drafted by the Lexipol project team.
- III.J.8.
  - ○ ACH Status: N/A
  - ○ SSO Status: PARTIAL COMPLIANCE
    - ▪ This item is pending approval of the effective communication order however, RCCC has no standard practice for notification. Officers assigned to housing units where a deaf inmate is housed are advised by the Compliance Unit officers of the need for special accommodations regarding verbal announcements. Same at MJ/officers will go to the door if they know they are deaf and need to come out.

| **Disability-Related Grievance Process** |
| :---: |
| **(Section III; Provision K.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: PARTIAL COMPLIANCE** |

**K.  Disability-Related Grievance Process**

1. The County shall implement a grievance system for prisoners with disabilities to report any disability-based discrimination or violation of the ADA, this Remedial Plan, or Jail ADA-related policy, and shall provide a prompt response and equitable resolution in each case.
2. The County shall ensure that the grievance procedures are readily available and accessible to all prisoners.
   a) The County shall make reasonable efforts to ensure all prisoners are aware of the disability grievance procedures, including the availability of accommodations and staff assistance to submit a grievance and/or appeal.
   b) The County shall ensure the prisoners with disabilities have meaningful access to grievance forms, including through provision of staff assistance and large print materials.
3.  Response to Grievances
   a) The County shall develop and implement an ADA grievance process that includes (1) a reasonable timeline for response to ADA-related grievances and appeals, including an expedited process for urgent ADA

grievance (e.g., involving prisoner safety or physical well-being); and (2) provision for interim accommodations pending review of the individual's grievances/appeals.

    b) The County shall ensure that prisoners with communication needs are interviewed and provided assistance as part of the grievance/appeal process where necessary to ensure meaningful access and Effective Communication.

    c) The County shall document each denial of a reasonable accommodation request and shall record the basis for such determination.

    d) The County shall provide in writing a copy of the grievance (or appeal) response to the prisoner, including the resolution, the basis for a denial (if applicable), and the process for appeal.

    e) The County shall ensure that completed grievance responses are effectively communicated to prisoners with disabilities.

4. The submission, processing, and responses for disability-related grievances and complaints shall be tracked.

**Compliance Status by Section:**

- III.K.1
  - ACH Status: PARTIAL COMPLIANCE
    - ACH has implemented a grievance process as outlined in policy approved by Class Counsel and court-appointed Experts where patients with disabilities can report any disability-based discrimination or violation of the ADA, the Remedial Plan, or ACH's ADA policy.  This item will be in SUBSTANTIAL COMPLIANCE once a "prompt response" is consistently provided.
    - ACH has requested growth for an additional QI RN to be designated to resolve grievances promptly however it was not approved for the 24/25 budget. The Interim Nursing Director redirected staff and grievances are assigned at each facility to designated staff.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Medical Grievance boxes installed. ADA added to grievance forms. Grievance Policy 607 published to SSO employees most recently updated 04/08/2024.
- III.K.2.
  - ACH Status: SUBSTANTIAL COMPLIANCE

- ▪ The medical grievance process is outlined in the Sheriff's Inmate Handbook that is given at booking. Medical staff review and update the Handbook prior to each revision to ensure all pertinent medical information is included.
- ▪ ACH has grievance forms available in each pod. As staff collect grievances daily, they ensure forms are stocked.
- ▪ To allow for secure submission, confidential grievance lock boxes are in each pod as well.
- o SSO Status: PARTIAL COMPLIANCE
  - ▪ Grievances are made available to all inmates. Process is included in handbook and orientation video (in process).
    - • a) Current practice. Policy 607 was updated on 4/08/2024.
    - • b) Current practice however, large print has not been developed yet. Reading glasses can be purchased on commissary as well as keep on person self-magnifying cards at RCCC and MJ.

- III.K.3.a.
  - o ACH Status: NON-COMPLIANCE
    - ▪ This provision is non-compliant due to the delays in responding to patient grievances. Nursing staff are frequently pulled to cover intake, withdrawal monitoring, and medication administration therefore making it difficult to respond to grievances. ACH has requested growth for a QI RN that will be assigned to overseeing the entire grievance process.

  - o SSO Status: PARTIAL COMPLIANCE
    - ▪ This item is pending the approval and completion of the ADA policy. Grievance Policy 607 was updated on 04/08/2024.
- III.K.3.b-e.
  - o ACH Status: PARTIAL COMPLIANCE
    - ▪ The Grievance policy and forms were substantially revised based on Medical Expert feedback.  Key additions include immediate review of each grievance by a nurse and immediate action when indicated, specific timeframes for requesting and responding to appeals, and more detail on the grievance and appeal forms.
    - ▪ ACH QI has developed and implemented a Grievance Corrective Action Plan to support greater compliance in meeting response timeframes.
      - • A shared folder was created for both jail nursing staff and QI staff.
      - • Both facilities maintain a combined spreadsheet of open grievances and a copy scanned to the secured folder for review by nursing and QI.

- QI is able to view all open grievances based on the information in the shared folder.
- Corrective actions and updates are discussed at a monthly multi-disciplinary meeting.
- The grievance disposition form was updated.
- A grievance collection tool was developed to ensure the grievances are being collected timely and will be implemented 07/01/24.
- The process was reviewed and the policy was updated to improve our compliance.  The revised policy was sent to the SMEs for review on 06/06/2024.
- The Grievance Cap will be completed once the policy is finalized.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - b) Compliance staff provides assistance or finds resources when necessary.
    - d)  Current practice. The process for appeal is contained within the inmate handbook and the orientation video.
    - e) Current Practice. Policy 607 was updated 04/08/2024.
- IIII.K.4.
  - ACH Status: PARTIAL COMPLIANCE
    - A grievances tracking system is in place and overseen by QI. ACH and SSO Custody continue to discuss an electronic Grievance form process – which will support more accurate tracking.
    - Staff violations of the ADA/disability process resulting in grievances are also tracked in a Staff Complaint category that is reported on quarterly. Staff complaints are monitored and follow-up on by management as appropriate.
    - QI continues to monitor medical staff scanning grievances as they are collected; as it is an area of deficiency previously.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current Practice. Policy 607 was updated 04/08/2024.

| Alarms/Emergencies |
| :---: |
| **(Section III; Provision L.)** |
| **ACH Status: N/A** |

| SSO Status: PARTIAL COMPLIANCE |
|---|

**L.  Alarms/Emergencies**

1. The County shall ensure that all written policies regarding alarms and emergencies contain mandatory provisions to accommodate prisoners with disabilities.
2. The County shall implement written policies regarding the expectations of staff as to prisoners with identified disabilities during emergencies and alarms, including as to disabilities that may affect prisoners' ability to comply with orders or otherwise respond to emergencies and alarms. For example, the policies shall ensure appropriate handling of prisoners with mobility-related disabilities who are unable to prone or take a seated position on the ground during an alarm or emergency. Such policies shall be communicated to staff, incorporated into the relevant Operations Orders, and communicated to prisoners with disabilities using Effective Communication.
3. The County shall implement written policies for staff regarding communicating effectively and appropriately with prisoners who have disabilities that may present barriers to communication during emergencies or alarms.
4. In order to facilitate appropriate accommodations during alarms or emergencies, the County shall offer, but shall not require, individuals who have disabilities visible markers to identify their disability needs (e.g., identification vests). The County shall maintain a list, posted in such a way to be readily available to Jail staff in each unit, of prisoners with disabilities that may require accommodations during an alarm or emergency.
5. The County shall install visual alarms appropriate for individuals who are deaf or hard of hearing, which shall comply with relevant fire code regulations.
6. All housing units shall post notices for emergency and fire exit routes.

**Compliance Status by Section:**

- III.L.1.
  - ACH Status: N/A
  - SSO Status: PARTIAL COMPLIANCE
    - This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team.
- III.L.2.
  - ACH Status: N/A
  - SSO Status: PARTIAL COMPLIANCE

- ▪ In February 2023 the Sheriff's Office formed a new Legal and Policy Bureau. A Lieutenant position was added to lead the unit. One of the core duties of this unit it to update all policies and procedures to the Lexipol system with a focus on policies and procedures related to the Mays Consent Decree.
- ▪ Even though the policy is not in place, staff does offer assistance during emergencies at RCCC and Main Jail and disabilities are taken into consideration by staff.

- III.L.3.
  - ○ ACH Status: N/A
  - ○ SSO Status: PARTIAL COMPLIANCE
    - ▪ Even though the policy is not in place, staff does offer assistance during emergencies at RCCC and Main Jail and disabilities are taken into consideration by staff.

- III.L.4.
  - ○ ACH Status: N/A
  - ○ SSO Status: NON-COMPLIANT
    - ▪ ATIMS allows staff to see anyone housed in their facility that requires accommodation.

- III.L.5.
  - ○ ACH Status: N/A
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ At RCCC and MJ, visual alarms are currently installed compliant with relevant fire code regulations.

- III.L.6.
  - ○ ACH Status: N/A
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Emergency and fire exit routes posted.

| Searches, Restraints, and Extractions |
|---|
| **(Section III; Provision M.)** |
| ACH Status: N/A |
| SSO Status: PARTIAL COMPLIANCE |
| **M. Searches, Restraints, and Extractions** |

1. The County shall modify its written policies to ensure that prisoners with mobility impairments, including those with prosthetic devices, receive reasonable accommodations with the respect to the following: (1) Pat searches and unclothed body searches; (2) Application of restraints devices, including Pro-Straint Chair; and (3) Cell extractions.

**Compliance Status by Section:**

- III.M.1.
  - ACH Status: N/A
  - SSO Status: PARTIAL COMPLIANCE
    - MJ and RCCC Compliance Lieutenants have continued their commitment to policy and procedure revisions during the first half of 2024.
    - In February 2023 the Sheriff's Office formed a new Legal and Policy Bureau. A Lieutenant position was added to lead the unit. One of the core duties of this unit it to update all policies and procedures to the Lexipol system with a focus on policies and procedures related to the Mays Consent Decree.
    - Other related policies are forthcoming.

| Transportation |
|:---:|
| **(Section III; Provision N.)** |
| **ACH Status: N/A** |
| **SSO Status: SUBSTANTIAL COMPLIANCE** |

## N. Transportation

1. The County shall provide reasonable accommodations for prisoners with disabilities when they are in transit, including during transport to court or outside health care services.
2. Prescribed HCAs/ADs/DME, including canes, for prisoners with disabilities shall be available to the prisoner at all times during the transport process, including in temporary holding cells, consistent with procedures outlined in Part VII.
3. The County shall use accessible vehicles to transport prisoners in wheelchairs and other prisoners whose disabilities necessitate special transportation, including by maintaining a sufficient number of accessible vehicles.
4. Prisoners with mobility impairments shall be provided assistance onto transport vehicles.

**Compliance Status by Section:**

- III.N.1.-4.
  - ACH Status: N/A
  - SSO Status: Substantial Compliance
    - RCCC received an ADA Compliant Van in August 2021. Main Jail has ADA compliant vans. Policy 516 was issued on 02/20/2024

| **Prisoners with Intellectual Disabilities** |
|:---:|
| **(Section III; Provision O.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: NON-COMPLIANCE** |

**O. Prisoners with Intellectual Disabilities**

1. The County shall, in consultation with Plaintiffs' counsel, develop and implement a comprehensive written policy and procedure regarding prisoners with an Intellectual Disability, including:
   a) Screening for Intellectual Disabilities;
   b) Identification of prisoners' adaptive support needs and adaptive functioning deficits; and
   c) Monitoring, management, and accommodations for prisoners with Intellectual Disabilities.
2. A multidisciplinary team that includes appropriate health care staff will monitor and ensure appropriate care for prisoners with an Intellectual Disability. The multidisciplinary team will develop an individualized plan for each prisoner with an Intellectual Disability, which addresses: (1) safety, vulnerability, and victimization concerns, (2) adaptive support needs, (3) programming, housing, and accommodation needs. The multidisciplinary team's plan will be regularly reviewed and updated as needed.
3. Prisoners with an Intellectual Disability assigned to a work/industry position will be provided additional supervision and training as necessary to help them meet the requirements of the assignment.

**Compliance Status by Section:**

- III.O.1. a.-c.:
  - ACH Status: SUBSTANTIAL COMPLIANCE

- The County has in consultation with Plaintiffs' counsel, developed and implemented a comprehensive written policy and procedure regarding prisoners with an Intellectual Disability, including Screening for Intellectual Disabilities; Identification of prisoners' adaptive support needs and adaptive functioning deficits; and Monitoring, management, and accommodations for patients with Intellectual Disabilities.
- The Nurse Intake policy and Mental Health Adaptive Support Program policy were completed in approval with Class Counsel and the court-appointed Experts.
- As part of the Intake Health Screening, Nursing gathers information through screening, past history, self-identification, third party report or observation noting possible intellectual disability and refers patients identified to mental health staff for an assessment and treatment plan.

- SSO Status: NON-COMPLIANCE
  - MJ and RCCC Compliance Lieutenants have continued their commitment to policy and procedure revisions during the first half of 2024.
  - In February 2023 the Sheriff's Office formed a new Legal and Policy Bureau. A Lieutenant position was added to lead the unit. One of the core duties of this unit it to update all policies and procedures to the Lexipol system with a focus on policies and procedures related to the Mays Consent Decree.
    - a) Pending. Mental Health performs assessments and provides custody staff with Adaptive Support Plans for people with intellectual disabilities identifies communication needs necessary.
    - b) Pending. Current practice, when MH identifies a person in need of an ASP they provide a copy of the physical form to staff assigned to their facility and to the Compliance unit for follow up and the information is also updated in ATIMS.
    - c) Pending.

- III.O.2:
  - ACH Status: PARTIAL COMPLIANCE
    - A multidisciplinary team that includes appropriate health care staff will monitor and ensure appropriate care for prisoners with an Intellectual Disability. The multidisciplinary team will develop an individualized plan for each prisoner with an Intellectual Disability, which addresses: (1) safety, vulnerability, and victimization concerns, (2) adaptive support needs, (3) programming, housing, and accommodation needs. The multidisciplinary team's plan will be regularly reviewed and updated as needed.

- Mental Health began staff training and implementation of the Mental Health Adaptive Support Program in September 2022. Adaptive Support Plans (ASPs) are entered into patient charts as well as a copy provided to housing unit Custody. The ASP is also entered on the patient Problems and Conditions in the EHR.
- Mental Health completes an ASP for every patient with a confirmed diagnosed with an Intellectual Disability.
- Trained core staff to complete MoCA assessments to identify patients with cognitive impairments who require adaptive supports.
- Assigned a MH supervisor to review patient caseload on a weekly basis to ensure that ASP is in place for all patients diagnosed with ID and patient is referred to EOP.
- MH worked with SSO to place male patients at the Main Jail with ID in 3W  and 3E  in designated housing. Females with ID are mostly housed in 7W 100. This allows for easier access to patients who need additional assistance and is an added layer of security for patient safety.
-  A patient's mental health ASP indicates the additional assistance a patient needs in order to program in the jail, based on diagnosis and identified needs. Once a patient has a mental health ASP, it is required that all staff interacting with the patient provide the adaptive supports identified in the ASP during encounters and document to such in the encounter note. This information has been messaged to all service lines in multiple ways, including the ACH Newsletter.
- Custody staff assigned to IOP and APU received training on MH ASP on 11/2022.
- MH creates an alert in the patient's chart to inform medical and custody that the patient has adaptive supports in place.  Custody receives the alert via ATIMS.
- In April 2024, the ASP form was added to the EHR and replaced the paper form that was previously utilized.  The ASP immediately becomes a part of the medical record and transmits ASP data to ATIMS that includes an intellectual disability or suspected cognitive impairment flag, the ASP and needed accommodations.
- In April, 2024, per the MH SME recommendation, MH added ID specific items to the MDT audit and will integrate the findings in the next QI study.
- In April 2024, per the MH SME recommendation, MH included ID as a component of the RVR and UOF review/QI.
- In May 2024, per the MH SME recommendation, MH and SSO established a UOF Review Committee to review all unplanned UOF incidents involving patients on the MH caseload or with ID.
- SSO Status: Partially Compliant. ACMH provided Brain Development/Intellectual Disability and Adaptive Support Plan training to all MJ and RCCC deputies.

- III.O.3:
  - ACH Status: N/A
  - SSO Status: NON-COMPLIANCE
    - This will be contained in future policy.

| ADA Training, Accountability, and Quality Assurance |
|---|
| **(Section III; Provision P.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: PARTIAL COMPLIANCE |

**P. ADA Training, Accountability, and Quality Assurance**

1. The County shall ensure all custody, health care, facility maintenance, and other Jail staff receive ADA training appropriate to their position.
   a) The County shall provide to all staff appropriate training on disability awareness, including the use and purpose of accommodations and modifications in accordance with the ADA.
   b) The ADA training shall include: formalized lesson plans and in-classroom or virtual training for staff (including managers, supervisors, and rank-and-file staff) provided by certified or otherwise qualified ADA trainers.
2. ADA instructors shall have appropriate ADA training and subject matter expertise necessary to effectively provide ADA training to staff.
3. The County shall, in consultation with Plaintiffs' counsel, develop and implement written policies and procedures regarding monitoring, investigating, and tracking staff violations (or allegations of violations) of ADA requirements and Jail ADA policies.
4. The County shall develop an ADA accountability plan that will ensure quality assurance and establish staff accountability for egregious, serious, or repeated violations of the ADA and Jail ADA-related policies and procedures.

**Compliance Status by Section:**

- III.P.1. & 2.
  - ACH Status: SUBSTANTIAL COMPLIANCE

- ADA and Effective Communication (EC) Training and Documentation PowerPoints were developed and approved.  The documentation PowerPoint has been updated to include changes to EHR templates.
- Training is mandatory for all ACH staff, including contracted mental health staff, in the jails as well as administrative positions (Case Management and Quality Improvement) working offsite.
  - SSO Status: PARTIAL COMPLIANCE
    - 1. A New ADA component has been added to the Adult Corrections Supplemental Core Course, but is awaiting approval. ADA training is in module 8.0. All staff assigned to corrections (sworn staff and records officers) were assigned consent decree training in September of 2021. as new hires come on they are assigned the training and must attest to the completion of the training.
      - a) & b)  This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team.
    - 2. This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team.

- III.P.3
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - ACH has, in consultation with Plaintiffs' counsel, developed and implemented written policies and procedures regarding monitoring, investigating, and tracking staff violations (or allegations of violations) of ADA requirements and jail ADA policies.
    - Alleged staff violations of ADA requirements are captured in the Grievance Process. See **Disability-Related Grievance Process** (Provision K.) for further detail.
  - SSO Status: PARTIAL COMPLIANCE
    - This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team.
  - III.P.4
  - ACH Status: PARTIAL COMPLIANCE
    - ACH has created an ADA Accountability Plan and has established ADA related audits and patient grievances concerning ADA related issues as methods for identifying violations of policy. This element of the provision is partially compliant due to the delays in responses to patient grievances that may hinder immediate and appropriate actions resulting from grievance reviews.
    - If any egregious or repeated violations are identified, corrective actions that include staff disciplinary measures will be enforced.

   ○ SSO Status: PARTIAL COMPLIANCE
     ▪ This item is pending the approval and completion of the ADA policy. All policies related to the Consent Decree are currently being drafted by the Lexipol project team.
     ▪ Policy 724 Continuous Quality Improvement.

| Accessibility Remedial Plan to Address Physical Plant Deficiencies |
|---|
| **(Section III; Provision Q.)** |
| ACH Status: N/A |
| SSO Status: PARTIAL COMPLIANCE |
| **Q.  Accessibility Remedial Plan to Address Physical Plant Deficiencies**<br><br>1.  The County shall, within 24 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, develop and fully implement an Accessibility Remedial Plan to address Jail physical plant deficiencies that result in access barriers for prisoners with disabilities. In the interim, the Sheriff's Office shall house prisoners with disabilities in the most integrated and appropriate housing possible, providing reasonable accommodations and assistance where necessary to ensure appropriate accessibility to Jail programs, services, and activities.<br>2.  The Accessibility Remedial Plan shall ensure the following:<br> a)  Adequate provision of accessible cells and housing areas with required maneuvering clearances and accessible toilet fixtures, sanitary facilities, showers, dining/dayroom seating, and recreation/yard areas.<br> b)  Accessible paths of travel that are compliant with the ADA.<br>3.  Equal and adequate access for all prisoners with disabilities to Family and Attorney Visiting areas in reasonable proximity to their housing location. |

**Compliance Status by Section:**

- III.Q.1.
  - ACH Status: N/A
  - SSO: Status: PARTIAL COMPLIANCE
    - At RCCC and MJ, inmates with disabilities are housed according to their security classification and granted access to programs according to their classification. Reasonable accommodations are made where necessary to ensure special needs are met.

- III.Q.2.
  - ACH Status: N/A
  - SSO: Status: NON COMPLIANCE
    - a) & b) On December 8, 2022 the Sacramento Board of Supervisors approved to build a Jail Intake and health Services Facility as well as make ADA facility improvement to the current Jail.  While the IHSF has been put on hold, current plans are still in place for renovating the existing Main Jail infrastructure for accessibility needs. Interim plans are being explored to address issues while waiting for these facility improvements.
    - c) At RCCC, legal visitation areas provide equal and adequate access for inmates with disabilities. RCCC social visitation areas provide inmates with disabilities the same opportunity to visit with their family.  Social and Attorney visits continue to overwhelm the current Main Jail as there is only one Attorney Visit booth, and 2 Social Visit booths without stairs (located on the 2-East housing unit). Any individual who cannot climb stairs is required to use the visiting area on 2-East.

## IV. MENTAL HEALTH

### Policy & Procedures
**(Section IV; Provision A.)**

**ACH Status: PARTIAL COMPLIANCE**

**SSO Status: PARTIAL COMPLIANCE**

**A. Policies and Procedures**

1. The County shall establish policies and procedures that are consistent with the provisions of this Remedial Plan and include the following:

   a) A written document reflecting the complete spectrum of mental healthcare programming and services provided to prisoners;

   b) Minimum and maximum timeframes for when each type of mental healthcare service will be completed, including but not limited to laboratory tracking and psychiatry follow-up services, in accordance with prevailing community and professional standards;

   c) An intake and referral triage system to ensure timely and effective resolution of inmate requests and staff referrals for mental healthcare;

   d) Specific credentialing requirements for the delivery of mental healthcare services, including but not limited to only qualified mental health professionals may make critical treatment decisions.

   e) Clinical monitoring of inmates, including but not limited to those who are involuntarily medicated, clinically restrained or secluded, segregated, or on suicide watch;

   f) Descriptions of specialized mental health programming that specifically identify admitting and discharge criteria and the staff members who have the authority to place inmates in specialized mental health housing;

g) Procedures for involuntary medications and other appropriate measures for the management of inmates with serious mental illness who lack the capacity to give informed consent, in accordance with relevant state law;

h) Training for all staff members who are working with inmates with mental illness in all aspects of their respective duty assignments.

2. The County's policies and procedures shall be revised, as necessary, to reflect all of the remedial measures described in this Remedial Plan.

3. The County shall continue to operate its acute inpatient program and its Outpatient Psychiatric Pod (OPP) program. The County shall establish a new Intensive Outpatient Program (IOP) for inmates who require a higher level of outpatient psychiatric care than what is provided in the OPP program.

4. The County shall operate its non-acute mental health programs – IOP, OPP, and General Population-Mental Health – consistent with the JPS Psychiatric Services overview, attached as **Exhibit A-2** [in the Remedial Plan].

**Compliance Status by Section:**

- IV.A.1.a. – h.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - The County ACH and ACH Mental Health established policies and procedures that are consistent with the provisions of this Remedial Plan requirement as listed above.
  - SSO Status: PARTIAL COMPLIANCE
    - a) – g) N/A
    - h) Lexipol training for custody deputies.  24-hour CIT training for IOP/JBCT deputies, 8-hour CIT for all other deputies. All new employees will receive 4-hours of in-person suicide prevention training developed in collaboration with the suicide prevention SME. Current employees will receive a 2-hour refresher course annually.  This was implemented in May 2021.

- IV.A.2.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - The County's policies and procedures are revised as necessary, to reflect all of the Remedial Plan measures described in this Remedial Plan.
  - SSO Status: PARTIAL COMPLIANCE

- ▪ MJ and RCCC Compliance Lieutenants have continued their commitment to policy and procedure revisions during the first half of 2024.
- ▪ In February 2023 the Sheriff's Office formed a new Legal and Policy Bureau. A Lieutenant position was added to lead the unit. One of the core duties of this unit it to update all policies and procedures to the Lexipol system with a focus on policies and procedures related to the Mays Consent Decree.

- IV.A.3.
  - ○ ACH Status: PARTIAL COMPLIANCE
    - ▪ ACH Mental Health continues to operate its acute inpatient program and its Outpatient Psychiatric Pod (OPP) program. The County established a new Intensive Outpatient Program (IOP) for inmates who require a higher level of outpatient psychiatric care than what is provided in the OPP program.
    - ▪ MH added three social work staff to the Acute Psychiatric Unit; these staff provide therapeutic interventions, crisis intervention, group therapy, case management, and coordination of MDTs.
    - ▪ MH administration has daily bed assignment/utilization meetings with SSO Custody to review movement between the IOP, OPP, and the Acute Psychiatric Unit. This includes admissions, discharges, and MH recommendations for housing.
    - ▪ The plan to increase high security/high acuity IOP beds to serve patients with SMI who are housed in Administrative Segregation was implemented – an additional 8 IOP female beds were added at the Main Jail in late May/early June 2022 and 24 male IOP beds were implemented in September 2022 at the RCCC.
    - ▪ IOP services have been found to effectively decrease the number of disciplinary write-ups, emergent referrals and number of days a patient stayed in the APU:

**Summary: June 2023-August 2023**

| Month | Patients | 90-DAYS PRE-IOP | | | 90-DAYS POST-IOP | | |
|---|---|---|---|---|---|---|---|
| | | Disciplinary Write-Ups | Emergent Referrals | Days in APU | Disciplinary Write-Ups | Emergent Referrals | Days in APU |
| June | 15 | 11 | 132 | 181 | 11 | 59 | 75 |
| July | 21 | 17 | 217 | 65 | 9 | 67 | 49 |
| August | 18 | 14 | 194 | 178 | 9 | 69 | 73 |
| TOTAL | 54 | 42 | 543 | 424 | 29 | 195 | 197 |

31% decrease in disciplinary write-ups post IOP

64% decrease in emergent referrals post IOP

53% decease in days spent in the APU post IOP

71

- MH reallocated EOP staff to support expansion of the high acuity/high security IOP as staffing for the additional IOP beds was not included in the budget augmentation for FY 2022/23. Reallocation of EOP staff reduced the capacity of patients that can be served in EOP in FY 2022/23.
- MH received mid-year budget augmentation in FY 2023/24, which restored EOP positions and increased EOP service capacity to 525 patients.
- EOP services have assisted in decreasing the number of disciplinary write ups, emergent referrals and the number of days a patient stayed in the APU:

**Summary: June 2023-August 2023**

| Month | Patients | 90-DAYS PRE-EOP | | | 90-DAYS POST-EOP | | |
|---|---|---|---|---|---|---|---|
| | | Disciplinary Write-Ups | Emergent Referrals | Days in APU | Disciplinary Write-Ups | Emergent Referrals | Days in APU |
| June | 20 | 18 | 73 | 5 | 7 | 41 | 0 |
| July | 20 | 11 | 68 | 112 | 10 | 63 | 13 |
| August | 21 | 18 | 158 | 104 | 14 | 49 | 81 |
| **TOTAL** | **61** | **47** | **229** | **221** | **31** | **153** | **94** |

34% decrease in disciplinary write-ups post EOP

33% decrease in emergent referrals post EOP

57% decrease in days spent in APU post EOP

- ACH Medical, MH, and SSO Custody continue to hold space planning meetings to discuss an interim proposal to increase the Acute Psychiatric Unit (APU) beds.
- Partial Compliance is due to the need for more APU and IOP beds. Until this occurs, this provision will remain in partial compliance.
- The County meets regularly to ensure progress continues on the APU expansion project.
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - Main Jail IOP has 20 male and 23 female beds. RCCC IOP and HS IOP has 48 male beds. RCCC has 32 male beds for JBCT and 32 males for EASE. We have 13 combined of EASE for female.
    - Expansion plans for IOP at the Main Jail are in process for as many as 20 male and 10 female beds.
- IV.A.4.
  - o ACH Status: PARTIAL COMPLIANCE
    - ACH Mental Health operates its non-acute mental health programs – IOP, OPP, and Enhanced Outpatient Program/General Population-Mental Health – consistent Remedial Plan requirements.

- EOP currently serves 275 patients; services include crisis intervention, case management, care coordination, advocacy, discharge planning, and therapeutic interventions including 1:1 and group programming.
- MH received mid-year budget augmentation in FY 2023/24 which restored EOP positions and increased EOP service capacity to 525 patients; services are being titrated as staff are hired.
- Implementation of MDTs began for patients participating in EOP.
- EOP expanded therapeutic group services for EOP patients housed on 3E & 3W, 7W, 4E & 4W and 8E.

**Summary: January 2024 – March 2024 Groups Scheduled and Cancelled**

| Programs | Number Groups Scheduled | Number Groups Canceled |
|---|---|---|
| APU | 213 | 91(43%) |
| EOP | 108 | 9(8%) |
| IOP Main Jail: Female | 272 | 21(8%) |
| IOP Main Jail: Male | 352 | 27(8%) |
| IOP RCCC: 400 Pod | 165 | 23(14%) |
| IOP RCCC: 500 Pod | 151 | 27(18%) |
| **TOTAL** | **1,261** | **198(16%)** |

- **16%** of groups scheduled for this report period were canceled. The reasons for cancelations were due to:

  - 40% (78/198) custody staffing
  - 29% (58/198) other
  - 24% (48/198) MH staffing
  - 5% (10/198) unavailable space
  - 2% (4/198) facility lockdown

- MH no longer utilizes manual tracking logs to track canceled groups.  Supervisors and staff are responsible for entering offered and canceled groups directly into the EHR.
- PARTIAL COMPLIANCE is due to titration of EOP services with long-term plan for all patients on the MH caseload to be assigned to an EOP level of care.
- SSO Status: N/A

| Organizational Structure |
|---|
| **(Section IV; Provisions B.)** |
| ACH Status: SUBSTANTIAL COMPLIANCE |
| SSO Status: SUBSTANTIAL COMPLIANCE |
| **B. Organizational Structure**<br><br>1. The County shall develop and implement a comprehensive organizational chart that includes the Sheriff's Department ("Department"), Correctional Health Services ("CHS"), Jail Psychiatric Services ("JPS"), Chief Administrative Officer, Medical Director of the JPS Program, and any other mental health staff, and clearly defines the scope of services, chains of authority, performance expectations, and consequences for deficiencies in the delivery of mental health care services.<br>2. A Medical Director of Jail Psychiatric Services shall be designated and shall oversee all mental health care functions in the jails, including psychiatric prescribers and psychiatric nurses. The Director shall possess clinical experience and a doctoral degree.<br>3. The Medical Director of Jail Psychiatric Services shall participate in jail executive leadership and shall be responsible for overseeing program development, clinical practice, and policy, as well as interfacing with jail and medical leadership and community mental health. |

**Compliance Status by Section:**

- IV.B.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - The County maintains a comprehensive organizational chart for Adult Correctional Health (ACH) and ACH Mental Health provided by UCD that clearly outlines the chains of authority. ACH also developed and implemented Position Standards and job descriptions, outlining scope of services and performance expectations for each position. Both the County and UCD have County and UCD-wide policies and disciplinary processes as relates to not meeting standard performance and duties.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - The Sheriff's Organizational chart exists.
- IV.B.2.
  - ACH Status: SUBSTANTIAL COMPLIANCE

- ▪ ACH Mental Health (MH) has a Medical Director designated to oversee all mental health care functions in the jails, including psychiatric prescribers and psychiatric nurses. The ACH Mental Health Medical Director possesses clinical experience and a doctoral degree. ACH MH reorganized the leadership structure to address Consent Decree requirements and support program and staff expansion.
    - ○ SSO Status: N/A
- ● IV.B.3.
    - ○ ACH Status: SUBSTANTIAL COMPLIANCE
        - ▪ The ACH MH Medical Director and MH Program Manager participate in ACH Executive Team leadership meetings as well as a variety of meetings including Quality Improvement, Multidisciplinary Team Meetings, ACH leadership and SSO Custody leadership meetings, and ad hoc meetings.
    - ○ SSO Status: N/A

| Patient Privacy |
| :---: |
| **(Section IV; Provisions C.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: PARTIAL COMPLIANCE** |

**C. Patient Privacy**

1. All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff. In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification.
    a) For any determination that a clinical interaction with a patient requires the presence of custody staff, staff shall document the specific reasons for the determination. Such decisions shall be reviewed through the Quality Assurance process.
    b) If the presence of custody staff is determined to be necessary to ensure the safety of medical staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

c) The County's patient privacy policies, as described in this section, shall apply to contacts between inmates and Triage Navigator Program staff and/or other staff that provide mental health-related services on site at the Jail.

2. Jail policies that mandate custody staff to be present for any mental health treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above. Custody and mental health staff shall be trained accordingly.

3. It shall be the policy of the County that mental health clinicians shall not conduct their patient contacts at cell front except pursuant to documented refusals or specific, documented security concerns that warrant cell front contacts.

4. For each clinical contact, mental health staff shall document whether the encounter was confidential, including whether it took place at cell front. If the contact occurred at cell front or otherwise was non-confidential, the reasons shall be clearly documented in the individual patient record and for purposes of Quality Assurance review procedures.

5. A process shall exist for sick call slips or other mental health treatment-related requests to be collected without the involvement of custody staff.

**Compliance Status by Section:**

- IV.C.1.
  - ACH Status: PARTIAL COMPLIANCE
    - All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff. In making such a determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification.
    - MH understands the importance of seeing all patients confidentially; however, due to facility infrastructure and lack of confidential interview space, this area remains in PARTIAL COMPLIANCE.
    - MH staff document the confidential status of encounters including rationale when it is not confidential.
    - As a result of audit findings, MH has further defined a drop-down menu of common reasons for the lack of confidentiality for uniformity and data purposes.  The form was in production in June 2023 and is used by all service lines.

- MH supervisors monitor the use of confidential space in booking and classrooms and have regular discussions with staff regarding challenges/barriers to use of confidential space.  Staff are documenting rationale when a confidential interview is not possible.
- MH and SSO Custody meet regularly to discuss challenges/barriers preventing confidential encounters.  MH and Custody are developing plans to increase efficiency of using attorney booths on all floors, confidential interviews with patients who present with assaultive or high security/safety issues, and Custody standby while ensuring auditory privacy.
- Due to ongoing collaboration and training between MH and SSO, audits of confidential encounters have shown a decrease in the number of "safety and security" reasons for non-confidential contacts. Lack of available confidential space continues to be the primary reason for non-confidential encounters.
- MH supervisors continuously reinforce the importance and requirements of confidential individual interviews and group programming during staff meetings and huddles.
- Designated MH outpatient staff moved to a nearby G St office. Staff vacated a classroom on the third floor that was converted into IOP office space.  This increased confidential programming space for groups and individual assessments and interventions.
- SSO and MH consulted with the office furniture distributor to discuss the construction of confidential interview booths for each floor.  SSO received approval for proof of concept and a confidential booth was installed on 3W in October 2023. This booth is in frequent use and offers excellent auditory privacy.
- SSO has received approval to install confidential booths in each housing unit.  The estimated completion date is the end of 2024.
- SSO Custody distributed IDC to deputy staff in June 2023, directing custody to support MH use of attorney booths and classrooms for confidential contacts.
- Mental Health (MH) staff use designated attorney booths as available for confidential interviews.
- MH developed a workflow outlining the process for utilizing attorney booths.
- MH obtained a custody escort 2 hours a day, 3 days at week at RCCC to support confidential contacts for patients housed in the barracks.
- MH and ACH collaborated to develop a schedule for JKF/KBF interview room use to ensure both medical and MH had access to confidential interview space.

- ▪ MH expanded the use of the attorney booths at RCCC for to increase confidential encounters.IV.C.1.a. – c. a. PARTIAL COMPLIANCE See above IV.C.1.
  - ○ SSO Status: PARTIAL COMPLIANCE
    - ▪ Main Jail has secluded privacy interview room created on first floor for booking related clinical interactions. Current use of classrooms with the door shut or confidential visit booths for housing unit clinical interactions. Additional booths are in the planning stages and will consist of plexiglass enclosures with doors situated in the indoor rec area of each housing unit. One booth has been ordered to construct on 3-West as a proof of concept.
    - ▪ All RCCC facilities have ACMH offices available for interviews. These areas are private and are not audio recorded.  The doors to these offices were changed so they can be closed and the officer can see what is going on inside through windows. Officers standby as needed based on the inmate's classification/behavior while offer the highest amount of privacy possible.
      - • a) ACMH and both Compliance Lieutenants have a standing monthly meeting to discuss confidentiality issues and review for QA/QI.
      - • b) Custody and ACMH staff are reminded specific documented security concerns must exist for cell front contacts otherwise MH contacts must occur inside the classroom or a confidential visit booth. The Main Jail has purchased one confidential interview booth to be constructed on 3-West as a proof of concept. Construction to start tentatively by the end of July 2023. The goal is to have 2 booths for every indoor rec area at the Main Jail. Some booths will have a security desk/chair. SSO has purchased security desk/chair (same used at Santa Clara SO), which allows leg shackles to be secured.  This allows clinicians to safely speak to higher security inmates in privacy without custody staff standing nearby.
- • IV.C.2.
  - ○ ACH Status: SUBSTANTIAL COMPLIANCE
    - • All MH Jail policies that mandated custody staff to be present for any mental health treatment in such a way that disrupts confidentiality have been revised to reflect the individualized process set forth above. Custody and mental health staff have been trained accordingly.
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - • No policies exist mandating custody to be present for mental health treatment.
- • IV.C.3.
  - ○ ACH Status: PARTIAL COMPLIANCE

- It is the policy of the County that mental health clinicians shall not conduct their patient contacts at cell front except pursuant to documented refusals or specific, documented security concerns that warrant cell front contacts.
- Due to ongoing collaboration and training between MH and SSO, audits of confidential encounters have shown a decrease the number of "safety and security" reasons for non-confidential contacts.  Lack of available confidential space continues to be the primary reason for non-confidential encounters.
- MH staff document confidential status of encounters including rationale when it is not confidential.
- Primary reason for PARTIAL COMPLIANCE is facility infrastructure and lack of confidential space.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Case Management Post Order covers this provision. At RCCC MH patients are seen in the attorney booth or one of the offices where the doors have been changed so they can be closed and the officers can still see what is taking place inside.
    - ACMH and the Compliance Lieutenant meet regularly to discuss MH assessments and confidentiality. Custody and ACMH staff are reminded specific documented security concerns must exist for cell front contacts otherwise MH contacts must occur inside the classroom or a confidential visit booth.
    - The Main Jail has purchased one confidential interview booth to be constructed on 3-West as a proof of concept. Construction to start tentatively in July of 2024.
- IV.C.4.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - MH staff document confidential status of encounters including rationale when it is not confidential. As a result of audit findings, MH has further defined a drop-down menu of common reasons for lack of confidentiality for uniformity and data purposes.  The form will be used by all service lines and was implemented in June 2023. Several reports have been conducted for Quality Assurance review procedures.
    - Supervisors are completing spot-checks daily to ensure staff are appropriately utilizing confidential space.
    - Results of confidential contacts audit for period January-March 2024:

      Main Jail

**8W: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 378 | 247(65%) | 131(35%) |
| February | 336 | 239(71%) | 97(29%) |
| March | 332 | 198(60%) | 134(40%) |
| Total | 1046 | 684(65%) | 362(35%) |

**8W: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 8(6%) | 41(31%) | 73(56%) | 9(7%) |
| February | 3(3%) | 21(22%) | 69(71%) | 4(4%) |
| March | 9(7%) | 47(35%) | 67(50%) | 11(8%) |
| Total | 20(6%) | 109(30%) | 209(58%) | 24(7%) |

**8E: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 325 | 169(52%) | 156(48%) |
| February | 289 | 128(44%) | 161(56%) |
| March | 398 | 167(42%) | 231(58%) |
| Total | 1012 | 464(46%) | 548(54%) |

**8E: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 108(69%) | 10(6%) | 25(16%) | 13(8%) |
| February | 87(54%) | 10(6%) | 47(29%) | 17(11%) |
| March | 144(62%) | 16(7%) | 46(20%) | 25(11%) |
| Total | 339(62%) | 36(7%) | 118(22%) | 55(10%) |

**7W: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 378 | 237(63%) | 141(37%) |
| February | 328 | 205(63%) | 123(38%) |
| March | 399 | 213(53%) | 186(47%) |
| Total | 1105 | 655(59%) | 450(41%) |

**7W: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 89(63%) | 10(7%) | 27(19%) | 15(11%) |
| February | 77(63%) | 18(15%) | 23(17%) | 5(4%) |
| March | 105(56%) | 37(20%) | 34(18%) | 10(5%) |
| Total | 271(60%) | 65(14%) | 84(19%) | 30(7%) |

**7E: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 56 | 30(54%) | 26(46%) |
| February | 45 | 27(60%) | 18(40%) |
| March | 70 | 29(41%) | 41(59%) |
| Total | 171 | 86(50%) | 85(50%) |

**7E: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 16(62%) | 1(4%) | 7(27%) | 2(8%) |
| February | 11(61%) | 0 | 2(11%) | 5(27%) |
| March | 29(71%) | 1(2%) | 8(20%) | 3(7%) |
| Total | 56(66%) | 2(2%) | 17(20%) | 10(12%) |

**6W/6E: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 295 | 210(71%) | 85(29%) |
| February | 257 | 183(71%) | 74(29%) |
| March | 248 | 189(76%) | 59(24%) |
| Total | 800 | 582(73%) | 218(27%) |

**6W/6E: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 53(62%) | 5(6%) | 23(27%) | 4(5%) |
| February | 54(73%) | 3(4%) | 15(20%) | 2(3%) |
| March | 33(56%) | 2(4%) | 22(37%) | 2(3%) |
| Total | 140(64%) | 10(5%) | 60(28%) | 8(4%) |

**5W/5E: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 268 | 199(74%) | 69(26%) |
| February | 236 | 145(61%) | 91(39%) |
| March | 317 | 199(63%) | 118(37%) |
| Total | 821 | 543(66%) | 278(34%) |

**5W/5E: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 41(59%) | 4(6%) | 22(32%) | 2(3%) |
| February | 59(65%) | 6(7%) | 23(25%) | 3(3%) |
| March | 77(65%) | 1(1%) | 29(25%) | 11(9%) |
| Total | 177(64%) | 11(4%) | 74(27%) | 16(6%) |

**4W/4E: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 651 | 383(59%) | 268(41%) |
| February | 563 | 360(64%) | 203(36%) |
| March | 646 | 410(63%) | 236(37%) |
| Total | 1860 | 1153(62%) | 707(38%) |

**4W/4E: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 219(82%) | 3(1%) | 36(13%) | 10(4%) |
| February | 168(83%) | 7(3%) | 25(12%) | 3(1%) |
| March | 185(78%) | 9(4%) | 36(15%) | 6(4%) |
| Total | 572(81%) | 19(3%) | 97(14%) | 19(3%) |

**3W: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 1490 | 1057(71%) | 433(29%) |
| February | 1203 | 904(75%) | 299(25%) |
| March | 1229 | 940(76%) | 289(24%) |
| Total | 3922 | 2901(74%) | 1021(26%) |

**3W: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 73(17%) | 74(17%) | 169(39%) | 117(41%) |
| February | 43(14%) | 56(19%) | 150(50%) | 50 (17%) |
| March | 47(16%) | 51(18%) | 159(55%) | 32(11%) |
| Total | 163(16%) | 181(18%) | 478(47%) | 199(19%) |

**3E: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 475 | 270(57%) | 205(43%) |
| February | 439 | 272(62%) | 167(38%) |
| March | 480 | 282(59%) | 198(41%) |
| Total | 1394 | 824(59%) | 570(41%) |

**3E: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 131(64%) | 15(7%) | 51 (25%) | 8(4%) |
| February | 115(69%) | 11(7%) | 34(20%) | 7(4%) |
| March | 125(63%) | 9(5%) | 60(30%) | 4(2%) |
| Total | 371(65%) | 35(6%) | 145(25%) | 19(3%) |

**BOOKING: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 237 | 118(50%) | 119(50%) |
| February | 229 | 111(48%) | 118(52%) |
| March | 231 | 89(39%) | 142(61%) |
| Total | 697 | 318(47%) | 379(54%) |

**BOOKING: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused Leave Cell | Other |
|---|---|---|---|---|
| January | 5(4%) | 29(24%) | 80(67%) | 5(4%) |
| February | 8(7%) | 40(34%) | 68(58%) | 2 (2%) |
| March | 21(15%) | 33(23%) | 86(61%) | 2(1%) |
| Total | 34(9%) | 102(27%) | 234(62%) | 9(2%) |

- Findings:
  - 3W has the highest number patient encounters at 3,922. 74% (2901/3922) occurred in confidential setting. The high rate of confidential contacts can be attributed to the privacy booth that was installed in 2023.
  - A total of 12,828 patient encounters were completed during this report period. 64% (8210/12,828) occurred in a confidential setting. This is an increase of 1% from the last report period.

RCCC

**CBF: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 836 | 658(79%) | 178(21%) |
| February | 700 | 572(82%) | 128(18%) |
| March | 660 | 525(80%) | 135(20%) |
| Total | 2196 | 1755(80%) | 441(20%) |

**CBF: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 3(2%) | 74(42%) | 68(38%) | 33(19%) |
| February | 2(2%) | 45(35%) | 44(34%) | 37(29%) |
| March | 4(3%) | 38(28%) | 73(54%) | 20(15%) |
| Total | 9(2%) | 157(36%) | 185(42%) | 90(20%) |

**SBF: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 158 | 82(52%) | 76(48%) |
| February | 221 | 80(36%) | 141(64%) |
| March | 150 | 57(38%) | 93(62%) |
| Total | 529 | 219(41%) | 310(59%) |

**SBF: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 0 | 1(1%) | 55(72%) | 20(26%) |
| February | 1(1%) | 12(9%) | 55(39%) | 73(52%) |
| March | 0 | 0 | 83(89%) | 10(12%) |
| Total | 1 | 13(4%) | 193(62%) | 103(33%) |

**KBF: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 124 | 77(62%) | 47(38%) |
| February | 117 | 88(75%) | 29(25%) |
| March | 179 | 146(82%) | 33(18%) |
| Total | 420 | 311(79%) | 109(26%) |

**KBF: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 30(64%) | 8(17%) | 2(4%) | 7(15%) |
| February | 24(83%) | 1(3%) | 4(14%) | 0 |
| March | 15(45%) | 2(6%) | 16(48%) | 0 |
| Total | 69(63%) | 11(10%) | 22(20%) | 7(6%) |

**JKF: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 151 | 115(76%) | 36(24%) |
| February | 145 | 117(81%) | 28(19%) |
| March | 162 | 134(83%) | 28(17%) |
| Total | 458 | 366(80%) | 92(20%) |

**JKF: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 11(31%) | 11(31%) | 13(36%) | 1(3%) |
| February | 20(71%) | 0 | 8(29%) | 0 |
| March | 5(18%) | 2(7%) | 21(75%) | 0 |
| Total | 36(39%) | 13(14%) | 42(46%) | 1(1%) |

**SLF: Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 268 | 227(85%) | 41(15%) |
| February | 265 | 234(88%) | 31(12%) |
| March | 276 | 248(90%) | 28(10%) |
| Total | 809 | 709(88%) | 100(12%) |

**SLF: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 2(5%) | 16(39%) | 20(49%) | 3(7%) |
| February | 9(29%) | 6(19%) | 14(45%) | 2(6%) |
| March | 8(29%) | 5(18%) | 14(50%) | 1(4%) |
| Total | 19(19%) | 27(27%) | 48(48%) | 6(6%) |

**Honors(C/D/G/H/M/MHU): Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 104 | 44(42%) | 60(58%) |
| February | 110 | 62(56%) | 48(44%) |
| March | 101 | 51(50%) | 50(50%) |
| Total | 315 | 157(50%) | 158(50%) |

**Honors: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 44(73%) | 1(2%) | 3(5%) | 12(20%) |
| February | 36(75%) | 3(6%) | 5(10%) | 4(8%) |
| March | 33(66%) | 2(4%) | 4(8%) | 11(22%) |
| Total | 113(72%) | 6(4%) | 12(8%) | 27(17%) |

**Barracks(A/B/J/K): Total Patient Encounters**

| Month | Total Patient Encounters | Confidential Patient Encounters | Non-Confidential |
|---|---|---|---|
| January | 122 | 15(12%) | 107(88%) |
| February | 131 | 10(8%) | 121(92%) |
| March | 136 | 26(19%) | 110(81%) |
| Total | 389 | 51(13%) | 338(88%) |

**Barracks: Reason for Non-Confidential Encounter**

| Month | Confidential Space Unavailable | Safety & Security | Refused to Leave Cell | Other |
|---|---|---|---|---|
| January | 54(50%) | 52(49%) | 1(1%) | 0 |
| February | 45(37%) | 59(49%) | 14(12%) | 3(2%) |
| March | 69(63%) | 40(36%) | 0 | 1(1%) |
| Total | 168(50%) | 151(45%) | 15(4%) | 4(1%) |

- Findings:
  - Housing units where more non-confidential encounters occurred than confidential encounters:
    - Barracks: 50% (168/338) of non-confidential encounters due to "confidential space unavailable"
    - Honors: 72% (113/158) of non-confidential encounters due to "confidential space unavailable"
    - SBF: 62% (193/310) of non-confidential encounters due to patient "refused to leave cell"

- Facility wide, 8% (131/1548) of patient encounters were in non-confidential setting due to medical quarantine.
- CBF continues to have the highest total patient encounters, 2,196. 80% of encounters were completed in a confidential setting.
- A total of 5,116 patient encounters were completed during this report period. 70% (3568/5116) occurred in a confidential setting.
  - o SSO Status: N/A
- IV.C.5.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - The Health Services Request policy outline above outlines the process allowing patients to submit requests or other mental health treatment-related requests to be collected without the involvement of SSO Custody staff involvement.
  - o SSO Status: N/A

| Clinical Practices |
|---|
| (Section IV; Provisions D.) |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: N/A |

**D. Clinical Practices**

1. Mental health staff shall develop and maintain at each jail facility an accurate case list of all prisoners requiring mental health treatment services at the jail ("caseload") which, at a minimum, lists the patient's name, medical chart number, current psychiatric diagnoses, date of booking, date of last appointment, date of next appointment, and the name of the treating prescriber.
2. Qualified mental health professionals shall have access to the patient's medical record for all scheduled clinical encounters.
3. Qualified mental health professionals shall provide individual counseling, group counseling, and psychosocial/psychoeducational programs based on individual patients' clinical needs.
4. A qualified mental health professional shall conduct and document a thorough assessment of each individual in need of mental health care following identification.

5. The County shall ensure prompt access to psychiatric prescribers following intake and in response to referrals and individual patient requests in accordance with the referral and triage timelines defined in the Access to Care provisions, below.

6. The County shall, in consultation with Plaintiffs' counsel, implement an electronic system for tracking mental health evaluation, treatment, and other clinical contacts, as well as sick call slips and other mental health treatment related requests or referrals.

7. The County shall develop and implement an electronic tracking system with alert and scheduling functions to ensure timely delivery of mental health services to individual patients.

8. Treatment planning:

   a) The County shall ensure that each prisoner on the mental health caseload receives a comprehensive, individualized treatment plan based on the input of the Multi-Disciplinary Treatment Team (MDT). The MDT shall include multiple clinical disciplines with appropriate custody and counseling staff involvement.

   b) The treatment plan shall reflect individual clinical need, and the County shall ensure that all clinically indicated services are available and provided.

   c) The treatment plan shall include, at a minimum, the frequency of follow-up for clinical evaluation and adjustment of treatment modality, the type and frequency of diagnostic testing and therapeutic regimens (which may include clinical contacts more frequent than the minimum intervals described herein), and instructions about adaptation to the correctional environment.

   d) This treatment plan shall include referral to treatment after release from the facility when recommended by treatment staff.

   e) Custody staff shall be informed of a patient's treatment plan where appropriate to ensure coordination and cooperation in the ongoing care of the patient.

   f) The County shall, in consultation with Plaintiffs' counsel, develop and implement a Treatment Plan Form that will be used to select and document individualized services for prisoners who require mental health treatment.

   g) The County shall implement guidelines and timelines for the initiation and review of individual treatment plans, consistent with the JPS Psychiatric Services overview, attached as Exhibit A-2.

**Compliance Status by Section:**

- IV.D.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE

- MH staff have developed and maintained at each jail facility an accurate case list of all prisoners requiring mental health treatment services at the jail ("caseload") which, at a minimum, lists the patient's name, medical chart number, current psychiatric diagnoses, date of booking, date of last appointment, date of next appointment, and the name of the treating prescriber.
- ACH has developed a MH caseload report that includes relevant information regarding the current diagnosis and level of mental health services.
- MH is able to access all of the above information via the patient's medical record in the EHR.
  - o SSO Status: N/A
- IV.D.2.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - Qualified mental health professionals have access to the patient's medical record for all scheduled clinical encounters.
    - MH staff have full access to all areas of the EHR and pending clinical encounters.
  - o SSO Status: N/A
- IV.D.3.
  - o ACH Status: PARTIAL COMPLIANCE
    - Qualified mental health professionals provide individual counseling, group counseling, and psychosocial/psychoeducational programs based on individual patient's clinical needs.
    - MH provides individual and group counseling and psychosocial/psychoeducational programs in the IOP, APU, and EOP.
    - This area remains in PARTIAL COMPLIANCE due to staffing and titrating EOP services to the entire MH caseload.
  - o SSO Status: N/A
- IV.D.4.
  - o ACH Status: PARTIAL COMPLIANCE
    - A qualified mental health professional conducts and documents a thorough assessment of each individual in need of mental health care following identification.
    - MH completes a full assessment of patients as identified as needing mental health services.
    - This area remains in PARTIAL COMPLIANCE due to staffing and compliance with timelines to care.

- o SSO Status: N/A
- IV.D.5.
  - o ACH Status: PARTIAL COMPLIANCE
    - The County ensures prompt access to psychiatric prescribers following intake and in response to referrals and individual patient requests in accordance with the referral and triage timelines defined in the Access to Care provisions.
    - MH increased psychiatric prescriber coverage to seven (7) days per week in the Outpatient Program.
    - MH has increased the number of prescribers from four to seven NPs and two to three psychiatrists.
    - A Psychiatrist with combined Internal Medicine/ Psychiatry training joined the acute psychiatric mental health team – allowing for enhanced diagnosis and treatment of patients with combined mental health and medical issues.
    - Worked with ACH to create a hard stop in Intake assessment to ensure nursing staff was documenting last known pharmacy if patient reported community medication.  Following this update, MH continues to improve timeliness to medication verification.

| Reporting Period | Verified Medication within 48 hours |
| --- | --- |
| 01/01/2023-02/28/2023 | 52/67 (78%) |
| 03/01/2023 – 05/31/2023 | 63/79 (80%) |
| 06/01/2023 – 08/31/2023 | 51/63 (81%) |
| 09/01/2023-11/30/2023 | 58/66 (88%) |

- **98% (56/57)** charts had the pharmacy's contact information documented in the intake note.
- MH verified **100% (66/66)** of medications for all referrals.
- On average, MH verified **88% (58/66)** of medications within 48 hours. This is a 7% increase from the last reporting period.. 8 patients' community MH medications were not verified within 48 hours, however, 63% (5/8) of those patients' medication was verified within 72 hours.

- MH revised the medication verification workflow to streamline the process for triaging and verifying community medications.
- MH continues to audit the timeliness to medication verification to ensure patients are receiving community medication within the designated timeframe.
- MH is working with ACH to develop a MH Essential Medication question in the nursing intake to automatically generate a medication verification order that will streamline the verification process and increase compliance with timelines to medication verification.
  - ○ SSO Status: N/A
- IV.D.6.
  - ○ ACH Status: SUBSTANTIAL COMPLIANCE
    - The County has implemented an electronic system for tracking mental health evaluation, treatment, and other clinical contacts, as well as sick call slips and other mental health treatment-related requests or referrals.
    - MH utilizes ACHs EHR to track mental health treatment, encounters, HSRs, and other MH treatment-related requests or referrals.
  - ○ SSO Status: N/A
- IV.D.7.
  - ○ ACH Status: PARTIAL COMPLIANCE
    - The County shall develop and implement an electronic tracking system with alert and scheduling functions to ensure timely delivery of mental health services to individual patients.
    - MH utilizes ACHs EHR to schedule all MH encounters.
    - Mental Health EHR Updates:
      - **Confidential Encounter Form** has been enhanced to include the facility along with encounter location and reason(s) for a non-confidential encounter.  This form is included in every medical and mental health encounter:



- **MH Encounters and Confidentiality Report** is in production and utilized by MH to track MH encounters for patients:

## MH Encounters and Confidentiality

Description: This report returns signed Mental Health encounters for a specified date range. This includes patient location information and the associated providers for each encounter.

*Encounter dates between 6/1/2023 12:00:00 AM and 6/2/2023 12:00:00 AM     Report ran on: 6/16/2023 10:25:18 AM*

- **Discharge Planning** – Report in production tracking patient roster for Discharge Linkages to community MH resources:



| Patient | Patient ID | Encounter Date | Location | Referral Type | Outcome | Program | County MH | Acute Psych | County ADS | Other | Other Desc | MHCClient | Patient Pickup | Responsible Provider |
|---------|-----------|----------------|----------|---------------|---------|---------|-----------|-------------|-----------|-------|-----------|-----------|----------------|----------------------|

- **MH Group Participation Report**: The Fusion Group Notes application is being further enhanced and tested to track attendance as well as scheduled and canceled groups. Additionally, a report is being developed to track groups that are offered and refused, average number of hours of structured treatment offered per patient per week, average number of hours of structured treatment received/attended per week and average number of hours of structured treatment canceled per patient per week.  Current report data:

## Group Participation

| Subtotal | Group Date | Group Name | Minutes | Location | Staff Name | Start Time UTC | End Time | Attendance |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

**Summary: January 2024 – March 2024 Groups Scheduled and Cancelled**

| Programs | Number Groups Scheduled | Number Groups Canceled |
|---|---|---|
| APU | 213 | 91(43%) |
| EOP | 108 | 9(8%) |
| IOP Main Jail: Female | 272 | 21(8%) |
| IOP Main Jail: Male | 352 | 27(8%) |
| IOP RCCC: 400 Pod | 165 | 23(14%) |
| IOP RCCC: 500 Pod | 151 | 27(18%) |
| **TOTAL** | **1,261** | **198(16%)** |

- **16%** of groups scheduled for this report period were canceled. The reasons for cancelations were due to:
  - 40% (78/198) custody staffing
  - 29% (58/198) other
  - 24% (48/198) MH staffing
  - 5% (10/198) unavailable space
  - 2% (4/198) facility lockdown


- **Timelines to Care** – Report in production and includes the following data elements:
- MH completed an audit of timelines to care from December 2023-February 2024:

## Mental Health Timelines to Care

| Start Date | Start Time | Completed Date | Completed Time | Encounter Date | Encounter Time | Encounter Description | Elapsed Time Frame | Order Status | Order Instructions |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

- MH completed audits of referrals and timelines to care and will continue to utilize the report to monitor compliance with timelines to care.

- **Suicide Precautions EHR form** – The most recent enhancements are in production.  Enhancements include communication with custody jail management system (ATIMS) to alert as to observation type, item/privilege restrictions, Danger to Self/Other:



- **Confidential Contacts Report** – report in production to audit compliance with confidential MH contacts (See MH Encounters and Confidentiality Report above).  Able to utilize study to highlight facility infrastructure limitations and other challenges that impede confidential services with patients Confidentiality data being tracked via the report:

| Facility | Block | Cell | Bed | Confidentiality | Non Confidential Reason | Non Confidential Reason2 | Interview Location |
|---|---|---|---|---|---|---|---|

- MH is working with ACH to develop SMI and MH Caseload flags that will transmit to ATIMS.  These flags will alert custody of patients who have SMI and/or are on the MH Caseload.  Additionally, the flags will ensure that SSO is aware of and can refer timely for MH RVR referrals and Planned Use of Force events.
- MH is working with ACH to embed the Suicide Risk Assessment into the MH Clinical SOAP note.  This will improve consistency of documentation, ease of locating SRA, and eliminate duplication/redundancy of documentation.
- This area remains in PARTIAL COMPLIANCE due to staffing and compliance with timelines to care.
  - SSO Status: N/A
- IV.D.8.a. – g.
  - ACH Status: PARTIAL COMPLIANCE
    - Treatment Planning remains in PARTIAL COMPLIANCE due to staffing and titrating EOP services to entire MH caseload.
    - MH established a workgroup to review treatment planning module in EHR and develop a workflow to guide staff in treatment planning requirements.
    - Clinical Multidisciplinary Team (MDT) meetings began in IOP August 2021 with full implementation November 2021.
    - IOP and EOP staff received training on completing treatment plans and MDTs in December 2021. Workflows were developed to help staff understand processes and policies.
    - Provided training to staff on the process for completing MDT meetings and documenting patient's absence at MDT in instances where patients refuse to attend.
    - Comprehensive treatment plans utilizing the EHR template were implemented for EOP patients in March 2021.
    - Prescribers began attending EOP MDTs in March 2023.
    - Began training SSO Custody working in MH programs on the MH Adaptive Support Program (November 2022).
    - MH updated the treatment planning workflow and training to ensure all staff were utilizing the treatment planning module appropriately and identifying treatment goals, interventions and objectives.
    - In December 2023, MH begin a new process of documenting MDTs and Treatment Plans within the same note in the EHR to ensure both are completed on the same day.
    - MH completed baseline study of MDTs and treatment planning in IOP and APU:

**Summary: July 2023 – September 2023**

| Programs | Charts with MDT | Charts with Treatment Plan | MDT References Treatment Goals | MDT and Treatment Plan Completed on Same Date |
|---|---|---|---|---|
| APU | 15/15(100%) | 14/15(93%) | 15/15(100%) | 15/15(100%) |
| IOP (Main Jail) | 15/15(100%) | 15/15(100%) | 14/15(93%) | 7/15(47%) |
| IOP (RCCC) | 15/15(100%) | 15/15(100%) | 12/15(80%) | 11/15(73%) |
| **TOTAL** | **45/45(100%)** | **44/45(98%)** | **41/45(91%)** | **33/45(73%)** |

*Previously Reported Data: April 2023 – June 2023*

| Programs | Charts with MDT | Charts with Treatment Plan | MDT References Treatment Goals | MDT and Treatment Plan Completed on Same Date |
|---|---|---|---|---|
| APU | 18/19(95%) | 18/19(95%) | 18/19(95%) | 17/19(89%) |
| IOP (Main Jail) | 18/18(100%) | 18/18(100%) | 17/18(94%) | 9/18(50%) |
| IOP (RCCC) | 18/18(100%) | 17/18(94%) | 17/18(94%) | 14/18(78%) |
| **TOTAL** | **54/55(98%)** | **53/55(96%)** | **52/55(95%)** | **40/55(73%)** |

**Findings:**
- For all programs:
  - **45/45(100%)** of charts had completed MDTs.
  - **44/45(98%)** of charts had treatment plans.
  - **41/45(91%)** of charts had MDTs referencing treatment goals.
  - **33/45(73%)** of charts had MDT and Treatment plans completed on the same date.

- In August 2023, the MH QA Supervisor began observing and auditing IOP MDTs to identify strengths, challenges and barriers of MDT process and staff coordination and completion of all MDT requirements.
- Social work clinicians were imbedded on the APU in January 2023.  MH anticipates that treatment planning and MDT compliance will increase in the next review period.
- In January 2024, MH Treatment Planning, Part 2 was provided to IOP, APU and EOP staff with a focus on SMART goals and interventions.  Documentation was streamlined and included embedding the clinical assessment and findings in the treatment plan document as well as inclusion of standardized headings to increase compliance with treatment planning requirements.
  - SSO Status: N/A

| **Medication Administration and Monitoring** |
| :---: |
| **(Section IV; Provisions E.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: SUBSTANTIAL COMPLIANCE** |

## E.  Medication Administration and Monitoring

1. The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws and through the following:
   a) The County shall ensure that initial doses of prescribed medications are delivered to inmates within 48 hours of the prescription, unless it is clinically required to deliver the medication sooner;
   b) The County shall make best efforts to verify a patient's prescribed medications and current treatment needs at intake, including outreach to pharmacies and community providers to request prescriptions and other health care records relating to ongoing care needs. The policy shall ensure that any ongoing medication, or a clinically appropriate alternative, shall be provided within 48 hours of verification of the prescription or from a determination by a physician that the medication is medically necessary. Any orders that cannot be reconciled or verified, such as those with conflicting prescriptions from multiple prescribers, shall be referred to a health care provider for reconciliation or verification the next clinic day after booking.
   c) The County shall ensure that medical staff who administer medications to inmates document in the inmate's Medical Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, and (3) the date and time for any refusal of medication.
2. Qualified mental health professionals shall, for each individual patient, establish targets for treatment with respect to the use of psychotropic medication and shall assess and document progress toward those targets at each clinical visit.
3. Qualified mental health professionals shall, for each individual patient, monitor and document the following with respect to psychotropic mediations: (1) levels of medications, (2) adverse impacts (including through renal and liver function tests where indicated), (3) side effects, and (4) efficacy.
4. Qualified mental health professionals shall, for each individual patient, conduct and document baseline studies, including ECG, blood, urine, and other studies, as clinically appropriate, prior to the initiation of treatment.
5. The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.
6. Medication adherence checks that serve a clinical function shall be conducted by nursing staff, not custody staff. Custody staff shall conduct mouth checks when necessary to ensure institutional safety and security.
7. Psychiatric prescribers shall consider clinically indicated considerations and conduct an in-person consultation, with the patient prior to changing or initiating medications. In the event there is no in-person consultation before prescribing or changing

| medications the psychiatric prescriber shall note and document the reasons for why there was not an in-person consultation with the patient. |
| --- |

**Compliance Status by Section:**

- IV.E.1.a. and c.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - ACH has developed and implemented policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws.
    - ACH staff document all required medication administration information in the MAR.
  - SSO Status: N/A
- IV.E.1b.
  - ACH Status: PARTIAL COMPLIANCE

| Reporting Period | Verified Medication within 48 hours |
| --- | --- |
| 01/01/2023 – 02/28/2023 | 52/67 (78%) |
| 03/01/2023 – 05/31/2023 | 63/79 (80%) |
| 06/01/2023 – 08/31/2023 | 51/63 (81%) |
| 09/01/2023 – 11/30/2023 | 58/66 (88%) |

- **98% (56/57)** charts had the pharmacy's contact information documented in the intake note.
- MH verified **100% (66/66)** of medications for all referrals.
- On average, MH verified **88% (58/66)** of medications within 48 hours. This is a 7% increase from the last reporting period.. 8 patients' community MH medications were not verified within 48 hours, however, 63% (5/8) of those patients' medication was verified within 72 hours.
- MH revised the medication verification workflow to streamline the process for triaging and verifying community medications.

- ▪ MH continues to audit the timeliness to medication verification to ensure patients are receiving community medication within the designated timeframe.
  - o SSO Status: N/A
- IV.E.2.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ Qualified mental health professionals establish targets for treatment with respect to the use of psychotropic medication and shall assess and document progress toward those targets at each clinical visit.
    - ▪ QMHPs establish targets for treatment with respect to psychotropic medication and assess and document progress toward those targets at each clinical visit.
    - ▪ MDT meetings in APU and IOP settings include targets for treatment with respect to the use of psychotropic medication and assessment of progress towards those targets.
    - ▪ Established a MH Prescriber Meeting in August 2021 to improve communication, patient care practices, and standards related to the Consent Decree.
    - ▪ Prescribers began attending EOP MDTs in March 2023.
    - ▪ MH hired an NP Supervisor in 11/2023 to oversee clinical activities of NP staff.
  - o SSO Status: N/A
- IV.E.3.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ Qualified mental health professionals monitor and document the following with respect to psychotropic medications: (1) levels of medications, (2) adverse impacts (including through renal and liver function tests where indicated), (3) side effects, and (4) efficacy.
    - ▪ QMHPs monitor and document levels of medications, and adverse impacts, order labs, and document side effects and treatment efficacy as appropriate.
    - ▪ In May 2024, MH completed an initial Psychiatric Prescriber Audit and identified the following areas of substantial compliance:
      - 92% establishing target treatments and assessing progress toward goals
      - 94% conducting in-person meetings, if indicated, when making medication changes
      - 100% monitoring for adverse impacts/side effects
      - 100% monitoring for treatment efficacy

- o SSO Status: N/A
- IV.E.4.
  - o ACH Status: PARTIAL COMPLIANCE
    - Qualified mental health professionals conduct and document baseline studies, including ECG, blood, urine, and other studies, as clinically appropriate, prior to the initiation of treatment.
    - Psychotropic treatment may be started prior to labs for a variety of reasons including emergency need, patient noncompliance, phlebotomist unavailability or other security issues within the facility.
    - In May 2024, MH completed an initial Psychiatric Prescriber Audit and identified areas for improvement related to ordering ECG for patients on antipsychotics and ensuring completion of routine labs for patients prescribed antipsychotics, mood stabilizers and/or antidepressants.
  - o SSO Status: N/A
- IV.E.5.
  - o ACH Status: PARTIAL COMPLIANCE
    - All RNs and LVNs have been cross-trained to administer medications allowing RNs to fill critical staffing shortages and avoid medication administration delays. A minimum number of staff has been established in order to cover pill call and when there are shortages, RNs will assist to ensure coverage.
    - Medication administration times shall outline acceptable dosing times to ensure timely delivery of medications.
    - Established distribution areas to ensure efficient delivery of medications.
    - Staffing matrix has been developed to reflect 12 hour shifts to maximize staffing.
    - During the previous reporting period, ACH management met with the LVN Union to make necessary changes to medication administration schedules to achieve substantial compliance. Required meetings occurred, and a Notice was sent out to all LVN's assigned to medication administration on 12/12/23 informing them that they will be moving to the day shift. Both BID medication administration times will occur on the dayshift in order to ensure safer medication practices and an abundance of staff to cover medication administration.
    - In January 2024, ACH leadership rolled out the new pill call process and new medication administration times. The two heaviest pill calls (AM and PM) are on the same shift. We have transferred the majority of LVN staffing to this shift so ensure adequate staffing. Due to this change, we always have enough staff to cover pill call...

- ACH leadership and SSO leadership have met multiple times to coordinate medication administration efforts. The Main Jail Captain wrote his operations order to align with the ACH workflow. This ensures SSO and nursing staff have the same information which creates less confusion and/or conflict.
- Training on the new medication administration workflow took place at a nursing all staff meeting on 12/20/23 and ongoing since then.
- Hiring efforts have significantly increased.
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - Specialty programs like APU, IOP and SITHU have additional custody staff available to help with medication administration.
    - Since April 2023 the Main Jail has been staffing medical escorts allowing medical staff better access to patients. While the majority of the escorts are for doctor and nurse sick-call, these escorts allow floor custody staff more time for other responsibilities such as medication administration.
    - RCCC has at least four dedicated medical escorts. Deputies assigned to facilities are also available.

- IV.E.6.
  - o ACH Status: PARTIAL COMPLIANCE
    - Medication adherence checks that serve a clinical function are required to be conducted by nursing staff, not custody staff. In-person observation audits have begun, and QI will work on additional review tools in the next monitoring period as well as in-person audits on medication administration and mouth-check adherence.
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - Current practice. ACH, ACMH and Compliance Lieutenants meet regularly to discuss and rectify any issues related to medication distribution and medication diversion by inmates as well as ensure staff is conduction required checks.

- IV.E.7.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - Psychiatric prescribers consider clinically indicated considerations and conduct an in-person consultation with the patient prior to changing or initiating medications. In the event, there is no in-person consultation before prescribing or changing medications the psychiatric prescriber documents the reasons why there was not an in-person consultation with the patient.

- ▪ In May 2024, MH completed a Psychiatric Prescriber Audit and found that MH conducted an in-person meeting, if indicated, when making medication changes in 94% of the charts reviewed.
    - ▪ Telepsychiatric visits may occur due to a variety of reasons and medications may be restarted when confirmed from community/ other collateral or as clinically indicated.
  - o SSO Status: N/A

| Placement Conditions, Privileges, and Programming |
|:---:|
| **(Section IV; Provisions F.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: PARTIAL COMPLIANCE** |

**F.  Placement, Conditions, Privileges, and Programming**

1. Placement:
   a) It shall be the policy of the County to place and treat all prisoners on the mental health caseload in the least restrictive setting appropriate to their needs.
   b) Placement in and discharge from Designated Mental Health Units shall be determined by qualified mental health professionals, with consultation with custody staff as appropriate.
   c) Absent emergency circumstances, the County shall obtain the assent of qualified mental health professionals before transferring prisoners with SMI into or out of Designated Mental Health Units.
   d) It shall be the policy of the County to place prisoners with SMI in appropriate settings that ensure provision of mental health services, patient safety, and the facilitation of appropriate programs, activities, and out-of-cell time. Co-housing with other populations shall be avoided to the extent that such a practice prevents or hinders any of the above.
   e) All patients requiring placement in a Designated Mental Health Unit shall be provided access to such placement and care based on current clinical need and without any requirement for director-level approval.
2. Programming and Privileges
   a) All Designated Mental Health Units shall offer a minimum of 7 hours of unstructured out-of-cell time per week and 10 hours of structured out-of-cell time per week for each prisoner. While out-of-cell hours per prisoner may vary from day to day, each prisoner will be offered some amount of out-of-cell time every day of the week. All treatment and out-of-cell time shall be documented for each prisoner, and reviewed as part of Quality Assurance procedures.
   b) The County shall ensure that prisoners on the mental health caseload have access and opportunity to participate in jail programming, work opportunities, and education programs, consistent with individual clinical input.

    c) The County shall develop and implement, in the 2P inpatient unit and the IOP unit, a program for progressive privileges (including time out of cell, property allowances, etc.) for patients as they demonstrate behavioral progress. A patient's level of privileges and restrictions shall be based on both clinical and custody input regarding current individual needs. The County shall ensure a process to review custody classification factors when necessary, so that placement, privileges, and restrictions match current individual circumstances and needs.

    d) Individuals on a mental health caseload shall receive, at minimum, privileges consistent with their classification levels, absent specific, documented factors which necessitate the withholding of such privileges. Clinical staff shall be informed of the withholding of privileges and the reasons for the withdrawal shall be documented and regularly reviewed by clinical and custody staff. The restoration of privileges shall occur at the earliest time appropriate based on individual factors.

    e) Where a prisoner in a Designated Mental Health Unit is subject to any restrictions of property, privileges, or out-of-cell time, the mental health treatment provider and Multi-Disciplinary Treatment Team will, on a weekly basis, assess and discuss with the prisoner progress and compliance with the prisoner's individual case plan. This process will include clinical contact in a private, face-to-face, out-of-cell setting. The Multi-Disciplinary Treatment Team will provide input to classification staff regarding the prisoner's mental health and appropriateness for removal of imposed restrictions. Classification staff will follow the recommendation of the Multi-Disciplinary Treatment Team to remove restrictions unless there is a clear, documented security reason to maintain the restriction.

3. Conditions:

    a) Staff shall provide prisoners in Designated Mental Health Units with the opportunity to maintain cell cleanliness and the opportunity to meet their hygiene needs. Custody and clinical staff shall provide assistance to prisoners on these matters, as appropriate to individual patient needs

    b) The County shall ensure uniformity of practice with respect to cell searches, such that searches are not done for punitive or harassment reasons. The County shall monitor whether cell search practices may be serving as a disincentive for prisoners in Designated Mental Health Units to leave their cells for treatment or other out-of-cell activities, and shall take steps to address the issue as appropriate.

4. Bed planning:

    a) The County shall provide a sufficient number of beds in Designated Mental Health Unit, at all necessary levels of clinical care and levels of security, to meet the needs of the population of prisoners with SMI.

    b) The County shall conduct a bed needs assessment, to be updated as appropriate, in order to determine demand for each category of Designated Mental Health Unit beds and shall ensure timely access to all levels of mental health care, consistent with individual treatment needs.

    c) The County shall establish mental health programming for women that ensures timely access to all levels of care and is equivalent to the range of services offered to men.

5. General Exclusion of Prisoners with Serious Mental Illness from Segregation

a) Prisoners with Serious Mental Illness will not be housed in Segregation units, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and there is no reasonable alternative, in which cases the provisions of Section VIII.D of the Segregation/Restrictive Housing Remedial Plan shall apply.

b) Where prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit are assessed a Disciplinary Segregation term, they will serve the term in a Designated Mental Health Unit, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and shall receive structured out-of-cell time and programming as determined by the Multi-Disciplinary Treatment Team.

6. Access to Care

a) The County shall designate and make available custody escorts for mental health staff in order to facilitate timely completion of appointments and any other clinical contacts or treatment-related events.

b) The County shall ensure sufficient and suitable treatment and office space for mental health care services, including the Triage Navigator Program and other mental health-related services provided on site at the Jail.

c) Locations shall be arranged in advance for all scheduled clinical encounters.

d) The County shall track and document all completed, delayed, and canceled mental health appointments, including reasons for delays and cancelations. Such documentation shall be reviewed as part of the Quality Assurance process.

e) Referrals and triage:

    i. The County shall maintain a staff referral process (custody and medical) and a kite system for prisoners to request mental health services. Referrals by staff or prisoners must be triaged within 24 hours.

    ii. Referrals and requests for mental health services shall be handled in accordance with the following timeframes, and based on the definitions and guidance in Exhibit A-2:

- Prisoners with "Must See" (Emergent) mental health needs shall be seen for assessment or treatment by a qualified mental health professional as soon as possible, and within six (6) hours. Prisoners with emergent mental health needs shall be monitored through continuous observation until evaluated by a mental health professional.

- Prisoners with Priority (Urgent) mental health needs shall be seen for assessment or treatment by a qualified mental health professional within 36 hours.

- Prisoners with Routine mental health needs shall be seen for assessment or treatment by a qualified mental health professional within two (2) weeks;

- Prisoners whose requests do not require formal clinical assessment or intervention shall be issued a written response, with steps taken to ensure effective communication.

**Compliance Status by Section:**

- IV.F.1.

- o ACH Status: PARTIAL COMPLIANCE
  - ▪ This area remains in PARTIAL COMPLIANCE due to insufficient APU and IOP beds which prevent placing some patients on the MH caseload in the least restrictive setting appropriate to their needs.
  - ▪ MH determines placement and discharge from Designated Mental Health Units (DMHU).
  - ▪ Absent emergency circumstances, custody obtains consent of MH before transferring patients with SMI out of DMHU.
  - ▪ Patients requiring placement in a DMHU do not require director level approval.
  - ▪ Developed a plan and process with SSO Custody to ensure MH is determining which patients are placed in Outpatient Psychiatric Pod (OPP) housing.
  - ▪ Coordinated with SSO Custody to update Custody's classification form to better communicate MH recommendations regarding housing of patients served by MH.
  - ▪ Established single-cell housing unit on 3E for patients with SMI who require a single-cell due to clinical or behavioral factors.
  - o SSO Status: SUBSTANTIAL COMPLIANCE
- • IV.F.2.
  - o ACH Status: PARTIAL COMPLIANCE
    - ▪ IOP offers 10 hours of structured out-of-cell time per week to each patient.
    - ▪ MH placed three social work staff on the APU which has increased structured out-of-cell time.  APU offers 19 hours of group therapy/programming per week.
    - ▪ MH determines the level of privileges and restrictions for patients in the APU.  Any removal or reinstatement of privileges, property or clothing is by MD order and follows LPS Denial and Restoration of Patient's Rights requirements.
    - ▪ IOP patients who are subject to restrictions of property, privileges, or out-of-cell time are placed on an Alternative Treatment Plan.  The multidisciplinary team meets daily to discuss the patient's progress and the transition of the patient from ATP to general programming.
    - ▪ This area remains in PARTIAL COMPLIANCE due to SSO developing reporting for tracking of out-of-cell time.
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ a) Designated MH Units (IOP, JBCT) structured out of cell time is determined by program coordinators (ACMH, UC Davis) as part of their treatment. Inmates in these programs generally have more than seven hours of unstructured out of cell time and more than ten hours of structured time per week. Both Main Jail and RCCC Compliance monitor out-of-cell times.

- b)  Current practice.  Work assignments will be based on the patient's ability to safely perform those functions given the appropriate level of supervision.
- d)  Current practice.  Work assignments will be based on the patient's ability to safely perform those functions given the appropriate level of supervision.
- e)  Current practice. On an operational level, the IOP and Acute Unit custody staff work with ACMH on property and privileges. The IOP Sergeant monitors compliance.

- IV.F.3.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - MH and Custody assist patients in the IOP and APU with maintaining cell cleanliness and promoting personal hygiene.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - b) Cell searches are done randomly on a revolving basis. They are not done for punitive or harassment reasons. They are done to ensure the inmates do not have any contraband or weapons that can harm themselves, ACMH staff or SSO staff. Policy 512 was published on 05/03/2024

- IV.F.4.
  - ACH Status: PARTIAL COMPLIANCE
    - Although IOP has significantly increased its bed capacity, PARTIAL COMPLIANCE due to insufficient APU and IOP beds.
    - MH provides mental health programming and access to all levels of care to female patients.  MH recently increased female IOP beds from 8 to 23.  APU and EOP services are also provided to female patients.
    - Planning meetings are in place for the Intake Health Services Facility (IHSF) building which will substantially increase our bed capacity for patients with mental health needs.
  - SSO Status: PARTIAL COMPLIANCE
    - a) IOP units have been created for male and female patients, with the expansion of Enhanced Treatment pods. Female IOP will be at the Main Jail.  RCCC expanded the male IOP program and added 24 new beds in the CBF 500 pod. RCCC added 24 beds for EASE.  Often the need for mental health beds is greater than the structural capacity of the physical facilities. December 8, 2022 the County BOS approved a new Intake and Health Services Facility (IHSF) which will be planned with sufficient bed space for the mental health population.  While the plans for IHSF are on hold, interim plans are being worked on which would increase APU beds by as many as 20 and IOP beds by as many as 30.

- c) Women's IOP and OPP unit established at Main Jail.  Main Jail has 23 female IOP beds. Acute Psychiatric services are offered to women. RCCC has 13 female beds for JBCT and EASE.

- IV.F.5.
  - ACH Status: PARTIAL COMPLIANCE
    - Multidisciplinary Intervention Plans are utilized in OPP and EOP to address significant or dangerous behaviors or significant disruptions to the therapeutic milieu.
    - Patients housed in IOP or APU are not placed in disciplinary segregation.  Patients unable to program or engaging in assaultive behaviors or posing a security concern will be placed on an Alternative Treatment Plan.  Daily meetings are held with the treatment team to determine interventions and transition the patient back to general programming.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - a) Current Practice. ACMH is using an alternative treatment program in IOP to take Administrative Segregation inmates.  Fewer and fewer Administrative Segregation inmates are on the SMI caseload.  Main Jail has implemented female high security IOP with 8 additional beds 3W 100 pod. RCCC added male high security IOP with 24 additional beds. Main Jail has also implemented a male OPP single cell housing unit in the 3E 100 Pod. Many of these inmates were previously classified as ADSEG on 8 West.
    - b) Current practice.  All discipline hearings on designated mental health housing areas (OPP, IOP, APU) are conducted by the IOP Sergeant. Before implementing discipline, the IOP Sergeant confers with an ACMH staff member about the proposed discipline.

- IV.F.6.
  - ACH Status: PARTIAL COMPLIANCE
    - IOP and APU have designated custody support to facilitate clinical contacts and treatment-related activities.
    - Patients may request mental health services through an HSR.
    - Patients are provided a written response after submitting an HSR.

Summary: Triaged Health Service Requests December 2023 – February 2024

| Month | Total HSR | HSR Triaged within 24 Hours | HSR Triaged Outside of 24 hours | Average Triage Time |
|-------|-----------|------------------------------|----------------------------------|---------------------|
| December 2023 | 1311 | 1063(81%) | 248(19%) | 15 |
| January 2024 | 1344 | 1193(89%) | 151(11%) | 12 |
| February 2024 | 1515 | 1214(80%) | 301(20%) | 13 |
| **TOTAL** | **4170** | **3470(83%)** | **700(17%)** | |

- 4,170 MH HSRs were triaged from December 2023-February 2024
- December 2023: 81% of HSRs were triaged within 24 hours
- January 2024: 89% of HSRs were triaged within 24 hours
- February 2024: 80% of HSRs were triaged within 24 hours
- MH completed audits of referrals and timelines to care and will continue to utilize the report to monitor compliance with timelines to care.
- MH continues to experience a high level of referrals for services:

  - *Emergent/Must See Referrals (January 2021 - March 2024)*

**2021**

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | TOTAL |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| 301 | 202 | 264 | 268 | 291 | 293 | 286 | 337 | 383 | 369 | 426 | 467 | **3,887** |

**2022**

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | TOTAL |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| 496 | 421 | 622 | 644 | 723 | 686 | 824 | 845 | 992 | 1267 | 1075 | 1213 | **9,808** |

**2023**

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | TOTAL |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| 1121 | 1032 | 1004 | 1043 | 1168 | 1398 | 1493 | 1121 | 1041 | 1345 | 1109 | 1129 | **14,004** |

**2024**

| Jan | Feb | Mar | TOTAL |
|-----|-----|-----|-------|
| 1211 | 1004 | 1062 | **3,279** |

- **On-site Mental Health Referrals (January 2021 - March 2024)**

**2021**

| Jan | Feb | Mar | April | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | TOTAL |
|-----|-----|-----|-------|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| 864 | 900 | 1118 | 1147 | 1103 | 1190 | 1152 | 1267 | 1192 | 1029 | 1112 | 1084 | 13,158 |

**2022**

| Jan | Feb | Mar | April | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | TOTAL |
|-----|-----|-----|-------|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| 903 | 909 | 1260 | 1176 | 1271 | 1297 | 1388 | 1355 | 1309 | 1325 | 1174 | 1286 | 14,653 |

**2023**

| Jan | Feb | Mar | April | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | TOTAL |
|-----|-----|-----|-------|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| 1273 | 1330 | 1509 | 1426 | 1838 | 1925 | 2103 | 1824 | 1601 | 1523 | 1492 | 1201 | 19,045 |

**2024**

| Jan | Feb | Mar | TOTAL |
|-----|-----|-----|-------|
| 1332 | 1155 | 1357 | 3,844 |

- Findings:
  - January 2021-December 2022 a 152% increase in emergent referrals and a 11% increase in onsite referrals
  - January 2022-December 2023 a 43% increase in emergent referrals and a 30% increase in onsite referrals
  - This area remains in partial compliance due to the high number of referrals, MH staffing challenges, limited confidential interview space and custody escorts to facilitate efficient patient assessments.
- SSO Status: SUBSTANTIAL COMPLIANCE
  - a) IOP deputies have been structured to oversee MH treatment on the entire third floor. The JBCT/IOP and EASE programs at RCCC have 16 officers and 1 sergeant assigned to them. These officers are responsible for ensuring the inmates receive what they need from a custody perspective. They act as escorts for the mental health staff. If the inmates need to be taken to an appointment off-site, that is facilitated by our medical escort team. Same is true for Main Jail although we have 20 deputies and a sergeant assigned to IOP.
  - b) At RCCC, office space for MH care providers and treatment is available and constantly being re-evaluated based on needs and advisement of ACMH administrators. At MJ we work collaboratively with ACMH when space needs arise.
  - e) SSO staff make ACMH referrals based on personal observations or at the request of the inmate; Inmates may also request MH services via a Health Services Request (HSR).  See ACH Status Report for their practices and policies regarding response time.

| **Medico-Legal Practices** |
|:---:|
| **(Section IV; Provisions G.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: N/A** |

**G. Medico-Legal Practices**

1. The County shall provide access to appropriate inpatient psychiatric beds to all patients who meet WIC § 5150 commitment criteria. At the time a patient's need for inpatient care is identified, commitment paperwork shall be initiated immediately. Placement in an inpatient unit shall occur at the earliest possible time, and in all cases within 24 hours. For individual prisoners placed on a pre-admit or wait list for inpatient placement, affirmative steps to process and place them shall begin immediately.
2. The County shall not discharge patients from the LPS unit and immediately readmit them for the purpose of circumventing LPS Act requirements. For patients with continuing need for LPS commitment, the County shall follow all required procedures under the LPS Act.
3. The County shall review all County and JPS policies and procedures for PREA compliance, and revise them as necessary to address all mental health-related requirements.

**Compliance Status by Section:**

- IV.G.1.
  - ACH Status: PARTIAL COMPLIANCE
    - This area remains in partial compliance due to insufficient APU beds which prevents placing some patients on the MH caseload in the least restrictive setting appropriate to their needs.
    - MH provides access to inpatient psychiatric beds to patients who meet WIC § 5150 commitment criteria.  Should a patient be unable to access the inpatient unit due to being filled, they receive daily status checks from outpatient services and receive mental health care, including psychiatric medications, while waiting for admission.
    - APU Involuntary Detention Audit

**Summary Period: January 2024 – March 2024 (does not include 1370s and voluntary)**

| Month | 5150 | 5250 | 5270 |
|---|---|---|---|
| January | 24 | 12 | 5 |
| February | 22 | 14 | 7 |
| March | 24 | 18 | 10 |
| **Total** | **70** | **44** | **22** |

*Previously Reported: January 2023 – December 2023 (does not include 1370s and voluntary)*

| Month | 5150 | 5250 | 5270 |
|---|---|---|---|
| January | 21 | 13 | 5 |
| February | 20 | 12 | 4 |
| March | 26 | 9 | 5 |
| April | 23 | 16 | 2 |
| May | 26 | 9 | 7 |
| June | 23 | 14 | 7 |
| July | 25 | 20 | 8 |
| August | 24 | 17 | 10 |
| September | 23 | 18 | 8 |
| October | 30 | 17 | 8 |
| November | 29 | 18 | 10 |
| December | 25 | 20 | 4 |
| **Total** | **295** | **183** | **78** |

- Plans are active in construction of new annex building which will include new and expanded inpatient beds. Discussions continue with County leadership to expand APU by 20 beds on 3 East to assist with the APU waitlist.
  - SSO Status: N/A
- IV.G.2.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - MH follows all LPS Act requirements regarding LPS commitments and does not discharge and readmit patients to circumvent the LPS Act.
  - SSO Status: N/A
- IV.G.3.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - ACH has reviewed all County and JPS policies and procedures for PREA compliance and revised them as necessary to address all mental health-related requirements.
  - SSO Status: N/A

| Clinical Restraints and Seclusion |
|---|
| **(Section IV; Provisions H.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: N/A |

## H. Clinical Restraints and Seclusion

1. Generally:
   a) It is the policy of the County to employ restraints and seclusion only when necessary and to remove restraints and seclusion as soon as possible.
   b) It is the policy of the County to employ clinical restraints and seclusion only when less restrictive alternative methods are not sufficient to protect the inmate-patient or others from injury. Clinical restraint and seclusion shall not be used as punishment, in place of treatment, or for the convenience of staff.
   c) The placement of a prisoner in clinical restraint or seclusion shall trigger an "emergent" mental health referral, and a qualified mental health professional shall evaluate the prisoner to assess immediate and/or long-term mental health treatment needs.
   d) When clinical restraints or seclusion are used, Jail staff will document justification for their application and the times of application and removal of restraints.
   e) There shall be no "as needed" or "standing" orders for clinical restraint or seclusion.
   f) Individuals in clinical restraints or on seclusion shall be on constant watch, or on constant video monitoring with direct visualization every 15 minutes. All checks will be documented.
   g) Fluids shall be offered at least every four hours and at meal times.
2. Clinical Restraints
   a) The opinion of a qualified health care professional or qualified mental health professional on placement and retention in restraints will be obtained within one hour from the time of placement.
   b) A thorough clinical assessment shall be conducted by qualified health care professional or qualified mental health professional every four hours to determine the need for continued restraint.
   c) Individuals in restraints shall be checked every two hours by a nurse for vital signs, neurovascular assessment, and limb range, and offered an opportunity for toileting.
3. Reentry Services
   a) The County shall provide a 30-day supply of current psychotropic medications to inmates on the mental health caseload, who have been sentenced and have a scheduled released date, immediately upon release.

b) Within 24 hours of release of any inmate who is on the mental health caseload and classified as pre-sentence, the County shall transmit to a designated County facility a prescription for a 30-day supply of the inmate's current psychotropic medications.

c) The County, in consultation with Plaintiffs' counsel, develop and implement a reentry services policy governing the provision of assistance to prisoners on the mental health caseload, including outpatient referrals and appointments, public benefits, medical insurance, housing, substance abuse treatment, parenting and family services, inpatient treatment, and other reentry services.

d) The County agrees that, during the course of the implementation of the remedial plans contained in this agreement, it will consider Plaintiffs' input on measures to prevent unnecessary or avoidable incarceration of individuals with serious mental illness.

**Compliance Status by Section:**

- IV.H.1.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ MH only employs restraints and seclusion when clinically necessary and removes restraints and seclusion as soon as possible.
  - o SSO Status: N/A
- IV.H.2.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ MH does not utilize "as needed" or "standing" orders for clinical restraint and seclusion.
    - ▪ MH actively utilizes de-escalation and less restrictive means prior to initiating clinical restraints and only when other interventions are not sufficient to protect the patient or others from injury. MH rarely employs clinical restraints on the APU.
    - ▪ MH never uses clinical restraint or seclusion as a punishment, in place of treatment, or for the convenience of staff. Hourly documentation of clinical restraints and seclusion includes justification, time of application, monitoring of restraints, patient assessment and range of motion, opportunity for toileting, circulation checks, patient presentation, discussion with patient regarding behaviors necessary for release from restraints, rationale for not removing restraints and offering of food and fluids every two hours.
  - o SSO Status: N/A
- IV.H.3.
  - o ACH Status: PARTIAL COMPLIANCE

- Staff provide sentenced patients a 30-day supply of prescribed medications upon release.  Presentenced patients may obtain a prescription for a 30-day supply of medication at the County Primary Care Pharmacy.  See Reentry Services (Provision Q.) for further detail.
- MH continues to meet regularly with County Behavioral Health to refine the referral process for community-based mental health services.  A report was developed to capture the projected release date and level of care to identify patients with SMI and release dates within 6 weeks.
- The County is preparing to implement the CalAIM 90-day PreRelease Program in 2025. Through this initiative, Sacramento County is taking significant steps to address poor health outcomes of individuals incarcerated in Sacramento County Jails by establishing pre-release Medi-Cal enrollment strategies to ensure individuals have continuity of coverage upon their release, as well as access to key services to help them successfully return to their communities. This will include warm hand-off to Enhance Care Management and In Reach services.
- ACH meets internally and participates in County-wide meetings to address obstacles to improve discharge planning and successful linkage to ongoing care.  Collaboration between ACH Medical and Mental health, SSO Custody, the Courts, community partners such as Community Health Works (formerly known as Sacramento Covered) for ongoing medical needs and County Behavioral Health for individuals with serious mental illness (SMI) is necessary for successful discharge planning.
- County Behavioral Health established the Community Justice Support Program – a full-service partnership to serve justice-involved patients with serious mental illness.  ACH Mental Health meets regularly with the program leadership to address barriers and collaborate on the referral process. A report was developed to capture the projected release date and level of care to identify patients with SMI and release dates within 6 weeks.
- Medi-Cal Managed Care Plans rolled out a new benefit under the initiative California Advancing and Innovating Medi-Cal (CalAIM). CalAIM provides enhanced care management (ECM) and coordination for patients with intensive health/mental health needs.
- This provision remains in partial compliance due to the need for more discharge planners.
  - o SSO Status: N/A

| Training |
| --- |
| **(Section IV; Provisions I.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: SUBSTANTIAL COMPLIANCE** |

**I.  Training**

1.  The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:
    a)  All jail custody staff shall receive formal training in mental health, which shall encompass mental health policies, critical incident response, crisis intervention techniques, recognizing different types of mental illness, interacting with prisoners with mental illness, appropriate referral practices, suicide and self-harm detection and preventions, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.
    b)  Custody staff working in Designated Mental Health Units shall receive additional training, including additional information on mental illness, special medico-legal considerations, de-escalation techniques, working with individuals with mental health needs, relevant bias and cultural competency issues, and the jail's mental health treatment programs.
    c)  Mental health staff shall receive training on the correctional mental health system, correctional mental health policies, suicide assessment and intervention, relevant bias and cultural competency issues, and treatment modalities to be offered in the jails.

**Compliance Status by Section:**

- IV.I.1.
  - ACH Status: PARTIAL COMPLIANCE
    - MH provides training to custody staff working in designated mental health housing units:  Understanding Mental Health Symptoms in the Correctional Setting (Custody specific training)
    - Began training custody staff working in MH programs on the MH Adaptive Support Program (November 2022).
    - MH provided Planned Use Of Force with Mental Health Patients to custody staff in IOP, APU, JBCT, and the CERT teams and Sgts in November 2022 and May – June 2023.
    - MH has a training coordinator who monitors training compliance.
    - Training was developed and provided on the following:
      - Treatment Planning and MDT Meetings

- Brain Development/Intellectual Disability
- Effective Communication/ADA
- Consent Decree
- 5150 Certification
- Prison Rape Elimination Act
- Understanding Mental Health Symptoms in the Correctional Setting (Custody specific training)
- WPATH Transgender Care
- MH Adaptive Support Plan
- Suicide Prevention – 2-Hour Training
- Suicide Prevention – 4-Hour Training
- Suicide Risk Assessment
- Planned Use of Force and De-escalation
- Updated Safety Planning Training (January 2023)
- MH RVR and Segregation Assessments
- Cultural Intelligence in Healthcare: The Impact of Unconscious/Implicit Bias in Healthcare (October 2023)

- ACH leadership was able to procure a guest trainer on the topic of "Documentation Practices and Litigation" who has been featured at the National Commission on Correctional Health Care (NCCHC). Attorney Doug Bitner is an attorney who has defended the County in over 2000 cases regarding inmate-patient lawsuits. He provided a tailored training for Sacramento County Jail staff on the importance of documentation. This training will be included as part of new employee onboarding.
- MH added Understanding Mental Health Symptoms in the Correctional Setting (Custody specific training) after each scheduled 4-hour Suicide Prevention Training to provide all new SSO staff an opportunity to take the training.
- MH provided Brain Development/Intellectual Disability and Adaptive Support Plan training to all MJ and RCCC deputies.
- 98% of MH staff have completed Cultural Intelligence in Healthcare: The Impact of Unconscious/Implicit Bias in Healthcare.

o SSO Status: SUBSTANTIAL COMPLIANCE

- ▪ a) The Academy now offers graduates the 24-hour CIT class, as well as an additional 20 hours of behavioral health as part of their final training before being employed. These classes cover many of the topics listed. Additionally, our staff will be assigned various classes through Lexipol, which they must complete online. Many of these topics are covered through these classes as well.  All new employees receive 4-hours of in-person suicide prevention training developed in collaboration with the suicide prevention SME. Current employees will receive a 2-hour refresher course annually.  This was implemented in May 2021.
- ▪ b) IOP and JBCT deputies are given 24 hours of additional CIT training.  Several deputies from the Main Jail and RCCC have received a 2-hour negotiations class specific to a custody setting.

| V.  Disciplinary Measures and Use of Force for Prisoners with Mental Health or Intellectual Disabilities |
|---|

| Role of Mental Health Staff In Disciplinary Process |
|---|
| (Section V; Provision A.) |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status:  SUBSTANTIAL COMPLIANCE |

**A.  Role of Mental Health Staff in Disciplinary Process**

1. The County's policies and procedures shall require meaningful consideration of the relationship of a prisoner's behavior to any mental health or intellectual disability, the efficacy of disciplinary measures versus alternative interventions, and the impact of disciplinary measures on the health and well-being of prisoners with disabilities.
2. Prisoners who are alleged to have committed a rules violation shall be reviewed by a qualified mental health professional if any of the following apply:
   - a) Prisoner is housed in any Designated Mental Health Unit;
   - b) Jail staff have reason to believe the prisoner's behavior was unusual, uncharacteristic, or a possible manifestation of mental illness;
   - c) Prisoner is on the mental health caseload and may lose good time credit as a consequence of the disciplinary infraction with which he or she is charged.

3. If any of the above criteria is met, the qualified mental health professional shall complete the form attached as Exhibit A-3 (JPS-Rules Violation Mental Health Review) and indicate:
   a) Whether or not the reported behavior was related to mental illness, adaptive functioning deficits, or other disability;
   b) Whether the prisoner's behavior is, or may be, connected to any of the following circumstances:
      i. An act of self-harm or attempted suicide
      ii. A cell extraction related to transfer to a medical/mental health unit or provision of involuntary treatment
      iii. Placement in clinical restraints or seclusion.
   c) Any other mitigating factors regarding the prisoner's behavior, disability, and/or circumstances that should be considered and whether certain sanctions should be avoided in light of the prisoner's mental health disability or intellectual disability, treatment plan, or adaptive support needs.

**Compliance Status by Section:**

- V.A.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - d) MH policies and procedures contain meaningful consideration of the relationship of a patient's behavior to any mental health or intellectual disability, the efficacy of disciplinary measures versus alternative interventions, and the impact of disciplinary measures on the health and well-being of patients with disabilities.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - All policies related to the Consent Decree are currently being drafted by the Lexipol project team. A Chief Disciplinary Hearing Officer Post Order has been approved by plaintiff's counsel. Each facility has appointed a Chief Disciplinary Hearing Officer, who works collaboratively with ACMH (formerly JPS) to identify mental health or intellectual disability needs and modify discipline to ensure health, well-being, and fairness. All discipline hearings on designated mental health housing areas (OPP, IOP, APU) are conducted by the IOP Sergeant. Before implementing discipline, the IOP Sergeant confers with an ACMH staff member about the proposed discipline.
- V.A.2.
  - ACH Status: PARTIAL COMPLIANCE
    - Custody consults MH staff concerning disciplinary measures when a patient is located in MH housing.
    - MH collaborated with SSO Custody on development of a Rule Violation Review (RVR) and Administrative Segregation referral form and trained custody on the referral process and workflow for Administrative Segregation assessments (December 2021).

- MH and SSO continue to meet and refine the referral process and update the RVR and Administrative Segregation referral form to ensure referrals are received timely and tracked appropriately.
- MH received budget approval FY 2022/23 for additional clinicians to support RVR and Administrative Segregation reviews, assessments, and recommendations.  MH continues to actively recruit for these positions. As of May 2024, a supervisor and five clinicians have been hired.
- MH has staff available 7 days a week to complete RVR and Administrative Segregation Reviews.
- MH RVR/Ad Seg supervisor and clinicians access ATIMS to ensure that all patients placed on Administrative Segregation and/or full discipline are identified and assessed by MH.
- MH assigned a MH RVR/Ad Seg clinician to complete assessments at RCCC.
- MH continues to increase the number of RVRs completed.
- In April 2024, per the MH SME recommendation, MH included ID as a component of the RVR and UOF review/QI.
- MH completed an audit of MH RVR and Administrative Segregation Referrals for a period of January – March 2024 and identified areas for improvement in coordination with SSO.


- **Summary: RVR/Ad Seg Referrals and Assessments for Main Jail and RCCC (January-March 2024)**

**Summary: RVR Assessments for Main Jail (January – March 2024)**

| Month | # Main Jail MH RVR | # Main Jail MH RVR Criteria Not Met/Released/Disc Already Imposed | # Main Jail MH RVR Assessments Completed |
|---|---|---|---|
| January 2024 | 98 | 16 | 81/82 |
| February 2024 | 100 | 34 | 66/66 |
| March 2024 | 106 | 33 | 73/73 |
| **TOTAL** | **303** | **83** | **(99%)** |

Previously Reported Data:  RVR Assessments for Main Jail (January – December 2023)

| Month | # Main Jail RVR/Ad Seg Referrals | # Main Jail RVR/Ad Seg Criteria Not Met/Released/Disc Already Imposed | # Main Jail RVR/Ad Seg Assessments Completed |
|---|---|---|---|
| January 2023 | 58 | 14 | 41/44 (93%) |
| February 2023 | 69 | 37 | 22/32 (69%) |
| March 2023 | 75 | 23 | 13/52 (25%) |
| April 2023 | 46 | 10 | 31/36 (86%) |
| May 2023 | 52 | 10 | 42/42 (100%) |
| June 2023 | 61 | 15 | 46/46 (100%) |
| July 2023 | 104 | 40 | 64/64 (100%) |
| August 2023 | 120 | 61 | 43/59 (73%) |
| September 2023 | 115 | 40 | 72/75 (96%) |
| October 2023 | 56 | 19 | 37/37(100%) |
| November 2023 | 44 | 10 | 34/34(100%) |
| December 2023 | 59 | 7 | 52/52(100%) |
| **TOTAL** | **859** | **286** | **497/573(87%)** |

- Findings:
  - Main Jail received a total of 303 RVR referrals.  This is a 90% increase from the last report (83/303) of referrals were not included in the overall score for the following reasons: 1) they did not meet criteria for a review, 2) they were released from custody, and/or 3) restriction was already imposed.
  - Main Jail completed 99% (219/220) of MH RVR referrals this report period.

Summary: RVR Assessments for Rio Cosumnes Correctional Center (January  - March 2024)

| Month | # RCCC MH RVR | # RCCC MH RVR Criteria Not Met/Released/Disc Already Imposed | # RCCC MH RVR Assessments Completed |
|---|---|---|---|
| January 2024 | 22 | 0 | 21/22 |
| February 2024 | 12 | 0 | 11/12 |
| March 2024 | 13 | 0 | 13/13 |
| **TOTAL** | **47** | **0** | **45/47(96%)** |

Previously Reported Data:  RVR Assessments for RCCC (January – December 2023)

| Month | # RCCC RVR/ Seg Referrals | # RCCC RVR/Ad Seg Criteria Not Met/Released/Disc Already Imposed | # RCCC RVR/Ad Seg Assessments Completed |
|---|---|---|---|
| January 2023 | 8 | 4 | 1/4 (25%) |
| February 2023 | 72 | 4 | 2/68 (3%) |
| March 2023 | 43 | 19 | 5/24 (21%) |
| April 2023 | 6 | 0 | 4/6 (67%) |
| May 2023 | 47 | 6 | 17/41 (41%) |
| June 2023 | 20 | 1 | 9/19 (47%) |
| July 2023 | 12 | 3 | 7/9 (78%) |
| August 2023 | 24 | 3 | 18/21 (86%) |
| September 2023 | 15 | 1 | 9/14 (64%) |
| October 2023 | 16 | 1 | 6/15(40%) |
| November 2023 | 22 | 0 | 22/22(100%) |
| December 2023 | 23 | 2 | 21/21(100%) |
| TOTAL | 308 | 44 | 121/264(45%) |

- Findings:
  - RCCC received 47 RVR referrals for this report period.
  - RCCC completed 96% (45/47) of MH RVR referrals this report period.

| Month | # Main Jail RVR/Ad Seg Referrals | # Main Jail RVR/Ad Seg Criteria Not Met/Released/Disc Already Imposed | # Main Jail RVR Assessments Completed | # RCCC RVR Referrals | # RCCC RVR/Ad Seg Criteria Not Met/Released/Disc Already Imposed | # RCCC RVR Assessments Completed |
|---|---|---|---|---|---|---|
| January 2023 | 58 | 14 | 41/44 (93%) | 8 | 4 | 1/4 (25%) |
| February 2023 | 69 | 37 | 22/32 (69%) | 72 | 4 | 2/68 (3%) |
| March 2023 | 75 | 23 | 13/52 (25%) | 43 | 19 | 5/24 (21%) |
| April 2023 | 46 | 10 | 31/36(86%) | 6 | 0 | 4/6(67%) |
| May 2023 | 52 | 10 | 42/42(100%) | 47 | 6 | 17/41(41%) |
| June 2023 | 61 | 15 | 46/46(100%) | 20 | 1 | 9/19(47%) |
| TOTAL | 361 | 109 | 195/252(77%) | 196 | 34 | 38/162(23%) |

- MH began completing Administrative Segregation assessments for patients on MH caseload in November 2022 and in November 2023, for all patients placed in Administrative Segregation.
- SSO Status: SUBSTANTIAL COMPLIANCE

- ▪ a) JBCT, IOP, and EASE mental health workers are immediately notified of disciplinary write-ups that occur and they work closely with custodial staff to determine the best course of action. All discipline hearings on designated mental health housing areas (OPP, IOP, APU) are conducted by the IOP Sergeant. Before implementing discipline, the IOP Sergeant confers with an ACMH staff member about the proposed discipline.
- ▪ b) Each facility has appointed a Chief Disciplinary Hearing Officer, who works collaboratively with ACMH to identify mental health or intellectual disability needs and modify discipline to ensure health, well-being, and fairness.
- ▪ c) All discipline hearings on designated mental health housing areas (OPP, IOP, APU) are conducted by the IOP Sergeant. Before implementing discipline, the IOP Sergeant confers with an ACMH staff member about the proposed discipline.
- V.A.3.
  - ○ ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ MH completes the MH RVR form for every patient assessed for a rules violation. The review form was developed in consultation with Class Counsel and SME and incorporates all of the above assessment factors.
    - ▪ See V.A.2. a. – c.
  - ○ SSO Status: N/A

| Consideration of Mental Health Input and Other Disability Information in Discplinary Process |
|---|
| **(Section V; Provision B.)** |
| ACH Status: N/A |
| SSO Status: PARTIAL COMPLIANCE |
| **B. Accommodations for Prisoners with Mental Health or Intellectual Disabilities During the Disciplinary Process**<br><br>1. The County shall designate one Chief Disciplinary Hearing Officer for each jail facility, who shall be responsible for ensuring consistency in disciplinary practices and procedures.<br>2. The Disciplinary Hearing Officer shall ensure that prisoners are not disciplined for conduct that is related to their mental health or intellectual disability.<br>3. The Disciplinary Hearing Officer shall consider the qualified mental health professional's findings and any other available disability information when deciding what, if any, disciplinary action should be imposed. |

4. The Disciplinary Hearing Officer shall consider the qualified mental health professional's input on minimizing the deleterious effect of disciplinary measures on the prisoner in view of his or her mental health or adaptive support needs.

5. If the Disciplinary Hearing Officer does not follow the mental health staff's input regarding whether the behavior was related to symptoms of mental illness or intellectual disability, whether any mitigating factors should be considered, and whether certain sanctions should be avoided, the Disciplinary Hearing Officer shall explain in writing why it was not followed.

6. Prisoners will not be subjected to discipline which prevents the delivery of mental health treatment or adaptive support needs, unless necessary for institutional safety.

7. Prisoners shall not be subject to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of selfinjurious behavior.

**Compliance Status by Section:**

- V.B.1.-7.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current practice. Policy 600 was issued on 05/14/2024.
    - Inmates with suicidal ideations or self-injurious tendencies are closely evaluation by ACMH staff; Documentation of their behavior is made however; no disciplinary actions are taken against the inmate. Inmates may refuse medications at any time unless the administration of medication is mandated by the court through a valid order. ACMH is heavily involved in this process.

| Accommodations for Prisoners with Mental Health or Intellectual Disabilities During the Disciplinary Process |
|---|
| **(Section V; Provision C.)** |
| ACH Status: N/A |
| SSO Status: PARTIAL COMPLIANCE |

**C. Accommodations for Prisoners with Mental Health or Intellectual Disabilities During the Disciplinary Process**

1. The County shall provide reasonable accommodations during the hearing process for prisoners with mental health or intellectual disabilities.

> 2.  The County shall take reasonable steps to ensure the provision of effective communication and necessary assistance to prisoners with disabilities at all stages of the disciplinary process.

**Compliance Status by Section:**

- V.C.1.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
- V.C.2.
  - ACH Status: N/A
  - SSO Status: PARTIAL COMPLIANCE
    - SSO Effective Communication policy and procedure documents are in draft form.  Although there is currently no policy, a Post Order has been approved. Each facility has appointed a Chief Disciplinary Hearing Officer, who works collaboratively with ACMH (formerly JPS) to identify mental health or intellectual disability needs and modify discipline to ensure health, well-being, and fairness.

| Use of Force for Prisoners with Mental Health or Intellectual Disabilities |
|---|
| **(Section V; Provision D.)** |
| ACH Status: **PARTIAL COMPLIANCE** |
| SSO Status: **PARTIAL COMPLIANCE** |

## D.  Use of Force for Prisoners with Mental Health or Intellectual Disabilities

1.  The County shall designate one Chief Disciplinary Hearing Officer for each jail facility, who shall be responsible for ensuring consistency in disciplinary practices and procedures.
2.  For prisoners with a known mental health or intellectual disability, and absent an imminent threat to safety, staff shall employ de-escalation methods that take into account the individual's mental health or adaptive support needs.
3.  The County's Correctional Services Use of Force policies shall include a definition and a protocol for a planned Use of Force that provides appropriate guidance for a planned Use of Force that involves a prisoner with mental health or intellectual disability.
4.  Prior to any planned Use of Force, such as a cell extraction, against a prisoner with mental health or intellectual disabilities, there will be a "cooling down period," consistent with safety and security needs. This period includes a structured attempt by mental

> health staff (and other staff if appropriate), to de-escalate the situation and to reach a resolution without Use of Force. Such efforts, including the use of adaptive supports, will be documented in writing. Medical and/or mental health staff should be consulted if the purpose of the cell extraction is related to the delivery of treatment.
>
> 5. The County shall require video documentation for any planned Use of Force, absent exigent circumstances. Jail staff shall endeavor to record the specific actions, behavior, or threats leading to the need for Use of Force, as well as efforts to resolve the situation without Use of Force.
>
> 6. The County shall ensure the completion of supervisory review of Use of Force incidents, including video (for any planned Use of Force), interviews, and written incident documentation, in order to ensure appropriateness of Use of Force practices including de-escalation efforts. The County shall take corrective action when necessary.
>
> 7. The County shall review and amend as appropriate its policies on Use of Force, including its policies on Custody Emergency Response Team (CERT) and Cell Extraction Procedures.

**Compliance Status by Section:**

- V.D.1.
  - ACH Status: N/A
  - SSO Status: PARTIAL COMPLIANCE
    - In February 2023 the Sheriff's Office formed a new Legal and Policy Bureau. A Lieutenant position was added to lead the unit. One of the core duties of this unit it to update all policies and procedures to the Lexipol system with a focus on policies and procedures related to the Mays Consent Decree.
    - On 4/11/2023 a post order was created outlining the response to these situations. "Planned use of force, inmates with mental health issues."

- V.D.2.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - At the Main Jail, ACMH is consulted and given the opportunity to de-escalate during all preplanned use of force with inmates under MH care. The is the same practice at RCCC when ACMH is available.
    - At the MJ, inmates with intellectual disabilities are housed on the IOP floor where additional trained custody staff are available.
    - Several members from both facilities have received a 2-hour negotiations class specific to a custody setting which can help facilitate de-escalation.

- V.D.3.

- o ACH Status: N/A
- o SSO Status: SUBSTANTIAL COMPLIANCE
  - ▪ April 2023 SSO published a POST Order on Planned Use of Force and training was conducted by ACMH for CERT members and Sergeants.
  - ▪ The POST Order will be superseded by the Lexipol Policy/Procedure system in the future.
- V.D.4.
  - o ACH Status: PARTIAL COMPLIANCE
    - ▪ Prior to any planned Use of Force, such as a cell extraction, against a prisoner with mental health or intellectual disabilities, there will be a "cooling down period," consistent with safety and security needs. This period includes a structured attempt by mental health staff (and other staff if appropriate), to deescalate the situation and to reach a resolution without Use of Force. Such efforts, including the use of adaptive supports, will be documented in writing. Medical and/or mental health staff should be consulted if the purpose of the cell extraction is related to the delivery of treatment.
    - ▪ MH and SSO collaborated to develop a referral process for Planned UOF incidents with implementation in May 2023.
    - ▪ MH implemented training for clinicians UOF policy and MH's role in Planned UOF incidents in November 2022.
    - ▪ MH provided Planned Use of Force with Mental Health Patients training to custody staff in IOP, APU, JBCT and the CERT teams and Sgts in November 2022 and May – June 2023.
    - ▪ MH and SSO Custody meet regularly to discuss planned UOF in order to develop a multidisciplinary approach to address UOF incidents.
    - ▪ SSO developed a report in ATIMS that will track both planned and unplanned UOF incidents.
    - ▪ MH and SSO training coordinators are developing custody specific training on Planned UOF.
    - ▪ MH responds to custody referrals for Planned UOF incidents.
    - ▪ In April 2024, per the MH SME recommendation, MH included ID as a component of the RVR and UOF review/QI.
    - ▪ In May 2024, per the MH SME recommendation, MH and SSO established a UOF Review Committee to review all unplanned UOF incidents involving patients on the MH caseload or with ID.
    - ▪ In February 2024, MH began auditing PUOF and UOF incidents utilizing data from both MH and SSO.
    - ▪ A total of 24 charts were reviewed. Data was collected for both Main Jail and RCCC utilizing SSOs UOF and MHs PUOF tracking logs.

Summary:

| Month | Total Use of Force | Referrals for Planned Use of Force | Patients with SMI | Patients on MH caseload | Patients with ID |
|-------|--------------------|-----------------------------------|-------------------|------------------------|------------------|
| February 2024 | 23/24* (96%) | 2/24(8%) | 10/24 (42%) | 16/24(67%) | 1/24 (4%) |

*LCSW Intervention

- ▪ Findings:
  - • Of the 24 patients involved in a UOF and/or PUOF: 42% had SMI, 67% were on the MH caseload and 4% had an Intellectual Disability.
  - • MH received 2 (20%) referrals for a PUOF and the remainder of cases (22) were unplanned UOF incidents.
    - ○ This area remains in PARTIAL COMPLIANCE due to SSO Custody referral process and cooridation with MH.
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ This is the current practice with all planned use of force incidents involving inmates in specialized units. The officers assigned to MH units work closely with ACMH staff when incidents requiring a planned use of force arise. After consultation with ACMH staff and ample opportunities for consultation and intervention by ACMH.
    - ▪ April 2023 SSO published a POST Order on Planned Use of Force and training was conducted by ACMH for CERT members and Sergeants.
- • V.D.5.-6.
  - ○ ACH Status: N/A
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
- • V.D.7.
  - ○ ACH Status: N/A
  - ○ SSO Status: PARTIAL COMPLIANCE
    - ▪ In February 2023 the Sheriff's Office formed a new Legal and Policy Bureau. A Lieutenant position was added to lead the unit. One of the core duties of this unit it to update all policies and procedures to the Lexipol system with a focus on policies and procedures related to the Mays Consent Decree.
    - ▪ April 2023 SSO published a POST Order on Planned Use of Force and training was conducted by ACMH for CERT members and Sergeants.

| Training & Quality Assurance<br>(Section V; Provision E.) |
| --- |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: PARTIAL COMPLIANCE** |
| **E.  Training and Quality Assurance**<br><br>1. All custody staff, and mental health staff, shall be trained on the policies and procedures outlined herein that are relevant to their job and classification requirements. Custody staff will receive periodic training on identifying behaviors that may be manifestations of mental illness and other situations warranting a referral to mental health staff, including for a Rules Violation Mental Health Review or other mental health assessment.<br>2. All custody staff shall be trained on the identification of symptoms of mental illness, the provision of adaptive supports, and the use of de-escalation methods appropriate for prisoners with mental health or intellectual disabilities.<br>3. The County shall track the outcomes of all disciplinary hearings for prisoners who are on the mental health caseload or who have intellectual disabilities, including whether the recommendation of the mental health professional was followed.<br>4. The County shall track all Uses of Force (planned and reactive) involving prisoners who are on the mental health caseload or who have intellectual disabilities, including the number of Uses of Force and the number of cell extractions by facility.<br>5. The County shall implement a continuous quality assurance/quality improvement plan to periodically audit disciplinary and Use of Force practices as they apply to prisoners who are on the mental health caseload or who have intellectual disabilities. |

**Compliance Status by Section:**

- V.E.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - All mental health staff have been trained on the policies and procedures listed above relevant to their job and classification requirements.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - All staff assigned to corrections (sworn staff and records officers) have received consent decree training since September of 2021. As new hires come on they are assigned the training and must attest to the completion of the training.
    - Department in service training required on a 2-year cycle often includes mental health topics. Custody specific mental health training topics are received through initial housing unit and booking training with new employees.

- V.E.2.
  - ACH Status: PARTIAL COMPLIANCE
    - MH added training module for all staff, including deputies, to follow the 4-hour Suicide Prevention Training. This will ensure all new employees receive training on understanding and working with patients who have a mental health disorder.
  - SSO Status: PARTIAL COMPLIANCE
    - Many aspects of this training are already covered during in-service and pre-service training. A comprehensive review of current training offerings, compared against the needs of this element is under review. We are also working with ACMH to determine how to fully address this. Every year, sworn and professional staff receive a 2 hour course provided by mental health.
- V.E.3.
  - ACH Status: PARTIAL COMPLIANCE
    - MH and SSO continue to meet regularly to discuss the MH RVR process and are developing an audit that will include whether SSO followed the recommendation(s) of the MH professional.
    - MH and SSO are developing a process to have MH RVR clinicians attend discipline hearings for patients with ID.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Tracked by the Chief Disciplinary Hearing Officer for each faciility.
- V.E.4.
  - ACH Status: PARTIAL COMPLIANCE
    - In February 2024, MH began auditing PUOF and UOF incidents utilizing data from both MH and SSO.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current Practice. All use of force is reviewed and tracked up to and including by the Division Commander or designee. An ATIMS alert flag is added for those with mental health or intellectual disabilities.
- V.E.5.
  - ACH Status: PARTIAL COMPLIANCE
    - In April 2024, per the MH SME recommendation, MH included ID as a component of the RVR and UOF review/QI.
    - In May 2024, per the MH SME recommendation, MH and SSO established a UOF Review Committee to review all unplanned UOF incidents involving patients on the MH caseload or with ID.
    - In February 2024, MH began auditing PUOF and UOF incidents utilizing data from both MH and SSO.

- o  SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current use of Blue-Team software to track and monitor use of force incidents, while predicting possible problematic trends in officer behavior.

| VI. MEDICAL CARE |
|:---:|

Class Counsel outlined five areas of focus for the monitoring period, including the intake screening, sick call system, chronic care, specialty care, and roll out of the new electronic health record (EHR) system.

| Staffing |
|:---:|
| **(Section VI; Provision A.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: N/A |

**G. Staffing**

1. The County shall maintain sufficient medical, mental health and custody staffing to meet professional standards of care to execute the requirements of this remedial plan, including clinical staff, office and technological support, QA/QI units and custody staff for escorts and transportation.
2. Provider quality shall be evaluated regularly to ensure that relevant quality of care standards is maintained. This review shall be in addition to peer review and quality improvement processes described in this plan. The parties shall meet and confer regarding any deficiencies identified in the evaluation. Should the parties disagree regarding matters of provider quality, the Court Expert shall evaluate the quality of provider care and to complete a written report.

**Compliance Status by Section:**

- VI.A.1
  - ACH Status: PARTIAL COMPLIANCE
    - The County has increased positions for Medical staff from **118.5** FTEs pre-Consent Decree in FY 2017/18 to **225.5** in FY 2023/24.
    - County ACH Medical staff and Administrative FTEs has increased from **112.5** pre-Consent Decree to a total of **251.5** permanent allocated FTEs.
      - As of 6/4/2024, the total vacancy rate for ACH Medical and Administrative staff is currently at **8%** - the highest number of vacancies are associated with the LVN positions.
    - Staffing Analysis:

- ACH outlined current service functions requiring SSO Custody Escorts based on the level of current staffing and available spacing – sent email outlining to SSO Custody 04/04/23.
- ACH secured a contract with a third-party consultant to complete the required Staffing Analysis. A Nurse consultant referred by the medical SME has expertise in County Jail staffing analyses and was contracted in January 2024. However, she assisted with other high-priority projects firstand the ACH Interim Nursing Director is actively working on a thorough Medical staffing analysis that will detail required healthcare functions to meet service demand and service need. Analysis will include a daily average of the following by facility (MJ/RCCC):
  - Service demand by service function (ex: # HSRs, NSC appts, PSC appts, Med, Detox Monitoring, Specialty appts/clinics onsite, etc.)
  - Staffing Discipline Type per service function
  - Productivity potential by service function per Staff Discipline (ex: # PSC appts/day, # NSC appts/day, etc.)
  - Space to provide service functions
  - Policy timeframe requirements by service function
  - ANALYSIS OUTCOME:
    - TOTAL staff by discipline per day required to meet service demand within policy timeframes.
    - TOTAL exam/service space to perform service functions within policy timeframes.
  - ACH will provide a copy of the Staffing Analysis outlining service functions requiring SSO Custody Escorts to meet service needs within policy timeframes to SSO Custody & court-appointed Experts.
    - SSO Status: N/A
- VI.A.2.
  - ACH Status: PARTIAL COMPLIANCE
    - Provider quality is being evaluated by the Assistant and Interim Medical Directors during chart reviews pertaining to mortality reports, review of grievances, incident reports, class counsel SME inquiries, ER Send-Outs, and routine review of provider sick calls. Provider quality is also evaluated during the utilization review of specialty consults and services.
      - After chart reviews, when there is need for feedback/education, the Assistant or Interim Medical Director

has been meeting one-on-one with the provider to accomplish such.

- In addition, if systemic issues are identified, they are discussed and addressed during monthly Provider meetings and/or emails are sent out to all providers.
- Systemic issues that can be addressed through EHR, policy, or workflow improvements are discussed and addressed at weekly Medical Operations meetings to make improvements to those areas.

- Medical Director is currently establishing a peer review process and physician QI projects to include:
  - Working with clinical pharmacist to reduce hemoglobin A1c through collaborative agreement for medication management.
  - Reduction in plypharmacy by tracking when providers review medication indications for patients with eight or more prescribed medications.
  - Continue to track emergency department send-outs.
  - MAT QI project.
- The new Peer Review policy and process will be sent to the SMEs for review.
- SSO Status: N/A

| **Intake** |
| :---: |
| **(Section VI; Provision B.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: N/A** |

### B.  Intake

1. All prisoners who are to be housed shall be screened upon arrival in custody by Registered Nurses (RNs). RN screening shall take place prior to placement in jail housing.
2. Health Care intake screening shall take place in a setting that ensures confidentiality of communications between nurses and individual patients. Custody staff may maintain visual communication, unless security concerns based upon an individualized determination of risk that includes a consideration of requests by the health care staff that custody staff be closer at hand. There shall be visual and auditory privacy from other prisoners.

3. The County shall, in consultation with Plaintiffs, revise the content of its intake screening, medical intake screening, and special needs documentation to reflect community standards and ensure proper identification of medical and disability related concerns.

4. Nurses who perform intake screening shall consult any available electronic health care records from prior incarcerations or other county agencies. The form shall include a check box to confirm that such a review was done.

5. The County shall make best efforts to verify a patient's prescribed medications and current treatment needs at intake, including outreach to pharmacies and community providers to request prescriptions and other health records related to ongoing care needs. The policy shall ensure that any ongoing medication, or clinically appropriate alternative, shall be provided within 48 hours of verification or from a determination by a physician that the medication is medically necessary. Any orders that cannot be reconciled or verified, such as those with conflicting prescriptions from multiple providers, shall be referred to a health care provider for reconciliation or verification the next clinic day after booking.

6. The County shall follow a triage process in which intake nurses schedule patients for follow-up appointments based upon their medical needs and acuity at intake and shall not rely solely on patients to submit Health Services Requests once housed. The policy shall, in consultation with Plaintiff's counsel, establish clear protocols that include appropriate intervals of care based on clinical guidelines, and that intake nurses shall schedule follow-up appointments at the time of intake based upon those protocols.

7. All nurses who perform intake screenings will be trained annually on how to perform that function.

**Compliance Status by Section:**

- VI.B.1.
  - ○ ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ All patients booked into the Jails are screened upon arrival by a Registered Nurse prior to placement in jail housing.
  - ○ SSO Status: N/A
- VI.B.2.
  - ○ ACH Status: NON-COMPLIANT
    - ▪ In December 2022, the Intake Screening area in Booking was reconstructed for greater privacy/space however auditory privacy is still inadequate..
    - ▪ To meet SUBSTANTIAL COMPLIANCE, the County developed a comprehensive plan to restructure the arrest report room/medical intake area. The plan involves DGS repurposing the current room where the breathalyzer is stored, a bathroom, an exam room and an office into four medical intake confidential spaces.

- ▪ This plan was shared in detail with the SME's and Class Counsel and the response was favorable in that it would meet requirements to achieve compliance.
- ▪ ACH, SSO, DGS, and Class Counsel meet regularly to ensure progress continues and that the short timeframe for completion is met.
- ▪ An trailer was recently added at RCCC. This trailer will be designated for intakes, therefore reducing the impact at the Main Jail.
  - • Currently in the process of making the trailer ADA compliant with the addition of a wheelchair lift and bathroom install).
  - o SSO Status: N/A
- • VI.B.3.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ The Intake screening has been revised previously with all court-appointed expert's agreement and implemented. However, ACH is working with the medical SMEs to create a tier one/tier two format and streamline the questions for better flow and reduce redundancy. This new system will roll out once the new confidential medical intake rooms are available for use. In conjunction with the SMEs, ACH will revise the current intake process and policy to ensure efficiency as described above.
    - ▪ ACH's EHR has been updated to send automatic orders based on patient response to ensure needed care consistent with community standards.
    - ▪ ACH is following policy by ordering an initial H&P at intake for patients with chronic care issues, patients with SMI, and patients with substance use issues at risk for withdrawal.
    - ▪ Women are being referred to GYN clinic for pelvic exams when indicated.
  - o SSO Status: N/A
- • VI.B.4.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ Nurses check the box in the EHR to confirm previous records were reviewed. QI has observed in-person Nursing Intake and found previous history is reviewed consistently, meeting this requirement.
  - o SSO Status: N/A
- • VI.B.5.
  - o ACH Status: SUBSTANTIAL COMPLIANCE

- ACH Intake policy outlines that any ongoing medication, or a clinically appropriate alternative, shall be provided within 48 hours of verification of the prescription or from a determination by a physician that the medication is medically necessary. Any orders that cannot be reconciled or verified, such as those with conflicting prescriptions from multiple prescribers, shall be referred to a health care provider for reconciliation or verification the next clinic day after booking.
- QI is also auditing to this provision and find that staff have maintained SUBSTANTIAL COMPLIANCE in both the audit of August 2022 (100% compliance), February 2023 (96% compliance), August 2023 (100% compliance), and February 2024 (100% compliance) of meeting timeliness standards for patients receiving initial medications. See recent data from the Medication Initiation and Renewal Audit below.

| Medication Initiation and Renewal | | | | |
|---|---|---|---|---|
| **Indicator** | **Data Period** | | | |
| | 08/17/22 (N=42) | 02/16-17/23 (N=44) | 08/16/23 (N=52) | 02/16/2024 (N=48) |
| Timely initial medication (<48 hours from order) | 35/35 (100%) | 23/24 (96%) | 44/44 (100%) | 37/37 (100%) |
| Timely renewal (no missed doses) | 6/7 (86%) | 18/20 (90%) | 5/8 (62%) | 11/11 (100%) |

- o SSO Status: N/A
- VI.B.6.
  - o ACH Status: PARTIAL COMPLIANCE
    - The policies listed above are consistent with this requirement and were implemented with approval of the court-appointed experts.
      - The nurse intake encounter has been configured to have recommended orders based on responses to intake questions. Each order has a priority level dependent upon the response and to all service lines. Orders can be easily made by clicking the button within the nurse intake encounter.
      - Regarding the SME recommendation -

- Nurses send referrals to providers based on the acuity of patient needs. The orders are built into the Nurse Intake Encounter.
- Orders for withdrawal monitoring are automatically ordered when the patient scores a CIWA or COWS score of 0 or above.
- ACH meets the Consent Decree required timeframes for initial medication review and first dose.
- Order sets for detox monitoring exist within the nurse intake encounter.
  - SSO Status: N/A
- VI.B.7.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - Annual Nurse Intake Training was developed and first provided in December 2022.  Annual training is required annually and tracked in the County's software, ProList.
    - QI staff developed several audit tools to assess the nurse intake process.  Reviews completed during this monitoring period include:
      - ADA Identification and Documentation at Intake
      - Withdrawal Monitoring in the Booking Loop
      - Medication Initiation and Renewal
      - Referrals at Intake
    - Intake Continuous Quality Improvement (CQI) studies occur on a regular basis and are sent to SME.
    - QI began in-person observation audits of the Nurse Intake process in January 2023 to ensure all screening questions are asked and will continue with each Intake Audit.

**Intake Referral Audit**

Focus:  To determine whether RNs ordered appropriate referrals at intake.

| Type of Referral Needed: | Patients Referred as Needed | | | | |
|---|---|---|---|---|---|
| | 01/31/23 (N=19) | 5/31/23 (N=21) | 08/16/2023 (N=33) | 11/15/2023 (N=30) | 02/15/2024 (N=30) |
| Provider | 11/13 (85%) | 10/18 (56%) | 13/17 (76%) | 19/23 (83%) | 17/21 (81%) |

| | | | | | |
|---|---|---|---|---|---|
| Mental Health | 11/11 (100%) | 1/17 (6%) | 18/18 (100%) | 6/9 (67%) | 11/12 (92%) |
| SUD Counselor | 7/10(70%) | 5/10 (50%) | 5/10 (50%) | 7/9 (78%) | 9/14 (64%) |
| Dental | 4/4 (100%) | 2/7 (29%) | 30/33 (91%) | 28/30 (93%) | 26/30 (87%) |

- o SSO Status: N/A

| **Access to Care** |
|---|
| **(Section VI; Provision C.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: SUBSTANTIAL COMPLIANCE |

**C.  Access to Care**

1. The County shall ensure that Health Service Requests (HSRs) are readily available to all prisoners, including those in segregation housing, from nurses and custody officers.
2. The County shall provide patients with a mechanism for submitting HSRs that does not require them to share confidential information with custody staff. The county shall install lockboxes or other secure physical or electronic mechanism for the submission of HSRs (as well as health care grievances) in every housing unit. Designated staff shall collect (if submitted physically) or review (if submitted electronically) HSRs at least two times per day in order to ensure that CHS receives critical health information in a timely manner. Designated health care staff shall also collect HSRs during pill call and go door to door in all restricted housing units at least once a day to collect HSRs. HSRs and health care grievances will be promptly date- and time-stamped. The county may implement an accessible electronic solution for secure and confidential submission of HSRs and grievances.
3. The County shall establish clear time frames to respond to HSRs:
   a) All patients whose HSRs raise emergent concerns shall be seen by the RN immediately upon receipt of the HSR. For all others, a triage RN shall, within 24 hours of receipt of the form (for urgent concerns) or 72 hours of receipt of the form (for routine concerns):
      i. Conduct a brief face-to-face visit with the patient in a confidential clinical setting.
      ii. Take a full set of vital signs, if appropriate.
      iii. Conduct a physical exam, if appropriate.

        iv.   Assign a triage level for a provider appointment of emergent, urgent, routine, or written response only.

        v.   Inform the patient of his or her triage level and response time frames.

        vi.   Provide over-the-counter medications pursuant to protocols; and

        vii.  Consult with providers regarding patient care pursuant to protocols, as appropriate.

  b)  If the triage nurse determines that the patient should be seen by a provider:

        i.   Patients with emergent conditions shall be treated or sent out for emergency treatment immediately.

        ii.   Patients with urgent conditions shall be seen within 24 hours of the RN face-to-face; and

        iii.  Patients with only routine concerns shall be seen within two weeks of the RN face-to-face.

  c)  Patients whose requests do not require formal clinical assessment or intervention shall be issued a written response, with steps taken to ensure effective communication, within two weeks of receipt of the form.

  d)  The County shall permit patients, including those that are illiterate, non-English speaking, or otherwise unable to submit verbal or electronic HSR's to verbally request care. Such verbal requests shall immediately be documented by the staff member who receives the request on an appropriate form and transmitted to a qualified medical professional for response in the same priority as those HSRs received in writing.

4. The County shall designate and make available custody escorts for medical staff in order to facilitate timely and confidential clinical contacts or treatment-related events.

5. The County shall track and regularly review response times to ensure that the above timelines are met.

6. The County shall discontinue its policy of prohibiting patients from reporting or inquiring about multiple medical needs in the same appointment.

7. When a patient refuses a medical evaluation or appointment, such refusal will not indicate a waiver of subsequent health care.

  a)  When a patient refuses a service that was ordered by medical staff based on an identified clinical need, medical staff will follow-up to ensure that the patient understands any adverse health consequences and to address individual issues that caused the patient to refuse a service.

  b)  Any such refusal will be documented by medical staff and must include: (1) a description of the nature of the service being refused, (2) confirmation that the patient was made aware of and understands any adverse health consequences by medical staff, and (3) the signature of the patient, and (4) the signature of the medical staff. In the event the signature of the patient is not possible, the staff will document the circumstances.

## Audits

- Health Services Request Audit
- Chronic Care Management Audit

**Compliance Status by Section:**

- VI.C.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - Health Service Requests (HSRs) are readily available to all patients throughout the facility, including those in segregation housing from ACH or SSO Custody.
    - Nursing collects health service requests (HSRs) at least twice daily, once in the morning and once in the evening, and designated staff are responsible to ensure adequate supplies.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current practice. HSRs are available at medical appointments, pill call, and in housing units.
- VI.C.2.
  - ACH Status: PARTIAL COMPLIANCE
    - Confidential locked boxes labeled "Health Service Requests" are installed in multiple locations at both jail facilities for patients to submit HSRs to protect confidentiality. Locked boxes are also throughout both facility's housing units to submit grievances. Designated staff collect HSRs at least two times per day as well as during medication administration and door to door in all restricted housing units at least once a day. HSRs and health care grievances are promptly date- and time stamped.  QI completes in-person observations as well as chart audits to ensure that HSR collection and time-stamping processes are occurring accordingly.  SUBSTANTIAL COMPLIANCE will be reached once there is consistent time-stamping and timely collection as evidenced by designated Nursing staff physically scanning HSR forms immediately after collecting.
    - ACH has created a HSR/Grievance collection form for staff to fill out each time they make rounds to collect both forms in the housing units. This provides supervisors and QI a mechanism to ensure HSRs and Grievances are being collected regularly and timely. Use and tracking of this form will be implemented July 2024.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - HSRs are turned in directly to nursing staff during pill call twice a day. Lock boxes for Medical Grievances and HSR's have been in installed in all housing units at RCCC and Main Jail. Medical staff collects and tracks health care grievances and HSR's. The lock boxes are checked twice a day.
- VI.C.3.
  - ACH Status: PARTIAL COMPLIANCE
    - ACH has established clear time frames to respond to HSRs in accordance with the remedial plan. Key changes to the Health Service Request policy includes clarification regarding access to care timelines, such as the face-

to-face appointment must be completed when indicated within the priority timeframes – rather than the appointment ordered.

- Since the medical monitoring visit, NSC numbers have significantly reduced due to the Interim Nursing Director assigning nurses to conduct sick call daily. Sick call is prioritized and HSRs are being followed up on more timely.

- VI.C.3.a. Emergent HSRs are seen immediately by the RN upon receipt of the HSR; however, ACH continues to strategize on areas to meet the 24-hour and 72-hour timelines consistently.  Efforts added during this review period in this area:

  - As space is limited, ACH collaborated with SSO to identify additional exam room stationing areas to provide additional, confidential space to complete services on each floor in each wing – including Nurse Sick Call.

  - Inventory on medical equipment currently in stock as well as additional equipment needed to support additional fully functioning stations on each floor in each wing was developed and ordered.

    o Replaced worn-out/old/broken medical beds at both facilities.
    o Replaced all portable sinks in the medical exam room and specialty clinic at both facilities  .
    o Replaced rolling medical bags/cart for LVNs to transport medical supplies to different medical floors.
    o Main Jail 2 East Provider exam room was completed.
    o Main Jail 2 Medical provider charting office was also completed.
    o Other improvements to the Main Jail medical areas include the new nursing station on 2 East and the new interview cubicles.
    o Excess storage was removed to storage offsite.
    o Replaced desks in Medical Housing Unit at RCCC, and in all exam rooms, and in SRN office.
    o Added ramps at Honors unit in the main entrance at RCCC.
    o Expanded Intake at RCCC using a trailer with 2 intake workstation and an exam room.
    o Utility room created at 2M to use for lab work and CPAP charging station.
    o Improve outer CBF clinic at RCCC with new desk, lockable cabinets, new flooring, and fresh paint.
    o Replaced exam bed and removed old cabinets and replace with new locakble cabinets at MD sick call room SLF RCCC.

- Purchased Autogen and manual heat press for "Keep on Patient" medication blister packaging for pharmacy.
- Purchased iPads on wheels for video telehealth appointments and deployed November 2023.  Initial purchase included eight (8) units for pilot program.  Wi-Fi connectivity for stronger Wi-Fi signal quality and Access Points project completed at Main Jail on April, 6th, 2023 and RCCC on September, 1, 2023.
- ACH developed a new ACH Activity Schedule to clearly identify times and location needs for Custody Escorts to meet access to care timelines.
- Team-based approach – assigning a doctor/MA/RN/Ancillary staff on each floor.
- There continues to be an insufficient number of escorts at Main Jail to ensure timely access to care although allocation of custody escorts have greatly improved since the last report.  SSO appointed a Sergeant to supervise the scheduling and oversight of medical escorts. This addition has helped with the coordination of medical and SSO schedules to obtain additional support where needed.
  - Staff started meeting with SSO Custody leadership on a monthly basis beginning August 2022 to address ongoing issues with patient access to care.  In addition, ACH created an Access to Care Encounter to capture access to care barriers.
  - ACH and SSO started meeting for daily huddles in April 2023, where ACH and ACMH escort needs are identified and SSO provides daily escort allocation for each facility.
- **Access to Care Encounter:** An Access to Care encounter has been implemented in digital format in the EHR.  This form captures details regarding obstacles/issues in providing access to patient care.  It has been updated to include the applicable service line as well as the associated order(s) for which service is being attempted. It also includes the type of care appointment attempted as well as reasons for healthcare staff not being able to access the patient.  The form is designed to require the user to complete follow up actions/instructions before the document can be saved to the patient chart.  This allows ACH management to report on, monitor, and review incidents where access to care was delayed, denied, or otherwise not provided.  As such, better collaboration is achieved between ACH and custody staff on any operations which may be preventing or prohibiting proper access to care.

**Access to Care**

X-REF: _____

|  |  | HR | MIN | AM/PM |
|---|---|---|---|---|
| Date: _____ ▪ | Today | Time: ___ ▾ | _____ | _____ ▾ |

First Name: Jennifer          Last Name: Zzztest          DOB: 10/12/1982

Appointment Type: _____ ▾       Facility: ___ ▾       Location: _____ ▾

Service Line:
- ☐ Nursing
- ☐ Mental Health
- ☐ Dental
- ☐ Provider
- ☑ Pharmacy
- ☐ SUD Counselor
- ☐ Other

Associated Order: _____ ▾

Order Number: _____     Order Priority _____     Referring ACH Provider: _____

Custody Escort (Officer Name/Badge #) _____

I was unable to meet with the patient to provide health care services offered at the Sacramento County Jails due to the following reason:

Select One
| |
|---|
| Custody Escort's Reported Reason |
| ACH Conflict Reason |



- ACH and SSO implemented a Daily ACH/SSO Huddle agenda template and meet each morning to coordinate on service needs, Custody Escort needs, and strategize around challenges.
- VI.C.3.a.i. ACH conducts a brief face-to-face visit with the patient in a confidential clinical setting whenever possible.  Space limitations make meeting this requirement consistently difficult. The goal is to improve patient care and Provider productivity.
- VI.C.3.a.ii.-iii. RNs taking vitals and a full exam during Nurse Sick Call when indicated is current practice.

- VI.C.3.a.iv. Assigning a Triage level for Provider appointments is current practice and is reflected in the EHR.
- VI.C.3.a.v. ACH has a Patient Notification Letter that is generated for the patient when an HSR is logged into the EHR that informs them their HSR was received, and they will be seen in the near future.  Including timeframes and monitoring to delivery is still in development. EHR Support has also developed several other response to patient handouts related to HSRs to more efficiently provide respones to patients base upon the nature of the original HSR



-
- VI.C.3.a.vi. ACH provides over-the-counter medications pursuant to protocols.
- VI.C.3.a.vii.  ACH nursing consult with providers regarding patient care pursuant to protocols, as
- appropriate. Providers are now stationed on each floor and have been instructed to be available if nursing has questions or issues that arise. SRNs will contact the providers when needed.
- VI.C.3.b.i.- If the triage nurse determines that the patient should be seen by a provider, protocol is in place for a Provider to see the patient per priority protocol. Patients with emergent conditions are sent out for emergency treatment immediately. Providers are seeing patients within the required timeframes the majority of the time. QI and the Medical Director will continue to monitor.
- VI.C.3.c. Patients whose requests do not require formal clinical assessment or intervention are issued a Patient Notification Letter, with steps taken to ensure effective communication, within two weeks of receipt of the form – letting them know their request is being addressed and no appointment is needed.
- VI.C.3.d. ACH has practices in place that allows patients, including those that are illiterate, non- English speaking, or otherwise unable to submit verbal or electronic HSR's to verbally request care. Such verbal requests are documented by the staff member who receives the request on an HSR, and disposition provided in the same priority as those HSRs received in writing.
- ○ SSO Status: N/A

- VI.C.4.
  - ○ ACH Status: N/A
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Since April 2023 the Main Jail has been staffing medical escorts allowing medical staff better access to patients. RCCC has continually staffed at least four dedicated medical escorts for this update period.
    - ▪ In early 2024 the Main Jail assigned a dedicated supervisor to oversee the medical escort positions and assigned an additional 3 full time positions to the unit.  Overtime is used to supplement these positions durig dayshift and swing shift.
    - ▪ Medical Escorts are independent of shift staffing and are dedicated to assisting medical staff for patient care. ACH determines their assignment depending on daily needs.
- VI.C.5.
  - ○ ACH Status: PARTIAL COMPLIANCE
    - ▪ The electronic HSR form in the EHR was updated to better capture data helpful in monitoring timeliness at each step of the process. The electronic form also ensures HSR information is documented in the EHR to better support facilitate data reporting capabilities.
    - ▪ **Health Service Requests (HSR)**:  The electronic HSR form in the EHR has been updated to further provide more detail for monitoring and quality improvement, including:
      - Updates to the form include the following:
        - ○ Date/time received, entered, and triaged for improved tracking purposes.
        - ○ Disposition criteria specific to the service line assigned to the HSR.
        - ○ Fields created to capture the ACH response to the patient and action(s) to be taken.
      - Tracking data is then generated to monitor the following response timelines:
        - ○ When the HSR was completed by the patient.
        - ○ When the HSR is in receipt by ACH
        - ○ When ACH entered the HSR data into the EHR
        - ○ When the service line received the HSR for response
        - ○ Details as to the disposition and needed action(s).



- ▪ ACH QI tracks and regularly review response times to ensure that the above timelines are met. See HSR audit findings below.  QI studies will continue quarterly.
  - o SSO Status: N/A
- • VI.C.6.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ ACH discontinued prohibiting patients from reporting or inquiring about multiple medical needs in the same appointment shortly after execution of the Consent Decree – this has been practice. Patients are permitted to report or inquire about multiple medical needs on a single HSR or during a single appointment.
  - o SSO Status: N/A

- VI.C.7.
  - ACH Status: PARTIAL COMPLIANCE
    - Ongoing healthcare is offered and provided as medically indicated, regardless of previous refusals for services.
    - VI.C.7.a. ACH staff are required to follow-up to ensure that the patient understands any adverse health consequences and to address individual issues that caused the patient to refuse service per policy. The follow-up discussion is also documented in the EHR. The Informed Consent and Right to Refuse Policy has been updated to capture all requirements in this provision – including use of the Refusal Form to document the refusal per policy.
    - C.7.b. The Refusal Form captures all requirements outlined in the Remedial Plan.
    - ACH developed a Corrective Action Plan (CAP) in July 2022 to address deficiencies in the health service request system.  The CAP is monitored in monthly meetings between nursing leadership and QI.
    - As part of the CAP, ACH is in the process of reviewing and revising the HSR and created a new Nurse Sick Call policy. They will be provided to the SMEs by the end of June or beginning of July 2024for review.
    - ACH also developed an HSR collection tool that will ensure the HSR are collected according to the policy timeframes. The use and tracking of this form will be implemented July 2024.
    - Staff developed an audit tool for timely access to services and completed a baseline study prior to the policy revision.  Staff will begin periodic audits of the HSR process after training and implementation. Due to the changes in assigning nurses to sick call on a daily basis following the recent medical monitoring site visit, we anticipate significant improvements in timelines to care audits in the next report period.

| Q3 FY23/24 HSR Audit (All HSR Types) | |
|---|---|
| Service Line | Totals |
| Medical | 6899/11260 (61%) |
| Dental | 1434/11260 (13%) |
| Mental Health | 2927/11260 (26%) |
| Total | 11260/11260 (100%) |

| Medical: HSR Documentation | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility (HSR Count) | Collected | | | Paper HSR Form: Stamped | | | Scanned | | | Entered accurately into EHR | | |
| | Within 24 hours of submission | After 24 hours of submission | UTD[1] | Stamp Legible | Stamp Illegible | Not Stamped / Scanned | Yes | No | Average # days for scanning | Yes | No | UTD[2] |
| MAIN 9 | 8 (89%) | 1 (11%) | 0 (0%) | 9 (100%) | 0 (0%) | 0 (0%) | 9 (100%) | 0 (0%) | 6.12 | 3 (33%) | 6 (67%) | 0 (0%) |
| RCCC 18 | 14 (78%) | 4 (22%) | 0 (0%) | 6 (33%) | 10 (56%) | 2 (11%) | 17 (94%) | 1 (6%) | 8.61 | 8 (44%) | 9 (50%) | 1 (6%) |
| All 27 | 22 (81%) | 5 (19%) | 0 (0%) | 15 (56%) | 10 (37%) | 2 (7%) | 26 (96%) | 1 (4%) | 7.75 | 11 (41%) | 15 (56%) | 1 (4%) |

[1]UTD: the HSR paper form was not scanned into the system or the paper HSR form did not have a date of submission shown, AND no other entry exists on the electronic HSR form

[2]UTD: the HRS was never scanned accurately into the EHR.

| Medical: Triage of Paper HSR | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility (HSR Count) | Triage Time by SRN/RN | | | | Initial Triage:  Was it Clinically Appropriate? | | | | | | |
| | <= 3 hrs. | > 3 hrs. <= 24 hrs. | > 24 hrs. <= 48 hrs. | > 48 hrs. | Emergent/Stat | | Urgent | | Routine | | Written Response Required | |
| | | | | | Yes | No | Yes | No | Yes | No | Yes | No |
| MAIN 9 | 2 (22%) | 0 (0%) | 6 (67%) | 1 (11%) | 0 (0%) | 0 (0%) | 3 (33%) | 0 (0%) | 5 (56%) | 0 (0%) | 1 (11%) | 0 (0%) |
| RCCC 18 | 14 (78%) | 0 (0%) | 4 (22%) | 0 (0%) | 0 (0%) | 0 (0%) | 1 (6%) | 0 (0%) | 17 (94%) | 0 (0%) | 0 (0%) | 0 (0%) |
| All 27 | 16 (59%) | 0 (0%) | 10 (37%) | 1 (4%) | 0 (0%) | 0 (0%) | 4 (15%) | 0 (0%) | 22 (81%) | 0 (0%) | 1 (4%) | 0 (0%) |

| Medical: Timeframes by Triage Category | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility (HSR Count) | Emergent/Stat | | | Urgent | | | Routine | | | Written Response Required | | |
| | Within TF | Outside TF | Not seen | Within TF | Outside TF | Not seen | Within TF | Outside TF | Not seen | Within TF | Outside TF | Not Sent[1] |
| MAIN 9 | 0 (0%) | 0 (0%) | 0 (0%) | 2 (22%) | 1 (11%) | 0 (0%) | 1 (11%) | 3 (33%) | 0 (0%) | 0 (0%) | 0 (0%) | 2 (22%) |
| RCCC 18 | 0 (0%) | 0 (0%) | 0 (0%) | 1 (6%) | 0 (0%) | 0 (0%) | 8 (44%) | 8 (44%) | 1 (6%) | 0 (0%) | 0 (0%) | 0 (0%) |
| All 27 | 0 (0%) | 0 (0%) | 0 (0%) | 3 (11%) | 1 (4%) | 0 (0%) | 9 (33%) | 11 (41%) | 1 (4%) | 0 (0%) | 0 (0%) | 2 (8%) |

[1] One patient was released from Custody before the written response could be sent.

| Medical: Referrals | | | | | |
|---|---|---|---|---|---|
| Facility (HSR Count) | Order Created | | | Status of Created Orders | |
| | Yes | No | N/A | Closed | Open |
| MAIN 9 | 8 (100%) | 1 (11%) | 0 (0%) | 1 (12%) | 7 (88%) |
| RCCC 18 | 18 (100%) | 0 (0%) | 0 (0%) | 0 (0%) | 18 (100%) |
| All 27 | 26 (96%) | 1 (4%) | 0 (0%) | 1 (4%) | 25 (96%) |

| Dental: HSR Documentation | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility (HSR Count) | Collected | | | Paper HSR Form: Stamped | | | Scanned | | | Entered accurately into EHR | | |
| | Within 24 hours of submission | After 24 hours of submission | UDT[1] | Stamp Legible | Stamp Illegible | Not Stamped / Scanned | Yes | No | Average # days for scanning | Yes | No | UTD[2] |
| MAIN 2 | 1 (50%) | 1 (50%) | 0 (0%) | 2 (100%) | 0 (0%) | 0 (0%) | 2 (100%) | 0 (0%) | 6.07 | 2 (100%) | 0 (0%) | 0 (0%) |
| RCCC 3 | 2 (67%) | 1 (33%) | 0 (0%) | 1 (33%) | 2 (67%) | 0 (0%) | 3 (100%) | 0 (0%) | 4.93 | 1 (33%) | 2 (67%) | 0 (0%) |
| All 5 | 3 (60%) | 2 (40%) | 0 / 5 (0%) | 3 (60%) | 2 (40%) | 0 (0%) | 5 (100%) | 0 (0%) | 5.39 | 3 (60%) | 2 (40%) | 0 (0%) |

[1] UTD: the HSR paper form was not scanned into the system or the paper HSR form did not have a date of submission shown, AND no other entry exists for the date of submission on the electronic HSR form.

[2] UTD: the HRS was never scanned accurately into the EHR.

| Facility (HSR Count) | Triage Time by SRN/RN | | | | Initial Triage:  Was it Clinically Appropriate? | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Dental: Triage of Paper HSR** | | | | | | | | | | | | |
| | <= 3 hrs. | > 3 hrs. <= 24 hrs. | > 24 hrs. <= 48 hrs. | > 48 hrs. | Emergent/Stat | | Urgent | | Routine | | Written Response Required | |
| | | | | | Yes | No | Yes | No | Yes | No | Yes | No |
| MAIN 3 | 1 (33%) | 1 (33%) | 1 (33%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 3 (100%) | 0 (0%) | 0 (0%) | 0 (0%) |
| RCCC 2 | 0 (0%) | 0 (0%) | 2 (100%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 2 (100%) | 0 (0%) | 0 (0%) | 0 (0%) |
| All 5 | 1 (20%) | 1 (20%) | 3 (60%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 5 (100%) | 0 (0%) | 0 (0%) | 0 (0%) |

**Dental: Timeframes by Triage Category**

| Facility (HSR Count) | Emergent/Stat | | | Urgent | | | Routine | | | Written Response Required | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Within TF | Outside TF | Not seen | Within TF | Outside TF | Not seen | Within TF | Outside TF | Not seen | Within TF | Outside TF | Not Sent |
| MAIN 2 | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 1 (50%) | 0 (0%) | 0 (0%) | 1 (50%) | 0 (0%) | 0 (0%) |
| RCCC 3 | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 2 (67%) | 0 (0%) | 0 (0%) | 0 (0%) | 1 (33%) |
| All 5 | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 1 (20%) | 2 (40%) | 0 (0%) | 1 (20%) | 0 (0%) | 1 (20%) |

**Dental: Referrals**

| Facility (HSR Count) | Order Created | | | Status of Created Orders | |
| --- | --- | --- | --- | --- | --- |
| | Yes | No | N/A | Closed | Open |
| MAIN 2 | 2 (100%) | 0 (0%) | 0 (0%) | 0 (0%) | 1 (50%) |
| RCCC 3 | 3 (100%) | 0 (0%) | 0 (0%) | 0 (0%) | 2 (67%) |
| All 5 | 5 (100%) | 0 (0%) | 0 (0%) | 0 (0%) | 3 (60%) |

- **Findings:**
  - 96% (14/20) of Medical HSRs and 100% (5/5) of Dental HSRs were scanned into the EHR and available for comparison to the EHR HSR encounter at the time of audit.
  - In 46% (12/26) of medical cases (where the patient was not released before an opportunity to be visited), the HSR was addressed within the required timeframe. In 40% (2/5) of dental cases (where the patient was not released before an opportunity to be visited) the HSR was addressed within the required timeframe.
  - Scanning the HSRs took 7.75 days on average for Medical HSRs and 5.39 days on average for Dental HSRs.
  - Approximately 93% (25/27) of Medical and 100% (5/5) of Dental paper HSR forms were date stamped when received.
  - 59% (25/27) of medical paper HSR forms and 40% (2/5) of Dental paper HSR forms were triaged within 3 hours of being received by healthcare staff. One Medical paper HSR form was triaged after 48 hours.
  - All the Medical and Dental HSRs are considered to have an appropriate priority level assigned.
  - All Dental HSRs, and all but one of the Medical HSRs, were filled out by the patient on the most recently updated paper HSR form.
- MH Triaged Health Service Requests Audit – Triage within 24 Hours of MH Receiving HSR:

**Summary: Triaged Health Service Requests December 2023 – February 2024**

| Month | Total HSR | HSR Triaged within 24 Hours | HSR Triaged Outside of 24 hours | Average Triage Time |
|-------|-----------|------------------------------|----------------------------------|---------------------|
| December 2023 | 1311 | 1063(81%) | 248(19%) | 15 |
| January 2024 | 1344 | 1193(89%) | 151(11%) | 12 |
| February 2024 | 1515 | 1214(80%) | 301(20%) | 13 |
| **TOTAL** | **4170** | **3470(83%)** | **700(17%)** | |

- SSO Status: N/A

| Chronic Care |
|---|
| **(Section VI; Provision D.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: N/A |

## D. Chronic Care

1.  Within three months of the date the Remedial plan is issued by the Court, the County shall, in consultation with Plaintiffs' counsel, develop and implement a chronic disease management program that is consistent with national clinical practice guidelines. The chronic disease program will include procedure for the identification and monitoring of such patients and the establishment and implementation of individualized treatment plans consistent with national clinical practice guidelines.

    a)  The chronic disease management program shall ensure that patients with chronic illness shall be identified and seen after intake based upon acuity (on the day of arrival for patients with high acuity and not to exceed 30 days for all others). The County will timely provide clinically indicated diagnostic testing and treatment, including prior to this post-intake appointment. Follow-up appointments will be provided in intervals that do not exceed 90 days unless patients are clinically stable on at least two consecutive encounters, in which case, follow-up appointment intervals will not exceed 365 days (and sooner if clinically indicated), subject to a chart review every 6 months.

    b)  The chronic disease management program shall ensure patients are screened for hepatitis C at intake. If medical staff recommend Hepatitis testing based upon screening results, such testing shall be offered on an "opt-out" basis for those individuals who remain in custody long enough to receive a housing assignment. If the patient declines testing the refusal shall be documented in the health record. Patients found to have hepatitis C shall be offered immunizations against hepatitis A and B.

    c)  The chronic disease management program shall include a comprehensive diabetic management program consistent with the American Diabetes Association (ADA) Diabetes Management in Correctional Institutions. The protocol shall be developed in coordination with custody administration to address normal circadian rhythms, food consumption times and insulin dosing times.

    d)  The chronic disease management program shall ensure that patients who take medications for their chronic conditions shall have the medications automatically renewed unless the provider determines that it is necessary to see the patient before renewing the medication. In that case, the patient shall be scheduled to be seen in a reasonable time period to ensure medication continuity.

2. The County shall track compliance with the chronic disease management program requirements for timely provision of appointments, procedures, and medications. The County shall ensure that its electronic medical record system is adequate to support these critical functions.

3. The County shall review its infection control policies and procedures for dialysis treatment to ensure that appropriate precautions are taken to minimize the risk of transmission of blood-borne pathogens, given the proximity of HCV+ and HCV- patients receiving dialysis in the same room.

**Audits & Reports:**

- Chronic Physical Health Conditions Report
- Chronic Disease Management Audit
- Chronic Care Audit- Diabetes Management

**Compliance Status by Section:**

- VI.D.1.
  - ACH Status: PARTIAL COMPLIANCE
    - ACH has implemented a chronic disease management program to be consistent with national clinical practice guidelines. ACH has expanded its Chronic Disease Monitoring program and developed a quarterly Chronic Disease Management Audit. The Intake nurse places an order for an History and Physical (H&P) exam for anyone identified as having a chronic disease. At this initial H&P, the provider will assess the level of disease control and schedule chronic care follow-up appointments based on medical acuity and level of disease control.
    - VI.D.1.a. The chronic disease management program includes a process to ensure chronic care patients are referred for an H&P based upon acuity. Monitoring to the adherence to this process is included in the Chronic Disease Management Audit.  A corrective action plan has been implemented by QI to address a backlog in lab orders to ensure patients receive timely and effective treatment.
      - Providers have been trained and have started managing chronic diseases.  As staffing improves, more dedicated chronic care providers will be assigned to manage patients with multiple chronic diseases and higher acuity. Given lower patient turnover and lower acuity patients, consistency in CC providers for individual patients has been very successful at RCCC. As more regular, full-time providers are working at MJ, we expect to be able to have more consistency with floor assignments, which will aid in having an assigned provider to these patients.

- Since the last report, ACH has hired a clinical pharmacist to provide Chronic Care Management for diabetes, hypertension, and hyperlipidemia (Metabolic Syndrome). The clinical pharmacist began seeing patients in June 2024 and will order labs, adjust medications and provide education to the patients on their disease state as appropriate.
- Providers have been trained in all chronic disease policies or guidelines at past Provider meetings and new providers are required to review it as part of onboarding. These policies are expected to be updated in the coming year as we get real-time feedback after implementation.
- Providers have been trained to use the right document type to capture the chronic care encounter and to address all chronic care problems during a Provider Sick Call, as clinically appropriate.
- Chronic care compliance will improve once the floor nurses are staffed and able to monitor a panel of patients to ensure timely follow-up, including completion of labs, imaging, and other coordination of care as needed.
- A clinical pharmacist is currently in background clearance and will be added to the chronic care team to enable Providers to better manage chronic care patients with diabetes, HTN, hyperlipidemia, Hep C, asthma, and OUD.
- A primary care provider with additional training in HIV conducts a twice weekly (at least) HIV Clinic. Infectious disease consultation is also available through RubiconMD or contracted off-site Infectious Disease specialist as clinically indicated.
- A primary care provider with additional training in gender affirming care conducts and Transgender Care Clinic every 2 weeks, and patients on hormones prior to incarceration have them continued as part of our Essential Medications process.
- Medical Director developed guidelines for routine vaccinations and health screenings (e.g., diabetes, breast cancer, and colorectal cancer screenings) and trained providers in December 2021.
- VI.D.1.b. The chronic disease management program ensures patients are screened for Hepatitis C, HIV, syphilis, and GC/CT at Intake and offered testing on an "opt- out" basis for those individuals who remain in custody long enough to receive a housing assignment. If the patient declines testing the refusal is documented in the health record. Patients found to have hepatitis C are offered immunizations against hepatitis A and B. A specialist provides onsite Gastroenterology and Hepatology clinics every other week.  Services started in October 2021.

- VI.D.1.c. The chronic disease management program includes a diabetes management clinic consistent with the American Diabetes Association (ADA) Diabetes Management in Correctional Institutions. Diabetic medications are scheduled to coincide with food consumption times. The Assistant Medical Director is working with custody and Case Management to get continuous glucose monitors available to all type 1 diabetics.
- VI.D.1.d. Currently, medications are prescribed for one year. Prior to expiration, pharmacy sends an EHR alert for the Providers to renew. The Medical Director will work with Pharmacy Director to make renewals automatic when the clinical pharmacists are implemented into the chronic care program next FY. Medication Initiation and Renewal Audits have been conducted to measure compliance of uninterrupted medication renewals. The audit conducted on August 2022 data showed 86% compliance, on February 2023 data showed 90%, on August 2023 data showed 62% compliance, and on February 2024 data showed 100% compliance with this provision.
  - SSO Status: N/A
- VI.D.2.
  - ACH Status: PARTIAL COMPLIANCE
    - ACH QI has conducts Chronic Care audits – QI conducts regularly audits surrounding compliance with diabetic chronic care requirements, the most recent audit completed for Q3 of FY 2023/2024 (March 2024). QI also implemented a new compliance audit on overall chronic disease management within the Jails.
    - A Chronic Conditions report has been developed and is available to clinical staff.  It can be run by ICD-10 code for a particular time period and/or facility.  Data elements being tracked include:
      - ICD-10 Code and Problem Description
      - Degree of Control
      - First PHP Visit
      - Last provider visit details
      - Recent Lab Reports and Future Lab Orders
      - Follow up Chronic Care clinic dates.
    - Providers have been trained to create alerts in the EHR to ensure a particular patient will return to that provider for follow-up care when possible.
    - Initial H&P and Provider Chronic Care Follow-Up forms are active in the EHR.  Both encounter types include several forms for data collection, such as Periodic Health Assessment and Patient Education details.
    - The Asthma form in the EHR was updated to capture additional information during chronic care follow-up visits.

- ▪ The Practitioner Assessment & Plan form in the EHR has been updated to include Chronic Care follow up reasons and automatically generated future appointment orders as well as a link to the necessary documentation should the patient require to be sent for an emergency room visit.
  - o SSO Status: N/A
- VI.D.3.
  - o ACH Status: PARTIAL COMPLIANCE
    - ▪ ACH contracts with Spectrum to provide onsite dialysis treatment, who is required to maintain and follow regulations and policies surrounding appropriate precautions to minimize the risk of transmission of blood-borne pathogens while providing dialysis.
    - ▪ ACH Infection Control has recently worked with the California Department of Public Health to update the Infection Control Policies to be consistent with standards.
    - ▪ Staff are pulling data reports on chronic conditions and labs which will help with chronic disease management. See table below:

| Chronic Physical Health Conditions Report Point in Time | | | | | | |
|---|---|---|---|---|---|---|
| | 12/27/23 | 1/24/24 | 2/28/24 | 3/27/24 | 4/24/24 | 5/29/24 |
| % of Patients with chronic physical health conditions | 41% | 42% | 41% | 41% | 42% | 43% |
| Of those with chronic physical health conditions, % have two or more conditions | 41% | 41% | 41% | 41% | 40% | 40% |
| % of Patients on medication | 83% | 82% | 83% | 84% | 73% | 82% |

| Chronic Conditions Report<br>Point in Time | | | | | | |
|---|---|---|---|---|---|---|
| | **12/27/23** | **1/24/24** | **2/28/24** | **3/27/24** | **4/24/24** | **5/29/24** |
| % of Patients with chronic conditions | 79% | 80% | 79% | 78% | 80% | 81% |
| Of those with a chronic condition, % have two or more conditions | 69% | 71% | 70% | 70% | 70% | 69% |
| % of Patients on medication | 83% | 82% | 83% | 84% | 73% | 82% |

**Chronic Care Audit – Diabetes Management**

- QI developed an audit tool for diabetes management and conducted a baseline audit in November 2021.
- The data shows that Providers are improving with respect to scheduling follow-up visits and HbA1c testing within appropriate timeframes.  See table above.

| Indicator | Data Period | | | | |
|---|---|---|---|---|---|
| | *Sample of patients with diagnosis of diabetes* | | | | |
| | 03/2023 (N=26) | 06/2023 (N=26) | 09/2023 (N=29) | 12/2023 (N=28) | 03/2024 (N=26) |
| Provider follow-up visit within timeframe based on degree of disease control | 16/26 (62%) | 18/26 (69%) | 20/29 (69%) | 17/28 (61%) | 17/28 (61%) |
| Hemoglobin A1c (HbA1c) test scheduled within 6 months of last result | 18/26 (69%) | 24/26 (92%) | 29/29 (100%) | 24/28 (86%) | 26/28 (93%) |

- HbA1c testing according to policy timeframe significantly improve from 56% in February 2022 to 93% in March 2024.
- Staff recently developed additional chronic care audit tools and are currently conducting the Chronic Care Audit.
  - SSO Status: N/A

| **Specialty Services** |
|---|
| **(Section VI; Provision E.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: N/A** |

## E.  Specialty Services

1. The County shall develop and implement policies regarding specialty referrals using an algorithm with evidence-based referral criteria and guidelines.

2. Within 3 months of the date the Remedial plan is issued by the Court, the County shall develop and implement policies and procedures to ensure that emergency consultations and diagnostic treatment procedures, as determined by the medical provider; are provided immediately; high priority consultations and procedures, as determined by the medical provider are seen within 14 days of the date of the referral; and routine consultations and procedures, as determined by the provider are seen within 90 days of the date of the referral.

3. Patients whose routine specialty consultation or procedure do not take place within 90 calendar days from the date of the referral shall be examined by a clinician monthly and evaluated to determine if urgent specialty care is indicated.

4. Within 5 days of the completion of a high priority specialty consultation or procedure, or within 14 days of a routine specialty consultation or procedure, patients returning to the Sacramento County Jail shall have their specialty reports and follow-up recommendations reviewed by a jail nurse practitioner, physician assistant or physician.

5. Specialty care consultations and outside diagnostic and treatment procedures shall be tracked in a log that identifies the referral request date, the date the referral was sent to the specialty care provider, the appointment date for the consultation or procedure is scheduled, the date the appointment takes place, and, if the appointment is rescheduled or cancelled, the reason it was rescheduled or canceled.

6. Requests for specialty consultations and outside diagnostic and treatment procedures shall also be tracked to determine the length of time it takes to grant or deny the requests and the circumstances and reasons for denials.

7. At least twice a year, the County shall conduct an audit of specialty care referral logs described in subsections (5) and (6), above, and complete a report as to whether each category of specialty care is provided in a reasonable timeframe, consistent with established timeframes. If any specialty care area has a record of untimely appointments as determined by the Correctional Health Service Continuous Quality Improvement Committee, the County shall report to Plaintiffs and the parties shall meet and confer to take prompt steps to address the issue. The County will provide Plaintiffs access to the specialty care referral logs and audit reports periodically and upon written request. The parties will work to resolve issues with untimely specialty care in individual patient cases and with respect to systemic trends, including through the dispute resolution process.

8. The County shall consider implementing an e-referral system to reduce delays and facilitate communication between specialists and primary care providers, as well as reducing unnecessary transportation costs and unnecessary specialist appointments by ensuring that the specialist has all the information he or she needs before an appointment takes place.

9. The County shall ensure that utilization management and/or scheduling staff provides notification of whether a patient's specialty care appointment is scheduled to occur within the timeline pursuant to the referral and/or clinical recommendation, including as follows:

   a) Medical staff may request and obtain information as to whether any patient's specialty care appointment is scheduled, and as to the general timing of the appointment (e.g. within a one-week's date range).

> b) If a specialty care appointment is denied or is not scheduled to occur within the timeline pursuant to the referral and/or clinical recommendation, such information will be affirmatively provided to the treatment team and to the patient.
> c) If a previously scheduled specialty care appointment is postponed to a date that is outside the timeline pursuant to the referral and/or clinical recommendation, such information will be affirmatively provided to the treatment team and to the patient.
> 10. The County shall consider creating a physical therapy clinic at the jail to more efficiently meet the significant demand for this service.

ACH attempts to contract with Specialty providers willing to provide onsite services when possible and capable of providing quality patient care in the Jails. Below is a list of onsite Specialty Services:

- o   Audiology
- o   Cardiology
- o   Dialysis
- o   Dermatology
- o   Gastroenterology/Hepatitis C Clinic
- o   Nephrology (telemedicine)
- o   Ophthalmology Clinic
- o   Optometry Clinic
- o   Otolaryngology (ENT)
- o   Physical Therapy Clinic
- o   Podiatry
- o   Pulmonary (telemedicine)
- o   RubiconMD Specialty E-Consult Services

**Audits:**

- Specialty Care Audit

**Compliance Status by Section:**

- VI.E.1.
  - o   ACH Status: SUBSTANTIAL COMPLIANCE

- ▪ ACH has implemented policies regarding specialty referrals in collaboration and agreement with court-appointed Experts.
- ▪ Specialty Care Referral Provider Guidelines were developed, and training is provided ongoing to assist providers in submitting sufficient documentation when making referrals. Also see Utilization Management section.
  - o SSO Status: N/A
- VI.E.2.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ ACH has implemented policies regarding specialty referrals in collaboration and agreement with court-appointed Experts.
    - ▪ Urgent referrals are required to be seen within 14 days of referral rather than the 21 days stated in the Remedial Plan.
  - o SSO Status: N/A
- VI.E.3.
  - o ACH Status: PARTIAL COMPLIANCE
    - ▪ ACH Case Management (CM) has a system to schedule Provider follow-up appointments for all patients who have not yet had their Specialty consultation or procedure and therefore fall outside of the 90-day timeframe. CM indicates the purpose of the visit and has a system to track the number of follow-up visits that occur per policy. Providers have been trained on this requirement and how this visit is flagged in the health record.
  - o SSO Status: N/A
- VI.E.4.
  - o ACH Status: PARTIAL COMPLIANCE
    - ▪ ACH CM has a tracking system to ensure collection of the consult or procedure paperwork from the Specialty provider and schedules the ACH Provider follow-up appointment within the timeframe requirements (5 days of the completion of a high priority specialty consultation or procedure, or within 14 days of a routine) – which is tracked and reported out quarterly.  There are sometimes difficulty in obtaining the paperwork timely. CM often has to follow-up with the outside provider multiple times, which causes delay's in the follow up appointments with onsite providers.
    - ▪ CM has recently gained access to the following outside EHR's to search for and obtain paperwork:

- Cerner (San Joaquin General Hospital). At the moment, only the CM SRN has this access, we are in process of gaining access for the other CM staff.
- Sutter Link
- Staff must fax requests for records for any UC Davis consults/procedures
  - SSO Status: N/A
- VI.E.5-6.
  - ACH Status: PARTIAL COMPLIANCE
    - CM has been tracking and reporting on Specialty care consultations and outside diagnostic and treatment procedures since February 2021 and continued to expand the tracking elements.  All elements outlined in this Remedial Plan requirement were being tracked for offsite consults only, including the time it takes to grant or deny requests and the circumstances or reasons for denials, meeting this Remedial Plan requirement. Additional information has been added to the Specialty Referral tracker based on Expert recommendations. This includes tracking of additional workup prior to appointment when needed, date specialty documentation was received post specialty appointment, if a nurse visit occurred upon return from a specialty appointment, and if additional tests are needed post appointment.
    - In February 2024 CM began tracking all specialty consults on the tracker. However due to the increase in providers, specialty referrals have increased significantly. CM is now receiving between 400-500 specialty referrals per month. Many of which are incomplete and need further workup before an appointment can be requested. CM was unable to keep up with the workload with the current practice of communicating back and forth with the provider to get the workup needed. The Executive Team met multiple times to discuss internal process changes needed. Following these workgroups, the following was implemented in June 2024:
      - Providers were instructed to consult with Rubicon MD first before generating certain specialty referrals.
      - CM spoke with each specialty provider to determine what was specifically needed (labs, imaging, etc) for each type of referral. Order sets were created so the workup is automatically ordered urgently. Providers follow up in three weeks via chart review to ensure workup is complete, then submit the order so an appointment may be scheduled. Urgent referrals are automatically processed with no provider follow up.

- The EHR team worked with D-Tech to get the Specialty Tracker automated and pulled directly from order manager. This new tracker is in testing and should be finalized by July 2024. This eliminates the burden of managing an extensive excel spreadsheet. The Specialty Data report will be compiled once live.
- ACH management is meeting regularly to discuss the changes and get updates on progress. This is a major step forward in tracking compliance in this area.
  - SSO Status: N/A
- VI.E.7.
  - ACH Status: PARTIAL COMPLIANCE
    - Auditing and reporting on off-site ppecialty care referral tracking as outlined above generally occurs quarterly – exceeding this Remedial Plan requirement of twice yearly. The exception is during this reporting period while we work with D-Tech to automate the report. These audit reports are gone over in the UM Subcommittee Meeting, and any issues are discussed with the goal of addressing at that time. In addition, the Medical Director now meets weekly with CM to discuss and review Specialty referrals for priority level appropriateness. The Specialty tracking sheet and/or Specialty audit reports are provided to Plaintiff's counsel and court-appointed Experts upon written request. Data is always reported 90 days in arrears in order to accurately capture compliance timeframes.
    - The first audit of the Off-site Specialty Referral Data was completed on 07/28/21 for the months of February through April 2021. Comparison data shows improvement in appointments meeting the 90-day timeframe 63% of the time during the first report period to 74% in the most recent report period of FY 22/23 July 2022 through June 2023.
    - In February 2024 CM began tracking on-site and off-site referrals on the tracker, so the next Specialty Referral Data will include both.
    - Upon consultation with Executive Medical Leadership and CM, ACH has created an "Expedited" referral category where appointments should be completed within 45 days.
    - Historically, appointments have been scheduled by SSO transportation staff. Due to issues with prioritizing scheduling and booking appointments outside of required timeframes to accommodate staff scheduling; ACH CM assumed the responsibility. This function has proven to be incredibly difficult due to workload demands and difficulty creating a smooth-running workflow. Therefore, ACH has developed a hybrid system with SSO. SSO

assists in making the appointments but CM medical staff have complete authority on priority levels and decision making attached to the appointment. This system is working well.

- o SSO Status: N/A
- VI.E.8.
  - o ACH Status: PARTIAL COMPLIANCE
    - See full detail under VI.E.5-6 above, in order to reduce unnecessary delays, the following was implemented in June 2024:
      - Providers were instructed to consult with Rubicon MD first before generating certain specialty referrals.
      - CM spoke with each specialty provider to determine what was specifically needed (labs, imaging, etc) for each type of referral. Order sets were created so the workup is automatically ordered urgently. Providers follow up in three weeks via chart review to ensure workup is complete, then submit the order so an appointment may be scheduled. Urgent referrals are automatically processed with no provider follow up.
      - ACH management is meeting regularly to discuss the changes and get updates on progress. This is a major step forward in tracking compliance in this area.
  - o SSO Status: N/A
- VI.E.9.
  - o ACH Status: PARTIAL COMPLIANCE
    - There are weekly meetings with the Medical Director and CM to review all referrals over 30 days. There is an initial review of all new referrals to determine if they can move forward by ensuring they have the proper work up completed to process the referral. The Provider will decide what work up is needed, decide the appropriateness of the triage level, or if it should be denied.
    - Medical staff can request information at any time regarding specialty appointments. CM schedules a provider visit with each patient monthly if their appointment falls outside of the timeframes – per policy. Providers are informed in the request why they are seeing the patient and to determine if anything significant has changed during the wait time regarding the reason for referral. Providers are also informed when a referral is denied and rationale is provided to them. They are instructed to meet with the patient to inform them.
    - A Physical Therapy clinic has been established and has been expanded to occur twice weekly in order to meet the demand and due to the length of time it takes to clear a patient from the list.

- CM is closely tracking provider visits post-appointment and ensuring results are reviewed.
- Telemedicine is currently being utilized for pulmonary and MAT consults and will continue to expand.
- ACH is working with SSO on procuring and downloading Physical Therapy exercise videos onto patient tablets. This will allow for more patients to exercise while in their cell. This will allow providers an option to work with patients on chronic pain relieving techniques prior to sending a PT referral.
- QI has been auditing specialty referrals, assessing timeliness, and identifying barriers since February 2021.

**Specialty Care Report: Fiscal Year 2022/2023 (Data as of December 2023)**

| Specialty Referrals by Priority | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Referral Priority** | **July** | **Aug** | **Sept** | **Oct** | **Nov** | **Dec** | **Jan** | **Feb** | **Mar** | **April** | **May** | **June** | **Total** |
| Routine | 52 | 55 | 64 | 62 | 44 | 60 | 48 | 64 | 57 | 75 | 72 | 63 | 716 (93%) |
| Expedited | - | - | - | - | - | - | - | 1 | 6 | 10 | 10 | 8 | 35 (5%) |
| Urgent | 2 | 2 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 5 | 4 | 5 | 21 (2%) |
| **Total** | **54** | **57** | **64** | **62** | **45** | **60** | **48** | **67** | **63** | **90** | **86** | **76** | **772** |

| Routine Specialty Referral Timeliness | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **90 Day Timeframe** | **July** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** | **Jan** | **Feb** | **Mar** | **Apr** | **May** | **June** | **Total** |
| Met | 22 | 18 | 26 | 29 | 20 | 28 | 26 | 30 | 20 | 39 | 29 | 36 | 323 (74%) |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Not Met: Appointment Over 90 Days | 2 | 10 | 7 | 4 | 5 | 7 | 10 | 6 | 9 | 5 | 3 | 3 | 71 (16%) |
| Not Met: No Appointment – Over 90 Days when Released | 3 | 5 | 6 | 2 | - | 3 | - | 1 | 4 | 4 | 6 | 1 | 35 (8%) |
| Pending | - | - | - | - | - | - | - | 1 | 4 | - | 1 | 1 | 7 (2%) |
| **Total** | **27** | **33** | **39** | **35** | **25** | **38** | **36** | **38** | **37** | **48** | **39** | **41** | **436** |

| Not Included in Timeframe | July | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | April | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Released Before 90 Days | 17 | 17 | 14 | 18 | 12 | 14 | 5 | 19 | 8 | 23 | 21 | 14 | 182 (65%) |
| Refused Appointment | 5 | 2 | 7 | 5 | 2 | 5 | 2 | 4 | 7 | 1 | 9 | 4 | 53 (19%) |
| Excluded (Temp-Out to State Hospital) | 3 | 3 | 4 | 4 | 5 | 3 | 5 | 3 | 5 | 3 | 3 | 4 | 45 (16%) |
| **Total** | **25** | **22** | **25** | **27** | **19** | **22** | **12** | **26** | **20** | **27** | **33** | **22** | **280** |
| **Grand Total** | **52** | **55** | **64** | **62** | **44** | **60** | **48** | **64** | **57** | **75** | **72** | **63** | **716** |

| Expedited Specialty Referral Timeliness | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **45 Day Timeframe** | **July** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** | **Jan** | **Feb** | **Mar** | **April** | **May** | **June** | **Total** |
| Met | - | - | - | - | - | - | - | 1 | 4 | 3 | 7 | 5 | 20 (95%) |
| Not Met: Appointment Over 45 Days | - | - | - | - | - | - | - | 0 | 0 | 1 | 0 | 0 | 1 (5%) |
| **Total** | | | | | | | | **1** | **4** | **4** | **7** | **5** | **21** |
| | | | | | | | | | | | | |
| **Not Included in Timeframe** | **July** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** | **Jan** | **Feb** | **Mar** | **April** | **May** | **June** | **Total** |
| Excluded | - | - | - | - | - | - | - | - | - | - | - | 1 | 1 (7%) |
| Refused | - | - | - | - | - | - | - | - | - | - | 1 | 1 | 2 (14%) |
| NIC | - | - | - | - | - | - | - | - | 2 | 6 | 2 | 1 | 11 (79%) |
| Total | - | - | - | - | - | - | - | - | 2 | 6 | 3 | 3 | 14 |
| **Grand Total** | | | | | | | | **1** | **6** | **10** | **10** | **8** | **35** |
| **Reasons for Delay** | April referral delayed due to outside provider limited appointments. | | | | | | | | | | | | |

| Urgent Specialty Referral Timeliness | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **14 Day Timeframe** | **July** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** | **Jan** | **Feb** | **Mar** | **April** | **May** | **June** | **Total** |
| Met | 1 | 2 | - | - | - | - | - | 1 | - | 1 | 1 | 2 | 8 (89%) |

| Not Met: Appointment Over 14 Days | - | - | - | - | 1 | - | - | - | - | - | - | - | 1 (11%) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **1** | **2** | **0** | **0** | **1** | **0** | **0** | **1** | **0** | **1** | **1** | **2** | **9** |
| | | | | | | | | | | | | | |
| **Not Included in Timeframe** | **July** | **August** | **Sep** | **Oct** | **Nov** | **Dec** | **Jan** | **Feb** | **Mar** | **April** | **May** | **June** | **Total** |
| Excluded | 1 | - | - | - | - | - | - | - | - | - | - | - | 1 (8%) |
| Refused | - | - | - | - | - | - | - | - | - | - | 1 | - | 1 (8%) |
| NIC | - | - | - | - | - | - | - | 1 | - | 4 | 2 | 3 | 10 (83%) |
| Total | 1 | - | - | - | - | - | - | 1 | - | 4 | 3 | 3 | 12 |
| **Grand Total** | **2** | **2** | **0** | **0** | **1** | **0** | **0** | **2** | **0** | **5** | **4** | **5** | **21** |
| **Reasons for Delay** | Patient was excluded because he left the facility on a temp out basis. | | | | | | | | | | | | |

- ○ SSO Status: N/A

| Medication Administration & Monitoring |
|---|
| (Section VI; Provision F.) |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: N/A |

F. **Medication Administration and Monitoring**

1. The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws through the following:
   a) Ensuring that initial doses of prescribed medications are delivered to patients within 48 hours of the prescription, unless it is clinically required to deliver the medication sooner.
   b) Ensure that medical staff who administer medications to patients document in the patient's Medication Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, (3) the date and time for any refusal of medication, and (4) in the event of patient refusal, documentation that the prisoner was made aware of and understands any adverse health consequences by medical staff.

2. The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

3. The County shall provide pill call twice a day in each housing unit, at regular times that are consistent from day to day, except as may be required by non-routine facility security concerns. The County shall develop and implement policies and procedures to ensure that prescribed medications are provided at therapeutically appropriate times as determined by the ordering physician. Any patient who requires administration of medications at times outside the regular pill call shall be provided that medication at the times determined by the ordering physician.

4. The County shall develop and implement policies and procedures to ensure that patients are provided medications at therapeutically appropriate times when out to court, in transit to and from any outside appointment, or being transferred between facilities. If administration times occurs when a patient is in court, in transit, or at an outside appointment, medication will be administered as close as possible to the regular administration time.

5. The County shall develop policies and procedures to ensure that medication efficacy and side effects are monitored by staff and reviewed by appropriate clinicians at appropriate intervals.

6. The County shall explore the expansion of its Keep-on-Person medication program, (especially for inhalers and medications that are available over-the-counter in the community) and to facilitate provision of medications for people who are out to court, in transit, or at an outside appointment.

**Audits:**

- Medication and Initiation and Renewal Audit

**Compliance Status by Section:**

- VI.F.1.
  - ACH Status: PARTIAL COMPLIANCE
    - ACH has implemented policies regarding medication administration in collaboration and agreement with court-appointed Experts. In addition, several key changes have been completed including changes in pharmacy schedules, deployment of new pill carts, reassigning some tasks, and improving the network capacity. Additional medical escorts are required to ensure efficient operations.
      - VI.F.1.a SUBSTANTIAL COMPLIANCE - QI has begun auditing to this provision and found that staff have maintained SUBSTANTIAL COMPLIANCE in both the audit of August 2022 (100% compliance), February 2023 (96% compliance), August 2023 (100% compliance), and February 2024 (100% compliance) meeting timeliness standards for patients receiving initial medications. See Section VI. B Intake for audit detail.
      - VI.F.1.b. PARTIAL COMPLIANCE – Staff document each administered medication as required in the patient's MAR. The medication refusal form has been modified and staff have been trained on the requirement to educate patients on adverse health consequences upon refusal. Handheld tablets have been purchased and have been fully implemented in order for nurses to document in real-time when administering medications at the cell. The devices are HIPAA-compliant and compatible with the EHR.
        - Purchased new medication administration carts, they are being configured and full implementation is expected July 2024.
        - Both the Main Jail and RCCC have installed several additional Wi-Fi access points throughout both facilities. This has greatly improved the accessibility by both PC and laptop devices used by staff, thereby allowing more efficient and stable EHR access and documenting ability. However Wi-Fi issues still slow down pill call processes at times. ACH leadership is working with D-Tech to identify and resolve the issue.
        - ACH has been engaged in regular meetings with the EHR vendor (Fusion) regarding business requirements for eMAR 4X. This includes the following:
          - Barcode capabiltiy.

- Enabling bidirectional communication with the Pharmacy Management System (CIPS).
  - Pharmacy Status field updates to reflect "Verified" or "Unverified" signifying if the medication order was verified by a pharmacist.
  - "Note Change" alerts to alert nurses of a dosage change.
  - In the meantime, the user manual for the current eMAR 4 has been posted for reference on the ACH intranet site.  Additionally, ACH tablets include barcode readers in anticipation of the barcode functionality available in eMAR.
  - SSO Status: N/A
- VI.F.2.
  - ACH Status: PARTIAL COMPLIANCE
    - During the previous reporting period, ACH management met with the LVN Union to make necessary changes to medication administration schedules to achieve substantial compliance. Required meetings occurred, and a Notice was sent out to all LVN's assigned to medication administration on 12/12/23 informing them that they will be moving to the day shift. Both BID medication administration times will occur on the dayshift in order to ensure safer medication practices and an abundance of staff to cover medication administration.
    - In January 2024, ACH leadership rolled out the new pill call process and new medication administration times. The two heaviest pill calls (AM and PM) are on the same shift. We have transferred the majority of LVN staffing to this shift so we have adequate staffing. Due to this change, we always have enough staff to cover pill call. We will reach substantial compliance in this provision when administration times fall one hour before or after the scheduled timeframe on a consistent basis.
    - All RNs and LVNs have been cross trained to administer medications allowing RNs to fill staffing shortages and avoid medication administration delays.
    - Established distribution areas to ensure efficient delivery of medications.
    - Medication Assisted Treatment (suboxone) has been separated from the normal pill call and is administered separately due to the time it takes to monitor the patient appropriately while the medication dissolves. A designated custody escort is usually assigned to assist with monitoring this pill call due to the high diversion potential.
    - Staffing matrix has been developed to reflect 12 hour shifts to maximize staffing.

- ACH leadership and SSO leadership have met multiple times to coordinate medication administration efforts. The Main Jail Captain wrote his operations order to align with the ACH workflow. This ensures SSO and nursing staff have the same information which creates less confusion and/or conflict.
- Training on the new pill call workflow took place at a nursing all staff meeting on 12/20/23 and ongoing as the process rolled out.
- Hiring efforts have significantly increased.
  - Staff will be designated to specific assignments and stations daily. Regular assignments will increase efficiency and reduce patient load.
- A third pill call was created for Hours of Sleep (HS) medication that needs to be administered before bedtime. Less staffing is needed for this since it is a smaller pill call consisting primarily of psychiatric medication.
- Regular in-person audits of the pill call process are needed to ensure staff are following policy. Supervision of this process has greatly increased at the end of June and will continue due to staff not adhering to policy requirements.
  - SSO Status: N/A
- VI.F.3.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - ACH provides medication administration three times a day in each housing unit, at regular times that are consistent from day to day, except as may be required by non-routine facility security concerns. ACH Medication Administration policy outlines that prescribed medications are provided at therapeutically appropriate times as determined by the ordering physician and that any patient who requires administration of medications at times outside the regular pill call shall be provided that medication at the times determined by the ordering physician.
    - Medication administration times have been changed to improve efficiency.
  - SSO Status: N/A
- VI.F.4.
  - ACH Status: NON-COMPLIANCE
    - The ACH/ATIMS project team created "turn on" and "turn off" flags and alerts accordingly depending on the patient's current condition(s). This includes sending an alert when a patient is on medication so that custody staff can be readily aware. Currently, the team is enchancing the flag to identify the actual pill call schedule for individual patients to allow staffing. Three pill call schedules are identified: AM, PM, and HS.

- The court medication process will be improved by the implementation of a 24-hour pharmacy. Employee growth has been approved for an additional Pharmacist and Pharmacy Technician for the 24/25 budget year. These staff will be responsible for same day court medications and discharge medications.
  - SSO Status: N/A
- VI.F.5
  - ACH Status: PARTIAL COMPLIANCE
    - ACH developed policies and procedures listed above with approval from Medical Experts to ensure that medication efficacy and side effects are monitored by staff and reviewed by appropriate clinicians at appropriate levels; however, this provision is not currently being conducted and will be a focus during the next reporting period.
  - SSO Status: N/A
- VI.F.6.
  - ACH Status: PARTIAL COMPLIANCE
    - PP 04-20 Keep on Person (KOP) Medications was approved by the Medical Experts in February 2022.  KOP medications were expanded to include inhalers, chronic disease medications, over-the-counter medications, and others.  Staff developed a Patient Medication Guide handout to inform patients of the KOP and discharge medication programs.
    - ACH has increased eligibility – including for patients on restricted medications, by only dispensing the non-restricted medications as KOP.  Patients with restricted medications still go through the pill line for the restricted medications. ACH is also assessing all levalbuterol inhalers (rescue inhalers), thus increasing KOP.
    - Expansion of KOP to all eligible patients; Phamacy has started transioning delivery to the nursing staff. RCCC nurses deliver the KOP, allowing more time to convert patients to KOP.Once this process is fully implemented, this provision will be in substantial compliance.
    - All rescue inhalers and nitroglycerin 0.4mg are provided KOP unless the patient is disqualified from the program. Scheduled inhalers are also provided to patients.
      - All rescue inhalers are KOP (234 patients as of 12/08/2023
      - All nitroglycerin for chest pain is KOP (19 patients as of 12/08/2023)
    - Routine and chronic care medication are provided to eligible patients. If patients are on a restrictive medication, they will continue to go to pill line to receive the restrictive medication.

- Pharmacy staff monitors compliance upon dispensing refilled medications and educate patients on proper use, use of the EHR to document participants' compliance, and use the Pharmacy Information System for data management.
- ACH developed a new audit tool to evaluate the timeliness of medication initiation and renewal.
- An initial baseline audit assessed outcomes in February 2022, and additional audits are completed biannually.
- QI data is presented in the Pharmacy and Therapeutics Subcommittee for review and recommendations. See table below:

| Medication Initiation and Renewal | | | | |
|---|---|---|---|---|
| Indicator | Data Period | | | |
| | 08/17/22 (N=42) | 02/16-17/23 (N=44) | 08/16/23 (N=52) | 02/16/2024 (N=48) |
| Timely initial medication (<48 hours from order) | 35/35 (100%) | 23/24 (96%) | 44/44 (100%) | 37/37 (100%) |
| Timely renewal (no missed doses) | 6/7 (86%) | 18/20 (90%) | 5/8 (62%) | 11/11 (100%) |

  o SSO Status: N/A

| Clinical Space and Medical Placements |
|---|
| (Section VI; Provision G.) |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: PARTIAL COMPLIANCE |
| **H.  Clinical Space and Medical Placements** |
| |
| 1.  The County shall provide adequate space in every facility to support clinical operations while also securing appropriate privacy for patients. Adequate clinical space includes visual and auditory privacy from prisoners, and auditory privacy from staff, the |

space needed reasonably to perform clinical functions as well as an examination table, sink, proper lighting, proper equipment, and access to health records.

2. The County shall ensure that any negative pressure isolation rooms meet community standards, including an antechamber to ensure that the room remains airtight, appropriate pressure gauges, and regular documented checks of the pressure gauges.

3. The County shall ensure that absent individualized, documented safety and security concerns, patients in acute medical or quarantine placements shall be allowed property and privileges equivalent to what they would receive in general population based upon their classification levels.

4. The County shall ensure that patients in medical placements are not forced to sleep on the floor, including providing beds with rails or other features appropriate for patients' clinical needs and any risk of falling.

5. The County shall not discriminate against patients in medical placements solely because of their need for C-Pap machines, but instead shall provide access to programs and services in accordance with their classification level, as set forth in the ADA remedial plan.

**Compliance Status by Section:**

- VI.G.1.
  - ACH Status: PARTIAL COMPLIANCE
    - Short-Term Plan:
      - ACH worked with SSO to identify additional exam room stationing areas to provide additional, confidential space to complete services on each floor in each wing – including NSC.
      - Inventory medical equipment currently in stock as well as additional needed to support additional fully functioning stations on each floor in each wing, including, but not limited to:
        - Exam Carts with computers, stocked with exam equipment and materials.
        - Privacy Screens
      - ACH has implemented a Daily Healthcare Service Schedule that will assign exam rooms and times for RNs to provide NSC, as well as all service functions.
    - Mid-Term Plan
      - Use of transparent interviewing cubicles to be constructed in 2024 with four pods on each floor, two in each wing. MH staff will use one in each wing for confidential interviews and small multi-disciplinary meetings and nursing staff will use the other for NSC, lab draws and other medical contacts. ACH worked with DGS and SSO to choose a privacy curtain on rails to ensure visual privacy during specific exams.

Class Counsel and the SMEs have seen the plans and are satisfied that this will meet clinic space and privacy requirements.

- To address the privacy issues that prevent compliance in the nurse intake area, the County developed a comprehensive plan to restructure the arrest report room/medical intake area. The plan involves DGS repurposing the current room where the breathalyzer is stored, a bathroom, an exam room and an office into four medical intake confidential spaces.
- This plan was shared in detail with the SME's and Class Counsel and the response was favorable in that it would meet requirements to achieve compliance.
  - 
- Long Term Plan Completion of Intake Health Services Facility (IHSF):
  - A project to build this facility has been approved by the Board of Supervisors (BOS) and will ultimately be needed to meet this requirement.
  - DGS is leading an effort to build an annex that includes a new booking loop with the required amount of space for inmate privacy adjacent and connected to the current Main Jail. The project is currently undergoing a third party peer review.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - RCCC- All medical and psychiatric offices are confidential and free of recording. There are no cameras in medical offices to ensure privacy for inmates. All medical offices have equipment determined to be necessary by ACH. RCCC MHU Cells are recorded. No Audio
    - All exam rooms at Main Jail are visually and auditorily confidential.
- VI.G.2.
  - ACH Status: NON-COMPLIANCE
    - Jail reduction efforts and planning have begun to occur and will continue. Main Jail annex project was approved by the Board of Supervisors and criteria documents are currently undergoing a third party peer review.
    - This provision will not be in compliance until new construction.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - At Main Jail our negative pressure rooms are checked daily by DGS to ensure the requested standards are met.
    - On December 8, 2022 the Sacramento Board of Supervisors approved to build a Jail Intake and Health Services Facility as well as make ADA facility improvement to the current Jail.

- VI.G.3.
  - ACH Status: PARTIAL COMPLIANCE
    - All cells in medical housing are required to have medical beds. If a bed is out for repair, we provide a temporary replacement or the cell is deemed to be out of commission.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - All inmates in medical or quarantine placements are allowed to keep personal property with them as well as participate in programs that do not interfere with safety and security concerns.
- VI.G.4.
  - ACH Status: PARTIAL COMPLIANCE
    - Patients in need of CPAP machines were previously housed in the same area due to the need for electrical outlets. ACH secured a contract and ordered 20 battery-operated CPAP machines, so that these patients can be housed in the general population.  ACH Medical Director programmed the machines, helped create the workflow and assisted nursing in training staff.  All battery-operated CPAPs are now in use. For this reason, we have freed up needed cells on 2 East. We are able to move patients who are in our 2 Medical infirmary into 2 East, allowing more flexibility to conduct onsite monitoring and reduce send-outs. Maintaining open beds in 2 Medical and 2 East is critical for operations. We are now conducting in-house sleep studies with a contracted specialist, which has created the need for more battery-operated CPAPs. ACH will purchase more with the new budget in July 2024. This provision will be in substantial compliance once the battery-operated CPAP machines distributed to all who need them.
    - Patients are not to be denied programs and services based on this housing location.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - RCCC and Main Jail- No inmate is forced to sleep on the floor. Beds with rails are available in the Medical Housing Unit.
- VI.G.5.
  - ACH Status: N/A
  - SSO Status: PARTIAL COMPLIANCE
    - Housing units in RCCC currently do not have outlets near any sleeping areas, except MHU. Inmates housed in the Medical Housing Unit are able to participate in programs and services consistent with others in their

classification. At MJ inmates who require C-Pap machines are housed on 2E. They have equal access to programs and services in accordance to their classification level.

| Patient Privacy |
|---|
| **(Section VI; Provision H.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: PARTIAL COMPLIANCE |

**H. Patient Privacy**

1. The County shall develop and implement policies and procedures to ensure that appropriate confidentiality is maintained for health care services. The policies shall ensure confidentiality for clinical encounters, including health care intake screening, pill call, nursing and provider sick call, specialty appointments, and mental health treatment. The policies shall also ensure confidentiality for written health care documents, such as health care needs requests and grievances raising medical care or mental health concerns, which shall not be collected by custody staff.
2. The County shall provide adequate clinical space in each jail to support clinical operations while also securing appropriate privacy for patients, including visual and auditory privacy from prisoners and auditory privacy from staff.
3. All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff. In making such a determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be made based on housing placement or custodial classification. The issuance of pills does not constitute a clinical interaction.
   a) For any determination that a clinical interaction with a patient requires the presence of custody staff, staff shall document the specific reasons for the determination. Such decisions shall be reviewed through the Quality Assurance process.
   b) If the presence of a correctional officer is determined to be necessary to ensure the safety of staff for any clinical encounter, steps shall be taken to ensure auditory privacy of the encounter.
   c) The County's patient privacy policies, as described in this section, shall apply to contacts between patients and all staff who provide health-related services on site at the jail.
4. Jail policies that mandate custody staff to be present for any medical treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above. Custody and medical staff shall be trained accordingly.

**Compliance Status by Section:**

- VI.H.1.
  - ACH Status: PARTIAL COMPLIANCE
    - Exam rooms and attorney booths provide confidentiality for some health encounters. ACH is working on expanding exam space that will allow for greater privacy.
    - ACH has changed the ITI form/process to no longer include PHI that is visible to SSO. The form now instructs the nurse to place all medical information in an attached envelope to send to the provider. The form now instructs the outside provider to protect PHI by returning documentation in a sealed envelope.
  - SSO Status: PARTIAL COMPLIANCE
    - Clinical encounters are offered in a private and confidential setting. Deputies stand near when necessary for safety, while still offering privacy. All written health care correspondence is handled directly by Medical staff, including medical grievances.
- VI.H.2.
  - ACH Status: NON-COMPLIANCE
    - Nurse Intake renovation took place in December 2022 to create more confidential space, however that did not satisfy the privacy requirements.
    - To meet SUBSTANTIAL COMPLIANCE, the County developed a comprehensive plan to restructure the arrest report room/medical intake area. The plan involves DGS repurposing the current room where the breathalyzer is stored, a bathroom, an exam room, and an office into four confidential medical intake spaces.
    - This plan was shared in detail with the SME's and Class Counsel and the response was favorable in that it would meet requirements to achieve compliance.
    - ACH, SSO, DGS, and Class Counsel meet regularly to ensure progress continues and that the short timeframe for completion (early fall 2024) is met
    - ACH worked with SSO to identify additional exam room stationing areas to provide additional, confidential space to complete services on each floor in each wing – including NSC. These pop-up stations are currently being used for NSC.
    - Use of transparent interviewing cubicles to be constructed with four pods on each floor, two in each wing – estimated completion date is December of 2024. MH staff will use one in each wing for confidential interviews and small multi-disciplinary meetings and nursing staff will use the other for NSC, lab draws and other medical

contacts. ACH worked with DGS and SSO to choose a privacy curtain on rails to ensure visual privacy during specific exams. Class Counsel and the SMEs have seen the plans and are satisfied that this will meet clinic space and privacy requirements.

- See section G. Clinic Space for short and long-term space plans.
- o SSO Status: PARTIAL COMPLIANCE
  - RCCC- The intake medical trailer is equipped with video recording for staff safety, but does not have any audio. All medical and psychiatric offices are confidential and free of recording. There are no cameras in medical offices to ensure privacy for inmates. Medical offices on floors have video, but no audio, for nurse's safety.
  - MJ - Medical offices floors 3-8 are located in the elevator salle port away from the general floor area to provide privacy. Medical offices on floors have video, but no audio, for nurse's safety.
  - None the less, real structural space issues exist at both facilities. Neither has enough confidential treatment space to become fully compliant.

- VI.H.3.
  - o ACH Status: PARTIAL COMPLIANCE
    - See section G. Clinic Space for short and long-term space plans.
    - H.3.a. Current process - There is a confidential encounter indicator in each health encounter form where staff indicates if the visit was confidential or non-confidential and the rationale.
    - H.3.b. Maintaining auditory privacy is difficult due to space configuration.  County has a project approved by the BOS to build the IHSF and other space modifications to resolve the privacy issues.
    - H.3.c. Current practice - The County's patient privacy policies apply to all health-related contacts
  - o SSO Status: PARTIAL COMPLIANCE
    - Efforts are made to ensure medical and psychiatric visits are done in a private and confidential setting. Officers standby when necessary for safety, while still offering privacy to the inmate.
    - None the less, real structural space issues exist at both facilities. Neither has enough confidential treatment space to become fully compliant.
    - Policy on privacy of care  was published on 05/15/2024.
      - b) Deputies stand at a distance that offers their ability to intervene, if necessary, while offering auditory privacy. Current practice. Deputies stand at a distance that offers their ability to intervene, if necessary, while offering auditory privacy.

- VI.H.4.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - Current practice - Jail policies that mandate custody staff to be present for any medical treatment in such a way that disrupts confidentiality are revised to reflect the individualized process set forth above. Custody and medical staff are trained accordingly.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - No policies exist mandating deputies be present during medical treatment.

| **Health Care Records** |
| :---: |
| **(Section VI; Provision I.)** |
| ACH Status: SUBSTANTIAL COMPLIANCE |
| SSO Status: N/A |

### I. Patient Privacy

1. The County shall develop and implement a fully integrated electronic health care record system that includes medical, psychiatric, and dental records and allows mental health and medical staff to view the medical and mental health information about each patient in a single record. This shall be accomplished within 12 months of the date the Remedial plan is issued by the Court.
2. Until such a system is implemented, the County shall develop and implement policies and procedures to ensure that medical staff have access to mental health information and mental health staff have access to medical information, as needed to perform their clinical duties. This information shall include all intake records. Medical and mental health staff shall be trained in these policies and procedures within one month of the date the Remedial plan is issued by the Court.
3. The County shall develop and implement policies and procedures to monitor the deployment of the CHS Electronic Health Record (EHR) to ensure the records system is modified, maintained, and improved as needed on an ongoing basis, including ongoing information technology support for the network infrastructure and end users.

**Compliance Status by Section:**

- VI.I.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE

- ACH has developed and implemented a fully integrated electronic health care record system that includes medical, psychiatric, and dental records and allows mental health and medical staff to view the medical and mental health information about each patient in a single record.
- The athenaPractice EHR provides all of these components to medical and mental health staff via end user access to patient charts containing medical, dental and mental health data/records.  The EHR is also integrated with several web applications for eMAR, mental health groups, managing orders and labs as well as with several medical reference and resource websites.
  - Medical EHR Updates:
    - **Public Health Lab Requisitions/Test Results**:  The remaining compendium of lab types identified for submittal via the Public Health Lab requisition process have been deployed as of of July 2023.  Also, specimen label printers have been installed and configured at several workstations in both facilities so labels will automatically print for each lab requisition entered.  This will improve data accuracy and completeness for all specimens submitted for analysis. A Public Health Lab Orders report is in production and available to staff for tracking lab order status by date and by facility. The report also provides totals by facility, order status, and order type/description.
    - **Voice recognition device and software (VRS)** – ACH providers have continued to use the VRS system for dictation in patient charts.  Microphone devices have been deployed to all workstations accessed by providers at both facilities. VRS admins are able to create new accounts and run usage reports as required. ACH will be renewing the licenses for the VRS software.
- Telehealth – The rugged laptops being used for pill call and related tasks will be used for a telehealth pilot project using Microsoft Teams.  Clinical staff will be able to schedule appointments between the patient and a remote provider/healthcare worker.  The patient can be seen virtually with audio and video functionality built into the laptop.  A pilot project with testers from all service lines is scheduled to kick off in June 2024 The goal is to improve patient care and Provider productivity.
  - ACH Status: SUBSTANTIAL COMPLIANCE
- VI.I.2.
  - ACH Status: SUBSTANTIAL COMPLIANCE

- ▪ The EHR provides the access as described above and contains information regarding medical, mental health and intake records.
  - o SSO Status: N/A
- VI.I.3.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ ACH has developed and implemented policies and procedures to monitor the deployment of the ACH Electronic Health Record (EHR) to ensure the records system is modified, maintained and improved as needed on an ongoing basis, including ongoing information technology support for the network infrastructure and end users.
    - ▪ Several systems are in place to achieve maintenance and enhancements for the EHR:
      - **Sac Count IT Help Desk (JIRA)**
      - The County's IT department (DTech) has an IT Service Desk application (JIRA) for tracking/assigning help desk calls for EHR support.  Details regarding nature of the call, user info, resolution description, IT staff assigned, etc.  Reports are available for tracking call volume, type, frequency, etc. ACH EHR support staff have been given the permissions/ability to create and assign their own help desk tickets for EHR-related issues/problems.  This greatly increases the efficiency with which outages, errors, glitches, etc. can be addressed and a resolution provided.



      - **Fusion Help Desk**
      - ACH EHR Support staff have access to the EHR Vendor's (Fusion) help desk for more complicated troubleshooting problems and enhancement requests.  Issues can be tracked by type of subject –

Interfaces/Forms/Reports/App Issues.   Reports can be requested via the Sac County Account manager regarding call volume/type/frequency, etc.



- **ASAP System**
- There is an application to request new EHR accounts, access to particular EHR functionality, etc. for new ACH staff and/or modify access for ACH staff.  Report requests are also sent through this system.  Additionally, internal ACH EHR support staff have taken over creation of EHR accounts for new employees/users upon receiving notification that a network account has been created.  This enables a more a complete account setup with correct system security permissions for staff based on job classification and business need.  It also ensures staff are able to complete assigned tasks within the EHR without getting permission/access errors necessitating additional help desk requests.



o   SSO Status: N/A

| Utilization Management |
| :---: |
| **(Section VI; Provision J.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: N/A** |

**J.   Utilization Management**

1.   The County shall revise its utilization management (UM) system to ensure that critical health decisions about patients' access to care are made with sufficient input from providers and a thorough review of health care records.
2.   The County shall ensure that decisions about a patient's access to, timing of or need for health care are made by a physician, with documented reference to the patient's medical record. Nurses may gather information and coordinate the UM process, so long as it does not interfere with that requirement. All decisions by the UM committee shall be documented, including the clinical justification for the decision.
3.   The UM system shall ensure that providers and patients are promptly informed about decisions made by the UM committee, including denial of a specialist referral request.
4.   The UM system shall include an appeal process to enable patients and providers to appeal a decision denying a referral request.

**Compliance Status by Section:**

- VI.J.1.
  - ACH Status: PARTIAL COMPLIANCE
    - ACH has implemented policies regarding our utilization management (UM) system in collaboration and agreement with court-appointed Experts.
    - Case Management staff began using InterQual as the Utilization Management platform for specialty referrals in March 2021. However, after using InterQual criteria to make decisions regarding specialty services approval and denial, ACH found that using InterQual criteria resulted in denials of most specialty services requests. Therefore ACH has discontinued the use of InterQual.  Instead, there are weekly meetings with the Medical Director and CM to review all referrals over 30 days. There is an initial review of all new referrals to determine if they can move forward by ensuring they have the proper work up completed to process the referral. The Provider will decide what work up is needed, decide the appropriateness of the triage level, or if it should be denied. However due to the increase in providers, specialty referrals have increased significantly. CM is now receiving between 400-500 specialty referrals per month. Many of which are incomplete and need further workup before an appointment can be requested. CM was unable to keep up with the workload with the current practice of communicating back and forth with the provider to get the workup needed. The Executive Team met multiple times to discuss internal process changes needed. Following these workgroups, the following was implemented in June 2024:
      - Providers were instructed to consult with Rubicon MD first before generating certain specialty referrals.
      - CM spoke with each specialty provider to determine what was specifically needed (labs, imaging, etc) for each type of referral. Order sets were created so the workup is automatically ordered urgently. Providers follow up in three weeks via chart review to ensure workup is complete, then submit the order so an appointment may be scheduled. Urgent referrals are automatically processed with no provider follow up.
    - ACH management is meeting regularly to discuss the changes and get updates on progress. This is a major step forward in tracking compliance in this area.
    - Specialty Care Referral Provider Guidelines were developed, and training is continually provided to assist providers in submitting sufficient documentation when making referrals that are processed through InterQual.
    - A Utilization Management (UM) Subcommittee was formed and began meeting in October 2021.  Subcommittee members include service line directors, QI, MH, and case management.

- ▪ The UM Subcommittee continued reviewing selected cases of high utilizers, high risk, complex, and/or high cost in order to ensure that resources are applied appropriately and timely during the monitoring period.
  - o SSO Status: N/A
- VI.J.2.
  - o ACH Status: PARTIAL COMPLIANCE
    - ▪ All specialty referrals are ordered by physicians who determine the priority level based on their clinical assessment. The orders are routed to CM to review for completeness of workup and/or information to schedule the appointment.
  - o SSO Status: N/A
- VI.J.3.
  - o ACH Status: PARTIAL COMPLIANCE
    - ▪ The Medical Director meets weekly with CM to discuss and review Specialty referrals for priority-level appropriateness. All decisions for approval and denial are documented, including the clinical justification for the decision.
    - ▪ A lead physician and CM meet weekly to review new referrals. Priority levels may change as a result of the review and the provider is notified immediately.
  - o SSO Status: N/A
- VI.J.4.
  - o ACH Status: PARTIAL COMPLIANCE
    - ▪ If the specialty service is denied, CM will schedule a provider sick call so the ordering provider can discuss the decision with the patient. The patient is then informed of the appeal process. This provision will move into Substantial Compliance when we can monitor this process with evidence to support.
    - ▪ Referrals are typically denied when there is a specialty service that must occur prior to the service the patient was referred to. The ordering provider is given the information so the correct service can happen first. For example, providers have referred patients to surgery prior to receiving a surgery consultation by a specialist first. The surgery referral will be denied and the provider will be informed that a consultation will need to occur first.
  - o SSO Status: N/A

| Sanitation |
|---|
| **(Section VI; Provision K.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: N/A |
| **K.  Sanitation**<br><br>1.  The County shall consult with an Environment of Care expert to evaluate facilities where patients are housed and/or receive clinical treatment, and to make written recommendations to address issues of cleanliness and sanitation that may adversely impact health. |

**Compliance Status by Section:**

- VI.K.1.
    - ACH Status: PARTIAL COMPLIANCE
        - The County consulted with an Environment of Care Expert to evaluate facilities where patients are housed in medical and mental health units and in medical clinic areas to address consistent with environmental cleaning and sanitation standards.
            - An Action Item tool was developed to follow up on the recommendations from the Environment of Care Report and was sent to the SMEs.
            - ACH/DGS contracted with  Bissel Brothers now called Olympic Cleaning Service for environmental cleaning services requested in the Environment of Care Report. The contract was executed February 2024. There have been no major complaints about the execution of their work.
        - The County has updated the Infection Prevention and Control Manual to include policies and procedures with guidelines on proper cleaning and disinfecting approved by the California Department of Public Health for the medical and mental health areas.
        - Adult Correctional Health completed a Scope of Work consistent with the approved policies and is in collaboration with the Department of General Services and the Sheriff's Office to either expand the current cleaning contract or obtain a new contract with a professional cleaning vendor.  The contract is anticipated to be in place this Fiscal Year 23/24.
    - SSO Status: N/A

| Reproductive and Pregnancy Related Care |
| :---: |
| **(Section VI; Provision L.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: N/A |

**L.  Reproductive and Pregnancy Related Care**

1.  The County shall ensure that pregnant patients receive timely and appropriate prenatal care, specialized obstetrical services when indicated, and postpartum care (including mental health services).
2.  The County will provide pregnant patients with comprehensive counseling and timely assistance in accordance with their expressed desires regarding their pregnancies, whether they elect to keep the child, use adoptive services, or have an abortion.
3.  The County will provide non-directive counseling about contraception to female prisoners, shall allow female prisoners to continue an appropriate method of birth control while incarcerated (with consideration given to the patient's preference and/or current method of birth control), and shall provide access to emergency or other contraception when appropriate.

**Compliance Status by Section:**

- VI.L.1.
  - ACH Status: PARTIAL COMPLIANCE
    - Current Practice - ACH maintains a weekly OB/GYN clinic at the main jail. Pregnant patients are identified and followed by UCD OB onsite consistent with policy and federal and state regulations. However there were recent issues with women from RCCC being identified and transported to their appointments. The problem was in the interface between Athena and ATIMS where OB/GYN appointments were not showing on the medical transport list.
    - When acute issues arise, on-site providers evaluate the patient and consult with UCD OBGYNs via phone as needed.
    - ACH QI developed audit indicators to review reproductive and pregnancy-related care and expect the audit will be in production in 2024.

- - SSO Status: N/A
- VI.L.2.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - Current Practice - ACH provides pregnant patients with comprehensive counseling and timely assistance in accordance with their expressed desires regarding their pregnancies, whether they elect to keep the child, use adoptive services, or terminate the pregnancy. If patients elect for termination, coordination with UCDavis occurs immediately and their team prioritizes patients to be scheduled based on their gestational age, as is done in the community.
  - SSO Status: N/A
- VI.L.3.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - Current Practice - ACH provides non-directive counseling about contraception to female prisoners, allows female patients to continue an appropriate method of birth control, provides access to emergency or other contraception when appropriate. All forms of contraception including Depo-Provera, COCs, Progesterone only pill, and IUDs are offered.
  - SSO Status: N/A

| **Transgender and Gender Non-Conforming Health Care** |
|---|
| **(Section VI; Provision M.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: NOT APPLICABLE |
| **M. Transgender and Non-Conforming Health Care**<br><br>1. The County shall implement policies and procedures to provide transgender and intersex prisoners with care based upon an individualized assessment of the patient's medical needs in accordance with accepted standards of care and prevailing legal and constitutional requirements, including, as appropriate:<br>   a) Hormone Therapy<br>   b) Surgical Care<br>   c) Access to gender-affirming clothing |

> d) Access to gender affirming commissary items, make-up, and other property items
> 2. The County shall ensure that medical and mental health staff have specific knowledge of and training on the WPATH Standards of Care.

**Compliance Status by Section:**

- VI.M.1.
  - ACH Status: PARTIAL COMPLIANCE
    - ACH has implemented policies and procedures to provide transgender and intersex patients with care based upon an individualized assessment of the patient's medical needs in accordance with accepted standards of care and prevailing legal and constitutional requirements, including, as appropriate:
      - Hormone Therapy
      - Surgical Care
      - Access to gender-affirming clothing
      - Access to gender affirming commissary items, make-up, and other property items
    - For continuity of care, patients who are identified as receiving hormone treatment from a community licensed provider continue the medication while incarcerated. A provider will assess the patient and include the medication as part of the patient's treatment plan. This provision will be in substantial compliance when all patients who qualify are referred and seen in a timely manner at the gender-affirming clinic.
- VI.M.2.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - Mental Health staff worked with a consultant to develop training on the WPATH Standards of Care, LGBTQIA and health equity. Feedback from Medical, Mental Health and Suicide Prevention Experts has been incorporated. In consideration of the Medical Expert recommendation, ACH has created additional slides regarding the WPATH standards in relation to ACH policy to be included in the training. The training was approved, and training began in March 2023. 63% of ACH staff have completed the training. Newly Hired staff are expected to complete it within 3 months of hire and trainings are offered about every 4-6 months.
    - 100% of ACMH staff have completed the LGBTQ+ WPATH training.
  - SSO Status: Not applicable

| Detoxification Protocols |
| :---: |
| **(Section VI; Provision N.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: N/A |

**N. Detoxification Protocols**

1. Within three months of the date the Remedial plan is issued by the Court, the County shall develop and implement protocols for assessment, treatment, and medication interventions for alcohol, opiate, and benzodiazepine withdrawal that are consistent with community standards.
2. The protocols shall include the requirements that:
   i. nursing assessments of people experiencing detoxification shall be done at least twice a day for five days and reviewed by a physician.
   ii. nursing assessments shall include both physical findings, including a full set of vital signs, as well as psychiatric findings.
   iii. medication interventions to treat withdrawal syndromes shall be updated to provide evidenced-based medication in sufficient doses to be efficacious.
   iv. the County shall provide specific guidelines to the nurses for intervention and escalation of care when patients do not respond to initial therapy; and
   **v.** patients experiencing severe-life threatening intoxication (an overdose), or withdrawal shall be immediately transferred under appropriate security conditions to a facility where specialized care is available.

**Audits:**

- o Withdrawal Monitoring Audit

**Compliance Status by Section:**

- VI.N.1.
  - o ACH Status: PARTIAL COMPLIANCE
    - ACH developed and implemented policies and protocols for assessment, treatment, and medication interventions for alcohol, opiate and benzodiazepine withdrawal that are consistent with community standards

and in agreement/approval from court-appointed Medical Experts (see above). ACH will continue to train RNs on Withdrawal Management ACH policies and SNPs, emphasizing monitoring timeframe based on acuity.

- Electronic health record templates were revised to capture the latest changes.
- A withdrawal monitoring unit was created in 6 East. It is an entire pod of patients identified at intake that will need withdrawal monitoring services. This allows the nurses easier access to patients in order to conduct their monitoring.
- Withdrawal Monitoring is being tracked daily by the MAT/Withdrawal Monitoring Supervising Registered Nurse, however we have not reached substantial compliance with the level of monitoring required. This will be an areas of focus in the next reporting period. ACH will continue discussions with SSO to determine how we can create space in 2 East for patients in need of 4 and 6 hour monitoring or create a nurse station in the withdrawal monitoring pod for consistent nurse presence.
- As of April 2024, two MAT nurses are assigned to withdrawal monitoring per shift.
- Electrolytes have been placed in these units to assist patients with hydration, which may prevent emergency department send outs.
- Staff developed an audit tool to evaluate withdrawal monitoring in the Main Jail booking loop in March 2022. Audits are completed monthly and a corrective action plan was issued due to delays in timely monitoring for the purpose of identifying and correcting issues with monitoring patients at risk of withdrawal.
- ACH has been very proactive with overdose prevention by going from only continuing  MAT with a valid prescription to a full MAT induction program at the jail. The following efforts have taken place:
  - All providers are  required to provide MAT services.
  - MAT providers are assigned to take calls from nurses to continue MAT medications during weekdays. After hours, standby providers order bridge treatment.
  - ACH has been participating in a MAT expansion grant through Health Management Associates (HMA). It was decided that the funding would be used to purchase suboxone and pilot MAT inductions at the Main Jail. The pilot population was for those testing positive for fentanyl or admitting to using fentanyl at intake. In addition to the funding, HMA has been an incredible resource for ACH in providing technical assistance and training to our staff.

- ACH worked with County Behavioral Health Leadership and obtained $1 Million dollars in Opioid Settlement funds to rollout a full MAT induction program. This funding has extended into the new fiscal year.

- 

- Despite heavy opposition from the Provider Union group, ACH implemented the MAT induction program In October 2023.

- All patients who have disclosed recent opiate use are offered a MAT assessment and provided MAT services as medically indicated. All patients who were previously incarcerated before the induction rollout have received the same assessment and have been inducted if appropriate.

- On October 15, 2023, MAT induction housing was established at the Main Jail. ACH has been successful in hiring Addiction Medicine Specialists to staff the induction unit daily and to provide ongoing training and assistance to our other providers.

- ACH staff  continue to work with SSO to procure and download SUD education groups onto patient tablets. We plan to purchase a full video curriculum of relapse prevention/education groups. This will be available to all patients, which will assist our limited SUD Counselors to focus on discharge planning efforts.

- ACH and SSO meet weekly to discuss MAT induction housing to identify and resolve any issues that arise.

- Providers and Nursing staff are required to watch an initial Sublocade Administration training video before administering the medication.

- Due to the diversion that exists with this medication, ACH has created a medication diversion note that informs the providers of the details of the incident so they can speak with the patient to determine how to prevent future diversion. If diversion continues, patients are offered Sublocade as a preferred alternative to discontinuing the medication. In June 2024, we had an average of eight patients on sublocade.

- HMA has featured Sacramento County's MAT program several times at learning collaboratives and national trainings.

- Narcan has been placed in housing units directly available to inmates, and in control rooms.



Patients on MAT

| | Aug. 31 | Sept. 29 | Oct. 31 | Nov. 30 | Jan. 2 | Jan. 31 | Mar. 1 | Mar. 29 | 30-Apr |
|---|---|---|---|---|---|---|---|---|---|
| Patients | 152 | 216 | 357 | 498 | 544 | 593 | 638 | 666 | 694 |

- ○ SSO Status: N/A
- VI.N.2.
  - ○ ACH Status: PARTIAL COMPLIANCE
    - ▪ N.2.i. ACH worked in collaboration with Custody at Main Jail to designate a specific housing pod for a Detox Unit to support consistent withdrawal monitoring as a result of a decreased need for quarantine pods. Two RNs are designated for MAT services and designated nurses are assigned to administer medications daily. Due to the implementation of the Detox Units, twice-daily checks are improving and being closely monitored. See above for futher detail.
    - ▪ VI.N.2.ii. Nursing assessments include both physical findings, including a full set of vital signs, as well as psychiatric findings. If patients refuse their withdrawal monitoring checks, the RN goes to the cell and has SSO open the door. The nurse will attempt to engage the patient and get as much information on their status as they can.

- VI.N.2.iii. Medication interventions have been updated to treat withdrawal syndromes and in sufficient doses to be efficacious. ACH Medical leadership will develop a protocol for starting patients on opiate withdrawal medications at intake based on history and self-reporting– rather than solely dependent upon assessment scoring. ACH will continue to discuss initiating medications at intake for patients not yet in alcohol and benzodiazepine withdrawal with Experts, Custody, and County Counsel due to patient safety concerns related to compounding depressants as well as risks associated with quick releases from Custody.
- VI.N.2.iv. Detoxification protocols are in place to instruct nurses on intervention and escalation when needed.
- VI.N.2.v. Nurse intake screening will declare patients experiencing life-threatening intoxication unfit and send them to the ER for appropriate treatment. For those experiencing life-threatening withdrawal post intake – the nurse conducting monitoring will alert SSO and providers of the need to transport to the ER when identified. The unfit criteria was recently updated and the Medical Director trained all nursing staff.
- The MAT policy was revised in December 2023.

**Withdrawal Monitoring Monthly Data Summary Report**

**April 2024**

| Withdrawal Protocol Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Substance | WD Scoring at Intake | Substance Use Assessment Form Completed at Intake | Breathalyzer[1] Or UDS Performed, Refused, or Deferred Intake | SUD Counselor Offered at Intake | WD Monitoring/ WD Housing Required at Intake | WD Monitoring/ WD Housing Required at Some Point After Intake |
| Alcohol | 10 | 10 (100%) | 0 | 8 (80%) | 10 (100%) | 0 |
| Benzo | 4 | 4 (100%) | 4 (100%) | 4 (100%) | 2 (50%) | 1 (25%) |
| Opioid | 5 | 5 (100%) | 5 (100%) | 4 (80%) | 4 (80%) | 0 |
| **Total** | **19** | **19/19 (100%)** | **9/19 (47%)** | **16/19 (84%)** | **16/19 (84%)** | **1/19 (5%)** |

[1]Nurses were advised by Nursing Leadership via email on 7/10/23 to hold off on breathalyzer use at intake until further notice.

| Withdrawal Housing[1] Ordered | | | | |
|---|---|---|---|---|
| Substance | Required At Some Point | When Initially Indicated | After Initially Indicated | Not Ordered |
| Alcohol | 10 | 7 (70%) | 1 (10%) | 2 (20%) |
| Benzo | 3 | 3 (100%) | 0 | 0 |
| Opioid | 4 | 4 (100%) | 0 | 0 |
| TOTAL | 17 | 14/17 (82%) | 1/17 (6%) | 2/17 (12%) |

| ER Send out | | | | |
|---|---|---|---|---|
| Substance | Required at Some point | When Initially Indicated | After Initially Indicated | Not Done |
| Alcohol | 1 | 1 (100%) | 0 | 0 |
| Benzo | 1 | 1 (100%) | 0 | 0 |
| Opioid | 1 | 1 (100%) | 0 | 0 |
| TOTAL | 3 | 3/3 (100%) | 0 | 0 |

[1] If a patient requires "Detox housing" and then later requires "Medical housing" due to worsening symptoms, the EHR "order" for housing that will be considered in the table above will be the one that took longer to be entered relative to the time the type of housing was indicated.

| Withdrawal Monitoring Ordered | | | | |
|---|---|---|---|---|
| Substance | Required At Some Point | When Initially Indicated | After Initially Indicated | Not Ordered |
| Alcohol | 10 | 8 (80%) | 2 (20%) | 0 |
| Benzo | 3 | 2 (67%) | 1 (33%) | 0 |
| Opioid | 4 | 4 (100%) | 0 | 0 |
| TOTAL | 17 | 14/17 (82%) | 3/17 (18%) | 0 |

| Implementation of Withdrawal Monitoring Ordered | | | | |
|---|---|---|---|---|
| Substance | Monitoring Ordered | Monitored Per Policy (5-7 Days, at least twice daily) | Monitored ≥ 3 Days (at least once daily) | Monitored < 3 Days |
| Alcohol | 10 | 4 (40%) | 6 (60%) | 0 |
| Benzo | 3 | 0 | 3 (100%) | 0 |
| Opioid | 4 | 1 (25%) | 3 (75%) | 0 |
| TOTAL | 17 | 5/17 (29%) | 12/17 (71%) | 0 |

| Withdrawal Medications Ordered | | | | |
|---|---|---|---|---|
| Substance | Required | When Initially Indicated | After Initially Indicated[1] | Not Ordered |
| Alcohol | 5 | 3 (60%) | 1 (20%) | 1 (20%) |
| Benzo | 3 | 0 | 3 (100%) | 0 |
| Opioid | 4 | 2 (50%) | 2 (50%) | 0 |
| **TOTALS** | 12 | **5/12 (42%)** | **6/12 (50%)** | **1/12 (8%)** |

| Administration of Withdrawal Medications Ordered | | | | | |
|---|---|---|---|---|---|
| Substance | Meds Ordered | Administered (< 0-3hrs of ordering) | Administered (≥ 3 hrs and < 5 hrs of ordering) | Administered (≥ 5hrs of ordering) | Never Administered |
| Alcohol | 4 | 4 (100%) | 0 | 0 | 0 |
| Benzo | 3 | 2 (67%) | 0 | 0 | 0 |
| Opioid | 4 | 3 (75%) | 0 | 1 (25%) | 0 |
| **TOTALS** | 11 | **9/11 (82%)** | **0** | **1/11 (9%)** | **0** |

[1]WD Meds were ordered after initially Indicated either because (i) monitoring was done but indications were not heeded, OR (ii) monitoring was not ordered promptly OR (iii) monitoring was ordered but not done promptly.

| Provider Referral Ordered | | | | |
|---|---|---|---|---|
| Substance | Required | When Initially Indicated | After Initially Indicated | Not Ordered |
| Alcohol | 5 | 2 (40%) | 2 (40%) | 1 (20%) |
| Benzo | 3 | 1 (33%) | 2 (67%) | 0 |
| Opioid | 4 | 1 (25%) | 3 (75%) | 0 |
| **TOTALS** | 12 | **4/12 (33%)** | **7/12 (58%)** | **1/12 (8%)** |

| Patients Seen by Provider (MD) after Referral | | | | |
|---|---|---|---|---|
| Substance | MD Referral Ordered | Within Policy Timeframe | Beyond Policy Timeframe | Not Seen |
| Alcohol | 4 | 3 (75%) | 1 (25%) | 0 |
| Benzo | 3 | 3 (100%) | 0 | 0 |
| Opioid | 4 | 2 (50%) | 2 (50%) | 0 |
| **TOTALS** | 11 | **8/11 (73%)** | **3/11 (27%)** | **0** |

**Findings:**

- o Compared to last month:
  - o The Substance Use Assessment form completion percentage increased from 90% in March to 100% in April.
  - o The percentage of patients who were seen by a provider within the designated policy timeframe increased, from 35% in March to 73% in April.
  - o The minimum requirement for WD monitoring is twice per day for the prescribed number of days for the designated medication. This was achieved in 29% of the reviewed cases in April. This is not acceptable and ACH will continue to work with SSO to determine where we can create space for patients in need of 4 and 6 hour monitoring or create a nurse station in the withdrawal monitoring pod for consistent nurse presence.
  - o SSO Status: N/A

| **Nursing Protocols** |
|---|
| **(Section VI; Provision O.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: N/A** |
| **O. Nursing Protocols**<br><br>1. Nurses shall not act outside their scope of practice.<br>2. To that end, the County shall revise its nursing standardized protocols to include assessment protocols that are sorted, based on symptoms, into low, medium, and high-risk categories.<br>   a) Low-risk protocols would allow RNs to manage straightforward symptoms with over-the-counter medications;<br>   b) Medium-risk protocols would require a consultation with a provider prior to treatment; and<br>   c) High-risk protocols would facilitate emergency stabilization while awaiting transfer to a higher level of care. |

**Standardized Nursing Procedures (SNP):**

- The Remedial Plan states that SNPs shall include assessment protocols that are sorted based on symptoms into low, medium, and high risk categories. As of right now, each SNP notes symptoms RNs may manage, those requiring a Provider consult, and those that require emergency stabilization. ACH will continue to work on categorizing SNPs this way as required.
- A total of 52 SNPs have been created and are available on the Intranet site. They include SNPs in the functional areas listed below.

- General (1)
- Abdominal (1) – *Medical Expert feedback received 08/05/22*
- Allergies (1)
- Cardiovascular & Lung (7)
- Dental (1)
- Endocrine (1)
- Eyes, Ears, Nose & Throat (5)
- Infection Control (1)
- Musculoskeletal (2)
- Neurological (4)
- Pregnancy (1)
- Skin (13)
- Substance Use Disorders (4) – *Medical Expert feedback received 04/20/22*
- Urological (5)
- Sexually Transmitted Infections (5) – *Medical Expert feedback received 11/18/22*

- Nurse managers are reviewing other areas that may require SNPs.
- Registered Nurses have completed SNP testing for all SNPs which are current as of June 2024.
- Nursing is currently updating all SNPs into a new format, which will also serve as a contingency form. The new format is currently awaiting the Medical Expert's feedback and approval.
  - After receiving the Medical Expert's feedback and approval, the template will be uploaded and available in the EHR.

**Compliance Status by Section:**

- VI.O.1.
  - ACH Status: PARTIAL COMPLIANCE
    - The Nursing Director oversees two Senior Health Program Coordinators (nurse managers) responsible for overseeing nursing staff at each respective jail facility for continuity to overall nursing services.
    - Nursing has 14 Supervising Registered Nurses (SRNs) directly supervising nursing staff and daily operations.

- Regularly scheduled meetings with nurse managers (Senior Health Program Coordinators and SRNs) and meetings with direct nursing staff include trainings on policies and procedures, review of QI audits and corrective action plans to strategize problem solving around areas of concern, announcements, etc.
- Nursing Position Standards were created or revised for the Senior Health Program Coordinators (Sr HPCs), Supervising Registered Nurses, Infection Prevention Coordinator, Registered Nurses, Licensed Vocational Nurses, Medical Assistants, and Certified Nursing Assistants.
- Nurses shall not act outside their scope of practice. Nurses shall demonstrate proficient knowledge, experience, and training in nursing principles and practices. They must maintain competency in performing nursing standardized procedure functions.
- Nursing Services has designated a supervising RN as staff development coordinator to ensure hiring, onboarding, and retention of nurses.
- New employees complete a structured onboarding process under the direct supervision of the staff development coordinator.  The Nursing Director is revamping the onboarding process to include a comprehensive initial new-hire orientation, competency and skills check, and preceptorship.
- The Nursing Director conducts concurrent medical chart reviews for nursing documentation and application of nursing practice.  Staff who are not in compliance with policies and procedures receive additional training and mentorship as needed.
- The Training Coordinator (QI SRN) has begun implementing trainings for nursing and will be able to increase training to nursing staff during the next monitoring period.
- SRNs make daily rounds to ensure efficiencies and competencies of nursing staff.
- SRNs and Sr HPCs review encounter from the EHR to ensure productivity.
- Nursing Director created and implemented daily staff assignments for both facilities, ensureing all the positions/assignments are covered.
  - o SSO Status: N/A
- VI.O.2.
  - o ACH Status: PARTIAL COMPLIANCE
    - A total of 52 SNPs have been completed consistent with this requirement; however, 4 Standardized Nursing Procedures have been finalized, 6 are in process of revision and development and 42 continue to be pending medical Expert review.

▪ The Nursing Director and Medical Director will continue to revise and reformat SNPs. Staff will be trained accordingly.
- ○ SSO Status: N/A

| Review of In Custody Deaths |
| --- |
| **(Section VI; Provision P.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: SUBSTANTIAL COMPLIANCE |

**P.  Review in Custody Deaths**

1. Preliminary reviews of in-custody deaths shall take place within 30 days of the death and shall include a written report of the circumstances of the events leading to the death, with the goal to identify and remedy preventable causes of death and any other potentially systemic problems.
2. Mortality reviews shall include an investigation of the events occurring prior to the death, an analysis of any acts or omissions by any staff or prisoners which might have contributed to the death, and the identification of problems for which corrective action should be undertaken.

**Compliance Status by Section:**

- VI.P.1.
  - ○ ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ Preliminary reviews of in-custody deaths take place within 30 days of the death and include a written Clinical Mortality Review report of the circumstances of the events leading to the death, with the goal to identify and remedy preventable causes of death and any other potentially systemic problems.
    - ▪ Leadership staff are notified when there is an in-custody death and review of the medical chart is initiated by key service line directors.
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current practice. In-CUSTODY Death Reviews shall happen as soon as possible, within 30 days. Lexipol Policy on Reporting In-Custody Deaths  was published on 02/20/2024.
- VI.P.2.

- o ACH Status: PARTIAL COMPLIANCE
  - Mortality reviews include an investigation of the events occurring prior to the death, an analysis of any acts or omissions by any staff or prisoners which may have contributed to the death, and the identification of problems for which corrective action should be undertaken.
  - During this reporting period, ACH and SSO leadership and SSO began collaborating more closely on investigations surrounding the event. As a result, more comprehensive corrective action plans are being developed. ACH will continue to develop this provision.
  - ACH developed and implemented a tracking log and process that went into effect in February 2022.
  - ACH continues to schedule a joint administrative review meeting with Custody leadership within ten days of a patient death to determine if any immediate actions are required.
  - Monthly multidisciplinary meetings are scheduled recurring to review the episode of care and develop corrective action plans when indicated to address systemic or training issues.
  - ACH has implemented a monthly Mortality CAP meeting to monitor active corrective action plans until completed. This is an interdisciplinary approach that involves all parties.
  - ACH reviewed and revised the "In Custody Death" policy. It is currently under reviewed by Class Counsel and the SMEs. They received it on 05/13/2024.
  - Key ACH staff are on the distribution list for coroner's reports.  Death certificates are obtained from Public Health staff when available. ACH designee initiates request for death certificates if not received timely.
- o SSO Status: SUBSTANTIAL COMPLIANCE

| Reentry Services |
|---|
| **(Section VI; Provision Q.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: N/A** |
| **Q. Reentry Services** |

1. The County shall provide a 30-day supply of current medications to patients who have been sentenced and have a scheduled release date, immediately upon release.
2. Within 24 hours of release of any patient who receives prescription medications while in custody and is classified as pre-sentence, the County shall transmit to a designated County facility a prescription for a 30-day supply of the patient's current prescription medications.
3. The County, in consultation with Plaintiffs, shall develop and implement a reentry services policy governing the provision of assistance to chronic care patients, including outpatient referrals and appointments, public benefits, inpatient treatment, and other appropriate reentry services.

**Compliance Status by Section:**

- VI.Q.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - The County shall provide a 30-day supply of current medications to patients who have been sentenced and have a scheduled release date, immediately upon release.
    - Sentenced and court-ordered patients are provided a 30-day supply of prescribed medications when released. ACH staff are coordinating with SSO Custody for more accurate lists of potential release candidates in order to increase medications delivered at release. Alert is entered into Athena(eHr) to indicate (Conditional Release Flag - Medications prior to Release) to custody that patient must get medication prior to release.
    - Discharge medications continue to be provided to approximately 80% of eligible sentenced and 95% court-ordered patients upon release. Staff continue to work on the discharge medication release process with Medical leadership and Custody staff.
    - Planning discussions to support a 24-hour pharmacy at Main Jail during next fiscal year continue, which will increase medication distribution. ACH was approved for an additional Pharmacist and a Pharmacy Technician for the 24/25 fiscal year.
    - Also, running reports in Athena that lists all sentenced patients on medication improves the notification process.
  - SSO Status: N/A
- VI.Q.2.
  - ACH Status: NON-COMPLIANCE
    - Within 24 hours of release of any patient who receives prescription medications while in custody and is classified as presentence, the County is to transmit to a designated County facility a prescription for a 30-day supply of

the patient's current prescription medications.  ACH was sending scripts to the Primary Care Clinic; however, due to the following, ACH no longer sends scripts to the Primary Care Clinic:

- Presentenced patients may obtain a prescription for a 30-day supply of medication upon request at the County Primary Care Pharmacy. Under 5% of the patients pick up their medications from Primary Care Pharmacy. Due to lack of patients picking up prescriptions from Primary Care Medical Directors discontinued calling scripts in. Upon patients arriving at Primary Care, pharmacy communicates with ACH pharmacy and/or 2nd floor MD office to acquire prescriptions.
- A patient can request a prescription be filled from the Primary Care Clinic after release and ACH will fill the prescription.
- ACH is participating in joint efforts working with SSO regarding the upcoming CalAIM 90-Day Prerelease benefit, which will include filling of prescriptions for those indicated upon release.
    - Notification from SSO Custody prior to release is pertinent for preparation of medication upon release.
    - ACH has established an email box for County Public Defenders, Conflict Attorneys and District Attorneys to communicate releases and patient medication needs. This has been a useful tool to learn quickly about same day releases. This email is monitored daily.
    - Filling prescriptions prior to release will increase the continuity of care as compared to sending the script to an offsite pharmacy.
- Sacramento County developed and submitted a CalAIM implementation plan in March 2024 that focuses on reentery services for the justice involved population. ACH is currently working on a readiness assessment that is required by CalAIM before they greenline the county to implement the CalAIM 90 day Prerelease program. The program is expected to go live in 2025.
    - o SSO Status: N/A
- VI.Q.3.
    - o ACH Status: PARTIAL COMPLIANCE
        - ACH developed and implemented a Discharge Planning for Reentry services policy governing the provision of assistance to chronic care patients, including outpatient referrals and appointments, public benefits, inpatient treatment, and other appropriate reentry services.
        - Discharge Planning policy was revised to become a joint policy with Mental Health and incorporates Expert feedback.

- ACH meets internally and participates in County-wide meetings to address obstacles to improve discharge planning and successful linkage to ongoing care.  Collaboration between ACH Medical and Mental health, SSO Custody, the Courts, community partners such as Community Health Works (formerly known as Sacramento Covered) for ongoing medical needs and County Behavioral Health for individuals with serious mental illness (SMI) is necessary for successful discharge planning.
- A Designated Discharge Planning nurse and MA work with patients with complex conditions to ensure there is continuity of care post-release.
- SUD counselors work with patients in need of continuity of SUD treatment and MAT. However, with the increase in MAT inductions, it became clear that ACH needed dedicated MAT discharge planners to connect patients to MAT programs upon release. The HSA, QI Director, and budget analyst applied for a grant through the Board of State and Community Corrections (BSCC) to fund two of these positions (one for each jail). Sacramento County was awarded this grant and is scheduled to begin in July 2024. However it is uncertain at this time if the grant monies will be approved in the California State budget. The BSCC has informed ACH not to move forward with planning at this time. If not approved, ACH will restructure the duties of the SUD counselors to focus more on this aspect.
- Mental health staff are required to provide linkage of patients with SMI to County Mental Health – a workflow was created and MH staff were trained on the referral process.
- County Behavioral Health established the Community Justice Support Program – a full-service partnership to serve justice-involved patients with serious mental illness.  ACH Mental Health meets regularly with the program leadership to address barriers and collaborate on the referral process. A report was developed to capture the projected release date and level of care to identify patients with SMI and release dates within 6 weeks.
- Medi-Cal Managed Care Plans rolled out a new benefit under the initiative California Advancing and Innovating Medi-Cal (CalAIM). CalAIM provides enhanced care management (ECM) and coordination for patients with intensive health/mental health needs. The CalAIM program is expected to roll out in 2025.
- This provision remains in partial compliance due to the need for more discharge planners.

- SSO Status: N/A

| Training |
|---|
| **(Section VI; Provision R.)** |
| **ACH Status: N/A** |
| **SSO Status: Partial Compliance** |
| **R.  Training**<br><br>1.  The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:<br>    a)  All jail custody staff shall receive formal training in medical needs, which shall encompass medical treatment, critical incident response, crisis intervention techniques, recognizing different types of medical emergencies, and acute medical needs, appropriate referral practices, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum. |

**Compliance Status by Section:**

- VI.R.1.
    - ACH Status: N/A
        - Refer to SSO response.  ACH collaborates with SSO on training as requested.
        - The ACH Medical Director has created a didactic training for staff on critical incident response. All SSO staff at MJ were trained in June 2024. RCCC SSO staff is scheduled to be trained in July 2024.
    - SSO Status: PARTIAL COMPLIANCE
        - No one class encompasses all requirements of this provision every 2 years.
        - All Sheriff's attend a 6-month academy with specific learning domains covering bias and discrimination (LD 42) and First Aid and CPR (LD 34).  Updated 10 hours of medical emergency and CPR training is done every two years.
        - All Custody staff receive either 8 hours Crisis intervention.  Specialized units, especially those assigned to designated mental health units, receive additional training relevant to their assignment. SSO and JPS will be holding more formal, joint training in 2024 encompassing these topics.

## VII. SUICIDE PREVENTION

| Substantive Provisions |
|---|
| (Section VII; Provisions A.) |
| ACH Status: SUBSTANTIAL COMPLIANCE |
| SSO Status: SUBSTANTIAL COMPLIANCE |

**A.  Substantive Provisions**

1. The County recognizes that comprehensive review and restructuring of it suicide assessment, monitoring, and prevention practices are necessary to address the risk of suicide and self-harm attendant to detention in a jail setting.
2. The County shall establish, in consultation with Plaintiffs' counsel, a new Suicide Prevention Policy that shall be in accordance with the following: [see section B. Training]**.**

Class Counsel outlined six areas for focus including revision of the Suicide Prevention Policy, changes to the policy and practice of Safety Suits, confidentiality at intake and for suicide risk assessment, property and privileges, and resuming a Suicide Prevention Task Force or a multidisciplinary committee.

**Compliance Status by Section:**

- VII.A.1.
  - ○ ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ The County recognizes that comprehensive review and restructuring of its suicide assessment, monitoring, and prevention practices are necessary to address the risk of suicide and self-harm attendant to detention in a jail setting.
    - ▪ The Suicide Precautions and/or Grave Disability Observations – Custody Instructions form was created to provide MH staff directions regarding housing, observation level, property, privileges, and clothing restrictions.
    - ▪ MH developed a training module called *Suicide Precautions and LCSW Role* and provided training to MH staff and custody leadership on the form and workflow.

- Began implementation of Morbidity and Mortality reviews during Suicide Prevention Subcommittee meetings in December 2021.
- Updated MH PP 04-07 Acute Psychiatric Unit Precautions and Observations to include relevant sections from the Suicide Prevention Program policy.  Finalized June 2022.
- Complete weekly audits on MH compliance on determining and documenting housing, observation level, property, privileges, and clothing restrictions for patients placed on suicide precautions.  Report findings to Suicide Prevention Subcommittee on monthly basis.
- Implemented Constant Observation Program and have filled all vacancies.  Staff are available 24/7 to provide 1:1 constant observation.
- Developed workflow and implemented procedure for posting suicide precaution forms outside of patient cells in APU.
- Developed process to restrict OTC and KOP medications in MH housing units (IOP, APU, SITHU) as a suicide prevention measure.
- MH is working with ACH to embed the Suicide Risk Assessment into the MH Clinical SOAP note.  This will improve consistency of documentation, ease of locating SRA, and eliminate duplication/redundancy of documentation.
- Audit findings from Febraury 2024-April 2024, indicate MH is meeting substantial compliance when determining and documenting housing, observation level, property, privileges and clothing restrictions for patients place on suicide precautions.  Due to meeting substantial compliance, SP SME determined audit could be completed on quarterly vs monthly cycle.

Summary: February 2024 – April 2024

| Month | Suicide Precautions form completed | Removal of privileges and property documented with clinical justification | Decisions about removal of clothing / safety smock recommended by MH staff | Daily assessments for restoration of privileges and property | Daily assessments to determine restoration of clothing or documentation of continued use |
|---|---|---|---|---|---|
| February | 60/60 | 60/60 | 60/60 | 43/43* | 43/43* |
| March | 60/61 | 60/61 | 60/61 | 44/45* | 44/45* |
| April | 45/45 | 45/45 | 44/45 | 32/37* | 32/37* |
| TOTAL | 165/166(99%) | 165/166(99%) | 164/166(99%) | 119/125(95%) | 119/125(95%) |

* Initial assessment (day 1), not included in count.

Previously Reported January 2023 – January 2024 Summary:

| Month | Suicide Precautions form completed | MH assessments daily for restoration of privileges and property | Removal of privileges and property documented with clinical justification | Decisions about removal of clothing / safety smock recommended by MH staff | Daily assessments conducted to determine restoration of clothing or documentation of continued use |
|-------|------|------|------|------|------|
| January 2023 | 100% | 100% | 100% | 100% | 100% |
| February 2023 | 100% | 100% | 100% | 100% | 100% |
| March 2023 | 100% | 100% | 100% | 100% | 100% |
| April 2023 | 100% | 100% | 100% | 100% | 100% |
| May 2023 | 100% | 100% | 100% | 100% | 100% |
| June 2023 | 100% | 100% | 100% | 100% | 100% |
| July 2023 | 100% | 100% | 100% | 100% | 100% |
| August 2023 | 100% | 97% | 100% | 100% | 97% |
| September 2023 | 100% | 92% | 100% | 100% | 90% |
| October 2023 | 100% | 100% | 100% | 100% | 100% |
| November 2023 | 100% | 82% | 100% | 100% | 82% |
| December 2023 | 100% | 91% | 100% | 100% | 91% |
| January 2024 | 100% | 94% | 100% | 100% | 94% |

- Implemented monthly Suicide Prevention Multidisciplinary meetings to discuss patients with complex mental health needs who engage in self-injurious behaviors (July 2022)
- MH staffreceived updated training on the new process of developing safety plans at the time of a Suicide Risk Assessment (SRA) evaluation starting in January 2023.  All MH staff have been trained and a compliance audit was completed to identify areas for process improvement:

*Previously Reported Period: June 2023-August 2023*

| Month | Initial Suicide Risk Assessment | Placed on Suicide Precaution: Completed Initial Safety Plan | Discharged from Suicide Precaution: Suicide Risk Assessment | Discharged from Suicide Precautions: Completed/Updated Safety Plan |
|---|---|---|---|---|
| June 2023– Aug 2023 | 75/77 (97%) | 10/57 (18%) | 45/45 (100%) | 31/45 (69%) |

- ▪ MH completed a suicide risk assessment for 99% (74/75) of patients referred for being a danger to self.
- ▪ 72% (33/46) of patients placed on suicide precautions had a safety plan completed at time of initial SRA. This is a 54% increase from the last report period. Of the 13 (33 of 46) patients with no safety plan during the initial placement on suicide precautions (due to inability or unwillingness to engage in safety planning), 12 patients had a completed safety plan once they were cleared from suicide precautions.
- ▪ 96% (24/25) of charts had a completed suicide risk assessment for patients discharged from suicide precautions.
- ▪ 80% (20/25) of charts had completed safety plans for patients discharged from suicide precautions. This is an 11% increase from the last report period.
- o SSO Status: SUBSTANTIAL COMPLIANCE
  - ▪ Suicide Prevention and Intervention Policy and Procedure 713 were updated on 09/12/2023 and 2/14/24 respectively.
- • VII.A.2.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ County ACH Mental Health established a Suicide Prevention Policy in agreement/approval with Class Counsel and the court-appointed Experts.
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Suicide Prevention and Intervention Policy and Procedure 713 was updated on 09/12/2023

| Training |
|---|
| **(Section VII; Provisions B.)** |
| **ACH Status: PARTIAL COMPLIANCE** |

| SSO Status: SUBSTANTIAL COMPLIANCE |
|---|

## B.  Training

1. The County shall develop, in consultation with Plaintiffs' counsel, a four-to-eight-hour pre-service suicide prevention curriculum for new Jail employees (including custody, medical, and mental health staff), to be conducted in person in a classroom or virtual classroom setting, that includes the following topics:

    a)  avoiding obstacles (negative attitudes) to suicide prevention;

    b)  prisoner suicide research;

    c)  why facility environments are conducive to suicidal behavior;

    d)  identifying suicide risk despite the denial of risk;

    e)  potential predisposing factors to suicide;

    f)  high-risk suicide periods;

    g)  warning signs and symptoms;

    h)  components of the jail suicide prevention program

    i)  liability issues associated with prisoner suicide;

    j)  crisis intervention.

2. The County shall develop, in consultation with Plaintiffs' counsel, a two-hour annual suicide prevention curriculum for all custody, medical, and mental health staff, to be conducted in person in a classroom or virtual classroom setting, that includes:

    a)  review of topics (a)-(j) above

    b)  review of any changes to the jail suicide prevention program

    c)  discussion of recent jail suicides or attempts

3. Custody officers assigned to Designated Mental Health Units shall receive additional specialized training on suicide prevention and working with prisoners with serious mental illness.

4. All mental health staff, including nurses, clinicians, and psychiatrists, shall receive additional training on how to complete a comprehensive suicide risk assessment and how to develop a reasonable treatment plan that contains specific strategies for reducing future suicidal ideation.

5. All mental health staff and custody officers shall be trained on the appropriate use of safety suits—i.e., not to be utilized as a default, not to be used as a tool in behavior management, not to be utilized for patients being observed at 30-minute observations.

6. The County shall ensure that all staff are trained in the new Suicide Prevention Policy.

**Compliance Status by Section:**

- VII.B.1.
    - ACH Status: PARTIAL COMPLIANCE

- County ACH MH developed and implemented a four-hour Suicide Prevention training for new Jail employees (including SSO Custody, medical, and mental health staff) in agreement and approval from Class Counsel and court-appointed Experts.
- The 4-hour Suicide Prevention Training for new employees was approved by Class Counsel and Suicide Prevention Expert in February 2022. MH staff worked with custody and medical staff to prepare for the training. The first training was conducted on June 2, 2022, and is ongoing. Staff are required to attend training within 3 months of hire.
- As of June 4, 2024, 100% of MH staff are compliant with 4-hour training requirement.
- Since ACH relies heavily on registry staff, many who work minimal hours per month – compliance numbers are not sufficient for compliance. 56% of ACH staff, including the on-call registry staff have had the in-person 4-hour training. To improve this, ACH is working on changing registry contract language to include this as a requirement prior to starting. However since it is required to be in person, it poses a significant barrier to an on-call temporary employee.
- SSO Status: SUBSTANTIAL COMPLIANCE
  - As part of pre-service training, the Adult Corrections Officer Supplemental Core Course has been revised where Module 19.0 addresses suicide prevention. This section has been approved by the Board of State & Community Corrections (BSCC) as well as the Standards and Training for Corrections (STC).
  - All current employees have received the 2-hour suicide prevention training developed in collaboration with the mental health SMEs. New employees have received the 4-hour suicide prevention training since May 22, 2022.
  - All current employees have received the 2-hour suicide prevention training developed in collaboration with the mental health SMEs. New employees have received the 4-hour suicide prevention training.
  - Current practice. Lexipol Procedure on Suicide Prevention and Intervention was updated on 02/24/2024.
- VII.B.2.
  - ACH Status: PARTIAL COMPLIANCE
    - County developed a two-hour annual Suicide Prevention Training for all staff (SSO Custody, medical, and mental health staff) in agreement and approval from Class Counsel and court-appointed Experts.
    - MH began offering a 2-hour Suicide Prevention training to medical and custody staff in December 2021 and is ongoing. Staff attend on an annual basis.
    - As of June 4, 2024, 96% of MH staff are compliant with 2-hour training requirement.

- As of April 2024, 77% of ACH staff are compliant with the 2-hour training requirement. ACH QI will be developing a corrective action plan to increase compliance in this area.
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - Current Practice.  Suicide Prevention and Intervention Policy was updated on 09/12/2023. Lexipol Procedure on Suicide Prevention and Intervention was published on 02/14/2024.
    - Discussions occur daily with IOP and ACMH staff. If there are any attempts, they will be covered in these conversations. Additionally, the Suicide Prevention Committee meets regularly to review serious suicide attempts. There is also a Suicide Precautions Multidisciplinary Team Meeting to discuss management of inmates on suicide precautions which are particularly challenging.

- VII.B.3.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - Custody officers assigned to Designated Mental Health Units receive additional specialized training on suicide prevention and working with prisoners with serious mental illness.
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - IOP and JBCT Deputies receive 24 hours of advanced CIT training.  Several IOP/JBCT Deputies also attended negotiation training specific to custody.

- VII.B.4.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - All mental health staff, including clinicians, and psychiatrists, receive additional training on how to complete a comprehensive suicide risk assessment and how to develop a reasonable treatment plan that contains specific strategies for reducing future suicidal ideation.
    - The Suicide Risk Assessment Training was approved by SME. Staff complete the training within 3 months of hire and again every 2 years.
  - o SSO Status: N/A

- VII.B.5.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - All mental health staff and custody officers are trained on the appropriate use of safety suits—i.e., not to be utilized as a default, not to be used as a tool in behavior management, not to be utilized for patients being observed at 30- minute observations. This element has been incorporated into the Suicide Prevention Training.

- o SSO Status: SUBSTANTIAL COMPLIANCE
    - Safety Suits are used at the discretions of ACMH based on collaboration with custody staff and not as a behavior management tool.
    - During the 4 hour and 2-hour Suicide Prevention Class there is training and discussion about proper safety suit use consistent with this remedial plan.
    - Lexipol Procedure on Suicide Prevention and Intervention was updated on 02/14/2024.
- VII.B.6.
    - o ACH Status: SUBSTANTIAL COMPLIANCE
        - The Suicide Prevention Policy is incorporated in the Annual Suicide Prevention Training that is required for all staff.
    - o SSO Status: SUBSTANTIAL COMPLIANCE
        - Suicide Prevention and Intervention Policy and Procedure 713 was updated on 09/12/2023. Staff are prompted to review and acknowledge the policy which is electronically recorded in Lexipol.

| Nurse Intake |
|---|
| **(Section VII; Provisions C.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: N/A |

**C.  Nursing Intake Screening**

1. Intake screening for suicide risk will take place at the booking screening and prior to a housing assignment. If clinically indicated, JPS will then perform an additional clinical assessment after the inmate is placed in a housing assignment.
2. All nursing intake screening shall be conducted in an area that provides reasonable sound privacy and confidentiality. If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.
3. The County shall revise its nursing intake assessment procedures and screening forms to ensure timely identification of acute and high-risk mental health conditions, consistent with the recommendations made by Lindsey Hayes. Intake screening, as documented on screening forms, shall include:
    a) Review of suicide risk notifications in relevant medical, mental health, and custody records, including as to prior suicide attempts, self-harm, and/or mental health needs;

b) Any prior suicidal ideation or attempts, self-harm, mental health treatment, or hospitalization;

c) Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;

d) Other relevant suicide risk factors, such as:

    i. Recent significant loss (job, relationship, death of family member/close friend);

    ii. History of suicidal behavior by family member/close friend;

    iii. Upcoming court appearances;

e) Transporting officer's impressions about risk.

4. Regardless of the prisoner's behavior or answers given during intake screening, a mental health referral shall always be initiated if there is a documented history related to suicide or self-harm, including during a prior incarceration.

5. The County shall develop and implement a written policy and procedure for referrals to mental health by intake staff. The policy shall correspond with the triage system and timeframes set forth in the Mental Health Remedial Plan.

6. Any prisoner expressing current suicidal ideation and/or current suicidal/self-injurious behavior shall be designated as an emergent referral and immediately referred to mental health staff.

**Compliance Status by Section:**

- VII.C.1
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - Intake screening for suicide risk takes place at the booking Receiving Screening and prior to a housing assignment. If clinically indicated, a referral is made to ACH MH, who will then perform an additional clinical assessment after the patient is placed in a housing assignment.
  - SSO Status: N/A
- VII.C.2.
  - ACH Status: NON COMPLIANCE
    - Nurse Intake stations were reconfigured in Booking to increase space and add soundboards to increase auditory privacy however it is still inadequate and out of compliance.
    - To resolve compliance issues, the County developed a comprehensive plan to restructure the arrest report room/medical intake area. The plan involves DGS repurposing the current room where the breathalyzer is stored, a bathroom, an exam room and an office into four medical intake confidential spaces.
    - This plan was shared in detail with the SME's and Class Counsel and the response was favorable in that it would meet requirements to achieve compliance.

- ▪ ACH, SSO, DGS, and Class Counsel meet regularly to ensure progress continues and that the short timeframe for completion is met.
  - o SSO Status: N/A
- VII.C.3.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ County ACH revised the nursing Intake assessment procedures and screening forms to ensure timely identification of acute and high-risk mental health conditions, consistent with the recommendations made by the court-appointed Suicide Prevention Expert (Lindsey Hayes) to be consistent with this requirement.
    - ▪ Training has been developed for intake nurses on screening for mental health issues, suicide risk assessment screening, danger-to-self or others and grave disability and referral process for emergent MH evaluations. Formal Intake training by the Training Coordinator began December 2022.
  - o SSO Status: N/A
- VII.C.4.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ Regardless of a patient's behavior or answers given during intake screening, an automatic mental health referral is initiated if there is a documented history related to suicide or self-harm, including during a prior incarceration.
  - o SSO Status: N/A
- VII.C.5.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ County ACH updated and implemented the Nurse Intake policy and procedure that includes referrals to mental health by Intake staff. The policy corresponds with the triage system and timeframes set forth in the Mental Health Remedial Plan.
  - o SSO Status: N/A
- VII.C.6.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ Any patient expressing current suicidal ideation and/or current suicidal/self-injurious behavior shall be designated as an emergent referral and immediately referred to mental health staff. See below for emergent referral data. Note the significant increase in emergent referrals since nurse intake questions and orders were changed due to this provision.

▪ Due to ongoing challenges with Intake nursing asking all suicide risk screening questions, QI Nursing began onsite monitoring of the nurse intake process, including suicide risk assessment questions to ensure compliance with screening requirements.

*Emergent/Must See Referrals (January 2021 - March 2024)*

- *Emergent/Must See Referrals (January 2021 - March 2024)*

**2021**

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | TOTAL |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| 301 | 202 | 264 | 268 | 291 | 293 | 286 | 337 | 383 | 369 | 426 | 467 | 3,887 |

**2022**

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | TOTAL |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|------|------|------|-------|
| 496 | 421 | 622 | 644 | 723 | 686 | 824 | 845 | 992 | 1267 | 1075 | 1213 | 9,808 |

**2023**

| Jan  | Feb  | Mar  | Apr  | May  | Jun  | Jul  | Aug  | Sep  | Oct  | Nov  | Dec  | TOTAL  |
|------|------|------|------|------|------|------|------|------|------|------|------|--------|
| 1121 | 1032 | 1004 | 1043 | 1168 | 1398 | 1493 | 1121 | 1041 | 1345 | 1109 | 1129 | 14,004 |

**2024**

| Jan  | Feb  | Mar  | TOTAL |
|------|------|------|-------|
| 1211 | 1004 | 1062 | 3,279 |

  ○ SSO Status: N/A

| **Post-Intake Mental Health Assessment Procedures** |
|:---:|
| **(Section VII; Provisions D.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: PARTIAL COMPLIANCE** |
| **D. Post-Intake Mental Health Assessment Procedures** |

1. All mental health assessments shall be conducted in an area that provides reasonable sound privacy and confidentiality. If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.
2. Mental health staff shall conduct assessments within the timeframes defined in the mental health referral triage system.
3. The County shall revise its mental health assessment procedures and related forms to ensure identification of historical and current patient mental health and suicide risk information, consistent with the recommendations of the subject matter expert.

**Compliance Status by Section:**

- VII.D.1.
    - ACH Status: PARTIAL COMPLIANCE
        - MH clinicians document whether assessments are confidential or non-confidential including rationale.
        - Structural/space issues continue to be a major barrier to achieving SUBSTANTIAL COMPLIANCE.
- VII.D.2.
    - ACH Status: PARTIAL COMPLIANCE
        - Mental health staff are required to conduct assessments within the timeframes defined in the mental health referral triage system.
        - Auditing of MH compliance meeting four (4) and six (6)-hour timelines to care is being completed and presented to MH QI Subcommittee and Suicide Prevention Subcommittee.  Findings indicate that low staffing levels and high levels of emergent referrals are impacting compliance:

*Emergent Referral - Safety Cell Placements*

| Month | Safety Cell Placement | Seen w/in 4 hours | Not seen within 4 hours | Avg Response Time (hrs) |
|---|---|---|---|---|
| December 2023 | 25 | 8(32%) | 17(68%) | 6.2 |
| January 2024 | 29 | 10(34%) | 19(66%) | 6.9 |
| February 2024 | 18 | 10(56%) | 8(44%) | 5.8 |
| **TOTAL** | **72** | **28(39%)** | **44(61%)** | **6.3** |

*Emergent Referral - Sobering Cell or Segregation Cell Placements*

| Month | Sobering/Segregation Cell Placement | Seen w/in 6 hours | Not seen within 6 hours | Avg Response Time (hrs) |
|---|---|---|---|---|
| December 2023 | 519 | 305(59%) | 214(41%) | 6.5 |
| January 2024 | 531 | 330(62%) | 201(38%) | 6.5 |
| February 2024 | 533 | 303(57%) | 230(43%) | 6.6 |
| **TOTAL** | **1,583** | **938(59%)** | **645(41%)** | **6.5** |

- **Emergent/Must See Referrals (January 2021 - March 2024)**

2021

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | **TOTAL** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 301 | 202 | 264 | 268 | 291 | 293 | 286 | 337 | 383 | 369 | 426 | 467 | **3,887** |

2022

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | **TOTAL** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 496 | 421 | 622 | 644 | 723 | 686 | 824 | 845 | 992 | 1267 | 1075 | 1213 | **9,808** |

2023

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | **TOTAL** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1121 | 1032 | 1004 | 1043 | 1168 | 1398 | 1493 | 1121 | 1041 | 1345 | 1109 | 1129 | **14,004** |

2024

| Jan | Feb | Mar | **TOTAL** |
|---|---|---|---|
| 1211 | 1004 | 1062 | **3,279** |

| Month | Sobering/Segregation Cell Placements | Seen w/in 6 Hours | Not Seen w/in 6-Hour Timeline to Care | Avg Response Time |
|---|---|---|---|---|
| June 2022 | 59 | 32/59 (54%) | 27/59 (46%) | 5.8 hrs. |
| July 2022 | 59 | 35/59 (59%) | 24/59 (41%) | 6.0 hrs. |
| August 2022 | 40 | 18/40 (45%) | 22/40 (55%) | 7.3 hrs. |
| September 2022 | 62 | 37/62 (60%) | 25/62 (40%) | 5.7 hrs. |
| October 2022 | 34 | 16/34 (47%) | 18/34 (53%) | 6.8 hrs. |
| November 2022 | 46 | 34/46 (74%) | 12/46 (26%) | 4.7 hrs. |
| December 2022 | 41 | 26/41 (63%) | 15/41 (37%) | 4.9 hrs |
| Jan 2023 | 43 | 27/43 (63%) | 16/43 (37%) | 6.2 hrs. |
| Feb 2023 | 48 | 30/48 (62%) | 18/48 (38%) | 6 hrs. |

- o SSO Status: N/A
- VII.D.3.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - MH has revised its mental health assessment procedures and related forms to ensure identification of historical and current patient mental health and suicide risk information, consistent with the recommendations of the subject matter expert.
    - Nursing Intake and SRA forms have been updated and approved by SME.
    - MH is working with ACH to embed the Suicide Risk Assessment into the MH Clinical SOAP note. This will improve consistency of documentation, ease of locating SRA, and eliminate duplication/redundancy of documentation.
  - o SSO Status: N/A

| **Response to Identification of Suicide Risk or Need for Higher Level of Care** |
|---|
| **(Section VII; Provisions E.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: SUBSTANTIAL COMPLIANCE** |
| **E.  Response to Identification of Suicide Risk or Need for Higher Level of Care** |

1. When a prisoner is identified as at risk for suicide and placed by custody staff in a safety cell, on suicide precautions, and/or in a safety suit, mental health staff shall be contacted immediately. A qualified mental health professional, or other appropriately trained medical staff in consultation with mental health staff, shall complete a confidential in-person suicide risk assessment as soon as possible, consistent with the "must-see" referral timeline.

2. Consistent with current RCCC policy, if there is no mental health staff on site at RCCC at the time that an emergent mental health need is identified, the prisoner shall be transported to the Main Jail for emergency evaluation within two hours of the initial report.

3. The County shall revise its JPS suicide risk assessment procedures and forms in consultation with Plaintiffs. The County shall ensure that its JPS suicide risk assessment process, policies, and procedures consider and document the following:

    a) Review of suicide risk notifications and records from any previous incarcerations at the Jail, including records pertaining to suicide attempts, self-harm, and/or mental health needs;

    b) Other prior suicide ideation or attempts, self-harm, mental health treatment or hospitalization;

    c) Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;

    d) Suicide risk factors and protective factors, such as:

        i.   Recent significant loss (job, relationship, death of family member/close friend);

        ii.  History of suicidal behavior by family member/close friend;

        iii. Upcoming court appearances;

    e) Transporting officer's impressions about risk;

    f) Suicide precautions, including level of observation.

4. The County shall ensure that the meal service schedule or other custody-related activities cause no delay in the completion of suicide risk assessments for prisoners.

**Compliance Status by Section:**

- VII.E.1.
  - ACH Status: PARTIAL COMPLIANCE
    - When a patient is identified as at risk for suicide and placed by custody staff in a safety cell, on suicide precautions, and/or in a safety suit, mental health staff are required to be contacted immediately. A qualified mental health professional, or other appropriately trained medical staff in consultation with mental health staff, then complete a confidential in-person suicide risk assessment as soon as possible, consistent with the "must-see" referral timeline.

- Regular auditing of MHs compliance meeting four (4) and six (6)-hour timelines to care are being completed and presented to MH QI Subcommittee and Suicide Prevention Subcommittee.  Findings indicated that low staffing levels and high levels of emergent referrals are impacting compliance.
  - SSO Status: PARTIAL COMPLIANCE
    - Current practice at RCCC.  At Main Jail, inmate privacy is a priority. When ACMH assessments are conducted we offer the maximum level of privacy afforded given the case-by-case safety risk. At Main Jail a private booking attorney booth has been converted to be utilized as a confidential interview room for Mental health assessments.
    - Structural space issues exist at both facilities. Neither has enough confidential treatment space to become fully compliant.
    - On MJ housing floors, additional booths are in the planning stages and will consist of plexiglass enclosures with doors situated in the indoor rec area of each housing unit. Some booths will have a partition for safety as well as a security desk/chair. Funding and BSCC approval pending.
    - SSO has purchased security desk/chair (same used at Santa Clara SO), which allows leg shackles to be secured. This allows clinicians to safely speak to higher security inmates in privacy without custody staff standing nearby.
    - At Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for Mental health assessments in booking.
    - Custody staff place the inmate/patient in the least restrictive setting as possible contingent on available space. Staff constantly attempts to move inmate/patients out of safety cells to segregation cells (toilet and sink) or a 3-West suicide resistant SITHU cell.
    - 16 cells on the lower tier of 3-West 200 pod have been modified to provide additional suicide resistant cells.
    - RCCC we have an office designated for mental health evaluations.
- VII.E.2.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - Consistent with current RCCC policy, if there is no mental health staff on site at RCCC at the time that an emergent mental health need is identified, the prisoner shall be transported to the Main Jail for emergency evaluation within two hours of the initial report.
    - MH provides a televisit option for after-hours emergent referrals.  If a Main Jail MH clinician is not available to complete the televisit assessment, SSO transports the patient to the Main Jail for an evaluation.

- o SSO Status: SUBSTANTIAL COMPLIANCE
  - ▪ Current practice with Telehealth as an option for assessment.  RCCC at-times will use suicide resistant cells for IOP inmates based on ACMH recommendations.  This was suggested by the suicide prevention SME.
- • VII.E.3.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ MH has revised its suicide risk assessment procedures and forms in consultation with Plaintiffs.
    - ▪ The Suicide Risk Assessment captures the information listed in this provision.
    - ▪ Suicide Risk Assessment and Suicide Prevention Program policy developed and revised in conjunction with SME and Class Counsel.
    - ▪ MH staff complete a review of the patients EHR, including previous and current records pertaining to suicide attempts, self-harm and/or mental health needs.
    - ▪ See Post-Intake Mental Health Assessment Procedures (Provision D.) for work accomplished in this area.
  - o SSO Status: SUBSTANTIAL COMPLIANCE

| Housing of Inmates on Suicide Precautions |
|---|
| **(Section VII; Provisions F.)** |
| ACH Status: SUBSTANTIAL COMPLIANCE |
| SSO Status: SUBSTANTIAL COMPLIANCE |
| **F.  Housing of Inmates on Suicide Precautions**<br><br>   1.  The County's policy and procedures shall direct that prisoners, including those identified as being at risk for suicide, be treated in the least restrictive setting appropriate to their individual clinical and safety needs. |

**Compliance Status by Section:**

- • VII.F.1.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ County's ACH MH Suicide Prevention Program policy and procedure directs that patients, including those identified as being at risk for suicide, be treated in the least restrictive setting appropriate to their individual

clinical and safety needs. MH policies state all patients, including those identified as being at risk for suicide, are treated in the least restrictive setting appropriate to their clinical needs.

- o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current policy.

| **Inpatient Placements** |
| :---: |
| **(Section VII; Provisions G.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: PARTIAL COMPLIANCE** |
| **G. Inpatient Placements**<br><br>1. The County shall ensure that prisoners who require psychiatric inpatient care as clinically indicated are placed in the 2P unit within 24 hours of identification, absent exceptional circumstances. In all cases, the provision of clinically indicated treatment to any prisoner requiring inpatient level of care shall be initiated within 24 hours. |

**Compliance Status by Section:**

- • VII.G.1.
    - o ACH Status: PARTIAL COMPLIANCE
        - ▪ MH staff ensures that patients are assessed for the APU and placed in the unit as soon as possible and within 24 hours when there is bed availability.
            - • Patients who are on the preadmission list beyond 24 hours are assessed daily for continuous need of placement or clearance.
        - ▪ ACH has regular meetings with SSO Custody leadership to discuss space needs and options for increasing APU beds. See IOP, OPP, & Acute Bed Assessment & Planning (Section II. General Provision) for detail.
        - ▪ MH meets daily to discuss patients pending APU admission and triage level of care.
        - ▪ Facility deficiencies result in this area remaining non-compliant due to insufficient space for APU beds.
    - o SSO Status: PARTIAL COMPLIANCE

- On December 8, 2022 the Sacramento Board of Supervisors approved to build a Jail Intake and health Services Facility as well as make ADA facility improvement to the current Jail. The inpatient unit will be designed to comply with this 24-hour requirement.
- There will be an interim solution of converting a pod to an expanded psychiatric inpatient unit to move toward compliance with the 24-hour requirement.
- IOP level of care has been expanded which can help reduce inpatient care requirements.

| **Temporary Suicide Precautions**<br>**(Section VII; Provisions H.)** |
| :---: |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: PARTIAL COMPLIANCE** |

## H. Temporary Suicide Precautions

1. No prisoner shall be housed in a safety cell, segregation holding cell, or other Temporary Suicide Precautions Housing for more than six (6) hours. If mental health or medical staff determine it to be clinically appropriate based on detoxification-related needs, this time limit may be extended to no more than eight (8) hours. If exceptional circumstances prevent transfer within these timelines, those circumstances shall be documented, and transfer shall occur as soon as possible. This does not preclude the housing of a prisoner in the IOP unit if clinically indicated.
2. The County shall ensure, including by revising written policies and procedures where necessary, the timely and adequate completion of medical assessments for prisoners in need of suicide precautions, as required under Operations Order 4/05 (i.e., within 12 hours of placement of the next daily sick call, whichever is earliest, and then every 24 hours thereafter).
3. The County shall ensure that any cell used for holding prisoners on suicide precautions is clean prior to the placement of a new prisoner, as well as cleaned on a normal cleaning schedule.
4. The County shall create and implement a written policy ensuring adequate frequency for meals, fluids, hygiene, showers, prescribed medications, and toileting when a prisoner is in cell used for holding prisoners on suicide precautions.
5. Inmates on suicide precautions shall not automatically be on lockdown and should be allowed dayroom or out-of-cell access consistent with security and clinical judgments.
6. The classrooms or multipurpose rooms adjacent to the housing units in the Main Jail are designed for, and should be made available for, prisoner programs and treatment. Absent an emergency, the County shall not use the classrooms and multipurpose rooms to hold prisoners pending a mental health evaluation or on suicide precautions. Where such emergency occurs, the County shall document the reasons for retention and move the prisoner, within six (6) hours, to the inpatient unit or other appropriate housing location for continued observation, evaluation, and treatment.

**Compliance Status by Section:**

- VII.H.1.
  - ACH Status: N/A
  - SSO Status: PARTIAL COMPLIANCE
    - The recently approved Jail Intake and Health Services Facility will bring the County in compliance. The County currently follow these timeframes as much as possible with the limited number of cells in the APU.
    - The addition of 8 female IOP and 24 male IOP beds has brought us closer to compliance.
    - Custody staff places the inmate/patient in the least restrictive setting as possible contingent on available space. Staff constantly attempts to move inmate/patients out of safety cells to segregation cells (toilet and sink) or a 3-West suicide resistant SITHU cell.
    - The Main Jail has a total of 26 SITHU cells available.

- VII.H.2.
  - ACH Status: PARTIAL COMPLIANCE
    - ACH revised the Mental Health policy 04-09 Acute Psychiatric Unit Admission, Program and Discharge (revision 11/30/22) including procedures to ensure the timely and adequate completion of medical assessments for patients in need of suicide precautions.
    - Patients are receiving a medical assessment within 12 hours of placement and every 24 hours after and is documented in Nurse Sick Call encounters.
    - If the patient is not transferred to the APU, the nurse continues to evaluate the patient. The APU Certified Nursing Assistant will monitor the patient once they move to the APU.
    - ACH and SSO are in discussion to determine how to reinstate the open bed SITHU. Plans are in process.
    - QI will develop an audit to monitor compliance.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current practice. Custody staff shall notify medical staff within fifteen (15) minutes that a prisoner is temporarily housed in a safety or segregation cell and medical staff shall complete an assessment within 12 hours of placement or the next sick call, whichever us earliest.

- VII.H.3.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE

- ▪ Current practice. Lexipol Policy on Safety, Separation, and Sobering Cells was published on 05/21/2024.
- VII.H.4.
  - o ACH Status: N/A
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current practice.  Will add the language to the new Suicide Prevention policy. RCCC has no cells designed for long term housing of inmates on suicide precautions. RCCC does not have ACMH staff available 24 hours a day, but has TELEPSYCHIATRY available after hours, including weekends.
- VII.H.5.
  - o ACH Status: N/A
  - o SSO Status: SUBSTANTIAL COMPLIANCE
- VII.H.6.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ Classrooms are only being used for programs and treatment and no longer used to hold patients pending an evaluation or on suicide precautions.
  - o SSO Status: SUBSTANTIAL COMPLIANCE

| Suicide Hazards in High-Risk Housing Locations |
|---|
| (Section VII; Provisions I.) |
| ACH Status: N/A |
| SSO Status: SUBSTANTIAL COMPLIANCE |

### I.  Suicide Hazards in High-Risk Housing Locations

1. The County shall not place prisoners identified as being at risk for suicide or self-harm, or for prisoners requiring IOP level of care, in settings that are not suicide-resistant as consistent with Lindsay Hayes's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities."
2. Cells with structural blind spots shall not be used for suicide precaution.

**Compliance Status by Section:**

- VII.I.1.
  - o ACH Status: N/A

- - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current practice. Inmates at risk for suicide, self-harm, or IOP level of care are housed in suicide resistant cells.
- VII.I.2.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current practice.
    - The Main Jail has a total of 26 SITHU level cells available.

| Supervision/Monitoring of Suicidal Inmates |
|---|
| **(Section VII; Provisions J.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: PARTIAL COMPLIANCE** |

## J.  Supervision/Monitoring of Suicidal Inmates

1.  The County shall ensure adequate visibility and supervision of prisoners on suicide precautions.
2.  The County shall not cover cell windows with magnetic flaps or any other visual barrier preventing visibility into any cell that is housing a prisoner on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need.
3.  The County shall revise its policies regarding the monitoring of prisoners on suicide precautions to provide for at least the following two defined levels of observation:
    a)  <u>Close observation</u> shall be used for prisoners who are not actively suicidal but express suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) or have a recent prior history of self-destructive behavior. Close observation shall also be used for prisoners who deny suicidal ideation or do not threaten suicide but are engaging in other concerning behaviors indicating the potential for self-injury. Staff shall observe the prisoner at staggered intervals not to exceed every 15 minutes and shall document the observation as it occurs.
    b)  <u>Constant observation</u> shall be used for prisoners who are actively suicidal, either threatening or engaging in self-injury, and considered a high risk for suicide. An assigned staff member shall observe the prisoner on a continuous, uninterrupted basis. The observation should be documented at 15-minute intervals. Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation.
4.  For any prisoner requiring suicide precautions, a qualified mental health professional shall assess, determine, and document the clinically appropriate level of monitoring based on the prisoner's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically-determined level of monitoring.

| 5. Video monitoring of prisoners on suicide precaution shall not serve as a substitute for Close or Constant observation. |
| --- |

**Compliance Status by Section:**

- VII.J.1.
  - ○ ACH Status: PARTIAL COMPLIANCE
    - ▪ SSO expanded the number of suicide resistant observation cells in the Suicidal Temporary Housing Unit (SITHU) at the Main Jail.
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
- VII.J.2.
  - ○ ACH Status: N/A
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current practice. Lexipol Procedure on Suicide Prevention and Intervention was published on 02/14/2024.
- VII.J.3.
  - ○ ACH Status: PARTIAL COMPLIANCE
    - ▪ MH has revised its policies regarding the monitoring of patients on suicide precautions to provide for at least the following two defined levels of observation:
    - ▪ VII.J.3.a. Close Observation: Staff shall observe the patient at staggered intervals not to exceed every 15 minutes and shall document the observation as it occurs.
    - ▪ VII.J.3.b. Constant Observation: An assigned staff member shall observe the patient on a continuous, uninterrupted basis. The observation should be documented at 15-minute intervals. Staff should be physically stationed outside of the patient's cell to permit continuous, uninterrupted observation. This is included in the ACH PP 02-05 Suicide Prevention Program policy. Constant Observation began in March 2023 with the addition of Mental Health Worker positions.
    - ▪ Implemented Constant Observation Program and have filled all vacancies.  Staff are available 24/7 to provide 1:1 constant observation. However, this area remains in PARTIAL COMPLIANCE due to limited number of MHWs to providing constant observation.  Requested budget augmentation FY 24/25 for additional MHWs.
  - ○ SSO Status: PARTIAL COMPLIANCE
    - ▪ a) Lexipol Procedure on Suicide Prevention and Intervention was published on 02/14/2024. The revised policy addresses this issue. The SSO Suicide Prevention policy language has been agreed upon by Class Counsel and

> SSO. The policy was updated in September of 2023, each Sheriff's Office staff member must read and acknowledge the policy.
>> ▪ b) ACMH is in the process of hiring constant observation workers to perform this function.

- VII.J.4.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ For any patient requiring suicide precautions, a qualified mental health professional assesses, determines, and documents the clinically appropriate level of monitoring based on the patient's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically determined level of monitoring.
    - ▪ Licensed MH clinicians make these determinations and document them in the SRA and on the Suicide Precaution form given to custody and entered into ATIMS.
    - ▪ SSO expanded the number of suicide resistant observation cells in the Suicidal Temporary Housing Unit (SITHU) at the Main Jail.
    - ▪ MH hired staff and implemented constant observation level of monitoring in March 2023.
    - ▪ MH completes weekly audits on compliance determining and documenting housing, observation level, property, privileges, and clothing restrictions for patients placed on suicide precautions.  Findings are reported to Suicide Prevention Subcommittee on quarterly basis.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current practice. Once ACMH staff has completed the inmate's evaluation, the ACMH staff member shall consult with custody staff to determine the appropriate housing location for the inmate.
- VII.J.5.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ Video monitoring of suicidal inmates ended in November 2021.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current practice. The Procedure on Suicide Prevention and Intervention was published on 02/14/2024.

| Treatment of Inmates Identified as at Risk of Suicide |
|---|
| **(Section VII; Provisions K.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: SUBSTANTIAL COMPLIANCE** |

**K.  Treatment of Inmates Identified as at Risk of Suicide**

1. Qualified mental health professionals shall develop an individualized treatment plan and/or behavior management plan for every prisoner that mental health staff assesses as being a suicide risk.
2. Treatment plans shall be designed to reduce suicide risk and shall contain individualized goals and interventions. Treatment plans shall be reviewed following discharge from suicide precautions and updated as clinically indicated.
3. All assessments, treatment, and other clinical encounters shall occur in an area that provides reasonable sound privacy and confidentiality. If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

**Compliance Status by Section:**

- VII.K.1.
  - ACH Status: PARTIAL COMPLIANCE
    - MH staff have received updated training on the new process of developing safety plans at the time of an SRA evaluation starting in January 2023 with a pilot study with ongoing training. Audits of compliance will happen after all MH staff have been trained on the new process.
  - SSO Status: N/A
- VII.K.2.
  - ACH Status: PARTIAL COMPLIANCE
    - Treatment plans are designed to reduce suicide risk and shall contain individualized goals and interventions. Treatment plans shall be reviewed following discharge from suicide precautions and updated as clinically indicated.  MH staff have received training on this requirement in both SRA and Treatment Planning training.
  - SSO Status: N/A
- VII.K.3.
  - ACH Status: PARTIAL COMPLIANCE
    - Staff utilize the confidential interview office in booking, classrooms, and attorney booths for confidential interviews when available. Facility deficiencies that result in a lack of confidential space keeps the status at PARTIAL COMPLIANCE.
  - SSO Status: SUBSTANTIAL COMPLIANCE

- When necessary, custody staff will standby for security while offering auditory privacy. Proximity is dependent on the inmate's behavior safety risk. This can be accomplished at RCCC due to the design of the three offices where these contacts take place. All of the doors can be closed. They have windows where the officers can stand outside and see what is taking place in the room.
- At Main Jail a private attorney booth has been converted to be utilized as a confidential interview room for Mental health assessments in booking.
- On MJ housing floors, classrooms and confidential attorney booths are available for clinical encounters.
- Additional booths consisting of plexiglass enclosures with doors situated in the indoor rec area of each housing unit will be added in 2024. Some booths will have a partition for safety as well as a security desk/chair.
- SSO has purchased security desk/chair (same used at Santa Clara SO), which allows leg shackles to be secured. This allows clinicians to safely speak to higher security inmates in privacy without custody staff standing nearby.

| Conditions for Individual Inmates on Suicide Precautions |
|---|
| (Section VII; Provisions L.) |
| ACH Status: SUBSTANTIAL COMPLIANCE |
| SSO Status: SUBSTANTIAL COMPLIANCE |
| **L.  Conditions for Individual Inmates on Suicide Precautions** |
| 1.  The County's Suicide Prevention Policy shall set forth clear and internally consistent procedures regarding decisional authority for determining the conditions for individual inmates on suicide precautions. Mental health staff shall have primary authority, consistent with individualized classification and security needs, with respect to the following: [see M. Property and Privileges]. |

**Compliance Status by Section:**

- VII. L.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - The Suicide Prevention Policy addresses MH's role as the primary authority to make decisions on property and privileges, use of safety suits, and discharge from suicide precaution based on clinical assessment.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current practice, Mental Health staff's recommendations are taken into consideration when making housing decisions for inmates with mental health concerns.

| Property and Privileges |
|---|
| **(Section VII; Provisions M.)** |
| ACH Status: SUBSTANTIAL COMPLIANCE |
| SSO Status: SUBSTANTIAL COMPLIANCE |

**M. Property and Privileges**

1. Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of routine privileges (e.g., visits, telephone calls, recreation) that are otherwise within the limitations of a prisoner's classification security level. Any removal of privileges shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

2. Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff depending on suicide risk, the removal and/or return of a prisoner's clothing and possessions (e.g., books, slippers/sandals, eyeglasses) that are otherwise within the limitations of a prisoner's classification security level. The removal of property shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

3. Cancellation of privileges should be avoided whenever possible and utilized only as a last resort.

**Compliance Status by Section:**

- VII.M.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - Licensed MH clinicians make these determinations and document them in the SRA and on the Suicide Precaution form given to custody and entered into ATIMS.
    - The Suicide Precautions and/or Grave Disability Observations – Custody Instructions Form was developed to document MH staff's directions regarding housing, observation level, property, privileges, and clothing restrictions.
    - MH provided training and created a workflow for staff on responsibilities related to suicide precautions and clinical decisions regarding housing, observation levels, privileges, clothing, and property in August 2021.

- MH completes weekly audits on compliance determining and documenting housing, observation level, property, privileges, and clothing restrictions for patients placed on suicide precautions.  Findings are reported to Suicide Prevention on quarterly basis.
- Suicide Precautions Audit findings indicate MH is meeting substantial compliance when determining and documenting housing, observation level, property, privileges and clothing restrictions for patients place on suicide precautions. (See audit results below)

   o SSO Status: SUBSTANTIAL COMPLIANCE
   - Current practice.  Prisoners placed in a safety cell shall be allowed to retain enough clothing or be provided with a suitably designed "safety garment" to provide for the prisoner's personal privacy unless specific identifiable risks to the prisoner's safety or to the security of the facility exist and are documented. The Procedure on Suicide Prevention and Intervention was updated on 02/14/2024.
   - At the Main Jail the Intensive Outpatient Supervisor (IOP) conducts monthly audits for suicidal inamtes in the SITHU and in safety cells to evaluate compliance with mental health's recommendations.  The results of these audits are shared with the SME.

- VII. M.2.
   o ACH Status: SUBSTANTIAL COMPLIANCE
   - Licensed MH clinicians make these determinations and document them in the SRA and on the Suicide Precaution form given to custody and entered into ATIMS.
   - Developed workflow and implemented procedure for posting suicide precaution forms outside of patient cells in the APU.
   - MH staff received updated training on the new process of developing safety plans at the time of a Suicide Risk Assessment (SRA) evaluation starting in January 2023. All MH staff have been trained and a compliance audit was completed to identify areas for process improvement.

   o SSO Status: SUBSTANTIAL COMPLIANCE
   - Current practice.  If deemed necessary by ACMH staff, the inmate's clothing shall be taken and the inmate will be given a "safety suit" to wear.  Prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damage property. The Procedure on Suicide Prevention and Intervention was updated on 02/14/2024.

- VII.M.3.

- o  ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ Cancellation of privileges is avoided whenever possible and utilized only as a last resort consistent with policy.

**Suicide Precautions Weekly Audit-Quarterly Review**

**Summary: February 2024 – April 2024**

| Month | Suicide Precautions form completed | Removal of privileges and property documented with clinical justification | Decisions about removal of clothing / safety smock recommended by MH staff | Daily assessments for restoration of privileges and property | Daily assessments to determine restoration of clothing or documentation of continued use |
|---|---|---|---|---|---|
| February | 60/60 | 60/60 | 60/60 | 43/43* | 43/43* |
| March | 60/61 | 60/61 | 60/61 | 44/45* | 44/45* |
| April | 45/45 | 45/45 | 44/45 | 32/37* | 32/37* |
| **TOTAL** | **165/166(99%)** | **165/166(99%)** | **164/166(99%)** | **119/125(95%)** | **119/125(95%)** |

\* Initial assessment (day 1), not included in count.

- o  SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current practice. Cancellation of privileges would be done only as a last resort or if deemed necessary per ACMH. The Procedure on Suicide Prevention and Intervention was updated on 02/14/2024.

| **Use of Safety Suits** |
|---|
| **(Section VII; Provisions N.)** |
| **ACH Status: SUBSTANTIAL COMPLIANCE** |
| **SSO Status: SUBSTANTIAL COMPLIANCE** |

## N. Use of Safety Suits

1. Decisions about the use of a safety suit (smock) or removal of normal clothing will be under mental health staff's authority, based on individualized clinical judgment along with input from custody staff.
2. Custody staff may only temporarily place an inmate in a safety suit based on an identified risk of suicide by hanging until the qualified mental health professional's evaluation, to be completed within the "must see" referral timeline. Upon completion of

the mental health evaluation, the mental health professional will determine whether to continue or discontinue use of the safety suit.

3. If an inmate's clothing is removed, the inmate shall be issued a safety suit and safety blanket.

4. As soon as clinically appropriate, the provision of regular clothing shall be restored. The goal shall be to return full clothing to the inmate prior to discharge from suicide precautions.

5. A qualified mental health professional shall conduct daily assessments of any prisoner in a safety suit and document reasons for continued use when clinically indicated.

6. If a qualified mental health professional determines that 30-minute (or less frequent) observations are warranted for a prisoner, safety suits shall not be used on that prisoner.

7. Safety suits shall not be used as a tool for behavior management or punishment.

**Compliance Status by Section:**

- VII.N.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - Licensed MH clinicians make these determinations and document them in the SRA and on the Suicide Precaution form given to custody and entered into ATIMS. (See data above).
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current practice. Outlined in the current Suicide Prevention Program Operations Order. The use of the "Safety Suit" shall be at the discretion of ACMH, based on collaboration with intake or custody staff. The Procedure on Suicide Prevention and Intervention was updated on 02/14/2024.

- VII.N.2.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - In these instances, a qualified mental health professional completes an evaluation within the "must see" referral timeline. Upon completion of the mental health evaluation, the mental health professional determines whether to continue or discontinue use of the safety suit.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Absent direction from ACMH deeming a "safety garment" necessary, a sworn supervisor must authorize custody staff to take the clothing and supply the prisoner with a "safety garment". Unless a "safety garment" is necessitated by the prisoner's behavior, prisoners shall be allowed to retain personal clothing except for shoelaces, shoes, belts, or any other clothing articles which could threaten his/her safety or damage property.

- VII.N.3.

- o ACH Status: N/A
- o SSO Status: SUBSTANTIAL COMPLIANCE
  - ▪ Current practice. The Procedure on Suicide Prevention and Intervention713 was updated on 02/14/2024.
- VII.N.4.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ MH assesses the need for continued safety suit daily.  Regular jail issued clothing is restored as soon as clinically indicated.
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current practice. Determination is made by ACMH.  At the Main Jail, After Lindsey Hayes visit in November 2022, it was discovered SSO was not conducting QA reviews of safety smock use pursuant to the MOA filed June 3, 2022. Moving forward the IOP Sergeant conducts QA audits of safety smock use and timely return of clothing and property when notified by ACMH.
- VII.N.5.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ All patients on the pre-admit list and in the APU are seen daily to assess continued use of safety suit, observation level and restriction of property and privileges.  MH documents clinical justification for continued use of the safety suit and/or restriction of property and privileges.
    - ▪ MH staffreceived updated training on the new process of developing safety plans at the time of a Suicide Risk Assessment (SRA) evaluation starting in January 2023. All MH staff have been trained and a compliance audit was completed to identify areas for process improvement.
  - o SSO Status: N/A
- VII.N.6.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
  - o When MH determines that 30-minute (or less frequent) observations are warranted for a patient, safety suits are not used for that patient.
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current practice, use of safety suit and 30 minute or less frequent observations are done if determined by ACMH.
- VII.N.7.

- o ACH Status: SUBSTANTIAL COMPLIANCE
  - ▪ Safety suits are not used as a tool for behavior management or punishment.
  - ▪ All staff are trained on this during the Annual Suicide Prevention Training.
- o SSO Status: SUBSTANTIAL COMPLIANCE
  - ▪ Current practice. Safety suits are only used when necessary for the safety and security of the inmate. The Procedure on Suicide Prevention and Intervention was updated on 02/14/2024.

| Beds and Bedding |
| :---: |
| **(Section VII; Provisions O.)** |
| ACH Status: N/A |
| SSO Status: SUBSTANTIAL COMPLIANCE |
| **O. Beds and Bedding**<br><br>1. All prisoners housed for more than four hours on suicide precautions and/or in an inpatient placement shall be provided with an appropriate bed, mattress, and bedding unless the prisoner uses these items in ways for which they were not intended (e.g., tampering or obstructing visibility into the cell). Such a determination shall be documented and shall be reviewed on a regular basis. |

**Compliance Status by Section:**

- VII.O.1.
  - o ACH Status: N/A
    - ▪ See SSO response.
    - ▪ This is an element tracked by SSO.
    - ▪ Custody distributed new suicide-resistant mattresses to the high acuity MH housing areas and safety cells in May 2022.
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ This is current practice. Those housed in safety cells in the booking area are moved to appropriate suicide resistant housing as soon as a bed/cell opens up.
    - ▪ 26 SITHU cells are available at the Main Jail.

| Discharge from Suicide Precautions |
|---|
| **(Section VII; Provisions P.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: SUBSTANTIAL COMPLIANCE |

**P.  Discharge from Suicide Precautions**

1. A qualified mental health professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions in order to ensure that the discharge is appropriate and that appropriate treatment and safety planning is completed.
2. Treatment plans shall be written for all prisoners discharged from suicide precautions. The treatment plan shall describe signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur.
3. Qualified mental health professionals shall provide clinical input regarding clinically appropriate housing placement (e.g., whether isolation is contraindicated for the prisoner) upon discharge. Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement. Once clinically discharged from suicide precautions, the prisoner shall be promptly transferred to appropriate housing.
4. Prisoners discharged from suicide precautions shall remain on the mental health caseload and receive regularly scheduled clinical assessments and contacts. Unless a prisoner's individual circumstances direct otherwise, a qualified mental health professional shall provide follow-up assessment and clinical contacts within 24 hours of discharge, again within 72 hours of discharge, again within one week of discharge.

**Compliance Status by Section:**

- VII.P.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - A qualified mental health professional completes and documents a suicide risk assessment prior to discharging a patient from suicide precautions in order to ensure that the discharge is appropriate, and that appropriate treatment and safety planning is completed.
  - SSO Status: SUBSTANTIAL COMPLIANCE
- VII.P.2.
  - ACH Status: PARTIAL COMPLIANCE

- ▪ The treatment plan describes signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur. MH staff have received training as part of the SRA and Treatment Planning trainings to ensure treatment goals are included to reduce suicide risk. Auditing of charts is needed to ensure SUBSTANTIAL COMPLIANCE.
  - ○ SSO Status: N/A
- VII.P.3.
  - ○ ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ MH provides clinical input regarding clinically appropriate housing placement (e.g., whether isolation is contraindicated for the prisoner) upon discharge. Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement. Once clinically discharged from suicide precautions, the prisoner shall be promptly transferred to appropriate housing.
    - ▪ Patients are transferred to the IOP (based upon bed availability) and/or assigned a clinically appropriate level MH care at time of discharge from the APU.
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current custody practice. This is accomplished with the input of Classification staff and ACMH.
- VII.P.4
  - ○ ACH Status: PARTIAL COMPLIANCE
    - ▪ Patients who are discharged from the APU after being treated for a suicide attempt or ideation receive follow up MH appointments (24 hours, 72 hours, and 5 days).
    - ▪ Patients on the APU pre-admit list who have been discharged from suicide precautions receive follow-up MH appointments (24 hours, 72 hours again within one week of discharge)
    - ▪ PARTIAL COMPLIANCE pending audit and confirmation that timelines to care are being met.

**Summary: January 2024 – March 2024**

| Total Discharges Reviewed January 2024 to March 2024 | Patients seen within 24 hours of discharge | Patients seen within 72 hours of discharge | Patients seen within 5 days of discharge |
|---|---|---|---|
| 25 | 15/18(83%) | 13/14(93%) | 11/13(85%) |
| | 7 N/A | 11 N/A | 12 N/A |

N/A = not applicable. This number is subtracted from the total number of discharges reviewed due to patient being TEMP OUT, released or placed back on the preadmit list.

*Previously reported data (January 2023 – June 2023)*

| Time Frames | Total Discharges Reviewed | Patients seen within 24 hours of discharge | Patients seen within 72 hours of discharge | Patients seen within 5 days of discharge |
|---|---|---|---|---|
| Jan 2023 – June 2023 | 28 | 18/21 (86%) | 19/20 (95%) | 16/18 (89%) |
| July 2023 – Sept 2023 | 19 | 13/15 (87%) | 14/14 (100%) | 11/14 (79%) |
| Oct 2023 – Dec 2023 | 21 | 16/19 (84%) | 15/16 (94%) | 15/16 (94%) |

- o SSO Status: N/A

| Emergency Response |
|---|
| **(Section VII; Provisions Q.)** |
| **ACH Status: SUBSTANTIAL COMPLIANCE** |
| **SSO Status: SUBSTANTIAL COMPlIANCE** |

**Q. Emergency Response**

1. The County shall keep an emergency response bag that includes appropriate equipment, including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units. All custodial and medical staff be trained on the location of this emergency response bag and shall receive regular training on emergency response procedures, including how to use appropriate equipment.
2. All custody and medical staff shall be trained in first aid and CPR.
3. It shall be the policy of the County that any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff shall begin to administer standard first aid and/or CPR, as appropriate.

**Compliance Status by Section:**

- VII.Q.1.
  - o ACH Status: SUBSTANTIAL COMPLIANCE

- The County shall keep an emergency response carts and bag that includes appropriate equipment, including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units. All custodial and medical staff be trained on the location of this emergency response bag and shall receive regular training on emergency response procedures, including how to use appropriate equipment.
- ACH health staff maintains emergency equipment and supplies to ensure availability and operability in the event of an emergency. A monthly inventory check is performed to ensure that supplies are not expired.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    -

- VII.Q.2.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - All Medical staff are required to be trained in first aid and CPR. QI tracks this area for compliance and reporting.
    - All staff shall receive regular training on emergency procedures including how to use emergency equipment.
    - Man down drills are practiced once a year on each shift at each jail facility. These drills are debriefed, and results are shared with all health staff, and recommendations for health staff are acted upon.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current custody practice. Sworn staff receives CPR training every two years. It is part of our Advanced Officer Training (AOT) program.
- VII.Q.3. SUBSTANTIAL COMPLIANCE
  - It is the policy of the County that any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff begins to administer standard first aid and/or CPR, as appropriate.
  - SSO Status: SUBSTANTIAL COMPLIANCE

| Quality Assurance and Quality Improvement |
|---|
| **(Section VII; Provisions R.)** |
| ACH Status: SUBSTANTIAL COMPLIANCE |
| SSO Status: SUBSTANTIAL COMPLIANCE |
| **R.  Quality Assurance and Quality Improvement** |

1. The County shall establish regularly scheduled multidisciplinary meetings related to treatment, and plan of care issues, on a monthly basis, between medical, and mental health personnel.
2. The County shall, in consultation with Plaintiffs' counsel, revise its in-custody death review policy and procedures. Reviews shall be conducted with the active participation of custody, medical, and mental health staff. Reviews shall include analysis of policy or systemic issues and the development of corrective action plans when warranted.
3. For each suicide and serious suicide attempt (e.g., requiring hospitalization), the County's Suicide Prevention Task Force shall review: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt. Where applicable, the Review Team shall generate recommendations for changes in policy, training, physical plant, medical or mental health services, and operational procedures.
4. The County will track all critical incidents which include prisoner suicides, attempted suicides, and incidents involving serious self-harm. The County shall review critical incidents and related data through its quality assurance and improvement processes.
5. The County shall implement a continuous quality assurance/quality improvement plan to periodically audit suicide prevention procedures that include, but are not limited to: intake screening (to include audits to ensure that staff ask and record all suicide screening questions), mental health assessments, suicide risk assessments, crisis response, and treatment plans/behavior management plans for prisoners identified as being at risk of suicide or self-harm.

**Compliance Status by Section:**

- VII.R.1.
    - ACH Status: SUBSTANTIAL COMPLIANCE
        - MH implemented monthly Suicide Prevention Multidisciplinary meetings to discuss patients with complex mental health needs who engage in self-injurious behaviors (July 2022).
    - SSO Status: N/A
- VII.R.2.
    - ACH Status: SUBSTANTIAL COMPLIANCE
        - ACH has, in consultation with Plaintiffs' counsel, revised its in-custody death review policy and procedures. Reviews are conducted with the active participation of custody, medical, and mental health staff. Reviews include analysis of policy or systemic issues and the development of corrective action plans when warranted.
    - SSO Status: SUBSTANTIAL COMPLIANCE
- VII.R.3.
    - ACH Status: SUBSTANTIAL COMPLIANCE

- ▪ The Suicide Prevention Subcommittee established a Morbidity and Mortality (M&M) Review for cases meeting provision criteria in December 2021.
        - ▪ The M&M Workgroup reviews cases and reports findings back to Suicide Prevention Subcommittee.
    - o SSO Status: SUBSTANTIAL COMPLIANCE
        - ▪ Current practice. The Suicide Prevention Task Force has been reestablished and has had several meetings.
- VII.R.4
    - o ACH Status: SUBSTANTIAL COMPLIANCE
        - ▪ MH tracks incidents of suicide, attempted suicide and serious self-harm.
        - ▪ MH completes incident reports and reviews on deaths by suicide, attempted suicide and serious self-harm and submits incident reports to ACH QI for review and tracking.
    - o SSO Status: N/A
- VII.R.5.
    - o ACH Status: SUBSTANTIAL COMPLIANCE
        - ▪ MH convened a multidisciplinary Suicide Prevention Subcommittee to review, track, and audit the requirements.
        - ▪ Suicide Prevention Subcommittee moved meetings from a quarterly to monthly schedule to improve communication, implement Suicide Prevention training, and complete morbidity and mortality reports in a timely manner.
        - ▪ MH completes Suicide Precaution Weekly Audits and reports results to Suicide Prevention Subcommittee on a qaurterly basis.
        - ▪ MH completes audits of 4 and 6-hour timelines to care and reports findings and recommendations to MH QI and Suicide Prevention Subcommittees.
        - ▪ MH complete audits of number of confidential versus non-confidential contacts and present findings and recommendations to MH QI Subcommittee.
        - ▪ Completed quarterly baseline studies of MH Rules Violation Reviews and presented findings and recommendations to MH QI Subcommittee.
        - ▪ Completed QI study of MHs timeliness to medication verification and initiation following intake referral and presented findings and recommendations to MH QI Subcommittee. As a result of study findings worked with

nursing leadership to message intake nurses on importance of identifying community pharmacy and created a hard-stop in intake form that requires response if patient indicates they receive medication in the community.

- Completed Multidisciplinary Intervention Plan (MDIP) Audit to determine the number of completed MDIPs. Used this data to meet with staff and discuss importance of considering MDIPs for patients who meet criteria.
- Completed QI study utilizing the APU Daily Patient Activity Report which staff use to track custody support on the APU. As a result of the study, identified need for additional deputies and worked with SSO to increase deputy coverage on the APU.
- Utilized new reporting feature in Athena that tracks number of groups offered and cancelled and developed QI study that highlighted reasons for cancelled groups.  Shared results and recommendations with MH QI Subcommittee.
- Developed baseline MDT and Treatment Planning study to identify compliance with treatment planning and MDTs in IOP and APU.  Presented findings and recommendations to MH QI Subcommittee.
- Completed study on the number of MH referrals and completed encounters by clinicians and prescribers and presented findings to MH QI Subcommittee.
- Completed APU Discharge Follow-ups and Timelines to Care report and presented findings and recommendations to MH QI and Suicide Prevention Subcommittees.
- Completed APU Involuntary Detention Audit and presented findings to MH QI and Suicide Prevention Subcommittees.

o SSO Status: N/A

## VIII.  SEGREGATION/RESTRICTED HOUSING

### General Principles
**(Section VIII; Provisions A.)**

**ACH Status: N/A**

**SSO Status: SUBSTANTIAL COMPLIANCE**

## A.  General Principles

1. Prisoners will be housed in the least restrictive setting necessary to ensure their own safety, as well as the safety of staff, other prisoners, and the public.
   a) The County shall not place prisoners in more restrictive settings, including Segregation, based solely on a mental illness or any other disability. Prisoners will be housed in the most integrated setting appropriate to their individual needs.
   b) The County shall not place prisoners into Segregation units based solely on classification score.
   c) The County shall review the housing and restrictions of female prisoners classified as high security to ensure that this population is not subject to Segregation conditions of confinement.
   d) Specialized medical units (e.g., Main Jail 2 West Med/Psych, Main Jail 2 East) and mental health units (e.g., OPP, IOP, MHU, 2P) are not Segregation housing units. The County shall ensure that prisoners housed in these units receive daily access to out-of-cell time, telephones, showers, and other programs, services, and activities consistent with their classification and treatment plan.

2. The County shall not place a prisoner in Segregation units without first determining that such confinement is necessary for the safety of the staff, other prisoners, or the public. The County shall clearly document in writing the specific reason(s) for a prisoner's placement and retention in Segregation housing. The reason(s) shall be supported by clear, objective evidence. Prisoners will remain in Segregation housing for no longer than necessary to address the reason(s) for placement.
   a) A qualified mental health or medical professional shall conduct check-ins at least once a week, to assess and document the health status of all prisoners in Segregation, and shall make referrals as necessary. The check-in shall include a brief conversation with each prisoner, a visual observation of the cell, and an inquiry into whether the prisoner would like to request a confidential meeting with a mental health or medical provider. Steps shall be taken to ensure effective communication, as well as auditory privacy consistent with security needs. When a prisoner in Segregation requests a confidential meeting with a mental health or medical provider, or the medical or mental health professional identifies a mental health or medical need, staff shall make appropriate arrangements to include triage, examination

> and treatment in an appropriate clinical setting. In such cases, staff shall give the prisoner the opportunity to complete a health care request but will otherwise initiate a referral without requiring the prisoner to complete a request form.
>
> 3. The County shall not place the following prisoners in a Segregation setting unless necessary to address a serious risk of physical harm, and in such cases only for the minimum time necessary to identify an alternative appropriate placement:
>    a) Prisoners with acute medical needs that require an inpatient level of care and/or daily nursing care;
>    b) Prisoners who are pregnant, post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy.

**Compliance Status by Section:**

- VIII.A.1.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - a) At the Main Jail we have implemented ADSEG classification review utilizing objective criteria and forms created with the assistance of DRC/PLO. Those placed in ADSEG are reviewed based on objective factors for segregation and not mental health status. At the Main Jail the female IOP program was expanded with 8 high security beds to better service the SMI population. RCCC has implemented several SMI program pods, where inmates housed in a single cell are only assigned based on ACMH recommendation and allowed program/recreation time with other inmates, minimum 17 hours a week. A high security IOP program has been implemented at RCCC with additional 24 male beds. This reduces reliance on restrictive housing for inmates who are hard to manage.
    - b) Several objective indicators are used to determine the appropriateness of segregation. Written documentation is required and we are working towards periodic review of justification for segregation. Inmates solely classified as "high" are not routinely segregated.
    - d) To provided needed programming custody staff on 2P is now 12hr day/7 days a week for better availability requested by ACMH. An additional Deputy position has been added to evening coverage on 2P. 3-West IOP deputies provide needed staffing for daily access to programing consistent with this requirement. The IOP schedule has also been changed to increase staffing during peak daytime hours to better facilitate the need for dedicated escorts during mental health programs. The MJ implemented a male OPP single celled housing unit with 30 beds on 3-East 100 Pod. The female IOP program was expanded with 8 high security beds to better service the SMI population. A similar high security IOP program has been implemented at RCCC with additional

24 male beds. SSO and ACMH have added staffing to provide better services to this population.  RCCC has an open floor plan setting for medical housing with access to phones, showers, and yard. Our IOP housing units have constant programming which allows them to exceed the minimum out of cell time of 17 hours.

- VIII.A.2.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - With the assistance of Plaintiff's Counsel, ADSEG forms were created and are currently being utilized by SSO staff to comply with this requirement. Staff strives to use objective factors when determining segregation status of individual inmates.
- VIII.A.3.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - New ADSEG forms being utilized to ensure objective reasons for segregation status.
      - b) Not codified in policy, however is our current practice as we now have regular collaboration with ACMH and review all inmates who are housed in segregation.

| **Conditions of Confinement** |
| --- |
| **(Section VIII; Provisions B.)** |
| **ACH Status: N/A** |
| **SSO Status: PARTIAL COMPLIANCE** |

**B.  Conditions of Confinement**

1. The County will provide at least 17 hours of out-of-cell time per week for all prisoners, with the exception of prisoners subject to Administrative Segregation Phase I and Disciplinary Segregation in accordance with this remedial plan. The County will monitor out-of-cell time, and if minimum out-of-cell time requirements are routinely not being met at a particular facility or in a particular housing unit, the Sheriff's Department division commander or designee will review the situation and take appropriate steps to resolve the issue.
   a) The County shall implement a policy to document out-of-cell time provided to each prisoner. The County shall conduct monthly audits to ensure that prisoners have been provided the required treatment and recreation time out of cell. This data will be regularly reviewed as part of the County's Quality Assurance procedures.

2. Out-of-cell time with the opportunity to exercise shall be provided to each prisoner seven (7) days per week, including outdoors/recreation time when feasible. The County shall offer out-of-cell time at appropriate times of day.
3. The County shall modify its non-disciplinary Segregation policies and procedures to allow reasonable access to the following: (1) Personal phone calls for all prisoners, including at least five hours or three weekdays per week of phone access during normal business hours; (2) Education, rehabilitation, and other materials (e.g. writing implements, art supplies, tablets), for in-cell activities; (3) Personal and legal visiting; (4) Religious services; and (5) Commissary.
   a) The conditions and privileges described above shall be provided unless there is a specific safety or security issue preventing provision of such materials or the prisoner is subjected to disciplinary action.
4. Cell windows shall not be covered with magnetic flaps, towels, sheets, or any other visual barrier preventing visibility into and out of the cell, unless there is a specific security or privacy need that is documented, and then for only a period of time necessary to address such security or privacy need. This provision shall apply to all cells housing prisoners.
5. The County shall establish procedures so that all housing unit cells are searched and cleaned prior to a prisoner's placement in the cell.
6. The County shall establish procedures to ensure that no prisoner is placed in a Segregation housing cell without a mattress and appropriate bedding.

**Compliance Status by Section:**

- VIII.B.1.
  - ACH Status: N/A
  - SSO Status: PARTIAL COMPLIANCE
    - At the MJ, weekly out of cell time reports are distributed to supervisors and managers to ensure compliance. The Main Jail is compliant on most floors other than the 8th floor.
    - RCCC has been able to meet the required out of cell time almost consistently across housing units who are not in COVID 19 quarantine/isolation. Out of cell totals are monitored by the compliance unit to ensure we are reaching the required totals.
    - Policy 1003 was published on 05/15/2024.
      - a) Out of cell time is monitored and recorded in the current ATIMS system.  Reports are generated on a weekly basis, and checked for compliance. A Post Order regarding this topic has been approved. The officers are aware of the amount of out-of-cell time each classification of inmate is entitled to receive.

- VIII.B.2.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE

- ▪ Schedules have been created to ensure fair distribution of outdoor recreation.
- VIII.B.3.
  - o ACH Status: N/A
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ At MJ phones are available during any out of cell time.
    - ▪ At RCCC phones are available during any out of cell time which for non-disciplinary segregation is 17 hours per week. RCCC does not have Administrative Segregation housing.
    - ▪ The Policy on Exercise and Out of Cell Time was published on 05/15/2024.
    - ▪ The Procedure for Special Management of Incarcerated Persons  was updated 07/23/2024.
    - ▪ Both facilities enabled the feature on the inmate assigned tablets allowing the use of the telephone feature. The tablets are distrubted to inmates in the morning and collected before 11PM.
- VIII.B.4.
  - o ACH Status: N/A
  - o SSO Status: SUBSTANTIAL COMPLIANCE
- VIII.B.5.
  - o ACH Status: N/A
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current Practice.  The Post Order regarding this topic was approved.
- VIII.B.6.
  - o ACH Status: N/A
  - o SSO Status: SUBSTANTIAL COMPLIANCE

| Mental Health Functions in Segregation Units |
| :---: |
| **(Section VIII; Provisions C.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: SUBSTANTIAL COMPLIANCE** |
| **C.  Mental Health Functions in Segregation Units** |
| 1.  Segregation Placement Mental Health Review |

a) All prisoners placed in a non-disciplinary Segregation housing unit and all prisoners housed in a Disciplinary Detention unit shall be assessed by a qualified mental health professional within 24 hours of placement to determine whether such placement is contraindicated. All prisoners subjected to Disciplinary Segregation conditions for 72 hours in their general population housing unit (i.e., confined to cell 23 hours per day) shall also be assessed by a qualified mental health professional no later than the fourth day of such placement.

b) Any decision to place prisoners with Serious Mental Illness in Segregation shall include the input of a qualified mental health professional who has conducted a clinical evaluation of the prisoner in a private and confidential setting (absent a specific current risk that necessitates the presence of custody staff), is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

c) Mental Health Staff shall consider each prisoner's age and cognitive functioning as part of the Segregation Placement review. Staff shall receive training regarding the features of youth and brain development of young adults (i.e., 24 years old and younger) and the needs of individuals with intellectual disabilities.

d) If mental health or medical staff find that a prisoner has a Serious Mental Illness or has other contraindications to Segregation, that prisoner shall be removed from Segregation absent exceptional and exigent circumstances.

e) The County shall document and retain records of all Segregation Placement mental health evaluations, as described above. The County shall consult with Plaintiffs regarding such documentation, including the development of new forms where necessary.

2. Segregation Rounds and Clinical Contacts

a) Cell checks (to ensure that prisoners are safe and breathing) shall be conducted for all prisoners in Segregation at least every 30 minutes, at staggered intervals. Completion of cell checks will be timely documented.

b) A qualified mental health or medical professional shall conduct check-ins at least once a week, to assess and document the health status of all prisoners in Segregation, and shall make referrals as necessary. The check-in shall include a brief conversation with each prisoner, a visual observation of the cell, and an inquiry into whether the prisoner would like to request a confidential meeting with a mental health or medical provider. Steps shall be taken to ensure effective communication, as well as auditory privacy consistent with security needs. When a prisoner in Segregation requests a confidential meeting with a mental health or medical provider, or the medical or mental health professional identifies a mental health or medical need, staff shall make appropriate arrangements to include triage, examination and treatment in an appropriate clinical setting. In such cases, staff shall give the prisoner the opportunity to complete a health care request but will otherwise initiate a referral without requiring the prisoner to complete a request form.

3. Response to Decompensation in Segregation

a) If a prisoner in Segregation develops signs or symptoms of mental illness where such signs or symptoms had not previously been identified, suffers deterioration in his or her mental health, engages in self-harm, or develops a heightened risk of suicide, the prisoner shall immediately be referred for appropriate assessment and treatment from a qualified mental health professional who will recommend appropriate housing and/or programming.

> b) Jail staff shall follow a mental health recommendation to remove a prisoner from Segregation unless such removal poses a current safety risk that is documented. In such a case, the Commander or management-level designee shall be notified and staff shall work to remove the prisoner from Segregation and secure a placement in an appropriate treatment setting at the earliest possible time.

**Compliance Status by Section:**

- VIII.C.1.
  - ACH Status: PARTIAL COMPLIANCE
    - MH staff provide case management to patients with serious mental illness who are in segregated housing.
    - 3E 100 was converted to single cells for patients on the MH caseload and eliminates need to classify as administrative segregation when MH recommends single-celled housing.
    - Developed 24 high acuity/high security male IOP beds at the Rio Cosumnes Correctional Center – the majority of patients admitted were housed in administrative segregation.
    - Collaboration occurred with Custody on the development of the RVR and Administrative Segregation referral form and trained custody on referral process in December 2021.
    - MH provided updated training on MH RVR and Administrative Segregation Reviews following SME recommendations related to Administrative Segregation assessment in April 2023.
    - MH continues to actively recruit for MH RVR/Ad Seg positions. As of May 2024, a supervisor and five clinicians have been hired.
    - MH established a Positive Behavioral Support Team that provides specific DBT interventions and staff consultation to address patient behaviors that interfere with patients participating in programming or being housed in the least restrictive setting.
    - Updated MH RVR and Administrative Segregation Assessment referral forms to improve communication between MH and Custody and ensure timely response to referral requests.
    - MH has staff available 7 days a week to complete RVR and Administrative Segregation Reviews.
    - MH RVR/Ad Seg supervisor and clinicians access ATIMS to ensure that all patients placed on Administrative Segregation and/or full discipline are identified and assessed by MH.
    - MH assigned a MH RVR/Ad Seg clinician to complete assessments at RCCC.
  - SSO Status: PARTIAL COMPLIANCE

- a) Current practice. Custody staff notifies ACMH immediately after an inmate is moved to disciplinary housing.
- b) The need to place prisoners with SMI into segregation has been greatly reduced: Objective ADSEG Forms reduce unnecessary segregation The MJ implemented a male OPP single celled housing unit with 30 beds on 3-East 100 Pod reduced those on ADSEG. The female IOP program was expanded with 8 high security beds to better service the SMI population.  A similar high security IOP program has been implemented at RCCC with total of 48 male beds. SSO and ACMH have added staffing to provide better services to this population.  MJ SSO and ACMH meets regularly to discuss confidential MH visits and troubleshoot non-compliance.  RCCC has multiple SMI programs. Inmates in IOP and JBCT are not in segregation/restriction housing. Disciplinary housing is issued only with clearance from ACMH staff assigned to these programs. Consultation with SMI inmates and ACMH in these programs are confidential.
- d) We are working to meet compliance with feedback from plaintiff's counsel. At the MJ female inmates with SMI are removed from segregation and placed into IOP which has was expanded with 8 more beds on 3W100. A similar high security IOP program has been implemented at RCCC.

- VIII.C.2.
  - ACH Status: PARTIAL COMPLIANCE
    - Began Administrative Segregation MH assessments in December 2021.
    - MH staff provide case management to patients with serious mental illness who are in segregated housing.
    - MH continues to collaborate with custody on efficient use of attorney booths for patients in administrative segregation.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - a) Current practice. Thje Lexipol Policy on Special Management of Incarcerated Persons was published on 05/14/2024.
    - b) At the MJ and RCCC custody staff provides access to inmates for medical and mental health staff. No inmate is denied a request for access to medical or mental health care regardless of housing or classification. If an inmate request to see medical they can fill out a kite if it is not an emergency. If it is an emergency, officers notify medical or mental health.  MJ SSO and ACMH meets regularly to discuss confidential MH visits and troubleshoot non-compliance.  At the Main Jail additional booths consisting  of plexiglass enclosures with doors situated in the indoor rec area of each housing unit will be constructed in 2024. Some booths will have a partition for safety as well as security desk/chair. Funding and BSCC approval pending.  SSO has purchased security

desk/chair (same used at Santa Clara SO), which allows leg shackles to be secured.  This allows clinicians to safely speak to higher security inmates in privacy without custody staff standing nearby.

- VIII.C.3.
  - ACH Status: PARTIAL COMPLIANCE
    - Patients developing signs/symptoms of decompensation are referred to mental health for assessment.
    - MH staff provide case management to patients with serious mental illness who are in segregated housing and monitor for decompensation.
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - a) Objective ADSEG Forms reduce unnecessary segregation. With the reduction of COVID Intake Pods, inmates on 8-West who have been stepped down off ADSEG will be redistributed to other floors with less restrictions. The MJ implemented a male OPP single celled housing unit with 30 beds on 3-East 100 Pod reduced those on ADSEG. The female IOP program was expanded with 8 additional beds to better service the SMI population.  A similar high security IOP program has been implemented at RCCC. SSO and ACMH have added staffing to provide better services to this population.
    - b) Numerous former inmates who were housed in segregated units have been distributed to the following mental health housing units in collaboration with ACMH: The MJ implemented a male OPP single celled housing unit with 30 beds on 3-East 100 Pod reduced those on ADSEG. The female IOP program was expanded with 8 additional beds to better service the SMI population.  A similar high security IOP program has been implemented at RCCC. SSO and ACMH have added staffing to provide better services to this population.

| **Placement of Prisoners with Serious Mental Illness in Segregation** |
|:---:|
| **(Section VIII; Provisions D.)** |
| **ACH Status: PARTIAL COMPLIANCE** |
| **SSO Status: PARTIAL COMPLIANCE** |

**D.  Placement of Prisoners with Serious Mental Illness in Segregation**

1. Prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit (2P, IOP, OPP) will not be placed in Segregation, but rather will be placed in an appropriate treatment setting – specifically, the inpatient unit or other Designated Mental Health Unit providing programming as described in Exhibit A-2.

2.  In rare cases where a prisoner with a mental health condition meeting criteria for placement in a Designated Mental Health Unit presents an immediate danger or significant disruption to the therapeutic milieu, and there is no reasonable alternative, such a prisoner may be housed separately for the briefest period of time necessary to address the issue, subject to the following:

   a)  The prisoner shall receive commensurate out-of-cell time and programming as described in Exhibit A-2 (including for IOP and OPP, 10 hours/week of group treatment/structured activities, 7 hours/week unstructured out-of-cell time, weekly individual clinical contact) with graduated programming subject to an individualized Alternative Treatment Program.

   b)  The prisoner shall receive the following:

      i.  As part of the weekly confidential clinical contact, the clinician shall assess and document the prisoner's mental health status and the effect of the current placement on his or her mental health, and determine whether the prisoner has decompensated or is at risk of decompensation.

      ii.  The weekly check-ins described in Section VIII.C.2.b shall supplement, and not be a substitute for, the weekly treatment session described herein.

      iii.  Treatment provided in the least restrictive setting that is appropriate based on the prisoner's circumstances.

      iv.  Privileges commensurate with the Designated Mental Health Unit program, unless modified in an Alternative Treatment Program based on individual case factors that are regularly reviewed.

      v.  Daily opportunity to shower.

3.  A prisoner with Serious Mental Illness requiring restraints (e.g., handcuffs, belly chains, etc.) shall not be denied clinically indicated group or individual treatment due to security factors, absent exceptional circumstances that are documented. Prisoners with Serious Mental Illness housed in Segregation who require restraints when out of cell shall have the opportunity to work their way out of restraints through graduated programming subject to an individualized Alternative Treatment Program.

**Compliance Status by Section:**

- VIII.D.1.
  - ACH Status: PARTIAL COMPLIANCE
    - Patients with a mental health condition meeting criteria for placement in a Designated Mental Health Unit (APU, IOP, OPP) are not to be placed in Segregation, but rather will be placed in an appropriate treatment setting – specifically, the inpatient unit or other Designated Mental Health Unit providing programming as described in Exhibit A-2.

- 3E 100 was converted to single cells for patients on the MH caseload and eliminates need to classify as administrative segregation when MH recommends single-celled housing.
- Developed 24 high acuity/high security male IOP beds at the Rio Cosumnes Correctional Center – the majority of patients admitted were housed in administrative segregation.
- Remains PARTIALLY COMPLIANT due to insufficient APU and IOP beds.

- o SSO Status: SUBSTANTIAL COMPLIANCE
    - Numerous former inmates who were housed in segregated units have been distributed to the following mental health housing units in collaboration with ACMH:
    - The MJ implemented a male OPP single celled housing unit with 30 beds on 3-East 100 Pod reduced those on ADSEG. The female IOP program was expanded with 8 additional beds to better service the SMI population.
    - A similar high security IOP program has been implemented at RCCC. SSO and ACMH have added staffing to provide better services to this population.
    - There sometimes is an objective reason or need to keep individuals separated from other inmates for safety or security reasons. Individuals are integrated into small groups for treatment whenever feasible to prevent segregation. Segregation is never based on SMI.

- VIII.D.2.
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - In rare cases where a patient with a mental health condition meeting criteria for placement in a Designated Mental Health Unit presents an immediate danger or significant disruption to the therapeutic milieu, and there is no reasonable alternative, that patient may be housed separately for the briefest period of time necessary to address the issue.,
    - Alternative Treatment Plans are utilized in IOP and Multidisciplinary Intervention Plans are utilized in OPP and EOP to address significant or dangerous behaviors or significant disruptions to the therapeutic milieu.
    - MH established a Positive Behavioral Support Team that provides specific DBT interventions and staff consultation to address patient behaviors that interfere with patients participating in programming or being housed in the least restrictive setting.
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - Current Practice and in collaboration with ACMH.  Rarely ever used. Often between the APU or IOP units, segregation is not needed.

- a) We are working to meet compliance with feedback from plaintiff's counsel. At both facilities, IOP will no longer remove patients that are disruptive without clinical assessment and agreement by ACMH. When patients are moved, they are monitored by ACMH through case management. Staff now has more options with the MJ single celled OPP pod, expanded female IOP program and RCCC's 48 bed male high security IOP unit.
- b. iv.)  Inmates in DMHUs housed without a cellmate receive program and recreation time with other inmates. Incentives programs are utilized as advised by ACMH staff. They generally exceed the 17-hour minimum per our weekly reports. ACMH determines when an inmate in these housing facilities must be housed in a solitary cell.  Custody has deferred all decisions related to property and privileges to ACMH unless deemed a safety or security risk which will be documented with articulable facts.  Two (2) dedicated deputies are assigned to the Acute Psychiatric Unit (2P) to facilitate programing during the day. Their schedule allows for coverage 12hrs day/7 days a week for better availability requested by ACMH. An additional deputy was added to the evening shift allowing for additional programing and treatment.
- b. v.) Current practice. Hygiene opportunities are available during any recreation time and incentivized in some programs

- VIII.D.3.
  - ○ ACH Status: PARTIAL COMPLIANCE
    - ▪ A patient with Serious Mental Illness requiring restraints (e.g., handcuffs, belly chains, etc.) shall not be denied clinically indicated group or individual treatment due to security factors, absent exceptional circumstances that are documented. Patients with Serious Mental Illness housed in Segregation who require restraints when out of cell have the opportunity to work their way out of restraints through graduated programming subject to an individualized Alternative Treatment Program.
    - ▪ MH developed 24 high acuity/high security male IOP beds at the Rio Cosumnes Correctional Center – the majority of patients admitted were housed in administrative segregation.
    - ▪ IOP patients who are subject to restrictions of property, privileges, or out-of-cell time are placed on an Alternative Treatment Plan.  The multidisciplinary team meets daily to discuss the patient's progress and the transition of the patient from ATP to general programming.
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE

| **Administrative Segregation** |
|:---:|
| **(Section VIII; Provisions E.)** |
| **ACH Status: N/A** |
| **SSO Status: PARTIAL COMPLIANCE** |

## E.  Administrative Segregation

1. Use of Administrative Segregation
   a) Only the Classification Unit can assign a prisoner to Administrative Segregation.
   b) The County may use Administrative Segregation in the following circumstances:
      i. Objective evidence indicates that a prisoner participated in a recent assault and the assaultive behavior involved an assault on staff or visitors, serious injury, use of a weapon, gang removals, or multiple prisoner assaults. Mutual combat situations that do not otherwise qualify for Administrative Segregation are excluded.
      ii. During a brief investigative period not to exceed ten days while Classification staff attempts to verify the need for Protective Custody or while the prisoner is awaiting transfer to another facility.
   c) The Compliance Commander shall have the authority to place prisoners in Administrative Segregation under the following circumstances:
      i. The prisoner poses an extraordinary safety risk and no other housing unit is sufficient to protect the prisoner from harm;
      ii. The prisoner has failed to integrate into a lesser restrictive housing setting because of repeated and recent history of assaultive behavior or current threats of violence associated with being in a lesser restrictive setting; or
      iii. Objective evidence indicates that the prisoner attempted to escape or presents an escape risk.
2. Notice, Documentation, and Review of Administrative Segregation Designations
   a) The Classification Unit shall document the rationale for designating a prisoner for Administrative Segregation in the classification file using objective evidence. For prisoners younger than 24, the Classification Unit shall consider the prisoner's age as a mitigating factor when assigning the prisoner to Administrative Segregation.
   b) Classification shall attempt to down-class prisoners to a lesser restrictive housing setting at the earliest possible opportunity, consistent with safety and security.
   c) County shall provide prisoners in Administrative Segregation with a written notice within 72 hours of the prisoner's initial placement in Administrative Segregation, explaining the reasons for the prisoner's Administrative Segregation designation and how the prisoner may progress to a lesser restrictive housing setting.

    d) Prisoners housed in Segregation units will, at least every thirty (30) days, receive face-to-face interviews in a private out-of-cell setting, consistent with individual security needs, to discuss progress and compliance with their individual case plan as part of a classification review. Consideration will be given to their mental health and to their appropriateness for transfer to a less restrictive setting.

    e) The Compliance Commander or higher-ranked officer will review and approve the decision to designate a prisoner for Administrative Segregation for longer than 15 days.

    f) The County shall document the reason the prisoner is retained in the same Administrative Segregation Phase. The prisoner will be given written notice of the reasons the prisoner is being retained in the same Phase of Administrative Segregation and what conduct the prisoner is required to exhibit to progress to a lesser restrictive housing setting.

    g) The Compliance Commander or higher-ranked officer must approve the continued retention of a prisoner in Administrative Segregation for longer than 90 days, and the Compliance Commander or higher-ranked officers must reauthorize such placement at least every 90 days thereafter.

3. Administrative Segregation Phases

    a) The County shall develop and implement a phased system for prisoners designated as Administrative Segregation to achieve a lesser restrictive housing setting.

    b) Administrative Segregation Phase I:

        i. This is the most restrictive designation for prisoners in Administrative Segregation.

        ii. Prisoners shall be offered a minimum of one hour per day out of cell time for a total of seven hours per week.

        iii. Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least five of the seven hours per week.

        iv. Prisoners shall not remain in Phase I for longer than 15 days unless the prisoner engages in new conduct warranting retention in Administrative Segregation as specified in Section VIII.E.1.b.

    c) Administrative Segregation Phase II:

        a. Prisoners shall be offered a minimum of 17 hours of out of cell time per week.

        b. Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least 10 of the 17 hours per week.

        c. Prisoners shall be offered the opportunity to program in groups of two to four prisoners, unless pairing with another prisoner is not possible for safety or security reasons, and those reasons are documented by the County.

        d. The County shall develop a program of incentives for good behavior.

        e. Prisoners shall not remain in Phase II for longer than 30 days unless the prisoner commits a serious behavioral violation while in Administrative Segregation: fighting; threatening staff or other prisoners; resisting or delaying an order from staff that impedes Jail operations (e.g., failure to lock down); refusing to

submit to a search of person or property; destroying or damaging Jail property (excluding property issued to a prisoner and/or minor defacing of property or destruction of low-value property) or facilities; possessing contraband that implicates safety or security (e.g., weapons, razors, unauthorized medication, but not extra clothing, commissary items, or food); cell flooding; tampering with cell locking mechanisms or other security features (e.g., cameras); and/or sexual activity/harassment. In the event a prisoner engages in a serious behavioral violation, the conduct will be referred to the Classification Sergeant or higher-ranking officer, who shall have the discretion to extend the prisoner's Phase II time by 15 days, and shall develop an individual behavioral management plan, if one does not yet exist for the prisoner.

**Compliance Status by Section:**

- VIII.E.1.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - The MJ has implemented ADSEG forms created in collaboration with Plaintiff's Counsel to objectively determine if an individual should be classified in ADSEG status. There forms are also used to objectively determine if continued ADSEG classification is appropriate consistent with this section.
      - a) Current practice. The Procedure on Special Management of Incarcerated Persons was updated on on 07/03/2024.
      - b. i.) The Main Jail uses the ADSEG classification review utilizing objective criteria and forms created with the assistance of DRC/PLO. Those placed in ADSEG are reviewed based on objective factors for segregation.  SSO continues to move towards compliance with input from Plaintiff's Counsel. While many inmates have been stepped down to GP they remain on floor 8-West. SSO agrees 8-West objectively appears to be a segregated housing unit.
      - b. ii.) We are working to meet compliance with feedback from plaintiff's counsel. More serious investigations, such as sexual assault, may take longer to conclude causing segregation to go beyond 10 days.
- VIII.E.2.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE

- ▪ Current practice as age is a potential mitigating factor to classification as an Administrative Segregation inmate. The Procedure on Special Management of Incarcerated Persons5 was published on 07/03/2024.
  - • a) Current practice as age is a potential mitigating factor to classification as an Administrative Segregation inmate. The Post Order regarding this topic has been approved.
  - • e) Current practice. The Procedure of Special Management of Incarcerated Personswas published on 05/15/2024.
- • VIII.E.3.
  - o ACH Status: N/A
  - o SSO Status: PARTIAL COMPLIANCE
    - ▪ c. a.) Out of cell time is monitored weekly but do not regularly receive 17 hours of out of cell time.
    - ▪ c. b.)  Out of cell time is monitored weekly but do not regularly receive 17 hours of out of cell time.
    - ▪ c. c.) Current Practice-when possible those on level 2 are grouped with other individuals.  This also helps maximize the time used.
    - ▪ c. d.) ACMH utilizes an incentive program consisting of commissary items for those on the MH caseload for good behavior.

| Protective Custody |
|---|
| **(Section VIII; Provisions F.)** |
| **ACH Status: N/A** |
| **SSO Status: PARTIAL COMPLIANCE** |

**F.  Protective Custody**

1. When a prisoner faces a legitimate threat from other prisoners, the County will seek alternative housing, by transferring the threatened prisoner to the general population of another facility or unit, or to a special-purpose housing (Protective Custody) unit for prisoners who face similar threats.
2. The County will not operate Protective Custody units with Segregation-type conditions of confinement. Prisoners placed in Protective Custody shall have the same programs and privileges as general population prisoners, absent exceptional circumstances that are documented.

3. The County shall create a policy that describes the process and criteria for placement of prisoners into Protective Custody. The County shall consult with Plaintiffs to develop such a policy.
4. Prisoners who are lesbian, gay, bisexual, transgender, or intersex (LGBTI) or whose appearance or manner does not conform to traditional gender expectations should not be placed in Segregation or Protective Custody solely on the basis of such identification or status, or because they are receiving gender dysphoria treatment.
    a) When a prisoner who is LGBTI or gender nonconforming faces a legitimate threat, the County shall identify alternative housing, with conditions comparable to those of general population. Privileges and out-of-cell time for this population will be documented and regularly reviewed by supervisory level staff to ensure appropriate housing, out-of-cell-time, and related conditions for this group of prisoners.
    b) In deciding whether to assign a transgender or intersex prisoner to a facility or program for male or female prisoners, the County shall consider on a case-by-case basis whether a placement would ensure the prisoner's health and safety, and the health and safety of other prisoners, giving serious consideration to the prisoner's own views.
    c) Jail staff will receive training on the unique issues of managing transgender prisoners, with refresher training at least bi-annually.
5. For prisoners who are LGBTI or whose appearance or manner does not conform to traditional gender expectations, the County shall identify the prisoner's preferred gender of jail staff who will perform searches of the prisoner. The County shall honor the request except in exigent circumstances when doing so is not possible.

**Compliance Status by Section:**

- VIII.F.1.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current Practice. Inmates who face threats from other inmates are transferred to other housing units of the same classification and not automatically classed to a higher security level.
- VIII.F.2.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - We are working to meet compliance with feedback from plaintiff's counsel. RCCC currently has re-entry programs for PC classifications and dorm style housing units with open dayroom.

- ▪ At the Main Jail, protective custody inmates are generally housed on 4-West with access to privileges consistent with general population. As we strive to meet compliance adjustments can be made to individual needs, housing location, and program availability to better serve this population.
- VIII.F.3.
  - ○ ACH Status: N/A
  - ○ SSO Status: Substantial Compliance
    - ▪ Lexipol Policy on Special Management of Incarcerated Persons was published on 05/14/2024.
- VIII.F.4.
  - ○ ACH Status: N/A
  - ○ SSO Status: PARTIAL COMPLIANCE
    - ▪ a) We are working to meet compliance with feedback from plaintiff's counsel.
    - ▪ c) A lesson plan and PowerPoint has been implemented for the topic of Cultural Awareness, which covers managing transgender prisoners.  This training has been provided in the Adult Corrections Officer Supplemental Core Course starting 2021 with all new hires. This course will be transitioned into an online bi-annual refresher training.
- VIII.F.5.
  - ○ ACH Status: N/A
  - ○ SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current practice.  Statement of preference form completed by TGNI prisoners allowing them to request the gender of searching officer.

| **Disciplinary Segregation**<br>**(Section VIII; Provisions G.)** |
|---|
| **ACH Status: N/A** |
| **SSO Status: SUBSTANTIAL COMPLIANCE** |
| **G.  Disciplinary Segregation** |

1. The County will not place a prisoner in disciplinary housing pending investigation of, and due process procedures for, an alleged disciplinary offense unless the prisoner's presence in general population would pose a danger to the prisoner, staff, other prisoners or the public.
2. The County will adhere to a discipline matrix, developed in consultation with Plaintiffs, that clearly defines when disciplinary housing may be imposed.
3. Prisoners who are found to have violated disciplinary rules following due process procedures will be placed in Segregation only after the County has determined that other available disciplinary options are insufficient, with reasons documented in writing.
4. The denial of out-of-cell time for more than four (4) hours will not be imposed as a sanction absent a formal disciplinary write-up and due process hearing.
5. Prisoners serving a Disciplinary Segregation term shall receive at least seven (7) hours per week of out-of-cell time. Out-of-cell time with the opportunity to exercise shall be provided to each prisoner one (1) hour a day, seven (7) days per week.
6. Prisoners in Disciplinary Segregation shall, absent an individualized assessment of security risk that is documented be provided at least one book (which prisoners may regularly exchange), legal documents, hygiene materials, legal phone calls, and legal visits.
7. No Disciplinary Segregation term for non-violent rules violations will exceed 15 days.
8. The County will, in consultation with Plaintiffs' counsel, modify its inmate discipline policy and practice to limit placements in Disciplinary Segregation conditions to no more than 15 days, absent cases of serious violations stemming from distinct incidents and with Watch Commander-level approval.
9. No prisoner shall be placed in Disciplinary Segregation for more than 30 consecutive days.
10. If after a Disciplinary Segregation term, Jail staff, with the input of a mental health clinician, determine that the prisoner cannot safely be removed from Segregation, placement on Administrative Segregation status may occur only subject to the process set forth in Section VIII.E.
11. Once a prisoner has been moved out of Disciplinary Segregation, that prisoner shall not be placed back into Disciplinary Segregation absent (a) a new incident warranting discipline, and (b) completion of all mental health review procedures required for new Segregation placements.

**Compliance Status by Section:**

- VIII.G.1.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current practice. The Procedure on Disciplinary Separation was published on 05/14/2024.
- VIII.G.2.
  - ACH Status: N/A

- - SSO Status: SUBSTANTIAL COMPLIANCE
    - Both facilities utilize a discipline matrix approved in 2023.
- VIII.G.3.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current practice. If an inmate's discipline warrants a segregation he/she will be moved to that housing and it is documented.
- VIII.G.4.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current Practice.  All Shift Supervisors and Watch Commanders have been notified any denial of out of cell time for more than four (4) hours requires a due process hearing. The Procedure on Disciplinary Separation was published on 05/14/2024.
- VIII.G.5.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current Practice.  We have been continuously messaging out-of-cell times to include Disciplinary Segregation. This is monitored weekly by the Compliance Units.
- VIII.G.6.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current practice.  Numerous books, recommended by Plaintiff's Counsel, have been purchased.  Book exchange is available daily and upon request.
- VIII.G.7.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER.
- VIII.G.8.
  - ACH Status: N/A

- o SSO Status: SUBSTANTIAL COMPLIANCE
  - ▪ Current practice. The Procedure on Disciplinary Separation was published on 05/14/2024.
- VIII.G.9.
  - o ACH Status: N/A
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current practice, contained in Discipline Housing Procedure.
- VIII.G.10.
  - o ACH Status: N/A
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current practice. SEE DISCIPLINARY SEGREGATION POST ORDER
- VIII.G.11.
  - o ACH Status: N/A
  - o SSO Status: SUBSTANTIAL COMPLIANCE
    - ▪ Current practice. The Procedure on Disciplinary Separation was published on 05/14/2024.

| **Avoiding Release from Jail Directly from Segregation** |
| :---: |
| **(Section VIII; Provisions H.)** |
| **ACH Status: N/A** |
| **SSO Status: PARTIAL COMPLIANCE** |
| **H. Avoiding Release from Jail Directly from Segregation**<br><br>1. The County will avoid the release of prisoners from custody directly from Segregation-type housing, to the maximum extent possible.<br>2. If a sentenced prisoner housed in Segregation has an upcoming expected release date (i.e. less than 120 days), the County will take and document steps to move the prisoner to a less restrictive setting, consistent with safety and security needs. If Segregation becomes necessary during this time, the County will provide individualized discharge planning to prepare the sentenced prisoner for release to the community. |

**Compliance Status by Section:**

- VIII.H.1.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - The Procedure on Special Management of Incarcerated Persons was published on 07/03/2024.
- VIII.H.1.
  - ACH Status: N/A
  - SSO Status: PARTIAL COMPLIANCE
    - The Procedure on Special Management of Incarcerated Persons was published on 07/03/2024.

| No Food-Related Punishment |
|---|
| **(Section VIII; Provisions I.)** |
| ACH Status: N/A |
| SSO Status: SUBSTANTIAL COMPLIANCE |
| **I.  No Food-Related Punishment** <br><br> 1. The County shall modify its policy and take steps to ensure that the denial or modification of food is never used as punishment. The County shall eliminate use of "the loaf" as a disciplinary diet. Nothing in this paragraph shall be read to preclude the County from denying a prisoner use of the commissary. |

**Compliance Status by Section:**

- VIII.I.1.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current practice. The Policy on Disciplinary Separation was published on 05/15/2024.

| **Restraint Chairs**<br>**(Section VIII; Provisions J.)** |
|---|
| **ACH Status: SUBSTANTIAL COMPLIANCE** |
| **SSO Status: SUBSTANTIAL COMPLIANCE** |
| **J.  Restraint Chairs**<br><br>  1.  Restraint chairs shall be utilized for no more than six hours.<br>  2.  The placement of a prisoner in a restraint chair shall trigger an "emergent" mental health referral, and a qualified mental health professional shall evaluate the prisoner to assess immediate and/or long-term mental health treatment needs.<br>  3.  The opinion of a qualified medical professional on placement and retention in a restraint chair will be obtained within one hour from the time of placement. |

**Compliance Status by Section:**

- VIII.J.1.
  - ACH Status: N/A
  - SSO Status: SUBSTANTIAL COMPLIANCE
    - Current practice. The Policy on Use of Restraints Policy was updated 05/15/2024.  It should be noted the Sheriff's Office no longer uses the restraint chair but many of these practices have transferred over to the utilization of the WRAP restraint device.

- VIII.J.2.
  - ACH Status: N/A
    - See SSO Response.
    - The placement of a prisoner in a restraint chair triggers an "emergent" mental health referral, and a qualified mental health professional evaluates the prisoner to assess immediate and/or long-term mental health treatment needs.
    - MH assesses patients referred by SSO in a WRAP within emergent timelines to care requirements.
  - SSO Status: PARTIAL COMPLIANCE
    - The Use of Restraints Policy was updated 05/15/2024.  After SME review, changes to the policy will outline the mergent referral.

- VIII.J.3.

- o ACH Status: PARTIAL COMPLIANCE
  - ▪ MH assesses patients referred by SSO in a WRAP within an emergent timelines to care requirements.
- o SSO Status: PARTIAL COMPLIANCE

## IX.  QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT

| **Generally** |
|---|
| **(Section IX; Provisions A.)** |
| **ACH Status: SUBSTANTIAL COMPLIANCE** |
| **SSO Status: N/A** |
| **A.  Generally**<br><br>1. The County shall develop and implement, in collaboration with Plaintiffs' counsel, a quality assurance ("QA") plan to regularly assess and take all necessary measures to ensure compliance with the terms of this Remedial Plan.<br>2. The QA/QI Unit shall meet regularly and include representatives from all levels of the organization and from all facilities. The meeting shall include custody representatives for topics that are relevant to custody operations.<br>3. The County shall provide sufficient resources to the QA/QI program. |

Prior to the Remedial Plan, there were limited Quality Improvement (QI) policies and practices as a result of no dedicated staff, no data, and no QI audits.  Extensive actions have been taken to expand the QI structure as listed below.

**Compliance Status by Section:**

- IX.A.1
  - o ACH Status: SUBSTANTIAL COMPLIANCE
    - ▪ Many data reports have been developed and will continue to be developed – including audit reports and semiannual data reports. This provision will be in substantial compliance when all provisions of the consent decree are monitored by QI.

- QI audits are developed as policies are implemented and staff are trained to audit.
- Staff continues to audit areas of focus on a regular basis.  Examples include disability identification and documentation, diabetes management, and referrals at intake.  Audit data is shared with service line managers for appropriate actions.
- Several new audits were developed and conducted during the monitoring period.  Examples include chronic disease management, health service request audits, and onsite monitoring audits.
- New audit tools are continuously being developed.
- Consent Decree training was developed and provided to medical and mental health staff in late 2021 and early 2022.  The training is provided to new staff during new hire orientation.
- A Utilization Review (UR) team formed in December 2022 and met to discuss UR tools and other logistics.
- Monthly Continuous Quality Improvement meetings started March 2023 to review randomly selected cases pulled from patient grievances.
  - The review team includes a provider, QI RN, QI Coordinator, QI Director, and Medical Director.
  - Targeted reviews may result from the original UR and tools will be revised as needed.
  - SSO Status: N/A
- IX.A.2.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - Quality Improvement Committee and several subcommittees (Pharmacy & Therapeutics, Mental Health QI, and Safety) meet quarterly.  The meetings are multidisciplinary.
    - The Suicide Prevention Subcommittee changed to monthly meetings, effective November 2021.
    - A Utilization Management Subcommittee was formed and began meeting quarterly in October 2021.
    - The Safety Subcommittee will be refocused to include infection control in 2023 and led by a designated QI Coordinator.
    - QI staff updated a list of reports and created a list of audits based on the indicators listed in the Remedial Plan. The lists clarify types of data for review in each subcommittee.  These documents have been reviewed with service line managers in the Quality Improvement Committee and the MH QI Committee. QI will monitor progress.
  - SSO Status: N/A
- IX.A.3.
  - ACH Status: SUBSTANTIAL COMPLIANCE

- The QI team currently includes a total of nine (8) positions, including:
  - QI Director
  - Two (2) QI Coordinators
  - Two (2) QI Nurses
  - Two (2) Senior Office Assistants
  - Administrative Services Officer II
- The Training Coordinator position was moved under Nursing, effective December 2023.
- The two QI Nurse positions were filled and began employment in late May and early June 2022. One of the QI nursing positions became vacant in October 2023 and was promptly filled in December 2023.
- Currently, one vacant Senior Office Assistant as of 06/01/2024.
- A new Health Program Manager position (QI Director) was approved in the budget for FY 2022/23 and started in January 2023.
  - The QI Director will lead the QI team and take point on the Consent Decree planning, which has been led by the Health Services Administrator.
- The Administrative Services Officer II position was filled and started March 2023.
- The demands of the QI team continue to grow and therefore the need for additional positions continue to grow as well. However, this growth was not approved in the 24/25 budget.
- SSO Status: N/A

| Quality Assurance, Mental Health Care |
|---|
| (Section IX; Provisions B.) |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: N/A |
| **B.  Quality Assurance, Mental Health Care** |
| 1.  The JPS Medical Director, the JPS Program Manager, jail administrators, and the medical psychiatric, dental, and nursing directors, or appropriate designees, will attend and participate in this process at a minimum of every quarter. Formal minutes will be taken and maintained whenever the committee convenes. |
| 2.  The mental health care quality assurance plan shall include, but is not limited to, the following:<br>    a)   Intake processing; |

b) Medication services;

c) Screening and assessments;

d) Use of psychotropic medications;

e) Crisis response;

f) Case management;

g) Out-of-cell time;

h) Timeliness of clinical contacts;

i) Provision of mental health evaluation and treatment in confidential settings;

j) Housing of inmates with SMI, including timeliness of placements in higher levels of care and length of stay in various units;

k) Number of commitments pursuant to Welf. & Inst. Code § 5150, et seq.;

l) Use of restraint and seclusion;

m) Tracking and trending of agreed upon data on a quarterly basis;

n) Clinical and custody staffing;

o) Morbidity and mortality reviews with critical analyses of causes or contributing factors, recommendations, and corrective action plans with timelines for completion; and

p) Corrective action plans with timelines for completion to address problems that arise during the implementation of this Remedial Plan and prevent those problems from reoccurring.

3. The County will conduct peer and supervisory reviews of all mental health staff and professionals at least annually to assess compliance with policies and procedures and professional standards of care.

**Compliance Status by Section:**

- IX.B.1.
  - ACH Status: SUBSTANTIAL COMPLIANCE
    - Mental health representatives participate in all QI meetings. There are three specific mental health multidisciplinary subcommittees: Mental Health (chaired by the MH Program Manager), Suicide Prevention (chaired by the MH Medical Director). The MH QI Subcommittee meets quarterly, and Suicide Prevention Subcommittee meets monthly. The chair will attend all subcommittee meetings or will assign a designee.
  - SSO Status: N/A
- IX.B.2.
  - ACH Status: SUBSTANTIAL COMPLIANCE

- Audit tools and reports have been developed related to mental health and suicide prevention Remedial Plan provisions and include:
  - Emergent, Urgent and Routine Timelines to Care Report
  - Health Service Requests-Timelines to Care
  - Confidential Contacts-Main Jail & RCCC
  - APU Involuntary Detention Audit
  - APU Daily Patient Activity Report
  - APU Clinical Restraint Report
  - MH Referrals and Encounters
  - Prescriber Audit
  - Medication Refusals Audit
  - MDIP Outcome Report
  - APU Discharge Follow-ups-Timelines to Care
  - MH Groups Scheduled & Canceled
  - Suicide Precautions Quarterly Audit
  - Suicide Risk Assessment & Safety Planning
  - MDT & Treatment Plan Report
  - MH RVR Audit-Main Jail & RCCC
  - Medication Verification and Initiation
  - Planned and Unplanned Use of Force Referrals & Assessments
- **Audit tools and reports in development:**
  - Administrative Segregation Referrals and Assessments
  - Groups scheduled, canceled & average number of hours of treatment offered, attended and canceled per patient, per week
  - Expanded Census Report that includes all data aspects as defined by Consent Decree
  - APU Clinical Restraint Audit
  - Adaptive Support Plan Report

- ▪ Morbidity and Mortality reviews of serious suicide attempts are reviewed at each Suicide Prevention Subcommittee meeting.  Staff adopted a Review Checklist suggested by the Suicide Prevention expert.
    - ▪ Committee Chairs are responsible to ensure indicators are reviewed and tracked.
  - o SSO Status: N/A
- IX.B.3.
  - o ACH Status: PARTIAL COMPLIANCE
    - ▪ All MH staff undergo performance evaluations every year.  MH is also working on implementing a peer review process.
    - ▪ In May 2024, MH completed an initial Psychiatric Prescriber Audit and identified the following areas of substantial compliance:
      - 92% establishing target treatments and assessing progress toward goals
      - 94% conducting in-person meetings, if indicated, when making medication changes
      - 100% monitoring for adverse impacts/side effects
      - 100% monitoring for treatment efficacy
    - ▪ Areas for improvment included: ordering ECG for patients on antipsychotics and ensuring completion of routine labs for patients prescribed antipsychotics, mood stabilizers and/or antidepressants.
  - o SSO Status: N/A

| Quality Assurance, Medical Care |
| :--- |
| **(Section IX; Provisions C.)** |
| ACH Status: PARTIAL COMPLIANCE |
| SSO Status: N/A |
| **C.  Quality Assurance, Medical Care** |
| 1.   The County shall establish a Quality Assurance/Quality Improvement (QA/QI) Unit to develop accurate tracking mechanisms and monitor the timeliness and effectiveness of the following processes of health care, ensuring that all are reviewed at least annually, and shall recommend corrective action for all deficiencies:<br>a)   intake screenings; |

b) emergent, urgent, and routine requests from patients and staff referrals for health care, including Health Service Request availability;

c) clinical monitoring of patients, including the delivery of chronic care services to those patients who qualify as chronic care patients;

d) prescriptive practices by the prescribing staff;

e) medication administration, including the initiation of verified medications, the first doses of medications, medication errors, patient refusals, and patterns of medication administration;

f) grievances regarding healthcare;

g) specialty care (including outside diagnostic tests and procedures);

h) clinical caseloads;

i) coordination between custody staff and medical staff, including escorts to medical appointments and delivery of care.

2. The studies shall be done with sufficient sample numbers to arrive at statistically valid conclusions. The studies shall include (a) a clearly articulated goals, objective, and methodology to determine if standards have been met, including a sampling strategy; (b) data collection; (c) analysis of data to identify trends and patterns; (d) analysis to identify the underlying causes of problems; (e) development of remedies to solve problems; (f) a written plan that identifies responsible staff and establishes a specific timeline for implementing remedies; (g) follow-up data collection; and (h) analysis to determine if the remedies are effective.

3. The QA/QI Unit study recommendations shall be published to all staff.

4. The County will conduct peer and supervisory reviews of all medical staff and professionals at least annually to assess compliance with policies and procedures and professional standards of care.

**Compliance Status by Section:**

- IX.C.1. PARTIAL COMPLIANCE
  - ACH developed a Quality Assurance/ Quality Improvement (QA/AI) continuous quality improvement (CQI) program, which has implemented several tracking systems and audits to monitor to timeliness and effectiveness of health care delivery consistent with community standards.  Corrective Action Plans are developed and implemented to address areas of deficiency.
  - IX.C.1.a. – i.
    - Audits include, but are not limited to, the following:
      - Nurse Intake Audits monitoring referrals at intake and ADA identification and documentation.
      - Access to Care Audit monitoring timeliness of emergent, urgent, and routine requests from patients and staff from Health Service Requests.

- Chronic Disease Management Audit monitoring delivery of chronic care services for those with chronic conditions. A separate Chronic Disease Management- Diabetes Management, specifically assesses the quality of services related to Diabetes.
- Medication Initiation and Renewal Audit monitoring initiation of verified medication, first dose of medications, medication errors, and patient refusals.
- Grievance Report monitors all grievances by type, service area, frequency, and response timeliness.
- Specialty Care Audit, which includes monitoring service types and appointment timeliness. QI and Case Management will include onsite specialty clinics in a separate Onsite Specialty Care Audit during the next fiscal year.
- Withdrawal Monitoring Audit analyzes the frequency and timeliness of required face-to-face monitoring, medication, and referrals as appropriate.
- QI tracks SSO escort allocation for daily medical activities and delivery of care. Since the last monitoring period, QI developed a Daily Huddle template and implemented Daily Huddle meetings to ensure continuous coordination between custody and medical staff.
    - Additionally, the ACH and SSO leadership team meets in person monthly to discuss operational needs and plans.
  - ACH continues to develop audits to monitor clinical caseloads, prescriptive practices by prescribing staff, and coordination between medical staff and SSO Custody, including medical appointments and delivery of care.
  - ACH QI had adopted the medical Subject Matter Expert's recommendation to expand the timeframes of audits and avoid "point-in-time" data collection. This element will be reflected in audits moving forward.
  - As audits are completed, service line directors are required to submit Corrective Action Plans for deficiencies that do not improve over time.
- IX.C.2. PARTIAL COMPLIANCE
  - Studies are completed with sufficient sample numbers, include clear goals, objectives, and methodology to determine if standards are met, including sampling strategy. Studies include overall findings, recommendations, and comparative analysis.  The underlying causes of the problems are reflected in the audits' findings section.
    - As stated above, QI has improved the sampling strategy and expanded the data collection timeframes as opposed to "point-in-time" sampling, as recommended by the medical SME.

- o QI is continuously improving efforts to implement recommendations derived from the audits via corrective action plans and monthly Continuous Quality Improvement (CQI) meetings. Corrective Action Plans and CQI identify responsible staff and specific timelines for implementing improvement strategies.
- o QI uses Plan-Do-Study-Act (PDSA) for focused interventions.
- IX.C.3. SUBSTANTIAL COMPLIANCE
  - o QI shares recommendations in Executive team meetings, Quality Improvement Committee meetings, and subcommittee meetings as appropriate.
  - o Medical representatives participate in all QI meetings.  Each forum is quarterly.
  - o QI Committee Chairs are responsible for ensuring indicators are reviewed and tracked. Recommendations and corrective actions are discussed, and follow-up is conducted as needed.
  - o Since the last report period, audits and recommendations are now published on ACH intranet for all staff.
- IX.C.4. PARTIAL COMPLIANCE
  - o QI staff have created and implemented a UR nurse chart review tool and began utilizing it in the monthly CQI Chart review meetings. In-person observation audits are conducted on the nurse intake, HSR, and Withdrawal Monitoring processes. QI will continue to work on additional review tools in the next monitoring period as well as in-person audits on medication administration and mouth-check adherence.
  - o Performance Evaluations are required annually for permanent County staff and more frequently for probationary staff (ACH PP 03-09 Performance Evaluations).
    A Physician Peer Review process is currently being developed under the leadership of the new Medical Director

## COUNTY EFFORTS TO REDUCE THE JAIL POPULATION

Sacramento County (representatives from the County Executive's Office, criminal justice partners, SSO, DHS Behavioral Health, and ACH) is engaged in many efforts to reduce the jail population.  On August 10, 2021, the County Executive proposed and the Board of Supervisors (BOS) approved an ordinance to create a new Public Safety and Justice Agency, headed by a Deputy County Executive. The recruitment and hiring was completed in February 2022 for the Deputy County Executive who now oversees efforts to reduce the jail population and compliance with the Consent Decree. County efforts with justice partners have produced some progress with justice reforms, programs and services necessary to reduce the jail population. Guided by expert reports, ongoing input and feedback from social service and justice agencies, other stakeholders and advisory groups, Class Counsel and the community, the County will

continue existing efforts and begin new efforts identified in updated plans. In early 2023, the County continued development of timeline and cost estimates as well as metrics for items in the Jail Population Reduction Plans.  In 2024, the County revised its methodology to consolidate the original 33 individual plan items within six strategies that apply additional more in-depth analysis and prioritization of tasks and projects for reducing the jail bookings, length of stay, and returns to custody.  Collectively, full implementation of plans is estimated to reduce the average daily jail population by 600, from a baseline of approximately 3,200, through incarceration alternatives and individualized services that safely reduce the number of people booked into the jail, the average length of stay in jail, and returns to custody.

See the BOS meetings webpage for the following status updates provided regarding efforts:

- BOS Meeting dated 10/22/2019, Item #66 (*Report on County Efforts to Reduce the Jail Population*).

- BOS Meeting dated 03/10/2021, Item #3 (*Workshop – Review the Design-Build Process Related to the Correctional Health and Mental Health Services Facility Project, And Approve Contract No. 81555*…)

- BOS Meeting dated 08/10/2021, Item #2 (*Adopt An Ordinance Amending Various Sections Of Chapter 2.09 And Chapter 2.61 Of the Sacramento County Code Related To Creation Of A Public Safety And Justice Agency,…*)

- On 02/15/2022, the BOS authorized the appointment of the new Deputy County Executive (DCE) for the Public Safety and Justice Agency.

- BOS Meeting dated 06/14/2022, the new DCE presented a charter to establish a Public Safety and Justice Agency (PSJA) Advisory Committee to provide a community voice in dialogue on decreasing the jail population, recognizing the importance of including voices of individuals with lived experiences and those most closely impacted by incarceration.

  o PSJA Advisory Committee began meeting in October 2022

- BOS Meeting dated 09/14/2022, the County held a workshop with the Board of Supervisors to share the status of ongoing efforts to identify and address criminal justice system issues, including those specified in the Mays Consent Decree. This included public release of reports completed by Nacht and Lewis, experienced architecture firm, and Kevin O'Connell, a criminal justice and behavioral health data analytics expert Main Jail Improvement Report - Analysis indicates to meet needs, the Main Jail's capacity must be reduced to 1,357 beds from its rated capacity of 2,397 – a loss of 1,040 beds or nearly 44% to get closer to compliance, but substantial compliance with all consent decree requirements is not possible within the Main Jail;

- BOS Meeting dated 12/08/2022, deliberations on recommendations presented 12/07/22 regarding Jail Population Reduction Plans and Plans to address Jail Facility Deficiencies for the Mays Consent Decree resulted in their approval.

- At the 3/28/2023 BOS Meeting, the Department of Health Services was authorized to apply for and accept $1,700,000 in CalAIM Providing Health and Transforming Health Justice-Involved (PATH JI)Capacity Building Round 2 funding for implementation of the Social Health Information Exchange (SHIE) and to designate the Department of Human Assistance as the entity responsible for assisting county jail inmates and youth with submitting an application for, or otherwise assisting with their enrollment in a health insurance affordability program. Planning is in process to develop a Social Health Information Exchange (SHIE) for integration of health, housing and justice data.  A consultant has been hired and work is in process. This work to implement and procure information technology (IT) infrastructure and application products has been incorporated in Jail Population Reduction Plans.

  - SHIE will serve low-income communities through the development of countywide data infrastructure that links medical, behavioral health, social service and housing data from multiple sources. It will enable care coordination between health and social service providers in Sacramento County, and support health equity by allowing providers to identify and serve vulnerable low-income individuals during emergencies such as COVID-19. Establishing the Social Health Information Exchange in Sacramento County is an approximately three-year initiative that aligns with CalAIM. The Department of Technology will assist with the procurement process which includes the development of the appropriate RFPs, the selection and the negotiation of the vendor contract and development/implementation of Social Health Information Exchange System.

- At the BOS Meeting dated 4/19/2023, an update was provided on the County's progress toward implementation of Framework 1 (Implementation of Jail Population Reduction Plans) and Framework 2 (Construction to Remediate Jail Facility Deficiencies) for Mays Consent Decree compliance.  Another quarterly update on implementation of Jail Population Reduction Plans (15 New Recommendations, 18 Existing, 33 Total Strategies) will be provided in July or August 2023.

- Ongoing planning for implementing expansion of a Medi-Cal benefit called CalAIM to better serve justice involved individuals. The State has delayed the component for the justice involved population which was targeted for January 2023.  Planning will continue.

- At the BOS Meeting dated 6/7/2023, the County's FY 2023-24 Recommended Budget was approved with growth funding added for programs and services to comply with the Mays Consent Decree.

- At the BOS Meeting dated 6/13/2023, the Public Safety and Justice Agency was authorized to execute a revenue agreement with the Department of State Hospitals to provide annual funding for the collaborative stakeholder workgroup program and an agreement with O'Connell Research, Inc. to produce strategies and solutions that reduce criminalization of individuals with serious mental illnesses and reduce the number of individuals who are determined to be Incompetent to Stand Trial on felony charges in Sacramento County. The work will align with and expand upon previous work with O'Connell Research, Inc. related to the County's efforts in support of the Stepping Up Initiative (Resolution 2019- 0043), the Data Driven Recovery Project (Resolution 2019-0687), and the Mays Consent Decree Jail Population Reduction Plans approved December 8, 2022.

- At the Board of Supervisors (BOS) Meeting dated, 4/9/2024, the County's Jail Population Reduction Plans Annual Update provided a revised methodology that consolidates the original 33 individual plan items within six strategies that apply additional more in-depth analysis and prioritization of tasks and projects for reducing the jail bookings, length of stay, and returns to custody. Some highlights in the update included a 6% reduction in average daily jail population from 2021 to 2023, expansion of mental health and crisis resources fostering continued collaboration across systems and the community, a new pre-arraignment release policy that added another avenue for release decisions within 18 hours of booking, significant growth in Mental Health Diversion, efforts to support expansion of resources available to jail inmates at release including partnership work on expansion of care coordination through CalAIM Justice-Involved Initiative and Social Health Information Exchange (SHIE).

- At the BOS Meeting dated 6/5/2024, the County's FY 2024-25 Recommended Budget approved funding to sustain positions and services added and expanded in FY 2023-24 for services provided through the Conflict Criminal Defender, Probation, and Public Defender. Additionally, strong levels of funding were sustained and added for treatment and support services to people going through the justice system, consistent with jail population reduction, behavioral health, and housing initiatives.


**Active Programs:**

Mental Health Treatment Center (MHTC): Provides short term comprehensive acute inpatient mental health services, 24/7, for adults 18 and older experiencing a mental health crisis and/or condition. The County's Intake Stabilization Unit (ISU) provides up to 23-hour crisis stabilization and intensive services in a safe 4 environment. The ISU responds to hospital ED staff and law enforcement calls 24/7, provides direct access from the mobile crisis support teams and SB82 triage navigator program, and receives adults and minors that have been medically cleared for 24/7 crisis stabilization services. In April 2023, the ISU increased from 5 to 25 beds available for 5151

holds from law enforcement. This was done in response to the Jail Population Reduction Plans Law Enforcement Booking Alternatives Workgroup request for additional involuntary options for people experiencing mental health crisis.

Pretrial Assessment and Monitoring: Probation (lead agency) receives local funding and grant funding from the Superior Court to utilize the Public Safety Assessment (PSA) tool to inform pretrial release and monitoring decisions based on risk of failure to appear (FTA), risk of new criminal activity, and risk of new violent criminal activity.  Pretrial Monitoring began as a pilot program in October 2019. It now serves as a permanent resource for the court to support additional pretrial release, community safety, and successful returns to court after release from jail. Probation conducts assessments on individuals booked into custody and monitors individuals released to Pretrial by the Superior Court at no cost to the client. Monitoring can include court reminder telephone calls, office visits, community visits and GPS monitoring. Pretrial monitoring expanded to include support and monitoring for clients the court has granted Felony Mental Health Diversion with pretrial monitoring. Superior Court has released 8,300 clients on Pretrial Monitoring from October 2019 through May 2024. With additional officers added specifically for Mental Health Diversion clients, the number of clients receiving monitoring services increased 25% from 724 in January 2024 to 906 in May 2024

- BOS Meeting dated 12/14/2021, Item #25 (Authorization To Execute A Memorandum of Understanding With The Superior Court…For The Pretrial Release Program…)

Public Defender Pretrial Support Project (PTSP): Public Defender (lead agency) received a grant from the Bureau of Justice Assistance (BJA) to develop and operate a pretrial support program using evidence-based tools to interview jail inmates prior to arraignment to identify needs, provide social worker support/case management (in custody and in the community), link to services, and coordinate safe discharge plans. Pretrial defendants started receiving screening through this program in January 2021. The BOS subsequently approved additional county funds to expand this program in both fiscal years 2022-24, and at the December 14, 2021 BOS meeting (item #27) through approval of an MOU between the Public Defender's Office and Superior Court for additional grant funds from December 15, 2021 through December 2023 for PTSP to provide supplemental services (transitional housing, transportation from jail and to court/probation/services, behavioral health intervention, employment, phone, clothing, etc.) to clients released on Pretrial Monitoring. In March 2022, the Exodus Project was contracted to connect community intervention workers with PTSP social workers to provide additional support to individuals released under the Pretrial Support Project. County funding and ongoing grant funds from Superior Court continue to support PTSP.

Dept. of State Hospitals Pretrial Felony Mental Health Diversion: Public Defender (lead agency) received a grant from the Department of State Hospitals (DSH) to implement a Pretrial Mental Health Diversion Program. The target population includes adults with serious mental illness charged with felonies that are incompetent to stand trial or at risk of being mentally incompetent to stand trial (IST). Public Defender contracted with Telecare to provide services. Through additional grant funds from DSH in March 2023 through June 2024, Telecare increased from a capacity of 50 with housing for 25 to serve up to 100 individuals with housing for 50. DSH ended the

pilot funds for Felony Mental Health Diversion in June 2024. Working with the Department of Health Services and the service provider, the Public Defender's Office successfully ended the pilot program with DSH June 30, 2024. Because of the success and need for the program, DSH established a new permanent Felony IST Mental Health Diversion grant program starting July 2024. The Dept. of Health Services is the leading agency on the new program that continues to use Telecare to provide treatment services for Felony IST individuals the Court has granted Mental Health Diversion. The new program is serving up to 60 new clients per year.

Mental Health Diversion began when AB 1810 was signed into law June 27, 2018, but the eligibility requirements changed over the years, with the biggest change being a significant expansion of eligibility that went into effect January 2023. Currently, Mental Health Diversion includes the following requirements, per Penal Code Section 1001.35 and 1001.36:

- Nexus is presumed so long as diagnosis within 5 years, 1001.36 (b)(1)
- DA has burden to prove that a nexus does not exist, 1001.36 (b)(2)
- Individuals granted MHD IST do not have to give consent or waive rights to a speedy trial, 1001.36 (c)(2)
- Felony case = 2 year max, Misdemeanor case= 1 year max, 1001.36 (f)(1)(C)
- Defines "qualified expert", 1001.36 (f)(2)
- Outlines circumstances court shall hold a hearing once granted, 1001.36(g)

Since January 2023, Mental Health Diversion has grown significantly. In calendar year 2023, the Court made decisions on nearly 600 Mental Health Diversion applications from felony defendants. County partners are working to improve collaboration and coordination along with increased efficiency so the growth in Mental Health Diversion can help advance jail population reduction efforts to link individuals to community-based services designed to prevent future criminal activity and reduce returns to custody.

Crisis Receiving for Behavioral Health (CRBH): Formerly the Substance Use Respite & Engagement (SURE) Program, operated by WellSpace Health 24 hours a day 7 days a week at 631 H St., is conveniently located behind the Main Jail. CRBH provides short-term (4-12 hour) recovery, detox, and recuperation from effect of acute alcohol/drug intoxication or behavioral health crisis. Staffed by healthcare professionals to provide medical monitoring, SUD counseling, and connections to supportive services and transportation to service partner or home after completion of short-term recovery. Clients are referred by partner agencies, no walk-ins. Outreach efforts to law enforcement increased to ensure they are aware of the availability of CRBH for individuals they encounter who need short-term recovery has increased referrals. Materials have been developed and distributed to better align with law enforcement needs and protocols and increase utilization.

Forensic Behavioral Health Innovation Program- Forensic Full Service Partnership (FSP): DHS Behavioral Health created a Mental Health Services Act (MHSA) Innovation Project for individuals with a serious mental illness and criminal justice involvement who are being released from the jail.  This project fills a gap in meeting needs of the justice-involved population who "fall through the cracks" and

return to custody due to the complexity involved in accessing resources across multiple systems. Through a Behavioral Health Services contract, Forensic Full Service Partnership (FSP) provides peer support, medication support, intensive case coordination, support with benefits acquisition, housing support, therapy, skill building sessions and groups. Utilizing a Multi-System Team approach and providing tailored services to address the unique needs of the justice-involved population, treatment targets include criminal behavior, mental illness and substance use for clients 18 years and older, experiencing serious mental illness with significant functional impairment may be referred by justice partners and MH services within the jail. El Hogar Community Services began providing Forensic FSP services at an easily accessible site in South Sacramento in March 2022. In FY 2023-24, Forensic FSP treatment expanded its multidisciplinary approach to coordinate across various systems persons may be involved with such as probation, courts, medical, medication support, cash aid, Cal Fresh, mental health, employment, etc., to provide intensive support services (including housing, employment, life skills.

Jail Diversion Treatment and Resource Center (JDTRC): Probation (lead agency) received an infrastructure grant to provide a community based facility to divert criminal justice-involved adults with mental health disorders, substance use disorders, and/or other trauma-related disorders from jail and/or prison.  Om December 2021, JDTRC began services targeting individuals who have been granted participation in Misdemeanor Mental Health Diversion or are pending a court decision relative to their participation. This one-stop center provides easily accessible, community-based, individualized support services and linkages for adult individuals in a convenient location. JDTRC participants, including those recently released from custody, may receive a myriad of services.

Community Wellness Crisis Response Team (CWRT, formerly, Wellness Crisis Call Center and Response Team): At the September 2020 Budget Hearing, BOS asked staff to develop a proposal for alternative responses to mental health and homeless-related 911 calls to complement the existing Mobile Crisis Support Teams (MCST).  The County facilitated an internal countywide work group to review data, review models from other jurisdictions, and obtain community input. Staff received approval for crisis response plans that include a 24/7 Crisis Call Center, Crisis Receiving Facilities, Urgent Care, and Mobile Field Response during the FY 2021/22 budget hearings. Because of staffing shortfalls and ramp up challenges, it was not until early 2024, that CWRT services became available 24/7. Community Wellness Response Team (CWRT) mental health counselor and a peer with lived experience, receives Mobile Response Requests from 988 that may benefit from in-person de-escalation services, assess needs and risks, and create safety plans. This includes identifying and leveraging individual strengths and natural supports; coordinating with existing Mental Health Plan (MHP) and Substance Use Prevention and Treatment (SUPT) providers as appropriate; linking to ongoing services; voluntary transport to urgent/emergency resources and accessing Mobile Crisis Support Teams or other emergency responders when necessary. Monthly status updates are posted on the Community Wellness Response Team website to share staffing, 988 call and CWRT deployment data and success stories.

**System Planning:**
Development and implementation of plans to reduce use of the Jail have been ongoing for many years. In 2020, a Correctional Facilities Committee adopted a work plan to implement recommendations from the Carey Group Report. The group became inactive while leadership changes were underway for the new Deputy County Executive of Public Safety and Justice. While recruitment and hiring was underway, additional consultant studies were conducted per the request of Class Counsel. The new Deputy County Executive began work to lead the jail population reduction efforts along with an extensive list of other duties in February 2022. On September 14, 2022, the new Deputy County Executive presented a Board workshop on Criminal Justice System Issues and Reforms that included findings from the new consultant studies. Public Safety and Justice work has within a very short timeframe significantly increased the amount of information publicly posted, presented and discussed with stakeholders and advisory groups, which includes expert reports and population reduction plans posted on a Reports and Resources website. After the September 2022 Board workshop, the Memorandum of Agreement with Class Counsel required completion of jail population reduction plans and plans for addressing jail facility deficiencies. The Jail Study Report completed by Kevin O'Connell, who has been working with Sacramento County on the Data Driven Recovery Project (DDRP) since 2020, provided a foundation for jail population reduction plans that incorporate new recommendations along with outstanding Carey Group recommendations and approaches focused on reducing bookings, length of stay, and returns to custody. The Sequential Intercept Model (SIM) also helped with development of plans. On December 8, 2022, the Board of Supervisors approved the County's Jail Population Reduction Plans (JPRP) to implement recommendations grouped into two categories: 1) reducing jail admissions; and 2) reducing lengths of stay and returns to custody that together aim to reduce the Average Daily Population (ADP) of Sacramento County Jail facilities by at least 600 over the course of several years. The original JPRP included 33 individual plan items, including 15 items requiring new or expanded investments of resources, time, and partnerships to implement. The JPRP were designed to be able to be changed and modified to suit county and community needs as new information became available. Based on information learned from activities during the first year of implementation, and updated compositional data about the jail population and its drivers, the County's Public Safety and Justice Agency (PSJA) revised its JPRP to more effectively focus efforts in a framework that consolidates the original 33 items into six strategies that reduce jail admissions, length of stay, and returns to custody. Status reports from the original JPRP and the Revised JPRP are provided to the BOS and posted on the Public Safety and Justice Reports and Resources website.

**Overall Progress Toward Reducing Jail Population:**  From 2021 to 2023, Sacramento County's Jail population declined by 6%. In 2023, the Sacramento County jail continued to evolve and respond to impacts from the COVID-19 pandemic. The initial study of the jail was completed using data from 2021 and completed in summer of 2022. Sacramento County made programming and fiscal decisions on how to reduce the population in 2022 and 2023. The overlay of the COVID restrictions, and the ending of them, makes 2023 a more valid compositional baseline for looking at progress since any reduction or increase in certain areas was a combination of external factors that impacted counties across the state. Further, although bookings and total ADP may change, an important factor significantly

impacting jail population reduction strategies is the composition of the jail. Since Sacramento County made large investments across systems and agencies, the goal is to both understand how these investments are impacting the jail and to understand the changing composition of the population in the jail. Below is a high-level timeline of events since the Jail Study was presented, with an overlay of select policies and efforts implemented to address the jail population at a high level.



**Appendix**

**Policies**

**Chapter 1: Governance and Administration**

01-01 Department and Division Overview

01-02 Mission and Values

01-03 Responsible Health Authority

01-04 Medical/Clinical Autonomy

01-05 Policies and Procedures

01-06 Administrative Meetings and Reports

01-07 Quality Improvement Program

01-08 Medical Review of In-Custody Deaths

01-09 Grievance Process for Health/Disability Complaints

01-10 Organizational Charts

01-11 Service Overview

01-12 Access to Care

01-13 Pharmacy and Therapeutics Committee

01-14 Utilization Management

01-15 Suicide Prevention Subcommittee

01-16 Multidisciplinary Meetings

01-17 Citizen Complaints & Administrative Claims

01-18 Utilization Management Subcommittee

01-19 Roll Out Operational Implementation

01-20 Facilities & Equipment Maintenance

**Chapter 2: Health Promotion, Safety, and Disease Prevention**

02-01 Incident Reporting

02-02 Infection Prevention and Control Program

02-03 Female Reproductive Services

02-04 Medication Incident Reporting

02-05 Suicide Prevention Program

02-06 Hunger Strive

02-07 Safety Awareness

**Chapter 3: Personnel and Training**

03-01 Provider Consults After Hours

03-02 Attendance and Punctuality

03-03 Hiring Process

03-04 Timesheet Preparation and Approval

03-05 Vacation and Holiday in Lieu Accrual

03-06 Staff Scheduling

03-07 Credentialing

03-08 Staff Development and Training

03-09 Performance Evaluations

03-10 Employee Status Change

03-11 Appearance Standards

03-12 Nurse Practitioner Standards

**Chapter 4: Ancillary Health Care Services**

04-01 Medication Automated Drug Delivery System (ADDS)

04-02 Insulin Administration

04-03 Medication Removal, Return, Waste and Replenishment (ADDS)

04-04 Discrepancy Report Resolution (ADDS)

04-05 Medication Overrides (ADDS)

04-06 ADDS Training (ADDS)

04-08 Specialty Referrals

04-09 Medical Transportation

04-10 Discharge Medication

04-11 Emergency Equipment

04-12 Emergency Medical Response

04-13 Man-Down Drill

04-14 Disaster Response

04-15 Equipment Maintenance

04-16 Drug Formulary

04-17 Medication Administration

04-18 Medication Order Entry

04-19 Over-the-Counter Medications

04-20 Keep on Person Medications

04-21 Non-Formulary Medications

04-22 Hospital Care (Revised 12/04/23)

04-23 Hazardous Drugs

**Chapter 5: Patient Care and Treatment**

05-01 Oral Care Services

05-02 Medication Assisted Treatment

05-03 Foreign Body

05-04 Pregnancy Testing

05-05 Nurse Intake

05-06 Methadone Treatment

05-07 SUD Counselor

05-08 Access to Oral Care

05-09 Health Service Requests

05-10 Discharge Planning for Reentry

05-11 Diversion of Intakes

05-12 Transgender and Gender Diverse Health Care

05-13 Initial History and Physical Assessment

05-14 Benzodiazepine Withdrawal Treatment

05-15 Opioid Withdrawal Monitoring and Treatment

05-17 Alcohol Withdrawal Treatment

05-18 Chronic Disease Management

05-19 Hepatitis C Testing and Treatment

05-20 Diabetes Management

05-21 Restraints and Seclusion

05-22 Patients in Segregation

05-23 Gravely Disabled Patients


**Chapter 6: Special Needs and Services**

06-01 Lactation Support

06-02 Patients with Disabilities

06-03 Effective Communication

06-04 Interpretation Services

06-05 ADA Coordination

06-06 Patients with Disabilities or Other Significant Health Care Needs

06-07 Health Care Appliances, Assistive Devices, and Durable Medical Equipment


**Chapter 7: Medical-Legal Issues**

07-01 Informed Consent and Right to Refuse

07-02 Court Ordered Testing (HIV/Hepatitis C)


**Chapter 8: Health Information Management**

08-01 Safeguarding Protected Health Information

08-02 Data Sharing - Physical Health and Mental Health Staff

08-03 Release of Protected Health Information

08-04 Standardized Abbreviations

08-05 VPN Access Request

08-06 Records Retention

08-07 Receiving and Responding to a Subpoena

08-08 Patient Privacy

08-09 Electronic Health Record Change Request

08-10 Electronic Health Record Contingency Plan

08-11 Electronic Health Record Issue Reporting

08-12 Electronic Health Record Management for Clinical Records

08-13 Document Scanning and Indexing

08-14 EHR Account Audit

# ATTACHMENT 1

**ACH Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

*Initial 07/08/20. Updated by Class Counsel 07/01/21.*  <mark>*Updated by County 06/11/24.*</mark>
<mark>Yellow highlighting</mark> - used for most recent updates.
Tan shading - final policies.
**Bold -** review and change in process.

Color coding indicates policies pending review by: <mark>Blue</mark> – Medical Experts <mark>Pink</mark> – MH Experts <mark>Green</mark> – Class Counsel

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-01 Department & Division Overview (Joint policy) *CHS Policy 1000* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 No comments | 7/13/20 Sent policy. Joint policy – FINAL |
| 01-03 Responsible Health Authority *CHS Policy 1100* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Minor comments | 7/13/20 Sent policy. 6/25/21 Accepted feedback for formatting changes which pertain to several PP.  Policy revision pending. 7/16/21 Policy revised with formatting/title changes – FINAL |
| 01-04 Medical/ Clinical Autonomy (Joint policy) *CHS Policy 1101* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Minor comments. Ensure leadership titles are consistent between policies 01-03 and 01-04. | 7/13/20 Sent policy. 6/25/21 Accepted feedback on titles/ format.  Policy revision pending. 7/16/21 Policy revised with formatting/title changes – FINAL |
| 01-07 Quality Improvement Program (Joint policy) | 7/1/21 Class counsel comments (on inclusion of specific Remedial Plan QA/QI provision) sent. | | 6/25/21 Policy revised and sent. 7/16/21 Per Counsel questions and response via email, staff will create a separate PP on Multi-disciplinary meetings. Specialty Log tracking is noted in Specialty Referrals PP. This item will be tracked in new QI subcommittee Utilization Management to start this year. Baseline report in process. – FINAL |

1

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-08 Medical Review of In-Custody Deaths (Joint policy) | 7/1/21 Class counsel comments sent. All SMEs should review the draft vis-à-vis their disciplinary focus.<br><br>1/10/22 Class Counsel defer to the Medical SMEs on any additional revisions.<br><br>1/9/24- Class Counsel sent feedback for the revised policy. | 12/10/21 Medical SMEs sent edits & questions about 2021 death reviews. 12/15/21 Medical SME sent additional questions about autopsies. 12/17/21 SP SME sent policy edits. 2/1/22 Medical SMEs sent comments on the revised draft. | 6/25/21 Policy revised and sent. 7/16/21 Per Counsel questions and response via email, all deaths are considered in custody even if occurs offsite. SSO approved content of initial draft.  Pending SME. 12/16/21 In review and revision. 1/4/22 Sent email with revised draft policy based on SME feedback. Unchanged: SSO keeps binders & admin review within 30 days as specified in remedial plan & NCCHC 2/4/22 In review and revision. 2/16/22 Policy finalized with SME requested changes. – FINAL **5/24/23- revised** **10/24/23 revised (not posted)** **12/29/23- sent to SME for feedback** **1/9/24- In ACH review – re: CC feedback** **5/13/24- Sent to Class Counsel for review** |

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-09 Grievance Process for Health/ Disability Complaints (Joint policy) *CHS Policy 1435* | 1/5/21 Policy sent to Medical SME for review. 3/19/21 Class Counsel sent comments on 12/17/20 revision. 5/5/21 Policy and forms reviewed and approved by class counsel. 6/29/22 Class Counsel sent feedback. | 6/11/21 Substantive comments. 7/28/22 Medical SME sent feedback. 9/20/23 MH SME approved. | 7/13/20 Resent policy/forms.  Last submission incorporated edits on forms (wanted term disability). Believe these were approved. 12/17/20 This policy was updated. 4/15/21 Sent updated policy/forms based on PLO/DRC feedback. 6/25/21 In review and revision. 12/1/21 Feedback incorporated. Sent revised policy/forms for final review. 8/3/22 In review. Pending MH SME 9/20/23 FINAL 4/3/24 In ACH review 5/9/24 With County Counsel (CoCo) for review 5/14/24- Received CoCo's feedback **6/10/24- Sent to SMEs for Review** |
| 01-10 Organizational Charts | | 6/11/21 Ensure that titles are consistent across PPs. See comments in First Mays Monitoring Report. Nursing services have no direct or indirect reporting relationship to the Division Manager at the jail and outside the jail supervisory structure. | 10/19/20 See attached policy. 6/25/21 Revising titles across PP. Incorporating organizational changes as discussed. Policy in revision. 7/16/21 Policy revised with formatting/title/reporting. – FINAL |
| 01-11 Service Overview | 1/5/21 Policy sent to Medical SME for review. Please review. 7/1/21 Class counsel do not have comments at this time. Ready for Medical Experts' final review. | 6/11/21 See comments regarding types of services available. | 10/19/20 See attached policy. 6/25/21 Accepted feedback. Policy revised and sent. 7/16/21 Policy revised with Med Expert feedback – FINAL |

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-12 Access to Care<br>*CHS Policy 1407*<br>- Access to Care Guide | 1/5/21 Policy and guide sent to Medical SME for review. Please review. | 6/11/21 Added language regarding barriers to care to be consistent with NCCHC standards. See comments regarding standardizing terminology and timeframes for referral.<br>8/13/21 SME sent additional edits to the Access to Care Guide.<br>9/28/22 Medical SME sent feedback on policy and Access to Care Guide.<br>2/16/23- Medical SME stated she reviewed and revised policy and Access to Care Guide, and has no further comments. | 10/19/20 See attached policy.<br>6/25/21 In revision based on SME feedback.<br>2/4/22 Sent revised policy and Access to Care Guide.<br>10/5/22 In review<br>1/27/23 Sent revised policy and Access to Care Guide.<br>**3/1/23- In Review**<br>5/24/23 FINAL<br>**10/19/23 Revised & posted** |
| 01-13 Pharmacy and Therapeutics Committee | 1/5/21 Policy sent to Medical SME for review.  Please review.<br>7/1/21 Class counsel do not have comments at this time. Ready for Medical Experts' final review. | 6/11/21 Comments regarding key indicators the P&T committee should track. | 10/19/20 See attached policy.  This is a QIC subcommittee.<br>6/25/21 Accepted feedback. Policy revised and sent. – FINAL |
| 01-14 Utilization Management | 1/5/21 Policy sent to Medical SME for review.<br>*SMEs: Please review 4/15/21 version.*<br><br>5/5/21 Class counsel do not have comments at this time. | 6/11/21 Added operational detail regarding the UM process including timelines and tracking tools. | 4/15/21 Policy finalized and InterQual guidelines implemented.<br>6/25/21. In review based on SME feedback.<br>8/19/21 Accepted feedback. Tracking log details are noted in PP 04-08 Specialty Referrals.  Policy revised and sent. – FINAL |

4

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-15 Suicide Prevention Subcommittee (Joint policy) | 5/14/21 Class counsel comments sent. ACH to review, and also ready for Suicide Prevention/Mental Health SME review.<br><br>5/26/21 Awaiting ACH revision.<br><br>8/26/21 Class Counsel have no further comments on Policy 01-15. Ready for Lindsay's review. | 6/11/21 Minor comment regarding including titles only rather than names of key personnel to avoid having to revise the policy every time there is personnel turnover.<br><br>8/24/21 MH SME sent minor comments.<br><br>8/30/21 Lindsay Hayes sent final comments on Policy 01-15.<br><br>9/10/21 Lindsay Hayes sent minor edits. | 5/7/21 Joint policy drafted & sent. 5/21/21 Accepted Counsel feedback. Policy in revision. Creating separate Multidisciplinary Meeting policy to define members & how the meetings will interact with other committees. 7/16/21 Policy revised with Medical SME comments re: title changes and sent. Pending MH SME feedback. 8/24/21 Will review MH SME input. 9/2/21 Accepted Lindsay's feedback. MH team now reviewing. 9/7/21 MH team has no further edits. Final draft sent to all via email. 9/10/21 Incorporated Lindsay's edits. – FINAL |
| 01-16 Multidisciplinary Meetings (Joint policy) | 6/14/22 Class Counsel provided input during meeting with ACH.  After updates, Class Counsel approved. | 9/28/22 Medical SME sent feedback. 10/30/22 MH SME sent feedback. 11/30/22 MH SME provided feedback during meeting with MH. | 10/1/21 Sent new policy.  See ACH notes on PP 01-07 QI Program & 01-15 Suicide Prevention Subcommittee 6/14/22 Sent updated policy. 11/14/22 In review. 12/29/22 SME feedback included – FINAL |

5

**ACH Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 02-03 Female Reproductive Services *CHS Policy 1118* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Needs to address gynecological services including STD screening and access to cervical and breast cancer screening. | 10/19/20 See attached policy. 6/25/21 In revision based on feedback. Discussing separate PP for preventative health & STI screening. PCPs will order routine HPV & Pap. 7/16/21 Policy revised with SME feedback and sent. STI screening and cancer screening will be included in separate PP that is not yet developed. – FINAL **5/24/23 Rev & posted based on State's feedback** |

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 02-05 Suicide Prevention (Joint policy) *CHS Policies 1412 and 1415 JPS Policies 1009, 1010, 1011, 1027, 1049* | Plaintiffs sent comments to R Heyer, 3/7/20, awaiting response.

Question to ACH: *Will ACH Policy 07-04 be a Joint Policy w/ JPS? Or is a discrete JPS policy forthcoming?*

7/1/21 Class counsel will allow Lindsay Hayes to review and provide input on this draft policy before we offer feedback.

8/26/21 Class Counsel provided feedback on Policy 02-05.

9/10/21 Class Counsel shared input during meeting with ACH. 6-hour timeframe will not work for patients in safety cells.

1/31/22 Class Counsel sent questions about the Suicide Precautions and/or Grave Disability Observations Custody Instructions form. | 7/2/21 Received extensive comments from Lindsay Hayes. Requested a combined policy for medical/MH and integrate safety suit. He also requested to review in draft form.
8/16/21 Lindsay Hayes sent edits on the revised draft policy.

8/24/21 MH SME sent an edit on the final draft policy.

8/30/21 Lindsay Hayes sent comments on Policy 02-05.

9/10/21 Lindsay Hayes sent final comments on Policy 02-05.  MH SME responded to the emergent referral timeframe issue noting that 4 hours was a standard of practice. | 7/13/20 Not ready to submit.  Needs internal work. Not sure if it will be joint or separate.
6/25/21 Sent policy drafts for review
07/16/21 Drafts were combined into one policy with SME input included. Renumbered from 07-XX to 02-05. Incorporated safety suit policy and will eliminate MH PP 09-03 Use of Safety Suits.
7/30/21 Sent revised draft policy to SME for final review. Joint policy.
8/19/21 In review and revision.
8/24/21 Incorporated SP SME feedback. Incorporated safety cell policy and will eliminate PP 07-03 Patients in Safety Cells. Sent final draft policy to MH & SP SMEs and Counsel for review.
9/2/21 Accepted Class Counsel and SME feedback. MH team reviewing.
9/7/21 Sent final draft policy along with MH Medical Director note regarding emergent referral timeframe. Requested Class Counsel & SME review and response.
9/10/21 Policy will be finalized next week based on feedback from SP & MH SMEs and Class Counsel.
9/15/21 Edits incorporated. – FINAL
11/19/21 Sent revised policy. CCTV monitoring deleted.
1/31/22 MH explained the form. |

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 03-08 Staff Development & Training (Joint policy) *CHS Policy 1302* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Needs to include training on alcohol and drug withdrawal assessment, treatment and monitoring. 1/5/23 Medical SME sent comments. 2/16/23- Medical SME stated that she reviewed and revised policy and has no further comments. | 7/13/20 Sent policy.  Joint policy. 11/30/20 This policy was updated. 6/25/21 In revision due to feedback and updating based on practice. 7/16/21 Policy revised with SME feedback and sent.  Alcohol & Withdrawal is part of Nursing Clinical Skills and Assessment. Pending MH SME feedback. 3/30/22 Updating this policy. 12/29/22 Policy updated and sent. 1/27/23 Sent revision based on Medical SME feedback. **3/1/23- In Review** **3/3/23 FINAL** |
| 04-08 Specialty Referrals *CHS Policy 1400* | Time-sensitive, per Remedial Plan IV.E. 5/5/21 Class counsel have reviewed and expressed concern about provision A.1 (access to surgery, specialty imaging, and orthotic devices). See comments in 5/5/21 Class Counsel email. We request Medical SMEs' input and further discussion with ACH. 5/26/21 Class Counsel provided additional input on revised version. | 6/11/21 Substantive comments. The denial of specialty services based upon known or unknown lengths of stay alone is not appropriate and may result in delayed diagnosis and treatment of potentially life-threatening conditions (e.g., imaging services for cancer), etc. Establishing a diagnosis, even if treatment cannot be completed is necessary for serious medical conditions. Time frames for UM approval are addressed. 10/21/22 Medical SME sent comments. | 7/13/20 Reviewed with Plaintiffs' Counsel at March 2020 meeting. Re-sent for submission to SME. 10/19/20 Have installed an evidence based tool.  Training has begun but has not been implemented due to COVID work/provider recruitment. 4/15/21 Policy updated with minor revisions. 5/21/21 Accepted Class Counsel feedback and amended the policy. 6/25/21 In review. 8/19/21 Accepted feedback. This policy has tracking log details. Policy revised and sent. 8/17/22 Policy revised & emailed. 9/7/22 Edits incorporated – FINAL |

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 04-09 Medical Transportation (Joint policy) *CHS Policy 1400* | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 Policy should address medical transportation of disabled and or pregnant inmates including use of restraints. | 7/13/20 Sent policy.  Joint policy. 6/25/21 In review. 7/30/21 Policy revised with Medical Expert feedback – FINAL |
| 04-10 Discharge Medication (Joint policy) | 1/5/21 Policy sent to Medical SME for review. Please review. | 6/11/21 SME comments regarding providing operational detail to how the policy will be implemented, including consent decree paragraphs in the references, and removing names of individuals and including titles only. | 7/13/20 Sent policy. 6/25/21 In review based on SME feedback. 10/29/21 Policy revised and sent. Will pilot the process for presentered patients before full implementation. – FINAL |
| 04-11 Emergency Equipment | 12/30/20 Policy sent to MH/SP SMEs for review. Please review. 1/5/21 Policy sent to Medical SME review. Please review. | 6/11/21 Minor comments. Suggest use of plastic locks on emergency bags to maintain integrity of the supplies in the bag and avoid the need for unnecessary inspections. | 7/13/20 Sent policy. 6/25/21 In review to clarify procedures based on SME feedback. 8/26/21 Accepted SME feedback. Policy revised and sent. – FINAL |
| 04-12 Emergency Medical Response *CHS Policies 1429 and 1403* | 12/30/20 Policy sent to MH/SP SMEs. 1/5/21 Policy sent to Medical SME. Please review. 5/11/22 Class Counsel defers to SMEs. | 5/11/22 Medical SME sent feedback. 5/11/22 SP SME sent edits. 6/17/22 MH SME approved. | 7/13/20 Sent policy. 5/06/22 Sent revised policy. 5/19/22 SME edits incorporated. 6/23/22 FINAL |
| 04-13 Man-down Drill | 1/5/21 Policy sent to Medical SME for review. Please review. | 9/29/22 Medical SME sent feedback. | 12/17/20 See attached policy. **10/5/22 In review**. |
| 04-14 Disaster Response | 1/5/21 Policy sent to Medical SME for review. Please review. | 9/29/22 Medical SME sent feedback. | 10/19/20 See attached policy. **10/5/22 In review**. |

9

**ACH Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 04-17 Medication Administration *CHS Policy 1601* | 1/5/21 Policy and form sent to Medical SME for review. Please review. | 7/21/21 Medical SME sent comments including possibly combining Med Administration and Pill Call into one policy. 2/1/22 Medical Experts approved the policy. | 11/12/20 See attached policy/form. 6/25/21 Staff are refining this policy and Pill Call due to procedural changes.  It will include process for medications when patient is off-site. 7/19/21 Will not finalize until we receive SME feedback.  New carts & computers are delayed until August. 7/22/21 In review and revision. 12/16/21 Sent revised policy. 2/4/22 FINAL 8/3/22 Policy updated. 11/9/23- In ACH Review- updates **1/12/24- In ACH Review- updating according to new process** ==**4/3/24- Revised and posted**== |
| ~~04-18 Pill Call~~ | | | 12/16/21 Policy deleted. Contents integrated into PP 04-17. |
| 04-18 Medication Order Entry | | 7/18/22 Medical SME sent feedback on policy and Patient Med Guide. | 10/29/21 New policy draft sent. Includes Patient Medication Guide handout to explain KOP program & discharge medications to patients. 9/22/22 Feedback accepted – FINAL |
| 04-19 Over the Counter Medications *CHS Policies 1604 and 1605* | 1/5/21 Policy sent to Medical SME for review.  Please review. | 7/29/22 Medical SME sent feedback. | 11/12/20 See attached policy. 9/22/22 Feedback accepted – FINAL |

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 04-20 Keep on Person Medications | 1/5/21 Policy and KOP list sent to Medical SME for review. Please review.<br>5/5/21 Class Counsel emphasize importance of this policy vis-à-vis the remedial plan, including w/r/t KOP-inhalers.<br>Remedial Plan Provision VI.F.6: *"The County shall explore the expansion of its Keep-on-Person medication program, (especially for inhalers and medications that are available over-the-counter in the community) and to facilitate provision of medications for people who are out to court, in transit, or at an outside appointment."*<br>5/26/21 Awaiting ACH revision. | 12/28/21 Medical SME sent feedback.<br>2/1/22 Medical Experts approved the policy. | 11/12/20 See attached policy and KOP Medication List.<br>5/5/21 Sent Counsel feedback to Medical leadership for review.<br>5/21/21 Medical staff are meeting with custody on KOP medications.<br>6/25/21 Medical staff continue to meet with custody on expanding KOP.  Will create a method to track KOP meds including inhalers. Will revise based on feedback.<br>9/17/21 Policy revision is in review internally.  Will send when ready.<br>10/29/21 Final draft sent. Will pilot before full implementation.<br>12/30/21 Will review and revise.<br>1/12/22 Sent revised policy with SME feedback incorporated.<br>2/4/22 FINAL |
| 04-22 Hospital Care | 5/5/21 Class counsel do not have comments at this time.<br>*SMEs: Please review 4/15/21 policy.* | | 04/15/21 Sent initial policy.<br>**12/4/23 Revised**<br>12/29/23 sent to SMEs |

11

**ACH Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 05-05 Nurse Intake<br>*CHS Policy 1404* | 1/5/21 Policy sent to Medical SME for review. Please review.<br><br>7/1/21 Class counsel comments sent. Policy draft should be reviewed by ALL subject matter experts.<br><br>9/7/21 Class counsel approved nurse intake form revision. | 7/15/21 MH SME sent minor edits and Medical SME sent extensive edits.<br><br>9/7/21 Lindsay Hayes approved the nurse intake form revision.<br><br>9/9/21 Lindsay Hayes sent additional comments on the intake form.<br><br>9/14/21 Medical experts sent comments on the intake form. | 7/13/20 Sent draft policy.<br>11/30/20 This policy was updated.<br>6/25/21 Policy & EHR forms revised to include Remedial Plan provisions.<br>7/16/21 Received SME edits. Need to regroup with team.<br>9/2/21 Draft nurse intake form sent to Counsel and SMEs for review and feedback. Policy revision to follow.<br>9/10/21 Pending Medical SME input<br>9/17/21 Finalizing the EHR form. Working on policy revision.<br>10/18/21 Sent final draft policy and workflow. Input requested by 10/26.<br>10/29/21 No comments received. Will begin training 11/2021- FINAL<br>11/19/21 Sent updated workflow.<br>12/29/22 Minor updates to policy.<br>**12/28/23- In ACH Review for updates**<br>**05/14/24- Resend to Nursing for ACH Review** |

**ACH Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 05-09 Health Service Requests<br>- HSR form<br>*CHS Policy 1409* | 5/14/21 Class counsel comments sent. ACH to review, and also ready for Medical/Mental Health SME review.<br><br>5/26/21 The revised versions (5/21/21) look good. | 8/13/21 Medical SME sent extensive edits and recommended combining this policy with PP 05-16 Medical Sick Call.<br>2/3/22 Medical SME sent comments on the 10/29/21 policy revision.<br>6/15/22 MH SME approved the form<br>6/17/22 MH SME sent feedback on the policy.<br>2/16- SME requested a conference call with key stakeholders *Questions about how the policy is to be operationalized.*<br>6/23/23- ACH Met with Medical SME- continue to discuss | 5/7/21 Policy and the HSR form were revised based on SME report recommendations.<br>5/21/21 Accepted Class Counsel comments. Amended policy & form.<br>10/29/21 Policy revised and sent. Combined this policy with PP 05-16 Medical Sick Call (to be deleted). Added a process to respond to patient who submits a HSR.<br>2/4/22 In review and revision.<br>5/19/22 Sent revised policy with Medical SME feedback included.<br>6/23/22 Added MH SME edit. ~~FINAL~~<br>1/27/23 Sent revised policy.<br>**2/6/23** ~~FINAL~~<br>2/22- ACH Met with Medical SME<br>6/23/23- ACH Met with Medical SME- continue to discuss<br>8/31/2023- revised<br>9/28/23- revised<br>12/20/23 In ACH Review<br>5/9/24 With County Counsel (CoCo) for review<br>==**5/14/24- Received CoCo's feedback**== |

**ACH Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 05-10 Discharge Planning (Joint policy) *CHS Policy 1423* *JPS Policy 800* | 1/5/21 Policy, referral form, and linkage guide sent to Medical SME for review. Please review. 5/26/21 Class Counsel provided written input. We request input from Medical and Mental Health SMEs. | 6/11/21 See SME comments: Policy should reference and incorporate consent decree requirements. 6/17/22 MH SME approved. | 10/19/20 See PP and Linkage Guide. Discharge planning is complex and multi-faceted. Phasing in actions. 5/7/21 Updating PP. Will reissue. 5/21/21 Policy and Health Care Linkage Guide revised and sent. 6/25/21 In revision based on feedback & procedural changes. 5/19/22 Major revision completed based on Medical SME feedback. Now a joint policy & will delete MH PP 05-01 Discharge Planning. 6/23/22 FINAL |
| 05-12 Transgender and Gender Nonconforming Health Care (Joint policy) - Training PowerPoint | 1/5/21 Policy sent to Medical SME. Class counsel have previously provided input on this policy. Revised draft ACH policy sent to Plaintiffs, 4/15/20. Class counsel accepted ACH revisions and approve pending implementation. 5/5/21 Class counsel have no further comments at this time. *SMEs: Please review 4/15/21 policy.* 5/13/22 Class Counsel sent feedback on policy and training slides. 1/11/23 Class Counsel sent minor edits to policy and training. With these changes, both are approved. 6/30/23 Class Counsel sent feedback on policy | 5/11/22 Medical SME sent feedback on the policy. 6/17/22 MH SME sent minor comment on the policy. 6/28/22 MH SME sent feedback on training slides. 8/3/22 Medical SME sent feedback on training. 11/17/22 Medical SME asked about WPATH Standards training. 1/5/23 Medical SME approved the training. 1/10/23 MH SME approved the training with minor addition. 5/26/23- Medical SME sent recommendation | 7/13/20 Sent to Counsel 4/13/20. Re-sent today. 4/15/21 Sent policy; training pending. 5/9/22 Sent draft training slides. 5/19/22 Will review and revise. 6/23/22 Policy in review. 11/14/22 Sent revised training slides. 12/29/22 Sent revised training slides. 1/27/23 Class Counsel and SME feedback incorporated into policy and training. – ~~FINAL~~ 3/21/23- Provider added sect E to PP 5/26/23- Added SME Recommendation 6/8/23- sent revisions for feedback on sect. E. 7/12/23 – Class Counsel recommendations added/slight additions by medical. 8/23/23 - FINAL |

**ACH Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 05-13 Initial History & Physical Assessment | 1/5/21 Policy sent to Medical SME.<br><br>5/5/21 Class counsel have no comments at this time.<br><br>*SMEs: Please review 4/15/21 policy.* | 12/28/21 Medical SME sent feedback.<br>2/1/22 Medical Experts approved the policy. | 11/30/20 See attached policy DRAFT. This is pending review by PLO/DRC.  Implementation depending on hiring providers.<br>4/15/21 Initial policy sent.<br>12/30/21 Will review and revise.<br>1/12/22 Sent revised policy with SME feedback incorporated.<br>2/4/22 FINAL<br>7/12/23 Revised FINAL |

15

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| Detoxification Policies *CHS policies 1404, 1405, 1406*<br><br>05-14 Benzodiazepine Withdrawal Treatment<br><br>05-15 Opioid Withdrawal Monitoring and Treatment<br><br>05-17 Alcohol Withdrawal Treatment | Time-sensitive per Remedial Plan VI.N<br>5/5/21 Class counsel have no comments at this time.<br>*SMEs: Please review 4/15/21 Policy 05-14, 5/7/21 Policy 05-15, and 5/21/21 Policy 05-17.*<br>7/1/21 Class counsel do not have comments at this time. Ready for Subject Matter Experts' review. | 3/3/22 Medical SME sent edits on the Alcohol Withdrawal policy.<br>3/8/22 Medical SME sent edits on Benzodiazepine Withdrawal policy.<br>3/9/22 Medical SME sent edits on Opioid Withdrawal policy.<br>4/20/22 Medical SMEs approved the 3 withdrawal treatment policies with minor edits to PP 05-15 Opioid Withdrawal Monitoring and Treatment. | 4/15/21 Benzodiazepine Withdrawal policy revised and sent.<br>5/7/21 Sent Opioid Withdrawal PP.<br>5/21/21 Sent Alcohol Withdrawal PP<br>6/25/21 Alcohol Withdrawal policy revised and sent.<br>3/8/22 Sent revised Alcohol Withdrawal policy with feedback incorporated for final review.<br>3/11/22 Sent revised Benzo & Opioid Withdrawal policies with feedback incorporated for final review.<br>3/29/22 Re-sent Alcohol & Opioid Withdrawal policies with minor revisions.<br>4/20/22 Accepted edits. – FINAL<br>12/13/23- Benzo, Opioid, & Alcohol revised & approved in ET<br>**4/30/24 Alcohol Withdrawal Treatment, Opioid Withdrawal Monitoring and Treatment, Benzodiazepine Withdrawal Treatment sent to CoCo for review**<br>**==5/6/24 Alcohol Withdraw Treatment (5-17) approved by CoCo.==**<br>**==5/10/24 Opioid Withdrawal Monitoring and Treatment, Benzodiazepine Withdrawal Treatment CoCo questions sent to service line directors==** |
| 05-16 Medical Sick Call | | | 10/29/21 Policy deleted. See PP 05-09 Health Service Requests. |

**ACH Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 05-18 Chronic Disease Management<br>*CHS Policy 1741* | Time-sensitive per Remedial Plan VI.D<br><br>5/26/21 Class Counsel do not have comments on Policy 05-18 Chronic Disease Management at this time. Ready for Medical SMEs review. | 7/19/21 Medical SMEs sent extensive feedback on PP 05-18 Chronic Disease Management.<br>8/13/21 Medical SMEs reviewed policy revisions and have no further edits. Requested to be notified when policy is finalized and implemented. | 7/13/20 See notes in the Remedial Plan Status Report re: Chronic Disease, Hepatitis C, & Detox PP.<br>11/30/20 See Draft PP 05-XX Chronic Disease Management.<br>5/21/21 Chronic Disease policy sent.<br>7/27/21 Sent revised draft PP 05-18 to SMEs for final review. Requested SMEs prioritize Hep C & Diabetes.<br>8/19/21 Will inform SMEs when policy is implemented. – FINAL |
| Provider Treatment Guidelines<br>• Hypertension<br>• **Diabetes**<br>• HIV/AIDS<br>• Asthma | 5/26/21 Medical SMEs: Please review Provider Treatment Guidelines – Hypertension<br>7/1/21 HIV/AIDS and Hypertension Provider Treatment Guidelines ready for SME review.<br>1/30- Add Medication provision | 8/6/22 Medical SME sent feedback on Hypertension guidelines.<br>8/19/22 Medical SME sent feedback on Diabetes guidelines.<br>3/10/23- Medical SME sent feedback on Diabetes guidelines. | 5/21/21 Provider Treatment Guidelines for hypertension sent.<br>6/25/21 Treatment Guidelines for Diabetes and HIV/AIDS sent.<br>11/19/21 Asthma Guidelines sent.<br>9/22/22 DM in review and revision.<br>11/14/22 Sent revised HTN guidelines.<br>1/27/23 Sent revised DM guidelines.<br>2/10/23- Added Class Counsel's feedback<br>**3/1/23- In review**<br>**3/23/23 Review SME Feedback**<br>6/12/23 Accepted SME feedback<br>6/14/23 Posted FINAL Diabetes Guideline |

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 05-19 Hepatitis C Testing, Treatment and Monitoring | Plaintiffs provided input on Hepatitis C policy via letter, 12/11/19, awaiting response. 1/5/21 Chronic Disease and Hepatitis C policies sent to Medical SME for review. Question: We are not clear whether a revised policy is drafted/forthcoming. (Answered by ACH 5/5/21.) 5/26/21 Class Counsel provided written input. We request input from Medical SMEs on Hepatitis C Policy 05-19. 3/30/22 Class Counsel sent comments. 4/13/22 Class Counsel approved the policy and requested ACH track and report on patients with Hepatitis C diagnosis. | 12/10/21 Medical SMEs sent edits. 3/31/22 Medical SME concurs with Class Counsel's 3/30/22 comments. 4/20/22 Medical SMEs approved the policy. | 11/30/20 See Draft PP 05-XX. 5/5/21 Chronic Care and Hepatitis C policies are still draft. 5/21/21 Hepatitis C policy sent. 6/25/21 PP 05-19 Hepatitis C is in revision. Class Counsel feedback accepted. 7/16/21 Pending SME feedback prior to revision. 7/27/21 Requested SMEs to prioritize review of Hep C policy. 11/10/21 Sent draft policy revision. 12/16/21 In review and revision. 1/12/22 Sent revised policy. Edits accepted. Staff changed testing to day 10 vs. 3 or 4. Sources do not specify testing date. 4/7/22 Sent policy with Class Counsel comments incorporated. 4/20/22 Will develop tracking and reporting. – FINAL |
| 05-20 Diabetes Management | 7/1/21 Class Counsel notes that the American Diabetes Association is expected to issue an updated position statement on Diabetes Management in Correctional Institutions, which should inform ACH policy per the Remedial Plan. 11/5/21 Class Counsel sent ADA's new guidance on Diabetes Management in Detention Facilities. 12/16/21 Class Counsel sent feedback on SME edits. | 12/10/21 Medical SMEs sent edits. | 5/5/21 Diabetes protocol will be drafted this month. 6/25/21 Sent PP 05-20 Diabetes Management. 7/30/21 Requested SMEs to prioritize review of diabetes policy. 12/16/21 In revision based on feedback. 01/12/22 Sent revised policy. Class Counsel & Medical SME feedback incorporated. – FINAL 1/27/23 Policy updated based on ADA 2023 guidelines. |

**ACH Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 05-21 Restraints and Seclusion (Joint policy) *CHS Policy 1413 JPS Policy 1008* Forms: - Restraint Reporting - Restraint Documentation | 10/21/21 Class Counsel and SMEs met with County and provided feedback.<br><br>3/30/22 Class Counsel sent comments. 5/20/22 Class Counsel Deferred to MH Expert on forms. | 10/21/21 Class Counsel and SMEs met with County and provided feedback.<br><br>5/6/22 MH Expert approved policy. 5/19/22 MH Expert approved forms. 6/14/22 MH Expert sent comments on the policy. | 9/10/21 Policy revised and sent. 10/21/21 Met with Class Counsel and SMEs for feedback. Working on a joint policy. Will delete MH PP 09-09 Clinical Restraint & Seclusion in Acute Psychiatric Unit. 12/16/21 Sent revised joint policy. 5/16/22 Added policy attachments. 5/19/22 Forms approved. – FINAL |
| 05-22 Patients in Segregation (Joint policy) *CHS Policy 1416* | 4/2/22 Class Counsel sent comments on draft policy and assessment form. 5/27/22 Class Counsel approved policy and form. | 4/4/22 MH SME sent comments. 5/17/22 MH SME approved policy and form. | 9/17/21 Draft in development. 12/30/21 Sent draft policy and attachments.  Joint policy. 4/28/22 Sent revised policy. 5/27/22 Renumbered to PP 05-22 – FINAL |
| 05-24 Sobering Cell Observation | | 3/28/24 SP SME sent comments | 3/20/24- sent draft policy to SME/PLO for review 4/4/24- CoCo provided feedback 4/10/24- Sent SME feedback to MH **4/10/24- In ACH review** |
| 06-02 Patients with Disabilities (Joint policy) *CHS Policies 1107, 1125, 1128, 1417, 1422, 1439* | 3/19/21 Class counsel reviewed and confirmed approval of policy, with Class Counsel input incorporated.<br><br>Policy looks good, subject to implementation. | | 7/10/20 Sent policy draft with Disabilities Form. Joint policy. 8/24/20 PLO/DRC approved form on 8/13/20. Unsure if PP approved. We incorporated their changes. 10/19/20 See comments for PP 06-03 below. – FINAL |

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 06-03 Effective Communication (Joint policy) | 3/19/21 Class counsel reviewed and confirmed approval of policy, with Class Counsel input incorporated.<br><br>5/5/21 Class counsel have reviewed 4/15/21 version. Policy looks good, subject to implementation. | | 7/10/20 Accepted policy revisions & sent with EC form. Joint policy. 8/24/20 PLO/DRC approved form on 8/13/20. Unsure if PP approved. We incorporated their changes. 10/19/20 Have worked on templates in the EHR.  Staff are now testing these forms.  Staff are also working on a draft PPT of policy/forms. 4/15/21 Sent revised policy - FINAL |
| Disabilities Screening Tool and Effective Communication (EC) Form | 3/19/21 Class counsel reviewed and provided comments to tool/forms.<br><br>5/5/21 ACH incorporated class counsel feedback and provided revised drafts on 4/15/21. Class counsel have no further comments. Forms look good, subject to implementation. | | 7/13/20 See PP 06-02 & 06-03 above 10/19/20 See comments for PP 06-03 4/15/21 Revised based on feedback. 7/16/21 Per email with Counsel, will revise communication inquiry to make it in simpler language. 9/2/21 Sent revised form with EC inquiry simplified. Class Counsel approved. – FINAL |
| 06-04 Interpretation Services | 3/19/21 Class counsel reviewed and provided comments. 5/5/21 ACH incorporated class counsel feedback and provided revised draft on 4/15/21. Class counsel have no further comments. Policy looks good, subject to implementation. | | 2/19/21 Sent policy. 4/15/21 Policy revised based on PLO/DRC feedback. – FINAL |
| 06-05 ADA Coordination *CHS Policy 1107* | 3/19/21 Class counsel reviewed and provided comments. 5/5/21 ACH incorporated class counsel feedback and provided revised draft on 4/15/21. Class counsel have no further comments. Policy looks good, subject to implementation. | | 2/19/21 Sent policy. 4/15/21 Policy revised based on PLO/DRC feedback. **7/16/21 Will revise post implementation of ATIMs.** 11/5/21 Policy revised and sent. Added more operational detail. FINAL (subject to revision noted) |

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| ACH PP | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 06-06 Patients with Disabilities or Other Significant Health Care Needs *CHS Policy 1422* | 3/19/21 Class counsel reviewed and provided comments. 5/5/21 ACH incorporated class counsel feedback and provided revised draft on 4/15/21. Class counsel have no further comments. Policy looks good, subject to implementation. | | 2/19/21 Sent policy. 4/15/21 Name changed and policy revised based on PLO/DRC feedback. FINAL |
| 06-07 Health Care Appliances Assistive Devices and Durable Medical Equipment *CHS Policies 1125 and 1128* | 3/19/21 Class counsel reviewed and provided comments. 5/5/21 ACH incorporated class counsel feedback and provided revised draft on 4/15/21. Class counsel have no further comments. Policy looks good, subject to implementation. | | 2/19/21 Sent policy. 4/15/21 Policy revised based on PLO/DRC feedback. FINAL |
| 07-01 Informed Consent and Right to Refuse - Health Care Refusal Form | 11/14/22 Class Counsel sent comments on form & defers to SMEs on policy. | 11/14/22 All SMEs: Prioritize review. 11/18/22 Medical SME sent feedback. 9/20/23 MH SME approved. | 10/5/22 Sent policy and form with draft revisions for review. 12/29/22 In review. Pending MH SME feedback **9/20/23 FINAL** |
| 07-03 Patients in Safety Cells | | | 8/26/21 Contents integrated into joint PP 02-05 Suicide Prevention. |
| 07-XX Patients in Segregation | | | 5/27/22 Changed number to ACH PP 05-22. |
| 08-01 Safeguarding Protected Health Information (Joint) | 7/1/21 Class counsel do not have comments at this time. Ready for Medical and MH Experts' review. | 9/20/23 MH SME approved. | 6/25/21 Policy revised and sent. Joint policy. 9/20/23 Pending Medical SME feedback. |
| 08-08 Patient Privacy (Joint policy) *CHS Policy 1117* | 5/26/21 Class counsel have no comments at this time. Ready for all SMEs' review, including as to its compliance with Remedial Plan Sections IV.C, VI.B.2, VI.H, VII.C.2, VII.E.1, etc. | 9/20/23 MH SME sent feedback. | 5/21/21 Policy sent. Joint policy. 9/20/23 In review. Pending Medical SME feedback. |

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| Standardized Nursing Procedure | Counsel Comments | Medical Expert Comments | County Response |
|---|---|---|---|
| • SNP Manual- *New* | | | **12/22/23- Created New SNP Manual- will include all SNPs**<br>**12/29/23 sent for feedback** |
| Infection Control Section:<br>COVID-19 Symptomatic Patient | Medical SMEs: Please review 4/15/21 version. | | 4/15/21 Sent new SNP. |
| Pregnancy Section:<br>• Pregnancy Diagnosis, Treatment and Conditions | | | 12/16/21 Sent revised SNP.<br>10/5/22 Sent revised SNP.<br>4/30/24 Pregnancy Diagnosis Treatment and Conditions sent to CoCo for Review<br>**5/6/24 Pregnancy Diagnosis Treatment and Conditions approved by CoCo** |
| Skin Section:<br>• Acne Vulgaris<br>• Acute Contact Dermatitis<br>• Atopic Dermatitis<br>• Bites and Stings<br>• Corns and Calluses<br>• Folliculitis & Beard Infections<br>• Fungal Skin Infections<br>• Impetigo<br>• Intertrigo<br>• Irritation- *New*<br>• ~~Lice or Scabies~~ Infestations<br>• Psoriasis<br>• Seborrheic Dermatitis/Dandruff | Medical SMEs: Please review 4/15/21 version. | | 4/15/21 Sent revised SNPs.<br>8/19/21 Lice/Scabies SNP renamed Infestations, revised and sent.<br>**12/29/23 Sent New Skin Irritation SNP on New template** |
| Substance Use Disorders:<br>• Benzodiazepine Withdrawal Monitoring and Treatment<br>• Opioid Withdrawal Monitoring and Treatment – FINAL | Medical SMEs: Please review 4/15/21, 5/7/21, and 5/21/21 versions, respectively. | 3/3/22 Medical SME sent edits on SNP Alcohol Withdrawal.<br>3/8/22 Medical SME sent edits on SNP Benzodiazepine Withdrawal. | 4/15/21 Sent revised SNPs Benzodiazepine & Opiate Withdrawal Treatment.<br>5/7/21 Sent new Suspected Opioid Overdose.<br>5/21/21 Alcohol Withdrawal revised & sent.<br>6/25/21 Benzodiazepine Withdrawal and Alcohol Withdrawal revised again and sent. |

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| Standardized Nursing Procedure | Counsel Comments | Medical Expert Comments | County Response |
|---|---|---|---|
| • Alcohol Withdrawal Monitoring and Treatment<br>• Suspected Opioid Overdose | 7/1/21 Benzodiazepine Withdrawal and Alcohol Withdrawal ready for SME review. | 3/9/22 Medical SME sent edits on SNP Opioid Withdrawal.<br>3/31/22 Medical SME sent comments on Benzodiazepine & Alcohol Withdrawal SNPs.<br>4/1/22 Medical SME approved Opioid Withdrawal SNP & sent minor comments on Suspected Opioid Overdose SNP.<br>4/20/22 Medical SMEs approved all SUD SNPs. | 10/15/21 Benzodiazepine, Opioid, & Alcohol Withdrawal SNPs revised and sent.<br>3/8/22 Sent revised Alcohol Withdrawal SNP with feedback incorporated for final review.<br>3/29/22 Sent revised Benzodiazepine, Opioid & Alcohol Withdrawal SNPs.<br>4/7/22 Sent revised Benzodiazepine, Alcohol Withdrawal and Suspected Opioid Overdose SNPs with SME feedback incorporated.<br>4/20/22 FINAL<br>4/30/24 •Alcohol Withdrawal Monitoring and Treatment, Opioid Withdrawal Monitoring and Treatment, Benzodiazepine Withdrawal Monitoring and Treatment sent to CoCo for review<br>**5/6/24 Benzodiazepine Withdraw Monitoring and Treatment approved by CoCo.**<br>**5/10/24 Opioid Withdrawal Monitoring and Treatment, Alcohol Withdrawal Treatment CoCo questions sent to service line directors** |
| Urological Section:<br>• Penile Discharge<br>• Renal or Ureteral Colic<br>• Scrotal Pain<br>• Urinary Retention<br>• Urinary Tract Infection | Medical SMEs: Please review 4/15/21 version. | | 4/15/21 Revised SNPs sent.<br>8/19/21 Scrotal Pain SNP revised and sent.<br>9/10/21 Penile Discharge revised and sent. |
| General:<br>• SNP Overview<br>Abdominal Section:<br>• Emergent, Non-Emergent & Hernia | Medical SMEs: Please review 5/7/21 versions.<br><br>7/1/21 SNPs ready for SME review. Class | 8/5/22 Medical SME sent feedback on Abdominal SNP | 5/7/21 Sent revised SNPs.<br><br>6/25/21 Sent the following SNPs:<br>• Diabetes (revision)<br>• Visual Complaints (new) |

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| Standardized Nursing Procedure | Counsel Comments | Medical Expert Comments | County Response |
|---|---|---|---|
| Cardiovascular & Lung Section:<br>• Asthma<br>• Bronchitis, Pneumonia, & Shortness of Breath<br>• Cardiac Dysrhythmias<br>• Chest Pain<br>• Chronic Stable Angina<br>• Hypertension Urgency and Emergency<br>• Hyperventilation<br>Dental Section:<br>• Dental Conditions<br>Endocrine Section:<br>• Diabetes<br>Eyes, Ears, Nose & Throat:<br>• Ear Conditions<br>• Eye Conditions<br>• Nose Conditions<br>• Throat Conditions<br>• Visual Complaints<br>Musculoskeletal Conditions:<br>• Non-traumatic<br>• Traumatic<br>Neurological Section:<br>• Head/Cervical Spine Injury<br>• Headaches<br>• Seizure Disorders<br>• Vasovagal Syncope | Counsel notes that the American Diabetes Association is expected to issue an updated position statement on Diabetes Management in Correctional Institutions, which should inform ACH policy per the Remedial Plan. | 4/19/24 Medical SME sent feedback on the SNP- Adult-Endocrine-Diabetes | 7/16/21 Received Counsel feedback. Pending SME review prior to review.<br><br>9/17/21 SNPs Ear Conditions and Visual Complaints revised and sent.<br><br>6/23/22 Visual Complaints updated & sent.<br><br>8/3/22 Abdominal: Emergent, Non-Emergent & Hernia updated & sent.<br>**9/22/22 Abdominal in review and revision**.<br>**12/11/23 Chest Pain revised**<br>12/29/23 sent Chest Pain to SME for feedback<br>4/16/24 sent Endocrine Diabetes to SME & CC for feedback. |
| Sexually Transmitted Infections:<br>• Bacterial Vaginosis<br>• Chlamydia<br>• Gonorrhea<br>• Pelvic Inflammatory Disease<br>• Trichomoniasis | | 8/5/22 Medical SME sent feedback.<br>11/18/22 Medical SME sent feedback on 5 new draft SNPs. | 8/3/22 Sent new SNP Vaginitis.<br>9/22/22 In review and revision.<br>11/14/22 Sent new draft STI SNPs and deleted vaginitis.<br>**12/29/22 In review and revision**. |

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| Standardized Nursing Procedure | Counsel Comments | Medical Expert Comments | County Response |
|---|---|---|---|
| Allergies: <br> • Allergic Reactions Including Anaphylaxis | | | 12/29/22 Sent new SNP Allergic Reactions. |

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| 01-03 Responsible Mental Health Authority | 12/30/20 Policy sent to MH SMEs. <br> 5/5/21 MH/SP SMEs: Please review. | **MH SME review priority 2** | 12/17/20 See attached policy. <br> 9/27/23- Sent to SME & PLO |
| 01-10 Access to Mental Health Services | 12/30/20 Policy sent to MH SMEs. <br> 5/5/21 MH/SP SMEs: Please review. | 6/17/22 MH SME sent comment on timeframes. | 7/13/20 Sent draft. <br> 8/19/21 Policy revised and sent. <br> 6/23/22 In review. <br> 8/3/22 Added timeframes for emergent referrals when patient in safety cell.  Kept Remedial Plan timeframes for other emergent and urgent referrals. – FINAL <br> 7/12/23 Revised FINAL |
| 03-01 Medical Assistant Responsibilities <br> *JPS Policy 1051* | | 09/24/23 MH SME approved. | 8/19/21 Policy revised and sent. <br> **09/24/23 – FINAL** <br> **11/22/23- ACHM request removal of PP d/t no longer using MAs in ACMH.** |
| 03-02 Overview of Staff Responsibilities – APU <br> *JPS Policy 1021* | | 09/20/23 MH SME sent feedback. | 8/19/21 Policy revised and sent. <br> **09/20/23 – In review.** <br> 10/06/23- Sent MH Expert for review. |
| 03-03 Overview of Staff Responsibilities – Outpatient <br> *JPS Policy 1022* | 1/9/24- Class Counsel sent feedback | 09/24/23 MH SME sent feedback. | 8/19/21 Policy revised and sent. <br> **09/24/23 – In review.** <br> 10/25/23- sent to MH SME for review <br> 12/29/23- sent 10/25/23 version for review to PLO & SME |

25

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| | | | 1/9/24- Sent CC Feedback to MH for review. |
| 03-04 Psychiatric Prescriber Duties<br>*JPS Policies 1204 & 1207* | 9/1/23- *We defer to SME on review of policy* | 09/20/23 MH SME sent feedback. | 9/10/21 Policy revised and sent.<br>**09/20/23 – In review**.<br>**11/15/23 – Revised with SME Feedback & Approved by ET &posted**<br>**12/29/23- FINAL** |
| 03-05 Acute Psychiatric Nursing Responsibilities<br>*JPS Policy 1021* | | 09/24/23 MH SME approved. | 12/16/21 Sent policy.<br>**09/24/23 – FINAL**<br>**12/20/23 In Review**<br>**02/07/24 -FINAL POSTED** |
| 03-06 Acute Psychiatric Unit Psychiatrist Responsibilities<br>*JPS Policies 1201 & 1203* | | 10/30/22 MH SME sent feedback.<br>11/30/22 MH SME gave verbal feedback during meeting. | 12/16/21 Sent policy.<br>11/14/22 In review.<br>12/29/22 Feedback accepted – 11/30/22 FINAL POSTED |
| 04-01 Intensive Outpatient Program (IOP) | 12/30/20 04-01 IOP Policy sent to MH SMEs.<br>5/5/21 MH/SP SMEs: Please review. | 6/14/22 MH SME sent feedback. | 7/13/20 Sent 04-01 Intensive Outpatient Program policy.<br>6/23/22 In review.<br>8/3/22 Feedback accepted – FINAL<br>**3/23/23- Revised to correct timeframes.**<br>**3/24/23- Posted** |
| 04-02 FOSS Levels | 12/30/20 Policy sent to MH SMEs.<br>5/5/21 MH/SP SMEs: Please review. | 11/5/21 MH SME sent comments requesting a call to discuss the final draft.<br>12/7/21 MH SME met with County to discuss final draft.<br>12/27/21 MH SME approved. | 12/17/20 See attached policy.<br>9/17/21 In discussion internally.<br>11/5/21 Final draft sent.<br>12/22/21 Sent revised final draft. MH SME feedback incorporated.<br>12/30/21 FINAL |
| 04-03 Basic MH Services<br>*JPS Policies Section 10* | 3/30/22 Class Counsel noted MH & SP SMEs may need to provide feedback. | 6/14/22 MH SME sent edits. | 8/19/21 Sent policy. |

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| *CHS Policy 1411* | 6/15/22 Class Counsel send a comment. | | 8/3/22 Class Counsel and SME edits incorporated. – FINAL |
| 04-04 Outpatient MH Services & Levels of Care *JPS Policies 1029 & 1037* | 3/30/22 Class Counsel noted MH & SP SMEs may need to provide feedback. | 6/15/22 MH SME approved. | 10/15/21 Sent policy. 6/23/22 FINAL |
| 04-07 Acute Psychiatric Unit Precautions and Observation *JPS Policies 1009 & 1011* | 4/1/22 Class Counsel approved the policy. | 3/15/22 SP SME sent comments. 4/26/22 SP SME requested clarification. 5/9/22 SP SME approved. 6/17/22 MH and SP SME sent edits. | 8/19/21 Policy revised and sent. 11/19/21 Sent revised policy. CCTV monitoring deleted. 3/29/22 In review. 4/1/22 Sent policy with feedback incorporated for final review. 6/23/22 Edits accepted – **FINAL** ==12/13/23- Revised with SME feedback and Approved by ET-== |
| ~~04-08 Outpatient Program – Suicide Precautions, Observation Levels & Item Restriction~~ | | 3/15/22 SP SME sent comments. 3/18/22 MH SME sent comments. | 10/1/21 Sent new policy. 3/29/22 Policy deleted. Contents are included in joint ACH PP 02-05 Suicide Prevention Program. |
| 04-09 Acute Psychiatric Unit Admission, Program, and Discharge *JPS Policies 309, 700, 701, 704, 706, 707 & 805* | | 12/17/21 Suicide Prevention SME sent comments. 12/27/21 MH SME sent feedback on policy/attachments. 5/6/22 MH SME sent minor feedback. 10/30/22 MH SME sent additional feedback. 11/30/22 MH SME gave minor verbal feedback during meeting. | 12/16/21 Sent policy and attachments. 12/22/21 Sent revised policy with SP SME edits incorporated. 12/30/21 In review and revision. 1/12/22 Sent final draft policy and attachments for final review. 5/6/22 Feedback accepted. 12/29/22 Minor edits included – **FINAL** ==12/13/23- Revised with SME feedback & Approved by ET== |
| ~~05-01 MH Discharge Planning~~ | 12/30/20 Policy and Discharge Resource List sent to MH SMEs. 5/5/21 MH/SP SMEs: Please review. | | 5/19/22 Integrated contents into joint PP 05-10 Discharge Planning and deleted MH PP 05-01. |

27

**ACH Policy Revisions Tracking Chart**

*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| ~~07-01 Behavior Management Plan~~ <br> *JPS Policy 1003* | 1/7/22 Class Counsel sent comments. No additional edits to MH SME feedback. | 1/3/22 MH SME sent edits. <br> 1/25/22 Parties met to discuss MH SME feedback. | 3/8/22 Integrated contents into MH PP 07-02 based on MH SME feedback. Deleted MH PP 07-01. |
| 07-02 Treatment Planning <br> - Multidisciplinary Intervention Plan form | 12/30/20 Policy sent to MH SMEs. <br> 5/5/21 MH/SP SMEs: Please review. | 8/5/22 MH SME sent feedback on policy and form. <br> 9/13/22 MH SME met with MH staff to discuss policy and form. <br> 10/12/22 MH SME approved the policy and form. | 11/30/20 See attached policy. <br> 3/8/22 Sent revised policy with contents of Behavior Management Plan policy incorporated. <br> 9/22/22 Sent revised policy and form. – FINAL |
| *Detoxification Policies* <br> 07-03 Use of Benzodiazepines <br> 07-04 Patients with Substance Use Disorders <br> *JPS Policies 1032, 1112* | Time-sensitive, per Remedial Plan VI.N. <br> 5/5/21 Class counsel have no comments at this time. <br> SMEs: Please review 4/15/21 version. | 8/10/23 MH SME review, minor edits no further review needed. | Other Withdrawal PP – *Joint*. See ACH PP 05-14, 05-15, & 05-17. <br> 4/15/21 MH 07-03 revised & sent. <br> 8/19/21 MH PP 07-04 revised and sent. <br> 8/15/23 SME edits accepted - Final |
| 07-05 Mental Health Evaluations for Planned Use of Force | 10/21/21 Class Counsel and SMEs met with County and provided feedback. | 10/21/21 Class Counsel and SMEs met with County and provided feedback. <br> 1/24/22 MH SME approved the policy. | 9/2/21 Initial policy sent. <br> 10/21/21 Met with Class Counsel and SMEs for feedback on policy. <br> 12/16/21 Sent revised policy draft for final review. <br> 2/4/22 FINAL |
| 07-06 Mental Health Rules Violation Review | 1/7/22 Class Counsel sent feedback. | 11/7/21 MH SME sent edits and comments on policy and form. <br> 12/29/21 MH SME sent comments on the revised form. <br> 1/4/22 MH SME sent minor comments on revised policy. <br> 1/24/22 MH SME approved the policy and form. | 11/5/21 Initial policy & form sent. <br> 12/16/21 Sent revised policy/form <br> 12/30/21 In review and revision. <br> 1/12/22 Sent revised policy and form with feedback incorporated for final review. <br> 2/4/22 FINAL |
| 07-07 Mental Health Adaptive Support Program <br> - Alta Regional Referral Form | 12/6/21 Class Counsel sent feedback. <br> 5/9/22 Class Counsel sent feedback. <br> 6/15/22 Class Counsel approved with minor edit. | 11/5/21 MH SME reviewed and had nothing to add. | 9/17/21 Received IDD screening materials from Class Counsel. Draft policy in development. |

**ACH Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| - Adaptive Support Survey<br>- MH Adaptive Support Program Screener | | | 11/5/21 Sent final draft policy and referral form.<br>12/16/21 In review and revision.<br>1/21/22 Sent revised policy/forms.<br>5/19/22 Included feedback & sent to Class Counsel for final review.<br>6/17/22 Accepted edit.– FINAL |
| 07-09 Constant Observation of Mental Health Patients | 7/3/23- Class Counsel sent feedback and added Lindsay Hayes for additional feedback.<br><br>1/9/24- Class Counsel sent feedback (included feedback from 7/3/23 & 9/29/23). | 2/17/23- Medical SME reviewed and added comments/questions<br>**MH SME review priority 3**<br>09/20/23 MH SME sent feedback. | 1/27/23 New policy sent.<br>3/1/23 Responses to Medical SME questions added– Pending CC & MH SME feedback<br>7/3/23- received & review CC feedback.<br>7/5/23- CC feedback approved by MH- Waiting for Lindsay Hayes feedback.<br>**09/20/23 – In review**<br>**9/29/23- sent to MH SME for review**<br>**12/29/23- sent 9/29/23 version for review to PLO & SME**<br>1/9/24- Sent CC Feedback to MH for review. |
| 09-02 Lanterman-Petris-Short (LPS) Conservatorship | 12/30/20 Policy sent to MH SMEs. Please review.<br>5/5/21 MH/SP SMEs: Please review. | 09/20/23 MH SME approved. | 12/17/20 See attached policy.<br>**09/20/23 - FINAL** |
| 09-03 Use of Safety Suits | | | See joint ACH PP 02-05 |
| 09-04 Administration of Involuntary Psychotropic Medication | 7/1/21 Class counsel do not have comments at this time. Ready for Medical and MH Experts' review. | 8/10/23 MH SME approved. | 6/25/21 Policy revised and sent.<br>8/15/23 FINAL |
| 09-05 Informed Consent – Acute Inpatient Unit | 7/1/21 Class counsel do not have comments at this time. Ready for Medical and MH Experts' review. | 09/20/23 MH SME sent feedback. | 6/25/21 Policy revised and sent.<br>**09/20/23 – In review** |

**ACH Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| | 1/9/24- Class Counsel sent feedback | | 9/29/23- sent to MH SME for review w/ sme feedback incorporated **12/29/23- sent 9/29/23 version for review to PLO & SME** 1/9/24- Sent CC Feedback to MH for review. 3/11/24- Incorporated feedback & approved in ET- **FINAL** |
| 09-06 Patient Rights *JPS Policy 303* | 8/4/21 Class Counsel sent feedback on policy and Patient Rights Handbook. | | 7/30/21 Policy revised and sent. 8/19/21 In review. 10/15/21 Policy/handbook revised based on feedback – FINAL |
| 09-07 Denial of Rights | 9/1/23-<br><br>Class Counsel Comment: *While this policy relates to state law requirements for operations in an acute mental health unit holding LPS patients, the Rights being discussed in this policy (and the related Policy MH-09-06: Patient Rights) overlap with the process for removal of property/privileges for patients as set forth in the Policy ACH-02-05: Suicide Prevention Program (at pp. 5-7) Policy. A cross-reference and/or repetition of the key policy components on this topic is appropriate.* | **MH SME review priority 1** 9/27/23- MH SME- No comments on policy | 8/19/21 Sent policy. 9/27/23- sent for review **09/27/23 FINAL** |
| 09-08 PREA Referrals and Evaluations *JPS Policy 1052* | | 09/20/23 MH SME sent feedback. | 8/19/21 Policy revised and sent. **09/20/23 - In review** |

**ACH Policy Revisions Tracking Chart**
*Mays v. County of Sacramento,* Case No. 2:18-cv-02081-TLN-KJN

| MH Policies | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| | | 04/23/24 MH SME Approved changes to PREA Policy | 10/06/23- Sent MH Expert for review. 4/25/24 FINAL |
| 09-09 Clinical Restraint and Seclusion in Acute Psych Unit | | | See joint ACH PP 05-21 Restraints and Seclusion |
| 09-10 Suicide Prevention | | | See joint ACH PP 02-05 Suicide Prevention for all comments. |
| 09-11 Involuntary Detainment Advisement *JPS Policy 304* | | 10/30/22 MH SME approved. | 10/15/21 Policy revised and sent. 11/14/22 FINAL |
| LGBTQI Treatment, Policies | | | See joint ACH PP 05-12 |
| Grievance Procedures | | | See joint ACH PP 01-09 |

*Quarterly Data Reporting (Remedial Plan Section II.C)* – SMI Data sent quarterly.  Link: https://www.sacsheriff.com/pages/transparency.php

| Training | Class Counsel Comments | SME Comments | County Response |
|---|---|---|---|
| Suicide Prevention for New Employees (4-hour) Training | 1/3/22 Class Counsel sent comments. 2/3/22 Class Counsel has questions & concerns about the revised training. 2/7/22 Class Counsel approved revised training PPT. | 12/29/21 MH & SP SMEs sent joint edits. 2/5/22 SP SME sent comments. | 12/17/21 Sent DRAFT training. 1/21/22 In review and revision. 2/1/22 Sent revised training. 2/7/22 Sent revised PPT with SP SME comments incorporated. |
| Use of Force Training | 10/11/22 Class Counsel sent comments. 10/25/22 Class Counsel approved. | 9/26/22 MH SME sent comments. 10/25/22 MH SME approved. | 9/21/22 Sent draft training. 10/5/22 In review. 11/14/22 Feedback incorporated – FINAL |