# Fifth Monitoring Report of the Medical Consent Decree

## Mays et al. v. County of Sacramento

## Case No. 2:18-cv--02081

Submitted

July 15, 2024

**FINAL**

Madeleine L. LaMarre MN, FNP-BC

Angela Goehring RN, MSA, CCHP

Susi Vassallo MD

# Contents

Introduction .................................................................................................. 3

Compliance Definitions.................................................................................. 4

Facility Description ........................................................................................ 5

Glossary ........................................................................................................ 6

Executive Summary ....................................................................................... 8

Findings........................................................................................................ 15

   A. Staffing .............................................................................................. 15

   B. Intake ................................................................................................ 23

   C. Access to Care .................................................................................. 34

   D. Chronic Care .................................................................................... 46

   E. Specialty Services ............................................................................. 56

   F. Medication Administration and Monitoring ................................... 67

   G. Clinic Space and Medical Placements ............................................. 75

   H. Patient Privacy ................................................................................. 79

   I. Health Care Records.......................................................................... 81

   J. Utilization Management .................................................................... 83

   K. Sanitation ........................................................................................ 85

   L. Reproductive and Pregnancy Related Care..................................... 87

   M. Transgender and Non-Conforming Health Care ............................ 91

   N. Detoxification Protocols ................................................................. 94

   O. Nursing Protocols ......................................................................... 102

   P. Review in Custody Deaths.............................................................. 105

   Q. Reentry Services ........................................................................... 111

   R. Training .......................................................................................... 114

   IX.  Quality Assurance Systems for Health Care Treatment ............... 115

Medical Remedial Plan Compliance Summary .......................................... 122

# Introduction

On July 31, 2018, Plaintiffs Lorenzo Mays, Ricky Richardson, Jennifer Bothun, Leertese Beirge, and Cody Garland filed a federal class action complaint[1] alleging that Defendants failed to provide minimally adequate medical and mental health care to incarcerated persons in its jails; imposed harmful and excessive use of solitary confinement in violation of the Eighth and Fourteenth Amendments to the US Constitution; and discriminated against individuals with disabilities in violation of the American with Disabilities Act (ADA) and section 504 of the Rehabilitation Act.

On October 18, 2018 the parties entered a Consent Decree, and Defendants agreed to implement measures set forth in a Remedial Plan, to be monitored by court-appointed Court Experts.[2] On January 13, 2020, the Consent Decree was approved by the federal court. Among other things, the Consent Decree requires Defendants to issue periodic status reports describing the steps taken to implement each provision set forth in the Remedial Plan and identifying provisions of the Remedial Plan which have not yet been implemented. With respect to the provisions of the Remedial Plan not yet implemented, Defendant's Status Reports must describe all steps taken toward implementation; set forth with as much specificity as possible those factors contributing to non-implementation; set forth a projected timeline for anticipated implementation based upon the best information available to Defendant.

We thank Tim Lutz, MBA, Director of Health Services, Noel Vargas, Deputy Director of the Department of Health Services, Primary Health Division, Tianna Hammock, Health Services Administrator, Deputy Chief Don Donelli, Sacramento Sheriff's Office, and their staffs for their assistance and cooperation in completing this review.

---

[1] Mays et al. v. County of Sacramento, Case No: 2:18-cv-02081-TLN-KJN (E.D. Cal.).
[2] Madeleine LaMarre MN, FNP-BC, Angela Goehring RN, MSA, CCHP and Susi Vassallo MD are the Medical Experts. Mary Perrien is the Mental Health Expert. Lindsay Hayes is the Suicide Prevention Expert.

# Compliance Definitions

The Consent Decree offers limited guidance to the court-appointed experts regarding the measurement of compliance with the Remedial Plan, simply stating that the experts should determine whether the Defendants are in substantial compliance or not in "substantial compliance" with an individual provision. To measure compliance more accurately with the provisions of this Consent Decree, as well as to provide guidance to the parties, the court-appointed experts subsequently created a three-tier system for the measurement of compliance. Each of the experts have utilized such a system in prior federal court monitoring assignments. As such, the court-appointed experts agreed to the following definitions for compliance measurement for each of the provisions in this Remedial Plan:

**Substantial Compliance:** Defendants have achieved compliance with most or all components of the relevant provision of the Consent Decree for both the quantitative (e.g., 90% performance measure) and qualitative measures (e.g., consistent with the larger purpose of the Decree). If an individual compliance measure necessitates either a lower or higher percentage to achieve substantial compliance, it will be so noted by the expert. Compliance has been sustained for a period of at least 12 months.

**Partial Compliance:** Defendants have achieved compliance on some of the components of the relevant provision of the Consent Decree, but significant work remains. A minimum requirement is that for each provision, relevant policies and procedures must be compliant with Remedial Plan requirements, contain adequate operational detail for staff to implement the policy, staff are trained, and the County has begun implementation of the policy.

**Non-Compliance:** Defendants have not yet addressed the requirements of a provision of the Consent Decree or have not made substantive progress.

# Facility Description

The Sacramento County Jail is comprised of two adult jails, the Main Jail (MJ) and Rio Cosumnes Correctional Center (RCCC), also known as "the Branch."

The Main Jail is a multistory building built in 1989 with an original rated capacity of 1,250 that was later increased to 2,380. It is the primary intake center for the jails and houses individuals of varying custody levels. Housing unit design is primarily single and double cells with solid doors. As of 2/1/24, Main Jail population was 1,747, including 1569 male and 178 female inmates. This is 73% of the official rated capacity, but near 100% of functional capacity.

RCCC is in Elk Grove and was originally constructed as an Air Force base, which was deeded to the County in 1947 and converted to a jail around 1960. It is the primary custody facility for detainees sentenced to county jail by the Sacramento County Courts. An increasing percentage of the detainees housed at RCCC are pre-sentence detainees, to keep the population levels down at the Main Jail. Housing units are a combination of single and double cells, as well as open barracks or dormitories. It has a current rated capacity of 1,625 detainees. As of 2/1/24, RCCC population was 1,288, including 1,144 male and 144 female inmates, or 79% of rated capacity.

The Sacramento Sheriff's Office (SSO) has overall responsibility for management of the jails. Adult Correctional Health (ACH), a program in the Department of Health Services (DHS) Primary Health Division, provides health care services and physical/behavioral health services through county and contracted staff working in partnership with SSO.

Due to the age of the jails, they were not designed for health care and are not compliant with the American with Disabilities Act (ADA) or Health Insurance Portability and Accountability Act (HIPAA), which were enacted at later dates. The County plans to renovate Main Jail to provide a new acute psychiatric unit, and to construct an Intake and Health Services Facility (IHSF) medical building to become compliant with the Consent Decree.[3]

---

[3] Remedial Plan Status Report. Adult Correctional Health. January 8, 2024.

# Glossary

| | |
|---|---|
| ACH | Adult Correctional Health Care |
| ADA | American With Disabilities Act |
| APU | Acute Psychiatric Unit |
| AED | Automatic External Defibrillator |
| ATIMS | Automated Information Technology Management System |
| AUD | Alcohol Use Disorder |
| BAC/BAL | Blood Alcohol Content/Blood Alcohol Level |
| BUD | Benzodiazepine Use Disorder |
| CalAIM | California Advancing & Innovation Medi-Cal |
| CIPS | Center for Innovative Pharmacy Solutions |
| CM | Case Management |
| CAP | Corrective Action Plan |
| CNA | Certified Nurse Assistant |
| CDCR | California Department of Corrections and Rehabilitation |
| CIWA-Ar | Clinical Institute Withdrawal Assessment-Alcohol |
| CIWA-B | Clinical Institute Withdrawal Assessment-Benzodiazepine |
| COWS | Clinical Opiate Withdrawal Scale |
| CPR | Cardiopulmonary Resuscitation |
| CT | Computed Tomography |
| DDS | Doctor of Dental Surgery |
| DGS | Department of General Services |
| DT | Delirium Tremens |
| ED | Emergency Department |
| EDD | Estimated Due Date |
| EGD | Esophagogastroduodenoscopy |
| EHR | Electronic Health Record |
| EKG/ECG | Electrocardiogram |
| EMS | Emergency Medical Services |
| EMG | Electromyography |
| eMAR | Electronic Medication Administration Record |
| EOP | Enhanced Outpatient Program |
| FSBS | Finger Stick Blood Sugar |
| FTE | Full Time Equivalent |
| HSR | Health Services Requests |
| HUSC | Hospital Unit Services Coordinator |
| IHSF | Intake Health Services Facility |
| KOP | Keep on Person |
| LCSW | Licensed Clinical Social Worker |

| | |
|---|---|
| LMFT | Licensed Marriage and Family Therapist |
| LOC | Level of Consciousness |
| LVN | Licensed Vocational Nurse |
| MA | Medical Assistant |
| MD | Medical Doctor |
| MAT | Medication Assisted Treatment |
| MH | Mental Health |
| MHA | Mental Health Assessment |
| IT | Information Technology |
| MJ | Main Jail |
| MRI | Magnetic Resonance Imaging |
| MRSA | Methicillin Resistant *Staphylococcus Aureus* |
| MR | Mortality Review |
| MRT | Magnetic Resonance Tomography |
| MUD | Methamphetamine Use Disorder |
| NCCHC | National Commission on Correctional Healthcare |
| NP | Nurse Practitioner |
| OB/GYN | Obstetrician/Gynecologist |
| OUD | Opioid Use Disorder |
| PAWSS | Prediction of Alcohol Withdrawal Severity Scale |
| PEFR | Peak Expiratory Flow Rate |
| PharmD | Doctor of Pharmacy |
| RCCC | Rio Cosumnes Correctional Center |
| RDA | Registered Dental Assistant |
| RN | Registered Nurse |
| ROI | Release of Information |
| QI/QA | Quality Improvement/Quality Assurance |
| SCJ | Sacramento County Jail |
| SMI | Serious Mental Illness |
| SrHPM | Senior Health Program Manager |
| SRN | Supervising Registered Nurse |
| SSO | Sacramento Sheriff's Office |
| STI | Sexually Transmitted Infection |
| SNP | Standardized Nurse Procedures |
| SUD | Substance Use Disorder |
| SW1 | Social Worker 1 |
| TBI | Traumatic Brain Injury |
| UM | Utilization Management |

# Executive Summary

The Medical Experts conducted an on-site tour at Sacramento County Jail from January 30 to February 3, 2024. We express our appreciation to the County for the level of cooperation, transparency, and engagement, during and following the site visit.

We particularly thank Tim Lutz, Director, Health Services, Noel Vargas Deputy Director, Primary Health Services, Tianna Hammock, Health Service Administrator, Nicole Harper, Quality Improvement Director, Jackie Abdalla MD, Assistant Medical Director, and Eric Sergienko, MD, Medical Director, Reema Singh RN, Interim Nursing Director, Mike Wanless, Chief Pharmacist, Captain Matthew Owens, Main Jail, and Captain Matthew Warren, Branch Jail.

**Summary of Medical Remedial Plan Compliance**

| Substantive Area | Total Provisions | Substantial Compliance | | Partial Compliance | | Non-Compliance | | Not Evaluated | |
|---|---|---|---|---|---|---|---|---|---|
| **Medical** | **80** | **24** | **30%** | **31** | **41%** | **23** | **29%** | **0** | **0%** |

Since the last monitoring report in August 2023, the County has made meaningful progress in several areas of health care delivery and has increased the number of Consent Decree provisions in substantial and partial compliance. Fifty-five (70%) provisions are either in substantial or partial compliance, and 23 (29%) in noncompliance.[4]

We believe that these improvements are the result of strong health care leadership and increased cooperation between health care and custody leadership, and could not have been accomplished without this strong working relationship. [5]

Despite these changes, there has been ongoing noncompliance with key provisions of the Mays Consent Decree that result in ongoing harm to the patient population at Sacramento County Jail. These include:

- Lack of custody medical escorts to conduct health care operations;
- Custody obstructing access to care, resulting in harm and preventable hospitalization;[6]
- RCCC inmates being empowered to control other inmates' access to health services request and grievance forms;
- Ongoing lack of privacy in the booking area, causing demonstrable harm to patients.[7]

---

[4] One provision, E.5. related to tracking of specialty consults was downgraded from substantial to partial. Three other provisions were partial compliance (low), bordering on noncompliance due to 846 consults not being entered onto the tracking log as of the site visit in late January 2024, and the October to November 2023, showed many specialty requests with no dates of appointments.
[5] This includes Captain Owens at Main Jail and Captain Warren at RCCC.
[6] Patient #9.
[7] See Class Counsel letter to Rick Heyer, County Counsel regarding lack of privacy in booking. October 17, 2023.

- Failure of the access to care system (nurse sick call);
- Ongoing serious medication errors caused by the pharmacy system, medical providers, and nurses, resulting in preventable harm and hospitalizations; and
- System and quality issues related to medical screening and use of the sobering cell.

The Medical Experts have discussed these problems during and after the initial debriefing, and understand that Adult Correctional Health (ACH) and the Sacramento Sheriff's Office (SSO) have developed plans to address them.[8]

However, we are obligated to note that these conditions have existed since the beginning of the Mays Consent Decree, are causing ongoing harm, and must be immediately and definitively corrected.   These issues are described below, including contributing factors the County needs to address immediately.

### There continues to be profound lack of patient access to care due to insufficient custody escorts for health care appointments and operations.

Since the onset of the Mays Consent Decree, the County has consistently failed to provide enough officers dedicated to health care operations.  We note that there is greatly improved cooperation and collaboration between health care and custody staff, but this has not resulted in sustained increase in the number of officers dedicated to health care. *On the first day of our site visit, only one officer was dedicated to health care at Main Jail.*  This effectively grinds health care services to a stop, including medical, nursing, dental, and mental health care, and is unsustainable. In record reviews we found documentation that medications were not administered due to lack of custody escorts, medical appointments were not kept, and nurses could not see patients who had submitted health requests.[9] This has caused demonstrable harm to patients.[10]

### Custody staff continues to interfere with access to care.

Since the onset of monitoring, previous review shows ongoing custody interference with access to health care, including obstetrical appointments.  During this review, we found an egregious case in which a patient self-declared an emergency multiple times over a 3-day period and officers denied him access to medical care despite his obviously worsening condition. The officers said that his condition was "not an emergency."[11] The patient was subsequently hospitalized for 9 days to receive antibiotics for periorbital (preseptal) cellulitis.[12] This case is briefly described below.

---

[8] An ACH/SSO corrective action plan was finalized on 5/1/24.
[9] ACH and custody discuss availability of officers daily, at morning huddles.
[10] The County's corrective action plan meaningfully addresses lack of dedicated medical escorts, but the effectiveness of this plan cannot be assessed today.
[11] The patient wrote a letter to the Prison Law Office complaining of difficulty with accessing health services at the Main jail in November 2023.
[12] Patient #9. Described in the Access to Care Section of this report.

*On 11/18/23, the patient submitted a health request describing multiple scalp wounds, feeling ill, and needing medical assistance. He described pushing the emergency medical button in his cell and being told by the deputy she did not believe he had an emergency.  He flagged a second deputy down asking for assistance, and was told there were inmates in the jail "dying" and his condition was not an emergency.  By 11/19/23, his condition worsened, and he again activated the emergency button in his cell only to be told by the deputy there were 240 people in line ahead of him.[13]  After being unable to sleep because of head pain and blurred vision, he again pushed the emergency button. On 11/21/23, he again activated the emergency button attempting to be seen after his face had swollen to the point that his right eye was completely closed.  Again, he was told by the deputy he did not have an emergency and to stop bothering the deputies. He waited until the next shift and again pushed the emergency button and "passed out" by the door. The deputy responded to his cell, and phoned the medical unit and a nurse saw him at that time. The following morning, the physician saw him in the housing unit exam room and sent him to the emergency department where he was admitted and diagnosed with orbital (preseptal) cellulitis. Complications may have included an extension of the infection to the eye, meningitis, and abscess of the brain. This patient was hospitalized for 9 days to receive intravenous antibiotics.*

As reported by the patient, his access to care was blocked by several officers over a 3-day period. This was deliberate indifference to this patient's serious medical needs. This reflects a culture where officers make decisions about who has an emergency and who does not. This is extremely dangerous, and results in negative patient outcomes, as occurred in this case. When patients declare a self-emergency, the officers only option is to call health care staff, *who must see the patient.*[14]

## Inmates have been empowered to control other inmates access to care.

A shocking finding at the Branch Jail was that some inmates in designated leadership roles in the housing units were denying other inmates' access to care. Custody designated inmates in housing units as the "House Man," and a deputy reported to the experts that the House Man was responsible for keeping order in the unit.  However, we learned that House Man also maintained control and access to Health Services Request and grievances forms. In addition, the House Man required inmates to submit their forms to them to review the contents of health requests and grievances, reportedly to look for "snitches."  The House Men threw away inmate health requests and grievances.

---

[13] This meant 240 patients awaiting medical appointments. This information was likely reported in the Huddle, a daily meeting with medical and custody staff.

[14] When informed by officers of patients who self-declare an emergency, nurses need to see the patient at that time, and either have the patient escorted to the medical clinic or go to the patient. Nurses should not just schedule the patient for a nurse sick call appointment.

We independently interviewed inmates from several housing units who confirmed what we were told. Inmates reported being bullied by the House Man, and feared for their life by speaking with the medical experts. *That some inmates were given control of other inmates' access to health care is an egregious finding, as it violates patients' fundamental right of access to care.* We discussed this with Captain Matthew Warren who immediately discontinued the practice.[15] However, we are concerned that this was ever an established practice. We believe that close supervision will be necessary to ensure that this practice does not continue informally.

### Privacy is not provided to patients during the intake screening process and other clinical encounters.

Despite the County's physical modifications to the booking area, patients are not provided auditory privacy during intake screening, due to the proximity of the arresting officer.  Patients will often not disclose sensitive medical, mental health or substance use history in the presence of officers.  When patients do disclose information regarding substance use, it presents a risk that the arresting officer will use the information in the charging document. This happened in September 2023, when an arresting officer overheard a patient's disclose use of methamphetamine, and it was added to the charging document. Patients are also able to overhear the conversations of other patients, allowing them access to sensitive medical, mental health, or substance use histories.  This is also true of clinical encounters that are conducted cell side due to lack of clinic space or medical escorts.[16]

### The current use of the Sobering Cell is dangerous to patients.

The current use of the "Sobering cell" is dangerous, as there are no clear medical or mental health criteria for who is placed in the cell, and precisely how patients are to be monitored. Currently, both health care and custody staff can place a patient in the cell whose purpose is medical observation.  As such, the Sobering Cell and should be named to reflect its true purpose (e.g., Medical Observation Room). As this is a component of intake screening, the Medical Receiving/Intake screening policy needs to be revised to include system changes to make the intake process safer.[17]

Patients admitted to the sobering cell need to be monitored more frequently to ensure that any changes reflecting deterioration of the patient are rapidly identified to provide treatment or determine whether the patient should be sent to the emergency department.

---

[15] Captain Warren had been in his position only two weeks and was not aware of this practice.

[16] The County has developed a plan to provide space in the intake area that is described later in this report.

[17] ACH has developed a draft intake and sobering cell policy which the medical experts are reviewing.

**The access to care system (nurse sick call) is broken, resulting in ongoing delays in access to health care and preventable harm to patients.**

The reasons for the broken system are multifactorial. The Access to Care/Nurse Sick Call policy builds in delays in the triage and scheduling process.[18] Health Service Request (HSR) forms are not timely collected, triaged, and patients are not timely seen. HSRs are not legibly signed and dated and do not include a triage disposition. HSRs are also not timely scanned into the electronic health record (EHR). These issues have resulted in inmates submitting multiple requests (e.g., 8 in one day), and large backloads of patients to be seen for nurse sick call. It also contributes to delays in medical provider referrals and access to a higher level of medical, dental, and mental health care.

At RCCC we found stacks of HSRs. Nursing leadership and supervisors were unaware whether these patients had been seen or not.[19] As a result of delays in care, inmates submit multiple health services requests, which increases nursing workload, and complicates scheduling by creating multiple appointments.

Nurse sick call has not been prioritized as an essential daily operation. There are insufficient numbers of nurses assigned to nurse sick call to keep up with the demand. Review of nursing assignments showed that on some days, no nursing staff were assigned to conduct nurse sick call, and when assigned, only one nurse was dedicated to conduct sick call at Main Jail. For a population of 1800 inmates this is clearly inadequate. And, despite increased collaboration between health care and custody, there are still not enough officers dedicated to escort patients to health care appointments, including nurse sick call.

Both at Main Jail and RCCC, nurses do not have dedicated clinic space to see patients, and no set schedule to see patients each day. ACH and SSO are implementing plans to install two "Pop up" examination rooms for each housing unit to accommodate nurses and mental health staff. The experts have advised the County that these examination rooms need to be equipped to conduct adequate examinations and to provide patient privacy, both auditory and visual. [20]

**The Specialty Services Tracking Log did not include all off-site and on-site specialty services, and they were not tracked for completion or timeliness.**

At the end of the January 2024 site visit, the experts were advised that there were 846 specialty services requests that were not included on the tracking log. This included both on and off-site referrals, going back as far as 2022, and which included cardiology, hematology, nephrology, gynecology, endocrinology, surgery, neurology, and physical therapy. Many patients were lost

---

[18] We have discussed this with health care leadership and the policy is under revision. Re-engineering of the process is required including establishment of a comprehensive tracking system.

[19] The experts were later informed that the health requests had been triaged, but the HSR's lacked documentation of the date and time a nurse triaged the forms, a legible signature with credentials, and a triage disposition. This has been identified in previous reports but not addressed. This reflects lack of nursing supervision and action.

[20] On 5/9/24, ACH reported that there were no backlogs of health services requests to triage and schedule for an appointment.

to follow-up and did not receive timely care. This reflects lack of adequate supervision of specialty services. Quality Improvement conducted an analysis of each of the consult requests and found that some had been completed and some had not been completed. We were advised that the decision to not enter onsite consults onto the tracking log was made by the previous Deputy Director. Therefore, the County has never been compliant with the requirement to enter all consults on the tracking log, and these consults were not included in Quality Improvement (QI) studies regarding timeliness of approval, scheduling, completion of appointments and provider follow-up.  Following the site visit, all specialty services were entered onto the tracking log.

## Medication errors occur frequently, with some errors resulting in preventable hospitalizations.

Record reviews show that patients are subject to multiple and sometimes serious medication errors during their incarceration. The causes are multifactorial and include:

- The electronic medication administration record (eMAR) does not communicate directly with the pharmacy software program (CIPS). This results in health care providers writing orders that are directly inputted to the eMAR, rather than going through the pharmacy first, to review whether the medication order is complete, consistent with FDA approved dosing and frequency, and to check drug interactions and patient's allergies.[21]
- Medical providers do not consistently discontinue a previous medication order before ordering it again. When this occurs, the pharmacy does not contact medical providers to have the second order discontinued.  Therefore, there are two active orders for the same medication. Usually, nurses ignore the second order, (which is another problem), however we reviewed the record of a patient with type 1 diabetes who had two active orders for Lantus insulin 30 units, and a nurse gave the patient both doses of the insulin. The following day, an alert nurse noted the duplicate order and it was discontinued.
- When medical providers write an incomplete order, the pharmacy is unable to see it as it is not forwarded to CIPS.
- The pharmacy prepares medications for distribution to the housing units first thing in the morning. If a provider discontinues or changes a medication after the pharmacy has dispensed the medication, nurses may inadvertently administer the medication to the patient.  At our last site visit, we interviewed a patient who had a severe allergic reaction to a non-steroidal drug, Naproxen. After it was discontinued the patient was given another dose which resulted in an anaphylactic reaction and an emergency department visit.
- When patients do not receive their morning dose of medication (e.g., when the patient is out to court), some nurses administered both the morning and evening dose together. In

---

[21] Mike Wanless, Pharmacy Director, has been working with Fusion and CIPS to interface the pharmacy with the MAR, but it has not yet been corrected.

one case, a patient with heart failure was sent to the emergency room with hypotension after the nurse gave a double dose of his medication.

- Medications are not automatically discontinued when patients are out of the facility for 24 hours. When patients are hospitalized their medication regimen often changes, including discontinuation of previous medications, but providers may not timely review hospital recommendations and the same medication regimen is continued.

- It appears that serious medication errors resulting in emergency department visits or hospitalizations are unrecognized, and not treated as sentinel events for the purposes of modifying the system, or addressing provider and nursing practice to avoid these errors.

In summary, this review shows that the County needs to develop and implement a plan for short and long-term solutions that will address the critical issues that have persisted since the beginning of monitoring. This review also shows how strong medical and custody leadership can continue to make progress in the face of the challenges that exist.

The Medical Experts remain confident that if the County makes the resource commitments to develop and sustain an adequate health care system, it will achieve compliance with the Consent Decree. *This will require the full support of the Sacramento County Sheriff's Office who shares responsibility for the success of the health care program.*

# Findings

| |
|---|
| ### A. Staffing |
| 1. The County shall maintain sufficient medical, mental health and custody staffing to meet professional standards of care to execute the requirements of this remedial plan, including clinical staff, office and technological support, QA/QI units and custody staff for escorts and transportation. |
| 2. Provider quality shall be evaluated regularly to ensure that relevant quality of care standards is maintained. This review shall be in addition to peer review and quality improvement processes described in this plan. The parties shall meet and confer regarding any deficiencies identified in the evaluation. Should the parties disagree regarding matters of provider quality, the Court Expert shall evaluate the quality of provider care and to complete a written report. |

**Findings:** The County currently does not have sufficient medical, mental health, and custody staffing to meet professional standards of care and to execute the requirements of this remedial plan, including clinical staff, office and technological support, QA/QI units and custody staff for escorts and transportation (A.1).[22] Provider quality, outside of peer review and quality improvement processes, has not been regularly reviewed (A.2).

The County is in process of a multi-year staffing plan and has submitted growth requests each year. The County has increased medical and administrative staff from 112.5 FTEs[23] pre-Consent Decree, to a total of 251.5 permanent allocated FTEs for the current fiscal year. The vacancy rate is currently 19%, and the County continues to interview and hire staff. Registered nurse positions have the highest vacancy rate (26%). The lack of adequate RNs to conduct basic health care operations at the jail (e.g., nurse sick call, detox monitoring, etc.) has resulted in harm to patients through lack of access to care and detox monitoring and treatment.

Previously, ACH used registered nurses (RNs) to administer medications, but now has Licensed Vocational Nurses (LVNs) administer medications, which is an appropriate use of staff. Registered nurses can now be reallocated to services that require a higher credentialing (e.g., Intake, Nurse Sick Call). ACH advised the medical experts that 19 RN positions were in the process of being onboarded; however, while the Sheriff's Office rapidly conducts security clearance, the Department of Personnel Services, typically takes two to three months. This length of time for DPS to conduct a security clearance negatively impacts the County's ability to competitively recruit and hire staff, and negatively impacts the County's ability to achieve compliance with the Consent Decree.

---

[22] Mental health staffing has increased from 50.3 pre-Consent Decree to 133.8 FTE allocated positions for the current fiscal year. The vacancy rate for mental health positions is 25.8%. The medical experts defer to the mental health expert regarding adequacy of mental health staffing.

[23] Full Time Equivalent.

It raises the question as to why the Sheriff's Office security clearance process is not adequate to bring the employee on immediately, pending any other type of clearance from the Department of Personnel Services.  We strongly recommend that once candidates have security clearance from SSO, they are immediately permitted to work pending the completion of the DPS process.

The experts did not assess the adequacy of ancillary services staffing; however given the number of quality improvement activities being conducted, we recommend that ACH assess whether quality improvement staffing is adequate to meet the needs of the program and Consent Decree requirements. Certified nurse assistants (CNA) are employed from an agency, and are not oriented and trained by ACH staff.  The Director of Nurses is planning to develop an orientation checklist and have ACH staff train agency staff.

There are 10 full time physician FTE's of which 7.0 are filled, 5.5 nurse practitioner FTEs of which 2.0 are filled, and 19 on-call physicians FTEs. The on-call physicians may work varying number of hours up to 1.0 FTE. [24]

This number of medical provider FTE's is adequate to meet the requirements of the Consent Decree, and medical provider should be deployed to areas of greatest need. *Currently no medical provider is assigned to detox units to make daily rounds on all patients in the unit and to discharge them when medically appropriate.*

Although medical provider staffing is adequate, there continues to be medical provider backlogs at Main Jail and RCCC.  There are likely several contributing factors, including lack of custody escorts, low provider productivity expectations, and provider performance less than expectations. Currently, there are 3-5 providers assigned to RCCC during weekdays, with plans to shift a provider to evening hours. At Main Jail there are 7 to 11 providers during weekdays, three to five on weekends, and at least one dedicated MAT provider.

As of 5/8/24 at Main Jail, there are 234 HSR requests older than 14 days at Main Jail, 25% of which are estimated to be MAT appointment follow-ups. There are 29 urgent provider sick call requests older than 24 hours, with the oldest being from 5/3/24. At RCCC, there are 153 routine requests older than 14 days, and zero urgent requests outside the 24-hour window.[25] ACH plans to conduct two blitzes soon to reduce backlogs to zero.

Recognizing that there are problems with medical escorts, given the level of medical provider staffing, it is unclear why there are provider backlogs, and raises questions about provider productivity.  We recommend that the Medical Director address this as soon as possible.

For the prior monitoring periods, the previous Medical Director's expectations were that providers would schedule 12 patients per day, or only 1.5 patients per hour. For a 3-month period

---

[24] ACH Position Control Report. 12/26/23.
[25] Email from Eric Sergienko MD. 5/9/24.

there were between 16 and 21 providers that worked at the jail.[26] Provider productivity ranged from 1.35 to 1.57 patients per hour. This level of productivity did not enable the County to meet the health needs of the population.  We recommended that scheduled provider appointments be increased to 3.0 patients per hour, and then revaluate productivity after 3 months. If scheduled patients have been released, out to court, or otherwise unavailable, clinic nurses should coordinate with custody to have other patients brought to the clinic.  We requested this type of provider productivity data for this most recent monitoring period, but this data was not provided to us.

As noted above, despite improved cooperation and collaboration between health care and custody, custody has not provided enough escorts to conduct daily health care operations.  On the first day of the site visit on 1/30/24, one medical custody escort was dedicated to health care services.  The lack of medical escorts has caused demonstrable harm to patients, as medical, dental, and mental health appointments are not kept. In addition, medical records show that custody staff makes decisions whether patients have an emergency or not, resulting in delayed care and preventable hospitalizations.[27] Whether this is due to culture or lack of custody staffing, or both, cannot be discerned by the experts, but needs to be addressed.

Positively, Sacramento Sheriff's Office (SSO) has taken action to increase medical escorts, by requesting 8 positions in the growth budget. Since the January site visit, SSO is prioritizing the allocation of dedicated medical escorts, and recent data shows some improvement in the availability of medical escorts (4-5 per shift).[28]  However, as of June, ACH reports that the number of medical escorts continues to be unpredictable, with as few as 2 escorts at Main Jail.

In February, SSO created a new Sheriff Supervisor position-The Medical Liaison Supervisor- who will be responsible for scheduling medical escorts. A civilian position has been added to assist with patient flow on 2 Medical.   An additional two deputies were dedicated as medical escorts Monday through Friday.  Finally, the Sheriff's Office will be changing its practice of employing on-call or part-time help, increasing the availability of staff that can be dedicated as medical escorts. *These are concrete and durable measures to increase medical escorts and improve access to care, and reflects the cooperation and integration of health care delivery into jail operations. Captain Owens at Main Jail and Captain Warren at RCCC are to be commended for their concerted efforts to increase medical escorts.*

Since the last report, there have been changes in health care leadership at the jail.
- Tianna Hammock was appointed Health Services Administrator in the fall of 2023.
- Dr. Nicole Harper, DHA, LMFT, is Program Manager and Director of Quality Improvement. She has numerous responsibilities, including but not limited to:  quality improvement committee and subcommittees, policy and procedure workgroup, SSO/ACH leadership meetings, all CAP

---

[26] March to May 2023.

[27] Patient #9.

[28] Given that multiple health care operations occur simultaneously and in different locations throughout the day, it is still likely insufficient.

and development and CAP meetings, court medication work-group, monthly mortality meetings, medical operations meetings, staffing analysis development, and more recently, Case Management.

- Mike Wanless, PharmD, is the Pharmacy Director, and works with IT to make modifications to the EHR.
- Reema Singh RN, who has worked at the jail for many years, has been appointed Interim Director of Nursing, and brings expertise in infection control.
- Dr. Jackie Abdalla was appointed Assistant Medical Director, and then Acting Medical Director when the previous Medical Director departed. [29]
- Dr. Eric Sergienko, Medical Director as of March 1, 2024.

Among the accomplishments of this leadership team are the following:
- Implementation of the Medication Assisted Treatment (MAT) program;
- Securing a grant to fund 2 full time substance use disorder (SUD) discharge planners.
- Obtaining the tools for continuous glucose monitoring for diabetics, who then will not need fingerstick blood sugars;
- Securing insulin pumps for patients with type 1 diabetes. Providing insulin pumps is a major step forward for diabetes disease control and patient safety, preventing hypo-and hyperglycemia;
- Daily monitoring of medical beds on 2 Medical and 2 East to ensure that patients no longer needing a higher-level care are discharged to general population making beds available for higher acuity patients;
- Addressing polypharmacy, the prescribing and continuation of multiple medications, some which may interact with one another or are no longer needed for the patient;
- Onboarding 2 new addiction specialists to orient them to patient care at the jail, and so they can assist with policy and workflow improvements;
- Securing funding to offer Sublocade, an extended-release form of suboxone given once a month to patients with opioid use disorder. This will reduce the need for daily dosing of suboxone and save both nursing and custody time.
- Worked with OB/GYNs and custody to allow women in labor to have a support person with them.
- Working with custody on healthier commissary items.

As noted above, in November 2023, Dr. Eric Sergienko was hired as Interim Medical Director in a memorandum of agreement with Mariposa County, such that half of his time would be devoted to Sacramento County Jail, and half to Mariposa County. In March 2024, he became the full time Medical Director.

---

[29] Dr. Abdalla will soon be taking leave and stepping down from her role as Assistant Medical Director. She plans to return to the jail later this year, in a part-time capacity.

We met with Dr. Sergienko during the site visit.  At the conclusion of the visit, it is our opinion that Dr. Sergienko needs to:

- Conduct only Sacramento County business when he is onsite at the jail;
- Be familiar with the Mays Consent Decree requirements regarding medical care, and be available to engage the medical experts, leadership, and staff during Mays monitoring visits;
- Be knowledgeable about health care operations at the jail;
- Be knowledgeable about critical issues at the jail and take a lead in the addressing these issues.
- Meet the requirements of the ACH Medical Director's Job Description[30] that includes oversight of daily clinical operations and providing patient care.
- Fall under the direct supervision of the Health Services Administrator.[31]

*A.2 requires that: Provider quality shall be evaluated regularly to ensure that relevant quality of care standards is maintained. This review shall be in addition to peer review and quality improvement processes described in this plan. The parties shall meet and confer regarding any deficiencies identified in the evaluation. Should the parties disagree regarding matters of provider quality, the Court Expert shall evaluate the quality of provider care and to complete a written report.*

The County has not conducted regular evaluation of provider quality as required by the Consent Decree (A.2).

As noted in prior reports, the previous Medical Director did not address provider quality issues, resulting in medical care that did not meet contemporary standards. Since the last report, there has been turnover in medical leadership and some physicians whose care resulted in harm to patients. We continue to have concerns about the practice of cutting and pasting previous notes that result in inaccurate documentation of the patients' condition.

Record reviews show improvement in the quality of care, particularly related to management of patients that are enrolled in the chronic disease program. ACH reported a downward trend in emergency department visits, which may represent improvement in medical care that prevented an ED send out. However, we reviewed other cases that showed critical lapses in care and there have been no systematic studies assessing medical provider quality.

---

[30] ACH Position Standard: Medical Director. March 30, 2022.
[31] Currently, Dr. Sergienko is under the supervision of Tim Lutz, Director, Department of Health Services, which is two levels above the Health Services Administrator.  This arrangement was created for special reasons related to the previous medical director, but is outside the normal chain of command and creates a dysfunctional reporting relationship. Supervisors need to be able to provide day to day supervision of employees for performance accountability. This arrangement does not permit that supervision and may undermine the authority of the HSA, who is not the direct supervisor.  We strongly recommend that a normal reporting relationship be established.

As a methodology to meet substantial compliance, the experts recommend that the types of studies could include the following:

- Provider compliance with chronic disease guidelines;
- Evaluation of ED or hospital send outs to determine if medical care was appropriate prior to the send out, whether providers timely reviewed and addressed all ED/hospital recommendations, implemented an appropriate treatment plan, and monitored the patient until the desired clinical outcome was achieved;
- Polypharmacy;
- Whether medical care following intake was timely and appropriate; and
- Evaluation of other ACH identified quality issues.

The medical experts recommend that the general methodology for the studies includes:

1. Studies of provider quality at both jails;
2. An adequate sample size for each jail (e.g., 30) to support the conclusions of the study;
3. Record sample is over time (e.g., 1-3 months) rather than point in time;
4. Identifying types of quality issues and an assessment of the root causes of poor medical quality (e.g. provide knowledge, clinical decision making, failure to address abnormal diagnostic testing, lack of monitoring of the patient, etc.).
5. A corrective action plan to address findings including medical provider counseling and further monitoring, etc.

As the provision to meet the requirement for evaluating provider quality "regularly", we recommend that a study is conducted at each jail quarterly and is targeted towards known or suspected quality of care issues.

The results of these studies need to be documented, and may contribute to peer review activities and/or additional quality improvement studies that produce recommendations regarding system changes that may improve provider quality.

Finally, as noted in the last report, we believe there is continued value in reviewing potentially preventable ED send outs to identify possible lapses in medical or nursing care, or delayed access due to custody issues. We recommend selecting conditions for review using the Agency for Healthcare Quality and Research (AHQR) Prevention Quality Indicators (QI's).

*The Prevention QIs consist of the following 16 ambulatory care sensitive conditions which are measured as rates of admission to the hospital:*

- *Bacterial pneumonia.*
- *Dehydration.*
- *Urinary tract infection.*
- *Perforated appendix.*
- *Angina without procedure.*
- *Congestive heart failure.*

- *Hypertension.*
- *Adult asthma.*
- *Chronic obstructive pulmonary disease.*
- *Diabetes short-term complication.*
- *Diabetes long-term complication.*
- *Uncontrolled diabetes.*
- *Lower-extremity amputation among patients with diabetes.*
- *Seizure*
- *Sepsis or any diagnosis of significant infection (e.g., endocarditis, fasciitis, etc.)*
- *Delirium tremens or drug withdrawal symptoms*
- *Altered mental status*
- *Soft tissue infection*
- *Uncommon illnesses requiring specialized care (e.g., ulcerative colitis, sickle cell disease, myasthenia gravis, etc.)*

*Although other factors outside the direct control of the health care system, such as poor environmental conditions or lack of patient adherence to treatment recommendations, can result in hospitalization, the Prevention QIs provide a good starting point for assessing quality of health services in the community. Because the Prevention QIs are calculated using readily available hospital administrative data, they are an easy-to-use and inexpensive screening tool. They can be used to provide a window into the community—to identify unmet community health care needs, to monitor how well complications from several common conditions are being avoided in the outpatient setting, and to compare performance of local health care systems across communities." [32]*

**Compliance Assessment:**
A.1=Partial Compliance
A.2=Noncompliance

**Recommendations:**
We repeat the recommendations from the previous site report:
1. As health care programs are implemented, reanalyze health care operations and health care and custody positions that are needed to provide timely access to care (A.1).
2. Conduct a staffing analysis to determine whether there is sufficient health care staffing (e.g., nurses, ancillary personnel) to meet demands for health care services and Consent Decree (A.1).
3. Analyze root causes of vacancies, roadblocks in recruiting, and determination of the current market rate for nursing positions (A.1).
4. Work with the Department of Personnel Services (DPS) to conduct background clearances in 30 days.

---

[32] The Prevention Quality Indicators. Edited for Corrections by Mike Puisis DO.

5.  In the interim, allow employees who have passed SSO security clearance to immediately begin work pending DPS review.

6.  Increase the number of scheduled patients that providers are expected to see per day to keep pace with the demand for medical appointments (A.1).

7.  Continue to expand medical provider coverage at the jail when appropriate, including weekend hours (A.1).

8.  Conduct more robust and real time oversight, and address lapses in medical care (A.2).

9.  Consider using AHRQ Quality Prevention Indicators when selecting records to review pre-hospital and post-hospital care (A.2).

10. Establish expectations for procedures that providers can safely performed on-site such as suturing, drain removal, IV fluids and other minor procedures to reduce emergency department send outs. Consider implementing the use of *i-STAT* machines to rapidly evaluate blood samples for abnormalities.[33]

---

[33] The County advised that providers are expected to perform minor procedures such as suturing, and IV fluids and antibiotics can be given on site. Email 6/27/23.

**B. Intake**

1. All prisoners who are to be housed shall be screened upon arrival in custody by Registered Nurses (RNs). RN screening shall take place prior to placement in jail housing.

2. Health Care intake screening shall take place in a setting that ensures confidentiality of communications between nurses and individual patients. Custody staff may maintain visual communication, unless security concerns based upon an individualized determination of risk that includes a consideration of requests by the health care staff that custody staff be closer at hand. There shall be visual and auditory privacy from other prisoners.

3. The County shall, in consultation with Plaintiffs, revise the content of its intake screening, medical intake screening, and special needs documentation to reflect community standards and ensure proper identification of medical and disability related concerns.

4. Nurses who perform intake screening shall consult any available electronic health care records from prior incarcerations or other county agencies. The form shall include a check box to confirm that such a review was done.

5. The County shall make best efforts to verify a patient's prescribed medications and current treatment needs at intake, including outreach to pharmacies and community providers to request prescriptions and other health records related to ongoing care needs. The policy shall ensure that any ongoing medication, or clinically appropriate alternative, shall be provided within 48 hours of verification or from a determination by a physician that the medication is medically necessary. Any orders that cannot be reconciled or verified, such as those with conflicting prescriptions from multiple providers, shall be referred to a health care provider for reconciliation or verification the next clinic day after booking.

6. The County shall follow a triage process in which intake nurses schedule patients for follow-up appointments based upon their medical needs and acuity at intake and shall not rely solely on patients to submit Health Services Requests once housed. The policy shall, in consultation with Plaintiff's counsel, establish clear protocols that include appropriate intervals of care based on clinical guidelines, and that intake nurses shall schedule follow-up appointments at the time of intake based upon those protocols.

7. All nurses who perform intake screenings will be trained annually on how to perform that function.

**Findings:** In the prior monitoring period, registered nurses had not been performing full medical screening for newly arriving inmates in the booking area. This was due to custody removing inmates from booking after Tier 1 was completed to continue custody processing, and then moving the inmate to a housing unit. This came to the attention of the medical experts in late July 2023. Thereafter, the separation of Tier 1 and Tier 2 screening was discontinued, and all

medical screening was completed in the intake area.  A QI study showed that when Tier 1 and Tier 2 were separated, the average time to complete intake averaged 10 to 13 hours. ACH conducted a QI study that showed some inmates had Tier 2 screening more than 24 hours of arrival, some inmates had been released without medical screening, and some inmates still at the jail *never had intake medical screening.* (B.1). This was dangerous, and in violation of the Consent Decree, and all correctional standards. The process was reversed to conduct Tier 1 and Tier 2 screening in the intake area. Since then, ACH monitors the timeliness of medical screening.

During the week of 3/10/24 to 3/16/2024, the average time from beginning to completion of medical screening was 21 minutes with some taking as little as 3 minutes and some more than an hour. The data also show many intakes for patients found fit for confinement took as little as 5 to 7 minutes to complete. While some patients may be completely healthy, just asking questions on the intake form would take more than 5 minutes. This raises questions as to whether nurses ask all medical screening questions, including substance use histories.

Confidentiality for patients is not provided during medical screening despite physical plant improvements (B.2). Arresting officers and other inmates are privy to confidential conversations between the nurse and the patient. On 9/27/23, an arresting officer heard medical information regarding substance use and used the information in the charging document for crimes committed.  Patients will not share sensitive medical information such as HIV infection and substance use if they believe it can be overheard by officers or other inmates.  This raises the risk that patients will not be treated for their serious medical conditions. This has been an ongoing violation of the Consent Decree.

The County collaborated with Class Counsel to make changes to the intake screening form, and the County continues to make changes as medical intake processes are amended (B.3).

Intake nurses still do not consistently review medical records from prior admissions and transfers from other jails or the state prison system.  This results in lack of awareness of the patient's medical and mental health history and medications.  Intake nurses attempt to verify medications. However, when medications are verified, medical and mental health providers sometimes do not acknowledge and continue the patient's prescribed medications. If not continued, providers do not consistently document the clinical rationale for stopping or changing the patient's medication regimen (B.4).

In some cases, Release of Information (ROI) forms related to medication are not followed up upon, resulting in delays of treatment for serious medical conditions (B.5).

While some nurses perform abbreviated medical screening, compared to previous reviews, intake nurses make more appropriate referrals to medical providers for urgent conditions and 14-day history and physical examinations, medication assisted treatment (MAT), etc. However, this is not consistently taking placing, and we found cases in which patients were not

appropriately referred. In one case, a patient that was pregnant and opioid dependent was not seen by the MAT provider for 4 days, during which time she experienced severe withdrawal before treatment was initiated. This patient is described later in this section (B.6).

The County trains nurses performing intake screening annually (B.7).

We toured the intake area during out February 2024 site visit. We observed lack of auditory privacy. Both officers and other inmates could hear what patients were saying to the nurse. A plexiglass barrier between nurse and patient made it difficult for them to hear each other, even with a cutout of glass, and both nurse and patient raised their voices, and could be heard by others in the area.

We observed the sobering cell which had two inmates who were laying on the floor face down. It was unclear whether a nurse or officer placed them in the sobering cell and why they were there. Staff reported that patients that were intoxicated were placed there. It was difficult to observe whether they were breathing. A nurse came to take vital signs and we asked about performance of CIWA and COWS checks for alcohol and opioid withdrawal.  The nurses reported that she only takes vital signs, and does not conduct withdrawal monitoring in the sobering cell, as appropriate because patients in the sobering cell are still under the influence and not in withdrawal.  One inmate was brought out of the sobering cell and sat on the floor (not in a chair) to have his vital signs taken. The patient was talking incoherently to himself and needed both urgent medical and mental health evaluation.

One of the medical experts, Dr. Vassallo expressed concern that patients with an altered level of consciousness (LOC) should not be assumed to be intoxicated and may have other serious, and undiagnosed medical conditions. If patients are intoxicated, changes in LOC may be the result of a fall and head injury, resulting in brain hemorrhage, which has occurred in other jails.[34] Patients with altered mental status need urgent evaluation by a medical provider.

Previously, nurses measured blood alcohol content (BAC) per policy, but this practice was discontinued by the previous Medical and Interim Nursing Director, because of inaccurate readings. Custody staff test inmates for BAC, but this information is not shared with nurses. It is important this information is known to intake nurses, as a high BAC is a criterion for nurses to declare patients unfit for confinement and sent to the ED. If BAC is negative, and the patient has altered LOC, it cannot be attributed to alcohol intoxications and these patients also need urgent medical evaluation.

---

[34] An example of this is found in this article. https://www.nytimes.com/2024/02/18/us/washington-woman-dui-arrest-brain-bleed.html?smid=nytcore-ios-share&referringSource=articleShare

The policy and practices for declaring patients unfit for confinement are not consistent. A one page "Go By"[35] document is unclear and conflicts with the intake policy.  For example, the ACH Nurse Intake Policy directs the nurse to declare a patient unfit for incarceration if their vital signs are unstable, but the policy does not give specific vital signs parameters that define unstable. A memorandum authored by the previous Medical Director, and distributed by the Nursing Director on 9/19/23, directs nurses to consider a patient unfit for incarceration when their blood pressure is greater than or equal to 180/110 mm Hg and their heart rate is greater than 120 per minute.[36] The "Go By" document, derived from a 9/19/18 policy[37] and currently being used, directs the nurse to call a provider if the systolic blood pressure is greater than 230 mm Hg or less than 80 mm Hg, or the diastolic blood pressure is greater than 120 mm Hg or less than 50 mm Hg.  The "Go By" also directs the nurse to notify the provider if the pulse is greater than 125/minute.

The memorandum authored by the previous Medical Director and distributed by the Director of Nursing also directs nursing staff to consider arrestees unfit for incarceration if they are intoxicated and/or at high risk for withdrawal. The new "Go By" instructs nursing staff to declare the patient unfit for incarceration if they appear to be in active delirium tremens (DTs). The four separate directives contain conflicting directives, assessment parameters, and generally confusing guidance. The Interim Medical Director and previous Nursing Director acknowledged being aware of the various discrepancies between documents, which raises the question as to why the document was distributed to the medical experts for review.  All policies and procedures and related documents need to be consistent with each other and vetted, prior to distribution for comment.

Revision of medical screening policies need to be revised to develop specific medical and/or mental health criteria for placement in a medical monitoring cell (i.e., the sobering cell), including what medical evaluation needs to occur prior to placement. The current use of the "Sobering cell" is dangerous, as there are no clear medical or mental health criteria for who is placed in the cell. As the purpose of the cell is for medical observation/monitoring and should be renamed to reflect its purpose (e.g., Medical Observation Room). The policy needs to include the frequency of monitoring and documentation requirements.

We reviewed medical records that showed issues with the medical screening process. These cases are described below.

**Patient #17** This 38-year-old woman arrived at SCJ on 11/27/23 and was released on 3/30/24. Her medical history includes pregnancy EDD 1/11/24, opioid and methamphetamine use

---

[35] A title of "Go By" to describe criteria for declaring patients unfit does not describe the contents of the document and is confusing.

[36] When the nurse determines the patient is unfit for incarceration, the arresting agency is required to transport the patient to the emergency department.

[37] The 2018 Nurse Intake policy (05-05) was updated 12-01-22, and is not the most recent policy.

disorders, hepatitis C infection, and adjustment disorder with mixed anxiety and depressed mood. Her medications at the time of release were methadone, sertraline, and hydroxyzine. The patient had a previous admission to the jail from April 25 and July 2023.

**First admission**

On 7/14/23 at 15:30, a RN conducted what appears to be Tier 1 screening, Urine Drug Screen (UDS) positive for benzos, fentanyl, and methamphetamines. She was pregnant. Her CIWA score=3. COWS=1. The nurse did not contact a provider immediately for treatment of alcohol and opioid withdrawal, order COWS/CIWA monitoring, or refer the patient to OB/GYN.

On 7/14/23 at 22:05, and 5 hours after arrival, a RN conducted tier 2 screening in the housing unit. The patient's pregnancy test was positive. *The patient reported heroin and fentanyl injection drug use, 3 grams daily, and she reported last use was one hour prior to Tier 2 screening, mitigating her symptoms.* COWS=0, CIWA=not measured. The nurse ordered OB/GYN sick call, detox housing, MAT nurse, and mental health referral, but did not immediately call a provider or order an urgent MAT provider appointment or COWS and CIWA assessments.

There were no further COWS or CIWA assessments conducted for 3 days. On 7/17/23 the patient's COWS score=12. On 7/18 and 7/19/23 only one COWS assessment was conducted and none thereafter in this pregnant woman who was experiencing withdrawal symptoms.

On 7/15/23 at 14:12, a MAT nurse noted that the patient refused a MAT evaluation, but there is no documentation that the nurse checked on the patient to attempt to conduct a COWS/CIWA assessment. The nurse completed a refusal of treatment form that is not signed by the patient. On 7/16/23, nurses did not conduct any COWS/CIWA assessments for the patient.

On 7/17/23 at 13:42, a MAT nurse saw the patient for detox evaluation, noting that she was pregnant and experiencing nausea, vomiting, diarrhea, cold sweats, body aches, smokes 3 grams of fentanyl daily. COWS=12. The patient did not know she was pregnant before admission to the jail. The RN consulted the MAT provider who ordered suboxone. The nurse ordered an OB/GYN consult.

Four days after arrival, on 7/18/23 at 12:38, a MAT provider saw the patient for opioid use disorder (OUD) detox in pregnancy, documenting a thorough note. The patient was still having withdrawal symptoms because she swallowed the medication film, instead of applying it to the inside of her cheek. Bedside ultrasound (US) showed an estimated 14-week gestation. Plan: Suboxone 8 mg was given stat, prenatal vitamin, and Pedialyte, anatomy US, and chronic disease follow-up. On 7/20/23, a medical provider saw the patient for follow-up and increased suboxone dose. On 8/21/23, the patient was switched to methadone.

On 7/21/23 at 08:12 the OB/GYN saw the patient.

On 8/20/23, five weeks after arrival, a LCSW conducted a mental health assessment (MHA) noting that the patient had bipolar disorder, anxiety, and depression and referred the patient to a mental health provider. This appointment took place on 9/9/23.

On 9/3/23, the patient submitted an HSR complaining of persistent detox symptoms and requesting an increase in methadone. The HSR is not date stamped and is unsigned and undated. Staff wrote: Patient has OB/GYN appointment on 9/8/23.

*Note: The nurse needed to contact a medical provider immediately for the patient's continued withdrawal symptoms while pregnant.*

Seven weeks after admission, a MH NP saw the patient for an initial MH psychiatric evaluation. Patient only sleeps 4 hours a night.  History of bipolar disorder. Past trials of Celexa, Lithium, Buspar and Vistaril. One past psychiatric hospitalization. The NP ordered sertraline for depression and Benadryl for insomnia. RTC in 4 weeks.

On 9/15/23, OB/GYN saw the patient for follow-up.

On 9/20/23, the patient was transferred to Central California Women's Facility (CCWF). An appointment with the AEGIS/CORE treatment center was made for 11/25/24.

**Summary**: Following Tier 1 screening, this pregnant and opioid dependent patient did not receive timely Tier 2 medical screening for five hours, and in the interim the patient took fentanyl at the jail to mitigate her withdrawal symptoms. The intake nurse did not order COWS/CIWA monitoring, and when ordered was not timely completed. This pregnant patient experienced withdrawal symptoms for 3 days before treatment was provided, and 4 days before seeing the MAT provider. When COWS assessments were ordered, either following intake or later during her pregnancy they were not conducted consistent with the clinical needs of the patient, Consent Decree, and Standardized Nurse Procedures. This is of particular concern as the patient continued to have withdrawal symptoms throughout her pregnancy, despite frequent adjustments in MAT. The patient did not receive timely mental health evaluation and treatment.

### Second Admission

On 11/27/23 at 14:11, the patient transferred from a CDCR prison back to SCJ.  Medical records were transported with the patient. She was still pregnant. Medications included methadone and prenatal vitamins. COWS score=0. The nurse referred the patient for an essential medication check and OB/GYN, mental health and dental, and MAT nurse appointment. The nurse did not order COWS assessments or refer the patient to the MAT provider. The same day, pharmacy contacted CORE for methadone.  Methadone was given the same day.

On 11/27/23, a Social Worker 1 noted that the patient's MHA was scheduled.

On 11/27/23 at 18:16, a medical provider conducted an essential medication review. He ordered most, but not all medications, and documented the rationale for not ordering certain medications (e.g., aspirin).

On 11/28/23, a MH NP ordered Sertraline and Benadryl.

On 11/28/23, a MAT nurse saw the patient and conducted an assessment. The patient had received methadone, and was "instantly happy." No complaints.

On 12/1/23, OB/GYN saw the patient and conducted a thorough review of the patient's care to date. Ordered follow-up care.

On 12/9/23, the patient submitted an HSR requesting an increase in methadone. Five days later, on 12/14/23, a RN dated, timed, and signed the HSR with an urgent referral to the MAT RN.

On 12/14/23, the patient submitted another HSR requesting an increase in methadone.  On 12/17/23, a RN initialed and dated the HSR with a routine referral to the MAT nurse.

On 12/15/23, OB/GYN saw the patient, who was at 36 weeks gestation.

On 12/22/23, approximately 3 weeks after arrival, a Licensed Clinical Social Worker (LCSW) conducted a MHA.

On 12/22/23 at 12:51, deputy brought patient to 2M because the patient was vomiting.  The nurse observed the patient vomiting large amounts of clear fluid. No other review of systems (ROS). COWS=11. VS=normal. The RN contacted a medical provider who ordered Zofran and to observe the patient.

On 12/22/23 at 13:15, a medical provider saw the patient, noting her history of alcohol, benzo, and opioid use. UDT=negative for alcohol and benzos. Unable to provide history and only allowed limited examination. A: Opiate detox. SC in 2 days.  Will stay on 2M for observation until tomorrow morning.

*Note: Following admission to 2M, a RN did not document an assessment in 2M for another 7 hours.*

On 12/22/23 at 20:11, the patent reported not feeling well, denied vomiting but nausea. Pulse=55/minute. Given detox regimen at that time. COWS=10.

*Although the patient was in the 2 medical infirmary nurses did not document rounds or COWS assessments while the patient was in the infirmary with withdrawal symptoms.*

On 3/13/24, a MH provider followed up with the patient.

On 3/13/24, the pharmacy prepared discharge medications.

On 3/30/24, the patient was released.

**Summary:**   During this second admission, the patient was transferred from CDCR and was prescribed methadone, which was timely continued as was the patient's psychotropic medications.  However, the intake nurse did not refer the patient to the MAT provider, who saw the patient 6 weeks later, or order COWS assessments. *When COWS assessments were ordered for the patient, they were not performed, even when the patient was in the 2M infirmary due to nausea and a COWS score of 10. It is deeply concerning that 2M nurses did not document a patient assessment for a patient that was vomiting and experiencing opioid withdrawal.* The patient did not receive a mental health assessment for 3 weeks after arrival.  Nurses did not adequately respond to HSRs for which the patient complained of withdrawal symptoms. This resulted in preventable suffering for the patient and fetus.

**Patient #20** This 38-year-old woman arrived at SCJ on 1/9/24 and was released on 1/12/24. Her medical history includes alcohol, opiate and methamphetamine substance use disorder, late latent syphilis, herpes simplex, trichomonas, blindness right eye, major depressive disorder, severe with psychotic episodes, and radial nerve palsy. Medications were Citalopram and acyclovir.

At a previous admission in July 2023, the patient was given Penicillin G 2.4 million units for syphilis.  On 10/14/23, she was released.

On 1/9/24, the patient was transferred from San Joaquin County Correctional Healthcare Services to Sacramento County Jail. Medical transfer information was forwarded. At 09:57 an intake nurse conducted intake screening.  The patient was feeling helpless and hopeless. She thought that she might be pregnant, but a pregnancy test was negative. The patient was prescribed Depo Provera for birth control. The patient had a history of alcohol use, a pint a day, with withdrawal seizure; and fentanyl, and amphetamine use, with opiate overdose.   COWS=2, PAWSS=4, CIWA=2. Medications included Celexa and acyclovir. The nurse ordered STI labs, HIV, RPR, HCV, referred the patient to mental health, provider sick call, COWS, CIWAs, Detox and MAT induction housing. The RN did not notify a provider regarding the patient's history of alcohol-related seizures to obtain an order for an alcohol withdrawal regimen.

On 1/9/24 at 15:25, a RN assessed the patient for substance use and withdrawal symptoms. The patient had a history of drinking 1-2 pints of hard liquor daily.  CIWA=8. PAWSS=4.  COWS=11. The nurse contacted a medical provider who ordered an alcohol and opiate withdrawal regimen. Nurses did not conduct any CIWA assessments thereafter.

On 1/9/24 at 16:08, a SWI ordered a MHA and essential medication check. It is unclear whether the MHA was an urgent or routine referral.

On 1/9/24 at 18:35, the patient's Citalopram was verified and a MH NP ordered the medication the next day.

On 1/10/24 at 14:11, a medical provider wrote a thorough note and ordered CIWA's twice daily for 5 days.

*No CIWAs were conducted for the next 60 hours.*

On 1/12/24 at 00:01, a RN attempted to conduct detox monitoring at cell side in the female release tank. The patient refused to come out.  The patient was released at 00:24.

**Summary:** The nurse did not contact a provider for this patient's history of severe alcohol withdrawal. Nurses did not conduct withdrawal monitoring.

**Compliance Assessment:**
- B.1=Substantial Compliance
- B.2=Noncompliance
- B.3=Substantial Compliance
- B.4=Partial Compliance
- B.5=Partial Compliance
- B.6=Partial Compliance
- B.7=Substantial Compliance

**Recommendations:**
1. The County needs to develop and implement a permanent solution at Main Jail to provide privacy during medical screening.  The County has developed a plan to be completed in 90 days from this report.
2. Revise Nurse Intake policy to include the following:
   a. Change the title to Receiving Medical Screening, consistent with NCCHC standards and EHR templates.

b. Separate Tier 1 from Tier 2 screening to determine fitness for confinement.[38] Develop specific medical and mental health criteria for declaring patients unfit for confinement, including altered level of consciousness and other symptoms, vital signs, blood sugars, and blood alcohol content (BAC).

c. Develop a priority system for patients to receive Tier 2 screening, using color coded wristbands or other methods (e.g., electronic dashboard) to replace the current first come, first serve, system.  For wristbands, red=acute conditions, intoxication or at risk of withdrawal; yellow=stable chronic conditions, and green=no chronic diseases or serious medical conditions. Consider bands to identify patients needing mental health evaluation. Patients with urgent conditions are expedited ahead of patients with lower acuity levels.

d. Develop criteria for nurses to notify a medical provider. This includes notifying a medical provider regarding decisions to declare a patient unfit for confinement and initiating any Standardized Nurse Procedures (SNP) with prescription medications, in accordance with new pharmacy regulations.

e. Develop monitoring requirements while patients remain in the booking area (e.g., alcohol or opioid withdrawal monitoring, frequency of CIWA and COWS assessments, and other patients requiring medical monitoring (e.g., blood sugar or vital sign checks).

3. Revise the Safety and Sobering Cell policy to include:

a. Consider changing the name of the sobering cell to Medical Monitoring Room (to include mental health patients).

b. Criteria for which patients can be placed in the sobering cell and upon whose authority (e.g., placement only for intoxication, acute mental health needs, or suicide prevention).

c. Frequency of rounds (e.g., Welfare checks every 30 minutes and nursing assessments every 2 hours).

d. Criteria for releasing patients from the monitoring cell, in addition to regulations that address maximum hours the patient can be in the sobering cell.  (i.e. six hours).

4. Revise, reorganize, and simplify the Intake Screening form to streamline and not require the nurse to ask duplicate questions.

5. Receiving Screening Assessments

a. Ensure that nurses ask all medical screening questions. Assess whether there are factors that contribute to rushed assessments.

b. Retrain nurses to review health information more diligently from previous admissions or transfer forms.

---

[38] The County responded that the intake policy is currently being revised to separate Tier 1 and Tier 2 medical screening.

    c. Retrain nurses to take thorough alcohol and other substance use histories and assess the risk of severe withdrawal.

    d. Retrain nurses and monitor compliance with making appropriate referrals to medical and mental health providers and ordering COWS and CIWA assessments.

    e. ACH needs to review data that identifies medical screenings that are completed in less than 15 minutes, and conduct random record reviews to determine if, given the patient's medical and mental health history, the timeframe to conduct the screening is appropriate.

6. When patients are referred to medical providers following intake, providers need to: review medical and mental health information, including medications from previous admissions, assess all acute problems; review the patient's substance use history to elicit information not revealed at intake; order alcohol, benzodiazepine, opiate detox regimens; and conduct the initial chronic disease visit, ordering pertinent labs.

## C. Access to Care

1. The County shall ensure that Health Service Requests (HSRs) are readily available to all prisoners, including those in segregation housing, from nurses and custody officers.

2. The County shall provide patients with a mechanism for submitting HSRs that does not require them to share confidential information with custody staff. The county shall install lockboxes or other secure physical or electronic mechanism for the submission of HSRs (as well as health care grievances) in every housing unit. Designated staff shall collect (if submitted physically) or review (if submitted electronically) HSRs at least two times per day in order to ensure that CHS receives critical health information in a timely manner. Designated health care staff shall also collect HSRs during pill call and go door to door in all restricted housing units at least once a day to collect HSRs. HSRs and health care grievances will be promptly date- and time stamped. The county may implement an accessible electronic solution for secure and confidential submission of HSRs and grievances.

3. The County shall establish clear time frames to respond to HSRs:

   a. All patients whose HSRs raise emergent concerns shall be seen by the RN immediately upon receipt of the HSR. For all others, a triage RN shall, within 24 hours of receipt of the form (for urgent concerns) or 72 hours of receipt of the form (for routine concerns).

      (i) Conduct a brief face-to-face visit with the patient in a confidential clinical setting.

      (ii) Take a full set of vital signs, if appropriate.

      (iii) Conduct a physical exam, if appropriate.

      (iv) Assign a triage level for a provider appointment of emergent, urgent, routine, or written response only.

      (v) Inform the patient of his or her triage level and response time frames.

      (vi) Provide over-the-counter medications pursuant to protocols; and

      (vii) Consult with providers regarding patient care pursuant to protocols, as appropriate.

   b. If the triage nurse determines that the patient should be seen by a provider:

      (i) Patients with emergent conditions shall be treated or sent out for emergency treatment immediately.

      (ii) Patients with urgent conditions shall be seen within 24 hours of the RN face-to-face; and

      (iii) Patients with only routine concerns shall be seen within two weeks of the RN face-to-face.

   c. Patients whose requests do not require formal clinical assessment or intervention shall be issued a written response, with steps taken to ensure effective communication, within two weeks of receipt of the form.

> d. The County shall permit patients, including those that are illiterate, non-English speaking, or otherwise unable to submit verbal or electronic HSR's to verbally request care. Such verbal requests shall immediately be documented by the staff member who receives the request on an appropriate form and transmitted to a qualified medical professional for response in the same priority as those HSRs received in writing.
>
> 4. The County shall designate and make available custody escorts for medical staff in order to facilitate timely and confidential clinical contacts or treatment-related events.
> 5. The County shall track and regularly review response times to ensure that the above timelines are met.
> 6. The County shall discontinue its policy of prohibiting patients from reporting or inquiring about multiple medical needs in the same appointment.
> 7. When a patient refuses a medical evaluation or appointment, such refusal will not indicate a waiver of subsequent health care.
>    a. When a patient refuses a service that was ordered by medical staff based on an identified clinical need, medical staff will follow-up to ensure that the patient understands any adverse health consequences and to address individual issues that caused the patient to refuse a service.
>    b. Any such refusal will be documented by medical staff and must include: (1) a description of the nature of the service being refused, (2) confirmation that the patient was made aware of and understands any adverse health consequences by medical staff, and (3) the signature of the patient, and (4) the signature of the medical staff. In the event the signature of the patient is not possible, the staff will document the circumstances.

**Findings:** As noted in the Executive Summary of this report, there continues to be profound lack of patient access to care resulting in harm to patients. Key findings include:

- At RCCC, health services requests (HSRs) were not readily and consistently available to inmates in the housing units. Access to HSRs was being restricted by other inmates designated by custody to be the "House Man."[39] Officers also maintained control of HSR forms (C.1).
- At RCCC, there were no locked HSR boxes in some housing units.[40] There are locked HSR boxes at Main Jail that patients have ready access to (C.2).
- At both Main Jail and RCCC, the routine access to care system (nurse sick call) is dysfunctional. This is due in part to a flawed policy, and delayed nurse triage and patient assessments (if they occur at all). These issues have resulted in inmates submitting multiple requests (e.g., 8 in one

---

[39] This practice was stopped immediately during the site visit, and immediately following our site visit, SSO sent a division wide email regarding a policy not to permit inmates to exert control of other inmates, increased custody supervision of housing pods, installing HSR boxes in housing units and posted educational posters for inmates. *See* SSO Corrective Action Plan 5/1/24.
[40] The County responds that it has installed lockable sick call boxes all in housing units at RCCC.

day), and large backlogs of patients to be seen for nurse sick call. It also contributes to delays in medical provider referrals and access to a higher level of medical, dental, and mental health care.  Other contributing factors are lack of:

- *Nurses dedicated to nurse sick call functions, there have been many days in which not a single nurse was assigned to conduct sick call;*[41]
- Clinic examination space and underutilization of existing space;[42]
- A schedule for clinic space utilization;
- Custody dedicated to medical operations; and
- Day to day supervision.[43]

- The Consent Decree requires that registered nurses see patients with emergent concerns immediately, see patients with urgent conditions in 24 hours, and see patients with routine concerns within 72 hours.  However, ACH policy states that nurses will not triage or see patients with non-medical HSRs (mental health and dental), but rather forward the HSRs to the respective discipline.  This builds in further delay in the process, and dental and mental health staff do not consistently triage and see patients in accordance with Consent Decree requirements*. This methodology is no longer acceptable, and policy and practice need to be revised to require that nurses triage all HSR requests and see the patient, unless dental and mental health staff can see the patient in accordance with the patients clinical acuity and Consent Decree timeframes.*

- Nurses do not timely see patients in an adequately equipped room that provides privacy, and when nurses do perform assessments, they are often inadequate and not according to pertinent Standardized Nurse Procedures (SNP) (C.3a).

- Medical records and ACH data show that medical providers do note timely see patients resulting in provider backlogs (C.3.b).

- ACH nursing and medical staff have begun to send patient notifications in response to lab reports and health care appointments, but record review shows that this is very early in implementation (C.3.c).

- Patients have access to and have used interpretive services, however this is not consistently taking place (C.3.d).

- Custody has not provided adequate medical escorts for access to care (C.4).[44]

- The County has not developed an HSR tracking system that enables nurse managers to track HSR timeliness in real time. (C.5).

---

[41] On days, 3 and possibly 4 nurses were assigned to intake. This is a misuse of nursing resources as it ignored the critical function of nurse sick call.

[42] The examination room on 2E s not utilized for nurse sick when its vacant; rooms dedicated to mental health are also not used by medical staff when not in use.

[43] Reema Singh RN has been appointed the new Interim Nursing Director.

[44] In response to the medical experts debriefing during the site visit, SSO established a Medical Liaison Supervisor who will be responsible for scheduling medical escorts daily, assigned two full time deputies dedicated to medical escort Monday to Friday and established a civilian position to assist patient flow on the medical floor. With respect to access to care, in addition to policy requirements, the County plans to: Assign 1-2 nurses daily and use overtime to conduct sick call, etc.  ACH/SSO CAP. 5/1/24.

- The County has discontinued its policy of prohibiting inmates from listing multiple complaints in health request forms. However, given the current paper triage system, it is unclear how HSRs with multiple types of complaints (i.e. medical, dental, and mental health) are routed and timely addressed (C.6).
- Health care staff (e.g., medical, dental, and mental health) do not consistently follow-up with the patient at the time of the service to determine if it is a true refusal, counsel the patient, and obtain a signed refusal. Although identified as a problem in previous reports, staff continue to accept refusals on behalf of patients from custody, or because the patient "refused to come out of his cell." *This has resulted in negative patient outcomes, including hospitalizations[45] and deaths (C.7.a and C7.b).*

Both at Main Jail and RCCC, nurses do not have dedicated clinic space to see patients, and no set schedule to see patients each day.  ACH and SSO have developed a plan to construct two examination rooms to be placed in the day room of each housing unit. This is to accommodate nurses, phlebotomists, and mental health staff, but implementation is not expected to be completed until December 2024.  *While we support the long-term plan, patients need to have full access to care today.[46]*

In the Executive Summary, we described an egregious example of a patient that was hospitalized for pre-septal cellulitis following custody staff obstructing access to care over a 3-day period. Other cases reflecting problems with access to care are noted below.

**Patient #13** This 55-year-old man arrived at SCJ on 10/14/23 and is still at the jail. His medical history includes hypertension, asthma, renal calculus, schizophrenia, conjunctivitis, preseptal cellulitis, and COVID-19.  His medications are amlodipine, montelukast, albuterol, tamsulosin, fluticasone, and mirtazapine.

On 11/25/23, the patient submitted an HSR complaining of broken teeth, one that is infected and bleeds. On 11/29/23, a staff member wrote that a dental appointment was already pending.

On 11/30/23, he submitted an HSR complaining of painful urination, urine red in color and his urine was now back to normal. The date stamp was illegible. On 11/30/23, an unknown staff member (due to illegible signature) documented that the HSR was received, but did not document a triage disposition. A nurse saw him in the housing unit the same day and noted that the patient had a history of kidney stones and he denied flank pain. She advised him to drink more water, but did not make a referral to a medical provider. The nurse also noted that the patient retreated the patient for scabies. The nurse wrote instructions for custody to change clothes and linens.

---

[45] Patient #5.
[46] The County is implementing the plan to install two clinic spaces on each floor which is anticipated to be completed on 10/9/24.

On 12/2/23 the patient submitted an HSR stating to disregard his last dental kite. *"I was able to remove myself, a shard of broken tooth and putrid debris."* No date stamp on the form. Received 12/4/23. Routine disposition.

*Note: On 11/25/23 the patient complained of a broken, infected, and bleeding tooth. Dental did not timely see him, resulting in the patient removing his tooth and pus himself.*

On 12/2/23, at 17:54, a deputy contacted a nurse because the patient complained of headache, sore throat, and toothache. NSC scheduled.

At 17:58, a different nurse tested the patient for COVID which was negative. The nurse did not address the patients other symptoms.

At 19:03 a RN saw the patient for c/o abdominal pain and gas, headache, back aches, rash, and coughing up black stuff. No vital signs. The nurse indicated to the patient that only the provider could change his medication.

At 19:13, the patient was placed in isolation for possible COVID.

On 12/3/23 at 10:26, a provider saw the patient for c/o fever, chills, no cough, SOB, chest pain. Fever relieved with Tylenol. The provider did not address each patient complaint from the night before, or listen to the patient's lungs. Awaiting PCR (COVID) test.

On 12/4/23, at 04:43, a RN saw the patient who complained of putting hydrocortisone on his face and when he woke up his right eye and face were swollen. Hives were noted on his forehead and right cheek and his right eye was noted to be swollen. The nurse ordered Benadryl per SNP and provider sick call.

On 12/4/23 at 06:45, a RDA reviewed two dental HSRs, one on 11/29/23 complaining of chronic pain from broken teeth and another from 12/1/23 stating that "My tooth is aching. People have noticed a bad smell from my mouth." The RDA noted that the patient was already pending an appointment.  There were no new orders, and the patient was not seen.

*Note: Documenting that a patient has a "pending appointment" is not appropriate unless the pending appointment date is within the time frame of the clinical needs of the patient and Consent Decree requirements. The patient had already removed his broken tooth and associated pus.*

On 12/4/23 at 08:30, custody called the MHU to notify the nurse that the patient needed to be seen. The nurse noted the patient had right eye swelling and periorbital edema which started early that morning. Erythema scatted on left side of forehead. The patient complained of chills, pain 8 out of 10 in severity on his whole face and head.  Temp=99.9 F.  The nurse told the patient to let custody/medical know if it got worse. The nurse did not contact a physician but ordered nurse sick call.

*Note: These findings warranted immediate notification of a medical and dental provider.*

At 13:59, a CNA imported vital signs by a RN taken earlier that day. The patient had a headache, swollen face, and low-grade fever.

*Note The CNA needed to repeat the patient's vital signs, not copy them from earlier in the day.*

On Tuesday, 12/5/23 at 03:39, a RN attempted to see the patient for nurse sick call but did not because the patient was sleeping.

*Note: Routinely seeing patients at 03:39 is an unreasonable barrier to care; however, in this case, the patient's condition earlier in the day warranted an urgent nursing assessment of the patient.*

On 12/5/23 at 08:31, a RN received a call from a concerned MA that the patient had a swollen face, right >left.  Patient is already scheduled for nurse sick call and MD sick call.

*Note: The nurse needed to see the patent immediately, and not rely on a previously scheduled nurse or provider appointment.*

On 12/5/23 at 16:14, a RN note that the patient had worsening periorbital edema and increased vision obstruction from right facial swelling and hardness.  The nurse did not measure the patients temperature. The patient was sent to ED.

On 12/5/23 at 23:45, the patient returned to the jail, diagnosed with preseptal cellulitis. The patient's white blood cell count was high (WBC=13, normal=4-10), indicating a bacterial infection. The ED provider gave IV Ketorolac and an antibiotic and recommended reevaluation in in 3 days. Upon the patient's return the nurse noted the patient's facial swelling with redness and both eyes were slightly closed. Temp=99.9° F. No medications were noted to be ordered.

On 12/6/23 at 07:55, a medical provider saw the patient, noting the patient was diagnosed with preseptal cellulitis, and that the hospital made no antibiotic recommendations. He ordered Augmentin x 10 days. He addressed all chronic diseases including asthma.  Follow-up in 2 days.

*Note: Upon review of Kaiser records, the hospitalist had ordered Augmentin x 10 days in the discharge orders. Although the provider did not see the orders, he independently prescribed antibiotics for 10 days.*

On 12/7/23, a different provider saw the patient for follow-up noting that he was improving.

Review of the patient's MAR shows he received Augmentin; however, some 1900 doses were significantly delayed in administration and given at 02:28, 23:48, 22:56, 01:30, 02:06, 00:42.

**Summary:** This patient did not receive timely dental or medical care for possible dental abscess/and or facial infection, resulting in pre-septal cellulitis, and an emergency department visit, which may have been preventable had the patient received earlier access to care. This case involves poor judgement by a registered dental assistant and nurses. When patients report signs and symptoms of a potentially serious condition (e.g., dental or facial infection), *health care staff must see the patient,* and should not document that a medical or dental appointment is pending. Medication administration records show that 7 pm medications are not being administered for up to 6 and 7 hours later.

**Patient #5**   This 44-year-old patient was admitted to SCJ on 10/5/23 and released on 1/29/24. His medical history includes alcohol, opioid, and methamphetamine use disorders, type 1

diabetes, diabetic ketoacidosis, abnormal liver function tests and thrombocytopenia, diabetic neuropathy, and hypertension.[47] He was prescribed numerous medications, including Lantus and Lispro Insulin. At intake, a CVS medication report showed that the patient was prescribed other medical and mental health medications, but neither medical nor mental health providers acknowledged this list.

On 10/6/23 at 03:30, a nurse did not administer the patient's Lantus Insulin. The status was "pending." *A LVN later completed a refusal of treatment form stating the patient refused to come out of his cell.*

On 10/6/23 at 08:45, a SRN ordered 2M walk-in blood sugar checks before lunch daily. Per the NP, the patient was permitted to stay in 6W for now until a bed in 2 East was available.

On 10/6/23 at 9:11 a HUSC called the pharmacy and spoke with someone who indicated that the patient did not have any prescriptions on file with CVS.  However, a printout from CVS showed the patient was prescribed Escitalopram (Lexapro) 10 mg, alprazolam .25, and Trazodone 150 mg.

On 10/6/23 at 11:21 a RN documented that the patient, per a deputy, refused to come down to 2M for his blood sugar check (and insulin per sliding scale).

On 10/6/23 at 13:28, a LVN administered lisinopril 5 mg to the patient.

On 10/6/23 at 13:58, a MA noted that the patient refused to come out of his call for a medical appointment, and the risks and benefits were explained to the patient.

*Note: A LVN administered lisinopril 20 minutes before that patient was reported to refuse to come out of his cell for a medical appointment.*

*On 10/6/23 at 15:30, a LVN documented on the eMAR that the patient was seen lying on the floor, c/o pain, responsive and able to follow commands, unlabored breathing. BS checked, 516, sent to medical for evaluation.*

On 10/6/23 at 15:37, a 2M RN checked the patient's blood sugar that was 540 mg/dl. The patient had "refused to come down earlier for a blood sugar check." The RN contacted a medical provider, who ordered Humulin Insulin 15 units and to recheck the patient's blood sugar after 3 hours. The RN noted that the patient was scheduled for an urgent H&P. The patient was returned to 6 West, Pod 100.

On 10/6/23 at 15:48, a RN documented that Humulin 15 units was administered to the patient, but at 16:12 changed it to "Not administered" for "Other" reason.

---

[47] The patient also had dyslipidemia, seizure, latent syphilis, latent TB infection, COVID-19 infection, lumbar radiculopathy, GERD, unspecified fracture of navicular (scaphoid) bone with non-union, and major depressive disorder with psychotic features.

*Note: It is a serious concern that the nurse did not administer Humulin Insulin to the patient, whose blood sugar was extremely high at 540, and it is unclear why the Humulin Insulin was not administered to the patient.*

On 10/6/23 at 22:08 a RN administered atorvastatin and pantoprazole to the patient.

*On 10/7/23 at 0330, a LVN documented that the patient's Humulin Insulin was not administered because the patient "refused to come out." The refusal of treatment form has no explanation.*

On 10/7/23 at 11:21, a LVN did not check the patient's blood sugar or administer the patient's Humulin insulin because the patient "Refused to Come Out." The refusal form, timed at 10:45, it said: "Refused to answer deputy/Come out of the cell for FSBS.

On 10/7/23 at 15:30 a LVN did not check the patient's blood sugar or administer the patient's Humulin Insulin. The Refusal of Treatment form said: "None Given."

*Note: For these 3 refusals, the LVN did not check on the patient to assess his condition and the refusal of treatment.*

On 10/7/23 at 12:20, a LCSW received a custody referral because the patient was not taking care of self, cell dirty, laying around in cell, no dayroom, not eating food served, refusing medical appointments. Wheelchaired to medical yesterday, however ambulated to wheelchair and was seen.  The LCSW ordered an urgent mental health referral (to be seen in 6 hours).

On 10/7/23 at 12:34, a LVN noted that the patient was not given Lisinopril due to refusal.

*Note: Given the documented condition of the patient 15 minutes earlier, it is likely that the patient would not be capable of refusing medication.*

On 10/7/23 at 14:57, a LVN noted that the patient refused Humulin insulin due to refusal.

On 10/7/23 at 17:34, a RN noted that the patient was found on cell floor, naked, not responding to staff. Vital signs stable, Narcan 8 mg given without response. FSBS=Hi, Humulin 15 units given. Code 3 for rule out diabetic ketoacidosis (DKA). There was no documentation that a medical provider was notified or gave the order to send the patient to the hospital.  A medical provider signed this note on 10/12/23.

*Hospitalization: On 10/7/23 at 18:37 the patient was admitted to Sutter Hospital for altered mental status, seizure-like activity, and severe diabetic ketoacidosis. Upon arrival, he had decreased level of consciousness and gaze deviation, concerning for seizure.  Blood sugar=1,200. Suspected acute kidney injury secondary to rhabdomyolysis.  He was admitted to the ICU. On 10/8/23, the patient was obtunded and an EEG was abnormal, and suggestive of diffuse cerebral dysfunction, hypoxic-ischemia encephalopathy, medication effects, post-ictal state. or other bilateral cerebral dysfunctions. No evidence of seizure activity. Brain CT and chest x-ray were normal.*

On 10/7/23 at 20:05, an ACH medical provider ordered Humulin 15 units SC three times daily before meals. The patient was at the hospital at that time.

On 10/11/23 at 13:39, an ACH medical provider wrote that the patient did not come to the clinic for an H&P. The provider documented that he reviewed previous notes and outside records, but did not note that the patient was at Sutter Hospital.

*Note: This raises the question as to whether the provider reviewed previous notes and outside records as the provider was unaware that the patient was at Sutter Hospital in DKA.*

On 10/11/23 at 22:04, a RN documented not giving atorvastatin due to the patient "not coming out," but the patient was at Sutter Hospital.

On 10/12/23 at 03:43, a LVN documented that the patient refused a blood sugar check and insulin. The patient was at the hospital.

On 10/12/23 at 11:43, a medical provider noted that the patient "presents to the clinic for initial H&P", and that he "reviewed previous notes and outside records", but then noted that the patient had been sent to the ED.

On 10/12/23, the patient was discharged from Sutter Hospital. His discharged diagnoses were seizure-like activity, altered mental status and diabetic ketoacidosis.  *Discharge medications included Lantus insulin 20 units daily, plus Lispro 6 units before meals and sliding scale insulin before meals and at bedtime, titrate to keep at 100-150.*

On 10/12/23 at about 15:30 he was discharged back to 2 Medical at Main Jail. A RN saw the patient.

**Summary:** This review shows multiple system issues and individual practice issues that resulted in hospitalization for rhabdomyolysis and severe diabetic ketoacidosis that was life-threatening. These include:

- Lack of access to care through sick call;
- Failure of nurses to give insulin and other medications to the patient;
- Nurses not checking on the patient when custody reported that would "not come out of his cell," or that he "refused" his insulin and other medications;
- Health care staff documenting that the patient did "not come out of his cell," when the patient was at the hospital.
- Custody not notifying medical staff when the patient was found lying in his cell and unable to care for himself.
- Providers not reviewing and ordering medications in accordance with discharge orders;
- A serious medication error resulting in the patient receiving two doses of Lantus insulin;
- lack of a functioning sink in his cell for 3 days, resulting in severe dehydration to this fragile patient with type 1 diabetes and acute kidney injury;
- Untimely ophthalmology consult;

- Lack of evaluation for liver disease, and lack of access to care through nurse sick call.

*In addition, this case as well as others we have reviewed, during this and previous monitoring period shows that patients with acute medical conditions at Main Jail are not placed in a higher level of care for medical monitoring, in part reflecting lack of adequate numbers of infirmary beds, but also a lack of recognition that a patient needs a higher level of care. Moreover, even when patients are placed in 2M, nurses do not adequately monitor patients in the infirmary including for withdrawal monitoring.[48] The effect is that instead of being placed in a higher level of care, at Main Jail acutely ill patients are sent back to their housing unit where they deteriorate and require, not just an emergency department visit, but inpatient hospitalization in the ICU.*

*At RCCC, infirmary beds for men appear to be adequate and RCCC nurses document thorough progress notes at least twice daily. However, there are no infirmary beds for women at RCCC.*

*Although not specifically addressed in the Consent Decree, the County must provide a higher level of care for both men and women at the jail. Potential options include repurposing beds on the APU if patients can be safely managed in another location, designating beds on 2 East as infirmary beds, and expanding the RCCC MHU to include a separate infirmary and detox monitoring unit for women.*

Finally, record review shows that nurses are not compliant with Standardized Nursing Procedures. The case below is an example:

Another 54-year-old male patient booked into the jail on 12/2/23 with a history of substance use disorder using methamphetamine, specifically "crank." On 12/28/23 at 02:20, the patient was seen in the medical unit after complaining of a moderate burning sensation from his left shoulder down his left arm that had begun 30 minutes prior, rating the pain a 6 out of 10. His blood pressure was 127/80 mm Hg, pulse 112/minute, SPO2 95%, and temperature 99.5° F. The nurse failed to follow the chest pain SNP and/or notify a provider, and simply instructed the patient to rest and find a comfortable position to relieve the pain and sent him back to his cell. Patients reporting symptoms with the potential of being cardiac related should be assessed utilizing the standardized nursing protocol, including notification of a provider.[49]

**Compliance Assessment:**
- C.1=Noncompliance
- C.2=Partial Compliance
- C.3.a=Noncompliance
- C.3.b=Partial Compliance
- C.3.c=Partial Compliance

---

[48] Patent #4.
[49] Patient #29

- C.3.d=Partial Compliance
- C.4=Noncompliance
- C.5=Noncompliance
- C.6=Substantial Compliance
- C.7.a=Noncompliance
- C.7.b=Noncompliance

The Medical Experts recognize the actions taken by ACH and SSO during, and immediately following the site visit, as well as the County's initial ACH/SSO Corrective Action Plan of 3/11/24 that was finalized on 5/1/24.

**Recommendations:**

1. Revise the Nurse Sick Call and Provider Sick Call policies to streamline access to care and remove obstacles to timely care as discussed in this and previous reports.
2. The policy needs to include a requirement that health care staff directly interact with all patients that refuse care, including those reported by custody, or for patient's that "refuse to come out of their cell," for medication administration, withdrawal monitoring, or any other health care appointment.
3. Custody must provide escorts for nurses to see patients.
4. Conduct systemwide training for all health care and custody staff regarding access to care policies.
5. Establish an HSR tracking system that provides accountability for all HSRs from collection until the final disposition of the HSR. This includes:
   a. Patient name and X-ref number;
   b. Date the patient wrote the HSR;
   c. Date and time the HSR was collected;
   d. Date and time the SRN triaged each HSR, including dental and mental health requests;[50]
   e. Triage disposition (Emergent, Urgent and Routine);
   f. Date the RN, dental, or mental health staff saw the patient;
   g. Location of the Encounter (examination room, cell-side, other);
   h. Provider referral (Yes/No);
   i. Date patient scheduled to see a provider;
   j. Date of reschedule or cancellation;
   k. Reason for reschedule or cancellation (e.g., patient released, lack of escorts, provider not available, etc.);
   l. Date that a medical, dental, or mental health provider saw the patient.
6. Nurse and medical provider managers, monitor aging reports and take action to ensure that patients are timely seen.

---

[50] Legibly sign each HSR. We encourage the use of name stamps with credentials, and nurse initials on each HSR.

7. Conduct a daily huddle with ACH and SSO representatives at the beginning of the day shift to review sentinel events (e.g., emergency department transfers and hospitalizations) that happened since the last huddle, as well as other metrics (e.g., nursing and provider backlogs, specialty services, appointments, etc.).

8. Monitor and resource additional staff in real time, to avoid nursing and provider sick call backlogs.

9. Provide a means of communication for nurses (e.g., radios, cell phones) to permit nurse supervisors and staff to communicate in real time.

10. Nurses and other health care staff need to escalate obstacles to care up the health care and custody chain of command in real time, so the issue can be resolved.

11. Prioritize and schedule nurse sick call to be conducted in an adequately equipped examination room at a designated time, 7 days a week. Nurse sick call should not be scheduled and conducted at times that present a barrier to care.

12. Create higher level medical bedspace for patients requiring a higher level of care, for both men and women at both jails.

13. Retrain nurses on the use of Standardized Nurse Procedures.

14. Perform CQI studies regarding access to care, to include all Consent Decree and policy requirements. CQI studies need to be expanded beyond a specific point in time to measure performance over time (e.g., 30–60-day period that includes records selected from all 7 days of the week. Sample sizes need to be expanded to 30 per facility for any high-volume activities (e.g., intake, nurse and provider sick call, medication administration, etc.) to have sufficient data to demonstrate compliance.

15. Regarding CQI study methodology, HSR's that are not found to have dates and times should be counted as non-compliant and/or unable to determine, rather than reducing the sample size and artificially elevating the scoring. ACH policy requires HSRs and all patient encounters to be date and time stamped.

## D. Chronic Care

1. Within three months of the date the Remedial plan is issued by the Court, the County shall, in consultation with Plaintiffs' counsel, develop and implement a chronic disease management program that is consistent with national clinical practice guidelines. The chronic disease program will include procedure for the identification and monitoring of such patients and the establishment and implementation of individualized treatment plans consistent with national clinical practice guidelines.

   a. The chronic disease management program shall ensure that patients with chronic illness shall be identified and seen after intake based upon acuity (on the day of arrival for patients with high acuity and not to exceed 30 days for all others). The County will timely provide clinically indicated diagnostic testing and treatment, including prior to this post-intake appointment. Follow-up appointments will be provided in intervals that do not exceed 90 days unless patients are clinically stable on at least two consecutive encounters, in which case, follow-up appointment intervals will not exceed 365 days (and sooner if clinically indicated), subject to a chart review every 6 months.

   b. The chronic disease management program shall ensure patients are screened for hepatitis C at intake. If medical staff recommend Hepatitis testing based upon screening results, such testing shall be offered on an "opt-out" basis for those individuals who remain in custody long enough to receive a housing assignment. If the patient declines testing the refusal shall be documented in the health record. Patients found to have hepatitis C shall be offered immunizations against hepatitis A and B.

   c. The chronic disease management program shall include a comprehensive diabetic management program consistent with the American Diabetes Association (ADA) Diabetes Management in Correctional Institutions. The protocol shall be developed in coordination with custody administration to address normal circadian rhythms, food consumption times and insulin dosing times.

   d. The chronic disease management program shall ensure that patients who take medications for their chronic conditions shall have the medications automatically renewed unless the provider determines that it is necessary to see the patient before renewing the medication. In that case, the patient shall be scheduled to be seen in a reasonable time period to ensure medication continuity.

2. The County shall track compliance with the chronic disease management program requirements for timely provision of appointments, procedures, and medications. The County shall ensure that its electronic medical record system is adequate to support these critical functions.

3. The County shall review its infection control policies and procedures for dialysis treatment to ensure that appropriate precautions are taken to minimize the risk of transmission of blood-borne pathogens, given the proximity of HCV+ and HCV- patients receiving dialysis in the same room.

**Findings:**  The Chronic Disease Management policy was published on 8/18/2021 and revised on 11/14/2022. The written policy is compliant with Consent Decree requirements. The policy states that the Medical Director will develop chronic disease guidelines for the following conditions:

- Diabetes
- Asthma
- COPD
- Seizure Disorder
- Cancer
- Autoimmune Disease
- Hyperlipidemia
- Hypertension
- Coronary Artery Disease
- Hepatitis C
- Psychotic Disorders/Mood Disorders [51]

The previous Medical Director developed Provider Treatment Guidelines for Asthma, Hypertension and HIV infection. There is a policy for hepatitis C infection, but not a clinical guideline. The Medical Experts have previously provided feedback for the Asthma, Diabetes, Hypertension, and HIV guidelines:

- The Asthma Guideline was developed 11/19/2021 and is consistent with UpToDate, an evidenced-based clinical decision support resource. Current national asthma guidelines were updated in 2023. The ACH asthma guideline has not yet been updated.[52]

- The Hypertension Protocol was revised in February 2023.  It is consistent with the 2017 Guidelines for Prevention, Detection, Evaluation, and Management of High Blood Pressure in Adults.[53] The monitors have provided comments regarding identification of patients with hypertension at intake and the process for enrollment into the chronic disease program. The medical experts await feedback on the recommendations.

- The HIV treatment guideline is not consistent with national HIV treatment guidelines.[54]  The guideline is a policy focused on process for new arrivals, frequency of clinics, etc. We have previously recommended the County adopt the Department of Health and Human Services

---

[51] Patients are provided care management and monitoring by mental health psychiatric providers and/or social workers depending on the level of service needed.
[52] The Global Strategy for Asthma Management and Prevention was updated in 2023.
[53] Whelton PK, Carey RM, Aronow WS, et al. 2017 ACC/AHA/AAPA/ABC/ACPM/AGS/APhA/ASH/ASPC/NMA/PCNA Guideline for the Prevention, Detection, Evaluation, and Management of High Blood Pressure in Adults: A Report of the American College of Cardiology/American Heart Association Task Force on Clinical Practice Guidelines. Hypertension 2018; 71: e13.
[54] DHHS Guidelines for the Use of Antiretroviral Agents in HIV-1 infected Adults.

(DHHS) Guidelines for the use of Antiretroviral Agents in Adolescents and Adults with HIV, however this has not taken place. [55]

- The Hepatitis C Infection policy includes criteria for treatment, but is not a hepatitis C treatment guideline. The American Association for the Study of Liver Diseases (AASLD) and Infectious Disease Society (ISDA) have developed guidelines for the treatment of hepatitis C that are the standard of care for chronic hepatitis C infection.   The County needs to adopt these guidelines.

The County needs to develop other chronic disease guidelines noted in the policy that are consistent with nationally recognized guidelines (D.1).

It is unknown whether all patients with chronic diseases are enrolled into the program. We were provided a list of patients with diabetes and asthma, and no other chronic diseases.  The diabetes list contains the names of 133 patients with diabetes in the spreadsheet. For a population of 3,000 inmates, this is between 4 and 5%, which is lower than the expected number for this patient population. It has been estimated that 9% of incarcerated populations have diabetes.[56]  It may be that some patients with diabetes have not been referred to the chronic disease program, included in the list, not entered on the Problem List, or have not been diagnosed as having diabetes.

Diabetes and asthma are two among many chronic diseases. The County needs capacity to identify other patients with chronic diseases such as:
1. Cardiovascular (hypertension, coronary artery disease, aortic or mitral valve disease and heart failure)
2. Pulmonary (asthma, chronic obstructive pulmonary disease (COPD), and pulmonary fibrosis)
3. Endocrine disease (hyper- and hypothyroidism, etc.)
4. Infectious diseases (HIV, syphilis, hepatitis B and C, latent TB infection, active tuberculosis.
5. Autoimmune diseases (type 1 diabetes, systemic lupus erythematosus (SLE), rheumatoid arthritis, Crohn's disease, and ulcerative colitis, celiac.
6. Chronic kidney disease, including patients on dialysis.
7. Gastroenterology (irritable bowel syndrome (IBS), GERD, peptic ulcer disease)
8. Neurological (seizure disorder, Parkinson's, and other neurodegenerative diseases)
9. Obstetrical/Gynecological (current or recent pregnancy, history of abnormal pap smear and mammograms, endometriosis, menopause).
10. Cancers (lung, GI, colon, breast, cervical and uterine, leukemia).
11. Dermatological (psoriasis, eczema, rosacea)

---

[55] The County responded that an infectious disease specialist manages HIV patients, however the County needs to develop guidelines that are consistent with national guidelines, and monitor compliance with the guidelines. https://clinicalinfo.hiv.gov/sites/default/files/guidelines/documents/adult-adolescent-arv/guidelines-adult-adolescent-arv.pdf.
[56] Diabetes Management in Detention Facilities: A statement of the American Diabetes Association.  March 24, 2024.

12. Substance use disorders (alcohol, benzodiazepines, opioids, methamphetamine)
13. Other (fibromyalgia)

As noted in previous reports, except for diabetes, there is no functional chronic disease tracking system that can be used by nurses and providers to ensure that chronic disease appointments are timely completed. The current electronic health record does not have the capacity to produce reports with an associated tracking system. This is a major impediment to ensuring that all patients are enrolled in the program and timely seen. A true tracking system facilitates scheduling of appointments and labs to be drawn in advance of clinic visits, so providers have current information upon which to base treatment decisions. This relies on medical providers to add diagnoses to the Problem Lists as patients enter the jail or are later diagnosed with chronic diseases. This did not occur in a patient with hypertension.[57] This needs to be a requirement of a new EHR.

A chronic disease electronic tracking log would include the following information.
- Name and X-ref number
- Date of Birth
- Date of arrival/initial medical screening
- Date of history and physical
- Date of initial chronic disease visit
- Date that initial labs are scheduled
- Date that labs are completed
- Pertinent lab results (e.g., Hemoglobin A1C, CD4 count/HIV and HCV viral load)
- Date of next appointment
- Date that follow-up labs are scheduled.
- Date that labs are completed.
- Date of next appointment

The tracking log could also include testing and evaluations to be compliant with chronic disease guidelines, such as annual diabetic eye and foot examinations, and immunizations, etc. The current tracking log for diabetes includes this information, and needs to be expanded to include other diseases. Since many patients have multiple chronic diseases, we recommend that there is an integrated list of patients with chronic diseases and not separated by type of disease. This will avoid duplication of patients on different lists of chronic diseases.

There are some chronic disease templates (e.g., asthma) in the EHR to prompt the provider to address all disease components, such as conducting a review of systems, physical examination, labs, medication adherence and patient education. For this review, medical provider documentation regarding assessments of each patient's chronic was improved since previous

---

[57] Patient #9.

reports. However, providers do not consistently use chronic disease template(s) and do not always address key information needed to assess disease control.

For example, evaluating asthma control includes performance of baseline and subsequent peak expiratory flow rates (PEFR) using a peak flow meter, particularly for asthma exacerbations.[58] This review showed that nurses performed PEFR more frequently, but not consistently for provider chronic disease visits and asthma exacerbations. [59]

Inhalers are now included in the Keep on Person (KOP) program, increasing access to treatment. However, some patients have orders for nebulizer treatments that are administered in the medical clinic. We continue to find instances in which licensed vocational nurses (LVNs), refused to administer as needed albuterol, if PEFR's are within "normal range." In November 2023, a LVN denied a patient a nebulized albuterol treatment, because the patient's lungs were "clear."[60] No PEFR measurements were performed. Later that day, the patient was seen urgently due to shortness of breath and wheezing, and a RN administered nebulizer treatment at that time. *LVN's do not have the authority to deny patients' medical treatments PRN (as needed) treatments.*[61]

The County has modified the intake screening form to conduct opt-out testing for HIV, syphilis, and hepatitis C (1.b).  Previously there was confusion regarding the interpretation of a "Yes" or "No" answer with respect to whether the patient was refusing.  The process has been changed so that the nurse confirms the patient's wishes to accept or refuse testing. Record review shows that patients are being tested, but timeliness of testing varies.

The Mays Consent Decree requires the County to develop a comprehensive diabetic management program consistent with the American Diabetes Association. The program is to be developed in coordination with custody administration to address normal circadian rhythms, food consumption times, and insulin dosing time. Scientific evidence links the circadian rhythm

---

[58] Peak Expiratory Flow (PEF) provides objective information about airway restriction in asthmatics. Spirometry is used to evaluate patients with COPD. However, some patients have components of asthma and COPD, and PEFR use for exacerbations and monitoring, can provides objective data to assess disease control.

[59] According to the Global Strategy for Asthma Management and Prevention (2023 Update), peak expiratory flow monitoring has the following short and long-term benefits:

Short term monitoring:

• Patients should be trained to keep track of their symptoms and take to action if symptoms start to worsen;

• Peak Expiratory Flow (PEF) monitoring may be useful following an exacerbation, to monitor recovery following a change in treatment, and to help in assessing whether the patient has responded;

• If symptoms appear excessive (for objective evidence of degree of lung function and impairment); and

• To assist in the identification of occupational or domestic triggers.

For long-term monitoring:

• Earlier detection of exacerbations, mainly in patients with poor perception of airflow limitation;

• For patients with a history of sudden severe exacerbations; and

•For patients who have difficult-to-control or severe asthma.

[60] Patient #19.

[61] The County responded that the issue of LVN's denying patients nebulizer treatments, had previously been addressed in September 2023, and was no longer an issue.  However, as noted above we found that a LVN denied a patient a nebulizer treatment in November 2023, which was during this monitoring period.

to various aspect of diabetes pathology and treatment.[62]  The County has not yet developed and implemented a comprehensive program and it does not appear that steps have been taken to create a program. Nurses perform fingerstick blood sugars (FSBS) and administer insulin at 3 am, which is not consistent with normal circadian rhythms. This results in patient refusals of FSBS's and insulin, and worsening diabetes control.  Providers order diabetic and other medical diets, but the County has not employed a dietician to develop and supervise medical diets. Nursing leadership reported that, in the past, the County contracted with a dietician, who did not come on site. Whether the main menu or ordered medical diets are provided to patients with diabetes and other diseases needing special diets (renal) is unknown (1c.). A comprehensive diabetic program also includes patient education and counseling regarding the cause and effects of diabetes, complications, glycemic goals, nutrition, exercise, and self-management of diabetes.

The Consent Decree requires that chronic disease patients' prescriptions are automatically renewed unless the provider determines that it is necessary to see the patient before renewing the medication. Currently medications are prescribed for one year. Prior to expiration, pharmacy sends an EHR alert for the providers to renew. The plan is for the ACH Medical Director to work with the Pharmacy Director to make renewals automatic when clinical pharmacists are integrated into the chronic care program. (1.d).   A small QI study conducted on 8/16/23 regarding medication renewals showed that 5 of 8 (62%) of patients medications were timely renewed.[63]

Some providers renew medications without seeing the patient or reviewing the patient's medical record.  This can be problematic when medical providers renew a medication regimen that is not effective and needs to be changed.  The case below is an example.

**Patient #9** This 44-year-old man booked into the jail on 9/20/23.  His medical history included hypertension, and multiple blood pressure measurements following admission showed the patient's hypertension was poorly controlled on a low dose diuretic. On 12/6/23, a provider saw the patient and addressed all medical conditions, but did not order a follow-up chronic disease appointment. Blood pressure measurements continued to show the patient's hypertension was poorly controlled. On 2/19/24, a medical provider reordered the patient's antihypertensive medication, an apparently ineffective regimen, without seeing the patient. The patient's poorly controlled hypertension warranted an in person visit to discuss medication adherence, side effects, and to adjust treatment as clinically indicated.  In addition, record review showed a medication error because of interface issues between the eMAR and CIPS. On 2/19/24, the patient received two doses of hydrochlorothiazide, instead of one dose. This is further discussed in section F. Medication Administration and Pharmacy of this report.

---

[62] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5899235/
[63] The methodology of this study limits what conclusions can be drawn regarding medication continuity. We have previously recommended that ACH expand QI studies to include a larger sample (e.g. 20 to 30 records) over a longer period (e.g. 2 or 3 months) and include sampling of different chronic diseases, and select records from different days of the week, including weekends.

The County did not provide documentation supporting that patients with chronic diseases are timely enrolled in the program and monitored in accordance with their clinical acuity and Consent Decree requirements (1.a). Medical record review shows that patients with chronic diseases are timelier seen following their admission into the jail, as compared to previous reports. This is due to intake nurses either ordering medical provider referrals or 14-day physical examinations (H&P). Medical providers more consistently, but not always, use chronic disease templates that prompt the provider to conduct disease specific evaluations. Providers usually order follow-up visits consistent with the patient's disease control, which is an improvement from previous monitoring periods.

There are systems issues that lead to fragmentation of care, including that patients may be managed by multiple medical providers who are not familiar with the patient and does not foster continuity of care. This emphasizes the importance of medical providers reviewing previous notes, test results, and the status of specialty services.

ACH does have designated providers for treatment of patients withdrawing from alcohol, benzodiazepine, and opioid use, patients needing transgender care, and patients with HIV infection.  Cross training is needed for medical providers in management of specialized conditions facilitates good care, when designated providers are on vacation or leave jail employment.

While recognizing improvements in the chronic disease program, we noted records that showed multiple systems and individual performance issues that need to be addressed.  A few cases are noted below.

**Patient #5** This 44-year-old patient was admitted to SCJ on 10/5/23 and was released on 2/29/24. His medical history included alcohol, opioid, and methamphetamine use disorders, type 1 diabetes, diabetic ketoacidosis, abnormal liver function tests and thrombocytopenia, diabetic neuropathy, hypertension, dyslipidemia, seizure, latent syphilis, latent TB infection, major depressive disorder with psychotic features and other health conditions. He was on numerous medications, including Lantus Insulin 30 units SC every morning and Lispro sliding scale, three times a day prior to meals.

**Summary:** This patient review shows multiple system issues and individual practice issues that resulted in hospitalization for severe diabetic ketoacidosis that was life-threatening and post-hospitalization issues. These include:

- LVNs not checking on the patient when custody reported that he "refused" his insulin;
- Custody not notifying medical staff when the patient was found lying in his cell and unable to care for himself:
- Providers not reviewing and ordering medications in accordance with discharge orders;
- A serious medication error resulting in two doses of Lantus insulin;
- Lack of a functioning sink in his cell for 3 days, resulting in severe dehydration;
- Untimely ophthalmology consult;
- Lack of evaluation for liver disease and possible cirrhosis; and

- Lack of access to care through nurse sick call.

The patient arrived 10/5/23 and on 10/7/23, at 18:37, the patient was admitted to Sutter Hospital for altered mental status, seizure-like activity, and severe diabetic ketoacidosis. Suspected acute kidney injury secondary to rhabdomyolysis. He was admitted to the ICU. His survival was in question.[64]

On 10/12/23, upon discharge from the hospital, a medical provider did not review and address hospital discharge orders and wrote insulin orders that were inconsistent with the hospital treatment plan, which included Lantus insulin 20 units, Lispro 6 units before meals and sliding scale insulin. Instead, a medical provider ordered Lantus 30 units every morning and sliding scale insulin, without ordering short acting insulin with meals.  Because previous medication orders were not automatically discontinued when the patient was hospitalized for >24 hours, and a medical provider did not discontinue a previous order for Lantus insulin 30 units, and there were two active orders for Lantus insulin 30 units.

On 10/13/23, a nurse administered two doses of Lantus Insulin.  This error appears to have gone unrecognized by nursing, medicine, and pharmacy.  Following the error, a medical provider did not evaluate the patient for adverse effects.  On 10/14/23, another nurse notified a provider to discontinue the second Lantus insulin order.

On 10/14/23, the patient felt weak and dizzy and was hypotensive and tachycardic. He reported that the fountain in his room was not working for 3 days. The provider was advised that the sink was working, but these symptoms are consistent with *severe dehydration*, even more deeply concerning since the patient experienced acute kidney injury due to diabetic ketoacidosis and rhabdomyolysis.

Subsequent medical providers did not appear to be aware of hospital discharge orders (fixed dose insulin before meals and sliding scale) but adjusted the patient's insulin, and the patient's hemoglobin A1C declined from 13.1% to 9.3%. While still poorly controlled, the patient's diabetes control was trending towards better control.

The patient has a history of alcohol use disorder, abnormal liver function tests, thrombocytopenia (low platelets) which are associated with severe liver disease and cirrhosis. One of the patient's prescribed medications prior to arrival was propranolol, which is used in the treatment of patients with cirrhosis. The patient was not evaluated for cirrhosis, which is concerning as patients with cirrhosis require monitoring for complications, including liver cancer and esophageal varices that may cause severe bleeding.

---

[64] On 10/8/23, the patient was obtunded and an EEG was abnormal, and suggestive of diffuse cerebral dysfunction, hypoxic-ischemia encephalopathy, medication effects, post-ictal state. or other bilateral cerebral dysfunctions. No evidence of seizure activity. Brain CT and chest x-ray were normal.

Specialty services were not timely provided to the patient. In October, a provider ordered an ophthalmology consult (to screen for diabetic retinopathy), and an endocrine consult for management and an insulin pump, clearly needed to control the patients diabetes.

**Patient #18** This 43-year-old woman transferred from Colusa County Jail on 12/12/23 and was released on 1/23/24. Her medical history includes obesity, type 2 diabetes, hypertension, left breast abscess and recurrent MRSA infections, and hirsutism.  At the time of admission her medications were metformin, Humalog insulin three times daily, and labetalol.

On 12/12/23 at 16:40 an intake nurse conducted intake screening, noting the patient's medical history included obesity, diabetes, and hypertension. Weight=340 lbs. Afebrile, BP=155/86 mm Hg, FSBS=135. The patient was referred to OB and determined to be a high-risk OB patient.

On 12/12/23 at 21:09 the patient received metformin, labetalol, and prenatal vitamin.

On 12/13/23, a medical provider saw the patient who noted the patient was 5 months pregnant. She was homeless. HbA1C=8.1%. For undocumented reasons, the provider discontinued metformin (which is safe during pregnancy) and started the patient on Glyburide.

On 12/15/23 at 08:00, OB saw the patient and conducted a comprehensive visit. Ordered diabetic diet, and labs. The OB discontinued Glyburide and added aspirin. Ordered OB high risk consult.

**Summary:** The medical provider discontinued the patient's metformin without explanation and started the patient on another antihyperglycemic medication, that was discontinued by the OB two days later. Medical providers need to provide continuity of medications unless there is a clinical reason not to continue the medication.  This should be documented in the medical record.

**Compliance Assessment:**
- D.1=Partial Compliance
- D.1.a=Partial Compliance
- D.1.b=Partial Compliance
- D.1.c=Noncompliance
- D.1.d=Partial Compliance
- D.2=Noncompliance
- D.3=Substantial Compliance

**Recommendations:**
1. Intake nurses need to refer patients with chronic disease to a medical provider based upon their medical acuity.
2. Medical providers need to continue known medications, independent of compliance, if medically indicated. If providers change medications, the rationale for doing so needs to be documented.
3. Medical providers need to review the patient's medical record prior to medication renewal, so that medication regimens that are ineffective are not continued.

4. Medical providers need to meet with the patient when changing medication dosages or changing medications, so the patient can be informed of the reason, side effects, and be able to ask questions.

5. An electronic tracking system for chronic disease patients is developed and implemented to include:
   a. Name and X-ref Number
   b. Date of arrival/Intake Receiving Screening
   c. Date of initial history and physical examination
   d. Date of initial labs
   e. Date of initial chronic disease visit
   f. Dates that lab tests are to be performed prior to the next chronic disease visit
   g. Pertinent lab results
   h. Dates of follow-up visits

6. A nurse should be assigned to monitor the tracking log to ensure that appointments are timely kept and rescheduled if needed.

7. Medical providers should address all chronic diseases at each visit by performing a review of systems, pertinent physical examination, review of labs, treatment plan and patient education.

8. Medical providers should timely review and address chronic disease findings and recommendations when patients return from specialty services appointments, emergency departments, and hospitalizations.

9. Medical providers need to monitor whether medical orders are timely implemented.

10. Medical providers need to review lab, x-ray, and imaging reports within 3 business days, and document a plan for follow-up.

11. Medical providers and nurses should use peak flow meters to assess airflow restriction for patients with asthma and mixed asthma/COPD, and not rely on oxygen saturation.[65]

12. As required by the Consent Decree, the ACH and SSO should adjust timing of finger stick blood sugars, (FSBS), insulin administration, and meals to conform with normal circadian rhythms.

13. The County needs to contract with a registered dietician to evaluate whether meals served at the jail are consistent with ADA guidelines, and develop menus for patients with diabetes and other diseases that require a specialized medical diet (renal). The County needs to implement a dietary plan for patients requiring a medical diet consistent with medical provider orders.

14. Nurses should contact providers for elevated blood sugars (>350), positive ketones, and abnormal vital signs, and providers should timely see patients to adjust the treatment plan.

---

[65] This recommendation has been made in previous reports.

15. Medical reviews related to provider quality should be timely performed and documented with a corrective action plan. The Medical Director should timely reevaluate providers whose practice falls below the standard of care.

16. Perform QI studies related to clinical quality measures. These clinical quality measures need to be based upon national guidelines, and not be limited to timeliness of appointments and labs.

---

## E. Specialty Services

1. The County shall develop and implement policies regarding specialty referrals using an algorithm with evidence-based referral criteria and guidelines.

2. Within 3 months of the date the Remedial plan is issued by the Court, the County shall develop and implement policies and procedures to ensure that emergency consultations and diagnostic treatment procedures, as determined by the medical provider; are provided immediately; high priority consultations and procedures, as determined by the medical provider are seen within 14 days of the date of the referral; and routine consultations and procedures, as determined by the provider are seen within 90 days of the date of the referral.

3. Patients whose routine specialty consultation or procedure do not take place within 90 calendar days from the date of the referral shall be examined by a clinician monthly and evaluated to determine if urgent specialty care is indicated.

4. Within 5 days of the completion of a high priority specialty consultation or procedure, or within 14 days of a routine specialty consultation or procedure, patients returning to the Sacramento County Jail shall have their specialty reports and follow-up recommendations reviewed by a jail nurse practitioner, physician assistant or physician.

5. Specialty care consultations and outside diagnostic and treatment procedures shall be tracked in a log that identifies:
    a. The date of the referral request
    b. The date the request is sent to UM
    c. The date of UM notification of approval or denial
    d. The date the referral was sent to the specialty care provider
    e. The date of the consultation or procedure appointment

     f.   The date the consultation or procedure took place

     g.   If cancelled or rescheduled, the reason for the cancellation/rescheduling

     h.   The date the appointment was rescheduled.

6. Requests for specialty consultations and outside diagnostic and treatment procedures shall be tracked to determine the length of time it takes to grant or deny requests and the circumstances or reasons for denials (Note: date of approval should be on specialty services tracking log, see above).

7. At least twice a year, the County shall conduct an audit of specialty care referral logs described in subsections (5) and (6), above, and complete a report as to whether each category of specialty care is completed in a reasonable time frame, consistent with established time frames. If any specialty care area has a record of untimely appointments as determined by the Correctional Health Service Continuous Quality Improvement (CQI) Committee, the County shall report to Plaintiffs and the parties shall meet and confer to take prompt steps to address the issue. The County will provide Plaintiff's access to the specialty care referral logs and audit reports periodically and upon written request. The parties will work to resolve issues with untimely specialty care in individual patient cases and with respect to systemic trends, including through the dispute resolution process.

8. The County shall consider implementing an e-referral system to reduce delays and facilitate communication between specialists and primary care providers, as well as reducing unnecessary transportation costs and unnecessary specialist appointments by ensuring that the specialist has all the information he or she needs before an appointment takes place.

9. The County shall ensure that utilization management and/or scheduling staff provides notification of whether a patient's specialty care appointment is scheduled to occur within the timeline pursuant to the referral and/or clinical recommendation, including as follows:

     a.   Medical staff may request and obtain information as to whether any patient's specialty care appointment is scheduled, and as to the general timing of the appointment (e.g., within a one-week date range).

     b.   If a specialty care appointment is denied or is not scheduled to occur within the timeline pursuant to the referral and/or clinical recommendation, such information will be affirmatively provided to the treatment team and to the patient.

     c.   If a previously scheduled specialty care appointment is postponed to a date that is outside the timeline pursuant to the referral and/or clinical recommendation, such information will be affirmatively provided to the treatment team and to the patient.

10. The County shall consider creating a physical therapy clinic at the jail to more efficiently meet the demand for service at the jail.

**Findings:** During this review period, patients were not provided timely specialty services in accordance with the acuity of their condition, particularly for patients with urgent medical conditions.

The status of compliance with Consent Decree E. provision is as follows:

- ACH revised the Specialty Referrals policy and procedure (revised 9/7/2022). ACH is utilizing InterQual criteria to make decisions about the appropriateness of medical referrals. After using InterQual criteria to make decisions regarding specialty services approval and denial, ACH found that using InterQual criteria resulted in denials of most specialty services requests. Given this, the County discontinued the use of InterQual. Instead, ACH has weekly meetings to review specialty service requests. Given that use of InterQual criteria had the effect of increasing denial rates, the medical experts support ACH's decision to discontinue its use at the jail (E.1).[66]

- The policy referral time frames meet Consent Decree Requirements; however, in practice, ACH has not met these time frames, particularly with respect to urgent referrals. (E.2).

- Providers do not consistently monitor patients monthly, or keep patients informed regarding of the status of their specialty services referral, particularly when the appointment is not scheduled within required time frames. (E.3).

- Providers do not timely review emergency department and hospitalization reports and recommendations. For some patients, providers do not address consultant recommendations at all (E.4).

- ACH does maintain a tracking log that contains all required elements (E.5).

- ACH has tracked the length of time it takes to grant or deny specialty services requests, and reasons for denials of requests, but not for specialty services not entered onto the tracking log (E.6).

- Twice a year, ACH conducts audits examining the timeliness of the Specialty service Referral Log described in subsections (5) and (6), and completes a report as to whether each category is completed in a reasonable time frame. ACH provided a QI study of timeliness from July 2023 to through September 2023. However, this study did not include specialty services not entered on the tracking log (E.7).

- The County has implemented Rubicon, an e-referral system. Record review showed that medical providers utilize Rubicon for clinical decision making (E.8).

- Case Management does not notify providers whether the referral appointment is scheduled to occur within the time frame pursuant to the referral and/or clinical information (E.9). Record review shows that medical providers are not aware of the status of scheduled or unscheduled specialty services appointments. In multiple records specialty services appointments were not timely scheduled, and providers documented

---

[66] Since the medical experts do not have the authority to amend the requirements of the Consent Decree, we recommend that the parties discuss and come to agreement on whether the experts can find the County is substantial compliance on this provision.

"consult pending," without contacting case management to find out the status of the consult, and whether further action is clinically necessary.  In addition, some specialists (e.g., orthopedics) order tests or procedures (e.g., CT, MRTs, surgery) but do not schedule the patient for follow-up to evaluate the patient's function and severity of pain while the procedures are pending, and to determine if any action is needed to expedite imaging and/or surgery.  Patients have experienced negative outcomes because of lack of timely follow-up.

- The County has a contract with Spectrum Accountable Care Company for physical therapy services and physical therapy is being conducted at the jail. (E.10).

This review showed that specialty services are not timely completed. A quality improvement study showed that for the period of July through September 2023, 62% of routine consults were timely completed (<90 days), 25% were not timely completed and 13% were pending. Providers timely followed up with the patient in 83% of cases (<14 days), and in 17% of cases follow-up was untimely.

For expedited referrals (<45 days), 76% were timely and 24% untimely. For urgent referrals (<14 days), 60% were timely completed and 40% were untimely. Provider follow-up for urgent referrals was timely in 71% of cases. It should be noted that the number of urgent referrals for this 3-month period was only six patients. In addition, the Specialty Services tracking log shows that beginning in November 2023, many referrals had no appointment date, as of January 1, 2024. In addition, we learned during the site visit that 846 on and off-site consults were not entered on the tracking log.

ACH provided the specialty service tracking log from July 2023 to January 2024. The log was well maintained from July 2023 through October 2023, however, beginning in November the tracking log showed that the log was not kept up to date. For November 2023, 3 specialty services were timely performed, 0 were listed in noncompliance, and 42 were listed as pending, many with no appointment date. There is no further tracking of these consults on the log since November 2023. In December 2023, 5 consults were noted to be compliant, none were noted to be noncompliant, and 59 were noted to be pending, but very few had a scheduled appointment as of January 2024.

At the end of the January 2024 site visit, the experts were advised that there were 846 specialty services requests that were not included on the tracking log. This included both on and off-site referrals, going back as far as 2022, and which included cardiology, hematology, nephrology, gynecology, endocrinology, surgery, neurology, and physical therapy.  QI did a review of each of the consult requests and found that some had been completed and some had not been completed. We were advised that the decision to not enter onsite consults onto the tracking log was made by the previous Deputy Director. Therefore, the County has never been compliant with the requirement to enter all consults on the tracking log, and these consults were not included in Quality Improvement (QI) studies regarding timeliness of approval, scheduling and completion of appointments and provider follow-up.

Many women housed at RCCC who were scheduled for gynecological appointments at Main Jail were not transported to Main Jail. The OB/GYN log shows that patients were not transported to Main Jail each month from July to December2023.  On each Friday in December 2023 (12/1, 12/8, 12/15, and 12/22), groups of patients were not transported from RCCC to Main Jail for their GYN appointments. For 12/22/23, all 12 patient appointments were not kept. We reported this to health care leadership for investigation. In some cases, patients may have refused; however, we were advised that the list of patients that custody pulled from ATIMS was inaccurate, only pulling 10-20% of orders in the EHR.  Leadership notified Information Technology (IT) staff to correct the problem and in the meantime, nursing staff reverted to a previous system of printing out the list of patients due for appointments from Fusion Order Manager, and gives the list to custody. Although there is a list of patients to be seen, there is no tracking log or other system that tracks the timeliness of gynecological appointments at RCCC or Main Jail.

Failure to transport RCCC patients to Main Jail has been a systemic issue delaying patient access to care and treatment for potential and known gynecological conditions (e.g., abnormal pap smears and mammograms).[67]  It also prevents patients from receiving routine gynecological care. This raises the question as to how this could take place for so long without ACH awareness and intervention.

We found some egregious cases in which patients with serious conditions have not received adequate medical care, that is below the standard of care, and is indifferent to the patient serous medical needs. This first case is an example.

**Patient #7**-This 26-year-old woman was admitted to the jail on 1/8/22 and is still at the jail. Her medical history includes methamphetamine use disorder, chronic obstructing left renal stone with hydronephrosis with stent placement in January 2021, retained ureteral stent with encrustation, recurrent urinary tract infections, urosepsis, syphilis, blood in stool, iron deficiency anemia, and adjustment disorder.

**Summary:** The patients ureteral stent was supposed to be removed in 2021, and is still present. The patent has been in the jail for four months, since January 2024, has inflammatory infectious ureteritis, recurrent urinary tract infections, and hydronephrosis, and has not received timely medical care. She needs removal of an infected right ureteral stent. Multiple providers have seen the patient without addressing the patient's urgent medical needs. On 4/12/24, UCD urology saw the patient but the records are not in the chart as of 5/10/24. The patient is to have a urology appointment but it is pending an MRI and jail panel before she is to see urology.  This case was brought to medical leadership's attention but no action has yet been taken. This care is indifferent

---

[67] Patient #19.

to the patient's serious medical needs.  We referred this case back to the Medical Director on 5/10/24.

**Patient #11** This 24-year-old man arrived at SCJ on 10/20/23 and is still at the jail.  His medical history included poorly controlled seizure disorder, and left ankle fracture in March 2023, with open reduction and internal fixation (ORIF). He was taking Keppra for his seizure disorder.

**Summary:** This patient arrived at the jail in October 2023 with a history of left ankle fracture with surgical repair and insertion of screws. At that time the patient had open wounds on his ankle and a provider ordered a referral to orthopedics (the order is not found in the EHR orders) that did not take place for over six months, and only after the patient had been hospitalized for left ankle infection and possible osteomyelitis.

During this time, providers wrote that the orthopedic consult was pending but did not follow-up to determine the status of the consult. By early December 2023 the patient was complaining of purulent and bloody drainage, and requested to have the screws removed, but his infection was not addressed until 1/17/24 when he was hospitalized for wound dehiscence and infected ankle hardware. In the weeks preceding his hospitalization both nursing and provider notes appear to minimize the patient symptoms and examination findings. Just 5 days before he was hospitalized and treated for osteomyelitis, a provider documented that there was "no infection."

Upon release back to the jail, providers reviewed and addressed hospital recommendations, however an infectious disease consult was ordered but it never took place, and this has gone unnoticed by providers.

*ACH response: Case management responded that the orthopedic referral was moved from 10/20/23 to 1/12/2024, because the referral said only that the patient reported persistent ankle pain and recurrent wounds.  Apparently there was no documented examination of the patient's ankle wounds, only the patient's statement of ankle pain. CM apparently did not contact the provider for clarification of the patient's condition, and CM prioritizes acute fractures before referrals for patient only with symptoms.  Therefore, the referral was not scheduled in accordance with the needs of the patient. The patient was scheduled to see the on-site orthopedist a week prior to hospitalization for infection, but the patient was not seen on 1/12/24 due to custody conducting count. This was not noticed or addressed. When patients are scheduled for a consult, there needs to be a system for an "outcount," where patients with scheduled appointments can attend them. In addition, the hospital discharge recommendation for infectious diseases follow-up never took place.*

Other issues in the care of this patient were medication errors on the eMAR, and access to care problems that are multifactorial, but included lack of custody escorts.

**Patient #3** This 41-year-old man arrived at SCJ on 1/17/23 and is still at the jail. His medical history includes opioid use disorder, hypertension, displaced fracture of head of left radius. His medications are amlodipine, suboxone, and meloxicam.

On Tuesday, 5/16/23 at 11:58 a RN saw the patient who fell in the kitchen, landing on his left elbow. He complained of severe pain to his left wrist and elbow. On 5/18/23 the medical provider sent the patient to the ED that showed left radial head fracture and cortical irregularity at radial head. Hospital discharge recommendations were to see orthopedics for follow-up and cast the arm in 5-7 days. However, the patient was not seen by onsite orthopedics until 3 weeks later (6/9/23). The orthopedist removed the splint and encouraged range of motion exercises. Subsequently the patient submitted multiple health requests complaining of severe pain and swelling but was not seen by orthopedics. On 7/14/23, the onsite orthopedist noted x-ray changes indicating 2mm displacement and articular step-off.

*Note: In Dr. Vassallo's opinion, a CT scan was indicated at this time, but not ordered.*

On 8/26/23, the patient reported that his elbow was bent, and he continued to have pain and popping in his elbow.  On 9/8/23, the orthopedist saw the patient and noted that his elbow had healed in malunion and the patient agreed to surgery to repair the malunion. The onsite orthopedist an elbow CT scan and orthopedic surgical consult. Five months later, on 1/30/24, the CT scan was performed and showed a depressed fracture. On 2/6/24, surgical orthopedics at San Joaquin General Hospital saw the patient and determined that, at this time, the patient had normal function with improved pain. The surgical orthopedist recommended conservative management with the possibility of future surgery.  On 2/23/24, the onsite orthopedist saw the patient, approximately 5 months after he referred the patient for imaging and surgery.

At the medical experts request, the Medical Director reviewed care provided by the orthopedist, who found that he met the standard of care.  Dr.  Vassallo does not concur with this opinion, noting that a CT scan needed to be performed much sooner, which would likely have resulted in immediate surgery. The orthopedist did not timely monitor the patient to assess whether the treatment plan (CT scan, surgical orthopedic consult) was timely completed and to assess the patient's function and pain pending the procedures.

**Patient #19** This 34-year-old woman was transferred from Santa Clara County Jail to SCJ on 10/26/23 and was released on 12/27/23.  Her medical history includes traumatic Brain Injury (TBI) with seizure disorder, complex migraine headaches, chronic pain and paresthesia's right side of neck, severe alcohol, cocaine, and amphetamine use disorder, anemia, asthma, breast lump, bipolar disorder and STI's. Her medications were gabapentin, Valproic acid, ferrous sulfate, sucralfate, pantoprazole, and mirtazapine.

The patient had a previous admission to the jail and was released in September 2022.  During that admission, she was diagnosed with a left breast lump/mass, for which a breast ultrasound was ordered but not completed prior to release. A 9/22/22 EKG was abnormal, showing a probable lateral infarct.

On 10/25/23, the day prior to transfer from Santa Clara Jail to SCJ, the patient was sent to the ED for headache, nausea, vomiting, diarrhea, abdominal pain, chills, body aches and right flank pain. There was concern for sepsis. At the ED, the patient had an abdominal CT that was suggestive of

duodenitis/enteritis (which may be caused by infection or an ulcer).  There were multiple system issues in the care of the patient that are described in the summary.

**Summary:** This patient did not receive timely medical or mental health care during her 2-month incarceration.  Her care was fragmented with no one provider in charge of her care.   Issues included:

1. Just prior to admission, the patient was hospitalized for nausea, vomiting and abdominal pain. The patient was anemic.  An abdominal CT suggested duodenitis. Following admission to the jail, on 10/27/23, a provider noted her history and ordered a GI consult. She continued to have persistent chest and abdominal pain radiating to her back, coffee ground emesis, and tarry stools. Her hemoglobin dropped from 11.2 to 9.5, but this decline in hemoglobin was not addressed (it later returned to baseline). An *H. pylori* test was ordered to determine if she had an infection in her stomach that causes ulcers, but it was not performed. On 11/12/23, GI recommended an EGD (urgency unspecified) but it was not completed prior to her release on 12/27/23.

2. The patient reported having an ovarian cyst, and on 10/27/23, pelvic ultrasound was ordered. On 11/17/23, the ultrasound showed a possible ovarian cyst but ectopic gestation should be considered.  On 12/5/24, three weeks later, a primary care provider reviewed this report. There is no documentation that an OB/GYN reviewed this report. This is a serious concern given the possibility of ectopic pregnancy.  The patient's pregnancy test was previously negative, and the patient had a Nexplanon birth control, however, the findings of the pelvic ultrasound needed to be addressed immediately for clinical correlation.

3. On 11/15/23, a provider saw the patient who gave a history of a breast lump/mass in 2022 with no work-up. The provider did not order a mammogram.

4. On 11/17/23, a provider noted that in 2020, the patient had an abnormal Pap (HGSIL) smear requiring colposcopy due to increased risk of cervical cancer, but the patient did not have the procedure done at that time because of her negative interaction with the outside doctor.  OB/GYN planned to perform a Pap smear and ordered colposcopy due to risk of cervical cancer, however, the Pap smear was not performed and the outside facility would not schedule the procedure without the Pap smear report. On 12/2/23, the provider was notified by case management and saw the patient 3 weeks later 12/22/23. The patient wanted to wait 2 weeks to have the Pap smear, "to be ready", but the patient was released the following week.

5. At the time of admission, intake screening noted officer concerns about risk for suicide. The nurse documented a history of bipolar disorder and that the patient was taking Abilify.  On 10/27/23, an initial mental health assessment was ordered but not completed. On 11/19/22, the patient intentionally overdosed on Keppra and Trileptal and was hospitalized for 3 days. On 11/22/23, a provider saw the patient following her return and noted that hospital psych recommendations were to start Remeron and discontinue all other medications. A RN documented discontinuing Abilify and hydroxyzine, but there is no documentation that the

nurse spoke with a MH provider.  An urgent mental health referral was made but not completed, and the recommendation for Remeron was not addressed. Four days later, on 11/26/23, the patient had an initial mental health assessment, a month after admission.  On 12/9/23, the patient overdosed again. The patient did not have an initial psychiatric evaluation until 12/13/23, until after the second suicide attempt and two weeks before her release.  This case was referred to Mary Perrien and ACH/JPS leadership.

6.  The patient had a history of seizures due to traumatic brain injury, and following a Rubicon consult, a provider later requested an outside consult. The case management provider reviewing the consult recommended another Rubicon consult, but there is no documentation the provider was informed.  On 12/21/23, for reasons that are unclear, case management requested an endocrinology appointment.

7.  The patient had a history of an abnormal EKG in 2022 (i.e. probable lateral infarct), and the patient frequently complained of chest pain, but nurses did not perform adequate assessments, and it does not appear that a provider evaluated the patient for chest pain.

8.  In November 2023, a LVN denied a patient a nebulized albuterol treatment, because the patient's lungs were "clear". No peak expiratory flow rate measurements were obtained. Later that day, the patient was seen urgently due to shortness of breath and wheezing, and a RN administered nebulizer treatment at that time. LVN's do not have the authority to deny patients' medical treatments PRN (as needed) treatments. This has been reported in previous reports. [68]

9.  There is a problem with the timely review of lab and imaging reports. As noted above, some reports were not reviewed for weeks. When providers reviewed reports that were abnormal (hemoglobin 11.2 decreasing to 9.5), they were sometimes signed off by providers who did not order the labs/imaging, but who also did not address abnormal findings or notify providers who ordered the tests. *All lab and imaging reports need to be reviewed in 3 business days (and sooner if ordered urgently), and there needs to be ongoing monitoring that this is indeed taking place.*

10. Health care appointments were not completed for custody reasons (e.g., lack of escorts).

**Patient #10** This is a 38-year-old man who arrived at SCJ on 4/19/22. [69] He did not have any significant medical problems. On 7/7/22 he was sent out to the ED following an injury to his right temple and concern for jaw fracture, which was negative. He said that during the transport, his hands were handcuffed behind his back for more than 4 hours.  Following his return, beginning in September 2022, and over a period of months, he developed chest pain and neck pain, and

---

[68] The County responded that this is no longer an issue, however this event occurred during the current monitoring period, in November 2023,

[69] Plaintiff's counsel requested that the medical experts review this patient's care.

increasing left arm weakness, pain, and numbness. His left hand was cooler than his right hand. He had multiple consults, including orthopedic, cardiology, and vascular. The medical provider suspected Thoracic Outlet Syndrome (TOS) and referred him to vascular surgery.

On 3/18/23 vascular surgery saw the patient who was unable to raise his left arm above his head and wore a sling. Vascular recommended an EMG and shoulder MRV (Magnetic Resonance Venography).  Both requests were submitted to Case Management, although it may have been an MRI that was requested, not an MRV.  On 4/18/23, case management documented that SJGH did not do EMG's but we find no further notes about attempts to get this done.  On 5/11/23 a left arm ultrasound showed increased diameter of subclavian vein with decreased blood flow possibly consistent with TOS. Consider MRV (Magnetic Resonance Venography) of the patient's left shoulder.  On 1/18/24, the patient had an EMG that was normal.

 **Summary:** This patient has been evaluated by multiple specialists and had multiple tests, including cardiology, vascular surgery, MRI's, and a stress test. An EMG was ordered in March 2023, but ACH did not have a contract for this service, and took no further action at that time to pursue a contract with an outside provider. The experts advised that when a consultant recommends a test that his needed for diagnosis and/or treatment, it must be timely provided to the patient. ACH had difficulty establishing a contract with an EMG provider, but through subsequent persistent efforts, established a contract for EMG services and the patient had an EMG. Medical providers continue to monitor the patient.

**Patient #1** This 66-year-old man arrived at SCJ on 12/9/22, and is still at the jail. His medical history includes hypertension, hyperlipidemia, pre-diabetes, hearing impairment, traumatic brain injury, chronic headaches, and adjustment disorder with depressed mood.

The patient had a history of head trauma and cerebral spinal fluid leak that was surgically repaired. The patient complained of and chronic headaches and was worried about a brain tumor, because he said his brother had a brain tumor. On 12/2/23 a provider ordered an expedited brain CT, that was to be completed in 45 days, but was completed on 1/30/24, approximately 60 days later.

Incidental findings were that a medical provider discontinued metformin due to the patient's normal hemoglobin A1C, however the patient submitted HSRs saying he did not understand the reason for discontinuation of metformin, an issue of patient education.[70]

**Compliance Assessment:**
E.1=Substantial Compliance
E.2=Partial Compliance
E.3=Noncompliance

---

[70]  This patient also reported being bullied in his living unit. The medical experts learned during the site visit, that other inmates, designated as House Men, took control of health request forms, read them to look for snitches, and discarded HSRs and grievances.  This was reported to medical and custody leadership, who took measures to discontinue the practice.

E.4=Partial Compliance
E.5=Partial Compliance (low)
E.6=Partial Compliance (low)
E.7=Partial Compliance (low)
E.8=Substantial Compliance
E.9=Noncompliance
E.10=Substantial Compliance

**Recommendations:**

1. Continue the transition for specialty services appointment scheduling from Custody Transport to Case Management.  This needs to be done in coordination with custody.
2. Timely approve/deny specialty services referrals. The approval should not be denied or delayed pending lab work or imaging.
3. Routinely inform providers of the dates of appointments (not sharing the information with the patient) and when specialty services are rescheduled.
4. Regularly monitor high-risk patients to ensure their condition is not deteriorating and needing intervention.
5. Bring all patients returning from appointments to 2 Medical or the Medical Housing Unit (MHU) so that a nurse can review findings and recommendations and notify a provider of urgent recommendations requiring immediate orders.
6. Consider having the clinic nurse who sees the patient upon return schedule the patient for medical provider follow-up appointments, and notify Case Management, so that it can be tracked on the log.
7. Providers need to timely review all consultant recommendations, develop a treatment plan, and educate the patient about the diagnosis and treatment plan. Schedule follow-up as requested by the specialist, or as clinically indicated.
8. Assess the demand for specialty services and custody staff needed to transport patients to specialty services appointments. Submit growth requests as needed. Health Protected Information (HPI) needs to kept confidential.
9. Explore contracts with other on-site consultants, if existing on-site consultants do not provide reliable services, delays diagnosis and treatment for the patient.
10. Conduct QI studies on the timeliness of labs and radiology reports.

**F. Medication Administration and Monitoring**

1.  The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws through the following:

    a.  Ensuring that initial doses of prescribed medications are delivered to patients within 48 hours of the prescription, unless it is clinically required to deliver the medication sooner.

    b.  Ensure that medical staff who administer medications to patients document in the patient's Medication Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, (3) the date and time for any refusal of medication, and (4) in the event of patient refusal, documentation that the prisoner was made aware of and understands any adverse health consequences by medical staff.

2.  The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

3.  The County shall provide pill call twice a day in each housing unit, at regular times that are consistent from day to day, except as may be required by non-routine facility security concerns. The County shall develop and implement policies and procedures to ensure that prescribed medications are provided at therapeutically appropriate times as determined by the ordering physician. Any patient who requires administration of medications at times outside the regular pill call shall be provided that medication at the times determined by the ordering physician.

4.  The County shall develop and implement policies and procedures to ensure that patients are provided medications at therapeutically appropriate times when out to court, in transit to and from any outside appointment, or being transferred between facilities. If administration times occurs when a patient is in court, in transit, or at an outside appointment, medication will be administered as close as possible to the regular administration time.

5.  The County shall develop policies and procedures to ensure that medication efficacy and side effects are monitored by staff and reviewed by appropriate clinicians at appropriate levels.

6.  The County shall explore the expansion of its Keep-on-Person medication program, (especially for inhalers and medications that are available over-the-counter in the community) and to facilitate provision of medications for people who are out to court, in transit, or at an outside appointment.

**Findings:** This review showed system, process, and individual performance issues that resulted in patients not timely receiving medications, and serious medication errors resulting in harm to patients (e.g., emergency department visits, etc.). Among the system issues are that the pharmacy software system Center of Innovative Pharmacy Solutions (CIPS) does not interface with the Fusion electronic medication administration record (eMAR), which permits two active

orders at the same time, and results in medication errors. The risk of harm to patients will be ongoing until these problems are corrected. [71] Our findings regarding Consent Decree compliance and other findings are described below.

- The County has revised pharmacy and medication policies, procedures, and practices, including for patients that are sent out to court (F.1.a).
- Medications are usually delivered to patients within 48 hours of the medication order. However, there can be delays from the time the provider ordered the medication until the pharmacy processes the order and dispenses the medication for administration. Nurses document the date and time medications are administered. However, following the initial dose of medication, many MARs show blank spaces, meaning that the medication dose was not administered to the patient. This is sometimes due to cancellation of medication administration due to lack of custody escorts. When patients refuse, or are reported to refuse medications, nurses do not consistently engage the patient to determine the reasons for refusal and explain the risks of refusal. In addition, nurses still accept patient refusals reported by deputies, which are not confirmed as a true refusal (F.1.b).
- The County has not provided enough nurses and deputies to timely administer medications. As noted above, nurses documented that medication administration was cancelled altogether for lack of custody staff (F.2.).
- The County provides medication administration up to three times daily day in each unit. Although scheduled for the same time (07:30, 15:30, and 21:00) nurses do not timely administer medications to patients, often with more than a 3 or 4-hour delay. Evening doses of medications are often administered to patients after midnight and up until 2 am, predictably resulting in patient refusals. The schedule for medication administration times was recently changed, and due to missed morning doses or delays in medication administration, nurses sometimes give patients two doses of the same medication at narrow intervals (e.g., heart medications, antibiotics, etc.) For example, a patient missed a morning medication dose, and later that afternoon a nurse administered the morning and evening dose together, which is a medication error. In this case, a patient was given 2 doses of a medication to treat heart failure, became hypotensive, and was sent to the emergency department.[72] This is an adverse outcome of a medication error (F.3).
- The County has developed policies to ensure that patients are provided medications at therapeutically appropriate times, when out to court, in transit to outside appointments, and when transferred between facilities. The pharmacy prepares medications for patients who are going to court (F.4).
- The County has developed policies and procedures to ensure that medication efficacy and side effects are monitored by staff. Record review shows that providers do evaluate the

---

[71] The Pharmacist in Chief is working with CIPS and Fusion eMAR to correct the problem, but it is unknown when this will be corrected.
[72] Patient #25.

effectiveness and side effects of medications. However, we found instances in which providers renewed medications without seeing the patient to evaluate the effectiveness of medications, including one whose chronic disease was poorly controlled (F.5).

- The County has developed and implemented a Keep-On-Person (KOP) policy[73] for chronic disease medications and for potentially emergent conditions such as asthma. (F.6.)  Since the last report, the County has also made over-the-counter medications available in the commissary, at no cost to the patient.

Pharmacy and medication administration issues are further described below.

**Medications are not timely administered to patients and medications are not timely renewed.**
ACH conducted a point in time Quality improvement (QI) study in August 2023, that measured whether medicines were timely administered after the initial order, if medications were renewed without interruption, and if patients were educated about newly prescribed medications. The study showed that 100% of the ordered medications were started timely (within 48 hours of order), but only 62% of medications were renewed without interruption.  The internal study identified challenges with the timeliness of medication renewal orders which negatively affects continuity of care. The study also identified the continued practice of late administration of medications, including during the hours of sleep.  We also found that evening medications (i.e., 21:00) are administered as late as 01:00 and 02:00 which undoubtedly results in patient refusals and lack of counseling due to the late hour.  *This contributes to poor control of medical and mental health conditions.*

ACH is commended for conducting the medication order study however, the study methodology used a point in time sampling (i.e., a single day), rather than a sampling of records over time (e.g., 30 records over 1-3 months).  When studies select a sample to a single day, it limits the conclusions of the study.  Jail health care operations can vary widely from day to day, shift to shift, and weekday to weekends. When measuring any operational program, it is imperative to adequately sample across days, weeks, or months, including weekdays and weekends and different shifts.

ACH developed and implemented a plan to address the untimeliness of medication administration. This included changing the time Licensed Vocational Nurses (LVNs) report for duty.  In January 2024, the LVNs scheduled to work the night shift, were moved to day shift, working twelve hours each day.  The morning shift begins at 6:00 a.m. and ends at 6:30 p.m. Effective January 2024, the medication administration times are 7:30 a.m., 3:30 p.m., 7 pm and 9:00 p.m.  The LVNs administer medication at 7:30 a.m. and 3:30 p.m., and RNs administer the bedtime medications at 9:00 p.m.  Additionally, the practice of medication administration was changed from patients lining up at a medication cart, to the nurse administering medications at

---

[73] Keep-On-Person (KOP) Medications Policy, 04-20. Revised 1/12/2022.

each patient's cell door.  This was changed during the site visit to have patients line up to receive medications, which is much more efficient.

Standards of nursing practice allow medications to be given one hour before and one hour after a scheduled medication time. Review of medication administration records shows this is not happening, even with the changes of nursing schedules and medication administration times.

An example of these challenges includes Patient #24.  A sampling of medication administration days from December 2023, and January, February, and March 2024 are depicted in the tables below.

| December 2023 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07:00 | N/A | 11:15 | 13:57 | 10:13 | 09:31 | 10:50 | 10:51 | 10:28 | 09:31 | 09:50 | 11:21 |
| 14:00 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 19:00 | 21:08 | 02:29 | 21:08 | 01:45 | 20:30 | 20:40 | 22:25 | 21:33 | 21:10 | 20:21 | 20:55 |

For the selected time frame in December 2023, the patient received 0 (0%) of 11 morning medications timely. Medications delays ranged from 0.5 hours to 3.25 hours. For the 19:00 administration 0% medications were given timely. Medication delays ranged from 0.5 hours to 4.5 hours.

| January 2024 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07:30 | 09:08 | 08:28 | 08:30 | 09:44 | 09:17 | 08:34 | 08:54 | 11:12 | 09:47 | 08:46 | 08:48 |
| 15:30 | 15:32 | 14:54 | 16:30 | 15:41 | 14:53 | 15:29 | 15:19 | 16:46 | 16:48 | 16:54 | 15:17 |

For 11 days in January 2024, the patient received 2 (18%) of 11 morning doses timely. Medication delays ranged from 4 minutes to 2 hours and 42 minutes.

For the afternoon medication administration, the patient received 8 (73%) of 11 doses timely. Medication delays ranged from 14 minutes to 24 minutes.

| February 2024 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07:30 | 09:11 | 09:45 | 09:04 | 09:09 | 08:58 | 08:55 | 08:54 | 11:00 | 08:42 | 08:50 | 08:47 |
| 15:30 | 15:27 | 17:04 | 15:13 | 16:15 | 15:27 | 15:25 | 15:43 | 15:29 | 15:26 | 15:19 | 15:30 |

For 11 days in February 2024, the patient received 0 (0%) of the morning doses timely. Medication delays ranged from 12 minutes to 2.5 hours.

For the afternoon administration, the patient received 10 (91%) of 11 doses timely.

For Patient #26 medication delays are depicted in the table below.

| February 2024 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 07:30 | 10:32 | 08:22 | 08:57 | 08:26 | 10:14 | 10:27 | 09:36 | 08:04 | 07:13 | 07:41 |
| 15:30 | 16:54 | 16:03 | 14:30 | 14:36 | 17:39 | 17:20 | 16:44 | 15:41 | 16:03 | 15:54 |
| 21:00 | 21:20 | 20:59 | 22:06 | 21:05 | 21:58 | 21:14 | 22:41 | 20:57 | 20:25 | 21:25 |

In February, the patient received 5 (50%) of 10 morning doses timely. Medication delays ranged from 27 minutes to 2 hours and 2 minutes.

The patient received 6 (60%) of 10 doses timely. Medication delays ranged from 24 minutes to 1 hour and 9 minutes.

The patient received 8 (80%) of 10 bedtime doses timely. Medication delays ranged from 6 minutes to 41 minutes.

**Medication Errors Lead to Patient Harm.**

Delayed medication administration is a patient safety issue, may impact the efficacy of treatment and poses health risks when doses are given too close, or too far apart.  An example of a patient that suffered a negative health outcome because of untimely medication administration and duplicate dosing is a 38-year-old patient who transferred to the Sacramento Jail from another jurisdiction.[74] His significant medical history included hyperlipidemia, hypertension, congestive heart failure, cardiac pacemaker, bipolar disorder, sleep apnea, coronary artery disease, and angina.[75]

A nurse made an urgent referral to a provider who reviewed previous records, noting a history of asthma and COPD with prior prescriptions for albuterol and Fluticasone-Salmeterol. The provider renewed the patient's medications, including those found from previous records.

On 1/15/24, the patient's MAR showed the patient received his daily Lasix dose scheduled for 07:30, at 15:55, a delay of 7 hours.  His Entresto doses scheduled for 07:30 and 15:30 were also both given, at the same time, at 15:55.  At 16:51, the patient was seen by the nurse and then referred to the provider for complaints of chest pain and shortness of breath.  He reported having 9 prior myocardial infarctions, history of stent placement, and being hospitalized twice in the prior three weeks for unknown cardiac arrythmias. The provider sent the patient to the emergency department. The ED physician documented the patient had experienced dizziness while at the jail and was found to be hypotensive in the emergency department.  His blood pressures were in the

---

[74] Patient #25.
[75] His medications were:  Atorvastatin 80 mg every HS, Carvedilol 3.125 mg BID, Clopidogrel 75 mg daily, Entresto 24-26 mg BID; Furosemide 30 mg daily, Gabapentin 300 mg every HS, Pantoprazole 40 mg daily, Paroxetine 20 mg daily, Ranolazine 500 mg BID; and Spironolactone 5 mg daily.

80s over 60s.[76]  There is no documentation indicating this medication error was reported to the provider, nor is there indication the provider reviewed the medication administration record when evaluating the patient for his complaint of shortness of breath and chest pain.

He was admitted for a cardiac workup and released on 1/18/24.  The discharge diagnosis was hypotension, with suspicion of diuresis due to multiple diuretics and other medications for heart failure. *This medication error led to a preventable hospitalization.*

The practice of untimely administration, and "double dosing" of medications, without provider approval, is dangerous and does not meet nursing standards of care.  Additionally, when medication errors occur, e.g. wrong dose, wrong time, etc., the provider must be notified as patient monitoring or additional treatment orders may be indicated.  A systems issue is that the current (eMAR) allows nursing staff to administer all doses of medications that were scheduled earlier in the day.  *Each medication administration time needs to have a window during which the medication can be administered, and then closed so that nurses cannot administer the medication after the window.*

**Lack of interface between the Fusion eMAR and CIPS results in medication errors.**

Another challenge is the electronic medication administration record eMAR does not bi-directionally communicate via interface with the pharmacy software program (CIPS).  This results in health care providers writing orders that are directly inputted to the eMAR, rather than going through the pharmacy first, to review whether the medication order is compete, consistent with FDA approved dosing and frequency, and to check for drug interaction and allergies. Also, when providers write an incomplete medication order, pharmacy staff does not see it.  Mike Wanless, Pharmacy Director has been working with Fusion and CIPS to develop the bi-directional interface between the pharmacy and the eMAR, but is has not yet been completed. ACH has developed a plan to have clinic nurses print medication orders that are incomplete, so the medical provider can make the order complete.

**Medical providers do not discontinue previous medication orders when reordering medications, resulting in lapses in medications.**

Medical providers do not consistently discontinue a previous medication order before ordering it again, and pharmacy staff are unable to see duplicate orders in real time. When this occurs, the pharmacy does not contact medical providers to have the second order discontinued and results in two orders for the same medication.  Usually, nurses ignore the second order, which is another problem, as the duplicate order needs to be addressed.  We reviewed the record of a patient with type 1 diabetes who had two active orders for Lantus insulin 30 units, and a nurse gave the patient

---

[76] The emergency department physician documented the patient's Entresto and Lasix had been held at the jail, prior to his arrival.  It is not clear where the emergency physician obtained this information however, it is inaccurate.

both doses of the insulin.  The following day, an alert nurse noted the duplicate order, notified a provider, and the medication was discontinued.

Because the pharmacy software does not communicate with the eMAR in a bi-directional fashion, medication errors occur on a regular basis.  The pharmacy prepares medications for distribution to the housing units the evening before the scheduled morning administration.  If a provider discontinues or changes a medication, after the pharmacy has dispensed the medication, nurses may inadvertently administer the medication to the patient.  At our last site visit, we interviewed a patient who had a severe allergic reaction to a non-steroidal drug (Naproxen), and after it was discontinued, another dose was given to the patient which resulted in an anaphylactic reaction and an emergency department visit.

Medication orders that are written or given telephonically after the pharmacy has prepared the medications for distribution result in the medication not being available on the medication cart. This requires nursing staff to access newly ordered medications via the automated machine that holds stock of all formulary medications (XT medication cabinet). However, the current practice by nursing staff is to document the medication as not available.  This practice results in significant delay of the patient receiving the initial dose of medication.  The requirement for nursing staff to access the XT medication cabinet adds significant time to the administration process that is already struggling with timely medication administration.

A challenge for timely medication administration is the movement of patients within the facility. Because the pharmacy packages the medications the night before the scheduled morning administration time, patients are often moved to a new housing unit.  When the nurse conducts the medication administration in the patient's newly assigned unit, the medicines are in another medication cart at the patient's previous housing unit.  This requires nurses to notify the nurse where the patient has transferred to and ensure that medications are delivered to the nurse on that housing unit.

**Medications are not automatically discontinued when patients are out of the facility greater than 24 hours.**
Medication orders are not currently discontinued when a patient is hospitalized or out of the facility for 24 hours.  This is dangerous because hospitalized patients medication regimens often change, including discontinuation of previous medications, but providers may not timely review, or have access to the hospital recommendations and the same medication regimen is continued.

**Compliance Assessment:**
- F.1.a=Substantial Compliance
- F.1.b=Partial Compliance
- F.2=Noncompliance
- F.3=Partial Compliance
- F4=Partial Compliance
- F.5=Substantial Partial

- F.6=Partial Compliance

**Recommendations:**

1. The County needs to immediately rectify the information technology (IT) and pharmacy software issues that contribute to medications errors.
2. Until pharmacy software issues are resolved, the pharmacy needs to track system related medication errors such as duplicate medication orders/doses and missed first doses to identify any critical medication errors (e.g., nurses giving double doses of insulin and other medications, etc.), and determine if patient harm has occurred. This should be reported on at monthly QIC meetings
3. Assess the adequacy of nurse and custody staffing such that medications are administered within a two-hour time window (i.e., an hour before and an hour after the designated time). Develop and plan to achieve this standard of nursing practice.
4. Ensure that medication administration is never cancelled due to lack of nursing or custody staffing.
5. Place electronic limitations for the eMAR that prohibits administration of doses outside their scheduled time (2-hour window).
6. Modify medication policies to discontinue all medications when a patient is outside the jail for 24 hours or longer. Ensure that following return from a hospital, that a medical provider timely reviews and addresses the hospital discharge summary and reorders medications as appropriate.
7. Assign a medical assistant to produce reports of incomplete medication orders requiring reconciliation at the conclusion of each provider clinic. Providers need to reconcile incomplete medication orders by the end of the clinic day.
8. Nurses assigned to the medication administration process need to review inmate movement lists to determine whether patients have moved into, or out of housing units assigned to them.
9. The nurse needs to ensure, to the extent possible, ensure that all medications are in the cart prior to medication administration. This can be done by obtaining the medication from the automated stock medication cabinet, locating the dose prepared by the pharmacy before patients housing location changed, or contacting the pharmacy to obtain a medication dose.
10. Nurses need to document the administration status for each dose of medication and not leave blanks on the MAR.  To do this, nurses need to run a list of all medications not administered and reconcile the MAR prior to the end of the shift. [77]
11. ACH needs to require nurses assigned to medication administration, to run a patient medication compliance report, prior to the end of each medication administration to ensure notifications of non-compliance have been sent to the provider.

---

[77] To reconcile means to document the status of each dose as administered, not administered and the reason why such as refusals or at the hospital, etc. There should be no blanks on the MAR.

12. Retrain all nurses on the requirement to report all medication errors.
13. Document, track, and trend medication errors. Evaluate data monthly and determine and address root causes.

---

### G. Clinic Space and Medical Placements

1. The County shall provide adequate space in every facility to support clinical operations while also securing appropriate privacy for patients. Adequate clinical space includes visual and auditory privacy from prisoners, and auditory privacy from staff, the space needed reasonably to perform clinical functions as well as an examination table, sink, proper lighting, proper equipment, and access to health records.
2. The County shall ensure that any negative pressure isolation rooms meet community standards, including an antechamber to ensure that the room remains airtight, appropriate pressure gauges, and regular documented checks of the pressure gauges.
3. The County shall ensure that absent individualized, documented safety and security concerns, patients in acute medical or quarantine placements shall be allowed property and privileges equivalent to what they would receive in general population based upon their classification levels.
4. The County shall ensure that patients in medical placements are not forced to sleep on the floor, including providing beds with rails or other features appropriate for patients' clinical needs and any risk of falling.
5. The County shall not discriminate against patients in medical placements solely because of their need for C-Pap machines, but instead shall provide access to programs and services in accordance with their classification level, as set forth in the ADA remedial plan.

---

**Findings:**  The County has not met the requirements of the Consent Decree with respect to providing adequate clinic space for health care operations and patient examination and interviews with privacy (G.1).  The negative pressure room on 2 Medical is not functional (G.2). The County, absent a security reason, does allow patients assigned to acute or quarantine housing to keep their property (G.3). Patients in acute care settings are placed in a medical bed. However, patients placed in the sobering cell for medical monitoring are not provided a bed or chair, and must lay on the floor (G.4).  Patients with C-Pap machines can access programs and recreation (G.5).

As noted in the Fourth Report, there are structural issues and operational practices that do not support compliance with Consent Decree requirements. These include:

- Modifications to the medical screening stations that re insufficient to provide auditory privacy for patients as they go through the medical screening process.[78]

---

[78] Since publishing the draft report, the County has developed a plan in the booking loop to provide privacy. The experts reviewed and support the plan. This is expected to be completed within 90 days.

- Patients requiring monitoring for alcohol and drug withdrawal are placed in a "Sobering Cell," a large room that is used to monitor a person for withdrawal symptoms. It is dehumanizing and no place for any type of therapeutic monitoring.
- There are insufficient clinical examination rooms for nurses to perform adequate nurse assessments with privacy, and nurses continue to perform cell-front assessments.
- The negative pressure room used to house tuberculosis suspects on 2M does not have an anteroom and the room lacks negative pressure needed to provide respiratory isolation. It cannot be used to house tuberculosis and other patients requiring respiratory isolation.
- 2 East 100 is designated for disabled inmates in wheelchairs. It has five cells and, according to staff is always full. Both 2 East 200 and 300 pods can also house patients in wheelchairs.[79]

To address the physical plant deficiencies that impact delivery of care and impede consent decree compliance, the County approved a long-term project to provide a new intake area and mental health space, among other medical and mental health functions. There were cost and other concerns about the conceptual plans and architectural program for the project presented to the Board of Supervisors on August 8, 2023, so the County has engaged a third-party peer review to ensure consent decree compliance.  The review was expected to be complete within six months, but is currently ongoing. Ultimately, even if approved, the completed new construction of medical and mental health space would not be available for several years. [80]

It is unclear what health care operations will be included in the IHSF, however in addition to space for primary care (nurse, medical, dental, and mental health), specialized health services that need to be considered for the IHSF include:

- Intake and Medical Screening
- Detoxification and Medication Assisted Treatment (MAT) Units
- Specialty services and telemedicine
- Medical Infirmaries for men and women
- Acute Psychiatric Unit (APU) and Enhanced Outpatient Program (EOP)
- Dialysis
- Respiratory Isolation Room with Anteroom
- ADA accessible housing units

As noted above, the medical intake area not provide *any* auditory privacy for patients from either the arresting officer or other inmates. As noted earlier in the report, this has resulted in adverse outcomes for at least one patient in the past year, for whom the arresting officer overheard his

---

[79] The County asserts that there are enough beds available for wheelchair patients. We did not assess this during the current site visit.
[80] Intake and Health Services Facility (IHSF)

responses to his drug use, and used the information in the charging document. Patients will not disclose sensitive information such as substance use disorders and medical conditions (e.g., HIV, etc.) if they believe the information will be used against them or put them at risk from other inmates, increasing the risk of harm to patients.  While the medical experts appreciate previous measures taken by the County to try to provide privacy in the booking loop, these measures do not provide auditory privacy.

In the interim between the draft and final report, the County has developed a plan to provide privacy during the intake process by creating nursing stations in rooms with a door to provide auditory privacy. The medical experts have reviewed and support the plan, which is to be implemented in the next 90 days. The medical experts will review the area at our next site visit in September 2024 to verify that privacy is provided.

With respect to clinic space in housing units, ACH is working with SSO and Department of General Services to install two examination/interview rooms on each floor to provide additional examination space to improve medical and mental health access to care and patient privacy.  Labs will also be drawn in these rooms. The medical experts have reviewed the plan and support the plan as presented.[81]

ACH is inventorying and ordering medical equipment and supplies to establish fully functioning stations on each floor. This includes examination carts with equipment and supplies, lab chairs, and privacy screens. There needs to be an exam table so the patient can lay flat and nurses can conduct adequate physical examinations, including heart, lung, and abdominal examinations. ACH plans to implement a daily schedule to permit each professional discipline access to the rooms. Floors with heavy medical and mental health activity will be prioritized. The estimated date of completion of this plan is October 2024.

Regarding 2 Medical at Main Jail, the nurses station cabinets are falling apart. This area was to have been renovated, but reportedly had not been due, in part, to concerns about moving the control board for the individual cells. The medication room floor that was previously restored is in poor condition. Due to permanent markings on the floor, it is not possible to determine whether the floor is clean or dirty.  Due to their poor condition, surfaces cannot be adequately disinfected, presenting a risk to staff and patients.

Regarding medical bed space, at Main Jail infirmary there are 10 beds, which we were advised are always full.  The Medical Director works daily to clear patients who can be moved to continue

---

[81] One room has been installed as a pilot, and is used daily for Mental Health clinical contacts. The rooms are clear on all 4 sides, and the rooms do not provide visual privacy. Inmates in the day room and housing units would be able to see patients that are in the room, including inmates assigned to the top tier living units. We recommend that 360-degree curtains are hung in the inside of the pop-up examination rooms to provide visual privacy. The length should allow officers to see the feet of the nurse and patient to monitor safety. This arrangement needs to ensure that inmates in housing units (top or lower tier) cannot see into the room at all.  Privacy screens may need to be included as well for when nurses need to conduct sensitive examinations (e.g., genital, breast, etc.).

the flow of patients in these beds. These infirmary beds are used for both male and female inmates.  At RCCC, there is a large dormitory style infirmary with several individual cells, that is used only for male inmates. Therefore, there is no dedicated medical bed space for women for post-operative and postpartum care, as well as monitoring patients that are withdrawing from opioids or other conditions.[82]  At the last site visit, a female patient was withdrawing from opioids for as long as 5 months, and was sent to the emergency department (ED) for dehydration more than once due to a lack of ability to administer intravenous fluids and monitor the patient in real time. *Thus, female inmates are not provided the same access to infirmary level care as men. The County must provide the same higher level of medical care to women as it provides to men.*

At the last site visit, ACH advised the monitors that dialysis was going to be moved to RCCC due to severe lack of space in the Main Jail dialysis room.  At that time, we toured the proposed space to be renovated for dialysis at RCCC which was 2-3 times larger than at Main Jail. [83]

However, we were advised that the Department of General Services (DGS) indicated that they would not move forward with the plan to establish a dialysis unit at RCCC because the area to be renovated was "too small," however we note that the RCCC space designated for dialysis is much larger than the one at Main Jail.

It is the County's decision where to provide dialysis services. Decisions regarding the location need to consider the availability of the vendor to the jail, and the capacity to provide emergency services for dialysis related complications (e.g., bleeding, hypotension, stroke, etc.) and the availability of medical escorts.

**Compliance Assessment:**
- G.1=Noncompliance
- G.2=Noncompliance
- G.3=Substantial Compliance
- G.4=Substantial Compliance.
- G.5. Substantial Compliance

**Recommendations:**
1. Move or renovate the current intake medical screening area to provide auditory privacy for patients.
2. Provide nurses adequate exam space that is properly equipped and supplied, and adequate to conduct sick call daily, both morning and evening shifts.

---

[82] Inmates report that they have easy access to substances, including fentanyl.
[83] The medical experts recommended that in addition to the dialysis unit, that the County renovate the area to provide an infirmary for women. The number of beds would be determined by the need for higher level beds, and might include both single cell rooms as well as an open, small dormitory setting.

3. Complete renovations on 2 Medical to include replacing broken cabinets, refurbishing the floor in the medication room with materials that will prevent scratching and enable staff to determine that sanitation of the floor.

4. Reassess the risk and benefits of moving dialysis to RCCC.

5. At RCCC, provide sufficient infirmary beds for women to meet the demand for higher level care.

6. Revise the policy regarding use of the "sobering cell" to ensure patient safety.[84]

---

## H. Patient Privacy

1. The County shall develop and implement policies and procedures to ensure that appropriate confidentiality is maintained for health care services. The policies shall ensure confidentiality for clinical encounters, including health care screening, pill call, nursing and provider appointments, and mental health treatment. The policies shall also ensure confidentiality for written health care documents, such as health care needs requests and grievances raising medical care or mental health concerns, which shall not be collected by custody staff.

2. The County shall provide adequate clinical space in each jail to support clinical operations while securing appropriate privacy for patients, including visual and auditory privacy from prisoners and auditory privacy from staff.

3. All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff. In making such a determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be made based upon housing placement or custodial classification. The issuance of pills does not constitute a clinical interaction.

   a. For any determination that a clinician interaction with a patient requires the presence of custody staff, staff shall document the specific reasons for the determination. Such decisions shall be reviewed through the Quality Assurance process.

   b. If the presence of a correctional officer is determined to be necessary to ensure the safety of staff for any clinical encounter, steps shall be taken to ensure auditory privacy of the encounter.

   c. The County's patient privacy policies, as described in this section, shall apply to contacts between patients and all staff who provide health-related services on site at the jail.

4. Jail policies that mandate custody staff to be present for any medical treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above. Custody and medical staff shall be trained accordingly.

---

[84] ACH is in process of revising the policies on the sobering cell and safety cells.

**Findings:**  With respect to privacy, the findings at this site visit are unchanged from previous monitoring reports. The County does not provide confidentiality and privacy to patients for clinical and other health related encounters (H.1). ACH has not provided adequate space in each jail to support clinical operations while securing appropriate privacy for patients (H.2). ACH has revised policies involving patient privacy, but has been unable to fully implement these policies in a manner that provides privacy and confidentiality of medical information. Jail policies that mandate custody staff to be present for any medical treatment that disrupts confidentiality have been revised to meet Consent Decree requirements (H.4).

There is no privacy at intake, and both arresting officers and inmates can overhear patient responses to nurses questions, including substance use and medical diagnoses.  As noted earlier in this report, the lack of privacy resulted in an arresting officer overhearing the patient describe his substance use, and this information was included in a charging document.

The County has taken meaningful steps to provide privacy, and the plan is described in Section G. Clinic Space and Medical Placements.

Both Main Jail and RCCC have insufficient clinical space to provide confidential clinical encounters (H.2).  When there is no available space to see the patient, or when there is no deputy to escort the patient to an examination room, nurses and providers conduct cell side interviews/assessments which are not confidential (H.3).

**Compliance Assessment:**
- H.1=Noncompliance
- H.2=Noncompliance
- H.3=Noncompliance
- H.4=Substantial Compliance

**Recommendations:**
1. Continue to make modifications to the physical plant, to provide patient privacy and confidentiality.
2. Provide adequate numbers of deputies to escort patients to an examination room that provides privacy and confidentiality.

---

**I. Health Care Records**

1. The County shall develop and implement a fully integrated electronic health care record system that includes medical, psychiatric, and dental records and allows mental health and medical staff to view the medical and mental health information about each patient in a single record. This shall be accomplished within 12 months of the date the Remedial plan is issued by the Court.
2. Until such a system is implemented, the County shall develop and implement policies and procedures to ensure that medical staff have access to mental health information and mental health staff have access to medical information, as needed to perform their clinical duties. This information shall include all intake records. Medical and mental health staff shall be trained in these policies and procedures within one month of the date the Remedial plan is issued by the Court.
3. The County shall develop and implement policies and procedures to monitor the deployment of the CHS Electronic Health Record (EHR) to ensure the records system is modified, maintained, and improved as needed on an ongoing basis, including ongoing information technology support for the network infrastructure and end users.

---

**Findings:** ACH continues to use Centricity Fusion electronic health record software, and staff have access to all patient records including medical, behavioral health, and dental (I.1). As previously reported, this software fails to meet the administrative needs for data analytics and population health management, and negatively impacts patient care due to the lack of interface between the electronic medication administration record (eMAR) and Correctional Inpatient Pharmacy Software (CIPS). ACH is in the process of reviewing available electronic health record software options that would better meet the operational and administrative needs of the healthcare program. In selecting a new electronic health record (EHR), the County needs to ensure that the EHR can be programmed to integrate all health care operations, and interface with needed software programs (ATIMS, eMAR, etc.).

As identified in previous reports, requests for information (ROIs) are sometimes not responded to, and there is no follow-up to ensure the requested records are obtained. Also, previous reports showed staff did not have timely access to health records required to provide timely medical care (i.e., specialty services and emergency department physician recommendations). This is essentially unchanged. Record review shows that outside records (e.g., hospital discharge instructions and/or summaries) are still not timely received and scanned into the electronic record. Of note, case management tracks hospital reports, but no one is assigned to be responsible for tracking emergency department records and discharge summaries. Some inhouse procedures (EKG) are not filed into the EHR. For example:

**Patient #30** is a 41-year-old female mentally ill patient that was sent to the emergency department on multiple occasions for swallowing contraband, abdominal pain, rectal bleeding, and chest pain.  On 10/13/23 at 03:47, the patient returned from the emergency department (ED). The provider saw the patient for follow-up, but discharge documentation and instructions

were not available, requiring the provider to rely on the patient's verbal report.  The discharge report was not scanned into the health record until 10/19/23 at 14:56, six days after the provider saw the patient.   On 10/20/23, the same patient was again sent to the ED with a GI bleed and was discharged to the jail on 10/21/23. The nurse saw that patient upon return and summarized the contents of the discharge recommendation in the encounter documentation however, the ED paperwork was never scanned into the electronic health record.

**Patient #25** is a 38-year-old man who on 1/15/24 at 16:51, was seen in nursing sick call for complaints of chest pain. An EKG was performed and was abnormal. A provider reviewed the EKG and sent the patient to the emergency department.  The EKG was not scanned into the record until 1/17/24 at 09:45.

Medical providers' review of outside medical records, lab, and radiology reports are often delayed for weeks or more, following scanning into the electronic health record. When reports are abnormal, providers do not necessarily document acknowledgment of the result, and document a plan of care, if indicated.  This negatively affects patient care.

Health Service Request (HSR) forms are not timely scanned to the electronic health record, often delayed by a week or more. Details of the access to care process are discussed in Section C of this report, including the impact of delays in care for patients.

Health staff must have the entire contents of the medical record available to them during patient encounters. Delays of scanning critical information such as HSRs, specialty services reports, and hospital discharge summaries and inpatient records, results in providers' inability to timely know findings and recommendations, and adjust the treatment plan as needed. This increases the risk of error in the diagnosis, treatment, continuity of care, and sometimes unnecessary duplication of services.[85]

Due to lack of space at Main Jail, Health Information Services are maintained at an administration building on G street. The current practice for scanning paper records involves transporting the documents in a locked box from Main Jail or RCCC to the medical records department in the administrative building.

The electronic records system is maintained, supported, and improved as needed by the County Information Technology (IT) department.  More complex and complicated Fusion software issues are addressed by the Centricity Fusion help desk (I.3).  As discussed in previous reports, healthcare data reporting and tracking currently available to ACH staff are not sufficient to support the data analytics needs required for effective health services operations, including population health management.  The EHR does not have the ability to track and analyze aging of patient health services requests, ordered laboratory and radiology tests, patients with chronic diseases, and with specialty services.  Because the system in insufficient, manual tracking using

---

[85] Labs and x-rays are automatically imported into the record.

spreadsheets and logs is required, which is not efficient and reliable.  Currently, there is no system for tracking patients with chronic diseases.

**Compliance Assessment:**
- I.1=Substantial Compliance
- I.2=Partial Compliance
- I.3=Substantial Compliance

**Recommendations:**
1. Reengineer the system of timely retrieval, scanning, tracking, and notification to providers of required review of health records including:
   a. Release of Information (ROI) requests;
   b. Health services request forms (HSRS);
   c. Emergency department and hospital reports;
   d. Laboratory, radiology, and imaging reports;
   e. Specialty services reports.
2. Prioritize the selection and procurement of a new electronic health record system that is customized to support ACH workflows and data management needs.
3. Fix the interface problems between the Fusion eMAR and CIPS.

| J. Utilization Management |
|---|
| 1. The County shall revise its utilization management (UM) system to ensure that critical health decisions about patients' access to care are made with sufficient input from providers and a thorough review of health care records. |
| 2. The County shall ensure that decisions about a patient's access to, timing of or need for health care are made by a physician, with documented reference to the patient's medical record. Nurses may gather information and coordinate the UM process, so long as it does not interfere with that requirement. All decisions by the UM committee shall be documented, including the clinical justification for the decision. 3. The UM system shall ensure that providers and patients are promptly informed about decisions made by the UM committee, including denial of a specialist referral request. 4. The UM system shall include an appeal process to enable patients and providers to appeal a decision denying a referral request. |

**Findings:** The County has developed a case management (i.e. utilization management) system to ensure that health care decisions about patient's access to care are made by a medical provider (J.1).  Decisions about the need for and timing of care are made by a physician, but time frames are frequently not met. (J.2)   The case management system does not result in providers and

patients being timely notified of case management decisions (J.3). [86] The UM policy provides for an appeal process (J.4).

Utilization Management 01-14 policy is compliant with the Consent Decree except it does not include the process of promptly notifying providers and patients of decisions of the cases management committee. Operational changes have been made since the policy was revised on 8/6/21, and needs to be updated to include requiring all specialty services requests on the tracking log, and describe the process for scheduling appointments with outside and on-site providers, including coordination with custody medical transport. The policy includes a section on a Utilization Review Committee (UMC) but does not include operational detail such as what members of the health care team are on the committee, who leads the UMC, and the operational details such as how often the committee is to meet and function.

During the site visit, the medical experts were advised that there were 846 specialty requests that were not listed on the Specialty Services Tracking Log, including onsite and offsite referrals. Consults that were not listed on the tracking log went as far back as July 2022. The types of specialty services not included on the log included: cardiology (20), ophthalmology (67), Gastroenterology (90), nephrology (2), neurology (8), vascular surgery (2), orthopedic (65), physical therapy (101) and optometry (250), as well as other services. The decision to not place onsite referrals on the tracking log was made by the previous Deputy Director with the knowledge by previous Medical Directors, and became standard practice up to this time. The medical experts were not aware that on-site consults were not on the tracking log. That specialty services such as cardiology, nephrology and orthopedics were not tracked on the log, dramatically increases the risk of harm to patients.

ACH hired a Case Management (CM) Supervising Registered Nurse (SRN) who onboarded in July 2022. The SRN has morning huddles with the CM team. Nicole Harper, Quality Improvement Director, has recently acquired supervision of Case Management. She has revised the Specialty Services Tracking Log to be more user friendly and meets weekly to discuss progress and to address any issues. There are also weekly CM meetings with Dr. Abdalla to discuss individual patient referrals, as well as monthly meetings with Drs. Abdalla and Sergienko to discuss all referrals outside of the required time frames.  On-site referrals have not been included in QI studies of timeliness, but ACH reports will be included in future studies.[87]

Record review shows that both medical providers and patients are not timely informed of the status of their specialty services request.[88] We note that in the weeks prior to an appointment, staff does not meet with the patient to determine if the patient still wants to have the specialty service appointment. Because of sometimes extensive delays, some patients may have changed

---

[86] The County responded that Since January 2024, after the weekly meeting between CM and Dr. S/Abdalla or Dr. Nugent the provider is informed if a referral has been denied and that they should 1) inform the patient, or 2) complete necessary processes for the referral to be accepted. The experts have not been able to assess that this is occurring and will evaluate it at the next site visit.

[87] Email communication from Nicole Harper, DHA, LMFT. 4/10/24.

[88] Not to include information about appointments dates.

their minds or are unprepared on the day of the appointment. This likely contributes to patient refusals for specialty services; a waste of resources that could be utilized by another patient. Frequent cancellations also harm working relationships with specialists and may result with specialists no longer being willing to see SCJ patients.

**Compliance Assessments:**
- J.1=Substantial Compliance
- J.2=Partial Compliance
- J.3=Noncompliance
- J.4=Substantial Compliance

**Recommendations:**
1. Revise the UM policy to include Consent Decree requirements to:
   a. Track both onsite and offsite specialty services.
   b. Notify providers when appointments are scheduled and whether the appointment is within or outside required time frames.[89]
   c. Notify patients that a specialty services appointment has been scheduled (without providing the date).
   d. Have a nurse meet with the patient within two weeks of the appointment to determine if the patient still wants the service; and as needed, convey any information preparation for the appointment (e.g., NPO, coloscopy prep, etc.).
   e. Clarify the composition and role of the Case Management Committee (e.g., leadership, membership, frequency of meetings and maintenance of meeting minutes.
2. QI needs to conduct studies of both on-site and off-site specialty requests.

---

**K. Sanitation**

1. The County shall consult with an Environment of Care expert to evaluate facilities where patients are housed and/or receive clinical treatment, and to make written recommendations to address issues of cleanliness and sanitation that may adversely impact health.

---

**Findings:**  The monitors observed continued improvement in the cleanliness and sanitation efforts in the medical areas. However, we did not inspect housing unit cleanliness. The booking nurse interview stations were noted to be well organized and clean, including the floors.

The County has a contract with the Department of General Services (DGS) for professional cleaning service however they do not clean medical exam areas, including surfaces and

---

[89] The Consent Decree states that medical providers *may* request information about whether the appointment is scheduled and the date of the appointment. So, while not required to notify each provider, this would assist providers in decisions about whether the time frame is appropriate, or whether an appointment needs to be sought earlier on behalf of the patient.

equipment, which results in medical staff having to clean those areas.  Since the monitors' last tour, the ACH contracted with Bissell for the provision of medical grade cleaning.  They clean daily and perform deep cleaning every other Sunday.

Environmental inspection reports and Safety Committee Meeting minutes were provided for 2023. The environmental inspection reports provided examine intake, nurse stations 1-4, and the exam room. The January 2023 intake inspection reports identified a rug that needed replacement and the same issue remained unmitigated through December 2023.  Also, in July 2023 an eyewash station above the sink was not mounted and as of the site visit, still had not been installed. These two issues were not addressed in Safety Committee Meeting minutes. The minutes do reflect that a medical assistant (MA) is inspecting other medical areas in the jail however, there were no completed inspection reports for those areas to provide proof of practice.

Inspections are critical for surveillance and mitigation of safety and infection control issues.  Once identified, swift action must be taken to rectify the identified problems.  These issues should be part of the discussion in Infection Control meetings as well as administrative meetings, to ensure timely and satisfactory resolution.

**Compliance Assessment:**
- K.1=Substantial Compliance

**Recommendations:**
1. Continue the contract with Bissell for medical professional cleaning.
2. Utilize inspection tools for the environmental inspections in all areas of the jail where health care is provided e.g., exam rooms in M2, exam rooms on the various housing floors, dialysis unit, 2 Medical at Main Jail and the Medical Housing Unit at RCCC, etc., and provide these inspection reports as proof of practice.
3. Examine the process for mitigating identified sanitation/safety issues to ensure accountability for corrective action.
4. Ensure the meeting minutes include all areas identified as substandard during the inspections and track the progress toward timely correction.
5. Consider obtaining periodic independent consultations from Diane Skipworth, MCJ, RDN, LD, RS, CCHP, Environment of Care expert (who previously conducted an inspection at SCJ), or another independent environment of care expert to provide guidance to Sacramento County Jail regarding improving environmental conditions related to health and safety.

---

**L. Reproductive and Pregnancy Related Care**

1. The County shall ensure that pregnant patients receive timely and appropriate pre-natal care, specialized obstetric services when indicated, and post-partum care (including mental health services).
2. The County will provide pregnant patients with comprehensive counseling and timely assistance in accordance with their expressed desires regarding their pregnancies, whether they elect to keep the child, use adoptive services, or have an abortion.
3. The County will provide non-directive counseling about contraception to female prisoners, shall allow female prisoners to continue an appropriate method of birth control, shall provide access to emergency or other contraception when appropriate.

---

**Findings:**  This review showed that in some cases, patients did not receive timely gynecological care and anatomy ultrasound. (L.1).  Obstetricians discussed pregnancy options with patients (L.2.). Records lack documentation that patients were counseled about birth control options (L.3.).  OB case reviews are noted below.

**Patient #17.** This 38-year-old woman arrived at SCJ on 11/27/23 and was released on 3/30/24. Her medical history included pregnancy, opioid and methamphetamine use disorders, hepatitis C infection, and adjustment disorder with mixed anxiety and depressed mood. Her medications at the time of release were methadone, sertraline, and hydroxyzine. The patient had previous admissions to the jail and was pregnant at a July 2023 admission.

At the patient's first admission in July 2023, the intake nurse did not refer the patient to the OB/GYN clinic. Nevertheless, OB saw the patient 7 days later and monitored the patient monthly, with progress notes in between visits documenting the results of lab and ultrasounds. There was concern for oligohydramnios (low amniotic fluid for the gestational age) that increased risk of complications to the fetus. The patient had a previous child with gastroschisis (an abdominal defect in the fetus that results in intestine extending outside the abdominal wall). OB ordered an expedited anatomy ultrasound, but it was not performed for 2 months, when the patient was at 23 weeks.

Although OB visits occurred timely, there were serious concerns regarding the management of the patient's OUD during her pregnancy. The intake nurse did not refer the patient to a MAT provider, or order OUD withdrawal monitoring. The patient suffered from withdrawal for 3 days before a nurse notified a provider for treatment, and 4 days until the MAT provider saw the patient.  When COWS assessments were ordered, either following intake or later, nurses did not conduct monitoring in accordance with the needs of the patient, Consent Decree, and Standardized Nurse Procedures. This is of particular concern as the patient continued to have withdrawal symptoms throughout her pregnancy, with nausea and vomiting that resulted in dehydration and hypotension despite frequent adjustments in MAT.  The patient was transferred and returned to the jail on 11/27/23.

During the second admission, the patient was transferred from CDCR and taking methadone, which was timely continued at SCJ. OB visits were timely; however, the patient refused an OB visit in late December, about 2 weeks prior to delivery, but was not counseled regarding risks of refusal. The intake nurse did not refer the patient to the MAT provider or order COWS assessments. The patient submitted multiple HSRs complaining that her opioid withdrawal symptoms were not well controlled, but was not referred to the MAT provider until 6 weeks after arrival and a week prior to delivery.  This subjected both the patient and fetus to withdrawal symptoms.

The patient was transported to UC Davis for delivery.  UCD OB's noted that they did not have records of the patient's prenatal care. Delivery was complicated by second degree perineal laceration and bilateral urethral laceration (not requiring repair). This complication was not acknowledged upon the patient's return to the facility.  The patient had one postpartum visit following discharge. There is no documentation the patient was counseled regarding birth control options following delivery.  An incidental finding was that on two occasions, CNAs documented giving health snacks to the patient when she was hospitalized. This is falsification of documentation.

**Patient #18** This 43-year-old woman transferred from Colusa County Jail on 12/12/23 and was released on 1/23/24. Her medical history includes obesity, type 2 diabetes, hypertension, left breast abscess and recurrent MRSA infections, and hirsutism.  At the time of admission her medications were metformin, Humalog insulin three times daily, and labetalol.

The patient received timely OB services during this brief 2-month admission. An NP saw the patient the day after arrival noting the patient was 5 months pregnant. The patient was diabetic and prescribed Metformin. The NP discontinued the patient's Metformin and started glyburide, without documenting the clinical rationale for the change.

On 12/15/23, OB saw the patient and conducted a thorough initial visit. OB noted that she could not follow fingerstick blood sugars (FSBS), as nurses did not document whether the glucose values were fasting, pre-prandial or post-prandial. OB discontinued Glyburide, added aspirin, and requested a high-risk consult that was performed on 12/26/23. OB saw the patient for follow-up on 1/5/24 and the patient was released on 1/23/24.

**Gynecology Care**

We reviewed lists of RCCC patients scheduled for gynecology appointments. At least as far back as July 2023 and every month up to the end of December, custody did not transport many patients for their GYN appointments.  In December 2023 alone, every Friday for which GYN appointments were scheduled, it appears that whole clinics were cancelled. We reached out to Dr. Abdalla who investigated the problem and it appeared to be a problem with orders for GYN appointments not showing up in the jail management system (ATIMS), to notify custody that a patient had a scheduled appointment.  Until this IT problem can be addressed, ACH changed back to a previous method of having a nurse print the appointment list and giving the list to custody.  A question and

concern are how many patients with serious gynecological conditions (e.g., abnormal pap smears, etc.) have not had timely care to provide treatment.   The case below illustrates a patient who did not receive timely care for her gynecological conditions.

**Patient #19** This 43-year-old woman transferred from Colusa County Jail on 12/12/23 and was released on 1/23/24. Her medical history includes obesity, type 2 diabetes, hypertension, left breast abscess and recurrent MRSA infections, and hirsutism.   At the time of admission her medications were metformin, Humalog insulin three times daily, and labetalol.

This patient did not receive timely medical care for her gynecological conditions during her 2-month incarceration.   The patient reported having an ovarian cyst, and on 10/27/23, pelvic ultrasound was ordered. On 11/17/23, the ultrasound showed a possible ovarian cyst but ectopic gestation should be considered.  A primary care provider reviewed this report 3 weeks later, on 12/5/23.  There is no documentation that an OB/GYN reviewed this report. This is a serious concern given the possibility of ectopic pregnancy.  The patient's pregnancy test was previously negative, and the patient had Nexplanon birth control, however, the findings of the pelvic ultrasound needed to be timely reviewed and addressed for clinical correlation.

On 11/15/23, a provider saw the patient who gave a history of a breast lump/mass in 2022 with no work-up. The provider did not order a mammogram.

On 11/17/23, a provider noted that in 2020, the patient had an abnormal Pap (HGSIL) smear requiring colposcopy due to increased risk of cervical cancer, but the patient did not have the procedure done at that time because of her negative interaction with the outside doctor.  OB/GYN planned to perform a Pap smear and ordered colposcopy due to risk of cervical cancer, however, the Pap smear was not performed and the outside facility would not schedule the procedure without the Pap smear report. On 12/2/23, the provider was notified by case management and saw the patient 3 weeks later 12/22/23. The patient wanted to wait 2 weeks to have the Pap smear, "to be ready", but the patient was released the following week.

We referred this to Dr. Aballa who followed up with OB regarding the delay in repeating the Pap smear. OB did not perform the Pap smear due to the expected short stay of the patient. This may also have applied to the patient's history of breast mass and failure to order a mammogram.

In summary, this limited sample showed:
- Following referral to obstetrics for pregnancy, patients receive timely and appropriate services. However, patients were not timely treated for opioid use disorder, which negatively affects the patient and her fetus.
- An anatomy scan was not timely performed for the patient who had a previous child with a birth defect.
- There was no documentation of birth control counseling.
- There were delays in performing a Pap smear for a patient with a history of an abnormal Pap, and a mammogram was not ordered for the same patient with a history of breast mass due

to providers belief that the patient would be released soon, and could not be informed of test results.

- There are issues with nurses not documenting the timing of fingerstick blood sugars (i.e., fasting, pre- or postprandial.
- Nurses did not appropriately respond to HSRs that indicated this pregnant patient was suffering from withdrawal (i.e. Immediate notification of a provider).
- A provider switched the patient from Metformin to Glyburide without documenting the clinical rationale. OB discontinued the Glyburide two weeks later.

**Compliance Assessment:**
- L.1=Partial Compliance.
- L.2=Substantial Compliance
- L.3=Partial Compliance

**Recommendations:**
1. Reassess the intake process, clarify expectations, retrain staff, and monitor compliance with OB and MAT provider referrals, and SUD withdrawal monitoring.
2. Correct the interface problem with the medical record and ATIMS so that appointments appear on the custody medical transport list.
3. For patients with a history of abnormal Pap smears and mammograms, providers should perform or order diagnostic testing.
4. OB/GYN providers need to document discussion with the patient about birth control options.  Working in collaboration with OB/GYN consultants, consider having a nurse trained to perform family planning counseling, not only for pregnant patients, but all women of child-bearing age at the jail.
5. The Medical Director needs to conduct stronger oversight of specialty services, including referrals for OB/GYN procedures (e.g., expedited anatomy ultrasounds).
6. Nurses need to document the timing of blood sugars.
7. Nursing leadership needs to address expectations for nurses regarding management of health request forms at the time of triage, and when to urgently see the patient/and or notify a provider, particularly as it relates to patients with poorly controlled substance use disorders.
8. Providers should not arbitrarily discontinue medications and substitute another without documenting the clinical rationale that supports the decision.

---

**M. Transgender and Non-Conforming Health Care**

1. The County shall implement policies and procedures to provide transgender and intersex prisoners with care based upon an individualized assessment of the patient's medical needs in accordance with accepted standards of care and prevailing legal and constitutional requirements, including, as appropriate:
   a. Hormone Therapy
   b. Surgical Care
   c. Access to gender-affirming clothing
   d. Access to gender affirming commissary items, make-up, and other property items
2. The County shall ensure that medical and mental health staff have specific knowledge of and training on the WPATH Standards of Care.

---

**Findings:** ACH policy 05-12, Transgender and Gender Diverse Health Care, revised 1/18/2023 is compliant with the Consent Decree (M.1). ACH provided documentation that staff is trained regarding the revised policy and WPATH Standards of Care (M.2).

ACH provided a log for patients who are transgender.  The log included patients who were booked into the jail from 7/1/23 to 12/31/23. Currently, there are 27 transgender patients at the jail.

With respect to the log, it appears that the date listed is the date a nurse or provider ordered a referral to the gender affirming clinic. Most of the referrals were from the intake, and other orders from a medical provider later.  The column to identify the patient's provider in most cases is an RN, and not a medical provider. The log does not include the dates of follow-up to track timeliness of appointments.

At the last site visit, we found that transgendered patients were timely enrolled and monitored in the Gender-Affirming clinic, consistent with the patient's medical needs.  For this review, we found that there were delays in referrals, for both initial and follow-up visits. In one case, the patient was not referred to the gender affirming clinic and not seen by a provider prior to her release six weeks later. These examples are described below:

**Patient #14** This 27-year-old binary/transgender woman transferred from CDCR to SCJ on 9/13/23 and is still at the jail.[90]   Her medical history includes gender dysphoria, opioid use disorder (OUD), sickle cell trait, history of seizures, and depression.  Her medications are currently Buprenorphine. There were several systems issues in this case, including:

- Lack of tier 2 medical screening. The patient was not referred from intake to the gender-affirming clinic.
- Delayed initial visit. The patient was referred to the gender-affirming clinic at the 14-day H&P. The first appointment took place 6 weeks later.

---

[90] Patient #14.

- Delayed follow-up care. The provider requested follow-up in 3 months.  On 2/22/24, the visit did not take place because custody did not escort the patient to the provider, despite the provider making multiple requests to custody over 2 hours. The medical provider saw the patient om 3/19/24, 4 months after the last appointment.
- Lack of timely responses to HSRs.
- Non-completed medical and mental health appointments due to lack of custody escorts.
- Medication non-compliance for medical and psychotropic medications not timely noted or addressed by nurses and medical and mental health providers.

I reviewed this case with Mary Perrien, mental health expert.  We found that:

- MH staff did not review of the patients previous admissions that showed she was receiving mental health treatment.
- MH staff did not timely perform a mental health assessment, which occurred 2 months after it was ordered.
- MH staff did not conduct an assessment following an emergency referral from custody for approximately 18 hours, rather than 6 hours.
- Violation of privacy and failure to evaluate the patient, when on 9/24/23, a mental health worker in response to the patient's HSR that stated "I need to talk to someone before something bad happens," called custody to ask the patient if she had suicidal and/or homicidal ideation. Custody called the MH worker back to say she denied SI/HI ideation.
- A psychiatric provider did not see the patient for 3 months after arrival.

**Clinical Concern**

- This 27-year-old patient has reported blood in her stool and has microcytic anemia. The record shows a strong family history of cancer (both paternal grandparents died of colon cancer in their 50's, as well as other cancers). Given the strong family history and increasing incidence of colon cancer in younger patients in the US, consider revaluating this patient to confirm the patient's family history and to consider further work up for GI bleeding. This case was forwarded to Dr. Abdalla, who saw the patient soon thereafter.

**Patient #15** This 27-year-old woman arrived at SCJ on 9/21/23 and was released on 11/5/23.  She was readmitted on 12/28/23 and was released on 2/9/24. Her medical history includes opioid and methamphetamine use disorder, syphilis, impacted right radial styloid fracture with volar malunion, anxiety and bipolar disorder. Thus, patient had two admissions a short time apart.

1. For the first admission, the patient was timely referred to the gender-affirming clinic and the appointment took place within 10 days. At the second admission, the intake nurse did not refer the patient to the gender-affirming clinic and the patient was not seen prior to release, six weeks later.

2. Care provided by the physician adheres to current WPATH guidelines for gender-affirming care.

3. During the first admission, the patient was treated for syphilis. Due to the shortage of bicillin, doxycycline was ordered twice daily for 14 days or 28 doses. The eMAR showed 27 doses to be given not 28, and therefore the patient did not receive all ordered doses. The flaw in the eMAR that enabled the nurse to only administer 27 instead of 28 doses is related to the lack of interface between the Fusion eMAR and CIPS.[91]

4. When patient's refuse treatment for serious medical conditions like syphilis, the nurse needs to know and immediately notify a provider. Doxycycline is a common antibiotic used for many reasons. We discussed with ACH the possibility of having a chart alert for nurses when antibiotics are prescribed for STIs.

5. We understand that the infection prevention nurse position is currently vacant. ACH needs to ensure there is a surveillance system in place to patients for patients with active infections (e.g., HIV, HCV, STI's, LTBI [92]and active TB disease, and skin infestations such as scabies and lice, etc.) is taking place and to monitor patient completion of treatment for communicable diseases.[93] The infection prevention program needs to function regardless of whether the infection prevention nurse position is filled.


**Patient #16** This 44-year-old transgender woman arrived at SCJ on 1/3/24 and is still at the jail. Her medical history includes obesity, transgender (male to female), asthma, HIV infection, syphilis, methamphetamine use disorder, left knee osteoarthritis, major depression with psychosis. Her medications are estradiol, spironolactone minipress, Descovy, Tivicay, amlodipine, Doxepin, Seroquel, Lexapro, and vitamin D3.

The patient was timely enrolled and monitored in the gender-affirming and HIV clinic. There was a brief delay in ordering the patient's second HIV medication (Tivicay). The patient's HIV disease and transgender condition are well-controlled.

An incidental finding is that mental health appointments and continuity of medication were not provided. The patient, who was hospitalized in December 2023, did not receive continuity of psychotropic medications, although medication records were available in the record one day after her arrival at the jail. Multiple patient health services requests for MH medications did not result in a timely in person visit with a mental health provider.

**Compliance Assessment:**
1. Partial Compliance
2. Substantial Compliance

---

[91] This is a known issue for which ACH has developed a plan to address.
[92] Latent TB infection.
[93] HIV, HCV, STI's, LTBI [93]and active TB disease, and skin infestations such as scabies and lice, etc.

**Recommendations**

1. ACH needs to retrain intake nurses regarding referring patients to the transgender affirming clinic and timely schedule clinic appointments, no later than 14 days, and sooner if clinically indicated.

2. ACH needs to develop a tracking system to monitor whether clinical follow-up is timely, and in accordance with provider orders.

3. ACH and JPS need to evaluate and conduct a root cause analysis of delayed emergency referrals, mental health assessments, and initial psychiatric appointments.

4. Continue to train staff on WPATH standards.

5. Implement an infection prevention system that is not reliant on the presence of an individual staff member, such that surveillance, including completion of ordered treatment for infectious disease is monitored and addressed as appropriate.

---

### N. Detoxification Protocols

1. Within three months of the date the Remedial plan is issued by the Court, the County shall develop and implement protocols for assessment, treatment, and medication interventions for alcohol, opiate and benzodiazepine withdrawal that are consistent with community standards.

2. The protocols shall include the requirements that:
   (i)   nursing assessments of people experiencing detoxification shall be done at least twice a day for five days and reviewed by a physician.
   (ii)  nursing assessments shall include both physical findings, including a full set of vital signs, as well as psychiatric findings.
   (iii) medication interventions shall be updated to treat withdrawal syndromes to provide evidenced-based medication in sufficient doses to be efficacious.
   (iv)  the County shall provide specific guidelines to the nurses for intervention and escalation of care when patients do not respond to initial therapy; and
   (v)   patients experiencing severe-life threatening intoxication (an overdose), or withdrawal shall be immediately transferred under appropriate security conditions to a facility where specialized care is available.

---

**Findings:** The County has made some progress in the areas of Medication Assisted Treatment and overdose prevention. As noted in the Executive Summary these measures include the following:

1. Custody has designated several housing units as detox units for patients with substance use disorders.

2. Electrolytes have been placed in these units to assist patients with hydration, which may prevent emergency department send outs.

3. Custody has also designated a housing unit for patients on Medication Assisted Treatment (MAT).

4. The physician assigned to the 6th floor monitors patients and adjusts treatment as needed.
5. An SRN has been assigned to the detox unit.
6. Narcan has been placed in housing units directly available to inmates, and in control rooms.
7. Custody has strengthened inmate search procedures at intake to identify contraband.[94]

There have been no deaths at the jail due to overdose since these measures have been implemented.  However, in the interim between the draft and final report, there was a death in the detox unit for a patient for whom alcohol withdrawal monitoring was not completed, reportedly due to patient refusal.[95]

While recognizing progress in MAT, there continue to be problems with:
• Timely identification of patients with substance use disorders (SUD) during medical screening
• Lack of timely monitoring by nurses, and,
• Delayed treatment of patients with withdrawal symptoms.

Record review shows that nurses do not conduct detox monitoring timely, *even in detox units*. This is due to lack of nurse staffing. Patients are not placed in an open dorm environment *that would provide ready visual access to patients and permit nurses to timely monitor and identify patients whose withdrawal symptoms are escalating, so that treatment can be initiated.*

In addition, although a medical provider is assigned to the MAT unit, there is no medical provider assigned to detox units to make daily rounds, evaluate patients, order treatment, and discharge patients to general population when their symptoms have improved. Given the ongoing problems with monitoring and treatment of patients in withdrawal, the experts strongly recommend that this be implemented immediately.  Other findings are described below.

The County has developed protocols for the assessment, treatment, and administration of medication for alcohol, opiate, and benzodiazepine withdrawal, however there are discrepancies between the protocols, policies and procedures, email communication, and temporary directives referred to as "go by" documents[96] (N.1). Implementation of detoxification protocols is dependent on the nurse taking a complete and accurate substance use history, however review of intake records show that nurses often fail to obtain a complete history of substance use, and as a result, nurses do not order CIWAs or COWS assessment, or implement detoxification

---

[94] This is positive, however inmates reported to us that drugs were widely available, and if they "put in an order today, I can pick it up tomorrow."
[95] We recommend that ACH leadership review video to determine whether nurses went into the cell to assess the patient.
[96] See Section B for description of "Go By" documents.

protocols. This results in patients who are untreated for their withdrawal until it becomes severe following their arrival at the jail.[97]

An example of conflicting directives is the ACH Nurse Intake Policy that guides the nurse to complete a baseline Clinical Institute Withdrawal Assessment (CIWA) and/or Clinical Opiate Withdrawal Scale (COWS) assessment, for patients reporting use of alcohol and/or opiates, within six hours of arrival.  The ACH Alcohol Withdrawal Monitoring and Treatment Standardized Nursing Protocol (SNP) directs the nurse to complete a Prediction of Alcohol Withdrawal Severity Scale (PAWSS) at intake for each patient that endorses actively consuming alcohol. The Nurse Intake Policy is silent on the requirement to complete a PAWSS assessment.  The SNP also directs the nurse to place intoxicated persons in a sobering cell and evaluate them with a CIWA scale every 4 hours, or every 2 hours if they are unable to complete the CIWA monitoring assessment, in contrast with the Nurse Intake Policy that requires the initial CIWA /COWS assessment to be completed within 6 hours. [98]

A requirement of completing the PAWSS scale assessment is to obtain a blood alcohol level (BAL) using a breathalyzer. However, on 7/10/23, an email from the previous Medical Director instructed nurses to stop using the breathalyzer until further notice.[99]  Reportedly, this directive was given secondary to inconsistent readings.  As of 2/27/24, new breathalyzer machines had been received and training of nursing staff was pending.[100]

On 1/30/24, the monitors observed the practice of nurses' monitoring patients in the sobering cell.  On the day we observed, there were two patients in the sobering cell. One patient was observed lying face down with his face toward the wall, and fully clothed.  Assessing the patient's breathing, color, and over well-being not possible from outside the cell.[101]  At the medical experts request, custody entered the cell, aroused the patient, and escorted him outside the cell.   The patient was required to sit on the floor while the nurse obtained vital signs.  The previous Director of Nursing incorrectly reported that vital signs and CIWA/COWS assessments are completed every four hours on patients placed in the sobering cell however, when interviewed, the nurse assessing the patient reported that only vital signs were done, not CIWA/COWS assessments as reported by the Director of Nursing.  The nurse also reported that security staff did not allow patients to be seated in a chair while the assessments are completed.  When the nurse was questioned on the history of the patient, including what his prior vital signs were, she was unable to provide the

---

[97] Record review also shows that some LCSWs take more thorough histories during the initial mental health assessment, and referrals to providers are sometimes through mental health staff.
[98] ACH has revised its Sobering Cell policy which the medical experts are reviewing and will soon provide comments.
[99] The monitors noted the breathalyzer room utilized by law enforcement in the booking area which raises the question why nursing staff did not utilize their reading to assist them in completing their intoxication assessment.
[100] Blood alcohol level is included in the PAWSS assessment as a risk indicator for severe withdrawal.
[101] Patient #31.

information because the laptop computer does not have connectivity thus not accessing the patients' health records.

The monitors observed the nurse assessing the second patient housed in the sobering cell that spoke only Spanish.[102] One of the CERT officers from the booking area was used as an interpreter, rather than use the language line for the clinical encounter. Again, only vital signs were obtained and a CIWA or COWS assessment was not done.

Review of both patients records found that neither patient endorsed drug or alcohol use nor had the nurse recommended them for placement in the sobering cell. Patient #30 was suspected of having COVID infection and the nurse ordered isolation pending test results. The patient should not have been housed in the sobering cell with another patient. Neither patients plan of care in their health record included ongoing monitoring by nursing staff, nor did they meet the criteria as outlined in policy, for monitoring in the sobering cell. It appears that nursing staff simply obtain vital signs for patients placed in the sobering cell, rather than monitor patients based on their individual plan of care, written guidance found in policy and procedures, and standardized nursing protocols. This raises the question of who is determining when a patient should be placed in the sobering cell, and why nursing leadership was not knowledgeable of the nursing practice relative to use of the sobering cell. Since then, we have made policy recommendations with respect to the revised draft sobering cell policy.

ACH QI conducted point in time studies in August, September, and October 2023, measuring compliance with substance use withdrawal protocols. The studies found that:

- Nursing staff were completing the substance use assessment during the intake screening;
- Breathalyzer testing was not performed;
- Needed referrals to a medical provider occurred only 63% of the time;
- Withdrawal medications were ordered 61% of the time;
- Withdrawal monitoring per policy was completed 0% of the time.

Recent ACH QI studies continue to show that withdrawal monitoring is not being performed in accordance with policy and the Consent Decree; and these findings are consistent with record reviews.

An example of the failure to follow the withdrawal policy and protocols is a 29-year-old male that arrived at the jail on 10/30/23 at 13:58, after being released just two weeks prior on 10/13/23.[103] He had received Suboxone during his prior incarceration however, when discharged from jail he relapsed due to not having the medication. He reported taking methadone and fentanyl in the weeks prior to his most recent arrest and his initial COWS score was 1. He refused a urine drug screen and the nurse ordered twice daily withdrawal monitoring. The following day, on 10/31/23

---

[102] Patient #30.
[103] Patient #21

at 09:50, the patient reported to the nurse that he drank a pint of alcohol daily for fifteen years and his last drink was just prior to arrest.  He complained of hot flashes, itching, anxiety, and restlessness.  The nurse placed him on CIWA monitoring and contacted the provider who ordered medications for alcohol withdrawal.  The below table illustrates the lack of monitoring per policy and Consent Decree provisions.

| Date | Time | COWS Score | CIWA Score | Comments |
|------|------|-----------|-----------|----------|
| 10/30/23 | 13:58 | 1 | | |
| 10/30/23 | 23:43 | 7 | | Patient asked for suboxone. Pulse=125/minute.  Urine drug screen neg. for fentanyl and benzodiazepines, positive for cocaine, ecstasy, methamphetamine, THC, and amphetamines. |
| 10/31/23 | 09:50 | 6 | 8 | Started on alcohol detox monitoring |
| 10/31/23 | | Not Done | Not Done | |
| 11/1/23 | 13:11 | 10 | 5[104] | Nurses did not monitor the patient for over 24 hours. The patient's COWS score increased from 6 to 10. |
| 11/1/23 | 20:50 | 2 | 0 | |
| 11/2/23 | 11:24 | 3 | 1 | |
| 11/2/23 | 21:07 | 5 | 1 | |
| 11/3/23 | | Not Done | Not Done | |
| 11/3/23 | | Not Done | Not Done | |
| 11/4/23 | 10:42 | 0 | 0 | |
| 11/4/23 | | Not Done | Not Done | |
| 11/5/23 | 10:45 | 4 | 4 | |
| 11/5/23 | | Not Done | Not Done | |
| 11/6/23 | | Not Done | Not Done | |
| 11/6/23 | | Not Done | Not Done | |
| 11/7/23 | 10:02 | 5 | Not Done | |
| 11/7/23 | 23:10 | Not Done | Not Done | Patient refused. |

In addition to not monitoring the patient twice daily per policy, the assessments that were done were often not timely.  The morning assessment on 11/1/24 was not done until 13:11 and the 11/2/24 assessment was not done until 11:24. The evening assessment was not attempted until 23:10 and the patient refused.  Twice daily monitoring should be done as close to twelve hours apart as possible, or more frequently as clinically indicated to ensure changes in a patient's signs and symptoms of withdrawal are recognized and appropriate changes to the plan of care are

---

[104] The nurse scored the patient a zero for nausea/vomiting on the COWS assessment however assigned a score of 2 for GI upset on the CIWA assessment, which is indicative of an inconsistent assessment.

made.  Late assessments create a risk of patients experiencing decompensation and delay of adjustments to the plan of care.  Assessments attempted during the patient's normal hours of sleep increase the chance the patient will refuse, but must be completed as ordered.

Another 38-year-old patient booked into the jail on 12/17/23 at 13:52 after being released just three days earlier.[105]  He reported a history of alcohol and substance abuse disorder, endorsing drinking beer and smoking marijuana the day prior.  His prior intake screening, done on 12/13/23 documented his report of daily methamphetamines and attempted suicide by overdosing on fentanyl.  The nurse failed to obtain a urine drug screen, required by ACH policy 05-05, but completed the initial CIWA assessment, and ordered twice daily withdrawal monitoring.  At 20:33, the patient was still in the booking holding cell when the nurse attempted the CIWA screening and "Refused to come out" was documented.

On 12/18/23 at 09:03, the nurse documented "Deputy escorted RN to PT door after he refused to respond via intercom. Pt. was seen laying on the lower bunk facing the wall, when addressed he turned toward the door, frowned, and waved his hand, then turned back to the wall.  When asked if he was ok, patient remained facing the wall and gave no verbal response.  Appears to be in NAD (no acute distress), appointment will remain open."  When a patient does not respond to a nurse, the cell door should be opened so the nurse can access the patient, engage them in conversation, and bring them out of the cell for an assessment.  A true refusal requires a nurse patient interaction, with patient education provided.

A follow-up CIWA assessment was not attempted again until 12/21/23 at 00:18, two days and fifteen hours after the last attempt when the patient did not response to the nurse.  The patient told the nurse he had been taking methamphetamines daily for nine months and believed it may have been laced with fentanyl.  He repeated that he attempted suicide by overdosing with fentanyl two month prior. The nurse completed a urine drug screen, and it was positive for Amphetamines, Ethyl Glucuronide (alcohol marker), and Methamphetamine. The nurse documented, "No Fentanyl substance found in UDT, pt. (Patient) denies taking Fentanyl."[106] The patient scored 2 on the CIWA assessment.

The patient was not monitored again until 12/22/23 at 02:33, twenty-six hours after the last assessment.  The patient told the nurse he had been drinking a 5th of gin daily, along with using methamphetamines.  He was complaining of body aches, and 3 or 4 diarrhea stools that day.  The nurse ordered Loperamide for 3 days and Acetaminophen for 7 days. It is not clear what standardized nursing protocols were used to authorize the ordered medications.  The non-emergency abdominal standardized nursing protocol (SNP) authorizes the nurse to order Loperamide 2 mg BID x 3 days, for non-purulent, non-bloody diarrhea, accompanied by a welfare check in 24 hours, but does not authorize ordering Acetaminophen.  Additionally, the history and

---

[105] Patient #22
[106] Current urine drug tests do not measure or detect fentanyl.

physical assessment, required of the non-emergency abdominal SNP, was not completed, nor was the patient seen in twenty-four hours for a welfare check.

The patient did not receive the ordered Loperamide until 23:37, twenty-one hours after the nurse ordered it.  The 07:00 dose was documented as not available and the 15:30 dose was delayed until 23:37, representing an eight-hour delay beyond the scheduled evening dose time. The pattern of delay in administration of medications is fully addressed in Section F. of this report. Timely administration of ordered medications is required to effectively treat withdrawal symptoms and the practice of requiring patients to wait twenty-one hours to receive needed medications results in unnecessary suffering.

Consistent and timely monitoring for symptoms of withdrawal and the patient's response to ordered withdrawal medications is critical to ensure the timely identification of symptoms indicative of severe withdrawal. When patients "refuse to come out" of their cell and/or fail to respond when the nurse attempts to engage them is concerning and requires additional effort and investigation.

Since our last report, several improvements have occurred relative to substance abuse and withdrawal monitoring.  As noted above, Narcan has been placed in intake and each housing units, maintaining the availability of two doses. These doses are in addition to the supply kept in the control rooms at both facilities.  This is helpful in rapidly responding to any overdose situation, without waiting for security or medical staff to arrive with the medication.  Electrolytes are made available in detox units.

Another improvement is the expansion of the medication assisted treatment (MAT) program. The program now includes initiation of MAT for patients admitted to the jail not currently receiving it in the community. This initiative, under the direction of Dr. Jackie Abdalla, is laudable and ACH is congratulated for the successful implementation of the program.   There is currently an entire unit, comprised of 60 beds for males being monitored and treated for opiate withdrawal, 60 beds for males being monitored and treated for alcohol and/or benzodiazepines, and 60 beds available for females being monitored and treated for substance abuse disorder.  The unit is currently staffed five days a week with a physician with plans for staffing seven days per week in the future. The addition of a dedicated physician to the MAT program results in the rapid stabilization and movement of the patient to general population, where they continue their MAT therapy.[107]

The implementation of the MAT program has resulted in additional unintended challenges for ACH.  The increase in patients requiring monitoring related to initiation of MAT impacted the workload for both nursing and providers.  Additionally, the increase in ordered medications, resulted in the need to establish a medication administration cart specific to the MAT program, which requires a dedicated nurse to perform assessments and administer the medications.  Finally, the additional referrals to the substance abuse counselors have exponentially increased

---

[107] However, the detox units are not staffed by a medical provider, but need to be.

requiring increased resources devoted to discharge planning and reentry services.  The specific challenges related to reentry services is further discussed in Section Q of this report.  Without ample discharge planning and linkage with community organization for continuation of ordered MAT, the patient is at risk of not having access to continued medication for continuity of care, and risks relapse as depicted above.[108]

**Compliance Assessment:**
N.1=Partial Compliance
N.2=Partial Compliance

**Recommendations:**
1.  ACH needs to revise their policies, procedures, and standardized nursing protocols such that operational guidance, clinical parameters, and clinical guidance are consistent.
2.  The County needs to find and implement a solution for the lack of timely withdrawal monitoring, including the establishment of a dormitory style housing unit on 2 East.
3.  Nurses need to obtain and document more complete histories of alcohol, benzodiazepine, opioid and methamphetamine substance use, and when indicated, refer the patient to a medical provider to be seen within 24 hours.
4.  The County must provide adequate nursing and custody staffing to permit timely monitoring and treatment of patients in withdrawal.
5.  The County needs to retrain nursing staff on the policies, procedures, and SNPs relative to withdrawal monitoring and treatment, including performing CIWA and COWS assessments.
6.  The County needs to develop a system to monitor, track, and trend instances when ordered withdrawal monitoring and treatment is delayed or not provided at all.
7.  Consider implementation of fixed dose treatment regimens (as opposed to symptom triggered treatment) to prevent escalation of withdrawal syndromes until the County can provide timely monitoring and medication administration.
8.  The County should expand QI studies to include qualitative and quantitative studies focused on substance abuse screening, withdrawal monitoring, and administration of ordered treatment.

---

[108] Patient #21

---

**O. Nursing Protocols**

1. Nurses shall not act outside their scope of practice.
2. To that end, the County shall revise its nursing standardized protocols to include assessment protocols that are sorted, based on symptoms, into low, medium, and high-risk categories.
   a. Low risk protocols would allow registered nurses to manage straightforward symptoms with over-the-counter medications;
   b. Medium-risk protocols would require a consultation with a provider prior to treatment; and
   c. High-risk protocols would facilitate emergency stabilization while awaiting transfer to a higher level of care.

---

**Findings:** Standardized Nursing Protocols (SNP) for common patient complaints guide the nurse in methodically obtaining a comprehensive history, conducting a physical examination, and executing an approved standardized treatment plan. SNPs are collaboratively developed by nursing and medical leadership and approved by the Medical Director. These protocols must also contain specific guidance, such that the urgency of the patient's condition is identified, and results in an appropriate treatment plan, including determination of the urgency of referral to a medical, dental, or mental health provider.

ACH has standardized nursing protocols that are being revised. The medical experts have provided feedback, including model protocol samples to assist ACH in the process.  There are key components that must be considered during the revision process. The protocols must be formatted to allow a methodical nursing process flow.  Of concern, the current protocols require the nurse to identify the patient's condition or diagnosis prior to selecting one of forty-six protocols to use.  For example, when the patient complains of a skin issue, prior to choosing the appropriate protocol from twelve available skin related protocols, the nurse must diagnose psoriasis, seborrheic dermatitis, acute contact dermatitis, atopic dermatitis, folliculitis, and others.  The protocols should flow opposite the current format, guiding the nurse in gathering data, examining the skin, and then choosing the appropriate treatment, based on the nursing assessment.

The nursing protocols must include red flag symptoms with instruction to contact the provider. For example, the current urology protocols are silent on what actions are required for patients reporting blood in their urine.  Critical signs and symptoms for all body systems must be included in the protocols to ensure patients are appropriately and timely referred to a provider for urgent conditions.

Finally, the protocols need to be formatted so that they can be translated into electronic health record format. The current protocol format requires nurses to manually document the medical history, presenting complaint, assessment, and treatment plan.  This requires the nurse to consult the paper protocol rather than having the protocol embedded in the electronic health record.

ACH is in the process of identifying new electronic health record (EHR) software, so the revision process should include consideration of the EHR format that will be used going forward.

As discussed in the previous two reports, nursing staff continue to not adhere to the nursing protocols.  ACH QI studies focused on the timeliness of response to requests for health services and did not examine the quality of the nursing care and adherence to nursing protocols.  Staff frequently omit collection and documentation of key aspects of the patient history, fail to complete the examination components required by the protocol, and fail to follow the approved protocol treatment plan. Some examples include:

**Patient #30** This 41-year-old female has a complex medical and behavioral health history that includes bi-polar disorder, seizure disorder, and pica with multiple ingestions of foreign bodies requiring endoscopic intervention, most recently on 9/14/23.  Her medications include Keppra and Polyethylene glycol at bedtime.  On 10/11/23 at 15:53, the nurse saw the patient cell side in the female booking safety cell for complaints of chest pain.  Her blood pressure was 114/74 mm Hg, pulse= 101/ per minute, respirations =17/minute, and SpO2 98%.  The patient reported her left arm and face were numb.  The nurse documented that she looked anxious, no signs of distress were noted, and there were no signs of cardiac compromise or symptoms.  The nurse noted the patient had been sleeping all day on her left side facing the wall and had not moved around.  She ordered an EKG.  A physical assessment of heart and lung sounds was not done, the nursing protocol for chest pain was not followed, nor was a provider notified. The ordered EKG was not attempted until 10/19/23, 8 days later, and the medical assistant documented it was not done secondary to the patient being on suicide watch.

On 10/14/23, at 16:26, the patient was seen by the Director of Nursing with complaints of chest pain, rating it 5 out of 10, with pain radiating to the left arm, of one hour duration. She also reported her left arm felt numb.  Her blood pressure was 91/57 mm Hg, pulse 103 per minute, and SpO2 96%. The on-call provider was called, and an EKG was ordered which the patient refused.  The on-site provider available then saw the patient and ordered her transported via EMS to the UCD emergency department.  The workup was negative for a myocardial infarction and neurological imaging was deferred as her presentation with seizure-like symptoms was consistent with her history of pseudo seizures.  The patent was admitted after swallowing a pulse oximeter during the discharge process.  On 10/17/23 she was discharged from the hospital back to the jail.

On 10/23/23 at 16:59, the nurse saw the patient for complaints of abdominal pain and bleeding from her rectum and mouth.  Her blood pressure was 117/81 mm Hg, pulse 102/minute, and SpO2 97%.  The patient showed the nurse a tissue with a small amount of bright red blood she stated came from her rectum.  She also reported vomiting up blood. The nurse did not document a physical assessment and the nurse educated the patient to show staff bloody vomit if it occurred again.  The nursing protocol for abdominal pain was not followed, nor was a provider consulted.  An urgent provider sick call was scheduled however, the patient was not seen as she ingested a spoon and was sent to the ED later that evening.

On 11/4/23 at 16:33, the patient was seen at the 2 Medical nursing station for complaints of chest tightness and rectal bleeding. Her blood pressure was 132/90 mm Hg, pulse 97 per minute, and SpO2 99%. The nurse documented the patient was tolerating food and fluids, was calm and cooperative, hydrated, in no respiratory distress, and had a steady gait. The patient was encouraged to maintain hydration, rest, and to notify staff of any medical concerns. The chest pain protocol was not followed, nor was a provider contacted.

**Patient #29** is a 54-year-old male that arrived at the jail on 12/23/23, with a health history that included substance abuse disorder with daily use of methamphetamines. On 12/29/23, at 02:20, the patient presented to the medical unit complaining of moderate burning from his left shoulder, down his left arm, which had abruptly started thirty minutes prior. He rated his pain as a 6 out of 10 and reported the pain as constant. His heart rate was 120/minute and his SpO2 was 95%. The nurse failed to consider the arm pain as a potential cardiac event, failed to follow the chest pain protocol, and failed to contact a provider. The nurse educated him to rest and find a comfortable position to relieve the sensation, sent him back to his cell, and scheduled a follow-up appointment with the provider. The following morning at 11:56, the patient was released from the jail without being seen.

**Compliance Assessment:**
- O.1= Partial Compliance
- O.2= Partial Compliance

**Recommendations:**
1. Nursing leadership, in conjunction with the Medical Director, need to continue to revise the Standardized Nursing Protocols (SNPs).
2. The Standardized Nursing Protocols should be formatted by body system, conducive to integration into the electronic health record, and contain adequate referral criteria to minimize the risk that nurses will exceed their scope of practice.
3. Nurses need to be retrained regarding SNPs, with demonstration of competency.
4. The County should perform QI studies that measure compliance with SNPs, with particular attention to the quality of the medical history, review of symptoms, physical assessment, and whether the nurse made and followed the protocol regarding referral to a higher-level provider. The QI studies should measure performance over time, with a sample selection that encompasses several weeks or months and a wide range of nursing staff utilizing the protocols.

> **P. Review in Custody Deaths**
>
> 1. Preliminary reviews of in-custody deaths shall take place within 30 days of the death and shall include a written report of the circumstances of the events leading to the death, with the goal to identify and remedy preventable causes of death and any other potentially systemic problems.
> 2. Mortality reviews shall include an investigation of the events occurring prior to the death, an analysis of any acts or omissions by any staff or prisoners which may have contributed to the death, and the identification of problems for which corrective action should be undertaken.

**Findings:**  The Medical Director conducts preliminary mortality reviews (MR) within 30 days of the patient's death (P.1).  Mortality reviews include an investigation of the events occurring prior to death, but do not consistently identify critical lapses in care and system issues that may have contributed to the patient's death (P.2).

In January 2024, the medical experts reviewed a draft Review of In-Custody Deaths policy. The draft policy was not internally consistent and did not appear to be a final draft.  The draft policy compressed the time frame for completing all mortality review into 14 days.  Since completion of some steps are dependent on other steps being completed, ACH would not be able to meet these internal deadlines. We recommend that ACH stagger the timing of due dates for each step, using the full 30-day time frame available. Policy comments include:

- The mortality review process should be integrated with other disciplines from the beginning (e.g., medical, nursing, mental health, etc.), rather than independent reviews by each discipline. This is needed particularly for mortality reviews involving patients who are gravely disabled and/or seriously mentally ill and deteriorate medically.
- The policy states that mortality reviews will be conducted only for deaths that occur while the patient is in the Sheriff's custody, and not if the patient was released from custody following arrival at the hospital. Although we understand that the legal status of the person has changed, this does not change the need to conduct a mortality review for patients that died after being sent to ED or hospital.  The MR goal is the same, to determine whether care was appropriate leading up to the patient's death, and to take measures as needed to reduce future harm and deaths.  Despite policy, the County currently *does* conduct mortality reviews for patients that were released from custody prior to death.[109]
- The Consent Decree states that mortality reviews will be completed in 30 days. Understanding that death certificates, toxicology, and autopsy reports may not be available in 30 days, we believe that this 30-day review is preliminary, and to be finalized once necessary documents and reports are received.
- A mortality review tracking log needs to be created and an ACH staff person designated to track the process and monitor receipt of the documents.

---

[109] Patient 343.

We reviewed mortality records and accompanying mortality reviews. The reviews are more thorough than in previous monitoring reports, however some reviews do not identify critical lapses in care. [110]  In one case, a provider did not send the patient to the emergency department when he had new symptoms of fatigue, shortness of breath, in the context of a 30-pound weight gain[111] and bilateral lower extremity edema. The patient needed immediate cardiac evaluation including echocardiography. The MR reviewer assessment did not address this lapse in care, or whether there was any relationship between the patient's symptoms of heart failure and ultimate demise from septic shock.[112]

Medical and mental health mortality reviews are conducted independently and not integrated for analysis of problems.  For example, a patient died in early July 2023, after being in the jail for 6 days. Among findings that the patient was not monitored for substance abuse withdrawal, the medical mortality review noted that the patient had an urgent mental health referral but was not timely seen by mental health staff.  However, the mental health director determined that there were no lapses in the patient's mental health care. *Thus, the mortality review process was not integrated between disciplines and had discrepant findings*.

In addition, no input from the Director of Nursing was evident in the review.  Future mortality reviews need to incorporate nursing findings as they are often critical to the identification of root causes.

On 1/24/24, the corrective action plan for this review was limited to developing a plan for each deficiency, but contained no substance to the plan, and no evidence that it was implemented.  In essence, this corrective action plan was no plan at all.

Although autopsies are timely conducted after patient deaths, there continue to be lengthy delays in obtaining autopsy and toxicology reports from the Medical Examiner's office, some over two years, thus many mortality reviews remain preliminary, even more than 2 years after the patient's death.[113]  and they are not scanned into the EHR.  Preliminary mortality reviews are not timely finalized.  We recommend that the Medical Director call the Medical Examiner's office within 2 weeks of the death to receive the autopsy report, which may increase the likelihood of responsiveness.

Another serious concern is that there is no evidence that corrective action plans are timely and fully implemented. *Mortality reviews have no impact on improving care if corrective actions are not implemented and assessed as to their effectiveness. We note that in terms of effective corrective actions for system issues, training staff is not effective if the root cause is a flawed system.*

---

[110] Patient #43.
[111] The patient had been started on Abilify, but most of the patient's weight gain was prior to this date.
[112] Patient #43.
[113] Patient #44.

We reviewed several mortality review cases that are described below.

**Patient #43** This 47-year-old patient arrived at the jail on 2/19/23 and died on 5/23/23. His medical history included hypertension. Following his arrival, he developed bilateral lower extremity redness, pain, and edema. On 3/31/23, the patient was sent to the ED, and deep vein thrombosis (DVT) and infection were ruled out. BNP[114] (a test for heart failure) was normal (37, normal=<300).[115]   The patients' antihypertensive medication, a diuretic (hydrochlorothiazide) was resumed.[116] On 4/18/23, a provider conducted a chronic disease visit, but performed no physical examination. Beginning 4/28/23, the patient reported that his legs were again swollen and that he had alerted custody and medication nurses, "to no avail", suggesting an access to care issue.

Beginning 4/30/23, the patient complained of new symptoms of shortness of breath upon exertion, and now had bilateral 3+ lower extremity edema. He had gained 30 lbs. in the previous two months. The provider considered cardiomyopathy and ordered a cardiology consult.[117]

*Note: The provider considered cardiomyopathy but did not send the patient to the emergency department, which was indicated given the patient's new and worsening symptoms.*

On 5/5/23, the Medical Director changed it to an "expedited consult."

Starting 5/20/23, the patient presented with chills, high fever (103.1 F), headache, sore throat, and vomiting. The patient tested negative for Covid and influenza. The provider treated the patient empirically for sinusitis, which was not supported by the physical findings. The patient was not placed in the 2M infirmary for monitoring but was sent back to his housing unit. Over the next 48 hours, the patient continued to have high fever, severe headache, vomiting, and abnormal vital signs, but nurses did not notify a medical provider.

 On 5/22/23, a provider saw the patient who still had persistent high fever and severe headache for at least 48 hours. He was unresponsive to treatment, with worsening condition as evidenced by dizziness, weakness, nausea and vomiting, and inability to eat. The patient's weight had decreased from 258 to 232 lbs.[118] The provider changed the patient's antibiotics and ordered IV fluids; however, the patient should have been immediately sent to the ED.  Nurses were unable to start an IV but did not tell the provider that IV fluids were not administered as ordered.

On 5/23/23, at 08:40 a medical provider saw the patient for follow-up of nausea, vomiting and dehydration. "Seems lethargic in speech. Breathing comfortable, clear to auscultation. Received

---

[114] Brain Natriuretic Peptide (BNP) is a test that, if elevated indicates heart failure. Normal=<300.

[115] On 3/18/23, a chest x-ray was normal.

[116]  About that time, the patient was started on started on Abilify, which is associated with weight gain, and the patient's weight increased to 254 lbs.

[117] An EKG or repeat chest x-ray had not been performed.

[118] This may have been a measurement error.

2 liters per IV yesterday per nursing. Wants to go back to his cell." VS=Temp=Not measured, BP=70's systolic, repeat BP=80/60 mm Hg, pulse=137/minute. Plan: Send to ED. EMS was notified at 09:00 and arrived at 09:10 and departed at 09:17.

The patient died on 5/25/23.

**Summary:** This patient, who presented with bilateral lower extremity pitting edema, 30-pound weight gain, fatigue, and shortness of breath with exertion, needed to be sent the ED. Nursing and medical care between 5/20 and 5/23/23, showed multiple lapses that were identified in the Mortality Review, but did not identify that the patient needed to be sent to the ED much earlier, on 4/30/23.

**Patient #41 This** 25-year-old man arrived at SCJ on 5/30/23 and was released from custody on 9/8/23. He died on 11/6/23.  His medical history includes SMI, schizoaffective disorder bipolar type, and ADHD. His medications were Olanzapine and Valproic acid.

On 8/23/23, the patient was in an altercation and strangled by his cellmate.  The patient became pulseless. A physician and nurses responded to the scene. At 18:54 CPR was initiated and an automatic external defibrillator (AED) applied to the patient at 1855. No shock was delivered however the patient was resuscitated. EMS arrived at 19:05, oxygen applied and epinephrine given. EMS intubated the patient and departed at 19:13. He was transported to Sutter hospital where he was diagnosed with traumatic asphyxiation, left lung collapse, acute hypoxic respiratory failure, anoxic brain injury. He was intubated during EMS transport. Brain MRI showed hypoxic injury. He died on 11/6/93.

**Summary:** An administrative review was to be conducted, but the administrative that was provided was not substantive, and consisted primarily of the agenda for the meeting.  Our medical record review shows that emergency response was timely and appropriate.

**Patient #42** This 37-year-old patient arrived on 7/20/23 at 14:46, after being discharged from the ED for reported ingestion of fentanyl. A nurse completed Tier 1 medical screening. He provided a history of chronic hepatitis C infection "fentanyl, benzodiazepine, methamphetamine, and alcohol use disorders, with reports of "continuous alcohol consumption." The patient's COWS score was 1. The nurse ordered detox housing, but not COWS and CIWA assessments, alcohol/opioid detox regimens, nor an urgent referral to a provider. The RN then ordered a second nurse intake assessment.  At 22:23, a RN conducted a second full intake assessment, about 5.5 hours after the Tier 1 screening.  The patient's COWS score had risen to 9. The RN ordered an opioid detox regimen and gave a first dose, ordered detox housing, COWS monitoring twice daily, a lower bunk, and a medical provider referral.

*Note: Given a COWS score of 9, withdrawal monitoring needed to be conducted within 4 hours to ensure that his symptoms were improving.*

Twelve hours later, on 7/21/23 at 09:18, the patient had just taken his medications from the nurse. About 3-5 minutes later, he was witnessed by custody to have a cardiac arrest. Emergency measures, including CPR and Narcan 12 mg were given to the patient with no response.

On 8/12/23, The Acting Medical Director conducted a preliminary and thorough review of the clinical course of the patient's death, noting EKG evidence of cardiovascular disease. At that time, toxicology reports were pending. A Corrective Action Plan was developed, but there is no evidence of implementation.

On 10/8/23, the coroner's report noted toxicology findings of methamphetamine (204+135 ng/mL) and Fentanyl in the patient's blood stream (Concentration=80 +- 14 ng/mL). The cause of death was acute fentanyl and methamphetamine intoxication.[119]  A final mortality review has not been completed.

**Summary:** Two concerns in this case not specifically addressed by the mortality review was the separation of Tier 1 and Tier 2 medical screening by 5.5 hours during which time the patient's COWS score increased from 1 to 9.[120] An opioid detox regimen was initiated with a first dose given. In addition, given a score of 9, COWS assessments needed to be conducted more frequently than every 12 hours. The preliminary mortality review identified opportunities for improvement and a CAP was developed, however there is no evidence that it was implemented. A final mortality review has not been completed.

In summary, there has been improvement in the quality of mortality reviews, however some lapses in care are not identified.  Many mortality reviews are still preliminary.  Finally, as noted above, for some patient deaths, there is no evidence that corrective action plans are timely and fully implemented. *Mortality reviews have no impact on improving care if corrective actions are not implemented and assessed as to their effectiveness. In addition, in terms of effective actions for system issues, training staff is not effective if the root cause is a flawed system.*

Provision P.2 is found to be in partial compliance, however, if there is no evidence of improvement in implementation of corrective action plans during this upcoming monitoring period, this provision will be downgraded to noncompliance.

**Compliance Assessment:**
- P.1=Substantial Compliance

---

[119] Dr. Vassallo notes that the autopsy toxicology demonstrated fentanyl and amphetamine and the death was attributed to fentanyl intoxication. However, the observed collapse of the patient in the 3-5 minutes following receiving medications, laughing, and joking with other inmates, and no symptoms of fentanyl ingestion (e.g., drowsiness, altered level of consciousness prior to the collapse), and the lack of responsiveness to immediate Narcan does not support Fentanyl as the cause of death.
[120] The separation of Tier 1 and Tier 2 screening was discontinued in August 2023.

- P.2=Partial Compliance

**Recommendations:**
1. Develop a framework for mortality reviews that identifies both critical lapses in care and system issues that may have contributed to the patient's death.  Policy recommendations to establish this framework include the following:
    a. Conduct the administrative review as soon as possible, and no later than 7 days from the death to identify immediate issues that need to be corrected (e.g. oxygen tank empty, cut down tool not available, etc.
    b. Since autopsy reports are written on the day of the autopsy, it is available upon request. We recommend that the Medical Director contact the county Medical Examiner's office within 30 days to obtain the autopsy and toxicology results.
    c. A QI nurse conducts a review within 14 days to assess nursing care and health care systems, including interaction/communication between health care disciplines. The QI nurse completes a summary of the review and advises the respective clinical directors (nursing, medicine, mental health, pharmacy) of system issues that may have contributed to a negative outcome.
    d. Conduct the clinical mortality review within 21 days. The Medical, Nursing, and Mental Health Directors may independently write assessments of medical and mental health care, but should meet, including custody representatives to discuss and integrate their respective findings before finalizing the mortality review.  We recommend that pertinent information from the multidisciplinary QI review be incorporated into the preliminary/final review.
    e. The policy should indicate when a custody representative will be included at Mortality Review meetings. Custody participation provides useful feedback regarding custody factors that facilitated or hindered response time. (e.g., communication lapses, delay in access to the patient, delay in starting CPR or calling 911), and possible solutions.
    f. An interdisciplinary committee meets within 30 days to discuss the mortality, chronology of care, and whether health care met community standards, key quality indicators, and policies and protocols.
    g. Implement a mortality review tracking log, and designate a responsible person to monitor whether all reports have been obtained (e.g., autopsy, toxicology, and death certificates. SSO has a death binder, however, ACH needs to maintain an independent folder for each mortality to track whether all information is timely received.
    h. Complete the final mortality review within 30 days of receipt of the autopsy, toxicology report, and other relevant documentation related to the patient's death.
    i. Corrective action plans (CAP) need to include the specifics of the plan, responsible persons, time frames for completion, and determination of the effectiveness of the CAP.

2. Ensure that all staff involved in direct patient care have current BLS certification.
3. Within 30 days, retrain staff on CPR, and conduct emergency drills on all shifts.
4. Continue to conduct mortality for all patients whose deaths occurred following admission to the hospital, independent of custody status,
5. The Medical Director needs to monitor the mortality review process to ensure that it is timely and effective.

---

**Q. Reentry Services**

1. The County shall provide a 30-day supply of current medications to patients who have been sentenced and have a scheduled release date, immediately upon release.
2. Within 24 hours of release of any patient who receives prescription medications while in custody and is classified as presentence, the County shall transmit to a designated County facility a prescription for a 30-day supply of the patient's current prescription medications.
3. The County, in consultation with Plaintiffs, shall develop and implement a reentry services policy governing the provision of assistance to chronic care patients, including outpatient referrals and appointments, public benefits, inpatient treatment, and other appropriate reentry services.

---

**Findings:** Challenges remain for ACH to become compliant with re-entry services. There are two key policies related to discharge planning, Discharge Planning for Reentry, and Discharge Medication, both of which are compliant with Consent Decree requirements.

The current ACH staffing for the reentry program is 1 Registered Nurse, and 1 Medical Assistant. In addition to the ACH staff, there is a contract with SacCovered, a non-profit, community-based organization that provides four community health workers to work at the jail. Although these contracted workers come to the jail to meet with patients, they are not issued security clearance, requiring the ACH reentry staff to escort them, taking them away from their assigned duties.

Referrals are generated during booking process when a patient endorses specific chronic or mental health conditions. Additionally, patients that are initiated or continue Medication Assisted Treatment (MAT) for substance abuse disorders are also referred. Although the expansion of the MAT program at the jail is laudable, it has significantly increased the number of patients requiring re-entry planning and services, likely requiring additional resources.

Community services needed by patients released from the jail include, but are not limited to, mental health services, housing/shelter, and assistance with Supplemental Security Income (SSI) applications. Other needed services include, continuation of Medication Assisted Treatment (MAT) for patients with substance abuse disorders (SUD), or other services. Often patients require assistance and community linkages for more than one category of service.

Data available from January 2023 through November 2023 demonstrated that a total of 617 patients or an average of 56 per month were seen by the ACH re-entry staff, referring 100% of them to SacCovered for initiation of community-based services upon release.[121]  Although the number of patients that were seen by the re-entry staff is significant, it represents a tiny percentage of the total number of referrals that were ordered.  On the day the monitors interviewed the re-entry staff, they reported having 833 outstanding referral orders at the Main jail, and 704 outstanding at RCCC, totaling 1,537. Currently reentry staff prioritize interviewing patients with known release dates occurring within 14 days.

Challenges also remain for ACH to obtain reliable release dates for sentenced inmates.  Projected discharge dates are transmitted via interface between the jail management system (ATIMs) and the electronic medical record (Athena).  From this list, providers are notified to execute discharge medication orders for the patients.  Once the providers submit the orders, the pharmacy fills the prescription and stages the medication for delivery to the patient upon release.  On the actual release date, SSO staff notify the pharmacy, and the medication is taken to the patient.

The specific challenge is that SSO is unable to provide a true release date for each sentenced inmate, only a projected date. This is due to several variables (e.g., additional charges) that impact the actual release date.  This results in the pharmacy being unable to capture all eligible sentenced inmates, and the pharmacy does not have the ability to calculate the total percentage of eligible patients to receive medication to measure compliance.

In the 90-day period between November 1, 2023 and January 29, 2024, there were 502 inmates reported with release dates by SSO.  Of those 502, the pharmacy filled 492 prescriptions (98%) however, only 429 (85%) were released and received medication.[122]  According to the Pharmacy Director, the patient's release date may change, and the medication is stored, but patients usually receive their medications when finally released.  Patients granted "time served" by the court are released immediately often resulting in the pharmacy not being notified of their release to provide medications.

In 2021 and 2022, ACH looked at data for pre-sentenced patients being released, whose prescriptions were telephoned to the pharmacy for filling and found a very low percentage were picked up by the patient.  Given the extremely low number, and the amount of provider and pharmacy time required to fill a prescription, ACH paused the process to consider other strategies to meet the Consent Decree.  SSO does not provide the names of any unsentenced patients being released to ACH, preventing the pharmacy from the knowledge of the release, and the opportunity to prepare release medications.

With the onset of CalAIM, ACH is required to provide all eligible patients a 30-day supply of medications upon release.  In anticipation of meeting CalAIM requirements, the jail pharmacy growth request included pharmacy staff that allows the pharmacy to operate 24 hours a day, 7

---

[121] ACH 2023 Discharge Planning Statistical Report; ACH 2023 Discharge Planning Referral Statistical Report
[122] ACH Sentenced Release Medication Report, 11/01/23-101/29/24

days a week. This should assist the County to become compliant with the requirements of the Consent Decree. [123]

ACH is currently exploring options for a new electronic health record. The requirements of the Consent Decree and CalAIM specific to re-entry and the provision of medication must be part of the evaluation and selection process.

CalAIM and the expanded MAT program has clearly impacted the volume of patients requiring re-entry assistance and community linkages. The current budgeted staffing for the re-entry program is insufficient and it is unlikely the number of inmates meeting CalAIM eligibility in the future will decrease, requiring substantial program expansion. It will also require linkages to community MAT providers and systems established to ensure a seamless transfer of the MAT treatment plan at the time the patient is discharged. ACH's long-term plan includes growth requests to meet the needs of the growing program and needs of the patient population.

**Compliance Assessment:**
- Q.1=Partial Compliance
- Q.2=Non-Compliance
- Q.3=Substantial Compliance

**Recommendations:**
1. Continue to analyze sentenced discharge medication data and explore solutions to capture accurate release dates, including the identification of patients that will not be released as scheduled secondary to additional charges or other reasons
2. Evaluate the impact of MAT and CalAIM requirements on the program to substantiate growth requests.
3. Explore with SSO the specific number of custody medical escorts required for the SacCovered community health workers, allowing the ACH employees to focus on their assigned re-entry tasks.
4. Continue to explore physical plant and staffing growth requests required to implement a discharge process that results in all discharging inmates being seen by staff at the time of their release, so that medications are administered, and information on community resources and linkages are reviewed with the inmate.

---

[123] Of note, most jails in the United States do not have on-site pharmacies staffed with pharmacists, but are also required and able to provide discharge medications upon release. There are several methodologies that enable these jails to provide discharge medications, including ordering the discharge medications in tandem with the initial provider order, or supplying ordered medications in blister packs, rather than unit dose, such that the remainder of the patient specific blister pack can be given to the patient upon release. Finally, contracts with community pharmacy chains can be negotiated and the prescription called to the pharmacy upon patient request, and filled only when the patient presents to the community pharmacy. The medical experts can provide more information as requested.

**R. Training**

1. The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

    a. All jail custody staff shall receive formal training in medical needs, which shall encompass medical treatment, critical incident response, crisis intervention techniques, recognizing different types of medical emergencies, and acute medical needs, appropriate referral practices, relevant bias and cultural competency issues, and confidentiality standards. Training shall be at a minimum every two years.

**Findings:** The County has developed training curricula for planned use of force, CPR and first aid. The County has not provided curricula for medical treatment, critical incident response, crisis intervention techniques, recognizing different type of medical emergencies and acute medical needs, appropriate referral practices, relevant bias, and cultural competency issues. The County has not provided documentation of staff training.

**Compliance Assessment:**
- R.1=Noncompliance

**Recommendations:**
1. Develop curricula for topics required by the Consent Decree.
2. Ensure that training is performed and documented every two years.
3. Maintain centralized records and tracking system of staff training.

---

### IX.  Quality Assurance Systems for Health Care Treatment

C.  Quality Assurance Medical Care

1.  The County shall establish a Quality Assurance/Quality Improvement Unit to develop accurate tracking mechanisms and monitor the timeliness and effectiveness of the following processes of health care, ensuring that all are reviewed at least annually, and shall recommend corrective action for all deficiencies;

   a.  Intake screenings;
   b.  Emergent, urgent, and routine requests from patients and staff referrals for health care, including Health Service Request availability;
   c.  Clinical monitoring of patients, including delivery of chronic care services to those patients who qualify as chronic care patients;
   d.  Prescriptive practices by the prescribing staff;
   e.  Medication verification, including the initiation of verified medications, the first doses of medications, medication errors; patient refusals, and patterns of medication administration;
   f.  Grievances regarding healthcare;
   g.  Specialty care (including outside diagnostic tests and procedures;
   h.  Clinical caseloads:
   i.  Coordination between custody staff and medical staff, including escorts to medical appointments and delivery of care.

2.  The studies shall be done with sufficient sample numbers to arrive at statistically valid conclusions. The studies shall include:

   a.  Clearly articulated goals, objective, and methodology to determine if standards have been met, including sample strategy;
   b.  Data collection;
   c.  Analysis of data to identify trends and patterns;
   d.  Analysis to identify the underlying causes of problems;
   e.  Development of strategies to solve problems;
   f.  A written plan that identifies responsible staff and establishes a specific timeline for implementing remedies;
   g.  Follow-up data collection; and
   h.  Analysis to determine if remedies are effective.

3.  The QA/QI Unit study recommendations shall be published to all staff.

4.  The County will conduct peer review and supervisory reviews of all medical staff and professionals at least annually to assess compliance with policies and procedures and professional standards of care.

---

**Findings:**  The County has developed a robust QI program, and a description of the program is found in its quality improvement plan last revised in 2022.[124] The Quality Improvement (QI) program has developed tracking mechanisms for some, but not all key indicators required by the Consent Decree (e.g., chronic diseases). The QI program conducts multiple audits and studies on

---

[124] Quality Improvement Plan. Adult Correctional Health. Revised April 13, 2022.

an ongoing basis and that are described in the ACH Audit and Policy Tracker. However, for many studies the full circle of the Quality Improvement process: study development, implementation, analysis, corrective action plans, and follow-up to measure improvement has not been completed. (C.1).

The County has not established a tracking system for patients with chronic diseases (except diabetes) and did not conduct a study of the timeliness and quality of care for these patients during this review period except for patients with diabetes. Studies need to be conducted for patients with other chronic diseases (e.g., hypertension, heart disease, seizure disorders, etc.).

The process for development, implementation, analysis, and follow-up of audits and studies is unclear with respect to the involvement of the respective service directors (e.g., medical, nursing, dental and mental health). Many studies conclude with QI forwarding the report to the respective service directors, and there is no further documentation of what actions, if any, took place thereafter. Some studies presented were for the prior to this monitoring period and not the current one (e.g., chronic diseases).

C.1.  We reviewed each of the studies provided for review. Below we comment briefly on the findings of the study and whether actions were taken to support Consent Decree compliance.

    a. **Intake Screening**:
        i. On 8/22/23, QI conducted a point in time observational study of Tier 2 nursing intakes in the booking loop. This followed an email that directed nursing staff to conduct both Tier 1 and Tier 2 prior to custody moving patients into housing units (see Fourth Mays Report). The study described how the intake process should be conducted, with observations of two nurses who conducting intake screenings. The QI study authors made recommendations, but there is no documentation of what took place thereafter, including whether a corrective action plan was made to implement study recommendations, and to repeat the study using a larger sample to measure improvement.  Health care leadership reports that many spontaneous observations of the intake process have been conducted, but not written up as an audit.

        ii.  Since August 2023, ACH also has conducted weekly tracking to measure the average length of time it takes for nurses to conduct intake screening. These data showed that overall, timeliness of intake screening improved from prior to August 2023.  Weekly tracking data was not included as part of a QI study, and there were outliers of nurse intake screenings that were conducted in 5 minutes or less for patients that were determined to be fit for confinement. This raised concerns that nurses were not properly conducting intake screening and which warranted further investigation and monitoring of medical records and possibly video of intakes that were conducted in such a short time frame.

**b. Health Service Requests/Access to Care:**

    i. In the 3rd quarter of fiscal year 2023/2024, QI conducted a study to determine whether HSR's were timely collected and triaged, and assigned a priority level, disposition, and response. Medical and dental HSRs were included in the study but not mental health.  From a pool of 11,260 HSRS, 27 medical and 5 dental HSR's were selected from both jails. The study identified policy noncompliance at each stage of the process. QI made recommendations to the Nursing Director for improvement. No recommendations were forwarded to the Dental Director, however with a limited sample of 5 records, no conclusions could be drawn from this sample. There was no documentation of any actions that were taken in follow-up to the limited study, or plans to reconduct the study following intervention.

**c. Clinical Monitoring/Chronic Care:**

    i. In March 2023, a study was conducted using a sample of 35 patients with various chronic diseases. The study assessed timeliness and quality of chronic disease encounters over 2 visits and found low compliance with many key indicators. QI thoughtfully identified findings from record reviews and made recommendations to the previous Medical Director. There is no documentation of any follow-up to this study or corrective action plan. [125]

    ii. In the 3rd quarter of fiscal year 2023/2024, QI conducted a study of patients with diabetes to assess the timeliness of visits and lab tests, provider documentation of disease control, ordering of follow-up visits, and provider use of the EHR chronic disease template to document findings. Compliance with timeliness of chronic disease visits for patients with diabetes was 61%. QI made general recommendations but they were not directed to a specific person (i.e., Medical Director). There is no further documentation of a corrective action plan, including a plan to repeat the study to determine whether improvement has taken place.

    iii. There is a chronic disease tracking system only for patients with diabetes, and not for patients with other chronic diseases. No studies were presented regarding the timeliness and quality of care for patients with other chronic diseases.

**d. Provider Prescriptive Practices**

    i. ACH reported that review of provider prescriptive practices, including polypharmacy are or will be performed soon, but no documentation of provider prescriptive practices, including the appropriateness of prescribed medications was provided during this review period.

---

[125] This study was conducted prior to the current review period. A more current study was not provided for review.

**e. Medication Timeliness and Renewals**

i. In February 2024, ACH conducted a point in time study of the timeliness of first medication doses (<48 hours), whether chronic disease medications were timely renewed, and whether providers documented patient education. The methodology included review of 48 medication orders in 22 patient records who were at Main Jail or RCCC. Of the medication orders, 37 were for first dose timeliness, and 11 were for timeliness of medication renewal. The study showed 100% compliance for both first doses and medication order renewals. The study sample for medication renewal was extremely small, and the findings cannot be generalized to the patient population. The study did not indicate whether these renewals were done at the time of a clinic visit or from remote notification by pharmacy, which would impact whether providers conduct and document patient education. Documentation of patient education was 59%.

ii. At the conclusion of the study, it stated: "*This report should be sent to the Medical Director, Pharmacy Director, and Nursing Director for review, follow-up, and necessary actions*." However, no documentation was provided as to what follow-up took place, including presentation at quality improvement committee meetings, and a corrective action plan identifying responsible persons, timelines for completion, and a follow-up study to measure key indicators that fell below expectations. If the results of the study are not timely and effectively addressed in the context of the quality improvement process with key stakeholders involved, the likelihood of improvement diminishes.

**f. Health Care Grievances**

i. In March 2004, QI reported on a study of health care grievances from July 2023 to March 2024.[126] The study broke down grievances by area of service (e.g., access to care, medications, staff complaints (etc.).

ii. From January to March 2024, there were 74 grievances (Jan=50, Feb=10, March=14). *Access to care* (38%) and *medication issues* (26%) accounted for a combined 73% of all grievances.

iii. Most of medical access to care grievances were related to *delayed primary care (57%)* and *delayed specialty care* (42%). Most medication grievances were related to requests for *medication changes* (54%) and *medications not given (33%)*.

iv. Of dental grievances, 21 out of 28 (75%) were related to *access to care*.

v. Of Mental health grievances, 77% were related to access to care and medications. Of MH access to care grievances, 88% were due to delayed primary care. Of medication grievances, 78% were related to changes in medications.

---

[126] There was no date as to when the report was created.

vi. The study characterized the amount and type of grievances by service and issues related to grievance process. The key findings were clear and related to access to care and medication issues. No documentation was provided regarding a plan to conduct a root cause analysis or to develop a corrective action plan related to the findings of the study.

**g. Specialty Services**

i. ACH conducted a study of specialty services from July to September 2023, that characterized the types of specialty services, designated priority, and timeliness of urgent, expedited, and routine services. It also addressed medical provider follow-up following the services. At that time, routine referrals were timely in 64% of cases, a decline from 71% during the previous monitoring period. Urgent referrals were timely in 40% of cases. The study revealed issues with timely medical provider follow-up.

ii. QI/CM conducted a detailed analysis of the data and identified several areas for improvement and made pertinent recommendations. However, as noted in other studies, there was no documented action plan associated with this study.[127]

**h. Clinical Caseloads**

i. The County indicates that it continues to develop audits to monitor clinical caseloads and prescriptive practices.[128] Audits were not provided for this review period.

**i. Coordination between Custody**

i. This report reflects that ACH and SSO have been collaborating daily regarding access to care and delivery of health services. ACH also tracks the number of medical escorts daily and seeks to resolve issues in real time.

ii. No summary audits/studies were presented for this provision for this review period.

Per ACH, the QI program has also conducted the following studies and activities, several since the site visit in February 2024:

- QI has completed many audits and projects related to **Access to Care**, such as:
  - Access to Care EHR Encounter and Report (Captures Access to Care barriers).
  - Revising Health Service Request (HSR) policy and procedures to improve process.
  - Creating and implementing HSR collection form to monitor twice daily collection compliance

---

[127] We incidentally note our review, that included the period of September to December 2023, showed that the tracking log tracking log was not maintained and a significant number of outside and on-site consults were not included on the tracking log.

[128] The medical experts are uncertain as to the requirements of this provision and will seek clarification from the parties.

- Other **Access to Care** improvements include:
  - Daily ACH/SSO schedule (filled out before huddle and discussed during huddle).
  - Access to Care issues involving ACH or SSO staff are escalated to leadership and addressed.
  - Key designated staff are assigned specific daily HSR duties to ensure compliance (collection, triage).
  - Continuous communication regarding the process.

- ACH has addressed **Specialty Services** as described below:
  - The Medical Director meets with CM weekly for regularly scheduled consultation meetings to discuss referral over 30 days old.
  - Impromptu discussions discussion also as needed (especially when urgent issues come up).
  - QI, CM, and HSA are working closely with the EHR team and DTech developer to implement a digital Specialty Referral Tracking system. Data is captured from referrals in the Fusion Order Manager and the Case Management Referral form in the EHR. The digital tracker captures on-site and offsite specialty appointments and referrals. The digital tracker is currently in testing.
  - CM schedules a Provider follow-up appointment for all patients that have not had their specialty consultation or procedure timely.
  - Order bundles (order sets) are now automatically included as providers make a specialty referral to ensure labs/workups are ordered correctly.
  - ACH leadership meets with CM weekly to discuss progress and barriers and identify solutions.

2. The studies are to be done with sufficient sample numbers to arrive at statistically valid conclusions. Our review showed that of the studies presented (C.2):
   a. Some are not designed to include measurement of performance over time, or have an adequate sample of records or observations to enable any general conclusions to be drawn from the study;
   b. Some include clearly articulated goals, while others are simply descriptive of data or focused on process without addressing the findings of the study (e.g., grievances);
   c. Lack analysis of the underlying (i.e., root) causes of problems;
   d. Do not include strategies to solve problems:
   e. Do not include a written plan that identifies responsible staff and establishes a specific timeframe for implementing remedies;
   f. Do not include a specific timeline for implementing remedies; and
   g. Do not include plans for follow-up data collection and analysis to determine if remedies are effective.

3. The County provided documentation of QI Committee meeting minutes that shows discussion and follow-up of audits. ACH publishes the results of QI studies, findings, and recommendations on the Intranet. QI shares recommendations in executive team meetings,

Quality Improvement Committee Meetings, and subcommittee meetings as appropriate. (C.3).

4. No documentation was provided to demonstrate that that the County conducted peer review and supervisory reviews of all medical staff and professionals at least annually to assess compliance with policies and procedures and professional standards of care (C. 4).

**Compliance Assessment:**
- C.1=Partial Compliance
- C.2=Partial Compliance
- C.3=Partial Compliance
- C.4=Noncompliance

**Recommendations:**
1. ACH leadership needs to assess the process of study development and involvement of QI leadership and services directors, from study initiation to completion (C.1).
2. ACH and mental health need to integrate studies that have a medical and mental health overlap (e.g., medication adherence for patients with serious mental illness.
3. Study design needs to ensure that all requirements of the Consent Decree are incorporated into the study. These studies should meaningfully evaluate timeliness of access to care and quality of care (C.2).
4. ACH needs to ensure that each step of study design, implementation, analysis, corrective action plan, and follow-up is documented. The study results presented in QI meeting minutes.
5. Regarding sample size, ACH needs to increase sample size (e.g., 30) at each jail to be able to generalize conclusions of the study. If a sample size does not include 30 applicable records, then continue to expand the sample size until 30 eligible records are found (e.g., medication renewal records).
6. In addition to Intranet distribution of studies, QI study conclusions and resulting CAPs needs to be distributed to staff with training as appropriate. (C.3).
7. The County needs to conduct peer and supervisory reviews of all medical staff and professionals at least annually and provide proof of practice (C.4).
8. ACH need to assess whether the QI program has adequate resources to meet the requirements of the Consent Decree and timely implement and repeat studies in which performance falls below expectations.

# Medical Remedial Plan Compliance Summary

|  | Paragraph | Substantial Compliance | Partial Compliance | Noncompliance | Not Evaluated |
|---|---|---|---|---|---|
| 1. | A.1. |  | 7/20/24 |  |  |
| 2. | A.2. |  |  | 7/20/24 |  |
| 3. | B.1. | 7/20/24 |  |  |  |
| 4. | B.2. |  |  | 7/20/24 |  |
| 5. | B.3. | 7/20/24 |  |  |  |
| 6. | B.4. |  | 7/20/24 |  |  |
| 7. | B.5. |  | 7/20/24 |  |  |
| 8. | B.6. |  | 7/20/24 |  |  |
| 9. | B.7. | 7/20/24 |  |  |  |
| 10. | C.1. |  |  | 7/20/24 |  |
| 11. | C.2. |  | 7/20/24 |  |  |
| 12. | C.3.a |  |  | 4/20/24 |  |
| 13. | C.3.b |  | 7/20/24 |  |  |
| 14. | C.3.c |  | 7/20/24 |  |  |
| 15. | C.3.d |  | 7/20/24 |  |  |
| 16. | C.4. |  |  | 7/20/24 |  |
| 17. | C.5 |  |  | 7/20/24 |  |
| 18. | C.6. | 7/2024 |  | 7/20/24 |  |
| 19. | C.7.a |  |  | 7/20/24 |  |
| 20. | C.7.b |  |  |  |  |
| 21. | D.1. |  | 7/2024 |  |  |
| 22. | D.1.a |  | 7/2024 |  |  |
| 23. | D.1.b |  | 7/2024 |  |  |
| 24. | D.1.c |  |  | 7/20/24 |  |
| 25. | D.1.d |  | 7/2024 |  |  |
| 26. | D.2. |  |  | 7/20/24 |  |
| 27. | D.3 | 7/2024 |  |  |  |
| 28. | E.1. | 7/2024 |  |  |  |
| 29. | E.2. |  | 7/2024 |  |  |
| 30. | E.3. |  |  | 7/2024 |  |
| 31. | E.4. |  | 7/2024 |  |  |
| 32. | E.5 |  | 7/2024 |  |  |
| 33. | E.6. |  | 7/2024 |  |  |

|     | Paragraph | Substantial Compliance | Partial Compliance | Noncompliance | Not Evaluated |
| --- | --- | --- | --- | --- | --- |
| 34. | E.7. | | 7/2024 | | |
| 35. | E.8. | 7/2024 | | | |
| 36. | E.9 | | | 7/2024 | |
| 37. | E.10. | 7/2024 | | | |
| 38. | F.1.a | 7/2024 | | | |
| 39. | F.1.b | | 7/2024 | | |
| 40. | F.2. | | | 7/2024 | |
| 41. | F.3. | | 7/2024 | | |
| 42. | F.4. | | 7/2024 | | |
| 43. | F.5. | 7/2024 | | | |
| 44. | F.6. | | 7/2024 | | |
| 45. | G.1. | | | 7/2024 | |
| 46. | G.2. | | | 7/2024 | |
| 47. | G.3. | | | 7/2024 | |
| 48. | G.4 | 7/2024 | | | |
| 49. | G.5 | 7/2024 | | | |
| 50. | H.1. | | | 7/2024 | |
| 51. | H.2. | | | 7/2024 | |
| 52. | H.3. | | | 7/2024 | |
| 53. | H.4. | 7/2024 | | | |
| 54. | I.1. | 7/2024 | | | |
| 55. | I.2. | | 7/2024 | | |
| 56. | I.3 | 7/2024 | | | |
| 57. | J.1. | 7/2024 | | | |
| 58. | J.2. | | 7/2024 | | |
| 59. | J.3. | | | 7/2024 | |
| 60. | J.4 | 7/2024 | | | |
| 61. | K.1 | 7/2024 | | | |
| 62. | L.1. | | 7/1/24 | | |
| 63. | L.2. | 7/2024 | | | |
| 64. | L.3. | | 7/2024 | | |
| 64. | M.1. | | 7/2024 | | |
| 66. | M.2. | 7/2024 | | | |
| 67. | N.1. | | /2024 | | |
| 68. | N.2. | | 4/2024 | | |
| 69. | O.1. | 7/2024 | | | |
| 70. | O.2. | 7/2024 | | | |
| 71. | P.1. | 7/2024 | | | |
| 72. | P.2. | | 7/2024 | | |
| 73. | Q.1. | | 7/2024 | | |

|  | Paragraph | Substantial Compliance | Partial Compliance | Noncompliance | Not Evaluated |
|---|---|---|---|---|---|
| 74. | Q.2. | | | 7/2024 | |
| 75. | Q.3. | 7/2024 | | | |
| 76. | R.1. | | | 7/2024 | |
| 77. | IX C.1 | | 72024 | | |
| 78. | IX C.2 | | 7/2024 | | |
| 79. | IX. C.3 | | 7/2024 | 7/2024 | |
| 80. | IX. C.4 | | | 7/2024 | |
| | **Total** | **24 (30%)** | **33 (41%)** | **23 (29%)** | |