# Sixth Monitoring Report of the Mays Medical Consent Decree

# Mays et al. v. County of Sacramento

# Case No. 2:18-cv--02081

**Final**

Submitted
January 26, 2025

Madeleine L. LaMarre MN, FNP-BC
Angela Goehring RN, MSA, CCHP

# Table of Contents

**Introduction** ............................................................................................................ **3**

**Compliance Definitions** ........................................................................................... **4**

**Facility Description** ................................................................................................. **5**

**Glossary** .................................................................................................................. **6**

**Executive Summary** ................................................................................................ **8**

**Findings** ................................................................................................................. **18**

    A. Staffing ............................................................................................................ 18

    B. Intake ............................................................................................................... 33

    C. Access to Care ................................................................................................. 43

    D. Chronic Care ................................................................................................... 57

    E. Specialty Services ........................................................................................... 73

    F. Medication Administration and Monitoring ................................................... 89

    G. Clinic Space and Medical Placements ............................................................ 94

    H. Patient Privacy .............................................................................................. 101

    I. Health Care Records ...................................................................................... 104

    J. Utilization Management ................................................................................ 109

    K. Sanitation ...................................................................................................... 115

    L. Reproductive and Pregnancy Related Care ................................................... 117

    M. Transgender and Non-Conforming Health Care ........................................... 122

    N. Detoxification Protocols ............................................................................... 127

    O. Nursing Protocols ......................................................................................... 136

    Q. Reentry Services ........................................................................................... 150

    R. Training ......................................................................................................... 152

    IX. Quality Assurance Systems for Health Care Treatment ................................ 154

**Medical Remedial Plan Compliance Summary** ..................................................... **159**

# Introduction

On July 31, 2018, Plaintiffs Lorenzo Mays, Ricky Richardson, Jennifer Bothun, Leertese Beirge, and Cody Garland filed a federal class action complaint[1] alleging that Defendants failed to provide minimally adequate medical and mental health care to incarcerated persons in its jails; imposed harmful and excessive use of solitary confinement in violation of the Eighth and Fourteenth Amendments to the US Constitution; and discriminated against individuals with disabilities in violation of the American with Disabilities Act (ADA) and section 504 of the Rehabilitation Act.

On October 18, 2018 the parties entered a Consent Decree, and Defendants agreed to implement measures set forth in a Remedial Plan, to be monitored by court-appointed Court Experts.[2] On January 13, 2020, the Consent Decree was approved by the federal court. Among other things, the Consent Decree requires Defendants to issue periodic status reports describing the steps taken to implement each provision set forth in the Remedial Plan and identifying provisions of the Remedial Plan which have not yet been implemented. With respect to the provisions of the Remedial Plan not yet implemented, Defendant's Status Reports must describe all steps taken toward implementation; set forth with as much specificity as possible those factors contributing to non-implementation; set forth a projected timeline for anticipated implementation based upon the best information available to Defendant. The Consent Decree also requires that court-appointed neutral experts report periodically on Defendant's compliance with the Remedial Plan in publicly-filed reports. This report is responsive to that requirement.

We thank Tianna Hammock, Health Services Administrator, Chief Mathew Warren, Sacramento Sheriff's Office (SSO), Captain Mathew Owens and Captain Mark Limbird and their staffs for their assistance and cooperation in completing this review.

---

[1] *Mays et al. v. County of Sacramento*, Case No: 2:18-cv-02081-TLN-KJN (E.D. Cal.).
[2] Madeleine LaMarre MN, FNP-BC, Angela Goehring RN, MSA, CCHP are the Medical Experts. Mary Perrien is the Mental Health Expert. Lindsay Hayes is the Suicide Prevention Expert.  Susi Vassallo MD was the physician member of the monitoring team. She  resigned October 4, 2024.

# Compliance Definitions

The Consent Decree offers limited guidance to the court-appointed experts regarding the measurement of compliance with the Remedial Plan, simply stating that the experts should determine whether the Defendants are in substantial compliance or not in "substantial compliance" with an individual provision. To more accurately measure compliance with the provisions of this Consent Decree, as well as to provide guidance to the parties, the court-appointed experts subsequently created a three-tier system for the measurement of compliance. Each of the experts have utilized such a system in prior federal court monitoring assignments. As such, the court-appointed experts agreed to the following definitions for compliance measurement for each of the provisions in this Remedial Plan:

**Substantial Compliance:** Defendants have achieved compliance with most or all components of the relevant provision of the Consent Decree for both the quantitative (e.g., 90% performance measure) and qualitative measures (e.g., consistent with the larger purpose of the Decree). If an individual compliance measure necessitates either a lower or higher percentage to achieve substantial compliance, it will be so noted by the expert. Compliance has been sustained for a period of at least 12 months.

**Partial Compliance:** Defendants have achieved compliance on some of the components of the relevant provision of the Consent Decree, but significant work remains. A minimum requirement is that for each provision, relevant policies and procedures must be compliant with Remedial Plan requirements, contain adequate operational detail for staff to implement the policy, staff are trained, and the County has begun implementation of the policy.

**Non-Compliance:** Defendants have not yet addressed the requirements of a provision of the Consent Decree or have not made substantive progress.

# Facility Description

The Sacramento County Jail is comprised of two adult jails, the Main Jail (MJ) and Rio Cosumnes Correctional Center (RCCC), also known as "the Branch."

The Main Jail is a multistory building built in 1989 with an original rated capacity of 1,250 that was later increased to 2,380. It is the primary intake center for the jails and houses individuals of varying custody levels. Housing unit design is primarily single and double cells with solid doors. As of 9/15/24, Main Jail population was 1,800, including 1,569 male and 224 female inmates. This is 76% of the official rated capacity, but near 100% of functional capacity.

RCCC is in Elk Grove and was originally constructed as an Air Force base, which was deeded to the County in 1947 and converted to a jail around 1960. It is the primary custody facility for detainees sentenced to county jail by the Sacramento County Courts. An increasing percentage of the detainees housed at RCCC are pre-sentence detainees, to keep the population levels down at the Main Jail. Housing units are a combination of single and double cells, as well as open barracks or dormitories. It has a current rated capacity of 1,625 detainees. As of 9/15/24, RCCC population was 1,401 including 1,282 male and 119 female inmates, or 86% of rated capacity.

The Sacramento Sheriff's Office (SSO) has overall responsibility for management of the jails. Adult Correctional Health (ACH), a program in the Department of Health Services (DHS) Primary Health Division, provides health care services and physical/behavioral health services through county and contracted staff working in partnership with SSO.

Due to the age of the jails, they were not designed for health care and are not compliant with the American with Disabilities Act (ADA) or Health Insurance Portability and Accountability Act (HIPAA), which were enacted at later dates. The County has represented that it plans to renovate Main Jail to provide a new acute psychiatric unit, and to construct an Intake and Health Services Facility (IHSF) medical building to become compliant with the Consent Decree.[3]

---

[3] Remedial Plan Status Report. Adult Correctional Health. January 8, 2024.

# Glossary

| | |
|---|---|
| ACH | Adult Correctional Health Care |
| ADA | Americans With Disabilities Act |
| APU | Acute Psychiatric Unit |
| AED | Automatic External Defibrillator |
| ATIMS | Automated Information Technology Management System |
| AUD | Alcohol Use Disorder |
| BAC/BAL | Blood Alcohol Content/Blood Alcohol Level |
| BUD | Benzodiazepine Use Disorder |
| CalAIM | California Advancing & Innovation Medi-Cal |
| CIPS | Center for Innovative Pharmacy Solutions |
| CM | Case Management |
| CAP | Corrective Action Plan |
| CNA | Certified Nurse Assistant |
| CDCR | California Department of Corrections and Rehabilitation |
| CIWA-Ar | Clinical Institute Withdrawal Assessment-Alcohol |
| CIWA-B | Clinical Institute Withdrawal Assessment-Benzodiazepine |
| COWS | Clinical Opiate Withdrawal Scale |
| CPR | Cardiopulmonary Resuscitation |
| CT | Computed Tomography |
| CD | Consent Decree |
| DDS | Doctor of Dental Surgery |
| DGS | Department of General Services |
| DON | Director of Nursing |
| DT | Delirium Tremens |
| ED | Emergency Department |
| EDD | Estimated Due Date |
| EGD | Esophagogastroduodenoscopy |
| EHR | Electronic Health Record |
| EKG/ECG | Electrocardiogram |
| EMS | Emergency Medical Services |
| EMG | Electromyography |
| eMAR | Electronic Medication Administration Record |
| EOP | Enhanced Outpatient Program |
| FSBS | Finger Stick Blood Sugar |
| FTE | Full Time Equivalent |
| HSR | Health Services Requests |
| HUSC | Hospital Unit Services Coordinator |
| IHSF | Intake Health Services Facility |

| | |
|---|---|
| KOP | Keep on Person |
| LCSW | Licensed Clinical Social Worker |
| LMFT | Licensed Marriage and Family Therapist |
| LOC | Level of Consciousness |
| LVN | Licensed Vocational Nurse |
| MA | Medical Assistant |
| MD | Medical Doctor |
| MAT | Medication Assisted Treatment |
| MH | Mental Health |
| MHA | Mental Health Assessment |
| IT | Information Technology |
| MJ | Main Jail |
| MRI | Magnetic Resonance Imaging |
| MRSA | Methicillin Resistant *Staphylococcus Aureus* |
| MR | Mortality Review |
| MRT | Magnetic Resonance Tomography |
| MUD | Methamphetamine Use Disorder |
| NCCHC | National Commission on Correctional Healthcare |
| NP | Nurse Practitioner |
| OB/GYN | Obstetrician/Gynecologist |
| OUD | Opioid Use Disorder |
| PAWSS | Prediction of Alcohol Withdrawal Severity Scale |
| PEFR | Peak Expiratory Flow Rate |
| PharmD | Clinical pharmacist/Doctor of Pharmacy |
| RCCC | Rio Cosumnes Correctional Center |
| RDA | Registered Dental Assistant |
| RN | Registered Nurse |
| ROI | Release of Information |
| QI/QA | Quality Improvement/Quality Assurance |
| SCJ | Sacramento County Jail |
| SMI | Serious Mental Illness |
| SrHPM | Senior Health Program Manager |
| SRN | Supervising Registered Nurse |
| SSO | Sacramento Sheriff's Office |
| STI | Sexually Transmitted Infection |
| SNP | Standardized Nurse Procedures |
| SUD | Substance Use Disorder |
| SW1 | Social Worker 1 |
| TBI | Traumatic Brain Injury |
| UM | Utilization Management |

# Executive Summary

The Medical Experts thank Tianna Hammock, Chief Mathew Warren, and their staffs for their assistance in conducting the site visit. Everyone was extremely cooperative and helpful to us. We specifically thank Captain Mathew Owens and Lieutenant Connor Milligan at Main Jail, and Captain Mark Limbird and Lieutenant Matt Burton at the Branch Jail for their assistance during the site visit. [4]

During the site visit, we toured both facilities, reviewed documents, interviewed health care and custody leadership, and line staff. We also interviewed inmates selected from medical record reviews and at class counsel request. Following our site visit we reviewed additional medical records and documents. We thank the County for providing additional information and clarifications following the site visit.

The monitors appreciate and carefully considered comments provided to us by the parties for the draft report and made modifications based upon feedback we received. In some instances, assignments of provision compliance were amended and resulted in both upgrades and downgrades in compliance assessments.[5]

**Summary of Medical Remedial Plan Compliance**

| Substantive Area | Total Provisions | Substantial Compliance | | Partial Compliance | | Non-Compliance | | Not Evaluated | |
|---|---|---|---|---|---|---|---|---|---|
| **Medical** | 80 | 15 | 19% | 40 | 51% | 24 | 29% | 1 | 1% |

This review showed mixed progress with respect to Consent Decree (CD) compliance. Compliance assessments increased for 10 provisions, remained the same for 51 provisions, declined for 18 provisions, with 1 provision not evaluated. Nine provisions declined from substantial compliance to a lower compliance assessment. Two of these (G.3. and I.1) did not represent a change in performance but a correction of previous compliance assessments based on new information or data.

Key Consent Decree provisions for which compliance did not improve or declined included access to a medical provider, chronic disease management, utilization review, specialty services, evaluation and monitoring of patients experiencing substance use withdrawal, medications, and evaluation of medical care quality. There was also lack of progress in development of patient tracking systems that are included is several sections.

---

[4] This review period includes the time frame of January 2024 until the site visit in mid-September 2024. Following the visit the monitors requested clarifications. Additional information was provided by the County up to distribution of the draft report on 12/10/24. Some record reviews included information prior to January 1, 2024, but the reviews clarified that findings prior to this date were outside the review period.

[5] In some cases, we included comments from the parties as footnotes.

Notable accomplishments during this review period include the following:

- Improvement in the booking process including privacy, two-phase screening process, and use of colored bands to indicate patient triage acuity.
- Increase in custody medical escorts.
- Reduction in the backlog of nursing health service request (HSR) appointments.
- Improvement in the medication administration process and performance of mouth checks.
- Further expansion of the MAT program.
- Successful hiring of RN supervisors with correctional experience.

**Patient access to care through Health Services Requests (HSRs) has improved.**

The County ensures that adequate supplies of health service request and grievance forms are available in housing units, however at RCCC, inmates continue to report that other inmates collect HSR forms violating privacy and impeding their access to care.  RCCC leadership reported that it addressed this issue immediately at the last site visit, however inmates report that it still continues.

For routine care, nursing leadership has made concerted efforts to improve the timeliness of collection and triage of *medical* HSRs. Nurses saw patients more timely during this review period, reducing the backlog of nurse sick call appointments. While performance improved for medical HSRs, there is no consistency in the timeliness of HSR triage for dental and mental health HSRs. This is because current policy does not require nurses to triage all HSRs, but to forward dental and mental health HSRs directly to the respective discipline. Record review shows that dental and mental health HSRs are not timely triaged which  results in predictable delays in access to care.[6] The current policy is not compliant with the Consent Decree which requires that registered nurses triage all HSRs and to see patients in accordance with their acuity.[7]

With respect to nursing quality of care, nurses do not consistently use or are not compliant with standardized procedures to assess patients. This results in errors in nursing judgement.

---

[6] The County asserts that it is meeting the timeframes for nurses to see patients with urgent and routine conditions, however this conclusion is not supported by record reviews, and the County has not provided audits to demonstrate compliance.

[7] ACH Health Services Requests policy 05-09, draft rev 9/26/24, is based upon the applicable NCCHC standard, Nonemergency Health Care Requests and Services. J-E-7,that requires that qualified health care staff conducts a face to face encounter with the patient within 24 hours of HSR receipt by health care staff. The policy addresses time frames to see patients with emergent and urgent complaints, but not routine complaints. The Consent Decree permits patients with routine complaints to be seen within 72 hours, but this will result in patient back logs and is not consistent with NCCHC standards. NCCHC standards are considered to be the minimum standards of care in correctional facilities.

The County has not developed a tracking system for health service requests so that the timeliness of patient access to care can be tracked on a daily basis. In addition, the health care grievance system is dysfunctional as there is no reliable tracking system and grievances are often lost.[8] Patients do not timely receive responses to grievances, if they receive one at all. [9]

**Patient access to a medical provider has worsened since the last review period.**

Timeliness of access to a medical provider has declined since the last report, resulting in a backlog of approximately 350 patients.[10] This is despite adequate medical provider staffing and increased custody medical escorts.  A contributing factor is low provider productivity (i.e., 1.3 patients per hour). The County has not focused sufficient attention to reduce medical provider backlogs, thus not providing patients timely access to medical care and delaying diagnosis and treatment.  This often results in patients submitting multiple HSRs until a medical provider sees the patient, unnecessarily increasing staff workload.[11]

With respect to emergency care, record reviews show that when a medical provider orders that a patient be transported to the hospital, there are delays up to 4 hours before custody initiates the transport, including for patients experiencing chest pain and possible heart attack.[12]  Delays in the transport of patients experiencing emergencies are extremely dangerous.

We interviewed inmates on different floors who reported to us that custody does not respond timely, and often not at all, when they press the emergency button. They also reported that if deputies answered the emergency button at all, some were verbally abusive.[13]   A medical provider told us that inmates universally report that custody does not respond to emergency call buttons. Custody staff are a critical first link in the access to care process, and need to timely respond to patients who self-declare urgent medical, dental, or mental health needs, and to immediately notify health care staff. [14]

---

[8] The finding that grievances have been lost was determined during and after the site visit and verified by nursing leadership.

[9] The County responded that the Mays Consent Decree does not require a written response, however ACH Grievance policy rev, 5/22/24 states that a written copy of the grievance response will be provided to the patient as soon as possible and no later than 15 days.  The monitors are not aware of any correctional grievance system that does not include written responses to the patient, with an opportunity for appeal.

[10] As of 10/7/24.

[11] For example, Patient #27 submitted multiple (i.e., 10)  HSRs for a complaint of wrist pain following an injury. The patient had a displaced fracture but was not timely informed of the x-ray findings or provided timely treatment.

[12] See Patients #2, #3 and #17.  Page 25.  Providers need to determine the method of transport based upon the nature of the emergency,  and need to send all patients with life-threatening conditions (e.g., acute coronary syndrome) by ambulance and not custody van.

[13] The monitors provided examples to custody leadership investigate during the site visit.

[14] In one case, custody reported that Patient # 3, who had multiple poorly controlled chronic diseases and was seriously mentally ill, cried "help me, help me," all night long, but custody did not immediately notify medical or mental health staff while the patient was in distress, but waited until the morning to tell mental health staff.

**Patients lack timely access to specialty services which has resulted in patient harm.**

Utilization management and specialty services processes continue to be dysfunctional and lack medical oversight. Record reviews show that patients did not receive timely specialty services, if they received services at all. These delays have caused actual harm, and on-going risk of harm to patients.

The case management (utilization review) process does not involve the use of an evidence-based algorithm or medical provider review of each specialty request to determine the clinical necessity and urgency of the specialty referral. The majority of referrals are approved by default, and may or may not be medically necessary (i.e., elective). Medically unnecessary referrals utilize limited County resources, including specialty service providers, custody transport, and financial resources.

The lack of utilization review has resulted in a large volume of specialty referrals. The specialty services tracking log showed that from February 1 to July 15, 2024, there were 2,540 approved specialty services referrals, averaging 462 per month, an extremely high number given a population of 3,000 inmates. Case management staff have been unable to keep up with this volume and of the total consults, 666 (26%) were on "Administrative Hold," meaning that staff had not reviewed the referral. Included among the 26% of patient referrals not processed were cardiology, ENT, gastroenterology, oncology, optometry, ophthalmology, referrals ordered back in February and March 2024. This resulted in predictable delays in access to specialty services and harm to patients.

The County developed a new specialty services tracking log that is extracted from the electronic health record (EHR). Unlike the previous tracking log, the current log does not include all the relevant Consent Decree requirements, including whether the referral was approved or denied. The log included only referrals that were ordered in 2024.  At the beginning of 2024, there were about 850 patients with referral orders from 2022 and 2023 that were not on the log and that were to be added to the tracking log, but this was not done. Record review showed some patients were lost to follow-up and did not receive care.[15] Therefore, current specialty services tracking log does not accurately and reliably include all patients with specialty referrals. The County needs to modify the Case Management template in the EHR to include all required tracking elements to ensure an accurate and reliable tracking log.

There has been minimal medical oversight of specialty services. At the last site visit, we recommended that the County closely monitor the specialty services process and develop a plan to address system issues to ensure patients received timely access to care. This did not occur.[16]

---

[15] ACH did a recent analysis of referrals ordered prior to 2024 and found that 5 were pending, and the remaining referrals were completed, cancelled, or the patient released. The analysis did not include length of time that each patient was pending a specialty referral order.
[16] Consent Decree specialty services provisions E.1, E.2, and E.7 were downgraded from partial to noncompliance.

Positively, the County has hired a new Supervising Registered Nurse (SRN) and increased case management staffing to establish a functional and reliable system for processing specialty service referrals. The County needs to assign a medical provider to the case management team to review specialty services referral requests for approval, to monitor the tracking log, and to follow high-risk patients to ensure they receive timely care.[17]

**Patients with chronic diseases are not consistently provided care in accordance with nationally recognized chronic disease guidelines.**

The County has not adopted national clinical practice guidelines as specified in the Consent Decree and chronic disease policy, trained health care staff, and integrated the guidelines into clinical practice at the jail.[18] Record review shows that several medical providers conduct thorough and comprehensive medical evaluations, implement treatment plans, and monitor patients in accordance with their disease control, providing excellent care. However, this does not consistently occur, and in some cases, care fell below medical care standards.

Clinical pharmacists have been integrated as part of the chronic disease management team, and play a valuable role in monitoring medication adherence and side effects, providing patient education, adjusting treatment, and discontinuing medications for certain medical conditions. Clinical pharmacists should not independently manage patients with multiple comorbidities. However, we found that a medical provider delegated management of a patient with poorly controlled diabetes and hypertension to a clinical pharmacist, but did not continue to manage the patient or who had other chronic diseases, or provide medical oversight of care provided by the clinical pharmacist.[19] Ten weeks after admission to the jail, this patient presented with chest pain and shortness of breath, was admitted to the hospital with pneumonia, and died 5 days later of multiorgan failure.  Optimal management of patients with chronic diseases is a team approach, but medical providers must retain responsibility to manage the care of the patient's medical conditions.

The County has not developed an electronic or manual chronic disease tracking system that ensures that all patients with chronic diseases have been identified and enrolled into the program. We found that some patients are not timely monitored or have been lost to follow-up.[20] The development of a chronic disease tracking system is long overdue.

---

[17] The monitors recommend a 1.0 medical provider dedicated to specialty services until the system is corrected.
[18] The County has developed 3 chronic disease guidelines since 2021 (for asthma, hypertension, and diabetes), but not for other common chronic diseases specified by the chronic disease policy. No documentation has been provided that medical providers have been trained regarding the existing treatment guidelines.
[19] The Medical Director signed the clinical pharmacist's notes, but did not appreciate that the patient's diabetes continued to be uncontrolled requiring closer monitoring and more frequent medication adjustments.
[20] Patient #6.

The County has not developed a comprehensive diabetic program, including patient education, that is consistent with American Diabetes Association (ADA) Standards of Medical Care in Diabetes, and in accordance with normal circadian rhythms. Nurses conduct fingerstick blood sugars and administer insulin at 3 am, prior to breakfast, which results in systemic patient refusals and worsening diabetes control. The County has not provided documentation to show that a plan is in development to meet the Consent Decree requirements to establish a comprehensive diabetes program. Such a program must involve adjusting institutional schedules to provide care in accordance with normal circadian rhythms.

Positively, the County has incorporated technology to improve diabetes control including use of continuous glucose monitoring (CGM) devices and insulin pumps when clinically appropriate.

**The County has not conducted regular evaluations of provider quality resulting in continuation of care that does not meet current medical care guidelines.**

The County has not developed a program to conduct regular evaluations of medical provider quality.  As noted above, some medical providers conduct comprehensive medical evaluations and provide treatment that meets current guidelines, but in some cases, medical providers' care does not meet current medical care standards, resulting in continuation of poorly controlled chronic diseases. The lack of consistent medical care quality is, in part, related to the failure of the County to adopt national chronic disease guidelines, train health care staff, and to conduct studies of medical provider quality to identify system issues or individual provider performance that falls below the standard of care.

**The County has not established and implemented a medically supervised withdrawal monitoring program consistent with national guidelines reflective of community standards.[21] Patients are generally timely referred to the Medication Assisted Treatment Program.**

Positively, the County has hired addiction medicine specialists to implement the Medication Assisted Treatment (MAT) program for patients with substance use disorders (SUD) at the jail. The number of patients currently enrolled in the MAT program is over 500.[22] We commend the County for increasing access to treatment.

A medically supervised substance withdrawal program and the MAT program have overlap, but are distinct from one another, as some patients do not desire MAT.  Both are dependent on intake nurses identifying and referring patients who are at risk of, or experiencing substance use withdrawal to medical providers. Timely medical assessments are needed not just to evaluate patients' substance use disorders, but other conditions common to patients with SUD. For example, in July 2024, a patient died in the detox unit of a medical condition unrelated to withdrawal.[23] An intake nurse had made a medical provider referral, but in the almost 72 hours

---

[21] Guidelines on Managing Substance Use Withdrawal in Jails, Department of Justice, June 2023 (*see* https://bja.ojp.gov/news/new-resource-guidelines-managing-substance-withdrawal-jails).
[22] The County reports that the number of patients in the program is now 700.
[23] Patient #7.

from the time of the patient's admission until his death, a medical provider did not evaluate the patient.[24] The patient's death may have been preventable.

The monitors previously provided current guidelines for medically supervised withdrawal to medical leadership.[25] Following the patient's death, the monitors made a specific recommendation for a medical provider to conduct daily rounds in the detox units. Daily rounds are to evaluate whether patients' conditions is improving or worsening and need adjustments in treatment, or to discharge patients with improved symptoms creating space for new patient admissions. This was not done, and patients with substance use disorders continue to not receive timely medical evaluations following admission.

Nurses do not conduct timely withdrawal assessments in accordance with standardized nurse procedures (SNP) and current guidelines. Sometimes nurses almost immediately change SNP orders to downgrade patient monitoring from every 6 hours to twice daily, prior to completion of the minimum SNP time frame. Nurses often accept patient refusals reported by deputies without going into the patient's cell to determine whether the patient is ill and unable to get out of bed, which would warrant treatment.  Record review and observation of nurses conducting withdrawal monitoring show that nurses do not correctly perform and score withdrawal assessments by asking the patient about each withdrawal symptom. Nurses also did not ask about symptom severity which may warrant a higher withdrawal score and initiation or intensification of treatment. Consequently, withdrawal assessment scores are often erroneous and under-score the severity of the patients' withdrawal. An addiction specialist told the monitors that he often saw patients with withdrawal symptoms that were more severe than the withdrawal scores assigned by nurses. Due to these issues, current detox monitoring audits are likely inaccurate with respect to compliance.[26]

**Pharmacy software issues contribute to medication errors.  Other system issues result in delays in medication administration and missed medication doses when patients transfer between jails.**

*Pharmacy Services timely dispenses medications to patients at the jail on a daily basis, however lack of pharmacy software bidirectional interface with the electronic health record MAR results in predictable medication errors.*

---

[24] The death was unrelated to substance use withdrawal. However, if a medical provider conducted daily rounds to medically evaluate each patient, the patient's serious medical condition may have become known prior to his death.

[25] Guidelines for Management of Substance Withdrawal in Jails.  Department of Justice. June 2023. See https://bja.ojp.gov/news/new-resource-guidelines-managing-substance-withdrawal-jails.

[26] The reason that withdrawal audits compliance assessments are likely inaccurate is that when nurses accept deputy reports of patient refusals of withdrawal assessments without personally assessing the patient, the audit will reflect compliance for a withdrawal assessment, when the patient may not have refused, but be too ill to get out of bed. In addition, if nurses do not conduct complete and accurate withdrawal assessments, it will result in lower withdrawal scores and premature discontinuation of monitoring, and lack of timely treatment.

The lack of bidirectional (real time) software interface between the pharmacy program and the electronic medical record results in delays in processing medical provider orders and in some cases, the pharmacy does not receive the order and does not know it exists.[27]  This results in delays in pharmacy processing orders and initiating or discontinuing medications. This has resulted in untimely discontinuation of medications that have caused severe allergic reactions and nursing medication errors, such as giving duplicate doses of medication. Other software issues result in patients systematically not receiving all ordered medication doses. The County has attempted to mitigate the software issues in several ways, however these mitigation efforts are person-, rather than system-, dependent. *Medication errors are a significant cause of harm in health care settings, including deaths. The County needs to definitively correct pharmacy software issues to prevent harm to patients.*

*System issues related to patient transfer between jails and patients going out to court result in patients missing medication doses.*

Patients transferred from Main Jail to RCCC may miss medication doses, including doses of suboxone.  The County does not have a policy that requires nurses to conduct an intra-system review prior to transfer between jails so that medications for the patient can be prepared and transported with them at the time of transfer. Because there is not an intra-system transfer process, it increases the risk that patients will not receive continuity of medications.

Patients continue to be transferred to court prior to their medication being administered. Consider using a "court medication cart" so that patients receive all ordered medications prior to court transfer.

*Patients do not timely receive medication doses.*

Nurses do not consistently administer medications one hour before or after the scheduled time. This may result in nurses administering the morning medication too closely to the afternoon dose, resulting in an inadequate dosing interval, and possible medication side effects.[28]  Nurses do not timely administer 21:00 hour medications that are often administered as late as 01:00 or 02:00, resulting in patient refusals and worsening medical and/or mental health conditions.

**Review of In-Custody Deaths**

During this review period, there were 5 deaths that showed problems with emergency response, lack of timely rounds in detox units, and/or nursing care that fell below the standard of care. A sixth death recently occurred that showed serious problems with medical care quality.[29]

Modifications were made to the mortality review process to include video review of emergency response. Review of information in ATIMS measuring custody response to emergency buttons,

---

[27] This resulted in downgrading I.1. from substantial compliance to partial compliance.
[28] The electronic health record eMAR does not have a cut off time, that would not allow a nurse to give a dose of medication if it occurred outside the window. This needs to be corrected for patient safety.
[29] Patient #13. The ACH mortality review was completed after the draft report was distributed.

etc., can provide additional information regarding emergency response that can be used to assess timeliness of care. The review of medical care quality needs to be more rigorous to identify system and individual performance issues that need to be addressed.

Deaths from drug overdoses continue. Custody has implemented increased measures to prevent drugs from coming into the jail. This includes enhanced inmate searches and separation of new arrivals from the general population. The Sheriff's office has implemented searches of non-uniformed staff, including health care. These measures have been insufficient to keep drugs out of the jail, and inmates reported to with us that drugs are readily available to them. Further measures need to be taken to prevent illicit drugs from entering the jail. At present, there are no measures in place to detect the introduction of contraband by custody staff. In our experience at jails and prisons across the country, including California Department of Corrections and Rehabilitation (CDCR), all staff, including uniformed staff are subject to searches for contraband. We recommend that this be implemented at the jail in order to reduce the flow of drugs into the jails and to prevent overdoses and deaths.

**The County lacks adequate medical leadership at the jail.**

The Consent Decree provisions that are related to medical care have not continued to improve. The areas of inadequate progress include: medical provider backlogs, utilization management, specialty services, chronic disease tracking system, adoption of clinical guidelines, and a medically supervised substance withdrawal program. In addition, the County has not developed a system to regularly review provider quality. Previous reports have identified systemic issues in each of these areas, but the County has not meaningfully responded to these issues and most of these areas either have not improved or have worsened.

The monitors identified patients with serious medical needs that required medical intervention and follow-up. We forwarded these cases to the County to coordinate follow-up care.[30] However, the County took no action to provide these patients needed medical care, weeks or months after forwarding the cases to medical leadership.

The County's failure to take action on behalf of these patients showed a callous disregard for their safety and well-being.  In over 20 years of monitoring health care in prisons and jails, we have never encountered a situation in which medical leadership failed to ensure appropriate medical care follow-up of patients.

**Summary**

This review showed mixed progress with Consent Decree compliance. There was improvement in some provisions and a decline in others. There are some Consent Decree provisions for which

---

[30] Patients #1, #2, #3, and #17.

no plans have been made to meet Consent Decree requirements,[31] or that substantive progress has not been achieved.[32]

Given the magnitude of work to be done, we encourage the County to establish an internal Consent Decree Strike Team that is multidisciplinary team (e.g. medical, nursing, pharmacy, dental, mental health, QI etc.) under the direction of health care leadership, whose sole responsibilities are focused on implementing corrective action plans. This might also include an external correctional health care expert to provide guidance on implementation of corrective action plans.

We believe that the majority of County leadership and staff are working diligently to improve the timeliness and quality of heath care services, and are confident that progress can continue.  The monitors are available to discuss the findings and recommendations in this report.

Respectfully,


Madie LaMarre MN, FNP-BC

Angela Goehring, RN, MSA, CCHP

---

[31] For example, developing a comprehensive Diabetic Program that is consistent with normal circadian rhythms.
[32] For example, establishing bidirectional interface between CIPS and the Fusion eMAR.

# Findings

| A. Staffing |
| --- |
| 1. The County shall maintain sufficient medical, mental health and custody staffing to meet professional standards of care to execute the requirements of this remedial plan, including clinical staff, office and technological support, QA/QI units and custody staff for escorts and transportation. |
| 2. Provider quality shall be evaluated regularly to ensure that relevant quality of care standards is maintained. This review shall be in addition to peer review and quality improvement processes described in this plan. The parties shall meet and confer regarding any deficiencies identified in the evaluation. Should the parties disagree regarding matters of provider quality, the Court Expert shall evaluate the quality of provider care and to complete a written report. |

**Findings:** The County has significantly increased health care staffing.  To assess whether staffing is adequate, the County needs to conduct a staffing assessment to determine whether there are sufficient numbers and types of medical, mental health, ancillary, and custody staffing to meet professional standards of care and to execute the requirements of this remedial plan. The assessment needs to include clinical staff, office, and technological support, QA/QI units and custody staff for escorts and transportation (VI. A.1). The County has not conducted studies of whether the quality of care meets professional practice standards and chronic disease and other guidelines (VI. A.2).

The County has hired a third-party consultant to complete a staffing analysis that will include total staff by discipline needed to meet required service demands within policy time frames (and the Consent Decree); examination rooms or other space needed to accommodate staff; and productivity potential by service function.[33] Before performing the analysis, the County has requested the consultant to assist with other high priority projects.

The County is in the process of a multi-year staffing plan and has submitted growth requests each year. The County increased medical and administrative staff from 112.5 FTEs[34] pre-Consent Decree, to a total of 251.5 permanent allocated FTEs for the 2023/2024 fiscal year. Since then, the County has both added and deleted FTEs in accordance with the needs of the health program. There are now 252.5 FTEs and a vacancy rate of 8%, down from 19% from our last report. This is a significant improvement in staffing.

**Medical Provider Staffing**
There are a total of 9.5 physician FTEs not including the Assistant Medical Director (see Tables 1. and 2.).  Of this number, 6.5 are assigned to Main Jail and 3.0 are assigned to RCCC.  There are also 17 Associate Physician FTEs, and 5.0 nurse practitioner FTEs, 2 assigned to Main Jail, 2 to

---

[33] Mays Status Report. July 15, 2024. Page 130.
[34] Full Time Equivalent.

RCCC and 1 on-call NP. This totals 33.75 medical provider FTEs. This is more than adequate medical provider staffing to meet the clinical needs of patients and Consent Decree requirements. The County has identified 3 associate physician positions for deletion.

**Table 1. Medical Providers at Main Jail-Full and Part-Time FTEs[35]**

| Medical Providers | FTEs | Filled | Vacant |
|---|---|---|---|
| Assistant Medical Director | 1.0 | 0.5 | 0.5 |
| Physician FTE | 5.0 | 5.0 | 0.0 |
| Physician-PT | 1.5 | 1.0 | 0.50 |
| Associate Physician FTE | 17.0 | 10.0 | 7.0 |
| Nurse Practitioner FTE | 2.0 | 2.0 | 0.0 |
| Nurse Practitioner PT | 0.75 | 0.0 | 0.75 |
| **Total** | **27.25** | **18.50** | **8.75** |

**Table 2. Medical Providers at RCCC-Full and Part-Time FTEs**

| Medical Providers | FTEs | Filled | Vacant |
|---|---|---|---|
| Physician FTE | 2.0 | 2.0 | 0.0 |
| Physician PT | 0.50 | 0.50 | 0.0 |
| Nurse Practitioner PT | 2.0 | 2.0 | 0.0 |
| **Total** | **4.50** | **4.50** | **0.0** |

As noted above, this allocation of medical providers FTEs is adequate for a population of 3,000 inmates. However, the County continues to have significant backlogs of physician provider appointments. From 6/27/24 to 10/7/24 there were:

- 57 patients with urgent provider sick call or history & physical (H&P) appointments at Main Jail outside the 24 hour time frame;
- 206 patients with routine provider sick call or H&P appointments at Main Jail outside the 14 day time frame;
- 2 patients with urgent provider sick call or H&P appointments at RCCC outside the 24 hour time frame; and
- 85 patients with routine provider sick call or H&P appointments at RCCC outside the 14 day time frame.

These data show that 350 patients had not received timely access to care. This includes 59 patients with urgent conditions, poorly controlled chronic diseases, newly arrived patients needing chronic disease medications, patients who are at risk of substance withdrawal, or who have returned from the hospital.

---

[35] Part time staff are a 0.50 FTE.

Medical provider appointment backlogs have persisted since the beginning of the Consent Decree. Contributing factors are low provider productivity and the methodology of how patients are selected to be seen each day. These are discussed below.

**Medical Provider Productivity**

For the previous monitoring period, medical provider productivity averaged between 1.35 to 1.57 patients per hour, with some providers averaging fewer than one patient per hour. For this review period, data shows that productivity dropped slightly, to an average of 1.3 patients per hour, with some providers averaging as low as 0.4 patients per hour. (see Table 3.).

*Table 3. Medical Provider Productivity for the Months of February 1 to July 1, 2024*

| Month 2024 | Number of Providers[36] | Average Number of Patients Per Hour | Range of Provider Encounters per Hour | Encounters per 8 Hour Shift |
|---|---|---|---|---|
| February | 18 | 1.2 | 0.7-3.0 | 10.1 |
| March | 21 | 1.2 | 0.7-2.0 | 7.93 |
| April | 23 | 1.4 | 0.8-2.6 | 11.5 |
| May | 25 | 1.3 | 0.4-3.5 | 10.1 |
| June | 24 | 1.4 | 0.8-2.3 | 11.0 |
| **Monthly Average** | **22.2** | **1.3** | **0.7-2.7** | **10.1** |

The monitors recognize that some patients are medically complex requiring 45-60 minutes or more at each encounter.  However, many patients are referred to providers for acute and self-limited complaints, or quasi-medical concerns such as requests for supplemental vitamins, special shoes, an extra mattress, a low bunk, an extra blanket, skin lotion, lab follow-up, or previously treated conditions (e.g., strep throat).[37] These types of appointments can be completed, including documentation, in 15-20 minutes or less. Some provider referrals appear to be medically unnecessary and may be reduced if nurses have real time access to medical providers for consultation and immediate resolution of the patient's needs.[38]  In the past two reports we have recommended a provider productivity rate of 3.0 patients per clinic hour in order to prevent backlogs.

Given the number of medical providers and increase in custody medical escorts, there should be no medical provider backlogs, but backlogs appear to have become an accepted part of the culture.  Record review shows that nurses tell patients not to expect to be seen anytime soon. At the September site visit at RCCC, the monitors were advised that the provider backlog was more than 400 patients. When asked when the backlog would be eliminated, the County advised that

---

[36] This is the total number of medical providers who saw patients at the jail. Some are full time and some are part time.

[37] *See* Main Jail and RCCC provider backlog report, 10/7/24.

[38] Nurses often conduct sick call encounters in areas of the jail where medical providers are not easily accessible, and would require the nurse to call the provider during the encounter. This can be mitigated when nurses and providers  conduct patient encounters on the housing unit at the same time after nurse examinations rooms are in place.

the backlog would not be eliminated until December 2024. This conveyed a lack of urgency to improve access to care. *The monitors previously recommended that the County prioritize elimination of provider backlogs to improve access to care, but as of the September site visit, this had not been done. As a result, patients continue to not receive timely care for their serious medical needs.*

**Lack of a scheduling system for provider appointments results in delays in access to care.** System issues that contribute to delayed access to care include the lack of a structured provider scheduling system, and the methodology of selecting patients to be seen each day. Currently, providers are given a list of all pending appointments at the beginning of each day and select the patients they wish to see.[39] This methodology results in patients not being timely seen because they continue to get bumped down the list, and some patients are not seen at all. As of 10/7/24, provider backlog data show that some pending patient appointments were ordered more than 3 months prior, as far back as 6/27/24.

Most correctional facilities establish a structure for provider access to care. This involves establishing a threshold of clinic appointments for each day (e.g. 3 patients per clinic hour). The duration of appointments varies according to the type of visit (e.g., chronic disease, nurse referral, quasi-medical requests, etc.) and patient acuity (e.g., urgent, routine). Ancillary or nursing staff create a list of patients that are to be seen the next day and provide it to custody so they can anticipate the number and location of medical escorts needed for the following day. More patients than appointments are typically included on the list because some patients will have been moved to another housing location, be out to court, or released, and other patients on the list can fill those time slots. If scheduled patients are not seen during the day, providers that provide evening coverage may see the patients with urgent conditions, and others can be rescheduled for the following day. Another step that can improve productivity and patient access to care is staging patients on a bench in the clinic area so there is a continuous flow of patients. We know this is occurring in some jail locations and encourage the County to expand staging within the limitations of security considerations.

In summary, if the structure of the access to care system remains unchanged, provider appointment backlogs will persist, placing patients at ongoing risk of harm. Conducting periodic "blitzes" is a bandaid and does not prevent future backlogs. *The County needs to make durable structural and process changes to improve patient access to care, and closely monitor whether structural changes are working or need adjustment.*

### *Nurse staffing has improved*
Nurse staffing has improved with respect to total FTEs and filled positions (See Table 4.). This includes a second Director of Nursing (DON) position[40] at RCCC and increases in the number of Supervising Registered Nurses (SRNs) to provide daily oversight of their areas of responsibility.

---

[39] This occupies time and delays the beginning of clinic time.

[40] Given that there are two DON positions, the County needs to establish, and the table of organization reflect who is the final authority for decisions regarding nursing practice and utilization of nursing resources at the jail.

Vacancy rates vary by type of position. The vacancy rate for SRNs is 24%[41], RNs is 7%, and LVNs is 15%. LVNs were hired primarily for medication administration, but the County had difficulty hiring into the positions and has converted some LVN positions back to RNs. Approval for Supervising Registered Nurses (SRN) on the night shift has occurred, but the positions have not been filled.

There is no attendance policy in force for nursing staff, allowing frequent, last minute call-offs to occur without any consequence. This results in the inability to backfill the post and results in inadequate staffing and delays in critical services such as medication administration, nursing sick call, etc.  By nursing leadership report, staff abuse of calling off gravely impacts the night shift. Record review confirms that this negatively impacts medication administration and withdrawal monitoring.  The SRNs are tasked with calling staff to fill vacant shifts in the schedule, in addition to last minute call offs.  It was reported there are 4 staff in the County offices on G Street whose responsibilities include staffing. We recommend examination of how those staff can be utilized to fill in shift vacancies, freeing the SRNs to manage nursing operations  by walking about the jail and working with staff, rather than being tied to an office conducting staffing duties.

SRNs are also tasked with approval of timesheets for payroll processing, another time thief that detracts from their ability to directly supervise clinical staff and operations. Each clerical activity that can be shifted away from the SRNs should be done.  The DON is also involved with processing registry nurse applications to ensure they are efficiently moved through the staffing department, a task that seems unnecessary for the Director of Nursing (DON) to assume if the department was efficient.

**Table 4. Nurse Staffing: Main Jail and RCCC Full Time and On-Call Positions**

| Nurse Managers | FTEs | Filled | Vacant |
|---|---|---|---|
| Director of Nursing | 2.0 | 2.0 | 0.0 |
| Senior Health Program Coordinator | 3.0 | 2.0 | 1.0 |
| Health Care Program Coordinator | 1.0 | 0.0 | 1.0 |
| Supervising Registered Nurse | 21.0 | 16.0 | 5.0 |
| **Nursing FTEs** | **27.0** | **21.0** | **6.0** |
| Registered Nurse | 82.0 | 76.0 | 6.0 |
| Registered Nurse-On Call | 13.0 | 13.0 | 0.0 |
| Licensed Vocational Nurse | 33.0 | 28.0 | 5.0 |
| Licensed Vocational Nurse-On Call | 5.0 | 5.0 | 0.0 |
| Medical Assistant | 23.0 | 23.0 | 0.0 |
| **Total Nurse Staffing[42]** | **156.0** | **145.0** | **11.0** |

---

[41] This number includes new SRN positions.
[42] This excludes some nursing administrative positions.

Improved staffing and nurse management has lowered nurse sick call appointment backlogs. As of 11/26/24 at Main Jail, there were 64 pending nurse sick call appointments, the oldest HSR was from 10/31/24. At RCCC, there were 34 pending nurse sick call appointments. With focused attention these backlogs can be resolved in a short period of time.

However, record review shows medication administration still occurs as late as 01:00 or 02:00, resulting in patient refusals. This may or may not be related to staffing shortages, but to other factors, such as the availability of medical escorts. ACH and custody leadership need to address this so that medications are administered one hour prior to or one hour after a designated scheduled time.[43] This will likely significantly decrease patients' refusals of medications and improve adherence.

**Dental Staffing**
The adequacy of dental staffing is determined by whether it allows for timely and appropriate care in accordance with the clinical needs of the patient, and Consent Decree time frames (See Table 5.).

*Table 5. Dental Staffing*

| Type of Health Care Staff | FTEs | Filled | Vacant |
|---|---|---|---|
| Dental Director | 1.0 | 1.0 | 0.0 |
| Dentists | 4.0 | 4.0 | 0.0 |
| Dental Assistant | 7.0 | 7.0 | 0.0 |
| Dental Hygienist | 1.0 | 1.0 | 0.0 |
| Dental Hygienist On-Call | 1.0 | 1.0 | 0.0 |
| **Total Dental FTEs** | **14.00** | **13.0** | **1.0** |

ACH Access to Oral Care policy 05-08 has two access categories: one for response to HSR requests, and the other for access to dental treatment, which occurs following the development of a treatment plan by the dentist. The policy includes the following time frames for patients to be seen for dental sick call:

- STAT/Emergent      =Within 24 hours
- Urgent                  =Within 48 hours
- Routine                 =Within 14 days

The corresponding Consent Decree provision VI. C.3.a requires the following:

> *All patients whose HSRs raise emergent concerns shall be seen by the RN immediately upon receipt of the HSR. For all others, a triage RN shall, within 24*

---

[43] For example, medications to be given at 21:00 may be given from 20:00 to 22:00.

*hours of receipt of the form (for urgent concerns) or 72 hours of receipt of the form (for routine concerns).[44]*

However, current practice is for SRNs to triage medical HSRs and to forward dental and mental health HSRs to the respective disciplines. Record review shows that this policy and practice results in delayed HSR triage and disposition for non-medical HSRs . Adding to the delay is that the Access to Oral Care  policy is not compliant with Consent Decree time frames for HSR access to care.

The Consent Decree is clear that, following submission of an HSR, health care staff must see patients with emergent conditions immediately, patients with urgent conditions within 24 hours, and routine conditions within 72 hours, not 14 days.  These time frames are not being met, and patients do not consistently have timely access for their dental needs.[45]  If a nurse assesses a patient with an urgent dental need (e.g., moderate to severe pain and/or infection) the nurse needs to contact a dentist or medical provider to provide interim care until the patient can be seen by the dentist in accordance with the patient's dental acuity.

County data regarding the timeliness of dental sick call (DSC) for health service requests appointments is as follows:

At Main Jail:
- The DSC total is 304, with 3 patients outside the 60-day timeframe.[46]
- Onsite referral to dental is at 2 with 1 being "urgent" for "infection."
- Hygiene sick call appointments are 72, with 1 patient outside the 60-day timeframe.
- Dental intake assessment is at 1 with zero outside the 14-day timeframe.

At RCCC:
- DSC total is 367, with 9 patients outside the timeframe of 60 days. There are 4 urgent that are outside of the timeframe.
- Onsite referral to dental is at 2 with 1 being urgent for "Oral Consult."
- Hygiene sick calls are 118, with 29 outside the 60-day timeframe.
- Dental intake assessments are at 2 with zero outside the 14-day timeframe.

Using 60 days as the threshold for timely access to *dental sick call* is not consistent with ACH policy or the Consent Decree, and therefore timeliness of dental access cannot be accurately assessed.[47]

---

[44] See full citation of VI.C.3.a at page 45.  The Consent Decree does not distinguish between medical, dental ,and mental health HSRs for initial triage and disposition.

[45] Currently, HSRs are collected by CNAs, delivered to SRNs and forwarded to dental staff. Record review shows that dental staff does not date, time and document a legible signature on each HSR.  ACH HSR audits do not include an adequate sample to determine timeliness of patient access to dental care.

[46] The dental team treats or triages urgent or emergent cases on the same day, or within 48 hours per policy. Email correspondence from ACH Dental Director. 12/13/24.

[47] The monitors requested updated data using Consent Decree times frames for timeliness of access to dental care.

With respect to access to dental *treatment,* ACH policy is to see patients with emergent conditions within 24 hours, urgent conditions within 48 hours, and routine treatment within 14-60 days. As noted above, any patient with an emergent dental complaint must be seen immediately either on-site or at the emergency department (ED). Patients with an urgent need for treatment need to be seen within 24 hours.[48] Following a dental sick call encounter, dentists develop a treatment plan which may take 14-60 days to implement in accordance with the acuity and complexity of the patients' dental needs.

ACH reports that dental provider productivity ranges from 11.3 to 14.6 patients per day with hygiene usually around 9 patients per day.[49]

To determine whether there is adequate dental provider staffing, the County needs to revise its dental access to care and dental treatment policies to be compliant with the clinical needs of patients, Consent Decree, and NCCHC standards.[50] The County can then assess productivity and dental provider backlogs to assess adequacy of dental staff.

**Pharmacy Staffing has Increased to Meet Cal-AIM Requirements**
Pharmacy positions have increased to provide pharmacy services 24 hours a day, 7 days a week in order to meet Cal-AIM medication discharge requirements (See Table 6.). The County has hired a clinical pharmacist to provide chronic care management of patients with diabetes, hypertension, and dyslipidemia.[51] The County plans to add another clinical pharmacist to the chronic care team to enable providers to better manage patients with opioid use disorder, hepatitis C infection, and asthma.[52]

*Table 6. Pharmacy Staffing: Full Time and Interim Positions*

| Type of Health Care Staff | FTEs | Filled | Vacant |
|---|---|---|---|
| Pharmacy Manager | 1.0 | 1.0 | 0.0 |
| Pharmacist | 14.5 | 13.5 | 1.0 |
| Pharmacy Technician | 12.0 | 11.0 | 1.0 |
| **Total Pharmacy FTEs** | **27.5** | **25.5** | **2.0** |

Clinical pharmacists play a valuable role in assessing patients' medication adherence and side effects, counseling, adjusting medication dosages, and in some instances independently

---

[48] The County responds that patients with emergent and urgent dental needs are seen immediately and within 24 hours, respectively, however ACH policy is not consistent with the Consent Decree, the County has not conducted audits that demonstrate that patients with urgent dental needs are seen within 24 hours, and record review shows that patients with urgent dental needs are not seen within 24 hours. See Patient #6 who submitted multiple HSRs but was not timely seen by dental staff and finally pulled out his own tooth.

[49] Time frame not specified in 12/13/24 email.

[50] The County currently bases its policies on National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails. 2018.

[51] ACH Mays 180-Day Status Report. July 15, 2024. Page 153.

[52] Ibid.

discontinuing medications. The monitors understood that clinical pharmacists would provide supplemental care as members of the chronic disease team, but would not independently manage patients. However, one record review showed that a medical provider delegated management of a patient with chronic diseases to a clinical pharmacist, without continuing to manage the patients' overall medical care.  A brief description is provided below.

In August 2024, a female patient was booked into the jail with multiple poorly controlled chronic diseases.[53] Following intake, a medical provider did not conduct a comprehensive medical evaluation of each of the patient's chronic diseases, but delegated management of the patient to a clinical pharmacist. Over the following 10 weeks, neither a medical provider nor clinical pharmacist provided timely or appropriate care for the patient's diabetes, dyslipidemia, heart failure, and other serious needs.  The clinical pharmacist made medication changes remotely without speaking with the patient, and the patient's diabetes remained uncontrolled with blood sugars in the 300s. The patient had a hypertensive crisis,[54] but neither a medical provider nor a clinical pharmacist saw the patient following the ED visit. In mid-November 2024, the patient presented emergently with 3 days prior onset of chest pain and shortness of breath.[55] She was hospitalized for pneumonia which progressed to multiorgan failure, and the patient died 5 days after hospital admission. The poor diabetes control provided to the patient at the jail increased her risk of infection and may have contributed to the development of pneumonia and death.

*Clinical pharmacists are valuable members of the chronic care team and play an important role in improving the quality of patient care with respect to chronic diseases. However, medical providers must maintain responsibility for the patient's care for the duration of their incarceration, and cannot delegate responsibility for their patients solely to clinical pharmacists. Currently, the number of patients with chronic diseases who are non-adherent to medications is high. Consider prioritizing these patients for interventions by clinical pharmacists.*

### Other Medical Staff

The County developed a structured written orientation program but has not conducted training because a staff training position was vacant.  Instead, the County relied on-the-job training by existing employees (who were also not formally trained), which resulted in staff conveying incorrect policy information to new employees, and lack of policy and Consent Decree compliance. The County has identified a candidate and is in process of filling the staff training position.

The  current orientation program lacks security training, so that new employees know how to function in a correctional environment. This is dangerous to employees and places them at risk of unknowingly violating safety and security. The orientation program needs to include security training.  With respect to implementation, consider establishing an orientation schedule that is

---

[53] Patient #13.
[54] BP=119/114 mm Hg.
[55] Per emergency department records.

conducted twice a month (e.g., 1st and 15th day) and require new employees to attend orientation prior to assignment of work duties.  This structure makes the orientation process more efficient.

The County has recently added several positions to the Specialty Services program which hopefully will facilitate timely processing of specialty referrals and scheduling of medical appointments (see Utilization Management).

### *Custody Staffing*
Custody has provided increased numbers of medical escorts since the site visit in January 2024 and we commend custody leadership for this progress. However, until a staffing analysis is completed, the true number of custody medical escorts needed cannot be known.

In August and September 2024, medical escorts for Main Jail ranged from 3 to 7 escorts, and at RCCC 6 to 8 medical escorts.  The number of available escorts each day relies on dedicated positions, retired annuitants, and use of staff overtime to try to meet the demand for medical escorts. The need to use retired annuitants and overtime indicates that the County has insufficient numbers of dedicated medical escort positions to meet the demand for health care services. Custody submitted a growth request for 8 officers to be dedicated as medical escorts, however, the County approved only 4 positions.  We support approving 4 additional positions and then reevaluating the adequacy of medical escorts. SSO is considering other measures such as dedicating non-uniformed officers as medical escorts, which is promising.  Captain Matt Owens at Main Jail and Captain Mark Limburg at RCCC and their staffs are to be commended for their concerted efforts to increase medical escorts.

### **Delays in Custody Transportation to the Hospital**
Record reviews showed concerns about lack of timely access to care related to delayed transfer from the jail to the hospital, increasing the risk of harm to patients. The following cases were noted.
- **Patient #17**: This 34-week high-risk pregnant woman complained of lower pelvic pain and decreased fetal movement. She had not received previously ordered ultrasounds to assess the fetus. On 6/13/24 at 15:31, a provider ordered the patient urgently sent to the hospital. Approximately 4 hours later, at 19:21, an officer signed a custody ITI[56] form to transport the patient to the hospital. Although the patient and fetus did not experience a negative outcome, a 4-hour delay in sending a pregnant patient to the hospital may have had a serious negative outcome for the mother and fetus.
- **Patient #2:**  On 1/18/24 at 14:52, a medical provider ordered a patient with chest pain and history of severe heart failure to be transported to the hospital for suspected acute coronary syndrome (i.e., heart attack). The custody ITI form showed that the officer signed it at 18:00 and the patient arrived at the hospital at 19:00, almost 4 hours after the

---

[56] Intent to Incarcerate. It includes directions to transport patients to the hospital and includes date and time of departure.

provider ordered the patient to be transported. Although the patient was not diagnosed with a heart attack, if he was having one, he may not have survived the 4 hour delay.[57]

- **Patient #2:** On 3/7/24, the same patient presented with a rash and suspected severe allergic reaction to clindamycin and vancomycin. Custody transported the patient to the hospital 2.5 hours after the medical provider's order.  The risk is that the patient would go into anaphylactic shock during van transport, without the availability of life-saving treatment.[58]
- **Patient #3:**  On 1/31/24 at 09:40, this patient presented with severe scrotal swelling and pain, a concern for an incarcerated hernia. A medical provider ordered the patient to be transported to the hospital but the patient was not transported for 4 hours.

Whether delays in custody transports to the hospital are a result of staff or van shortages is unknown, however in these cases, patients were at risk of harm and experienced severe pain due to delays in transport for emergent and urgent conditions.

In cases of life-threatening emergencies (e.g., heart attack, stroke, etc.), or for patients with time sensitive conditions (high risk pregnancy, fetal distress, etc.), medical providers need to order an ambulance, or a fire department squad if they have the capability to initiate advanced cardiovascular life support (ACLS).  For other patients with urgent and time sensitive health conditions (e.g., severe pain), that can be transported by custody van, the patient needs to be transported as soon as possible (e.g., 30 minutes, etc.) and no later than an hour. Medical providers need to advise custody on the urgency of the patient's condition so that informed decisions can be made about the method of transport to the hospital.

*A.2 requires that: Provider quality shall be evaluated regularly to ensure that relevant quality of care standards are maintained. This review shall be in addition to peer review and quality improvement processes described in this plan. The parties shall meet and confer regarding any deficiencies identified in the evaluation. Should the parties disagree regarding matters of provider quality, the Court Expert shall evaluate the quality of provider care and  complete a written report.*

**The County has not conducted regular evaluations of provider quality as required by the Consent Decree (VI. A.2). This review must be conducted as a matter of priority.**

Record reviews show that some medical providers conduct comprehensive medical evaluations, develop treatment plans, and monitor patients in accordance with their disease control.  Record reviews also show that some providers' care does not meet medical care standards for chronic diseases, and in some cases, medical care fell below the standard of care per chronic disease guidelines.[59]  The County has not conducted any evaluations of medical provider compliance with

---

[57] This patient should have been sent via ambulance in the event of cardiac arrest.
[58] This patient needed to be sent to the hospital via an EMS squad or ambulance as they are equipped to manage severe allergic reactions.
[59] Patient #13.

current guidelines,[60] nor developed a methodology to measure provider quality. No documentation was provided to support any regular evaluation of medical care quality. This is a violation of the Consent Decree.

The County has also failed to address the systems issues that contribute to poor medical quality. These include:

- Lack of patient access to specialty services (See E. Specialty Services and J. Utilization Management);
- Failure to adopt, train and integrate nationally recognized chronic disease guidelines into provider practice, resulting in care that did not meet the standards (See D. Chronic Diseases);
- Lack of implementation of  a medically supervised substance use withdrawal program that included medical providers conducting timely medical evaluations of patients at risk or experiencing withdrawal in the detox unit (See N. Detoxification Protocols).[61]
- No plan to reduce medical provider backlogs at Main Jail and RCCC since the site visit in January 2024 (See A. Staffing)
- Failure to identify and address key lapses of care that contributed to mortalities (See P. Review of In-Custody Deaths).

As noted earlier in this report, it is deeply concerning is that over the course of this review period, the monitors forwarded  the names of patients needing medical intervention to the County for follow-up of their serious medical conditions. The monitors anticipated the County would take action to address these concerns. However, when updating our reviews of patient care we found that no intervention for these patients had taken place, weeks or months after the patient information was forwarded to the County. For example:

- This 67-year-old patient did not have timely care for his serious medical conditions including obstructive uropathy leading to bilateral hydronephrosis, pyelonephritis, chronic kidney disease, migraine headaches with vision loss/changes and blackouts, and suspected cubital tunnel syndrome.[62] On 8/7/24, Dr. Vassallo forwarded her concerns regarding this patient's care to the County. The patient had been lost to follow-up for urological, ophthalmology, and orthopedic specialty services.  The patient had also been lost to follow-up for chronic disease management, having last been seen 7/24/24. As of 11/12/24, 3 months after forwarding the monitors serious concerns, nothing had been done for this patient.
- This 56-year-old patient's labs showed that she had significantly elevated triglycerides (>500, normal≤150) that places her at risk of pancreatitis,[63] and for which treatment is needed. On 11/1/24, we forwarded this patient's information to the County to arrange for the patient to

---

[60] Diabetes, hypertension, dyslipidemia, asthma/COPD, seizure disorders, and HIV and Hepatitis C infection.

[61] Following the death of a patient who was not medically evaluated in the 3 days he was housed at the detox unit, the monitors recommended that a medical provider conduct daily rounds, consistent with national guidelines. The County did not assign a provider to conduct rounds in the unit.

[62] Patient #6.

[63] Patient #1.

be seen. As of 11/22/24, a provider had not seen the patient. We recontacted the County the same day, who then arranged for the patient to be seen and treated. The County should have taken action immediately given the seriousness of the patient concerns.

- A 28-year-old woman was pregnant upon arrival and following delivery at the hospital expressed a desire for birth control.[64] The OB/GYN provider planned to counsel the patient on 8/9/24, but this appointment did not take place. On 8/22/24, the monitors contacted the County to arrange birth control counseling prior to the patient's discharge. The patient was released on 10/14/24 without counseling or birth control.

- A 39-year-old patient was newly diagnosed with diabetes during a hospitalization for back pain and surgery in July 2024.[65] Other than a patient handout, there is no documentation that providers or nurses counseled the patient about the causes of diabetes, progression of the disease, approach to treatment, and diabetes complications. The patient has been nonadherent to medications because he "doesn't think he needs it," reflecting a lack of knowledge about the disease process. The patient anticipated being discharged soon. On 11/20/24, the monitors notified the County that the patient needed comprehensive diabetic education. On 12/5/24, a medical provider saw the patient following nurse sick referral for a swollen ankle. The provider addressed the patient's poorly controlled diabetes and counseled the patient regarding a medical diet, but did not discuss other components of comprehensive diabetes education with the patient.

In our monitoring experience we have never encountered a situation in which the County did not take action to ensure patients received timely and appropriate follow-up for their serious medical needs. Each of these cases varies in the severity of potential negative outcomes, but the fact that the County did not follow-up on each of these cases is alarming and reflects lack of ownership of the patients under the County's care.

*Types of audits to evaluate medical care quality*
Chronic disease audits, if properly designed, can quickly identify care that is not compliant with current standards of care. The audits currently in place are ineffective. For example, the chronic disease audits for diabetes consisted of measuring whether hemoglobin A1C's have been performed in the past 6 months (when in most cases it should be conducted every 3 months) and whether providers monitor patients in accordance with the patient's disease control (61% compliance in March 2024). These audits do not measure the quality of care provided to patients with diabetes. Study design needs to include whether medical providers conduct pertinent medical evaluations, order pertinent labs, place diabetic patients on a statin or aspirin as indicated, and order specialty referrals (e.g., ophthalmology, etc.) to evaluate patients for diabetes complications (e.g., retinopathy).[66]

As a methodology to meet substantial compliance for this provision, the monitors previously recommended that the types of studies to measure medical quality include the following:

---

[64] Patient #17.
[65] Patient #14.
[66] Retinopathy is damage to the retina caused by diabetes.

- Provider compliance with chronic disease guidelines;
- Evaluation of ED or hospital send outs to determine if medical care was appropriate prior to the send out, whether providers timely reviewed and addressed all ED/hospital recommendations, implemented an appropriate treatment plan, and monitored the patient until the desired clinical outcome was achieved;[67]
- Review of polypharmacy;[68]
- Evaluation of whether medical care following intake was timely and appropriate; and
- Evaluation of other ACH identified medical provider quality issues.

The monitors recommend that the general methodology for the studies includes:
1. Medical provider quality at both jails;
2. An adequate sample size for each jail (e.g., 20-30 at each jail) to support the conclusions of the study or a targeted sample such as review of 10 records of patients whose chronic diseases were poorly controlled (e.g., hemoglobin A1C ≥9%);
3. Record sample is over time (e.g., 1-3 months) rather than point in time (e.g. a single day);
4. Identifying types of quality issues and an assessment of the root causes of poor medical quality (e.g. provider knowledge, clinical decision making, failure to address abnormal diagnostic testing, lack of monitoring of the patient, etc.);
5. A corrective action plan to address findings including medical provider counseling and further monitoring, etc.

As to the provision to meet the requirement for evaluating provider quality "regularly", we recommend that a study is conducted at each jail quarterly and is targeted towards known or suspected quality of care issues. These studies can identify system issues that need to be addressed to improve provider quality. The County needs to assess whether quality improvement resources are adequate to carry out multiple audits simultaneously.

In summary, the County has not developed and implemented a system to evaluate medical care quality with a corresponding plan to address performance that falls below expectations.

**Compliance Assessment:**
A.1=Partial Compliance
A.2=Noncompliance

---

[67] We recommend selecting conditions for review using the Agency for Healthcare Quality and Research (AHQR) Prevention Quality Indicators (QIs).

[68] Polypharmacy is the practice of prescribing multiple medications simultaneously, usually for patients with multiple chronic medical and mental health diagnoses. Polypharmacy may lead to drug interactions and side effects, and resulting harm to the patient. It is good practice to review records of patients with 10 or more medications to determine if any can be safely discontinued.

**Recommendations:**

1. Finalize heath care processes and policies, and conduct an analysis of health care staffing, medical space, and custody staffing needed to provide timely access to care (VI. A.1). In the interim, we suggest the County pause on adding more staff until the staffing analysis is completed.

2. Assess the adequacy of Quality Improvement staffing to timely perform required Consent Decree audits and other studies to measure medical care quality.

3. The County needs to establish thresholds for medical provider productivity to meet patient demand for health care services, closely monitor provider productivity, and address medical provider appointment backlogs. As in previous reports, we recommend a goal of 3.0 patients per clinic hour.

4. Revise access to care policies to have registered nurses triage and see all patients submitting HSRs, then reassess staffing needs.

5. Conduct studies of dental provider productivity to provide data for an assessment of adequacy of dental staffing.

6. Ensure that access to dental care meets Consent Decree requirements.
   a. Revise dental policy to be compliant with HSR Consent Decree timeframes.
   b. Conduct access to dental care audits for HSRs and dental treatment.
   c. Following dental audits, reassess the dental staffing needs.

7. Continue to evaluate needs for custody medical escorts and transport vans to ensure that medical appointments are timely completed and patients are timely transported to the hospital.

8. The County needs to adopt, train and implement nationally recognized chronic disease guidelines, and conduct studies to measure adherence to the guidelines on a quarterly basis.

9. In the next six months, conduct comprehensive studies to measure compliance with the most frequent chronic diseases (e.g., diabetes, hypertension, dyslipidemia, heart failure, asthma, etc.)

10. The County needs to develop a program for evaluation of medical provider quality, peer review, and meaningful audits to measure compliance with medical standards of care  and meet the express requirement of the Consent Decree.

11. Consider using AHRQ Quality Prevention Indicators when selecting records to review pre-hospital and post-hospital care.

**B. Intake**

1. All prisoners who are to be housed shall be screened upon arrival in custody by Registered Nurses (RNs). RN screening shall take place prior to placement in jail housing.
2. Health Care intake screening shall take place in a setting that ensures confidentiality of communications between nurses and individual patients. Custody staff may maintain visual communication, unless security concerns based upon an individualized determination of risk that includes a consideration of requests by the health care staff that custody staff be closer at hand. There shall be visual and auditory privacy from other prisoners.
3. The County shall, in consultation with Plaintiffs, revise the content of its intake screening, medical intake screening, and special needs documentation to reflect community standards and ensure proper identification of medical and disability related concerns.
4. Nurses who perform intake screening shall consult any available electronic health care records from prior incarcerations or other county agencies. The form shall include a check box to confirm that such a review was done.
5. The County shall make best efforts to verify a patient's prescribed medications and current treatment needs at intake, including outreach to pharmacies and community providers to request prescriptions and other health records related to ongoing care needs. The policy shall ensure that any ongoing medication, or clinically appropriate alternative, shall be provided within 48 hours of verification or from a determination by a physician that the medication is medically necessary. Any orders that cannot be reconciled or verified, such as those with conflicting prescriptions from multiple providers, shall be referred to a health care provider for reconciliation or verification the next clinic day after booking.
6. The County shall follow a triage process in which intake nurses schedule patients for follow-up appointments based upon their medical needs and acuity at intake and shall not rely solely on patients to submit Health Services Requests once housed. The policy shall, in consultation with Plaintiff's counsel, establish clear protocols that include appropriate intervals of care based on clinical guidelines, and that intake nurses shall schedule follow-up appointments at the time of intake based upon those protocols.
7. All nurses who perform intake screenings will be trained annually on how to perform that function.

**Findings:** The County is implementing measures to make the medical screening process more private, safer, and efficient.  The intake process has been recently changed to separate fitness for confinement screening from receiving screening, and the County is identifying changes that might be needed to the process. Health care and custody leadership are commended for these improvements. Nevertheless, we identified concerns that need to be addressed.

Medical screening is primarily conducted at Main Jail, but the County added a modular trailer at RCCC to conduct receiving screening if needed to relieve pressure on Main Jail.

The County updated the intake screening form, and the County continues to evaluate and make changes as medical intake processes are refined and amended. While the County has revised the content of the intake form, this review showed multiple records in which nurses did not properly

identify medical and disability related concerns resulting in lack of continuity of care and harm to patients *(VI. B.3)*.[69]  The County is in the process of revising medical screening policies.[70]

*The County has made significant changes to the medical screening process to improve patient privacy and safety.*

Registered nurses screen all inmates upon arrival using a two-phase process. (VI. B.1.) Phase 1 screening is to determine fitness for confinement (FIT).[71] This includes a full set of vital signs, a review of the arresting officer's observations, and an assessment to ensure that the patient has no injuries or acute medical conditions requiring transfer to the hospital for further evaluation. Nurses then determine the priority of the patient for Phase 2 screening and place a color-coded wristband on the patient, designating their triage level. Patients who are high-priority receive a red wrist band, patients of medium priority receive a yellow wrist band, and patients who are low-priority receive a green wrist band. We reviewed a record in which both the Phase 1 and Phase 2 nurses wrote intake referral orders. This can result in confusion and duplication of orders. The primary responsibility of the nurse conducting Phase 1 is to determine fitness for confinement and assign an acuity priority to the patient, and for the nurse conducting Phase 2 screening to conduct an in-depth review of the patient's medical history and order needed follow-up.

*The County provides auditory privacy in the booking suite.*

Confidentiality among patients during the medical screening has improved because of the recently completed physical plant changes (VI. B.2.). The County restructured the arrest report room and medical intake area at the Main jail. The rooms that previously stored the breathalyzer, a bathroom, an exam room, and an office were repurposed into confidential medical spaces.[72] Two newly designed medical screening offices adjacent to the sallyport have a door with a window that allows for auditory privacy while providing visibility of the nurse and patient. Arresting agency staff can maintain the arrestee in their line of sight by standing outside the closed door. The patient is cuffed with their arms behind their back, and the cuff is attached to a wall-mounted security bar, ensuring nurse safety.

*Arresting officers or designees do not consistently monitor patients while the nurse conducts receiving screening.*

The monitors observed that the arresting officer, or designee, does not consistently maintain visual oversight of the patient and nurse during the Phase 1 screening process. This raises a

---

[69] The monitors previously assigned this provision substantial compliance based upon the County modifying the intake screen to identify medical and disability related concerns. However, medical record reviews show multiple instances in which nurses did not review previous medical records to identify medical, mental health or disability needs and order needed follow-up.

[70] The name of the ACH policy is Nurse Intake; however, the receiving screening process is more than what nurses do. It is a multidisciplinary process. The monitors recommend that the County adopt NCCHC standards language regarding medical screening. The related standard is J.E.2., Receiving Screening.

[71] Arrestees may be declared unfit for confinement at any point of the intake screening process, however, the primary purpose of Phase 1 screening is to determine fitness for confinement and priority for Phase 2 screening.

[72] Sacramento County 180-Day Remedial Plan Status Report, page 133. July 11, 2024.

concern regarding the patient's ability to stand, kick, and otherwise be aggressive toward the nurse, given the limited size of the interview room and location of the door.  If a patient's behavior escalates and safety becomes a concern, the nurse must move toward the patient to exit the room.  If the nurse cannot de-escalate the patient, intervention by the officer may be required, such as opening the door, moving the patient to a larger area, or temporarily discontinuing the screening. Therefore, officers must remain diligent in their ongoing observation of the patient during the encounter with the nurse.

One nurse voiced concern to the monitors about being exposed to verbal abuse and feeling safe in the examination room without the officer at the window. The nurses are seemingly unsure how to handle an escalating patient and to what extent they can request the arresting agency staff to manage the patient more closely. This warrants training for both healthcare staff and custody regarding roles and responsibilities.

*Phase 2 screening*
Patients who have completed Phase 1 screening and have been provided a colored wristband are placed on benches in the booking area, awaiting their turn to complete the Phase 2 receiving screening.  While it is not unusual to have both males and females in the same area, we observed that a male arrestee was seated right next to a female arrestee, such that, even with his hands cuffed behind his back he would be able to touch the female and/or speak to her in a vulgar manner. Males and females need to be seated on separate benches.

Nurses complete the Phase 2 screening in an examination room with a door and window, maintaining auditory privacy and allowing the arresting officer to keep the patient in their line of sight. The separation of the receiving screening into a two-part process and the physical plant changes are significant improvements and allow for increased privacy for the patient.

*There is no tracking system to ensure that patients are timely seen in accordance with their medical acuity and duration in the booking suite.*
There is no process for keeping track of which patient in each acuity category is next in line, leaving nurses completing the Phase 2 screening to guess which patient is next. ACH reports that an electronic board is on order to track patients in the queue and provide staff a better understanding of which patients are next in line. This can be used for any stage of the booking process, including pre-booking, urgent mental health appointments, and placement in medical observation, safety or segregation cells.[73]

Medical screening needs to be continuous while patients are in the booking area. During the site visit, we observed that patients awaited Phase 1 screening, but no nurse was available to conduct screening because both nurses were on lunch break.  Neither did the SRN step in to conduct

---

[73] At Miami-Dade County Jail, a tracking board is used to track all phases of the booking process, including custody procedures, medical and mental health assessments. Timeframes for completion is tracked on the tracking board so all staff can see what needs to be completed before the patient is moved to a housing unit. The monitors strongly recommend that this be done at Sacramento County Jail.

screening, delaying this critical element of the process. This increases the risk of adverse patient outcomes. We reviewed a record of a patient who was pregnant with triplets that was not screened for over two hours, and when finally screened was declared unfit for confinement due to reported vaginal bleeding.[74]  While the patient suffered no harm in this instance, it is a concern that this patient was not immediately identified as needing expedited Phase 1 screening.

To ensure timeliness of the intake process, ACH leadership and SRNs need to organize the staff relief process so that the intake process is conducted continuously. SRNs need to supervise all health care activities in the booking area to ensure that patients are timely screened and the intake process is conducted smoothly.

*Nurses do not consistently review previous medical records and fail to identify medical, mental heath and disability needs requiring continuity of care.*
Intake nurses do not consistently review medical records from prior admissions and transfers from other jurisdictions. (VI. B.4).  Nursing review of previous medical records is primarily done during Phase 2 medical screening. Some nurses conduct thorough review of previous admissions and medical records and some nurses are not conducting any review as evidenced by lack of documentation of previous medical, dental, or mental health conditions.

When nurses do not conduct an adequate review of a patient's previous admissions it results in failure to order needed follow-up such as referrals to medical or mental health providers, essential medication review, substance use withdrawal monitoring, and Chronos. As a consequence, patients experience discontinuity of care with adverse outcomes.

**Patient #3:** A 61-year-old man arrived at the jail on 1/27/24 and was released on 3/22/24. He had serious chronic medical and mental health conditions, including heart failure, alcohol use disorder, hepatitis C infection, end-stage liver disease, hypertension, scrotal hernia, psychosis, bipolar disorder, and severe depression. Upon arrival, the nurse noted reviewing previous medical records, but based on the nurse's documentation and lack of follow-up action, this does not appear to be accurate. The patient denied medical and mental health conditions to the nurse at the time of intake, but records from an October 2023 admission showed the patient had heart failure and alcohol dependence, among many other serious medical and mental health conditions. The nurse did not note that in April 2023, the patient was taking multiple medications for heart failure. The intake nurse did not order essential medication review, an urgent medical provider visit, or alcohol withdrawal monitoring. The day after arrival, the patient presented urgently with shortness of breath. The RN noted that the patient had heart failure, COPD, hypertension, and hepatitis C infection, and contacted a provider, who ordered an albuterol inhalation treatment. Later that day, a provider ordered essential medications, but did not see the patient for medical evaluation. On 1/29/24, custody reported that the patient was disoriented, hallucinating, on detox monitoring, and was to be moved to the detox unit. There were no orders for detox monitoring. Had the nurse reviewed the patient's April and October

---

[74] Patient #16.

2023 admissions, information regarding the patient's alcohol use disorder would have been known. Given the patient's history, disorientation and hallucinations, a medical provider needed to urgently evaluate the patient to rule out severe alcohol withdrawal. A provider saw the patient 3 days after admission.

In addition, this patient's Avatar history showed a history of bipolar disorder, psychosis, and depressive disorders, but throughout his detention, MH staff noted that the patient did not have serious mental illness. This is despite the patient being hospitalized for medical reasons, and hospital providers starting the patient on Risperdal and Depakote due to previous psychiatric evaluations. The patient's mental health diagnoses are not documented on the patient's problem list. This failure to identify a patient's serious mental health needs is dangerous.

**Patient #16**: This 30-year-old woman arrived at SCJ on 5/14/24 and was released on 5/31/24. Her medical history included severe alcohol use disorder with withdrawal seizures, delirium tremens, and ICU admissions, moderate to severe methamphetamine, opioid, and benzodiazepine use disorders, triplet pregnancy at 13 weeks, untreated urinary tract infection, history of attempted suicide and adjustment disorder.  Upon the patient's arrival at the jail, there was an over 2-hour delay until a nurse conducted fit for confinement screening. When performed, a RN declared the patient unfit for confinement due to the patient being pregnant with triplets and reported vaginal bleeding.  Upon the patient's return to the jail, an intake RN appropriately contacted a medical provider, and ordered the patient to be admitted to the 2 Medical infirmary. Obstetrics saw this high-risk pregnant patient within 72 hours of arrival.  The patient reported a history of suicide attempts and the intake nurse made a mental health referral. A Social Worker 1 ordered an urgent mental health assessment and mental health provider referral, however neither took place in the 17 days the patient was at the jail.

**Patient #10:** The patient was a 41-year-old man who arrived at SCJ on 3/28/24 and died on 6/28/24. His medical history included type 2 diabetes, hyperlipidemia, elevated blood pressure, seizure disorder, serious mental illness, schizoaffective disorder, bipolar type, and suspected cognitive impairment. The patient had 2 admissions to the jail since December 2023.  The patient gave a history of hypertension and taking medication but could not remember the name of his medication. At the patient's second admission to the jail, a medical provider did not order antihypertensive medication, despite his history and elevated blood pressure. Instead, the provider deleted hypertension from the Problem List replacing it with "Elevated blood pressure without hypertension." The provider did not document the clinical justification for this change in diagnosis and treatment.

**Patient #19:** This 33-year-old women arrived at SCJ on 3/20/24 and is still at the jail. Her medical history includes opioid use disorder, dental abscesses, peripheral edema, and pregnancy. The patient reported feeling hopeless. Her medications are prenatal vitamins, buprenorphine pantoprazole, fluticasone, sertraline, and trazodone. The RN ordered OB/GYN referral, HIV, RPR, HCV and STI testing, mental health referral, TST, intake dental assessment, general population

housing and a prenatal vitamin. The RN did not order a medical provider referral, low tier, and a low bunk.

**Patient #30**: On 8/19/24, a 30-year-old female with a history of mental illness and amphetamines, fentanyl, and methamphetamine use disorder arrived at the jail. She had previously been admitted on 7/25/24 and was released on 7/29/24.

On 8/19/24, the nurse conducted intake screening but did not order withdrawal monitoring for the patient nor conduct a urine drug screen and pregnancy test. Had the nurse reviewed her recent admission, the nurse would have known about her substance abuse history.

On 8/21/24, a medical provider saw the patient for sick call because she complained of body aches, chills, and stomach pain. The provider diagnosed her with opiate withdrawal and ordered withdrawal monitoring and medications. The provider also referred the patient to the MAT provider, who saw her that afternoon. This patient did not receive timely care for opioid withdrawal.

Even when referred, patients may not be seen in a timely manner with negative patient outcomes. The following case is an example.

**Patient #33:** On 4/27/24, a 38-year-old male patient with a history of fentanyl, heroin, and methamphetamine use was booked into the jail. A nurse ordered COWS monitoring and referred the patient to the MAT provider, but he was not timely seen. Seven days later, on 5/4/24, the patient overdosed on fentanyl and was sent to the hospital. Upon his return, he reported to the mental health professional that he used the fentanyl because he felt so bad from withdrawing and just wanted to feel better. A provider did not start MAT until 5/6/24, nine days after he arrived at the jail.[75]

*Nurses attempt to verify medications.*
Intake nurses attempt to verify patient-reported medications; however, the process for medication verification is fragmented and often results in medications not being verified. Release of information forms (ROIs) are often obtained but not followed up on, leaving medications unreconciled, resulting in delay of treatment for serious medical and mental health conditions (VI. B.5). A contributing factor is discrepancy in staff practices due to the lack of a formal training program for newly hired nurses, and when policies and procedures are revised.

When patient's report, or nurses note previously prescribed essential medications, nurses order a medical or mental health provider essential medication review. Medical and mental health providers sometimes do not continue verified prescribed medications and do not consistently document the clinical rationale for not ordering or for changing the medication regimen. (VI. B.4). This is particularly true for patients with mental health disorders, who have had recent admissions to the jail. If a patient was discharged the month prior on psychotropic medications,

---

[75] Patient #33.

medical providers need to continue these medications until a mental health provider can assess the patient. When this does not happen, patients are not provided continuity of psychotropic medications, and submit health requests asking why their medications have not been continued.[76]

*Medical Observation Cells*

The County is revising policies regarding the use of medical observation cells which includes multi-person, safety, and segregation cells to monitor patients under the influence of drugs and alcohol that are a threat to their safety or the safety of others. The monitors have provided comments regarding the Medical Observation Cell policy to the County. The County also drafted a flowsheet to guide nursing staff to monitor and document 30-minute well-being checks. Once the policy is finalized, formal staff training will be necessary to ensure compliance with the policy.

Staff monitor patients who are under the influence of substances in a large multi-man cell adjacent to the nurses' station. A window with a direct line of sight into the cell is available to the nurse from an examination room. The County plans to assign a nurse to this post to accomplish the 30-minute checks. The medical observation cell is currently void of any bench, bed, or mattress, requiring patients to lie on a hard rubberized floor. Because patients placed in the medical observation unit are often unwell, we recommend the County provide patients a mattress to lie down on while patients are being monitored.[77] This was done during the site visit in another area of the jail when a medical provider evaluated a patient experiencing severe withdrawal. The patient was so ill that the provider requested that a mattress be brought into the examination room for the patient to lie down on while the provider evaluated the patient.

*Expediting care for patients needing further medical evaluation*

At the conclusion of medical screening, nurses make determinations about the patient's need for special housing or follow-up care that requires urgent intervention but does not meet the threshold for transferring the patient to the hospital. Such conditions include elevated blood pressure and blood sugar, wound care, intoxication, etc. The booking suite is not conducive to monitoring patients for any length of time and a system is needed to expedite transfer patients from booking to 2 Medical or 2 East to provide further treatment of their medical conditions. Establishing a system for escalation and expediting the booking process will also positively impact the flow of inmates and better control crowding in the booking suite.  SRNs in coordination with custody need to be actively involved in promoting flow of patients to medical units when needed. *Intake documents are not timely scanned into the medical record resulting in lack of timely access to clinical information.*

An issue is the inability to scan important medical information into the electronic health record at intake. Patients transferred from other jurisdictions with medical summaries such as county

---

[76] See Patient #10, second and third admission, Patient #11, Patient #22.

[77] The County reported that the idea of mattresses was explored but believes that use of mattresses would present a safety or slip risk, however it is unclear to the monitors why this would be the case. Patient's in safety cells are provided a mattress. We recommend that the County provide mattresses in medical observation as a therapeutic measure so patients do not have to lay on a hard surface while experiencing withdrawal.

jails and CDCR, or those arriving directly from an emergency department or a hospital with clinical reports and/or after-visit summaries, requires the nurse to summarize and manually enter sometimes critical information into the health record. While it is important to document information needed for continuity of care in the intake note, documents containing more detailed information need to be timely scanned and available to nurses, medical and mental health providers and other health care staff.

The monitors observed a patient being evaluated by a provider in a cell in 2M after being found on the floor. He had arrived at the jail the prior evening, and the nurse documented he had been taken to the hospital after suffering a head injury before his arrest. Because the hospital report had not been scanned into the health record, the providers had only the narrative documentation from the nurse noting that the emergency department had cleared him before arriving at the jail. It was unclear whether the hospital report had been requested or if it accompanied the patient upon arrival. The availability of a scanner in the booking area would facilitate scanning collateral documentation upon arrival making it available to health care staff treating the patient in subsequent encounters.

*Formal training is needed for health care and custody staff regarding medical screening and medical observation cell procedures*
The newly instituted changes have positively impacted the privacy issues in the booking area. However, there remains confusion, disorganization, and during times of heavy arrest traffic, chaos. The County policy and procedure are still pending, and "training" has covered the changes during County staff meetings. Security training is conducted annually, leaving newly hired and agency staff working without basic safety and security knowledge, which may affect their feeling safe in their environment. During the tour, custody leadership voiced their willingness to begin providing security training twice monthly, preferably in conjunction with orientation for new employees, which is a positive step.

While communicating changes during staff meetings is laudable, formal training predicated on policies and procedures, with documentation of completion for all staff is necessary. Current County training is limited to self-study documents. Adequate training for staff new to the carceral setting requires proctored training such that staff can ask questions, discuss potential situations and challenges, and practice taught skills. (VI. B.7).

**Compliance Assessment:**
- B.1=Substantial Compliance
- B.2=Partial Compliance
- B.3=Partial Compliance
- B.4=Partial Compliance
- B.5=Partial Compliance
- B.6=Partial Compliance
- B.7=Partial Compliance

**Recommendations:**

Intake Screening Process Flow

1.  Require the arresting officer to remain until completion of the Phase I receiving screening so that pertinent information and observation data are communicated directly to the nurse completing the screening.

2.  Require the arresting officer or designee to remain at the intake examination room window, in the line of the arrestee's site, to monitor the patient's behavior during Phase 1 and Phase 2 screening, and until the patient has been declared fit for confinement.

3.  Develop a system that organizes the patient queue within each acuity category so that nursing staff can identify who is next in line for screening.

4.  Nursing Supervisors and/or designees need to make sure that patients who need to be expedited for Phase 1 screening are timely seen (e.g., pregnant patient with triplets).[78]

5.  Develop a relief system so nursing screening posts are backfilled during the assigned nurse's breaks and lunch periods.

6.  Provide a scanner(s) in the booking suite to facilitate contemporaneous scanning of medical documents received with arriving patients.

7.  Develop a system to escalate and expedite the booking process and transfer of patients to the 2M medical unit with medical conditions that require care but do not reach the threshold of transfer to the hospital.

Intake Screening

8.  Finalize and publish policies and procedures related to intake screening and medical observation.  Consider adopting NCCHC standards nomenclature, Receiving Screening for the intake process.

9.  Develop staff training and orientation programs that provide proctored training, opportunities for questions, a review of potential situations, and a discussion of recommended steps the nurse should take.

10. Include security training for newly hired and existing staff at structured orientation programs.

11. Retrain nursing staff on the requirement to review previous jail admissions and medical records to identify medical, dental, and mental health conditions that require further care. Nurses should not check the box on the form indicating that previous records were reviewed unless the nurse actually performed the review.

12. Conduct QI studies to assess compliance with nurse review of previous medical records and whether nurses made appropriate referrals.

13. Monitor compliance with timely completion of medical and mental health referrals for patients with chronic illnesses, at risk for withdrawal from alcohol or drugs, needing

---

[78] Patient #16.

medication continuity, requiring medication-assisted treatment (MAT), serious mental illness, and disability related conditions.

14.  Providers need to continue verified medical and mental health medications until the patient can be seen by a medical and/or mental health provider. Providers need to document the clinical the rationale for not continuing patients' verified medication regimens.

15. Develop a tracking system for medication verification, including ROIs, to ensure that medications are timely ordered, and that there is follow up of patients for whom that previous medications cannot be verified.

## C. Access to Care

1. The County shall ensure that Health Service Requests (HSRs) are readily available to all prisoners, including those in segregation housing, from nurses and custody officers.

2. The County shall provide patients with a mechanism for submitting HSRs that does not require them to share confidential information with custody staff. The county shall install lockboxes or other secure physical or electronic mechanism for the submission of HSRs (as well as health care grievances) in every housing unit. Designated staff shall collect (if submitted physically) or review (if submitted electronically) HSRs at least two times per day in order to ensure that CHS receives critical health information in a timely manner. Designated health care staff shall also collect HSRs during pill call and go door to door in all restricted housing units at least once a day to collect HSRs. HSRs and health care grievances will be promptly date- and time stamped. The county may implement an accessible electronic solution for secure and confidential submission of HSRs and grievances.

3. The County shall establish clear time frames to respond to HSRs:

   a. All patients whose HSRs raise emergent concerns shall be seen by the RN immediately upon receipt of the HSR. For all others, a triage RN shall, within 24 hours of receipt of the form (for urgent concerns) or 72 hours of receipt of the form (for routine concerns).

      (i)    Conduct a brief face-to-face visit with the patient in a confidential clinical setting.

      (ii)   Take a full set of vital signs, if appropriate.

      (iii)  Conduct a physical exam, if appropriate.

      (iv)   Assign a triage level for a provider appointment of emergent, urgent, routine or written response only.

      (v)    Inform the patient of his or her triage level and response time frames.

      (vi)   Provide over-the-counter medications pursuant to protocols; and

      (vii)  Consult with providers regarding patient care pursuant to protocols, as appropriate.

   b. If the triage nurse determines that the patient should be seen by a provider:

      (i)    Patients with emergent conditions shall be treated or sent out for emergency treatment immediately.

      (ii)   Patients with urgent conditions shall be seen within 24 hours of the RN face-to-face; and

      (iii)  Patients with only routine concerns shall be seen within two weeks of the RN face-to-face.

   c. Patients whose requests do not require formal clinical assessment or intervention shall be issued a written response, with steps taken to ensure effective communication, within two weeks of receipt of the form.

   d. The County shall permit patients, including those that are illiterate, non-English speaking, or otherwise unable to submit verbal or electronic HSR's to verbally request care. Such verbal requests shall immediately be documented by the staff member who receives the request on an appropriate form and transmitted to a qualified

> medical professional for response in the same priority as those HSRs received in writing.
>
> 4. The County shall designate and make available custody escorts for medical staff in order to facilitate timely and confidential clinical contacts or treatment-related events.
> 5. The County shall track and regularly review response times to ensure that the above timelines are met.
> 6. The County shall discontinue its policy of prohibiting patients from reporting or inquiring about multiple medical needs in the same appointment.
> 7. When a patient refuses a medical evaluation or appointment, such refusal will not indicate a waiver of subsequent health care.
>     a. When a patient refuses a service that was ordered by medical staff based on an identified clinical need, medical staff will follow-up to ensure that the patient understands any adverse health consequences and to address individual issues that caused the patient to refuse a service.
>     b. Any such refusal will be documented by medical staff and must include: (1) a description of the nature of the service being refused, (2) confirmation that the patient was made aware of and understands any adverse health consequences by medical staff, and (3) the signature of the patient, and (4) the signature of the medical staff. In the event the signature of the patient is not possible, the staff will document the circumstances.

**Findings:** There continues to be significant delays in patients' access to care, resulting in preventable pain and suffering due to lack of timely diagnosis and treatment. This is due to flaws in the access to care process.  Findings include:

- Health services request (HSR) forms are available in the housing units.  The forms are also available from health and custody staff; however, at RCCC, patients reported that the "House Man" reviews the completed health service request and grievance forms to ensure they are complete (VI. C.1).[79]

- HSRs are collected twice daily and are accepted during medication administration times, including those inmates housed in segregation cells with limited out-of-cell time. The HSRs are date and time-stamped; however, an audit showed that 37% of date stamps on medical HSRs were illegible, so that timeliness of nurse triage from the time of receipt cannot be measured. (VI. C.2).

---

[79] This process was identified during the last site visit.  SSO sent a division-wide email outlining a policy to prohibit inmates from exerting control of other inmates, increased custody supervision of housing pods, installed HSR collection boxes in all housing units, and posted educational posters for inmates.  During this tour, Custody leadership reported that a list of inmates found to be exerting control is kept, and those individuals are prohibited from being selected as "House Men." Nonetheless, the practice of controlling the submission of HSRs continues at RCCC.

- At RCCC, health care grievances were not collected, date and time stamped, and placed into the health care grievance response system, *resulting in hundreds of health care grievances going unanswered for up to six months or longer* (VI. C.2).
- Nurses do not see patients submitting HSRs in accordance with Consent Decree timeframes, often fail to conduct the encounter in a clinical setting, and perform inadequate assessments that do not comply with the approved Standardized Nursing Procedure (SNP) (VI. C.3.a).
- Review of medical records and County data demonstrates that medical providers do not see patients referred to them in a timely manner, resulting in significant provider backlogs (VI. C.3.b).
- Communication with patients who do not require a clinical assessment is sent through the jail mail system, and does not assure that the patient will receive the written response (VI.C.3.c).
- Interpretation services are available but are not consistently used and documented. (VI. C.3.d)
- Although the number of custody escorts has increased, some days there are as few as 2-4[80] escorts which does not ensure timely access to care (VI. C.4).
- The County has not developed a comprehensive tracking system for HSRs and health care grievances that ensures all requests are received, tracked, and timely responded to (VI. C.5).
- The County discontinued the policy of prohibiting patients from making multiple requests during the same HSR; however, because there is no comprehensive tracking system, monitoring whether the patient was timely responded to by each applicable discipline, e.g., medical, dental, and mental health, and duplicate complaints, is not possible. (VI. C.6).
- Patients are frequently documented as refusing based on reports from security or "refused to come out of cell" without health staff attempting to determine the validity of the reported refusal, investigate the cause of the refusal, encourage the patient to accept care, or educate and counsel the patient. This issue was identified in previous reports; however, staff continues this unacceptable practice, which has resulted in adverse patient outcomes, including hospitalizations (VI. C.7.a and VI. C.7.b).

The current access to care and nursing sick call process is not compliant with PP-Adult-ACH 01-12, Access to Care, and consistently results in delays in care. A comprehensive tracking system has not been implemented to ensure timely response to HSRs, and results in significant delays in access to care. *These delays cause harm to patients, including unnecessary pain and suffering.* The chronic delays also result in patients writing multiple health services requests for the same issue, often on the same day.  In addition to those noted above, other process flaws include:

---

[80] Main Jail Custody Medical Escorts: 9/30/24 to 10/4/24, 7/29/24-8/2/24, 7/22/24 to 7/26.

- Lack of timely scanning or transcribing of the health service request into the health record when received. In a QI audit, the average time to scan HSRs into the EHR for medical and mental health HSRs was 7.75 days.
- Delays in transcription of the health service request into the health record, often beyond the time allowed by policy timeframes secondary to acuity, e.g. 24 hours and 48 hours. [81]
- Lack of, or inaccurate dating and time stamping of HSRs upon receipt.
- Lack of documentation of the date and time the nursing triage was completed.
- Incomplete nursing signatures and credentials or initials only. The County reported to the monitors that some nurses do not want to include complete signatures so patients do not know their names because of perceived safety issues. However, for medical-legal purposes, all staff need to legibly document their full names and credentials on documents in the health record. We recommend name stamps with credentials.
- Untimely completion of nursing sick call encounters as required by patient acuity and policy with some patients never being evaluated by a nurse.
- Failure to monitor and track ordered diagnostics to ensure timely completion, e.g., urgent x-rays.

The County needs to implement a comprehensive tracking system for health service requests that ensures timely response, timely completion of nursing sick call encounters, timely completion of referrals to providers, and timely completion of all ordered treatment, including diagnostic testing. When services are timely and reliable, inmates trust the system and do not feel the need to write multiple requests for the same complaint, which further burdens a dysfunctional system. The current nursing sick call list contains nursing encounters not related to health service requests. Such encounters include wellness checks for patients on safety precautions,[82] treatments, and ongoing monitoring (e.g., blood pressure checks). Consider separating nursing tasks from the HSR tracking system.

The following 3 cases exemplify problems described above and are described in detail to appreciate delays in access to care. *The first case is an egregious example of lack of timely access to care for an arm injury and the patient's continued efforts to obtain information about x-rays that showed his arm was fractured. The patient's care is summarized below followed by a detailed chronology of his care.*

*Patient #27: This 32-year-old male arrived at the jail on 8/15/24. Despite the patient submitting multiple including duplicate HSRs this patient did not receive timely information and access to care for his fractured wrist. Despite nurses' timely collection and triaging of the patient's HSRs, a medical provider did not timely see the patient and ordered x-rays were not timely completed.*

---

[81] If HSRs were timely scanned into the EHR, this step would not be necessary. It is not an optimal use of staff time.
[82] Nurses have been required to conduct wellness checks for patients on safety precautions, however because behavioral health sees these patients daily, this is not optimal use of nursing staff. The monitors recommended that this practice be discontinued, which the County has done.

*The patient was initially booked into the jail on 8/15/24 and released on 8/24/24. During this first admission a deputy reported to a nurse that the patient believed he fractured his wrist, but the nurse did not see the patient.  The next day a nurse documented that the patient refused an appointment but it is unclear whether she spoke to the patient or accepted the refusal from a deputy. A provider remotely ordered x-rays but they were delayed because the patient transferred to RCCC.  Following the x-rays the patient continued to complain of pain and sought the results of his x-rays, which were read as normal. On 8/24/24 he was released prior to learning the results of his x-ray or being seen by a medical provider.*

*On 8/28/24 the patient was rebooked into the jail and submitted 6 HSRs regarding wrist and arm pain before a medical provider saw the patient 21 days arrival. On 9/25/24 wrist and arm x-rays showed a scaphoid fracture and flexion deformity of his 5th digit. On 10/4/24, the on-site orthopedist saw the patent, but did not document the range of treatment options for the patient, including surgery for a displaced fracture, but focused solely on the adverse outcomes of the displaced middle third of the navicular (scaphoid) bone. The orthopedist requested follow-up in six weeks, but as of 11/25/24, this had not taken place. We have concerns as to whether the on-site orthopedists care meets the standard of care.[83]  We referred this case to the County for follow-up but did not receive a response. This case was notable for the patient submitting multiple HSRs in an effort to receive care, and even though nurses timely triaged the HSRs, it did not result in timely care for the patient because he was not timely seen by a medical provider.  The patient's chronology of care is noted below.*

**Patient #27:** A 32-year-old male arrived at the jail on 8/15/24. On 8/17/24, a deputy called the nurse, reporting that the patient believed he had broken his arm. The nurse told the deputy that the patient would be placed on the sick call list but that if his symptoms worsened, he should call again.

*Note: The RN should have seen the patient immediately for a report of possible arm fracture.*

On 8/18/24, the nurse documented that the patient refused, with the nurse writing, "Pt. called out for NSC, but refused to be seen at this time. No reason given. Will keep appointment open to try again at a later time."

*Note: It is unclear whether the reported refusal was to a deputy or directly to the nurse.*

On 8/19/24 at 14:43, the patient walked into the medical unit complaining of left wrist pain. He reported falling from his bike four days before his arrest. The nurse contacted the provider and an x-ray of the left wrist was ordered. However, on 8/20/24, at 13:21 the patient transferred from Main Jail to RCCC before the x-ray was completed. A RCCC nurse ordered the x-ray 24 hours after a Main Jail provider ordered the x-ray.

---

[83] There have been several cases in the on-site orthopedist has not provided timely care, and the patients experienced adverse outcomes such as non-union of fractures, deformity and loss of function. We recommend that the County take measures to evaluate the quality of care provided by the orthopedist.

On 8/21/24, a radiology technician notified the provider that the patient's forearm was also swollen, and an x-ray of the forearm was ordered. On 8/22/24, a provider reviewed the x-ray results noting that there was no evidence of a fracture or dislocation of the forearm and left wrist.[84]

On 8/23/24, the patient wrote  another HSR: "I had an x-ray 2 days ago downtown. I would like to know the results." On 8/23/24 at 15:58, the HSR was received and a RN triaged as routine. On 8/24/24 at 17:12, the patient was released from custody.

Four days later, on 8/28/24, the patient was rebooked into Main Jail. On 8/31/24, he submitted a HSR (#1) writing, "I had an x-ray on my wrist and forearm a few weeks ago. I would like to know the results." An unidentified staff member wrote on the bottom of the form, "Print Handout- Results normal, no evidence of fracture or dislocation." On 9/1/24 at 01:02, a CNA transcribed the HSR into the health record, and printed a notification to the patient that the x-rays were normal, and placed it in the jail mail system for delivery to the patient.

*Note: Placing notification of test results in the jail mail system does not assure that the patient received the information. This patient transferred to RCCC 3 days later without being notified of his x-ray result. Health care staff need to deliver the information to patients.*

On 9/4/24, the patient was transferred to RCCC and submitted another HSR (#2) writing, "My wrist hurts really bad." I had an x-ray a few weeks ago, but they never told me the results." On 9/10/24 at 20:49, the HSR was received. On 9/11/24 at an undocumented time, a nurse triaged the HSR as routine and a CNA transcribed it into the health record.

On 9/11/24, the patient submitted another HSR (3#), writing, "I think I broke my wrist." On 9/11/24 at 21:25, the HSR was received. On 9/11/24 at an undocumented time, a nurse triaged the HSR as routine. The HSR was transcribed to the health record on 9/12/24 at 00:00.

The next day, on 9/12/24, the patient wrote another HSR (#4), writing, "I think I broke or fractured my wrist. I need to see a doctor."  On 9/12/24 at 03:55, the HSR was received, and at 11:54, a nurse triaged the HSR as urgent. Also, on 9/12/24, the patient submitted a request on a Corrections Services Message Request (#5) writing, "I think I broke or fractured my wrist; it is swollen. I need to see a doctor." The HSR was transcribed to the health record on 9/12/24 at 11:52.   An unidentified staff person wrote on the bottom of the form, "NSC urgent. 9/24/24 (sic)."

On 9/12/24 at 11:40, the nurse in the medical unit saw the patient. He reported a bike injury and jamming his wrist before being arrested the first time and denied reinjuring it after he was released. He complained of swelling and significant pain. The nurse documented that his left wrist

---

[84] Was this x-ray overread by a radiologist, and if so, when was this done?

was slightly larger than the right, and range of motion was painful. The nurse ordered full range of motion, Naprosyn, and a provider appointment.

On 9/14/24, a nurse saw the patient in the lobby of the medical unit. The nurse advised him that he had a scheduled provider appointment and his x-ray results were pending.

On 9/16/24, the patient submitted another health service request (#6), writing, "My left wrist still hurts. I think it's fractured or broken. In a lot of pain." On 9/17/24 at 08:04, the HSR was received and triaged at an undocumented time with a routine disposition. On 9/17/24 at 10:28, a nurse saw the patient in nursing sick call He rated his pain as the worst possible. The nurse documented the wrist was tender when pressure was applied. The patient requested a wrist brace and reported that he believed his wrist was broken. The nurse informed him that his x-rays were normal and showed no fracture. The nurse also told the patient that the provider would need to order a wrist brace and that even if one were ordered, "it would take time to receive it." The nurse informed the patient he would try to get his appointment with the provider moved forward.

On 9/18/24 at 10:30, a medical provider evaluated the patient. Repeat x-rays and a follow-up appointment in one week were ordered. The provider requested the x-rays be obtained urgently.

*Note: This provider visit took place 21 days after arrival and following at least 6 HSR requests. The x-rays were order on 9/18/24 but not completed until 9/24/24.*

On 9/21/24, the patient submitted another health services request (#7), writing, "I think I broke my wrist or fractured it. In a lot of pain. Need to see a doctor." On 9/21/24 at 20:34, the HSR was received, and it was triaged on 9/22/24, at an undocumented time. The HSR was transcribed into the health record on 9/22/24 at 02:19.

On 9/21/24, the patient wrote another health services request (#8), writing, "I think I broke or fractured my wrist. In a lot of pain. Please help." On 9/22/24 at 09:05, the HSR was received and was triaged as routine. "Duplicate" was written on the bottom of the form. On 9/22/24 at 04:47, The HSR was transcribed into the health record.

On 9/22/24, the patient again submitted a health services request (#9), writing, "I think I broke or fractured my wrist. In a lot of pain. Please help." The HSR was received on 9/22/24 at 21:11 but not triaged. A nurse wrote "Appointment pending" on the bottom of the form. An SRN signed the HSR on 9/23/24.

On 9/24/22, the patient authored another health services request (#10), writing, 'I think I broke or fractured my wrist. In a lot of pain. Please help." The HSR was received on 9/24/22 at 09:15 and 30 minutes later, a nurse triaged it as urgent. A nurse wrote "Duplicate HSR" at the bottom of the form. This was at least the tenth written request the patient had made in an effort to receive care.

On 9/24/24 at 12:35, the patient was seen in nursing sick call. The nurse documented that the patient had already been seen by a nurse and a provider. X-rays and a follow-up appointment were pending. The patient's wrist was rewrapped with Coban. The nurse educated the patient on the importance of not missing a pending appointment. There was no prior documentation indicating an order was received to wrap the patient's wrist, nor that it had previously been wrapped. The nurse noted that the x-rays were ordered urgently six days prior. The x-rays were completed the same day.

On 9/25/24 at 06:44, an x-ray report was reviewed by the physician. The x-rays were compared to the prior x-rays and now showed a faint lucency about the scaphoid waist, which was not previously seen. A subtle scaphoid fracture should be considered, and scaphoid views were recommended.

On 9/25/24, the patient submitted another HSR (#11), writing, "I would like to know the results of my x-ray that I got on 9/24/24. Still in a lot of pain. Please help." The request was received on 9/25/24 at 20:39. The HSR was transcribed into the health record on 9/26/24 at 01:10.

On 9/28/24 at 09:36, a provider saw the patient. Repeat x-rays with scaphoid views were ordered. A call to the ortho tech was made to place the patient in an L thumb spica or volar wrist splint. An urgent orthopedic referral and an appointment for follow-up in 2 weeks were ordered. The left short arm thumb spica splint was applied at 12:15. On 9/27/24, case management received the specialty referral and the patient was scheduled to see the on-site orthopedist on 10/4/24.

On 9/30/24, the patient submitted another health services request (#12), writing, "I have a splint for my left wrist. Doctor said he would call me for a check-up. I was wondering when that would be?" On 9/30/24 at 10:50, the HSR was received and triaged as routine at an undocumented time. The HSR was transcribed to the health record on 9/30/24 at 23:57.

On 10/2/24, the patient was seen in nursing sick call and was advised he had a pending appointment with the provider and the orthopedic specialist.

On 10/3/24, the provider reviewed the x-ray results. Findings included a faint lucency noted about the scaphoid waist, most consistent with a fracture. *Flexion deformity of the 5th digit was also demonstrated.*

On 10/4/24, the onsite orthopedist saw the patient. The clinical exam and x-rays were reviewed with the patient. The diagnosis was a displaced fracture of the middle third of the navicular (scaphoid) bone. The orthopedist discussed the anatomy of the scaphoid bone and the high risk of nonunion and avascular necrosis with the fracture with the patient. A thumb spica short arm splint was applied, and the patient was educated to keep the wrist elevated. The specialist discussed possible sequelae of his injury, including the loss of reduction, malunion, nonunion, avascular necrosis, posttraumatic arthritis, persistent wrist pain, swelling, stiffness, weakness,

and other dysfunctions in the future. A follow-up in six weeks was needed for a repeat exam, and x-rays were ordered.

On 10/10/24, a provider saw the patient who reviewed the orthopedist's findings, recommendations, and prognosis with the patient. Coban was applied around the splint, and an order for weekly wound care and rewrapping was given.  Follow-up in six weeks after the ortho follow-up was also ordered.

On 10/14/24 at 02:49, a health services request (#13) was transcribed into the health record stating, "I have a splint on my left wrist. I need to see a doctor because there is a whole new spot on my wrist that hurts." The HSR was documented as received on 10/14/21 at 02:51. The HSR was not found nor scanned to the health record. The patient was not seen in nursing sick call to address this health services request.

On 10/15/24, a nurse saw the patient to address the health services request he authored on 9/30/24 and triaged as routine, requesting his follow-up appointment with the provider. The nurse advised him he was already scheduled for follow-up.  This nursing encounter should have been completed within 48 hours of receipt, or 10/2/24.  *This patient has not received timely and appropriate care.*

The next two cases show system issues with the access to care process.

**Patient #30:** A 30-year-old female patient submitted a health services request (HSR) on 8/25/24, complaining of an ear infection and asking for immediate help. The request was erroneously dated, and time stamped as 1/1/2000 at 00:00 because the document time stamp machine required ink replacement and recalibration.  On 8/29/24, the HSR was triaged as urgent, time not documented, which by policy requires the nurse to see the patient within 24 hours. The HSR information was not transcribed into the health record until 8/31/24 at 05:34, two days after the nurse had triaged it.  The nurse did not see the patient until 9/1/24, seven days after the HSR was written and three days after the patient's condition was triaged as urgent.  The nurse referred the patient to the provider, who saw the patient the same day and treated her for an ear infection.  The HSR was not scanned into the health record until 9/10/24 at 13:24, 16 days after it was written.

On 8/30/24, prior to being seen for the first HSR, the patient wrote an HSR complaining of an ear infection, stating, "Please help!!". The HSR was not dated or time-stamped, nor was it triaged. On 8/31/24, "Duplicate HSR 1950" was written on the form, which was illegibly initialed by staff. This HSR was not scanned into the health record until 9/10/24 at 10:36, 11 days after it was written.

On 9/5/24, the patient submitted a health services request, writing, "Check if I have a hernia because it hurts in my stomach." On 9/6/24 at 03:49, a CNA transcribed the request into the health record documenting that it was received and triaged as routine on 9/5/24 at 10:58.  On 9/16/24 at 16:10, the HSR was scanned into the health record, 11 days after it was received.

On 9/5/24, the patient wrote a second HSR writing, "I need to check if I have a hernia. It hurts." On 9/5/24 at 10:59, the HSR was date and time stamped as received, but a nurse did not triage the HSR.  "Duplicate 2110" was documented at the bottom of the form. On 9/16/24 at 16:11, the form was scanned into the health record, 11 days after receiving it.

On 9/7/24 at 03:32, the nurse saw the patient for the two HSRs in the indoor recreation area. The nurse documented that the patient described having hemorrhoids and that she educated her on the difference between hemorrhoids and a hernia. The nurse documented that the patient then stated she does not have any matching symptoms (sic) and she also does not have pain anymore. There was no physical examination completed, nor was the standardized nursing procedure for abdominal pain or hemorrhoids used.

On 9/9/24, the patient submitted another HSR complaining of ear pain "in the other ear." On 9/8/24 at 08:05 the HSR was received and a nurse triaged the HSR as routine later that day, but the time was not documented. The HSR information was transcribed into the health record on 9/9/24 at 11:29 and scanned into the health record on 9/17/24, 8 days after receiving it.  A nurse did not see the patient for this complaint.

On 9/12/24, the patient submitted another HSR, writing, "I feel light-headed every time I get up." On 9/12/24 at 19:05, the HSR was received. Later that day at an undocumented time, a nurse triaged the patient's complaint as urgent. The HSR information was transcribed into the health record on 9/13/24 at 02:05. A nurse needed to see the patient in 24 hours, but this did not occur.

On 9/15/24 at 11:30, three days after the patient submitted the HSR, a nurse saw the patient in nursing sick call.

The nurse did not use a standardized nursing procedure for the encounter. The nurse documented that her vital signs were "non-remarkable."  Two cups of electrolytes were provided to the patient, and she was educated to drink more fluids and get up slowly.  The HSR was not scanned into the health record until 9/19/24 at 14:44, 7 days after receiving it.

**Patient #28:** A 34-year-old patient arrived at the jail on 8/24/24 and submitted a health service request on 8/29/24, writing, "I broke my right arm." The HSR was incorrectly dated and time stamped as 1/1/00 at 12:00 because the machine required recalibration. On 8/29/24 at an unknown time, a nurse triaged the HSR as urgent. On 8/31/24 at 04:24, A CNA transcribed the contents of the HSR into the medical record. The patient was not seen within 24 hours of the triage as required by policy. On 8/31/24 at 11:15 pm, a nurse saw the patient "outside the control area." The patient reported slipping and falling in his cell two days prior. The nurse documented the patient's right forearm was "a little swollen, no bruises, no redness, no stiffness, with pain rate 4/10." The plan was to order Naprosyn for the patient and to follow-up in 7 days. The standardized nursing procedure for traumatic musculoskeletal conditions, which involves pain because of trauma, e.g., falls, requires notification of the provider, even for muscle strain/sprain.

The nurse failed to notify the provider. The follow-up encounter did not occur, and the patient was released on 9/17/24.[85]

**Health Care Grievances**

The health care grievance system is dysfunctional at every step of the process. The County has not established a system that ensures that inmates' grievances are tracked, reviewed, and responded to in a timely and appropriate manner.

Patients submit health grievances by placing them in locked boxes in the housing units or handing them directly to a nurse.  At RCCC, inmates interviewed by the monitors reported giving their written grievances to the "House Man" for submission. They explained that the "House Man" reviews the grievance for "completeness," *which is not a credible reason.* As noted in the last report, inmates report that the House Man is looking for snitches, thereby exerting control over inmates' access to health care and grievances.  It is a grave violation of patient privacy. Although SSO leadership immediately addressed the problem at the previous site visit, the practice apparently continues. This is a violation of patient privacy, unacceptable, and must be immediately stopped.  Inmates should be prohibited from handling grievances or health requests authored by other inmates.[86]

A registered nurse is the minimum credential needed to investigate and respond to health grievances. This includes review of the grievance and the medical record, interview of staff as appropriate, and interview the patient to gain further insight and clarify what would resolve the patient's concerns. When the complaint investigation confirms a problem, the grievance is founded. The County needs to address all founded grievances to resolve both the patient-specific concern and/or systemic issues. If grievances are founded due to systemic concerns, the County needs to correct this issue, even if the patient has been released.

Grievance data is an essential component of measuring the effectiveness of a health services program, and this requires an effective tracking system. Review and reporting of founded versus unfounded grievances should be done monthly as part of the overarching quality improvement program. However, the County currently lacks a comprehensive grievance tracking system that ensures timely and appropriate responses. The grievances are collected and medical grievances are assigned to a SRN for review and response. Dental and mental health grievances are distributed to the appropriate discipline for response. Once the response is completed, the grievance is sent to the ACH QI department, where it is placed on a log and scanned into an electronic file.

---

[85] On 11/7/24, the patient was readmitted to the jail. He was diagnosed with grave disability and fentanyl use. The nurse referred the patient for opioid withdrawal monitoring. During a previous admission the patient gave a history of asthma and trigeminal neuralgia.  As of 11/25/24, a medical provider has not seen the patient.

[86] The monitors reported this information to RCCC during the site visit. Independent of the issue of inmate "house man" handling other inmates health request and grievance forms, the County needs to ensure that inmate house men have any authority over other inmates.

The monitors interviewed several inmates who complained that their grievances were not answered promptly, reporting that it sometimes takes up to six months to receive a response. They also reported that sometimes grievances are not answered at all.  Two inmates provided copies of their submitted grievances, some of which had been answered six months after it was written and others pending a response. Our findings confirm the credibility of these reports by inmates.

The County was transparent regarding the challenges the leadership team had recently experienced.  *The team reported finding hundreds of unanswered grievances in both jails' drawers and other obscure areas, dated many months prior.* At RCCC, a nursing assistant collects the grievances and gives them to the SRN on duty, who is responsible for answering them and sending them to the QI department. At the Main Jail, a medical assistant accepts and responds to the grievances with the Senior Health Manager "signing off" on them before sending them to the QI department. The current practice leaves multiple opportunities for untimely and inappropriate responses, and because the grievances are not immediately logged into a tracking system, likely contributes to loss and diversion of patient grievances.

The monitors were shown a spreadsheet of grievances that included the date of submission, the date assigned to the SRN, and the date completed.  A review of the log found that the answered grievances provided by the inmates to the monitors were not listed on the spreadsheet. The monitors randomly selected grievances from the log and requested QI staff to provide the grievances and responses to us for review. The staff could not locate the requested grievances selected from the log and those provided by the interviewed inmates. Thus, *the current grievance system and oversight is deeply flawed and requires complete revamping.*

Another problem is how grievance responses are categorized: resolved or unresolved, and how each grievance is responded to. For example, if a patient files a grievance that his chronic disease medication orders lapsed, causing the patient to miss medication doses, staff investigates the complaint. If found to be true, staff notifies a provider to renew the medications, and determines the grievance to be "resolved," requiring no further action to investigate why the patient's medication orders lapsed, and whether it was an isolated or systemic issue. This defeats a primary purpose of a grievance system.

The grievance system needs to include two categories: whether a grievance is founded or unfounded, and whether the patient's grievance is resolved or unresolved.  If the grievance was founded, the County needs to address the patient's specific concern and identify whether there is a system or individual performance issue that needs to be addressed. *Founded grievances always need an action plan to address the reason, regardless of whether it was resolved or unresolved.* All grievances need to be included on the tracking log, independent of whether it was founded or unfounded; resolved or unresolved, or withdrawn. [87]

---

[87] The County reports it has updated the grievance form to include whether the grievance was founded/unfounded. However in May 2024 staff were responding to grievances submitted in 2021 and did not document whether the grievance was founded or unfounded.  See grievance number 24/7-30 (5079984).

*The County is ultimately responsible to provide adequate health care to the jail population. To provide accountability for the grievance process, the County needs to centralize tracking and response to all medical, dental, and mental health grievances.*

Health grievance forms must be dated, time-stamped upon receipt, and immediately entered on a centralized log. Once logged, they should be assigned to the appropriate discipline leader, such as the Nursing Supervisor, Dental Director, or Mental Health Director, with the date of assignment recorded by the grievance coordinator. Timelines for grievance response needs to be included in policy and monitored by the QI coordinator or designee. Clinical complaints may require the participation of the Medical, Dental, or Mental Health Directors in the investigative process and authoring of a response.

Once the response is completed, it should be routed directly to the patient by assigned health staff, and the date the patient received the response recorded on the log. In some cases, meeting with the patient may be warranted.

Positively, the County has established a grievance coordinator position to oversee the entire process. Responsibilities of this position would include:
- Creating a unified health grievance tracking system that includes medical, dental and mental health;
- Ensuring timely, accurate, and appropriately written responses to the patient;
- Timely scanning and maintenance of the grievance forms:
- Summarizing the data, identifying trends, and monitoring any corrective action required to mitigate identified individual and systemic problems.[88]

**Compliance Assessment:**
- C.1=Substantial Compliance
- C.2=Partial Compliance
- C.3.a=Noncompliance
- C.3.b=Noncompliance
- C.3.c=Partial Compliance
- C.3.d=Partial Compliance
- C.4=Partial Compliance
- C.5=Noncompliance
- C.6=Substantial Compliance
- C.7.a=Noncompliance
- C.7.b=Noncompliance

---

[88] The County has identified a candidate and is in the process of filling the position.

**Recommendations:**

1. The County needs to reinforce the policy prohibiting inmates from handling other inmates' health services requests and grievance forms, and monitor how HSRs are handled in housing units to make sure it does not continue. [89]

2. The County needs to develop comprehensive logs that track each step of the health service request and grievance process to ensure timely responses and avoid loss or diversion of forms.

3. The health services request log should be reconciled at the end of each shift, with uncompleted encounters prioritized at the beginning of the next shift.

4. Upon receipt, Health Service Requests should be scanned into the patient's record in the EHR.

5. The date and time of the nursing triage should be contemporaneously documented.

6. Nurses need to document complete and legible signatures, or use name stamps and initial the document.

7. Nursing sick call encounters should be conducted in a clinical setting.

8. Nurses should be required to follow the approved standardized nursing procedures and document the completion of each component of assessment needed.

9. The County needs to eliminate provider backlogs and ensure that patients are seen by medical providers in compliance with Consent Decree time frames.

10. The County should staff sufficient custody escorts to ensure timely access to all clinical encounters.

11. Nurses, medical and dental providers should verify that patient's refuse appointments or care by observing and speaking with the patient, encouraging patient compliance, and obtaining an informed signed refusal.

12. Health care staff need to monitor whether laboratory or diagnostic testing is timely performed and reports reviewed.

13. Health care staff should deliver normal diagnostic test results, reports, and grievance responses *directly to the patient* and not send them through the jail's inmate mail system.

14. Nursing staff should cease educating patients to expect delays in being seen by providers and receiving ordered medical testing, treatments, and supplies.

---

[89] The County reports that it is in the process of updating the Inmate Handbook.

### D. Chronic Care

1. Within three months of the date the Remedial plan is issued by the Court, the County shall, in consultation with Plaintiffs' counsel, develop and implement a chronic disease management program that is consistent with national clinical practice guidelines. The chronic disease program will include procedure for the identification and monitoring of such patients and the establishment and implementation of individualized treatment plans consistent with national clinical practice guidelines.

    a. The chronic disease management program shall ensure that patients with chronic illness shall be identified and seen after intake based upon acuity (on the day of arrival for patients with high acuity and not to exceed 30 days for all others). The County will timely provide clinically indicated diagnostic testing and treatment, including prior to this post-intake appointment. Follow-up appointments will be provided in intervals that do not exceed 90 days unless patients are clinically stable on at least two consecutive encounters, in which case, follow-up appointment intervals will not exceed 365 days (and sooner if clinically indicated), subject to a chart review every 6 months.

    b. The chronic disease management program shall ensure patients are screened for hepatitis C at intake. If medical staff recommend Hepatitis testing based upon screening results, such testing shall be offered on an "opt-out" basis for those individuals who remain in custody long enough to receive a housing assignment. If the patient declines testing the refusal shall be documented in the health record. Patients found to have hepatitis C shall be offered immunizations against hepatitis A and B.

    c. The chronic disease management program shall include a comprehensive diabetic management program consistent with the American Diabetes Association (ADA) Diabetes Management in Correctional Institutions. The protocol shall be developed in coordination with custody administration to address normal circadian rhythms, food consumption times and insulin dosing times.

    d. The chronic disease management program shall ensure that patients who take medications for their chronic conditions shall have the medications automatically renewed unless the provider determines that it is necessary to see the patient before renewing the medication. In that case, the patient shall be scheduled to be seen in a reasonable time period to ensure medication continuity.

2. The County shall track compliance with the chronic disease management program requirements for timely provision of appointments, procedures, and medications. The County shall ensure that its electronic medical record system is adequate to support these critical functions.

3. The County shall review its infection control policies and procedures for dialysis treatment to ensure that appropriate precautions are taken to minimize the risk of transmission of blood-borne pathogens, given the proximity of HCV+ and HCV- patients receiving dialysis in the same room.

**Findings:** The County has not established a chronic disease program that provides patients with timely and appropriate care that meets national clinical practice guidelines and the requirements of the Consent Decree (VI. D.1). Key elements of an effective chronic disease program in the correctional setting are establishment a functional patient tracking system and adoption and implementation of nationally recognized treatment guidelines.

The County has not developed an electronic or manual chronic disease tracking system that ensures that all patients with chronic diseases have been identified and are being monitored. (VI. D.5). The current electronic health record (EHR) does not have the capability to produce a tracking system. The County intended to rely on the acquisition of a new EHR to develop such a tracking system, but this has been deferred until health care processes at the jail have been established.[90]

The County reports that there is a "chronic conditions report" that has been developed and is available to staff. It includes diagnoses, degree of control, last provider visit details, recent lab reports, and future appointment dates. We were provided an excel spreadsheet for chronic disease encounters that includes patient appointment dates, responsible providers, and patient location. It does not include types of chronic diseases for every patient, lab results, patient disease control, and future visits. We note that many providers schedule sick call encounters to follow patients for their chronic diseases, instead of ordering chronic disease follow-up appointments. This tracking system does not assure that all patients with chronic diseases are captured. The lack of a reliable system has resulted in patients not being timely seen, and some patients are lost to follow-up. *The County can no longer defer the development of a reliable chronic disease tracking system pending the arrival of a new EHR.*

Medical providers evaluate patients with chronic disease management using electronic health record templates (e.g., asthma) to prompt the provider to conduct evaluations consistent with chronic disease treatment guidelines. This includes a review of systems, pertinent physical

---

[90] In addition to common chronic diseases, such as diabetes and asthma, the County needs to identify patients with other chronic diseases such as:
1. Cardiovascular (hypertension, coronary artery disease, aortic or mitral valve disease and heart failure)
2. Pulmonary (asthma, chronic obstructive pulmonary disease (COPD), and pulmonary fibrosis)
3. Endocrine disease (hyper- and hypothyroidism, etc.)
4. Infectious diseases (HIV, syphilis, hepatitis B and C, latent TB infection, active tuberculosis.
5. Autoimmune diseases (type 1 diabetes, systemic lupus erythematosus (SLE), rheumatoid arthritis, Crohn's disease, and ulcerative colitis, celiac.
6. Chronic kidney disease, including patients on dialysis.
7. Gastroenterology (irritable bowel syndrome (IBS), GERD, peptic ulcer disease)
8. Neurological (seizure disorder, Parkinson's, and other neurodegenerative diseases)
9. Obstetrical/Gynecological (current or recent pregnancy, history of abnormal pap smear and mammograms, endometriosis, menopause).
10. Cancers (lung, GI, colon, breast, cervical and uterine, leukemia).
11. Dermatological (psoriasis, eczema, rosacea)
12. Substance use disorders (alcohol, benzodiazepines, opioids, methamphetamine)
13. Other (fibromyalgia)

examination, and labs that support the providers assessment of the patient's disease control. Record review shows that many providers document thorough patient assessments and appropriate care plans that meet current guidelines. However, record review also shows that some evaluations are incomplete, assessments of disease control are inaccurate, and follow-up intervals are not in accordance with recognized guidelines and the Consent Decree. This results in lack of timely follow-up for patients whose chronic diseases are not at goal. The adoption, training, and implementation of chronic disease guidelines would bring more consistency to the quality of medical care provided to patients.

Providers usually, but do not always, document medical conditions on the patient's Problem List.[91] In some cases, providers remove *well established* diagnoses from the Problem List without clinical justification. In one case, the patient gave a history of hypertension and taking medication but could not remember the name of his medication.[92] Despite the patient's history and elevated blood pressure, a medical provider did not order antihypertensive medication for the patient but instead, deleted hypertension from the Problem List replacing it with "Elevated blood pressure without hypertension." The provider did not document the clinical justification for this change in diagnosis and treatment. We also noted that for patients with well established serious mental illness per Avatar, mental health staff removed diagnoses such as bipolar disorder and schizophrenia for which the patient had recently been treated.[93]

The Chronic Disease Management policy states that the Medical Director will develop chronic disease guidelines for the following conditions:
- Diabetes
- Asthma
- COPD
- Seizure Disorder
- Cancer
- Autoimmune Disease
- Hyperlipidemia
- Hypertension
- Coronary Artery Disease
- Hepatitis C
- Psychotic Disorders/Mood Disorders [94]

The previous Medical Director developed guidelines for asthma, diabetes, and hypertension that met national chronic disease guidelines.[95] The County has not adopted or developed guidelines

---

[91] Patient #10.
[92] At intake the patient's blood pressure was 141/84 mm Hg. On 4/8/24, BP=144/94 mm Hg and 167/89 mm Hg.
[93] Patients #10 and #20.
[94] Patients are provided care management and monitoring by mental health psychiatric providers and/or social workers depending on the level of service needed.
[95] Guidelines for Hepatitis C and HIV infection are policies and not clinical guidelines.

for other chronic diseases such as dyslipidemia, heart failure, hepatitis C and HIV infection, etc. This has resulted in some patients not receiving the standard of care for these conditions (VI. D.1). The following cases exemplify patients that are not being monitored in accordance with their disease control and not provided care consistent with national guidelines that represent the community standard of care.

**Patient #14**: This 39-year-old man arrived at SCJ on 11/23/22 and is still at the jail. His medical history includes opioid use disorder, type 2 diabetes, spinal stenosis, L5-S1 microdiscectomy, and serious mental illness.

**Summary:** This patient with recently diagnosed diabetes has not been evaluated, treated, and monitored in accordance with his disease control and American Diabetes Association medical care standards. In July 2024, the patient was urgently hospitalized for severe back for which surgery was performed. While hospitalized, he was newly diagnosed with uncontrolled type 2 diabetes (HbA1C=9.4%). At the hospital, the patient was treated with Lantus 50 units at bedtime, and 18 units Lispro insulin with meals. Upon discharge back to the jail, Lantus was continued at a lower dose, but not Lispro insulin with meals or sliding scale insulin. Providers have not addressed the patient's diabetes at each visit (e.g., review fingerstick blood sugars) and have not conducted a basic medical evaluation that includes labs (e.g., lipids, metabolic panel, liver function tests, spot urine albumin to creatinine ratio, etc.), a physical examination pertinent to diabetes, including peripheral pulses, foot, and eye examinations. He has not been offered recommended immunizations.

Other than a patient handout, there is no documentation that providers or nurses have educated and counseled the patient about causes of diabetes, disease progression and its complications, and benefits of good diabetes control. The patient has refused fingerstick blood sugars in the morning that are performed as early as 03:00, which is a barrier to care. Although the patient initially took insulin, he began refusing it because he did not feel he needed it and wanted to manage his diabetes through diet and exercise. Later Metformin was added but the patient is refusing that as well. A medical provider or nurse has not had the patient brought in for diabetes education and counseling for nonadherence to medication.

On 10/23/24, a medical provider saw the patient for follow-up. The patient's diabetes control had improved since has initially diagnosed (HbA1C=8.3%), but the patient's diabetes was not at goal (e.g. HbA1C≤7%). The provider scheduled a follow-up appointment in 3 months which was not appropriate given that the patient's diabetes was not controlled.[96] As recently as 11/15/24 the

---

[96] Tight blood sugar control reduces micro and macrovascular complications of diabetes. The American Diabetes Association recommends a glycemic goal of ≤7%, however providers may set different glycemic goals if the patient has limited life expectancy and/or functional and cognitive impairments. See 2024 ADA Standards of Care, Chapter 6, *Glycemic Goals and Hypoglycemia: Standards of Care in Diabetes—2024*, available at https://diabetesjournals.org/care/article/47/Supplement_1/S111/153951/.

patient's afternoon blood sugar was very elevated (FSBS=338), but he was not prescribed sliding scale insulin to treat this elevated glucose. The patient may be discharged soon, and it important that the patient understand the long-term consequences of poorly controlled diabetes and the need for ongoing monitoring and treatment.[97]

**Patient #13:** This 54-year-old woman arrived at SCJ on 8/28/24 and died on 11/12/24 at Sutter Medical Center. The patient's medical history included diabetes, hypertension, congestive heart failure (CHF) with systolic dysfunction, diabetic retinopathy, diabetic foot ulcer with left foot osteomyelitis, bilateral amputations of her toes, and poor dentition. At the time of death her medications were Lantus and regular insulin, Januvia, hydrochlorothiazide, gabapentin, and olanzapine.

A 1/24/2023, Avatar showed that the patient had a history of schizoaffective disorder bipolar type, with psychotic features, depression, generalized anxiety, panic disorder, and post-traumatic stress disorder (PTSD). The patient had multiple psychiatric inpatient hospitalizations as far back as 2004. The Avatar also says the patient had a history of hypothyroidism, GERD, epilepsy, and osteoarthritis.

**Summary:** From 8/24/24 until she was admitted to Sutter Medical Center (SMC) on 11/7/24, a medical provider never conducted a comprehensive evaluation of each of the patient's chronic diseases in accordance with national guidelines. On 11/7/24, the patient presented to SMC with a 3-day history of shortness of breath and chest pain.[98] She was diagnosed with *Klebsiella* pneumonia and sepsis. She went into multiorgan failure and died on 11/12/24. Her death may have been preventable.

Specific concerns regarding care of the patient include the following:
- A medical provider saw the patient for a history and physical exam but did not conduct a review of the patient's previous admissions to the jail, evaluate each of the patient's chronic diseases, and develop an initial plan of care for each condition.
- The patient had poorly controlled diabetes, but the provider did not evaluate her baseline diabetes regimen, or order diabetes specific labs (e.g., hemoglobin A1C, lipids, spot urinary albumin to creatinine ratio, etc.).[99]
- Although the patient had known hypertension, the medical provider did not order antihypertensive medication for the patient.
- When labs were later performed, medical providers did not address the patient's elevated lipids and triglycerides, and prescribe a statin for her dyslipidemia, or an ACE inhibitor/ARB in accordance with American Diabetes Association (ADA) guidelines.[100]

---

[97] We forwarded this case to the County for follow-up, but none occurred. We recontacted the County.
[98] Per Sutter Medical Records.
[99] To check for protein reflecting kidney damage.
[100] Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association (Mar. 2024), available at https://diabetesjournals.org/care/article/47/4/544/154277. Angiotensin-converting enzyme (ACE)

- She had a history of non-proliferative diabetic retinopathy but was not referred to ophthalmology for evaluation.
- Per Avatar, the patient had a history of hypothyroidism. Labs showed an abnormally low thyroid stimulating hormone (TSH=0.08, normal=0.4 to 4.0) indicating hyperthyroidism but providers did not note or address this finding.[101]
- A provider did not evaluate the patient for signs and symptoms of heart failure, order an echocardiogram, or refer her to cardiology.[102]
- The patient's blood sugars were routinely in the high 300's but providers did not monitor the patient's fingerstick blood sugars. LVN's administering insulin also did not notify providers when the patient had very high blood sugars (FSBS=448). Nurses conducting fingerstick blood sugars did not consistently administer sliding scale insulin when the patient's blood sugars were high.
- The County has established a system for clinical pharmacists to provide chronic care management for patients with metabolic syndrome (diabetes, hypertension and dyslipidemia). In June 2024, the clinical pharmacist began seeing patients to order labs, adjust medications, and provide patient education.[103] There are plans to expand the role of the clinical pharmacist to manage asthma, hepatitis C, and opioid use disorder. However, review of this record raises serious questions about how this program is being implemented and decisions of the clinical pharmacist.
- On 9/22/24 at 12:10, the patient had a hypertensive crisis (BP=199/114 mm Hg) with headache, chest pain, nausea, vomiting, weakness and inability to walk. A NP saw the patient and ordered her to be sent to the ED. The deputy transporting the patient signed the ITI at 14:00. At 17:56, a RN saw the patient as a hospital return, but did not document what happened. There was a new order for Keflex with no explanation. The RN did not refer the patient to a medical provider and a provider did not see the patient following this event.
- On 10/2/24, a clinical pharmacist met with the patient cell-side to discuss medication adherence, noting that her blood sugars were in the 250's. Ten days prior the patient had a hypertensive crisis, but the clinical pharmacist did not reference this event, or note other blood pressure measurements. Conducting cell side visits raises questions about privacy and whether the clinical pharmacist has access to the medical record to view events such as emergency department visits for poorly controlled hypertension or diabetes.
- On 10/11/24, a clinical pharmacist wrote a note reviewing the patient's blood sugars and determined that the patient's short acting, meal-time insulin should be increased, not the patient's long-acting (Lantus) insulin. This was not the appropriate action, as the patient's

---

inhibitor and Angiotensin Receptor Blocker (ARB) are two types of medications recommended for patients with diabetes, unless there are contraindications.

[101] An overactive thyroid can cause weight loss, heart problems, eye disease, and osteoporosis.

[102] GDMT is treatment for patients with heart failure and reduced ejection fraction, and includes medications such as beta-blockers and other categories of heart medications.

[103] Mays 180-Day status report. Page 153.

long-acting insulin needed to be changed to provide 24-hour insulin coverage for the patient. In addition, no changes were made to the patient's twice daily sliding scale insulin regimen. The note indicated that the patient was seen at the patient's cell, but it does not appear that the clinical pharmacist actually met with the patient to discuss the plan.

- On 10/15/24, a clinical pharmacist changed the patient's Lantus insulin from 10 units to 12 units. This was the first insulin dosage change in seven weeks.[104] While incremental adjustments in insulin are appropriate for poorly controlled blood sugars, frequent follow-up and insulin adjustment is needed until glycemic goals are reached, and to ensure the patient is not having hypoglycemia. This did not occur for this patient. There is no documentation that the clinical pharmacist met with the patient to discuss changes in her insulin dosage, and see if she had any questions or concerns. This is remote control medicine rather than patient centered medicine.

- Other concerns are that when medical providers write orders for sliding scale insulin, the insulin scale does not appear in the order itself, nor does it appear on the eMAR. When conducting record review, there is no way to know how much insulin nurses are supposed to give the patient according to blood glucose thresholds, and whether a nurse gave the correct amount of insulin. For example, in one instance, on 8/29/24 at 16:48, the patient's blood sugar was 448 ml/dl. The nurse gave Lantus 10 units but no short-acting insulin was given to the patient. On 8/31/24, the patient's blood sugar was 350. Lantus 10 units was given and no short acting sliding scale insulin was given.

- On the day the patient was admitted to the hospital, a medical provider saw the patient for chest pain and shortness of breath, noting that her symptoms were reported to nurses earlier that day. However, there are no nursing notes in the record regarding this serious complaint. Upon admission to SMC, ED providers noted that the patient complained of chest pain and shortness of breath for 3 days prior to admission. This raises serious questions about the patient's access to care.

A comprehensive chronic care program involves a multidisciplinary team of medical providers, nurses, pharmacists, dentists and mental health providers. With respect to the function of clinical pharmacists in the chronic disease program, the monitors understood medical providers are responsible for managing patients with chronic diseases in accordance with their disease control and ensuring that medical care meets national guidelines. The County explained to the monitors that clinical pharmacists would monitor patient's medication adherence, address side effects, and counsel patients. Clinical pharmacists could discontinue certain patients' medications for nonadherence. *It was not our understanding that clinical pharmacists would independently manage patients with chronic diseases as appeared to have been the case with this patient. Medical providers are ultimately responsible for the patient's medical care. The Medical Director cosigned each of the clinical pharmacists' notes indicating review and concurrence with the plan,*

---

[104] On 10/16/24 the patient's hemoglobin A1C was 9.8% showing her diabetes was uncontrolled, and which warranted weekly follow-up to adjust her insulin regimen.

*but did not recognize that the patient's treatment plan was not resulting in improved diabetes control.*

Other cases show that providers do not timely address abnormal lab tests, medically evaluate the patient, and make a timely diagnosis. For example:

**Patient #1** This 56-year-old female arrived at SCJ on 6/22/23 and is still at the jail. Her medical history includes opioid use disorder, asthma, hypertension, heart failure LVEF 55% in 2023 asthma, GERD, GI ulcer, thrombocytopenia, leukopenia, splenomegaly, latent TB infection, chronic back pain with sciatica, DJD, anxiety, and depression.

**Summary:**  This patient did not receive timely diagnosis and treatment for multiple serious medical conditions including abnormal labs that indicate the patient may have an autoimmune disease such as systemic lupus erythematosus (SLE), and elevated triglycerides that places the patient at risk of pancreatitis,[105] The patient also has a history of heart failure that has not been addressed and she has not been referred to cardiology. The patient is supposed to be on a low salt-diet but reports that she does not receive it, which can exacerbate her heart failure, raising concerns about the provision of medical diets. Finally, she is immunosuppressed and has not been treated for latent TB infection.

In December 2023, labs showed the patient had a positive ANA titer of 1:320.[106] This lab test is associated with autoimmune disorders. A provider reviewed the report but did not address this abnormal finding. The patient had other abnormally low blood counts and was referred to hematology. On 3/27/24, hematology noted the positive ANA and recommended referral to rheumatology, labs, and hematology follow-up in 3 months. A medical provider determined that the positive ANA and titer were inconclusive, and in consultation with a physician did not refer the patient to rheumatology, but planned to "observe" the patient. However, no medical evaluation was performed of the patient's medical history, symptoms, or physical findings associated with autoimmune disorders.[107] Other rheumatology labs were not ordered.[108] On 9/26/24, a Rubicon rheumatology consult was performed. The rheumatologist recommended additional labs and referral to an outside rheumatologist. On 10/8/24, other autoimmune lab tests were abnormal and an outside rheumatology referral was made. A 11/1/24, telemedicine appointment with San Joaquin General Hospital had to be rescheduled because the patient was not brought to the appointment location. The patient has not received timely evaluation for autoimmune disease, almost a year after the positive ANA test.

---

[105] Acute pancreatitis is inflammation of the pancreas that can be life-threatening or result in chronic pancreatitis a serious condition.

[106] A positive Antinuclear Antibody (ANA) in conjunction with other tests are used to diagnoses patients with autoimmune diseases such as systemic lupus erythematosus, rheumatoid arthritis and other autoimmune conditions.

[107] The patient reported to the monitors that as a young woman, she had a butterfly rash on her face, which is commonly associated with lupus.

[108] The monitors interviewed the patient and contacted ACH leadership regarding lack of follow-up on the positive ANA and recommendation from hematology to refer the patient to rheumatology.

In addition, the only assessment of the patient's heart failure took place on 5/24/24. At that visit, a provider saw the patient for complaints of chest pain and reviewed her cardiac history and echocardiogram results. She was being followed by a cardiologist in the community, but providers have not referred her to cardiology. *This is particularly concerning as the patient had been complaining of chest pain.* The patient reported that a low sodium medical diet was ordered for her but she does not receive it, and the food has high levels of sodium.

On 10/8/24, a lipid panel showed the patient's triglycerides were extremely high (TG=501), which increases the patient's risk of pancreatitis. As of 11/1/24, a provider had not addressed this result, and the monitors forwarded this case to the County for follow-up. As of 11/22/24, a medical provider had not seen the patient. The monitors contacted the County again, and a medical provider saw the patient and started her on fenofibrate the same day. The United States Preventative Services Task Force (USPSTF) recommends that clinicians prescribe a statin for patients age 40 to 75 year of age with one or more cardiovascular risk factors (e.g., hypertension, dyslipidemia, etc.) Consider adding a statin in addition to a fibrate to the patient's medication regimen.

Lastly, the patient has been at the jail for more than a year and not been treated for her history of TB infection in accordance with CDC guidelines, which recommend treatment of all patients who will be in the jail long enough to complete a treatment regimen, regardless of age. The patient is immunocompromised[109] with an increased the risk of active TB.[110] This patient's care falls far below the standard of care.

**Patient #5:** This 56-year-old man arrived at SCJ on 8/9/24 and is still at the jail. His medical history includes alcohol and methamphetamine use disorder, hypertension, stage 3 chronic kidney disease, and stage III malignant melanoma, bipolar disorder, anxiety, and PTSD. He also had a history of rectal bleeding.  The patient has had previous admissions to the jail.

**Summary:** The patient has several chronic diseases including hypertension, stage III chronic kidney disease, and obstructive sleep apnea with history of C-PAP. The diagnosis of obstructive sleep apnea is not on the patient's problem list.  At each visit, medical providers have not addressed each of the patient's chronic diseases. The patient's LDL is elevated (LDL=114). He has not been prescribed a statin. His blood pressure has not been consistently controlled in the past 6 months (systolic BP ranges from 116-175 mm Hg, diastolic ranges from 78-102, mm Hg).

On Monday, 9/23/24, the patient reported to the surgical oncologist that he was experiencing g chest heaviness on and off, and possible shortness of breath with exertion. The following day, on 9/24/24, a nurse saw the patient who reported that he felt his blood pressure was high and that

---

[109] She has low white and red blood cell counts and low platelets.
[110] There are preventive TB regimens 1-4 months in duration, as well as the 9-month Isoniazid regimens. https://www.cdc.gov/mmwr/volumes/69/rr/rr6901a1.htm#:~:text=The%20two%20alternative%20treatment%20r egimens,to%20fit%20individual%20clinical%20circumstances.

he felt like someone was "sitting on his chest with pressure which made it hard for him to breathe." He reported onset of symptoms 3 days prior. BP=167/94 mm Hg. EKG=normal sinus rhythm. Provider verbal orders were given to add an antihypertensive medication, and an urgent MD sick call in one week.  A provider saw the patient the next day and did not address his chest pain and shortness of breath. On 9/25/24, the patient submitted an HSR that his ankles were swelling from the new medications (amlodipine) but this was not addressed.[111]

*The patient has presented with classic symptoms of coronary artery disease that he has experienced over an unknown period of time. Given the patient's clinical presentation and risk factors for coronary artery disease, including poorly controlled hypertension, untreated dyslipidemia, and chronic kidney disease, he needs to be considered for evaluation for coronary artery disease.*

**Patient #6**: This 67-year-old male arrived at SCJ on 2/10/23 and is still at the jail.  His medical history includes benign prostatic hypertrophy (BPH), bilateral hydronephrosis, pyelonephritis, s/p insertion of nephrostomy tubes on 10/12/23, stage III chronic kidney disease, hyperlipidemia, migraine headaches with vision changes, neuropathic pain, chest pain, left knee pain, and adjustment disorder without depressed mood.[112] He is noted to be on the EOP waitlist for enhanced mental health services.  He also has chronic left elbow and hand pain with paresthesia's and been diagnosed with possible cubital tunnel syndrome but this is not noted on the Problem List.

**Summary:** This patient has not had timely care for his serious medical conditions including obstructive uropathy leading to bilateral hydronephrosis, pyelonephritis, chronic kidney disease, migraine headaches with vision loss/changes and blackouts, suspected cubital tunnel syndrome. *The patient has been lost to urological, ophthalmology, orthopedic, and chronic disease follow-up*. A provider last saw the patient for chronic disease management on 7/24/24. There are no orders for a future appointment. The patient is currently lost to chronic disease follow-up. *Providers have remotely renewed the patient's medications 3 times without seeing the patient.*

These cases demonstrate the lack of adherence to chronic disease guidelines, providers not addressing all chronic diseases at each visit, lack of timely follow-up abnormal test results,  and failure to monitor patients in accordance with their disease control.

Providers made changes to patient medications or dosing without informing and discussing changes with the patient. Providers did not consistently monitor the patient's medication adherence. There is no documentation that nurses or pharmacists timely notify medical providers of persistent non-compliance with chronic disease medications.

---

[111] There are specialty services concerns with this patient described in the specialty section of this report.

[112] At Sutter Hospital on 10/13/23, the patient was noted to have severe current major depression with psychotic features.

Per the Consent Decree, the County is responsible for the adoption training and implementation of nationally recognized standards (e.g., ADA Standards of Care in Diabetes-2024) and development of a comprehensive chronic disease program.[113] The failure to do so has caused harm to patients.  The County needs to make this an immediate priority.

*Screening for Hepatitis C and HIV infection and other Sexually Transmitted Infections.*
The County offers patients testing for hepatitis C, HIV and other sexually transmitted infections such as syphilis, gonorrhea and chlamydia. Providers should offer Hepatitis C treatment in accordance with national guidelines if the patient will be at the jail long enough to complete a full course of HCV therapy. Typically this takes 8 to 12 weeks. The County needs to include offering hepatitis A and B immunizations in the hepatitis C clinical treatment guideline, and ensure patients are offered vaccination (VI. D.1.b).

*Acceptance of HCV and HIV Testing at Intake is Low*
The goal of testing is to identify persons that can benefit from treatment and prevent transmission of infectious diseases, a tremendous benefit to public health. Opt-out testing[114] is designed to increase acceptance of testing for blood-borne and sexually transmitted infections, however, in the majority of records we reviewed, patients refused testing at intake.  Contributing factors to high refusal rates may be due to the intake environment, patient's not feeling well, lack of readiness, lack of an immediate result, or how staff word the offer to test the patient. Patients may also refuse if they have been tested recently at prior admissions to the jail. There are now dual point of care (POC) tests for syphilis and HIV that can be conducted in a few minutes and offer an opportunity to rapidly identify patients in need of treatment at intake.[115]  This is particularly important for women of childbearing age, as rates of congenital syphilis have increased 10 fold in the past decade.[116] HIV/syphilis testing can be done through fingerstick blood samples, with results obtained in minutes. The County needs to assess barriers to testing. Strategies for increasing testing acceptance rates might include medical providers reoffering testing to patients at the history and physical, or the first chronic disease clinic visit.

*The County Lacks a Comprehensive Diabetic Management Program*
The *Mays* Consent Decree requires the County to develop a comprehensive diabetic management program consistent with the American Diabetes Association (ADA) Standards of Medical Care in Diabetes.[117] A comprehensive diabetic program includes patient education and counseling regarding the cause and effects of diabetes, complications, glycemic goals, nutrition, exercise, and self-management of diabetes.

---

[113] The monitors forwarded the American Diabetes Association's Standards of Medical Care for Diabetes 2024 to the Medical Director.

[114] Opt-out testing is defined as conducting testing after notifying patients that the test will be conducted and that they may decline or defer testing. Historically, opt-out testing results in higher testing rates.

[115] These would be subject to a confirmation blood test.

[116] dc.gov/media/releases/2023/s1107-newborn-syphilis.html

[117] Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association (Mar. 2024), available at https://diabetesjournals.org/care/article/47/4/544/154277.

The County has implemented the use of technology to improve diabetes monitoring and treatment with use of continuous glucose monitoring (CGM) devices. The County also plans to continue the use of insulin pumps for eligible patients, which can dramatically improve diabetes control and reduce the risk of hypoglycemia. However, the County has not implemented all the components of a comprehensive program.  This includes:

- Timely routine and as-needed screening for diabetes-related complications.

- Timely referrals/appointments with appropriate specialty care, including optometrists and ophthalmologists, nephrologists, podiatrists and cardiologists.

- Provision of individualized diabetes management plan (and behavioral plan, if appropriate) developed by a health-care provider-coordinated team (with members including physicians, nurse practitioners, physician associate/physician assistants, nurses, registered dietitian nutritionists, clinical pharmacists, and mental health professionals with expertise in diabetes).

With respect to meals, the diabetes program must be developed in coordination with custody administration to address normal circadian rhythms, food consumption times, and insulin dosing times. Scientific evidence links the circadian rhythm to various aspect of diabetes pathology and treatment.[118]

While the County links morning and afternoon blood sugar checks and insulin administration with meals, it is not scheduled in accordance with normal circadian rhythms. Nurses perform fingerstick blood sugars (FSBS) and administer insulin at 3 am, which is not in accordance with normal circadian rhythms. Record review shows frequent patient refusals of FSBSs and insulin, with worsening diabetes control.  The 3 am timing of FSBS and insulin administration constitutes an unreasonable barrier to care.

Nutritional counseling and menu planning are cornerstones of the multidisciplinary approach to diabetes management in detention facilities. However, records show that patients do not receive diabetes education, including how food choices affect diabetes control. The County does not provide patients access to a nutritionist. Providers prescribe medical diets, but patients and other inmates report not receiving them, that they are inedible, or make them ill.[119] At RCCC, a worker reported that he has unloaded food containers from trucks that were expired, including milk.[120] We observed inmates putting soup containers directly onto the housing unit floor, which is unsanitary.

At Main Jail, two patients reported that they develop diarrhea whenever they eat food from the main kitchen, so they eat food from the commissary which is likely high in salt and does not

---

[118] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5899235/
[119] Patient #1.
[120] We discussed this with RCCC custody leadership who acknowledged that this concern had been raised before. The County disputes that it has served expired food.

provide minimum daily requirements for protein and other essential nutrients. One patient requested a vegetarian diet and was provided two pieces of bread with a slice of tomato and cucumber.

The County provided the monitors the main menu and reported that it provides for medical diets. The monitors are not qualified to evaluate the main menu with respect to the capacity to offer diabetic, renal, and gluten free diets, but given feedback from inmates and reports of expired food being delivered to the facility, it raises questions about purchasing, storage, preparation, and distribution of food trays, and daily supervision of food services.  For these reasons, it is unclear whether patients receive medically prescribed diets (IV. D.1.c).

The Consent Decree requires that chronic disease patients' prescriptions are automatically renewed unless the provider determines that it is necessary to see the patient before renewing the medication.  Currently prescribers order medications for a one year duration. Prior to order expiration, the pharmacy sends an EHR alert for the providers to renew medications.  We were previously advised that the Medical Director will be working with the Pharmacy Director to make renewals automatic when clinical pharmacists are integrated into the chronic care program. However, while we support procedures to ensure medication continuity, safeguards need to be in place to ensure that medication continuity is automatically provided for patients whose diseases are well controlled, but not automatically continued for patients whose diseases are not well controlled and that require a clinical encounter. (VI. D.1.d).

In several records, providers or pharmacists changed medications without discussion with the patient.[121] For one patient, medical providers renewed his chronic disease medications on 4/12, 6/18, 9/3, and 9/4/24, without seeing the patient, which was over a 5 month period.[122]

*The County has reviewed its dialysis infection control policies*
The County has a contract with Spectrum to provide onsite dialysis treatment. Spectrum is required to comply with regulations and policies to minimize the risk of transmission of bloodborne pathogens during dialysis.  ACH Infection Control has worked with the California Department of Public Health to update the infection control policies to be consistent with the standards (VI. D.3).

County chronic disease audits are not designed to study and provide meaningful information about  the quality of care being provided to patients with chronic diseases. For example, for diabetes an audit was conducted to determine whether patients had an A1C within 6 months of the last result (93% in March 2024), and whether patients were followed up in accordance with their disease control (61% in March 2024). The threshold of performing an A1C every 6 months would only apply to patients with well controlled diabetes, and not to most diabetics whose A1C should be measured every 3 months. This is a very limited study that does not provide meaningful information about whether patients with diabetes receive timely and appropriate care.

---

[121] Patient #13.
[122] Patient #6.

A study designed to show whether patients with diabetes are provided the standard of care would include the following:

- Patient was identified at intake and timely referred to the chronic disease program.
- A medical provider performed a diabetes evaluation that included the following:
  - Past medical and family history
  - Physical examination consistent with American Diabetes Association standards of care.
  - Recommended labs (e.g., A1C, metabolic profile, lipid panel, liver function tests, spot urinary albumin to creatinine ratio, TSH).
  - Assess the patient for diabetic complications (atherosclerotic cardiovascular disease (ASCVD), retinopathy, chronic kidney disease, peripheral neuropathy).
  - Immunizations (e.g. pneumococcal, influenza, herpes zoster, COVID-19, etc.)
  - Confirmed the diagnosis and classify the patient's diabetes (Type 1, Type 2 or other type).
  - Diagnoses are included on the Problem List
  - Providers follow-up patients in accordance to the patients disease control.
  - The patient been provided comprehensive diabetes education.
- A1C: goal≤7%: Has the provider modified the treatment plan to meet glycemic goals.
- LDL: goal=≤70. Is the patient on a statin?
- Triglycerides=≤150. If not controlled on a statin. Were other medications considered (fenofibrate, Omega-3, etc.).
- Monitoring based upon the patients' disease control.

When performance is below expectations, the County needs to develop a corrective action plan that addresses each indicator. Similar studies can be developed for other chronic diseases.

**Compliance Assessment:**
- D.1=Noncompliance
- D.1.a=Partial Compliance
- D.1.b=Partial Compliance
- D.1.c=Noncompliance
- D.1.d=Partial Compliance
- D.2=Noncompliance
- D.3=Substantial Compliance

**Recommendations:**
1. Intake nurses need to review the patient's medical history including previous admissions, and refer patients with *confirmed* chronic diseases to a medical provider based upon their medical acuity, and order a referral to the chronic disease program to reduce the risk that the patient will not be timely enrolled.

2. The intake nurse should refer patients whose chronic diseases are *unconfirmed* to a medical provider for a history and physical examination and decision whether to enroll the patient into the chronic disease program.

3. Develop an electronic tracking system for patients with chronic diseases and conduct a 100% record review to identify all patients who are currently not on the tracker.[123]

   a. The tracking system needs to include the following:
   a. Name and X-ref Number
   b. Gender
   c. Date of arrival/Intake Receiving Screening
   d. Date of initial history and physical examination (or chronic disease visit)
   e. Date of initial labs
   f. Date of first chronic disease visit
   g. Dates that lab tests are to be performed prior to the next chronic disease visit
   h. Pertinent lab results (e.g., A1C for diabetes, LDL)
   i. Dates of follow-up chronic disease visits

2. ACH needs to assign staff to monitor the tracking system and ensure that labs are timely ordered and performed, appointments kept, and rescheduled as needed.

4. Develop order sets for patients with chronic diseases to include standard labs (e.g., diabetics: A1C, metabolic panel, lipid panel, TSH, spot urine for albumin to creatinine ratio, and other tests recommended by the American Diabetes Association. etc.). Do this for other chronic diseases.

5. Implement USPSTF/ADA guidelines to screen all adults above age 35 for diabetes regardless of risk factors.[124]

6. Implement USPSTF[125] recommendations to offer a statin for primary prevention of CVD to adults age 40 to 75 who have 1 or more cardiovascular risk factors (e.g., diabetes, hypertension, dyslipidemia, and smoking). [126]

7. Medical providers need to review lab, x-ray, and imaging reports within 3 business days, and document a plan for follow-up.

8. Glucose and A1C point of care testing equipment needs to be calibrated to ensure that results are accurate.

9. The County needs to develop a system in the EHR to notify providers of point of care testing performed by medical assistants or nurses. MAs and nurses need to contract providers for significantly abnormal tests (e.g., A1C=>9%).

---

[123] The initial search for patients can be done by searching medical records for ICD-9 codes, chronic disease medications, chronic disease labs, and specialty services. For remaining records, conduct a review of every record to identify patients with chronic diseases.

[124] https://www.cdc.gov/diabetes/data-research/research/diabetes-screening-eligible.html.

[125] United States Preventive Services Task Force.

[126] https://www.uspreventiveservicestaskforce.org/uspstf/recommendation-topics/uspstf-a-and-b-recommendations.

10. Develop and/or adopt clinical guidelines for each of the chronic diseases specified in ACH policy within 30 days.

11. Develop a chronic disease training curriculum to include in orientation and training of new health care staff.

12. Train all staff involved in the chronic disease program regarding each chronic disease guideline (e.g., providers, nurses, pharmacists) within 30 days of adoption of the guidelines.

13. Develop a patient education program for patients with diabetes and other chronic diseases. Train nurses to provide diabetic education to patients. Consider contacting community diabetes programs for staff training and/or assistance with providing patient education materials.

14. Develop a policy regarding the role of pharmacists in managing patients with chronic diseases, relative to the role of medical providers, including the importance of meeting with patients in a clinical setting with privacy, having the medical record available to review pertinent information, and informing and discussing medication changes with the patient.

15. Consider having providers offer HIV, hepatitis C and STI testing again if it is refused at intake.  Consider point of care testing for HIV and syphilis.

16. Develop a comprehensive diabetes program consistent with ADA standards and conforms with normal circadian rhythms as required by the Consent Decree. This will require the County to adjust timing of finger stick blood sugars, (FSBS), insulin administration, and meals to conform with normal circadian rhythms.

17. Hire an independent consultant qualified to evaluate the food service program regarding food purchasing, food quality, conditions for food storage, preparation, and plating to determine whether it is being done safely; review the composition of medical diets (diabetic, renal, gluten free, etc.) to ensure they are appropriate, and observe workers preparing and plating meals to determine whether this is being done properly.

18. Medical reviews related to provider quality should be timely performed and documented with a corrective action plan. The County needs to conduct peer review for providers whose practice falls below the standard of care.

19. Perform QI studies related to clinical quality measures. These clinical quality measures need to be based upon national guidelines, and not be limited to timeliness of appointments and labs.

### E. Specialty Services

1. The County shall develop and implement policies regarding specialty referrals using an algorithm with evidence-based referral criteria and guidelines.

2. Within 3 months of the date the Remedial plan is issued by the Court, the County shall develop and implement policies and procedures to ensure that emergency consultations and diagnostic treatment procedures, as determined by the medical provider; are provided immediately; high priority consultations and procedures, as determined by the medical provider are seen within 14 days of the date of the referral; and routine consultations and procedures, as determined by the provider are seen within 90 days of the date of the referral.

3. Patients whose routine specialty consultation or procedure do not take place within 90 calendar days from the date of the referral shall be examined by a clinician monthly and evaluated to determine if urgent specialty care is indicated.

4. Within 5 days of the completion of a high priority specialty consultation or procedure, or within 14 days of a routine specialty consultation or procedure, patients returning to the Sacramento County Jail shall have their specialty reports and follow-up recommendations reviewed by a jail nurse practitioner, physician assistant or physician.

5. Specialty care consultations and outside diagnostic and treatment procedures shall be tracked in a log that identifies:
   a. The date of the referral request
   b. The date the request is sent to UM
   c. The date of UM notification of approval or denial
   d. The date the referral was sent to the specialty care provider
   e. The date of the consultation or procedure appointment
   f. The date the consultation or procedure took place
   g. If cancelled or rescheduled, the reason for the cancellation/rescheduling
   h. The date the appointment was rescheduled.

6. Requests for specialty consultations and outside diagnostic and treatment procedures shall be tracked to determine the length of time it takes to grant or deny requests and the circumstances or reasons for denials (Note: date of approval should be on specialty services tracking log, see above).

7. At least twice a year, the County shall conduct an audit of specialty care referral logs described in subsections (5) and (6), above, and complete a report as to whether each category of specialty care is completed in a reasonable time frame, consistent with established time frames. If any specialty care area has a record of untimely appointments as determined by the Correctional Health Service Continuous Quality Improvement (CQI) Committee, the County shall report to Plaintiffs and the parties shall meet and confer to take prompt steps to address the issue. The County will provide Plaintiff's access to the specialty care referral logs and audit reports periodically and upon written request. The parties will work to resolve issues with untimely specialty care in individual patient cases and with respect to systemic trends, including through the dispute resolution process.

8. The County shall consider implementing an e-referral system to reduce delays and facilitate communication between specialists and primary care providers, as well as reducing

unnecessary transportation costs and unnecessary specialist appointments by ensuring that the specialist has all the information he or she needs before an appointment takes place.

9.  The County shall ensure that utilization management and/or scheduling staff provides notification of whether a patient's specialty care appointment is scheduled to occur within the timeline pursuant to the referral and/or clinical recommendation, including as follows:

    a.  Medical staff may request and obtain information as to whether any patient's specialty care appointment is scheduled, and as to the general timing of the appointment (e.g., within a one-week date range).

    b.  If a specialty care appointment is denied or is not scheduled to occur within the timeline pursuant to the referral and/or clinical recommendation, such information will be affirmatively provided to the treatment team and to the patient.

    c.  If a previously scheduled specialty care appointment is postponed to a date that is outside the timeline pursuant to the referral and/or clinical recommendation, such information will be affirmatively provided to the treatment team and to the patient.

10. The County shall consider creating a physical therapy clinic at the jail to more efficiently meet the demand for service at the jail.

**Findings:** The utilization management and specialty services processes are dysfunctional and lack medical oversight.[127]  The volume of referrals each month is so high that case management staff are unable to timely process them, resulting in delayed access to specialists. These delays have caused actual harm, and on-going risk of harm to patients.

With respect to staffing, the County reports that from February through July 2024, there was limited Case Management (CM) staff. These staff were trying to manage all referrals and CM duties, as well as other duties not directly related to case management. Since July 2024, a second permanent CM RN and a registry RN were added. Since September 2024, 1 new SRN was hired who replaced the previous SRN, and a new registry office assistant (OA) was hired. Two more registry staff are in background and two more permanent positions have been designated to the CM program.[128]

There has been minimal medical oversight of specialty services which has resulted in services not being timely provided, especially for high-risk patients. These cases are described later in this section.

The status of compliance with Consent Decree E. provision is as follows:

- The Consent Decree requires the County to develop and implement policies regarding special services using an algorithm with evidence-based referral criteria (VI. E.1).  ACH revised the specialty services policy in 2022 and the utilization management policy in 2021, which

---

[127] ACH reports that utilization management and specialty services were under the auspices of Quality Improvement, but in late September or October of 2024 was moved to be under the direction of the Medical Director.
[128] Per ACH leadership.

includes the application of InterQual for clinicians to make evidence-based decisions.[129] At the last site visit, the County advised the monitors that the use of InterQual criteria to make utilization management decisions about the appropriateness of medical referrals resulted in denials of most referrals. Given this, the County discontinued the use of InterQual and instead had weekly meetings to review specialty service requests. Given that ACH's use of InterQual criteria had the effect of high denial rates, the medical experts supported ACH's decision to discontinue its use at the jail *with the understanding that the UM physician would review and make decisions about approval or denial of each specialty services request.*

However, the Case Management physician does not review the great majority of specialty requests, resulting in the default approval of almost all referrals.[130] The specialty services tracking log showed that from February 1 to July 15, 2024, there were 2,540 approved specialty services referrals, averaging 462 per month, an extremely high number given a population of 3,000 inmates. Of this number, 1048 (41%) consults were completed, 666 (26%) were on "Administrative Hold," meaning that case management staff had not started review of the referral, 249 (10%) were "in process" and 574 (23%) referrals had been canceled.[131] Included among the 26% of patient referrals not processed by July 15, were cardiology, ENT, GI, oncology, optometry, ophthalmology, and optometry referrals ordered in February and March 2024. Among the 23% of active patient referrals that were canceled, the log did not include the reason for cancelation for the majority of patients.

Medical record review showed that some specialty service referrals were elective,[132] likely delaying access for patients of higher priority. In addition, elective procedures utilize limited medical, custody, and budgetary resources. The County plans to return to the use of InterQual to conduct a review of every referral.  We support a return to the use of InterQual combined with the case management physician review of referrals.

- The policy referral time frames for urgent and routine consults meet Consent Decree Requirements; however, in practice, the County has often not met these time frames, particularly with respect to urgent referrals.[133] The County did not provide an audit of specialty services for this period of review to show compliance with policies and the Consent Decree. (VI. E.2).

---

[129] Specialty Services. ACH-04-08. Revised 9/7/22. Utilization Management. ACH-01-14. Revised 8/6/21.

[130] There are some services such as optometry, that if the patient met certain criteria (e.g., poor visual acuity, annual diabetic retinal exam), would not need physician approval, but could be scheduled by Case Managers.

[131] 953 (38%) specialty referrals were canceled.

[132] Small, reducible umbilical hernia, small lipoma located on the patient's forehead, etc.

[133] Patient #1.

- Case management does not notify providers of the status of specialty services requests when the date is beyond required time frames (i.e., 14 or 90 days).[134] Case management documents the process for each referral in case management notes, but prior to this site visit, ACH providers did not have access to case management notes in the EHR to enable them to track the status of the referral, including whether the appointment date was appropriate for the patient's condition.[135] Providers did not consistently monitor patients whose urgent and routine appointments were beyond 14 and 90 days, respectively (VI. E.3).

- Providers do not consistently and timely meet with the patient following urgent and routine specialty services consultations and/or procedures to review findings and recommendations with the patient. (VI. E.4).[136]

- The County developed a new electronic specialty services tracking log.[137] An EHR template was created in case management notes that allows data extraction to produce the tracking log.  This new tracking log does not contain all required elements of the Consent Decree and key information to track the process. The previous Excel spreadsheet tracking log contained the following elements which enabled case management to know the status of each specialty request:
  - Patient name, date of birth, and X-ref number
  - Date of referral request[138]
  - Type of specialty referral (e.g., cardiology)[139]
  - Reason for referral (e.g., chest pain)
  - Off-site provider (e.g., UC Davis, Kaiser, etc.)[140]
  - Priority of referral (urgent/normal)[141]
  - Date of InterQual approval/denial

---

[134] ACH reports that CM inconsistently ordered provider sick call appointments when referrals were beyond provider ordered, or Consent Decree time frames.  The CD requirement is to notify providers of the status of the appointment, which may or may not require a provider appointment.

[135] The monitors raised concerns about the lack of case management notes regarding the status of specialty services and were informed that we did not have security access to the notes. At this site visit, we were given access to these case management notes.

[136] ACH reports that: "CM started ordering the follow-up visits, however there has been a problem with specialty providers not providing documentation of the visit in which the providers had been postponing the follow-up appointment until records are available which can take upwards of a week. Case Management has been requesting records and also requesting Medical Records upload them into the EHR for providers to see but it is a lengthy process which has also added work to our CMs. At the provider meeting 10/31/24 CM SRN discussed this and providers agreed that CM will email records to providers and then email Medical Records in an effort for providers to have these records for this follow-up appointment. CM is also actively recruiting an additional Office Assistant to help with this medical records process to offload the work from Case Managers."

[137] The County reports that the tracking log continues to be developed to address and add additional fields.

[138] Required by the Consent Decree and/or policy.

[139] The log includes "Order Description" and Referral Type. Recommend Type of Specialty Service only.

[140] The current log indicates whether the service is on- or offsite but does not specify the location of off-site services.

[141] The term normal is not used by the medical community with respect to timeliness of services. Change to Routine.

- o Date of UM physician approval or denial, if denied by InterQual
- o Reason for denial
- o Date referral sent to a specialty provider for scheduling[142]
- o Date of appointment
- o Date of rescheduled appointment
- o Reason for rescheduling the appointment
- o Date of completed appointment
- o Date paperwork received
- o If any delays, document the length and reason for delay
- o Provider follow-up if delays in the appointment
- o Appointment status if not completed (e.g. pending, canceled, released, etc.)
- o Nurse saw the patient upon return (Yes/No)
- o Date medical provider follow-up scheduled with the patient (i.e., <5 days)
- o Date medical provider appointment took place.
- o Number of days to complete the scheduled appointment
- o Whether the time frames met Consent Decree requirements (i.e., 14 days for urgent consults and 90 days for routine consults)

The new tracking log does not include dates of UM review and whether the consult was approved or denied.  It contains two columns that both duplicate the date the provider ordered the services:  "Order Create Date" and "Date of Referral."  It is not organized in a way that is visually friendly.  The County needs to revise the specialty services tracking system to include elements in the previous tracking log.

When a specialty services request has been approved, case management prepares paperwork that includes necessary clinical information.  Case management forwards the information to the outside specialist, and then to Custody Medical Transport (CMT) to schedule the appointment.[143] There is no documentation in the EHR as to the date CMT attempts to schedule the appointment. However, the tracking log includes a column for "Date sent to Specialty Provider," and it often shows that the date of the request for an appointment was sent to the specialist two days in advance of the actual appointment, often after the specialty referral  has been pending for

---

[142] PP-Adult-ACH-04-8 Specialty Referrals revised 9/7/22 states that appointments for approved specialty services will be requested within 3 business days of determination of clinical need.

[143] The process for scheduling a specialty services appointment is not addressed in the Utilization Management or Specialty Services policies, and does not include the role and process of custody scheduling specialty appointments. The tracking log is unclear whether it is case management or custody that sends the referral request to the specialist to make the appointment.

months.[144],[145] It is unusual to obtain appointments two days after contacting the specialist, particularly for non-urgent requests. The reason for appointment cancellation(s) is not included on the log, including cancellations due to custody reasons. It is important that the tracking log is accurate to assess problems with providing timely access to services (IV. E.5, VI. E.6).

- At least twice a year, the County is to conduct audits examining the timeliness of specialty services as described in subsections (5) and (6), and complete a report as to whether each category is completed in a reasonable time frame (VI. E.7). The County provided a QI study of timeliness of specialty services from July 2023 through September 2023, but has not provided QI studies for the last two monitoring periods. Moreover, the previous study did not include specialty services not entered on the tracking log. This provision is in noncompliance (VI. E.7).

- The County has implemented Rubicon, an e-referral system. Record review showed that medical providers utilize Rubicon for clinical decision making (VI. E.8).

- Case Management does not notify providers whether the referral appointment is scheduled to occur within the time frame pursuant to the referral and/or clinical information (VI. E.9). Prior to the site visit, medical providers were not provided EHR access to case management notes so that they could see whether the patient's appointment was scheduled (VI. E.9.a). Case management did not affirmatively notify providers when specialty appointments were scheduled outside of clinical need or Consent Decree timeframes. Record review shows that medical providers are not aware of the status of scheduled or unscheduled specialty services appointments. In multiple records, specialty services appointments were not timely scheduled, and providers repeatedly documented "consult pending," without contacting case management to find out the status of the consult, and whether further action is needed to obtain the specialty service. In addition, some specialists (e.g., orthopedics) order tests or

---

[144] Patient #4: Ophthalmology referral ordered 4/17/24, referral sent to specialist on 6/23 and the appointment scheduled on 6/26/24, but was It was canceled. On 7/15/24, the appointment request was sent to the ophthalmologist and scheduled for 7/17/24, but was canceled. CM contacted the specialist again on 7/25/24 and an appointment was scheduled for 7/29/24, but it was canceled. The referral was then lost to follow-up and has not been rescheduled. See full description on page 80.

[145] ACH reports that on-site Specialty Clinic appointments and off-site specialty appointments are handled differently. On-site clinics are scheduled 1-2 times a month, depending on the specialty, by the Contracts department based on the specialty providers schedule. CM creates the clinic list and sends the list to the MA, Physician, SRNs and Contract manager. On the day of the clinic, the MA provides the appointment list to custody for escorts. For off-site referrals, the medical packet is created and emailed as a request for service to the specialty provider. Each provider's process is a bit different and some require up to 2 days to "process the referral." Custody transport contacts the specialty clinic providers office (sometimes by phone, sometimes by email-depends on that specialty providers process), in which dates are typically provided by the Specialty Provider Clinic-the priority/urgency of the appointment as ordered by our providers is on the RFS medical packet; however the dates provided are based on the Specialty Provider's availability, so if they can accommodate our requested timeframe they will, if the wait for the community is 6 months to see that Specialty then our patient's wait as well-we don't get priority over the standard community wait times.

procedures (e.g., CT, MRTs, surgery) but do not schedule the patient for follow-up to evaluate the patient's function and severity of pain while the procedures are pending, and to determine if any action is needed to expedite imaging and/or surgery. This system of communication is dysfunctional and dangerous. Patients have experienced negative outcomes because of lack of timely follow-up (VI. E.9.b and VI. 9.c).

- The County has a contract with Spectrum Accountable Care Company for physical therapy services and physical therapy is being conducted at the jail through June 30, 2025. Medical records show that physical therapy services were sometimes not available (VI. E.10).[146],[147]

We reviewed the case management process and noted that there are systemic issues that delay patient access to specialty services and prevent compliance with the Consent Decree. See J. Utilization Management.

We found the following:

- When a medical provider orders a referral through the EHR, the order is placed on Administrative Hold in the EHR pending utilization review. Case managers pull the list from the Fusion Order Manager. The specialty referral tracking log showed that as of 7/15/24, there were 666 (26%) referrals on Administrative Hold. *Thus, a quarter of the 2,540 referrals were awaiting case management review. This is an enormous backlog or referrals to be processed.*

- Case managers retrieve referral lists from the Fusion Order Manager several times per week, not daily, and they are processed as "time allows."[148] Per policy, UM needs to address referrals within 24 hours and 72 hours for urgent and routine referrals, respectively.[149] Checking the list several times a week cannot ensure that the timeframes are met. Record review shows that case management has not addressed referral orders for weeks and sometimes months. Sometimes referral orders are not addressed at all. *ACH reports that they are in the process of obtaining more staff to process specialty referrals. This needs to include sufficient medical provider hours to conduct daily review of specialty referrals.*

- Case Management Utilization Review (UR) meetings occur weekly with the CM physician to review off-site referrals. On average, 20 patient referrals are evaluated at each meeting. Given the number of referrals on administrative hold, conducting UR once weekly is clearly insufficient to provide timely medical services. In the case management template in the EHR, there is a heading for Medical Director Review, but record review shows that most often this section is not completed.

---

[146] Patient #4.
[147] ACH leadership reports that a new physical therapist was hired and started on 10/18/24.
[148] 11/2/24 communication from Dr. Sergienko.
[149] Specialty Services Policy. Revised 09/2022.

- For on-site specialty referrals, if required labs and imaging have been performed, case managers approve the referral. This process does not ensure that the actual referral is medically indicated. All referrals need to be subjected to InterQual or CM physician review.

- Case managers do not schedule medical appointments with off-site providers in collaboration with Custody Medical Transport (CMT). Rather, as noted in previous reports, CM forwards the requests for appointments to Custody Medical Transport (CMT) deputies who schedule the appointment within custody resources and may not have information about Consent Decree timeframes. We have met with CMT deputies who are very dedicated and conscientious about trying to schedule timely appointments. However, because deputies are not medically trained, they cannot appreciate the importance of prioritizing certain appointments over others (e.g., scans to rule out cancer versus scans for other medical conditions), and it results in the sharing of Protected Health Information (PHI) with non-medical staff.[150]

- While the County has taken measures to minimize the amount of medical information available to CMT deputies, the process itself results in the ongoing sharing of PHI.[151]

- Record review shows that nurses did not consistently see patients upon return to the jail, and patients were not consistently scheduled to see patients within policy timeframes (i.e., 5 days for urgent referrals and 14 days for routine).

- Specialty services reports were not always scanned into the EHR in a timely manner. Sometimes reports were timely scanned into the record, but providers and consultants were not aware of the report, which sometimes resulted in repeating ultrasounds and CT scans.[152]

The following cases illustrate the problems noted above.

**Patient #4** This is a 36-year-old male who arrived at SCJ on 2/10/24 and is still at the jail. His medical history includes trauma secondary to being hit by a motor vehicle as a pedestrian with multiple injuries including liver and spleen lacerations, and rib and back fractures with related

---

[150] HIPPA regulations permit sharing of protected health information with custody if such information is necessary for the provision of health care to inmates. However, the scheduling of medical appointments with access to PHI is a health care responsibility not a custody function. Whereas, transporting patients to health care appointments is a custody function for which staff need to be provided sufficient information to complete the appointment. See 45CFR 164.512(k)(5).

[151] ACH reports that the "scheduling process is a collaborative process between CM, Custody transport and the off-site Specialty Provider. Each provider has different processes however Case Management indicates the priority of the referral (Urgent or Routine), if the dates provided don't match the priority then CMT contacts CM via email, phone, or Teams message to select a date provided." However, *actual practice shows that this arrangement does not result in timely appointments based upon patient needs and CD requirements*.

[152] Patient #12.

surgeries, bilateral blindness with some vison in his left eye, positive rheumatoid factor, thrombocytopenia, and pancytopenia.

**Summary:** This 36-year-old patient has not had timely specialty services for multiple serious medical conditions. At intake, he reported a history of bilateral blindness due to glaucoma, failed cataract surgery, and a history of boxing. He retained some vision in his left eye.

The patient was not provided timely access to ophthalmology, hematology, and podiatry services. The onsite ophthalmologist repeatedly canceled scheduled patient appointments. As of 9/9/24, The patient still has not been seen by ophthalmology.

On 4/17/24, a medical provider referred him to ophthalmology to determine if the remaining vision in his left eye could be preserved. CM received the referral the following day.

Two months later, on 6/23/24, CM responded to this referral and noted the appointment was scheduled the following day, but ophthalmology canceled the appointment. On 7/15/24 and 7/25/24, the appointment was rescheduled, but CM noted that the specialist canceled both appointments again.  On 9/19/24, the order was changed to an outside ophthalmologist, but CM notes do not show that actions have been taken to obtain the appointment. On 10/10/24, the patient was referred to onsite optometry for visual acuity and intraocular pressure testing for glaucoma, but it is on Administrative Hold and has not been scheduled.

*Note: There are no notes that reflect CM contacted the UM or Medical Director regarding ophthalmology's repeated cancelation of patient appointments.*

As of 11/1/24, CM has taken no further action to schedule the offsite ophthalmology appointment. This patient is at risk of losing the remaining vision in his left eye and complete blindness.

The patient's labs showed that he had thrombocytopenia/pancytopenia, a condition of low platelet, white, and red blood cell counts. He has a positive rheumatoid factor (RF+), but medical providers did not review this report and acknowledge the +RF result.

On 4/22/24, a provider ordered an urgent hematology consult which was due by 5/5/24, but the appointment did not take place for two months, on 6/26/24. Hematology recommended blood tests and a follow-up appointment in 2-3 months. *On 7/1/24, a medical provider reviewed the hematology consult recommendations, and ordered recommended labs, but not follow-up with hematology.*  Almost 6 weeks later, on 8/9/24 another medical provider reviewed the hematology report and ordered hematology follow-up. Case management did not submit the request for an appointment for two weeks, until 8/22/24.

*Addendum: On 10/10/24, the hematology consult was performed, but as of 11/1/24, there is no report in the record, thus medical providers are unaware of findings and recommendations.*

*Some specialty referrals do not appear as a medical order in the patient's record or case management notes, resulting in delays in care.*

On 4/17/24, a provider ordered an abdominal ultrasound for the patient that was completed 5/8/24.  We note that when providers order imaging (ultrasounds), the order is found in the progress note, but not always found in medical orders or case management notes. Because the order is not included in medical orders or case management notes, the record does not provide accountability for timely completion of the order. In other words, if the ultrasound is not performed the only way to know that an ultrasound was ordered is to review each medical provider progress note. This can result in the imaging not being completed without being noticed. All provider orders need to be visible in the patient's medical orders with the status of the order (e.g., pending, completed).  On 6/26/24, the hematologist did not see the initial ultrasound report and reordered an abdominal ultrasound. On 7/16/24, a deputy told a radiology technician that the patient refused the ultrasound and the radiology technician discontinued the order and made a referral to obtain a refusal of treatment form. *No one verified with the patient that he refused the ultrasound or counseled him about the consequences of refusal. A medical order can only be discontinued by the ordering provider, not a radiology technician.*

On 5/24/24, podiatry saw the patient for bilateral painful ingrown toenails and bilateral arch pain preventing him from walking distances. Podiatry recommended purchase of 8.5 size power step arch support orthotics to reduce pain and promote mobility. *This order did not appear on pending medical orders and the arch supports were not provided to the patient.* On 8/29/24, the podiatrist reordered arch supports. The order is found in medical orders but is listed as on Administrative Hold, meaning that CM has not yet processed the order.

**Patient #5**: This 56-year-old man arrived at SCJ on 8/9/24 and is still at the jail. His medical history includes alcohol and methamphetamine use disorder, hypertension, stage 3 chronic kidney disease, stage III malignant melanoma, bipolar disorder, anxiety, and PTSD. He had a history of rectal bleeding.   His current medications are amlodipine, losartan, and hydrochlorothiazide.

**Summary:** In April 2024, he was diagnosed with stage III malignant melanoma below his left shoulder. He underwent wide excision with clear margins, and 1 of 3 axillary lymph nodes were positive.  Surgery recommended a follow-up axillary ultrasound and PET scan that were scheduled for 9/16/24 and 9/18/24, respectively.[153] Oncology recommended follow-up in December 2024 with chest CT every 6 months x 3 years, and then annually x 2 years.

Upon release from the hospital in May 2024, appointments had been scheduled on 9/16/24 for an axillary ultrasound and 9/18/24 for a PET scan to detect metastases but staff did appear to be aware that the patient had these scheduled appointments.  Following arrival at the jail, the staff

---

[153] Per patient HSR.

did not initially schedule for the axillary ultrasound, but class counsel contacted the County on the patient's behalf. On 8/27/24 the Medical Director ordered an expedited left axillary ultrasound that was completed on 9/3/24.

On 9/18/24, case management submitted a request for an oncology appointment in December 2024.  *As of 11/2/24, an appointment has not been scheduled for the oncologist, and there are no orders for a CT scan recommended by oncology. This poses a serious risk to the patient, and the failure is particularly troubling because class counsel has already intervened with respect to this patient's oncological care.*

**Patient #2:** This is a 36-year-old male who arrived at SCJ on 11/22/23 and was released on 8/14/24. His medical history includes alcohol and opioid use disorder, intravenous drug use (IVDU), hepatitis C infection, resolved, asthma, chronic chest pain, heart failure, GERD, rectal bleeding, and bipolar disorder. His medications included aspirin, metoprolol, buspar, pantoprazole, and depakote.

**Summary:**  The patient had a known history of heart failure and frequently complained of chest pain resulting in emergency department (ED) visits. On 1/19/24, he was referred to in-house cardiology. On 2/7/24, cardiology saw the patient and performed a point of care echocardiogram (POCUS) in the office that showed an ejection fraction of 25-35% (normal=>50%). The cardiologist ordered previous medical records and a formal echo. The echo was not completed for 3 months, which, given his symptoms and POCUS result needed to be conducted urgently. Previous medical records were not obtained and scanned into the record.

Medical providers frequently noted that the echocardiogram was pending but did not contact case management to find out the appointment date and whether it needed to be expedited. Following the formal echocardiogram, the in-house cardiologist saw the patient noting the need to implement Goal Directed Medical Therapy (GDMT) for heart failure. *Inexplicably, the cardiologist did not start GDMT and discharged the patient from his care. He sent an alert to another medical provider for her to implement GDMT for the patient. We have never encountered the situation of an onsite specialist discharging the patient from care before the patient has been treated and followed to determine the effectiveness of treatment, prior to the implementation of treatment.*[154]

The provider to whom the alert was sent documented on more than one occasion that the cardiologist would not see the patient again. Labs showed the patient has thrombocytopenia (low platelets) but this has not been noted or added to the problem list. Other cardiac lab tests were normal (BNP=<4).

---

[154] The Medical Director reported that the cardiologist quit one day and said he was not coming back.  This raises the question of patients current access to cardiology services.

Positively, nurses conducted prompt assessments when the patient presented with chest pain and palpitations and timely notified medical providers. Medical providers timely saw the patient following episodes of chest pain.

There were delays in custody transport to the emergency department. On 1/18/24 at 14:52, a medical provider suspected that the patient was having acute coronary syndrome (e.g., myocardial infarction) and ordered the patient to be transported to the hospital, but custody did not sign the Intent to Incarcerate (ITI) form until 18:00, and the patient did not arrive at Sutter Medical Center until 19:00. The patient was not diagnosed with a heart attack, but had he had one in progress, the patient may not have survived a 4-hour delay in treatment.

On 3/7/24, the patient presented with a rash over his body following treatment with clindamycin and vancomycin, indicating a severe allergy. The provider ordered the patient sent to the ED, but custody did not transport the patient for 2.5 hours. The criteria for sending patients to the ED for potentially life-threatening conditions via van or ambulance needs to be reviewed.

**Patient #3** This 61-year-old man arrived at the jail on 1/27/24 and was released on 3/22/24. He has serious chronic medical and mental health conditions, including heart failure, alcohol use disorder (AUD), hepatitis C infection, end-stage liver disease, hypertension, and scrotal hernia. He did not receive timely specialty services for advanced heart failure with ejection fracture of 17%, and continuity of heart failure medications recommended following hospitalization. The record showed other system and individual medical, nursing, mental health[155] and custody performance issues.  Key concerns are noted below.

1. On 2/2/24, a medical provider ordered an urgent in-house cardiology consult for the patient due to advanced heart failure and ejection fraction of 17%.  Case management notes do not show the referral.  On 2/18/24, the patient was sent to the Sutter ED with acute systolic heart failure where it was determined that the patient needed more aggressive diuretic therapy and ordered two diuretics for the patient. Upon return from the hospital, a provider ordered discharge medications that included the two diuretics. *However, another medical provider, without reviewing hospital discharge records, determined that two diuretics were inappropriate and discontinued the more potent diuretic (Bumex), increasing the risk of exacerbation of the patient's heart failure.* CM did not schedule the patient for follow-up with the cardiologist until 3/13/24 when the ordering physician contacted case management regarding the status of the consult.

2. Per current guidelines, for patients with heart failure and ejection fraction <30%, the standard of care is urgent implantation of a defibrillator due to the risk of sudden death.[156] This was not addressed during the patient's hospitalization or by the in-house cardiologist.

---

[155] This case was reviewed by Mary Perrien, court-appointed mental health expert, who agreed with the conclusions.
[156] See https://www.ahajournals.org/doi/10.1161/CIRCHEARTFAILURE.122.009634#:~:text=13-,Guideline%20Recommendations%20for%20Primary%20Prevention%20Defibrillator%20Therapy,40%20days%20af

*3.* Nurses did not always refer the patient to a medical provider when clinically indicated. Shortly after the patient's arrival, the patient complained to custody of abdominal pain from a hernia. The nurse did not assess the patient and follow a standardized nurse procedure or notify a medical provider of the patient's complaint of abdominal pain. The following day, a medical provider sent the patient to the emergency department for a scrotal ultrasound. Upon return, the medical provider noted that the patient had a "right sided hiatal hernia containing a loop of bowel," and would benefit from a surgical consult, but noted the patient was going to be released in 45 days and did not order a surgical consult in the progress note. *Because release dates are unpredictable, providers should not base specialty services referral decisions based upon the patient's expected release date.*

4. Although the provider did not order a surgical consult in the progress note orders, on 2/16/24, case management noted that the patient was reviewed with the UM physician and the patient needed an ultrasound prior to surgical repair of his hernia. Case management did not note that an ultrasound had been completed on 1/31/24 or consider whether repeating was necessary. This may have delayed the scheduling of the surgical consult and it was not ordered prior to the patient's release on 3/22/24.

5. Shortly after arrival, custody made a mental health referral because the patient was not programming well and having fights with other inmates.  A social worker saw the patient who appeared disoriented and was on a detox protocol.  The SW consulted with a LCSW and a decision was made not to order a mental health assessment and "advised" to make a future referral if needed once detox was completed.  The patient's Avatar history showed a history of bipolar disorder, psychosis, and depressive disorders, but throughout his detention, MH staff noted that the patient did not have serious mental illness, even though the patient had been started on Risperdal and Depakote at the hospital due to previous psychiatric treatment. These mental health diagnoses are not on the patient's problem list.

Other findings:

6. At the hospital, the patient was found to be mildly hypothyroid (TSH=6.2), normal Free T4 and was started on levothyroxine 100 mcg. Over the next 3 weeks, the patient lost 16 pounds. From the time of arrival, and prior to being placed on levothyroxine, the patient complained of being hungry and not being fed meals. The patient's weight loss may have been due to continued diuresis, excess levothyroxine, or not receiving meals due to diversion or other reasons; however, the patient's weight loss was not addressed and he was released shortly thereafter.

---

ter%20myocardial%20infarction.&text=For%20patients%20with%20ischemic%20cardiomyopathy,%3C30%25%20f or%20ICD%20therapy.

7. There were many alleged refusals, some accepted from custody, others through the cell intercom. There were virtually no signed refusals in the record. In one case, a medical provider saw the patient for a court-ordered visit. The patient had initially refused the appointment but changed his mind and came to the exam room. The patient had changed his mind because he was short of breath and worried he would pass out. The medical provider did not listen to his heart or lungs, examine the patient's abdomen which was distended, or the patient's extremities. The patient needed evaluation for exacerbation of his heart failure. At that time, his medication list showed that he was not prescribed Bumex, recommended by cardiology. In this case, it appears that the patient's initial refusal was because he was not feeling well, but staff did not go to his cell when he refused the appointment to engage the patient.

8. The medical record shows that custody has interfered with access to medical and mental health care and treatment. Custody took the patient's inhalers from him that he needed for treatment of COPD. Custody prevented a mental health provider from having access to the patient for an urgent mental health visit because the unit was "too busy."  There was a transport delay of 4 hours when a provider referred the patient to the ED. On 1/31/24, at 09:40 a provider ordered the patient transported to the ED, but custody did not depart for four hours, at 13:30. These are serious instances of custodial interference in essential patient health care.

9. Custody did not always contact medical staff when the patient was in acute distress. One night, custody reported to mental health staff in the morning that the patient kept yelling "help me, help me" all night.  The record does not reflect the reason why the patient asked for help. Custody needed to notify both medical and mental health staff at the time of the patient's distress to medically evaluate the patient.

**Patient #18**: This is a 28-year-old woman who arrived at SCJ on 3/5/24 and was released on 7/17/24. Her medical history included pregnancy and schizophrenia.  She is allergic to Bactrim and Keflex.

**Summary:** This patient was briefly admitted to SCJ in late December 2023 and was pregnant. She was readmitted in March and had no prenatal care at approximately 26 weeks.

Case management did not timely schedule anatomy and growth ultrasounds.  On 3/8/24, the OB provider ordered an anatomy ultrasound. On 4/10/24, the anatomy US was completed, and UCD recommended a growth ultrasound in 4 weeks. However, this was not timely performed.

On 4/26/24, the OB noted that the requested ultrasound was on "administrative hold."[157]  By 5/24/24, the growth ultrasound had not been performed. Concerned, the OB provider sent the patient to UCD labor and delivery for fetal monitoring, and the patient was released from the

---

[157] Administrative hold means that it was in the case management list of specialty referrals to process.

hospital the following day.  However, on 5/26/24, the OB provider ordered the patient sent back to UCD due to fetal size being less than 1% of expected growth with a diagnosis of fetal growth restriction.

On 6/7/24, the patient was admitted to the hospital for induced labor and delivery due to fetal growth restriction. The patient delivered without complications.

At discharge, the patient desired POPS (Progestin Only Contraceptive Pills) for birth control. Recommendations included follow-up by the PCP.  However, on 7/17/24, the patient was released without birth control counseling, which is not compliant with the Consent Decree.

Patients #17 and #19 who were pregnant also did not receive timely anatomy ultrasounds.

**Compliance Assessment:**
- E.1=Noncompliance
- E.2=Noncompliance
- E.3=Noncompliance
- E.4=Partial Compliance
- E.5=Partial Compliance
- E.6=Partial Compliance
- E.7=Noncompliance
- E.8=Substantial Compliance
- E.9=Noncompliance
- E.10=Substantial Compliance

**Recommendations:**
1. The County needs to comprehensively re-evaluate utilization management/specialty services processes to provide timely and appropriate care to patients with serious medical needs.
2. Revise the utilization management and specialty services policies to accurately reflect all aspects of procedures. This includes how specialty services are scheduled and the role of UM in tracking the timeliness of appointments.
3. Allocate sufficient nursing and medical resources to catch up on the backlog specialty services referrals that have not been processed by case management.
4. Identify high risk patients and urgent referrals to be prioritized for processing.
5. Eliminate the backlog of referrals to be processed within 45 days.
6. Reestablish the use of InterQual and/or physician review for both off-site and on-site specialty services.
7. Ensure that referrals are matched to the appropriate service (e.g., optometry instead of ophthalmology, etc.)
8. Educate providers about ordering referrals for medical necessity versus elective procedures.

9. Establish criteria for selected services that do not need to be put through the case management process (e.g., routine optometry referrals for visual acuity, glaucoma screening, and annual diabetic retinal screening).

10. Review and process specialty referrals daily.

11. The case management template and log need to accurately reflect the date a provider ordered the referral. Consider auto populating as much information as feasible.

12. In combination with InterQual, a UM physician needs to review all referrals daily for approval or denial. For denials, the UM physician needs to recommend an alternate treatment plan.

13. Revise the case management template in the EHR to include all required elements that need to be captured for the tracking log (most that are included on the previous tracking log) see above).  Specifically, the template needs to include:

    a. The date that case managers reviewed and processed each referral,

    b. Whether the referral was approved or denied.

    c. Whether the referral was approved via InterQual criteria and/or the name of the physician making the UM decision

    d. Include multiple entries in the event the appointment was canceled and/or rescheduled and the reason why, including lack of custody resources.

    e. Date report was received.

    f. Whether the specialist requested follow-up (e.g., labs, scans, or an appointment)

    g. Date of scheduled follow-up appointment with a medical provider

    h. Date of completed medical provider appointment.

14. Establish productivity expectations for on-site consultants (e.g., to see x number of patients within 4 or 8 hours). Case managers should schedule appointments based upon priority of need.

---

**F. Medication Administration and Monitoring**

1. The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws through the following:

   a. Ensuring that initial doses of prescribed medications are delivered to patients within 48 hours of the prescription, unless it is clinically required to deliver the medication sooner.

   b. Ensure that medical staff who administer medications to patients document in the patient's Medication Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, (3) the date and time for any refusal of medication, and (4) in the event of patient refusal, documentation that the prisoner was made aware of and understands any adverse health consequences by medical staff.

2. The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

3. The County shall provide pill call twice a day in each housing unit, at regular times that are consistent from day to day, except as may be required by non-routine facility security concerns. The County shall develop and implement policies and procedures to ensure that prescribed medications are provided at therapeutically appropriate times as determined by the ordering physician. Any patient who requires administration of medications at times outside the regular pill call shall be provided that medication at the times determined by the ordering physician.

4. The County shall develop and implement policies and procedures to ensure that patients are provided medications at therapeutically appropriate times when out to court, in transit to and from any outside appointment, or being transferred between facilities. If administration times occurs when a patient is in court, in transit, or at an outside appointment, medication will be administered as close as possible to the regular administration time.

5. The County shall develop policies and procedures to ensure that medication efficacy and side effects are monitored by staff and reviewed by appropriate clinicians at appropriate levels.

6. The County shall explore the expansion of its Keep-on-Person medication program, (especially for inhalers and medications that are available over-the-counter in the community) and to facilitate provision of medications for people who are out to court, in transit, or at an outside appointment.

---

**Findings:** The County has made changes to medication administration and monitoring processes since the last monitoring report; however, challenges remain. The County has revised policies and procedures specific to medication management and administration in collaboration with the court-appointed experts. (VI. F.1.)

Initial doses of prescribed medications are usually administered to patients within 48 hours of the prescription. Nursing staff contemporaneously document the administration of drugs;

however, delays in medication administration still occur due to lack of ACH staffing and/or custody escorts (VI. F.1.a, VI. F.1.b, and VI. F.2). Medications must be administered up to one hour before and one hour after the scheduled time to be timely administered.  Record review found delays in administration at all scheduled times. Medications scheduled for administration at 21:00 are often not administered until after midnight and as late as 02:00, disrupting the patients' normal sleep cycle and contributing to patient refusals of the medication. This is an unacceptable barrier to care.

Standards of nursing practice and the Consent Decree requires documentation regarding medication administration, including that in the event of patient refusal the patient is made aware of and understands any adverse health consequences by medical staff. Currently, nurses document the refusal of medications on the eMAR and, according to policy, are to obtain a written refusal if the patient refuses a critical medication (e.g., insulin), For all other medications, nurses are to send an alert to a medical or mental health provider for patients who miss 3 consecutive days or 50% of doses in a week.[158] However, during medication administration, nurses do not consistently provide counseling of adverse consequences for each dose of medication that patients refuse and obtain a signed refusal form. This is in part because due to the volume of patients who refuse medication and the amount of time it would take to counsel each patient during medication administration. When nurses send medical and mental providers an alert, it is the providers responsibility to schedule an appointment with the patient to discuss reasons for noncompliance (e.g., lack of knowledge, side effects, barriers such as medications at 3 am), address the reason, and counsel the patient. The provider can make a decision to change or discontinue the medication, avoiding the need for a signed refusal of treatment. However, providers need to obtain a signed refusal of care for patients whose refusal of medications place them at risk of harm (e.g., a patient with type 1 diabetes who is refusing any insulin and is at risk of diabetic ketoacidosis and death).

However, record review shows that nurses do not consistently refer non-adherent patients to a medical or mental health provider or a clinical pharmacist, and providers do not timely counsel patients about nonadherence. Nurses need to timely make the referrals, and providers and/or clinical pharmacists schedule the patient for counseling (VI. F.1.b)

Medications are routinely scheduled for administration at 07:30, 15:30, and 21:00 (VI.F.3.). To administer the scheduled morning and afternoon, the County moved nursing staff assigned to medication administration to the day shift, and except for the 21:00 administration time, they administer all scheduled medications. The change was made to mitigate untimely medication administration. However, a review of health records finds that untimely medication administration continues.[159]

---

[158] ACH-04-17 Medication Administration. Revised 7/29/22.
[159] The County assigned provision F.3 as being in substantial compliance, however this is not supported by record review.

We reviewed medication administration records (MAR) over six randomly selected days during June and July 2024 for a patient prescribed three psychotropic medications. These medications were scheduled for administration at 07:30, 15:30, and 21:00. *Record review found medications timely administered only 14% (4 of 29 doses) of the time*.[160]

A patient prescribed Metformin for the treatment of diabetes was scheduled for medication at 07:30 and 15:30. A review of medication administration records over eight days showed that medication doses were timely administered 35% (6 of 17) of the time.[161]

Another patient, prescribed medications for the treatment of withdrawal from alcohol and opiates, was scheduled for medication administration at 07:30, 09:30, 15:30, and 21:30. Review of the patient's MAR over a randomly selected nine-day period, showed he timely received medications 45% (9 of 20 doses) of the time.[162] The review also found that this patient did not receive the ordered medications before going to court, resulting in a missed dose of medication. ACH policy 04-17, Medication Administration provides sufficient guidance to health staff on preparing medications for patients going to court, in transit, or intra-system transferred; however, generally, the practice is not compliant with the policy. (VI. F.4.)

The monitors interviewed a patient at RCCC who had been transferred from the Main Jail early that morning.  He was scheduled to receive Suboxone for the treatment of his opioid substance use disorder. He reported being pulled from his unit around 06:00 and did not receive his Suboxone dose scheduled for 07:30.[163]  The nurse conducting medication administration was observed telling the patient she did not have medication for him and that he would "probably get it tomorrow." The monitors escalated the situation to the Director of Nursing, who reported that patients who were transferring between jails get their medication within 24 hours of the transfer. The Director of Pharmacy was present and took action that allowed the patient to receive his missed dose at 15:59. *Although County policy requires patients to receive their medications before departing for off-site appointments or when transferred, a system has not been implemented to ensure compliance with the policy.*

Another patient was prescribed a daily dose of Suboxone for the treatment of opiate substance use disorder. A review of a random 10-day period in May and June 2024 found that only 30% (3 out of 10 doses) of doses were timely administered.[164] Timely administration of once time per day doses of Suboxone is critical to avoid the patient experiencing cravings, which often leads to using opiates and increased risk of overdose.

The County reports that an additional Pharmacist and Pharmacy Technician have been approved for the 2024/2025 budget year, creating 24-hour-per-day pharmacy services.  Pharmacy staff is responsible for preparing medications for patients going to court and being discharged.

---

[160] Patient #29.
[161] Patient #30.
[162] Patient #31.
[163] Patient #32.
[164] Patient #33.

During this monitoring cycle, the County changed the medication administration process. At the Main Jail, rather than requiring patients to queue in front of the medication cart, a unit officer and the nurse go cell to cell and administer the medications.  The monitors observed the newly implemented process and found the process moved quickly; however, the mouth checks conducted by staff were sometimes done without use of a light and done so rapidly that adequate visualization of the mouth was impossible. Inmates in the dayroom were allowed to take their medication and then depart for the water fountain to ingest them without security intervening and correcting the behavior. Staff reported that frequently, there are issues with the laptop on the medication cart syncing with the desktop computer, risking inadequate transfer of critical medication administration data.  Although the newly implemented process reduces the time required for medication administration, adequate time must be taken to ensure proper mouth checks, accurate documentation, and data transfer. [165]

At RCCC, medications are administered at the door of the housing unit.  There are three units where medications are administered at the individual patient cell door.  The monitors observed the medication administration process during morning and afternoon administration times.  Staff medication administration practices were consistent between nursing staff and administration times.  The practice of security staff varied.  One officer allowed patients to stand in the queue without their shirts on, and the mouth checks were done rapidly, sometimes without using a light to visualize the oral cavity. Inmates were allowed to refuse by yelling out from a distance and by sending a message through another inmate.

We observed an afternoon medication administration at KBF 100 pod. The deputy did an excellent job of managing the process, controlling inmates and the unit, with no talking while in the queue, and thorough mouth checks completed using illumination. The deputy commanded respect while being respectful of the inmates. Obviously, this was his routine practice and not a temporary change.  He should be championed and used in a training capacity until there is consistent practice among all staff. [166]

The County is to develop policies and procedures to ensure that that medication efficacy and side effects are monitored by staff and reviewed by appropriate clinicians at appropriate levels (VI. F.5). The Remedial Plan indicates that the County has developed policies and procedures "to ensure that medication efficacy and side effects are monitored by staff and reviewed at appropriate levels." The chronic disease policy assigns the responsibility to explain and monitor side effects to a RN. *However, chronic disease policies and protocols need to clarify that medical providers are initially responsible to explain the purposes of medication and their side effects;  and at each chronic disease visit to review eMARs to assess the patient's medication adherence, drug efficacy, and side effects, to include handouts if available.* Nurses also need to review medication

---

[165] Per SSO, the policy has been updated and mouth checks have been discussed multiple with staff members.  SSO audits of floor operations now include ensuring pill call procedures are properly followed by both SSO & ACH. Any problems are passed along to ACH/SSO leadership if/when found.

[166] The monitors provided the name of the deputy to be commended to the County.

adherence and reeducate the patient as needed. Record review shows that medical providers do not consistently assess medication adherence at each visit, but do document side effects when present.

The County has developed and implemented a Keep-On-Person (KOP) policy for chronic disease medications and medications for potentially emergent conditions such as angina and asthma (VI. F.6). Pharmacy staff prepares and administers the KOP medication supplies to the patients. The name, dose, and administration date are documented on the electronic medication record (eMAR); however, the amount of medication is not documented. Pharmacy staff can view the amount of medication administered in the pharmacy software (CIPS), but health staff cannot. As discussed in our prior reports, there is no software interface between CIPS and the Fusion eMAR, resulting in incomplete documentation of KOP administration of medications. The Pharmacy Director, has been working with Fusion and CIPS to develop a bi-directional interface, but it has not yet been completed. It is essential to document the date and time of delivery of KOP medications, as well as the quantity given to the patient. Staff also need to document administration of discharge medications and the quantity in the EHR at the time of the patient's release.

A concerning issue is that orders for sliding scale insulin including blood sugar thresholds and specific insulin dosing are not included in medical orders, the eMAR or anywhere in the EHR. Nurses document patient blood sugars and the amount of insulin given, but there is no way to know if the amount of insulin given was correct, because there are no orders in the EHR. We found records that show the patient's blood sugar was extremely high (e.g., 448) but no sliding scale insulin was given, apparently because there were no orders for the patient. These are both clinical and EHR issues that need to be addressed.

**Compliance Assessment:**
- F.1. =Partial Compliance
- F.1.a=Substantial Compliance
- F.1.b=Partial Compliance
- F.2=Partial Compliance
- F.3=Partial Compliance
- F.4=Noncompliance
- F.5=Partial Compliance
- F.6=Substantial Compliance[167]

**Recommendations:**
1. The County needs to prioritize the interface between the Fusion eMAR and the pharmacy software (CIPS) to correct predictable medication errors and avoid harm to patients. This is a critical issue.

---

[167] The County assigned this provision Partial Compliance, however based upon Consent Decree requirements and implementation, the monitors believe the County is in Substantial Compliance.

2.  Orders for sliding scale insulin need to be visible in the EHR, both in medical orders and the eMAR.
3.  The County needs to document all medications and quantity given to the patient on the eMAR, including KOP and discharge medications.
4.  The County needs to prioritize adequate custody staffing to ensure the timely delivery of medications for all scheduled administration times, seven days a week.
5.  The County needs to prioritize nursing scheduling to ensure the timely delivery of medications for all medication administration times, seven days a week.
6.  The County needs to develop and implement a system that ensures that ordered medications are administered before departure when patients go out to court, off-site specialty appointments, and transfer to other facilities.
7.  The County needs to implement a process for the timely transfer of patient-specific medications for all intra-system transfers, ensuring no disruption in patients' ordered medication regimen.
8.  The County should train and reinforce with custody staff on proper medication administration practices. When possible, use custody champions who have demonstrated excellence in managing medication administration.
9.  Nursing staff must ensure all required medicines are in the cart before initiating medication administration. Medication should be obtained by locating it in the cart to which it was assigned before inmate movement, obtaining the medication from the automated stock medication cabinet, or calling the pharmacy to get it.

---

### G. Clinic Space and Medical Placements

1.  The County shall provide adequate space in every facility to support clinical operations while also securing appropriate privacy for patients. Adequate clinical space includes visual and auditory privacy from prisoners, and auditory privacy from staff, the space needed reasonably to perform clinical functions as well as an examination table, sink, proper lighting, proper equipment, and access to health records.
2.  The County shall ensure that any negative pressure isolation rooms meet community standards, including an antechamber to ensure that the room remains airtight, appropriate pressure gauges, and regular documented checks of the pressure gauges.
3.  The County shall ensure that absent individualized, documented safety and security concerns, patients in acute medical or quarantine placements shall be allowed property and privileges equivalent to what they would receive in general population based upon their classification levels. The County shall ensure that patients in medical placements are not forced to sleep on the floor, including providing beds with rails or other features appropriate for patients' clinical needs and any risk of falling.
4.  The County shall not discriminate against patients in medical placements solely because of their need for C-Pap machines, but instead shall provide access to programs and services in accordance with their classification level, as set forth in the ADA remedial plan.

**Findings:**  Since the last site visit in late January 2024, the County has modified the booking area to provide clinical rooms for nurses to conduct confidential intake interviews and provide patients auditory privacy. This is a critical step forward, and while it does not address privacy concerns in other areas of the jail, it moves the County into partial compliance with this provision (VI. G.1).

Specifically, an intake office and bathroom were re-purposed, which resulted in the establishment of one interview room to be used during Phase 1 fitness for confinement (FFC) screening. Also established were three interview rooms for the completion of Phase 2 receiving screening. One of these rooms has an examination table that can be used by medical providers or nurses when clinically indicated. Each interview room has a door with a window that ensures auditory privacy during the patient-nurse interview.  The creation of these rooms is laudable.

The arresting officer or designee is supposed to stand at the door's window so that the nurse and arrestee can see them. The practice we observed differs from the prescribed practice.  The monitors observed the arresting officer with their back to the door, talking with others, or completely removed from the area altogether, leaving the nurse and the arrestee unattended. At least one nurse voiced concern about her safety.  Although the patient is cuffed behind their back and to a bar affixed to the wall, if they were aggressive and wanted to lunge and kick at the nurse, the nurse would be required to move toward them to access the door, which is between the nurse's desk and the cuffed arrestee. The officer must remain diligent with the observation of the encounter such that early intervention is completed when the situation requires it.

Patients found to be a threat to themselves or others due to intoxication are placed in a medical observation, safety, or segregation cell for medical monitoring. The medical observation cell is a multi-person cell. Patients who may be experiencing withdrawal symptoms (e.g., nausea, vomiting or diarrhea) lie on a hard rubberized floor (VI. G.4). This is not appropriate for patients who are or may become ill.  There is running water and a toilet available in the observation cell, but not in safety or segregation cells, and therefore requires nurses to closely monitor patients for dehydration. There is a window between the medical monitoring cell and the nurses' station, providing a direct line of sight for monitoring purposes.  A newly authored medical observation cell policy provides staff guidance on required monitoring but has not been finalized.

On the housing units, the numbers of clinical examination/interview rooms remain insufficient to provide timely access to care in a clinical setting and that provides privacy. Nurses and providers use the examination room adjacent to the elevators between the housing units on each jail floor.  These examination rooms are insufficiently organized to ensure staff safety.  The desk and computer are in the far corner of the room, with the arrestee either sitting on the examination table or in a chair closest to the door.   An officer is not stationed near the examination room. Instead, the nurse and the arrestee are viewed via a camera that connects to the control booth. If the patient becomes aggressive or attempts to harm staff,  they would need

to push an emergency alarm button to summon help, both of which would delay an immediate intervention by officers.[168]

The negative pressure isolation room located on 2 Medical is not functional and is without an attached anteroom, which is required for infection control purposes.  New construction (i.e., IHSF) is needed to achieve compliance with this provision of the Consent Decree (VI. G.2).

Patients using wheelchairs are housed in 2 East 100, 200 and 300 pods. Patients needing C-PAP machines were previously housed in 2 East 200 due to the need for access to electricity, but these patients have been issued battery operated C-PAP machines and the County reports are housed anywhere in the jail in accordance with their custody classification.  There are other medically complex and fragile patients housed on 2 East. 2 East also houses inmates in protective custody. There has been discussion of dedicating 2 East 100 for patients needing medically-supervised substance withdrawal.

Because of the proximity of 2 East to the 2 Medical nurses' station, the unit's highest medical use would be for patients at risk of withdrawal from drugs and alcohol, and medically complex and/or fragile patients *who frequently need urgent care*. The County is encouraged to explore repurposing and dedicating all beds on 2 East as medical beds.[169]

There is a County-approved long-term project that includes the construction of an Intake and Health Services Facility (IHSF) to include a new medical intake, and to create space to move other medical and mental health operations from Main Jail to the IHSF (e.g. dialysis, etc.).  However, costs and other concerns arose, and the County contracted with a third party to study and make recommendations relative to compliance with the consent decree and other factors. That contract and study are ongoing, and a definitive timeline for initiation and completion is pending.

At our request, we were provided the Draft IHSF Conceptual Plan and Draft Criteria Architecture Program by Nacht & Lewis, and submitted our comments to the County.  We subsequently met with CGL, third-party consultants contracted to provide feedback on the draft plan.  We are very concerned  that none of the *Mays* subject matter experts for medical, mental health or suicide prevention were included in the conceptual design and programming. The lack of expert involvement is reflected in the project conceptual design, which lacks adequate numbers of medical examination rooms and dedicated medical offices for supervisory staff and key health care operations.

The conditions of 2 Medical at the Main jail remain unchanged and insufficient. The cabinets and floors are in poor condition, making it impossible to perform adequate disinfection and determine their cleanliness. Supplies are stored on the floor, creating a chaotic and unkempt

---

[168] The County is in process of installing and operationalizing examination/interview rooms at Main Jail on each wing of floors 3-8, increasing clinical  and  interviewing rooms. In the next reporting period, privacy curtains will be installed on half of these privacy pods, providing visual privacy for nurse sick call encounters.
[169] The experts understand that this would require relocating protective custody inmates.

environment that poses a safety risk to staff and patients. This area needs to be prioritized for renovation prior to the next monitoring site visit.

By staff report, 2 Medical infirmary beds almost always remain full, and house both males and females. The Medical Director monitors admissions and discharges daily to ensure patient flow in and out of the infirmary is appropriate and timely.

There are no infirmary beds for females at RCCC. Female patients housed at RCCC who require infirmary level care are said to be transported to the Main Jail. This is not optimal when a patient is sick and needs infirmary level care given delays in custody transport (due to staff or van limitations). Moreover, as noted in previous reports, we are concerned that females that are acutely ill requiring infirmary care are *not* consistently transferred to the 2 Medical infirmary, but instead left in their housing units without medical monitoring. As a result, _female patients are not provided the same access to infirmary-level care as men and may needlessly suffer._ The County is responsible for providing equal access to a higher level of care for both genders. This can be accomplished by constructing an infirmary at RCCC.

By policy, the County allows patients assigned to acute medical housing to keep their property, absent a security reason. (VI. G.3). This provision also requires that patients in acute medical beds are provided access to privileges equal to what they would receive in general population based upon their classification levels. On a practical level, most acutely ill or quarantined patients will not be well enough to access programs or be permitted outside their cell while in quarantine. However, patients that are assigned to a medical housing unit for intermediate or long-term care need to be provided access to services. The RCCC MHU has a yard adjacent to it and patients and orderlies have relatively free access to use it. However, we interviewed an orderly at the RCCC MHU who reported that he was not able to access other programs available to inmates. When movies and other activities are announced through speakers on the yard, he is often unable to hear the announcements, and relies on deputies to let him know about the activity so that he can attend. He reported that there is inconsistency among deputies in informing inmates that activities are occurring. While the orderly is not a patient, similarly situated MHU patients that may only have mobility issues, are well enough, and desire to attend programs need to be provided access to them.

We contacted the County about this concern. In response, we were provided the following information and data regarding out of cell time in the RCCC MHU:

*At RCCC recreation and classification staff reported that they do not foresee any issue with allowing the MHU pod workers access to movie time and "big yard" if they want to attend. Effective immediately, recreation staff will now offer these programs to the MHU pod workers during the same time they offer these programs to M Dorm. SSO reports that other inmates housed in the MHU will continue to not be offered big yard or recreation time, as determined by ACH clinicians, as their medical condition requires them to be under medical supervision and they have access to movies both on pod televisions and inmate tablets. Other*

*opportunities are available such as educational services for which patients on the unit can submit a request. For all dorms unable to have in-person classes, distance learning is offered via tablet.*

For 2 Medical and 2 East, SSO reported that it has established an out of cell time schedule for access to the dayroom 7 days a week, in which groups of inmates are permitted to be out for 2.5 hours for each day, or 17.5 hours per week for each person.

The exception is P1 through 4 (cells in the 2P acute psychiatric unit), whose occupants are offered out of cell time just once a week. We contacted the County who provided the following response:

*These groups are within the APU and meet 5150 criteria. Recently, SSO added an additional swing shift Deputy with the intention of safely increasing out-of-cell time for these inmates. This increase in staffing has now resulted in full swing shift coverage increasing from 4 days a week to 7 days a week. SSO Compliance is actively tracking the impact of this staffing change and expects an improvement in out-of-cell time data for these inmates in future reporting periods.*

FIGURE 1:

| MAIN JAIL DAYROOM SCHEDULE (2 East) | | | | | | | |
|---|---|---|---|---|---|---|---|
| TIMES | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
| **06:45** | COUNT | | | | | | |
| **0730-1030** | GROUP 1 | GROUP 2 | GROUP 3 | GROUP 4 | GROUP 1 | GROUP 2 | GROUP 3 |
| **1030-1100** | CHOW | | | | | | |
| **1100-1330** | GROUP 2 | GROUP 3 | GROUP 4 | GROUP 1 | GROUP 2 | GROUP 3 | GROUP 4 |
| **1345-1615** | GROUP 3 | GROUP 4 | GROUP 1 | GROUP 2 | GROUP 3 | GROUP 4 | GROUP 1 |
| **1615-1645** | CHOW | | | | | | |
| **1700** | COUNT | | | | | | |
| **1845** | COUNT | | | | | | |
| **1900-2200** | GROUP 4 | GROUP 1 | GROUP 2 | GROUP 3 | GROUP 4 | GROUP 1 | GROUP 2 |
| **1900-2300** | Court Shaves | | | | | | |

The monitors randomly selected a week each month to review the SSO's out of cell time logs of offered and actual out-of-cell time. The data showed the following:

**2 Medical Time Offered and Actual Out of Cell Time**

| Week in 2024 | Maximum Hours Per Person per Week | Out of Cell Hours Offered | Actual Hours | % Hours Accepted |
|---|---|---|---|---|
| March 10 to 16 | 17.5 | 14.9 | 7.37 | 49% |
| April 7 to 13 | 17.5 | 15.14 | 9.15 | 60% |
| May 19 to 25 | 17.5 | 9.5 | 2.42 | 25% |

| June 2 to 8 | 17.5 | 8.16 | 0.0 | 0.0% |
| June 23 to 29 | 17.5 | 8.3 | 1.58 | 19% |

These data are not readily interpretable because some patients' length of stay in the 2M infirmary was less than a full week, and were therefore offered less than 17.5 hours. To better understand the data, it is necessary to know the number of hours each patient was in 2M, so that hours offered can be prorated per patient. Given that the infirmary is reported to be almost always full, the trend that each month the numbers of hours patients were offered and accepted out of cell time was lower than the previous month raises questions that need to be further investigated.

Patients on 2 Medical and 2 East are not offered outdoor recreation. While patients on 2M are typically acutely ill for which outdoor recreation is not appropriate, patients on 2 East, whose primary limitations are mobility issues (e.g., wheelchair, walker, etc.), may spend the duration of their incarceration on this housing unit. They are not offered the same access to outdoor recreation as the general population.   We contacted custody leadership who provided the following responses:

*Out-of-Cell Time for 2 Medical (2M) and 2 East (2E) are managed differently due to their different population needs.*

*2 Medical patients have emergent medical needs under direct observation by ACH. For these 10 cells, their dayroom privileges are determined by their individual classification as assigned before they came to 2 Medical; 2Medical deputies communicate with the originating floor deputy about dayroom time.  Further, there may be exceptions to dayroom for various medical reasons, and/or dayroom is offered on 2 East or 2P to promote continuous medical observation.  SSO is investigating whether dayroom time data is erroneously being populated to the originating floor or 2East or 2P in these cases.  SSO will explore programmatic and/or technological changes that ensure accurate reflection of total out-of-cell time offered to these inmates in the jail management system. Additionally, SSO Compliance will continue to analyze this trend to identify any other potential causes for a decrease in hours offered and accepted at 2 Medical.*

*2 East consists of 3 entire pods for inmates that require "medical accommodation" for things like long term mobility issues or complex chronic care.  Pill call and/or routine medical needs, which can be lengthy in these pods and/or delayed due to unforeseen circumstances, can have a cascade effect on other programming.  SSO will continue to work with ACH to reduce pill call/medical process delays that impact out-of-cell time for these inmates and SSO will explore modifications to their scheduling when delayed or extended pill calls/medical process occur to maximize out-of-cell time.*

*Given the more complex medical needs of patients on 2 East, the days designated for outdoor recreation are Wednesdays and Fridays. 2 East deputies escort 2 East inmates to outdoor recreation on the 3rd Floor via an elevator to a wheelchair accessible outdoor area.  Due to facility limitations, mobility limited inmates require additional planning and resources to safely facilitate outdoor time. SSO will continue to explore both programmatic, scheduling, and staffing changes*

*that will provide all inmates, including those on 2 East, an equitable and safe outdoor recreation opportunity.*

The monitors will revaluate out of cell time at the next monitoring visit.

*Dialysis*
The dialysis unit remains in a room in the 2 Medical unit. It is cramped but clean and as organized as it can be given lack of space. Previous plans to move dialysis services to RCCC were not implemented due to Department of General Services (DGS) stating that there was not enough space, however the space is larger than the current space at Main Jail. Ultimately, decisions about the location of dialysis services need to take into consideration for access to emergency services for dialysis complications.

**Compliance Assessment:**
- G.1=Partial Compliance
- G.2=Noncompliance
- G.3=Partial Compliance[170]
- G.4=Partial Compliance
- G.5=Substantial Compliance

**Recommendations:**
1. Require arresting agency officers, or their designee, to remain at the booking unit interview room window during the Phase 1 and Phase 2 receiving screening encounters.
2. Provide low-lying hard plastic beds with mattresses in the medical observation cell in the intake unit and in the multi-purpose rooms used for MAT and addiction medicine provider encounters.
3. Provide nurses  access to exam space that is properly equipped and supplied and adequate to conduct sick calls daily, both on the morning and evening shifts.
4. Reorganize clinic and interview rooms so that staff have quick access from the room in the event a patient becomes threatening.
5. Complete renovations on 2 Medical, including replacing broken cabinets and refurbishing the floor in the medication room with durable materials that enable sanitation. Provide adequate cabinetry for storage in rooms used by staff as nursing offices so that supplies are not placed on the floor.
6. Provide sufficient infirmary beds for women at RCCC to meet the demand for higher-level care.
7. Finalize the policy regarding medical observation in the intake suite to ensure patient safety.

---

[170] This provision was downgraded from Substantial Compliance to Partial Compliance due the Monitor basing substantial compliance at the last visit on anecdotal information, as the monitor was not aware that data was available. For this review, data was provided to show the County was in partial compliance. It does not represent a downgrade based upon a change in performance.

8. Explore the feasibility of repurposing beds in 2 East for monitoring patients at risk of withdrawal from drugs and alcohol, and other medically complex and fragile patients who frequently need urgent care.

9. Provide equivalent opportunities for out-of-cell time, programming, and outdoor recreation to patients in 2 East and 2 Medical, consistent with individual clinical factors.

---

### H. Patient Privacy

1. The County shall develop and implement policies and procedures to ensure that appropriate confidentiality is maintained for health care services. The policies shall ensure confidentiality for clinical encounters, including health care screening, pill call, nursing and provider appointments, and mental health treatment. The policies shall also ensure confidentiality for written health care documents, such as health care needs requests and grievances raising medical care or mental health concerns, which shall not be collected by custody staff.

2. The County shall provide adequate clinical space in each jail to support clinical operations while securing appropriate privacy for patients, including visual and auditory privacy from prisoners and auditory privacy from staff.

3. All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff. In making such a determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be made based upon housing placement or custodial classification. The issuance of pills does not constitute a clinical interaction.

   a. For any determination that a clinician interaction with a patient requires the presence of custody staff, staff shall document the specific reasons for the determination. Such decisions shall be reviewed through the Quality Assurance process.

   b. If the presence of a correctional officer is determined to be necessary to ensure the safety of staff for any clinical encounter, steps shall be taken to ensure auditory privacy of the encounter.

   c. The County's patient privacy policies, as described in this section, shall apply to contacts between patients and all staff who provide health-related services on site at the jail.

4. Jail policies that mandate custody staff to be present for any medical treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above. Custody and medical staff shall be trained accordingly.

---

**Findings:** ACH has developed a policy and procedure to ensure that appropriate privacy and confidentiality is maintained during health care encounters that is compliant with the Consent Decree (VI. H.1).[171] The policy includes a procedure for addressing circumstances in which custody may need to be present based upon the patients' behavior and other security concerns

---

[171] ACH-08-08-Patient Privacy. Revised 05/13/21.

needed to ensure the safety of medical staff, and that requires documentation of the specific and current risk that necessitates the presence of custody staff and are not based upon housing or classification reasons. These decisions are to be reviewed through the QI program (VI. H.3). Jail policies that mandate custody staff to be present for any medical treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth in VI. H.3. (VI. H.4). The County has developed policies that are compliant with the Consent Decree.[172]

However we found lack of staff adherence to the policy. Staff often document that encounters are nonconfidential due to custody being present without specifying the specific security risk that the patient presents (e.g., combative, etc.).

In addition to lack of privacy for clinical encounters, privacy is also violated during certain medication administration procedures (e.g., administration of suboxone) and from inmate "house man" collection of health requests and patient grievances at RCCC. (VI. H.1). [173]

Patient privacy has improved in the intake unit. As described in Section G. of this report, the County remodeled the intake area, creating two private interview rooms for use during Phase 1 of receiving screening. Two more rooms are also available for Phase 2 receiving screening, that provide patient privacy. All the rooms have a door with a window that allows the arresting officer or designee to observe the patient while the nurse completes the interview. The revised nurse intake policy is pending finalization. It provides staff guidance regarding privacy during the intake process, including security staff responsibilities when interview rooms are in use.

At Main Jail and RCCC, aside from modifications to intake, there remain inadequate numbers of examination and interview rooms that provide patient auditory and visual privacy during health care encounters (VI. H.2). The insufficient amount of clinical space at the Main Jail and RCCC results in patients being seen cell side for non-confidential interviews and assessments. For example, at Main Jail, nurses conduct withdrawal assessments in the housing unit dayrooms, directly in front of cells occupied by inmates and custody staff. While it is positive that nurses have patients come out of their cell for assessments, the assessments need to be conducted in an examination room. In the interim, care needs to be taken that other inmates and staff are an appropriate distance away to provide auditory privacy. (VI. H.3). [174]

Lack of privacy is further exacerbated when there are insufficient custody escorts to take the patient to an examination or interview room, necessitating that the encounter take place in a nonconfidential setting. At RCCC, nursing sick call was done in the vestibule, just inside the medical unit. Even though a privacy screen was used, the foot traffic from the outside and between the infirmary and staff offices, and inmates resulted in a non-confidential encounter. In

---

[172] SSO policy 718.

[173] For some encounters, staff do not document any reason that confidentiality was not maintained, or was for "custody concerns," which is vague. See Patient #5.

[174] As noted in section G. Clinic Space, at Main Jail the County is in process of adding examination/interview rooms to each wing of floors 3-8, but they are not fully operational.0

another area at RCCC, sick call was held in an office without an examination table. The patient complained of urinary-related symptoms, requiring the nurse to accept a urine specimen and then walk through the adjacent exam room, occupied by another patient and a provider and in front of other waiting inmates to complete the urine dipstick analysis.

A patient at the Main Jail complained about the lack of privacy during the administration of Suboxone.  He reported that the "call for Suboxone" is broadcast over the intercom, alerting all inmates to why specific patients are exiting the unit. Privacy is further breached when patients are required to sit in chairs directly in front of the housing unit, in full view of inmates in their cells, for the duration of the MAT administration process. This patient wrote a grievance, written in January of this year, which was answered six months later, stating that observation while sitting in the chair was required to continue his ordered medication. The method of administration of specific medications to patients with specific diagnoses, e.g., suboxone to treat opioid addiction, should ensure patient privacy and confidentiality of protected health information. The medication cart and chairs the patients sit in should be moved away from the line of sight of other inmates. These practices violate the Remedial Plan.

At the last site visit, we learned that at RCCC, the inmate orderly or "house man" in each housing unit collected other inmates' health services requests and grievances. It was reported to us that the house men were looking for "snitches." Custody leadership immediately addressed this problem; however, at this visit, we received reports that this practice continues. This is coercive behavior by an inmate or another inmate and needs to be further addressed.  We recommend that a directive is given that forbids an inmate from handling another inmate's health request or grievance. This needs to be monitored to ensure that the practice does not continue. ACH has revised policies involving patient privacy but has yet to fully implement these policies in a manner that provides consistent privacy and confidentiality of medical information.

**Compliance Assessment:**
- H.1=Partial Compliance
- H.2=Noncompliance
- H.3=Noncompliance
- H.4=Substantial Compliance

**Recommendations:**
1. The County needs to ensure staff document specific reasons that require to be present during clinical encounters.
2. Continue to modify the physical plant to increase the number of examination and interview rooms to ensure patient privacy and confidentiality of medical information.
3. Consistently provide adequate custody escorts such that the patient flow to examination rooms is uninterrupted and maximized, providing privacy and confidentiality.
4. Explore "staging" of patients in all examination room areas to ensure a constant patient queue and flow so that patients can be seen in a confidential setting.
5. Revise the process of MAT administration to ensure patient privacy and prohibit observation by inmates not receiving medications.

6. Reinforce and if necessary, revise custody policies to forbid inmates from handling other inmates' health requests. Institute routine monitoring to ensure that this does not take place.

| **I. Health Care Records** |
|---|
| 1. The County shall develop and implement a fully integrated electronic health care record system that includes medical, psychiatric, and dental records and allows mental health and medical staff to view the medical and mental health information about each patient in a single record. This shall be accomplished within 12 months of the date the Remedial plan is issued by the Court. |
| 2. Until such a system is implemented, the County shall develop and implement policies and procedures to ensure that medical staff have access to mental health information and mental health staff have access to medical information, as needed to perform their clinical duties. This information shall include all intake records. Medical and mental health staff shall be trained in these policies and procedures within one month of the date the Remedial plan is issued by the Court. |
| 3. The County shall develop and implement policies and procedures to monitor the deployment of the CHS Electronic Health Record (EHR) to ensure the records system is modified, maintained, and improved as needed on an ongoing basis, including ongoing information technology support for the network infrastructure and end users. |

**Findings:** ACH uses Centricity Fusion electronic health record (EHR) software, which provides health care staff access to patient medical, behavioral health, and dental records, but does not interface between the EHR and Correctional Inpatient Pharmacy Software (CIPS).

The software, in its current form, fails to provide sufficient administrative reports required for data analytics and population health management, including challenges to identifying and tracking patients with chronic diseases. Other issues are described below.

*Lack of Fusion and CIPS interface results in medication errors*
There is no bidirectional interface between the Fusion eMAR and the Correctional Inpatient Pharmacy Software (CIPS). At the previous site visit, the monitors learned that the lack of eMAR and CIPS software bidirectional interface resulted in provider medication orders being inputted in real time to the eMAR, but not concurrently into CIPS for pharmacy review for correct dosing, allergies, etc. This leads to medication errors, such as duplicate dosing, and increases the risk of serious harm to patients such as needing to be sent out to the emergency department, as was described in the previous monitoring report.[175]

Another software issue is that when providers order a course of treatment (e.g., Amoxicillin 500 mg twice daily for 14 days, or 28 doses), the number of scheduled doses on the eMAR are for the number of days (14), rather than the number of doses (28). If the pharmacy processes the

---

[175] Fifth Monitoring Report of the Mays Consent Decree.

medication order after the morning medication administration, only 27 doses are scheduled to be given to the patient, causing predictable errors of omission. Record review showed that this error occurs repeatedly. The County has tried to mitigate the number of errors by advising providers to order non urgent medications to start the next day, or by ordering a STAT dose today, followed by the course of treatment beginning the following day. However, this is provider dependent, and not consistently done. Another issue is that if a provider writes an incomplete order, these orders are not forwarded to CIPS, and pharmacists are unaware of the order, so that they may contact the provider to correct or complete the order.

The eMAR does not show the date when a medication order has been discontinued. For example, a provider ordered doxycycline twice daily for 30 days, but the eMAR showed the patient was scheduled to receive the medication for only 14 days, and not the remaining 16 days. There is no indication on the eMAR that the original order had been discontinued after 14 days, so it appears that the patient did not receive the full course of therapy. [176] This information is visible in CIPS, but providers do not have access to view CIPS.

These software issues reflect that the electronic health record is not fully integrated. At the previous site visit we recommended that the County correct the lack of bidirectional interface between Fusion and CIPS. The problems have not been corrected resulting in ongoing medication errors, which is dangerous to patients. This provision has been downgraded to partial compliance (VI. I.1).

*Case Management Template in the EHR*

During this review period, the monitors were unable to locate case management notes that documented case management processing of specialty services referrals. We were advised that access to case management (CM) notes was limited to CM staff, and not available to medical providers (or the medical monitors). Lack of access to case management notes prevents medical providers from knowing the status of the patient's specialty referral, including whether case management had processed the referral and whether an appointment had been scheduled. A specialty referral template has been created in the EHR, from which data points are extracted to create the specialty services tracking log. The template is missing key information required by the Consent Decree that would be included on the tracking log, including the date the referral was received by CM, the method of review (InterQual or UM physician) and whether the referral was approved or denied. The template does not include how and when an appointment was scheduled. See Specialty Services for more detailed information.[177]

*New Electronic Health Record (EHR)*

ACH has explored and reviewed options available to replace the Centricity Fusion software, however have not yet identified another product that satisfies the various operational and

---

[176] Patient #24.

[177] Following the site visit, the County permitted medical providers to have access to case management notes, as well as the monitors.

reporting requirements. Centricity Fusion is scheduled to provide several updates that will enhance performance and customizable options.

The monitors caution the County about the purchase and implementation of a new electronic health records system during a time of rapid change in health care operations. While there has been overall progress toward compliance with specific components of the Consent Decree, the health services systems at the Sacramento County Jail remains fragile. Implementation of a new electronic health record when some health care processes are not yet in place or are being revised, may result in disruption of existing processes with negative patient outcomes.

If the County believes it is in the best interest of the program to obtain a new electronic health record system, guidance and experienced leadership in the selection, customization, planning, and implementation will be required to ensure a seamless transition without interruption of patient care.

*Tracking and scanning of outside documents into the EHR*
Timely access to outside health records (e.g., specialty services, emergency department clinical documentation, health services requests, etc.) is essentially unchanged from the last report. Record review shows that Requests for Information (ROI) for previous health care are completed at intake or later during detention. However, the current system for tracking ROIs to obtain medical or mental health information does not result in timely retrieval and scanning into the EHR. There is no system to notify providers that requested health information is available. Similarly, the system for tracking and receipt of recent health records, including emergency department, after-visit summaries, and hospital records is not yet reliable.

At intake, health documents are sometimes transported with the patient, and nurses document an abbreviated summary in the receiving screening section of the EHR. The original documents are later scanned into the record. However, nurses may inadvertently omit critical information regarding recommendations for follow-up care. While it is appropriate for nurses to document key information (e.g., new diagnoses and medications, etc.), the original document needs to be scanned into the EHR as soon as possible, so it is available to medical, nursing, dental, and mental health providers. Scanners need to be placed in the booking suite so that documentation from the hospital and community providers accompanying the patient is immediately scanned to the patient's health record. A positive finding is that medical providers more frequently import outside hospital records from Hospital Connect, facilitating timely care.

*Custody Medical Transport continues to have access to protected health information*
As noted in previous reports, case management does not schedule outside health appointments but provides information, including Protected Health Information (PHI), to Custody Medical Transport to schedule the appointment. This violates patient confidentiality. HIPPA regulations permit sharing of protected health information with custody if such information is necessary for the provision of health care to inmates. However, using custody staff to schedule medical appointments is not necessary to provide the services to the patient, as this is a health care responsibility. Alternatively, transporting patients to health care appointments is a necessary custody function for which staff need to be provided sufficient information to complete the

appointment.[178]   This is further discussed in Utilization Management. The County agreed to assume the responsibility for scheduling and to provide Custody Medical Transport staff the date of the appointment with any special instructions, such as the need for the patient to be fasting, etc. which preserves confidentiality.   However, the County later reported that for several reasons, including medical and possibly custody resources, they were unable to assume responsibility for scheduling appointments.  The addition of case management staff can facilitate resolution of this issue.

*Electronic Health Record Steering Committee*

ACH established an EHR steering committee that meets monthly to discuss recent and upcoming changes and address any service line concerns that may exist. The committee's work has resulted in reports that include the population descriptors by diagnosis and patients being monitored for withdrawal from drugs and alcohol. Additional reports are in the development and testing phase. ACH has completed software changes to provide the following:

- Dietary restrictions are transmitted to kitchen staff through ATIMS.
- Medical flags or alerts can be turned on and off as needed specific to patient specific orders.
- Medication orders are discontinued when the patient is released from custody.
- A "patient location" was added to facilitate specific tracking of patients during the intake process.
- ATIMS flags are transmitted to Fusion for such things as assaultive behaviors, inmate worker, etc.
- Documentation of the two-phase receiving screening/intake process.

Additional software changes being tested but not yet implemented include:

- Computerized Provider Order Entry and prescribing of controlled substances, utilizing a multifactor authentication system.
- Barcoding that communicates with the eMAR that verifies correct dosage with alerts when excessive amounts are scanned.
- Use of tablets for telehealth encounters.
- Automatic transfer of vital sign readings directly to the patient's electronic health record.

The County information technology department maintains and supports the electronic health record system. The County IT staff works with the software vendor to produce data reports required to monitor clinical services compliance. The County staff supports the end users as needed and refers complex Fusion software issues to the Centricity Fusion help desk (VI. I.3.).

---

[178] See 45CFR 164.512(k)(5).

**Compliance Assessment:**
- I.1=Partial Compliance
- I.2=Partial Compliance
- I.3=Substantial Compliance

**Recommendations:**
1. Correct the lack of bidirectional interface between the Fusion eMAR and CIPS.
2. Amend the Fusion eMAR and CIPS software so that the numbers of scheduled doses are in accordance with provider medication orders so that patients receive the total number of ordered doses.
3. Revise the case management template in the EHR to include all steps in the referral process required by the Consent Decree and needed to track the progress of the referral.
4. Reengineer the system for timely retrieval, scanning, tracking, and reporting that includes aging for:
   a. Release of Information (ROIs) requests.
   b. Health services requests (HSRs).
   c. ED department and hospital reports.
   d. Laboratory, radiology, and imaging reports.
   e. Specialty services reports.
5. Develop a system for timely provider notification of labs and outside health records.
6. Carefully review and consider the benefits vs. risks of selecting a new electronic health record system that better supports ACH workflows and data management needs.
7. Continue to expand the reporting function for clinical data management and analysis.
8. Modify the eMAR to enable nurses and clinicians to see the dates that medications are discontinued or extended.
9. Modify the EHR to ensure that sliding scale orders are complete in medical orders and show the amount of insulin to be given based upon blood sugar results. Modify the eMAR to show complete sliding scale orders.
10. Place document scanners in the booking suite, M2, and other strategic clinical areas such that HSRs, and outside records accompanying patients to the jail, are immediately scanned to the health record.

| **J. Utilization Management** |
|---|
| 1. The County shall revise its utilization management (UM) system to ensure that critical health decisions about patients' access to care are made with sufficient input from providers and a thorough review of health care records. |
| 2. The County shall ensure that decisions about a patient's access to, timing of or need for health care are made by a physician, with documented reference to the patient's medical record. Nurses may gather information and coordinate the UM process, so long as it does not interfere with that requirement. All decisions by the UM committee shall be documented, including the clinical justification for the decision. |
| 3. The UM system shall ensure that providers and patients are promptly informed about decisions made by the UM committee, including denial of a specialist referral request. |
| 4. The UM system shall include an appeal process to enable patients and providers to appeal a decision denying a referral request. |

**Findings:**  The County has developed a utilization management system (i.e., case management) in which medical providers order specialty services for patients. However, as noted in the Specialty Services section of this report, both utilization management and specialty services processes are dysfunctional at every step of the process, resulting in markedly delayed access to specialty servicers, if they occur at all.[179]  There has been minimal medical oversight of the UM and Specialty services processes during this review period.

Some information found in the Specialty Services section overlaps with Utilization Management and is included in this section.  The status of Consent Decree compliance is as follows:

- The County revised its Utilization Management[180] policy, which indicates that providers determine the medical necessity and timing for diagnostic testing, imaging, and specialty referrals.  However, while providers determine the initial priority of the referral based upon the clinical needs of the patient, providers are not informed of when specialty referral appointments have been scheduled and/or are significantly delayed. Because of this, providers are not able to make subsequent decisions about whether the delay is clinically acceptable or that UM needs to seek alternative specialty resources to ensure the patient receives timely care (VI. J.1).[181]

- Health care providers determine the need for and timing (i.e., routine, urgent) of specialty services, however, CMT/UM does not schedule patients for appointments in accordance with the urgency of the request (VI. J.2).  For onsite consults, the County reports that on-site clinics are held approximately 1-2 times monthly and that specialty services appointments, particularly urgent consults, cannot consistently be scheduled to take place within Consent

---

[179] Case management functioned under the auspices of Quality Improvement until August 2024, after the former QI Director departed. As of August 2024, case management was placed under the supervision of the Medical Director.
[180] Utilization Management. 01-14. Revised 5/5/22.

Decree timeframes. If so, the County needs to increase the volume and/or frequency of onsite specialty appointments.

- Case Management is not using an evidenced-based algorithm to make decisions regarding the medical necessity of each referral, nor does the UM physician review every referral request for medical necessity.[182] The UM physician reviews approximately 20 patients at the weekly case management meeting, or approximately 80 referrals each month.  But CM receives approximately 460 patient referrals each month. Therefore, most specialty service approval decisions are defaulted to Nurse Case Managers, who approve virtually every specialty referral request, and no justification for CM decisions are documented in case management notes.  The specialty services tracking log was changed and no longer includes a column to document the approval or denial of each referral.[183, 184]

  This process has resulted in an enormous volume of specialty referrals to be processed each month. Nurse Case Managers are unable to timely review specialty services requests, schedule appointments in accordance with the urgency of the referral or track the status of each request to completion, resulting in some patients being lost to follow-up.

- To illustrate delays in access, the specialty services tracking log showed that from February 1 to July 15, 2024, there were 2,540 approved specialty services referrals, averaging 462 per month, an extremely high number given a population of 3,000 inmates. Of this number, 1048 (41%) consults were completed, 666 (26%) were on "Administrative Hold," meaning that case management staff had not started review of the referral, 249 (10%) were "in process" and 574 (23%) referrals had been canceled.[185]  Included among the 26% of patient referrals not processed by July 15, were cardiology, ENT, GI, oncology, optometry, ophthalmology, and optometry referrals ordered in February and March 2024. Among the 23% of active patient referrals that were canceled, the log did not include the reason for cancelation for the majority of patients. Record reviews described in this report show serious delays in access to care.

  *Of deep concern is that at the January 2024 site visit, the monitors learned that approximately 846 on-site and off-site specialty referrals were not entered onto the tracking log, some referrals (e.g., cardiology, oncology, etc.) being made as far back as 2022-2023.  At that time,*

---

[182] The County reports that: "With the staffing barriers and the sheer volume of the workload, CM has worked diligently to simply process referrals in addition to all the other CM assignments/tasks/functions, including working countless hours of OT trying to meet the growing needs. Order sets were implemented for providers, as well as the use of Rubicon MD, in an effort to ensure medical necessity was met. We are now renegotiating the contract for InterQual and attempting to hire additional staff to perform UR of all referrals."

[183] Consent Decree provision 5.c.

[184] The Case Management Supervising RN is working with IT to make modifications to the electronic health record to reinstate tracking elements need to effectively track referrals and to meet Consent Decree requirements.

[185] 953 (38%) specialty referrals were canceled.

*the County advised that these referrals were added to the tracking log. (VI. J.2) .[186] The log we were provided had no specialty services that were ordered in 2022-2023, raising the question about the status of these referrals. The County conducted a review and found that there were 5 referrals from this time frame that were still pending from this time frame, but without further analysis the number of patients that were not timely seen, or were never seen is unknown.*

- Medical record review showed that some specialty service referrals were elective[187], likely delaying access for patients of higher priority. In addition, elective procedures utilize limited medical, custody, and budgetary resources. ACH is considering returning to the use of InterQual to conduct of review of every referral.  We support a return to the use of InterQual or other algorithm-based model combined with the case management physician to review all referrals.[188]

Case management does not notify providers of the status of specialty services requests when the date is beyond required time frames (i.e., 14 or 90 days). Case management documents the process for each referral in case management notes, but prior to this site visit, ACH providers did not have access to case management notes in the EHR to enable them to track the status of the referral, including whether the appointment date was appropriate for the patient's condition. Providers did not consistently monitor patients whose urgent and routine appointments were beyond 14 and 90 days, respectively (VI. J.3).  Medical providers are responsible for the care of the patient and need to be aware if specialty referrals are not timely scheduled.  This is highly problematic for patient outcomes.

The Utilization Management policy includes an appeals process for medical and dental providers when specialty referrals are denied.[189]  The respective providers are to submit a request to the Medical or Dental Director with clinical justification for the referral. If still denied, the providers are to meet with the patient and develop and alternate treatment strategy.  During this review period, virtually all referrals are approved and we are not aware of any circumstance in which a provider appealed a UM decision.

The policy indicates that patients may also file an appeal, but there is no other information in the policy to explain whether patients are informed of their right to appeal a denial of service or the procedure for patients to initiate an appeal.  The policy needs to be revised to include a process for patients to be informed of their right to appeal a specialty service (e.g., Inmate Handbook or

---

[186] The County ran a Fusion Order Manager list and pulled for specialty services from 1/1/2021-1/31/2024. Date showed that 15,320 CM Specialty Care Referrals were ordered. 7,494 Completed, 7,821 Cancelled, 5 In process, and 0 in Admin Hold.  This information is encouraging, however, the monitors found orders for patients with specialty referrals that were not on the tracking log, and other patients that were lost to follow-up, so it is not known whether the data captured all patients.

[187] Small umbilical hernia, small lipoma on the forehead etc.

[188] There are some clinics such as optometry for which visual acuity criteria can be established for approval and nurses may schedule the appointment. Annual diabetic exams could also be included. These still need to be tracked.

[189] ACH-01-14 Utilization Management Policy. Revised 05/05/22.

Tablet) and how they would go about doing so (e.g., health grievance form).  At this time we are unable to assess County compliance with this provision.

*Specialty Services Tracking Log*

The County developed a new electronic specialty services tracking log. An EHR template was created in case management notes that allows data extraction to produce the tracking log.  This new tracking log does not contain all required elements of the Consent Decree and key information to track the process. The previous excel spreadsheet tracking log contained the following elements which enabled case management to know the status of each specialty request:

o      Patient name, date of birth, and X-ref number
o      Date of referral request
o      Type of specialty referral (e.g., cardiology)
o      Reason for referral (e.g., chest pain)
o      Off-site provider (i.e. name of off-site provider, UC Davis, Kaiser, etc.)
o      Priority of referral (urgent/routine)
o      Date of InterQual approval/denial
o      Date of UM physician approval or denial, if denied by InterQual
o      Reason for denial
o      Date referral sent to specialty provider for scheduling
o      Date of appointment
o      Date of rescheduled appointment
o      Reason for rescheduling the appointment
o      Date of completed appointment
o      Date paperwork received
o      If any delays, document the length and reason for delay
o      Provider follow-up if delays in the appointment
o      Appointment status if not completed (e.g. pending, canceled, released, etc.)
o      Nurse saw the patient upon return (Yes/No)
o      Date medical provider follow-up scheduled with the patient (i.e., <5 days)
o      Date medical provider appointment took place.
o      Number of days to complete the scheduled appointment.
o      Whether the time frames met Consent Decree requirements (i.e.,14 days for urgent consults and 90 days for routine consults).

The current tracking log does not contain all elements required to be tracked as the previous log, or contains duplicate information. This includes:

• Two columns that duplicate the date the provider ordered the services:  *Order Create Date* and *Date of Referra*l.
• Date that CM reviewed the request (these are in the notes but not on the log)
• Case management decision regarding approval or denial
• Space to document when multiple appointment cancellations take place and the reason why.
• Date of medical provider follow up scheduled and completed

- Whether further follow-up by the specialist is needed.

In addition, the current tracking log is not visually friendly as like information is kept together and the reviewer needs to scroll all the way across the page to see key dates. It would be more user friendly to have key information together, such as date of the order, date of CM review, approval decision, date of scheduled appointment, date of rescheduled appointment and why, date the appointment was completed, and whether follow-up is needed. [190]

*Custody Medical Transport (CMT) schedules medical appointments and has access to Protected Health Information (PHI)*
Case managers do not schedule medical appointments with off-site providers in collaboration with Custody Medical Transport (CMT). Rather, as noted in previous reports, CM forwards the request to schedule the appointment to Custody Medical Transport (CMT) deputies who schedule the appointment within custody resources. *These appointments are often not in accordance with the clinical need of the patient or Consent Decree requirements.*

We have met with CMT deputies who are very dedicated and conscientious about trying to schedule timely appointments. However, because deputies are not medically trained, they cannot appreciate the importance of prioritizing certain appointments over others (e.g., scans to rule out cancer versus scans for other medical conditions), and the process results in the sharing of Protected Health Information (PHI) with non-medical staff. While the County has taken measures to minimize the amount of medical information available to CMT deputies, the process itself involves the ongoing sharing of PHI.

The County previously agreed to assume responsibility for scheduling all medical appointments and this was piloted at RCCC. Per the County the pilot program caused delays in care due to the enormity of the workload. As a compromise, CMT deputies continue to schedule the appointments but the County ensures that all priority scheduling is led by them. However, this is not working.

Once the backlog of specialty referrals is reduced, the County needs to assume this responsibility in order to maintain control of the timelines of appointments. In the interim, CM needs to check weekly with CMT regarding referrals that are pending an appointment. According to ACH policy, specialty referral appointments need to be requested within 3 calendar days. If there are difficulty obtaining appointments, CM needs to be made aware so that other sources of services can be considered, and if clinically necessary to notify the Medical Director. Case Management should document communications with CMT in the EHR to show steps taken to obtain services.

**Compliance Assessments:**
- J.1=Partial Compliance
- J.2=Noncompliance
- J.3=Noncompliance

---

[190] As noted earlier in the report, the County reports that the tracking log is being revised.

- J.4=Not Evaluated

**Recommendations:**

1. The County needs to comprehensively re-evaluate utilization management specialty services processes to provide timely and appropriate care to patients with serious medical needs.
2. Revise Utilization Management and Specialty Services policy to accurately reflect all aspects of procedures. This includes how specialty services are scheduled for on and offsite referrals, and the role of UM in tracking the timeliness of appointments.
3. Allocate sufficient nursing and medical resources to catch up on the backlog of specialty services referrals that have not been processed by case management.
4. Determine the status of the 5 patients for whom specialty referrals were requested in 2022 and 2023 but were not completed by January 2024 and take action as necessary to ensure their access to care.
5. Identify high risk patients and urgent referrals to be prioritized for processing.
6. Eliminate the backlog of referrals to be processed within 45 days.
7. Reestablish the use of InterQual and/or physician review for both off-site and on-site specialty services.  Continue the robust use of Rubicon.
8. Ensure that referrals are matched to the appropriate service (e.g., optometry instead of ophthalmology, etc.)
9. Educate providers about ordering referrals for medical necessity versus elective procedures.
10. Establish criteria for selected services that do not need to be put through the case management process (e.g., routine optometry referrals for visual acuity and glaucoma screening, and annual diabetic retinal screening).
11. Review and process specialty referrals daily (Monday-Friday, on call providers on weekends).
12. The case management EHR template and log need to accurately reflect the date a provider ordered the referral. Consider auto populating as much information in the tracking log as feasible.
13. In combination with InterQual, a UM physician needs to review all referrals daily for approval or denial.  For denials, the physician needs to recommend an alternate treatment plan.
14. Revise the case management template in the EHR to include all required elements that need to be captured for the tracking log (most that are included on the previous tracking log) see above).  Specifically, the template needs to include:
    a. The date that case managers received the referral
    b. Date CM processed the referral.
    c. Whether the referral was approved or denied.
    d. Whether the referral was approved via InterQual criteria and/or the name of the physician making the UM decision.
    e. Date that the appointment was requested and obtained, as well as date of the appointment.
    f. Include the ability to enter multiple entries in the event the appointment was canceled and/or rescheduled and the reason why, including lack of custody resources.
    g. Date report was received.
    h. Whether the specialist requested follow-up (e.g., labs, scans, or an appointment)
    i. Date of scheduled follow-up appointment with a medical provider

> j.   Date of completed medical provider appointment.

15. Establish productivity expectations for on-site consultants (e.g., to see x number of patients with 4 or 8 hours). Case managers should schedule appointments based upon priority of need.

16. Increase the frequency of onsite specialty clinics and/or productivity to meet the clinical needs of patients and Consent Decree time frames.

17. Conduct UM and specialty services audits every 4 months to assess the functionality of the UM and specialty services process.

| K. Sanitation |
|---|
| 1.   The County shall consult with an Environment of Care expert to evaluate facilities where patients are housed and/or receive clinical treatment, and to make written recommendations to address issues of cleanliness and sanitation that may adversely impact health. |

**Findings:** The County consulted with an Environment of Care expert, Diane Skipworth, Environmental of Care. On 6/21/22, she published her findings (VI. K.1).

The medical experts found most of the medical areas clean, with staff complying with standard infection control practices, such as sanitizing exam tables, equipment, and surfaces between patients. The County contracts for professional cleaning services with the Department of General Services (DGS); however, they do not clean medical examination areas, including equipment and surfaces. ACH contracted with Bissell for daily medical-grade cleaning and bi-weekly deep cleaning.

Regarding sanitation in housing units, several patients complained to the monitoring team that the showers and sinks lacked hot water and had mold and mildew. Inmates also complained of inoperable urinals and toilets.

At Main Jail, inmates on 8 West complained that the inmates were urinating in the showers.[191] The monitors did not inspect every shower, but they did find the complaint valid in one 8 West shower that had standing water, rags on the floor, and obviously had not been cleaned. In addition, the cell front doors on 8W had food residue that had dripped down from the food port. The unit is obviously not being regularly cleaned.

Environmental inspection reports for the Main Jail and RCCC dated 4/27/23, 4/11/24, and 4/16/24 were provided to the monitors for review. Based on the inspection report findings, the overall conditions at both jails have deteriorated and parallel conditions noted in the 6/14/22 Skipworth expert report.

---

[191] This raises the question of why inmates are urinating in the showers. Is it because toilets in their cells are inoperable, inmates are locked in showers for hours, or other reasons. This needs to be investigated to resolve the primary cause(s).

Common findings at both jails, many of which were identified during the 2023 inspection, include:
- Inoperable showers and hand-washing sinks
- Hot water lacking in showers
- Cold water lacking in showers
- Mattresses with insufficient padding and/or tears
- Hot water lacking at hand washing sinks, including 4 medical housing unit cells.
- Cold water lacking at hand washing sinks
- Mildew, mold, algae, and scum build up in showers
- Insufficient inmate cleaning supplies
- Unclean and clogged toilets
- Unclean and clogged sinks
- Sewage back-up and gasses in the main drain at the mop sink
- Unclean and inoperable drinking fountains

Technically, this provision is in substantial compliance because the county hired Diane Skipworth to conduct an environment of care report in 2022, which was the only requirement. However, environmental reports show that living conditions in the housing units are deplorable and have been deteriorating. These conditions increase the risk of skin infections and are dangerous for both patients and staff.

Sanitation is critical for maintaining a safe and healthy environment. When environmental inspection reports identify problems, swift corrective action is required. Ongoing monitoring, surveillance, and accountability for upholding basic sanitation practices are paramount to the health and safety of staff and the inmate population. It is disappointing to find a downward trend in the cleanliness and sanitation of the living areas of both jails. More must be done to address the ongoing issues and ensure that a clean and sanitary environment is maintained.

**Compliance Assessment:**
- K.1=Substantial Compliance

**Recommendations:**
1. Examine the process to mitigate and maintain compliance in all identified areas of sub-standard sanitation, assigning specific staff accountable.
2. Develop a corrective action plan with specific assignments of personnel accountable for mitigation and timelines for completing each mitigation step.
3. Obtain a follow-up independent consultation with Diane Skipworth, MCJ, RDN, LD, RS, CCHP, Environment of Care Expert, or another environment of care expert to provide guidance to the County regarding improving environmental conditions related to health and safety.
4. Maintain the contract with Bissell for medical professional cleaning services.

5. Monitor infections, including the patients' housing locations, to facilitate early identification of infections resulting from poor sanitation and housing unit cleanliness.

---

### L. Reproductive and Pregnancy Related Care

1. The County shall ensure that pregnant patients receive timely and appropriate pre-natal care, specialized obstetric services when indicated, and post-partum care (including mental health services).
2. The County will provide pregnant patients with comprehensive counseling and timely assistance in accordance with their expressed desires regarding their pregnancies, whether they elect to keep the child, use adoptive services, or have an abortion.
3. The County will provide non-directive counseling about contraception to female prisoners, shall allow female prisoners to continue an appropriate method of birth control, shall provide access to emergency or other contraception when appropriate.

---

**Findings:** For the current *Mays* status report, the County assessed that it was partially compliant with this consent decree provision.

There are two OB/GYN providers associated with the University of California at Davis (UCD) that alternate coming to Main Jail every Friday to see patients. For acute obstetrical conditions, ACH staff consult with obstetricians by phone or send the patient to UCD labor and delivery (VI. L.1).

Obstetric providers document discussion with the patient as to whether the pregnancy is desired or the patient wishes to terminate the pregnancy. Arrangements are made for pregnancy termination if the patient wishes. OB/GYN providers also discuss and counsel the patient regarding risk factors that may impact management of the patient's pregnancy. This included options for reduction of embryos for a patent that had triplets, and need for cesarean section for patients with a history of pre-term pregnancies. OB/GYN providers counsel patients about signs and symptoms of early labor (VI. L.2).

There is no system to provide non-directive contraceptive counseling for women at the jail. Medical record documentation reflects a lack of birth control counseling for pregnant patients. Patients are discharged from care prior to counseling taking place. OB/GYN tracking logs show that some patients are scheduled for birth control appointments for IUD or Nexplanon removal (VI. L.3).

Record review shows that following intake screening, pregnant patients are timely referred and monitored by OB/GYN providers. Prenatal labs are timely performed, but screening tests for gestational diabetes are sometimes delayed.[192] A significant concern is that anatomy and growth ultrasounds are not timely performed, resulting in the obstetricians sometimes making urgent requests. This occurred for one patient for whom OB was concerned about restrictive fetal

---

[192] Patient #17.

growth syndrome, which is associated with perinatal morbidity and mortality.[193] The issue is primarily related to Case Management not timely addressing and requesting ultrasound appointments from UCD.[194]

When these delays or other issues occur, there is no documentation that reflects direct communication between the OB/GYN providers and case management staff or the Medical Director, and therefore issues persist.

A systems issue is that in one case, a patient pregnant with triplets was not timely medically screened for more than two hours following arrival, and then declared unfit for confinement due to reported vaginal bleeding. It is a concern that fit for confinement screening would be delayed for any patient, particularly for a patient pregnant with triplets. SRN's or designees need to survey new arrivals to determine if there are arrestees that need to be prioritized for fit for confinement screening.

Another systems issue relates to delayed provider review of lab reports. Each OB/GYN provider comes to the jail every other Friday.  When OB providers order labs, reports are routed to their inbox which, if not checked between clinics, leads to delayed review of abnormal labs and medical treatment. This occurred for a high-risk patient with triplets with a urinary tract infection, who was released before being treated.[195]  The County needs to ensure that a system is in place to ensure that all labs are reviewed daily, and in no case later than 3 business days. For patients with significantly abnormal labs, providers that sign the report need to document a progress note and treatment plan or confer with the treating provider.

When medical providers order late-term patients suspected to be in labor to the hospital, we found delays in custody transport to the hospital via van.  *Criteria needs to be developed for when patients can be transported via van versus EMS, and the time frame for safe departure (e.g., within 30 minutes, etc.), reducing the risk that patients will deliver precipitously in a custody van.*

During past reviews, there were issues with RCCC patients not being transported to Main Jail for gynecological appointments. This was due to a problem with the interface between Athena and ATIMS, as scheduled gynecological appointments for women were not showing up on the RCCC medical transport list.[196]  The current tracking log shows that although the frequency has been greatly reduced, some patients are still not being transported from RCCC to Main Jail for gynecological appointments, with the most recent examples being on 5/10/24, when 4 of 7 RCCC patients were not transported to Main Jail, and 6/28/24 when 2 of 5 patients were not transported. Patient refusal was not noted to be the reason.

---

[193] Patient #18.
[194] Repeated delays in obtaining anatomy and growth ultrasounds resulted in downgrading this provision from substantial to partial compliance.
[195] Patient #16.
[196] Sacramento County Remedial Plan Status Report. July 11, 2024.

**Patient #16**: This 30-year-old woman arrived at SCJ on 5/14/24 and was released on 5/31/24. Her medical history included severe alcohol use disorder, with withdrawal seizures, delirium tremens and ICU admissions; severe methamphetamine disorders, moderate opioid use disorder, and benzodiazepine use disorder, triplet pregnancy at 13 weeks, untreated urinary tract infection, history of attempted suicide and adjustment disorder.

**Summary:** This patient with severe alcohol use disorder and pregnant with triplets was at the jail for a little over 2 weeks. Upon arrival at the jail, there was an over 2-hour delay until a nurse screened the patient. The RN declared the patient unfit for confinement due to the patient reporting vaginal bleeding.

Upon return to the jail, an intake RN appropriately contacted a medical provider who ordered the patient to be admitted to the 2 Medical infirmary. A medical provider timely saw the patient within hours of admission and ordered an alcohol withdrawal regimen for the patient's severe AUD. *Nurses did not conduct alcohol withdrawal assessments as ordered while the patient was in the infirmary* (i.e., every 4-6 hours).

Obstetrics saw the patient within 72 hours of arrival and routinely monitored the patient throughout her pregnancy. A urinalysis and culture (5/14) showed the patient had a urinary tract infection. However, neither an OB provider nor an ACH medical provider reviewed and addressed the reports before the patient was released on 5/31/24. Thus, the patient was released with an untreated urinary tract infection, which is associated with adverse pregnancy outcomes.

At the initial visit, there was no documented plan to provide birth control counseling to the patient in accordance with the Consent Decree.

The patient reported a history of suicide attempts and the intake nurse made a mental health referral. A Social Worker 1 ordered an urgent mental health assessment and mental health provider referral, however neither took place in the 17 days the patient was at the jail.

**Patient #17:** This is a 27-year-old woman who arrived at the Sacramento County Jail (SCJ) on 4/18/24 and is still at the jail. Her medical history includes pregnancy, status post cesarian section on 7/6/24, Group B streptococcus (GBS) positive,[197] and adjustment disorder with mixed anxiety. She is taking prenatal vitamins.

**Summary:** This patient was timely referred to obstetrics from intake and received regular follow-up throughout her pregnancy. However, orders for an anatomy ultrasound (US) first ordered on 4/19/24 was not timely scheduled or completed. Case management did not submit the US request until 5/25/24, and by 6/7/24 it still had not been completed. The OB provider then ordered it urgently. On 6/11/24, an Intent to Incarcerate (ITI) form was completed to accompany the patient to the appointment, but there is no documentation that an appointment occurred on

---

[197] Infection with Group B Streptococcus typically does not harm the mother, but can cause pre-term labor, stillbirths, and post-delivery infection of the newborn.

this date and no explanation noted in the EHR. This raises the question as to whether custody transported the patient to an appointment. Other ordered tests including Glucola and Glucose Tolerance Test (GTT) were not timely completed.

On 7/2/24, the patient was near term and presented with increased contractions. A RN contacted UCD labor and delivery who recommended transport to the hospital. The patient was sent via a custody van that departed an hour later. Given that the patient was near full term and having contractions, the patient needed to be transported as soon as possible and no later than 30 minutes.

The OB provider scheduled the patient for a follow-up visit to discuss birth control counseling, but this did not occur. The medical experts notified the County so that counseling could be provided prior to the patient's release. This did not occur.

Other findings include that the patient was not initially assigned a low tier until she submitted a health request. Certified Nurse Assistants deliver health snacks as late as 1 or 2 am documented, but it is unclear whether they are delivered to the patient versus custody control. One CNA documented giving the health snack to the patient when she was at the hospital.

**Patient #18:** This is a 28-year-old woman who arrived at SCJ on 3/5/24 and was released on 7/17/24. Her medical history included pregnancy and schizophrenia. She is allergic to Bactrim and Keflex.

**Summary:** This patient was briefly admitted to SCJ in late December 2023 and her pregnancy test was positive. She was readmitted in March 2024 and reported no prenatal care (now at approximately 26 weeks).

The OB provider ordered anatomy and growth ultrasounds (US) that were not timely completed. On 3/8/24, the OB provider ordered an anatomy ultrasound. On 4/10/24, the anatomy ultrasound was completed with recommendations for a growth ultrasound in 4 weeks.

On 4/12/24, the OB provider ordered the growth US, but on 4/26/24, the obstetrician noted that the requested ultrasound was on "administrative hold."

By 5/24/24, the growth ultrasound had still not been performed. The obstetrician was concerned and sent the patient to UCD for fetal monitoring and growth ultrasound. UCD released the patient the following day indicating that fetal monitoring was reassuring, but did not perform the growth ultrasound.

On 5/26/24, the patient reported contractions all night and the obstetrician ordered the patient sent back to UCD due to fetal size being less than 1% of expected growth with a diagnosis of fetal growth restriction. The patient was monitored and released. A growth ultrasound was not performed. A RN noted the patient had returned but did not assess the patient.

On 6/7/24, the patient was admitted to the hospital for induced labor and delivery due to fetal growth restriction. The patient delivered a baby girl without complications. At hospital discharge, the patient desired POPS (Progestin Only Contraceptive Pills) for birth control. Recommendations included follow-up by the PCP.  However, more than five weeks later, on 7/17/24, the patient was released without birth control counseling.

**Patient #19:** This 33-year-old woman arrived at SCJ on 3/20/24 and is still at the jail. Her medical history includes opioid use disorder, dental abscesses, peripheral edema, and pregnancy. Her medications are prenatal vitamins, buprenorphine pantoprazole, fluticasone, sertraline, and trazodone.

**Summary:**  The patient was timely referred and closely monitored by obstetrics. As noted in other cases, ordered anatomy and/or growth ultrasounds were not timely completed. Although initially ordered on 4/26/24, Case Management did not request an appointment for an anatomy until 5/25/24. On 6/14/24, OB ordered the US urgently and it was completed the same day.

**Compliance Assessment:**
- L.1=Partial Compliance
- L.2=Substantial Compliance
- L.3=Partial Compliance

**Recommendations:**
1. Ensure that all newly arriving patients are timely screened for fitness for confinement, and identify high risk patients that need to be prioritized for medical screening.
2. Address Case Management issues that result in delayed imaging such as anatomy and growth ultrasounds.
3. Develop a system for timely review of lab and hospital reports.
4. Providers who sign lab, imaging, and discharge summaries, need to review the report, and document significantly abnormal findings, if present. If clinically indicated, initiate a treatment plan, and/or timely refer the patient back to the primary care provider (PCP).
5. Increase communication with OB/GYN providers to identify and address system issues.
6. Develop criteria for the method and timeliness of transport to UCD labor and delivery.
7. OB/GYN providers need to develop a plan to provide birth control counselling to patients and if requested, birth control. Consider training ACH nurses to provide individual birth control counseling or group classes, or collaborate with family planning agencies to provide birth control counseling at the jail.

   Develop a system to ensure that birth control education counseling is provided to *all women at the jail per the Consent Decree.* This could include giving handouts at intake regarding birth control, videos and referral to agencies the patient can access when released,[198] and offer group or individual counseling for patients still at the jail.

---

[198] This is birth control education but is not individual counseling as required by the Consent Decree.

| **M. Transgender and Non-Conforming Health Care** |
|---|
| 1. The County shall implement policies and procedures to provide transgender and intersex prisoners with care based upon an individualized assessment of the patient's medical needs in accordance with accepted standards of care and prevailing legal and constitutional requirements, including, as appropriate:<br>   a. Hormone Therapy<br>   b. Surgical Care<br>   c. Access to gender-affirming clothing<br>   d. Access to gender affirming commissary items, make-up, and other property items<br>2. The County shall ensure that medical and mental health staff have specific knowledge of and training on the WPATH Standards of Care. |

**Findings:** In the records reviewed, ACH provides timely and appropriate transgender care and non-conforming care for patients with gender dysphoria. The status of Consent Decree requirements is as follows;

- ACH policy 05-12, Transgender and Gender Diverse Health Care, revised 1/18/2023, is compliant with the Consent Decree (VI. M.1).
- ACH provided documentation that staff is trained regarding the revised policy and WPATH Standards of Care (VI. M.2).

The County tracks patients with gender dysphoria by extracting lists of patients through the EHR Fusion Order Manager. The completeness of the list appears to rely upon intake or other staff entering an order for referral to the gender affirming clinic.[199] However, this may not capture all patients.

In some records, referrals were not always made by the intake nurse but captured later by medical or mental health providers. Patients are listed more than once on the tracking log, as it includes all patient visits. This permits staff to retroactively see which patients have been seen and how often, but does not include future appointments to ensure that patients continue to be timely seen. A true tracking log would include future appointments and laboratory test results (e.g., estradiol and testosterone). We recommend that this be developed and implemented.

We reviewed seven admissions to the jail in three medical records. Several of the admissions were brief (approximately two weeks). Overall, patients were timely seen. One patient was released without providing a prescription and medications for testosterone.

**Patient #24:** This 27-year-old transgender male to female patient arrived at SCJ on 3/2/24 and is still at the jail. Her medical history includes alcohol, opioid, and methamphetamine use disorders, syphilis in October 2023, right radial styloid fracture with volar malunion, and possible memory

---

[199] If staff have not referred/enrolled a patient in the clinic, another source of patient information would be to search patients on estrogen and testosterone.

loss after being struck by a truck. Her medications are buprenorphine, spironolactone, vitamin D and loratadine.

The patient had three separate admissions to the jail; in September 2023, December 2023, and March 2024.

**First Admission**

In September 2023, the patient, who previously had identified as gay, reported that she was transgender. She was referred to the gender affirming clinic within 2 weeks. She had no history of hormone treatment but planned to get surgery when she got out. The provider noted that it was unclear if the patient met WPATH criteria. She has had gender dysphoria for at least 6 months, but is actively delusional and may not have decision making capacity. The provider counseled the patient and planned to follow-up in two weeks. The provider ordered STI labs, and chronic care follow-up. On 10/1/23, the patient's syphilis screen was reactive with a titer of 1:256. On 10/17/23, a provider saw the patient, and diagnosed her with primary syphilis. No bicillin was available and the provider ordered doxycycline 100 mg twice daily for 14 days. Email sent to County Syphilis Surveillance Team. Repeat Labs in 6 months.

The MAR shows that 27 of 28 doses were included in the MAR. The patient received 21 of 28 doses. For six doses not administered, the reason was "Refused to come out," however the nurse attempted to administer two doses at 02:55 in the morning. All other missed doses were offered between 21: 30 and 22:46.

The patient was released on 11/5/23.

**Second Admission**

On 12/28/23, the patient was readmitted to the jail. The patient is male. The nurse noted that he reported bipolar disorder and appeared to have auditory hallucinations. The nurse did not note the patient had been previously referred to the gender affirming clinic. No referral to gender affirming clinic, or for 14-day H&P. The same day, a MH NP ordered olanzapine, lithium and Buspar. Shortly thereafter, the patient reported suicidal ideation and transferred to 3 West.

1/17/24 at 10:38: A medical provider saw the patient for an H&P, OUD, and history of syphilis. She ordered labs which the patient refused. She started the patient on Bup.

2/12/24 at 10:23: Another medical provider saw the patient and conducted a thorough review of the patient's medical history. She believed the patient should have been treated with 4 weeks of doxycycline for syphilis instead of 2 weeks in October 2023. A/P: doxycycline 100 mg twice daily x 2 weeks. Reading glasses. RPR in 6 months.

*Note: The MAR listed 27 of 28 doses of doxycycline. The patient received 24 of 28 ordered doses.*

2/29/24: The patient was released.

**Third Admission**

3/21/24 at 14:13: A RN conducted a receiving screening. The patient reported being transgendered. STI labs were ordered.  States she was bipolar but not anymore. Denied opioid use. The nurse did not note the patient had been previously treated with buprenorphine 2 months prior. The nurse assessed that the patient was at risk for alcohol withdrawal and ordered CIWA monitoring.  The nurse referred the patient to the transgender clinic.

3/22/24 at 21:33: A RN noted the patient's history of opioid use and being treated with suboxone. A UDT is needed for screening and/or confirmation.

*Note: The information was already available in the previous admission notes. The nurse did not refer the patient to a provider.*

3/27/24 at 15:10: A medical provider saw the patient for an H&P and addressed transgender status and opioid use disorder. Started buprenorphine and opioid detox protocol. The provider made an ortho referral.

3/29/24: RPR titer=1:2.

4/1/24 at 09:20: The Medical Director noted that the patient had untreated syphilis for greater than and ordered doxycycline x 4 weeks.

*Note: The patient had two separate courses of doxycycline, one in October 2023 and February 2024, and did not receive all ordered doses. The MAR shows that the medication was ordered for 28 days or 56 doses, but the MAR only scheduled 19 doses, which the patient was compliant.  We discussed this with the pharmacy director who said that the doxycycline order was shorted to two weeks, but there is no indication on the MAR that the last two weeks of doxycycline were discontinued. This is a significant problem as per the MAR, the order was valid for 30 days.*

4/10/24 at 13:38: A medical provider saw the patient for gender affirming care. The patient was uncertain as to whether he wanted to be male or female. The provider has questions about the patient's decision-making capacity.  The provider addressed all chronic conditions. Plan: Follow-up in 2-3 months. Repeat RPR.

6/10/24 at 10:24: The provider saw the patient for gender-affirming care. The patient wished to start hormone therapy.  Weight=132.2. The provider ordered labs and Aldactone. Plan to start hormones after lab results.

*Note: On 10/3/23 the patient's weight was 165 lbs. On 12/28/23, the patient's weight was 156.8. On 9/24/23, the patient's weight was 122 lbs. A decrease of 43 lbs. in a year. 8/29/24: Chest x-ray=normal.*

6/14/24 at 11:52: Provider noted that estrogen and Aldactone were ordered for the patient, "who is aware the medications would start".

6/19/24 at 10:23: A provider saw the patient for memory loss and seizures since being hit by a truck. He cannot remember dreams. Syphilis titer increased from 1:4 to 1:8. A:P Retreat the patient with doxycycline twice daily x 30 days. Get ED records regarding being struck by a truck.

A medical provider followed up with the patient on 8/28/24, 9/24/28, and 9/30/24.

**Patient #22:** This is a 36-year-old transgender male to female transferred from Riverside County Jail to SCJ on 4/26/24 and released on 5/21/24. Her medical history includes opioid use disorder and right breast lump. Her medications were spironolactone, finasteride, buprenorphine, Delestrogen IM, bupropion, Klonopin, and Ambien.

**Summary:** On 4/26/24, the patient was transferred from Riverside to Sacramento County Jail, giving a history of transgender treatment, including weekly estrogen injections. Two of her medications for transgender treatment were continued, but not the weekly estrogen injection, pending evaluation by the provider in the transgender clinic. Although referred from intake, she was not scheduled to see the transgender provider for 3 weeks. On 5/17/24, a medical provider saw the patient, but there was no exam room so the provider was unable to perform a physical examination pertinent to her history of a breast lump. The provider noted that the patient had a break in estrogen treatment in the past month, ordered estrogen and testosterone levels, and submitted a request for information (ROI) regarding transgender care and history of breast lump to Salinas Valley State Prison and Riverside County. Labs were pending at the time when the patient was transferred back to Riverside County on 5/21/24. *Although the patient was not at the jail for very long, she was not timely seen for transgender care following her arrival and was not provided continuity of medications for transgender treatment.*

The patient also had a history of mental health treatment for depression and anxiety. The patient was prescribed bupropion and other MH medications. Although referred for a mental health assessment at intake, a mental health provider did not conduct a mental health assessment. The patient submitted two health requests to obtain medication, but was not seen by a mental health provider, and received no psychotropic medications.

**Patient #23:** This is a 31-year-old trans female to male transferred from Contra Costa to SCJ on 1/24/24 and was released on 2/7/24. The patient was readmitted on 6/10/24 and released on 6/14/24. The patient was readmitted on 7/11/24 and released on 7/23/24.

His medical history included opioid use disorder with a history of overdose in 2023, pneumomediastinum due to esophageal perforation from recurrent vomiting in February 2023, methamphetamine use disorder, serious mental illness with inpatient hospitalizations, bipolar disorder, asthma, scoliosis deformity of the spine, and intermittent low back pain. MVC at age 25 with head injury and hospitalization x 3-4 months. His medications were Buprenorphine, Depakote, Abilify, and Lexapro.

The patient had 3 brief admissions to the jail

**First Admission Summary:**

This patient was at the jail for approximately two weeks. The patient initially reported taking testosterone but did not want to continue it. The patient later told MH and a nurse that he changed his mind.  A referral to the transgender clinic was not made prior to release.

**Second Admission Summary**

The patient received timely referral and a provider saw the patient in the transgender clinic.

On 6/10/24 at 11:55, the patient transferred from Contra Costa Jail to SCJ.  The patient initially identified as female and lesbian, but later requested referral to the transgender clinic.

6/12/24 at 20:32: Patient requested referral to transgender clinic for testosterone shots. The nurse referred the patient to the transgender clinic.

On 6/14/24 at 13:02: A medical provider saw the patient in transgender clinic.  On testosterone since age 27, none for 6 months.  ROI.  OUD. Cravings are controlled. Patient wishes to become a male. Scoliosis: bending forward approximately 2 inches in height difference. Posterior ribs. Plan: Patient counseled, ROI, Testosterone cypionate 200 mg/ml every 2 weeks. Jail panel, STI labs (these had been previously ordered and drawn the day before).

Later that day, the patient was discharged from the jail, prior to receiving the first dose of testosterone.

**Third admission Summary**

On 7/11/24, the patient was admitted to the jail for two weeks. The patient was timely referred to the transgender clinic. On 7/12/24, the provider ordered testosterone injections that were given the following day. On 7/23/24, the patient was released. Prescriptions for discharge medications, including buprenorphine, albuterol inhaler and psychotropic medications were sent to the pharmacy.  However, although testosterone was ordered, the pharmacy did not fill the prescription and give the medication to the patient. The patient did not receive continuity of transgender treatment.

**Compliance Assessment:**
- M.1=Substantial Compliance
- M.2=Substantial Compliance

**Recommendations:**
1. Develop a tracking system that includes lab results and future appointments.
2. Continue to train staff on WPATH Standards

| **N. Detoxification Protocols** |
|---|
| 1.  Within three months of the date the Remedial plan is issued by the Court, the County shall develop and implement protocols for assessment, treatment, and medication interventions for alcohol, opiate and benzodiazepine withdrawal that are consistent with community standards. |
| 2.  The protocols shall include the requirements that:<br>    (i)    nursing assessments of people experiencing detoxification shall be done at least twice a day for five days and reviewed by a physician.<br>    (ii)   nursing assessments shall include both physical findings, including a full set of vital signs, as well as psychiatric findings.<br>    (iii)  medication interventions shall be updated to treat withdrawal syndromes to provide evidenced-based medication in sufficient doses to be efficacious.<br>    (iv)  the County shall provide specific guidelines to the nurses for intervention and escalation of care when patients do not respond to initial therapy; and<br>    (v)   patients experiencing severe-life threatening intoxication (an overdose), or withdrawal shall be immediately transferred under appropriate security conditions to a facility where specialized care is available. |

**Findings:**   The County has continued to expand the Medication Assisted Treatment (MAT) program. Accomplishments related to detoxification and substance use disorder (SUD) including:

1.  Several housing units have been designated for patients at risk of withdrawal and those receiving MAT.
2.  Electrolyte drinks are available in the designated detox units to encourage adequate hydration.
3.  A Supervising Registered Nurse (SRN) is now assigned to the detox and MAT units.
4.  Addiction medicine providers see patients receiving MAT and adjust treatment as indicated.
5.  Narcan is available in the control booth and the units, with direct access by the inmate population.
6.  The search procedure during the booking process has been expedited and expanded so that it is completed as close as possible to the arrestee's arrival.

Despite these improvements, the County has not provided patients experiencing, or at risk of substance use withdrawal, timely medical evaluation, treatment, and monitoring. Several significant issues still place patients at risk of harm.  These problems include lack of:

1.  Timely and accurate identification of patients with substance use disorders at intake who may be at risk of withdrawal.
2.  Medical evaluation and treatment for patients at risk of moderate to severe withdrawal, and failure to medically monitor patients in detox units.
3.  Timely nursing withdrawal monitoring.

4. Medical rounds in the detox unit to assess patients for the effectiveness of treatment and readiness for discharge from the unit.[200]

We also found:

5. Inaccurate nursing withdrawal assessments and under-scoring of symptoms results in artificially low CIWA and COWSS scores.
6. Nurses routinely accepting patient's refusals for withdrawal assessments (e.g., CIWA, COWS, etc.) from custody, or because the patient does not want to ambulate out of bed or their cell.
7. Delayed treatment of patients with withdrawal symptoms.
8. Delays in initiating MAT for patients with SUD resulting in patients seeking Fentanyl to relieve symptoms and overdosing.[201]
9. Concerns with the accuracy of detoxication audits.

These concerns are described below.

*Record review shows that nurses do not consistently review prior jail records that identify patients with known substance use disorder and fail to order withdrawal monitoring.*

An example is a 32-year-old male who arrived at the jail on 5/12/24 with a history of opiate and alcohol withdrawal during previous incarcerations.[202] The patient endorsed daily use of methamphetamines and appeared to be under the influence at the time of his receiving screening.  The nurse failed to complete a urine drug screen and to initiate withdrawal monitoring.  Six hours after completion of his receiving screening, he was found difficult to arouse and verbally non-responsive.  He was transferred to the emergency department, where his urine drug screen was positive for amphetamines, ecstasy, and Fentanyl (VI. N.2.v).

*Medical providers do not consistently and timely medically evaluate patients at risk of moderate or severe substance use withdrawal, and providers do not conduct rounds on the detox units to assess whether the patient's condition is improving or needs adjustment in his detox regimen.*

Current guidelines for management of substance use withdrawal in jails[203] state that patients at risk of moderate to severe withdrawal or who are symptomatic need to be referred for an immediate clinical assessment. Clinical assessment is defined as:

> *…. conducted only by qualified health care professionals, who focus first on establishing substance intoxication or withdrawal as the likely and primary cause of any findings. They collect vital signs, take a medical and psychiatric history, and evaluate the individual for signs of other physical or mental health conditions to help determine withdrawal-related risks and risk for*

---

[200] Currently this is done by nurses based upon CIWA and COWS scores, however these scores are often inaccurate and artificially low.
[201] Patient #30.
[202] Patient #28.
[203] Guidelines for Management of Substance Abuse in Jails. US Department of Justice. June 2023.

*complications. For example, the use of more than one substance or underlying psychiatric conditions may complicate management of the withdrawal syndrome. Telehealth may be used to support clinical assessment.*[204]

The Consent Decree requires that patients be monitored at least twice a day for five days, and reviewed by a physician (VI. N.1). The Guidelines recommend immediate assessment and frequency of monitoring based upon the type of substance and is noted in the table below.

**Withdrawal Risk Triage by Substance**[205]

| Substance | Refer for Immediate Clinical Assessment | Monitor for Withdrawal Signs and Symptoms |
|---|---|---|
| **Alcohol** | Appears unwell to a layperson.<br><br>Self-report of ≥8 standard drinks for men and ≥6 drinks for women ≥4 days/week.<br><br>Reports past week alcohol use and a history of complicated alcohol withdrawal (e.g., withdrawal-related seizures). | Self-Reported risk for alcohol<br><br>Reports of recent alcohol use below specified for immediate clinical assessment AND does not report a history of complicated alcohol withdrawal<br><br>*Monitor at least 6 hours for 72 hours from arrival at the facility.* |
| **Sedatives** | Appears unwell to a layperson<br><br>Self-report of near daily use and use within the past 7 days.<br><br>Reports past -week sedative use and a history complicated sedative withdrawal (e.g., withdrawal related seizures, psychosis, hallucinations). | Self-reported risk for sedative withdrawal.<br><br>Reports recent sedative use below specified for immediate clinical assessment AND does not report a history of complicated sedative withdrawal.<br><br>*Monitor at least 6 hours for the first week from arrival at the facility.* |
| **Opioids** | Appears unwell to a layperson<br><br>Clinical Opiate Withdrawal Score (COWS) ≥3. | Self-reported risk for opioid withdrawal or reports recent opioid use AND COWS≥3.<br><br>Monitor every 4 hours for the first 72 hours from arrival to the facility. |
| **Stimulants** | Appears unwell to a layperson<br><br>Signs and symptoms emerge. | Self-reported risk for stimulant withdrawal or reports recent stimulant use.<br><br>Monitor at least twice per day for the first 72 hours from arrival at the facility. |

The County has developed standardized nurse procedures (SNPs) for patients with substance use disorder that included an evaluation process and decision tree for ordering medication regimens as order sets (e.g., valium for alcohol and benzodiazepine use disorder). SNP frequency of

---

[204] Ibid. Page 11.
[205] Ibid. Page 10.

monitoring varies from every 4-6 hours to twice daily monitoring. The SNPs include medication regimens, including controlled substances.  Implementation of these SNPs at intake screening provides the means to timely treat patients for their SUDs. However, for several reasons, including federal regulations, *these SNPs have not been implemented for the purposes of ordering treatment*.[206] This has resulted in delays in evaluation and treatment of patients with SUD.

*Nurses do not timely conduct withdrawal monitoring as ordered and as required by ACH policy*

Monitoring of patients is needed to assess whether the patient has symptoms, whether they are improving or worsening, and to provide timely treatment.  Record review shows that this is not occurring. (VI. N.2.i).  Examples are described below.

**Patient #39:** A 44-year-old female was booked into the jail on 4/24/24 at 23:55, endorsing daily drinking of liquor and a history of experiencing withdrawal when she stopped drinking. She also had a history of Hashimoto's Disease, a thyroid nodule, and bulging lumbar discs. The nurse ordered alcohol withdrawal monitoring (CIWA-Ar) every 4-6 hours, detox housing on a low tier, and a provider history and physical, and referral to the SUD counselor.

- On 4/25/24, a nurse completed three of four (75%) scheduled withdrawal assessments.
- From 4/26/24 through 5/1/24, nurses performed withdrawal assessments only once daily.
- On 4/26/24, at 17:28, the nurse documented the patient complained of not being able to sleep due to being in alcohol withdrawal; however, a CIWA-Ar was not completed, with the nurse documenting, "Declined to get up for VS at this time."
- On 5/1/24, the physician saw the patient for the history and physical.  She was diagnosed as detoxing from alcohol, and the provider ordered a one-week extension of withdrawal monitoring.
- Nurses did not timely administer withdrawal medications.

**Patient #40:** On 8/19/24, a 30-year-old female was booked into the jail with a prior history of substance use disorder and withdrawal monitoring for fentanyl, methamphetamine, and amphetamines. The nurse did not order withdrawal monitoring.  On 8/21/24 at 15:00, a nurse practitioner saw the patient who complained of body aches, chills, and stomach pain. She reported stopping Fentanyl use just before she arrived at the jail but was not sure of the exact date. The nurse practitioner ordered opiate withdrawal monitoring (COWS) *every 6 hours*, as well as an opioid withdrawal regimen to alleviate her symptoms.

- At 22:33, a nurse did not conduct the second monitoring assessment because the patient was out to court when a COWS assessment was due.
- 8/22/24 and 8/23/24: A nurse conducted COWS monitoring in only 1 out of 4 (25%) ordered assessments.

---

[206] These SNPs could be utilized by the nurses, but would require that a nurse contact a medical provider for each patient.

- 8/24/24: A nurse assessed the patient twice.
- 8/25/24: A nurse assessed the patient once.
- 8/26/24: A nurse did not assess the patient.
- 8/27/24: A nurse assessed the patient once.

**Patient #33:** On 4/27/24 at 05:47, a 38-year-old male arrived at the jail endorsing the daily use of fentanyl, heroin, and methamphetamines. The intake nurse ordered COWS monitoring *every 4-6 hours* per policy.  Monitoring was conducted as follows:

- 4/27/24 at 15:34: ten hours after intake, a nurse repeated a COWS assessment.
- 4/28/24 at 17:53: 24 hours later, a nurse attempted to conduct an assessment.
- 4/29/24: A nurse did not perform withdrawal monitoring.
- 4/30/24: A nurse documented that the patient's "refused to come out" for a COWS assessment and "refused to sign refusal."
- 5/1/24: A nurse documented that the patient "refused to come out" for a COWS assessment and "refused to sign refusal."
- 5/2/24: A nurse conducted two withdrawal assessments.
- 5/3/24: A nurse did not conduct any withdrawal assessments.
- 5/4/24:, the patient was found by custody in his cell unresponsive but breathing.  He was transported to the emergency department and diagnosed with fentanyl overdose. (N.2.v.).
- 5/4/24, at 19:55: the patient returned from the hospital. The patient admitted to taking fentanyl, stating, "I just wanted to feel better. I've asked to be on the MAT program". The nurse did not schedule COWS monitoring but did schedule an urgent provider sick call. The nurse failed to order COWS monitoring until 5/6/24 at 13:49, representing a two-day delay.
- On 5/6/24 a medical provider ordered Suboxone induction, nine days after the patient arrived at the jail.

The monitors interviewed this patient. He recalled being in severe withdrawal that included vomiting, diarrhea, and severe bone pain, and found it difficult to get out of bed.  He reported telling the nurse that he needed medication to treat his cravings, not just the symptoms he was having, and that he was too sick to get up.  He said each time the nurse came to his cell, he asked for suboxone. After several days, he ordered Fentanyl from another inmate in a desperate attempt to treat his acute withdrawal. (VI. N.2.iv).

This case demonstrates the grave risks to patients who are seeking, even begging for treatment for their substance use disorder (SUD) but not provided it on a timely basis.  In this case, the patient sought fentanyl to relieve his cravings and suffered an overdose that could have been fatal.  It also highlights the continued failure of the County to halt the inflow of fentanyl and other drugs.

**Nurses do not perform withdrawal assessments correctly resulting in inaccurate withdrawal scores.**

The monitors observed nursing staff conducting withdrawal monitoring and found the assessments incomplete and the scoring of findings incorrectly done. The withdrawal monitoring tools (e.g., CIWA and COWS) contain questions about specific symptoms that commonly occur during withdrawal from alcohol and drugs. The nursing staff generally ask the patient if they are experiencing "symptoms" rather than asking about *each* symptom the withdrawal monitoring tool requires to be scored. Patients do not necessarily understand what it means to experience "symptoms." Unless asked, patients may not volunteer or realize that feeling anxious, feeling goosebumps on the skin, or experiencing sweating and chills are related to withdrawal.

The monitors observed a nurse conducting withdrawal assessments. A patient reported to the nurse that he had been vomiting. Rather than include vomiting as a symptom on the assessment tool, the nurse omitted the symptom. As a result of this failure to document symptoms accurately, the patient's COWS score was a 1 instead of a 3. When questioned, the nurse reported the practice was to score reports of vomiting as 1 unless they directly observed the patient vomiting "because we don't know if they're lying."

Correctional health care staff beliefs that inmates always lie is extremely dangerous and has resulted in preventable deaths in correctional institutions across the country. Staff must never begin an encounter with the assumption that a patient is going to lie to them, but conduct a thorough and careful assessment to determine whether there are objective findings that support the patient symptoms. When in doubt, placing the patient in an environment where further monitoring can take place will provide additional information. The County needs to provide training to health care staff regarding biases that all inmates lie and actions to take to safeguard patient safety.

Nursing staff need to document patients' reports of symptoms and score them accordingly. If the clinical presentation does not align with the subjective data obtained from the patient, closer monitoring may be warranted. *Simply downgrading the assessment is not acceptable, and practicing with the belief that patients are lying and that vomiting must be observed before being scored does not meet the nursing standard of care.*

The same patient asked the nurse if he was going to die. She lightly chuckled and said, "No, you're not dying" and the patient left the encounter shortly thereafter. Nursing staff must carefully listen to their patients and explore comments and questions that, on the surface, may seem irrational. After the nurse's assessment, we interviewed the patient who said that he asked if he was dying because, during his previous experience with withdrawal at the jail, he experienced severe stomach pain and bloody emesis, requiring transfer to the hospital for treatment. Care and treatment of withdrawal require assessment and care for physical and psychological symptoms. (N.2.ii.)

Another assessment failure was the nurse not requiring patients to extend their arms so that tremors could be visualized. The assessment for tremors requires touching the patient, as tremors are felt before being seen, and asking them to extend their arms, which enhances visualization of tremors. Because these routine practices are not incorporated into withdrawal assessments, the calculated scores are artificially low and likely result in undertreatment of withdrawal symptoms.

Withdrawal assessments and resulting scores vary between nursing staff.

**Patient #34:** On 9/13/24 at 10:28, a nurse assessed a patient for alcohol withdrawal. The registered nurse assigned him a CIWA score of 6, one point each for nausea, vomiting, tremors, paroxysmal sweats, agitation, and headache.[207]  On 9/13/24 at 10:30, another registered nurse assessed him in a nursing sick call at 10:30, and his alcohol withdrawal score was a 1, noting tremors as his only symptom.[208]  *It's not credible to believe the patients' score improved from 6 to 1 in the two minutes separating the encounters.*

On 9/16/24 at 11:52, the monitors observed the encounter between this patient and a nurse. BP=179/71 mm hg, pulse=112/minute. His CIWA score was 7, and he reported chest pain and numbness radiating down his left arm and told the nurse that the night before that he also experienced chest pain. Nursing documentation from 9/15/24 at 21:22 does not include complaints of chest pain, although his blood pressure was moderately elevated at 157/108 mm Hg and he was tachycardic with a pulse of 110 per minute. His CIWA score was 8 at that time. The nurse did not repeat the patient's vital signs.

*Note: The nurse did not evaluate the patient for chest pain using a standardized nursing protocol or repeat the patient's blood pressure.*

*Patients experiencing withdrawal need to be provided a safe environment.*

The monitors observed the MAT clinic in progress on 9/19/24, noting a patient lying on the hard rubberized floor with the provider and medical assistant present.[209]  The patient did not feel well and asked to lie on the floor rather than sit in the chair.  The provider reported he believed the patient was safer on the floor, to avoid a potential fall.  The patient's COWS score was recorded by nursing as a 6, indicating mild withdrawal.  The provider, an addiction specialist, documented, "Patient clinically with S/S (signs/symptoms) of significant opioid withdrawal, and greater than 48 hours from last use." The monitors discussed with the MAT provider our observation of the practice of scoring symptoms very low, such as vomiting and diarrhea, because nurses did not witness it, and the failure to assess for tremors and other symptoms adequately.  *The provider reported commonly seeing patients with low COWS scores who were in clinically significant withdrawal, discrepant from the nurses' scoring.*

---

[207] The nurse did not complete documentation of the assessment until 17:05.
[208] The nurse completed documentation of the assessment at 10:38.
[209] Patient #35.

Patients too ill to ambulate or sit in a chair should be allowed to lie on a proper bed, not a hard rubberized floor. For patients who are too sick to ambulate, the nurse should complete the withdrawal assessment in their cell at their bedside, and not require them to ambulate to the day room or outside the unit.  A portable bed with a mattress should be made available for patients who can ambulate but are too ill to sit in a chair. Adjacent to the multi-purpose room used by the MAT provider, plastic beds and mattresses are easily accessible and available for temporary use during the MAT clinic.

*An Intake Medical Observation Cell policy has been developed and is pending finalization.*

ACH has drafted an Intake Medical Observation Cell policy for use when patients are at risk to themselves or others secondary to intoxication from alcohol or drugs.  The monitors provided recommendations for edits, and the finalization of this policy is pending. During the onsite tour, there were no patients placed in the medical observation cell for detox monitoring of intoxicated patients.  The cell has a toilet and sink with running water but does not have benches or beds, which is not clinically appropriate. Also viewed was a window that connects the cell with an examination room used for Phase 2 intake receiving screening. Direct line of sight is optimal for adequate monitoring of intoxicated patients.  The monitors recommend the placement of a bench for sitting and low-to-the-floor beds with mattresses for patient use when placed in the medical observation cell, avoiding the need for them to lie on the hard rubberized floor.

In summary, the monitors have serious concerns about the County's performance of withdrawal monitoring. Nurses do not conduct CIWA and COWS assessments correctly, resulting in under scoring the severity of the patient's symptoms and premature discontinuation of monitoring. Detox monitoring audits show high compliance with conducting withdrawal assessments, however this is not supported by record reviews that show nurses often accept patient refusals from deputies without going into the patient's cell to determine if the patient is too ill to get out of bed. Until these issues are corrected, patients will continue to experience suffering and harm.

**Compliance Assessment:**
- N.1=Partial Compliance
- N.2=Noncompliance

**Recommendations:**
1. Following intake, ensure that medical providers conduct immediate clinical assessments of patients in accordance with DOJ guidelines for managing substance use withdrawal in jails.
2. A provider needs to be assigned to the detoxification unit(s) to accomplish daily rounds, adjust medication, modify patient plans of care.
3. Establish sufficient nursing staffing to ensure consistent and timely withdrawal monitoring.
4. Assign patients at risk of withdrawal to low tiers, avoiding the use of stairs during ambulation.

5. Place a low-to-the-floor portable bed with a mattress in the multi-purpose room used by the MAT provider.

6. When patients are too sick to ambulate from their bunks, complete the nursing withdrawal assessments at the bedside.

7. Notify medical providers when patients are too sick to ambulate from their bunks. Consider placing these patients in 2M or the MHU.

8. Develop a tracking system for monitoring patients referred for MAT, to ensure timely initiation of treatment.

9. Finalize the Intake Medical Observation policy.

10. Revise ACH policy and standardized nurse procedures regarding assessment, monitoring, and treatment of patients at risk of withdrawal to be consistent with current guidelines.

11. Develop a policy for the detoxification and MAT units, to include:
    a. Clinical Assessment by a medical provider
    b. Criteria for admission to and discharge from the units
    c. Nurse admission procedures
    d. Frequency of nurse monitoring
    e. Frequency of provider rounds

12. For detox monitoring audits, reevaluate the criteria for compliance. The audits need to accurately reflect when nurses conducted a withdrawal assessment, and if is not performed, the reason why.  The tracker can be used to identify root causes of failed assessments.

13. Develop a comprehensive nursing training curriculum to include:
    a. Identification of patients with substance abuse disorder who are at risk for withdrawal.
    b. Nursing assessment and scoring of withdrawal from alcohol, opiates, and benzodiazepines.
    c. Medical Observation Unit policy.

14. Ensure that all nursing staff are trained and demonstrate competency in performing withdrawal assessments. Document training attendance.

15. Complete qualitative and quantitative CQI studies that measure compliance with substance abuse screening, withdrawal monitoring, and administration of ordered treatment.

| **O. Nursing Protocols** |
|---|
| 1. Nurses shall not act outside their scope of practice. |
| 2. To that end, the County shall revise its nursing standardized protocols to include assessment protocols that are sorted, based on symptoms, into low, medium, and high-risk categories. |
|     a. Low risk protocols would allow registered nurses to manage straightforward symptoms with over-the-counter medications; |
|     b. Medium-risk protocols would require a consultation with a provider prior to treatment; and |
|     c. High-risk protocols would facilitate emergency stabilization while awaiting transfer to a higher level of care. |

**Findings:** Standardized nursing protocols guide nursing staff in methodically assessing the patient, establishing a nursing diagnosis, and executing an approved standardized treatment plan within their scope of nursing practice. The ACH protocols, as written, are poorly designed and lack sufficient clinical assessment pathways to guide nurses in collecting thorough subjective and objective clinical data, which results in inappropriate clinical decision-making and nursing diagnosis. (VI. O.1). The ACH nursing protocols establish low-, medium-, and high-risk categories that include administration of over-the-counter medications, directives to notify a provider when a medium-risk is identified, and guidance to facilitate transfer to a higher level of care when emergency stabilization is necessary. Record review shows that nursing practice does not adhere to SNPs (VI. O.2). The ACH protocols are being revised, and the medical experts have provided feedback and samples to assist in the revision process.

Our prior report discussed the need to revise the protocols to align with the standardized nursing process of obtaining subjective and objective data before arriving at a nursing diagnosis. The current nursing protocols are not part of the Athena EHR template and require the nurse to document subjective and objective data narratively. Because the revision of the standardized nursing protocols is pending completion, nurses currently must select a protocol based upon a diagnosis before assessing the patient. *This results in incorrect nursing assessments and diagnoses*. Instead of assessing the patient based upon a presumed diagnosis, nurses must select a protocol based upon the patient's presenting signs or symptoms.

Effective standardized nursing protocols are systems-based, with templates embedded in the electronic health record system, and methodically guide the nurse through a complete and thorough assessment process, culminating in a proper nursing diagnosis and authorized treatment plan that includes thresholds for referrals, approved orders for over-counter medications, and suggestions for appropriate patient education. Without effective standardized nursing protocols, the quality of the patient assessment depends on the individual nurses' training, experience, and expertise with a specific clinical presentation.

Record review and observation found nurses failed to collect subjective and objective data methodically. Frequently, they failed to obtain a complete history of symptoms and complete a thorough physical examination. Generally, nurses author a narrative summary note and order over-the-counter medications, which may or may not be included in the standardized protocol specific to the patient's clinical situation.

For example, the monitors observed a nursing sick call encounter with a 58-year-old male patient who complained of painful urination, right flank and back pain.[210] The nurse followed a standardized nursing procedure for urinary tract infection, requiring a diagnosis of the patient's condition before beginning the encounter. The nurse did not review the patient's prior history before completing the encounter, and had the nurse done so, would have seen that a provider saw the patient the day before, diagnosed him with a weak urinary stream, and prescribed Flomax. However, the nurse reviewed this information after the encounter was completed and did not incorporate the information into her assessment.

The encounter was done in a room without an exam table, and the nurse conducted the physical examination, including a back and abdominal assessment, with the patient sitting in a chair. The assessment was documented in the health record in a narrative note format. The nurse obtained a urine specimen and completed a multi-chem dipstick but did not contact a provider for urine culture or medication orders. Because the encounter was done in an office without access to handwashing facilities, the urine was carried through an exam room down the hall and into the lab area where the test was completed.  The nurse reassured the patient that the urine dipstick was normal and alerted the provider to review the urinalysis, and the patient's request for an extra blanket for back support.

The nurse documented patient education, including daily range of motion, and walking exercises as tolerated, and reported that the patient verbalized understanding. However, observation of this patient encounter did not show patient education relative to the range of motion and walking exercises, nor did the patient verbalize understanding of the education.

On 8/15/24, a 32-year-old male arrived at the jail. On 8/17/24, a deputy called the nurse and reported the patient was in pain and thought his arm was broken. On 8/18/24, the nurse documented the patient refused his nursing sick call documenting, "Refused to come out". On 8/19/24, he walked into the medical unit complaining of left wrist pain and reporting that he had fallen off his bike four days prior to his arrest. He was referred to the provider and an x-ray was ordered. On 8/22/24, the x-ray was taken and showed no evidence of a fracture or dislocation. On 8/23/24, the patient submitted a health services request, asking for the results of his x-ray. The patient was released on 8/24/24,[211] and rebooked into the jail on 8/28/24.

On 8/31/24, the patient submitted a health services request asking for the results of his x-ray. A patient handout reporting normal results was printed and was assumably routed through the jail

---

[210] Patient #26
[211] Patient #27

mail system. On 9/4/24, the patient was transferred to RCCC. On 9/10/24, he submitted another health service request, complaining of a painful wrist and requesting the results of his x-ray. On 9/11/24, he submitted another HSR writing, "I think I broke my wrist". The request was triaged by the SRN as routine. On 9/12/24, he submitted another health services request, writing that he thought he fractured his wrist and complained that it was swollen.  He asked to see a doctor. The SRN triaged the request as routine. He submitted a second request the same day writing, "I think I broke my wrist". Another RN triaged the request as urgent. Also, on 9/12/24, the patient sent a message on the security message form, writing, "I think I broke my wrist, it's swollen, and I need to see a doctor."

On 9/12/24, the patient was seen in nursing sick call. The nurse used the Musculoskeletal Conditions-Non-Traumatic Standardized Nursing Procedure (SNP) and documented "No" to swelling; however, the narrative note described the left wrist as slightly larger than the right one. The nurse failed to document a nursing diagnosis.  The SNP directs the nurse treating a sprain to contact the provider, splint or compression wrap if indicated, order Naprosyn and Tylenol for pain, and follow-up in 7 days.  *The nurse completing the sick call encounter did not contact a provider and did not provide a splint.* The nurse prescribed Naprosyn and follow-up with nursing in 7 days. Authoring narrative notes, in addition to completing the SNPs, is an inefficient use of nursing time and facilitates the risk of duplicative, conflicting documentation, such as checking "no" to swelling and then narratively describing the left wrist as appearing more significant than the right wrist.

On 9/17/24, a RN saw the patient again in nursing sick call. The monitors observed this encounter. The patient complained of continued left wrist pain and asked the nurse to provide a splint to help support his painful wrist. He described the pain as a 10 out of 10 in severity. He also reported that the Naprosyn was not helping. The patient had not been notified of the x-ray results taken on 8/22/24.  The nurse informed the patient the x-ray was unremarkable. The nurse told the patient that a wrist brace required an evaluation by the provider and that "even if the doctor orders a brace, it will take at least a week or more to get here." He told the patient he had an appointment with the provider scheduled for 9/19/24, but he would try and move the appointment to the following day.

*Patients should not be educated to expect delays in medically indicated care.  If the ability to splint a limb, as required by the SNPs, cannot be accomplished without delay, the nurse needs to notify a provider and health care leadership to resolve the system issue.*

On 9/18/24, a provider saw the patient an ordered repeat x-rays that were taken on 9/25/24, which revealed a possible fracture. Three weeks later, on 10/4/24, orthopedics splinted his fracture. This was a delay in care.

Another patient submitted a health services request on 8/29/24, writing, "I broke my right arm."[212] On 8/31/24 at 23:15, the patient was seen in a nursing sick call "outside the control

---

[212] Patient #28

area." He told the nurse he slipped in his cell two days prior and hit his right arm. The nurse failed to follow the SNP Musculoskeletal Conditions-Traumatic. The SNP requires obtaining critical information such as the mechanism of the injury (e.g., did the patient fall on the arm, break the fall with their arm, strike their arm on the bunk?). The objective data and physical assessment require describing any break in the skin, evaluation of pulses, paresthesia, paralysis, etc. The documentation relative to the assessment included only the patient's pain rating of 4 out of 10, swelling of the right outer forearm, and the ability to raise his arm without pain. No nursing diagnosis was documented.

Whether the diagnosis is a suspected fracture or sprain, the SNP-authorized treatment plan requires notification of the provider. The nurse did not notify a provider and educated the patient to rest his arm. Naprosyn was ordered for five days, and a follow-up nursing sick call was ordered in seven days. On 9/17/24, the patient was released without further follow-up.

Not only was the physical assessment required by the SNP not completed, but any time a patient reports a fall, an exploration of the incident is required. Often, inmates will report a fall in the shower or their cell, when the injury is a result of an assault. Nurses must conduct nursing sick encounters in a private clinical setting, that provides a milieu conducive to the patient feeling safe in reporting actual events without fear of being overheard, seen, or set up for retaliation from predators.

**Compliance Assessment:**
- O.1=Partial Compliance
- O.2=Partial Compliance

**Recommendations:**
1. Revise the standardized nursing procedures in a body systems format that guides the nurse down a clinical pathway, ensuring a complete and thorough assessment.
2. Revise the standardized nursing procedures to include nursing diagnoses, not medical diagnoses, outside the scope of a registered nurse.
3. Incorporate the revised standardized nursing procedures into the electronic health record in a "point and click" environment, limiting narrative documentation to the "by exception" documentation method.
4. Until the nursing protocols are revised to be symptom-based, require nurses to complete nursing sick call assessments using the current protocols and to cease authoring duplicative narrative notes.
5. Nursing staff should be required to escalate issues causing delays in care, such as the inability to obtain medical supplies, e.g., braces, included in SNP treatment plans.
6. The County should perform QI studies that measure compliance with SNPs, with particular attention to the quality of the medical history, review of symptoms, physical assessment, and whether the nurse made and followed the protocol referral to a higher-level provider. The QI studies should measure performance over time, with a sample selection encompassing several weeks or months and a wide range of nursing staff utilizing the protocols.

| **P. Reviews of In-Custody Deaths** |
|---|
| 1. Preliminary reviews of in-custody deaths shall take place within 30 days of the death and shall include a written report of the circumstances of the events leading to the death, with the goal to identify and remedy preventable causes of death and any other potentially systemic problems. |
| 2. Mortality reviews shall include an investigation of the events occurring prior to the death, an analysis of any acts or omissions by any staff or prisoners which may have contributed to the death, and the identification of problems for which corrective action should be undertaken. |

**Findings:**  Since May 2024, there have been five deaths in the Sacramento County Jails. Adult Correctional Health (ACH) leadership and the *Mays* court-appointed medical experts have conducted comprehensive reviews of four of the five deaths and met to discuss identified problems. Review of these deaths showed serious system and individual performance issues, including inadequate emergency response, inadequate medical care prior to death, and in one case, callous deliberate indifference to a man who was so obviously gravely ill that even a lay person would see that the patient needed emergent care. We also found that the County mortality review process did not recognize and/or omitted critical information that contributed to patient deaths, resulting in inadequate corrective action plans.[213]

The County has recently added video review of events surrounding the patient's death to the mortality review process. Video reviews provided key information that assisted the County in identifying factors that may have contributed to patient deaths and formed the basis for corrective action plans.

Through review of medical records and video footage, we concluded that some of the recent deaths in the jail may have been preventable. A summary of each death is described below.

**Patient #7**: This is a 45-year-old man admitted to the jail on 5/3/24 and died on 5/6/24. His medical history included alcohol and methamphetamine use disorders. During intake medical screening, a registered nurse (RN) ordered a medical provider sick call referral, alcohol withdrawal monitoring (CIWA) every four to six hours, and to house the patient on a detox unit. However, during the three days the patient was at the jail, a medical provider did not medically evaluate the patient to determine whether he needed alcohol withdrawal treatment that would reduce the risk of severe withdrawal and death. Nurses did not conduct CIWA screening every four to six

---

[213] The *Mays* Consent Decree (Section P) requires that: Preliminary reviews of in-custody deaths shall take place within 30 days of the death and shall include a written report of the circumstances of the events leading to the death, with the goal to identify and remedy preventable causes of death and any other potentially systemic problems. Mortality reviews shall include an investigation of the events occurring prior to the death, an analysis of any acts or omissions by any staff or prisoners which may have contributed to the death, and the identification of problems for which corrective action should be undertaken.

hours as ordered, but at 9-, 12-, and 14-hour intervals. Per medical orders, the patient should have had withdrawal monitoring up to 4 times daily, but in the 3 days the patient was in the detox unit, nurses attempted alcohol withdrawal assessments only four times, and completed it just once. Even these "attempts" were problematic. Nine hours after intake screening, a nurse went to the patient's housing location to conduct a withdrawal assessment, but noted the patient was "probably still in booking property." The nurse made no attempt to locate the patient.

Twelve hours later, on 5/3/24 at 10:38, a nurse saw the patient outside his cell door in the day room, took his vital signs, and his CIWA score=0. Ten hours later, a RN noted being at the cell side and unable to conduct a CIWA assessment because the patient was lying in his bunk and refused to come out. "Patient lying in bunk, refused to get up. Asked if he have (sic) withdrawal symptoms, answered back 'no symptoms.'" The RN noted educating the patient regarding the risks and benefits of refusal, and that he refused to sign the refusal form. There is no documentation that the nurse went into the cell to engage the patient and ask specific alcohol withdrawal symptoms.

On 5/4/24 at 10:27, 14 hours after the last attempted withdrawal assessment, a RN documented that the patient refused to come out of his cell to be assessed for alcohol withdrawal. "Officer asked him twice but he would not come out." In this case, the nurse did not go to the cell to engage the patient and assess his condition, but simply accepted what the deputy told her.

On 5/5/24 at 10:03, 9.5 hours after the last attempted assessment, the nurse engaged the patient, who refused vital signs. The nurse did not document asking the patient specific alcohol withdrawal symptoms.

On 5/5/24 just prior to 22:00 pm, the patient pressed the emergency button in his cell and said he was about to go "Man Down." Custody went to his cell and found him minimally responsive and went to "get help." Although not addressed in the ACH preliminary mortality review, the deputy located a nurse on another floor, who upon being informed that a patient needed medical attention, did not respond to the scene. Instead, the nurse told the deputy to call "downstairs."

Upon returning to his cell, the deputy found the man unresponsive and moved him out of his cell. At about 21:56, a RN arrived at the patient's location and assessed the patient and documented conflicting findings, such as the patient had a blood pressure and pulse, but also that his pupils were fixed and dilated.[214] Narcan was administered and CPR initiated. Although an automatic external defibrillator (AED) was brought to the scene, neither custody nor medical applied it to the patient, reducing the patient's chance for survival. About 22:07, Emergency Medical Services (EMS) responded to the scene and took over emergency response, but the patient did not respond to resuscitation efforts. The time of death was not documented in the medical record.

---

[214] Following a cardiac arrest depriving the patient of oxygen, pupils become fixed and dilated after brain death.

An autopsy report identified the cause of death to be hemorrhagic intestinal volvulus[215] with 400 ml of blood in his abdominal cavity. It is Dr. Vassallo's[216] opinion that the patient must have been in agonizing pain prior to his death. The emergency response to the patient was inadequate, and his death may have been preventable.

The ACH preliminary mortality review did not identify key lapses in care information regarding the patient's care prior to the terminal event and the emergency response. Among the deficiencies that were not identified by the review include the following:

- Although ordered at intake, a medical provider did not medically evaluate the patient for withdrawal treatment at any time prior to the patient's death.[217]
- Nine hours after admission, the nurse who was to conduct the first CIWA made no attempt to locate the patient, whom the nurse believed might still be in booking.
- When a deputy found the patient minimally responsive, the deputy went to another floor, found a nurse, and told the nurse that a patient needed medical attention. The nurse did not respond to the patient's location but told the deputy to call downstairs. This delayed medical response to the patient, fell below the standard of nursing care, and was negligent.
- Alcohol withdrawal monitoring did not occur as ordered.
- The County noted that the patient refused three of four alcohol withdrawal assessments, but this is not supported by the medical record. A nurse accepted a patient refusal from a deputy without going into the cell to assess the patient, and another nurse did to conduct an assessment because "The patient would not get up." That nurse also did not go into the patient's cell to engage the patient. A nurse also did not locate the patient after intake screening when a withdrawal assessment was overdue (9 hours).
- The review failed to identify that a nurse did not respond to the scene when notified that the patient needed medical attention, warranting further investigation.

In summary, this case represents a failure to medically evaluate, monitor and treat, the patient for alcohol withdrawal prior to his death. It also represents a failure of emergency response. In the mortality review, the County did not include key system and individual performance issues that needed to be addressed.

---

[215] The coroner found 400 ml of blood in the patient's abdominal cavity.

[216] Susi Vassallo was the physician expert on the monitoring team prior to her resignation on 10/4/24.

[217] The County responded that a nurse made a routine sick call referral at intake to be performed in 72 hours, and that the time had not elapsed. The patient had a history of alcohol use disorder and the Standardized Nurse Procedure states that the referral will take place in 24 hours. However, even if the County's timeline is accepted, the patient had been at the jail for 70 hours at the time of his death at 10 pm, and would not have been seen by a medical provider within 72 hours.

**Patient #8**: On 5/12/24 at 01:07, the patient entered the jail and died three hours later in booking. Review of his medical record and of video showed the conduct of arresting officers, health care staff, and Sacramento Sheriff's Office (SSO) deputies was egregious, shocking, and demonstrated callous disregard for the patient's serious medical condition. Actions and omissions by staff directly contributed to his death. Critical findings are as follows:

Upon arrival at the jail, arresting officers dragged the patient from their patrol car across the garage to intake because he was unable to stand or walk. The officers reportedly told health care staff that the patient had been able to walk at the time of arrest but was now "playing possum." *Because the arrestee was unable to stand or walk, the officers should have taken him directly to the hospital to receive medical treatment, and not to the jail.*

A certified nurse assistant (CNA) did not timely notify a registered nurse of the patient's condition upon arrival and difficulty obtaining vital signs. *This delayed a nursing assessment of the patient.*

A registered nurse (RN) failed to conduct a medical screening or nursing assessment of the patient who was in obvious distress and in need of emergent medical evaluation and treatment. *The nurse took no action to send the patient to the hospital or notify a medical provider. The nurse's conduct fell below the standard of nursing practice, was negligent, callous, and deliberately indifferent to his serious medical condition.*

In addition to the RN's failure to complete the medical screening, the *RN falsely documented that he completed the full medical screening for the patient, including vital signs.*

SSO deputies who began the booking process *failed to recognize the seriousness of the patient's condition demonstrated by his inability to participate in any booking processes. Instead, they dragged him through the booking process as his condition deteriorated. At the point it became clear that the patient had an altered level of consciousness and was unable to stand or participate in the booking process, deputies should have immediately notified a nurse.*

While the patient was lying on the floor, surrounded by deputies and obviously gravely ill, the intake nurse walked by him and made no effort to respond to the patient, which is a violation of his duty to the patient. When SSO staff asked him about the patient, he said that the patient's vitals were fine, "he's just old and homeless."[218] *The nurse abandoned the patient who was dying.*

The subsequent emergency response was disorganized with nurses initially failing to bring an AED, oxygen tank and bag-valve mask to the patient's location, delaying care.

---

[218] There was not audio on the tape, but this statement was reported by nurse to custody attending the patient.

The patient was entitled to timely medical care, dignity, and respect by arresting officers, health care staff, and SSO deputies; he received none of these. With timely care, his death may have been preventable. The combined actions and inactions of each of the entities (police officers, ACH nurses, and SSO deputies) involved with the patient while he was at the jail directly contributed to the patient's death, warranting investigation, policy review, and training.[219]

With respect to health care staff, the actions and omissions by the intake nurse included:

- Failure to medically screen the patient
- Failure to recognize that the patient needed emergent medical care
- Failure to send the patient to the hospital
- Falsification of patient medical records
- Patient neglect and abandonment

The ACH's initial mortality review and corrective action plan did not identify key factors that contributed to the patient's death[220] including:

- Arresting officers should have taken the patient directly to the hospital, not the jail;
- The RN did not just conduct an inadequate assessment, but failed to complete *any* assessment in the three minutes he was with the patient
- The RN falsified documentation of medical screening in the medical record;
- SSO deputies did not alert medical staff of the patient's condition and demand reevaluation of the patient;
- Failure to acknowledge the seriousness of the RN's egregious actions when he walked by the patient who was near death.
- Without including identifying personnel information, acknowledge that there were "individual performance issues that warrant further investigation and progressive discipline." [221]

The Consent Decree requires that the County maintains sufficient medical, mental health and custody staffing to meet professional standards to execute the requirements of the remedial plan.[222]  The medical experts do not get involved with personnel decisions, but employing staff that are unethical, incompetent, and/or dangerous to patients is incompatible with providing adequate health care to the jail population, and is inconsistent with the Consent Decree. The

---

[219] The medical experts understand that the County is making significant structural changes to the medical screening process. However, this case involves lack of judgement, as well as substandard nursing care and supervision.

[220] The County later amended the mortality review and CAP.

[221] In our over 40 years of experience in nursing and correctional health care, the actions by the registered nurse would result in immediate termination and he would be reported to the Board of Nursing. In similar cases across the country, nurses who falsified medical records and jeopardized patient safety have lost their license, and in some cases, were charged and convicted of felonies for patient endangerment.

[222] *See* Mays Consent Decree IV. A.1.

evidence shows that this nurse is dangerous to patients and at minimum needed to be removed from direct patient care, pending the results of investigation. [223]

**Patient #10:** The patient was a 41-year-old man who arrived at the jail on 3/28/24 and died on 6/28/24. His medical history included type 2 diabetes, hyperlipidemia, elevated blood pressure, seizure disorder,[224] serious mental illness, schizoaffective disorder, bipolar type, and suspected cognitive impairment.

This case presents several concerns related to chronic disease management, specialty services, access to mental health, continuity of medications, failure to address abnormal lab results, and falsification of medical records. It also raises serious questions about the timeliness and effectiveness of custody rounds as when the patient was found, he was already in rigor.[225]

Concerns include the following:

1. On 4/8/24, a family member witnessed the man having seizure during a visit at the jail. It was then reported that he had a previous seizure two months prior to admission. The patient was prescribed Topamax, which is used to treat migraines, alcohol use, and seizures, but the medical record did not reflect the patient had a history of seizures prior to admission to the jail.  Previous medical records were not requested.
2. On 4/8/24, a medical provider ordered a brain MRI and epilepsy protocol, and on 4/12/24, case management approved the specialty service. The provider did not order a follow-up appointment. *Case management took no action to schedule an appointment, and he was not evaluated prior to his death 10 weeks later. During this time, a medical provider did not monitor the patient*.
3. The patient gave a history of hypertension but could not remember the name of his medication. At the patient's second admission, a medical provider did not order antihypertensive medication, despite his history and elevated blood pressure. Instead, the *provider deleted hypertension from the Problem List replacing it with "Elevated blood pressure without hypertension."* The provider did not document the clinical justification for this change in diagnosis and discontinuation of treatment.[226]
4. A medical provider prescribed Atorvastatin 80 mg, a high dose for treatment of hyperlipidemia. Atorvastatin is known for serious side effects that include liver and muscle injury.  A medical provider did not monitor the patient for side effects.
5. On 4/17/24, staff conducted a point of care (POC) urine dipstick that showed large amounts of blood, protein, bilirubin, and ketones, but there is no documentation that this test result was reported to or seen by a medical provider, and it was not addressed.

---

[223] The employee faced disciplinary action and resigned. The County reported the nurse to the California Board of Nursing.
[224] His seizure disorder was diagnosed after his admission to the jail.
[225] Rigor mortis begins approximately 2 hours after death and continues for 6-8 hours. National Institutes of Health.
[226] Second admission to the jail.

6. The patient had a history of serious mental illness (SMI) and suspected cognitive impairment, but his care related to these conditions was concerning for several reasons. At the second admission, although the patient's medications were verified at the previous admission, the medical provider conducting an essential medication review did not continue the psychotropic medications pending review by a mental health provider. Subsequently, mental health staff noted that the patient had no history of SMI, acute inpatient hospitalizations, or medications, which was false. The patient was released four days later without his medications being ordered.  At the third admission, *mental health did not renew the patient's psychotropic medications for 11 days after arrival.* Although initially compliant with his medications in April, the patient became increasingly agitated and noncompliant with his medications. He was placed on the Intensive Outpatient (IOP) waiting list. In late June, plans were made to have a case conference, but the patient died a week later.

7. The experts have not reviewed the video or received ACH's preliminary mortality review however, we were provided a corrective action plan (CAP) dated 7/16/24, that includes only nursing corrective actions, suggesting that medical and mental health issues were not identified and addressed.

In summary, this review showed concerns related to medical and mental health care prior to death, and custody concerns regarding the timeliness and/or effectiveness of rounds.  Whether the ACH mortality review identified key issues is not yet known.

**Patient #9.** This patient was a 29-year-old man who was booked into the jail on 4/20/22, and died on 6/8/2024. His medical history included a gunshot wound to the chest s/p thoracotomy, small right pneumothorax, liver, spleen, and biliary leakage, s/p biliary stent, and thrombocytosis secondary to GSW.  His medications were aspirin and duloxetine.

Prior to admission to the jail, in April 2022, the patient experienced trauma secondary to 4 gunshot wounds, with injuries to his chest, back, abdomen, and right arm. His liver was lacerated, and he had a bile leak that was stented.  He was discharged to the jail with recommendations for trauma, GI, and orthopedic follow-up. ACH timely implemented these recommendations, and the patient was monitored through the chronic care clinic.

The patient was not a high utilizer of health services, but had sharp, intermittent right chest pain along the axillary line throughout his incarceration, submitting multiple health services requests for which the patient was generally timely seen.

During his incarceration, he had no fever or weight loss, and his vital signs were normal.  A 5/9/24 chest x-ray showed no pneumothorax or acute findings. The chest x-ray was ordered approximately 16 months after he first complained of chest pain.

The documentation of the emergency response to the patient's death was severely lacking. Specifically, the nurse responding to the emergency did not fully describe the events, including

who, if any, other health care staff responded to the scene. The nurse also did not describe that an AED was deployed by deputies, the time it was applied, and whether the AED advised shock or no shock. There is no documentation of events after the Fire Department staff arrived, including time of death, and when Fire Department staff left. There was no documentation in he medical record that the nurse notified a nursing supervisor or the Medical Director.

In summary, prior to the patient's cardiac arrest, care was generally timely and appropriate. However, the nurse responding to the emergency did not accurately document what happened during the emergency response. According to the Sacramento Coroner, the patient's cause of death was methadone toxicity. ACH corrective action plan includes conducting in person audits of crash carts at an unspecified frequency to ensure they are fully stocked and ready for emergencies. Doing periodic audits of crash carts is insufficient preparation for emergency response. Inspections need to be conducted each shift.

*Summary of the Medical Care, Emergency Response, and Mortality Reviews*

The medical experts find that medical care and emergency response were inadequate in three of four recent deaths.[227] *Importantly, several ACH mortality reviews failed to identify and address critical issues that, if not corrected, will likely result in future deaths. The ACH mortality review process needs to be more rigorous and acknowledge the seriousness of critical lapses. In addition, the corrective action plans need to include not only dates that actions are due and completed, but plans to reevaluate the effectiveness of these actions. This might include results of scheduled and unscheduled emergency drills, audits of system issues and/or peer review.*

*County Response to Deaths at SCJ*

On 9/13/24, the County responded to the medical monitors' concerns about the recent mortalities, concurring with most of the monitors' findings, and communicating the County's commitment to "work tirelessly to follow-up on corrective action plans, improve the mortality review process, and maintain the safety of patients at the jail." According to County, it has developed comprehensive and detailed action plans in response to each death that include, but are not limited to:

- SSO notification of arresting agencies regarding criteria that require that the arrestee be taken to the hospital;
- Changes in health care processes including intake medical screening;
- Training for health care and custody staff;
- Emergency medical drills;
- Changes and/or reinforcement of medication administration practices;
- Mandatory SSO meetings for all supervisors;
- Increasing ACH staff supervision of health care operations;

---

[227] The fifth death is currently under review, so the experts have no official opinion as to the adequacy of the care and emergency response.

- Reporting nurses who violate the Nurse Practice Act, falsify medical records, neglect, or abandon patients to the California Board of Nursing.

The response of the County is encouraging, but will require ongoing training, implementation, and supervision of the plan to ensure it is timely implemented. The quality and effectiveness of some ACH mortality reviews and corrective action plans have been inadequate, and need to be improved to correct systemic issues and prevent future deaths.

**Compliance Assessment:**
- P.1=Partial Compliance
- P.2=Partial Compliance

**Recommendations:**

Corrective action to prevent future deaths requires cooperation and collaboration between arresting agencies, SSO deputies, and Adult Correctional Health. It will require policy review, training, emergency response drills, and where indicated, individual employee progressive disciplinary action. It will also require strong leadership to address the dangerous deficiencies described in this letter. Our recommendations include the following:

1. The County needs to retrain all its patrol officers on the criteria for taking patients in need of emergency care to the hospital. This includes arrestees who are:
   - Unconscious or semi-conscious
   - Unable to stand or walk without assistance
   - Severely intoxicated
   - Severely mentally ill
   - Exhibiting obvious symptoms of alcohol or drug withdrawal
   - Bleeding or with injuries that occurred prior to or during arrest; or
   - Otherwise in need of urgent medical care (e.g., shortness of breath, chest pain or abdominal pain, etc.).

2. The County needs to retrain all jail deputies to:
   - Recognize signs of serious medical and mental health conditions that warrant arrestees being declared unfit for confinement, either at the time of arrival, during the booking process, or
   - After notifying health care staff, if the patient is not sent out, procedures for going up the chain of command if they believe the patient meets the criteria for being unfit for confinement.
   - When health care staff do not respond to an emergency, deputies must call a "Man down," and notify the custody or health care chain of command.

2. Adult Correctional Health needs to:
   a. Review and reinforce all emergency response procedures, including:

     i. The need for direct care staff to respond immediately when notified by a deputy of a patient with an urgent or emergent condition.

     ii. The need to bring all emergency equipment to the scene, including emergency response bag/cart and AED.

     iii. The need to inventory emergency response bags/carts every shift, and after each use, to ensure they contain all needed equipment and supplies.

     iv. The need to assume the responsibility for implementing a code, and designate staff roles during an emergency response (e.g., who is in charge, who notifies 911, who is the recorder, who applies the AED and conducts CPR, etc.).[228]

     v. The need to ensure that all direct patient care staff are basic life support (BSL) certified, and a tracking system is maintained to notify staff 30 days in advance that their certification will expire.

     vi. The need to conduct scheduled and unscheduled emergency drills on all shifts.

     vii. The need to validate each licensed staff member's emergency response skill through return demonstration.

     viii. The need to continue real-time, or video review, of all emergency responses until competent response is obtained and sustained.

b. Complete revision of the entire intake screening process including:

     i. Separation of "fit for confinement" screening (Phase 1) from completion of the medical screening process (Phase 2).[229]

     ii. Train all health care staff regarding criteria for fitness for confinement.

     iii. Supervise staff performing intake screening to ensure they adhere to policy and procedure.

     iv. Continue to monitor how long it takes intake nurses to complete medical screening to identify outliers (i.e., screening that is conducted in less than 10 minutes, etc.). Watch videotape of staff that conduct medical screening in less than 10 minutes to validate compliance with policy.

c. Ensure that mortality reviews address staff performance (without identifying the staff member) that falls below the standard of care, is egregious, dangerous, and/or deliberately indifferent to patients' serious medical needs.

     i. Progressive discipline must be appropriate to the seriousness of the acts of omission or commission.

     *ii. Nurses who commit egregious and dangerous acts of commission or omission (including falsification of medical records) need to be suspended immediately, and possibly terminated following investigation by ACH or Department of Personnel Services as applicable.*

---

[228] If deputies are adequately performing CPR, they should continue to do so until switched out by another staff member.

[229] The County has revised the medical intake process.

     iii.  Nurses who violate the Nurse Practice Act, falsify medical records, neglect, or abandon patients need to be reported to the California Board of Nursing for investigation and consideration of license sanctions.

     iv.  Nurses who are incompetent, dangerous, or unethical should not be permitted to provide patient care.

---

### Q. Reentry Services

1. The County shall provide a 30-day supply of current medications to patients who have been sentenced and have a scheduled release date, immediately upon release.
2. Within 24 hours of release of any patient who receives prescription medications while in custody and is classified as presentence, the County shall transmit to a designated County facility a prescription for a 30-day supply of the patient's current prescription medications.
3. The County, in consultation with Plaintiffs, shall develop and implement a reentry services policy governing the provision of assistance to chronic care patients, including outpatient referrals and appointments, public benefits, inpatient treatment, and other appropriate reentry services.

---

**Findings:**  There has been minimal change in reentry services since the last monitoring report. Challenges with supplying a 30-day supply of medications to sentenced patients immediately upon release continue. The primary challenge is that the Sacramento County Sheriff's Office cannot provide the pharmacy with an actual release date for sentenced inmates.  A projected release date is provided, but due to several variables, such as additional charges, court orders, etc., the projected release date is unreliable and subject to change (VI. Q.1).

Medical and mental health providers write discharge prescriptions for patients about to be released that are transmitted to the ACH pharmacy to be filled. However, pharmacy staff do not document in the EHR whether medications were successfully delivered to the patient. Medical record review shows sporadic documentation by pharmacy staff of discharge medications supplied to individual patients. Pharmacy staff do not document the amount of each medication administered to the patient in the  health record.

No reports are provided that measure the percentage of patients who are provided a 30-day supply of discharge medications.  The pharmacy can generate reports regarding the number of discharge medications they prepare, however, because the County does not provide the number of patients with release dates to ACH, the percentage of eligible patients who received discharge medications cannot be calculated and analyzed for compliance purposes.

Patients who were receiving medications during their detention that are classified as pre-sentenced and released present a separate challenge (VI. Q.2). Prior attempts at utilizing community pharmacies and calling the prescription to the pharmacy failed.  The compliance rate of patients reporting to the pharmacy to pick up the prescription resulted in community pharmacies being unwilling to fill the orders.

The County reports that with the onset of CalAIM, they must provide all eligible patients, sentenced, and presentenced with a 30-day supply of medications upon release. The County is working on staffing a pharmacist at the pharmacy so that pharmacy services are available 24 hours a day, seven days a week, to meet the need. The onset of CalAIM will significantly impact the number of patients who require discharge planning and reentry services to successfully provide bridge medications and linkages to community resources and programs.

The County tracks the number of patients referred for reentry services generated during the medical intake process for patients endorsing chronic or mental health conditions. Also referred are patients who receive medication-assisted treatment (MAT) for substance use disorders. The County provides assistance to patients to find community mental health services, shelter, and housing and help with applying for Supplemental Security Income (SSI).  In the first six months of 2024, the County received 641 referrals. No data analysis report was produced that demonstrated rates of completed referrals, administration of discharge medications, and completion of referrals to community services, including continuation of MAT. (VI. Q.3).

With respect to staffing, one registered nurse and medical assistant are allocated to the Reentry program.  The reported number of reentry referrals appears low for a system with an average daily population of about 3,000, and the number of staff allocated to the discharge planning process is insufficient even to meet the current demand.  Given that current staffing is insufficient for reentry programs, the County needs to prioritize providing adequate resources to meet the requirements of CalAIM and Consent Decree requirements.

As discussed in previous reports, staff from the community-based organizations that come inside the jail to meet with referred patients are not granted security clearance. This results in the ACH discharge planning staff supporting the community-based program staff by escorting them to meet with patients and removing them from their assigned discharge planning duties.

The County applied for a grant through the Board of State and Community Corrections (BSCC) to fund two SUD counselors to assist patients with connecting to community MAT programs upon release.  The allocated grant money was not approved in the California State Budget, and the BSCC informed the County not to proceed.[230] This is unfortunate as patient linkages with community MAT programs are key to supporting patients recovery from substance use disorder.

**Compliance Assessment:**
- Q.1=Partial Compliance
- Q.2=Noncompliance
- Q.3=Partial Compliance

**Recommendations:**

---

[230] Sacramento County Remedial Plan Status Report, 7/11/24.

1. The County needs to identify solutions to provide reliable release dates to ACH, such that adequate discharge planning, including medications, is provided to patients being released.[231]
2. Establish a reporting mechanism demonstrating proof of compliance, including the total number of sentenced patients released and the percentage of them receiving a 30-day supply of ordered medications.
3. Staff that deliver discharge medications to patients need to document this in the EHR.
4. Evaluate the impact of CalAIM and determine the numbers of additional staff required to comply with the Consent Decree and CalAIM.
5. The County needs to provide sufficient security escorts for community-based reentry staff such that ACH discharge planning staff are not used as escorts.
6. The County should consider alternative procedures for non-sentenced patients released from custody that ensure they can meet with health staff and receive a supply of their ordered medications before release.

---

### R. Training

1. The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:
   a. All jail custody staff shall receive formal training in medical needs, which shall encompass medical treatment, critical incident response, crisis intervention techniques, recognizing different types of medical emergencies, and acute medical needs, appropriate referral practices, relevant bias and cultural competency issues, and confidentiality standards. Training shall be at a minimum every two years.

---

**Findings:** The County has developed training curricula for the planned use of force, CPR, and First Aid. The County developed a didactic training for all staff on critical incident response. Training was completed at both the Main and RCCC jails in June and July 2024.

Sheriff's Office staff attend a 6-month academy that covers bias, discrimination, First Aid, and CPR. Staff are to receive 9 hours of CPR/AED/First Aid retraining every 2 years, however, no documentation was provided to verify staff received the biannual training.

There is not a comprehensive training class that covers all areas required by the Consent Decree for all staff every two years. (VI. R.1.a.) To demonstrate compliance with the Consent Decree requirement, comprehensive training must be developed and provided to all staff, at a minimum every two years. A system for tracking, analyzing, and reporting training compliance will need to be developed and presented as proof of compliance.

---

[231] The County reports that release dates for pre-sentenced inmates are driven by the court and not SSO.

**Compliance Assessment:**
- R.1=Noncompliance

**Recommendations:**
1. Continue developing curricula for topics required by the Consent Decree.
2. Ensure that training is completed and documented every two years for all staff.
3. Maintain centralized records and a tracking system of staff training.

---

### IX. Quality Assurance Systems for Health Care Treatment

C.  Quality Assurance Medical Care

1.  The County shall establish a Quality Assurance/Quality Improvement Unit to develop accurate tracking mechanisms and monitor the timeliness and effectiveness of the following processes of health care, ensuring that all are reviewed at least annually, and shall recommend corrective action for all deficiencies;

   a.  Intake screenings;
   b.  Emergent, urgent, and routine requests from patients and staff referrals for health care, including Health Service Request availability;
   c.  Clinical monitoring of patients, including delivery of chronic care services to those patients who qualify as chronic care patients;
   d.  Prescriptive practices by the prescribing staff;
   e.  Medication verification, including the initiation of verified medications, the first doses of medications, medication errors; patient refusals, and patterns of medication administration;
   f.  Grievances regarding healthcare;
   g.  Specialty care (including outside diagnostic tests and procedures;
   h.  Clinical caseloads:
   i.  Coordination between custody staff and medical staff, including escorts to medical appointments and delivery of care.

2.  The studies shall be done with sufficient sample numbers to arrive at statistically valid conclusions. The studies shall include:

   a.  Clearly articulated goals, objective, and methodology to determine if standards have been met, including sample strategy;
   b.  Data collection;
   c.  Analysis of data to identify trends and patterns;
   d.  Analysis to identify the underlying causes of problems;
   e.  Development of strategies to solve problems;
   f.  A written plan that identifies responsible staff and establishes a specific timeline for implementing remedies;
   g.  Follow-up data collection; and
   h.  Analysis to determine if remedies are effective.

3.  The QA/QI Unit study recommendations shall be published to all staff.

4.  The County will conduct peer review and supervisory reviews of all medical staff and professionals at least annually to assess compliance with policies and procedures and professional standards of care.

---

**Findings:** The County has established a Quality Assurance/Quality Improvement (QI) unit and program, and implemented several auditing systems to monitor the timeliness and effectiveness of some key health care delivery components, but not all of them (e.g., chronic care, prescriptive practices, coordination between custody and medical staff, and health grievances).

Quality improvement studies were completed that measured components of the following service delivery processes:

- Intake receiving screening (VI. C.1.a)
- Health services requests-Access to care (VI. C.1.b.)
- Drug and alcohol withdrawal monitoring
- Diabetes chronic care
- Intake suicide risk assessment
- Nursing sick call
- Medication orders
- MAT administration
- Intake ADA screening

Studies not completed, required for compliance with the Consent Decree include:

- Hypertension, Asthma, HIV, Seizure disorder, and other chronic diseases (VI. C.2.c.)
- Prescriptive practices (VI. C.2.d.)
- Medication verification, errors, patient refusal, and patterns of administration (VI. C.2.e.)
- Health care grievances (VI. C.2.f.)
- Specialty services (VI. C.2.g.)
- Clinical caseloads (VI. C.2.h.)
- Coordination between custody and medical staff, including escorts to medical appointments and delivery of care (VI. C.1.)

The service areas that have not been studied are critical areas and need to be conducted in the next monitoring cycle. Audits of medication administration, medication errors, and patient refusals need to be prioritized as medication errors are built into the system due to the lack of bidirectional interface between CIPS and Fusion, and has resulted in critical medication errors (see Fourth and Fifth Monitoring Reports of the *Mays* Consent Decree). Likewise, audits of specialty services/utilization management also need to be conducted.

A review of the completed qualitative studies included a review of nursing sick call, administration of MAT, and intake suicide risk assessments. In these studies, the staff was directly observed, and identified opportunities for improvement and recommendations were included. The staff sampling was insufficient as only one nurse was observed, and  no statistically valid conclusions can be drawn (VI. C.2).  The study did not sample across various days and shifts, which is required to identify patterns and trends, and provide an adequate sample to arrive at statistically valid conclusions.

QI staff make recommendations for improvement, and not necessarily leadership of the respective discipline (e.g., nursing, medicine, dental, mental health, etc.). Rather, QI recommendations are forwarded to the respective team leader of the involved discipline.

Several recommendations were unrealistic and not in compliance with recognized correctional standards of care.  For example, a recommendation in the nursing sick call study was for nurses to review the medical record to determine if an upcoming appointment with a provider was

scheduled, and in cases where an appointment was scheduled, not to complete the nursing sick call encounter. Nurses serve as gatekeepers to providers and are authorized, through standardized nursing protocols, to assess and provide first-line treatment for many conditions. Removing the nursing sick call encounter may result in an unnecessary provider encounter, delayed response for the patient, and have the potential to overwhelm the provider queue and further delay care.

Another concerning recommendation was made in the study of medication orders. The study identified that patients were not educated about newly prescribed medications before the first dose.  The recommendation made was for nursing staff administering the medication to explain the expected therapeutic effects and possible side effects, instruct the patient to notify custody if adverse effects are experienced, and for the nurse to document the education in the comments section of the electronic medication administration record.

First, medical, dental, and mental health providers ordering new medication are responsible for patient education during the clinical encounter, explaining the purpose, dosing, duration, and medication side effects to their patients, allowing sufficient time for the patient to ask questions and understand their prescribed plan of care.

As a practical matter, the recommendation cannot realistically be implemented. Medication administration is primarily done in the housing units, with the nurse going cell to cell, or at RCCC, by forming a medication line at a medication administration window. Timely completion of the medication administration is critical to ensure that medications are administered from one hour before and up to one hour after the assigned administration time. Custody requires timely administration of medication administration so that other critical unit programming, e.g., laundry, meals, counts, etc., can be accomplished in a timely manner. Finally, comprehensive medication education requires understanding the patient's care plan, all prescribed medications, and the disease process. A licensed vocational nurse, usually staffed for medication administration, cannot adequately address these components.

The corrective action plans lack sufficient specificity in describing the action steps and fail to identify specific staff responsible for implementation (VI. C.2.f). The action steps are assigned to the respective health care discipline (e.g., nursing, mental health, etc.), rather than specific staff persons.

QI Staff document the date the corrective action plan was completed; however, the studies are not timely repeated the study to assess the efficacy of the planned corrective actions (VI. C.2.g). The measures recommended by the QI staff are not always reflected in the corrective action plan. Also, the effects of the mitigation steps authored in the corrective action plan were not remeasured to demonstrate the efficacy of the action steps (VI. C.2.h).  The practice of the QI department is to remeasure during the next monitoring cycle, which, in many cases, is the following year, and not soon enough for critical services.

The quantitative studies reviewed included intake receiving screening, health services requests-access to care, drug and alcohol withdrawal monitoring, diabetes chronic care, intake suicide risk assessments, medication orders, intake nursing referrals, and intake ADA screening. The sampling of each of these studies was of a statistically adequate size. Each study identified the background, purpose, findings, and recommendations. The study designs, however, did not include a written plan with specific mitigation action steps, identify responsible staff, and the timeframe for completion. Also not completed was a follow-up study that remeasured the effectiveness of the corrective actions to demonstrate improvement or identify the need for further study and/or corrective actions.

The QI staff communicate the outcome of the studies to staff in QI meetings and sub-committee meetings attended by some staff. They communicate to other staff by affixing studies to the wall in the nurses' work areas and by making them electronically available via the ACH intranet (VI. C.3.). There is, however, no tracking system that demonstrates staff compliance with reviewing the study and the accompanying corrective action and signing an attestation of understanding. The process described by the QI staff is person dependent and not a system for communicating the results of studies and training staff regarding proposed changes.

The County requires an annual performance review for all permanent County staff. However, there is no requirement for a Supervisory review of part-time and per diem staff. A peer review process is not in place as the Consent Decree requires. (VI. C.2.4)

**Compliance Assessment:**
- C.1=Partial Compliance
- C.2=Partial Compliance
- C.3=Partial Compliance
- C.4=Noncompliance

**Recommendations:**
1. The County needs to assess the process of QI program design, study design and development, and staff involvement from study initiation to communication of findings and required corrective action steps to all staff, regardless of their FTE status.
2. The County needs to integrate studies that have a medical and mental health overlap (e.g., medication adherence for patients with serious mental illness.)
3. Ensure that the study design meets all requirements of the Consent Decree and adequately evaluates the timeliness of access to care.
4. The County needs to determine an adequate sample size to ensure sufficient analysis and statistical significance.
5. The QI staff needs to include clinical line staff when analyzing root causes and making recommendations.
6. The corrective action plans need to include detailed action steps to complete the planned mitigation strategies.

7.  The corrective action plan steps must be assigned to a specific staff person to facilitate accountability.

8.  Once the mitigation steps are completed, a new study needs to be conducted to provide proof of the efficacy of the corrective action plan, or lack thereof.  The re-study should not be delayed until the following year.

9.  Besides posting studies on the ACH intranet, training relevant to the planned mitigation strategies with documentation of completion for all staff is required.

10. The County needs to develop a peer and supervisory review process for all medical and professional staff at least annually and provide proof of practice.

# Medical Remedial Plan Compliance Summary

|  | Provision | Substantial Compliance | Partial Compliance | Noncompliance | Not Evaluated |
|---|---|---|---|---|---|
| 1. | A.1. | | 9/2024 | | |
| 2. | A.2. | | | 9/2024 | |
| 3. | B.1. | 9/2024 | | | |
| 4. | B.2. | | 9/2024 | | |
| 5. | B.3. | | 9/2024 | | |
| 6. | B.4. | | 9/2024 | | |
| 7. | B.5. | | 9/2024 | | |
| 8. | B.6. | | 9/2024 | | |
| 9. | B.7. | | 9/2024 | | |
| 10. | C.1. | | 9/2024 | | |
| 11. | C.2. | | 9/2024 | | |
| 12. | C.3.a | | | 9/2024 | |
| 13. | C.3.b | | | 9/2024 | |
| 14. | C.3.c | | 9/2024 | | |
| 15. | C.3.d | | 9/2024 | | |
| 16. | C.4. | | 9/2024 | | |
| 17. | C.5 | | | 9/2024 | |
| 18. | C.6. | 9/2024 | | | |
| 19. | C.7.a | | | 9/2024 | |
| 20. | C.7.b | | | 9/2024 | |
| 21. | D.1. | | | 9/2024 | |
| 22. | D.1.a | | 9/2024 | | |
| 23. | D.1.b | | 9/2024 | | |
| 24. | D.1.c | | | 9/2024 | |
| 25. | D.1.d | | 9/2024 | | |
| 26. | D.2. | | | 9/2024 | |
| 27. | D.3 | 9/2024 | | | |
| 28. | E.1. | | | 9/2024 | |
| 29. | E.2. | | | 9/2024 | |
| 30. | E.3. | | | 9/2024 | |
| 31. | E.4. | | 9/2024 | | |
| 32. | E.5 | | 9/2024 | | |
| 33. | E.6. | | 9/2024 | | |
| 34. | E.7. | | | 9/2024 | |
| 35. | E.8. | 9/2024 | | | |
| 36. | E.9 | | | 9/2024 | |
| 37. | E.10. | 9/2024 | | | |
| 38. | F.1.a | 9/2024 | | | |

| | Provision | Substantial Compliance | Partial Compliance | Noncompliance | Not Evaluated |
|---|---|---|---|---|---|
| 39. | F.1.b | | 9/2024 | | |
| 40. | F.2. | | 9/2024 | | |
| 41. | F.3. | | 9/2024 | | |
| 42. | F.4. | | | 9/2024 | |
| 43. | F.5. | | 9/2024 | | |
| 44. | F.6. | 9/2024 | | | |
| 45. | G.1. | | 9/2024 | | |
| 46. | G.2. | | | 9/2024 | |
| 47. | G.3. | | 9/2024 | | |
| 48. | G.4 | | 9/2024 | | |
| 49. | G.5 | 9/2024 | | | |
| 50. | H.1. | | 9/2024 | | |
| 51. | H.2. | | | 9/2024 | |
| 52. | H.3. | | | 9/2024 | |
| 53. | H.4. | 9/2024 | | | |
| 54. | I.1. | | 9/2024 | | |
| 55. | I.2. | | 9/2024 | | |
| 56. | I.3 | 9/2024 | | | |
| 57. | J.1. | 9/2024 | | | |
| 58. | J.2. | | | 9/2024 | |
| 59. | J.3. | | | 9/2024 | |
| 60. | J.4 | | | | 9/2024 |
| 61. | K.1 | 9/2024 | | | |
| 62. | L.1. | | 9/2024 | | |
| 63. | L.2. | 9/2024 | | | |
| 64. | L.3. | | 9/2024 | | |
| 65. | M.1. | 9/2024 | | | |
| 66. | M.2. | 9/2024 | | | |
| 67. | N.1. | | | 9/2024 | |
| 68. | N.2. | | 9/2024 | | |
| 69. | O.1. | | 9/2024 | | |
| 70. | O.2. | | 9/2024 | | |
| 71. | P.1. | | 9/2024 | | |
| 72. | P.2. | | 9/2024 | | |
| 73. | Q.1. | | 9/2024 | | |
| 74. | Q.2. | | | 9/2024 | |
| 75. | Q.3. | | 9/2024 | | |
| 76. | R.1. | | | 9/2024 | |
| 77. | IX C.1 | | 9/2024 | | |
| 78. | IX C.2 | | 9/2024 | | |

| | Provision | Substantial Compliance | Partial Compliance | Noncompliance | Not Evaluated |
|---|---|---|---|---|---|
| 79. | IX. C.3 | | 9/2024 | | |
| 80. | IX. C.4 | | | 9/2024 | |
| | **Total** | **15 (19%)** | **40 (50%)** | **24 (30%)** | **1 (1%)** |